AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Laura Smith, being duly sworn, state as follows:

INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to

the Boston, Massachusetts Field Office.  I joined the FBI in 2010 as a forensic accountant

conducting complex financial investigations.  I am currently a special agent on a squad that

investigates economic crimes, including various forms of corporate fraud, securities fraud and

bribery.  I hold a Bachelor's degree in Criminal Justice-Economic Crimes Investigation and a

Master's degree in Accounting.  As an FBI Special Agent, I am an investigative or law

enforcement officer of the United States within the meaning of Title 18, United States Code,

Section 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests

for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      I make this affidavit in support of criminal complaints charging the following

individuals (collectively, "the defendants") with conspiracy to commit mail fraud and honest

services mail fraud, in violation of Title 18, United States Code, Section 1349:

| DEFENDANT | PAGE |
|---|---|
| GREGORY ABBOTT | 36 |
| MARCIA ABBOTT | 36 |
| GAMAL ABDELAZIZ | 83 |
| DIANE BLAKE | 169 |
| TODD BLAKE | 169 |
| JANE BUCKINGHAM | 15 |
| GORDON CAPLAN | 22 |
| I-HSIN "JOEY" CHEN | 42 |
| AMY COLBURN | 193 |

| | |
|---|---|
| GREGORY COLBURN | 193 |
| ROBERT FLAXMAN | 196 |
| MOSSIMO GIANNULLI | 88 |
| ELIZABETH HENRIQUEZ | 44 |
| MANUEL HENRIQUEZ | 44 |
| DOUGLAS HODGE | 162 |
| FELICITY HUFFMAN | 72 |
| AGUSTIN HUNEEUS, Jr. | 96 |
| BRUCE ISACKSON | 107 |
| DAVINA ISACKSON | 107 |
| MICHELLE JANAVS | 153 |
| ELISABETH KIMMEL | 143 |
| MARJORIE KLAPPER | 79 |
| LORI LOUGHLIN | 88 |
| TOBY MACFARLANE | 180 |
| WILLIAM E. McGLASHAN, Jr. | 58 |
| MARCI PALATELLA | 137 |
| PETER JAN SARTORIO | 177 |
| STEPHEN SEMPREVIVO | 186 |
| DEVIN SLOANE | 129 |
| JOHN B. WILSON | 122 |
| HOMAYOUN ZADEH | 199 |
| ROBERT ZANGRILLO | 118 |

3.     Specifically, as set forth below, I have probable cause to believe that the

defendants conspired with others known and unknown:  (1) to bribe college entrance exam

administrators to facilitate cheating on college entrance exams; (2) to bribe varsity coaches and

administrators at elite universities to designate certain applicants as recruited athletes or as other

favored candidates, thereby facilitating the applicants' admission to those universities; and (3) to

use the façade of a charitable organization to conceal the nature and source of the bribe payments.

4.      The facts set forth in this affidavit come from my personal involvement with this investigation, interviews with witnesses, including the cooperating witnesses described below, and my review of documents—including bank records, flight records, e-mails, telephone toll records, cell site data and other materials obtained through grand jury subpoenas and search warrants—as well as Court-authorized Title III wiretap recordings, consensual recordings made by a cooperating witness, and information provided by other law enforcement agents.

5.      In submitting this affidavit, I have not included each and every fact known to me about this investigation. Rather, I have included only those facts that I believe are sufficient to establish probable cause.

<u>PROBABLE CAUSE</u>

<u>Overview of the Conspiracy</u>

6.      Beginning in or about 2011, and continuing through the present, the defendants— principally individuals whose high-school aged children were applying to college—conspired with others to use bribery and other forms of fraud to facilitate their children's admission to colleges and universities in the District of Massachusetts and elsewhere, including Yale University, Stanford University, the University of Texas, the University of Southern California, and the University of California – Los Angeles, among others. Evidence I have reviewed shows that the scheme included the following:

a.      Bribing college entrance exam administrators to allow a third party to facilitate cheating on college entrance exams, in some cases by posing as the actual students, and in others by providing students with answers during the exams or by correcting their answers after they had completed the exams;

3

b.      Bribing university athletic coaches and administrators to designate applicants as purported athletic recruits—regardless of their athletic abilities, and in some cases, even though they did not play the sport they were purportedly recruited to play—thereby facilitating their admission to universities in place of more qualified applicants;

c.      Having a third party take classes in place of the actual students, with the understanding that grades earned in those classes would be submitted as part of the students' college applications;

d.      Submitting falsified applications for admission to universities in the District of Massachusetts and elsewhere that, among other things, included the fraudulently obtained exam scores and class grades, and often listed fake awards and athletic activities; and

e.      Disguising the nature and source of the bribe payments by funneling the money through the accounts of a purported charity, from which many of the bribes were then paid.

### Certain Relevant Persons and Entities

7.      The Edge College & Career Network, LLC, also known as "The Key," is a for-profit college counseling and preparation business based in Newport Beach, California that was established in or about 2007 and registered in California in or about 2012.

8.      The Key Worldwide Foundation ("KWF") is a non-profit corporation founded in or about 2012 and based in Newport Beach, California. In or about 2013, the Internal Revenue Service ("IRS") approved KWF as an exempt organization under Section 501(c)(3) of the Internal Revenue Code, meaning that KWF is exempt from paying federal income tax, and that individuals who contribute to KWF may deduct those contributions from their taxable income, subject to certain limitations.

9.      ACT, Inc. is a non-profit organization headquartered in Iowa City, Iowa that administers the ACT exam, a standardized test that is widely used as part of the college

4

admissions process in the United States. The ACT includes sections on English, mathematics, reading and science, and is graded on a scale of 1 to 36.

10.     The College Board is a non-profit organization headquartered in New York, New York. Together with Educational Testing Service ("ETS"), a non-profit organization headquartered in Lawrence Township, New Jersey, the College Board develops and administers the SAT, a standardized test that, like the ACT exam, is widely used as part of the college admissions process in the United States. Between 2005 and January 2016 the SAT was graded on a scale of 600 to 2400. As of March 2016, the SAT has been scored on a scale of 400 to 1600. The College Board and ETS also develop and administer SAT subject tests, which are also used as part of the college admissions process.

11.     Georgetown University ("Georgetown") is a highly selective private university located in Washington, D.C.

12.     Stanford University ("Stanford") is a highly selective private university located in Palo Alto, California.

13.     The University of California at Los Angeles ("UCLA") is a highly selective public university located in Los Angeles, California.

14.     The University of San Diego ("USD") is a selective private university located in San Diego, California.

15.     The University of Southern California ("USC") is a highly selective private university located in Los Angeles, California.

16.     The University of Texas at Austin ("U-Texas") is a highly selective public university located in Austin, Texas.

17.     Wake Forest University ("Wake Forest") is a highly selective private university located in Winston-Salem, North Carolina.

18.     Yale University ("Yale") is a highly selective private university located in New Haven, Connecticut.

19.     The athletic teams of Georgetown, Stanford, UCLA, USD, USC, U-Texas, Wake Forest and Yale (collectively, "the Universities") compete in most sports at the Division I level, the highest level of intercollegiate athletics sanctioned by the National Collegiate Athletic Association ("NCAA").

20.     Cooperating Witness 1 ("CW-1") is an individual who participated in the scheme. CW-1 founded and, together with others, operated The Key and KWF.[1]

21.     Cooperating Witness 2 ("CW-2") is an individual who participated in the scheme. CW-2 was employed at relevant times as the director of college entrance exam preparation at a private college preparatory school and sports academy in Bradenton, Florida.[2]

---

[1] CW-1 has agreed to plead guilty in the United States District Court for the District of Massachusetts to racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d); money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h); conspiracy to defraud the United States, in violation of Title 18, United States Code, Section 371; and obstruction of justice, in violation of Title 18, United States Code, Section 1512(c). CW-1 has been cooperating with the government's investigation since in or about late September 2018, in the hope of obtaining leniency when he is sentenced. In or about October 2018, after he began cooperating with the government, CW-1 alerted several subjects of the investigation to its existence, resulting in the obstruction of justice charge to which he has agreed to plead guilty. Information provided by CW-1 has been corroborated by, among other things, Court-authorized wiretaps, e-mails, documents, consensual recordings, and interviews of other witnesses, including cooperating witnesses.

[2] CW-2 has agreed to plead guilty in the United States District Court for the District of Massachusetts to conspiracy to commit mail fraud and honest services mail fraud, in violation of Title 18, United States Code, Section 1349; and conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h). CW-2 has been cooperating with the government's investigation since in or about February 2019, in the hope of obtaining leniency when he is sentenced. Information provided by CW-2 has been corroborated by, among other

22.    Cooperating Witness 3 ("CW-3") is an individual who participated in the scheme. CW-3 was employed at relevant times as the head coach of women's soccer at Yale.[3]

General Background on Standardized Testing and the College Admissions Process

23.    The ACT and the SAT are typically administered to large groups of students on specified dates and under strict time limits.  However, students with certain learning or other disabilities may qualify for extended time.  In such circumstances, students take the test alone, under the supervision of a test administrator retained by ACT, Inc. or the College Board.

24.    Prior to administering the ACT, test administrators must typically certify that they will administer the exam in accordance with the ACT Administration Manual, and will ensure that the "test materials are kept secure and confidential, used for this examinee only, and returned to ACT immediately after testing."  Similarly, prior to administering the SAT exam, test administrators must typically certify that they will administer the test in accordance with the SAT coordinator's manual, that the SAT is the property of the College Board, and that no one other than the student can "open the test book and see the test content."

25.    The ACT and SAT exams, and the scores students earn on those exams, are the intellectual and physical property of ACT, Inc. and the College Board, respectively.

