95.     The HENRIQUEZES' daughter received a score of 1900 out of a possible 2400 on the October 2015 test, an improvement of 320 points over the best score she had previously achieved taking the test legitimately.

96.     Thereafter, the HENRIQUEZES agreed with CW-1 to have CW-2 purport to proctor their younger daughter's ACT exam at the Houston Test Center.

97.     On or about August 10, 2016, the HENRIQUEZES' younger daughter received a letter from ACT, Inc. notifying her that her request for "extra time" on the exam had been granted.

98.     On or about September 13, 2016, ELIZABETH HENRIQUEZ e-mailed a counselor at her daughter's high school falsely stating, in substance, that her daughter wanted to take the ACT on October 22, 2016, but that "we have to be in Houston" on that date.  The e-mail continued: "Through connections there, we have been able to secure a site and a proctor to test [my daughter] for the two days."  The counselor responded, "No worries – thank you for letting me know."  ELIZABETH HENRIQUEZ forwarded the e-mail exchange to CW-1.

99.     CW-2 flew from Tampa to Houston for the exam, which occurred on or about October 22, 2016.  CW-2 purported to proctor the exam for the HENRIQUEZES' daughter and another student.  CW-2 has advised law enforcement agents, in substance, that he discussed the answers during the exam with the two students, but directed them each to answer different questions incorrectly in an effort to conceal their cheating from ACT, Inc.

100.    The younger HENRIQUEZ daughter ultimately received a score of 30 out of a possible 36 on the exam.  On or about October 24, 2016, CW-1 paid $50,000 to Martin Fox, who introduced CW-1 to Niki Williams, the administrator of the Houston Test Center.  CW-1 has

advised law enforcement agents that his understanding was that part of this money would be used to pay Williams. On or about October 31, 2016, CW-1 paid CW-2 $20,000.

101.    CW-1 initially e-mailed Masera instructions to invoice MANUEL HENRIQUEZ and another parent $75,000 each for the ACT scheme. CW-1 has advised law enforcement agents, however, that in lieu of paying for the cheating, MANUEL HENRIQUEZ agreed to use his influence at Northeastern University, in Boston, Massachusetts—where he is an alumnus and former member of the Northeastern University Corporation, one of the university's governing bodies—to help CW-1 secure the admission of an applicant to that school.

102.    In an e-mail exchange on or about October 20, 2016, CW-1 sent MANUEL HENRIQUEZ a copy of the Northeastern applicant's college entrance exam scores and application. MANUEL HENRIQUEZ responded, "Thank you and I will reach out Monday." Two days later, CW-1 e-mailed Masera instructions not to invoice MANUEL HENRIQUEZ, noting: "There will be a hold on Henriquez. I am doing a deal with them – tell you soon."

103.    On or about October 26, 2016, in an e-mail to a senior development officer at Northeastern University, MANUEL HENRIQUEZ described the Northeastern applicant as an "excellent candidate for the College of Social Sciences and Humanities." MANUEL HENRIQUEZ then e-mailed CW-1: "Just confirmed with the university, have [the applicant] file [early decision] normal channels to get into the systems and make sure his application is complete. Then the folks I connected will flag it."

104.    On or about November 1, 2016, MANUEL HENRIQUEZ met with the applicant in Atherton, California, and thereafter relayed details about the meeting to his contact at Northeastern. MANUEL HENRIQUEZ then followed up with CW-1: "I liked him very much,

and just informed the school according[ly]. It is now in their hands, and they understand he is looking for [early decision], and I will reinforce early next week."

105.    MANUEL HENRIQUEZ repeatedly followed up with Northeastern officials in Boston about the applicant's candidacy. The student was ultimately admitted to Northeastern. The applicant's parents paid CW-1 $250,000 after he was admitted.

106.    According to CW-1, in or about 2017, CW-1 met with the HENRIQUEZES at their home, where they paid him between $25,000 and $30,000 in cash to arrange for a third party ("Proctor 2") to facilitate cheating on three SAT subject tests and the ACT for their younger daughter.[13]

107.    On or about April 24, 2017, CW-1 e-mailed Proctor 2: "I have an opportunity over two days over two weeks for you in June. If interested please call me."

108.    In or about May 2017, CW-1 exchanged multiple e-mails with Dvorskiy about moving the HENRIQUEZES' younger daughter's SAT subject tests and ACT to the West Hollywood Test Center. ELIZABETH HENRIQUEZ e-mailed CW-1 that she would give her daughter's school a "heads up re test center change."

109.    CW-1 purchased tickets for Proctor 2 to fly from San Jose, California to Los Angeles for the exam on or about June 2, 2017, and to return to San Jose the next day.

110.    The HENRIQUEZES' daughter took the SAT subject tests at the West Hollywood Test Center, with Proctor 2 purporting to proctor the exams. As set forth below, Proctor 2 later told CW-1 that he provided her with answers to certain exam questions.

---

[13] CW-1 and CW-2 have advised law enforcement agents that CW-1 relied on Proctor 2 for the exam because CW-2 was already purporting to proctor exams for two other students at the same time, and because Proctor 2 was less expensive than CW-2.

111.    On or about June 5, 2017, CW-1 mailed Dvorskiy a check for $40,000, drawn on one of the KWF charitable accounts.  On or about June 3, 2017, CW-1 mailed Proctor 2 a check for $2,000.

112.    The following weekend, Proctor 2 again flew from San Jose to Los Angeles and purported to proctor the ACT exam for the HENRIQUEZES' daughter at the West Hollywood Test Center.

113.    After the exams, CW-1 mailed Proctor 2 a check for $4,000.

114.    The HENRIQUEZES' daughter received a score of 33 out of a possible 36 on the ACT, and scores of 720, 740, and 770 out of a possible 800 on the SAT subject tests for math, Spanish, and history, respectively.

115.    In addition to cheating on the ACT and SAT exams, the HENRIQUEZES agreed with CW-1 to bribe Ernst, the head tennis coach at Georgetown, to designate their older daughter as a recruited athlete, in order to facilitate her admission to the university.

116.    As part of that scheme, on or about August 19, 2015, CW-1 e-mailed ELIZABETH HENRIQUEZ and her daughter, directing them to send an e-mail with a "PDF of subject tests and transcript to Gordie Ernst at Georgetown using my message asap thanks." Accompanying the e-mail was a message CW-1 had drafted for the HENRIQUEZES' daughter to send to Ernst in her own name, stating, among other things: "I have been really successful this summer playing tennis around the country.  I am looking forward to having a chance to be part of the Georgetown tennis team and make a positive contribution to your team's success."  CW-1 has advised investigators that the information in the note was fabricated.

117.    ELIZABETH HENRIQUEZ replied to CW-1's message that her daughter was "on it." The next day, the HENRIQUEZES' daughter sent CW-1's message to Ernst, who forwarded it to an admissions officer with the note: "Potential spot."

118.    On or about August 24, 2015, CW-1 circulated to ELIZABETH HENRIQUEZ and her daughter a draft application essay. The essay included no mention of tennis. Two days later, CW-1 e-mailed ELIZABETH HENRIQUEZ and her daughter again, advising that he was going to change the essay to "talk about tennis." The final essay submitted to Georgetown falsely stated: "[B]eing a part of Georgetown women's tennis team has always been a dream of mine. For years I have spent three – four hours a day grinding out on and off court workouts with the hopes of becoming successful enough to play college tennis especially at Georgetown. What is most amazing is how quickly I connected with Coach Ernst. He spent time with me while on campus and at several tournaments I played in."

119.    On or about October 22, 2015, the HENRIQUEZES' daughter e-mailed Ernst her fraudulently obtained SAT scores.

120.    The HENRIQUEZES' daughter's application was submitted to Georgetown on or about October 25, 2015. In addition to the falsified essay, the application falsely indicated that she played "club tennis" all through high school for 20 hours per week and 52 weeks per year, and listed her as having a "Top 50 ranking" in the United States Tennis Association ("USTA") Junior Girls Tennis for her sophomore through senior years of high school, and as being on the USTA All-Academic Team for tennis for her junior and senior years. In fact, records obtained from the USTA do not show that she played at any USTA tournaments in high school.[14]

---

[14] At her best, she appears to have ranked 207th in Northern California in the under-12 girls division, with an overall win/loss record of 2-8.

121. On or about November 6, 2015—less than two weeks after submitting her application—the HENRIQUEZES' daughter received a letter from Georgetown indicating that the university had "conducted an initial review of [her] application to the Class of 2019 at the request of Mr. Gordie Ernst, tennis coach," and that her admission was "likely." The HENRIQUEZES' daughter was ultimately offered admission to Georgetown the following spring.

122. On or about May 4, 2016, the Henriquez Family Trust made a purported contribution of $400,000 to KWF. On or about May 9, 2016, CW-1 caused a donation receipt letter to be sent to ELIZABETH HENRIQUEZ stating that the gift would "allow us to move forward with our plans to provide educational and self-enrichment programs to disadvantaged youth." The letter falsely stated that "no goods or services were exchanged" for the money.

123. Between approximately September 11, 2015 and November 30, 2016, KWF paid Ernst $950,000. CW-1 has advised that these payments were made in exchange for Ernst's designation of the HENRIQUEZES' daughter and several other students as purported tennis recruits, in order to facilitate their admission to Georgetown.

124. On or about October 24, 2018, CW-1 called ELIZABETH HENRIQUEZ at the direction of law enforcement agents and told her that KWF was being audited by the IRS. The following is an excerpt from the call, which was consensually recorded.

| CW-1 | Well, the reason I'm callin' is-- So I'm in Boston now. And I just wanted to let you know that-- |
| --- | --- |
| E. HENRIQUEZ | You-- well, first of all, you didn't-- sayin' it right.   Boston. Yeah. |
| CW-1 | Okay.  Excuse me.  So my-- so my foundation is getting audited now. |
| E. HENRIQUEZ | Oh. |
| CW-1 | Uh-- |

| | |
|---|---|
| E. HENRIQUEZ | Well, that sucks. |
| CW-1 | Right.  And they're going back, like they always do. |
| E. HENRIQUEZ | Yeah. |
| CW-1 | Pretty normal. So they're taking a look at all my payments. So they asked me about the large sums of money that came in from you guys. |
| E. HENRIQUEZ | Okay. |
| CW-1 | And so, essentially-- |
| E. HENRIQUEZ | For all the good deeds that you do. |
| CW-1 | Absolutely. So, of course, I didn't say anything-- you know, I'm not gonna tell the IRS that, you know, [CW-2] took the test for [your eldest daughter] or that Gordie-- |
| E. HENRIQUEZ | Right.  Yeah. |
| CW-1 | --or that Gordie-- you know, we paid-- |
| E. HENRIQUEZ | Like-- Yeah. |
| CW-1 | --Gordie to help her get into Georgetown, right? |
| E. HENRIQUEZ | Right. |
| CW-1 | So I just want to make sure that you and I are on the same page-- |
| E. HENRIQUEZ | Okay. |
| CW-1 | --in case they were to call. |
| E. HENRIQUEZ | So what's your story? |
| CW-1 | So my story is, essentially, that you gave your money to our foundation to help underserved kids. |
| E. HENRIQUEZ | You-- Of course. |
| CW-1 | And-- |

E. HENRIQUEZ          Those kids have to go to school.

CW-1                  Absolutely.

125.    In a call on or about November 5, 2018, CW-1 and ELIZABETH HENRIQUEZ

discussed the ACT that the HENRIQUEZES' younger daughter took in 2016 at the Houston Test

Center and the multiple exams she took in June 2017 at the West Hollywood Test Center.  The

following is an excerpt from the conversation, which was consensually recorded.

CW-1                  Okay.  So, essentially [your younger daughter] came to Houston in
                      October to ta-- in 2016 to take her tests with [CW-2]--

E. HENRIQUEZ          Right.

CW-1                  --and then I have it again that she-- in 2017, in June, we took it in L.A.
                      because-- and it's like-- and I don't under-- and I'm trying to figure out
                      wh-- what happened there because there's money that went in my
                      foundation and then there's also a seven-- like a $75,000 credit. I think
                      that's when Manuel helped [the Northeastern applicant] get in
                      Northeastern, but I'm--

E. HENRIQUEZ          Right.  I don't know that deal a whole-- 100%. I know there was a deal
                      you guys talked about but--

CW-1                  Ri--

E. HENRIQUEZ          Yeah.  So I think that that was it because-- right. And that went against the
                      June one in L.A., which wasn't [CW-2]. It was obviously the other
                      situation.

CW-1                  Okay, Okay. All right. And so--

E. HENRIQUEZ          So we didn't have [CW-2] for that. We had-- oh-- we had what's his face
                      [Proctor 2]. Uh--

CW-1                  But it was an ACT test.

E. HENRIQUEZ          Right.

CW-1                  Wasn't it?

E. HENRIQUEZ          He did it again.

| | |
|---|---|
| CW-1 | Oh, we did it again. |
| E. HENRIQUEZ | Remember the first one was-- no, actually, those-- remember those were subject tests, as well. |
| CW-1 | But they couldn't have been because—because in June-- so was June the subject test? |
| E. HENRIQUEZ | Yeah.  Those are the subject tests they take after they get out. Remember there was a-- it-- what did she take?   English, history. |
| CW-1 | Okay. |
| E. HENRIQUEZ | There was a-- there was a math one because I know that-- that was one we really need-- it was like math B or II or whatever you call it. And then she also did Spanish, some Spanish and some English or history or something. Shit, I don't remember. Getting confused between subject tests and AP tests. |
| CW-1 | Yeah, because-- okay.  Because-- |
| E. HENRIQUEZ | See, can I just looked back at her ACT stuff and get back to you? Like I-- I can look back in her file or just-- I can just ask. |
| CW-1 | Okay, that would be great. That would be great. And then-- yeah, because I think that's-- |
| E. HENRIQUEZ | I think that's when he went back down in June.  I don't think it was another ACT.  We stuck with the ACT. |
| CW-1 | In October. |
| E. HENRIQUEZ | Had, I think. Yeah. |
| CW-1 | Okay. So why-- if you could go back and check that would be great. |
| E. HENRIQUEZ | Yeah, that was subject test.  I'm almost positive that was-- that was-- because that would be the time of year that would be. |
| CW-1 | Right.  That's what I thought. That's what I thought. But it looks like the date was on an ACT date but I don't know that. So if you could check that would be great. |
| E. HENRIQUEZ | Yeah.  So I will get back to you on that one.  I'll-- I'll-- I can ask [my younger daughter]. She definitely will remember. |

CW-1            Okay.

E. HENRIQUEZ    Do you want--

CW-1            And then I know the first one was the-- in Houston. [CW-2] was there.
                Okay. So that's what I needed to know. Okay.

E. HENRIQUEZ    Yeah, that was easy.   That one I totally remember.

126.    ELIZABETH HENRIQUEZ later called CW-1 back to advise him, in substance,

that she had checked with her daughter and that CW-2 had purported to proctor the ACT exam in

Houston and that Proctor 2 had purported to proctor the exams at the West Hollywood Test

Center.

