# U.S. District Court
## SOUTHERN DISTRICT OF TEXAS (Houston)
## CRIMINAL DOCKET FOR CASE #: <u>4:19−mj−00433</u> All Defendants
### *Internal Use Only*

Case title: USA v. Wilson

Date Filed: 03/12/2019

Other court case number:  1:19mj06087 Massachusetts District
Court − Boston

Assigned to: Magistrate Judge
Nancy K Johnson

**<u>Defendant (1)</u>**

| | | |
|---|---|---|
| **John Wilson**<br>*Unsecured Bond $100,000* | represented by | **Brandt Arthur Leibe**<br>King and Spalding LLP<br>1100 Louisiana<br>Ste 4000<br>Houston, TX 77002<br>713−751−3235<br>Email: bleibe@kslaw.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>Designation: Retained |

| **<u>Pending Counts</u>** | **<u>Disposition</u>** |
|---|---|
| None | |

| **<u>Highest Offense Level (Opening)</u>** | |
|---|---|
| None | |

| **<u>Terminated Counts</u>** | **<u>Disposition</u>** |
|---|---|
| None | |

| **<u>Highest Offense Level<br>(Terminated)</u>** | |
|---|---|
| None | |

| **<u>Complaints</u>** | **<u>Disposition</u>** |
|---|---|
| 18:1349 Conspiracy to commit<br>mail fraud | |

**<u>Plaintiff</u>**

USA

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/12/2019 | 1 | 3 | Copy of Complaint from the Massachusetts District Court − Boston Division 1:19mj06087 as to John Wilson, filed.(kmurphyadi, 4) (Entered: 03/12/2019) |
| 03/12/2019 | | 213 | Arrest (Rule 40) of John Wilson. (kmurphyadi, 4) (Entered: 03/12/2019) |
| 03/12/2019 | | 210 | ***Set Hearing as to John Wilson: Initial Appearance − Rule 40 set for 3/12/2019 at 10:00 AM before Magistrate Judge Nancy K Johnson (kmurphyadi, 4) (Entered: 03/12/2019) |
| 03/12/2019 | | 211 | Minute Entry for proceedings held before Magistrate Judge Nancy K Johnson: INITIAL APPEARANCE IN RULE 5(c)(3) PROCEEDINGS as to John Wilson held on 3/12/2019. Order of Temporary Detention Pending Hearing. Detention/Identity Hearings set for 03.12.19 @2PM before Judge Johnson. Appearances:AUSA J. Jocher, Brandt Leibe.(ERO:Yes) Deft remanded to Custody, filed.(sjones, 4) (Entered: 03/13/2019) |
| 03/12/2019 | | 212 | Attorney update in case as to John Wilson. Attorney Brandt Arthur Leibe for John Wilson added. (sjones, 4) (Entered: 03/13/2019) |
| 03/12/2019 | 2 | 214 | Order of Temporary Detention Pending Hearing as to John Wilson Identity and Detention Hearing set for 3/12/2019 at 02:00 PM in Courtroom 700 before Magistrate Judge Nancy K Johnson ( Signed by Magistrate Judge Nancy K Johnson) Parties notified. (sjones, 4) (Entered: 03/13/2019) |
| 03/12/2019 | 3 | 215 | WAIVER of Rule 5 & 5.1 Hearings by John Wilson, filed.(sjones, 4) (Entered: 03/13/2019) |
| 03/12/2019 | 4 | 216 | Unsecured Bond Entered as to John Wilson in amount of $ 100,000,, filed. (Attachments: # 1 Unredacted attachment Order)(sjones, 4) (Entered: 03/13/2019) |
| 03/12/2019 | 5 | 218 | ORDER Setting Conditions of Release ( Signed by Magistrate Judge Nancy K Johnson) (Attachments: # 1 Unredacted attachment Order) Parties notified. (sjones, 4) (Entered: 03/13/2019) |
| 03/12/2019 | | 231 | Minute Entry for proceedings held before Magistrate Judge Nancy K Johnson: IDENTITY AND DETENTION HEARING as to John Wilson held on 3/12/2019. Deft WAIVED Identity. Unsecured Bond $100,000. Appearances:AUSA C. Moyer, Brandt Arthur Leibe.(ERO:Yes), filed.(sjones, 4) (Entered: 03/13/2019) |
| 03/13/2019 | 6 | 230 | ORDER for Defendant to Appear in the District Where Charges Are Pending and Transferring Bail as to John Wilson. The clerk is ordered to transfer any bail deposited in the registry of this court to the clerk of the court where the charges are pending. Charging District: USDC of Massachusetts, Boston Division, 1:19mj6087. ( Signed by Magistrate Judge Nancy K Johnson) Parties notified. (sjones, 4) (Entered: 03/13/2019) |
| 03/13/2019 | | 232 | RULE 5 Papers sent via email to USDC of Massachusetts Division as to John Wilson, filed.(sjones, 4) (Entered: 03/13/2019) |

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

District of Massachusetts

United States Courts
Southern District of Texas
FILED

*March 12, 2019*

David J. Bradley, Clerk of Court

| | |
|---|---|
| United States of America<br>v.<br>GREGORY ABBOTT, MARCIA ABBOTT, GAMAL<br>ABDELAZIZ, DIANE BLAKE, TODD BLAKE, JANE<br>BUCKINGHAM, GORDON CAPLAN, I-HSIN CHEN<br>(see below for additional names)<br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.<br><br>     MJ No. 19-6087-MPK<br><br>     **4:19mj0433** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ 2011 to the present _____ in the county of _____ Suffolk and elsewhere _____ in the

_____ District of _____ Massachusetts _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC 1349 | Conspiracy to commit mail fraud and honest services mail fraud |

This criminal complaint is based on these facts:

See Affidavit of FBI SA Laura Smith. Amy and Gregory Colburn, Robert Flaxman, Mossimo Giannulli, Elizabeth and Manuel Henriquez, Douglas Hodge, Felicity Huffman, Agustin Huneeus Jr., Bruce and Davina Isackson, Michelle Janavs, Elisabeth Kimmel, Marjorie Klapper, Lori Loughlin, Toby MacFarlane, William McGlashan Jr., Marci Palatella, Peter Jan Sartorio, Stephen Semprevivo, Devin Sloane, John Wilson, Homayoun Zadeh, Robert Zangrillo

☐ Continued on the attached sheet.

*Complainant's signature*

Laura Smith, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 03/11/2019 _____

City and state: _____ Boston, Massachusetts _____    Hon. M. Page Kelley, USMJ
*Printed name and title*

3

JS 45 (5/97) - (Revised U.S.D.C. MA 3/25/2011)

| **Criminal Case Cover Sheet** | **U.S. District Court - District of Massachusetts** |

**Place of Offense:**  Category No. __I__  Investigating Agency __FBI__

**City** __Boston__  **Related Case Information:**

**County** __Middlesex__  Superseding Ind./ Inf. _____ Case No. __19-MJ-6087-MPK__
Same Defendant _____ New Defendant __X__
Magistrate Judge Case Number _____
Search Warrant Case Number __See additional information__
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name __John Wilson__  Juvenile: ☐ Yes ☑ No

Is this person an attorney and/or a member of any state/federal bar: ☐ Yes ☑ No

Alias Name _____

Address __(City & State) Hyannis Port, MA__

Birth date (Yr only): __1959__  SSN (last4#): __0685__  Sex __M__  Race: __White__  Nationality: __USA__

**Defense Counsel if known:** _____  Address _____

**Bar Number** _____

**U.S. Attorney Information:**

**AUSA** __Eric S. Rosen__  Bar Number if applicable __NY4412326__

**Interpreter:** ☐ Yes ☑ No  List language and/or dialect: _____

**Victims:** ☑ Yes ☐ No  If yes, are there multiple crime victims under 18 USC§3771(d)(2) ☑ Yes ☐ No

**Matter to be SEALED:** ☑ Yes ☐ No

☑ Warrant Requested  ☐ Regular Process  ☐ In Custody

**Location Status:**

**Arrest Date** _____

☐ Already in Federal Custody as of _____ in _____ .
☐ Already in State Custody at _____ ☐ Serving Sentence ☐ Awaiting Trial
☐ On Pretrial Release: Ordered by: _____ on _____

**Charging Document:** ☑ Complaint  ☐ Information  ☐ Indictment

**Total # of Counts:** ☐ Petty ____ ☐ Misdemeanor ____ ☑ Felony __1__

Continue on Page 2 for Entry of U.S.C. Citations

☑ I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.

Date: __March 11, 2019__  Signature of AUSA: _____

4

JS 45 (5/97) (Revised U.S.D.C. MA 12/7/05) Page 2 of 2 or Reverse

**District Court Case Number** (To be filled in by deputy clerk): 19-MJ-6087-MPK

**Name of Defendant**   John Wilson

## U.S.C. Citations

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1   18 U.S.C. 1349 | Conspiracy to Commit Mail Fraud | 1 |
| | & Honest Services Mail Fraud | |
| Set 2 | | |
| Set 3 | | |
| Set 4 | | |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

**ADDITIONAL INFORMATION:**   18-6218-MPK, 18-6237-MPK, 18-6236-MPK, 18-6234-MPK, 18-6238-MPK

18-6235-MPK, 18-6476-MPK, 18-6477-MPK, 18-6475-MPK, 18-6478-MPK, 18-6261-MPK, 18-6260-MPK

19-6003-MPK, 19-6005-MPK, 19-6004-MPK, 19-6006-MPK, 18-6240-MPK, 18-6310-MPK, 18-6474-MPK, 18-6474-MPK

18-7227-MPK, 19-6029-MPK, 19-6030-MPK

USAMA *CRIM* - Criminal Case Cover Sheet.pdf  3/4/2013

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Laura Smith, being duly sworn, state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Boston, Massachusetts Field Office. I joined the FBI in 2010 as a forensic accountant conducting complex financial investigations. I am currently a special agent on a squad that investigates economic crimes, including various forms of corporate fraud, securities fraud and bribery. I hold a Bachelor's degree in Criminal Justice-Economic Crimes Investigation and a Master's degree in Accounting. As an FBI Special Agent, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      I make this affidavit in support of criminal complaints charging the following individuals (collectively, "the defendants") with conspiracy to commit mail fraud and honest services mail fraud, in violation of Title 18, United States Code, Section 1349:

| DEFENDANT | PAGE |
|---|---|
| GREGORY ABBOTT | 36 |
| MARCIA ABBOTT | 36 |
| GAMAL ABDELAZIZ | 83 |
| DIANE BLAKE | 169 |
| TODD BLAKE | 169 |
| JANE BUCKINGHAM | 15 |
| GORDON CAPLAN | 22 |
| I-HSIN "JOEY" CHEN | 42 |
| AMY COLBURN | 193 |

| | |
|---|---|
| GREGORY COLBURN | 193 |
| ROBERT FLAXMAN | 196 |
| MOSSIMO GIANNULLI | 88 |
| ELIZABETH HENRIQUEZ | 44 |
| MANUEL HENRIQUEZ | 44 |
| DOUGLAS HODGE | 162 |
| FELICITY HUFFMAN | 72 |
| AGUSTIN HUNEEUS, Jr. | 96 |
| BRUCE ISACKSON | 107 |
| DAVINA ISACKSON | 107 |
| MICHELLE JANAVS | 153 |
| ELISABETH KIMMEL | 143 |
| MARJORIE KLAPPER | 79 |
| LORI LOUGHLIN | 88 |
| TOBY MACFARLANE | 180 |
| WILLIAM E. McGLASHAN, Jr. | 58 |
| MARCI PALATELLA | 137 |
| PETER JAN SARTORIO | 177 |
| STEPHEN SEMPREVIVO | 186 |
| DEVIN SLOANE | 129 |
| JOHN B. WILSON | 122 |
| HOMAYOUN ZADEH | 199 |
| ROBERT ZANGRILLO | 118 |

3.     Specifically, as set forth below, I have probable cause to believe that the

defendants conspired with others known and unknown:  (1) to bribe college entrance exam

administrators to facilitate cheating on college entrance exams; (2) to bribe varsity coaches and

administrators at elite universities to designate certain applicants as recruited athletes or as other

favored candidates, thereby facilitating the applicants' admission to those universities; and (3) to

2

7

use the façade of a charitable organization to conceal the nature and source of the bribe payments.

4.      The facts set forth in this affidavit come from my personal involvement with this investigation, interviews with witnesses, including the cooperating witnesses described below, and my review of documents—including bank records, flight records, e-mails, telephone toll records, cell site data and other materials obtained through grand jury subpoenas and search warrants—as well as Court-authorized Title III wiretap recordings, consensual recordings made by a cooperating witness, and information provided by other law enforcement agents.

5.      In submitting this affidavit, I have not included each and every fact known to me about this investigation. Rather, I have included only those facts that I believe are sufficient to establish probable cause.

<u>PROBABLE CAUSE</u>

<u>Overview of the Conspiracy</u>

6.      Beginning in or about 2011, and continuing through the present, the defendants— principally individuals whose high-school aged children were applying to college—conspired with others to use bribery and other forms of fraud to facilitate their children's admission to colleges and universities in the District of Massachusetts and elsewhere, including Yale University, Stanford University, the University of Texas, the University of Southern California, and the University of California – Los Angeles, among others. Evidence I have reviewed shows that the scheme included the following:

a.      Bribing college entrance exam administrators to allow a third party to facilitate cheating on college entrance exams, in some cases by posing as the actual students, and in others by providing students with answers during the exams or by correcting their answers after they had completed the exams;

3

    b.    Bribing university athletic coaches and administrators to designate applicants as purported athletic recruits—regardless of their athletic abilities, and in some cases, even though they did not play the sport they were purportedly recruited to play—thereby facilitating their admission to universities in place of more qualified applicants;

    c.    Having a third party take classes in place of the actual students, with the understanding that grades earned in those classes would be submitted as part of the students' college applications;

    d.    Submitting falsified applications for admission to universities in the District of Massachusetts and elsewhere that, among other things, included the fraudulently obtained exam scores and class grades, and often listed fake awards and athletic activities; and

    e.    Disguising the nature and source of the bribe payments by funneling the money through the accounts of a purported charity, from which many of the bribes were then paid.

### Certain Relevant Persons and Entities

7.    The Edge College & Career Network, LLC, also known as "The Key," is a for-profit college counseling and preparation business based in Newport Beach, California that was established in or about 2007 and registered in California in or about 2012.

8.    The Key Worldwide Foundation ("KWF") is a non-profit corporation founded in or about 2012 and based in Newport Beach, California. In or about 2013, the Internal Revenue Service ("IRS") approved KWF as an exempt organization under Section 501(c)(3) of the Internal Revenue Code, meaning that KWF is exempt from paying federal income tax, and that individuals who contribute to KWF may deduct those contributions from their taxable income, subject to certain limitations.

9.    ACT, Inc. is a non-profit organization headquartered in Iowa City, Iowa that administers the ACT exam, a standardized test that is widely used as part of the college

4

admissions process in the United States. The ACT includes sections on English, mathematics, reading and science, and is graded on a scale of 1 to 36.

10.     The College Board is a non-profit organization headquartered in New York, New York. Together with Educational Testing Service ("ETS"), a non-profit organization headquartered in Lawrence Township, New Jersey, the College Board develops and administers the SAT, a standardized test that, like the ACT exam, is widely used as part of the college admissions process in the United States. Between 2005 and January 2016 the SAT was graded on a scale of 600 to 2400. As of March 2016, the SAT has been scored on a scale of 400 to 1600. The College Board and ETS also develop and administer SAT subject tests, which are also used as part of the college admissions process.

11.     Georgetown University ("Georgetown") is a highly selective private university located in Washington, D.C.

12.     Stanford University ("Stanford") is a highly selective private university located in Palo Alto, California.

13.     The University of California at Los Angeles ("UCLA") is a highly selective public university located in Los Angeles, California.

14.     The University of San Diego ("USD") is a selective private university located in San Diego, California.

15.     The University of Southern California ("USC") is a highly selective private university located in Los Angeles, California.

16.     The University of Texas at Austin ("U-Texas") is a highly selective public university located in Austin, Texas.

5

17.     Wake Forest University ("Wake Forest") is a highly selective private university located in Winston-Salem, North Carolina.

18.     Yale University ("Yale") is a highly selective private university located in New Haven, Connecticut.

19.     The athletic teams of Georgetown, Stanford, UCLA, USD, USC, U-Texas, Wake Forest and Yale (collectively, "the Universities") compete in most sports at the Division I level, the highest level of intercollegiate athletics sanctioned by the National Collegiate Athletic Association ("NCAA").

20.     Cooperating Witness 1 ("CW-1") is an individual who participated in the scheme. CW-1 founded and, together with others, operated The Key and KWF.[1]

21.     Cooperating Witness 2 ("CW-2") is an individual who participated in the scheme. CW-2 was employed at relevant times as the director of college entrance exam preparation at a private college preparatory school and sports academy in Bradenton, Florida.[2]

---

[1] CW-1 has agreed to plead guilty in the United States District Court for the District of Massachusetts to racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d); money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h); conspiracy to defraud the United States, in violation of Title 18, United States Code, Section 371; and obstruction of justice, in violation of Title 18, United States Code, Section 1512(c). CW-1 has been cooperating with the government's investigation since in or about late September 2018, in the hope of obtaining leniency when he is sentenced. In or about October 2018, after he began cooperating with the government, CW-1 alerted several subjects of the investigation to its existence, resulting in the obstruction of justice charge to which he has agreed to plead guilty. Information provided by CW-1 has been corroborated by, among other things, Court-authorized wiretaps, e-mails, documents, consensual recordings, and interviews of other witnesses, including cooperating witnesses.

[2] CW-2 has agreed to plead guilty in the United States District Court for the District of Massachusetts to conspiracy to commit mail fraud and honest services mail fraud, in violation of Title 18, United States Code, Section 1349; and conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h). CW-2 has been cooperating with the government's investigation since in or about February 2019, in the hope of obtaining leniency when he is sentenced. Information provided by CW-2 has been corroborated by, among other

22.    Cooperating Witness 3 ("CW-3") is an individual who participated in the scheme. CW-3 was employed at relevant times as the head coach of women's soccer at Yale.[3]

General Background on Standardized Testing and the College Admissions Process

23.    The ACT and the SAT are typically administered to large groups of students on specified dates and under strict time limits.  However, students with certain learning or other disabilities may qualify for extended time.  In such circumstances, students take the test alone, under the supervision of a test administrator retained by ACT, Inc. or the College Board.

24.    Prior to administering the ACT, test administrators must typically certify that they will administer the exam in accordance with the ACT Administration Manual, and will ensure that the "test materials are kept secure and confidential, used for this examinee only, and returned to ACT immediately after testing."  Similarly, prior to administering the SAT exam, test administrators must typically certify that they will administer the test in accordance with the SAT coordinator's manual, that the SAT is the property of the College Board, and that no one other than the student can "open the test book and see the test content."

25.    The ACT and SAT exams, and the scores students earn on those exams, are the intellectual and physical property of ACT, Inc. and the College Board, respectively.

---

things, Court-authorized wiretaps, e-mails, documents, consensual recordings, and interviews of other witnesses, including cooperating witnesses.

[3] CW-3 has agreed to plead guilty in the United States District Court for the District of Massachusetts to wire fraud, in violation of Title 18, United States Code, Section 1343; honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346; and conspiracy to commit the same, in violation of Title 18, United States Code, Section 1349.  CW-3 has been cooperating with the government's investigation since in or about April 2018, in the hope of obtaining leniency when he is sentenced.  Information provided by CW-3 has been corroborated by, among other things, Court-authorized wiretaps, e-mails, documents, consensual recordings, and interviews of other witnesses, including cooperating witnesses.

26.     Most of the Universities require prospective students to submit standardized test scores—typically, either the ACT or the SAT—as part of their application packages. When submitted, standardized test scores are a material part of the admissions process at each of the Universities.

27.     All of the Universities also recruit students with demonstrated athletic abilities, and typically apply different criteria when evaluating applications from such students, with the expectation that recruited athletes will be contributing members of the Univerities' athletic teams once enrolled. Typically, the admissions offices at the Universities allot a set number of admission slots to each head coach of a varsity sport for that coach's recruited athletes. At each of the Universities, the admissions prospects of recruited athletes are higher—and in some cases substantially higher—than those of non-recruited athletes with similar grades and standardized test scores.

28.     Student athletes recruited by coaches at USC and UCLA, for example, are typically considered by designated admissions committees, which give consideration to their athletic abilities, and may admit applicants whose grades and standardized test scores are below those of other USC or UCLA students, including non-recruited athletes. At Wake Forest, as another example, approximately 128 admissions slots are designated for athletic recruitment, and recruited students are typically assured of admission to the university provided they meet certain minimum academic standards. Similarly, at Georgetown, approximately 158 admissions slots are allocated to athletic coaches, and students recruited for those slots have substantially higher admissions prospects than non-recruited students.

8

29.     At each of the Universities, admissions slots, the determination of which students to admit, and the resulting composition of undergraduate classes are important assets of the University.

The College Entrance Exam Cheating Scheme

30.     The college entrance exam cheating scheme generally worked as follows:

a.     CW-1 instructed clients of The Key to seek extended time for their children on college entrance exams if they had not done so already, including by having the children purport to have learning disabilities in order to obtain the medical documentation that ACT, Inc. and the College Board typically require before granting students extended time.

b.     Once the students were granted extended time—which generally allowed them to take an exam over two days instead of one, and in an individualized setting—CW-1 instructed his clients to change the location of the exam to one of two test centers he told them he "controlled": a public high school in Houston, Texas (the "Houston Test Center") or a private college preparatory school in West Hollywood, California (the "West Hollywood Test Center"). For example, in explaining the scheme to defendant WILLIAM E. McGLASHAN, Jr., CW-1 explained that he needed to "control the center" for the scheme to work, and that by obtaining "extended time" for the test, McGLASHAN's son would be able to take the test at CW-1's "facility," rather than at his own high school. At those test centers, CW-1 had established relationships with test administrators who had agreed to accept bribes to facilitate the cheating scheme: Niki Williams at the Houston Test Center, and Igor Dvorskiy at the West Hollywood Test Center.[4] CW-1 typically instructed his clients to fabricate a reason—such as a bar mitzvah

---

[4] Williams and Dvorskiy have been indicted by a federal grand jury in the District of Massachusetts on a charge of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).

9

or a wedding—that their children purportedly needed to take the test in Houston or West Hollywood instead of at their own schools.

        c.      After the location of the exam had been changed, ACT, Inc. and the College Board sent the exams to those test centers, typically via private interstate commercial carrier, such as Federal Express ("FedEx") in the case of ACT, Inc., and United Parcel Service ("UPS") in the case of the College Board.

        d.      CW-1 bribed the test administrators to allow a third-party—typically CW-2—to take the exams in place of the actual students, to serve as a purported proctor for the exams while providing students with the correct answers, or to review and correct the students' answers after they completed the exams. In many instances, the students taking the exams were unaware that their parents had arranged for this cheating.

        e.      The corrupt test administrators sent the doctored exams back to ACT, Inc. and the College Board, typically via either UPS or FedEx.

        f.      CW-1's clients paid CW-1 between $15,000 and $75,000 per test to participate in the cheating scheme, with the payments typically structured as purported donations to the KWF charity.

        g.      CW-1, in turn, paid Dvorskiy bribes of approximately $10,000 per test to permit the cheating. CW-1 likewise bribed Williams, typically via payments through a mutual acquaintance, Martin Fox, who introduced CW-1 to Williams.[5] However, in July 2018, CW-1 sent Williams a $5,000 check directly. CW-1 also paid CW-2 approximately $10,000 to take or

---

[5] Fox has been indicted by a federal grand jury in the District of Massachusetts on a charge of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).

correct each student's test. Most of the payments to Dvorskiy and CW-2 were drawn on the account of the KWF charity.

        h.     In explaining the scheme to clients, CW-1 typically sought to earn their trust and confidence by noting that he had previously done the same thing many times before with other families. As set forth below, for example, CW-1 had the following exchange with defendant GORDON CAPLAN in a call on or about June 15, 2018 (prior to the time CW-1 began cooperating with the government's investigation), that was intercepted pursuant to a Court-authorized wiretap: [6]

CAPLAN     And it works?

CW-1        Every time. (laughing)

CAPLAN     (laughing)

CW-1        I mean, I'm sure I did 30 of them at different, you know, dates because there's different dates, and they're all families like yours, and they're all kids that wouldn't have perform[ed] as well, and then they did really well, and it was like, the kids thought, and it was so funny 'cause the kids will call me and say, "Maybe I should do that again. I did pretty well and if I took it again, I'll do better even." Right? And they just have no idea that they didn't even get the score that they thought they got.

Indeed, in many cases, CW-1's clients referred other parents to him, or inquired directly about other parents' involvement in the scheme. For example, as set forth in greater detail below, defendant AGUSTIN HUNEEUS, Jr., told CW-1, in substance, that he was aware that McGLASHAN had participated in the college entrance exam scheme, but that McGLASHAN had not advised his own son of that fact, and that McGLASHAN's son thus "had no idea … that you helped him on the ACT."

---

    [6] Excerpts of wiretap interceptions and consensual recordings set forth herein are based on draft transcripts of those recordings.

i.     The children of CW-1's clients submitted the fraudulently obtained exam scores as part of their applications to universities nationwide, including Boston College, Boston University and Northeastern University in the District of Massachusetts.[7]

<u>The College Recruitment Scheme</u>

31.     Between approximately 2011 and 2018, parents paid CW-1 approximately $25 million to bribe coaches and university administrators to designate their children as purported recruited athletes, or as members of other favored admissions categories, thereby facilitating the children's admission to those universities.  The recruitment scheme typically worked as follows:

a.     CW-1 told parents, in sum and in substance, that he could facilitate their children's admission to certain universities via what he termed the "side door."  He described the side door scheme as a *quid pro quo*, pursuant to which the parents would purport to make charitable donations to KWF.  CW-1, in turn, would funnel those payments to particular athletic coaches, or to university programs designated by those coaches, using KWF to disguise the nature and source of the payments.  CW-1 typically explained to parents that, in exchange for the payments, the coaches would designate their children as recruited athletes—regardless of their athletic abilities—thereby facilitating their admission to the universities.

b.     CW-1 typically explained to his clients, in substance, that the scheme was a tried-and-true method of gaining admission to colleges, and that many other families were participating or had already participated in it, leveraging connections CW-1 had developed at multiple universities over years of work with prior clients.  For example, set forth below is how

---

[7] In addition, as set forth herein, e-mails, wire transfers and mailings in furtherance of the conspiracy were sent to and from the District of Massachusetts, telephone calls in furtherance of the conspiracy were also made to and from the District of Massachusetts, and two of the conspirators have residences in the District of Massachusetts.

12

CW-1 described the scheme to CAPLAN in the June 15, 2018 call, during which CW-1 represented to CAPLAN that he had successfully engaged in the same scheme with nearly 800 other families:

> Okay, so, who we are-- what we do is we help the wealthiest families in the U.S. get their kids into school …. Every year there are-- is a group of families, especially where I am right now in the Bay Area, Palo Alto, I just flew in. That they want guarantees, they want this thing done. They don't want to be messing around with this thing. And so they want in at certain schools. So I did 761 what I would call, "side doors." There is a front door which means you get in on your own. The back door is through institutional advancement, which is ten times as much money. And I've created this side door in. Because the back door, when you go through institutional advancement, as you know, everybody's got a friend of a friend, who knows somebody who knows somebody but there's no guarantee, they're just gonna give you a second look. My families want a guarantee. So, if you said to me 'here's our grades, here's our scores, here's our ability, and we want to go to X school' and you give me one or two schools, and then I'll go after those schools and try to get a guarantee done. So that, by the time, the summer of her senior year, before her senior year, hopefully we can have this thing done, so that in the fall, before December 15th, you already knows she's in. Done. And you make a financial commitment. It depends on what school you want, may determine how much that actually is. But that's kind of how the the side and back door work.

      c.      Once parents agreed to participate in the scheme, CW-1 sent bribes to coaches and, in one case, a university administrator, typically out of a KWF bank account. In some instances, he directed the money to the recipients directly, for their personal use, including one receipient who received bribe payments by mail at his residence in the District of Massachusetts. In other instances, he directed the money to designated accounts at the Universities that were controlled by the recipients, including in some instances via mailings from the District of Massachusetts. In still other instances, CW-1's clients made the payments directly to the designated accounts at the Universities, as directed by the bribe recipients.

      d.      In recruiting coaches to participate in the scheme, CW-1 sought to earn their trust and confidence by making clear to them, as he did to his clients, that other coaches were already engaged in the same conduct with him. For example, set forth below are two

excerpts from a call on or about May 4, 2018, in which CW-1 sought to enlist the assistance of

CW-3 in recruiting additional coaches to join the conspiracy:

CW-1            You can say he's doing it at, for this year I did [seven elite schools], we've
                done it everywhere.

CW-3            Okay, see that might, yeah it definitely would make them feel more
                comfortable with all those places.

                                        ....

CW-3            Okay, alright, and all those schools, like, you-- you're-- you're comfortable.
                I can-- I can tell her comfortably that you worked with all those schools.

CW-1            Absolutely.

CW-3            Huh.

CW-1            It's all different-- it's all—absolutely, but it's all-- it's different programs at
                every school.

CW-3            Right, right, right, I know, I know. But saying that you worked with those
                schools I think that makes her feel more comfortable, knowing that you've
                worked with all the schools before.

CW-1            You can tell them I did 760 of these this year, 96 the year before.

    e.  In exchange for the bribes, the recipients designated the children of CW-

1's clients as purported athletic recruits—without regard for their athletic abilities—or as

members of other favored admissions categories, such as "VIP lists," thereby facilitating their

admission to the Universities.

    f.  As part of the scheme, CW-1, together with others, also fabricated athletic

"profiles" for students, which CW-1 submitted to the Universities in support of the students'

applications, and which contained falsified athletic credentials—including fake honors the

students had purportedly received and elite athletic teams they had purportedly played on. In

some instances, parents assisted CW-1 in creating the fabricated profiles, including by supplying

staged photographs of their children engaged in athletic activity. In other instances, CW-1 and

14

his associates simply found photos of athletes on the Internet and either used those photos or used software such as PhotoShop to insert the applicants' faces onto the bodies of legitimate athletes. For example, as set forth in greater detail below, CW-1 explained to McGLASHAN that he would create a falsified athletic profile for McGLASHAN's son, something he told McGLASHAN he had "already done ... a million times," and which would involve him using "Photoshop and stuff" to deceive university admissions officers.

g.      As another example, on or about November 13, 2017, CW-1 sent a falsified athletic profile to CW-3. The profile falsely described an applicant as the co-captain of a prominent club soccer team in southern California. CW-3, in exchange for a promised bribe payment, designated the applicant as a recruit for the Yale women's soccer team, despite the fact that, as he knew at the time, she did not play competitive soccer. On or about January 1, 2018— after the applicant was admitted to Yale—CW-1 mailed CW-3 a check in the amount of $400,000, drawn on a KWF bank account. Relatives of the applicant subsequently paid CW-1 approximately $1.2 million in multiple installments, including approximately $900,000 that was directed to KWF as a purported charitable donation.

<u>THE INDIVIDUAL DEFENDANTS</u>

A. <u>JANE BUCKINGHAM</u>

32.      Defendant JANE BUCKINGHAM is a resident of Los Angeles, California. BUCKINGHAM is chief executive officer ("CEO") of a boutique marketing company based in Los Angeles.

33.      In or about June 2018, BUCKINGHAM agreed to make a purported charitable donation of $50,000 to KWF, in exchange for which CW-1 arranged to have CW-2 take the ACT on behalf of BUCKINGHAM's son at the Houston Test Center the following month.

15

34.     Thereafter, CW-1 made arrangements with Williams to to allow CW-2 to purport to proctor the ACT for BUCKINGHAM's son.  In return, CW-1 promised Williams that he would send her money to "go on vacation."

35.     In a call with BUCKINGHAM on or about July 10, 2018, CW-1 explained, in substance, that CW-2 would not require all of the extended time BUCKINGHAM's son had been granted to take the ACT.  The following is an excerpt from the conversation, which was intercepted pursuant to a Court-authorized wiretap.

| | |
|---|---|
| CW-1 | Hey there, so I just talked to Niki.  So you guys are gonna meet at 8 a.m. in front of the [Houston Test Center]. |
| BUCKINGHAM | Okay. |
| CW-1 | And you're actually not gonna take the test there you because they're doing some re-modeling at the school. |
| BUCKINGHAM | Okay. |
| CW-1 | But she's gonna walk you across the street to Texas Southern University, 'cause it's right across the street. |
| BUCKINGHAM | Okay. |
| CW-1 | And they're gonna have a classroom all set up for the proctor, [CW-2] and [your son], and then Niki will take care of the rest. |
| BUCKINGHAM | Amazing, and is it okay if he takes it all in one day? |
| CW-1 | He's going to take it one day 'cause [CW-2] is only flying in from Florida for one day. |
| BUCKINGHAM | There you go that's-- |
| CW-1 | But on, but on, but on the form it will say two days. |
| BUCKINGHAM | Got it, got it. |
| CW-1 | So we will document that he took it over two days. |

16

36.     After speaking with BUCKINGHAM, CW-1 called CW-2 to review the logistics of the plan for CW-2 to take the exam.  CW-1 told CW-2 that he would send him a check for $10,000.

37.     In a call on or about July 12, 2018, BUCKINGHAM advised CW-1, in substance, that her son had developed tonsillitis and that his doctor had advised against allowing him to travel.  BUCKINGHAM asked CW-1 whether it would be possible for her to obtain a copy of the exam that she could have her son take at home—so that he would believe he had taken the test—while CW-2 took the actual exam on his behalf in Houston.  The following is an excerpt from the conversation.

| | |
|---|---|
| BUCKINGHAM | So I guess my question is, look-- |
| CW-1 | Go ahead. |
| BUCKINGHAM | First of all, he can get on the plane like he, according to him, he's like, "I really don't feel that bad, I think I'm okay." And I do think that this doctor is a little over conservative.  Part of my challenge is that my ex-husband is being incredibly difficult about the whole surgery, and if I take him to Houston and then he can't get the surgery he's gonna be very annoyed with me. So my question is, there is no way for him to not go and it still to be done, I assume? |
| CW-1 | Oh maybe I can do that, but I just don't-- I have to talk to the proctor [to make sure she is] fine with doing it. |
| BUCKINGHAM | Right. |
| CW-1 | It's the gal who runs the school. |
| BUCKINGHAM | Right. |
| CW-1 | So I have to ask her. I just got off the phone with her, but if, are you okay with that? And then just-- |
| BUCKINGHAM | Well what? |
| CW-1 | The score. |

17

| | |
|---|---|
| BUCKINGHAM | What I would do is, I would say to you, can you give me a test for him to take at home that we proctor him, that I proctor him? |
| CW-1 | Got it, got it. Okay, yeah, I guess we could do we could do something like that. |
| BUCKINGHAM | I mean that's just, I guess, and it's the only thing I can think of, if you think it's doable? |
| CW-1 | Yeah, so, the only fact, the only other way is that ACT allows a three week window, unlike SAT, which is a three day window. |
| BUCKINGHAM | Right. |
| CW-1 | So I just talked to Niki, the gal at [the Houston Test Center], and she is back on the 25th of July. |
| BUCKINGHAM | It just depends on whether he gets the surgery or not. |
| CW-1 | I know, I know. |
| BUCKINGHAM | He can't, he can't fly for two weeks after that. |
| CW-1 | Okay, so let me call Niki and ask her if she would have a problem with [CW-2] just doing this. |
| BUCKINGHAM | Yeah. |
| CW-1 | Which would actually make it easier for him to do it, because it would take less time, but let me call Niki right now and see what she says. |

38. Later that same day, CW-1 called BUCKINGHAM to tell her that Williams was willing to go along with BUCKINGHAM's plan. The following are two excerpts from the conversation.

| | |
|---|---|
| CW-1 | Okay, so here's the deal. |
| BUCKINGHAM | Okay. |
| CW-1 | So Niki is is willing to do it. |
| BUCKINGHAM | Yep. |

18

| CW-1 | We are looking for my, correct, that we are trying to get ourselves like 34 on the ACT? |
|------|------|
| BUCKINGHAM | Yeah, yeah. |
| CW-1 | So [CW-2] will do that. It's really-- can be a 33, it could be a 34, it could be a 35. |
| BUCKINGHAM | Right. |

....

| CW-1 | But, so, anyways, so the, she said she would do it, she would send us a copy of the test that we're gonna take-- |
|------|------|
| BUCKINGHAM | Okay. |
| CW-1 | And then, even though we're already gonna send in his test, there at least [your son] will have taken the same test. |
| BUCKINGHAM | Thank you, thank you. |
| CW-1 | Okay, so your donation is gonna be 50. It'll it'll end up being through our foundation. |
| BUCKINGHAM | Okay. |
| CW-1 | And I'm already sending a check to the proctor today, and to Niki today, 'cause she said, "I gotta have the money first." |
| BUCKINGHAM | Okay. |
| CW-1 | I said, "Niki, I have been doing this forever." She said, "I get it, but this like, this is crazy." |
| BUCKINGHAM | Yeah. I know this is craziness, I know it is. And then I need you to get him into USC, and then I need you to cure cancer and [make peace] in the Middle East. |
| CW-1 | I can do that, I can do that if you can figure out a way to boot your husband out so that he treats you well-- you're treated better-- |
| BUCKINGHAM | That's impossible. That's impossible. But, you know, peace in the Middle East. You know, Harvard, the rest of it. I have faith in you. |

19

| CW-1 | Got it, got it. Alright, so I will tell [CW-2] now that he's just gonna pick it up [from] Niki, take it, [and] Niki will send us a copy, and then [your son] can take it sometime next week when he's feeling better. |
| --- | --- |
| BUCKINGHAM | Yeah, I mean look, he can take it Saturday, I have no problem with him taking [it then]. |
| CW-1 | But it's not an issue with that. It can be anytime he wants. |
| BUCKINGHAM | Right, okay, okay. |
| CW-1 | That's not an issue, 'cause it has to be sent in from Houston. |
| BUCKINGHAM | And is-- will you send me where and how I should send the check? |
| CW-1 | Oh yeah, yeah, yeah, yeah. We'll send it so that you get your [IRS tax] writeoff. |
| BUCKINGHAM | Oh, even better! |
| CW-1 | Yeah, it will be, it will be through the, our foundation, our 501(c)(3), and then we'll send the checks to all the parties. |
| BUCKINGHAM | Okay. |
| CW-1 | And that way you, there's no, people aren't saying, "Well, why [did] you send a check to [the Houston Test Center]?" and da da da. |
| BUCKINGHAM | Right, right. |

39.     On or about July 13, 2018, CW-2 asked CW-1 for a handwriting sample from BUCKINGHAM's son so that CW-2 could attempt to match his handwriting on the exam. CW-1 called BUCKINGHAM to request the sample. The following is an excerpt from the conversation.

| CW-1 | Hey could you get me a handwriting sample? |
| --- | --- |
| BUCKINGHAM | Yep. |
| CW-1 | And a signature sample, so that he can kind of get close. Had he not taken the test before we wouldn't have to do this, but I just want to make sure we're close in our writing. |

20

25

BUCKINGHAM        Yes. He has not great writing.  I'm gonna give you that, but I'm going to, actually I'm bringing [him] to the doctor right now, so we will sit down in the waiting room and I will send it to you.

40.      Shortly thereafter, BUCKINGHAM sent CW-1 an e-mail with the notation, "Good luck with this."  Attached to the e-mail was a photograph of the following:

To whom it may concern, this provides an example of my current writing style. Thank you for your attention.
Sincerely,

41.      CW-2 took the ACT exam on or about July 14, 2018, in his room at a Houston-area hotel.  The next day, CW-1 e-mailed BUCKINGHAM, "Test went well."

42.      On or about July 17, 2018, BUCKINGHAM asked CW-1, via e-mail, "[D]o you think we could get a copy of the ACT for [my son] to take?"  Later that same day, an employee of The Key e-mailed BUCKINGHAM a copy of an ACT practice test.

43.      On or about July 18, 2018, BUCKINGHAM wired $35,000 to a bank account in the name of the KWF charity as a partial payment toward the agreed-upon fee of $50,000. BUCKINGHAM advised CW-1 that she would seek to have her former spouse pay the remaining $15,000 she owed.

44.      BUCKINGHAM's son received a score of 35 out of a possible 36 on the ACT exam CW-2 secretly took on his behalf.

45.      On or about October 29, 2018, at the direction of law enforcement agents, CW-1 called BUCKINGHAM from Boston, Masschusetts.  On the call, BUCKINGHAM said that she would "probably like to do the same thing with [my daughter] with her ACTs" because she is "not a great test taker."  BUCKINGHAM said her daughter would not "need to get a 35" to be

21

admitted to her chosen schools, "but if she got a 32 or 33, I'm assuming that would make her pretty competitive."

### B. GORDON CAPLAN

46.     Defendant GORDON CAPLAN is a resident of Greenwich, Connecticut and New York, New York.  CAPLAN is an attorney and the co-chairman of an international law firm based in New York.

47.     In or about November and December 2018, CAPLAN participated in the college entrance exam cheating scheme by making a purported charitable donation of $75,000 to KWF, in exchange for which CW-1 arranged to have CW-2 purport to proctor CAPLAN's daughter's ACT exam and correct the answers after she had completed it.

48.     In a call on or about June 15, 2018, CW-1 explained to CAPLAN, in sum and substance, how the scheme worked.  The following is an excerpt from the conversation, which was intercepted pursuant to a Court-authorized wiretap.

CW-1     So here's the first thing we need to do. And I think I mentioned this to your wife. We need to get your daughter tested for a learning difference. Here's why. If she gets tested for a learning difference, and let's say it's my person that does it, or whoever you want to do it, I need that person to get her 100% extended time over multiple days. So what that means is, we'll have to show that there's some discrepancies in her learning, which there's gotta be anyways. And if she gets 100%, Gordon, then, I own two schools. I can have her test at one of my schools, and I can guarantee her a score. If it's ACT, I can guarantee her a score in the, in the 30s. And if it's the SAT, I can guarantee her a score in the 1400s. Now, all of a sudden, her test score does not become an issue with all the colleges. Because she's strong enough. Then, if we clean up her transcript, then her ability, with her athletic ability and her testing and her getting better at school, it's much easier to get her into school, because you're not fighting huge obstacles at the types of schools you're talking about. Now, if we do that, there's a financial consideration that you have to pay to the school to get it done, because this is absolutely unheard of, to make this happen. I can make scores happen, and nobody on the planet can get scores to happen. She won't even know that it happened. It will happen as though, she will think that she's really super smart, and she got lucky on a test, and you got a score now. There's lots of ways to do this. I can do anything and everything, if you guys are amenable to doing it.

22

CAPLAN    Okay, so let me let me understand the two components. What is the, what is the, the number?

CW-1      So the number-- the number--

CAPLAN    --At Cornell for instance.[8]

CW-1      Well, hold on a second. The number on the testing is $75,000. Okay? It's $75,000 to get any test scores you would like to get on the SAT or ACT. Okay, that's--

CAPLAN    Explain to me how that works.

CW-1      I just explained it to you. You get extended time, you gotta get the extended time first. Then you're going to fly to L.A. And you're going to be going on a fake recruiting visit. You'll visit some schools, while you're out here in L.A. And then on a Saturday, which is the national test day if it's ACT or SAT, she's going to sit down and take the test. I will have a proctor in the room, that's why, when you have 100% extended time, you have-- you get to take it at a-- you don't take it with everybody else, you get to take it over multiple days. And you get to take it at a-- you can take it at your school or another school. Okay? And then this kid, 'cause she's taking online classes, you have to go somewhere anyway.[9] So you come to my school, take the test on a Saturday. She'll be in the room for six, six and a half hours taking this test. My proctor would then answer her questions, and by the end of the day, she would leave, and my proctor would make sure she would gets a score that would be equivalent to the number that we need to get.

CAPLAN    Okay.

CW-1      That's how simple it is. She doesn't know. Nobody knows what happens. It happened, she feels great about herself. She got a test score, and now you're actually capable for help getting into a school. Because the test score's no longer an issue. Does that make sense?

CAPLAN    That does.

49.    Later that same day, CW-1 had a follow-up call with CAPLAN in which he again

explained, in substance, how the scheme worked, and in particular the need for CAPLAN's

daughter "to be stupid" when a psychologist evaluated her for learning disabilities in order to

---

[8] CAPLAN's reference to the "number" for Cornell was a reference to the athletic recruitment scheme, which he also expressed an interest in but ultimately decided not to pursue.

[9] CAPLAN's daughter was enrolled at an online high school.

23

obtain the documentation necessary to obtain extended time on the exam. The following are two

excerpts from the conversation.

CAPLAN    Well again, thanks for taking the time earlier today. Look, I'm particularly
          interested in working with you guys and figuring out what's best for [my
          daughter]. She's an interesting kid. I'm sure you've seen them all. But this notion
          of effectively going in, flying out to L.A., sitting with your proctor, and taking the
          exam is pretty interesting.

CW-1      It's the homerun of homeruns.

CAPLAN    And it works?

CW-1      Every time. (laughing)

CAPLAN    (laughing)

CW-1      I mean, I'm sure I did 30 of them at different, you know, dates because there's
          different dates, and they're all families like yours, and they're all kids that
          wouldn't have perform[ed] as well, and then they did really well, and it was like,
          the kids thought, and it was so funny 'cause the kids will call me and say, "Maybe
          I should do that again. I did pretty well and if I took it again, I'll do better even."
          Right? And they just have no idea that they didn't even get the score that they
          thought they got.

CAPLAN    Right.

CW-1      Which is great, that's the way you want it. They feel good about themselves.

CAPLAN    Yeah, absolutely, and there's nothing, just ask you directly, there's nothing that
          the schools are concerned about with this, or have a problem with?

CW-1      Schools don't know. Schools don't know. That's why you have to get 100%
          time or you have to get 50% multiple days. The only, so the way it works is, if
          you get 50% time you have to take it at a national test center okay? If you get
          100% time you have to find a school that'll actually give you the test. So, if she
          were at a traditional school, she would be taking it at that school. What I do is, I
          always tell the family, "Oh, you got a bar mitzvah out of town that weekend, so
          you found a school to take it at," and they go take it at our school and then they
          come home and they get a score. So the key is the testing, and we have to get the
          testing so that we show a discrepancy. It sounds like she has a discrepancy, but I
          need the discrepancies to be significant enough so that we don't have to appeal
          and we can go forward. The fact that she's in an online school, that may be
          helpful for us as well.

CAPLAN    And you work all of that out? You figure that out? Or?

24

CW-1        Yeah, absolutely.

CAPLAN      And do you ever have a problem getting the 100% time?

CW-1        Oh yeah, there's times when we have to appeal because, you know, for whatever reason. You have to understand that College Board and ACT both outsource their decisions to a committee, 'cause they're tired of being sued. For, you know, so they do the outsourcing. So, sometimes you have to re-appeal so that psychologist that'll do the testing, will actually write up an appeal. So we'll do that, and I also need to tell [your daughter] when she gets tested, to be as, to be stupid, not to be as smart as she is. The goal is to be slow, to be not as bright, all that, so we show discrepancies. And she knows that she's getting all this extra time, everywhere that she is right now. At the Academy kids are getting extra time all the time.

CAPLAN      You mean the Greenwich Academy?

CW-1        Everywhere.

CAPLAN      Oh, oh you mean at her tennis academy. I see. Yeah. Okay.

CW-1        Yeah, everywhere around the country. What happened is, all the wealthy families that figured out that if I get my kid tested and they get extended time, they can do better on the test. So most of these kids don't even have issues, but they're getting time. The playing field is not fair.

CAPLAN      No, it's not. I mean this is, to be honest, it feels a little weird. But.

CW-1        I know it does. I know it does. But when she gets the score and we have choices, you're gonna be saying, okay, I'll take all my kids, we're gonna do the same thing. (laughing)

CAPLAN      Yeah, I will.

                                        ....

CAPLAN      So, how do I get this done with you? What do I need to do?

CW-1        So what I need to do is, I'm gonna talk to our psychologist, and we may have to send her to you, or you to her, so that she can get the testing done. I'm gonna talk to her, because she's going to a school online, there are forms that have to be filled out by her teachers that she's doing online, so we'll need to send the whole packet to them. It's a huge writeup. It's, you know, it's, I don't know what it is, it costs like four or five grand to get the report all done and all the testing done and have, takes two days to get the testing done. And it shows all the discrepancies. Here's the great thing. When she goes to college, she gets to bring this report with her and she'll get extended time in all those things in whatever

25

|  |  |
|---|---|
|  | school she goes to, which is huge again. She'll get all the accommodations when she gets to college as well. |
| CAPLAN | Huh. |
| CW-1 | Which will be really helpful. |
| CAPLAN | Okay, okay. |
| CW-1 | So I need to follow up, what I need to do is get your wife to send me her classes she's in, her transcript, and then let me then have a discussion with our psychologist and ask her what she needs to get the ball rolling. |
| CAPLAN | Okay. And how do I ensure that she's working with you, and, you know, the people that you want her working with? |
| CW-1 | So what happens is, I think your family already talked to my person who lives in New York. |
| CAPLAN | Alright. |
| CW-1 | [My employee] and she'll start working with [my employee]. [My employee] will be aware of everything that's going on, she won't say anything 'cause she knows. 'Cause we have a bunch of other New York families that are doing the same thing. And then what we'll do is, she'll work on a weekly basis with [my employee], the testing will be done by the psychologist, and then lastly, I already got the proctor already set up. He lives in Florida. He actually played tennis at Harvard and he'll be the proctor. And then, when we get a score, and get her grades changed, and she retakes her classes, then we'll figure out how good she is, late spring next year and we'll go after those schools-- |
| CAPLAN | Okay, so what? |
| CW-1 | --want to get into. |
| CAPLAN | When will the-- so when will she take this extended test? |
| CW-1 | Here's the thing, we gotta get her tested, and I gotta figure out if her school will check the box that, normally it takes four months of getting accommodations but she doesn't go to a traditional school, so they should be able to check off the box without the four months. Then we would take it late fall this year and we would take it one time and be done. |
| CAPLAN | Hmm. And a score of? You would think would be? |
| CW-1 | The score will be whatever we need it to be. |
| CAPLAN | Got it, okay. I will. |

26

50.     During a call with CAPLAN and CAPLAN's spouse on or about July 5, 2018,

CW-1 suggested that they hire a member of his staff to take classes for her, in order to improve

her grades in preparation for her application to college. CW-1 explained, "We would do them

online and one of my people would take the class for her." CAPLAN's spouse replied that she

had a "problem with that." At that point, CAPLAN picked up the phone and spoke with CW-1

privately. The following are two excerpts from the conversation.

| | |
|---|---|
| CAPLAN | It's just you and me. Is that kosher? I mean, can we? |
| CW-1 | Absolutely, I do it all the time man. I do it all the time for families and then we take college classes for kids, you know, online to raise their GPA. Because again, it's not, nobody knows who you are 'cause you're, you don't take a, there is nothing that, you know, is filmed when you take your test and everything, that's what's so great about it. So that's why I asked. |
| CAPLAN | Is, let me put it differently, if somebody catches this, what happens? |
| CW-1 | The only one who can catch it is if you guys tell somebody. |
| CAPLAN | I am not going to tell anybody. |
| CW-1 | Well (laughing) |
| CAPLAN | (laughing) |
| CW-1 | Neither am I. And, neither am I. So the only way is, if somebody says at [your daughter's] school, "Oh by the way, you re-took this class, congratulations, you got an A, blah, blah blah," she can't act like, "Really? When did I take that?" |
| CAPLAN | I see, okay. |

51.     Later in the call, CAPLAN inquired again about the "ACT thing."

| | |
|---|---|
| CW-1 | Yeah, so, you're getting tested by our psychologist, |
| CAPLAN | Right. |
| CW-1 | I don't know what she charges, and I, I don't make any money on this stuff. I don't really care about it to be frank with you. The school that she would be taking the test at, with the proctor, is $75,000 and we get the score we need to get. It's one time, it's done, she can't, but she has to show up and be there. She'll ask-- |

27

| CAPLAN | Done, done, not a problem. |
|---|---|
| CW-1 | She'll, she'll think, right, she'll think she took it. She'll feel good about herself. She'll get a great score and she'll be like, "Mom and dad, can I…" You know what's going to happen? She's going to say, "Dad, can I re-take the test again? 'Cause I think I can do better." And that happens all the time, right? She'll get whatever, and we will say no, just so you know that. |
| CAPLAN | But it will be somewhere in the 30s |

….

| CAPLAN | Okay, well look, we are in for the, get her extra time, to the extent we can, extra time on the test. |
|---|---|
| CW-1 | Right |
| CAPLAN | And then, and taking the test one time and get her a, you know, a score in the 30s. |
| CW-1 | Correct. |
| CAPLAN | We are in for that, at 75, not an issue. |
| CW-1 | Done. |
| CAPLAN | Done. The other stuff (laughing)-- |
| CW-1 | That will be up to you guys, it doesn't matter to me. |
| CAPLAN | Yeah, I, I hear ya. It's just, to be honest, I'm not worried about the moral issue here. I'm worried about the, if she's caught doing that, you know, she's finished. So I, I just-- |
| CW-1 | It's never happened before in twenty-some-odd years. The only way anything can happen is if she-- |
| CAPLAN | Someone talks-- |
| CW-1 | Yeah, if she tells somebody. And that's why even on the payment to the school thing, nobody, we never tell the, you know, she just needs to know that you're gonna get some help on this class. |
| CAPLAN | Correct. |
| CW-1 | She'll be more than happy. |
| CAPLAN | Oh yeah, I, she, she won't talk. |

28

52.     On or about July 21, 2018, CAPLAN and his daughter flew to Los Angeles to meet with a psychologist in an effort to obtain the medical documentation required to receive extended time on the ACT exam.

53.     After twice denying the request, the ACT ultimately granted CAPLAN's daughter extended time on the exam at the request of law enforcement on or about November 6, 2018. In a call two days later, CAPLAN asked CW-1, in sum and substance, whether anyone involved in the cheating scheme had ever been caught. The following is an excerpt from the conversation, which was consensually recorded.[10]

| | |
|---|---|
| CAPLAN | So [my daughter] did get the extension. Totally unexpected. We got it last night. |
| CW-1 | Really? |
| CAPLAN | Yeah. |
| CW-1 | That's cool. Cool. |
| CAPLAN | Yeah. And you were right. I mean, it was like third time was the charm.  So everybody was telling us there's no way, and then all of a sudden it comes in through [her school]. So, again, and-- keep in mind I am a lawyer. So I'm sort of rules oriented. Doing this with you, no way-- she's taking the test. It's her taking the test, right? There's no way-- |
| CW-1 | So-- |
| CAPLAN | -- any trouble comes out of this, nothing like that? |
| CW-1 | Okay. So-- so normally-- so let me-- [I] explained this to you before and-- |
| CAPLAN | Yes, and I-- and I apologize.  It's just-- |
| CW-1 | No, no. I get you. |
| CAPLAN | Bear with me. |

---

[10] By the time of this conversation, CW-1 was cooperating with the government's investigation.

CW-1        Okay. So I'm going to-- I'll explain to you the process and you get-- you get to decide the process. Okay? So what normally happens in our case is I'll call [CW-2], who's our proctor, and I'll call Igor, who's the principal of [the West Hollywood Test Center] and I'll say, "Okay, what dates are you available?" Because, my guess, if you're taking the ACT, our next test date is between December 8th and we have two weeks to take the test. Is that what the letter says?

CAPLAN      That's a good question.

CW-1        It should, but just call it that it is. Okay?

CAPLAN      Okay.

CW-1        All right. I'll--

CAPLAN      And I could-- I could forward it to you, too.

CW-1        Okay. That's normally the case. So then-- so what happens is, is then you guys have already registered for the December 8th test at a national test center, correct?

CAPLAN      I believe so, yes.

CW-1        Okay. So then what happens is, I need the ticket that--

CAPLAN      And your-- I'm sorry. Your e-mail is [E-MAIL ADDRESS REDACTED]

CW-1        It's [E-MAIL ADDRESS REDACTED].

CAPLAN      Yeah. At Gmail, right?

CW-1        Yes. [E-MAIL ADDRESS REDACTED].

CAPLAN      Okay. Just sent it to you.

CW-1        Okay. So-- so what normally happens is, you'll send me the ticket and then I will give it to Igor. Igor will do the paperwork so that the test center is moved to the [West Hollywood Test Center]. Okay?

CAPLAN      Okay. Okay.

CW-1        So then what'll happen is, instead of wherever she was going to take the test, it'll-- now a test will show up-- usually the Wednesday before the 8th, at [the West Hollywood Test Center]. Then what'll happen is, [CW-2], who is the proctor, will fly in, and he will show up on Friday night, just like you guys would show up on Friday night, and then on Saturday morning at 7:45, 8 o'clock, you guys will show up at the school, which is on [LOCATION REDACTED]. And

30

then what'll happen is, you'll go in, [CW-2] will be your proctor. And so this is--this is, again, how it all works. She'll take the test. It'll be all her taking the test and then at the end of the test, it would be decided that we want to score, let's say, 33, so that she never has to take the test again. It'll be one and done. Then she'll--you guys will leave and then [CW-2] will then look at all of her answers. Because her answers will be put on a separate sheet of paper and then [CW-2] will go through the answers and will figure out on all four of the-- there's five sections. The fifth is writing. On all four sections and he will decipher her answers and--and he will go back and-- and ensure that he makes it so that her score ends up being between a 32 and 34, just depending on the curve for that particular test day. And normally he's right on. And that is essentially how it would happen.

CAPLAN      And has anybody ever gotten into an issue with this?

CW-1        Nobody. We've done this for four or five years and had probably 20-plus people do it. So-- but that's the process.

CAPLAN      Never been an issue?

CW-1        Never been an issue. So the decision here is yours. I'm-- I'm not-- I don't want to influence you in any way. It's totally up to you guys, however you guys want to do this.

CAPLAN      And do other-- are you guys the only ones who do this or--?

CW-1        Based on what I know. I only know myself and the families that we work with. And so, you know, we have lots and lots of families. Not everybody gets extended time. Not everybody gets extended time with multiple days. So there's lots of people who cannot do it and then there's lots of people that do do it. So it's kind of all in your corner. But now-- you understand the process now.

CAPLAN      I do.

CW-1        So that, it's really simple and easy, and it's-- it's up to you to decide one way or another. And it doesn't matter to me. Whatever you guys want to do.

CAPLAN      No, I understand that, [CW-1]. I-- I appreciate that and I-- I appreciate the candor here, and the directness. Okay. Give me a little bit to think about it and I will be back to you on it tomorrow. You-- you obviously need to firm this up right away, right?

CW-1        Yeah, because we'll need to get the $25,000 wire and then I need to call [CW-2] and Igor to see-- to make sure they're available. My guess is you guys are available on the 8th because you guys were going to take it on the 8th anyways.

CAPLAN      Yeah. We'll just make ourselves available.

31

36

54.     On or about November 13, 2018, CAPLAN wired $25,000 to a bank account in

Boston, Massachusetts in the name of the KWF charity that, unbeknownst to CAPLAN, CW-1

had opened at the direction of law enforcement agents.  CW-1 had previously advised CAPLAN

that the $25,000 would be a "deposit" to reserve the services of CW-2, who CW-1 said was his

"best test-taker" and could "nail a score-- he's that good."

55.     On or about November 15, 2018, CAPLAN called CW-1 about changing the

location of the test to the West Hollywood Test Center, and again inquired whether anyone "has

ever gotten in trouble with this?" The following is an excerpt from the conversation, which was

consensually recorded.

CW-1      You got my-- you got my e-mail?

CAPLAN    I did and, that's sort of what I'm responding to, and part of the reason why I'm
          taking [my spouse] off of this. [My spouse is] very nervous about all this, and I
          just - I want to have a-- if we make this change, does that create some sort of
          suspicion or issue? They say, "Why the hell is somebody living in Greenwich
          taking it out in California?"

CW-1      Good point. Good point. So normally-- so anybody-- you know, for-- all of the
          kids that have taken the [test] some live somewhere else. They always-- and
          essentially if anybody were to-- to ask, essentially, "We're going to a-- a bat
          mitzvah," or, "We're going to a wedding. We're going to be gone that weekend.
          That's the weekend we're going to take the test." In your case, for your daughter,
          because she goes to a-- an unorthodox school, not your typical-- you know, brick
          and mortar kind of place, it's simple, because she could be playing a tournament
          there, we've got to take the test. Anything. But nobody ever asks them. But to--
          you have to do this to be able to move the test from where it's located. Plus, when
          you did your original ticket, I believe you didn't have the time.

CAPLAN    No, we didn't.

CW-1      Right. So now you got to go to a place that will actually administer and proctor
          the test for you. Because the place that you would go on that national test center
          date, they could not do that at that center, because they don't-- they have to have
          somebody special be a proctor, to go into a room-- a special room. But that's why
          they don't give those, with those kind of accommodations at a national test center.

32

| CAPLAN | [Let me] ask you straight up. You've never had an issue with this? No one has ever gotten in trouble with this? |
|--------|------|

CAPLAN      [Let me] ask you straight up. You've never had an issue with this? No one has ever gotten in trouble with this?

CW-1        I've never--

CAPLAN      Um--

CW-1        --had an issue with anybody. We've done this, you know, probably 20 times plus. We did it this summer, because, you know, they moved the ACT, they offered a July test date in California. You couldn't take it in California so we-- we weren't a test center for the-- the summer, so a young person had to go to Houston to do it. We just did it for the subject test for a-- actually a girl that lives both in New York and Aspen. So nothing-- nothing to this point has happened.

CAPLAN      Could you ever see that happening?

CW-1        I-- I'm not-- I have never seen it happen. The only-- so what happened is they changed the test form so that's why Igor got confused, because the form is different for this new school year. So that's why we called ACT, to say, "Okay, what's the simplest way to do this, because she already had a regular ticket, not an accommodations ticket, and this is exactly what they told us on the phone.

CAPLAN      But what I'm-- what I'm asking is, is there any way for this to get back to [my daughter] or to the family? I mean, this comes out-- I-- I don't even want to know what you guys do.

CW-1        So the-- so here-- again, let me just-- I'll just go retrace again. When [your daughter] takes the test, on the 8th, she's going to take the test like she's regularly taking the test, but she will take it, [CW-2] will be there. [CW-2] can answer any questions that she has. But [CW-2] will proctor the test. She will have all the time, she'll use her computer. She will think when she's done with the test she has taken the test. No doubt about it. The difference is-- is that what we'll do is, instead of her bubbling into the test, which we do with all kids who have learning differences, is they bub-- they write their answers on a separate sheet to the side of it, so that we can rebubble, so we don't screw up the bubbling, which happens a lot for kids. Because they screw up their bubbling. And then she'll-- she'll leave at the end of the test time. Which I don't know who's going to take her. And then--

CAPLAN      I will. I'll be there.

CW-1        Okay. And you'll-- you'll meet [CW-2] and Igor, and you'll-- you'll go your own way. [Your daughter] will go in and take the test. She'll be the only one, taking it in the room with-- with [CW-2]. She will take the test. She will walk out the door. At the end of it she'll say to you, "Dad, it was so hard," or "I'm so tired," or whatever the typical reaction out of the kid. Then [CW-2] will finish the exam. He will then take the exam and look at her-- what she's done, and then ensure that

33

whatever score we decide that we want to get-- he has it down to a-- unbelievable that he can do it. Get that number based on the four sections. She'll do the computer writing of the essay herself. That'll be all her. He can help her if she wants some guidance [inaudible] approach. But other than that, that will be all her writing. And she will sign it and she'll walk out of there and she will never know that this actually occurred. You will get your results back in, you know, anywhere from, 11-- depends on what day it goes back in. But anywhere from 11 to 20 days. And she'll get her results and she'll say, "Oh, my God, Dad, I got a 33!"

CAPLAN    So she's been taking Logic Prep and has been getting-- I think her highest score so far is a 22, and she'll probably get up to a 24 on her next practice test. The fact that this could be different than what she had been showing on the practice test--

CW-1    What-- so you tell me if you want-- would [you] prefer to have her get a 28? 27? 28? 29? Probably based on what you're just telling me right now, right, that-- maybe that's a better approach, because that's still a very good score with her abilities and disability but--

CAPLAN    Well, I-- I'm thinking 30, 31 is all we need to do here.

CW-1    Okay. Done deal. Done deal. It'll be-- it'll be 30, 31. So what happens is the test is curved. I don't know if you know that. The test is curved against everybody in the country. So it can-- we can be one question off, or two questions off, and it can be a 30, it can be a 31. It may be a 29. It could be a 32. Just depends on the curve of the day. But it'll be-- it'll be right there.

CAPLAN    But what I'm asking you is, will that be an issue? So when Logic Prep asks us, well, how did she score, will they say, "Hmm?"

CW-1    So - well, I don't think it matters what they say, because at the end of the day she had a great day, they get credit for her doing really well and they have nothing to do with ACT and/or the colleges she's going to apply [to].

CAPLAN    And they don't feel incumbent on them to say this is suspicious?

CW-1    Well, I don't see why they would. It would only be a success story for them.

CAPLAN    Okay. Okay. I will send out the e-mail and I will send you what I get back.

56.    On or about December 6, 2018, two days before the ACT exam, CAPLAN and

CW-1 spoke again. The following is an excerpt from the conversation, which was consensually

recorded.

34

| | |
|---|---|
| CAPLAN | When will we know the score? |
| CW-1 | Normally, you know, the score, between-- it could be, in 11 days or it could be in 20 days. It depends on-- so what normally happens is Igor sends everything in on Monday. And because they're giving the test nationally as long as the test is in by Wednesday, then usually you get scored with everybody else in the country, because everybody has to have-- from their test centers-- have to have their tests back. And then normally you get your scores back in anywhere from 11 to 20 days. And there's been times when it's taken as much as 30 days but that would be because there's an issue across the country, not because of anything that happened with her. |
| CAPLAN | And the score we're hoping for here is, we're really hoping for, is a 32. Is that what we discussed? |
| CW-1 | You tell me. Whatever you think we want to have. And we will get within one point. So if you say 32, it'll be either 31, 32, 33. If you say you want 31, it'll be 30, 31, 32. It just depends on the curve of the test for that day. |
| CAPLAN | Yeah, I-- I don't want it to be higher than a 32. |
| CW-1 | Okay. So-- |
| CAPLAN | It's just-- it's just going to be hard to justify in light-- light of-- [CW-1] look-- |
| CW-1 | No, I t-- |
| CAPLAN | I, this is all a hope, right? What she-- what we hope she can do. |
| CW-1 | Right. |
| CAPLAN | We hope she can get a 32 or pretty close thereto. |
| CW-1 | Got you. So can I just-- I want to clarify. So she's going to take the test on her own, she's going to do her best, all that stuff, and then we're going to do our magic on the back end. |
| CAPLAN | You're going to-- you're going to do what you do. |
| CW-1 | Okay, all right, I just want to make sure that the-- I just want to sure that we're all on the same page. That essentially, that's why I know I can get a 31, 32, you know, so we're going to aim for 31, so that if we go 30 or 32 we're safe, how's that? |
| CAPLAN | I think that's fine. |

35

| CW-1 | Okay, I-- |
|---|---|
| CAPLAN | I think that's fine, I-- I'm just, uh, uh, uh, uh, uh, [CW-1], you understand my-- |
| CW-1 | I totally get it. |
| CAPLAN | And you are absolutely confident there is no issue here. |
| CW-1 | We've been doing this for a long time. Luckily she'll be the only one taking the test, on Saturday. Sometimes there's multiple kids. So all I can do is just tell you that [CW-2] will fly in from Florida. He is an expert at getting within-- it just depends on one-point standard deviation on the-- whatever the curve is. Igor does his part. He signs off. He's the site coordinator. Nobody'll be there but you guys. And that'll be it. And I, you know, I've never even been there, I-- |
| CAPLAN | Igor has never had an-- Igor has never had an issue? He has no blemishes on anybody? |
| CW-1 | No. No issues at all. |
| CAPLAN | Okay. |

57.     On or about December 8, 2018, law enforcement agents observed Dvorskiy arrive at the West Hollywood Test Center at approximately 7:05 a.m. CAPLAN and his daughter arrived approximately ten minutes later, and Dvorskiy, CAPLAN and CAPLAN's daughter went inside the building. At approximately 7:21 a.m., CW-2 entered the West Hollywood Test Center. At approximately 7:31 a.m., Dvorskiy and CAPLAN walked out of the building and had a brief conversation. At approximately 11:52 a.m., CAPLAN's daughter left the West Hollywood Test Center, met CAPLAN, and drove away.

58.     On or about December 20, 2018, CAPLAN wired an additional $50,000 into the KWF bank account in Boston.

        C.     GREGORY ABBOTT and MARCIA ABBOTT

59.     Defendants GREGORY ABBOTT and MARCIA ABBOTT, a married couple (collectively, the "ABBOTTS"), are residents of New York, New York and Aspen, Colorado.

GREGORY ABBOTT is the founder and chairman of a packaging company for the food and beverage industry, and the former chairman and CEO of a private-label clothing manufacturer.

60.     As set forth below, in or about April 2018, the ABBOTTS made a purported charitable donation of $50,000 to KWF, in exchange for which CW-1 arranged to have CW-2 purport to proctor their daughter's ACT, and correct her answers after she had completed it.

61.     In or about March 2018, MARCIA ABBOTT e-mailed CW-1 her daughter's ACT registration form and admissions ticket, in preparation for her daughter to take the ACT at the West Hollywood Test Center.

62.     On or about April 9, 2018, CW-1's accountant e-mailed GREGORY ABBOTT an invoice for $50,000, with a note thanking him for his "generous donation to the Key Worldwide Foundation." CW-1 was copied on the e-mail, and later forwarded it to MARCIA ABBOTT.

63.     Three days later, $50,000 was wired from a brokerage account in the name of the Abbott Family Foundation to a bank account in the name of the KWF charity. That same day, GREGORY ABBOTT left CW-1 a voicemail stating, in substance, that he had sent the wire.

64.     On or about April 13, 2018, CW-2 flew from Tampa, Florida to Los Angeles, California. The following day, the ABBOTTS' daughter took the ACT at the West Hollywood Test Center. CW-2 purported to proctor the exam and, after the ABBOTTS' daughter had completed it, corrected her answers. On or about April 15, 2018, CW-2 returned to Florida.

65.     On or about April 17, 2018, at CW-1's direction, KWF paid Dvorskiy $20,000, representing $10,000 for the ABBOTTS' daughter and $10,000 for the son of I-HSIEN "JOEY" CHEN, who took the ACT at the West Hollywood Test Center at the same time as the ABBOTTS' daughter, as set forth below. On or about May 14, 2018, KWF paid CW-2 $20,000, representing $10,000 for each of the two students.

37

66.     The ABBOTTS' daughter received a score of 35 out of a possible 36 on the exam.

67.     On or about June 6, 2018, MARCIA ABBOTT called CW-1 to inquire, in substance, whether CW-1 could arrange for someone to take SAT subject tests for her daughter. The call was intercepted pursuant to a Court-authorized wiretap. CW-1 replied, "[GREGORY ABBOTT] would have to be willing to pay for it." MARCIA ABBOTT responded, "Yeah, well he can donate, I mean, whatever the donations are."

68.     On or about August 3, 2018, MARCIA ABBOTT called CW-1 to inquire, in substance, how cheating on the subject tests would work. The following is an excerpt from the conversation.

| | |
|---|---|
| MARCIA ABBOTT | What is the situation with subject tests? Is it basically the same that happened with the SATs? |
| CW-1 | Yeah, it's a little more a little more expensive because now you gotta have somebody which, you gotta make sure that you do well on both of those areas. It's not like the SATs. They're much harder. |
| MARCIA ABBOTT | Yeah, well they're very specialized, and for her she was gonna take Math II and English Lit. |
| CW-1 | Right, so if we have somebody help her, I have to get, I have to figure out who that's gonna be, that's gonna be able to take care of both of those |
| MARCIA ABBOTT | Alright, she loves the guy [CW-2] who took the SATs, she said. She said she started having heart palpitations but she said he was so sweet, he let me walk around the hallway. She said, "Can't I take my SAT subjects with him?" And I said, "Nah, I don't think so. I mean, I think, you know, you just, it's whole different area and that was 'cause we happened to be out in California seeing schools. So you know we're gonna take them here." So, alright, so there's no way for [August] 27th. Then I guess we should take them here down [in the Aspen area] on the 27th and let's see how she does. |
| CW-1 | Absolutely, absolutely. |
| MARCIA ABBOTT | And what would be, the donation be for, if you found someone for October? Because the other one was, what, $50,000? |

38

| CW-1 | It was, I think it was 50. It will be at least 75. |
| MARCIA ABBOTT | Yeah, that's fine. |

69.     In a call on or about September 4, 2018, MARCIA ABBOTT told CW-1, in substance, that she wanted to proceed with the cheating scheme for the SAT subject tests because her daughter did not think she had done well on the tests she had taken on her own. The following are two excerpts from the conversation.

| MARCIA ABBOTT | Can your people can cover the math and lit? |
| CW-1 | Yes, if they're available that weekend. |
| MARCIA ABBOTT | If so, yes, October 6th. So I guess they give a mix alright. Well, let's see how she does, She's convinced that she bombed the lit because she was too tired, so … And [Duke University] told us they didn't want anything below a 750. |
| CW-1 | That's right. |
| MARCIA ABBOTT | It doesn't, it doesn't add to her resume. |
| CW-1 | That's correct because, yeah well, she would have-- |
| MARCIA ABBOTT | Yeah. |
| CW-1 | Good thing that she did this for the ACT, 'cause her score was not exceptional. |
| MARCIA ABBOTT | What? Excuse me what'd you say? |
| CW-1 | I said it was a good thing that we did it for the first test. |
| MARCIA ABBOTT | Oh yeah, my gosh, I mean, I'm sure her, you kidding me? She was gonna throw up like every single drug in the world for mono and lyme [disease]. I'm sure it was a disaster. |
| CW-1 | She got, she got a 23. |
| MARCIA ABBOTT | Yeah, that would be what I would have guessed at, 25, you know. So yeah, I mean, yeah, I don't know. We'll see how she does on the math. But she herself even says she doesn't have high hopes for English Lit. |

….

39

Case 1:19-cr-10080-LTS Document 71 Filed 03/18/19 Page 45 of 225

| MARCIA ABBOTT | Yeah, so do you think we should do it now then, this week? |
| CW-1 | I have to, I have to ask the person in Houston if she'll do it. |
| MARCIA ABBOTT | Oh, so it'd be in Houston. |
| CW-1 | Yeah, because the person, the person who's gonna be the proctor is based in, half the time, somewhere across the country. |
| MARCIA ABBOTT | Yeah alright, well I rather do, I rather go for it then. Because you know what, even she gets like a 740, 730 on her math, she still needs to get higher. |
| CW-1 | Okay, well I'll talk to the person in Houston tomorrow and see, and the proctor, and see if they're available. |
| MARCIA ABBOTT | Okay, great. And that's your only one in the country? |
| CW-1 | Nobody in the country even has one. |
| MARCIA ABBOTT | Okay, no, I just wanted to know if they're not available, if for some-- |
| CW-1 | That this is like, nobody, nobody can do this. |
| MARCIA ABBOTT | And if they're not available then that's it? There's just, there's just one person? |
| CW-1 | Well then, we can do it in November if they're available. |
| MARCIA ABBOTT | And November's not too hard [or] late for early [action]? |
| CW-1 | Not if it is what it is, she's not getting into any schools without them. |
| MARCIA ABBOTT | Yeah I know. |
| CW-1 | So. |
| MARCIA ABBOTT | Okay, well let's see. Let's see what we can do. |

70.    On or about September 13, 2018, the Abbott Family Foundation made a purported donation of $75,000 to the KWF charity.

71.    In a call with MARCIA ABBOTT on or about September 28, 2018, CW-1 confirmed that the SAT subject tests would occur at the West Hollywood Test Center, and also

40

discussed the scoring of the tests. CW-1 said, "We'll get 750 and above," to which MARCIA

ABBOTT replied, "That's fabulous."

72.     On or about October 5, 2018, CW-1 called MARCIA ABBOTT at the direction of

law enforcement agents. The following is an excerpt from the conversation, which was

consensually recorded.

| | |
|---|---|
| CW-1 | Did you guys get to L.A.? |
| MARCIA ABBOTT | We did. We just checked in. We got on the last flight out of Aspen last night. |
| CW-1 | Congratulations. So I'm in Boston today, but I just wanted to make sure everything was cool. I know [CW-2] has already gotten there to proctor the test. Igor will be there in the morning, so everything should go smoothly. So I just wanted to make sure you-- everything's cool with you guys. |
| MARCIA ABBOTT | Fabulous. Yeah, everything's fine. Igor's the one who proctored her before? Or was it [CW-2]? |
| CW-1 | No, [CW-2] did. Igor will be, the person-- he's the test administrator for the school. |

73.     On or about October 6, 2018, law enforcement agents observed Dvorskiy arrive at the

West Hollywood Test Center at approximately 7:28 a.m., with MARCIA ABBOTT and her

daughter arriving approximately 15 minutes later.

74.     In a call on or about October 8, 2018, which was consensually recorded, CW-2—

who was not cooperating with the government's investigation at the time—told CW-1 that he

believed he had scored "800 on the math" and between 700 and 800 on the literature test.

75.     In a call on or about October 18, 2018, CW-1 discussed the SAT subject tests

with GREGORY ABBOTT. In the call, CW-1 advised GREGORY ABBOTT, in substance, that

"it was a good move" for him to pay $75,000 to have CW-2 take the exam for his daughter.

41

GREGORY ABBOTT then inquired how his daughter would have scored in the absence of
cheating. The following is an excerpt from the call, which was consensually recorded.

| GREGORY ABBOTT | Do you know how she did on her own? |
|---|---|
| CW-1 | Do I know how she did on her own? Yeah, I do. She scored in the mid-600s. |
| GREGORY ABBOTT | Yeah. |

76.     Ultimately, the ABBOTTS' daughter received a score of 800 out of a possible 800
on the math subject test and 710 on the literature subject test.

### D. I-HSIN "JOEY" CHEN

77.     Defendant I-HSIN "JOEY" CHEN is a resident of Newport Beach, California.
CHEN operates a Torrance, California-based provider of warehousing and related services for
the shipping industry.

78.     As set forth below, in or about April 2018, CHEN paid $75,000 to CW-1's for-
profit entity, The Key, in exchange for which CW-1 arranged to have CW-2 purport to proctor
CHEN's son's ACT, and correct his answers. As noted above, CHEN's son and the ABBOTTS'
daughter both took the exam on the same day at the West Hollywood Test Center.

79.     On or about April 16, 2018, CHEN paid CW-1 $75,000 to participate in the
cheating scheme. The money was deposited into The Key's bank account. CW-1 has advised
law enforcement agents that he agreed to provide CHEN with an invoice falsely indicating that
the payment was for "consulting" services for CHEN's business.

80.     CHEN's son scored a 33 out of a possible 36 on the ACT exam.

81.     In a call on or about October 23, 2018, CW-1, acting at the direction of law
enforcement agents, told CHEN that CW-1's charitable foundation was being audited by the
IRS. The following is an excerpt from the conversation, which was consensually recorded.

42

| CW-1 | And so they're looking at all the payments that have gone into our foundation. |
|---|---|
| CHEN | Uh-huh. |
| CW-1 | So they asked about your payment, which was for [your son], you know, taking the test that we did for him at [the West Hollywood Test Center], with [CW-2] – |
| CHEN | Yeah. |
| CW-1 | And I've said that your payment of $75,000-- |
| CHEN | Uh-huh. |
| CW-1 | --went to our foundation to help underserved kids. |
| CHEN | Uh-huh. |
| CW-1 | Okay? |
| CHEN | Uh-huh. |

82.     Shortly after that call, CHEN called CW-1 back and said, in substance, that the description on the invoice he had received from CW-1 said "consulting service." CHEN asked, "[W]hat should I say [if the IRS asks]-- consulting service or foundation?" CW-1 replied, "consulting services for the foundation." CHEN responded, "Okay."

83.     In a call on or about February 21, 2019, CW-1, acting at the direction of law enforcement agents, told CHEN that the IRS audit had been completed. The following is an excerpt from the conversation, which was consensually recorded.

| CW-1 | I wanted to call you 'cause I called you before about our audit-- |
|---|---|
| CHEN | Uh-huh. |
| CW-1 | --and I wanted to let you know that our audit is over. |
| CHEN | Uh-huh. |
| CW-1 | We're all okay. And we are okay because, so you, you're not, no issues with you. So nobody will be contacting you, okay? |

| CHEN | Okay. |
|------|-------|
| CW-1 | Because your-- the payment that you made, we created a fake consulting invoice that you paid that, instead of making a donation to our foundation. |
| CHEN | Uh-huh. |
| CW-1 | So there was no link, for the audit in our foundation, because we-- you paid the $75,000 to my for-profit company-- |
| CHEN | Uh-huh |
| CW-1 | --with a fake, with a fake consulting invoice. So that's-- that's why we're clear. |
| CHEN | Oh-huh, okay. |
| CW-1 | And then, the other thing is, they asked a question about [CW-2], who took the test for [your son], and Igor, who was the site coordinator, how come I paid them from the foundation at the same time that [your son] was taking the test-- |
| CHEN | Uh-huh. |
| CW-1 | --and since you paid the for-profit company the $75,000, there was no payment for the-- as a donation. |
| CHEN | Uh-huh. |
| CW-1 | And I think that we are past that. So that we both agree that [CW-2] took the test for [your son], right? |
| CHEN | Yeah. |
| CW-1 | And so everything should be fine so I just wanted to make sure that you're okay to know that the audit is over, and we should be in good shape. |
| CHEN | Oh, okay, sounds good. |

### E. ELIZABETH HENRIQUEZ and MANUEL HENRIQUEZ

84.     Defendants ELIZABETH HENRIQUEZ and MANUEL HENRIQUEZ, a married couple (together, the "HENRIQUEZES"), are residents of Atherton, California. MANUEL HENRIQUEZ is the founder, chairman, and CEO of a publicly traded specialty finance company based in Palo Alto, California.

44

85.     As set forth below, the HENRIQUEZES participated in the college entrance exam cheating scheme, on four separate occasions, for their two daughters. In addition, the HENRIQUEZES conspired to bribe Gordon Ernst, the head tennis coach at Georgetown University, to designate their older daughter as a tennis recruit in order to facilitate her admission to Georgetown.[11]

86.     In or about the fall of 2015, the HENRIQUEZES paid CW-1 $25,000 to have CW-2 purport to proctor their older daughter's SAT exam, and correct her answers.

87.     On or about August 19, 2015, CW-1 e-mailed CW-2 a round-trip plane ticket from Tampa, Florida to San Francisco, California. CW-1 forwarded the ticket receipt to Steven Masera, his bookkeeper, with the instruction to bill the ticket to the "Henriquez account."[12]

88.     At or about the same time, CW-1 made arrangements for CW-2 to serve as an exam proctor at the private college preparatory school in Belmont, California, attended by the HENRIQUEZES' daughter. On or about September 19, 2015, CW-1 e-mailed CW-2: "You are going to receive an e-mail from the [high school guidance] counselor to tell you what to do with materials, et cetera ... before responding to her let me know so we can say the right thing."

89.     In a series of e-mails in late September, 2015, CW-2 explained to the HENRIQUEZES' daughter's high school counselor, in sum and substance, that he was willing to fly from Tampa to San Francisco to proctor the exam "because my wife has a new-born," noting, "I would really appreciate the opportunity to proctor the test because I'm applying to grad schools and I could quite frankly use the work." The counselor responded, "I have you set up to

---

[11] Ernst has been indicted by a federal grand jury in the District of Massachusetts on a charge of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).

[12] Masera has been indicted by a federal grand jury in the District of Massachusetts on a charge of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).

45

proctor and read for [the HENRIQUEZES' daughter] this coming Saturday, October 3rd at 8:00 a.m." CW-2 forwarded the e-mail to CW-1, who forwarded it to ELIZABETH HENRIQUEZ with the note, "[CW-2] has the testing covered."

90.     On or about September 28, 2015, CW-1 directed Masera to bill the "parents 15k that is to be written to [CW-1] and goes to my home or personal account. 10k to The Key for Testing Support."

91.     On or about October 2, 2015, CW-2 flew to San Francisco. That same day, ELIZABETH HENRIQUEZ e-mailed CW-2 directly to "touch base regarding Saturday am plans." She arranged to meet CW-2 at her daughter's high school at 7:15 a.m. the next day.

92.     On or about October 3, 2015, CW-2 purported to proctor the exam for the HENRIQUEZES' daughter at her school. According to CW-2, unbeknownst to the school, he sat side-by-side with the daughter during the exam and provided her with answers to the exam questions, and after the exam, he "gloated" with ELIZABETH HENRIQUEZ and her daughter about the fact that they had cheated and gotten away with it.

93.     On or about October 20, 2015, CW-1 sent an e-mail instructing Masera to bill $25,000 to the HENRIQUEZES, with $15,000 directed into CW-1's personal account. On November 18, 2015, with the invoices still unpaid, CW-1 e-mailed ELIZABETH HENRIQUEZ to inquire about the status of payment. ELIZABETH HENRIQUEZ responded: "Manuel set up electronic checks when we first received the invoices. I will check with him."

94.     On or about November 24, 2015, the Henriquez Family Trust wired $15,000 to CW-1's personal bank account and $10,000 to an account in the name of The Key. After receiving the funds, CW-1 caused KWF to pay CW-2 a total of $10,000 in three separate installments.

46

95.     The HENRIQUEZES' daughter received a score of 1900 out of a possible 2400 on the October 2015 test, an improvement of 320 points over the best score she had previously achieved taking the test legitimately.

96.     Thereafter, the HENRIQUEZES agreed with CW-1 to have CW-2 purport to proctor their younger daughter's ACT exam at the Houston Test Center.

97.     On or about August 10, 2016, the HENRIQUEZES' younger daughter received a letter from ACT, Inc. notifying her that her request for "extra time" on the exam had been granted.

98.     On or about September 13, 2016, ELIZABETH HENRIQUEZ e-mailed a counselor at her daughter's high school falsely stating, in substance, that her daughter wanted to take the ACT on October 22, 2016, but that "we have to be in Houston" on that date. The e-mail continued: "Through connections there, we have been able to secure a site and a proctor to test [my daughter] for the two days." The counselor responded, "No worries – thank you for letting me know." ELIZABETH HENRIQUEZ forwarded the e-mail exchange to CW-1.

99.     CW-2 flew from Tampa to Houston for the exam, which occurred on or about October 22, 2016. CW-2 purported to proctor the exam for the HENRIQUEZES' daughter and another student. CW-2 has advised law enforcement agents, in substance, that he discussed the answers during the exam with the two students, but directed them each to answer different questions incorrectly in an effort to conceal their cheating from ACT, Inc.

100.    The younger HENRIQUEZ daughter ultimately received a score of 30 out of a possible 36 on the exam. On or about October 24, 2016, CW-1 paid $50,000 to Martin Fox, who introduced CW-1 to Niki Williams, the administrator of the Houston Test Center. CW-1 has

47

advised law enforcement agents that his understanding was that part of this money would be used to pay Williams. On or about October 31, 2016, CW-1 paid CW-2 $20,000.

101.    CW-1 initially e-mailed Masera instructions to invoice MANUEL HENRIQUEZ and another parent $75,000 each for the ACT scheme. CW-1 has advised law enforcement agents, however, that in lieu of paying for the cheating, MANUEL HENRIQUEZ agreed to use his influence at Northeastern University, in Boston, Massachusetts—where he is an alumnus and former member of the Northeastern University Corporation, one of the university's governing bodies—to help CW-1 secure the admission of an applicant to that school.

102.    In an e-mail exchange on or about October 20, 2016, CW-1 sent MANUEL HENRIQUEZ a copy of the Northeastern applicant's college entrance exam scores and application. MANUEL HENRIQUEZ responded, "Thank you and I will reach out Monday." Two days later, CW-1 e-mailed Masera instructions not to invoice MANUEL HENRIQUEZ, noting: "There will be a hold on Henriquez. I am doing a deal with them – tell you soon."

103.    On or about October 26, 2016, in an e-mail to a senior development officer at Northeastern University, MANUEL HENRIQUEZ described the Northeastern applicant as an "excellent candidate for the College of Social Sciences and Humanities." MANUEL HENRIQUEZ then e-mailed CW-1: "Just confirmed with the university, have [the applicant] file [early decision] normal channels to get into the systems and make sure his application is complete. Then the folks I connected will flag it."

104.    On or about November 1, 2016, MANUEL HENRIQUEZ met with the applicant in Atherton, California, and thereafter relayed details about the meeting to his contact at Northeastern. MANUEL HENRIQUEZ then followed up with CW-1: "I liked him very much,

48

and just informed the school according[ly]. It is now in their hands, and they understand he is looking for [early decision], and I will reinforce early next week."

105. MANUEL HENRIQUEZ repeatedly followed up with Northeastern officials in Boston about the applicant's candidacy. The student was ultimately admitted to Northeastern. The applicant's parents paid CW-1 $250,000 after he was admitted.

106. According to CW-1, in or about 2017, CW-1 met with the HENRIQUEZES at their home, where they paid him between $25,000 and $30,000 in cash to arrange for a third party ("Proctor 2") to facilitate cheating on three SAT subject tests and the ACT for their younger daughter.[13]

107. On or about April 24, 2017, CW-1 e-mailed Proctor 2: "I have an opportunity over two days over two weeks for you in June. If interested please call me."

108. In or about May 2017, CW-1 exchanged multiple e-mails with Dvorskiy about moving the HENRIQUEZES' younger daughter's SAT subject tests and ACT to the West Hollywood Test Center. ELIZABETH HENRIQUEZ e-mailed CW-1 that she would give her daughter's school a "heads up re test center change."

109. CW-1 purchased tickets for Proctor 2 to fly from San Jose, California to Los Angeles for the exam on or about June 2, 2017, and to return to San Jose the next day.

110. The HENRIQUEZES' daughter took the SAT subject tests at the West Hollywood Test Center, with Proctor 2 purporting to proctor the exams. As set forth below, Proctor 2 later told CW-1 that he provided her with answers to certain exam questions.

---

[13] CW-1 and CW-2 have advised law enforcement agents that CW-1 relied on Proctor 2 for the exam because CW-2 was already purporting to proctor exams for two other students at the same time, and because Proctor 2 was less expensive than CW-2.

49

111.    On or about June 5, 2017, CW-1 mailed Dvorskiy a check for $40,000, drawn on one of the KWF charitable accounts. On or about June 3, 2017, CW-1 mailed Proctor 2 a check for $2,000.

112.    The following weekend, Proctor 2 again flew from San Jose to Los Angeles and purported to proctor the ACT exam for the HENRIQUEZES' daughter at the West Hollywood Test Center.

113.    After the exams, CW-1 mailed Proctor 2 a check for $4,000.

114.    The HENRIQUEZES' daughter received a score of 33 out of a possible 36 on the ACT, and scores of 720, 740, and 770 out of a possible 800 on the SAT subject tests for math, Spanish, and history, respectively.

115.    In addition to cheating on the ACT and SAT exams, the HENRIQUEZES agreed with CW-1 to bribe Ernst, the head tennis coach at Georgetown, to designate their older daughter as a recruited athlete, in order to facilitate her admission to the university.

116.    As part of that scheme, on or about August 19, 2015, CW-1 e-mailed ELIZABETH HENRIQUEZ and her daughter, directing them to send an e-mail with a "PDF of subject tests and transcript to Gordie Ernst at Georgetown using my message asap thanks." Accompanying the e-mail was a message CW-1 had drafted for the HENRIQUEZES' daughter to send to Ernst in her own name, stating, among other things: "I have been really successful this summer playing tennis around the country. I am looking forward to having a chance to be part of the Georgetown tennis team and make a positive contribution to your team's success." CW-1 has advised investigators that the information in the note was fabricated.

50

117.    ELIZABETH HENRIQUEZ replied to CW-1's message that her daughter was "on it." The next day, the HENRIQUEZES' daughter sent CW-1's message to Ernst, who forwarded it to an admissions officer with the note: "Potential spot."

118.    On or about August 24, 2015, CW-1 circulated to ELIZABETH HENRIQUEZ and her daughter a draft application essay. The essay included no mention of tennis. Two days later, CW-1 e-mailed ELIZABETH HENRIQUEZ and her daughter again, advising that he was going to change the essay to "talk about tennis." The final essay submitted to Georgetown falsely stated: "[B]eing a part of Georgetown women's tennis team has always been a dream of mine. For years I have spent three – four hours a day grinding out on and off court workouts with the hopes of becoming successful enough to play college tennis especially at Georgetown. What is most amazing is how quickly I connected with Coach Ernst. He spent time with me while on campus and at several tournaments I played in."

119.    On or about October 22, 2015, the HENRIQUEZES' daughter e-mailed Ernst her fraudulently obtained SAT scores.

120.    The HENRIQUEZES' daughter's application was submitted to Georgetown on or about October 25, 2015. In addition to the falsified essay, the application falsely indicated that she played "club tennis" all through high school for 20 hours per week and 52 weeks per year, and listed her as having a "Top 50 ranking" in the United States Tennis Association ("USTA") Junior Girls Tennis for her sophomore through senior years of high school, and as being on the USTA All-Academic Team for tennis for her junior and senior years. In fact, records obtained from the USTA do not show that she played at any USTA tournaments in high school.[14]

---

[14] At her best, she appears to have ranked 207th in Northern California in the under-12 girls division, with an overall win/loss record of 2-8.

51

121.    On or about November 6, 2015—less than two weeks after submitting her application—the HENRIQUEZES' daughter received a letter from Georgetown indicating that the university had "conducted an initial review of [her] application to the Class of 2019 at the request of Mr. Gordie Ernst, tennis coach," and that her admission was "likely." The HENRIQUEZES' daughter was ultimately offered admission to Georgetown the following spring.

122.    On or about May 4, 2016, the Henriquez Family Trust made a purported contribution of $400,000 to KWF. On or about May 9, 2016, CW-1 caused a donation receipt letter to be sent to ELIZABETH HENRIQUEZ stating that the gift would "allow us to move forward with our plans to provide educational and self-enrichment programs to disadvantaged youth." The letter falsely stated that "no goods or services were exchanged" for the money.

123.    Between approximately September 11, 2015 and November 30, 2016, KWF paid Ernst $950,000. CW-1 has advised that these payments were made in exchange for Ernst's designation of the HENRIQUEZES' daughter and several other students as purported tennis recruits, in order to facilitate their admission to Georgetown.

124.    On or about October 24, 2018, CW-1 called ELIZABETH HENRIQUEZ at the direction of law enforcement agents and told her that KWF was being audited by the IRS. The following is an excerpt from the call, which was consensually recorded.

CW-1            Well, the reason I'm callin' is-- So I'm in Boston now. And I just wanted to let you know that--

E. HENRIQUEZ   You-- well, first of all, you didn't-- sayin' it right.    Boston. Yeah.

CW-1            Okay.  Excuse me. So my-- so my foundation is getting audited now.

E. HENRIQUEZ   Oh.

CW-1            Uh--

52

| | |
|---|---|
| E. HENRIQUEZ | Well, that sucks. |
| CW-1 | Right. And they're going back, like they always do. |
| E. HENRIQUEZ | Yeah. |
| CW-1 | Pretty normal. So they're taking a look at all my payments. So they asked me about the large sums of money that came in from you guys. |
| E. HENRIQUEZ | Okay. |
| CW-1 | And so, essentially-- |
| E. HENRIQUEZ | For all the good deeds that you do. |
| CW-1 | Absolutely. So, of course, I didn't say anything-- you know, I'm not gonna tell the IRS that, you know, [CW-2] took the test for [your eldest daughter] or that Gordie-- |
| E. HENRIQUEZ | Right. Yeah. |
| CW-1 | --or that Gordie-- you know, we paid-- |
| E. HENRIQUEZ | Like-- Yeah. |
| CW-1 | --Gordie to help her get into Georgetown, right? |
| E. HENRIQUEZ | Right. |
| CW-1 | So I just want to make sure that you and I are on the same page-- |
| E. HENRIQUEZ | Okay. |
| CW-1 | --in case they were to call. |
| E. HENRIQUEZ | So what's your story? |
| CW-1 | So my story is, essentially, that you gave your money to our foundation to help underserved kids. |
| E. HENRIQUEZ | You-- Of course. |
| CW-1 | And-- |

53

E. HENRIQUEZ Those kids have to go to school.

CW-1 Absolutely.

 125. In a call on or about November 5, 2018, CW-1 and ELIZABETH HENRIQUEZ

discussed the ACT that the HENRIQUEZES' younger daughter took in 2016 at the Houston Test

Center and the multiple exams she took in June 2017 at the West Hollywood Test Center. The

following is an excerpt from the conversation, which was consensually recorded.

CW-1 Okay. So, essentially [your younger daughter] came to Houston in
October to ta-- in 2016 to take her tests with [CW-2]--

E. HENRIQUEZ Right.

CW-1 --and then I have it again that she-- in 2017, in June, we took it in L.A.
because-- and it's like-- and I don't under-- and I'm trying to figure out
wh-- what happened there because there's money that went in my
foundation and then there's also a seven-- like a $75,000 credit. I think
that's when Manuel helped [the Northeastern applicant] get in
Northeastern, but I'm--

E. HENRIQUEZ Right. I don't know that deal a whole-- 100%. I know there was a deal
you guys talked about but--

CW-1 Ri--

E. HENRIQUEZ Yeah. So I think that that was it because-- right. And that went against the
June one in L.A., which wasn't [CW-2]. It was obviously the other
situation.

CW-1 Okay, Okay. All right. And so--

E. HENRIQUEZ So we didn't have [CW-2] for that. We had-- oh-- we had what's his face
[Proctor 2]. Uh--

CW-1 But it was an ACT test.

E. HENRIQUEZ Right.

CW-1 Wasn't it?

E. HENRIQUEZ He did it again.

54

| | |
|---|---|
| CW-1 | Oh, we did it again. |
| E. HENRIQUEZ | Remember the first one was-- no, actually, those-- remember those were subject tests, as well. |
| CW-1 | But they couldn't have been because—because in June-- so was June the subject test? |
| E. HENRIQUEZ | Yeah.  Those are the subject tests they take after they get out. Remember there was a-- it-- what did she take?   English, history. |
| CW-1 | Okay. |
| E. HENRIQUEZ | There was a-- there was a math one because I know that-- that was one we really need-- it was like math B or II or whatever you call it. And then she also did Spanish, some Spanish and some English or history or something. Shit, I don't remember. Getting confused between subject tests and AP tests. |
| CW-1 | Yeah, because-- okay.  Because-- |
| E. HENRIQUEZ | See, can I just looked back at her ACT stuff and get back to you? Like I-- I can look back in her file or just-- I can just ask. |
| CW-1 | Okay, that would be great. That would be great. And then-- yeah, because I think that's-- |
| E. HENRIQUEZ | I think that's when he went back down in June.  I don't think it was another ACT.  We stuck with the ACT. |
| CW-1 | In October. |
| E. HENRIQUEZ | Had, I think. Yeah. |
| CW-1 | Okay. So why-- if you could go back and check that would be great. |
| E. HENRIQUEZ | Yeah, that was subject test.  I'm almost positive that was-- that was-- because that would be the time of year that would be. |
| CW-1 | Right.  That's what I thought. That's what I thought. But it looks like the date was on an ACT date but I don't know that. So if you could check that would be great. |
| E. HENRIQUEZ | Yeah.  So I will get back to you on that one.  I'll-- I'll-- I can ask [my younger daughter]. She definitely will remember. |

55

| | |
|---|---|
| CW-1 | Okay. |
| E. HENRIQUEZ | Do you want-- |
| CW-1 | And then I know the first one was the-- in Houston. [CW-2] was there. Okay. So that's what I needed to know. Okay. |
| E. HENRIQUEZ | Yeah, that was easy.  That one I totally remember. |

126.    ELIZABETH HENRIQUEZ later called CW-1 back to advise him, in substance, that she had checked with her daughter and that CW-2 had purported to proctor the ACT exam in Houston and that Proctor 2 had purported to proctor the exams at the West Hollywood Test Center.

127.    Thereafter, CW-1, at the direction of law enforcement agents, called Proctor 2. In the call, which was consensually recorded, Proctor 2 confirmed that he had proctored the SAT subject tests for the HENRIQUEZES' daughter in Los Angeles, that he had been paid $2,000 for doing so, and that he had answered questions for her during the exams.

128.    On or about January 27, 2019, CW-1, acting at the direction of law enforcement agents, met with both MANUEL HENRIQUEZ and ELIZABETH HENRIQUEZ at their home in Atherton, California. In the meeting, CW-1 told the HENRIQUEZES that Williams, the Houston test administrator, had been subpoenaed to testify before a grand jury in Boston about students from out-of-state, including their daughter, who had flown to Houston to take the ACT in 2016. The HENRIQUEZES first discussed, in substance, what excuse they could offer about why their daughter had taken the exam in Houston, given that they live near San Francisco. CW-1 then told the HENRIQUEZES that there was no "paper trail" of money for that exam, due to the fact that MANUEL HENRIQUEZ had agreed to help the Northeastern applicant gain admission to that university. The following is an excerpt from the conversation, which was consensually recorded.

56

| M. HENRIQUEZ | Okay. So why did [my daughter] do the test there [Houston]? So we gotta get into that story. |
|---|---|
| CW-1 | So-- so lemme, go into that.    So you're right. That's-- that's part of it, right? So Niki said to me, "Don't worry about it. You know, these are the outta-state kids. Essentially, there's nowhere where anybody knows--" Because in my books, it doesn't show that there was any money paid for [CW-2] helping [your daughter] do the test. Okay? So there's nothing-- Because we did the deal with [the Northeastern applicant]. So [it] doesn't show anything at all, in our foundation or anything, just so you know. |
| E. HENRIQUEZ | So there's no paper trail of money? |
| CW-1 | There's no paper trail of money. Okay? 'Cause remember we did that? And you helped? So. |
| M. HENRIQUEZ | Right. |

129.    Later in the conversation, MANUEL HENRIQUEZ told CW-1 that if anyone

asked about the testing, he would not answer them.

| M. HENRIQUEZ | So-- Well, the-- the question is that, anybody calls me, the response is that "I'm not gonna comment regarding my daughter's Houston issue," on simply getting a phone call from somebody. Uh-- |
|---|---|
| E. HENRIQUEZ | Well, remember she went there because she needed special-- |
| M.HENRIQUEZ | I understand. |
| CW-1 | Accommodations. |
| E. HENRIQUEZ | Accommodations. |
| M. HENRIQUEZ | But I'm not gonna comment.  We gotta be very careful-- |
| E. HENRIQUEZ | Yeah. |
| M. HENRIQUEZ | --on just getting an inbound call from somebody. "I have no idea who you are. So I'm not responding to an inbound call from anybody." |

57

F.  WILLIAM E. McGLASHAN, Jr.

130.    Defendant WILLIAM E. McGLASHAN, Jr. is a resident of Mill Valley, California.  McGLASHAN is a senior executive at a global private equity firm.

131.    As set forth below, McGLASHAN participated in both the college entrance exam cheating scheme and the college recruitement scheme, including by conspiring to bribe Donna Heinel, the senior associate athletic director at the University of Southern California ("USC"), to facilitate his son's admission to USC as a recruited athlete.[15]

132.    CW-1 has advised law enforcement agents that McGLASHAN agreed to make a purported donation of $50,000 to KWF, with the understanding that CW-1 would arrange for CW-2 to serve as a purported proctor for McGLASHAN's son's ACT exam at a test center that CW-1 "controlled," and that CW-2 would, in exchange for money, correct his son's answers after the test was completed.

133.    On or about November 20, 2017, McGLASHAN's assistant sent CW-1 an e-mail attaching a "Request for Arranged Testing" form for the ACT, requesting that McGLASHAN's son be permitted to take the ACT at the West Hollywood Test Center instead of at his own high school in Marin County, California.  CW-1 forwarded the form to Dvorskiy, who completed required portions and sent it back to CW-1.  CW-1, in turn, forwarded the forms back to McGLASHAN, noting, "Bill the forms are attached.  Please send into ACT."

134.    On or about November 30, 2017, Masera e-mailed McGLASHAN an invoice for "payment regarding [the West Hollywood Test Center]. You are welcome to wire the funds or remit a check."

---

[15] Heinel has been indicted by a federal grand jury in the District of Massachusetts on a charge of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).

58

135.     On or about December 6, 2017, three days before the ACT exam, McGLASHAN made a purported donation of $50,000 to the KWF charity from his personal charitable donation fund.

136.     On or about December 8, 2017, CW-2 traveled to Los Angeles from Tampa to proctor the test for McGLASHAN's son and two other individuals on December 9, 2017. CW-2 has advised investigators that, while at the West Hollywood Test Center, he met McGLASHAN, and that after McGLASHAN's son completed the exam, CW-2 corrected his answers. CW-2 returned to Tampa on or about December 10, 2017.

137.     I have reviewed historical cell site data obtained through a Court-authorized search warrant for phones used by both McGLASHAN and his son. The records indicate that on the evening of December 8, 2017, both telephones traveled from the San Francisco area to Los Angeles. At approximately 7:30 a.m. on the morning of December 9, 2017, both telephones hit off cellular towers near the West Hollywood Test Center. Shortly after 3:00 p.m., both phones left Los Angeles and returned to the San Francisco area, where they remained for the rest of that evening and the next day.

138.     After administering ACT exams, Dvorskiy returned the testing materials to ACT, Inc., together with a form called an "ACT Administration and Payment Report – Special Testing." The form showed that McGLASHAN's son took the English and math sections on December 9, 2017, and the reading, writing and science sections on December 10, 2017, all at the West Hollywood Test Center. Accordingly, while the records Dvorskiy provided to ACT, Inc. showed McGLASHAN's son taking the exam in Los Angeles on December 10, 2017, cell site records indicate that McGLASHAN's son was hundreds of miles away, in Marin County, at that time.

59

139.     On or about December 19, 2017, CW-1 caused KWF to pay Dvorskiy $40,000, and on or about December 27, 2017, CW-1 caused KWF to pay CW-2 $35,000.

140.     McGLASHAN's son received a score of 34 out of a possible 36 on the exam.[16]

141.     On or about July 30, 2018, CW-1 and McGLASHAN discussed repeating the ACT cheating scheme for McGLASHAN's two younger children, and the need to obtain extended time on the exam in order to facilitate the scheme. The following is an excerpt from the conversation, which was intercepted pursuant to a Court-authorized wiretap.

| | |
|---|---|
| McGLASHAN | One other, just family question, with [my younger son] now entering his sophomore year, and sort of, the process is beginning, we have him on time and a half. I told [my spouse] yesterday, and [my daughter] by the way, who is the, who I think is the one who needs the most time, has no extra time currently. And [my spouse] is talking to the doctor that assessed them, to get her to ask, to request time for [my daughter]. I told her she should be requesting double time for all of them. |
| CW-1 | 100% multiple days. No matter what, multiple days. So, even if it's 50%, time and a half, multiple days. |
| McGLASHAN | So is that a different ask to get multiple days versus-- |
| CW-1 | Well the 100%. |
| McGLASHAN | And if they get time and a half, can they use your facility to take the test? |
| CW-1 | No, not unless it's multiple days. |
| McGLASHAN | So as long as it's multiple days, we're in. |
| CW-1 | Correct, correct. Like it could be-- |
| McGLASHAN | And they, that's a separate filing? |
| CW-1 | Overall it's the same. Well, so, you're saying [your younger son's] got a, time and a half? |
| McGLASHAN | Yeah. |

---

[16] On or about October 22, 2018, McGLASHAN's son submitted that fraudulently obtained score as part of his application to Northeastern University in Boston.

| | |
|---|---|
| CW-1 | So, what has to happen, is there has to be an appeal to get the multiple days. The doc's got to come up with stuff, discrepancies, to show why he needs multiple days. That he can't sit six and a half hours taking one test. |
| McGLASHAN | Perfect. |
| CW-1 | And so if he gets multiple days, then I can control the center. |
| McGLASHAN | Thank you. |
| CW-1 | Yes. |
| McGLASHAN | And then what about-- If you get a, if you get double time, you automatically get multiple days? |
| CW-1 | Automatically, yes. |
| McGLASHAN | Oh, so it's either multiple days with 1.5, or double, two times time? |
| CW-1 | Correct. |
| McGLASHAN | Got it, okay, I'll make sure [my spouse] goes to work. |
| CW-1 | And we don't care if it's SAT or ACT. |
| McGLASHAN | Yup, yup. |
| CW-1 | Because we're just going to take it one time and be done anyway. |

142. On the same call, CW-1 described the college recruitment scheme to McGLASHAN, which CW-1 referred to as "the side door." CW-1 told McGLASHAN that the scheme could enable McGLASHAN's older son to receive a letter of admission to USC—where McGLASHAN said his son hoped to attend the Jimmy Iovine and Andre Young Academy, a specialty program in arts, technology and business—"before he even applies," as set forth in the excerpt below.

| | |
|---|---|
| CW-1 | Sure, so, so, in this path, you'd pay 250. You'd get accepted. Let me get his stuff and I'll take it to them. If they [USC] can accept him in the fall. |
| McGLASHAN | Yup. |
| CW-1 | He may be-- It may be before he even applies. |

| | |
|---|---|
| McGLASHAN | See, that would be great. |
| CW-1 | Right. |
| McGLASHAN | I would do that in a heartbeat. |
| CW-1 | Right, and then you get this unofficial, official letter. |
| McGLASHAN | Now does he, here's the only question, does he know? Is there a way to do it in a way that he doesn't know that happened? |
| CW-1 | Oh yeah. Oh he-- |
| McGLASHAN | Great. |
| CW-1 | What he would know is, that I'm going to take his stuff, and I'm going to get him some help, okay? |
| McGLASHAN | So that, that he would have no issue with. You lobbying for him. You helping use your network. No issue. |
| CW-1 | That letter, that letter comes to you. |
| McGLASHAN | Yup. |
| CW-1 | So, my families want to know this is done. |
| McGLASHAN | Yup. |
| CW-1 | Right, so they want this letter to come to them, so I have them, I have admissions, and that's why I extend the letter to you, you hold it. |
| McGLASHAN | Right. |
| CW-1 | You don't have to tell him a thing. |
| McGLASHAN | Yup. |
| CW-1 | At that, at that point, that, as soon as you get that letter, then they expect just a $50,000 check, and it goes to Women's Athletics. |
| McGLASHAN | Great. |
| CW-1 | And then the other 200 comes in March, after you get your official, official letter, but the letter you're actually getting [in the fall] is the same letter you're getting in March. |
| McGLASHAN | I love it. |

62

143.    CW-1 went on in the same call to explain that in order to take advantage of the

"side door," CW-1 would need to create a fake athletic profile for McGLASHAN's son, which

he said he had done "a million times" for other families.  CW-1 explained, in substance, that the

fake profile would allow McGLASHAN's son to be admitted to USC as a recruited athlete, as set

forth in the excerpt below.

| | |
|---|---|
| CW-1 | I have to do a profile for him in a sport, which is fine, I'll create it.  You know, I just need him-- I'll pick a sport and we'll do a picture of him, or he can, we'll put his face on the picture whatever.  Just so that he plays whatever.  I've already done that a million times.  So-- |
| McGLASHAN | Well, we have images of him in lacrosse.  I don't know if that matters. |
| CW-1 | They don't have a lacrosse team.  But as long as I can see him doing something, that would be fine. |
| McGLASHAN | Yeah. |
| CW-1 | And then what happens is, then what you have to do, because this would be a specialty program, is that you have to then talk to the department and say, "Hey listen, can you take him in the department?  We've gotten him accepted into the university." |
| McGLASHAN | Yup. Well I can handle, I think I, I mean, I'll know after this lunch.  I think I can handle them at Iovine and Young. |
| CW-1 | Right. |
| McGLASHAN | Yeah.  Which is where he really wants to go. |
| CW-1 | Right. So you're saying, "Hey listen, I think I can get him into this school." |
| McGLASHAN | Yup. |
| CW-1 | Now, now, can you, 'cause they're going to come to you and say, this is a selective program, would you want this kid?  And he's quote an "athlete" who's coming to you.  In fact, would you take him?  And the department says yes. |
| McGLASHAN | Now, would he see that, 'cause that, he's going to be fairly well seen at the school, because half the board knows me, and I'm going to be sort of |

63

68

|   |   |
|---|---|
|   | calling in and asking people to help, you know [Board Member 1] and [Board Member 2], and all those guys? |
| CW-1 | But, so-- what I would suggest is, have you called them? Any of them yet? |
| McGLASHAN | No. |
| CW-1 | Good, don't. |
| McGLASHAN | Okay. |
| CW-1 | Because you don't need, because when this, the way this, the quieter it, the quieter this is, the better it is, so people don't say, "Well, okay, this guy, why are all these people calling us? The kid's already been accepted. He's coming here as an athlete. He's already in." What you just want is, the person you're meeting with on Friday to say, you know, what we want [is] this kid. |
| McGLASHAN | So he doesn't have to know how he got in. Is that the case? |
| CW-1 | What I would say to him, if you want to have that discussion now with [your son] there, that we have friends in athletics, they are going to help us, because [he] is an athlete, and they're going to help us. From the-- |
| McGLASHAN | But I can't say that in front of [my son], 'cause he knows he's not. |
| CW-1 | No, no, right. |
| McGLASHAN | Yeah. |
| CW-1 | And just say, you know what, we're going to get, we're going to get some, we're going to get people to help us. |
| McGLASHAN | Why wouldn't, why wouldn't I say, "Look, leave it to me to worry about getting him in, 'cause I have a lot of friends involved in the school." |
| CW-1 | Perfect, perfect. |

144. CW-1 continued in the call to explain how the "side door" scheme worked, as set forth in the excerpt below.

|   |   |
|---|---|
| CW-1 | What is going to happen when they see his application, he'll be flagged as an athlete. |
| McGLASHAN | Okay. |

64

69

| | |
|---|---|
| CW-1 | But once he gets, once he gets here, he just goes, he doesn't go to the athletic orientation. He goes to the regular orientation like all my other kids just did. They all got home, and everything's fine. The issue is the specialty program. And he could do-- |
| McGLASHAN | So how does he-- just as a, just as a, just as this plays out, my worry on this is, [my son] starts getting letters at home from the athletics program and-- |
| CW-1 | He won't. |
| McGLASHAN | Okay. |
| CW-1 | He won't. What he will get in the summer is a letter saying come to the athletic orientation. Okay, but here's what I would-- |
| McGLASHAN | What, yeah, what do we do about that? |
| CW-1 | Here's what I would do. I would just tell him. I would tell him, "Listen I got lots of friends in athletics. You're an athlete kind of guy, and my friends in athletics are going to help you. So I'm letting you know. They're going to help you get in. Because they have the easiest way in. And, all the coaches, I'm friends with all the coaches. So, they're going to help you get in." And, but maybe here's a better idea. Maybe this is a better idea. We go this path. You work with the dean, but, but, how, how would you feel about, if you already know that he's going to get into the program, but we apply to letters and sciences as a regular student? |
| McGLASHAN | Yup. |

145.    McGLASHAN and CW-1 continued to have additional telephone discussions about the "side door" scheme throughout August 2018, not just with respect to USC but also with respect to Stanford University. The conversations were intercepted pursuant to a Court-authorized wiretap. On or about August 22, 2018, CW-1 left McGLASHAN a voicemail message explaining, in substance, that CW-1 would create a fake football profile using Photoshop software, which would allow McGLASHAN's son to be admitted as a purported football recruit.

| | |
|---|---|
| CW-1 | Hey Bill, so we're gonna-- met with [USC], because the [high school your son attends] does not have a football team, I'm gonna make him a kicker/punter and they're gonna walk him through with football, and I'll |

65

get a picture and figure out how to Photoshop and stuff, so it looks like it and the guy who runs the biggest kicking camp is a good friend, so we'll put a bunch of stuff about that on his profile, and we should be in pretty good shape to get that done. It's just a matter of, when I get the profile done, get it to them and figure out when they're gonna have a sub-committee meeting, so I'll let you know. Stanford said no, too tough, grades too low, just don't want to make that an exception right now for him. So I wanted you to know that as well, and then I think I'm seeing you next Tuesday, so if there's anything you need from me just let me know. See ya. Bye-bye.

146. A few minutes later, McGLASHAN returned CW-1's phone call. The following is an excerpt from the conversation.

| | |
|---|---|
| McGLASHAN | [CW-1]. |
| CW-1 | Hey, so you got an NFL punter huh? |
| McGLASHAN | You there [CW-1]? |
| CW-1 | Yes. |
| McGLASHAN | Oh there you are, perfect. Lost ya. |
| CW-1 | You got an NFL punter? |
| McGLASHAN | I did. That's just totally hilarious. So he-- so this is for, so, the one part you were garbled at the beginning is, the school doesn't have a football team, meaning, obviously [USC] does. What does that mean? |
| CW-1 | Your high school. |
| McGLASHAN | Oh, the high school. Yes, of course. Got it. |
| CW-1 | So they asked me, "What sport could we put him through?" And I said, "Well, I don't want, you know," 'cause your school doesn't have football it's easy, because I can say, because they have all these kicking camps and these kickers always get picked up outside of the school-- |
| McGLASHAN | Yeah perfect. Perfect. |
| CW-1 | So I'm gonna make him a kicker. |
| McGLASHAN | (laughs) He does have really strong legs. |
| CW-1 | (laughs) Well, this will be for-- this will be good for one of the-- |

66

| | |
|---|---|
| McGLASHAN | Maybe he'll-- maybe he'll become a kicker. You never know. |
| CW-1 | Yeah! Absolutely. |
| McGLASHAN | You could inspire him, [CW-1]. You may actually turn him into something. I love it. |
| CW-1 | I know. Well I had a boy last year, I made him a long snapper. And-- |
| McGLASHAN | I love it. |
| CW-1 | --he was 145 pounds.  Long snapper.  So-- |
| McGLASHAN | I love it. I love it. That is so funny. So, so, and then, just remind me again, we get all these done and the, the obvious deal you and I talked about, the 50K and the 200K.  And-- and then, do we know he's in?  You and I at least know he's in? |
| CW-1 | Yeah, yeah. Because when he gets in, they'll send me a letter which will be the, and-- |
| McGLASHAN | Yup. |
| CW-1 | The same letter that he's going to get later on. |
| McGLASHAN | Yup. |
| CW-1 | But it'll just be in your hands. It's always-- |
| McGLASHAN | Perfect |
| CW-1 | For the parents to know that everything's cool. |

147.    CW-1 went on in the call to tell McGLASHAN, in substance, that if they could get his son accepted to USC as a fake "kicker" or "punter," his odds of admission would jump to 90 percent, as set forth in the excerpt below.

| | |
|---|---|
| CW-1 | So, you know, essentially she [Heinel] told me when I get all the paperwork together, and I gotta create this profile pic. So what I'll probably need, if you guys have any pictures of him playing multiple sports, or something where you can kind of see his face a little bit in action? |
| McGLASHAN | Umm.  Hmm. |

67

| | |
|---|---|
| CW-1 | It would be helpful because I will Photoshop him onto a kicker. |
| McGLASHAN | (laughs) Okay. Okay. Let me look through what I have. Pretty funny. The way the world works these days is unbelievable. |
| CW-1 | It's totally cra-- like, last year I had a boy who did the water polo, and when the dad sent me the picture, he was way too high out of the water. That nobody would believe that anybody could get that high. |
| McGLASHAN | Yeah-- |
| CW-1 | So I told that dad, I said, "What happened?" He said he was standing on the bottom! I said, "No no no no no." |
| McGLASHAN | Yeah exactly. You gotta be swimming. Exactly. |
| CW-1 | That's right. |
| McGLASHAN | That's funny. That's great. Okay, well yeah, it's too bad that she doesn't have a lacrosse program with scholarship positions. That'd be easy. |
| CW-1 | I know. It'd be much easier. But she said, "That's cool, let's do it that way." So, that's the path we're gonna go. |
| McGLASHAN | Okay perfect. And then what are your sense of the odds at this point if we, once you get the package in and everything? |
| CW-1 | 90 percent. |
| McGLASHAN | Okay. Great. Great. Well, I'll get you some photos and obviously I'll see you on the broader, the other matters on Tuesday on the business matters. And, and I'm gonna keep pushing him on the, on the, you know, the pitch. |
| CW-1 | Good. |

148. On or about August 30, 2018, CW-1 received a call from AGUSTIN F. HUNEEUS, whose daughter attended the same high school as McGLASHAN's son. HUNEEUS asked if "McGLASHAN [is] doing any of this shit? Is he talking a clean game with me and helping his kid or not? 'Cause he makes me feel guilty." HUNEEUS explained, in substance, that McGLASHAN's "kid had no idea ... that you helped him on the ACT." HUNEEUS noted: "And the way, kinda Bill McGLASHAN laid it out, which I know is not true, is he-- he laid it

68

73

out and he said, 'Look, I'm gonna push, I'm gonna prod, I'm gonna use my relationships, but I'm not gonna go and pay to get my kid in.' And that's kinda how he drew the line."

149.    On or about September 1, 2018, CW-1 spoke with McGLASHAN about, among other things, his conversation with HUNEEUS.  The following is an excerpt from the call.

| | |
|---|---|
| CW-1 | Your guy AGUSTIN. |
| McGLASHAN | AGUSTIN HUNEEUS, yeah. |
| CW-1 | He is pushing hard on trying to find out your guys' approach with [your son].  He came to me and I said I did not, I was not willing to talk to him about it. |
| CW-1 | Right. |
| McGLASHAN | And sort of wants the, he obviously wants to get your help, you know, with his daughter, and I just said, "Look, you gotta make your own call what you want to do." I said, "You just need to talk to [CW-1] and work with [CW-1]," not knowing, A, what you want to do with him or B, not wanting HUNEEUS to frankly be in our family business. So I did not. |
| CW-1 | No that's good.  He was pushing hard, like, "You gotta tell me what they're doing." And I said, "Listen, that's their situation and you know Bill's very connected, and you need to discuss it with Bill, not discuss it with me." |
| McGLASHAN | Well he tried that, he tried that, and just so you know, he had a conversation with another family and sort of started talking about the side door approach you have, and was sort of suggesting, "Do you think this is right and dut duh duh." And I made the comment to him, "You know, HUNEEUS, you shouldn't be talking about that. You know, what [CW-1] does is very specific to circumstances, and you think of it as, he's the best coach you could ever have as a kid, trying to figure out where to go to school, 'cause he helps kids get into the right school etcetera, etcetera." But it just bothered me he was out talking about it. |
| CW-1 | Agreed, agreed yeah.  And that's what, and that worries me too. |
| McGLASHAN | Yup. |
| CW-1 | So I said, "Listen, you are in a very competitive environment.  You gotta keep what you do to yourself." |
| McGLASHAN | Yup, yup. |

69

| CW-1 | It will blow up on you, no matter who you think you know, it doesn't matter. |
|---|---|
| McGLASHAN | That's right, yeah, so he's not discreet at all. So that's why I wasn't comfortable saying it to him. |
| CW-1 | Good. |

150. As noted above, after CW-1 was approached by law enforcement agents in or about September 2018 and began cooperating with the government's investigation, he secretly approached several subjects of the investigation, including McGLASHAN, and warned them about the investigation. CW-1 subsequently advised investigators that he called McGLASHAN and told him, in substance, that he needed to meet with him in person at the Santa Monica airport because he believed his phone was "wired." CW-1 further advised that he did not, ultimately, meet with McGLASHAN at the airport.

151. On or about October 24, 2018—after acknowledging to law enforcement agents his attempt to obstruct the government's investigation and agreeing to plead guilty to an additional charge of obstruction of justice—CW-1 spoke with McGLASHAN by telephone again, this time at the agents' direction. In the call, CW-1 told McGLASHAN that CW-2 had been interviewed by IRS agents in Florida with respect to payments he had received from CW-1's KWF charity. The following is an excerpt from the call, which was consensually recorded.

| CW-1 | So here's kinda what happened: [CW-2], who is the-- my expert test-taker, who took the test for [your son]-- |
|---|---|
| McGLASHAN | Mm-hmm. |
| CW-1 | --at Igor's school, [the West Hollywood Test Center]. He called me to meet at Barney's Beanery, you know, in West Hollywood. Have you ever been there? |
| McGLASHAN | Never. |

70

| CW-1 | Okay. Well, it's a really cool place in West Hollywood. But he calls me, and he kinda comes out to L.A. every once in a while, and he just had his, his first child, so his in-laws live in L.A., so he said, "Let's meet at Barney's Beanery." So anyway, so [CW-2] starts talkin' to me and tells me a story that he, he got interviewed by the-- an IRS agent in Florida, because he lives in Bradenton, about the payments that he received from my foundation. And, as you know, when families pay for either, either takin' the test or goin' through the side door, all the money goes through my foundation, and then I pay it out to whoever needs to get paid, like I did for, you know, [your son]-- [your son's] test when he took the test at [the West Hollywood Test Center]. So I paid half of it to [CW-2] and half of it to [the West Hollywood Test Center] through my foundation, so that the family essentially has no connection back to what has happened. So I asked [CW-2] what he did with the agent, and what they talked about, and he told me that he hasn't been declaring his payments from my foundation as income for his taxes. So apparently he's been declaring all this income as a gift, which was stupid. But the agent said, "I'm really not so focused on [CW-2] and your payments; what I'm focused on is this foundation." And he kept asking him questions about the foundation's mission, what they do, how they help underserved kids, so on and so forth. So, you know, since [CW-2] does tutoring for us he told the agent that, you know, he works with kids for us-- underserved kids in the Bradenton area. |
|---|---|
| McGLASHAN | Mm-hmm. |
| CW-1 | So when he gets done speaking, I kinda freak out, right? Because now I'm thinking, "Oh, shit, I'm in a-- I'm in a lot of trouble here," and the IRS has me wired. They probably have me-- you know, bugged my house, the whole thing, because he's talking all about my foundation, and, you know, he really wants to dive into this. So when I met with [my lawyer], he told me, "[CW-1], hold on. Just relax. For them to get a wiretap on you, it takes a, a bunch of months to happen, and you just need to relax." So-- |
| McGLASHAN | Mm-hmm. |
| CW-1 | --you know, overnight I'm a lot less worried than I was a couple days ago (laughs) when we talked, but I just-- you know, I'm gonna use this [other] phone, which is my son's phone, and I did it-- |
| McGLASHAN | Mm-hmm. |
| CW-1 | --for us to talk so that there are, you know, no issues, just in case. |
| McGLASHAN | Yep, yep. |

71

### G. FELICITY HUFFMAN

152. Defendant FELICITY HUFFMAN is a resident of Los Angeles, California. HUFFMAN, who has two daughters, is an actress.

153. As set forth below, HUFFMAN and her spouse made a purported charitable contribution of $15,000 to KWF to participate in the college entrance exam cheating scheme on behalf of her oldest daughter. HUFFMAN later made arrangements to pursue the scheme a second time, for her younger daughter, before deciding not to do so.

154. CW-1 has advised law enforcement agents that, prior to the December 2017 SAT, CW-1 met with HUFFMAN and her spouse in their Los Angeles home and explained, in substance, how the college entrance exam scheme worked. According to CW-1, he advised HUFFMAN and her spouse that he "controlled" a testing center, and could arrange for a third party to purport to proctor their daughter's SAT and secretly correct her answers afterwards. CW-1 has advised investigators that HUFFMAN and her spouse agreed to the plan.

155. In or about the summer of 2017, HUFFMAN and CW-1 exchanged multiple e-mails about how to obtain 100 percent extra time on the SAT for her daughters.

156. On or about October 16, 2017, HUFFMAN's older daughter received a letter from the College Board advising that she had been approved for 100 percent extended time. HUFFMAN forwarded the e-mail to CW-1 and a counselor at HUFFMAN's daughter's high school with the note, "Hurray! She got it."

157. The high school counselor wrote back to HUFFMAN the next day, stating, "Now you will register [your daughter] for the December 3rd SAT ... Collegeboard considers double time a school based exam, so [our high school] is the test center. I will proctor test on Dec 4th & 5th and that's the process in nutshell." HUFFMAN forwarded the e-mail to CW-1 with the note,

72

"Ruh Ro! Looks like [my daughter's high school] wants to provide own proctor." CW-1 responded, "We will speak about it."

158.    In subsequent e-mails, CW-1 and HUFFMAN agreed to tell the high school counselor that HUFFMAN's daughter would take the SAT at a different location on December 2nd and 3rd—a Saturday and Sunday—so that she would not miss any school.

159.    In or about late October 2017, Dvorskiy completed paperwork to move HUFFMAN's daughter's exam from her own high school to the West Hollywood Test Center. ETS records reflect that, in calls to ETS, HUFFMAN and the high school counselor confirmed that the location for HUFFMAN's daughter's SAT had been switched to the West Hollywood Test Center.

160.    On or about December 1, 2017, CW-2 flew from Tampa to Los Angeles. CW-2 has advised investigators that each time he was in Los Angeles to proctor an SAT or ACT, he facilitated cheating, either by correcting the student's answers after the test or by actively assisting the student during the exam.

161.    On or about December 2, 2017, CW-2 purported to proctor HUFFMAN's daughter's SAT exam at the West Hollywood Test Center. On or about December 3, 2017, CW-2 returned to Tampa.

162.    Ultimately, HUFFMAN's daughter received a score of 1420 on the SAT, an improvement of approximately 400 points over her PSAT, taken without CW-2 one year earlier. On or about December 19, 2017, KWF paid Dvorskiy $40,000 for administering the SAT to HUFFMAN's daughter and three other students. On or about December 27, 2017, KWF paid CW-2 $35,000 for purporting to proctor the exam for HUFFMAN's daughter and exams for several other clients of CW-1.

73

163.    On or about February 27, 2018, HUFFMAN and her spouse made a purported contribution of $15,000 to KWF. On or about March 21, 2018, Masera sent them a letter thanking them for the purported donation and falsely stating that it would "allow us to move forward with our plans to provide educational and self-enrichment programs to disadvantaged youth." The letter falsely stated that "no goods or services were exchanged" for the $15,000.

164.    In a telephone call with CW-1 on or about October 23, 2018, HUFFMAN discussed repeating the SAT cheating scheme for her younger daughter. The call, which was consensually recorded, is excerpted below.

CW-1            Okay. Great. So I also just wanted to let you know that the-- the guy who took the test for [your older daughter], [CW-2]--

HUFFMAN         Yeah.

CW-1            --he just had a baby.

HUFFMAN         Aw.

CW-1            So if-- so I need to give him at least three weeks' notice, if you want to take the tes-- want us to take the test for [your younger daughter] in December.

HUFFMAN         Okay. So that takes us to like November-something. Okay. I won't-- I won't know until she takes that-- the practice test, of when we should take it. I mean, unless you want to play it safe and do it in March.

CW-1            The next test date would be February. So let's try to plan for December.

165.    In a call with CW-1 on or about November 12, 2018, HUFFMAN confirmed that she wanted to proceed with the cheating scheme, but probably only after her daughter first took the exam on her own, without cheating. CW-1 has advised law enforcement agents that, in such instances—when parents had their children first take the exams by themselves, to see how they scored without cheating—CW-1 would typically direct CW-2 to ensure that their second score did not increase by more than 30 percent from the first "baseline" score, in order to avoid any

74

suspicion of cheating.  Excerpts from the call, which was consensually recorded, are set forth

below.

| | |
|---|---|
| CW-1 | Okay, great. Okay. So then, the question I have for you, because [what] I'm not sure is, I know she's-- she's preparing with [a tutor]. Is she-- |
| HUFFMAN | Uh-huh. |
| CW-1 | --going to make that with her extended time at her school or are we going to do like what we--with [your older daughter], where [CW-2] -- |
| HUFFMAN | We're going to do like we did with [my older daughter]. |
| CW-1 | Okay. So [CW-2] will take it with her and for her at Igor's place at [the West Hollywood Test Center]. So-- |
| HUFFMAN | Yes. |
| CW-1 | Because I'll need to do the paperwork for that. And you're okay with that? |
| HUFFMAN | Yeah, totally. |
| CW-1 | Okay, okay. All right. So then when we get closer to that point, or over-- maybe I'll have it done over the next week or so-- |
| HUFFMAN | Yeah. |
| CW-1 | --[inaudible] the paperwork set up to move that forward. |
| HUFFMAN | Okay. Now, my only thing, [CW-1], is-- sorry it's loud in here. I'm outside. But is that I'm pretty sure-- we are doing it the same way as [with my older daughter]? I'm pretty sure with [my younger daughter] that she's going to want to take it twice no matter what. |
| CW-1 | Okay. |
| | …. |
| HUFFMAN | So do we do it twice then? |
| CW-1 | The-- well, that's-- that's a good -- well, how about-- let's do this. Why don't we-- why don't we work to get a first score, and then we already have a baseline?  Because what happens is, if she takes it and doesn't do well the first time -- |
| HUFFMAN | Yeah. |

75

CW-1        --then we can only go up a certain amount the second time.

HUFFMAN      Yeah. No, I totally figured that. I just know that no matter what, she's so academically driven--

CW-1        Okay.

HUFFMAN      --that no matter what happens, even if we go, "This is a great score," that she'll go, "I really want to take it again."

CW-1        Okay.

HUFFMAN      I just wanted to give you a heads-up, so I just thought then she'll just take it twice in that-- in the-- you know, in [the West Hollywood Test Center] or whatever that place was.

CW-1        Okay, go-- gotcha. Okay. All right. So--

HUFFMAN      All right.

CW-1        So I'm going to-- I'll talk to Igor and [CW-2], confirm that we can get a March-- the March test date on that Saturday.

HUFFMAN      Great.

....

CW-1        I just need you-- yeah. I just need to get Igor confirmed that--

HUFFMAN      Mm-hmm.

CW-1        --that we can use his site.

HUFFMAN      Okay.

CW-1        And I need to get [CW-2] confirmed that he can fly in and take the test with and for [your younger daughter] so that I can make sure that they're available.

HUFFMAN      Okay, that sounds great.

166.    On or about December 12, 2018, HUFFMAN and her spouse spoke with CW-1 again to finalize plans for their younger daughter's exam. During the call, CW-1 confirmed that

the price to participate in the cheating scheme would be $15,000, and discussed with HUFFMAN

and her spouse whether they thought their daughter would actually take the exam over two days,

in order to achieve as high a score as possible before CW-2 corrected her answers. Excerpts

from the call, which was consensually recorded, are set forth below.

| | |
|---|---|
| CW-1 | Yeah. So I guess the question for both of you guys are-- is, are we going to do this similarly that we did with [your older daughter] where the [younger daughter] will take the test at [the West Hollywood Test Center] -- |
| SPOUSE | Yeah, I think [inaudible]. |
| CW-1 | I'm sorry. |
| SPOUSE | Yes, I think we are [inaudible]. |
| CW-1 | Okay. Same exact. Same exact so she'll take the test [at the West Hollywood Test Center]. [CW-2] will be the proctor. We will ensure that sh-- we get a score that will be in the 14s or-- or, or higher because we want to achieve the schools we want to get to, correct? |
| SPOUSE | --we're talking about Georgetown, places like-- |
| CW-1 | Yeah. So we'll need to b-- we'll need to be mid 14s to 1500 to be-- to be solid. That's out of 1600. So that means that sh-- she'll score in the 700s in each category. |
| | …. |
| CW-1 | Okay, and then, so then are we-- so again the last time we did this. Just so I can make sure the financial part is all squared away that then we'll-- we will send you an invoice for $15,000 and we'll-- and that'll be all taken care of. Are we all okay with the financial side and the actual operational side of it? |
| SPOUSE | --cool. |
| CW-1 | Okay. That's what I wanted-- that's what I wanted to know, Okay, so what I'll do is we will start the paperwork of getting everything accomplished in February so that the test can be sent to [the West Hollywood Test Center]. And, and then Felicity, my guess is you'll have [a] conversation, the school, may have [a] conversation with you and you'll just say, "You know, essentially what we're going to do is [my |

> older daughter] took the-- the exam here, we don't want to miss any school, we're going to take it over the weekend, and we're-- we're very comfortable with this process because we've already done it once before and it worked out really well."

SPOUSE: That's [inaudible].

HUFFMAN: Okay.

....

SPOUSE  Do we want two days?

HUFFMAN  Better for her to take it over two days? I think it is.

CW-1  Well, at this point, Felicity, it doesn't really matter because we're going to get a s-- a score--

SPOUSE  --I -- I understand that.

CW-1  But it's up to you how you want to do this in-- in her head.

SPOUSE  She'll score higher. Just her base score will be higher if we did it over two days.

167. On or about February 13, 2019, HUFFMAN spoke with CW-1 again about the plan for her daughter to take the exam first on her own, and the second time as part of the cheating scheme. During the call, HUFFMAN expressed concern, in substance, about whether a dramatic increase in her daughter's scores would cause her SAT tutor to suspect cheating. Excerpts from the call, which was consensually recorded, are set forth below.

HUFFMAN  Hey, thank you so much for calling. [My spouse] gave me the update that she'll take the test March --

CW-1  Ninth.

HUFFMAN  --Ninth, at [her high school] and then we will plan it again for May--

CW-1  May. 'Cause she said she wanted to take it twi- a couple of times anyways.

HUFFMAN  Yup.

78

| CW-1 | So the goal-- because we gotta get, based on the schools that she thinks she wants to go to, we're gonna have to get her a 1400-plus. |
| HUFFMAN | Yes. |
| CW-1 | So I don't know what she will get the first time on her own, hopefully she kicks ass and, you know, it's a moot point, but that's what we're gonna need to do. |
| HUFFMAN | Okay. And what do I need to do to facilitate that switch? |
| CW-1 | So we'll do the paperwork for that in mid-April, or beginning of April-- |
| HUFFMAN | Okay. |

....

| HUFFMAN | And, you know, [the tutor] gave her that practice test, and as I said to you, you know, she came in at around 1200 and she said, "But I think, you know, we can bring that--" |
| CW-1 | We can go 14-- |
| HUFFMAN | --yeah, we can bring that up." But I just didn't know if it'd be odd for [the tutor] if we go, "Oh, she did this in-- in March 9th, but she did so much better in May." I don't know if that'd be like-- if [the tutor] would be like "Wow." |
| CW-1 | --[the tutor] is just doing her job so I don't think she gets well-engaged in that kind of world. |
| HUFFMAN | Okay. |
| CW-1 | So I wouldn't worry about that. |

168. Ultimately, HUFFMAN and her spouse decided not to pursue the SAT cheating scheme for their younger daughter.

## H. MAJORIE KLAPPER

169. Defendant MARJORIE KLAPPER is a resident of Menlo Park, California. KLAPPER co-owns a jewelry business.

79

170.     As set forth below, KLAPPER made a purported charitable contribution of $15,000 to KWF in or about November 2017 to participate in the college entrance exam cheating scheme on behalf of her son.

171.     On or about March 1, 2017, KLAPPER e-mailed CW-1 that she had learned from another client of CW-1's that the other client's daughter was planning to take the ACT in Los Angeles. KLAPPER asked if her son could do so as well. CW-1 replied, "it is not a definite as there [is] a financial consideration to take it there. They will only do with a donation."

172.     Throughout the spring and summer of 2017, CW-1 and KLAPPER exchanged e-mails about getting extra time on the ACT and SAT exams for her son. As an example, on or about June 10, 2017, KLAPPER forwarded to CW-1 a letter from the College Board that granted her son 50 percent extra time. KLAPPER wrote: "Another failed attempt at 100%. We have it for ACT. What should we do? Do these accomodations mean alternate location? Still debating our conversations too." CW-1 replied, "As long as you have ACT with 100 percent time we can take the test at an alternate site."

173.     On or about September 13, 2017, KLAPPER forwarded ACT registration instructions for her son to CW-1, who forwarded them to Dvorskiy. Dvorskiy, in turn, notified ACT, Inc. that KLAPPER's son would take the ACT on October 28, 2017 at the West Hollywood Test Center.

174.     On or about October 27, 2017, CW-2 traveled from Tampa to Los Angeles to proctor the ACT exam for KLAPPER's son the following day at the West Hollywood Test Center. CW-2 returned to Tampa on or abut October 29, 2017.

175.     In an e-mail on or about October 29, 2017, CW-1 directed Masera to invoice KLAPPER $15,000 through KWF.

80

176.     On or about November 1, 2017, KWF paid CW-2 $18,000 for proctoring the ACT for KLAPPER's son and another student.  On or about November 6, 2017, KWF paid Dvorskiy $13,000.

177.     On or about November 2 and 3, 2017, KLAPPER made a purported charitable contribution totaling $15,000 to KWF.

178.     KLAPPER's son received a score of 30 out of a possible 36 on the ACT exam. On or about November 20, 2017, KLAPPER e-mailed a copy of the score report to CW-1, noting: "Omg.  I guess he's not testing again."  CW-1 replied, "Yep he is brilliant."

179.     On a telephone call with KLAPPER on or about October 24, 2018, CW-1, acting at the direction of law enforcement agents, told KLAPPER that his foundation was being audited.  The following is an excerpt from the call, which was consensually recorded.

| | |
|---|---|
| CW-1 | So, I wanted to let you kn-- our foundation, is, is being audited-- |
| KLAPPER | Yeah. |
| CW-1 | --which is very normal. Right? |
| KLAPPER | Yeah. |
| CW-1 | And so they're lookin' at all of our payments. |
| KLAPPER | Mm-hmm. |
| CW-1 | And so they're lookin' at, you know, the payment-- including your payment that you made for 15K, to have [CW-2] take the test for [your son]. |
| KLAPPER | Yeah. |
| CW-1 | So I jus-- I just want to make sure that you and I are on the same page. 'Cause, of course, I'm not gonna tell the IRS that-- that, you know, you paid 15,000 for [CW-2] to take the test for [your son], obviously.  So I just wanted to make sure that you and I are on the same page, in case you get a call. |

81

| KLAPPER | Okay. So if I get a call-- |
| CW-1 | You're gonna say that the-- the $15,000 that you paid to our foundation was to help underserved kids. |
| KLAPPER | Okay. |
| CW-1 | So that's what our foundation does. |
| KLAPPER | Mm-hmm. |
| CW-1 | So I just wanted to make sure that our stories were aligned. |
| KLAPPER | Okay. Got it. Yeah. |
| CW-1 | Okay? |
| KLAPPER | When-- whe-- these, currently happening? |
| CW-1 | The audit is happening now, yes. |
| KLAPPER | Yes. Okay, okay. |
| CW-1 | Which, which happens to all foundations, all people. So. |
| KLAPPER | Oh, it's happening to us too. We have a random one going on right now too. |
| CW-1 | Okay. So we're all havin' fun. |
| KLAPPER | It's so fun. Yeah. Actually, I don't even know wha-- what's happening, exactly. But it's-- and it is really like, random stuff. Yeah. |
| CW-1 | Oh, absolutely. So I just wanted to make sure that you and I were on the same page, in case a phone call comes to you. |
| KLAPPER | Okay. Okay. So-- And it's The Key, isn't it? |
| CW-1 | Yeah, The Key Worldwide Foundation, yes. |
| KLAPPER | Yeah. Okay. So, if somebody calls and said, "Why did you write this check?" |
| CW-1 | Yeah. You're gonna say-- |

82

| KLAPPER | I'm gonna say, "I wrote it to support the foundation, which serves under-underprivileged kids." |
| CW-1 | Absolutely-- And it's not for [CW-2] taking the test for [your son]. So we don't have to even go there. |
| KLAPPER | Don't even know who [CW-2] is. |
| CW-1 | Gotcha. |
| KLAPPER | Okay. |

### I. GAMAL ABDELAZIZ

180. Defendant GAMAL ADBELAZIZ, also known as "Gamal Aziz," is a resident of Las Vegas, Nevada. ABDELAZIZ served, until in or around September 2016, as a senior executive of a resort and casino operator in Macau, China, and previously held other senior executive positions in the hotel and casino industries.

181. As set forth below, ADBELAZIZ conspired to bribe Heinel, the senior associate athletic director at USC, to designate his daughter as a recruit to the USC basketball team, in order to facilitate her admission to the university.

182. CW-1 has advised investigators that, in or about 2017, he discussed with ABDELAZIZ that his daughter was unlikely to be admitted to USC and similarly ranked universities based on her academic record, but that her prospects would improve dramatically as a recruited athlete. According to CW-1, although ABDELAZIZ's daughter played basketball in high school, she was not sufficiently competitive to be recruited by USC. CW-1 advised that ABDELAZIZ provided information for a falsified basketball "profile"—which included exaggerated and altogether fabricated basketball credentials—to submit to USC on his daughter's behalf.

83

183.     On or about July 14, 2017, CW-1 e-mailed Laura Janke, a former assistant coach of women's soccer at USC, "I met with Donna this week in her office and she gave the action item to create profiles for all the kids I presented to her. . . . Would you be willing to put the profiles together for pay?"[17]  CW-1 indicated that the profile for ABDELAZIZ's daughter should be for basketball.  Two days later, Janke responded that she would prepare the requested profiles.

184.     On or about July 16, 2017, in an e-mail bearing the subject line, "For Me to complete USC athletic profile," CW-1 asked ABDELAZIZ to send biographical information about his daughter.  The e-mail indicated that the profile would include falsified honors, including "Beijing Junior National Team."  In a subsequent e-mail sent on or about July 27, 2017, CW-1 requested that ABDELAZIZ provide an action photo of his daughter to be used in the profile.  ABDELAZIZ replied, "Got it," and provided the biographical information and photo that same day.

185.     On or about August 7, 2017, Janke sent CW-1 a draft of the profile, which falsely described ABDELAZIZ's daughter as having received numerous athletic honors, including "Asia Pacific Activities Conference All Star Team," "2016 China Cup Champions," "Hong Kong Academy team MVP," and "Team Captain."  In the cover e-mail, Janke wrote, "Let me know if you want me to add any other awards to her profile or if you think that is enough."  CW-1 forward Janke's e-mail and the false profile to ABDELAZIZ and wrote, "Gamal please answer below[.]"

186.     Heinel presented ABDELAZIZ's daughter to the USC subcommittee for athletic admissions on or about October 5, 2017, and—based on falsified athletic credentials—obtained

---

[17] Janke has been indicted by a federal grand jury in the District of Massachusetts on a charge of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).

84

the subcommittee's approval to admit her to USC as a basketball recruit. On or about October 10, 2017, Heinel e-mailed CW-1 a provisional acceptance letter for ABDELAZIZ's daughter confirming that her admission was premised upon "records [that] indicate that you have the potential to make a significant contribution to the intercollegiate athletic program." The letter conditioned the admission on ABDELAZIZ's daughter maintaining a grade point average of at least 3.3, with no grade lower than a C, for the duration of her senior year in high school.

187.    In a voicemail message on or about December 4, 2017, Heinel instructed CW-1 that a payment of $200,000 for ABDELAZIZ's daughter should be directed to the gift account for the Galen Center, the arena for USC's basketball and volleyball programs. CW-1 has advised law enforcement agents that he and Heinel subsequently agreed that, instead of directing the money to USC, Heinel would receive payments of $20,000 per month personally in exchange for her assistance in securing the admission of ABDELAZIZ's daughter, and the children of CW-1's other clients, to USC as purported athletic recruits.

188.    On or about January 12, 2018, ABDELAZIZ e-mailed CW-1 a copy of his daughter's report card, noting, "GPA: 3.5." CW-1 forwarded the e-mail to Heinel.

189.    On or about March 16, 2018, an employee of CW-1 e-mailed ABDELAZIZ an invoice from KWF for $300,000 and wrote, "Thank you for your generous donation." On or about March 26, 2018, ABDELAZIZ wired the purported $300,000 contribution to KWF.

190.    In or about July 2018, KWF began making payments of $20,000 per month to Heinel personally.

191.    ABDELAZIZ's daughter matriculated at USC in the fall of 2018 but did not join the basketball team.

192. ABDELAZIZ has made clear in telephone calls with CW-1 that he understood his purported contribution to KWF was in exchange for Heinel's assistance in securing his daughter's admission to USC as a purported basketball recruit. For example, on or about October 25, 2018, CW-1 called ABDELAZIZ from Boston, at the direction of law enforcement agents. On the call, CW-1 told ABDELAZIZ that KWF was being audited by the IRS. The following are two excerpts from the call, which was consensually recorded.

| | |
|---|---|
| CW-1 | So the reason for my call is I just wanted to make sure that you knew. So my foundation, which happens to all these foundations, especially as we got-- we've gotten bigger, so we're getting audited right now. |
| ADBELAZIZ | Yes. |
| CW-1 | So-- which is typical, right. And so they're looking at all my payments-- |
| ADBELAZIZ | Yes. |
| CW-1 | --that have come into our foundation and so they asked me, you know, about the $300,000 payment-- |
| ADBELAZIZ | Yes. |
| CW-1 | --that was made. |
| ADBELAZIZ | Yes. |
| CW-1 | And so I just want you to know from the IRS, you know, I'm not going to tell the IRS anything about the fact that your $300,000 was paid to Donna-- Donna Heinel at USC to get [your daughter] into school even though she wasn't a legitimate basketball player at that level. So I'm not going to-- I'm not going to say that to the IRS obviously. Are you-- |
| ADBELAZIZ | Okay. |
| CW-1 | You're okay with that, right? |
| ADBELAZIZ | Of course. |

....

86

| CW-1 | I'll tell you a funny story, is that Donna Heinel, who is the senior women's administrator, she actually called me and said-- she called me and says, "Hey [CW-1], that profile that you did for [ADBELAZIZ's daughter], I loved it. It was really well done and going forward, anybody who isn't a real basketball player that's a female, I want you to use that profile going forward." |
|---|---|
| ADBELAZIZ | I love it. |
| CW-1 | But-- yeah, it was great. Absolutely great. So I just want to make sure our stories are together. I'm going to essentially say that your $300,000 payment, was made to our foundation to help underserved kids. |
| ADBELAZIZ | Okay. |

193.    ADBELAZIZ discussed the bribery scheme with CW-1 again in a call on or about

January 3, 2019. On that call, at the direction of law enforcement agents, CW-1 told

ADBELAZIZ, in substance, that Heinel, when asked why ADBELAZIZ's daughter was not

playing basketball for USC, had responded that she had suffered an injury. ADBELAZIZ

confirmed that he would provide the same cover story if questioned. The following is an excerpt

from the call, which was consensually recorded.

| CW-1 | Donna Heinel, who's the senior women's administrator at USC, she called me-- to give me a heads up, and asked-- she was asked by admissions as to why [your daughter] did not show up for women's basketball in the fall. |
|---|---|
| ADBELAZIZ | Yeah. |
| CW-1 | So she told them that [your daughter] had an injury-- and that it happened over the summer-- and that she would be out for six to eight months. |
| ADBELAZIZ | Okay. |
| CW-1 | So I just wanted to give you a heads up, because this has happened to several of our other families that went through the side door--. |
| ADBELAZIZ | Yes. |

87

| | |
|---|---|
| CW-1 | --and I just wanted to make sure-- and nobody's gotten a phone call from anybody. And I [inaudible] that admissions will call you regarding [your daughter], you know, getting in through the side door and n-- and not showing up for practice. I doubt that will happen 'cause it hasn't happened to anybody else. |
| ADBELAZIZ | Okay. |
| CW-1 | But they may ask you, is she okay, whatever. So I think that Donna told them that she had plantar fasciitis-- |
| ADBELAZIZ | Okay. |
| CW-1 | --and, and so-- which is typical for lots of athletes. |
| ADBELAZIZ | Yes. |
| CW-1 | So I just wanted you to know in case they call, you, you know-- |
| ADBELAZIZ | That we-- would they ask her, [CW-1]? |
| CW-1 | No, they won't ask [your daughter]-- It would go-- it would go to the parent. |
| ADBELAZIZ | Okay. |
| CW-1 | So I just-- but I have no idea if they're gonna call or not. I just wanted to give you a heads up they asked about it, and Donna replied-- |
| ADBELAZIZ | Okay. |
| CW-1 | -- and I wanted you to know what her reply was. |
| ADBELAZIZ | That's fine. I will answer the same, should they call me. |

## J.  MOSSIMO GIANNULLI and LORI LOUGHLIN

194.    Defendants MOSSIMO GIANNULLI and LORI LOUGHLIN (collectively, "the GIANNULLIS"), a married couple, are residents of Los Angeles, California. GIANNULLI is a fashion designer. LOUGHLIN is an actress.

195.    As set forth below, the GIANNULLIS agreed to a pay bribes totaling $500,000 in exchange for having their two daughters designated as recruits to the USC crew team—despite the fact that they did not participate in crew—thereby facilitating their admission to USC.

196.    On or about April 22, 2016, GIANNULLI, copying LOUGHLIN, sent an e-mail to CW-1, noting:

> We just met with [our older daughter's] college counselor this am. I'd like to maybe sit with you after your session with the girls as I have some concerns and want to fully understand the game plan and make sure we have a roadmap for success as it relates to [our daughter] and getting her into a school other than ASU!

197.    CW-1 responded, "If you want [U]SC I have the game plan ready to go into motion. Call me to discuss."

198.    In an e-mail on or about July 24, 2016, CW-1 advised GIANNULLI that his older daughter's academic qualifications were at or just below the "low end" of USC's admission standards. Thereafter, the GIANNULLIS agreed with CW-1 to use bribes to facilitate her admission to USC as a recruited crew coxswain, even though she did not row competitively or otherwise participate in crew.

199.    On or about September 7, 2016, GIANNULLI sent CW-1 an e-mail attaching a photograph of his older daughter on an ergometer.

200.    Heinel presented the GIANNULLIS' daughter to the USC subcommittee for athletic admissions as a purported crew recruit on October 27, 2016. At the meeting, the subcommittee approved her conditional admission to the university.

201.    Two days later, on or about October 29, 2016, CW-1 e-mailed GIANNULLI, "Please send $50K payment to the person below[:] Donna Heinel, Senior Women[']s Associate Athletic Director[,] c/o of USC Athletics[.]"

89

202.     On or about November 1, 2016, GIANNULLI replied, "I told biz mgr to Fed Ex today." GIANNULLI also asked CW-1 whether it was permissible to discuss his daughter's admission with the then-USC Athletic Director, with whom he was acquainted. GIANNULLI wrote: "BTW, headed to Augusta in 2 weeks with [the USC Athletic Director]. I was planning on saying nothing? Agree or okay to mention anything?" CW-1 replied: "Best to keep [the USC Athletic Director] out of it. When I met with him a year ago about [your daughter] he felt you were good for a million plus." GIANNULLI responded, "HAH!!"

203.     On or about November 28, 2016, CW-1 sent GIANNULLI confirmation that his daughter had been provisionally admitted to USC based upon "records [that] indicate that you have the potential to make a significant contribution to the intercollegiate athletic program . . . ." CW-1 wrote: "FYI attached is the letter you can hold on to. As long as [your daughter] doe[s] what she is doing all is good."

204.     On or about March 23, 2017, USC mailed the GIANNULLIS' daughter her formal acceptance letter. One week later, Masera sent the GIANNULLIS an invoice from KWF for $200,000, and wrote, "Thank you for your pledge to The Key Worldwide Foundation. Your pledge is now due . . . . Our receipt letter will go out to you upon full payment." GIANNULLI responded, "Again thanks for all. We are currently on holiday in the Bahamas but will gladly handle this when home next week."

205.     On or about April 10, 2017, GIANNULLI wired $200,000 to KWF. The following day, an employee of CW-1 sent the GIANNULLIS a receipt from KWF falsely indicating that "no goods or services were exchanged" for the purported donation.

206.     On or about April 10, 2017, GIANNULLI copied LOUGHLIN on an e-mail to CW-1 bearing the subject line, "Trojan happiness." He wrote: "I wanted to thank you again for

90

your great work with [our older daughter], she is very excited and both Lori and I are very appreciative of your efforts and end result!" CW-1 replied, "With [your younger daughter] please let me know if there is a similar need anywhere so we do not lose a spot." GIANNULLI responded, "Yes [our younger daughter] as well," and LOUGHLIN added, "Yes USC for [our younger daughter]!" CW-1 replied, "So work to acquire [U]SC? As soon as the semester is over I will need a transcript and test scores."

207.    On or about July 14, 2017, CW-1 e-mailed Janke directing her to prepare a crew profile for the GIANNULLIS' younger daughter. Janke responded: "Ok sounds good. Please send me the pertinent information and I will get started."

208.    On or about July 16, 2017, CW-1 e-mailed the GIANNULLIS requesting information for the crew profile. CW-1 indicated that the profile would present their younger daughter, falsely, as a crew coxswain for the L.A. Marina Club team, and requested that the GIANNULLIS send an "Action Picture." Four days later, CW-1 sent the GIANNULLIS a second request, noting, "If we want USC I will need a transcript, test scores and picture on the ERG." LOUGHLIN, copying GIANNULLI, replied later that day, "Moss will get this done. We are back in town on Monday."

209.    On or about July 28, 2017, GIANNULLI, copying LOUGHLIN, e-mailed CW-1 a photograph of their younger daughter on an ergometer.

210.    Heinel presented the GIANNULLIS' younger daughter to the USC subcommittee for athletic admissions on or about November 2, 2017. At the meeting, the subcommittee approved her conditional admission to the university.

211.    Less than two weeks later, on or about November 16, 2017, CW-1 sent the GIANNULLIS an e-mail bearing the subject line, "CONGRATULATIONS!!!" with their

91

younger daughter's conditional acceptance letter attached.  LOUGHLIN responded, "This is wonderful news! [High-Five Emoji]."  CW-1 replied: "Please continue to keep hush hush till March."  LOUGHLIN responded: "Yes of course."

212.    Approximately two weeks later, on or about November 29, 2017, CW-1 directed the GIANNULLIS  to "send a 50K check to USC and the address is below.  Additionally the rest of the 200k will be paid to our foundation a 501 3C [sic] after [your younger daughter] receives his [sic] final letter in March."  GIANNULLI, copying LOUGHLIN, responded, "Will get this handled this week."  The next day, GIANNULLI directed his business manager to send a $50,000 check to Heinel.

213.    CW-1 has advised investigators that, in or about late 2017, a guidance counselor from the high school attended by GIANNULLIS' daughters inquired of the younger daughter about her sister's athletic recruitment to USC.  According to CW-1, the counselor did not believe that either of the GIANNULLIS' daughters participated in crew, and was concerned that their applications may have contained misleading information.

214.    On or about December 12, 2017, LOUGHLIN e-mailed CW-1, copying GIANNULLI and their younger daughter, to request guidance on how to complete the formal USC application, in the wake of her daughter's provisional acceptance as a recruited athlete. LOUGHLIN wrote: "[Our younger daughter] has not submitted all her colleges [sic] apps and is confused on how to do so.  I want to make sure she gets those in as I don't want to call any attention to [her] with our little friend at [her high school].  Can you tell us how to proceed?" CW-1 responded by directing an employee to submit the applications on behalf of the GIANNULLIS' younger daughter.

92

215.    On or about February 6, 2018, GIANNULLI wired $200,000 to one of the KWF

charitable accounts. On or about February 7, 2018, an employee of CW-1 sent the

GIANNULLIS a receipt from KWF falsely indicating that "no goods or services were

exchanged" for the purported donation.

216.    On or about March 23, 2018, USC mailed the GIANNULLIS' younger daughter

her formal acceptance letter.

217.    Shortly thereafter, on or about April 12, 2018, the high school counselor e-mailed

GIANNULLI memorializing an encounter between the two men earlier that day:

> I wanted to provide you with an update on the status of [your younger daughter's]
> admission offer to USC. First and foremost, they have no intention of rescinding
> [her] admission and were surprised to hear that was even a concern for you and
> your family. You can verify that with [the USC senior assistant director of
> admissions] . . . if you would like. I also shared with [the USC senior assistant
> director of admission] that you had visited this morning and affirmed for me that
> [your younger daughter] is truly a coxswain.

218.    The same day, Heinel left CW-1 the following voicemail message:

> I just want to make sure that, you know, I don't want the -- the parents getting
> angry and creating any type of disturbance at the school. I just want to make sure
> those students . . . if questioned at the school that they respond in a[n] appropriate
> way that they are, walk-on candidates for their respective sports. They're looking
> forward to trying out for the team and making the team when they get here. OK?
> That's what I just want to make sure of. [Inaudible.] So I just don't want
> anybody going into . . . [the GIANNULLIS' daughter' high school], you know,
> yelling at counselors. That'll shut everything -- that'll shut everything down.

219.    In a call with GIANNULLI on or about October 25, 2018, CW-1, acting at the

direction of law enforcement agents, told GIANNULLI that the IRS was auditing KWF. The

following is an excerpt from the call, which was consensually recorded:

CW-1         I'm calling 'cause I just want to make sure you're-- give you a
             heads-up that-- so my foundation is being audited--

GIANNULLI    Okay.

CW-1         --which, as you know, is normal.

93

| | |
|---|---|
| GIANNULLI | Yeah. |
| CW-1 | And so they're looking at all the payments. So they-- they asked me about your 2 payments of 200,000. |
| GIANNULLI | Uh-- |
| CW-1 | And, of course, I'm not gonna say anything about your payments going to Donna Heinel at USC to get the girls into USC, through crew. So-- |
| GIANNULLI | Sure. |
| CW-1 | --that's for sure. |
| GIANNULLI | Right. |
| CW-1 | But what's funny-- It's funny. Because Donna called me couple weeks ago and says, "Hey, uh," you know, "going forward, can you use the same format you used for [the GIANNULLIS' older daughter] and [their younger daughter], and the regattas that you put in there, for any girls, going forward, that don't row crew?" So it's funny how-- I thought I was just makin' stuff up. |
| GIANNULLI | Uh, right. Uh-- |
| CW-1 | But-- but they loved it, love-- |
| GIANNULLI | Uh, right. Perfect. |
| CW-1 | So I just want to make sure out stories are the same, because-- |
| GIANNULLI | Yeah. |
| CW-1 | --and th-- and that your $400K was paid to our foundation to help underserved kids. |
| GIANNULLI: | Uh, perfect. |
| CW-1 | Okay? So I just want to make sure that we're on the same page, in case-- |
| GIANNULLI | Uh-- |
| CW-1 | Who knows if they'll call or they don't? |

94

GIANNULLI    Perfect.  Got it.

220.    Likewise, in a call on or about November 29, 2018, CW-1, acting at the direction of law enforcement agents, told LOUGHLIN that the audit of KWF was focused on payments related to students who had been admitted to USC, including her daughters.  The following is an excerpt from the call, which was consensually recorded.

CW-1    The IRS audits foun-- large foundations and we have so much money in our foundation and we give away so much money they're-- they want to-- you know, they're always worried about things going on in foundations.

LOUGHLIN    I see.

CW-1    So what I-- what I wa-- I told Moss already and I wanted to make sure that you knew, as well, if they happened to call you, is that nothing has been said about the girls, your donations helping the girls get into USC to do--

LOUGHLIN    Okay.

CW-1    --crew even though they didn't do crew. So nothing like that has been ever mentioned.

LOUGHLIN    [inaudible]

CW-1    If you ever-- ever were to say anything.

LOUGHLIN    So we-- so we just-- so we just have to say we made a donation to your foundation and that's it, end of story.

CW-1    That is correct.

LOUGHLIN    Okay.

CW-1    Terrific.

LOUGHLIN    Okay.

CW-1    I just wanted to make sure I touched base because I didn't want you--

95

LOUGHLIN        Yeah.

CW-1            --to all of a sudden what-- like what's this call coming from.

LOUGHLIN        Okay, yeah. Okay. Totally. All right. So-- so that's it. So it's-- it's
                the IRS. It's not anyone from USC, it's the IRS.

CW-1            That is correct.

LOUGHLIN        Okay. Very good.

### K. AGUSTIN HUNEEUS, Jr.

221.    Defendant AGUSTIN HUNEEUS, Jr. is a resident of San Fransico, California.
HUNEEUS is an owner of vineyards in Napa, California and elsewhere.

222.    In or about 2017 and 2018, HUNEEUS participated in both the college entrance
exam cheating scheme and the college recruitment scheme for his daughter, including by
conspiring to bribe Heinel and Jovan Vavic, the USC water polo coach,[18] to facilitate his
daughter's admission to USC as a purported water polo recruit.

223.    CW-1 has advised law enforcement agents that, in exchange for HUNEEUS's
purported contribution of $50,000 to KWF, CW-1 arranged for CW-2 to purport to proctor the
SAT exam for HUNEEUS's daughter at the West Hollywood Test Center in or about March
2018. According to CW-1, he explained to HUNEEUS that he "controlled" the test center, and
that CW-2 would correct his daughter's answers after she completed the exam.

224.    In an e-mail to HUNEEUS and a psychologist selected by CW-1 on or about May
25, 2017, CW-1 noted that HUNEEUS's daughter "needs testing for 100 percent time with
multiple days" and directed HUNEEUS and the psychologist to "[p]lease connect."

---

[18] Vavic has been indicted by a federal grand jury in the District of Massachusetts on a
charge of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).

225.    In or about August 2017, the psychologist provided HUNEEUS's daughter with documentation recommending that she receive extended time on the SAT.  On or about October 7, 2017, the College Board granted HUNEEUS's daughter extended time to take the exam over successive days.

226.    On or about January 22, 2018, HUNEEUS forwarded CW-1 an e-mail he had received from an employee at his daughter's high school, indicating that she planned to proctor his daughter's test at the school on March 10th and March 11th.  HUNEEUS wrote, "Here is the email."  CW-1 replied, "You can tell her you are going to be out of town and have found a location to provide the test so [your daughter] does not have to miss school.  The school is [the West Hollywood Test Center] for your use."

227.    On or about February 16, 2018, an employee at the high school wrote to HUNEEUS that HUNEEUS's executive assistant "had mentioned trying to arrange for [his daughter] to take the exam in L.A.  If that is the case, please make sure the [College] Board knows where to send the exam."  That same day, Dvorskiy e-mailed CW-1 confirmation that the College Board had shipped SAT materials for HUNEEUS's daughter to the West Hollywood Test Center.  CW-1 forwarded the confirmation to HUNEEUS.  On or about February 21, 2018, a College Board representative confirmed in an e-mail to HUNEEUS's daughter and Dvorskiy that "[W]e have received confirmation that [the West Hollywood Test Center] is able to accommodate your testing for the March SAT."

228.    On or about March 9, 2018, CW-2 flew from Tampa to Los Angeles to proctor HUNEEUS's daughter exam on March 10, 2018.  CW-2 has advised investigators that while there he met with HUNEEUS, who brought his daughter to the exam.  According to CW-2, he

97

assisted HUNEEUS's daughter to answer questions during the exam, and corrected her answers after she had completed it. CW-2 returned to Tampa on or about March 11, 2018.

229. On or about April 3, 2018, HUNEEUS wired $50,000 as a purported charitable contribution to KWF. CW-1, in turn, paid Dvorskiy and CW-2 $10,000 each.

230. HUNEEUS's daughter received a score of 1380 out of a possible 1600 on the SAT, which was in the 96th percentile nationally. HUNEEUS subsequently complained about the score in a call with CW-1 on or about August 30, 2018. The following are two excerpts from the call, which was intercepted pursuant to a Court-authorized wiretap.

| | |
|---|---|
| CW-1 | The whole world is scamming the system. And I got 'em, 'cause I have a ton of kids who have extended time and they shouldn't get extended time. |
| HUNEEUS | No, I know you do. I kn-- I know your system well. I wha-- what my concern is, wha-- what I'm trying to understand is that I, it feels like, you know, you, you have a plan for the system, so you know, if you had wanted to, I mean [my daughter's] score could have been 1550 right? |
| CW-1 | No. 'Cause I would have got investigated for sure based on her grades. |
| HUNEEUS | Okay. |
| CW-1 | Absolutely, th-- now we got a bigger problem. |
| HUNEEUS | Mm-hmm. |
| CW-1 | Now she's gonna have to take it at her school in front of everybody. |
| HUNEEUS | Okay. |
| CW-1 | And now when she gets 1100, 1200, now what do we do? |
| HUNEEUS | Oh huh. Um. |

....

98

103

| | |
|---|---|
| HUNEEUS | Is Bill McGLASHEN doing any of this shit? Is he just talking a clean game with me and helping his kid or not? 'Cause he makes me feel guilty. |
| CW-1 | Um-- |
| HUNEEUS | Or are you just taking care of him in a way that he doesn't know because you have other interests with him? |
| CW-1 | No, no, let me-- not at all. Nothing to do with his-- I will say this. |
| HUNEEUS | But he didn't know-- his kid had no idea and he didn't have any idea that you helped him on the ACT, or the test you took. |
| CW-1 | 'Cause that was what he he asked for. |
| HUNEEUS | Bill McGLASHAN? |
| CW-1 | Asked for [his son] not knowing. |
| HUNEEUS | Okay. |
| CW-1 | All right, so he has not been as forthcoming-- |
| HUNEEUS | With me? |
| CW-1 | With you, and with his own kid, which is-- he wants it that way. |

231. In the same call, CW-1 also explained the college recruitment scheme to

HUNEEUS. The following are three excerpts from the call.

| | |
|---|---|
| HUNEEUS | I just wanted you to walk me through the whole, kinda, water polo thing again and how it works. You and I did, you know, like the economics, the timing, how all that works. You and I had a brief conversation about it, but I wanted to kinda get it straight, if you don't mind? |
| CW-1 | Okay, okay. So, I'm putting together, I need to put together [your daughter's] sports profile. It will be a water polo profile, now. |
| HUNEEUS | Yup, yup. |
| CW-1 | I take her transcript, test scores, and profile to th-- to the senior women's athletic director, who actually is the liaison for all sports at USC, football, everybody has to go through her. |

99

| HUNEEUS | Okay. |
|---|---|

| CW-1 | And then she, they have meetings every other Thursday, which are called subcommittee meetings, where the dean of admissions, and two admissions off-- two admissions staff and she are there, and they go through the athletes for that particular subcommittee meeting. It could be water polo this week, it could be football the next week, it could be basketball. Just depends on where they are in the seasons and what's going on. |

| HUNEEUS | Okay. |

| CW-1 | So what she does is, she already works on presenting the kids before she gets to the meeting so she knows everything about them, she knows why they want them, she knows where to slot them based on their GPA and test score, and be ready to answer questions if admissions has questions. |

| HUNEEUS | Okay. |

....

| CW-1 | [Your daughter will] get presented and if they, in the committee if they say okay good, she's in, then what happens is Donna [Heinel] tells me she's in, we're good, and then she gets a letter from admissions, which'll say in there she's been admitted, conditionally admitted, she needs to do her NCAA clearing house, she needs to send her transcripts to the NC clearing house, blah, blah, blah, blah, so on, so forth. That letter will come to me and I'll send that letter to you, and you can hold the letter yourself, she won't know anything. At that point, you will write a check for $50,000 that will, I'll give you the address, and exactly who-- it will go to Donna Heinel and for senior women's athletic director. It will be made out to USC Women's Athletics. |

| HUNEEUS | Okay. |

| CW-1 | Okay? That, that's essentially just, it goes right in, right to her, she took care of that part, and then when you get your, and then we apply, we send her application. Essentially, you've been admitted before she even has applied. Okay? |

| HUNEEUS | Okay, so there's no chance I give that 50 and then she's not admitted? |

| CW-1 | You won't send it until you get the letter. |

100

| | |
|---|---|
| HUNEEUS | Oh, okay. Got it. |
| | .... |
| CW-1 | And then on March 25th, when they send the rest of the letters out, she'll get her final letter-- It'll be a regular official packet. The normal stuff they normally send out. But you will have already had it in your hands, the same letter in your, so that you know it's taken care of. |
| HUNEEUS | Got it. |
| CW-1 | At that point, then you will write, we will, my foundation will send you a invoice. You will send a $200,000 check to our foundation, you'll get your letter, thank you, with your write off, tax ID write off stuff, and then Jovan [Vavic, the water polo coach] will call me and say, "Okay, this is how I want the money split," and so on and so forth. And that won't happen until around April 1st. |
| HUNEEUS | Does all of that, do all of those funds go to USC, or do some go to stay in your foundation? |
| CW-1 | No, they go to USC in different ways. |
| HUNEEUS | Okay. |
| CW-1 | So, what Jovan usually does is, I subsidize his staff salaries. . . . I put two of his staff members on my books as contractors. . . . And then I pay them throughout the year . . . . So, this is a way of, all coaches there know that now, so they just call me instead, because they don't want it to go to the general fund. |
| HUNEEUS | Mm-hmm. |
| CW-1 | 'Cause he's the guy giving up the spot. |

232. HUNEEUS acknowledged in the call that his daughter was not qualified to be a USC water polo recruit, and expressed concern about "this thing blow[ing] up in my face." The following are two additional excerpts from the call.

| | |
|---|---|
| CW-1 | So, in this case it's gonna be, it, it's a li-- it's, it's a little different because Jovan is totally supporting our applications. So, and Jovan-- |

101

| | |
|---|---|
| HUNEEUS | And why? |
| CW-1 | Because he owe -- |
| HUNEEUS | Because I und--, you understand that [my daughter] is not worthy to be on that team. |
| CW-1 | No, no, he he's my guy. . . . [A]nd he knows [s]he's not coming to play, he knows all that. |
| HUNEEUS | Okay. |
| | .... |
| HUNEEUS | And is there any risk that this thing blows up in my face? |
| CW-1 | Hasn't in 24 years. |
| HUNEEUS | Yeah-- |
| CW-1 | We're not doing-- |
| HUNEEUS | I know but but the, the, the, the environment. . . . [L]ike some article comes out that the, the-- |
| CW-1 | Oh no. |
| HUNEEUS | --polo team is selling seats into the school for 250 grand. |
| CW-1 | Well, no, because she's a water polo player. |
| HUNEEUS | But she's not. I mean that's what I mean-- |

233. As part of the scheme, CW-1 advised HUNEEUS that Heinel was using a
fabricated profile of HUNEEUS's daughter as a collegiate-level water polo recruit to advance
her application within USC. On or about September 18, 2018, shortly before Heinel intended to
present HUNEEUS's daughter to the admissions subcommittee, CW-1 repeated a request that
HUNEEUS provide a photograph of his daughter playing water polo. The following is an
excerpt from the call, which was intercepted pursuant to the Court-authorized wiretap.

| HUNEEUS | I'm gonna just call her right now to make sure she has a photo. |
|---|---|
| CW-1 | And if she doesn't have a photo, what I'm gonna do is, I gotta do something, so I'm-- |
| HUNEEUS | No, she'll have a-- [CW-1], she will have a photo. |
| CW-1 | Okay. |
| HUNEEUS | We've been talking about this for six fucking months. |
| CW-1 | I totally agree, I totally agree. |

234.    On or about September 20, 2018, CW-1 sent Heinel an e-mail that included HUNEEUS's daughter's high school transcripts, her fraudulent SAT score, and a fabricated athletic profile that falsely identified her as a "3-year Varsity Letter winner" in water polo and "Team MVP 2017," along with the following photograph, which is of another individual.



235.    On or about September 22, 2018, CW-1 advised HUNEEUS that since his daughter had not sent a photograph in time, he had used a photograph of someone else in the profile.  The following is an excerpt from the call.

| CW-1 | I was calling to tell you that we did not make the deadline with her picture.  She didn't send it to me 'till a day later.  However I did create the profile with the different picture that, you can't tell it's not her, but it's athletic enough, and put in all the honors and awards to match, and I got it to them on Thursday morning, but they didn't have a enough time to put her through sub-co so we'll |

103

probably go in the next couple weeks. But the issue was not getting the picture.

HUNEEUS:        Okay.

CW-1            So I just wanted you to know kind of what was going on because I told you it would go through Thursday but, and I was texting her all night, all day, and I never got it so the next, 'till a day later.

HUNEEUS:        Okay, does that mean her chances change in any way?

CW-1            It means that she didn't go through sub-co, so-- I don't think it changed as much except for it may she's gonna go through with a different group of kids, so I don't know.

    236.    In a call on or about October 25, 2018, HUNEEUS sought reassurance that his

$50,000 payment to Heinel would be returned if his daughter was not admitted to USC. The

following is an excerpt from the call, made at the direction of law enforcement, which was

consensually recorded.

HUNEEUS         And then, if-- if for whatever chance she didn't get in, would-- that wouldn't come back to me, right?

CW-1            Um--

HUNEEUS         So I'm taking a bit of a risk there?

CW-1            I-- that's never, ever, ever happened.

HUNEEUS         Okay.

CW-1            So I want to say no.

HUNEEUS         Okay. Great. So that's my second question. And then in March we get the real letter.

CW-1            Correct. With everybody else. We get a package that comes from USC. It's a beautiful thing. The whole thing.

HUNEEUS         Okay. And then at that point that's when my funds go to you, as well?

CW-1            To our foundation, yes.

| HUNEEUS | To your foundation. Yes. Okay. And the check of that is how much? Remind me again. |
| CW-1 | That'll be $200,000. |
| HUNEEUS | Okay. And do you need that all in one year? |
| CW-1 | I-- I do. I do. |
| HUNEEUS | Okay. |
| CW-1 | And-- and we can take it also around June. So you have a little window to play with. |
| HUNEEUS | Okay. |
| CW-1 | And then remember that I have to take that money and pay the folks at USC as they tell me where that money goes. |
| HUNEEUS | No, I un-- I understand. |

237. In the same call, HUNEEUS also sought reassurance that his daughter would not actually have to join the USC water polo team, despite being admitted as a water polo recruit.

| HUNEEUS | [CW-1], and then how does this impact-- like she-- I-- I think you've said this but I just want to confirm. She actually won't really be part of the water polo team, right? |
| CW-1 | No, no. She doesn't have to do anything. She's just-- here's what's going to happen. In-- in late spring she's going to get a letter from the-- from athletics and adm-- and orientation. They're going to send her a letter saying this is your orientation date. What you're going to do is not pay attention to it and you're going to sign up for the first orientation date for regular students and just go to that date and from that point on you're no longer a part of athletics. |
| HUNEEUS | Okay. |

238. Heinel presented HUNEEUS's daughter to the USC subcommittee for athletic admissions on or about November 2, 2018, using a falsified profile that depicted her as a competitive water polo player.

105

239.     Five days later, on or about November 7, 2018, Heinel e-mailed CW-1 a conditional acceptance letter for HUNEEUS's daughter stating that she was being admitted to USC because "[y]our records indicate that you have the potential to make a significant contribution to the intercollegiate athletic program." CW-1 forwarded the letter to HUNEEUS and requested that he "[p]lease send 50K check . . . made payable to USC Women's Athletic Board . . . to USC Women's Athletic c/o Donna Heinel."

240.     On or about November 19, 2018, HUNEEUS caused his executive assistant to send a $50,000 check to Heinel by FedEx, payable to "USC Women's Athletics Board" with the memo line referencing his daughter.

241.     On or about November 29, 2018, CW-1 called HUNEEUS from Boston at the direction of law enforcement agents. On the call, CW-1 told HUNEEUS that the IRS was auditing KWF. The following is an excerpt from the call, which was consensually recorded.

| CW-1 | I just want to give you a heads-up. So I just -- they just started an audit on my foundation. |
|---|---|
| HUNEEUS | Yeah. |
| CW-1 | So I just want to give you a heads up before McGLASHEN, before anybody, that essentially they're-- they're going to go-- they've been asking about both past and present payments. So there's a payment obviously for 50k in April, for us, taking-- for [your daughter] taking the test.. |
| HUNEEUS | Yeah, I remember. |
| CW-1 | Okay. So what I want to make sure is that you and I are both on the same page because what I'm going to tell them is that you made a 50k donation to my foundation for underserved kids and not that [CW-2] took the test for [your daughter] or she took the test at [the West Hollywood Test Center]. |
| HUNEEUS | Dude, dude, what do you think, I'm a moron? |

106

| | |
|---|---|
| CW-1 | No. It doesn't-- I'm not saying you're a moron. The point is, is that--. |
| HUNEEUS | I got it, [CW-1]-- I got it. |
| CW-1 | Okay. |
| HUNEEUS | Yeah. |
| CW-1 | Okay. |
| HUNEEUS | I'm going to say that I've been inspired how you're helping underprivileged kids get into college. Totally got it. |

### L. BRUCE ISACKSON and DAVINA ISACKSON

242.  Defendants BRUCE ISACKSON and DAVINA ISACKSON, a married couple (together, "the ISACKSONS"), live in Hillsborough, California. BRUCE ISACKSON is president of a real estate development firm in Woodside, California.

243.  As set forth below, the ISACKSONS took part in both the college recruitment scheme and the college entrance exam cheating scheme.

244.  CW-1 has advised law enforcement agents that in or about 2015 and 2016, the ISACKSONS agreed with him to use bribery to secure their older daughter's admission to college as a recruited athlete. Initially, according to CW-1, he sought to secure the ISACKSONS' daughter's admission to USC—her first-choice school—as a purported soccer recruit. In or about mid-September 2015, CW-1 e-mailed her high school transcripts, ACT score and a falsified soccer profile to Janke, who forwarded the materials to the USC women's soccer coach.

245.  On or about February 17, 2016, an assistant athletic director at USC e-mailed the women's soccer coach that the application had been diverted to the regular admissions process due to a "clerical error."

107

246.    On or about May 20, 2016, Ali Khosroshahin, the former head coach of women's soccer at USC, forwarded the falsified soccer profile, ACT score and transcripts on CW-1's behalf to Jorge Salcedo, the head coach of UCLA men's soccer.[19]  Khosroshahin wrote: "soccer player/student manager.  I have attached her profile, player explanation, transcripts for both high schools and ACT scores…will make sure she has registered with the NCAA.  Please let me know if you need any additional information[.]"

247.    On or about June 28, 2016, the UCLA student-athlete admissions committee approved the ISACKSONS' daughter for provisional admission that fall.  CW-1 notified the ISACKSONS via e-mail the following day.  DAVINA ISACKSON responded, copying BRUCE ISACKSON and their daughter:  "I know it has been a rough ride but I thank you from the bottom of my heart and soul for your persistence, creativity and commitment towards helping [our daughter]."

248.    On or about July 7, 2016, CW-1 directed a payment of $100,000 from one of the KWF charitable accounts to a sports marketing company controlled by Salcedo.  CW-1 subsequently also caused KWF to issue a check to Khosroshahin in the amount of $25,000.

249.    On or about July 8, 2016, Masera sent DAVINA ISACKSON an invoice from KWF in the amount of $250,000.  The invoice stated:  "Private Contribution – Letter of receipt will be provided upon payment."  On or about July 11, 2016, BRUCE ISACKSON e-mailed CW-1, copying DAVINA ISACKSON:  "Thanks for the follow up call regarding the attached Key Worldwide Foundation invoice.  Per our discussion can you please send me an email

---

[19] Khosroshahin and Salcedo have been indicted by a federal grand jury in the District of Massachusetts on a charge of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).

confirming that if [our daughter] is not admitted to UCLA as a freshman for the Fall 2016 class that The Key Worldwide Foundation will refund our $250,000.00 gift. Again, both Davina and I are greatly appreciative of all your efforts on [our daughter]'s behalf!"

250.    That same day, CW-1 e-mailed the ISACKSONS: "[T]his is to confirm that your donation of $250,000 to The Key Worldwide Foundation supporting educational initiatives we have created to help those who need it the most will be returned if [your daughter's] admission to UCLA is reversed from the email acceptance she has already received."

251.    On or about July 15, 2016, ISACKSON transferred 2,150 shares of Facebook, Inc. stock, having a value of approximately $251,249, to KWF. Approximately one week later, Masera sent the ISACKSONS a letter acknowledging the purported charitable contribution, and stating: "Your generosity will allow us to move forward with our plans to provide educational and self-enrichment programs to disadvantaged youth." The letter falsely indicated that "no goods or services were exchanged" for the money.

252.    CW-1 has advised law enforcement agents that the ISACKSONS thereafter agreed with him to engage in the college entrance exam cheating scheme for their younger daughter.

253.    On or about January 23, 2017, DAVINA ISACKSON e-mailed CW-1 documentation of ACT, Inc.'s approval for her younger daughter to take the ACT over successive days.

254.    On or about May 8, 2017, DAVINA ISACKSON e-mailed CW-1: "She is working towards June 10, 11 testing in LA . . . Please send me details of testing location and anything I need to do beforehand."

255.    On or about June 9, 2017, CW-2 traveled from Tampa to Los Angeles. The
ISACKSONS' daughter took the ACT at the West Hollywood Test Center on or about the
following day.  CW-2 returned to Tampa on or about June 11, 2017.

256.    The ISACKSONS' daughter received a score of 31 out of a possible 36 on the
exam.

257.    On or about June 12, 2017, CW-1 paid CW-2 $15,600 via a check issued from
one of the KWF charitable accounts.  On or about June 21, 2017, BRUCE ISACKSON caused
shares of stock having a value of approximately $101,272 to be transferred to KWF.

258.    Thereafter, according to CW-1, the ISACKSONS agreed with him to secure their
younger daughter's admission to USC as a purported rowing recruit, even though she was not
competitive in rowing, but instead was an avid equestrian.

259.    In or about October 2017, CW-1 sent the ISACKSONS' daughter's high school
transcript and fraudulently obtained ACT score to Heinel, writing, "Another Crew Girl," and
directed Janke to create a crew profile for her.  The profile, which CW-1 then forwarded to
Heinel, falsely stated that the ISACKSONS' daughter was a "Varsity 8 Stroke" for the Redwood
Scullers and listed a number of falsified crew honors.

260.    Heinel presented the ISACKSONS' younger daughter to the USC subcommittee
for athletic admissions as a purported crew recruit on or about November 30, 2017.  On or about
December 15, 2017, Heinel e-mailed CW-1 a letter notifying the ISACKSONS' daughter that
she had been conditionally admitted to USC as a student athlete. The letter stated: "Your records
indicate that you have the potential to make a significant contribution to the intercollegiate
athletic program as well as to the academic life of the university."

110

261.    CW-1 forwarded the letter to the ISACKSONS and their daughter, writing, "Please keep this hush hush till late March." DAVINA ISACKSON responded, "Very exciting news...we will definitely lay low until March . . . Would you like to chat next week to discuss any steps I need to take on my end for USC? Thank you again for your help!" CW-1 replied, "Only steps have been discussed with Bruce."

262.    On or about April 9, 2018, shortly after USC mailed a formal acceptance letter to the ISACKSONS's daughter, a KWF employee e-mailed DAVINA ISACKSON a $250,000 invoice for the ISACKSONS' "generous donation to The Key Worldwide Foundation." DAVINA ISACKSON responded, copying BRUCE ISACKSON, "We are out of the country and will send payment early during the week of April 16th."

263.    On or about April 20, 2018, BRUCE ISACKSON caused shares of stock having a value of $249,420 to be transferred to KWF. CW-1 has advised investigators that he earmarked $50,000 of the ISACKSONS' payment for Heinel, who in July 2018 began receiving monthly payments of $20,000 from KWF.

264.    In a call on or about August 23, 2018, CW-1 and DAVINA ISACKSON spoke on the telephone about engaging in the college entrance exam cheating scheme on behalf of the ISACKSONS' third child. The call was intercepted pursuant to a Court-authorized wiretap. In the call, CW-1 asked DAVINA ISACKSON whether they were going to try to "control the test room or is he taking it on his own." DAVINA ISACKSON responded that they wanted to control the testing environment.

265.    On or about September 26, 2018, BRUCE ISACKSON called CW-1 and requested a receipt, for tax purposes, for his purported $100,000 contribution to KWF for his younger daughter's testing scheme. The following is an excerpt from the call.

111

| | |
|---|---|
| B. ISACKSON | Hey, I was checking for one thing, just for my taxes. I need to get the letter, like you did last time-- |
| CW-1 | Okay. |
| B. ISACKSON | --for the-- for the Facebook stock that I did-- |
| CW-1 | Okay. |
| B. ISACKSON | --do you-- that I think was like 100,000, something like that, las-- is-- can you-- do you track that down to your guys, get the exact amount-- |
| CW-1 | Yeah. |
| B. ISACKSON | --internally-- |
| CW-1 | Yeah. Lemme-- |
| B. ISACKSON | --if you wouldn't m--? |
| CW-1 | --lemme-- lemme find out. Was this for-- was this for [your second daughter]? |
| B. ISACKSON | This was, when we did the testing. Yeah. Yeah. |
| CW-1 | Uh-- |
| B. ISACKSON | I can give you exact date of it, that the stock-- I actually send that to you, if that helps you. |
| CW-1 | Okay. Why don't you do that? |
| B. ISACKSON | Yeah. |
| CW-1 | That would be grea-- |
| B. ISACKSON | Yeah. And, actually got it for-- a copy of it from the broker. But I'll do that to you. That'd be awesome, just that one-page letter-- |
| CW-1 | Uh-- |
| B. ISACKSON | --saying it's a 501--(3)-- |
| CW-1 | Okay. |

112

266.    On or about October 24, 2018, CW-1 called BRUCE ISACKSON at the direction

of law enforcement agents and told him that KWF was being audited by the IRS. The following

is an excerpt from the conversation, which was consensually recorded.

CW-1            So, so I'm calling because I'm in Boston--

B. ISACKSON     Uh-huh.

CW-1            --and I-- so what's happened is my foundation is, is getting audited now.

B. ISACKSON     Uh-huh.

CW-1            Which, as you know, is pretty typical.

B. ISACKSON     Uh-huh.

CW-1            Right? So they're looking at all my payments.

B. ISACKSON     Okay.

CW-1            So they asked about your payments. One of them for when [CW-2] took
                the test for [your second daughter].

B. ISACKSON     Okay.

CW-1            The payment that we made to Jorge, to help [your first daughter] get into
                UCLA through soccer.

B. ISACKSON     Okay.

CW-1            And then the payment that we made to Donna Heinel at USC to help [your
                second daughter] get in through crew.

B. ISACKSON     Okay.

CW-1            So, of course I'm not going to tell the IRS this is where the money went--

B. ISACKSON     Right, right, right.

CW-1            --and [inaudible]. So I just, I just want to make sure that-- what I've told
                them so far is that that 600K-plus has actually gone to pay for-- paid to our
                foundation for underserved kids.

B. ISACKSON     Uh-huh.

113

| | |
|---|---|
| CW-1 | So I guess, first-- one of the questions I have is, did you take a write-off for those? |
| B. ISACKSON | I did take a write-off for those, yes. |
| CW-1 | Okay. All right, I just, I just want to make sure I'm-- |
| B. ISACKSON | Yeah. |
| CW-1 | --on the same page as you. |
| B. ISACKSON | Yeah, I did, I did. |
| CW-1 | Okay. Okay. |
| B. ISACKSON | I did. I mean-- go ahead, I'm sorry. |
| CW-1 | No, you go. |
| B. ISACKSON | Yeah, well, I got-- remember, I was asking for the letter [inaudible] asked for, you know, to the extent that we don't have it. You know, if we do get audited or something, we would need a letter or something like that. |
| CW-1 | Gotcha. Totally. |
| B. ISACKSON | That's after the fact. Okay. |
| CW-1 | Okay, no problem. So I just wanted to make sure our stories are aligned. |
| B. ISACKSON | Yeah. |

267.    On or about December 3, 2018, CW-1 called DAVINA ISACKSON at the

direction of law enforcement agents and told her that KWF was being audited by the IRS. The

following is an excerpt from the conversation, which was consensually recorded.

| | |
|---|---|
| CW-1 | So they asked about the payments that Bruce had made. And I-- I think I told him. But I'm going to tell you. Essentially, that I didn't say anything about [your second daughter] taking the, the test down at [the West Hollywood Test Center] and having [CW-2] and-- [CW-2] take it and Igor being the site coordinator. I didn't say anything about that. I just said that |

114

it was a donation to our foundation for underserved kids. Are you okay with that?

D. ISACKSON          Okay. Yeah. Yeah.

268.     Although the quality of the phone call was clear, DAVINA ISACKSON then told CW-1, "It's really hard to hear you but why don't we talk later tonight[.]"

269.     CW-1 went to the ISACKSONS' home later that evening to meet with BRUCE ISACKSON. The meeting was consensually recorded. During the meeting, CW-1 asked if DAVINA ISACKSON—who was traveling—wanted to participate by phone. BRUCE ISACKSON responded: "You know, I am so paranoid about this fucking thing you were talking about. I don't like talking about it on the phone, you know." Later in the meeting, BRUCE ISACKSON noted: "I'm so paranoid about Davina, I go, 'I really don't want you talking on the phone to [CW-1] about this.' You know, I'm thinkin', you know, are they—I mean, I can't imagine they'd go to the trouble of tapping my phone—but would they tap someone like your phones?"

270.     BRUCE ISACKSON and CW-1 then discussed what would happen if the ISACKSONS received a call from the IRS. The following is an excerpt from the conversation.

B. ISACKSON          [W]orst case, we were to get a call from them, and they would say to you, you know, I guess, "Prove you gave this money," they'd ask for some--

CW-1                 Which you did.

B. ISACKSON          --yeah-- ask for some kind of thing, and I don't-- I only got, I think, a, a, a receipt from you, or, I don't know, like, one-- like, the last two of 'em I don't think I did.

CW-1                 Okay.

B. ISACKSON          If we-- if we-- you know, if you want to--

CW-1                 Well, we can get that to you.

115

| | |
|---|---|
| B. ISACKSON | --i-if we can do that -- |
| CW-1 | Yeah, absolutely. |
| B. ISACKSON | --that would be great, yeah.    But, you know, just the letter saying "Thank you for your gift" or whatnot, of whatever-- |
| CW-1 | Right. |
| B. ISACKSON | --you know, you're helping out with. But so, so let's say they, they, they, they, they do that. For example, when we did the testing thing-- |
| CW-1 | Mm-hmm. |
| B. ISACKSON | --that was as a gift, right? Yeah. |
| CW-1 | Right. |
| B. ISACKSON | And they're not-- there's no way they can correlate and say that that wasn't for a gift? That would only be if they would talk to you about that and say "Where did that go?"  Right?  You know what I'm saying? |
| CW-1 | Right.  Right-- |
| B. ISACKSON | Yeah. |
| CW-1 | --so they wouldn't-- at least, I wouldn't know-- |
| B. ISACKSON | Right. |
| CW-1 | --how they would know? |
| B. ISACKSON | Yeah. |
| CW-1 | It would just be looked at as a gift. |
| B. ISACKSON | Mm-hmm. |
| CW-1 | Um-- |
| B. ISACKSON | But what happens when they track, [CW-1], worst case, that 75,000, and they say, "Show me where that went"? |
| CW-1 | Well-- So that-- so I guess what I-- I guess-- that's a good question. |
| B. ISACKSON | Yeah. |

116

| CW-1 | So that 75 comes in. |
|------|------|
| B. ISACKSON | Uh-huh. |
| CW-1 | It's a part of a lot of other money, right? |
| B. ISACKSON | But part-- |
| CW-1 | So-- |
| B. ISACKSON | --part of-- When you say-- |
| CW-1 | Well, because a lotta other money's in, in the pot. |
| B. ISACKSON | Coming in the pot, right. |
| CW-1 | Right? And then I'm turning around and paying [CW-2] and Igor. And so I guess they could s-- they could see that-- |
| B. ISACKSON | Right. |
| CW-1 | --and maybe they'll cor-- Yeah, that's a good q-- that's good-- |
| B. ISACKSON | Yeah, yeah. |
| CW-1 | --because they may correlate-- |
| B. ISACKSON | Right. |
| CW-1 | --that the testing was a part of it. |
| B. ISACKSON | Ri-- I, I don't know, yeah. |

271.    At a number of points in the meeting, BRUCE ISACKSON and CW-1 discussed the potential repercussions if the IRS were to uncover the true purpose of the payments to KWF:

| CW-1 | And I'm just saying, "Hey, I was just told to call everybody." |
|------|------|
| B. ISACKSON | Yeah, no, I appreciate that, and I'm glad you did. It's just something that when it happened, my stomach, like, kind of fell out. |
| CW-1 | Oh, well, sure. |
| B. ISACKSON | Yeah. |

117

| | |
|---|---|
| CW-1 | I think it should. |
| B. ISACKSON | Oh, yeah. I'm just thinking, oh my God, because you're thinking, does this roll into something where, you know, if they get into the meat and potatoes, is this gonna be this-- be the front page story with everyone from Kleiner Perkins do whatever, getting these kids into school, and-- |
| CW-1 | Well, the, the person who'd be on the front page-- |
| B. ISACKSON | Well, I, I-- But if-- but they, they -- |
| CW-1 | Yes. |
| B. ISACKSON | --went the meat and potatoes of it, which a-- which a guy would love to have is, it's so hard for these kids to get into college, and here's-- look what-- look what's going on behind the schemes, and then, you know, the, the embarrassment to everyone in the communities. Oh my God, it would just be-- Yeah. Ugh. |

272.    Later, in the conversation, BRUCE ISACKSON told CW-1 that if they proceeded with the college entrance exam cheating scheme for their third child, "I think we'll definitely pay cash this time, and not, not-- not run it through the other way."

### M. ROBERT ZANGRILLO

273.    Defendant ROBERT ZANGRILLO is a resident of Miami, Florida. ZANGRILLO is the founder and CEO of a Miami-based private investment firm focused on venture capital and real estate investments.

274.    As set forth below, ZANGRILLO conspired to bribe athletic department officials at USC to designate his daughter as an athletic recruit, thereby facilitating her admission to USC, as well as to have CW-1's employee, Mikaela Sanford, secretly take classes on behalf of his

daughter, so that the grades Sanford earned in ZANGRILLO's daughter's name could be submitted to USC as part of her application.[20]

275.    In or about 2017, ZANGRILLO's daughter's initial application for admission to USC was rejected.

276.    CW-1 has advised law enforcement agents that, in the wake of that rejection, CW-1 told ZANGRILLO that he could secure ZANGRILLO's daughter's admission to USC as a transfer student by arranging for her to be recruited onto the USC crew team, even though she did not row competitively.

277.    ZANGRILLO's daughter's transfer application was submitted to USC on or about February 1, 2018.  In contrast to her earlier application, which made no reference to rowing, the second application falsely stated that she rowed crew at a club for an average of 44 hours per week for 15 weeks per year, and that she was taking classes at a number of schools, including Santa Monica College, Rio Salado College, and the University of Colorado at Boulder.

278.    In a telephone call with ZANGRILLO, his daughter, and Sanford on or about June 11, 2018, CW-1 explained, in sum and substance, that he had asked members of the USC athletics department to facilitate ZANGRILLO's daughter's admission "as though she's been sculling and rowing," and that the USC crew coach had agreed to designate her as a purported recruit to the crew team, provided that "[y]ou guys help us."  The following is an excerpt from the call, which was intercepted pursuant to a Court-authorized wiretap.

CW-1                     So we went through athletics, went through this deal and they
                         came back to me and said, "There's all these comments in her file,
                         blah, blah, blah, blah, blah.  She[] rides horses, does all this stuff.

---

[20] Sanford has been indicted by a federal grand jury in the District of Massachusetts on a charge of conspiracy to commit racketeering, in violation of Title 18, United States Code, Section 1962(d).

119

So I convinced them that she's at [a local community college offering online courses], she's gonna do well, "Would you guys help her get in? We'll put her as though she's been sculling and rowing and then will you get-- will you put me on the phone with the crew coach?" Crew coach got on the phone with me, said, "Okay, I will take her. You guys help us, we'll help you. I'll take her, I just need her to finish all these credits and all the-- all of her classes."

279. On the call, CW-1 told ZANGRILLO that, in order to secure his daughter's admission to USC as a recruited athlete, she needed to complete the classes she had advised the university she was taking. ZANGRILLO's daughter inquired, in substance, what CW-1 was doing about an "F" grade that she had received in an art history class she had taken. CW-1 explained that he had "Mikaela retake [the art history] class," and that she had "already got the class almost done." CW-1 asked if this plan made sense. ZANGRILLO and his daughter both replied, "Yes."

280. ZANGRILLO then inquired, in substance, whether Sanford could take his daughter's biology class as well. Sanford replied that she was "happy to assist." ZANGRILLO added: "If you can do the biology thing, just makes sure it gets done as quickly as possible, so we have a backup plan for the conditional [acceptance to USC], and then you do the best you can to overturn the art history [grade]."

281. Three days later, on or about June 14, 2018, USC offered ZANGRILLO's daughter admission as a transfer student beginning in the spring semester of 2019, conditioned on her maintaining "a GPA of 3.3 or higher in at least 12 transferable units in the Fall 2018 semester with no individual grade lower than C."

282. On or about June 26, 2018, Heinel e-mailed CW-1 that she had not actually presented ZANGRILLO's daughter to the admissions department as an athletic recruit, but had instead "advocated for her" and placed her "on our VIP list for transfers."

120

283. On or about August 29, 2018, CW-1 caused KWF to issue an invoice to ZANGRILLO in the amount of $200,000. The line item on the invoice was "Donation."

284. On or about September 20, 2018, ZANGRILLO wired $200,000 to one of the KWF charitable accounts. On or about the same day, ZANGRILLO mailed a check in the amount of $50,000 to "USC Women's Athletics," as directed by CW-1.

285. In a telephone call with ZANGRILLO on or about October 25, 2018, CW-1, at the direction of law enforcement agents, told ZANGRILLO that the IRS was auditing KWF.

| | |
|---|---|
| CW-1 | I won't say that the, the moneys went to go pay Heinel for USC to get her in. And the other part is when [inaudible] audit-- |
| ZANGRILLO | What-- what-- what-- what-- what will be the thing -- what was [my daughter's] payment for? Just so I know, so we have the story straight. |
| CW-1 | So [your daughter's] payment is all the same thing. All your moneys, including the classes that Mikaela took for-- |
| ZANGRILLO | Yeah, yeah. |
| CW-1 | --[your daughter], all will show they're to our foundation. |
| ZANGRILLO | Yeah. |
| CW-1 | And will all show that she, that they were given to-- for our programs that handle underserved kids. |
| ZANGRILLO | Okay, great, perfect. |
| CW-1 | Okay? |
| ZANGRILLO | Okay, I got it. |

286. During a subsequent call with CW-1 on or about January 3, 2019, ZANGRILLO confirmed that his daughter would not say anything to her advisor about being admitted through athletics. The call, which was consensually recorded, is excerpted below.

| | |
|---|---|
| CW-1 | All right, but one thing I want to make sure is when she-- if the-- 'cause this has happened with other kids is-- |

121

| ZANGRILLO | Mm-hmm. |
|---|---|
| CW-1 | --they get to the [USC undergraduate] advisor, and the advisor say[s], "By the way, you were admitted through athletics. Are you competing in a sport?" And, and we know that-- and we don't-- what I don't want her to say, or anything like this, is that she got in through athletics-- she got in because of a payment to athletics, which I know-- |
| ZANGRILLO | Right. |
| CW-1 | --that she won't-- right? |
| ZANGRILLO | Right. No, she won't say that. |
| CW-1 | Okay. And then we should be fine. |

### N. <u>JOHN B. WILSON</u>

287.    Defendant JOHN B. WILSON is a resident of Lynnfield, Massachusetts. WILSON is the founder and CEO of a private equity and real estate development firm.

288.    As set forth below, WILSON conspired to bribe Jovan Vavic, the USC water polo coach, to designate his son as a purported recruit to the USC men's water polo team, thereby facilitating his admission to USC. WILSON also sought to use bribes to obtain the admission of his two daughters to Stanford University and Harvard University as recruited athletes.

289.    CW-1 has advised law enforcement agents that he first began working with WILSON in or about 2012, and that WILSON agreed to make a purported contribution to KWF to facilitate a bribe to Vavic to designate WILSON's son as a purported water polo recruit.

290.    On or about February 10, 2013, WILSON e-mailed CW-1 and asked for the "deadline to decide on side door for USC or BC or Georgetown etc. this year" and to "confirm for which schools is side door option really viable." CW-1 responded that the deadline for USC and Boston College was "mid July." When WILSON replied that he thought the deadline for

USC was earlier, CW-1 explained: "Jovan [Vavic] is giving me 1 boys slot and as of yet no one has stepped up to commit that is why it is later."

291.     On or about February 28, 2013, WILSON's spouse, who was copied on the earlier e-mail chain, replied to CW-1 and WILSON and asked, "Is this spot still available for USC[?]" CW-1 responded that the spot was still available. WILSON's spouse replied to CW-1 and WILSON and asked, in substance, whether another candidate was looking at USC such that she and WILSON should "be pushing [their son] to decide if that's his number 1 choice." WILSON's spouse indicated that their son "is unaware of this arrangement."

292.     On or about March 26, 2013, WILSON e-mailed CW-1 and asked, "Would the other kids know [my son] was a bench warmer side door person?" In a follow-up e-mail the next day, WILSON added: "So it sounds like even if [my son] practices all the time etc it will be known that he is a bench warming candidate? Obviously his skill level may be below the other freshmen. In your view will he be so weak as to be a clear misfit at practice etc?"

293.     CW-1 advised WILSON that his son would not actually be expected to play water polo for USC. On or about March 27, 2013, in response to an e-mail from WILSON about his son's commitment to the team "if he did the side door at USC," CW-1 replied: "Travel is only if he is playing so No- the commitment is to be on the roster not attend all practices but he will have to attend drug tests and other mandatory functions for 1 year then walk away/frankly after the 1st semester he can move on."

294.     In an e-mail to CW-1 on or about August 24, 2013, WILSON inquired about the timing of his payments to Vavic to secure his son's admission as a purported water polo recruit. WILSON wrote: "What does Jovan need by [S]ept 20? Do u have what we need? Do I make the first payment to u then?" CW-1 responded, in substance, that he had everything he needed to

send to Vavic "so he can add [your son] to his recruit list and present him to admissions in October." WILSON replied: "Great - let me know when u have verified u have it all completed and into Jovan. Also when and where to wire money."

295.    In an e-mail exchange on or about October 3, 2013, Vavic advised CW-1 that he needed an athletic profile for WILSON's son and that it "needs to be a good resume." CW-1 subsequently provided Vavic with a falsified profile that included fabricated swimming times and awards.

296.    In an e-mail exchange on or about January 21, 2014, Vavic asked CW-1 to confirm that WILSON's son was still interested in attending USC. CW-1 confirmed that WILSON's son was still interested and that the "family is ready to help." Vavic replied that he would present WILSON's son to the USC subcommittee for athletic admissions with his "top walkons."

297.    On or about February 26, 2014, Vavic e-mailed a USC athletics administrator that WILSON's son "would be the fastest player on our team, he swims 50 y in 20 [seconds], my fastest players are around 22 [seconds], this kid can fly." CW-1 has advised that this purported performance figure, which was derived from the falsified athletic profile CW-1 provided Vavic, was fabricated.

298.    WILSON's son was granted admission to USC as water polo recruit on or about February 28, 2014. USC mailed him a formal offer letter on or about March 26, 2014.

299.    On or about March 1, 2014—one day after the admissions decision—WILSON e-mailed CW-1 under the subject line "USC fees." WILSON wrote:

> Thanks again for making this happen! Pls give me the invoice. What are the options for the payment? Can we make it for consulting or whatever from the [K]ey so that I can pay it from the corporate account ?

124

CW-1 replied that he could make the invoice for business consulting fees, so that WILSON could "write off as an expense." WILSON replied, "Awesome!"

300. On or about April 7, 2014, WILSON's company wired $100,000 to KWF, as well as $100,000 to The Key, CW-1's for-profit entity, and $20,000 to CW-1 directly.

301. On or about April 16, 2014, CW-1 withdrew a $100,000 cashier's check, made out to "USC Men's Water Polo," from The Key's account. The "Purpose/Remitter" identified on the check was "Wilson Family."

302. On or about July 28, 2014, USC sent WILSON and his spouse a gift receipt for their $100,000 donation to USC Athletics.

303. WILSON's son withdrew from the USC water polo team after his first semester at USC.

304. During a call with CW-1 on or about September 29, 2018, WILSON inquired about potential "side door" opportunities for his daughters. CW-1 explained, in substance, that he could get WILSON's daughters into college through the athletic recruitment scheme even if they did not play the sport for which they were purportedly recruited. The following is an excerpt from the call:

| | |
|---|---|
| WILSON | And what were the schools in that, if you did the side door? And I'm interested about the side door and that stuff-- |
| CW-1 | So the side door is gonna be-- gonna happen where you want 'em to happen. [inaudible] |
| WILSON | It can happen anywhere? Does it have to be a sports side door? I wasn't clear on that. |
| CW-1 | Well, so that's the-- that's the easiest way to approach it, right-- |
| WILSON | Yeah. |

125

| CW-1 | --because all of the coaches have -- you know, they have guaranteed spots, and you've done a good job, you got athletic girls who got great size, they're in the right sports, so, you know, potentially there's a sailing option, and potentially there's a crew option. I mean, I don't know how good of athletes they are. They may be good enough to be able to compete at some of these schools, and then who knows what we have to do, depending on where, where the spots [inaudible]. |
|---|---|
| WILSON | Mm-hmm. Yeah, so they-- |
| CW-1 | So you have-- |
| WILSON | --have to get that sports. What if they're not really that good? I mean, they can do some crew, but I don't know they're gonna be good. [One daughter's] not even that good competitively at sailing. She just taught sailing and did sailing in, you know [inaudible] |
| CW-1 | Right, so-- |
| WILSON | --yacht club. |
| CW-1 | But at the end of the day, by the side door, I may be able to go to the sailing coach and say, "Hey, this family's willing to make the contributions. She could be on your team. She is a sailor. She may not be up to the level you are, but she can con-- you know, you're gonna get a benefit, and the family's gonna get benefit. So are you will-- are you interested in doing that?" |

305.     During a call on or about October 15, 2018, CW-1, acting at the direction of law enforcement agents, listed various "side door" options for WILSON's daughters and noted that for any of those options, WILSON's daughters "don't have to play. They just-- that's the path I'm gonna get 'em in on." WILSON responded, "Gotcha." WILSON asked CW-1 what would happen if his daughters "don't actually get in?" CW-1 replied, "Oh, no, no, no. Y-you don't have to worry about it. They're-- it's g-- it's a done deal." WILSON subsequently advised CW-1 that he wanted to pursue "side doors" for his daughters at Stanford and Harvard.

306.     During the same call, CW-1 explained that if WILSON were to deposit $500,000 into KWF immediately, he would give WILSON first priority on any admission spots he secured,

because CW-1 had to give spots to "whoever's gonna ante up." The following is an exceprt from the call, which was consensually recorded.

CW-1   So if anybody asks me for, like, [the] Stanford spot and we're not sure yet, then I can call you and say, "Hey, somebody wants that spot and I only have one," or "I'm gonna get a second one," or whatever. But having the money already, in advance, makes it much easier. Because I gotta go with whoever's gonna ante up.

  307.  WILSON responded, "Yeah," and asked CW-1 for his wire information. On or about October 17, 2018, WILSON's company wired $500,000 to an account in the name of KWF in the District of Massachusetts. Unbeknownst to WILSON, the account had been opened by CW-1 at the direction of federal agents.

  308.  Thereafter, on or about October 27, 2018, CW-1, at the direction of law enforcement agents, advised WILSON that he had secured a "side door" deal for one of WILSON's daughters with the Stanford sailing coach, John Vandemoer, and that the deal with Vandemoer was hidden from Stanford.[21] The following is an excerpt from the call, which was consensually recorded.

CW-1   So I had a conversation with the Stanford sailing coach and, so I just gave the Stanford sailing coach [$]160,000 for his program and while we were having that conversation I said, "Hey, I'm hoping that this 160 that I'm helping you with helps secure a spot for next year. Can I be guaranteed a spot for next year?" And he said, "Yes."

WILSON  [inaudible] all it takes?

CW-1   So-- no, no, no, no. That's not all it takes.

WILSON  Okay. (Laughter)

CW-1   This is not TJ Maxx or Marshall's or something like that. So--

---

[21] Vandemoer has agreed to plead guilty, in the United States District Court for the District of Massachusetts, to a charge of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).

| | |
|---|---|
| WILSON | Right. |
| CW-1 | So essentially if you're-- I want you to have first dibs, like I told you. So if you want I can provide John Vandemoer-- which I'm going to essentially send John directly the check, to the coach. I can send him your [$]500,000 that you wired into my account to secure the spot for one of your girls. I asked him for a second spot in sailing and he said he can't do that because he has to actually recruit some real sailors so that Stanford doesn't-- |
| WILSON | (Laughter) |
| CW-1 | --catch on. |
| WILSON | Right. |
| CW-1 | Okay. So-- |
| WILSON | Yeah, no. He's got to-- |
| CW-1 | --Stanford-- |
| WILSON | -- actually have some sailors. Yeah. |
| CW-1 | Yeah. So that Stanford doesn't catch on to what he's doing. |
| WILSON | Right. |
| CW-1 | So-- and I-- that doesn't mean I'm not going to pursue other Stanford coaches, and to be frank with you, it doesn't matter if it's one of the girls who's not a sailor. I can still put her as a sailor. Or, obviously, the one that is, I can-- I'll mark that she's a sailor because she is, but not at the level in which she can sail at Stanford. |
| WILSON | Right, right. |

309.     In a call on or about November 29, 2018, CW-1, at the direction of law enforcement agents, told WILSON that he had secured an admissions spot at Harvard through a fictitious "senior women's administrator," and that, in exchange for a $500,000 payment to her, the administrator would designate one of WILSON's daughters as an athletic recruit. The following is an excerpt from the call, which was consensually recorded.

| CW-1 | So I got the senior women's administrator at Harvard is going to give us a spot. What we have to do is we'll have to give her $500,000. That money, obviously, like the others, will go through my foundation and then I will fund the senior women's administrator at Harvard. And then in the spring, since I've already paid John Vandemoer the 500 and now we'll give the senior women's administrator 500, so I got another deal for you. Is-- your total's going to be 1.5. 250 will come in the spring for Stanford and 250 for Harvard in the spring and we'll ha-- and we'll be solid. We'll be done. We'll apply like a normal student but we'll know that we're getting in in the late fall of next year. |
|---|---|
| WILSON | Okay, great. So what is that going to be? This is the senior women's-- what does she have, no team or anything like that or-- |
| CW-1 | She'll figure it out. So it won't mean-- it doesn't matter the sport at this point. She will figure it out and get it done. So-- and the same thing for-- maybe she won't have to sail but we're going to put her through sailing and John Vandemoer. This is actually a better play at Harvard because she will just get her in through athletics in one of the sports but it won't matter. It won't matter at all. |

310. During the call, CW-1 told WILSON he would need another $500,000 payment to secure the spot at Harvard. Thereafter, on or about December 11, 2018, WILSON's company wired another $500,000 to the Massachusetts account in the name of KWF.

O. DEVIN SLOANE

311. Defendant DEVIN SLOANE is a resident of Los Angeles, California. SLOANE is the founder and CEO a Los Angeles-based provider of drinking water and wastewater systems, among other businesses.

312. As set forth below, SLOANE conspired to bribe USC's Heinel to designate SLOANE's son as a recruit to the USC men's water polo team, thereby facilitating his admission to USC.

313. On or about January 4, 2017, SLOANE e-mailed CW-1: "Should we start thinking of a short list of schools to tour now?" CW-1 responded, in substance, that a short list typically required "SAT and Subject test scores," but that SLOANE could begin to create a list if

129

"you are ready to commit to the notion of the financial side door. Your thoughts?" SLOANE replied three minutes later that he and his son would "come up with schools to visit."

314.     CW-1 has advised law enforcement agents that he agreed with SLOANE to secure his son's admission to USC as a purported water polo recruit, even though SLOANE's son did not play water polo competitively.

315.     Records obtained from Amazon.com indicate that, on or about June 5, 2017 and June 16, 2017, SLOANE purchased water polo gear, including a ball and a cap.

316.     Thereafter, on or about June 26, 2017, SLOANE received an e-mail from a graphic designer bearing the subject line, "Water Polo Photo – 06/26/17." The designer wrote:

> We researched a few water polo athlete images and the majority are cropped against a background so they can use them in promotional materials (and it takes out undesirable elements from the crowd etc). We were able to adjust the color and complete a clean extraction to mimic this look (attached).

317.     SLOANE responded, "OK, but any chance to put him in a setting that looks like an outdoor [polo] pool?" The graphic designer replied:

> We looked for a few shots yesterday but could not find one that was a solid fit (we're looking within istockphoto for the pool BG scene). We'll keep looking and should have a few final examples today.

318.     On or about June 27, 2017, SLOANE e-mailed CW-1 a photograph of his son purporting to play water polo, with his right arm and upper torso exposed above the water line. In the e-mail, SLOANE asked, "Does this work??" CW-1 responded: "Yes but a little high out of the water- no one gets that high."

On or about the following day, June 28, 2017, SLOANE sent CW-1 a photograph in which his son appeared to be lower in the water, with his torso and arm now mostly submerged. SLOANE wrote, "Hope this works . . ." CW-1 replied, "perfect." In both photographs, SLOANE's son appears to be using the items SLOANE purchased from Amazon.com a few weeks earlier.

319.    On or about July 14, 2017, CW-1 e-mailed Janke and directed her to create a
water polo profile for SLOANE's son. Two days later, Janke wrote, "Ok sounds good. Please
send me the pertinent information and I will get started."

320.    On or about July 16, 2017, CW-1 e-mailed SLOANE to request biographical
details for the profile. CW-1 indicated that the profile would falsely present SLOANE's son as a
"Perimeter Player" who played for the "Italian Junior National Team" and the "LA Water Polo"
team. The following day, SLOANE replied with the personal information for the profile.

321.    Heinel presented SLOANE's son to the USC subcommittee for athletic
admissions in or about November 2017. On or about November 16, 2017, Heinel e-mailed CW-
1 a conditional acceptance letter for SLOANE's son, indicating that his admission was premised
upon "records [that] indicate that you have the potential to make a significant contribution to the
intercollegiate athletic program."

322.    Less than two weeks later, on or about November 29, 2017, CW-1 e-mailed
SLOANE the following:

> Devin can you send a 50K check to USC and the address is below. Additionally
> the rest of the 200K will be paid to our foundation a 501 3C [sic] after [your son]
> receives his final letter in March.
>
> Made Payable to:
>
> USC Women's Athletics
>
> Send to:
>
> Donna Heinel
> Senior Women's Athletic Director
> 3501 Watt Way
> Los Angeles, California 90089-0602
>
> Please confirm when sent[.]

131

323.    That same day, SLOANE sent Heinel, by FedEx, a $50,000 check payable to "USC Women[']s Athletics."

324.    On or about January 29, 2018, one of CW-1's employees e-mailed SLOANE an invoice from KWF in the amount of $200,000 and wrote, "Thank you for your generous donation." SLOANE forwarded the e-mail to CW-1 and asked, "Hi [CW-1]: I believe you mentioned this would be due after we received the official letter from USC in March. Is that correct or did something change?" CW-1 responded: "We are getting everyone ready – I am trying to get money in so there is no delay as [U]SC will call the markers in very soon thereafter."

325.    On or about March 22, 2018, USC mailed SLOANE's son a formal acceptance letter. On or about April 11, 2018, SLOANE wired $200,000 to KWF.

326.    On or about April 1, 2018, a guidance counselor at SLOANE's son's high school e-mailed SLOANE and his son for an update on what schools had accepted SLOANE's son. SLOANE forwarded the request to CW-1 with the note: "What do you think we should do? Either we can list all the non-USC acceptances and not include USC or include everything or do nothing?" CW-1 responded as follows:

> They know about USC. One of the counselors questioned [your son] getting in as Water Polo player this week. My folks at [U]SC called me so we could restate [your son] playing in Italy as [his high school] does not have a team.

SLOANE replied, "Any concerns?" Three minutes later SLOANE responded again, as follows:

> The more I think about this, it is outrageous! They have no business or legal right considering all the students privacy issues to be calling and challenging/question [my son's]'s application.

327.    On or about April 11, 2018, Heinel e-mailed the USC Director of Admissions as follows:

132

Wanted to complete the loop. [SLOANE's son] doesn't play on the men's water polo team at [his high school] because they do not sponsor water polo at his school. He plays at LA Water Polo Club during the year and travels international during the summer with the youth junior team in Italy. I don't know if the people at [his high school] are unaware of his participation. He participates in tournaments in Greece, Serbia (how he met Jovan [Vavic]) and Portugal. I believe the parents do have money since he is enrolled in [his high school] plus is able to travel so extensively during the summer. He is small but he has a long torso but short strong legs plus he is fast which helps him win the draws to start play after goals are scored. He is an attack perimeter player. Thanks for bring to my attention.

The information in Heinel's e-mail was fabricated. The USC Director of Admissions replied as

follows:

Thanks, for this. If you don't mind, I'll pass an edited/paraphrased version of your note along to the school, to assure them we're looking at this stuff. They seemed unusually skeptical. I think they do have a water polo team, but I wouldn't expect it to be competitive. It's a small school; I read a good deal about tennis, some basketball, but not much else in the way of athletics.

CW-1 forwarded SLOANE this e-mail chain at approximately 10:41 p.m. that same day.

328. Approximately two hours later, CW-1 sent SLOANE the following e-mail, which

CW-1 has advised investigators contained fabricated information for SLOANE to use as a script

if questioned by his son's high school:

I received a call from Coach Vavic last night asking why [my son's high school] is pushing back on my decision to take [my son] as a member of my team - WHY?

[My son] is strong enough student to compete as a student-athlete and be a postive role model for our program throughout USC - again WHY are they questioning??

Head Water Polo Coach-- Jovan Vavic and Lisa his wife have become family friend for several years since [my son] has participated in Water Polo in the summers while we were in Italy[.]

Coach Vavic goes to Serbia, Greece, Italy, Spain and Portugal with his college teams to train and recruit players to bring to the US; consequently, we have created a close relationship.

133

Coach Vavic knows [my son] very well and realizes he is not at the National Level of USC as a water polo player but he encouraged us to have [him] consider attending USC and being a part of his team[.]

Coach Vavic stated to us that he has 40-50 guys on his team annually. Only a couple handful play but he needs practice players and great teammates plus he knows we are a generous family.

329.    Later that day, Heinel left CW-1 the voicemail referenced in paragraph 218

above, in which she told him, among other things, "I just don't want anybody going into

[SLOANE's son's high school] or [GIANNULLI's daughter's high school], you know, yelling at

counselors. That'll shut everything -- that'll shut everything down."

330.    In a call with CW-1 on or about August 30, 2018, SLOANE described how he

had misled a representative of the USC advancement office about the reason for his $50,000

payment. The following is an excerpt from the call, which was intercepted pursuant to the

Court-authorized wiretap.

SLOANE          I got reached out to by the main development people at, at, [USC's senior vice president for university advancement]--

CW-1            Yup.

SLOANE          --at university advancement. But he had an underling reach out to me and then I told the underling, "Hey, I got a letter from [USC's senior vice president for university advancement] himself." She's like, "Oh, oh, okay, well maybe I need to involve him now." I don't know. But she understood it was-- but she knew we made the donation to women's sports, and she's like, "Well, I was curious-- you know, how, how did you come up with that?" I said "Well you know, my mom, my mother was an Olympic athlete and she just passed away last year, and we as a family decided that we wanted to support women's--"

CW-1            You're the greatest.

SLOANE          "--women's sports, and my, my son had done a big essay, a big, big interview with an Olympic hockey-- female hockey player. The subject was, you know, about women in sports and how they need more access, and all that stuff. So we thought it was a good

134

> way." And I said, "I knew it would get your guys's attention. You
> know, I'm a pretty subtle guy, but I knew I'd get on your radar
> quickly and we want to part of the community," and all that.

CW-1                    That's great. You are-- you are slick.

SLOANE                  So that was good.

    331.    On or about October 25, 2018, CW-1 called SLOANE from Boston at the

direction of law enforcement agents. On the call, CW-1 told SLOANE that the IRS was auditing

KWF. SLOANE expressed concern about speaking over the telephone. The following are two

excerpts from the call, which was consensually recorded.

CW-1                    So I just want to let you know so my foundation right now--

SLOANE                  Mm-hmm.

CW-1                    --is being audited.

SLOANE                  Uh-huh.

CW-1                    Like everybody on the planet, right?

SLOANE                  Sure.

CW-1                    And so, they're looking at all of our payments so they, w-- you
                        know, we have hundreds and hundreds of them. So one of them
                        they asked about was the 200K that-- that you paid.

SLOANE                  Yeah.

CW-1                    So I just want to make sure that, [inaudible], so when the IRS talks
                        to me, but what I'm-- what I'm not going to tell the IRS obviously
                        is that the 2-- the 250 which was the total and 200 that went to our
                        foundation went to get [your son] into USC through Donna Heinel
                        for-- for men's water polo. So I'm not going to do that but I just
                        was-- I just want to make sure we're on the same page.

SLOANE                  Uh-huh, yeah.
                                          ....

CW-1                    So what I'm going to tell the IRS is that your donation--

135

| | |
|---|---|
| SLOANE | Mm-hmm. |
| CW-1 | --to our foundation essentially went-- |
| SLOANE | Wait [inaudible], wait, [CW-1], let me ask you a question, shouldn't we get together for a coffee over this as opposed to over the phone? |
| CW-1 | Whatever you want to do I'm fine. |
| SLOANE | No, no, might be-- might be-- I think m-- better. |
| CW-1 | Okay, okay, so-- |
| SLOANE | [inaudible] but-- but yeah, I think [inaudible]. |
| CW-1 | [inaudible] I'm in Boston now. |
| SLOANE | Oh, okay. |
| CW-1 | I'm in Boston now. So I mean whatever you want you tell me. |
| SLOANE | Well, you know what the best thing would be, I'm sure you got some materials on your foundation, do you have any like marketing materials about what the foundation d-- |
| CW-1 | Well, we don't. |
| SLOANE | Okay. |
| CW-1 | We don't, we have a website and all that stuff. Other than that-- |
| SLOANE | Will you send me the link to the website? |
| CW-1 | Yes. |
| SLOANE | And then, maybe I can brush up on that and then—then-- then be consistent like that. |
| CW-1 | Yeah, because essentially what-- all I'm going to tell the IRS is that you made donation to our foundation for underserved kids, that's it. |
| SLOANE | Yeah, yeah, yeah. |

136

CW-1                    And I'll leave it at that.

SLOANE                  Okay. Yeah. Yeah, yeah.

        P.  MARCI PALATELLA

332.    Defendant MARCI PALATELLA is a resident of Hillsborough, California.

PALATELLA is the CEO of a liquor distribution company in Burlingame, California.

333.    As set forth below, PALATELLA took part in both the college entrance exam

cheating scheme and the athletic recruitment scheme, including by conspiring to bribe USC's

Heinel to designate her son as a football recruit in order to facilitate his admission to USC.

334.    In or about 2016, CW-1 arranged for PALATELLA's son to be evaluated by a

psychologist with whom CW-1 was acquainted, in order to obtain the medical documentation

necessary to qualify for extended time on his college entrance exams.

335.    On or about September 26, 2016, after receiving the psychologist's evaluation,

PALATELLA e-mailed CW-1 to inquire whether she should apply for extended time on both the

SAT and the ACT.  CW-1 replied: "Do both that way if one says no we have the other."

336.    On or about February 27, 2017, after her son was granted extended time on the

SAT, PALATELLA e-mailed her son's high school that he would be "taking his SAT test at [the

West Hollywood Test Center] in Los Angeles on March 11 and 12, 2017."  PALATELLA

explained that "[w]e are taking [our son] to LA that weekend to look at schools and his outside

college advisor recommended he take his test at that facility."

337.    On or about March 7, 2017, PALATELLA wired $75,000 to one of the KWF

charitable accounts.

338.     On or about March 10, 2017, CW-2 flew from Tampa to Los Angeles for
PALATELLA's son's SAT exam. CW-2 purported to proctor the exam the following day and
returned to Tampa on or about March 12, 2017.

339.     PALATELLA's son received a score of 1410 out of a possible 1600 on the SAT.

340.     At or about the same time that PALATELLA made arrangements with CW-1 to
facilitate cheating on her son's college entrance exams, she also inquired about the college
recruitement scheme. In an e-mail exchange on or about March 13, 2016, PALATELLA asked
CW-1 for advice on how to "position" her son for his college applications. In response, CW-1
asked, "Are you willing to make a contribution of several hundred thousand as a donation to get
him in as a participant in someone's program." PALATELLA replied: "Money, for the right
environment, Yes. But he can never know."

341.     On or about the following day, CW-1 provided PALATELLA with a price list,
which he described as "the number it would take to get admitted even with the fudging of the
scores." For USC, he advised that there was a 75 percent chance of getting her son admitted
with a "large but not significant" donation. PALATELLA asked for "the approximate number it
would take to get in there," and added, "[w]hen we spoke $300-400 was one level, and the
second level was $750-1m. Can you clarify?" CW-1 answered: "Georgetown BC may be over
1m others as stated."

342.     In an e-mail exchange on or about October 3, 2016, PALATELLA asked CW-1
whether certain schools would be "realistic" for her son assuming he "had a B average, and SAT
scores that you can guess at (I'm assuming fairly accurately) . . . if we were also 'generous?'"
CW-1 replied:

> Several of the school's besides being very difficult to get in are a grind and there
> are no easy classes. . . . No matter the board member you know the grades and

138

very good/solid scores will not get him in unless you anti [sic] in the many
millions. The only way in is through athletics due to the leeway given athletes.

PALATELLA responded that her son was not a realistic football recruit, noting:

You know that [my son] took a year off football this year and says he just needed
a break and will play next year. So given that, and they he's [sic] not the team's
star but a good solid player, would he really still have an athletic edge? [My son]
is a natural but he's gotten the message that he is not big enough for college
football. I think that's one of the reasons he dropped out. . . . How would he have
an athletic edge at a bigger named school given the other players are huge?

CW-1 answered:

He needs to get in through Football so my relationship at that levels gives [him] a
shot since that is the sport with the lowest grades. Notre Dame and Vandy lowest
football players are 3.4 and have to be big time players. Cannot hide him there.

PALATELLA responded, "Ok. Got it," and asked if her son should "go back now this season or

can he go back as a senior??" CW-1 replied: "I got it covered no worries on the story for [your

son]." PALATELLA responded with four heart emojis.

343. On or about July 27, 2017, approximately four months after engaging in the SAT

cheating scheme, PALATELLA e-mailed CW-1 a photo of her son in his football uniform and

asked, "Will this work?" CW-1 forwarded the photo to Janke, together with PALATELLA's

son's grades and test scores, which included the fraudulently obtained SAT score. Janke created

a football profile for PALATELLA's son that falsely described him, among other things, as an

active player on his high school football team as a member of the "defensive line" and a "long

snapper" and as a member of several local and statewide championship teams between 2015 and

2017.

344. Heinel presented PALATELLA's son to the USC subcommittee for athletic

admissions as a purported football recruit on or about November 16, 2017, falsely describing him

as a long snapper.

345.    On or about November 30, 2017, Heinel e-mailed CW-1 a conditional acceptance letter for PALATELLA's son. The letter stated that he had the "potential to make a significant contribution to the intercollegiate athletic program as well as to the academic life of the university." CW-1 forwarded the letter to PALATELLA.

346.    On or about the next day PALATELLA mailed Heinel a $100,000 check, payable to the USC Women's Athletic Board, with a note that said, "Our son … is beyond thrilled at the prospect of attending USC as a freshman this fall."

347.    USC mailed PALATELLA's son his formal acceptance letter on or about March 22, 2018. Six days later, CW-1 instructed a KWF employee to send PALATELLA an invoice in the amount of $400,000. PALATELLA wired the money to KWF on or about April 1, 2018.

348.    On or about October 24, 2018, CW-1 called PALATELLA from Boston at the direction of law enforcement agents, and told her that the IRS was conducting an audit of KWF. The following are two excerpts from the call, which was consensually recorded.

| | |
|---|---|
| CW-1 | My foundation is being audited, which is typical, right? You know, we're all-- |
| PALATELLA | Okay. |
| CW-1 | --businesspeople. |
| PALATELLA | Right. |
| CW-1 | So they're, they're looking at all my payments. |
| PALATELLA | Mm-mmm. |
| CW-1 | And they asked about your payment, which was for [CW-2] taking the test for [your son], which we know happened at [the West Hollywood Test Center], and that whole thing happened, and [CW-2] took it. And of course when I talk to the IRS, I'm definitely not saying anything about that. I'm just saying that your payment for-- that $75,000 payment was essentially for helping-- going to our foundation to help underserved kids. |

140

PALATELLA        Oh, yeah, totally. Everything we've done is.

CW-1             Absolutely. And then the, the additional money, the 400K-plus,
                 was-- that we get through Donna-- to help [your son] get into USC,
                 through football. That's essentially [the] same thing I've told the
                 IRS, just money's gone to our foundation, and is essentially to help
                 underserved kids in the programs that we're doing. So essentially
                 what I want to do is make sure that our stories are the same.

PALATELLA        Well, here's-- I think they are, but I think there's even more to it.
                 So hold on a second. Just one sec. Let me go into-- I'm in a big
                 environment here. I think the other thing is that we don't come
                 from this, and we are so grateful for the educational opportunities
                 our own kids have gotten, and we feel like we want to give to
                 something that can support these kids and give other kids the same
                 chance that our son had.

CW-1             Absolutely. Absolutely.

PALATELLA        Are you comfortable with that?

CW-1             Absolutely. Absolutely. So the other question I just want to ask is
                 for the sale of-- are you or did you take a write-off-- because
                 they've asked me that question, and I just want to make sure that I
                 know the answer to the question.

PALATELLA        Yes, because you're a nonprofit, correct?

CW-1             Right absolutely. Yeah, 501(3)(c) [sic].

PALATELLA        Oh yeah. No, no. Yeah, no, no, no, we took the write-off, and we
                 are-- but our-- yeah. I mean, I love the work you're doing, and
                 love the fact that you help take care of these kids and inspire them
                 and go out into the communities. It was a year we could afford to
                 do it. That's-- which is not even true, but-- (laughs). We made
                 sure it was.

                                  ....

PALATELLA        What are they looking for?

CW-1             They're just looking for to figure out, this money-- because what's
                 happened, Marci, is our foundation has grown significantly . . . .
                 So what's happened now people are focused on, okay, where's all
                 this money going? Who are you really helping? Is this money,
                 you know, being used for the appropriate reason? So we-- my

                                  141

|   | books are solid. We've proven it. And I just want to make sure that if anybody comes to you, that your stories are the same, that essentially that first 75 [$75,000], essentially, which we know is for [CW-2] taking the test for [your son], but-- |
|---|---|
| PALATELLA | No, no, no, it's-- no, that was also for the same thing. |
| CW-1 | Absolutely. |
| PALATELLA | I don't think, I don't think we have to involve [CW-2]. |
| CW-1 | Okay, got it. Got it. Okay. |
| PALATELLA | I don't think-- I, I think eliminate [CW-2], that we, we did it. We were really happy with the work you were doing. We know people at Goldman Sachs who have, you know, recommended you highly, and we were looking for a place to-- we'd already donated to our schools, and we were, you know, looking for a place where we could really help kids, not just in our own neighborhood, but elsewhere, and we felt really good about everything you were doing. And you were involved in athletics, and my husband was a professional athlete, and-- you know. |
| CW-1 | Terrific. Terrific. [Inaudible]. |
| PALATELLA | [inaudible]. |
| CW-1 | I just want to make sure that all the payments made-- we're on the same page, that's all. I just want to give you a heads-up-- |
| PALATELLA | I don't think you-- I don't even think you should go down the [CW-2] road. Or did, did you? |
| CW-1 | No, we haven't-- no, not at all. |
| PALATELLA | Don't even-- I just think that was our first one, and then we felt really good about you, and-- |
| CW-1 | They, they, they know nothing about [CW-2]. They know nothing about any of it. I have just said that all the money went to our foundation to help underserved kids. That's it. |

349.  On or about January 10, 2019, PALATELLA called CW-1 to tell him about a

"disturbing call" that she had had with a neighbor whom she had told, in confidence, that she had

paid CW-1 $200,000 to secure her son's admission to USC—although, in fact, she had paid CW-1 and Heinel two-and-a-half times that amount. According to PALATELLA, her neighbor had told PALATELLA's son that we "basically paid off to get in," after promising that "she wouldn't say anything." PALATELLA told CW-1 that she and her spouse "laugh every day" about how grateful they were for CW-1's services, telling him, "We're like, 'it was worth every cent.'"

Q. ELISABETH KIMMEL

350.    Defendant ELISABETH KIMMEL is a resident of Las Vegas, Nevada and La Jolla, California. KIMMEL is the owner and president of a media company.

351.    As set forth below, KIMMEL participated in the college recruitment scheme by conspiring to use bribery to facilitate her daughter's admission to Georgetown as a purported tennis recruit, and her son's admission to USC as a purported track recruit.

352.    KIMMEL's daughter's application to Georgetown stated that she played "Southern California Junior Tennis" throughout high school and was a "ranked player." In fact, the United States Tennis Association, which operates the Southern California Junior Tennis program, has no record of KIMMEL's daughter's participation in that program.

353.    On or about November 26, 2012, an admissions administrator at Georgetown e-mailed KIMMEL's daughter, copying Ernst, that "[i]n order to send you your likely letter, your application needs to be complete. Although Coach Ernst has shared with me your unofficial SAT score report, we have not received the scores officially from the College Board and this is a requirement for admission." On or about December 12, 2012, KIMMEL's spouse responded to the e-mail on behalf of his daughter, copying KIMMEL, Ernst and CW-1, that he had ordered his daughter's official score report to be sent to Georgetown.

143

354.     Eight days later, on or about December 20, 2012, the Georgetown admissions department sent KIMMEL's daughter a letter stating that the "Committee on Admissions has conducted an initial review of your application to the Class of 2017 at the request of Mr. Gordie Ernst, Tennis Coach. I am pleased to report that the Committee has rated your admission as 'likely.'"

355.     KIMMEL's daughter matriculated at Georgetown in the fall of 2013 and graduated in or about May 2017. She was not a member of the tennis team during her four years at Georgetown.

356.     On or about April 2, 2013, Masera e-mailed KIMMEL: "I understand you have received a [Georgetown University] acceptance letter. Would you like me to revise the Foundation letter to reflect the full $200,000.00 payment?"

357.     Upon receipt of Masera' e-mail, KIMMEL e-mailed CW-1: "Thank you, again, for making Georgetown possible for [my daughter]." She added: "Steve [Masera] sent me a letter to get the process going on our donation, but had $200K as the amount. My memory was that the amount was $275K over two payments. Do I have it right?" CW-1 replied, copying Masera: "Please make the payment as it works with your foundation calendar- I believe it was one amount now and one in June?"

358.     On or about April 15, 2013, the Meyer Charitable Foundation, a family foundation on which KIMMEL and her spouse serve as officers, issued a check, payable to KWF, in the amount of $100,000. The check was signed by KIMMEL. Masera therafter sent a letter to the Meyer Charitable Foundation falsely confirming that "no goods or services were exchanged" for the purported donation. On or about June 27, 2013, the Meyer Charitable Foundation issued a second check to KWF in the amount of $170,000 to KWF. On or about July

144

16, 2013, the Meyer Charitable Foundation issued a third check to KWF in the amount of $5,000. The June and July checks were also signed by KIMMEL.

359. Between on or about September 5, 2012 and on or about September 6, 2013, CW-1 caused The Key, and later KWF, to pay Ernst, the Georgetown tennis coach, $244,000, in monthly installments of between $11,000 and $24,000.

360. The Meyer Charitable Foundation filed a tax return on or about September 25, 2013, for the period June 1, 2012 to May 31, 2013, listing a purported charitable donation to KWF of $100,000. The Meyer Charitable Foundation filed a tax return on or about September 18, 2014, for the period June 1, 2013 to May 31, 2014, listing a purported charitable donation of $175,000 to KWF.

361. On or about August 10, 2017, CW-1 directed Janke to create an athletic profile for KIMMEL's son. Janke inquired, via e-mail, what sport the profile should be for and whether there are "pictures or do I need to find one." CW-1 responded: "pole vaulter" and asked her to find "pole vaulter pics."

362. Janke prepared an athletic profile falsely describing KIMMEL's son as an elite high school pole vaulter and including the following photograph purporting to be of KIMMEL's son, but which, in fact, depicts another individual.

145



363.    The high school attended by KIMMEL's son has no record that he ever participated in pole vaulting or track and field.

364.    On or about August 18, 2017, CW-1 forwarded the false profile to Heinel, writing in the subject line, "per our discussion today thanks."

365.    In or about early October 2017, Heinel presented KIMMEL's son to the USC subcommittee for athletic admissions as a purported track and field recruit. On or about October 10, 2017, Heinel forwarded to CW-1 a conditional letter of admission, addressed to KIMMEL's son, stating that his admission to USC had been approved, and that his records indicated he had the "potential to make a significant contribution to the intercollegiate athletic program as well as to the academic life of the university." Among the conditions was the requirement that he register with the NCAA Eligibility Center.

366.    CW-1 forwarded the letter to to KIMMEL and her spouse. KIMMEL responded, "Thanks," and inquired: "[W]hat does it mean in point 3, where it says he must register with the NCAA Eligibility Center?" CW-1 responded: "I have to register him as an athlete in case he

146

wants to compete – no one sees the registration but me, you and USC – we did the same for [your daughter] too."

367.    On or about October 23, 2017, the Meyer Charitable Foundation made a $50,000 payment to the USC's Women's Athletics Board. The check was signed by KIMMEL's spouse.

368.    On or about November 28, 2017, KIMMEL e-mailed CW-1 that she had received her son's formal USC application from Mikaela Sanford, CW-1's employee, to review prior to its submission. KIMMEL noted: "I wasn't sure about telling her to submit because the application didn't have the activity you were going to include." CW-1 replied to KIMMEL, copying Sanford, directing Sanford to "please wait to submit [the application to] USC. I have one activity to add- track and field- pole vaulter."

369.    The application ultimately submitted to USC falsely described KIMMEL's son as a "3 year Varsity Letterman" in track and field and "one of the top pole vaulters in the state of California."

370.    On or about February 23, 2018, the Meyer Charitable Foundation issued a check to KWF in the amount of $200,000. The check was signed by KIMMEL.

371.    USC formally admitted KIMMEL's son on or about March 22, 2018.

372.    On or about March 24, 2018, KIMMEL e-mailed CW-1 that one of the letters in her son's acceptance packet indicated that he needed to register with the NCAA and asked whether "we need to do anything re the NCAA?" CW-1 responded that her son's test scores and final transcript needed to be sent to the NCAA. KIMMEL replied that she did not recall "doing it for [her daughter]."

373.    On or about May 26, 2018, KIMMEL e-mailed Sanford to ask if the transcript needed "to be submitted to the NCAA if [her son is] not going to participate in a college sport?"

147

Sanford replied the following day: "Even though he will not play a sport, he was admitted as an athlete so he has to abide by the NCAA regulations for entering into the university." KIMMEL responded by asking if the transcript needed to come from her son's school, or if she could send it to the NCAA herself because she was "concerned that asking [her son's] counselor to submit his transcript to NCAA will raise questions, particularly since [his counselor] knows him well and is familiar with all of his activities/extra-curriculars." Sanford provided KIMMEL with instructions on how to submit an official copy of the transcript to the NCAA herself without alerting her son's high school counselor.

374. In a call on or about July 26, 2018, KIMMEL and her spouse told CW-1 that their son's advisor at USC had inquired about his status as a track athlete, and noted that their son believed this to be a mistake because he was unaware that he had been admitted to USC as a recruited athlete. The following are two excerpts from the call, which was intercepted pursuant to a Court-authorized wiretap.

| SPOUSE | It's-- [spouse] and Elizabeth are here. |
| KIMMEL | Hey [CW-1], how are you? |
| CW-1 | Okay. Hi there. |
| SPOUSE | So I want to-- hold on just a second [CW-1]. |
| CW-1 | Okay. |
| SPOUSE | So [my son] and I just got back from [U]SC Orientation. It went great. The only kind of glitch was, and I-- he didn't-- [my son] didn't tell me this at the time-- but yesterday when he went to meet with his advisor, he stayed after a little bit, and the-- apparently the advisor said something to the effect of, "Oh, so you're a track athlete?" And [my son] said, "No." 'Cause, so [my son] has no idea, and that's what-- the way we want to keep it. |
| CW-1 | Right. |

148

153

| SPOUSE | So he said, "No, I'm not." So she goes, "It has it down that you're a track athlete." And he said, "Well I'm not." She goes, "Oh, okay, well I have to look into that." |
| | …. |
| KIMMEL | So why is he still, why was he flagged by this advisor as being a track athlete? |
| CW-1 | He was flagged as an athlete getting in. |
| KIMMEL | So does that just follow him around? On all of his records? |
| CW-1 | I have no idea ELISABETH, but it doesn't matter because every other kid who's gone through the same process will be having the same thing and it doesn't matter 'cause he gets no priority over anybody. I'm sure on his application he's flagged as ev-- as all the kids as they got in-- like there's a water polo kid who's not gonna be a water polo kid, there's the baseball kid who's not gonna be a baseball kid and they just-- they're not being recruited. They're not on the [athlete] priority [registration list] to get any priority stuff, so I would just go about your business and let it be as it [is] and not even pay attention to it 'cause it's the first time as anybody's ever [said] anything. |
| KIMMEL | I will-- so we have to hope this advisor doesn't start poking around? |
| CW-1 | Well if the advisor does, she's gonna call the person who's responsible for all of this, that's the person who got [your son] admitted, and she'll just say he decided not-- to not compete. |
| KIMMEL | She won't call the track coach? Does he know about it? |
| CW-1 | Doesn't matter, she has to go [to] the senior women's administrator. |
| KIMMEL | Okay. |
| CW-1 | It wouldn't make sense for an advisor to call anybody. So I'll [let] Donna know it-- that's the way it is. |

375. On or about August 2, 2018, KIMMEL forwarded CW-1 an e-mail from her son's advisor at USC about scheduling times for track practice. KIMMEL noted that her son "told me about this e-mail (see below), which he assumed was a mistake," adding: "[P]erhaps you already spoke to your contact about this, but has [my son] been taken off 'the list' so he doesn't continue

149

to receive notifications about practice times (or missed practices), athletics meetings, etc." CW-1 forwarded the e-mail to Heinel who responded: "I will take care of tmw."

376.  In a call on or about October 26, 2018, CW-1, at the direction of law enforcement agents, told KIMMEL that KWF was being audited by the IRS. The following is an excerpt from the call, which was consensually recorded.

CW-1        So they-- they've asked a couple questions about the-- you know, because essentially over $450,000 has been donated by your guys' family foundation.

KIMMEL      Uh-huh.

CW-1        So, of course, I'm not going to tell the IRS that-- I'm not going to say anything about the payments-- the first group of payments for [your daughter] going to Gordie Ernst at Georgetown, nor am I going to say anything about the-- 200,000-- well, 250 total going for [your son] to Donna Heinel at USC for his admission as a pole vaulter. So I just want to make sure that you and I are on the same page, so that nothing-- you know, I'm going to-- essentially what I'm going to tell the IRS is that your donations were made to my foundation to fund underserved kids, which is the mission of our foundation. So I just wanted to make sure that we were on the same page.

KIMMEL      Oh, well, as far as I know, I don't know what you've done with the money I gave your foundation. I mean, I-- you never really told me.

CW-1        Okay, that's-- that's perfect.

377.  In a call on or about January 3, 2019, CW-1, at the direction of law enforcement agents, told KIMMEL that the USC admissions department was asking questions about a number of students who had been recruited but did not show up for practice. The following is an excerpt from the call, which was consensually recorded.

CW-1        Several of my families-- I was told through Donna, may get some phone calls because they went through the side door, through Donna, and they-- admissions is asking, "So how come these kids didn't show up for practice?" And so she had to talk to admissions about why the kids haven't shown up for practice.

150

| | |
|---|---|
| KIMMEL | Oh. |
| CW-1 | So, so I-- I just wanted you to know in case you get a phone call from anybody, 'cause so far all this stuff-- [your son] was taken off the list-- |
| KIMMEL | Uh-huh. |
| CW-1 | -- so I don't think it'll ever happen. |
| KIMMEL | Were the other kids not taken off the list? |
| CW-1 | They didn't have any issue with advising, so we did not take them off any list, 'cause we've -- |
| KIMMEL | Oh. |
| CW-1 | --never had to. |
| KIMMEL | Huh. And they didn't have issues with the coaches saying, "Why aren't you at practice?" (Laughs) |
| CW-1 | No, not at all, because their boss, who's Donna Heinel, essentially put 'em on the recruited walk-on list, which happens all the time, and they just don't show up for practice, and that's fine. Coaches are okay with that because, essentially, donations are going to help their programs, and they know that. |
| KIMMEL | Hmm. Okay. |
| CW-1 | So what I wanted you to know is that you may get a phone call from admissions, just asking why [your son] didn't show up for practice, which I don't believe will happen, because he's not on anybody's list-- |
| KIMMEL | Mm-hmm. |
| CW-1 | --but I wanted you to be aware. |
| KIMMEL | So what do you recommend I say? |
| CW-1 | I would say that if they do ask you, which I doubt they will, that [your son] had an injury over the summer, to his shoulder, and so he stopped vaulting. |
| KIMMEL | Mmm. Okay. |

151

378.     Shortly after that call ended, KIMMEL called CW-1 back to confirm that no one

would be contacting her son about the issue because he was unaware of the circumstances

surrounding his admission to USC.  The following is an excerpt from the call.

| | |
|---|---|
| CW-1 | Elisabeth. |
| KIMMEL | Hey [CW-1].  I just had a follow-up question regarding our earlier conversation. |
| CW-1 | Okay. |
| KIMMEL | Are the kids getting called, also? |
| CW-1 | No, no and no.  And nobody has even called anybody at this point, but we're just getting [a] heads up, and the-- what Donna said to me is if anybody were to-- it would be-- they would call the family, the parent. They wouldn't talk to the kids. |
| KIMMEL | Oh. So-- but they've called her. |
| CW-1 | [inaudible] And so she's helped a bunch of kids get into the [inaudible] them why they didn't come for practice. And so she's-- in each case, she's told them a reason why they haven't come. And it's predominantly all injury, which is the typical thing for most kids. |
| KIMMEL | Okay. So admissions is not in on what she's been doing. |
| CW-1 | That is correct. Admissions is in on that she brings athletes, or potential athletes, or VIPs, to admissions, and then admissions does admission based on if athletics wants 'em, just like if Jim Ellis from the Business School has a VIP list, and he puts kids on the VIP list, and says to admissions, "I want these families to get in," and then those families are making donations to the Business School. |
| KIMMEL | Oh, okay. |
| | .... |
| KIMMEL | Why didn't [the other students] get e-mails about, "Why aren't you at practice?" and a practice schedule, like [my son] got? |
| CW-1 | I have no idea. |
| KIMMEL | 'Cause that was the first thing that happened to him is he got an e-mail, "Here's your practice," and I guess track had fall practices. |

152

| CW-1 | Yeah, I have no idea at all, but I know that she-- you know, you told me, and I got Donna to squash the whole thing. |
|---|---|
| KIMMEL | Why, why didn't she squash everyone else?  Just 'cause it would look too weird? |
| CW-1 | Just w-w-- and-- yeah, nobody said anything, so-- and she did-- and we've been doing this for years. |
| KIMMEL | Oh. |
| CW-1 | So-- |
| KIMMEL | So why poke the bear? |
| CW-1 | Yes. |
| KIMMEL | Okay. All right. Then I won't say anything to [my son], 'cause he's (laughs)-- |
| CW-1 | No, don't say anything. |
| KIMMEL | -- still in the dark. |

R. <u>MICHELLE JANAVS</u>

379.    Defendant MICHELLE JANAVS is a resident of Newport Coast, California. JANAVS is a former executive at a large food manufacturer formerly owned by members of her family.

380.    As set forth below, JANAVS participated in both the college entrance exam scheme and the athletic recruitment scheme, including by conspiring to use bribery to facilitate her daughter's admission to USC as a purported beach volleyball recruit.

381.    On or about August 11, 2017, JANAVS forwarded CW-1 correspondence from ACT, Inc. indicating that her daughter had been approved for extended time on the ACT.  CW-1 replied: "Awesome news.  It works."

153

382.    On or about August 31, 2017, JANAVS received an e-mail from ACT, Inc. with instructions on how to register her daughter to take the ACT, with extended time, at her high school. JANAVS forwarded the e-mail to CW-1 and asked, "Do I sent this info/form requested to [my daughter's high school] or directly to you?" CW-1 responded: "Normally your school then we request the test to move."

383.    On or about October 27, 2017, CW-2 flew from Tampa to Los Angeles. On or about October 28, 2017, JANAVS' daughter took the ACT at the West Hollywood Test Center, with CW-2 serving as the purported proctor. CW-2 returned to Tampa the following day. JANAVS' daughter received a score of 32 out of a possible 36 on the exam.

384.    On or about October 29, 2017, the day after the test, CW-1 directed a KWF employee to send an invoice to JANAVS in the amount of $50,000. CW-1 also caused KWF to pay $18,000 to CW-2 and $13,000 to Dvorskiy for helping JANAVS' daughter and another student cheat on the ACT.

385.    On or about November 30, 2017, JANAVS sent a check for $50,000 from her foundation to KWF.

386.    In or about the fall of 2018, the falsified ACT scores were included as part of JANAVS' daughter's application for admission to USC, and JANAVS provided information to CW-1 for use in facilitating her daughter's admission to the university as a purported beach volleyball recruit. In fact, while JANAVS' daughter played volleyball in high school, she did not play competitive beach volleyball.

387.    For example, on or about August 24, 2018, CW-1 e-mailed JANAVS to request that she send him "an action volleyball indoor and beach photo of [your daughter] as soon as

154

possible." Two days later, JANAVS e-mailed CW-1 photos of her daughter playing beach and indoor volleyball.

388.    On or about September 4, 2018, CW-1 e-mailed Heinel an athletic profile of JANAVS' daughter that included two of the photos and falsely described her as the winner of multiple beach volleyball tournaments in California.

389.    In a call on or about October 1, 2018, CW-1 told JANAVS that Heinel planned to present her daughter to the USC admissions committee as a beach volleyball player, and explained where to send the bribe payments. The following is an excerpt from the call, which was consensually recorded.

| | |
|---|---|
| CW-1 | So she's gonna go through on Thursday, so I just want to confirm the process, the next pro-- part of the process, which would be soon thereafter I will get a letter from USC stating-- like a likely letter-- that she has been in-- admitted under these conditions, which is doing an NCAA clearinghouse, finishing her semester, blah, blah, blah, and at that point you guys would send a $50,000 check to USC Athletics, in care of Women's Athletics-- |
| JANAVS | Okay. |
| CW-1 | --at that point. Are you okay with that? |
| JANAVS | Yes. |
| CW-1 | Okay, and-- |
| JANAVS | [inaudible] that's fine. |
| CW-1 | Okay, and then when she gets her final, final letter, which will happen around March 25th, then you would send the rest of the money. So, I just-- |
| JANAVS | To USC or to you? |
| CW-1 | To our foundation. |
| JANAVS | Yeah, so the first $50,000 goes to USC? |

CW-1        Right, correct.     .

JANAVS      Okay.

390.    Heinel presented JANAVS' daughter to the USC subcommittee for athletic
admissions as a purported beach volleyball recruit on or about October 3, 2018.

391.    On or about October 17, 2018, at the direction of law enforcement agents, CW-1
forwarded to JANAVS a letter noting that her daughter had been conditionally admitted to USC.
The letter stated: "Your records indicate that you have the potential to make a significant
contribution to the intercollegiate athletic program as well as to the academic life of the
university." JANAVS replied, "Thank you. Let me know about next steps."

392.    On or about October 26, 2018, CW-1, at the direction of law enforcement, e-
mailed JANAVS instructing her to mail a $50,000 check to Heinel payable to the USC Women's
Athletics Fund. JANAVS advised CW-1 that she mailed the check to Heinel later that same day.

393.    One month later, on or about November 26, 2018, JANAVS called CW-1 to
discuss plans to engage in the college entrance exam scheme for her younger daughter. The
following is an excerpt from the call, which was consensually recorded.

JANAVS      [CW-1], I had a question for you. So I was able to get [my younger
            daughter] the multiday ACT.

CW-1        Okay, you got her extended time multiple days, got it.

JANAVS      Yes, so I got that, the only thing is h-- [my younger daughter] is not like [my
            older daughter]. I'm not [inaudible] works. She's not stupid. So if I said to
            her, "Oh, well, we're going to take it up at [CW-1]'s," she's going to wonder
            why. How do you do this without telling the kids what you're doing?

CW-1        Oh, in most cases, Michelle, none of the kids know.

JANAVS      No, I know that.

CW-1        Essentially what happens is they take the test with a proctor like they
            normally do and w--, and then so they take the test, they leave, and then the

156

proctor looks at what she's already done and then whatever number that we're trying to get, that's what he works to get. So she doesn't even know.

JANAVS            Right, but how-- no, I understand, she won't even know. But how do you explain [it] to her? Because I got the letter from the school and they said, "You know, you need to take it at the school." Because remember last time they gave [inaudible] little bit of a hard time? How do you-- how do they work around that?

CW-1              So one of the ways you could do it is to say, "Listen, we're going to take it on the weekend. And we don't want you to miss any school." Because it's difficult when [inaudible] much class time. And we need to take this over a Saturday-Sunday. So we're going to do [it] up there because they'll administer the test over multiple days. But the school-- but-- but-- hold-- let's go back. It doesn't matter about the school at all. The issue is [your daughter]. The school-- school wants to be able to give it, but they don't have to give it. So you don't really have to say anything. For the school you could say that weekend you guys are going to be up in L.A. and [inaudible].

JANAVS            That's what we did last time. Yeah, so when-- well, [my daughter] is the issue. There's two issues. Yeah. One is, you know-- I mean [my daughter] is more the issue because she's going to say to me, "You know, well, why am I taking it up there?"

CW-1              And you're just going to say, "We don't want you to miss any school so we're going to do this on a weekend up here because we g-- [inaudible] because it's really easy, it's convenient, and we can get it done over the weekend, you won't miss any school."

JANAVS            So do you-- so I would actually have her go Saturday and Sunday to pretend like she's taking it over multiple days.

CW-1              Well, if you want to do that, because she's--

JANAVS            She's smart, she's going to figure this out. Yeah, she's going to say to me-- she already thinks I'm up to, like, no good.

CW-1              I got it. So let's, yeah, so that's what we would have to do is over multiple days.

JANAVS            Okay. So then the other question is, if I want to sign her up-- or I've already signed her up for February. Or can I sign her up in December and not have it go through [her high school] at all?

CW-1              Well, no matter what it goes through. Because it's her home school [inaudible] what we have to do is redirect the test to be-- to be given at

157

|  |  |
|---|---|
|  | [inaudible] site. So [inaudible] so stick with where you are. We'll just redirect. She's already signed up. We just have to redirect the materials to be sent like we did for [your older daughter]. |
| JANAVS | Okay. Okay. Right, I see. Okay. Okay. Okay. Yeah, they're not stupid either, but whatever, I don't care. They can't say anything to me. I mean they're going to be suspicious that every kid I have does so well somewhere else, but that's okay. So we'll, I just didn't-- I just didn't want to have this conversation with [my younger daughter]. |
| CW-1 | No, no, totally get it, yeah. No, I totally get it. |
| JANAVS | She's totally different than [my older daughter]. Like she needs to really think she d-- [my older daughter] is like, "This test is such bullshit. I don't really care. I don't ever want to take it." But [my younger daughter] is like actually studying to try and get a 34. |
| CW-1 | Got it. Got it. |
| JANAVS | So it would-- it would actually be a great boost to her. And [my older daughter] came to me and she says, "You're not going to tell [my sister], are you?" I was like, "No." Weird-- weird family dynamics, but every kid is different. |
| CW-1 | Cool. |
| JANAVS | Okay. Okay, so we'll just stick with February and now I know we're just trying to get it done on the weekend. You'll just go up too. And she doesn't see you at all. |
| CW-1 | No. |
| JANAVS | So we'll just say there's a proctor. I don't even have to say anything about you. |
| CW-1 | Yeah. No, not at all. |

394. In a call on or about January 3, 2019, JANAVS discussed the cost of the exam bribery scheme with CW-1. The following is an excerpt from the call, which was consensually recorded.

| JANAVS | Yeah, so it helped that you mentioned it to [my daughter]. You could tell, she was like, "Well I should just do it at school." I'm like, "Oh my god, no." Yeah, let's just go ahead and I'll just come up with something for her. Let's |

158

take it over there. But the thing [is], I need her to do the full thing and take it over two days-- like as if she is really doing it. She's not stupid.

CW-1    No, I got you. She's, she's, you know, she's taking the test anyways on her own [inaudible] as if she is really doing it. We'll just split it in half. And then [CW 2] will clean it up so we can get the score we need to get, afterwards. So I'll just tell him he has to do it for two days. And we'll do half a day, half of that time on Saturday and half the time on Sunday.

JANAVS    Yeah, how much is that still?

CW-1    I think it's like $50,000.

JANAVS    Yeah, that's what we did last time. Okay.

395.    During the same call, CW-1 told JANAVS that Heinel had been questioned about why JANAVS' older daughter was on the volleyball recruit list at USC. The following is an excerpt from the call.

CW-1    I got a call from Donna Heinel, at USC.

JANAVS    Uh-huh.

CW-1    And so the sa-- 'cause we went through sand volleyball, which we know she's really not a-- you know, I -- I couldn't put her through as a 6-person volleyball, indoor volleyball--

JANAVS    Ri—

CW-1    --because they're-- they're so awesome. So the sand volleyball coach was asking Donna-- 'cause she saw her list of student athletes that they recruited. So she asked about [your daughter]. And so I doubt it but you may get a call from the staff, at USC sand volleyball.

JANAVS    Okay.

CW-1    And if you do, you're ju-- they may just ask you, "Is [your daughter] preparing for the fall?" And, of course, you will say--

JANAVS    Yes.

| CW-1 | "Yes. And we live in Newport. And w-- she'll play tournaments over the summer." And then, if they do call you, let me know. And then I will call Donna, to squash this thing. |
| --- | --- |

| JANAVS | Okay. |
| --- | --- |

396. On or about January 14, 2019, JANAVS sent CW-1 the following text message: "Spoke with [my younger daughter]. We are set to take up in LA." Later that same day, JANAVS spoke with CW-1 about the exam scheme by telephone. The following are two excerpts from the call, which was consensually recorded.

| JANAVS | So I have a question for you. I'm trying to figure out how best to deal with [my younger daughter] on this. So [my daughter] has said to me, "I'm gonna get a 34 on this ACT," or "I'm gonna keep taking it till I get a 34." And I'm like, "[Daughter], what if you got like a 32 or a 33?" She's like, "W-- no. I would take it till I get a 34." I don't know if that's true, but she's fucking driving me nuts. But what I don't want to happen is us to say-- she gets a 33 and her go, "I'm gonna take it again." |
| --- | --- |

| CW-1 | I gotcha. Oh, I totally get that. |
| --- | --- |

| JANAVS | I'm like-- you know, I just want this one done. And I don't know if she's serious. Because she's not scoring that well on these. |
| --- | --- |

| CW-1 | Right. |
| --- | --- |

| JANAVS | So I don't know if she's serious that she would take it again. I mean, I think a 34 might be a little high. But at the same time, maybe it's like, screw it, just give her the damn 40-- 34, so that we don't have to worry about her saying, "I'm taking it again." |
| --- | --- |

| CW-1 | Totally agree. |
| --- | --- |

….

| CW-1 | She may end up with a 35, just because there could be a question here or a question there that sh-- I mean, 'cause it's like missing hardly any questions at all. So it depends on the curve of the day. So, you know. And it may end up-- again, it could be a 35, it could be a 34, it could be a 33. It could be within one question. You don't know, for that day. |
| --- | --- |

| JANAVS | I see. Okay. So do you-- |
| --- | --- |

160

| CW-1 | Because she's sco-- she's scored against everybody else in the country that's takin' the test. |
|---|---|
| JANAVS | Right. Right, right. So it's not like a guarantee. But it'll be a guarantee between a 33 and a 35. |
| CW-1 | Correct. |
| JANAVS | Okay. And if she gets a 33 and tells me she's gotta take it again, then you deal with her. |
| CW-1 | I know. |
| JANAVS | Then she's your problem. |
| CW-1 | I totally gotcha. So here's one thing. I'm waiting for [CW-2], who's our proctor/test-taker. He just had a baby, so I'm waiting to confirm that he can do it on that weekend. So once I get that back, I'll let you know. But we're ready to do all the paperwork and all that stuff, but as soon as I know. I'm hoping he'll tell me in the next couple days. |
| JANAVS | Okay. |

397.    On or about February 5, 2019, JANAVS mailed KWF a check in the amount of $25,000.

398.    On or about February 9, 2019, JANAVS' younger daughter took the ACT at the West Hollywood Test Center. Law enforcement agents conducting surveillance observed Dvorskiy, the test center administrator, arrive at the school at approximately 7:10 a.m. CW-2 arrived two minutes later. At approximately 7:49 a.m., JANAVS and her daughter met Dvorskiy in the front of the building, and then went inside together. JANAVS left the building approximately three minutes later. Agents observed JANAVS return to the test center at approximately 12:41 p.m. JANAVS' daughter left the building approximately fifteen minutes later and drove away with her mother. CW-2 left the test center approximately two hours later.

161

399.    JANAVS wired $25,000 to a Boston, Massachusetts account in the name of KWF on or about February 12, 2019. JANAVS was unaware that the account had been opened by CW-1 at the direction of federal agents.

## S. DOUGLAS HODGE

400.    Defendant DOUGLAS HODGE is a resident of Laguna Beach, California. HODGE is the former CEO of a large investment management company based in Newport Beach, California.

401.    As set forth below, HODGE agreed to use bribery to facilitate the admission of two of his children to USC as purported athletic recruits, and sought to enlist CW-1 to secure the admission of a third child to college through bribery as well.

402.    In an e-mail to HODGE and his spouse on or about February 4, 2008, CW-1 wrote: "I spoke to my connection at Georgetown and he will work with us. He helped me get two girls in last week." HODGE responded that his eldest daughter "had a great experience at Georgetown. So, who knows? This may prove the defining piece in the college puzzle." CW-1 replied, in substance, that HODGE's daughter had only a 50 percent chance "at best" of getting into Georgetown based on her academic record, but that "there may be an Olympic Sports angle we can use."

403.    HODGE's daughter's application to Georgetown, submitted on or about November 4, 2008, indicated, among other things, that she won multiple United States Tennis Association tournaments. In fact, USTA records indicate that HODGE's daughter never played in a USTA match.

404.    On or about December 23, 2008, Georgetown mailed HODGE's daughter a conditional acceptance letter noting that "[t]he Committee on Admissions has conducted an

162

initial review of your application to the Class of 2013 at the request of Mr. Gordie Ernst, Tennis Coach. I am pleased to report that the Committee has rated your admission as 'likely.'"

405.　HODGE's eldest daughter did not play tennis at Georgetown.

406.　On or about September 28, 2012, HODGE e-mailed his younger daughter's high school transcripts and class schedule to CW-1 and wrote: "I think this is what you were looking for. Sorry for the delay."

407.　On or about October 15, 2012, CW-1 directed a payment of $50,000 from CW-1's for-profit business account to a bank account in the name of a private soccer club controlled by Khosroshahin, then the head coach of women's soccer at USC, and Janke, then an assistant coach of women's soccer at USC.

408.　HODGE's daughter's application to USC, submitted on or about December 16, 2012, stated that she was a co-captain of a Japanese national soccer team, and an "All American" midfielder on a prestigious club soccer team in the United States.

409.　On or about February 12, 2013, CW-1 directed another $50,000 payment from his for-profit business to the private soccer club controlled by Janke and Khosroshahin.

410.　On or about February 13, 2013, Khosroshahin e-mailed Heinel an athletic profile falsely describing HODGE's daughter as, among other things, a "TOP DRAWER ESTIMATED # 3 RECRUTING CLASS IN NATION," "All Ex Patriot Japan National Select Team Player," and a member of the "All National Championship Tournament Team."

411.　Heinel presented HODGE's daughter to the USC subcommittee for athletic admissions as a purported soccer recruit on or about February 14, 2013. On or about March 26, 2013, USC mailed HODGE's daughter a formal acceptance letter.

163

412.     Less than two weeks later, on or about April 3, 2013, CW-1 e-mailed HODGE that he "wanted to follow up on next steps for [your daughter] and USC. At your convenience please give me a call?"

413.     On or about April 5, 2013, CW-1 e-mailed HODGE instructions to direct a $150,000 payment to The Key, CW-1's for-profit entity, and a $50,000 payment to KWF as a purported contribution. HODGE wired the money as directed four days later. The following day, Masera sent HODGE a letter falsely indicating that "no goods or services were exchanged" for the $50,000 payment to KWF.

414.     On or about May 10, 2013, CW-1 registered HODGE's daughter for the NCAA Eligibility Center. CW-1 sent an e-mail to HODGE the following day requesting that her official high school transcript be mailed "either to my office" or to the NCAA directly. On or about May 12, 2013, in an e-mail titled "transcript," HODGE asked CW-1: "What's the question here? I do not want to raise any suspicion at [my daughter's high school]."

415.     On or about May 15, 2013, CW-1 directed another $50,000 payment from KWF to the private soccer club controlled by Janke and Khosroshahin.

416.     HODGE's daughter matriculated at USC in or about the fall of 2013. She did not join the USC soccer team.

417.     On or about July 28, 2013, HODGE e-mailed CW-1, "Need to start discussion about the next one. [My son] is at [high school] in New Hampshire and entering his junior year."

418.     In an e-mail to CW-1 on or about December 20, 2014, HODGE inquired whether his son was "really qualified" for USC, noting, "He would go there in a heartbeat!!" CW-1 responded: "No but I can try to work a deal. . . . maybe Basketball or Football will give me a

spot since their kids are not that strong." HODGE responded: "Understood. I will talk with [my son] tomorrow."

419.    On or about January 28, 2015, HODGE's spouse e-mailed CW-1, with a copy to HODGE, noting that she had not been able to find photos of the son who was applying to USC playing football, but had found photos of his brother playing football. CW-1 forwarded the e-mail to Janke and wrote: "See below—I am sure there is a tennis one too. The boys look alike so I thought a football one would help too?"

420.    On or about January 30, 2015, HODGE e-mailed Heinel: "Thanks so much for your time yesterday. We are preparing [my son's] 'sports resume' as you requested and should be ready to send it on to you early next week." Heinel responded: "Great, looking forward to it…you should concentrate on his primary sport with accolades and achievement, then" add his secondary sport. HODGE forwarded the e-mail chain to CW-1.

421.    Later that same day, Janke e-mailed two falsified athletic profiles of HODGE's son—one relating to football, the other relating to tennis—to CW-1. The football profile included various fabricated football achievements, including "Varsity Football Sophomore – Senior Year," "Team Captain – Senior Year," and "NH Independent Schools All-American Selection 2013, 2014." In fact, records from the HODGE's son's school indicate that he did not play football in high school other than during his freshman year. The tennis profile included fabricated or exaggerated tennis achievements, including that, while in high school, HODGE's son was a member of the First Team Lakes Region League. In fact, while HODGE's son did play tennis on his high school's team, the school has no record of his involvement on the First Team Lakes Region League. CW-1 forwarded the profiles to HODGE and wrote:

> Doug I have provided t[w]o profiles from Laura. Please download and send to
> Donna [Heinel] and ask her to use whichever one she likes. Obviously we have

165

stretched the truth but this is what is done for all kids. Admissions just needs something to work with to show he is an athlete. They do not follow up after Donna presents. Please confirm receipt and when you send to Donna.

422.    On or about February 2, 2015, Janke e-mailed Heinel that HODGE "is on his way to Japan for work so he asked me to send these over to you as he did not have your email on him but wanted to get these to you ASAP." Attached to the e-mail were the two falsified athletic profiles. Heinel replied with the athletic profile of a different student with a note that said "an example of football." In a separate e-mail, bearing the subject line "Suggestions," Heinel provided handwritten edits to the football profile and indicated that the photograph included on the profile should be exchanged for a "better picture" that was "more athletic."

423.    Heinel presented HODGE's son to the USC subcommittee for athletic admissions as a purported football recruit on or about February 12, 2015.

424.    On or about March 17, 2015, Janke e-mailed CW-1 the following:

I just got this message from Donna [Heinel]:  [HODGE's son]'s admission packet will be mailed on March 24th. After the the [sic] packet is received please let the father know to send the check directly to me at USC, make out to what we had discussed before. Thank you!

425.    CW-1 forwarded the message to HODGE and wrote:

Doug one of the folks helping us at USC sent the message below that [your son's] Admit Packet will be sent on March 24. I will need to take care of the different parties separately, which I will accomplish to finalize all the dealings. Once you receive the Acceptance please let me know so we can move forward financially.

HODGE replied, "Fanstatic!! Will do."

426.    USC mailed HODGE's son a formal acceptance letter on or about March 24, 2015. Exactly one week later, HODGE mailed Heinel a $75,000 check payable to the USC "Womens Athletic Board." On or about April 1, 2015, HODGE wired $125,000 to The Key, and $125,000 to KWF. CW-1, in turn, directed a payment of $50,000 from KWF to a bank account controlled, in part, by Janke in the name of "SC Futbol Academy," a private soccer team.

166

427.     On or about April 10, 2015, KWF issued a letter to HODGE falsely representing that "no goods or services were exchanged" for his purported contribution of $125,000.

428.     HODGE's son deferred his admission to USC, ultimately matriculating there in 2017. He did not join the football team.

429.     On or about August 10, 2018, HODGE called CW-1 to discuss the possibility of pursuing the college recruitment scheme to facilitate his youngest son's admission to Loyola Marymount University ("LMU"). The following is an excerpt from the call, which was intercepted pursuant to a Court-authorized wiretap.

| | |
|---|---|
| HODGE | So LMU, when we went down this past the last time-- and this is where, you know, this is the [CW-1] magic at work. You sa-- I remember you saying well, listen, if you want LMU, and you want to commit to LMU, let me know because, you know, this is one of the schools where you have developed relationships. |
| CW-1: | And we can get it done. |
| HODGE | And-- |
| CW-1: | Done. |
| HODGE | Yeah, so-- and I know how this works. I you know we, we, we don't have to talk in code. We know how this works. |
| CW-1: | Right. |
| HODGE | So if, if, if LMU, I mean, this requires him to commit, like LMU is my first choice. Because once, once you go to bat for him it's, that's pretty much a done deal right? |
| CW-1: | Correct, yeah. |

430.     In a call on or about November 30, 2018, CW-1, at the direction of law enforcement agents, told HODGE that the IRS was conducting an audit of KWF. The following is an excerpt from the call, which was consensually recorded.

| | |
|---|---|
| CW-1 | We had the discussion about us being audited. |
| HODGE | Yes. |
| CW-1 | Now they've decided that they are going to make phone calls to all the USC kids' donations. |
| HODGE | Okay. |
| CW-1 | So there's-- there's 25, 30, 35 kids total. I don't know who they're going to call and who they're not but I-- you know, what I've told them is, you know, there was $200,000 for [your daughter], 250[,000] for [your son], that they both got in, and that we both know they both got in through athletics. [Your daughter] got in even though she wasn't a-- a legit soccer player and [your son] not a legit-- I think we did football for [him]. |
| HODGE | Right. |
| CW-1 | But we didn't go in there. We didn't even discuss that. What I said to them is that your monies essentially went to our foundation to help fund underserved kids and that's how we left it. But I think that they're going to call some of the USC families that we've gone [inaudible] the years. So I just wanted you to have a heads-up. |
| HODGE | So with [my daughter]-- [my son] I'm fine. I'm complete-- and I'm first of all, I will-- I-- what you just described is exactly-- would be my words, okay. So you don't have to worry. I'm not going to-- I'm not-- I'm not going off script here. One thing to remember is, I had a conversation. You set me up with this woman, who I think was like the-- not-- she wasn't the soccer coach but she was in the athletics department. |
| CW-1 | So it might have been with Donna Heinel that you guys-- |
| HODGE | Yeah. |
| CW-1 | Okay. |
| HODGE | But we talked on the phone and she said, you know, "Thank you very much," and I said, "Well, we want to support USC athletics and looking forward to [my daughter]," and, you know, all this-- all that stuff. So that conversation sort of pierces that story of, I made a donation into the foundation, because she was like basically, "Well, thank you, Mr. HODGE, for your-- I'll call it |

support." We didn't talk about money. There was no conversation about-- there was not dollars discussed on that phone call. But, you know, we're kind of talking in code here.

CW-1          Right.

HODGE        So that's out there.

CW-1          Yeah.

HODGE         I don't know if they talked to her, what she might say, but I-- I know what I did, which is I donated to your foundation. That foundation has-- its stated mission is to help underserved kids basically get into-- you know, through-- get through college. And that's all I'm going to say.

### T. TODD BLAKE and DIANE BLAKE

431.    Defendants TODD BLAKE and DIANE BLAKE, a married couple (together, "the BLAKES"), are residents of Ross, California. TODD BLAKE is an entrepreneur and investor. DIANE BLAKE is an executive at a retail merchandising firm.

432.    As set forth below, the BLAKES agreed to bribe Heinel to facilitate their daughter's admission to USC as a purported volleyball recruit.

433.    On or about January 29, 2017, DIANE BLAKE e-mailed CW-1, copying TODD BLAKE, noting that their daughter was interested in attending USC but that DIANE BLAKE assumed the school was "in the reach stretch category." CW-1 responded: "There is a way to garner a guarantee at USC if that is first choice but best to discuss without [your daughter] being present." DIANE BLAKE replied, copying TODD BLAKE: "Look forward to discussing."

434.    On or about February 1, 2017, DIANE BLAKE e-mailed CW-1, copying TODD BLAKE, noting that only she and TODD BLAKE would be on a call they had planned for that evening.

169

435. On or about June 28, 2017, DIANE BLAKE e-mailed CW-1, copying TODD
BLAKE: "We are fully committed to the USC plan. Is there anything else you need from us at
this point?" CW-1 responded: "I am meeting with USC July 10th. If I can have an unofficial
transcript and a PDF of best test scores- each set that would be the first step." The next day,
DIANE BLAKE e-mailed CW-1, copying TODD BLAKE, "the info for USC," including their
daughter's high school transcript.

436. On or about August 7, 2017, Janke e-mailed CW-1 a volleyball profile for the
BLAKES' daughter. Approximately one week later, CW-1 forwarded the profile to Heinel,
writing, "[BLAKES's daughter] - Volleyball and Lacrosse . . . I provided info in the past." The
profile sent to Heinel contained falsified information regarding the BLAKES' daughter's
volleyball experience, including that she had received a number of honors and played on two
club volleyball teams, one of which qualified for the junior nationals three years in a row.

437. On or about August 26, 2017, DIANE BLAKE e-mailed CW-1, copying TODD
BLAKE: "We wanted to double check that you have everything you need, and reconnect on
next steps regarding the USC plan and the overall application process. We love the USC plan
and hope it will work out!" CW-1 responded that USC had everything they needed but he did
not yet know when the BLAKES' daughter would be presented to the admissions committee.

438. Heinel presented the BLAKES' daughter to the USC subcommittee for athletic
admissions as a purported volleyball recruit on or about September 7, 2017. Approximately one
week later, on or about September 14, 2017, Heinel e-mailed CW-1 a letter, addressed to the
BLAKES' daughter, notifying her of her conditional admission to USC as a student athlete. The
letter stated: "Your records indicate that you have the potential to make a significant contribution
to the intercollegiate athletic program as well as to the academic life of the university." CW-1

170

forwarded the letter to to TODD BLAKE and DIANE BLAKE that same day. TODD BLAKE responded by thanking CW-1 and stating that he would register his daughter with the NCAA Eligibility Center as instructed in the letter.

439.    Two days later, CW-1 e-mailed TODD BLAKE: "I will send you the person and address to send the first 50k check to today." Later that day, CW-1 instructed TODD BLAKE to send the check to "USC Women's Athletics c/o Senior Women's Administrator Donna Heinel." TODD BLAKE responded by asking CW-1 to "provide [him] with the exact wording for the check's 'Payable To' line." CW-1 replied that the check should be made payable to "USC Women's Athletics." That same day, TODD BLAKE mailed a $50,000 check to USC Women's Athletics.

440.    On or about October 7, 2017, a KWF employee e-mailed CW-1 regarding the BLAKES' daughter's college applications. The employee wrote: "Met with [the BLAKES' daughter] and DIANE BLAKE and they asked me to run schools and EA plan by you. Her list is below[.]" The list, which included several colleges, noted, "USC-First choice (Side door)." CW-1 responded: "Why are we mak[ing] such a huge effort? [The daughter] does not know this but parents do that she has been admitted to USC already." The KWF employee replied, in part, "Ok, so just go through the motions . . . ?"

441.    Later that same day, the KWF employee e-mailed DIANE BLAKE: "Do you have a moment for a quick chat sometime today . . . This is regarding Side door, so no need to involve [your daughter]." DIANE BLAKE responded: "Yes! I just saw your email. I can talk now if you are still available."

442.     On or about January 26, 2018, CW-1 instructed a KWF employee to send the BLAKES an invoice in the amount of $200,000.  On or about February 5, 2018, TODD BLAKE wired $200,000 to one of the KWF charitable accounts.

443.     On or about March 19, 2018, TODD BLAKE e-mailed CW-1, copying DIANE BLAKE, to ask whether their daughter would "receive a [formal admission] letter from USC when letters are mailed on Friday."  TODD BLAKE also noted that "we will want to engage with you to get our son [ ] started on the college process."

444.     The BLAKES' daughter was formally admitted to USC on or about March 22, 2018.  Although currently enrolled at the university, she is not listed on the roster for the women's volleyball team.

445.     On or about October 25, 2018, CW-1 called TODD BLAKE at the direction of law enforcement agents and told him that KWF was being audited by the IRS.  The following is an excerpt from the call, which was consensually recorded.

| CW-1 | And so they-- they look into all our payments and they s-- saw your guys' 250 payment-- |
|---|---|
| T. BLAKE | Okay. |
| CW-1 | --of many.  And they asked me -- |
| T. BLAKE | Okay. |
| CW-1 | --so, you know, "What's that all about." And so of course I'm not going to tell the IRS that essentially we got [your daughter] in-- |
| T. BLAKE | Right. |
| CW-1 | --through Donna Heinel with women's volleyball. |
| T. BLAKE | Right. |
| CW-1 | So I'm not going to do that but I'll tell you [inaudible] |

172

| T. BLAKE | It was-- it was basketball, wasn't it? |
| CW-1 | No, it wasn't basketball [inaudible]. It was volleyball. |
| T. BLAKE | Oh. So USC applied my payment to women's basketball. |
| CW-1 | Oh, y-- the reason why is because Donna is the senior women's administrator. |
| T. BLAKE | Okay. |
| CW-1 | So sh-- the money went towards her and she gets to decide where it goes within the department. |
| T. BLAKE | I see. Okay, great. |
| CW-1 | So that's probably why you got credit from women's basketball. |

446. During the call, TODD BLAKE told CW-1 that USC had approached him in the wake of his payment to USC Women's Athletics, and asked him to donate additional money to women's basketball. TODD BLAKE explained that he misled USC about his reasons for giving the money. The following is an excerpt from the conversation.

| T. BLAKE | And, to let you know, USC has approached me because they see the dollar amount and they've approached me from a fundraising perspective twice already, one from the Annenberg School of Communications which is [my daughter's] school, and then another from the athletics fund. |
| CW-1 | Okay. |
| T. BLAKE | And what I've told them essentially is I've been-- I've been very, like, evasive, haven't told them anything. I said that basically in-- in the first situation I said that, you know, I felt for equity reasons it was-- it would be great to give money to a nonrevenue sport, that football, basketball, on the men's side get a-- they get a ton of money. And it'd be nice to donate money to a program that was, you know, not as-- funded as strongly. And then when the athletics department guy, guy named Brent, really nice guy, followed up by e-mail, he basically, you know, said, "You know, I've noticed you give money to women's basketball, we'd love to get you down for a game, and so forth." And I said, "Well, it's probably just going to be a one-time donation. If I donate it'll be probably to Annenberg resident athletics fund." |

173

| CW-1 | Sure. |
|------|-------|
| T. BLAKE | [inaudible] He—he was great. So I've effectively, you know, evaded both, you know, answering anything there. So we're good. |
| CW-1 | Okay, well, again on our side, from my side I just want to make sure because the, you know, I'm not going to tell the IRS that essentially we did this [for your daughter] and-- and it was, it was [your daughter] getting in through Donna Heinel and women's volleyball. |
| T. BLAKE | Right. |
| CW-1 | [inaudible] payment and that was the payment. |
| T. BLAKE | Mm-hmm. |

447.    In the call, TODD BLAKE also acknowledged that his daughter was not a legitimate volleyball recruit:

| CW-1 | [Inaudible] what I was going to say was the funny thing is, Donna calls me and says, "Hey, [CW-1], that profile you did for [the BLAKES' daughter] was awesome so any, woman, girl that you have that is going to come in--" |
| T. BLAKE | Oh good. |
| CW-1 | "--the same way, that isn't good enough to play volleyball here--" |
| T. BLAKE | Right. |
| CW-1 | "--and you're going to make a payment for--" |
| T. BLAKE | Mm-hmm. |
| CW-1 | "--follow that same profile that you did for [the BLAKES' daughter]." |
| T. BLAKE | Oh, good.  So did she get audited as well? |
| CW-1 | No, no, I'm g-- I'm the [one getting] audited, I'm getting audited. |
| T. BLAKE | Okay. |
| CW-1 | Nobody else is getting audited. |

174

448.    Finally, TODD BLAKE asked CW-1 what he should say in the event that the IRS called him to discuss the payments.

| T. BLAKE | And will I get contacted, and if so how would you like me to answer? |
| CW-1 | Great, that's perfect, so what I want you to say is that your money went to our foundation, which it did. |
| T. BLAKE | Yeah. Okay. |
| CW-1 | And it helped underserved kids. |
| T. BLAKE | Yeah. |
| CW-1 | You made a donation to help underserved kids. |
| T. BLAKE | Right. Okay, good. |
| CW-1 | All good? |
| T. BLAKE | Yeah, sounds great. |

449.    In a call on or about February 22, 2019, CW-1, at the instruction of law enforcement agents, told DIANE BLAKE that USC had received a subpoena for athletic records for the past 12 years. The following is an excerpt from the conversation, which was consensually recorded.

| CW-1 | So, so USC, they were subpoenaed for all athletes' records for the past 12 years. That's a lot of kids. |
| D. BLAKE | Yeah. |
| CW-1 | Okay. So my contacts at USC called me kind of to give me a heads up. And since [your daughter] was accepted through volleyball, but wasn't really a volleyball player in reality at [the] USC level-- |
| D. BLAKE | Yeah. |
| CW-1 | --I just wanted you to know that they-- I mean it could be absolutely nothing, because it's thous-- you know, it's a lot of folks. But [your daughter] is one of those that got in with you guys making a payment. You |

175

| | |
|---|---|
| | know the 50,000 to USC women's athletics directly, and then 200 to my foundation. |
| D. BLAKE | Right. |
| CW-1 | That was payment to get her in. |
| D. BLAKE | Right. |
| CW-1 | So I just wanted you to know that if they ask for the records-- |
| D. BLAKE | Oh my god. |
| CW-1 | --don't know if anything is gonna ever come about it but I just wanna make sure everybody is aware. |
| D. BLAKE | So what does that mean? |
| CW-1 | I think that they're the-- whoever it is that subpoenaed the records is looking at, kind of, all the athletes and how the process works and what happens over-- but it's, you know, it's a long time. So I have, I have no idea to be frank with you. They just told me, "Hey, just a heads up you have a lot of kids that went through the side door here. Just want you to be aware of it." That's all. It may be nothing, who knows, so I just wanted you to be aware. |
| D. BLAKE | Hmm. So, wow. Okay. Okay, gotcha. Like, should I be concerned? |
| CW-1 | No, I don't think so. I mean, it's, it's a lot of years and a lot of kids and a lot of sports. |
| D. BLAKE | Right. |
| CW-1 | So it may not have anything to do with anything. I just-- I, I just wanted to make sure that everybody is aware. |
| D. BLAKE | Okay. Like [inaudible] |
| CW-1 | Okay. |
| D. BLAKE | --in case we got a call or something? |
| CW-1 | Yes. Yeah. |
| D. BLAKE | Okay. |

| CW-1 | Which I doubt. |
| D. BLAKE | Okay. Well I will let you know if we do of course. |
| CW-1 | Okay. |
| D. BLAKE | Yikes. Right. I mean, [our daughter] doesn't even know, you know? |
| CW-1 | No. No, I know that. |

### U. PETER JAN "P.J." SARTORIO

450. Defendant PETER JAN "P.J." SARTORIO is a resident of Menlo Park, California. SARTORIO is a packaged food entrepreneur.

451. As set forth below, SARTORIO agreed to participate in the college entrance exam cheating scheme by paying CW-1 $15,000 in cash in or about June 2017 to have CW-2 purport to proctor the ACT for SARTORIO's daughter, and correct her exam answers.

452. On or about May 8, 2017, ACT, Inc. notified SARTORIO's spouse via e-mail that SARTORIO's daughter had been approved for extended time on the ACT exam. SARTORIO's spouse forwarded the notification to SARTORIO, CW-1 and Sanford, noting, "Yay, she was approved!"

453. On or about May 18, 2017, CW-1 forwarded SARTORIO's daughter's ACT information to Dvorskiy, writing, "New student." Dvorskiy responded by attaching a completed form requesting that SARTORIO's daughter be permitted to take the ACT at the West Hollywood Test Center instead of at her own high school. ACT, Inc. authorized the move on or about May 31, 2017.

454. CW-2 flew from Tampa to Los Angeles on or about June 9, 2017—the day before SARTORIO's daughter took the ACT exam at the West Hollywood Test Center. CW-2 returned to Tampa on or about June 11, 2017, the day after the exam.

177

455.     On or about June 12, 2017, CW-1 caused KWF to issue a check in the amount of $15,600 to CW-2, representing payments for the ACT exams that CW-2 purported to proctor for SARTORIO's daughter and the ISACKSONS' daughter (discussed above).

456.     As noted, SARTORIO paid CW-1 $15,000 in cash for the ACT scheme. Bank records indicate that SARTORIO withdrew a total of $15,000 in cash in three separate transactions between on or about June 16, 2017 and on or about June 20, 2017.

457.     SARTORIO'S daughter received a score of 27 out of a possible 36 on the ACT, which placed her in approximately the 86th percentile. Although she had not previously taken the ACT, she had previously earned scores of 900 and 960 out of a possible 1600 in successive administrations of the PSAT, which placed her between the 42nd and 51st percentile for her grade level.

458.     On or about October 25, 2018, CW-1 answered a call from SARTORIO at the direction of law enforcement agents, and told him that KWF was being audited by the IRS. The following is an excerpt from the call, which was consensually recorded.

| | |
|---|---|
| CW-1 | So let me just-- the reason why I was calling you is because-- I'm in Boston. And one, I wanted to check in on [your daughter]. And then the other thing I wanted to let you know is, which is so typical, so my foundation is getting audited now-- which is, as you know, pretty natural. |
| SARTORIO | Yeah? |
| CW-1 | So they're looking at all my payments, everything that's come into our group, and all of those kinds of things. So I just wanted to make you aware, but, y-- 'cause they're asking about everything that-- every family that was involved with us, every payment that's ever come to us, all that kinda stuff. So one of the big things is that, you know, because [CW-2] took the test for [your daughter], I just want to make sure that-- when the IRS talks to me about, you know, what's happened with [your daughter] and the Sartorios, I'm not gonna say anything about [CW-2] taking the test for [her]. I'm essentially going to just say that monies that came in to us just went in to us to take care of you know, all the normal fees-- |

178

| SARTORIO | Uh— |
|----------|------|
| CW-1 | --that occur for taking care of families. Because, of course, you guys-- |
| SARTORIO | Uh— |
| CW-1 | --you won't show up on my books, because you paid cash, essentially, for her to take the test with [CW-2]. |
| SARTORIO | Right. |
| CW-1 | So that doesn't show up. Right? |
| SARTORIO | Right. |
| CW-1 | Right. So I-- all I want you to do is just-- 'Cause I could see, at some point, they're gonna call some families. And I just wanted to make sure that I remind you tha-- |
| SARTORIO | Oh-- oh, yeah. You do-- no. No, no. Yeah. I shouldn't say-- Absolutely. Believe me. There would be no-- there would be no mention of that. 'Cause that's never happened. There's no record of-- All I know is I-- I-- I paid bills that were sent to me, invoiced. |
| CW-1 | Uh-- |
| SARTORIO | Those were paid. |
| CW-1 | Uh-- |
| SARTORIO | That's all I know. That's all we did. And [my daughter] took a test. And that's all I know. I don't know of anything else. So. |
| CW-1 | Okay. Well, again-- and obviously, because you paid in cash, we do-- there was n-- you didn't take a write-off of that. So-- |
| SARTORIO | No. |
| CW-1 | Okay. Okay. Again, I just want to make sure that our stories are correct. Because it's some-- |
| SARTORIO | There is no-- no-- there is no record on my end like a 1040. There is nothing on my end that shows that your company, [CW-1], or anybody, received any cash payments. Only payments they could look at would be an invoiced amount or an actual check. And that's what w-- that was |

179

already discussed. But anything that was done verbally, that was verbal and there's no record. There's nothing. There's nothing.

| | |
|---|---|
| CW-1 | Got it. |
| SARTORIO | [inaudible] Got it. |
| CW-1 | Got it. Okay. I just-- I just wanted to touch bases with you. Because, you know, all the audit stuff is coming in. And I have no idea where they'll go or where they won't go, as you know. |
| SARTORIO | Yeah. |
| CW-1 | So I just wanted to touch bases. |
| SARTORIO | Yeah. What-- what you-- what you do is up to you. I gave-- Yeah. There's no—no-- Yeah. We're good. |

## V. TOBY MACFARLANE

459.    Defendant TOBY MACFARLANE is a resident of Del Mar, California. During the relevant period, MACFARLANE was a senior executive at a title insurance company.

460.    As discussed below, MACFARLANE participated in the college recruitment scheme by agreeing to use bribery to facilitate the admission of his daughter to USC as a purported soccer recruit and, later, his son as a purported basketball recruit.

461.    On or about October 3, 2013, CW-1 e-mailed MACFARLANE's daughter's high school transcript and SAT scores to Khosroshahin and Janke, writing, "1st of 2 players."

462.    On or about October 17, 2013, CW-1 caused KWF to wire $50,000 to a private soccer club controlled by Khosroshahin and Janke.

463.    On or about October 25, 2013, Janke e-mailed CW-1 requesting "a profile and list of current work in progress" for MACFARLANE's daughter because Janke needed "to turn in everything by Monday" for her to be presented to the USC subcommittee on athletic admissions on November 4, 2013. CW-1 sent Janke information on MACFARLANE's daughter's high

180

school courses as well as a soccer profile, which included a photo of MACFARLANE's daughter playing soccer that MACFARLANE's spouse had previously sent to CW-1.

464.   MACFARLANE's daughter's USC application falsely indicated that she was, among other things, a "US Club Soccer All American" in the 10th, 11th, and 12th grades.

465.   On or about September 17, 2013, CW-1 e-mailed MACFARLANE and his daughter a draft application essay, which stated: "On the soccer or lacrosse field I am the one who looks like a boy amongst girls with my hair tied up, arms sleeveless, and blood and bruises from head to toe. My parents have a hard time attending my soccer matches because our opponent's parents are always making rude remarks about that number 8 player who plays without a care for her body or anyone else's on the field. It is true that I can be a bit intense out there on the field."

466.   MACFARLANE's daughter was presented to the USC subcommittee for athletic admissions on or about November 4, 2013, and formally admitted to USC the following spring, with an admissions letter mailed to her on or about March 26, 2014.

467.   On or about April 14, 2014, in an e-mail addressed to MACFARLANE's daughter but sent to MACFARLANE, the NCAA Eligibility Center noted that she needed to complete her NCAA eligibility paperwork. MACFARLANE forwarded the e-mail to CW-1 the following day, asking, "Is this something [my daughter] needs to do?" CW-1 responded to MACFARLANE, "I believe we did it but I will check." CW-1 also forwarded the e-mail to Masera, asking, "Have you contacted him about the 200k for [MACFARLANE's daughter] and USC?"

468.   That same day, Masera sent MACFARLANE an e-mail with the subject line "Placement Fees $200K," stating that he would be coordinating the placement fees for

181

MACFARLANE's daughter and asking how MACFARLANE would be transmitting the payment. On or about April 17, 2014, MACFARLANE sent CW-1 an e-mail with the subject line "Real Estate Consulting Invoice," asking CW-1 to "provide an invoice for the entire amount due." On or about May 2, 2014, MACFARLANE issued a $200,000 check to CW-1's for-profit entity, The Key, with "Real Estate Consulting & Analysis" written in the memo line. Approximately ten days later, on or about May 12, CW-1 caused The Key to issue a $100,000 payment to a private soccer club controlled by Khosroshahin and Janke.

469.   In or about the summer of 2014, a USC athletics academic counselor e-mailed MACFARLANE's daughter regarding her fall 2014 class schedule, asking her to change her Friday classes because she would be missing most Fridays "due to travel or games." The e-mail was copied to the newly appointed head coach of women's soccer at USC. MACFARLANE's daughter forwarded the e-mail to MACFARLANE, asking whether she needed to respond. MACFARLANE forwarded the e-mail chain to CW-1, asking for his advice. CW-1 responded: "Has the program reached out to you to discuss anything yet? The new coaches have been on board for a while. If you speak to them let them know that [your daughter] has an injury - Plantar Fasciitis and will not be practicing or playing for a while[.]"

470.   On or about August 15, 2014, the newly appointed head coach of women's soccer at USC responded to the e-mail from the academic counselor, noting, "[MACFARLANE's daughter] doesn't play for us." The coach then e-mailed MACFARLANE's daughter directly: "I'm sorry but I don't have you on my list of players. Could you contact me asap please." The coach also e-mailed a member of the USC athletics department that "[MACFARLANE's daughter] was on the list from the coaches, but I don't know who she is and [she] is not counted in my numbers."

182

471.     MACFARLANE's daughter matriculated at USC in or about the fall of 2014 and graduated in 2018. She did not play soccer at USC.

472.     On or about October 8, 2016, CW-1 made the following note in his phone: "[MACFARLANE's son] - USC 250 - 50 Donna[.]"

473.     In an e-mail on or about November 15, 2016, CW-1 asked MACFARLANE's spouse for a photo of MACFARLANE's son playing basketball in his high school basketball uniform. MACFARLANE's spouse responded that she would take the photo and send it.

474.     On or about November 27, 2016, CW-1 directed Janke to create a fabricated basketball profile for MACFARLANE's son. The basketball profile created by Janke falsely listed MACFARLANE's son's height as 6'1" and indicated that he played on his high school's varsity basketball team from 2014 through 2016. In fact, records from MACFARLANE's son's high school indicate that MACFARLANE's son did not play on the varsity basketball team until his senior year. And a personal statement for MACFARLANE's son, drafted by CW-1 but ultimately not submitted to USC, described how he knew that his height (5'5") would be a detriment to making his high school's varsity basketball team.

475.     CW-1 e-mailed the athletic profile to Heinel, along with MACFARLANE's son's high school transcript and SAT scores, in or about December 2016. Heinel presented MACFARLANE's son to the USC subcommittee for athletic admissions on or about January 26, 2017.

476.     On or about February 9, 2017, USC issued a letter to MACFARLANE's son, notifying him of his conditional admission to USC as a student athlete. The letter stated, "Your records indicate that you have the potential to make a significant contribution to the intercollegiate athletic program as well as to the academic life of the university."

183

477.     On or about February 13, 2017, MACFARLANE wrote a $50,000 check payable
to USC Athletics. The memo line of the check reads, "[MACFARLANE's son] Women Athletic
Board."

478.     USC issued a formal acceptance letter to MACFARLANE's son on or about
March 23, 2017.  On or about April 18, 2017, MACFARLANE paid CW-1 $200,000 via a check
to the KWF charity.  MACFARLANE wrote "Real Estate Consulting" in the memo line of the
check.

479.     MACFARLANE's son attended USC briefly, but withdrew in or about May 2018.
He did not play basketball at USC.

480.     On or about October 26, 2018, CW-1 called MACFARLANE at the direction of
law enforcement agents and told him that KWF was being audited by the IRS.  The following is
an excerpt from the call, which was consensually recorded.

| | |
|---|---|
| CW-1 | So, of course, my foundation is being audited now. |
| MACFARLANE | Okay. |
| CW-1 | Because we have so many hundreds of, you know, folks who have made kind donations to our foundation so I wanted to make sure-- |
| MACFARLANE | Yes. |
| CW-1 | --that you were aware-- |
| MACFARLANE | Okay. |
| CW-1 | --and [inaudible] they're looking at in the-- $400,000 payments that have been made over the years. And so I just wanted you to know that-- that I'm not going to tell the IRS that, you know, the-- the first $200,000 that was paid to get [your daughter] into school through soccer. So I'm not going to say anything about that and I'm not going to say anything about the $200,000 essentially paid to USC for [your son] to get in through-- to Donna Heinel to get in through men's basketball. So I just-- |
| MACFARLANE | Right. |

184

| | |
|---|---|
| CW-1 | I just wanted you to know that what-- what I'm-- are you okay with that? |
| MACFARLANE | That you're not going to tell them that? |
| CW-1 | That is correct. |
| MACFARLANE | Yeah, and I think that's the-- the proper tact, for sure. |
| CW-1 | Okay. So what we'll-- |
| MACFARLANE | Do you think-- do you think-- are you expecting me to get some backlash on that or-- |
| CW-1 | No, don't-- no, right. |
| MACFARLANE | Okay. |
| CW-1 | [inaudible] there's-- there's hundreds of people involved. Hundreds. |
| MACFARLANE | Okay. |
| CW-1 | And-- |
| MACFARLANE | Okay. |
| CW-1 | --I'm just trying to connect with folks just to say, "Hey, I-- I-- you know, this is what really happened, right?" |
| MACFARLANE | Yeah. |
| CW-1 | Like [your daughter] got in and [your son] got in and they're really not collegian athletes-- |
| MACFARLANE | Yes. |
| CW-1 | --but we-- we made it work through, you know, Donna Heinel in soccer and basketball and USC athletics, but I don't want-- I want to make sure that you guys don't say anything to contradict what I'm going to say, which is that your $400,000 helped-- was funded-- paid to my foundation. |
| MACFARLANE | Right. |
| CW-1 | And that we help underserved kids and that's why you gave the money. |
| MACFARLANE | Yeah. Okay. |

185

| | |
|---|---|
| CW-1 | And then-- |
| MACFARLANE | Sure. Yeah, good. We're on the same page. |
| CW-1 | You okay with that? |
| MACFARLANE | Yeah, completely. |
| CW-1 | Okay. |
| MACFARLANE | I mean, I-- I actually wro-- I wrote it off as-- as a consultant-- a consultant fee but-- |
| CW-1 | Okay. |
| MACFARLANE | Yeah. But I-- if-- if it doesn't ever, you know, come back that far then it shouldn't be a problem. |
| CW-1 | Right, right. |

## W. STEPHEN SEMPREVIVO

481. Defendant STEPHEN SEMPREVIVO resides in Los Angeles, California. SEMPREVIVO is an executive at a privately held provider of outsourced sales teams, based in Agoura Hills, California.

482. As discussed below, SEMPREVIVO agreed to bribe Ernst, the Georgetown tennis coach, to designate his son as a tennis recruit—despite the fact that he did not play tennis competitively—in order to facilitate his admission to Georgetown.

483. On or about August 19, 2015, CW-1 sent SEMPREVIVO, his spouse and their son an e-mail with the subject line "Dear Coach Ernst." CW-1 instructed SEMPREVIVO's son: "[P]lease send this note and a PDF of transcripts and test scores to Gordie Ernst Mens' Tennis at Georgetown U from your email-then let me know it is done." The note drafted by CW-1 and set forth below included fabricated representations about the SEMPREVIVO's son's purported tennis experience and prior contacts with Ernst.

186

Dear Coach Ernst

I wanted to update you on my summer doings. After your suggestion I have
played very well with terrific success in Doubles this summer and played
quite well in singles too.

I am looking forward to having a chance to play for you. Our conversations
have inspired me to try to dominate my competition this summer.

Senior year is about to start and you can count on me to achieve great grades.

Thanks for the chance to play for you and Georgetown University.

484.     SEMPREVIVO's son e-mailed the note to Ernst, as instructed, later that same
day, along with his high school transcript and SAT scores.

485.     Ernst forwarded the e-mail the following day to a member of the Georgetown
admissions staff, who responded, "looks fine." Ernst then e-mailed the admissions officer to
"confirm" that he had used three of his allocated admissions "spots"—one for SEMPREVIVO's
son and, unbeknownst to the admissions officer, two for other clients of CW-1—and that he still
had three more spots left to fill.

486.     On or about August 26, 2015, CW-1 made the following notation in his e-mail
account: "Semprevivo 400 Gtown."

487.     On or about October 11, 2015, CW-1 e-mailed SEMPREVIVO and his son an
"activity" essay for inclusion in his Georgetown application. The subject line of the e-mail
stated, "This is the Final for Activity for Gtown … USE THIS ONE." The essay read, in part:
"When I walk into a room, people will normally look up and make a comment about my height –
I'm 6'5 – and ask me if I play basketball. With a smile, I nod my head, but also insist that the
sport I put my most energy into is tennis."

488.     SEMPREVIVO's son's Georgetown application falsely indicated that he played
tennis during all four years of high school and was ranked in singles and doubles tennis. The

187

application further listed SEMPREVIVO's son as a "CIF Scholar Athlete" and "Academic All American" in tennis and basketball and stated that he made the "Nike Federation All Academic Athletic Team" in tennis. College applications submitted by SEMPREVIVO's son to schools other than Georgetown did not reference tennis. Records obtained from the United States Tennis Association do not include any match records for SEMPREVIVO's' son.

489. On or about November 6, 2015, Georgetown sent SEMPREVIVO's son a letter noting that "[t]he Committee on Admissions has conducted an initial review of your application to the Class of 2020 at the request of Mr. Gordie Ernst, Tennis Coach" and that "the Committee has ranked your admission as 'likely.'" The letter explained that candidates rated "likely" have a greater than 95 percent chance of being admitted to Georgetown and that SEMPREVIVO's son would receive a final decision by April 1, 2016.

490. On or about April 22, 2016, after SEMPREVIVO's son was granted formal admission to Georgetown, a KWF employee e-mailed SEMPREVIVO and his spouse an invoice in the amount of $400,000 for their purported "Private Contribution" to KWF. On or about April 28, 2016, the SEMPREVIVO Family Trust issued a check to KWF in the amount of $400,000.

491. CW-1 made numerous payments to Ernst from the KWF account into which the SEMPREVIVO family made their donation. Between on or about September 11, 2015 and November 30, 2016, CW-1 caused KWF to issue checks to Ernst totaling $950,000, representing payments for the purported recruitment of SEMPREVIVO's son and the children of other clients of CW-1.

492. SEMPREVIVO's son matriculated at Georgetown on or about the Fall of 2016. Since enrolling at the university, he has not joined the tennis team.

493.     On or about October 25, 2018, CW-1 called SEMPREVIVO's spouse at the
direction of law enforcement agents and told her that KWF was being audited by the IRS. The
following is an excerpt from the call, which was consensually recorded.

| | |
|---|---|
| CW-1 | Well, I wanted to touch bases because I wanted to let you know that-- so my foundation is being audited, which is, you know, very typical. |
| SPOUSE | Uh-huh. |
| CW-1 | Because we have so many families that have made payments to our foundation. So I just wanted to make sure that-- they're looking at the payments and they looked at your guy-- your family's $400,000 payment, that was made for [your son]. So I wanted to make sure that we were on the same page as I talk to the IRS. |
| SPOUSE | Okay. |
| CW-1 | Of course, I'm not go-- I'm not-- I am not going to say anything about-- that your payment went to help [your son] get into Georgetown, and the payment was made to Coach Gordie Ernst and Georgetown tennis and obviously [your son] wasn't a tennis player. So I'm not going to talk about that at all. What-- |
| SPOUSE | Okay. |
| CW-1 | What-- is that okay? |
| SPOUSE | Yeah. No, I—yeah. And I think I would want maybe Stephen to talk to you as well. |
| CW-1 | Okay. And just so you know, so—essentially what I'm going to tell the IRS is that your $400,000 payment was made to our foundation to help, you know, serve underserved kids that that we do with our foundation. |
| SPOUSE | Okay. That's-- that sounds good. |
| CW-1 | Right. And that-- and that's what we want, because obviously we're not going to say anything about, you know, [your son] going in through Gordie Ernst and the payment being made to Gordie and then through Georgetown tennis. So I just want to make sure that you and I are, and Stephen, are on the same page. You can just-- |
| SPOUSE | Okay. |

189

| CW-1 | --know that I will be stating that the payment was made to our foundation and-- but you may get-- somebody may reach out to you. Somebody may not. We have so many families that have-- that have made payments through our foundation. So I wouldn't worry about it at all. |
|------|---|
| SPOUSE | Okay. Thank you. |
| CW-1 | You're very welcome. I just-- just wanted to make sure that we were on the same page. |
| SPOUSE | Okay. Stephen might just give you a call but-- but yeah. That seems pretty straightforward. |
| CW-1 | Okay. That's all. I just wanted to touch bases. |
| SPOUSE | Okay. Okay. Thanks, [CW-1]. |

494. On or about December 3, 2018, CW-1 called STEPHEN SEMPREVIVO at the direction of law enforcement agents and told him that he wanted to provide an update on the IRS audit. The following is an excerpt from the conversation, which was consensually recorded.

| CW-1 | Well, thanks for letting me call you. I-- I talked to [your spouse], but I just want to give you an update. So they've been doing an audit on my foundation. |
|------|---|
| SEMPREVIVO | Okay. |
| CW-1 | And they've finally now kind of picked—pegged out some stuff. So they keep-- you know, they're going-- I think they may call all the folks that we, helped get into Georgetown. |
| SEMPREVIVO | Um-hmm. |
| CW-1 | And so I just wanted to make sure that we were all on the same page that-- because I'm sure that my-- I don't know if they're going to call you, but it sounds like they're going to call all these folks, because we have probably 15, 20 folks over the coup-- last couple of years that have gotten in, and so I essentially-- you know, I've told them my-- I'll tell you what I have not told them. I did not tell them that [your son] was-- that he got in through tennis and that he wasn't a tennis player, but that you guys made a payment to Gordie Ernst in Georgetown tennis. I didn't say that. I just essentially said that [your son] got in through one of my relationships at Georgetown and just left it at that, and that you guys made a donation to our foundation to help underserved kids. And I just used one of my |

190

|  |  |
|---|---|
|  | relationships. And it wasn't anything to do with that he was or wasn't a tennis player, which he wasn't. So I just wanted you to know that in case they call you. |
| SEMPREVIVO | Okay. Yeah. Yeah. You know, however you-- that-- that-- that, you know, we donate to the-- we donated to the, you know, foundation. It does great work and, you know-- and, you know, we appreciate, you know, any help outside of that that-- that we got from you. So, you know-- |
| CW-1 | Perfect. That-- that's all I wanted you to know, so in case they call, because these people that audit-- I'm sure you've been audited before. They-- they're-- they're-- they have no mercy. |
| SEMPREVIVO | Um-hmm. |
| CW-1 | So I just wanted you to be aware, in case you got a call. |
| SEMPREVIVO | Yeah. Yeah. They-- and-- and-- and, my experience has been they like to do stuff in a-- and-- and, you know, send you documents and have you kind of do something in writing and-- and we'll see what happens in terms of them-- |
| CW-1 | Okay. |

495. On or about March 3, 2019, CW-1 spoke with SEMPREVIVO again at the direction of law enforcement agents. CW-1 advised SEMPREVIVO that Georgetown was conducting an internal investigation to determine why students who were not tennis players had been admitted to Georgetown through Ernst. The following is an excerpt from the call, which was consensually recorded.

|  |  |
|---|---|
| CW-1 | So, I got a call this morning from the-- my Georgetown people and they said that they were doing an internal investigation because Gordie Ernst, who was the men's and women's tennis coach when [your son] got admitted, they're doing an internal investigation to figure out why all these kids got in that were not tennis players, like [your son]. Right? |
| SEMPREVIVO | Okay. |
| CW-1 | So, I'm-- so I just wanted you to know. I don't know what the impact will be or anything but it's just internal and it's all about, "So why didn't, you know, all these kids, like [your son], who weren't tennis players, didn't come out for the team and where are they now and what's going on." So, |

191

> since he wasn't a tennis player they're looking at, you know, all the kids that just didn't come out and I just didn't-- want to make sure you knew, because he wasn't a tennis player that-- I don't know if anything will come out of it. But just-- I wanted you to be aware of it that, that's what, that's what they're looking at internally.

SEMPREVIVO      Okay.

496.      SEMPREVIVO then asked CW-1 questions about the Georgetown investigation and the IRS audit of KWF. With respect to Georgetown's internal investigation, SEMPREVIVO asked CW-1 if he knew "how many kids they're investigating" and whether the university would be contacting SEMPREVIVO's son directly. When CW-1 again noted that SEMPREVIVO's son was not a tennis player, SEMPREVIVO responded: "I'm just gonna, I'm just gonna, um, you know I think that [inaudible]." At that point, the call disconnected.

497.      SEMPREVIVO called CW-1 back moments later and said that he did not feel comfortable continuing the discussion. He said: "Hey, [CW-1], I, you know I don-- you know, whatever you do, you do. You know? I really don't feel comfortable talking to you about this stuff in terms of, kind of, you know, in terms of, in terms of, kind of your-- your, you know, your dealings." SEMPREVIVO then denied knowing that his son was admitted to Georgetown through Ernst. The following is an excerpt from the conversation.

| | |
|---|---|
| SEMPREVIVO | You know, all I know is that we, you know, we used you for the charity stuff and we used you for the counseling, and your dealings are your dealings. And so, you know. |
| CW-1 | No I get that. And I understand that, but at the same time we were all a part of-- |
| SEMPREVIVO | No, I don't agree with that at all. You-- |
| CW-1 | You don't agree that we got him in through tennis and you didn't know that [inaudible]? |
| SEMPREVIVO | I don't. I don't. I do-- you know, you did what you did, [CW-1], and that was your stuff. Okay? So-- |

| CW-1 | Okay. |
|---|---|
| SEMPREVIVO | --I think, I think that that's how, you know, you did what you did and so I'm not going to take accountability for your actions and I think that, you know, you need to be accountable for [inaudible]-- |
| CW-1 | And I'm-- absolutely. I'm totally accountable that I got him in through tennis and that you guys were aware of it, but I'm totally aware of it and I'm totally-- accept the responsibility that I used my relationship and made [your son] a tennis player. And we all agreed that that's what we were going to do. |
| SEMPREVIVO | You know, I don't have any details, but I think that, I think that you need to be accountable for what you did. So I don't want to talk about this any more because, you know, I think there were two separate things. And, we used you and we donated. We donated as a charity, and it was a good charity and we were excited we could help you and, you know, in terms of, you know, how you do favors for people separately that's, you know, I-- we appreciate any help you gave us. But, you know, we used you in terms of the, you know, in terms of your college stuff. We paid you well for the, you know, for the work you did there separately. So, and we appreciate it. So, I think that, you know, if you're trying to turn something around in terms of, you know, what you did and how you did it then I don't want to be, I don't want to be a part of that. |

## X. GREGORY COLBURN and AMY COLBURN

498.    Defendants GREGORY COLBURN and AMY COLBURN, a married couple (together, "the COLBURNS"), are residents of Palo Alto, California. GREGORY COLBURN is a physician.

499.    As set forth below, the COLBURNS participated in the college entrance exam cheating scheme on behalf of their son.

500.    On or about October 10, 2017, AMY COLBURN e-mailed CW-1 that she was still waiting to hear back about her son's testing accommodation from the College Board. On or about December 31, 2017, CW-1 e-mailed AMY COLBURN an SAT admission ticket for the COLBURNS' son for an exam with extended time on March 10, 2018.

193

501.    In or about mid-December 2017, GREGORY COLBURN initiated a transfer of stock to KWF with a value of $24,443.50.  On or about December 30, 2017, GREGORY COLBURN issued a check in the amount of $547.45 to KWF.  In the memo line of the check, GREGORY COLBURN wrote "charitable donation."

502.    On or about December 29, 2017, KWF issued a letter to GREGORY COLBURN falsely indicating that "no goods or services were exchanged" for his purported donation of $25,000.

503.    On or about February 1, 2018, Dvorskiy submitted paperwork to the College Board to change the location of the March 10 test site from the COLBURNS' son's high school in Palo Alto to the West Hollywood Test Center.

504.    On or about March 9, 2018, CW-2 flew from Tampa to Los Angeles.  On or about March 10, 2018, the COLBURNS' son took the SAT at the West Hollywood Test Center with CW-2 as the purported proctor.  CW-2 returned to Tampa on or about March 11, 2018.

505.    CW-1 caused KWF to issue payments of $20,000 each to Dvorskiy, on or about March 14, 2018, and to CW-2, on or about March 23, 2018, for their roles in executing the SAT cheating scheme for the COLBURNS' son and another student who took the exam that same day.

506.    On or about October 24, 2018, CW-1 called the COLBURNS at the direction of law enforcement agents and told them the IRS was auditing KWF.  Initially, CW-1 spoke only with AMY COLBURN.  The following is an excerpt from the call, which was consensually recorded.

CW-1            Okay. So, so, you know, essentially, they asked me about your payments for [your son] taking the test, with [CW-2] at [the West Hollywood Test Center].

194

| A. COLBURN | Okay. Is that a problem? |
|---|---|
| CW-1 | No. So I just, I just want to-- of course, I'm not going to mention to the IRS that [CW-2] took the test for [your son]. |
| A. COLBURN | Mm-hmm. |
| CW-1 | So, so what I've stated to the IRS, [is] that your payment went to our foundation to help underserved kids. |
| A. COLBURN | Okay. |

507.    AMY COLBURN then put GREGORY COLBURN on the phone. The following is an excerpt from the conversation.

| CW-1 | So what I'm telling the IRS is that-- I'm not-- well, let me say this. What I'm not telling the IRS is that [your son]-- that [CW-2] [inaudible] took the test for [your son] at [the West Hollywood Test Center]. |
|---|---|
| G. COLBURN | No, I got that. Yes. No, I got that. |
| CW-1 | All right. But what I am telling them is that your payment essentially went to our foundation to help underserved kids. |
| G. COLBURN | Right. Okay. |
| CW-1 | So I just want to make sure that our stories-- |
| G. COLBURN | Yes. |
| CW-1 | --are aligned. |
| G. COLBURN | Yes. I said that no goods and services were exchanged for this. Yeah. I, I, I-- that's correct. |
| CW-1 | Okay. All right. So that's really what I wanted to make sure, was that we're both on the same page. |
| G. COLBURN | Good. |
| CW-1 | Excuse me. And just in case they were to call you, I just wanted to-- because I've already told them that, you know, this-- essentially, this payment was made to our foundation in lieu of, but we both know that, [CW-2] took the test for [your son]. But I just wanted to make sure that we don't-- we're all on the same page. |

195

G. COLBURN          Right.  It was to help underserved kids.

CW-1                Correct.

G. COLBURN          Got it.  No problem.

          Y. <u>ROBERT FLAXMAN</u>

    508.    Defendant ROBERT FLAXMAN is a resident of Beverly Hills, California. FLAXMAN is the president and CEO of a Los Angeles-based real estate development firm.

    509.    As set forth below, in or about 2016, FLAXMAN participated in both the college recruitment scheme and the college entrance exam scheme.

    510.    On or about October 25, 2015, CW-1 e-mailed FLAXMAN's son's ACT scores and transcript to Martin Fox, who forwarded the materials to a varsity coach at the University of San Diego ("USD").  On or about October 26, 2015, CW-1 e-mailed FLAXMAN that he "spoke to USD and they received [your son's] info.  They are interested in helping."

    511.    On or about November 2, 2015, FLAXMAN e-mailed CW-1 asking for an update on the status of his son's admission to USD.  CW-1 replied: "The coach I am working with has not gotten his scheduled appointment with Admissions for all of his recruitable athletes.  He is on board to help and has [your son's] materials.  I am sure I will receive a call on next steps soon."  On or about November 12, 2015, a USD admissions counselor e-mailed the varsity coach a memorandum giving the coach approval to sign FLAXMAN's son to the coach's team.

    512.    On or about November 16, 2015, CW-1 e-mailed FLAXMAN and his son.  The subject line of the e-mail was: "Here is what I came up with that touches on a lot of who you are and what I put on your application."  The essay, and the application ultimately submitted to USD, referenced FLAXMAN's son's purported volunteer work as the manager of an elite youth athletic team.  Prior essay drafts contained no references to that sport.

513.     USD formally admitted FLAXMAN's son on or about March 7, 2016.

514.     On or about April 22, 2016, a KWF employee e-mailed FLAXMAN an invoice in the amount of $250,000.  The cover e-mail described the invoice as a "courtesy reminder of the pledge made to [KWF]."  On or about May 9, 2016, the KWF employee e-mailed FLAXMAN again: "Hi Bob, We have some obligations that we must meet.  When can we count on your payment?"  FLAXMAN replied that he "was supposed to receive [a] revised request that included 501(c)3 info for tax purposes.  I would like to make two payments.  One now and one end of June."

515.     FLAXMAN's company wired two payments of $125,000 each to KWF on or about May 13, 2016 and June 23, 2016.

516.     On or about June 6, 2016, CW-1 caused KWF to issue a payment of $100,000 to Fox.  Fox advised CW-1 that he, in turn, paid the USD coach for facilitating FLAXMAN's son's admission.

517.     In or about April 2016, FLAXMAN's daughter took the ACT and received a score of 20 out of a possible 36.  On or about September 12, 2016, FLAXMAN e-mailed CW-1 that his daughter took the "ACT this weekend and thought she did better than the last time.  She actually finished the exam."  FLAXMAN's daughter received a score of 24 on the September test.

518.     On or about October 4, 2016, CW-1 e-mailed FLAXMAN that his contact at ACT "has the paperwork and will put [your daughter] into [the Houston Test Center] for Oct."  FLAXMAN replied: "Ok.  I will need details soon.  Address.  Who and where to check in and what instructions we need to give [my daughter] to use at the test."  On or about October 6, 2016,

197

CW-1 e-mailed FLAXMAN the address of the Houston Test Center and contact information for Niki Williams, the test center administrator.

519.     On or about October 15, 2016, CW-1 directed a KWF employee to send invoices to FLAXMAN and another client in the amount of $75,000 each. CW-1 further instructed the employee to send $50,000 to Fox and $20,000 to CW-2. CW-1 has advised law enforcement agents that the payments were for Fox's facilitation of CW-1's relationship with Williams, as well as for CW-2's purported proctoring of the exam for FLAXMAN's daughter and the child of CW-1's other client.

520.     On or about October 20, 2016, FLAXMAN's company wired $75,000 to KWF. On or about October 21, 2016, a KWF employee sent FLAXMAN a letter falsely attesting that "no goods or services were exchanged" for the purported contribution.

521.     CW-2 flew from Tampa to Houston on or about October 21, 2016. On or about October 22, 2016, FLAXMAN's daughter and the child of another client of CW-1 both took the ACT at the Houston Test Center. CW-2 has advised investigators that he assisted FLAXMAN's daughter and the other student to answer questions on the exam, and instructed them to answer different questions incorrectly so that they did not have the same incorrect answers on their tests, and the ACT would therefore not suspect cheating. CW-2 returned to Tampa the next day.

522.     FLAXMAN's daughter received a score of 28 on the ACT exam.

523.     On or about October 23, 2018, CW-1 called FLAXMAN at the direction of law enforcement agents and told him that KWF was being audited by the IRS. The following is an excerpt from the call, which was consensually recorded.

CW-1                    Okay-- so our-- so our books show there was a $250,000 payment for [your son's] side door into USD, through [the USD varsity coach] and [the varsity sport]--

198

| FLAXMAN | Yeah. |
|---|---|
| CW-1 | --and there was a 75K payment for [CW-2] to take-- |
| FLAXMAN | Yeah. |
| CW-1 | --the standardized testing, SAT, ACT, with [your daughter]. |
| FLAXMAN | Yeah. |
| CW-1 | Okay. So we're both on the same page. |
| FLAXMAN | An-an-and the-- the reason for the payments is what? |
| CW-1 | The reason for the payments were to, essentially-- We won't say that it went to pay for [your son] to get into USD. We'll say that the payments were made to our foundation to help kids-- underserved kids. |
| FLAXMAN | Okay. That's fine. |

### Z. HOMAYOUN ZADEH

524. Defendant HOMAYOUN ZADEH is a resident of Calabasas, California. ZADEH is an associate professor of dentistry.

525. As set forth below, ZADEH conspired to bribe Heinel to designate his daughter as a lacrosse recruit—despite the fact that she did not play lacrosse competitively—thereby facilitating her admission to USC.

526. In an e-mail on or about December 8, 2016, ZADEH instructed his daughter's tutor to forward his daughter's "unofficial transcripts and SAT scores" to CW-1. The tutor sent the materials to CW-1, who forwarded them to Janke, writing, "Picture to follow for USC."

527. In an e-mail on or about December 16, 2016, ZADEH provided CW-1 with a photograph of his daughter cheerleading. CW-1 forwarded the photograph to Janke, writing, "Laura any way to build the profile for [ZADEH's daughter] playing lacrosse – I told Donna [Heinel] it would come soon."

528. Janke created a lacrosse profile for ZADEH's daughter, and CW-1 forwarded the profile to Heinel on or about December 23, 2016. The profile falsely described ZADEH's daughter as being an elite player on two club lacrosse teams in the Los Angeles area. Heinel then created a separate lacrosse profile for ZADEH's daughter, on USC letterhead, which falsely stated that ZADEH's daughter was "one of the top defenders within the youth club development league," and was a "player who knows how to work as a team in order to win," and included fabricated comments that Heinel included to appear as though they were from the USC lacrosse coach.

529. Heinel presented ZADEH's daughter to the USC subcommittee for athletic admissions as a purported lacrosse recruit on or about March 15, 2017.

530. In a lengthy text message exchange that began on or about March 20, 2017, ZADEH discussed the admission of his daughter to USC with CW-1. In the conversation, CW-1 requested that ZADEH confirm that his daughter would attend USC. CW-1 told ZADEH that he "must act quickly." ZADEH replied that his daughter had become "extremely upset as to why I am pressuring her to make a decision on the spot." ZADEH wanted "a little time so that [he could] approach [his] daughter in a way that is more conducive. I really appreciate what you have done." CW-1 responded: "I can ask tomorrow but my guess is the answer will be no. Since the funds have been transmitted I need to cover myself. If they say no then I need to pull the trigger then." ZADEH replied that his daughter was concerned that "she did not get in on her own merits. I have not shared anything about our arrangement but she somehow senses it. She's concerned that others may view her differently." CW-1 and ZADEH then had the following exchange:

| ZADEH | I will go with our arrangement. However I don't have $100k of cash. You had previously told me that half was now to USC and I was going to put |
|---|---|

> on card and you said half wa[s] in the fall. In our phone conversation, you mentioned that I can pay you over 6 months. If so. I can provide you each month a check

CW-1 Thank you for your response ... as for payment- the money will be deposited in the next day or two. My foundation sent the money as requested.[22] Normally the first 50k is sent immediately after acceptance and before the final letter is received. Then the next portion is sent soon after the final letter is provided. Since both are happening on top of each other I sent the monies to my contact as a donation so there is no conflict internally because you are designated as a giver through another department but that was not the group who helped. The group helping wants the credit and funds so it is cleaner through me. Yes I agree that you can make the 100k payment over the next 6 months starting April 1st. You can send to my foundation as a donation/write off or if you have your own company we can invoice you as a business consulting fee from our profit business and you write off as an expense. If you want to complete the transaction by credit card that is fine too. I just need you to designate, which path do you want to be invoiced. Please let me know? Final acceptance will come in the next 10 days or so.

ZADEH responded that he would consult with his CPA "to see which path is preferable."

531.    On or about April 5, 2017, a KWF employee e-mailed an invoice to ZADEH and his spouse for their purported "pledge" of $100,000, noting that the payments would "be made in six equal installments beginning immediately." ZADEH's spouse replied to the e-mail, copying ZADEH, and stated that she and ZADEH were "in the process of refinancing our house to take some of the equity out in order to make these payments." She continued that "April is a difficult month between property taxes and personal taxes," and offered to put $5,000 on her credit card because she did not want CW-1 "to think we are not fulfilling our end of the agreement."

---

[22] USC records reflect that KWF made a $50,000 contribution to the Women's Athletics Board on or about March 27, 2017.

201

532.    On or about October 5, 2017, ZADEH's spouse e-mailed the KWF employee, copying ZADEH, that the refinancing had been completed, but noting that "Homa should have never agreed to pay you back in 6 months."

533.    Between May 30, 2017 and September 7, 2018, ZADEH made the following payments to KWF:

| Date Posted to KWF Account | Amount |
| --- | --- |
| 5/30/2017 | $5,000 |
| 9/25/2017 | $10,000 |
| 10/23/2017 | $10,000 |
| 12/27/2017 | $10,000 |
| 2/15/2018 | $5,000 |
| 3/26/2018 | $5,000 |
| 4/27/2018 | $5,000 |
| 9/7/2018 | $5,000 |

534.    On or about December 27, 2017, KWF issued a letter to ZADEH and his spouse falsely attesting that "no goods or services were exchanged" for their donations.[23]

535.    In a call on or about October 25, 2018, CW-1, at the direction of law enforcement agents, told ZADEH that KWF was being audited by the IRS. The following is an excerpt from the call, which was consensually recorded.

| | |
| --- | --- |
| CW-1 | So my foundation is being audited now, which is typical of all the foundations which have lots-- lots of action. |
| ZADEH | Sure. Sure. |
| CW-1 | And so what I wanted to make sure is that when [inaudible] they asked about your guys' payment-- |
| ZADEH | Right. |

---

[23] On or about March 6, 2019, ZADEH's spouse e-mailed CW-1, copying ZADEH, noting that she had sent an additional $5,000 to KWF. ZADEH's spouse asked for a tax receipt for the $25,000 that was "donated in 2018."

| | |
|---|---|
| CW-1 | --so I just want to make sure that obviously I'm not going to tell the IRS that we got [your daughter] in through-- |
| ZADEH | Right. |
| CW-1 | --lacrosse-- |
| ZADEH | Right. |
| CW-1 | --and Donna Heinel at USC. |
| ZADEH | Right. |
| CW-1 | Right? |
| ZADEH | Right. |
| CW-1 | And, you know, we created a profile that wasn't real. |
| ZADEH | Right. |
| CW-1 | Right? For lacrosse. I just want to make sure that we're on the same page that we're not going to say that. What we are going to say is that your donation is going to my foundation which essentially-- |
| ZADEH | Yeah. |
| CW-1 | --is helping underserved kids. |
| ZADEH | Right. |
| CW-1 | You good with that? |
| ZADEH | Okay, yeah. |

## CONCLUSION

536.    Based on my knowledge, training and experience, and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that the defendants conspired to commit mail fraud and honest services mail fraud, in violation of Title 18, United States Code, Section 1349.

Respectfully submitted,

Laura Smith
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on March 11th, 2019

The Honorable M. Page Kelley
United States Magistrate Judge

204

```
MIME-Version:1.0
From:DCECF_LiveDB@txs.uscourts.gov
To:DC_Notices@localhost.localdomain
Bcc:
--Case Participants: Magistrate Judge Nancy K Johnson (shannon_butler@txs.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:30134701@txs.uscourts.gov
Subject:Activity in Case 4:19-mj-00433 USA v. Wilson Set/Reset Hearings
Content-Type: text/html
```

## U.S. District Court

## SOUTHERN DISTRICT OF TEXAS

**Notice of Electronic Filing**

The following transaction was entered on 3/12/2019 at 10:45 AM CDT and filed on 3/12/2019

| | |
|---|---|
| **Case Name:** | USA v. Wilson |
| **Case Number:** | 4:19−mj−00433 |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
 **\*\*\*Set Hearing as to John Wilson: Initial Appearance − Rule 40 set for 3/12/2019 at 10:00 AM before Magistrate Judge Nancy K Johnson (kmurphyadi, 4)**

**4:19−mj−00433−1 Notice has been electronically mailed to:**

**4:19−mj−00433−1 Notice has not been electronically mailed to:**

```
MIME-Version:1.0
From:DCECF_LiveDB@txs.uscourts.gov
To:DC_Notices@localhost.localdomain
Bcc:
--Case Participants: Magistrate Judge Nancy K Johnson (shannon_butler@txs.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:30140922@txs.uscourts.gov
Subject:Activity in Case 4:19-mj-00433 USA v. Wilson Initial Appearance - Rule 5(c)(3)
```
Content−Type: text/html

## U.S. District Court

## SOUTHERN DISTRICT OF TEXAS

### Notice of Electronic Filing

The following transaction was entered on 3/13/2019 at 7:19 AM CDT and filed on 3/12/2019

| | |
|---|---|
| **Case Name:** | USA v. Wilson |
| **Case Number:** | 4:19−mj−00433 |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
 **Minute Entry for proceedings held before Magistrate Judge Nancy K Johnson: INITIAL APPEARANCE IN RULE 5(c)(3) PROCEEDINGS as to John Wilson held on 3/12/2019. Order of Temporary Detention Pending Hearing. Detention/Identity Hearings set for 03.12.19 @2PM before Judge Johnson. Appearances:AUSA J. Jocher, Brandt Leibe.(ERO:Yes) Deft remanded to Custody, filed.(sjones, 4)**

**4:19−mj−00433−1 Notice has been electronically mailed to:**

**4:19−mj−00433−1 Notice has not been electronically mailed to:**

```
MIME-Version:1.0
From:DCECF_LiveDB@txs.uscourts.gov
To:DC_Notices@localhost.localdomain
Bcc:
--Case Participants: Brandt Arthur Leibe (bleibe@kslaw.com), Magistrate Judge Nancy K
Johnson (shannon_butler@txs.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:30140924@txs.uscourts.gov
Subject:Activity in Case 4:19-mj-00433 USA v. Wilson Add and Terminate Attorneys
```
Content−Type: text/html

## U.S. District Court

## SOUTHERN DISTRICT OF TEXAS

**Notice of Electronic Filing**

The following transaction was entered on 3/13/2019 at 7:20 AM CDT and filed on 3/12/2019

| | |
|---|---|
| **Case Name:** | USA v. Wilson |
| **Case Number:** | 4:19−mj−00433 |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
 **Attorney update in case as to John Wilson. Attorney Brandt Arthur Leibe for John Wilson added. (sjones, 4)**

**4:19−mj−00433−1 Notice has been electronically mailed to:**

Brandt Arthur Leibe &nbsp &nbsp bleibe@kslaw.com

**4:19−mj−00433−1 Notice has not been electronically mailed to:**

```
MIME-Version:1.0
From:DCECF_LiveDB@txs.uscourts.gov
To:DC_Notices@localhost.localdomain
Bcc:
--Case Participants: Magistrate Judge Nancy K Johnson (shannon_butler@txs.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:30134678@txs.uscourts.gov
Subject:Activity in Case 4:19-mj-00433 USA v. Wilson Arrest - Rule 40
```
Content−Type: text/html

## U.S. District Court

## SOUTHERN DISTRICT OF TEXAS

### Notice of Electronic Filing

The following transaction was entered on 3/12/2019 at 10:43 AM CDT and filed on 3/12/2019

| | |
|---|---|
| **Case Name:** | USA v. Wilson |
| **Case Number:** | 4:19−mj−00433 |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**Arrest (Rule 40) of John Wilson. (kmurphyadi, 4)**

**4:19−mj−00433−1 Notice has been electronically mailed to:**

**4:19−mj−00433−1 Notice has not been electronically mailed to:**

United States District Court
Southern District of Texas
**ENTERED**
March 13, 2019
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | Case No. 4:19−mj−00433 |
| | § | |
| John Wilson | § | |

## ORDER OF DETENTION PENDING HEARING

A hearing in this case is scheduled as follows:

Identity and Detention Hearing
March 12, 2019 at 02:00 PM
Courtroom 700
United States District Court
515 Rusk Street
Houston, TX 77002

**IT IS ORDERED:** Pending the hearing, the defendant is to be detained in the custody of the United States Marshal or any other authorized officer. The custodian must bring the defendant to the hearing at the time, date, and place set forth above.

Date: March 12, 2019

_____
Nancy K. Johnson
United States Magistrate Judge

AO 466A (Rev. 01/09)  Waiver of Rule 5 & 5.1 Hearings (Complaint or Indictment)

# UNITED STATES DISTRICT COURT
for the

~~United States District~~ District of Texas
~~Southern District of Texas~~
FILED

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| MAR 12 2019 | ) |
| David J. Bradley, Clerk of Court | ) |
| John Wilson | ) |
| Defendant | ) |

Case No. 4-19MJ433

Charging District's Case No. 1:19MJ6087

## WAIVER OF RULE 5 & 5.1 HEARINGS
### (Complaint or Indictment)

I understand that I have been charged in another district, the *(name of other court)* District of MASS
of Massachusetts

I have been informed of the charges and of my rights to:

(1)    retain counsel or request the assignment of counsel if I am unable to retain counsel;

(2)    an identity hearing to determine whether I am the person named in the charges;

(3)    production of the warrant, a certified copy of the warrant, or a reliable electronic copy of either;

(4)    a preliminary hearing within 10 days of my first appearance if I am in custody and 20 days otherwise — unless I am indicted — to determine whether there is probable cause to believe that an offense has been committed;

(5)    a hearing on any motion by the government for detention;

(6)    request transfer of the proceedings to this district under Fed. R. Crim. P. 20, to plead guilty.

I agree to waive my right(s) to:

☐    an identity hearing and production of the warrant.

☐    a preliminary hearing.

☐    a detention hearing.

☒    an identity hearing, production of the warrant, and any preliminary or detention hearing to which I may be entitled in this district.  I request that those hearings be held in the prosecuting district, at a time set by that court.

I consent to the issuance of an order requiring my appearance in the prosecuting district where the charges are pending against me.

Date:  Mar. 12, 2019

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

Brandt Leibe
*Printed name of defendant's attorney*

# United States District Court

## SOUTHERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA
V.

**APPEARANCE BOND**

JOHN WILSON
Defendant

CASE NUMBER: **4:19mj433**

Non-surety:    I, the undersigned defendant acknowledge that I on an Unsecured Bond
Surety:       We, the undersigned, jointly severally acknowledge that we and our . . .
personal representatives, jointly and severally, are bound to pay to the United States of America the sum of $100,000.

The conditions of this bond are that the defendant  JOHN WILSON
(name)

is to appear before this court and at such other places as the defendant may be required to appear, in accordance with any and all orders and directions relating to the defendant's appearance in this case, including appearance for violation of a condition of defendant's release as may be ordered or notified by this court or any other United States district court to which the defendant may be held to answer or the cause transferred. The defendant is to abide by any judgment entered in such a matter by surrendering to serve any sentence imposed and obeying any order or direction in connection with such judgment.

It is agreed and understood that this is a continuing bond (including any proceeding on appeal or review) which shall continue until such time as the undersigned are exonerated.

If the defendant appears as ordered or notified and otherwise obeys and performs the foregoing conditions of this bond, then this bond is to be void, but if the defendant fails to obey or perform any of these conditions, payment of the amount of this bond shall be due forthwith. Forfeiture of this bond for any breach of its conditions may be declared by any United States district court having cognizance of the above entitled matter at the time of such breach and if the bond if forfeited and if the forfeiture is not set aside or remitted, judgment may be entered upon motion in such United States district court against each debtor jointly and severally for the amount above stated, together with interest and costs, and execution may be issued and payment secured as provided by the Federal Rules of Criminal Procedure and any other laws of the United States.

This bond is signed on    03.12.19    at  Houston, Texas
                         Date                    Place

Defendant.  _____  Address.
Surety.  _____  Address.
Surety.  _____  Address.

Signed and acknowledged before me on    03.12.19
                                          Date

                                                Judicial Officer/Clerk

Approved:  _____
              Judicial Officer

216

(Rev. 12/08)

UNITED STATES DISTRICT COURT        SOUTHERN DISTRICT OF TEXAS

---

UNITED STATES OF AMERICA     §
                                  §
                                  §
vs.                               §     CRIMINAL NO. H-_____
                                  §
                                  §
_John Wilson_                §

## ORDER SETTING CONDITIONS OF RELEASE

IT IS ORDERED that the defendant's release is subject to the following conditions:

1.     The defendant must not violate any federal, state or local law while on release.

2.     The defendant must not intimidate or attempt to intimidate a witness, juror or officer of the court (18 USC § 1503), obstruct a criminal investigation (18 USC § 1510), or tamper with or retaliate against a witness, victim or informant (18 USC §§ 1512 and 1513).

3.     The defendant must immediately advise the Court, defense counsel and the Pretrial Services Agency, in writing, before any change in address and telephone number.

4.     The defendant must appear in court as required and must surrender to serve any sentence imposed. The defendant must appear at (if blank, to be notified):

       _Boston Fed Court_ on _March 29 2019_ _2:30 pm_
       Place                                   Date/Time

### RELEASE ON PERSONAL RECOGNIZANCE OR UNSECURED BOND

IT IS FURTHER ORDERED that the defendant be released on condition that:

[X]    5.     The defendant promises to appear in court as required and surrender to serve any sentence imposed.

[X]    6.     The defendant executes an unsecured bond binding the defendant to pay the United States the sum of $ _100,000_ in the event of a failure to appear as required or to surrender to serve any sentence imposed.

       [ ]     The bond shall be signed by the following person(s) as surety:

                _____    _____

                _____    _____

                _____

### Additional Conditions of Release

Upon finding that release by one of the above methods will not by itself reasonably assure the defendant's appearance and the safety of other persons or the community, it FURTHER ORDERED that the defendant's release is subject to the conditions marked below:

[ ]    7.    The defendant is placed in the custody of:

_____
(Name of person or organization)

_____
(Address)

_____    _____
(City/State/Zip Code)        (Area Code/Telephone Number)

who agrees (a) to supervise the defendant in accordance with all conditions of release, (b) to use every effort to assure the defendant's appearance at all scheduled court proceedings, and (c) to notify the court immediately if the defendant violates any conditions of release or disappears.

Signed:_____
                         Custodian or Proxy          Date

[X]    8.    The defendant must:

[X]    a.    Report to the **U. S. Pretrial Services Agency - Phone: 713-250-5218**, no later than _____.

[ ]    b.    Execute a bond or an agreement to forfeit upon failing to appear as required the following sum of money or designated property:
_____
_____

[ ]    c.    Post with the court the following proof of ownership of the designated property, or the following amount or percentage of the above-described sum
_____.

[ ]    d.    Execute a bail bond with solvent sureties in the amount of $ _____.

[X]    e.    Maintain or actively seek employment. *you think*

[ ]    f.    Maintain or commence an education program.

[X]    g.    Surrender U.S. Passports and/or Foreign Passport to the U.S. ~~District Clerk~~ *Probation*.

[X]    h.    Obtain no passport.

[X]    i.    Abide by the following restrictions on personal association, place of abode, or travel:
— Continental United States —

2

[X] j.    Avoid all contact, directly or indirectly, with any person who is or may become a victim or potential witness in the investigation or prosecution, including but not limited to:

_including co-defendants_
_____
_____.

[ ] k.    Undergo medical or psychiatric treatment or remain in an institution as follows:
_____
_____

[ ] l.    Return to custody each (week) day at _____ o'clock after being released each (week) day at _____ o'clock for employment, schooling, or the following purpose(s):
_____
_____
_____

[ ] m.    Maintain residence at a halfway house or community corrections center, as the Pretrial Services Office or supervising officer considers necessary.

[X] n.    Refrain from possessing a firearm, destructive device, or other dangerous weapons.

[X] o.    Refrain from ( ) any (X) excessive use of alcohol.

[X] p.    Refrain from use or unlawful possession of a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.

[ ] q.    Submit to any testing required by the Pretrial Services Office or the supervising officer to determine whether the defendant is using a prohibited substance. Any testing may be used with random frequency and include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing. The defendant must refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of any prohibited substance testing or monitoring which is (are) required as a condition of release.

[ ] r.    Participate in a program of inpatient or outpatient substance abuse therapy and counseling if the Pretrial Services Office or supervising officer considers it advisable.

[ ] s.    Participate in one of the following location monitoring program components and abide by its requirement as the Pretrial Services Office or supervising officer instructs.
     [ ]    (i)    **Curfew**. You are restricted to your residence every day    ( ) from

3

_____ to _____, or ( ) as directed by the Pretrial Services Office or supervising officer; or

[ ]    (ii)    **Home Detention.** You are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities pre-approved by the Pretrial Services Office or supervising officer; or

[ ]    (iii)    **Home Incarceration.** You are restricted to your residence at all times except for medical needs or treatment, and court appearances pre-approved by the Pretrial Services Office or supervising officer.

[ ]    t.    Submit to the location monitoring indicated below and abide by all of the program requirements and instructions provided by the Pretrial Services Office or supervising officer related to the proper operation of the technology.

    [ ]    The defendant must pay all or part of the cost of the program based upon your ability to pay as the Pretrial Services Office or supervising officer determines.

    [ ]    (i)    Location monitoring technology as directed by the Pretrial Services Office or supervising officer;

    [ ]    (ii)    Radio Frequency (RF) monitoring;

    [ ]    (iii)    Passive Global Positioning Satellite (GPS) monitoring;

    [ ]    (iv)    Active Global Positioning Satellite (GPS) monitoring (including "hybrid" (Active/Passive) GPS);

    [ ]    (v)    Voice Recognition monitoring.

[X]    u.    Special Conditions:

_Reports all contact w/ law enforcement to Pretrial Services_

_May not sell or liquidate any personal w/o court permission_

_May not transfer any personal/domestic asset overseas_

**Advice of Penalties and Sanctions**

4

Violation of any of the foregoing conditions of release may result in the immediate issuance of a warrant for the defendant's arrest, a revocation of release, an order of detention, as provided in 18 USC § 3148, and a prosecution for contempt as provided in 18 USC § 401 which could result in a possible term of imprisonment or fine.

The commission of any offense while on pretrial release may result in an additional sentence upon conviction for such offense to a term of imprisonment of not more than ten years, if the offense is a felony, or to a term of imprisonment of not more than one year, if the offense is a misdemeanor. This sentence shall be consecutive to any other sentence and must be imposed in addition to the sentence received for the offense itself. 18 USC § 3147.

18 USC § 1503 makes it a criminal offense punishable by up to five years of imprisonment and a $250,000 fine to intimidate or attempt to intimidate a witness, juror or officer of the court; 18 USC § 1510 makes it a criminal offense punishable by up to five years imprisonment and a $250,000 fine to obstruct a criminal investigation; 18 USC § 1512 makes it a criminal offense punishable by up to ten years of imprisonment and a $250,000 fine to tamper with a witness, victim or informant; and 18 USC § 1513 makes it a criminal offense punishable by up to ten years of imprisonment and a $250,000 fine to retaliate against a witness, victim or informant, or threaten or attempt to do so.

It is a criminal offense under 18 USC § 3146, if after having been released, the defendant knowingly fails to appear as required by the conditions of release, or to surrender for the service of sentence pursuant to a court order. If the defendant was released in connection with a charge of, or while awaiting sending, surrender for the service of a sentence, or appeal or certiorari after conviction for:

 1.  an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more, the defendant shall be fined not more than $250,000 or imprisoned for not more than ten years, or both;

[ ]  2.  an offense punishable by imprisonment for a term of five years or more, but less than fifteen years, the defendant shall be fined not more than $250,000 or imprisoned for not more than five years, or both;

[ ]  3.  any other felony, the defendant shall be fined not more than $250,000 or imprisoned for not more than two years, or both;

[ ]  4.  a misdemeanor, the defendant shall be fined not more than $100,000 or imprisoned for not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender shall be consecutive to the sentence of imprisonment for any other offense. In addition, a failure to appear may result in the forfeiture of any bail posted.

## Acknowledgment of Defendant

I acknowledge that I am the defendant in this case, and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and to surrender for service of any sentence imposed. I am aware of the penalties and sanctions set forth above.



_____
Signature of Defendant

_____
Address

_____
City/State/Zip Code

_____
Telephone Number

## Direction to United States Marshal

[X] The defendant is ORDERED released after processing.

[ ] The United States Marshal is ORDERED to keep the defendant in custody until notified by the clerk or judicial officer that the defendant has posted bond and complied with all other conditions for release. The defendant shall be produced before the appropriate judicial officer at the time and place specified, if still in custody.

Date: _3-12-19_____

_____
Nancy K. Johnson
United States Magistrate Judge

6

United States District Court
Southern District of Texas
**ENTERED**
March 13, 2019
David J. Bradley, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | Case No. 4:19−mj−00433 |
| | § | Charging District: USDC of Massachusetts |
| | § | |
| John Wilson | § | Charging District's Case No. 1:19mj6087 |

**ORDER REQUIRING DEFENDANT TO APPEAR IN THE DISTRICT**
**WHERE CHARGES ARE PENDING AND TRANSFERRING BAIL**

After a hearing in this court, the defendant is released from custody and ordered to appear in the district court where the charges are pending to answer those charges. If the time to appear in that court has not yet been set, the defendant must appear when notified to do so. Otherwise, the time and place to appear in that court are:

| Place:<br>USDC of Massachusetts, Boston Division<br>1 Courthouse Way, Suite 2300, Boston, MA 02210 | Location: Courtroom 24, 7th Floor |
|---|---|
| | Date and Time:<br>03.29.19 at 2:30PM |

The clerk is ordered to transfer any bail deposited in the registry of this court to the clerk of the court where the charges are pending.

Date: 3/13/2019

Nancy K. Johnson
United States Magistrate Judge

```
MIME-Version:1.0
From:DCECF_LiveDB@txs.uscourts.gov
To:DC_Notices@localhost.localdomain
Bcc:
--Case Participants: Brandt Arthur Leibe (bleibe@kslaw.com), Magistrate Judge Nancy K
Johnson (shannon_butler@txs.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:30141596@txs.uscourts.gov
Subject:Activity in Case 4:19-mj-00433 USA v. Wilson Identity and Detention Hearing
```
Content−Type: text/html

## U.S. District Court

## SOUTHERN DISTRICT OF TEXAS

### Notice of Electronic Filing

The following transaction was entered on 3/13/2019 at 8:39 AM CDT and filed on 3/12/2019

| | |
|---|---|
| **Case Name:** | USA v. Wilson |
| **Case Number:** | 4:19−mj−00433 |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
 **Minute Entry for proceedings held before Magistrate Judge Nancy K Johnson: IDENTITY AND DETENTION HEARING as to John Wilson held on 3/12/2019. Deft WAIVED Identity. Unsecured Bond $100,000. Appearances:AUSA C. Moyer, Brandt Arthur Leibe.(ERO:Yes), filed.(sjones, 4)**

**4:19−mj−00433−1 Notice has been electronically mailed to:**

Brandt Arthur Leibe &nbsp &nbsp bleibe@kslaw.com

**4:19−mj−00433−1 Notice has not been electronically mailed to:**

```
MIME-Version:1.0
From:DCECF_LiveDB@txs.uscourts.gov
To:DC_Notices@localhost.localdomain
Bcc:
--Case Participants: Brandt Arthur Leibe (bleibe@kslaw.com), Magistrate Judge Nancy K
Johnson (shannon_butler@txs.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:30141653@txs.uscourts.gov
Subject:Activity in Case 4:19-mj-00433 USA v. Wilson Rule 5 Papers Sent
```
Content−Type: text/html

## U.S. District Court

## SOUTHERN DISTRICT OF TEXAS

**Notice of Electronic Filing**

The following transaction was entered on 3/13/2019 at 8:40 AM CDT and filed on 3/13/2019

| | |
|---|---|
| **Case Name:** | USA v. Wilson |
| **Case Number:** | <u>4:19−mj−00433</u> |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
 **RULE 5 Papers sent via email to USDC of Massachusetts Division as to John Wilson,
filed.(sjones, 4)**

**4:19−mj−00433−1 Notice has been electronically mailed to:**

Brandt Arthur Leibe &nbsp &nbsp bleibe@kslaw.com

**4:19−mj−00433−1 Notice has not been electronically mailed to:**