# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| DAVID SIDOO et al., | No. 1:19-cr-10080-NMG |
| Defendants. | |

## DEFENDANT JOHN WILSON'S SUPPLEMENTAL MOTION TO COMPEL PRODUCTION OF EXCULPATORY EVIDENCE

### I.     INTRODUCTION

Defendant John Wilson, joined by other defendants,[1] hereby (a) joins in the motion to compel submitted by defendants Giannulli and Loughlin, ECF No. 693 (the "Giannulli Motion"); and (b) moves further to compel production of the additional categories of exculpatory evidence discussed below.  To avoid repetition, this brief incorporates by reference the background and law described in the Giannulli Motion.

The government has implausibly denied that it possesses any exculpatory evidence, and has rejected wholesale the defendants' requests for specified categories of exculpatory evidence. *See* Ex. 1 (previously filed at ECF No. 693-2).  Several categories of exculpatory evidence carry special importance to Wilson's defense.  As the indictment recognizes, Wilson did not pay a single dollar as a bribe to any individual.  Of the $200,000 Wilson intended to donate to USC, Rick Singer stole half; USC received the other half as planned, acknowledging the gift in an official thank-you letter.  Ex. 2.  When USC classified Wilson's son as a water-polo recruit,

---

[1] The following defendants (through counsel) join this motion:  David Sidoo, Gregory Colburn, Amy Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, Joey Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, Homayoun Zadeh, and Robert Zangrillo.

Wilson had no reason to suspect misconduct:  His son was a highly competitive high-school and club water-polo player, who in fact joined USC's team as planned.  Ex. 3.  And when Singer and Wilson subsequently discussed possible donations to Harvard and Stanford, Singer assured Wilson (in a Title III-recorded conversation) of the propriety of such donations, reporting that the President of Harvard was on board:

> [T]hat's why I'm going to Harvard next Friday, because the President wants to do a deal with me, because he found out that I've already got four already in, without his help, so he's like . . . why would you go to somebody else if you could come to me?

Ex. 4, at 8.  Wilson now understands that Singer had no such conversation with the President of Harvard.  This was just one of the many false statements Singer made to soften up his marks for his con.

Wilson is entitled to the categories of evidence discussed below, all of which defendants requested from the government, in order to defend himself and establish his innocence.

## II.    ADDITIONAL CATEGORIES OF EXCULPATORY EVIDENCE

### A.    Singer's Descriptions of His Practices

The Giannulli Motion explains the significance of Singer's statements to his clients about who would be receiving their money.  ECF No. 693, at 8-15.[2]  Similarly important to the charges are Singer's more general explanations about his donation-related strategies.  *See* Ex. 1 ¶¶ 3-7.

---

[2] The government has argued that it does not matter whether the defendants' money was intended to be delivered to USC or to individual employees.  The cases that the government cites do not support that view.  Generally, those cases involve defendants who betrayed fiduciary duties in exchange for payments to their relatives, businesses, or preferred charities.  *See United States v. DeMizio*, 741 F.3d 373 (2d Cir. 2014) (payments to "family, friends, or others loyal to the defendant"); *United States v. Hausmann*, 345 F.3d 952 (7th Cir. 2003) (payments to individuals who had provided services to the defendant, to a firm working for the defendant, to businesses in which the defendant held interests, and to charities that the defendant supported).  And in the case the government identified most recently, the Second Circuit *reversed* a conviction where the defendant was not "paid to act in breach of his duties," such that the

The context for such discussions was the standard-issue college-counseling services that Singer provided:  advising families about which colleges to apply to, tutoring applicants for standardized tests, reviewing draft application essays, and tracking the application process. Against the backdrop of such relationships, Singer gave clients additional advice about making potentially impactful donations to colleges.  One of his insights was that specific college programs and teams would be more appreciative of relatively modest donations than centralized development offices.  At USC, for example, all but the largest athletic teams received limited budgets, and covered the remainder of their expenses through independent fundraising.  To support such efforts, aimed both at applicants' families and others, USC stationed more than a dozen full-time development officers (i.e., fundraisers) within the athletic department.  *See* Ex. 5. Singer believed that the staff responsible for smaller teams and programs were more likely than the university-wide development office to advocate for the admission of an applicant related to a team-specific donor.

Singer called the practice of donating moderate amounts to specific programs a "side door" to admission.  He assured clients and potential clients that such donations, and their potential impact on admission, were common, lawful, and endorsed by the colleges.  For instance, Singer wrote to one parent:

> There is a side door in most schools as I did 409 of them last year—which means you support the school at a lot lesser cost than through institutional advancement.

