UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Criminal No.: 19-10080-NMG |
| | ) |
| v. | ) Violations: |
| | ) |
| (1)　DAVID SIDOO, | ) Count One: Conspiracy to Commit |
| (2)　GREGORY COLBURN, | ) Mail and Wire Fraud and Honest |
| (3)　AMY COLBURN, | ) Services Mail and Wire Fraud |
| (4)　GAMAL ABDELAZIZ, | ) (18 U.S.C. § 1349) |
| (5)　DIANE BLAKE, | ) |
| (6)　TODD BLAKE, | ) Count Two: Conspiracy to Commit |
| (7)　I-HSIN "JOEY" CHEN, | ) Federal Programs Bribery |
| (8)　MOSSIMO GIANNULLI, | ) (18 U.S.C. § 371) |
| (13)　ELISABETH KIMMEL, | ) |
| (14)　LORI LOUGHLIN, | ) Count Three: Money Laundering Conspiracy |
| (15)　WILLIAM McGLASHAN, Jr., | ) (18 U.S.C. § 1956(h)) |
| (16)　MARCI PALATELLA, | ) |
| (17)　JOHN WILSON, | ) Counts Four to Ten: Wire Fraud and Honest |
| (18)　HOMAYOUN ZADEH, and | ) Services Wire Fraud; Aiding and Abetting |
| (19)　ROBERT ZANGRILLO | ) (18 U.S.C. §§ 1343, 1346 and 2) |
| | ) |
| Defendants | ) Counts Eleven and Twelve: Federal Programs |
| | ) Bribery; Aiding and Abetting |
| | ) (18 U.S.C. §§ 666(a)(2) and 2) |
| | ) |
| | ) Count Thirteen: Filing a False Tax Return |
| | ) (26 U.S.C. § 7206(1)) |
| | ) |
| | ) Forfeiture Allegations: |
| | ) (18 U.S.C. § 981(a)(1)(C) and |
| | ) 28 U.S.C. § 2461) |
| | ) |
| | ) Money Laundering Forfeiture Allegations: |
| | ) (18 U.S.C. § 982(a)(1)) |
| | ) |

FOURTH SUPERSEDING INDICTMENT

At all times relevant to this Fourth Superseding Indictment:

General Allegations

1.　　Defendant DAVID SIDOO was a resident of Vancouver, Canada.

2.      Defendant GREGORY COLBURN was a resident of Palo Alto, California.

3.      Defendant AMY COLBURN was a resident of Palo Alto, California.

4.      GREGORY COLBURN and AMY COLBURN (together, "the COLBURNS") were a married couple.

5.      Defendant GAMAL ABDELAZIZ, also known as "Gamal Aziz," was a resident of Las Vegas, Nevada.

6.      Defendant DIANE BLAKE was a resident of Ross, California.

7.      Defendant TODD BLAKE was a resident of Ross, California.

8.      DIANE BLAKE and TODD BLAKE (together, "the BLAKES") were a married couple.

9.      Defendant I-HSIN "JOEY" CHEN was a resident of Newport Beach, California.

10.     Defendant MOSSIMO GIANNULLI was a resident of Los Angeles, California.

11.     Defendant LORI LOUGHLIN was a resident of Los Angeles, California.

12.     MOSSIMO GIANNULLI and LORI LOUGHLIN (together, "the GIANNULLIS") were a married couple.

13.     Defendant ELISABETH KIMMEL was a resident of Las Vegas, Nevada and La Jolla, California.

14.     Defendant WILLIAM McGLASHAN, Jr. was a resident of Mill Valley, California.

15.     Defendant MARCI PALATELLA was a resident of Hillsborough, California.

16.     Defendant JOHN WILSON was a resident of Lynnfield, Massachusetts. WILSON was the sole shareholder of Hyannis Port Capital, Inc. ("HPC"). HPC was an "S" Corporation for federal tax purposes.

17.     Defendant HOMAYOUN ZADEH was a resident of Calabasas, California.

18.     Defendant ROBERT ZANGRILLO was a resident of Miami, Florida.

### Other Relevant Persons and Entities

19.     The Edge College & Career Network, LLC, also known as "The Key," was a for-profit college counseling and preparation business based in Newport Beach, California that was established in or about 2007 and registered in California in or about 2012.

20.     The Key Worldwide Foundation ("KWF") was a non-profit corporation founded in or about 2012 and based in Newport Beach, California.   In or about 2013, the Internal Revenue Service ("IRS") approved KWF as an exempt organization under Section 501(c)(3) of the Internal Revenue Code, meaning that KWF was exempt from paying federal income tax, and that individuals who contributed to KWF could deduct those contributions from their taxable income, subject to certain limitations.

21.     ACT, Inc. was a non-profit organization headquartered in Iowa City, Iowa that administered the ACT, a standardized test that is widely used as part of the college admissions process in the United States.

22.     The College Board was a non-profit organization headquartered in New York, New York. Together with Educational Testing Service ("ETS"), a non-profit organization headquartered in Lawrence Township, New Jersey, the College Board developed and administered the SAT, a standardized test that, like the ACT, is widely used as part of the college admissions process in the United States.   The College Board and ETS (together, the "College Board") also developed and administered SAT subject tests, which are also used as part of the college admissions process.

3

23.     Georgetown University ("Georgetown") was a highly selective private university located in Washington, D.C.   Georgetown received benefits in excess of $10,000 annually under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

24.     Stanford University ("Stanford") was a highly selective private university located in Palo Alto, California.   Stanford received benefits in excess of $10,000 annually under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

25.     The University of California at Los Angeles ("UCLA") was a highly selective public university located in Los Angeles, California.   UCLA received benefits in excess of $10,000 annually under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

26.     The University of Southern California ("USC") was a highly selective private university located in Los Angeles, California.   USC received benefits in excess of $10,000 annually under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

27.     Harvard University ("Harvard") was a highly selective private university located in Cambridge, Massachusetts.   Harvard received benefits in excess of $10,000 annually under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

28.     The athletic teams of Georgetown, Stanford, UCLA, USC, and Harvard (collectively, "the Universities") compete in most sports at the Division I level, the highest level of intercollegiate athletics sanctioned by the National Collegiate Athletic Association ("NCAA").

29.     The Universities are commercial enterprises that, among other things, charge tuition for their services.

4

30.     William "Rick" Singer was a resident, variously, of Sacramento and Newport Beach, California.   Singer founded and, together with others, operated The Key and KWF.

31.     Mark Riddell was a resident of Palmetto, Florida.   Riddell was employed at relevant times as the director of college entrance exam preparation at a private college preparatory school and sports academy in Bradenton, Florida.

32.     Igor Dvorskiy was a resident of Sherman Oaks, California.   Dvorskiy was employed as the director of a private elementary and high school located in West Hollywood, California (the "West Hollywood Test Center").   Dvorskiy also served as a compensated standardized test administrator for ACT, Inc. and the College Board.

33.     Niki Williams was a resident of Houston, Texas. Williams was employed as an assistant teacher at a public high school in Houston (the "Houston Test Center").   Williams also served as a compensated standardized test administrator for ACT, Inc. and the College Board.

34.     Gordon Ernst was a resident of Chevy Chase, Maryland and Falmouth, Massachusetts.   Until January 2018, Ernst was employed as the head coach of men's and women's tennis at Georgetown.

35.     Martin Fox was a resident of Houston, Texas.   Fox was employed as the president of a private tennis academy and camp in Houston.

36.     Steven Masera was a resident of Folsom, California.   Until in or about December 2017, Masera was employed as an accountant and financial officer for The Key and KWF.

37.     Mikaela Sanford was a resident of Sacramento, California. Sanford was employed in various capacities for The Key and KWF.

38.     Donna Heinel was a resident of Long Beach, California.   Heinel was employed as the senior associate athletic director at USC.

5

39.     Ali Khosroshahin was a resident of Fountain Valley, California.   Until on or about November 8, 2013, Khosroshahin was employed as the head coach of women's soccer at USC.

40.     Laura Janke was a resident of North Hollywood, California.   Until on or about January 10, 2014, Janke was employed as an assistant coach of women's soccer at USC.   Janke reported to Khosroshahin until his departure from the university.

41.     Jovan Vavic was a resident of Rancho Palos Verdes, California.   Vavic was employed as the head coach of men's and women's water polo at USC.

42.     Jorge Salcedo was a resident of Los Angeles, California.   Salcedo was employed as the head coach of men's soccer at UCLA.

43.     John Vandemoer was a resident of Palo Alto, California.   Vandemoer was employed as the head sailing coach at Stanford.

44.     The Internal Revenue Service ("IRS") was an agency of the United States Department of Treasury responsible for administering and enforcing federal tax laws.

General Background on Standardized Testing and the College Admissions Process

45.     Most selective colleges and universities in the United States require prospective students to submit standardized test scores—typically, either the ACT or the SAT—as part of their application packages.   When submitted, standardized test scores are a material part of the admissions process.

46.     The ACT includes sections on English, mathematics, reading, and science, and is scored on a scale of 1 to 36.

47.     The SAT includes sections on writing, critical reading, and mathematics.   Between 2005 and January 2016, the SAT was scored on a scale of 600 to 2400.   As of March 2016, the SAT has been scored on a scale of 400 to 1600.

48.     The ACT and the SAT are typically administered to large groups of students on specified dates and under strict time limits.  In some instances, however, students with certain learning or other disabilities may qualify for testing accommodations, including extended time, and, in such circumstances, may take the test alone, under the supervision of a test administrator retained by ACT, Inc. or the College Board.

49.     ACT and SAT administrators are agents of ACT and the College Board, respectively, and owe a duty of honest services to those organizations.

50.     Prior to administering the ACT, test administrators must typically certify that they will administer the test in accordance with the ACT Administration Manual, and that they will ensure that the "test materials are kept secure and confidential, used for this examinee only, and returned to ACT immediately after testing."

51.     Similarly, prior to administering the SAT, test administrators must typically certify that they will administer the test in accordance with the SAT coordinator's manual, that the SAT test is the property of the College Board, and that no one other than the student can "open the test book and see the test content."

52.     The ACT tests are typically sent to and from the testing sites via Federal Express, a private, interstate commercial carrier.

53.     The SAT tests are typically sent to and from the testing sites via United Parcel Service ("UPS"), a private, interstate commercial carrier.

54.     The ACT and SAT tests, and the scores students earn on those tests, are the intellectual and physical property of ACT, Inc. and the College Board, respectively.

55.     Many selective colleges and universities in the United States, including all of the Universities, recruit students with demonstrated athletic abilities, and typically apply different

7

criteria when evaluating applications from such students, with the expectation that recruited athletes will be contributing members of the Universities' athletic teams once enrolled. Typically, the admissions offices at the Universities allot a set number of admission slots to each head coach of a sport for that coach's recruited athletes. At each of the Universities, the admissions prospects of recruited athletes are higher—and in some cases substantially higher—than those of non-recruited athletes with similar grades and standardized test scores.

56. Athletic coaches and administrators are employees and agents of the universities that employ them, and owe a duty of honest services to their employers.

57. At each of the Universities, admissions slots, the determination of which students to admit, and the resulting composition of undergraduate classes are important assets of the University, and tuition typically does not cover the cost of a student's attendance.

General Background on Federal Tax Law

58. Pursuant to the Internal Revenue Code and attendant regulations, individual taxpayers generally are required to report their income, attendant tax obligations, and, where appropriate, any claim for a refund on a U.S. Individual Income Tax Return, Form 1040, which must be filed annually with the IRS. IRS Tax Form 1040X is the Amended U.S. Individual Income Tax Return ("Form 1040X"), which is designed for taxpayers who need to correct mistakes or make changes to a previously filed tax return.

59. Domestic corporations are generally required to file an annual income tax return, whether or not they had any taxable income.

60. S corporations are closely held companies that choose to be taxed under Subchapter S of Chapter 1 of the Internal Revenue Code. S corporations are required to report their annual gross receipts or sales, expenses, and resulting income or loss on a Form 1120-S (an "S-Return")

8

filed with the IRS, and to pass any income or loss through to their shareholders for federal tax purposes.  The shareholders, in turn, are required to report that income or loss on their own individual tax returns using a "Schedule K-1," and to pay any tax due as a result.

61.     Section 501(c)(3) of the Internal Revenue Code permits organizations operated exclusively for charitable purposes to be exempt from taxation ("501(c)(3) entities").  Among other things, 501(c)(3) entities must not be organized or operated for the benefit of private interests, and none of the earnings of a 501(c)(3) entity may inure to the benefit of any private shareholder or individual.

