

| | |
|---|---|
| **From:** | Rick Singer ████████████████████ |
| **Sent:** | Friday, April 22, 2016 2:51 PM |
| **To:** | Mossimo Giannulli ████████████ |
| **Cc:** | Lori Giannulli ██████████████████ |
| **Subject:** | Re: new address |

If you want SC I have the game plan ready to go into motion. Call me to discuss- ████████████

Sent from my iPhone

On Apr 22, 2016, at 9:46 AM, Mossimo Giannulli ██████████████████ wrote:

> Rick,
>
> We just met with ████████ college counselor this am. I'd like to maybe sit with you after your session with the girls as I have some concerns and want to fully understand the game plan and make sure we have a roadmap for success as it relates to ██████ and getting her into a school other than ASU!
> Thanks,
> M/.
>
> Mossimo Giannulli
>
> 
>
>> On Apr 22, 2016, at 9:43 AM, Rick Singer ██████████████████ wrote:
>>
>> Terrific Thx
>>
>> Sent from my iPhone
>>
>>> On Apr 22, 2016, at 9:31 AM, Lori Giannulli ██████████████ wrote:
>>>
>>> Hi Rick,
>>>
>>> Our new address is ████████████████ See you tomorrow.
>>>
>>> Best,
>>> Lori

USAO-VB-00413205

# B

**From:**          Rick Singer █████████████

**Sent:**          Friday, August 19, 2016 2:49 AM

**To:**            Mossimo Giannulli

**Cc:**            Lori Giannulli

**Subject:**       Re: USC

thx

On Thu, Aug 18, 2016 at 6:41 PM, Mossimo Giannulli ████████████████
wrote:

> Fantastic. Will get all.
>
> Sent from cup and string
>
> > On Aug 18, 2016, at 4:23 PM, Rick Singer ███████████████wrote:
> >
> > Lori and Moss, I met with USC today about ██████ I need a PDF of her
> transcript and test scores very soon while I create a coxswain
> portfolio for her. It would probably help to get a picture with her on
> an ERG in workout clothes like a real athlete too.
> >
> > Sent from my iPhone
>


--
Rick Singer
████████████████

1

PM-00001018

VB-RECORDS-00247522



**From:**     Mossimo Giannulli █████████████

**Sent:**     Wednesday, September 7, 2016 11:14 PM

**To:**     Rick Singer ███████████████

**Cc:**     ████████████████████████

**Subject:**    █████ rowing

**Attach:**    IMG_4534.JPG; Untitled attachment 73432.txt



**From:**  laura janke ████████████████████████

**Sent:**  Friday, October 7, 2016 9:25 PM

**To:**  Rick Singer ████████████████████████

**Subject:**  Re: ████████ Profile

**Attach:**  ██████ docx ████ pdf

Here you go.

On 7 October 2016 at 18:22, Laura Janke ████████████████████ wrote:
> Sorry I got pulled out of the office right after I sent to you. Will get it done right now
>
> Sent from my iPhone
>
> On Oct 7, 2016, at 4:07 PM, Rick Singer ████████████████████ wrote:
>
>> Can you use pic one and upload into profile?
>>
>> Sent from my iPhone
>>
>> On Oct 7, 2016, at 9:54 AM, laura janke ████████████████████ wrote:
>>
>>> I am thinking it probably needs to be one of the top 2 when I look at them all side by side.
>>>
>>> On 7 October 2016 at 09:31, Rick Singer ████████████████████ wrote:
>>>> Laura based on the photo we sent which one do you think is best
>>>>
>>>> Sent from my iPhone
>>>>
>>>> On Oct 7, 2016, at 9:00 AM, laura janke ████████████████████ wrote:
>>>>
>>>>> Looking for more but this is what I could find so far. The one labeled C 4 is actually a MAC rower which is what I listed for her on her profile
>>>>>
>>>>> On 7 October 2016 at 05:37, Rick Singer ████████████████████ wrote:
>>>>>> Donna asked for a picture of her in a boat. Is there a coxswain picture we can use that is tough to see the face since they are sitting online?
>>>>>>
>>>>>> Sent from my iPhone
>>>>>
>>>>> <c 1.PNG>
>>>>>
>>>>> <c 2.PNG>
>>>>>
>>>>> <c 3.PNG>
>>>>>
>>>>> <c 4.PNG>

<c pics.docx>

COXSWAIN

**PERSONAL**



**ROWING INFO**

*MAC ROWING*
Coxswain
- Skill set: awareness, steering, organization and direction

Women's Novice 8
- USRowing Southwest Regional Junior Championships
- Head of the American Participant
- Marin Crew Festival Participant
- Head of the Charles Participant
- San Diego Crew Classic, Gold Medal

Participation in Sparks Coxswain programs:
- University of Washington
- Oklahoma

**EXTRA CURRICULAR**

███████ Soccer Club
- Starting midfielder
- Team Captain
- Top 3 on team for speed
- Lead team in assists

███████ HS Soccer Team
- Forward
- Honorable Mention All League

USAO-VB-00431724



COXSWAIN

**PERSONAL**

**ROWING INFO**

*MAC ROWING*
Coxswain
-   Skill set: awareness, steering, organization and direction

Women's Novice 8
-   USRowing Southwest Regional Junior Championships
-   Head of the American Participant
-   Marin Crew Festival Participant
-   Head of the Charles Participant
-   San Diego Crew Classic, Gold Medal

Participation in Sparks Coxswain programs:
-   University of Washington
-   Oklahoma

**EXTRA CURRICULAR**

██████████ Soccer Club
-   Starting midfielder
-   Team Captain
-   Top 3 on team for speed
-   Lead team in assists

████████ HS Soccer Team
-   Forward
-   Honorable Mention All League

# E

**From:**          Rick Singer ███████████████
**Sent:**          Wednesday, September 21, 2016 4:42 AM
**To:**            Mossimo Giannulli
**Cc:**            ███████████████Lori Giannulli
**Subject:**       Re: i need a pdf of scores and picture asap

got it all. Profile is being made as a coxswain and USC is awaiting my packet with the transcript, test scores and profile. Most likely they will have it by Monday.

On Tue, Sep 20, 2016 at 9:20 PM, Mossimo Giannulli ████████████████ wrote:

> Please confirm photos needed of what? Scores and ████?
>
> Sent from cup and string
>
> > On Sep 20, 2016, at 9:20 PM, Rick Singer ███████████████ wrote:
> >
> >
>

1

PM-00000966

VB-RECORDS-00247470



| | |
|---|---|
| **From:** | Mossimo Giannulli ██████████████ |
| **Sent:** | Tuesday, September 27, 2016 6:18 PM |
| **To:** | Lori Giannulli |
| **Subject:** | Fwd: USC Admissions |

The nicest I've been at blowing off somebody.
Mossimo Giannulli



Begin forwarded message:

**From:** ████████████████████████████
**Subject: RE: USC Admissions**
**Date:** September 27, 2016 at 11:10:13 AM PDT
**To:** Mossimo Giannulli ██████████████

That's great!  If you'd ever like to discuss the impact your philanthropy or participation in our mentorship programs might have on our students and community, please let me know.  Alumni support of cancer research, climate science, social justice programs, and the arts and humanities, among other areas, is critical.

Here's an interesting video on the Renaissance Scholars program, inspired by da Vinci:  https://dornsife.usc.edu/videos/featured/141/renaissance-scholars/.  I think you'll find it interesting.

Best,



PM-00002944

VB-RECORDS-00360228

THE
CAMPAIGN
*for the*
University
of Southern
California

FAS REGNA TROJAE

**From:** Mossimo Giannulli ███████████████
**Sent:** Tuesday, September 27, 2016 10:57 AM
**To:** ████████████████████████
**Subject:** Re: USC Admissions

She will be applying. I've been to the school a few times and have some folks that keep me abreast of the latest and greatest!
Thanks for reaching out,
M/

Mossimo Giannulli



On Sep 27, 2016, at 10:53 AM, ████████████████████████ wrote:

Thanks for the quick reply, Mossimo. I'm glad to hear that you're all set. Will she indeed be applying?

On another note, would you be interested in connecting to discuss your own involvement with USC? So much has changed since you were a student. I'd love to be able to update you on the amazing stuff that's happening. How about meeting in your area on Oct. 3rd, 4th, or 5th?

Best,



2

PM-00002945

VB-RECORDS-00360229

**Learn more:** USC Dornsife Giving Opportunities

<image001.png>

**From:** Mossimo Giannulli ████████████████
**Sent:** Tuesday, September 27, 2016 10:49 AM
**To:** ████████████████████
**Subject:** Re: USC Admissions

Thanks so much, I think we are squared away.

Best,
M/


Mossimo Giannulli
████████████████

<image002.jpg>

On Sep 27, 2016, at 10:47 AM, ████████████
████████████ wrote:

Hi Mossimo,

It's been a while and fall has now arrived so I just wanted to check in
and see if your daughter is continuing with the admissions process at
USC. I know when we last connected you mentioned she was a junior
so I imagine she'll be submitting her application this fall. Please let me
know if I can be at all helpful in setting up a 1:1 opportunity for her,
customized tour of campus for the family, and/or classroom visit? I'd
also be happy to flag her application.

I look forward to hearing from you.

Best,



<image001.png>

3

PM-00002946

VB-RECORDS-00360230



**From:**           Mossimo Giannulli ████████████████

**Sent:**            Tuesday, November 1, 2016 4:10 PM

**To:**               Rick Singer

**Subject:**       Re: Please send 50K payment to the person below

**Attachments:**   Moss e-sig.jpg


I told biz mgr to Fed Ex today.

M/
Mossimo Giannulli




> On Oct 29, 2016, at 9:36 AM, Rick Singer ████████████████ wrote:
>
> Donna Heinel
> Senior Womens Associate Atheltic Director c/o of USC Athletics
> ████████████████
> ████████████████
>
> Check should be made out to USC Athletics
>
> Please let me know when sent
>
>
>

1

PM-00000954

VB-RECORDS-00247458

# H

## STUDENT PROFILE

Date: 10/27/16 _____ Major: _____

Name: ████████████████████ _____

SS#: _____ Birthdate: _____

Fresh: ✓ Trans _____ (Units) _____ (Semesters) _____

Sport: WROW _____ %Scholarship W.O.

High School: _____

Junior College: _____

University: _____

████████████████████████████████████

NCAA Clearinghouse Approved Courses:

English _____ Math _____ Science _____ FLang _____ Social Science _____

| SUBCO Comment/Interview | Athletic Accomplishment |
|---|---|
| R+G | |
| ████ 10/27/16 | |
| ████ 10/27/16 | |
| ████ 10-28.16 | **Other Factors** |
| | |
| | |
| | |
| | |
| | |

USC-00003651



**Walk On**

Position: Coxswain
Program: MAC Rowing
Rowing Experience: 2 years

Women's Varsity 8
- US Rowing Southwest Regional Junior Champions
- Head of the American Semifinalist
- Marin Crew Festival Finalist
- Head of the Charles Semifinalist
- San Diego Crew Classic, Gold Medal
Participation in Sparks Coxswain programs:
- University of Washington
- Oklahoma

██████ is an earnest, outspoken, incredibly positive-minded coxswain. She talks straight to the point and puts extra effort in everything she does. ██████ has proven to have incredible awareness which has enabled her to organize and direct the boat under to most demanding of competitions. ██████ also has the skills, size, energy and drive that we are looking for in a coxswain. What is just as important is that she has a strong desire to be at USC and to be on our rowing team, and her family will be paying the cost of attendance, because they can both afford it and believe that the scholarships should go to rowers who will be physically moving the boat forward to win the National Championship. Yet, ██████ is aware of the fact that she can earn a scholarship by advancing to the Varsity 8+ during her career at USC.

Over the past few years we have had difficulty in recruiting capable walk-ons. Therefore, it is essential that we have athletes like ██████ join our team to give us more depth in the coxswain department without costing us a scholarship at this time, since there are so few scholarships becoming available next year.

USC-00003652

USC-00003653

USC-00003654



USC-00003655





Score Report

I

**From:** Mossimo Giannulli ████████████████
**Sent:** Tuesday, November 1, 2016 5:26 PM
**To:** Rick Singer
**Subject:** Re: Please send 50K payment to the person below
**Attachments:** Moss e-sig.jpg

HAH!!

Mossimo Giannulli

████████████████████████

> On Nov 1, 2016, at 10:24 AM, Rick Singer ████████████████ wrote:
>
> Best to keep Pat out of it. When I met with him a year ago about ████
> he felt you were good for a million plus
>
> Sent from my iPhone
>
> On Nov 1, 2016, at 9:58 AM, Mossimo Giannulli ████████████████████████ wrote:
>
>> BTW headed to Augusta in 2 weeks with Pat Haden. I was planning on saying nothing? Agree or okay to mention anything?
>> Mossimo Giannulli

████████████████████████

>>
>> <Moss e-sig.jpg>
>>
>>> On Oct 29, 2016, at 9:36 AM, Rick Singer ████████████████████████ wrote:
>>>
>>> Donna Heinel
>>> Senior Womens Associate Atheltic Director c/o of USC Athletics
>>>
>>> ████████████████
>>>
>>> Check should be made out to USC Athletics
>>>

1

PM-00000930

VB-RECORDS-00247434

>>> Please let me know when sent
>>>
>>>
>>>
>>

PM-00000931

VB-RECORDS-00247435



Naviance List:



Account of Counselor Call:

3/10/2017 – Conducted routine counselor call with USC to check up on the dozens of applicants that year.  When we got to ▇▇▇ our representative, ▇▇▇▇ said she was "flagged" as an admitted recruit for the crew team.  I told him I had no knowledge of ▇▇▇ involvement in crew and based on what I knew of her doubted she was involved in crew.  We than all moved on to another student.

Email Records:
See attached

VB-RECORDS-00129293



**From:** Mossimo Giannulli ███████████████
**Sent:** Monday, April 10, 2017 4:12 PM
**To:** ████████████████
**Subject:** Fwd: Invoice 1132 from The Key Worldwide Foundation
**Attachments:** Moss e-sig.jpg; �; Inv_1132_from_The_Key_Worldwide_Foundation_9272.pdf; �

Good news my daughter ██████ is in SC.... bad is I had to work the system.

M/

Mossimo Giannulli



> Begin forwarded message:
>
> From: ████████████████
> Subject: Fwd: Invoice 1132 from The Key Worldwide Foundation
> Date: April 10, 2017 at 9:00:08 AM PDT
> To: Mossimo Giannulli ████████████████
>
>
>
> Sent from my iPhone
>
> Begin forwarded message:
>
>> From: "Steve Masera" ████████████████████████
>> Date: March 30, 2017 at 7:43:30 AM PDT
>> To: ████████████████████
>> Cc: ████████████████████
>> Subject: Invoice 1132 from The Key Worldwide Foundation
>>
>> Hello Mossimo and Lori,
>> Thank you for your pledge to The Key Worldwide Foundation.  Your pledge is now due and our courtesy invoice is attached to this email.  Wire instructions are on the invoice and in the body of this email.

1

PM-00000701

PM-00000701

Begin forwarded message:

**From:** ██████████████

**Subject: Fwd: Invoice 1132 from The Key Worldwide Foundation**

**Date:** April 10, 2017 at 9:00:08 AM PDT

**To:** Mossimo Giannulli ████████████████

Sent from my iPhone

Begin forwarded message:

> **From:** "Steve Masera" ██████████████████████
>
> **Date:** March 30, 2017 at 7:43:30 AM PDT
>
> **To:** ████████████████
>
> **Cc:** ████████████████
>
> **Subject: Invoice 1132 from The Key Worldwide Foundation**

Hello Mossimo and Lori,

Thank you for your pledge to The Key Worldwide Foundation.  Your pledge is now due and our courtesy invoice is attached to this email.  Wire instructions are on the invoice and in the body of this email.

Our receipt letter will go out to you upon full payment.

Thank you both.

Wire Instructions : **The Key Worldwide Foundation**

Routing #: ██████████████

Account #: ██████████████

Swift Code: ██████████████

Bank Information: ████████████████████████████████

Tax ID : ██████████

*Steve R. Masera*

*The Key Worldwide Foundation*

████████████████████████

████████████████████████████

# *The Key Worldwide Foundation*

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/30/2017 | 1132 |

| Bill To |
|---------|
| Mossimo & Lori Giannulli |

| Description | Amount |
|-------------|--------|
| Private Contribution - Letter of receipt will be provided upon payment. | 200,000.00 |
| | |
| Wire Instructions :  The Key Worldwide Foundation | |
| Routing #: | |
| Account #: | |
| Swift Code: | |
| Bank Information: | |
| Tax ID : | |

| 501c3 FEIN | Total | $200,000.00 |
|------------|-------|-------------|

PM-00000706

PM-00000706

PM-00000707

PM-00000707

# L

**From:**          Rick Singer ██████████████████████████
**Sent:**          Tuesday, April 11, 2017 12:09 AM
**To:**            ██████████████████████████
**Cc:**            Mossimo Giannulli
**Subject:**       Re: Trojan happiness
**Attachments:**   Moss e-sig.jpg

So work to acquire SC? As soon as the semester is over I will need a transcript and test scores. Thx

Sent from my iPhone

> On Apr 10, 2017, at 3:47 PM, ████████████████ wrote:
>
> Yes USC for ██████!
>
> Sent from my iPhone
>
>> On Apr 10, 2017, at 2:51 PM, Rick Singer ██████████████████ wrote:
>>
>> SC?
>>
>> Sent from my iPhone
>>
>>> On Apr 10, 2017, at 2:34 PM, Mossimo Giannulli ███████████████████ wrote:
>>>
>>> Yes ██████ as well.
>>>
>>>
>>>
>>> Mossimo Giannulli
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
>>>
>>>
>>>> On Apr 10, 2017, at 2:32 PM, Rick Singer █████████████████████ wrote:
>>>>
>>>> I am very happy ██████ got what she wanted and worked for the last couple years.
>>>>
>>>> With ██████ please let me know if there is a similar need anywhere so we do not lose a spot.

1

PM-00000675

VB-RECORDS-00247179

>>>>
>>>> Take care
>>>>
>>>> Sent from my iPhone
>>>>
>>>>> On Apr 10, 2017, at 1:16 PM, Mossimo Giannulli  wrote:
>>>>>
>>>>> Rick,
>>>>>
>>>>> I wanted to thank you again for your great work with ███████ she is very excited and both Lori and I are very appreciative of your efforts and end result!
>>>>>
>>>>>
>>>>> See you soon with ██████ I'm sure.
>>>>> M/
>>>>>
>>>>>
>>>>>
>>>>>
>>>>> Mossimo Giannulli
>>>
>>>
>>>
>>>
>>>
>>>
>>>
>>>
>>>
>>>
>>>>> <Moss e-sig.jpg>
>>>>>
>>>

2



**From:**     Rick Singer ████████████████

**Sent:**     Thursday, July 20, 2017 4:36 PM

**To:**       Mossimo Giannulli ████████████  Mossimo Giannulli ████████████████████ Lori Giannulli ████████████

**Subject:**  If we want USC I will need a transcript, test scores and picture on the ERG.

USAO-VB-00375075

# M1

**From:**      laura janke ███████████████████
**Sent:**      Sunday, August 6, 2017 11:58 PM
**To:**        Rick Singer ██████████████████████
**Subject:**   Re:

I need all the other information on her so I can finish her resume and add a rowing club to her profile based off where she lives.

On 28 July 2017 at 11:11, Rick Singer ██████████████████████ wrote:

████████████████

Sent from my iPhone

Begin forwarded message:

> **From:** Mossimo Giannulli ██████████████████████
> **Date:** July 28, 2017 at 10:47:22 AM PDT
> **To:** Rick Singer ██████████████████
> **Cc:** Lori Giannulli ██████████████████████



Sent from cup and string

SINGER-00378334



**From:** ███████████████
**Sent:** Monday, August 7, 2017 11:14 AM
**To:** Mossimo Giannulli
**Subject:** Re: Fwd: Re:

Oh shoot. Can you call ███████ today and get her transcripts. Tell ████ to walk over to █████████ and see if she can get them. Or maybe you could call first. I think school might be closed at the moment.

Sent from my iPhone

> On Aug 7, 2017, at 12:42 AM, Mossimo Giannulli ███████████████ wrote:
>
> Do you have the transcripts?
>
> Sent from cup and string
>
> Begin forwarded message:
>
>> From: Rick Singer ████████████
>> Date: August 6, 2017 at 9:34:54 PM PDT
>> To: laura janke ████████████████ Mossimo Giannulli ████████████████ Giannulli Mossimo

>> Subject: Re:
>>
>> Mossimo- I need ████'s transcript,  test scores, email address, cell phone number,  and home address asap
>>
>> Sent from my iPhone
>>
>>> On Aug 6, 2017, at 10:58 PM, laura janke ██████████████ wrote:
>>>
>>> I need all the other information on her so I can finish her resume and add a rowing club to her profile based off where she lives.
>>>
>>>> On 28 July 2017 at 11:11, Rick Singer ███████████████ wrote:
>>>>█████████████
>>>>
>>>> Sent from my iPhone
>>>>
>>>> Begin forwarded message:
>>>>
>>>>> From: Mossimo Giannulli ████████████████
>>>>> Date: July 28, 2017 at 10:47:22 AM PDT
>>>>> To: Rick Singer ████████████████
>>>>> Cc: Lori Giannulli ████████████████
>>>>>
>>>>>
>>>>>
>>>>> <IMG_5490.JPG>

1

PM-00000417

VB-RECORDS-00246921

>>>>>
>>>>>
>>>>>
>>>>> Sent from cup and string
>>>

PM-00000418

VB-RECORDS-00246922



**From:** ███████████████
**Sent:** Thursday, November 16, 2017 10:29 PM
**To:** Rick Singer ███████████████
**Cc:** Mossimo Giannulli ███████████████ ████████
**Subject:** Re: CONGRATULATIONS!!!

---

Yes of course

Sent from my iPhone

On Nov 16, 2017, at 5:20 PM, Rick Singer ███████████████ wrote:

> Please continue to keep hush hush till March. Thanks

> On Thu, Nov 16, 2017 at 5:05 PM, ███████████████ wrote:
> This is wonderful news! ✋□
>
> Sent from my iPhone
>
> > On Nov 16, 2017, at 4:31 PM, Rick Singer ███████████████ wrote:
> >
> > See Attached
> > ███████████████

**From:**          Rick Singer █████████████████
**To:**            Mossimo Giannulli ██████████████  Lori Giannulli ████████████████████
                   ██████████████████████████
**Sent:**          11/16/2017 7:31:10 PM
**Subject:**       CONGRATULATIONS!!!
**Attachments:**   ███████████████████

See Attached



OFFICE OF ADMISSION

November 14, 2017



Dear ███

Congratulations!  I am pleased to inform you that the Admission Committee, after careful review of your credentials, has approved your admission to the University of Southern California for the fall 2018 semester.  Your records indicate that you have the potential to make a significant contribution to the intercollegiate athletic program as well as to the academic life of the university.  I can assure you that the faculty and staff will do all that we can to support you in achieving your goals as a student-athlete at USC.

Please be advised that this letter of acceptance is based upon a preliminary review of your academic records.  In order to validate this acceptance you must:

1. Complete in full an Undergraduate Application by January 15th, 2018.
2. Send official college entrance exam scores (SAT or ACT) to USC directly from the appropriate testing agency.
3. Register with the NCAA Eligibility Center.
4. Meet all NCAA test score and core course initial-eligibility requirements.
5. Send USC a final, official transcript which verifies high school graduation by August 1st, 2018.
6. Avoid academic and behavioral misconduct.

If these conditions are not met, your approval will be revoked.

On behalf of the university, I would like to express our pleasure with your commitment to USC.  We are delighted to welcome you to our community of scholars and to our athletic program.  We look forward to seeing you on campus next year.

Sincerely,



Timothy E. Brunold
Dean of Admission

# P

**From:** Mossimo Giannulli <span style="background:black">████</span>
**Sent:** Wednesday, November 29, 2017 7:21 PM
**To:** Rick Singer
**Cc:** Lori Giannulli
**Subject:** Re: USC
**Attachments:** Moss e-sig.jpg


Will get this handled this week.

M/


Mossimo Giannulli



> On Nov 29, 2017, at 11:10 AM, Rick Singer ████████ wrote:
>
> Mossimo can you send a 50K check to USC and the address is below. Additionally the rest of the 200K will be paid to our foundation a 501 3C after ████ receives his final letter in March.
>
>
> Made Payable to:
>
> USC Womens Athletics
>
> Send to:
>
> Donna Heinel
> Senior Womens Athletic Director
>
>
>
> Please confirm when sent
> --
> Rick Singer

1

PM-00000293

PM-00000293



DO NOT CASH THIS CHECK UNLESS YOU CAN SEE THE TRUE WATERMARK. HOLD UP TO LIGHT TO SEE "SAFE" AND VERIFY FIRST
THIS DOCUMENT HAS A NANOCOPY SECURITY BACKGROUND.

**MOSSIMO GIANNULLI TRUST**

Date   12-05-17      Check No.   **1252**

162      AKC

3K9

# FIFTY THOUSAND DOLLARS EXACTLY

****$50,000.00

Pay to the
order of

GALEN CENTER GIFT - USC

DONNA HEINEL
SENIOR WOMENS ATHLETIC DIRECTOR

# R

| | |
|---|---|
| **From:** | ██████████████ |
| **Sent:** | Tuesday, January 30, 2018 2:25 AM |
| **To:** | ██████████████ |
| **Subject:** | Fwd: Invoice 1166 from The Key Worldwide Foundation |
| **Attachments:** | Inv_1166_from_The_Key_Worldwide_Foundation_9516.pdf; � |

FYI

Sent from my iPhone

Begin forwarded message:

> From: ████████████████████████████████████
> Date: January 29, 2018 at 2:26:59 PM PST
> To: █████████████████████
> Cc: █████████████████████
> Subject: Invoice 1166 from The Key Worldwide Foundation
>
> Dear Mossimo & Lori Giannulli,
>
> Thank you for your generous donation.
>
> Our courtesy invoice is attached hereto and contains wire information should you prefer to wire the funds.
>
> Thank you again,
>
>
> ██████████████████
>
> The Key Worldwide Foundation
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
>

1

PM-00000154

VB-RECORDS-00246658

# Invoice

## The Key Worldwide Foundation

| Date | Invoice # |
|------|-----------|
| 1/29/2018 | 1166 |

**Bill To**

Mossimo & Lori Giannulli

| Description | Amount |
|-------------|--------|
| Private Contribution - Letter of receipt will be provided upon payment. | 200,000.00 |

| **501c3 FEIN** | **Total** | $200,000.00 |
|-----------------|-----------|-------------|

PM-00000156

VB-RECORDS-00246660

S

| | |
|---|---|
| **From:** | Mossimo Giannulli ██████████████████ |
| **Sent:** | Monday, February 5, 2018 9:44 PM |
| **To:** | ██████████████████ |
| **Subject:** | Re: ████████ Transfer Update |
| **Attachments:** | Moss e-sig.jpg |

yes please.
you can e mail that person for the wire instructions.

Thank you.


Mossimo Giannulli

█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████

> On Feb 5, 2018, at 1:33 PM, ████████████████████████ wrote:
>
> Moss,
>
> Did you want me to wire the $200,000 to cover the invoice?  Can we get the foundation to reconfirm wire transfer instructions so we have current data and then I can wire with your verbal.
>
> Thanks,
>
> ████
>
> From: Mossimo Giannulli ██████████████████████████████
> Sent: Monday, February 5, 2018 9:39 AM
> To: ████████████████████████████████
> Subject: Re: ████████ Transfer Update
>
> ████ was gone this am and left word. Happy to send and send back when I receive.
>
>
> Also the last college "donation" for ████ Can't I write this off?
>

1

PM-00000150

VB-RECORDS-00246654

>
>
>
>
>
>
>
> Mossimo Giannulli



>
> <image001.jpg>
>
>
> On Feb 2, 2018, at 10:10 AM, ████████████████████████████████ wrote:
>
> Hey Moss,
>
> Just a quick update on where we stand and what I still need. First, your trust account at ████ has you listed as Trustee and not ████████████████████████ so I need to send you a trust certification form that needs to be notarized. Can I UPS the form to your work address for Monday delivery and can I also schedule a mobile notary to meet your office to do a quick 10 minute signing? Any day is fine as long as you give me some lead time to schedule the notary. Let me know what would work best for you.
>
> Second, I still need these documents from ████ as well as them setting up duplicate statements going forward so I don't have to bother you every month. ████ is requiring that you call ████████████ to request these be sent to me. ████ can be reached at ██████████████████
>
> 1.)   Copy of your Dec 31st ████ Statement

2

PM-00000151

VB-RECORDS-00246655

> 2.)    Copy of your Jan 31st ██ Statement
> 3.)    Copy of the Dec 31st 529 Account Statements
> 4.)    Copy of your December 31st performance report (PMR Report) both for the personal accounts and the 529 accounts.
> 5.)    Request that duplicate statements be sent going forward to ████████████████████████████████
> ████████████████████████████
>
> All of the above ██ documents can be sent direct to me via secure email.
>
> Let me know if you have any questions otherwise I will wait to hear from you on what works best for the notarization of the Trust Certification Form.
>
> Thanks,
>

████████████████████████████████████████████████████

████████████████████████████████████████████████████

3

PM-00000152

VB-RECORDS-00246656

T

█████████ 2018-10-25 13-17-38 10670-001                          Page 1

1   **Call Date:**  2018-10-25

2   **Call Duration:**  2:13

3   **Call Begin** [     ] **Call End** [     ]

4   **Call Participants:**

5        Mossimo Giannulli

6        Rick Singer

7   **File Name:**  █████████  2018-10-25 13-17-38 10670-001

8   **Bates No:**

9

10  SINGER:   [00:00] Moss.  How are ya?

11  GIANNULLI:      Uh, good, pal.  How are you doin'?

12  SINGER:   Uh...  How's your business?

13  GIANNULLI:      Uh, it's unbelievable.

14  SINGER:   Tell me about it.

15  GIANNULLI:      It's goin' just fantastic.  Uh, I sold half of

16       it to █████████  And, uh --

17  SINGER:   Oh, did ya?

18  GIANNULLI:      -- yeah -- and it's just -- we're just scaling

19       now.  It's just been fantastic.

20  SINGER:   Well, congratulations.  It's awesome.

21  GIANNULLI:      Thank you.  And the girls are absolutely loving

22       SC.

23  SINGER:   That's what you want, ri--?

24  GIANNULLI:      Yeah.

1   SINGER:   Every dad wants that.

2   GIANNULLI:     Yeah.  So.  And ██████'s is really flourishing

3        too, which is nice.  So I'm really happy for her.

4   SINGER:   No, that's fabulous.  So.  So I'm -- I'm calling,

5        uh, 'cause I just want to make sure you're -- give you a

6        heads-up that...  So my foundation is being audited --

7   GIANNULLI:     OK.

8   SINGER:   -- which, as you know, is normal.

9   GIANNULLI:     Yeah.

10  SINGER:   And so they're looking at all the payments.  So they

11       -- they asked me about your 2 payments of 200,000.

12  GIANNULLI:     [01:00] Uh...

13  SINGER:   And, of course, I'm not gonna say anything about

14       your payments goin' to Donna Heinel at USC to get the

15       girls into USC, through crew.  So --

16  GIANNULLI:     Sure.

17  SINGER:   -- that's for sure.

18  GIANNULLI:     Right.

19  SINGER:   But what's funny...  It's funny.  Because Donna

20       called me couple weeks ago and says, "Hey, uh," you know,

21       "going forward, can you use the same format you used for

22       ██████████████████, and the regattas that you put in there,

23       for any girls, going forward, that don't row crew?"  So

24       it's funny how...  I thought I was just makin' stuff up.

1   GIANNULLI:      Uh, right.  Uh...

2   SINGER:   Uh, but -- but they loved it, love--

3   GIANNULLI:      Uh, right.  Perfect.

4   SINGER:   So I just want to make sure our stories are the

5        same, because --

6   GIANNULLI:      Yeah.

7   SINGER:   -- an th-- and that your 400K was paid to our

8        foundation to help underserved kids.

9   GIANNULLI:      Uh, perfect.

10  SINGER:   OK?  So I just want to make sure that we're on the

11       same page, in case...

12  GIANNULLI:      Uh...

13  SINGER:   Who knows if they'll call or they [02:00] don't.

14  GIANNULLI:      Perfect.  Got it.

15  SINGER:   OK.

16  GIANNULLI:      Uh...

17  SINGER:   And congratulations to the girls and --

18  GIANNULLI:      Thank you.

19  SINGER:   -- on your business.

20  GIANNULLI:      Thank you.  Thanks, pal.

21  SINGER:   A--

22  GIANNULLI:      We'll talk to you.

23  SINGER:   OK.

24  GIANNULLI:      OK.

1   SINGER:    Take care.  Uh...

2   GIANNULLI:     Uh...

3   SINGER:    Buh-bye.  [02:13]

4

5                          END OF AUDIO FILE



1    **Call Date:**    11/29/2018

2    **Call Duration:** 04:13

3    **Call Begin [] Call End []**

4    **Call Participants:**

5         Rick Singer

6         Laurie

7    **File Name:**       ██████████   2018-11-29 17-39-37 12374-001

8    **Bates No.:**

9

10   LAURIE _: [00:00] Hello?

11   SINGER:   Laurie (sp?), it's Rick Singer.  How are you?

12   LAURIE _: I'm good, Rick, how are you?

13   SINGER:   Good.  The girls good?

14   LAURIE _: They're really good.  They love USC.  They're really

15        happy.

16   SINGER:   And are you on -- onsite, on -- whatev-- whatever --

17        um, filming now?  Are you at home?

18   LAURIE _: I'm at home right now actually.

19   SINGER:   Awesome.  Awesome.

20   LAURIE _: Yeah.  Yeah.

21   SINGER:   So I had -- I had talked to Moss (sp?) a couple, uh,

22        weeks ago that we were getting audited --

23   LAURIE _: Uh-huh.

24   SINGER:   -- our foundation.

1    LAURIE _: Uh-huh.

2    SINGER:   So I -- I just -- and I'm -- I just tried reaching

3         out to -- so what I wanted to try to do is just make sure

4         that you guys know they went through all my -- a bunch of

5         folks and they're going to make calls to several families

6         and it looks like you guys are going to be one of those.

7         There'll probably be 8 or 9 that they're going to call.

8    LAURIE _: [01:00] OK.

9    SINGER:   Because they had this question about why did my

10        foundation get $200,000 2 consecutive years and then

11        nothing after that.  So I just want to make sure that you

12        know that, one, that you're probably going to get a call

13        and that I have not told them anything about the girls

14        going through the side door, through crew, even though

15        they didn't do crew to get into USC.  So I -- that is --

16        all I told them was that you guys made a donation to our

17        foundation to help underserved kids.

18   LAURIE _: Um-hmm.

19   SINGER:   And that's why you guys have done it.  And lots of

20        people don't make successive donations going forward.

21   LAURIE _: OK.  But I-- I'm confused.  But we -- so we made 2

22        donations 2 years in a row and so what are they

23        questioning?

```
 1   SINGER:   They're -- so they're questioning all -- they're

 2        looking at all of my donations to my foundation.  [02:00]

 3        OK?

 4   LAURIE _: OK, uh-huh.

 5   SINGER:   And so they went through everybody's and they

 6        started looking at everybody and saying, "OK, why these

 7        guys?  Why did these guys?  Who did these guys fund?  Why

 8        did they do -- why did they do?"  So we went through

 9        everybody --

10   LAURIE _: Um-hmm.

11   SINGER:   -- and they just picked out 10, 12 people and said,

12        "Hey, we're just going to follow-up with these folks and

13        ask them why they made a donation to your program," to

14        our foundation.

15   LAURIE _: Right.

16   SINGER:   So I said that's fine.  I said, "Can you give me

17        some idea of who those people are?"

18   LAURIE _: Right.

19   SINGER:   And your -- your guys were one of them.  And I said,

20        "Well, this is very clean.  They made a donation to our

21        foundation for underserved kids.  They're a great family.

22        They've been doing work all over LA.  Their kids are very

23        engaged in LA and I don't know why you guys think that

24        this is weird."  And they said, "It's not that we think
```

```
 1          it's weird.  We just want to follow-up as part of our

 2          audit."  They're driving me crazy so far.  So I --

 3   LAURIE _: Who's -- who's auditing you?

 4   SINGER:   The IRS.

 5   LAURIE _: [03:00]  Oh, OK.

 6   SINGER:   Right.  The IRS audits foun-- large foundations and

 7          we have so much money in our foundation and we give away

 8          so much money they're -- they want to -- you know,

 9          they're always worried about things going on in

10          foundations.

11   LAURIE _: I see.

12   SINGER:   So what I -- what I wa-- I told Moss already and I

13          wanted to make sure that you knew, as well, if they

14          happened to call you, is that nothing has been said about

15          the girls, um, your donations helping the girls get into

16          USC to do --

17   LAURIE _: OK.

18   SINGER:   -- crew even though they didn't do crew.  SO nothing

19          like that has been ever mentioned.

20   LAURIE _: (inaudible).

21   SINGER:   If you ever -- ever were to say anything.

22   LAURIE _: So we -- so we just -- so we just have to say we

23          made a donation to your foundation and that's it, end of

24          story.
```

1    SINGER:   That is correct.

2    LAURIE _: OK.

3    SINGER:   Terrific.

4    LAURIE _: OK.

5    SINGER:   I just wanted to make sure I touched base because I

6          didn't want you --

7    LAURIE _: Yeah.

8    SINGER:   -- to all of a sudden what -- like what's this call

9          coming from.

10   LAURIE _: OK, yeah.  OK.  Totally.  All right.  So -- so

11         that's it.  So it's -- it's the IRS.  It's not anyone

12         from USC, it's the IRS.

13   SINGER:   [04:00] That is correct.

14   LAURIE _: OK.  Very good.

15   SINGER:   OK.

16   LAURIE _: All right.

17   SINGER:   All the best.

18   LAURIE _: All right.  Thank you, Rick.  Happy holidays.

19   SINGER:   You, too.  Take care.

20   LAURIE _: OK, thanks.

21   SINGER:   OK.  Bye-bye.

22   LAURIE _: Bye.  [04:13]

23

24                         END OF AUDIO FILE





| | |
|---|---|
| **From:** | ████████████████ |
| **Sent:** | Friday, September 8, 2017 6:18 PM |
| **To:** | McGlashan, Bill |
| **Subject:** | Fwd: Double time |

This message has been archived. View the original item
<http://evserver1.texpac.com/EnterpriseVault/ViewMessage.asp?VaultId=1707063E3F22DD847AB2B3E1B2E27EB86111
0000evsite1.texpac.com&SavesetId=201712102872612~201709090118230000~Z~10AAC1B86673F34F969FB65645C1D4
D1>

████████ McGlashan
██████████████

Begin forwarded message:

From: ████████████████████████████████
Date: September 7, 2017 at 8:10:07 PM PDT
To: ████████████████████████
Subject: Re: Double time

Hi ████████

Unfortunately, the college board requires updated testing and sets the time period for te-documentation, irrespective of
whether or not it is actually needed in the opinion of the evaluator ████████████████████████
████████████████████████████████████

Because it's been more than 3 years since the evaluation I'm pretty sure a recommendation change would not be readily
accepted without updated testing-and even then it may not be approved depending on the results in terms of scores.

I hope this makes sense. Feel free to reach out for clarification if you'd like more explanation.

Best,

████████

Get Outlook for iOS<https://urldefense.proofpoint.com/v2/url?u=https-
3A__aka.ms_o0ukef&d=DwMCaQ&c=QbuapHRvbn0JdC8vTVkPHg&r=wDGwWdSmjX2leznTn6qJF12GKDdK5ko28xIIp_jdl
DQ&m=djxbzjA40484Dv-
NwjyczcV1HwnjZgk5l7AjO8IbiX4&s=xUMfZxdL_Umpae_9OE3t1qwKMNEspfqQmiHaPVltPPM&e=>

On Thu, Sep 7, 2017 at 5:12 PM -0700, ████████████████████████████████████ wrote:

TPG-MA-00000276
VB-RECORDS-00158839

Hi ███

I was wondering if I could possibly get double time for the ACT/SAT tests. ████████████████████
████████████████████████████. Also that i would be taking it over the course of two days, would
allow me to maintain focus more easily. If not it's not the end of the world. Thanks for the help!

_____

███ McGlashan
████████████

2



**From:** ███████████████████████
**Sent:** Saturday, October 21, 2017 8:44 PM
**To:** ████████ McGlashan
**Cc:** McGlashan, Bill; ████████████████████████
**Subject:** ACT decision
**Attachments:** DecisionNotificationDocument1859150100165200001.pdf.pdf

Hi ███████
You are all set for double time and a computer for ACT.  So glad it worked out!

Because of your accommodations, you must be proctored at school so you have to notify ████████████ (cc:ed here) at least 4 weeks before any test that you register to take so she can set up a proctor for you.  Are you planning to take the Dec 9 ACT that you registered for?  Either way, please email me and ██████ asap to let us know your plans.

Have a great Sunday.  Best, ████████

1

TPG-MA-00002340

 **Decision Notification**

10/21/2017



TAA Personal Identification Number (PIN):

Dear

Your request for accommodations and/or English learner (EL) supports has been reviewed. This notification is your record of the decisions that were made. Please work with the test coordinator at your school to resolve any questions you may have, or if applicable, to submit a request for reconsideration.

## Accommodations/EL Supports Approved

The following accommodations and/or EL supports are approved.
- Computer (Essay or short answer for Paper Testing only)
- TC 2 - Double Time (over multiple days)
- The approved accommodations are offered only through Special Testing. Testing materials will be shipped in advance of the three week Special testing window to the test coordinator or test accommodations coordinator at your school who submitted your request for accommodations.  The three week Special testing window begins on the National test date that you are registered for.  Testing may be scheduled on days and at times mutually agreed to by you and the test coordinator.
- The use of a computer is approved for the writing test only. Testing staff must certify that all tools such as spell check and grammar check are turned off on the word processing program.  The examinee's essay must be printed in 12-point type on standard 8 1/2 x 11 paper with the following margins: 2 inches for the top margin and 1.5 inches for the bottom margin and 1 inch on both sides. The entire essay must be deleted from the computer.

This notification includes all requested accommodations and EL supports the examinee is eligible to receive. Not all of these accommodations and/or EL supports may be compatible and, thus, cannot be utilized together during the scheduled test administration (e.g. 50% extended time and double time). If you have questions about what accommodations and supports can be used together for the upcoming administration, please contact ACT at

No additional approved accommodations or EL supports are authorized. Testing with accommodations or EL supports that are not approved by ACT will result in a voided score for the examinee.





## ACT decision

**MCGLASHAN** ███████████████          Mon, Nov 13, 2017 at 2:02 PM

To: ███████████████████
Cc: ██████████████████████ McGlashan ███████████████

Thanks ████████

On Nov 13, 2017, at 11:34 AM, ██████████████████████

Hi ████████████████

Great! I will proctor him in my office, upstairs ████████ room 205 at 9:00 am on Wednesday the 20th and Thursday the 21st of December.

Please arrive with your printed admission ticket, your photo ID, at least two #2 pencils, an eraser and a calculator. We will provide a laptop with appropriate parameters for your essay.

The double time total (of actual testing time) is 7 hours and 10 minutes (day one - English & Math (3:30) – day two: Reading, Science and the Essay (3:40)).

The sections are timed as follows:

### ACT Special Testing
Special Testing students receive double time per section. Test sections are spaced out over days, but students may not stop mid-section. Breaks are determined by each individual student's accommodations.

**English** – *90 minutes*
**Math** – *120 minutes*
**Reading** – *70 minutes*
**Science** – *70 minutes*
**Essay** – *80 minutes*

Please reach out with any questions.

Kind regards,

████████

On Mon, Nov 13, 2017 at 11:25 AM ███████████████████████████ wrote:
Hi ████████,

████████ did decide on the December 20 and 21 dates.

Thank you so much!
Best,
████████

On Nov 13, 2017, at 11:22 AM, ██████████████████ wrote:

Hi ████████,

Z

**From:**           McGlashan, Bill
**Sent:**           Tuesday, November 28, 2017 12:46 PM
**To:**             ██████████████
**Subject:**        Favor

This message has been archived. View the original item
<http://evserver1.texpac.com/EnterpriseVault/ViewMessage.asp?VaultId=10E5BB38F70B61141952FA54EDA6B4FDD111
0000evsite1.texpac.com&SavesetId=201803019896972~201711282046000000~Z~60558DD96058B1F6E43D445EBF47C
BE1>

██████████

I am in LA with ███████ on Dec 9, and Rick (███████'s college councilor) has arranged for ███████ to take the ACT test at a
school while we are there over the weekend.  ACT needs his TAA Pin#.  We have the letter we got from ACT with the
double time, but we did not get that number.  Do you happen to have it?

Hope you had a great Thanksgiving, and see you soon!

Bill

_____

Bill McGlashan
Founder & Managing Partner | TPG Growth
Co-Founder & CEO | The Rise Fund

TPG-MA-00000769
VB-RECORDS-00159332



To : Rick Singer
Date : 11/22/2017 04:22:54 PM
Will do

To YOU
Date : 11/25/2017 03:03:44 AM
███████████████████ are they billed?

To : Rick Singer
Date : 11/25/2017 07:32:40 AM
Not sure.  Sounds familiar.  Will let you know when I get in Monday AM.

To YOU
Date : 11/25/2017 07:32:54 AM
Thx

To : Rick Singer
Date : 11/27/2017 06:58:19 AM
███████████████████ billed and paid.

To YOU
Date : 11/27/2017 08:56:50 AM
Thx

To YOU
Date : 11/29/2017 12:27:02 PM
Steve please send a 40k donation to West Hollywood College Prep

To : Rick Singer
Date : 11/29/2017 12:39:37 PM
Will do.

To YOU
Date : 11/29/2017 12:51:06 PM
Thx

To YOU
Date : 11/30/2017 09:47:57 AM
Steve from Bill McGlashan to fund our foundation for testing at West Hollywood College Prep-
for son ██████

Can you send me details where I send the 50

To YOU
Date : 11/30/2017 09:47:58 AM
payment and who I make it out to etc?

To : Rick Singer

# BB

**From:**        Steve Masera ███████████████████

**Sent:**        Thursday, November 30, 2017 10:30 AM

**To:**          McGlashan, Bill

**Subject:**     West Hollywood Prep

**Attachments:** scan0001.pdf

Hi Bill,

Attached is your invoice and information or payment regarding West Hollywood Prep. You are welcome to wire the funds or remit a check.

Thanks,

Steve R. Masera

Director of Finance

The Key



1

# Invoice

*The Key Worldwide Foundation*

| Date | Invoice # |
|------|-----------|
| 11/30/2017 | 1149 |

**Bill To**

Bill McGlashan

| Description | Amount |
|-------------|--------|
| Regarding West Hollywood College Prep | 50,000.00 |
| | |
| Wire Instructions :  The Key Worldwide Foundation | |
| Routing #: ███████ | |
| Account #: ████████ | |
| Swift Code: ████████ | |
| Bank Information: ████████████████ | |
| Tax ID : ██████ | |
| **501c3 FEIN** ██████ | **Total** $50,000.00 |

TPG-MA-00002225



**From:**
**Sent:**       12/4/2017 12:20:07 PM
**To:**         McGlashan, Bill
**Subject:**    RE:

I will check on Waldorf.

I have the check taken care of, already confirmed it will be sent via Fed-Ex.

_____

TPG Growth

**From:** McGlashan, Bill
**Sent:** Monday, December 04, 2017 12:18 PM
**To:**
**Subject:**

Can you go through          's office to book me a room at the Waldorf Astoria for Friday night. Need two beds.

Also, please make sure they fedexed the check to Key Foundation.

_____

Bill McGlashan
Founder & Managing Partner | TPG Growth
Co-Founder & CEO | The Rise Fund

TPG-MA-00005827

# DD

**From**: McGlashan, Bill ███████████
**Sent**: 12/4/2017 10:00:32 PM
**To**: ████████████████████

**This message has been archived. <u>View the original item</u>**

Can you book me flight to LA. If commercial, needs to be about 6:30 Friday and return at 2pm on Sat. If not possible: ████████, can do LA Friday at 5:30 and return Sat at 1pm.  Please book us a table on the roof of Waldorf for dinner, and ask for heater.  If you have to, go through ████'s office.

---

Bill McGlashan
Founder & Managing Partner | TPG Growth
Co-Founder & CEO | The Rise Fund

TPG-MA-00005892

# EE



**Flight Itinerary**                Reservation:        Departing:
                                                        **Friday Dec 08, 2017**

REQUEST #:

**SAN FRANCISCO INTL**          **SANTA MONICA MUN**
SAN FRANCISCO, CA               SANTA MONICA, CA

# KSFO        ✈        # KSMO

**Friday Dec 08, 2017**          **Friday Dec 08, 2017**

**17:30 (5:30 PM)**              **18:30 (6:30 PM)**

11111111
Other

Phenom 300

Phenom 300

DISTANCE: 332 SM    EST. TRAVEL: 1 H 0 M          FLIGHT RULE: PART 135

---

**PASSENGER MANIFEST**                                TOTAL PASSENGERS: 2

1.   **William McGlashan**

2.   ▮▮▮ McGlashan

Prior to boarding, each adult passenger must present a government-issued identification such as a current passport or driver's license. This is required by the Transportation Security Administration.

---

**DEPARTURE SERVICES**                        AIRPORT: SAN FRANCISCO INTL

**Catering:** 🍴

2          **Wall Street Journal (Not Available on Sundays)**
1          **New York Times**

**Ground:** 🚗

Please let us know if we may assist you with any ground transportation.

---

Report Created On: Thursday, 07 Dec 2017 18:05 Z                    1 of 2

TPG-MA-00006684

## ARRIVAL SERVICES                                    AIRPORT: SANTA MONICA MUN

### Ground: 

Please let us know if we may assist you with any ground transportation.

## COMMENTS

**Request Instructions:**

██████████████████

## ADVISORY NOTES

<u>Security</u> The Transportation Security Administration prohibits carriage of certain items on commercial aircraft. The list of such items can be found at www.tsa.gov.

<u>Hazardous Materials</u> Federal law prohibits carriage of hazardous materials aboard the aircraft (whether in luggage or on person). Violation of these laws may result in five-year imprisonment and penalties of $250,000 or more.

Restricted hazardous materials include any quantity of explosives, flammable liquids or solids, compressed gases, oxidizers, poisons, corrosives, and radioactive substances.

<u>Spare</u> lithium batteries for electronic devices may be carried on person, but not in luggage that is placed in designated baggage or cargo compartments. However, devices with <u>installed</u> batteries may be carried in luggage placed in designated baggage or cargo compartments. Furthermore, e-cigarettes and vaping devices may be carried on person, but not in luggage placed in designated baggage or cargo compartments.

<u>Oxygen</u> Federal law prohibits carriage of <u>compressed oxygen cylinders</u> aboard the aircraft. However, Portable Oxygen Concentrators (POC) may be used during flight. The device must bear a label on the exterior, with the following statement in red lettering: "The manufacturer of this POC has determined this device conforms to all applicable FAA acceptance criteria for POC carriage and use on board aircraft." This label is not required on certain concentrators that had been previously approved by the FAA, for carriage.

If you have any doubt regarding an item you intend to carry aboard the aircraft, please contact your Owner Services Team, or advise the Captain, prior to boarding the aircraft.

The U.S. Department of Transportation (DOT), with the Federal Aviation Administration (FAA) and the Pipeline and Hazardous Materials Safety Administration (PHMSA), has issued an emergency order to ban all Samsung Galaxy Note7 smartphone devices from air transportation in the United States. Effective Saturday, October 15, 2016, the Samsung Galaxy Note7 device may no longer be transported on one's person, in carry-on baggage, or in checked baggage on flights to, from, or within the United States. This prohibition includes all Samsung Galaxy Note7 devices.

## SUMMARY OF RESERVATION NO. ████████

| ███████ | Dec 08, 2017 | Phenom 300 Signature | KSFO | KSMO | 17:30 - 18:30 PST | 18:30 - 19:30 PST |

███████████████████████████████████████████████████████

███████████████████████

TPG-MA-00006685



**From**: ████████████████████
on behalf of ████████████████
**Sent**:    12/9/2017 1:21:38 PM
**To**:      ████████████████████████
**CC**:      ████████████████████████
**Subject**: ██████ itinerary: Sat Dec 09, 2017 - KBUR to KSFO - Reservation ███████████

**This message has been archived. <u>View the original item</u>**

Hello again ████████

I have added ████████ to the flight home for today and have attached an updated itinerary. Please let me know if there is anything more I can do.


Sincerely,
████████████████


████████████████


Reservation: ████████████


Saturday Dec 09, 2017

Request: ████████████

BURBANK
KBUR

█████████████████████████████████████████████████

SAN FRANCISCO
KSFO


2:45 PM


3:57 PM


████████████████████████████████████



Travel Details

Travel Time: 1H 12M

Requested Aircraft: Citation Excel/XLS *

* This Citation Excel/XLS upgrade is subject to availability on the day of your departure. The Citation Excel/XLS is guaranteed for this flight.

Passenger Info

2

TPG-MA-00005949

Lead Passenger: William McGlashan

Contact Person: William McGlashan

Phone #: ████████████

Inflight Catering / Ground Transportation

No Catering R

(27 KB)

(1 KB)

(1 KB)

**From**: ███████
on behalf of   ████████████
**Sent**:   12/9/2017 3:25:00 PM
**To**:   ███████████████████
**CC**:   ███████████████████████████████
**Subject**:   ████  Flight Status Notification

**This message has been archived. <u>View the original item</u>**

████  Flight Status Notification

To ensure delivery, add ██████████████████████ to your contacts.

████████████████████████████████████████████

Request ██████████████

Dear ████████

Tail number ████████ has departed from BURBANK, CA.

ACTUAL DEPARTURE
Saturday Dec 9, 2017
3:21 PM local

ENROUTE TO ███████████████████████████
SAN FRANCISCO, CA
KSFO

ARRIVAL
Saturday Dec 9, 2017
4:33 PM estimated
3:57 PM requested

# GG

# ACT Administration and Payment Report—Special Testing

DEC 1 9 2017

Return this form with the answer folders to be scored. Instructions on reverse. Print legibly.

**A**

| | |
|---|---|
| ▮▮▮▮ High School Code | West Hollywood College Preparatory School   Room Name/Number #4 |
| School Name | |
| West Hollywood | CA / USA |
| City | State/Country     Number of Examinees |

**B** — Enter the Timing Code. Enter the information requested for all examinees testing in this room. Attach additional pages if more than 5 examinees.

Timing Code for this room: _____
Only one Timing Code is allowed per room.

| Examinee Names - Please print. | 1—English Date & Time | Min. | 2—Mathematics Date & Time | Min. | 3—Reading Date & Time | Min. | 4—Science Date & Time | Min. | Writing Test Date & Time | Min. | Total Min. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. ▮▮▮ McGlashan | 12/9/17 12:01pm | 90 | 12/10/17 1:40pm | 120 | 12/10/17 12:00pm | 70 | ▮▮▮ | 70 | 12/10/17 2:40pm | 80 | 430 |
| 2. | | | | | | | | | | | |
| 3. ▮▮▮ | | | | | | | | | | | Thrio |
| 4. | | | | | | | | | | | |
| 5. | | | | | | | | | | | |

**C** — All staff members for this room must complete the information and sign below, even if not requesting payment (attach additional pages).
Staff Statement: By signing, I verify that the information is accurate and that I was actively involved in the administration.

| | Test Coordinator | Proctor | Institution Payment Address |
|---|---|---|---|
| Full Name: | ▮▮▮▮▮▮▮▮▮ | | |
| *Signature: | ▮▮▮▮▮▮▮▮▮ | | |
| Email: | ▮▮▮▮▮▮▮▮▮ | | |
| Phone: | ▮▮▮▮▮▮▮▮▮ | | |
| Mailing Address: | ▮▮▮▮▮▮▮▮▮ | | |

**D**

- ☐ **Pay to staff.** Staff must have a Supplier Registration and Payment System (SRPS) account to receive payment.
- ☐ **Pay to institution.** W-9 required and institution must have an SRPS account to receive payment.
- ☒ **No payment**—administration was during school hours and part of staff's regular responsibilities.

VB-RECORDS-0005094

School Name: *West Hollywood College Preparatory School* — *West Hollywood*  CA/US

City: *West Hollywood*

State/Country: CA/US

Examined Name: *McGlashan*

Timing Code: 2

Test Date: 12/9/17 - 12/10/17

| Test | Standard Time Duration (minutes) | Time each test — Test Start time | Time each test — Test Stop time | Total the minutes from test start to test stop | Time any breaks taken DURING tests — Record break start/stop times | Total the break minutes used DURING tests — If none, enter "0" | Actual Testing Time — Subtract break minutes from during-test time from test minutes (A) |
|---|---|---|---|---|---|---|---|
| Example | | 8:00 a.m. | 9:03 a.m. | 63 | 8:35–8:48, 9:15–9:20 | 18 | 45 |
| Test 1 English | 45 | 12:01 pm | 1:31 pm | 90 | | 0 | 90 |
| Test 2 mathematics | 60 | 1:40 pm | 3:40 pm | 120 | | 0 | 120 |
| Test 3 reading | 35 | 12:00 pm | 1:10 pm | 70 | | 0 | 70 |
| Test 4 science | 35 | 1:20 pm | 2:30 pm | 70 | | 0 | 70 |
| Writing | 40 | 2:40 pm | 4:00 pm | 80 | | 0 | 80 |

A Grand total for all tests: 430

B Grand total for all tests: 0

C Grand total for all tests: 430

| Time any breaks taken BETWEEN tests — Record start/stop times for breaks taken between tests OTHER THAN scheduled breaks built in to the exam instructions. For example, include the standard time built-in breaks that occur after Test 2 and before the writing test. | Total the break minutes used BETWEEN tests — If none, enter "0" | Total Break Time — Add together total break minutes used DURING tests (B) and BETWEEN tests (D) |
|---|---|---|
| | D Total: 39 | E Total: 39 |

All staff members for this room must complete the information and sign below, even if not requesting payment. **Staff Statement:** By signing, I verify that the information is accurate and that I was actively involved in the administration.*

| | Test Coordinator (the person administering the test in the test room) | Proctor (in the test room) | Institution Payment Address (required only if payment is made to the institution) |
|---|---|---|---|
| Full Name | | | |
| *Signature | | | |
| Email | | | |
| Phone | | | |
| Mailing Address | | | |

Select one payment option, below. If no option is selected, no payment will be issued.

☐ **Pay to staff.** Staff must have a Supplier Registration and Payment System (SRPS) account to receive payment.

☐ **Pay to institution.** W-9 required and institution must have an SRPS account to receive payment.

☒ **No payment**—administration was during school hours and part of staff's regular responsibilities.

117



| Participants | From | Body | Status | Platform | Timestamp: Date | Timestamp: Time |
|---|---|---|---|---|---|---|
| ██████ Bill McGlashan (owner) ██████ Rick Singer Bill McGlashan (owner) | ██████ Bill McGlashan | You have a very relieved and motivated young man!  Very grateful. | Sent | Unknown | 1/10/2018 | 1/10/2018 11:19:16 AM(UTC-8) |

# II

**From:** ████████████████████
**Sent:** Wednesday, August 1, 2018 1:21 PM
**To:** ████████████████████████ McGlashan, Bill
**Cc:** █████████████████
**Subject:** decision letter attached.
**Attachments:** McGlasshan - appeal decision letter.pdf

Dear ████████ and William,

Please see ████'s attached decision letter from the College Board. Unfortunately, they did not approve the 100% extended time we appealed for but fortunately, you will still have 50% extended time should you take the SAT.

The details regarding why they made this decision are outlined in the attached letter and states:

The following provides more specific information regarding our decision:

*    ██████████████████████████████████████████ █████████████ the documentation does not sufficiently demonstrate the need for 100% extended time on College Board tests. However, you previously have been approved for 50% extended time through the school verification process which has been determined to effectively accommodate your disability.
*    Although the documents that you provided indicate ███████████████████████████ the documentation, when taken as a whole, does not show a ██████████████ that would require testing accommodations of more than 50% extended time on College Board tests.
*    Please note that failure to complete a College Board test, in and of itself, does not necessitate testing accommodations.


I'm glad we did the appeal because you never know unless you ask.

Warm regards,

████████████

--

██████████████████████████████████████████████████████████



2

TPG-MA-00001278
VB-RECORDS-00159841

**JJ**

| Participants | From | Body | Status | Platform | Timestamp: Date | Timestamp: Time | Delivered: Date |
|---|---|---|---|---|---|---|---|
| ████ Bill McGlashan (owner) Rick Singer Bill McGlashan (owner) | ████ Bill McGlashan | Rick, as you know ████ was turned down by SAT for double time. Is there a time and a half scenario where he can take a test at one of your sites? Multi-day time and a half or something like that? | Sent | Unknown | 8/25/2018 | 8/25/2018 11:19:55 AM(UTC-7) | 8/25/2018 |
| ████ Bill McGlashan (owner) Rick Singer Bill McGlashan (owner) | ████ Rick Singer | Yes if multiple days and college board has agreed-I believe we have ACT multiple not sure SAT? | Read | Unknown | 8/25/2018 | 8/25/2018 12:00:24 PM(UTC-7) | |
| ████ Bill McGlashan (owner) Rick Singer Bill McGlashan (owner) | ████ Bill McGlashan | He has 1.5 for SAT, but I am wondering if he can ask for multiple day with that. He was turned down on 100% extra time. Only granted 50% | Sent | Unknown | 8/25/2018 | 8/25/2018 1:04:24 PM(UTC-7) | 8/25/2018 |



**07/30/2018 15:04:47 Incoming Call, Rick Singer and ████████ (Bill MCGLASHAN)**

**[Session 4146]**

| SINGER | Bill. |
|--------|-------|
| MCGLASHAN | Hey Rick, how are you? |
| SINGER | Great, how about yourself? |
| MCGLASHAN | I'm good. How go the wars? |
| SINGER | Uh, things are good. We are all we got rid of a couple of the ideas and companies. |
| MCGLASHAN | [Laughter] |
| SINGER | And, we are, we made some amazing traction in some areas we never thought, um, of doing, and it impacts more people than anybody on the planet. |
| MCGLASHAN | Wow. |
| SINGER | Um, we're involved in this now. We signed a deal with ████ and uh, we created a platform called the recovery platform. |
| MCGLASHAN | Mmmm. |
| SINGER | And now we're doing a whole, we create, I took, I hired six addicts, and we created seven month mobile app for addiction after they leave rehab. |
| MCGLASHAN | Wow. |
| SINGER | And then the state of North Carolina hired us, so they were the first state to do the opioid program. Every state has it, which is to take on all of the um, opioid abusers through the courts. |
| MCGLASHAN | That's awesome. As a, as an attempt to keep them off opioids [OV] and, |
| SINGER | Yes, they're going to force them into doing... you know, they got to go get their testing, and then here's their seven month program. It's online. That we created a counseling program for them. For a group of individuals [UI] on a daily basis and, then we're all the silver living homes all over. We've already started in Sacramento and Orange County to test it. It's pretty amazing because this issue is huge in not only opioids, but alcohol, drugs, everything. |
| MCGLASHAN | No, it's uh, it's uh, it's uh, a devastating problem for society. I mean it's incredible. |

| SINGER | But yeah, and we got the, you know, we got the ███████ partnership, and we've got the first state partnerships [IA] ability. Um, now we just got to get everybody enrolled and then get started. |
| MCGLASHAN | That is so cool, Rick. That's a, that's a, that's a fairly dramatic pivot from what you've been doing. |
| SINGER | Well that's one of them, yeah. And then the ███████, so that's ██████. And then the job business is actually changed too, because that became a talent aggregation. I bought a company called ██████████. Which they have all the PhDs coming out of the 80 top colleges in America, and none of those People can get academic jobs, so right away they've got to get a real job. |
| MCGLASHAN | Mmm. |
| SINGER | And they don't even know what the hell to do. They have no idea. So, we got a subscription with all these universities, and then we go after individually helping these people, and they pair, so now I just created a virtual grad school, because the masters population is three times as big as the PhD population. |
| MCGLASHAN | Mmm. |
| SINGER | So when I met with the █████ people, I said, how about if I can give you a list of all the masters candidates from these schools and here's their stats. Here's the behavior. Here's your skill. Here's the PhD candidates. I got 'em all. What do you say? They're like, well shit, then we don't have to go find them? |
| MCGLASHAN | Gotta love that. |
| SINGER | Right, and I got all the... |
| MCGLASHAN | They'll pay them very big origination fee on that. |
| SINGER | Right, so I figured, that's the best way to get them. Just own the talent. |
| MCGLASHAN | Mmhmm. |
| SINGER | So that business is going well. And then █████ business to getting into colleges, just about ready to launch the beta test, so we're ready to start there. So you know, I learn a lot. I get my ass kicked a lot. But that's okay. |
| MCGLASHAN | You keep entrepreneuring. I love it. |
| SINGER | [Laughs] |
| MCGLASHAN | It's awesome. Did you, have you followed all the education |

| | |
|---|---|
| | stuff we've done at this point. |
| **SINGER** | No I haven't, no. |
| **MCGLASHAN** | So we're now the largest education investor in the world at Rise. |
| **SINGER** | Okay. |
| **MCGLASHAN** | From a zero start, as you know. |
| **SINGER** | Right. |
| **MCGLASHAN** | A year and a half ago.  Um so it, it ranges from, you know K through 12 tools.  We just bought... It'll be public as of, I think, I think the press is tomorrow, but um, ███████ which is the company that, um math, math company run by this woman, ███ that does um, uh, completely customized, uses algorithms to completely customize the math learning journey for students. |
| **SINGER** | Okay, that's cool. |
| **MCGLASHAN** | Amazing outcomes, you know data behind it. ███████ was the original investor in it. |
| **SINGER** | Okay. |
| **MCGLASHAN** | And it's become a big company, um, and by far the most, um, interesting on the spectrum of , of um, you know tools that allow you to deliver.  You know, it's a little like a ████████ ████████ except that... |
| **SINGER** | Right. |
| **MCGLASHAN** | ████ doesn't actually give you a customized path, it just responds.  It just allows you to sort of create your own path. |
| **SINGER** | Right. |
| **MCGLASHAN** | Um, there, it's used in the schools instead of as an adjunct um, program.  We bought ████████. |
| **SINGER** | Okay. |
| **MCGLASHAN** | Um, um, with ████████ We and they partnered to buy the company.  We just closed that deal. |
| **SINGER** | Okay. |
| **MCGLASHAN** | Um, obviously you already knew about ████████ and what we're... |
| **SINGER** | Yup. |
| **MCGLASHAN** | Our sorry, if we ever find what we're doing there.  Um, we bought, funded ████████, which is a, um, a company that's leading technical coding platform in Latin America. |
| **SINGER** | That's great. |
| **MCGLASHAN** | Um, which is really cool, because, it's, it, uh, it's sort of |

| | |
|---|---|
| | partnered with all the big, uh, employers, uh to get these folks trained up, 'cause they need 'em, in that, in that environment. Um, we did ▆▆▆ with India, which is a, school in a box solution, focused on creating affordable private schools in India.   We're actually doing a platform in, in uh, Africa. Which buying eight schools to start with in Nigeria, but doing it with a blended finance model with philanthropy. |
| SINGER | That's great. |
| MCGLASHAN | [OV] to make economics work. |
| SINGER | That's great. |
| MCGLASHAN | And then, we're, we, finally got agreement from ▆▆ .  I don't know if you know ▆▆▆ over at ▆ ? |
| SINGER | Yeah, we, uh, uh, he's actually after me really hard, because we're opening 24 universities in China. |
| MCGLASHAN | Oh, interesting. |
| SINGER | And, so, uh, ▆▆▆ called me from ▆▆▆ ▆▆▆ .  He wants to be our partner there.  Because you can't put university [IA], a family that has the, um, that has the license. |
| MCGLASHAN | Mmm. |
| SINGER | So I need, I have to have an American partner that can give me... I don't need a degree, I need to create a certificate program. |
| MCGLASHAN | Mmmhmm. |
| SINGER | So that the Chinese can actually do it in hospitality, digital media, um, and then service oriented stuff, like nursing.  And there's between five and twenty million people in each part of the second and third tier cities in China, right? |
| MCGLASHAN | Mmhmm. |
| SINGER | And our partner in China is ▆▆▆  And ▆▆▆ is one of the biggest companies in China, so they're going to be all the real estate stuff, and it's all online.  So, we may end up... |
| MCGLASHAN | I love it. |
| SINGER | Going, to, we may end up going to ▆▆▆ with ▆▆ ▆▆▆ from ▆ .  Because you know, they won a public battle with the ▆▆▆ . |
| MCGLASHAN | Mmhmm. |
| SINGER | But, ▆▆▆ quite a guy. He's got a [OV] |
| MCGLASHAN | Yeah, he is. |

4

| SINGER | He's got a, he's done an amazing job. |
| MCGLASHAN | Well, so what, so what he's done with us, is you know the program, the four year degree program, that he, that you know is the ▇▇▇▇▇▇ program. |
| SINGER | Yup. |
| MCGLASHAN | That's, again this is just between you and me, for now, but that's, we're privatizing that, and we're the shareholder, alongside ▇▇. Um, we've gotten his commitment that we bring four, three other universities in, so they're four to start with, um, ▇▇▇▇▇▇▇... |
| SINGER | Okay. |
| MCGLASHAN | ...is one.  Um, there's one in Australia.  Leading program in Australia, I forget the name of it.  But anyway, it's a platform of universities.  Um, we're way down the track with ▇▇▇▇ and a few others now as well, to launch the same program, you know as an employee benefit offer [OV] as a four year degree. 15 |
| 13 | 07 to 15 |
| 13 | 11 [IA] |
| MCGLASHAN | Rick |
| 15: 13: 11 to 15:13:15 [IA] | |
| SINGER | ▇▇▇▇▇ program that you guys are doing.  There's 70,000 kids behind. |
| MCGLASHAN | Mmhmm. |
| SINGER | So he asked me if we could do this across the country for them, so that we could get to the number they want to get to. So, I know they're not getting to the numbers, um... |
| MCGLASHAN | No, they're not. |
| SINGER | [UI] made of steel. And so they asked. |
| MCGLASHAN | That's right. |
| SINGER | They asked me to go, I help them with that.  So... |
| MCGLASHAN | All this, all this sort of says, we've got to get, you, me and ▇▇▇▇ together in a room.  And probably, you know, ▇▇▇▇, um, and just have a conversation together.  We should just air out, here's exactly where we are, and what we're doing. |
| SINGER | Yup. |
| MCGLASHAN | You should do the same, and just figure out how we get aligned here. |
| SINGER | I would love to do that.  That would be great, because all |

| | |
|---|---|
| | these things, we, like, maybe some of your colleges could be the ones we use in China. |
| MCGLASHAN | Yup, totally. |
| SINGER | Right, right, because. |
| MCGLASHAN | Totally. |
| SINGER | I got, I got to have this cheap way of approaching this certificate program which does not affect their cert... their accreditation, that's what makes it so great. |
| MCGLASHAN | Mmhmm. |
| SINGER | They can pretty much do whatever they want because I'm partnering with, the hospitality, I got is the certificates going to be called the intercontinental certificate.  So that in China, now you feel like you got...because the American university doesn't mean diddly to them. |
| MCGLASHAN | Yeah. |
| SINGER | And those right, and those places. |
| MCGLASHAN | That's right. |
| SINGER | Yeah, we should do that, absolutely. |
| MCGLASHAN | I love it.  I love it.  Um, jumping, so I'll have Jess coordinate for us to do the meeting. |
| SINGER | Okay, okay.  What's going with ███████? |
| MCGLASHAN | It's very timely, because the momentum couldn't be better. |
| SINGER | Absolutely. |
| MCGLASHAN | So just quick on ██████.  He feels really good. |
| SINGER | Good. |
| MCGLASHAN | I mean he's, he's, you've probably saw his grades have been sort of dramatically improving. |
| SINGER | Yeah, yes. |
| MCGLASHAN | I mean, he's actually working, which is sort of amazing how boys.  It just takes them a while I think to... |
| SINGER | Yup. |
| MCGLASHAN | Clue in. |
| SINGER | And he's got the confidence, he's got a score, he's got confidence. |
| MCGLASHAN | Yup, totally.  I mean it's sort of miraculous.  He's engaging.  His internships have been brilliant.  You know, he was at ████████████████ you know for the first two weeks. |
| SINGER | Right. |
| MCGLASHAN | And then ████████ went really well.  That was his second round at ██████.  They love him.  Um, and then um, and |

6

| | |
|---|---|
| | then he's now down at ▮▮▮▮▮▮ you know, working.  Um I, I've set up through the, you know friends of mine who are involved there this lunch on Friday with... |
| SINGER | Yup. |
| MCGLASHAN | Um, the dean of the, of the Iovine and Young [PH] Academy. |
| SINGER | Right. |
| MCGLASHAN | Um, he's already met the, the number two dean, the vice dean, ▮▮▮▮▮▮ |
| SINGER | Okay. |
| MCGLASHAN | This dean asked if, if, we could have lunch, uh, or a meeting. And I sort of thought, shit, I don't have the time, but I figured, you know, lunch is a better... |
| SINGER | Absolutely. |
| MCGLASHAN | ...engagement model, right. Uh [OV] you had said to me before, do a meal, get to know these people. |
| SINGER | Always. |
| MCGLASHAN | So, yeah, so we're, well we'll have lunch on Friday, and then she'll give us a tour, a couple hours with her.  Um, what they ask, I went through a buddy of mine on the board there.  I've got a number of friends, quite a few friends that are of the board.  Um, and I, basically said the following, I wanted to run this by you and get your instinct on it.  But I said, look, the issue is with early admission, with these schools like a Brown, the only way I can really lean on my friends there, et cetera, is if he applies early. |
| SINGER | Correct, and applies... |
| MCGLASHAN | Um, yeah, so it's bind... The problem is it's binding.  And all else being equal, if he were to get into Iovine and Young, he would go to SC over Brown. |
| SINGER | Right. |
| MCGLASHAN | The clear sense I'm getting.  You should have your own discussion with him. |
| SINGER | He, that's the way it felt last time I was with him. |
| MCGLASHAN | Yeah, so, what I said to ▮▮▮▮ and he's the guy that helped me. ▮▮▮▮▮▮ on the board there.  Is I said, and he's not had this explicit conversation with her, but he said, um, I would need, you know, he's basically the manage of we need to know that ▮▮▮▮ is going to get in.  In other words, other wise he's better off applying to Brown.  It's not that you need to contractually agree or anything, but basically, he's getting |

| | |
|---|---|
| | in.  So, that's that's what I'm trying to angle for, is that after, she has his, his uh, [OV], self cores and, uh, and his grades. |
| SINGER | Right. |
| MCGLASHAN | Already.  ▇ get, sent them over to her.  And so she wanted those, because she said I need to know if he's going to get into SC.  I, I said to ▇, look, I really have a hard time imagining he can't get into SC, generically. |
| SINGER | Now his grades are not good enough to get into SC. |
| MCGLASHAN | Is that right? |
| SINGER | Oh yeah, oh yeah. |
| MCGLASHAN | That's amazing.  Wow, okay. |
| SINGER | [OV] Because the issue is not [UI] that his grades aren't good enough.  The number of kids applying from schools that are stronger than him. |
| MCGLASHAN | Yup. |
| SINGER | [IA] That [UI] the issue.  So, she's, that's why she's, she's so, she's probably going to tell you, is, think about this.  Here's some strategies. |
| MCGLASHAN | Yup. |
| SINGER | The department, each department has a VIP list. |
| MCGLASHAN | Mmhmm. |
| SINGER | And, essentially what they do, is they can walk a kid through admissions with Tim, and say we want this family.  The problem occurs... |
| 15:18: 16 to 15:18:20 [IA] | |
| MCGLASHAN | Rick, you're breaking up. |
| SINGER | Oh, sorry. |
| MCGLASHAN | Yup... |
| SINGER | [IA] |
| MCGLASHAN | You said the problem occurs and I lost you. |
| SINGER | Yup, so let me...  I'm going to go to a different place, one second.  So what happens is they have a VIP list.  Each department, each dean, has their own VIP list.  And essentially at some point they get the opportunity to go to Tim, and say, here's my list.  This is what I want.  That's how they... that may not happen until January, February. |
| MCGLASHAN | Mmhmm. |
| SINGER | They may give us a nod, saying, hey, it looks good.  It looks good.  But, you haven't really, you haven't really sat in front of Tim and said, it's done. |

| | |
|---|---|
| MCGLASHAN | Yup. |
| SINGER | Okay.  So, I was thinking about this for you.  I don't know how you want to handle it.  I would just give you some.  Here's some approaches maybe.  Okay. |
| MCGLASHAN | Yup. |
| SINGER | I don't know if this makes sense.  So, one is to go just down that path, and my guess is you'll get accepted, and it'll happen, but you won't know, until you know, mid-spring, and/or right before they get the admissions letter right before March 25th.  Which is not a good... |
| MCGLASHAN | Yup. Yup. |
| SINGER | Not a good, not a good feeling for you guys, not knowing. |
| MCGLASHAN | Yup. |
| SINGER | Right, 'cause they're going to say, it's looking good, it's looking good, well, how about like let's get it done. |
| MCGLASHAN | Yeah. |
| SINGER | Okay, so, another way some people have done it, is, I told you I have a side door there.  There is a financial thing in there, but what happens is we get them accepted in the fall, earlier.  Latest is first week of February, or January because they want to see first semester grades.  But let's just say it happens in the fall, then what would have to happen, would make it much easier, is your department says, we'll take that kid, because, what will happen is, when we apply like that, they're going to say, yeah, we'll admit him, but we can't say he's getting into that program.  But if the program already said we'll take him. |
| MCGLASHAN | That's great. |
| SINGER | Right.  So you would go... |
| MCGLASHAN | That's great. |
| SINGER | You would go through athletics. |
| MCGLASHAN | The, the, the, the interesting thing is the side door at, that ■■ is working at the Iovine and Young academy is, which doesn't apply to overall admissions to your point.  But even here, I'm going to have to play games.  They're saying, ■■ said, look, you've got to be willing to join the board of Iveen and Young, you personally.  [OV] And, you know, I told her you'll write, a one to three million dollar check.  And, and uh, that's, you know, I said, wow, okay.  The only awkward thing for me is I don't want... I said if I, even if I agree to do that, I |

9

| | |
|---|---|
| | would want to join the board a year after ▮▮▮▮ gets in or something, so I don't create a weird dynamic for him, you know. |
| SINGER | Sure, so, so, in this path, you'd pay 250, you'd get accepted. Uh, let me get his stuff and I'll take it to them.  If they can accept him in the fall. |
| MCGLASHAN | Yup. |
| SINGER | He may be... It may be before he even applies. |
| MCGLASHAN | See that would be great. |
| SINGER | Right. |
| MCGLASHAN | I would do that in a heartbeat. |
| SINGER | Right, and then you get this unofficial, official letter. |
| MCGLASHAN | Now does he, here's the only question, does he know?  Is there a way to do it in a way that he doesn't know that happened? |
| SINGER | Oh yeah.  Oh he... |
| MCGLASHAN | Great. |
| SINGER | What he would know is, that I'm going to take his stuff, and I'm going to get him some help, okay. |
| MCGLASHAN | So that, that he would have no issue with.  You lobbying for him.  You helping use your network.  No issue. |
| SINGER | That letter, that letter comes to you. |
| MCGLASHAN | Yup. |
| SINGER | So, my families want to know this is done. |
| MCGLASHAN | Yup. |
| SINGER | Right, so they want this letter to come to them, so I have them, I have admissions, and that's why I extend the letter to you, you hold it. |
| MCGLASHAN | Right. |
| SINGER | You don't have to tell him a thing. |
| MCGLASHAN | Yup. |
| SINGER | At that, at that point, that, as soon as you get that letter, then they expect just a $50,000 check, and it goes to Women's Athletics. |
| MCGLASHAN | Great. |
| SINGER | And then the other 200 comes in March after you get your official, official letter, but the letter you're actually getting is the same letter you're getting in March. |
| MCGLASHAN | I love it. |
| SINGER | Right, and they just do it that way. |

| MCGLASHAN | But again, he wouldn't, he wouldn't, have to see any of these letters. |
| SINGER | He wouldn't see any of them. |
| MCGLASHAN | Correct, what he would know... |
| SINGER | None of them. |
| MCGLASHAN | ...is Rick would say, hey, I had a great conversation, ███████, things are looking great. You know. |
| SINGER | Correct. |
| MCGLASHAN | Keep your grades up, work hard, but things are looking great. That kind of thing. |
| SINGER | Correct.  I have to keep, I have to do a profile for him in a sport, which is fine, I'll create it.  You know, I just need him... I'll pick a sport and we'll do a picture of him, or he can, we'll put his face on the picture whatever.  Just so that he plays whatever.  I've already done that a million times. So... |
| MCGLASHAN | Well we have images of him in Lacrosse.  I don't know if that matters. |
| SINGER | They don't have a lacrosse team. [OV] But as long as I can see him doing something, that would be fine. |
| MCGLASHAN | Yeah. |
| SINGER | And then what happens is then what you have to do, because this would be a specialty program, is that you have to then talk to the department and say, hey listen, can you take him in the department, we've gotten him accepted into the university. |
| MCGLASHAN | Yup. Well I can handle, I think I, I mean I'll know after this lunch.  I think I can handle them at Iovine and Young. |
| SINGER | Right. |
| MCGLASHAN | Yeah.  Which is where he really wants to go. |
| SINGER | Right.  So you're saying, hey listen, I think I can get him into this school. |
| MCGLASHAN | Yup. |
| SINGER | Now, now, can you, 'cause they're going to come to you and say, this is selective program, would you want this kid? And he's quote an athlete who's coming to you.  In fact, would you take him? And the department says yes. |
| MCGLASHAN | Now would she see that, 'cause, that, he's going to be fairly well seen at the school, because half the board knows me, and I'm going to be sort of calling in and asking people to help, you know ███████████████████████████ all those guys. |
| SINGER | But, so, so, what I would suggest is have you called them? |

|  | Any of them yet? |
|---|---|
| MCGLASHAN | No |
| SINGER | Good, don't. |
| MCGLASHAN | Okay. |
| SINGER | Because you don't need, because when this, the way this, the quieter it, the quieter this is, the better it's so, people don't say well, okay, this guy, why are all these people calling us. The kid's already been accepted.  He's coming here as an athlete.  He's already in.  What you just want, is the person you're meeting with on Friday to say, you know what we want this kid. |
| MCGLASHAN | So she doesn't have to know how he got in.  Is that the case? |
| SINGER | What I would say to her, if you want to have that discussion now with ▓▓▓ there, that we have friends in Athletics they are going to help us, because ▓▓▓ is an athlete, and they're going to help us.   From the... |
| MCGLASHAN | But I can't say that in front of ▓▓▓, 'cause he knows he's not. |
| SINGER | No, no, right. |
| MCGLASHAN | Yeah. |
| SINGER | And just say, you know what, we're going to get, we're going to get some, we're going to get people to help us. |
| MCGLASHAN | Why wouldn't, why wouldn't I say look, leave it to me to worry about getting him in, 'cause I have a lot of friends involved in the school. |
| SINGER | Perfect, perfect. |
| MCGLASHAN | And, I feel confident, I can figure out a way to get the school to help us. ▓▓▓▓▓▓▓ board's a friend. |
| SINGER | Correct. |
| MCGLASHAN | And, uh. |
| SINGER | Correct. |
| MCGLASHAN | You know what I mean. |
| SINGER | Correct, right, so you could you, what is going to happen when they see his application, he'll be flagged as an athlete. |
| MCGLASHAN | Okay. |
| SINGER | But once he gets, once he gets here, he just goes, he doesn't go to the athletic orientation.  He goes to the regular orientation like all my other kids just did.  They all got home, and everything's fine.  The issue is the specialty program.  And he could do... |

| | |
|---|---|
| **MCGLASHAN** | So how does he... just as a, just as a, just as this plays out, my worry on this is, ███████ starts getting letters at home from the athletics program and... |
| **SINGER** | He won't. |
| **MCGLASHAN** | Okay. |
| **SINGER** | He won't.  What he will get in the summer, is a letter saying come to the athletic orientation.  Okay, but here's what I would... |
| **MCGLASHAN** | What, yeah, what do we do about that. |
| **SINGER** | Here's what I would do.  I would just tell him.  I would tell him, listen I got lots of friends in athletics.  You're an athlete kind of guy, and my friends in athletics are going to help you.  So I'm letting you know.  They're going to help you get in.  Because they have the easiest way in.  And, [OV] all the coaches, I'm friends with all the coaches.  So, they're going to help you get in.  And, um, but maybe here's a better idea.  Maybe this is a better idea.  We go this path.  You work with the dean, but, but, how, how would you feel about, if you already know that he's going to get into the program, but we apply to letters and sciences as a regular student. |
| **MCGLASHAN** | Yup. |
| **SINGER** | Once he's there, when he goes to orientation, you, they, you switch him.  Because the department's already said it's okay, you can switch him.  Then... |
| **MCGLASHAN** | So what am I... I'm switching him from what to what? |
| **SINGER** | From letters and sciences, undeclared, to the program. |
| **MCGLASHAN** | To the Iovine and Young? |
| **SINGER** | Yes. |
| **MCGLASHAN** | But what if he's able to get into the Iovine and Young program out of the gates? |
| **SINGER** | Well if he gets into the program out of the gate, [OV] |
| **MCGLASHAN** | I think you have to... Don't you have to get in anyway to one of the other... |
| **SINGER** | You do, but you are all have a relationship with these people, and they're already know that he's one of the spots.  All I'm trying to do is cut away any other people looking in. |
| **MCGLASHAN** | Yeah, yeah. So I guess, what I'm wondering, I think normally the way it works is you have to apply to the school period. |
| **SINGER** | Correct, correct. |
| **MCGLASHAN** | And then you separately apply to Iovine and Young.  So they |

13

| | |
|---|---|
| | expect you to get admitted to both places right. |
| SINGER | No, what happens is, when they see you, he's applying to Iovine and Young now, but you have to first be admitted to USC before Iovine and Young can take you. |
| MCGLASHAN | Right. |
| SINGER | But his application will actually say, and he'll write his essays to fit Iovine and Young. |
| MCGLASHAN | Okay. |
| SINGER | Does that make sense? |
| MCGLASHAN | Yeah, but they have a separate, what they have is a... |
| SINGER | A supplement. |
| MCGLASHAN | A, well it's a, it's his pitch he has to do.  To come down and present to ██████████████ and everybody for this idea that he has. |
| SINGER | Correct, it's a sup... it's their supplement.  It's that department's supplement. |
| MCGLASHAN | Yup. |
| SINGER | Yup, so let me do, my own, I'll do... Let me take some of this week and do my own research. |
| MCGLASHAN | Yup. |
| SINGER | As to what is the best way that it keeps him, nobody knows, he doesn't know anything, and it can flow much easier. |
| MCGLASHAN | Perfect. |
| SINGER | Let me do that, and then that way, hopefully by Friday I'll have some answers so that you can at least be poised to um, have a discussion after that, with them. |
| MCGLASHAN | Exactly, exactly, that's perfect.  That Friday, the focus of Friday'll be you know... |
| SINGER | Intro. |
| MCGLASHAN | You know, intro, tell us about the school, vision, |
| SINGER | Yes. |
| MCGLASHAN | You know, where you going with this.  Um... |
| SINGER | Yes. |
| MCGLASHAN | Yeah, perfect.  Um, that's great.  And then I guess the part that was new news to me is that in order to use the, the uh, athletic sort of, you know, department side door if you will, he has to actually apply to letters and arts, he can't be applying to Iovine and Young? |
| SINGER | No, that's not true.  I just was trying to figure out the easiest way. |

14

| MCGLASHAN | Got it. |
| SINGER | That, because it's a guarantees in letters and sciences.  To get into Iovine and Young you need them to take him. |
| MCGLASHAN | What's, what's interesting, with the, friends of ours that went into the, that applied to film school, uh, that's friends with their [UI] daughter applied.  She did not get in, but then she was pushed over to a generic, you know get into SC.  So she got into SC, but she didn't get into the film school. |
| SINGER | [UI] |
| MCGLASHAN | What, where would she have gotten in? Was it, would it have been like letters and sciences or something?  Where would they put her? |
| SINGER | Yeah, yeah, in letters and sciences.  Absolutely. |
| MCGLASHAN | Got it.  Got it. |
| SINGER | Because that's the big school.  That's anthropology, the zoology, biology, economics, everything. The whole planet is in there.  And that's where normally people start. |
| MCGLASHAN | Yup. |
| SINGER | Because they're not sure what they want to do. |
| MCGLASHAN | And then you go onto a new more, yup. |
| SINGER | Yes. |
| MCGLASHAN | Got it, yeah, because they have people transfer into Iovine and Young their sophomore year, but they make them start over and take the full... |
| SINGER | Sure. |
| MCGLASHAN | ...program, even including the freshman courses. |
| SINGER | Sure. |
| MCGLASHAN | That are required at Iovine and Young.  They want them to have the full four year... |
| SINGER | Sure. |
| MCGLASHAN | ...program.  Which is, which is, whatever it is, you know 60% of your course work, 'cause it covers so many different departments. |
| SINGER | Correct. |
| MCGLASHAN | In that, in that program.  Okay, well, so you'll, you'll, you'll give me a heads up [OV] and then one other, just family question, with ▮▮▮▮ now entering his sophomore year, and sort of, the process is beginning, we have him on time and a half.  I told ▮▮▮▮ yesterday, and ▮▮▮▮ by the way, who is the, who I think is the one who needs the most time, has no |

| | |
|---|---|
| | extra time currently.  And, ███ 's talking to the doctor that assessed them, to get her to ask, to request time for ███ .  I told her she should be requesting double time for all of them. |
| SINGER | 100% multiple days.  No matter what, multiple days.  So, even if it's 50% time and a half, multiple days. |
| MCGLASHAN | So is that a different ask to get multiple days versus... |
| SINGER | Well the 100%. |
| MCGLASHAN | [OV] And if they get time and a half, can they use your facility to take the test? |
| SINGER | No, not unless it's multiple days. |
| MCGLASHAN | So as long as it's multiple days, we're in. |
| SINGER | Correct, correct.  Like it could be [OV] |
| MCGLASHAN | And they, that's a separate filing? |
| SINGER | Overall it's the same.  Well, so, you're saying ███ 's got a, time and a half. |
| MCGLASHAN | Yeah. |
| SINGER | So, what has to happen, is there has to be an appeal to get the multiple days.  The doc's got to come up with stuff discrepancies to show why he needs multiple days.  That he can't sit six and a half hours taking one test. |
| MCGLASHAN | Perfect. |
| SINGER | And so if he gets multiple days, then I can control the center. |
| MCGLASHAN | Thank you. |
| SINGER | Yes. |
| MCGLASHAN | And then what about...  If you get a, if you get double time, you automatically get multiple days? |
| SINGER | Automatically, yes. |
| MCGLASHAN | Oh, so it's either multiple days with 1.5 or um, double, 2X time. |
| SINGER | Correct. |
| MCGLASHAN | Got it, okay, I'll make sure ███ goes to work. |
| SINGER | And we don't care if it's SAT or ACT. |
| MCGLASHAN | Yup, yup. |
| SINGER | Because, we're just going to take it one time and be done anyway. |
| MCGLASHAN | Yup, exactly.  The ███ is going through the stress of her SSATs, which is totally cute and sad to watch.  But it's like Jesus Christ.  This whole testing thing is such a nightmare for kids. |
| SINGER | It is. |

| | |
|---|---|
| **MCGLASHAN** | It's awful.  It really is. |
| **SINGER** | Agreed. |
| **MCGLASHAN** | Awful.  Yeah.  Alright, my brother. |
| **SINGER** | [OV] Okay, I'll talk to you [UI] |
| **MCGLASHAN** | My follow ups are to get us together with the group.  And then you're going to let me know what the right plan of action would be.  And I'm totally open to that if that's the right, uh, what the right approach is. |
| **SINGER** | Exactly, yeah, let me find out. |
| **MCGLASHAN** | Awesome. |
| **SINGER** | You got it. |
| **MCGLASHAN** | Okay. |
| **SINGER** | Take care. |
| **MCGLASHAN** | Thanks a lot. |
| **SINGER** | Yup, take care, buh bye. |



08/22/2018 19:38:16 Outgoing Call, William MCGLASHAN and Rick SINGER
**[Session 6574]**

| Voicemail | Hello this is Bill McGlashan, leave a message at the tone. |
|---|---|
| RS | Hey Bill, so we're gonna um met with SC, um, because the school does not have a football team um, I'm gonna make him a kicker/punter and uh they're gonna walk him through with football and I'll get  picture and figure out how to photoshop and stuff so it looks like it and um, the guy who runs the biggest kicking camp is a good friend, so we'll put a bunch of stuff about that uh, on his profile and we should be uh in pretty good shape to get that uh done uh, it's just a matter of when I get the profile done, get it to them and figure out when they're gonna have a sub-committee meeting, so I'll let you know. Stanford said no, um too tough, grades too low um just don't want to uh make that an exception right now um for him, so I wanted you to know that as well and then I think I'm seeing you next Tuesday so if there's anything you need from me just let me know, see ya, buh-bye. |

MM

08/22/2018 19:46:25 Outgoing call from Rick SINGER (RS) to William MCGLASHAN (WM)
**[Session 6577]**

| | |
|---|---|
| WM | Rick. |
| RS | Hey so you got an NFL punter huh? |
| WM | You there Rick? |
| RS | Yes. |
| WM | Oh there you are, perfect. Lost ya. |
| RS | You got an NFL punter. |
| WM | I I did. That's just totally hilarious. So he...so this is for, so, the one part you were garbled at the beginning is the school doesn't have a football team, meaning, obv- obviously SC does. What does that mean? |
| RS | Your high school. |
| WM | Oh the high school. yes of course. Got it. |
| RS | So they asked me what sport could we put him through. And I said well, I don't want, you know, cause your school doesn't have football it's easy because I can say, because they have all these kicking camps and these kickers always get picked up outside of the school... |
| WM | Yeah perfect. perfect. |
| RS | So I'm gonna make him a kicker. Um... |
| WM | (laughs) He does have really strong legs. |
| RS | (laughs) Well, this will be for...this will be good for one of the... |
| WM | Maybe he'll...maybe he'll become a kicker. You never know. |
| RS | Yeah! Absolutely. |
| WM | You could inspire him Rick. You may actually turn him into something. I love it. |
| RS | I know. Well I had a boy last year, I made him a a long snapper. And |
| WM | I love it |
| RS | He was 145 pounds. Long snapper. So. |
| WM | I love it. I love it. That is so funny. So um, and then, just remind me again, we get all these done and the the the obvious deal you and I talked about the $50K and the $200K. And...and then uh, do we know he's in? You and I at least know he's in? |
| RS | Yeah, yeah. Beacause when he gets in they'll send me a letter which will be the |

| | |
|---|---|
| | and you... |
| WM | Yup |
| RS | The same letter that he's going to get later on. |
| WM | Yup. |
| RS | But it'll just be in your hands. It's always (OV) |
| WM | Perfect |
| RS | For the parents to know that everything's cool. |
| WM | Perfect. And then, cause I, by the way I've had...I've had a ton of kids friends who's, uh, friends who's kids have gotten in already to all these schools. It's amazing how, you know, they'll take them as early as sophomore years you know in these sports programs now where they tell them they're in. |
| RS | Well yeah but they're not really in. So they de-committ them, you know that. Eighty percent... |
| WM | Oh I didn't know that. |
| RS | Decommit rate. |
| WM | Wow...So these kids all think they're in, and then they may not be. |
| RS | They're not. They're not. Especially, especially if it's a girl. |
| WM | Yep. |
| RS | Because they recruit the girls early and what happens is... |
| WM | It is girls, these are friends of ours who's girls have said no they were admitted to like all these top schools as like sophomores. |
| RS | And they weren't admitted. |
| WM | Wow. |
| RS | Nothing's happened. It's not a commitment, it's not a for sure thing, as them "Do you have it in writing?" and they'll say no. |
| WM | Wow. |
| RS | Because it's not in writing. |
| WM | Fascinating. |
| RS | So they all take themselves off the market. And then... |
| WM | Yeah, totally well and they also stop worrying about their grades cause they're |

| | |
|---|---|
| | already in. |
| RS | That's right and they're not...and they're not in...because they have not done their applications. They have not.. |
| WM | That's actually terrible, they shouldn't be doing that. |
| RS | Well, what happens is it's because the parents have been pushing this for so...so hard... |
| WM | Yeah. |
| RS | And they want to be able to tell their families they got in here and here. So what happens is the 10th grade girl commits and then what happens is she doesn't get any better. |
| WM | Yup. Yup. |
| RS | And now the kid who grows later and gets better later... |
| WM | And the kid who's hungrier...cause they don't think they've got a shoe in yet. They're still fighting. And trying and, yeah. |
| RS | That's exactly right. |
| WM | Wow. So, so...um, I had an exchange, I forwarded you that email. I had an exchange with uh, with um, ███████ the Dean over at the academy, and she was very positive about him. He still has to get obviously get his...he's gotta actually do the work on his pitch. Uh... |
| RS | Right. |
| WM | Which I think he's got a pretty clever concept, but he's..he's sorta needing to all the work to put it into a compelling, you know, package. He's gonna run that by when. he meets you next by the way...Um...uh |
| RS | And he sent me stuff already, I just sent him back edits. |
| WM | Perfect. For his application? |
| RS | Yeah. |
| WM | Yeah that's on the general application right?  No the um |
| RS | Correct. |
| WM | I don't think he's done with the pitch yet. |
| RS | No. |
| WM | I mean he's he's  getting..uh, he's doing graphic design, getting you know, uh, |

| | |
|---|---|
| | screenshots done...and he's..you know..a guy, a blockchain guy helping him. And...I think he'll do a good job but we'll see. Um, but that's on the academy side so either way we can target getting him in, and then he can get in or not on the academy beyond that. |
| RS | Right. So... |
| WM | Perfect. |
| RS | So you know essentially she told me when I get all the paperwork together, and I gotta create this profile pic. So what I'll probably need if you guys have any pictures of him, um playing multiple sports or something where you can kind of see his face a little bit in action? |
| WM | Umhm. |
| RS | It would be helpful because I will photoshop him onto a kicker. |
| WM | (laughs) Ok. Ok. Let me look through what I have. Pretty funny. The way the world works these days is unbelievable. |
| RS | It's totally cra...like last year I had a boy who did the water polo, and when the dad sent me the picture, he was way too high out of the water. That nobody would believe that anybody could get that high. |
| WM | Yeah (OV) |
| RS | So I told that dad. I said "What happened?"  He said...he was standing on the bottom! I said "No no no no no." |
| WM | Yeah exactly. You gotta be swimming. Exactly. |
| RS | That's right. |
| WM | That's funny. That's great. Ok well yeah, it's too bad that she doesn't have a uh lacrosse program with scholarship positions. That'd be easy. |
| RS | I know. It'd be much easier. But she said, that's cool, let's do it that way. So, that's the path we're gonna go. |
| WM | Okay perfect. And then what are you sense of the odds at this point if we, once you get the package in and everything? |
| RS | Uh, 90%. |
| WM | Ok. Great. Great. Well, I'll get you some photos and um, obviously I'll see you on |

| | |
|---|---|
| | the broader, the other matters on Tuesday on the business matters. And and uh and I'm gonna keep pushing him on the uh on the uh, you know the pitch. Uh.. |
| RS | Good. |
| WM | But that's a project. The other thing I guess, a question for you is on, on um, on the Brown process. I did a uh conversation with uh ███████ and ███████ two of board members and they both, I was very open with them about his grades, showed the positive trend, it didn't really bother them. Brown has an interesting philosophy where they don't care as much about the earlier grades if he's showing he can do it now, and is getting good grades now,  they call them slow risers. |
| RS | Right. |
| WM | It's a term they use for boys. Um, so they were actually intrigued...they wanted him to submit the same pitch he's doing for for the academy to Brown because they have a similar social um, you know, entrepreneurship program. Um, I...I actually think, I'd love your help on this, next time you talk to ████, I actually think he doesn't...it bums me out but I don't think he loves Brown. I think he loves SC. I don't know if you've had that conversation, but, um, I don't....I don't think there's any chance he would go to Brown over SC. If he had the choice. |
| RS | No. |
| WM | Is that your read? |
| RS | Yeah. And part of the reason, um, Bill is that he believes the program at SC he has much more liberty and choices of things he can do? |
| WM | Umhm. |
| RS | And he is a little worried about the other academic stuff at Brown. |
| WM | Umhm. |
| RS | That the caliber... |
| WM | Which I which I find..I I find hilarious cause there's no easier program to get |

| | |
|---|---|
| | through than Brown. Frankly it'll be alot easier than SC, academically. |
| RS | Right. |
| WM | I mean it's it's the most grade inflated program in the country. They call them gentlemen's B. I mean you don't have to do anything and you get a B. |
| RS | (laughs) |
| WM | You know? So I I I think it's I I think I think he would be surrounded by people that are generally more academic than he is. But you know, his his uh his actually ability to perform when he actually knuckles down is great (OV) |
| RS | Oh it's great |
| WM | And he can actually focus. He has a hard time focusing obviously but when he does it's it's he's plenty bright enough to be in that crew. (OV) |
| RS | He has grown up a lot |
| WM | So I would hate... |
| RS | Right..he's grown up alot. |
| WM | What's that? No he has, it's amazing how he's changing. I mean it's almost like his frontal lobes grew or something yeah. |
| RS | (UI) But here's the other thing, uh, I just sent ███████ do you know ███? |
| WM | Uhh I feel like I do, why do I know that name? |
| RS | She used to run ████████, she just took over ████. |
| WM | Yeah I I I actually just met with her. What a weird coincidence. With her and ███, her boss. |
| RS | Ok so, so, I have ███ kids of course. She's dropping off the oldest right now but they just got done meeting the president at Brown.. |
| WM | Uh huh. |
| RS | Because if you're gonna do this, I know you have the two, but him being in front of her is important just so that she knows...cause she knows him and pushes everything through. If that's what you guys end up... |
| WM | So so so, these guys said the same thing. And I, and she's quite excited about |

| | |
|---|---|
| | what we're doing and wants to meet. I...I worry a little bit that she wants to meet because of uh, she wants to sit down with me as opposed to having any desire to meet ████. But uh you know, they they were suggesting I go and have dinner with ████ and her, or lunch, with you know ████ and her. |
| RS | Yep. (OV) |
| WM | Um, my worry is I don't want to lean on these guys. I'd love your wisdom on this. But I don't want to lean on these guys cause I can certainly (OV) do that and push and pry them with a big donation (OV) and stuff but if ████ doesn't want to go there anyway. And by the way he doesn't have to apply early, in fact they they said that they probably shouldn't apply early to Brown (OV), cause he's not you know, one of those candidates. |
| RS | No they...and they defer everybody. So let's wait for that for December January. (OV) If we don't have the letter by then. And and then you go. But I, that is the path because, and you're right, she wants to meet with...like wanted to meet with ████ more than she wanted to meet with the two girls, and... |
| WM | Yup. |
| RS | But I said ████, this is what you gotta do. |
| WM | Yep. |
| RS | And so...so so yeah. I'd wait til December January. |
| WM | And do we...when do you think...what's the timing on the letter from, from SC, once we actually submit everything? (OV) |
| RS | So it either either comes in two waves. So it'll either happen sometime um mid-late November or it'll happen, which I don't want to have happen, it'll happen on the next recruiting period, which will be January February. |
| WM | Umhm. |
| RS | My goal is to get his picture and everything into her now... |
| WM | Yep. |
| RS | So that in that first wave we can get it |

7

|  | done, so you can have it by Thanksgiving. Or earlier. Even before his application goes in. |
|---|---|
| WM | Perfect. Ok. Ok. Great. Alright, that would be good. Alright brother. |
| RS | Alright. Hang in there. |
| WM | I will see you Tuesday. Thanks for everything. |
| RS | Yup. You got it my friend. Take care. |
| WM | Ok yup bye bye. |
| RS | Alright bye bye. |

# NN

**From:** Rick Singer █████████████
**To:** Bill McGlashan █████████
**Sent:** 8/24/2018 9:57:36 PM
**Subject:** USC needs

Bill can you get me an unofficial transcript, pdf of test scores and an action sports photo of ████ asap.

Thanks



**From:** Rick Singer ██████████
**Sent:** Saturday, August 25, 2018 11:17 AM
**To:** janke ██████████
**Subject:** Fwd: IMG_1514.jpeg

---

Kicker/punter

Sent from my iPhone

Begin forwarded message:

> **From:** "McGlashan, Bill" ██████████
> **Date:** August 25, 2018 at 8:13:09 AM PDT
> **To:** ██████████
> **Subject: IMG_1514.jpeg**

DOJ-SINGER-TIII-00013123



# The ACT

Log Out

## View Your Scores

Download student score report pdf
Downloading Tips

**Test Date: December 2017**
Test Location: School
Test Option: The ACT with writing

More Information About Your Scores

| | Score |
|---|---|
| **Composite Score:** | **34** |

This is not an official ACT score report and is
intended only for your informational use.

Does your score meet the ACT College
Readiness Benchmark?

| | | | |
|---|---|---|---|
| **English** | 35 | ✔ | Yes. |
| **Mathematics** | 34 | ✔ | Yes. |
| **Reading** | 33 | ✔ | Yes. |
| **Science** | 34 | ✔ | Yes. |
| **Writing** | 09 | | |
| Ideas And Analysis | 09 | | |
| Development And Support | 08 | | Learn how to further improve your writing skills. |
| Organization | 08 | | |
| Language Use And Conventions | 10 | | |
| **English Language Arts (ELA)** | 31 | ✔ | Yes. |
| **Science, Technology, Engineering, And Mathematics (STEM)** | 34 | ✔ | Yes. |
| **Understanding Complex Texts** | Above Proficient | | Learn more about your results for Understanding Complex Texts. |
| **Progress Toward Career Readiness** | Progress Toward Gold Level NCRC | | Learn more about your results for Progress Toward Career Readiness. |

Dashes (--) indicate no score.

More Information About Your Scores

⊕ **Composite**

⊕ **Writing**

⊕ **English Language Arts (ELA)**

### Navigation (sidebar)

Home
Register to Test
**Your Test Dates and Scores**
› Send Your Scores
› About Your Scores
› View Order History
Manage Your Profile
Test Preparation
College and Career Planning
Non-test for State and District
FAQ
Log Out

DOJ-SINGER-TIII-00013124

Bill McGlashan
Founder & Managing Partner | TPG Growth
Co-founder & CEO | The Rise Fund

This message is intended only for the person(s) to which it is addressed
and may contain privileged, confidential and/or insider information.
If you have received this communication in error, please notify us
immediately by replying to the message and deleting it from your computer.
Any disclosure, copying, distribution, or the taking of any action concerning
the contents of this message and any attachment(s) by anyone other
than the named recipient(s) is strictly prohibited.

This message is intended only for the person(s) to which it is addressed
and may contain privileged, confidential and/or insider information.
If you have received this communication in error, please notify us
immediately by replying to the message and deleting it from your computer.
Any disclosure, copying, distribution, or the taking of any action concerning
the contents of this message and any attachment(s) by anyone other
than the named recipient(s) is strictly prohibited.

DOJ-SINGER-TIII-00013125

# PP

**From:**      Rick Singer
**To:**        janke
**Sent:**      8/26/2018 3:39:28 PM
**Subject:**   Fwd:

Sent from my iPhone

Begin forwarded message:

**From:** "McGlashan, Bill"
**Date:** August 26, 2018 at 12:37:32 PM PDT
**To:**

USAO-VB-01069439



Bill McGlashan
Founder & Managing Partner | TPG Growth

USAO-VB-01069440

Co-founder & CEO | The Rise Fund

This message is intended only for the person(s) to which it is addressed
and may contain privileged, confidential and/or insider information.
If you have received this communication in error, please notify us
immediately by replying to the message and deleting it from your computer.
Any disclosure, copying, distribution, or the taking of any action concerning
the contents of this message and any attachment(s) by anyone other
than the named recipient(s) is strictly prohibited.

This message is intended only for the person(s) to which it is addressed
and may contain privileged, confidential and/or insider information.
If you have received this communication in error, please notify us
immediately by replying to the message and deleting it from your computer.
Any disclosure, copying, distribution, or the taking of any action concerning
the contents of this message and any attachment(s) by anyone other
than the named recipient(s) is strictly prohibited.

USAO-VB-01069441



| Participants | From | Body | Status | Platform | Timestamp: Date | Timestamp: Time |
|---|---|---|---|---|---|---|
| ████ Bill McGlashan (owner) ████ Rick Singer Bill McGlashan | ████ Bill McGlashan | I also want to get you ramped on ████ | Sent | Unknown | 9/27/2018 | 9/27/2018 3:23:34 PM(UTC-7) |
| ████ McGlashan (owner) ████ Rick Singer Bill McGlashan (owner) | ████ Rick Singer | ████ has sent me his USC stuff for admission but I am waiting on the other schools which should be to me soon.<br><br>Once I get out of this depo on Friday I should have more time for ████ | Read | Unknown | 9/27/2018 | 9/27/2018 3:25:29 PM(UTC-7) |
| ████ McGlashan (owner) ████ Rick Singer Bill McGlashan (owner) | ████ Bill McGlashan | How are you feeling on USC? | Sent | Unknown | 9/27/2018 | 9/27/2018 3:28:05 PM(UTC-7) |
| ████ McGlashan (owner) ████ Rick Singer Bill McGlashan (owner) | ████ Rick Singer | No change for our conversations | Read | Unknown | 9/27/2018 | 9/27/2018 4:31:44 PM(UTC-7) |

# RR



## Extraction Report
Apple iPhone Logical

### Chats (1)

⚠ * These details are cross-referenced from this device's contacts

iMessage: ▮▮▮▮▮▮▮▮

| # | | | Deleted |
|---|---|---|---|
| 1 | Participants:<br>▮▮▮▮▮▮<br>Rick Singer* (owner)<br>▮▮▮▮▮▮<br>Bill McGlashan Cell*<br>* * *<br>Source: iMessage: ▮▮▮▮▮▮<br>Body file: chat-1.txt | Start Time: 9/29/2018 1:07:45 PM(UTC-4)<br>Last Activity: 9/30/2018 9:50:42 AM(UTC-4)<br>Number of attachments: 0 | |

9/29/2018 1:07:45 PM(UTC-4)Direction:Incoming, ▮▮▮▮▮▮ Bill McGlashan Cell)
So when will we know definitively on USC?

Status: Read
Read: 9/30/2018 9:49:37 AM(UTC-4)

9/30/2018 9:50:42 AM(UTC-4)Direction:Outgoing, ▮▮▮▮▮▮ Rick Singer)
They had their first Subco last week- football has a while before going through Subco- later in the fall as it is in season

Status: Sent
Delivered: 9/30/2018 9:50:44 AM(UTC-4)

SS

1   **Call Date:**  2018-10-24

2   **Call Duration:**  11:17

3   **Call Begin [    ] Call End [    ]**

13   **File Name:**  10_24_2018 10 28 39

14   **Bates No.:**

15

16   [00:00]

1

2

3

4   (phone ringing)   [01:00]

5   M1:  Rick, you there?

6   SINGER:   I'm here.  How are ya, Bill?

7   M1:  Oh, hey, sorry about that.  My, my bad cell coverage

8        there for a minute.

9   SINGER:   No problem.

10  M1:  I'm good.

11  SINGER:   No problem.

12  M1:  So what's goin' on?

13  SINGER:   So --

14  M1:  I've been feelin' bad for ya.

15  SINGER:   Well, I wanted to apologize yes-- for, you know,

16        screwin' up our meeting, so I apologize.  I essentially

17        flew up to Sacramento yesterday, and I'm super happy I

18        did, 'cause I got a chance to meet with my old attorney,

19        ████████████  --

20  M1:  Uh-huh.

21  SINGER:   -- a-and he talked me off the ledge, because, as you

22        know -- as you could tell by my call the other day, I was

23        on the ledge.

24  M1:  Yeah.

1   SINGER:   Um, he told me that I was overreacting a little bit

2          because, um...  So I just wanted to make sure that we

3          talked, and, uh, you kinda knew what was goin' on.  And

4          since I respect your opinion, I just wanted to get an --

5          your opinion of kinda what's happened --

6   M1:  Mm-hmm.

7   SINGER:   -- so that, um -- because you have more experience

8          just in the world than I do.  So here --

9   M1:  Mm-hmm.

10  SINGER:   -- so here's kinda what happened: [02:00] uh, Mark

11         Ridell (sp?), who is the -- my expert test-taker, who

12         took the test for ██████████ --

13  M1:  Mm-hmm.

14  SINGER:   -- at Igor School, West Hollywood College Prep, um,

15         he called me to meet at ██████████████, you know, in

16         West Hollywood.  Have you ever been there?

17  M1:  Never.

18  SINGER:   OK.  Well, it's a really cool place in West

19         Hollywood.  But he calls me, and he kinda comes out to LA

20         every once in a while, and he just had his, his first

21         child, so his in-laws live in LA, so he said, "Let's meet

22         at █████████████."  So anyway, so Mark starts talkin'

23         to me and tells me a story that he, he got interviewed by

24         the -- an IRS agent in Florida, because he lives in

 1        Bradenton, about the payments that he received from my
 2        foundation.  And, as you know, when families pay for
 3        either, either takin' the test or goin' through the side
 4        door, all the money goes through my foundation, and then
 5        I pay it out to whoever needs to get paid, like I did
 6        for, you know, ███████ ███████████ [03:00] test when he
 7        took the test at West Hollywood College Prep.  So I paid
 8        half of it to Mark and half of it to West Hollywood
 9        College Prep through my foundation, so that the family
10        essentially has no connection back to what has happened.
11        So I asked Mark what he did with the agent, and what they
12        talked about, and he told me that he hasn't been
13        declaring his payments from my foundation as income for
14        his taxes.  So apparently he's been declaring all this
15        income as a gift, which was stupid.  But the agent said,
16        uh, "I'm really not so focused on Mark and your payments;
17        what I'm focused on is this foundation."  And he kept
18        askin' him questions about the foundation's mission, what
19        they do, um, how they help underserved kids, so on and so
20        forth.  So, you know, since Mark does tutoring for us
21        [04:00] he told the agent that, you know, he works with
22        kids for us, i-- underserved kids in the Bradenton area.
23   M1:  Mm-hmm.

1    SINGER:   So when he gets done speakin', I kinda freak out,

2          right?  Because now I'm thinkin', oh, shit, I'm in a --

3          I'm in a lot of trouble here, and the IRS has me wired.

4          Um, they probably have me -- you know, bugged my house,

5          the whole thing, because he's talkin' all about my

6          foundation, and, you know, he really wants to dive into

7          this.  So when I met with ▉, he told me, "Rick, hold

8          on.  Just relax.  Um, for them to get a wiretap on you,

9          it takes a, a bunch of months to happen, and you just

10         need to relax."  So --

11   M1:  Mm-hmm.

12   SINGER:   -- you know, overnight I'm a lot less worried than I

13         was a couple days ago (laughs) when we talked, but I just

14         -- you know, I'm gonna use this phone, which is my son's

15         phone, um, and I did it --

16   M1:  Mm-hmm.

17   SINGER:   -- for us to talk so that there are, you know, no

18         issues, just in case.

19   M1:  Yep, yep.

20   SINGER:   And [05:00] it's, it's real-- to be frank with you,

21         um, Bill, it's really embarrassing, so I hope you'll just

22         keep this between you and I.

23   M1:  Of course.  Well, I think -- I mean, the good news is --

24         I mean, from, from my personal perspective, is, is, uh,

```
 1        you know, we, we s-- sorta haven't done anything yet,

 2        which I'd prefer not to do in the context -- just t-till

 3        it's all cleared up exactly, you know, what the dynamic

 4        is of the foundation.  I'd rather just sorta lay low.

 5   SINGER:   OK.  So, so --

 6   M1:  I mean, I -- it, it, it seem-- it seems like a better

 7        idea, because, I mean, until you're confident that...

 8        Uh, m-my, my concern, obviously, is I'm trying to help my

 9        son, but I don't want to create a dynamic for him that's,

10        that's impossible --

11   SINGER:   Right.

12   M1:  -- to manage.

13   SINGER:   Right.

14   M1:  Yep.

15   SINGER:   Right, and, and, you know, we have the applications

16        ready.  I mean, I know --

17   M1:  Well, I want -- I want you to keep doing what you do

18        brilliantly, which is coaching my kids and helping them,

19        um -- helping them the way you are.  I -- I'm, [06:00]

20        I'm grateful for what you do, and you're, you're, you're

21        unique at it.  The fact is that side door is a lovely

22        additional de-stresser, but if it doesn't -- if it isn't

23        possible, it isn't possible.

24   SINGER:   OK, gotcha.  Well --
```

```
 1   M1:  You know?

 2   SINGER:   -- so I, I will keep you in play, um, and I know --

 3   M1:  Yeah.

 4   SINGER:   -- you got -- you got ███████████████ you got

 5        all those guys helpin' you, and that's cool --

 6   M1:  Yeah.

 7   SINGER:   -- and that's cool.  We just, as you --

 8   M1:  Well, (inaudible), the, the iro-- the irony -- (laughs)

 9        the irony of the whole way the system works, as I've

10        become sort of conscious of it -- I had this call with,

11        with, uh, the -- our -- ████████████  knows ██████  is

12        interested in SC, and so he, he just gave 20 million

13        bucks to the school and is on the board, and he called

14        down to this, this guy, who's one of the development

15        folks, that, and just said, "Look, I want you to know who

16        Bill is," and da-da-da.  The irony of the whole thing is

17        that i-it is...  (laughs) The way these schools work,

18        particularly commercial schools like SC, you -- uh, my

19        [07:00] impression -- uh, this may be wrong; you would

20        know -- is it, it is so, um, commercial.  I mean, you

21        know, it, it, it's very clear to me that if they sense

22        that I'm gonna write a check, they're gonna do what they

23        can do to get me in --

24   SINGER:   And --
```

1   M1:  -- at that school.

2   SINGER:   And you're -- and --

3   M1:  My son in.

4   SINGER:   And you're right, and that's where -- that's, that's

5         --

6   M1:  It's just -- it's just --

7   SINGER:   -- why USC's become the power.

8   M1:  -- it's...  It's just (inaudible)...  Well, and by the

9         way, you flip it around, you say if you've got 5,000

10        kids, effectively, in an undergraduate class, you could

11        have 4,000 of them be 4.0, perfect, you know, test

12        scores, and still let a thousand in that are -- that are,

13        you know, people that are well-connected, that are gonna

14        help you grow your school, and you've got an amazing

15        program --

16  SINGER:   And --

17  M1:  -- you know?

18  SINGER:   And, and that's essentially what USC's done, right?

19  M1:  Yeah, it's brilliant.

20  SINGER:   Right?  You got -- you know, ██████'s given his

21        money, and, uh, you know, everybody else is, is gi-- is

22        doin' their thing.  They're tryin' to hire the president.

23        Everybody who's --

24  M1:  Yeah.

1    SINGER:   -- on the board is anteing up to get the right

2          president in.  It's, you know, it's crazy.

3    M1:  [08:00] Mm-hmm.

4    SINGER:   It's crazy.  So l-- so just so you know, I don't

5          know if you saw ██████ Chapman, the Boulder --

6    M1:  Yeah.

7    SINGER:   -- and --

8    M1:  Uh, well, he was totally excited that there was a green

9          checkbox next to his Chapman electronic submission.

10         (laughs)

11   SINGER:   Uh, uh, absolutely.  So he's done a fabulous --

12   M1:  But (inaudible), I, I have to say, between you doing what

13         you're doin' for him and ██████, with her, you know,

14         c-- tutoring that he's been getting, you know, and just

15         his writing, all that, i-it's, it's been -- it's, it's

16         not been a...  I mean, my memories as a kid is this was

17         totally torturous.  It's felt OK with ██████  I mean, he

18         needs some help on, um -- and he's gonna need your help

19         on getting his pitch in to the Iovine and Young Academy -

20         -

21   SINGER:   Yeah.

22   M1:  -- just 'cause he doesn't man-- as you know, he's -- has

23         a hard time sort of managing his time, but he's growin'

24         up.  I mean, he's, he's doin' a lot better than he was.

1   SINGER:   No, he's, he's been amazing, and he's been on top of

2        stuff.  Like, he hounds me, which is so different,

3        because I was [09:00] hounding him.

4   M1:  Don't you love that?  That's great.

5   SINGER:   Yeah.

6   M1:  Very good sign.

7   SINGER:   No, that's good, and, and --

8   M1:  Yeah.

9   SINGER:   -- and I'll jump on ███ here soon.

10  M1:  Perfect.

11  SINGER:   Um, I just want to get all the applications done,

12       but I --

13  M1:  By the way, I got -- I got, uh, ████ um...  We-- w-

14       weirdly, he did his first, uh -- you know, his PSAT, and

15       then he, at time and a half, ran out of time, and was

16       quite frustrated that he couldn't finish.  And I called

17       the, the assessment -- you know, the neuros--

18       neurospecialist --

19  SINGER:   Yeah.

20  M1:  -- who had done the assessment for both ███ and ████

21       and she said, "Why doesn't he have double time?  I called

22       for double time."  And his, his friggin' school -- his --

23       like, she -- the woman who runs that, ██████, who's a

24       lovely woman, but she sort of feels it's her job to

1       prevent kids from getting, you know, uh, concessions, um,

2       as opposed to being their advocate.  So it -- it's right

3       there in his report, so we've gone back to her this week

4       and said, "You've gotta give him the double time, and you

5       gotta go back to ACT and SAT and pitch him for the double

6       time."

7  SINGER:   Absolutely.

8  M1:  Um, [10:00] so we're on that with ██████ as well --

9  SINGER:   OK.

10 M1:  -- to help him as he gets into his test cycle.

11 SINGER:   OK.  Well, that's great.  So, thanks --

12 M1:  Yeah.

13 SINGER:   -- thanks for takin' the call, and --

14 M1:  By the way, uh, so you know, the, the, uh, the, the...

15      You know, in my experience with a guy like that who isn't

16      paying his taxes, the issue the IRS always has is taxes.

17      They, they -- the IRS doesn't care about anything other

18      than you're paying your taxes.  And, you know, they tend

19      to be aggressive about making sure that organizations are

20      doin' what they're supposed to do from a tax perspective,

21      but they're -- that's all they care about at the end of

22      the day.

23 SINGER:   Gotcha.  Gotcha.  Well, I appre--

1   M1:  And they really -- they really -- that-that's, that's the

2        whole kit and kaboodle is tax.

3   SINGER:   Well, I appreciate that, and thanks for keepin' this

4        between us.  It's just a little --

5   M1:  Of course.

6   SINGER:   -- embarrassing, so thanks.

7   M1:  No, it shouldn't be embarrassing.  It is what it is.

8   SINGER:   OK.  Thanks, Bill.

9   M1:  All right, buddy.  (overlapping dialogue; inaudible).

10  SINGER:   Take care.  OK, bye-bye.

11  M1:  Yeah.

12  SINGER:   Uh...

13  (phone beeps)



22                    END OF AUDIO FILE

TT

**From:**     Wilson, John █████████████
**Sent:**     Saturday, August 24, 2013 3:16 AM
**To:**       Rick Singer █████████████
**Subject:**  Re: Update on applications

---

R

I meant i assumed that the applications are available.

Sounds like some are. Balance over next 6 weeks.

Worry █████ keeps blowing things off.

What does Jovan need by sept 20?  Do u have what we need?  Do I make the first payment to u then?

J

Sent from my iPhone

On Aug 24, 2013, at 9:08 AM, "Rick Singer" █████████████ wrote:

> Absolutely not. The apps became available at the beginning of August. The common is registered and uploaded to where it can be
> until meeting with █████ tomorrow. Most all schools Siemens are not out till September 1-15. A final list of schools has to be
> prepared. I as stated in several other communications have never seen what he has done with █████ Hopefully I will get it
> tomorrow. UC app not out till October 1. As they become available we will input but need to see █████ for info and a final list of
> schools. Jovan is in Greece. He texted me yesterday that he wants █████ material not app around September 20th.
>
> Sent from my iPhone
>
> On Aug 23, 2013, at 11:44 PM, "Wilson, John" █████████████ wrote:
>
>> R
>>
>> Where do we stand on applications ? I assume they are all out and can u pls send me electronic copies.  What progress is ████
>> making on the essays etc? Back up schools and USC?
>>
>> When do I make first donation?
>>
>> J
>>
>> Sent from my iPhone
>

USAO-VB-00202920

# UU

**From:**     John Wilson

**To:**       Rick Singer

**Sent:**     10/13/2013 8:20:40 AM

**Subject:**  Re: ▮▮▮▮ apps and USC etc

R

Do u have  his latest personal statement draft?  Can u forward it and I will talk with him about it.

Does he have all your feedback and clear on what additional improvements u suggest?

Thx

J

Sent from my iPhone

On Oct 13, 2013, at 2:11 PM, "Rick Singer" ▮▮▮▮▮▮▮▮▮▮▮▮ wrote:

First is to finalize the Personal Statement- this is all about ▮▮▮▮ putting in time not me- my work is done quickly or is done. The profile I am assuming you are speaking about Naviance? I have attached the common to Naviance filled in schools etc- all done. The teacher Rec part he will do this week.

Jovan will provide ▮▮▮▮ info to admission when he does his other guys over the next month. No payment of money till he gets a verbal and written from admissions and then 50 percent to a savings account I set up.
Then the remainder upon an acceptance letter in March with everyone else.
Sent from my iPhone

On Oct 13, 2013, at 1:59 AM, "John Wilson" ▮▮▮▮▮▮▮▮▮▮▮▮ wrote:

R
Thx.  When is ▮▮▮▮ going to have his profile and teacher recs done?  What about other essays?

Also When is Jovan going to be able to give us decision on USC? And when do I pay u ? Was it 50% in nov? 50% in feb when we get final official notice?

Thx

J



Sent from my iPhone

On Oct 13, 2013, at 8:46 AM, "Rick Singer" ▮▮▮▮▮▮▮▮▮▮ wrote:

Common application will be submitted between Dec 1-15th after next test dates and apps done. Jovan has ▮▮▮▮ 's stuff and asked me to embellish his profile more, which I am doing. ACT signed up for October 26th, SAT Nov 2nd.


On Sat, Oct 12, 2013 at 12:50 PM, John Wilson ▮▮▮▮▮▮▮▮▮▮▮▮ wrote:
R

Hope all is well.  I wanted to catch up on where the college app process stands (personal statement , USC, other essays, the total application status, when ▮ is taking the new SAT and ACTs etc.  Is there a time we can chat today or tmrw?

John

Sent from my iPhone


--
Rick Singer



**From:**       Rick Singer ██████████████████

**Sent:**       Saturday, October 19, 2013 7:30 PM

**To:**         John Wilson ████████████████████

**Subject:**    Fwd: WILSON

**Attach:**     WILSON.pdf

fyi

---------- Forwarded message ----------
From: ████████████████████
Date: Sat, Oct 19, 2013 at 4:26 PM
Subject: WILSON
To: Rick Singer ██████████████████

--
Rick Singer
████████████████

2014



**Awards & Honors:**
**Water Polo**
2010,2011,2012, 2013 -- Varsity Letterman
2011,2012,2013-- Co Captain
Central Coast Section - 2011,2012.2013 All Section

**Team**
CCS - 2012 Offensive  Most Valuable Player
California Scholar Athlete Award - 2011,2012, 2013
US National Water Polo Qualifier- 2013
Pacific Zone Water Polo Qualifier 2011, 2012, 2013
Junior Olympics Pacific Team 2010,2011,2012,2013
Asics National Sports Youth Leadership Council - 2012, 2013

**Swimming**
2010,2011,2012, 2013 Varsity Letterman
2011,2012, 2013 - Co Captain
All American Swimmer - 2012, 2013
Central Coast Section - High Point Scorer- 2012
US Junior Olympic National Swimming Championships

Position:                    Driver-- #6

Swimming Times --     50 Freestyle 20.12 short course
                              100 Freestyle 43.98 short course

Water Polo                 Coach

Water Polo Club          Coach



**From:**       John Wilson ███████████████████████

**Sent:**       Wednesday, October 23, 2013 8:40 PM

**To:**         Rick Singer ██████████████████

**Cc:**         ████████████████████████████████

**Subject:**    Re: quick q on ██████ spring/summer

___

R

Thx we are encouraging ██████ to focus on water polo this spring and he will do █████ and ██████ club. (Not varsity swimming - As that requires him to skip all senior trips - off)

That way he can take senior trip to Spain for a week and also spend two weeks in the spring coming to Europe to visit w us.

I strongly prefer he plays as hard as he can and at least suits up and scrimmages w the team.  Would it also make sense for him to try a week of camp at USC ?

When would he need to start this August? Or September?

Sent from my iPhone

On Oct 23, 2013, at 3:12 PM, "Rick Singer" ████████████████████ wrote:

> Just be ready for practice in the fall as a player on the roster or just a member of the squad but not get in the pool. he has to be on the roster for a year one way or another.

> On Wed, Oct 23, 2013 at 3:10 PM, John Wilson ███████████████████ wrote:

>> R

>> What are the expectations if ██████ gets into USC thru this WP approach?

>> Does he have to play ██████ club in addition to ██████ club and or varsity swim team?

>> We want to know to start planning spring and summer commitments.  His preference is to take senior trip for a week to Spain (which he can't do if he is on varsity swimming).  He also doesn't want to do ██████ club this summer but would rather come to Europe and cape cod with us.

>> Is this going to be a problem? look bad?

john

<image001.jpg>

John B. Wilson
Hyannis Port Capital

--
Rick Singer



Message

**From:**      Jovan Vavic ███████████

**Sent:**      2/26/2014 06:36:46 PM

**To:**        ████████████████████████████████

**Subject:**   FW: ██████████ last semester Grades

**Attachments:** ██████████ Current Grades.pdf

---

**From:** Jovan Vavic ████████████

**Date:** Wed, 26 Feb 2014 09:56:50 -0800

**To:** ████████████████

**Subject:** ██████████ last semester Grades

██████

This kid would be the fastest player on our team, he swims 50 y in 20", my fastest players are around 22", this kid can fly, he was the captain of his hs team as sophomore, great work ethic, was ALL CCS, he is a legid walk on who could end up playing for us very soon.

USC-00007212

SINGER-GJ-0146279



**From:**      John Wilson █████████████████████

**Sent:**      Saturday, March 1, 2014 9:54 AM

**To:**        Rick Singer █████████████

**Cc:**        ████████████████████████████████

**Subject:**   Re: USC fees

---

R

Awesome!

Hyannis Port
Capital, Inc

██████████████████████

John

Sent from my iPhone

> On Mar 1, 2014, at 3:11 PM, "Rick Singer" ██████████████ wrote:
>
> Yes we can send you an invoice for business consulting fees and you may write off as an expense. What is the name address etc you want the invoice to be made out to?
>
> Sent from my iPhone
>
>> On Mar 1, 2014, at 4:51 AM, John Wilson █████████████████████ wrote:
>>
>> Rick
>>
>> Thanks again for making this happen!  Pls give me the invoice.  What are the options for the payment?  Can we make it for consulting or whatever from the key so that I can pay it from the corporate account ?
>>
>> J
>>
>> Sent from my iPhone

SINGER-00193228

ZZ

**From:**     John Wilson ▮▮▮▮▮▮▮▮▮▮
**To:**     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:**     3/29/2014 12:14:03 PM
**Subject:**     Re: Wire to the key

Business Consulting - the invoice will be for consulting - pls work with him to get invoice correct.

Thx


Sent from my iPhone

> On Mar 29, 2014, at 5:12 PM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:
>
> And what is the acct I'm charging this to?
>
>
>
>> On Mar 29, 2014, at 7:09 AM, "John Wilson" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:
>>
>> D
>>
>> Monday we will get an invoice and wiring instructions for $250k. To be paid by hpc inc.
>>
>> Thx
>>
>> J
>>
>> Sent from my iPhone

AAA

**From:**     Steve Masera █████████████████████████████

**Sent:**     Wednesday, April 2, 2014 11:05 AM

**To:**       ████████████████████████████████

**Subject:**  Modified Invoices

**Attach:**   scan0001.pdf

---

Hi ██████

If you need any further alterations, just let me know on Monday.

Thanks.

Steve


Steve R. Masera

*Accounting*

***The Key***

████████████████████████████████

## The Key Worldwide Foundation — FEIN ████

Date April 07, 2014

Hyannis Port Capital
████████████

Thank you for your contribution of $100,000.00 to The Key Worldwide Foundation.  Your generosity will allow us to move forward with our plans to provide educational and self-enrichment programs to disadvantaged youth.  We are very excited about the impact that these programs will have in the communities in which we will engage.

This letter shall serve as formal acknowledgement of your contribution or, for which no goods or services were exchanged.

The Key Worldwide Foundation, Inc., was incorporated in the State of California on December 14, 2012 as a non-profit, public benefit charitable organization and tax-exemption applications for recognition as 501(c)3 charitable status have been filed with the Internal Revenue Service and the California Franchise Tax Board.  While we have been fully authorized by the state of California, we are currently awaiting final authorization from the Federal Government.

Donations received while the applications are pending may be treated as tax-deductible contributions to the extent allowed by law retroactive to the date of the organization's formation assuming the applications are approved.  We do not foresee any reason why our applications will not be approved, but should there be any issue with the progress of our pending applications, we will immediately inform you.

We will forward you a copy of the formal letter from the IRS confirming the organization's status as a tax-exempt, 501(c)3 charitable organization as soon as we receive it.

Thank you again for your generous support of our new foundation.

Sincerely,

Steve Masera
The Key Worldwide Foundation
████████████████████

# *Invoice*

April 1, 2014

**The Key**

▮▮▮▮▮▮▮▮▮▮

**Invoice No. : 6431**

To:

**Hyannis Port Capital**

▮▮▮▮▮▮▮

Ship to (if different address):

| Representative | Your P.O. No. | Date Shipped | Shipped Via | F.O.B. Point | Terms |
|---|---|---|---|---|---|
| Rick Singer | | | | | Due on Receipt |

| Quantity | Description | Unit Price | Amount |
|---|---|---|---|
| | Business Consulting- August through June 2014 | | $100,000.00 |
| | | | 0.00 |
| | | | 0.00 |
| | | | 0.00 |
| | | | 0.00 |
| | | | 0.00 |
| | | | 0.00 |
| | Subtotal | | 0.00 |
| | Sales Tax | | 0.00 |
| | Shipping & Handling | | 0.00 |
| | Total Due | | $100,000.00 |

**Make all checks payable to:**

**The Key**

▮▮▮▮▮▮▮▮

**If you have any questions concerning this invoice, call:**
Steve Masera, ▮▮▮▮

▮▮▮▮▮▮▮▮

Rick Singer

# Invoice 

| Date | Invoice # |
|------|-----------|
| 4/1/2014 | 110761 |

Bill To

Hyannis Port Capital

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
|          | Special Consulting Income | 20,000.00 | 20,000.00 |
|          | Concept, design, and implementation of Professional Development program for Hyannis Port Capital associates. | | |

| | Total | $20,000.00 |
|--|-------|-----------|

VB-RECORDS-00374963

# BBB

| | |
|---|---|
| **From:** | ████████████████████ |
| **Sent:** | Tuesday, April 1, 2014 5:06 PM |
| **To:** | Steve Masera ████████████ |
| **Cc:** | ████████████████████ |
| **Subject:** | RE: Requested Documents |

I'm also getting info from CPA on what is required for documentation purposes in the event of an audit.  Consulting services I'm 100% will not be acceptable without some sort of fetailed description of services provided .   I will get that info and provide to you.



**From:** Steve Masera ████████████████
**Sent:** Tuesday, April 01, 2014 2:02 PM
**To:** ████████
**Subject:** RE: Requested Documents

Certainly.

**From:** ████████████████
**Sent:** Tuesday, April 01, 2014 1:08 PM
**To:** Steve Masera
**Cc:** ████████
**Subject:** RE: Requested Documents

I am out of the office tomorrow-Friday.  Can these wires go out on Monday?



**From:** Steve Masera ████████████
**Sent:** Tuesday, April 01, 2014 12:50 PM
**To:** ████████
**Subject:** RE: Requested Documents

I am out of the office, but will have this for you early in the AM.

**From:** ████████████████
**Sent:** Tuesday, April 01, 2014 10:47 AM
**To:** Steve Masera

**Cc:** ███████████

**Subject:** RE: Requested Documents

Donation ack should be to Hyannis Port Capital – Please update address on invoices to ████████████████ ████. Can you please update and send back.  Once I have the corrected docs, I will forward to John to approve.  Once I have his approval, I will initiate the wires.



---

**From:** Steve Masera ██████████████████████████████
**Sent:** Tuesday, April 01, 2014 9:33 AM
**To:** ██████████████████
**Subject:** Requested Documents

Good morning ██████
Attached are the documents that we promised yesterday.  Please send me your mailing address if you prefer hard copy.
Best to you.
Steve


Steve R. Masera
*Accounting*
***The Key***

CCC



**CASHIER'S CHECK**

No. 5280505170

90-3582
1222

DATE: APRIL 16, 2014

PAY    ONE HUNDRED THOUSAND DOLLARS AND 00 CENTS

$  100,000.00

TO THE
ORDER OF:   USC MENS WATER POLO

PURPOSE/REMITTER: WILSON FAMILY

Location:

Details on Back.

Security Features Included.

APR 22 2014

# DDD

**From:** ███████ ██
**Sent:** Tuesday, July 22, 2014 1:22 PM
**To:**
**Cc:**
**Subject:** Re: ████ ████ / waterpolo player
**Attachments:** Adjust Anonymous 04422411.pdf

**Categories:** Need reply

Hi ████,

Please adjust the attached gift to CRS ID ██████ A12 Donor.  Update the name by removing (available for use).

This is the mysterious $100,000 cashier check for water polo.

Thank you.

███████████

**From:** ███████████████
**Date: Monday, July 21, 2014 6:23 PM**
**To:** ███████████████
**Subject: Re:** █████████ / waterpolo player

█████████ let's post to an A donor record for this.  I can understand why they want to keep this quiet since son is coming in the fall.

Thanks

Sent from my iPad

███████████
Executive Director of Stewardship
University Advancement

1

VB-RECORDS-001163004

USC-00008558



THE
CAMPAIGN
*for the*
University
of Southern
California

FAS REGNA TROJAE

On Jul 21, 2014, at 11:50 AM, ███████ ████████ wrote:

Hi ███,

What do you think, post to actual record and code anonymous, post to An Donor, or leave in ███████ Anonymous record.

The actual donors are parents, ████████ John Wilson and ███████████████.

Thanks.

███████

███████ ██
Senior Executive Director
University Advancement
University of Southern California

2

VB-RECORDS-00163005

USC-00008559

THE
CAMPAIGN
*for the*
University
of Southern
California

VAS REGNA TROJAE

**From:** ▮▮▮▮▮▮▮▮▮
**Date: Monday, July 21, 2014 11:17 AM**
**To:** ▮▮▮▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮▮▮
**Subject: Re:** ▮▮▮▮▮▮ **/ waterpolo player**
**Resent-From:** ▮▮▮▮▮▮▮▮▮
**Resent-Date: Monday, July 21, 2014 11:17 AM**

Thanks

It will remain anonymous from our end.

Sent from my iPhone

On Jul 21, 2014, at 10:22 AM, ▮▮▮▮▮▮▮▮▮ wrote:

FYI

PS – please note that (per Vavic) the family was very concerned it was going to be made public and they really wanted to keep it anonymous.

Thanks so much.



3

VB-RECORDS-00163006

USC-00008560

**Stay Connected With USC Athletics**
<image002.png><image003.png><image004.png><image005.png>

---

**From:** ▮▮▮▮▮
**Sent:** Monday, July 21, 2014 9:12 AM
**To:** ▮▮▮▮▮
**Cc:** ▮
**Subject:** RE: ▮▮▮▮▮ / waterpolo player

Hi B▮▮▮,

Sorry for the delay as I just got back in the office.

His parents' names are John and ▮▮▮ Wilson.  Address is ▮▮▮▮▮ and John's number is ▮▮▮▮▮.

Let me know if you need more info.

▮▮

---

**From:** ▮▮▮▮▮
**Sent:** Thursday, July 17, 2014 2:28 PM
**To:** ▮▮▮
**Cc:** ▮▮
**Subject:** ▮▮▮▮▮ / waterpolo player

Good afternoon ▮▮▮,

I hope you had a great vacation!

Ron is trying to locate the information on an incoming freshman from ▮▮▮▮▮ is going to play on water polo team.  Jovan suggested I contact you to get his information (parents name and address).

▮▮▮▮▮g is his email.

When you could, we would greatly appreciate a reply asap.  Thanks so much.

Fight On!
▮▮▮▮▮, Development Asst.

4

VB-RECORDS-00163007

USC-00008561



**Stay Connected With USC Athletics**
<image002.png><image003.png><image004.png><image005.png>

<1633_001[1].pdf>

5

VB-RECORDS-00163008

USC-00008562

# EEE

1  **Call Date:**  2018-09-29

2  **Call Duration:**  13:40

3  **Call Begin [   ] Call End [   ]**

4  **Call Participants:**

5      Rick Singer

6      John Wilson

7  **File Name:**  ████████  2018-09-29 15-24-23 09249-001

8  **Bates No.:**

9

10  [00:00:00]

11  WILSON:   Hey, Rick.  How ya doin'?

12  SINGER:   Hey, John.  How are ya?

13  WILSON:   Good.  You feelin' better?

14  SINGER:   Lot better.

15  WILSON:   Oh, (overlapping dialogue; inaudible).

16  SINGER:   You good?  You been out of town?

17  WILSON:   Yeah, I've been out of town.  Been traveling.  I'm

18      goin' to Europe next week, so it'll be easier to connect

19      this week, so...

20  SINGER:   OK, cool.  So the girls --

21  WILSON:   So, yeah --

22  SINGER:   -- were great.

23  WILSON:   Cool.  I, I still didn't get a c-- a f-- a full

24      debrief from 'em, but talked to ████████.  They, um,

1       they have any clarity on, on where they want to go, what

2       majors, or still (overlapping dialogue; inaudible)?

3   SINGER:   Yeah.  Yeah, well, I mean, you have done a great job

4       of, uh -- (laughs) it's so funny -- influencing 'em on

5       what is the appropriate path to go down.  What do you

6       think they both said?  (overlapping dialogue; inaudible)

7       --

8   WILSON:   What, all the Ivy League schools?

9   SINGER:   No, no, I mean --

10  WILSON:   (overlapping dialogue; inaudible).

11  SINGER:   -- uh, uh, uh, they want to be business and

12      engineering.  (laughter) I said, "So do..."  I said,

13      "Does that come from your dad?"  And, of course, "Well,

14      my dad -- they pr-- my dad's programmed us," right?

15      (laughter) [00:01:00] So I said, "That's cool.  So we can

16      make all that happen."  I said, "You think you might like

17      that?"  They said, "Well, my dad (inaudible), so..."

18  WILSON:   (laughter) Come on!  I thought they actually liked

19      science and engineering.  They (overlapping dialogue;

20      inaudible) --

21  SINGER:   No, I'm sure they --

22  WILSON:   -- science.

23  SINGER:   -- I -- but you're -- you've influenced them, right?

24      (overlapping dialogue; inaudible) --

1  WILSON:   Yeah, I've influenced 'em, but I want 'em to pick

2       what they like.

3  SINGER:   No, definitely they get it, they get it, right?  And

4       it's just --

5  WILSON:   OK.

6  SINGER:   -- it's just funny, 'cause then when ██████ kinda

7       interjected they're like, "Mom, stay out of it.  Mom,

8       stay out of it."  Right?  It was funny.  Um, but they're

9       both obviously great girls.  They want -- in a lot of

10      ways, they want to have kind of the same kinds of things

11      from the school.  We, um -- I have a huge list of schools

12      for them.  Um, you know, and, and I said, "You guys gotta

13      send me dates, because you both go to 2 separate schools,

14      and ██████ and then -- and ██████, different dates of

15      days off.  So ██████'s gonna be runnin' all over the

16      place tryin' to figure out [00:02:00] how to get 1 over

17      here for a day, and over here."

18 WILSON:   Yeah.

19 SINGER:   But, uh, that's why I need to know your dates, so I

20      can figure out where to go visit that would be best

21      suited.

22 WILSON:   Right.  Now, would they go on weekends, or gotta go

23      during school days (overlapping dialogue; inaudible)?

```
 1   SINGER:   You gotta go on a school day, or, or a day when it's

 2       a school day but they're off of school.

 3   WILSON:   Yeah, OK.

 4   SINGER:   That's the ideal situation, 'cause --

 5   WILSON:   That's gonna be tougher, yeah.  But the ideal isn't

 6       just seeing the campus on a weekend?

 7   SINGER:   Yeah, 'cause I gotta get to a point where we know if

 8       we're applyin' ED or where we're goin', what we want,

 9       'cause you're gonna want to know first choice, second

10       choice, all that stuff.

11   WILSON:   Yeah, no, exactly.  And just so I'm, I'm clear on

12       the, the kinda pecking order schools, and UCLAs and all

13       that stuff versus -- uh, I think you said UCLAs mostly

14       are in the, the bracket of, um, like, uh, Stanford -- or

15       not Stanford, but like, uh, USC and so forth.  And what

16       were the schools in that, if you did the side door?  And

17       I'm interested about the side door and that stuff, um --

18   SINGER:   So the side door is gonna be -- gonna happen where

19       you want 'em to happen.  (overlapping dialogue;

20       inaudible) --

21   WILSON:   It can happen anywhere?  Does it have to be

22       [00:03:00] a sports side door?  I wasn't clear on that.

23   SINGER:   Well, so that's the -- that's the easiest way to

24       approach it, right --
```

1   WILSON:    Yeah.

2   SINGER:    -- because all of the coaches have...  You know,

3          they have guaranteed spots, and you've done a good job,

4          you got athletic girls who got great size, they're in the

5          right sports, so, you know, potentially there's a sailing

6          option, and potentially there's a crew option.  I mean, I

7          don't know how good of athletes they are.  They may be

8          good enough to be able to compete at some of these

9          schools, and then who knows what we have to do, depending

10         on where, where the spots (inaudible).

11  WILSON:    Mm-hmm.  Yeah, so they --

12  SINGER:    So you have --

13  WILSON:    -- have to get that sports.  Uh, what if they're not

14         really that good?  I mean, they can do some crew, but I

15         don't know they're gonna be good.  ████████████   not

16         even that good competitively at sailing.  She just taught

17         sailing and did sailing in, you know, (overlapping

18         dialogue; inaudible) --

19  SINGER:    Right, so --

20  WILSON:    -- Yacht Club.

21  SINGER:    But at the end of the day, by the side door, I may

22         be able to go to the sailing coach and say, "Hey, this

23         family's willing to make the contributions.  She could be

24         on your team.  She is a sailor.  She may not be up to the

1        level you are, but she can con-- you know, you're gonna

2        get a benefit, [00:04:00] and the family's gonna get

3        benefit.  So are you will-- are you interested in doing

4        that?"

5   WILSON:   Yeah.  OK.  And just -- but -- and what's the other

6        side?  If it's not a sport, what is it?  Is there any

7        other side doors in --

8   SINGER:   Then I have to go to -- then I have to go to

9        department chairs, and, and, and get...  Some schools

10        have a VIP list at the department chair level, so we

11        could go that route, and then you can help their

12        (inaudible) -- their, their program.  It just depends on

13        which school you want to go to.

14   WILSON:   OK, you know, I have this friend -- you know, one of

15        the things I wanted to talk to you about, too, is I -- I

16        don't know how -- I remember last time I did this, you

17        didn't really make any money on this, on the side, this

18        stuff.  You just charge, and then you make a donation to

19        the school, and that's it?

20   SINGER:   Well, uh, so it depends in different ways.  So

21        what's happened in the grown-up world of my world now,

22        compared to when, you know, we did ██████, was that

23        essentially now the money goes into my foundation, as a

24        donation, (overlapping dialogue; inaudible) --

1    WILSON:   Oh, to your foundation, not to the schools.

2    SINGER:   Yeah, then that way the kids don't know it happens,

3           right?

4    WILSON:   Yeah.

5    SINGER:   So -- and then the other part [00:05:00] of that is

6           they don't chase you all the time for money.  'Cause once

7           you -- you know, once you're -- they know you gave money,

8           that's a different story.  And then what I can -- what

9           I'll do is I'll split the money potentially to the coach

10          or other pl-- parties that are out that school that need

11          the money, right?

12   WILSON:   Mm-hmm.

13   SINGER:   So...  Or it may go right to the coach, um, that's

14          helping us.  It ju-- it just depends on the school.

15   WILSON:   Right.  OK, so you don't actually get credit for a

16          donation to the school, or get hounded for that.  You

17          get, uh --

18   SINGER:   (overlapping dialogue; inaudible)

19   WILSON:   -- your donation to you, or your foundation, the Key

20          or whatever --

21   SINGER:   Right, and you get --

22   WILSON:   -- that, uh -- and --

23   SINGER:   -- your write-off, and then you do your thing.

24   WILSON:   OK.

```
 1   SINGER:   And then the kids get in the school.

 2   WILSON:   So my colleagues -- so, so you c-- you, you

 3             (inaudible) I assume take a share of that or something.

 4             If it's all going to your foundation, you can't take a

 5             share if it goes to your foundation.  You don't get a fee

 6             on that, then?

 7   SINGER:   Um, I just do my fee for what I take when I do your

 8             normal applications.

 9   WILSON:   Yeah, that's, like, terrible.  I, I think, from a

10             business model point of view, again, I advised you last

11             time, (laughter) I still advise you, this is worth a lot

12             to people, and so, you know, to the extent you [00:06:00]

13             want to make more money, I would think you would have

14             some kind of fee for that.  (inaudible) it's 350 to the

15             foundation, plus another 20% for me for using my leverage

16             and my relationships --

17   SINGER:   Yeah.

18   WILSON:   -- or something, no?

19   SINGER:   Well, I'm, I'm gonna use your business model going

20             forward.

21   WILSON:   I think you should.  I, I really would advise you...

22             But anyway, I -- so then I have this, uh, close friend of

23             mine here who works at, uh, ████████ with me, and he's

24             very well off.  He's the head of, uh, one of these big
```

1       areas in ████████ for a lot of years.  And his daughter's

2       -- wants to go to Brown next year.  His concern -- I

3       said, "Well, have you thought about...?"  It may be too

4       late, 1.  I don't know.  Um, she's going through her

5       senior year right now.

6   SINGER:   Well, what's the relationship that that person would

7       have...?  I mean, is that g-- is that person big enough

8       in ████████ that people would know who that person is?

9   WILSON:   Uh, yeah, probably.

10  SINGER:   OK, so then here would be my suggestion, to be frank

11      with you --

12  WILSON:   OK.

13  SINGER:   -- and I'd love to help -- you know, it is late and

14      all of that.  The president takes meetings all the time

15      from influential people.  She's a good gal.  And she--

16  WILSON:   Of Brown?  Yeah, I don't know.

17  SINGER:   Yeah, at Brown.  So what I would suggest is that,

18      [00:07:00] um, he calls up her office -- they have a

19      scheduling person for the president -- and he sets up a

20      meeting for he and his daughter to go meet, and she kinda

21      meets with them, and then she'll give an indication, and

22      he'll get an idea of what it's gonna need -- what's gonna

23      need to be done to, to have her to go to Brown.  That's -

24      -

```
 1    WILSON:   (overlapping dialogue; inaudible) the front door --

 2    SINGER:   -- that's the path I would go.

 3    WILSON:   -- like, like, $10,000,000 kind of thing?  Or that'd

 4         be the (overlapping dialogue; inaudible) --

 5    SINGER:  No, no, no, I think it's a lot less than that.  I

 6         think it's a lot less than that.  But, um, but it's first

 7         getting the meeting with the president, and just talkin'

 8         about -- and then also what he could do for the

 9         university, not only financially but, you know, just in -

10         - he could be a, a guest lecturer.  He could do, you

11         know, lots of different things.

12    WILSON:   Uh-huh.

13    SINGER:   That would be my suggestion.  (overlapping dialogue;

14         inaudible) --

15    WILSON:   He wanted to do it -- so the, the other thing he had

16         a concern was he wanted to do it in a way his daughter

17         wouldn't know.  His daughter's already said, "Dad, don't

18         help me with this, don't help me with that."  She's very

19         kind of, uh --

20    SINGER:  Well, then that's a different path, and then -- then

21         I may have to get involved in that.  Um --

22    WILSON:   Right, so that's --

23    SINGER:   -- but, but it's really --

24    WILSON:   -- the only thing he's sensitive to.
```

1   SINGER:   -- it's --

2   WILSON:   [00:08:00] His daughter's, like, really independent

3        that way.

4   SINGER:   Right.

5   WILSON:   And she's very smart.  She got a 35 or 31 below

6        perfect --

7   SINGER:   But, but --

8   WILSON:   -- on the ACTs --

9   SINGER:   -- I --

10   WILSON:   -- and all that, but...

11   SINGER:   No, I get it, but it -- what I would do is I would

12        still -- because him goin' to meet the president isn't --

13        doesn't mean that she's gonna help him, but that's a good

14        starting point.

15   WILSON:   Mm-hmm.  Well, maybe I'll just connect you 2 by an

16        email, and (inaudible) somethin' like that?

17   SINGER:   So --

18   WILSON:   Does that make sense?

19   SINGER:   So I can make the -- I can call the office, and then

20        what they normally...  So I just had a family do that,

21        and essentially what they told me to do was just, um,

22        have, have my family call the scheduling coordinator for

23        a time --

24   WILSON:   Mm-hmm.

```
 1   SINGER:   -- and, and -- with the background of the

 2        candidates, and then they'll, they'll usually set up the

 3        meeting.  Sounds like this person's well -- high enough

 4        up that it makes sense for (overlapping dialogue;

 5        inaudible) --

 6   WILSON:   Yeah, he's one of the top, let's say, 12 people.

 7        He's on the Executive Board and all that stuff like that,

 8        so...

 9   SINGER:   Yeah, yeah, so then that makes sense.

10   WILSON:   Now, he's, um...  [00:09:00] Let's see, what else?

11        Uh, that's her f-- uh, what do you call it, early

12        decision school, I think, and all that stuff?

13   SINGER:   Yeah.

14   WILSON:   So she's got all that --

15   SINGER:   Yeah.

16   WILSON:   -- stuff goin' for her.  She really loves it, wants

17        to get there and all that stuff, and he's willin' to pay

18        a million, 2 million.  He didn't care.  Um, so it's that

19        -- it's his last daughter, and he's, you know, pretty

20        well off that way.  I don't know what -- um, is Brown one

21        of those 350 or million...?

22   SINGER:   Oh, it's in the millions.  Yeah, yeah, yeah.  No,

23        there's no --

24   WILSON:   2 million (overlapping dialogue; inaudible)?
```

```
 1   SINGER:   -- 350 (inaudible)...  Yeah, there's no -- there's

 2       no (laughs) 350...  I'll -- I would have a (overlapping

 3       dialogue; inaudible) --

 4   WILSON:   I thought that Stanford -- not Stanford -- I thought

 5       that UCLA and USC and stuff like that was (overlapping

 6       dialogue; inaudible) --

 7   SINGER:   Yeah, that's a different story.  They're not Brown.

 8   WILSON:   No, no, that's what I meant.  The, the -- there's

 9       the 350 schools, or...  (laughter)

10   SINGER:   Yeah.  Yeah, exactly.

11   WILSON:   And everybody else jumps up to the million

12       (inaudible), yeah?

13   SINGER:   Yeah, you gotta ante way up.  Yeah, absolutely.

14   WILSON:   There's not much, uh -- not much in between.  Uh,

15       because (inaudible), too, like, (inaudible) is just -- a,

16       a bunch of them are 350s, the second tier or whatever you

17       want to call 'em, and then everything else just jumped

18       immediately to --

19   SINGER:   That's correct.

20   WILSON:   -- (inaudible) 1, 2.

21   SINGER:   W-- yeah.

22   WILSON:   There's no, like, 500 or 700 (overlapping dialogue;

23       inaudible) --

24   SINGER:   No, no.
```

1   WILSON:   -- or...?

2   SINGER:   No.  No, because it makes no sense for them to get

3             involved at those schools unless they're gonna really get

4             after.  But in [00:10:00] your case, with the girls, I

5             may be able to negotiate, knock it down so that, you

6             know, (inaudible) for 2 and figure it out.

7   WILSON:   L-let's say, let's say they both wanted to go to a

8             Harvard or a Stanford, right?  Obviously -- is it much

9             more difficult in Stanford versus Harvard, or Princeton?

10  SINGER:   No, same -- no, but it's the same --

11  WILSON:   Are they all the same?

12  SINGER:   They're all the same.

13  WILSON:   Yeah.  If you wanted to do 2 at Harvard or 2 at

14            Stanford...?  Now, I'm an alumni at Harvard.  I've given

15            some money, but not a lot.  I've given, you know, a few

16            hundred grand or (overlapping dialogue; inaudible).

17  SINGER:   Uh, well, uh, so we just need to strategize on how

18            we're gonna -- where we're gonna go, where we wanna go,

19            right?  'Cause I don't think the girls have any, any idea

20            right now.

21  WILSON:   Yeah, no, I don't think...  They would love to go to

22            Stanford or Harvard.  (inaudible) --

23  SINGER:   Sure.

```
 1   WILSON:   -- she loves the school there, and loves the thought

 2        of it.  Uh, ████████ loves Harvard, just from the thought

 3        of it.  I know she's said to her friends...  Uh, I just

 4        listen to 'em talkin' to their friends, you know?

 5   SINGER:   Right.

 6   WILSON:   "Where would you like to go?"  You hear that stuff.

 7        It doesn't have my influence...  It has my influence

 8        indirectly, and, of course, they have these big, you know

 9        -- oh, that's a great school, just the, the brand name in

10        their minds, you know.

11   SINGER:   Well, and, again, most people don't think they can

12        get into Stanford so they don't even [00:11:00] bring up

13        that name.

14   WILSON:   Yeah, but they lived out there and they went --

15   SINGER:   I know.

16   WILSON:   -- swimming in the waterfalls.

17   SINGER:   Right.

18   WILSON:   They know that --

19   SINGER:   No, no, I totally get it.  (laughs) I totally get

20        it.  No, I get it.

21   WILSON:   (inaudible) lived there.

22   SINGER:   Yeah.
```

```
 1   WILSON:   So those are the 2 that are on the top.  I-it's,

 2        it's the strategy to try to get into those 2.  Um, is

 3        Harvard easier 'cause I'm --

 4   SINGER:   No, it's not that.

 5   WILSON:   -- legacy?

 6   SINGER:   But --

 7   WILSON:   That doesn't mean shit?

 8   SINGER:   Your legacy means 0, because... (laughter)

 9   WILSON:   (inaudible) my life, you know.

10   SINGER:   John, (overlapping dialogue; inaudible) --

11   WILSON:   Unless you're donating a building, huh?

12   SINGER:   You've done quite well for yourself, so for a guy

13        that has no legacy, you're OK.  (laughter)

14   WILSON:   Oh, shit.  So legacy doesn't help at all, huh?

15   SINGER:   Unless you're a big legacy, but you --

16   WILSON:   Especially a big donor legacy, huh?  OK.

17   SINGER:   -- you haven't -- you haven't done that yet.

18   WILSON:   OK, I see.  That's interesting.  So that doesn't

19        matter.  Um --

20   SINGER:   Like, what's your -- like, how much do you give to

21        Harvard?

22   WILSON:   Nothing.  Like, a couple hundred grand over the

23        years, so...

24   SINGER:   OK.  (laughter)
```

```
 1  WILSON:   So they have too much money.  It pisses me off every

 2       time they ask for money.  I say, sure, I'll give you 10

 3       grand, you know.  Stop botherin' me.

 4  SINGER:   No, I get it.  I get it.

 5  WILSON:   [00:12:00] The fuckin' endowment's $30,000,000,000.

 6       Like, are you shitting me?  (laughter)

 7  SINGER:   I know.  I know, I know, I know.  I know, I get it.

 8       I get it.

 9  WILSON:   (inaudible) give to, you know, other charities.  But

10       anyway, that's a -- that's a whole different story.  But

11       i-is it --

12  SINGER:   So --

13  WILSON:   -- a better strategy to try and split 'em across the

14       2 --

15  SINGER:   Oh, yeah, I got (inaudible) strategies --

16  WILSON:   -- try to get 'em to go to 1.

17  SINGER:   -- I'm gonna...  No, I'm gonna use athletics to help

18       you, because that's the easiest way.

19  WILSON:   'Cause they're pretty tall and strong, and I think

20       they could actually...  I mean, when I saw ████████

21       rowing --

22  SINGER:   No, they're good athletes.

23  WILSON:   When I saw ██████████████ --

24  SINGER:   Yeah.
```

1  WILSON:   -- row on fuckin' that crew machine, I thought she

2       was gonna break the machine, she was goin' so hard.

3  SINGER:   No, she -- no, th-they en-- they, they may end up

4       gettin' in without even a donation, but, but you --

5       you'll know at least this route, we got an --

6  WILSON:   They gotta get (overlapping dialogue; inaudible) --

7  SINGER:   -- we got the side door route, too.

8  WILSON:   -- though, right?

9  SINGER:   Yeah, yeah.

10  WILSON:   But they're not really playing crew much.  They're

11       not doing crew, running crew.

12  SINGER:   Right.

13  WILSON:   So you gotta (overlapping dialogue; inaudible).

14  SINGER:   So we'll, we'll, we'll figure it out.  So --

15  WILSON:   But what would it be, if they wanted to go to one...

16       Uh, is that -- it's gonna be 2 and a half (overlapping

17       dialogue; inaudible) --

18  SINGER:   It's gonna be 1 -- it -- normally it's 1, 2 each,

19       right?  So I would have to make a deal if you wanted 'em

20       both at the same school, and if they could even take 'em

21       at the same school, and it would cost you -- it'd cost

22       you a couple million dollars.  Big guy like you,

23       [00:13:00] (laughs) that's easy.

1   WILSON:   Yeah.  Not so easy on liquidity, but yeah,

2          (laughter) (inaudible).  You got the installment plan?

3          (inaudible).

4   SINGER:   (inaudible).  Listen, I gotta go to an a-- another

5          appointment.  I just wanted to make sure I got back to

6          you.  I'm gonna be spending some time in Boston, because

7          I'm gonna be reading in Harvard this year, so I'll be

8          able to get together with you.

9   WILSON:   Oh, I'd love that.  That'd be great.  And I'm gonna

10          connect you -- I'll just (inaudible) -- I'll send an

11          email to you, and the guy's name is ██████████, and --

12   SINGER:   OK.

13   WILSON:   -- he could become a client and do whatever, and

14          I'll let the 2 of you kinda email back and forth and

15          stuff.  He'd love to do something not known to his

16          daughter at Brown.

17   SINGER:   Got it.

18   WILSON:   (laughs) And he's got money.

19   SINGER:   I gotcha.  I gotcha.

20   WILSON:   OK.

21   SINGER:   All right.  Take care.

22   WILSON:   All right, take care.  Bye.

23   SINGER:   OK, bye-bye.

24   [00:13:40]

1

2                        END OF AUDIO FILE

# FFF

1   **Call Date:**      2018-10-15

2   **Call Duration:** 11:18

3   **Call Begin [] Call End []**

4   **Call Participants:**

5        Rick Singer

6        John Wilson

7   **File Name:**      ██████████   2018-10-15 17-45-46 10126-001

8   **Bates No.:**

9

10   SINGER: [00:00] John.  How are ya?

11   WILSON: Hey, Rick.  Doin' well.  And yourself?

12   SINGER: It's ki-- you're goin' in and out.  Sorry.

13   WILSON: I got a -- I got a bad, uh, (inaudible).  It's just a

14          --

15   SINGER: Where is tha--?

16   WILSON: -- (inaudible) they got a big thunderstorm goin'

17          through.  Can you hear me better here?

18   SINGER: Yeah, I can hear you better.

19   WILSON: Uh...

20   SINGER: That's much better.

21   WILSON: Uh, you're pr-- busy these days, huh?

22   SINGER: Yeah.  We got early decision comin' up.

23   WILSON: Sh--

```
 1   SINGER: Uh, you're gonna be goin' through the same thing,

 2           so...

 3   WILSON: Oh, I know, next year, exactly.  So, hey, uh, there

 4           were a couple topics.  One was, ya kno-- my

 5           daughter's, and, uh, making some donations now,

 6           whatever -- how that can work.  And then, second, I do

 7           want to give some time, uh, to, uh, talk a bit about

 8           your overall, uh, pricing strategy and your economic

 9           model, if you want.

10   __:     Uh...

11   WILSON: I don't want to force it on you.  But I just think --

12   SINGER: No, no.  Uh, yeah.  So le--

13   WILSON: -- could be helpful.

14   SINGER: -- well, let's -- let's start with number one.  So

15           what would be great is... You know, w-- I have a

16           bunch of schools that we work with directly.  And, you

17           know, it's kind of a first serve-- firs-first come,

18           first [01:00] served.  Right?  So like I have

19           opportunity with Stanford in sailing.  And I can do

20           other Stanford sports potentially too.  And we have

21           Yale and we have Harvard.  And then I can go after all

22           these other schools too.  But, of course, I don't know

23           what the girls want.
```

```
 1   WILSON: Right.  Well, help me understand where you have first
 2           come, first serve and, uh...  So, uh, you have, as you
 3           said, Stanford, sailing.
 4   SINGER: Stanford, sailing.  Got Yale, soccer, um, Harvard...
 5   WILSON: They probably wouldn't want Yale.  Harvard?  What, uh
 6           -- what do you have at Harvard?
 7   SINGER: Harvard, we could do multiple sports.  I just need to
 8           go to them.  I could actually even go to Y-- uh, you
 9           don't want Yale, because you thought that they were
10           too what?  Too conservative or they were too liberal?
11   WILSON: Too liberal.
12   SINGER: OK.  I don't know which -- I don't know which side of
13           the room, uh, you know, you -- you come from.  So.
14           Uh, you know, we could do Stanford.  We can do,
15           obviousl-- USC with anything.  Right?  So that's an
16           easy one.
17   WILSON: How about UCLA?
18   SINGER: UCLA, I could do the same thing.
19   WILSON: And [02:00] what about, uh...?  Got, uh, multiple
20           there.  And what about the, um -- uh, Georgetown?
21   SINGER: Uh, for where?
22   WILSON: Georgetown?
23   SINGER: Georgetown, we could do the same thing.  Yeah.
24   WILSON: Lots of mul--ple options.
```

```
 1   SINGER: Yeah.

 2   WILSON: So Stanford only has 1 or 2.  Just sailing?  Is that

 3           about it?

 4   SINGER: Um, so, uh, usually I can go t-- sailing, I can go to

 5           the crew coach, 'cause I'm friendly with her, um, and

 6           we can, you know, d-- always do women's lacrosse.  And

 7           again, ya know, they don't have to play.  They just --

 8           I j-- that's the path I'm gonna get 'em in on.

 9   WILSON: Gotcha.  And what about Harvard?  Crew, sailing.

10           Anything else?

11   SINGER: Um, sailing, crew, sometimes tennis.  The key to here

12           is that, if I were to get a deposit, l-- you know,

13           like, uh, uh, half a million dollars in the bank, then

14           it's --

15   WILSON: Uh...

16   SINGER: -- ya know, we can figure out where they wanna go.  So

17           what I'd like to do is...  I'm gonna be in town on

18           November 1st and 2nd.  If you can start probin' with

19           the girls as [03:00] to potentially their -- what

20           they're thinking, then we -- you and I could -- if

21           you're -- if you can be in town one of those days -- I

22           think it's a Thursday, Friday -- and we could talk

23           face-to-face, then we could figure out, OK, what are

24           we gonna go after.  So if anybody asks me for like a
```

1      Stanford spot and we're not sure yet, then I can call

2      you and say, "Hey, somebody wants that spot and I only

3      have 1," or "I'm gonna get a second one," or whatever.

4      But having the money already, in advance, makes it

5      much easier.  Because I gotta go with whoever's gonna

6      ante up.

7  WILSON: Yeah.  And who do we make these, uh, checks out to?

8      And, uh, what's, uh -- uh, what's your foundation?  Do

9      you have a whole wiring -- send me an email with all

10     your wiring and all, uh...?

11 SINGER: Yeah.  I can send ya a email with all the wiring

12     instructions.  And then g-- uh, uh, your check will be

13     -- to into our foundation's account.

14 WILSON: Ri-- goes to your foundation, right.

15 SINGER: Yeah.

16 WILSON: Uh, uh, do you have mul--?  So you have multiples, uh,

17     at Harvard and Stanford and, uh...

18 SINGER: Correct.

19 WILSON: You have mul--ples everywhere, it sounds like.

20 SINGER: Correct.

21 WILSON: And they don't actually have to do that sport, you're

22     saying.  They could just go in and --

23 SINGER: Correct.

24 WILSON: -- be like the, uh -- the [04:00] scorekeeper or --

```
 1  SINGER: Corre--

 2  WILSON: -- water boy, water girl.

 3  SINGER: Manager or whatever you want to call 'em.  Yeah.

 4  WILSON: Uh, manager, those things.  OK.  And you can do 2 at 1

 5          school, as well.  You could do 2 at, uh...?

 6  SINGER: It's more difficult to do.

 7  WILSON: Uh...

 8  SINGER: That's why it depends on where it is.  And the earlier

 9          I know, then that gives me a chance to go after it.

10          'Cause I'll have to solicit, uh...

11  WILSON: Uh, let's say it's 2 at either Stanford or Harvard.

12  SINGER: So then, uh...

13  WILSON: Are those impossible or...?

14  SINGER: No, it's not impossible, absolutely not.  It's just a

15          matter of I just need to know that I go-- I gotta

16          start doin' my work now on that.  So by you makin' the

17          deposit, it makes it easier for me, because I know I

18          g-- uh, because what they're gonna first say to me...

19          If I go to them...  And let's say we're doin' 2 girls

20          in 1 place.  Then they're gonna say to me, uh, "We're

21          gonna give up a spot for you.  Are you --"

22  WILSON: Uh...

23  SINGER: "-- are you guaranteeing me that's she's comin'?  And

24          is the family guaranteeing me that they're gonna ante
```

```
 1              up and they're gonna make a payment?"  Because they

 2              don't want to give up a spot.  And the earlier I do

 3              it, the better.

 4    WILSON: Gotcha.  So, uh, what about Princeton?  They have

 5              multiples [05:00] too?

 6    SINGER: 1.  Usually, I could try to get a second, but it's

 7              more difficul--

 8    WILSON: Only 1 at Princeton.  OK.

 9    SINGER: Yeah.

10    WILSON: And same kinda deal, any spor--?  You don't have to

11              really play the sport?

12    SINGER: That's correct.

13    WILSON: And you can do that -- you can also get some kinda

14              chair things too, if you don't do the sport?

15    SINGER: Uh...

16    WILSON: Or, uh, sport mostly is your...?

17    SINGER: Um, yeah, the...  It jus-- well, like it depends on

18              the school.  To go after a dean is a little more

19              difficult.  With your girls, because they're athletic

20              and they're big and all of that, I can sell to anybody

21              that they're athletic enough to be able to take 'em

22              and there'll be no question.

23    WILSON: Yeah.  Their size and, uh...  So they...  Yeah.

24    SINGER: Correct.
```

1   WILSON: Even though they wouldn't play.  OK.

2   SINGER: R--

3   WILSON: And Brown?  Is, uh, Brown also 2?  Or wh--?

4   SINGER: Brown's an option too.  Yeah, sure.

5   WILSON: A couple of 'em.  OK.

6   SINGER: Yeah.

7   WILSON: Uh, and those are all -- except for like UCLA and

8           USC...?  Those are like the 350 and the other ones are

9           gonna be like 1,000,000, whatever?

10  SINGER: Yeah.  The -- the big boys are gonna cost you over

11          1,000,000.  And, uh, probably -- if I know early

12          enough, I could probably get it done at 1.5 for both

13          girls.  Uh, I just need to -- [06:00] I need to push

14          now.

15  WILSON: OK.  So, yeah, I can get ya more now, if that helps

16          you and makes everything certain.  Uh, yeah.  So I'll

17          give you at least half.  Maybe I can get ya ¾ of a

18          million now, if that makes it like, you know, more

19          certain and you're gonna say --

20  SINGER: OK.

21  WILSON: -- (inaudible) done, that's a better way to do it, for

22          you.

23  SINGER: Uh...

```
 1   WILSON: It makes it better -- you're saying better with the

 2           schools, everything, it's much better to get it --

 3   SINGER: We-- uh, th-the --

 4   WILSON: -- as a guarantee.

 5   SINGER: -- the amount, uh, that doesn't ma-matter right now.

 6           It matters you're committed.  And you putting down

 7           some money, th-that I know...  John, I kn-- known you

 8           for years.  So I know, when, uh, we get the girls in,

 9           it's a done deal and you're gonna take care of your

10           part of it, you're gonna make the payments to the

11           schools and the -- to the coaches.  And that's what I

12           need -- that's -- tha-- so I'm not worried about that.

13   WILSON: Uh, uh, help me understand the logistics?  I thought I

14           make the payment to you and you make the payment to

15           the school.

16   SINGER: Correct.  That's correct.

17   WILSON: Oh, you said I make the payment to the schools.

18   SINGER: Well, no, no.

19   WILSON: You're (inaudible)...

20   SINGER: Uh, essentially, uh, it's gonna come to my

21           foundation...  That's correct.

22   WILSON: And you pay.  Uh, r-- OK.

23   SINGER: That's correct.
```

1   WILSON: Now, um, uh, how does that actually wor--?  What if

2           they don't actually get in?  Uh, it's not a b-- uh...

3   SINGER: Oh, no, no, no.  Y-you don't have to [07:00] worry

4           about it.  They're -- it's g-- it's a done deal.  And

5           I'll know beforehand if it's gonna be done or not.

6   WILSON: Uh...

7   SINGER: But, uh --

8   WILSON: When will you know --

9   SINGER: -- see, uh --

10  WILSON: -- in the summer of next year?

11  SINGER: -- I need a score.  See?  That's why I need their

12          grades and scores.  And that's wh--

13  WILSON: Yeah.  They get PSATs.  And they just took the PSATs.

14  SINGER: Correct.  And then I need the real scores.  That would

15          be -- that's gonna -- that's gonna be able to tell me

16          how easy it is to -- to flow it through or no-- and

17          I'm hopefu-- both girls get the same or something

18          similar to each other.

19  WILSON: They've gotten pretty similar scores all along, plus

20          and minus math and English, that kinda stuff.

21  SINGER: Right.

22  WILSON: Yeah.

23  SINGER: Right.

```
 1   WILSON: As long as, you know, like you can -- 1300 or so, is

 2           that OK --

 3   SINGER: Correct.

 4   WILSON: -- is it --

 5   SINGER: Yes.  Yeah.

 6   WILSON: -- 1300 plus?  OK.

 7   SINGER: Yeah.

 8   WILSON: Now, do you ha-- when you say you need to know, we

 9           have to actually have picked a school by when too,

10           that it's -- OK, it's 2 to Stanford, 2 at Harvard, or

11           1 in each --

12   SINGER: Well, uh, late --

13   WILSON: -- 1 in USC, or...?

14   SINGER: -- so I need that late spring.

15   WILSON: So late spring only.  OK.

16   SINGER: Right.  And you guys are gonna visit the schools by

17           then.  You'll have so much fun, uh.

18   WILSON: Yeah, yeah.  They're g-- they haven't gone to these

19           place-- they've been to some of them.

20   SINGER: Correct.

21   WILSON: But they didn't go to them, look at 'em.  Uh, does it

22           matter if they go to them and look at the -- an-and

23           have this whole tour, with the [08:00] school knowing,

24           or just go and look at themselves?
```

```
 1   SINGER: No, uh.  It's a --

 2   WILSON: Want to suck up to the dean?

 3   SINGER: -- uh, a regular tour -- regular -- regular tour.

 4   WILSON: OK.  Do those have to be done durin' the week too?

 5           They can't do 'em --

 6   SINGER: Yeah.

 7   WILSON: -- on a weekend really?

 8   SINGER: Yeah.  The weekends -- you know, because they don't

 9           have the same energy.

10   WILSON: No, no.  I understand that.  But I meant for the

11           school, to meet with the whatever, faculty -- or not

12           the facu-- but the...

13   SINGER: Well, they d-- they're just gonna go on a regular

14           tour.  They're not gonna meet, uh, faculty anyways.

15   WILSON: I mean, see the class, I mean-- not meet the faculty

16           but see the classrooms.

17   SINGER: Well, if we have kids that go there.  We can set it up

18           with 'em.  If I don't kids that go, they don't go see

19           classes.  People do--

20   WILSON: Oh, they do not.  They just go on a tour --

21   SINGER: No.  People are worried --

22   WILSON: -- of campus by --

23   SINGER: -- about all that.  Yes.
```

```
 1   WILSON: -- admissions?  OK.  So it's admissions tour, not like

 2           a classroom tour.

 3   SINGER: Correct.

 4   WILSON: OK.  Uh...

 5   SINGER: Correct.  Unless I have kids there.

 6   WILSON: Uh, gotcha.  OK.  So if I do it early on, you might

 7           even get, you said, 2 -- uh, 2 (inaudible) the top

 8           ones (inaudible) 1 (inaudible).

 9   SINGER: Correct.

10   WILSON: And does it really matter, though, if it's 2 at 1 or,

11           uh, not?

12   SINGER: It d--

13   WILSON: Ho-how much did you...?

14   SINGER: It makes it ea-- it makes it easier, if it isn't, but

15           it can be done.

16   WILSON: It could be done.  OK.  And you're pretty confident

17           right now, a-and all those top schools, you could get

18           something done, as long as they get --

19   SINGER: Yeah.

20   WILSON: -- a test score of [09:00] 1300.

21   SINGER: Because I'm -- I'm usin' up my spot now.  And then you

22           have the ne-- you're early.

23   WILSON: OK.  Great.  And then, uh...  You only have like 1 or

24           2 spots in each of these place, though, you're saying.
```

```
 1   SINGER: Correct.

 2   WILSON: Or, y-- uh, you have several, depending on the sport,

 3           you were s-- uh, 'cause like --

 4   SINGER: Well, it depends.

 5   WILSON: -- Harvard, you can a couple --

 6   SINGER: Uh, uh...

 7   WILSON: -- both crew and saili--

 8   SINGER: Well, John, it, uh -- it depends on boy or girl, all

 9           of that, right?  Because --

10   WILSON: But I'm saying 2 girls.

11   SINGER: -- (inaudible).  Yeah, usually 2 girls.

12   WILSON: So my t-- you can get a couple girls in each year, to

13           these places.  And they may --

14   SINGER: Correct.

15   WILSON: -- take both of those spots.

16   SINGER: Correct.

17   WILSON: OK.  Sound like you got 20 spots.  You may only have

18           2.

19   SINGER: No.  Uh, right.  You're crazy.

20   WILSON: No.  It's why you need to charge a bigger premium, my

21           friend.

22   SINGER: I got it.  Well, we'll have that discussion in --

23   WILSON: Uh...

24   SINGER: -- in, uh, November.  How's that?
```

```
 1  WILSON: OK.  And that sounds great.  So I w-- I will get

 2          you...  Send me an email with where you need to send

 3          these funds.  And so you don't care.  Half a million,

 4          whatever, is good, ¾ of a million, doesn't really

 5          matter, you're saying, just send something to you.

 6  SINGER: Correct.

 7  WILSON: And then, uh -- uh, then you know we're locked in for

 8          2.  We don't know where yet.

 9  SINGER: R--

10  WILSON: We'll determine that a little bit later in the year,

11          maybe November.  [10:00] So you have your dates?  Is

12          it 1 and 2, for sure?  What is your schedule?

13  SINGER: Excuse me?

14  WILSON: The dates (inaudible) --

15  SINGER: Yeah.  November --

16  WILSON: -- come back to Boston, uh.

17  SINGER: -- 1st and 2nd.  Yeah.  November 1st and 2nd -- it's a

18          Thursday, Friday -- I'll be...

19  WILSON: OK.  Yeah.  Right now we were plannin' on being out of

20          town, damn it.  We're gonna be in Europe.  Uh, when's

21          the next time you're in, uh, Boston, uh?

22  SINGER: Uh, I'll have to figure that out.  I'll let you know,

23          though.
```

```
 1   WILSON: OK.  My girls'll be in town.  But w-- Leslie and I
 2           will be out, yeah.
 3   SINGER: OK.  Gotcha.
 4   WILSON: All right.  Oh, by the way, you should mark your
 5           calendar for next Ju-July, if you want, in, uh, Paris.
 6           Got a big birthday, July, uh, 19.
 7   SINGER: OK.
 8   WILSON: I rented out Versailles.
 9   SINGER: Oh, my God.  You're crazy.
10   WILSON: I know.  A black-tie party there.  So you'll have to
11           come.
12   SINGER: Uh...
13   WILSON: Anyway.  Uh, I will -- I'll get you -- uh, I'll parti-
14           -
15   SINGER: I'll send you the -- I'll send you the w-- uh,
16           information about the bank and the wiring stuff, uh,
17           probably in the next day or so.
18   WILSON: OK.  That's great.  It's good to hear that earlier is
19           better.
20   SINGER: Yeah.
21   WILSON: I'm glad we had this conversation.  And then I'll have
22           the girls run a filter, over the next few weeks.  Uh,
23           they could meet with you in November without us.  Is
24           that [11:00] OK?  Or would you --
```

```
 1    SINGER: Sure.

 2    WILSON: -- want (inaudible) with us?

 3    SINGER: Absolutely.

 4    WILSON: OK.

 5    SINGER: Absol--

 6    WILSON: So I'll have the girls plan on meeting you sometime

 7            November 1 and 2.  Let me know the next time you're on

 8            (inaudible).

 9    SINGER: Will do.

10    WILSON: Yeah.  I'd be happy to help you with your business

11            model.  So I think you're leaving a lotta money on the

12            table.

13    SINGER: I know y-- I know that.  We'll have that discussion.

14    WILSON: OK.  So the g--

15    SINGER: All right, John.

16    WILSON: Uh...

17    SINGER: Thanks.

18    WILSON: Take, uh...

19    SINGER: OK.  Buh-bye.  [11:18]

20

21                        END OF AUDIO FILE
```

# GGG



**Your checking account**

THE KEY WORLDWIDE FOUNDATION   |   Account #          |   October 1, 2018 to October 31, 2018

## Deposits and other credits

| Date | Description | Amount |
|------|-------------|--------|
| 10/17/18 | WIRE TYPE:WIRE IN DATE: 181017 TIME:1616 ET TRN SEQ:18101712342108SM/002732 ORIG:HYANNIS PORT CAPITAL INC ID: BK:FIRST REPUBLIC BANK ID: | 500,000.00 |

**Total deposits and other credits**

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|--------|

**Total withdrawals and other debits**

HHH

**From:**    John Wilson ██████████ ███████████████ >
**To:**
**Sent:**    10/17/2018 2:15:45 PM
**Subject:**    Re: The Key Worldwide FOundation

Yes

John B Wilson

President and CEO,
Hyannis Port Capital Inc.

████████████

On Oct 17, 2018, at 13:13, ██████████████████████████ wrote:

Ok, so I'm assuming you will let me know when this is to be wired, so I'll wait for further direction.

**From:** John Wilson
**Sent:** Wednesday, October 17, 2018 11:09 AM
**To:** ██████████
**Subject:** Re: The Key Worldwide FOundation

It's a $500k donation I am going to make this year.  Tax write off and help getting into colleges.

John B Wilson

President and CEO,
Hyannis Port Capital Inc.

████████████

On Oct 17, 2018, at 11:58, ██████████████████████████ wrote:

I just received a text with Bank info for The Key Worldwide Foundation, what is this for?



1    **Call Date:**    10/27/2018

2    **Call Duration:** 05:23

3    **Call Begin [ ] Call End [ ]**

4    **Call Participants:**

5         John Wilson

6         Rick Singer

7    **File Name:**    ██████████  2018-10-27 17-13-18 10823-001

8    **Bates No.:**

9

10   SINGER:   [00:00] John, how are you?

11   WILSON:   Hey, Rick, I'm OK.  I'm here in a big rainstorm in

12        Saudi Arabia.  [laughter]

13   SINGER:   In Saudi Arabia.

14   WILSON:   Unusual.  Yeah, I'm in Dubai.

15   SINGER:   I didn't -- I didn't know that they, uh, had storms

16        like that in the desert.

17   WILSON:   I know.  It's very unusual.  Very strange, yeah.

18        (inaudible) all this lightning.  It was crazy.  Anyway,

19        now I'm in the car.  We're heading out so I had a little

20        free time.

21   SINGER:   OK.

22   WILSON:   What's happening?

23   SINGER:   So I had a conversation with the Stanford sailing

24        coach and, um, so I just gave the Stanford sailing coach

1        160,000 for his program and while we were having that

2        conversation I said, "Hey, I'm hoping that this 160 that

3        I'm helping you with helps secure, um, a spot for next

4        year.  Can I be guaranteed a spot for next year?"

5        [01:00] And he said, um, "Yes."

6   WILSON:   (inaudible) all it takes?

7   SINGER:   So... Uh, no, no, no, no.  That's not all it takes.

8   WILSON:   OK.  [laughter]

9   SINGER:   This is not TJ Maxx or Marshall's or something like

10       that.  So, um...

11  WILSON:   Right.

12  SINGER:   So essentially if you're -- um, I want you to have

13       first dibs, like I told you.  So if you want I can

14       provide John Vandemoer, um, -- which I'm going to

15       essentially send John directly the check, to the coach.

16       I can send him your 500,000 that you hired into my

17       account to secure the spot for one of your girls.  Um, I

18       asked him for a second spot in sailing and he said he

19       can't do that because he has to actually recruit some

20       real sailors so that Stanford doesn't --

21  WILSON:   [laughter]

22  SINGER:   -- [02:00] catch on.

23  WILSON:   Right.

24  SINGER:   OK.  So --

```
 1   WILSON:   Yeah, no.  He's got to --

 2   SINGER:   -- Stanford --

 3   WILSON:   -- actually have some sailors. Yeah.

 4   SINGER:   Yeah.  So that Stanford doesn't catch on to what

 5             he's doing.

 6   WILSON:   Right.

 7   SINGER:   So...  Um, and I -- that doesn't mean I'm not going

 8             to pursue other Stanford coaches, um, and to be frank

 9             with you, it doesn't matter if, um, it's one of the girls

10             who's not a sailor.  I can still put her as a sailor.

11             Or, obviously, the one that is, I can -- I'll mark that

12             she's a sailor because she is, but not at the level in

13             which she can sail at Stanford.

14   WILSON:   Right, right.

15   SINGER:   I just need to know if you want me to go forward and

16             secure that spot.

17   WILSON:   Yeah, that's what I need to think.  I know the girls

18             were looking at, you know, Harvard and Stanford, are

19             their two -- you know, two tops.  Anything on Harvard?

20             So if we did that, we're then precluded -- you know,

21             you've gone (inaudible) already.

22   SINGER:   So we're not --

23   WILSON:   You're saying once you do this you're (inaudible)

24             down that path?
```

```
1    SINGER:   Well, that's what I'm trying [03:00] to get.  I'm

2          trying to get -- that you got one and then I'm going to

3          go after the other one, others at Stanford.  I don't --

4          you know, obviously I just started here because I already

5          have that relationship with the sailing coach and I've

6          already --

7    WILSON:   Yeah.

8    SINGER:   -- given him 160,000.  That doesn't mean I'm not

9          going to go after Harvard, as well, and I probably am

10         going to go after Harvard for one spot or two spots but I

11         just haven't been there yet because it's too early.

12   WILSON:   Right.  So what -- uh, (inaudible) so is it, uh,

13         you're committed once you make this call, you're saying?

14   SINGER:   Excuse me?

15   WILSON:   Would we be committed?  Because I don't even -- you

16         know, the girls haven't been out there yet to look at it

17         yet.  How does that work?

18   SINGER:   No, so...  No.  So let -- I'll -- let -- you know,

19         let me have a discussion with the coach to say when I

20         have to have the commitment from you guys.

21   WILSON:   OK.

22   SINGER:   Because that would tell you if you guys needed to be

23         out there to visit or are you just going to [04:00] take

24         the spot now or do we have time.  I'll get back to you on
```

```
 1          that.  I just want to make sure, you know, I'm working on

 2          it for you and that I got the spot.  I just need to know

 3          if that's what you want me to do and I'll -- and I'll

 4          work on the rest of it over the next day or two to figure

 5          out what the next parameters are.  And then I'll text you

 6          and you can call me from, you know, the Nile with Moses

 7          and Cleopatra and whatever you want.

 8  WILSON:    [laughter]  OK.  I'll be here, then I'll be in Abu

 9          Dhabi and Dubai later in the week and then (inaudible)

10          after that.  All right.  Um -- you know, what about the

11          timing?  Anything -- any news on the Harvard side?

12  SINGER:    I'm just working on the Harvard side now.

13  WILSON:    Is that likely to be in the next few weeks, too.

14          Because I thought we had until spring on some of that.

15  SINGER:    We do, we do.  But I -- but I -- you know, I first

16          got to worry about my kids for this year.  But because

17          you --

18  WILSON:    Yeah.

19  SINGER:    -- provided me the money and I already was on the

20          phone with them, I'm thinking about you guys first.

21  WILSON:    Oh, OK, great.  [05:00]  That's always nice of you.

22          I appreciate that.

23  SINGER:    OK.  So I will --

24  WILSON:    All right.
```

```
 1   SINGER:    -- get back to you on the questions you had but I

 2       just wanted to pose this to you now.

 3   WILSON:    Right.  Oh, it sounds great.  Appreciate it.

 4   SINGER:    OK.  So I'll get back to you --

 5   WILSON:    All right.

 6   SINGER:    -- or I'll text you.

 7   WILSON:    OK, super.

 8   SINGER:    OK, John.

 9   WILSON:    Thank you.

10   SINGER:    Take care.

11   WILSON:    Take care.

12   SINGER:    OK, bye-bye. [05:23]

13

14                         END OF AUDIO FILE
```

# JJJ

1  **Call Date:**    11/29/2018

2  **Call Duration:** 04:02

3  **Call Begin [] Call End []**

4  **Call Participants:**

5       Rick Singer

6       John

7  **File Name:**       ████████  2018-11-29 15-25-36 12347-001

8  **Bates No.:**

9

10  JOHN _:   [00:00]  Hello, Rick.

11  SINGER:   John, how are you?

12  JOHN _:   Not too bad.  How about you?  You coming up for air

13       yet?

14  SINGER:   We're coming up for air.  Where are you at?  Where

15       are you at today?

16  JOHN _:   I'm in, uh, Houston today.  Yeah.

17  SINGER:   OK, cool.  Well, I'm in Boston working on your pet

18       project, Harvard.

19  JOHN _:   [laughter] OK.

20  SINGER:   OK.  So, um --

21  JOHN _:   How long are you in Boston for?  I'm supposed to be

22       back there tonight.

23  SINGER:   About 10 minutes.

24  JOHN _:   [laughter]

```
1   SINGER:   I came here because I wanted to make sure I get this

2            thing taken care of for you so that my phone doesn't have

3            the all-time record of most texts.

4   JOHN _:   [laughter]  Oh, come on.  I'm -- I'm being calm.

5   SINGER:   I know.  You're -- you're calm compared to some.  I

6            get it.  So here's what we got.  I'm just leaving Harvard

7            now.  I'm going to go to the airport and essentially we -

8            - we got a spot if -- if that's what you're saying, that

9            ███████████ wants to go to Harvard.

10  JOHN _:   Yeah.

11  SINGER:   So I got [01:00] the senior women's administrator at

12           Harvard is going to give us a spot.  What we have to do

13           is we'll have to give, um, her, um, $500,000.  That

14           money, obviously, like the others, will go through my

15           foundation and then I will fund the senior women's

16           administrator at Harvard.  And then in the spring, since

17           I've already paid ██████████████ (sp?) the 500 and now

18           we'll give the senior women's administrator 500, so I got

19           another deal for you.  Is -- your total's going to be

20           1.5.  250 will come in the spring for Stanford and 250

21           for Harvard in the spring and we'll ha-- and we'll be

22           solid.  We'll be done.  We'll apply like a normal student

23           but we'll, um, know that we're getting in in the late

24           fall of next year.
```

```
 1   JOHN _:   OK, great.  So what is that going to be?  This is
 2            the senior women's -- what does [02:00] she have, no team
 3            or anything like that or...?
 4   SINGER:  She'll figure it out.  Um, so it won't mean -- it
 5            doesn't matter the sport at this point.  She will figure
 6            it out and get it done.  Um, so -- and the same thing for
 7            -- maybe she won't have to sail but we're going to put
 8            her through sailing and John Van de Moore.  This is
 9            actually a better play at Harvard because she will, um,
10            just get her in through at-- um, athletics in one of the
11            sports but it won't matter.  It won't matter at all.
12   JOHN _:   She (inaudible) sail actually so sailing's actually
13            a logical thing.  She could be even the mascot, whatever,
14            but she knows sailing.
15   SINGER:  OK, the mascot.  OK.
16   JOHN _:   [laughter]
17   SINGER:   (inaudible) the mascot.  I love it.  I love that
18            one.
19   JOHN _:   So do you need 500 now or what's the (inaudible)?
20            What do you think?
21   SINGER:   Yeah.  I -- I think --
22   JOHN _:   How quickly do you need the 500?
23   SINGER:  By next week or so.
24   JOHN _:   Next week.  OK.  Um...
```

██████████  2018-11-29 15-25-36 12347-001                    Page 4

```
 1   SINGER:   You have to liquidate?  Is that what you have to do?

 2   JOHN _:   To do it in the next week or so, yeah.  I wasn't --

 3       do you know what my -- do -- I've been doing a lot of tax

 4       planning, (inaudible), and paying stuff, and all that.

 5       Um...

 6   SINGER:   What is --

 7   JOHN _:   It has to be before year end, right?

 8   SINGER:   (inaudible).  [03:00] Uh, before year end, yes.

 9   JOHN _:   All right.  Let me, uh, let me try and pull some --

10       pull some leverage.  But that sounds fantastic.

11   SINGER:   OK.  So --

12   JOHN _:   All right.

13   SINGER:   Um --

14   JOHN _:   That's great news.

15   SINGER:   You just -- yeah.  It's great news and you got a

16       discount and we got both settled.  I mean, life is good

17       over at the Wilson house.

18   JOHN _:   Yeah.  Well, hopefully it's settled, right?  I mean,

19       I always -- I'm -- I'm on pins and needles here, I know,

20       because it's like, OK, they got to still get good test

21       grades, of course, all that stuff.

22   SINGER:   No, they got to be -- they got to be good.  They

23       don't have to be over the top.

24   JOHN _:   OK.
```

1    SINGER:   So if they get their -- they get their 30s, you

2          know, in the low 30s, we're good.

3    JOHN _:   OK.

4    SINGER:   ██████████████████████████████████████████,

5          ████████████████████████████████████████████

6          ████████.

7    JOHN _:   Right.

8    SINGER:   And if we can perform the same level we're great.

9    JOHN _:   Yeah, I think that's a good -- PSAT.  And they

10          haven't taken the ACT yet.  They take that (inaudible).

11          OK, so it's just that kind of level.  OK, that sounds

12          (inaudible).

13    SINGER:   That's correct.  That's correct.

14    JOHN _:   And then -- all right.  Well, I really appreciate

15          your help on this.  Definitely.  That's great news.

16    SINGER:   No problem.

17    JOHN _:   Thanks for sharing.

18    SINGER:   All right.

19    JOHN _:   All right.

20    SINGER:   Enjoy.  I'll --

21    JOHN _:   Thanks.

22    SINGER:   I'll wait to hear back from you.

23    JOHN _:   OK, great.  Thank you.

24    SINGER:   OK, thanks [04:00].  Bye-bye.  [04:02]

1

2                      END OF AUDIO FILE

KKK



**Your checking account**

THE KEY WORLDWIDE FOUNDATION   |   Account #████████   |   December 1, 2018 to December 31, 2018

## Deposits and other credits

| Date | Description | Amount |
|---|---|---|
| 12/11/18 | WIRE TYPE:WIRE IN DATE: 181211 TIME:1323 ET TRN█ SEQ:18121109060308SM/001517 ORIG:HYANNIS PORT CAPITAL INC ID█ BK:FIRST REPUBLIC BANK ID█PMT DET:RE :DONATION | 500,000.00 |

**Total deposits and other credits**

## Withdrawals and other debits

| Date | Description | Amount |
|---|---|---|

**Total withdrawals and other debits**

# LLL

1    **Call Date:**  2018-08-30

2    **Call Duration:**  30:38

3    **Call Begin** [     ] **Call End** [     ]

4    **Call Participants:**

5         Agustin Huneeus

6         Rick Singer

7    **File Name:**██████████ 2018-10-02 20-11-36 07089-001.wav

8    **Bates No:**

9

10   HUNEEUS:  [00:00] Hey, Rick.

11   SINGER:   Hey, there.

12   HUNEEUS:  Is this --

13   SINGER:   Is this a good time?

14   HUNEEUS:  -- a good time for you?

15   SINGER:   Yeah, it's good for me.

16   HUNEEUS:  OK, great.  So I just wanted you to walk me through

17        the whole kinda water polo thing again and how it works.

18        You and I did, you know, like the economics, the timing,

19        how all that works.  You and I had a brief conversation

20        about it.  But I wanted to kinda get it straight --

21   SINGER:   OK.

22   HUNEEUS:  -- if you don't mind.

```
 1   SINGER:   OK.  So, um, I'm putting together -- I need to put

 2        together, uh, ███████ uh, pro-- sports profile --

 3        will be a water polo profile -- now --

 4   HUNEEUS:  Yeah.  Yeah.

 5   SINGER:   -- and take her transcript, test scores, and profile

 6        to the s-- to the senior women's athletic director, who

 7        actually is the liaison for all sports at USC.  So

 8        football, everybody, has to go through her.

 9   HUNEEUS:  OK.

10   SINGER:   And then she -- [01:00] they have meetings every

11        other Thursday, which are called subcommittee meetings,

12        where the dean of admissions and two admissions offi--

13        two admissions staff and she are there and they go

14        through the athletes for that particular subcommittee

15        meeting.  It could be water pol-- this week.  It could be

16        football the next week --

17   HUNEEUS:  Uh, uh...

18   SINGER:   -- basketball.  Just depends on where they are in

19        the seasons, uh, what's going o--

20   HUNEEUS:  Uh...

21   SINGER:   So what she does is she already works on presenting

22        the kids, before she gets to the meeting, so she knows

23        everything about 'em, she knows why they want 'em, she

24        knows where to slot 'em based on their GPA and test score
```

```
 1       -- and be ready to answer questions, if admissions has

 2       questions.

 3  HUNEEUS:  OK.

 4  SINGER:   Because they have the ones that are scholarship

 5       athletes, which are just -- stamp 'em and go, and then

 6       there's the recruited, walk-on kids.  And sometimes she

 7       has to explain those kids.

 8  HUNEEUS: Got it.

 9  SINGER:   So in this case it's gonna be -- uh, it's a [02:00]

10       l-- it's -- it's a little different, because Jovan is

11       totally supporting our applications.  So it's...

12  HUNEEUS:  And why?

13  SINGER:   Because he owes, uh...

14  HUNEEUS:  Because I under-- you understand that ▮▮▮ is not

15       worthy to be on that tea--

16  SINGER:   No, no.  H-he's my guy.  OK?

17  HUNEEUS:  OK.

18  SINGER:   So...

19  HUNEEUS:  So he's got a back door.

20  SINGER:   He has his spots.  So he's giving up one of his

21       spots.  So instead of women's athletic giving up a spot,

22       he's giving up his spots.

23  HUNEEUS:  His water polo spots.
```

1    SINGER:   Y-yes, uh.  And he knows, uh, she's not comin' there

2         to play.  He knows all that.

3    HUNEEUS:  OK.

4    SINGER:   So I have been working with him for 12 years.  And I

5         have actually helped b-- all of his kids get into

6         college, all over the country.

7    HUNEEUS:  Mm-hmm.

8    SINGER:   So I've helped all 4 kids, at no cost to him.

9    HUNEEUS:  Got it.

10   SINGER:   So her stuff will go in.  We will continue to work

11        on her applications [03:00] and her essays.  If there's a

12        subcommittee meeting that she gets presented at before

13        December, then -- which w-- my guess, the answer will be,

14        yes, it will happen -- may happen in September 20th or it

15        may happen two weeks after that.  She'll get presented.

16        And if they -- in the committee, if they say, "OK, good,

17        she's in," then what happens is Donna tells me, "She's

18        in.  We're good," and then she gets a letter from

19        admission, which'll say in there, uh, she's been

20        admitted, uh, conditionally admitted, she needs to do her

21        NCA-- clearinghouse, she needs to send her transcripts to

22        the NC-- clearinghouse, blah, blah, blah, blah, so and so

23        forth.  That letter will come to me.  And I'll send that

24        letter to you.  And you can hol-hold the letter yourself.

1        She won't know anything.  At that point, you will, uh,

2        write a check for $50,000.  Uh, well, I'll give you the

3        address and [04:00] exactly wh-- it'll go to Donna Heinel

4        -- and se-- it's, uh, senior women's athletic director.

5        It'll be made out to USC women's athletics.

6   HUNEEUS:  OK.

7   SINGER:  OK?  That -- and that essentially jus-- it goes

8        right in -- right to her.  She took care of that part.

9        And then, when you get your...  And then we apply.  We

10       send her application.  Essentially, you've been admitted

11       before she even has appl-- OK?

12  HUNEEUS:  Uh, so there's no chance I'd give that 50 and then

13       she's not admitted.

14  SINGER:  You won't send it until you get the letter.

15  HUNEEUS:  Oh, OK.  Got it.

16  SINGER:  OK?  So you don't g--

17  HUNEEUS:  But, uh, I thought -- I thought that letter was

18       provisional.

19  SINGER:  Uh, every letter's provisional.  Even when you get

20       your final letter --

21  HUNEEUS:  Yeah.  OK.

22  SINGER:  -- it's provisional.

23  HUNEEUS:  Got it.  Good.  So tha-that ex-- that answers that.

24       OK.  Keep goin'.

1   SINGER:   So then we apply December 1st -- before December 1st.

2           She goes through the process.  She'll already be flagged

3           that she's been accepted.  And then on March 25th, when

4           they send the rest of the letters out, she'll get her

5           final letter.  It won't have on there, uh, you know,

6           [05:00] you need to do the NCA-- stuff, uh, thi-this and

7           that.  It'll be a regular official packet, the normal

8           stuff they normally send out.  But you will have already

9           had in your hands the same letter, in your -- so that you

10          know it's taken care of.

11  HUNEEUS:  Got it.

12  SINGER:   At that point, then you'll write...  Um, we will --

13          my foundation will send you a invoice.  You'll send a

14          $200,000 check to our foundation.  You'll get your letter

15          of thank-you, with your write-off -- uh, tax ID write-off

16          stuff.  And then Jovan will call me and say, "OK, this is

17          how I want the money split," uh, and so on and so forth.

18          And that won't happen until around April 1st.

19  HUNEEUS:  Does all of that -- do all of those funds go to USC

20          or does some go to -- stay in your foundation?

21  SINGER:   No, they go to USC, in different ways.

22  HUNEEUS:  OK.

23  __:  Uh...

1   SINGER:   So what Jovan usually does is -- I subsidize his

2        staff's salaries.

3   HUNEEUS:  OK.

4   SINGER:   'Cause it's too expensive to stay down [06:00]

5        there.  So I put two of his staff members on my books, as

6        contractors --

7   HUNEEUS:  Got it.

8   SINGER:   -- and then I pay them throughout the year, uh, more

9        -- uh, additional salary than they normally get.  And

10        there'll be a certain percentage, where he'll send me an

11        invoice.  'Cause he'll take his team to Hungary or Serbia

12        and play.  And he'll send me another $100,000 invoice.

13        And I'll pay that.  So...

14   HUNEEUS:  Uh..

15   SINGER:   Uh, because just what happened about a month ago was

16        he had $250,000 in his bank account at USC and they took

17        150 of it out, which pissed him off.  'Cause he raised

18        the money.  And it went to football.

19   HUNEEUS:  OK.

20   SINGER:   So this is a way of...  All the coaches there know

21        that now.  So they just call me instead.  Because they

22        don't want it to go to the general fund.

23   HUNEEUS:  Mm-hmm.

24   SINGER:   'Cause he's the guy givin' up the spot.

1    HUNEEUS:  And what level of confidence would you have that ██

2        gets in with this backdoor [07:00] approach?

3    SINGER:  95 -- 90, 95 --

4    HUNEEUS:  OK.

5    SINGER:  -- 100.

6    HUNEEUS:  OK.  And...

7    SINGER:  As long as she doesn't screw up with school.

8    HUNEEUS:  No, she won't screw up with school.  No, no, no.

9        I'm -- obviously, uh, I mean in the context of who she is

10       currently.

11   SINGER:  Right.

12   HUNEEUS:  What would her chances be, without this process?

13   SINGER:  Zero.

14   HUNEEUS:  She won't get in.

15   SINGER:  Zero.  She has zero chance.

16   HUNEEUS:  Explain that to me.  Why?

17   SINGER:  Way too many kids are applying from her school.  Uh,

18       USC's very diligent about figuring out how many kids from

19       their school, who we're gonna take, who we're not gonna

20       take, where they fall in that mix.  Because they're

21       catching so much shit from the schools, the -- uh, the

22       high schools, callin' 'em up, sayin', "Why'd you take

23       this kid?  We have 4 kids so much stronger than those

24       kids.  And you're denying these kids?"  They're catchin'

1    so much shit it's unbelievable.  And she's not gonna be

2    in the top 30 kids that apply from her school.

3  HUNEEUS:  Uh, [08:00] well, I mean, it depends on how you

4    think about it, right?

5  SINGER:  90...  Her...

6  HUNEEUS:  Well...  Yeah.

7  SINGER:  Th--



19  HUNEEUS:  OK.  What about all these kids that get in through

20    the French program and Paris or --

21  SINGER:  So...

22  HUNEEUS:  -- go to junior college?

23  SINGER:  Yes.

24  HUNEEUS:  What about those back doors, for her?

1  SINGER:   They're not back doors.

2  HUNEEUS:  They're not backdoor.

3  SINGER:   They're all de-- they're all decided by admission.

4         So admissions gets the pool of kids.  Right?  And they

5         decide, "This group's getting in in the fall" -- OK? --

6         which is a very tough group to get into.  Because, uh,

7         it's test score-driven -- and great grades-driven.  But

8         test score-driven is a big part of tha-- and then they

9         have all the people that they...

10  HUNEEUS:  An-and her score isn't good enough for that.

11  SINGER:   Uh, her score is solid.

12  HUNEEUS:  Right.

13  SINGER:   Yeah, her score is good enough.  Her grades are

14         nowhere [09:00] near close.

15  HUNEEUS:  And even with strong recommendations -- "This kid

16         had --"

17  SINGER:   Doesn't matter.

18  HUNEEUS:  "-- ██████████████████████"...  Uh...

19  SINGER:   (inaudible) care about --

20  HUNEEUS:  How can that be, Rick?

21  SINGER:   -- (inaudible).  The...  Uh, how can it be?

22  HUNEEUS:  Yeah!

██  SINGER:   ████████████████████████████████████

24         ██████████████

1   HUNEEUS:  Uh...

2   ████████      ████████████████████.

3   ████████    ████████   ████████████    ██████████

4   ████████    ████████████████

5   ████████    ████

█   SINGER:     ██████████████████████████████

█            ██████████████████    ████████████████████

█            ████████████████████████████████

9            ████████████████████████████.

10  HUNEEUS:  OK.

11  SINGER:   The whole world is scammin' the system.  And I got

12            'em!  'Cause I have a ton of kids who have extended time

13            and they shouldn't get extended t--

14  HUNEEUS:  No, I know you do.  I know y-- I know your system,

15            uh, well, uh.  I mean, wha-what my concern is -- wha-what

16            I'm tryin' to understand is that, uh, it feels like, you

17            know, you -- you have a plan for the system, so, you

18            know, if you had wanted to, ████████ I mean, ████████ score

19            coulda been 1550, right?

20  SINGER:   No.  'Cause I woulda gotten [10:00] investigated,

21            for sure.  Based on her grades...?

22  HUNEEUS:  OK.

23  SINGER:   Absolu-- uh.  And then w-- now we got a bigger

24            problem.

1   HUNEEUS:   Mm-hmm.

2   SINGER:   Now she's gonna have to take it at her school, in

3        front of everybody.

4   HUNEEUS:  OK.

5   SINGER:   And now, when she gets, uh, 1100, 1200, now what do

6        we do?

7   HUNEEUS:  Uh-huh.  Uh...

8   SINGER:   So let's go back to what you a-- the question, which

9        is the admissions approaches.  So either get in in the

10       fall -- OK? -- or...  They admit 400 kids in the spring,

11       who have really good grades and solid test scores and are

12       alumnus families, who have been giving money for years.

13       Then they have the 3rd pool, which is Trojan Transfer,

14       which is a year later.  And so they decide on those kids.

15       So there's about 500 of those kids, that get Trojan

16       Transfer.  They can go wherever they want for a year.  As

17       long as they get a 3.0 wherever [11:00] they go and 30

18       units, then they can transfer in.  Then they have the 4th

19       pool, which they created several years ago, which is they

20       send kids that are a lot lower than that to Switzerlan--

21       London, Paris.  And they have to get 3.3 and 30 units.

22       And then they can be an automatic transfer into USC.

23   HUNEEUS:  Is that a semester or is that a year?

24   SINGER:   Year --

1   HUNEEUS:   OK.

2   SINGER:   -- full year.  So that's why you have to have 30

3        units.

4   HUNEEUS:   OK.

5   SINGER:   'Cause you walk in as a sophomore.

6   HUNEEUS:   So if I decided, you know, because...  Uh, I have

7        these conversations, uh, you know, with McGlashan.  And,

8        you know --

9   SINGER:   H--

10  HUNEEUS:   -- McGlashan doesn't know all this stuff is goin'

11       on.  So he says, "I'm not doin' any of that stuff for my

12       kids."  Right?  And I asked him why.  And he says, "Well,

13       because I have a friend and he paid -- his kid to go into

14       Stanford and it was a fucking disaster.  And I don't want

15       the kid to know that," uh, you know, blah, blah, blah,

16       blah, blah.  So if I did -- uh, decided to go [12:00]

17       straight, cold turkey, no back door, just straight in,

18       where would we be targeting ███ for?

19  SINGER:   At USC or overall?

20  HUNEEUS:   Overall.  No.  I think you just told me she has no

21       chance at USC.

22  SINGER:   Yeah.  So you're lookin' at, uh, University of San

23       Diego...  Uh, Santa Clara is harder than San Diego.

24  HUNEEUS:   Uh...

```
 1   SINGER:   She wouldn't get into any of the top 6 UCs.  Uh...

 2   HUNEEUS:  Uh...

 3   SINGER:   Go outta state.  Maybe she gets into Washington.

 4        'Cause her test scores are strong enough to get into

 5        Washington.  They want her.  They want test scores like

 6        hers, and her ethnicity.  'Cause Washington doesn't have

 7        it.

 8   HUNEEUS:  Right.

 9   SINGER:   Uh, if you go back East, uh...

10   HUNEEUS:  Like a Barnard.

11   SINGER:   No way.

12   HUNEEUS:  Won't get into a Barnard.  Sh--

13   SINGER:   And she's gonna need subject, uh...

14   HUNEEUS:  OK.

15   SINGER:   So that becomes the other issue, is you look at the

16        more, uh...

17   HUNEEUS:  Barnar-Barnard needs, uh, su-- s-- uh, I'm...  Uh,

18        do th--?  Uh, I -- I [13:00] guess I'm a little bit

19        confused, because of the dissonance, in the context of

20        the students from her school that have gotten into these

21        places.  You know, I just don't get it.  Because...

22        Anyway.  D-doesn't matter.  Let's keep going.  So Barnard

23        does require subject tests?
```

```
 1   SINGER:   Uh, not required, needed.  'Cause your grades aren't

 2        strong enough.

 3   HUNEEUS:  Uh...

 4   SINGER:   So here's the problem you have.  You have a group of

 5        kids who applies, SAT with subjects tests, ACT with

 6        subject tests, and ACT with no subject test.

 7   HUNEEUS:  Uh...

 8   SINGER:   So the only way you can prove that the grades are

 9        real is by telli-- by taking subject t-- I just had a boy

10        call me who's takin' a year off.  And I had his

11        girlfriend.  And he's g-- she's goin' to Duke.  She's

12        there now.  He had 34 ACT, 4.3 GPA, on the national

13        soccer team, and, uh, fell through with all the schools

14        that wanted to recruit him.

15   HUNEEUS:  Mm-hmm.

16   SINGER:   So he's gonna go to Davis.

17   HUNEEUS:  Uh...

18   SINGER:   He got denied [14:00] by everybody.  And I said to

19        him, "Why --?" like, "You have good grades and good

20        scores.  Why'd you get denied from WashU, Emory,

21        Vanderbilt, all these guys?"  He said, uh, "I don't

22        really know."  I said, "Well, did you take the subject

23        test?"  He said, "Yeah.  I got 650s."  Uh, that's why.
```

1      They don't believe the 4.3's a real 4.3.  And that was

2      really easy to tell.

3   HUNEEUS:  Got it.

4   SINGER:  But if she goes...  Sh-she can appl-- I mean, even

5      at NYU, based on what happened at NYU this year, the only

6      way she has a shot at getting in is to go in the school

7      of preprofessional studies.  And she'll have to either

8      pick -- probably pick real estate, because it's somewhat

9      like...  Or she could go into hotel/restaurant

10     management.

11  HUNEEUS:  Yeah.

12  SINGER:  Uh, uh...

13  HUNEEUS:  She likes that.

14  SINGER:  That would be the preprofessional program that she

15     would have to go in, uh, and then write her essays about

16     why she wants to be in that program, what she's actually

17     done in that world.

18  HUNEEUS:  [15:00] Mm-hmm.

19  SINGER:  And then she'd have a -- then she'd have a chance.

20  HUNEEUS:  OK.

21  SINGER:  But those, uh -- that's -- that's how tough it is to

22     get in.

23  HUNEEUS:  And at --

24  SINGER:  And they take nobody off the wait li--

```
 1   HUNEEUS:  -- OK -- and at NY-- a-at USC there's no program
 2        that she would have a chance in.
 3   SINGER:   N-- I don't even think, gerontology, she would.
 4   HUNEEUS:  Latin -- I mean, Hispanic --
 5   SINGER:   Uh, that's, uh, the school...
 6   HUNEEUS:  -- hard worker, great recommendations.  She'll have
 7        great recommendations from her teacher, that talk about
 8        how she came in here and was a shitty student and turned
 9        it around and became a straight-A student.
10   SINGER:   Well, let's put it this way.  She lives in San
11        Francisco.  She goes to a super-wealthy school.
12   HUNEEUS:  Yeah.
13   SINGER:   So she's not an underserved kid.
14   HUNEEUS:  No, for sure.  But that's not --
15   SINGER:   Uh...
16   HUNEEUS:  -- the way it works.  I mean, I read the article --
17   SINGER:   But it is.
18   HUNEEUS:  -- today in, uh...
19   SINGER:   That's first.
20   HUNEEUS:  I'm sorry?
21   SINGER:   That's first and foremost.
22   HUNEEUS:  OK.
23   SINGER:   That's first and forem-- "Let's help the underserved
24        kid first" --
```

```
 1   HUNEEUS:  For sure.

 2   SINGER:  -- "And the-- and then, if we can't get the

 3            underserved kid in enough quota, then [16:00] we'll look

 4            at the other."  If she was African American, that's a

 5            better deal than bein' La-Latino.

 6   HUNEEUS:  Mm-hmm.  Yeah, no.

 7   SINGER:  Uh...

 8   HUNEEUS:  I knew that.  But I can't do anything about that.

 9   SINGER:  I know, uh.  I ca-- I totally ge-- but -- but, you

10            see, if you -- whatever box you pick, if you pick Latin

11            American studies or whatever it is, it's still in

12            Dornsife.

13   HUNEEUS:  OK.

14   SINGER:  It's in the School of Letters and Sciences.  So

15            you're competing with everybody else.  And they've been

16            mandated --

17   HUNEEUS:  And -- and again, I jus--

18   SINGER:  -- to make it a unified school.

19   HUNEEUS:  I'm gonna ask you this again.  And, uh, you gave me

20            the answer.  But I need to cross all my t's and dot the

21            i's.  Right.  What if ▮▮▮▮▮▮ -- what about ▮▮▮▮▮ record

22            at USC with a strong recommendation from ▮▮▮▮▮▮

23            ▮▮▮▮▮

24   SINGER:  I think he can help.  Absolutely.  Absolu--
```

1   HUNEEUS:  Uh, does she have a shot --

2   SINGER:   I don't know if she gets, uh...

3   HUNEEUS:  -- without doing the water polo thing?

4   SINGER:   Does -- does he have a shot?

5   HUNEEUS:  No.

6   SINGER:   He has a sho--

7   HUNEEUS:  Does *she* -- does she have a shot?

8   SINGER:   With his help.

9   HUNEEUS:  Yes.

10  SINGER:   Oh, it increases significantly.  Absolutely.

11  HUNEEUS:  Uh, OK.

12  SINGER:   Because he's [17:00] a player.

13  HUNEEUS:  I'm just tryin' to understand it, Rick.  So --

14  SINGER:   But he may not be a f--

15  HUNEEUS:  -- so I'm sorry if I'm being pedantic here.

16  SINGER:   -- no, that's OK -- but he may not be a f-- he may

17       not get her in in the fall.

18  HUNEEUS:  OK.

19  SINGER:   She may be a spring admit, a Trojan Transfer.

20       Here's what I believe.  No matter what, they get her into

21       one of the 4, with his help --

22  HUNEEUS:  OK.

23  SINGER:   -- as long as he's supporting only her.

```
 1   HUNEEUS:  That's what he has committe-- well, what he has

 2        said, he -- he only supports one person per year.  And he

 3        hasn't given me that commitment yet.  And I've kinda laid

 4        off, because, you know, you kinda said it's one or the

 5        other.  What you said to me was --

 6   SINGER:  Yeah.  I ca--

 7   HUNEEUS:  -- use her --

 8   SINGER:  -- I ca-- yeah -- I can't.

 9   HUNEEUS:  -- use her --

10   SINGER:  Because...

11   HUNEEUS:  -- you said to me --

12   SINGER:  You can.  Or you, uh...

13   HUNEEUS:  -- to get into the business school.  Right.

14   SINGER:  Yeah.

15   HUNEEUS:  Tha-that's kinda what you said.

16   SINGER:  Yeah.  'Cause she's not getting in the business

17        school.

18   HUNEEUS:  That's what...  I understand.  I remember that.  OK.

19        Uh, uh, uh, we've talked about a bunch of different

20        schools to do this at, right?  One was Berkeley.  [18:00]

21        You had, uh, an approach also for NYU.

22   SINGER:  Mm-hmm.

23   HUNEEUS:  Uh, the way this works --

24   SINGER:  Uh...
```

 1   HUNEEUS:  -- we have to pick 1.  Right?

 2   SINGER:   Correct.

 3   HUNEEUS:  And then you go in.  And is Berkeley still an option

 4       for her?

 5   SINGER:   No.

 6   HUNEEUS:  Or have you --

 7   SINGER:   It's already go--

 8   HUNEEUS:  -- committed that spot?  OK.

 9   SINGER:   Uh, we did 6 of 'em.  They're all gone.

10   HUNEEUS:  And is US-- uh, NYU still an option, for this

11       approach --

12   SINGER:   Yeah.

13   HUNEEUS:  -- for her?

14   SINGER:   Yeah.

15   HUNEEUS:  But that would no-- uh, and that was not a sports-

16       related back door, was it?

17   SINGER:   Correct.  No, not at all.

18   HUNEEUS:  Uh, an-and how would that process -- look like?  Is

19       this...?

20   SINGER:   Uh...

21   HUNEEUS:  Can you describe that one?

22   SINGER:   Uh, same exact process --

23   HUNEEUS:  OK.

1  SINGER:   -- except that you won't get a -- you wo-- you will

2      not get a letter early.

3  HUNEEUS:  Mm-hmm.

4  SINGER:   You won't get any notification.  We'll know before

5      it happens but we don't know -- like you won't get a

6      letter way in advance --

7  HUNEEUS:  Mm-hmm.

8  SINGER:   -- before you even apply.  So what'll happen is you

9      will apply.  [19:00] Um, let's say we apply early,

10     November 1st, early decision.  Um, and then we'll go -- s-

11     - my person there will go and meet with everybody and

12     make sure that we're all OK.  And then, probably a week

13     or so before or maybe sooner than that, before December

14     15th, we'll know that she's already been admitted.

15 HUNEEUS:  And the fees are the same.

16 SINGER:   Correct.

17 HUNEEUS:  And is there any risk that this thing blows up in my

18     face?

19 SINGER:   Um, hasn't in 24 years.

20 HUNEEUS:  Yeah, I know.

21 SINGER:   And I'm doin'...

22 HUNEEUS:  Bu-but the -- the -- the -- the environment's

23     different --

24 SINGER:   No, because it's not --

1  HUNEEUS:  -- isn't it?

2  SINGER:  -- goin' to NYU.

3  HUNEEUS:  No, no, no.  I meant USC or NYU or whatever --

4  SINGER:  No!

5  HUNEEUS:  -- and then in the context of N-U.

6  SINGER:  Well, I don't know how...  Uh, the only way it could

7       is if...  So let's think about that.  How could it be?

8       The only thing that has ever, uh...

9  HUNEEUS:  No, like some article comes out that --

10  SINGER:  Oh, no.

11  HUNEEUS:  -- the polo team is selling [20:00] seats into the

12       school for 250 grand.

13  SINGER:  Uh, well, no.  Because she's a water polo player.

14  HUNEEUS:  Uh, but she's not.  I mean, y-- tha-that's what I

15       mean.

16  SINGER:  Well, but she is.

17  HUNEEUS:  OK.

18  SINGER:  Now if she was a -- if she wasn't an athlete...  So

19       tha--

20  HUNEEUS:  Uh...

21  SINGER:  Uh, like I had a boy today go to Stanford.  And we

22       were first gonna use sailing.  But I ended up getting a

23       water polo spot.  And he is a water polo player.  But we

1    were gonna use sailing.  Right?  So, uh, that is a little

2    trickier.

3    HUNEEUS:  Got it.  Um, back to Berkeley again.  My dad, uh,

4    let me know that he had recently had a meeting with the

5    guy who is the head of the Center for Latin American

6    Studies.

7    SINGER:   Mm-hmm.

8    HUNEEUS:  I think I mentioned to you that he had committed to

9    pay for half of the building, kind of a fundraising

10    challenge --

11    SINGER:   Mm-hmm.

12    HUNEEUS:  -- up to some amount --

13    SINGER:   Mm-hmm.

14    HUNEEUS:  -- $5,000,000 or $10,000,000.  I don't remember.

15    And, of course, they're struggling to kinda... Th-

16    they're not super organized.  [21:00] They -- they're one

17    of these departments that has never done this type of

18    fundraising, uh.

19    SINGER:   Right.

20    HUNEEUS:  Uh, and so he like looks -- he said like, "Look, it

21    just doesn't look like they're very together."  But what

22    he said to me is, "Look, ██████," who's the -- the head

23    of Center for Latin American Studies, and some dean or

24    chancellor that he was with, you know, they totally know

```
 1        who he is and that he's made this commitment.  And they

 2        kinda signaled to him that they're looking...  'Cause he

 3        asked a little bit about it, I think in a very soft way -

 4        - my father's very soft about this stuff --

 5   SINGER:   Uh-huh.

 6   HUNEEUS:  -- uh, an-and asked, "You know, my -- my

 7        granddaughter, uh..."  And they said, "Well, we really

 8        want Hispanic kids," and this, uh.  Uh, explain to me

 9        again how that works, in the context of a UC Berkeley.

10   SINGER:   Uh, talk about getting in trouble?

11   HUNEEUS:  Yeah?

12   SINGER:   That's the easiest way to get in trouble.

13   HUNEEUS:  OK.  So --

14   SINGER:   Because the...

15   HUNEEUS:  -- there -- there's no allowance in their system for

16        big donors, like there are in other systems.

17   SINGER:   Uh, there are.  There are.  But they will -- they

18        have to be really, really care-- so [22:00] they've been

19        told by the governor and the president of the UC system

20        that nobody gets special favor -- uh, they're all gonna

21        lose their job.

22   HUNEEUS:  OK.

23   SINGER:   So if they do something, uh...

24   HUNEEUS:  What could they do?
```

```
 1   SINGER:   Um, well, that guy from the Latin American studies

 2        is gonna have to go to somebody and say, "We want to help

 3        this kid get in."

 4   HUNEEUS:  Mm-hmm.  OK.

 5   SINGER:   And they're gonna have to keep it very quiet.

 6        Because the system is set up, in a public institution, to

 7        show no favor.  In the old days, everybody had a board of

 8        regent in their pocket.

 9   HUNEEUS:  Yeah, no.  I know.  That's how I got it.

10   SINGER:   OK.  OK.

11   HUNEEUS:  Fuckin' Bill Koblums (sp?).  Yeah.  No, I get it.

12   SINGER:   I thought it was you're br-- you're brilliant.

13   HUNEEUS:  No.  I was -- I became brilliant later in life.  Uh,

14        [23:00] i-is Bill McGlashan doin' any of this shit?  Is

15        he just talkin' a clean game with me an-and helpin' his

16        kid or not?  'Cause he makes me feel guilty.

17   SINGER:   Uh...  L--

18   HUNEEUS:  Or are you just --

19   SINGER:   -- lemme --

20   HUNEEUS:  -- taking care of him in a way that he doesn't know

21        --

22   SINGER:   -- no -- lemme...

23   HUNEEUS:  -- because you have other interest with him?

24   SINGER:   -- no, no! -- lemme...  No, not at all!
```

 1   HUNEEUS:  OK.

 2   SINGER:  Uh...

 3   HUNEEUS:  But like -- like...

 4   SINGER:  Nothing to do with his...  I will say this.  If...

 5        That would be...

 6   HUNEEUS:  But he didn't know hi-- his kid has no idea and he

 7        didn't have any idea that you helped him on the -- on the

 8        ACT or the test he took.

 9   SINGER:  Becau-- 'cause that was what he, uh -- he asked for.

10   HUNEEUS:  Bill McGlashan.

11   SINGER:  Asked for ███████ not knowing.

12   HUNEEUS:  OK.

13   SINGER:  Uh, so he has not been as, uh, forthcoming --

14   HUNEEUS:  With me.

15   SINGER:  -- uh, with you and with his own kid, which is...

16        He wants it that way.

17   HUNEEUS:  OK.

18   SINGER:  So I will tell you this, that they are working on

19        getting him into a special program at USC.

20   HUNEEUS:  Yes, I know --

21   SINGER:  Right?

22   HUNEEUS:  -- the acting program --

23   SINGER:  OK.

24   HUNEEUS:  -- where ███████████ got into.  Yeah.

```
 1   SINGER:   OK.  But here's the deal.  [24:00] They were told by

 2        that peo-- those people, "We can't help him unless he

 3        gets in here.  And we can't help him get in.  We can help

 4        him get in our program."

 5   HUNEEUS:  But you --

 6   SINGER:   Uh...

 7   HUNEEUS:  -- you already helped them, by giving him a fuckin'

 8        35 or whatever on his, uh...

 9   SINGER:   Can't get in.

10   HUNEEUS:  H-- even with his ACT score?  It's super hot.

11   SINGER:   Uh, his grades aren't great.  His grades are g--

12   HUNEEUS:  OK.

13   SINGER:   -- are better th-- are good but they're not great.

14        So he's in the exact same boat.

15   HUNEEUS:  Well, no.  You said that ████████ if she had a

16        1550, would get challenged.  He won't -- or didn't.  Or

17        somehow, that risk was --

18   SINGER:   Well, he's not --

19   HUNEEUS:  -- not there for h--

20   SINGER:   -- going to get in.  He's not going to get in.

21   HUNEEUS:  No, no, no.

22   SINGER:   So...

23   HUNEEUS:  But you were referring to the testing -- the --

24        the...  Whatever.  Doesn't matter.
```

```
 1   SINGER:   Uh, it wou--

 2   HUNEEUS:  Becau--

 3   SINGER:   -- it would help him but it's not gonna get him i--

 4        it's not a for-sure to get him in.

 5   HUNEEUS:  Mm-hmm.

 6   SINGER:   So they want -- they need him to get in, so that

 7        they can get him into that program.

 8   HUNEEUS:  Yes.

 9   SINGER:   So they're calling me, [25:00] sayin', "Can we get

10        him in?" --

11   HUNEEUS:  Right.

12   SINGER:   -- "We gotta get him in, so we can get him in that

13        program."  Because the dean told them, "Uh-uh.  We can't

14        help you get in.  But we can help you when you --" like

15        kinda like I'm sayin' about your friend.

16   HUNEEUS:  Yeah.  No, I got it.

17   SINGER:   So whatever everybody tells you on the front isn't

18        always quite true.

19   HUNEEUS:  I believe that.  I'm -- I'm totally with ya.  OK.

20        And -- and in the context of ██████ process -- right? --

21        you still advise against having her take the -- the SAT.

22        Or -- or what if...?  You know, because she looks just

23        like her sister.  Remember my original idea, I'd tell her
```

1        sister to go take the ACT for her?  And then she would

2        have a high score on the SAT and the ACT.

3   SINGER:   Your issue is that she has extended time.

4   HUNEEUS:  Not for the ACT.

5   SINGER:   Oh, the ACT.  Then she can go and take it.  Sure.

6   HUNEEUS:  And then -- and then what would happen?  Let's say

7        she came up with a [26:00] 32 on the ACT.

8   SINGER:   32's not high.

9   HUNEEUS:  OK.  I d-- I don't know the relat-- what would be

10       the relative score for like a 1550, on the ACT?

11  SINGER:   35.

12  HUNEEUS:  Oh, it's that high.  OK.  So if she gets a 35.

13       That's what ██████ got, right?

14  SINGER:   N-- thirty-- he got a 34.

15  HUNEEUS:  Oh, he got a 34.  OK.  And so with that score, what,

16       uh -- what, uh -- what would that mean?  How would that

17       change the perspective --

18  SINGER:   UH, it would just give her --

19  HUNEEUS:  -- from the effect, uh...

20  SINGER:   -- a higher test scoring.  And --

21  HUNEEUS:  Yeah.  So let's say --

22  SINGER:   -- uh, if she applied, uh...

23  HUNEEUS:  -- that now -- now it's ███ with a 34 on the ACT.

24       How -- how would we...?  The same conversation we just

1      had.  Does she have a chance at USC?  Does she have a

2      chance at Barnard?  Does she have a chance --

3  SINGER:   Uh...

4  HUNEEUS:  -- at a UC...?

5  SINGER:   She need subject te--

6  HUNEEUS:  She needs subject tests for all of those.

7  SINGER:   For...  No, not for USC.

8  HUNEEUS:  OK.

9  SINGER:   For Barnard, yes.

10  HUNEEUS:  And if she wanted to take subject te-- how would we

11      do that?  Or...?  I know you recommend against it.  But

12      would that be the Houston thing, or not?

13  SINGER:   Yeah.  Yeah.

14  HUNEEUS:  And that would cost me another 50.

15  SINGER:   Yeah.

16  HUNEEUS:  [27:00] Uh...

17  SINGER:   Maybe I could do it, uh -- nah -- uh, maybe we could

18      do it in LA.

19  HUNEEUS:  OK.

20  SINGER:   But we'd have to do it somewhere.

21  HUNEEUS:  She only needs help on 1.

22  SINGER:   Well, the Spanish one really isn't...  Uh, they

23      already know.  Right?  So it's really not a -- a real

24      test.

```
 1   __:  Uh...

 2   HUNEEUS:  Oh, so it doesn't count?

 3   SINGER:   It counts.

 4   HUNEEUS:  Like i-if you're --

 5   SINGER:   But it's not...  They have, uh, the...

 6   HUNEEUS:  -- really good at something, they're not gonna take

 7        it into account?

 8   SINGER:   Well, like the kids who go to the Hebrew school,

 9        they go to the Jewish school and they all take Hebrew or

10        the kids who go to the French school --

11   HUNEEUS:  Uh...

12   SINGER:   -- in your area.  Uh...

13   HUNEEUS:  Is there a -- is there a Hebrew test in the subject

14        test?

15   SINGER:   Absolutely.

16   HUNEEUS:  Oh, I didn't know that.  OK.  Yeah.  OK.  I got it.

17        So, uh...

18   SINGER:   Uh, so if you're gonna do it, why not just take two

19        tests?

20   HUNEEUS:  Yeah, no.  I get it.  Uh, there's something -- I

21        feel like I'm cheating.  And it bugs me.  And --

22   SINGER:   Uh...

23   HUNEEUS:  -- and -- and the way kinda Bill McGlashan laid it

24        out, which I know is not true, is he -- he laid it out
```

```
 1        and he said, "Look, [28:00] I'm gonna push, I'm gonna
 2        prod, I'm gonna use my relationships, but I'm not gonna
 3        go and pay to get my kid in."  And that's kinda how he
 4        drew the line.  And when he said that, he meant it in the
 5        context, I think, o-of not what we're doing but in the
 6        context of like what his brother-in-law did, which is
 7        gave a lotta money to Stanford so his son would get in.
 8        Right?  And so -- you know? -- to me that felt ethically
 9        right.  And so that's kinda what I'm struggling with.
10   SINGER:  Well, don't think...  Uh, let's put it this way.  If
11        ███████ wanted to go to Brown --
12   HUNEEUS:  Mm-hmm.
13   SINGER:  -- which Bill would like him to go to, the chances
14        are...  Well, I will tell you right now.  He'd be writing
15        a big check.
16   HUNEEUS:  Yeah.  OK.
17   SINGER:  Bu-- and tha-that's dad's first choice for him.  And
18        USC is ███████ first choice.
19   HUNEEUS:  Mm-hmm.  Right.
20   SINGER:  So that check would be a --
21   HUNEEUS:  A-and --
22   SINGER:  -- a whole different check.
23   HUNEEUS:  -- and he's totally outta the league for, uh,
24        [29:00] Brown, right?
```

```
 1   SINGER:   Uh, who's, uh...?

 2   HUNEEUS:  Uh, who, uh, cares?  Yeah.  Uh, that's none of my

 3             business.  Hey.  And what about -- uh, are there schools

 4             that we have not talked about or thought about, that are

 5             places that you think would be a good fit for ██ and

 6             will value both her ethnicity and her improvement and

 7             progress and work ethic, uh, in a way that maybe USC

 8             couldn't care less about?

 9   SINGER:   Well, USC has so much diversity there...

10   HUNEEUS:  That's what I'm sayin'.  I get it.  So what schools

11             would it matter to?  Like I'm sure ███████ -- right --

12             (inaudible)...

13   SINGER:   Boston College.

14   HUNEEUS:  OK.  BC.

15   SINGER:   Uh, not Georgetown.

16   HUNEEUS:  Uh...

17   SINGER:   'Cause he's a DACA guy.

18   HUNEEUS:  And subject tests.

19   SINGER:   Yeah.  And BC needs subject tests, as well.

20   HUNEEUS:  OK.

21   SINGER:   So the problem is, the schools that don't have su--

22             so all your more competitive schools'll have subject

23             tests.
```

1   HUNEEUS:  Yeah.  OK.  By taking the [30:00] SAT and getting

2           extended time on that, does she also get ne-- uh,

3           automatically extended time on the, uh, uh, subject

4           tests?

5   SINGER:  Yes.  And the APs.

6   HUNEEUS:  And the APs.  OK.  Uh, that's it.  Thank you.

7   SINGER:  You got it.

8   HUNEEUS:  No.  I just wanted to get clarity on this an-and

9           where -- all was with ████   And I hope you don't mind me

10          being so direct.  But I just...

11  SINGER:  No!  Uh...

12  HUNEEUS:  Uh...

13  SINGER:  No.  Uh, this is a-- this is all about winnin' the

14          game for your family.  That's, uh...

15  HUNEEUS:  I got it.  No.  You're awesome.  Thank you, Rick.

16  SINGER:  OK.  Take care.

17  HUNEEUS:  Uh...

18  SINGER:  That's about, uh...  [30:38]

19

20                      END OF AUDIO FILE

MMM

06/11/2018 17:44:38 Outgoing call to CONFERENCE CALL (███████ MIKAELA, BOB) from Rick SINGER . █████████████████████████
**[Session 514]**

| | |
|---|---|
| M LNU: | ████ |
| ██ | Hello. |
| ██ | Hello. |
| ██ | Hello.  Rick? |
| RS: | Yes, Rick Singer. |
| MS: | [OV] This is Mikaela. |
| ██ LNU: | Hi Rick, this is ████ and Mikaela? |
| MS: | Yes. |
| ████ | Hi, are you with |
| RS: | No.  Why would we be with ████ |
| ████ | Ok, so we're still waiting for ████ Ok. |
| RS: | [OV] No. |
| ████ | No, no, no I just knew that she was on the phone with ████ earlier I didn't know if they were calling in together.  Ok, so let's see if ████ jumps on and then I'll connect Bob. |
| ████ | Here she is.  Hold on one second I'll put Bob on. |
| ██ | Hello? |
| RS: | Ok. |
| | How are you- |
| RS: | [OV] ████ hi it's Mikaela and Rick and um ████ is trying to get [IA] on the phone. |
| | Ok. |
| ██ : | Bob's on. |
| RS: | Bob you're joined? |
| BZ: | Hey Rick, I'm here. |
| RS: | Ok, so we got ████ Mikaela, you and I. |
| BZ: | Yes. |
| RS: | So, ████ the meeting's yours. |
| BZ: | So I- |
| ██ : | So I just wanted to make sure cuz I know there's been like a lot going on for everything and I'm just like super anxious I guess cuz I only like applied to USC and I just- I don't know what's really exactly happening, and I did talk to Mikaela quite a bit today.  And I feel like um I feel a little bit better about it I was just really anxious cuz I- I had no idea what I'm doing.  Like its- like what's going on. |
| RS: | Well- well none of us have any idea. |
| BZ: | [IA] |
| ██ | Yea. |
| BZ: | Right, so, so Rick my assumption I just want to make sure we're all on the same page is that we were splitting, if ████ was able to complete the 15 credits and have over a 3.0 grade average, that she was going to be accepted into the school.  Is that correct or not correct? |
| RS: | That's- that's not correct.  The- the fact is that she had to do well, they didn't never say 3.0.  They said that she needed to do all the classes, do all the things- So here's- here's- here's the hurdles that we've already jumped |

| | |
|---|---|
| | through.  The original application which she applied when she came out of high school had in the application that there was a VIP application.  Cuz we weren't involved in that part of it. ▮▮▮ I think you may have asked somebody to help you. |
| ▮▮ | Yea.  I had um ▮▮▮▮▮▮ write me a letter of recommendation last year. |
| RS: | Ok.  So it's in her file that the VIP was- was tried to help you get in but you weren't um you- you weren't even close.  They denied you in the first read even with her- with his letter.  So when we tried to do this we went through- |
| BZ: | [OV] -was home schooled. |
| RS: | Right.  Well it didn't matter.  Her whole record, the whole thing just they- they were confused and were scared to admit her because if- all the things that went on.  Ok, and that's USC's issue not anybody else's issue.  So, we went through athletics, went through this deal and they came back to me and said there's all these comments in her file blah blah blah blah blah she's- rides horses, does all this stuff so I convinced them that she's at Santa Monica City, she's gunna do well, would you guys help her get in, we'll put her as though she's been um sculling and rowing and then will you get- will you put me on the phone with the crew coach- crew coach got on the phone with me, said ok I will take her, you guys help us, we'll help you, I'll take her, I just need her to finish all these credits and all the all of her classes.  If she needs to do well there, so she can get A's and B's that's great, and she finishes all the units then I- then we can help her get in, I've already coded her, flagged her, and she's already just sitting in the system waiting for all the stuff to get done.  Then we had the issue of us leaving Santa Monica, essentially, and then I had to go back in and have another discussion with them about why because- and then I explained the mildew issue, and you're um- you're illness and blah blah blah blah so that is already in- in the process, it's in the system, it's already there and they have not pushed back on that.  So all that's left is for you to finish all your classes now.  That we have stated that we would take already, which includes those classes you dropped out of  Santa Monica City. |
| ▮▮ | [OV] Ok. |
| RS: | They have not finished transfer admission yet, so I have another boy who's actually really strong student who's trying to transfer in and they would not transfer him in even though we've shown them in progress grades, first semester grades, everything until he actually finishes, which is at Santa Monica and he'll finish ah next week, and then when they get the grades then they'll admit him, he's been coded as well just like you.  So it's all about finishing the race. |
| ▮▮ | So, that's what I'm worried about is because these courses are eight weeks then how do I- how would I be accepted if the courses aren't complete?  That's- that's what I was wondering. |
| RS: | Am I correct in assuming that besides the class that Mikaela's engaged in with you this bio class is the only class that's left? |
| ▮▮ | Yea. |
| RS: | Ok.  And- [OV] |
| BZ: | Would that push her above the 30 required credits or is the bio class- |
| RS: | [OV] I don't know. |
| BZ: | required?  Since- |
| RS: | [OV]  Mikaela, do you know?  How many- how many credits do we have already?  Or where we will finish at? |

| MS: | Um, sorry that's gunna take a sec for me to calculate, but just give me a moment. |
| RS: | But either way she doesn't have a science and that will be an issue to them too. So we got the math covered, we got the English covered, the science may be an issue, they always ask me to finish all the little requirements that they ask. But let's say um so I'm gunna still go in to my person and say ok we did everything we need to do um you'll write- you'll write an acceptance there will be a conditional acceptance with her finishing her biology class um my guess is they'll say B- and above. And that'll be- um but she'll get a conditional admission. |
| ■ | Ok. |
| RS: | Which everybody gets anyways cuz you have to finish the race to be able to get admitted. And so final- |
| BZ: | [OV] And the rate- the right amou- the rate [IA] is there a chance they might admit her anyway and they just know that she's taking that class? If she- |
| RS: | [OV] It would- it'd be- |
| BZ: | [OV] -credits, or is it- |
| RS: | It'd be a condition admit. If we got it, it'd be a conditional admit with the finishing of the class. |
| BZ: | Cuz she didn't have the science, not because she didn't have enough credits? |
| RS: | Well we have two- two issues. |
| BZ: | Cuz I just- I- |
| RS: | We ha- we have two issues. She already- she already signed up for the class at Santa Monica City. And I promised them that she would finish everything that she took there um this the way they were doing it. Cuz they wanted everything done-_____ |
| ■ | [OV] Ok. |
| RS: | Because she had already enrolled in that class at Santa Monica. |
| ■ | The only thing that I was worried about is on the letter I got from USC it says that um in order to be um considered all my grades would have to be in like to the school by June 30th. |
| BZ: | [OV] By June 30th. |
| RS: | Right but you're- |
| ■ | [OV] [IA] -Rio Salado. What? |
| RS: | Right but remember that- that you're going in under athletics and not under the regular admission. |
| ■ | So I don't need to worry about that? |
| RS: | Well not that we don't- they want to push- they want to get you admitted. They want to get this thing done. They want to finish the class. That's- that's why they're pushing everybody. |
| ■ | Um I just don't think we had sent them the Rio Salado transcripts because of the um- |
| RS: | [OV] Correct, we're waiting for the class. Correct. Correct. And I haven't even had that discussion with them yet because all the Santa Monica City kids haven't finished yet either. |
| ■ | Um, but my concern is that they can't send my Rio Salado transcript with the F on it. |
| RS: | That's correct. And we won't send it unless- if they change the grade that's great, and if not we have another alternative to to to fix that to. |
| ■ | Ok. |

| BZ: | | What is that? |
|---|---|---|
| RS: | | Um essentially that I had Mikaela retake the class in the meantime right now and so we're trying to get- she's already got the class almost done they just won't- they won't take the class any faster than six weeks, not eight- so like she's already done with all the work again.  We just re-enrolled and did it again.  So then that way if they said no to this change of grade, then we've- but we've already got the class done. That make sense? |
| BZ: | | Yes. |
| ▇ | | Yes. |
| RS: | | We didn't wanna wait because they friggin could take forever and we don't wanna wait we just- so I had to re-enroll in the class and take it.  And get it all done.  And they tol- and we got everything done, but we can't submit all the final stuff um it's a six week period not an eight week period so, they'll do it two weeks early but not any faster than that. |
| BZ: | | And Mikaela do you know when that grade would be posted? |
| MS: | | That grade would be posted with the six week um at like probably the last day of June. Um or the first couple days of July. |
| RS: | | I would hope we have an answer- |
| BZ: | | [OV] [IA] |
| RS: | | Before that. |
| BZ: | | Right so at least when you go back you can say might say F, but it's gunna say A or whatever it is? |
| RS: | | Right, cuz she- we re-took [IA] and I'll explain the situation about what happened at the school blah blah blah.  But we gotta re-take and she took it and she got the A.  We- we're good to go.  I just haven't brought that to the attention until we get an answer from them. |
| BZ: | | [OV]  Ok, and then- and Mikaela did you run the calculation on the number of units she currently has? |
| MS: | | Right now it's looking like 46.  Between um Santa Monica City, all the work at Rio Salado, this includes the bio class as well as the math class. |
| ▇ | | [IA] -from here? |
| BZ: | | And what was- Rick what was she requiring?  So did the- in terms of credits or units? |
| RS: | | They didn't ask for credits- they just need her to be a sophomore. |
| BZ: | | Ok.  So there- there wasn't a 30 unit- |
| RS: | | No. |
| BZ: | | Test to- |
| ▇ | | [OV]  Dad, dad I- I definitely have enough credits, but Rick is saying they want me to have the science class done because- |
| RS: | | Yea |
| BZ: | | [OV]  ok. |
| ▇ | | [OV]  -Santa Monica. |
| BZ: | | Ok, so I guess then the last question is I was sending, by the way just so you know ah ▇ (sp) got a 4.0 grade average. |
| RS: | | That's awesome. |
| BZ: | | If that helps. So you- I think now she's got a 3.85 and ▇ got a 4.0.  Um ah ah so is it possible because I had ▇ leaving tomorrow to go to Europe to take care of ▇ who's getting a surgery in Switzerland, yanno is it possible to have Mikaela assist on the biology class? |
| RS: | | You have- you have to ask Mikaela.  It's not my gig. |

| | |
|---|---|
| BZ: | Yea, yea no I'm asking.  I mean- I- that's why I have everybody on the call. |
| MS: | Yea, that's- I'm happy to- I'm happy to assist. |
| BZ: | Ok.  Ok.  And then that grade would be due when?  When will that grade come back?  Is that gunna be a July- |
| MS: | [OV]  -the same as. |
| RS: | [OV]   -unless she can do it in six weeks. |
| MS: | Yea, that one's gunna be um the start date for the class is today um let me log in to see the last possible date for the class.  Right now, sorry just bear with me again. |
| BZ: | Ok.  So you'd have to explain that the science would be a contingency of admission?  And this- [IA] |
| RS: | [OV]  Right. |
| BZ: | [OV]  Additional admission- |
| MS: | So, with the biology class the last the last end date possible is um August 4th.  So we would say about two weeks ahead of that um so that would bring us to July July 21st. |
| BZ: | Ok. |
| RS: | So I would tell USC that we- that we have one class left.  We've been taking all of our classes, here are our grades.  And that one class will be in by around July 21st we have a commissional- conditional admission now and based on that grade.  And if she does well in the class then we're all set.  If she doesn't then it's our fault.  But we want a conditional admission. |
| BZ: | Ok, and then when do you think Rick or Mikaela, we're gunna hear back on the art history class being over turned and not having to rely on the new grade? |
| MS: | You know, that unfortunat- I would have liked to- it was supposed to be two weeks um- |
| BZ: | [OV] Right. |
| MS: | -and I've been in communication with Rio Salado and they haven't given me any insight in into where they are in the process.  So I'm still keeping at it.  I'm still answering their questions as needed um and as soon as we have an update I will get back to you. |
| BZ: | Ok, so we need either that- |
| RS: | [OV]  - finish the class. |
| BZ: | -is that or the other grades? |
| RS: | Correct.  To be able to go to conditional admission.  Correct.  You're correct. |
| BZ: | Right.  So we really won't know when ▮▮▮▮ can relax and say ok I think I've got it.  I mean with what you're laying out it should be that if Mikaela takes biology class and gets a B- or better and the art history crass- class either gets reversed or they take the new grade assuming she gets a a B or better, she should be able to get in through what you have set up. |
| RS: | There should be a conditional admit, yes. |
| BZ: | Right, and she should fulfill the conditional obligation and everything should work out. |
| RS: | That- that's  our hope. |
| BZ: | That's your hope. |
| RS: | [OV] Nobody's pushed Nobody's |
| BZ: | [OV] probability on that? |
| RS: | No, I dont' have a probability.  I just would say that there's been push back.  The boy, we're waiting for the grade, he actually got a denial letter already. |

5

| | |
|---|---|
| | And then ███ the Dean, called him up and told him we made a mistake.  So, there- there are- you- you haven't gotten anything, which is good because you're on board of getting everything accepted.  There's been no issues. |
| ███ | Ok. |
| RS: | Well, you would've already gotten a letter with it- |
| BZ: | [OV]  Ok. |
| RS: | [OV]  -with all these other- there- there like 30 kids who got the wrong letter.  So you're not one of em, which is great. |
| ███ | I can't even imagine how much anxiety that was. |
| RS: | Well, but at least they reversed it right away so that was good. |
| BZ: | [OV] So- |
| ███ | That's good. |
| BZ: | Ok.  Alright.  So we- we'll know when you get that grade.  Hopefully we get it this week and if not then we won't know until the end of the month.  So she's not gunna know for at least a week to- |
| RS: | [OV]  -two weeks. |
| BZ: | [OV]  -sometime in mid July. |
| RS: | Well a couple weeks. |
| BZ: | Right. |
| RS: | By the end of this month, that's our goal. |
| BZ: | Ok. |
| ███ | I just want to make sure that you know that my- my grades for Rio Salado have not been sent, any of them because of the one class. |
| RS: | Because when we do then there- all that'll be on there. |
| ███ | Yea. |
| RS: | That's why we want it all at one time. |
| ███ | Yea.  Ok. |
| BZ: | Ok.  Alright.  So we have a plan.  Mikaela if you can do the biology thing just makes sure it gets done as quickly as possible, so we have a backup plan for the conditional and then you do the best you can to overturn the art history and ah ███ you're just gunna have to trust the process.  Rick do you think ███ should be thinking about a backup plan?  Or are you highly confident this is gunna work out? |
| RS: | I mean I'm confident but yanno you never know what's gunna happen right?  So, what would- if she had a backup plan what- where would you want to go?  Or what would you want to do?  Would you still- |
| ███ | [OV]  I mean I didn't apply anywhere anywhere else. |
| RS: | [OV]  That's not, that's not- |
| ███ | [OV]  So I don't know where- |
| RS: | [OV]  That's not the problem.  I can handle [IA].  If you were would you go another semester to yanno like what we're doing or SMC or whatever it is- gunna go to a four year right now what school would you want to go to? |
| ███ | I have no idea. |
| RS: | Ok, well think about it. |
| BZ: | [OV] If she doesn't get acceptance though.  Does- |
| ███ | [OV] Something I've got to think about. |
| BZ: | Isn't it highly unlikely she would get in to USC in the future, or is it not the case? |
| RS: | No, no, no.  No, it just, we're time is- time is becoming.  It's a matter of how many kids- the worse case scenario I'm gunna go to them and I'm gunna say |

| | |
|---|---|
| █ | listen they don't need housing, just take this as an admit, don't worry about the housing part of it, we'll cover that because that'll become after awhile we'll throw that back at me and I'll just say we don't need housing cuz right █ you're gunna stay with your sister? |
| █ | Yup.  [IA] As long as I'm in the school |
| RS: | Right, right, right. |
| █ | I don't care where I live. [Laughing] |
| RS: | But that's- that's what they'll throw back at me Bob, and I'll just say don't worry about it we got that covered just admit her.  I got the- I don't need a I don't need a spot. |
| BZ: | Ok.  Alright.  So █ I think you should go with your sister to Europe, relax don't worry about it, and we'll just be patient and trust that this works out. |
| █ | Ok. |
| BZ: | Ok?  Alright.  Thank you guys. |
| █ | [OV]  Mikaela I'll keep in touch with you.  Thank you so much Rick. |
| RS: | Ok guys. |
| BZ: | [OV]  Ok, thank you. |
| RS: | [OV]  Take care. |
| MS: | [OV]  Ok, █ I'll touch base with you later. |
| BZ: | [OV] Ok, bye. |

NNN

**From:**      Rick Singer █████████████████
**To:**        ████████████████████████████
**CC:**        ████████████████████████
**Sent:**      9/20/2018 2:16:32 PM
**Subject:**   Re: Invoices

Reference Women's Athletics Donation

Sent from my iPhone

On Sep 20, 2018, at 10:58 AM, ████████████████████ wrote:

Hi Rick, do I need to referenece anything for the check to USC or just write donation on it? I am sending today and also wire for 200K

████

**From:** Rick Singer █████████████████
**Sent:** Monday, September 17, 2018 3:39 PM
**To** ██████████████████████████████████
**Subject:** Re: Invoices

████did you send an invoice for 200K donation to Bob Zangrillo through ████?

████ also a check for 50K goes to

USC Women's Athletics
c/o of Sr Women's Administrator Donna Heinel
██████████████████████

On Mon, Sep 17, 2018 at 3:02 PM ██████████████████ wrote:
Hi Rick, Bob mentioned an invoice you were going to send me, Only have one, he mentioned another
Thx

████

USAO-VB-01018333



06/15/2018 11:42:22 Incoming call to Rick SINGER from CAPLAN, ████GORDON
**[Session 782]**

**CAPLAN family – █████████████████████, and Gordon Caplan**

| | |
|---|---|
| █████ LNU: | Give em your shit, dude. Give em the razzle dazzle, Rick. |
| Rick Singer: | No problem. |
| ██ LNU: | Alright, here we go. Gordon... Gordon, is coming, 2 seconds...Gordon? |
| Gordon Kaplan: | Yeah. |
| ██ LNU: | Meet, Rick Singer, the Godfather. |
| Rick Singer: | Is this Gordon Gecko of Wall Street? |
| Gordon Kaplan: | No its its Gordon Kaplan, how are you? |
| Rick Singer: | I'm only kidding with you Gordon, how are you doing? |
| Gordon Kaplan: | Yeah...good. Uh...so, you just uh...my wife has told me a little bit about what you guys do. Could you just, give me a little bit of background? |
| Rick Singer: | Uh, background of who we are or background on what we can do? |
| Gordon Kaplan: | Uh both, please. |
| Rick Singer: | Ok, so, who we are. We are a 290 million dollar company that I own of 1,000 employees across the US and 280 internationally. And what we do is we help the wealthiest families in the U.S. get their kids into school. So we have the ████████████, we have every NBA owner, every NFL owner, we got everybody. So what we do is we create a concierge service for all of our families to help them get into school. Every year there are- is a group of families, especially where I am right now in the Bay Area, Palo Alto, I just flew in. That they want guarantees, they want this thing done. They don't want to be messing around with this thing. And so they want in at certain schools. So I did 761 what I would call, side doors. There is a front door which means you get in on your own. The back door is through institutional advancement, which is ten times as much money. And I've created this side door in. Because the back door, when you go through institutional advancement, as you know, everybody's got a friend of a friend, who knows somebody who knows somebody but there's no guarantee, they're just gonna give you a second look. My families want a guarantee. So, if you said to me 'here's our grades, here's our scores, here's our ability, and we want to go to X school' and you give me one or two schools, and then I'll go after those schools and try to get a guarantee done. So that, by the time, the summer of her senior year, before her senior year, hopefully we can have this thing done, so that in the fall, before December 15th, you already knows she's in. Done. And you make a financial commitment. It depends on what school you want, may determine how much that actually is. Um...but that's kind of how the the side and back door work. So like give me give me an example of a school that you think that you want your daughter at? |
| Gordon Kaplan: | Ok so I...uh...I went to Cornell. Uh, I've already given about three quarters of a million dollars there. Um..she's about 150th or 170th top college recruit for...for tennis. And she- she...uh...is not a terrific student. Her grades, uh, particularly in.... |
| Rick Singer: | I know she's got a ████████ I already know that. And she's gotta fix them. |
| Gordon Kaplan: | Uh, and she's been testing very badly. Um. She does well in English and she does ah reasonably well in math. |
| Rick Singer: | Ok, so- so Gordon, let's let's be frank. Right? First of all, your 750 is diddly |

|  | dink in the world. Like I have the ███████████, they've given 50 million to Cornell. Right? And I have all the ███████). They they they only get one guarantee a year, and they ask for 5 or 6 a year. Okay? So here's the first thing we need to do. And I think I mentioned this to your wife. We need to get your daughter tested for a learning difference. Here's why. If she gets tested for a learning difference, and let's say its my person that does it or whoever you want to do it, I need that person to get her 100% extended time over multiple days. So what that means is we'll have to show that there's some discrepancies in her learning, which there's gotta be anyways. And if she gets 100%, Gordon, then, I own two two schools. I can have her test at one of my schools, and I can guarantee her a score. If it's ACT I can guarantee her a score in the in the 30s. And if its the SAT I can guarantee her a score in the 1400s. Now, all of a sudden, her test score does not become an issue with all the colleges. Because she's strong enough. Then if we clean up her transcript, then her ability with her athletic ability, and her testing and her getting better at school, it's much easier to get her into school because you're not fighting huge obstacles at the types of schools you're talking about. Now, if we do that, there's a financial consideration that you have to pay to the school to get it done, because this is absolutely unheard of, to make this happen. I can make scores happen, and nobody on the planet can get scores to happen. She won't even know that it happened. It will happen as though she will think that she's really super smart, and she got lucky on a test, and you got a score now. There's lots of ways to do this. I can do I can do anything and everything, if you guys are amenable to doing it. |
|---|---|
| Gordon Kaplan: | Ok, so let me let me understand the two components. What is the, what is the...um...the number? |
| Rick Singer: | So the number...the number... |
| Gordon Kaplan: | (OV) At Cornell for instance. |
| Rick Singer: | Well, hold on a second. The number on the testing is 75,000. Okay? It's 75,000 to get any test scores you would like to get on the SAT or ACT. Ok, that's- |
| Gordon Kaplan: | Explain to me how that works. |
| Rick Singer: | I just explained it to you. You get extended time, you gotta get the extended time first, then you're going to fly to LA. And you're going to be going on a fake recruiting visit. You'll visit some schools, while you're out here in LA. And then on a Saturday, which is the national test day if its ACT or SAT, she's going to sit down and take the test. I will have a proctor in the room, that's why when you have 100% extended time, you have- you get to take it at a- you don't take it with everybody else, you get to take it over multiple days. And you get to take it at a- you can take it at your school or another school. Okay? And then this kid, cause she's taking online classes, you have to go somewhere anyway. So you come to my school, take the test on a Saturday. She'd be in the room for 6, 6 and a half hours taking this test. My proctor would then um answer her questions, and by the end of the day, she would leave, and my proctor would make sure she would get a score that would be equivalent to the number that we need to get. |
| Gordon Kaplan: | Ok. |
| Rick Singer: | That's how simple it is. She doesn't know. Nobody knows what happens. It happened, she feels great about herself. She got a test a score and now you're actually capable for help getting into a school. Because the test |

| | |
|---|---|
| | score's no longer an issue. Does that make sense? |
| Gordon Kaplan: | That does. Now, what is the...um...what is the number I have to give? |
| Rick Singer: | Now at Cornell? It'll depend. It'll be between 250 250 and 5. Probably 250-350 to pull her, um, we did 4 of em last year at Cornell and they were over 5. But because she's a pretty good athlete, I think I can do it for less. But I would need to talk to them, and I need her transcripts to be cleaned up, and then it would be done. If you wanted to go somewhere else...I I have to be frank with you...I don't know if Cornell Cornell is the right place for her? |
| Gordon Kaplan: | It might not be. |
| Rick Singer: | I'll tell you why. Because, it is a grade deflation school. And, I don't know if it would be the best place for her. It's not a grade inflation school, its a grade deflation school. Do you know what I mean by that? |
| Gordon Kaplan: | I I do I went there, so yes. No, I know. |
| Rick Singer: | Ok, so you worked your ass off and you're super smart and you went Harvard or Stamford, and they have 70....so look at the difference, Harvard and Stamford have 71% of their kids have an A, A- average. And at Cornell, its 26%. Same kids. |
| ▮▮▮  LNU: | Rick, where is a good school for her? |
| Rick Singer: | I don't know the girl yet. So I need to know if I can talk to her and see what she's looking for socially. Because the social part of school and the team part of school is really important. I want her to feel comfortable and feel good. Right? At at least for my perspective, she's my daughter, that's what I want. |
| ▮▮▮  LNU: | Gordon, ▮▮▮ where do you see her besides Cornell? |
| Gordon Kaplan: | Well I don't necessarily see her at Cornell, it's just the school I know. Um...I'd like, look, she is, a a as ▮▮▮ knows, a reasonably good tennis player ah she's not top 100. She may get close to that. Uh, she's a very social kid. Uh..and she is not that motivated academically, which we're trying to change, but we've been trying to change that for years. Uh...so I'd like her in a good academic environment surrounded by ah smart people that she could ah benefit from. Ah I don't want her at a party school, I think she would like to be at a party school. But I don't want her at a party school, because I think that will induce in her...um...adverse consequences. |
| Rick Singer: | So...let me...can I just throw out a bunch of names of schools that are...um...really good schools but also they have, they're well rounded sports programs, she'll be busy, good kids, smart kids, hard to get into kind of deal? I'm just gonna I'm just gonna throw out names of schools. So we'll start at, we'll start with Duke, UVA, Penn, Notre Dame, Northwestern, USC, Santa Barbara, UCLA, Rice, UT, places like that. Again, hoping that she's getting better as a player and a year from now she'll be a better player than she is today? Right? |
| Gordon Kaplan: | Yup. |
| Rick Singer: | Um but those are all really good academic places and she's not getting into any of them...on her own. |
| Gordon Kaplan: | Nope. |
| Rick Singer: | I mean, tell me if I'm in the right realm. I don't even know if I'm talking your language, I don't know. |
| Gordon Kaplan: | No, you are. You're in the...those are the types of types of schools. Now, the issues with Duke, UVA, Notre Dame, UCLA, ah University of Texas are that they are very tough D1 tennis schools. Uh...and...she's not likely going to be good enough to play at a high level at those schools. She'll be good |

| | |
|---|---|
| | enough to play, for those that are in the top 30, of Division 1 schools, she'll probably be able to play in the next 30 of division 1 schools. |
| Rick Singer: | But...but... |
| ▉ LNU: | Rick... |
| Rick Singer: | Yes sir, but that's a freshman, what about when she gets a little bit older? |
| ▉ LNU: | you know, um, those like Penn maybe. Uhh UC Santa Barbara, Rice, uh would be the maybes from a tennis standpoint. The rest of em are gonna be...uhh....tough sledding. |
| Rick Singer: | Even, Notre Dame? |
| ▉ LNU: | Notre Dame is gonna hire a really good coach and they're gonna do way better coming up here soon. |
| Rick Singer: | Ok. |
| ▉ LNU: | Ummm. Rick, real quick, and then, I don't want Gordon to throw tomatoes at me. But, what what about like the Richmonds, Georgetowns, Tulanes, SMU's of world. I know SMU and Tulane are a little social and party. But what about some of those tiers? |
| Rick Singer: | Done deal. We can get that done easy. |
| ▉ LNU: | But what do you think? Does that fit Gordon's criteria being around intelligent, smart, you know, motivated people? |
| Rick Singer: | (OV) It does. It's the next level down. |
| ▉ LNU: | And....and....and...like...here's the deal, Rick like I don't know, Gordon said to me, like, last week, he goes, look...get into Cornell it's easy to do well. But you gotta get in. And so.  But I'm also like get in and want you to do well. You know what I'm saying, like, and obviously we do want her to have somewhat of a...we know that tennis is is not gonna be the next you know Serena Williams, but its a nice, its a nice medium for her you know. And she's worked hard.  Rick Singer: I get ya. I get ya. I get ya. It's just, those schools are, from an academic perspective they're all, and she wouldn't get in on her own, but they would still be good enough academically. She would be able to get many more A's than B's at those schools. Whereas the group I just gave you, she would be getting many more B's than A's. It's just a matter of, here's here's the way I look at things, I look at young people today and I agree with with Gordon. If they're around really smart people, they're going to excel, and they're going to step up to the plate with the rest of the group. And they end up, its okay to be a B A student instead of an A B student at the end of the day. But you want to be around smart people. I just need to know where you want to be in the country and then we can make it happen. This is this is not hard stuff to do, if I can get a score and clean up her transcript, this could be a done deal. |
| Gordon Kaplan: | Ok. So, let's let's go back to the score... |
| Rick Singer: | But...but.. |
| Gordon Kaplan: | Go ahead....sorry... |
| Rick Singer: | Here's the problem. I'm here I just flew in town, and I need to make a sale on a facility. I'm buying a a ten million dollar facility right now. And these guys are waiting on me. So um...can I call can we figure out a way to talk later, when I maybe when I'm on my way back to the airport again? |
| Gordon Kaplan: | Sure. You want to just give me a call directly? I can ah- |
| Rick Singer: | Sure, could you guys just send me all your info. That would great. |
| Gordon Kaplan: | Sure. ▉ will send you my direct ah information. |
| Rick Singer: | Great. And I apologize, I didn't expect to have this call. |

| | |
|---|---|
| Gordon Kaplan: | No no no. Rick look I really do appreciate this. I come off as a little...ah um...direct. |
| Rick Singer: | No, you can be direct because this is about.... |
| Gordon Kaplan: | I'm just trying to get to the bottom of it quickly. Look, if there's a way to get her, what we need to get her on testing. She is not a good test taker, and its 75,000 dollars, and you're telling me you can that done. Consider that a done deal with us. |
| Rick Singer: | I agree, totally agree. Alright, I gotta run. |
| ██ LNU: | Rick, I'll send you Gordon's cell. |
| Rick Singer: | Ok thanks. |
| ██ LNU: | Bye. |
| Rick Singer: | Arite, buh-bye. |
| Gordon Kaplan: | Thanks. |

5

# PPP

09/19/2018 16:47:36 Incoming Call, ███████████████ and Rick SINGER
[8374]

| (RS | Hi. |
|---|---|
| ███ | Hey how are you? |
| (RS | Good, what's going on? |
| (███ | I call you at a bad time? |
| (RS | No, driving to San Diego. |
| (███ | Oh, how's the traffic? |
| (RS | Awesome [UI] not the traffic getting to San Diego, it's the traffic getting out of Newport with these assholes when park when the school, let's out the whole freaking planet they just stop. |
| ███ | Sorry for laughing I understand your pain, I've done the schlep [PH] from LA down to San Diego many times and I know how badly it sucks. |
| (RS | Terrible. So, no big deal. |
| (███ | So anyway, look, I'm just uh, you obviously got my little comment on my, on my, you tapped into my, my uh what I was getting at. And just wanted to you know chat about it. I mean, I'm aware of it I guess from a summary perspective from ████ but uh tell me how it works and uh just educate me a little bit so I can kinda make an informed decision, if you wouldn't mind. |
| | |
| (RS | Okay. So, you know we have relationships everywhere. So, I'm probably... this year we're doing about, almost 760 of these. Out of about 11,000 kids. And they range from Stanford and Harvard, to anyplace potentially. And essentially what I do is have relationships at a different level at every school that needs funding, and so they come to me or call me a lot of times and just say 'hey listen, you have a family that wants to come here.' And in turn, this is what we need. So it kinda depends on the school, so if it's USC or USD, what I have to do is I have to gather up transcripts, test scores, and depending on where the relationship lies, [UI] the President, we do it one way. If it's with athletics we do it a different way [IA] we do it a different way. Normally stay away from the departments because they don't have guaranteed admit. My families, they want guaranteed. They want this thing done. |
| (███ | Right. |
| (RS | Um, so the kid doesn't know, and it's done and everybody can relax. Sometimes the families tell the kids, um [UI] not that they paid to get in, but they tell them earlier that they got in, because a lot of times I'll be able to find out that they already got in way before. Or they hold off and then the kid gets the letter and he's surprised. |
| (███ | Right. Understood. |
| (RS | So everybody's at a different place so it depends on, let's say if it's USC, then I'll probably use athletics to help them get in, and I'll go to one of the coaches, because we've already done six at USC already. I'll go to one of the coaches who has a guaranteed spot in a sport, and ask them if they'll give me that spot. And in turn we will help their |

| | |
|---|---|
| | program, um and then the kid gets in. We apply usually early, and then the kid gets in early action if it's a place like USC. They don't hear until March 25 but I hear months before. |
| ◼ | When you um, do what you just described through the sports program, does that tie the kid to the sports program at all? Or is just the funding to the sports program, the kid doesn't have to play sports? |
| (RS | Kid doesn't have to play the sport. Most of the time, kid doesn't even play the sport. |
| ◼ | Okay, understood. |
| (RS | So, at the time, like at USC there's no men's soccer. We can't use men's soccer so I have to go to a different coach and get him to use a spot. So what I normally have to do is I have to create a profile of that kid in that particular sport. And then the athletic liaison takes that person to admissions when they have what they call sub-committee meetings, which happen usually every other Thursday, at most schools. And then they walk the kid through with whatever sport it is. And they make decisions right then and there if the kids are getting in, or they may say I need to see one more set of grades, or I need to see a progress report and then we'll admit. And it's done. Families don't pay anything until after it's done. I take the risk, and I take the responsibility. So they trust me that I'll do it, and the way the mechanics of it works is I have a 501-3C. Families fund my 501-3C and then the universities tell me how I want their checks and what they want done with it. So for example, if it's at USC, the first 50,000 will go directly to USC to women's athletics. And then the next couple hundred thousand dollars will come to my foundation, that sport will call me and say okay, I'll give an example... let's say it's water polo. Um Jovan will call me and say hey I'm taking 62 people to Hungary this summer, it's gonna cost this amount, I'm gonna send you the invoices just pay them.  Other, other people will say, like at UCLA they're having a struggle with salaries because people don't make enough money on the assistant side and they have to live in LA which is expensive, so they'll come to me and say hey I got three assistants that need the money to go to their three assistants, I'll 1099 the three assistants, make them employees at one of our companies, and then we'll pay them. They'll get paid by the university and they'll get paid outside, because the coach has to raise additional money to pay their salaries. |
| ◼ | So you actually do this through public universities as well as private? |
| (RS | Absolutely. Even though it's much harder. |
| ◼ | Yeah. I understand it would be. Okay, um... alrighty. So one of the, you know, a very candid question for, cause I have a couple of very candid questions and uh, I'm just interested to hear about it. Um, you know, I don't know how far away ◼ scores and test scores and scores are away from uh a likely admit into USD, that's the University of San Diego, and so when I look at it I say well one method is guaranteed, I get that. One method is not guaranteed. You could you |

| | |
|---|---|
| | could think you were in and all of the sudden you're not. One way is potentially more expensive than the other, which I totally understand and I get it. The question is, based upon your assessment, you know and I'm asking you in a way to negotiate against yourself and I'm hopefully asking this for an honest response. |
| (RS | I'm honest. |
| ■ | And look, I figure you got you got more kids lined.... more families lined up outside of here with more inexhaustible resources so if you don't, if I'm not there, then someone else is. So I think that allows you to be honest, right? |
| (RS | And, and it doesn't matter to me one bit. |
| ■ | So the question is you know, I'd be interested to know given the differential, uh the cost of just going the standard route of just crossing your fingers and the guaranteed route. You know, can give me your assessment of you know how far, as to how far away he is from a likely chance of admitting into USD. |
| (RS | So if he has a really, he gets just about straight A's this semester, with his scores, he's a 50/50 guy. If he doesn't do exceptionally well he's a 20-30% guy. At that. |
| ■ | Okay. |
| (RS | The problem with San Diego is everybody just uses it as a safety with no intention of going there. |
| ■ | Alright they fill up the admit's with, and they won't know until afterwards. So, but if that's the case Rick, if a lot of people use it as a safety and ultimately don't go, that leaves a lot of open spaces and that doesn't increase the chances that guys at 50/50 are gonna get in. I would assume that it would to some extent. |
| (RS | No, they essentially already know what their yield [IA] San Diego is 32-35%. |
| ■ | Okay. |
| (RS | So they admit for that, or they could get totally screwed obviously is if they don't get that number, it's lower. Than they, then that's why now everybody, it's so weird. So five years ago nobody have wait list of 1,000 kids. |
| ■ | Alright. |
| (RS | Now everybody has a wait list of 1,000 kids. |
| ■ | Yeah. |
| (RS | And then you don't, you don't know until between the middle of May to July if you're getting off it, because everybody's worried. [IA] places like USC and USD sometimes are over subscribed and then they go to the rising Juniors and ask them to take a year abroad at no cost to them. |
| ■ | Okay. |
| (RS | Because they got, they guarantee the freshman housing. |
| ■ | Right. Okay. Alright, um okay I think I have a general understanding of how it works. Is there more to how it works that I need to know? |
| (RS | No, um there's [IA] time is really important because I have all these |

3

| | |
|---|---|
| | other people, 700 plus, [IA] they're already in. They're getting in. Done. So I have to go get another spot because my spots are used. |
| (█████ | Okay. So really the question for me then, in order to, in order to, a big part of my [UI] has to be understanding what the financial commitment is. Is there a way for you to give me a ballpark of what that is for different universities? |
| (RS | Yeah, yeah yeah I'll tell you exactly. |
| (█████ | Okay. |
| (RS | So at USD it'll be about 200. At USC, it'll be between 250 and 300. |
| (█████ | Okay. [UI] and the timing of those commitments will be shortly after, the fulfillment of those commitments will be shortly after the formal acceptances are announced to the public, is that is that accurate? |
| (RS | Right. April ish. |
| (█████ | Got it. |
| (RS | And then, and then it'll be a donation and you'll get your write off and all that. But yeah, that's how it's done. |
| (█████ | Okay. So, the other question I have for you is uh there is, is it correct to say that it reflects poorly on you if um, if a student, if you slot a student in and then they end up leaving the university or you know whatever. |
| (RS | Uh. |
| (█████ | It's just them or it's the curriculum is too difficult. How does that how does that work? |
| (RS | Well you know it's funny, is that I have never had a kid not succeed. And even kids that they said there's no, I mean this is a stretch. And I'm like first of all, as long as you don't go to grade deflation school my kids are fine because my kids are smart, they just may not get all A's but their gonna get A's and B's and C's if there just a regular student. They're gonna be fine. |
| (█████ | Right. THey're gonna pass, they're gonna get through the curriculum. |
| (RS | Yeah. So my kids, you know I've only had one kid leave, which I didn't even know about til six months later because she had going in, of course the parent didn't tell me that she had a drug addiction, and it got worse when she went to school. But other than that, the kids, you know like I can't get ████ into Harvard right now. But I will tell you this, he would get A's, B's and C's there. |
| (█████ | Well the good thing, I'm glad, I'm glad that that's not on my list so uh that's good. |
| (RS | But right, right even USC right, it's a caliber student at so much different than it used to be. |
| (█████ | Oh yeah. |
| (RS | But the kids the kids will be fine. |
| (█████ | Okay. Alright so next question I have for you, do you still have some time if I have a few more questions? |
| (RS | Yeah well, I think somebody's gonna call me, from new York, they're supposed to call me now but go head. |
| (█████ | Okay, well if we have to resume the call, so I would take the route of |

| | | |
|---|---|---|
| | you know not advising about any [UI] connected to this but I wanted to just kind of- | |
| (RS | Hold on I'm gonna, let me call you back cause they're calling right now. | |
| (█ | Okay got it. | |
| (RS | Okay. | |

QQQ

**From:**       Rick Singer ████████████████

**Sent:**       Tuesday, April 15, 2014 6:36 PM

**To:**         ████████████████████████

**Cc:**         ████████████████████

**Subject:**    Re: SAT Subject Tests

---

If we have a desire I can start to lay the groundwork for ████████ to consider helping ████ get into USC and possibly have a spot on the roster if he works hard- may never ay but be a part of the program for a donation. This year was 200k.

Sent from my iPhone

On Apr 15, 2014, at 3:31 PM, ████████████████████████ wrote:

> Told you I was ignorant – but appreciate the guidance!
>
> Not sure what you mean about a possible side-door USC baseball – my "Rick speak" is still at the kindergarten level.  Would do whatever I could to be that (I think??), but don't know what that means/how to do it.   Translate? ████
>
> ████████████████████
>
> **From:** Rick Singer ████████████████
> **Sent:** Tuesday, April 15, 2014 3:29 PM
> **To:** ████████████████████
> **Cc:**
> **Subject:** Re: SAT Subject Tests
>
> He has not touched the surface of the material for subject tests.
>
> Btw- I am meeting with ████████ on Thursday before the USC -Arizona baseball game- are we a possible side door USC baseball?
>
> Sent from my iPhone
>
> On Apr 15, 2014, at 3:25 PM, ████████████████████ wrote:
>
> > No...Just regular. ████
> >
> > ████████████████████
> >
> > **From:** Rick Singer ████████████████

**Sent:** Tuesday, April 15, 2014 3:25 PM
**To:** ████████████████████████████
**Cc:**
**Subject:** Re: SAT Subject Tests

He is not in AP Chem?

Sent from my iPhone

On Apr 15, 2014, at 3:23 PM, ████████████████████████ wrote:

> OK, thanks.  What about Chem? ████

████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████

**From:** ████████████████████████████
**Sent:** Tuesday, April 15, 2014 3:22 PM
**To:**
**Cc:** ████████████████████████████
**Subject:** Re: SAT Subject Tests

Math 1 is not accepted by schools anymore ( last 10 years ) it is in ace for those schools where it is mandated an athlete must take but is not skilled in math it is a way around the tougher test.

Sent from my iPhone

On Apr 15, 2014, at 2:36 PM, ████████████████████████████ wrote:

> Hey Rick.  Sorry to be ignorant, but should ████ be signing up for or plan on taking an SAT Subject Matter test – I don't know much about these, but it seems like he is eligible for Mathematics 1?  Or is this something he should "train" for later?  Any other subject matters?  Chemistry?  Many thanks!

████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████

USAO-VB-00157098

# RRR

**From:** Rick Singer ███████████████████

**Sent:** Friday, February 24, 2017 10:44 AM

**To:** ████████████████████████████Steve Masera

**Subject:** Northeastern

Gentleman please let me clarify the Northeastern questions. First in doing this for 24 years no side door has ever been 100k nor would I ever say that. Secondly, the donation is250k and is paid to our foundation which I explained to  already as several groups with Northeastern receive the monies for supporting the process. Monies have already been funded on your behalf as I always must fund immediately after admission. I have explained this in detail already and am perplexed as to why this is an on going issue?

The process we are following is the same we are doing with every other family.

The monies are going to our nonprofit so the write off occurs to your benefit.

Please let me know if you have other questions. You can call me at ███████████████

Please take care of this quickly as I have done my part, they did their part and now you are at bat.

Thanks

Sent from my iPhone

1

SM_0000004068
VB-RECORDS-00336087

SSS

**From:**  Rick Singer ███████████████

**Sent:**  Wednesday, February 5, 2014 9:49 PM

**To:**  ████████████████████████

**Subject:**  Re: Hello Rick/college visits

Ok side door is not improper nor is back door both are how all schools fund their special programs or needs. Nevertheless we can apply to some of his top choices that are above his qualifications but the chances of getting in would be limited.

Sent from my iPhone

On Feb 5, 2014, at 5:44 PM, ██████████████████████ wrote:

> Thanks. If a " backdoor" is a donation to the school or something like that I do not want to do anything improper and I am ambivalent whether we should tell █████ or not. I do not want to ruin his motivation or make him feel he did not accomplish on his own merit. On the other hand I do not want it keep stuff from him. Any thoughts?
> Sent from my iPhone
>
> On Feb 6, 2014, at 3:30 AM, Rick Singer <███████████████ wrote:
>
>> Weekdays. I can set up whatever we decide.
>>
>> On Wed, Feb 5, 2014 at 5:25 PM, ███████████████████ wrote:
>>> Are college visits typically during the weekend or weekdays?
>>>
>>> Sent from my iPhone
>>>
>>> On Feb 6, 2014, at 12:55 AM, Rick Singer ████████████████ wrote:
>>>
>>>> For Our discussion
>>>>
>>>> School choices -- ******* schools with that notation will need to be done through the side door as █████ is not close with his grades and scores.
>>>>
>>>> Boston
>>>>
>>>> Northeastern
>>>> Boston U
>>>> Babson
>>>>
>>>> NY
>>>>
>>>> Fordham
>>>> NYU*******
>>>>
>>>> Philly
>>>>
>>>> Drexel
>>>> Villanova

USAO-VB-00190221

DC

Georgetown********
GW
American
U Maryland College Park

Miami

U Miami

New Orleans

Tulane

Chicago

Loyola U
DePaul

Colorado

Denver U
CU Boulder

Midwest

Indiana U
U Michigan*******
U Wisconsin

LA

USC*******
UCLA*****
UCSB

Bay Area

Santa Clara
Cal Poly
USF
UC Davis

On Wed, Feb 5, 2014 at 12:39 AM, 
wrote:
> Hi Rick,
> greetings from south africa..i am here for a quick business trip, and
> will be back sunday. so i look forward seeing you on monday for our
> usual get together with ███

One thing i would like to resolve is the choice of which colleges to visit in the spring break for ███

1. which colleges should we visit?

2. When?████s on spring break from March 8 th the 23rd. I will be in brussell on wed12-thrusday13, so I could visit colleges on the east coast (or west coast) the weekend and monday (8-11), or when i am back sat15 all week until the 23. what do you suggest?

Once we decide where and when, we can contact the colleges for logistics and also i can get going with airplane tickets and all that…. let me know what you think and thank you for all your help!

███

--
Rick Singer
████

--
Rick Singer
████

**TTT**



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

Main Reception: (617) 748-3100                *John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

November 27, 2019

Via E-Mail
Sean Berkowitz, Esq.
Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611

     Re:    *United States v. Mossimo Giannulli and Lori Loughlin*,
           No. 19-cr-10080-NMG

Dear Mr. Berkowitz:

As we have indicated to you under separate cover, we have re-reviewed the FBI 302 reports of witness interviews in this case and – although we do not believe that any of the information set forth below is exculpatory – we are disclosing it to you in an abundance of caution.

- Rick Singer has advised the government, in sum and in substance, that: (a) Singer told Giannulli and Loughlin that, in exchange for getting ▮▮▮▮ admitted to the University of Southern California ("USC") as a recruited coxswain, they would need to write a $50,000 check to Donna Heinel at USC and pay an additional $200,000 through the KWF; (b) Lori Loughlin was in charge and told the couple's daughters that they needed to do better in high school; (c) Singer did not have to explain how the side door scheme would work with ▮▮▮▮ since both Giannulli and Loughlin were familiar with the scheme since they had used it to secure ▮▮▮▮ admission to USC; (d) as far as Singer was aware, ▮▮▮▮ and ▮▮▮▮ took their standardized tests on their own; and (e) when ▮▮▮▮▮▮▮ began asking questions about why ▮▮▮▮ was admitted to USC as a recruit to the crew team (given that she did not participate in crew), Singer told Giannulli that ▮▮▮▮ could mess things up and advised Giannulli to speak with ▮▮▮▮.

- ▮▮▮▮▮▮ USC's crew coach, has advised the government, in sum and in substance, that, while it was not typical, the USC crew team sometimes would have walk-on coxswains without experience.

- ███████████ Co-Director of College Counseling at ███████████ has advised the government, in sum and in substance, that: (a) Giannulli asked if █████ had told USC that his daughters were bad candidates, and confirmed that he did not; and (b) Giannulli told ███████ that █████ was a coxswain; and (c) ███████ told Giannulli that he would tell USC that █████ was a coxswain.

- ███████████, Head of School at ███████████████ has advised the government, in sum and in substance, that: (a) Giannulli told ████████ that █████████ rowed crew at a private club; and (b) ████████ told Giannulli that ████████ would not interfere with ████████ application to USC.

We are aware of the continuing nature of our discovery obligations, and we will continue to make additional disclosures as required. We reiterate our request for reciprocal Rule 16 discovery.

Sincerely,

ANDREW E. LELLING
United States Attorney

By: */s/ Kristen A. Kearney*
    ERIC S. ROSEN
    JUSTIN D. O'CONNELL
    KRISTEN A. KEARNEY
    LESLIE A. WRIGHT
    Assistant U.S. Attorneys

2

UUU

| **From:** | Tim Brunold </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=909699F2DBD44EA7B6BE60B76723A129-SCSH3QV6> |
|---|---|
| **To:** | Donna Heinel |
| **Sent:** | 7/6/2015 7:42:58 PM |
| **Subject:** | Rick Singer |

Hi Donna,

As a quick follow up to today's conversation about that Singer guy--he isn't the guy I thought had done previous marketing for USC--the fellow I was thinking of was named ████ ████████

So, again, I don't know anything about this Singer guy, except to steer clear!

Have a good evening,

Tim

USAO-VB-01220082



Message

| | |
|---|---|
| **From:** | Donna Heinel [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=2BF62813E2894234A74A0DFD90C81487-SCHV8RH5] |
| **Sent:** | 3/29/2018 07:20:08 PM |
| **To:** | ████████/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=42de75f59ca24777ab8125844680e3a6-scrj6bv4] |
| **Subject:** | RE: walk ons |

████ was on crew in the Fall of last year but did not continue in Spring due to the coach ████. At the end of the year We fired ████ and hired ████. ████ was on the list of novice prospects that ██ inherited. He was seen her cox for the men's team during the Fall and thinks she has talent. Her MAC club is competitive on both the men's and women's side. He honored the invitation that was extended to ████ from the past staff and is welcoming her to be a walk on and to earn a spot.

████ does NOT start for ████████ but is highly talented baseball player. ████████ is very political and ██ is behind the son of a donor that gave 1 million dollars to the baseball program. ████ plays with the ████████ during the summer which is where USC saw his talent. He can play multiple positions 2B, INF, have a good bat, has great baseball IQ, smart in the classroom and can offered to come to USC. These were all the factors that baseball looked at.

This is the feedback thus far.

**From:** ████████
**Sent:** Wednesday, March 28, 2018 4:10 PM
**To:** Donna Heinel <████████
**Cc:** Tim Brunold <████████
**Subject:** walk ons

Hi Donna,
Here are a couple students whose high schools were quite surprised to hear they were being admitted as athletic recruits.

Thanks for looking into it.

Thanks,
████

| | | | | |
|---|---|---|---|---|
| | | | ████ | Sister was also recruited for WCRW last year. School doesn't think either of the students are serious crew participants. Sister, ████ is not on the online crew roster for this year. They are daughters of actress Lori Loughlin. |
| ████ | ████ | Giannulli | Women's Crew | |

| | |
|---|---|
| ████████ | School reports that he is not a starter on their baseball team. Seems to be a second tier player. |
| | School reports that he does not play for their school team which is very competitive. His packet indicated USTA play but not tons of travel that would preclude his participation on the school team. |

USC-00005857

VB-RECORDS-00122082



USC-00005858

VB-RECORDS-00122083

WWW



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

Main Reception: (617) 748-3100

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

November 27, 2019

John Hueston, Esq.
Hueston Hennigan LLP
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660

  Re: *United States v. William McGlashan*
     No. 19-cr-10080-NMG

Dear Mr. Hueston:

  We write in response to your letter of November 15, 2019.  This letter supplements the government's letters of September 16, 2019, September 24, 2019, October 1, 2019 and October 31, 2019.

  Your contention that we have not provided specific responses to your Rule 16 requests is not true.  Our responses to your requests are clear.  Rule 16, however, does not require that we answer civil-style interrogatories demanding that we itemize what we have produced, what we have not produced, and what we do not possess, in 90 separate categories.  We believe we have satisfied our Rule 16 obligations.  To the extent we come into possession of additional Rule 16 materials, we will produce those to you in a timely manner, as required.

  Likewise, we do not believe that *Brady* requires the government to "make a representation" with respect to each of 40 separate categories "as to whether or not it possesses such information."  To the contrary, it is the defendant's burden, in making such requests, to specify as to each request what evidence you hope to find, why you think it exists, and why such evidence would be both favorable to the defendant and material.  *See United States v. Prochilo*, 629 F.3d 264, 268 (1st Cir. 2011).  You have not even attempted to meet this burden.[1]

---

  [1] In your most recent letter, you suggest by way of example that Request 124, which "seeks documents evidencing any lie or misrepresentation Singer made to McGlashan," would provide evidence "that McGlashan was misled regarding the nature of the agreement (or agreements) he purportedly entered into and did not have the requisite intent for the charged crimes."  Putting aside for the moment that we have already produced to you, as part of Rule 16

Notwithstanding the foregoing – and despite the fact that we do not believe <u>any</u> of the information set forth below constitutes *Brady* material – we have re-reviewed the FBI 302 reports of witness interviews in light of your requests, and we make the following disclosures in an abundance of caution:

- ██████████ has advised the government, in sum and in substance, that ██ spoke with ████████████ USC admissions representative a few days before the March 12, 2019 arrests in this case, and that the admissions representative told him that ████ McGlashan was on the "VIP list." ████ said that this information did not surprise him, and that it was clear to him that McGlashan had connections at certain schools and was working those connections.

- ████████████ has advised the government, in sum and in substance, that ██████ ██████ was very smart, and that an ACT score of 34 was not "crazy," although grades were only "ok."

- ████████ ██████ has advised the government, in sum and in substance, that William McGlashan and his wife were not stressed about school.

- ██████████ has advised the government, in sum and in substance, that as far as he knew the McGlashans were not involved in the cheating scheme and that he viewed the family as "above board." ████████ said that ██████ McGlashan was a good student, and that ████ would be somewhat surprised, but not shocked, if ██████ received a 34 on his ACT exam because ████████ scores on practice exams were in the mid to upper 20s.

- Mark Riddell has advised the government, in sum and in substance, Riddell generally allowed students whose exams he proctored to use their cell phones to advise their parents prior to beginning the final examination section that they were about to start the final section.

- Rick Singer has advised the government, in sum and in substance, that William McGlashan knew that someone else would be taking the ACT for ██████ ████████ and getting a good score, but that William McGlashan did not want the full details of how the cheating scheme would work. Singer said that ██████ ████████ has a learning difference and would have received a score around 1200 on the SAT had he taken the test on his own. Singer also said that ██████ ████████ did not know that someone was

---

discovery, all documents within our possession that were exchanged between McGlashan and Singer, your contention that evidence of "any lie or misrepresentation" by Singer about *any* subject would prove that McGlashan was misled about the conspiracy and did not have criminal intent is obviously untrue. Indeed, this example illustrates your failure to demonstrate the relevance and materiality of your requests, as well as their overbreadth and speculative nature. Similarly, you suggest that Request 96, which seeks "any documents showing that McGlashan had reason to believe that a potential donation to USC would be valuable for the school," would provide evidence that McGlashan believed "a donation to USC would be legitimate." But, of course, that does not follow. A payment, styled as a donation, may be valuable to its recipient, even as it is also a bribe to the person who demanded it as a quid pro quo.

taking the ACT exam for him, and that he also did not know about the "deal" to recruit him as a purported kicker in exchange for a payment of $250,000.

- ████████ has advised the government, in sum and in substance, that if ████ was accepted to the ████████████████████ at USC, ████ would hope that William McGlashan would then make a donation to that school. ████████ said he was shocked that William McGlashan was involved in the college admissions case.

We are aware of the continuing nature of our discovery obligations, and we will continue to make additional disclosures as required. We reiterate our request for reciprocal Rule 16 discovery.

Sincerely,

ANDREW E. LELLING
United States Attorney

By: /s/ Kristen A. Kearney
ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
Assistant U.S. Attorneys



| | |
|---|---|
| **From:** | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| **Sent:** | Friday, April 27, 2018 9:05 AM |
| **To:** | ▮▮▮▮▮▮▮ |
| **Cc:** | ▮▮▮▮▮▮▮  McGlashan, Bill |
| **Subject:** | Other Colleges to Explore |

This message has been archived. View the original item
<http://evserver1.texpac.com/EnterpriseVault/ViewMessage.asp?VaultId=1707063E3F22DD847AB2B3E1B2E27EB86111
0000evsite1.texpac.com&SavesetId=201807272735080~201804271605040000~Z~F10383EBBC6643225BF0C04B0FA283
81>

▮▮▮▮▮-Thanks for coming in yesterday. You're making good progress on your colleges and what you might want. Given your takeaways from this last trip, I wanted to suggest some other colleges:

Tulane, Wake Forest, and U of Miami would seem to fit the type of "vibe" you have described thus far.

Some slightly (and I mean barely) less selective schools to try and get you some likely colleges that have specific programs where you might have an interest would be the following:

Cooper Union: This college is in Manhattan and is one of the best colleges in the country in synthesizing science and art. If you want Brown/RISD in a single college, it's Cooper.

Lehigh: A mid-size liberal arts college with excellent engineering and design thinking/entrepreneurial
<https://urldefense.proofpoint.com/v2/url?u=https-
3A__ibe.lehigh.edu_&d=DwMFaQ&c=QbuapHRvbn0JdC8vTVkPHg&r=wDGwWdSmjX2leznTn6qJF12GKDdK5ko28xIIp_jdl
DQ&m=tuRN8Y15CgKnry-Q1-qcDmANtaQgK3OtQXzH_P5oSvs&s=7B2UiJ-
F1KLeQk56UnaFtlWxEvERYpHW4K2jRaVNEKU&e=>  courses. They also have a growing presence here in SF with a small campus in the Nasdaq building.

George Washington: While best know for politics, GW has the Center for Entrepreneurial
Excellence<https://urldefense.proofpoint.com/v2/url?u=https-3A__business.gwu.edu_research_center-2Dfor-
2Dentrepreneurial-2Dexcellence-
2Dcfee&d=DwMFaQ&c=QbuapHRvbn0JdC8vTVkPHg&r=wDGwWdSmjX2leznTn6qJF12GKDdK5ko28xIIp_jdlDQ&m=tuRN8
Y15CgKnry-Q1-qcDmANtaQgK3OtQXzH_P5oSvs&s=-bI5youtXjaBWEYPKrvDKOzDkIRoCLeBNubTsU6JWTo&e=>  in
addition to classes in engineering and film while in a major city.

Northeastern: Similar to GW, this college has both engineering and film and is mid-size in the middle of Boston. It is also one of the quickest rising profile colleges in the nation.

Syracuse: While remote, I think you would absolutely love the school of management and their film courses. They also have awesome entrepreneurship<https://urldefense.proofpoint.com/v2/url?u=https-3A__whitman.syr.edu_pr

TPG-MA-00000184
VB-RECORDS-00158747

# YYY

# AUDIO FILE

*ZZZ*



**U.S. Department of Justice**

***Andrew E. Lelling***
*United States Attorney*
*District of Massachusetts*

Main Reception: (617) 748-3100          *John Joseph Moakley United States Courthouse*
                                         *1 Courthouse Way*
                                         *Suite 9200*
                                         *Boston, Massachusetts 02210*

November 27, 2019

Michael Kendall, Esq.
White & Case LLP
75 State Street
Boston, MA 02109

Re:    *United States v. John Wilson*,
       No. 19-cr-10080-NMG

Dear Mr. Kendall:

As we have indicated to you under separate cover, we have re-reviewed the FBI 302 reports of witness interviews in this case and – although we do not believe that any of the information set forth below is exculpatory – we are disclosing it to you in an abundance of caution.

- Rick Singer has advised the government, in sum and in substance, that ▇▇▇▇▇▇▇ played water polo.

- ▇▇▇▇▇▇▇ has advised the government, in sum and in substance, that he believes ▇▇▇▇▇▇▇ attended the first day of water polo practice.

We are aware of the continuing nature of our discovery obligations, and we will continue to make additional disclosures as required. We reiterate our request for reciprocal Rule 16 discovery.

Sincerely,

ANDREW E. LELLING
United States Attorney

By:  */s/ Leslie A. Wright*

     ERIC S. ROSEN
     JUSTIN D. O'CONNELL
     KRISTEN A. KEARNEY
     LESLIE A. WRIGHT
     Assistant U.S. Attorneys

AAAA



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

Main Reception: (617) 748-3100

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

April 25, 2019

Counsel
*United States v. Ernst et al*

**VIA E-MAIL**

    **Re: Varsity Blues Discovery (19-CR-10081-NMG)**

Counsel:

    The purpose of this letter is to provide you with an update on discovery that you will soon receive. You will soon receive via Federal Express a hard drive and a disc from the United States Attorney's Office containing discovery. You are being provided with this discovery pursuant to the agreed-upon protective order subject to any amendments by the Court or agreed-upon amendments between the parties.

    There is one volume of discovery on the hard drive, which contains four encrypted SecureZip zip files. The password for each of these zip files is: ▮▮▮▮▮▮▮▮

    To extract the contents of the zip files on the hard drive, you will need to run the SecureZip Reader installation file, which is provided for you on the hard drive. There is an instruction PDF file as well as ZIPReader.exe, which you may find helpful. Please note that you will not be able to successfully extract all the files from the encrypted zip files if you do not use the provided SecureZip Reader application. If you have any issues regarding accessing the production or opening the hard drive please contact ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The discovery we are providing now will be supplemented as we collect more evidence and as more evidence gets processed.

    **HARD DRIVE DATA**

    VB_DISCOVERY001-01.zip contains records 27,754 obtained by the government primarily, but not exclusively, through subpoenas. These are labelled with the Bates scheme "VB-RECORDS-00000001 through VB-RECORDS-00167098." This is being provided to you

in "load-ready" format, so processing is not needed.  An index of these records is provided on the VOL002 disc.

VB_DISCOVERY001-02.zip contains 706,502 records obtained by the government, primarily through e-mail search warrants.  These are labelled with the Bates scheme "USAO-VB-00000001 through USAO-VB-01568780).  Again, this is being provided to you in "load-ready" format, so processing is not needed.  An index of these e-mail records is provided on the VOL002 disc.

VB_DISCOVERY001-03.zip contains e-mails obtained through T-III interceptions of Rick Singer's email accounts.  There is a file called T-III_DISCOVERY001_01 that contains 21,799 records (DOJ-SINGER-TIII-000001 through DOJ-SINGER-TIII-00042787) and T-III_DISCOVERY001_02 that contains 3,299 records (DOJ-SINGER-TIII-00042788 through DOJ-SINGER-TIII-00052051). Many of the emails obtained from the T-III are duplicative of records obtained through search warrants. These are being provided in load-ready format. An index of these records is provided on the VOL002 disc.

VB_DISCOVER001-04.zip file contains files that are not contained within databases, and these are not provided in "load-ready format."  These files are foldered as follows (an index of these records is provided on the VOL002 disc):

- Financial records;

- Historical cellsite and ping data;

- Legal process;

- Text messages and voicemails from Singer's telephone;

- Surveillance photographs;

- Wiretap and consensual recordings, including rough transcripts (see below on how to access).

**DISC DATA**

We have also prepared a disc, named VOL002, which contains a subsequent production of discovery as well as the indexes set forth above.  There is a separate index provided for this discovery volume on the disc, as well. The disc is password encrypted and can be accessed using the same password as the zip files on the hard drive ███████████.

The disc contains:

- Hotel room meeting video;

- Legal process related to historical cellsite;

- Historical cellsite information;

- Consent forms signed by Singer;

- Cooperation and plea agreements for cooperating witnesses;

- Folder containing information regarding mailings/money transfers to/from Massachusetts; and,

- Phone download and financial records.

Thank you for your patience.  At this time, given the agreed upon protective order, I estimate that the hard drive should be with you Monday or Tuesday at the latest.


Regards,


Eric S. Rosen

cc:

   █████████, Paralegal (USAO)
   ██████████ Litigation Technology (USAO)
   Marty Weinberg, counsel for David Sidoo
   David Schumaker, counsel for Gregory and Amy Colburn


To access the wiretap recordings, click on the "PackageExplorerLauncher.exe" which will bring up the pertinent calls.



# BBBB

# BRUCE ISACKSON



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*          *John Joseph Moakley United States Courthouse*
                                          *1 Courthouse Way*
                                          *Suite 9200*
                                          *Boston, Massachusetts 02210*

April 3, 2019

William Burck, Esq.
Quinn Emanuel LLP
1300 I Street NW, Suite 900
Washington, DC 20005

      Re:    <u>United States v. Bruce Isackson</u>

Dear Mr. Burck:

The United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Bruce Isackson ("Defendant"), agree as follows:

    1.    <u>Change of Plea</u>

No later than April 30, 2019, Defendant will waive Indictment and plead guilty to counts one through three of the  Information charging: conspiracy to commit mail fraud and honest services mail fraud, in violation of Title 18, United States Code, Section 1349 (Count One); conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h) (Count Two); and, conspiracy to defraud the United States, in violation of Title 18, United States Code, Section 371 (Count Three). Defendant admits that he committed the crimes specified in these counts and is in fact guilty of each one. Defendant also agrees to waive venue, to waive any applicable statute of limitations, and to waive any legal or procedural defects in the Information.  Defendant does not dispute the accuracy of the Information.

The U.S. Attorney agrees that, based upon the information known to the U.S. Attorney's Office at this time, no further criminal charges will be brought against Defendant in connection with the conduct set forth in the Information.

    2.    <u>Penalties</u>

Defendant faces the following maximum penalties:

- Count One (conspiracy to commit mail fraud and honest services mail fraud): incarceration for 20 years; supervised release for three years; a fine of $250,000, or twice the gross gain or loss, whichever is greater; a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Information.

- Count Two (conspiracy to commit money laundering): incarceration for twenty years; supervised release for three years; a fine of $500,000, or twice the gross gain/loss, whichever is greater; a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Information.

- Count Three (conspiracy to defraud the United States): incarceration for five years; supervised release for three years; a fine of $250,000, or twice the gross gain/loss, whichever is greater; a mandatory special assessment of $100; and restitution.

3.    Sentencing Guidelines

The parties agree, based on the following calculations, that Defendant's total "offense level" under the Guidelines is 21:

a) Defendant's base offense level is 7, because Defendant is pleading guilty to an offense of conviction that has a statutory maximum term of imprisonment of 20 years or more (USSG § 2B1.1(a)(1));

b) Defendant's offense level is increased by 14, because the gain or loss from the offense of conviction is more than $550,000, but not more than $1,500,000 (USSG § 2B1.1(b)(1)(H));

c) Defendant's offense level is increased by 2, because Defendant was convicted under Title 18, United States Code, Section 1956 (USSG § 2S1.1(b)(2)(B));

d) Defendant's offense level is increased by 1 pursuant to USSG § 3D1.4 because the number of units involved in the crimes of conviction is 1.5; and,

e) Defendant's offense level is decreased by 3, because Defendant has accepted responsibility for his crime (USSG § 3E1.1).

Defendant understands that the Court is not required to follow this calculation, and that Defendant may not withdraw his guilty plea if Defendant disagrees with how the Court calculates the Guidelines or with the sentence the Court imposes.

Defendant also understands that the government will object to any reduction in his sentence based on acceptance of responsibility if: (a) at sentencing, Defendant does not clearly accept responsibility for the crime he is pleading guilty to committing; or (b) by the time of sentencing, Defendant has committed a new federal or state offense, or has in any way obstructed justice.

2

SINGER-VOL002-000387

If, after signing this Agreement, Defendant's criminal history score or Criminal History Category are reduced, the U.S. Attorney reserves the right to seek an upward departure under the Guidelines.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

4.    <u>Sentence Recommendation</u>

The U.S. Attorney agrees to recommend the following sentence to the Court:

    a) incarceration at the low end of the Guidelines as calculated by the parties in Paragraph 3;

    b) a fine or other financial penalty of $150,000;

    c) 12 months of supervised release;

    d) a mandatory special assessment of $100, which Defendant must pay to the Clerk of the Court by the date of sentencing;

    e) restitution to the Internal Revenue Service in an amount of $139,509; and,

    f) forfeiture as set forth in Paragraph 6.

In addition, the parties agree jointly to recommend the following special condition of any term of supervised release or probation:

During the period of supervised release or probation, Defendant must, within six months of sentencing or release from custody, whichever is later:

    a) cooperate with the Examination and Collection Divisions of the IRS;

    b) provide to the Examination Division all financial information necessary to determine Defendant's prior tax liabilities;

    c) provide to the Collection Division all financial information necessary to determine Defendant's ability to pay;

    d) file accurate and complete tax returns for those years for which returns were not filed or for which inaccurate returns were filed; and

    e) make a good faith effort to pay all delinquent and additional taxes, interest, and penalties.

3

SINGER-VOL002-000388

5.      Waiver of Appellate Rights and Challenges to Conviction or Sentence

Defendant has the right to challenge his conviction and sentence on "direct appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence.  Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that his conviction or sentence should be overturned.

Defendant understands that he has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

 a) He will not challenge his <u>conviction</u> on direct appeal or in any other proceeding, including in a separate civil lawsuit; and

 b) He will not challenge his <u>sentence,</u> including any court orders related to forfeiture, restitution, fines or supervised release, on direct appeal or in any other proceeding, including in a separate civil lawsuit.

Defendant understands that, by agreeing to the above, he is agreeing that his conviction and sentence will be final when the Court issues a written judgment after the sentencing hearing in this case. <u>That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge his conviction and sentence, regardless of whether he later changes his mind or finds new information that would have led him not to agree to give up these rights in the first place.</u>

Defendant acknowledges that he is agreeing to give up these rights at least partly in exchange for concessions the U.S. Attorney is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later claim that his lawyer rendered ineffective assistance of counsel, or that the prosecutor engaged in misconduct serious enough to entitle Defendant to have his conviction or sentence overturned.

6.      Forfeiture

Defendant hereby waives and releases any claims Defendant may have to any vehicles, currency, or other personal property seized by the United States, or seized by any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution of this case, and consents to the forfeiture of all such assets.

4

7.   Civil Liability

This Plea Agreement does not affect any civil liability, including any tax liability, Defendant has incurred or may later incur due to his criminal conduct and guilty plea to the charges specified in Paragraph 1 of this Agreement.

8.   Breach of Plea Agreement

Defendant understands that if he breaches any provision of this Agreement, Defendant cannot use that breach as a reason to withdraw his guilty plea. Defendant's breach, however, would give the U.S. Attorney the right to be released from his commitments under this Agreement, and would allow the U.S. Attorney to pursue any charges that were, or are to be, dismissed under this Agreement.

If Defendant breaches any provision of this Agreement, the U.S. Attorney would also have the right to use against Defendant any of Defendant's statements, and any information or materials he provided to the government during investigation or prosecution of his case. The U.S. Attorney would have this right even if the parties had entered any earlier written or oral agreements or understandings about this issue.

Finally, if Defendant breaches any provision of this Agreement, he thereby waives any defenses based on the statute of limitations, constitutional protections against pre-indictment delay, and the Speedy Trial Act, that Defendant otherwise may have had to any charges based on conduct occurring before the date of this Agreement.

9.   Who is Bound by Plea Agreement

This Agreement is only between Defendant and the U.S. Attorney for the District of Massachusetts. It does not bind the Attorney General of the United States or any other federal, state, or local prosecuting authorities.

10.   Modifications to Plea Agreement

This Agreement can be modified or supplemented only in a written memorandum signed by both parties, or through proceedings in open court.

5

SINGER-VOL002-000390

\*   \*   \*

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below.  Please also sign below as Witness.  Return the original of this letter to Assistant U.S. Attorney Eric S. Rosen.

Sincerely,

ANDREW E. LELLING
United States Attorney

By: _____

STEPHEN E. FRANK
Chief, Securities and Financial Fraud Unit
JORDI DE LLANO
Deputy Chief, Securities and Financial Fraud Unit

_____

ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
Assistant U.S. Attorneys

6

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter and discussed it with my attorney. The letter accurately presents my agreement with the United States Attorney's Office for the District of Massachusetts. There are no unwritten agreements between me and the United States Attorney's Office, and no United States government official has made any unwritten promises or representations to me in connection with my guilty plea. I have received no prior offers to resolve this case.

I understand the crimes I am pleading guilty to, and the maximum penalties for those crimes. I have discussed the Sentencing Guidelines with my lawyer and I understand the sentencing ranges that may apply.

I am satisfied with the legal representation my lawyer has given me and we have had enough time to meet and discuss my case. We have discussed the charges against me, possible defenses I might have, the terms of this Agreement and whether I should go to trial.

I am entering into this Agreement freely and voluntarily and because I am in fact guilty of the offenses. I believe this Agreement is in my best interest.

Bruce Isackson
Defendant

Date: 4/7/19

I certify that Bruce Isackson has read this Agreement and that we have discussed what it means. I believe Bruce Isackson understands the Agreement and is entering into it freely, voluntarily, and knowingly. I also certify that the U.S. Attorney has not extended any other offers regarding a change of plea in this case.

William Burck, Esq.
Attorney for Defendant

Date: 4/7/19



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*                    *John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

April 3, 2019

William Burck, Esq.
Quinn Emanuel LLP
1300 I Street NW, Suite 900
Washington, DC 20005

   Re: <u>United States v. Bruce Isackson</u>
     Cooperation Agreement

Dear Mr. Burck:

   This letter sets forth the understanding between the United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Bruce Isackson ("Defendant"), concerning Defendant's cooperation with the U.S. Attorney in the above-referenced case. This Cooperation Agreement supplements, but does not supersede, the Plea Agreement between the parties dated April 3, 2019 ("Plea Agreement"). Defendant and the U.S. Attorney further understand and agree that the original of this Cooperation Agreement shall be maintained by the U.S. Attorney, but may be later disclosed pursuant to the U.S. Attorney's discovery obligations, or submitted to the District Court under seal, with notice to Defendant. In addition, Defendant and the U.S. Attorney understand and agree that the U.S. Attorney will submit this Cooperation Agreement to the U.S. Probation Office for its use in preparing the Presentence Report. Nothing in this Cooperation Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

   The Cooperation Agreement is as follows:

1. <u>Terms of Cooperation</u>

   Defendant agrees to cooperate fully with law enforcement agents and government attorneys. Defendant must provide complete and truthful information to all law enforcement personnel. If Defendant's testimony is requested, Defendant must testify truthfully and completely before any grand jury, and at any hearing and trial. Defendant must answer all questions posed by any law enforcement agents and government attorneys and must not withhold any information.

Defendant must not attempt to protect any person or entity through false information or omission, or to implicate falsely any person or entity. Upon request, Defendant must furnish all documents, objects and other evidence in Defendant's possession, custody or control that are relevant to the government's inquiries.

Defendant understands that he has a right to have counsel present when communicating with representatives of the government about the criminal conduct with which Defendant has been charged. To facilitate Defendant's cooperation, Defendant hereby knowingly and voluntarily waives this right with respect to all debriefings by law enforcement agents and government attorneys and all appearances to testify. Defendant or Defendant's counsel may revoke this waiver with a specific request at any time without otherwise affecting the terms or enforceability of this Cooperation Agreement.

To ensure that the Court has all relevant sentencing information, Defendant waives any rights to prompt sentencing and will join in any requests by the U.S. Attorney that sentencing be postponed until Defendant's cooperation is complete. Defendant understands that the date of Defendant's sentencing is within the sole discretion of the Court and that this Cooperation Agreement may require Defendant's cooperation to continue even after Defendant has been sentenced. Defendant's failure to continue to cooperate pursuant to the terms of this Cooperation Agreement after sentence is imposed shall constitute a breach of this Cooperation Agreement by Defendant.

2. Substantial Assistance Motion

Should Defendant provide substantial assistance in the investigation or prosecution of another person who has committed a criminal offense, the U.S. Attorney agrees that, at or before sentencing, the U.S. Attorney will file a motion under USSG § 5K1.1 to recommend that the Court impose a sentence below the advisory Guidelines sentencing range.

The determination whether Defendant has provided substantial assistance rests solely in the discretion of the U.S. Attorney and is not subject to appeal or review. The U.S. Attorney will make this determination based on the truthfulness and value of Defendant's assistance, regardless of the outcome or result of any proceeding or trial. The U.S. Attorney reserves the right to decline to file a motion pursuant to USSG § 5K1.1 if Defendant violates any condition of pretrial release, violates any of the requirements of honesty and candor detailed in Paragraph 1 above, or engages in any criminal conduct after the date Defendant signs this Cooperation Agreement and/or the Plea Agreement. Defendant may not withdraw his guilty plea if the U.S. Attorney determines that Defendant has not rendered substantial assistance or otherwise declines to file a motion pursuant to USSG § 5K1.1 for any of the reasons listed above, or if the Court refuses to grant the U.S. Attorney's motion for a downward departure.

3. Sentence Recommendation with Substantial Assistance

If Defendant provides substantial assistance, subject to all of the provisions of Paragraphs

2

SINGER-VOL002-000382

1 and 2 above, the U.S. Attorney will advise the Court of the full nature, extent, and value of the assistance provided by Defendant.  In such an event, the U.S. Attorney reserves the right to recommend a particular sentence or sentencing range, or to make no recommendation at Defendant's sentencing, subject to the requirements of Paragraph 2 above.  In no case will the U.S. Attorney's recommendation exceed that set forth in Paragraph 4 of the Plea Agreement between the parties.

Any sentencing recommendation the U.S. Attorney may make based upon Defendant's substantial assistance is not binding upon the Court.  Rather, the sentence to be imposed is within the Court's sole discretion.  Should the Court decline to follow the U.S. Attorney's sentencing recommendation (if any), the U.S. Attorney reserves the right to defend the Court's sentence in any direct appeal or future challenge (collateral or otherwise).

4.     <u>Letter Immunity</u>

In return for Defendant's full and truthful cooperation, the U.S. Attorney agrees not to use any information provided by Defendant pursuant to this Cooperation Agreement or pursuant to the proffer letter dated April 2, 2019 (or any information directly or indirectly derived therefrom) against Defendant in any criminal case except in a prosecution: (1) for perjury or obstruction of justice, or for making a false statement after the date of this Cooperation Agreement or the Plea Agreement; or (2) for an act of physical violence against the person of another, or conspiracy to commit any such act of violence.  The U.S. Attorney reserves the right to respond fully and accurately to all requests for information by the Court and U.S. Probation Office in this case.  All such disclosures, however, shall be made subject to the constraints identified in USSG § 1B1.8(a) and its commentary on the use of this information by the Court and U.S. Probation Office. Regardless of the provisions of USSG § 1B1.8(b)(5) and its commentary, the U.S. Attorney agrees to take the position at sentencing that information provided by Defendant pursuant to this Cooperation Agreement and the Plea Agreement should not be used as a basis for the Court to refuse to depart downward.

5.     <u>Breach of Cooperation Agreement</u>

If the U.S. Attorney determines that Defendant has breached this Cooperation Agreement by making any false, incomplete or misleading statement, or by providing any false, incomplete or misleading information to any law enforcement personnel, grand jury or court, the U.S. Attorney may terminate this Cooperation Agreement and/or the Plea Agreement as set forth in Paragraph 8 of the Plea Agreement; may pursue any and all of the remedies for breach set forth in Paragraph 8 of the Plea Agreement; and may prosecute Defendant for any and all offenses that could be charged against Defendant in the District of Massachusetts, including, but not limited to, false statements and perjury.

3

SINGER-VOL002-000383

6.     Complete Cooperation Agreement

This letter contains the complete supplemental agreement between the parties relating to Defendant's cooperation in this matter.  No other promises, representations or agreements have been made other than those set forth in this Cooperation Agreement, the proffer letter dated April 2, 2019, which is superseded by this Cooperation Agreement as to any statements made after the date of this Cooperation Agreement, and the Plea Agreement.  This Cooperation Agreement can be modified or supplemented only in a written document signed by the parties or on the record in court.

If this letter accurately reflects the cooperation agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Agreement below.  Please also sign below as Witness.  Return the original of this letter to Assistant U.S. Attorney Eric S. Rosen.

Sincerely,

ANDREW E. LELLING
United States Attorney

By:

STEPHEN E. FRANK
Chief, Securities and Financial Fraud Unit
JORDI DE LLANO
Deputy Chief, Securities and Financial Fraud Unit

ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
Assistant U.S. Attorneys

4

## <u>ACKNOWLEDGMENT OF COOPERATION AGREEMENT</u>

I have read this Cooperation Agreement in its entirety and discussed it with my attorney. I hereby acknowledge that it fully sets forth my cooperation agreement with the United States Attorney's Office for the District of Massachusetts. I further state that no additional promises or representations have been made to me by any official of the United States in connection with this matter other than those set forth in the Plea Agreement dated April 3, 2019 and the proffer letter dated April 2, 2019. I understand the crimes to which I have agreed to plead guilty, the maximum penalties for those offenses, and the Sentencing Guideline penalties potentially applicable to them. I am satisfied with the legal representation provided to me by my attorney. We have had sufficient time to meet and discuss my case. We have discussed the charges against me, possible defenses I might have, the terms of this Cooperation Agreement (and the April 3, 2019 Plea Agreement), and whether I should go to trial. I am entering into this Cooperation Agreement freely, voluntarily, and knowingly.

Bruce Isackson
Defendant
Date: 4/7/19

I certify that Bruce Isackson has read this Cooperation Agreement, and that we have discussed both its meaning and its relationship to the Plea Agreement dated April 3, 2019. I believe he understands the Cooperation Agreement and is entering into the Cooperation Agreement freely, voluntarily, and knowingly.

William Burck, Esq.
Attorney for Defendant
Date: 4/7/19

SINGER-VOL002-000385

# DAVINA ISACKSON



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

April 3, 2019

David K. Willingham, Esq.
Boies Schiller Flexner LLP
725 South Figueroa Street, 31st Floor
Los Angeles, California 90017

      Re:    <u>United States v. Davina Isackson</u>

Dear Mr. Willingham:

The United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Davina Isackson ("Defendant"), agree as follows:

    1.    <u>Change of Plea</u>

No later than April 30, 2019, Defendant will waive Indictment and plead guilty to count one of an Information charging her with conspiracy to commit mail fraud and honest services mail fraud, in violation of Title 18, United States Code, Section 1349. Defendant admits that she committed the crime specified in that count and is in fact guilty of that crime. Defendant also agrees to waive venue, to waive any applicable statute of limitations, and to waive any legal or procedural defects in the Information. Defendant does not dispute the accuracy of the Information.

The U.S. Attorney agrees that, based upon the information known to the U.S. Attorney's Office at this time, no further criminal charges will be brought against Defendant in connection with the conduct set forth in the Information.

    2.    <u>Penalties</u>

Defendant faces the following maximum penalties: incarceration for 20 years; supervised release for three years; a fine of $250,000, or twice the gross gain or loss, whichever is greater; a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Information.

**SINGER-VOL002-000398**

3.   <u>Sentencing Guidelines</u>

The parties agree, based on the following calculations, that Defendant's total "offense level" under the Guidelines is 18:

a)   Defendant's base offense level is 7, because Defendant is pleading guilty to an offense of conviction that has a statutory maximum term of imprisonment of 20 years or more (USSG § 2B1.1(a)(1));

b)   Defendant's offense level is increased by 14, because the gain or loss from the offense of conviction is more than $550,000, but not more than $1,500,000 (USSG § 2B1.1(b)(1)(H)); and

c)   Defendant's offense level is decreased by 3, because Defendant has accepted responsibility for her crime (USSG § 3E1.1).

Defendant understands that the Court is not required to follow this calculation, and that Defendant may not withdraw her guilty plea if Defendant disagrees with how the Court calculates the Guidelines or with the sentence the Court imposes.

Defendant also understands that the government will object to any reduction in her sentence based on acceptance of responsibility if: (a) at sentencing, Defendant does not clearly accept responsibility for the crime she is pleading guilty to committing; or (b) by the time of sentencing, Defendant has committed a new federal or state offense, or has in any way obstructed justice.

If, after signing this Agreement, Defendant's criminal history score or Criminal History Category are reduced, the U.S. Attorney reserves the right to seek an upward departure under the Guidelines.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

4.   <u>Sentence Recommendation</u>

The U.S. Attorney agrees to recommend the following sentence to the Court:

a)   incarceration at the low end of the Guidelines as calculated by the parties in Paragraph 3;

b)   a fine or other financial penalty of $100,000;

c)   12 months of supervised release;

d)   a mandatory special assessment of $100, which Defendant must pay to the Clerk of the Court by the date of sentencing;

2

SINGER-VOL002-000399

e)  restitution in an amount to be determined by the Court at sentencing; and

f)  forfeiture as set forth in Paragraph 6.

In addition, the parties agree jointly to recommend the following special condition of any term of supervised release or probation:

During the period of supervised release or probation, Defendant must, within six months of sentencing or release from custody, whichever is later:

a)  cooperate with the Examination and Collection Divisions of the IRS;

b)  provide to the Examination Division all financial information necessary to determine Defendant's prior tax liabilities;

c)  provide to the Collection Division all financial information necessary to determine Defendant's ability to pay;

d)  file accurate and complete tax returns for those years for which returns were not filed or for which inaccurate returns were filed; and

e)  make a good faith effort to pay all delinquent and additional taxes, interest, and penalties.

5.      <u>Waiver of Appellate Rights and Challenges to Conviction or Sentence</u>

Defendant has the right to challenge her conviction and sentence on "direct appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence.  Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that her conviction or sentence should be overturned.

Defendant understands that she has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

a)  She will not challenge her <u>conviction</u> on direct appeal or in any other proceeding, including in a separate civil lawsuit; and

b)  She will not challenge her <u>sentence,</u> including any court orders related to forfeiture, restitution, fines or supervised release, on direct appeal or in any other proceeding, including in a separate civil lawsuit.

3

SINGER-VOL002-000400

Defendant understands that, by agreeing to the above, she is agreeing that her conviction and sentence will be final when the Court issues a written judgment after the sentencing hearing in this case. That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge her conviction and sentence, regardless of whether she later changes her mind or finds new information that would have led her not to agree to give up these rights in the first place.

Defendant acknowledges that she is agreeing to give up these rights at least partly in exchange for concessions the U.S. Attorney is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later claim that her lawyer rendered ineffective assistance of counsel, or that the prosecutor engaged in misconduct serious enough to entitle Defendant to have her conviction or sentence overturned.

6.      Forfeiture

Defendant hereby waives and releases any claims Defendant may have to any vehicles, currency, or other personal property seized by the United States, or seized by any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution of this case, and consents to the forfeiture of all such assets.

7.      Civil Liability

This Plea Agreement does not affect any civil liability, including any tax liability, Defendant has incurred or may later incur due to her criminal conduct and guilty plea to the charge specified in Paragraph 1 of this Agreement.

8.      Breach of Plea Agreement

Defendant understands that if she breaches any provision of this Agreement, Defendant cannot use that breach as a reason to withdraw her guilty plea. Defendant's breach, however, would give the U.S. Attorney the right to be released from his commitments under this Agreement, and would allow the U.S. Attorney to pursue any charges that were, or are to be, dismissed under this Agreement.

If Defendant breaches any provision of this Agreement, the U.S. Attorney would also have the right to use against Defendant any of Defendant's statements, and any information or materials she provided to the government during investigation or prosecution of her case. The U.S. Attorney would have this right even if the parties had entered any earlier written or oral agreements or understandings about this issue.

Finally, if Defendant breaches any provision of this Agreement, she thereby waives any defenses based on the statute of limitations, constitutional protections against pre-indictment delay,

4

SINGER-VOL002-000401

and the Speedy Trial Act, that Defendant otherwise may have had to any charges based on conduct occurring before the date of this Agreement.

9.   <u>Who is Bound by Plea Agreement</u>

This Agreement is only between Defendant and the U.S. Attorney for the District of Massachusetts. It does not bind the Attorney General of the United States or any other federal, state, or local prosecuting authorities.

10.   <u>Modifications to Plea Agreement</u>

This Agreement can be modified or supplemented only in a written memorandum signed by both parties, or through proceedings in open court.

\*       \*       \*

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below.  Please also sign below as Witness.  Return the original of this letter to Assistant U.S. Attorney Eric S. Rosen.

Sincerely,

ANDREW E. LELLING
United States Attorney

By:

STEPHEN E. FRANK
Chief, Securities and Financial Fraud Unit
JORDI DE LLANO
Deputy Chief, Securities and Financial Fraud Unit

ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
Assistant U.S. Attorneys

5

SINGER-VOL002-000402

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter and discussed it with my attorney. The letter accurately presents my agreement with the United States Attorney's Office for the District of Massachusetts. There are no unwritten agreements between me and the United States Attorney's Office, and no United States government official has made any unwritten promises or representations to me in connection with my guilty plea. I have received no prior offers to resolve this case.

I understand the crime I am pleading guilty to, and the maximum penalties for that crime. I have discussed the Sentencing Guidelines with my lawyer and I understand the sentencing ranges that may apply.

I am satisfied with the legal representation my lawyer has given me and we have had enough time to meet and discuss my case. We have discussed the charge against me, possible defenses I might have, the terms of this Agreement and whether I should go to trial.

I am entering into this Agreement freely and voluntarily and because I am in fact guilty of the offense. I believe this Agreement is in my best interest.

_____
Davina Isackson
Defendant

Date: _____4|7|19_____

I certify that Davina Isackson has read this Agreement and that we have discussed what it means. I believe Davina Isackson understands the Agreement and is entering into it freely, voluntarily, and knowingly. I also certify that the U.S. Attorney has not extended any other offers regarding a change of plea in this case.

_____
David K. Willingham, Esq.
Attorney for Defendant

Date: _____4|8|19_____

6



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

April 3, 2019

David K. Willingham, Esq.
Boies Schiller Flexner LLP
725 South Figueroa Street, 31st Floor
Los Angeles, California 90017

      Re:    <u>United States v. Davina Isackson</u>
                Cooperation Agreement

Dear Mr. Willingham:

This letter sets forth the understanding between the United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Davina Isackson ("Defendant"), concerning Defendant's cooperation with the U.S. Attorney in the above-referenced case. This Cooperation Agreement supplements, but does not supersede, the Plea Agreement between the parties dated April 3, 2019 ("Plea Agreement"). Defendant and the U.S. Attorney further understand and agree that the original of this Cooperation Agreement shall be maintained by the U.S. Attorney, but may be later disclosed pursuant to the U.S. Attorney's discovery obligations, or submitted to the District Court under seal, with notice to Defendant. In addition, Defendant and the U.S. Attorney understand and agree that the U.S. Attorney will submit this Cooperation Agreement to the U.S. Probation Office for its use in preparing the Presentence Report. Nothing in this Cooperation Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

The Cooperation Agreement is as follows:

1.    <u>Terms of Cooperation</u>

Defendant agrees to cooperate fully with law enforcement agents and government attorneys. Defendant must provide complete and truthful information to all law enforcement personnel. If Defendant's testimony is requested, Defendant must testify truthfully and completely before any grand jury, and at any hearing and trial. Defendant must answer all questions posed by any law enforcement agents and government attorneys and must not withhold any information.

<small>rev. 01/17/17</small>

SINGER-VOL002-000393

Defendant must not attempt to protect any person or entity through false information or omission, or to implicate falsely any person or entity. Upon request, Defendant must furnish all documents, objects and other evidence in Defendant's possession, custody or control that are relevant to the government's inquiries.

Defendant understands that she has a right to have counsel present when communicating with representatives of the government about the criminal conduct with which Defendant has been charged. To facilitate Defendant's cooperation, Defendant hereby knowingly and voluntarily waives this right with respect to all debriefings by law enforcement agents and government attorneys and all appearances to testify. Defendant or Defendant's counsel may revoke this waiver with a specific request at any time without otherwise affecting the terms or enforceability of this Cooperation Agreement.

To ensure that the Court has all relevant sentencing information, Defendant waives any rights to prompt sentencing and will join in any requests by the U.S. Attorney that sentencing be postponed until Defendant's cooperation is complete. Defendant understands that the date of Defendant's sentencing is within the sole discretion of the Court and that this Cooperation Agreement may require Defendant's cooperation to continue even after Defendant has been sentenced. Defendant's failure to continue to cooperate pursuant to the terms of this Cooperation Agreement after sentence is imposed shall constitute a breach of this Cooperation Agreement by Defendant.

2.      Substantial Assistance Motion

Should Defendant provide substantial assistance in the investigation or prosecution of another person who has committed a criminal offense, the U.S. Attorney agrees that, at or before sentencing, the U.S. Attorney will file a motion under USSG § 5K1.1 to recommend that the Court impose a sentence below the advisory Guidelines sentencing range.

The determination whether Defendant has provided substantial assistance rests solely in the discretion of the U.S. Attorney and is not subject to appeal or review. The U.S. Attorney will make this determination based on the truthfulness and value of Defendant's assistance, regardless of the outcome or result of any proceeding or trial. The U.S. Attorney reserves the right to decline to file a motion pursuant to USSG § 5K1.1 if Defendant violates any condition of pretrial release, violates any of the requirements of honesty and candor detailed in Paragraph 1 above, or engages in any criminal conduct after the date Defendant signs this Cooperation Agreement and/or the Plea Agreement. Defendant may not withdraw her guilty plea if the U.S. Attorney determines that Defendant has not rendered substantial assistance or otherwise declines to file a motion pursuant to USSG § 5K1.1 for any of the reasons listed above, or if the Court refuses to grant the U.S. Attorney's motion for a downward departure.

3.      Sentence Recommendation with Substantial Assistance

If Defendant provides substantial assistance, subject to all of the provisions of Paragraphs

2

1 and 2 above, the U.S. Attorney will advise the Court of the full nature, extent, and value of the assistance provided by Defendant. In such an event, the U.S. Attorney reserves the right to recommend a particular sentence or sentencing range, or to make no recommendation at Defendant's sentencing, subject to the requirements of Paragraph 2 above. In no case will the U.S. Attorney's recommendation exceed that set forth in Paragraph 4 of the Plea Agreement between the parties.

Any sentencing recommendation the U.S. Attorney may make based upon Defendant's substantial assistance is not binding upon the Court. Rather, the sentence to be imposed is within the Court's sole discretion. Should the Court decline to follow the U.S. Attorney's sentencing recommendation (if any), the U.S. Attorney reserves the right to defend the Court's sentence in any direct appeal or future challenge (collateral or otherwise).

4.      Letter Immunity

In return for Defendant's full and truthful cooperation, the U.S. Attorney agrees not to use any information provided by Defendant pursuant to this Cooperation Agreement or pursuant to the proffer letter dated April 2, 2019 (or any information directly or indirectly derived therefrom) against Defendant in any criminal case except in a prosecution: (1) for perjury or obstruction of justice, or for making a false statement after the date of this Cooperation Agreement or the Plea Agreement; or (2) for an act of physical violence against the person of another, or conspiracy to commit any such act of violence. The U.S. Attorney reserves the right to respond fully and accurately to all requests for information by the Court and U.S. Probation Office in this case. All such disclosures, however, shall be made subject to the constraints identified in USSG § 1B1.8(a) and its commentary on the use of this information by the Court and U.S. Probation Office. Regardless of the provisions of USSG § 1B1.8(b)(5) and its commentary, the U.S. Attorney agrees to take the position at sentencing that information provided by Defendant pursuant to this Cooperation Agreement and the Plea Agreement should not be used as a basis for the Court to refuse to depart downward.

5.      Breach of Cooperation Agreement

If the U.S. Attorney determines that Defendant has breached this Cooperation Agreement by making any false, incomplete or misleading statement, or by providing any false, incomplete or misleading information to any law enforcement personnel, grand jury or court, the U.S. Attorney may terminate this Cooperation Agreement and/or the Plea Agreement as set forth in Paragraph 8 of the Plea Agreement; may pursue any and all of the remedies for breach set forth in Paragraph 8 of the Plea Agreement; and may prosecute Defendant for any and all offenses that could be charged against Defendant in the District of Massachusetts, including, but not limited to, false statements and perjury.

3

SINGER-VOL002-000395

6.    Complete Cooperation Agreement

This letter contains the complete supplemental agreement between the parties relating to Defendant's cooperation in this matter. No other promises, representations or agreements have been made other than those set forth in this Cooperation Agreement, the proffer letter dated April 2, 2019, which is superseded by this Cooperation Agreement as to any statements made after the date of this Cooperation Agreement, and the Plea Agreement. This Cooperation Agreement can be modified or supplemented only in a written document signed by the parties or on the record in court.

If this letter accurately reflects the cooperation agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney Eric S. Rosen.

Sincerely,

ANDREW E. LELLING
United States Attorney

By:

STEPHEN E. FRANK
Chief, Securities and Financial Fraud Unit
JORDI DE LLANO
Deputy Chief, Securities and Financial Fraud Unit

ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
Assistant U.S. Attorneys

4

## ACKNOWLEDGMENT OF COOPERATION AGREEMENT

I have read this Cooperation Agreement in its entirety and discussed it with my attorney. I hereby acknowledge that it fully sets forth my cooperation agreement with the United States Attorney's Office for the District of Massachusetts. I further state that no additional promises or representations have been made to me by any official of the United States in connection with this matter other than those set forth in the Plea Agreement dated April 3, 2019 and the proffer letter dated April 2, 2019. I understand the crime to which I have agreed to plead guilty, the maximum penalties for that offense, and the Sentencing Guideline penalties potentially applicable to it. I am satisfied with the legal representation provided to me by my attorney. We have had sufficient time to meet and discuss my case. We have discussed the charge against me, possible defenses I might have, the terms of this Cooperation Agreement (and the April 3, 2019 Plea Agreement), and whether I should go to trial. I am entering into this Cooperation Agreement freely, voluntarily, and knowingly.

Davina Isackson
Defendant

Date: 4|7|19

I certify that Davina Isackson has read this Cooperation Agreement, and that we have discussed both its meaning and its relationship to the Plea Agreement dated April 3, 2019. I believe she understands the Cooperation Agreement and is entering into the Cooperation Agreement freely, voluntarily, and knowingly.

David K. Willingham, Esq.
Attorney for Defendant

Date: 4|9|1

5

SINGER-VOL002-000397

# LAURA JANKE



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

Main Reception: (617) 748-3100

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

April 11, 2019

Stephen Huggard, Esq.
Huggard Law LLC
470 Atlantic Avenue, 4th Floor
Boston, Massachusetts 02210

      Re:    <u>United States v. Laura Janke</u>

Dear Mr. Huggard:

The United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Laura Janke ("Defendant"), agree as follows:

    1.    <u>Change of Plea</u>

No later than May 30, 2019, Defendant will plead guilty to the one count in the Indictment charging her with conspiracy to commit racketeering, in violation of Title 18, United States Code, Section 1962(d). Defendant admits that she committed the crime specified in that count and is in fact guilty of that crime. Defendant also agrees to waive venue, to waive any applicable statute of limitations, and to waive any legal or procedural defects in the Indictment. Defendant does not dispute the accuracy of the Indictment.

The U.S. Attorney agrees that, based upon the information known to the U.S. Attorney's Office at this time, no further criminal charges will be brought against Defendant in connection with the conduct set forth in the Indictment.

    2.    <u>Penalties</u>

Defendant faces the following maximum penalties: incarceration for 20 years; supervised release for three years; a fine of $250,000, or twice the gross gain or loss, whichever is greater; a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Indictment.

3.    Sentencing Guidelines

The parties agree, based on the following calculations, that Defendant's total "offense level" under the Guidelines is 18:

  a)  Defendant's base offense level is 7, because Defendant is pleading guilty to an offense of conviction with statutory maximum term of imprisonment of 20 years or more (USSG §§ 2E1.1(a)(2) & 2B1.1(a)(1));

  b)  Defendant's offense level is increased by 12, because the gain or loss from the offense of conviction is more than $250,000, but not more than $550,000 (USSG § 2B1.1(b)(1)(G));

  c)  Defendant's offense level is increased by 2, because Defendant abused a position of trust (USSG § 3B1.3); and

  d)  Defendant's offense level is decreased by 3, because Defendant has accepted responsibility for her crime (USSG § 3E1.1).

Defendant understands that the Court is not required to follow this calculation, and that Defendant may not withdraw her guilty plea if Defendant disagrees with how the Court calculates the Guidelines or with the sentence the Court imposes.

Defendant also understands that the government will object to any reduction in her sentence based on acceptance of responsibility if: (a) at sentencing, Defendant does not clearly accept responsibility for the crime she is pleading guilty to committing; or (b) by the time of sentencing, Defendant has committed a new federal or state offense, or has in any way obstructed justice.

If, after signing this Agreement, Defendant's criminal history score or Criminal History Category are reduced, the U.S. Attorney reserves the right to seek an upward departure under the Guidelines.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

4.    Sentence Recommendation

The U.S. Attorney agrees to recommend the following sentence to the Court:

  a)  incarceration at the low end of the Guidelines as calculated by the parties in Paragraph 3;

  b)  a fine or other financial penalty within the Sentencing Guidelines range;

  c)  12 months of supervised release;

2

    d)  a mandatory special assessment of $100, which Defendant must pay to the Clerk of the Court by the date of sentencing;

    e)  restitution in an amount to be determined by the Court at sentencing; and

    f)  forfeiture as set forth in Paragraph 6.

In addition, the parties agree jointly to recommend the following special condition of any term of supervised release or probation:

During the period of supervised release or probation, Defendant must, within six months of sentencing or release from custody, whichever is later:

    a)  cooperate with the Examination and Collection Divisions of the IRS;

    b)  provide to the Examination Division all financial information necessary to determine Defendant's prior tax liabilities;

    c)  provide to the Collection Division all financial information necessary to determine Defendant's ability to pay;

    d)  file accurate and complete tax returns for those years for which returns were not filed or for which inaccurate returns were filed; and

    e)  make a good faith effort to pay all delinquent and additional taxes, interest, and penalties.

5.    <u>Waiver of Appellate Rights and Challenges to Conviction or Sentence</u>

Defendant has the right to challenge her conviction and sentence on "direct appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence. Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that her conviction or sentence should be overturned.

Defendant understands that she has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

    a)  She will not challenge her <u>conviction</u> on direct appeal or in any other proceeding, including in a separate civil lawsuit; and

SINGER-VOL002-000411

b) She will not challenge her <u>sentence,</u> including any court orders related to forfeiture, restitution, fines or supervised release, on direct appeal or in any other proceeding, including in a separate civil lawsuit.

Defendant understands that, by agreeing to the above, she is agreeing that her conviction and sentence will be final when the Court issues a written judgment after the sentencing hearing in this case.  <u>That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge her conviction and sentence, regardless of whether she later changes her mind or finds new information that would have led her not to agree to give up these rights in the first place.</u>

Defendant acknowledges that she is agreeing to give up these rights at least partly in exchange for concessions the U.S. Attorney is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later claim that her lawyer rendered ineffective assistance of counsel, or that the prosecutor engaged in misconduct serious enough to entitle Defendant to have her conviction or sentence overturned.

6.     Forfeiture

Defendant understands that the Court will, upon acceptance of Defendant's guilty plea, enter an order of forfeiture as part of Defendant's sentence, and that the order of forfeiture may include assets directly traceable to Defendant's offense, assets used to facilitate Defendant's offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

The assets to be forfeited specifically include, without limitation, the following:

a.     $134,213.90 in United States currency, to be entered in the form of an Order of Forfeiture (Money Judgment).

Defendant admits that $134,213.90 is subject to forfeiture on the grounds that it is equal to the amount of proceeds the defendant derived from the offense.

Defendant acknowledges and agrees that the amount of the forfeiture money judgment represents proceeds the Defendant obtained (directly or indirectly), and/or facilitating property and/or property involved in, the crimes to which Defendant is pleading guilty and that, due at least in part to the acts or omissions of Defendant, the proceeds or property have been transferred to, or deposited with, a third party, spent, cannot be located upon exercise of due diligence, placed beyond the jurisdiction of the Court, substantially diminished in value, or commingled with other property which cannot be divided without difficulty.  Accordingly, Defendant agrees that the United States is entitled to forfeit as "substitute assets" any other assets of Defendant up to the value of the now missing directly forfeitable assets.

4

SINGER-VOL002-000412

Defendant agrees to consent to the entry of an order of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant understands and agrees that forfeiture shall not satisfy or affect any fine, lien, penalty, restitution, cost of imprisonment, tax liability or any other debt owed to the United States.

If the U.S. Attorney requests, Defendant shall deliver to the U.S. Attorney within 30 days after signing this Plea Agreement a sworn financial statement disclosing all assets in which Defendant currently has any interest and all assets over which Defendant has exercised control, or has had any legal or beneficial interest. Defendant further agrees to be deposed with respect to Defendant's assets at the request of the U.S. Attorney. Defendant agrees that the United States Department of Probation may share any financial information about the Defendant with the United States Attorney's Office.

Defendant also agrees to waive all constitutional, legal, and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement.

Defendant hereby waives and releases any claims Defendant may have to any vehicles, currency, or other personal property seized by the United States, or seized by any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution of this case, and consents to the forfeiture of all such assets.

### 7.   Civil Liability

This Plea Agreement does not affect any civil liability, including any tax liability, Defendant has incurred or may later incur due to her criminal conduct and guilty plea to the charge specified in Paragraph 1 of this Agreement.

### 8.   Breach of Plea Agreement

Defendant understands that if she breaches any provision of this Agreement, Defendant cannot use that breach as a reason to withdraw her guilty plea. Defendant's breach, however, would give the U.S. Attorney the right to be released from his commitments under this Agreement, and would allow the U.S. Attorney to pursue any charges that were, or are to be, dismissed under this Agreement.

If Defendant breaches any provision of this Agreement, the U.S. Attorney would also have the right to use against Defendant any of Defendant's statements, and any information or materials she provided to the government during investigation or prosecution of her case. The U.S. Attorney would have this right even if the parties had entered any earlier written or oral agreements or understandings about this issue.

SINGER-VOL002-000413

Finally, if Defendant breaches any provision of this Agreement, she thereby waives any defenses based on the statute of limitations, constitutional protections against pre-indictment delay, and the Speedy Trial Act, that Defendant otherwise may have had to any charges based on conduct occurring before the date of this Agreement.

     9.   <u>Who is Bound by Plea Agreement</u>

This Agreement is only between Defendant and the U.S. Attorney for the District of Massachusetts. It does not bind the Attorney General of the United States or any other federal, state, or local prosecuting authorities.

     10.   <u>Modifications to Plea Agreement</u>

This Agreement can be modified or supplemented only in a written memorandum signed by both parties, or through proceedings in open court.

*     *     *

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney Eric S. Rosen.

Sincerely,

ANDREW E. LELLING
United States Attorney

By:

STEPHEN E. FRANK
Chief, Securities and Financial Fraud Unit
JORDI DE LLANO
Deputy Chief, Securities and Financial Fraud Unit

ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
Assistant U.S. Attorneys

6

SINGER-VOL002-000414

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter and discussed it with my attorney. The letter accurately presents my agreement with the United States Attorney's Office for the District of Massachusetts. There are no unwritten agreements between me and the United States Attorney's Office, and no United States government official has made any unwritten promises or representations to me in connection with my guilty plea. I have received no prior offers to resolve this case.

I understand the crime I am pleading guilty to, and the maximum penalties for that crime. I have discussed the Sentencing Guidelines with my lawyer and I understand the sentencing ranges that may apply.

I am satisfied with the legal representation my lawyer has given me and we have had enough time to meet and discuss my case. We have discussed the charge against me, possible defenses I might have, the terms of this Agreement and whether I should go to trial.

I am entering into this Agreement freely and voluntarily and because I am in fact guilty of the offense. I believe this Agreement is in my best interest.

_____
Laura Janke
Defendant

Date: _4|21|19_____

I certify that Laura Janke has read this Agreement and that we have discussed what it means. I believe Laura Janke understands the Agreement and is entering into it freely, voluntarily, and knowingly. I also certify that the U.S. Attorney has not extended any other offers regarding a change of plea in this case.

_____
Stephen Huggard, Esq.
Attorney for Defendant

Date: _4/20/19_____

7



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*     *John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

April 11, 2019

Stephen Huggard, Esq.
Huggard Law LLC
470 Atlantic Avenue, 4th Floor
Boston, Massachusetts 02210

Re:   United States v. Laura Janke          **UNDER SEAL**
      Cooperation Agreement

Dear Mr. Huggard:

This letter sets forth the understanding between the United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Laura Janke ("Defendant"), concerning Defendant's cooperation with the U.S. Attorney in the above-referenced case. This Cooperation Agreement supplements, but does not supersede, the Plea Agreement between the parties dated April 11, 2019 ("Plea Agreement"). Defendant and the U.S. Attorney further understand and agree that the original of this Cooperation Agreement shall be maintained by the U.S. Attorney, but may be later disclosed pursuant to the U.S. Attorney's discovery obligations, or submitted to the District Court under seal, with notice to Defendant. In addition, Defendant and the U.S. Attorney understand and agree that the U.S. Attorney will submit this Cooperation Agreement to the U.S. Probation Office for its use in preparing the Presentence Report. Nothing in this Cooperation Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

The Cooperation Agreement is as follows:

1.    Terms of Cooperation

Defendant agrees to cooperate fully with law enforcement agents and government attorneys. Defendant must provide complete and truthful information to all law enforcement personnel. If Defendant's testimony is requested, Defendant must testify truthfully and completely before any grand jury, and at any hearing and trial. Defendant must answer all questions posed by any law enforcement agents and government attorneys and must not withhold any information. Defendant must not attempt to protect any person or entity through false information or omission,

rev. 01/17/17

or to implicate falsely any person or entity.  Upon request, Defendant must furnish all documents, objects and other evidence in Defendant's possession, custody or control that are relevant to the government's inquiries.

Defendant understands that she has a right to have counsel present when communicating with representatives of the government about the criminal conduct with which Defendant has been charged.  To facilitate Defendant's cooperation, Defendant hereby knowingly and voluntarily waives this right with respect to all debriefings by law enforcement agents and government attorneys and all appearances to testify.  Defendant or Defendant's counsel may revoke this waiver with a specific request at any time without otherwise affecting the terms or enforceability of this Cooperation Agreement.

To ensure that the Court has all relevant sentencing information, Defendant waives any rights to prompt sentencing and will join in any requests by the U.S. Attorney that sentencing be postponed until Defendant's cooperation is complete.  Defendant understands that the date of Defendant's sentencing is within the sole discretion of the Court and that this Cooperation Agreement may require Defendant's cooperation to continue even after Defendant has been sentenced.  Defendant's failure to continue to cooperate pursuant to the terms of this Cooperation Agreement after sentence is imposed shall constitute a breach of this Cooperation Agreement by Defendant.

2.     Substantial Assistance Motion

Should Defendant provide substantial assistance in the investigation or prosecution of another person who has committed a criminal offense, the U.S. Attorney agrees that, at or before sentencing, the U.S. Attorney will file a motion under USSG § 5K1.1 to recommend that the Court impose a sentence below the advisory Guidelines sentencing range.

The determination whether Defendant has provided substantial assistance rests solely in the discretion of the U.S. Attorney and is not subject to appeal or review.  The U.S. Attorney will make this determination based on the truthfulness and value of Defendant's assistance, regardless of the outcome or result of any proceeding or trial.  The U.S. Attorney reserves the right to decline to file a motion pursuant to USSG § 5K1.1 if Defendant violates any condition of pretrial release, violates any of the requirements of honesty and candor detailed in Paragraph 1 above, or engages in any criminal conduct after the date Defendant signs this Cooperation Agreement and/or the Plea Agreement.  Defendant may not withdraw her guilty plea if the U.S. Attorney determines that Defendant has not rendered substantial assistance or otherwise declines to file a motion pursuant to USSG § 5K1.1 for any of the reasons listed above, or if the Court refuses to grant the U.S. Attorney's motion for a downward departure.

2

SINGER-VOL002-000405

3.   Sentence Recommendation with Substantial Assistance

If Defendant provides substantial assistance, subject to all of the provisions of Paragraphs 1 and 2 above, the U.S. Attorney will advise the Court of the full nature, extent, and value of the assistance provided by Defendant.  In such an event, the U.S. Attorney reserves the right to recommend a particular sentence or sentencing range, or to make no recommendation at Defendant's sentencing, subject to the requirements of Paragraph 2 above.  In no case will the U.S. Attorney's recommendation exceed that set forth in Paragraph 4 of the Plea Agreement between the parties.

Any sentencing recommendation the U.S. Attorney may make based upon Defendant's substantial assistance is not binding upon the Court.  Rather, the sentence to be imposed is within the Court's sole discretion.  Should the Court decline to follow the U.S. Attorney's sentencing recommendation (if any), the U.S. Attorney reserves the right to defend the Court's sentence in any direct appeal or future challenge (collateral or otherwise).

4.   Letter Immunity

In return for Defendant's full and truthful cooperation, the U.S. Attorney agrees not to use any information provided by Defendant pursuant to this Cooperation Agreement or pursuant to the proffer letter dated March 25, 2019 (or any information directly or indirectly derived therefrom) against Defendant in any criminal case except in a prosecution: (1) for perjury or obstruction of justice, or for making a false statement after the date of this Cooperation Agreement or the Plea Agreement; or (2) for an act of physical violence against the person of another, or conspiracy to commit any such act of violence.  The U.S. Attorney reserves the right to respond fully and accurately to all requests for information by the Court and U.S. Probation Office in this case.  All such disclosures, however, shall be made subject to the constraints identified in USSG § 1B1.8(a) and its commentary on the use of this information by the Court and U.S. Probation Office. Regardless of the provisions of USSG § 1B1.8(b)(5) and its commentary, the U.S. Attorney agrees to take the position at sentencing that information provided by Defendant pursuant to this Cooperation Agreement and the Plea Agreement should not be used as a basis for the Court to refuse to depart downward.

5.   Breach of Cooperation Agreement

If the U.S. Attorney determines that Defendant has breached this Cooperation Agreement by making any false, incomplete or misleading statement, or by providing any false, incomplete or misleading information to any law enforcement personnel, grand jury or court, the U.S. Attorney may terminate this Cooperation Agreement and/or the Plea Agreement as set forth in Paragraph 8 of the Plea Agreement; may pursue any and all of the remedies for breach set forth in Paragraph 8 of the Plea Agreement; and may prosecute Defendant for any and all offenses that could be charged against Defendant in the District of Massachusetts, including, but not limited to, false statements and perjury.

3

6.     Complete Cooperation Agreement

This letter contains the complete supplemental agreement between the parties relating to Defendant's cooperation in this matter.  No other promises, representations or agreements have been made other than those set forth in this Cooperation Agreement, the proffer letter dated March 25, 2019, which is superseded by this Cooperation Agreement as to any statements made after the date of this Cooperation Agreement, and the Plea Agreement.  This Cooperation Agreement can be modified or supplemented only in a written document signed by the parties or on the record in court.

If this letter accurately reflects the cooperation agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Agreement below.  Please also sign below as Witness.  Return the original of this letter to Assistant U.S. Attorney Eric S. Rosen.

Sincerely,

ANDREW E. LELLING
United States Attorney

By:

STEPHEN E. FRANK
Chief, Securities and Financial Fraud Unit
JORDI DE LLANO
Deputy Chief, Securities and Financial Fraud Unit

ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
Assistant U.S. Attorneys

4

## ACKNOWLEDGMENT OF COOPERATION AGREEMENT

I have read this Cooperation Agreement in its entirety and discussed it with my attorney. I hereby acknowledge that it fully sets forth my cooperation agreement with the United States Attorney's Office for the District of Massachusetts. I further state that no additional promises or representations have been made to me by any official of the United States in connection with this matter other than those set forth in the Plea Agreement dated April 11, 2019 and the proffer letter dated March 25, 2019. I understand the crime to which I have agreed to plead guilty, the maximum penalties for that offense, and the Sentencing Guideline penalties potentially applicable to it. I am satisfied with the legal representation provided to me by my attorney. We have had sufficient time to meet and discuss my case. We have discussed the charge against me, possible defenses I might have, the terms of this Cooperation Agreement (and the April 11, 2019 Plea Agreement), and whether I should go to trial. I am entering into this Cooperation Agreement freely, voluntarily, and knowingly.

Laura Janke
Defendant

Date: 4/21/19

I certify that Laura Janke has read this Cooperation Agreement, and that we have discussed both its meaning and its relationship to the Plea Agreement dated April 11, 2019. I believe she understands the Cooperation Agreement and is entering into the Cooperation Agreement freely, voluntarily, and knowingly.

Stephen Huggard, Esq.
Attorney for Defendant

Date:

5

# MARK RIDDELL



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

February 18, 2019

Ben Stechschulte, Esq.
Stechschulte Nell
1105 W. Swann Avenue
Tampa, FL 33606

  Re: United States v. Mark Riddell

Dear Mr. Stechschulte:

  The United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Mark Riddell ("Defendant"), agree as follows:

  1.  Change of Plea

  At the earliest practicable date, Defendant shall waive indictment and plead guilty to an Information substantially in the form attached to this Plea Agreement charging him with one count of conspiracy to commit mail fraud and honest services mail fraud, in violation of Title 18, United States Code, Section 1349, and one count of conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956. Defendant expressly and unequivocally admits that he committed the crimes charged in Counts One and Two of the Information, did so knowingly, willfully, and intentionally, and is in fact guilty of those offenses. Defendant also agrees to waive venue, to waive any applicable statute of limitations, and to waive any legal or procedural defects in the Information.

  2.  Penalties

  Defendant faces the following maximum penalties on Counts One and Two of the Information: incarceration for twenty years; supervised release for three years; a fine of $250,000, or twice the gross gain/loss, whichever is greater; a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Information.

  Defendant also recognizes that pleading guilty may have consequences with respect to Defendant's immigration status if Defendant is not a citizen of the United States. Under federal

SINGER-VOL002-000422

law, a broad range of crimes are removable offenses, including the offenses to which Defendant is pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and Defendant understands that no one, including defense counsel and the District Court, can predict to a certainty the effect of this conviction on Defendant's immigration status. Defendant nevertheless affirms his decision to plead guilty regardless of any immigration consequences that this plea may entail, even if the consequence is Defendant's automatic removal from the United States.

3.   Sentencing Guidelines

The sentence to be imposed upon Defendant is within the discretion of the District Court ("Court"), subject to the statutory maximum penalties set forth above and the provisions of the Sentencing Reform Act, and the advisory United States Sentencing Guidelines ("USSG" or "Guidelines"). While the Court may impose a sentence up to and including the statutory maximum term of imprisonment and statutory maximum fine, it must consult and take into account the USSG and the other factors set forth in 18 U.S.C. § 3553(a) in imposing a sentence.

The parties will take the position that Defendant's total offense level under the USSG (prior to any adjustment for acceptance of responsibility) is calculated as follows:

a) in accordance with USSG § 2B1.1(a)(1), Defendant's base offense level is seven, because Defendant is pleading guilty to an offense of conviction that has a statutory maximum term of imprisonment of 20 years or more;

b) in accordance with USSG § 2B1.1(b)(1)(H), Defendant's offense level is increased by 14, because the intended gain or loss from the offenses of conviction and related conduct is more than $550,000 but not more than $1,500,000; and,

c) in accordance with USSG § 3B1.3, Defendant's offense level is increased by two, because Defendant was convicted under 18 U.S.C. § 1956.

The U.S. Attorney reserves the right to oppose Defendant's arguments for a departure from, or a sentence outside, the USSG under the factors set forth in 18 U.S.C. § 3553(a).

Based on Defendant's prompt acceptance of personal responsibility for the offenses of conviction in this case, and information known to the U.S. Attorney at this time, the U.S. Attorney agrees to recommend that the Court reduce by three levels Defendant's adjusted offense level under USSG § 3E1.1.

The U.S. Attorney reserves the right not to recommend a reduction under USSG § 3E1.1 if, at any time between Defendant's execution of this Plea Agreement and sentencing, Defendant:

a) Fails to admit a complete factual basis for the plea;

2

b)  Fails to truthfully admit Defendant's conduct in the offenses of conviction;

c)  Falsely denies, or frivolously contests, relevant conduct for which Defendant is accountable under USSG § 1B1.3;

d)  Fails to provide truthful information about Defendant's financial status;

e)  Gives false or misleading testimony in any proceeding relating to the criminal conduct charged in this case and any relevant conduct for which Defendant is accountable under USSG § 1B1.3;

f)  Engages in acts that form a basis for finding that Defendant has obstructed or impeded the administration of justice under USSG § 3C1.1;

g)  Intentionally fails to appear in Court or violates any condition of release;

h)  Commits a crime that is chargeable under the Sentencing Guidelines;

i)  Transfers any asset protected under any provision of this Plea Agreement; or

j)  Attempts to withdraw Defendant's guilty plea.

Defendant understands and acknowledges that Defendant may not withdraw his plea of guilty if, for any of the reasons listed above, the U.S. Attorney does not recommend that Defendant receive a reduction in offense level for acceptance of responsibility.  Defendant also understands and acknowledges that, in addition to declining to recommend an acceptance-of-responsibility adjustment, the U.S. Attorney may seek an upward adjustment pursuant to USSG § 3C1.1 if Defendant obstructs justice after the date of this Plea Agreement.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

3

4.    Sentence Recommendation

The U.S. Attorney agrees to recommend the following sentence before the Court:

    a)   incarceration at the low end of the Guidelines sentencing range as calculated by the parties in Paragraph 3;

    b)   a fine at the low end of the Guidelines sentencing range as calculated by the parties in Paragraph 3, unless the Court finds that Defendant is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay a fine;

    c)   36 months of supervised release;

    d)   a mandatory special assessment of $200, which Defendant must pay to the Clerk of the Court on or before the date of sentencing (unless Defendant establishes to the Court's satisfaction that Defendant is unable to do so); and,

    e)   forfeiture as set forth in Paragraph 9.

Defendant agrees to provide the U.S. Attorney expert reports, motions, memoranda of law and documentation of any kind on which Defendant intends to rely at sentencing not later than 21 days before sentencing.  Any basis for sentencing as to which Defendant has not provided the U.S. Attorney all such items at least 21 days before sentencing shall be deemed waived.

5.    Protection of Assets for Payment of Restitution, Forfeiture and Fine

Defendant agrees not to transfer, or authorize the transfer of, any asset that has been restrained by Order of the Court in this case or any asset, whether or not restrained, that Defendant has agreed to forfeit pursuant to this Plea Agreement.

Defendant agrees not to transfer, or authorize the transfer of any other asset in which Defendant has an interest without prior express written consent of the U.S. Attorney, except for:

a)   Assets subject to superior, secured interests of innocent third parties, in which Defendant has an equity interest of less than $10,000;

b)   Ordinary living expenses necessary to house, clothe, transport, and feed Defendant and those to whom Defendant owes a legal duty of support, so long as such assets do not exceed $5,000 per month; and

c)   Attorney's fees incurred in connection with this criminal case.

This prohibition shall be effective as of the date of Defendant's execution of this Plea Agreement and continue until the fine, forfeiture, and restitution ordered by the Court at sentencing

4

are satisfied in full.

If the U.S. Attorney requests, Defendant further agrees to complete truthfully and accurately a sworn financial statement and to deliver that statement to the U.S. Attorney within 30 days of signing this Plea Agreement.

6.  Waiver of Rights to Appeal and to Bring Future Challenge

a)  Defendant has conferred with his attorneys and understands that he has the right to challenge both his conviction and his sentence (including any orders relating to the terms and conditions of supervised release, fines, forfeiture, and restitution) on direct appeal.   Defendant also understands that, in some circumstances, Defendant may be able to argue in a future proceeding (collateral or otherwise), such as pursuant to a motion under 28 U.S.C. § 2255, 28 U.S.C. § 2241, or 18 U.S.C. § 3582(c), that Defendant's conviction should be set aside or Defendant's sentence (including any orders relating to the terms and conditions of supervised release, fines, forfeiture, and restitution) set aside or reduced.

b)  Defendant waives any right to challenge Defendant's conviction on direct appeal or in a future proceeding (collateral or otherwise).

c)  Defendant agrees not to file a direct appeal or challenge in a future proceeding (collateral or otherwise) any sentence of imprisonment of 41 months or less or any orders relating to the terms and conditions of supervised release, fines, forfeiture, and restitution.   This provision is binding even if the Court's Guidelines analysis is different from that set forth in this Plea Agreement.

d)  The U.S. Attorney likewise agrees that, regardless of the analysis employed by the Court, the U.S. Attorney will not appeal any imprisonment sentence of 33 months or more.

e)  Regardless of the previous sub-paragraphs, Defendant reserves the right to claim that: (i) Defendant's lawyer rendered ineffective assistance of counsel under Strickland v. Washington; or (ii) the prosecutor in this case engaged in misconduct that entitles Defendant to relief from Defendant's conviction or sentence.

7.  Other Post-Sentence Events

a)  If, despite the waiver provision of sub-paragraph 6(c), Defendant appeals or challenges in a future proceeding (collateral or otherwise) Defendant's sentence, the U.S. Attorney reserves the right to argue the correctness of the sentence imposed by the Court (in addition to arguing that any appeal or future challenge (collateral or otherwise) is waived as a result of the waiver in sub-

5

paragraph 6(c)).

b) If, despite the waiver provision of sub-paragraph 6(c), Defendant seeks re-sentencing, Defendant agrees not to seek to be re-sentenced with the benefit of any change to the Criminal History Category that the Court calculated at the time of Defendant's original sentencing, except to the extent that Defendant has been found actually factually innocent of a prior crime.

c) In the event of a re-sentencing following an appeal from or future challenge (collateral or otherwise) to Defendant's sentence, the U.S. Attorney reserves the right to seek a departure from and a sentence outside the USSG if, and to the extent, necessary to reinstate the sentence the U.S. Attorney advocated at Defendant's initial sentencing pursuant to this Plea Agreement.

8.    Court Not Bound by Plea Agreement

The parties' sentencing recommendations and their respective calculations under the USSG are not binding upon the U.S. Probation Office or the Court. Within the maximum sentence Defendant faces under the applicable law, the sentence to be imposed is within the sole discretion of the Court. Defendant's plea will be tendered pursuant to Fed. R. Crim. P. 11(c)(1)(B). Defendant may not withdraw his plea of guilty regardless of what sentence is imposed, or because the U.S. Probation Office or the Court declines to follow the parties' USSG calculations or recommendations. Should the Court decline to follow the U.S. Attorney's USSG calculations or recommendations, the U.S. Attorney reserves the right to defend the Court's calculations and sentence in any direct appeal or future challenge (collateral or otherwise).

9.    Forfeiture

Defendant understands that the Court will, upon acceptance of Defendant's guilty plea, enter an order of forfeiture as part of Defendant's sentence, and that the order of forfeiture, which may be satisfied at any time prior to sentencing, may include assets directly traceable to Defendant's offenses, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

The assets to be forfeited specifically include the following:

a.    $239,449.42 in United States currency, to be entered in the form of an Order of Forfeiture (Money Judgment).

Defendant admits that the $239,449.42 in United States currency is subject to forfeiture on the grounds that it is approximately equal to the amount of proceeds the Defendant obtained (directly or indirectly) as a result of the offenses.

Defendant acknowledges and agrees that the amount of the forfeiture money judgment represents proceeds the Defendant obtained (directly or indirectly), and/or facilitating property

6

and/or property involved in, the crimes to which Defendant is pleading guilty and that, due at least in part to the acts or omissions of Defendant, the proceeds or property have been transferred to, or deposited with, a third party, spent, cannot be located upon exercise of due diligence, placed beyond the jurisdiction of the Court, substantially diminished in value, or commingled with other property which cannot be divided without difficulty. Accordingly, Defendant agrees that the United States is entitled to forfeit as "substitute assets" any other assets of Defendant up to the value of the now missing directly forfeitable assets.

Defendant agrees to consent to the entry of an order of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant understands and agrees that forfeiture shall not satisfy or affect any fine, lien, penalty, restitution, cost of imprisonment, tax liability or any other debt owed to the United States.

If the U.S. Attorney requests, Defendant shall deliver to the U.S. Attorney within 30 days after signing this Plea Agreement a sworn financial statement disclosing all assets in which Defendant currently has any interest and all assets over which Defendant has exercised control, or has had any legal or beneficial interest. Defendant further agrees to be deposed with respect to Defendant's assets at the request of the U.S. Attorney. Defendant agrees that the United States Department of Probation may share any financial information about the Defendant with the United States Attorney's Office.

Defendant also agrees to waive all constitutional, legal, and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement.

Defendant hereby waives and releases any claims Defendant may have to any vehicles, currency, or other personal property seized by the United States, or seized by any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution of this case, and consents to the forfeiture of all such assets.

10.   Information for Presentence Report

Defendant agrees to provide all information requested by the U.S. Probation Office concerning Defendant's assets.

7

11.   Civil Liability

By entering into this Plea Agreement, the U.S. Attorney does not compromise any civil liability, including but not limited to any tax liability, Defendant may have incurred or may incur as a result of Defendant's conduct and plea of guilty to the charges specified in Paragraph 1 of this Plea Agreement.

12.   Rejection of Plea by Court

Should Defendant's guilty plea not be accepted by the Court for whatever reason, or later be withdrawn on Defendant's motion, this Plea Agreement shall be null and void at the option of the U.S. Attorney.

13.   Breach of Plea Agreement

If the U.S. Attorney determines that Defendant has failed to comply with any material provision of this Plea Agreement, has violated any condition of Defendant's pretrial release, or has committed any crime following Defendant's execution of this Plea Agreement, the U.S. Attorney may, at his sole option, be released from his commitments under this Plea Agreement in their entirety by notifying Defendant, through counsel or otherwise, in writing. The U.S. Attorney may also pursue all remedies available to him under the law, regardless whether he elects to be released from his commitments under this Plea Agreement. Further, the U.S. Attorney may pursue any and all charges that have been, or are to be, dismissed pursuant to this Plea Agreement. Defendant recognizes that his breach of any obligation under this Plea Agreement shall not give rise to grounds for withdrawal of Defendant's guilty plea, but will give the U.S. Attorney the right to use against Defendant before any grand jury, at any trial or hearing, or for sentencing purposes, any statements made by Defendant and any information, materials, documents or objects provided by Defendant to the government, without any limitation, regardless of any prior agreements or understandings, written or oral, to the contrary. In this regard, Defendant hereby waives any defense to any charges that Defendant might otherwise have based upon any statute of limitations, the constitutional protection against pre-indictment delay, or the Speedy Trial Act.

14.   Who is Bound by Plea Agreement

This Plea Agreement is limited to the U.S. Attorney for the District of Massachusetts, and cannot and does not bind the Attorney General of the United States or any other federal, state or local prosecutive authorities.

15.   Modifications to Plea Agreement

This Plea Agreement can be modified or supplemented only in a written memorandum signed by the parties or on the record in court.

8

SINGER-VOL002-000429

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below.  Please also sign below as Witness.  Return the original of this letter to Assistant U.S. Attorney Eric S. Rosen.

Very truly yours,

ANDREW E. LELLING
United States Attorney

By: 

STEPHEN E. FRANK
Chief, Securities and Financial Fraud Unit
JORDI DE LLANO
Deputy Chief, Securities and Financial Fraud Unit

ERIC S. ROSEN
Assistant U.S. Attorney

9

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter in its entirety and discussed it with my attorney. I hereby acknowledge that (a) it accurately sets forth my plea agreement with the United States Attorney's Office for the District of Massachusetts; (b) there are no unwritten agreements between me and the United States Attorney's Office; and (c) no official of the United States has made any unwritten promises or representations to me, in connection with my change of plea. In addition, I have received no prior offers to resolve this case. I understand the crimes to which I have agreed to plead guilty, the maximum penalties for those offenses, and the Sentencing Guideline penalties potentially applicable to them. I am satisfied with the legal representation provided to me by my attorney. We have had sufficient time to meet and discuss my case. We have discussed the charges against me, possible defenses I might have, the terms of this Plea Agreement and whether I should go to trial. I am entering into this Plea Agreement freely, voluntarily, and knowingly because I am guilty of the offenses to which I am pleading guilty, and I believe this Plea Agreement is in my best interest.

Mark Riddell
Defendant

Date: 2/22/19

I certify that Mark Riddell has read this Plea Agreement and that I have discussed its meaning with him. I believe he understands the Plea Agreement and is entering into the Plea Agreement freely, voluntarily, and knowingly. I also certify that the U.S. Attorney has not extended any other offers regarding a change of plea in this case.

Ben Stechschulte, Esq.
Attorney for Defendant

Date: 2/22/2019

10

SINGER-VOL002-000431



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

February 18, 2019

Ben Stechschulte, Esq.
Stechschulte Nell
1105 W. Swann Avenue
Tampa, FL 33606

    Re:    <u>United States v. Mark Riddell</u>        <u>**UNDER SEAL**</u>
            Cooperation Agreement

Dear Mr. Stechschulte:

    This letter sets forth the understanding between the United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Mark Riddell ("Defendant"), concerning Defendant's cooperation with the U.S. Attorney in the above-referenced case. This Cooperation Agreement supplements, but does not supersede, the Plea Agreement between the parties dated February 18, 2019 ("Plea Agreement"). Defendant and the U.S. Attorney further understand and agree that the original of this Cooperation Agreement shall be maintained by the U.S. Attorney, but may be later disclosed pursuant to the U.S. Attorney's discovery obligations, or submitted to the District Court under seal, with notice to Defendant. In addition, Defendant and the U.S. Attorney understand and agree that the U.S. Attorney will submit this Cooperation Agreement to the U.S. Probation Office for its use in preparing the Presentence Report. Nothing in this Cooperation Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

    The Cooperation Agreement is as follows:

    1.    <u>Terms of Cooperation</u>

    Defendant agrees to cooperate fully with law enforcement agents and government attorneys. Defendant must provide complete and truthful information to all law enforcement personnel. If Defendant's testimony is requested, Defendant must testify truthfully and completely before any grand jury, and at any hearing and trial. Defendant must answer all questions posed by

any law enforcement agents and government attorneys and must not withhold any information. Defendant must not attempt to protect any person or entity through false information or omission, or to implicate falsely any person or entity. Upon request, Defendant must, consistent with Swiss law, furnish all documents, objects and other evidence in Defendant's possession, custody or control that are relevant to the government's inquiries.

Defendant understands that he has a right to have counsel present when communicating with representatives of the government about the criminal conduct with which Defendant has been charged. To facilitate Defendant's cooperation, Defendant hereby knowingly and voluntarily waives this right with respect to all debriefings by law enforcement agents and government attorneys and all appearances to testify. Defendant or Defendant's counsel may revoke this waiver with a specific request at any time without otherwise affecting the terms or enforceability of this Cooperation Agreement.

To ensure that the Court has all relevant sentencing information, Defendant waives any rights to prompt sentencing and will join in any requests by the U.S. Attorney that sentencing be postponed until Defendant's cooperation is complete. Defendant understands that the date of Defendant's sentencing is within the sole discretion of the Court and that this Cooperation Agreement may require Defendant's cooperation to continue even after Defendant has been sentenced. Defendant's failure to continue to cooperate pursuant to the terms of this Cooperation Agreement after sentence is imposed shall constitute a breach of this Cooperation Agreement by Defendant.

2.     Substantial Assistance Motion

Should Defendant provide substantial assistance in the investigation or prosecution of another person who has committed a criminal offense, the U.S. Attorney agrees that, at or before sentencing, the U.S. Attorney will file a motion under USSG § 5K1.1 to recommend that the Court impose a sentence below the advisory Guidelines sentencing range.

The determination whether Defendant has provided substantial assistance rests solely in the discretion of the U.S. Attorney and is not subject to appeal or review. The U.S. Attorney will make this determination based on the truthfulness and value of Defendant's assistance, regardless of the outcome or result of any proceeding or trial. The U.S. Attorney reserves the right to decline to file a motion pursuant to USSG § 5K1.1 if Defendant violates any condition of pretrial release, violates any of the requirements of honesty and candor detailed in Paragraph 1 above, or engages in any criminal conduct after the date Defendant signs this Cooperation Agreement and/or the Plea Agreement. Defendant may not withdraw his guilty plea if the U.S. Attorney determines that Defendant has not rendered substantial assistance or otherwise declines to file a motion pursuant to USSG § 5K1.1 for any of the reasons listed above, or if the Court refuses to grant the U.S. Attorney's motion for a downward departure.

2

3.     Sentence Recommendation with Substantial Assistance

If Defendant provides substantial assistance, subject to all of the provisions of Paragraphs 1 and 2 above, the U.S. Attorney will advise the Court of the full nature, extent, and value of the assistance provided by Defendant.  In such an event, the U.S. Attorney reserves the right to recommend a particular sentence or sentencing range, or to make no recommendation at Defendant's sentencing, subject to the requirements of Paragraph 2 above.  In no case will the U.S. Attorney's recommendation exceed that set forth in Paragraph 4 of the Plea Agreement between the parties.

Any sentencing recommendation the U.S. Attorney may make based upon Defendant's substantial assistance is not binding upon the Court.  Rather, the sentence to be imposed is within the Court's sole discretion.  Should the Court decline to follow the U.S. Attorney's sentencing recommendation (if any), the U.S. Attorney reserves the right to defend the Court's sentence in any direct appeal or future challenge (collateral or otherwise).

4.     Waiver of Rights to Appeal and to Bring Future Challenge Against Sentence

Notwithstanding the provisions of Paragraph 6(c) of Defendant's Plea Agreement, Defendant agrees that, if the Court grants the U.S. Attorney's motion for a downward departure pursuant to USSG § 5K1.1 and does, in fact, depart downward on that basis, Defendant will not file a direct appeal or challenge in a future proceeding (collateral or otherwise) Defendant's sentence (including any orders relating to supervised release, fines, forfeiture, and restitution).  In all other circumstances, Paragraph 6(c) of Defendant's Plea Agreement controls the filing of any direct appeal or challenge in a future proceeding (collateral or otherwise) of Defendant's sentence (including any orders relating to supervised release, fines, forfeiture, and restitution).  This provision is binding even if the Court's Guidelines analysis is different from that set forth in Defendant's Plea Agreement.

If, despite this waiver, Defendant appeals or challenges in a future proceeding (collateral or otherwise) his sentence, the U.S. Attorney reserves the right to argue the correctness of the sentence imposed by the Court (in addition to arguing that any appeal or future challenge is waived as a result of this waiver).

5.     Letter Immunity

In return for Defendant's full and truthful cooperation, the U.S. Attorney agrees not to use any information provided by Defendant pursuant to this Cooperation Agreement or pursuant to the proffer letter dated February 18, 2019 (or any information directly or indirectly derived therefrom) against Defendant in any criminal case except in a prosecution: (1) for perjury or obstruction of justice, or for making a false statement, after the date of this Cooperation Agreement or the Plea Agreement; or (2) for an act of physical violence against the person of another, or conspiracy to commit any such act of violence.  The U.S. Attorney reserves the right to respond fully and accurately to all requests for information by the Court and U.S. Probation Office in this case.  All

3

such disclosures, however, shall be made subject to the constraints identified in USSG § 1B1.8(a) and its commentary on the use of this information by the Court and U.S. Probation Office. Regardless of the provisions of USSG § 1B1.8(b)(5) and its commentary, the U.S. Attorney agrees to take the position at sentencing that information provided by Defendant pursuant to this Cooperation Agreement and the Plea Agreement should not be used as a basis for the Court to refuse to depart downward.

6.   <u>Breach of Cooperation Agreement</u>

If the U.S. Attorney determines that Defendant has breached this Cooperation Agreement by making any false, incomplete or misleading statement, or by providing any false, incomplete or misleading information to any law enforcement personnel, grand jury or court, the U.S. Attorney may terminate this Cooperation Agreement and/or the Plea Agreement as set forth in Paragraph 13 of the Plea Agreement; may pursue any and all of the remedies for breach set forth in Paragraph 13 of the Plea Agreement; and may prosecute Defendant for any and all offenses that could be charged against Defendant in the District of Massachusetts, including, but not limited to, false statements and perjury.

7.   <u>Complete Cooperation Agreement</u>

This letter contains the complete supplemental agreement between the parties relating to Defendant's cooperation in this matter. No other promises, representations or agreements have been made other than those set forth in this Cooperation Agreement, the proffer letter dated February 18, 2019, which is superseded by this Cooperation Agreement as to any statements made after the date of this Cooperation Agreement, and the Plea Agreement. This Cooperation Agreement can be modified or supplemented only in a written document signed by the parties or on the record in court.

4

If this letter accurately reflects the cooperation agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Agreement below.  Please also sign below as Witness.  Return the original of this letter to Assistant U.S. Attorney Eric S. Rosen.

Very truly yours,

ANDREW E. LELLING
United States Attorney

By: _____

STEPHEN E. FRANK
Chief, Securities and Financial Fraud Unit
JORDI DE LLANO
Deputy Chief, Securities and Financial Fraud Unit

_____

ERIC S. ROSEN
Assistant U.S. Attorney

5

## ACKNOWLEDGMENT OF COOPERATION AGREEMENT

I have read this Cooperation Agreement in its entirety and discussed it with my attorneys. I hereby acknowledge that it fully sets forth my cooperation agreement with the United States Attorney's Office for the District of Massachusetts. I further state that no additional promises or representations have been made to me by any official of the United States in connection with this matter other than those set forth in the Plea Agreement dated February 18, 2019, and the proffer letter dated February 18, 2019. I understand the crimes to which I have agreed to plead guilty, the maximum penalties for those offenses, and the Sentencing Guideline penalties potentially applicable to them. I am satisfied with the legal representation provided to me by my attorneys. We have had sufficient time to meet and discuss my case. We have discussed the charges against me, possible defenses I might have, the terms of this Cooperation Agreement (and the February 18, 2019 Plea Agreement), and whether I should go to trial. I am entering into this Cooperation Agreement freely, voluntarily, and knowingly.

Mark Riddell
Defendant
Date: 2/22/19

I certify that Mark Riddell has read this Cooperation Agreement, and that we have discussed both its meaning and its relationship to the Plea Agreement dated May 2, 2019. I believe he understands the Cooperation Agreement and is entering into the Cooperation Agreement freely, voluntarily, and knowingly.

Ben Stechschulte, Esq.
Attorney for Defendant
Date: 2/25/19

6

SINGER-VOL002-000421

# MICHAEL CENTER



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

March 28, 2019

John H. Cunha, Jr., Esq.
Cunha and Holcomb, P.C.
1 State Street, Suite 500
Boston, MA 02109

Re:   United States v. Michael Center

Dear Mr. Cunha:

The United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Michael Center ("Defendant"), agree as follows:

1.   Change of Plea

No later than April 30, 2019, Defendant will waive Indictment and plead guilty to count one of the Information charging him with conspiracy to commit wire fraud and honest services wire fraud, in violation of Title 18, United States Code, Section 1349. Defendant admits that he committed the crime specified in that count and is in fact guilty of that crime. Defendant also agrees to waive venue, to waive any applicable statute of limitations, and to waive any legal or procedural defects in the Information. Defendant does not dispute the accuracy of the Information.

The U.S. Attorney agrees that, based upon the information known to the U.S. Attorney's Office at this time, no further criminal charges will be brought against Defendant in connection with the conduct set forth in the Information.

2.   Penalties

Defendant faces the following maximum penalties: incarceration for 20 years; supervised release for three years; a fine of $250,000, or twice the gross gain or loss, whichever is greater; a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Information.

1

3.   Sentencing Guidelines

The parties agree, based on the following calculations, that Defendant's total "offense level" under the Guidelines is 14:

    a) Defendant's base offense level is 7, because Defendant is pleading guilty to an offense of conviction that has a statutory maximum term of imprisonment of 20 years or more (USSG § 2B1.1(a)(1));

    b) Defendant's offense level is increased by 8, because the gain or loss from the offense of conviction is more than $95,000 but not more than $150,000 (USSG § 2B1.1(b)(1)(E));

    c) Defendant's offense level is increased by 2, because Defendant abused a position of trust (USSG § 3B1.3));

    d) Defendant's offense level is decreased by 3, because Defendant has accepted responsibility for his crime (USSG §3E1.1).

Defendant understands that the Court is not required to follow this calculation, and that Defendant may not withdraw his guilty plea if Defendant disagrees with how the Court calculates the Guidelines or with the sentence the Court imposes.

Defendant also understands that the government will object to any reduction in his sentence based on acceptance of responsibility if: (a) at sentencing, Defendant does not clearly accept responsibility for the crime he is pleading guilty to committing; or (b) by the time of sentencing, Defendant has committed a new federal or state offense, or has in any way obstructed justice.

If, after signing this Agreement, Defendant's criminal history score or Criminal History Category are reduced, the U.S. Attorney reserves the right to seek an upward departure under the Guidelines.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

4.   Sentence Recommendation

The U.S. Attorney agrees to recommend the following sentence to the Court:

    a) incarceration at the low end of the Guidelines sentencing range as calculated by the parties in Paragraph 3;

    b) a fine or other financial penalty in an amount within the Guidelines range as calculated by the parties in Paragraph 3, unless the Court finds that Defendant is not able, and is not likely to become able, to pay such a fine or financial penalty;

2

SINGER-VOL002-000438

    c)  12 months of supervised release;

    d)  a mandatory special assessment of $100, which Defendant must pay to the Clerk of the Court by the date of sentencing;

    e)  restitution in an amount to be determined by the Court at sentencing; and,

    f)  forfeiture as set forth in Paragraph 6.

5.    <u>Waiver of Appellate Rights and Challenges to Conviction or Sentence</u>

Defendant has the right to challenge his conviction and sentence on "direct appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence. Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that his conviction or sentence should be overturned.

Defendant understands that he has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

    a)  He will not challenge his <u>conviction</u> on direct appeal or in any other proceeding, including in a separate civil lawsuit; and

    b)  He will not challenge his <u>sentence,</u> including any court orders related to forfeiture, restitution, fines or supervised release, on direct appeal or in any other proceeding, including in a separate civil lawsuit.

Defendant understands that, by agreeing to the above, he is agreeing that his conviction and sentence will be final when the Court issues a written judgment after the sentencing hearing in this case. <u>That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge his conviction and sentence, regardless of whether he later changes his mind or finds new information that would have led him not to agree to give up these rights in the first place.</u>

Defendant acknowledges that he is agreeing to give up these rights at least partly in exchange for concessions the U.S. Attorney is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later claim that his lawyer rendered ineffective assistance of counsel, or that the prosecutor engaged in misconduct serious enough to entitle Defendant to have his conviction or sentence overturned.

SINGER-VOL002-000439

6.    Forfeiture

Defendant understands that the Court will, upon acceptance of Defendant's guilty plea, enter an order of forfeiture as part of Defendant's sentence, and that the order of forfeiture may include assets directly traceable to Defendant's offense, assets used to facilitate Defendant's offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

The assets to be forfeited specifically include, without limitation, the following:

a.   $60,000 in United States currency, to be entered in the form of an Order of Forfeiture (Money Judgment).

Defendant admits that $60,000 is subject to forfeiture on the grounds that it is equal to the amount of proceeds the defendant derived from the offense.

Defendant acknowledges and agrees that the amount of the forfeiture money judgment represents proceeds the Defendant obtained (directly or indirectly), and/or facilitating property and/or property involved in, the crimes to which Defendant is pleading guilty and that, due at least in part to the acts or omissions of Defendant, the proceeds or property have been transferred to, or deposited with, a third party, spent, cannot be located upon exercise of due diligence, placed beyond the jurisdiction of the Court, substantially diminished in value, or commingled with other property which cannot be divided without difficulty.  Accordingly, Defendant agrees that the United States is entitled to forfeit as "substitute assets" any other assets of Defendant up to the value of the now missing directly forfeitable assets.

Defendant agrees to consent to the entry of an order of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.  Defendant understands and agrees that forfeiture shall not satisfy or affect any fine, lien, penalty, restitution, cost of imprisonment, tax liability or any other debt owed to the United States.

If the U.S. Attorney requests, Defendant shall deliver to the U.S. Attorney within 30 days after signing this Plea Agreement a sworn financial statement disclosing all assets in which Defendant currently has any interest and all assets over which Defendant has exercised control, or has had any legal or beneficial interest.  Defendant further agrees to be deposed with respect to Defendant's assets at the request of the U.S. Attorney.  Defendant agrees that the United States Department of Probation may share any financial information about the Defendant with the United States Attorney's Office.

Defendant also agrees to waive all constitutional, legal, and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement.

4

SINGER-VOL002-000440

Defendant hereby waives and releases any claims Defendant may have to any vehicles, currency, or other personal property seized by the United States, or seized by any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution of this case, and consents to the forfeiture of all such assets.

7.    Civil Liability

This Plea Agreement does not affect any civil liability, including any tax liability, Defendant has incurred or may later incur due to his criminal conduct and guilty plea to the charge specified in Paragraph 1 of this Agreement.

8.    Breach of Plea Agreement

Defendant understands that if he breaches any provision of this Agreement, Defendant cannot use that breach as a reason to withdraw his guilty plea. Defendant's breach, however, would give the U.S. Attorney the right to be released from his commitments under this Agreement, and would allow the U.S. Attorney to pursue any charges that were, or are to be, dismissed under this Agreement.

If Defendant breaches any provision of this Agreement, the U.S. Attorney would also have the right to use against Defendant any of Defendant's statements, and any information or materials he provided to the government during investigation or prosecution of his case. The U.S. Attorney would have this right even if the parties had entered any earlier written or oral agreements or understandings about this issue.

Finally, if Defendant breaches any provision of this Agreement, he thereby waives any defenses based on the statute of limitations, constitutional protections against pre-indictment delay, and the Speedy Trial Act, that Defendant otherwise may have had to any charges based on conduct occurring before the date of this Agreement.

9.    Who is Bound by Plea Agreement

This Agreement is only between Defendant and the U.S. Attorney for the District of Massachusetts. It does not bind the Attorney General of the United States or any other federal, state, or local prosecuting authorities.

10.    Modifications to Plea Agreement

This Agreement can be modified or supplemented only in a written memorandum signed by both parties, or through proceedings in open court.

SINGER-VOL002-000441

\*       \*       \*

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below.  Please also sign below as Witness.  Return the original of this letter to Assistant U.S. Attorney Eric S. Rosen.

Sincerely,

ANDREW E. LELLING
United States Attorney

By:

STEPHEN E. FRANK
Chief, Securities and Financial Fraud Unit
JORDI DE LLANO
Deputy Chief, Securities and Financial Fraud Unit

ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Assistant U.S. Attorneys

6

SINGER-VOL002-000442

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter and discussed it with my attorney. The letter accurately presents my agreement with the United States Attorney's Office for the District of Massachusetts. There are no unwritten agreements between me and the United States Attorney's Office, and no United States government official has made any unwritten promises or representations to me in connection with my guilty plea. I have received no prior offers to resolve this case.

I understand the crime I am pleading guilty to, and the maximum penalties for that crime. I have discussed the Sentencing Guidelines with my lawyer and I understand the sentencing ranges that may apply.

I am satisfied with the legal representation my lawyer has given me and we have had enough time to meet and discuss my case. We have discussed the charge against me, possible defenses I might have, the terms of this Agreement and whether I should go to trial.

I am entering into this Agreement freely and voluntarily and because I am in fact guilty of the offense. I believe this Agreement is in my best interest.

_____
Michael Center
Defendant

Date: ___4/3/19_____

I certify that Michael Center has read this Agreement and that we have discussed what it means. I believe Michael Center understands the Agreement and is entering into it freely, voluntarily, and knowingly. I also certify that the U.S. Attorney has not extended any other offers regarding a change of plea in this case.

_____
John Cunha
Attorney for Defendant

Date: ___4/4/19_____

7

SINGER-VOL002-000443



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

March 28, 2019

John H. Cunha, Jr., Esq.
Cunha and Holcomb, P.C.
1 State Street, Suite 500
Boston, MA 02109

Re:   United States v. Michael Center          **UNDER SEAL**
       Cooperation Agreement

Dear Mr. Cunha

        This letter sets forth the understanding between the United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Michael Center ("Defendant"), concerning Defendant's cooperation with the U.S. Attorney in the above-referenced case. This Cooperation Agreement supplements, but does not supersede, the Plea Agreement between the parties dated March 28, 2019 ("Plea Agreement"). Defendant and the U.S. Attorney further understand and agree that the original of this Cooperation Agreement shall be maintained by the U.S. Attorney, but may be later disclosed pursuant to the U.S. Attorney's discovery obligations, or submitted to the District Court under seal, with notice to Defendant. In addition, Defendant and the U.S. Attorney understand and agree that the U.S. Attorney will submit this Cooperation Agreement to the U.S. Probation Office for its use in preparing the Presentence Report. Nothing in this Cooperation Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

        The Cooperation Agreement is as follows:

1.      Terms of Cooperation

        Defendant agrees to cooperate fully with law enforcement agents and government attorneys. Defendant must provide complete and truthful information to all law enforcement personnel. If Defendant's testimony is requested, Defendant must testify truthfully and completely before any grand jury, and at any hearing and trial. Defendant must answer all questions posed by

SINGER-VOL002-000432

any law enforcement agents and government attorneys and must not withhold any information. Defendant must not attempt to protect any person or entity through false information or omission, or to implicate falsely any person or entity. Upon request, Defendant must furnish all documents, objects and other evidence in Defendant's possession, custody or control that are relevant to the government's inquiries.

Defendant understands that he has a right to have counsel present when communicating with representatives of the government about the criminal conduct with which Defendant has been charged. To facilitate Defendant's cooperation, Defendant hereby knowingly and voluntarily waives this right with respect to all debriefings by law enforcement agents and government attorneys and all appearances to testify. Defendant or Defendant's counsel may revoke this waiver with a specific request at any time without otherwise affecting the terms or enforceability of this Cooperation Agreement.

To ensure that the Court has all relevant sentencing information, Defendant waives any rights to prompt sentencing and will join in any requests by the U.S. Attorney that sentencing be postponed until Defendant's cooperation is complete. Defendant understands that the date of Defendant's sentencing is within the sole discretion of the Court and that this Cooperation Agreement may require Defendant's cooperation to continue even after Defendant has been sentenced. Defendant's failure to continue to cooperate pursuant to the terms of this Cooperation Agreement after sentence is imposed shall constitute a breach of this Cooperation Agreement by Defendant.

2.    Substantial Assistance Motion

Should Defendant provide substantial assistance in the investigation or prosecution of another person who has committed a criminal offense, the U.S. Attorney agrees that, at or before sentencing, the U.S. Attorney will file a motion under USSG § 5K1.1 to recommend that the Court impose a sentence below the advisory Guidelines sentencing range.

The determination whether Defendant has provided substantial assistance rests solely in the discretion of the U.S. Attorney and is not subject to appeal or review. The U.S. Attorney will make this determination based on the truthfulness and value of Defendant's assistance, regardless of the outcome or result of any proceeding or trial. The U.S. Attorney reserves the right to decline to file a motion pursuant to USSG § 5K1.1 if Defendant violates any condition of pretrial release, violates any of the requirements of honesty and candor detailed in Paragraph 1 above, or engages in any criminal conduct after the date Defendant signs this Cooperation Agreement and/or the Plea Agreement. Defendant may not withdraw his guilty plea if the U.S. Attorney determines that Defendant has not rendered substantial assistance or otherwise declines to file a motion pursuant to USSG § 5K1.1 for any of the reasons listed above, or if the Court refuses to grant the U.S. Attorney's motion for a downward departure.

2

3.     <u>Sentence Recommendation with Substantial Assistance</u>

If Defendant provides substantial assistance, subject to all of the provisions of Paragraphs 1 and 2 above, the U.S. Attorney will advise the Court of the full nature, extent, and value of the assistance provided by Defendant. In such an event, the U.S. Attorney reserves the right to recommend a particular sentence or sentencing range, or to make no recommendation at Defendant's sentencing, subject to the requirements of Paragraph 2 above. In no case will the U.S. Attorney's recommendation exceed that set forth in Paragraph 4 of the Plea Agreement between the parties.

Any sentencing recommendation the U.S. Attorney may make based upon Defendant's substantial assistance is not binding upon the Court. Rather, the sentence to be imposed is within the Court's sole discretion. Should the Court decline to follow the U.S. Attorney's sentencing recommendation (if any), the U.S. Attorney reserves the right to defend the Court's sentence in any direct appeal or future challenge (collateral or otherwise).

4.     <u>Letter Immunity</u>

In return for Defendant's full and truthful cooperation, the U.S. Attorney agrees not to use any information provided by Defendant pursuant to this Cooperation Agreement or pursuant to the proffer letter dated March 28, 2019 (or any information directly or indirectly derived therefrom) against Defendant in any criminal case except in a prosecution: (1) for perjury or obstruction of justice, or for making a false statement after the date of this Cooperation Agreement or the Plea Agreement; or (2) for an act of physical violence against the person of another, or conspiracy to commit any such act of violence. The U.S. Attorney reserves the right to respond fully and accurately to all requests for information by the Court and U.S. Probation Office in this case. All such disclosures, however, shall be made subject to the constraints identified in USSG § 1B1.8(a) and its commentary on the use of this information by the Court and U.S. Probation Office. Regardless of the provisions of USSG § 1B1.8(b)(5) and its commentary, the U.S. Attorney agrees to take the position at sentencing that information provided by Defendant pursuant to this Cooperation Agreement and the Plea Agreement should not be used as a basis for the Court to refuse to depart downward.

5.     <u>Breach of Cooperation Agreement</u>

If the U.S. Attorney determines that Defendant has breached this Cooperation Agreement by making any false, incomplete or misleading statement, or by providing any false, incomplete or misleading information to any law enforcement personnel, grand jury or court, the U.S. Attorney may terminate this Cooperation Agreement and/or the Plea Agreement as set forth in Paragraph 8 of the Plea Agreement; may pursue any and all of the remedies for breach set forth in Paragraph 8 of the Plea Agreement; and may prosecute Defendant for any and all offenses that could be charged against Defendant in the District of Massachusetts, including, but not limited to, false statements and perjury.

3

6.     Complete Cooperation Agreement

This letter contains the complete supplemental agreement between the parties relating to Defendant's cooperation in this matter.  No other promises, representations or agreements have been made other than those set forth in this Cooperation Agreement, the proffer letter dated March 28, 2019, which is superseded by this Cooperation Agreement as to any statements made after the date of this Cooperation Agreement, and the Plea Agreement.  This Cooperation Agreement can be modified or supplemented only in a written document signed by the parties or on the record in court.

If this letter accurately reflects the cooperation agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Agreement below.  Please also sign below as Witness.  Return the original of this letter to Assistant U.S. Attorney Eric S. Rosen.

Sincerely,

ANDREW E. LELLING
United States Attorney

By: _____

STEPHEN E. FRANK
Chief, Securities and Financial Fraud Unit
JORDI DE LLANO
Deputy Chief, Securities and Financial Fraud Unit

_____
ERIC S. ROSEN
LESLIE A. WRIGHT
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
Assistant U.S. Attorneys

4

## ACKNOWLEDGMENT OF COOPERATION AGREEMENT

I have read this Cooperation Agreement in its entirety and discussed it with my attorney. I hereby acknowledge that it fully sets forth my cooperation agreement with the United States Attorney's Office for the District of Massachusetts. I further state that no additional promises or representations have been made to me by any official of the United States in connection with this matter other than those set forth in the Plea Agreement dated March 28, 2019 and the proffer letter dated March 28, 2019. I understand the crime to which I have agreed to plead guilty, the maximum penalties for that offense, and the Sentencing Guideline penalties potentially applicable to it. I am satisfied with the legal representation provided to me by my attorney. We have had sufficient time to meet and discuss my case. We have discussed the charge against me, possible defenses I might have, the terms of this Cooperation Agreement (and the March 29, 2019 Plea Agreement), and whether I should go to trial. I am entering into this Cooperation Agreement freely, voluntarily, and knowingly.

Michael Center
Defendant

Date: 4/3/19

I certify that Michael Center has read this Cooperation Agreement, and that we have discussed both its meaning and its relationship to the Plea Agreement dated March 28, 2019, I believe he understands the Cooperation Agreement and is entering into the Cooperation Agreement freely, voluntarily, and knowingly.

Jack Cunha, Esq.
Attorney for Defendant

Date: 4/4/19

5

SINGER-VOL002-000436

# IGOR DVORSKIY



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

October 1, 2019

Melissa Weinberger, Esq.
Touchton & Weinberger LLP
800 Wilshire Blvd., Suite 1050
Los Angeles, CA 90017

      Re:    <u>United States v. Igor Dvorskiy</u>

Dear Ms. Weinberger:

The United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Igor Dvorskiy ("Defendant"), agree as follows:

    1.    <u>Change of Plea</u>

No later than November 20, 2019, Defendant will plead guilty to Count One of the Indictment, charging him with conspiracy to commit racketeering, in violation of Title 18, United States Code, Section 1962(d). Defendant admits that he committed the crime specified in that count and is in fact guilty of that crime. Defendant also agrees to waive venue, to waive any applicable statute of limitations, and to waive any legal or procedural defects in the Indictment. Defendant does not dispute the accuracy of the Indictment.

The U.S. Attorney agrees that, based upon the information known to the U.S. Attorney's Office at this time, no further criminal charges will be brought against Defendant in connection with the conduct set forth in the Indictment.

    2.    <u>Penalties</u>

Defendant faces the following maximum penalties: incarceration for 20 years; supervised release for three years; a fine of $250,000, or twice the gross gain or loss, whichever is greater; a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Indictment.

3.      Sentencing Guidelines

The parties agree, based on the following calculations, that Defendant's total "offense level" under the Guidelines is 17:

Underlying Racketeering Activity: Mail/Wire Fraud and Honest Services Mail/Wire Fraud

- a) Defendant's base offense level is 8, because the underlying racketeering activity involved mail fraud and honest services mail fraud (USSG §§ 2E1.1(a)(2) & 2B4.1(a));

- b) Defendant's offense level is increased by 10, because the value of the bribes, and the gain to the Defendant, was more than $150,000, but not more than $250,000 (USSG §§ 2B4.1(b)(1)(B) & 2B1.1(b)(1)(F));

- c) Defendant's offense level is increased by 2, because Defendant abused a position of trust in a manner that significantly facilitated the commission or concealment of the offense (USSG § 3B1.3); and

- d) Defendant's offense level is decreased by 3, because Defendant has accepted responsibility for his crime (USSG § 3E1.1).

Defendant understands that the Court is not required to follow this calculation, and that Defendant may not withdraw his guilty plea if Defendant disagrees with how the Court calculates the Guidelines or with the sentence the Court imposes.

Defendant also understands that the government will object to any reduction in his sentence based on acceptance of responsibility if: (a) at sentencing, Defendant does not clearly accept responsibility for the crime he is pleading guilty to committing; or (b) by the time of sentencing, Defendant has committed a new federal or state offense, or has in any way obstructed justice.

If, after signing this Agreement, Defendant's criminal history score or Criminal History Category are reduced, the U.S. Attorney reserves the right to seek an upward departure under the Guidelines.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

4.    Sentence Recommendation

The U.S. Attorney agrees to recommend the following sentence to the Court:

    a) incarceration at the low end of the Guidelines as calculated by the parties in Paragraph 3;

    b) a fine or other financial penalty within the Sentencing Guidelines range;

    c) 12 months of supervised release;

    d) a mandatory special assessment of $100, which Defendant must pay to the Clerk of the Court by the date of sentencing;

    e) restitution in an amount to be determined by the Court at sentencing; and

    f) forfeiture as set forth in Paragraph 6.

5.    Waiver of Appellate Rights and Challenges to Conviction or Sentence

Defendant has the right to challenge his conviction and sentence on "direct appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence. Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that his conviction or sentence should be overturned.

Defendant understands that he has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

    a) Defendant will not challenge any prison sentence of 30 months or less or any court orders relating to forfeiture, restitution, fines or supervised release. This provision is binding even if the Court's Guidelines analysis is different than the one in this Agreement.

    b) The U.S. Attorney agrees that, regardless of how the Court calculates Defendant's sentence, the U.S. Attorney will not appeal any sentence of imprisonment of 24 months or more.

Defendant understands that, by agreeing to the above, he is agreeing that his conviction and sentence will be final when the Court issues a written judgment after the sentencing hearing in this case.  That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge his conviction and sentence, regardless of whether he later changes

his mind or finds new information that would have led him not to agree to give up these rights in the first place.

Defendant acknowledges that he is agreeing to give up these rights at least partly in exchange for concessions the U.S. Attorney is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later claim that his lawyer rendered ineffective assistance of counsel, or that the prosecutor engaged in misconduct serious enough to entitle Defendant to have his conviction or sentence overturned.

6.  Forfeiture

Defendant understands that the Court will, upon acceptance of Defendant's guilty plea, enter an order of forfeiture as part of Defendant's sentence, and that the order of forfeiture may include assets directly traceable to Defendant's offense, assets used to facilitate Defendant's offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

The assets to be forfeited specifically include, without limitation, the following:

a.  $149,540 in United States currency, to be entered in the form of an Order of Forfeiture (Money Judgment).

Defendant admits that $149,540 is subject to forfeiture on the grounds that it is equal to the amount of proceeds the defendant derived from the offense.

Defendant acknowledges and agrees that the amount of the forfeiture money judgment represents proceeds the Defendant obtained (directly or indirectly), and/or facilitating property and/or property involved in, the crimes to which Defendant is pleading guilty and that, due at least in part to the acts or omissions of Defendant, the proceeds or property have been transferred to, or deposited with, a third party, spent, cannot be located upon exercise of due diligence, placed beyond the jurisdiction of the Court, substantially diminished in value, or commingled with other property which cannot be divided without difficulty. Accordingly, Defendant agrees that the United States is entitled to forfeit as "substitute assets" any other assets of Defendant up to the value of the now missing directly forfeitable assets.

Defendant agrees to consent to the entry of an order of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant understands and agrees that forfeiture shall not satisfy or affect any fine, lien, penalty, restitution, cost of imprisonment, tax liability or any other debt owed to the United States.

4

If the U.S. Attorney requests, Defendant shall deliver to the U.S. Attorney within 30 days after signing this Plea Agreement a sworn financial statement disclosing all assets in which Defendant currently has any interest and all assets over which Defendant has exercised control, or has had any legal or beneficial interest. Defendant further agrees to be deposed with respect to Defendant's assets at the request of the U.S. Attorney. Defendant agrees that the United States Department of Probation may share any financial information about the Defendant with the United States Attorney's Office.

Defendant also agrees to waive all constitutional, legal, and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement.

Defendant hereby waives and releases any claims Defendant may have to any vehicles, currency, or other personal property seized by the United States, or seized by any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution of this case, and consents to the forfeiture of all such assets.

7.    Civil Liability

This Plea Agreement does not affect any civil liability, including any tax liability, Defendant has incurred or may later incur due to his criminal conduct and guilty plea to the charge specified in Paragraph 1 of this Agreement.

8.    Breach of Plea Agreement

Defendant understands that if he breaches any provision of this Agreement, Defendant cannot use that breach as a reason to withdraw his guilty plea. Defendant's breach, however, would give the U.S. Attorney the right to be released from his commitments under this Agreement, and would allow the U.S. Attorney to pursue any charges that were, or are to be, dismissed under this Agreement.

If Defendant breaches any provision of this Agreement, the U.S. Attorney would also have the right to use against Defendant any of Defendant's statements, and any information or materials he provided to the government during investigation or prosecution of his case. The U.S. Attorney would have this right even if the parties had entered any earlier written or oral agreements or understandings about this issue.

Finally, if Defendant breaches any provision of this Agreement, he thereby waives any defenses based on the statute of limitations, constitutional protections against pre-indictment delay, and the Speedy Trial Act, that Defendant otherwise may have had to any charges based on conduct occurring before the date of this Agreement.

9.    Who is Bound by Plea Agreement

This Agreement is only between Defendant and the U.S. Attorney for the District of Massachusetts. It does not bind the Attorney General of the United States or any other federal, state, or local prosecuting authorities.

10.    Modifications to Plea Agreement

This Agreement can be modified or supplemented only in a written memorandum signed by both parties, or through proceedings in open court.

\*        \*        \*

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney Eric S. Rosen.

Sincerely,

ANDREW E. LELLING
United States Attorney

By:

STEPHEN E. FRANK
Chief, Securities and Financial Fraud Unit
JORDI DE LLANO
Deputy Chief, Securities and Financial Fraud Unit

ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Assistant U.S. Attorneys

6

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter and discussed it with my attorney. The letter accurately presents my agreement with the United States Attorney's Office for the District of Massachusetts. There are no unwritten agreements between me and the United States Attorney's Office, and no United States government official has made any unwritten promises or representations to me in connection with my guilty plea. I have received no prior offers to resolve this case.

I understand the crime I am pleading guilty to, and the maximum penalties for that crime. I have discussed the Sentencing Guidelines with my lawyer and I understand the sentencing ranges that may apply.

I am satisfied with the legal representation my lawyer has given me and we have had enough time to meet and discuss my case. We have discussed the charge against me, possible defenses I might have, the terms of this Agreement and whether I should go to trial.

I am entering into this Agreement freely and voluntarily and because I am in fact guilty of the offense. I believe this Agreement is in my best interest.

Igor Dvorskiy
Defendant

Date:     10/01/2019

I certify that Igor Dvorskiy has read this Agreement and that we have discussed what it means. I believe Igor Dvorskiy understands the Agreement and is entering into it freely, voluntarily, and knowingly. I also certify that the U.S. Attorney has not extended any other offers regarding a change of plea in this case.

Melissa Weinberger, Esq.
Attorney for Defendant

Date:     10 | 1 | 19

7



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

October 1, 2019

Melissa Weinberger, Esq.
Touchton & Weinberger LLP
800 Wilshire Blvd., Suite 1050
Los Angeles, CA 90017

   Re: <u>United States v. Igor Dvorskiy</u>
     Cooperation Agreement

Dear Ms. Weinberger:

   This letter sets forth the understanding between the United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Igor Dvorskiy ("Defendant"), concerning Defendant's cooperation with the U.S. Attorney in the above-referenced case. This Cooperation Agreement supplements, but does not supersede, the Plea Agreement between the parties dated October 1, 2019 ("Plea Agreement"). Defendant and the U.S. Attorney further understand and agree that the original of this Cooperation Agreement shall be maintained by the U.S. Attorney, but may be later disclosed pursuant to the U.S. Attorney's discovery obligations, or submitted to the District Court, with notice to Defendant. In addition, Defendant and the U.S. Attorney understand and agree that the U.S. Attorney will submit this Cooperation Agreement to the U.S. Probation Office for its use in preparing the Presentence Report. Nothing in this Cooperation Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

   The Cooperation Agreement is as follows:

   1. <u>Terms of Cooperation</u>

   Defendant agrees to cooperate fully with law enforcement agents and government attorneys. Defendant must provide complete and truthful information to all law enforcement personnel. If Defendant's testimony is requested, Defendant must testify truthfully and completely before any grand jury, and at any hearing and trial. Defendant must answer all questions posed by any law enforcement agents and government attorneys and must not withhold any information.

rev. 01/17/17

Defendant must not attempt to protect any person or entity through false information or omission, or to implicate falsely any person or entity. Upon request, Defendant must furnish all documents, objects and other evidence in Defendant's possession, custody or control that are relevant to the government's inquiries.

Defendant understands that he has a right to have counsel present when communicating with representatives of the government about the criminal conduct with which Defendant has been charged. To facilitate Defendant's cooperation, Defendant hereby knowingly and voluntarily waives this right with respect to all debriefings by law enforcement agents and government attorneys and all appearances to testify. Defendant or Defendant's counsel may revoke this waiver with a specific request at any time without otherwise affecting the terms or enforceability of this Cooperation Agreement.

To ensure that the Court has all relevant sentencing information, Defendant waives any rights to prompt sentencing and will join in any requests by the U.S. Attorney that sentencing be postponed until Defendant's cooperation is complete. Defendant understands that the date of Defendant's sentencing is within the sole discretion of the Court and that this Cooperation Agreement may require Defendant's cooperation to continue even after Defendant has been sentenced. Defendant's failure to continue to cooperate pursuant to the terms of this Cooperation Agreement after sentence is imposed shall constitute a breach of this Cooperation Agreement by Defendant.

2.    Substantial Assistance Motion

Should Defendant provide substantial assistance in the investigation or prosecution of another person who has committed a criminal offense, the U.S. Attorney agrees that, at or before sentencing, the U.S. Attorney will file a motion under USSG § 5K1.1 to recommend that the Court impose a sentence below the advisory Guidelines sentencing range.

The determination whether Defendant has provided substantial assistance rests solely in the discretion of the U.S. Attorney and is not subject to appeal or review. The U.S. Attorney will make this determination based on the truthfulness and value of Defendant's assistance, regardless of the outcome or result of any proceeding or trial. The U.S. Attorney reserves the right to decline to file a motion pursuant to USSG § 5K1.1 if Defendant violates any condition of pretrial release, violates any of the requirements of honesty and candor detailed in Paragraph 1 above, or engages in any criminal conduct after the date Defendant signs this Cooperation Agreement and/or the Plea Agreement. Defendant may not withdraw his guilty plea if the U.S. Attorney determines that Defendant has not rendered substantial assistance or otherwise declines to file a motion pursuant to USSG § 5K1.1 for any of the reasons listed above, or if the Court refuses to grant the U.S. Attorney's motion for a downward departure.

2

3. <u>Sentence Recommendation with Substantial Assistance</u>

If Defendant provides substantial assistance, subject to all of the provisions of Paragraphs 1 and 2 above, the U.S. Attorney will advise the Court of the full nature, extent, and value of the assistance provided by Defendant. In such an event, the U.S. Attorney reserves the right to recommend a particular sentence or sentencing range, or to make no recommendation at Defendant's sentencing, subject to the requirements of Paragraph 2 above. In no case will the U.S. Attorney's recommendation exceed that set forth in Paragraph 4 of the Plea Agreement between the parties.

Any sentencing recommendation the U.S. Attorney may make based upon Defendant's substantial assistance is not binding upon the Court. Rather, the sentence to be imposed is within the Court's sole discretion. Should the Court decline to follow the U.S. Attorney's sentencing recommendation (if any), the U.S. Attorney reserves the right to defend the Court's sentence in any direct appeal or future challenge (collateral or otherwise).

4. <u>Letter Immunity</u>

In return for Defendant's full and truthful cooperation, the U.S. Attorney agrees not to use any information provided by Defendant pursuant to this Cooperation Agreement or pursuant to the proffer letter dated September 12, 2019 (or any information directly or indirectly derived therefrom) against Defendant in any criminal case except in a prosecution: (1) for perjury or obstruction of justice, or for making a false statement after the date of this Cooperation Agreement or the Plea Agreement; or (2) for an act of physical violence against the person of another, or conspiracy to commit any such act of violence. The U.S. Attorney reserves the right to respond fully and accurately to all requests for information by the Court and U.S. Probation Office in this case. All such disclosures, however, shall be made subject to the constraints identified in USSG § 1B1.8(a) and its commentary on the use of this information by the Court and U.S. Probation Office. Regardless of the provisions of USSG § 1B1.8(b)(5) and its commentary, the U.S. Attorney agrees to take the position at sentencing that information provided by Defendant pursuant to this Cooperation Agreement and the Plea Agreement should not be used as a basis for the Court to refuse to depart downward.

5. <u>Breach of Cooperation Agreement</u>

If the U.S. Attorney determines that Defendant has breached this Cooperation Agreement by making any false, incomplete or misleading statement, or by providing any false, incomplete or misleading information to any law enforcement personnel, grand jury or court, the U.S. Attorney may terminate this Cooperation Agreement and/or the Plea Agreement as set forth in Paragraph 8 of the Plea Agreement; may pursue any and all of the remedies for breach set forth in Paragraph 8 of the Plea Agreement; and may prosecute Defendant for any and all offenses that could be charged against Defendant in the District of Massachusetts, including, but not limited to, false statements and perjury.

3

6.    Complete Cooperation Agreement

This letter contains the complete supplemental agreement between the parties relating to Defendant's cooperation in this matter. No other promises, representations or agreements have been made other than those set forth in this Cooperation Agreement, the proffer letter dated September 12, 2019, which is superseded by this Cooperation Agreement as to any statements made after the date of this Cooperation Agreement, and the Plea Agreement. This Cooperation Agreement can be modified or supplemented only in a written document signed by the parties or on the record in court.

If this letter accurately reflects the cooperation agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney Eric S. Rosen.

Sincerely,

ANDREW E. LELLING
United States Attorney

By:

STEPHEN E. FRANK
Chief, Securities and Financial Fraud Unit
JORDI DE LLANO
Deputy Chief, Securities and Financial Fraud Unit

ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Assistant U.S. Attorneys

4

## ACKNOWLEDGMENT OF COOPERATION AGREEMENT

I have read this Cooperation Agreement in its entirety and discussed it with my attorney. I hereby acknowledge that it fully sets forth my cooperation agreement with the United States Attorney's Office for the District of Massachusetts. I further state that no additional promises or representations have been made to me by any official of the United States in connection with this matter other than those set forth in the Plea Agreement dated October 1, 2019 and the proffer letter dated September 12, 2019. I understand the crime to which I have agreed to plead guilty, the maximum penalties for that offense, and the Sentencing Guideline penalties potentially applicable to it. I am satisfied with the legal representation provided to me by my attorney. We have had sufficient time to meet and discuss my case. We have discussed the charge against me, possible defenses I might have, the terms of this Cooperation Agreement (and the October 1, 2019 Plea Agreement), and whether I should go to trial. I am entering into this Cooperation Agreement freely, voluntarily, and knowingly.

Igor Dvorskiy
Defendant

Date: 10/01/2019

I certify that Igor Dvorskiy has read this Cooperation Agreement, and that we have discussed both its meaning and its relationship to the Plea Agreement dated October 1, 2019. I believe he understands the Cooperation Agreement and is entering into the Cooperation Agreement freely, voluntarily, and knowingly.

Melissa Weinberger, Esq.
Attorney for Defendant

Date: 10/1/19

5

# RUDOLPH MEREDITH



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

March 4, 2019

Paul Thomas, Esq.
Duffy Law, LLC
129 Church Street, Suite 310
New Haven, CT 06510

     Re:    <u>United States v. Rudolph "Rudy" Meredith</u>

Dear Mr. Thomas:

The United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Rudolph "Rudy" Meredith ("Defendant"), agree as follows:

    1.    <u>Change of Plea</u>

At the earliest practicable date, Defendant shall waive indictment and plead guilty to an Information substantially in the form attached to this Plea Agreement charging him with one count of conspiracy to commit honest services wire fraud, in violation of Title 18, United States Code, Section 1349, and one count of honest services wire fraud, in violation of Title 18, United States Code, Section 1343 and 1346. Defendant expressly and unequivocally admits that he committed the crimes charged in Counts One and Two of the Information, did so knowingly, willfully, and intentionally, and is in fact guilty of those offenses. Defendant also agrees to waive venue, to waive any applicable statute of limitations, and to waive any legal or procedural defects in the Information.

    2.    <u>Penalties</u>

Defendant faces the following maximum penalties on Counts One and Two of the Information: incarceration for twenty years; supervised release for three years; a fine of $250,000, or twice the gross gain/loss, whichever is greater; a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Information.

Defendant also recognizes that pleading guilty may have consequences with respect to Defendant's immigration status if Defendant is not a citizen of the United States. Under federal

law, a broad range of crimes are removable offenses, including the offenses to which Defendant is pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and Defendant understands that no one, including defense counsel and the District Court, can predict to a certainty the effect of this conviction on Defendant's immigration status. Defendant nevertheless affirms his decision to plead guilty regardless of any immigration consequences that this plea may entail, even if the consequence is Defendant's automatic removal from the United States.

3.   Sentencing Guidelines

The sentence to be imposed upon Defendant is within the discretion of the District Court ("Court"), subject to the statutory maximum penalties set forth above and the provisions of the Sentencing Reform Act, and the advisory United States Sentencing Guidelines ("USSG" or "Guidelines"). While the Court may impose a sentence up to and including the statutory maximum term of imprisonment and statutory maximum fine, it must consult and take into account the USSG and the other factors set forth in 18 U.S.C. § 3553(a) in imposing a sentence.

The parties will take the position that Defendant's total offense level under the USSG (prior to any adjustment for acceptance of responsibility) is calculated as follows:

   a)   in accordance with USSG § 2B1.1(a)(1), Defendant's base offense level is seven, because Defendant is pleading guilty to an offense of conviction that has a statutory maximum term of imprisonment of 20 years or more;

   b)   in accordance with USSG § 2B1.1(b)(1)(H), Defendant's offense level is increased by 14, because the gain or loss from the offenses of conviction and related conduct is more than $550,000 but not more than $1,500,000; and,

   c)   in accordance with USSG § 3B1.3, Defendant's offense level is increased by two, because Defendant abused a position of private trust.

The U.S. Attorney reserves the right to oppose Defendant's arguments for a departure from, or a sentence outside, the USSG under the factors set forth in 18 U.S.C. § 3553(a).

Based on Defendant's prompt acceptance of personal responsibility for the offenses of conviction in this case, and information known to the U.S. Attorney at this time, the U.S. Attorney agrees to recommend that the Court reduce by three levels Defendant's adjusted offense level under USSG § 3E1.1.

The U.S. Attorney reserves the right not to recommend a reduction under USSG § 3E1.1 if, at any time between Defendant's execution of this Plea Agreement and sentencing, Defendant:

2

a) Fails to admit a complete factual basis for the plea;

b) Fails to truthfully admit Defendant's conduct in the offenses of conviction;

c) Falsely denies, or frivolously contests, relevant conduct for which Defendant is accountable under USSG § 1B1.3;

d) Fails to provide truthful information about Defendant's financial status;

e) Gives false or misleading testimony in any proceeding relating to the criminal conduct charged in this case and any relevant conduct for which Defendant is accountable under USSG § 1B1.3;

f) Engages in acts that form a basis for finding that Defendant has obstructed or impeded the administration of justice under USSG § 3C1.1;

g) Intentionally fails to appear in Court or violates any condition of release;

h) Commits a crime that is chargeable under the Sentencing Guidelines;

i) Transfers any asset protected under any provision of this Plea Agreement; or

j) Attempts to withdraw Defendant's guilty plea.

Defendant understands and acknowledges that Defendant may not withdraw his plea of guilty if, for any of the reasons listed above, the U.S. Attorney does not recommend that Defendant receive a reduction in offense level for acceptance of responsibility. Defendant also understands and acknowledges that, in addition to declining to recommend an acceptance-of-responsibility adjustment, the U.S. Attorney may seek an upward adjustment pursuant to USSG § 3C1.1 if Defendant obstructs justice after the date of this Plea Agreement.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

3

SINGER-VOL002-000469

4.  Sentence Recommendation

The U.S. Attorney agrees to recommend the following sentence before the Court:

a)  incarceration at the low end of the Guidelines sentencing range as calculated by the parties in Paragraph 3;

b)  a fine at the low end of the Guidelines sentencing range as calculated by the parties in Paragraph 3, unless the Court finds that Defendant is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay a fine;

c)  36 months of supervised release;

d)  a mandatory special assessment of $200, which Defendant must pay to the Clerk of the Court on or before the date of sentencing (unless Defendant establishes to the Court's satisfaction that Defendant is unable to do so); and,

e)  forfeiture as set forth in Paragraph 9.

Defendant agrees to provide the U.S. Attorney expert reports, motions, memoranda of law and documentation of any kind on which Defendant intends to rely at sentencing not later than 21 days before sentencing. Any basis for sentencing as to which Defendant has not provided the U.S. Attorney all such items at least 21 days before sentencing shall be deemed waived.

5.  Protection of Assets for Payment of Restitution, Forfeiture and Fine

Defendant agrees not to transfer, or authorize the transfer of, any asset that has been restrained by Order of the Court in this case or any asset, whether or not restrained, that Defendant has agreed to forfeit pursuant to this Plea Agreement.

Defendant agrees not to transfer, or authorize the transfer of any other asset in which Defendant has an interest without prior express written consent of the U.S. Attorney, except for:

a)  Assets subject to superior, secured interests of innocent third parties, in which Defendant has an equity interest of less than $10,000;

b)  Ordinary living expenses necessary to house, clothe, transport, and feed Defendant and those to whom Defendant owes a legal duty of support, so long as such assets do not exceed $5,000 per month; and

c)  Attorney's fees incurred in connection with this criminal case.

This prohibition shall be effective as of the date of Defendant's execution of this Plea Agreement and continue until the fine, forfeiture, and restitution ordered by the Court at sentencing

4

SINGER-VOL002-000470

are satisfied in full.

If the U.S. Attorney requests, Defendant further agrees to complete truthfully and accurately a sworn financial statement and to deliver that statement to the U.S. Attorney within 30 days of signing this Plea Agreement.

6.    <u>Waiver of Rights to Appeal and to Bring Future Challenge</u>

     a)  Defendant has conferred with his attorneys and understands that he has the right to challenge both his conviction and his sentence (including any orders relating to the terms and conditions of supervised release, fines, forfeiture, and restitution) on direct appeal. Defendant also understands that, in some circumstances, Defendant may be able to argue in a future proceeding (collateral or otherwise), such as pursuant to a motion under 28 U.S.C. § 2255, 28 U.S.C. § 2241, or 18 U.S.C. § 3582(c), that Defendant's conviction should be set aside or Defendant's sentence (including any orders relating to the terms and conditions of supervised release, fines, forfeiture, and restitution) set aside or reduced.

     b)  Defendant waives any right to challenge Defendant's conviction on direct appeal or in a future proceeding (collateral or otherwise).

     c)  Defendant agrees not to file a direct appeal or challenge in a future proceeding (collateral or otherwise) any sentence of imprisonment of 41 months or less or any orders relating to the terms and conditions of supervised release, fines, forfeiture, and restitution. This provision is binding even if the Court's Guidelines analysis is different from that set forth in this Plea Agreement.

     d)  The U.S. Attorney likewise agrees that, regardless of the analysis employed by the Court, the U.S. Attorney will not appeal any imprisonment sentence of 33 months or more.

     e)  Regardless of the previous sub-paragraphs, Defendant reserves the right to claim that: (i) Defendant's lawyer rendered ineffective assistance of counsel under <u>Strickland v. Washington</u>; or (ii) the prosecutor in this case engaged in misconduct that entitles Defendant to relief from Defendant's conviction or sentence.

7.    <u>Other Post-Sentence Events</u>

     a)  If, despite the waiver provision of sub-paragraph 6(c), Defendant appeals or challenges in a future proceeding (collateral or otherwise) Defendant's sentence, the U.S. Attorney reserves the right to argue the correctness of the sentence imposed by the Court (in addition to arguing that any appeal or future challenge (collateral or otherwise) is waived as a result of the waiver in sub-

5

paragraph 6(c)).

b) If, despite the waiver provision of sub-paragraph 6(c), Defendant seeks re-sentencing, Defendant agrees not to seek to be re-sentenced with the benefit of any change to the Criminal History Category that the Court calculated at the time of Defendant's original sentencing, except to the extent that Defendant has been found actually factually innocent of a prior crime.

c) In the event of a re-sentencing following an appeal from or future challenge (collateral or otherwise) to Defendant's sentence, the U.S. Attorney reserves the right to seek a departure from and a sentence outside the USSG if, and to the extent, necessary to reinstate the sentence the U.S. Attorney advocated at Defendant's initial sentencing pursuant to this Plea Agreement.

8. <u>Court Not Bound by Plea Agreement</u>

The parties' sentencing recommendations and their respective calculations under the USSG are not binding upon the U.S. Probation Office or the Court. Within the maximum sentence Defendant faces under the applicable law, the sentence to be imposed is within the sole discretion of the Court. Defendant's plea will be tendered pursuant to Fed. R. Crim. P. 11(c)(1)(B). Defendant may not withdraw his plea of guilty regardless of what sentence is imposed, or because the U.S. Probation Office or the Court declines to follow the parties' USSG calculations or recommendations. Should the Court decline to follow the U.S. Attorney's USSG calculations or recommendations, the U.S. Attorney reserves the right to defend the Court's calculations and sentence in any direct appeal or future challenge (collateral or otherwise).

9. <u>Forfeiture</u>

Defendant understands that the Court will, upon acceptance of Defendant's guilty plea, enter an order of forfeiture as part of Defendant's sentence, and that the order of forfeiture, which may be satisfied at any time prior to sentencing, may include assets directly traceable to Defendant's offenses, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

The assets to be forfeited specifically include the following:

a. Cashier's check in the amount of $308,225.61, provided to the Federal Bureau of Investigation on or about May 21, 2018; and,

b. $557,774.39 in United States currency, to be entered in the form of an Order of Forfeiture (Money Judgment).

Defendant admits that the $308,225.61 cashier's check and the $557,774.39 in United States currency is subject to forfeiture on the grounds that it is approximately equal to the amount of proceeds the Defendant obtained (directly or indirectly) as a result of the offenses.

6

SINGER-VOL002-000472

Defendant acknowledges and agrees that the amount of the forfeiture money judgment represents proceeds the Defendant obtained (directly or indirectly), and/or facilitating property and/or property involved in, the crimes to which Defendant is pleading guilty and that, due at least in part to the acts or omissions of Defendant, the proceeds or property have been transferred to, or deposited with, a third party, spent, cannot be located upon exercise of due diligence, placed beyond the jurisdiction of the Court, substantially diminished in value, or commingled with other property which cannot be divided without difficulty. Accordingly, Defendant agrees that the United States is entitled to forfeit as "substitute assets" any other assets of Defendant up to the value of the now missing directly forfeitable assets.

Defendant agrees to consent to the entry of an order of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant understands and agrees that forfeiture shall not satisfy or affect any fine, lien, penalty, restitution, cost of imprisonment, tax liability or any other debt owed to the United States.

If the U.S. Attorney requests, Defendant shall deliver to the U.S. Attorney within 30 days after signing this Plea Agreement a sworn financial statement disclosing all assets in which Defendant currently has any interest and all assets over which Defendant has exercised control, or has had any legal or beneficial interest. Defendant further agrees to be deposed with respect to Defendant's assets at the request of the U.S. Attorney. Defendant agrees that the United States Department of Probation may share any financial information about the Defendant with the United States Attorney's Office.

Defendant also agrees to waive all constitutional, legal, and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement.

Defendant hereby waives and releases any claims Defendant may have to any vehicles, currency, or other personal property seized by the United States, or seized by any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution of this case, and consents to the forfeiture of all such assets.

10.    Information for Presentence Report

Defendant agrees to provide all information requested by the U.S. Probation Office concerning Defendant's assets.

SINGER-VOL002-000473

11.   Civil Liability

By entering into this Plea Agreement, the U.S. Attorney does not compromise any civil liability, including but not limited to any tax liability, Defendant may have incurred or may incur as a result of Defendant's conduct and plea of guilty to the charges specified in Paragraph 1 of this Plea Agreement.

12.   Rejection of Plea by Court

Should Defendant's guilty plea not be accepted by the Court for whatever reason, or later be withdrawn on Defendant's motion, this Plea Agreement shall be null and void at the option of the U.S. Attorney.

13.   Breach of Plea Agreement

If the U.S. Attorney determines that Defendant has failed to comply with any material provision of this Plea Agreement, has violated any condition of Defendant's pretrial release, or has committed any crime following Defendant's execution of this Plea Agreement, the U.S. Attorney may, at his sole option, be released from his commitments under this Plea Agreement in their entirety by notifying Defendant, through counsel or otherwise, in writing. The U.S. Attorney may also pursue all remedies available to him under the law, regardless whether he elects to be released from his commitments under this Plea Agreement. Further, the U.S. Attorney may pursue any and all charges that have been, or are to be, dismissed pursuant to this Plea Agreement. Defendant recognizes that his breach of any obligation under this Plea Agreement shall not give rise to grounds for withdrawal of Defendant's guilty plea, but will give the U.S. Attorney the right to use against Defendant before any grand jury, at any trial or hearing, or for sentencing purposes, any statements made by Defendant and any information, materials, documents or objects provided by Defendant to the government, without any limitation, regardless of any prior agreements or understandings, written or oral, to the contrary. In this regard, Defendant hereby waives any defense to any charges that Defendant might otherwise have based upon any statute of limitations, the constitutional protection against pre-indictment delay, or the Speedy Trial Act.

14.   Who is Bound by Plea Agreement

This Plea Agreement is limited to the U.S. Attorney for the District of Massachusetts, and cannot and does not bind the Attorney General of the United States or any other federal, state or local prosecutive authorities.

15.   Modifications to Plea Agreement

This Plea Agreement can be modified or supplemented only in a written memorandum signed by the parties or on the record in court.

8

SINGER-VOL002-000474

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below.  Please also sign below as Witness.  Return the original of this letter to Assistant U.S. Attorney Eric S. Rosen.

Very truly yours,

ANDREW E. LELLING
United States Attorney

By: _____

STEPHEN E. FRANK
Chief, Securities and Financial Fraud Unit
JORDI DE LLANO
Deputy Chief, Securities and Financial Fraud Unit

_____

ERIC S. ROSEN
Assistant U.S. Attorney

9

SINGER-VOL002-000475

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter in its entirety and discussed it with my attorney. I hereby acknowledge that (a) it accurately sets forth my plea agreement with the United States Attorney's Office for the District of Massachusetts; (b) there are no unwritten agreements between me and the United States Attorney's Office; and (c) no official of the United States has made any unwritten promises or representations to me, in connection with my change of plea. In addition, I have received no prior offers to resolve this case. I understand the crimes to which I have agreed to plead guilty, the maximum penalties for those offenses, and the Sentencing Guideline penalties potentially applicable to them. I am satisfied with the legal representation provided to me by my attorney. We have had sufficient time to meet and discuss my case. We have discussed the charges against me, possible defenses I might have, the terms of this Plea Agreement and whether I should go to trial. I am entering into this Plea Agreement freely, voluntarily, and knowingly because I am guilty of the offenses to which I am pleading guilty, and I believe this Plea Agreement is in my best interest.

_____
Rudolph "Rudy" Meredith
Defendant

Date: 3/5/19

I certify that Rudolph "Rudy" Meredith has read this Plea Agreement and that I have discussed its meaning with him. I believe he understands the Plea Agreement and is entering into the Plea Agreement freely, voluntarily, and knowingly. I also certify that the U.S. Attorney has not extended any other offers regarding a change of plea in this case.

_____
Paul Thomas, Esq.
Attorney for Defendant

Date: 3/4/19

10



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

March 4, 2019

Paul Thomas, Esq.
Duffy Law, LLC
129 Church Street, Suite 310
New Haven, CT 06510

     Re:    United States v. Rudolph "Rudy" Meredith    **UNDER SEAL**
                Cooperation Agreement

Dear Mr. Thomas:

This letter sets forth the understanding between the United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Rudolph "Rudy" Meredith ("Defendant"), concerning Defendant's cooperation with the U.S. Attorney in the above-referenced case. This Cooperation Agreement supplements, but does not supersede, the Plea Agreement between the parties dated March 4, 2019 ("Plea Agreement"). Defendant and the U.S. Attorney further understand and agree that the original of this Cooperation Agreement shall be maintained by the U.S. Attorney, but may be later disclosed pursuant to the U.S. Attorney's discovery obligations, or submitted to the District Court under seal, with notice to Defendant. In addition, Defendant and the U.S. Attorney understand and agree that the U.S. Attorney will submit this Cooperation Agreement to the U.S. Probation Office for its use in preparing the Presentence Report. Nothing in this Cooperation Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

The Cooperation Agreement is as follows:

1.    Terms of Cooperation

Defendant agrees to cooperate fully with law enforcement agents and government attorneys. Defendant must provide complete and truthful information to all law enforcement personnel. If Defendant's testimony is requested, Defendant must testify truthfully and completely before any grand jury, and at any hearing and trial. Defendant must answer all questions posed by any law enforcement agents and government attorneys and must not withhold any information.

Defendant must not attempt to protect any person or entity through false information or omission, or to implicate falsely any person or entity. Upon request, Defendant must, consistent with Swiss law, furnish all documents, objects and other evidence in Defendant's possession, custody or control that are relevant to the government's inquiries.

Defendant understands that he has a right to have counsel present when communicating with representatives of the government about the criminal conduct with which Defendant has been charged. To facilitate Defendant's cooperation, Defendant hereby knowingly and voluntarily waives this right with respect to all debriefings by law enforcement agents and government attorneys and all appearances to testify. Defendant or Defendant's counsel may revoke this waiver with a specific request at any time without otherwise affecting the terms or enforceability of this Cooperation Agreement.

To ensure that the Court has all relevant sentencing information, Defendant waives any rights to prompt sentencing and will join in any requests by the U.S. Attorney that sentencing be postponed until Defendant's cooperation is complete. Defendant understands that the date of Defendant's sentencing is within the sole discretion of the Court and that this Cooperation Agreement may require Defendant's cooperation to continue even after Defendant has been sentenced. Defendant's failure to continue to cooperate pursuant to the terms of this Cooperation Agreement after sentence is imposed shall constitute a breach of this Cooperation Agreement by Defendant.

2.    Substantial Assistance Motion

Should Defendant provide substantial assistance in the investigation or prosecution of another person who has committed a criminal offense, the U.S. Attorney agrees that, at or before sentencing, the U.S. Attorney will file a motion under USSG § 5K1.1 to recommend that the Court impose a sentence below the advisory Guidelines sentencing range.

The determination whether Defendant has provided substantial assistance rests solely in the discretion of the U.S. Attorney and is not subject to appeal or review. The U.S. Attorney will make this determination based on the truthfulness and value of Defendant's assistance, regardless of the outcome or result of any proceeding or trial. The U.S. Attorney reserves the right to decline to file a motion pursuant to USSG § 5K1.1 if Defendant violates any condition of pretrial release, violates any of the requirements of honesty and candor detailed in Paragraph 1 above, or engages in any criminal conduct after the date Defendant signs this Cooperation Agreement and/or the Plea Agreement. Defendant may not withdraw his guilty plea if the U.S. Attorney determines that Defendant has not rendered substantial assistance or otherwise declines to file a motion pursuant to USSG § 5K1.1 for any of the reasons listed above, or if the Court refuses to grant the U.S. Attorney's motion for a downward departure.

2

SINGER-VOL002-000462

3.     Sentence Recommendation with Substantial Assistance

If Defendant provides substantial assistance, subject to all of the provisions of Paragraphs 1 and 2 above, the U.S. Attorney will advise the Court of the full nature, extent, and value of the assistance provided by Defendant. In such an event, the U.S. Attorney reserves the right to recommend a particular sentence or sentencing range, or to make no recommendation at Defendant's sentencing, subject to the requirements of Paragraph 2 above. In no case will the U.S. Attorney's recommendation exceed that set forth in Paragraph 4 of the Plea Agreement between the parties.

Any sentencing recommendation the U.S. Attorney may make based upon Defendant's substantial assistance is not binding upon the Court. Rather, the sentence to be imposed is within the Court's sole discretion. Should the Court decline to follow the U.S. Attorney's sentencing recommendation (if any), the U.S. Attorney reserves the right to defend the Court's sentence in any direct appeal or future challenge (collateral or otherwise).

4.     Waiver of Rights to Appeal and to Bring Future Challenge Against Sentence

Notwithstanding the provisions of Paragraph 6(c) of Defendant's Plea Agreement, Defendant agrees that, if the Court grants the U.S. Attorney's motion for a downward departure pursuant to USSG § 5K1.1 and does, in fact, depart downward on that basis, Defendant will not file a direct appeal or challenge in a future proceeding (collateral or otherwise) Defendant's sentence (including any orders relating to supervised release, fines, forfeiture, and restitution). In all other circumstances, Paragraph 6(c) of Defendant's Plea Agreement controls the filing of any direct appeal or challenge in a future proceeding (collateral or otherwise) of Defendant's sentence (including any orders relating to supervised release, fines, forfeiture, and restitution). This provision is binding even if the Court's Guidelines analysis is different from that set forth in Defendant's Plea Agreement.

If, despite this waiver, Defendant appeals or challenges in a future proceeding (collateral or otherwise) his sentence, the U.S. Attorney reserves the right to argue the correctness of the sentence imposed by the Court (in addition to arguing that any appeal or future challenge is waived as a result of this waiver).

5.     Letter Immunity

In return for Defendant's full and truthful cooperation, the U.S. Attorney agrees not to use any information provided by Defendant pursuant to this Cooperation Agreement or pursuant to the proffer letter dated May 2, 2018 (or any information directly or indirectly derived therefrom) against Defendant in any criminal case except in a prosecution: (1) for perjury or obstruction of justice, or for making a false statement, after the date of this Cooperation Agreement or the Plea Agreement; or (2) for an act of physical violence against the person of another, or conspiracy to commit any such act of violence. The U.S. Attorney reserves the right to respond fully and accurately to all requests for information by the Court and U.S. Probation Office in this case. All such disclosures, however, shall be made subject to the constraints identified in USSG § 1B1.8(a)

3

and its commentary on the use of this information by the Court and U.S. Probation Office. Regardless of the provisions of USSG § 1B1.8(b)(5) and its commentary, the U.S. Attorney agrees to take the position at sentencing that information provided by Defendant pursuant to this Cooperation Agreement and the Plea Agreement should not be used as a basis for the Court to refuse to depart downward.

6.    Breach of Cooperation Agreement

If the U.S. Attorney determines that Defendant has breached this Cooperation Agreement by making any false, incomplete or misleading statement, or by providing any false, incomplete or misleading information to any law enforcement personnel, grand jury or court, the U.S. Attorney may terminate this Cooperation Agreement and/or the Plea Agreement as set forth in Paragraph 13 of the Plea Agreement; may pursue any and all of the remedies for breach set forth in Paragraph 13 of the Plea Agreement; and may prosecute Defendant for any and all offenses that could be charged against Defendant in the District of Massachusetts, including, but not limited to, false statements and perjury.

7.    Complete Cooperation Agreement

This letter contains the complete supplemental agreement between the parties relating to Defendant's cooperation in this matter.  No other promises, representations or agreements have been made other than those set forth in this Cooperation Agreement, the proffer letter dated May 2, 2018, which is superseded by this Cooperation Agreement as to any statements made after the date of this Cooperation Agreement, and the Plea Agreement.  This Cooperation Agreement can be modified or supplemented only in a written document signed by the parties or on the record in court.

4

If this letter accurately reflects the cooperation agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Agreement below.  Please also sign below as Witness.  Return the original of this letter to Assistant U.S. Attorney Eric S. Rosen.

Very truly yours,

ANDREW E. LELLING
United States Attorney

By:

STEPHEN E. FRANK
Chief, Securities and Financial Fraud Unit
JORDI DE LLANO
Deputy Chief, Securities and Financial Fraud Unit

ERIC S. ROSEN
Assistant U.S. Attorney

5

SINGER-VOL002-000465

## ACKNOWLEDGMENT OF COOPERATION AGREEMENT

I have read this Cooperation Agreement in its entirety and discussed it with my attorneys. I hereby acknowledge that it fully sets forth my cooperation agreement with the United States Attorney's Office for the District of Massachusetts. I further state that no additional promises or representations have been made to me by any official of the United States in connection with this matter other than those set forth in the Plea Agreement dated March 4, 2019, and the proffer letter dated May 2, 2018. I understand the crimes to which I have agreed to plead guilty, the maximum penalties for those offenses, and the Sentencing Guideline penalties potentially applicable to them. I am satisfied with the legal representation provided to me by my attorneys. We have had sufficient time to meet and discuss my case. We have discussed the charges against me, possible defenses I might have, the terms of this Cooperation Agreement (and the March 4, 2019 Plea Agreement), and whether I should go to trial. I am entering into this Cooperation Agreement freely, voluntarily, and knowingly.

Rudolph "Rudy" Meredith
Defendant

Date: 3/5/19

I certify that Rudolph "Rudy" Meredith has read this Cooperation Agreement, and that we have discussed both its meaning and its relationship to the Plea Agreement dated March 4, 2019. I believe he understands the Cooperation Agreement and is entering into the Cooperation Agreement freely, voluntarily, and knowingly.

Paul Thomas, Esq.
Attorney for Defendant

Date: 3/6/19

6

SINGER-VOL002-000466