UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA  )<br>  )<br>        v.              )  Criminal No.: 19-10080-NMG<br>  )<br>DAVID SIDOO, *et al.*,        )<br>  )<br>        Defendants.          ) | |

**GOVERNMENT'S CONSOLIDATED SUR-REPLY
IN OPPOSITION TO DEFENDANTS' MOTIONS TO COMPEL**

The defendants' reply briefs make three principal assertions: first, that the government's recent disclosures were late; second, that the government is withholding exculpatory evidence; and third, that the government should be ordered to disclose the complete FBI-302 reports of its witness interviews. These claims are without merit.

First, the defendants complain that the government's January 28 disclosures should have been made earlier – McGlashan, for example, contends the information should have been disclosed within 28 days of his arraignment last spring, Dkt. 806 at 2 ("McGlashan Br."), and Loughlin and Giannulli assert that it was disclosed at "the eleventh hour," Dkt 807 at 3 ("Giannulli Br.") – are baseless because the interviews were not conducted until recently.[1] The government's disclosures of statements by Rick Singer, for example, were largely based on an interview conducted in December. That is why, in its response brief, the government alerted the Court and the parties that it anticipated "making supplemental disclosures to the defendants in the next few days after this

---

[1] It is, of course, not the "eleventh hour." No trial date has been set in this case. But if Loughlin and Giannulli believe their contention, it begs the question why they have not made any Rule 16 disclosures, and why they should not therefore be precluded from introducing any items as part of their case-in-chief that they have not disclosed.

brief is filed concerning the most recent interview reports." Dkt. 736 at 2 ("Gov't Br."). The government has broad powers, but they do not include mental telepathy or time travel. The government cannot disclose witness statements before the witnesses make them.

Second, the defendants demand that the government "cease withholding critical evidence" (Giannulli Br. at 4), and contend that the government "still [has] not made any clear statement regarding what they might have beyond the 302s that has [sic] not been produced" (McGlashan Br. at 10). Putting aside for the moment that the government is under no obligation to itemize what it has not produced, the government *has*, in fact, made precisely such a disclosure. As set forth in its response brief, the government "has produced e-mails, financial records, audio recordings, and other documentary evidence in its possession, custody or control pertaining to each of the categories of information the defendants seek. The government has not withheld any such evidence based on its disagreement about the merits of the defendants' requests." (Gov't Br. at 3-4). In addition, the government has, in a demonstration of its good faith, provided FBI-302 reports of witness interviews to the Court, together with the related disclosures, for *in camera* review. These disclosures make clear that the government is *not* withholding exculpatory evidence. While the defendants may, understandably, be upset about the lack of exculpatory evidence, the absence of such evidence is a result of their criminal conduct, not any government disclosure violations.[2]

Third, as the government has noted, the instant dispute boils down to the defendants' demand for the FBI-302 reports in their entirety. But the defendants are simply not entitled to those

---

[2] The defendants complain that "the Government's view of the evidence determines what is *Brady*." (McGlashan Br. at 5). Their gripe is with the law, not the government. As the Supreme Court has made clear, "[t]he government is primarily responsible for deciding what evidence it must disclose to the defendant under *Brady*." *United States v. Prochilo*, 629 F3d 264, 268 (1st Cir. 2011) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 59–60 (1987)).

reports at this time. The rules concerning the disclosure of impeachment information and Jencks material are clear. Calling such material "*Brady*" does not make it so. This case presents no basis to depart from the well-established procedures that govern every criminal case, notwithstanding the defense's histrionic briefs that appear to be written for an audience other than the Court. While the government may, in the interests of efficiency, disclose impeachment materials earlier than is required under the Local Rules, the defendants' request for Court intervention is without merit and should be denied.

The government briefly addresses the defendants' specific requests in turn.

Lori Loughlin and Mossimo Giannulli

1. Singer's "Full Statements" About Loughlin's and Giannulli's Payments

Loughlin and Giannulli demand that the government disclose Singer's "full statements" about "the nature of their payments." (Giannulli Br. at 9-10, 17).

