# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

DAVID SIDOO et al.,

Defendants.

No. 1:19-cr-10080-NMG

## DEFENDANT JOHN WILSON'S CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF HIS MOTIONS TO SEVER, TO DISMISS, AND TO STRIKE

### I.    INTRODUCTION

Defendant John Wilson stands out among the parents charged in connection with this case, because the evidence at his trial will be so different.  By shoe-horning his different facts into the same indictment, the government cobbled together a mishmash of a prosecution that conflicts with binding case law.  The government's joinder of Wilson with other defendants is both inefficient and unfairly prejudicial.

Wilson's son was a star-high school athlete, who became a contributing member of USC's renowned water polo team.  The government recognizes that Wilson's son honestly earned grades and scores that met USC's admission standards (even for non-athlete applicants).  Wilson's donations went only to ordinary USC bank accounts, not to any individual recipient.  Indeed, when Wilson's son enrolled as a USC freshman—in 2014—William "Rick" Singer had not yet even met Donna Heinel, and she played no role in Wilson's son's admission.

Four and a half years later, in late 2018, Rick Singer was working as a government cooperator.  At the government's direction, Singer advised Wilson to make advance donations to Singer's charity in connection with the future college careers of Wilson's daughters.  The daughters were still first-term high-school juniors, whose college applications would not be due

until 2020.  Based on those conversations between Singer and Wilson (the "2018 Conduct"), the Fourth Superseding Indictment (the "Indictment") piles on five substantive fraud and bribery charges against Wilson alone (the "Substantive Counts").

Wilson is joining the motions to dismiss that the defendants are filing jointly.  He submits this memorandum in support of the additional motions that he makes individually, based on his unique factual situation.  Wilson asks the Court:

(a)  To sever Wilson's trial from those of his codefendants, for reasons of both fairness and efficiency, and try Wilson alone.

(b)  To dismiss the Substantive Counts, namely Counts Six, Eight, Nine, Eleven, and Twelve, as legally deficient and factually impossible.

(c)  To strike as surplusage the allegations concerning the 2018 Conduct in paragraphs 238-44 of the Indictment.

The Court should grant these motions for the reasons explained below.

## II.   BACKGROUND[1]

### A.   USC 2013-2014

Singer ran a highly successful college consulting business that provided conventional services such as tutoring, editing essays, and helping applicants to select and apply for appropriate colleges.  Wilson hired Singer at two separate junctures to provide help and advice in connection with the Wilson children's college applications.  Indictment ¶ 225.  The first

---

[1] The facts recited in this brief are alleged in the indictment, not materially disputed, or both. *See United States v. Brissette*, 919 F.3d 670, 676 (1st Cir. 2019) ("[A] district court may consider a pretrial motion to dismiss an indictment where the government does not dispute the ability of the court to reach the motion and . . . does not dispute the pertinent facts."  (quoting *United States v. Musso*, 914 F.3d 26, 29-30 (1st Cir. 2019))).

engagement concerned Wilson's son, who applied to college in the fall of 2013.  *Id.*  Wilson's son was a successful swimmer and a top-caliber water polo player.  He won individual awards and played on top-tier, nationally competitive club teams.  He was selected for a United States Olympic Development Program Training Team, and for one of the California Coast Section All-Star Teams.  Exs. 1, 2.  Several colleges, including Division I schools, were interested in recruiting him for their water polo or swim teams; and his high-school coach spoke to the USC water polo coaching staff in support of his candidacy for the USC team.  Ex. 3, at 1.  Below is a photo of the son in high-school water polo action:



Wilson's son was also a good student—well within the range of USC's admission pool in terms of both GPA and board scores, all of which he attained (the government concedes) fairly and honestly.

Singer told Wilson that USC Water Polo was one of several college programs that welcome, and indeed rely on, donations from the families of applicants who are qualified to join the team as non-scholarship "walk-ons."  Singer said that the program provides additional support in the application process to applicants whose families pledge such gifts, which Singer called "side door" donations.  Singer emphasized—in unrecorded calls that mirror his statements to many other parents—that the "side door" fundraising method is an equally legitimate analog of the "back door," meaning (in Singer's lexicon) larger donations to the university-wide development office, resulting in more potent and long-lasting solicitude toward the donor's family.

The allegations against the other USC-connected defendants occurred years later, when Singer's contact at USC's athletics department was USC Senior Associate Athletic Director Donna Heinel.  Indictment ¶¶ 119, 129, 149, 178, 208, 221, 247, 274.  But when Wilson's son was applying to colleges—in 2013—Singer had not yet even met Heinel; Athletic Director Pat Haden made the introduction almost two years later.  *See* Ex. 4.

