UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ | |
| ) | |
| ) | |
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                              ) | CRIMINAL NO. 19-10080 |
| ) | Leave to File Granted on April 1, 2020 |
| DAVID SIDOO, et al            ) | |
| Defendants         ) | |
| ) | |
| _____) | |

**DEFENDANTS' MOTION TO SUPPRESS TITLE III INTERCEPTIONS OR ALTERNATIVELY FOR A *FRANKS* HEARING**

Now come the Defendants Robert Zangrillo, Amy Colburn, John Wilson, Elisabeth Kimmel, Marci Palatella, I-Hsin Chen, and William McGlashan, Jr., by and through undersigned counsel, pursuant to 18 U.S.C. § 2518(10)(a), and hereby respectfully request that this Honorable Court suppress the contents of any conversations intercepted pursuant to the four Title III Orders issued in this case, as well as any evidence derived therefrom.  As grounds and reasons therefor, the defendants state that the interception of calls to and from a California phone that never entered this District or was even alleged to have been used to place a call to a phone in this District (excluding calls initiated by the government through cooperators) did not occur within the "territorial jurisdiction" of this Court, as required by § 2518(3).  To make matters worse, certain material and misleading omissions from the government's affidavits served to obscure the lack of connection between Singer's scheme and Massachusetts.  *See infra* at 14-15.

The affidavits submitted in support of the government's Title III applications sought

1

authorization to tap a California phone used by California resident Rick Singer, who was suspected

to be engaged in illegal activity with a number of other California residents aimed at facilitating their

children's admission to largely California universities.  Not a single target or subject of the

investigation identified in any of the four affidavits was a Massachusetts resident.  Not a single overt

act outlined in the affidavits occurred in this District, other than a handful manufactured by the

government through a cooperator.  Each successive affidavit further demonstrated the lack of a

connection between any ongoing criminal conspiracy and the District of Massachusetts that would

necessitate applications to a District of Massachusetts judge seeking electronic surveillance warrants

to intercept calls and texts that were occurring outside the District.

The government, however, did not openly acknowledge this lack of meaningful contact to

Massachusetts in its presentation to the issuing judge.  ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████  ██  ████████████

████████████████████████████████████████████████████

████████████████████████████████, leaving unstated the utter lack

of evidence that the target phone had ever been used inside this District.  Excising the government's

misleading statements from the affidavits, the documents provided no reason to believe that any

intercepted call would be made to or from Massachusetts.  Accordingly, there was no reason to

believe at the time of the initial application that the interception for which authorization was sought

---

[1] The exhibits to this Motion and the defendants' Motion to Suppress Evidence Derived from the
Government's Four Wiretaps are contained in a sealed Joint Appendix submitted with this
Motion.

would occur in the territorial jurisdiction of this Court and, as each ensuing thirty-day set of interceptions resulted in not a single mention of any interception of a non-government speaker in Massachusetts, no additional evidence of a foreseeable future interception of a conversation between two interceptees occurring in the District of Massachusetts (making each successive affidavit forecasting the need for a Title III interception in Massachusetts progressively less reliable). Suppression of the intercepted communications is warranted in these circumstances.

### Request for Hearing

The defendants respectfully request a hearing on their motion.

Each of the defendants joining this motion is an "aggrieved person" within the meaning of Title III because (1) their communications were intercepted pursuant to the Title III Orders and/or (2) they were named as targets in the government's Title III applications. *See* 18 U.S.C. § 2510(11) (defining "aggrieved person" to mean "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed"). Accordingly, the defendants have standing to seek suppression of the recordings. *See* § 2518(10)(a)(i) ("Any aggrieved person in any trial, hearing, or proceeding in or before any court . . .  may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that . . . the communication was unlawfully intercepted.").

