# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

    v.

DAVID SIDOO et al.,

        Defendants.

Case No. 19-cr-10080-NMG

*Leave to File 25-Page Brief*
*Granted on 3/30/2020*

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS COUNT ONE INSOFAR AS IT ALLEGES CONSPIRACY TO DEFRAUD <u>UNIVERSITIES OF PROPERTY</u>**

**<u>ORAL ARGUMENT REQUESTED</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

BACKGROUND .........................................................................................................3

ARGUMENT ..............................................................................................................4

    I.     THE FRAUD STATUTES ARE LIMITED TO "TRADITIONAL"
         FORMS OF PROPERTY ......................................................................5

    II.    UNIVERSITY "ADMISSION SLOTS" ARE NOT "TRADITIONAL"
         FORMS OF PROPERTY ......................................................................7

         A.     The Government Has Identified No Case, Treatise, Or Other
                Historical Source Establishing That An Admission Slot Is A
                Traditional Form Of Property ....................................................8

         B.     The Supreme Court's Decision In *Plyler* Establishes That Lying In
                An Application Does Not Implicate a Property Deprivation....................11

         C.     Defendants Obtained "Offers" To Exchange Tuition For
                Educational Services, Not Property .........................................15

         D.     Educational Services Are Not A Traditional Form Of Property...............19

    III.   The Government's Novel Property Theory Massively Expands Criminal
         Liability And Threatens Constitutional Values .....................................23

CONCLUSION.........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Bond v. United States*,
    572 U.S. 844 (2014)............................................................................1

*Carpenter v. United States*,
    484 U.S. 19 (1987)......................................................................6, 15

*Cleveland v. United States*,
    531 U.S. 12 (2000)................................................................. *passim*

*Commonwealth v. McCray*,
    242 A.2d 229 (Pa. 1968).................................................................20

*De Lima v. Sessions*,
    867 F.3d 260 (1st Cir. 2017).......................................................3, 21

*Gleason v. Thaw*,
    236 U.S. 558 (1915)....................................................................3, 19

*Hisey v. Lewis-Gale Hosp.*,
    27 F. Supp. 20 (W.D. Va. 1939) ...................................................20

*Kelly v. United States*,
    139 S. Ct. 2777 (2019) (cert. granted June 28, 2019)......................1

*Kolender v. Lawson*,
    461 U.S. 352 (1983).......................................................................25

*Matter of Lombard*,
    739 F.2d 499 (10th Cir. 1984) ......................................................20

*Marinello v. United States*,
    138 S. Ct. 1101 (2018).....................................................................1

*McDonnell v. United States*,
    136 S. Ct. 2355 (2016).........................................................1, 23, 24

*McGregor v. United States*,
    134 F. 187 (4th Cir. 1904) ............................................................12

*McNally v. United States*,
    483 U.S. 350 (1987).................................................................. *passim*

*Palmer v. Colladay*,
    18 App. D.C. 426 (D.C. Cir. 1901).................................................................................13

*Pasquantino v. United States*,
    544 U.S. 349 (2005)..........................................................................................................7, 8

*Sekhar v. United States*,
    570 U.S. 729 (2013)................................................................................................................1

*Skilling v. United States*,
    561 U.S. 358 (2010)...................................................................................................... *passim*

*State v. Dixon*,
    553 A.2d 1 (N.J. 1989)........................................................................................................20

*State v. Eicher*,
    140 So. 498 (La. 1932) .......................................................................................................20

*State v. Frusha*,
    91 So. 430 (La. 1922) .........................................................................................................20

*State v. Smith*,
    197 So. 429 (La. 1940) .......................................................................................................19

*Tyner v. United States*,
    23 App. D.C. 324 (D.C. Cir. 1904)...............................................................................12, 13

*United States v. Abbott*,
    No. 19-cr-10117 (D. Mass. Sept. 13, 2019), ECF No. 443......................................................9

*United States v. Alsugair*,
    256 F. Supp. 2d 306 (D.N.J. 2003) ...................................................................................21

*United States v. Baldinger*,
    838 F.2d 176 (6th Cir. 1988) ...............................................................................................7

*United States v. Barnow*,
    239 U.S. 74 (1915)..............................................................................................................12

*United States v. Berroa*,
    856 F.3d 141 (1st Cir. 2017)................................................................................5, 7, 24, 25

*United States v. Bizzack*,
    No. 19-cr-10222 (D. Mass. Oct. 30, 2019), ECF No. 34.......................................................9

*United States v. Bonds*,
    784 F.3d 582 (9th Cir. 2015) (*en banc*) ...............................................................................1

*United States v. Bunting*,
   82 F. 883 (E.D. Pa. 1897) ................................................................................................13

*United States v. Corona-Sanchez*,
   291 F.3d 1201 (9th Cir. 2002), *superseded by statute on other grounds as
   recognized in United States v. Vidal*, 426 F.3d 1011 (9th Cir. 2005)....................................21

*United States v. Czubinski*,
   106 F.3d 1069 (1st Cir. 1997).............................................................................................24

*United States v. Ernst*,
   No. 19-10081-IT (D. Mass. Jan. 17, 2020), ECF. No. 367.....................................................8

*United States v. Fermin Castillo*,
   829 F.2d 1194 (1st Cir. 1987).............................................................................................5

*United States v. Frost*,
   125 F.3d 346 (6th Cir. 1997) .................................................................................9, 10, 11

*United States v. Goldberg*,
   105 F.3d 770 (1st Cir. 1997)...............................................................................................22

*United States v. Henry*,
   29 F.3d 112 (3d Cir. 1994)..................................................................................................7

*United States v. Isackson*,
   No. 19-cr-10115 (D. Mass. May 1, 2019), ECF No. 325 ........................................................4

*United States v. MacFarlane*,
   No. 19-cr-10131 (D. Mass. Nov. 13, 2019), ECF. No. 340 (Gorton, J.) ..................................9

*United States v. Meredith*,
   No. 19-cr-10075 (D. Mass. Mar. 15, 2019), ECF No. 18 ......................................................4

*United States v. Ngige*,
   780 F.3d 497 (1st Cir. 2015)...............................................................................................4

*United States v. Ochs*,
   842 F.2d 515 (1st Cir. 1988)...............................................................................................6

*United States v. Plyler*,
   222 U.S. 15 (1911)...........................................................................................................2, 14

*United States v. Sadler*,
   750 F.3d 585 (6th Cir. 2014) ........................................................................................2, 17, 22

*United States v. Takhalov*,
   827 F.3d 1307 (11th Cir. 2016) ......................................................................................2, 18

*United States v. Vandemoer*,
  No. 19-cr-10079 (D. Mass. June 12, 2019), ECF No. 26 ........................................................9

*In re Wright*,
  584 F.2d 83 (5th Cir. 1978) ............................................................................................20

*Yates v. United States*,
  574 U.S. 528 (2015)..........................................................................................................1

## STATUTES

11 U.S.C. § 523(a)(2)(A) .....................................................................................................22

18 U.S.C.
  § 371........................................................................................................................11, 21
  § 1029(e)(1) .................................................................................................................22
  § 1341 ...........................................................................................................4, 5, 21, 25
  § 1343 .........................................................................................................................4, 5
  § 1346 ...........................................................................................................................21

3 Act of June 8, 1872, ch. 335, § 302, 17 Stat. 323 ...........................................................5

3 Compiled Statutes of the United States tit. 70 ch. 5 §§ 5418, 5440 (John. A.
  Mallory ed. 1902)..........................................................................................................11

Act of Mar. 4, 1909, ch. 321, § 215, 35 Stat. 1130.......................................................5, 14

Bankruptcy Act, Pub. L. 95-598, 92 Stat. 2549 (1978) .....................................................22

Model Penal Code § 223.7, cmt. 1 ....................................................................................20

