UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No.: 19-10080-NMG |
| ) | |
| DAVID SIDOO, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**DECLARATION OF ERIC S. ROSEN**

I, Eric S. Rosen, state the following:

1. I am an Assistant United States Attorney ("AUSA") in the United States Attorney's Office for the District of Massachusetts. I have served as an AUSA for approximately eight years, including nearly five years in the District of Massachusetts and, before that, more than three years in the Western District of Pennsylvania. In that capacity, I have investigated and prosecuted a variety of crimes including drug trafficking, money laundering, securities and financial fraud, and bribery. Prior to that I worked as an Assistant District Attorney in the New York County District Attorney's Office for three years, and as an associate at Richards, Kibbe & Orbe LLP, a law firm in New York, New York that specializes in white collar defense and complex civil litigation. I also clerked for The Hon. Robert P. Patterson, Jr., of the United States District Court for the Southern District of New York.

2. I have been assigned to "Operation Varsity Blues," an investigation of fraud and bribery in the college admissions process, since approximately March 2018.

3. I am aware that, on September 21, 2018, agents from the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service ("IRS") approached William "Rick" Singer, a target of the investigation, to see if he wanted to cooperate.

4.      Thereafter, the agents and I met with Singer and his attorney on multiple occasions to interview Singer and to discuss his cooperation. During those meetings, we repeatedly told Singer that he needed to be completely truthful with us.

5.      Singer was initially a reluctant cooperator. He was not fully forthcoming, tried to protect certain of his co-conspirators, and resisted making consensually recorded calls.

6.      In late September and early October 2018, Singer made a series of consensually recorded phone calls with parents and coaches at our direction. The calls with parents involved parents who had begun, but not completed the fraud and bribery scheme. Singer also spoke with brand new clients who had contacted him. For these calls, the agents and I generally instructed Singer to be more explicit – for instance, to say that the money was going to be paid to a coach in exchange for their children's admission as fake athletic recruits. I understood that Singer was not usually this explicit with his clients, typically telling them that the money was a "donation" to an athletic "program." But it was important to me that Singer be clear and direct, so that, among other reasons, clients who were still actively involved in the scheme, or considering it for the first time, could not later claim they were confused or entrapped.

7.      Singer resisted our instruction because this wasn't what he usually told his clients. He explained that he could not suddenly be more explicit with clients to whom he had already explained the fraud. For those clients, who were in the middle of the fraud, Singer generally remained consistent with his previous conversations. For new clients, we instructed him to be more explicit, and he followed that direction.

8.      Several weeks later, toward the end of October 2018, the agents and I turned our attention to the parents who had already completed the scheme before Singer began cooperating. That includes most of the defendants in this case. By that time, I had a good faith basis to believe,

based on the evidence developed to that point, that each of these parents had engaged in the scheme with the requisite knowledge and criminal intent. In order to corroborate that evidence, the agents and I instructed Singer to call these parents using a ruse that the IRS was auditing his foundation. For parents whose children had been admitted to the University of Southern California ("USC"), we instructed him to say, in substance, that he would not tell the IRS that they had paid "Donna" at USC to have their children recruited as fake athletes. At that time, the evidence demonstrated that most of the parents knew who Donna was, because they had sent their money directly to her attention, and Singer had forwarded emails from her to a few of the parents. And even if they did not know her name, I believed, based on the evidence, that they knew that someone at USC was complicit in the scheme in exchange for the money. Likewise, for parents who had engaged in the test cheating, we instructed Singer to say, in substance, that he would not tell the IRS that their money had been used to pay the participants in that fraud. At that time, the evidence demonstrated that these parents knew that they had paid Singer to have an individual correct their children's exams, with the complicity of the test site coordinator. The purpose of these calls was to give any parent who did not have this understanding the opportunity to say so, and to explain what their understanding was. We frequently told Singer to pause during the conversations to allow the parents an opportunity to respond to what he was saying.

9. I first saw a portion of Singer's October 2 note on October 28, 2018. I did not "investigate" the allegations in the note because, as described above, I knew what the agents and I had instructed Singer to say on the consensual calls, and I was either present when he made those calls or reviewed them afterwards. Singer's contention that the agents asked him "to tell a fib and not restate what I told my clients as to where the money was going" did not surprise me because the agents and I *had* instructed Singer to tell new and ongoing clients that, if they moved forward,

they would be paying a coach to recruit their children. I knew that Singer had pushed back on this at the time because it was not the way he typically described his scheme. I also knew that, as described above, Singer's October 2 note had nothing to do with the audit calls in late October to the defendants in this case.

10. I do not recall seeing the portion of the October 2 note concerning Gordon Caplan on October 28. But I had no intention of entrapping anyone and would never do so. Indeed, although Caplan had already agreed to pursue the testing fraud by the time we approached Singer, and had committed overt acts in furtherance of that fraud, I specifically instructed Singer to tell Caplan that the choice to proceed with the fraud was Caplan's, that he was under no pressure to do so, and that he could back out at any time. Singer followed those instructions in a call on November 8, 2018.

11. I did not direct Singer to fabricate evidence against anyone. I did not direct Singer "to ask questions and retrieve responses that are not accurate" about the parents' understanding of the scheme. I did not direct Singer to ask parents "to agree to a lie [he] was telling them" about their actions and intent. I did not tell Singer that I wanted to "nail" or entrap any defendant. I did not ask Singer to bend the truth, other than by using the proactive investigative techniques I described above.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 24, 2020

_____
Eric S. Rosen
Assistant U.S. Attorney