UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                )
UNITED STATES OF AMERICA                         )
                                                )
         v.                                      )          Criminal No. 19-10080-NMG
                                                )
GREGORY COLBURN,                                 )          *Leave to File 65-Page Response*
AMY COLBURN,                                     )          *Granted on 4/30/20 [ECF No. 1129]*
GAMAL ABDELAZIZ,                                 )
DIANE BLAKE,                                     )
TODD BLAKE,                                      )
I-HSIN "JOEY" CHEN,                              )
MOSSIMO GIANNULLI,                               )
ELIZABETH KIMMEL,                                )
LORI LOUGHLIN,                                   )
WILLIAM McGLASHAN, Jr.,                           )
MARCI PALATELLA,                                 )
JOHN WILSON,                                     )
HOMAYOUN ZADEH, and                              )
ROBERT ZANGRILLO,                                )
                                                )
         Defendants                              )
_____)


**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DIMISS THE FOURTH SUPERSEDING INDICTMENT
[ECF NOS. 341, 1019, 1021, 1023, 1026, 1031, 1035, 1037, 1039, 1041]**

## **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 2

ARGUMENT ............................................................................................................. 3

    I.   THE INDICTMENT ADEQUATELY ALLEGES SINGLE CONSPIRACIES AND THE DEFENDANT CO-CONSPIRATORS ARE PROPERLY JOINED ........................ 3

        A.  Whether there were single or multiple conspiracies is a question of fact for the jury. ........................................................................................................... 4

        B.  The defendants are properly joined in a single Indictment. ...................................... 13

    II.  VENUE IS PROPER IN THE DISTRICT OF MASSACHUSETTS ............................. 17

        A.  Applicable law .......................................................................................... 17

        B.  The allegations of the Indictment establish venue for the charged conspiracies in the District of Massachusetts. ........................................................... 19

    III.  THE DEFENDANTS' CHALLENGES TO THE FRAUD ALLEGATIONS FAIL ...... 25

        A.  The Indictment adequately alleges mail and wire fraud. ........................................ 25

        B.  The Indictment adequately alleges honest services mail and wire fraud. ............... 39

    IV.  THE DEFENDANTS' CHALLENGES TO THE FEDERAL PROGRAMS BRIBERY CONSPIRACY AND SUBSTANTIVE COUNTS ARE EQUALLY MERITLESS. ........................................................................................... 52

    V.  THE DEFENDANTS' CHALLENGE TO THE MONEY LAUNDERING CONSPIRACY COUNT IS WITHOUT MERIT. ............................................. 53

        A.  Applicable law. ......................................................................................... 53

        B.  The Indictment properly alleges conspiracy to commit money laundering. ........... 54

CONCLUSION .......................................................................................................... 60

## **INTRODUCTION**

In a series of motions, the defendants seek the dismissal of all counts of the Fourth Superseding Indictment ("FSI" or "Indictment") based on a variety of purported factual and legal infirmities.

*First*, they argue that the factual allegations do not support joining them together in the charged conspiracies, or even in a single indictment—and that as a result, venue for this case does not properly lie in the District of Massachusetts.

*Second*, they argue that the mail and wire fraud charges (and the related conspiracy) are invalid to the extent they rely on a property theory, because the victim universities and testing companies were not deprived of cognizable property interests.

*Third*, they argue that those counts are also invalid to the extent they rely on an honest services fraud theory, because test administrators do not owe a fiduciary duty to testing companies, and because the monies the defendants allegedly paid as a *quid pro quo* to secure their children's admission to college as purported athletic recruits were not bribes.  They seek dismissal of the federal programs bribery counts for the same reasons.

*Fourth*, they contend that the charged money laundering conspiracy is not viable because the funds they allegedly conspired to launder were not "proceeds" of a specified unlawful activity.

The defendants' motions are without merit.  Their challenges to the conspiracy counts, joinder and venue boil down to a dispute over the sufficiency of the government's evidence.  But that is a matter for the jury, not the Court on a motion to dismiss.  Their property and honest-services fraud arguments contravene black-letter law.  And their contention that the money-laundering charge is invalid because the Indictment does not sufficiently allege "proceeds" of crime is equally meritless.

For all these reasons, and the reasons set forth below, the defendants' motions should be denied.[1]

## BACKGROUND

The Indictment charges the defendants with conspiring with one another, and with other co-conspirators, to secure the admission of their children to selective colleges and universities in the District of Massachusetts and elsewhere using fraud and bribery.  [FSI ¶ 64.]  The manner and means of the conspiracy included paying off standardized test proctors and administrators to engage in cheating on college entrance exams, falsifying the children's academic transcripts by paying third parties to take classes in their names, falsifying the children's college applications in order to portray them as elite athletes, and bribing college athletic coaches and administrators, including through purported donations to their programs, to designate the children as athletic recruits based on those phony credentials.  [FSI ¶¶ 66(a)-(h).]  The Indictment alleges that all of the defendants worked with the architect of the conspiracy, William "Rick" Singer, who explained to them that these fraudulent methods were "tried-and-true," and had been successfully employed by many other clients.  [*See, e.g.*, FSI ¶ 66(i).]  And it alleges that the conspirators sought to conceal their scheme from, among others, the universities and standardized testing agencies they were defrauding.  [FSI ¶ 66(j).]

In particular, Count One of the Indictment charges the 14 remaining defendants with conspiring to commit two crimes—wire fraud and mail fraud—by depriving the victim testing companies and universities of property (tests and test scores, and admissions slots to their entering

---

[1] This brief responds to the following defense motions, several of which raise substantially similar and overlapping arguments:  ECF Nos. 341, 1019, 1021, 1023, 1026, 1031, 1035, 1037, 1039, and 1041.  The corresponding defense memoranda are located at ECF Nos. 1020, 1022, 1025, 1026, 1032, 1036, 1038, 1040, 1042.  Hereinafter, reference to these memoranda will be [D.XXX at XX.].

classes, respectively) and of their right to the honest and faithful services of their test administrators, athletic coaches, and university administrators.  [FSI ¶¶ 369-70.]  Each of the defendants is charged with conspiring to commit both of those object crimes as part of a single overarching scheme to secure the admission of their children to elite colleges through bribery and deception.  Count Two charges 11 of the defendants with conspiring to commit federal programs bribery by bribing agents of the University of Southern California ("USC") to facilitate the admission of their children to USC.  [FSI ¶¶ 371-72.]  Count Three charges all of the defendants with conspiring to commit money laundering by funneling bribe and other payments in furtherance of the scheme through Singer's sham charitable foundation, The Key Worldwide Foundation ("KWF"), and his for-profit college counseling business, The Key, in an effort to conceal the nature, source, ownership and control of that money.  [FSI ¶¶ 373-74.]  Counts Four through Twelve are substantive fraud and bribery charges [FSI ¶¶ 375-78], while Count Thirteen charges defendant Wilson with tax fraud based on his alleged deduction of bribe payments from his taxes as purported charitable donations and business expenses.  [FSI ¶¶ 379-80.]

## **ARGUMENT**

## I.     **THE INDICTMENT ADEQUATELY ALLEGES SINGLE CONSPIRACIES AND THE DEFENDANT CO-CONSPIRATORS ARE PROPERLY JOINED**

The defendants seek dismissal of Counts One through Three of the Indictment, contending that the allegations are duplicitous because they make out multiple conspiracies, not the single conspiracies charged in each of those counts.  [D.1032 at 7–17; *see also* D.314.]  Based on similar logic, they also challenge their joinder in a single indictment.  [D.1032 at 17–24.]  The defendants' arguments are contrary to black-letter law and the facts as pled.  Whether the government can ultimately prove the allegations in the Indictment is a question of fact for the jury, *not* a basis for dismissal on the pleadings.  The defendants' motions should, accordingly, be denied.

### A.      Whether there were single or multiple conspiracies is a question of fact for the jury.

In support of their duplicity argument, the defendants rely primarily on *Kotteakos v. United States*, 328 U.S. 750 (1946) [*see* D.1032 at 8–15], in which the Supreme Court reversed the convictions of defendants convicted of a single conspiracy because the evidence at trial "proved not one conspiracy but some eight or more different ones of the same sort executed through a common key figure, Simon Brown." 328 U.S. at 752. Brown, who acted as a loan broker, was charged with conspiring with borrowers to make fraudulent loan applications. But the Court found that the evidence proved "no connection" among the borrower-defendants "other than that Brown had been the instrument in each instance for obtaining the loans." *Id.* at 754. And the government *conceded* that there was no evidence at trial of a connection among the defendants—a "rim of the wheel to enclose" various "spokes" who separately agreed with a common "hub"—and that the proof therefore "made out a case, not of a single conspiracy, but of several." *Id.* at 755.

*Kotteakos* is not this case. In citing it, the defendants conflate what the government must *prove* at trial with what it must *plead* in an indictment. *Kotteakos* did not concern the latter. The only question presented was whether the variance between the single conspiracy charged in the indictment and the multiple conspiracies later proved at trial was harmless. *Id.* at 758 (noting that "[t]he question we have to determine is whether the same [harmlessness] ruling [of *Berger v. United States*, 295 U.S. 78 (1935)] may be extended to a situation in which one conspiracy only is charged and at least eight having separate, though similar objects, are made out by the evidence, if believed"); *see also id.* at 775 (stating explicitly that the decision did not address the validity of the indictment).[2] While the underlying court of appeals decision opined that the trial judge

---

[2] The defendants also overstate the Supreme Court's answer to the question presented. The Court did *not* find that the prejudice from a variance between a single conspiracy and multiple

"'should have dismissed the indictment,'" [D.1032 at 12 (quoting *United States v. Lekacos*, 151 F.2d 170, 172 (2d Cir. 1945)], that statement was *dicta*, and was written in 1945—*before* the modern notice pleading standard was implemented. *See* FED. R. CRIM. P. 7(c)(1) (effective March 21, 1946). "While detailed allegations might well have been required under common-law pleading rules, they surely are not contemplated by Rule 7(c)(1), which provides that an indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged." *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (internal citation and quotations omitted)).

The defendants do not, because they cannot, point to any appellate authority holding that an indictment should be dismissed for failure to allege a "rim." And Rule 7(c)(1) does not require such specificity. To the contrary, the law is clear that "[w]hether a single conspiracy or a multiple conspiracy exists is, of course, a question of fact for the jury." *United States v. LiCausi*, 167 F.3d 36, 45 (1st Cir. 1999); *accord, e.g.*, *United States v. Bedini*, 861 F.3d 10, 14 (1st Cir. 2017); *United States v. Niemi*, 579 F.3d 123, 127 (1st Cir. 2009); *United States v. Villarman-Oviedo*, 325 F.3d 1, 12 (1st Cir. 2003); *United States v. Wihbey*, 75 F.3d 761, 774 (1st Cir. 1996); *United States v. Sepulveda*, 15 F.3d 1161, 1190–91 (1st Cir. 1993); *United States v. Mena-Robles*, 4 F.3d 1026, 1033 (1st Cir. 1993); *United States v. David*, 940 F.2d 722, 732 (1st Cir. 1991); *United States v. Drougas*, 748 F.2d 8, 17 (1st Cir. 1984).

---

conspiracies is "virtually presumptive," and that is not the law. [D.1032 at 27.] *See, e.g.*, *United States v. Glinton*, 154 F.3d 1245, 1252 (11th Cir. 1998) ("When the proof at trial reveals the existence of more than one conspiracy, the adequacy of the trial judge's instructions are of critical importance in evaluating the likelihood that confusion or prejudice resulted from transference of guilt from one conspiracy to another.") (internal quotations omitted). If the evidence at trial warrants, the Court can instruct the jury on how to distinguish a single conspiracy from multiple conspiracies. *See, e.g., United States v. Soto-Beniquez*, 356 F.3d 1, 22 (1st Cir. 2003).

The defendants contend that "several" federal courts have taken the path they urge, but cite a total of three district court cases in support of that contention.  [D.1032 at 28.]  None is persuasive.  The first is a case from the Middle District of North Carolina, in which the court dismissed a conspiracy count as duplicitous where one defendant was alleged to have engaged in four objects, but the remaining defendants were alleged to have engaged in only one, and the court found that the allegations made out two separate schemes.  *See United States v. Eury*, No. 1:14CR39-1, 2015 WL 1861807, at *6-7 (M.D.N.C. Apr. 23, 2015).  Here, however, *all* of the defendants are alleged to have agreed to the charged object(s) of the conspiracies.  And despite the defendants' efforts to reframe the allegations as involving three entirely separate schemes, the Indictment alleges otherwise:  that they conspired in *a single overarching scheme* to gain admission to college through various means.

The defendants next cite the Eastern District of North Carolina's decision in *United States v. Jackson*, 926 F. Supp. 2d 691 (E.D.N.C. 2013).  [D.1032 at 28.]  In that case, the district court dismissed a conspiracy charge against two of five defendants where the government *conceded* that they had no involvement in a scheme "to circumvent federal gun laws for the purpose of enriching corporate profits," but simply helped to cover it up.  *Id*. at 703-04.  Again, not this case.

Finally, in *United States v. Munoz-Franco*, 986 F. Supp. 70 (D.P.R. 1997), the District of Puerto Rico dismissed conspiracy counts where "the description of the overt acts [was] neatly divided between two distinct sets of co-conspirators" and "the only element of commonality" between the alleged schemes was that they "were to defraud one same bank and both include[d] the same bank officers."  986 F. Supp. at 71-72.  In so doing, the court failed to acknowledge that the question whether there is a single conspiracy or multiple conspiracies is generally one for the jury, or cite any authority in support of its view that the question could be decided on the basis of

the pleadings alone.  The case has never been relied upon by another court to dismiss a conspiracy alleged to be unitary, and has been criticized as inconsistent with "the strong preference for juries to determine the question of whether multiple or single conspiracies exist and how this preference affects the pleading requirements."  *See United States v. Ohle*, 678 F. Supp. 2d 215, 222 & n.5 (S.D.N.Y. 2010).

