UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

DAVID SIDOO et al.,

Defendants.

No. 1:19-cr-10080-NMG

## MOTION FOR RECONSIDERATION REGARDING THE APPLICABILITY OF THE COURT'S MAY 8, 2020 ORDER TO DEFENDANT JOHN WILSON

In its May 8, 2020 Order (the "Order"), the Court denied the defendants' motion to dismiss the indictment based on government misconduct (ECF No. 971). The motion was jointly filed and denied as to all defendants. Defendant John Wilson respectfully moves the Court to reconsider the denial of the motion with respect to the suppression of evidence concerning Wilson, because the undisputed facts show that:

a. The Singer-Wilson consensual tapes misrepresent facts concerning Wilson;

b. An unrecorded FaceTime call between Singer and Wilson on September 28, 2018 provided highly exculpatory context for the subsequent, misleading recordings, and Singer and the Government have taken steps to remove all traces of this call from text messages, reports, and notes; and

c. Wilson will not be able to adequately address these issues at trial, because Singer in unlikely to be candid about the events, and the government may well seek to offer the tapes without calling him to testify.

The Court has stated that "[a]n evidentiary hearing is required if . . . not only are there material facts in doubt but also . . . those facts cannot be resolved on the papers." Order 10. The facts concerning Singer's deceptive calls to Wilson are not in doubt, because the Government

has chosen not to dispute Wilson's affidavit and related evidence.  The undisputed facts establish that any use at trial of the Singer-Wilson calls, and the evidence they generated, would reward government misconduct, impede the jury's ability to find the facts, and cause injustice.  Wilson therefore moves the Court to reconsider whether the Order should apply to the evidence concerning Wilson.

## I.   BACKGROUND

Prior briefs have described the facts concerning Wilson's prosecution.  *See* ECF Nos. 699, 972, 995.  The following paragraphs highlight the facts central to the instant Motion.

### A.   Historical Context:  USC Application in 2013

Wilson's son applied to the University of Southern California in 2013.  Wilson's son was a gifted water polo player:  a starter on several nationally competitive teams, a regional all-star, and a member of the United States Olympic Development Program.  USC accepted Wilson's son, and he participated on the school's water polo team as planned.  Wilson made a donation to USC's water polo team, for which USC sent him a thank-you letter.  Singer told Wilson at all times that this donation—and Singer's strategies in general—were honest, above-board, and approved by the university.  *See* ECF No. 972-43 ¶¶ 3-4 ("Wilson Aff.").[1]

### B.   Immediate Context:  First Two Substantive Calls of September 2018

In early September 2018, Wilson and Singer began discussing the 2020 college applications of Wilson's daughters, who had just begun their junior year of high school.  The first conversation about this occurred on September 15, several days before Singer learned of the investigation's existence.  On that call, captured by the government's wiretap, Singer

---

[1] Singer, who was planning to steal $100,000 of Wilson's gift, had a significant interest in seeing Wilson's son accepted; he apparently decided to send USC an exaggerated description of Wilson's son's already impressive accomplishments.

emphasized the legitimacy of his program:  he stated that he planned "730 of these side doors this year" at "50 or 60" universities; and he asserted that, because he had already arranged four such donations at Harvard, the President of Harvard University himself wanted "to do a deal with [Singer]."  ECF No. 995-13, at 9, 11.  Consistent with his descriptions of Wilson's donations to the water polo team five years earlier, Singer did not tell Wilson that his donations would go to "a coach" personally, would corrupt any university personnel, or were in any way improper.

The second discussion about the Wilson daughters was a 33-minute video call on the Apple FaceTime application.  The call took place on September 28, by which time Singer was cooperating.  Singer made the call from the FBI's offices in the middle of a proffer session, with the government's advance knowledge, and with six prosecution team members present.  Exs. 1-2.

During that call, Singer again underscored the permissibility of "side door" donations, which he said universities used as a "common fundraising method."  Wilson Aff. ¶ 8(c).  Singer added, moreover, that "[s]chools knew and accepted that applicants utilizing the side-door program did not have to be athletes capable of competing on the school's varsity sports team, and did not need to be accomplished athletes.  They could be team assistant managers or have similar nonplaying roles."  *Id.* ¶ 8(b).

Even though Singer had at least one telephone that automatically recorded all calls, he used an unrecorded technology for the September 28 call.  The prosecution team made this call disappear.  They refrained from recording, transcribing, or otherwise memorializing the call.  They did not mention it in their interview memoranda or notes, other than to say inscrutably that, at the time Singer made the call, "[a] break was taken" in the interview.  Ex. 1; ECF No. 1141, at 7.  They also allowed Singer to delete text messages relating to the call.  Wilson Aff. ¶ 11; Order

3.  More recently, the government evaded defense counsel's repeated requests for an explanation of this conduct.  Ex. 2.  And although the three affiants in support of the government's Sur-Reply were present at the September 28 proffer session, and all participated in the "break" to allow Singer to call Wilson, their affidavits do not even mention the Singer-Wilson video call; nor does the 302 report of Singer's April 2020 interview.

