UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID SIDOO et al.,<br><br>Defendants. | No. 1:19-cr-10080-NMG |

**DEFENDANT JOHN WILSON'S REPLY BRIEF IN SUPPORT OF HIS MOTIONS TO SEVER, TO DISMISS, AND TO STRIKE**

Defendant John Wilson submits this reply in further support of his motions to sever, to dismiss, and to strike (ECF Nos. 992, 993, 994).  In its opposition to these motions (ECF No. 1135), the government:  rebuts none of the reasons why a severed trial of Wilson alone would promote fairness and efficiency; concedes that the charged substantive offenses are factually impossible; and generally resists Wilson's motions by insisting on the implausible theory that Wilson and hundreds of other individuals took part in a single, overarching, nationwide conspiracy.  The Court should grant Wilson's three motions.

### I.   MOTION TO SEVER

The government's Opposition brief does not deny the facts described in Wilson's opening memorandum.  Those facts make clear that severance would contribute to both fairness and efficiency.

The government's arguments otherwise arise from its fixation on conceptualizing this case as an "overarching," "nationwide" conspiracy.[1]  It is that attitude that produces the

---

[1] *See, e.g.*, Press Release, U.S. Att'y's Office, Dist. of Mass., Arrests Made in Nationwide College Admissions Scam, https://www.justice.gov/usao-ma/pr/arrests-made-nationwide-college-admissions-scam-alleged-exam-cheating-athletic (Mar. 12, 2019).

tautological assertion that "virtually all the evidence" involving *any* defendant is "independently admissible" against Wilson.  Opp'n 7.  In truth, the Indictment reveals that Wilson's two engagements of Singer had no connection to Singer's work with any other parents; the Indictment does not identify a single act concerning another parent that—even according to the government—Wilson agreed to.  Common sense, too, belies the idea that Wilson agreed with other parents to fraudulently facilitate the college admissions of those other parents' children, or that other parents agreed to commit fraud in service of Wilson's children's applications.  Accordingly, at a trial of Wilson alone, evidence regarding conduct that Wilson undisputedly did not commit, did not agree to, and did not know about would be properly excluded under Federal Rules of Evidence 401 and 403.

In any event, the counterintuitive fiction of a single, nationwide conspiracy does not bind the Court's discretionary severance determinations.  *See United States v. Leichter*, 160 F.3d 33, 35 (1st Cir. 1998) (discussing the District Court's "power to order separate trials ' . . . as an aspect of its inherent right and duty to manage its own calendar'" (quoting *United States v. Gay*, 567 F.2d 916, 919 (9th Cir. 1978))).  A more realistic analysis supports severance because the allegations, evidence, and legal theories concerning Wilson differ in detail and in nature from those concerning other defendants.  *See* ECF No. 995, at 2-10, 12-15 ("Wilson Mem.").  The following paragraphs reiterate the key distinctions.

*First*, the Indictment emphasizes the contacts and financial dealings between Singer and Donna Heinel, whom the Indictment mentions 25 times.  Heinel is irrelevant to Wilson's conduct, and would not need to be discussed at his trial; when Wilson made his donation to USC

water polo—which the university acknowledged with a written thank you note—Singer had not even met Heinel.[2]

*Second*, Heinel's conduct ultimately veered away from the pattern of donations to programs that Singer described to parents such as Wilson. As the government concedes, "Wilson's money went to a USC athletic program," Opp'n 8, and Singer never suggested any contrary plan to Wilson. By contrast, the Indictment alleges that Heinel accepted *personal* payments from Singer. Indictment ¶¶ 119, 121. The government's effort to minimize the importance of that distinction is disingenuous given (a) the Indictment's specific references to payments into Heinel's pocket (*id.*); (b) the Indictment's repeated allegation that the defendants agreed to "enrich[] . . . the recipients of the bribes" (*id.* ¶¶ 65, 280)[3]; (c) the government's recently disclosed belief that, to obtain evidence of a crime, it needed Singer to discuss "a 'payment' to a 'coach'" in calls with parents (ECF No. 1104, at 3-4, 9); and (d) the government's resulting "[l]oud and abrasive" browbeating of Singer "to tell a fib and not restate what [he] told [his] clients as to where [their] money was going[—]to the program not the coach[—]and that it was a donation [not] a payment" (ECF No. 972-1).

