UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID SIDOO et al.,<br><br>Defendants. | No. 1:19-cr-10080-NMG |

# DEFENDANT JOHN WILSON'S RENEWED MOTION TO COMPEL THE PRODUCTION OF EXCULPATORY EVIDENCE

## ORAL ARGUMENT REQUESTED

Defendant John Wilson seeks the Court's intervention because the government refuses to provide meaningful responses to straightforward requests for exculpatory evidence. As detailed further below, the government has refused:

(a) To disclose the exculpatory circumstances surrounding the government's last-minute cancellation of a meeting it had arranged between Rick Singer and Wilson for September 23, 2018, two days after Singer began cooperating;

(b) To disclose the facts concerning an unrecorded, unmemorialized, and exculpatory FaceTime call five days later, on September 28, 2018, which Singer made to Wilson from the FBI's offices; and

(c) To state whether it is complying with the defendants' *Brady* requests to date, or to specify any request as to which it is withholding responsive evidence.

The Court should order the government to comply with these requests.

### I.   REQUESTS CONCERNING THE SEPTEMBER 2018 INTERACTIONS

#### A.   Relevant Background

Wilson's son was a nationally competitive high-school and club water polo player who applied to USC as a walk-on in 2014. Wilson made a donation that Singer said would go entirely to the sports program, though Singer ultimately stole $100,000 of it for himself.

Wilson and Singer began discussing Wilson's daughters' college plans one week before government agents confronted Singer and secured his cooperation. Their first, wiretapped phone conversation was on September 15, 2018. Singer emphasized on that call that the program of "side door" donations was widespread and legitimate. He added that he would soon be coming to Boston to meet with the President of Harvard University, who was interested in expanding the "side door" program at Harvard. Ex. 1. The call included no discussion about bribery or falsifying athletic credentials.

On September 21, 2018, government agents drew Singer to a Boston hotel room on a ruse, and persuaded him to cooperate. ECF No. 1104, at 2. They immediately began debriefing him. During the second day of the debriefing (September 22), Singer made plans to meet Wilson, his wife, and their daughters at Logan airport the following day (September 23). Ex. 2.[1] Government agents were planning to accompany Singer to that meeting. *Id.*

On the morning of September 23, however, government agents told Singer "that there was a change of plans." *Id.* The agents said Singer would not be working with the government that day, and "would not travel with case agents to meet with the [Wilson] family at the Hilton Boston Logan Airport." *Id.* By the time Singer called Wilson to say (falsely) that he was too ill to attend the meeting, Wilson and his family were already on their way to the meeting. *See* Sept. 23, 2018, 11:47:48 telephone call.[2] Singer simultaneously postponed a Skype meeting with Wilson's daughters scheduled for the next afternoon. *Id.*

---

[1] Singer had previously scheduled, then canceled, a meeting with Wilson and his wife for September 21. Ex. 10.

[2] It appears that the government has not transcribed this call.

Later that same day, the government instructed Singer that he should speak to certain individuals only in the presence of government agents. Those individuals included Wilson or his son. Ex. 2.

Singer scheduled his next discussion with the Wilsons for Friday, September 28. On that Friday, he was at a proffer session in the FBI's Sacramento offices with six members of the Boston prosecution team. Ex. 3. Despite owning at least one phone that automatically recorded all calls for the government, and sitting in an office full of recording devices, Singer made the call with the Wilsons using Apple FaceTime, a technology that does not record. The call was thirty-three minutes long. Ex. 4. During the call, Singer reiterated to Wilson that "side door" donations are common and legitimate; he added that universities now welcomed such donations from non-college-level athletes. ECF No. 972-43 ¶ 7. The government team made no transcript, memorialization, or record of the call, and omitted all references to it from their reports or notes (other than to state that "a break was taken" at the same time of the call). *See* Ex. 3. To all appearances (from the government's reports), the call was never conducted or discussed.

