UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

v.

DAVID SIDOO et al.,

Defendants.

Case No. 19-cr-10080-NMG

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS
COUNT ONE INSOFAR AS IT ALLEGES CONSPIRACY TO
<u>DEFRAUD UNIVERSITIES OF PROPERTY</u>**

**<u>ORAL ARGUMENT REQUESTED</u>**

i

## INTRODUCTION

As the Supreme Court and First Circuit have recognized, the mail and wire fraud statutes do "not purport to reach all frauds." *United States v. Berroa*, 856 F.3d 141, 152 (1st Cir. 2017) (quoting *Schmuck v. United States*, 489 U.S. 705, 710 (1989)). While these provisions may "encompass a broad range of behavior," "there are limits nonetheless, and they must be defined by more than just prosecutorial discretion." *United States v. Weimert*, 819 F.3d 351, 370 (7th Cir. 2016). As noted in Defendants' motion, federal prosecutors in recent years have repeatedly pushed the boundaries of the fraud statutes, particularly in high profile cases—but the Supreme Court has consistently pushed back. *See* Opening Br. at 1 & n.1. That precise dynamic played out again just one day before the Government filed its response. In *Kelly v. United States*, 140 S. Ct. 1565 (2020), a unanimous Supreme Court struck down the wire fraud convictions of the public officials convicted in the "Bridgegate" scandal. The Court did not dispute that the defendants had engaged in "wrongdoing—deception, corruption, abuse of power." *Id.* at 1568. But that was insufficient to uphold their convictions because the fraud statutes "do not criminalize all such conduct." *Id.* Instead, they are limited to schemes to obtain "money or property," *id.*, and "*that requirement . . .* prevents these statutes from criminalizing all acts of dishonesty." *Id.* at 1571 (emphasis added). *Kelly* resoundingly affirms the argument at the heart of Defendants' motion: The mail and wire fraud statutes' property element provides an important substantive limitation that the Government must fully satisfy.[1]

Apparently unchastened by *Kelly*, the Government presses forward with an even more expansive theory of property here. Its opposition openly urges this Court to abandon the Supreme

---

[1] The Government does not even mention *Kelly* until halfway through its brief, and then only devotes two sentences to addressing it. Opp. at 33-34.

Court's limitation of the fraud statutes to *traditional* forms of property. *Id.* at 25-27. It repeatedly invokes an outdated, inapt Sixth Circuit decision, *United States v. Frost*, 125 F.3d 346 (6th Cir. 1997), while largely ignoring Defendants' discussion of the recent, on-point Sixth Circuit case that undermines its argument, *United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014). And it belittles Defendants' reliance on the very same policy considerations that informed the Supreme Court's decision in *Kelly*, as well as a litany of prior Supreme Court and court of appeals opinions. Opp. at 34-35. In short, the Government's response confirms that it has no good explanation for how "admission slots" are traditional property, and no pertinent case law to support this view. The Court should therefore grant Defendants' motion to dismiss Count One of the indictment insofar as it alleges property fraud.

**ARGUMENT**

    1. Instead of trying to explain how an admission slot is a traditional form of property, the Government proposes disregarding that entire mode of analysis: "Although the Supreme Court referred to 'traditional concepts of property' in *Carpenter* and *Cleveland*, it did not suggest that the statutory definition [of mail or wire fraud] was *limited* to such property." Opp. at 26. The Government's assertion is surprising because of how easily disprovable it is: the Supreme Court and numerous courts of appeals have repeatedly held that the fraud statutes are limited to traditional forms of property, and the Government cannot identify a single case contravening that principle. In *Cleveland v. United States*, for example, the Court rejected the argument that unissued poker licenses are property, noting that such licenses have not "long been recognized as property" and changing that status would infringe on traditional state functions. 531 U.S. 12, 24 (2000). Similarly, *Carpenter v. United States* examined historical sources to conclude that

confidential business information satisfies the fraud statutes' property limitation because it has "long been recognized as property." 484 U.S. 19, 26 (1987) (citations omitted).

