# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 19-cr-10080-NMG |
| v. | *Leave to File Reply Brief* |
| DAVID SIDOO et al., | *Granted on 5/5/20 (ECF No. 1156)* |
| Defendants. | |

# DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CRIMINAL PROCEDURE 8 AND 12(b)(3)(B)(i), (iv), AND (v)

# ORAL ARGUMENT REQUESTED

The Government's Opposition to the Defendants' Motion to Dismiss Pursuant to Fed. R. Crim. P. 8 and 12(b)(3)(B)(i), (iv), and (v) can befound at pages 3-17 of the Government's "omnibus" filing (ECF No. 1170 ("Opp.")). The Opposition is most notable for what it does not say. Especially conspicuous is the omission of any discussion of the substance of *Kotteakos v. United States*, 328 U.S. 750 (1946).[1] In *Kotteakos,* the Supreme Court enshrined the principle that a "hub-and-spoke" arrangement is not a single conspiracy when the various "spokes" of the wheel interact only with the putative "hub," not with each other, and when each spoke acts only for his or her own benefit, and not for a common purpose. The Government cannot distinguish *Kotteakos* and its progeny, and so its Opposition ignores them.

Equally striking is the absence of any relevant case law to support the Government's substantive contentions: (1) that even though each Defendant acted for what the Government concedes were "individual motives," Opp. at 8 & n.4, they supposedly shared the "common conspiratorial goal" of "using fraud and bribery" to achieve their personal objectives; (2) that Rick Singer's participation in independent transactions with the individual Defendants provides the "overlap" needed for a hub-and-spoke conspiracy, *id.* at 9; and (3) that even though the Indictment alleges no manner of group effort, and even though the Defendants did nothing to assist or collaborate with each other, their activities were nevertheless "interdependent" because some of them "were aware that their activities were part of a larger enterprise." *Id.* at 11.

*Kotteakos* and its offspring refute all three propositions in a variety of contexts, including cases where the alleged co-conspirators all dealt separately with the same hub, all using "fraud" or "bribery," but each acting for discrete purposes generated by indisputably individual motives. In

---

[1] The Government tries to distinguish *Kotteakos* only on procedural grounds. Opp. at 4-5. *See* Section II, below.

1

every one of those cases, the court found as a matter of law that the charging document asserted (or the evidence showed) the existence of multiple conspiracies, not a "single overarching scheme." Opp. at 6.

In this situation, absence of evidence *is* evidence of absence: the Government cites no relevant supporting decisions because such decisions do not exist. The Government falls back instead on buzzwords and boilerplate, to the exclusion of concrete analysis; its argument is a cynical, if self-confessed, attempt to turn an inquiry about the fundamental adequacy of a criminal indictment into a "mere matter of semantics." Opp. at 8. What the Government seeks here is to persuade the Court (and force the Defendants) to accompany it on a journey into forbidden prosecutorial territory. Defendants ask the Court to decline the invitation and to restrain the Government from overreach by dismissing the defective conspiracy counts.

**I.      The Indictment Fails To Allege A "Single Overarching" Conspiracy.**

*Kotteakos* is the "seminal case" for the analysis of hub-and-spoke conspiracy allegations. *United States v. Glinton*, 154 F.3d 1245, 1251 (11th Cir. 1998). Moreover, as the Defendants explained in their opening brief, when it comes to the Indictment's assertion of a "single overarching scheme," *Kotteakos* is functionally indistinguishable from this case. *See* ECF No. 1032 ("Opening Br.") at 11-12.  In both *Kotteakos* and this case, the alleged hub facilitated the submission of applications—college applications here, loan applications in *Kotteakos*—on behalf of a number of individual clients. The success of each application supposedly depended on the commission of fraud by the broker and the applicant on a third party—a college here, a bank in *Kotteakos*. And the fraudulent success of any particular application redounded only to the benefit of the broker and the client, not to the group of clients as a whole and not to any other "spoke." In

2

both cases, the Government nevertheless prosecuted many of the individual clients together on a collective charge of participating in a single conspiracy.

