UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

UNITED STATES OF AMERICA

v.

DAVID SIDOO et al.,

Defendants

No. 1:19-CR-10080-NMG

---

## MEMORANDUM IN SUPPORT OF MOTION TO STRIKE THE SECOND SENTENCE OF PARAGRAPH 119 AND ALL OF PARAGRAPH 121 FROM THE FOURTH SUPERSEDING INDICTMENT

Defendants respectfully request that the Court strike the second sentence of paragraph 119 and all of paragraph 121 from the Fourth Superseding Indictment.  These sentences currently read:

- Subsequently, Heinel and Singer agreed that instead of directing this money to USC, Heinel would receive payments of $20,000 per month personally in exchange for her assistance in securing the admission of ABDELAZIZ'S daughter, and the children of other Singer clients, to USC as purported athletic recruits.

- In or about July 2018, KWF began paying Heinel $20,000 per month in exchange for facilitating the admission of ABDELAZIZ'S daughter, and the children of other Singer clients, to USC as purported athletic recruits. The payments included at least one check that Singer mailed to Heinel in California on or about January 3, 2019.

These sentences are the only references in the Fourth Superseding Indictment to Heinel receiving money personally.  As set forth below, these sentences are "immaterial or irrelevant allegations" and are highly prejudicial to Defendants.  *See United States v. Lewis*, 40 F.3d 1325, 1346 (1st Cir. 1994).  The government **admits** that Defendants were never told, did not know, and did not agree that their funds would be used to line Heinel's pockets.  *See* Dkt. 1104 at 7.  The

government **admits** that, instead, Defendants were told, understood, and agreed that their funds would be used to support USC athletic programs.  *Id.*  The government's legal theory is that Defendants are still guilty because "it doesn't matter if a payment is called 'donation,' or is directed to an athletic program instead of a coach's pocket[.]"  *Id.* at 2-3.  *See also* June 3, 2019 Hr'g Tr. at 13:8-10 (Dkt. 396) (AUSA Rosen: "[I]t simply doesn't matter whether the money went to a coach's program or whether it went to a -- the coach's pocket directly.").  That theory should rise or fall on its own merits.  The government should not be permitted to incorporate irrelevant and misleading allegations into the indictment as a "backup plan" to ensure that even if its theory is ultimately rejected, the specter of money lining Heinel's pockets will cause such confusion and prejudice that it will nevertheless lead the jury to convict.

## ARGUMENT

Federal Rule of Criminal Procedure 7 permits the Court to "strike surplusage from the indictment or information" on the Defendant's motion.  As the Advisory Committee Notes explain, the rule is a "means of protecting the defendant against immaterial or irrelevant allegations in an indictment or information, which may, however, be prejudicial."  Fed. R. Crim. P. 7(d), Advisory Committee Notes to 1944 Adoption.  Whether to strike surplusage "rests in the sound discretion of the district court."  *Lewis*, 40 F.3d at 1346.  This Court should exercise its discretion to strike the second sentence of paragraph 119 and the entirety of paragraph 121 because the allegations therein are irrelevant to the charged conspiracies and serve no purpose other than to prejudice the Defendants, confuse the factfinder, and complicate these proceedings.

The government now admits that the Defendants did **not know** that their money would be funneled to Donna Heinel personally.  If that were not enough to strike the second sentence of paragraph 119 and paragraph 121, the government has gone one step further, admitting that far from being unaware of the destination of their funds, the Defendants affirmatively "knew" and

"understood" that they were sending funds—through Singer—to a **USC athletic program**. As the government stated in its recent filing:

- The government was not attempting to build a case that the parents understood Heinel to be personally pocketing money, and the government has **never alleged that**. The government *has* alleged—and the calls, checks and emails prove—that the defendants **knew** that one or more complicit insiders at USC were facilitating the admission of their children as recruited athletes **in exchange for payments to a USC athletic program.**

- [T]he defendants **understood** they were making *quid pro quo* payments **to a USC fund** to induce a university insider to facilitate the fraudulent recruitment of their children.

Dkt. 1104 at 7, 9-10 (emphasis added). These government concessions are critical. The government's admission that, all along, the Defendants understood they were providing funds to USC athletic programs rather than to Heinel personally is fully supported by the extensive discovery produced by the government and by AUSA Rosen's **sworn statement** that Singer typically told his clients that "the money was a 'donation' to an athletic 'program.'" Dkt. 1104-3 at ¶ 6.

Because the parents never knew their funds would be directed to Heinel personally, the allegations in paragraphs 119 and 121 that Singer—in cahoots with Heinel—later diverted their funds to Heinel cannot have any bearing on the parents' intent to join the charged conspiracies. Nor does it have any bearing on any aspect whatsoever of the charged conspiracies. The text of the indictment—together with the government's concessions—make clear that Singer's agreement to line Heinel's pockets was a **side deal**—a separate conspiracy between Singer and Heinel which the Defendants did not join and which the Fourth Superseding Indictment does not charge.

