# EXHIBIT A

1    **Call date:**     9/15/18

2    **Duration:** 18:00

3    **Call Begin: [ ] Call End [ ]**

4    **Call Participants:**

5         Rick Singer

6         John LNU

7    **File Name:**      █████████  2018-09-15 13-04-26 08137-001

8    **Bates No.:**

9

10   _:   [00:00] Good morning.

11   SINGER:   Good morning (inaudible).

12   LNU: Hello, Rick.

13   SINGER:   Hey, John.

14   _:   (inaudible) how you doing?

15   LNU: How you doing?

16   SINGER:   Good.  How you doing?

17   LNU: Hey, you at a game?

18   SINGER:   No, no.  I'm just leaving somewhere.

19   LNU: OK.  [laughter]  Hey, what's the best way for us to put

20        together a structured relationship for the girls and, uh,

21        you know, get some -- you know, let's say regular advice

22        or at least some periodic advice for them as they go

23        through the search process and they're trying to identify

24        majors --

1   SINGER:   So --

2   LNU: -- in schools and all that.

3   SINGER:   So we just need -- you decide that that's what you

4        want to do.  You want to go forward then --

5   LNU: Yeah.

6   SINGER:   -- I will -- I will meet with the kids via Skype or

7        Facetime, um, every 4 weeks and, uh, if they need help in

8        between they can cal me or text me or whatever and

9        that'll be it.

10  LNU: OK, that sounds good.  And, uh, what's the fee for that?

11       How does that work?

12  SINGER:   So are we going to do any, um, test prep [01:00]

13       stuff with them?

14  LNU: Uh, potentially.  I -- I don't know.  They've done a lot

15       of test prep already.  You -- did you see -- you saw the

16       test scores, right?

17  SINGER:   Yeah.

18  LNU: And they were from like a year ago.

19  SINGER:   (inaudible).

20  LNU: They were when they were freshmen so they're pretty --

21       you know, they're pretty good scores already.  I assume

22       they're going to get better now that they're juniors.

23  SINGER:   So that's a question for you.  So are we going to

24       help them prepare for -- so they get the right -- they

1      get the -- the best scores and on the subject tests, too?

2      Or are we just -- am I just going to work with them, uh,

3      every 4 weeks?

4    LNU: The -- oh, I don't know, I think the scores, too.  How

5      does that -- what's the difference in price (inaudible)

6      going to work with somebody local on that?  How does that

7      work for you guys to do something on the test prep?

8    SINGER:   So what we do is we just have somebody -- one of my

9      better people Skype with them every week and they work

10     with -- on the testing with them every week and then they

11     have homework in between and then I -- I see them every

12     fourth week.

13   LNU: OK.  I feel like it makes sense.  I got to make sure it's

14     doable from their schedule and all that stuff.  But, uh,

15     that probably [02:00] makes sense, too, yeah.

16   SINGER:   OK.  So -- so the difference is -- one is $8,000

17     annually and one's $5,000 annually.

18   LNU: OK.  I'll go for the full Monty, yeah.

19   SINGER:   It's up to you.  Whatever you guys want.

20   LNU: Yeah.  Let's -- let's try the full Monty and -- and try

21     to make sure...  Well, I got to, you know, make sure it

22     works for them but, uh, we can pay for it and if it

23     doesn't work I guess (inaudible) yeah, just not do it.  I

24     just worry about their overall schedule.  But they'll

1    make it flexible, right?  You guys are not on the West

2    Coast always or...  Are you guys spread out?  Or that

3    would help them do the test prep?

4  SINGER:   I could-- could you say that again, John?

5  LNU: In terms of the guys who would help on the test prep, is

6    that something that is -- like they're based on the East

7    Coast or West Coast or -- just in terms of timeline.

8  SINGER:   OK.  They're based on both and they can make the

9    time.  The is--

10 LNU: OK.

11 SINGER:   I mean, they're -- they're doing it with kids all

12    over the country and it's been pretty (inaudible).

13 LNU: OK, great.  So you've got the logistics down.  OK.

14 SINGER:   Yeah.

15 LNU: So logistics work.

16 SINGER:   Yeah.

17 LNU: OK, super.  That's good to hear.  And I'd love to have a

18    -- a game plan and kind of overall strategy session with

19    you up front with them, (inaudible) how do we think about

20    visiting schools and how do we think about that stuff,

21    [03:00] how do we think about the extracurricular, you

22    know, the whole clue or whatever, et cetera.

23 SINGER:   Right.  So we can -- we can definitely set that up.

24    Um, because they're both probably different because of

1       their circumstances, right, and they're probably -- are

2       they -- yeah, right.  Are they going to be going to the

3       same schools or are they looking at separate schools?

4   LNU: Uh, probably looking at separate schools but there'll

5       probably -- I imagine be a lot of overlap, too.  You

6       know, they'd love to go to, you know, some top school.  I

7       think right now they're leaning a little bit more

8       towards, you know, science and engineering, which is

9       great.  I think that the -- you know, great for gals who

10      are good in science and engineering and math.

11  SINGER:   And do you -- and, I mean, do we have like schools

12      in mind that they're thinking about?

13  LNU: Uh, they've mentioned (inaudible) they don't really know.

14      Maybe undecided.  I think Corny's looking at, you know,

15      the top schools.  Whether that's Ivy or whether that's,

16      you know, the kind of, you know, the Cornells or the

17      Princeton's for engineering or that kind of stuff, she

18      could.  She'd love to get into those top schools.  Then

19      there's a second --

20  SINGER:   (inaudible).

21  LNU: I mean, I have to look at the secondary school.

22  SINGER:   Yes.  Yeah.  [04:00] To get into engineering in

23      those schools she's got to have perfect grades, perfect

24      score.

1   LNU: You need perfect grades you think?  Yeah.

2   SINGER:   And perfect score on the subject test and SATs.  I

3        mean, you've got to be -- be in engineering, you've got

4        to be 1550 plus and you've got to be 800 in the math on

5        the subject test and at least 780 on the, um, science

6        subject test, as well.  So that's if you want to apply in

7        those -- in those majors.

8   LNU: OK.  Uh, and if you want to be applying in, uh, other

9        majors like science or something like that or math or...?

10  SINGER:   Science -- science is the same thing.

11  LNU: (inaudible).

12  SINGER:   They're all -- they're all the same unless you're

13       applying --

14  LNU: (inaudible).

15  SINGER:   Unless you're applying in humanities.

16  LNU: OK.  What if you want to go into like business or is that

17       considered humanities?

18  SINGER:   Um, it's less than.  I mean, you know that the Ivies

19       potentially post -- you know, Princeton, Yale, Harvard,

20       none of them have undergraduate business programs.

21       They're all econ.

22  LNU: Yeah, economics.  Yeah, economics or some schools [05:00]

23       have business but not the Ivies, right.

24  SINGER:   Only Penn does.

1   LNU: In the Ivies, right.  But they --

2   SINGER:   Yes.

3   LNU: But they (inaudible) they want to (inaudible) second tier

4        schools, as well, (inaudible) Boston Colleges and

5        Georgetowns and (inaudible) second tiers --

6   SINGER:   They -- they -- they all have -- they have pre--

7        they have -- BC, Georgetown, um, you know, Northwestern

8        is -- does not -- Duke does not.  Um, Emory does.  So it

9        just depends on where they want to go to school.

10  LNU: Yeah, they like west -- either East Coast or West Coast I

11       think is what they're looking at.  So West Coast they'd

12       love to be everything from USC to UCLA to Stanford, you

13       know, kind of stuff.  Um...

14  SINGER:   So --

15  LNU: And those are obviously top-notch, too, right?

16  SINGER:   Right, right.  So, you know, back to the, uh...  And

17       we'll try and (inaudible).

18  LNU: Well, they only have a ███ whatever, on the ACT or

19       whatever the hell that thing is called.  But that was as

20       a freshman.  That's not bad, I guess, but, you know, it's

21       not a ██ or ██

22  SINGER:   No, that's good.  Right.  And that's what it's going

23       to take to even play in the game [06:00] on their -- on

24       their own, right.

 1   LNU: Right.

 2   SINGER:   If you said -- and you know that -- that if you said

 3        you wanted to go somewhere like Stanford or Harvard or

 4        Yale and go through a different door, you can do that.

 5        But to go in directly you've got to be -- just to play

 6        you've got to be 35, 36 plus essentially perfect grades

 7        and then you've got to have subject test scores in the

 8        mid-700s.

 9   LNU: Right.  OK.  Well, that's good, uh, good general

10        direction.  And then on the, um -- the other doors, you

11        have certainly things like crew.  Can they try that?  Is

12        that still your -- your number one differentiator?  If

13        they had a really good time, they could work on that and

14        get a time of X, that might be a second door.  Or you

15        have the other door, where, you know, you can, you know,

16        make a contribution kind of thing.

17   SINGER:   Yeah.  So we -- we're -- that's why I'm going to

18        Harvard next Friday, because the president wants to do a

19        deal with me [07:00] because he found out that I've

20        already got 4 already in without his help.  So he's like,

21        "How about -- why would you go to somebody else if you

22        could come to me?"  I said, "Well, I didn't know I could

23        come to you."  Huh.

1  LNU: That's funny, yeah.  I knew ██████  ██████ used to be on our

2       board but she's gone now.  I don't know this new guy.

3       But, uh...

4  SINGER:   Yeah.

5  LNU: So what kind of deals is it there?  Is it like, you know,

6       (inaudible) water polo, and a donation?  Or what is it

7       like, you know, to get into that?

8  SINGER:   So where was -- so pick a place you want to go.

9  LNU: So if you said, uh, HP -- uh, Harvard (inaudible).  But

10      if you said Harvard or Princeton or Georgetown, you know,

11      what are those things?

12 SINGER:   So Harvard -- Harvard is, uh...  It's usually about

13      1.2.

14 LNU: Jesus.

15 SINGER:   Stanford is 1.2.  Um, but, you know, the backdoor is

16      -- Harvard's asking for 45 million.

17 LNU: [laughter]  God.

18 SINGER:   Stanford's asking for 50 million.  [08:00]

19 LNU: Wow.

20 SINGER:   And they're getting it.  That's the crazy thing.

21      They're getting it from the Bay Area and from New York.

22      Crazy.

23 LNU: Wow.

24 SINGER:   Crazy.  Absolutely crazy.  (inaudible).

1   LNU: What about -- what about like Georgetown or, uh, those

2        other ones or, yeah?

3   SINGER:   Yeah.  So Georgetown's like 500.  BC's the same

4        thing.  Um, so -- you know, those are your -- kind of

5        your numbers across the board at different places.  You

6        know, USC hasn't changed.  Um, UCLA can be done for about

7        3.  Um, you know, public schools are really hard in

8        California because everybody's watching them.

9   LNU: Mm-hmm, mm-hmm.

10  SINGER:   But...

11  LNU: So (inaudible) the sports angle and, you know, 3 and UCLA

12       or something?

13  SINGER:   Yes, yes.  Yes.  Yes.  So I'm doing -- now we're

14       doing -- John, this is how crazy it's gotten.  We're

15       doing -- I'm going to do over 730 of these [09:00] side

16       doors this year.

