United States District Court
District of Massachusetts

```
_____
                            )
United States of America,   )
                            )
          Plaintiff,        )
                            )
          v.                )   Criminal Action No.
                            )   19-10080-NMG
Sidoo et al,                )
                            )
          Defendants.       )
_____ )
```

MEMORANDUM & ORDER

GORTON, J.

The government has charged defendants with conspiring with William "Rick" Singer ("Singer") to have their children fraudulently admitted to elite universities by, <u>inter alia</u>, fabricating applications, falsifying academic and athletic credentials, cheating on standardized tests, making payments to corrupt exam proctors and bribing university employees and athletic coaches.  The defendants have moved to dismiss the indictment on a number of grounds, including that the indictment fails properly to allege (1) a single conspiracy; (2) mail and wire fraud and honest services mail and wire fraud and federal programs bribery and (3) a money laundering conspiracy.

This memorandum and order addresses the following motions to dismiss: (1) Defendants' Motion to Dismiss Count One Insofar as it Alleges Conspiracy to Defraud Testing Companies of

Property and Honest Services (Docket No. 1021); (2) Defendant
William McGlashan's Motion to Dismiss Count Seven of the Fourth
Superseding Indictment (Docket No. 1023); (3) Defendant I-Hsin
"Joey" Chen's Motion to Dismiss Count Five of the Fourth
Superseding Indictment (Docket No. 1026); (4) Defendants' Motion
to Dismiss Pursuant to Federal Rules of Criminal Procedure 8 and
12(b)(3)(B)(i), (iv), and (v) (Docket No. 1031); (5) Elisabeth
Kimmel's Motion to Dismiss Pursuant to Federal Rules of Criminal
Procedure 12(b)(1) and 12(b)(3)(B) (Docket No. 1035); (6)
Defendants' Motion to Dismiss (i) Count One Insofar as it
Alleges Conspiracy to Commit Honest Services Fraud against the
University of Southern California and Georgetown University and
(ii) Count Two Alleging Conspiracy to Commit Federal Programs
Bribery (Docket No. 1037); (7) Defendants' Motion to Dismiss the
Money Laundering Conspiracy (Count III) (Docket No. 1039) (8)
Defendants' Motion to Dismiss Count One Insofar as it Alleges
Conspiracy to Defraud Universities of Property (Docket No. 1041)
and (9) The Joint Motion of Amy and Gregory Colburn to Dismiss
Second Superseding Indictment (Docket No. 341).  For the
following reasons, those motions will be denied.

I.   **Background**

A. **"Side door"**

The Fourth Superseding Indictment ("the FSI") alleges that,
beginning in 2007 and continuing through February, 2019, Singer

orchestrated a scheme, which he referred to as the "side door" whereby he conspired with defendants (other than defendants Gregory and Amy Colburn and I-Hsin Chen) to fraudulently designate students as athletic recruits to bypass the traditional admissions process.  In order to effectuate and conceal the scheme, Singer used two entities, the Edge College & Career Network, LLC ("The Key"), a for-profit college counseling and preparation business, and the Key Worldwide Foundation ("KWF"), a non-profit corporation.

In essence, the government alleges that the side-door operated as follows: Defendants would agree with Singer to begin the scheme and would make large payments to The Key and/or KWF, often $250,000 or more per student.  Singer, in concert with defendants, would fabricate academic and athletic records for defendants' children.  He would then submit the falsified athletic application to the targeted university, at which point a corrupt university insider or coach would present the student as a legitimate athletic recruit to obtain admission for the student.  In return, Singer would make payments, disguised as donations, from one of his entities to the corrupt insider or accounts at the university over which the insiders exercised control.

**B. Test Cheating**

In addition to the side-door scheme, the FSI alleges that

Defendants William McGlashan, I-Hsin Chen, Marci Palatella, and Gregory and Amy Colburn (collectively, the "testing defendants") conspired with Rick Singer to fraudulently inflate their children's scores on the ACT and SAT college admissions exams.

As part of the test cheating scheme, the testing defendants allegedly paid Singer to hire individuals to pose as exam proctors (and secretly correct or provide exam answers) and to bribe exam administrators to allow the cheating to occur. Specifically, to achieve the desired high scores, the indictment alleges that Singer and the testing defendants paid (1) Mark Riddell, an allegedly corrupt test proctor, to provide or correct the student's answers on the tests (or take the tests himself) and (2) Igor Dvorskiy, a corrupt test site administrator who Singer bribed to allow test cheating to occur at a testing facility in West Hollywood, California.

