UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG |
| | ) | |
| (14)   JOHN WILSON | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT
JOHN WILSON'S MOTION TO SUPPRESS (Dkt. 1437)**

The government respectfully submits this opposition to defendant John Wilson's motion for relief based on the government's search and seizure of his email account. For the reasons set forth below, Wilson's motion should be denied without a hearing.

## INTRODUCTION

A. <u>Factual Overview</u>

Wilson and his wife began working with Singer to secure their son's admission to USC through the "side door" in the spring of 2013. Although Wilson's son played water polo, Wilson knew (1) that his son's skill level was below that of the typical USC water polo recruit; (2) that USC's water polo coach, Jovan Vavic, would purport to recruit him only in exchange for a payment to his program; and (3) that this approach required the falsification of his son's credentials.

In March 2013, for example, Wilson wrote to Singer stating that his son's skill level "may be below the other freshman," and asked if his son would "be so weak as to be a clear misfit at practice etc?" *See* Ex. A (Mar. 27, 2013 email). In August 2013, Wilson emailed Singer to ask, "What does Jovan need by sept 20? . . . Do I make the first payment then?" Singer responded that Singer would need to provide Vavic with a "player profile" so that Vavic could present Wilson's son to "admissions in October." *See* Ex. B (Aug. 24, 2013 email). In October 2013, Singer advised Wilson, "Jovan has [your son]'s stuff and asked me to embellish his profile more, which I am

doing." Ex. C (Oct. 13, 2013 email). Wilson responded, "When is Jovan going to be able to give us decision on USC? And when do I pay u? Was it 50% in nov? 50% in feb when we get final official notice?" *Id*. Singer replied, "No payment of money till he gets a verbal and written from admissions and then 50 percent to a savings account I set up. Then the remainder upon an acceptance letter in March with everyone else." *Id*. Singer later sent Wilson the embellished athletic profile, which included fabricated awards. *See* Ex. D (Oct. 19, 2013 email and profile); Ex. E (interview of high school coach). And Singer confirmed to Wilson that this "approach" would not require that his son actually "get in the pool." *See* Ex. F (Oct. 23, 2013 email).

In February 2014, Vavic used the falsified profile to secure the admission of Wilson's son to USC as a recruited water polo player, advising the athletic admissions subcommittee: "This kid would be the fastest player on our team . . . this kid can fly, he was the captain of his [high school] team as sophomore, great work ethic, was ALL CCS, he is a legi[t] walk on who could end up playing for us very soon." *See* Ex. G (Feb. 26, 2014 email); Ex. H (Feb. 26, 2014 email); Ex. I (Wilson subcommittee profile); Ex. E (interview of high school coach). Days later, Wilson sent Singer an email with the subject line "USC fee," writing, "Thanks again for making this happen! Pls give me the invoice. What are the options for the payment? Can we make it for consulting or whatever from the key so that I can pay it from the corporate account?" Ex. J (Mar. 1, 2014 email). Singer replied, copying his bookkeeper, "Yes we can send you an invoice for business consulting fees and you may write off as an expense. What is the name address etc you want the invoice to be made out to?" *Id.* Wilson responded with the name and address of his business, Hyannis Port Capital. *Id.*

In March 2014, after Wilson's son received a formal admission letter, Wilson instructed his bookkeeper to wire $250,000 from Hyannis Port Capital to Singer's for-profit entity, The Key,

and to ensure that the invoice reflected "Business Consulting."[1] *See* Ex. K (Mar. 29, 2014 email). Ultimately, Wilson's company paid Singer $220,000, comprised of a purported $100,000 donation to the Key Worldwide Foundation ("KWF"), Singer's purported charity, a $100,000 payment to The Key, Singer's for-profit business, for purported "Business Consulting – August through June 2014," and a $20,000 payment to Singer personally.[2] *See, e.g.*, Ex. L (Apr. 2, 2014 email and attachments). Wilson deducted the payments from his taxes as purported business expenses and a charitable donation. In April 2014, The Key issued an anonymous $100,000 cashier's check to USC Men's Water Polo, listing the "purpose/remitter" as "Wilson Family." Ex. N (check).

In the fall of 2018, at approximately the same time that Singer began cooperating with the government's investigation, Wilson inquired of Singer about potential "side door" opportunities for his twin daughters. *See* Ex. P (Sept. 29, 2018 transcript). In September 2018, Wilson asked, "Does it have to be a sports side door?" *Id*. at 4. Singer explained, "that's the easiest way to approach it, right . . . because all of the coaches have-- you know, they have guaranteed spots." *Id.* at 4-5. Wilson responded:

> What if they're not really that good? I mean, they can do some crew, but I don't know they're gonna be good. [One daughter's] not even that good competitively at sailing. She just taught sailing and did sailing in, you know . . . yacht club.

