UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREGORY COLBURN et al.,<br><br>Defendants. | No. 1:19-cr-10080-NMG |

**DEFENDANT JOHN WILSON'S [PROPOSED] REPLY BRIEF
IN SUPPORT OF HIS MOTION FOR RELIEF BASED ON THE
GOVERNMENT'S IMPROPER SEARCH AND SEIZURE OF EMAILS**

Seeking access to defendant John Wilson's emails, the government submitted a search warrant affidavit (the "Affidavit") falsely swearing to the existence of critical evidence that the government did not possess. The government then ignored bright-line limits imposed by the warrant, the Fourth Amendment, and the common law to review, retain, and widely distribute thousands of Wilson's emails.

To defend the Affidavit's constitutionality, the government's Opposition relies on factually irrelevant evidence, and on evidence that was not before the magistrate (and is therefore *legally* irrelevant). To defend its excessive search, the government misinterprets the warrant, ignores constitutional limits, and distorts both the facts and the law relating to Wilson's communications with his wife. The Court should grant the Motion.

### I.   THE WARRANT APPLICATION WAS MATERIALLY FALSE

Wilson explained in his September 16, 2020 Memorandum of Law ("Wilson Mem.") that the government's warrant application made two separate false statements, both essential to the Affidavit's showing of probable cause. The Opposition confirms the falseness of these statements by offering no factual basis for them.

**A.  The Affidavit stated falsely that Wilson intended to mislead USC.**  The government concedes that, to show any crime, it must prove that "Wilson knew . . . that [Singer's] approach required the falsification of [Wilson's] son's credentials."  Opp'n 1.  The only assertion in the Affidavit suggesting that Wilson knew about Singer's plan to falsify any credentials was the assertion that "Singer has explained to investigators that . . . *Wilson agreed that Singer would provide fabricated information to USC about his son's water polo abilities*."  Wilson Mem. Ex. 1 ¶ 55(a) (emphasis added).  But voluminous discovery materials show that Singer had never made such a statement to the government prior to the July 1, 2019 Affidavit.

The government could have dispelled Wilson's argument by stating simply that Singer in fact had told agents that Wilson had agreed to the credential-fabricating plan.  The government does not say this, however, confirming that the conversation reported in the Affidavit did not occur, and thus corroborating the FBI interview memoranda (which indicate that Singer never said this in his debriefings prior to July 1, 2019).

To distract from the alarming admission that its Affidavit included a fundamental falsehood, the government offers three red herrings:

(1)  The government asserts that—according to Singer—Wilson agreed to donate to USC, saw the donation as an "exchange for" his son's admission, and did not believe that his son would have been "recruited" to USC but for the donation.  Opp'n 9-10.  But even if all of these facts were true (which Wilson disputes), none of them would supply the critical missing ingredient—namely Wilson's agreement *to give USC false information* about his son.  Even in the government's view, a donation that candidly nudges a university to accept an athlete is not a crime.  In fact, USC documents reveal this to have been routine practice.

(2)  The government states that, in a "series of interviews . . . Singer described how his scheme worked," and identified Wilson as "one of the parents who was complicit in the scheme."  Opp'n 10.  This argument deliberately muddles the facts surrounding Singer's operations.  As the government's charges reveal, there was no single "scheme" Singer operated.  He had hundreds of clients.  Some made donations to schools, yet were not indicted.  Some were charged with behaviors, such as test-cheating, that the government concedes did not occur in Wilson's case.  The fact that Singer told the government that *some* of his clients

        knew about falsities submitted to universities—about their own children—says nothing about *Wilson*'s knowledge concerning *his* son's application.  Thus, notwithstanding anything Singer said about *other* parents, the Affidavit was indisputably false in stating that "Singer [had] explained to investigators that . . . *Wilson* agreed that Singer would provide fabricated information to USC."  Wilson Mem. Ex. 1 ¶ 55(a).

(3)     Lastly, the government identifies what it calls a "falsified profile Singer provided to Wilson before submitting it to USC."  Opp'n 10.  Setting aside the question of which inferences can reasonably be drawn from this document—which the government misunderstands—the document is legally irrelevant to the analysis, because *it was not presented or described to the magistrate* (either in the Affidavit or in the criminal complaint).

The government in its Affidavit thus stated falsely that, as of July 1, 2019, it had learned from Singer that Wilson had agreed to mislead USC.  The falsity of this fundamental allegation requires a *Franks* hearing.

