UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREGORY COLBURN et al.,<br><br>Defendants. | No. 1:19-cr-10080-NMG<br><br>Leave to file granted on November 3, 2020 |

**DEFENDANT JOHN WILSON'S REVISED REPLY BRIEF
IN SUPPORT OF HIS MOTION FOR RELIEF BASED ON THE
GOVERNMENT'S IMPROPER SEARCH AND SEIZURE OF EMAILS**

Seeking access to defendant John Wilson's emails, the government filed a search warrant affidavit (the "Affidavit") falsely swearing to the existence of key evidence the government did not possess. The government then ignored limits imposed by the warrant, the Constitution, and the common law to review, retain, and widely distribute thousands of Wilson's privileged emails.

The government has responded to the Motion in a public Opposition brief and a sealed brief and affidavit. In these filings, the government defends the Affidavit by citing factually irrelevant evidence, as well as evidence that was not before the magistrate (and thus is *legally* irrelevant). The government defends its search by misinterpreting the warrant, ignoring constitutional restraints, and distorting the facts and law relating to Wilson's privileged marital communications. The Court should grant the Motion.

###### I. THE AFFIDAVIT WAS MATERIALLY FALSE

Wilson explained in his September 16, 2020 Memorandum ("Wilson Mem.") that the Affidavit made two false statements, both essential to its showing of probable cause. The government confirms the statements' falseness by offering no factual basis for them. Indeed, its sealed filings decline to defend the Affidavit, effectively conceding the *Franks* error.

**A. The Affidavit stated falsely that Wilson intended to mislead USC.** The government concedes that, to show a crime, it must prove "Wilson knew . . . that [Singer's] approach required the falsification of [Wilson's] son's credentials." Opp'n 1. The only assertion in the Affidavit suggesting that Wilson knew of a plan to falsify credentials was the statement: "Singer has explained to investigators that . . . *Wilson agreed that Singer would provide fabricated information to USC about his son's water polo abilities*." Wilson Mem. Ex. 1 ¶ 55(a). But discovery shows that Singer had not said this to the government as of the July 1, 2019 Affidavit.

The government could have mooted this argument by stating simply that Singer in fact *had* told agents that Wilson had agreed to a credential-falsifying plan. The government does not say this, however—confirming that the conversation reported in the Affidavit did not occur, and corroborating the FBI's interview memoranda (which record no such discussion prior to July 1).

To distract from the alarming admission that its Affidavit included a fundamental falsehood, the government offers three red herrings:

(1)   The government asserts that, according to Singer, Wilson saw his donation to USC as an "exchange for" his son's admission, and did not believe that his son would have been "recruited" if not for the donation. Opp'n 9-10. But even if these facts were true, they would not supply the critical missing ingredient—i.e., Wilson's agreement *to give USC false information* about his son. Even in the government's view, it is not a crime for a donation to candidly nudge a university to accept an athlete. Indeed, at USC this was a routine practice.

(2)   The government states that, in a "series of interviews . . . Singer described how his scheme worked," identifying Wilson as "one of the parents who was complicit in the scheme." Opp'n 10. This argument obscures the nature of Singer's operation. The government has charged Singer with *multiple* "schemes." He had hundreds of dispersed, disconnected clients. Some made donations to schools, yet were not indicted. Some were charged with conduct, such as test-cheating, that the government does not ascribe to Wilson. The fact that Singer told agents that *other* clients knew about falsities told to colleges—about their own children— says nothing about *Wilson*'s knowledge or *his* son's application. The Affidavit thus was indisputably false in stating that "Singer explained to investigators that . . . *Wilson*"—and not other parents—"agreed that Singer would provide fabricated information to USC." Wilson Mem. Ex. 1 ¶ 55(a).

(3) Lastly, the government identifies what it calls a "falsified profile Singer provided to Wilson before submitting it to USC." Opp'n 10. Setting aside the question of which inferences can be drawn from this document, which the government misunderstands, the document is legally irrelevant, because *it was not presented or described to the magistrate* (in the Affidavit or the criminal complaint).

