United States District Court
District of Massachusetts

| | |
|---|---|
| United States of America,<br><br>v.<br><br>John Wilson,<br><br>Defendant. | Criminal Action No.<br>19-10080-NMG-17 |

**MEMORANDUM & ORDER**

**GORTON, J.**

Defendant John Wilson ("Wilson" or "defendant") has been charged, alongside 30 other parents, with conspiring with William "Rick" Singer ("Singer") to have his children fraudulently admitted into an elite university by falsifying their athletic credentials and bribing university employees and athletic coaches.  Pending before this Court is Wilson's motion for relief based on the government's improper search and seizure of emails (part, but not all, of Docket No. 1437). For the reasons that follow, that motion will be denied.

I.   **Background**

The facts of this case have been broadly recited in prior orders of this Court, see Docket Nos. 1169 and 1334, but relevant here is the following:

In the spring of 2013, Wilson hired Singer to assist his son in his college application process. Wilson's son played high school water polo but was not qualified to play on the varsity water polo team at the University of Southern California ("USC"). Singer, nonetheless, communicated with the water polo coach at USC, Jovan Vavic ("Vavic"), about having Wilson's son accepted to USC as a "bench warmer side door" water polo recruit. Wilson, Singer and Vavic planned specifically to have Wilson's son "recruited" as a walk-on in exchange for a "donation" to USC. In executing that plan, Singer embellished the athletic profile of Wilson's son to include fabricated awards.

Wilson's son was admitted to USC in March, 2014, after which Wilson "donated" approximately $220,000 to USC via Singer's charity, the Key Worldwide Foundation ("KWF"), and his for-profit consulting business, The Key. His son subsequently enrolled in the university and joined the water polo team which he quit after his first semester.

In the fall of 2018, Wilson contacted Singer again, this time inquiring about using the "side door" to improve the college opportunities for his twin daughters. Singer, who was cooperating with law enforcement by that time, explained to Wilson that his daughters could be recruited for the sailing or crew teams at Stanford and Harvard but would not actually have

to participate on either team. Wilson subsequently wired multiple payments in the aggregate of $1.5 million to Singer and his "foundation".

In December, 2018, the Federal Bureau of Investigations ("FBI") interviewed Singer (who was then identified as a confidential human source), during which Singer provided information with respect to the participation of over a dozen parents in his "side door" scheme. As to Wilson specifically, Singer indicated that,

> JOHN WILSON knew that the money was in exchange for JOVAN VAVIC to get his kid in to USC, and that his kid was not actually recruited.

In March, 2019, Special Agent Laura Smith, who was present during the interview of Singer, executed a lengthy affidavit in support of the arrest of Wilson and more than 30 other parents on charges of conspiracy to commit mail fraud and honest services mail fraud in violation of 18 U.S.C. § 1349. The affidavit alleged, <u>inter</u> <u>alia</u>, that, in order for Singer to facilitate the admission of his clients' children into elite universities, he devised a "side door" scheme which involved creating falsified athletic "profiles" of the children and bribing university coaches and athletics administrators to designate the children as purported athletic recruits.

With respect to Wilson specifically, the affidavit asserts that he conspired with Singer 1) to bribe the water polo coach

at USC to designate his son as a recruited USC water polo player in order to ensure his son's admission into that school and 2) to bribe university employees at Stanford and Harvard to secure the admission of his daughters as recruited athletes in those schools.

**A. The Warrant**

In July, 2019, the government applied for and received a warrant to search the email accounts of Wilson and other defendants. Special Agent Smith executed another lengthy affidavit in support of the warrant application which incorporated her prior affidavit.

Both affidavits described in detail various email conversations sent to or from Wilson's email account that discussed the process in which Singer intended to secure the admission of Wilson's children into elite universities. One such email was sent from Wilson's email account in March, 2013, in which he asked Singer, "[w]ould the other kids know [my son] was a bench warmer side door person?" Another cited email from Wilson's account was sent after his son was admitted to USC as a (side door) water polo recruit in which Wilson said to Singer:

> Thanks again for making this happen! Pls give me the invoice. What are the options for the payment? Can we make it for consulting or whatever from the [K]ey so that I can pay it from the corporate account?

Singer replied that Wilson could draft an invoice for business consulting fees and "write [it] off as an expense," to which Wilson responded, "Awesome!"  As detailed in the affidavit, Wilson's company subsequently wired about $220,000 to Singer and his companies.

