**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>GREGORY COLBURN, et al.,<br><br>　　　　　　Defendants. | Case No. 1:19-cr-10080-NMG<br><br>*Motion for leave to file excess pages and partially under seal granted on July 29, 2021 (ECF No. 1980)* |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE TO REQUIRE THE GOVERNMENT TO PROFFER ITS CORROBORATING EVIDENCE OF THE ALLEGED CONSPIRACY UNDER *PETROZZIELLO*__**

By the Defendants' count, 514 of the 643 items on the government's exhibit list are either e-mails, text messages, letters, transcribed voicemails, or recorded telephone calls. *See* ECF No. 1928, Government's Initial Exhibit List (filed under seal). Every one of these exhibits is hearsay: the declarants whose statements they contain did not make those statements "while testifying at the current trial or hearing," Fed. R. Evid. 801(c)(1), and it's a sure bet that the government intends to submit them "to prove the truth of the matter[s] asserted in the statement[s]" they contain. Fed. R. Evid. 801(c)(2).

The government will undoubtedly try to justify the admission of many of these exhibits by invoking the "coconspirator" exclusion to the hearsay rule. It is equally likely to rely on the exclusion to enable witnesses, such as William "Rick" Singer, to relate out-of-court statements made by or to them. The coconspirator exclusion provides that a statement is not hearsay—even if it was made out of court, and even if it is submitted for its truth—if it is offered against an opposing party and was made by that party's coconspirator, and if the declarant made the statement

1

both during and in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E). *See generally United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977).

The path to admission under Rule 801(d)(2)(E), however, is fraught with potential error. Under the circumstances, the government could use the coconspirator exclusion only by showing that each declarant, and each opposing party against whom that declarant's statements are offered, belonged to the conspiracy alleged in the indictment—a single "overarching" conspiracy spanning seven years and involving more than 150 people, more than 100 of them clients of Rick Singer. Not one of the out-of-court statements at issue, however, is itself probative of such a broad scheme. The proposed exhibits themselves do not suggest that any of Singer's clients entered into arrangements more extensive than their own transactions with Singer and his associates. The government's ability to carry its threshold burden with non-hearsay evidence, meanwhile, is doubtful to say the least. *See United States v. Portela*, 167 F.3d 687, 703 (1st Cir. 1999) (*Petrozziello* determination must rest at least in part on corroborating evidence beyond that contained in the statements at issue).

In an ordinary case, the Court might properly admit Rule 801(d)(2)(E) evidence on a conditional basis, subject to a true-up at the close of evidence. *Id.* at 702-03. But this is no ordinary case. The government's single-conspiracy theory is so tenuous, and so likely to generate a mistrial if the statements at issue are even provisionally admitted, that the better course—which the Court has complete discretion to follow—is to put the government's supporting evidence to the immediate test by detailed, pre-trial proffer.

## BACKGROUND

**1.     The Alleged Conspiracy.**

The Fourth Superseding Indictment alleges that all of the Defendants were members of a single conspiracy. ECF No. 732 at ¶ 64. In the government's description, this "single" conspiracy effectuated an "overarching" scheme "to secure admission of [the Defendants'] children to elite colleges through bribery and deception." ECF No. 1170 at 3; *see also* ECF No. 867 at 1 ("[t]he defendants are charged with engaging in a *single* scheme, as part of a *single* conspiracy to use various forms of fraud to facilitate their children's admission to college") (emphasis in original). Rick Singer was the center of the alleged conspiracy, but according to the government its population was comparable to that of a small town. The government's automatic discovery identified, by name or by reference, no fewer than 156 "known … co-conspirators" to "the conspiracies charged in the indictment…." Ex. A, Government's Automatic Discovery (May 30, 2019) at 3-7.

The alleged members of this sprawling conspiracy can be sorted into 5 groups:

1.      At the center, Rick Singer and the entities through which he did business, the Key Worldwide Foundation and The Edge College & Career Network.

