UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG |
| | ) | |
| ELISABETH KIMMEL *et al.*, | ) | **LEAVE TO FILE EXCESS PAGES AND** |
| | ) | **UNDER SEAL GRANTED [DKT. 1976,** |
| | ) | **1984]** |
| Defendants | ) | |

### GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE IRRELEVANT EVIDENCE CONCERNING UNCHARGED THIRD PARTIES

The government moves *in limine* to preclude the defendants from introducing hundreds of documents regarding uncharged third parties, including other applicants to the University of Southern California ("USC") and Georgetown University and their relatives, who had no known involvement with William "Rick" Singer or any of the defendants.  Such evidence is both voluminous and irrelevant to this case, and its introduction will do no more than waste time, confuse the issues, and distract the jury from the conspiracy charged.

The remaining side-door defendants are charged with conspiring with others, including Singer, to fraudulently secure their children's admission to college as recruited athletes.[1]  In support of its case, the government has marked fewer than 650 exhibits.  Dkt. 1926.[2]  The defendants, by contrast, have marked close to *four* times as many exhibits – nearly 2,500 – with defendant Wilson alone marking more than 1,100.  Dkts. 1953, 1954, 1956, 1958.  Only a tiny fraction of the defendants' proposed exhibits – approximately 10 percent – relate to the defendants, their children, or the charged conspiracy.  The remainder – a collection of newspaper clippings,

---

[1] The Indictment also alleges that defendant Palatella engaged in the test-cheating portion of the scheme.  *See* FSI ¶¶ 210–18.

[2] Some of these exhibits relate to defendant Homayoun Zadeh, who pled guilty after the government filed its initial exhibit list.

LinkedIn profiles, emails, and other documents – relate principally to *other* applicants to USC and Georgetown who have nothing to do with this case, as well as the philanthropic histories of their parents and other relatives, and the expectations of university development officials concerning their philanthropic potential.[3]

The Court should exclude this evidence for at least three reasons.  <u>First</u>, it is irrelevant to the charges and any cognizable defenses.  Evidence concerning third parties who were *not* part of the charged conspiracy has no bearing on whether these defendants joined a conspiracy with Singer and others to defraud USC and Georgetown.  <u>Second</u>, even if the evidence had any probative value at all, it would be vastly outweighed by the prejudice and confusion that would be caused by engaging in a series of extended mini-trials – based on misleading snippets and out-of-context quotes from emails and other documents – concerning applicants who have no relationship to this case or these defendants.  <u>Third</u>, even if the evidence were relevant and probative, it consists almost entirely of inadmissible hearsay.

## I.      <u>RELEVANT BACKGROUND</u>

### A.      <u>The Defendants</u>

The defendants are charged with, among other things, conspiring with Singer and others to commit fraud and honest services fraud by falsely presenting their children to university admissions departments as recruitable athletes, and using *quid pro quo* payments styled as charitable donations to induce athletic department officials to facilitate their children's admission as recruited athletes.  FSI ¶ 66.  The defendants' deceptive acts were a central feature of the charged conspiracy.  For example:

---

[3] Some of the defendants' proposed exhibits relate to other clients of Singer who have not been charged or identified by the government as unindicted co-conspirators.  For all of the reasons described herein, this evidence also is not relevant.

- Defendant Elisabeth Kimmel paid Singer $275,000 to secure her daughter's admission to Georgetown as a recruited tennis player – a sport she did not play competitively – and asked Singer whether to instruct her to "avoid discussing field hockey" (a sport she actually did play) during an admissions interview because it would "raise red flags."  FSI ¶¶ 167–68. Kimmel paid Singer an additional $250,000 to secure her son's admission to USC as a track and field recruit – a sport he did not play at all.  Once Kimmel's son was admitted, based on an athletic profile that contained a photograph of someone else, Kimmel worried that his USC academic advisor would "start poking around" and discover her fraud.  *Id.* at ¶ 181.

- Defendant Gamal Abdelaziz paid Singer $300,000 to facilitate his daughter's admission to USC as a purported basketball recruit, and approved the submission of an application falsely presenting her as a highly accomplished basketball player, including an athletic profile Singer prepared containing false accolades and a photograph of someone else.  *Id.* at ¶ 117; Dkt. 3-3 at ¶ 185.  In reality, Abdelaziz's daughter failed even to qualify for her high school's varsity basketball team.  Once she was admitted to USC as a recruited basketball player, Abdelaziz agreed with Singer to falsely claim that she had suffered an injury that rendered her unable to play.  FSI ¶ 122.

