UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.   )<br>)<br>ELISABETH KIMMEL, *et al.*,   )<br>)<br>Defendants.   ) | Criminal No.: 19-10080-NMG<br><br>**REDACTED** |

### GOVERNMENT'S MOTION *IN LIMINE*
### TO INTRODUCE MARITAL COMMUNICATIONS

The government respectfully moves *in limine* to introduce at trial certain marital communications identified below, and attached as Exhibit A, because they do not fall within the confidential marital communication privilege.

### I.   RELEVANT BACKGROUND

The government provides a brief summary of the marital communications at issue.

**Gamal Abdelaziz**

**Ex. 273:** On March 1, 2017, defendant Gamal Abdelaziz and his wife discussed ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Singer intended to use the photo on the fraudulent basketball profile he was creating for Abdelaziz's daughter to be presented to the University of Southern California ("USC") subcommittee on athletic admissions.

**Ex. 315:** On May 31, 2017, Abdelaziz asked his wife ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. In a subsequent email dated June 13, 2017, Abdelaziz's wife emailed the other counselor to terminate his employment, copying Abdelaziz and their daughter. *See* Ex. 316 (attached as Exhibit B).

**Ex. 330:** On July 17, 2017, Abdelaziz forwarded his wife ▬▬▬▬▬▬▬▬▬▬▬▬▬



███████  On August 18, 2017, in response to an email from Singer that the photos Abdelaziz had sent were not accepted by USC, Abdelaziz's wife sent Abdelaziz additional basketball photos, which Abdelaziz forwarded to Singer.  *See* SINGER-LAPTOP-00140245 (attached as Ex. C).

**Elisabeth Kimmel**

**Ex. 19:**  On September 7, 2012, defendant Elizabeth Kimmel forwarded her husband ███ ████████████████████████████████████████████████████ ███

**Ex. 21:**  On September 13, 2012, Kimmel forwarded to her husband ████████ ████████████████████████████████████████████████████ In a September 18, 2012 email, Kimmel notified Singer, copying her husband, that her husband would be taking their daughter to meet Ernst and asked for Ernst's contact information, which Kimmel's husband forwarded from his personal email to his work email.  *See* Ex. 24 (attached hereto as Ex. D.).

**Exs. 42 & 52:**  In these emails, dated January 17, 2013 and April 1, 2013, respectively, Kimmel discussed with her husband ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████

**Ex. 304:**  On April 5, 2017, Kimmel forwarded her husband ████████████ ████████████████████████████████████████████████████ ████████████████████████  After Kimmel and her husband pursued the "side door" for their

son at USC as a purported track and field recruit, Singer forwarded Kimmel and her husband a copy of USC's "likely letter," which stated that their son had been approved for admission as a student athlete. *See* Ex. 388 (attached hereto as Ex. E).  The likely letter listed several requirements Kimmel's son had to satisfy, including registering with the NCAA, and Kimmel exchanged several emails with Singer about the registration requirement, to which Singer replied, "I have to register him as an athlete in case he wants to compete- no one sees the registration but me, you and Usc [*sic*] – we did the same for [your daughter] too."  Kimmel's husband was copied on each of these emails.  *See* Ex. 391 (attached as Ex. F).

**Ex. 498:**  In an email dated March 26, 2018, Kimmel told her husband  In a subsequent phone call on July 26, 2018, which was intercepted pursuant to a Court-authorized wiretap of Singer's phone, Kimmel and her husband discussed with Singer their concern that their son would discover that he had been admitted to USC as an athlete.  *See* Ex. 538 (draft transcript attached as Ex. G).

**John Wilson**[1]

**Ex. 48:**  Defendant John Wilson's wife forwarded Wilson Wilson's wife told Singer that she did not want to "lose" the spot at USC and that their son was "unaware of this arrangement."

---

[1] Each of the Wilson emails was sent to or from Wilson's Hyannis Port Capital email account, to which at least three of Wilson's employees had access.

3

**Ex. 77:**  Wilson forwarded his wife an email ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

**Ex. 131:**  Wilson's wife forwarded him ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

## II.  APPLICABLE LAW

"'In federal criminal cases, claims of privilege are governed by common law.'" *United States v. Wilson*, 505 F. Supp. 3d 3, 12 (D. Mass. 2020) (Gorton, J.) (quoting *United States v. Breton*, 740 F.3d 1, 9 (1st Cir. 2014)). "With respect to the marital relationship, common law recognizes two related but distinct privileges." *Id.* At issue here is the marital communications privilege, which protects confidential communications between spouses, and "'permits a defendant to refuse to testify, and allows a defendant to bar his spouse or former spouse from testifying, as to any confidential communications made during their marriage.'" *Id.* (quoting *Breton*, 740 F.3d at 10) (emphasis omitted). "[L]ike all privileges, the marital privileges hamper the truth-seeking process and must be interpreted narrowly." *Breton*, 740 F.3d at 11; *see also id.* at 10 (marital privilege "'is not limitless, and courts must take care to apply it only to the extent necessary to achieve its underlying goals'") (quoting *In re Keeper of the Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 22 (1st Cir. 2003)).

