UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG |
| | ) | |
| ELISABETH KIMMEL *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |

**GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE**
**AND LIMIT DEFENDANTS' PROPOSED EXPERT TESTIMONY**

The defendants have disclosed that they intend to call five expert witnesses in this case.

For the reasons set forth below, the government moves *in limine* to preclude and limit the proposed

testimony of Kent A. Kiehl, Ph.D., Kent John Chabotar, Ph.D., William Tierney, Ph.D., and

Richard Speier.[1]

**I.      RELEVANT BACKGROUND**

**A.      Kent A. Kiehl**

The defendants intend to call Kent A. Kiehl, a psychology professor at the University of

New Mexico, to testify about how cooperating witness William "Rick" Singer scores on the Hare

Psychopathy Checklist Revised ("PCL-R"), a psychopathy evaluation "relating to lying and

manipulativeness, among other items."  Ex. A at 2; Ex. B at 4.  Dr. Kiehl is the author of the

---

[1] The defendants have also identified forensic accountant Peter Resnick, of Charles River Associates, and CPA Daniel Morris, of Morris + D'Angelo, as witnesses, but have not identified them as experts, produced an expert disclosure, or disclosed any statements pursuant to Fed. R. Crim. P. 26.2. Dkt. 1955 at 3–4. The government is unaware of any first-hand knowledge either witness possesses about any fact in this case. According to his biography, Mr. Resnick "provid[es] expert testimony and analysis at trials." The defendants have indicated that he will testify about the "flow of funds." The government requests that the defendants be required to provide an expert disclosure or other proffer about the anticipated testimony of those witnesses, and to produce witness statements in compliance with Rule 26.2.

website psychopathwhisperer.com and the book *The Psychopath Whisperer: The Science of Those Without Conscience.*[2]   He is expected to testify about the 20 traits on the PCL-R checklist, including pathological lying, parasitic lifestyle, and promiscuous sexual behavior, and to opine that individuals with high scores on the PCL-R "are more likely to lie compulsively, manipulate others, commit crimes, including violent crimes, and are more likely to be recidivists." *Id.* at 4–5.

Dr. Kiehl has previously authored articles and books explaining that the PCL-R evaluation requires a multi-hour interview of a subject.[3]   In this case, however, he expects to testify that the PCL-R "may be applied via file review with or without a live interview" of Singer. *Id.* at 4.  Based on his review of discovery and "private investigative reports commissioned by the defendants,"[4] the defendants propose to have him testify that Singer "scores highly on the Factor 1 interpersonal and affective traits associated with primary psychopathy," and to opine about how Singer's score compares to "incarcerated males in the United States."

### B.   Kent John Chabotar and William Tierney

The defendants expect to call two retired college professors to opine on, among other things, "the finances and economics of higher education institutions and the ways in which those economics drive other aspects of higher education decision-making," and "the change in reputation, culture, and priorities of USC over time."  Ex. A at 1, 3.  Specifically:

- The defendants intend to call Dr. Kent John Chabotar, a partner of an education consulting firm and retired president of Guilford College, to opine (i) about the finances and fundraising of universities "like USC and Georgetown," (ii) that "[m]any private institutions, particularly those focused on fundraising, consider a family's potential for

---

[2] The book concerns Dr. Kiehl's interviews of "remorseless serial killers he meets with behind bars."  *See* https://psychopathwhisperer.com/?p=25.

[3] Kiehl KA, Hoffman MB.  *The Criminal Psychopath: History, Neuroscience, Treatment, and Economics*, Jurimetrics, 2011, 51:355-397; Kiehl, KA, Sinnott-Armstrong, W., *Handbook on Psychopathy and Law*, Chapter 2 at p.6.

[4] The defendants have produced only one such report, which is based solely on publicly available records, including Singer's driving record, voter registration records, and assets.

giving [money] . . . in making admissions decisions," and (iii) that "[t]he relationships between collegiate athletics and their institutions are complicated because they are expensive." Ex. B at 2–4.

- The defendants seek to call Dr. William Tierney, a retired USC professor, to "present a mix of expert and fact testimony." *Id.* at 5. He will opine, *inter alia*, that (i) the former President of USC "was acutely focused on fundraising for the university" and "wanted USC to be the best of the best," (ii) "[t]here were [] so many new buildings being build [*sic*] that USC came to be known, humorously, as the University of Summer Construction," and (iii) "as a result of the lack of oversight of [the President], [USC] was also vulnerable to problems whose severity is exacerbated by a lack of guardrails." *Id.* at 6–7.

