**Cory S. Flashner**
617 348 1605
csflashner@mintz.com



MINTZ

One Financial Center
Boston, MA 02111
617 542 6000
mintz.com

July 19, 2021

**VIA EMAIL**

Stephen E. Frank
United States Attorney's Office
John Joseph Moakley United States Courthouse
1 Courthouse Way
Suite 9200
Boston, Massachusetts 02210

      Re:    *United States v. Colburn, et al.*, **Case No. 1:19-cr-10080-NMG**

AUSA Frank:

      I write in response to your July 9, 2021 letter regarding our July 2, 2021 expert disclosures on behalf of Defendant Elisabeth Kimmel. We dispute your contention that the July 2, 2021 disclosures failed to comply with Federal Rule of Criminal Procedure 16(b)(1)(C).[1] Rule 12(b)(1)(C) does not dictate "the *quantity* [or] *specificity*" of the expert disclosure; it requires only that a defendant disclose "(1) the expert witness's opinions, (2) the bases for those opinions, and (3) the expert's qualifications." *United States v. Mehta*, 236 F. Supp. 2d 150, 155 (D. Mass. 2002). Nonetheless, Mrs. Kimmel provides this supplemental disclosure in a showing of good faith. Defendants Abdelaziz, Palatella, and Wilson join this supplemental disclosure in full and, as before, provide notice that they may join in presenting the testimony disclosed herein at trial.

      Although some of the testimony described in this letter may not constitute expert testimony, we nonetheless disclose it in an abundance of caution. Mrs. Kimmel reserves all rights to present fact and/or summary testimony from these witnesses. In addition, each of the disclosed experts may testify in rebuttal to any government rebuttal experts on subject matters that are within their expertise.

---

[1] Your letter contends only that the disclosures do not provide a summary of the expert's expected testimony and do not adequately identify the bases, reasons, and sources for the experts' opinions. Your letter does not suggest that the disclosures do not sufficiently articulate the expert's qualifications—nor could it, as supplying an expert's curriculum vitae is sufficient, in and of itself, to disclose such qualifications. *Mehta*, 236 F. Supp. 2d at 155.

BOSTON   LONDON   LOS ANGELES   NEW YORK   SAN DIEGO   SAN FRANCISCO   WASHINGTON

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.

**MINTZ**

July 19, 2021
Page 2



**Kent John Chabotar, Ph.D.**

Mrs. Kimmel expects to call Kent John Chabotar, a Founding Partner of MPK&D Partners, a higher education consulting firm.  President Chabotar is President *Emeritus* and Professor of Political Science of Guilford College in Greensboro, North Carolina.  President Chabotar has been on the faculty of the Harvard Institutes for Higher Education since 1983, and previously has been on the faculties of the Harvard Graduate School of Education, the University of Massachusetts, and Michigan State University.  Prior to becoming President of Guilford, President Chabotar was vice president for finance and administration and treasurer at Bowdoin College, and a member of the faculty.  Professor Chabotar has published extensively on a variety of topics relating to higher education strategy and finance.  His Ph.D. degree in public administration from Syracuse University concentrated on higher education.   Mrs. Kimmel previously provided his curriculum vitae as an attachment to her July 2, 2021 expert disclosures.

President Chabotar is expected to offer the following testimony and opinions:

- Like any other business or organization, higher education institutions must maintain adequate revenue streams to cover their expenses.
- Tuition and fees are what is charged to a student to attend the school.  Elite private institutions provide substantial discounts on tuition and fees so that many students do not pay the full "sticker" price.
- At premier research universities, tuition and fees alone are not a sufficient revenue source to pay for expenses.  Nearly every college and university relies upon  endowment spending, annual giving, and auxiliary services, including dining and summer programs, for additional revenue streams, among others.
- An endowment is in essence an institutional investment and savings account.  The general rule in the industry is that institutions should not spend more than 7% of their endowment market value in a given year but most aim at around 5%, and large endowments over $1-2 billion spend even less.  Most university budgets anticipate some endowment spending every year.
- Based on a review of USC's financial disclosures, in 2018, USC had negative operating results of about $100,000 on revenues of $5 billion.   When an institution has a tight bottom line, endowment spending can make the difference between operating at a deficit or not.  This means that fundraising efforts—that is, obtaining gifts or donations for the endowment, and obtaining annual contributions from donors—are essential to USC's operating budget.  This is true of most other private universities in the United States.
- Typically, contributions refer to both capital giving and annual giving but can include other forms of contributions.  Contributions can be given with or without donor restrictions.
- Capital giving is a category of revenue consisting of substantial donations to a university usually intended for new construction and major renovations.  Annual giving is a category of revenue consisting of donations or gifts made to the university for current

