UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID SIDOO et al.,<br><br>   Defendants | No. 1:19-CR-10080-NMG |

**MOTION IN LIMINE TO EXCLUDE EVIDENCE OR REFERENCE TO DONNA HEINEL PERSONALLY RECEIVING ANY MONEY FROM RICK SINGER**

Defendants respectfully move for an Order excluding all evidence of, or reference to, Donna Heinel personally receiving any money from Rick Singer. The government **has conceded** that Defendants were never told, did not know, and did not agree that their funds would be used to line Heinel's pockets. *See* Dkt. 1104 at 7. The government **has conceded** that, instead, Defendants were told, understood, and agreed that any funds would be used to support USC athletic programs. *Id.* Allowing the government to present evidence about the Heinel-Singer secret "side deal" of which the Defendants were unaware would unfairly prejudice the Defendants, confuse the issues, and mislead the jury. Fed. R. Evid. 403. Applying the rubric set forth by the First Circuit—that "when assessing the probative value of evidence under Rule 403, a court must consider both whether the evidence was offered to prove an issue that was in genuine dispute, and whether the evidentiary point could have been made with other evidence that did not present a risk of unfair prejudice," *United States v. Bain*, 874 F.3d 1, 27 (1st Cir. 2017)— it is absolutely clear that evidence about the Singer-Heinel secret "side deal" must be excluded.

Moreover, the evidence of the Singer-Heinel "side deal" is inadmissible hearsay to which no exception applies because the "side deal" constitutes a separate conspiracy between Singer and Heinel. Given the government's concessions, as a matter of law the government will be unable to make the required to showing that evidence of the Singer-Heinel "side deal" qualifies under Rule 801(d)(2)(E). As the government admits, Singer made a deal with the parents to donate their money **to USC.** The fact that Singer made a secret deal with a third person (Heinel) to later spend funds in a manner that was **inconsistent with the Defendants' original agreement** cannot possibly mean that the Defendants were part of Singer's separate "side deal" conspiracy with Heinel. This is not, as the government has half-heartedly argued, an *allocation* issue. Singer's promises to the Defendants that their funds would be donated to USC (which the government **concedes**) means that the parents could not have been part of an **agreement** (i.e., conspiracy) to funnel money elsewhere. Therefore, to admit evidence of the Singer-Heinel "side deal" under 801(d)(2)(E) or to deem it relevant as evidence of a broader conspiracy would constitute reversible error.[1]

A similar issue was before the Court last year when Defendants moved to strike the portions of the Fourth Superseding Indictment regarding personal payments to Heinel. Although the Court found that Defendants had "not met the exacting standard for a motion to strike," the Court stated that "Whether that evidence should be admitted at trial only in conjunction with a limiting instruction to the jury is, however, a question for another day." Dkt. 1430 at 4-5. Defendants respectfully submit that now is the time for the Court to exclude this highly prejudicial evidence from the trial. This evidence is so distinct from and prejudicial to the

---

[1] There is no point in asking the government for a pre-trial proffer as to the Singer-Heinel "side deal" being part of the conspiracy with the parents under *Petrozziello*. By explicitly conceding that the parents were told and understood that their money was going to USC and that Singer violated that agreement by later diverting funds to Heinel, the government has conceded that there were two separate agreements.

2

Defendants, that admission of it under any circumstances would be irrevocably prejudicial. However, if the Court does not grant the Defendants' request, Defendants move in the alternative that a limiting instruction be read to the jury each time such evidence is introduced.

### I. The Government Admits That Defendants <u>Did Not Know</u> About the Secret "Side Deal" And That Defendants Thought Their Money Was Being Donated to USC Athletics

The government charged a single conspiracy comprised of the Defendant-parents, Rick Singer and his alleged accomplices at the Key Worldwide Foundation and, as relevant here, USC athletics administrator Donna Heinel.  The government has developed evidence that **after** the Defendants agreed to donate money to USC—or to USC through the Key Worldwide Foundation—Singer and Heinel separately agreed that Heinel would begin receiving personal payments.  By the government's own admission, the parents never knew about this secret "side deal."[2]  In fact, at the time the Defendants agreed to make payments to USC, Singer's secret "side deal" with Heinel did not even exist.