---

things, Court-authorized wiretaps, e-mails, documents, consensual recordings, and interviews of other witnesses, including cooperating witnesses.

[3] CW-3 has agreed to plead guilty in the United States District Court for the District of Massachusetts to wire fraud, in violation of Title 18, United States Code, Section 1343; honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346; and conspiracy to commit the same, in violation of Title 18, United States Code, Section 1349.  CW-3 has been cooperating with the government's investigation since in or about April 2018, in the hope of obtaining leniency when he is sentenced.  Information provided by CW-3 has been corroborated by, among other things, Court-authorized wiretaps, e-mails, documents, consensual recordings, and interviews of other witnesses, including cooperating witnesses.

26.     Most of the Universities require prospective students to submit standardized test scores—typically, either the ACT or the SAT—as part of their application packages. When submitted, standardized test scores are a material part of the admissions process at each of the Universities.

27.     All of the Universities also recruit students with demonstrated athletic abilities, and typically apply different criteria when evaluating applications from such students, with the expectation that recruited athletes will be contributing members of the Univerities' athletic teams once enrolled. Typically, the admissions offices at the Universities allot a set number of admission slots to each head coach of a varsity sport for that coach's recruited athletes. At each of the Universities, the admissions prospects of recruited athletes are higher—and in some cases substantially higher—than those of non-recruited athletes with similar grades and standardized test scores.

28.     Student athletes recruited by coaches at USC and UCLA, for example, are typically considered by designated admissions committees, which give consideration to their athletic abilities, and may admit applicants whose grades and standardized test scores are below those of other USC or UCLA students, including non-recruited athletes. At Wake Forest, as another example, approximately 128 admissions slots are designated for athletic recruitment, and recruited students are typically assured of admission to the university provided they meet certain minimum academic standards. Similarly, at Georgetown, approximately 158 admissions slots are allocated to athletic coaches, and students recruited for those slots have substantially higher admissions prospects than non-recruited students.

29.    At each of the Universities, admissions slots, the determination of which students to admit, and the resulting composition of undergraduate classes are important assets of the University.

The College Entrance Exam Cheating Scheme

30.    The college entrance exam cheating scheme generally worked as follows:

a.    CW-1 instructed clients of The Key to seek extended time for their children on college entrance exams if they had not done so already, including by having the children purport to have learning disabilities in order to obtain the medical documentation that ACT, Inc. and the College Board typically require before granting students extended time.

b.    Once the students were granted extended time—which generally allowed them to take an exam over two days instead of one, and in an individualized setting—CW-1 instructed his clients to change the location of the exam to one of two test centers he told them he "controlled": a public high school in Houston, Texas (the "Houston Test Center") or a private college preparatory school in West Hollywood, California (the "West Hollywood Test Center"). For example, in explaining the scheme to defendant WILLIAM E. McGLASHAN, Jr., CW-1 explained that he needed to "control the center" for the scheme to work, and that by obtaining "extended time" for the test, McGLASHAN's son would be able to take the test at CW-1's "facility," rather than at his own high school. At those test centers, CW-1 had established relationships with test administrators who had agreed to accept bribes to facilitate the cheating scheme: Niki Williams at the Houston Test Center, and Igor Dvorskiy at the West Hollywood Test Center.[4] CW-1 typically instructed his clients to fabricate a reason—such as a bar mitzvah

---

[4] Williams and Dvorskiy have been indicted by a federal grand jury in the District of Massachusetts on a charge of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).

or a wedding—that their children purportedly needed to take the test in Houston or West Hollywood instead of at their own schools.

      c.     After the location of the exam had been changed, ACT, Inc. and the College Board sent the exams to those test centers, typically via private interstate commercial carrier, such as Federal Express ("FedEx") in the case of ACT, Inc., and United Parcel Service ("UPS") in the case of the College Board.

      d.     CW-1 bribed the test administrators to allow a third-party—typically CW-2—to take the exams in place of the actual students, to serve as a purported proctor for the exams while providing students with the correct answers, or to review and correct the students' answers after they completed the exams.  In many instances, the students taking the exams were unaware that their parents had arranged for this cheating.

      e.     The corrupt test administrators sent the doctored exams back to ACT, Inc. and the College Board, typically via either UPS or FedEx.

      f.     CW-1's clients paid CW-1 between $15,000 and $75,000 per test to participate in the cheating scheme, with the payments typically structured as purported donations to the KWF charity.

      g.     CW-1, in turn, paid Dvorskiy bribes of approximately $10,000 per test to permit the cheating.  CW-1 likewise bribed Williams, typically via payments through a mutual acquaintance, Martin Fox, who introduced CW-1 to Williams.[5]  However, in July 2018, CW-1 sent Williams a $5,000 check directly.  CW-1 also paid CW-2 approximately $10,000 to take or

---

[5] Fox has been indicted by a federal grand jury in the District of Massachusetts on a charge of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).

correct each student's test.  Most of the payments to Dvorskiy and CW-2 were drawn on the account of the KWF charity.

        h.     In explaining the scheme to clients, CW-1 typically sought to earn their trust and confidence by noting that he had previously done the same thing many times before with other families.  As set forth below, for example, CW-1 had the following exchange with defendant GORDON CAPLAN in a call on or about June 15, 2018 (prior to the time CW-1 began cooperating with the government's investigation), that was intercepted pursuant to a Court-authorized wiretap:[6]

| | |
|---|---|
| CAPLAN | And it works? |
| CW-1 | Every time. (laughing) |
| CAPLAN | (laughing) |
| CW-1 | I mean, I'm sure I did 30 of them at different, you know, dates because there's different dates, and they're all families like yours, and they're all kids that wouldn't have perform[ed] as well, and then they did really well, and it was like, the kids thought, and it was so funny 'cause the kids will call me and say, "Maybe I should do that again. I did pretty well and if I took it again, I'll do better even." Right? And they just have no idea that they didn't even get the score that they thought they got. |

Indeed, in many cases, CW-1's clients referred other parents to him, or inquired directly about other parents' involvement in the scheme.  For example, as set forth in greater detail below, defendant AGUSTIN HUNEEUS, Jr., told CW-1, in substance, that he was aware that McGLASHAN had participated in the college entrance exam scheme, but that McGLASHAN had not advised his own son of that fact, and that McGLASHAN's son thus "had no idea … that you helped him on the ACT."

---

[6] Excerpts of wiretap interceptions and consensual recordings set forth herein are based on draft transcripts of those recordings.

i.   The children of CW-1's clients submitted the fraudulently obtained exam scores as part of their applications to universities nationwide, including Boston College, Boston University and Northeastern University in the District of Massachusetts.[7]

### The College Recruitment Scheme

31.   Between approximately 2011 and 2018, parents paid CW-1 approximately $25 million to bribe coaches and university administrators to designate their children as purported recruited athletes, or as members of other favored admissions categories, thereby facilitating the children's admission to those universities.  The recruitment scheme typically worked as follows:

a.   CW-1 told parents, in sum and in substance, that he could facilitate their children's admission to certain universities via what he termed the "side door."  He described the side door scheme as a *quid pro quo*, pursuant to which the parents would purport to make charitable donations to KWF.  CW-1, in turn, would funnel those payments to particular athletic coaches, or to university programs designated by those coaches, using KWF to disguise the nature and source of the payments.  CW-1 typically explained to parents that, in exchange for the payments, the coaches would designate their children as recruited athletes—regardless of their athletic abilities—thereby facilitating their admission to the universities.

b.   CW-1 typically explained to his clients, in substance, that the scheme was a tried-and-true method of gaining admission to colleges, and that many other families were participating or had already participated in it, leveraging connections CW-1 had developed at multiple universities over years of work with prior clients.  For example, set forth below is how

---

[7] In addition, as set forth herein, e-mails, wire transfers and mailings in furtherance of the conspiracy were sent to and from the District of Massachusetts, telephone calls in furtherance of the conspiracy were also made to and from the District of Massachusetts, and two of the conspirators have residences in the District of Massachusetts.

CW-1 described the scheme to CAPLAN in the June 15, 2018 call, during which CW-1 represented to CAPLAN that he had successfully engaged in the same scheme with nearly 800 other families:

> Okay, so, who we are-- what we do is we help the wealthiest families in the U.S. get their kids into school .... Every year there are-- is a group of families, especially where I am right now in the Bay Area, Palo Alto, I just flew in. That they want guarantees, they want this thing done. They don't want to be messing around with this thing. And so they want in at certain schools. So I did 761 what I would call, "side doors." There is a front door which means you get in on your own. The back door is through institutional advancement, which is ten times as much money. And I've created this side door in. Because the back door, when you go through institutional advancement, as you know, everybody's got a friend of a friend, who knows somebody who knows somebody but there's no guarantee, they're just gonna give you a second look. My families want a guarantee. So, if you said to me 'here's our grades, here's our scores, here's our ability, and we want to go to X school' and you give me one or two schools, and then I'll go after those schools and try to get a guarantee done. So that, by the time, the summer of her senior year, before her senior year, hopefully we can have this thing done, so that in the fall, before December 15th, you already knows she's in. Done. And you make a financial commitment. It depends on what school you want, may determine how much that actually is. But that's kind of how the the side and back door work.

    c.       Once parents agreed to participate in the scheme, CW-1 sent bribes to coaches and, in one case, a university administrator, typically out of a KWF bank account. In some instances, he directed the money to the recipients directly, for their personal use, including one receipient who received bribe payments by mail at his residence in the District of Massachusetts. In other instances, he directed the money to designated accounts at the Universities that were controlled by the recipients, including in some instances via mailings from the District of Massachusetts. In still other instances, CW-1's clients made the payments directly to the designated accounts at the Universities, as directed by the bribe recipients.