127.    Thereafter, CW-1, at the direction of law enforcement agents, called Proctor 2.   In

the call, which was consensually recorded, Proctor 2 confirmed that he had proctored the SAT

subject tests for the HENRIQUEZES' daughter in Los Angeles, that he had been paid $2,000 for

doing so, and that he had answered questions for her during the exams.

128.    On or about January 27, 2019, CW-1, acting at the direction of law enforcement

agents, met with both MANUEL HENRIQUEZ and ELIZABETH HENRIQUEZ at their home

in Atherton, California.   In the meeting, CW-1 told the HENRIQUEZES that Williams, the

Houston test administrator, had been subpoenaed to testify before a grand jury in Boston about

students from out-of-state, including their daughter, who had flown to Houston to take the ACT

in 2016.   The HENRIQUEZES first discussed, in substance, what excuse they could offer about

why their daughter had taken the exam in Houston, given that they live near San Francisco.   CW-

1 then told the HENRIQUEZES that there was no "paper trail" of money for that exam, due to

the fact that MANUEL HENRIQUEZ had agreed to help the Northeastern applicant gain

admission to that university.   The following is an excerpt from the conversation, which was

consensually recorded.

56

| M. HENRIQUEZ | Okay. So why did [my daughter] do the test there [Houston]? So we gotta get into that story. |
| --- | --- |
| CW-1 | So-- so lemme, go into that.   So you're right. That's-- that's part of it, right? So Niki said to me, "Don't worry about it. You know, these are the outta-state kids. Essentially, there's nowhere where anybody knows--" Because in my books, it doesn't show that there was any money paid for [CW-2] helping [your daughter] do the test. Okay? So there's nothing-- Because we did the deal with [the Northeastern applicant]. So [it] doesn't show anything at all, in our foundation or anything, just so you know. |
| E. HENRIQUEZ | So there's no paper trail of money? |
| CW-1 | There's no paper trail of money. Okay? 'Cause remember we did that? And you helped? So. |
| M. HENRIQUEZ | Right. |

129.   Later in the conversation, MANUEL HENRIQUEZ told CW-1 that if anyone

asked about the testing, he would not answer them.

| M. HENRIQUEZ | So-- Well, the-- the question is that, anybody calls me, the response is that "I'm not gonna comment regarding my daughter's Houston issue," on simply getting a phone call from somebody. Uh-- |
| --- | --- |
| E. HENRIQUEZ | Well, remember she went there because she needed special-- |
| M.HENRIQUEZ | I understand. |
| CW-1 | Accommodations. |
| E. HENRIQUEZ | Accommodations. |
| M. HENRIQUEZ | But I'm not gonna comment.  We gotta be very careful-- |
| E. HENRIQUEZ | Yeah. |
| M. HENRIQUEZ | --on just getting an inbound call from somebody. "I have no idea who you are. So I'm not responding to an inbound call from anybody." |

### F.  WILLIAM E. McGLASHAN, Jr.

130.    Defendant WILLIAM E. McGLASHAN, Jr. is a resident of Mill Valley, California.  McGLASHAN is a senior executive at a global private equity firm.

131.    As set forth below, McGLASHAN participated in both the college entrance exam cheating scheme and the college recruitement scheme, including by conspiring to bribe Donna Heinel, the senior associate athletic director at the University of Southern California ("USC"), to facilitate his son's admission to USC as a recruited athlete.[15]

132.    CW-1 has advised law enforcement agents that McGLASHAN agreed to make a purported donation of $50,000 to KWF, with the understanding that CW-1 would arrange for CW-2 to serve as a purported proctor for McGLASHAN's son's ACT exam at a test center that CW-1 "controlled," and that CW-2 would, in exchange for money, correct his son's answers after the test was completed.

133.    On or about November 20, 2017, McGLASHAN's assistant sent CW-1 an e-mail attaching a "Request for Arranged Testing" form for the ACT, requesting that McGLASHAN's son be permitted to take the ACT at the West Hollywood Test Center instead of at his own high school in Marin County, California.  CW-1 forwarded the form to Dvorskiy, who completed required portions and sent it back to CW-1.  CW-1, in turn, forwarded the forms back to McGLASHAN, noting, "Bill the forms are attached.  Please send into ACT."

134.    On or about November 30, 2017, Masera e-mailed McGLASHAN an invoice for "payment regarding [the West Hollywood Test Center].  You are welcome to wire the funds or remit a check."

---

[15] Heinel has been indicted by a federal grand jury in the District of Massachusetts on a charge of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).

135.    On or about December 6, 2017, three days before the ACT exam, McGLASHAN made a purported donation of $50,000 to the KWF charity from his personal charitable donation fund.

136.    On or about December 8, 2017, CW-2 traveled to Los Angeles from Tampa to proctor the test for McGLASHAN's son and two other individuals on December 9, 2017. CW-2 has advised investigators that, while at the West Hollywood Test Center, he met McGLASHAN, and that after McGLASHAN's son completed the exam, CW-2 corrected his answers. CW-2 returned to Tampa on or about December 10, 2017.

137.    I have reviewed historical cell site data obtained through a Court-authorized search warrant for phones used by both McGLASHAN and his son. The records indicate that on the evening of December 8, 2017, both telephones traveled from the San Francisco area to Los Angeles. At approximately 7:30 a.m. on the morning of December 9, 2017, both telephones hit off cellular towers near the West Hollywood Test Center. Shortly after 3:00 p.m., both phones left Los Angeles and returned to the San Francisco area, where they remained for the rest of that evening and the next day.

138.    After administering ACT exams, Dvorskiy returned the testing materials to ACT, Inc., together with a form called an "ACT Administration and Payment Report – Special Testing." The form showed that McGLASHAN's son took the English and math sections on December 9, 2017, and the reading, writing and science sections on December 10, 2017, all at the West Hollywood Test Center. Accordingly, while the records Dvorskiy provided to ACT, Inc. showed McGLASHAN's son taking the exam in Los Angeles on December 10, 2017, cell site records indicate that McGLASHAN's son was hundreds of miles away, in Marin County, at that time.

59

139.    On or about December 19, 2017, CW-1 caused KWF to pay Dvorskiy $40,000, and on or about December 27, 2017, CW-1 caused KWF to pay CW-2 $35,000.

140.    McGLASHAN's son received a score of 34 out of a possible 36 on the exam.[16]

141.    On or about July 30, 2018, CW-1 and McGLASHAN discussed repeating the ACT cheating scheme for McGLASHAN's two younger children, and the need to obtain extended time on the exam in order to facilitate the scheme. The following is an excerpt from the conversation, which was intercepted pursuant to a Court-authorized wiretap.

| McGLASHAN | One other, just family question, with [my younger son] now entering his sophomore year, and sort of, the process is beginning, we have him on time and a half. I told [my spouse] yesterday, and [my daughter] by the way, who is the, who I think is the one who needs the most time, has no extra time currently. And [my spouse] is talking to the doctor that assessed them, to get her to ask, to request time for [my daughter]. I told her she should be requesting double time for all of them. |
|---|---|
| CW-1 | 100% multiple days. No matter what, multiple days. So, even if it's 50%, time and a half, multiple days. |
| McGLASHAN | So is that a different ask to get multiple days versus-- |
| CW-1 | Well the 100%. |
| McGLASHAN | And if they get time and a half, can they use your facility to take the test? |
| CW-1 | No, not unless it's multiple days. |
| McGLASHAN | So as long as it's multiple days, we're in. |
| CW-1 | Correct, correct. Like it could be-- |
| McGLASHAN | And they, that's a separate filing? |
| CW-1 | Overall it's the same. Well, so, you're saying [your younger son's] got a, time and a half? |
| McGLASHAN | Yeah. |

---

[16] On or about October 22, 2018, McGLASHAN's son submitted that fraudulently obtained score as part of his application to Northeastern University in Boston.

| | |
|---|---|
| CW-1 | So, what has to happen, is there has to be an appeal to get the multiple days. The doc's got to come up with stuff, discrepancies, to show why he needs multiple days. That he can't sit six and a half hours taking one test. |
| McGLASHAN | Perfect. |
| CW-1 | And so if he gets multiple days, then I can control the center. |
| McGLASHAN | Thank you. |
| CW-1 | Yes. |
| McGLASHAN | And then what about-- If you get a, if you get double time, you automatically get multiple days? |
| CW-1 | Automatically, yes. |
| McGLASHAN | Oh, so it's either multiple days with 1.5, or double, two times time? |
| CW-1 | Correct. |
| McGLASHAN | Got it, okay, I'll make sure [my spouse] goes to work. |
| CW-1 | And we don't care if it's SAT or ACT. |
| McGLASHAN | Yup, yup. |
| CW-1 | Because we're just going to take it one time and be done anyway. |

142. On the same call, CW-1 described the college recruitment scheme to McGLASHAN, which CW-1 referred to as "the side door." CW-1 told McGLASHAN that the scheme could enable McGLASHAN's older son to receive a letter of admission to USC—where McGLASHAN said his son hoped to attend the Jimmy Iovine and Andre Young Academy, a specialty program in arts, technology and business—"before he even applies," as set forth in the excerpt below.

| | |
|---|---|
| CW-1 | Sure, so, so, in this path, you'd pay 250. You'd get accepted. Let me get his stuff and I'll take it to them. If they [USC] can accept him in the fall. |
| McGLASHAN | Yup. |
| CW-1 | He may be-- It may be before he even applies. |

| McGLASHAN | See, that would be great. |
|---|---|
| CW-1 | Right. |
| McGLASHAN | I would do that in a heartbeat. |
| CW-1 | Right, and then you get this unofficial, official letter. |
| McGLASHAN | Now does he, here's the only question, does he know? Is there a way to do it in a way that he doesn't know that happened? |
| CW-1 | Oh yeah. Oh he-- |
| McGLASHAN | Great. |
| CW-1 | What he would know is, that I'm going to take his stuff, and I'm going to get him some help, okay? |
| McGLASHAN | So that, that he would have no issue with. You lobbying for him. You helping use your network. No issue. |
| CW-1 | That letter, that letter comes to you. |
| McGLASHAN | Yup. |
| CW-1 | So, my families want to know this is done. |
| McGLASHAN | Yup. |
| CW-1 | Right, so they want this letter to come to them, so I have them, I have admissions, and that's why I extend the letter to you, you hold it. |
| McGLASHAN | Right. |
| CW-1 | You don't have to tell him a thing. |
| McGLASHAN | Yup. |
| CW-1 | At that, at that point, that, as soon as you get that letter, then they expect just a $50,000 check, and it goes to Women's Athletics. |
| McGLASHAN | Great. |
| CW-1 | And then the other 200 comes in March, after you get your official, official letter, but the letter you're actually getting [in the fall] is the same letter you're getting in March. |
| McGLASHAN | I love it. |

143.    CW-1 went on in the same call to explain that in order to take advantage of the

"side door," CW-1 would need to create a fake athletic profile for McGLASHAN's son, which

he said he had done "a million times" for other families.  CW-1 explained, in substance, that the

fake profile would allow McGLASHAN's son to be admitted to USC as a recruited athlete, as set

forth in the excerpt below.

| | |
|---|---|
| CW-1 | I have to do a profile for him in a sport, which is fine, I'll create it.  You know, I just need him-- I'll pick a sport and we'll do a picture of him, or he can, we'll put his face on the picture whatever.  Just so that he plays whatever.  I've already done that a million times.  So-- |
| McGLASHAN | Well, we have images of him in lacrosse.  I don't know if that matters. |
| CW-1 | They don't have a lacrosse team.  But as long as I can see him doing something, that would be fine. |
| McGLASHAN | Yeah. |
| CW-1 | And then what happens is, then what you have to do, because this would be a specialty program, is that you have to then talk to the department and say, "Hey listen, can you take him in the department?  We've gotten him accepted into the university." |
| McGLASHAN | Yup.  Well I can handle, I think I, I mean, I'll know after this lunch.  I think I can handle them at Iovine and Young. |
| CW-1 | Right. |
| McGLASHAN | Yeah.  Which is where he really wants to go. |
| CW-1 | Right.  So you're saying, "Hey listen, I think I can get him into this school." |
| McGLASHAN | Yup. |
| CW-1 | Now, now, can you, 'cause they're going to come to you and say, this is a selective program, would you want this kid?  And he's quote an "athlete" who's coming to you.  In fact, would you take him?  And the department says yes. |
| McGLASHAN | Now, would he see that, 'cause that, he's going to be fairly well seen at the school, because half the board knows me, and I'm going to be sort of |

> calling in and asking people to help, you know [Board Member 1] and [Board Member 2], and all those guys?

CW-1      But, so-- what I would suggest is, have you called them? Any of them yet?

McGLASHAN      No.

CW-1      Good, don't.

McGLASHAN      Okay.

CW-1      Because you don't need, because when this, the way this, the quieter it, the quieter this is, the better it is, so people don't say, "Well, okay, this guy, why are all these people calling us? The kid's already been accepted. He's coming here as an athlete. He's already in." What you just want is, the person you're meeting with on Friday to say, you know, what we want [is] this kid.

McGLASHAN      So he doesn't have to know how he got in. Is that the case?

CW-1      What I would say to him, if you want to have that discussion now with [your son] there, that we have friends in athletics, they are going to help us, because [he] is an athlete, and they're going to help us. From the--

McGLASHAN      But I can't say that in front of [my son], 'cause he knows he's not.

CW-1      No, no, right.

McGLASHAN      Yeah.

CW-1      And just say, you know what, we're going to get, we're going to get some, we're going to get people to help us.

McGLASHAN      Why wouldn't, why wouldn't I say, "Look, leave it to me to worry about getting him in, 'cause I have a lot of friends involved in the school."

CW-1      Perfect, perfect.

     144.     CW-1 continued in the call to explain how the "side door" scheme worked, as set forth in the excerpt below.

CW-1      What is going to happen when they see his application, he'll be flagged as an athlete.