Ex. 6.  Singer told another parent:

---

"element of corruption [was] not present."  *United States v. Dixon*, 536 F.2d 1388, 1400-01 (2d Cir. 1976).  It would be both unprecedented and illogical to view a donation to an employer, such as USC, as a bribe to the employee, such as a coach, in derogation of the employee's employment duties.

> [S]ide door is not improper nor is back door[,] both are how all schools fund their
> special programs or needs.

Ex. 7.  And as noted *supra*, Singer told Wilson (falsely) that the President of Harvard supported

the "side door" practice and wished to personally negotiate additional side-door donations.

Singer's representations to clients about the legitimacy of "side door" donations directly

rebut the government's allegations that they acted "with bad purpose, either to disobey or

disregard the law," and in a "wrongful, immoral, depraved, or evil" manner.  *See* 1st Cir. Pattern

Jury Instructions § 4.18.134 (defining "willfully"); *Arthur Andersen LLP v. United States*, 544

U.S. 696, 705 (2005) (defining "corruptly").  It is impossible to believe that the government did

not discuss this topic with Singer.  The defendants are entitled to any evidence arising from those

discussions in the government's possession.

## B.      Singer's Referral Sources

For similar reasons, the defendants are entitled to evidence about Singer's efforts to foster

sources of referrals to his college-consulting business.  Families such as the Wilsons received

their introductions to Singer from highly reputable financial or educational advisors.  Many were

affiliated with the most respected financial institutions or high schools in the United States.

Singer caused such contacts to portray him as reliable, professional, and expert.  Through such

introductions, Singer minimized the likelihood of clients doubting his representations regarding

the legitimacy of his practices.

Title III recordings produced in discovery show that Singer devoted time and energy to

developing his relationships with his referral sources.  The discovery does not, however, reveal

the full magnitude or character of those relationships, including the extent to which Singer's

references were familiar with his practices, and the degree to which they benefitted financially

(or otherwise) from their referrals.  The defendants specifically requested that information, Ex. 1

¶¶ 27-28, and the Court should compel the government to produce it.

C.     **Colleges' Attitudes Toward Fundraising from Applicants**

To a significant degree, Singer's representations to his clients were true.  Colleges such

as USC were highly focused on fundraising, and openly supported the admissions cases of

potential donors' family members.  As the Giannulli Motion points out, "there is good reason to

believe that numerous USC officials were aware of Singer's operation."  ECF No. 693, at 16, as

evidenced by the fact that Singer met with USC Athletic Director Pat Haden.  USC's more

general attitudes toward fundraising and admissions decisions are likewise important to the

defense.

The government has charged the defendants with, among other things, depriving USC of

the honest services of its employees.  With regard to defendants such as Wilson (whose money

did not go to any college employee), the government's theory is that a college employee violated

fiduciary duties by fundraising for the college's benefit.  This far-fetched view is further

undermined by evidence that USC endorsed the precise type of fundraising at issue here, namely

supporting the admission of applicants related to actual or potential donors.

The motion practice regarding defendant Robert Zangrillo's subpoena to USC has placed

before the Court discovery documents showing that fundraising considerations influenced (a) the

admissions decisions of USC's admissions office, and (b) the admissions recommendations of

USC's athletic department.  *See* ECF No. 546.  For instance, spreadsheets listing applicants

supported by the athletic department, which the Dean of Admissions promised to "handle with

care," regularly highlighted applicants' ties to donors.  *See* ECF Nos. 546-1 to 546-10.  In one

memorable instance, Donna Heinel reported to the Dean that an applicant's family "came

through Athletics due to father endowing our community services position for 5 mil.," to which

the Dean responded:  "I have just been directed to admit this student."  ECF No. 546-14.  USC

was so fixated on fundraising from parents that—with "approv[al] by compliance" and by

Haden, the Athletic Director—the athletic department offered to grant an athletic scholarship to

the daughter of a donor in connection with his promise to make a $500,000 gift.  Ex. 8.[3]  The

discovery contains numerous other examples of USC's pro-donor admissions philosophy, dating

back at least to 2007.

USC's readiness to support the application cases of potential donors directly negates the

allegation of a conspiracy to deprive USC of its right to honest services.  There could be no such

conspiracy where the relevant USC personnel were doing exactly what USC wanted.  Likewise,

any misrepresentation or omission by a USC employee to other USC personnel concerning an

applicant-related donation was not "material" where USC sanctioned the very practice of

soliciting such donations.  *See* 1st Cir. Pattern Jury Instructions § 4.18.1343.

It is not plausible that the government has refrained from discussing this topic with

witnesses from USC, the purported victim.  Information from those witnesses consistent with the

attitude consistently displayed in the discovery is exculpatory.[4]  The defendants made specific

requests relating to this topic, Ex. 1 ¶¶ 16-24, as well as requests for related internal

investigations, *id.* ¶¶ 25-26.  The Court should compel compliance with these requests.[5]

---

[3] In effect, USC allowed the donor to receive a tax deduction for his daughter's tuition costs.