62.     To encourage public support of charitable organizations, federal law permits individuals to deduct contributions to 501(c)(3) entities from their taxable income.  Such deductions, which are subject to certain limitations, are typically reported to the IRS on a donor's income tax return, thereby reducing the donor's income tax obligation.

63.     Title 26, United States Code, Section 170 provides, among other things, that no deduction for a charitable contribution of $250 or more shall be allowed unless it is substantiated by a written acknowledgment from the recipient organization indicating whether any goods or services were provided in consideration for the contribution, and, if so, providing a description and good faith estimate of the value of the goods or services provided.  Any deduction must be reduced by the value of goods or services provided in exchange.

<u>The Fraud Conspiracy</u>

64.     From in or about 2007 through in or about February 2019, the defendants conspired with others known and unknown to the Grand Jury to use bribery and other forms of fraud to

facilitate their children's admission to selective colleges and universities in the District of Massachusetts and elsewhere.

Objects and Purposes of the Fraud Conspiracy

65.     The principal objects of the fraud conspiracy were to commit mail and wire fraud, and honest services mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346.   The principal purposes of the conspiracy included:   (1) securing the admission of the defendants' children to selective colleges using fraudulently obtained test scores, bogus academic and athletic credentials, falsified applications, and bribes; (2) enriching Singer and the recipients of the bribes; (3) funding designated university accounts over which the bribe recipients exercised discretion or that otherwise benefited them professionally; and (4) concealing the fraud scheme.

Manner and Means of the Fraud Conspiracy

66.     Among the manner and means by which the defendants and co-conspirators known and unknown to the Grand Jury carried out the fraud conspiracy were the following:

  a. Seeking extended time for their children on college entrance exams, including by having the children purport to have learning disabilities in order to obtain the medical documentation that ACT, Inc. and the College Board typically require before granting students extended time;

  b. Changing the location of the exams to one of two test centers: the Houston Test Center or the West Hollywood Test Center;

  c. Bribing college entrance exam administrators at the Houston Test Center and the West Hollywood Test Center to permit cheating, in violation of the administrators' duty of honest services to ACT, Inc. and the College Board;

10

d. Paying Riddell or another third party to pose as an exam proctor or as a student taking the exam, so that he could secretly provide students with answers during the exam, replace the students' exam responses with his own, or take the exam in place of the students;

e. Having a third party take classes in place of the defendants' children, with the understanding that grades earned in those classes would be submitted as part of the students' college applications;

f. Bribing athletic coaches and university administrators to designate students as purported athletic recruits—with little or no regard for their athletic abilities and, in some cases, even though they did not play the sport they were purportedly recruited to play—and as members of other favored admissions categories, in violation of the coaches' and administrators' duties of honest services to their employers;

g. Fabricating athletic "profiles" containing falsified athletic credentials— including fake honors the students purportedly received, elite athletic teams on which they purportedly played, and staged photographs of the students purportedly engaged in athletic activity—to submit in support of the students' college applications;

h. Submitting falsified applications for admission to colleges and universities in the District of Massachusetts and elsewhere that, among other things, included the fraudulently obtained standardized test scores and class grades, fake awards, athletic activities, and fabricated essays;

11

    i.   Explaining to clients and prospective clients of The Key that these fraudulent schemes were tried-and-true methods of improving exam scores and gaining admission to college that had been successfully employed by many other clients; and

    j.   Concealing the fraud to prevent the scheme from being discovered, including by the Universities and standardized testing entities.

<u>Acts in Furtherance of the Fraud Conspiracy</u>

67.    On various dates from in or about 2007 through in or about February 2019, the defendants and co-conspirators known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the fraud conspiracy:

<u>DAVID SIDOO</u>

68.    In or about the fall of 2011, SIDOO agreed with Singer to pay $100,000 to have Riddell secretly take the SAT in place of SIDOO's older son.

69.    On or about September 16, 2011, SIDOO e-mailed Singer copies of his older son's driver's license and student identification card for the purpose of creating a falsified identification card for Riddell.

70.    Singer used the documents to obtain a falsified identification card bearing Riddell's likeness and the name of SIDOO's older son.

71.    On or about December 1, 2011, Singer sent the falsified identification bearing Riddell's likeness and the name of SIDOO's older son by UPS from California to a hotel in Vancouver, Canada.

72.    On or about December 2, 2011, Riddell flew from Tampa, Florida to Vancouver, Canada to take the SAT in place of SIDOO's older son.   After he arrived, Riddell collected the falsified identification in the name of SIDOO's older son that Singer had sent to the hotel.

12

73.     To minimize suspicion and reduce the chance of getting caught, Singer directed Riddell not to obtain too high a score, because SIDOO's older son had previously taken the exam himself and obtained a total score of 1460 out of a possible 2400.

74.     On or about December 3, 2011, Riddell used the falsified identification card to pose as SIDOO's older son in order to secretly take the SAT in his place.   Riddell earned a total score of 1670 out of a possible 2400.

75.     On or about December 7, 2011, Singer e-mailed Masera a number of receipts from Riddell's trip to Vancouver.   Singer told Masera that the receipts were "[e]xpenses to pay back mark riddell" and that he should "bill david sidoo" for the expenses as well as for Riddell's airfare from Tampa, Florida to Vancouver, Canada.

76.     On or about December 23, 2011, Singer e-mailed a copy of the SAT score Riddell secretly obtained to an administrator at Chapman University, a private university in Orange, California, on behalf of SIDOO's older son.

77.     SIDOO paid Singer $100,000, as agreed, for having Riddell take the SAT for SIDOO's older son.

78.     In or about 2012, SIDOO agreed to pay Singer to have Riddell secretly take a Canadian high school graduation exam in place of SIDOO's older son.

79.     On or about May 15, 2012, Singer purchased plane tickets for Riddell to fly from Tampa, Florida to Vancouver, Canada on June 8, 2012, and to return to Tampa shortly thereafter.

80.     On or about June 9, 2012, Riddell posed as SIDOO's older son in order to secretly take the Canadian high school graduation exam in his place.

81.     In or about the fall of 2012, SIDOO agreed with Singer to pay $100,000 to have Riddell secretly take the SAT in place of SIDOO's younger son.

82.     On or about October 31, 2012, SIDOO e-mailed Singer a document listing his younger son's address and other biographical information for the purpose of creating a falsified identification card for Riddell.

83.     Singer used the information to obtain a falsified identification card bearing Riddell's likeness and the name of SIDOO's younger son.

84.     On or about November 22, 2012, Singer purchased a plane ticket for Riddell to fly from Tampa, Florida to Los Angeles, California on November 29, 2012, in order to take the SAT for SIDOO's younger son.

85.     Singer directed Riddell to obtain a high score because SIDOO's younger son had not previously taken the SAT.

86.     On or about December 1, 2012, Riddell used a falsified identification card to pose as SIDOO's younger son in order to secretly take the SAT in his place at a high school in Orange County, California.   Riddell earned a total score of 2280 out of a possible 2400.

87.     On or about January 21, 2013, SIDOO e-mailed Singer asking for wire transfer instructions.

88.     On or about January 22, 2013, an employee of The Key provided SIDOO with wire instructions for a company bank account in California.

89.     On or about January 23, 2013, SIDOO wired $100,000 to the account, as agreed, for having Riddell take the SAT for SIDOO's younger son.

90.     In 2013 and 2014, the SAT scores Riddell secretly obtained on behalf of SIDOO's younger son were submitted as part of his applications to colleges and universities in the United States, including on or about March 12, 2014 to Georgetown in Washington, D.C.

91.     Singer paid Riddell approximately $5,000 plus travel expenses for each of the three exams Riddell took in place of SIDOO's children.

92.     In or about October 2013, Singer drafted a falsified application essay describing SIDOO's younger son's purported internship with an organization that worked to combat violence among Los Angeles-based gangs.   The essay falsely claimed that SIDOO's younger son had been held up at gun point by gang members in Los Angeles.   Singer e-mailed the essay to SIDOO. SIDOO wrote back with minor changes to the essay, and asked, "can we lessen the interaction with the gangs.   Guns ...?   [T]hat's scary stuff.   Your call you know what they look for."   The essay, without the reference to guns, was later submitted as part of SIDOO's younger son's application for admission to multiple universities.

93.     Beginning in approximately 2015, SIDOO asked Singer if he could have Riddell take either the Graduate Management Admission Test ("GMAT"), a standardized test that is widely used as part of the business school admissions process, or the Law School Admission Test ("LSAT") on behalf of his older son.   In exchange for taking one of the exams, Sidoo agreed to pay Singer a sum of money, and Singer, in turn, agreed to pay Riddell approximately $100,000.

94.     Singer and Riddell researched the security measures in place for both exams.   On or about April 28, 2015, Singer told SIDOO that their plan to have Riddell take the LSAT in place of SIDOO's son was "[n]ot happening due to fingerprinting" requirements on the exam.

95.     On or about December 15, 2016, Riddell used Western Union to wire $520 to China to pay for fraudulent drivers' licenses that he intended to use to pose as SIDOO's older son for the GMAT.   Riddell had the identifications mailed to Singer.   The false identifications were not of high quality, and Riddell ultimately decided not to take the exam on behalf of SIDOO's son.

96.     On or about October 25, 2018, Singer called SIDOO from Boston, Massachusetts. During the call, SIDOO noted that his older son was applying to business school, adding, "I thought you were gonna call me and say I got a 2100 on my GMAT."   In fact, the GMAT is scored on a scale of 200 to 800.   Singer responded, "They don't have a 2100 for the GMAT.   But I would do my best to get it for ya."   SIDOO replied, "I know."

GREGORY COLBURN and AMY COLBURN

97.     In or about the fall of 2017, GREGORY COLBURN and AMY COLBURN agreed with Singer to pay $25,000 to have Riddell pose as a proctor for their son's SAT exam and secretly correct his answers.

98.     On or about September 13, 2017, AMY COLBURN e-mailed her son's high school education specialist, at Singer's direction, to request accommodations for her son's SAT and ACT exams, including the ability to take the exams with extended time over multiple days.

99.     On or about October 10, 2017, AMY COLBURN e-mailed Singer that she was waiting to hear back about whether her son would be granted the requested accommodations.

100.    On or about November 17, 2017, AMY COLBURN e-mailed Singer to tell him that she "got the accommodations we wanted for SAT" for her son.

101.    In or about December 2017, GREGORY COLBURN initiated a transfer of stock to KWF with a value of approximately $24,452.55, to pay for the SAT cheating scheme.

102.    GREGORY COLBURN subsequently issued an additional check in the amount of $547.45 to KWF and wrote "charitable contribution" in the memo line.

103.    On or about December 31, 2017, Singer e-mailed AMY COLBURN an admission ticket for the COLBURNS' son for an SAT exam with extended time to be administered on or about March 10, 2018.

104. On or about December 31, 2017, AMY COLBURN reserved a hotel room for the night of March 9, 2018 in West Hollywood, California for two adults and one child.

105. On or about March 9, 2018, Riddell flew from Tampa, Florida to Los Angeles, California to purport to proctor the SAT for the COLBURNS' son and another student who took the test at the West Hollywood Test Center the same day.

106. Singer directed Riddell not to obtain too high a score on the COLBURNS' son's SAT, so that the score would not raise any red flags.

107. On or about March 10, 2018, after the COLBURNS' son and another student had completed the exam, Riddell reviewed and corrected their answers.

108. Riddell earned a total score of 1190 out of a possible 1600 for the COLBURNS' son.

109. On or about March 12, 2018, Dvorskiy sent the completed SAT exams, via UPS, to the College Board in New Jersey.

110. On or about March 14, 2018, Singer caused KWF to issue a payment of $20,000 to Dvorskiy for facilitating Riddell's cheating on behalf of the COLBURNS' son and another student.

111. On or about March 14, 2018, Singer caused KWF to issue a payment of $20,000 to Riddell for correcting the SAT answers for the COLBURNS' son and another student.

112. In or about 2018, the SAT score Riddell secretly obtained on behalf of the COLBURNS' son was submitted as part of his applications to various colleges and universities.

113. During a call on or about October 24, 2018, Singer told AMY COLBURN that the IRS was auditing KWF and Singer was "not going to mention to the IRS that Mark [Riddell] took the test for [your son]," to which AMY COLBURN replied, "Mm-hmm." Later in the same call, Singer told GREGORY COLBURN that he was not telling the IRS that "Mark Riddell took the

test for [your son] at [the West Hollywood Test Center]."   GREGORY COLBURN replied, "No, I got that.   Yes.   No, I got that."