As previously noted, the government has disclosed all communications in its possession, custody and control between or among Singer, Loughlin and Giannulli, as well as summaries of what Singer told government investigators about what he recalled about his communications with Loughlin and Giannulli concerning their payments. Counsel for Giannulli and Loughlin complain that "the Government has offered no justification for providing a prosecutor's sanitized characterization of the 302 Reports rather than the actual Reports and accompanying notes from the interviewers themselves." (*Id*. at 12). But the defendants' characterization of the government's disclosure as "sanitized" is baseless and untrue, and "the Government is under no legal obligation to explain why it chose to summarize the statements at issue rather than produce the notes and FBI 302s." *United States v. Collins,* 409 F. Supp. 3d 228, 244–45 (S.D.N.Y. 2019) ("Defendants do not cite case law that supports their argument that the Government is required to produce primary

materials containing exculpatory statements in order to meet its *Brady* obligation. This is not surprising because such disclosure is not legally required. . . .").[3]

To the extent the defendants seek Singer's statements to other, uncharged parents concerning "their admissions-related donations" (Giannulli Br. at 7), the government has, as noted, provided the *actual* communications in its possession, custody or control. That said, the defendants correctly note that the government has not disclosed the substance of Singer's statements to investigators about what he told other, uncharged parents. That is because those statements are not exculpatory as to these defendants.[4] The defendants' contention that, if "Singer *did* in fact tell some clients that their admissions-related donations were legitimate," that would "corroborate[] Defendants' lack of fraudulent intent" is farcical. (*Id.*). Communications the defendants did not know about cannot be "quintessential *Brady*," as they contend, because those communications are not evidence of the defendants' state of mind and could not have shaped their intent. Indeed, unlike co-conspirator statements, they are not even admissible.[5] (*Id.*).

2. USC's Knowledge of Admissions-Related Donations

Loughlin and Giannulli also seek all information concerning "USC's knowledge about Singer and his operation." As the government has noted, it has disclosed all documents and communications relevant to its investigation that it obtained from USC, including all documents

---

[3] *See also, e.g., United States v. Mavashev*, 2010 WL 670083, at *1-*3 (E.D.N.Y. Feb. 23, 2010) (rejecting defense request for witness statements where government produced summaries of favorable information witnesses provided); *United States v. Henderson*, 250 Fed. Appx. 34, 38-39 (5th Cir. 2007) (approving government's disclosure of information by letter).

[4] To the extent such evidence constitutes Jencks or impeachment material, the government will disclose it as such in accordance with the Local Rules.

[5] Moreover, to the extent Singer described his scheme to an uncharged parent as "not improper," such communications simply highlight the *inculpatory* nature of his communications with Giannulli and Loughlin.

4

related to Loughlin, Giannulli or Singer. The government has also reviewed FBI 302 reports of its witness interviews, but – with the notable exception of cooperating witnesses who were members of the charged conspiracy – has not interviewed any USC witness who was aware of Singer's scheme to facilitate the admission of his clients' children as purported athletic recruits, in exchange for money. No witness has suggested that USC condoned this scheme, tacitly or otherwise. Nor is the government in possession of any evidence suggesting that anyone at USC, save Heinel, was aware the Giannulli children were admitted in exchange for money, or that they were not the athletes they purported to be.[6]

Moreover, the evidence the government has already disclosed explains the absence of such information. For example, Heinel took steps to make sure that payments from Singer could *not* be traced to the admission of any student. *See* Ex. A at 3 (Oct. 5, 2018 call in which Heinel instructed Singer to delay having side door families send her the $50,000 checks because she did not want the money "so close" to the time of the applicant's admission). Likewise, to the extent that Heinel apprised the Dean of Admissions about legitimate donations by the families of applicants, she specifically did *not* do so with respect to the payments by Loughlin and Giannulli. *See* Ex. B (presentation of Giannullis' younger daughter to athletics subcommittee with no reference to "donations"). Similarly, to the extent that Singer, through his purported charity, made payments to Heinel's accounts at USC, he typically did so through cashier's checks. *See* Ex. C (examples of cashiers checks).

---

[6] Singer himself has advised the government that he hid the scheme from USC's athletic director, and that he was not aware of anyone at the university, besides Heinel and the other co-conspirators, who knew about it.

William McGlashan Jr.

1. Evidence of McGlashan's Knowledge

McGlashan seeks evidence "reflecting what and how much he knew" about the standardized test cheating and the USC "side door" recruitment, including whether his co-conspirators deceived or were forthcoming with him.[7] (McGlashan Br. at 8). Evidence that he was deceived, McGlashan contends, should be produced as exculpatory, while evidence that he was *not* deceived should be produced as pursuant to Rule 16(a)(1)(E)(i) as "material to the preparation of the defense."

Like Loughlin and Giannulli, what McGlashan really seeks are witness statements, inasmuch as the government has already produced all of his all recorded telephone calls, e-mails and text messages with Singer. The government has also reviewed the FBI 302 reports of interviews with Singer and Mark Riddell and produced any statements in those reports reflecting McGlashan's lack of knowledge of the scheme, as well as any statements Singer and Riddell have made concerning whether his son had a legitimate learning disability.[8] While McGlashan may, understandably, be disappointed that this disclosure was limited, that fact is attributable to the absence of exculpatory evidence, *not* any failure to disclosure it.