Singer did know USC water polo coach Jovan Vavic, Indictment ¶ 228, whose teams were legendary for their top-of-the-nation results, grueling training regimens, and deep rosters. Documents from both the government and USC disclose that Wilson's son was one in a long line of walk-on water polo players who came to USC with both water polo talent and a family willing to support the program financially.  USC's practice of recruiting such applicants, soliciting donations from their families, and supporting their candidacies dated back to at least 2007, with

4

the backing of the top of the Athletic Department hierarchy.  *See* Exs. 5, 6[2]; ECF Nos. 546-1 to 546-10.

Wilson agreed to donate $200,000 to USC.  Indictment ¶¶ 236-37.  Though it is alleged that Singer relayed payments originating from certain parents to the pockets of college personnel, this did *not* occur in Wilson's case:  Singer persuaded Wilson to route his donation through Singer's charity, the Key Worldwide Foundation (KWF), and though his for-profit consulting business.  Singer forwarded $100,000 to USC in Wilson's name, whereupon USC issued a letter thanking Wilson for supporting "Men's Water Polo," and invited Wilson to become one of USC's "Ambassadors."  Singer stole the other $100,000 for himself.   Indictment ¶¶ 237, 343, 344; Exs. 7, 8.  Numerous members of USC's athletics and development staff—including Haden, the Athletic Director—knew that Wilson had made a donation through Singer, though obviously they did not know about Singer's theft.  Exs. 9, 10.

USC admitted Wilson's son in March 2014.  Indictment ¶¶ 235-36.  He joined the USC water polo team as planned.  A government witness verified the content of Wilson's son's profile page on the USC team roster.  Ex. 11; Ex. 3, at 5.  Wilson's son also appears in the team's annual photo, below (rear left):

---

[2] Wilson will file Exhibit 6, either under seal or in the public record, following the Court's resolution of his pending Motion for Leave to File (ECF No. 989).



Wilson's son left the team after completing the full 2014 season and playoffs, because of

multiple concussions he had suffered in and out of the water polo pool over several years.  Ex.

12.  He graduated USC with good grades.[3]

## B.    Conversations in 2018-2019

The Indictment makes no allegations relating to Wilson during the four and a half years

between April 2014, Indictment ¶ 237, and September 2018, *id.* ¶ 238.

When they reconnected, Wilson and Singer discussed the college plans of Wilsons' twin

daughters.  The daughters were first-term high school juniors at the time.  They had strong

academic backgrounds and serious academic ambitions.  Their early test scores were good, with

the potential to improve.  Ex. 13, at 2, 7.  At this early stage of the process, both daughters

---

[3] Wilson expects that the Government may claim that Singer "embellished" the athletic
accomplishments of Wilson's son presented to USC's admissions subcommittee.  Indictment
¶¶ 229, 231-34.  A closer examination of the evidence shows that Wilson took no part in any
deceitful conduct in which Singer may have engaged.

wanted to take the same rigorous college engineering major, with strong doses of math and science.  *Id.* at 5.

Wilson and Singer had one discussion before Singer began cooperating with the government.  During that conversation, Singer described two levels of preparation services he could offer, at different prices.  *Id.* at 2-3.  When the discussion turned to "side door" donations, Singer again confirmed that such donations were a legitimate way of improving the odds of acceptance.  Singer stated, in fact, that the President of Harvard had just endorsed such donations:

> [T]hat's why I'm going to Harvard next Friday, because the president wants to do a deal with me because he found out that I've already got 4 already in without his help.  So he's like, "How about—why would you go to somebody else if you could come to me?"

*Id.* at 8.[4]  Singer also explained that side door donations were now common:  he was planning "to do over 730 of these side doors this year," at "50 or 60" schools.  *Id.* at 10.

Singer reiterated the legitimacy and commonness of the side-door-donation program in a subsequent video call, using the Apple FaceTime application, with Wilson and his family. During that lengthy call, Singer also noted that colleges now accepted "side door" donations from applicants who could join athletic teams as managers, or in other support roles, even if (unlike Wilson's son) they were not strong enough athletes to compete at the varsity level.  *Cf.* Indictment ¶¶ 238-39 (describing a subsequent call in which Singer stated that an applicant "could be on [the] team" even though she "may not be up to the [usual] level," and that Wilson's daughters "don't have to play").  Although Singer told the government that he was going to

---

[4] Wilson now assumes that Singer's claim was false, i.e., that the President of Harvard had no such conversations with Singer.

make the FaceTime call to the Wilson family from the FBI's offices in Sacramento, and although he indeed did so—with six agents and prosecutors from Boston present and waiting for at least 48 minutes—the government apparently decided to neither record nor monitor that call. The agents' notes and reports do not even mention that Singer made this FaceTime call, never mind memorialize Singer's exculpatory sales pitch.