I.   *Title III Affidavits*

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

4

5

6

7

8



[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

II.    _Argument_

   a.  *The affidavits facially fail to provide a nexus to Massachusetts to support territorial jurisdiction and the selection of Massachusetts as a listening post should not provide this nexus*

   Simply put, the affidavits provide no indication whatsoever that Singer was likely to bring his phone to Massachusetts or use it to contact anyone in that state.  It is telling that, after approximately three months of monitoring Singer's calls, the government was unable to identify a single relevant call placed to or from Massachusetts, [REDACTED]

   This lack of meaningful connection to the District should have legal significance.  Title III generally permits a court to authorize wiretaps only within its "territorial jurisdiction."  18 U.S.C. § 2518(3).  While some courts have adopted a so-called "listening post" theory, holding in essence that interception occurs wherever the government decides to locate its listening post,[6] the First

---

[6] *See United States v. Cano-Flores*, 796 F.3d 83, 86-87 (D.C. Cir. 2015); *United States v. Luong*, 471 F.3d 1107, 1109 (9th Cir. 2006); *United States v. Ramirez*, 112 F.3d 849, 852 (7th Cir. 1997); *United States v. Denman*, 100 F.3d 399, 403 (5th Cir. 1996); *United States v. Rodriguez*, 968 F.2d 130, 135-36 (2d Cir. 1992).  While the Supreme Court recently accepted a defendant's

10

Circuit has yet to rule on this issue. One circuit judge has, albeit in a concurring opinion, cogently articulated why a listening post theory should be rejected for purposes of creating territorial jurisdiction under Title III. Under such a theory:

> any federal district court, circuit court of appeals or appropriate state court may authorize a wiretap any place in the country. A judge in the Southern District of New York may . . . authorize a tap on a phone in Chippewa Falls, Wisconsin, Nome, Alaska or Prescott, Arizona, even if no calls are ever placed to the east coast, as long as the listening post is set up in Manhattan.

*United States v. Rodriguez*, 968 F.2d 130, 144 (2d Cir. 1992) (Meskill, J., concurring). The government is, therefore, "able to shop, free from territorial constraints, for a judge who would be likely to authorize a wiretap." *Id.* Even after "a judge in one district denies authorization, law enforcement officials may simply move their listening posts to another jurisdiction until they find a judge willing to authorize the wiretap." *Id.*

Nor is such a troubling result mandated by the statutory language. Indeed, "the statute does not refer to a 'listening post.'" *United States v. Glover*, 736 F.3d 509, 514 (D.C. Cir. 2013). The courts that have endorsed the listening post theory have relied heavily upon Title III's definition of "intercept" to include the "aural or other acquisition of the contents" of a communication. 18 U.S.C. § 2510(4). However, as Judge Meskill explained, when the government intercepts communications in one venue and diverts them to a far away listening post, it is merely transforming "*previously acquired* contents . . . into sound." *Rodriguez*, 968 F.2d at 144 (Meskill, J., concurring). Acquisition

---

concession "that an intercept takes place *either* where the tapped telephone is located *or* where the Government's 'listening post' is located," *Dahda v. United States*, 138 S. Ct. 1491, 1495 (2018), the *Dahda* Court had no occasion to decide the issue, which was uncontested in the case at hand.

occurs in the initial venue where the communications are "already within the control of the law enforcement agents." *Id.*  The modifier "aural" does not change this result.  The word was included in the statutory definition "principally to place devices such as pen registers and trap and tracing mechanisms (which do not capture the sound of a conversation) outside the scope of Title III." *Id.* (citing S. Rep. No. 90-1097).  Courts adopting the listening post theory have also cited the policy justification that, "where the authorities seek to tap telephones in more than one jurisdiction and to monitor them in a single jurisdiction, . . . [i]f all of the authorizations are sought from the same court, there is a better chance that unnecessary or unnecessarily long interceptions will be avoided." *Id.* at 136.  The *Rodriguez* majority, however, cited no support for this hypothesis and, as Judge Meskill noted, it is equally possible if not more likely that the listening post theory will run counter to Title III's goal of protecting individual privacy.  This is because "judges may be more hesitant to authorize excessive interceptions within their territorial jurisdiction, in their own back yard so to speak, than in some distant, perhaps unfamiliar, part of the country." *Id.* at 145 (Meskill, J., concurring).