Rev. Stat.
  § 5418.................................................................................................................11, 12, 14
  § 5440.................................................................................................................11, 12, 13

U.S.S.G. § 2B1.1 cmt. n.3(A)(iii) .........................................................................................9

## RULES

Fed. R. Crim. P. 12(b)(3)(B)(v) .............................................................................................4

## OTHER AUTHORITIES

2 J. Kent, Commentaries on American Law *351 ................................................................8

3 W. Blackstone, Commentaries on the Laws of England 153-155 (1768) ........................8

Abraham S. Goldstein, *Conspiracy to Defraud the United States*, 68 Yale L.J.
  405, 417-30 (1959)........................................................................................................12

Joshua A. Kobrin, *Betraying Honest Services: Theories of Trust and Betrayal Applied to the Mail Fraud Statute and § 1346*, 61 N.Y.U. Ann. Surv. Am. L. 779, 790- 92 & n.50 (2006) ...........................................................................................12

Paul Mogin, *The Property-Rights Limitation in Mail and Wire Fraud Cases*, 32-APR Champion 24, 26-27 (2008) ........................................................................10

IV Oxford English Dictionary 1471 (1st ed. Suppl. 1933)............................................15

Black's Law Dictionary 955 (2d ed. 1910)...................................................................8, 9, 19

Wharton's Law Lexicon 689-90 (11th ed. 1911).........................................................15

Wayne R. LaFave, 3 Subst. Crim. L. § 19.7(e) (3d ed. Oct. 2019) ..............................20

## INTRODUCTION

Federal criminal law is not an all-purpose tool for policing every form of unethical conduct. Rather, it is reserved for only the most serious wrongs that Congress has clearly determined warrant federal sanction.  In recent years, prosecutors have repeatedly pushed the boundaries of what counts as a federal criminal offense, across a variety of contexts.  But the Supreme Court has repeatedly pushed back, consistently enforcing a strict construction of penal statutes and not hesitating to overturn convictions when the Government overreaches.[1]

This case presents the latest example of an overzealous prosecution for conduct that—even if it occurred just as the Government alleges—does not violate the law.  At its core, the Government's theory in Count One of the indictment is that Defendants made misrepresentations to help their children obtain offers of admission to certain universities.  That alleged misconduct may be unethical and improper, but it does not violate the federal mail or wire fraud statutes. Accepting the Government's theory would massively expand criminal fraud liability beyond anything authorized by Congress or the Supreme Court.

The Supreme Court has repeatedly held that the mail and wire fraud statutes are limited to schemes to obtain "money or property."  *See, e.g.*, *Cleveland v. United States*, 531 U.S. 12, 19 (2000) (quoting *McNally v. United States*, 483 U.S. 350, 357 (1987)).  It has further clarified that the latter term encompasses only "*traditional* concepts of property," as established by judicial precedents, treatises, and the common law.  *Id.* at 24 (emphasis added).  Here, however, the only

---

[1] *See, e.g.*, *Marinello v. United States*, 138 S. Ct. 1101 (2018); *McDonnell v. United States*, 136 S. Ct. 2355 (2016); *Yates v. United States*, 574 U.S. 528 (2015); *Sekhar v. United States*, 570 U.S. 729 (2013); *Bond v. United States*, 572 U.S. 844 (2014); *Skilling v. United States*, 561 U.S. 358 (2010); *Cleveland v. United States*, 531 U.S. 12 (2000); *McNally v. United States*, 483 U.S. 350 (1987); *see also Kelly v. United States*, 139 S. Ct. 2777 (Mem.) (2019) (cert. granted June 28, 2019); *United States v. Bonds*, 784 F.3d 582 (9th Cir. 2015) (*en banc*).

"property" allegedly at issue are offers of admission to universities.  Such offers do not qualify as "traditional" forms of property under any historical understanding of that term.

*First*, the Government has presented no evidence that an offer of admission has ever been considered a form of property.  As best we can tell, its novel property theory has never been advanced to—or accepted by—any court, anywhere, ever.  Nor is there any other historical basis for treating admission offers as property.  The unprecedented nature of the Government's theory is reason enough to dismiss Count One insofar as it alleges a deprivation of property.

*Second*, to the extent the historical record addresses anything analogous to "admission slots," it shows that they do *not* count as property.  In *United States v. Plyler*, 222 U.S. 15 (1911), the Supreme Court recognized that telling lies in an application to gain admission to the federal civil service does not deprive the government of "property."  That decision was handed down at almost the exact same time Congress added the "money or property" limitation to the mail fraud statute in 1909, and it reflects the contemporaneous understanding of what counts as "property." For present purposes, there is no relevant distinction between a fraudulently obtained "admission slot" in the civil service or at a competitive college.  Neither is "property" under the fraud statutes.

*Third*, there is no deprivation of "property" when a misrepresentation merely induces a subsequent transaction in which the person making the misrepresentation pays full price for the goods or services at issue.  *See, e.g.*, *United States v. Sadler*, 750 F.3d 585, 590-91 (6th Cir. 2014); *United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016).  Here, even if the alleged misrepresentations prompted offers of admission from the universities, Defendants ultimately paid full tuition for their children.  The universities received the benefit of that tuition in exchange for providing educational services; they were not deprived of property.

*Fourth*, the educational services at issue here do not constitute a traditional form of

property.  At common law, *services* were generally not considered *property*.  *See, e.g., Gleason v. Thaw*, 236 U.S. 558, 561 (1915) (noting that the "meaning [of property] as employed in ordinary speech and business" does not include "professional services"); *De Lima v. Sessions*, 867 F.3d 260, 266 (1st Cir. 2017).  Indeed, the distinction between services and property is why common-law larceny statutes—which prohibited deprivations of property—were historically construed not to prohibit the theft of professional services.  To this day, multiple federal statutes—and the Supreme Court's decision in *McNally*—show that when Congress wants to criminalize deprivation of services, it does so expressly.

*Finally*, and most importantly, treating a misrepresentation on a college application as an effort to deprive the college of "property" leads to absurd results that would massively expand criminal liability beyond anything Congress intended.  Under the Government's theory, it is a federal crime—punishable by up to 20 years in prison—to embellish a letter of recommendation; plagiarize a high-school term paper; overstate the emergency of a plumbing problem to secure an earlier appointment; or obtain a reservation at a favorite restaurant by falsely claiming a birthday celebration.  None of those activities is praiseworthy, but no one (except maybe the Government) thinks they violate federal criminal law.  Numerous canons of statutory construction—including those addressing absurdity, lenity, federalism, and constitutional avoidance—confirm that the fraud statutes should be construed to avoid such anomalous results.

For all of these reasons, the Court should reject the Government's novel theory and dismiss Count One of the indictment to the extent it alleges that Defendants conspired to obtain "property" in violation of the mail and wire fraud statutes.

## BACKGROUND

Count One of the indictment charges Defendants with conspiracy to commit mail and wire fraud.  *See* Fourth Superseding Indictment ¶¶ 369-70, ECF No. 732 ("FSI").  The mail and wire

fraud statutes prohibit knowingly using the mail or wires to obtain "money or property" by fraudulent means. *See* 18 U.S.C. §§ 1341, 1343. According to the Government, Defendants violated those statutes by submitting untruthful applications for their children to various universities and by bribing certain university officials. *See* FSI ¶¶ 369-70; *see generally id.* ¶¶ 1-278.

The Government alleges this conduct violates the mail and wire fraud statutes in two ways. First, it contends that Defendants fraudulently obtained "property" in the form of "admission to the Universities." *Id.* ¶ 370(a), (b). The Government considers a university's "admission slots"—*i.e.*, offers of admission made to prospective students—to constitute the university's property.[2] Second, the Government claims that Defendants fraudulently deprived universities of the "honest services" of their employees. *See id.* ¶¶ 369-70. Although both of these theories are legally and factually incorrect, this motion addresses only the property theory.