In fact, courts routinely *decline* to dismiss conspiracy counts based on pre-trial claims of duplicity, even in extreme cases.  In *United States v. Gabriel*, for example, Judge Rakoff declined to dismiss an indictment that, "on any but a superficial reading," appeared to allege "two distinct conspiracies," with overt acts that were divisible into two sets, each "different in impetus, duration, personnel and purpose."  920 F. Supp. 498, 503-04 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 89 (2d Cir. 1997).  Noting that, "if it were within the power of the Court to do, [it] would dismiss . . . for duplicity," Judge Rakoff found that, given "boilerplate allegations of a single conspiracy," he could *not* conclude "on the basis of the pleadings alone that there [was] *no* set of facts . . . that could warrant a reasonable jury in finding a single conspiracy."  *Id.* at 505 (emphasis in original); *accord, e.g.*, *United States v. Molina*, No. 11 Cr. 528(JFK), 2013 WL 2455922 (S.D.N.Y. June 5, 2013) (agreeing that "a district court should ordinarily not grant a motion to dismiss for duplicity where the indictment sufficiently alleges a single conspiracy . . . even where the indictment 'appears to actually allege two distinct conspiracies and thus to offend the prohibition against combining multiple conspiracies within a single conspiracy count'") (quoting *Gabriel*, 920 F. Supp. at 504–05); *see also United States v. Berlin*, 707 F. Supp. 832, 837 (E.D. Va. 1989) ("[I]f the indictment as drawn would permit the government to prove a set of facts that would support a

finding of one conspiracy, then the indictment is proper and the decision as to how many conspiracies existed is for the jury.") (citation omitted).[3]

The Indictment in this case is facially valid, and each of the first three counts properly alleges a single conspiracy. *First*, the Indictment alleges that the defendants shared the common conspiratorial goal of using bribery and fraud for the purpose of securing the admission of the their children to selective colleges and universities. It alleges a similar purpose with respect to the federal programs bribery conspiracy. And it alleges that the money laundering conspiracy sought to conceal the above-described fraud scheme by funneling bribe payments through Singer's foundation and his for-profit company. More is not required. *See United States v. Ortiz-Islas*, 829 F.3d 19, 25 (1st Cir. 2016) (existence of a common goal "is broadly drawn"); *United States v. Portela*, 167 F.3d 687, 695 (1st Cir. 1999) ("The common goal requirement has generally been broadly drawn by the Courts of Appeals: Given these broad common goals the common objective test may have become a mere matter of semantics.") (citation and internal quotation marks omitted); *cf. Soto-Beniquez*, 356 F.3d at 18–19 (noting that a "common purpose" can include "selling drugs for a profit").[4]

Nor does the fact that the defendants accomplished their common goal by various means— such as paying bribes, cheating on tests or in online courses, and falsifying credentials—turn one

---

[3] As the defendants concede [D.332 at 15-16], dismissal would in any event be without prejudice to re-indicting them on what they refer to as "little conspiracies" comprised of individual defendants (or married couple-defendants) and Singer. Their suggestion that such charges would fail because they were merely Singer's clients is frivolous. A "mere buyer-seller relationship, without more," may not establish a conspiracy [D.1032 at 16 n.4 (internal quotations omitted)], but a buyer and seller joining forces to defraud a third party does.

[4] While the defendants may have had individual motives for joining the conspiracy—such as a desire for their children to gain admission to the colleges of their choice—that does not mean they did not also share in the conspiracy-wide goal of using fraud and bribery to gain admission for their children to elite colleges and universities.

conspiracy into multiple conspiracies.  The First Circuit's decision in *United States v. Prieto* is

instructive.  *See* 812 F.3d 6 (1st Cir. 2016).  In that case, which involved a charge of mail fraud,

rather than conspiracy, the court *rejected* the defendant's duplicity claim where the government

alleged that the defendant ran a multi-faceted scheme that defrauded some 30 mortgage lenders

and involved "deceit of homeowners, straws, and lenders" alike.  *Prieto*, 812 F.3d at 10.  Noting

that the indictment "packaged all averments under a single mail fraud count," the court concluded

that the indictment properly "made clear that the government undertook the burden of proving a

single, overarching scheme." *Id*. at 10-11.  It reasoned:

> Schemes to defraud are often, by their nature, complex. The
> accomplishment of a scheme's fraudulent goal and the simultaneous
> evasion of detection by its victims of the authorities often necessitate
> multi-faceted patterns of criminal activity that may harm different
> groups of victims at different times. . . . .  Having put together such
> a multi-faceted scheme, [the defendant] can hardly protest that the
> government was willing to charge and bear the burden of proving
> such a scheme.

*Id*. at 12.  Likewise here, the mere fact that the defendants accomplished the goals of their

conspiracy in a multi-faceted way does not morph a single agreement into multiple conspiracies.

*Cf., e.g*., *United States v. Holt*, 777 F.3d 1234, 1263 (11th Cir. 2015) ("[I]t is often possible . . . to

divide a single [ ] conspiracy into subagreements," but "this does not necessarily mean that more

than one conspiracy exists."); *United States v. Rugiero*, 20 F.3d 1387, 1392 (6th Cir. 1994) ("The

fact that a conspiracy can be divided into distinctive sub-groups does not mean that there is more

than one conspiracy.  As long as the different sub-groups are committing acts in furtherance of one

overall plan, the jury can still find a single, continuing conspiracy."); *United States v. Smith*, 789

F.2d 196, 200 (3d Cir. 1986) ("[A] finding of a master conspiracy with sub-schemes does not

constitute a finding of multiple, unrelated conspiracies").

*Second*, the Indictment sufficiently alleges overlap among the participants in the charged conspiracies.  Not only does it allege "the pervasive involvement of a *single* core conspirator," *Portela*, 167 F.3d at 695 (emphasis added and internal quotations and citation omitted)—e.g., Singer—but it also alleges that *all* of the defendants agreed to the object(s) of the conspiracies with which they are charged.  The defendants' contention that such overlap was not "meaningful," [D.1032 at 13], is, in fact, meaningless.  The Indictment alleges otherwise, and that factual question is properly reserved for the jury at trial.  Similarly, the fact that some defendants were involved in some aspects of the scheme but not others is of little moment.  Even if "every defendant did not participate in every transaction necessary to fulfill the aim of their agreement [that] does not transform a continuing plan into multiple conspiracies."  *Drougas*, 748 F.2d at 17; *see also United States v. Berroa*, 85 F.3d 131, 154 (1st Cir. 2017) (each defendant need not know "all of the details of the conspiracy or participate in every act in furtherance of the conspiracy").

*Third*, while the government is not required to allege interdependence, the Indictment does just that, insofar as it alleges that the manner and means of the conspiracy included explaining to clients and prospective clients that the scheme's methods were "tried-and-true," and "had been successfully employed by many other clients."  [FSI ¶ 66(i).]  The defendants concede as much, but dismiss these allegations as insufficient because they "at most suggest that some parents knew Singer had other customers."[5]  [D.1032 at 15.]  But the question of what the evidence "suggests" is reserved for the jury.  And, in any event, the Indictment makes plain that a critical aspect of the scheme was re-assuring the defendants that others had pursued it successfully.  The evidence at

---

[5] The defendants' concession is directly at odds with their assertion that the Indictment "does not allege or support an inference that any of the defendants knew, or knew of, any of their co-defendants when the events at issue occurred, or that they knew or knew of any participants in Singer's schemes, other than those with whom they directly interacted."  [D.1032 at 5.]

trial will prove that the defendants sought such assurances as a pre-requisite to joining, and were keenly interested in the scheme's overall success.[6]   This case is, accordingly, unlike those the defendants cite in which the "hub" sought to keep his customers "separate from and ignorant of the existence of the others," *United States v. Chandler*, 388 F.3d 796, 807 (11th Cir. 2004), or in which the customers were indifferent to "[w]hether the operation included 3000 additional [customers] or none," *People v. Luciano*, 35 Misc. 3d 1217(A), 2012 WL 1473438, at *15 (N.Y. Cty. Sup. Ct. Apr. 27, 2012).   Here, the defendants were aware that their activities were part of a larger enterprise.   *See, e.g.*, *United States v. Seher*, 562 F.3d 1344, 1368 (11th Cir. 2009) (awareness that co-conspirators "were purchasing [jewelry] from [a central hub] for the same purpose [of money laundering], and . . . even encouraged others to do likewise," constituted "substantial evidence that [they] were aware of the nature and scope of [the central hub's] scheme, thereby distinguishing [the] situation from the rimless wheel discussed in . . . *Kotteakos*"); *United States v. Nerlinger*, 862 F.2d 967, 972-73 (2d Cir. 1988) (evidence from which jury could "infer that the [defendants] knew their activities were parts of a larger enterprise operated by [the central hub]" was sufficient to take the case out of the *Kotteakos* rule).   Indeed, the very nature of the alleged scheme depended on having numerous parents willing to engage in bribery and fraud, and a network of corrupt coaches, class takers, test takers, exam administrators, and others willing to facilitate those crimes.   No parent thought Singer was doing this just for them—and the scheme as structured would not have worked had he done so.   *See Portela*, 167 F.3d at 695 n.2 ("The analysis we use to determine 'interdependence' is often characterized in the caselaw as an analysis of 'the nature of the scheme,' but there is no conceptual difference between the tests.") (citation omitted).

---

[6] Indeed, the evidence will show, among other things, that parents inquired about what Singer was doing for other parents, complained when they thought other parents were being loose-lipped, and referred friends.

*Cf. id.* at 697-98 (affirming conviction of drug supplier for conspiring with other suppliers, among others, where "the work of other suppliers was essential to the health of [the intermediary's] network, and thus also to the ultimate success of [the supplier's] transaction" with that intermediary). The defendants' conclusory assertion that Singer's activities "on behalf of any one of his clients . . . weren't 'necessary' to the success of his efforts on behalf of any other," [D.1032 at 14], is thus untrue—and premature in the context of a motion to dismiss.

At bottom, the defendants' motion is little more than a challenge to the sufficiency of the government's evidence. But as the First Circuit has repeatedly made clear, including as recently as last week, that is not proper on a motion to dismiss. *See United States v. Alexander*, -- F.3d --, 2020 WL 2079163 (1st Cir. Apr. 30, 2020); *see also, e.g.*, *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015) ("The problem with [defendant's] argument is that it fails to attack the facial validity of the indictment and instead challenges the government's substantive case."); *United States v. Guerrier*, 669 F.3d 1, 4 (1st Cir. 2011) (noting that "courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations"). The issue on a motion to dismiss is not the government's proof, but "solely whether the allegations in the indictment are sufficient to apprise the defendant[s] of the charged offense[s]." *United States v. Savarese*, 686 F.3d 1, 7 (1st Cir.2012). The Indictment indisputably does that, and the defendants' "attempt to sink a facially valid indictment with a motion to dismiss that targets the strength of the government's *evidence* misfires."[7]   *Guerrier*, 669 F.3d at 3 (emphasis in original).

---

[7] The conclusion that the Indictment properly alleges single conspiracies disposes of Kimmel's separate motion to dismiss the charges against her or, alternatively, to limit the allegations to those concerning her efforts to secure her son's admission to USC.  [D.1036.] Kimmel contends that her conduct comprised "two wholly-disconnected alleged conspiracies," one involving her daughter's admission to Georgetown, the other involving her son's admission

### B.    The defendants are properly joined in a single Indictment.

Building on their *Kotteakos* argument, the defendants contend that they have been improperly joined under Federal Rule of Criminal Procedure 8(b), and that the acts each defendant allegedly took in furtherance of the conspiracies are not sufficiently related to be joined under that rule.  [D.1032 at 17-24.]  But the defendants' misjoinder argument simply rehashes their *Kotteakos* arguments, and they also misstate the remedy for improper joinder, which is severance, not dismissal.  Because the defendants have been properly joined, their motion should be denied.

### 1.    Applicable law.

Rule 8(b) provides that an indictment:

> may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.  The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count.

To be properly joined, "the offenses in question must constitute a series of acts or transactions," and there must be "a showing that joining the defendants is a benefit to the government."  *United States v. Prange*, 922 F. Supp. 2d 127, 129 (D. Mass. 2013) (Gorton, J.) (citing *United States v. Santiago Barbosa*, 666 F.2d 704, 707-08 (1st Cir. 1981)).  "'In the ordinary case, a rational basis

---

to USC.  [D.1036 at 7.]  But Kimmel's involvement in the single conspiracy the government charged did not terminate with her daughter's admission, and then resume when it was her son's turn.  "[I]n order to withdraw from a conspiracy, a conspirator must act affirmatively either to defeat or disavow the purposes of the conspiracy. . . .  [M]ere cessation of activity in furtherance of the conspiracy does not constitute withdrawal from a conspiracy."  *United States v. Piper*, 298 F.3d 47, 53 (1st Cir. 2002) (citation and internal quotation marks omitted).  Moreover, Kimmel's suggestion that the Court should strike the allegations concerning her efforts to secure her daughter's admission to Georgetown fails because Kimmel cannot satisfy the "exacting" standard for striking surplusage, *United States v. Sawyer*, 878 F. Supp. 279, 294 (D. Mass. 1995) (Gorton, J.), *aff'd*, 85. F.3d 713 (1st Cir. 1996), particularly where evidence of the allegations would be admissible in a trial of her later actions to show knowledge, intent, and absence of mistake, *see United States v. Anzalone*, 783 F.2d 10, 12 (1st Cir. 1986) (actions outside the statute of limitations period are not barred from admission under Rule 404(b)).

for joinder of multiple counts should be discernible from the face of the indictment.'"  *United States v. Azor*, 881 F.3d 1, 10 (1st Cir. 2017) (quoting *United States v. Natanel*, 938 F.2d 302, 306 (1st Cir. 1991)).  Put differently, "the propriety of joinder under Rule 8(b) is to be judged according to the language of the indictment, not according to the government's proof at trial."  *United States v. Sutherland*, 656 F.2d 1181, 1190 (5th Cir. 1981) (citing *Schaffer v. United States*, 362 U.S. 511 (1960)).  "[I]t is settled that a conspiracy count can forge the needed linkage" for proper joinder, absent a showing that the charge was included in bad faith.  *Natanel*, 938 F.2d at 307 (citations omitted); *United States v. Luna*, 585 F.2d 1, 4 (1st Cir. 1978).  Further, "[j]oinder is proper . . . even when the objecting defendant is only connected to one part of [the] scheme."  *Azor*, 881 F.3d at 11 (citation omitted); *see also Santiago Barbosa*, 666 F.2d at 708 ("lack of total identity is the whole purport of" Rule 8(b)).  Defendants bear the burden of showing misjoinder, and the remedy for misjoinder is severance.  *Natanel*, 938 F.2d at 306.