        C.        **The Government's Interference with Singer's Narrative**

By late September, government agents were well-acquainted with Singer's pitches to parents, such as those he made in his first two substantive calls with Wilson that month.  The agents knew that Singer told parents that they would be making legitimate donations to university programs.  The government was therefore concerned that Singer's unscripted conversations did *not* show that parents such as Wilson "understood that their money would be used to induce a university insider to commit fraud."  ECF No. 1104, at 3-4 ("Sur-Reply").  From the prior recordings—the government admits—it was *not* "obvious that that the money would be a quid pro quo for fraud."  *Id.* at 5.

The agents wanted Singer to say "that the money went 'to the coach.'"  *Id.* at 3.  Singer "pushed back."  Singer 302 (ECF No. 1104-4) 1.  He was "particularly resistant" to the government's instructions with regard to parents, such as Wilson, whom "he had already told . . . that their money would go to an athletic program, not a coach."  Sur-Reply 5.

But the government instructed Singer that "quid pro quo and bribe were the same," and there is no "legal distinction between a 'donation' to a 'program' and a 'payment' to a 'coach.'"  Sur-Reply 3; Singer 302, at 2.  They held "tense calls," during which Special Agent Keating "raised her voice somewhat" (in the government's retelling).  Sur-Reply 3.  Singer's real-time understanding was that agents were requiring him "to tell a fib and not restate what I told my

clients as to where [their] money was going[—]to the program not the coach[—]and that it was a donation and they want it to be a payment." ECF No. 972-1, at 2.

### D. Ensuing Evidence Concerning Wilson

The government asserts that, in the telephone calls Singer complained about in his iPhone notes, he "was discussing *future* or *ongoing* conduct." Sur-Reply 5. According to the government, those calls concerned "only one . . . remaining defendant in this case," namely Wilson. *Id.* at 3; Order 2, 7.

The "fib" that Singer described the government forcing into his mouth is apparent in transcripts of Singer's subsequent calls with Wilson. But not because those calls made any crime "obvious" (as the government says, Sur-Reply at 5). For instance, Singer did not say to Wilson, as he told another parent, that a "coach . . . wants [Singer] to wire him the $100,000 bribe." ECF No. 699-11, at 2. He did not say that any payment would personally benefit a university employee. He never characterized *anything* he advised Wilson to do as wrong.

Instead, Singer scattered his calls to Wilson with ambiguous comments about "payment" to "the coach," creating a record of sinister overtones—especially without the context, namely Singer's prior descriptions of his plan as lawful and university-approved. Thus, in a recorded call one day after the September 28 unrecorded video call, Singer interspersed references to "the coach," even as Wilson repeatedly indicated that he intended donations to universities:

> WILSON:    . . . I remember last time I did this, you didn't really make any money . . . [Y]ou make *a donation to the school*, and that's it? . . .
>
> SINGER:    . . . [W]hat I'll do is I'll split the money potentially *to the coach* or other . . . parties that are [at] that school that need the money . . . Or it may go right *to the coach* . . .
>
> WILSON    . . . [S]o you [i.e., a donor] don't actually get credit for *a donation to the school*, or get hounded for that.

ECF No. 972-45, at 7-8 (emphasis added).  Likewise, an October 15, 2018 call included the following exchange:

> SINGER:   . . . You're gonna make the payments *to the schools* and the—*to the coaches*.  And that's what I need . . .
>
> WILSON:   Uh, uh, help me understand the logistics?  I thought I make the payment to you and you made the payment *to the school*.
>
> SINGER:   Correct. That's correct.
>
> WILSON:   Oh you said that *I* make the payments *to the schools*.

ECF No. 995-16, at 3 (first, second, third, and fifth emphases added).  Finally, on a November 5, 2018 call, Singer made short, ambiguous comments about paying a "coach," ECF No. 972-46, at 4, 8 ("I have to pay the coach"; "we'll pay the coach"; "we pay the coach"); while simultaneously implying that the plan continued to be a legitimate donation, *id.* at 4 ("women's lacrosse is always looking for help.  Women's fencing, looking for help").  Wilson remained oblivious, inquiring about the "budget" (which a program would have, but not an individual). *Id.* at 5.[2]

## II.   ARGUMENT

"When faced with a motion for reconsideration, district courts should apply an interests-of-justice test."  *United States v. Siciliano*, 578 F.3d 61, 72 (1st Cir. 2009) (citing *Greene v. Union Mut. Life Ins. Co. of Am.*, 764 F.2d 19, 23 (1st Cir. 1985)).  The interests of justice support

---

[2] In subsequent conversations, Singer urged Wilson to make a "deposit" on his donations, to which Wilson agreed.  This Motion applies to any other such evidence that is a fruit of the Singer-Wilson consensual calls, such as the deposit payments, all of which resulted from the same government-orchestrated manipulations.

reconsideration of the Order's applicability to Wilson, because the briefing has made clear that reasons unique to Wilson warrant bespoke treatment of the evidence concerning him.[3]

The heart of the problem is that interlocking government tactics have created evidence that would mislead the jury and impair the justice-seeking mission of the courts:

- Through intimidation and misstatements of law, government agents caused Singer to insert misleading statements—designed for the jury's ears—into recorded calls with Wilson.