The distinction between a donation to the alleged victim (here, USC) and a payment to the pocket of a "rogue employee" is central to the legal definition of a bribe (*see* ECF No. 1038); to the government's likelihood of proving a "bad purpose, either to disobey or disregard the

---

[2] The government states that "Wilson's arrangement with Vavic . . . eventually led Singer to Heinel." Opp'n 7. That is both irrelevant—because it has no bearing on guilt or innocence—and incorrect: Singer came into contact with Heinel, in mid-2015, not through Vavic but through USC Athletic Director Pat Haden. *See* ECF No. 995-4.

[3] The Indictment's allegations regarding Singer's payments to Heinel and the defendants' alleged intent to "enrich" her are perplexing given the government's recent admission that *none* of Singer's clients "understood Heinel to be personally pocketing money." ECF No. 1104, at 8.

law"[4]; to its likelihood of proving "wrongful, immoral, depraved, or evil" behavior[5]; and to the overall venality of the conduct presented to the jury.  Indeed, the government has not cited a single decision in which money provided 100% to a "victim" employer, for one of the employer's lawful operations (here, the water polo program), was deemed a "bribe" that defrauded the employer-victim.  A trial of Wilson should not be infected by the (likely extensive) evidence regarding Heinel and Singer's payments to her.

*Third*, the government misses the point when it asserts that Wilson was not "the only defendant whose child actually played the sport."  Opp'n at 6.  The charges against the defendants require proof of willful, knowing, materially false representations intended to defraud the universities.  1st Cir. Pattern Jury Instructions § 4.18.134.  Wilson's son was not only a high-caliber water polo player; he also—alone among the children of the indicted defendants—*joined and contributed to* the college athletic team to which he was recruited.  That is the context in which the government must persuade a jury that Wilson possessed the requisite intent to defraud USC through material falsehoods.  It would be unfairly prejudicial, as well as inefficient, for the government to sway Wilson's jury through evidence regarding parents alleged to have known that, though their children applied as athletes, they never went on to play (and never intended to do so).

*Fourth*, the government does not meaningfully dispute that the specific facts and allegations concerning Wilson would inject unnecessary complications into a joint mega-trial, likely increasing the length of that trial by 5-6 days dedicated to Wilson-specific evidence. There is no rational reason to burden a multi-defendant trial with evidence regarding the

---

[4] 1st Cir. Pattern Jury Instructions § 4.18.134 (defining "willfully").

[5] *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005) (defining "corruptly").

practices of USC's water polo program; evidence regarding Wilson's son's stellar water polo credentials and water polo career at USC; testimony from multiple witnesses about Wilson's 2014 tax return and general tax-related practices; time-consuming analysis of the more-than-a-dozen lengthy recordings of telephone calls Singer had with Wilson while he was cooperating (should the Court decline to suppress them); testimony regarding the circumstances through which the government created those recordings (again, should the Court decline to suppress them), including an unrecorded, exculpatory "kick off" call with Wilson that the government has taken pains to obscure (*see* ECF No. 1184); other evidence relating to the substantive counts against Wilson alone; and jury instructions concerning both the tax count and the substantive counts.

For these reasons, a short, severed trial of Wilson alone—likely 9-11 days long—would best serve both the interests of justice and the Court's trial docket. *See Leichter*, 160 F.3d at 35.[6]

## II.   MOTION TO DISMISS

The government concedes that the substantive charges it piled on against Wilson (Counts Six, Eight, Nine, Eleven, and Twelve) were factually impossible, because the government orchestrated the conduct at issue from the outset.[7] The arguments that the government offers to rescue those charges are unpersuasive.

---

[6] The government states repeatedly that a severed trial "would heighten the risk of inconsistent verdicts." Opp'n 1, 5. But even where the government charges conspiracy, it is almost never truly "inconsistent" for juries to acquit one defendant and convict another. *See United States v. Bucuvalas*, 909 F.2d 593 (1st Cir. 1990).