The government has disclosed that the ten days or so starting on September 21 were a crucible that molded Singer's cooperation. Government agents "remember tense calls with Singer during this period." ECF No. 1104, at 5. Singer recalls "several arguments with the agents," which in real time he experienced as "loud and abrasive." ECF Nos. 1104-4, 972-1. Before the government's pressure-cooker persuasion operation, Singer "had already told [parents] that their money would go to an athletic program, not a coach"; he himself "never considered that what he was doing was a bribe" and "didn't think it was a crime." ECF No. 1104-4, at 1-2. He "pushed back on the agents." *Id.* But the government persuaded Singer to change his narrative, and to start talking about "paying a coach," chastising him that "quid pro

quo and bribe were the same," and that there is no "legal distinction between a 'donation' to a 'program' and a 'payment' to a 'coach.'" ECF No. 1104, at 3; ECF No. 1104-4, at 2.

As a result, starting on September 29, Singer started to scatter references to "paying a coach" in his calls with Wilson. The government concedes that the Singer-Wilson calls were among those that, in his October 2 iPhone note, Singer described as containing "fibs"—namely, Singer's allusions to payments to insiders, which shed false light on Singer's prior, uniform representations to Wilson that he was making legitimate donations "to the program." ECF No. 972-1; ECF No. 1104, at 3-4.

B.  **Request Concerning the September 23 Meeting**

Wilson has made repeated requests for information about the plan for, and cancellation of, the September 23 Singer-government-Wilson meeting. The specifics that Wilson requested were pieces of information that the government excluded from its September 23 FBI report, namely: (a) what Singer told the government about Wilson prior to the meeting; (b) what statements or information prompted the government to schedule the meeting; (c) what information caused the government's last-minute cancellation; and (d) what the government told Singer about scheduling and canceling the meeting. *See* Ex. 5; Ex. 6, at 3. The government rebuffed Wilson's requests, citing its unwillingness to disclose "work product." ECF No. 1071, at 5; Ex. 6, at 1.

The Court should compel the government to disclose this information. The FBI memoranda discussing Singer's debriefing prior to September 23 contain no information whatsoever about Wilson, and by necessity no incriminating information. When Singer spoke to the agents about Wilson a few days later, he explained that Wilson's son "was a real water polo player and [actually] played." Ex. 7. In a subsequent iPhone note, which appears to compile

errors in a list of payments that the government categorized as "bribes," Singer included the entry: "John Wilson . . . donation to USC program for real polo player." Ex. 8. In other words, in Singer's view, Wilson had not bribed anyone.

Moreover, government agents had monitored Singer's September 15 call (a week prior), during which Singer assured Wilson that "side door" donations were common, legitimate, and indeed solicited by the President of Harvard University. ECF No. 699-4. The agents knew that, until they shouted at him otherwise, Singer did not think donations to support specific programs—or any of his strategies—were illegal, did not describe them to Wilson as such, and (necessarily) did not think Wilson was breaking the law either. ECF No. 1104-4. Indeed, the government has recently disclosed that it doubted whether Singer's pre-cooperation pitches to parents showed criminal intent on the parents' part. *See* ECF No. 1104, at 3-4, 5, 9 (stating that the government wanted Singer to change his wording so that parents would "underst[and] that their money would be used to induce a university insider to commit fraud").

Against this background, it appears that the government canceled its plan for the September 23 meeting based on some combination of facts indicating that the government possessed no evidence of a crime, and that a Singer-Wilson meeting before the government gave Singer more "coaching" would produce exculpatory evidence. The Court should compel the government to disclose the circumstances surrounding the meeting, including related communications between Singer and the agents about Wilson, and any other facts leading to the meeting's scheduling and cancellation.[3]

---

[3] There is no reason why such disclosures would need to invade attorney work product; but in any event, evidentiary immunities must yield to defendants' constitutional rights. *See, e.g.*, *Roviaro v. United States*, 353 U.S. 53, 60-61 (1957).