The Government suggests (at 27) that the Supreme Court somehow changed its property inquiry *sub silentio* in *Pasquantino v. United States*, 544 U.S. 349 (2005), but, in fact, *Pasquantino* conducted the exact type of historical analysis that the Court used in *Carpenter* and *Cleveland*, and the same one Defendants employ in their motion. *Id.* at 356. Moreover, numerous courts of appeals have recognized that the fraud statutes are limited to traditional forms of property, and the Government identifies no court that has rejected that view.[2]

Against this weight of authority, the Government asks this Court to be the first to reject the traditional property limitation, *see* Opp. at 25-27, but it offers no suggestions for how to replace this limiting principle. What other "non-traditional" forms of property fall within the scope of the federal fraud statutes? The Government provides no answer, simply suggesting that the implications of its novel theory should be left for another day. But this lack of any meaningful limitation weighs heavily against adoption of the Government's reading. *See Cleveland*, 531 U.S. at 24 (rejecting "the Government's theories of property rights" because the Government's position "invites us to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress"); *Berroa*, 856 F.3d at 150 (rejecting Government's theory, under which "virtually any false statement in an application for a medical license could constitute a federal crime").

There is simply no plausible basis for suggesting that an "admission slot" is a traditional form of property. The Government offers *no* evidence—neither case nor statute nor treatise—that

---

[2] *See, e.g.*, *Berroa*, 856 F.3d at 149; *United States v. DeFries*, 43 F.3d 707, 709 (D.C. Cir. 1995); *United States v. Henry*, 29 F.3d 112, 115 (3d Cir. 1994); *United States v. Baldinger*, 838 F.2d 176, 179 (6th Cir. 1988).

an admission slot has long (or ever) been considered property. This Court should conduct the inquiry mandated by the Supreme Court and dismiss Count One insofar as it alleges property fraud.

2. Defendants' motion explained that the most analogous precedent for this case is *United States v. Plyler*, 222 U.S. 15 (1911). *Plyler* addressed similar subject matter—misrepresentations on an application to obtain a job—and was decided around the time Congress added the "money or property" limitation to the mail fraud statute in 1909. And *Plyler* accepted the premise that falsifying an application for a civil service position did not constitute a property deprivation. *Plyler* cited *Curley v. United States*, 130 F. 1 (1st Cir. 1904), only for the proposition that the statute at issue (which had no property limitation) "covers this case," and the Government's suggestion that the Court adopted *Curley*'s property analysis is belied by the language of *Plyler* itself. Other decisions addressing fraudulent civil service applications confirm that they do not implicate traditional property rights. *See, e.g.*, *United States ex rel. Starr v. Mulligan*, 59 F.2d 200, 202 (2d Cir. 1932) (observing that statute that was "confined to frauds which cause the United States pecuniary or property loss . . . cannot be extended to cover the fraudulent obtaining of the privilege of taking a civil service examination"). Indeed, if lying in an application *was* considered fraud to obtain property at common law, the question in *Plyler* would never have come up.

Dismissing *Plyler* as "ancient," Opp. at 31, the Government relies heavily upon three out-of-circuit cases to argue that admission slots qualify as property. *Id.* at 27-29. None of those non-binding authorities, however, can bear the weight the Government places upon them.

The Sixth Circuit's decision in *Frost* is readily distinguishable because it addressed a property interest in a university's *unissued degrees*—not in its admission slots. 125 F.3d at 367. The Government conflates these concepts and argues that "this is a distinction without a difference" because "[s]tudents gain admission to a college or university for the purpose of and

4

with the expectation that they will obtain a degree." Opp. at 28. Even accepting the premise, this argument does not follow. Consider, for example, someone who fraudulently gains access to an invite-only charity auction and then bids on, wins, and pays for an item. The fact that the organizer had a property interest in the *auctioned item* tells us nothing about whether the organizer had a property interest in the *guest slots*. The same goes for a job application versus a paycheck—and for degrees versus admission slots.