By ignoring the point-to-point similarities between *Kotteakos* and this case, the Government tacitly admits their existence. The factual identity of the two cases entails the legal insufficiency of the Indictment. The opinions in *Kotteakos* and *United States v. Lekacos*, 151 F.2d 170 (2d Cir. 1945)—the appellate decision that the Supreme Court reviewed—explicitly or implicitly reject all of the Government's arguments for the viability of the conspiracy counts. First, in a case like this one, where each of the defendants has acted for individual motives, Opp. at 8, n.4, the crucial "common purpose" element is not supplied by allegations or evidence that each used similar means to achieve their personal goals. Nor does the fact that each spoke had a separate connection to the same hub demonstrate the requisite "overlap" among the participants. And finally, the element of "interdependence" is not furnished by allegations that some of the spokes knew that the hub had connections to other spokes who used his services in similar fashion for their own purposes.

### A.   Using Similar Means To Achieve An Individual Purpose Is Not A "Conspiracy-Wide Goal."

The flaw in many hub-and-spoke conspiracy allegations is, as the Supreme Court put it in *Kotteakos*, that they lack "the rim of the wheel to enclose the spokes." 328 U.S. at 755. In wheel-conspiracy analysis, the metaphoric "rim" is supplied by the existence of a "common purpose," which is therefore a "necessary part" of the alleged conspiracy. *United States v. Botti*, 2010 U.S. Dist. LEXIS 15600, at *17 (D. Conn. Feb. 23, 2010); *see also United States v. Taggert*, 2010 U.S. Dist. LEXIS 11992, at *2-3 (S.D.N.Y. Feb. 9, 2010).

The Defendants argued in their opening brief that the conspiracy charged here lacked even an alleged rim because each parent's purpose in doing business with Rick Singer was self-

3

evidently personal to him or her: the Indictment itself alleges that each Defendant acted "to facilitate *their* children's admission to selective colleges." Opening Br. at 12 (quoting Indictment, ¶ 64 (emphasis added)). The Government doesn't deny this; it acknowledges (1) that "the defendants may have had *individual motives* for joining the conspiracy—such as a desire for their children to gain admission to the colleges of their choice…," Opp. at 8, n.4 (emphasis added); and (2) that each defendant acted for the "*purpose* of securing the admission of the their [sic] children to selective colleges and universities." *Id.* at 8 (emphasis added).

Nevertheless, the Government insists, each parent "shared the common conspiratorial goal" of "using bribery and fraud" to achieve this individual purpose. *Id.* This, however, is just words on a page, as the Government effectively concedes when it invites the Court to treat its analysis of the common purpose requirement as "a mere matter of semantics." *Id.* (quoting *United States v. Portela*, 167 F.3d 687, 695 n. 3 (1st Cir. 1999)). But even semantic arguments need to be logical, and the government's is not: (1) if each defendant had an "*individual* motive" for doing business with Singer because each acted on "a desire for their children to gain admission to the colleges of their choice;" and (2) if each parent thus did business with Singer "for the *purpose* of securing the admission of … their children to selective colleges and universities;" then (3) it follows—even as a "mere matter of semantics"—that each Defendant acted for an *individual purpose* when he or she transacted with Singer. No other inference can rationally be taken from the Government's own description of the Defendants' alleged motives and purposes.[2]

---

[2] The cases cited in this portion of the Opposition are all inapposite. One of them, discussed at some length for the proposition that a single conspiracy can have multiple "facets," Opp. at 8-9, isn't even a conspiracy case. *United States v. Prieto*, 812 F.3d 6 (1st Cir. 2016). All but one of the conspiracy cases cited by the Government were *drug* conspiracy cases, which frequently differ from cases like this one in two important ways. First, drug-distribution enterprises are often "multi-faceted" in the sense—not applicable here—that they are "characterized by different activities carried on with regard to the same subject such that each conspirator, in a chain-like manner,

4

According to the Government, what ties the Defendants to each other is not their individual motives or their equally-independent purposes; it is the allegation that all agreed with Rick Singer to "us[e] fraud and bribery" to achieve their personal goals. Opp. at 8 & n.4. But this is a spurious connection: the use of allegedly similar *means* in the pursuit of admittedly individual *purposes* does not satisfy the common purpose requirement or make a series of distinct transactions into a "single overarching scheme."