For instance, paragraphs 114-119 of the indictment state, "Beginning in or about the summer of 2017, Gamal Abdelaziz **agreed** with Singer to pay an amount . . . for facilitating his

3

daughter's admission to USC . . . . On or about December 4, 2017, Heinel instructed Singer that a payment of $200,000 for Abdelaziz's daughter should be directed to the gift account for the Galen Center, the arena for USC's basketball and volleyball programs." (emphasis added).  But the second sentence of paragraph 119 states, "**Subsequently, Heinel and Singer agreed** that instead of directing this money to USC, Heinel would receive payments of $20,000 per month personally in exchange for her assistance . . . ." (emphasis added).  The indictment itself states that this **subsequent agreement** to line Heinel's pockets was between just two people—Singer and Heinel—neither of whom are defendants in this case.  And as the government's briefing cited above makes clear, the Defendants had no knowledge or involvement in that subsequent agreement.

The government contends that the Singer-Heinel side deal was simply an "allocation" matter and was part and parcel of the charged conspiracies even if the Defendants did not know of its existence.  *See* Dkt. 1170 at 52.  While each conspirator need not "kn[o]w all of the details of the conspiracy or participate[] in every act in furtherance of the conspiracy," *United States v. Berroa*, 856 F.3d 141, 154 (1st Cir. 2017), this is **not** the typical case where the defendants simply did not know one way or the other about some aspect of the conspiracy.  Rather, the Defendants were informed by their alleged co-conspirator Singer and understood (as the government admits), that their funds would be spent in one manner.  Later, Singer made a secret deal with a third person (Heinel) to spend Defendants' funds in a manner that was **inconsistent with the Defendants' original agreement.**

Simply put, Singer and Heinel's "subsequent agreement" to divert funds from USC athletic programs to Heinel's own wallet was not part of the conspiracies charged in the Fourth Superseding Indictment.  Further, the government has essentially admitted that the allegations in paragraphs 119 and 121 are **not even relevant** to the charged conspiracies.  In the government's

4

own words, "there is [not] a legal distinction between a 'donation' to a 'program' and a 'payment' to a 'coach' . . . provided that the money is intended as a *quid pro quo*." Dkt. 1104 at 3. The government's theory is that:

> Paying money in exchange for guaranteed admissions spots for unqualified athletes based on fabricated credentials is illegal. The issue is not *where* the money was sent, or what the payments were called, but *why* it was sent and what the parents received in exchange. Here, they received their children's guaranteed admission to elite universities as recruited athletes in sports they did not play (or did not play at that level).

*Id.* at 8. In other words, the government believes the Defendants are guilty of conspiring to commit mail/wire fraud and federal programs bribery if they agreed to provide money (no matter the destination) in exchange for their children's admission to USC based on embellished or fake athletic credentials. As the government further explained with respect to Defendant Abdelaziz specifically:

> [W]hether Abdelaziz's payment was ultimately funneled at Heinel's direction to a USC fund over which she exercised discretion, or to her own personal account, **is irrelevant to the question whether the payment was a bribe.** So long as it was paid corruptly, as a *quid pro quo*, it was a bribe either way. And the ultimate destination of the money **is even less relevant to Abdelaziz's intent in making the payment, and thus to the conspiracy crimes with which he is charged** . . . . In short, how Abdelaziz's funds were allocated after he paid them—whether to Heinel personally, or to a university account she controlled—is **irrelevant** to the question of whether he intended to induce Heinel to violate her duty of honest services to USC in exchange for a secret payment.

Dkt. 670 at 11-12. It is "**irrelevant**," in the government's own words, whether Abdelaziz or any other Defendants agreed to send their money to a USC athletic program or directly to Heinel. That is a perfectly fine theory for the government to argue to this Court. But if: (A) the government believes the intended destination of Defendants' funds "does not matter," because there is no "legal distinction" between a payment to a USC program and a payment directly to Heinel, Dkt. 1104 at 2-3; and (B) the government admits Defendants understood they were making payments to a USC program and never knew of payments directly to Heinel, Dkt. 1104

at 7-9, then **why does the Fourth Superseding Indictment contain three sentences referencing payments directly to Heinel?**

The answer is clear: to **prejudice Defendants**.  The government knows that even though Defendants understood their money would be sent to USC athletics and never knew Heinel would pocket any money personally, the jury will confuse the issues.  The mere mention of money lining Heinel's pockets in exchange for admission will lead to a conviction on the mistaken basis that the parents were somehow participants in the Singer-Heinel side deal.  In addition to prejudicing the Defendants, paragraphs 119 and 121 will also **vastly complicate the trial proceedings by sowing confusion about issues that the government has already conceded are irrelevant and immaterial.**  With six defendants in each trial, the trials in this matter will be long enough, and the juries will have a difficult time keeping the facts of each defendant's case straight.  There is no need to further complicate matters by having the government prove a side deal between Singer and Heinel which the government admits has no bearing on its case.