17  LNU: Wow.  And how many schools are you doing those at now?

18       It's like just the top 20 or 50 or is it more than that?

19  SINGER:   Uh, it's, you know, 50 to 60 different schools.

20  LNU: So 50 or 60.  OK.

21  SINGER:   Yes.

22  LNU: And in terms of engineering schools, uh, what are the

23       best ones these days?  MIT, do they have a side door?

1    SINGER:   No.  But MIT's not even a fun place to go to school,

2         John.  It's --

3    LNU: I know.  I looked at it and I didn't -- I didn't go.

4    SINGER:   Nobody likes it.

5    LNU: But RPI sucked, too.  [laughter]

6    SINGER:   Yeah.

7    LNU: (inaudible) all the engineering schools kind of suck.

8    SINGER:   But -- but --

9    LNU: For pure engineering.

10   SINGER:   But you see -- but if you...  Like the great thing

11        about going to Harvard or going to Stanford or places

12        like that, if I -- you know, if I could get you in, you

13        can do whatever you want when you get there.

14   LNU: Yeah.

15   SINGER:   Because they don't care, right.

16   LNU: Yeah.

17   SINGER:   Um, if you're -- if you're going to go to a -- you

18        know, a -- a traditional engineering school, you know,

19        then you're -- you -- you want to go to, you know,

20        Berkeley and UCLA [10:00] are almost impossible to get

21        into.  Um --

22   LNU: Because of the Asian factor?

23   SINGER:   (inaudible)?

24   LNU: The scores are (inaudible) high?

```
1    SINGER:   Uh, no.  The -- the dean -- yeah.  Essentially --

2         I'll give you an example.  The dean at Berkeley came in

3         to meet with all the coaches in the AD and told them --

4         them, "We don't care who you recruit.  We don't care how

5         strong they are.  They cannot be engineers because

6         they're -- they're going to miss too much practice and

7         too many labs.  So don't recruit them for that."  See,

8         the nice thing about USC, for example, in engineering,

9         you get to cut out half of your general ed.  So you get

10        into engineering on day 1.  They already start you there.

11        So you're not playing --

12   LNU: (inaudible).

13   SINGER:   Yeah.  All the humanities games and all the other

14        stuff.  Now, the best engineering school they could go

15        to, if you really wanted to do that, truthfully, they're

16        ranked number one in the country [11:00] in computer

17        science and number three in engineering, is Georgia Tech.

18   LNU: Yeah, that's kind of...  I'm not sure.  I always think of

19        that as just being too, uh, too redneck and...

20   SINGER:   Well, Atlanta's not redneck.

21   LNU: I know, I know.  It's just...  [laughter]

22   SINGER:   Atlanta -- Atlanta's very, very hip.  But anyways,

23        but that -- you asked for the best schools.  They are the

24        best.
```

```
 1   LNU: But what are the 5 -- top 5 or 10 if you listed

 2        engineering and science schools, you know, the Georgia

 3        Techs, the MITs, the CalTechs, the, uh...

 4   SINGER:   Yeah.  Nobody goes to CalTech or MIT that's a

 5        regular kid.

 6   LNU: Cornell?

 7   SINGER:   Cornell's not.  (inaudible).

 8   LNU: Princeton.

 9   SINGER:   Stanford.

10   LNU: Stanford.

11   SINGER:   Stanford, Harvard, um, if you're going to do comp

12        sci then Brown is.  Um, if you're going to do -- and then

13        obviously Georgia Tech is in there, um, then you have the

14        UCs, um, Carnegie Mellon, Casewestern, [12:00]

15        Northwestern, Penn.  Those are all your top schools.

16        Yale's becoming --

17   LNU: Not (inaudible) Dartmouth?

18   SINGER:   Dartmouth's OK.

19   LNU: Dartmouth (inaudible).

20   SINGER:   They don't have a -- Dartmouth doesn't have a true

21        engineering program.

22   LNU: Yeah.

23   SINGER:   You get an --

24   LNU: Cornell.
```

1   SINGER:   You get an AP -- Cornell has one but it's really a

2        grind.

3   LNU: Uh-huh.

4   SINGER:   Um, and then you got -- like Yale's becoming a

5        math/science school.

6   LNU: Yeah.  Yale's way too liberal, I think, (inaudible) my

7        friend's have gone there.  They're disappointed with

8        their kids, want to get them out.

9   SINGER:   [laughter]

10  LNU: Becoming like this liberal like, you know, hotspot.

11  SINGER:   Yeah, but your -- your kid doesn't have to make that

12       decision to do that.  Your kid's going to be who they

13       are.

14  LNU: Yeah, I know, I know.  But the parents don't want to even

15       support the school anymore.  It's funny.  Three

16       generations you've been a Yale family saying, "This place

17       sucks."  Anyway, I -- I wouldn't want them to go to Yale.

18       But an-- in terms of, um, uh, [13:00] if they wanted to

19       go more economics, as well, then it's going to be the --

20       what, the top Ivies, some of the UCs?

21  SINGER:   Yes.  Yes.  Duke, Northwestern.

22  LNU: Georgetown.

23  SINGER:   Georgetown (inaudible).

```
 1   LNU: They want to stay East Coast.  Yeah, East Coast or West

 2        Coast.

 3   SINGER:   Yeah.  So USC, UCLA, Berkeley, the Claremont

 4        colleges.

 5   LNU: Stanford, of course, (inaudible).

 6   SINGER:   [sneezing]

 7   LNU: Bless you.

 8   SINGER:   Sorry?

 9   LNU: Stanford, of course, would be --

10   SINGER:   Of course.  They're -- they're --

11   LNU: -- (inaudible).

12   SINGER:   -- the number one school in America.

13   LNU: Yeah.

14   SINGER:   They got everything.  They got the weather --

15   LNU: Yeah.

16   SINGER:   -- they got sports, they got grade inflation, they

17        offer every major.  I mean, they're the --

18   LNU: Yeah.

19   SINGER:   That's -- if anybody could go there, that's the

20        place.

21   LNU: (inaudible).  Yeah.  So you're saying that's the minimum,

22        the 1.2 and the side door?

23   SINGER:   Yeah.
```

1    LNU: What sports would be best for them?  Is -- is crew the --

2         the best -- you know, you talk about the Ivies and

3         (inaudible) stuff like that.  Is that not going to even

4         matter?

5    SINGER:  Crew -- [14:00] they'll -- oh, for me it doesn't

6         matter.  I'll -- I'll make them a sailor or something

7         because of where you live.

8    LNU: That's probably more than they'll want to go for.  Is

9         there a 2-for-1 special, you got twins?

10   SINGER:  [laughter]  Unfortunately -- I know -- you've -- but

11        you've probably been asking that your whole life.

12   LNU: Yes.  [laughter]

13   SINGER:  Um, I know you, John.  You've been asking for --

14        every time you go out for dinner, is there a 2-for-1

15        sale.

16   LNU: Yeah, exactly.  There's no piggybacking like that at all,

17        I assume?

18   SINGER:  No, I'm sorry about that.  They are independent

19        people.

20   LNU: Yeah.  And so in terms of things that are more in the

21        half or 300, what is that set of schools?

22   SINGER:  You know, so that's, uh, Georgetown, Boston College,

23        Georgia Tech, USC, US-- um, UCLA, Berkeley, you know...

24   LNU: So UCLA is in that range, too, huh?  OK, that's not bad.

1   SINGER:   Yeah, yeah.

2   LNU: [15:00]  And in the northeast it's just Georgetown, BC?

3   SINGER:   Georgetown, BC.  Duke's more expensive.  Duke has

4        become the hottest school.

5   LNU: Duke, wow.

6   SINGER:   Um, yeah.  It's the hottest school there is.

7   LNU: And if I want to try to get anything, you know, backdoors

8        at like Harvard, you know, being an alumni doesn't really

9        help much.  Is it going to be better from Lynnfield than

10       from, um, Andover, just because of how many kids are

11       already legacy?

12   SINGER:   (inaudible) that?

13   LNU: I'm not really legacy --

14   SINGER:   Yeah.

15   LNU: -- from the undergrad, I'm legacy from the grad school.

16   SINGER:   And -- and a lot of undergrad.  But you know what?

17       At the end of the day it's easier if...  You know, the

18       easiest way, as you know, is -- is being a student

19       athlete because you can -- you can -- you overlap and

20       overplay the, um, the, uh, legacy.

21   LNU: Yeah, so --

22   SINGER:   But the athlete -- athlete gets first priority.

23   LNU: Athlete first priority, then a legacy [16:00] will help,

24       and then, uh --

1   SINGER:   Yeah.

2   LNU: -- some additional side door money or you have to do all

3       3?

4   SINGER:   Um...

5   LNU: Can you try the first 2?

6   SINGER:   Well, you -- we -- if we just tried the athlete, uh,

7       and you were using the side door with the athlete, it's -

8       - it's a done deal.  Just like with John.

9   LNU: Right.  But you're saying athlete side, even as an

10      alumni, is (inaudible) 1.2?

11  SINGER:   Absolutely.  The guy's giving up --

12  LNU: But if you're --

13  SINGER:   Guy's giving up a spot.  He's -- they're not a good

14      enough athlete to compete (inaudible).

15  LNU: Well, what would it have to be in terms of crew, I guess,

16      (inaudible) good enough athlete (inaudible)?

17  SINGER:   She'd have to be one of -- she'd -- they'd have to

18      be one of the best in the country.  They'd have to be

19      rowing --

20  LNU: So (inaudible) top times.

21  SINGER:   They got to have top times and be rowing at the Head

22      of the Charles, which is coming up, and then they got to

23      go to nationals and they got to compete.

```
 1   LNU: Yeah.  So they've got to be top -- tops in the nation.

 2       Yeah.

 3   SINGER:   You got -- yeah.  They can get whoever they want.

 4   LNU: And they'll get (inaudible).

 5   SINGER:   [17:00] That's the problem.  That's the problem.

 6   LNU: Yeah.  No, that's a big issue.  [laughter]  Oh, my God.

 7       And is that -- uh, are those numbers, is there any way to

 8       make those like tax deductible?  Are they donations to

 9       the school and stuff?

10   SINGER:   Yeah.

11   LNU: How does that work?

12   SINGER:   They're all tax de-- it's all tax deduct--

13       deductible.  It's -- it's going into a nonprofit,

14       501(3)(c).  It's all non-- it's all -- it's all tax

15       deductible.  Every one -- every piece of it.

16   LNU: OK.

17   SINGER:   All of it.

18   LNU: Still big numbers.  Wow.

19   SINGER:   It's actually --

20   LNU: When there's so many people who want to do that.

21   SINGER:   I'm --

22   LNU: They're just all...

23   SINGER:   They -- yeah.  And they can do it (inaudible) you

24       know, so the guy's from Goldman called me yesterday.
```