Defendants allegedly participated in the test cheating scheme in several ways, including supplying Singer with copies of their children's photo identification to allow Singer to create false identifications for Riddell to take exams on the students' behalf and obtaining testing accommodations at Singer's direction or by requesting that Singer and Riddell obtain specific scores for their children.  The government maintains that Riddell often communicated directly with defendants to discuss the test answers and scores.  In exchange

for the services of Singer and Riddell, defendants paid up to $75,000 per student as a "donation" to KWF which Singer then used to pay Riddell and Dvorskiy.

**C. The Indictment**

Count One of the FSI charges the defendants with conspiracy to commit wire fraud and conspiracy to commit mail fraud.  In brief, the government maintains that the defendants conspired to deprive universities and testing companies of (1) property in the form of admissions slots and accurate test scores and (2) the honest services of their coaches and administrators and test administrators, respectively.

Count Two of the FSI charges nine of the defendants with conspiring to commit federal programs bribery by bribing agents of the University of Southern California ("USC") in order to secure the admission of their children to that university.

Count Three of the FSI charges the defendants with conspiracy to commit money laundering in connection with payments made to KWF and The Key in furtherance of the admissions scheme.

Counts Four through Twelve charge defendants with substantive fraud and bribery and Count Thirteen charges just defendant Wilson with tax fraud.

## II.  <u>Legal Standard on a Motion to Dismiss</u>

The Federal Rules of Criminal Procedure provide that an indictment must contain "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  When considering a motion to dismiss in a criminal case, a court accepts the factual allegations in the indictment as true. <u>Boyce Motor Lines</u> v. <u>United States</u>, 342 U.S. 337, 343 n.16 (1952).  Such a motion is properly directed only to the question of the validity of the indictment on its face and Courts are to be mindful that

> the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense.

<u>United States</u> v. <u>Ngige</u>, 780 F.3d 497, 502 (1st Cir. 2015) (citation omitted).  It is typically sufficient that an indictment articulate the offense in "the words of the statute itself as long as those words set forth all the elements of the offense without any uncertainty or ambiguity." <u>United States</u> v. <u>Brown</u>, 295 F.3d 152, 154 (1st Cir. 2002)(citation omitted).  An indictment is ripe for dismissal if the facts demonstrate that, as a matter of law, the prosecution will not be able to prove each of the elements of the charged offense. <u>United States</u> v. <u>Huet</u>, 665 F.3d 588, 596-97 (3d Cir. 2012).

### III. **Defendants' Motion to Dismiss the Conspiracy**

Each of the three conspiracy counts in the FSI charges defendants with a single conspiracy.  Defendants have moved to dismiss the FSI on the grounds that: (1) the allegations are duplicitous and allege individual conduct, not a single conspiracy _i.e._, a so-called rimless wheel conspiracy and (2) it improperly joins the defendants in a single prosecution.

### A. Conspiracy Allegations

In support of their contention that the indictment should be dismissed for failure to allege a single conspiracy, the defendants rely on the United States Supreme Court decision in Kotteakos v. United States, 328 U.S. 750 (1946) which held that a so-called "rimless wheel" conspiracy cannot sustain conviction for a single conspiracy.  As articulated by the Fourth Circuit Court of Appeals,

> A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction.

Dickson v. Microsoft Corp., 309 F.3d 193, 203 (4th Cir. 2002).

It is well established, however, that "whether a single conspiracy or a multiple conspiracy exists is, of course, a question of fact for the jury." United States v. LiCausi, 167 F.3d 36, 45 (1st Cir. 1999); see also United States v.

- 7 -

Villarman-Oviedo, 325 F.3d 1, 12 (1st Cir. 2003)(noting that the "issue of single conspiracy v. multiple conspiracies is a question of fact for the jury."). To properly charge a conspiracy an indictment must allege the existence of: (1) a common goal, (2) overlap between the participants and (3) interdependence. See United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999). On its face the FSI adequately alleges a single conspiracy, the existence of which is a factual question for the jury.

The FSI alleges that for both the fraud and the federal programs bribery conspiracies the defendants shared the common goal of using bribery and fraud in order to secure their childrens' admission to prestigious colleges and universities. With respect to the money laundering conspiracy it alleges that defendants sought to effectuate, and conceal, their fraud by funneling payments through Singer's entities, The Key and KWF. The common goal requirement is to be "broadly drawn" and such allegations are sufficient to allege a common goal and survive a motion to dismiss. Id. at 69 n.3; see also United States v. Ortiz-Islas, 829 F.3d 19, 25 (1st Cir. 2016).

That defendants allegedly accomplished their common goal through varied chicanery (including but not limited to test cheating and the "side-door" admissions) does not warrant dismissal of the indictment for failure to allege a conspiracy.

- 8 -

A conspiracy may be multifaceted or contain multiple components but may still be properly charged as a single overarching scheme. See United States v. Holt, 777 F.3d 1234, 1263 (11th Cir. 2015); United States v. Prieto 812 F.3d 6 (1st Cir. 2016).