*Id.* at 5.   Singer replied:

> At the end of the day, by the side door, I may be able to go to the sailing coach and say, "Hey, this family's willing to make the contributions. She could be on your team. She is a sailor. She may not be up to the level you are, but she can con-- you know, you're gonna get a benefit, and the family's gonna get benefit. So are you will-- are you interested in doing that?"

---

[1] Wilson later corrected himself, noting that the payment would be for $200,000.

[2] The $20,000 payment was initially invoiced as "Special Consulting Income, Planning and Consulting August through June 2014," but the invoice was revised to "Special Consulting Income[.] Concept design and implementation of Professional Development program for Hyannis Port Capital associates." *See also* Ex. M (Apr. 1, 2014 email, Wilson's executive assistant expressing concerns about a potential audit).

*Id.* at 5-6.

In October 2018, Wilson confirmed that he wanted to pursue "side doors" for his daughters at Stanford and Harvard. *See* Ex. Q (Oct. 15, 2018 transcript). At the direction of law enforcement, Singer told Wilson that his daughters "don't have to play. They just-- that's the path I'm gonna get 'em in on." *Id.* at 4. Wilson replied, "Gotcha." *Id.*

Two days later, Wilson's company wired $500,000 to KWF. *See* Ex. R (Oct. 17, 2018 wire transfer). Wilson emailed his bookkeeper, writing that the payment was a "$500k donation I am going to make this year. Tax write off and help getting into colleges." Ex. S (Oct. 17, 2018 email).

In October 2018, Singer advised Wilson that he had secured a "side door" for one of Wilson's daughters at Stanford, and that the Stanford sailing coach had hidden the deal from the university. *See* Ex. T (Oct. 27, 2018 transcript). In November 2018, Singer told Wilson he had secured an admissions spot at Harvard through a (fictitious) "senior women's administrator," and that, in exchange for $500,000, the administrator would designate one of Wilson's daughters as an athletic recruit to secure her admission. *See* Ex. U at 2-3 (Nov. 29, 2018 transcript). In December 2018, Wilson's company wired another $500,000 to KWF. *See* Ex. V (Dec. 11, 2018 wire transfer).

B.     The Criminal Complaint

On March 11, 2019, Special Agent Laura Smith executed a 204-page affidavit in support of the arrest of more than 30 parents, including Wilson, on a charge of conspiracy to commit mail and wire fraud and honest services mail and wire fraud.   *See* Ex. W (Mar. 11, 2019 complaint). As relevant here, the affidavit alleged that Singer's "side door" scheme involved bribing university coaches and athletics administrators to designate the children of Singer's clients as purported athletic recruits—thereby facilitating their admission to the universities—by funneling payments to the coaches, or to university programs they designated, through Singer's charity, KWF. *See* Ex.

W at ¶ 31. And it alleged that, as part of the scheme, Singer created falsified athletic "profiles," which he submitted to universities in support of the students' applications. *Id.* at ¶ 31(f) and (g).

Over the course of seven pages, the affidavit explained that Wilson had conspired to bribe Vavic, the USC water polo coach, to designate Wilson's son as a recruited water polo player, and also sought to use bribes to secure the admission of his two daughters to Stanford and Harvard as recruited athletes. *Id.* at ¶¶ 287-310. The affidavit cited numerous examples of emails Wilson or his spouse sent or received in furtherance of the scheme. For example:

- Wilson's spouse, copying Wilson, told Singer that their son was "unaware of this arrangement" to pay money to secure his admission to USC. Ex. W ¶ 291

- Wilson acknowledged that his son was not a legitimate USC water polo recruit but would instead be a "bench warmer side door person" who would be so "weak as to be a clear misfit at practice." *Id.* ¶ 292.

- Singer told Wilson that his son could quit the water polo team after his first semester. *Id.* ¶ 293.

- Wilson inquired about "when and where to wire the money" that would secure his son's admission as a purported water polo recruit.  *Id.* ¶ 294.

- After Wilson's son was admitted to USC, Singer agreed with Wilson that the $220,000 payment would be invoiced as a "consulting" fee so that Wilson could pay it from his corporate account and write it off as a business expense. *Id.* ¶ 299.

C.   The Search Warrant Affidavit

On July 1, 2019, Special Agent Smith executed an affidavit in support of an application to search the email accounts of Wilson and other defendants. *See* Ex. X (under seal). The affidavit incorporated the affidavit underlying the criminal complaint. *See* Ex. X at ¶ 3. The Target Offenses identified included mail/wire fraud, honest services fraud, money laundering, and tax fraud. *Id.* at ¶ 2.[3]

The July 1 affidavit alleged that, in 2013, Wilson had agreed to pay "an amount, ultimately totaling $220,000 to facilitate the admission of his son to USC as a purported water polo recruit,"

_____

[3] The government moved to seal the search warrant affidavit on the basis that much of the

Ex. X at ¶ 55(a), and noted that "Singer has explained to investigators that, to facilitate this scheme, Wilson agreed that Singer would provide fabricated information to USC about his son's water polo abilities so that Jovan Vavic, the USC water polo coach . . . could present him to the admissions committee as a purported athletic recruit." *Id*. It further alleged that, in April 2014, "after USC mailed Wilson's son a formal acceptance letter," Wilson's company paid Singer a total of $220,000 ($100,000 to KWF, $100,000 to The Key and $20,000 to Singer directly), and that Singer sent $100,000 of that money to "USC Men's Water Polo." *Id*.