      **B.  The Affidavit stated falsely that Wilson agreed to pay a bribe.**  The Affidavit's second material falsehood was its statement that Wilson "used [his email] account to communicate with Singer and others about . . . *bribe payments*."  Wilson Mem. Ex. 1 ¶ 57 (emphasis added).  The government concedes that none of Wilson's money was a bribe (to an individual); it is uncontested that Wilson intended his contribution to go to USC, and that none of Wilson's money went to any individual USC employee.  *See* Opp'n 10-11.

      To defend the truth of its Affidavit, the government resorts to the theory that Wilson's donation payments were "bribes because they were secretly exchanged as a quid pro quo for the admission of Wilson's son."  Opp'n 10.  But the novel theory that a donation to a "victim" university may be prosecuted as a bribe—a theory reflected in no prior case—appeared neither in the Affidavit nor in the criminal complaint; the government created this theory only in its January 14, 2020 Fourth Superseding Indictment, where it first alleged that "bribes" consisted of donations to "university accounts over which [individuals charged with receiving bribes] exercised discretion."  ECF No. 732, ¶¶ 65, 280. When the criminal complaint and the Affidavit

spoke of parents "paying bribes," a reasonable magistrate would have applied a plain-language, commonsense reading to that phrase, to denote a private payment to the faithless employee.

The government further defends the truth of the Affidavit's representations by stating that the Affidavit disclosed that "Singer forwarded $100,000 [of Wilson's money] to 'USC Men's Water Polo.'" Opp'n 10. But this half-disclosure is the heart of the problem: the Affidavit withheld from the magistrate that Wilson's complete *$200,000* payment was supposed to be delivered to USC. The plain text of the Affidavit thus indicated—falsely—that the balance of Wilson's payment *was* the "bribe" the Affidavit alleged (when, in fact, Singer stole that money).

**C. The falsehoods were necessary to the Affidavit's probable cause.** The government cites a kitchen-sink of documents in its Opposition, attempting to obscure both the significance of those documents and whether they were presented to the magistrate. For instance, the government cites "seven *pages* of facts" in the criminal complaint about "Wilson's involvement in the side door." Opp'n 11. But Singer used the term "side door" in discussions with Wilson and other parents differently than the government now interprets the term. Not a *word* in the Affidavit or complaint suggests that the "side door" discussed *with Wilson* involved either the submission of false information (i.e., fraud) or any private payment to any individual (i.e., bribery). Indeed, extensive evidence establishes that Singer regularly—and in conversations with Wilson—used the phrase "side door" to denote permissible donations to university programs. *See, e.g.*, Ex. A (Singer telling a parent that "[t]here is a side door in most schools . . . which means you support the school at a lot lesser cost than through institutional advancement"); Ex. B (Singer telling a parent that "side door is not improper nor is back door[,] both are how all schools fund their special programs or needs"); Ex. C (Singer telling a public audience of Starbucks employees that "[t]he back door is through institutional advancement . . . and the side

door is figuring out how I can do that for one tenth of the money" (reproduced from ECF No. 1145-9)); Ex. D (Singer telling Wilson that the President of Harvard "wants to do a deal with [Singer], because he found out that [Singer] already got four [side-door applicants] in").

Excising the warrant's falsehoods would have left the magistrate without a single piece of evidence even remotely suggesting that Wilson (a) agreed to submit false information to USC, or (b) agreed to commit bribery, within the ordinary, customary meaning of that term.

The government offers two last-ditch arguments to fend off the critical importance of its falsehoods to the Affidavit's showing of probable cause, but neither is persuasive:

(1)  The government suggests that, *even if Wilson was unaware of any scheme to commit bribery or fraud*, the Affidavit nevertheless showed probable cause that "evidence of the Target Offenses—whether incriminating as to Singer, Vavic, or Wilson—would be found in Wilson's email account." Opp'n 10-11.  This argument makes no sense:  If Singer communicated no fraud or bribery plan to Wilson, then Wilson's emails would contain no evidence of those plans. Moreover, nothing in the Affidavit claims that *Vavic*, *either*, knew of any incorrect information in Wilson's son's application materials or received a bribe. *See* Wilson Mem. Ex. 1, at 11-14.