The Affidavit thus was untruthful in stating that, as of July 1, 2019, Singer had stated that Wilson had agreed to mislead USC. The falsity of this core allegation requires a *Franks* hearing.

**B. The Affidavit stated falsely that Wilson agreed to bribery.** The Affidavit's second false statement was that Wilson "used [email] to communicate . . . about . . . *bribe payments*." Wilson Mem. Ex. 1 ¶ 57. The government admits that none of Wilson's money was a bribe, i.e., a payment to an individual, and that he meant his entire payment to go to USC. Opp'n 10-11.

To defend the Affidavit's truth, the government invokes the theory that a donation to a "victim" university equals a criminal bribe to the university team's coach, even if he received no personal benefit. *See* Opp'n 10. But this novel theory appeared neither in the Affidavit nor in the complaint; the government hatched the theory only later, in its January 2020 Fourth Superseding Indictment, where it first alleged that "bribes" consisted of donations to "university accounts over which [coaches] exercised discretion." ECF No. 732, ¶¶ 65, 280. In the complaint and Affidavit, nothing alerted the magistrate that the government intended to reinvent the well-worn term "bribe" to incorporate a brand-new meaning. A reasonable magistrate therefore would have applied a commonsense reading to that phrase, as denoting a private payment to a faithless employee. Again, it is undisputed that Wilson agreed to no such payment.

The government also asserts that the Affidavit disclosed that "Singer forwarded $100,000 [of Wilson's money] to 'USC Men's Water Polo.'" Opp'n 10. But this half-truth exacerbated the problem: the Affidavit withheld from the magistrate that Wilson intended his complete *$200,000* payment to go to USC. The plain text of the Affidavit thus indicated, falsely, that the balance of Wilson's payment—which in fact Singer stole—*was* the "bribe" in question.

***C. The falsehoods were crucial to the Affidavit's probable cause.***  The government cites a kitchen-sink of documents, but obscures their factual and legal irrelevance.  For instance, it cites "seven pages" in the complaint about "Wilson's involvement in the side door."  Opp'n 11.  But Singer used the term "side door" in discussions with Wilson (and other parents) differently than the government now reads the phrase.  Not a word in the Affidavit or complaint suggests that the "side door" Singer described *to Wilson* involved false credentials (i.e., fraud) or payments to corrupt employees (i.e., bribery).  Rather, as the government knew, Singer regularly used the phrase "side door" with parents to mean lawful donations to college programs.  *See* Ex. A (Singer telling a parent that "side door . . . means you support the school at a lot lesser cost"); Ex. B (Singer telling a parent that "side door is not improper nor is back door"); Ex. C (Singer telling a public audience that "the side door is figuring out how I can do [a donation] for one tenth of the money"); Ex. D (Singer telling Wilson that the President of Harvard "wants to do a deal with [Singer], because . . . [Singer] already got four [side-door applicants] in").[1]

Excising the warrant's falsehoods would have left the magistrate without evidence that Wilson (a) agreed to submit false information to USC, or (b) agreed to commit bribery (within the heretofore recognized meaning of that term).  The government offers two last-ditch arguments to fight this conclusion, but neither is persuasive:

(1) The government suggests that, *even if Wilson was unaware of any scheme to commit bribery or fraud*, the Affidavit nevertheless established that "evidence of the Target Offenses—whether incriminating as to Singer, [USC Coach] Vavic, or Wilson—would be found in Wilson's email account."  Opp'n 10-11.  This theory makes no sense:  If Singer did not communicate a fraud or bribery plan to Wilson,

---

[1] In fact, as Wilson explained in his September 16, 2020 Memorandum, government agents—including the affiant, Special Agent Smith—had stormy conversations with Singer, because Singer had communicated to parents, including Wilson, "that their money would go to an athletic program, not a coach," and the government was concerned that such communications did not make out a crime.  *See* Wilson Mem. 9 and the documents cited there.