The affidavit also described emails sent from Wilson's account with respect to the prospective admission of his daughters into Harvard and Stanford through the side door.  For instance, the affidavit cites one email sent from Wilson's account in 2018 in which he provides details of a $500,000 wire transfer from his company account to KWF in support of his arrangement with Singer to secure the admission of one of his daughters into Harvard.

The warrant authorized law enforcement to search all "user-generated data stored" in Wilson's email account between February, 2013, and February, 2019, and to seize "evidence, fruits or instrumentalities" of the charged crimes (18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1346 (honest services fraud), 18 U.S.C. § 1956 et seq. (money laundering) and 26 U.S.C. § 7201 (tax evasion)), including

> [a]ll communications between or among Rick Singer and others discussing college admissions, the payment of bribes . . . the Key Worldwide Foundation, . . . and securing admission for students into college.

Before executing the warrant, the government asked defense counsel to provide

> a list of the names and e-mail addresses of counsel so that [it] can remove potentially privileged materials from our review.

Wilson's defense counsel initially responded by providing the names of attorneys Wilson had retained and, six weeks later, requested the government to add Wilson's wife to the list.

In executing the warrant, the government implemented a calculated protocol to identify materials responsive to the warrant whereby agents instructed the Technology Support Team of the United States Attorney's Office ("Technology Support Team"):

> 1) to upload Wilson's emails to a searchable database;
>
> 2) to segregate any materials outside of the date range identified in the warrant;
>
> 3) to apply search terms to filter out potentially privileged attorney-client communications, using the names and email addresses provided by Wilson;
>
> 4) to segregate emails exchanged exclusively between Wilson and his spouse;
>
> 5) to apply additional search terms to filter-out materials unresponsive to the warrant and capture the responsive emails, such as the names of individuals and entities involved in the charged conspiracy and specific words frequently used by Singer and other co-conspirators during the course of the conspiracy, including "profile" and "recruit;" and
>
> 6) with respect to the marital emails, to use additional search terms to identify explicit email chains and determine which of those chains, if any, had content responsive to the warrant interspersed.

After execution of the warrant, the government had determined that about 76,200 of the approximately 81,700 emails seized were either protected by attorney-client privilege or unresponsive to the warrant.  It therefore produced about 5,500 emails (7% of the total emails received) in accordance with a protective order that it had requested from the Court.  With respect to the marital emails in particular, the government determined that 24 email chains contained explicit content, 19 of which were unresponsive to the warrant.  As to the remaining five, however, it found that interspersed were discussions of the children's athletic and academic performances.  The government produced those five responsive email chains but only after redacting explicit content.

**B. Wilson's Challenge to the Warrant and its Execution**

Wilson asserts that, in procuring and executing the search warrant, the government 1) relied on false statements in an affidavit which were necessary to a finding of probable cause, 2) seized information that exceeded the scope of the search warrant and what was permissible under the Fourth Amendment to the United States Constitution ("Fourth Amendment") and 3) reviewed and retained thousands of private emails between Wilson and his wife that are protected by the marital communication privilege. Accordingly, he requests that the Court a) hold a hearing pursuant to Franks v. Delaware, 438 U.S.

- 7 -

154 (1978) to suppress the fruits of the warrant, b) hold a hearing pursuant to <u>Kastigar</u> v. <u>United States</u>, 406 U.S. 441 (1972) to disqualify prosecutors and/or witnesses who were privy to the spousal emails and c) sever his trial from other defendants.

With respect to the first contention, Wilson avers that two statements contained in the affidavit were both false and necessary to a finding of probable cause:

1) Singer has explained to investigators that . . . WILSON agreed that Singer would provide fabricated information to USC about his son's water polo abilities; and

2) WILSON used [his email] account to communicate with Singer and others about . . . bribe payments.

As for his second and third contentions, Wilson challenges the execution of the warrant on the grounds that, of the thousands of emails retained from Wilson's server, fewer than 200 were communications to, from or copying Singer.  He contends that most of the emails retained are, instead, between Wilson and his wife.  Those private emails purportedly should have been returned to him or destroyed pursuant to the marital communication privilege.  Wilson contends that the failure to do so constitutes an unwarranted invasion of privacy in violation of the reasonableness requirement of the Fourth Amendment.