2.      Two employees of those entities, Steven Masera and Mikaela Sanford.

3.      Twenty-seven of Singer's alleged confederates, who worked as college coaches and university administrators, or as employees of entities that administered standardized college entrance exams or that coached students for those exams. These accomplices allegedly facilitated the scheme by advocating for admission of college applicants to particular schools, or by enabling students to cheat on standardized tests.

4. No fewer than 110 of Singer's clients, all parents of prospective college students. This group includes the four undersigned Defendants, who will be tried in September; three Defendants in this case whose trial is scheduled for next January; eleven other parents who were also charged in this Indictment; and another fourteen who were charged in other prosecutions in this District. The remaining seventy-eight alleged "client-conspirators" have not, to the Defendants' knowledge, ever been charged with crimes relating to their dealings with Singer.

5. At least 16 children of Singer's clients.

*See generally* ECF No. 732; Ex. A at 3-7.

**2. Defendants' Challenge to the Conspiracy Allegation.**

According to the government, all of the indicted and unindicted conspirators joined a "hub-and-spoke" conspiracy. Until he began to cooperate with the government in September 2018, Rick Singer was the hub, with his employees and confederates clustered in close orbit and assisting him on the "sell" side of his client transactions. Radiating from the hub were more than a hundred spokes, and at the end of each spoke was an individual client (or a married couple) who acted exclusively on the "buy" side of those transactions—i.e., "who made payments to Singer's entities, … or otherwise worked with Singer…." Ex. A at 4.

When they moved to dismiss the Indictment, the Defendants explained that the Indictment was insufficient to sustain charges based on the government's single-conspiracy theory. The Supreme Court long ago held that a hub and a group of spokes make up only a "rimless wheel" unless the government proves that the person at the end of each spoke intentionally joined an overlapping, interdependent arrangement for a common purpose. Absent such proof, each

4

relationship between the hub and an individual spoke is, at most, a separate conspiracy.[1] A multiplicity of independent connections (even to a common hub), when made for a variety of individual purposes, cannot constitute a "single" conspiracy. *See* ECF No. 1032, citing *Kotteakos v. United States*, 328 U.S. 750, 772 (1946).

In *Kotteakos*, moreover, the Supreme Court held that it was reversible error to convict on a single-conspiracy charge when the evidence at best might prove multiple conspiracies. Whether such error is treated as a variance between indictment and evidence, or as the misjoinder of defendants on distinct charges, *id.* at 774, it is inherently prejudicial. The "sheer difference in numbers, both of defendants and conspiracies proven," distinguished *Kotteakos* from a previous case in which one conspiracy was charged and "only two conspiracies invoving four persons all told were proved." *Id.* at 766. Where larger numbers of defendants and transactions are involved, "the burden of defense to a defendant, connected with one or a few of so many distinct transactions, is vastly different not only in preparation for trial, but also in looking out for and securing safeguard against evidence affecting other defendants, to prevent its transference as 'harmless error' or by psychological effect, in spite of instructions for keeping separate transactions separate." *Id.* 767.

In terms of "sheer … numbers," this case exceeds even *Kotteakos*. That case involved no more than 36 potential conspirators, *id.* at 769, and there was sufficient evidence of overlap, interdependence, and common purpose to enable the Supreme Court to group them into as few as eight conspiracies. *Id.* at 752. Here, on the other hand, the government claims that more than 100 clients transacted separately with Singer, each for the decidedly uncommon purpose of facilitating his or her own child's college admission. If the government fails to tie Singer's clients into the

---

[1] And not even that if, as here, the person at the end of the spoke merely purchased products or services from the hub. *See, e.g., United States v. Moran*, 984 F.2d 1299, 1302 (1st Cir. 1993) ("a mere buyer-seller relationship, without more, is inadequate" to establish a conspiracy).

5

single conspiracy alleged by the Indictment, then the evidence would (at most) prove dozens of distinct "conspiracies," producing a variance and misjoinder that could not possibly survive harmful-error analysis under the principles announced in *Kotteakos*.

The government's response to the motion to dismiss was, in effect, a promise to prove the single-conspiracy allegation to a jury. ECF No. 1170 at 3-12. The Court took the government at its word, and deferred the matter to trial.