- Defendant Marci Palatella paid Singer $500,000 to secure her son's admission to USC as a purported football recruit and sent Singer pictures for her son's fraudulent athletic profile, while admitting to Singer that her son was "not the team's star" on his high school's junior varsity team and had "gotten the message that he is not big enough for college football." Dkt. 3-4 at ¶ 342.

- Defendant John Wilson paid Singer $220,000 to secure his son's admission to USC as a water polo recruit based on credentials Singer told him would be "embellish[ed]" at the request of the team's corrupt coach.  FSI ¶ 229.  Wilson later paid Singer an additional $1 million to secure the admission of his twin daughters to Harvard and Stanford as fake athletes, after Singer told him they could not both be recruited to Stanford because the sailing coach "has to actually recruit some real sailors so that Stanford doesn't . . . catch on."  Dkt. 3-4 at ¶ 308; FSI ¶¶ 243–44.

### B.   Other Applicants

Confronted with these allegations, the defendants have marked hundreds of exhibits concerning dozens of *other* applicants to USC and Georgetown who have nothing to do with the charged conspiracy.  For example, Kimmel has marked dozens of emails, sent years *after* her daughter was admitted to Georgetown as a fake tennis recruit, about *other* potential tennis recruits. The emails are principally between corrupt former Georgetown coach Gordon Ernst and members of the Georgetown development office and/or admissions department.  Many include snippets

3

referencing "supportive parents," "development opportunities," or other references to money.[4]  As examples:



The defendants have likewise marked voluminous exhibits about USC applicants and their parents who have nothing to do with the charged conspiracy.  These exhibits include more than two dozen "packets" of athletic and academic credentials presented to the USC subcommittee for athletic admissions, as well as high-school recruiting profiles and hundreds of emails among parents, coaches, athletics and development officials, admissions employees, and others about those applicants.  Pursuant to this Court's Order, *see* Dkt. 1067, these materials have been redacted to substitute letters and numbers for the names of the students and their parents, who have not been charged in this case.[5]

---

[4] Attachment 1 to this motion provides an index matching the defendants' exhibit numbers cited in this motion to lettered exhibits filed under seal.  *See, e.g.*, Exs. 3330, 3331, 3334, 3366, 3370, 3372, 3374, 3375, 3378, 3379, 3380, 3381, 3382, 3386, 3387, 3393, 3400, 3406, 3407, 3409, 3410, 3411, 3415, 3419, 3420, 3445, 3450, 3471, 3472.

[5] Notwithstanding the redactions, the government notes that it may be possible to identify the students and their parents based on biographical information in the exhibits, including where they attended high school, what sports they played, teams they were on, accolades they earned, the date they were admitted to USC, and other information.  *See, e.g.*, Exs. 7202 (USC subcommittee

The exhibits the defendants have marked include numerous examples suggesting that athletics department officials – including Donna Heinel, the corrupt administrator who secured the admission of Kimmel's, Palatella's, and Abdelaziz's children, and Jovan Vavic, the corrupt coach who secured the admission of Wilson's son – also recruited *other* walk-on candidates based on factors other than their athletic ability, including personal relationships and apparent *quid pro quo* payments, and in which Heinel misled USC's admissions department about their qualifications, often with the complicity of other athletics department officials.  For example:



packet for A-45), 7203 (A-24), 7204 (A-25), 7206 (A-23), 7207 (A-20), 7208 (A-35), 7209 (A-27), 7210 (A-40), 7211 (A-31), 7212 (A-46), 7213 (A-17), 7214 (A-32), 7215 (A-30), 7216 (A-21), 7217 (A-33), 7218 (A-42), 7220 (A-18), 7223 (A-19), 7231 (A-38), 7234 (A-41), 7238 (A-43), 7239 (A-47), 7241 (A-48), 7243 (A-49), 7244 (A-50).

[6] *See, e.g.*, Ex. 1129.
[7] SINGER-01851755.
[8] Ex. 7214.
[9] Ex. 7478.
[10] Ex. 7479.
[11] USAO-VB-01353068.