The marital communications privilege "protects only confidential communications." *United States v. Dunbar*, 553 F.3d 48, 58 (1st Cir. 2009) (defendant's statements to wife in back of police car not privileged because no reasonable expectation of privacy). A "party waives the

4

marital communications privilege when he 'fails to take adequate precautions to maintain . . . confidentiality.'" *United States v. Hamilton*, 701 F.3d 404, 409 (4th Cir. 2012) (no expectation of privacy in emails sent over work system) (quoting *SEC v. Lavin*, 111 F.3d 921, 930 (D.C. Cir. 1997)) (ellipsis in original).  Indeed, "'[t]here can [be] no confidential communication where the spouses are on actual or constructive notice that their communications may be overheard, read, or otherwise monitored by third parties.'" *In re Reserve Fund Securities and Derivative Litig'n*, 275 F.R.D. 154, 159 (defendant's emails to wife using work email not privileged because no expectation of privacy) (quoting *United States v. Etkin*, No. 07-cr-00913-KMK, 2008 WL 482281, at *3 (S.D.N.Y. Feb. 20, 2008) (whether "the [employer] actually read Defendant's email" is irrelevant)); *see also Pereira v. United States*, 347 U.S. 1, 6 (1954) (marital privilege can "be overcome by proof of facts showing they were not intended to be private. The presence of a third party negatives the presumption of privacy"); *Wolfle v. United States*, 291 U.S. 7, 16–17 (1934) (finding husband's use of stenographer in dictating message to wife waived privilege where "husband and wife may conveniently communicate without stenographic aid").

The marital communications privilege does not protect communications made in furtherance of joint criminal activity.  *United States v Bey*, 188 F.3d 1, 5 (1st Cir. 1999).  "The spouse's involvement in the criminal activity, however, need not be particularly substantial to obviate the privilege."  *Id.*  Participation in discussions in furtherance of the criminal activity, involvement in payments, and efforts to conceal the criminal activity are sufficient to obviate the protection of the marital communications privilege.  *See, e.g.*, *id.* at 6 (finding wife was joint participant based on her "knowing acceptance of drug proceeds, her efforts to maintain [defendant's] cover story for the benefit of his unsuspecting couriers, and her decision to act as a go-between when [defendant] needed additional funds from [a co-conspirator] to conduct criminal

activity"); *United States v. Picciandra*, 788 F.2d 39, 43 (1st Cir. 1986) (finding wife was joint participant where she "participated in discussions regarding laundering of cash proceeds of the smuggling operation and evading income tax liability generated by the operation" and "delivered cash to [co-defendant] on at least one occasion"); *United States v. Short*, 4 F.3d 475, 478–79 (7th Cir. 1993) (finding wife was joint participant, albeit in a "minor role," where she prepared fraudulent title, registration, and other documents necessary for selling stolen cars to legitimate buyers).

A party can waive the privilege through disclosure. *E.g.*, *Jones-McNamara v. Holzer Health Sys.*, No. 2:13-CV-616, 2014 WL 4805412, at *3 (S.D. Ohio Sept. 26, 2014) ("the marital communications privilege is similar to the attorney-client privilege, which is also subject to waiver through voluntary disclosure of a privileged communication; but the scope of that waiver is also limited to questions which clearly pertain to the subject matter of the specific points on which a waiver did occur'") (*quoting In re Grand Jury Proceedings Oct. 12, 1995*, 78 F.3d 251, 256 (6th Cir.1996)). "A party may not, for example, selectively disclose part of a privileged communication in order to gain an advantage in litigation. . . . Disclosure is generally inconsistent with confidentiality, and courts need not permit hide-and-seek manipulation of confidences in order to foster candor." *Lavin*, 111 F.3d 921 at 929, 933 (citations omitted).

### III. <u>ANALYSIS</u>

The marital communications the government seeks to introduce are admissible for three reasons. *First*, the communications are admissible because the spouses of Abdelaziz, Kimmel, and Wilson were joint participants in the charged conspiracy, and their marital communications in furtherance of the conspiracy are therefore not protected by the marital communications privilege. *Second*, Wilson exchanged emails with his spouse from his workplace email account, in which he

did not have a reasonable expectation of privacy. *Third*, Wilson has identified several marital communications on his own exhibit list, thereby waiving any privilege over the subject matter of those communications.

### A. The Emails Are Admissible Under the Joint Participant Exception

As an initial matter, the marked communications are not protected by the marital communications privilege because they were made in furtherance of criminal activity that the defendants pursued jointly with their spouses. As set forth above, the emails at issue related directly to, and furthered, the charged scheme, insofar as they involved ███████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████. And, as set forth below, each of the defendants' spouses was a joint participant in that criminal activity.

For example, while Abdelaziz's wife played a limited role in the scheme, ███████ ███████████████████████████████████████████████████████████████████████ ███████, and assisted Abdelaziz to select photographs for the profile that Singer used to secure their daughter's admission to USC as a purported basketball recruit. As Ex. 330 makes clear, ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ Moreover, the photos Abdelaziz's wife sent did not all even depict their daughter, who did not play competitive basketball at the time, having failed to qualify for her school's varsity team.