### C.   <u>Richard Speier</u>

Defendants Wilson and Kimmel intend to call Richard Speier, a consultant and former acting chief of the criminal investigation division of the IRS, to opine, among other things, that the investigating agents "failed to adequately control, direct and supervise" Singer after he agreed to cooperate, including by failing to adequately secure his electronic devices and to properly record and memorialize all meetings. Ex. C at 1. According to Wilson's disclosure, "[t]he testimony will also include the agents' attempts to influence Mr. Singer to provide untruthful testimony." *Id.*

## II.   <u>APPLICABLE LAW</u>

The admissibility of expert testimony is governed by Fed. R. Evid. 702, and the Court's role as a gatekeeper is prescribed in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). *See United States v. Rodriguez-Berrios*, 573 F.3d 55, 70–71 (1st Cir. 2009) (affirming exclusion of expert testimony). Expert testimony is admissible only if it is both (i) "relevant to the task at hand" and (ii) "rest[s] on a reliable basis":

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002) (quoting Fed. R. Evid. 702) (court must

probe proffered expert testimony for "both reliability and relevance"). As to relevancy, expert testimony "must be relevant not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, would likely assist the trier of fact to understand or determine a fact in issue." *Id.* As to reliability, the review encompasses an evaluation not only of the validity of the expert's methods, but also of whether "that reasoning or methodology properly can be applied to the facts in issue." *Id.*

Even where expert testimony satisfies the relevancy and reliability hurdles, it "remains subject to exclusion under Rule 403." *United States v. Pires*, 642 F.3d 1, 12 (1st Cir. 2011) (excluding defendant's expert under Rule 403). In evaluating unfair prejudice, "courts must guard against letting [expert testimony] intrude in areas that jurors, by dint of common experience, are uniquely competent to judge without the aid of experts." *Id.*

## III.  ARGUMENT

### A.    Dr. Kiehl's Testimony Is Unreliable and Usurps the Role of the Jury

Dr. Kiehl's proposed testimony that Singer is a psychopath prone to "lie compulsively [and] manipulate others" is inadmissible for three reasons.

<u>First</u>, it is unreliable under Fed. R. Evid. 702. Dr. Kiehl has never met or examined Singer or reviewed his medical records. Setting aside the question whether the PCL-R is itself a reliable principle and method – a matter about which courts in this District are divided[5] – the defendants must establish that Dr. Kiehl "has applied the [PCL-R] reliably to *the facts of the case*." *Diaz*, 300 F.3d at 73 (emphasis added). They cannot do so here. In *United States v. Butt*, for example, the

---

[5] *See, e.g.*, *United States v. Sampson*, No. 01-10384-LTS, 2016 WL 11726919, at *17 (D. Mass. Sept. 2, 2016) (excluding expert testimony and crediting defendant's arguments that PCL-R was unreliable and significantly prejudicial); *United States v. Mahoney*, 53 F. Supp. 3d 401, 412 (D. Mass. 2014) (rejecting *Daubert* challenge to PCL-R where expert conducted "approximately ten formal interviews [of subject]").

First Circuit rejected a defendant's attempt to proffer expert testimony from a psychiatrist about a witness's psychiatric disorders as a "general, and therefore impermissible, attack on [her] credibility," even though the expert had reviewed portions of the witness's medical record. 955 F.2d 77, 83, 85 (1st Cir. 1992). The court concluded that the testimony about the witness's mental health was unreliable because "[n]either of defendants' experts had met [her]." *Id.* at 85. So, too, here. Indeed, the government is aware of no case, in the First Circuit or elsewhere, finding psychological expert testimony reliable where the opining expert failed to examine the subject or at least review his medical records. *Cf., e.g.*, *United States v. Gonzalez-Maldonado*, 115 F.3d 9, 15 (1st Cir. 1997) (allowing expert to testify about severed defendant's schizophrenia because expert conducted competency examination pre-trial). Dr. Kiehl's proposed testimony – based on nothing more than his review of "discovery materials" – is little more than an attack on a co-conspirator's credibility dressed up as a psychological evaluation. That is not permitted under Rule 702.

Second, Dr. Kiehl's testimony should be excluded under Rules 401 and 403 because it is both irrelevant and unfairly prejudicial, and it threatens to usurp the role of the jury. *See Pires*, 642 F.3d at 12 ("[C]ourts must guard against letting [expert testimony] intrude in areas that jurors, by dint of common experience, are uniquely competent to judge without the aid of experts."). As an initial matter, credibility determinations are a matter that is "squarely within the jury's domain." *United States v. Carroll*, 105 F.3d 740, 743 (1st Cir. 1997). Accordingly, "an expert's opinion that another witness is lying or telling the truth is ordinarily inadmissible pursuant to Rule 702 because the opinion . . . merely informs the jury that it should reach a particular conclusion." *United States v. Shay*, 57 F.3d 126, 131 (1st Cir. 1995) (allowing defense expert to testify that defendant, whom he had examined, suffered from mental disorder relevant to defendant's own