**MINTZ**

July 19, 2021
Page 3



- use. These donations are made by alumni, friends of the university, parents, foundations, and others. Although usually given without restriction, most universities allow donors to restricted part or all of their annual gift to an academic program, athletics, or other specific purpose.
- Universities like USC need both capital gifts and annual gifts to operate. Annual gifts in particular are essential to keeping the doors open, as they are typically spent in the year they are received.
- When a university decides to engage in a substantial project, such as building a new campus or dorm, the funds for such projects typically come from one of two sources: debt or gifts.
- Large universities like USC and Georgetown typically engage in "capital campaigns" to raise money for major projects or specific needs. Most of the universities in the "research 1" category of the Association of American Universities ("AAU") set a goal of $1 billion or higher for any capital campaign. Capital campaigns involve extensive research before launch and seek to obtain high levels of donor giving both in dollar value and in number of contributors.
- The relationships between collegiate athletics and their institutions are complicated because they are expensive programs to run, but they provide several opportunities and benefits to institutions. Almost all athletic programs incur budget deficits, standing alone, for universities, with few exceptions. At many elite private institutions, athletic programs can be a net-positive for the school because of the fundraising opportunities they present, despite being a net-negative operationally.
- "Responsibility center management" (RCM) is a model of budgeting, under which revenue-generating units are wholly responsible for managing their own revenues and expenditures. In exchange for this budget flexibility, the departments and programs under RCM have major fundraising responsibilities on their own or in partnership with other units. For example, Athletics may set fund-raising goals for the department and even for individual sports.
- The vast majority of elite private colleges and universities utilize "tip factors" in making decisions about which applicants to admit to their incoming undergraduate classes. Tip factors can serve to tip the decision-making in favor of a particular applicant. Many private institutions, particularly those focused on fundraising, consider a family's potential for giving, regardless of legacy status, in making admissions decisions.
- Former USC President C.L. Max Nikias and Former USC Athletic Director Patrick Haden both received substantial bonuses from USC during their tenure. These bonuses include a 2015 bonus for President Nikias which was a $1.5 million one-time special bonus to recognize his outstanding achievements, including the largest expansion of USC's campuses in its history and exceptional progress in USC's $6 billion fundraising campaign.

President Chabotar may offer additional testimony and opinions regarding USC's reputation and its ranking in U.S. News & World Report, and other additional testimony and

**MINTZ**

July 19, 2021
Page 4



opinions consistent with the topics identified in Mrs. Kimmel's July 2, 2021 expert disclosures. Mrs. Kimmel reserves the right to supplement this disclosure with additional opinions.

The bases and reasons for President Chabotar's opinions are his education and professional background, and the knowledge, training, skill, and experience he has developed over decades working in, studying, and advising on higher education administration. In reaching these opinions, President Chabotar also considered USC's financial statements and 990s, which are designated as Exhibits 3030-3043 and 3045-3055, and publicly available materials, copies of which are attached to this disclosure as Attachments A and B. To the extent President Chabotar's opinions are based on further materials that have not already been produced in this case, we will provide a supplemental disclosure identifying such materials.

**Kent A. Kiehl, Ph.D.**

Mrs. Kimmel expects to call Kent A. Kiehl, Professor in the Departments of Psychology, Neurosciences and Law at the University of New Mexico. Dr. Kiehl is also the Executive Science Officer of the Mind Research Network, and is a former Lecturer and Associate Clinical Professor in the Department of Psychiatry at Yale University. He received his M.A. and Ph.D. in Psychology and Neuroscience from the University of British Columbia. He has published extensively on psychopathy and other personality disorders. Mrs. Kimmel previously provided his curriculum vitae as an attachment to her July 2, 2021 expert disclosures.

Dr. Kiehl is expected to testify regarding the purpose, structure, and application of the Hare Psychopathy Checklist Revised ("PCL-R"). He will testify that the PCL-R is considered the gold standard assessment tool for psychopathy and one of the most empirically validated psychological assessment tools in use for any psychological disorder. Dr. Kiehl is expected to testify that the PCL-R may be employed in the clinical, research, or forensic setting, and may be applied via file review with or without a live interview.