With respect to Defendant Abdelaziz, the Fourth Superseding Indictment states: (1) "Beginning in or about the **summer of 2017**, Gamal Abdelaziz agreed with Singer to pay an amount, ultimately totaling $300,000, for facilitating his daughter's admission to USC." ¶ 114; (2)  "On or about **December 4, 2017**, Heinel instructed Singer that a payment of $200,000 for ABDELAZIZ's daughter should be directed to the gift account for the Galen Center, the arena for USC's basketball and volleyball programs" ¶ 119; (3) "**Subsequently, Heinel and Singer [but not Abdelaziz]** agreed that instead of directing this money to USC, Heinel would receive payments of $20,000 per month personally" *id*.; (4) "In or about **July 2018**, [Singer] began

---

[2]    When Wilson donated to USC water polo in 2014, Singer had not yet met Heinel.  When Singer finally met Heinel in mid-2015, Wilson's son had been attending USC for a year.  *See* Fourth Superseding Indictment ¶¶ 235-36; *see also* Dkt. 995 at 4-6.  The government does not allege that Heinel played any improper role in the admission of Wilson's son or was a member of the alleged Conspiracy at the time of the Wilson USC admission or received any funds that originated from Wilson.

3

paying Heinel $20,000 per month in exchange for facilitating the admission of ABDELAZIZ's daughter, and the children of other Singer clients, to USC as purported athletic recruits." ¶ 118. In other words, the secret "side deal" between Singer and Heinel was not struck until **after** Abdelaziz allegedly agreed with Singer to make a payment in exchange for his daughter's admission in the summer of 2017, ¶ 114, and **after** his daughter was provisionally admitted to USC on October 5, 2017, ¶ 118.  Moreover, Singer didn't start paying Heinel $20,000 per month until approximately four months **after** Abdelaziz's daughter received her final admission to USC on March 26, 2018.  ¶ 120.[3]

The Court need not rely on the undersigned's analysis of the indictment to determine that the Singer-Heinel secret "side deal" was formed after the parents' agreement with Singer and that the parents thought their money was going to USC.  Nor is this a factual question for the jury.  As noted at the outset, **the government has conceded these points**.  In an August 30, 2018 sworn affidavit in support of a wiretap application, FBI Special Agent Laura Smith told Judge Burroughs that "**Up until the summer of 2018, I believe that all the money SINGER provided to HEINEL for her assistance went to USC athletic programs**."  USAO-LP-001472.  And last year during the misconduct briefing before the Court, the government went one step further, making the extraordinary admission that the Defendants not only were **told** by Mr. Singer but actually **"knew" and "understood" (in the government's words—not Defendants') that their monies were being donated to USC athletics.**  As the government represented to the Court:

---

[3]     The donations from Elisabeth Kimmel and Marci Palatella to USC and Key Worldwide Foundation follow a similar pattern in that all donations were sent months prior to the Singer "side deal" with Heinel.  Kimmel's son was provisionally admitted to USC on October 10, 2017 and there was a $50,000 payment to USC on October 23, 2017. (¶ 179).  There was a subsequent $200,000 payment to Key Worldwide Foundation on February 1, 2018. (¶ 180).  Palatella's son was provisionally admitted to USC on or around November 16, 2017 and there was a $100,000 payment to USC on December 1, 2017. (¶¶ 220, 299).  There was a subsequent $400,000 payment to Key Worldwide Foundation on May 1, 2018. (¶ 300).

4

- "The government was not attempting to build a case that the parents understood Heinel to be personally pocketing money, and the government has **never alleged that**. The government *has* alleged—and the calls, checks and emails prove—that the defendants **knew** that one or more complicit insiders at USC were facilitating the admission of their children as recruited athletes **in exchange for payments to a USC athletic program.**"

- "[T]he defendants **understood** they were making *quid pro quo* payments **to a USC fund** to induce a university insider to facilitate the fraudulent recruitment of their children."

Dkt. 1104 at 7, 9-10 (emphasis added). Quite simply, both the Defendants and the government agree that the parents had no knowledge of the Singer-Heinel secret "side deal."