    d.       In recruiting coaches to participate in the scheme, CW-1 sought to earn their trust and confidence by making clear to them, as he did to his clients, that other coaches were already engaged in the same conduct with him. For example, set forth below are two

excerpts from a call on or about May 4, 2018, in which CW-1 sought to enlist the assistance of

CW-3 in recruiting additional coaches to join the conspiracy:

| | |
|---|---|
| CW-1 | You can say he's doing it at, for this year I did [seven elite schools], we've done it everywhere. |
| CW-3 | Okay, see that might, yeah it definitely would make them feel more comfortable with all those places. |
| | .... |
| CW-3 | Okay, alright, and all those schools, like, you-- you're-- you're comfortable. I can-- I can tell her comfortably that you worked with all those schools. |
| CW-1 | Absolutely. |
| CW-3 | Huh. |
| CW-1 | It's all different-- it's all—absolutely, but it's all-- it's different programs at every school. |
| CW-3 | Right, right, right, I know, I know. But saying that you worked with those schools I think  that makes her feel more comfortable, knowing that you've worked with all the schools before. |
| CW-1 | You can tell them I did 760 of these this year, 96 the year before. |

      e.     In exchange for the bribes, the recipients designated the children of CW-

1's clients as purported athletic recruits—without regard for their athletic abilities—or as

members of other favored admissions categories, such as "VIP lists," thereby facilitating their

admission to the Universities.

      f.     As part of the scheme, CW-1, together with others, also fabricated athletic

"profiles" for students, which CW-1 submitted to the Universities in support of the students'

applications, and which contained falsified athletic credentials—including fake honors the

students had purportedly received and elite athletic teams they had purportedly played on.  In

some instances, parents assisted CW-1 in creating the fabricated profiles, including by supplying

staged photographs of their children engaged in athletic activity.  In other instances, CW-1 and

14

his associates simply found photos of athletes on the Internet and either used those photos or used software such as PhotoShop to insert the applicants' faces onto the bodies of legitimate athletes.  For example, as set forth in greater detail below, CW-1 explained to McGLASHAN that he would create a falsified athletic profile for McGLASHAN's son, something he told McGLASHAN he had "already done … a million times," and which would involve him using "Photoshop and stuff" to deceive university admissions officers.

g.      As another example, on or about November 13, 2017, CW-1 sent a falsified athletic profile to CW-3.  The profile falsely described an applicant as the co-captain of a prominent club soccer team in southern California.  CW-3, in exchange for a promised bribe payment, designated the applicant as a recruit for the Yale women's soccer team, despite the fact that, as he knew at the time, she did not play competitive soccer.  On or about January 1, 2018—after the applicant was admitted to Yale—CW-1 mailed CW-3 a check in the amount of $400,000, drawn on a KWF bank account.  Relatives of the applicant subsequently paid CW-1 approximately $1.2 million in multiple installments, including approximately $900,000 that was directed to KWF as a purported charitable donation.

## THE INDIVIDUAL DEFENDANTS

### A.  JANE BUCKINGHAM

32.      Defendant JANE BUCKINGHAM is a resident of Los Angeles, California. BUCKINGHAM is chief executive officer ("CEO") of a boutique marketing company based in Los Angeles.

33.      In or about June 2018, BUCKINGHAM agreed to make a purported charitable donation of $50,000 to KWF, in exchange for which CW-1 arranged to have CW-2 take the ACT on behalf of BUCKINGHAM's son at the Houston Test Center the following month.

15

34.     Thereafter, CW-1 made arrangements with Williams to to allow CW-2 to purport

to proctor the ACT for BUCKINGHAM's son.  In return, CW-1 promised Williams that he

would send her money to "go on vacation."

35.     In a call with BUCKINGHAM on or about July 10, 2018, CW-1 explained, in

substance, that CW-2 would not require all of the extended time BUCKINGHAM's son had been

granted to take the ACT.  The following is an excerpt from the conversation, which was

intercepted pursuant to a Court-authorized wiretap.

| | |
|---|---|
| CW-1 | Hey there, so I just talked to Niki.  So you guys are gonna meet at 8 a.m. in front of the [Houston Test Center]. |
| BUCKINGHAM | Okay. |
| CW-1 | And you're actually not gonna take the test there you because they're doing some re-modeling at the school. |
| BUCKINGHAM | Okay. |
| CW-1 | But she's gonna walk you across the street to Texas Southern University, 'cause it's right across the street. |
| BUCKINGHAM | Okay. |
| CW-1 | And they're gonna have a classroom all set up for the proctor, [CW-2] and [your son], and then Niki will take care of the rest. |
| BUCKINGHAM | Amazing, and is it okay if he takes it all in one day? |
| CW-1 | He's going to take it one day 'cause [CW-2] is only flying in from Florida for one day. |
| BUCKINGHAM | There you go that's-- |
| CW-1 | But on, but on, but on the form it will say two days. |
| BUCKINGHAM | Got it, got it. |
| CW-1 | So we will document that he took it over two days. |

36.     After speaking with BUCKINGHAM, CW-1 called CW-2 to review the logistics of the plan for CW-2 to take the exam. CW-1 told CW-2 that he would send him a check for $10,000.

37.     In a call on or about July 12, 2018, BUCKINGHAM advised CW-1, in substance, that her son had developed tonsillitis and that his doctor had advised against allowing him to travel. BUCKINGHAM asked CW-1 whether it would be possible for her to obtain a copy of the exam that she could have her son take at home—so that he would believe he had taken the test—while CW-2 took the actual exam on his behalf in Houston. The following is an excerpt from the conversation.

| | |
|---|---|
| BUCKINGHAM | So I guess my question is, look-- |
| CW-1 | Go ahead. |
| BUCKINGHAM | First of all, he can get on the plane like he, according to him, he's like, "I really don't feel that bad, I think I'm okay." And I do think that this doctor is a little over conservative. Part of my challenge is that my ex-husband is being incredibly difficult about the whole surgery, and if I take him to Houston and then he can't get the surgery he's gonna be very annoyed with me. So my question is, there is no way for him to not go and it still to be done, I assume? |
| CW-1 | Oh maybe I can do that, but I just don't-- I have to talk to the proctor [to make sure she is] fine with doing it. |
| BUCKINGHAM | Right. |
| CW-1 | It's the gal who runs the school. |
| BUCKINGHAM | Right. |
| CW-1 | So I have to ask her. I just got off the phone with her, but if, are you okay with that? And then just-- |
| BUCKINGHAM | Well what? |
| CW-1 | The score. |

| | |
|---|---|
| BUCKINGHAM | What I would do is, I would say to you, can you give me a test for him to take at home that we proctor him, that I proctor him? |
| CW-1 | Got it, got it.  Okay, yeah, I guess we could do we could do something like that. |
| BUCKINGHAM | I mean that's just, I guess, and it's the only thing I can think of, if you think it's doable? |
| CW-1 | Yeah, so, the only fact, the only other way is that ACT allows a three week window, unlike SAT, which is a three day window. |
| BUCKINGHAM | Right. |
| CW-1 | So I just talked to Niki, the gal at [the Houston Test Center], and she is back on the 25th of July. |
| BUCKINGHAM | It just depends on whether he gets the surgery or not. |
| CW-1 | I know, I know. |
| BUCKINGHAM | He can't, he can't fly for two weeks after that. |
| CW-1 | Okay, so let me call Niki and ask her if she would have a problem with [CW-2] just doing this. |
| BUCKINGHAM | Yeah. |
| CW-1 | Which would actually make it easier for him to do it, because it would take less time, but let me call Niki right now and see what she says. |

38.     Later that same day, CW-1 called BUCKINGHAM to tell her that Williams was willing to go along with BUCKINGHAM's plan.  The following are two excerpts from the conversation.

| | |
|---|---|
| CW-1 | Okay, so here's the deal. |
| BUCKINGHAM | Okay. |
| CW-1 | So Niki is is willing to do it. |
| BUCKINGHAM | Yep. |

18

| CW-1 | We are looking for my, correct, that we are trying to get ourselves like 34 on the ACT? |
|---|---|
| BUCKINGHAM | Yeah, yeah. |
| CW-1 | So [CW-2] will do that. It's really-- can be a 33, it could be a 34, it could be a 35. |
| BUCKINGHAM | Right. |

....

| CW-1 | But, so, anyways, so the, she said she would do it, she would send us a copy of the test that we're gonna take-- |
|---|---|
| BUCKINGHAM | Okay. |
| CW-1 | And then, even though we're already gonna send in his test, there at least [your son] will have taken the same test. |
| BUCKINGHAM | Thank you, thank you. |
| CW-1 | Okay, so your donation is gonna be 50.  It'll it'll end up being through our foundation. |
| BUCKINGHAM | Okay. |
| CW-1 | And I'm already sending a check to the proctor today, and to Niki today, 'cause she said, "I gotta have the money first." |
| BUCKINGHAM | Okay. |
| CW-1 | I said, "Niki, I have been doing this forever." She said, "I get it, but this like, this is crazy." |
| BUCKINGHAM | Yeah.  I know this is craziness, I know it is. And then I need you to get him into USC, and then I need you to cure cancer and [make peace] in the Middle East. |
| CW-1 | I can do that, I can do that if you can figure out a way to boot your husband out so that he treats you well-- you're treated better-- |
| BUCKINGHAM | That's impossible. That's impossible. But, you know, peace in the Middle East. You know, Harvard, the rest of it. I have faith in you. |

CW-1     Got it, got it. Alright, so I will tell [CW-2] now that he's just gonna pick it up [from] Niki, take it, [and] Niki will send us a copy, and then [your son] can take it sometime next week when he's feeling better.

BUCKINGHAM  Yeah, I mean look, he can take it Saturday, I have no problem with him taking [it then].