McGLASHAN      Okay.

| CW-1 | But once he gets, once he gets here, he just goes, he doesn't go to the athletic orientation. He goes to the regular orientation like all my other kids just did. They all got home, and everything's fine. The issue is the specialty program. And he could do-- |
|---|---|
| McGLASHAN | So how does he-- just as a, just as a, just as this plays out, my worry on this is, [my son] starts getting letters at home from the athletics program and-- |
| CW-1 | He won't. |
| McGLASHAN | Okay. |
| CW-1 | He won't. What he will get in the summer is a letter saying come to the athletic orientation. Okay, but here's what I would-- |
| McGLASHAN | What, yeah, what do we do about that? |
| CW-1 | Here's what I would do. I would just tell him. I would tell him, "Listen I got lots of friends in athletics. You're an athlete kind of guy, and my friends in athletics are going to help you. So I'm letting you know. They're going to help you get in. Because they have the easiest way in. And, all the coaches, I'm friends with all the coaches. So, they're going to help you get in." And, but maybe here's a better idea. Maybe this is a better idea. We go this path. You work with the dean, but, but, how, how would you feel about, if you already know that he's going to get into the program, but we apply to letters and sciences as a regular student? |
| McGLASHAN | Yup. |

145.    McGLASHAN and CW-1 continued to have additional telephone discussions about the "side door" scheme throughout August 2018, not just with respect to USC but also with respect to Stanford University. The conversations were intercepted pursuant to a Court-authorized wiretap. On or about August 22, 2018, CW-1 left McGLASHAN a voicemail message explaining, in substance, that CW-1 would create a fake football profile using Photoshop software, which would allow McGLASHAN's son to be admitted as a purported football recruit.

| CW-1 | Hey Bill, so we're gonna-- met with [USC], because the [high school your son attends] does not have a football team, I'm gonna make him a kicker/punter and they're gonna walk him through with football, and I'll |

65

get a picture and figure out how to Photoshop and stuff, so it looks like it and the guy who runs the biggest kicking camp is a good friend, so we'll put a bunch of stuff about that on his profile, and we should be in pretty good shape to get that done. It's just a matter of, when I get the profile done, get it to them and figure out when they're gonna have a sub-committee meeting, so I'll let you know. Stanford said no, too tough, grades too low, just don't want to make that an exception right now for him. So I wanted you to know that as well, and then I think I'm seeing you next Tuesday, so if there's anything you need from me just let me know. See ya. Bye-bye.

146.    A few minutes later, McGLASHAN returned CW-1's phone call. The following

is an excerpt from the conversation.

| McGLASHAN | [CW-1]. |
|---|---|
| CW-1 | Hey, so you got an NFL punter huh? |
| McGLASHAN | You there [CW-1]? |
| CW-1 | Yes. |
| McGLASHAN | Oh there you are, perfect. Lost ya. |
| CW-1 | You got an NFL punter? |
| McGLASHAN | I did. That's just totally hilarious. So he-- so this is for, so, the one part you were garbled at the beginning is, the school doesn't have a football team, meaning, obviously [USC] does. What does that mean? |
| CW-1 | Your high school. |
| McGLASHAN | Oh, the high school. Yes, of course. Got it. |
| CW-1 | So they asked me, "What sport could we put him through?" And I said, "Well, I don't want, you know," 'cause your school doesn't have football it's easy, because I can say, because they have all these kicking camps and these kickers always get picked up outside of the school-- |
| McGLASHAN | Yeah perfect.  Perfect. |
| CW-1 | So I'm gonna make him a kicker. |
| McGLASHAN | (laughs) He does have really strong legs. |
| CW-1 | (laughs) Well, this will be for-- this will be good for one of the-- |

| | |
|---|---|
| McGLASHAN | Maybe he'll-- maybe he'll become a kicker. You never know. |
| CW-1 | Yeah! Absolutely. |
| McGLASHAN | You could inspire him, [CW-1]. You may actually turn him into something. I love it. |
| CW-1 | I know. Well I had a boy last year, I made him a long snapper. And-- |
| McGLASHAN | I love it. |
| CW-1 | --he was 145 pounds.  Long snapper.  So-- |
| McGLASHAN | I love it. I love it. That is so funny. So, so, and then, just remind me again, we get all these done and the, the obvious deal you and I talked about, the 50K and the 200K.  And-- and then, do we know he's in?  You and I at least know he's in? |
| CW-1 | Yeah, yeah. Because when he gets in, they'll send me a letter which will be the, and-- |
| McGLASHAN | Yup. |
| CW-1 | The same letter that he's going to get later on. |
| McGLASHAN | Yup. |
| CW-1 | But it'll just be in your hands. It's always-- |
| McGLASHAN | Perfect |
| CW-1 | For the parents to know that everything's cool. |

147.    CW-1 went on in the call to tell McGLASHAN, in substance, that if they could get his son accepted to USC as a fake "kicker" or "punter," his odds of admission would jump to 90 percent, as set forth in the excerpt below.

| | |
|---|---|
| CW-1 | So, you know, essentially she [Heinel] told me when I get all the paperwork together, and I gotta create this profile pic. So what I'll probably need, if you guys have any pictures of him playing multiple sports, or something where you can kind of see his face a little bit in action? |
| McGLASHAN | Umm.  Hmm. |

| | |
|---|---|
| CW-1 | It would be helpful because I will Photoshop him onto a kicker. |
| McGLASHAN | (laughs) Okay. Okay. Let me look through what I have. Pretty funny. The way the world works these days is unbelievable. |
| CW-1 | It's totally cra-- like, last year I had a boy who did the water polo, and when the dad sent me the picture, he was way too high out of the water. That nobody would believe that anybody could get that high. |
| McGLASHAN | Yeah-- |
| CW-1 | So I told that dad, I said, "What happened?" He said he was standing on the bottom! I said, "No no no no no." |
| McGLASHAN | Yeah exactly. You gotta be swimming. Exactly. |
| CW-1 | That's right. |
| McGLASHAN | That's funny. That's great. Okay, well yeah, it's too bad that she doesn't have a lacrosse program with scholarship positions. That'd be easy. |
| CW-1 | I know. It'd be much easier. But she said, "That's cool, let's do it that way." So, that's the path we're gonna go. |
| McGLASHAN | Okay perfect. And then what are your sense of the odds at this point if we, once you get the package in and everything? |
| CW-1 | 90 percent. |
| McGLASHAN | Okay. Great. Great. Well, I'll get you some photos and obviously I'll see you on the broader, the other matters on Tuesday on the business matters. And, and I'm gonna keep pushing him on the, on the, you know, the pitch. |
| CW-1 | Good. |

148.    On or about August 30, 2018, CW-1 received a call from AGUSTIN F. HUNEEUS, whose daughter attended the same high school as McGLASHAN's son. HUNEEUS asked if "McGLASHAN [is] doing any of this shit? Is he talking a clean game with me and helping his kid or not? 'Cause he makes me feel guilty." HUNEEUS explained, in substance, that McGLASHAN's "kid had no idea … that you helped him on the ACT." HUNEEUS noted: "And the way, kinda Bill McGLASHAN laid it out, which I know is not true, is he-- he laid it

68

out and he said, 'Look, I'm gonna push, I'm gonna prod, I'm gonna use my relationships, but

I'm not gonna go and pay to get my kid in.' And that's kinda how he drew the line."

149.    On or about September 1, 2018, CW-1 spoke with McGLASHAN about, among

other things, his conversation with HUNEEUS. The following is an excerpt from the call.

| | |
|---|---|
| CW-1 | Your guy AGUSTIN. |
| McGLASHAN | AGUSTIN HUNEEUS, yeah. |
| CW-1 | He is pushing hard on trying to find out your guys' approach with [your son]. He came to me and I said I did not, I was not willing to talk to him about it. |
| CW-1 | Right. |
| McGLASHAN | And sort of wants the, he obviously wants to get your help, you know, with his daughter, and I just said, "Look, you gotta make your own call what you want to do." I said, "You just need to talk to [CW-1] and work with [CW-1]," not knowing, A, what you want to do with him or B, not wanting HUNEEUS to frankly be in our family business. So I did not. |
| CW-1 | No that's good. He was pushing hard, like, "You gotta tell me what they're doing." And I said, "Listen, that's their situation and you know Bill's very connected, and you need to discuss it with Bill, not discuss it with me." |
| McGLASHAN | Well he tried that, he tried that, and just so you know, he had a conversation with another family and sort of started talking about the side door approach you have, and was sort of suggesting, "Do you think this is right and dut duh duh." And I made the comment to him, "You know, HUNEEUS, you shouldn't be talking about that. You know, what [CW-1] does is very specific to circumstances, and you think of it as, he's the best coach you could ever have as a kid, trying to figure out where to go to school, 'cause he helps kids get into the right school etcetera, etcetera." But it just bothered me he was out talking about it. |
| CW-1 | Agreed, agreed yeah. And that's what, and that worries me too. |
| McGLASHAN | Yup. |
| CW-1 | So I said, "Listen, you are in a very competitive environment. You gotta keep what you do to yourself." |
| McGLASHAN | Yup, yup. |

CW-1            It will blow up on you, no matter who you think you know, it doesn't
                matter.

McGLASHAN       That's right, yeah, so he's not discreet at all.  So that's why I wasn't
                comfortable saying it to him.

CW-1            Good.

150.    As noted above, after CW-1 was approached by law enforcement agents in or about September 2018 and began cooperating with the government's investigation, he secretly approached several subjects of the investigation, including McGLASHAN, and warned them about the investigation.  CW-1 subsequently advised investigators that he called McGLASHAN and told him, in substance, that he needed to meet with him in person at the Santa Monica airport because he believed his phone was "wired."  CW-1 further advised that he did not, ultimately, meet with McGLASHAN at the airport.

151.    On or about October 24, 2018—after acknowledging to law enforcement agents his attempt to obstruct the government's investigation and agreeing to plead guilty to an additional charge of obstruction of justice—CW-1 spoke with McGLASHAN by telephone again, this time at the agents' direction.  In the call, CW-1 told McGLASHAN that CW-2 had been interviewed by IRS agents in Florida with respect to payments he had received from CW-1's KWF charity.  The following is an excerpt from the call, which was consensually recorded.

CW-1            So here's kinda what happened: [CW-2], who is the-- my expert test-taker,
                who took the test for [your son]--

McGLASHAN       Mm-hmm.

CW-1            --at Igor's school, [the West Hollywood Test Center]. He called me to
                meet at Barney's Beanery, you know, in West Hollywood. Have you ever
                been there?

McGLASHAN       Never.

| CW-1 | Okay. Well, it's a really cool place in West Hollywood. But he calls me, and he kinda comes out to L.A. every once in a while, and he just had his, his first child, so his in-laws live in L.A., so he said, "Let's meet at Barney's Beanery." So anyway, so [CW-2] starts talkin' to me and tells me a story that he, he got interviewed by the-- an IRS agent in Florida, because he lives in Bradenton, about the payments that he received from my foundation. And, as you know, when families pay for either, either takin' the test or goin' through the side door, all the money goes through my foundation, and then I pay it out to whoever needs to get paid, like I did for, you know, [your son]-- [your son's] test when he took the test at [the West Hollywood Test Center]. So I paid half of it to [CW-2] and half of it to [the West Hollywood Test Center] through my foundation, so that the family essentially has no connection back to what has happened. So I asked [CW-2] what he did with the agent, and what they talked about, and he told me that he hasn't been declaring his payments from my foundation as income for his taxes. So apparently he's been declaring all this income as a gift, which was stupid. But the agent said, "I'm really not so focused on [CW-2] and your payments; what I'm focused on is this foundation." And he kept asking him questions about the foundation's mission, what they do, how they help underserved kids, so on and so forth. So, you know, since [CW-2] does tutoring for us he told the agent that, you know, he works with kids for us-- underserved kids in the Bradenton area. |
|---|---|
| McGLASHAN | Mm-hmm. |
| CW-1 | So when he gets done speaking, I kinda freak out, right? Because now I'm thinking, "Oh, shit, I'm in a-- I'm in a lot of trouble here," and the IRS has me wired. They probably have me-- you know, bugged my house, the whole thing, because he's talking all about my foundation, and, you know, he really wants to dive into this. So when I met with [my lawyer], he told me, "[CW-1], hold on. Just relax. For them to get a wiretap on you, it takes a, a bunch of months to happen, and you just need to relax." So-- |
| McGLASHAN | Mm-hmm. |
| CW-1 | --you know, overnight I'm a lot less worried than I was a couple days ago (laughs) when we talked, but I just-- you know, I'm gonna use this [other] phone, which is my son's phone, and I did it-- |
| McGLASHAN | Mm-hmm. |
| CW-1 | --for us to talk so that there are, you know, no issues, just in case. |
| McGLASHAN | Yep, yep. |

### G. FELICITY HUFFMAN

152.   Defendant FELICITY HUFFMAN is a resident of Los Angeles, California. HUFFMAN, who has two daughters, is an actress.

153.   As set forth below, HUFFMAN and her spouse made a purported charitable contribution of $15,000 to KWF to participate in the college entrance exam cheating scheme on behalf of her oldest daughter.  HUFFMAN later made arrangements to pursue the scheme a second time, for her younger daughter, before deciding not to do so.

154.   CW-1 has advised law enforcement agents that, prior to the December 2017 SAT, CW-1 met with HUFFMAN and her spouse in their Los Angeles home and explained, in substance, how the college entrance exam scheme worked.  According to CW-1, he advised HUFFMAN and her spouse that he "controlled" a testing center, and could arrange for a third party to purport to proctor their daughter's SAT and secretly correct her answers afterwards. CW-1 has advised investigators that HUFFMAN and her spouse agreed to the plan.

155.   In or about the summer of 2017, HUFFMAN and CW-1 exchanged multiple e-mails about how to obtain 100 percent extra time on the SAT for her daughters.

156.   On or about October 16, 2017, HUFFMAN's older daughter received a letter from the College Board advising that she had been approved for 100 percent extended time. HUFFMAN forwarded the e-mail to CW-1 and a counselor at HUFFMAN's daughter's high school with the note, "Hurray! She got it."

157.   The high school counselor wrote back to HUFFMAN the next day, stating, "Now you will register [your daughter] for the December 3rd SAT ... Collegeboard considers double time a school based exam, so [our high school] is the test center. I will proctor test on Dec 4th & 5th and that's the process in nutshell."  HUFFMAN forwarded the e-mail to CW-1 with the note,

"Ruh Ro! Looks like [my daughter's high school] wants to provide own proctor."  CW-1 responded, "We will speak about it."

158.    In subsequent e-mails, CW-1 and HUFFMAN agreed to tell the high school counselor that HUFFMAN's daughter would take the SAT at a different location on December 2nd and 3rd—a Saturday and Sunday—so that she would not miss any school.

159.    In or about late October 2017, Dvorskiy completed paperwork to move HUFFMAN's daughter's exam from her own high school to the West Hollywood Test Center. ETS records reflect that, in calls to ETS, HUFFMAN and the high school counselor confirmed that the location for HUFFMAN's daughter's SAT had been switched to the West Hollywood Test Center.

160.    On or about December 1, 2017, CW-2 flew from Tampa to Los Angeles.  CW-2 has advised investigators that each time he was in Los Angeles to proctor an SAT or ACT, he facilitated cheating, either by correcting the student's answers after the test or by actively assisting the student during the exam.

161.    On or about December 2, 2017, CW-2 purported to proctor HUFFMAN's daughter's SAT exam at the West Hollywood Test Center.  On or about December 3, 2017, CW-2 returned to Tampa.

162.    Ultimately, HUFFMAN's daughter received a score of 1420 on the SAT, an improvement of approximately 400 points over her PSAT, taken without CW-2 one year earlier. On or about December 19, 2017, KWF paid Dvorskiy $40,000 for administering the SAT to HUFFMAN's daughter and three other students.  On or about December 27, 2017, KWF paid CW-2 $35,000 for purporting to proctor the exam for HUFFMAN's daughter and exams for several other clients of CW-1.