[4] Documents inconsistent with that attitude are "material to preparing the defense" within the meaning of Rule 16.

[5] Among other information, such requests would necessarily cover (a) the identities of all students known to the government to have benefitted from USC's practice of favoring the applications of potential donors; and (b) any communications known to the government among USC personnel, or between USC personnel and Singer, about the candidacies of Johnny Wilson or other defendants' children.  Personal identifying details in such information would presumably be governed by the Protective Order (ECF No. 377).

### D.      Singer's Concealment of His Misrepresentations

The charges require the government to prove that the defendants intended to deceive the alleged victim(s).  *See* 1st Cir. Pattern Jury Instructions § 4.18.1343; *United States v. Sawyer*, 85 F.3d 713, 732 (1st Cir. 1996) ("a demonstrated intent to deceive is required").  To satisfy this requirement, the government relies on inaccuracies in applicants' application materials, principally relating to athletics.  Wilson disputes the government's theory as legally and factually inadequate.  But in any event, any inaccuracies could at most inculpate only defendants who knew about them, believed that they were material, and intended the admissions decision-makers to rely on them to the schools' detriment.

As noted *supra*, Wilson's son was a high-caliber swimmer and water-polo player at the high-school and club levels.  Indeed, the government has collected information from U.S. Water Polo about the son's water polo career, which shows (among other things) that he was selected for the U.S. Olympic Development Program and competed in national championships.  *See* Ex. 9.  It was reasonable for Wilson to expect that his son would be supported for admissions as a bona fide water-polo walk-on.

The discovery indicates that Singer and those working with him were able to introduce misinformation into applicants' materials by taking control of those materials—collecting applicants' log-in credentials, and then revising applications on their own.  The defendants requested additional evidence relating to such practices and thus rebutting the government's allegations of intent to deceive.  Ex. 1 ¶¶ 8, 11.  Again, it is impossible to believe that the government has not discussed this topic with Singer and his staff.  Evidence resulting from these discussions is exculpatory and discoverable.

### E.     Singer's Embezzlement from His Clients

The government maintains that the defendants conspired with Singer for 12 years, from 2007 to 2019.  3d Supers. Ind. ¶ 57.  The charges against each defendant rely on the theory that Singer acted in harmony and concert with his clients—that the clients were full and willing participants in his tactics.

The discovery belies this worldview.  First, numerous recordings and documents show Singer lying to his clients about a myriad of topics, such as his business operations and his professional relationships.  Moreover, financial records in discovery have revealed that Singer embezzled money that he had promised to deliver as donations.  The government acknowledged as much at a recent sentencing, saying with ironic understatement that Singer "did not disclose his middleman fee."  *United States v. Bizzack*, No. 19-cr-10222, ECF No. 34, at 25.  In Wilson's case, for instance, Singer represented that he would receive no compensation relating to Wilson's USC donation, prompting Wilson to pay Singer another $20,000.  *See* 3d Supers. Ind. § 200. Wilson learned only from the discovery that Singer had secretly stole another $100,000—half of Wilson's intended donation to USC.

The defendants requested evidence about Singer's embezzlement of their money, as well as his efforts to prevent them from learning about the fate of that money.  Ex. 1 ¶¶ 12-15.  That evidence directly negates at least the allegations of conspiracy, is therefore exculpatory, and must be produced.

### F.     Singer's Obstruction and Instructions from the Government

The government has alleged that, after agreeing to cooperate with the government and to make recordings on its behalf, Singer obstructed justice by enabling certain of his coconspirators to escape detection.  At his Rule 11 colloquy, Singer clarified that the government had actually directed him to create incriminating evidence against people who had not committed any crime:

"I went into the home and told the dad . . . you haven't done anything wrong yet, so please don't say anything that would be harmful to you guys because you haven't done anything . . . ." *United States v. Singer*, No. 19-cr-10078, ECF No. 24, at 29.

Singer's consensual recordings of Wilson likewise reveal the government's efforts to manufacture arguably incriminating exchanges.  Prior to Singer's cooperation, as noted *supra*, he had assured Wilson that his donations were approved by the President of Harvard.  But subsequently, when under the government's control, Singer occasionally mentioned payments "to coaches" in his calls with Wilson.  The obvious purpose of this ambiguous phrase was to permit the government to argue that Wilson's payment was intended for an individual; but Wilson's reactions show that he continued, obliviously, to believe Singer's earlier representation that Wilson would be donating "to the school":

> SINGER:    So I know when . . . we get the girls in it's a done deal and you're going to take care of your part of it, you're gonna make the payments *to the schools* and the—*to the coaches*.  And that's what I need . . . so I'm not worried about that.
>
> WILSON:    Uh, uh, help me understand the logistics?  I thought I make the payment to you and you made the payment *to the school*.
>
> SINGER:    Correct. That's correct.
>
> WILSON:    Oh you said that *I* make the payments *to the schools*.