GAMAL ABDELAZIZ

114.     Beginning in or about the summer of 2017, GAMAL ABDELAZIZ agreed with Singer to pay an amount, ultimately totaling $300,000, for facilitating his daughter's admission to USC as a purported basketball recruit.

115.     On or about July 16, 2017, in an e-mail bearing the subject line "For Me to complete USC athletic profile," Singer asked ABDELAZIZ to send biographical information about his daughter.   The e-mail indicated that the profile would include falsified information related to basketball.

116.     On or about July 27, 2017, Singer requested that ABDELAZIZ provide an action photo of his daughter playing basketball to be used in the athletic profile.   ABDELAZIZ e-mailed a photo that same day.

117.     On or about August 7, 2017, Janke e-mailed Singer a draft of the profile, which falsely described ABDELAZIZ's daughter as having received numerous athletic honors.   In the cover e-mail, Janke wrote, "Profile for [ABDELAZIZ's daughter]. . . . Let me know if you want me to add any other awards to her profile or if you think that is enough."   Singer forwarded Janke's e-mail and false profile to ABDELAZIZ.

118.     On or about October 5, 2017, Heinel presented ABDELAZIZ's daughter to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials— obtained the subcommittee's approval to admit her to USC as a basketball recruit.

119.     On or about December 4, 2017, Heinel instructed Singer that a payment of $200,000 for ABDELAZIZ's daughter should be directed to the gift account for the Galen Center,

18

the arena for USC's basketball and volleyball programs.   Subsequently, Heinel and Singer agreed that instead of directing this money to USC, Heinel would receive payments of $20,000 per month personally in exchange for her assistance in securing the admission of ABDELAZIZ's daughter, and the children of other Singer clients, to USC as purported athletic recruits.

120.    On or about March 26, 2018, after USC mailed ABDELAZIZ's daughter a formal acceptance letter, ABDELAZIZ wired $300,000 to KWF.

121.    In or about July 2018, KWF began paying Heinel $20,000 per month in exchange for facilitating the admission of ABDELAZIZ's daughter, and the children of other Singer clients, to USC as purported athletic recruits.   The payments included at least one check that Singer mailed from Massachusetts to Heinel in California on or about January 3, 2019.

122.    On or about January 3, 2019, Singer called ABDELAZIZ from Boston, Massachusetts.   During the call, Singer told ABDELAZIZ, in substance, that Heinel, when asked why ADBELAZIZ's daughter was not playing basketball for USC, had responded that she had suffered an injury.   ADBELAZIZ confirmed that he would provide the same cover story if questioned.

### DIANE BLAKE and TODD BLAKE

123.    Beginning in or about 2017, DIANE BLAKE and TODD BLAKE agreed with Singer to pay an amount, ultimately totaling $250,000, to facilitate their daughter's admission to USC as a purported volleyball recruit.

124.    On or about January 29, 2017, DIANE BLAKE e-mailed Singer, copying TODD BLAKE, noting that their daughter was interested in attending USC but that DIANE BLAKE assumed the school was "in the reach stretch category."   Singer responded: "There is a way to

garner a guarantee at USC if that is first choice but best to discuss without [your daughter] being present."   DIANE BLAKE replied, copying TODD BLAKE: "Look forward to discussing."

125.   On or about June 28, 2017, DIANE BLAKE e-mailed Singer, copying TODD BLAKE: "We are fully committed to the USC plan."

126.   On or about August 7, 2017, Janke e-mailed Singer a falsified volleyball profile for the BLAKES' daughter.   Approximately one week later, Singer forwarded the profile to Heinel.

127.   Heinel presented the BLAKES' daughter to the USC subcommittee for athletic admissions as a purported volleyball recruit on or about September 7, 2017.

128.   On or about September 14, 2017, Heinel e-mailed Singer a letter, addressed to the BLAKES' daughter, notifying her of her conditional admission to USC as a student athlete. Singer forwarded the letter to the BLAKES that same day.   TODD BLAKE responded by thanking Singer and stating that he would register his daughter with the NCAA Eligibility Center as instructed in the letter.

129.   On or about September 16, 2017, Singer instructed TODD BLAKE to send a check for $50,000 to "USC Women's Athletics c/o Senior Women's Administrator Donna Heinel." TODD BLAKE mailed a $50,000 check to USC Women's Athletics that same day.

130.   On or about February 5, 2018, TODD BLAKE wired $200,000 to KWF.

131.   On or about October 22, 2018, a USC Assistant Athletic Director e-mail TODD BLAKE, "I see you gave a gift to women's basketball last year. . . .   Was that for a particular reason?  Have you looked at annual scholarship support through the Trojan Athletic Fund[?]" TODD BLAKE falsely replied, "My financial gift was a one-time event, to commemorate a friend who was a former women's basketball coach. Given that USC Annenberg School of

Communications (my daughter's school) wants me to donate money to them, I expect to direct my contributions to that cause going forward."

132.    Three days later, in a call on or about October 25, 2018, TODD BLAKE told Singer, in sum and substance, that USC approached him "from a fund-raising perspective," because of his prior payment to USC.   TODD BLAKE told Singer that, in response to two requests from USC development personnel, he had been "very like evasive," adding, "I've effectively evaded both [requests], you know, answering anything there.   So we're good."

133.    In the same call, Singer told TODD BLAKE that he was not going to tell the IRS that the payment was for the BLAKES' daughter "getting in through Donna Heinel and women's volleyball."   TODD BLAKE replied, "Right."   TODD BLAKE later asked Singer, "And will I get contacted [by the IRS] and if so how would you like me to answer?"

134.    In a call on or about February 22, 2019, Singer told DIANE BLAKE that USC had received a subpoena for athletic records for the past 12 years.   Singer said he wanted to let DIANE BLAKE know about the subpoena "since [the BLAKES' daughter] was accepted through volleyball, but wasn't really a volleyball player in reality at [the] USC level[.]"   DIANE BLAKE responded, "Yeah."

### I-HSIN "JOEY" CHEN

135.    In or about the spring of 2018, CHEN agreed with Singer to pay $75,000 to have Riddell pose as a proctor for his son's ACT exam and secretly correct his answers.

136.    On or about April 10, 2018, Singer caused KWF to pay Dvorskiy $20,000 for facilitating Riddell's cheating on behalf of CHEN's son and another student.

137.    On or about April 13, 2018, Riddell flew from Tampa, Florida to Los Angeles, California.

138.    The following day, on or about April 14, 2018, CHEN's son took the ACT at the West Hollywood Test Center.   Riddell purported to proctor the exam and, after CHEN's son had completed it, corrected his answers.

139.    On or about April 16, 2018, CHEN's company wired $75,000 to The Key in exchange for having Riddell cheat on CHEN's son's ACT.

140.    On or about April 17, 2018, Singer caused KWF to pay Riddell $20,000 for correcting the ACT answers for CHEN's son and another student.

141.    On or about April 18, 2018, Dvorskiy sent the completed exams, via Federal Express, to ACT, Inc. in Iowa City.

142.    In or about 2018, the ACT score Riddell secretly obtained on behalf of CHEN's son was submitted via interstate wire communication to various colleges and universities, including, on or about October 8, 2018, to Emerson College in Boston, Massachusetts.

143.    On or about February 21, 2019, Singer called CHEN and asked: "[W]e both agree that Mark took the test for [your son], right?" CHEN responded: "Yeah."

### MOSSIMO GIANNULLI and LORI LOUGHLIN

144.    In or about 2016 and 2017, GIANNULLI and LOUGHLIN agreed with Singer to pay an amount, ultimately totaling $500,000, to facilitate the admission of their two daughters to USC as purported crew recruits.   GIANNULLI had previously been introduced to Singer by an unindicted co-conspirator.

145.    On or about April 22, 2016, GIANNULLI, copying LOUGHLIN, sent an e-mail to Singer, noting, "I have some concerns and want to fully understand the game plan and make sure

we have a roadmap for success as it relates to [our older daughter] and getting her into a school other than ASU!"   Singer responded, "If you want [U]SC I have the game plan ready to go into motion. Call me to discuss."

146.   On or about August 18, 2016, Singer sent an e-mail to GIANNULLI and LOUGHLIN stating that he needed a copy of their older daughter's transcript and test scores "very soon while I create a coxswain portfolio for her.   It would probably help to get a picture of her on an ERG in workout clothes like a real athlete too."   GIANNULLI replied, the next day, "Fantastic. Will get all."

147.   On or about September 7, 2016, GIANNULLI sent Singer an e-mail attaching a photograph of his older daughter on an ergometer.

148.   On or about October 27, 2016, Heinel presented the GIANNULLIS' older daughter to the USC subcommittee for athletic admissions, and—based on falsified athletic credentials—obtained the subcommittee's approval to admit her to USC as a crew recruit.

149.   On or about October 29, 2016, Singer e-mailed GIANNULLI:   "Please send $50K payment to the person below[:] Donna Heinel, Senior Women[']s Associate Athletic Director[,] c/o of USC Athletics[.]"

150.   On or about November 1, 2016, GIANNULLI replied to Singer: "I told biz mgr to Fed Ex [the payment] today."

151.   On or about March 30, 2017, Singer's bookkeeper e-mailed a $200,000 invoice to GIANNULLI and LOUGHLIN.   The invoice thanked GIANNULLI and LOUGHLIN for their pledge to KWF and further stated that their "private contribution" of $200,000 was now due.

152.    On or about April 2, 2017, in response to an e-mail attaching a $200,000 invoice, GIANNULLI e-mailed Singer's bookkeeper and LOUGHLIN, "We are currently on holiday in the Bahamas but will gladly handle this when home next week."

153.    On or about April 10, 2017, GIANNULLI forwarded the $200,000 invoice to his own financial advisor for payment, writing, "Good news my daughter . . . is in [U]SC . . . . bad is I had to work the system."

154.    On or about the same day, after the GIANNULLIS' daughter received a formal acceptance letter from USC, GIANNULLI wired $200,000 to KWF.

155.    On or about April 10, 2017, GIANNULLI e-mailed Singer, copying LOUGHLIN, "I wanted to thank you again for your great work with [our older daughter], she is very excited and both Lori and I are very appreciative of your efforts and end result!"   When Singer responded by asking if there was a "similar need anywhere so we do not lose a spot" for their younger daughter, LOUGHLIN replied, "Yes USC for [our younger daughter]!"

156.    On or about July 14, 2017, Singer directed Janke to prepare a falsified crew profile for the GIANNULLIS' younger daughter.

157.    On or about July 16, 2017, Singer e-mailed the GIANNULLIS requesting that they send an "action picture" for the crew profile.   Singer indicated that the profile would present their younger daughter, falsely, as a crew coxswain for the L.A. Marina Club team.

158.    On or about July 28, 2017, GIANNULLI, copying LOUGHLIN, e-mailed Singer a photograph of their younger daughter on an ergometer.

159.    On or about November 2, 2017, Heinel presented the GIANNULLIS' younger daughter to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials—obtained the subcommittee's approval to admit her to USC as a crew recruit.

160.     On or about November 29, 2017, Singer directed GIANNULLI and LOUGHLIN to "send a 50K check to USC and the address is below.   Additionally the rest of the 200K will be paid to our foundation a 501 3C [sic] after [your younger daughter] receives his [sic] final letter in March."

161.     On or about December 5, 2017, GIANNULLI directed his business manager to send a $50,000 check to Heinel.

162.     On or about February 6, 2018, GIANNULLI wired $200,000 to KWF.

163.     On or about October 25, 2018, Singer called GIANNULLI from Boston, Massachusetts.   During that call, Singer told GIANNULLI, "Donna called me couple weeks ago and says, 'Hey, uh,' you know, 'going forward, can you use the same format you used for [the GIANNULLIS' older daughter] and [their younger daughter], and the regattas that you put in there, for any girls, going forward, that don't row crew?'   So it's funny how-- I thought I was just makin' stuff up."   GIANNULLI replied, "Uh, right."

164.     On or about November 29, 2018, Singer called LOUGHLIN from Boston, Massachusetts.   During the call, Singer said, in sum and substance, that KWF was being audited by the IRS, which was asking about the two payments of $200,000 by the GIANNULLIS.   Singer added, "So I just want to make sure that you know that, one, that you're probably going to get a call and that I have not told them anything about the girls going through the side door, through crew, even though they didn't do crew to get into USC.   So I—that is—all I told them was that you guys made a donation to our foundation to help underserved kids."   LOUGHLIN replied, "Um-hmm."