To the extent that McGlashan seeks *inculpatory* witness statements, he is not now entitled to them. McGlashan continues to insist that he is entitled to such statements under Rule 16 as evidence "material" to his defense, citing a 2007 decision by then-Magistrate Judge Sorokin. In a

---

[7] McGlashan refers to two "schemes" but he is, in fact, charged with a single scheme, albeit one that was committed in multiple ways and had multiple victims.

[8] The government has also produced evidence obtained from McGlashan's school and a doctor regarding his son's learning disability.   Further, although not exculpatory, Riddell has told the government that he did not believe that McGlashan's son had a learning disability.

later case, however, Judge Sorokin acknowledged that his earlier conclusion does *not* apply to Jencks Act material, because FED. R. CRIM. P. 16(a)(2), specifically "exclude[s] Jencks Act Information from its reach." *United States v. O'Brien*, 2013 WL 1057929, at *9 (D. Mass. Mar. 13, 2013); *see also* FED. R. CRIM. P. 16(a)(2) (rule does *not* authorize the "discovery or inspection of statements made by prospective government witnesses except as provided by" the Jencks Act, and does not authorize the inspection of government reports or memoranda except as permitted by subsections concerning statements of the defendant and expert witnesses); *see also United States v. Nelson-Rodriguez*, 319 F.3d 12, 37 (1st Cir. 2003) (holding that the Jencks Act does not require government to disclose FBI 302 reports until after witness's testimony on direct examination). Tellingly absent from the "exceptions" set forth in Rule 16(a)(2) is Rule 16(a)(1)(E)(i)—the provision concerning items "material to preparing the defense." McGlashan's effort to render the Jencks Act meaningless is at odds with the plain language of Rule 16 and should be rejected.

2. Evidence that McGlashan Did Not Participate in the "Side Door"

McGlashan next seeks evidence "reflecting the fact that he did not participate in the side door scheme for which he is charged." (McGlashan Br. at 11). The government has already disclosed the substance of Singer's statements to investigators concerning McGlashan's intent to participate in the side door. There is nothing additional to disclose at this time.

3. Evidence Relevant to an Entrapment Defense

McGlashan complains that the government's disclosures concerning when Singer began cooperating and when "Singer first suspected that he was being investigated" are insufficient. (McGlashan Br. at 13). Once again, however, there is nothing more to disclose. As the government has noted, Singer was first approached by investigators on September 21, 2018, and the

7

government has no information suggesting that he was aware of the government's investigation prior to that date.

4. Evidence that USC Was Not the Victim of Fraud

Like Loughlin and Giannulli, McGlashan seeks evidence "showing that USC was familiar with Singer and his method of getting students admitted to USC (or that McGlashan believed as much)." (McGlashan Br. at 13). As set forth above, the government has no evidence that USC was aware of or condoned Singer's scheme, or of McGlashan's effort to secure his son's admission to the university as a purported football recruit in exchange for money.

5. Grand Jury Transcripts

McGlashan, in his reply, appears to abandon his request for grand jury transcripts, and instead now seeks *in camera* review of those transcripts on the grounds that the evidence presented to the grand jury was somehow "inaccurate." McGlashan offers nothing new in support of this request, and he does not identify a single inaccuracy in the Fourth Superseding Indictment.[9] Accordingly, McGlashan falls far short of meeting his heavy burden of showing a "particularized need" or "compelling necessity" warranting such review. *See United States v. Capozzi*, 486 F.3d 711, 727 (1st Cir. 2007) ("[T]he indispensable secrecy of grand jury proceedings must not be broken except where there is compelling necessity" and "[t]he burden of showing particularized need rests squarely on the defendant.").

---

[9] Contrary to McGlashan's contention, the Fourth Superseding Indictment correctly sets forth the date on which the ACT sent the fraudulently obtained score to Northeastern University. *See* FSI ¶¶ 200 and 376. While the Northeastern application itself, which contained the ACT score, was sent on October 22, 2018 – the date McGlashan cites – the ACT released the score directly to Northeastern via wire on October 24, 2018. *See* Ex. D (ACT Internet reporting date for Northeastern (school 1880) was in cycle 81330 for McGlashan, which was Oct. 24, 2018).