The Court is aware of the iPhone notes in which Singer described his "abrasive" conversations with government agents, who required Singer to "bend the truth" on recorded telephone calls. Ex. 14. In essence, even though Singer had told clients that their "money was going . . . to the program . . . and that it was a donation," the government instructed Singer to describe such donations as "payments" going to "the coach." *Id.* Also Singer expressed reluctance to "entrap" defendants, *id.*, his subsequent calls to Wilson followed the government's script—introducing ambiguous, prosecution-friendly phrases into the dialogue that contradicted Singer's prior representations and arguably obscured Wilson's innocent intent.

For example, in a call on September 29, 2018, Wilson repeatedly indicated that he was contemplating legitimate donations to universities, while Singer injected references to payments to "the coach":

> WILSON: . . . I remember last time I did this, you didn't really make any money . . . [Y]ou make *a donation to the school*, and that's it? . . .
>
> SINGER: . . . [W]hat I'll do is I'll split the money potentially *to the coach* or other . . . parties that are [at] that school that need the money . . . Or it may go right *to the coach* . . .
>
> WILSON . . . [S]o you [i.e., a donor such as Wilson] don't actually get credit for *a donation to the school*, or get hounded for that.

Ex. 15, at 2-3 (of 4 pages) (emphasis added). Singer also bolstered his credibility as Harvard-affiliated himself by stating that he was reading and evaluating college applications on Harvard College's behalf. *Id.* at 4 (of 4 pages).

Similarly, an October 15, 2018 consensual call between Singer and Wilson included the following exchange:

> SINGER:   So I know when . . . we get the girls in it's a done deal and you're going to take care of your part of it, you're gonna make the payments *to the schools* and the—*to the coaches*.  And that's what I need . . . so I'm not worried about that.
>
> WILSON:   Uh, uh, help me understand the logistics?  I thought I make the payment to you and you made the payment *to the school*.
>
> SINGER:   Correct. That's correct.
>
> WILSON:   Oh you said that *I* make the payments *to the schools*.

Ex. 16, at 2 (of 4 pages) (first, second, third, and fifth emphases added).  Whereas Singer used the phrase "payments . . . to the coaches"—word-for-word the phrase he denounced in his iPhone notes as false—Wilson's reactions show that he continued to believe Singer's earlier explanation, i.e., that Wilson would be donating "to the school."

One final illustration of the dynamic of these conversations is a November 5, 2018 call. There, Singer occasionally reinforced to Wilson the impression that the plan was a legitimate donation; he commented, for example, that "women's lacrosse is always looking for help. Women's fencing, looking for help."  Ex. 17, at 3 (of 4 pages).  But as the government had demanded, Singer also three times injected short, ambiguous, misleading comments about paying a "coach."  *See id.* at 2 (of 4 pages) ("I have to pay the coach"); *id.* ("we'll pay the coach"); *id.* at 3 (of 4 pages) ("we pay the coach, we get it done").  Wilson remained oblivious to this ploy, conditioned by his prior contribution to USC, by his earlier conversations with Singer, and by their recent FaceTime discussion.  Wilson thus continued to understand "the coach" as a shorthand for the coach's program.  He asked, for example, "Does he [i.e., the sailing coach] care

about budget this year versus next year?"  *Id.* at 4 (of 4 pages).  (Obviously, while sailing programs have annual budgets, bribe recipients do not.)[5]

As the government's investigation progressed, Singer urged Wilson to make an early "deposit" on his donations.  Singer and Wilson's discussions focused primarily on Harvard and Stanford, but the Wilson daughters were more than a year away from beginning the college-application process, and (naturally) had not even visited college campuses, taken the requisite standardized tests, or finalized their college choices.  Ex. 16, at 3-4 (of 4 pages).  Wilson eventually made the payments Singer proposed, making two wire transfers of $500,000 each from his S-Corp to KWF.  Indictment ¶¶ 241, 244.

## C.    Tax Return 2014

In the fifth and current iteration of the indictment, the government added a charge against Wilson of making a false statement on a tax return (26 U.S.C. § 7206).  The charge relates to Wilson's 2014 tax return.  That return took deductions for the $200,000 of donations Wilson had provided—for USC—to Singer, and an additional $20,000 Wilson had paid to Singer himself.  Indictment ¶ 365.  Wilson's bookkeeper made the arrangements concerning Singer's invoices to Wilson and Wilson's tax filings.  Indictment ¶ 358-62.  Wilson's returns were prepared by two accountants, both of whom communicated about the returns with Wilson's bookkeeper, not with Wilson himself.  Ex. 3, at 3.  Wilson is the only defendant going to trial on a tax charge.