Under the appropriate framework tying territorial jurisdiction to the location(s) where the communication occurs and is initially intercepted by law enforcement, such jurisdiction was clearly lacking in the present case.  The government sought authorization to tap a California phone, used by a California resident, who was suspected to be involved in illegal activity with dozens of other individuals most of whom resided in California and none of whom lived in Massachusetts.  The mere fact that the government, through cooperators, initiated a limited number of meetings, calls, and bank transfers involving Massachusetts does nothing to change the analysis.  Because these contacts were the product of the government's own doing, there was no reason to suspect that un-consented to calls

12

to or from Massachusetts would occur during the period of the interceptions.  What's more, these
government-initiated contacts cannot supply the needed predicate for electronic surveillance given
the absence of any necessity for the interceptions of such oral communications.  ██████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████  Indeed,
over the almost three months between the first and last Title III affidavits, the government failed to
identify a single non-government induced call to or from this District.[7]

    b.   *The defendants are entitled to a hearing on their request for suppression and to
suppression itself based on the government's misleading and material representations to
the issuing judge requiring suppression under Franks v Delaware*

    The defendants alternatively request that the Court hold a hearing pursuant to *Franks v.
Delaware* to determine whether the government made material misrepresentations in its affidavits
regarding the lack of any connection between Singer's suspected illegal activity and this District.

---

[7] The exception to Title III's territorial jurisdiction requirement for "mobile interception
device[s]" does not apply.  18 U.S.C. § 2518(3).  As a grammatical matter, "the term 'mobile'
modifies 'interception device' and the phrase 'mobile interception device' on its face appears to
refer to the mobility of the device used to intercept communications."  *United States v. Dahda*,
853 F.3d 1101, 1113 (10th Cir. 2017) (citation omitted).  Because "device" is statutorily defined
as something "which can be used to intercept a wire, oral, or electronic communication," it does
not include cellphones.  18 U.S.C. § 2510(5); *see also United States v. North*, 735 F.3d 212, 218
(5th Cir. 2013) (DeMoss, J., concurring) ("We decline to interpret the statute in any way that
eliminates important provisions regarding territorial restrictions in the case of cell phones,
particularly when such an interpretation is not obvious from the statutory language.").  This
reading is confirmed by the legislative history.  *See Dahda*, 853 F.3d at 1114.  The contrary
authority on this issue runs counter to the plain meaning of the statute and is therefore
unpersuasive.  *See Ramirez*, 112 F.3d at 852 (expressly disregarding "literal reading" of statute).

"[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in [a] warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).  After such a hearing, if the defendant proves the foregoing points by a preponderance of the evidence, "the search warrant must be voided and the fruits of the search excluded." *Id.* at 156.  This rule applies "not only [to] affirmative misrepresentations, but also . . . material omissions." *Jordan v. Town of Waldoboro*, 943 F.3d 532, 541 (1st Cir. 2019).  The First Circuit has applied *Franks* in the Title III context.  *See, e.g.*, *United States v. Burgos-Montes*, 786 F.3d 92, 101-02 (1st Cir. 2015).  While *Franks* hearings typically relate to the existence or non-existence of probable cause, the same framework is readily applicable to the issue of territorial jurisdiction under Title III.

Here, the officers presented a misleading view of Singer's scheme and its connection to Massachusetts which likely affected the Court's determination that it possessed territorial jurisdiction to authorize the interceptions. ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

Recklessly omitted was the fact that all of the overt acts occurring in Massachusetts were government-initiated. ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

14

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ The crucial omission

here was, of course, that, even after about three months of monitoring, there was no evidence that

Singer's phone had ever been used inside the jurisdiction. ██████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████ At this stage of the proceedings, there is a substantial likelihood

that the foregoing omissions ████████████████████████████

████, were at least reckless. *See United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1111 (9th Cir.