## ARGUMENT

Count One of the Fourth Superseding Indictment is defective because it fails to allege a deprivation of "property" as required by the mail and wire fraud statutes. 18 U.S.C. §§ 1341, 1343. It thus "fail[s] to state an offense" and should be dismissed as a matter of law. Fed. R. Crim. P. 12(b)(3)(B)(v). For purposes of this motion only, the Court takes the facts alleged in the indictment as true. *See United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015).

---

[2] *See, e.g.*, Waiver of Indictment & Plea to Information Hr'g Tr. 25, *United States v. Isackson*, No. 19-cr-10115 (D. Mass. May 1, 2019), ECF No. 325 (Government: "In this case, we would consider the property to be . . . the admission slots that they have a right to control and use how they see fit."); *id.* at 26 (Court: "So your view is, in any event, that the admissions slot is the property you're talking about?" Government: "Yes, your Honor."); Gov't Resp. to Ct.'s Mar. 14, 2019 Or. at 3, *United States v. Meredith*, No. 19-cr-10075, (D. Mass. Mar. 15, 2019), ECF No. 18 ("Here, the term 'property' refers to a place in the incoming class at Yale University, and Yale's right to control the composition of that class.").

## I.   THE FRAUD STATUTES ARE LIMITED TO "TRADITIONAL" FORMS OF PROPERTY

The mail and wire fraud statutes prohibit knowingly using mail or wire communication to carry out "any scheme or artifice to defraud" in order to "*obtain[] money or property* by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. §§ 1341, 1343 (emphasis added).  Congress first enacted the mail fraud statute in 1872, and it added the express "money or property" limitation in 1909.  *See* 3 Act of June 8, 1872, ch. 335, § 302, 17 Stat. 323; Act of Mar. 4, 1909, ch. 321, § 215, 35 Stat. 1130.  The wire fraud statute was enacted in 1952, and because it was "patterned on the mail fraud law," courts interpret both statutes the same way.  *United States v. Fermin Castillo*, 829 F.2d 1194, 1198 (1st Cir. 1987); *see United States v. Berroa*, 856 F.3d 141, 150-51 (1st Cir. 2017).

Since 1987, the Supreme Court has issued a series of rulings defining the statutes' property limitation.  As the Court has explained, that limitation must be strictly enforced to avoid overcriminalization and to take account of federalism and due process concerns.  Those rulings have emphasized that the scope of the fraud statutes is limited to *traditional* forms of property.

First, in *McNally v. United States*, 483 U.S. 350, 360 (1987), the Supreme Court held that the mail fraud statute is "limited in scope to the protection of property rights."  As it later explained, "[a]t the time *McNally* was decided, federal prosecutors had been using § 1341 to attack various forms of corruption that deprived victims of 'intangible rights' unrelated to money or property," such as the intangible right to honest government services.  *Cleveland*, 531 U.S. at 18.  *McNally* "stopped the development of the intangible-rights doctrine in its tracks."  *Skilling v. United States*, 561 U.S. 358, 401 (2010).  It held that the right to intangible *services*—namely, the honest services

of government officials or fiduciaries—is not a traditional property right.[3]

Shortly thereafter, the Supreme Court in *Carpenter v. United States*, 484 U.S. 19, 26 (1987) once again emphasized that the mail and wire fraud statutes are limited to the protection of property rights. *Carpenter* went on to explain, moreover, that the property right at stake must be one that has "*long been recognized as property*." *Id.* at 26 (emphasis added). There, the property in question was the confidential business information of a newspaper. To assess whether such information constituted "property" under the statutes, the Court relied on historical cases, statutes, and legal treatises establishing that confidential business information is a traditional concept of property. *See id.* That historical pedigree separated confidential business information from the "ethereal" right to "honest and faithful service," which had been at issue in *McNally*. *Id.* at 25.

Then, in *Cleveland v. United States*, the Supreme Court again reiterated that the fraud statutes must not "stray from traditional concepts of property." 531 U.S. at 24. There, the Government had argued that a state's unissued video poker licenses constituted "property" because they were economically valuable and because, like a patent, they involved the "right to exclude." *Id.* at 21-23. The Court did not dispute that such issued licenses were valuable or that unissued licenses involved the right to exclude. But it nonetheless rejected the Government's theory as a departure from "traditional concepts of property." *Id.* at 24. The Court explained that the State's interest in the licenses was principally "regulatory," and it dismissed the economic value of *unissued* licenses because "the State receives the lion's share of its expected revenue not while the licenses remain in its own hands, but only *after* they have been issued to licensees." *Id.* at 22.

---

[3]  After *McNally*, the First Circuit criticized other courts for "stretch[ing] to find more ingenious theories of property loss which purportedly satisfy *McNally*," and it refused to "let in through the back door the very prosecution theory that the Supreme Court tossed out the front." *United States v. Ochs*, 842 F.2d 515, 523, 527 (1st Cir. 1988).

*Cleveland* thus makes clear that stringing together various proprietary features—like economic value and the right to exclude—cannot transform novel conceptions of property into *traditional* forms of property cognizable under the fraud statutes.  And to resolve whether a traditional form of property is at stake, courts must turn to historical sources to determine if the purported property has *long been recognized* as property at common law.  In the decades since *Cleveland*, the Supreme Court and courts of appeals have continued to apply that historical analysis to discern the scope of the fraud statutes' property limitation.[4]

## II.   UNIVERSITY "ADMISSION SLOTS" ARE NOT "TRADITIONAL" FORMS OF PROPERTY

For at least four reasons, an "admission slot" is not a traditional form of property cognizable under the mail and wire fraud statutes.  *First*, the relevant historical record is bereft of any affirmative evidence that an admission slot has ever been considered property.  *Second*, to the extent the historical record addresses anything analogous to admission slots, it shows that lying on an application was *not* considered a deprivation of property.  *Third*, fraudulent statements made to induce a subsequent transaction in which the fraudster then pays full price is not fraud to obtain *property*.  And *fourth*, the universities here provided Defendants' children with educational *services*—but services were not classified as property under the common law.

---

[4] *See, e.g.*, *Pasquantino v. United States*, 544 U.S. 349, 356 (2005) (conducting historical analysis into common law sources); *United States v. Berroa*, 856 F.3d 141, 149 (1st Cir. 2017) (discussing *Cleveland*'s application of "traditional concepts of property"); *United States v. Henry*, 29 F.3d 112, 115 (3d Cir. 1994) ("[T]o determine whether a particular interest is property for purposes of the fraud statutes, we look to whether the law traditionally has recognized and enforced it as a property right."); *United States v. Baldinger*, 838 F.2d 176, 179 (6th Cir. 1988) ("[W]hile the Supreme Court recognized both tangible and intangible property interests, they nonetheless clearly intended to exclude from the reach of the mail fraud statute claims which did not involve a direct intention to deprive another of a recognized and traditional property right.").

A.      **The Government Has Identified No Case, Treatise, Or Other Historical Source Establishing That An Admission Slot Is A Traditional Form Of Property**

The Government asserts only one form of property that Defendants allegedly obtained by fraud: "admission to the Universit[y]."  FSI ¶ 370(a), (b).  But under the Supreme Court's historical analysis, a university's offer of admission is not a traditional form of property.