## 2.    The offenses charged in the Indictment are part of the same series of acts or transactions and joinder benefits the government.

"The government can indict jointly based on 'what it reasonably anticipates being able to prove against the defendants' at the time of indictment."  *Azor*, 881 F.3d at 10 (quoting *Natanel*, 938 F.2d at 306).  Here, as set forth above, the Indictment alleges, and the government anticipates proving at trial, that the defendants conspired together to commit mail and wire fraud and honest services mail and wire fraud, as well as to commit money laundering, and that 11 of the 14 defendants also conspired together to commit federal programs bribery.  The government also anticipates proving related substantive offenses, each of which is part of the same series of acts or transactions that give rise to the conspiracies.

The principal purposes of the federal programs bribery conspiracy are largely the same as those of the fraud conspiracy, and the acts underlying the conspiracies are also the same.  [*Compare*

FSI ¶ 280 (allegations concerning federal programs bribery conspiracy) *with* FSI ¶ 65 (allegations concerning fraud conspiracy).]  The money laundering conspiracy is likewise part of the same series of acts or transactions because it was designed to conceal the fraud scheme.  [FSI ¶ 307-08.] Each of the substantive wire fraud and federal programs bribery charges constitutes an act in furtherance of the conspiracies.  [*Compare* FSI ¶¶ 376, 378 (substantive wire fraud and federal programs bribery charges) *with* FSI ¶¶ 142, 200, 241-42, 244, 262, 275 (acts in furtherance of fraud conspiracy).]  Finally, the tax charge against Wilson concerns fraud arising from his deduction of bribe and other payments in furtherance of the conspiracies from his taxes, and is thus part of the same series of acts or transactions as the other charges.  The conspiracy charges thus "forge the needed linkage" for joinder.[8]

Courts have found proper joinder on much less.  In *Santiago Barbosa*, for example, the indictment charged distribution of heroin against one defendant and distribution of cocaine against the same defendant and two others.  666 F.2d at 706.  Even in the absence of a conspiracy charge linking the two counts, the First Circuit affirmed the denial of severance because one defendant was charged in both counts, "the place of sale was the same, and the second sale began five minutes after the first was completed."  *Id.* at 707.  Relying on *Santiago Barbosa*, this Court found three conspiracies alleged in *Prange* were part of the same series of acts or transactions, notwithstanding the fact that only one of the defendants was alleged to have participated in all three.  922 F. Supp. 2d at 129.  In reaching that conclusion, the Court considered that (1) the alleged transactions underlying all three took place in the same office in Massachusetts, (2) Prange and an undercover

---

[8] The defendants do not contend that the government included the conspiracy charges in bad faith—and it did not.  *See Luna*, 585 F.2d at 4  (rejecting appeal of denial of severance motion where conspiracy charge was sufficient link under Rule 8 and "appellants have not pointed to any evidence that the prosecutor had an impermissible motive in joining the three counts of the indictment").

agent took part in each transaction, (3) Prange was the initial link between the other defendants and the sting operation, and (4) Prange benefited from each conspiracy. *Id.* at 129.

Here, as noted, *all* the defendants are charged in two of the three conspiracies, 11 of the 14 are charged in the third, and the substantive charges are alleged to be acts in furtherance of those conspiracies. Moreover, even under the defendants' erroneous view of this case as alleging multiple "little conspiracies," joinder would still be proper, where Singer played a role analogous to Prange. *See also Schaffer*, 362 U.S. at 515-16 (affirming convictions on substantive offenses even where conspiracy charge that "originally justified joinder" was dismissed at close of government's case, and noting that trial judge's limiting instructions were sufficient to protect defendants against potential prejudice).

Singer, of course, is not the only link, and the defendants' argument that there is no identity of participants is based on their effort to break the charged conspiracy down into three "distinct" schemes: test cheating, class-taking, and athletic recruitment. [D.1032 at 20, 22.] But Rule 8(b) is governed by the Indictment, *Schaffer*, 362 U.S. at 513, which alleges not just single conspiracies but a single overarching scheme. That scheme was conducted through Singer's charitable and for-profit entities, and involved common victims and common participants, including Singer's employees and associates and the defendants themselves, several of whom participated in multiple aspects of the scheme. And there is complete identity of participants in Counts One and Three, and almost complete identity in Count Two.

Joinder also provides significant benefits to the government. As set forth in the government's opposition to the defendants' motion to sever [D.1136], conducting no fewer than 11 separate trials (assuming married couples are tried together) would be a massive waste of judicial and prosecutorial resources. Contrary to the defendants' conclusory arguments [D.1032

at 23-24], separate trials would feature much of the same evidence to prove the existence, nature, and scope of the charged conspiracies, including evidence relating to Singer and his operation, and intercepted and consensually recorded calls among Singer and his co-conspirators (including other parents who are alleged to have participated in the conspiracy), as well as testimony from victims, law enforcement and summary witnesses, and extensive documentary evidence.  And evidence that is relevant to proving each individual defendant's guilt as to the substantive charges is also relevant to proving the conspiracies with which all the defendants are charged.  *See Prange*, 922 F. Supp. 2d at 129.

Because the offenses alleged here are part of the same acts or transactions and joinder benefits the government, the defendants cannot meet their burden of establishing misjoinder.

## II.    VENUE IS PROPER IN THE DISTRICT OF MASSACHUSETTS

 The defendants separately seek to dismiss the conspiracy counts for lack of venue pursuant to Federal Rule of Criminal Procedure 12(b)(3)(A)(i), asserting that their alleged crimes have no connection to Massachusetts.  [D.1020.]  Because the Indictment adequately alleges conduct occurring in this District in furtherance of the charged conspiracies, that motion, too, should be denied.

### A.    Applicable law.

A defendant is entitled to be tried in a venue where the alleged crime was committed.  U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed[.]");  FED. R. CRIM. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed.").  "To deal with continuing offenses such as conspiracy, Congress enacted 18 U.S.C. § 3237(a) (1982),

establishing that 'any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.'" *United States v. Uribe*, 890 F.2d 554, 558 (1st Cir. 1989).

It is black-letter law that in a conspiracy case, venue is proper so long as any act in furtherance of the conspiracy was committed in the district, even if the defendant was not physically present there. *See id.*; *United States v. Josleyn*, 99 F.3d 1182, 1191 (1st Cir. 1996) ("As a general rule, venue in a conspiracy case depends upon whether an overt act in furtherance of the alleged conspiracy occurred in the trial district . . . .   The defendant need not have been physically present in the trial district during the conspiracy.") (internal citations omitted)*; see also United States v. Georgiadis*, 819 F.3d 4, 10-11 (1st Cir. 2016) (noting that if the defendant or any of his co-conspirators took an overt act in furtherance of the conspiracy to commit money laundering in Massachusetts, then venue in the District of Massachusetts was proper, and citing 18 U.S.C. § 1956(i)(2)[9] and *Whitfield v. United States,* 543 U.S. 209, 218 (2005) for the proposition that § 1956(i)(2) "functions as a confirmation of the 'longstanding rule' that 'venue is proper in any district in which an overt act in furtherance of the conspiracy was committed, even where an overt act is not a required element of the conspiracy offense'").

A motion to dismiss for lack of venue will be granted only if the indictment does not sufficiently allege conduct occurring in the trial district in furtherance of the alleged conspiracy. *See United States v. Acherman*, 140 F. Supp. 3d 113, 117–18 (D. Mass. 2015) (Sorokin, J.) (citing

---

[9] Under 18 U.S.C. § 1956(i)(2), a prosecution for an attempt or conspiracy offense under Section 1956 or Section 1957 "may be brought in the district where venue would lie for the completed offense . . . or in any other district where an act in furtherance of the attempt or conspiracy took place."

*United States v. Condo*, No. 11–cr–30017–NMG, 2014 WL 1400817, at *1 (D. Mass. Apr. 7, 2014) (Gorton, J.)).   At the motion to dismiss stage, "the allegations of the indictment and the unchallenged statement of proof of the prosecutor must be accepted as true."  *Id.* at 118 (quoting *United States v. Ferris*, 807 F.2d 269, 271 (1st Cir. 1986)).   "The government's ability to prove th[ose] allegation[s] is a question for trial."  *Id.* (citations omitted).  *See also United States v. Razo*, No. 1:11-CR-00184-JAW, 2012 WL 5874667, at *6 (D. Me. Nov. 20, 2012) ("For now, the allegations in the superseding indictment assert that the criminal conduct occurred in part in the District of Maine, and are thus facially sufficient to support venue in the District of Maine.  [The defendant] remains free to challenge those allegations at trial.").

### B.    The allegations of the Indictment establish venue for the charged conspiracies in the District of Massachusetts.

The Indictment alleges that the defendants conspired to use bribery and other forms of fraud to facilitate their children's admission to selective colleges in the District of Massachusetts and elsewhere.  [FSI ¶ 64.]  The Indictment further alleges that the manner and means by which the defendants and their co-conspirators carried out the fraud conspiracy included submitting falsified applications to colleges in the District of Massachusetts and elsewhere.  [FSI ¶ 66(h).]  The Indictment also alleges numerous acts occurring in this District in furtherance of the fraud conspiracy, including the following:

- In or about July 2018, Singer's sham charitable foundation, KWF, began paying USC athletics administrator Donna Heinel $20,000 per month in exchange for facilitating the admission of Abdelaziz's daughter, and the children of other Singer clients, to USC as purported athletic recruits.  The payments included at least one check that Singer mailed from Massachusetts to Heinel in California on or about January 3, 2019.  [FSI ¶ 121.]

- In or about 2018, the ACT score Singer's corrupt proctor, Mark Riddell, secretly obtained on behalf of Chen's son was submitted via interstate wire communication to various colleges and universities, including, on or about October 8, 2018, to Emerson College in Boston, Massachusetts.  [FSI ¶ 142.]

19

- On or about October 24, 2018, the ACT score Riddell secretly obtained on behalf of McGlashan's son was submitted to various colleges and universities, including Northeastern University, in Boston, Massachusetts, via wire communication in interstate commerce.  [FSI ¶ 200.]

- On or about October 17, 2018, Wilson's company, HPC, wired $500,000 to an account in the name of KWF in the District of Massachusetts in connection with Wilson's agreement to pay Singer an amount, ultimately totaling $1.5 million, to facilitate his twin daughters' admission to Stanford and Harvard as purported athletic recruits.  [FSI ¶ 241.]

- On or about December 11, 2018, Wilson's company, HPC, wired another $500,000 to the Massachusetts account in the name of KWF.  [FSI ¶ 244.][10]

- On or about August 24, 2017, Zangrillo's daughter's high school emailed her transcript to Boston University in the District of Massachusetts.  The transcript reflected credits earned by Sanford and another co-conspirator on behalf of Zangrillo's daughter.  [FSI ¶ 262.]

- Consensually recorded calls between Singer and certain of the defendants occurred when Singer was located in the District of Massachusetts.  [FSI ¶¶ 122, 163, 164, 223, 242, 243, 252, 274, 275, 350.]

Each of these allegations is re-alleged and incorporated by reference in Counts One, Two, and Three.  [*See* FSI ¶¶ 369, 371, 373.]

In addition, with respect to the money laundering conspiracy charged in Count Three, the Indictment alleges that the defendants conspired to conceal their fraud scheme by funneling bribe and other payments through The Key or KWF, including via payments to and from accounts in the District of Massachusetts.  [FSI ¶ 307.]  The Indictment further alleges that Singer funneled bribes through KWF and The Key to athletic coaches and university administrators in the District of

---

[10] The defendants note that the allegations regarding payments made by Wilson in 2018 are the subject of a separate motion to strike. For the reasons set forth in the government's consolidated opposition to Wilson's motions to sever, dismiss, and strike, there is no basis to strike those allegations. [*See* D.1135.] In any event, contrary to defendants' assertion, the Wilson allegations are among many that establish venue in this District.

Massachusetts and elsewhere, on behalf of other co-conspirators, in order to conceal and disguise the nature, location, source, ownership, and control of bribe money and other payments in furtherance of the bribery and fraud schemes. [FSI ¶ 351.]

In short, the Indictment alleges multiple overt acts occurring in Massachusetts in furtherance of each of the charged conspiracies, and these allegations are easily sufficient to support venue in this District. The defendants' contrary arguments are without merit. As to Count One, their primary contention is, once again, that the government has improperly joined them together in a single conspiracy. For all of the reasons set forth above, that is not true. And because the defendants are properly charged together in a single conspiracy, a single act by any co-conspirator in furtherance of the conspiracy occurring in this District is all that is required to give rise to venue here. The Indictment far surpasses that requirement. There is, accordingly, no need to analyze each defendant's ties to the District separately, and the defendants' remaining arguments in support of dismissing Count One for lack of venue are therefore moot.

With respect to Count Two, the defendants contend that the Indictment does not allege a single overt act tied to Massachusetts. That is incorrect. *All* of the alleged overt acts in furtherance of Count One are re-alleged and incorporated by reference in Count Two, including the allegation that, on or about January 3, 2019, Singer mailed a check from Massachusetts to Heinel in California, in exchange for Heinel facilitating the admission of Abdelaziz's daughter and the children of other Singer clients to USC as purported athletic recruits.

The defendants contend that this mailing does not support venue in Massachusetts because Singer's arrangement to pay Heinel $20,000 per month was a separate agreement formed after his agreements with the defendants. It wasn't. The defendants are charged with engaging in a single conspiracy with Singer, Heinel, and others, and steps taken by Singer and Heinel in furtherance of

21

that conspiracy—such as deciding how to allocate the bribes the defendants had previously agreed to pay—support venue as to all of them.  The fact that the $20,000 per month payments began later in the conspiracy is irrelevant.  The conspiracy was ongoing, and none of the defendants withdrew from it.  Indeed, a number of the defendants were actively working with Singer at the time—including McGlashan, who was pursuing the USC side door on behalf of his son at the time Singer was approached by law enforcement.  Nor does it matter whether the defendants were aware of this specific arrangement between Singer and Heinel.  The law is clear that each conspirator need not know all of the details of the conspiracy or participate in every act in furtherance of it.  *See Berroa*, 85 F.3d at 154.