- The unrecorded September 28 exculpatory call served as a "set-up" call for the subsequent misleading conversations. Purposefully, recklessly, or both, the government caused Singer to provide Wilson with unrecorded and unmemorialized exculpatory context to subsequent calls. That context included (a) assurances that the plan for the Wilson girls, like the prior plan for Wilson's son, included legitimate, university-approved donations; and (b) a further assurance that "side door" programs would now welcome the Wilson daughters, without deception, because "[t]hey could be team assistant managers or have similar nonplaying roles." Wilson Aff. ¶ 8(b).[4]

The interplay of these actions means that Singer's consensually recorded calls with Wilson could only mislead the jury regarding Wilson's intent.

---

[3] Although this brief focuses on suppression, Wilson stands on the defendants' collective argument for dismissal with prejudice.

[4] There is little probative significance to Singer's isolated comment to Wilson, in a later conversation, that Stanford's sailing coach does not want "Stanford [to] catch on to what he is doing." ECF No. 1066-1, at 176. This remark was contrary not only to Wilson's conduct in connection with the application of his son, but also to the explicit reassurances that Singer offered Wilson on the September 28 FaceTime call. Wilson Aff. ¶ 7.

The government claims that it shifted Singer's rhetoric away from "donation to a program" and toward "payment to a coach" in order "to ensure that the crime would be obvious." Sur-Reply 3, 8.  In the context of the calls between Singer and Wilson, this assertion makes no sense.  To most parents, the phrase "payment to a coach" would be ambiguous, denoting either a donation to a program or an improper bribe.  *See* Sur-Reply 4 (discussing Parent A).  But Wilson had already spoken to Singer at length about lawful plans for legitimate donations; he had already donated to USC, with USC's knowledge; and Singer had already told Wilson, in their first two substantive calls of September 2018, that he planned for Wilson to make additional above-board donations (such as those approved by the President of Harvard).  This context ensured that oblique references to a "coach" would *not* alert Wilson to any potential wrongdoing; such comments would only mislead a jury into imagining improper intent.  Suppressing the Singer-Wilson calls would therefore serve twin goals—both discouraging destructive prosecutorial behaviors and sparing the jury from unfairly prejudicial evidence lacking real probative value.  *See* Fed. R. Evid. 403.

The thrust of the reasoning described in the Order does not apply to Singer's calls with Wilson.  The Court found that Singer's iPhone note concerned "primarily" a sting operation targeting future or ongoing conduct, Order 7; but Wilson was one of the parents that the operation targeted (according to the government).  Sur-Reply 3.  The Court also noted that relevant facts were "addressed on the record by the proffered affidavits of federal agents and an AUSA which unequivocally deny the investigatorial misconduct," Order 10; but the agents, the AUSA, Singer, and the government's briefs all refuse to address the government's misconduct in connection with the September 28 FaceTime call and the deletion of Singer-Wilson Family texts—ignoring, but not denying, the facts surrounding that call and its content.

Lastly, the Court wrote that the defendants "will have ample opportunity to cross examine [Singer] if and when he testifies at trial." Order 7. Realistically, however, if the jury hears out-of-context discussions about "paying a coach," it will be difficult to unring that bell. Moreover, the qualification "*if* and when [Singer] testifies" looms large where the government has indicated that it may not call Singer to testify at trial (but may try to offer recordings through another witness); that scenario in particular would imperil Wilson's constitutional right to remain silent, because testifying will be his only way to address the critical context—the set-up call—of which the government made no record, which it has concealed, and for which it offers no explanation.

### III. CONCLUSION

For the foregoing reasons, Wilson moves the Court to reconsider the applicability of the Order to Wilson, and exclude from trial all consensually recorded calls between Singer and Wilson, as well as related evidence relating to or arising from those calls.

Respectfully submitted,

John Wilson,

By his Counsel,

/s/ Michael Kendall
Michael Kendall (BBO # 544866)
Yakov Malkiel (BBO # 689137)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
yakov.malkiel@whitecase.com

Andrew E. Tomback (pro hac vice)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8428
andrew.tomback@whitecase.com

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULES 7.1 AND 112.1

I hereby certify that, before filing this motion, defense counsel attempted in good faith to confer with the government to resolve or narrow the issues.

/s/ Michael Kendall
Michael Kendall

## CERTIFICATE OF SERVICE

I hereby certify that the above document is being filed on the date appearing in the header through the ECF system, which will send true copies to the attorneys of record.

/s/ Michael Kendall
Michael Kendall