[7] The defendants have jointly moved to dismiss the conspiracy counts (Counts One, Two, and Three). *See* ECF Nos. 1037, 1039, 1041. The reasons presented in those motions similarly mandate dismissal of the substantive counts against Wilson, because the wires and payments charged in those counts concerned no "bribe," and sought no "property," within the legal meanings of those terms. *See* Wilson Mem. 16-18; ECF Nos. 1038, 1042.

The government begins by citing commonplace propositions about elements that wire fraud and federal program bribery do *not* require: wire fraud does not require the "success . . . of a scheme," and federal program bribery can be committed through an "offer" of a bribe, even if the "official [does] not accept that offer." Opp'n at 10, 11 (quoting *United States v. Aigbevbolle*, 827 F.2d 664, 666 (10th Cir. 1987), and *United States v. Ring*, 706 F.3d 460, 467 (D.C. Cir. 2013)). But the flaw in the Indictment is not that the "scheme" ultimately failed, or that a targeted bribe-taker ultimately refused to "accept." The problem here is that the crime was impossible from the get-go—it was a government-propelled investigative artifice.

Impossibility is a distinct, complete defense to substantive charges, as the cases cited in Wilson's opening brief demonstrate. For instance, in *United States v. Petit*, the problem was not that the defendants did not ultimately receive stolen property, but that it was *never possible* for them to do so, because the property had already been commandeered by a government sting operation (and thus was not "stolen"). 841 F.2d 1546, 1549 (11th Cir. 1988). And in *United States v. Jannotti*, the district court was correct to dismiss substantive Hobbs Act counts, not because the bribe payments did not ultimately affect U.S. commerce, but because the fictitiousness of a government-contrived scheme meant "there was *no possibility*," from the outset, of completing that offense. 673 F.2d 578 (3d Cir. 1982) (emphasis added).

*Jannotti* is especially instructive, because the Hobbs Act offense charged there is essentially a bribery charge, akin to federal program bribery and honest-services fraud after *Skilling*. *See Wilkie v. Robbins*, 551 U.S. 537, 541 (2007) ("At common law, extortion by the public official was the rough equivalent of what is now described as 'taking a bribe.'"). In the instant case, as in *Jannotti*, the "scheme," the "agent of an organization," and the "business,

transaction, or series of transactions" alleged in the Indictment were all "entirely fictitious"—the same circumstances that, according to the Third Circuit, warranted dismissal.  673 F.2d at 590.

The remainder of the government's argument is, essentially, that the charged substantive offenses are essentially "inchoate" crimes, and as such are beyond the reach of the impossibility defense.  Opp'n 10.  That position is both troubling and novel:  troubling, because it would mean that the government can charge conspiracies as substantive offenses at its whim; and novel, because the First Circuit has never so held.[8]  Indeed, the case law of the Supreme Court, that of the First Circuit, and the First Circuit's Pattern Jury Instructions specifically call out "conspiracy" and "attempt" as the inchoate offenses impervious to the impossibility defense.  *See, e.g.*, *United States v. Jimenez Recio*, 537 U.S. 270, 274-75 (2003); *United States v. Zhen Zhou Wu*, 711 F.3d 1, 25 (1st Cir. 2013); 1st Cir. Pattern Jury Instructions § 4.18.00 cmt.4 ("factual impossibility" is not a defense to "the charge of attempt"); *id.* § 4.18.371(a) cmt.8 ("[i]mpossibility is not a defense" to conspiracy).  Defense counsel is not aware of any First Circuit decision holding that impossibility is not a valid defense to a substantive charge.

Accordingly, the Court should dismiss the substantive counts.