### C. Request Concerning the September 28 FaceTime Call

For over two months, Wilson has also asked the government for information about the September 28 FaceTime call, including: why the government chose not to record the call, why it has produced no materials describing the call, and whether the government disputes that Wilson and Singer spoke on the call. Exs. 5, 6, 9. The government has dodged these inquiries, and has indicated that—even now—it has carefully refrained from asking Singer about the FaceTime call. *See* Ex. 6, at 1 (stating that the government has "to date" obtained no evidence corroborating Wilson's account of the call, but might "obtain such information from Singer" in the future). The government likewise refused to address the FaceTime call in its April 24, 2020 affidavits and in its memorandum describing Singer's April 22, 2020 interview. *See* ECF Nos. 1104-1 to 1004-4.

The circumstances of the September 28 FaceTime call are both exculpatory and crucial to an understanding of Wilson's case. In essence, the September 28 conversation served as a "set up" call, in which Singer cemented Wilson's trust by reassuring him that the side door program was legitimate, and would not involve any deception. This further predisposed Wilson to assume that subsequent comments Singer inserted into recorded calls were innocuous. Once Singer made clear that Wilson would be making a legitimate, university-sanctioned donation to an athletic program, Wilson assumed that Singer's subsequent references to "paying a coach" were shorthand for such donations; and once Singer stated that universities were willing to accept "side door" donations from non-college-level athletes, who could fill roles such as "team manager," Wilson had no reason to be attuned to Singer's later insinuation that a sailing coach's plans were not fully known to the university. *See* ECF No. 1184.

The government's conduct surrounding the FaceTime call is also, on its own, exculpatory information that the Court should order the government to disclose. The call occurred at the height of the government's campaign to force Singer into injecting misleading, inculpatory statements into calls with parents such as Wilson; yet at that critical time, government agents let Singer loose to essentially eliminate the risk that Wilson would push back when, in subsequent calls, Singer spoke obliquely about "paying a coach" or keeping information from a university. The government caused this conversation to take place in an unrecorded, unmemorialized, possibly even unwitnessed setting, only days after warning Singer against taking calls outside the agents' presence, and even though half a dozen prosecution team members were on hand. Ex. 2. The government has since let Singer delete text messages relating to the call, has scrubbed all references to the call from their own notes and memoranda, and has refrained from asking Singer about the call even in the interview conducted in response to the Court's concerns about the government suborning a crime. This willful blindness to the existence of exculpatory facts casts doubt on the fairmindedness of the government's investigation.

The Court should therefore compel the government to disclose the facts in its possession concerning Singer's FaceTime call with Wilson, including: the advance information it received about the call, whether prosecution team members listened in on the call (and the reasons why any other team members absented themselves), the content of the discussion, the reasons for the government's decision not to record or memorialize the call, and the reasons why the government's September 28, 2018 notes and memorandum hide the call's occurrence.

* * * *

The September 23 meeting and September 28 FaceTime call are part of the same pattern demonstrated by Singer's iPhone notes, and by the government's treatment of those notes: the

government has been hiding exculpatory evidence, while simultaneously creating, through Singer, false evidence of criminal intent designed only to mislead the jury.

## II. RENEWAL OF PRIOR *BRADY* REQUESTS

In late 2019, Wilson and other defendants sent a series of letters to the government requesting exculpatory evidence. The letters listed various categories of exculpatory evidence, on such topics as: Singer's representations to clients about the recipients and purposes of their payments; his representations concerning the legitimacy of "side door" donations; USC's policies and practices concerning fundraising from applications; Singer's insertion of inaccuracies into application materials without his clients' knowledge; his obstruction of justice; and the government's promises, rewards, and inducements.