Even setting aside this clear distinction, the reasoning of *Frost* is unpersuasive. As the Government notes, *Frost* relied exclusively on the negative down-the-line economic effects of issuing degrees to students who have not earned them. The Government argues that admitting students who lied on their applications has similar consequences. But the potential for some eventual and uncertain future economic detriment cannot transform something into property. By that logic, there would be no distinction between honest-services fraud and property fraud because both have the potential to result in similar kinds of eventual economic harm. *Cf. Sekhar v. United States*, 570 U.S. 729, 740 (2013) ("[T]he term 'property' plainly does not . . . extend to everything that might in some indirect way portend the possibility of future economic gain." (Alito, J., concurring in the judgment)). Such a capacious definition of the property limitation is no limitation at all. It is also inconsistent with subsequent Sixth Circuit case law. *See Sadler*, 750 F.3d at 590 (vacating wire fraud conviction where "the government showed that [the defendant] lied to pharmaceutical distributors when she ordered pills for the clinic by using a fake name on her drug orders and by falsely telling the distributors that the drugs were being used to serve 'indigent' patients"). A pharmaceutical distributor's involvement (even if unwitting) in an illegal drug conspiracy, no less than alleged cheating in the college admissions process, would likely result in

5

reputational damage and decreased business. But that was not enough to satisfy the statute where the defendant had "paid full price" for the drugs, just as the Defendants paid full tuition here. *Id.*

Moreover, consideration of such attenuated economic impact runs afoul of binding precedent. The mail and wire fraud statutes both proscribe "scheme[s] or artifice[s] . . . for obtaining money or property by means of false or fraudulent pretenses." 18 U.S.C. §§ 1341, 1343. As the First Circuit recently instructed, the phrase "by means of" constitutes a "textual limitation" on the scope of the statutes. *Berroa*, 856 F.3d at 149 (quoting *Loughrin v. United States*, 134 S. Ct. 2384, 2393 (2014)). In order to satisfy this requirement, the defendant's fraud must be "the mechanism naturally inducing" the victim "to part with money." *Loughrin*, 134 S. Ct. at 2393. *Berroa* involved an alleged scheme to fraudulently obtain medical licenses. The First Circuit reversed the property fraud convictions, rejecting the Government's theory that the defendants used their ill-gotten licenses to obtain payment from healthcare consumers over the course of the ensuing years practicing medicine. 856 F.3d at 149-50. The connection between the fraud and the property was simply too attenuated for the latter to have been obtained "by means of" the former. In the present case, along similar lines, the mere fact that Defendants' alleged conduct is said to cause some (unquantified) indirect harm to the universities at some (unspecified) future date does not suggest that the Defendants obtained any property whatsoever, much less obtained property "by means of" the alleged misrepresentations in college applications.

The Third Circuit's decision in *Hedaithy*—which dealt with exam fraud—likewise has no application here.[3] There, the Government had alleged "that [a testing company] was defrauded of

---

[3] *Hedaithy* is also readily distinguishable from the Government's allegations related to the purported testing scheme, as articulated in Defendants' Motion to Dismiss Count One Insofar As It Alleges Conspiracy to Defraud Testing Companies Of Property And Honest Services (Dkt. 1022) and the accompanying reply.

6

at least two traditionally recognized property interests: (1) its confidential business information, and (2) its tangible score reports." 392 F.3d 580, 593 (3d Cir. 2004). The purported property at issue was not an admission slot or anything else akin to an "offer." And the traditional historical property analysis – the one that the Government has denounced (by necessity) in the present case – was in fact followed by the court in *Hedaithy*.

The Eleventh Circuit's decision in *Barrington* is even further afield. The Government says the court there found that a fraudulent grade-changing scheme "implicated [a] university's 'intangible property interest in the integrity of its grading system.'" Opp. at 29. But *Barrington* carefully avoided holding that an "intangible property interest" in grading integrity satisfied the property requirement. *See* 648 F.3d 1178, 1191-92 & n.11 (11th Cir 2011). Instead, it made clear that "the 'money or property' of which [the university] was deprived *was the lost tuition resulting from the unearned hours credited to the students, rather than the actual grades*." *Id.* at 1191-92 (emphasis added).