Case after case makes this clear. First among them, in both time and precedential weight, is *Kotteakos* itself. If the Government were right, and "using fraud" to line one's pockets (or get one's child into college) is sufficient to establish a single conspiracy, then the Supreme Court would have affirmed the convictions in *Kotteakos* because that is what happened in *Kotteakos*: each defendant profited separately by similar means, using "fraudulent applications" containing "false representations" to obtain bank loans under a federal housing program. *Lekacos*, 151 F.2d at 172, 173. Likewise, if "using … bribes" to achieve a personal benefit evinced each bribe-giver's

---

performs a separate function which serves as a step or phase in the accomplishment of the overall contrivance." *United States v. Perez*, 489 F.2d 51, 58 (5th Cir. 1973). Second, the "common purpose" of such drug conspiracies can be "broadly drawn" because, as found in each of the cases cited by the Government for this proposition, the purpose is often a variation on the theme of "selling drugs for a profit." *United States v. Soto-Beniquez*, 356 F.3d 1, 18-19 (1st Cir. 2003); *see also United States v. Ortiz-Isla*, 829 F.3d 19, 25 (1st Cir. 2016) ("shared interest in furthering the distribution of drugs"); *United States v. Portela*, 167 F.3d 687, 695 (1st Cir. 1999) ("The goal of selling cocaine for profit").

The only non-drug conspiracy case cited by the Government in this part of the Opposition is *United States v. Smith*, 789 F.2d 196, 200 (3d Cir. 1986), for the proposition that "a finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies." Opp. at 9. In *Smith*, however, *all* of the alleged conspirators participated in *both* the "master conspiracy" *and* the "sub-schemes"—all of them agreed to obtain contracts from state and local entities by paying bribes to public officials (the "master conspiracy"), and all of them were involved in the efforts to obtain three particular contracts through such efforts (the "sub-schemes"). *Id.* at 198, 200-01. That did not happen in this case. No single defendant was involved in any "sub-schemes" but his or her own, and each was connected to the "master conspiracy" only through his or her alleged "sub-scheme."

5

agreement to a "conspiracy-wide goal," then the Ninth Circuit would have affirmed the convictions in *United States v. Canella*, 157 F.2d 470 (9th Cir. 1946), where the alleged co-conspirators all paid bribes to the same Army officer to obtain jobs or contracts at a military base. *Id.* at 472. Instead, the Ninth Circuit reversed the convictions, holding that as a matter of law:

> "***there was no purpose common*** to Wyckoff or McCormac [who paid the officer to give a contract to their dairy] and Miller [who paid the officer to appoint him assistant fire chief on the base], nor to Wyckoff or McCormack and Elliott [who bribed the officer to give him a job as a painter], or any of the others who formed separate spokes in this rimless wheel…."

*Id.* at 477 (emphasis added).

Indeed, no matter what illegal means are used or alleged, the federal courts have always rejected single-conspiracy criminal charges (and civil claims as well) in cases like this one, where the only ties binding a set of accused conspirators are (1) that each agreed to use similar means in pursuit of individual goals, and (2) that each made his or her agreement separately with the same central figure. Even in drug cases, if the accused conspirators are not colleagues in an integrated enterprise who work together for "the accomplishment of the overall contrivance," *United States v. Perez*, 489 F.2d 51, 58 (5th Cir. 1973), but instead are independent retailers who happen to obtain product from the same wholesaler, "[i]t is clearly not sufficient simply to say that the defendants all shared a common goal, to-wit: profit from the sale of cocaine." *Glinton*, 154 F.3d at 1252 (finding no single conspiracy "as a matter of law" where each of the defendants "functioned by themselves" after buying drugs from a common supplier).[3]

---

[3] *See, e.g., United States v. Swafford*, 512 F.3d 833, 841-42 (6th Cir. 2008) (reversing single-conspiracy conviction of defendant who distributed precursor chemicals to some 40 customers, each of whom used the chemicals to cook methamphetamine for resale, because "the government failed to prove a common goal as between the customers"); *Rocha v. United States*, 288 F.2d 545 (9th Cir. 1961) (reversing conspiracy convictions of six immigrants who each entered into a "green card marriage" with a different woman, even though the same person brokered each marriage, because "in no event was any of the men … interested in any marriage but his own"); *New York*

One searches the Opposition in vain for a citation to even a single contrary decision. This omission has profound implications: it shows that, if the Court were to allow the conspiracy charges to go to trial, it would expose the Defendants to criminal jeopardy on the basis of a conception of "common purpose" that has no provenance in American law.