## CONCLUSION

For the reasons set forth above, Defendants request that the Court strike the second sentence of paragraph 119 of and all of paragraph 121 from the Fourth Superseding Indictment.

Dated:  May 29, 2020                                          Respectfully submitted,

                                                                                 */s/ Brian T. Kelly*
                                                                                 Brian T. Kelly (BBO No. 549566)
                                                                                 Joshua C. Sharp (BBO No. 681439)
                                                                                 Lauren M. Maynard (BBO No. 698742)
                                                                                 NIXON PEABODY LLP
                                                                                 53 State Street
                                                                                 Boston, MA 02109
                                                                                 617-345-1000

bkelly@nixonpeabody.com
jsharp@nixonpeabody.com
lmaynard@nixonpeabody.com

Robert Sheketoff (BBO No. 457340)
One McKinley Square
Boston, MA 02109
617-367-3449

*Counsel for Gamal Abdelaziz*

/s/ David S. Schumacher
David S. Schumacher (BBO #647917)
HOOPER, LUNDY & BOOKMAN, P.C.
470 Atlantic Avenue, Suite 1201
Boston, MA 02210
(617) 532-2700
(617) 345-3927 (fax)
dschumacher@health-law.com

Patric Hooper (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517
(310) 551-8111
(310) 551-8181 (fax)
phooper@health-law.com

Jordan Kearney (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
575 Market Street, Suite 2300
San Francisco, CA 94105
(415) 875-8500
(415) 875-8519 (fax)
jkearney@health-law.com

*Counsel for Amy and Gregory Colburn*

/s/ Jack W. Pirozzolo
Jack W. Pirozzolo (BBO # 564879)
jpirozzolo@sidley.com
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0304

John C. Hueston (*pro hac vice*)

/s/ David E. Meier
David E. Meier (BBO #341710)
Todd & Weld LLP
One Federal Street, 27th Floor
Boston, MA  02110
(617) 720-2626
dmeier@toddweld.com

Stephen H. Sutro, Esq.
Duane Morris, LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105-1127
(415) 957-3008
SHSutro@duanemorris.com

*Counsel for Diane Blake and Todd Blake*

/s/ Reuben Camper Cahn
Reuben Camper Cahn (*pro hac vice*)
Jennifer L. Keller (*pro hac vice*)
Chase A. Scolnick (*pro hac vice*)
KELLER/ANDERLE LLP
18300 Von Karman Avenue, Suite 930
Irvine, CA 92612
Tel: (949) 476-8700
rcahn@kelleranderle.com

*Counsel for I-Hsen "Joey" Chen*

/s/ R. Robert Popeo
R. Robert Popeo (BBO # 403360)
Mark E. Robinson (BBO # 423080)
Eóin P. Beirne (BBO # 660885)
Cory S. Flashner (BBO # 629205)
MINTZ, LEVIN, COHN, FERRIS,

jhueston@hueston.com
Marshall Camp (*pro hac vice*)
mcamp@hueston.com
HUESTON HENNIGAN LLP
523 W. 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4340

*Counsel for William McGlashan, Jr.*

/s/ Michael Kendall
Michael Kendall (BBO # 544866)
Yakov Malkiel (BBO # 689137)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
yakov.malkiel@whitecase.com

Andrew E. Tomback (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8428
andrew.tomback@whitecase.com

*Counsel for John Wilson*

/s/ Tracy A. Miner
Tracy A. Miner (BBO No. 547137)
Megan A. Siddall (BBO No. 568979)
Miner Orkand Siddall LLP
470 Atlantic Ave, 4th Floor
Boston, MA 02110
Tel.: (617) 273-8377
Fax: (617) 273-8004
tminer@mosllp.com
msiddall@mosllp.com

*Counsel for Homayoun Zadeh*

GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1605 (telephone)
(617) 542-2241 (fax)
rpopeo@mintz.com
mrobinson@mintz.com
ebeirne@mintz.com
csflashner@mintz.com

*Counsel for Elisabeth Kimmel*

/s/ Michael K. Loucks
Michael K. Loucks (BBO #305520)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
500 Boylston Street
Boston, MA 02116
(617) 573-4800
michael.loucks@skadden.com

Jack P. DiCanio (*pro hac vice*)
Allen J. Ruby (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
525 University Avenue
Palo Alto, CA 94301
(650) 470-4500
jack.dicanio@skadden.com
allen.ruby@skadden.com

*Counsel for Marci Palatella*

/s/ Martin G. Weinberg
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Matthew L. Schwartz (*admitted pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Tel.: (212) 446-2300
Fax: (212) 446-2350

E-mail:  mlschwartz@bsfllp.com

*Counsel for Robert Zangrillo*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the forgoing was filed electronically on May 29, 2020, and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing.

*/s/ Brian T. Kelly*
Brian T. Kelly