1        They got 4 families that have seniors right now, it's

2        late though, and they wanted to know if I could help

3        them.   (inaudible) because that's like -- compared to

4        what they're being quoted by the development office,

5        they're like [18:00] --

6

7                        END OF AUDIO FILE

EXHIBIT B

09/15/2018 13:22:51 Outgoing Call, John WILSON and Rick SINGER
[8138]

| | |
|---|---|
| John | Hey Rick Could you hear me? Cause you just dropped out. |
| RS | Yeah I now I can hear ya. |
| John | Okay great sorry you said something about the guys from Goldman and then boom we dropped out. |
| RS | Yeah they sent me 4 families on Thursday saying they been checking with development they'll pay the 1.2, 1.5, 2 million they don't care cause they're being quoted over $30 million. |
| John | (UI) Oh because they have to donate a whole building or something like that you're saying. |
| RS | They've been working the system and that's what they're being told. |
| John | Alright. |
| RS | So. |
| John | Alright well this is this is good general guide I'm pretty sure so in terms of pushing harder on different sports unless they can really get some national times in uh crew you're sayin it doesn't really matter for any top schools what does it does that matter for like the BCs and the. |
| RS | Yeah it can matter for them. |
| John | So sports will matter for their second tier choices. |
| RS | As long as they're considered heavy but it's not lightweight. |
| John | What do you mean by heavyweight vs. lightweight? |
| RS | It's all based on your weight they they give spots to heavyweights not to lightweight that means you gotta be I think heavyweight girls are like ah over 150. |
| John | Yeah maybe I think they're both about that they're both like almost 6 ft tall now. |
| RS | Which is great. |
| John | One's one's really heavy in heavy weight and the other is muscular and I think they're probably in that should be over 150. |
| RS | Yeah that's helpful so that's where they gotta be and then they're gotta crush it and they gotta go to nationals and they gotta really engage in the sport. |
| John | Yeah. |
| RS | If you wanna do it on your own and you only got this summer to do it, this fall, this spring. |
| John | Yeah I mean I really go crazy I guess then. |
| RS | Yep. |
| John | Yeah and then in terms of the uh difference of for each of the schools that can have an impact on them at all in terms of where they get in on their own or. |
| RS | Sure if they crush it. |
| John | Otherwise it's a second tier. |
| RS | Well even. |

| John | (OV) (UI) |
|------|-----------|
| RS | Well even second how easy to get into but yeah. |
| John | Only in their second tier. |
| RS | Okay. |
| John | (UI) Are you around you said next is it next Friday you're in town? Is it Boston? |
| RS | Yeah I'm in I'm in town but I'm in town short period of time I'm in and out um I have a I think I. |
| John | People stay up at like 11 o'clock here or something like that. |
| RS | Yeah I'm happy to talk. |
| John | Do you wanna talk and meet? |
| RS | Yeah we can meet uh um so I'm gonna be the meetings from uh I'm meeting at 10 o'clock at the something Marriott wharf? |
| John | Marriott Long Wharf? That downtown Boston okay. |
| RS | Yeah yeah that's where I'm meeting. |
| John | Then maybe ▇▇▇ and I can meet with you there or something like that so you're going from there to the airport or where you going after? |
| RS | Yeah I'm going from there to the airport yes. |
| John | Alright so maybe ▇▇▇ and I try to meet you there at the Marriott Longwharf I'll be in town on Friday's. |
| RS | So. |
| John | By this I'm usually tr I'm usually in Houston and Europe these days. |
| RS | How's your business? |
| John | Uh it's going really well doing some really good stuff (UI) with Mackenzie and uh got a big client that's got me pretty much full time for the next two years, he a multi-national you know oil services company so I spend a lot of time in the mid-east, Europe and um Houston (UI) and stuff. |
| RS | Well see all you gotta do is tell them to give you a quick bonus for helping ya and that will take that will be your donation for the kids. |
| John | Is's their installment plant? |
| RS | But you had you had to have done something with all that money that you uh sold your house for to the Chinese. |
| John | Yeah I gotta another house here now. |
| RS | Right? I mean the Chinese took care of ya didn't they? |
| John | Yeah they did it was good. |
| RS | They're taking care of everybody. |
| John | Exactly oh my so about that whole thing if we go down to one of those tests I guess it's first to better off to see what the time man pulling the trigger on one of those pads because we gotta figure out what schools they wanna go to and all that stuff and where the choices are. |
| RS | Gotta know by uh gotta know by June 1st. |
| John | Of which year of their sen of their next year they're entering into their junior they're senior year. |

| RS | Yeah the beginning of their at the end of Junior beginning of senior year because those spots will go away. |
| John | Alright so you need to make a decision by June 1st you're saying? |
| RS | Yeah. |
| John | Alright. |
| RS | By then you'll have all your data. |
| John | Yeah I know prepared about their test scores all that stuff I mean their scores already good enough to get into any place a side door I assume with the athlete's right? |
| RS | Uh not really they're okay I still gotta fight for it cause we don't have. |
| John | Yeah but I mean. |
| RS | They both (OV) |
| John | But I mean as freshman. |
| RS | Yeah. |
| John | I think as freshman they have a ▮ |
| RS | But they don't care about John they don't care if it happened in freshman year or eighth grade. |
| John | No no but I'm sure they're gonna do a lot better now I mean that was. |
| RS | Yeah. |
| John | That was 2 years ago I'm sure they'll be now in the higher range than that so I'm just saying. |
| RS | Then then they should be fine yeah. |
| John | Yeah okay so then but then they need what do they need subject tests? Subjects like math and shit?  Or what subjects do they need? |
| RS | Yeah well they're gonna take math 2 and depending on what classes they're in they'll take another one if there another AP courses so that's why I need to get them on the phone. |
| John | Okay alright maybe I don't next Friday (UI) for them probably too early. |
| RS | (OV) Yeah that's fine. |
| John | Let's sign them up for the whole thing let's sign up for the whole deal for them the (UI) training. |
| RS | Why don't you have the kids come at 11 uh 11 o'clock on next this coming Friday at the Boston Longwharf. |
| John | I'd have to pull them out of school though, I guess I could. |
| RS | For an hour or so? |
| John | Yeah but to get there and back is gonna be 3 hours round trip you know. |
| RS | Okay would you rather them be at go home and then I can skype with them? |
| John | Um which day you talking about? |
| RS | Next Friday. |
| John | Oh next Friday at 11 o'clock? |

| RS | Yeah. |
|------|------|
| John | Yeah it's gonna be a half an hour each way let me get let me figure out something we do maybe you'll skype we can skype even if we're together then and they can be on skype with you right? |
| RS | Correct. |
| John | From campus yeah yeah so maybe we'll just skype can you do a three-way skype? How does that work? |
| RS | Um we'd have to do zoom let me talk to my people about that yeah. |
| John | Alright maybe we do a three way zoom or something that be a good idea. |
| RS | Alright. |
| John | (UI) Set that up for Friday assuming we get the software on their you know phones and shit. |
| RS | Got it. |
| John | Alright super sounds good we'll (UI) next next Friday we'll be talking. |
| RS | You got it take care. |
| John | Thank you too. |
| RS | Ok.  Bye bye. |

EXHIBIT C

**From:**     John Wilson ████████████████████
**To:**       ████████  ██████████████████████
**Sent:**     9/17/2018 8:09:05 AM
**Subject:**  Re: This Friday


Ask rick directly — he was in town Friday so we could meet him face to face.

They could always do a call. He is only here in boston once in a blue moon

> On Sep 17, 2018, at 07:02, ████████████ <████████████████████████> wrote:
>
> HB
> I'll talk to ████████ about meeting or skyping with Rick Singer.
> This Friday isn't ideal, ██████ has in the morning: math, history, physics, english
>
> Any chance, Rick has time to skype this Wed? ██████████ has no school & ██████ has 1/2 a day
so she could skype 1:00 on.
>
> Hope your day is a great one!
> XXX
> ██

| | |
|---|---|
| **From:** | ███████████████████████ |
| **To:** | Rick Singer ████████████████ |
| **CC:** | John Wilson ████████████ |
| **Sent:** | 9/19/2018 4:23:46 PM |
| **Subject:** | Re: Meeting date |

Rick,

Yes, Monday is great at 4:30 EST.
Please keep me posted if you are coming to Boston, we'd love to have you meet ████████████ in person.

Thank you,
████

On Sep 19, 2018, at 11:55 AM, Rick Singer ████████████████ wrote:

████ Friday in Boston for me has been moved to NYC. So let's plan on me speaking with the girls at 4:30pm EST on Monday? Please confirm

Sent from my iPhone

On Sep 19, 2018, at 7:01 AM ████████████████████ wrote:

Rick,
Is there a day this week or next that ████████████ can skype with you anytime after 4:00 EST?

Any chance you're back in Boston over the next few months?

Thanks,
████

On Sep 18, 2018, at 10:49 PM, Rick Singer ████████████████ wrote:

████ I am coming in on the red-eye so no to Thursday night. I am on the 2pm going home.

On Tue, Sep 18, 2018 at 4:48 PM ████████ ████████████████ wrote:
Hi Rick,

Wishing you a a happy birthday - hope you are having a great day!

John mentioned us meeting with you this Friday with ████████████
But, this Friday the girls can't miss school.

John and I will still meet you in Boston.

Any chance you're in MA this Thursday night so they can meet you?

Or can we schedule a day to Skype with them after school, 4:00 EST?

USAO-VB-01604970

We're looking forward to seeing you on Friday.

Thank you,

--

Rick Singer

EXHIBIT D

# EXHIBIT E

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry  10/04/2018

On September 23, 2018, SAs Elizabeth Keating, Kaitlyn Cedrone and Laura Smith met with RICK SINGER at the Double Tree Hotel located in Chelsea, Massachusetts.

During the meeting, SA Smith explained to SINGER that there was a change of plans and SINGER would not be working with case agents during the day as previously planned.  In addition, SINGER would not travel with case agents to meet with the WILSON family at the Hilton Boston Logan Airport either.  At that time, SINGER asked if he could place a call to Mr. WILSON to explain that he was not able to meet the family.  On the phone call with Mr. WILSON, SINGER explained he was ill and would not be able to meet the Wilson family as planned.

Following the phone call with Mr. WILSON, SA Smith explained to SINGER that under no circumstances should he tell anyone, aside from his attorney, DON HELLER, about being approached by law enforcement, or anything regarding the federal investigation into his actions involving the side-door and SAT schemes.  SINGER asked whether he could tell his family about the situation.  SA Smith told SINGER he could not talk to his family about the situation, only his attorney.  SINGER acknowledged he understood this request.

SA Smith also advised SINGER that he should not move money from any of his bank accounts.  SINGER asked if he could continue to pay regular business expenses.  Smith advised SINGER he could pay regular business expenses, but should not move larger sums of money.  SINGER acknowledged he understood this request.

SA Smith also instructed SINGER to not pick up any phone calls he may receive from individuals case agents instructed SINGER to call while case agents were present on 9/22/2018 and instead let the calls go to voicemail.  SINGER had placed calls with ███████████, ██████ WILSON, ████████████████████████████████████████.  SA Smith advised SINGER that if SINGER continued to receive calls from any of these individuals looking to make contact with SINGER that he should contact SA Smith, Cedrone or Keating to discuss the matter.  SINGER acknowledged he understood this request.