The FSI also properly alleges overlap and, to the extent required, inter-dependence.  Overlap is "satisfied by the pervasive involvement of a single core conspirator."  Portela, 167 F.3d at 695.  The FSI plainly alleges that Singer acted as the core conspirator.  It further alleges that each defendant agreed to achieve the common objective of the conspiracy.  As the government notes, the extent and consequence of the alleged overlap will be properly determined by the jury.

With respect to inter-dependence, the government maintains the scheme as a whole would not have been feasible without the participation of the codefendants.  See Portela, 167 F.3d at 695 n.2 (noting that when discussing inter-dependence the analysis is regularly characterized "as an analysis of the nature of the scheme but there is no conceptual difference between the tests").  The FSI alleges that the defendants were aware of the nature and scope of the scheme.  They knew they were not the only participants.  That others had engaged successfully in the scheme, tended to promote it and encouraged others to enroll. The FSI alleges that the participation of others was necessary to the scheme's success.  Inter-dependence is therefore

satisfied for the purpose of the indictment. See United States
v. Seher, 562 F.3d 1344, 1368 (11th Cir. 2009).

Finally, as the government points out, district courts
consistently (and properly) rebuff defendants' efforts to
dismiss conspiracy allegations based on claims of duplicity.
See, e.g., United States v. Gabriel, 920 F. Supp. 498, 503-04
(S.D.N.Y. 1996).

In summary, the indictment sufficiently alleges that the
defendants engaged in a singular, overarching conspiracy.  The
question of whether they participated in a single conspiracy or
multiple conspiracies is properly left to the jury and the
defendants' motion to dismiss on that ground will be denied.

**B. Joinder**

Similar to their argument with respect to conspiracy,
defendants maintain that they have been improperly joined
pursuant to Fed. R. Crim. P. 8(b).  Under that rule:

> The indictment or information may charge 2 or more
> defendants if they are alleged to have participated in the
> same act or transaction, or in the same series of acts or
> transactions, constituting an offense or offenses. The
> defendants may be charged in one or more counts together or
> separately. All defendants need not be charged in each
> count.

The general rule in the First Circuit is that:

> those indicted together are tried together to prevent
> inconsistent verdicts and to conserve judicial and
> prosecutorial resources.

United States v. Soto-Beniquez, 356 F.3d 1, 29 (1st Cir. 2004).
The First Circuit recognizes two requirements for proper joinder
under Rule 8(b): (1) the offenses in question must constitute a
series of acts or transactions and (2) a showing that joining
the defendants is of benefit to the government. United States v.
Barbosa, 666 F.2d 704, 707-08 (1st Cir. 1981).  For the purposes
of Rule 8(b) a "series of acts o[r] transactions means more than
just similar acts." See United States v. Prange, 922 F. Supp. 2d
127, 129 (D. Mass. 2013) (quoting King v. United States, 355
F.2d 700, 703 (1st Cir. 1966)).

For joinder of multiple counts to be suitable, a "rational
basis . . . should be discernible from the face of the
indictment." United States v. Natanel, 938 F.2d 302, 306 (1st
Cir. 1991).  The burden falls on the defendant to demonstrate
misjoinder and, if that burden is carried, the appropriate
remedy is severance. Id.  Further, for joinder to be proper it
is "settled that a conspiracy count can forge the needed
linkage." Id. at 307.  Although some common activity between
defendants is required, joinder may be apt "even when the
objecting defendant is only connected to one part of [a]
scheme." United States v. Azor, 881 F.3d 1, 11 (1st Cir. 2017).

As to the first prong, joinder here is proper because the
allegations set forth in the FSI indicate that the charged
offenses are sufficiently related to constitute a "series of

transactions." Prange, 922 F. Supp. 2d at 129.  As previously discussed, the FSI alleges an overarching conspiracy, whereby defendants conspired, all with Singer, to commit fraud and money laundering and, as to all but three of defendants, federal programs bribery.  The scheme involved common participants, entities and victims.  All substantive fraud and bribery charges are acts that were alleged to have been conducted in furtherance of the scheme.

A rational basis for joinder is therefore apparent from the indictment.  Further, as is the case here, it is permissible for the government jointly to indict "based on what it reasonably anticipates being able to prove...at the time of indictment." Azor, 881 F.3d 1 at 10 (quoting Natanel, 939 F.2 at 306).

The second prong is also clearly satisfied.  Joinder will provide a substantial benefit.  Separate trials, of which there may be more than ten, would be extremely costly to the government and in judicial resources.  Moreover, if separate trials were to be held, much of the evidence and many witnesses would be duplicative.  As a final consideration weighing in favor of joinder, evidence which is relevant to one defendant's guilt may also be relevant to proving the overall conspiracy. See Prange, 922 F. Supp. 2d at 129.