The affidavit explained that, beginning in September 2018, Wilson agreed to pay an amount ultimately totaling $1.5 million to facilitate the admission of his two daughters to college as purported athletic recruits. The affidavit quoted a portion of a consensually recorded call between Wilson and Singer, and explained that Wilson sent Singer $1 million in the fall of 2018 to "secure 'side door' deals at Harvard and Stanford." *Id*. at 55(b).

The affidavit went on to explain the basis for its contention that there was probable cause to believe that Wilson's email account contained "fruits, evidence, and instrumentalities of the Target Offenses." *Id*. at ¶¶ 4, 57. Specifically, it explained that Wilson used his email account to communicate with Singer and others about: "securing a 'side door' deal at USC for his son; whether his son would actually have to play water polo at USC since his skill level would not be up to USC standards; and bribe payments to be paid for all three of his children's 'side door' admissions to college." *Id*. The affidavit provided the following specific examples of emails evidencing the Target Offenses that would be found in Wilson's email account:

- A February 10, 2013 email in which Singer told Wilson that the USC water polo coach had given him one admissions slot as part of the side door. *Id*. ¶ 57(a).

---

information in it concerned children. The motion did *not* rely on the fact that records seized pursuant to the warrant would contain spousal communications. *See* Ex. DD [motion to seal]. Any sensitive content seized pursuant to the warrant is protected from public disclosure pursuant to the Court's Protective Order of May 2, 2019. *See* 19-CR-10080 at Dkt. 377.

- A February 28, 2013 email exchange in which Wilson's wife noted to Wilson and Singer that the Wilson's son was "unaware" of their "arrangement" with Singer. *Id.* ¶ 57(b).

- A March 26, 2013 email in which Wilson acknowledged that his son's skill level was below that of the average USC recruit and inquired whether his son would be "so weak as to be a clear misfit at practice etc?" *Id.* ¶ 57(c).

- A March 27, 2013 email in which Singer told Wilson that his son could quit the water polo team after the first semester. *Id.* ¶ 57(d).

- A March 1, 2014 email exchange in which Wilson and Singer agreed to falsely describe Wilson's $220,000 payment as "for consulting or whatever," so that Wilson could "write [it] off as an expense." *Id.* ¶ 57(e)

- A December 11, 2018 email in which Wilson provided Singer with details of the $500,000 wire transfer from Wilson's company to KWF. *Id.* ¶ 57(g).

The attachments to the warrant authorized agents to search all "user-generated data stored" in Wilson's email account that was created between February 1, 2013 and February 13, 2019, and to seize "evidence, fruits or instrumentalities of violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1346 (honest services fraud), 18 U.S.C. § 1956 et seq. (money laundering), and 26 U.S.C. § 7201 (tax evasion), *id.* at pp. 58-61, including "[a]ll communications between or among Rick Singer and others discussing college admissions, the payment of bribes, standardized tests, the Key Worldwide Foundation, the Edge College & Career Network LLC, wire transfers and payments from abroad, bank accounts and securing admission for students into college," *id.* at 61-62. The warrant also authorized the seizure of emails concerning the identity of the user of the account, the existence of co-conspirators, the travel or whereabouts of the account owner, and computers used to access the account. *Id.*

    D.    <u>Execution of the warrant</u>

On July 31, 2019, the government produced copies of the warrants and the affidavit to the defendants, and requested that the defendants provide a "list of the names and email addresses of counsel so that we can remove potentially privileged materials from our review." *See* Ex. Y. On

August 22, 2019, Wilson's defense counsel responded by providing the names of attorneys Wilson

had used for purposes of conducting this privilege review. Six weeks later, on October 11, 2019,

Wilson's counsel asked the government to add Wilson's wife to "our list." *See* Ex. Z.

In response to the warrant for Wilson's account, Microsoft produced approximately 81,756

emails (125,233 documents). After initially segregating emails that were potentially attorney-client

privileged or exchanged between Wilson and his spouse, and screening of the remaining emails

for responsiveness to the warrant, the government produced 5,091 responsive documents (3,751

emails and attachments) to the defendant on January 29, 2020 (together with responsive emails

from the simultaneous searches of the other defendants' emails).

On April 27, 2020, the government produced additional responsive emails to the

defendants, which consisted primarily of emails between the defendants and their spouses. With

respect to Wilson, the production comprised 3,103 documents (1,779 emails and attachments).