(2)  In a footnote, the government asserts that the Affidavit "set forth evidence of tax fraud." Opp'n 12 n.7.  The government's tax case rests on the rickety premise that Wilson did not intend his donation payment to be a true donation.  But more critically for present purposes, even the Affidavit itself did not suggest that it showed probable cause concerning a tax offense.  The Affidavit stated that "there is probable cause to believe that the Target Subjects conspired with Singer and others to facilitate:  (a) cheating on the ACT or SAT exams for their children . . . and/or (b) bribery of athletic coaches and university administrators . . . ." Wilson Mem. Ex. 1, at 10.  The "tax fraud" theory of probable cause thus was not before the magistrate.

Absent its two false statements, the Affidavit lacked probable cause.  The Court should hold a *Franks* hearing and, thereafter, should suppress the fruits of the warrant.

## II. THE GOVERNMENT EXECUTED THE WARRANT IMPROPERLY

The Opposition confirms that the government had no legally valid reason for exceeding the warrant's scope, violating the Fourth Amendment, and disregarding the marital-communications privilege.

***A. The Scope of the Warrant.*** The government contends that it adhered to the warrant, but its arguments ignore the warrant's explicit terms. The warrant distinguished between two phases of the search-and-seizure process: Section II described a comprehensive universe of "Accounts and Files" to be copied by the email provider. Wilson Mem. Ex. 1, at 25. Section III described a narrower list of "Records and Data to be Searched and Seized by Law Enforcement Personnel." Wilson Mem. Ex. 1, at 27 (warrant § III). Those records consisted of eight enumerated categories of "evidence, fruits, or instrumentalities" of specific crimes. *Id.* at 27-28. The Motion challenges the government's failure to comply with Section III's limitations:

(1)   The government reviewed, retained, and widely disseminated thousands of documents that were not "evidence, fruits, or instrumentalities" of any criminal offense. Wilson Mem. Ex. 1, at 27-28. It is entirely irrelevant whether, as the government claims, the government refrained—as it was required to do—from searching and seizing *additional* documents unresponsive to the warrant. *See* Opp'n 12 (professing that the government "marked as responsive just 7% of the emails" of which it took possession). Wilson will not burden the Court with a submission collecting the thousands of emails that the government reviewed, retained, and produced despite the absence of any connection to the charges. And he has identified, in an ex parte affidavit of counsel, some of the irrelevant emails most damaging to his privacy and his defense. Nevertheless, this brief attaches several exemplars illustrating the government's complete disregard for the warrant's (and Fourth Amendment's) requirement that the seizure must be limited to evidence, fruits, and instrumentalities of specified crimes. *See* Exs. E-J.

(2)   Among the eight specific categories of "evidence, fruits, or instrumentalities" that Section III enumerated, *only one* permitted the government to search and seize "communications." Wilson Mem. Ex. 1, at 27-28.[1] That category was limited to

---

[1] Some of the other categories in concerned III sought technical data that could be available to the email provider, such as "[t]he identity of the person(s) who has owned or operated the target account(s)," and "[t]he identity . . . of any computers used to access the[] e-mail

"communications between or among Rick Singer and others" about specified topics. *Id.* It is therefore *critical* that nearly none of the email communications the government retained, reviewed, and produced involved Rick Singer, because *all* of those communications exceeded the warrant's scope.

The government appears to believe that documents can be "responsive to the warrant," Opp'n 13, even if they fit into *none* of the document categories that the warrant describes. But this approach is foreclosed by *United States v. Kuc*, 737 F.3d 129 (1st Cir. 2013). In *Kuc*, as here, the warrant's description of items to be seized included a heading ("evidence, fruits, and instrumentalities of [specified offenses]") followed by enumerated "categories of items." *Id.* at 131-32. In *Kuc*—but not here—the warrant stated that the heading "includ[ed], without limitation" the ensuing list of categories. *Id. Even so*, the First Circuit interpreted the list of categories as providing "more specific search constraints" that delimited the government's search. *Id.* at 133-34 (citing *United States v. Bucuvalas*, 970 F.2d 937 (1st Cir. 1992)). Here, where the warrant eschewed the language "including, without limitation" (replacing it with a colon), it is impossible to interpret the warrant as allowing the government to exceed the warrant's itemized categories.[2]