> then Wilson's emails would not contain any evidence of such plans. Moreover, nothing in the Affidavit claims that *Vavic*, *either*, knew of any wrong information in Wilson's son's materials, or took a bribe. *See* Wilson Mem. Ex. 1, at 11-14.

(2) In a footnote, the government asserts that the Affidavit mentioned tax offenses, and provided "evidence of tax fraud." Opp'n 12 n.7. The government's tax case rests on the faulty premise that Wilson did not intend his donation to be a donation. But more critically here, the Affidavit itself did not suggest that it showed probable cause concerning a tax offense. It stated: "there is probable cause to believe that the Target Subjects conspired . . . to facilitate: (a) cheating on the ACT or SAT exams . . . and/or (b) bribery of athletic coaches and university administrators." Wilson Mem. Ex. 1, at 10. The "tax" theory of probable cause was not before the magistrate.

Absent its false statements, the Affidavit lacked probable cause. A *Franks* hearing is required.

## II. THE GOVERNMENT EXECUTED THE WARRANT IMPROPERLY

The government offers no valid reason for exceeding the warrant's scope, violating the Fourth Amendment, and disregarding the marital-communications privilege.

***A. The Scope of the Warrant.*** To argue that it adhered to the warrant, the government ignores the warrant's plain terms. The warrant addressed two phases of the search-and-seizure process: Section II described a comprehensive set of "Accounts and Files" to be copied by the email provider. Wilson Mem. Ex. 1, at 25. Section III described a narrower list of "Records and Data to be Searched and Seized by Law Enforcement Personnel." *Id.* at 27 (warrant § III). The government violated Section III's limitations in two key ways.

*First*, section III limited the government's search to "evidence, fruits, or instrumentalities" of enumerated crimes. Wilson Mem. Ex. 1, at 27-28. Indeed, the Fourth Amendment and Fed. R. Crim. P. 41(c) inject this restriction into *every* warrant. Yet the government reviewed, retained, and widely distributed thousands of documents that were neither "evidence," nor "fruits," nor "instrumentalities" of any offense. Those documents exceeded the warrant's scope regardless of whether, as the government claims, they were "relevant" to the case in some vague, broader sense. *See* Sealed Gov't Br. 1, 4. Accordingly, the government's

citation to documents relating to "personal finances," "travel," and "photos of individuals playing sports" (*id.* at 3, 6-7) is completely irrelevant; such documents violated the warrant's scope because the transactions and travel in question related to no crime, and the government has never theorized that Wilson, who had any number of photos chronicling his son's water polo career, falsified other photos.[2]  The seizure of these so-called "relevant" emails turned the warrant into a forbidden general search, unhindered by the warrant or the Fourth Amendment.

In its recent, sealed filings, the government—having accessed the emails—does not dispute that thousands of them are in no way "evidence, fruits, or instrumentalities" of a crime. Instead, the government hangs its hat on Wilson's reluctance to self-inflict further harm by highlighting the government's worst infringements upon his rights.  *See* Sealed Gov't Aff. 2, 5. To address this cynical ploy, Wilson is filing (with the Court's leave) a sealed compilation of additional documents that the government has wrongly classified as responsive to the warrant.

*Second*, the warrant's section III *further* restricts the authorized search to eight specific categories of "evidence, fruits, or instrumentalities."  These categories encompass virtually none of the emails that the government retained, reviewed, and produced:

(1)   *Only one* of Section III's categories, namely category III.A.1, permitted the government to search and seize "communications."  Wilson Mem. Ex. 1, at 27-28. That category was limited to "communications between or among Rick Singer and others" about specified topics.  *Id.*  It is critical that Singer was absent from nearly all of the emails the government retained and reviewed, because *all* non-Singer communications exceeded the warrant's scope.  And it is irrelevant that the seized emails were "between or among *the defendant* and others," as the

---

[2] It is equally irrelevant whether the government refrained—as it was required to do—from searching and seizing additional documents unresponsive to the warrant.  *See* Opp'n 12 (professing that the government "marked as responsive just 7% of the emails" it received).