## II. Discussion

### A. Suppression Based on Statements in the Warrant Affidavit

Fundamentally, a sworn affidavit filed in support of a search warrant is entitled to a presumption of validity. United States v. Rigaud, 684 F.3d 169, 173 (1st Cir. 2012); see also Illinois v. Gates, 462 U.S. 213, 234 (1983) ("[C]ourts should not invalidate . . . warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner." (brackets in original) (internal citation omitted)).  A Franks hearing is warranted, therefore, only when

> the defendant makes a substantial preliminary showing that [(1)] a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit and [(2)] the allegedly false statement is necessary to the finding of probable cause.

Franks, 438 U.S. at 155-56.  Both prongs must be satisfied to warrant a hearing. Rigaud, 684 F.3d at 173; see also United States v. Swanson, 210 F.3d 788, 790 (7th Cir. 2000) ("These elements are hard to prove, and thus Franks hearings are rarely held").

Probable cause exists when, based on the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois, 462 U.S. at 235, 238.  It is a relaxed, practical, non-technical standard that cannot be "reduced to a neat set of

legal rules." Id. at 231-32  ("Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's [probable cause] decision . . . [because] only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause").

The government need not, in its warrant affidavit, establish with certainty that Wilson committed any crime.  It need only establish that there is a fair probability that evidence of the fraudulent college admissions scheme will be found in documents sent to or from Wilson's email account. Notwithstanding the challenged statements, the Court is satisfied that the totality of the circumstances alleged in the affidavits establish such a probability.  Those circumstances include, among others, that:

> 1) dozens of parents, including Wilson, had recently been charged criminally for conspiring with Singer to have their children fraudulently admitted into elite universities;
>
> 2) Singer had pled guilty to, inter alia, conspiracy to commit racketeering, conspiracy to commit money laundering and conspiracy to defraud the United States, all with respect to the fraudulent college admissions scheme;
>
> 3) Wilson had used his email account to communicate with Singer in securing a spot for his son as a "bench warmer side door" water polo recruit at USC and inquiring about a similar "side door" admission for his daughters to Stanford and Harvard;
>
> 4) Wilson agreed, via email, to pay Singer more than $200,000 after securing his son's "side door" admission to

USC and to invoice the payment as "business consulting fees" in order to "write [it] off as an expense;" and

5) Wilson had provided the details of a $500,000 wire transfer from his company to KWF to have Singer secure a side door spot at Harvard for one of his daughters.

Those circumstances, known to the government at the time of the application, clearly raise a fair probability that Wilson's email account would contain evidence of violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1346 (honest services fraud) and/or 26 U.S.C. § 7201 (tax evasion).  See, e.g., United States v. Rosen, 130 F.3d 5, 9 (1st Cir. 1997) ("Section 1341's scope is broad.  It covers deceptive schemes to deprive victims of a wide variety of tangible and intangible property interests."); United States v. Frost, 125 F.3d 346, 367 (6th Cir. 1997) ("Ultimately, a university is a business: in return for tuition money and scholarly effort, it agrees to provide an education and a degree . . . The University of Tennessee therefore has a property right in its unissued degrees.")).

### B. Suppression Based on the Government's Execution of the Warrant

With respect to the warrant itself, Wilson does not challenge its scope as approved by the magistrate but, instead, avers that its execution exceeded that scope and violated the Fourth Amendment.  Wilson submits that blanket suppression is

therefore warranted but, for the reasons that follow, the Court disagrees.

The Fourth Amendment provides that,

> [t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Law enforcement officers must generally secure a warrant supported by probable cause before conducting a search or seizure. United States v. Gifford, 727 F.3d 92, 98 (1st Cir. 2013). Evidence that is improperly obtained generally may not be used at trial. See Mapp v. Ohio, 367 U.S. 643, 655-56 (1961).

That said, the suppression of evidence should be the court's "last resort." Utah v. Strieff, -- U.S. --, 136 S. Ct. 2056 (2016) (quoting Hudson v. Michigan, 547 U.S. 586, 591 (2006)). Evidence should be suppressed only when the government's conduct reflects a "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." United States v. Aboshady, 951 F.3d 1, 5 (1st Cir. 2020) (quoting Davis v. United States, 564 U.S. 229, 238 (2011)). Accordingly,

> [t]he remedy in the case of a seizure that casts its net too broadly is . . . not blanket suppression but partial suppression.