## ARGUMENT

The "single conspiracy" issue should no longer be deferred. Proof of the conspiracy alleged in the Indictment is a condition for the admission of evidence under Rule 801(d)(2)(E), and given the size and scope of the alleged conspiracy, the Court should require the government to tender its proof at the outset, rather than granting conditional admission subject to the presentation of corroborating evidence during trial, a course that under the circumstances will incur the significant risk of a mistrial.

### I. The Government will have to rely on Rule 801(d)(2)(E) to admit the vast majority of its identified exhibits.

Although the government has yet to articulate a basis for admitting either (1) any of the out-of-court statements in its proposed exhibits, or (2) any out-of-court statements that may be related at trial by its witnesses, the coconspirator exclusion will almost certainly occupy a position of central evidentiary importance at trial. Rule 801(d)(2)(E) must, for example, be the purported basis for admitting most (if not all) of the designated exhibits in which the declarant is not a Defendant, but is an alleged member of the same "single" conspiracy that the Defendants supposedly joined—i.e., when the declarant is Rick Singer himself, one of his employees, one of his alleged college-based or test-service-based confederates, or one of his 100-plus other putative "client-conspirators."

As long as such exhibits and testimony are offered for the truth of the out-of-court statements they contain—and there is no other apparent purpose for offering them—they will be hearsay unless they qualify for one of the exclusions listed in Rule 801, and thus inadmissible unless they satisfy one of the exceptions enumerated in Rules 803 and 804. Since the government is unlikely to be able to rely on any of those provisions other than Rule 801(d)(2)(E), the coconspirator exclusion in Rule 801(d)(2)(E) will be its only option.

Rule 801(d)(2)(E) is likely to come into play even when the government tries to introduce exhibits or testimony that reflect out-of-court statements made by the Defendants themselves. True, a document that contains, for example, an out-of-court statement by Mrs. Kimmel, could be submitted under the party-opponent exclusion of Rule 801(d)(2)(A). That exclusion will apply, however, only insofar as the document is offered against Mrs. Kimmel herself. Fed. R. Evid. 801(d)(2).

The government, meanwhile, says that "virtually all the evidence [it] introduces" will be "independently admissible against *each* of the defendants." ECF No. 1136 at 5 (emphasis added). Mrs. Kimmel's hypothetical out-of-court statement might be admissible against *her* under Rule 801(d)(2)(A), but it could not be offered against "each of the defendants" under that exclusion. The only feasible way to introduce such evidence against the other defendants would be to invoke Rule 801(d)(2)(E), and to prove both that Mrs. Kimmel and the other defendants were "coconspirators," and that the statement was made in furtherance of their conspiracy.

**II.    The Government will have to show the "overarching" conspiracy alleged in the Indictment.**

Whenever it invokes Rule 801(d)(2)(E) to justify the admission of an out-of-court statement against "each of the defendants," the government will have to show that the declarant

and the Defendants were coconspirators in the single, overarching, 150-plus-member conspiracy alleged in the Indictment.

To be sure, under some circumstances, "the conspiracy to which Rule 801(d)(2)(E) refers need not be the identical conspiracy alleged in the indictment." *United States v. Gotti*, 644 F. Supp. 370, 374 (S.D.N.Y. 1986). But this workaround will not be available to the government here. The government cannot credibly argue that, for example, Rick Singer's statements to John Wilson are admissible under Rule 801(d)(2)(E) because Singer and Mr. Wilson were coconspirators in a narrow conspiracy of their own. A Singer-Wilson conspiracy theory would necessarily exclude Singer's other clients, including the other Defendants. Statements allegedly made in furtherance of a Singer-Wilson conspiracy could therefore be offered only against one of its members—in this hypothetical case, only against Mr. Wilson. Invoking Rule 801(d)(2)(E) on the basis of anything narrower than the conspiracy alleged in the Indictment would therefore defeat the government's stated intention to introduce "virtually all" of its evidence against "each of the defendants." ECF No. 1136 at 5.