The defendants have also marked hundreds of spreadsheets, emails and other documents concerning applicants to USC who were "flagged" by Heinel and other university officials as "special interest" or "VIP" candidates.  As just one example, the defendants have marked an email from Heinel to USC's Dean of Admission, Timothy Brunold, flagging 20 applicants as "VIPs", for various reasons, including ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████  Ex. 1044; *see also, e.g.*, Exs. 1273, 1275, 1277, 1282 (emails discussing VIP and special interest candidates).  Other examples include correspondence from development officials and trustees encouraging admissions officials to admit the children of wealthy donors, *see, e.g.*, Ex.

---

[12] Ex. 7234.
[13] Ex. 3712.
[14] Ex. 1074.
[15] Ex. 3553.
[16] Ex. 7503.
[17] Ex. 7504.
[18] Ex. 7239.
[19] Ex. 1105.

1278, admissions officials agreeing to interview the children of VIPs, *see, e.g.*, Exs. 1134, 1153, and dozens of emails discussing the applications of VIP candidates, *see, e.g.*, Exs. 1285, 1308.

## II.   <u>ARGUMENT</u>

The indictment in this case alleges that the defendants knowingly and intentionally joined a Singer-led conspiracy to secure their children's admission to college as purported athletic recruits on the basis of falsified athletic credentials and *quid pro quo* payments, styled as charitable contributions, to induce corrupt athletics department insiders to facilitate that fraud.   But the defendants seek to make the trial about something else:  whether athletics officials at Georgetown and USC also engaged in similar misconduct with respect to *other* applicants, and whether university admissions officials gave favorable consideration to the children of wealthy donors and other special interest candidates.  None of this evidence that the defendants seek to admit – whether through impeachment or as part of their case-in-chief – has anything to do with the defendants, Singer, or the charged conspiracy.  It sheds no light on the defendants' knowledge or intent, or whether there was an agreement to commit fraud relevant to the four defendants on trial.  Its introduction would amount to little more than a sideshow intended to inflame the jury and dirty the universities by suggesting through snippets and innuendo that they sold admission to the highest bidder.  That is false – but, perhaps more importantly, it is irrelevant to the crimes charged.

The evidence in this case will show that admissions officials at Georgetown and USC were duped by three corrupt athletics department officials – Ernst at Georgetown, and Heinel and Vavic at USC – into admitting the defendants' children based on false pretenses.  All three insiders *also* duped admissions officials in other instances unrelated to this case – in Heinel's case with the occasional complicity of other coaches and administrators in the USC athletics department.  But that is not a defense – it is simply additional evidence of criminality.  Indeed, the government has

separately charged Ernst with engaging in bribery and fraud in instances unrelated to Singer and the charged conspiracy.  *See, e.g.*, *United States v. Ernst*, 19-cr-10081-IT, Dkt. 505 at ¶¶ 120–49.

Likewise, the fact that Georgetown and USC may have given special consideration during the admissions process to the children of major donors, legacies, and other well-connected individuals is not a defense in this case.  None of the children of these defendants was admitted as a VIP or special interest candidate.[20]  And the fact that Georgetown and USC gave special consideration to other applicants has nothing to do with whether *these* defendants did what *they* are charged with doing:  agreeing with Singer and others to *lie* to USC and Georgetown and to secure the bogus recruitment of their children to Division I athletic teams based on false and inflated credentials and *quid pro quo* payments that induced corrupt athletics department insiders to facilitate that lie.  To the extent the evidence the defendants seek to introduce has any relevance to the charges at all – and it does *not* – its probative value is vastly outweighed by the prejudice and distraction it would cause and the time it would waste.

### A.   The Evidence Concerning Other Applicants Is Irrelevant

"While a defendant has a 'wide-ranging' right to present a defense, that right is not absolute and does not include the right to present irrelevant evidence."  *United States v. Gottesfeld*, 319 F. Supp. 3d 548, 553 (D. Mass. 2018) (Gorton, J.) (quoting *United States v. Maxwell*, 254 F.3d 21, 26 (1st Cir. 2001)).  Evidence is relevant only "if it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence."  Fed. R. Evid.

---

[20] By contrast, as the Court has previously noted, the daughter of former defendant Robert Zangrillo – who accepted a presidential pardon – *was* admitted to USC after being designated as a VIP (though Zangrillo conspired to have her admitted as a fake athletic recruit).  Dkt. 1067 at 1, 2–3 (noting that Zangrillo sought "information related to the so-called 'tagging' of applicants as VIPs or of 'special interest,'" that his "purported defense is that his daughter was admitted to USC as part of a legitimate application process whereby she was designated as a VIP," and that such information was, accordingly, "relevant to Zangrillo's potential defense").