Kimmel's husband played an active role in the scheme, including by meeting with Gordon Ernst, the Georgetown tennis coach who purported to recruit the Kimmels' daughter for

7

Georgetown's Division I tennis team even though she did not play competitive tennis. For example, after Singer emailed Kimmel on September 7, 2012 offering "to talk about the Georgetown option," Ex. 19, Kimmel's husband forwarded himself Ernst's contact information in preparation for a visit to Georgetown to meet Ernst. Ex. 24. ███████████ ███████████ and the Kimmels worked together to conceal the scheme from their son. Indeed, ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████ Exs. 42, 52. Later, after Kimmel agreed to pursue the scheme a second time for their son, Singer forwarded both Kimmels the "likely" letter pursuant to which their son was admitted to USC as a purported athletic recruit even though he was not a competitive athlete. Ex. 388. Kimmel advised her husband ███████████████████████████████████

█████████ Ex. 498, and in a call with Singer, the Kimmels directed him to ensure that their son would not receive any communications from USC's track and field team. Ex. 538.

Wilson's wife also participated in his crimes. Among other things, █████████ ███████████████████████████████████, Ex. 48, and subsequently emailed Singer directly about maintaining the confidentiality of "our financial discussions regarding [their son] & USC." Ex. 64 (attached as Ex. H). Wilson's wife also sent photographs to Singer of her son playing water polo, which she understood Singer would share with USC. Ex. 65 (attached as Ex. I). Wilson's wife was also involved in concealing the scheme from their son. *See, e.g.*, Ex. 48 (discussing the fact that the Wilsons' son was "unaware" of the side door). Wilson's wife also emailed defendant Marci Palatella about Singer's role in getting her son into USC, noting that she preferred to "talk [about it] on the phone," as opposed to over email. Ex. 409

8

(attached as Ex. J). Finally, Wilson's wife signed the couple's 2014 tax return and subsequent amendments, falsely attesting under penalty of perjury that the returns were true despite the fact that they improperly deducted payments to Singer as both a charitable donation and business expense. Exs. 174, 258, 501.

### B. Wilson Had No Reasonable Expectation of Privacy in His Workplace Emails

The marked Wilson communications are not protected by the marital communications privilege for the additional reason that Wilson had no reasonable expectation of privacy in the emails, which were transmitted over his workplace email account.[2]

Wilson provided at least three employees access to his work email account and routinely directed these individuals to access, search, and read his emails. *See, e.g.*, USAO-VB-01718819 (Nov. 30, 2016 email, in which Wilson's executive assistant told Wilson "I have access and Gary at 2G has access" to Wilson's email account and contacts); USAO-VB-01605447 (Nov. 15, 2018 email, in which Wilson directed a second executive assistant "to search thru emails" for flight details); USAO-VB-01718800 (May 18, 2018 e-mail, in which Wilson directed his executive assistant: "Can u pls search my emails . . . ."); USAO-VB-01604517 (Dec. 7, 2018 e-mail chain, in which Wilson directed an executive assistant to locate a flight confirmation and the executive assistant replied: "I updated the email address to: ▇▇▇▇▇▇▇▇ as I can get it [*i.e.*, the flight confirmation] to grab them there[.]") (all attached as Ex. K).[3] In such circumstances – where Wilson's workplace emails were not confidential, and Wilson could not reasonably have

---

[2] Kimmel and her husband also used their workplace email accounts for some of the communications at issue, which likewise undercuts any reasonable expectation of privacy.

[3] Wilson's spouse likewise was on notice that third parties had access to these communications. *See, e.g.*, USAO-VB-01714546 (Sept. 28, 2018 e-mail chain, forwarded to Wilson's spouse, in which Wilson directed his executive assistant to look for an invoice "in my email box") (attached as Ex. L).

had an expectation of privacy in those communications – the marital communications privilege does not apply.

### C.  Wilson Has Waived Any Privilege Over the Communications

Finally, Wilson has waived any privilege over the subject matter of his son's involvement in water polo by marking as exhibits marital communications concerning that subject matter.  For example, Wilson has marked as exhibits emails in which he and his wife discuss their son's water polo training and form, and lessons he received from a private coach.  *See, e.g.*, Exs. 8037, 8085 (attached as Ex. M).  Though Wilson has not yet formally sought to introduce those communications at trial, "if the holder intends to disclose the privileged material, [even] 'without realizing the impact' of the disclosure on the privilege, then there is a waiver." *United States v. Brock*, 724 F.3d 817, 822 (7th Cir. 2013).  Accordingly, Wilson has waived any surviving privilege over the communications the government seeks to introduce – concerning his son's fraudulent admission to USC as a purported water polo recruit – by marking for introduction marital communications concerning his son's water polo abilities.

## IV.   CONCLUSION

For the foregoing reasons, the Court should permit the government to introduce the marital communications identified in Ex. A.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By: */s/ Kristen A. Kearney*
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
STEPHEN E. FRANK
IAN J. STEARNS
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                     */s/ Kristen A. Kearney*
                                     KRISTEN A. KEARNEY
                                     Assistant United States Attorney