state of mind); *see also United States v. Navedo-Ramirez*, 781 F.3d 563, 58 (1st Cir. 2015) ("The real issue in this case was whether the jury accepted [witness's] testimony as credible.  An expert would not be helpful on that."); *United States v. Brien*, 59 F.3d 274, 276 (1st Cir. 1995) (rejecting defendant's expert testimony that "involved a credibility determination within the ken of the ordinary judge and juror").  This case is no different.  To the extent Singer testifies, it will be the exclusive province of the jury to assess his credibility.  More broadly, the relevant question is not whether Singer is a liar generally – as Dr. Kiehl apparently intends to testify – but whether he lied to the defendants in this case, and, if so, to what extent those lies mattered to the defendants' state of mind.  It is for the jury – and not a paid "psychopath whisperer" – to make those determinations based on the facts introduced into evidence.

### B.      The Testimony of Dr. Chabotar and Dr. Tierney Is Irrelevant and Prejudicial

The expert testimony of Drs. Chabotar and Tierney is inadmissible for three reasons.

<u>First</u>, the testimony is irrelevant.  As the government has explained in a separate motion, this case is *not* about whether USC, Georgetown, or other colleges gave more favorable consideration to applicants whose parents had philanthropic potential.  *See* Gov't Motion *in Limine* to Preclude Irrelevant Evidence Concerning Uncharged Third Parties, at 7–14.  It is about whether the defendants agreed to *lie* to secure their children's admission to those universities by falsely portraying them as legitimate athletic recruits based on fabricated credentials, and to corrupt athletic department insiders into facilitating that fraud using *quid pro quo* payments styled as legitimate donations.  Rule 702 "does not give [defendants] a right to present irrelevant evidence," and to be relevant, all evidence, including expert testimony, must make a fact more or less probable that relates to the elements of the crimes charged or cognizable defenses.  *See United States v. Maxwell*, 254 F.3d 21, 24–26 (1st Cir. 2001) (affirming exclusion of defendant's expert testimony

that was irrelevant to elements of charged crime).   In other words, there must be a "valid connection" between "the expert's testimony and a disputed issue," *Shay*, 57 F.3d at 132–33 & n.5, and "[i]t is common ground that a trial court may bar expert testimony if that testimony will not assist the jury to sort out contested issues."  *United States v. Mehanna*, 735 F.3d 32, 67 (1st Cir. 2013) (excluding defendant's experts' opinions that were irrelevant because they were a "non-issue" as to the charged crime and defenses).

Whether, in Dr. Chabotar's opinion, "many private institutions . . . consider a family's potential for giving [money] . . . in making admissions decisions," and whether, in Dr. Tierney's opinion, USC was so "acutely focused on fundraising" that it became "known, humorously, as the University of Summer Construction," is not probative of any fact relevant to the elements of the crimes charged or any cognizable defenses.  The defendants are not charged with giving money in the hope of receiving favorable consideration in admissions.  They are charged with *conspiring to lie* to have their children recruited as purported athletes and to make *quid pro quo* payments as directed by corrupt university insiders who agreed to employ that lie to secure their children's admission.  The issue in this case will be the defendants' knowledge and intent in joining the alleged conspiracy – *not* whether universities generally consider philanthropic "potential" in admissions decisions, or whether USC, in particular, was "focused on fundraising."  Indeed, even if both of those facts were true, neither would be a cognizable defense to the charges here.  *See United States v. Brandon*, 17 F.3d 409, 443–45 (1st Cir. 1994) (excluding defendant's expert testimony in bank fraud prosecution, where defendants were charged with lying about down payments required for consumer loans, because expert opinion that banks typically provided no-down-payment financing on commercial loans was irrelevant); *see also United States v. Tetioukhine*, 725 F.3d 1, 7 (1st Cir. 2013) (district court properly excluded expert witness

testimony, in part because it consisted of "unhelpful abstractions that failed to build the crucial bridge to the issue of [the defendant's] intent").

Second, the proffered opinions of Drs. Chabotar and Tierney are not a proper subject for expert testimony.  As an initial matter, their opinions are not necessary to "assist the trier of fact to understand or determine a fact in issue."  *Diaz*, 300 F.3d at 73.  "One of the criteria for the admission of expert testimony under Rule 702 is whether a lay person can be expected to decide the issue intelligently without an expert's help."  *United States v. Sebaggala*, 256 F.3d 59, 66 (1st Cir. 2001); *see also Brien*, 59 F.3d at 277 (1st Cir. 1995) (affirming exclusion of defendant's expert testimony that "tells the jury almost nothing beyond what common sense and argument would supply").  The jury does not need the aid of an expert to tell them, for example, that, "like any other business . . . [universities] must maintain adequate revenue streams," that universities fundraise, that "many private institutions" may consider a family's "potential for giving" in admissions, or that "USC came to be known, humorously, as the University of Southern Construction." Ex. B at 2–3, 7.  The jury also does not need the aid of two professors to distinguish *quid pro quo* payments designed to facilitate fraud from legitimate donations.  *See United States v. Navedo-Ramirez*, 781 F.3d 563, 568 (1st Cir. 2015) (noting that a jury is "able to determine whether [defendant] realized he was accepting a bribe without the assistance of expert testimony").