Dr. Kiehl is expected to testify that the PCL-R "checklist" is composed of twenty traits or behaviors, divided into two sections, or "Factors," and each further divided into two subgroups, called facets: for Factors 1a and 1b, interpersonal and affective traits and, for Factors 2a and 2b, impulsive lifestyle and antisocial behavior. Dr. Kiehl is expected to explain that each item on the list is scored on a scale of zero to two and explain the meaning of those scores. Dr. Kiehl will likely testify regarding the process of scoring an individual using the PCL-R, including the types of materials used to evaluate an individual.

Dr. Kiehl is expected to testify regarding the threshold score for psychopathy and the distribution of scores across populations in North America and worldwide for both incarcerated and non-incarcerated "control" populations. Dr. Kiehl is also expected to testify regarding the use of the PCL-R in forensic and legal settings, including by the Government in civil commitment proceedings. Dr. Kiehl is expected to testify regarding the predictive value of PCL-R scores for certain behaviors, including that those with high scores on the PCL-R are more


likely to lie compulsively, manipulate others, commit crimes, including violent crimes, and are more likely to be recidivists.

Dr. Kiehl is expected to testify regarding his own scoring of William "Rick" Singer on the PCL-R based on materials produced by the Government in this case and publicly available investigative reporting and other materials. Dr. Kiehl is expected to testify that Mr. Singer scores highly on the Factor 1 interpersonal and affective traits associated with primary psychopathy, but somewhat lower on the Factor 2 impulsive lifestyle and antisocial behavior facets. Dr. Kiehl is expected to testify as to how Mr. Singer's combined score compares to the control population and to incarcerated males in the United States and elsewhere.

The bases and reasons for Dr. Kiehl's opinions are his education, professional background, and the knowledge, training, skill, and experience he has developed over decades studying and applying the PCL-R in various contexts, as reflected in his CV, provided previously. In addition, Dr. Kiehl may base his opinions on materials that have been produced in this case, including Title III and consensual recordings of Mr. Singer made by the FBI and emails written by Mr. Singer. Dr. Kiehl will also rely on private investigative reports commissioned by the Defendants, which the Defendants will produce to the Government at its request. Dr. Kiehl will also rely on other collateral materials, including articles and books written by investigative journalists, and scientific literature. To the extent materials relied upon by Dr. Kiehl have not already been produced in this case, we will provide a supplemental disclosure and production of those materials.

### William Tierney, Ph.D.

Mrs. Kimmel expects to call William Tierney, University Professor Emeritus and Founding Director of the Pullias Center for Higher Education at the University of Southern California ("USC"). Dr. Tierney is a former Associate Dean for Research and Faculty Affairs at USC and a past-President of the Association for the Study of Higher Education and the American Educational Research Association. He also has chaired the Academic Senate, and Chaired the University Committee on Academic Review, which determined the quality of academic programs. He has authored more than eighty books and monographs on a wide range of topics concerning higher education, including on how to improve the performance of colleges and universities, academic leadership, and the role of Boards of Trustees, presidents and faculty in decision-making. During his time at USC, Dr. Tierney personally participated in numerous conversations and made first-hand observations about USC's governance, priorities, culture, and operations. Mrs. Kimmel previously provided his curriculum vitae as an attachment to her July 2, 2021 expert disclosures.

Dr. Tierney is expected to present a mix of expert and fact testimony. Specifically, he is expected to offer the following testimony and opinions:

**MINTZ**

July 19, 2021
Page 6



- In the last quarter century, research universities in the United States have seen a dramatic increase in the power of the president.  Previously, the faculty held greater power and authority within higher education institutions.
- Simultaneously, the role of the board of trustees of a research university has changed.  Trustees are considered external ambassadors and are focused on ensuring the university has balanced books.  At many institutions, trustees are expected to be substantial donors to the university or substantial developers of financial gifts from others.
- Now, university presidents play a critical role in influencing the culture and priorities, and shaping the reputation, of their institutions.
- At premier research universities, research funding and building the institution's endowment are critical.  Endowment funding comes primarily from substantial gifts to the university by individuals, foundations, and corporations.
- The University of Southern California ("USC") is a premier research university and a member of the Association of American Universities ("AAU").
- Stephen B. Sample served as the president of USC from 1991 until 2010.  President Sample ushered in a "new age" for USC.  He prioritized making USC a more prestigious institution.  He focused on increasing USC's revenue, profile, and ranking in the U.S. News & World Report.
- During President Sample's tenure, the board dramatically increased in size.  Additional members were primarily non-alumni of the USC undergraduate college.  Membership required trustees to either "give or get."  This shift was consistent with that seen at other premier institutions, but much more extreme.
- Under President Sample, USC switched to revenue-centered or responsibility-centered management ("RCM") (also known as "every tub on its own bottom").  This means that each school or department is responsible for doing its own fundraising and meeting its own budgets.  Under RCM, significant management authority is shifted to deans and department heads, and as a result, there is minimal centralized management.  One consequence of RCM is that deans and department heads spend a significant amount of time and effort raising money for their schools and departments.  USC's iteration of RCM is on the more extreme end of higher education management models, with extreme decentralization and extreme expectations for fundraising on each unit, with little central oversight and often inadequate checks and balances.
- At institutions with little centralized oversight, there is a constant tension between raising revenue at all costs and determining institutional priorities.
- C.L. Max Nikias assumed the presidency of USC in 2010 and continued to serve in that position until August 2018.
- President Nikias was acutely focused on fundraising for the university.  He wanted USC to be the best of the best under his leadership.  Under his tutelage, the university had an extensive development office, and each school had fundraising targets each year.
- President Nikias facilitated unparalleled philanthropy to USC.  In particular, President Nikias prioritized gifts that could be used currently, rather than planned giving.  The board of trustees, in turn, rewarded President Nikias with extraordinary compensation.

**MINTZ**

July 19, 2021
Page 7



- The capstone of USC's substantial fundraising efforts and success under President Nikias was the Campaign for USC, *Fas Regna Trojae*. The Campaign concluded on December 31, 2018 and had raised more than $7 billion. The Campaign reached its original goal of $6 billion 18 months early. It was the second largest capital campaign in the history of higher education.
- During President Nikias' tenure, the physical plant of USC changed dramatically. USC built a significant new USC Village and endeavored to improve its medical campus dramatically. There were also so many new buildings being build that USC came to be known, humorously, as the University of Summer Construction. These projects required significant fundraising.
- President Nikias was able to influence the overall direction of the university in part because of the substantial power invested in him as a result of the shift away from faculty governance and the changes in the composition and role of the board. However, as a result of the lack of oversight of President Nikias, the institution was also vulnerable to problems whose severity is exacerbated by a lack of guardrails.
- President Nikias had a close working relationship with USC Athletic Director Patrick Haden. Immediately upon his appointment as president, President Nikias asked AD Haden to resign from his position on the USC Board of Trustees and assume the role of athletic director. AD Haden reported directly to President Nikias.

Dr. Tierney may offer additional testimony and opinions consistent with the topics identified in Mrs. Kimmel's July 2, 2021 expert disclosures. Mrs. Kimmel reserves the right to supplement this disclosure with additional opinions.

The bases and reasons for Dr. Tierney's opinions are his education and professional background, and the knowledge, training, skill, and experience he has developed over decades working in, studying, and advising on higher education governance. Dr. Tierney's testimony and opinions are also based on his personal knowledge with respect to USC, as informed by his professional background as an expert in higher education governance, administration, and decision-making. In reaching these opinions, Dr. Tierney also considered articles that have been produced to the government bearing Bates numbers RD0000000552, RD0000000890, RD0000000929, RD0000000933, RD0000000939, RD0000000948, RD0000000953, RD0000000957, RD0000000968, RD0000000974, RD0000000985, RD0000006601, RD0000006846, RD0000007021, RD0000007021, RD0000007299, RD0000018966, RD0000018973, and VB-RECORDS-00010771, as well as publicly available materials, copies of which are attached to this disclosure as Attachment B. To the extent Dr. Tierney's opinions are based on further materials that have not already been produced in this case, we will provide a supplemental disclosure identifying such materials. Dr. Tierney's previous statements regarding issues related to this case are identified on his CV. Other known articles in which he has been quoted are enclosed in Attachment C. Dr. Tierney may also have been quoted in other news articles. To the extent counsel for Mrs. Kimmel identifies such statements, we will supplement this disclosure with that information.

**MINTZ**

July 19, 2021
Page 8



              Very truly yours,

              *Cory Flashner*

              Cory S. Flashner

Enclosures

      Attachment A: public documents reviewed by President Chabotar
      Attachment B: public documents reviewed by President Chabotar and Dr. Tierney
      Attachment C: known articles in which Dr. Tierney has been quoted

CC:    Justin O'Connell
        Leslie Wright
        Kristen Kearney
        Eóin P. Beirne
        Peter C. Mulcahy
        Mathilda S. McGee-Tubb

114436992