> II. **The Government Believes Defendants' Knowledge of the Secret "Side Deal" is Irrelevant to Their Guilt or Innocence**

The government's theory is not that Defendants are guilty because they knew Heinel was taking money personally (nor could it be, given the government's factual admission that Defendants understood their payments were going to USC). Rather, the government's theory is that Defendants are guilty because "it doesn't matter if a payment is called a 'donation,' or is directed to an athletic program instead of a coach's pocket[.]" *Id.* at 2-3. As the government has stated, "there is [not] a legal distinction between a 'donation' to a 'program' and a 'payment' to 'a coach' … provided that the money is intended as a *quid pro quo*."[4] Dkt. 1104 at 3. Therefore, "Whether the defendants were aware of this specific allocation of their payments to Heinel personally is likewise **immaterial** . . . ." Dkt. 1304 at 4 (emphasis added). *See also id.* at 5 ("Whether the payment went to Heinel personally or to USC is **not legally relevant** to whether it was a bribe."). Setting aside the novelty of the government's theory that a payment to the alleged victim can constitute a bribe,[5] the key point is that the government believes that the fact

---

[4] The government does not and cannot claim that Wilson donated to any account controlled by Heinel. Singer didn't even meet Heinel until after Wilson's son had already started attending USC.

[5] The undersigned has not located a single case where a court has found that funds being given to the victim

5

that Singer and Heinel secretly diverted the intended USC athletics donations to Heinel personally is "**immaterial**" and "**not legally relevant.**" It follows that under the government's own theory, the secret "side deal" is of zero "consequence in determining the action." *See* Fed. R. Evid. 401.

### III. The "Side Deal" Is A Separate Conspiracy, Evidence of Which is Inadmissible

Defendants believe that the indictment does not allege that the Singer-Heinel secret "side deal" was part of the alleged conspiracy and therefore that evidence of the *separate* Singer-Heinel conspiracy is not relevant, and is inadmissible against Defendants. Defendants acknowledge, however, that the Court has ruled that "Although the government does not allege that the defendants knew that Singer agreed to pay Heinel $20,000 per month, such evidence is relevant to explain the full extent of the conspiracy and to show what happened to the money paid by the parents." Dkt. 1430 at 4. That ruling was for purposes of determining the sufficiency of the indictment. At this stage, the Court must determine under *Petrozziello* whether the Defendants' agreements with Singer to donate their funds to USC and Singer's separate agreement with Heinel to funnel money to her personally could constitute a single conspiracy.

---

could constitute a bribe. The novelty of the government's theory was underscored in a colloquy between Judge Woodlock and AUSA Kearney during the sentencing of Defendant Bizzack.

> THE COURT: That's not a bribe, is it? It's received by USC. Then we've got a faithless employee. That's a different issue from bribery, right?
> [AUSA] KEARNEY: No, Your Honor, because in light of Skilling, there has to be a bribe or a kickback.
> THE COURT: Yes, there does, I agree. And this is a case in search of a bribe or a kickback . . . . So now we're back to this question of what was the bribe that [Heinel] received? Because it has to be to her, not some account that she controlled, unless you say it was reasonably foreseeable to [Bizzack] that **she was going to toy with that account.**

*United States v. Bizzack*, 19-cr-10222-DPW, Sentencing Tr. at 15-16. (emphasis added).

6

In light of the government's concessions, it cannot. As set forth above, the government does not dispute that the parents thought their funds were going to a USC athletic program and never knew that Heinel made a "side deal" with Singer to pocket money personally. While each conspirator need not "kn[o]w all of the details of the conspiracy or participate[] in every act in furtherance of the conspiracy," *United States v. Berroa*, 856 F.3d 141, 154 (1st Cir. 2017), the destination of the parents' funds—to the USC athletics department or to Heinel—was central to the very "agreement" itself.  This is not the typical case where the defendants simply did not know one way or the other about some aspect of the conspiracy.  Rather, the Defendants were informed by their alleged co-conspirator Singer and understood (as the government admits), that their funds would be spent in one manner.  Later, Singer allegedly made a secret deal with a third person (Heinel) to spend funds in a manner that was **inconsistent with the Defendants' original agreement.** [6]  *See United States v. Monserrate-Valentin*, 729 F.3d 31, 43 (1st Cir. 2013) ("[T]he gist of the conspiracy offense remains the agreement, and it is therefore essential to examine what kind of agreement or understanding existed *as to each defendant*." (quoting *United States v. Glenn*, 828 F.2d 855, 857 (1st Cir. 1987) (emphasis in original)).  In light of the government's admissions, there is simply no hope for the government to meet its burden under *Petrozziello*.