CW-1     But it's not an issue with that. It can be anytime he wants.

BUCKINGHAM  Right, okay, okay.

CW-1     That's not an issue, 'cause it has to be sent in from Houston.

BUCKINGHAM  And is-- will you send me where and how I should send the check?

CW-1     Oh yeah, yeah, yeah, yeah. We'll send it so that you get your [IRS tax] writeoff.

BUCKINGHAM  Oh, even better!

CW-1     Yeah, it will be, it will be through the, our foundation, our 501(c)(3), and then we'll send the checks to all the parties.

BUCKINGHAM  Okay.

CW-1     And that way you, there's no, people aren't saying, "Well, why [did] you send a check to [the Houston Test Center]?" and da da da.

BUCKINGHAM  Right, right.

   39.  On or about July 13, 2018, CW-2 asked CW-1 for a handwriting sample from BUCKINGHAM's son so that CW-2 could attempt to match his handwriting on the exam.  CW-1 called BUCKINGHAM to request the sample.  The following is an excerpt from the conversation.

CW-1     Hey could you get me a handwriting sample?

BUCKINGHAM  Yep.

CW-1     And a signature sample, so that he can kind of get close. Had he not taken the test before we wouldn't have to do this, but I just want to make sure we're close in our writing.

BUCKINGHAM        Yes. He has not great writing.  I'm gonna give you that, but I'm going
                  to, actually I'm bringing [him] to the doctor right now, so we will sit
                  down in the waiting room and I will send it to you.

40.     Shortly thereafter, BUCKINGHAM sent CW-1 an e-mail with the notation,

"Good luck with this."  Attached to the e-mail was a photograph of the following:

To whom it may Concern, this provides an example of my current writing style.
Thank you for your attention.
Sincerely,

41.     CW-2 took the ACT exam on or about July 14, 2018, in his room at a Houston-

area hotel.  The next day, CW-1 e-mailed BUCKINGHAM, "Test went well."

42.     On or about July 17, 2018, BUCKINGHAM asked CW-1, via e-mail, "[D]o you

think we could get a copy of the ACT for [my son] to take?"  Later that same day, an employee

of The Key e-mailed BUCKINGHAM a copy of an ACT practice test.

43.     On or about July 18, 2018, BUCKINGHAM wired $35,000 to a bank account in

the name of the KWF charity as a partial payment toward the agreed-upon fee of $50,000.

BUCKINGHAM advised CW-1 that she would seek to have her former spouse pay the

remaining $15,000 she owed.

44.     BUCKINGHAM's son received a score of 35 out of a possible 36 on the ACT

exam CW-2 secretly took on his behalf.

45.     On or about October 29, 2018, at the direction of law enforcement agents, CW-1

called BUCKINGHAM from Boston, Masschusetts.  On the call, BUCKINGHAM said that she

would "probably like to do the same thing with [my daughter] with her ACTs" because she is

"not a great test taker."  BUCKINGHAM said her daughter would not "need to get a 35" to be

admitted to her chosen schools, "but if she got a 32 or 33, I'm assuming that would make her pretty competitive."

### B. GORDON CAPLAN

46.     Defendant GORDON CAPLAN is a resident of Greenwich, Connecticut and New York, New York.  CAPLAN is an attorney and the co-chairman of an international law firm based in New York.

47.     In or about November and December 2018, CAPLAN participated in the college entrance exam cheating scheme by making a purported charitable donation of $75,000 to KWF, in exchange for which CW-1 arranged to have CW-2 purport to proctor CAPLAN's daughter's ACT exam and correct the answers after she had completed it.

48.     In a call on or about June 15, 2018, CW-1 explained to CAPLAN, in sum and substance, how the scheme worked.  The following is an excerpt from the conversation, which was intercepted pursuant to a Court-authorized wiretap.

CW-1        So here's the first thing we need to do. And I think I mentioned this to your wife. We need to get your daughter tested for a learning difference. Here's why. If she gets tested for a learning difference, and let's say it's my person that does it, or whoever you want to do it, I need that person to get her 100% extended time over multiple days. So what that means is, we'll have to show that there's some discrepancies in her learning, which there's gotta be anyways. And if she gets 100%, Gordon, then, I own two schools. I can have her test at one of my schools, and I can guarantee her a score. If it's ACT, I can guarantee her a score in the, in the 30s. And if it's the SAT, I can guarantee her a score in the 1400s. Now, all of a sudden, her test score does not become an issue with all the colleges. Because she's strong enough. Then, if we clean up her transcript, then her ability, with her athletic ability and her testing and her getting better at school, it's much easier to get her into school, because you're not fighting huge obstacles at the types of schools you're talking about. Now, if we do that, there's a financial consideration that you have to pay to the school to get it done, because this is absolutely unheard of, to make this happen. I can make scores happen, and nobody on the planet can get scores to happen. She won't even know that it happened. It will happen as though, she will think that she's really super smart, and she got lucky on a test, and you got a score now. There's lots of ways to do this. I can do anything and everything, if you guys are amenable to doing it.

CAPLAN        Okay, so let me let me understand the two components. What is the, what is the, the number?

CW-1          So the number-- the number--

CAPLAN        --At Cornell for instance.[8]

CW-1          Well, hold on a second. The number on the testing is $75,000. Okay? It's $75,000 to get any test scores you would like to get on the SAT or ACT. Okay, that's--

CAPLAN        Explain to me how that works.

CW-1          I just explained it to you. You get extended time, you gotta get the extended time first. Then you're going to fly to L.A. And you're going to be going on a fake recruiting visit. You'll visit some schools, while you're out here in L.A. And then on a Saturday, which is the national test day if it's ACT or SAT, she's going to sit down and take the test. I will have a proctor in the room, that's why, when you have 100% extended time, you have-- you get to take it at a-- you don't take it with everybody else, you get to take it over multiple days. And you get to take it at a-- you can take it at your school or another school. Okay? And then this kid, 'cause she's taking online classes, you have to go somewhere anyway.[9] So you come to my school, take the test on a Saturday. She'll be in the room for six, six and a half hours taking this test. My proctor would then answer her questions, and by the end of the day, she would leave, and my proctor would make sure she would gets a score that would be equivalent to the number that we need to get.

CAPLAN        Okay.

CW-1          That's how simple it is. She doesn't know. Nobody knows what happens. It happened, she feels great about herself. She got a test score, and now you're actually capable for help getting into a school. Because the test score's no longer an issue. Does that make sense?

CAPLAN        That does.

        49.    Later that same day, CW-1 had a follow-up call with CAPLAN in which he again

explained, in substance, how the scheme worked, and in particular the need for CAPLAN's

daughter "to be stupid" when a psychologist evaluated her for learning disabilities in order to

---

[8] CAPLAN's reference to the "number" for Cornell was a reference to the athletic recruitment scheme, which he also expressed an interest in but ultimately decided not to pursue.

[9] CAPLAN's daughter was enrolled at an online high school.

obtain the documentation necessary to obtain extended time on the exam. The following are two

excerpts from the conversation.

CAPLAN    Well again, thanks for taking the time earlier today. Look, I'm particularly
          interested in working with you guys and figuring out what's best for [my
          daughter]. She's an interesting kid. I'm sure you've seen them all. But this notion
          of effectively going in, flying out to L.A., sitting with your proctor, and taking the
          exam is pretty interesting.

CW-1      It's the homerun of homeruns.

CAPLAN    And it works?

CW-1      Every time. (laughing)

CAPLAN    (laughing)

CW-1      I mean, I'm sure I did 30 of them at different, you know, dates because there's
          different dates, and they're all families like yours, and they're all kids that
          wouldn't have perform[ed] as well, and then they did really well, and it was like,
          the kids thought, and it was so funny 'cause the kids will call me and say, "Maybe
          I should do that again. I did pretty well and if I took it again, I'll do better even."
          Right? And they just have no idea that they didn't even get the score that they
          thought they got.

CAPLAN    Right.

CW-1      Which is great, that's the way you want it. They feel good about themselves.

CAPLAN    Yeah, absolutely, and there's nothing, just ask you directly, there's nothing that
          the schools are concerned about with this, or have a problem with?

CW-1      Schools don't know. Schools don't know. That's why you have to get 100%
          time or you have to get 50% multiple days. The only, so the way it works is, if
          you get 50% time you have to take it at a national test center okay? If you get
          100% time you have to find a school that'll actually give you the test. So, if she
          were at a traditional school, she would be taking it at that school. What I do is, I
          always tell the family, "Oh, you got a bar mitzvah out of town that weekend, so
          you found a school to take it at," and they go take it at our school and then they
          come home and they get a score. So the key is the testing, and we have to get the
          testing so that we show a discrepancy. It sounds like she has a discrepancy, but I
          need the discrepancies to be significant enough so that we don't have to appeal
          and we can go forward. The fact that she's in an online school, that may be
          helpful for us as well.

CAPLAN    And you work all of that out? You figure that out? Or?

CW-1        Yeah, absolutely.

CAPLAN      And do you ever have a problem getting the 100% time?

CW-1        Oh yeah, there's times when we have to appeal because, you know, for whatever
            reason. You have to understand that College Board and ACT both outsource their
            decisions to a committee, 'cause they're tired of being sued. For, you know, so
            they do the outsourcing. So, sometimes you have to re-appeal so that
            psychologist that'll do the testing, will actually write up an appeal. So we'll do
            that, and I also need to tell [your daughter] when she gets tested, to be as, to be
            stupid, not to be as smart as she is. The goal is to be slow, to be not as bright, all
            that, so we show discrepancies. And she knows that she's getting all this extra
            time, everywhere that she is right now. At the Academy kids are getting extra
            time all the time.

CAPLAN      You mean the Greenwich Academy?

CW-1        Everywhere.