163.    On or about February 27, 2018, HUFFMAN and her spouse made a purported contribution of $15,000 to KWF. On or about March 21, 2018, Masera sent them a letter thanking them for the purported donation and falsely stating that it would "allow us to move forward with our plans to provide educational and self-enrichment programs to disadvantaged youth." The letter falsely stated that "no goods or services were exchanged" for the $15,000.

164.    In a telephone call with CW-1 on or about October 23, 2018, HUFFMAN discussed repeating the SAT cheating scheme for her younger daughter. The call, which was consensually recorded, is excerpted below.

| CW-1 | Okay. Great. So I also just wanted to let you know that the-- the guy who took the test for [your older daughter], [CW-2]-- |
| --- | --- |
| HUFFMAN | Yeah. |
| CW-1 | --he just had a baby. |
| HUFFMAN | Aw. |
| CW-1 | So if-- so I need to give him at least three weeks' notice, if you want to take the tes-- want us to take the test for [your younger daughter] in December. |
| HUFFMAN | Okay. So that takes us to like November-something. Okay. I won't-- I won't know until she takes that-- the practice test, of when we should take it. I mean, unless you want to play it safe and do it in March. |
| CW-1 | The next test date would be February. So let's try to plan for December. |

165.    In a call with CW-1 on or about November 12, 2018, HUFFMAN confirmed that she wanted to proceed with the cheating scheme, but probably only after her daughter first took the exam on her own, without cheating. CW-1 has advised law enforcement agents that, in such instances—when parents had their children first take the exams by themselves, to see how they scored without cheating—CW-1 would typically direct CW-2 to ensure that their second score did not increase by more than 30 percent from the first "baseline" score, in order to avoid any

74

suspicion of cheating. Excerpts from the call, which was consensually recorded, are set forth below.

| | |
|---|---|
| CW-1 | Okay, great. Okay. So then, the question I have for you, because [what] I'm not sure is, I know she's-- she's preparing with [a tutor]. Is she-- |
| HUFFMAN | Uh-huh. |
| CW-1 | --going to make that with her extended time at her school or are we going to do like what we--with [your older daughter], where [CW-2] -- |
| HUFFMAN | We're going to do like we did with [my older daughter]. |
| CW-1 | Okay. So [CW-2] will take it with her and for her at Igor's place at [the West Hollywood Test Center]. So-- |
| HUFFMAN | Yes. |
| CW-1 | Because I'll need to do the paperwork for that. And you're okay with that? |
| HUFFMAN | Yeah, totally. |
| CW-1 | Okay, okay. All right. So then when we get closer to that point, or over-- maybe I'll have it done over the next week or so-- |
| HUFFMAN | Yeah. |
| CW-1 | --[inaudible] the paperwork set up to move that forward. |
| HUFFMAN | Okay. Now, my only thing, [CW-1], is-- sorry it's loud in here. I'm outside. But is that I'm pretty sure-- we are doing it the same way as [with my older daughter]? I'm pretty sure with [my younger daughter] that she's going to want to take it twice no matter what. |
| CW-1 | Okay. |

….

| | |
|---|---|
| HUFFMAN | So do we do it twice then? |
| CW-1 | The-- well, that's-- that's a good -- well, how about-- let's do this. Why don't we-- why don't we work to get a first score, and then we already have a baseline? Because what happens is, if she takes it and doesn't do well the first time -- |
| HUFFMAN | Yeah. |

| CW-1 | --then we can only go up a certain amount the second time. |
|---|---|
| HUFFMAN | Yeah. No, I totally figured that. I just know that no matter what, she's so academically driven-- |
| CW-1 | Okay. |
| HUFFMAN | --that no matter what happens, even if we go, "This is a great score," that she'll go, "I really want to take it again." |
| CW-1 | Okay. |
| HUFFMAN | I just wanted to give you a heads-up, so I just thought then she'll just take it twice in that-- in the-- you know, in [the West Hollywood Test Center] or whatever that place was. |
| CW-1 | Okay, go-- gotcha. Okay. All right. So-- |
| HUFFMAN | All right. |
| CW-1 | So I'm going to-- I'll talk to Igor and [CW-2], confirm that we can get a March-- the March test date on that Saturday. |
| HUFFMAN | Great. |

....

| CW-1 | I just need you-- yeah. I just need to get Igor confirmed that-- |
|---|---|
| HUFFMAN | Mm-hmm. |
| CW-1 | --that we can use his site. |
| HUFFMAN | Okay. |
| CW-1 | And I need to get [CW-2] confirmed that he can fly in and take the test with and for [your younger daughter] so that I can make sure that they're available. |
| HUFFMAN | Okay, that sounds great. |

166.    On or about December 12, 2018, HUFFMAN and her spouse spoke with CW-1 again to finalize plans for their younger daughter's exam. During the call, CW-1 confirmed that

the price to participate in the cheating scheme would be $15,000, and discussed with HUFFMAN

and her spouse whether they thought their daughter would actually take the exam over two days,

in order to achieve as high a score as possible before CW-2 corrected her answers.  Excerpts

from the call, which was consensually recorded, are set forth below.

| | |
|---|---|
| CW-1 | Yeah.  So I guess the question for both of you guys are-- is, are we going to do this similarly that we did with [your older daughter] where the [younger daughter] will take the test at [the West Hollywood Test Center] -- |
| SPOUSE | Yeah, I think [inaudible]. |
| CW-1 | I'm sorry. |
| SPOUSE | Yes, I think we are [inaudible]. |
| CW-1 | Okay. Same exact. Same exact so she'll take the test [at the West Hollywood Test Center]. [CW-2] will be the proctor. We will ensure that sh-- we get a score that will be in the 14s or-- or, or higher because we want to achieve the schools we want to get to, correct? |
| SPOUSE | --we're talking about Georgetown, places like-- |
| CW-1 | Yeah.  So we'll need to b-- we'll need to be mid 14s to 1500 to be-- to be solid.  That's out of 1600. So that means that sh-- she'll score in the 700s in each category. |

....

| | |
|---|---|
| CW-1 | Okay, and then, so then are we-- so again the last time we did this. Just so I can make sure the financial part is all squared away that then we'll-- we will send you an invoice for $15,000 and we'll-- and that'll be all taken care of.  Are we all okay with the financial side and the actual operational side of it? |
| SPOUSE | --cool. |
| CW-1 | Okay.  That's what I wanted-- that's what I wanted to know, Okay, so what I'll do is we will start the paperwork of getting everything accomplished in February so that the test can be sent to [the West Hollywood Test Center].  And, and then Felicity, my guess is you'll have [a] conversation, the school, may have [a] conversation with you and you'll just say, "You know, essentially what we're going to do is [my |

older daughter] took the-- the exam here, we don't want to miss any school, we're going to take it over the weekend, and we're-- we're very comfortable with this process because we've already done it once before and it worked out really well."

SPOUSE:      That's [inaudible].

HUFFMAN:     Okay.

                                    ....

SPOUSE       Do we want two days?

HUFFMAN      Better for her to take it over two days?  I think it is.

CW-1         Well, at this point, Felicity, it doesn't really matter because we're going to get a s-- a score--

SPOUSE       --I -- I understand that.

CW-1         But it's up to you how you want to do this in-- in her head.

SPOUSE       She'll score higher.  Just her base score will be higher if we did it over two days.

167.   On or about February 13, 2019, HUFFMAN spoke with CW-1 again about the plan for her daughter to take the exam first on her own, and the second time as part of the cheating scheme.   During the call, HUFFMAN expressed concern, in substance, about whether a dramatic increase in her daughter's scores would cause her SAT tutor to suspect cheating. Excerpts from the call, which was consensually recorded, are set forth below.

HUFFMAN       Hey, thank you so much for calling. [My spouse] gave me the update that she'll take the test March --

CW-1          Ninth.

HUFFMAN       --Ninth, at [her high school] and then we will plan it again for May--

CW-1          May. 'Cause she said she wanted to take it twi- a couple of times anyways.

HUFFMAN       Yup.

78

| | |
|---|---|
| CW-1 | So the goal-- because we gotta get, based on the schools that she thinks she wants to go to, we're gonna have to get her a 1400-plus. |
| HUFFMAN | Yes. |
| CW-1 | So I don't know what she will get the first time on her own, hopefully she kicks ass and, you know, it's a moot point, but that's what we're gonna need to do. |
| HUFFMAN | Okay. And what do I need to do to facilitate that switch? |
| CW-1 | So we'll do the paperwork for that in mid-April, or beginning of April-- |
| HUFFMAN | Okay. |

....

| | |
|---|---|
| HUFFMAN | And, you know, [the tutor] gave her that practice test, and as I said to you, you know, she came in at around 1200 and she said, "But I think, you know, we can bring that--" |
| CW-1 | We can go 14-- |
| HUFFMAN | --yeah, we can bring that up." But I just didn't know if it'd be odd for [the tutor] if we go, "Oh, she did this in-- in March 9th, but she did so much better in May." I don't know if that'd be like-- if [the tutor] would be like "Wow." |
| CW-1 | --[the tutor] is just doing her job so I don't think she gets well-engaged in that kind of world. |
| HUFFMAN | Okay. |
| CW-1 | So I wouldn't worry about that. |

168.    Ultimately, HUFFMAN and her spouse decided not to pursue the SAT cheating scheme for their younger daughter.

### H.  MAJORIE KLAPPER

169.    Defendant MARJORIE KLAPPER is a resident of Menlo Park, California. KLAPPER co-owns a jewelry business.

170.     As set forth below, KLAPPER made a purported charitable contribution of

$15,000 to KWF in or about November 2017 to participate in the college entrance exam cheating

scheme on behalf of her son.

171.     On or about March 1, 2017, KLAPPER e-mailed CW-1 that she had learned from

another client of CW-1's that the other client's daughter was planning to take the ACT in Los

Angeles. KLAPPER asked if her son could do so as well. CW-1 replied, "it is not a definite as

there [is] a financial consideration to take it there. They will only do with a donation."

172.     Throughout the spring and summer of 2017, CW-1 and KLAPPER exchanged e-

mails about getting extra time on the ACT and SAT exams for her son. As an example, on or

about June 10, 2017, KLAPPER forwarded to CW-1 a letter from the College Board that

granted her son 50 percent extra time. KLAPPER wrote: "Another failed attempt at 100%. We

have it for ACT. What should we do? Do these accomodations mean alternate location? Still

debating our conversations too." CW-1 replied, "As long as you have ACT with 100 percent

time we can take the test at an alternate site."

173.     On or about September 13, 2017, KLAPPER forwarded ACT registration

instructions for her son to CW-1, who forwarded them to Dvorskiy. Dvorskiy, in turn, notified

ACT, Inc. that KLAPPER's son would take the ACT on October 28, 2017 at the West

Hollywood Test Center.

174.     On or about October 27, 2017, CW-2 traveled from Tampa to Los Angeles to

proctor the ACT exam for KLAPPER's son the following day at the West Hollywood Test

Center. CW-2 returned to Tampa on or abut October 29, 2017.

175.     In an e-mail on or about October 29, 2017, CW-1 directed Masera to invoice

KLAPPER $15,000 through KWF.

176. On or about November 1, 2017, KWF paid CW-2 $18,000 for proctoring the ACT for KLAPPER's son and another student. On or about November 6, 2017, KWF paid Dvorskiy $13,000.

177. On or about November 2 and 3, 2017, KLAPPER made a purported charitable contribution totaling $15,000 to KWF.

178. KLAPPER's son received a score of 30 out of a possible 36 on the ACT exam. On or about November 20, 2017, KLAPPER e-mailed a copy of the score report to CW-1, noting: "Omg. I guess he's not testing again." CW-1 replied, "Yep he is brilliant."

179. On a telephone call with KLAPPER on or about October 24, 2018, CW-1, acting at the direction of law enforcement agents, told KLAPPER that his foundation was being audited. The following is an excerpt from the call, which was consensually recorded.

| | |
|---|---|
| CW-1 | So, I wanted to let you kn-- our foundation, is, is being audited-- |
| KLAPPER | Yeah. |
| CW-1 | --which is very normal. Right? |
| KLAPPER | Yeah. |
| CW-1 | And so they're lookin' at all of our payments. |
| KLAPPER | Mm-hmm. |
| CW-1 | And so they're lookin' at, you know, the payment-- including your payment that you made for 15K, to have [CW-2] take the test for [your son]. |
| KLAPPER | Yeah. |
| CW-1 | So I jus-- I just want to make sure that you and I are on the same page. 'Cause, of course, I'm not gonna tell the IRS that-- that, you know, you paid 15,000 for [CW-2] to take the test for [your son], obviously. So I just wanted to make sure that you and I are on the same page, in case you get a call. |

| | |
|---|---|
| KLAPPER | Okay. So if I get a call-- |
| CW-1 | You're gonna say that the-- the $15,000 that you paid to our foundation was to help underserved kids. |
| KLAPPER | Okay. |
| CW-1 | So that's what our foundation does. |
| KLAPPER | Mm-hmm. |
| CW-1 | So I just wanted to make sure that our stories were aligned. |
| KLAPPER | Okay. Got it. Yeah. |
| CW-1 | Okay? |
| KLAPPER | When-- whe-- these, currently happening? |
| CW-1 | The audit is happening now, yes. |
| KLAPPER | Yes. Okay, okay. |
| CW-1 | Which, which happens to all foundations, all people. So. |
| KLAPPER | Oh, it's happening to us too. We have a random one going on right now too. |
| CW-1 | Okay. So we're all havin' fun. |
| KLAPPER | It's so fun. Yeah. Actually, I don't even know wha-- what's happening, exactly. But it's-- and it is really like, random stuff. Yeah. |
| CW-1 | Oh, absolutely. So I just wanted to make sure that you and I were on the same page, in case a phone call comes to you. |
| KLAPPER | Okay. Okay. So-- And it's The Key, isn't it? |
| CW-1 | Yeah, The Key Worldwide Foundation, yes. |
| KLAPPER | Yeah. Okay. So, if somebody calls and said, "Why did you write this check?" |
| CW-1 | Yeah. You're gonna say-- |

| KLAPPER | I'm gonna say, "I wrote it to support the foundation, which serves under-underprivileged kids." |
| CW-1 | Absolutely-- And it's not for [CW-2] taking the test for [your son]. So we don't have to even go there. |
| KLAPPER | Don't even know who [CW-2] is. |
| CW-1 | Gotcha. |
| KLAPPER | Okay. |

### I.  GAMAL ABDELAZIZ

180.    Defendant GAMAL ADBELAZIZ, also known as "Gamal Aziz," is a resident of Las Vegas, Nevada. ABDELAZIZ served, until in or around September 2016, as a senior executive of a resort and casino operator in Macau, China, and previously held other senior executive positions in the hotel and casino industries.