Ex. 10, at 9 (first, second, third, and fifth emphases added).  This attempted manipulation contrasts starkly with Singer's statement to a different (and uncharged) parent, eight days later, that "the Georgetown coach . . . wants me to wire him the $100,000 bribe."  Ex. 11, at 2.  The disparity between these conversations—both orchestrated by the government—reveals that Singer knew that Wilson would never have agreed to bribery, and that only vaguely worded trickery could draw Wilson into conversational exchanges potentially useful to the government.

Both Singer's alleged obstruction and the government's instructions to him are discoverable.  Duplicitous conduct by Singer relating to his cooperation would undermine the prosecution's theory of a single mega-conspiracy among dozens of charged and uncharged persons.  And the government's instructions to Singer about his cooperation would undermine both Singer's account and his consensual recordings, by exposing the prosecution's manipulative efforts to ensnare innocent conduct in this case.  The defendants therefore requested these two categories of evidence, which are necessarily in the government's sole possession.  Ex. 1 ¶¶ 29-30.  The Court should compel compliance with those requests.[6]

### G.    Promises, Rewards, and Inducements

Summaries and copies of promises, rewards, and inducements to likely witnesses are a category of exculpatory evidence required expressly by Local Rule 116.2(b)(1) and requested specifically by the defendants.  Ex. 1 ¶ 31.  The government has maintained that it possesses no such evidence, *see* ECF No. 693-1, at 8, but that position is not believable.  Sentencing courts have repeatedly postponed the sentencing hearings of several cooperating witnesses.  Trial will center around Singer, and will require testimony from USC as the victim.  Yet the discovery reveals potential exposure for at least Singer and USC, including exposure that no agreements disclosed by the government address:  Singer and several of his family members engaged in tax evasion and money laundering, running cash from the gambling-related business of Singer's brother through one of Singer's charitable organizations:

> [Singer:]  I do have a brother . . . he's in the credit card business . . . anybody who gambles off shore . . . comes to him . . . [H]e makes a lot of money but he also makes a lot of cash. . . . [Y]ou can't put the cash in the bank. . . . And what he does is like when we're doing the Oakland Soldier gig . . . and we have to put four

---

[6] The defendants reserve the right to make additional, specific requests of the government regarding the circumstances surrounding Singer's alleged obstruction.

or five hundred thousand dollars into the facility to upgrade it . . . we'll pay that to the contractors cash. . . . That's how he gets to utilize his money.

*See* Ex. 12, at 6-7.[7]  USC, as well as some of its employees, likely violated tax laws through the

practice of recycling donations into scholarships for at least one donor's child.  *See* Ex. 8.  The

Court should compel the government to comply with its obligations under *Brady* and the Local

Rules.

### III.    CONCLUSION

For the foregoing reasons, the Court should order the government to produce all

exculpatory evidence within its possession, custody, or control, including all documents and

information responsive to the requests enumerated in Exhibit 1.

Respectfully submitted:

John Wilson,

By his counsel,

/s/ Michael Kendall
Michael Kendall (BBO # 544866)          Andrew E. Tomback (pro hac vice)
Yakov Malkiel (BBO # 689137)            WHITE & CASE LLP
WHITE & CASE LLP                        1221 Avenue of the Americas
75 State Street                         New York, NY 10020
Boston, MA 02109-1814                   Telephone: (212) 819-8428
Telephone: (617) 979-9310               andrew.tomback@whitecase.com
michael.kendall@whitecase.com
yakov.malkiel@whitecase.com

And the defendants listed *supra* note 1, by their respective counsel.

---

[7] Singer also apparently placed his infirm father and his father's caregiver on the payroll of his college counseling business.  *See* Ex. 13.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULES 7.1 AND 112.1

I hereby certify that, before filing this motion, defense counsel attempted in good faith to confer with the government to resolve or narrow the issues.  Defense counsel's efforts included a letter asking the government to identify the issues "actually in dispute" and emails requesting an in-person conference.  The prosecutors declined to narrow the issues and stated that they "believe [they] have satisfied [their] meet-and-confer obligations."

/s/ Michael Kendall
Michael Kendall

## CERTIFICATE OF SERVICE

I hereby certify that the above document is being filed on the date appearing in the header through the ECF system, which will send true copies to the attorneys of record.

/s/ Michael Kendall
Michael Kendall