## ELISABETH KIMMEL

165.  Beginning in or about 2012, KIMMEL agreed to pay Singer an amount, ultimately totaling $275,000, to facilitate her daughter's admission to Georgetown as a purported tennis recruit.

166.  In or about September 2012, KIMMEL asked Singer for Ernst's contact information.

167.  On or about November 26, 2012, a Georgetown admissions director e-mailed KIMMEL's daughter, copying Ernst, that, "[i]n order to send you your likely letter, your application needs to be complete.  Although Coach Ernst has shared with me your unofficial SAT score report, we have not received the scores officially from the College Board and this is a requirement for admission."  Ernst forwarded this e-mail to Singer, who forwarded it to KIMMEL.

168.  On or about November 27, 2012, KIMMEL e-mailed Singer, and asked whether her daughter should "avoid discussing field hockey"—a sport she actually played—in her Georgetown alumni interview because it might "raise red flags."

169.  On or about December 20, 2012, the Georgetown admissions department sent KIMMEL's daughter a letter stating that the "Committee on Admissions ha[d] conducted an initial review of [her] application to the Class of 2017 at the request of Mr. Gordie Ernst, Tennis Coach" and "ha[d] rated [her] admission as 'likely.'"

170.  On or about January 16, 2013, Singer e-mailed KIMMEL and her spouse that "we need to collect monies to put into an escrow account for [your daughter's] acceptance to Georgetown.  As agreed to once the Likely Letter comes we need to have a deposit of --- you have two distribution amounts based on your foundation?  Normally a family provides us no less than

half - 125 upon acceptances of the Likely and the other half within a week of the final acceptance."
KIMMEL replied, "Please let me know the name of the payee and I will have the first check
prepared today."

171.    On or about April 2, 2013, Masera e-mailed KIMMEL the following:   "I
understand that you have received a GU acceptance letter.   Would you like me to revise the
Foundation letter to reflect the full $200,000.00 payment?"   KIMMEL replied that she would
"need to make two payments, one before June and the other after June 1."   KIMMEL added, "my
memory was that the total amount was higher-- $200 would be great, but I think we agreed on
$275K over the two payments."

172.    On or about April 4, 2013, KIMMEL caused the Meyer Charitable Foundation, a
family foundation on which KIMMEL and her spouse served as officers, to issue a check to KWF
in the amount of $100,000.

173.    On or about June 19, 2013, KIMMEL caused the Meyer Charitable Foundation to
issue a second check to KWF in the amount of $170,000.

174.    On or about July 2, 2013, KIMMEL caused the Meyer Charitable Foundation to
issue a third check to KWF in the amount of $5,000.

175.    Between on or about September 5, 2012 and on or about September 6, 2013, Singer
caused The Key, and later KWF, to pay Ernst $244,000 in monthly installments.

176.    Beginning in or about 2017, KIMMEL agreed with Singer to pay an amount,
ultimately totaling $250,000, to facilitate her son's admission to USC as a purported track and
field recruit.

177.    On or about August 10, 2017, Singer directed Janke to create a falsified athletic
profile for KIMMEL's son.   The profile falsely described KIMMEL's son as an elite high school

pole vaulter and included a photograph purporting to be of KIMMEL's son pole vaulting but which, in fact, depicted another individual.

178.    On or about October 5, 2017, Heinel presented KIMMEL's son to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials—obtained the subcommittee's approval to admit him to USC as a track and field recruit.

179.    On or about October 23, 2017, the Meyer Charitable Foundation issued a $50,000 check to the USC Women's Athletics Board.   The check was signed by KIMMEL's spouse.

180.    On or about February 1, 2018, KIMMEL caused the Meyer Charitable Foundation to issue a check to KWF in the amount of $200,000.

181.    On or about July 26, 2018, KIMMEL and her spouse called Singer to explain that their son's advisor at USC had inquired about his status as a track athlete.   KIMMEL asked Singer: "[S]o we have to hope this advisor doesn't start poking around?"

### WILLIAM McGLASHAN, Jr.

182.    In or about the fall of 2017, McGLASHAN agreed to pay Singer $50,000 to arrange for Riddell to purport to proctor his son's ACT exam and secretly correct his son's answers.

183.    On or about October 21, 2017, McGLASHAN received an e-mail from his son's high school notifying McGLASHAN that his son had received an accommodation from the ACT to take the test with "double time."   The e-mail further stated that McGLASHAN's son would "be proctored at school," and directed him to contact the school at least four weeks prior to the exam so that a proctor could be scheduled.

184.    On or about November 13, 2017, McGLASHAN's wife e-mailed a learning services assistant at her son's high school and confirmed that her son would take the exam at his high school on December 20 and 21, 2017.

185.    On or about November 20, 2017, Singer, McGLASHAN and Dvorskiy completed an ACT "Request for Arranged Testing" form to move McGLASHAN's son's ACT exam from his high school to the West Hollywood Test Center in Los Angeles.   After the form was completed, Singer instructed McGLASHAN to send it to the ACT.

186.    On or about November 28, 2017, McGLASHAN e-mailed a counselor at his son's high school as follows:   "I am in LA with [my son] on Dec 9, and Rick ([my son's] college councilor [sic]) has arranged for [my son] to take the ACT test at a school while we are there over the weekend."   The school counselor asked if the school should cancel McGLASHAN's son's ACT exam that had been scheduled to be administered at his own high school on December 20 and 21, 2017.   McGLASHAN responded:   "That is correct. . . .   Just decided on this alternative strategy today."

187.    On or about November 30, 2017, Singer's accountant sent an e-mail to McGLASHAN attaching an "invoice and information [f]or payment regarding [the West Hollywood Test Center]."   The attached invoice was for $50,000, with the description on the invoice listed as: "Regarding [the West Hollywood Test Center]."

188.    On or about December 4, 2017, McGLASHAN sent an e-mail to his assistant directing her to confirm that a check had been "fedexed" to KWF.   McGLASHAN's assistant responded:   "I have the check taken care of, already confirmed it will be sent via Fed-Ex."   That same day, McGLASHAN directed his assistant to book him a flight to Los Angeles leaving on the evening of Friday, December 8, 2017, and returning in the early afternoon of the following day, December 9, 2017.

189.    On or about December 6, 2017, McGLASHAN made a purported donation of $50,000 to KWF from his personal charitable donation fund.

190.   On or about December 8, 2017, at approximately 6:09 p.m., McGLASHAN departed San Francisco by private jet and arrived in Los Angeles at approximately 7:05 p.m.   That same day, Riddell traveled from Tampa, Florida to Los Angeles to purport to proctor the ACT exam for McGLASHAN's son and two other students.

191.   On or about December 9, 2017, McGLASHAN's son took the ACT exam at the West Hollywood Test Center.   After McGLASHAN's son completed the exam, Riddell corrected his answers.

192.   McGLASHAN and his son departed Los Angeles by private jet at approximately 3:21 p.m. on December 9, 2017, and arrived in San Francisco at approximately 4:15 p.m.

193.   On or about December 10, 2017, Riddell returned to Tampa, Florida from Los Angeles.

194.   On or about December 13, 2017, Dvorskiy sent McGLASHAN's son's completed ACT exam, via Federal Express, to ACT, Inc. in Iowa City. The "ACT Administration and Payment Report" for the exam falsely stated that the exam had been administered over two days, December 9 and 10, 2017.

195.   On or about December 15, 2017, Singer caused KWF to pay Dvorskiy $40,000 for facilitating Riddell's cheating on behalf of McGLASHAN's son and other students.

196.   On or about December 16, 2017, Singer caused KWF to pay Riddell $35,000 for correcting the exam answers for McGLASHAN's son and other students.

197.   On or about January 10, 2018, which was the day that McGLASHAN's son's ACT score became available online, McGLASHAN sent Singer a text message stating:   "You have a very relieved and motivated young man!   Very grateful."   Singer replied:   "Thank you.   It takes a lot of pressure off[.]"   McGLASHAN responded:   "Yes!"

198. On or about January 26, 2018, McGLASHAN's son's high school counselor e-mailed McGLASHAN and his son a list of colleges for McGLASHAN's son to consider. The list included Boston University and Northeastern University, both of which are located in the District of Massachusetts.

199. On or about April 27, 2018, McGLASHAN's son's high school counselor e-mailed McGLASHAN and his son a second list of colleges to consider. The list again included Northeastern University.

200. On or about October 24, 2018, the ACT score Riddell secretly obtained on behalf of McGLASHAN's son was submitted to various colleges and universities, including Northeastern University, in Boston, Massachusetts, via wire communication in interstate commerce.

201. Beginning in or about the summer of 2018, McGLASHAN agreed with Singer to pay an amount, ultimately totaling $250,000, to facilitate his son's admission to USC as a purported football recruit.

202. In a call on or about July 30, 2018, Singer told McGLASHAN, in substance, that he had a "side door" at USC that would allow McGLASHAN's son to be admitted "through athletics." Singer told McGLASHAN that the side door would cost $250,000, and that, in exchange for this payment, McGLASHAN's son would be accepted to USC. Singer further explained that after McGLASHAN received an "unofficial" admission letter for his son, McGLASHAN would need to make a payment of $50,000 to "Women's Athletics." Then, after McGLASHAN's son received his "official letter," McGLASHAN would owe the remaining $200,000. Singer also discussed with McGLASHAN the need to create a falsified athletic profile for McGLASHAN's son, which Singer said he had done "a million times," and the need for McGLASHAN to keep the scheme quiet.

203.    On or about August 22, 2018, Singer left McGLASHAN a voicemail in which Singer said that he met with USC and that, because McGLASHAN's son's high school did not have a football team, Singer would "make him a kicker/punter" and create a football profile using "Photoshop," so that McGLASHAN's son could be "walk[ed] … through with football" at a USC "sub-committee meeting."

204.    In a follow-up call that same day, Singer told McGLASHAN that he needed pictures of McGLASHAN's son "playing multiple sports, or something where you can kind of see his face a little bit in action," so that he could "Photoshop him onto a kicker."   During the call, McGLASHAN confirmed his understanding that the "deal" required him to make an initial payment of $50,000, followed by a second payment of $200,000.

205.    On or about August 24, 2018, Singer sent an e-mail to McGLASHAN with the subject line "USC needs."   Singer wrote:   "Bill can you get me an unofficial transcript, pdf of test scores and an action sports photo of [your son]."

206.    On or about August 25, 2018, McGLASHAN sent a text message to his son, asking "Did you get the photos?"   McGLASHAN's son replied that his brother had taken the photos and was uploading them to his computer.

207.    On or about August 25, 2018, McGLASHAN sent Singer his son's fraudulently obtained ACT score, high school transcript, and photos that depicted his son running and posing. Singer forwarded the materials to Janke with instructions to create a falsified profile of McGLASHAN's son as a "kicker/punter."

208.    On or about September 8, 2018, Singer e-mailed Heinel a profile that falsely depicted McGLASHAN's son as a football place kicker and punter.

209.    On or about September 29, 2018, McGLASHAN sent a text message to Singer asking: "So when will we know definitively on USC?"   Singer replied the next day: "They had their first Subco last week- football has a while before going through Subco- later in the fall as it is in season."

## MARCI PALATELLA

210.    Beginning in or about 2016, PALATELLA agreed to pay Singer $75,000 to arrange for Riddell to pose as a proctor for her son's SAT exam and secretly correct his answers. PALATELLA also agreed with Singer to pay an amount, ultimately totaling $500,000, to facilitate her son's admission to USC as a purported football recruit.

211.    On or about March 14, 2016, Singer e-mailed PALATELLA an assessment of which schools he believed her son could be admitted to "with the fudging of the scores."

212.    On or about February 27, 2017, after her son was granted extended time on the SAT, PALATELLA e-mailed her son's high school that he would be "taking his SAT test at [the West Hollywood Test Center] in Los Angeles on March 11 and 12, 2017."

213.    On or about March 7, 2017, PALATELLA's company wired $75,000 to KWF.

214.    On or about March 7, 2017, Singer caused KWF to issue a payment of $25,000 to Dvorskiy for facilitating Riddell's cheating on behalf of PALATELLA's son.