John Wilson

1. Singer's Description of His Practices to Parents

Like Loughlin and Giannulli, Wilson seeks "evidence that Singer assured his clients that their donations were lawful and were welcomed by the recipient institutions," which Wilson contends "directly negates the existence of the required element of bad intent." (Wilson Br. at 4). Once again, Wilson's demand is for a witness statement, because the government has already produced every communication in its possession, custody, or control between Singer and a parent or client regarding his scheme. But Wilson is not entitled to such witness statements because they are not exculpatory. While Singer's statements assuring clients that their donations were lawful might arguably be exculpatory as to the parents to whom Singer provided such assurances, they are assuredly *not* exculpatory as to Wilson, who received no such assurances (and who falsely deducted his payments from his taxes as purported business consulting expenses, supported by falsified invoices). Nor is the fact that the government has charged a "nationwide conspiracy" relevant to this analysis. (*Id*. at 5). The government has not alleged that all of Singer's clients were members of that conspiracy. And even exculpatory statements to other alleged co-conspirators would not "undermine the overall conspiracy," as Wilson contends, unless they were made (or known) to *every* alleged member of the conspiracy, thereby negating its existence. That is not the case.

2. Singer's Referral Sources

As Wilson acknowledges, the government has disclosed to Wilson that it was his long-time accountant who introduced him to Singer. Wilson complains that the disclosure should have been

9

made "many months ago." In contrast to Wilson, however, the government was not in possession of the information many months ago.

3. Colleges' Attitudes Towards Fundraising from Applicants

Wilson's contention that evidence concerning USC's "ordinary" fundraising practices "contradicts the government's theory that USC was defrauded into admitting Wilson's son" is untrue. (*Id*. at 6). To the contrary, information about the legitimate fundraising practices of USC and other schools is *inculpatory* as to Wilson and the other defendants because it highlights the illegality of their end-run around the legitimate development and admissions process. Likewise, Wilson's contention that his "payment was a donation by all commonsensical and precedent-based definitions of that word," is perplexing, since Wilson went to great lengths to deduct that payment from his taxes as a business expense, a scheme Wilson himself described as "Awesome."[10] (*Id*.) *See* Dkt. 736-1 at 219 and 221. Notwithstanding its disagreement that this information has any exculpatory value, however, the government will disclose to the defendants the substance of witness statements concerning the role of donations in the admissions process.

4. Singer's Concealment of Misrepresentations to Colleges

Wilson inaccurately describes the government's disclosure concerning his knowledge of the falsehoods on his son's USC application. What the government disclosed is that Singer, in a recent interview, did not *initially* recall whether, six years ago, Wilson was aware of falsehoods in his son's application, but later did recall, after refreshing his recollection by reviewing his e-mail correspondence, that Wilson *was* aware of those falsehoods. The government has no other

---

[10] Ultimately, $120,000 was deducted as a business consulting expense and the remaining $100,000 was deducted as a charitable payment to Singer's KWF. *See* Dkt. 736-1 at 223-26.

evidence suggesting that Wilson was unaware of the falsehoods in his son's application. To the contrary, the evidence is that Singer sent Wilson the water polo profile, which contained falsities.

Wilson still presents no argument for why evidence of what Singer did for *other* individuals is material or exculpatory as to Wilson. It is not, and Wilson is not entitled to additional disclosures on this subject.

5. Singer's Embezzlement from His Clients

The government has produced all bank records in its possession, custody or control showing how the money Singer received was disbursed, as well as charts tracking the money flow. To the extent that Singer (or anyone else) has suggested in interviews that Singer stole money from his clients, that information will be disclosed as impeachment material pursuant to the Local Rules.

6. Singer's Obstruction and Government Instructions

Wilson presents no argument as to why instructions to a cooperating witness are exculpatory, or why scripting a cooperator's conversations is relevant to a defendant's state of mind when the defendant does not know that the conversation has been scripted. To the extent that Singer failed to follow the government's instructions, however, the government will disclose the relevant evidence pursuant to *Giglio* and the Local Rules.[11]

---

[11] Wilson is, in any event, already in possession of the information about Singer's obstruction. During Singer's plea colloquy, he explained to Judge Zobel that he received instructions from investigators "that I could not tip anybody or couldn't talk to anybody about things," but that he did not follow those instructions and instead alerted certain clients to the government's investigation. *See* Singer's March 12, 2019 Rule 11 colloquy at 28-29.

11

CONCLUSION

For the foregoing reasons, the defendants' motions should be denied.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:    */s/ Eric S. Rosen*
ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Assistant United States Attorneys

Date: February 7, 2020

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on February 7, 2020.

By:    */s/ Eric S. Rosen*
ERIC S. ROSEN
Assistant United States Attorney