---

[5] In his scripted conversations with Wilson, Singer carefully refrained from using unambiguous language that would have alerted Wilson to the misleading record Singer was attempting to create.  Singer did not, for instance, say to Wilson—as he did to another, uncharged parent—that the "coach . . . wants me to wire him the $100,000 bribe."  Ex. 18, at 2 (of 4 pages).

### III.   MOTION TO SEVER

The Court should sever Wilson's trial from those of his codefendants and try Wilson alone.  Wilson estimates that his severed trial would take 9 to 11 trial days to get to jury deliberations.  Given the nature of the charged conduct and offenses, this severance would be both just and efficient.

Severance is warranted where there is "a serious risk that a joint trial would compromise a specific trial right." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).  "Such a risk might occur when evidence that the jury should not consider against a defendant . . . is admitted against a codefendant." *Id.*  "When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened." *Id.*  Even absent a risk to a "specific trial right," the District Court has the "power to order separate trials ' . . . as an aspect of its inherent right and duty to manage its own calendar.'" *United States v. Leichter*, 160 F.3d 33, 35 (1st Cir. 1998) (quoting *United States v. Gay*, 567 F.2d 916, 919 (9th Cir. 1978)).

The defendants are jointly filing motions[6] demonstrating that the government improperly joined all defendants into conspiracy charges that violate *Kotteakos v. United States*, 328 U.S. 750 (1946).  Each of the charged conspiracies alleges "no connection . . . between [the defendants] . . . other than that [Singer was] the instrument in each instance." *Id.* at 754-55. These archetypal hub-and-spoke conspiracies lack any "rim" connecting the parents to each

---

[6] Motion to Dismiss Pursuant to Federal Rules of Criminal Procedure 8 and 12(b)(3)(B)(i), (iv), and (v) (to be filed by April 1, 2020); Motion to Sever Pursuant to Federal Rules of Criminal Procedure 12(B)(3)(D) and 14 (same).

other.  The government does not even attempt to connect Wilson to any of his parent codefendants.

The problems of a joint trial are magnified because the facts and charges concerning Wilson are so different from those concerning his codefendants.  These discrepancies mean (a) that a joint trial would cause incurable prejudice to Wilson, but also (b) that a joint trial of Wilson would not yield any efficiency gains.  Three key aspects of Wilson's case yield this conclusion.

*First*, the government has consistently described this case as one about "fake athletes" gaining admissions with no true athletic prospects.  *See, e.g.*, Feb. 27, 2020 Hr'g Tr. 16, 18, ("these were fake athletes"; "You pay the money.  You get in as a fake athlete."; "USC . . . does not have a legitimate admissions process for fake rowers, fake football players, fake pole vaulters, or fake anything").  That depiction is not necessarily accurate with regard to *any* defendants' facts or beliefs.  But Wilson's son also was, in fact, truly qualified to join USC's athletic team in his chosen sport, and indeed joined the team as planned, *see supra* p. 5; Wilson appears to be the only defendant in this prosecution whose child actually participated as an athlete on his college's team.  Likely for that reason, Singer—well into his government cooperation—wrote an iPhone note that included Wilson in a compilation of ultimately-uncharged individuals and duplicate payments, stating:

> *John Wilson . . . donation to USC program for real polo player.*

Ex. 14, at 2.  Including Wilson at a trial in which the government will continue to beat the "fake athlete" drum would thus be particularly unfair to Wilson.  And on the other side of the scale, witnesses and evidence about Wilson's son's water polo career are likely to be necessary at Wilson's trial, but would be entirely irrelevant to the trials of his codefendants.  Indeed, the government has already interviewed multiple witnesses solely to explore this topic.

*Second*, this case is charged primarily as one involving "bribery," whether under 18 U.S.C. § 666 or pursuant to the "bribes or kickbacks" requirement of *Skilling v. United States*, 561 U.S. 358 (2010).  The government has indicated that it will try to show that Singer directed money to the pockets of Donna Heinel and other individuals.  But in Wilson's case, there is no dispute that not a single dollar of the payments alleged in the Indictment went to any USC-related individual.  USC received a $100,000 donation; Singer stole the other $100,000.  A focus on "bribery" at trial would only mislead the jury regarding Wilson's case.  Moreover, the entire portion of the government's case concerning Heinel's conduct is irrelevant to the Wilson prosecution, whereas evidence concerning Singer's arrangements with Coach Vavic is irrelevant to the cases of Wilson's codefendants.  *See United States v. Buchanan*, 930 F. Supp. 657, 668 (D. Mass. 1996) ("Where . . . the overlap between the . . . schemes . . . seems slight, the concerns of judicial economy balance lightly against the dangers of jury confusion . . . .").

*Third*, in its zeal to build pressure on Massachusetts-based Wilson, the government has leveled numerous charges against him that have no analogues in the cases against other parents. Wilson is the only defendant charged in a total of nine counts.  He is the only one facing substantive federal-program-bribery charges, and the only one facing a tax charge.  The Substantive Counts against Wilson arise from recorded conversations made during Singer's cooperation, and will require intensive exegesis that is irrelevant to the other defendants' cases.