2005) (holding that "clear proof of deliberate or reckless omissions or misrepresentations" was not

required "at the pleading stage" and finding the requisite substantial showing satisfied in light of "the

affiant's key role in the investigation"). Moreover, absent these misrepresentations regarding

Singer's scheme's purported connection to Massachusetts, it is likely that the Court would have

found its territorial jurisdiction lacking and refused to permit the interceptions.

   In addition to omitting important facts regarding the existence of territorial jurisdiction (or

lack thereof), the government also omitted information that would have suggested that there was no

probable cause to believe that the parents who enlisted Singer's services were implicated in the

object of the wiretaps – ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████   In one such material

omission, the government quoted heavily from a June 11, 2018 call involving defendant Robert

Zangrillo, in which Singer told Mr. Zangrillo that his daughter would be admitted to USC "as though

she[ had been] sculling and rowing."  Exhibit 2, July 3, 2018 Aff. at ¶ 53.  Singer further represented

to Mr. Zangrillo that he had personally spoken to the USC crew coach regarding Mr. Zangrillo's

daughter and the coach indicated that she would be admitted to the university.  *See id.*  The

government did not disclose to the issuing judge that it had no basis to believe that in fact Singer

spoke to any rowing coach (rather, that he had lied to Mr. Zangrillo).  In fact, Mr. Zangrillo's

daughter was not submitted to USC admissions nor admitted as a rower, but rather through the

school's well-established and widely accepted "VIP" or "special interest" admissions program.  *See*

Exhibit 19 (June 26, 2018 email from Heinel to Singer explaining that Mr. Zangrillo's daughter "was

not presented as an athlete we just advocated for her with Tim [Brunold, USC Dean of Admissions]

and Kirk [Brennan, USC Director of Admissions] as a transfer.  She went over on our VIP list for

transfers."); *see also generally* Dkt. 546 and 963.  Additionally, the government has not represented

in responses to Mr. Zangrillo's *Brady* and discovery requests that Singer had ever spoken to USC's

crew coach, much less received assurance that the coach would arrange for Mr. Zangrillo's

daughter's admission.  In a subsequent August 7, 2018 call with Mr. Zangrillo, Singer said that "Tim

. . . , who's the dean, . . . has decided he would take" Mr. Zangrillo's daughter, *see* Exhibit 20,

Session 5147 Tr., presumably referring to USC's Dean of Admissions Tim Brunold.  Unsurprisingly,

there is no record of Singer's having spoken to Brunold regarding Mr. Zangrillo's daughter, but the

mere fact that the representation was made to Mr. Zangrillo that USC's Dean of Admissions had

expressly approved of his daughter's acceptance stands as strong evidence of his good-faith.[8] ███

███████████████████████████████████████████████████████████████

████████████████████████  Had the foregoing omitted facts been disclosed to the issuing

judge, they would have given the Court cause to believe that, rather than being complicit in Singer's

bribery scheme, Mr. Zangrillo and the other parents were themselves victims of Singer's fraud.

In several other calls with parents who were not ultimately charged in this case, Singer

described his process in a way that gave the impression that it was legitimate and accepted.  Singer

told one parent that he was going to "see the President and the Dean" of a particular university to

discuss admitting a student in exchange for payment.  Exhibit 21, Session 5633 Tr. at 6.  Singer

opined that the officials would "probably" say "no problem we'll get his thing done for you Rick."

*Id.*  Singer also told parents that the funds they paid to his foundation would ultimately be provided

to the schools as a donation.  He explained to one parent:

> So what'll happen is you'll fund my foundation, you'll get your write
> off through a 501(c)(3) obviously, and then, . . . I will quietly when

---

█████████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████

███████████████████████████

> [the coach is] ready, . . . we will make the donations to the different
> things he needs it to get donated and where because [otherwise] the
> AD ▆▆▆▆ steals all the money and puts it in football.