The Government has not yet identified a single historical source that suggests an admission slot has "long been recognized" as property, as required by *Carpenter* and *Cleveland*.  *See, e.g.*, Gov't's Mem. in Opp'n to Defs.' Mots. to Dismiss at 41-43, *United States v. Ernst*, No. 19-10081, (D. Mass. Jan. 17, 2020), ECF No. 367 ("Gov't *Ernst* Opposition").  Nor do Defendants know of any such source.  The treatises relied on by the Supreme Court in *Pasquantino*, for instance, contain extensive discussions of property rights, but include nothing akin to an admission slot.  *See* 544 U.S. at 356 (citing 3 W. Blackstone, Commentaries on the Laws of England 153-55 (1768); 2 J. Kent, Commentaries on American Law *351).  That is unsurprising, because an admission slot is intangible, and there were relatively few well-recognized forms of intangible property at common law.  That is why the volume of Blackstone's Commentaries addressing "The Rights of Things" is devoted almost entirely to real property and personal property in the form of chattels, and recognizes few forms of intangible property—none of which are remotely analogous to college admission slots.  *See* Blackstone, Commentaries 21 (listing ten types of "incorporeal hereditaments," which are "advowsons, tithes, commons, ways, offices, dignities, franchises, corodies or pensions, annuities, and rents"); *id.* at 405-07 (discussing copyrights).

Contemporaneous legal dictionaries confirm the narrow conception of intangible property prevailing when Congress added the property element to the fraud statute.  *See, e.g.*, *Property*, Black's Law Dictionary 955 (2d ed. 1910) (defining property as "[r]ightful dominion over external objects; ownership; the unrestricted and exclusive right to a thing" and "the highest right a man

can have to anything; being used for that right which one has to lands or tenements, goods or chattels, which noway depends on another man's courtesy").  To be sure, the common law recognized some intangible personal property, such as stocks and intellectual property.  *See id.* at 956.  But an admission slot has little in common with such property.  Unlike stocks or intellectual property—but like the unissued video poker licenses in *Cleveland*—admission slots lack intrinsic value "in the hands of the victim."  531 U.S. at 15.  No one thinks that a university somehow becomes richer simply by extending more admissions offers—nor poorer when it admits full-paying students based on exaggerated resumes or embellished letters of recommendation.

Because admission slots have no inherent economic value to universities, sentencing courts in this case have rightly concluded that the alleged scheme did not inflict "pecuniary harm" on them for purposes of the Sentencing Guidelines.[5]  By definition, that means whatever harm was suffered was "non-economic" and therefore a property interest was not at stake.  *See generally* U.S.S.G. § 2B1.1 cmt. n.3(A)(iii) (defining "pecuniary harm" as  "harm that is monetary or that otherwise is readily measurable in money," and stating that "[a]ccordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.").

In its briefing thus far, the Government has rested its property theory on the Sixth Circuit's decision in *United States v. Frost*, 125 F.3d 346 (6th Cir. 1997).  *See* Gov't *Ernst* Opposition at 41-43.  There, the court reviewed the mail and wire fraud convictions of five defendants who were professors or graduate students at the University of Tennessee Space Institute.  125 F.3d at 352.  According to the Government, the defendants had operated a scheme in which the professors

---

[5]  *See* Sentencing Hr'g Tr. 5-7, *United States v. MacFarlane*, No. 19-cr-10131 (D. Mass. Nov. 13, 2019), ECF No. 340 (Gorton, J.); Mem. & Or. at 4-6, *United States v. Abbott*, No. 19-cr-10117 (D. Mass. Sept. 13, 2019), ECF No. 443; Sentencing Hr'g Tr. 21, 32, *United States v. Vandemoer*, No. 19-cr-10079 (D. Mass. June 12, 2019), ECF No. 26; Sentencing Hr'g Tr. 56-57, 61-63, *United States v. Bizzack*, No. 19-cr-10222 (D. Mass. Oct. 30, 2019), ECF No. 34.

traded academic degrees for help securing lucrative federal grants by the graduate students who had military connections. *Id.* at 353-54. The defendants were charged with depriving the federal government of property in the form of contracts and tuition money, *id.* at 353-63, and depriving the university of the honest services of its employees, *id.* at 363-70.

*Frost* does not come close to establishing that admission slots are "traditional" forms of property. Most significantly, *Frost* discussed a property interest with respect to *unissued degrees—i.e.*, "whether the school would give a degree to a student"—not *admission* to a university. *Id.* at 367. In reaching its conclusion, the court relied on Sixth Circuit cases that "have recognized that a *degree* is a property interest of the graduate" for constitutional due process purposes. *Id.* (emphasis added). The court's brief analysis held that unissued degrees can count as property when awarded to "inept students" or those who "have not earned" those degrees, insofar as such awards can harm the university's reputation and impair its fundraising and recruitment of tuition-paying students. *Id.* But such considerations are not sufficient to qualify unissued degrees as a *traditional* form of property—indeed, the Sixth Circuit conducted no analysis of any relevant history or tradition at all. Moreover, the mere potential for spillover economic consequences does not transform unissued degrees (or admission slots) into property. If it did, then a deprivation of "honest services"—which can likewise devalue an institution's brand in the marketplace—would necessarily count as property too. And *Frost*'s reliance on cases applying broad and evolving concepts of "property" for purposes of constitutional due process has no application to the fraud statute, which is limited to "*traditional* concepts of property." *Cleveland*, 531 U.S. at 24 (emphasis added); *see generally* Paul Mogin, *The Property-Rights Limitation in Mail and Wire Fraud Cases*, 32-APR Champion 24, 26-27 (2008) (explaining that "new property" theories recognized under Due Process Clause are not cognizable under mail and

10

wire fraud statutes).  If *Frost* is the Government's best evidence that an admission slot is a traditional form of property, then the Government is truly empty-handed.[6]

The Court need go no further than this.  Because the alleged property at issue here—university admission slots—is not a "traditional" form of property, the Court should dismiss Count One to the extent it is premised on a property theory of fraud.

**B.    The Supreme Court's Decision In *Plyler* Establishes That Lying In An Application Does Not Implicate a Property Deprivation**

To the extent the historical record addresses anything akin to "admission slots," it suggests that they are *not* traditional forms of property.  Indeed, the Supreme Court's decision in *Plyler* makes clear that a fraudulent application submitted to obtain a slot in the federal civil service does not constitute money-or-property fraud.  The same result follows here.

*Plyler* arose from a line of early-twentieth century cases addressing several new specialized fraud statutes that Congress enacted to protect the government: Revised Statute § 5418, which prohibited "forg[ing]" documents "for the purpose of defrauding the United States," and Revised Statute § 5440, which prohibited "conspir[ing] . . . to defraud the United States in any manner or for any purpose" (3 Compiled Statutes of the United States tit. 70 ch. 5 §§ 5418, 5440 (John. A. Mallory ed. 1902) (predecessor to what is now 18 U.S.C. § 371)).  Unlike prior statutes prohibiting fraud more generally, these government-focused statutes were broadly worded and not expressly limited to frauds depriving victims of money or property.  At the time, the question arose whether

---

[6]  *Frost* is inapposite for other reasons as well.  Its analysis of unissued degrees relied on pre-*Cleveland* case law about unissued government licenses, and its conclusion was thus uninformed by the Supreme Court's subsequent explanation that the property must have value "in the hands of the victim."  531 U.S. at 15.  Its property discussion also related to an honest-services fraud conviction, not a fraud conviction for depriving the victim of *property*.  125 F.3d at 363-65.  And the Sixth Circuit's case law required a lesser showing to find "property" for purposes of honest services fraud.  *Id.* at 368-69.  Indeed, it is notable that in *Frost* the Government did not even try to argue that the unissued degrees qualified as property for purposes of money-or-property fraud.

those government-focused statutes should nonetheless be limited to deprivations of property, like the traditional fraud statutes.  *See* Abraham S. Goldstein, *Conspiracy to Defraud the United States*, 68 Yale L.J. 405, 417-30 (1959); Joshua A. Kobrin, *Betraying Honest Services: Theories of Trust and Betrayal Applied to the Mail Fraud Statute and § 1346*, 61 N.Y.U. Ann. Surv. Am. L. 779, 790- 92 & n.50 (2006).