Likewise, that Singer was cooperating at the time he mailed the check to Heinel is irrelevant, because the conspiracy did not end with his cooperation.  The defendants quote the First Circuit's decision in *Portela* for the proposition that "[G]overnment agents do not count as coconspirators."  [*See* D.1020 at 3 (quoting *Portela*, 167 F.3d at 700 n.8).]  But their edits to that quote are telling.  The full quote says something quite different:  "'The rule that government agents do not count as co-conspirators has relevance *only in situations where the conspiracy involves only one defendant and a government informer.*'"  *Portela*, 167 F.3d at 700 n.8 (quoting *United States v. Giry*, 818 F.2d 120, 126 (1st Cir. 1987)); *see also Giry*, 818 F.2d at 126 (plurality requirement for conspiracy satisfied by participation of two true conspirators, so participation of government agents did not negate existence of conspiracy charge); *United States v. Cordero*, 668 F.2d 32, 43 (1st Cir. 1981) ("The participation of a government agent in a conspiracy does not negate the existence of that conspiracy nor make it any the less a violation of the law.").  Here, all of the defendants, and all of the other co-conspirators—including Heinel—remained a part of the conspiracy even after Singer began cooperating.  Accordingly, the payment to Heinel was in

furtherance of the conspiracy, and the mailing thus sufficient to support venue in this District. And that is true regardless of whether the mailing was at the direction of law enforcement. The First Circuit has explicitly rejected the concept of "manufactured venue" or "venue entrapment" and has held that government agents may influence where a crime occurs, and thus where venue lies. *See United States v. Valenzuela*, 849 F.3d 477, 489 (1st Cir. 2017). For all of these reasons, this allegation alone is sufficient to establish venue for Count Two, even without all the other allegations in the Indictment.

It is also sufficient to establish venue for Count Three. The defendants assert that the Indictment does not does not allege a single payment to or from an account in Massachusetts in support of the money laundering conspiracy. They once again ignore that the allegations in support of the fraud and bribery conspiracies—including the mailing to Heinel and the payments by Wilson—are re-alleged and incorporated by reference in Count Three. Those payments, made to and from accounts in this District, were in furtherance of the money laundering conspiracy and establish venue. Likewise, the defendants cite no support for their contention that the more general allegation that Singer funneled bribes through KWF and The Key to coaches and university administrators in Massachusetts does not suffice to establish venue. It does. At trial, the government will prove that Singer paid bribes to Ernst, the Georgetown tennis coach, out of The Key and KWF accounts, including in June 2018—prior to Singer's cooperation—when he caused a $100,000 check to be mailed to Ernst's residence in Falmouth, Massachusetts. At this stage, the general allegation in the Indictment and this statement of proof must be accepted as true. *See*

Case 1:19-cr-10080-LTS   Document 1170   Filed 05/08/20   Page 26 of 62

*Acherman*, 140 F. Supp. 3d at 118. Therefore, this too—even if it were standing alone—is sufficient to establish venue for Count Three (as well as Count One).

Finally, the defendants argue that even if the Court concludes that the government has properly alleged a single conspiracy and therefore that the act of any co-conspirator can support venue, it should adopt the Second Circuit's foreseeability test, which requires that an overt act must be foreseeable to each defendant to establish venue. But neither the First Circuit, nor any other circuit, has adopted this test. *See United States v. Renteria*, 903 F.3d 326, 329-30 (3d Cir. 2018) (declining to adopt a reasonable foreseeability test); *United States v. Johnson*, 510 F.3d 521, 527 (4th Cir. 2007) (finding no foreseeability requirement under 15 U.S.C. § 78aa, which governs venue for securities offenses); *United States v. Castaneda*, 315 F. App'x 564, 569-70 (6th Cir. 2009) (unpublished) (declining to adopt foreseeability as an element of venue); *United States v. Gonzalez*, 683 F.3d 1221, 1226 (9th Cir. 2012) ("Simply put, section 3237(a) does not require foreseeability to establish venue for a continuous offense.").

Neither the text of the Constitution nor of 18 U.S.C. § 3237(a) requires reasonable foreseeability, and such a test should not be implied given that venue is a jurisdictional element to which *mens rea* requirements do not apply. *See Renteria*, 903 F.3d at 330. As the Fourth Circuit reasoned in *Johnson*:

> If Congress [in enacting 15 U.S.C. § 78aa] had wanted to limit venue to those districts where the defendant could have reasonably foreseen his criminal conduct taking place, it could have easily done so. Instead, it enacted a broad venue provision, one that lacked any reference to a defendant's mental state or predictive calculus. . . . We are especially reluctant to imply a foreseeability requirement in light of the fact that it is well settled that mens rea requirements typically do not extend to the jurisdictional elements of a crime . . . This is because venue is similar in nature to a

24

> jurisdictional element . . . and typically lacks any sort of explicit
> knowledge or foreseeability prerequisite[.]

510 F.3d at 527 (internal citations and quotation marks omitted).  The defendants offer no sound basis for the Court to depart from these principles.  Accordingly, the Court should reject the defendants' request to adopt a foreseeability requirement that the First Circuit has not imposed, and the defendants' motion to dismiss for lack of venue should be denied.

## III.   THE DEFENDANTS' CHALLENGES TO THE FRAUD ALLEGATIONS FAIL.

As noted, Count One charges the defendants with conspiracy to commit mail and wire fraud on both a property and honest services theory, while Counts Four through Ten charge defendants Chen, McGlashan, Wilson, and Zangrillo with substantive counts of mail and wire fraud.  The defendants attack all of these counts, arguing that this case lacks both "property" and "bribes."  Both claims lack merit.

### A.    The Indictment adequately alleges mail and wire fraud.

The defendants argue that the Indictment does not allege that the universities or the testing companies were deprived of "property" cognizable under the mail or wire fraud statutes.  [D.1022; D.1042.]  That is wrong.  The "property" described in the Indictment—admissions slots at the universities and SAT/ACT tests and the scores on those tests—qualifies as such under settled precedent and the defendants cite no persuasive legal authority to the contrary.

#### 1.    The mail and wire fraud statutes are not limited to the protection of "traditional" forms of property.

The mail and wire fraud statutes prohibit the use of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. §§ 1341, 1343.  In *McNally v. United States*, 483 U.S. 350, 358 (1987), the

Supreme Court held that the mail fraud statute[11] did not reach deprivations of "intangible rights unrelated to money or property." *Cleveland v. United States*, 531 U.S. 12, 18 (2000) (discussing *McNally*). But *Carpenter v. United States* soon clarified that *McNally* had not "limit[ed] the scope of § 1341 to tangible as distinguished from intangible property rights," 404 U.S. 19, 25 (1987), and subsequent First Circuit cases construed the term "property" broadly. *See United States v. Ochs*, 842 F.2d 515, 522 (1st Cir. 1988) ("[T]he *Carpenter* Court gave a broad reading to protected property interests . . . ."); *United States v. Dray*, 901 F.2d 1132, 1142 (1st Cir. 1990) (noting that "the concept of property 'is to be interpreted broadly'") (quoting *McNally*, 483 U.S. at 356); *see also United States v. Rosen*, 130 F.3d 5, 9 (1st Cir. 1997) (explaining that the mail fraud statute protects "a wide variety of tangible and intangible property interests"). In *Pasquantino*, the Supreme Court affirmed this view, holding that "property" in the wire fraud statute is used "as that term is ordinarily employed[,] . . . 'extend[ing] to every species of valuable right and interest.'" 544 U.S. at 356 (quoting Black's Law Dictionary 1382 (4th ed. 1951)).

The defendants ask the Court to read into this precedent a rule that the mail and wire fraud statutes only reach forms of property with a "historical pedigree," such as those that appear in Blackstone's *Commentaries* or were recognized at common law. [D.1042 at 5-9.] This argument is without merit. Although the Supreme Court referred to "traditional concepts of property" in *Carpenter* and *Cleveland*, it did not suggest that the statutory definition was *limited* to such property. *See Carpenter*, 484 U.S. at 25-26; *Cleveland*, 531 U.S. at 24. And while *Pasquantino* consulted common law sources in deciding whether a foreign country's right to unpaid taxes was

---

[11] Although *McNally* was a mail fraud case, the Supreme Court "construe[s] identical language in the wire and mail fraud statutes in *pari materia*," *Pasquantino v. United States*, 544 U.S. 349, 355 n.2 (2005), and the government therefore discusses cases under both statutes interchangeably.

property, 544 U.S. at 356, the case did not *require* such an analysis.  Indeed, it expressly embraced

a definition of "property" that contained no such limitation.

That other appellate courts, including the Second, Third, and Sixth Circuits, construed

*Carpenter* to encourage consideration of traditional property concepts is equally unavailing.  *See*

*United States v. Henry*, 29 F.3d 112, 115 (3d Cir. 1994); *United States v. Evans*, 844 F.2d 36, 41

(2d Cir. 1988*); United States v. Baldinger*, 838 F.2d 176, 179 (6th Cir. 1988).  The force of those

precedents is doubtful following *Pasquantino*, *see United States v. Blaszczak*, 947 F.3d 19, 31-32

(2d Cir. 2019) (applying *Pasquantino*'s definition in determining whether a novel interest was

cognizable), and in any event, this Court is bound by the precedent of the First Circuit, which has

not so held.  *See Ochs*, 842 F.2d at 522; *Dray*, 901 F.2d at 1142; *Rosen*, 130 F.3d at 9.[12]

### 2.      Admissions slots are cognizable property interests.

Universities have a cognizable property interest in the composition of their undergraduate

degree programs.  *See Frost,* 125 F.3d 346.  In *Frost*, the defendants were professors and graduate

students convicted of mail fraud for their roles in a scheme to award masters and doctoral degrees

from the University of Tennessee Space Institute ("UTSI"), using, among other things, plagiarized

theses and dissertations, with the intent that the students—primarily military and government

personnel—would later steer contracts to the professors.  *Id.*at 352-53.  In upholding the

convictions of the professors, the Sixth Circuit held that by falsely certifying that the students had

satisfied degree requirements, the professors infringed a cognizable property right of UTSI in its

unissued masters and doctoral degrees.  *Id*. at 367.  The court noted that, "[i]n general, the concept

---

[12] Even if this were not the case, it is not clear that the property alleged in the Indictment
does not fall within "traditional" notions of property.  Indeed, the two cases most on-point, *United
States v. Frost*, 125 F.3d 346 (6th Cir. 1997), and *United States v. Hedaithy*, 392 F.3d 580 (3d Cir.
2004), arose in circuits that *do* consider traditional property interests.

of property refers to a bundle of rights which includes the rights to possess, use, exclude, profit,

and dispose." *Id.* (internal quotation marks and citation omitted).  It further explained:

> Ultimately, a university is a business:  in return for tuition money
> and scholarly effort, it agrees to provide an education and a degree.
> The number of degrees which a university may award is finite, and
> the decision to award a degree is in part a business decision.
> Awarding degrees to inept students . . . will decrease the value of
> degrees in general.  More specifically, it will hurt the reputation of
> the school and thereby impair its ability to attract other students
> willing to pay tuition, as well as its ability to raise money.  [USTI]
> therefore has a property right in its unissued degrees. . . .

*Id.*

The defendants argue that *Frost* is distinguishable because it addressed unissued degrees

rather than admissions slots [D.1042 at 10], but this is a distinction without a difference.  Students

gain admission to a college or university for the purpose of and with the expectation that they will

obtain a degree.  Thus, "admissions slots" and "unissued degrees" are little more than alternate

ways of describing the same thing.  *Frost*'s rationale, moreover, applies equally whether one

focuses on the process of gaining admission to a selective university or its awarding of degrees.

The number of admissions slots, like the number of degrees, is limited, and an institution of higher

education that awards coveted admissions slots to those "who have not earned them" will decrease

their value, damaging the institution's reputation and its ability to continue to attract tuition-paying

students.  *Frost*, 125 F.3d at 367.[13]

The defendants also dispute that admissions slots have "economic value," [D.1042 at 9],

but it is self-evident that undermining the integrity of the academic process imposes real costs,

ranging from the prospect of a decline in applications and reduced donations in the future to the

---

[13] The defendants also suggest that *Frost* may be distinguished because it was a prosecution for honest services fraud [D.1042 at 11 n.6], but the court's analysis of UTSI's property rights drew no such distinction, *see* 125 F.3d at 367, and defendants fail to show why this should matter.

immediate loss of an opportunity to field a competitive sports team. *Cf. United States v. Gray*, 96 F.3d 769, 775 (5th Cir. 1996) (noting, in a mail and wire fraud case involving a fraudulent scheme to retain ineligible basketball players, that the scheme harmed the university not only because it "did not get the quality student it expected" but because, absent the fraud, it "might have been able to recruit other qualified, eligible students to play basketball").[14]

Nor is *Frost* alone in its reasoning.  In *United States v. Barrington*, the Eleventh Circuit found that a wire fraud scheme—pursuant to which students accessed a university's grading system and changed grades to benefit themselves and friends—implicated the university's "intangible property interest in the integrity of its grading system."  648 F.3d 1178, 1191 n.11 (11th Cir. 2011).  And in *Hedaithy*, , the Third Circuit applied *Frost*'s rationale expressly to find that the property interests of a testing business were violated by a fraudulent scheme in which imposters were hired to take the Test of English as a Foreign Language ("TOEFL") exam on behalf of others.  392 F.3d at 585.  The court concluded that this scheme implicated the same property interests as the approval of fraudulent academic accomplishments in *Frost*, undermining the "integrity of the TOEFL testing process" and its "credibility, and thus the value of [the testing company's] entire investment in the process."  *Id.* at 600 (internal quotation marks omitted).  The same logic applies to those who gain access to a university under fraudulent pretenses, as the defendants here did for their children.  *See id*. at 601 (finding "no principled distinction" between the fraud perpetrated in *Frost* and its impact on degrees and the fraud perpetrated on the testing company and its impact on score reports).

---

[14] Contrary to the defendants' suggestion [D.1042 at 9], the government need not show pecuniary harm, but only that the defendant "contemplated either some articulable harm befalling the fraud victim or some gainful use of the object of the fraudulent scheme by the perpetrator." *Rosen*, 130 F.3d at 9 (internal quotation marks omitted).  The latter is certainly true here.