### III. MOTION TO STRIKE

Wilson's third motion seeks to strike the Indictment's allegations concerning Wilson's communications with Singer in 2018-2019 (¶¶ 238-44), by which time Singer was a government

---

[8] The government cites two First Circuit cases in support of its position.  But in *United States v. Prange*, 771 F.3d 17 (1st Cir. 2014), the impossibility defense was neither presented nor discussed.  In *United States v. Potter*, 463 F.3d 9 (1st Cir. 2006), none of the conspirators was a government agent, and again "[n]o impossibility defense was offered."  *Id.* at 22.  The First Circuit commented that the impossibility defense could not have succeeded "on the present facts"—but not as a matter of wire-fraud law; the defendants' scheme simply was *not impossible* because, although the legislator targeted by the scheme had recused himself from voting on relevant matters, he could nevertheless "make things happen" without voting.  *Id.* at 18, 22.

agent. *See* 1st Cir. Pattern Jury Instructions § 4.18.371(a) cmt.10 (conspiracy requires "at least two conspirators," and "government agents do not count"). The government responds that "all of [Wilson's] actions formed part of a single course of conduct," and that Wilson was part of "a single conspiracy that included co-conspirators besides Wilson and Singer." Opp'n 14. Neither argument holds water.

First, it is plain on the face of the Indictment that Wilson retained Singer twice, for two engagements. Indictment ¶ 225. The first engagement achieved its purpose with Wilson's son's admission to USC in 2014. Indictment ¶¶ 234-36; *see SEC v. Papa*, 555 F.3d 31, 36 n.3 (1st Cir. 2009) ("[A] conspiracy generally ends . . . after the central criminal purpose has been accomplished."). Singer and Wilson only began to negotiate the second engagement 4.5 years later. Indictment ¶ 238. The two engagements did not "form[] part of a single course of conduct," because neither was "necessary or advantageous to the success of [the other]," and because no one could have thought the two "aspects . . . interdependent." *United States v. Pappathanasi*, 383 F. Supp. 2d 289, 296 (D. Mass. 2005).

Second, as discussed *supra* and in a separate, joint motion (ECF No. 1032), the government's insistence that Wilson belonged to a nationwide conspiracy is false, implausible, and belied by the Indictment. Even in response to Wilson's motion, the government does not identify *any* individual—other than Singer—with whom, in the government's view, Wilson reached an illegal agreement in connection with the Wilson daughters' college applications. And after Singer began to cooperate with the Government in September 2018, he "do[es] not count" as a coconspirator.

Finally, the government distorts both text and context in its assertion that 2018-2019 communications illuminate Wilson's intentions concerning his son's 2013 application to USC. Opp'n 16. The context to those calls includes (a) the government's demand that Singer must

*change* his message in calls with parents, to create prosecution-usable evidence *different* from Singer's prior discussions with parents such as Wilson (ECF Nos. 1104, 1184); and (b) the critical, unrecorded "kick off" call in which Singer told Wilson that the plan for the Wilson daughters would be legitimate, and—with the university's consent—could involve "side door" donations for non-college-level athletes.  *See* ECF No. 972-43; ECF No. 1184.  As for the text of the calls, it is untrue that "Singer made it explicit to Wilson [in 2018-2019] that his daughters would be presented as fake athletic recruits."  Opp'n 16.  Singer was actually careful to say *nothing* explicit that would alert Wilson to potential illegality.  Thus, when Singer stated that the Wilson daughters could be "on the team" in non-playing roles, such as "manager," this plan made sense—particularly given the "kick off" call—precisely because it would *not* require the daughters to be "fake athletes."  *See* Indictment ¶¶ 238-39.

The Court should strike paragraphs ¶¶ 238-44 as surplusage.

### IV.   CONCLUSION

The Court should:  try Wilson at severed, one-defendant trial; dismiss Counts Six, Eight, Nine, Eleven, and Twelve; and strike paragraphs 238-44 from the Indictment.

Respectfully submitted,

John Wilson,

By his Counsel,

/s/ Michael Kendall
Michael Kendall (BBO # 544866)
Yakov Malkiel (BBO # 689137)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
yakov.malkiel@whitecase.com

Andrew E. Tomback (pro hac vice)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8428
andrew.tomback@whitecase.com

**CERTIFICATE OF SERVICE**

     I hereby certify that the above document is being filed on the date appearing in the header through the ECF system, which will send true copies to the attorneys of record.

/s/ Michael Kendall
Michael Kendall