The government rebuffed these requests, refusing even to state whether responsive evidence existed, and forcing the defendants to file motions to compel. *See* ECF No. 693-5 (government letter); ECF Nos. 648, 681, 693, 696, 699, 801, 865 (motions to compel). After months of briefing and an in-camera review, the government promised to produce large volumes of additional discovery, leading the Court to deny the outstanding *Brady* motions without prejudice. ECF No. 1072.

With discovery coming to a close, Wilson posed a simple request to the government: either to confirm that it is now withholding no evidence responsive to the defense's *Brady* requests; or to describe responsive materials that the government believes it is entitled to withhold. Ex. 6, at 3, 5. The prosecutors declined to answer, stating only that they believe they have complied with their discovery obligations. *Id.* The government thus insists that the defendants must blindly trust its discretion concerning the disclosure of exculpatory materials.

At this juncture, that position is neither fair nor practical. Wilson and other defendants posed discovery requests that, in their view, sought plainly exculpatory evidence within the

government's possession. The government refused to concede that any of the requested information was exculpatory in nature; instead, it forced the defendants into burdensome motion practice—only to avert rulings on the motions by promising additional discovery.

Even on the first go-around, the government's refusal to identify the requests actually in dispute (as opposed to those yielding no responsive evidence) was inconsiderate and inefficient. But its refusal to do so now is untenable: discovery is closing; the government has forestalled adjudication of the *Brady* motions once already; and, as the Court has found, the prosecution team in this case has *not* adhered scrupulously to its self-enforcing *Brady* obligations.[4] It would be inappropriate for defense counsel to accept blithely the government's assertion that it has discharged its obligations.

The defendants and the Court are entitled to know what evidence the government has withheld based on its disagreement with the defendants' *Brady* requests. If such categories of evidence exist, then the government needs to say so unambiguously, so the dispute can (if necessary) be litigated. Otherwise, the government will be free to repeat its conduct concerning Singer iPhone notes, i.e., to bury exculpatory evidence unless and until the defendants stumble upon evidence of that improper suppression.

---

[4] *See* May 8, 2020 Order (ECF No. 1169) (the government's failure to produce Singer's iPhone notes "much sooner than it did . . . was irresponsible and misguided"). In addition, the government's recently produced discovery includes exculpatory information that the government possessed from the earliest days of its investigation. For instance, during Singer's very first interview with the government, he stated that "initially all the payments to USC went to the programs," and that "[o]riginally all students admitted through the side door were players." ECF No. 972-28, at 4. As noted *supra*, during the first interview in which Singer discussed Wilson's case specifically, he told the government that Wilson's son "was a real water polo player and [actually] played." Ex. 7. Even documentary evidence from recent productions—which the government had represented it was producing in full, without regard for *Brady*'s boundaries (ECF No. 736, at 3-4)—contains patently exculpatory evidence that should have been disclosed months ago.

The Court should therefore order the government to certify that it is complying with the defendants' *Brady* requests to date, or to specify any requests as to which it is withholding responsive information. To the extent that any such disputed requests exist, the Court should deem the relevant previously filed motion(s) renewed.

### III. CONCLUSION

For the foregoing reasons, the Court should compel the government to comply with the discovery requests described in this Motion. Wilson respectfully submits that an oral argument on the Motion would be beneficial.

Respectfully submitted,

John Wilson,

By his Counsel,

/s/ Michael Kendall
Michael Kendall (BBO # 544866)
Yakov Malkiel (BBO # 689137)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
yakov.malkiel@whitecase.com

Andrew E. Tomback (pro hac vice)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8428
andrew.tomback@whitecase.com

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULES 7.1 AND 112.1**

  I hereby certify that, before filing this motion, defense counsel attempted in good faith to confer with the government to resolve or narrow the issues.

              /s/ Michael Kendall
              Michael Kendall

## **CERTIFICATE OF SERVICE**

  I hereby certify that the above document is being filed on the date appearing in the header through the ECF system, which will send true copies to the attorneys of record.

              /s/ Michael Kendall
              Michael Kendall