3. The Government also argues that it alleged a property right based on the universities' "right to control access to their valuable assets." Opp. at 30-31. But that vague right of control— standing alone—is not a cognizable property right for purposes of the fraud statutes.

As the Supreme Court explained in *Skilling v. United States*, "if a city mayor (the offender) accept[s] a bribe from a third party in exchange for awarding that party a city contract, yet the contract terms were the same as any that could have been negotiated at arm's length," then no money or property right is implicated. 561 U.S. 358, 400 (2010). And that is so even though the city is deprived of its right to control with whom it contracts. *See also Cleveland*, 531 U.S. at 23 ("the State's right of control does not create a property interest"); *United States v. Walters*, 997 F.2d 1219, 1226 n.3 (7th Cir. 1993) (Easterbrook, J.) (a university's "right to control" who receives

7

scholarships is not a cognizable property right under the fraud statutes).[4]  So the right to control who one contracts with is not itself a property right that is cognizable under the fraud statutes.[5]  Defendants do not dispute in this case that the right to control *property* is among the bundle of rights typically recognized by property law.  But *non-property* cannot be transformed into property by the mere allegation that the victim was deprived of control.  *See Kelly*, 140 S. Ct. at 1572 ("The State's intangible rights of allocation, exclusion, and control—its prerogatives over who should get a benefit and who should not—do not create a property interest." (citation omitted)).  In *Kelly*, the Court, in a 9-0 decision, made clear that the Port Authority's right to control the bridge lanes did not create a cognizable property interest where one did not otherwise exist.  The same is true here with respect to the university admission slots.

Next, the Government half-heartedly disputes that an "admission slot" is an offer.  *See* Opp. at 31-33.  But the basic mechanics of college admissions confirm that an "admission slot" is merely an offer to receive educational services in exchange for tuition payments.  Indeed, the "admission slot" inherently required further action before it culminated in any transaction— namely acceptance of the "slot," confirming its status as an offer.  And an *offer* is not a traditional form of property.  *See* Opening Br. at 15-16.  As *Skilling* and numerous courts of appeals confirm,

---

[4]  In the context of the Hobbs Act, the Supreme Court has also expressed its skepticism about whether the "right to control" can create a property right sufficient to support criminal liability.  *See Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 402 (2003) ("We need not now trace what are the outer boundaries of extortion liability under the Hobbs Act, so that liability might be based on obtaining something as intangible as another's right to exercise exclusive control over the use of a party's business assets.").

[5]  The cases cited by the Government are not to the contrary.  Indeed, as those very authorities recognize, "In cases resting upon the so-called 'right to control' theory of mail fraud, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction."  *United States v. Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998) (citation omitted).  Because the Government cannot claim, much less demonstrate, that the alleged misrepresentations here implicated the ultimate value of the ensuing transactions, its right to control theory does not salvage the indictment.

a victim is not defrauded of property when tricked into entering a subsequent transaction that is itself consummated on standard terms where the accepting party does not lose money or property. Where a contract's terms are the same as they would have been if negotiated "at arms length," a party "suffer[s] no tangible [property] loss." *Skilling*, 561 U.S. at 400; *see also, e.g.*, *United States v. Takhalov*, 827 F.3d 1307, 1318-19 (11th Cir. 2016); *Sadler*, 750 F.3d at 591.

The Government attempts to distinguish *Takhalov* by arguing that its holding turned on materiality. *See* Opp. at 32-33. But *Takhalov* does not support that distinction. Judge Thapar (sitting by designation) made clear that *even if* the deception that induces a party to enter a transaction is material, there is no cognizable fraud if the terms of the transaction are unaffected. *See* 827 F.3d at 1313 (no fraud even though "the transaction *would not have occurred but-for* the lie" (emphasis added)). Here, the Government has not alleged that the *actual transaction*—educational services for tuition—was different than the one the universities bargained for.