> **B.     Rick Singer's Participation Does Not Satisfy The 'Overlap' Requirement Of The Wheel-Conspiracy Analysis.**

In their opening brief, the Defendants explained how the Indictment also failed to allege any "overlap" among them because, while Rick Singer may have been involved in every transaction at issue and some of his confederates may have played a role in more than one, "each 'spoke' of the alleged wheel connected only to a single 'hub.'" Opening Br. at 13. The Government does not disagree with this account of the Indictment's allegations or suggest that the evidence at trial will prove something different from what the Indictment describes. Instead, the Opposition argues that the Indictment sufficiently alleges overlap *because* it says that each spoke connected to a central hub, i.e., because it alleges "the pervasive involvement of a *single* core conspirator…." Opp. at 10 (emphasis in original).

---

*Auto Ins. Plan v. All Purpose Agency & Brokerage*, 1998 U.S. Dist. LEXIS 15645, at *13 & n.3 (S.D.N.Y. Oct. 6, 1998) (granting summary judgment to defendant on civil RICO claim, but using "common law conspiracy" principles to hold that no single "enterprise" existed where numerous insureds, working through the same brokers, submitted fraudulent applications to insurers: "it appears that the Insureds each committed similar but independent frauds with the aid of the Producer-Defendants….Such a series of discontinuous independent frauds is not an 'enterprise'"); *Hoffman-La Roche, Inc. v. Greenberg*, 447 F.2d 872, 875 (7th Cir. 1971) (vacating judgment on civil conspiracy claim against three defendants who each bought stolen merchandise from the same thief or his confederates, since it "would unduly extend the conspiracy concept to make a purchaser of a few cartons of stolen merchandise a conspirator with all others who had made purchases from intermediaries dealing with a common thief"); *see also United States v. Marcus Schloss & Co.*, 710 F. Supp. 944, 951 (S.D.N.Y. 1989) (excluding evidence of insider trading by alleged co-conspirators, who were separately tried for scheduling reasons, because indictment did not sufficiently allege a single conspiracy: each supposed conspirator merely received stock tips from the same source).

This argument is wrong because it cannot be right. If the pervasive involvement of a central figure like Rick Singer were enough, then the "overlap" element would be superfluous to the analysis of hub-and-spoke conspiracy allegations: *every* wheel—even a defectively rimless one—contains a set of spokes connected to a single hub. *See United States v. Marcus Schloss & Co.*, 710 F. Supp. 944, 951 (S.D.N.Y. 1989) ("It is, of course, well settled that the spokes cannot be characterized as co-conspirators with each other in a single conspiracy solely because they share a common source at the center."). Again, *Kotteakos* itself refutes the Government's position. That case, too, was marked by the "pervasive involvement" of a "single core conspirator"—his name was Simon Brown, and just like Rick Singer, he played a broker's role in every one of the allegedly fraudulent transactions committed by his clients. *See Lekacos*, 151 F.2d at 171. But, just as Brown's "pervasive involvement" was not enough to save the single-conspiracy charge in *Kotteakos*, Singer's alleged involvement in distinct transactions with each of the Defendants cannot save the single-conspiracy charges in this case.

### C. Interdependence Cannot Be Demonstrated By Evidence That Some Spokes Knew There Were Other Spokes.

Finally, in their opening brief, the Defendants argued that the activities ascribed to each of them in the Indictment were not "interdependent" in the way that, for example, the components of an integrated drug distribution scheme depend on each other for the success of the larger enterprise. Moreover, the Defendants pointed out, the Indictment alleged no connections between them beyond a vague suggestion that, because Singer had explained to some of his clients that his methods were "tried-and-true," those clients must have known that Singer had other clients with whom he engaged in illegal activities. Opening Br. at 14-15.

The Government again does not suggest that the case will be tried on any basis other than the one described in the Indictment. Its argument for "interdependence," then, is not that it can

8

prove that Rick Singer's ability to deliver a college admission to one client actually *depended*, in practical terms, on the success or failure of his services to other clients. The Government's position is that the "interdependence" requirement can be satisfied by showing that "the defendants were aware that their activities were part of a larger enterprise," as reflected by evidence that some of Singer's clients asked him what he was doing for other clients, and that some "referred friends" to him. Opp. at 11 & n.6.