Investigation on  09/23/2018   at  Chelsea, Massachusetts, United States (In Person)

File #  318A-BS-2885343                                         Date drafted  09/23/2018

by  Smith Laura, Kaitlyn Cedrone, KEATING ELIZABETH ANNE

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

318A-BS-2885343

Continuation of FD-302 of  (U) Meeting with Rick Singer 09/23/2018  , On  09/23/2018  , Page  2 of 2



EXHIBIT F

**Call Date:**  2018-09-23

**Call Duration:**  0:45

**Call Begin** [      ] **Call End** [       ]

**Call Participants:**

    Rick Singer

    John Wilson

**File Name:** ████████ 2018-09-23 11-47-48 08641-001.mp3

**Bates No:**


WILSON: [00:00:00] Hello, Rick!

SINGER: Hi, John.  How are you?

WILSON: I'm great.  We're here at the airport, just tryin' to
       find the hotel.

SINGER: Uh, I -- I just threw up anothe-- t-- I've been sick all
       night.  And I threw up.

WILSON: Oh, no, I didn't know that.  Okay.  Uh...

SINGER: So I'm not gonna, uh, be able to make it.  And I
       apologize.  You guys drove all the way in.  But I just -
       - I just did it again.  So I'm not going to be able to
       make it.

WILSON: Oh.  Okay.  All right.  I guess, on Monday, we -- we got
       a call?  Is that right?  We gonna start it for -- can we
       do that call, uh, first?

SINGER: Well, uh, let me connect with you, as, uh -- when I feel

better.  And then --

WILSON: Okay.

SINGER: -- I'll connect and we can -- uh, we can talk.

WILSON: All right.

SINGER: Okay, John.  Than--

WILSON: All right.  Thanks, uh.  Hope you --

SINGER: Okay.

WILSON: -- feel better.  Uh, uh...  [00:00:45]


END OF AUDIO FILE

# EXHIBIT G

| | |
|---|---|
| **From:** | Rosen, Eric (USAMA) |
| **To:** | Kendall, Michael |
| **Cc:** | Bell, Karin (USAMA)3; O'Connell, Justin (USAMA); Wright, Leslie (USAMA); Kearney, Kristen (USAMA); Tomback, Andrew; Malkiel, Yakov; Frank, Stephen (USAMA) 1 |
| **Subject:** | RE: US v. Siddoo, Meet and Confer |
| **Date:** | Monday, March 30, 2020 2:21:00 PM |

Hi Mike –

In response to your email of March 30, 2020, the government does oppose your motions.

In addition, as we indicated in our prior email, we are continuing to review attorney notes. Based on this review, it appears that on September 27, 2018, Singer advised investigators that he was planning to have a conference call with the Wilsons the following day at 1:30pm PST. We'll let you know if we discover any additional notes related to the FaceTime call.

Eric

**From:** Kendall, Michael ████████████████████████
**Sent:** Monday, March 30, 2020 10:01 AM
**To:** Rosen, Eric (USAMA) ████████████████
**Cc:** Bell, Karin (USAMA)3 ████████████████ O'Connell, Justin (USAMA) ████████████████ Wright, Leslie (USAMA) ████████████████ Kearney, Kristen (USAMA) ████████████████ Tomback, Andrew ████████████████ Malkiel, Yakov ████████████████ Frank, Stephen (USAMA) 1 ████████████████
**Subject:** US v. Siddoo, Meet and Confer

Eric,

Defendant Wilson plans to file this week individual motions to sever his trial from the other defendants' trials, to dismiss the substantive counts, and to strike from the indictment the paragraphs referring to the 2018 Harvard/Stanford issues. We assume the USAO will oppose these motions, and this email will serve as a conference. If the USAO would like to discuss any of these motions, we are available by telephone today. Thanks.

Mike

**Michael Kendall** | Partner
████████████████████████████████

==========================================================================

This email communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this email in error by replying to the email or by telephoning ████████████. Please then delete the email and any copies of it. Thank you.

Our external privacy policy is available on ████████████████

==========================================================================

# EXHIBIT H

| 171 | Outgoing | **To:** ▓▓▓▓▓<br>**Direction:**<br>Outgoing | 9/28/2018<br>17:15(UTC-4) | 00:00:36 | us | | | |
| 172 | Outgoing | **To:** ▓▓▓ Wilson*<br>**Direction:**<br>Outgoing | 9/28/2018<br>16:30(UTC-4) | 00:33:08 | us | | Yes | FaceTime |
| 173 | Outgoing | **To:** ▓▓▓ Wilson*<br>**Direction:**<br>Outgoing | 9/28/2018<br>16:29(UTC-4) | 00:00:00 | us | | | |

# EXHIBIT I

**From:** Kendall, Michael █████████████████████
**Sent:** Tuesday, March 24, 2020 12:38 PM
**To:** Rosen, Eric (USAMA)██████████
**Cc:** Bell, Karin (USAMA)3███████████████; O'Connell, Justin (USAMA)█████████████████
Wright, Leslie (USAMA)██████████████████████; Kearney, Kristen (USAMA)██
Tomback, Andrew █████████████████████; Malkiel, Yakov █████████████████████████
**Subject:** US v. Siddoo, Follow up on discovery

Eric,

Thanks for your prompt reply.  It was very helpful.  We need to clarify a few details:

> What is the reason that the Government did not monitor the call?
> Did Singer fail to tell the Government about the call before it occurred?
> When and how did the Government first learn about the call—from our inquiries?

Mike

**Michael Kendall**  |  Partner
████████████████████████████████████████████

**From:** Rosen, Eric (USAMA)████████████████████
**Sent:** Tuesday, March 24, 2020 11:23 AM
**To:** Malkiel, Yakov ███████████████████   Bell, Karin (USAMA)3████████████████████████
**Cc:** O'Connell, Justin (USAMA)████████████████████; Wright, Leslie (USAMA)██████████
██████████████████████; Kearney, Kristen (USAMA)██████████████████████  Kendall, Michael
█████████████████████████████; Tomback, Andrew ███████████████████████
**Subject:** RE: US v. Siddoo, Follow up on discovery

Yakov –

> We are responding to your emails of March 21, 23 and 24, 2020.

> *First*, as we indicated in our reply on March 19, 2020, we do not believe we have any additional information responsive to your request about the note.  As we have previously indicated, we are reviewing our productions to ensure that that is the case.  To the extent Singer drafted the note "in response" to anything, we do not believe it was a request from the government.  It may have been a request from his own counsel.  To the extent we find any information responsive to your request, we will produce it promptly.

> *Second*, we do not believe we have additional agent reports or notes of the September 28, 2018 meeting in California.  As you note, the call occurred during a break in the meeting and the government did not play a "role" in the call or monitor it. To the extent we find any information responsive to your request, we will produce it promptly.

> Eric

**From:** Malkiel, Yakov ███████████████████████

# EXHIBIT J



| 54 | **Participants:** | | **Start Time:** 9/28/2018 17:47(UTC-4) | |
|---|---|---|---|---|
| | +▮▮▮▮▮▮ | | **Last Activity:** 9/30/2018 19:25(UTC-4) | |
| | Rick Singer* (owner) | | **Number of attachments:** 0 | |
| | * * * | | | |
| | +▮▮▮▮▮ | | | |
| | John Wilson cell* | | | |
| | * * * | | | |
| | **Source:** iMessage: +▮▮▮▮▮ | | | |
| | **Body file:** chat-304.txt | | | |

**9/28/2018 17:47(UTC-4)Direction:Incoming,** +▮▮▮▮ (John Wilson cell)
Heard girls had a good first session - can we Debrief at some Point?  Also good - very wealthy - friend has a daughter applying to Brown.  Is there a side door for non athletes? He would also be extremely concerned about her not knowing he pulled strings if that's possible for non Athlete

John

**Status:** Read
**Read:** 9/28/2018 17:47(UTC-4)

**9/29/2018 05:11(UTC-4)Direction:Incoming,** +▮▮▮▮ (John Wilson cell)
Rick can we chat this weekend ? Want to understand side door for my girls and does it also require sports connection ? John

**Status:** Read
**Read:** 9/29/2018 07:03(UTC-4)

**9/29/2018 14:47(UTC-4)Direction:Incoming,** +▮▮▮▮ (John Wilson cell)
Chat now?

**Status:** Read
**Read:** 9/29/2018 15:23(UTC-4)

**9/29/2018 15:53(UTC-4)Direction:Incoming,** +▮▮▮▮ (John Wilson cell)
Rick

I can help you a lot on the "value based" pricing front. Seriously (I don't want to brag) I am considered one of Mckinsey's world leaders in pricing strategy.

Anyway if you would like, let's set up an hour or two and review your business model and pricing.   John

**Status:** Read
**Read:** 9/29/2018 16:04(UTC-4)

# EXHIBIT K

**From:** ███████████████████

**To:** John Wilson ████████████████████████████████ John Wilson

**CC:** ███████████████████████

**Sent:** 9/28/2018 1:08:50 PM

**Subject:** TODAY'S DRIVER: Antonio +1-781-392-7940

---

**From:** John Wilson ████████████████████

**Sent:** Friday, September 28, 2018 12:41 PM

**To:** ██████████

**Cc:** ███████

**Subject:** [EXT]Re:

Ok I will meet you at your car by the limo area at 2.  Then we can enjoy a pleasant drive to Sturbridge  "Halfway to Middleton" (not sure if that's half way to hell or heaven) �

On Sep 28, 2018, at 12:11, ████████████████████ wrote:

I'm still sitting at the airport.  Seems like I'll land at 2, not 1.  I can get to Middletown a bit later (530).  BUT, I have a call at 430 that I do need to do.  ██████ – please adjust accordingly.  I can do whatever works for John within those constraints.

+========================================================================+

This email is confidential and may be privileged. If you have received it
in error, please notify us immediately and then delete it. Please do not
copy it, disclose its contents or use it for any purpose.

+========================================================================+
+========================================================================+

This email is confidential and may be privileged. If you have received it
in error, please notify us immediately and then delete it. Please do not
copy it, disclose its contents or use it for any purpose.

+========================================================================+

# EXHIBIT L

1   **Call Date:**  2018-09-29

2   **Call Duration:**  13:40

3   **Call Begin [   ] Call End [   ]**

4   **Call Participants:**

5       Rick Singer

6       John Wilson

7   **File Name:**  ████████  2018-09-29 15-24-23 09249-001

8   **Bates No.:**

9

10  [00:00:00]

11  WILSON:   Hey, Rick.  How ya doin'?

12  SINGER:   Hey, John.  How are ya?

13  WILSON:   Good.  You feelin' better?

14  SINGER:   Lot better.

15  WILSON:   Oh, (overlapping dialogue; inaudible).

16  SINGER:   You good?  You been out of town?

17  WILSON:   Yeah, I've been out of town.  Been traveling.  I'm

18      goin' to Europe next week, so it'll be easier to connect

19      this week, so...

20  SINGER:   OK, cool.  So the girls --

21  WILSON:   So, yeah --

22  SINGER:   -- were great.

23  WILSON:   Cool.  I, I still didn't get a c-- a f-- a full

24      debrief from 'em, but talked to ████ (sp?).  They, um,

1       they have any clarity on, on where they want to go, what

2       majors, or still (overlapping dialogue; inaudible)?