In short, the FSI alleges offenses which properly constitute a series of acts or transactions and joining defendants is of benefit to the government and to the court. Defendants have not met their burden to show misjoinder and their motion will be denied.

## IV.  Elizabeth Kimmel's Motion to Dismiss

Defendant Elizabeth Kimmel has moved to dismiss for reasons similar to the defendants' joint motion to dismiss the conspiracy and for improper joinder.  The FSI alleges that Ms. Kimmel participated in the side-door scheme twice, once in 2012 to secure admission for her daughter to Georgetown University as a purported tennis recruit and once in 2017 to secure admission for her son to USC as a purported track and field athlete.

In charging her with a single conspiracy offense in each count, Kimmel claims that the government has impermissibly grouped together two non-overlapping conspiracies, one involving Georgetown and one involving USC.  She claims the Georgetown conspiracy was entirely complete by 2013 and is unrelated to the USC conspiracy which began in 2017.  She maintains that any allegations with respect to the Georgetown conspiracy are therefore barred by the statute of limitations.

Kimmel's motion is premised on essentially the same argument that the indictment impermissibly alleges a single conspiracy which the Court has already addressed.  The common

goal and inter-dependence of the conspiracy is demonstrated as
to Kimmel just as it was with the other defendants for the
reasons expounded and her motion will also be denied.

**V.  Defendants' Motion to Dismiss Count One Insofar as it
    Alleges Conspiracy to Defraud Universities and Testing
    Companies of Property and Honest Services**

   **A. Legal Standard**

The mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343,
proscribe use of any

> scheme or artifice to defraud, or for obtaining money or
> property by means of false or fraudulent pretenses,
> representations, or promises.

The Court considers the mail and wire fraud statutes and
standards (and the relevant caselaw interpreting those statutes)
interchangeably. See Pasquantino v. United States, 544 U.S. 349,
355 n.2 (2005) (noting that the Supreme Court has "construed
identical language in the wire and mail fraud statutes in pari
materia.")

In the wire fraud statute, the word property is to be
"construed in accordance with its ordinary meaning: something of
value in the possession of the property holder." United States
v. Blaszczak, 947 F.3d 19, 31 (2d Cir. 2019) (citing Paquantino,
544 U.S. at 355).  Black's Law Dictionary, as cited by the
Paquantino Court, defines property as "extend[ing] to every
species of valuable right and interest." Property, Black's Law
Dictionary (4th ed. 1951).  Paquantino at 544 U.S. at 355.

- 14 -

In Carpenter v. United States, the United States Supreme
Court held that the contents and publication schedules of
forthcoming Wall Street Journal articles were confidential
business information that constituted property. 484 U.S. 19
(1987).  The Court held that the Journal had "a property right
in keeping confidential and making exclusive use" of its
confidential business information.  Id. at 26.  That the
property was intangible did "not make it any less property
protected by the mail and wire fraud statutes." Id. at 25.

As articulated by the First Circuit Court of Appeals,
the Carpenter Court gave a "broad reading to protected property
interests." United States v. Ochs, 842 F.2d 515, 522 (1st Cir.
1988).  The First Circuit has made clear that the wire fraud
statute should be read broadly and explained that it covers "a
wide variety of tangible and intangible property interests."
United States v. Rosen, 130 F.3d 5, 9 (1st Cir. 1997). See also
United States v. Dray, 901 F.2d 1132, 1142 (1st Cir.
1990)(noting that "the mail fraud statute is limited to the
protection of property rights, but the concept of property is to
be interpreted broadly")(quoting McNally v. United States, 483
U.S. 350, 356 (1987)).

Although broad, the mail and wire fraud statutes do not
have limitless reach.  In Cleveland v. United States, the
Supreme Court held

> a State's interest in an unissued video poker license was
> not property, because the interest in choosing particular
> licensees was purely regulatory and [could not] be
> economic.

Pasquantino 544 U.S. at 357 (2005) (quoting Cleveland v. United

States, 531 U.S. 12, 22-23 (2000)).  As noted by the Second

Circuit Court of Appeals, however, "while Cleveland remains good

law, courts have consistently rejected attempts . . . to apply

its holding expansively." Blaszczak, 947 F.3d 19, 32 (2d Cir.

2019).  After Cleveland, the Supreme Court reaffirmed that the

"exercise of regulatory power . . . fails to meet the statutes'

property requirement." Kelly v. United States, 140 S. Ct. 1565,

1568-69 (2020).