Prior to producing Wilson's emails, the government redacted explicit content.[4] In total, the

government has designated 5,563 emails out of 81,756—less than 7%—as responsive to the

warrant.

## LEGAL ARGUMENT

### I.   Wilson is not entitled to a *Franks* hearing.

Wilson argues that he is entitled to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154

(1978), concerning whether the search warrant affidavit falsely alleged that he agreed to bribe

---

[4] On May 5, 2020, the government made individual productions to Wilson and the other defendants of the entire contents of their respective email accounts—that is, all the documents their email service providers had produced, regardless of whether they were responsive to the warrants. The government has also made a number of small, supplemental productions of responsive emails, including, in Wilson's case, 22 emails on April 24, 2020, 9 emails on May 5, 2020, and two emails on June 19, 2020.

Vavic and to mislead USC about his son's athletic qualifications. His contentions border on the frivolous.

To qualify for a *Franks* hearing, a defendant must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause." 438 U.S. at 155-56; *United States v. Cartagena*, 593 F.3d 104, 112 (1st Cir. 2010). To prove reckless disregard, a defendant must demonstrate that an affiant "in fact entertained serious doubts as to the truth" of the allegations. *See United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002). If a defendant makes that substantial showing, "a *Franks* hearing may be held to address allegations of both material omissions as well as false statements." *Cartagena*, 593 F.3d at 112; *United States v. Swanson,* 210 F.3d 788, 790 (7th Cir.2000) ("These elements are hard to prove, and thus *Franks* hearings are rarely held."); *United States v. Patterson*, 120 F.Supp.3d 12, 17 (D. Mass. 2015) (Gorton, J.) (recognizing the high bar defendants must clear before obtaining a *Franks* hearing).

The statements Wilson challenges were not false, much less materially so. First, Wilson challenges the affidavit's contention that "Singer has explained to investigators that, to facilitate this scheme, Wilson agreed that Singer would provide fabricated information to USC about his son's water polo abilities so that Jovan Vavic, the USC water polo coach . . . could present him to the admissions committee as a purported athletic recruit." Wilson contends that this allegation is false because there is no FBI-302 report prior to the affidavit indicating that Singer said those exact words. But this argument is meritless. As the FBI-302 reports make clear, Singer confirmed to investigators, months before the warrant was executed, that "Wilson knew that [his] money was in exchange for Jovan Vavic to get his kid in to USC, and that his kid was not actually recruited."

9

*See* Ex. AA at 3 (Dec. 20, 2018 302 report). That statement came in the context of a series of interviews in which Singer described how his scheme worked, the falsehoods that he incorporated into athletic profiles, and which of his clients were complicit in the fraud.[5] Given this context, Singer's statement that Wilson knew that his "kid was not actually recruited" made clear that Wilson was one of the parents who was complicit in the scheme—that he knew that his son was not "actually recruited," but was admitted in exchange for money, based on a falsified profile Singer provided to Wilson before submitting it USC. *See* Ex. D. The affidavit accurately reflected the information Singer provided, which was corroborated by other evidence the government had gathered.[6]

Second, Wilson challenges the affidavit's statement that "WILSON used [his email] account to communicate with Singer and others about . . . bribe payments," contending that his purported "donations" to a USC account, as directed by Vavic, could not be a bribe. This contention is silly. The affidavit correctly described the payments as bribes because they were secretly exchanged as a *quid pro quo* for the admission of Wilson's son as a purported athletic recruit. *See* Dkt. 1334 at p. 25-27. Nor is there any possibility that the Court was misled about this fact, since the affidavit specified where Wilson's money went, noting that, of the $220,000 Wilson sent to Singer or his charity, Singer forwarded $100,000 to "USC Men's Water Polo," for which

---

[5] By the time the warrant was executed, the government had obtained emails in which Wilson and Singer specifically discussed that: (1) Wilson's son was not a legitimate water polo recruit and that his skill level was below that of real USC water polo recruits (*see, e.g.*, Ex. A); (2) Wilson's son was being recruited by USC *only* because of the payments Wilson planned to make in exchange for the recruitment (*see, e.g.*, Ex. B); (3) Singer needed to submit an athletic profile to USC admissions to facilitate the admission of Wilson's son as a water polo recruit (*see, e.g.*, Ex. B); and (4) the profile would contain falsehoods (*see, e.g.*, Ex. D).

[6] Tellingly, Wilson omits to note that in a subsequent proffer, Singer reaffirmed that Wilson was aware of the falsities on the water polo profile. *See* Ex. BB at 4 (Dec. 6, 2019 report).

USC sent Wilson a gift receipt. *See* Ex. X ¶¶ 55(a) & 57(e); Ex. W ¶¶ 299-302. Contrary to Wilson's contention, the affidavit neither stated nor implied that Wilson's money went to Vavic personally.