Finally, the government is too glib in asserting that "similar arguments" to Wilson's were rejected in *United States v. Aboshady*, 951 F.3d 1 (1st Cir. 2020). The differences between the cases are decisive: In *Aboshady*, the language of the warrant's Section III *allowed* law enforcement to search and seize every one of the defendant's emails. 951 F.3d at 4, 6 (Section III encompassed "'[a]ll communications between or among' . . . six [email] accounts," one of

---

account[]." Wilson Mem. Ex. 1, at 28. Additional categories are not readily comprehensible, may have been copied from a government template without careful analysis, but clearly do not encompass "communications." *Id.*

[2] In any event, such an interpretation would render the warrant impermissibly "general." *See Kuc*, 737 F.3d at 133-34.

which was the defendant's).  By contrast, here the warrant *on its face* restricts the government's review to communications involving Rick Singer (and certain non-communications); and *on its face* the warrant limits the government's review to "evidence, fruits, or instrumentalities" of specified criminal offenses.  The government flagrantly ignored these restrictions.[3]

   **B.  *The Marital-Communications Privilege.***  The government disregarded the marital-communications privilege even though:  Wilson's communications with his wife were private; those communications did not concern any crime; and no precedent permits the government to unilaterally ignore the privilege.

   *(i) The emails were private communications.*  The government contends that Wilson's email communications were not confidential because Wilson gave his assistants "access to his workplace email account."  Opp'n 14.  The government bases this argument entirely on emails that the government acquired through the very search warrant at issue; indeed, disturbingly, the prosecutors returned to Wilson's mailbox *while preparing their Opposition* in search of evidence to justify their actions.  *See* Gov't Exs. EE, GG (reflecting documents produced to the defense two days after the government filed its Opposition).  The government thus continues to violate the warrant's scope, misunderstanding the warrant as an all-purpose license to rummage through Wilson's emails.  It is not:  the warrant placed unmistakable constraints on the types of documents that the government was permitted to "Search[] and Seize[]" (Wilson Mem. Ex. 1, at 27).  It did not authorize the government to search for emails to justify its violation of the marital-communications privilege.  And documents of which the government was unaware at the

---

   [3] The other arguments that the First Circuit addressed in *Aboshady* concerned the length of the period during which the government retained the comprehensive dataset delivered by the email provider (under the warrant's Section II), and the government's delays in performing certain searches in that dataset.  951 F.3d at 6-7.  Those are not the arguments at issue here.

time of its decision to ignore the privilege cannot logically justify that decision.  *See United States v. Di Re*, 332 U.S. 581, 595 (1948) ("[A] search is not to be made legal by what it turns up.  In law it is good or bad when it starts and does not change character from its success.").

In any event, the government is wrong on the merits, because the emails between Wilson and his wife were confidential even according to the authorities on which the government relies.

"[E]mails today, 'in common experience,' are confidential."  *United States v. Hamilton*, 701 F.3d 404, 408 (4th Cir. 2012).  It is also now commonplace for third parties to possess the capacity to access a person's emails.  But the case law makes clear that the existence of such third-party access does not eliminate the reasonable expectation that emails will remain confidential; that expectation of privacy becomes unreasonable only when a person is informed that he or she should expect their emails to be accessed without their consent.  *See Hamilton*, 701 F.3d at 408 (workplace policy instructed the employee that "[a]ll information . . . is subject to inspection and monitoring at any time"); *United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000) (workplace policy "clearly stated that [the workplace] would 'audit, inspect, and/or monitor' employees' . . . e-mail messages"); *Rissetto v. Clinton Essex Warren Wash. Bd. of Coop. Educ. Servs.*, No. 15-cv-720, 2018 U.S. Dist. LEXIS 124214, at *18 (N.D.N.Y. June 25, 2018) (in general, courts find expectation of privacy unreasonable "where the employer has in place a clear policy which . . . reserves the right to search and/or monitor the computer and its usage, and informs the employee that she has no expectation of privacy in its use").