> government states (Sealed Gov't Br. 7)—because the warrant's plain language required the communications to include *Singer* (*not* "the defendant").[3]

(2) The warrant's category III.A.2 permitted the government to retain "[t]he identity of the person(s) who has owned or operated the target account(s)." On a plain reading, this category—unlike III.A.1—does not concern "communications." Rather, it covers a portion of the "subscriber information" that the warrant's section II requested from the email provider. *See* Wilson Mem. Ex. 1, at 26-27 (requiring the provider to produce "subscriber information" including "name(s) and account identifiers"). The government's creative reading of this category, as encompassing all emails suggesting that Wilson operated his own email account (Sealed Gov't Br. 6-7), would read all restrictions out of the warrant, creating a general search of every email to or from Wilson.[4]

(3) The warrant's category III.A.3 concerns "[t]he existence and identity of any co-conspirators." The government reads this provision as a license to retain all emails mentioning persons whom *the government* accuses of being coconspirators. Sealed Gov't Br. 3, 6 & n.4. But the warrant is not so broad; it encompasses—because it must—only *evidence* that certain individuals *were in fact* coconspirators. The government cannot pull any given email into the warrant's ambit simply by labeling an interlocutor as a suspected coconspirator.[5]

More generally, the government seems to believe that documents can be "responsive to the warrant," Opp'n 13, even if they satisfy *none* of the warrant's document categories. This

---

[3] *United States v. Okun*, No. 08-cr-132, 2009 U.S. Dist. LEXIS 7402 (E.D. Va. Feb. 2, 2009), is inapposite. The warrant there authorized a seizure of communications "between or among [Company A people] and [Company B people]." The court ruled that, "[t]aken in context," the warrant covered communications involving Company B people alone. The context of the phrase "between or among" in the instant case—"between or among Rick Singer and others"—is fundamentally different: reading these words to include all communications "among others" would vitiate the warrant's various other provisions, since category III.A.1 would encompass all emails among all persons in the world.

[4] In *United States v. Aboshady*, 951 F.3d 1 (1st Cir. 2020), the prosecution sought evidence that "the email account . . . alleged to be [the defendant's] was in his control," given the defendant's "apparent contention to the contrary." *Id.* at 8. Because no such contention exists in this case, emails containing Wilson's personal information cannot be evidence of any crime; the imaginary risk that a defendant might claim lack of control over his email account cannot possibly license the government to seize every email it chooses. Moreover, Wilson, unlike the *Aboshady* defendant, *does* "explain what meaning he would ascribe to [the term 'identity']," *id.*, namely subscriber information received from the email provider.

[5] Some of section III's other categories are not readily comprehensible, may have been copied from a template without careful analysis, but in any case do not cover "communications."

approach is foreclosed by *United States v. Kuc*, 737 F.3d 129 (1st Cir. 2013). In *Kuc*, as here, the warrant's description of items to be seized included a heading ("evidence, fruits, and instrumentalities of [certain offenses]") followed by enumerated "categories of items." *Id.* at 131-32. In *Kuc*—but not here—the warrant said that its heading "includ[ed], without limitation" the ensuing categories. *Id. Even so*, the First Circuit interpreted the categories as "more specific search constraints" that circumscribed the search. *Id.* at 133-34 (citation omitted). Here, where the warrant eschewed the language "including, without limitation" (replacing it with a colon), it is pellucid that the warrant extended no further than its itemized categories.

Lastly, the government is too glib in asserting that "similar arguments" to Wilson's were rejected in *Aboshady*, *supra*. The differences between the cases are decisive: In *Aboshady*, the language of the warrant's Section III *allowed* law enforcement to search and seize every one of the defendant's emails. 951 F.3d at 4, 6 (Section III encompassed "[a]ll communications" involving six email accounts, one of which was *the defendant's*). By contrast, here the warrant *on its face* restricted the government's review to communications involving Rick Singer; and *on its face* the warrant limited the review to "evidence, fruits, or instrumentalities" of specified offenses. The government flagrantly ignored these clear restrictions.