United States v. Falon, 959 F.2d 1143, 1149 (1st Cir. 1992).

Here, the Court finds no reason to impose the extraordinary remedy of blanket suppression with respect to the search and seizure of documents contained within Wilson's email account because Wilson has not shown that the government's conduct reflects a deliberate, reckless or grossly negligent disregard for the Fourth Amendment.  Indeed, in executing the warrant, agents of the government implemented reasonable measures to ensure their compliance with the warrant to the best of their ability.

First, the U.S. Attorney's Office had its Technology Support Team filter out any "user-generated data stored" from Wilson's email account that fell outside of the identified date range.  Second, they used search terms provided by defense counsel to filter out emails covered by the attorney-client privilege.  Third, they used calculated search terms to filter out unresponsive materials and to capture and produce only emails containing "evidence, fruits or instrumentalities" of the charged crimes, such as

> communications between or among Rick Singer and others discussing college admissions, the payment of bribes . . . the Key Worldwide Foundation, . . . and securing admission for students into college.

See Aboshady, 951 F.3d at 5 (upholding the government's search and seizure of over 430,000 emails because, in accordance with the warrant, the government had personnel from the Federal

Bureau of Investigation upload the emails to a searchable database and apply "search terms to filter out potentially privileged communications"); see also Dalia v. United States, 441 U.S. 238, 257 (1979) ("[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant.").

Using such procedures, the government marked over 93% of the emails initially received as unresponsive. As for the remaining 7%, the government limited its production in accordance with the protective order which restricted the disclosure, dissemination and use of the emails. Of the emails produced, at least 550 are "directly and critically relevant" to this case, as conceded by defense counsel. Although, by the count of defense counsel, only 200 emails are communications to, from or copying Singer, many others are responsive to the warrant which did not limit the seizure to emails only involving Singer.

Rather, the authorized the seizure of all communications sent to or from the target email accounts discussing, among other things, college admissions generally and securing the admission of students into college. Such an authorization includes spousal emails discussing the athletic and academic abilities of Wilson's children because they are directly

- 14 -

relevant to the fraudulent college admissions scheme purportedly used to secure the children's admission into elite universities through side door athletic recruitment.

Nonetheless, the government has conceded that, despite its diligent efforts, some of the emails seized are, in fact, unresponsive to the warrant.  To the extent Wilson seeks to exclude those emails from admission as evidence at trial, he may file a motion in limine specifically identifying the purportedly inadmissible emails. See Aboshady, 951 F.3d at 9 (concluding that the proper remedy for an overbroad search of emails is not blanket suppression but, instead, exclusion at trial of those emails specifically identified as outside the scope of the warrant).

### 1.   Marital Communication Privilege

In federal criminal cases, claims of privilege are governed by common law. United States v. Breton, 740 F.3d 1, 9 (1st Cir. 2014).  With respect to the marital relationship, common law recognizes two related but distinct privileges:

> (1) the spousal testimony privilege, which allows one spouse to refuse to testify adversely against the other in criminal or related proceedings; and (2) the marital communications privilege, which permits a defendant to refuse to testify, and allows a defendant to bar his spouse or former spouse from testifying, as to any confidential communications made during their marriage.

Id. at 10 (emphasis added).

Both privileges are testimonial and not constitutional. See Trammel v. United States, 445 U.S. 40, 55 n.12 (1980) ("[No] privilege prevents the Government from enlisting one spouse to give information concerning the other or to aid in the other's apprehension.  It is only the spouse's testimony in the courtroom that is prohibited.").  As a result, the "fruit of the poisonous tree" doctrine is inapplicable. See United States v. Warshak, 631 F.3d 266, 294 (6th Cir. 2010); United States v. Suillacote, 221 F.3d 542 (4th Cir. 2000).  The government's review and retention of spousal emails seized pursuant to a search warrant is, therefore, neither unreasonable nor grounds for blanket suppression pursuant to a motion to suppress.  See Aboshady, 951 F.3d at 6.