The government cannot have it both ways. Each Defendant's interactions with Singer had a single, uncommon objective: the particular admissions prospects, at a particular school, of that particular Defendant's child. Those individualized interactions are each Defendant's only connection to the broad conspiracy alleged in the Indictment; they are the spokes that link each Defendant to the putative hub. If the government claims for evidentiary purposes that, for example, Singer's hypothetical statement to Mr. Wilson was actually made in furtherance of a narrow Singer-Wilson conspiracy, it will effectively concede that the statement was *not* made in furtherance of the "overarching" conspiracy alleged in the Indictment, simultaneously undermining an essential element of the government's case and refuting its own argument for

8

joinder. *See* ECF No. 867 (arguing that defendants can properly be tried together because they "are charged with engaging in a *single* scheme, as part of a *single* conspiracy," making the evidence relating to any one conspirator "independently admissible" in the prosecution's case against "each of them"). Apply a narrow-conspiracy rationale to every statement Singer made to each of the Defendants, and the government's case will collapse into its own foundation.

### III.     The Government has yet to identify evidence of a single, overarching conspiracy.

To substantiate its single-conspiracy theory, the government must do more than show that Singer had a number of clients or that he provided his services with the assistance of a repertory company of alleged accomplices; it must demonstrate that each of the Defendants, and each declarant whose out-of-court statements the government tries to introduce under the coconspirator exclusion, *agreed* to participate in the overarching conspiracy described in the Indictment. *United States v. Morrow*, 39 F.3d 1228, 1234 (1st Cir. 1994).[2]

The relevant considerations for determining whether the alleged conspirators constituted a "multiplicity of actors united to accomplish the same crime," *Portela*, 167 F.3d at 695, include: (1) the extent to which they shared a "common goal," (2) the degree of "overlap" among the participants, and (3) the level of "interdependence" among them, in the sense that the activities of some were "necessary or advantageous to the success" of others. *Id.* at 695. With respect to this last element, "[e]ach individual must *think* the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key." *Id.* (emphasis added).

---

[2] In *Morrow*, the First Circuit warned that "[t]he law of conspiracy is fraught with difficulties," and that "perhaps no aspect is more confusing than 'the scope to be accorded to a combination, *i.e.*, the singleness or multiplicities of the conspiratorial relationships….'" 39 F.3d at 1234 (citation omitted). The First Circuit laid much of the responsibility for this confusion on "the verbal ambiguity which leads courts [sometimes] to deal with the crime of conspiracy as though it were a group rather than an act [*i.e.*, of agreement]." *Id.* (citation omitted, brackets in original). The "agreement" is properly the "core concept in conspiracy," and to emphasize it "implies that 'scope' is to be resolved by asking what the defendant agreed to do, or at least knew to be likely." *Id.*

For present, evidentiary purposes, the government has to prove its conspiracy theory by a preponderance of the evidence. *Petrozziello*, 548 F.2d at 23. In doing so, it may refer to the hearsay statements themselves, but it cannot rely on them exclusively: "a coconspirator's statement, standing alone, is insufficient to meet the preponderance standard of Rule 801(d)(2)(E)." *United States v. Sepulveda*, 15 F.3d 1161, 1182 (1st Cir. 1993). A valid *Petrozziello* determination must "rest at least in part on corroborating evidence beyond that contained in the statements at issue." *Portela*, 167 F.3d at 703.

The proposed exhibits strongly suggest that the government will be unable to carry its Rule 801(d)(2)(E) burden. They lack any hint that Singer's clients shared a "common goal"—i.e., evidence that any two Singer clients, much less all of them, agreed with each other to do anything "to facilitate *their* children's admission to college." ECF No. 867 at 1 (emphasis added). To the contrary, the proposed exhibits uniformly (and predictably) indicate that each of Singer's clients acted only for a purely personal purpose: to facilitate his or her *own* child's college admission. There is likewise nothing in the exhibits themselves to suggest that Singer's clients (including the Defendants) were interdependent in the sense that, e.g., Mr. Abdelaziz's transactions with Singer in 2017 over his child's admission to USC were in any way "necessary or advantageous to the success" of Mrs. Kimmel's daughter's application to Georgetown University in 2013, or Mr. Wilson's daughter's application to Stanford University several years later. ECF No. 732 at ¶¶ 68-86.