401. Thus, any relevant evidence at trial must relate to the elements of the crimes charged or applicable defenses. *See United States v. Smith*, 940 F.2d 710, 713 (1st Cir. 1998).

The defendants are charged with conspiring to commit mail fraud, wire fraud, and honest services mail and wire fraud; conspiring to commit federal programs bribery; and conspiring to commit money laundering.  18 U.S.C. §§ 1346, 1349, 371, 1956(h).[21]  Accordingly, there are essentially only two relevant elements: (i) whether the conspiracies alleged in the indictment existed between at least two people, with the underlying offenses as the objects of those conspiracies; and (ii) whether the defendants knowingly and intentionally joined those agreements. *See, e.g.*, *United States v. Wyatt*, 561 F.3d 49, 54 (1st Cir. 2009) (listing elements for Section 1349 conspiracy); *United States v. Colburn*, 475 F. Supp. 3d 18, 25 (D. Mass. 2020) ("factual impossibility is not a defense to," and therefore not relevant to, "crimes such as conspiracy").

The evidence the defendants seek to introduce about other applicants and athletic recruits, and the universities' decisions and internal communications about those other applicants, is not probative of any of the charges or potential defenses – most pertinently, the defendants' knowledge and intent.  For example, Kimmel has previously represented that the critical issue at trial will be her intent and her "belie[f] that she was making legitimate payments through Rick Singer to Georgetown and USC." Dkt. 1878 at 30.  But internal Georgetown communications that Kimmel never saw, concerning applicants who were not her children and had nothing to do with Rick Singer – and many of which occurred *after* she paid Singer $275,000 to secure her daughter's admission to Georgetown – are not probative of whether she believed it was "legitimate" to pay money in exchange for having her daughter recruited as a fake tennis player.  Likewise, whether

---

[21] Defendant Wilson is also charged with several substantive counts of wire fraud and honest services wire fraud, federal programs bribery, and a tax offense.

members of USC's athletics department considered financial contributions in deciding whether to recruit *other* applicants, or even made other illicit *quid pro quo* deals, has no bearing on whether the defendants intended to corrupt them with *quid pro quo* payments.  In other words, whether another applicant was a legitimate basketball recruit, whether that recruitment was connected to a financial contribution, whether Heinel misrepresented his athletic ability or the reason for his recruitment to the admissions department, and whether other athletics department employees knew about or were involved in Heinel's misrepresentations to the admissions department, does not make any fact relevant to the charges or defenses more or less probable.  *See Smith*, 940 F.2d at 713 (relevance is determined by elements of the crimes charged and legally cognizable defenses).

Similarly, to the extent the defendants seek to introduce evidence concerning USC's practices with respect to "VIP" lists and "special interest" flags, they are setting up a straw man: that college admissions is pay-to-play, particularly at USC, and that wink-and-nod donations by wealthy individuals to secure admission for their children is routine.  But even if that were true, it is irrelevant.  *None* of the children of these defendants was admitted as a VIP or special interest candidate – and this case is *not* about whether USC or other colleges gave more favorable consideration to applicants whose parents contributed money, or whose wealth suggested they might be likely to do so if their children were admitted.  Nor is it about whether the defendants believed that to be true.  The issue in this case is whether the defendants agreed *to lie* by falsely portraying their children as athletic recruits based on fabricated credentials, and to corrupt athletic department insiders into facilitating that fraud on the admissions department using *quid pro quo* payments styled as legitimate donations.  The defendants seek to conflate the two, and to introduce reams of evidence about donations *other* parents made, or that USC officials thought they *might* make, to suggest that USC had a practice of selling admission.  But the evidence the defendants

propose to introduce does not make any fact of consequence more or less likely.  Whether admissions officials looked more favorably on wealthy applicants, or those who made financial contributions to USC – or even whether officials sold admission outright – has no bearing on whether the defendants' agreed to *lie* to admissions officials by having athletics department insiders purport to recruit their children as athletic all-stars, and to use *quid pro quo* payments to facilitate that lie.  And there is no evidence that the defendants had knowledge of the internal communications they propose to introduce, such that those exhibits could have any bearing on their state of mind.  For these reasons, such evidence is irrelevant and should be excluded.