Third, the opinions of Drs. Chabotar and Tierney are inadmissible under Rule 403.  As to Dr. Tierney, the Court "must be mindful when the same witness provides both lay and expert testimony because of the heightened possibility of undue prejudice."  *United States v. Flores-De-Jesus*, 59 F.3d 8, 21 (1st Cir. 2009) (citation omitted).  For example, the defendants should not be permitted to present Dr. Tierney as an expert – with the enhanced credibility that bestows – and then elicit factual testimony concerning his personal "conversations and [] first-hand observations"

regarding USC's "priorities [and] culture," and his observation that the former USC President "was acutely focused on fundraising" and "had a close working relationship" with USC's athletic director – facts that are also not probative of any relevant issue.  Likewise, there is no probative value to Dr. Tierney's opinion that USC was "vulnerable to problems whose severity is exacerbated by a lack of guardrails," and the risk of prejudice from such "blame the victim" evidence is substantial.  Ex. B at 7; *see Brandon*, 17 F.3d at 445 (precluding expert testimony where "[w]hat defendants were really trying to show is that the [victim] or its officials were themselves perpetrating some sort of fraud and the defendants were unwittingly caught up in it").  The question in this case is not whether USC's "priorities and culture" rendered it "vulnerable to problems," but whether the defendants conspired to defraud it.  Testimony about USC's "priorities and culture," and about the finances of universities generally, will simply confuse the issues, mislead the jury, waste time, and result in unfair prejudice.  *See* Gov't Motion *in Limine* to Preclude Irrelevant Evidence Concerning Uncharged Third Parties, at 7–14; *see also Pires*, 642 F.3d at 12 (excluding defendant's expert testimony under Rule 403 due to "danger of jury confusion").

## C.     Mr. Speier's Expert Testimony Cannot Be Used to Establish Purported Facts

Defendants Wilson and Kimmel propose to have Mr. Speier testify about the investigating agents' purported "attempts to influence Mr. Singer to provide untruthful testimony." Ex. C at 1.  Although it is unclear what "testimony" of Singer's the defendants are referring to, they are presumably alluding to his 2018 notes referencing a "loud and abrasive call with agents."  This Court has previously considered those notes in connection with the defendants' contention  that the agents "coerc[ed] Singer into lying and fabricating evidence." The Court found that "government agents are permitted to coach cooperating witnesses and create ruses designed to elicit incriminating information," and concluded that the notes were "made before Singer was fully

9

cooperative with the government," "relative (primarily) to a sting operation involving parents not yet committed to Singer's 'program,'" and "insofar as [they] did relate to future calls to be made to defendants, w[ere] in response to the agents' efforts to get Singer to corroborate, not fabricate, evidence." *United States v. Sidoo*, No. 19-10080-NMG, 2020 WL 2308807, at *2–3 (D. Mass. May 8, 2020). Wilson and Kimmel are, of course, free to attempt to establish otherwise. For example, they may call witnesses with first-hand knowledge of Singer's interactions with agents, such as the agents themselves, to inquire about their purported attempts to influence Singer. What they may *not* do is call a purported expert, who lacks any personal knowledge of those interactions – or any other facts in this case – to opine that the agents "attempt[ed] to influence Mr. Singer to provide untruthful testimony." Expert witnesses do not establish facts. They provide opinion testimony based on facts. *See* Fed. R. Evid. 702; *see also, e.g.*, *United States v. Wilson*, 798 F.2d 509, 517–18 (1st Cir. 1986) (affirming exclusion of defendant's expert testimony: "As the government notes, the problem with [the expert's] testimony is that there was no evidence in the record to support the central assumption upon which it would be based. Thus, we agree with the district court that the testimony was excludable as guesswork, conjecture and speculation that would serve only to confuse the jury."). The defendants should not be permitted to use an expert witness to establish purported facts they cannot otherwise prove.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should preclude the defendants from introducing the expert testimony of Drs. Kiehl, Chabotar, and Tierney, and it should limit the proposed testimony of Mr. Speier as set forth above.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney


By: */s/ Ian J. Stearns*
    JUSTIN D. O'CONNELL
    KRISTEN A. KEARNEY
    LESLIE A. WRIGHT
    STEPHEN E. FRANK
    IAN J. STEARNS
    Assistant United States Attorneys


## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

*/s/ Ian J. Stearns*
IAN J. STEARNS
Assistant United States Attorney