### IV. Evidence of the "Side Deal" is Not Relevant, and Even if Relevant, is of Such Limited Probative Value That It Is Substantially Outweighed By The Risk of Unfair Prejudice, Confusing the Issues, and Misleading the Jury

However, even if one accepts that the secret "side deal" *was* part of Singer's conspiracy with each parent, and that evidence of the "side deal" may help "explain the full extent of the conspiracy," evidence of the secret "side deal" should still be excluded because "its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues [and]

---

[6]   Of course, the Defendants dispute that any of the funds Heinel received are traceable to their donations.

misleading the jury." Fed. R. Evid. 403. As the First Circuit has held, "When assessing the probative value of evidence under Rule 403, a court must consider both whether the evidence was offered to prove an issue that was in genuine dispute, and whether the evidentiary point could have been made with other evidence that did not present a risk of unfair prejudice." *United States v. Bain*, 874 F.3d 1, 27 (1st Cir. 2017). Here, there is no genuine dispute that: (1) the secret "side deal" existed; and (2) the Defendants did not know about it. Moreover, the government is more than capable of proving what it alleges to be "the full extent of the conspiracy" without the inflammatory fact that Singer and Heinel secretly diverted money to their own pockets **after** the Defendants' children were admitted to USC. Significantly, as the government itself admits, the secret "side deal" is "not legally relevant" to the Defendants' guilt.

More important, the "side deal" evidence will substantially confuse the issues. As this Court correctly stated in an earlier Order, "[T]o the extent the defendants maintain that they were unaware that their payments were going to corrupt insiders or of the extent to which those insiders deprived the universities of their honest services is a factual question to be resolved at trial." Dkt. 1334 at 27. If the parents thought their money was going to the USC athletics department—as the government admits—there are significant issues of proof with which the government must contend. Permitting the government to present evidence of the secret "side deal" will confuse the jury and lead them to conclude that the parents *were aware* of Heinel's personal enrichment—even though the government concedes they were not aware—and to convict on that erroneous basis.

The risk is not theoretical. The government included on its exhibit list multiple documents evidencing the secret side deal between Singer and Heinel. For instance, Exhibits 530, 593, 595, 596, and 618 are invoices from Heinel's company "Clear the Clearinghouse" to one of Singer's companies, "Counting Stars" for monthly payments of $20,000. One of these

8

invoices, attached as Exhibit A, is dated November 7, 2018, and states that it is for "consulting services" for Defendant Abdelaziz's daughter. The inclusion of Defendant Abdelaziz's name on this invoice is highly prejudicial and not at all relevant.  It is undisputed that the invoice is dated more than a year after his daughter was provisionally admitted to USC and it is also undisputed (as set forth above) that Defendant Abdelaziz (and the other Defendants) did not know anything about these payments.  The invoice is also dated **after** Mr. Singer began cooperating with the government, which raises the question of whether Mr. Singer instructed Ms. Heinel to include old student names on the invoices (either on his own or at the government's request) so as to manufacture evidence against Heinel or the Defendants.[7]  Perhaps the invoice is probative of Ms. Heinel's intent, but it has no probative value as to any of the elements of the crimes with which Defendant Abdelaziz and the other Defendants are charged.

The Defendants are not seeking to exclude purported co-conspirator "bad acts" of which they were unaware simply because the evidence will inflame the jury (although it will).  The bigger concern is confusion of the issues.  The central issue in this case is whether Defendants **intended** to deprive USC of honest services.  If the jury hears that Donna Heinel was taking money for her own pocket, they will conclude that evidence of those payments must bear on the parents' intent—which it clearly does not.  This very high risk of confusion on this central issue far outweighs any marginal "benefit" of the jury knowing "the full extent of the conspiracy."