CAPLAN      Oh, oh you mean at her tennis academy. I see. Yeah. Okay.

CW-1        Yeah, everywhere around the country. What happened is, all the wealthy families
            that figured out that if I get my kid tested and they get extended time, they can do
            better on the test. So most of these kids don't even have issues, but they're getting
            time. The playing field is not fair.

CAPLAN      No, it's not. I mean this is, to be honest, it feels a little weird. But.

CW-1        I know it does. I know it does. But when she gets the score and we have choices,
            you're gonna be saying, okay, I'll take all my kids, we're gonna do the same
            thing. (laughing)

CAPLAN      Yeah, I will.

                                    ....

CAPLAN      So, how do I get this done with you? What do I need to do?

CW-1        So what I need to do is, I'm gonna talk to our psychologist, and we may have to
            send her to you, or you to her, so that she can get the testing done. I'm gonna talk
            to her, because she's going to a school online, there are forms that have to be
            filled out by her teachers that she's doing online, so we'll need to send the whole
            packet to them. It's a huge writeup. It's, you know, it's, I don't know what it is,
            it costs like four or five grand to get the report all done and all the testing done
            and have, takes two days to get the testing done. And it shows all the
            discrepancies. Here's the great thing. When she goes to college, she gets to bring
            this report with her and she'll get extended time in all those things in whatever

                                      25

school she goes to, which is huge again. She'll get all the accommodations when she gets to college as well.

CAPLAN      Huh.

CW-1        Which will be really helpful.

CAPLAN      Okay, okay.

CW-1        So I need to follow up, what I need to do is get your wife to send me her classes she's in, her transcript, and then let me then have a discussion with our psychologist and ask her what she needs to get the ball rolling.

CAPLAN      Okay. And how do I ensure that she's working with you, and, you know, the people that you want her working with?

CW-1        So what happens is, I think your family already talked to my person who lives in New York.

CAPLAN      Alright.

CW-1        [My employee] and she'll start working with [my employee]. [My employee] will be aware of everything that's going on, she won't say anything 'cause she knows. 'Cause we have a bunch of other New York families that are doing the same thing. And then what we'll do is, she'll work on a weekly basis with [my employee], the testing will be done by the psychologist, and then lastly, I already got the proctor already set up. He lives in Florida. He actually played tennis at Harvard and he'll be the proctor. And then, when we get a score, and get her grades changed, and she retakes her classes, then we'll figure out how good she is, late spring next year and we'll go after those schools--

CAPLAN      Okay, so what?

CW-1        --want to get into.

CAPLAN      When will the-- so when will she take this extended test?

CW-1        Here's the thing, we gotta get her tested, and I gotta figure out if her school will check the box that, normally it takes four months of getting accommodations but she doesn't go to a traditional school, so they should be able to check off the box without the four months. Then we would take it late fall this year and we would take it one time and be done.

CAPLAN      Hmm. And a score of? You would think would be?

CW-1        The score will be whatever we need it to be.

CAPLAN      Got it, okay. I will.

26

50.     During a call with CAPLAN and CAPLAN's spouse on or about July 5, 2018,

CW-1 suggested that they hire a member of his staff to take classes for her, in order to improve

her grades in preparation for her application to college.  CW-1 explained, "We would do them

online and one of my people would take the class for her."  CAPLAN's spouse replied that she

had a "problem with that."  At that point, CAPLAN picked up the phone and spoke with CW-1

privately.  The following are two excerpts from the conversation.

| | |
|---|---|
| CAPLAN | It's just you and me.  Is that kosher? I mean, can we? |
| CW-1 | Absolutely, I do it all the time man. I do it all the time for families and then we take college classes for kids, you know, online to raise their GPA. Because again, it's not, nobody knows who you are 'cause you're, you don't take a, there is nothing that, you know, is filmed when you take your test and everything, that's what's so great about it. So that's why I asked. |
| CAPLAN | Is, let me put it differently, if somebody catches this, what happens? |
| CW-1 | The only one who can catch it is if you guys tell somebody. |
| CAPLAN | I am not going to tell anybody. |
| CW-1 | Well (laughing) |
| CAPLAN | (laughing) |
| CW-1 | Neither am I.  And, neither am I. So the only way is, if somebody says at [your daughter's] school, "Oh by the way, you re-took this class, congratulations, you got an A, blah, blah blah," she can't act like, "Really? When did I take that?" |
| CAPLAN | I see, okay. |

51.     Later in the call, CAPLAN inquired again about the "ACT thing."

| | |
|---|---|
| CW-1 | Yeah, so, you're getting tested by our psychologist, |
| CAPLAN | Right. |
| CW-1 | I don't know what she charges, and I, I don't make any money on this stuff. I don't really care about it to be frank with you. The school that she would be taking the test at, with the proctor, is $75,000 and we get the score we need to get. It's one time, it's done, she can't, but she has to show up and be there. She'll ask-- |

| | |
|---|---|
| CAPLAN | Done, done, not a problem. |
| CW-1 | She'll, she'll think, right, she'll think she took it. She'll feel good about herself. She'll get a great score and she'll be like, "Mom and dad, can I..." You know what's going to happen? She's going to say, "Dad, can I re-take the test again? 'Cause I think I can do better." And that happens all the time, right? She'll get whatever, and we will say no, just so you know that. |
| CAPLAN | But it will be somewhere in the 30s |

                                              ....

| | |
|---|---|
| CAPLAN | Okay, well look, we are in for the, get her extra time, to the extent we can, extra time on the test. |
| CW-1 | Right |
| CAPLAN | And then, and taking the test one time and get her a, you know, a score in the 30s. |
| CW-1 | Correct. |
| CAPLAN | We are in for that, at 75, not an issue. |
| CW-1 | Done. |
| CAPLAN | Done. The other stuff (laughing)-- |
| CW-1 | That will be up to you guys, it doesn't matter to me. |
| CAPLAN | Yeah, I, I hear ya. It's just, to be honest, I'm not worried about the moral issue here. I'm worried about the, if she's caught doing that, you know, she's finished. So I, I just-- |
| CW-1 | It's never happened before in twenty-some-odd years. The only way anything can happen is if she-- |
| CAPLAN | Someone talks-- |
| CW-1 | Yeah, if she tells somebody.  And that's why even on the payment to the school thing, nobody, we never tell the, you know, she just needs to know that you're gonna get some help on this class. |
| CAPLAN | Correct. |
| CW-1 | She'll be more than happy. |
| CAPLAN | Oh yeah, I, she, she won't talk. |

52.     On or about July 21, 2018, CAPLAN and his daughter flew to Los Angeles to meet with a psychologist in an effort to obtain the medical documentation required to receive extended time on the ACT exam.

53.     After twice denying the request, the ACT ultimately granted CAPLAN's daughter extended time on the exam at the request of law enforcement on or about November 6, 2018. In a call two days later, CAPLAN asked CW-1, in sum and substance, whether anyone involved in the cheating scheme had ever been caught. The following is an excerpt from the conversation, which was consensually recorded.[10]

| | |
|---|---|
| CAPLAN | So [my daughter] did get the extension. Totally unexpected. We got it last night. |
| CW-1 | Really? |
| CAPLAN | Yeah. |
| CW-1 | That's cool. Cool. |
| CAPLAN | Yeah. And you were right. I mean, it was like third time was the charm. So everybody was telling us there's no way, and then all of a sudden it comes in through [her school]. So, again, and-- keep in mind I am a lawyer. So I'm sort of rules oriented. Doing this with you, no way-- she's taking the test. It's her taking the test, right? There's no way-- |
| CW-1 | So-- |
| CAPLAN | -- any trouble comes out of this, nothing like that? |
| CW-1 | Okay. So-- so normally-- so let me-- [I] explained this to you before and-- |
| CAPLAN | Yes, and I-- and I apologize.   It's just-- |
| CW-1 | No, no. I get you. |
| CAPLAN | Bear with me. |

---

[10] By the time of this conversation, CW-1 was cooperating with the government's investigation.

CW-1    Okay. So I'm going to-- I'll explain to you the process and you get-- you get to
        decide the process. Okay? So what normally happens in our case is I'll call [CW-
        2], who's our proctor, and I'll call Igor, who's the principal of [the West
        Hollywood Test Center] and I'll say, "Okay, what dates are you available?"
        Because, my guess, if you're taking the ACT, our next test date is between
        December 8th and we have two weeks to take the test. Is that what the letter says?

CAPLAN  That's a good question.

CW-1    It should, but just call it that it is. Okay?

CAPLAN  Okay.

CW-1    All right. I'll--

CAPLAN  And I could-- I could forward it to you, too.

CW-1    Okay. That's normally the case. So then-- so what happens is, is then you guys
        have already registered for the December 8th test at a national test center, correct?

CAPLAN  I believe so, yes.

CW-1    Okay.  So then what happens is, I need the ticket that--

CAPLAN  And your-- I'm sorry. Your e-mail is [E-MAIL ADDRESS REDACTED]

CW-1    It's [E-MAIL ADDRESS REDACTED].

CAPLAN  Yeah.  At Gmail, right?

CW-1    Yes. [E-MAIL ADDRESS REDACTED].

CAPLAN  Okay. Just sent it to you.

CW-1    Okay. So-- so what normally happens is, you'll send me the ticket and then I will
        give it to Igor.  Igor will do the paperwork so that the test center is moved to the
        [West Hollywood Test Center]. Okay?

CAPLAN  Okay. Okay.