181.    As set forth below, ADBELAZIZ conspired to bribe Heinel, the senior associate athletic director at USC, to designate his daughter as a recruit to the USC basketball team, in order to facilitate her admission to the university.

182.    CW-1 has advised investigators that, in or about 2017, he discussed with ABDELAZIZ that his daughter was unlikely to be admitted to USC and similarly ranked universities based on her academic record, but that her prospects would improve dramatically as a recruited athlete. According to CW-1, although ABDELAZIZ's daughter played basketball in high school, she was not sufficiently competitive to be recruited by USC. CW-1 advised that ABDELAZIZ provided information for a falsified basketball "profile"—which included exaggerated and altogether fabricated basketball credentials—to submit to USC on his daughter's behalf.

183.    On or about July 14, 2017, CW-1 e-mailed Laura Janke, a former assistant coach of women's soccer at USC, "I met with Donna this week in her office and she gave the action item to create profiles for all the kids I presented to her. . . . Would you be willing to put the profiles together for pay?"[17] CW-1 indicated that the profile for ABDELAZIZ's daughter should be for basketball. Two days later, Janke responded that she would prepare the requested profiles.

184.    On or about July 16, 2017, in an e-mail bearing the subject line, "For Me to complete USC athletic profile," CW-1 asked ABDELAZIZ to send biographical information about his daughter. The e-mail indicated that the profile would include falsified honors, including "Beijing Junior National Team." In a subsequent e-mail sent on or about July 27, 2017, CW-1 requested that ABDELAZIZ provide an action photo of his daughter to be used in the profile. ABDELAZIZ replied, "Got it," and provided the biographical information and photo that same day.

185.    On or about August 7, 2017, Janke sent CW-1 a draft of the profile, which falsely described ABDELAZIZ's daughter as having received numerous athletic honors, including "Asia Pacific Activities Conference All Star Team," "2016 China Cup Champions," "Hong Kong Academy team MVP," and "Team Captain." In the cover e-mail, Janke wrote, "Let me know if you want me to add any other awards to her profile or if you think that is enough." CW-1 forward Janke's e-mail and the false profile to ABDELAZIZ and wrote, "Gamal please answer below[.]"

186.    Heinel presented ABDELAZIZ's daughter to the USC subcommittee for athletic admissions on or about October 5, 2017, and—based on falsified athletic credentials—obtained

---

[17] Janke has been indicted by a federal grand jury in the District of Massachusetts on a charge of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).

the subcommittee's approval to admit her to USC as a basketball recruit. On or about October 10, 2017, Heinel e-mailed CW-1 a provisional acceptance letter for ABDELAZIZ's daughter confirming that her admission was premised upon "records [that] indicate that you have the potential to make a significant contribution to the intercollegiate athletic program." The letter conditioned the admission on ABDELAZIZ's daughter maintaining a grade point average of at least 3.3, with no grade lower than a C, for the duration of her senior year in high school.

187.    In a voicemail message on or about December 4, 2017, Heinel instructed CW-1 that a payment of $200,000 for ABDELAZIZ's daughter should be directed to the gift account for the Galen Center, the arena for USC's basketball and volleyball programs. CW-1 has advised law enforcement agents that he and Heinel subsequently agreed that, instead of directing the money to USC, Heinel would receive payments of $20,000 per month personally in exchange for her assistance in securing the admission of ABDELAZIZ's daughter, and the children of CW-1's other clients, to USC as purported athletic recruits.

188.    On or about January 12, 2018, ABDELAZIZ e-mailed CW-1 a copy of his daughter's report card, noting, "GPA: 3.5." CW-1 forwarded the e-mail to Heinel.

189.    On or about March 16, 2018, an employee of CW-1 e-mailed ABDELAZIZ an invoice from KWF for $300,000 and wrote, "Thank you for your generous donation." On or about March 26, 2018, ABDELAZIZ wired the purported $300,000 contribution to KWF.

190.    In or about July 2018, KWF began making payments of $20,000 per month to Heinel personally.

191.    ABDELAZIZ's daughter matriculated at USC in the fall of 2018 but did not join the basketball team.

192.     ABDELAZIZ has made clear in telephone calls with CW-1 that he understood his purported contribution to KWF was in exchange for Heinel's assistance in securing his daughter's admission to USC as a purported basketball recruit.  For example, on or about October 25, 2018, CW-1 called ABDELAZIZ from Boston, at the direction of law enforcement agents.  On the call, CW-1 told ABDELAZIZ that KWF was being audited by the IRS.  The following are two excerpts from the call, which was consensually recorded.

| | |
|---|---|
| CW-1 | So the reason for my call is I just wanted to make sure that you knew.  So my foundation, which happens to all these foundations, especially as we got-- we've gotten bigger, so we're getting audited right now. |
| ADBELAZIZ | Yes. |
| CW-1 | So-- which is typical, right. And so they're looking at all my payments-- |
| ADBELAZIZ | Yes. |
| CW-1 | --that have come into our foundation and so they asked me, you know, about the $300,000 payment-- |
| ADBELAZIZ | Yes. |
| CW-1 | --that was made. |
| ADBELAZIZ | Yes. |
| CW-1 | And so I just want you to know from the IRS, you know, I'm not going to tell the IRS anything about the fact that your $300,000 was paid to Donna-- Donna Heinel at USC to get [your daughter] into school even though she wasn't a legitimate basketball player at that level.  So I'm not going to-- I'm not going to say that to the IRS obviously.  Are you-- |
| ADBELAZIZ | Okay. |
| CW-1 | You're okay with that, right? |
| ADBELAZIZ | Of course. |

....

86

CW-1                I'll tell you a funny story, is that Donna Heinel, who is the senior
                    women's administrator, she actually called me and said-- she
                    called me and says, "Hey [CW-1], that profile that you did for
                    [ADBELAZIZ's daughter], I loved it.  It was really well done and
                    going forward, anybody who isn't a real basketball player that's a
                    female, I want you to use that profile going forward."

ADBELAZIZ           I love it.

CW-1                But-- yeah, it was great.  Absolutely great.  So I just want to make
                    sure our stories are together.  I'm going to essentially say that your
                    $300,000 payment, was made to our foundation to help
                    underserved kids.

ADBELAZIZ           Okay.

193.    ADBELAZIZ discussed the bribery scheme with CW-1 again in a call on or about

January 3, 2019.  On that call, at the direction of law enforcement agents, CW-1 told

ADBELAZIZ, in substance, that Heinel, when asked why ADBELAZIZ's daughter was not

playing basketball for USC, had responded that she had suffered an injury.  ADBELAZIZ

confirmed that he would provide the same cover story if questioned.  The following is an excerpt

from the call, which was consensually recorded.

CW-1                Donna Heinel, who's the senior women's administrator at USC,
                    she called me-- to give me a heads up, and asked-- she was asked
                    by admissions as to why [your daughter] did not show up for
                    women's basketball in the fall.

ADBELAZIZ           Yeah.

CW-1                So she told them that [your daughter] had an injury-- and that it
                    happened over the summer-- and that she would be out for six to
                    eight months.

ADBELAZIZ           Okay.

CW-1                So I just wanted to give you a heads up, because this has happened
                    to several of our other families that went through the side door--.

ADBELAZIZ           Yes.

87

| | |
|---|---|
| CW-1 | --and I just wanted to make sure-- and nobody's gotten a phone call from anybody.  And I [inaudible] that admissions will call you regarding [your daughter], you know, getting in through the side door and n-- and not showing up for practice. I doubt that will happen 'cause it hasn't happened to anybody else. |
| ADBELAZIZ | Okay. |
| CW-1 | But they may ask you, is she okay, whatever.  So I think that Donna told them that she had plantar fasciitis-- |
| ADBELAZIZ | Okay. |
| CW-1 | --and, and so-- which is typical for lots of athletes. |
| ADBELAZIZ | Yes. |
| CW-1 | So I just wanted you to know in case they call, you, you know-- |
| ADBELAZIZ | That we-- would they ask her, [CW-1]? |
| CW-1 | No, they won't ask [your daughter]--  It would go-- it would go to the parent. |
| ADBELAZIZ | Okay. |
| CW-1 | So I just-- but I have no idea if they're gonna call or not.  I just wanted to give you a heads up they asked about it, and Donna replied-- |
| ADBELAZIZ | Okay. |
| CW-1 | -- and I wanted you to know what her reply was. |
| ADBELAZIZ | That's fine.  I will answer the same, should they call me. |

## J.   MOSSIMO GIANNULLI and LORI LOUGHLIN

194.   Defendants MOSSIMO GIANNULLI and LORI LOUGHLIN (collectively, "the GIANNULLIS"), a married couple, are residents of Los Angeles, California.  GIANNULLI is a fashion designer.  LOUGHLIN is an actress.

88

195.    As set forth below, the GIANNULLIS agreed to a pay bribes totaling $500,000 in exchange for having their two daughters designated as recruits to the USC crew team—despite the fact that they did not participate in crew—thereby facilitating their admission to USC.

196.    On or about April 22, 2016, GIANNULLI, copying LOUGHLIN, sent an e-mail to CW-1, noting:

> We just met with [our older daughter's] college counselor this am.  I'd like to maybe sit with you after your session with the girls as I have some concerns and want to fully understand the game plan and make sure we have a roadmap for success as it relates to [our daughter] and getting her into a school other than ASU!

197.    CW-1 responded, "If you want [U]SC I have the game plan ready to go into motion.  Call me to discuss."

198.    In an e-mail on or about July 24, 2016, CW-1 advised GIANNULLI that his older daughter's academic qualifications were at or just below the "low end" of USC's admission standards.  Thereafter, the GIANNULLIS agreed with CW-1 to use bribes to facilitate her admission to USC as a recruited crew coxswain, even though she did not row competitively or otherwise participate in crew.

199.    On or about September 7, 2016, GIANNULLI sent CW-1 an e-mail attaching a photograph of his older daughter on an ergometer.

200.    Heinel presented the GIANNULLIS' daughter to the USC subcommittee for athletic admissions as a purported crew recruit on October 27, 2016.  At the meeting, the subcommittee approved her conditional admission to the university.

201.    Two days later, on or about October 29, 2016, CW-1 e-mailed GIANNULLI, "Please send $50K payment to the person below[:]  Donna Heinel, Senior Women[']s Associate Athletic Director[,] c/o of USC Athletics[.]"

202.    On or about November 1, 2016, GIANNULLI replied, "I told biz mgr to Fed Ex today." GIANNULLI also asked CW-1 whether it was permissible to discuss his daughter's admission with the then-USC Athletic Director, with whom he was acquainted. GIANNULLI wrote: "BTW, headed to Augusta in 2 weeks with [the USC Athletic Director]. I was planning on saying nothing? Agree or okay to mention anything?" CW-1 replied: "Best to keep [the USC Athletic Director] out of it. When I met with him a year ago about [your daughter] he felt you were good for a million plus." GIANNULLI responded, "HAH!!"

203.    On or about November 28, 2016, CW-1 sent GIANNULLI confirmation that his daughter had been provisionally admitted to USC based upon "records [that] indicate that you have the potential to make a significant contribution to the intercollegiate athletic program . . . ." CW-1 wrote: "FYI attached is the letter you can hold on to. As long as [your daughter] doe[s] what she is doing all is good."

204.    On or about March 23, 2017, USC mailed the GIANNULLIS' daughter her formal acceptance letter. One week later, Masera sent the GIANNULLIS an invoice from KWF for $200,000, and wrote, "Thank you for your pledge to The Key Worldwide Foundation. Your pledge is now due . . . . Our receipt letter will go out to you upon full payment." GIANNULLI responded, "Again thanks for all. We are currently on holiday in the Bahamas but will gladly handle this when home next week."

205.    On or about April 10, 2017, GIANNULLI wired $200,000 to KWF. The following day, an employee of CW-1 sent the GIANNULLIS a receipt from KWF falsely indicating that "no goods or services were exchanged" for the purported donation.

206.    On or about April 10, 2017, GIANNULLI copied LOUGHLIN on an e-mail to CW-1 bearing the subject line, "Trojan happiness." He wrote: "I wanted to thank you again for

your great work with [our older daughter], she is very excited and both Lori and I are very appreciative of your efforts and end result!"  CW-1 replied, "With [your younger daughter] please let me know if there is a similar need anywhere so we do not lose a spot."  GIANNULLI responded, "Yes [our younger daughter] as well," and LOUGHLIN added, "Yes USC for [our younger daughter]!"  CW-1 replied, "So work to acquire [U]SC?  As soon as the semester is over I will need a transcript and test scores."

207.   On or about July 14, 2017, CW-1 e-mailed Janke directing her to prepare a crew profile for the GIANNULLIS' younger daughter.  Janke responded:  "Ok sounds good.  Please send me the pertinent information and I will get started."

208.   On or about July 16, 2017, CW-1 e-mailed the GIANNULLIS requesting information for the crew profile.  CW-1 indicated that the profile would present their younger daughter, falsely, as a crew coxswain for the L.A. Marina Club team, and requested that the GIANNULLIS send an "Action Picture."  Four days later, CW-1 sent the GIANNULLIS a second request, noting, "If we want USC I will need a transcript, test scores and picture on the ERG."  LOUGHLIN, copying GIANNULLI, replied later that day, "Moss will get this done. We are back in town on Monday."

209.   On or about July 28, 2017, GIANNULLI, copying LOUGHLIN, e-mailed CW-1 a photograph of their younger daughter on an ergometer.

210.   Heinel presented the GIANNULLIS' younger daughter to the USC subcommittee for athletic admissions on or about November 2, 2017.  At the meeting, the subcommittee approved her conditional admission to the university.

211.   Less than two weeks later, on or about November 16, 2017, CW-1 sent the GIANNULLIS an e-mail bearing the subject line, "CONGRATULATIONS!!!" with their

younger daughter's conditional acceptance letter attached.  LOUGHLIN responded, "This is wonderful news! [High-Five Emoji]."  CW-1 replied: "Please continue to keep hush hush till March."  LOUGHLIN responded: "Yes of course."

212.    Approximately two weeks later, on or about November 29, 2017, CW-1 directed the GIANNULLIS  to "send a 50K check to USC and the address is below.  Additionally the rest of the 200k will be paid to our foundation a 501 3C [sic] after [your younger daughter] receives his [sic] final letter in March."  GIANNULLI, copying LOUGHLIN, responded, "Will get this handled this week."  The next day, GIANNULLI directed his business manager to send a $50,000 check to Heinel.

213.    CW-1 has advised investigators that, in or about late 2017, a guidance counselor from the high school attended by GIANNULLIS' daughters inquired of the younger daughter about her sister's athletic recruitment to USC.  According to CW-1, the counselor did not believe that either of the GIANNULLIS' daughters participated in crew, and was concerned that their applications may have contained misleading information.