215.    On or about March 10, 2017, Riddell flew from Tampa, Florida to Los Angeles, California to purport to proctor the SAT for PALATELLA's son at the West Hollywood Test Center.

216.    On or about March 11, 2017, after PALATELLA's son completed the SAT exam at the West Hollywood Test Center, Riddell reviewed and corrected his answers.

217.    On or about March 11, 2017, Singer caused KWF to issue a payment of $10,000 to Riddell for correcting the SAT answers for PALATELLA's son.

218.    On or about March 13, 2017, Dvorskiy sent the completed SAT exam, via UPS, to the College Board in New Jersey.

219.    On or about July 27, 2017, PALATELLA e-mailed Singer a photo of her son in his football uniform and asked:  "Will this work?"  Singer forwarded the photo to Janke, together with PALATELLA's son's grade point average and the fraudulently obtained SAT score.  Janke created an athletic profile for PALATELLA's son that included falsified football credentials.

220.    On or about November 16, 2017, Heinel presented PALATELLA's son to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials—obtained the subcommittee's approval to admit him to USC as a football recruit.

221.    On or about December 1, 2017, PALATELLA mailed Heinel a check in the amount of $100,000, made payable to USC Women's Athletic Board.

222.    On or about May 1, 2018—after PALATELLA's son received a formal acceptance letter from USC—PALATELLA's company wired $400,000 to KWF.

223.    On or about October 24, 2018, Singer called PALATELLA from Boston, Massachusetts.  During the call, PALATELLA agreed to mislead the IRS if anyone inquired about her payments to KWF.

224.    On or about January 9, 2019, PALATELLA exchanged text messages with a friend regarding the money PALATELLA paid to KWF for her son's admission to USC.  Her friend stated:  "I can only think the money was spent wisely for school or else wise," to which PALATELLA replied:  "I don't think most of it went to the school between us only.  Please never ever repeat anything."

## JOHN WILSON

225.    Beginning in or about 2013, WILSON agreed to pay Singer an amount, ultimately totaling $220,000, to facilitate his son's admission to USC as a purported water polo recruit. Beginning in or about 2018, WILSON agreed to pay Singer an amount, ultimately totaling $1.5 million, to facilitate his twin daughters' admissions to Stanford and Harvard as purported athletic recruits.

226.    On or about February 10, 2013, WILSON e-mailed Singer and asked for the "deadline to decide on side door for USC or BC or Georgetown etc[.] this year" and to "confirm for which schools is side door option really viable." Singer responded that the deadline for USC and Boston College was "mid July."

227.    On or about August 24, 2013, WILSON e-mailed Singer about the timing of his payments to Vavic, the USC water polo coach, to secure his son's admission as a purported water polo recruit.  WILSON wrote:  "What does Jovan need by [S]ept 20?  Do u have what we need? Do I make the first payment to u then?"

228.    On or about October 4, 2013, Vavic advised Singer that he needed an athletic profile for WILSON's son and that it "needs to be a good resume."

229.    On or about October 12, 2013, WILSON e-mailed Singer requesting an update on the college application process.   Singer replied that Vavic had WILSON's son's information and "asked me to embellish his profile more, which I am doing."

230.    On or about October 13, 2013, WILSON e-mailed Singer asking:   "When is Jovan [Vavic] going to be able to give us decision on USC?   And when do I pay u?   Was it 50% in nov? 50% in feb when we get final official notice?"   Singer replied that "Jovan [Vavic] will provide [your son's] info to admission[s] when he does his other guys over the next month.   No payment

of money till he gets a verbal and written from admissions and then 50 percent to a savings account

I set up.   Then the remainder upon an acceptance letter in March with everyone else."

231.    On or about October 19, 2013, Singer forwarded WILSON a water polo profile for

WILSON's son that included fabricated awards.

232.    Singer subsequently provided Vavic with the falsified profile, which included

fabricated awards.

233.    On or about February 26, 2014, Vavic e-mailed a USC athletics administrator that

WILSON's son "would be the fastest player on our team, he swims 50 y in 20 [seconds], my fastest

players are around 22 [seconds], this kid can fly."

234.    On or about February 28, 2014, the USC subcommittee for athletic admissions

approved the admission of WILSON's son as a water polo recruit based on the falsified athletic

credentials.

235.    On or about March 1, 2014, WILSON e-mailed Singer under the subject line "USC

fees."   WILSON wrote:

> Thanks again for making this happen!   Pls give me the invoice.   What are the
> options for the payment?   Can we make it for consulting or whatever from the
> [K]ey so that I can pay it from the corporate account?

Singer replied that he could make the invoice for business consulting fees, so that WILSON could

"write [it] off as an expense."

236.    On or about April 7, 2014, after USC mailed WILSON's son a formal acceptance

letter, WILSON's company wired a total of $220,000 to Singer, including $100,000 to KWF,

$100,000 to The Key, and $20,000 to Singer directly.

237.    On or about April 16, 2014, Singer withdrew a $100,000 cashier's check, made out

to "USC Men's Water Polo," from The Key's account.   The "Purpose/Remitter" identified on the

check was "Wilson Family."

238.    On or about September 29, 2018, WILSON asked Singer about "side door" opportunities for his twin daughters.   Singer explained, in sum and substance, that "by the side door" he may be able to tell the sailing coach:   "'Hey, this family's willing to make the contributions.   She could be on your team.   She is a sailor.   She may not be up to the level you are, but she can con-- you know, you're gonna get a benefit, and the family's gonna get benefit.'"

239.    On or about October 15, 2018, Singer called WILSON to discuss various "side door" options for WILSON's daughters and noted that for any of those options, WILSON's daughters "don't have to play.   They just-- that's the path I'm gonna get 'em in on."   WILSON responded:   "Gotcha."

240.    On or about October 17, 2018, WILSON's executive assistant e-mailed him:   "I just received a text with Bank info for The Key Worldwide Foundation, what is this for?"   WILSON replied:   "It's a $500k donation I am going to make this year.   Tax write off and help getting into colleges."

241.    On or about the same day, WILSON's company, HPC, wired $500,000 to an account in the name of KWF in the District of Massachusetts.

242.    On or about October 27, 2018, Singer, who was located in the District of Massachusetts, told WILSON that he had secured a "side door" deal for one of WILSON's daughters with the Stanford sailing coach, John Vandemoer, and that the deal with Vandemoer was hidden from Stanford.

243.    On or about November 29, 2018, Singer, who was located in the District of Massachusetts, told WILSON that he had secured an admissions spot at Harvard through a purported "senior women's administrator" at the university, and that, in exchange for an initial

$500,000 payment to her, as well as a subsequent payment, the administrator would designate one of WILSON's daughters as an athletic recruit.

244.    On or about December 11, 2018, WILSON's company, HPC, wired another $500,000 to the Massachusetts account in the name of KWF.

## HOMAYOUN ZADEH

245.    Beginning in or about 2016, Zadeh agreed with Singer to pay an amount, ultimately totaling $100,000, to facilitate his daughter's admission to USC as a purported lacrosse recruit.

246.    On or about December 16, 2016, ZADEH provided Singer with a photograph of his daughter cheerleading.   Singer forwarded the photograph to Janke and directed her to fabricate a lacrosse profile for ZADEH's daughter.

247.    On or about March 15, 2017, Heinel presented ZADEH's daughter to the USC subcommittee for athletic admissions, and—based on falsified athletic credentials—obtained the subcommittee's approval to admit her to USC as a lacrosse recruit.

248.    On or about March 17, 2017, KWF sent $50,000 to the USC Women's Athletics Board.

249.    In a text message on or about March 20, 2017, ZADEH told Singer that his daughter was concerned that "she did not get in on her own merits.   I have not shared anything about our arrangement but she somehow senses it."

250.    During the same text exchange, Singer told ZADEH that he could "make the 100k payment over the next 6 months starting April 1st.   You can send to my foundation as a donation/write off or if you have your own company we can invoice you as a business consulting fee from our profit business and you write off as an expense."

251.    Between on or about May 30, 2017 and on or about September 7, 2018, ZADEH made or caused the following payments to be made to KWF:

| Date Posted to KWF Account | Amount |
|---|---|
| 5/30/2017 | $5,000 |
| 9/25/2017 | $10,000 |
| 10/23/2017 | $10,000 |
| 12/27/2017 | $10,000 |
| 2/15/2018 | $5,000 |
| 3/26/2018 | $5,000 |
| 4/27/2018 | $5,000 |
| 9/7/2018 | $5,000 |

252.    On or about October 25, 2018, Singer called ZADEH from Boston, Massachusetts. During the call, Singer told ZADEH, in sum and substance, that KWF was being audited by the IRS.  Singer said:  "I'm not going to tell the IRS that we got [your daughter] in through lacrosse." ZADEH responded:  "Right."  Singer continued:  "And Donna Heinel at USC."  ZADEH replied:  "Right." Singer also said:  "[Y]ou know, we created a profile that wasn't real." ZADEH responded:  "Right."

## ROBERT ZANGRILLO

253.    Beginning in or about 2017, ZANGRILLO agreed with Singer to pay for a third party to complete online high school courses for his daughter, with the understanding that credits earned in those classes would be submitted to colleges on his daughter's behalf, either as part of her college applications or to serve as proof of her high school graduation.  ZANGRILLO also agreed with Singer to pay for a third party to complete online college courses for his daughter, with the understanding that grades earned in those classes would be submitted as part of his daughter's college applications.

254.     In or about March 2017, even though she ultimately did not attend the university, ZANGRILLO's daughter was admitted to Boston University for the fall of 2017.  At the time, ZANGRILLO's daughter was enrolled in an online high school.

255.     In or about the spring of 2017, ZANGRILLO's daughter was enrolled in five courses through her online high school, all of which, once completed, would fulfill credits she needed to graduate.  ZANGRILLO's daughter had only partially completed each of these courses.

256.     On or about June 14, 2017, Sanford sent an e-mail to another individual, Co-Conspirator 1 ("CC-1"), containing the log-in information for ZANGRILLO's daughter's online high school.  Sanford and CC-1 used this log-in information to complete four of the outstanding courses for ZANGRILLO's daughter.

257.     On or about July 18, 2017, Masera e-mailed an invoice to ZANGRILLO and his assistant, copying Singer.  The e-mail stated, "Attached is a new invoice seeking reimbursement for course completion for [ZANGRILLO's daughter]."  The invoice listed four courses and billed ZANGRILLO for the coursework that Sanford and CC-1 completed on behalf of ZANGRILLO's daughter.

258.     On or about July 20, 2017, ZANGRILLO's assistant replied to Masera's e-mail: "Wire has been sent."  On or about the same day, ZANGRILLO wired $3,109.50 to The Key.

259.     On or about July 28, 2017, Sanford e-mailed ZANGRILLO's daughter's online high school and requested that her transcript be sent to Boston University.

260.     On or about the same day, a member of the counseling department at ZANGRILLO's daughter's high school e-mailed her that she needed to complete a course, Fitness Fundamentals, to fulfill her graduation requirements.

40

261.   Sanford subsequently completed the "Fitness Fundamentals" course for ZANGRILLO's daughter.   Thereafter, on or about August 23, 2017, Sanford e-mailed ZANGRILLO's daughter's high school and again requested that her transcript "with proof of graduation" be e-mailed to Boston University.

262.   On or about August 24, 2017, ZANGRILLO's daughter's high school e-mailed her transcript to Boston University in the District of Massachusetts.   The transcript reflected credits earned by Sanford and CC-1 on behalf of ZANGRILLO's daughter.

263.   On or about January 19, 2018, ZANGRILLO's assistant e-mailed ZANGRILLO and his daughter an invoice from The Key, dated August 23, 2017, in the amount of $2,500.   The invoice was for "Course Completion by Mikaela Sanford – Fitness Fundamentals 2." ZANGRILLO's assistant asked him to "please approve and confirm this payment for $2500 that they show as outstanding."

264.   On or about January 22, 2018, ZANGRILLO wired $2,500 to The Key.   The reference on the wire was ZANGRILLO's daughter's name.

265.   Beginning in or about 2018, ZANGRILLO agreed with Singer to pay an amount, ultimately totaling $250,000, to facilitate his daughter's transfer to USC as a purported crew recruit.

266.   On or about February 1, 2018, ZANGRILLO's daughter's transfer application was submitted to USC.   The application included falsified athletic credentials.

267.   In a call with ZANGRILLO, ZANGRILLO's daughter, and Sanford, on or about June 11, 2018, Singer explained, in sum and substance, that he had asked members of the USC athletics department to facilitate ZANGRILLO's daughter's admission "as though she's been

sculling and rowing," and that the crew coach had agreed to designate her as a purported crew recruit, provided that "you guys help us."