Joining Wilson's trial to any other defendant's trial accomplishes few efficiencies.  Most of the documents, recordings, and witnesses relating to Wilson are not relevant to the other defendants, and vice versa.  The government has categorized more than a dozen recorded calls between Singer and Wilson as "pertinent," whereas at most 2-4 recordings concern each other defendant.  Evidence uniquely relevant to Wilson, including evidence about his son's water polo

credentials, water polo career, and USC application could easily involve half a dozen witnesses irrelevant to every other defendant.  For the tax charge alone, Wilson and the government are likely to call at least five witnesses, including Wilson's two tax preparers, Wilson's bookkeeper, an IRS Revenue Agent, and a possible defense expert.  Even the Singer employees who worked with Singer in 2014, and are thus relevant to Wilson's son's application, are different from the employees who worked with the children of the other defendants.  In total, there are likely to be 10 or more fact witnesses relevant to Wilson but irrelevant to every other defendant.   And at Wilson's trial, the Court will need to instruct the jury on three substantive wire-fraud charges, two substantive federal-program-bribery counts, and the charge of making a false statement on a tax return—all of which are irrelevant to the other defendants.  It is consequently likely that a joint trial will devote at least five to six days to evidence and legal issues relevant to Wilson and no other defendant.[7]

---

[7] For essentially the same reasons presented in this memorandum, joining Wilson for trial with any grouping of defendants other than the grouping the Court has currently adopted would cause even greater unfairness and inefficiency.  There is little overlap between Wilson's case and those of defendants (in the second trial grouping) who are charged with conduct other than, or in addition to, USC donations.

14

The following chart summarizes the foregoing factors:

| Argument/evidence/topic | Role in other defendants' case | Role in Wilson's case |
|---|---|---|
| Applicants who did not join college teams ("fake athletes") | Likely | Irrelevant and unfairly prejudicial |
| Money provided to individuals ("bribes") | Likely (for some defendants) | Irrelevant and unfairly prejudicial |
| Donna Heinel's conduct (multiple witnesses) | Necessary | Irrelevant and unfairly prejudicial |
| Jovan Vavic's conduct (multiple witnesses) | Irrelevant and unfairly prejudicial | Necessary |
| Wilson's son's athletic career (multiple witnesses) | Irrelevant and unfairly prejudicial | Necessary |
| Wilson's tax returns (multiple witnesses) | Irrelevant and unfairly prejudicial | Necessary |
| Jury instructions on the substantive wire-fraud and federal-program-bribery counts arising from the 2018 Conduct | Irrelevant and unnecessarily complicating | Necessary (if not dismissed) |
| Jury instructions on making a false statement in a tax return | Irrelevant and unnecessarily complicating | Necessary |

A separate trial of Wilson would thus entail benefits both of fairness and of efficiency. The Court should exercise sever Wilson's trial and try Wilson alone.

## IV.    MOTIONS TO DISMISS

The government has leveled more charges against Wilson than against any other defendant, seizing on the fact that Wilson is the only defendant residing in Massachusetts, and thus adding multiple substantive charges that would plainly lack venue against other defendants.

The Indictment contains three conspiracy charges that join Wilson and other defendants, namely Counts One, Two, and Three.  All three of these conspiracy charges are subject to dismissal for reasons that the defendants are describing in separate, joint motions.[8]

The five Substantive Counts arise from the 2018 Conduct, namely Wilson's communications with Singer beginning in the fall of 2018.[9]  The Substantive Counts are subject to dismissal for two sets of reasons.  First, they each suffer from the deficiencies that, as the defendants explain in separate motions, defeat the Indictment's conspiracy counts.  Second, these counts charge *substantive, completed* offenses that, because of Singer's cooperation with the government, were factually impossible.

---

[8] These joint motions, to be filed by April 1, 2020, are:

- Motion to Dismiss, or in the Alternative to Sever, Pursuant to Federal Rules of Criminal Procedure 8, 12(b)(3)(B)(i), (iv), and (v), 12(b)(3)(D), and 14 (explaining that Counts One, Two, and Three charge rimless hub-and-spokes conspiracies).

- Motion to Dismiss Count One Insofar as It Alleges Conspiracy to Defraud Universities of Property (explaining that admissions "slots" are not a form of property recognized by the federal fraud offenses).

- Motion to Dismiss (1) So Much of Count One as Alleges Conspiracy to Commit Honest Services Fraud Against the University of Southern California and (2) Count Two Alleging Conspiracy to Commit Federal Programs Bribery (explaining that donations to universities are not "bribes" within the meaning of the honest-services and federal-program-bribery statutes).