Exhibit 22, Session 4809 Tr. at 3.  Along similar lines, when another parent asked if he should write

a check to the coach, Singer responded:

> no, no, absolutely not.  So what happens is you write your check,
> which would be a donation, to my non-profit 501(3)(c) [sic] and then
> – what [the coach] does, why he likes it, is [the coach] will want the
> check split.  Some of it will go to fund . . . a trip – he'll take the whole
> team to Serbia to play.  Uh, part of it will be to enhance the pool. . . .
> [S]ee, if it goes to ▆▆▆▆ directly, then the money ends up going to
> the general fund, and he doesn't see it.

Exhibit 23, Session 5819 Tr. at 6-7. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Had the above excerpts been included, they

would have likely caused the Court to doubt whether there was probable cause to believe that the

parents paying the purported bribes were complicit in Singer's scheme.  This, in turn, would have

undermined the government's assertion that a continued wiretap was necessary to identify those

parties including named parents as contrasted to coaches and would have accordingly required that

the agents minimize any Singer-parent call.

 c. *The good-faith exception does not provide a basis to avoid suppression*

 Title III expressly calls for suppression of communications that were "unlawfully

intercepted."  18 U.S.C. § 2518(10)(a)(i).  Here, all of Singer's intercepted calls fall into this category

because the interceptions occurred exclusively outside the Court's territorial jurisdiction and because

the government's affidavits supporting the warrant applications contained a number of material omissions.  Suppression under Title III is "not limited to constitutional violations."  *United States v. Giordano*, 416 U.S. 505, 527 (1974).  Rather, "Congress intended to require suppression" for "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device."  *Id.*  The defendants respectfully submit that the explicit statutory requirement that interception occur within the authorizing court's territorial jurisdiction is reflective of the core Congressional concern to limit wiretapping to situations where it is absolutely necessary.  *See United States v. North*, 735 F.3d 212, 219 (5th Cir. 2013) (DeMoss, J., concurring) ("Territorial limitations on a district court directly implicate Congress's intent to guard against the unwarranted use of wiretapping.").

Title III's statutory suppression provision contains no exception for good faith.  *See United States v. Rice*, 478 F.3d 704, 711 (6th Cir. 2007) (holding "that the government's good-faith argument is without merit, because the good-faith exception to the warrant requirement is not applicable to warrants obtained pursuant to Title III").  As the Sixth Circuit has explained, "the rationale supporting" the good-faith exception "was firmly rooted in the idea that the exclusionary rule is a judicially created remedy used to ameliorate violations under the Fourth Amendment, and that, as a judicially created remedy, it is subject to judicial modification based on social utility analysis."  *Id.* at 712.  "[T]he law governing electronic surveillance via wiretap is," by contrast, "codified in a comprehensive statutory scheme providing explicit requirements, procedures, and protections," which courts should be hesitant to disturb.  *Id.*  Moreover, the Supreme Court's

exposition of the good-faith exception in *Leon* occurred sixteen years after the passage of Title III, so Congress self-evidently could not have intended to incorporate that precedent. *See id.* at 713.[9]  Even assuming the availability of a good-faith argument, the exception does not apply where, as here, the "judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his [or her] reckless disregard of the truth." *United States v. Leon*, 468 U.S. 897, 923 (1984).

The scope of suppression under 18 U.S.C. § 2518(10) extends beyond the contents of the Title III intercepts themselves to also include any "evidence derived therefrom."  Here, the latter category includes records obtained pursuant to search warrants issued for the email accounts of several defendants, including Mr. Zangrillo. ███████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████  Accordingly, records obtained pursuant to the tainted search warrant must be suppressed, in addition to the interceptions themselves.