This open question mattered only when the fraud did *not* deprive the government of property.  Otherwise the crime would fall comfortably within traditional fraud and the issue would not arise.  Thus, test cases emerged in a variety of situations where fraudulent schemes were not directed at obtaining property.  *See, e.g.*, *United States v. Barnow*, 239 U.S. 74 (1915) (impersonating a federal officer); *McGregor v. United States*, 134 F. 187, 195 (4th Cir. 1904) (taking bribe but Government suffered no pecuniary loss).

One such situation that arose many times involved fraudulent applications submitted to the Civil Service Commission to obtain positions in the federal civil service.  Various applicants provided inaccurate information on their applications and were charged with forgery and conspiring to defraud the United States under Revised Statutes §§ 5418 and 5440.  *See Tyner v. United States*, 23 App. D.C. 324, 350-51 (D.C. Cir. 1904) (appellant collecting decisions addressing application of the revised fraud statutes to forged civil service applications).

The only reason these civil service cases raised the open statutory question under Revised Statutes §§ 5418 and 5440 was because the underlying conduct—falsifying an application to obtain a slot in the civil service—was generally understood *not* to involve a deprivation of government "property."  As one court put it when applying the new, government-focused fraud statutes to falsified applications: "When this case first came before me, I was under the impression that the defendants were indicted under the old law [containing a money-or-property requirement]

*. . . and as it was not shown that either of them had defrauded the government of money or other property, I was in doubt whether the statute covered the charge*." *United States v. Bunting*, 82 F. 883, 884 (E.D. Pa. 1897) (emphasis added).  But once the court reviewed "the Revised Statutes under which the defendants [we]re charged"—which were "broad and sweeping" and did not include a property limitation—the court was "of opinion that the offense comes within their terms." *Id.*  In short, if the relevant statutes had required a deprivation of property, lying on a civil service application would not constitute a violation.

Other courts reached the same conclusion.  In *Tyner v. United States*, 23 App. D.C. 324, 361-63 (D.C. Cir. 1904), for instance, another court considered whether fraudulent applications to the Civil Service Commission did not fall under the revised fraud statutes because they caused no "pecuniary injury."  Once again, the court concluded that such fraud was *not* a property deprivation, but nonetheless fell within the scope of the new government-focused statutes that did not include a property element:

> Any wilful or corrupt misconduct on the part of an official . . . that operates to impair this administration works a wrong to the United States and does them some substantial injury.  *The injury may be pecuniary, that is to say, one whereby public money or property may have been taken, destroyed, or expended, but it may also be one the general damage resulting from which may be most serious and far reaching, and yet not of a specific character susceptible of certain ascertainment and pecuniary compensation.  Of this latter kind is the injury embraced in the charges of this indictment*, and we are of the opinion that it is within the comprehension of the statute which makes punishable a conspiracy, not only to defraud the United States but to defraud them in any manner or for any purpose.

*Id.* at 362-63 (emphasis added); *see also Palmer v. Colladay*, 18 App. D.C. 426, 433-34 (D.C. Cir. 1901) (stating that Rev. Stat. § 5440 applies to forgery on Civil Service applications despite fact that such fraud does not deprive the government of "money" or "money value").

As *Bunting*, *Tyner*, and other cases show, the traditional understanding was that falsifying an application for a slot in the federal civil service did *not* implicate property.  The only question,

then, was whether such conduct was actionable under the new government-focused fraud statutes because those statutes covered additional harms to the government, above and beyond the money-or-property harms covered by the traditional all-purpose fraud statutes.

When that question reached the Supreme Court in *Plyler*, Justice Holmes made quick work of it.  There, the Court addressed the recurring issue of defendants who had forged the "vouchers required upon examination by the Civil Service Commission of the United States, certifying to the character, physical capacity, etc., of the applicant."  222 U.S. at 16.  The district court had dismissed an indictment brought against a North Carolina man who had submitted forged documents in support of his application to serve as a rural letter carrier in the federal civil service. The Supreme Court reversed, explaining that the forgery violated Section 5418 even though the slot in the civil service did *not* constitute a property interest.  As the Court explained, "[i]t now must be regarded as established that it is not essential to charge or prove an actual financial or property loss to make a case under [Rev. Stat. § 5418].  The section covers this case."  *Id.* (internal quotation marks omitted).  *Plyler* thus accepted the general premise that falsifying an application for a civil service position did not constitute a property deprivation, and concluded that the government-focused fraud statute reached the conduct nonetheless because—unlike the more generally applicable fraud statutes—it required no "financial or property loss."

*Plyler* and the cases leading up to it are highly instructive.  Those cases were decided during the same period that the "money or property" limitation was added to the mail fraud statute, *see* Act of Mar. 4, 1909, ch. 321, § 215, 35 Stat. 1130, and they reflect the general consensus that falsifying an application to obtain a slot in the civil service does not implicate the government's property interests.  That proposition was so uncontroversial that courts often accepted it as true with little elaboration or further comment, as *Plyler* did.

14

Here, the Government alleges that Defendants deprived the universities of property by submitting inaccurate applications to obtain offers of admission. But a university's "admission slot," like an admission slot to the federal civil service, is neither a "traditional" nor "long . . . recognized" form of property. *Cleveland*, 531 U.S. at 24; *Carpenter*, 484 U.S. at 26. Indeed, at the time the property element was added to the mail fraud statute, that theory was too farfetched to even warrant sustained discussion. It is equally meritless today.

### C.      Defendants Obtained "Offers" To Exchange Tuition For Educational Services, Not Property

The Government's novel theory also fails because a university "admission slot" is not property, but rather an *offer* to attend the university and receive educational services in exchange for tuition payments. And both the common law and the courts of appeals today agree that fraud related to an offer does not constitute a *property* deprivation if the subsequent transaction is consummated and the fraudster pays full price. That is just what occurred here, where Defendants paid full price tuition for the universities' educational services.

*First*, an *offer* is not a traditional or long-recognized form of *property*. While an offer of admission may be valuable to the recipient and may involve a university's right to exclude, those characteristics cannot overcome the complete absence of historical evidence that offers have been traditionally considered property. As best we can tell, *no* legal or general dictionary or treatise supports the assertion that an "offer" to engage in subsequent transaction counts as a form of property. *See supra* at 8-9 (citing historical sources); *Property*, Wharton's Law Lexicon 689-90 (11th ed. 1911); *Property*, IV Oxford English Dictionary 1471 (1st ed. Suppl. 1933).[7]

---

[7] Defining property as: "1. The condition of being owned by or belonging to some person or persons; hence, the fact of owning a thing; the holding of something as one's own; the right (esp. the exclusive right) to the possession, use, or disposal of anything (usually of a tangible material thing); ownership, proprietorship. 2. That which one owns; a thing or things belonging to

In all of its various filings and hearings related to this alleged conspiracy, the Government has yet to identify a single source that supports its offer-as-property theory.  The reason for that is plain.  An offer is not property, but rather an invitation to engage in a *future transaction* in which various interests—property or money or services—will be exchanged.  Here, each university's offer of admission was not property but rather an invitation to engage in a future transaction in which the university would provide services (an education) in exchange for money (tuition payments).  Moreover, the Government does not allege that Defendants defrauded the universities in that subsequent education-for-tuition transaction.  Nor could it.  Defendants paid full price for educational services, and the universities suffered no pecuniary harm.  *See supra* at 9 & n.5.