The conclusion that the universities have a cognizable interest in their admissions slots also follows from the well-established principle that "the property interests protected by the [mail and wire fraud] statutes include the interest of a victim in controlling his or her own assets." *United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 1998); *accord United States v. Gray*, 406 F.3d 227, 234 (4th Cir. 2005) (agreeing that a property owner's "intangible right to control the disposition of its assets" is an interest protected by the mail and wire fraud statutes and citing cases).[15]  This right is infringed, and a violation of the statutes occurs, when, as a result of the defendant's fraudulent scheme, the victim is "depriv[ed] . . . of information necessary to make discretionary economic decisions." *United States v. Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998); *United States v. Wallach*, 935 F.2d 445, 463 (2d Cir. 1991) ("[W]ithholding or inaccurate reporting of information that could impact an economic decision can provide the basis for a mail fraud prosecution.").

Universities, of course, have an interest in controlling which potential students have access to their vast array of valuable assets including dormitory rooms, classrooms and laboratories, and the labor of an extensive, highly trained workforce.  Where an applicant obtains admission—and thus access to such assets—based on fraudulent "misrepresentation of an essential element of the bargain," that conduct infringes a cognizable property interest under the mail and wire fraud statutes.  *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015).  That is precisely what happened here:  the defendants obtained admissions slots intended for skilled athletes by, among other things, representing that they were sufficiently qualified for those slots when they were not.

---

[15] *See also United States v. Welch*, 327 F.3d 1081, 1108 (10th Cir. 2003) ("[W]e have recognized the intangible right to control one's property is a property interest within the purview of the mail and wire fraud statutes."); *United States v. Bucuvalas*, 970 F.2d 937, 945 (1st Cir. 1992) (applying right to control theory in holding that the City of Boston had a cognizable interest in municipal licenses), *abrogated by Cleveland*, 531 U.S. 12.

In doing so, they deprived the universities of their right to control access to their valuable assets—a property interest that the mail and wire fraud statutes protect.

### 3.      The defendants' arguments to the contrary are without merit.

The defendants' remaining arguments provide no basis for concluding that admissions slots are not "property."

#### a.      *Plyler et al*. did not resolve the issue before this Court.

The defendants first argue that *United States Plyler*, 222 U.S. 15 (1911), and other ancient civil service fraud cases show that an admissions slot is not "property." [D.1042 at 11–15.]  That is incorrect.  *Plyler* did not hold that a civil service job—which the defendants analogize to an admissions slot [D.1042 at 11]—is not "property."  Indeed, such a reading of the case is belied by the Court's reliance on *Curley v. United States*, 130 F. 1 (1st Cir. 1904), which held that a defendant's use of "fraud and deception to avoid the requirement of the law in respect to qualifications, and to secure. . . an office for the duties of which the person was not qualified," *would* constitute a fraud implicating "property and property rights."  130 F. 1, 12–13 (1st Cir. 1904).  At most, this one-paragraph opinion suggests that forging civil service documents could be a "fraud[] against the United States" even if "an actual financial or property loss" did not result.  *See* 222 U.S. at 15.  It is inapposite here.[16]

#### b.      The Indictment properly alleges conspiracy to obtain admission, not offers.

The  defendants  next  contend  that  the  Indictment  alleges  a  scheme  to  deprive  the universities of admissions *offers*, not *slots*, and that the former is not "property."  [D.1042 at 15–

---

[16] Moreover, whatever propositions *Plyler* and its progeny established for the statutes they construed, they cannot form a basis to ignore the Supreme Court's and First Circuit's binding constructions of the term "property" in the mail fraud and wire fraud statutes, as described above.

18.]  This argument targets a straw man, and even a cursory reading of the Indictment debunks the claim.  The phrase "admissions slot" refers to a place in the admitted student body—such as the places "allot[ted] . . . to [a] head coach of a sport for that coach's admitted athletes."  [FSI ¶55.]  The Indictment expressly alleges that the defendants sought by their fraudulent scheme to obtain "admission to the Universities."  [FSI ¶¶ 370(a) (mail fraud) & 370(b) (wire fraud).]  This language establishes that the object of the conspiracy was to obtain these reserved positions—a commodity that, by its nature, is inherently limited.  [*Accord* FSI ¶ 65 (identifying as a "principal purpose[] of the conspiracy" the goal of "securing the admission of the defendants' children to selective colleges").]

Even if the Indictment had not been so clear, the defendants' reliance on *Skilling v. United States*, 561 U.S. 358 (2010), *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) and *United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014) [D.1042 at 15–19], does not advance their cause.  None of those cases addresses the question whether an "offer" is property.  Indeed, neither *Skilling* nor *Takhalov* addresses the meaning of "property" at all.  *Skilling*, 561 U.S. at 400; *Takhalov*, 827 F.3d at 1312–15.  The cases are also plainly distinguishable, for reasons *Takhalov* makes apparent.  Contrary to the defendants' suggestion [D.1042 at 18], *Takhalov*'s holding does not turn on the temporal relationship between a defendant's deceptive conduct and the resulting harm, but on the need for the deception to be material.  In construing the term "scheme to defraud," *Takhalov* distinguished between schemes that "do no more than cause their victims to enter into transactions they would otherwise avoid," from those "where there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver."  827 F.3d at 1314 (citations and internal quotation marks omitted).

The deception alleged here—falsified athletic and academic credentials—did more than cause the universities "to enter into transactions they would otherwise avoid." *Id.* (internal quotation marks omitted). Indeed, it is difficult to imagine a clearer example of a "discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered," *id.* (internal quotation marks omitted), than admitting an individual as a recruited athlete when the person does not have such skills, or based on a transcript or test scores that do not represent the applicant's academic abilities. This is, accordingly, not a case where the deceived party ended up with a bargain whose "terms were the same as any that could have been negotiated at arm's length," without such deception. *Skilling*, 561 U.S. at 400.

### c. The defendants' argument that the Indictment improperly alleges a deprivation of services is without merit.

The defendants next claim that if admissions slots are not offers, they must be "services," which they contend are also not property. [D.1042 at 19-22]. But that is plainly not true. As noted above, institutions of higher education possess numerous assets deployed to the benefit of admitted students. While some may be thought of as "services"—*i.e.*, instruction, administration—others, including dorm rooms, furniture, food, and access to institutional facilities, are not.

Nor does the distinction matter. As *Frost* made clear, the relationship between a university and an admitted student is ultimately a contractual one: "in return for tuition money and scholarly effort, [the university] agrees to provide an education and a degree." 125 F.3d at 367. And "fraudulently obtained contracts are property," notwithstanding that they are "promise[s] to pay for services rendered." *United States v. Sorich*, 523 F.3d 702, 713 (7th Cir. 2008). Moreover, the Supreme Court's decision this week in *Kelly v. United States* affirms that an employer's "right to its employees' time and labor . . . can undergird a property fraud prosecution," including a prosecution for wire fraud, so long as deprivation of those services is the "object of the fraud."

33

--- S.Ct.---, 2020 WL 220083, at *6 (May 7, 2020) (internal quotation marks omitted).  While the Court found that principle inapplicable in that case, because the redirection of government labor was merely "incidental" to the scheme that centered on an exercise of the government's regulatory function, *id.* at *7, the opposite is true here.  The object of the fraud was to obtain admission, which entailed access to the services of the universities' employees no less than to the universities' real property.  Given these precedents, the Indictment properly charges a deprivation of property whether or not some of what the defendants obtained as a result of their fraud may be described as educational "services."[17]

### d.      The defendants' policy arguments provide no basis for dismissal.

Finally, the defendants argue that the government's theory of property sweeps too broadly, placing college applicants "at the mercy of federal prosecutors" for any misstatement.  [D.1042 at 30-32.]  The defendants point to no case supporting the dubious proposition that this Court may dismiss a facially valid indictment based on concerns about application of its theory to other fact patterns.[18]  On that ground alone, this claim should be rejected.  But even assuming such authority existed, this case hardly represents a novel application of the mail and wire fraud statutes.  *See Barrington*, 648 F.3d at 1190-92 (upholding application of wire fraud statute to grade-changing scheme).  [*See also* D.1137, Exhibit A (chart identifying other cases in which academic cheating

---

[17] In light of *Kelly*'s confirmation that employee services are cognizable property, the defendants' argument that *McNally* supports the opposite view [D.1042 at 28], is untenable. Likewise, the defendants' citations to cases distinguishing "property" from "services" in far different contexts, including *De Lima v. Sessions*, which addressed the meaning of "generic theft" for purposes of sentencing, 867 F.3d 260, 266–67 (1st Cir. 2017), add nothing to their argument.

[18] The defendants' vagueness claim plainly fails for this reason, as dismissal for lack of notice prior to trial can only occur where the "facts surrounding the commission of the alleged offense" are entirely uncontested, which is not true here. *See United States v. Stepanets*, 879 F.3d 367, 375 (1st Cir. 2018) (internal quotation marks omitted).

formed the basis mail and/or wire fraud convictions).][19]   To be sure, close cases may arise in which courts must draw a line between forms of academic cheating that can satisfy the elements of mail and wire fraud and those that cannot.  But courts have no authority to do so by adopting a definition of "property" contrary to binding authority, as the defendants would have this Court do.   The Indictment alleges that the defendants engaged in a scheme to defraud the universities out of valuable admissions slots by falsely portraying their children as recruited athletes.  Wherever the line may ultimately be drawn, it is not here.

### 4.   The Indictment properly charges that the testing companies were deprived of property.

In a separate but related motion the defendants argue that the Indictment fails to allege that ACT, Inc. or the College Board was deprived of a cognizable property interest.  [*See generally* D.1022.]  Apart from the repetition of arguments already addressed above—*e.g.*, that the mail and wire fraud statutes only reach "traditional" forms of property and should be construed narrowly, and that educational "services" cannot be property [D.1022 at 2-3, 6-7]—this challenge reduces to two claims:  (1) that *Hedaithy*, the sole on-point appellate precedent, was wrongly decided, and (2) that *Hedaithy* does not apply to the allegations against them [D.1022 at 7-12].   Neither argument withstands scrutiny.

---

[19] Nor can the defendants plausibly claim that the garden-variety misstatements and fibs they describe—such as misleading a store to reserve a Christmas present [D.1042 at 24]—would become mail or wire fraud under the government's theory.  These circumstances fail to describe a crime for reasons unrelated to the property interest, including the lack of any knowing and willing participation in a "scheme or artifice to defraud using false or fraudulent pretenses" or a material misstatement.  *See United States v. Pena*, 910 F.3d 591, 596 (1st Cir. 2018) (internal quotation marks omitted); *United States v. Appolon*, 715 F.3d 362, 367-68 (1st Cir. 2013).

### a.   *Hedaithy* **was correctly decided.**

The defendants in *Hedaithy* were convicted of mail fraud for their roles in a scheme in

which hired imposters took the TOEFL, a test administered by Educational Testing Services, Inc.

("ETS"), to generate passing scores so that the defendants or others could remain in the United

States on student visas.  392 F.3d at 582.  On appeal from their convictions, the defendants argued

that the indictment did not identify a cognizable deprivation of property.   The Third Circuit

disagreed.   Following a review of Supreme Court and circuit precedent, the court held that the

scheme implicated two property interests: [20]   ETS's right to exclusive use of confidential business

information contained in the tests, which was violated when the imposters "gained access to ETS's

TOEFL exam on terms other than those prescribed by ETS," *id.* at 595; and ETS's interest in the

score reports and its "right to convey these items only to those individuals who [met] its prescribed

conditions," *id.* at 597.[21]

The defendants make no meaningful attempt to counter *Hedaithy*'s reasoning other than to

suggest that its holding that ETS had a property interest in unissued score reports contravenes

*Cleveland*.  [D.1022 at 12.]  As the Third Circuit explained, this argument "misunderstands the

fundamental basis of the Supreme Court's reasoning in that case":

> *Cleveland* was based upon the conclusion that the issuance of a
> government's licenses is an exercise of a state's police powers to
> regulate.  Because the issuance of such a license is a component of
> the state's regulatory scheme, the license was held not to be
> "property" in the hands of the regulator.  Such reasoning is wholly
> inapplicable in this case.  Here, ETS is a private business that

---

[20] The Third Circuit reviewed *McNally, Cleveland* and *Carpenter*.  *Pasquantino* had not
yet been decided.  *Id.* at 590-93.

[21] The court found it unnecessary to address two other property interests advanced by the
government, including ETS's interest in customer goodwill and in its test administration and
scoring services.  392 F.3d at 594 n.15.

> provides a service and reports test results in pursuit of a profit-seeking endeavor.  Unlike a state, ETS has no sovereign power to regulate.

*Id.* at 600.  *Hedaithy* also noted that, in *Cleveland*, the Supreme Court distinguished analogous circumstances involving private parties, such as "'a franchisor's right to select its franchisee,'" which "'derive[] from its ownership of a trademark, brand name, business, strategy or other product that it may trade or sell in the open market'"—circumstances that applied to ETS, which owned the rights to its trademark and copyrights and could sell or license those assets to others. *Id.* (quoting *Cleveland*, 531 U.S. at 24).  *Hedaithy*'s reasoning accords with that of the First Circuit. *See Berroa*, 856 F.3d at 149 (noting that *Cleveland* rested on the proposition that "any interest the state had in the licenses was 'regulatory' as opposed to proprietary").[22]

### b.  *Hedaithy* applies to this case.

The defendants' attempts to distinguish *Hedaithy* are also without merit.  The defendants first argue that *Hedaithy* does not apply because the Indictment alleges a property interest in test "scores," [FSI ¶¶ 54, 370(a, b)], while *Hedaithy* addressed score reports.  392 F.3d at 597.  [*See*

---

[22] As an alternative, the defendants argue that this Court should follow *United States v. Ferrara*, 701 F. Supp. 39 (E.D.N.Y. 1988), an easily distinguishable district court case.  *Ferrara*'s holding—that a non-profit entity had no property interest in English language and medical knowledge certificates issued to graduates of foreign medical schools—was based on the court's inability "to discern any meaningful difference between [that] certificate" and the state's medical license.  *See id* at 42–43.  The court noted that the non-profit lacked any "commercial interest in the certificate" and declined to find that an injury to the non-profit's reputation was sufficient to create a property interest.  *Id.* at 42-43 & nn.2-3.  Unlike the non-profit in *Ferrara,* there can be no argument that ACT, Inc. or the College Board acted as adjuncts of a state licensing authority, nor does the government's allegation of a property interest rely solely on customer goodwill.  [FSI ¶ 54.]  Moreover, *Ferrara*'s rationale—equating a private entity to a government regulatory authority—is untenable after *Cleveland*.  *See Hedaithy*, 392 F.3d at 600.  And Second Circuit precedent undermines *Ferrara*'s backhanded refusal to consider goodwill as a cognizable property interest.  *See United States v. Finazzo*, 850 F.3d 94, 111 & n.18 (2d Cir. 2017) (holding that deceits that cost a victim "good will" or result in "reputational harm" may support a prosecution for mail and wire fraud if they "could lead . . . to economic losses").