The Government also argues that the deception alleged here "did more than cause the universities 'to enter into transactions they would otherwise avoid.'" Opp. at 33 (quoting *Takhalov*, 827 F.3d at 1341). But that is wrong. What the Government has alleged here is a scheme in which the universities were tricked into extending offers for admission that they otherwise would not have made.

Ultimately, the Government's property theory boils down to the notion that the universities were entitled to accurate information before they extended offers of admission. But it cannot "plausibly be said that the right to accurate information amounts to an interest that 'has long been recognized as property.'" *Sadler*, 750 F.3d at 591. And "a university that loses the benefits of

9

[the] amateurism [of an athlete] . . . has been deprived only of an intangible right" that is not cognizable under the fraud statutes. *Walters*, 997 F.2d at 1226.[6]

4. The Government also urges the Court not to consider the policy implications of accepting its novel property theory. *See* Opp. at 34-35. The Government claims that no case supports the "dubious proposition" that the Court should weigh the consequences of adopting its broad reading of the statutes. *Id.* at 34. But of course, myriad statutory interpretation cases do just that, including every major Supreme Court case interpreting the property limitation in the mail and wire fraud statutes. *See, e.g.*, *Skilling*, 561 U.S. at 410-411 (rule of lenity); *Cleveland*, 531 U.S. at 25 (same); *McNally v. United States*, 483 U.S. 350, 359-60 (1987) (same).

The reason the Government wants the Court to ignore these policy implications is because it will effect just the type of sweeping expansion of federal criminal liability that the Supreme Court has expressly cautioned against. As the Supreme Court just said in *Kelly*, it is the *property requirement* that "prevents these [fraud] statutes from criminalizing all acts of dishonesty." 140 S. Ct. at 1571. And it is that exact limiting principle that the Government asks the Court to discard. Without such a limitation, or any alternative limiting principle, the Government cannot deny that under its prosecutorial theory embellishing a letter of recommendation to help a student get admitted to college, or for that matter embellishing a letter to help anyone get admitted to any

---

[6] In passing, the Government argues that the indictment does not allege fraudulent obtainment of "services," and that services are a cognizable form of property right in any case. *See* Opp. at 33-34. But the weight of authority confirms that services do *not* constitute a traditional property right. *See, e.g.*, *Gleason v. Thaw*, 236 U.S. 558, 561 (1915); Opening Br., at 19-22. The Government argues that the Supreme Court's recent decision in *Kelly* shows that services are cognizable property. But, as the Government concedes (at 34), *Kelly*'s discussion of that issue was dicta; the parties did not even dispute the matter. 140 S. Ct. at 1573. Moreover, here, unlike in *Kelly*, the purported property is not the services themselves, but merely an offer to contract for those services. And the universities at issue, unlike the Port Authority in *Kelly*, were fully compensated (in the form of tuition payments) for any services expended.

10

private club or business, would constitute federal fraud with a maximum penalty of twenty years in prison. The fraud statutes were never intended to vest such broad power in the hands of prosecutors.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Count One[7] of the indictment insofar as it alleges a conspiracy to deprive universities of property.

Dated:  May 27, 2020

Respectfully submitted,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Matthew L. Schwartz (admitted *pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Tel.: (212) 446-2300
Fax: (212) 446-2350
E-mail: mlschwartz@bsfllp.com

*Counsel for Robert Zangrillo*


**/s/ Brian T. Kelly**
Brian T. Kelly (BBO No. 549566)
Joshua C. Sharp (BBO No. 681439)
Lauren M. Maynard (BBO No. 698742)
NIXON PEABODY LLP
53 State Street
Boston, MA 02109
617-345-1000

---

[7] The principles set forth in the instant reply and in Defendants' initial motion also apply to the substantive wire-fraud offenses charged in Counts 4-10 insofar as they allege a scheme to defraud universities of property.