If this is how the Government intends to try the case, however, then *Kotteakos* again foredooms it. In that case, too, some of the hub's clients made referrals. *Kotteakos*, 328 U.S. at 753. And the Second Circuit—when it opined that the trial court "should have dismissed the indictment," *Lekacos*, 151 F.2d at 172—assumed that *all* of the defendants "knew that Brown was for the time being acting for a number of other persons, who were getting loans in fraud of the Act, and who were making false representations to the bank like those which they themselves were making." *Id.* at 173. But that knowledge, the Second Circuit held, "was not enough to make them confederates with the other applicants; it did not give them any interest in the success of any loans but their own; there was no interest, no venture, common to them and anyone else but Brown himself." *Id.*

## II.    Dismissal Is The Appropriate Remedy.

Without a substantive leg to stand on, the Government grasps procedure as a crutch, repeatedly urging the Court to deny the motion to dismiss because identifying a single or multiple conspiracy is a factual issue and deciding factual issues is a jury function. Opp. at 3-7, 10, 12. Thus, for example, the procedural history of *Kotteakos*, in which the Supreme Court reversed convictions after trial rather than dismissing an indictment before trial, is the only basis the Government provides for distinguishing that "seminal decision." *Id.* at 4.

9

Here as well, however, the Opposition ultimately resorts to pointless rhetorical quibbling. Unable to effectively distinguish or refute the cases Defendants cited as examples, the Government chides the Defendants for "contend[ing] that 'several' federal courts have taken the path they urge, but cit[ing] a total of three district court cases in support of that contention." Opp. at 6. The criticism is semantically incorrect. *See* "Several," MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/several (last visited May 27, 2020) (defining "several" to mean "more than two but fewer than many"). The cases Defendants cited, moreover, were examples, not an exhaustive catalog. There are more. *See, e.g., United States v. Hardy*, 762 F. Supp. 1403, 1410 (D. Haw. 1991) (dismissing conspiracy charge as duplicitous where indictment described two separate agreements on its face); *United States v. Marlinga*, 2005 U.S. Dist. LEXIS 3156, at *20 (E.D. Mich. Feb. 28, 2005) (after likening indictment to *Kotteakos*, District Court ordered the indictment "reformulated" and required "[s]eparate indictments" for the distinct conspiracies, rejecting a "single superceding indictment charging two conspiracies" as "not appropriate"); *People v. Luciano*, 951 N.Y.S.2d 88, 2012 N.Y. Misc. LEXIS 1955, at *47 (N.Y. Cty. Sup. Ct. Apr. 27, 2012) (dismissing conspiracy charges before trial where "the conceptual rules followed by the Second Circuit in analyzing *Kotteakos* claims" clearly indicated "that a single conspiracy was not adequately alleged in this case").

All of these cases applied a common-sense principle that the Government ignores: "an ounce of prevention is worth a pound of cure." *Hardy*, 762 F. Supp. at 1410. This maxim is especially valuable "where, as here, the preservation of defendants' Fifth and Sixth Amendment rights hangs in the balance." *Id.* As the Sixth Circuit has observed—in a decision that reversed a conspiracy conviction because the District Court had failed to dismiss it despite the evident legal insufficiency of three of its four prongs, forcing the defendants into a trial that was tainted by the

introduction of irrelevant and misleading evidence—"[i]ll-defined charges leave the prosecution free to roam at large…." *United States v. Adkinson*, 135 F.3d 1363, 1374 (6th Cir. 1998). If the trial courts could not weed out defective indictments like this one, "there would be no bar to improperly lumping numerous separate conspiracies into a single indictment and then obtaining all the benefits a single conspiracy prosecution enjoys up to the moment a trial sufficiency motion was determined." *Luciano*, 2012 N.Y. Misc. LEXIS 1955, at *45.

Rule 12 is on the books for exactly these reasons. *See Hardy*, 762 F.Supp. at 1410 (quoting *United States v. Gordon*, 844 F.2d 1397, 1400 (9th Cir. 1988) ("A duplicity objection can easily be made before trial because a duplicity claim is directed at the *face* of the indictment and not at the evidence presented at trial")). It authorizes—and in fact requires—duplicity and other defects in the indictment to be raised before trial, see Fed. R. Crim. P. 12(b)(3)(b)(i), (iv), and thus gives this Court the tool it needs to prevent a wasteful, wrong-headed, and oppressive prosecution from going forward. The Defendants urge the Court not to leave that valuable tool unused.