3    SINGER:   Yeah.  Yeah, well, I mean, you have done a great job

4       of, uh -- (laughs) it's so funny -- influencing 'em on

5       what is the appropriate path to go down.  What do you

6       think they both said?  (overlapping dialogue; inaudible)

7       --

8    WILSON:   What, all the Ivy League schools?

9    SINGER:   No, no, I mean --

10   WILSON:   (overlapping dialogue; inaudible).

11   SINGER:   -- uh, uh, uh, they want to be business and

12      engineering.  (laughter) I said, "So do..."  I said,

13      "Does that come from your dad?"  And, of course, "Well,

14      my dad -- they pr-- my dad's programmed us," right?

15      (laughter) [00:01:00] So I said, "That's cool.  So we can

16      make all that happen."  I said, "You think you might like

17      that?"  They said, "Well, my dad (inaudible), so..."

18   WILSON:   (laughter) Come on!  I thought they actually liked

19      science and engineering.  They (overlapping dialogue;

20      inaudible) --

21   SINGER:   No, I'm sure they --

22   WILSON:   -- science.

23   SINGER:   -- I -- but you're -- you've influenced them, right?

24      (overlapping dialogue; inaudible) --

1   WILSON:   Yeah, I've influenced 'em, but I want 'em to pick

2          what they like.

3   SINGER:   No, definitely they get it, they get it, right?   And

4          it's just --

5   WILSON:   OK.

6   SINGER:   -- it's just funny, 'cause then when ████████ kinda

7          interjected they're like, "Mom, stay out of it.   Mom,

8          stay out of it."   Right?   It was funny.   Um, but they're

9          both obviously great girls.   They want -- in a lot of

10          ways, they want to have kind of the same kinds of things

11          from the school.   We, um -- I have a huge list of schools

12          for them.   Um, you know, and, and I said, "You guys gotta

13          send me dates, because you both go to 2 separate schools,

14          and Lynnfield and then -- and Andover, different dates of

15          days off.   So ████████ gonna be runnin' all over the

16          place tryin' to figure out [00:02:00] how to get 1 over

17          here for a day, and over here."

18   WILSON:   Yeah.

19   SINGER:   But, uh, that's why I need to know your dates, so I

20          can figure out where to go visit that would be best

21          suited.

22   WILSON:   Right.   Now, would they go on weekends, or gotta go

23          during school days (overlapping dialogue; inaudible)?

1   SINGER:   You gotta go on a school day, or, or a day when it's

2        a school day but they're off of school.

3   WILSON:   Yeah, OK.

4   SINGER:   That's the ideal situation, 'cause --

5   WILSON:   That's gonna be tougher, yeah.  But the ideal isn't

6        just seeing the campus on a weekend?

7   SINGER:   Yeah, 'cause I gotta get to a point where we know if

8        we're applyin' ED or where we're goin', what we want,

9        'cause you're gonna want to know first choice, second

10        choice, all that stuff.

11   WILSON:   Yeah, no, exactly.  And just so I'm, I'm clear on

12        the, the kinda pecking order schools, and UCLAs and all

13        that stuff versus -- uh, I think you said UCLAs mostly

14        are in the, the bracket of, um, like, uh, Stanford -- or

15        not Stanford, but like, uh, USC and so forth.  And what

16        were the schools in that, if you did the side door?  And

17        I'm interested about the side door and that stuff, um --

18   SINGER:   So the side door is gonna be -- gonna happen where

19        you want 'em to happen.  (overlapping dialogue;

20        inaudible) --

21   WILSON:   It can happen anywhere?  Does it have to be

22        [00:03:00] a sports side door?  I wasn't clear on that.

23   SINGER:   Well, so that's the -- that's the easiest way to

24        approach it, right --

1   WILSON:    Yeah.

2   SINGER:    -- because all of the coaches have...  You know,

3          they have guaranteed spots, and you've done a good job,

4          you got athletic girls who got great size, they're in the

5          right sports, so, you know, potentially there's a sailing

6          option, and potentially there's a crew option.  I mean, I

7          don't know how good of athletes they are.  They may be

8          good enough to be able to compete at some of these

9          schools, and then who knows what we have to do, depending

10         on where, where the spots (inaudible).

11  WILSON:    Mm-hmm.  Yeah, so they --

12  SINGER:    So you have --

13  WILSON:    -- have to get that sports.  Uh, what if they're not

14         really that good?  I mean, they can do some crew, but I

15         don't know they're gonna be good.  ██████████  (sp?) not

16         even that good competitively at sailing.  She just taught

17         sailing and did sailing in, you know, (overlapping

18         dialogue; inaudible) --

19  SINGER:    Right, so --

20  WILSON:    -- Yacht Club.

21  SINGER:    But at the end of the day, by the side door, I may

22         be able to go to the sailing coach and say, "Hey, this

23         family's willing to make the contributions.  She could be

24         on your team.  She is a sailor.  She may not be up to the

```
 1       level you are, but she can con-- you know, you're gonna

 2       get a benefit, [00:04:00] and the family's gonna get

 3       benefit.  So are you will-- are you interested in doing

 4       that?"

 5  WILSON:   Yeah.  OK.  And just -- but -- and what's the other

 6       side?  If it's not a sport, what is it?  Is there any

 7       other side doors in --

 8  SINGER:   Then I have to go to -- then I have to go to

 9       department chairs, and, and, and get...  Some schools

10       have a VIP list at the department chair level, so we

11       could go that route, and then you can help their

12       (inaudible) -- their, their program.  It just depends on

13       which school you want to go to.

14  WILSON:   OK, you know, I have this friend -- you know, one of

15       the things I wanted to talk to you about, too, is I -- I

16       don't know how -- I remember last time I did this, you

17       didn't really make any money on this, on the side, this

18       stuff.  You just charge, and then you make a donation to

19       the school, and that's it?

20  SINGER:   Well, uh, so it depends in different ways.  So

21       what's happened in the grown-up world of my world now,

22       compared to when, you know, we did ██████ was that

23       essentially now the money goes into my foundation, as a

24       donation, (overlapping dialogue; inaudible) --
```

```
1   WILSON:   Oh, to your foundation, not to the schools.

2   SINGER:   Yeah, then that way the kids don't know it happens,

3        right?

4   WILSON:   Yeah.

5   SINGER:   So -- and then the other part [00:05:00] of that is

6        they don't chase you all the time for money.  'Cause once

7        you -- you know, once you're -- they know you gave money,

8        that's a different story.  And then what I can -- what

9        I'll do is I'll split the money potentially to the coach

10       or other pl-- parties that are out that school that need

11       the money, right?

12  WILSON:   Mm-hmm.

13  SINGER:   So...  Or it may go right to the coach, um, that's

14       helping us.  It ju-- it just depends on the school.

15  WILSON:   Right.  OK, so you don't actually get credit for a

16       donation to the school, or get hounded for that.  You

17       get, uh --

18  SINGER:   (overlapping dialogue; inaudible)

19  WILSON:   -- your donation to you, or your foundation, the Key

20       or whatever --

21  SINGER:   Right, and you get --

22  WILSON:   -- that, uh -- and --

23  SINGER:   -- your write-off, and then you do your thing.

24  WILSON:   OK.
```

 1  SINGER:   And then the kids get in the school.

 2  WILSON:   So my colleagues -- so, so you c-- you, you

 3        (inaudible) I assume take a share of that or something.

 4        If it's all going to your foundation, you can't take a

 5        share if it goes to your foundation.  You don't get a fee

 6        on that, then?

 7  SINGER:   Um, I just do my fee for what I take when I do your

 8        normal applications.

 9  WILSON:   Yeah, that's, like, terrible.  I, I think, from a

10        business model point of view, again, I advised you last

11        time, (laughter) I still advise you, this is worth a lot

12        to people, and so, you know, to the extent you [00:06:00]

13        want to make more money, I would think you would have

14        some kind of fee for that.  (inaudible) it's 350 to the

15        foundation, plus another 20% for me for using my leverage

16        and my relationships --

17  SINGER:   Yeah.

18  WILSON:   -- or something, no?

19  SINGER:   Well, I'm, I'm gonna use your business model going

20        forward.

21  WILSON:   I think you should.  I, I really would advise you...

22        But anyway, I -- so then I have this, uh, close friend of

23        mine here who works at, uh, McKinsey with me, and he's

24        very well off.  He's the head of, uh, one of these big

1        areas in McKinsey for a lot of years.  And his daughter's

2        -- wants to go to Brown next year.  His concern -- I

3        said, "Well, have you thought about...?"  It may be too

4        late, 1.  I don't know.  Um, she's going through her

5        senior year right now.

6   SINGER:   Well, what's the relationship that that person would

7        have...?  I mean, is that g-- is that person big enough

8        in McKinsey that people would know who that person is?