### B. Application to University Admissions Slots

The government contends that an "admissions slot" at a

university qualifies as a cognizable property interest under the

mail and wire fraud statutes.  It maintains that the mail and

wire fraud statutes are not, as defendants claim, limited to

"traditional" forms of property and that this conclusion follows

logically from Supreme and Circuit Court precedent.

Defendants counter that the Supreme Court has specifically

limited the fraud statutes to reach only "traditional" forms of

property which they contend are only those "long recognized in

common law."  Because university admissions slots do not

constitute such traditional property, defendants proclaim that

they cannot be subject to prosecution for wire fraud.  Further,
defendants protest that a reading of property which encompasses
admissions slots represents a sweeping expansion of criminal
liability not contemplated by Congress when it passed the fraud
statutes.

This Court holds that application slots to universities are
property interests owned by the university cognizable under the
mail and wire fraud statutes.  Although certainly not boundless,
the definition of "property" extends readily to encompass
admission slots.

This conclusion is supported by the Sixth Circuit Court of
Appeals' decision in United States v. Frost, 125 F.3d 346 (6th
Cir. 1997).  In Frost, graduate students and professors were
convicted of mail fraud for their roles in a scheme whereby
students were allowed to submit plagiarized academic work in
furtherance of a degree.  The Frost Court held that prospective
university degrees are property cognizable under the mail fraud
statute and explained:

> Ultimately, a university is a business: in return for
> tuition money and scholarly effort, it agrees to provide an
> education and a degree. The number of degrees which a
> university may award is finite, and the decision to award a
> degree is in part a business decision. Awarding degrees to
> inept students, or to students who have not earned them,
> will decrease the value of degrees in general. More
> specifically, it will hurt the reputation of the school and
> thereby impair its ability to attract other students

willing to pay tuition, as well as its ability to raise money.

Id. at 367.

The logic of Frost neatly applies to the case at bar.  As the government notes, an admissions slot is not, in this case, meaningfully distinct from an unissued degree.  A student seeks admission to a university with the purpose of gaining a degree and all the advantages, rights and privileges that such a degree confers.  Though not sufficient, gaining admission to a university is a necessary precursor to obtaining its degree.  The object of the alleged conspiracy in this case was to obtain those inherently limited "admission slots" at universities because they would, presumably, lead to degrees.  It follows that if a prospective degree is property, so too, is its direct precursor, an offer of admission.

Admission slots at competitive universities, such as USC, are both limited and highly coveted.  The ability to grant admission is an asset of the university subject to its control.  See United States v. Carlo, 507 F.3d 799, 802 (2d Cir. 2007) (noting that "[s]ince a defining feature of most property is the right to control the asset in question . . . the property interests protected by the statutes include the interest of a victim in controlling his or her own assets").  A university has a vested interest in admitting only those students who are

qualified and equipped to contribute to the academic community and campus life.  Most importantly, a university has an interest in admitting only those students who are capable of completing the coursework necessary to obtain a degree.

Admission slots and prospective degrees are valuable to a certain extent because they are limited.  Students seek admission to universities to be among other qualified and talented individuals and to learn from professors who are attracted to employment at a particular university, in part, for the opportunity to teach qualified students.  Admission also entitles those students to a vast array of material university resources, from dormitories to laboratories.

If a university admits students who are unqualified, it inevitably decreases the value of its degrees, hurts its reputation and its ability to attract qualified tuition-paying students and recruit accomplished professors.  It also impairs its ability to solicit donations.  Universities have an intangible property interest in the integrity of their academic system. See United States v. Barrington, 648 F.3d 1178, 1191 n.11 (11th Cir. 2011) (noting that a "[u]niversity certainly has an intangible property interest in the integrity of its grading system").  The integrity of that system begins with the probity of the admissions process.  Admission slots, therefore,

constitute an intangible property interest cognizable under the mail and wire fraud statutes.

### C. Application to Accurate Test Scores

In a similar vein, the testing defendants submit that accurate standardized test scores or score reports are not a traditional form of property and therefore the indictment cannot properly allege wire fraud with respect to the test cheating scheme.  The government, relying largely on reasoning articulated by the Court in United States v. Hedaithy, 392 F.3d 580 (3d Cir. 2004) maintains that accurate test scores constitute cognizable property for the purpose of the wire fraud statute.

In Hedaithy, foreign nationals hired an imposter to take and pass (on their behalf) the Test of English as a Foreign Language ("TOEFL"), a standardized test administered by the Educational Testing Service ("ETS").  The TOEFL is often used by educational institutions to assess English language proficiency and potential students are regularly required to pass the exam as a prerequisite to admission.  ETS owns copyrights to the TOEFL examination and its component questions and keeps its operations and test material confidential.