Third, Wilson does not come close to making the required showing that any of the allegations he contends were false were "necessary to the finding of probable cause." *United States v. Reiner*, 500 F.3d 10, 14 (1st Cir. 2007). The evidence set forth in the affidavit concerning Wilson's knowing involvement in the fraud against USC was overwhelming. The affidavit provided *seven specific examples* of emails sent to and from Wilson's email account that demonstrated Wilson's knowing participation in the side door; his son's lack of qualifications to be recruited to play water polo for USC; his desire to "write off" his payments to Singer as "business consulting fees"; and his payment of $500,000 to Singer's charity to facilitate the fraudulent admission of his daughters to Harvard and Stanford. *See* Ex. X ¶¶ 57(a)-(g). The search warrant affidavit also incorporated the complaint affidavit, which provided seven *pages* of facts detailing Wilson's involvement in the side door. *See* Ex. W at ¶¶ 287-310. The complaint affidavit provided additional examples of Wilson's use of email to commit fraud, bribery, and tax fraud. *Id.* at ¶¶ 290-97, 299. Against this backdrop, Wilson's claim that the warrant's "theory of probable cause hinged on the allegation that Wilson knew Singer was lying to USC about Wilson's son's credentials," is untrue. Probable cause for the search warrant did not hinge on the allegation that Wilson knew that Singer was lying to USC, but on the fact that Wilson's email account contained *evidence* of the crimes specified (for which the court had already found probable cause based on the complaint affidavit). Indeed, even assuming, *arguendo*, that Wilson was unaware of the criminal scheme, as he alleges, the emails described in the two affidavits provided probable cause

to believe that evidence of the Target Offenses—whether incriminating as to Singer, Vavic, or Wilson—would be found in Wilson's email account.[7]

## II.   The government properly executed the email search warrant.

Wilson contends that the government violated the terms of the search warrant by retaining approximately 8,000 records, of which, he argues, few relate to "the topics that the warrant identifies, namely college admissions, bribes, standardized tests, Singer's organizations, payments from abroad and bank accounts." Wilson is wrong, and similar arguments were rejected in the First Circuit's recent decision in *United States v. Aboshady*, 951 F.3d 1 (1st Cir. 2020).

First, the government precisely followed the procedures outlined in the attachments to the warrant. *See* Ex. X at p. 58-61. The government seized Wilson's email account for the permitted time period, filtered out communications potentially subject to the attorney-client privilege (using search terms Wilson's counsel provided), and ran search terms against the remaining documents to capture emails and attachments responsive to the warrant. In so doing, the government marked as responsive just 7% of the emails that were produced in response to the warrant, and it produced only those emails to the remaining defendants in discovery.[8] *Cf. United States v. Aboshady*, 297 F. Supp. 3d 232, 239 (D. Mass. 2018) (Gorton, J.) (rejecting suppression where *all* 430,081 retrieved documents were designated responsive to the warrant, but noting the "government's continued responsibility to minimize the extent and duration of digital discovery is not abrogated").

---

[7] Wilson does not dispute that the search warrant affidavit and the complaint set forth evidence of tax fraud stemming from Wilson's demand to falsely "write off" his payments to Singer as business consulting expenses. The warrant was supported on this ground alone.

[8] The emails designated as non-responsive remain accessible to two government contractors in the event that additional searches need to be run. *See Aboshady* 951 F.3d at 7 (authorizing the government to conduct follow-on searches of retained data as it "developed new theories" of defendant's criminal liability).

Though Wilson contends, in a highly-redacted attorney's affidavit, that "[o]nly a small minority" of the emails the government seized "relate to the charges in the indictment," he fails to provide any examples of large swaths of emails that are beyond the warrant's scope. Ex. CC [Kendall Aff. ¶ 5]. Instead, he contends that fewer than 200 of the seized communications are to or from Singer. But that is irrelevant. Numerous emails relating to Wilson's children—including, but not limited to, emails concerning their involvement in sports—are responsive to the warrant. Likewise, numerous emails related to Wilson's company are responsive to prove that Singer did not, in fact, provide consulting services to Wilson's business, and that the payments from Wilson's company were not legitimate business expenses. The warrant permitted the government to seize *all* "evidence, fruits, or instrumentalities of" mail and wire fraud, honest services fraud, money laundering and tax fraud—not just emails Wilson exchanged with Singer. Wilson fails to meet his burden of "clearly identif[ying] which emails . . . fell outside the scope of the warrant." *Aboshady*, 951 F.3d at 9.

Second, Wilson's requested relief is foreclosed by *Aboshady*, where the defendant challenged an email warrant on the basis that the government deemed *all* 430,081 emails as responsive. 951 F.3d at 3. As in this case, the emails in *Aboshady* included emails between the defendant and his wife. *Id*. at 4. The First Circuit affirmed this Court's denial of a suppression motion, finding that the seizure and retention of all emails in the account complied with the terms of the warrant.

## III.   The marital communications privilege does not protect Wilson's communications with his spouse or provide the relief Wilson seeks.