By contrast, where workplace policies and norms convey to a person that the privacy of his or her email account will be respected, the expectation of privacy remains reasonable *regardless* of third parties' ability to access that account.  *See United States v. Slanina*, 283 F.3d 670, 676 (5th Cir. 2002) (expectation of privacy was reasonable where an employer "did not

disseminate any policy that prevented the storage of personal information on [workplace] computers and also did not inform its employees that computer usage and internet access would be monitored"); *Leventhal v. Knapek*, 266 F.3d 64, 74 (2d Cir. 2001) (expectation of privacy was reasonable absent evidence that the employer "had a general practice of routinely conducting searches of office computers" and absent evidence that the employee was notified "that he should have no expectation of privacy in the contents of his office computer"); *Haynes v. Office of the AG*, 298 F. Supp. 2d 1154, 1161-62 (D. Kan. 2003) (expectation of privacy was reasonable *despite* a warning to the employee that "[t]here shall be no expectation of privacy using this system," where, among other things, "employees [were] allowed to use their work computers for private communications"); *Sprenger v. Rector & Bd. of Visitors of Va. Tech*, No. 07-cv-502, 2008 U.S. Dist. LEXIS 47115, at *13 (W.D. Va. June 17, 2008) (expectation of privacy was reasonable where "no affidavit or other evidence was offered as to [the spouses'] knowledge, implementation, or enforcement of [an applicable internet-use] Policy"); *United States v. Long*, 64 M.J. 57, 64 (C.A.A.F. 2006) (expectation of privacy was reasonable where a military headquarters' policy "describe[d] very limited conditions under which [an administrator] would monitor the network for unauthorized use").

Here, the government's argument concerning Wilson's expectation of privacy relies on the norms and practices that Wilson himself dictated in his working relationships with his assistants. Even the emails that the government adduces reflect the expectation that Wilson's assistants would access his account only specifically in accordance with his requests. *See, e.g.*, ECF No. 1510-1, at 347 ("can u pls search my emails . . ."); ECF No. 1510-1, at 349 ("Pls check jet blue Acct . . ."). No evidence suggests—because it is obviously not true—that Wilson should have expected his assistants to peruse his private emails at their discretion.

In any event, Wilson's primary assistant is providing an affidavit, attached to this brief, stating that: when she began working for Wilson, he instructed her to respect the privacy of the Wilson family's records, including their email correspondence; she has understood from the start that she us not permitted to read Wilson's and the family's documents, including emails, except when specifically requested to do so; these instructions have remained constant throughout her employment with Wilson; and she has obeyed them.  *See* Ex. K ¶¶ 3-5.

In short, it was reasonable for Wilson and his wife to expect their email communications to remain private because Wilson had established and enforced the rules so prescribing.  By communicating via email—as nearly all couples now do—the Wilsons did not waive their marital-communications privilege.  *See Hamilton*, 701 F.3d at 408 (stating that, "[i]n an era in which email plays a ubiquitous role in daily communications, [policy] arguments caution against lightly finding waiver of marital privilege by email usage").

*(ii) The "joint participant" exception is inapplicable.*  The government argues next that it was permitted to ignore the marital-communications privilege under the "joint-participant exception," on the basis that—according to the government—Wilson's wife was an unindicted coconspirator.  Opp'n 15-16.  This argument fails on both the facts and the law.

On the factual level, *none* of the evidence the government presents (nor any other evidence) remotely suggests criminal activity by Wilson's wife.  The emails on which the government relies indicate, at most, that Wilson's wife was aware of "financial discussions" with USC relating to a "spot" at the university.  *See* ECF No. 1050-1, at 353 ("Is this spot still available for USC . . ."); *id.* at 357 (the Wilsons' friends "do not know about out financial discussions regarding . . . USC").  *No* evidence supports any inference that Wilson's wife agreed to any misrepresentation or bribery.  *See United States v. Bey*, 188 F.3d 1, 6 (1st Cir. 1999)

(ambiguous conduct did not support the joint-participant exception because "[p]roof of a criminal conspiracy requires an act 'in furtherance of the conspiracy,' which is distinct from an act in furtherance of a working marriage"); *United States v. Guyton*, No. 11-cr-271, 2013 U.S. Dist. LEXIS 8984, at *7-8 (E.D. La. Jan. 22, 2013) (conversations that "suggest" one spouse "may have been assisting" in another's crime were "conjecture" insufficient to establish the joint-participant exception).