**B.   The Marital-Communications Privilege.**  The government disregarded the marital-communications privilege, which Wilson had explicitly asked the government to respect, even though: Wilson's emails with his wife were private; they concerned no crime; and no precedent permits the government to simply ignore the privilege.

*(i) The emails were private.*  The government contends that Wilson's emails were not confidential because Wilson gave his assistants "access to his workplace email account." Opp'n 14. The government bases this argument entirely on emails that it acquired through the warrant;

indeed, disturbingly, the prosecutors returned to Wilson's mailbox *while preparing their Opposition*, to seek support for their actions.  See Opp'n Exs. EE, GG (reflecting emails produced to the defense after the government filed its Opposition).  The government thus continues to misunderstand the warrant as an all-purpose license to rummage through Wilson's emails.  But nothing in the warrant allowed the government to conduct a search for emails justifying its violation of the privilege, and documents of which the government was unaware when it executed the search cannot excuse the violation retroactively.  *See United States v. Di Re*, 332 U.S. 581, 595 (1948) ("[A] search is not to be made legal by what it turns up.").

In any event, the government is wrong even in view of the documents they reviewed impermissibly, because the emails between Wilson and his wife were confidential under the same case law on which the government relies.

It is commonplace today for third parties to possess the capacity to access a person's emails.  Yet courts have made clear that such third-party access does not vitiate the reasonable expectation that emails will remain confidential; that expectation becomes unreasonable only when people are put on notice that they should expect their emails to be accessed without their consent.  *See United States v. Hamilton*, 701 F.3d 404, 408 (4th Cir. 2012) (workplace policy instructed employee that "[a]ll information . . . is subject to inspection and monitoring"); *United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000) (workplace policy "clearly stated that [the workplace] would 'audit, inspect, and/or monitor' . . . e-mail messages"); *Rissetto v. Clinton Essex Warren Wash. Bd. of Coop. Educ. Servs.*, No. 15-cv-720, 2018 U.S. Dist. LEXIS 124214, at *18 (N.D.N.Y. June 25, 2018) (in general, courts find no reasonable expectation of privacy "where the employer has in place a clear policy which . . . reserves the right to search and/or monitor the computer").

By contrast, where workplace policies and norms convey to a person that the privacy of an email account will be respected, the expectation of privacy remains reasonable *regardless* of third parties' ability to access the account.  *See United States v. Slanina*, 283 F.3d 670, 676 (5th Cir. 2002) (expectation of privacy reasonable where the employer "did not inform its employees that computer usage . . . would be monitored"); *Leventhal v. Knapek*, 266 F.3d 64, 74 (2d Cir. 2001) (expectation of privacy reasonable absent evidence that the employee was notified "he should have no expectation of privacy in the contents of his office computer"); *Haynes v. Office of the AG*, 298 F. Supp. 2d 1154, 1161-62 (D. Kan. 2003) (expectation of privacy reasonable where "employees [were] allowed to use their work computers for private communications"); *Sprenger v. Rector & Bd. of Visitors of Va. Tech*, No. 07-cv-502, 2008 U.S. Dist. LEXIS 47115, at *13 (W.D. Va. June 17, 2008) (expectation of privacy reasonable where no evidence "was offered as to [the spouses'] knowledge . . . of [an applicable internet-use] Policy").

Here the government's argument concerning Wilson's expectation of privacy relies on norms and practices that Wilson himself dictated in his working relationships with his assistants. Even the emails that the government adduces reflect Wilson's expectation that his assistants would access his account only in accordance with his specific requests.  *E.g.*, ECF No. 1510-1, at 347 ("can u pls search my emails for [a certain] order"); ECF No. 1510-1, at 349 ("Pls check jet blue Acct . . ."). Furthermore, Wilson's primary assistant has provided an affidavit stating that: when she began working for Wilson, he instructed her to respect the privacy of the Wilson family's records, including emails; she has always understood that she may not read Wilson's emails except when asked to do so for a defined purpose; and she has obeyed these instructions. *See* Ex. E ¶¶ 3-5.  No evidence suggests—because it obviously is not true—that Wilson should have expected his assistant to peruse his private emails freely and contrary to his instructions.