Here, the government did not violate the reasonableness requirement of the Fourth Amendment in reviewing and retaining Wilson's spousal emails because the marital communication privilege is a testimonial privilege applicable only at trial. Because the subject spousal emails have not yet been offered as evidence at trial, the government has not misused them. Moreover, the government took reasonable steps to minimize the intrusion into the spousal emails by 1) segregating them, 2) identifying email chains containing explicit content, 3) using search terms to filter out unresponsive materials and

4) redacting explicit content that is interspersed with responsive material before producing them for other defendants.

If Wilson seeks to exclude the contents of those emails at trial, he may do so via a motion in limine. See United States v. Ellefsen, No. 07-cr-5015, 2008 WL 2977347, at *2 (noting that the proper procedure to address the marital communication privilege is a motion in limine and not a motion to suppress). Because no such motion is now before the Court, it will reserve consideration of the admissibility of such emails until a later time.[1]

### C. Disqualifying Prosecutors

No binding law supports either of Wilson's contentions that 1) the government ought to have used a "taint team" to review the spousal communications retrieved from his email account and 2) its failure to do so warrants the disqualification of the prosecutors and witnesses who viewed those emails. See United States v. Kouri-Perez, 992 F. Supp. 551, 512 (D.P.R. 1997) ("[D]isqualificatoin should be a measure of last resort" (internal quotation marks and citation omitted)).  In his argument, Wilson relies on 1) cases involving the attorney-

---

[1] The Court declines at this time to consider whether Wilson's spousal emails are not subject to the marital communication privilege on the grounds that they were either disclosed to third parties and thus not confidential or were sent in furtherance of a crime.

client or work-product privileges which are subject to a different body of case law and 2) a section of a Department of Justice ("DOJ") manual relating to strategies for reviewing privileged computer files.  His reliance on those sources are misplaced.  For one, the manual cautions the government with respect to searching communications between the defendant and his lawyer, physician and clergyman but not his spouse.  Second, DOJ regulations provide that courts may not suppress or exclude evidence on the grounds that a search was violative of its policies. See 28 C.F.R. § 59.6.

In any event, the "Kastigar analysis is not triggered by the existence of [mere] evidence protected by a privilege" but, instead, by governmental conduct compelling a witness to testify over his or her claim of privilege. United States v. Suillacote, 221 F.3d 542, 559 (4th Cir. 2000); see also United States v. Warshak, 631 F.3d 266, 294 (6th Cir. 2010) ("[A]bsent compelled testimony, the full protections of Kastigar are inapplicable").  Thus, here, because no testimony has been compelled with respect to Wilson or his wife, there is no reason to hold a hearing pursuant to Kastigar as to whether to disqualify prosecutors and witnesses.

That the prosecutors were able to obtain, pursuant to a valid warrant, evidence that is "directly and critically relevant to Mr. Wilson's trial" and purportedly implicates him

in a crime is no reason to disqualify the attendant prosecutors. Wilson cannot rely upon the marital communication privilege to inhibit this Court's truth-finding function by invoking a testimonial privilege in a motion to suppress. Breton, 740 F.3d at 11 ("[T]he marital privileges hamper the truth-seeking process and must be interpreted narrowly.").

### D. Severing Wilson's Trial

Finally, with respect to Wilson's request that the Court sever his trial, this Court has already denied his first motion to sever in July, 2020 (Docket No. 1438) on the grounds that Wilson failed to identify a specific trial right that would be compromised by a joint trial or show that he would be unfairly prejudiced by evidence introduced against his co-conspirators. The Court finds that Wilson has, again, failed to make such a showing. See United States v. Silvestri, 790 F.2d 186, 188 (1st Cir. 1986) (holding that to prevail on a motion to sever, a defendant must make a strong showing of prejudice).  Wilson's only argument in support of severance is that his co-defendants received access to his personal emails but he has failed to show how his co-defendants could use those emails in a way that would deprive him of a fair trial.  The Court is unpersuaded but is mindful that current restrictions on the number of criminal defendants who can be tried together may yet present alternative grounds for severance.

In any event, the production of documents from Wilson's email account is subject to a protective order to minimize the dissemination of his personal information. Furthermore, before producing Wilson's spousal communications to his co-defendants, the government redacted any explicit content contained therein. To the extent that any potential prejudicial spillover may yet occur, the Court will consider appropriate limiting instructions to the jury.

**ORDER**

For the foregoing reasons, Wilson's motion for relief (part, but not all, of Docket No. 1437) is **DENIED**.

**So ordered.**

\s\ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated November 25, 2020