The exhibits at issue, finally, also do not show the sort of "overlap" that the law requires. Singer's presence on the "sell" side of every client transaction is inadequate to establish an overarching conspiracy, in exactly the same way that Simon Brown's role as the "common and

key figure in all of the transactions proven" in *Kotteakos* was incapable of sustaining conviction on a single-conspiracy charge. 328 U.S. at 753.

The proposed exhibits also show no relevant overlap on the "buy" side of the transactions. None of them indicate the sorts of cooperation, coordination, or assistance between Singer's clients that might enmesh them as coconspirators—they reflect nothing more than the occasional referral of one client to another, which is insufficient as a matter of law to establish the existence of a single, overarching conspiracy. *See United States v. Lekacos*, 151 F.2d 170, 172 (2d Cir. 1945) (evidence failed to establish single conspiracy alleged in indictment even though one client introduced another to the "hub," and two clients later "acted as intermediaries' between the hub and other clients), *rev'd on other grounds sub nom. Kotteakos v. United States*, 328 U.S. 750 (1946).

Because the exhibits themselves are devoid of useful evidence, the "corroborating" non-hearsay evidence required by the First Circuit, *Portela*, 167 F.3d at 703, will have to carry the government's entire burden under Rule 801(d)(2)(E). The government, of course, has not yet identified any such evidence. Rick Singer might testify to his individual interactions with his various clients, but his testimony will only emphasize the compartmentalized nature of those transactions, and will not provide the necessary proof of common purpose, overlap, or interdependence. Singer's employees and confederates may likewise be able to describe the roles they played in connection with specific transactions, but they will not be able to draw the connections between those transactions, or between the "buy" side participants in them, that is needed to establish a single conspiracy.

The only alleged client-conspirators on the government's witness list are Bruce and Davina Isackson, a married couple who pleaded guilty in a related case to charges arising out of deals they

11

made with Singer to misrepresent two of their children as athletes and to alter one child's standardized test scores. ECF No. 320, *United States v. Isackson, et al.*, No. 19-cr-10115-PBS (D. Mass. May 1, 2019).

The evidence that the government disclosed about the Isacksons, however, adds nothing to the analysis. Like all of Singer's clients, they allegedly acted for the personal purpose of getting their own children into college. The Isacksons apparently knew another Singer client, Liz Henriquez, and may have been referred to Singer by Mrs. Henriquez, but Mrs. Isackson told the FBI that she knew nothing about the nature of Mrs. Henriquez's dealings with Singer. Ex. B, FBI Form 302 at 1 (May 15, 2019) ("LIZ never told ISACKSON that she did anything related to the scheme with SINGER."). This hardly suggests that Mrs. Isackson conspired with Mrs. Henriquez, much less with the Defendants or with any of Singer's other alleged client-conspirators.[3]

## IV. The Court should not conditionally admit hearsay offered under Rule 801(d)(2)(E).

Given these deficiencies on the face of the exhibits the government has represented that it intends to introduce at trial, the Court should require the government to proffer its corroborating non-hearsay evidence *before* it allows any alleged coconspirator statements to be put before the jury. The more "usual course of action" in this circuit may be to admit hearsay evidence provisionally, subject to a *Petrozziello* determination at the close of evidence, *United States v. Baltas*, 236 F.3d 27, 35 (1st Cir. 2001), but this is, again, not the "usual" case, and in any event the provisional-admission approach is not a fixed requirement.

---

[3] The Isacksons' only other connection to another Singer client is laughably irrelevant. According to Mrs. Isackson's FBI interview, one of her daughters went to the same school as ▆▆▆▆▆▆ whose parents were identified as co-conspirators, though not, to the Defendants' knowledge, ever charged with a crime. *See* Ex. A at 5; Ex. B at 2. But neither of the Isacksons ever even spoke to the ▆▆▆▆ about Singer. In fact, according to Mrs. Isackson, the two couples "did not really talk at all," although the Isacksons "▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆" and thus "▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆" Ex. B at 2.