Likewise, to the extent the defendants seek to introduce evidence suggesting that other parents engaged in similar *quid pro quo* schemes with Heinel or other USC coaches – and that senior athletics department officials turned a blind eye or even participated in such conduct – they are simply setting up a distraction from their own actions and their own intentions.  There is no evidence that the defendants had any knowledge of this parallel conduct.  Moreover, evidence of uncharged criminal conduct by others, outside of the alleged conspiracy, is not relevant to any elements of the crimes charged here, or any legitimate defenses thereto.  *See, e.g.*, *United States v. Sans*, 731 F.2d 1521, 1530 (11th Cir. 1984) ("Whether the appellants knew that other bankers disobeyed the law was not relevant to whether they acted knowingly . . . .").

In this regard, the First Circuit's decision in *United States v. Brandon* is instructive.  17 F.3d 409 (1st Cir. 1994).  In that case, the court affirmed the exclusion of evidence offered by defendants charged with conspiring to commit bank fraud by "fraudulently representing the existence of down payments required by the bank."  *Id.* at 418.  The excluded evidence suggested that, in other situations and sometimes even customarily, the victim bank and other banks offered 100 percent financing without requiring down payments at all.  *Id.* at 443.  In affirming the

exclusion of this evidence, the First Circuit explained, "for the [100 percent financing] evidence to be relevant, there must be some reason to believe that 100% financing, or no down payment financing, is customarily provided in conjunction with paperwork showing fake down payments. A no down payment custom does not establish a fake down payment custom." *Id.* at 444. The court saw the true purpose of this evidence: "What defendants were really trying to show is that the bank or its officials were themselves perpetrating some sort of fraud and the defendants were unwittingly caught up in it. . . . This formulation, however, obscures the real issue: if Bay Loan intended to provide 100% financing, or if defendants thought down payments were waived, why did they have to take actions to falsify down payments?" *Id.* at 445. So too, here. Even if the corruption inside USC athletics and athletics development was more extensive than what is charged in this case, that does not make it more or less likely that *the defendants* agreed to join in a conspiracy to seek fraudulent admission to USC. Their actions and intentions and the conspiracy charged are the appropriate subject matter of this trial, and courts in the First Circuit and elsewhere have routinely concluded that "defendants in fraud cases may not adopt the 'blame the victim' theme in attacking the government's case." *United States v. June*, No. 10-CR-30021-MAP, 2012 WL 245243, at *2 (D. Mass. Jan. 25, 2012) (rejecting attempt to show victim's "general lending policies were so slipshod or so venal that [d]efendant's alleged lies about his income and assets were of no moment"); *United States v. Callipari*, 368 F.3d 22, 36 (1st Cir. 2004) (rejecting "blame the victim" defense), *vacated on other grounds*, 543 U.S. 1098 (2005); *United States v. Golfo*, 2020 WL 2513445, at *4-5 (E.D.N.Y. May 15, 2020) (rejecting "blame the victim" defense).

### B.     The Evidence Regarding Other Applicants Is Inadmissible Under Rule 403

Even were the Court to conclude that evidence of USC's practices with respect to either "VIP" candidates or athletic recruits uninvolved in the charged conspiracy has some relevance,

such evidence should nevertheless be excluded under Rule 403 for at least two reasons. *See United States v. Centeno-González*, 989 F.3d 36, 53 (1st Cir. 2021) (affirming exclusion of defendant's proffered evidence under Rule 403).

First, any probative value of such evidence is substantially outweighed by the danger that it would confuse the issues, mislead the jury, and waste time. *See* Fed. R. Evid. 403. Indeed, the introduction of such evidence would inevitably lead to dozens of mini-trials about other applicants and other families – none of them having anything to do with this case. The risk of such "mini-trials" has repeatedly been a concern for the First Circuit under Rule 403. *See, e.g.*, *United States v. George*, 761 F.3d 42, 57 (1st Cir. 2014) ("[T]he judge could have ended up with a mini-trial about a side issue – [a third party's] innocence of charges not made – that might have confused the jury."); *see also United States v. Taylor*, 848 F.3d 476, 485 (1st Cir. 2017) (excluding defense's attempt to introduce government's letter identifying an unindicted co-conspirator, which "could lead to a mini-trial about a side issue – to wit, why [the co-conspirator] was unindicted – so the risk of confusing the issues substantially outweighed the Letter's probative value"); *United States v. DeCologero*, 530 F.3d 36, 60 (1st Cir. 2008) (excluding evidence due to risk of mini-trials); *United States v. Thomas*, 467 F.3d 49, 56 (1st Cir. 2006) (Woodlock, J.) ("Here, in refusing to allow a trial within a trial on a collateral matter, the trial court struck the proper balance.").