### V.   In the Alternative, The Court Should Read A Limiting Instruction to the Jury

---

[7]   Defendants note that the presence of Ms. Abdelaziz's name on the invoice is also hearsay.  It is an out of court statement that the government intends to introduce for the truth of the matter asserted therein – that the $20,000 invoice was for services rendered to Ms. Abdelaziz.  Because Defendants believe that this statement was made in furtherance of a *separate* Singer-Heinel conspiracy, it is inadmissible against defendants.  And even if the hearsay was admissible under Rule 801(d)(2)(E), it is inadmissible under Rule 403.

Admission of the Singer-Heinel payments will be so prejudicial that no limiting instruction would be sufficient to cure the prejudice and confusion. But if the Court is not inclined to exclude evidence of the secret "side deal," Defendants respectfully request that the Court read a limiting instruction to the jury each time such evidence is introduced. Although Defendants believe that exclusion is required, a limiting instruction may have some utility in softening the prejudice defendants will face from the government's inflammatory, confusing, and barely relevant evidence of the secret "side deal." Defendants request a limiting instruction as follows:

> You have just heard or seen evidence which suggests Mr. Singer paid Ms. Heinel personally. You are instructed that the government has agreed that none of the Defendants knew about the personal payments to Ms. Heinel. Therefore, you are instructed that the evidence has no bearing on the parents' intent to commit the crimes with which they are charged. You may consider such evidence only to the extent it may bear on the scope of the conspiracy alleged by the government, and for no other purpose.

The limiting instruction is necessary to cabin the extreme prejudice the Defendants will face if evidence of the secret "side deal" is introduced. Defendants maintain, however, that even with the limiting instruction, evidence of the secret "side deal" is inadmissible.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court exclude all evidence or reference to Donna Heinel personally receiving any money from Rick Singer or, in the alternative, that a limiting instruction be read to the jury each time such evidence is introduced.

Dated: July 30, 2021

Respectfully submitted,

/s/ Brian T. Kelly
Brian T. Kelly (BBO # 549566)
Joshua C. Sharp (BBO # 681439)

Lauren M. Maynard (BBO # 698742)
NIXON PEABODY LLP
53 State Street
Boston, MA 02109
(617) 345-1000
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com
lmaynard@nixonpeabody.com

Robert Sheketoff (BBO # 457340)
One McKinley Square
Boston, MA 02109
617-367-3449

*Counsel for Gamal Abdelaziz*

*/s/ Cory S. Flashner*
R. Robert Popeo (BBO # 403360)
Mark E. Robinson (BBO # 423080)
Eóin P. Beirne (BBO # 660885)
Cory S. Flashner (BBO # 629205)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1605
rpopeo@mintz.com
mrobinson@mintz.com
ebeirne@mintz.com
csflashner@mintz.com

*Counsel for Elisabeth Kimmel*

*/s/ Michael K. Loucks*
Michael K. Loucks (BBO # 305520)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
500 Boylston Street
Boston, MA 02116
(617) 573-4800
michael.loucks@skadden.com

Jack P. DiCanio (*pro hac vice*)
Emily Reitmeier (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, CA 94301
(650) 470-4500
jack.dicanio@skadden.com
allen.ruby@skadden.com

11

*Counsel for Marci Palatella*

/s/ Michael Kendall
Michael Kendall (BBO # 544866)
Lauren M. Papenhausen (BBO # 655527)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
(617) 979-9300
michael.kendall@whitecase.com
lauren.papenhausen@whitecase.com

Andrew E. Tomback (pro hac vice)
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-1100
atomback@mclaughlinstern.com

*Counsel for John Wilson*

## LOCAL RULE 7.1(A)(2) CERTIFICATION

I hereby certify that counsel for the Defendant Abdelaziz conferred with counsel for the government in an attempt to resolve or narrow the issues raised by this motion. The government did not agree to the relief requested.

/s/ Joshua C. Sharp
Joshua C. Sharp

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically on July 30, 2021, and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing.

/s/ Joshua C. Sharp
Joshua C. Sharp