CW-1    So then what'll happen is, instead of wherever she was going to take the test,
        it'll-- now a test will show up-- usually the Wednesday before the 8th, at [the
        West Hollywood Test Center]. Then what'll happen is, [CW-2], who is the
        proctor, will fly in, and he will show up on Friday night, just like you guys would
        show up on Friday night, and then on Saturday morning at 7:45, 8 o'clock, you
        guys will show up at the school, which is on [LOCATION REDACTED]. And

30

then what'll happen is, you'll go in, [CW-2] will be your proctor. And so this is-- this is, again, how it all works. She'll take the test. It'll be all her taking the test and then at the end of the test, it would be decided that we want to score, let's say, 33, so that she never has to take the test again. It'll be one and done. Then she'll-- you guys will leave and then [CW-2] will then look at all of her answers. Because her answers will be put on a separate sheet of paper and then [CW-2] will go through the answers and will figure out on all four of the-- there's five sections. The fifth is writing. On all four sections and he will decipher her answers and-- and he will go back and-- and ensure that he makes it so that her score ends up being between a 32 and 34, just depending on the curve for that particular test day. And normally he's right on. And that is essentially how it would happen.

CAPLAN     And has anybody ever gotten into an issue with this?

CW-1       Nobody. We've done this for four or five years and had probably 20-plus people do it. So-- but that's the process.

CAPLAN     Never been an issue?

CW-1       Never been an issue. So the decision here is yours. I'm-- I'm not-- I don't want to influence you in any way. It's totally up to you guys, however you guys want to do this.

CAPLAN     And do other-- are you guys the only ones who do this or--?

CW-1       Based on what I know. I only know myself and the families that we work with. And so, you know, we have lots and lots of families. Not everybody gets extended time. Not everybody gets extended time with multiple days. So there's lots of people who cannot do it and then there's lots of people that do do it. So it's kind of all in your corner. But now-- you understand the process now.

CAPLAN     I do.

CW-1       So that, it's really simple and easy, and it's-- it's up to you to decide one way or another. And it doesn't matter to me. Whatever you guys want to do.

CAPLAN     No, I understand that, [CW-1]. I-- I appreciate that and I-- I appreciate the candor here, and the directness. Okay. Give me a little bit to think about it and I will be back to you on it tomorrow. You-- you obviously need to firm this up right away, right?

CW-1       Yeah, because we'll need to get the $25,000 wire and then I need to call [CW-2] and Igor to see-- to make sure they're available. My guess is you guys are available on the 8th because you guys were going to take it on the 8th anyways.

CAPLAN     Yeah. We'll just make ourselves available.

31

54.     On or about November 13, 2018, CAPLAN wired $25,000 to a bank account in

Boston, Massachusetts in the name of the KWF charity that, unbeknownst to CAPLAN, CW-1

had opened at the direction of law enforcement agents.  CW-1 had previously advised CAPLAN

that the $25,000 would be a "deposit" to reserve the services of CW-2, who CW-1 said was his

"best test-taker" and could "nail a score-- he's that good."

55.     On or about November 15, 2018, CAPLAN called CW-1 about changing the

location of the test to the West Hollywood Test Center, and again inquired whether anyone "has

ever gotten in trouble with this?" The following is an excerpt from the conversation, which was

consensually recorded.

CW-1        You got my-- you got my e-mail?

CAPLAN      I did and, that's sort of what I'm responding to, and part of the reason why I'm
            taking [my spouse] off of this. [My spouse is] very nervous about all this, and I
            just - I want to have a-- if we make this change, does that create some sort of
            suspicion or issue? They say, "Why the hell is somebody living in Greenwich
            taking it out in California?"

CW-1        Good point. Good point. So normally-- so anybody-- you know, for-- all of the
            kids that have taken the [test] some live somewhere else. They always-- and
            essentially if anybody were to-- to ask, essentially, "We're going to a-- a bat
            mitzvah," or, "We're going to a wedding. We're going to be gone that weekend.
            That's the weekend we're going to take the test." In your case, for your daughter,
            because she goes to a-- an unorthodox school, not your typical-- you know, brick
            and mortar kind of place, it's simple, because she could be playing a tournament
            there, we've got to take the test. Anything. But nobody ever asks them. But to--
            you have to do this to be able to move the test from where it's located. Plus, when
            you did your original ticket, I believe you didn't have the time.

CAPLAN      No, we didn't.

CW-1        Right. So now you got to go to a place that will actually administer and proctor
            the test for you. Because the place that you would go on that national test center
            date, they could not do that at that center, because they don't-- they have to have
            somebody special be a proctor, to go into a room-- a special room. But that's why
            they don't give those, with those kind of accommodations at a national test center.

CAPLAN      [Let me] ask you straight up. You've never had an issue with this? No one has ever gotten in trouble with this?

CW-1        I've never--

CAPLAN      Um--

CW-1        --had an issue with anybody.  We've done this, you know, probably 20 times plus. We did it this summer, because, you know, they moved the ACT, they offered a July test date in California. You couldn't take it in California so we-- we weren't a test center for the-- the summer, so a young person had to go to Houston to do it. We just did it for the subject test for a-- actually a girl that lives both in New York and Aspen. So nothing-- nothing to this point has happened.

CAPLAN      Could you ever see that happening?

CW-1        I-- I'm not-- I have never seen it happen. The only-- so what happened is they changed the test form so that's why Igor got confused, because the form is different for this new school year. So that's why we called ACT, to say, "Okay, what's the simplest way to do this, because she already had a regular ticket, not an accommodations ticket, and this is exactly what they told us on the phone.

CAPLAN      But what I'm-- what I'm asking is, is there any way for this to get back to [my daughter] or to the family? I mean, this comes out-- I-- I don't even want to know what you guys do.

CW-1        So the-- so here-- again, let me just-- I'll just go retrace again. When [your daughter] takes the test, on the 8th, she's going to take the test like she's regularly taking the test, but she will take it, [CW-2] will be there. [CW-2] can answer any questions that she has.  But [CW-2] will proctor the test. She will have all the time, she'll use her computer. She will think when she's done with the test she has taken the test. No doubt about it. The difference is-- is that what we'll do is, instead of her bubbling into the test, which we do with all kids who have learning differences, is they bub-- they write their answers on a separate sheet to the side of it, so that we can rebubble, so we don't screw up the bubbling, which happens a lot for kids. Because they screw up their bubbling. And then she'll-- she'll leave at the end of the test time. Which I don't know who's going to take her. And then--

CAPLAN      I will.  I'll be there.

CW-1        Okay.  And you'll-- you'll meet [CW-2] and Igor, and you'll-- you'll go your own way.  [Your daughter] will go in and take the test. She'll be the only one, taking it in the room with-- with [CW-2]. She will take the test. She will walk out the door. At the end of it she'll say to you, "Dad, it was so hard," or "I'm so tired," or whatever the typical reaction out of the kid. Then [CW-2] will finish the exam. He will then take the exam and look at her-- what she's done, and then ensure that

33

whatever score we decide that we want to get-- he has it down to a-- unbelievable that he can do it. Get that number based on the four sections. She'll do the computer writing of the essay herself. That'll be all her. He can help her if she wants some guidance [inaudible] approach. But other than that, that will be all her writing. And she will sign it and she'll walk out of there and she will never know that this actually occurred. You will get your results back in, you know, anywhere from, 11-- depends on what day it goes back in. But anywhere from 11 to 20 days. And she'll get her results and she'll say, "Oh, my God, Dad, I got a 33!"

CAPLAN     So she's been taking Logic Prep and has been getting-- I think her highest score so far is a 22, and she'll probably get up to a 24 on her next practice test. The fact that this could be different than what she had been showing on the practice test--

CW-1       What-- so you tell me if you want-- would [you] prefer to have her get a 28? 27? 28? 29? Probably based on what you're just telling me right now, right, that-- maybe that's a better approach, because that's still a very good score with her abilities and disability but--

CAPLAN     Well, I-- I'm thinking 30, 31 is all we need to do here.

CW-1       Okay. Done deal. Done deal. It'll be-- it'll be 30, 31. So what happens is the test is curved. I don't know if you know that. The test is curved against everybody in the country. So it can-- we can be one question off, or two questions off, and it can be a 30, it can be a 31. It may be a 29. It could be a 32. Just depends on the curve of the day. But it'll be-- it'll be right there.

CAPLAN     But what I'm asking you is, will that be an issue? So when Logic Prep asks us, well, how did she score, will they say, "Hmm?"

CW-1       So - well, I don't think it matters what they say, because at the end of the day she had a great day, they get credit for her doing really well and they have nothing to do with ACT and/or the colleges she's going to apply [to].

CAPLAN     And they don't feel incumbent on them to say this is suspicious?

CW-1       Well, I don't see why they would. It would only be a success story for them.

CAPLAN     Okay. Okay. I will send out the e-mail and I will send you what I get back.

56.     On or about December 6, 2018, two days before the ACT exam, CAPLAN and

CW-1 spoke again. The following is an excerpt from the conversation, which was consensually

recorded.

CAPLAN     When will we know the score?

CW-1     Normally, you know, the score, between-- it could be, in 11 days or it could be in 20 days. It depends on-- so what normally happens is Igor sends everything in on Monday. And because they're giving the test nationally as long as the test is in by Wednesday, then usually you get scored with everybody else in the country, because everybody has to have-- from their test centers-- have to have their tests back. And then normally you get your scores back in anywhere from 11 to 20 days. And there's been times when it's taken as much as 30 days but that would be because there's an issue across the country, not because of anything that happened with her.

CAPLAN     And the score we're hoping for here is, we're really hoping for, is a 32. Is that what we discussed?

CW-1     You tell me. Whatever you think we want to have. And we will get within one point. So if you say 32, it'll be either 31, 32, 33. If you say you want 31, it'll be 30, 31, 32. It just depends on the curve of the test for that day.

CAPLAN     Yeah, I-- I don't want it to be higher than a 32.