214.    On or about December 12, 2017, LOUGHLIN e-mailed CW-1, copying GIANNULLI and their younger daughter, to request guidance on how to complete the formal USC application, in the wake of her daughter's provisional acceptance as a recruited athlete. LOUGHLIN wrote: "[Our younger daughter] has not submitted all her colleges [sic] apps and is confused on how to do so.  I want to make sure she gets those in as I don't want to call any attention to [her] with our little friend at [her high school].  Can you tell us how to proceed?" CW-1 responded by directing an employee to submit the applications on behalf of the GIANNULLIS' younger daughter.

92

215.     On or about February 6, 2018, GIANNULLI wired $200,000 to one of the KWF

charitable accounts.  On or about February 7, 2018, an employee of CW-1 sent the

GIANNULLIS a receipt from KWF falsely indicating that "no goods or services were

exchanged" for the purported donation.

216.     On or about March 23, 2018, USC mailed the GIANNULLIS' younger daughter

her formal acceptance letter.

217.     Shortly thereafter, on or about April 12, 2018, the high school counselor e-mailed

GIANNULLI memorializing an encounter between the two men earlier that day:

> I wanted to provide you with an update on the status of [your younger daughter's]
> admission offer to USC.  First and foremost, they have no intention of rescinding
> [her] admission and were surprised to hear that was even a concern for you and
> your family.  You can verify that with [the USC senior assistant director of
> admissions] . . . if you would like.  I also shared with [the USC senior assistant
> director of admission] that you had visited this morning and affirmed for me that
> [your younger daughter] is truly a coxswain.

218.     The same day, Heinel left CW-1 the following voicemail message:

> I just want to make sure that, you know, I don't want the -- the parents getting
> angry and creating any type of disturbance at the school.  I just want to make sure
> those students . . . if questioned at the school that they respond in a[n] appropriate
> way that they are, walk-on candidates for their respective sports.  They're looking
> forward to trying out for the team and making the team when they get here.  OK?
> That's what I just want to make sure of.  [Inaudible.]  So I just don't want
> anybody going into . . . [the GIANNULLIS' daughter' high school], you know,
> yelling at counselors.  That'll shut everything -- that'll shut everything down.

219.     In a call with GIANNULLI on or about October 25, 2018, CW-1, acting at the

direction of law enforcement agents, told GIANNULLI that the IRS was auditing KWF.  The

following is an excerpt from the call, which was consensually recorded:

| CW-1 | I'm calling 'cause I just want to make sure you're-- give you a heads-up that-- so my foundation is being audited-- |
| --- | --- |
| GIANNULLI | Okay. |
| CW-1 | --which, as you know, is normal. |

| | |
|---|---|
| GIANNULLI | Yeah. |
| CW-1 | And so they're looking at all the payments. So they-- they asked me about your 2 payments of 200,000. |
| GIANNULLI | Uh-- |
| CW-1 | And, of course, I'm not gonna say anything about your payments going to Donna Heinel at USC to get the girls into USC, through crew. So-- |
| GIANNULLI | Sure. |
| CW-1 | --that's for sure. |
| GIANNULLI | Right. |
| CW-1 | But what's funny-- It's funny. Because Donna called me couple weeks ago and says, "Hey, uh," you know, "going forward, can you use the same format you used for [the GIANNULLIS' older daughter] and [their younger daughter], and the regattas that you put in there, for any girls, going forward, that don't row crew?" So it's funny how-- I thought I was just makin' stuff up. |
| GIANNULLI | Uh, right.  Uh-- |
| CW-1 | But-- but they loved it, love-- |
| GIANNULLI | Uh, right.  Perfect. |
| CW-1 | So I just want to make sure out stories are the same, because-- |
| GIANNULLI | Yeah. |
| CW-1 | --and th-- and that your $400K was paid to our foundation to help underserved kids. |
| GIANNULLI: | Uh, perfect. |
| CW-1 | Okay?  So I just want to make sure that we're on the same page, in case-- |
| GIANNULLI | Uh-- |
| CW-1 | Who knows if they'll call or they don't? |

94

GIANNULLI          Perfect.  Got it.

220.    Likewise, in a call on or about November 29, 2018, CW-1, acting at the direction

of law enforcement agents, told LOUGHLIN that the audit of KWF was focused on payments

related to students who had been admitted to USC, including her daughters.  The following is an

excerpt from the call, which was consensually recorded.

CW-1          The IRS audits foun-- large foundations and we have so much
              money in our foundation and we give away so much money
              they're-- they want to-- you know, they're always worried about
              things going on in foundations.

LOUGHLIN      I see.

CW-1          So what I-- what I wa-- I told Moss already and I wanted to make
              sure that you knew, as well, if they happened to call you, is that
              nothing has been said about the girls, your donations helping the
              girls get into USC to do--

LOUGHLIN      Okay.

CW-1           --crew even though they didn't do crew. So nothing like that has
              been ever mentioned.

LOUGHLIN      [inaudible]

CW-1          If you ever-- ever were to say anything.

LOUGHLIN      So we-- so we just-- so we just have to say we made a donation to
              your foundation and that's it, end of story.

CW-1          That is correct.

LOUGHLIN      Okay.

CW-1          Terrific.

LOUGHLIN      Okay.

CW-1          I just wanted to make sure I touched base because I didn't want
              you--

LOUGHLIN   Yeah.

CW-1   --to all of a sudden what-- like what's this call coming from.

LOUGHLIN   Okay, yeah. Okay. Totally. All right. So-- so that's it. So it's-- it's the IRS. It's not anyone from USC, it's the IRS.

CW-1   That is correct.

LOUGHLIN   Okay. Very good.

## K. AGUSTIN HUNEEUS, Jr.

221.   Defendant AGUSTIN HUNEEUS, Jr. is a resident of San Fransico, California. HUNEEUS is an owner of vineyards in Napa, California and elsewhere.

222.   In or about 2017 and 2018, HUNEEUS participated in both the college entrance exam cheating scheme and the college recruitment scheme for his daughter, including by conspiring to bribe Heinel and Jovan Vavic, the USC water polo coach,[18] to facilitate his daughter's admission to USC as a purported water polo recruit.

223.   CW-1 has advised law enforcement agents that, in exchange for HUNEEUS's purported contribution of $50,000 to KWF, CW-1 arranged for CW-2 to purport to proctor the SAT exam for HUNEEUS's daughter at the West Hollywood Test Center in or about March 2018. According to CW-1, he explained to HUNEEUS that he "controlled" the test center, and that CW-2 would correct his daughter's answers after she completed the exam.

224.   In an e-mail to HUNEEUS and a psychologist selected by CW-1 on or about May 25, 2017, CW-1 noted that HUNEEUS's daughter "needs testing for 100 percent time with multiple days" and directed HUNEEUS and the psychologist to "[p]lease connect."

---

[18] Vavic has been indicted by a federal grand jury in the District of Massachusetts on a charge of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).

225.    In or about August 2017, the psychologist provided HUNEEUS's daughter with documentation recommending that she receive extended time on the SAT.  On or about October 7, 2017, the College Board granted HUNEEUS's daughter extended time to take the exam over successive days.

226.    On or about January 22, 2018, HUNEEUS forwarded CW-1 an e-mail he had received from an employee at his daughter's high school, indicating that she planned to proctor his daughter's test at the school on March 10th and March 11th.  HUNEEUS wrote, "Here is the email."  CW-1 replied, "You can tell her you are going to be out of town and have found a location to provide the test so [your daughter] does not have to miss school.  The school is [the West Hollywood Test Center] for your use."

227.    On or about February 16, 2018, an employee at the high school wrote to HUNEEUS that HUNEEUS's executive assistant "had mentioned trying to arrange for [his daughter] to take the exam in L.A.  If that is the case, please make sure the [College] Board knows where to send the exam."  That same day, Dvorskiy e-mailed CW-1 confirmation that the College Board had shipped SAT materials for HUNEEUS's daughter to the West Hollywood Test Center.  CW-1 forwarded the confirmation to HUNEEUS.  On or about February 21, 2018, a College Board representative confirmed in an e-mail to HUNEEUS's daughter and Dvorskiy that "[W]e have received confirmation that [the West Hollywood Test Center] is able to accommodate your testing for the March SAT."

228.    On or about March 9, 2018, CW-2 flew from Tampa to Los Angeles to proctor HUNEEUS's daughter exam on March 10, 2018.  CW-2 has advised investigators that while there he met with HUNEEUS, who brought his daughter to the exam.  According to CW-2, he

assisted HUNEEUS's daughter to answer questions during the exam, and corrected her answers

after she had completed it.  CW-2 returned to Tampa on or about March 11, 2018.

229.    On or about April 3, 2018, HUNEEUS wired $50,000 as a purported charitable

contribution to KWF.  CW-1, in turn, paid Dvorskiy and CW-2 $10,000 each.

230.    HUNEEUS's daughter received a score of 1380 out of a possible 1600 on the

SAT, which was in the 96th percentile nationally.  HUNEEUS subsequently complained about

the score in a call with CW-1 on or about August 30, 2018.  The following are two excerpts from

the call, which was intercepted pursuant to a Court-authorized wiretap.

| | |
|---|---|
| CW-1 | The whole world is scamming the system.  And I got 'em, 'cause I have a ton of kids who have extended time and they shouldn't get extended time. |
| HUNEEUS | No, I know you do.  I kn-- I know your system well.  I wha-- what my concern is, wha-- what I'm trying to understand is that I, it feels like, you know, you, you have a plan for the system, so you know, if you had wanted to, I mean [my daughter's] score could have been 1550 right? |
| CW-1 | No.  'Cause I would have got investigated for sure based on her grades. |
| HUNEEUS | Okay. |
| CW-1 | Absolutely, th-- now we got a bigger problem. |
| HUNEEUS | Mm-hmm. |
| CW-1 | Now she's gonna have to take it at her school in front of everybody. |
| HUNEEUS | Okay. |
| CW-1 | And now when she gets 1100, 1200, now what do we do? |
| HUNEEUS | Oh huh.  Um. |

....

98

| HUNEEUS | Is Bill McGLASHEN doing any of this shit? Is he just talking a clean game with me and helping his kid or not? 'Cause he makes me feel guilty. |
| CW-1 | Um-- |
| HUNEEUS | Or are you just taking care of him in a way that he doesn't know because you have other interests with him? |
| CW-1 | No, no, let me-- not at all. Nothing to do with his-- I will say this. |
| HUNEEUS | But he didn't know-- his kid had no idea and he didn't have any idea that you helped him on the ACT, or the test you took. |
| CW-1 | 'Cause that was what he he asked for. |
| HUNEEUS | Bill McGLASHAN? |
| CW-1 | Asked for [his son] not knowing. |
| HUNEEUS | Okay. |
| CW-1 | All right, so he has not been as forthcoming-- |
| HUNEEUS | With me? |
| CW-1 | With you, and with his own kid, which is-- he wants it that way. |

231.    In the same call, CW-1 also explained the college recruitment scheme to

HUNEEUS. The following are three excerpts from the call.

| HUNEEUS | I just wanted you to walk me through the whole, kinda, water polo thing again and how it works. You and I did, you know, like the economics, the timing, how all that works. You and I had a brief conversation about it, but I wanted to kinda get it straight, if you don't mind? |
| CW-1 | Okay, okay. So, I'm putting together, I need to put together [your daughter's] sports profile. It will be a water polo profile, now. |
| HUNEEUS | Yup, yup. |
| CW-1 | I take her transcript, test scores, and profile to th-- to the senior women's athletic director, who actually is the liaison for all sports at USC, football, everybody has to go through her. |

| | |
|---|---|
| HUNEEUS | Okay. |
| CW-1 | And then she, they have meetings every other Thursday, which are called subcommittee meetings, where the dean of admissions, and two admissions off-- two admissions staff and she are there, and they go through the athletes for that particular subcommittee meeting. It could be water polo this week, it could be football the next week, it could be basketball. Just depends on where they are in the seasons and what's going on. |
| HUNEEUS | Okay. |
| CW-1 | So what she does is, she already works on presenting the kids before she gets to the meeting so she knows everything about them, she knows why they want them, she knows where to slot them based on their GPA and test score, and be ready to answer questions if admissions has questions. |
| HUNEEUS | Okay. |

.…

| | |
|---|---|
| CW-1 | [Your daughter will] get presented and if they, in the committee if they say okay good, she's in, then what happens is Donna [Heinel] tells me she's in, we're good, and then she gets a letter from admissions, which'll say in there she's been admitted, conditionally admitted, she needs to do her NCAA clearing house, she needs to send her transcripts to the NC clearing house, blah, blah, blah, blah, so on, so forth. That letter will come to me and I'll send that letter to you, and you can hold the letter yourself, she won't know anything. At that point, you will write a check for $50,000 that will, I'll give you the address, and exactly who-- it will go to Donna Heinel and for senior women's athletic director. It will be made out to USC Women's Athletics. |
| HUNEEUS | Okay. |
| CW-1 | Okay? That, that's essentially just, it goes right in, right to her, she took care of that part, and then when you get your, and then we apply, we send her application. Essentially, you've been admitted before she even has applied. Okay? |
| HUNEEUS | Okay, so there's no chance I give that 50 and then she's not admitted? |
| CW-1 | You won't send it until you get the letter. |

| | |
|---|---|
| HUNEEUS | Oh, okay.  Got it. |

....

| | |
|---|---|
| CW-1 | And then on March 25th, when they send the rest of the letters out, she'll get her final letter-- It'll be a regular official packet.  The normal stuff they normally send out.  But you will have already had it in your hands, the same letter in your, so that you know it's taken care of. |
| HUNEEUS | Got it. |
| CW-1 | At that point, then you will write, we will, my foundation will send you a invoice.  You will send a $200,000 check to our foundation, you'll get your letter, thank you, with your write off, tax ID write off stuff, and then Jovan [Vavic, the water polo coach] will call me and say, "Okay, this is how I want the money split," and so on and so forth. And that won't happen until around April 1st. |
| HUNEEUS | Does all of that, do all of those funds go to USC, or do some go to stay in your foundation? |
| CW-1 | No, they go to USC in different ways. |
| HUNEEUS | Okay. |
| CW-1 | So, what Jovan usually does is, I subsidize his staff salaries. . . .  I put two of his staff members on my books as contractors. . . .  And then I pay them throughout the year . . . .  So, this is a way of, all coaches there know that now, so they just call me instead, because they don't want it to go to the general fund. |
| HUNEEUS | Mm-hmm. |
| CW-1 | 'Cause he's the guy giving up the spot. |

232.    HUNEEUS acknowledged in the call that his daughter was not qualified to be a

USC water polo recruit, and expressed concern about "this thing blow[ing] up in my face."  The

following are two additional excerpts from the call.

| | |
|---|---|
| CW-1 | So, in this case it's gonna be, it, it's a li-- it's, it's a little different because Jovan is totally supporting our applications.  So, and Jovan-- |

| | |
|---|---|
| HUNEEUS | And why? |
| CW-1 | Because he owe -- |
| HUNEEUS | Because I und--, you understand that [my daughter] is not worthy to be on that team. |
| CW-1 | No, no, he he's my guy. . . . [A]nd he knows [s]he's not coming to play, he knows all that. |
| HUNEEUS | Okay. |

....

| | |
|---|---|
| HUNEEUS | And is there any risk that this thing blows up in my face? |
| CW-1 | Hasn't in 24 years. |
| HUNEEUS | Yeah-- |
| CW-1 | We're not doing-- |
| HUNEEUS | I know but but the, the, the, the environment. . . . [L]ike some article comes out that the, the-- |
| CW-1 | Oh no. |
| HUNEEUS | --polo team is selling seats into the school for 250 grand. |
| CW-1 | Well, no, because she's a water polo player. |
| HUNEEUS | But she's not.  I mean that's what I mean-- |

233.    As part of the scheme, CW-1 advised HUNEEUS that Heinel was using a fabricated profile of HUNEEUS's daughter as a collegiate-level water polo recruit to advance her application within USC.  On or about September 18, 2018, shortly before Heinel intended to present HUNEEUS's daughter to the admissions subcommittee, CW-1 repeated a request that HUNEEUS provide a photograph of his daughter playing water polo.  The following is an excerpt from the call, which was intercepted pursuant to the Court-authorized wiretap.