268.    During the same call, ZANGRILLO directed Sanford to take an online biology course and finish an online art history course for his daughter.  By that time, Sanford had already started the art history course and taken other online courses for ZANGRILLO's daughter through multiple colleges.

269.    During the spring of 2018, Singer's bookkeeper had sent several invoices to ZANGRILLO and his assistant for Sanford's completion of other courses on behalf of ZANGRILLO's daughter.  When these invoices went unpaid, Singer, in an e-mail on or about June 12, 2018, asked ZANGRILLO to "get this handled ASAP."  Singer added that, "Mikaela [Sanford] will suspend working on anything as of tomorrow if not taken care of."  In response, ZANGRILLO asked his assistant to "make sure this is taken care of this a[.]m[.]"  ZANGRILLO wired $10,800.26 on or about the same day.

270.    On or about August 15, 2018, Singer's bookkeeper e-mailed ZANGRILLO and his assistant an invoice for "course completion" for the biology course discussed in the June 11, 2018 call.  ZANGRILLO replied, "Approved."

271.    Transcripts reflecting the completion of these online courses were submitted to USC on behalf of ZANGRILLO's daughter.

272.    On or about September 20, 2018, after USC had mailed ZANGRILLO's daughter an acceptance letter, ZANGRILLO wired $200,000 to KWF.

273.    On or about that same day, ZANGRILLO caused a check in the amount of $50,000 to be issued to "USC Women's Athletics."

274. On or about October 25, 2018, Singer, who was located in the District of Massachusetts, called ZANGRILLO and told him that KWF was being audited. Singer told ZANGRILLO that he would not tell the IRS that the "monies went to go pay Donna Heinel for USC to get her [*i.e.*, ZANGRILLO's daughter] in." ZANGRILLO then asked what he should tell the IRS regarding the purpose of the payment "just so I know so we have the story straight." Singer responded that ZANGRILLO should say that all the money paid to KWF, including the money paid for Singer's assistant to take classes for ZANGRILLO's daughter, were for "our programs that handle underserved kids." ZANGRILLO replied: "Okay, great, perfect."

275. On or about January 3, 2019, Singer, who was located in the District of Massachusetts, called ZANGRILLO, who confirmed that his daughter would not say anything to her USC advisor about being admitted through athletics.

### Other Co-Conspirators

276. In addition to the exams Singer paid Riddell to take for the children of the defendants, Singer likewise paid Riddell to cheat on the SAT and ACT for the children of other co-conspirators known and unknown to the Grand Jury and, in many of those instances, bribed exam administrators, including Dvorskiy and Williams, to permit Riddell to do so.

277. Singer likewise bribed athletic coaches and university administrators on behalf of other co-conspirators known and unknown to the Grand Jury to designate the children of those co-conspirators as athletic recruits.

278. Singer also agreed with other co-conspirators known and unknown to the Grand Jury to arrange for Sanford and others to take courses on behalf of the children of these other co-conspirators with the understanding that grades earned in those classes would be submitted as part of the students' college applications.

## The USC Federal Programs Bribery Conspiracy

279.    From in or about 2007 through in or about February 2019, the defendants identified below conspired with others known and unknown to the Grand Jury to bribe agents of USC to secure their children's admission to that university.

### Objects and Purposes of the USC Federal Programs Bribery Conspiracy

280.    The principal object of the USC federal programs bribery conspiracy was to commit federal programs bribery, in violation of Title 18, United States Code, Section 666.   The principal purposes of the conspiracy included, among other things: (1) securing the admission of the defendants' children to USC; (2) enriching the recipients of the bribes; (3) funding designated university accounts over which the bribe recipients exercised discretion or that otherwise benefited them professionally; and (4) concealing the bribery scheme.

### Manner and Means of the USC Federal Programs Bribery Conspiracy

281.    Among the manner and means by which the defendants and co-conspirators known and unknown to the Grand Jury carried out the USC federal programs bribery conspiracy were the following:

a.  Fabricating athletic "profiles" containing falsified athletic credentials—including fake honors the students purportedly received, elite athletic teams on which they purportedly played, and staged photographs of the students purportedly engaged in athletic activity—to submit in support of the students' applications to USC;

b.  Paying bribes to USC athletic coaches and administrators in exchange for designating the defendants' children as purported athletic recruits—with little or no regard for their athletic abilities and, in some cases, even though

they did not play the sport they were purportedly recruited to play—and as members of other favored admissions categories; and

    c.   Explaining to clients and prospective clients of The Key that the bribes were a tried-and-true method of gaining admission to USC and other colleges and universities that had been successfully employed by many other clients.

<u>Overt Acts in Furtherance of the USC Federal Programs Bribery Conspiracy</u>

282.    On various dates from in or about 2007 through in or about February 2019, the defendants and co-conspirators known and unknown to the Grand Jury committed and caused to be committed the following overt acts, among others, in furtherance of the USC federal programs bribery conspiracy:

<u>GAMAL ABDELAZIZ</u>

283.    On or about March 26, 2018, ABDELAZIZ wired $300,000 to KWF.

<u>TODD AND DIANE BLAKE</u>

284.    On or about September 16, 2017, TODD BLAKE mailed a $50,000 check made payable to USC Women's Athletics, an account controlled by Heinel.

285.    On or about February 5, 2018, TODD BLAKE wired $200,000 to KWF.

<u>MOSSIMO GIANNULLI AND LORI LOUGHLIN</u>

286.    On or about November 1, 2016, GIANNULLI directed his business manager to send a $50,000 check, made payable to USC Women's Athletics, to Heinel.

287.    On or about April 10, 2017, GIANNULLI wired $200,000 to KWF.

288.    On or about December 5, 2017, GIANNULLI directed his business manager to send a $50,000 check, made payable to USC Women's Athletics, to Heinel.

289.    On or about February 6, 2018, GIANNULLI wired $200,000 to KWF.

## ELISABETH KIMMEL

290.    On or about October 23, 2017, the Meyer Charitable Foundation issued a $50,000 check to the USC Women's Athletics Board.   The check was signed by KIMMEL's spouse.

291.    On or about February 1, 2018, KIMMEL caused the Meyer Charitable Foundation to issue a check to KWF in the amount of $200,000.

## WILLIAM McGLASHAN, Jr.

292.    Beginning in or about the summer of 2018, McGLASHAN agreed with Singer to pay an amount, ultimately totaling $250,000, to bribe one or more USC employees to facilitate his son's admission to USC as a purported football recruit.

293.    On or about August 24, 2018, Singer sent an e-mail to McGLASHAN with the subject line "USC needs."   Singer wrote in the e-mail, "Bill can you get me an unofficial transcript, pdf of test scores and an action sports photo of [your son]."

294.    On or about August 25, 2018, McGLASHAN sent a text message to his son, asking "Did you get the photos?"   McGLASHAN's son replied that his brother had taken the pictures and was uploading the photos to his computer.

295.    On or about August 25, 2018, McGLASHAN sent Singer his son's fraudulently obtained ACT score, high school transcript, and photos that depicted his son running and posing. Singer forwarded the materials to Janke with instructions to create a falsified profile of McGLASHAN's son as a "kicker/punter."

296.    Janke then created a football profile for McGLASHAN's son, which falsely depicted him as an elite football place kicker and punter.

297.    On or about September 8, 2018, Singer e-mailed the fraudulent profile to Heinel.

298.    On or about September 29, 2018, McGLASHAN sent a text message to Singer, asking, "So when will we know definitively on USC?"   Singer replied, "They had their first Subco last week- football has a while before going through Subco- late in the fall as it is in season."

## MARCI PALATELLA

299.    On or about December 1, 2017, PALATELLA mailed Heinel a $100,000 check, made payable to USC Women's Athletic Board.

300.    On or about May 1, 2018, PALATELLA caused her company to wire $400,000 to KWF.

## JOHN WILSON

301.    On or about April 7, 2014, WILSON caused his company to wire a total of $220,000 to Singer, comprised of $100,000 to KWF, $100,000 to The Key, and $20,000 to Singer personally.

302.    On or about April 16, 2014, Singer caused KWF to issue a $100,000 cashier's check, made payable to "USC Men's Water Polo," to Vavic.

## HOMAYOUN ZADEH

303.    On or about March 17, 2017, Singer caused KWF to issue a $50,000 check, made payable to "USC Women's Athletics Board," to Heinel.

304.    Between on or about May 30, 2017 and on or about September 7, 2018, ZADEH made or caused the following payments to be made to KWF:

| Date Posted to KWF Account | Amount |
| --- | --- |
| 5/30/2017 | $5,000 |
| 9/25/2017 | $10,000 |
| 10/23/2017 | $10,000 |
| 12/27/2017 | $10,000 |
| 2/15/2018 | $5,000 |
| 3/26/2018 | $5,000 |

| Date Posted to KWF Account | Amount |
|---|---|
| 4/27/2018 | $5,000 |
| 9/7/2018 | $5,000 |

### ROBERT ZANGRILLO

305.    On or about September 20, 2018, ZANGRILLO wired $200,000 to KWF.

306.    On or about that same day, ZANGRILLO caused a check in the amount of $50,000 to be issued to "USC Women's Athletics."

### The Money Laundering Conspiracy

307.    The defendants conspired with others known and unknown to the Grand Jury to conceal their fraud scheme by funneling bribe and other payments through The Key or KWF, including via payments to and from accounts in the District of Massachusetts, and to promote their fraud scheme via payments to The Key and KWF from outside the United States.

### Objects and Purposes of the Money Laundering Conspiracy

308.    The principal objects and purposes of the money laundering conspiracy were: (a) to conceal and disguise the nature, location, source, ownership, and control of bribe and other payments in furtherance of the fraud scheme, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and, (b) to transport, transmit, and transfer funds to a place in the United States from and through a place outside the United States, with the intent to promote the fraud scheme, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

Manner and Means of the Money Laundering Conspiracy

309.     Among the manner and means by which the defendants and co-conspirators known and unknown to the Grand Jury carried out the money laundering conspiracy were the following:

        a.  Making purported charitable donations to KWF or payments to The Key to fund the bribe and other payments in furtherance of the fraud and bribery schemes;

        b.  Having KWF issue letters falsely attesting that the purported donations would help "provide educational and self-enrichment programs to disadvantaged youth," and that "no goods or services were exchanged" for the money;

        c.  Having The Key issue falsified "consulting" agreements and invoices stating that payments were for legitimate services, when in fact the payments were made in furtherance of the fraud and bribery schemes; and

        d.  Issuing bribe and other payments in furtherance of the fraud and bribery schemes from accounts in the name of The Key and KWF.

Acts in Furtherance of the Money Laundering Conspiracy

310.     On various dates from in or about 2011 through in or about February 2019, the defendants and co-conspirators known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the money laundering conspiracy:

DAVID SIDOO

311.     On or about January 23, 2013, SIDOO wired $100,000 from an account in Canada to an account in California in the name of The Key, to pay for the SAT cheating scheme for SIDOO's younger son.

## GREGORY COLBURN and AMY COLBURN

312.     In or about December 2017, GREGORY COLBURN initiated a transfer of stock to KWF with a value of approximately $24,452.55, to pay for the SAT cheating scheme for the COLBURNS' son.

313.     GREGORY COLBURN subsequently issued an additional check in the amount of $547.45 to KWF, and wrote "charitable contribution" in the memo line.

314.     On or about December 29, 2017, KWF issued a letter to GREGORY COLBURN falsely indicating that "no goods or services were exchanged" for the purported donation.

315.     In a call on or about October 24, 2018, Singer told AMY COLBURN, "So what I've stated to the IRS, [is] that your payment went to our foundation to help underserved kids." AMY COLBURN responded, "Okay."

316.     During the same call on or about October 24, 2018, Singer told GREGORY COLBURN, "I just wanted to make sure that we don't-- we're all on the same page."  GREGORY COLBURN replied, "Right.  It was to help underserved kids. . . . Got it.  No problem."

## GAMAL ABDELAZIZ

317.     On or about March 26, 2018, ABDELAZIZ wired a payment of $300,000 to KWF to pay for the scheme to admit his daughter to USC as a purported basketball recruit.

318.     On or about April 6, 2018, Singer's bookkeeper e-mailed ABDELAZIZ a letter from KWF falsely indicating that "no goods or services were exchanged" for the purported donation.