- Motion to Dismiss the Money Laundering Conspiracy (Count III) (explaining that the monies alleged to have been laundered were not the proceeds of any specified unlawful activity).

- Motion to Dismiss for Lack of Venue (relevant to Wilson as far as Count Two).

[9] The prosecutorial misconduct that gave rise to the evidence concerning the 2018 Conduct is discussed in Defendants' Motion to Dismiss Indictment with Prejudice or, in the Alternative, for Suppression of Evidence Based on Governmental Misconduct and for Discovery and an Evidentiary Hearing (ECF No. 971).

**A.      The Substantive Counts Share the Deficiencies of the Indictment's Wire-Fraud and Bribery Theories**

Each of the Substantive Counts alleges either wire fraud, 18 U.S.C. § 1343, or federal program bribery, 18 U.S.C. § 666, as follows:

- Counts Six and Nine charge wire fraud based on the two wire transfers, of $500,000 each, from Wilson's business to KWF.

- Count Eight charges wire fraud based on a telephone call between Wilson and Singer on October 27, 2018.

- Counts Eleven and Twelve charge federal program bribery based on the same two $500,000 wire transfers from Wilson's business to KWF.

The Substantive Counts rely on the same theories of fraud and bribery that undergird the Indictment's charges of conspiracy to commit wire fraud (Count One) and conspiracy to commit federal program bribery (Count Two).  As a result, the deficiencies that afflict the conspiracy counts (explained in separate motions) apply equally to the substantive counts against Wilson.

The three substantive wire fraud counts—Counts Six, Eight, and Nine—allege fraud of "money and property," as well as fraud of "honest services" through "bribes and kickbacks." Indictment ¶ 376.  The *money and property* at issue are "admission to the Universities." *Id.*  The theory that admissions "slots" are property is also the basis of the "money and property" component of the conspiracy charged in Count One.  But as the defendants explain in a separate, joint motion,[10] admissions slots are not a "traditional concept[] of property" recognized by the fraud offenses. *Cleveland v. United States*, 531 U.S. 12, 24 (2000).  This problem defeats the "money and property" component of Counts Six, Eight, and Nine.

---

[10] Motion to Dismiss Count One Insofar as It Alleges Conspiracy to Defraud Universities of Property (to be filed by April 1, 2020).

The "bribes and kickbacks" alleged in Counts Six, Eight, and Nine are donations to university bank accounts over which (according to the government) specific university employees exercised discretion.  Indictment ¶ 65.  These same donations are also the "bribes" alleged as the basis for the federal-program bribery charged in Counts Eleven and Twelve. Indictment ¶¶ 280, 378.[11]  And the same legal theory—that such donations are "bribes"—serves as the basis of Count One's honest-services component, and of Count Two (the § 666 conspiracy).  But as the defendants explain in a second joint motion,[12] that theory fails:  a donation to a person's employer, in this case a university, is not the type of "private favor" that constitutes a bribe within the meaning of *Skilling* and § 666.  This flaw defeats (a) the "honest services" component of Counts Six, Eight, and Nine; and (b) Counts Eleven and Twelve in their entirety.

Together, all five Substantive Counts fail to state offenses as a matter of law.

## B.    The Substantive Counts Allege Factually Impossible Crimes

In addition to the grounds raised in the joint motions to challenge the conspiracy counts, the Substantive Counts are also untenable because Singer's cooperation with the government made the charged substantive offenses factually impossible.  "Factual impossibility refers to those situations in which, unknown to the defendant, the consummation of the intended criminal act is physically impossible."  *United States v. Luttrell*, 889 F.2d 806, 810 (9th Cir. 1989).  A

---

[11] *See also* Feb. 27, 2020 Hr'g Tr. 16 ("[T]he payments were going to the program, not the coach . . . Judge, that's our theory of the case that we've been proceeding on for the entirety of this case. . . .  The parents were told that the money was going to the program and this was still a bribe").

[12] Motion to Dismiss (1) So Much of Count One as Alleges Conspiracy to Commit Honest Services Fraud Against the University of Southern California and (2) Count Two Alleging Conspiracy to Commit Federal Programs Bribery (to be filed by April 1, 2020).

close examination of applicable precedents shows that only *inchoate* charges, such as conspiracy, can survive factual impossibility problems; and that they can do so precisely because of their inchoate nature.

The First Circuit's discussion in *United States v. Zhen Zhou Wu* illustrates the point:

> [A] defendant can be *convicted of conspiracy* to steal a trade secret even if the documents he sought to steal did not in fact contain trade secrets. Similarly, a defendant can be *convicted of conspiracy* to distribute cocaine and narcotics even though, unbeknownst to him, the substances he was distributing turned out to be innocuous.