III.    *Conclusion*

For the foregoing reasons, the defendants respectfully request that the Court suppress the contents of any conversations intercepted pursuant to the four Title III Orders issued in this case, as

---

[9] The Eighth Circuit has reached a contrary result, holding that the good-faith exception does apply to motions to suppress Title III interceptions, but that court's reliance on legislative "intent to adopt suppression principles developed in Fourth Amendment cases" overlooks the fact that *Leon* would not be decided for more than a decade after Title III was enacted.  *United States v. Moore*, 41 F.3d 370, 376 (8th Cir. 1994).  While the First Circuit has not yet ruled on this issue, *see United States v. Cunningham*, 113 F.3d 289, 294 (1st Cir. 1997), the defendants respectfully submit that the Sixth Circuit's approach is far more persuasive than the Eighth Circuit's.

well as any evidence derived therefrom.

## COMPLIANCE WITH LOCAL RULE 7.1(a)(2)

Undersigned counsel conferred with counsel for the government and the government

opposes the defendants' requested relief.

Respectfully Submitted,
ROBERT ZANGRILLO
By His Attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Matthew L. Schwartz
Boies Schiller Flexner
55 Hudson Yards, 20th Floor
New York, NY 10001
(212) 303-3646
mlschwartz@bsfllp.com

AMY COLBURN
By Her Attorneys,

**/s/ David S. Schumacher**
David S. Schumacher (BBO #647917)
HOOPER, LUNDY & BOOKMAN, P.C.
470 Atlantic Avenue, Suite 1201
Boston, MA 02210
(617) 532-2700
(617) 345-3927 (fax)
dschumacher@health-law.com

21

Patric Hooper (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517
(310) 551-8111
(310) 551-8181 (fax)
phooper@health-law.com

Jordan Kearney (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
575 Market Street, Suite 2300
San Francisco, CA 94105
(415) 875-8500
(415) 875-8519 (fax)
jkearney@health-law.com


JOHN WILSON
By His Attorneys,

**/s/ Michael Kendall**
Michael Kendall (BBO # 544866)
Yakov Malkiel (BBO # 689137)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
yakov.malkiel@whitecase.com

Andrew E. Tomback (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8428
andrew.tomback@whitecase.com


ELISABETH KIMMEL
By Her Attorneys,

**/s/ R. Robert Popeo**

R. Robert Popeo (BBO # 403360)
Mark E. Robinson (BBO # 423080)
Eóin P. Beirne (BBO # 660885)
Cory S. Flashner (BBO # 629205)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1605 (telephone)
(617) 542-2241 (fax)
rpopeo@mintz.com
mrobinson@mintz.com
ebeirne@mintz.com
csflashner@mintz.com


MARCI PALATELLA
By Her Attorneys,

**/s/ Michael K. Loucks**
Michael K. Loucks (BBO #305520)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
500 Boylston Street
Boston, MA 02116
(617) 573-4800
michael.loucks@skadden.com

Jack P. DiCanio (*pro hac vice*)
Allen J. Ruby (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
525 University Avenue
Palo Alto, CA 94301
(650) 470-4500
jack.dicanio@skadden.com
allen.ruby@skadden.com


I-HSIN CHEN
By His Attorney,

23

**/s/ Reuben Camper Cahn**
Reuben Camper Cahn (*pro hac vice*)
KELLER/ANDERLE LLP
18300 Von Karman Avenue, Suite 930
Irvine, CA 92612
Tel. (949) 476-8700
rcahn@kelleranderle.com


WILLIAM McGLASHAN, Jr.
By His Attorneys,

**/s/ Jack W. Pirozzolo**
Jack W. Pirozzolo (BBO # 564879)
jpirozzolo@sidley.com
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0304


John C. Hueston (*pro hac vice*)
jhueston@hueston.com
Marshall Camp (*pro hac vice*)
mcamp@hueston.com
HUESTON HENNIGAN LLP
523 W. 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4340

Dated: April 1, 2020


## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, April 1, 2020, a copy of the foregoing document has been served via hand-delivery on counsel for the government.

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.