*Second*, the Government's offer-as-property theory has been roundly rejected by the Supreme Court and federal courts of appeals.  In *Skilling*, for example, the Supreme Court confirmed that a victim is not defrauded of property when tricked into entering a subsequent transaction that is itself consummated on standard terms.  There, the Court made clear that a city government would *not* be defrauded of property if its mayor "accepted a bribe from a third party in exchange for awarding that party a city contract, yet the contract terms were the same as any that could have been negotiated at arm's length."  561 U.S. at 400.  The Court explained that the bribe would constitute *honest services fraud*—but not money-or-property fraud—even though the fraudulent scheme resulted in the city giving up money in exchange for performance of the contract.  *Id.*  In those circumstances, because the contract terms were the same as would have been negotiated "at arm's length," the city "would suffer no tangible [property] loss."  *Id.*

The courts of appeals, meanwhile, have consistently reversed mail and wire fraud

---

or owned by some person or persons; a possession (usually material), or possessions collectively; (one's) wealth or goods."

convictions where the defendant's fraud merely induced an offer but the subsequent transaction was consummated at full price.  For example, in *United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014), the defendant owned a pain-management clinic and lied to pharmaceutical distributors in order to qualify to purchase certain prescription drugs.  *Id.* at 589.  She submitted false credentials by "using the clinic doctor's DEA registration," and she "falsely [told] the distributors that the drugs were being used to serve 'indigent' patients."  *Id.* at 589-90.  Once she qualified, however, she bought the drugs from the distributors at full price.  *Id.* at 590.  The Government brought wire fraud charges against the defendant because she had fraudulently induced the distributors to sell her the drugs—*i.e.*, she had procured their offer to do business by fraud.

In an opinion by Judge Sutton, the Sixth Circuit reversed the defendant's wire fraud conviction because "the government never showed that [the defendant] intended to deprive anyone of property."  *Id.*  The evidence showed that she had "paid full price for all the drugs she purchased."  So, the Court asked, how did she "deprive the distributors of property?"  *Id.*  The Government's first response was that the defendant had fraudulently obtained the drugs, but the court rejected that argument out of hand: "[The Defendant] may have had many unflattering motives in mind in buying the pills, but unfairly depriving the distributors of property was not one of them. . . . she ordered pills and paid the distributors' asking price, nothing more."  *Id.*  Next, the Government argued that the defendant deprived the distributors of their "right to accurate information" because the distributors would not have offered to do business with her had they known the truth.  The court flatly rejected this argument because the "statute is 'limited in scope to the protection of *property rights*,' and the ethereal right to accurate information doesn't fit that description."  *Id.* at 591 (quoting *McNally*, 483 U.S. at 360).  In sum, even though the defendant had lied to the distributors, that lie did not defraud the distributors of "property" because the

17

subsequent transaction was fair.

The Eleventh Circuit reached a similar conclusion in *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) (Thapar, J., sitting by designation).  There, the court held that defendants who owned a nightclub did not fraudulently obtain property from their customers when they had female employees pretend to be tourists to induce customers to patronize the club.  *Id.* at 1310, 1318, 1325.  The court explained its reasoning with the following analogy:

> Consider the following two scenarios.  In the first, a man wants to exchange a dollar into four quarters without going to the bank.  He calls his neighbor on his cell phone and says that his child is very ill.  His neighbor runs over, and when she arrives he asks her to make change for him.  She agrees; the quarters pass to the man; the dollar passes to the woman; and they part ways.  She later learns that the child was just fine all along.  The second scenario is identical to the first, except that instead of giving the woman a true dollar, he gives her a counterfeit one. . . .   The first scenario is not wire fraud; the second one is.

*Id.* at 1313.  Applying that reasoning to the case at hand, the Court noted, "if someone is lured to a bar under false pretenses but nevertheless gets precisely what he pays for, he has hardly been deceive[d] or cheat[ed] out of money or property."  *Id.* at 1318 (alterations in original) (citation omitted).  The matter would have been different, however, if the *future transaction* had been fraudulent, for example by "running up fake bills on the victims' credit cards and charging absurd drink prices that the menus nowhere advertised."  *Id.* at 1317.

As with the defendants in *Sadler* and *Takhalov*, the Government alleges that Defendants here made misrepresentations to induce an offer.  The Government claims they gave inaccurate information to the universities, and absent that inaccurate information, the universities would not have extended them an offer.  But just like in *Sadler* and *Takhalov*, the Government has *not* alleged that the subsequent transaction (here, educational services for tuition payments) was itself fraudulent.  Thus, the Government has failed to allege a deprivation of property sufficient to state an offense under the mail and wire fraud statutes.  In sum, the Government's offer-as-property

theory lacks historical support as a traditional concept of property, and it lacks contemporary support in the courts of appeals. This Court should reject the theory as well.

### D. Educational Services Are Not A Traditional Form Of Property

Even if the Government could bypass the fact that "admission slots" are offers, it has still failed to identify a traditional form of property. That is because universities do not exchange *property* for tuition payments, they exchange educational *services* for those payments. *See* FSI ¶ 29 (stating that the universities "charge *tuition* for their *services*" (emphases added)). And services are treated as distinct from property both at common law and in the courts today. Moreover, numerous statutes show that Congress knows how to include "services" when it wants to—but it conspicuously decided against that option here.

*First*, the Government has provided no historical evidence that *services* are traditionally considered a form of *property*. Neither Blackstone nor Kent nor Black define property to include services. And Black's definition of "service" does not suggest it is property. *See Service*, Black's Law Dictionary 1076 (2d ed. 1910) ("The being employed to serve another; duty or labor to be rendered by one person to another."). Indeed, courts and treatises have typically distinguished between the two.

Most notably, in *Gleason v. Thaw*, 236 U.S. 558, 561 (1915), the Supreme Court held that "professional services" did not qualify as "property" under a bankruptcy statute that exempted from general discharge any property obtained by false pretenses. While the Court's interpretation of "property" was specific to the bankruptcy statute, it was premised on "the word's meaning as employed in ordinary speech and business." *Id.* The Court also noted that the "constitutions of many States provide that *all property* shall be taxed, but it has never been supposed that this applies to professional services." *Id.*; *see also State v. Smith*, 197 So. 429, 431 (La. 1940) (noting that "labor" or "personal services" are not "*worldly goods or possessions*, or tangible things" and thus

"clearly do not fall within the ordinary meaning of the word 'property'" (citing *State v. Eicher*, 140 So. 498 (La. 1932); *State v. Frusha*, 91 So. 430 (La. 1922)).[8]

The development of statutes criminalizing "theft of services" also puts in sharp relief the longstanding distinction between property and services. At common law, the crime of false pretenses "covered only 'money, goods, wares or merchandise,' and thus was limited to tangible personal property and money." Wayne R. LaFave, 3 Subst. Crim. L. § 19.7(e) (3d ed. Oct. 2019). Because that traditional understanding of property did not include "services," fraudulently obtaining services was not covered by false pretenses statutes. To account for that gap, many states enacted "theft of services" statutes to criminalize such misconduct even when its object (services) extended beyond traditional notions of property. *See id.*; *State v. Dixon*, 553 A.2d 1, 2 (N.J. 1989) (explaining that theft of services statute arose because "[u]nder prior false-pretenses-criminality statutes and case law, the object of the crime was limited to theft of property," which did not include "services"); *Commonwealth v. McCray*, 242 A.2d 229, 230 (Pa. 1968) (similar). The Model Penal Code notes the same development in its commentary on theft of services: "Though arguably viewed as a species of 'property,' labor or professional service has not been included within the traditional scope of that term in ordinary theft statutes. Theft of services thus was not ordinarily a criminal offense in the absence of special legislation." Model Penal Code § 223.7, cmt. 1. As this history illustrates, although services have long been considered valuable, they have not traditionally been viewed as property.