*also* D.1022 at 9.]  That distinction is meaningless.  Test scores do not exist in a vacuum, and the Indictment's allegation that that the "scores" were the "intellectual and physical property" of the testing companies is broad enough to encompass an interest in the reports in which the scores were transmitted.  [FSI ¶ 54.]

Nor would it matter if this were not so.  While *Hedaithy* noted that the score reports at issue were "tangible items, held in the physical possession of [ETS]," its rationale for ascribing them value lay in ETS's interest in protecting the "goodwill" it had "developed . . . due to the integrity of the testing process."  392 F.3d at 600; *accord United States v. Alsgusair*, 256 F.Supp.2d 306, 316 (D.N.J. 2003).  The harm to this interest from fraudulently obtained scores does not depend on their presence in a report.  Rather, it results because the scores convey an implicit representation that they were produced in accordance with proper procedures, in the same way the unissued degrees in *Frost* were "property" because they carried an implicit representation that degree requirements were properly fulfilled, 125 F.3d at 367, and the altered grades in *Barrington* implicated the university's "intangible interest in the integrity of its grading system," 648 F.3d at 1191 n.11.[23]

Finally, the defendants argue that the allegation that Riddell corrected their children's tests after they were completed does not allege a scheme to defraud the testing companies of "standardized tests."  [D.1022 at 10-12].  That is nonsense.  A scheme to fraudulently take possession of tests after they are completed and "correct" them is no less a scheme to "fraudulently obtain" the tests than one in which the tests are taken by an imposter at the outset (which the

---

[23] The defendants also note that the ACT, Inc. website states that "students own their test scores" and may delete them [D.1022 at 9 (emphasis omitted)], but the ability to own a validly obtained test score simply confirms that test scores are property, and the ability to delete a score does not disprove the Indictment's allegation that the intellectual property that goes into the score is the property of ACT, Inc.  [FSI ¶ 54.]

Indictment alleges was also among the manner and means by which the scheme was executed, and which it alleges Riddell actually did in the case of defendant Sidoo, who has pled guilty and is awaiting sentencing).  [FSI ¶¶ 66d, 68-91.]  In either case, the schemer has "gain[ed] access to [the] test on terms other than prescribed by" a party possessing the right to control such access. *Hedaithy*, 392 F.3d at 595.  This is true, moreover, whether or not the children knew their answers were being corrected, because the focus is on whether the victim was deprived by the defendants' scheme of the "right to decide how to use" the information contained in the test, not on how that deprivation occurred.  *Id.* (internal quotation marks omitted).

In sum, the Indictment alleges a scheme to defraud the universities of admissions slots and the testing companies of their tests and test scores—each of which constitutes a cognizable property right.  Accordingly, the defendants' motion to dismiss Counts One and Four through Ten on this ground must be denied.

### B.     The Indictment adequately alleges honest services mail and wire fraud.

The honest services fraud statute defines a "scheme or artifice to defraud" as including a "scheme or artifice to deprive another of the intangible right of honest services."  18 U.S.C. § 1346.  In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court held that § 1346 applies to "offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." *Id.* at 407.

The defendants contend that Count One should be dismissed insofar as it alleges honest services fraud because the Indictment does not adequately allege that Dvorskiy owed a fiduciary duty to the testing companies [D.1022 at 12-16], or that Heinel, Vavic, and Ernst accepted bribes in violation of the fiduciary duty they owed to the universities [D.1038].  These arguments are without merit.

39

### 1.    The Indictment adequately alleges fiduciary duties.

The defendants do not dispute that the coaches they are charged with bribing owed a fiduciary duty to their university employers. *See Skilling*, 561 U.S. at 407 n.41 (describing the "existence of a fiduciary relationship" between an employee and employer as "beyond dispute"). They also do not meaningfully dispute that fiduciary duties may arise in independent contractor relationships.  In fact, the law is clear that § 1346 applies equally to "an officer or employee of a private entity . . . or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers." *United States v. Rybicki*, 354 F.3d 124, 127, 141–42 & n.17 (2d Cir. 2003) (en banc).  The existence of the fiduciary relationship turns not on labels but on whether the relationship is a "trusting [one] in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise." *United States v. Milovanovic*, 678 F.3d 713, 724 (9th Cir. 2012) (en banc) (reversing dismissal of indictment charging independent contractor with bribery-based scheme to help unqualified, non-resident applicants obtain commercial drivers' licenses by, among other things, cheating on exams).  Whether a given relationship qualifies is a question of fact for the jury. *Id.*; *United States v. Halloran*, 821 F.3d 321, 340 (2d Cir. 2016).

The defendants do not address this authority.  Instead, they argue that an independent contractor "typically" does not owe a fiduciary duty under Massachusetts law, and that the allegation that Dvorskiy "served as a compensated test administrator" [FSI ¶32], is therefore insufficient to "establish" a fiduciary relationship.  [D.1022 at 13-16.]  That is incorrect, for two reasons.  *First*, while compensation alone does not *establish* the existence of a fiduciary relationship, a criminal indictment is not required to "establish" anything.  It must only *allege* those "facts and circumstances as will inform the accused of the specific offence, coming under

the general description, with which he is charged." *United States v. Troy*, 618 F.3d 27, 34 (1st Cir. 2010) (quoting *Hamling v. United States*, 418 U.S. 87, 117–18 (1974)). *Second*, the Indictment does just that. It specifically alleges that ACT and SAT administrators like Dvorskiy "are agents of ACT and the College Board, respectively, and owe a duty of honest services to those organizations." [FSI ¶49; *see also* FSI ¶¶50–51 (alleging that test administrators must typically certify that they will administer the test in accordance with the ACT or SAT administration manual and ensure that the materials are used for the examinee only).] More is not required—and the defendants' argument concerning what the evidence shows about the nature of Dvorskiy's relationship with ACT and the College Board demonstrates that they understand precisely the nature of the charge. Their argument for dismissal of the honest services fraud allegations on this basis therefore fails.

### 2. The Indictment adequately alleges bribes.

The defendants next argue that the honest services fraud allegations should be dismissed because the Indictment fails to allege the "type" of *quid pro quo* necessary to support conviction for that offense. [D.1037 at 2.] The defendants thus concede that the Indictment alleges that they paid money as a *quid pro quo* for having university insiders recruit their children as purported athletes based on fabricated credentials. They nevertheless claim that the Indictment is deficient because neither payments made to university accounts designated by those insiders, nor payments directly to the insiders, constitute "bribes"—despite the fact that those payments were contingent on the defendants' receiving the benefit of their bargain, and were made only when they actually received it.

### a.   Payments to university accounts designated by corrupt coaches constitute bribes.

The Indictment alleges that *quid pro quo* payments to corrupt university insiders took two forms:  (1) payments by the defendants and Singer to designated university accounts over which the corrupt insiders exercised discretion or that otherwise benefited them professionally [FSI ¶65, 129, 149-150, 160-61, 179, 221, 237,[24] 248, 273; *see also* FSI ¶202[25]], and (2) payments by Singer's entities to the corrupt coaches personally [FSI ¶¶119, 121, 175.]  The defendants argue that the former were not "bribes," but rather the product of "an unauthorized form of fundraising" [D.1038 at 10], while the latter were simply gratuities.  Those arguments are incorrect as a matter of law, and misapprehend the very purpose of the honest services fraud doctrine.

A bribe is simply "a payment (or other benefit) given in exchange for an employee's provision of influence or favorable treatment from his employer."  *United States v. DeMizio*, 2012 WL 1020045, at *10 (E.D.N.Y. Mar. 26, 2012) (Gleeson, J.), *aff'd* 741 F.3d 373 (2d Cir. 2014); *see also United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 405 (1999) ("Bribery

---

[24] Wilson's contention that Singer "stole $100,000" of what he intended to be a $200,000 "donation" to the USC men's water polo team for which his son went on to play [D.1038 at 19], relies on a highly sanitized rendition of the facts devoid of mention that he is alleged to have agreed with Singer to embellish his son's athletic profile.  [FSI ¶¶229, 231, 233.]  In any event, to the extent Wilson wishes to argue that he acted in good faith because he believed the entirety of this payment would go to the designated USC fund (despite being routed through Singer) and constituted a legitimate donation (despite being accompanied by an embellished athletic profile), the place to do so is at trial.

[25] McGlashan notes the absence of any allegation that he actually paid the alleged bribe, claiming that this was because "he chose not to pursue the alleged side door scheme." [D.1023 at 1-2; *see also* D.1038 at 4 n.6.]  That is untrue.  In fact, the evidence will show that he was tipped off by Singer before the scheme could be completed.  In any event, the Indictment adequately alleges that he conspired with Singer to engage in the charged conspiracy, including *both* the testing and side door aspects of the scheme. [FSI ¶¶201-209.]  Any withdrawal defense is a question of fact for the jury.  *United States v. Leoner-Aguirre*, 939 F.3d 310, 318 (1st Cir. 2019), *cert. denied*, 140 S. Ct. 820, 205 L. Ed. 2d 499 (2020).

requires intent 'to influence' an official act or 'to be influenced' in an official act . . . .  In other words, for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act.") (emphasis in original).  The law is clear that payments to third parties, including even charities, may qualify as bribes or kickbacks.  *See, e.g.*, *DeMizio*, 741 F.3d at 381–82 (rejecting argument that "private-sector scheme does not qualify as a kickback unless the defendant employee himself or herself receives the payoff" and further noting that a scheme is "no less a kickback scheme when the employee directs the third party to share its profits with an entity designated by the employee in which the employee has an interest"); *United States v. Hausmann*, 345 F.3d 952, 954 (7th Cir. 2003) (kickback arrangement required payments to "individuals who had provided miscellaneous personal services to [the defendant] or his relatives . . . and . . . charities that [the defendant] supported").  Accordingly, whether the defendants' payments were sent, at Heinel's direction, to a USC fund over which she exercised discretion, or to her own personal account, is irrelevant.  So long as the money was paid with corrupt intent—as a *quid pro quo* for recruiting students as athletes based on false credentials—it was a bribe.

In arguing that their *quid pro quo* payments could not have been bribes because the money went to USC, the defendants emphasize that neither they nor the government has identified a case in which a payment to the alleged victim of honest services fraud has been held to constitute a bribe.  [D.1038 at 1, 14.]  But that fact is unremarkable.  *Skilling* did not limit honest services fraud to "conduct that fit the *traditional mold* of a bribe or kickback," as the defendants claim.  [D.1038 at 12 (emphasis added).]  It merely limited the doctrine to bribes or kickbacks.  *See, e.g.*, *United States v. Bryant*, 655 F.3d 232, 245 (3d Cir. 2011) ("*Skilling* did not eliminate from the definition of honest services fraud any particular type of bribery [or kickbacks], but simply eliminated honest services fraud theories that go beyond bribery and kickbacks."); *DeMizio*, 2012 WL 1020045, at

*6 ("[T]he "core" preserved by Skilling is [not] limited to particular fact patterns involving bribes or kickbacks that were recognized by pre-*McNally* case law."); *United States v. Scanlon*, 753 F. Supp. 2d 23, 26 (D.D.C. 2010) ("[*Skilling*] used the term 'core' not . . . to distinguish 'core bribe-and-kickback' cases from 'non-core bribe-and-kickback cases,' but rather to distinguish bribery and kickback cases (which themselves constitute the 'core' of pre-*McNally* case law) from cases involving mere undisclosed self-dealing."). The defendants' argument "would effectively freeze honest services fraud," by placing "[n]ovel bribery and kickback schemes . . . beyond the reach of the federal antifraud statutes. Nothing in *Skilling* or its reasoning supports this result." *DeMizio*, 2012 WL 1020045, at *7.

The defendants rely on *Wilkie v. Robbins*, 551 U.S. 537 (2007), for the proposition that a payment to an alleged victim cannot constitute a bribe. But that is not what *Wilkie* said. *Wilkie* was a civil case against government employees for allegedly committing Hobbs Act extortion by coercing a landowner to grant the government an easement over his land. 551 U.S. at 563. The Supreme Court held that extortion under color of official right requires "the sale of public favors for private gain" and "does not apply when the National Government is the intended beneficiary of allegedly extortionate acts." *Id.* at 563-64. The defendants analogize the universities to the government, and contend that payments to the universities cannot constitute bribes as a matter of law. But that analogy is as inapt as it sounds.

In *Wilkie*, the Court simply found that claims of Hobbs Act extortion under color of official right cannot be premised on "efforts of Government employees to get property for the exclusive benefit of the Government." 551 U.S. at 564–65 (citations omitted). The Court's concern was that "the fear of criminal charges or civil claims for treble damages . . . could well take the starch out of regulators who are supposed to bargain and press demands vigorously on behalf of the

Government and the public." *Id.* at 567; *see also id.* at 566 (regulators "'do not become racketeers by acting like aggressive regulators'") (quoting *Sinclair v. Hawke*, 314 F.3d 934, 944 (8th Cir. 2003)). It was on the basis of this concern that the Court rejected the landowner's reliance on its prior statement, made in the context of a union official's extortion to the benefit of the union, that "'extortion as defined in the Hobbs Act in no way depends upon having a direct benefit conferred on the person who obtains the property.'" *Id.* at 566 (quoting *United States v. Green*, 350 U.S. 415, 420 (1956)) (alteration omitted). It concluded that Congress "could very well have meant" "to prohibit extortionate acts in the interest of private entities like unions, but ignore them when the intended beneficiary is the Government," because "drawing a line between private and public beneficiaries prevents suits . . . against public officers whose jobs are to obtain property owed to the Government." *Id. Wilkie* thus does not support the proposition that a *quid pro quo* cannot be a "bribe" when payment is made to the employer, no matter who that employer may be.