bkelly@nixonpeabody.com
jsharp@nixonpeabody.com
lmaynard@nixonpeabody.com

Robert Sheketoff (BBO No. 457340)
One McKinley Square
Boston, MA 02109
617-367-3449

*Counsel for Gamal Abdelaziz*


**/s/ David E. Meier**
David E. Meier (BBO #341710)
Todd & Weld LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
dmeier@toddweld.com

**/s/ Stephen H. Sutro**
Stephen H. Sutro, Esq.
Duane Morris, LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105-1127
(415) 957-3008
SHSutro@duanemorris.com

*Counsel for Diane Blake and Todd Blake*


**/s/ David S. Schumacher**
David S. Schumacher (BBO #647917)
HOOPER, LUNDY & BOOKMAN, P.C.
470 Atlantic Avenue, Suite 1201
Boston, MA 02210
(617) 532-2700
(617) 345-3927 (fax)
dschumacher@health-law.com

Patric Hooper (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517
(310) 551-8111

(310) 551-8181 (fax)
phooper@health-law.com

Jordan Kearney (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
575 Market Street, Suite 2300
San Francisco, CA 94105
(415) 875-8500
(415) 875-8519 (fax)
jkearney@health-law.com

*Counsel for Amy and Gregory Colburn*


**/s/ Reuben Camper Cahn**
Reuben Camper Cahn (*pro hac vice*)
Jennifer L. Keller (*pro hac vice*)
Chase A. Scolnick (*pro hac vice*)
KELLER/ANDERLE LLP
18300 Von Karman Avenue, Suite 930
Irvine, CA 92612
Tel: (949) 476-8700
rcahn@kelleranderle.com

*Counsel for I-Hsen "Joey" Chen*


**/s/ Jack W. Pirozzolo**
Jack W. Pirozzolo (BBO # 564879)
jpirozzolo@sidley.com
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0304

John C. Hueston (pro hac vice)
jhueston@hueston.com
Marshall Camp (pro hac vice)
mcamp@hueston.com
HUESTON HENNIGAN LLP
523 W. 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4340

*Counsel for William McGlashan, Jr.*

13

**/s/ R. Robert Popeo**
R. Robert Popeo (BBO # 403360)
Mark E. Robinson (BBO # 423080)
Eóin P. Beirne (BBO # 660885)
Cory S. Flashner (BBO # 629205)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1605 (telephone)
(617) 542-2241 (fax)
rpopeo@mintz.com
mrobinson@mintz.com
ebeirne@mintz.com
csflashner@mintz.com

*Counsel for Elisabeth Kimmel*


**/s/ Michael Kendall**
Michael Kendall (BBO # 544866)
Yakov Malkiel (BBO # 689137)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
yakov.malkiel@whitecase.com

Andrew E. Tomback (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8428
andrew.tomback@whitecase.com

*Counsel for John Wilson*


**/s/ Michael K. Loucks**
Michael K. Loucks (BBO #305520)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
500 Boylston Street
Boston, MA 02116

        (617) 573-4800
        michael.loucks@skadden.com

        Jack P. DiCanio (*pro hac vice*)
        Allen J. Ruby (*pro hac vice*)
        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
        525 University Avenue
        Palo Alto, CA 94301
        (650) 470-4500
        jack.dicanio@skadden.com
        allen.ruby@skadden.com

        *Counsel for Defendant Marci Palatella*


        **/s/ Tracy A. Miner**
        Tracy A. Miner (BBO No. 547137)
        Megan A. Siddall (BBO No. 568979)
        Miner Orkand Siddall LLP
        470 Atlantic Ave, 4th Floor
        Boston, MA 02110
        Tel.: (617) 273-8377
        Fax: (617) 273-8004
        tminer@mosllp.com
        msiddall@mosllp.com

        *Counsel for Homayoun Zadeh*


## **CERTIFICATE OF SERVICE**

    I, Martin G. Weinberg, hereby certify that on this date, May 27, 2020, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

        **/s/ Martin G. Weinberg**