### III.   Joinder Of The Defendants Is Improper Under Rule 8(b).

With respect to the misjoinder arguments made by the Defendants in their opening brief, Opp. at 13-17, the Opposition is an exercise in misdirection. Its factual premise is that the Government could properly join, in a single Indictment, three *counts* alleging mail and wire fraud conspiracy, program bribery conspiracy, and money laundering conspiracy, respectively, because (1) the "principle purposes" of the conspiracies alleged in the first two counts were "largely the same," and (2) the conspiracy alleged in the third count "was designed to conceal the fraud scheme." *Id.* at 14-15. This is beside the point.

The Government is attacking a straw man. It is responding to a Rule 8(*a*) ("Joinder of *Offenses*") argument that the Defendants never made. The Defendants do not contend that the

"offenses charged" lack "the same or similar character." Fed. R. Crim. P. 8(a). The issue they raise expressly implicates Rule 8(*b*) ("Joinder of *Defendants*"), Opening Br. at 17-18, because their argument is based on the absence of a "substantial identity of *facts or participants underlying* the charged offenses." *United States v. Yefsky*, 994 F.2d 885, 895 (1st Cir. 1993) (quotation marks and citation omitted) (emphasis added). The question the Defendants pose, then, is a question that the Government does not attempt to answer: how the Court could justifiably try the individual Defendants together, given the disparate characteristics of their alleged activities; given the undisputed fact that no Defendant is alleged to have played any role in the activities of any other Defendant; and given the reality that the evidence against any single Defendant will consequently be mostly irrelevant (and thus unfairly prejudicial) to all of his or her co-Defendants.

Although the decisions on which the Government principally relies all apply (or at least mention) Rule 8(b), they are nevertheless inapposite. The opinion in *Schaffer v. United States*, 362 U.S. 511 (1960), discusses Rule 8(b) only briefly, *id.* at 514, and primarily applies Rule 14 (severance). *Id.* at 514-17. In *United States v. Prange*, 922 F. Supp. 2d 127, 129 (D. Mass. 2013), joinder was justified by the presence as a defendant of the common "hub" figure, i.e., that case's equivalent of Rick Singer. The benefit to the Government in that scenario—relief from the burden of proving the same defendant's guilt several times over—is absent here, where the central figure is not a defendant and may not even be a witness.

Finally, in *United States v. Barbosa*, 666 F.2d 704 (1st Cir. 1981), the First Circuit found the requisite "series of acts or transactions," Fed. R. Crim. P. 8(b), in facts that bear no resemblance to the allegations in the Indictment. In *Barbosa*, the Court approved the joinder of three defendants: one who had bought heroin from a government informant, and two who had purchased cocaine from the same informant. Both transactions took place in the same apartment, on the same night,

in the presence of the same witness. *Id.* at 706-707. In fact, the transactions occurred within five minutes of each other, and there was even evidence suggesting that the two sets of purchasers may have arrived at the scene in the same car. *Id.* at 707.

This case could hardly be more different. First, there are twelve defendants in this case, not three. Second, according to the Indictment, the various transactions may all have involved one common figure in Rick Singer, but because Singer used a shifting cast of employees and confederates, there will be no single third-party witness to all of them. Third, although the transactions in *Barbosa* involved two different drugs, they could both be classified as "Schedule I drug sales"; here, on the other hand, as the Defendants have explained (and the Government does not deny), the transactions alleged fall into three distinct "genres"—test-taking fraud, class-taking fraud, and athletic recruitment fraud—that defy unitary categorization. Finally, while the transactions in *Barbosa* could accurately be termed a "series" given their proximity in time (five minutes) and location (one apartment), the transactions alleged in the Indictment in this case span a decade and a continent, involving different defendants from different states seeking admission to different schools at different times between 2007 and 2019.

DATED: May 27, 2020                                    Respectfully submitted,

/s/ Eóin P. Beirne
R. Robert Popeo (BBO # 403360)
Mark E. Robinson (BBO # 423080)
Eóin P. Beirne (BBO # 660885)
Cory S. Flashner (BBO # 629205)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1605 (telephone)
(617) 542-2241 (fax)
rpopeo@mintz.com
mrobinson@mintz.com
ebeirne@mintz.com
csflashner@mintz.com