9   WILSON:   Uh, yeah, probably.

10  SINGER:   OK, so then here would be my suggestion, to be frank

11       with you --

12  WILSON:   OK.

13  SINGER:   -- and I'd love to help -- you know, it is late and

14       all of that.  The president takes meetings all the time

15       from influential people.  She's a good gal.  And she--

16  WILSON:   Of Brown?  Yeah, I don't know.

17  SINGER:   Yeah, at Brown.  So what I would suggest is that,

18       [00:07:00] um, he calls up her office -- they have a

19       scheduling person for the president -- and he sets up a

20       meeting for he and his daughter to go meet, and she kinda

21       meets with them, and then she'll give an indication, and

22       he'll get an idea of what it's gonna need -- what's gonna

23       need to be done to, to have her to go to Brown.  That's -

24       -

```
 1  WILSON:    (overlapping dialogue; inaudible) the front door --

 2  SINGER:    -- that's the path I would go.

 3  WILSON:    -- like, like, $10,000,000 kind of thing?  Or that'd

 4       be the (overlapping dialogue; inaudible) --

 5  SINGER:  No, no, no, I think it's a lot less than that.  I

 6       think it's a lot less than that.  But, um, but it's first

 7       getting the meeting with the president, and just talkin'

 8       about -- and then also what he could do for the

 9       university, not only financially but, you know, just in -

10       - he could be a, a guest lecturer.  He could do, you

11       know, lots of different things.

12  WILSON:    Uh-huh.

13  SINGER:    That would be my suggestion.  (overlapping dialogue;

14       inaudible) --

15  WILSON:    He wanted to do it -- so the, the other thing he had

16       a concern was he wanted to do it in a way his daughter

17       wouldn't know.  His daughter's already said, "Dad, don't

18       help me with this, don't help me with that."  She's very

19       kind of, uh --

20  SINGER:    Well, then that's a different path, and then -- then

21       I may have to get involved in that.  Um --

22  WILSON:    Right, so that's --

23  SINGER:    -- but, but it's really --

24  WILSON:    -- the only thing he's sensitive to.
```

```
 1   SINGER:    -- it's --

 2   WILSON:    [00:08:00] His daughter's, like, really independent

 3        that way.

 4   SINGER:    Right.

 5   WILSON:    And she's very smart.  She got a ██ or ██ below

 6        perfect --

 7   SINGER:    But, but --

 8   WILSON:    -- on the ACTs --

 9   SINGER:    -- I --

10   WILSON:    -- and all that, but...

11   SINGER:    No, I get it, but it -- what I would do is I would

12        still -- because him goin' to meet the president isn't --

13        doesn't mean that she's gonna help him, but that's a good

14        starting point.

15   WILSON:    Mm-hmm.  Well, maybe I'll just connect you 2 by an

16        email, and (inaudible) somethin' like that?

17   SINGER:    So --

18   WILSON:    Does that make sense?

19   SINGER:    So I can make the -- I can call the office, and then

20        what they normally...  So I just had a family do that,

21        and essentially what they told me to do was just, um,

22        have, have my family call the scheduling coordinator for

23        a time --

24   WILSON:    Mm-hmm.
```

```
 1   SINGER:   -- and, and -- with the background of the
 2            candidates, and then they'll, they'll usually set up the
 3            meeting.  Sounds like this person's well -- high enough
 4            up that it makes sense for (overlapping dialogue;
 5            inaudible) --
 6   WILSON:   Yeah, he's one of the top, let's say, 12 people.
 7            He's on the Executive Board and all that stuff like that,
 8            so...
 9   SINGER:   Yeah, yeah, so then that makes sense.
10   WILSON:   Now, he's, um...  [00:09:00] Let's see, what else?
11            Uh, that's her f-- uh, what do you call it, early
12            decision school, I think, and all that stuff?
13   SINGER:   Yeah.
14   WILSON:   So she's got all that --
15   SINGER:   Yeah.
16   WILSON:   -- stuff goin' for her.  She really loves it, wants
17            to get there and all that stuff, and he's willin' to pay
18            a million, 2 million.  He didn't care.  Um, so it's that
19            -- it's his last daughter, and he's, you know, pretty
20            well off that way.  I don't know what -- um, is Brown one
21            of those 350 or million...?
22   SINGER:   Oh, it's in the millions.  Yeah, yeah, yeah.  No,
23            there's no --
24   WILSON:   2 million (overlapping dialogue; inaudible)?
```

```
 1   SINGER:   -- 350 (inaudible)...  Yeah, there's no -- there's

 2        no (laughs) 350...  I'll -- I would have a (overlapping

 3        dialogue; inaudible) --

 4   WILSON:   I thought that Stanford -- not Stanford -- I thought

 5        that UCLA and USC and stuff like that was (overlapping

 6        dialogue; inaudible) --

 7   SINGER:   Yeah, that's a different story.  They're not Brown.

 8   WILSON:   No, no, that's what I meant.  The, the -- there's

 9        the 350 schools, or...  (laughter)

10   SINGER:   Yeah.  Yeah, exactly.

11   WILSON:   And everybody else jumps up to the million

12        (inaudible), yeah?

13   SINGER:   Yeah, you gotta ante way up.  Yeah, absolutely.

14   WILSON:   There's not much, uh -- not much in between.  Uh,

15        because (inaudible), too, like, (inaudible) is just -- a,

16        a bunch of them are 350s, the second tier or whatever you

17        want to call 'em, and then everything else just jumped

18        immediately to --

19   SINGER:   That's correct.

20   WILSON:   -- (inaudible) 1, 2.

21   SINGER:   W-- yeah.

22   WILSON:   There's no, like, 500 or 700 (overlapping dialogue;

23        inaudible) --

24   SINGER:   No, no.
```

```
 1   WILSON:    -- or...?

 2   SINGER:    No.  No, because it makes no sense for them to get

 3              involved at those schools unless they're gonna really get

 4              after.  But in [00:10:00] your case, with the girls, I

 5              may be able to negotiate, knock it down so that, you

 6              know, (inaudible) for 2 and figure it out.

 7   WILSON:    L-let's say, let's say they both wanted to go to a

 8              Harvard or a Stanford, right?  Obviously -- is it much

 9              more difficult in Stanford versus Harvard, or Princeton?

10   SINGER:    No, same -- no, but it's the same --

11   WILSON:    Are they all the same?

12   SINGER:    They're all the same.

13   WILSON:    Yeah.  If you wanted to do 2 at Harvard or 2 at

14              Stanford...?  Now, I'm an alumni at Harvard.  I've given

15              some money, but not a lot.  I've given, you know, a few

16              hundred grand or (overlapping dialogue; inaudible).

17   SINGER:    Uh, well, uh, so we just need to strategize on how

18              we're gonna -- where we're gonna go, where we wanna go,

19              right?  'Cause I don't think the girls have any, any idea

20              right now.

21   WILSON:    Yeah, no, I don't think...  They would love to go to

22              Stanford or Harvard.  (inaudible) --

23   SINGER:    Sure.
```

```
 1   WILSON:   -- she loves the school there, and loves the thought
 2        of it.  Uh, ████████ loves Harvard, just from the thought
 3        of it.  I know she's said to her friends...  Uh, I just
 4        listen to 'em talkin' to their friends, you know?
 5   SINGER:   Right.
 6   WILSON:   "Where would you like to go?"  You hear that stuff.
 7        It doesn't have my influence...  It has my influence
 8        indirectly, and, of course, they have these big, you know
 9        -- oh, that's a great school, just the, the brand name in
10        their minds, you know.
11   SINGER:   Well, and, again, most people don't think they can
12        get into Stanford so they don't even [00:11:00] bring up
13        that name.
14   WILSON:   Yeah, but they lived out there and they went --
15   SINGER:   I know.
16   WILSON:   -- swimming in the waterfalls.
17   SINGER:   Right.
18   WILSON:   They know that --
19   SINGER:   No, no, I totally get it.  (laughs) I totally get
20        it.  No, I get it.
21   WILSON:   (inaudible) lived there.
22   SINGER:   Yeah.
```

1   WILSON:   So those are the 2 that are on the top.  I-it's,

2          it's the strategy to try to get into those 2.  Um, is

3          Harvard easier 'cause I'm --

4   SINGER:   No, it's not that.

5   WILSON:   -- legacy?

6   SINGER:   But --

7   WILSON:   That doesn't mean shit?

8   SINGER:   Your legacy means 0, because... (laughter)

9   WILSON:   (inaudible) my life, you know.

10  SINGER:   John, (overlapping dialogue; inaudible) --

11  WILSON:   Unless you're donating a building, huh?

12  SINGER:   You've done quite well for yourself, so for a guy

13         that has no legacy, you're OK.  (laughter)

14  WILSON:   Oh, shit.  So legacy doesn't help at all, huh?

15  SINGER:   Unless you're a big legacy, but you --

16  WILSON:   Especially a big donor legacy, huh?  OK.

17  SINGER:   -- you haven't -- you haven't done that yet.

18  WILSON:   OK, I see.  That's interesting.  So that doesn't

19         matter.  Um --

20  SINGER:   Like, what's your -- like, how much do you give to

21         Harvard?

22  WILSON:   Nothing.  Like, a couple hundred grand over the

23         years, so...

24  SINGER:   OK.  (laughter)

1  WILSON:   So they have too much money.  It pisses me off every

2       time they ask for money.  I say, sure, I'll give you 10

3       grand, you know.  Stop botherin' me.

4  SINGER:   No, I get it.  I get it.

5  WILSON:   [00:12:00] The fuckin' endowment's $30,000,000,000.

6       Like, are you shitting me?  (laughter)

7  SINGER:   I know.  I know, I know, I know.  I know, I get it.

8       I get it.

9  WILSON:   (inaudible) give to, you know, other charities.  But

10      anyway, that's a -- that's a whole different story.  But

11      i-is it --

12 SINGER:   So --

13 WILSON:   -- a better strategy to try and split 'em across the

14      2 --

15 SINGER:   Oh, yeah, I got (inaudible) strategies --

16 WILSON:   -- try to get 'em to go to 1.

17 SINGER:   -- I'm gonna...  No, I'm gonna use athletics to help

18      you, because that's the easiest way.

19 WILSON:   'Cause they're pretty tall and strong, and I think

20      they could actually...  I mean, when I saw ████████

21      rowing --

22 SINGER:   No, they're good athletes.

23 WILSON:   When I saw █████ (sp?) --

24 SINGER:   Yeah.

```
 1   WILSON:    -- row on fuckin' that crew machine, I thought she

 2        was gonna break the machine, she was goin' so hard.

 3   SINGER:    No, she -- no, th-they en-- they, they may end up

 4        gettin' in without even a donation, but, but you --

 5        you'll know at least this route, we got an --

 6   WILSON:    They gotta get (overlapping dialogue; inaudible) --

 7   SINGER:    -- we got the side door route, too.

 8   WILSON:    -- though, right?

 9   SINGER:    Yeah, yeah.

10   WILSON:    But they're not really playing crew much.  They're

11        not doing crew, running crew.

12   SINGER:    Right.

13   WILSON:    So you gotta (overlapping dialogue; inaudible).

14   SINGER:    So we'll, we'll, we'll figure it out.  So --

15   WILSON:    But what would it be, if they wanted to go to one...

16        Uh, is that -- it's gonna be 2 and a half (overlapping

17        dialogue; inaudible) --

18   SINGER:    It's gonna be 1 -- it -- normally it's 1, 2 each,

19        right?  So I would have to make a deal if you wanted 'em

20        both at the same school, and if they could even take 'em

21        at the same school, and it would cost you -- it'd cost

22        you a couple million dollars.  Big guy like you,

23        [00:13:00] (laughs) that's easy.
```

```
1   WILSON:   Yeah.  Not so easy on liquidity, but yeah,

2           (laughter) (inaudible).  You got the installment plan?

3           (inaudible).

4   SINGER:   (inaudible).  Listen, I gotta go to an a-- another

5           appointment.  I just wanted to make sure I got back to

6           you.  I'm gonna be spending some time in Boston, because

7           I'm gonna be reading in Harvard this year, so I'll be

8           able to get together with you.

9   WILSON:   Oh, I'd love that.  That'd be great.  And I'm gonna

10          connect you -- I'll just (inaudible) -- I'll send an

11          email to you, and the guy's name is ███████ and --

12  SINGER:   OK.

13  WILSON:   -- he could become a client and do whatever, and

14          I'll let the 2 of you kinda email back and forth and

15          stuff.  He'd love to do something not known to his

16          daughter at Brown.

17  SINGER:   Got it.

18  WILSON:   (laughs) And he's got money.

19  SINGER:   I gotcha.  I gotcha.

20  WILSON:   OK.

21  SINGER:   All right.  Take care.

22  WILSON:   All right, take care.  Bye.

23  SINGER:   OK, bye-bye.

24  [00:13:40]
```

1

2                          END OF AUDIO FILE

# EXHIBIT M



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

Main Reception: ███████        *John Joseph Moakley United States Courthouse*
                                ████████

March 18, 2020

BY EMAIL

Michael Kendall, Esq.



>       Re:    *United States v. Sidoo, et al.*
>              No. 19-cr-10080-NMG

Dear Counsel:

　　　We write in response to your email of March 15, 2020. In response to your inquiries:

1.  The production you should have received on Monday includes the "1-A" files for each FBI report. To the extent any of these attachments were inadvertently not included, please let us know and we will provide them.

2.  We are exploring with USC's counsel whether there are additional documents responsive to the government's prior subpoenas. We have been advised that USC may produce additional documents concerning certain admitted students. It is our intention to produce any additional materials to the defendants should we receive them.