Affirming defendants' conviction for mail fraud after a thorough review of relevant caselaw, the Third Circuit Court of Appeals held that ETS had a cognizable property interest in its

confidential business information, (i.e. the TOEFL exam) and
that it had been deprived of "the right to decide how to use"
that confidential information. Id. at 595.  The Court concluded
that the TOEFL score reports themselves, and ETS' right to
distribute those score reports to only those individuals who met
its "prescribed conditions", constituted a cognizable property
interest under the mail fraud statue. Id. at 596-97.

     The reasoning articulated in Hedaithy is apposite to this
case.  Similar to ETS, The ACT and SAT are private for-profit
businesses that "provide[] a service and report test results in
pursuit of a profit-seeking endeavor." Id. At 600.  The FSI
alleges that ACT and SAT scores, and by logical extension the
score reports, just as the TOEFL, are the intellectual and
physical property of the testing companies.  And, as in
Hedaithy, the defendants here have allegedly made
misrepresentations (having Riddell correct exam answers) to the
ACT and SAT in order to achieve elevated test scores.

     It follows, therefore, that like the TOEFL, ACT and SAT
examinations and score reports are cognizable property.  When
the defendants allegedly conspired to have their childrens' test
answers altered to achieve higher scores they, as the defendants
in Hedaithy,

          (1) gain[ed] access [to the exam on] terms other than those
          prescribed [by ACT and (2) violated the testing companies]

right to convey [score reports] only to those individuals who [met] its prescribed conditions. Id. at 595-97.

Moreover, the product provided by a testing company is only valuable so long as it is not the product of fraud or viewed as corruptible and unreliable.  A testing company's business depends almost entirely upon the integrity of its testing process and the goodwill it has developed.  If that process is corrupted, or is viewed as corruptible, the product, i.e. its tests and the resulting scores, become valueless.  Eventually, if the integrity of the test is subverted (or perceived as subvertable) with any frequency the company itself becomes worthless. See e.g., Id. at 600; Barrington, 648 F.3d at 1192 n.11.

Accordingly, a testing company has a cognizable property right in its test and accurate test scores and the defendants' motion to dismiss the FSI based on the lack thereof will be denied.

### D. Honest Services Mail and Wire Fraud

#### 1. Fiduciary Duties

Defendants next move to dismiss Count One of the FSI because they submit that the government does not allege that ACT and College Board employee, Igor Dvorskiy ("Dvorskiy") had the requisite fiduciary duty to either testing company such that his

misconduct could constitute a theft of honest services in violation of the federal mail and wire fraud statutes.

For conduct to fall under the auspices of the honest services fraud statute it must involve an "offender[] who, in violation of a fiduciary duty, participated in bribery or kickback schemes." Skilling v. United States, 561 U.S. 358, 407 (2010).  As the Supreme Court noted, the existence of a fiduciary relationship between employer and employee is "beyond dispute." Id. at 407 n.41.  Relevant here, a fiduciary duty may also arise under certain circumstances in the context of an independent contractor relationship. See United States v. Rybicki, 354 F.3d 124, 127, 141-42, 142 n.17 (2d Cir. 2003) (noting that § 1346, when applied to private actors includes "an officer or employee of a private entity or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers."); United States v. Milovanovic, 678 F.3d 713, 722 (9th Cir. 2012)(noting that a defendant is not exempted from prosecution for mail fraud "simply because [he is an] independent contractor" and reviewing caselaw holding that such a fiduciary relationship "encompasses informal fiduciaries").  Whether or not a specific employment arrangement qualifies as creating a fiduciary relationship is a factual question reserved for the jury. Id. at 723.

The indictment sufficiently alleges that Dvorskiy, by the nature of his employment with ACT and the College Board, owed a fiduciary duty to those organizations.  It alleges that Dvorskiy and other test administrators were employed by ACT to administer standardized tests and were agents of the ACT and College board who owed a duty of honest services to those organizations.  The FSI further describes the duties of certification and test administration undertaken by an administrator such as Dvorskiy. Such allegations are sufficient to set forth an indictment for honest services fraud. See United States v. Troy, 618 F.3d 27, 34 (1st Cir. 2010).  Whether or not Dvorskiy indeed maintained the requisite fiduciary duty is another issue to be explored at trial and determined by the jury.

### 2. Bribery Allegations and Federal Programs Bribery Charges

Defendants also contend that the honest services fraud and federal programs bribery allegations must be dismissed because the FSI does not properly allege that payments made to university administrators and coaches constitute bribery.  The FSI identifies two sets of payments that the government alleges constitute bribes: 1) payments made by the defendants and Singer to university accounts controlled by corrupt insiders and 2) payments made by Singer (or Singer's entities) directly to corrupt athletic coaches.