Wilson also contends that the government's "mistreatment of thousands of private emails between Wilson and his wife violated the common law's marital-communications privilege." That is untrue. Wilson's emails with his wife are not protected by the marital communications privilege

both because he allowed multiple third parties access to his workplace email account—thereby vitiating any expectation of privacy in that account—and because Wilson and his wife communicated about their joint criminal activity, thereby rendering their emails subject to the joint participation exception. Moreover, even if the marital communications privilege somehow applied to Wilson's emails, there is no requirement that the government employ a taint team for spousal communications. *See United States v. Breton*, 740 F.3d 1, 11 (1st Cir. 2014) ("[M]arital privileges hamper the truth-seeking process and must be interpreted narrowly.").

### A.    The Marital Communication Privilege Is Not Applicable.

The marital communications privilege is limited to confidential communications, *see United States v. Vo*, 413 F.3d 1010, 1016 (9th Cir. 2005); *see also United States v. Dunbar*, 553 F.3d 48, 58 (1st Cir. 2009) (defendant's statements to wife in a police car were not privileged since the car was not a confidential place in which to talk), and does not protect communications made in furtherance of joint criminal activity. *See United States v. Mavroules*, 813 F. Supp. 115, 119 (D. Mass. 1993) (marital communications privilege does not cover "communications . . . made at a time when both the husband and the wife are jointly engaged in criminal activity.").

Wilson provided at least three employees access to his workplace email account. *See, e.g.*, Ex. EE (Nov. 30, 2016 email, in which Wilson's executive assistant tells Wilson "I have access and Gary at 2G has access" to Wilson's email account and contacts); Ex. FF (Nov. 15, 2018 email, in which Wilson directed a second executive assistant "to search thru emails" for flight details). Indeed, Wilson routinely *directed* these third parties to access, search, and read his emails. *See, e.g.*, Ex. GG (May 18, 2018 e-mail, in which Wilson directed his executive assistant: "Can u pls search my emails . . . ."); Ex. HH (Dec. 7, 2018 e-mail chain, in which Wilson directed an executive assistant to locate a flight confirmation and the executive assistant replied: "I updated the email address to: john@hyannisportcaptial.com as I can get it [*i.e.*, a flight confirmation] to grab them

there[.]"). Wilson's spouse likewise was on notice that third parties had access to these communications. *See, e.g.*, Ex. II (Sept. 28, 2018 e-mail chain, forwarded to Wilson's spouse, in which Wilson directed his executive assistant to look for an invoice "in my email box."). In such circumstances—where Wilson's workplace emails were not confidential, and neither Wilson nor his spouse could have reasonably had an expectation of privacy in those communications—the marital communications privilege does not apply. *See, e.g., Pereira v. United* States 347 U.S. 1, 6 (1954) (marital privilege can "be overcome by proof of facts showing they were not intended to be private. The presence of a third party negatives the presumption of privacy."); *United States v. Etkin*, 07-CR-913-KMK, 2008 WL 482281, *3 n.5 & 4 (S.D.N.Y. Feb. 20, 2008) ("there can no confidential communication where the spouses are on actual or constructive notice that their communications may be overheard, read, or otherwise monitored by third parties"; "log-on notices" provided "knowledge of the fact that any email he sent to his wife from his work computer could be read by a third party;" and it is irrelevant as to whether "the [employer] actually read Defendant's email."); *United States v. Hamilton*, 701 F.3d 404, 409 (4th Cir. 2012) (holding "that the emails [sent over a workplace system] were not subject to the marital communications privilege . . . accords . . . with the principle that one who is on notice that the allegedly privileged material is subject to search may waive the privilege when he makes no efforts to protect it.").

Moreover, contrary to Wilson's assertions, Wilson's wife participated in his crimes. *See, e.g.*, Ex. W at ¶¶ 290-91 (email involving Wilson, Singer, and Wilson's spouse discussing the fact that the Wilsons' son was "unaware" of the side door); Fourth Superseding Indictment at ¶ 366 (discussing declarations by Wilson and his wife that their taxes were true, correct and complete, despite the fact that their taxable income was underreported).[9] It is black-letter law that the marital

---

[9] There is ample evidence that Wilson's spouse participated in his criminal activity. *See, e.g.,* Exs. JJ (Feb. 28, 2013 email in which Singer said: "Jovan is giving me 1 boys slot and as of

communications privilege is "obviate[d]" where spouses jointly participate in crime. *See United States v Bey*, 188 F.3d 1, 5 (1st Cir. 1999) (a "spouse's involvement in the criminal activity . . . need not be particularly substantial to obviate the privilege").