On the doctrinal level, the overwhelming weight of authority limits the joint-participant exception to communications "concerning crimes in which the spouses are jointly participating," i.e., "conversations . . . made in furtherance of the conspiracy." *United States v. Picciandra*, 788 F.2d 39, 43 (1st Cir. 1986); *see also Bey*, 188 F.3d at 4 ("Communications concerning crimes in which the spouses are jointly participating"); 3 *Weinstein's Federal Evidence* § 505.11 & n.5 (2d ed. 2020) (collecting cases from the First, Second, Third, Fourth, Fifth, Seventh, and Ninth Circuits tying the joint-participant exceptions to statements "about present or ongoing criminal activity").[4]  Even the government does not suggest that more than a handful of emails between Wilson and his wife related in any way to the charged scheme.  *See* Opp'n 15 n.9 (listing three emails).  The government's reliance on the marital-communications privilege to excuse its review of *more than three thousand* confidential marital communications is therefore inapt.[5]

---

[4] Even *Bey*, on which the government relies, limits the joint-participant exception to "*relevant* confidential marital communications that take place after the spouse has become a joint participant in the criminal activity."  188 F.3d at 6 (emphasis added).  The thousands of communications the government reviewed here were plainly not "relevant" (and Wilson's wife was never a participant in criminal activity).

[5] In addition, the government again seeks to confuse the timeline, citing—as support for its review of marital communications in a July 2019 warrant return—facts discussed in the January 2020 Fourth Superseding Indictment, as well as emails that the government obtained only through the warrant.  But the government is not permitted to "act[] with the benefit of hindsight"

*(iii) The case law does not permit the government to disregard the marital-communications privilege.*  The Opposition attempts to disguise a startling concession:  that there is *no precedent* for these prosecutors' complete disregard for the privilege attached to marital communications they seized.  Every one of the cases the parties have identified concerning prosecutors' reviews of seized marital communications appears in footnote 9 of Wilson's opening brief.  In every one of those cases, the court protected the privilege by ensuring that marital communications were withheld from the prosecuting team.[6]  These decisions respect both the common-law privilege for marital communications and the essential nature of a warrant.

*The privilege* for marital communications protects "the confidence of the marital relationship—once described by [the Supreme] Court as 'the best solace of human existence.'" *Trammel v. United States*, 445 U.S. 40, 51 (1980) (quoting *Stein* v. *Bowman*, 13 Pet. 209, 223 (1839)).  The privilege's purpose is to give married couples "assur[ance] that their statements will never be subjected to forced disclosure." *United States v. Byrd*, 750 F.2d 585, 591 (7th Cir. 1984) (citation omitted).  The benefit of that assurance would evaporate if prosecutors could access marital communications at their whim.  *See United States v. Neal*, 532 F. Supp. 942, 949 (D. Colo. 1982), *aff'd*, 743 F.2d 1441 (10th Cir. 1984) ("One who bares his soul in privacy to his

---

by relying on evidence it lacked "at the time of the [warrant execution]." *United States v. DePalma*, 461 F. Supp. 800, 822 n.26. (S.D.N.Y. 1978).

[6] Those cases do *not*, as the government suggests (Opp'n 17 n.11), reflect voluntary government solicitousness for the privacy interests of married defendants.  Court orders *required* the government to use a taint team in *United States v. Nejad*, No. 18-cr-224, slip op. at 2 (S.D.N.Y. Oct. 16, 2018), and *In re Seacoast Sleep Solutions*, LLC, No. 10-mj-111 (D. Me. Sept. 22, 2010) (as well as *In re Search of Info. Associated with "staceypomrenke@gmail.com,"* No. 16-mj-73, 2016 U.S. Dist. LEXIS 80881, at *12 (W.D. Va. June 21, 2016)).  And in *United States v. Ventrella*, No. 19-cr-80030, slip op. at 3 (S.D. Fla. Mar. 17, 2020), the government's use of a taint team was the reason supporting the court's denial of a motion to suppress.

wife should not have to fear that . . . his words spoken to his wife are being heard and recorded by the police for later use . . . .").

And *a search warrant* permits the government to intrude on individuals' privacy for a circumscribed purpose, namely collecting *evidence* of a crime (as well as fruits and instrumentalities thereof). *See Warden v. Hayden*, 387 U.S. 294 (1967); *United States v. Gilbert*, 94 F. Supp. 2d 163, 168 (D. Mass. 2000); Fed. R. Crim. P. 41(c). "Because privileged marital communications . . . cannot be introduced as evidence at trial, [they] do not serve the purpose of a [warrant]." *State v. Mazzone*, 648 A.2d 978, 983 (Md. 1994) (citing *United States v. Harrelson*, 754 F.2d 1153, 1168 (5th Cir. 1985)). Otherwise stated, it is "unreasonable"—within the meaning of the Fourth Amendment—for the government to rummage through documents that are unusable for the warrant's stated purpose.