It thus was reasonable for Wilson and his wife to expect their emails to remain private because Wilson had made the rules so prescribing. By communicating via email—as virtually all couples now do—the Wilsons did not waive their privilege.

*(ii) The "joint participant" exception is inapplicable.* The government argues next that the marital-communications privilege is inapplicable because—according to the government—Wilson's wife was a "joint participant" in a conspiracy when the government applied for its warrant. Opp'n 15-16; O'Connell Aff. ¶ 15. This argument fails on facts, law, and procedure.

On the factual level, none of the evidence remotely suggests criminal activity by Wilson's wife. The emails on which the government relies indicate, at most, that Wilson's wife was aware of "financial discussions" with USC relating to a "spot" or "slot" at the university. *See* ECF No. 1050-1, at 357 (the Wilsons' friends "do not know about [their] financial discussions regarding . . . USC"); *id.* at 353 ("Is this spot still available for USC"); O'Connell Decl. ¶ 15 (same). *Even after reviewing the prior version of the instant brief*—and while relying improperly on documents that the government did not identify when it sought its warrant[6]—the government found no shred of evidence supporting an inference that Wilson's wife agreed to any misrepresentation or bribery. *Id.*; *see also United States v. Bey*, 188 F.3d 1, 6 (1st Cir. 1999) (ambiguous conduct did not support the joint-participant exception); *United States v. Guyton*, No. 11-cr-271, 2013 U.S. Dist. LEXIS 8984, at *7-8 (E.D. La. Jan. 22, 2013) (conversations "suggest[ing]" that one spouse "may have been assisting" another's crime were insufficient to establish the exception).

---

[6] To support its review of marital communications in a July 2019 warrant return, the government improperly cites facts introduced in the January 2020 Fourth Superseding Indictment, and emails seized only through the warrant.

From a doctrinal perspective, the overwhelming weight of authority limits the joint-participant exception to communications "made in furtherance of the conspiracy." *United States v. Picciandra*, 788 F.2d 39, 43 (1st Cir. 1986); *Bey*, 188 F.3d at 4 ("Communications *concerning crimes* in which the spouses are jointly participating"); 3 *Weinstein's Federal Evidence* § 505.11 & n.5 (2d ed. 2020) (collecting cases from seven circuits tying the joint-participant exceptions to statements "*about* present or ongoing criminal activity").[7]  Even the government does not suggest that more than a handful of emails between Wilson and his wife related in any way to the charged scheme.  *See* Opp'n 15 n.9 (listing three emails); O'Connell Decl. ¶ 15 (citing one of the same three).  The government's reliance on the marital-communications privilege to excuse its review of *more than three thousand* confidential marital communications is therefore illogical.

Finally, on a procedural plane, a prosecutor's suspicion that an exception to the privilege may apply is not a proper basis for delivering the privileged documents wholesale to the trial team.  *At a minimum*, a taint team should have reviewed the documents to determine whether some were non-privileged.  *See* Wilson Mem. 15 n.10; *United States v. Pedersen*, No. 12-cr-431, 2014 U.S. Dist. LEXIS 106227, at *92 (D. Or. Aug. 4, 2014) ("The government may not intentionally review privileged communications in order to develop the factual basis supporting an [exception].").  The government's complete disregard for the privilege is indefensible.

*(iii) The case law does not permit the government to disregard the marital-communications privilege.*  The Opposition attempts to disguise a startling concession:  that there is *no precedent* for these prosecutors' unilateral disregard for the privilege attached to marital

---

[7] Even *Bey*, on which the government relies, limits the joint-participant exception to "*relevant* confidential marital communications . . . after the spouse has become a joint participant in the criminal activity."  188 F.3d at 6.  The thousands of communications the government reviewed here were plainly not "relevant" (and Wilson's wife was never a participant in a crime).

communications they seized. Every one of the cases the parties have identified concerning prosecutors' reviews of seized marital communications appears in footnote 9 of Wilson's opening brief. In every one of those cases, the court *protected* the privilege by ensuring that marital communications were withheld from the prosecuting team.[8] These decisions respect both the common-law privilege for marital communications and the essential nature of a warrant.