When and how to put the government to the *Petrozziello* test, rather, "is a matter solely within the discretion of the district court." *United States v. Medina*, 761 F.2d 12, 17 (1985). The district court "*may* conditionally admit" a declaration offered under Rule 801(d)(2)(E), *United States v. Ciampaglia*, 628 F.2d 632, 635 (1st Cir. 1985) (emphasis added), but it retains the option to demand the government's proof in a way that enables the court to make an informed "pretrial determination" about the admissibility of the proffered statements. *United States v. Isabel*, 945 F.2d 1193, 1199 (1st Cir. 1991).

This discretion is afforded with good reason. As the First Circuit recognized in *Petrozziello*, the "usual" course of action creates the "danger that hearsay will be admitted in anticipation of a later showing of conspiracy that never materializes." *Petrozziello*, 548 F.2d at 23 n.3. If the government ultimately fails to "connect up" an out-of-court statement to a proven conspiracy, *Baltas* 236 F.3d at 34, quoting *United States v. James*, 590 F.2d 575, 582 (5th Cir. 1979), a cautionary instruction will be needed at the very least; and where a cautionary instruction is unlikely to obviate the risk of prejudice, the trial court may have no choice but to grant a mistrial. *United States v. Bernal*, 884 F.2d 1518, 1522 (1st Cir. 1989).

Given the "inevitable serious waste of time, energy and efficiency" that a mistrial creates, *James*, 590 F.2d at 582, several federal circuits have expressed a preference for pre-trial, or least early-trial, examination of the government's ability to carry its burden under Rule 801(d)(2)(E). Thus, the Fifth and Eighth Circuits have opted for a "preferred order of proof" in which the "district court should, whenever reasonably practicable, require the showing of a conspiracy and of the connection of the defendant with it before admitting declarations of a coconspirator." *Id.; see also United States v. Macklin*, 573 F.2d 1046, 1049 n.3 (8th Cir. 1978) ("it is preferable whenever possible that the government's independent proof of the conspiracy be introduced first, thereby

13

avoiding the danger[] recognized in *Petrozziello*"). The Seventh Circuit has likewise "directed that district courts make a ruling on the admissibility of a co-conspirator's statements pursuant to Rule 104(a) before they are admitted at trial." *United States v. Stephenson*, 53 F.3d 836, 842 (7th Cir. 1995), citing *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978). In the Seventh Circuit, the standard practice is a pre-trial proceeding known as a "*Santiago* hearing," *United States v. Williams*, 798 F.2d 1024, 1027 (7th Cir. 1986), or a "*Santiago* proffer," *United States v. Lillie*, 2009 WL 1406668, at *5 (N.D. Ill. May 15, 2009), depending on whether the district court opts for an oral or written demonstration of the government's proof.

Using the discretion granted to them by the First Circuit, trial courts here have acted flexibly to fit their procedures to the circumstances. Most often, to be sure, they take the conditional-admission route, which is admittedly less "time-consuming." *Petrozziello*, 548 F.2d at 23, n.3. But not always. Sometimes, as in *Petrozziello* itself, they require the government to put on its corroborating non-hearsay evidence at the outset of the trial, a format that the First Circuit noted with approval for its "meticulous" nature. *Id.* In still other cases, they have followed the Seventh Circuit and required a pre-trial proffer, made either in court or in writing. *Bernal*, 884 F.2d at 1522 (approving trial court's decision to require the prosecution to make an oral offer of proof before the trial began); *see also United States v. MacKenzie*, ECF No. 274 & accompanying electronic clerk's notes, Case No. 01-cr-10350 (D. Mass.) (Woodlock, J.) (following the "*Santiago* [i.e., Seventh Circuit] methodology").[4]

---

[4]   In *MacKenzie*, Judge Woodlock first noted that he would "consider requiring the Government to submit a proffer memorandum (per the *Santiago* methodology)." ECF No. 274, No. 01-cr-10350 (D. Mass. Oct. 16, 2003) (scheduling order dated October 16, 2003). He later ordered the government to file, before trial, a memorandum that included the "information which would be set forth at a *Petrozziello* hearing." *Id.* (no docket number, electronic clerk's notes for status conference held on November 20, 2003). The government complied and provided the Court with a lengthy written proffer. ECF No. 298, No. 01-cr-10350 (D. Mass. Dec. 11, 2003).