That risk is particularly acute here. In a multi-week case that is slated to cover evidence regarding just a handful of college applicants, the defendants seek to offer evidence concerning *dozens* more. Doing so would threaten to turn an orderly proceeding into a circus. The parties would necessarily introduce voluminous documents concerning those other individuals, and call and cross-examine witnesses about a sideshow: whether *other* applicants were qualified to be recruited as athletes, or otherwise be admitted on their own merits; what payments *other* parents

made or were expected to make; what *other* coaches and administrators knew and intended – all without a shred of probative value in assisting the jury to evaluate the guilt or innocence of *the four defendants on trial*.  Indeed, in previously arguing for severance, the defendants themselves asserted that the jury would be misled by evidence common to the *charged* conspiracy because it would "be unable to keep admissible evidence separate from inadmissible evidence as to each defendant."  Dkt. 1034 at 1.  Now, however, the defendants seek to introduce hundreds of exhibits about other people who were *not* part of the alleged conspiracy.  Such a defense by obfuscation and distraction would serve only "to confuse the jury rather than to assist it," *see United States v. Marrero-Ortiz*, 160 F.3d 768, 775 (1st Cir. 1998) (excluding defendant's evidence regarding parallel state court acquittal), and "encourage the jury to decide the case on improper grounds." *United States v. Arruda*, 757 F. Supp. 2d 66, 68 (D. Mass. 2010) (Gorton, J.).

Second, the introduction of such evidence would unduly lengthen the trial and waste the Court's and the jury's time.  Indeed, in moving to sever just weeks ago, defendant Wilson conceded that the side-door evidence at trial should encompass only "[a]dmissions applications that Rick Singer submitted to USC with Donna Heinel's involvement, and to Georgetown" (as well as his son's, through Jovan Vavic), and contended that, even with such parameters, "[t]he Government is simply trying to prove too many different things in one trial."  Dkt. 1909 at 1–2.  Now, however, Wilson has marked *more than 1,100 exhibits*, the overwhelming majority concerning applicants who have nothing to do with this case and nothing to do with his own knowledge and intent. Permitting the introduction of such evidence would substantially extend the trial, which the government has assiduously been working to streamline.[22]

---

[22] Allowing the introduction of such evidence also has considerable privacy implications for uncharged third parties, as this Court has previously noted. *See* Dkt. 1067 at 3 (noting that the

### C.    <u>The Evidence Regarding Other Applicants is Inadmissible Hearsay</u>

Finally, even if the evidence regarding other applicants were relevant and admissible under Fed. R. Evid. 403 – which it is not – much of it consists of inadmissible hearsay under Fed. R. Evid. 802.  For example, much of the evidence about other applicants consists of emails sent by Heinel and Ernst.  While the defendants have listed those individuals on their witness lists (Dkt. 1955 at 2–3) – even though they are criminal defendants in a pending case in this District and are obviously not going to testify – their communications are inadmissible hearsay.  Most of the communications do not relate to the charged conspiracy, and even if they did, it is well-established that the defendants cannot employ Fed. R. Evid. 801(d)(2)(E) to introduce co-conspirator statements. *See United States v. Milstein*, 401 F.3d 53, 73 (2d Cir. 2005) (excluding co-conspirator recording proffered by defendant: "The statement of a conspirator, offered for its truth by a co-conspirator, is not within this Rule."); *United States v. Kapp*, 781 F.2d 1008, 1014 (3d Cir. 1986) ("There is no authority for the proposition that the prosecution is a 'party' against whom such evidence can be offered. The rule is intended to allow for introduction of co-conspirators' statements as evidence against them as defendants.").  And many of the emails were written by anonymous parents and applicants who are not even listed as potential witnesses by either the government or the defendants.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should preclude the defendants from introducing exhibits or other evidence about third parties who are not alleged to have participated in the charged conspiracy.

---

Court is "sensitive to the privacy concerns of student applicants for admission to USC who are entirely devoid of any involvement in this criminal case").

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney


By: */s/ Ian J. Stearns*
    JUSTIN D. O'CONNELL
    KRISTEN A. KEARNEY
    LESLIE A. WRIGHT
    STEPHEN E. FRANK
    IAN J. STEARNS
    Assistant United States Attorneys


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

    */s/ Ian J. Stearns*
    IAN J. STEARNS
    Assistant United States Attorney