CW-1     Okay. So--

CAPLAN     It's just-- it's just going to be hard to justify in light-- light of-- [CW-1] look--

CW-1     No, I t--

CAPLAN     I, this is all a hope, right? What she-- what we hope she can do.

CW-1     Right.

CAPLAN     We hope she can get a 32 or pretty close thereto.

CW-1     Got you. So can I just-- I want to clarify. So she's going to take the test on her own, she's going to do her best, all that stuff, and then we're going to do our magic on the back end.

CAPLAN     You're going to-- you're going to do what you do.

CW-1     Okay, all right, I just want to make sure that the-- I just want to sure that we're all on the same page. That essentially, that's why I know I can get a 31, 32, you know, so we're going to aim for 31, so that if we go 30 or 32 we're safe, how's that?

CAPLAN     I think that's fine.

CW-1         Okay, I--

CAPLAN    I think that's fine, I-- I'm just, uh, uh, uh, uh, uh, [CW-1], you understand my--

CW-1         I totally get it.

CAPLAN    And you are absolutely confident there is no issue here.

CW-1         We've been doing this for a long time. Luckily she'll be the only one taking the test, on Saturday. Sometimes there's multiple kids. So all I can do is just tell you that [CW-2] will fly in from Florida. He is an expert at getting within-- it just depends on one-point standard deviation on the-- whatever the curve is. Igor does his part. He signs off. He's the site coordinator. Nobody'll be there but you guys. And that'll be it. And I, you know, I've never even been there, I--

CAPLAN    Igor has never had an-- Igor has never had an issue? He has no blemishes on anybody?

CW-1         No. No issues at all.

CAPLAN    Okay.

57.      On or about December 8, 2018, law enforcement agents observed Dvorskiy arrive at the West Hollywood Test Center at approximately 7:05 a.m. CAPLAN and his daughter arrived approximately ten minutes later, and Dvorskiy, CAPLAN and CAPLAN's daughter went inside the building. At approximately 7:21 a.m., CW-2 entered the West Hollywood Test Center. At approximately 7:31 a.m., Dvorskiy and CAPLAN walked out of the building and had a brief conversation. At approximately 11:52 a.m., CAPLAN's daughter left the West Hollywood Test Center, met CAPLAN, and drove away.

58.      On or about December 20, 2018, CAPLAN wired an additional $50,000 into the KWF bank account in Boston.

      C.   <u>GREGORY ABBOTT and MARCIA ABBOTT</u>

59.      Defendants GREGORY ABBOTT and MARCIA ABBOTT, a married couple (collectively, the "ABBOTTS"), are residents of New York, New York and Aspen, Colorado.

GREGORY ABBOTT is the founder and chairman of a packaging company for the food and beverage industry, and the former chairman and CEO of a private-label clothing manufacturer.

60.     As set forth below, in or about April 2018, the ABBOTTS made a purported charitable donation of $50,000 to KWF, in exchange for which CW-1 arranged to have CW-2 purport to proctor their daughter's ACT, and correct her answers after she had completed it.

61.     In or about March 2018, MARCIA ABBOTT e-mailed CW-1 her daughter's ACT registration form and admissions ticket, in preparation for her daughter to take the ACT at the West Hollywood Test Center.

62.     On or about April 9, 2018, CW-1's accountant e-mailed GREGORY ABBOTT an invoice for $50,000, with a note thanking him for his "generous donation to the Key Worldwide Foundation." CW-1 was copied on the e-mail, and later forwarded it to MARCIA ABBOTT.

63.     Three days later, $50,000 was wired from a brokerage account in the name of the Abbott Family Foundation to a bank account in the name of the KWF charity. That same day, GREGORY ABBOTT left CW-1 a voicemail stating, in substance, that he had sent the wire.

64.     On or about April 13, 2018, CW-2 flew from Tampa, Florida to Los Angeles, California. The following day, the ABBOTTS' daughter took the ACT at the West Hollywood Test Center. CW-2 purported to proctor the exam and, after the ABBOTTS' daughter had completed it, corrected her answers. On or about April 15, 2018, CW-2 returned to Florida.

65.     On or about April 17, 2018, at CW-1's direction, KWF paid Dvorskiy $20,000, representing $10,000 for the ABBOTTS' daughter and $10,000 for the son of I-HSIEN "JOEY" CHEN, who took the ACT at the West Hollywood Test Center at the same time as the ABBOTTS' daughter, as set forth below. On or about May 14, 2018, KWF paid CW-2 $20,000, representing $10,000 for each of the two students.

37

66.     The ABBOTTS' daughter received a score of 35 out of a possible 36 on the exam.

67.     On or about June 6, 2018, MARCIA ABBOTT called CW-1 to inquire, in substance, whether CW-1 could arrange for someone to take SAT subject tests for her daughter. The call was intercepted pursuant to a Court-authorized wiretap. CW-1 replied, "[GREGORY ABBOTT] would have to be willing to pay for it." MARCIA ABBOTT responded, "Yeah, well he can donate, I mean, whatever the donations are."

68.     On or about August 3, 2018, MARCIA ABBOTT called CW-1 to inquire, in substance, how cheating on the subject tests would work. The following is an excerpt from the conversation.

| | |
|---|---|
| MARCIA ABBOTT | What is the situation with subject tests? Is it basically the same that happened with the SATs? |
| CW-1 | Yeah, it's a little more a little more expensive because now you gotta have somebody which, you gotta make sure that you do well on both of those areas.  It's not like the SATs. They're much harder. |
| MARCIA ABBOTT | Yeah, well they're very specialized, and for her she was gonna take Math II and English Lit. |
| CW-1 | Right, so if we have somebody help her, I have to get, I have to figure out who that's gonna be, that's gonna be able to take care of both of those |
| MARCIA ABBOTT | Alright, she loves the guy [CW-2] who took the SATs, she said.  She said she started having heart palpitations but she said he was so sweet, he let me walk around the hallway. She said, "Can't I take my SAT subjects with him?" And I said, "Nah, I don't think so. I mean, I think, you know, you just, it's whole different area and that was 'cause we happened to be out in California seeing schools. So you know we're gonna take them here." So, alright, so there's no way for [August] 27th. Then I guess we should take them here down [in the Aspen area] on the 27th and let's see how she does. |
| CW-1 | Absolutely, absolutely. |
| MARCIA ABBOTT | And what would be, the donation be for, if you found someone for October? Because the other one was, what, $50,000? |

38

| | |
|---|---|
| CW-1 | It was, I think it was 50. It will be at least 75. |
| MARCIA ABBOTT | Yeah, that's fine. |

69.     In a call on or about September 4, 2018, MARCIA ABBOTT told CW-1, in substance, that she wanted to proceed with the cheating scheme for the SAT subject tests because her daughter did not think she had done well on the tests she had taken on her own.  The following are two excerpts from the conversation.

| | |
|---|---|
| MARCIA ABBOTT | Can your people can cover the math and lit? |
| CW-1 | Yes, if they're available that weekend. |
| MARCIA ABBOTT | If so, yes, October 6th. So I guess they give a mix alright.  Well, let's see how she does, She's convinced that she bombed the lit because she was too tired, so … And [Duke University] told us they didn't want anything below a 750. |
| CW-1 | That's right. |
| MARCIA ABBOTT | It doesn't, it doesn't add to her resume. |
| CW-1 | That's correct because, yeah well, she would have-- |
| MARCIA ABBOTT | Yeah. |
| CW-1 | Good thing that she did this for the ACT, 'cause her score was not exceptional. |
| MARCIA ABBOTT | What? Excuse me what'd you say? |
| CW-1 | I said it was a good thing that we did it for the first test. |
| MARCIA ABBOTT | Oh yeah, my gosh, I mean, I'm sure her, you kidding me? She was gonna throw up like every single drug in the world for mono and lyme [disease]. I'm sure it was a disaster. |
| CW-1 | She got, she got a 23. |
| MARCIA ABBOTT | Yeah, that would be what I would have guessed at, 25, you know. So yeah, I mean, yeah, I don't know. We'll see how she does on the math. But she herself even says she doesn't have high hopes for English Lit. |

….

| | |
|---|---|
| MARCIA ABBOTT | Yeah, so do you think we should do it now then, this week? |
| CW-1 | I have to, I have to ask the person in Houston if she'll do it. |
| MARCIA ABBOTT | Oh, so it'd be in Houston. |
| CW-1 | Yeah, because the person, the person who's gonna be the proctor is based in, half the time, somewhere across the country. |
| MARCIA ABBOTT | Yeah alright, well I rather do, I rather go for it then. Because you know what, even she gets like a 740, 730 on her math, she still needs to get higher. |
| CW-1 | Okay, well I'll talk to the person in Houston tomorrow and see, and the proctor, and see if they're available. |
| MARCIA ABBOTT | Okay, great. And that's your only one in the country? |
| CW-1 | Nobody in the country even has one. |
| MARCIA ABBOTT | Okay, no, I just wanted to know if they're not available, if for some-- |
| CW-1 | That this is like, nobody, nobody can do this. |
| MARCIA ABBOTT | And if they're not available then that's it? There's just, there's just one person? |
| CW-1 | Well then, we can do it in November if they're available. |
| MARCIA ABBOTT | And November's not too hard [or] late for early [action]? |
| CW-1 | Not if it is what it is, she's not getting into any schools without them. |
| MARCIA ABBOTT | Yeah I know. |
| CW-1 | So. |
| MARCIA ABBOTT | Okay, well let's see. Let's see what we can do. |

70.     On or about September 13, 2018, the Abbott Family Foundation made a purported donation of $75,000 to the KWF charity.

71.     In a call with MARCIA ABBOTT on or about September 28, 2018, CW-1 confirmed that the SAT subject tests would occur at the West Hollywood Test Center, and also

discussed the scoring of the tests. CW-1 said, "We'll get 750 and above," to which MARCIA

ABBOTT replied, "That's fabulous."