102

| | |
|---|---|
| HUNEEUS | I'm gonna just call her right now to make sure she has a photo. |
| CW-1 | And if she doesn't have a photo, what I'm gonna do is, I gotta do something, so I'm-- |
| HUNEEUS | No, she'll have a-- [CW-1], she will have a photo. |
| CW-1 | Okay. |
| HUNEEUS | We've been talking about this for six fucking months. |
| CW-1 | I totally agree, I totally agree. |

234.    On or about September 20, 2018, CW-1 sent Heinel an e-mail that included HUNEEUS's daughter's high school transcripts, her fraudulent SAT score, and a fabricated athletic profile that falsely identified her as a "3-year Varsity Letter winner" in water polo and "Team MVP 2017," along with the following photograph, which is of another individual.



235.    On or about September 22, 2018, CW-1 advised HUNEEUS that since his daughter had not sent a photograph in time, he had used a photograph of someone else in the profile.  The following is an excerpt from the call.

| | |
|---|---|
| CW-1 | I was calling to tell you that we did not make the deadline with her picture.  She didn't send it to me 'till a day later. However I did create the profile with the different picture that, you can't tell it's not her, but it's athletic enough, and put in all the honors and awards to match, and I got it to them on Thursday morning, but they didn't have a enough time to put her through sub-co so we'll |

probably go in the next couple weeks.  But the issue was not getting the picture.

HUNEEUS:      Okay.

CW-1          So I just wanted you to know kind of what was going on because I told you it would go through Thursday but, and I was texting her all night, all day, and I never got it so the next, 'till a day later.

HUNEEUS:      Okay, does that mean her chances change in any way?

CW-1          It means that she didn't go through sub-co, so-- I don't think it changed as much except for it may she's gonna go through with a different group of kids, so I don't know.

236.    In a call on or about October 25, 2018, HUNEEUS sought reassurance that his $50,000 payment to Heinel would be returned if his daughter was not admitted to USC.  The following is an excerpt from the call, made at the direction of law enforcement, which was consensually recorded.

HUNEEUS       And then, if-- if for whatever chance she didn't get in, would-- that wouldn't come back to me, right?

CW-1          Um--

HUNEEUS       So I'm taking a bit of a risk there?

CW-1          I-- that's never, ever, ever happened.

HUNEEUS       Okay.

CW-1          So I want to say no.

HUNEEUS       Okay. Great.  So that's my second question.  And then in March we get the real letter.

CW-1          Correct. With everybody else. We get a package that comes from USC.  It's a beautiful thing.  The whole thing.

HUNEEUS       Okay. And then at that point that's when my funds go to you, as well?

CW-1          To our foundation, yes.

| | |
|---|---|
| HUNEEUS | To your foundation. Yes. Okay. And the check of that is how much? Remind me again. |
| CW-1 | That'll be $200,000. |
| HUNEEUS | Okay. And do you need that all in one year? |
| CW-1 | I-- I do. I do. |
| HUNEEUS | Okay. |
| CW-1 | And-- and we can take it also around June. So you have a little window to play with. |
| HUNEEUS | Okay. |
| CW-1 | And then remember that I have to take that money and pay the folks at USC as they tell me where that money goes. |
| HUNEEUS | No, I un-- I understand. |

237. In the same call, HUNEEUS also sought reassurance that his daughter would not actually have to join the USC water polo team, despite being admitted as a water polo recruit.

| | |
|---|---|
| HUNEEUS | [CW-1], and then how does this impact-- like she-- I-- I think you've said this but I just want to confirm. She actually won't really be part of the water polo team, right? |
| CW-1 | No, no. She doesn't have to do anything. She's just-- here's what's going to happen. In-- in late spring she's going to get a letter from the-- from athletics and adm-- and orientation. They're going to send her a letter saying this is your orientation date. What you're going to do is not pay attention to it and you're going to sign up for the first orientation date for regular students and just go to that date and from that point on you're no longer a part of athletics. |
| HUNEEUS | Okay. |

238. Heinel presented HUNEEUS's daughter to the USC subcommittee for athletic admissions on or about November 2, 2018, using a falsified profile that depicted her as a competitive water polo player.

239.     Five days later, on or about November 7, 2018, Heinel e-mailed CW-1 a conditional acceptance letter for HUNEEUS's daughter stating that she was being admitted to USC because "[y]our records indicate that you have the potential to make a significant contribution to the intercollegiate athletic program." CW-1 forwarded the letter to HUNEEUS and requested that he "[p]lease send 50K check . . . made payable to USC Women's Athletic Board . . . to USC Women's Athletic c/o Donna Heinel."

240.     On or about November 19, 2018, HUNEEUS caused his executive assistant to send a $50,000 check to Heinel by FedEx, payable to "USC Women's Athletics Board" with the memo line referencing his daughter.

241.     On or about November 29, 2018, CW-1 called HUNEEUS from Boston at the direction of law enforcement agents. On the call, CW-1 told HUNEEUS that the IRS was auditing KWF. The following is an excerpt from the call, which was consensually recorded.

| | |
|---|---|
| CW-1 | I just want to give you a heads-up.  So I just -- they just started an audit on my foundation. |
| HUNEEUS | Yeah. |
| CW-1 | So I just want to give you a heads up before McGLASHEN, before anybody, that essentially they're-- they're going to go-- they've been asking about both past and present payments. So there's a payment obviously for 50k in April, for us, taking-- for [your daughter] taking the test.. |
| HUNEEUS | Yeah, I remember. |
| CW-1 | Okay. So what I want to make sure is that you and I are both on the same page because what I'm going to tell them is that you made a 50k donation to my foundation for underserved kids and not that [CW-2] took the test for [your daughter] or she took the test at [the West Hollywood Test Center]. |
| HUNEEUS | Dude, dude, what do you think, I'm a moron? |

106

| | |
|---|---|
| CW-1 | No. It doesn't-- I'm not saying you're a moron. The point is, is that--. |
| HUNEEUS | I got it, [CW-1]-- I got it. |
| CW-1 | Okay. |
| HUNEEUS | Yeah. |
| CW-1 | Okay. |
| HUNEEUS | I'm going to say that I've been inspired how you're helping underprivileged kids get into college. Totally got it. |

### L. BRUCE ISACKSON and DAVINA ISACKSON

242. Defendants BRUCE ISACKSON and DAVINA ISACKSON, a married couple (together, "the ISACKSONS"), live in Hillsborough, California. BRUCE ISACKSON is president of a real estate development firm in Woodside, California.

243. As set forth below, the ISACKSONS took part in both the college recruitment scheme and the college entrance exam cheating scheme.

244. CW-1 has advised law enforcement agents that in or about 2015 and 2016, the ISACKSONS agreed with him to use bribery to secure their older daughter's admission to college as a recruited athlete. Initially, according to CW-1, he sought to secure the ISACKSONS' daughter's admission to USC—her first-choice school—as a purported soccer recruit. In or about mid-September 2015, CW-1 e-mailed her high school transcripts, ACT score and a falsified soccer profile to Janke, who forwarded the materials to the USC women's soccer coach.

245. On or about February 17, 2016, an assistant athletic director at USC e-mailed the women's soccer coach that the application had been diverted to the regular admissions process due to a "clerical error."

107

246. On or about May 20, 2016, Ali Khosroshahin, the former head coach of women's soccer at USC, forwarded the falsified soccer profile, ACT score and transcripts on CW-1's behalf to Jorge Salcedo, the head coach of UCLA men's soccer.[19] Khosroshahin wrote: "soccer player/student manager. I have attached her profile, player explanation, transcripts for both high schools and ACT scores…will make sure she has registered with the NCAA. Please let me know if you need any additional information[.]"

247. On or about June 28, 2016, the UCLA student-athlete admissions committee approved the ISACKSONS' daughter for provisional admission that fall. CW-1 notified the ISACKSONS via e-mail the following day. DAVINA ISACKSON responded, copying BRUCE ISACKSON and their daughter: "I know it has been a rough ride but I thank you from the bottom of my heart and soul for your persistence, creativity and commitment towards helping [our daughter]."

248. On or about July 7, 2016, CW-1 directed a payment of $100,000 from one of the KWF charitable accounts to a sports marketing company controlled by Salcedo. CW-1 subsequently also caused KWF to issue a check to Khosroshahin in the amount of $25,000.

249. On or about July 8, 2016, Masera sent DAVINA ISACKSON an invoice from KWF in the amount of $250,000. The invoice stated: "Private Contribution – Letter of receipt will be provided upon payment." On or about July 11, 2016, BRUCE ISACKSON e-mailed CW-1, copying DAVINA ISACKSON: "Thanks for the follow up call regarding the attached Key Worldwide Foundation invoice. Per our discussion can you please send me an email

---

[19] Khosroshahin and Salcedo have been indicted by a federal grand jury in the District of Massachusetts on a charge of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).

confirming that if [our daughter] is not admitted to UCLA as a freshman for the Fall 2016 class that The Key Worldwide Foundation will refund our $250,000.00 gift. Again, both Davina and I are greatly appreciative of all your efforts on [our daughter]'s behalf!"

250.    That same day, CW-1 e-mailed the ISACKSONS: "[T]his is to confirm that your donation of $250,000 to The Key Worldwide Foundation supporting educational initiatives we have created to help those who need it the most will be returned if [your daughter's] admission to UCLA is reversed from the email acceptance she has already received."

251.    On or about July 15, 2016, ISACKSON transferred 2,150 shares of Facebook, Inc. stock, having a value of approximately $251,249, to KWF.  Approximately one week later, Masera sent the ISACKSONS a letter acknowledging the purported charitable contribution, and stating: "Your generosity will allow us to move forward with our plans to provide educational and self-enrichment programs to disadvantaged youth."  The letter falsely indicated that "no goods or services were exchanged" for the money.

252.    CW-1 has advised law enforcement agents that the ISACKSONS thereafter agreed with him to engage in the college entrance exam cheating scheme for their younger daughter.

253.    On or about January 23, 2017, DAVINA ISACKSON e-mailed CW-1 documentation of ACT, Inc.'s approval for her younger daughter to take the ACT over successive days.

254.    On or about May 8, 2017, DAVINA ISACKSON e-mailed CW-1: "She is working towards June 10, 11 testing in LA . . . Please send me details of testing location and anything I need to do beforehand."

255.    On or about June 9, 2017, CW-2 traveled from Tampa to Los Angeles.  The ISACKSONS' daughter took the ACT at the West Hollywood Test Center on or about the following day.  CW-2 returned to Tampa on or about June 11, 2017.

256.    The ISACKSONS' daughter received a score of 31 out of a possible 36 on the exam.

257.    On or about June 12, 2017, CW-1 paid CW-2 $15,600 via a check issued from one of the KWF charitable accounts.  On or about June 21, 2017, BRUCE ISACKSON caused shares of stock having a value of approximately $101,272 to be transferred to KWF.

258.    Thereafter, according to CW-1, the ISACKSONS agreed with him to secure their younger daughter's admission to USC as a purported rowing recruit, even though she was not competitive in rowing, but instead was an avid equestrian.

259.    In or about October 2017, CW-1 sent the ISACKSONS' daughter's high school transcript and fraudulently obtained ACT score to Heinel, writing, "Another Crew Girl," and directed Janke to create a crew profile for her.   The profile, which CW-1 then forwarded to Heinel, falsely stated that the ISACKSONS' daughter was a "Varsity 8 Stroke" for the Redwood Scullers and listed a number of falsified crew honors.

260.    Heinel presented the ISACKSONS' younger daughter to the USC subcommittee for athletic admissions as a purported crew recruit on or about November 30, 2017.  On or about December 15, 2017, Heinel e-mailed CW-1 a letter notifying the ISACKSONS' daughter that she had been conditionally admitted to USC as a student athlete. The letter stated:  "Your records indicate that you have the potential to make a significant contribution to the intercollegiate athletic program as well as to the academic life of the university."

261.    CW-1 forwarded the letter to the ISACKSONS and their daughter, writing, "Please keep this hush hush till late March." DAVINA ISACKSON responded, "Very exciting news...we will definitely lay low until March . . . Would you like to chat next week to discuss any steps I need to take on my end for USC? Thank you again for your help!" CW-1 replied, "Only steps have been discussed with Bruce."

262.    On or about April 9, 2018, shortly after USC mailed a formal acceptance letter to the ISACKSONS's daughter, a KWF employee e-mailed DAVINA ISACKSON a $250,000 invoice for the ISACKSONS' "generous donation to The Key Worldwide Foundation." DAVINA ISACKSON responded, copying BRUCE ISACKSON, "We are out of the country and will send payment early during the week of April 16th."

263.    On or about April 20, 2018, BRUCE ISACKSON caused shares of stock having a value of $249,420 to be transferred to KWF.  CW-1 has advised investigators that he earmarked $50,000 of the ISACKSONS' payment for Heinel, who in July 2018 began receiving monthly payments of $20,000 from KWF.

264.    In a call on or about August 23, 2018, CW-1 and DAVINA ISACKSON spoke on the telephone about engaging in the college entrance exam cheating scheme on behalf of the ISACKSONS' third child.  The call was intercepted pursuant to a Court-authorized wiretap.  In the call, CW-1 asked DAVINA ISACKSON whether they were going to try to "control the test room or is he taking it on his own." DAVINA ISACKSON responded that they wanted to control the testing environment.