### DIANE BLAKE and TODD BLAKE

319.    On or about September 16, 2017, TODD BLAKE mailed a $50,000 check to Heinel, payable to "USC Women's Athletics," to pay for the scheme to admit his daughter to USC as a purported volleyball recruit.

320.    On or about February 5, 2018, TODD BLAKE wired $200,000 to KWF as a further payment for the recruitment scheme.

321.    In call on or about October 25, 2018, TODD BLAKE asked Singer, "[W]ill I get contacted [by the IRS], and if so how would you like me to answer?"  Singer responded, "[W]hat I want you to say is that your money went to our foundation, which it did."  TODD BLAKE replied: "Yeah. Okay."  Singer later said, "You made a donation to help underserved kids." TODD BLAKE responded, "Right.  Okay, good."

322.    In a call on or about February 22, 2019, Singer told DIANE BLAKE that her daughter "got in with you guys making a payment, you know, for [$]50,000 to USC Women's Athletics directly and then [$]200[,000] to my foundation."  DIANE BLAKE responded "Right," and further agreed with Singer when he said that "that was the payment to get her in."

### I-HSIN "JOEY" CHEN

323.    On or about April 10, 2018, Singer's accountant e-mailed CHEN a falsified invoice from The Key in the amount of $100,000 for purported "Consulting services."

324.    On or about April 13, 2018, CHEN e-mailed Singer's accountant to ask for this invoice to be reduced to $75,000, which was the amount CHEN had agreed to pay Singer for participating in the ACT cheating scheme.

325.    On or about April 16, 2018, CHEN caused his company to wire $75,000 to The Key.

### MOSSIMO GIANNULLI and LORI LOUGHLIN

326.   On or about April 10, 2017, GIANNULLI wired $200,000 to KWF to pay for the scheme to admit his older daughter to USC as a purported crew recruit.

327.   On or about April 11, 2017, KWF issued a letter to GIANNULLI and LOUGHLIN falsely indicating that "no goods or services were exchanged" for the purported donation of $200,000.

328.   On or about February 6, 2018, GIANNULLI wired $200,000 to KWF to pay for the scheme to admit his younger daughter to USC as a purported crew recruit.

329.   On or about February 7, 2018, KWF issued a letter to GIANNULLI and LOUGHLIN falsely indicating that "no goods or services were exchanged" for the purported donation of $200,000.

### ELISABETH KIMMEL

330.   On or about April 4, 2013, KIMMEL caused the Meyer Charitable Foundation to issue a check to KWF in the amount of $100,000 as partial payment for securing her daughter's admission to Georgetown as a purported tennis recruit.

331.   Masera thereafter sent a letter to the Meyer Charitable Foundation, directed to KIMMEL and her spouse, falsely indicating that "no goods or services were exchanged" for the purported donation.

332.   On or about June 19, 2013, KIMMEL caused the Meyer Charitable Foundation to issue an additional check to KWF in the amount of $170,000 as further payment for securing her daughter's admission to Georgetown as a purported tennis recruit.

333.    On or about July 2, 2013, KIMMEL caused the Meyer Charitable Foundation to issue an additional check to KWF in the amount of $5,000 as further payment for securing her daughter's admission to Georgetown as a purported tennis recruit.

334.    On or about February 1, 2018, KIMMEL caused the Meyer Charitable Foundation to issue a check to KWF in the amount of $200,000 as payment for securing her son's admission to USC as a purported track and field recruit.

335.    On or about March 20, 2018, Singer's bookkeeper sent a letter to KIMMEL and her spouse falsely indicating that "no goods or services were exchanged" for the purported donation.

## WILLIAM McGLASHAN, Jr.

336.    On or about December 6, 2017, McGLASHAN sent $50,000 to KWF from his personal charitable donation fund to pay for the ACT cheating scheme for McGLASHAN's son.

337.    On or about December 16, 2017, Masera sent a letter to McGLASHAN falsely indicating that "no goods or services were exchanged" for the purported donation.

## MARCI PALATELLA

338.    On or about March 7, 2017, PALATELLA's company wired $75,000 to KWF to pay for the SAT cheating scheme for PALATELLA's son.

339.    On or about May 1, 2018, PALATELLA's company wired $400,000 to KWF to pay for the scheme to admit her son to USC as a purported football recruit.

## JOHN WILSON

340.    On or about March 1, 2014, WILSON asked Singer, in substance, whether he could pay Singer from his corporate account for the scheme to admit WILSON's son's to USC as a

purported water polo recruit, so that the payment would be deductible as a purported consulting fee business expense.

341.    On or about April 2, 2014, Masera sent a letter to WILSON's employee dated April 7, 2014, falsely indicating that "no goods or services were exchanged" for a purported $100,000 donation to KWF.

342.    On or about April 7, 2014, WILSON caused his company to wire $100,000 to KWF, $100,000 to The Key, and $20,000 to Singer personally.

343.    On or about April 16, 2014, Singer caused The Key to issue a $100,000 cashier's check, made payable to USC Men's Water Polo, to Vavic.   This check stated that the "purpose/remitter" was the "Wilson Family."

344.    On or about July 28, 2014, USC sent WILSON and his spouse a gift acknowledgment for their purported $100,000 charitable contribution to USC Men's Water Polo. USC issued this letter without knowing that WILSON's payment was made in exchange for facilitating his son's fraudulent admission to USC as a purported recruit.

<u>HOMAYOUN ZADEH</u>

345.    On or about March 17, 2017, Singer caused KWF to issue a $50,000 check, made payable to "USC Women's Athletics Board," to Heinel.

346.    On or about April 5, 2017, Masera e-mailed an invoice to ZADEH and his spouse for their purported "pledge" to KWF of $100,000, which was in fact a payment for facilitating ZADEH's daughter's fraudulent admission to USC as a purported lacrosse recruit.

347.    Between on or about May 30, 2017 and September 7, 2018, ZADEH and his spouse made eight payments totaling $55,000 to KWF.

348.    On or about December 27, 2017, Singer's bookkeeper sent a letter to ZADEH and his spouse falsely attesting that "no goods or services were exchanged" for their purported $40,000 in donations made in 2017.

## ROBERT ZANGRILLO

349.    On or about September 20, 2018, ZANGRILLO wired $200,000 to KWF to pay for the scheme to admit his daughter to USC as a purported crew recruit.

350.    In a call from Boston, Massachusetts on or about October 25, 2018, Singer told ZANGRILLO, in sum and substance, that the IRS was auditing KWF.  ZANGRILLO asked: "What was [my daughter's] payment for? Just so I know, so we have the story straight."  Singer responded, in substance, that the payments would appear to be "for our programs that handle underserved kids."  ZANGRILLO replied:  "Okay, great, perfect."

### Other Co-Conspirators

351.    Singer likewise funneled bribes through KWF and The Key to athletic coaches and university administrators in the District of Massachusetts and elsewhere, on behalf of other co-conspirators known and unknown to the Grand Jury, in order to conceal and disguise the nature, location, source, ownership, and control of bribe money and other payments in furtherance of the bribery and fraud schemes.

352.    Other co-conspirators known and unknown to the Grand Jury also transported, transmitted, and transferred monetary instruments and funds from a place outside the United States to and through KWF and The Key accounts inside the United States in furtherance of the bribery and fraud schemes.

### WILSON's False Tax Returns

353.     Beginning in or about 2013, WILSON agreed to pay Singer an amount, ultimately totaling $220,000, to facilitate WILSON's son's admission to USC as a purported water polo recruit.

354.     On or about August 24, 2013, WILSON e-mailed Singer about the timing of his payments to Vavic, the USC water polo coach, to secure WILSON's son's admission as a purported water polo recruit.  WILSON wrote:  "What does Jovan need by [S]ept 20?  Do u have what we need?  Do I make the first payment to u then?"  Singer replied, stating, "I believe I have everything.  Transcript[,] test scores[,] and a [water polo] player profile so [Vavic] can add [your son] to his recruit list and present him to admissions in October." WILSON replied: "Great," and added that he wanted to know "when and where to wire the money."

355.     On or about January 21, 2014, Vavic e-mailed Singer, asking if WILSON's son was "still interested in USC."   Singer replied, "Absolutely – family is ready to help."

356.     On or about February 28, 2014, WILSON's son was presented to the USC subcommittee on athletic admissions and admitted as a purported recruit to the water polo team.

357.     On or about March 1, 2014, WILSON sent Singer an e-mail with the subject line "USC fees," in which WILSON wrote:  "Thanks again for making this happen!  Pls give me the invoice.   What are the options for the payment?   Can we make it for consulting or whatever from the [K]ey so that I can pay it from the corporate account?"  Singer responded, "Yes we can send you an invoice for business consulting fees and you may write off as an expense.  What is the name address etc you want the invoice to be made out to?"  WILSON replied with the name and address of his company, HPC.

358.    On or about March 29, 2014, WILSON sent an e-mail to his employee ("HPC Employee-1") with the subject line "Re: Wire to the key," and wrote that HPC Employee-1 would soon receive "an invoice and wiring instructions for $250k," which would be paid for by HPC. HPC Employee-1 responded:  "And what is the acct I'm charging this to?"  WILSON replied: "Business Consulting – the invoice will be for consulting – pls work with him to get invoice correct."  In an e-mail the next day, WILSON clarified that the amount to be paid was $200,000 and not $250,000.

359.    On or about March 31, 2014, Masera e-mailed HPC Employee-1 that he would prepare two invoices: an invoice for $100,000 that would be payable to KWF, and a "consulting invoice" for "our Business" for the "other $100k."  Masera added that an additional $20,000 would also be paid to Singer.

360.    On the same day, HPC Employee-1 e-mailed WILSON as follows:  "Per Steve [Masera] 100k will be to his foundation, 100k an invoice from the Key and 20k to Rick Singer. Since you said 200K, we're at 220k, is this a moving target?"  WILSON responded:  "Yes I added $20 k for his expenses."  HPC Employee-1 then asked whether WILSON wanted the additional $200,000 "invoiced to HPC as well," and WILSON replied, "Yes."

361.    HPC Employee-1 then e-mailed Singer and Masera, writing: "So basically the first 100k is going to be a donation to your foundation.  The second 100k will be an invoice from the Key. . . .  As for the 20k, I will also need an invoice from Rick [Singer] on this as well to Hyannis Port Capital . . . ."

362.    On or about April 2, 2014, Masera sent HPC Employee-1 an e-mail with the subject line "Modified Invoices," writing: "If you need any further alterations, just let me know . . . ." Attached to the e-mail was:  (a) an invoice to HPC in the amount of $20,000, payable to Rick

Singer, containing the description, "Special Consulting Income[.] Concept, design, and implementation of Professional Development program for Hyannis Port Capital associates;" (b) an invoice to HPC in the amount of $100,000, payable to "The Key," containing the description, "Business Consulting – August through June 2014;" and (c) a letter stating, "Thank you for your contribution of $100,000 to The Key Worldwide Foundation. . . .  This letter shall serve as formal acknowledgement of your contribution or, for which no goods or services were exchanged."

363.    On or about April 7, 2014, HPC wired $100,000 to KWF, $100,000 to The Key, and $20,000 to Singer.

364.    On or about April 16, 2014, The Key made a $100,000 payment to USC Men's Water Polo.

365.    WILSON caused his tax preparers to create a Form 1120S for HPC for the tax year 2014, in which the $100,000 payment to KWF was improperly included as a charitable donation, and the $120,000 in purported "consulting" fees to Singer and The Key were improperly included as business expenses.   These deductions were included on the Schedule K-1 issued for HPC.

366.    WILSON's Form 1040 for the 2014 tax year was received by the IRS on or about December 29, 2015, containing declarations by WILSON and his wife, under penalty of perjury, that the information contained therein was true, correct and complete.   That return claimed, amongst other false and fraudulent items: (1) contributions to charity based, in part, on a $100,000 payment made by HPC to KWF; and, (2) business losses from HPC based, in part, on $120,000 in payments to Singer and The Key deducted by HPC as purported business expenses.   As a result, WILSON and his spouse's taxable income for 2014 was underreported.

367.    On or about January 11, 2017, the IRS received a 2014 1040X amended tax return from WILSON and his wife, containing declarations by WILSON and his wife, under penalty of

perjury, that the information contained therein was true, correct and complete.   Like the original 2014 return, it improperly included the $100,000 payment to KWF as a purported charitable contribution, and claimed losses from HPC based, in part, on the $120,000 in payments to Singer and The Key that HPC deducted as purported business expenses.