711 F.3d 1, 25 (1st Cir. 2013) (emphasis added, citations omitted). The specific nature and evils of conspiracy are the reasons why that offense embraces impossible agreements:

> The conspiracy poses a "threat to the public" over and above the threat of the commission of the relevant substantive crime—both because the "combination in crime makes more likely the commission of [other] crimes" and because it "decreases the probability that the individuals involved will depart from their path of criminality." Where police have frustrated a conspiracy's specific objective . . . these *special conspiracy-related dangers* remain.

*United States v. Jimenez Recio*, 537 U.S. 270, 274-75 (2003) (quoting *Callanan v. United States*, 364 U.S. 587, 593-94 (1961)) (emphasis added, first alteration in original). It is thus specifically the conspiracy offense that remains viable where "certain acts essential to the conspiracy's success are to be carried out by individuals who turn out to be government agents." *United States v. Giry*, 818 F.2d 120, 126 (1st Cir. 1987). The following examples illustrate.

In *United States v. Petit*, 841 F.2d 1546 (11th Cir. 1988), the defendants were charged with conspiring to receive stolen electronic equipment. The charges resulted from an FBI sting operation. The defendants argued "that the electronic equipment . . . had not been stolen but rather had been borrowed by the government with the [owner's] permission." *Id.* at 1549. The Eleventh Circuit upheld the *conspiracy* charge, while recognizing that the defendants "could not have been convicted of the substantive offense of possessing stolen merchandise." *Id.*; *see also*

*United States v. Sieger*, No. 84-cr-158, 1985 U.S. Dist. LEXIS 20569, at *20 (S.D.N.Y. Apr. 19, 1985) (where "blank tickets were . . . supplied by the company in aid of law enforcement efforts," the government properly "charge[d] defendants with conspiracy, not the substantive offense").

Likewise, in *United States v. Jannotti*, 673 F.2d 578 (3d Cir. 1982), a government agent offered a defendant a bribe in connection with a property-development project.  "[T]here never was any such planned project.  The [developers], their plans, and their money were all entirely fictitious."  *Id.* at 590.  The defendants were charged both with substantive Hobbs Act offenses and with conspiracy to violate the Hobbs Act.  The Third Circuit addressed "the significant distinction" between the two types of charges.  *Id.* at 591.  A conspiracy requires only "an agreement . . . to commit criminal acts," and therefore it is "irrelevant that the ends of the conspiracy were from the very inception of the agreement objectively unattainable."  *Id.*  On the other hand, the District Court was correct to have "dismissed the *substantive* Hobbs Act counts of the indictment on the ground that there was no possibility that the bribe payments could actually have affected commerce."  *Id.* (emphasis added).[13]

The Substantive Counts arise from plans, relating to Wilson's daughters, that Singer proposed as part of his government cooperation.  Those plans "were all entirely fictitious." *Jannotti*, 673 F.2d at 590.  Singer was neither taking action to advance the admission of Wilson's daughters nor preparing to do so; he was simply reciting government-written scripts.  Singer falsely *told* Wilson that he was making arrangements with a "Senior Women's Administrator" at

---

[13] Accordingly, while the First Circuit Pattern Jury Instructions state that "factual impossibility" is not a defense to "the charge of attempt" (§ 4.18.00 cmt.4), and that, with regard to conspiracy, "[i]mpossibility is not a defense" (§ 4.18.371(a) cmt.8), no such guidance applies to substantive offenses.

Harvard, and with the sailing coach at Stanford—but the government does not allege that he was actually doing so.  Indeed, the "Senior Women's Administrator" did not even exist (just as Singer had no role in Harvard's admissions process).

The essences and objectives of the Substantive Counts were thus impossible.  The wire-fraud counts require the existence of "a scheme to defraud," 1st Cir. Pattern Jury Instructions § 4.18.1343; *United States v. Cassiere*, 4 F.3d 1006 (1st Cir. 1993), but the scheme described in the Indictment was a government-manufactured mirage.  Similarly, federal program bribery requires the existence of an "agent . . . of an organization" intended to receive a thing of value, and of a "business, transaction, or series of transactions . . . involving anything of value of $5,000 or more," 18 U.S.C. § 666(a)(2); but Singer's descriptions of university "agents" poised to receive things of value were fictional, and there was no $5,000 "transaction" at stake.  The Substantive Counts disintegrate into nothing, and fail on impossibility grounds.

## V.    MOTION TO STRIKE

The Indictment also characterizes the 2018 Conduct as acts in furtherance of the wire-fraud conspiracy charged in Count One.  Indictment ¶¶ 238-44.  Wilson asks the Court to strike those allegations because they do not support the conspiracy charge, and are therefore "surplusage."  *See* Fed. R. Crim. P. 7(d).