*Second*, courts today still refuse to conflate property and services. As one court bluntly put

---

[8]  *See also Matter of Lombard*, 739 F.2d 499, 504 (10th Cir. 1984) (applying *Gleason* to conclude that architectural services are not property); *In re Wright*, 584 F.2d 83, 84 (5th Cir. 1978) (applying *Gleason* to conclude that "[p]rofessional services of all kinds, including legal services, are excluded from the definition of 'property' as it pertains to the Bankruptcy Act"); *Hisey v. Lewis-Gale Hosp.*, 27 F. Supp. 20, 23 (W.D. Va. 1939) (applying *Gleason* to medical services).

it when the Government advanced this theory in a mail fraud prosecution: "Quite simply, *there is no authority* to support the proposition that services are a traditional property interest.  Generally, services are *not* a traditional property interest . . . ."  *United States v. Alsugair*, 256 F. Supp. 2d 306, 314 (D.N.J. 2003) (emphasis added).  The First Circuit has agreed, emphatically stating that "[i]t is true . . . that the traditional common-law definition of theft was limited to property, and that services were not considered property in many common-law jurisdictions."  *De Lima v. Sessions*, 867 F.3d 260, 266 (1st Cir. 2017); *see also, e.g.*, *United States v. Corona-Sanchez*, 291 F.3d 1201, 1208 (9th Cir. 2002) (noting that theft of services is "generally [not] included within the scope of ordinary theft statutes because one's labor is not one's 'property'"), *superseded by statute on other grounds as recognized in United States v. Vidal*, 426 F.3d 1011 (9th Cir. 2005).

Moreover, the Supreme Court in *McNally* has already held that the fraud statutes are limited to "property rights," 483 U.S. at 360, and that the right to *services*—namely, the honest services of government officials or fiduciaries—is not a traditional property right.  *See Skilling*, 561 U.S. at 401-02.  After *McNally*, Congress knew that services were not covered by the property element, yet "Congress amended the law to cover [only] one of the 'intangible rights' that lower courts had protected under § 1341 prior to *McNally*."  *Cleveland*, 531 U.S. at 19-20; *see* 18 U.S.C. § 1346 (extending fraud statutes to include "a scheme or artifice to deprive another of the intangible right of honest services").  The Government has not explained how, after *McNally* and Congress's response, the property element could extend beyond honest services to educational services.

*Third*, Congress undoubtedly knows how to legislate beyond traditional property interests when it so chooses.  In other statutes, Congress has done just that.  For example, 18 U.S.C. § 371 criminalizes any conspiracy "to defraud the United States . . . in *any manner* or for *any purpose*." (emphases added).  There, Congress limited the scope of the statute by specifying the victim (the

United States), but expressly disavowed any limitation based on the object of the fraud ("in any manner or for any purpose").  Thus, as the First Circuit has noted, the statute is not limited to frauds that "deprive the government of money or property, but includes conspiracy to interfere with government functions." *United States v. Goldberg*, 105 F.3d 770, 773 (1st Cir. 1997).  It also presumably covers conspiracies to defraud the government of *services*.

Congress has not only defined the object of certain fraud statutes in broad terms, it has also expressly identified "services" as the object of other frauds.  For example, courts continued to faithfully apply the Supreme Court's holding in *Gleason*, *see supra* at 20 n.8, until Congress amended the bankruptcy statute to expressly cover "services" alongside "property," *see* Bankruptcy Act, Pub. L. 95-598, 92 Stat. 2549 (1978) (codified at 11 U.S.C. § 523(a)(2)(A) (providing an exception to discharge for "money, property, [or] *services*" obtained by "actual fraud" (emphasis added)); *see also* Access Device or Credit Card Fraud, 18 U.S.C. § 1029(e)(1) ("The term 'access device' means any card . . . or other means of account access that can be used . . . to obtain money, goods, *services* or any other thing of value." (emphasis added)).

Congress chose to limit the mail and wire fraud statutes to deprivations of "property."  It did not include a broader prohibition relating to fraud "in any manner" and it did not specifically include "services," as it has done elsewhere.  Even after *McNally* narrowly interpreted the money-or-property requirement, Congress did *not* respond by extending the statute to cover "anything of value" or all forms of service.  Instead, it carefully chose a limited amendment that would include only deprivations of "*honest* services."  As Judge Sutton put it, "Congress's reverberating silence about other intangible interests tells us all we need to know."  *Sadler*, 750 F.3d at 591.

III.   **THE GOVERNMENT'S NOVEL PROPERTY THEORY MASSIVELY EXPANDS CRIMINAL LIABILITY AND THREATENS CONSTITUTIONAL VALUES**

The Supreme Court has repeatedly warned against overly broad interpretations of the fraud statutes. *See, e.g.*, *McNally*, 483 U.S. at 356-61; *Skilling*, 561 U.S. at 415-25 (Scalia, J., concurring in part and concurring in the judgment). And rightly so. Open-ended criminal statutes "cast a pall of potential prosecution" over every day conduct and raise significant constitutional concerns. *McDonnell v. United States*, 136 S. Ct. 2355, 2372 (2016). For that reason, the Court's interpretation of the mail and wire fraud statutes has rigorously invoked principles of constitutional avoidance, federalism, and lenity to impose sensible limits on their scope. *See, e.g.*, *Skilling*, 561 U.S. at 410-11; *Cleveland*, 531 U.S. at 25; *McNally*, 483 U.S. at 359-60. Those considerations weigh strongly against the Government's novel and expansive property theory here.

In *Cleveland*, the Supreme Court rejected "the Government's theories of property rights not simply because they stray from traditional concepts of property," *but also* because they would effect "a sweeping expansion of federal criminal jurisdiction" into "a wide range of conduct traditionally regulated by state and local authorities." 531 U.S. at 24. Here, the Government's property arguments share the same problem. The Government's approach would criminalize a wide range of conduct that—even though unethical—no one thinks should constitute a federal crime punishable by 20 years in prison.

For starters, any misrepresentation in a college application would place the applicant at the mercy of federal prosecutors. The same goes for any exaggeration or fib in any other kind of application—or letter of recommendation—whether written to a university, a preschool, an employer, a civic organization, or any other entity accepting applications for limited membership or participation slots. It also presumably criminalizes any act of cheating or plagiarism that helps a high-school or college student earn a diploma or get accepted into a school, program, or club.

23

The Government's theory also means that *every* misrepresentation made to promote a subsequent transaction to induce a sales offer will be a federal felony—regardless of the fairness of the subsequent transaction—so long as the jurisdictional elements are met.  For example, the Government's theory would make a federal criminal of:

- The parent who convinces a local math teacher to tutor his son by claiming that his son's math struggles were due to illness, when they were really due to lack of effort;

- The man who persuades his barber to offer an earlier haircut appointment by claiming he has a last-minute business trip, when really the trip has been scheduled for weeks; and

- The parent who persuades a toy store to reserve one of its fast-selling toy trucks by claiming that he had promised his son the truck for Christmas, when really the gift is a surprise.

Congress intended none of this.  Telling a lie is dishonorable and wrong, but it does not violate the mail and wire fraud statutes and turn the dissembler into a federal criminal.  The fraud statutes do not criminalize all bad behavior or even all fraud; rather, they prohibit fraudulent schemes with the object of obtaining a traditional form of property.

Because of its breadth, the Government's expansive property theory would cloud the boundary between lawful and criminal conduct, thereby bestowing vast, unchecked discretion on prosecutors and opening the door to arbitrary and discriminatory enforcement of the law.  This is precisely the threat the Supreme Court has warned against.  *See McDonnell*, 136 S. Ct. at 2372-73 ("[W]e cannot construe a criminal statute on the assumption that the Government will 'use it responsibly.'" (citation omitted)).  Based on these same considerations, the First Circuit has recently rejected one of the Government's property theories under which "virtually any false statement in an application for a medical license could constitute a federal crime."  *Berroa*, 856 F.3d at 150; *see also United States v. Czubinski*, 106 F.3d 1069, 1079 (1st Cir. 1997) (warning that the "broad language" of the fraud statutes should not "be used to prosecute kinds of behavior that, albeit offensive to the morals or aesthetics of federal prosecutors, cannot reasonably be expected

24

by the instigators to form the basis of a federal felony").