Moreover, even if some form of personal benefit to the coaches were required, the Indictment alleges it: the payments went to university accounts over which the coaches had discretion or that otherwise benefitted them professionally. [FSI ¶ 65.] The Indictment thus alleges, explicitly, that the payments were a "thing of value" to the university insiders. And that proposition is supported by longstanding authority holding that the term "'thing of value' is defined broadly to include 'the value which the defendant subjectively attaches to the items received.'" *United States v. Renzi*, 769 F.3d 731, 744 (9th Cir. 2014) (quoting *United States v. Gorman*, 807 F.2d 1299, 1305 (6th Cir.1986)). "[A]ny payment that the defendant subjectively believes has value . . . constitutes a thing 'of value.'" *United States v. Crozier*, 987 F.2d 893, 901 (2d Cir. 1993).

45

Thus, for example, it is well-established that campaign contributions can constitute bribes—even in the absence of evidence that the money was directed to the candidate's pocket—because they can be used for "all manner of self-promotion" to secure the candidate's professional position. *United States v. McGregor*, No. 2:10CR186-MHT, 2011 WL 1576950, at *4 (M.D. Ala. Apr. 4, 2011); *see also United States v. Terry*, No. 1:10CR390, 2011 WL 5008415, at *5 (N.D. Ohio Oct. 19, 2011) ("The jury could most certainly have concluded that the defendant personally benefited from this assistance [in the form of campaign contributions and other benefits] as it was arguably instrumental in the defendant's bid to retain his seat as a common pleas judge."); *United States v. Vila*, No. CRIM 3:08CR297-PJB, 2009 WL 79189, at *4 (D.P.R. Jan. 9, 2009) ("It hardly seems plausible to suggest that the viability of a wire fraud prosecution should turn on a distinction as meaningless as whether a candidate personally receives a gift of two thousand dollars or whether that gift is instead made out to the candidate's political committee. Either way, the candidate reaps 'personal gain.'"). Notably, the candidate need not embezzle or misappropriate the funds to reap that benefit. *See, e.g.*, *Evans v. United States*, 504 U.S. 255, 257-59 (1992) (affirming Hobbs Act conviction of public official who attempted to claim the payment he received was a campaign contribution.); *United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013) (same, for honest services fraud conviction); *United States v. Whitfield*, 590 F.3d 325, 353 (5th Cir. 2009) (same, for federal programs bribery). As the Sixth Circuit explained in *Terry*,

> That a bribe doubles as a campaign contribution does not by itself insulate it from scrutiny. No doubt, a contribution is more likely to be a duty-free gift than a bribe because a contribution has a legitimate alternative explanation: The donor supports the candidate's election for all manner of possible reasons. But the

> prosecution may rebut that alternative explanation, and context may
> show that an otherwise legitimate contribution is a bribe.

707 F.3d at 613 (citation omitted).[26]

The defendants do not address this authority, much less explain how the "unauthorized form[s] of fundraising" found to be criminal in these cases is any different from the "unauthorized form of fundraising" they contend happened here.  Instead, they cite a series of Seventh Circuit cases applying a "private gain" requirement the Seventh Circuit adopted pre-*Skilling* to limit the reach of honest services fraud.  *See United States v. Bloom*, 149 F.3d 649, 655 (7th Cir. 1998).  But even the Seventh Circuit has acknowledged that its test "has come in for its share of criticism," *Sorich*, 523 F.3d at 708, and has explained that "[b]y 'private gain' we simply mean illegitimate gain, which usually will go to the defendant, but need not. . . .  Robin Hood may be a noble criminal, but he is still a criminal," *id*. at 709-10.

In any event, the cases the defendants cite are also inapt for other reasons.  In *United States v. Thompson*, for example, in which the court reversed the honest services fraud conviction of a

---

[26] The defendants rely on a passing statement by Judge Woodlock at the sentencing hearing in *United States v. Bizzack*, No. 19-cr-10222-DPW-1 (Oct. 30, 2019), to argue that payments to university accounts cannot constitute bribes absent foreseeable embezzlement or misappropriation of the funds by the university insiders.  [D.1038 at 9-10.]  But Judge Woodlock's comment, like a similar discussion that occurred at the sentencing in *United States v. Vandemoer*, No. 19-cr-10079-RWZ (June 12, 2019) [D.1038 at 9 n.10], concerned how to *monetize* bribes for purposes of calculating loss, *not* whether the defendants had engaged in honest services fraud.  [D.1038 Ex. D at 99 ("I've spent some time trying to figure out how do you monetize this case?"); D.1038 Ex. E at 23 ("I don't think rather Probation or the Defendant or I suggested that there was not fraud, both regular fraud and honest services fraud.").]  Indeed, Judge Woodlock *accepted* the defendant's plea to conspiracy to commit mail fraud *and* honest-services mail fraud, and analogized the case to paying off a maître d' to "get in the side door."  [D.1038 Ex. D at 89 ("[Y]ou have identified the fishbone in my throat on this case.  That is the other people who think that life is a series of encounters with maitre d's who, you give them a little bit of money and you get in the side door. . . . That's the way of I think of this case, crudely stated.").]  In any event, the defendants have not cited a single case supporting an embezzle-or-misappropriate requirement, and the government has found none.

state procurement officer who steered a state contract to a company her boss favored, the defendant was not accused of taking a bribe or receiving a kickback from a third party. 484 F.3d 877, 879 (7th Cir. 2007) ("[N]o *quid pro quo* was entailed."); *id.* at 881 ("Neither Thompson nor anyone else in state government was accused of taking a bribe or receiving a kickback."); *id.* at 883 (distinguishing cases involving "payoffs outside proper channels"). Nor did she act in exchange for political contributions by the contract recipient. *Id.* (observing that "[t]his would be a hard case" if she had). Rather, she merely "pursue[d] the public interest as [she] understood it," apparently in the hope that it would result in improved job security and a salary increase. *Id.* at 882, 884. In the absence of a *quid pro quo*, the court concluded that neither "peace of mind" from added job security nor "a raise approved through normal civil-service means" qualified as private gain under the Seventh Circuit standard. *Id.* at 882–84. The court affirmed this holding in *Sorich*, which was similarly devoid of a bribe or kickback. *See* 523 F.3d at 708-09. These cases, in other words, have nothing to do with whether professional benefits obtained by an employee as a result of a secret *quid pro quo* violate her duty of honest services.

The sole case the defendants cite in which the Seventh Circuit applied *Thompson* to a fact pattern involving a bribe or kickback is *United States v. Blagojevich*, involving efforts by the former governor of Illinois to exchange a Senate seat for a job in the President's Cabinet, or a private-sector job, or a donation to a fund Blagojevich would control. 794 F.3d 729, 734 (7th Cir. 2015) (Easterbrook, J.). But that case also does not help the defendants. Blagojevich's convictions were reversed because the jury instructions did not distinguish exchanging the official act for a private-sector job or donation to a fund Blagojevich would control—which the Seventh Circuit found *would have* qualified as "private benefit"—from exchanging it for a public post, which the

48

court found was simply a "political logroll . . . the swap of one official act for another." *Id.* at 734.
*Blagojevich* thus has no bearing here.[27]

Ultimately, the defendants' argument is that their scheme could not have constituted honest services fraud because the universities benefited from it financially. But that is not true. There is no requirement that an employer be harmed *financially* by an honest-services fraud scheme, and neither is there a bar to liability in the event it financially benefitted.[28] As the name implies, honest services fraud deprives an employer of the "intangible right to [the] honest services" of its employees. 18 U.S.C. § 1346. Thus, as the Supreme Court noted in *Skilling*, in describing the development of the "honest services" doctrine: "Unlike fraud in which the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other, the honest-services theory targeted corruption that lacked similar symmetry." 561 U.S. at 400. "*Even if the scheme occasioned a money or property gain for the betrayed party*, courts reasoned, actionable harm lay in the denial of that party's right to the offender's 'honest services.'" *Id.* (emphasis added). Likewise, "after *Skilling*, Section 1346 requires a Defendant to act in exchange for a bribe or kickback, but whether such actions benefited or harmed the employer who enjoyed a right to the honest services of its employee, is irrelevant." *United States v. Tanner*, No. 17 CR. 61 (LAP),

---

[27] The defendants' fallback argument—that even if the payments constituted a personal benefit to the university insiders, the Indictment is deficient because it contains no allegation that the defendants knew the corrupt coaches would personally benefit, merits little discussion. It is nothing more than a good-faith defense in motion-to-dismiss disguise.

[28] Nor does such a limitation make sense. By the defendants' logic, it would have been criminal if they had paid Heinel *personally* for secretly recruiting their unqualified children, even if she had turned around and paid all the money directly into the USC Women's Athletics Fund. But, they contend, it was *not* criminal for her to engage in the exact same secret *quid pro quo*, as long as she steered their payments directly into the fund, without a pit-stop in her bank account. Such a distinction is silly, and the law does not demand such formalism. Both instances involve using the same payment to secretly induce an employee to breach of her duty of honest services.

2018 WL 1737235, at *6 (S.D.N.Y. Feb. 23, 2018), *aff'd*, 942 F.3d 60, 65 (2d Cir. 2019); *see also United States v. Black*, 530 F.3d 596, 600 (7th Cir. 2008) (rejecting proposition that gain must "be at the expense of the persons (or other entities) to whom the defendants owed their honest services" as "a no harm-no foul argument"), *vacated and remanded on other grounds*, 561 U.S. 465 (2010); *Sorich*, 523 F.3d at 709–10 ("In the case of a successful scheme, the [entity to whom the duty of honest services is owed] is deprived of its servants' . . . honest services *no matter who receives the proceeds*.") (internal quotation omitted; emphasis added). What matters is whether, notwithstanding any financial gain, the employer viewed the scheme as material—and that is a question of fact for the jury. *Rybicki*, 354 F.3d at 145-46 (noting that "actual or intended economic or pecuniary harm to the victim need not be established. The only intent that need be proven in an honest services fraud is the intent to deprive another of the intangible right of honest services.") (citation, internal quotation marks and alteration omitted). The defendants' argument for dismissal of the honest services fraud allegations on this basis therefore also fails.

### b.   Payments made directly to corrupt coaches were not mere gratuities.

The defendants further contend that even the payments made to the corrupt coaches personally were at most gratuities, because Singer arranged with Heinel to direct payments to her personally *after* she fulfilled her end of the bargain.[29]   [D.1038 at 16-19.]   In advancing this

---

[29] The defendants contend that their argument applies equally to the allegations concerning Kimmel's efforts to facilitate her daughter's admission to Georgetown [D.1038 at 19 n.14], but it is unclear how. The Indictment alleges that Kimmel agreed with Singer "in or about 2012 . . . to pay an amount, ultimately totaling $275,000, to facilitate her daughter's admission to Georgetown as a purported tennis recruit," and that "[b]etween on or about September 5, 2012 and on or about September 6, 2013, Singer caused the Key, and later KWF, to pay Ernst $244,000 in monthly installments." [FSI ¶¶ 165, 175.] Kimmel's daughter was admitted to Georgetown on the basis of falsified athletic credentials while this agreement was in effect [FSI ¶¶ 169-171], so any argument concerning the timing of the payments relative to Ernst's actions is inapplicable. Any argument concerning Kimmel's *knowledge* of the arrangement fails for the reasons set forth below.

argument, the defendants acknowledge that payment need not precede the performance of the paid-for act in order to constitute a bribe.  [D.1038 at 16-17.]  "The core difference between a bribe and a gratuity," after all, "is not the time the illegal payment is made, but the *quid pro quo*. . . ."  *United States v. Fernandez*, 722 F.3d 1, 6 (1st Cir. 2013) (quoting *United States v. Griffin*, 154 F.3d 762, 764 (8th Cir. 1998)); *id.* at 23 ("[A] bribe can be promised before, but paid after, the official's action on the payor's behalf.") (quoting *United States v. Jennings*, 160 F.3d 1006, 1015 n.3 (4th Cir. 1998)).  The defendants nevertheless argue that the payments do not constitute bribes because Singer and Heinel did not agree that he would pay her personally, in monthly $20,000 installments, until after she had presented the defendants' children to the USC subcommittee for athletic admissions.  They contend that although "the *timing* of payments is not necessarily dispositive," "the timing of the *agreement* is."  [D.1038 at 16-17.]  They add that there is no allegation that they had knowledge of that agreement.  [D.1038 at 18-19.]

The defendants' argument focuses on the wrong agreement.  What matters is *not* when *Singer agreed with Heinel* to allocate the money to her personally, but when the defendants *agreed with Singer* to make payments to designated athletic programs and/or to Singer's purported charity with the understanding that those payments were a *quid pro quo* in exchange for having their children recruited as athletes based on falsified credentials.[30]  In every case, the Indictment alleges that the parents' agreements pre-dated the bogus recruitment—although their arrangement with Singer was that they would pay for the fraud only *after* their children had been at least conditionally

---

[30] Indeed, this would remain true even if Singer never paid Heinel at all, but simply pocketed the money and hid that fact.  *See United States v. Potter*, 463 F.3d 9, 16-17 (1st Cir. 2006) (wire fraud punishes devising a scheme to defraud, and conspiracy punishes an agreement to do the same).  The defendants' focus on whether (and when) their payments actually made their way to Heinel's pockets is therefore misplaced.  [D.1038 at 4 n.5 & 18.]  So, too, is Wilson's suggestion that the allegations against him fail to state a claim "[b]ecause his donation is not even alleged to have enriched any individual."  [D.1038 at 20.]

admitted.  The fact that Singer later arranged with Heinel to re-allocate those payments to her personally, instead of to the fund she had designated at USC, is irrelevant.  By that point, the parents had already agreed to the illicit *quid pro quo*.  Moreover, an honest services fraud defendant need "not know the precise way in which the money would reach [the intended recipient]"—he only has to expect that it would.  *Potter*, 463 F.3d at 15 (affirming honest services and conspiracy to commit honest services fraud convictions over an argument to the contrary).[31]  Here, the government alleges that the defendants knew their children would be recruited by a corrupt university insider as fake athletes in exchange for money.  How that money was allocated—whether to a university fund, to the insider personally, or to both (as it ultimately was here)—is irrelevant, as is whether the allocation changed over the course of the conspiracy.  The crime is the same.