*Counsel for Elisabeth Kimmel*

| | |
|---|---|
| */s/ Brian T. Kelly* | */s/ David E. Meier* |
| Brian T. Kelly (BBO No. 549566) | David E. Meier (BBO #341710) |
| Joshua C. Sharp (BBO No. 681439) | Todd & Weld LLP |
| Lauren M. Maynard (BBO No. 698742) | One Federal Street, 27th Floor |
| NIXON PEABODY LLP | Boston, MA 02110 |
| 53 State Street | (617) 720-2626 |
| Boston, MA 02109 | dmeier@toddweld.com |
| 617-345-1000 | |
| bkelly@nixonpeabody.com | */s/ Stephen H. Sutro* |
| jsharp@nixonpeabody.com | Stephen H. Sutro, Esq. |
| lmaynard@nixonpeabody.com | Duane Morris, LLP |
| | Spear Tower |
| Robert Sheketoff (BBO No. 457340) | One Market Plaza, Suite 2200 |
| One McKinley Square | San Francisco, CA 94105-1127 |
| Boston, MA 02109 | (415) 957-3008 |
| 617-367-3449 | SHSutro@duanemorris.com |
| | |
| *Counsel for Gamal Abdelaziz* | *Counsel for Diane Blake and Todd Blake* |
| | |
| */s/ David S. Schumacher* | */s/ Reuben Camper Cahn* |
| David S. Schumacher (BBO #647917) | Reuben Camper Cahn *(pro hac vice)* |
| HOOPER, LUNDY & BOOKMAN, P.C. | Jennifer L. Keller *(pro hac vice)* |
| 470 Atlantic Avenue, Suite 1201 | Chase A. Scolnick *(pro hac vice)* |
| Boston, MA 02210 | KELLER/ANDERLE LLP |
| (617) 532-2700 | 18300 Von Karman Avenue, Suite 930 |
| (617) 345-3927 (fax) | Irvine, CA 92612 |

dschumacher@health-law.com

Patric Hooper (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517
(310) 551-8111
(310) 551-8181 (fax)
phooper@health-law.com

Jordan Kearney (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
575 Market Street, Suite 2300
San Francisco, CA 94105
(415) 875-8500
(415) 875-8519 (fax)
jkearney@health-law.com

*Counsel for Amy and Gregory Colburn*

*/s/ Jack W. Pirozzolo*
Jack W. Pirozzolo (BBO # 564879)
jpirozzolo@sidley.com
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0304

John C. Hueston (*pro hac vice*)
jhueston@hueston.com
Marshall Camp (*pro hac vice*)
mcamp@hueston.com
HUESTON HENNIGAN LLP
523 W. 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4340

*Counsel for William McGlashan, Jr.*

*/s/ Tracy A. Miner*
Tracy A. Miner (BBO No. 547137)
Megan A. Siddall (BBO No. 568979)
Miner Orkand Siddall LLP
470 Atlantic Ave, 4th Floor
Boston, MA 02110
Tel.: (617) 273-8377

Tel: (949) 476-8700
rcahn@kelleranderle.com

*Counsel for I-Hsen "Joey" Chen*

*/s/ Michael K. Loucks*
Michael K. Loucks (BBO #305520)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
500 Boylston Street
Boston, MA 02116
(617) 573-4800
michael.loucks@skadden.com

Jack P. DiCanio (*pro hac vice*)
Allen J. Ruby (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, CA 94301
(650) 470-4500
jack.dicanio@skadden.com
allen.ruby@skadden.com

*Counsel for Defendant Marci Palatella*

*/s/ Martin G. Weinberg*
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Matthew L. Schwartz (*admitted pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Tel.: (212) 446-2300
Fax: (212) 446-2350
E-mail: mlschwartz@bsfllp.com

*Counsel for Robert Zangrillo*

Fax: (617) 273-8004
tminer@mosllp.com
msiddall@mosllp.com

*Counsel for Homayoun Zadeh*

*/s/ Michael Kendall*
Michael Kendall (BBO # 544866)
Yakov Malkiel (BBO # 689137)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
yakov.malkiel@whitecase.com

Andrew E. Tomback (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8428
andrew.tomback@whitecase.com

*Counsel for John Wilson*

**CERTIFICATE OF SERVICE**

I, Eóin P. Beirne, hereby certify that on May 27, 2020, this document, filed through the CM/ECF system, will be sent electronically to all registered participants in this matter as identified on the Notice of Electronic Filing (NEF).

*/s/ Eóin P. Beirne*
Eóin P. Beirne (BBO # 660885)