3.  There have been no promises, rewards or inducements to Singer regarding possible criminal conduct of Singer or his relatives that is uncharged and unrelated to this case beyond what has been disclosed. We have previously disclosed Singer's plea agreement and the information to which he pled guilty, which itemize specific assets to be forfeited. We have not reached any agreement with Singer to allow him to keep specific assets. We intend to produce further information about Singer's financial disclosures shortly.

4.  Session 9193 was a two-second call to Wilson's daughter, identified in Singer's iPhone contacts as "████ Wilson," on September 28, 2018. It does not appear that the call was completed and there is no content. Based on our review of the call logs that were contained in our production of the phone downloads on or about March 3, 2020, it appears that at 4:30 pm on September 28, 2018, Singer and Wilson's daughter spoke via FaceTime for 33

minutes.  The government's Title III wiretap did not intercept FaceTime communications. Singer and John Wilson next spoke on September 29, 2018 (Session 9249).

With respect to Singer's iPhone note of January 30, 2019, 22:26 (SINGER-PHONE-000664), it is unclear what "detailed information" you seek.  We produced the note itself on February 26, 2020.  We have now produced the remaining content of the phone.  We have also produced all checks and emails in the government's possession, custody or control relating to Wilson's $20,000 payment to Singer, $100,000 payment to KWF, and $100,000 payment to The Key, as well as a copy of Singer's $100,000 cashier's check made out to USC Men's Water Polo.

5. We do not believe that the government is in possession of additional information responsive to your requests of September 27, 2019 and January 28, 2020, beyond the emails, financial records, intercepted and consensually recorded calls, and FBI or IRS interview reports that have already been produced.  Nevertheless, we are re-reviewing our productions to date, and those we have previously indicated are forthcoming (including email search warrant returns of several defendants), to ensure that is the case.  We will continue to update our responses as necessary, consistent with our discovery obligations and as we identify prospective trial witnesses and complete ongoing privilege reviews (including with respect to communications with the ███ Company).  To the extent you have requested publicly available IRS guidance, we would direct you to the IRS website.

Sincerely,

ANDREW E. LELLING
United States Attorney

By: /s/ Eric S. Rosen
Eric S. Rosen
Justin D. O'Connell
Kristen A. Kearney
Leslie A. Wright
Karin M. Bell
Stephen E. Frank
Assistant U.S. Attorneys

cc: Counsel of Record

# EXHIBIT N

| From: | Bell, Karin (USAMA)3 |
| To: | Malkiel, Yakov; Kendall, Michael; Tomback, Andrew |
| Cc: | USAMA-Varsity Blues Trial (USA) |
| Subject: | Your remaining discovery questions |
| Date: | Friday, May 15, 2020 10:53:08 AM |

Hi Yakov,

Sorry for the delay.  The government's responses are in red, below.

Dear counsel,

In connection with your near-final production letter of May 5, 2020, we request that you confirm the following, or describe with specificity the materials you have not yet produced and state when you intend to produce them:

1.  That you are not withholding any documents or information responsive to the *Brady* requests we have made in this case, including (without limitation) in:

   a.  Our letters dated September 27, 2019, January 28, 2019, and February 29, 2020;
   b.  Joint letters from multiple defendants dated February 19, 2020 and February 28, 2020; and
   c.  All follow-up letters, emails, and filings relating to the foregoing.

The government believes it has complied with its discovery obligations under Federal Rule of Criminal Procedure 16, the Local Rules, and *Brady*, and the government will continue to do so.  The government is not intentionally withholding any such information.   As indicated in our reply to defendant's discovery chart (Docket #1071), the government will not provide an index of documents not yet produced as we are unaware of a legal basis to do so.  Nor will the government provide information about "intended" contacts between Singer and any defendant in this case.  As noted in our reply to the defendant's discovery chart, the government has provided information about actual contacts between Singer and the Wilson family, and there is no requirement that the government produce work product regarding "intended contacts" between a cooperator and a target.

2.  That, with the exception mentioned in your May 5 letter, you have now produced to the defendants (or made available for inspection, with respect to certain iPhone data) the following items:

   a.  All documents produced to the government in response to grand jury subpoenas in this matter;

The government believes it has produced all documents as required under Rule 16, the Local Rules and *Brady*.

   b.  All documents the government has seized and retained pursuant to search warrants issued in this matter;

The government believes that it has produced all such documents as required under Rule 16, the Local Rules and *Brady* to the extent those documents were responsive to Attachments B of the relevant search warrants and did not contain presumptively privileged information.  For instance, the government did not produce defendant Wilson's presumptively privileged

emails (obtained via search warrant) to other co-defendants; although the government did provide them to Wilson.  [Note, this does not include presumptively privileged documents obtained via search warrant from Singer.  Those documents have been disclosed as any privilege was waived.]

      c.   All documents that Rick Singer, and any other individuals, have produced to the government consensually in connection with this matter;

The government believes it has produced these documents as required under Rule 16, the Local Rules and *Brady*.  To the extent the government has not produced any such documents, *e.g.*, any of Singer's *Jencks* or *Giglio* materials, the government will produce such documents pursuant to the pre-trial schedule set by the parties and the court, *i.e.*, July 17, 2020 for *Giglio* material and well before the deadline required by 18 USC 3500.

      d.   All recordings and other records resulting from the government's T-III wiretap and consensual recordings  in this matter; and

 The government believes it has produced all of these documents as required under Rule 16, the Local Rules and *Brady*.

      e.   All documents memorializing, summarizing, or recording information that the government has obtained from witnesses in this matter (with the exception of grand jury transcripts).

The government has not yet compiled a witness list and thus has not produced all *Jencks* material.  Pursuant to the schedule set by the parties and the Court, the government will produce all *Giglio*/impeachment information on or before July 17, 2020 and any remaining *Jencks* materials well before the deadline required by 18 USC 3500.  As you are aware, the government has provided a significant number of law enforcement reports as well as an index of all FBI reports, even those not produced.  The government has also provided agent notes for all FBI reports produced to date.  Finally, the government has provided a summary of AUSA notes regarding interviews with Singer – to the extent such notes included information additional to or different from that in the relevant law enforcement report.

Thank you very much.

# EXHIBIT O

January 28, 2019

Eric S. Rosen, Justin D. O'Connell, Leslie A. Wright, and Kristen A. Kearney
Assistant United States Attorneys
United States Attorney's Office
John Joseph Moakley United States Courthouse
█████████████

*United States v. Sidoo et al.*, No. 19-cr-10080

Dear Counsel,

On behalf of defendant John Wilson, and in accordance with *Brady* and the Local Rules, we ask that you produce the following categories of exculpatory evidence:

1.   Evidence of any decisions that Wilson did not make regarding the number or wording of invoices from Rick Singer (or his organizations) to Wilson (or Hyannis Port Capital).

2.   Evidence of any communications in which Wilson did not participate regarding the number or wording of such invoices.

3.   Evidence of any decisions that Wilson did not make regarding the tax treatment of any payments from Wilson (or Hyannis Port Capital) to Singer, to his organizations, or to USC.

4.   Evidence of any communications in which Wilson did not participate regarding the tax treatment of such payments.

5.   Evidence of any communications to Wilson, from anyone, indicating that the Key Worldwide Foundation was an IRS-approved charity.

6.   Evidence of any communications involving ██████████ or any of Wilson's tax-preparers about whether the Key Worldwide Foundation was an IRS-approved charity, or any efforts by those people to determine this.

7.   Evidence that Singer (or his employees or associates) communicated to Singer's clients (a) that the Key Worldwide Foundation was an IRS-approved charity, or (b) that payments to or through Singer and his organizations were tax-deductible, or (c) that payments intended to benefit USC were tax-deductible.

8.   Evidence that any funds from Wilson benefitted USC or any of its programs.

9.   Evidence that Singer (or his employees or associates) communicated to Wilson that any funds from Wilson would benefit USC or any of its programs.

10. Evidence of any discussions between Singer and any USC employee suggesting that Singer could help to raise funds for USC or any of its programs.

11. Evidence that any USC employee understood that Singer was raising money for USC or any of its programs.

12. Evidence of any reaction by USC personnel to the receipt of a $100,000 check referencing Wilson.

13. Evidence of any guidance ever issued by the IRS that (a) describes the circumstances in which a donation to a public charity is not tax-deductible because of preferential treatment granted to the donor by the charity, or (b) indicates that a donor to a school is not entitled to a tax deduction because a relative of the donor was an applicant for admission to the school.

14. Evidence that ███████████████████████, or any personnel of the ███ Company did not orally discuss invoices from Singer (or his organizations) with Wilson.

15. Evidence that ████████ did not orally discuss the preparation of Wilson's and Hyannis Port Capital's 2014 tax returns with Wilson or ██████.

16. Evidence that ████████ and any personnel of the ███ Company did not orally discuss the preparation of Wilson's and Hyannis Port Capital's 2014 tax returns with Wilson or ██████.

These requests add to all previous requests we have made for exculpatory evidence. They include both documents and information from other sources, such as witness interviews. They are continuing in nature.

As you know, motion practice on *Brady*-related issues is ongoing, and began before the government obtained an indictment alleging a tax offense. We assume that, to make efficient use of the Court's time, we should aim to argue any disputes regarding the requests described above during the upcoming series of hearings that Magistrate Judge Kelley has indicated she will hold. Accordingly, please let us know as soon as you are able whether there are any requests among those listed above with which you do not intend to comply.

Sincerely,

Counsel to John Wilson

# EXHIBIT P

| | |
|---|---|
| **From:** | Bell, Karin (USAMA)3 |
| **To:** | Kendall, Michael; Frank, Stephen (USAMA) 1; Rosen, Eric (USAMA); O"Connell, Justin (USAMA); Kearney, Kristen (USAMA) |
| **Cc:** | Tomback, Andrew; Malkiel, Yakov |
| **Subject:** | RE: U.S. v. Wilson/Discovery Questions |
| **Date:** | Wednesday, May 20, 2020 1:07:28 PM |

Hi Mike,

The government already responded, in substance, to each of the letters you reference in question #1 below.  If you have new discovery requests, we are happy to consider those now.  Otherwise, our answer stands: we believe we have complied with our discovery obligations under Federal Rule of Criminal Procedure 16, the Local Rules, and *Brady*, and will continue to do so. We are not intentionally withholding any information under those Rules.

With regard to the FaceTime conversation on September 28, 2018, the government believes it has produced all materials concerning that conversation that it has obtained to date.  With regard to your question whether the government "disputes" that Wilson and Singer spoke during that conversation, we have, to date, obtained no evidence corroborating Mr. Wilson's statement that he participated in the September 28, 2018 FaceTime conversation.  Should we obtain such information, or other discoverable information concerning that conversation, from Singer or any other source, we will produce it to you.

With regard to the September 23 meeting and cancellation (the subject of your 5/18/20 email), on March 13, 2020 we disclosed the relevant FBI report documenting the Sept. 23, 2018 meeting between the agents and Singer concerning the cancellation of the meeting.  We do not intend to disclose work-product as your request seeks.

Finally, with respect to your two remaining requests – given their breadth (*e.g.*, "all documents produced to the government in response to grand jury subpoenas in this matter") – our answers stand:  The government believes it has produced all documents as required under Rule 16, the Local Rules and *Brady*, and will continue to do so.