### a. Payments to Universities

For a payment to constitute a bribe, there must be "a quid pro quo — a specific intent to give or receive something of value in exchange for an official act." United States v. Sun-Diamond Growers of California, 526 U.S. 398, 404–05 (1999).

The government contends that so long as defendants made payments with a corrupt intent (exchanging money for admission based on false credentials) those payments constitute bribes. The defendants rejoin that because 1) the payments went to the university and 2) in the case of USC, Donna Heinel did not receive any cognizable personal benefit from accepting the payments, those payments cannot be bribes.

The honest services fraud statute, as explained by the Supreme Court in Skilling, extends only to bribery and kickback schemes but includes those involving private sector employees. See United States v. Bryant, 655 F.3d 232, 245 (3d Cir. 2011) (noting that "Skilling did not eliminate from the definition of honest services fraud any particular type of bribery [or kickbacks], but simply eliminated honest services fraud theories that go beyond bribery and kickbacks"); United States v. DeMizio, 741 F.3d 373, 381 (2d Cir. 2014).

The federal programs bribery statute, 18 U.S.C. § 666(a)(2) incorporates the same extension and covers, in relevant part, whomever:

> corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value...

Even if the victim, in this case the university, ends up profiting as a result of a kickback scheme, there still exists actionable harm "in the denial of that party's right to the offender's honest services." See Skilling, 561 U.S. at 400. That the payments made by defendants eventually went to USC does not thereby preclude such payments from constituting bribes. See DeMizio, 741 F.3d at 381.

The issue, as the government reiterates, is whether the defendants paid money with the intent to accomplish a corrupt quid pro quo. Whether the defendants possessed the requisite corrupt intent is an issue of fact for the jury. See, e.g., United States v. DeMizio, No. 08-cr-336, 2012 WL 1020045, at *10 (E.D.N.Y. Mar. 26, 2012).

Further, the FSI alleges that the payments were made to designated accounts that were either controlled by the corrupt insiders or that otherwise inured to their benefit professionally. Those payments, therefore, represent a "thing

of value" to those insiders, even if the payments were not
deposited directly into personal accounts.  As the government
notes, in an honest services prosecution a

> thing of value is defined broadly to include the value
> which the defendant subjectively attaches to the items
> received.

United States v. Renzi, 769 F.3d 731, 744 (9th Cir.
2014)(citation omitted).

Payments made to accounts controlled by university
insiders, even if such payments were ultimately received by the
universities, may still constitute a benefit to those insiders
who exercise control over the accounts.  This logic applies to
the federal programs bribery charges as well.  Again, to the
extent the defendants maintain that they were unaware that their
payments were going to corrupt insiders or of the extent to
which those insiders deprived the universities of their honest
services is a factual question to be resolved at trial. In sum,
the FSI adequately alleges that the defendants engaged in a
scheme which falls under the ambit contemplated by the fraud and
federal program bribery statutes.

### b. Direct Payments to Coaches

Defendants next argue that payments made to Ms. Heinel by
Singer after she had presented the fraudulent applications to
the admissions committee constitute a legal gratuity rather than
a bribe.  The FSI alleges that Singer agreed to transfer money

directly to Heinel in late 2017, after Singer and Heinel had already engaged in the "side-door" scheme on numerous occasions. That the direct payments were made after Heinel had already participated in the scheme is not, however, relevant to the sufficiency of the indictment.

As explained by the First Circuit, the difference between a licit gratuity and a bribe is

> not [related to] the time the illegal payment is made, but the quid pro quo, or the agreement to exchange [a thing of value] for official action.

United States v. Fernandez, 722 F.3d 1, 19 (1st Cir. 2013)(citation omitted).  In discerning that difference, the relevant question is the "timing of the agreement to make or receive a payment." Id.  The government maintains that the probative agreement was not the agreement between Singer and Heinel to compensate her directly but the agreement between Singer and defendants to effectuate the side-door scheme.  That the defendants may have been unaware of the exact destination of their allegedly corrupt payments does not mandate dismissal of the indictment. United States v. Potter, 463 F.3d 9, 15 (1st Cir. 2006).

The FSI alleges that in exchange for admitting their children as specious athletic recruits, the defendants knew that their payments would be directed to corrupt university insiders.  Such

quid pro quo allegations are sufficient to survive the motion to
dismiss.

## VI.  Defendants' Motions to Dismiss the Money Laundering Conspiracy (Count III)

Count III of the FSI alleges that defendants engaged in a
money laundering conspiracy in violation of 18 U.S.C. § 1956(h).
In brief, the FSI contends that the defendants made purported
charitable donations to The Key or KWF with the intent that
those payments would then be used by Singer to effectuate the
side-door and test cheating schemes.  Singer did in fact use
that money to make payments to corrupt university insiders and
to test administrators.  The FSI further declares that the
defendants structured the payments as purported donations in
order to conceal their fraud.