> **B.   The marital communications privilege does not prohibit the government from obtaining and using purportedly protected information.**

Even assuming Wilson's communications were somehow protected, his unsupported contention that the marital communications "privilege itself forbids the government from seizing protected communication[s]" and delivering them to the prosecution team is untrue.[10]

Common law "recognizes two related but distinct marital privileges," both of which are testimonial privileges: the "spousal testimony privilege, which allows one spouse to refuse to *testify* adversely against the other," and the "marital communications privilege, which permits a defendant to refuse to *testify*, and allows a defendant to bar his spouse . . . from *testifying*, as to any confidential communications made during their marriage." *United States v. Breton*, 740 F.3d 1, 9-10 (1st Cir. 2014) (emphasis added); *see also United States v. Picciandra*, 788 F.2d 39, 43 (1st Cir. 1986) (marital communications privilege "prohibits one spouse from adversely *testifying*

---

yet no one has stepped up to commit that is why it is later." Wilson's spouse asked: "Is this spot still available for USC . . . [i]t would be such a sham to lose it because we didn't decide fast enough." After Singer confirmed the spot was still available, Wilson's spouse added: "Ok – is another candidate looking at USC also so we should be pushing [our son] to decide if that's his number 1 choice – as I mentioned hate to lose this due to us taking too long to decide ([our son] is unaware of this arrangement."); KK (Jun. 4, 2013 email to Singer in which Wilson's spouse writes: "They do not know about our financial discussions regarding [our son] & USC and we'd like to keep this confidential between you & I."); & LL (Jun. 11, 2013 email to Singer in which Wilson's spouse sends pictures of her son playing water polo and adds: "pass along to USC the on you like the best[.]").

[10] Wilson cites a Department of Justice publication concerning taint teams, but that document does not purport to create rights, or to apply to marital communications. The section Wilson cites addresses "searches of disinterested third party lawyers, physicians, and clergymen"—not those, like Wilson, who are implicated in crimes. *See* EXECUTIVE OFFICE FOR UNITED STATES ATTORNEYS, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations,* at 109-10 *available at* https://www.justice.gov/sites/default/files/criminal-ccips/legacy/2015/01/14/ssmanual2009.pdf.

to confidential communications made by the other during their marriage") (emphasis added).

"Testimonial exclusionary rules and privileges . . . must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Trammel v. United States*, 445 U.S. 40, 50 (1980). For that reason, marital privileges do not preclude the government from "enlisting one spouse to give information concerning the other or to aid in the other's apprehension. It is only the spouse's testimony in the courtroom that is prohibited." *Id.* at 55 n.12; *see also United States v. Burton*, 631 F.2d 280, 281 (4th Cir. 1980) (marital privilege does not prevent wife from supplying history of communications with husband for presentence report); *United States v. Chapman*, 866 F.2d 1326, 1333 (11th Cir. 1989) ("extrajudicial statements are not excludable on the basis of the spousal privilege.").

It is, accordingly, well-settled that the government can use communications purportedly protected by the marital communication privilege to investigate criminal conduct, as it did here.[11] *See, e.g., United States v. Giavasis,* 805 F.2d 1037 at *3 (6th Cir. Oct. 15, 1986) ("Privileges, of course, only protect against the disclosure of marital confidences in testimony, not cooperation with law enforcement officials. . . . the privilege rules do not prevent her disclosure of information to the police."); *United States v. Harper*, 450 F.2d 1032, 1042 (5th Cir 1971) (no violation of

---

[11] Wilson purports to rely on "a myriad of authorities show[ing] that a taint team (at a minimum) is warranted to protect the marital-communications privilege." (Def. Br. at 15). But the handful of cases he cites stand only for the unremarkable proposition that the government *may*, of its own volition, use taint teams to address privilege issues. The only authority Wilson cites requiring a taint team for marital communications is from a magistrate court in the District of West Virginia, where "[t]he court ha[d] little information before it" regarding the confidentiality of the purportedly attorney-client and marital privilege communications in question. *Matter of Search of Info. Associated with staceypomrenke@gmail.com*, 2016 WL 9752136 (No. 16-mj-73), Dkt. 15 at 6 (W.D. Va. June. 21, 2016) ("The court does not know whether any such communications were sent using privately owned devices over a privately owned network using private email accounts. Such facts would be crucial to a determination of whether the information conveyed was, indeed, a confidential communication[.]"). Not a single court has followed this opinion, which is, in any event, inapplicable here given that Wilson's workplace emails were not confidential.

marital communications privilege when government "used [a spouse's] statements as basis for its investigation of [the defendant spouse's] illegal activities and did not attempt to introduce any such statements at . . . trial."); *United States v. Alexio*, 13-01018-JMS, 2015 WL 6181752, at *2 (D. Haw. Oct. 21, 2015) ("Courts have consistently held that the government may use confidential marital communications to investigate crimes[.]"); *United States v. Carlson*, 946 F. Supp. 2d 1115, 1129 (D. Or. 2013) ("Because the marital privileges are not grounded in the Constitution … courts have refused to suppress evidence obtained as a result of one spouse's disclosure of confidential marital communications to police."); *United States v. Irons,* 646 F. Supp. 2d 927, 956-58 (E.D. Tenn. 2009) ("No privilege prevents the Government from enlisting one spouse to give information concerning the other or to aid in the other's apprehension.").