Cases discussing Title III intercepts, such as *Mazzone* and *Harrelson*, illustrate the wrongheadedness of the government's approach. The government maintains that the marital-communications privilege is "testimonial" in nature, and that it therefore lacks all consequences unless trial testimony is at stake. Opp'n 17-18. But if the government's view were correct, then agents conducting wiretaps could freely and fully monitor privileged spouse-to-spouse conversations, so long as those conversations were not introduced as evidence at trial. Courts have denied the government this freedom, instead compelling the government to respect the privilege by minimizing marital communications as soon as they are identified as such. *See Harrelson*, 754 F.2d at 1169 (the government must "minimize the interception of privileged communications" between spouses); *DePalma*, 461 F. Supp. at 821-23 (the government acted unreasonably and committed "serious transgressions" by failing to minimize three conversations between the defendant and his wife); *United States v. Goffer*, 756 F. Supp. 2d 588, 595

(S.D.N.Y. 2011) (it was "nothing short of 'disgraceful'" that the government failed to minimize conversations between spouses where "it should have been apparent within seconds that the conversation was privileged").

In short, none of the nuances of the marital-communications privilege permits prosecutors to disregard the privilege at will.[7]  The government's complete disregard for the privilege was grossly improper, and calls for correspondingly severe remedies.

*C. The Fourth Amendment.*  The government reviewed, retained, and produced to twenty-two defense teams thousands of emails that (a) do not relate to its case, but (b) disclose private, intimate details of Wilson's family's life.  The government does not even attempt to explain how this conduct could have satisfied the Fourth Amendment's touchstone of reasonableness.  No such explanation could hold water:  the government maximized its intrusion upon the Wilson family's privacy, instead of minimizing that intrusion as the Constitution requires.  *See Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976) ("[R]easonableness requires that searches and seizures by the government be 'conducted in a manner that minimizes unwarranted intrusions upon privacy.'").  Suppression is warranted for this reason alone.  *See*

---

[7] The cases the government cites do not suggest otherwise.  The government first makes the fundamental error of conflating the marital-communications privilege with the spousal testimonial privilege (which relieves a witness from the obligation to testify against his or her spouse).  It is the cases concerning the latter privilege that have limited the doctrine to testimony "in the courtroom," as opposed to statements given to police.  *See Trammel v. United States*, 445 U.S. 40, 55 n.12 (1980); *United States v. Chapman*, 866 F.2d 1326, 1333 (11th Cir. 1989).  Other cases the government cites hold only that the marital-communication privilege is limited to "communications," as opposed to non-communicative facts.  *See United States v. Giavasis*, 805 F.2d 1037 (6th Cir. 1986) (the privilege did not apply where a spouse turned over physical evidence to the police); *United States v. Harper*, 450 F.2d 1032, 1042 (5th Cir 1971) (the privilege did not apply where a wife told police about her husband's "illegal manufacture of methadone").  The government cites *no* case in which the government decided *unilaterally* to access private marital communications without either spouse's consent.

*Aboshady*, 951 F.3d at 5 ("[Suppression of evidence] . . . is permitted . . . when the government's conduct in searching or seizing the evidence in question reflects a 'deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights . . . .'" (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)).

### III. THE REMEDIES WILSON SEEKS ARE WARRANTED

"Courts have sought to preserve inviolable some small island of privacy as a refuge for the human spirit where government may not intrude. Here the question is whether one such sanctuary, protected by the common law for centuries, shall be breached, rendering the secrets told to wives by husbands fair game for government investigators." *Neal*, 532 F. Supp. at 946. The government in this case ran roughshod over Wilson's private emails, including thousands between Wilson and his wife, while flagrantly ignoring the limits imposed by the warrant, the Fourth Amendment, and the marital-communications privilege. For these reasons, and those described in Wilson's September 16, 2020 Memorandum of Law, the Court should hold the necessary hearings and suppress the fruits of the warrant, disqualify prosecutors and witnesses, and sever Wilson's trial.

Respectfully submitted:

*Counsel to John Wilson:*

/s/ Michael Kendall
Michael Kendall (BBO # 544866)
Yakov Malkiel (BBO # 689137)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
(617) 979-9310
michael.kendall@whitecase.com
yakov.malkiel@whitecase.com

Andrew E. Tomback (pro hac vice)
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-1100
atomback@mclaughlinstern.com