*The privilege* for marital communications protects "the confidence of the marital relationship—once described by [the Supreme] Court as 'the best solace of human existence.'" *Trammel v. United States*, 445 U.S. 40, 51 (1980) (citation omitted). The privilege's purpose is to give married couples "assur[ance] that their statements will never be subjected to forced disclosure." *United States v. Byrd*, 750 F.2d 585, 591 (7th Cir. 1984) (same). The benefit of that assurance would evaporate if prosecutors could access marital communications at their whim. *See United States v. Neal*, 532 F. Supp. 942, 949 (D. Colo. 1982), *aff'd*, 743 F.2d 1441 (10th Cir. 1984) ("One who bares his soul in privacy to his wife should not have to fear that . . . his words spoken to his wife are being heard and recorded by the police for later use . . . .").

And *a search warrant* permits the government to intrude on individuals' privacy for a circumscribed purpose, namely collecting evidence of a crime (as well as fruits and instrumentalities thereof). *See Warden v. Hayden*, 387 U.S. 294 (1967); Fed. R. Crim. P. 41(c). "Because privileged marital communications . . . cannot be introduced as evidence at trial, [they]

---

[8] The cases do *not*, as the government suggests (Opp'n 17 n.11), reflect voluntary government solicitousness for the privacy of married defendants. Court orders *required* the government to use a taint team in *United States v. Nejad*, No. 18-cr-224, slip op. at 2 (S.D.N.Y. Oct. 16, 2018), and *In re Seacoast Sleep Solutions*, LLC, No. 10-mj-111 (D. Me. Sept. 22, 2010) (as well as *In re Search of Info. Associated with "staceypomrenke@gmail.com,"* No. 16-mj-73, 2016 U.S. Dist. LEXIS 80881, at *12 (W.D. Va. June 21, 2016)). And in *United States v. Ventrella*, No. 19-cr-80030, slip op. at 3 (S.D. Fla. Mar. 17, 2020), the government's use of a taint team was the reason supporting the court's denial of a motion to suppress.

do not serve the purpose of a [warrant]." *State v. Mazzone*, 648 A.2d 978, 983 (Md. 1994) (citing *United States v. Harrelson*, 754 F.2d 1153, 1168 (5th Cir. 1985)).  Otherwise stated, it is "unreasonable"—within the meaning of the Fourth Amendment—for the government to rummage through documents that cannot be used for the warrant's permissible purpose.

Cases discussing Title III intercepts, such as *Mazzone* and *Harrelson*, illustrate the wrongheadedness of the government's approach.  The government maintains that the marital-communications privilege is "testimonial" in nature, and that any invasion of it lacks consequence unless trial testimony is at stake.  Opp'n 17-18.  But if the government's view were correct, then agents conducting wiretaps could freely and fully monitor privileged spouse-to-spouse conversations, so long as those conversations were not introduced as trial evidence.  Courts have denied the government this freedom, instead compelling agents to respect the privilege by minimizing marital communications as soon as they are identified as such.[9]  *See Harrelson*, 754 F.2d at 1169 (the government must "minimize the interception of privileged communications" between spouses); *United States v. Goffer*, 756 F. Supp. 2d 588, 595 (S.D.N.Y. 2011) (it was "nothing short of 'disgraceful'" that the government failed to minimize conversations between spouses where "it should have been apparent . . . that the conversation was privileged"); *United States v. DePalma*, 461 F. Supp. 800, 821-23 (S.D.N.Y. 1978) (the government committed "serious transgressions" in failing to minimize marital communications).

In short, nothing about the marital-communications privilege permits the government to disregard it at will.[10]  The government's grossly improper conduct calls for severe remedies.

---

[9] The minimization requirement itself derives from the Fourth Amendment's touchstone of reasonableness.  *E.g.*, *United States v. Biasucci*, 786 F.2d 504, 510 (2d Cir. 1986).