The procedures used in *Bernal* and *MacKenzie* are best suited to the circumstances of this case. The out-of-court statements themselves do nothing to substantiate the government's single-conspiracy theory, and the risks posed by their conditional admission are too great. If corroborating non-hearsay evidence does not materialize, and the government fails to prove the alleged single conspiracy at the evidentiary stage (where the standard is merely a preponderance of the evidence, and the weight of the out-of-court statements can be added to the balance), then what hope can the prosecution have of proving the same conspiracy beyond a reasonable doubt to the jury, after the hearsay statements have been removed from the equation? At that point, the government's only plausible hope of conviction would be a cautionary instruction that doesn't stick and a verdict founded on a misunderstanding of the scope of the admitted evidence. To obviate that unacceptable risk, the Court's only option would be to grant a mistrial.

## CONCLUSION

The "inevitable serious waste of time, energy and efficiency" that will be engendered by a mistrial can be avoided here by a simple expedient that is fully within the Court's discretion. The Defendants therefore ask the Court to require the government, by proffer, to detail forthwith its corroborating non-hearsay evidence, as required under *Petrozziello*, and to demonstrate before trial both (1) how it intends to satisfy its burden of proving the single conspiracy alleged in the Indictment, and (2) how it intends to show that the out-of-court statements in its proposed exhibits, and any similar statements that may be related at trial by its witnesses, were made in furtherance of that conspiracy.

Respectfully submitted,

*/s/ Cory S. Flashner*
R. Robert Popeo (BBO # 403360)
Mark E. Robinson (BBO # 423080)
Eóin P. Beirne (BBO # 660885)
Cory S. Flashner (BBO # 629205)
MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1605 (telephone)
(617) 542-2241 (fax)
rpopeo@mintz.com
mrobinson@mintz.com
ebeirne@mintz.com
csflashner@mintz.com

*Counsel for Elisabeth Kimmel*


*/s/ Brian T. Kelly*
Brian T. Kelly (BBO No. 549566)
Joshua C. Sharp (BBO No. 681439)
Lauren M. Maynard (BBO No. 698742)
NIXON PEABODY LLP
53 State Street
Boston, MA 02109
617-345-1000
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com
lmaynard@nixonpeabody.com

*Counsel for Gamal Abdelaziz*


DATED: July 30, 2021

*/s/ Michael Kendall*
Michael Kendall (BBO # 544866)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com

Andrew E. Tomback (*pro hac vice*)
MCLAUGHLIN & STERN
260 Madison Avenue
New York, NY 10016

*Counsel for John Wilson*

*/s/ Michael K. Loucks*
Michael K. Loucks (BBO #305520)
SKADDEN, ARPS, SLATE, MEAGHER &
  FLOM LLP
500 Boylston Street
Boston, MA 02116
(617) 573-4800
michael.loucks@skadden.com

Jack P. DiCanio (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
  FLOM LLP
525 University Avenue
Palo Alto, CA 94301
(650) 470-4500
jack.dicanio@skadden.com

*Counsel for Defendant Marci Palatella*

**RULE 7.1 CERTIFICATION**

Undersigned counsel certifies that, on July 28, 2021, counsel for Elisabeth Kimmel conferred with counsel for the government, and the government does not assent to the Motion.

**CERTIFICATE OF SERVICE**

I, Cory S. Flashner, counsel for Elisabeth Kimmel, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF, and paper copies will be sent to those indicated as non-registered participants.

*/s/ Cory S. Flashner*