72.     On or about October 5, 2018, CW-1 called MARCIA ABBOTT at the direction of

law enforcement agents. The following is an excerpt from the conversation, which was

consensually recorded.

| CW-1 | Did you guys get to L.A.? |
|------|---------------------------|
| MARCIA ABBOTT | We did. We just checked in. We got on the last flight out of Aspen last night. |
| CW-1 | Congratulations. So I'm in Boston today, but I just wanted to make sure everything was cool. I know [CW-2] has already gotten there to proctor the test. Igor will be there in the morning, so everything should go smoothly. So I just wanted to make sure you-- everything's cool with you guys. |
| MARCIA ABBOTT | Fabulous. Yeah, everything's fine. Igor's the one who proctored her before? Or was it [CW-2]? |
| CW-1 | No, [CW-2] did. Igor will be, the person-- he's the test administrator for the school. |

73.     On or about October 6, 2018, law enforcement agents observed Dvorskiy arrive at the

West Hollywood Test Center at approximately 7:28 a.m., with MARCIA ABBOTT and her

daughter arriving approximately 15 minutes later.

74.     In a call on or about October 8, 2018, which was consensually recorded, CW-2—

who was not cooperating with the government's investigation at the time—told CW-1 that he

believed he had scored "800 on the math" and between 700 and 800 on the literature test.

75.     In a call on or about October 18, 2018, CW-1 discussed the SAT subject tests

with GREGORY ABBOTT. In the call, CW-1 advised GREGORY ABBOTT, in substance, that

"it was a good move" for him to pay $75,000 to have CW-2 take the exam for his daughter.

GREGORY ABBOTT then inquired how his daughter would have scored in the absence of cheating. The following is an excerpt from the call, which was consensually recorded.

GREGORY ABBOTT     Do you know how she did on her own?

CW-1     Do I know how she did on her own? Yeah, I do. She scored in the mid-600s.

GREGORY ABBOTT     Yeah.

76.     Ultimately, the ABBOTTS' daughter received a score of 800 out of a possible 800 on the math subject test and 710 on the literature subject test.

### D. I-HSIN "JOEY" CHEN

77.     Defendant I-HSIN "JOEY" CHEN is a resident of Newport Beach, California. CHEN operates a Torrance, California-based provider of warehousing and related services for the shipping industry.

78.     As set forth below, in or about April 2018, CHEN paid $75,000 to CW-1's for-profit entity, The Key, in exchange for which CW-1 arranged to have CW-2 purport to proctor CHEN's son's ACT, and correct his answers. As noted above, CHEN's son and the ABBOTTS' daughter both took the exam on the same day at the West Hollywood Test Center.

79.     On or about April 16, 2018, CHEN paid CW-1 $75,000 to participate in the cheating scheme. The money was deposited into The Key's bank account. CW-1 has advised law enforcement agents that he agreed to provide CHEN with an invoice falsely indicating that the payment was for "consulting" services for CHEN's business.

80.     CHEN's son scored a 33 out of a possible 36 on the ACT exam.

81.     In a call on or about October 23, 2018, CW-1, acting at the direction of law enforcement agents, told CHEN that CW-1's charitable foundation was being audited by the IRS. The following is an excerpt from the conversation, which was consensually recorded.

CW-1        And so they're looking at all the payments that have gone into our foundation.

CHEN        Uh-huh.

CW-1        So they asked about your payment, which was for [your son], you know, taking
            the test that we did for him at [the West Hollywood Test Center], with [CW-2] –

CHEN        Yeah.

CW-1        And I've said that your payment of $75,000--

CHEN        Uh-huh.

CW-1        --went to our foundation to help underserved kids.

CHEN        Uh-huh.

CW-1        Okay?

CHEN        Uh-huh.

     82.    Shortly after that call, CHEN called CW-1 back and said, in substance, that the

description on the invoice he had received from CW-1 said "consulting service."  CHEN asked,

"[W]hat should I say [if the IRS asks]-- consulting service or foundation?"  CW-1 replied,

"consulting services for the foundation."  CHEN responded, "Okay."

     83.    In a call on or about February 21, 2019, CW-1, acting at the direction of law

enforcement agents, told CHEN that the IRS audit had been completed.  The following is an

excerpt from the conversation, which was consensually recorded.

CW-1        I wanted to call you 'cause I called you before about our audit--

CHEN        Uh-huh.

CW-1        --and I wanted to let you know that our audit is over.

CHEN        Uh-huh.

CW-1        We're all okay. And we are okay because, so you, you're not, no issues with you.
            So nobody will be contacting you, okay?

| | |
|---|---|
| CHEN | Okay. |
| CW-1 | Because your-- the payment that you made, we created a fake consulting invoice that you paid that, instead of making a donation to our foundation. |
| CHEN | Uh-huh. |
| CW-1 | So there was no link, for the audit in our foundation, because we-- you paid the $75,000 to my for-profit company-- |
| CHEN | Uh-huh |
| CW-1 | --with a fake, with a fake consulting invoice. So that's-- that's why we're clear. |
| CHEN | Oh-huh, okay. |
| CW-1 | And then, the other thing is, they asked a question about [CW-2], who took the test for [your son], and Igor, who was the site coordinator, how come I paid them from the foundation at the same time that [your son] was taking the test-- |
| CHEN | Uh-huh. |
| CW-1 | --and since you paid the for-profit company the $75,000, there was no payment for the-- as a donation. |
| CHEN | Uh-huh. |
| CW-1 | And I think that we are past that. So that we both agree that [CW-2] took the test for [your son], right? |
| CHEN | Yeah. |
| CW-1 | And so everything should be fine so I just wanted to make sure that you're okay to know that the audit is over, and we should be in good shape. |
| CHEN | Oh, okay, sounds good. |

E.  ELIZABETH HENRIQUEZ and MANUEL HENRIQUEZ

84.     Defendants ELIZABETH HENRIQUEZ and MANUEL HENRIQUEZ, a married couple (together, the "HENRIQUEZES"), are residents of Atherton, California.  MANUEL HENRIQUEZ is the founder, chairman, and CEO of a publicly traded specialty finance company based in Palo Alto, California.

44

85.     As set forth below, the HENRIQUEZES participated in the college entrance exam cheating scheme, on four separate occasions, for their two daughters. In addition, the HENRIQUEZES conspired to bribe Gordon Ernst, the head tennis coach at Georgetown University, to designate their older daughter as a tennis recruit in order to facilitate her admission to Georgetown.[11]

86.     In or about the fall of 2015, the HENRIQUEZES paid CW-1 $25,000 to have CW-2 purport to proctor their older daughter's SAT exam, and correct her answers.

87.     On or about August 19, 2015, CW-1 e-mailed CW-2 a round-trip plane ticket from Tampa, Florida to San Francisco, California. CW-1 forwarded the ticket receipt to Steven Masera, his bookkeeper, with the instruction to bill the ticket to the "Henriquez account."[12]

88.     At or about the same time, CW-1 made arrangements for CW-2 to serve as an exam proctor at the private college preparatory school in Belmont, California, attended by the HENRIQUEZES' daughter. On or about September 19, 2015, CW-1 e-mailed CW-2: "You are going to receive an e-mail from the [high school guidance] counselor to tell you what to do with materials, et cetera ... before responding to her let me know so we can say the right thing."

89.     In a series of e-mails in late September, 2015, CW-2 explained to the HENRIQUEZES' daughter's high school counselor, in sum and substance, that he was willing to fly from Tampa to San Francisco to proctor the exam "because my wife has a new-born," noting, "I would really appreciate the opportunity to proctor the test because I'm applying to grad schools and I could quite frankly use the work." The counselor responded, "I have you set up to

---

[11] Ernst has been indicted by a federal grand jury in the District of Massachusetts on a charge of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).

[12] Masera has been indicted by a federal grand jury in the District of Massachusetts on a charge of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).

proctor and read for [the HENRIQUEZES' daughter] this coming Saturday, October 3rd at 8:00

a.m." CW-2 forwarded the e-mail to CW-1, who forwarded it to ELIZABETH HENRIQUEZ

with the note, "[CW-2] has the testing covered."

90.     On or about September 28, 2015, CW-1 directed Masera to bill the "parents 15k

that is to be written to [CW-1] and goes to my home or personal account. 10k to The Key for

Testing Support."

91.     On or about October 2, 2015, CW-2 flew to San Francisco. That same day,

ELIZABETH HENRIQUEZ e-mailed CW-2 directly to "touch base regarding Saturday am

plans." She arranged to meet CW-2 at her daughter's high school at 7:15 a.m. the next day.

92.     On or about October 3, 2015, CW-2 purported to proctor the exam for the

HENRIQUEZES' daughter at her school. According to CW-2, unbeknownst to the school, he

sat side-by-side with the daughter during the exam and provided her with answers to the exam

questions, and after the exam, he "gloated" with ELIZABETH HENRIQUEZ and her daughter

about the fact that they had cheated and gotten away with it.

93.     On or about October 20, 2015, CW-1 sent an e-mail instructing Masera to bill

$25,000 to the HENRIQUEZES, with $15,000 directed into CW-1's personal account. On

November 18, 2015, with the invoices still unpaid, CW-1 e-mailed ELIZABETH HENRIQUEZ

to inquire about the status of payment. ELIZABETH HENRIQUEZ responded: "Manuel set up

electronic checks when we first received the invoices. I will check with him."

94.     On or about November 24, 2015, the Henriquez Family Trust wired $15,000 to

CW-1's personal bank account and $10,000 to an account in the name of The Key. After

receiving the funds, CW-1 caused KWF to pay CW-2 a total of $10,000 in three separate

installments.