265.    On or about September 26, 2018, BRUCE ISACKSON called CW-1 and requested a receipt, for tax purposes, for his purported $100,000 contribution to KWF for his younger daughter's testing scheme.  The following is an excerpt from the call.

| | |
|---|---|
| B. ISACKSON | Hey, I was checking for one thing, just for my taxes. I need to get the letter, like you did last time-- |
| CW-1 | Okay. |
| B. ISACKSON | --for the-- for the Facebook stock that I did-- |
| CW-1 | Okay. |
| B. ISACKSON | --do you-- that I think was like 100,000, something like that, las-- is-- can you-- do you track that down to your guys, get the exact amount-- |
| CW-1 | Yeah. |
| B. ISACKSON | --internally-- |
| CW-1 | Yeah.  Lemme-- |
| B. ISACKSON | --if you wouldn't m--? |
| CW-1 | --lemme-- lemme find out. Was this for-- was this for [your second daughter]? |
| B. ISACKSON | This was, when we did the testing.  Yeah. Yeah. |
| CW-1 | Uh-- |
| B. ISACKSON | I can give you exact date of it, that the stock-- I can actually send that to you, if that helps you. |
| CW-1 | Okay. Why don't you do that? |
| B. ISACKSON | Yeah. |
| CW-1 | That would be grea-- |
| B. ISACKSON | Yeah. And, actually got it for-- a copy of it from the broker. But I'll do that to you. That'd be awesome, just that one-page letter-- |
| CW-1 | Uh-- |
| B. ISACKSON | --saying it's a 501--(3)-- |
| CW-1 | Okay. |

266.    On or about October 24, 2018, CW-1 called BRUCE ISACKSON at the direction of law enforcement agents and told him that KWF was being audited by the IRS.  The following is an excerpt from the conversation, which was consensually recorded.

CW-1            So, so I'm calling because I'm in Boston--

B. ISACKSON     Uh-huh.

CW-1            --and I-- so what's happened is my foundation is, is getting audited now.

B. ISACKSON     Uh-huh.

CW-1            Which, as you know, is pretty typical.

B. ISACKSON     Uh-huh.

CW-1            Right?  So they're looking at all my payments.

B. ISACKSON     Okay.

CW-1            So they asked about your payments. One of them for when [CW-2] took the test for [your second daughter].

B. ISACKSON     Okay.

CW-1            The payment that we made to Jorge, to help [your first daughter] get into UCLA through soccer.

B. ISACKSON     Okay.

CW-1            And then the payment that we made to Donna Heinel at USC to help [your second daughter] get in through crew.

B. ISACKSON     Okay.

CW-1            So, of course I'm not going to tell the IRS this is where the money went--

B. ISACKSON     Right, right, right.

CW-1            --and [inaudible]. So I just, I just want to make sure that-- what I've told them so far is that that 600K-plus has actually gone to pay for-- paid to our foundation for underserved kids.

B. ISACKSON     Uh-huh.

113

| | |
|---|---|
| CW-1 | So I guess, first-- one of the questions I have is, did you take a write-off for those? |
| B. ISACKSON | I did take a write-off for those, yes. |
| CW-1 | Okay. All right, I just, I just want to make sure I'm-- |
| B. ISACKSON | Yeah. |
| CW-1 | --on the same page as you. |
| B. ISACKSON | Yeah, I did, I did. |
| CW-1 | Okay. Okay. |
| B. ISACKSON | I did. I mean-- go ahead, I'm sorry. |
| CW-1 | No, you go. |
| B. ISACKSON | Yeah, well, I got-- remember, I was asking for the letter [inaudible] asked for, you know, to the extent that we don't have it. You know, if we do get audited or something, we would need a letter or something like that. |
| CW-1 | Gotcha. Totally. |
| B. ISACKSON | That's after the fact. Okay. |
| CW-1 | Okay, no problem. So I just wanted to make sure our stories are aligned. |
| B. ISACKSON | Yeah. |

267.   On or about December 3, 2018, CW-1 called DAVINA ISACKSON at the

direction of law enforcement agents and told her that KWF was being audited by the IRS. The

following is an excerpt from the conversation, which was consensually recorded.

| | |
|---|---|
| CW-1 | So they asked about the payments that Bruce had made. And I-- I think I told him. But I'm going to tell you. Essentially, that I didn't say anything about [your second daughter] taking the, the test down at [the West Hollywood Test Center] and having [CW-2] and-- [CW-2] take it and Igor being the site coordinator. I didn't say anything about that. I just said that |

it was a donation to our foundation for underserved kids. Are you okay with that?

D. ISACKSON          Okay. Yeah. Yeah.

268.     Although the quality of the phone call was clear, DAVINA ISACKSON then told CW-1, "It's really hard to hear you but why don't we talk later tonight[.]"

269.     CW-1 went to the ISACKSONS' home later that evening to meet with BRUCE ISACKSON. The meeting was consensually recorded. During the meeting, CW-1 asked if DAVINA ISACKSON—who was traveling—wanted to participate by phone. BRUCE ISACKSON responded: "You know, I am so paranoid about this fucking thing you were talking about. I don't like talking about it on the phone, you know." Later in the meeting, BRUCE ISACKSON noted: "I'm so paranoid about Davina, I go, 'I really don't want you talking on the phone to [CW-1] about this.' You know, I'm thinkin', you know, are they—I mean, I can't imagine they'd go to the trouble of tapping my phone—but would they tap someone like your phones?"

270.     BRUCE ISACKSON and CW-1 then discussed what would happen if the ISACKSONS received a call from the IRS. The following is an excerpt from the conversation.

B. ISACKSON          [W]orst case, we were to get a call from them, and they would say to you, you know, I guess, "Prove you gave this money," they'd ask for some--

CW-1                 Which you did.

B. ISACKSON          --yeah-- ask for some kind of thing, and I don't-- I only got, I think, a, a, a receipt from you, or, I don't know, like, one-- like, the last two of 'em I don't think I did.

CW-1                 Okay.

B. ISACKSON          If we-- if we-- you know, if you want to--

CW-1                 Well, we can get that to you.

115

| | |
|---|---|
| B. ISACKSON | --i-if we can do that -- |
| CW-1 | Yeah, absolutely. |
| B. ISACKSON | --that would be great, yeah.    But, you know, just the letter saying "Thank you for your gift" or whatnot, of whatever-- |
| CW-1 | Right. |
| B. ISACKSON | --you know, you're helping out with. But so, so let's say they, they, they, they, they do that. For example, when we did the testing thing-- |
| CW-1 | Mm-hmm. |
| B. ISACKSON | --that was as a gift, right? Yeah. |
| CW-1 | Right. |
| B. ISACKSON | And they're not-- there's no way they can correlate and say that that wasn't for a gift? That would only be if they would talk to you about that and say "Where did that go?"  Right?  You know what I'm saying? |
| CW-1 | Right.  Right-- |
| B. ISACKSON | Yeah. |
| CW-1 | --so they wouldn't-- at least, I wouldn't know-- |
| B. ISACKSON | Right. |
| CW-1 | --how they would know? |
| B. ISACKSON | Yeah. |
| CW-1 | It would just be looked at as a gift. |
| B. ISACKSON | Mm-hmm. |
| CW-1 | Um-- |
| B. ISACKSON | But what happens when they track, [CW-1], worst case, that 75,000, and they say, "Show me where that went"? |
| CW-1 | Well-- So that-- so I guess what I-- I guess-- that's a good question. |
| B. ISACKSON | Yeah. |

| | |
|---|---|
| CW-1 | So that 75 comes in. |
| B. ISACKSON | Uh-huh. |
| CW-1 | It's a part of a lot of other money, right? |
| B. ISACKSON | But part-- |
| CW-1 | So-- |
| B. ISACKSON | --part of-- When you say-- |
| CW-1 | Well, because a lotta other money's in, in the pot. |
| B. ISACKSON | Coming in the pot, right. |
| CW-1 | Right? And then I'm turning around and paying [CW-2] and Igor. And so I guess they could s-- they could see that-- |
| B. ISACKSON | Right. |
| CW-1 | --and maybe they'll cor-- Yeah, that's a good q-- that's good-- |
| B. ISACKSON | Yeah, yeah. |
| CW-1 | --because they may correlate-- |
| B. ISACKSON | Right. |
| CW-1 | --that the testing was a part of it. |
| B. ISACKSON | Ri-- I, I don't know, yeah. |

271.   At a number of points in the meeting, BRUCE ISACKSON and CW-1 discussed

the potential repercussions if the IRS were to uncover the true purpose of the payments to KWF:

| | |
|---|---|
| CW-1 | And I'm just saying, "Hey, I was just told to call everybody." |
| B. ISACKSON | Yeah, no, I appreciate that, and I'm glad you did. It's just something that when it happened, my stomach, like, kind of fell out. |
| CW-1 | Oh, well, sure. |
| B. ISACKSON | Yeah. |

| | |
|---|---|
| CW-1 | I think it should. |
| B. ISACKSON | Oh, yeah. I'm just thinking, oh my God, because you're thinking, does this roll into something where, you know, if they get into the meat and potatoes, is this gonna be this-- be the front page story with everyone from Kleiner Perkins do whatever, getting these kids into school, and-- |
| CW-1 | Well, the, the person who'd be on the front page-- |
| B. ISACKSON | Well, I, I-- But if-- but they, they -- |
| CW-1 | Yes. |
| B. ISACKSON | --went the meat and potatoes of it, which a-- which a guy would love to have is, it's so hard for these kids to get into college, and here's-- look what-- look what's going on behind the schemes, and then, you know, the, the embarrassment to everyone in the communities.  Oh my God, it would just be-- Yeah. Ugh. |

272.    Later, in the conversation, BRUCE ISACKSON told CW-1 that if they proceeded

with the college entrance exam cheating scheme for their third child, "I think we'll definitely pay

cash this time, and not, not-- not run it through the other way."

### M. ROBERT ZANGRILLO

273.    Defendant ROBERT ZANGRILLO is a resident of Miami, Florida.

ZANGRILLO is the founder and CEO of a Miami-based private investment firm focused on

venture capital and real estate investments.

274.    As set forth below, ZANGRILLO conspired to bribe athletic department officials

at USC to designate his daughter as an athletic recruit, thereby facilitating her admission to USC,

as well as to have CW-1's employee, Mikaela Sanford, secretly take classes on behalf of his

daughter, so that the grades Sanford earned in ZANGRILLO's daughter's name could be submitted to USC as part of her application.[20]

275.    In or about 2017, ZANGRILLO's daughter's initial application for admission to USC was rejected.

276.    CW-1 has advised law enforcement agents that, in the wake of that rejection, CW-1 told ZANGRILLO that he could secure ZANGRILLO's daughter's admission to USC as a transfer student by arranging for her to be recruited onto the USC crew team, even though she did not row competitively.

277.    ZANGRILLO's daughter's transfer application was submitted to USC on or about February 1, 2018. In contrast to her earlier application, which made no reference to rowing, the second application falsely stated that she rowed crew at a club for an average of 44 hours per week for 15 weeks per year, and that she was taking classes at a number of schools, including Santa Monica College, Rio Salado College, and the University of Colorado at Boulder.

278.    In a telephone call with ZANGRILLO, his daughter, and Sanford on or about June 11, 2018, CW-1 explained, in sum and substance, that he had asked members of the USC athletics department to facilitate ZANGRILLO's daughter's admission "as though she's been sculling and rowing," and that the USC crew coach had agreed to designate her as a purported recruit to the crew team, provided that "[y]ou guys help us." The following is an excerpt from the call, which was intercepted pursuant to a Court-authorized wiretap.

CW-1            So we went through athletics, went through this deal and they came back to me and said, "There's all these comments in her file, blah, blah, blah, blah, blah. She[] rides horses, does all this stuff.

---

[20] Sanford has been indicted by a federal grand jury in the District of Massachusetts on a charge of conspiracy to commit racketeering, in violation of Title 18, United States Code, Section 1962(d).

> So I convinced them that she's at [a local community college offering online courses], she's gonna do well, "Would you guys help her get in? We'll put her as though she's been sculling and rowing and then will you get-- will you put me on the phone with the crew coach?" Crew coach got on the phone with me, said, "Okay, I will take her. You guys help us, we'll help you. I'll take her, I just need her to finish all these credits and all the-- all of her classes."

279. On the call, CW-1 told ZANGRILLO that, in order to secure his daughter's admission to USC as a recruited athlete, she needed to complete the classes she had advised the university she was taking. ZANGRILLO's daughter inquired, in substance, what CW-1 was doing about an "F" grade that she had received in an art history class she had taken. CW-1 explained that he had "Mikaela retake [the art history] class," and that she had "already got the class almost done." CW-1 asked if this plan made sense. ZANGRILLO and his daughter both replied, "Yes."

280. ZANGRILLO then inquired, in substance, whether Sanford could take his daughter's biology class as well. Sanford replied that she was "happy to assist." ZANGRILLO added: "If you can do the biology thing, just makes sure it gets done as quickly as possible, so we have a backup plan for the conditional [acceptance to USC], and then you do the best you can to overturn the art history [grade]."

281. Three days later, on or about June 14, 2018, USC offered ZANGRILLO's daughter admission as a transfer student beginning in the spring semester of 2019, conditioned on her maintaining "a GPA of 3.3 or higher in at least 12 transferable units in the Fall 2018 semester with no individual grade lower than C."

282. On or about June 26, 2018, Heinel e-mailed CW-1 that she had not actually presented ZANGRILLO's daughter to the admissions department as an athletic recruit, but had instead "advocated for her" and placed her "on our VIP list for transfers."

283.    On or about August 29, 2018, CW-1 caused KWF to issue an invoice to

ZANGRILLO in the amount of $200,000.  The line item on the invoice was "Donation."

284.    On or about September 20, 2018, ZANGRILLO wired $200,000 to one of the

KWF charitable accounts.  On or about the same day, ZANGRILLO mailed a check in the

amount of $50,000 to "USC Women's Athletics," as directed by CW-1.

285.    In a telephone call with ZANGRILLO on or about October 25, 2018, CW-1, at

the direction of law enforcement agents, told ZANGRILLO that the IRS was auditing KWF.

| | |
|---|---|
| CW-1 | I won't say that the, the moneys went to go pay Heinel for USC to get her in.  And the other part is when [inaudible] audit-- |
| ZANGRILLO | What-- what-- what-- what-- what will be the thing -- what was [my daughter's] payment for? Just so I know, so we have the story straight. |
| CW-1 | So [your daughter's] payment is all the same thing.  All your moneys, including the classes that Mikaela took for-- |
| ZANGRILLO | Yeah, yeah. |
| CW-1 | --[your daughter], all will show they're to our foundation. |
| ZANGRILLO | Yeah. |
| CW-1 | And will all show that she, that they were given to-- for our programs that handle underserved kids. |
| ZANGRILLO | Okay, great, perfect. |
| CW-1 | Okay? |
| ZANGRILLO | Okay, I got it. |

286.    During a subsequent call with CW-1 on or about January 3, 2019, ZANGRILLO

confirmed that his daughter would not say anything to her advisor about being admitted through

athletics.  The call, which was consensually recorded, is excerpted below.

| | |
|---|---|
| CW-1 | All right, but one thing I want to make sure is when she-- if the-- 'cause this has happened with other kids is-- |