368.    On or about March 30, 2018, the IRS received a second 2014 1040X amended tax return from WILSON and his wife containing declarations by WILSON and his wife, under penalty of perjury, that the information contained therein was true, correct and complete.   Like the prior 2014 returns, this return also included the $100,000 payment to KWF as a purported charitable contribution, and claimed losses from HPC based, in part, on the $120,000 in payments to Singer and The Key that HPC deducted as purported business expenses.   The second 2014 1040X amended tax return was mailed to the IRS from Lynnfield, Massachusetts on or about March 26, 2018.

<u>COUNT ONE</u>
Conspiracy to Commit Mail and Wire Fraud
and Honest Services Mail and Wire Fraud
(18 U.S.C. § 1349)

The Grand Jury charges:

369. The Grand Jury re-alleges and incorporates by reference paragraphs 1-278 of this Fourth Superseding Indictment.

370. From in or about 2007 through in or about February 2019, in the District of Massachusetts, and elsewhere, the defendants,

| | |
|---|---|
| (1) | DAVID SIDOO, |
| (2) | GREGORY COLBURN, |
| (3) | AMY COLBURN, |
| (4) | GAMAL ABDELAZIZ, |
| (5) | DIANE BLAKE, |
| (6) | TODD BLAKE, |
| (7) | I-HSIN "JOEY" CHEN, |
| (8) | MOSSIMO GIANNULLI, |
| (13) | ELISABETH KIMMEL, |
| (14) | LORI LOUGHLIN, |
| (15) | WILLIAM McGLASHAN, Jr., |
| (16) | MARCI PALATELLA, |
| (17) | JOHN WILSON, |
| (18) | HOMAYOUN ZADEH, and |
| (19) | ROBERT ZANGRILLO |

conspired with others known and unknown to the Grand Jury to commit the following offenses:

a. mail fraud and honest services mail fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property, to wit, ACT, SAT and other standardized tests and test scores, and admission to the Universities, by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive, variously, ACT, Inc., the College Board, and the Universities of their right to the honest and faithful services of their test administrators, athletic coaches and university administrators, through bribes and kickbacks, did, for the

60

purpose of executing and attempting to execute the scheme, deposit and cause to be deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier, in violation of Title 18, United States Code, Sections 1341 and 1346; and,

b.  wire fraud and honest services wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property to wit, ACT, SAT and other standardized tests and test scores, and admission to the Universities, by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive, variously, ACT, Inc., the College Board, and the Universities, of their right to the honest and faithful services of their test administrators, athletic coaches and university administrators, through bribes and kickbacks, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

All in violation of Title 18, United States Code, Section 1349.

COUNT TWO
Conspiracy to Commit Federal Programs Bribery
(18 U.S.C. § 371)

The Grand Jury charges:

371.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-306 of this Fourth Superseding Indictment.

372.    From in or about 2007 through in or about February 2019, in the District of Massachusetts, and elsewhere, the defendants,

|  |  |
|---|---|
| (4) | GAMAL ABDELAZIZ, |
| (5) | DIANE BLAKE |
| (6) | TODD BLAKE, |
| (8) | MOSSIMO GIANNULLI, |
| (13) | ELISABETH KIMMEL, |
| (14) | LORI LOUGHLIN, |
| (15) | WILLIAM McGLASHAN, Jr., |
| (16) | MARCI PALATELLA, |
| (17) | JOHN WILSON, |
| (18) | HOMAYOUN ZADEH, and |
| (19) | ROBERT ZANGRILLO |

conspired with others known and unknown to the Grand Jury to commit federal programs bribery, that is, to corruptly give, offer and agree to give anything of value to any person, with intent to influence and reward an agent of an organization, to wit, agents of USC, in connection with any business, transaction and series of transactions of USC involving anything of value of $5,000 or more, that is, in exchange for facilitating the admission to USC for the defendants' children, where USC received benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies, loan guarantees, insurance and other forms of federal assistance in any one-year period, in violation of Title 18, United States Code, Section 666(a)(2).

All in violation of Title 18, United States Code, Section 371.

COUNT THREE
Money Laundering Conspiracy
(18 U.S.C. § 1956(h))

The Grand Jury further charges:

373.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-352 of this Fourth Superseding Indictment.

374.    From in or about 2011 through in or about February 2019, in the District of Massachusetts, and elsewhere, the defendants,

| | |
|---|---|
| (1) | DAVID SIDOO, |
| (2) | GREGORY COLBURN, |
| (3) | AMY COLBURN, |
| (4) | GAMAL ABDELAZIZ, |
| (5) | DIANE BLAKE, |
| (6) | TODD BLAKE, |
| (7) | I-HSIN "JOEY" CHEN, |
| (8) | MOSSIMO GIANNULLI, |
| (13) | ELISABETH KIMMEL, |
| (14) | LORI LOUGHLIN, |
| (15) | WILLIAM McGLASHAN, Jr., |
| (16) | MARCI PALATELLA, |
| (17) | JOHN WILSON, |
| (18) | HOMAYOUN ZADEH, and |
| (19) | ROBERT ZANGRILLO |

conspired with others known and unknown to the Grand Jury to commit the following offenses:

a.   to conduct and attempt to conduct financial transactions, to wit, bribe payments and other payments funneled through a purported charitable organization and a for-profit corporation, knowing that that the property involved in such transactions represented the proceeds of some form of unlawful activity and which, in fact, involved the proceeds of specified unlawful activity, that is, mail and wire fraud and honest services mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346, and knowing that the transactions were designed, in whole and in part, to

63

conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

b. to transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds, to wit, bribes and other payments, to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, mail and wire fraud and honest services mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

All in violation of Title 18, United States Code, Section 1956(h).

COUNTS FOUR THROUGH TEN
Wire Fraud and Honest Services Wire Fraud; Aiding and Abetting
(18 U.S.C. §§ 1341 and 1346 and 2)

The Grand Jury further charges:

375.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-278 of this

Fourth Superseding Indictment.

376.     On or about the dates set forth below, in the District of Massachusetts, and

elsewhere, the defendants set forth below, having devised and intending to devise a scheme and

artifice to defraud and for obtaining money and property, to wit, ACT, SAT and other standardized

tests and test scores, and admission to the Universities, by means of materially false and fraudulent

pretenses, representations, and promises, and to defraud and deprive, variously, ACT, Inc., the

College Board, and the Universities, of their right to the honest and faithful services of their test

administrators, athletic coaches and university administrators, through bribes and kickbacks, did

transmit and cause to be transmitted, by means of wire communications in interstate and foreign

commerce, writings, signs, signals, pictures and sounds for the purpose of executing the scheme

to defraud, as follows:

| COUNT | DEFENDANT(S) | APPROXIMATE DATE | WIRE |
|---|---|---|---|
| 4 | ROBERT ZANGRILLO | August 24, 2017 | High school transcript sent to Boston University |
| 5 | JOEY CHEN | October 8, 2018 | ACT scores sent to Emerson College |
| 6 | JOHN WILSON | October 17, 2018 | $500,000 wire transfer to KWF |
| 7 | WILLIAM McGLASHAN JR. | October 24, 2018 | ACT scores sent to Northeastern University |
| 8 | JOHN WILSON | October 27, 2018 | Telephone call with Singer |
| 9 | JOHN WILSON | December 11, 2018 | $500,000 wire transfer to KWF |

| 10 | ROBERT ZANGRILLO | January 3, 2019 | Telephone call with Singer |

All in violation of Title 18, United States Code, Sections 1343, 1346 and 2.

COUNTS ELEVEN AND TWELVE
Federal Programs Bribery; Aiding and Abetting
(18 U.S.C. §§ 666(a)(2) and 2)

The Grand Jury further charges:

377.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-306 of this Fourth Superseding Indictment.

378.    On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant,

(17)  JOHN WILSON

corruptly gave, offered and agreed to give anything of value to any person, with intent to influence and reward an agent of an organization, as set forth below, in connection with any business, transaction and series of transactions of such organization involving anything of value of $5,000 or more, where such organization received benefits in excess of $10,000 annually under federal programs involving grants, contracts, subsidies, loan guarantees, insurance and other forms of federal assistance in any one-year period, as follows:

| COUNT | AGENT AND ORGANIZATION | APPROXIMATE DATE | PAYMENT |
|-------|------------------------|------------------|---------|
| 11 | Sailing coach of Stanford | October 17, 2018 | $500,000 wire transfer to KWF |
| 12 | Senior women's administrator of Harvard | December 11, 2018 | $500,000 wire transfer to KWF |

All in violation of Title 18, United States Code, Sections 666(a)(2) and (2).

## COUNT THIRTEEN
Filing a False Tax Return
(26 U.S.C. § 7206(1))

The Grand Jury further charges:

379.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-368 of this Fourth Superseding Indictment.

380.     On or about March 26, 2018 in the District of Massachusetts and elsewhere, the defendant,

### (17)   JOHN WILSON,

did willfully make and subscribe a joint Amended U.S. Individual Income Tax Return, Form 1040X, for the tax year 2014, which was verified by a written declaration that it was made under the penalties of perjury, and which was filed with Internal Revenue Service, and which return the defendant did not believe to be true and correct as to every material matter, in that, among other items, the lines for adjusted gross income and itemized deductions, and the attached Form 1040, included HPC losses and gifts to charity based on payments from HPC to KWF, Singer and The Key as purported charitable contributions or business expenses.

All in violation of Title 26, United States Code, Section 7206(1).

<u>FORFEITURE ALLEGATION</u>
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

381.    Upon conviction of the offenses in violation of Title 18, United States Code,

Sections 371, 666, 1341, 1346, 1349 and 2, set forth in Counts One through Two and Four through

Twelve of this Fourth Superseding Indictment, the defendants,

| | |
|---|---|
| (1) | DAVID SIDOO, |
| (2) | GREGORY COLBURN, |
| (3) | AMY COLBURN, |
| (4) | GAMAL ABDELAZIZ, |
| (5) | DIANE BLAKE, |
| (6) | TODD BLAKE, |
| (7) | I-HSIN "JOEY" CHEN, |
| (8) | MOSSIMO GIANNULLI, |
| (13) | ELISABETH KIMMEL, |
| (14) | LORI LOUGHLIN, |
| (15) | WILLIAM McGLASHAN, Jr., |
| (16) | MARCI PALATELLA, |
| (17) | JOHN WILSON, |
| (18) | HOMAYOUN ZADEH, and |
| (19) | ROBERT ZANGRILLO |

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C),

and Title 28, United States Code, Section 2461(c), any property, real or personal, which

constitutes or is derived from proceeds traceable to the offenses.

382.    If any of the property described in Paragraph 381 above as being forfeitable

pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code,

Section 2461(c), as a result of any act or omission of the defendants --

   a.   cannot be located upon the exercise of due diligence;

   b.   has been transferred or sold to, or deposited with, a third party;

   c.   has been placed beyond the jurisdiction of the Court;

   d.   has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 381 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

MONEY LAUNDERING FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(1))

383.    Upon conviction of the offense in violation of Title 18, United States Code, Section

1956(h), set forth in Count Three of this Fourth Superseding Indictment, the defendants,

|      |                            |
|------|----------------------------|
| (1)  | DAVID SIDOO,               |
| (2)  | GREGORY COLBURN,           |
| (3)  | AMY COLBURN,               |
| (4)  | GAMAL ABDELAZIZ,           |
| (5)  | DIANE BLAKE,               |
| (6)  | TODD BLAKE,                |
| (7)  | I-HSIN "JOEY" CHEN,        |
| (8)  | MOSSIMO GIANNULLI,         |
| (13) | ELISABETH KIMMEL,          |
| (14) | LORI LOUGHLIN,             |
| (15) | WILLIAM McGLASHAN, Jr.,    |
| (16) | MARCI PALATELLA,           |
| (17) | JOHN WILSON,               |
| (18) | HOMAYOUN ZADEH, and        |
| (19) | ROBERT ZANGRILLO           |

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any

property, real or personal, involved in such offense, and any property traceable to such property.

384.    If any of the property described in Paragraph 383 above as being forfeitable

pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act or omission of

the defendants --

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be divided without
       difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 383 above.

All pursuant to Title 18, United States Code, Section 982(a)(1).

A TRUE BILL,

FOREPERSON

ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
Assistant United States Attorneys
District of Massachusetts

District of Massachusetts: January 14, 2020
Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK

72