For the reasons described in the preceding section, conspiracy charges can be viable even where the substantive offense is factually impossible.  But conspiracy requires "at least two conspirators," and "government agents do not count."  1st Cir. Pattern Jury Instructions § 4.18.371(a) cmt.10; *Giry*, 818 F.2d at 126.  Thus, "a conspiracy may not be between one individual and a government agent."  *United States v. Rivera-Ruperto*, 884 F.3d 25, 32 (1st Cir. 2018) (citing *United States v. Portela*, 167 F.3d 687, 699-700 (1st Cir. 1999)).  The allegations concerning the 2018 Conduct fail this requirement.

As all defendants explain in separate, joint motions,[14] the Indictment seeks improperly to combine numerous, independent agreements into a single conspiracy in violation of *Kotteakos*. Singer's two engagements with the Wilson family were likewise (at most) two independent agreements.

"[A] conspiracy generally ends . . . after the central criminal purpose has been accomplished." *SEC v. Papa*, 555 F.3d 31, 36 n.3 (1st Cir. 2009) (quoting *Pyramid Sec. Ltd. v. IB Resolution, Inc*., 924 F.2d 1114, 1117-18 (D.C. Cir. 1991)).  For multiple behaviors to form a single conspiracy, "activities of one aspect of the scheme must be necessary or advantageous to the success of another aspect of the scheme," and "each individual must think the aspects of the venture interdependent."  *United States v. Pappathanasi*, 383 F. Supp. 2d 289, 296 (D. Mass. 2005) (quoting *Portela*, 167 F.3d at 695).

The Indictment states that, first, Wilson worked with Singer "to facilitate [Wilson's] son's admission to USC"; and that, four and a half years later, Wilson worked with Singer "to facilitate [Wilson's] twin daughters' admissions to Stanford and Harvard."  Indictment ¶ 225. Singer's work with Wilson's son plainly achieved its purpose with the son's admission in 2014. Indictment ¶¶ 234-36.  Indeed, by late 2018, Wilson's son was on the verge of graduating.  *See United States v. Doherty*, 867 F.2d 47, 60-62 (1st Cir. 1989) (conspiracy ended when the defendants received the promotions they sought).  And no aspect of Singer's work in that first vignette could have carried any effect or advantage over into Singer's work relating to Wilson's daughters.

---

[14] Motion to Dismiss Pursuant to Federal Rules of Criminal Procedure 8 and 12(b)(3)(B)(i), (iv), and (v) (to be filed by April 1, 2020); Motion to Sever Pursuant to Federal Rules of Criminal Procedure 12(B)(3)(D) and 14 (same).

By the fall of 2018, Singer and Wilson had not even decided whether Singer would provide assistance with the applications of the Wilson daughters. *See* Indictment ¶ 238 (in September 2018, WILSON *asked Singer about* 'side door' opportunities . . .." (emphasis added)); Ex. 13, at 2-3 (discussing two tiers of consulting services Singer offered to his clients). This fact alone refutes the notion that both episodes of work with Singer were aspects of the same conspiracy. *See United States v. Siebricht*, 59 F.2d 976, 978 (2d Cir. 1932) (reversing conviction on a single conspiracy count where "the second scheme was not designed until three weeks after the first had actually ended").

These were not two acts of a single play; they were two discrete plays, four and a half years apart and joined by no factual or strategic links.

At the time of his first relevant discussion with Wilson about Wilson's daughters, Singer was cooperating with the government. *See* Indictment ¶ 238. Wilson and Singer reached no decision or agreement regarding their strategy for the daughters' applications until several weeks later. Indictment ¶¶ 239-41. By then, that agreement was "between one individual and a government agent," *Rivera-Ruperto*, 884 F.3d at 32.[15] As such, it does not support a conspiracy charge. The Court should strike the allegations regarding the 2018 Conduct as surplusage.

## VI.  CONCLUSION

For the foregoing reasons, in conjunction with the separate motions Wilson is joining, the Court should sever Wilson's trial from those of his codefendants, and try Wilson alone; should dismiss Counts Six, Eight, Nine, Eleven, and Twelve; and should strike paragraphs 238-44 from the Indictment.

---

[15] Other parent defendants made no agreements relating to Wilson, and had completed their work with Singer by the time of the 2018 Conduct.

Respectfully submitted,

John Wilson,

By his Counsel,

<u>/s/ Michael Kendall</u>
Michael Kendall (BBO # 544866)
Yakov Malkiel (BBO # 689137)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
yakov.malkiel@whitecase.com

Andrew E. Tomback (pro hac vice)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8428
andrew.tomback@whitecase.com


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above document is being filed on the date appearing in the header through the ECF system, which will send true copies to the attorneys of record.

<u>/s/ Michael Kendall</u>
Michael Kendall