Moreover, any ambiguity as to the meaning of "property" must be resolved in favor of a narrow construction that leaves everyday human conduct outside the scope of liability.  The rule of lenity "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them."  *Berroa*, 856 F.3d, at 157 n.8 (citation omitted).  The Supreme Court has *repeatedly* invoked that rule to explain its rejection of the Government's ever-innovative property theories under the fraud statutes.  *See, e.g.*, *Skilling*, 561 U.S. at 410-411; *Cleveland*, 531 U.S. at 25 (stating that the rule of lenity is "especially appropriate in construing § 1341").  As the Court emphasized in *McNally*, "when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language."  483 U.S. at 359-60.  Here, it is entirely rational to conclude that an "admission slot" is not property.

Finally, the Government's theory of property is so untethered from any substantive definition that it raises serious vagueness concerns.  To satisfy due process, "a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  The Government's theory flunks that test.  As noted, the Government's arguments would transform everyday conduct into potential federal felonies.  In these circumstances, the Supreme Court has "instructed the federal courts to avoid constitutional difficulties by adopting a limiting interpretation if such a construction is fairly possible."  *Skilling*, 561 U.S. at 406 (alteration and citation omitted).  Here, such a limiting interpretation is not only possible but also the soundest reading of the statute.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Count One of the indictment insofar as it alleges a conspiracy to deprive universities of property.

25

Dated:  April 1, 2020

Respectfully submitted,

_/s/ William J. Trach_____

Sean M. Berkowitz (*admitted pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue,
Suite 2800
Chicago, IL 60611
Phone: 312.777.7700
Fax: 312.993.9767
sean.berkowitz@lw.com

William J. Trach (BBO #661401)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Phone: 617.948.6000
william.trach@lw.com

Perry J. Viscounty (*admitted pro hac vice*)
LATHAM & WATKINS LLP
650 Town Center Drive
20th Floor
Costa Mesa, CA 92626
Phone: 714.540.1235
perry.viscounty@lw.com

Roman Martinez (*admitted pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Phone: 202.637.2200
roman.martinez@lw.com

*Counsel for Mossimo Giannulli and Lori Loughlin*

George W. Vien (BBO #547411)
Joshua N. Ruby (BBO #679113)
DONNELLY,   CONROY   &   GELHAAR,
LLP
260 Franklin Street
Suite 1600
Boston, MA 02110
Phone: 617.720.2880
Fax: 617.720.3554
gwv@dcglaw.com
jnr@dcglaw.com

David C. Scheper (*admitted pro hac vice*)
SCHEPER KIM & HARRIS LLP
601 West Fifth Street
12th Floor
Los Angeles, CA 90071
Phone: 213.613.4655
Fax: 213.613.4656
dscheper@scheperkim.com

*Counsel for Lori Loughlin*

Mark E. Beck (*admitted pro hac vice*)
Mark Beck Law, A Professional Corporation
350 West Colorado Boulevard
Suite 200
Pasadena, CA 91105
Phone: 213.596.7828
mbeck@markbecklaw.com

*Counsel for Mossimo Giannulli*

*/s/ Brian T. Kelly*
Brian T. Kelly (BBO No. 549566)
Joshua C. Sharp (BBO No. 681439)
Lauren M. Maynard (BBO No. 698742)
NIXON PEABODY LLP
53 State Street
Boston, MA 02109
617-345-1000
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com
lmaynard@nixonpeabody.com

Robert Sheketoff (BBO No. 457340)
One McKinley Square
Boston, MA 02109
617-367-3449

*Counsel for Gamal Abdelaziz*

*/s/ David S. Schumacher*
David S. Schumacher (BBO #647917)
HOOPER, LUNDY & BOOKMAN, P.C.
470 Atlantic Avenue, Suite 1201
Boston, MA 02210
(617) 532-2700
(617) 345-3927 (fax)
dschumacher@health-law.com

Patric Hooper (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517
(310) 551-8111
(310) 551-8181 (fax)
phooper@health-law.com

Jordan Kearney (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
575 Market Street, Suite 2300
San Francisco, CA 94105
(415) 875-8500
(415) 875-8519 (fax)
jkearney@health-law.com

*Counsel for Amy and Gregory Colburn*

*/s/ David E. Meier*
David E. Meier (BBO #341710)
Todd & Weld LLP
One Federal Street, 27th Floor
Boston, MA  02110
(617) 720-2626
dmeier@toddweld.com

*/s/ Stephen H. Sutro*
Stephen H. Sutro, Esq.
Duane Morris, LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105-1127
(415) 957-3008
SHSutro@duanemorris.com

*Counsel for Diane Blake and Todd Blake*

*/s/ Reuben Camper Cahn*
Reuben Camper Cahn (*pro hac vice*)
Jennifer L. Keller (*pro hac vice*)
Chase A. Scolnick (*pro hac vice*)
KELLER/ANDERLE LLP
18300 Von Karman Avenue, Suite 930
Irvine, CA 92612
Tel: (949) 476-8700
rcahn@kelleranderle.com

*Counsel for I-Hsen "Joey" Chen*

27

/s/ Jack W. Pirozzolo
Jack W. Pirozzolo (BBO # 564879)
jpirozzolo@sidley.com
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0304

John C. Hueston (*pro hac vice*)
jhueston@hueston.com
Marshall Camp (*pro hac vice*)
mcamp@hueston.com
HUESTON HENNIGAN LLP
523 W. 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4340

*Counsel for William McGlashan, Jr.*

/s/ Michael Kendall
Michael Kendall (BBO # 544866)
Yakov Malkiel (BBO # 689137)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
yakov.malkiel@whitecase.com

Andrew E. Tomback (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8428
andrew.tomback@whitecase.com

*Counsel for John Wilson*

/s/ R. Robert Popeo
R. Robert Popeo (BBO # 403360)
Mark E. Robinson (BBO # 423080)
Eóin P. Beirne (BBO # 660885)
Cory S. Flashner (BBO # 629205)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1605 (telephone)
(617) 542-2241 (fax)
rpopeo@mintz.com
mrobinson@mintz.com
ebeirne@mintz.com
csflashner@mintz.com

*Counsel for Elisabeth Kimmel*

/s/ Michael K. Loucks
Michael K. Loucks (BBO #305520)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
500 Boylston Street
Boston, MA 02116
(617) 573-4800
michael.loucks@skadden.com

Jack P. DiCanio (*pro hac vice*)
Allen J. Ruby (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
525 University Avenue
Palo Alto, CA 94301
(650) 470-4500
jack.dicanio@skadden.com
allen.ruby@skadden.com

*Counsel for Defendant Marci Palatella*

*/s/ Tracy A. Miner*
Tracy A. Miner (BBO No. 547137)
Megan A. Siddall (BBO No. 568979)
Miner Orkand Siddall LLP
470 Atlantic Ave, 4th Floor
Boston, MA 02110
Tel.: (617) 273-8377
Fax: (617) 273-8004
tminer@mosllp.com
msiddall@mosllp.com

*Counsel for Homayoun Zadeh*

*/s/ Martin G. Weinberg*
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Matthew L. Schwartz (*admitted pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Tel.: (212) 446-2300
Fax: (212) 446-2350
E-mail:  mlschwartz@bsfllp.com

*Counsel for Robert Zangrillo*

## CERTIFICATE OF SERVICE

I certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those identified as non-registered participants.

*/s/ William J. Trach*
William J. Trach