## IV.   THE DEFENDANTS' CHALLENGES TO THE FEDERAL PROGRAMS BRIBERY CONSPIRACY AND SUBSTANTIVE COUNTS ARE EQUALLY MERITLESS.

As noted, Count Two of the Indictment charges 11 of the defendants with conspiracy to commit federal programs bribery, and Counts Eleven and Twelve charge Wilson with substantive federal programs bribery.  The defendants' arguments for dismissal of these counts mirror their arguments for dismissal of the honest services fraud charges [D.1038], and fail for the same reasons.  As set forth above, payments to third-parties—here, the university accounts that the corrupt insiders designated—may constitute a "thing of value."[32]  The defendants' motion to dismiss these counts should therefore be denied.

---

[31] And, as noted, each conspirator need not know all the details of the conspiracy.  *Berroa*, 85 F.3d at 154.

[32] It is likewise irrelevant for purposes of federal programs bribery whether the money actually ended up in the coaches' pockets.  *See* 18 U.S.C. § 666(a)(2) (criminalizing a mere "offer"

## V.  THE DEFENDANTS' CHALLENGE TO THE MONEY LAUNDERING CONSPIRACY COUNT IS WITHOUT MERIT.

The defendants separately move to dismiss Count Three, charging money laundering conspiracy, on the basis that it does not properly allege a transaction involving proceeds of a specified unlawful activity. [D.1040.] That is not true. The Indictment alleges that the defendants agreed to conduct money laundering transactions involving proceeds of the charged fraud scheme. For that reason, their motion should be denied.

### A.  Applicable law.

Because "the money laundering statute is meant to punish a separate offense from the underlying 'specified unlawful activity'. . . it criminalizes separate financial transactions involving the funds derived from such illegal activity." *United States v. Castellini*, 392 F.3d 35, 45 (1st Cir. 2004). In short, "'money laundering criminalizes a transaction in proceeds, not the transaction that creates the proceeds.'" *Id.* at 48 (quoting *United States v. Mankarious*, 151 F.3d 694, 705 (7th Cir. 1998)); *see also United States v. Richard*, 234 F.3d 763, 769 (1st Cir. 2000) ("'[T]he laundering of funds cannot occur in the same transaction through which those funds first became tainted by crime.'") (quoting *United States v. Butler*, 211 F.3d 826, 830 (4th Cir. 2000)); *Mankarious*, 151 F.3d at 704 ("A money launderer must obtain proceeds *before* laundering can take place.").

It is not a requirement, however, "that the underlying crime must be fully completed before any money laundering can begin," or that "the two crimes involved . . . be entirely separate in time." *Castellini*, 392 F.3d at 48. Rather, "[o]nce the basic elements of the underlying crime are

---

of something of value); *see also United States v. Ring*, 706 F.3d 460, 467 (D.C. Cir. 2013) ("That the official need not accept that offer for the act of bribery to be complete is evident from the structure of the statute, which defines two separate crimes:  the act of offering a bribe and the act of soliciting or accepting a bribe.").

sufficiently far along to create proceeds . . . the money becomes proceeds of illegal activities and it can be laundered." *Id.* Accordingly, a number of circuits, including the First Circuit, have held that proceeds are derived from a completed offense *or* a completed phase of an ongoing offense. *See Richard*, 234 F.3d at 770 (sustaining conspiracy and substantive money laundering convictions under 18 U.S.C. § 1957 where the government introduced sufficient evidence that the defendant's acceptance of checks constituted a completed phase in the ongoing bankruptcy fraud and that the defendant committed separate acts to launder the proceeds after he took them into his possession); *see also United States v. Nunez*, 419 F. Supp. 2d 1258, 1267 (S.D. Cal. 2005) ("The Ninth Circuit has said that 'proceeds' must be from a previous and completed criminal activity. . . . The First, Second, Third, Fourth, and Seventh Circuits have applied broader language, to include an already completed offense, *or completed phase of an ongoing offense.*") (citations and internal quotation marks omitted) (emphasis in original).

### B.   The Indictment properly alleges conspiracy to commit money laundering.

The defendants are all charged with conspiracy to commit money laundering by agreeing to conduct financial transactions involving the proceeds of specified unlawful activity—here, mail and wire fraud and honest services mail and wire fraud—knowing that the transactions were designed, at least in part, to conceal the nature and source of the proceeds. The defendants correctly note that, to properly charge a money laundering conspiracy under Section 1956, an indictment must allege that the financial transactions the defendants conspired to conduct involved proceeds of a specified unlawful activity. *See United States v. Misla-Aldarondo*, 478 F.3d 52, 68 (1st Cir. 2007). But the defendants' contention that the Indictment fails to do so in this case is plainly incorrect under First Circuit law.

The fraud scheme in which the defendants engaged created proceeds that the defendants agreed would be laundered through one of two entities:  KWF, Singer's purported charity, or The Key, his for-profit company.  The Indictment alleges that the defendants agreed with Singer to pay various amounts to engage in the scheme to secure their children's admission to selective colleges using fraudulently obtained test scores, bogus academic and athletic credentials, falsified applications, and bribes.  It alleges that each defendant paid at least a portion of the agreed-upon amount to KWF or The Key.  And it alleges that the defendants funneled the payments through Singer's entities to conceal the scheme.

In other words, the defendants made payments to Singer's entities with the intention that all or a portion of the money they paid would thereafter be used to further their bribery and fraud scheme.  And the defendants agreed with Singer to structure the transactions in this manner to conceal their illegal activity, so that the bribe and other payments would not be traced back to them.  This is precisely the type of conduct that the money laundering statute is intended to penalize.  *See Castellini*, 392 F.3d at 49 ("The money laundering of the proceeds of an underlying illegal activity may make the underlying crime more difficult to detect or to prove.  And Congress wanted to curtail the separate market of criminal activity which money laundering represents.").

The defendants' payments to KWF and The Key constituted completed wires or mailings in furtherance of the underlying scheme—rendering them guilty of wire or mail fraud at that moment, even without more.  But the scheme continued, and the payments thus also constituted a completed phase of that ongoing scheme.  Accordingly, the moment the defendants made those payments to Singer's entities, their clean funds became "tainted by crime," *Richard*, 234 F.3d at 769, and became proceeds of the specified unlawful activity.

Once this *first* phase of the scheme was complete, Singer used those proceeds to make the payments necessary to complete the *next* phase of the scheme.  These second-level transactions— the purported donations to athletic programs, payments to Dvorskiy, Ernst, Heinel, and others personally, and payments to Riddell and others to facilitate the scheme—were money laundering transactions, separate and distinct from the transactions that created the proceeds in the first place.

The First Circuit has upheld money laundering convictions on similar facts.  In *Richard*, for example, a defendant appealed his conviction for money laundering on the basis of his contention that the predicate offense of bankruptcy fraud was not complete because the funds he received from investors had not yet been deposited into the account of a co-conspirator's dummy corporation to conceal them from the bankruptcy court.  234 F.3d at 769.  On that basis, he argued, the money did not yet constitute proceeds of the bankruptcy fraud, and was therefore not "criminally derived," as required by Section 1957.  *Id.*  The First Circuit *rejected* that argument, finding that there was sufficient evidence from which a jury could conclude that, having commenced a bankruptcy fraud scheme, the defendant's acceptance of investor checks constituted a completed phase of that scheme—and the money therefore constituted proceeds of the scheme even before it was transferred into the dummy account.  *Id.* at 770.  That is, "the defendants' fraudulent scheme generated proceeds, and then [the defendant] committed separate acts to launder the proceeds after he took them into his possession."  *Id.*

The defendants attempt to distinguish *Richards*, and a similar bankruptcy fraud and money laundering case from the Ninth Circuit, *United States v. Nunez*, 419 F. Supp. 2d 1258 (S.D. Cal. 2005), on the basis that, unlike the defendants in those cases, they were not engaged in an ongoing crime.  [D.1040 at 13.]  But that is not true.  Indeed, the Indictment alleges, and the evidence at trial will show that the defendants' scheme worked in phases, with certain payments made at the

time their children were conditionally admitted, for example, and other payments made upon

formal admission.  As in *Richards*, the defendants here completed a phase of their scheme (and an

independent crime) as soon as they made their payments to KWF or The Key, and those payments

thus constituted proceeds of that scheme.  And as in *Richards*, the laundering of those funds

occurred in the next phase of the scheme, when Singer transferred those proceeds to other co-

conspirators.

Moreover, because the defendants are charged with money laundering *conspiracy*, they are

liable for the acts of their co-conspirators.  Those acts include the payments those co-conspirators

made to Singer's entities—all of which created proceeds that were commingled in the accounts of

KWF and The Key—and Singer's subsequent laundering of those proceeds through the bribe and

other payments he made from those accounts.  As the First Circuit explained in *Misla-Aldarondo*:

> [W]e should not forget that here [the defendant] was charged
> with *conspiracy* to commit both money laundering and extortion,
> and therefore is liable for the acts of his co-conspirators.  Indeed, the
> indictment specifically references the facts of Count 1 (the
> conspiracy to extort) to describe the source of the unlawful
> funds applicable to both Counts 3 and 4 [the money laundering
> conspiracy counts].  Since [the defendant] is liable for the acts of his
> co-conspirators . . . a reasonable jury could have found that the act
> of extortion was sufficiently complete upon [his co-conspirator]
> taking control of the funds from [the hospital].  Any of the
> concealing transactions that follow thus would clearly involve
> proceeds of unlawful activity.

478 F.3d at 68–69 (emphasis in original).  As in *Misla-Aldarondo*, once Singer took control of the

funds from the defendants, the underlying offense was sufficiently complete that the concealing

transactions that followed—the bribe and other payments out of Singer's accounts—involved

proceeds of specified unlawful activity.

Instead of grappling with First Circuit law, the defendants rely on a readily distinguishable

case from the Western District of Missouri, *United States v. LaBrunerie*, in which the defendants

were charged with conspiracy to commit bribery and money laundering for paying a city councilman to take various actions beneficial to them.  914 F. Supp. 340, 342 (W.D. Mo. 1995). [D.1040 at 13.]  The specified unlawful activity was federal programs bribery.  *See id.* at 344.  The government's theory was that the predicate offense was complete as soon as the defendants *offered* to pay bribes, and money laundering occurred when they prepared to pay those bribes by purchasing a check from the bank.  *See id.* at 344-45.  The court, adopting the report and recommendation of the magistrate judge, rejected that theory, finding that money "set aside" as a result of a mere agreement to pay bribes did not represent "proceeds" of the bribery scheme because "[t]he money [the defendants] earmarked to pay [the councilman] was in their control before they allegedly entered the [bribery] agreement; it was not money that came into their hands because of the agreement."  *Id.* at 342.

This case is different.  Here, the proceeds of the fraud scheme did not result from the conspirators' mere "agreement" to pay bribes.  Rather, the money became proceeds only after it was paid by the parent defendants to Singer's charitable foundation or for-profit corporation, thereby completing the first phase of the scheme (and giving rise to an independently chargeable crime).  The purpose of funneling the money through Singer's entities, disguised as either a charitable "donation" or a payment for college counseling services, and then commingling it with other co-conspirators' money, before distributing it to still other co-conspirators in the second phase of the scheme—either as a direct payment or as another purported "donation"—was to conceal its nature, location, source, ownership, and control.  Unlike *LaBrunerie*, there were thus *two separate* sets of transactions:  the payments the defendants made to KWF and The Key, followed by the bribe and other payments Singer made using those proceeds.  This two-step process served no legitimate purpose.  And in contrast to *LaBrunerie*, Singer did *not* use untainted

funds already in his possession to make the bribe payments.  He used the *defendants'* money, which was not under his control before the completion of the first phase of the scheme, and which came into his hands only because of that scheme.  *Cf. LaBrunerie*, 914 F. Supp. at 347 (magistrate judge recommending that the money laundering counts be dismissed because "neither §1956 nor § 1957 criminalize monetary transactions conducted with money *which has not yet been received* by the person committing the predicate offense) (emphasis added).[33]  This is quintessential money laundering:  the use of a "clean" entity, and the guise of a legitimate transaction, to "wash" money by masking where it came from, who it belonged to, and what it was for.

Finally, the defendants assert that the Indictment fails to allege specific monetary transactions, when those transactions occurred relative to the specified unlawful activity, and who participated in them.  [D.1040 at 13-15.]  But the defendants are charged with *conspiracy*, not substantive money laundering, and such detailed allegations are not required.  The Indictment plainly alleges that the defendants *agreed* with Singer to conduct financial transactions—the bribe and other payments Singer made from accounts in the name of KWF and The Key—knowing that the funds involved in those transactions were the proceeds of their fraud scheme, and that the transactions were designed, at least in part, to conceal the nature, location, source, ownership, and control of those proceeds.  That is all that is required.  *See United States v. Hynes*, 467 F.3d 951, 964 (6th Cir. 2006) (government need only prove that defendant "agreed with another person to

---

[33] Other cases the defendants cite are similarly distinguishable.  In *United States v. Christo*, 129 F.3d 578, 580 (11th Cir. 1997), for example, the court found that the withdrawal of funds charged as money laundering was one and the same as the underlying criminal activity of bank fraud and misapplication of bank funds.  *See also United States v. Gregg*, 179 F.3d 1312, 1315 (11th Cir. 1999) (noting that, in *Christo*, "the bank-fraud charge and the money-laundering charges were predicated on the same transaction, writing checks on accounts with insufficient funds and causing the bank to pay those checks through the check-kiting scheme").  Here, by contrast, there are two separate sets of transactions.

violate the substantive provisions of the money-laundering statute during the period alleged in the indictment"). The defendants cite no support for their contention that, to properly allege conspiracy, the money laundering transactions must be specifically identified, and fully traced back to the transactions that created the proceeds.

Accordingly, the defendants' motion to dismiss Count Three should be denied.

## **CONCLUSION**

For all the reasons set forth above, the defendants' motions should be denied.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: */s/ Leslie A. Wright*
ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
KARIN M. BELL
STEPHEN E. FRANK
ALEXIA DEVINCENTIS
RANDALL KROMM
Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated: May 8, 2020                    */s/ Leslie A. Wright*
Assistant United States Attorney