While not specifically responsive to any of your requests, the government provides the following information obtained from a further review of AUSA notes from the September 28, 2018 Singer proffer: ██████ Wilson (son) may have taken time-off from USC due to the death of ███████████; Wilson was going to do the side door again for his daughters and he was a very demanding parent; and, Wilson was in charge and ██████ Wilson was not involved with the side door.

Further, we have reviewed the grand jury testimony of █████████████.  We do not believe that the following is exculpatory, but we are disclosing it to you in an abundance of caution:

- John Wilson is the only person who does work for Hyannis Port Capital although there was an individual who performed maintenance;

- Hyannis Port Capital is a business involving private equity;

- ██████ Wilson is the wife of John Wilson;

- ███████████ did not know who Jovan Vavic was; and,

- ██████ (and not Wilson) would have updated the "cash uses" spreadsheet to reflect the $20,000 and $100,000 payments to Singer.

Thank you,
Karin


Karin M. Bell
Deputy Criminal Chief
U.S. Attorney's Office
District of Massachusetts
Boston, MA
███████████

---

**From:** Kendall, Michael ████████████████████████
**Sent:** Monday, May 18, 2020 7:11 PM
**To:** Bell, Karin (USAMA)3 ████████████████; Frank, Stephen (USAMA) 1 ███████████████████; Rosen, Eric (USAMA) ████████████████████; O'Connell, Justin (USAMA) ████████████████; Kearney, Kristen (USAMA)

**Cc:** Tomback, Andrew ███████████████████ Malkiel, Yakov ██████████████████
**Subject:** RE: U.S. v. Wilson/Discovery Questions

Karin,

Thanks for your response.  I realize it can come across as presumptuous to suggest deadlines, so please indulge me.  Can you get us a response by tomorrow, at least with respect to our inquiries about the September 23 and 28, 2018 events.  We first sent written requests seeking information about these events weeks or months ago.  We want to respect the Court's direction to get our filings in asap and this information is the only thing holding us back.

Mike

**Michael Kendall  |  Partner**
████████████████████████████████████████

**From:** Bell, Karin (USAMA)3 █████████████████
**Sent:** Monday, May 18, 2020 3:32 PM
**To:** Kendall, Michael ████████████████████ Frank, Stephen (USAMA) 1 ████████████████ Rosen,
Eric (USAMA)████████████████ ; O'Connell, Justin (USAMA)█████████████████ Kearney, Kristen
(USAMA) ███████████
**Cc:** Tomback, Andrew ████████████████████ Malkiel, Yakov ██████████████████
**Subject:** RE: U.S. v. Wilson/Discovery Questions

Hi Mike,

Just letting you know we got this.  We will respond at the same time we respond to your previous email.  Today is very busy and so it will not be by 5pm, but as soon as we are able.

Thank you,
Karin

**From:** Kendall, Michael ███████████████████
**Sent:** Monday, May 18, 2020 10:57 AM
**To:** Bell, Karin (USAMA)3████████████████ Frank, Stephen (USAMA) 1██████████████Rosen, Eric (USAMA)
███████████████ O'Connell, Justin (USAMA)████████████████ ; Kearney, Kristen (USAMA)
██████████████
**Cc:** Tomback, Andrew █████████████████████ ; Malkiel, Yakov ██████████████████
**Subject:** U.S. v. Wilson/Discovery Questions

Karin,

        In addition to responding to our requests of clarification below, we ask that you provide more information concerning the September 23, 2018 meeting that the Government asked Singer to cancel.  In particular, we ask that you disclose what Singer informed the Government about Wilson prior to the cancellation of the September 23 meeting, what the agents said to Singer, why the agents told Singer to schedule the meeting, and why the agents decided to cancel the meeting.  We believe these events include highly exculpatory statements and information, all of which is missing from the contemporaneous FBI reports produced to date.  Combined with the government's failure to record the September 28 FaceTime conversation, this cancelled meeting is directly relevant to our pending Motion for Reconsideration.  Judge Gorton has instructed the Government to respond specifically to the allegations surrounding Singer's Note dated October 2, 2018, yet we have still not received  this critically relevant information.  Given that the requested information is already known and readily available to the Government, and that we may need to present it to Judge Gorton forthwith, we ask that you provide such answers by 5 pm tonight.

**From:** Kendall, Michael
**Sent:** Saturday, May 16, 2020 11:35 AM
**To:** 'Bell, Karin (USAMA)3' ███████████
**Cc:** Malkiel, Yakov███████████████   Tomback, Andrew███████████████████████
'USAMA-VarsityBluesTrial@usa.doj.gov' ███████████████████
**Subject:** RE: Your remaining discovery questions

Karin,

Thank you for the response.  We found several of the answers below ambiguous and ask that you provide more clarity to help us narrow any disputes so we can decide if we need to present them to Judge Kelley. Our numbers immediately below correspond to the numbers we both have used in the prior emails.  Given the impending deadlines, we would appreciate an answer forthwith.

1.    You wrote, "The government believes it has complied with its discovery obligations under Federal Rule of Criminal Procedure 16, the Local Rules, and *Brady*, and the government will continue to do so.  The government is not intentionally withholding any such information."

Are you stating (a) the Government is not withholding any such information that we have requested and the Government possesses, or (b) the government is withholding information that the Defendants have requested but the Government believes it can do so based on how it interprets the applicable rules.  If your answer is (b), can you describe the materials that fall within our requests but outside your interpretation of the rules.

You wrote, " Nor will the government provide information about "intended" contacts between Singer and any defendant in this case.  As noted in our reply to the defendant's discovery chart, the government has provided information about actual contacts between Singer and the Wilson family, and there is no requirement that the government produce work product regarding "intended contacts" between a cooperator and a target.

We understand your position with respect to the Sept. 23 appointment, but Wilson maintains that he had an exculpatory FaceTime conversation with Singer on September 28, 2018.  The Government has not produced any  materials describing that conversation.  What is the Government's reason for not disclosing any such materials?  Please unambiguously tell us if the Government disputes that defendant John Wilson and Singer spoke during the September 28 FaceTime conversation.


2.    We asked you to affirm, "That, with the exception mentioned in your May 5 letter, you have now produced to the defendants (or made available for inspection, with respect to certain iPhone data) the following items:

    a.    All documents produced to the government in response to grand jury subpoenas in this matter; The government believes it has produced all documents as required under Rule 16, the Local Rules and *Brady*."

    . . . .

    d.    All recordings and other records resulting from the government's T-III wiretap and consensual recordings  in this matter; and

The government believes it has produced all of these documents as required under Rule 16, the Local Rules and *Brady.* "

Again, can you clarify, are you stating (a) the Government is not withholding any such information that we have requested and the Government possesses, or (b) the government is withholding information that the Defendants have requested but the Government believes it can do so based on how it interprets the applicable rules.  If your answer is (b), can you describe the materials that fall within our requests but outside your interpretation of the rules.


Thanks,

Mike



**Michael Kendall**  | Partner

██████████████████████████████████

**From:** Bell, Karin (USAMA)3█████████████
**Sent:** Friday, May 15, 2020 10:53 AM
**To:** Malkiel, Yakov███████████████████; Kendall, Michael█████████████████████
Tomback, Andrew███████████████████████
**Cc:** USAMA-Varsity Blues Trial (USA)██████████████████
**Subject:** Your remaining discovery questions

Hi Yakov,

Sorry for the delay.  The government's responses are in red, below.


Dear counsel,

In connection with your near-final production letter of May 5, 2020, we request that you confirm the following, or describe with specificity the materials you have not yet produced and state when you intend to produce them:

1. That you are not withholding any documents or information responsive to the *Brady* requests we have made in this case, including (without limitation) in:

   a. Our letters dated September 27, 2019, January 28, 2019, and February 29, 2020;
   b. Joint letters from multiple defendants dated February 19, 2020 and February 28, 2020; and
   c. All follow-up letters, emails, and filings relating to the foregoing.

The government believes it has complied with its discovery obligations under Federal Rule of Criminal Procedure 16, the Local Rules, and *Brady*, and the government will continue to do so.  The government is not intentionally withholding any such information.  As indicated in our reply to defendant's discovery chart (Docket #1071), the government will not provide an index of documents not yet produced as we are unaware of a legal basis to do so.  Nor will the government provide information about "intended" contacts between Singer and any defendant in this case.  As noted in our reply to the defendant's discovery chart, the government has provided information about actual contacts between Singer and the Wilson family, and there is no requirement that the government produce work product regarding "intended contacts" between a cooperator and a target.

2. That, with the exception mentioned in your May 5 letter, you have now produced to the defendants (or made available for inspection, with respect to certain iPhone data) the following items:

a.   All documents produced to the government in response to grand jury subpoenas in this matter;

The government believes it has produced all documents as required under Rule 16, the Local Rules and *Brady*.

b.   All documents the government has seized and retained pursuant to search warrants issued in this matter;

The government believes that it has produced all such documents as required under Rule 16, the Local Rules and *Brady* to the extent those documents were responsive to Attachments B of the relevant search warrants and did not contain presumptively privileged information. For instance, the government did not produce defendant Wilson's presumptively privileged emails (obtained via search warrant) to other co-defendants; although the government did provide them to Wilson. [Note, this does not include presumptively privileged documents obtained via search warrant from Singer. Those documents have been disclosed as any privilege was waived.]

c.   All documents that Rick Singer, and any other individuals, have produced to the government consensually in connection with this matter;

The government believes it has produced these documents as required under Rule 16, the Local Rules and *Brady*. To the extent the government has not produced any such documents, *e.g.*, any of Singer's *Jencks* or *Giglio* materials, the government will produce such documents pursuant to the pre-trial schedule set by the parties and the court, *i.e.*, July 17, 2020 for *Giglio* material and well before the deadline required by 18 USC 3500.

d.   All recordings and other records resulting from the government's T-III wiretap and consensual recordings  in this matter; and

 The government believes it has produced all of these documents as required under Rule 16, the Local Rules and *Brady*.

e.   All documents memorializing, summarizing, or recording information that the government has obtained from witnesses in this matter (with the exception of grand jury transcripts).

The government has not yet compiled a witness list and thus has not produced all *Jencks* material. Pursuant to the schedule set by the parties and the Court, the government will produce all *Giglio*/impeachment information on or before July 17, 2020 and any remaining *Jencks* materials well before the deadline required by 18 USC 3500. As you are aware, the government has provided a significant number of law enforcement reports as well as an index of all FBI reports, even those not produced. The government has also provided agent notes for all FBI reports produced to date. Finally, the government has provided a summary of AUSA notes regarding interviews with Singer – to the extent such notes included information additional to or different from that in the relevant law enforcement report.

Thank you very much.

==========================================================================
This email communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this email in error by replying to the email or by telephoning ███████████ . Please then delete the email and any copies of it. Thank you.

Our external privacy policy is available on ████████████████████████████

==========================================================================

==========================================================================
This email communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read,

copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this email in error by replying to the email or by telephoning ███████. Please then delete the email and any copies of it. Thank you.

Our external privacy policy is available on ██████████████████████

====================================================================
====================================================================

This email communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this email in error by replying to the email or by telephoning ███████. Please then delete the email and any copies of it. Thank you.

Our external privacy policy is available on ██████████████████████

====================================================================