### A. Legal Standard

The money laundering statute is intended to "punish a
separate offense from the underlying specified unlawful
activity." United States v. Castellini, 392 F.3d 35, 45 (1st
Cir. 2004).  It "criminalizes separate financial transactions
involving the funds derived from such illegal activity." Id.
Money laundering therefore must involve funds that were "the
proceeds of some form of unlawful activity." United States v.
Misla-Aldarondo, 478 F.3d 52, 68 (1st Cir. 2007).

The laundering of funds cannot be concurrent to the "transaction through which those funds first became tainted by crime." United States v. Richard, 234 F.3d 763, 769 (1st Cir. 2000)(citation omitted). There is, however, no requirement that the underlying crime be completed before money laundering can take place. Instead, so long as the underlying offense has progressed to the point of creating proceeds "the money becomes proceeds of illegal activities and it can be laundered." Castellini, 392 F.3d at 48. In other words, so long as a "phase" of the ongoing offense has been completed (and has generated proceeds) a defendant may be liable for money laundering. Id.

**B. Application to the Sufficiency of the Indictment**

Defendants maintain that the FSI does not properly allege that they engaged in a complete phase of an ongoing unlawful activity which generated proceeds prior to engagement in a separate money laundering transaction. In brief, they maintain that the government impermissibly presents the same transactions as both fraud and money laundering. The government rejoins that FSI properly alleges that the money laundering conspiracy came after a complete phase of the underlying fraud offenses. According to the government, as soon as the defendants made payments to KWF and/or The Key in furtherance of the admissions scheme, they had committed mail or wire fraud and thus those

payments constituted proceeds from that scheme.  When Singer
made payments from his corporate shell entities to corrupt
insiders using those proceeds, those transactions constituted
money laundering.

The FSI sufficiently alleges a money laundering conspiracy.
As set out in the indictment, the scheme operated in stages.
Defendants first allegedly made payments to KWF and The Key with
the intent that Singer would use the proceeds to pay Heinel,
Dvorskiy and others.  Singer then used that money to pay the
corrupt insiders and effectuate the admissions cheating.  The
purported initial payments to KWF and The Key therefore
constitute a discrete phase of an ongoing offense and were
consequently "tainted by crime." Richard, 234 F.3d at 769.
Accordingly, the payments made by Singer to Heinel and others,
if proven, were in fact money laundering transactions.

Further, as the government notes, because the defendants
are charged with money laundering conspiracy, if the allegations
are proved, they are liable for the actions of their co-
conspirators.  Each defendant is liable for the payment of every
other defendant to entities controlled by Singer.  Once those
funds were deposited in Singer-controlled accounts, the
subsequent payments to other co-conspirators in furtherance of
the scheme constituted money laundering transactions.

Defendants allegedly structured the payments in that manner in an attempt to conceal their scheme.  Such action is a hallmark of money laundering. See Castellini, 392 F.3d at 49 (noting that "[t]he money laundering of the proceeds of an underlying illegal activity may make the underlying crime more difficult to detect or to prove. And Congress wanted to curtail the separate market of criminal activity which money laundering represents").

Finally, as the government argues, defendants are charged only with a money laundering conspiracy.  Thus the government need only allege that defendants "agreed with another person to violate the substantive provisions of the money-laundering statute." United States v. Hynes, 467 F.3d 951, 964 (6th Cir. 2006).  As previously explained, the indictment alleges that defendants (1) made payments to Singer's entities; (2) agreed with Singer that he would use those proceeds to make subsequent payments to university and testing officials in furtherance of the fraud scheme and (3) structured the transaction to conceal the nature, location, source, ownership, and control of those proceeds. 18 U.S.C 1956(h).  Accordingly, the indictment properly alleges money laundering conspiracy and survives a motion to dismiss.

## VII. __Amy and Gregory Colburn's Joint Motion to Dismiss Second Superseding Indictment__

Because defendants Amy and Gregory Colburn raise identical or substantively similar arguments as those addressed and rejected by this memorandum and order, their motion to dismiss will also be denied.

## VIII. __William McGlashan's Motion to Dismiss Count Seven and I-Hsin Chen's Motion to Dismiss Count Five__

Likewise, the motions of defendants McGlashan and Chen will also be denied.

**ORDER**

For the foregoing reasons, the following motions of the defendants to dismiss the indictment (Docket Nos. 341, 1021, 1023, 1026, 1031, 1035, 1037, 1039 and 1041) are **DENIED.**


**So ordered.**


                                /s/ Nathaniel M. Gorton
                                Nathaniel M. Gorton
                                United States District Judge
Dated June 23, 2020