## IV.    Wilson is not entitled to the relief he requests.

Wilson's demands for blanket suppression of his emails, disqualification of prosecutors and witnesses, and severance, are unsupported by applicable law.

First, Wilson's contention that blanket suppression of his emails box is justified by the government's purportedly "flagrant" disregard for the "terms of the warrant and the Fourth Amendment," is meritless. The government's review of emails between Wilson and his wife was not improper, and the First Circuit's decision in *Aboshady* limits relief based on the contention that the review was overbroad insofar as it encompassed marital communications. *See Aboshady*, 951 F.3d at 6-7 (rejecting contention that search was overbroad where government seized and reviewed emails between defendant and his wife). But even assuming, *arguendo*, that the search was overbroad, the proper remedy is "not blanket suppression," but, at most, suppression of "those emails that were introduced at trial and that reasonably fell outside the scope of the warrant unless the lawful and unlawful parts of the search are inextricably intertwined or where the lawful parts

of the search are inextricably intertwined or where the lawful part seems to have been a kind of pretext for the unlawful part." *Id*. at 9. Any effort to obtain such relief is premature at this stage of the proceedings. Instead, should the government seek at trial to introduce communications that Wilson contends are protected or beyond the scope of the warrant, or to use such communications in cross-examination, the appropriate mechanism to preclude such use is a motion *in limine*. *See United States v. Ellefsen*, 07-5015-01-CR, 2008 WL 2977347, at *2 (W.D. Mo. Jul. 30, 2008) (privilege claims "should be addressed, if at all, at the proper stage of the trial proceedings in the context of a witness's impending trial testimony, or through a motion *in limine* that sets forth the communications defendant wants to exclude with sufficient specificity and in accordance with applicable law on marital confidential communication privilege."); *Aboshady*, 951 F.3d at 9 (defendant entitled to suppress only "those emails that were *introduced at trial* and that reasonably fell outside the scope of the warrant").

Wilson's request for a hearing pursuant to *Kastigar v. United States,* 460 U.S. 441 (1972), to disqualify prosecutors or witnesses is also meritless. Wilson cites not a single case in which such a hearing has been held based on the prosecution team's review of spousal communications, or in which prosecutors or witnesses have been disqualified on that basis.[12] That is because the marital communications privilege is not constitutional, and is not subject to a "fruit of the poisonous tree" analysis. *See United States v. Marashi,* 913 F.2d 724, 731 n.11 (9th Cir. 1990) ("[W]e need not resolve Marashi's claim that all evidence derived [from marital communications] should be excluded as fruits of the poisonous tree. Suffice it to say that no court has ever applied this theory to any evidentiary privilege[.]"); *see also United States v. Squillacote*, 221 F.3d 542,

---

[12] Wilson's reliance on cases involving the attorney-client or work-product privileges is inapt. (Def. Br. at 17-18). Those privileges have different origins and serve different purposes, and are subject to a different body of case law.

560 (4th Cir. 2000) (denying *Kastigar* hearing where investigative team was exposed to privileged communications between defendant and psychologist because the "government's right to compel testimony in the face of a claim of privilege is the issue at the heart of *Kastigar*, [and] its protections do not apply in cases where there is privileged evidence, but no compelled testimony").[13]

Finally, Wilson's renewed request for severance is meritless. Wilson's speculative and conclusory argument that his defense "would be hampered not only by the improper information possessed by prosecutors and government witnesses, but also by similar information possessed by his codefendants" (Def. Br. at 20), falls far short of the "substantial prejudice, amounting to a miscarriage of justice" that Wilson must demonstrate to obtain severance. *See United States v. Jones*, 10 F.3d 901, 908-09 (1st Cir. 1993).

## CONCLUSION

For the foregoing reasons, the Wilson's motion should be denied without a hearing.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:      /s/ Eric S. Rosen
ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
STEPHEN E. FRANK
KARIN M. BELL

Date:   September 30, 2020          Assistant United States Attorneys

---

[13] Wilson cites no support for his contention that "[p]rospective government witnesses presumably have been exposed to the" communications between Wilson and his spouse, and that contention is untrue. He likewise provides no support for his contention that the government has gained "an unacceptable advantage both in presenting the prosecution case and in cross-examining defense witnesses." To the extent Wilson relies on *ex parte* averments to contend that the government has an advantage that he cannot reveal to the government, his allegations should be rejected on their face. *See, e.g., United States v. Scott*, CR-19-30-GF-BMM, 2020 WL 2745445 (D. Mont. May 27, 2020) (court was "aware of no basis to permit a party to file an *ex parte* motion to suppress").

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on September 30, 2020.

                By:      */s/ Eric S. Rosen*
                         ERIC S. ROSEN
                         Assistant United States Attorney