[10] The cases the government cites do not suggest otherwise.  The government first makes the elementary error of conflating the marital-communications privilege with the spousal testimonial

**C. The Fourth Amendment.** The government reviewed, retained, and produced to twenty-two defense teams thousands of emails that (a) do not relate to its case, but (b) disclose private, intimate details of Wilson's family's life. In so doing, the government maximized its intrusion upon the Wilson family's privacy,[11] instead of minimizing that intrusion as the Constitution requires. *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976) ("[R]easonableness requires that searches and seizures by the government be 'conducted in a manner that minimizes unwarranted intrusions upon privacy.'"). Suppression is warranted for this reason alone. *See United States v. Lebovits*, No. 11-cr-134, 2012 U.S. Dist. LEXIS 189705, at *55, 58 n.17 (E.D.N.Y. Nov. 30, 2012) (where "non-pertinent communications intercepted . . . and distributed in discovery reveal[ed] highly personal information," suppression was unwarranted only because "government agents . . . were . . . unaware of how personal and sensitive they were").[12]

---

privilege (which excuses a witness from being compelled to testify against his or her spouse). It is cases concerning the latter privilege that have limited the doctrine to testimony "in the courtroom," as opposed to statements given to police. *See Trammel v. United States*, 445 U.S. 40, 55 n.12 (1980); *United States v. Chapman*, 866 F.2d 1326, 1333 (11th Cir. 1989). Other cases the government cites hold only that the marital-communication privilege is limited to "communications," as opposed to non-communicative facts. *See United States v. Giavasis*, 805 F.2d 1037 (6th Cir. 1986) (the privilege did not apply where a spouse gave the police physical evidence); *United States v. Harper*, 450 F.2d 1032, 1042 (5th Cir 1971) (the privilege did not apply where a wife told police about her husband's "illegal manufacture of methadone"). The government cites *no* case in which prosecutors unilaterally accessed marital communications without either spouse's consent.

[11] The government's unconstitutionally excessive intrusion on the Wilson family's privacy included, among other things: distributing private swimsuit photographs of Wilson's 11-year-old daughters—whose names and location have been widely publicized—to 22 uncontrolled, unaccountable defense teams; and providing the same group with details about highly private health issues and family relationships. *See* 2d Kendall Aff. ¶¶ 11, 13. The consequences of these disclosures are uncontrollable, presently unknowable, and potentially irreversible.

[12] The government reiterates its pre-motion assertion that it disseminated privileged, confidential documents to dozens of defense teams because of the defendants' appropriate request for *Brady* disclosures exculpating their alleged coconspirators. Sealed Gov't Br. 8. The suggestion remains absurd. Wilson Mem. 12 n.6. Moreover, the defendants expressed the

### III. THE REMEDIES WILSON SEEKS ARE WARRANTED

"Courts have sought to preserve inviolable some small island of privacy as a refuge for the human spirit where government may not intrude. Here the question is whether one such sanctuary, protected by the common law for centuries, shall be breached, rendering the secrets told to wives by husbands fair game for government investigators." *Neal*, 532 F. Supp. at 946. The government in this case ran roughshod over Wilson's private emails, including thousands between Wilson and his wife, while flagrantly ignoring the limits imposed by the warrant, the Fourth Amendment, and the marital-communications privilege. Commensurately severe remedies are necessary. After holding the necessary hearings, the Court should suppress the fruits of the warrant, disqualify tainted prosecutors and witnesses, and sever Wilson's trial.

Respectfully submitted:

*Counsel to John Wilson:*

/s/ Michael Kendall
Michael Kendall (BBO # 544866)
Yakov Malkiel (BBO # 689137)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
(617) 979-9310
michael.kendall@whitecase.com
yakov.malkiel@whitecase.com

Andrew E. Tomback (pro hac vice)
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-1100
atomback@mclaughlinstern.com

---

expectation that they all would receive "the same Discovery Materials" before learning that the government would use search warrants to seize private, privileged marital communications.