UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREGORY COLBURN et al.,<br><br>Defendants | Case No. 1:19-cr-10080-NMG<br>**Filed Under Seal**<br>**ORAL ARGUMENT REQUESTED**<br>Leave to file excess pages and to file brief and attached exhibits under seal granted on Aug. 6, 2021, in ECF No. 2027 |

**DEFENDANTS' OPPOSITION TO THE GOVERNMENT'S MOTION IN LIMINE [D.E. 2001; UNDER SEAL] TO PRECLUDE IRRELEVANT EVIDENCE CONCERNING UNCHARGED THIRD PARTIES**

From at least 2007 to 2019, the University of Southern California ("USC") had an official, widespread practice of seeking and rewarding donors by giving admission preferences to applicants related to the donors—evidence of which this Court has already described as relevant to multiple issues in this case. **Ex. A** (excerpting statements of Kelley, M.J., at sealed hearings). USC's practices derived, in part, from a school-wide effort to raise $6 billion, which then-USC President C.L. Max Nikias initiated in August 2011, achieved in 2017 (18 months earlier than expected), and extended thereafter.

The head of USC's Athletics Department oversaw part of this program. Many of its staff helped implement it. And USC personnel outside of the Athletics Department also advocated for applicants' admission, even as USC considered them for admission (a) through an athletics subcommittee—the "Subco"; (b) a VIP process; and (c) sometimes both. These practices were common knowledge among applicant families, and USC explicitly documented those practices in numerous emails and regularly maintained spreadsheets tracking such applicants. During USC's $6 billion campaign, well in excess of 200 college applicants unconnected to William "Rick" Singer received such admission preferences. USC's Athletics Department raised over $670 million from 2011 to 2016. Other universities involved in this case used similar strategies, though perhaps not quite as aggressive as USC's. Singer discussed these admissions-fundraising programs with each of Defendants Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, and

1

John Wilson ("Defendants"), and defrauded them of hundreds of thousands of dollars, by telling them he would facilitate their participation in this legal, well-known, and widespread strategy.

The government has asked the Court to exclude all evidence of USC's and Georgetown's admissions-fundraising programs, even though it is central to most of the defense issues in this case. The government's motion mischaracterizes this evidence as concerning "uncharged third parties"—but that is backwards. The evidence proves the lawful, intertwined practices of admissions, athletic recruitment, and fundraising that only happens to mention third parties.

Thus, the Defendants ask the Court to deny the government's motion. This evidence of these schools' fundraising-admissions strategies shows the objective reasonableness of Defendants' good-faith reliance on Singer's college-admissions counseling—including advice to donate to university programs to enhance their children's admission prospects. That advice matched the universities' own fundraising strategies and regular practices, and refutes the government's mischaracterization of Defendants' contributions as bribes.

The evidence that the government seeks to exclude also shows that USC itself channeled candidates for admission who had donor support through the Subco, the VIP process, and sometimes both, just a Singer himself did—regardless of whether those applicants actually had athletic talent and regardless of whether their families qualified as VIPs.[1] It appears the Athletics Department sometimes used the Subco for donor applicants with especially poor academics.

This evidence refutes several of the government's legal theories and provides necessary foundation, context, and a fuller, accurate factual account about how admissions at these schools actually worked. The evidence shows Defendants' good faith in making donations to universities to which their children applied, and that their contributions were not bribes. The evidence also shows that the universities were not defrauded, that their employees were not faithless, and that

---

[1] All of the Defendants and their children qualified as VIPs but were admitted under the Subco program. The government's motion relies heavily on the fact that the Defendants' children did not formally win admission through USC's VIP process, *e.g.*, Mot. at 8 & n.20, but that is only because Singer steered them away from the VIP process and towards the Subco because it made it easier for him to steal a significant portion of their donations.

2

the universities, in acknowledging donations, did not record favorable admissions decisions as services or goods that they had provided to donors—a critical issue in the tax charge against Wilson. In short, the evidence shows that the "side-door" that Singer openly promoted was in fact a valid, common practice—not the corrupt "scheme" of the government's imagination—and consistent with Defendants' good-faith belief in the validity of Singer's advice. None of the government's arguments to exclude this evidence has merit, and the Court should therefore deny the government's attempt to prevent Defendants from presenting their defense.

## I. EVIDENCE OF UNIVERSITY ADMISSIONS PRACTICES IS RELEVANT

The Defendants have numerous examples of USC giving admissions preferences to VIP and Subco applicants—classifications that were sometimes interchangeable and overlapping—because of donations. The Defendants will concisely organize and present this evidence efficiently at trial. The following is representative evidence of these practices that the government improperly asks the Court to exclude.[2] ***SEALED***

1. In Defendants' proposed trial exhibits 8045 (AB-001332) (attached as **Ex. B**) and 7242 (AB-000176) (**Ex. C**), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[2] The Defendants have added the yellow highlighting to the attached exhibits, all of which they file under seal. The USC-produced documents attached to this brief already included alpha-numeric redactions corresponding to information identifying individuals. The Defendants have not redacted such information in documents that the government originally produced. It is necessary to see this information to show USC discussing the same applicant across different documents. Again, the Defendants file all of these documents under seal.

3

████████████████████████████████████████████████████████████
██████████████████████████████████

2. In Defendants' proposed trial exhibit 7342 (USAO-VB-01452032) (**Ex. D**),

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████

3. In Defendants' proposed trial exhibits 7603 (USAO-VB-01452222) (**Ex. E**) and 7604 (USAO-VB-01329528) (**Ex. F**), ████████████████████████████████

████████████████████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████

4. In Defendants' proposed trial exhibit 7479 (USAO-VB-01198905) (**Ex. G**),

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████ In a different exchange, Defendants' proposed trial exhibit 7478 (USAO-VB-01239086) (**Ex. H**), ████████████████████████████████████████
█████████████████████████████████████

5. In Defendants' proposed trial exhibit 7389 (USAO-VB-01323985) (**Ex. I**), ██
████████████████████████████████████████████████████████████

4

███████████████████████████████████████████████████

█████████████████████ In a later exchange (Defs.' proposed trial ex. 7390 (USAO-VB-01322416) (**Ex. J**)), ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████

6. In Defendants' proposed trial exhibit 7361 (USAO-VB-01468446) (**Ex.** ██

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

7. In Defendants' proposed trial exhibit 7293 (USAO-VB-01304438) (**Ex. L**), ██

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████

8. ███████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████ Defs.' proposed trial ex. 1219 (USAO-VB-01496074) (**Ex. M**). ██

███████████████████████████████████████████████████

██

5

9.  █████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████ **\*\*\*SEALED\*\*\***

Excluding the preceding, illustrative evidence—and permitting the government to cherry-pick what the jury hears about the admissions process at USC and the other schools involved in this case—would present the jury an incomplete, inaccurate understanding of how admissions actually worked when Defendants' children applied to college. The Court should deny the government's motion. *See, e.g.*, *Brown v. Ruane*, 630 F.3d 62, 71-72 (1st Cir. 2011) ("[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense."). This evidence is directly relevant, will be the focus of many witnesses' testimony, and is necessary for the jury's credibility determinations of the eight USC witnesses on the government's proposed witness list.[3] *United States v. Callipari*, 368 F.3d 22, 37 (1st Cir. 2004). As this Court has already recognized, it is clearly proper for Defendants to use this evidence at trial. *United States v. Sidoo*, 468 F. Supp. 3d 428, 445 (D. Mass. 2020) (Gorton, J.) ("Again, to the extent the defendants maintain . . . insiders deprived the universities of their honest services is a factual question to be resolved at trial."); *see generally* **Ex. A**.

**A.    Defendants' proffered evidence concerning university admissions practices is relevant to multiple issues—as the Court already has repeatedly recognized**

Granting the government's motion would lead to reversible error by excluding relevant evidence of:

**1.    Defendants' good faith** in relying on Singer's college-counseling advice to donate to USC to enhance their children's admissions chances (and his repeated reassurances of the legality of this strategy)—contrary to the government's contentions that Defendants knowingly and intentionally entered a conspiracy to bribe and defraud USC. All of the

---

[3] Those witnesses are Kirk Brennan, Timothy Brunold, Rebecca Chassin, Al Checcio, Alex Garfio, Casey Moon, Lindsey Munday, Lauren Whittam, and Joseph Wood.

6

government's charges are specific-intent crimes.[4] And Defendants' good faith is a relevant, complete defense to all of the government's charges—as this Court has already recognized. *See* **Ex. A** (third through eighth bullets); *see also United States v. Gorski*, 880 F.3d 27, 32 n.3 (1st Cir. 2018); *United States v. Henry*, 136 F.3d 12, 17, n.3 (1st Cir. 1998); *United States v. Dockray*, 943 F.3d 152, 155 (1st Cir. 1991); *Cheek v. United States*, 498 U.S. 192, 203-04 (1991).[5] In short, the Court has already rejected the government's bald contentions that this evidence "sheds no light on defendants' knowledge or intent." Mot. at 7; *e.g.*, *id.* at 9.

**2.   USC's knowledge and promotion of intertwined admissions and fundraising objectives.** By openly advancing USC fundraising objectives as they advocated for the admission of donor applicants, USC personnel in and beyond the Athletic Department knew of the school's longstanding, common, and entirely legitimate practice of factoring philanthropy into admissions decisions. *See, e.g.*, *United States v. Bank of New England, N.A.*, 921 F.2 844, 856 (1st Cir. 1987).[6] This evidence shows, moreover, that a wide range of USC personnel—not just Heinel and not just Athletics Department personnel—were doing precisely what their fiduciary duties required them to do. The evidence thus shows that they complied with those duties by participating avidly in an unprecedented, $6 billion capital campaign and using admissions as a lever to raise money—defeating a central element of the government's honest-services charges. *See, e.g.*, *Skilling v. United States*, 561 U.S. 358, 368 (2010); *Sidoo*, 468 F. Supp. 3d at 443; *United States v. Joselyn*, 99 F3.d 1182, 1184 (1st Cir. 1996); *United States v. Cincotta*, 689 F.3d 238, 241-42 (1st Cir. 1982).

---

[4]   *See, e.g.*, *United States v. Piper*, 35 F.3d 611, 615 (1st Cir. 1994) (conspiracy); *United States v. Martinez*, 994 F.3d 1, 7 (1st Cir. 2021) (mail, wire fraud); *United States v. Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013) (federal program bribery); *United States v. Boyd*, 149 F.3d 1062, 1067 (10th Cir. 1998) (money laundering); *United States v. Pomponio*, 429 U.S. 10, 11 (filing false tax return).

[5]   *See also* ECF No. 2021-1 at 24 & n. 34, 33 & nn. 56-58, 34 & nn.59-60, 35 & nn.61-64, 42 & nn.75-76, 43-44 & nn.77-80, 55-56 & nn.103-108, 66 & nn.137-41, 73 & nn.156-58, 76-79, 82-83 & nn.164-66, 85-86 & nn.168-78 (Defs.' proposed jury instructions on good faith and various intent issues) (citing authorities).

[6]   *See also* ECF No. 2021-1 at 25-26 & nn. 35-36, 43 & n.78, 55 & n. 105, 58 & n.116, 66 & n.139, 68 & n.147 (Defs.' proposed jury instructions on collective knowledge and condonation) (citing authorities).

7

This Court has, likewise, repeatedly recognized the relevance of the very evidence for the precise purpose Defendants intend to introduce it—that USC knew and, in fact, authorized the consideration of philanthropy in making admissions decisions. *Sidoo*, 468 F. Supp. 3d at 445; **Ex. A** (first, second, and fourth through sixth and eighth bullets). The government mischaracterizes this evidence as evidence of "similar misconduct." *E.g.*, Mot. at 7. But that only assumes what the government must prove, and cannot justify excluding this evidence. This evidence also exposes precisely why *United States v. Brandon* is not, as the government contends, "instructive." Mot. at 11. This evidence of university admission practices provides the very foundation for a common practice that was *lacking* in *Brandon*. It was the absence of such evidence in *Brandon* that justified the exclusion of purported evidence of common practice and custom there. 17 F.3d 409, 443-45 (1st Cir. 1994). The government's bald complaints about the length of Defendants' proposed exhibit lists—which show the admissions practices described by the illustrative documents above—betray precisely why *Brandon* does not apply here.

Finally, the government itself has identified USC policy documents on its proposed trial exhibit list. The government cannot both exploit this evidence to try to show wrongdoing yet preclude the Defendants' from using similar evidence to show valid admissions practices that prove a central element of the defense: Defendants' good faith.[7] *United States v. Josleyn*, 99 F.3d 1182, 1194 (1st Cir. 1996) (approvingly quoting jury instruction that "any evidence of [victim's] actions or omissions, or evidence of deficiencies in the manner in which it implemented and enforced its policies and procedures, may be considered by you to the extent that such evidence bears on the issue of whether or not [defendant] formed the required intent to commit the crimes with which he is charged.").

    **3.**     **Materiality.** USC, even when considering donor applicants through the athletic Subco, marginalized, discounted, or was indifferent to candidates' actual athletic ability or

---

[7] The Defendants reserve their rights concerning the admissibility of those USC policies. There is no evidence that Defendants knew of these policies, and they were not even in place when Wilson's son applied.

academic credentials. This evidence contradicts the government's central contentions that alleged inaccuracies in the applications of Defendants' children, *e.g.*, Mot. at 2-3, 7-8, 10-11, were material to the schools' admissions decisions. *See, e.g.*, *Universal Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003-2004 (2016); Jury Trial Tr. Vol. XII, at 13-159 (Apr. 28, 2016) (ECF No. 513) in *United States v. DeNunzio*, No. 14-cr-10284-NMG (D. Mass.); *United States v. Williams*, 12 F.3d 452, 457 (5th Cir. 1994).[8] The government selectively cites some of Defendants' proposed trial exhibits about a "legitimate . . . recruit" or applicants' submissions that "do[ ] not appear to have been falsified." Mot. at 4, 5. These documents are relevant, in part, to the issues described in Sections I.A.1. and 2. above. But many other documents, *e.g.*, ¶¶ 1, 2, 4, 5 at 3-5 *supra*, illustrate the practice by which the Subco, nominally focused on evaluating athletic recruits, was often more sensitive to philanthropy and indifferent to athletics—establishing the very custom that undermines the materiality of alleged inaccuracies in the applications of Defendants' children and distinguishes this case from *Brandon*.

**4. USC's practice of channeling candidates with development potential through the Subco (as Singer did).** USC could have channeled Defendants' children through the so-called VIP process, which the government concedes was lawful, Mot. at 10, or the Subco, which clearly accounted for applicants' donor potential. The families of some of the applicants on USC's VIP lists gave as little as $15,000 to enhance their admissions chances, which Defendants' donations dwarfed and, thus, easily would have qualified them as VIP candidates. This evidence undermines the government's contentions, Mot. at 8 & n.20, 10, that there is some meaningful distinction between these two admissions processes. The same evidence also will help the jury understand a different and more significant distinction critical to Defendants' defense—that Singer, unbeknownst to the Defendants, steered their children to the Subco, rather than through the VIP process (where their donations would have gone directly to the school rather than through Singer), to facilitate his theft of Defendants' lawful donations (for which he

---

[8] *See also* ECF No. 2021-1, at 40 & n. 40, 41 & nn.71-74, 61 & nn.121-23 (Defs.' proposed jury instructions on materiality) (citing cases).

9

falsely presented himself as a legitimate middleman). Again, this is evidence that the Court has already recognized as relevant. *E.g.*, **Ex. A** (third, seventh bullets).

     **5.**     **The government's groundless tax charge against Wilson.**[9] USC itself is obligated to provide written disclosures to donors that include "good faith estimate[s]" of the value of "goods or services" provided as part of donors' "quid pro quo contribution[s]." 26 U.S.C. § 6115. USC may derive such estimates "by reference to the fair market value of similar or comparable goods or services." 26 C.F.R. § 1.6115-1(a)(2). The government, in trying to prove its tax charge against Wilson, intends to prove " 'the existence of a tax deficiency.' " *Boulware v. United States*, 552 U.S. 421, 424, 426-28 (2008) (quoting *Sansone v. United States*, 380 U.S. 343, 351 (1965)) (vacating order affirming convictions where district court precluded defendant from proffering and presenting evidence of alternative tax calculation). That burden entitles Wilson to present evidence of how USC treated *other* donors whose children, like Wilson's, may have benefited in the admissions process because of their families' donations. Yet, the government's motion, if granted, would deprive Wilson of this very evidence necessary to prove the proper calculation of Wilson's tax obligations—namely, that USC, in acknowledging and documenting gifts that USC expressly factored into favorable admissions decisions, valued those gifts as worthless. The exclusion of evidence of the other donations would be reversible error under controlling Supreme Court precedent.

     **6.**     **USC's bias.** Finally, based on documents produced in this case but unrelated to admission preferences, the government has evidence that USC solicited donations in violation of the tax code and that USC concealed the purpose of those donations with false paperwork. Yet, to the Defendants' knowledge, the government has not charged USC with any tax crime or civil penalty arising from those donations. This, too, is relevant evidence that the government's motion improperly seeks to exclude. The government's decision not to charge USC or and its employees constitutes a clear promise, reward, and inducement; exposes USC's bias; and should

---

[9]     Wilson, of course, contests the government's allegations of a *quid pro quo* that are a necessary predicate to the government's tax charges.

be evidence that Wilson may exploit at trial to contest the credibility of USC witnesses. *See, e.g.*, *Giglio v. United States*, 405 U.S. 150, 154 (1972).

## II. THE PROBATIVE VALUE OF EVIDENCE OF UNIVERSITY ADMISSIONS PRACTICES VASTLY OUTWEIGHS ANY PURPORTED PREJUDICE

Defendants' evidence is particularly relevant to the issue of intent—one of the central issues at trial. In such circumstances, as the First Circuit has noted, "[M]any courts have given the accused 'wide latitude' in the introduction of evidence which may tend to show a lack of willfulness or specific intent." *See, e.g.*, *United States v. Lussier*, 929 F.2d 25, 31 (1st Cir. 1991) (citing *United States v. Sternstein*, 596 F.2d 528, 530 (2d Cir. 1979)); *see also United States v. Garber*, 607 F.2d 92, 99 (5th Cir. 1999) ("[W]here the element of willfulness is critical to the defense, the defendant is entitled to wide latitude in the introduction of evidence tending to show lack of intent"). For this reason alone, the Court should reject the government's arguments to exclude this evidence under Federal Rule of Evidence 403. Notably, the government's Rule 403 arguments sidestep any actual prejudice and focus instead on imagined trial presentation issues. The Court should reject the government's arguments summarily.

*First*, the presentation of admissions-practice evidence that the government seeks to exclude will not devolve into "a series of extended mini-trials," as the government hyperbolically warns. Mot. at 2; *id*. 13-14. It also is not the case that the "parties would necessarily introduce voluminous documents concerning other individuals," at the government asserts. *Id*. at 13. The illustrative evidence that Defendants cite on pages 3-5 of this brief previews the efficiency with which Defendants intend to present this evidence at trial. And Defendants have various means by which they can—and will—streamline the presentation of their evidence.

*Second*, the government complains about the length of Defendants' proposed trial exhibit lists, *id.* at 1, to then assert that introducing this evidence will "unduly lengthen the trial." *Id*. at 14. This argument only restates the prior argument, and the Court should reject the government's pure speculation.

11

### III. EVEN IF THIS EVIDENCE WERE HEARSAY, MULTIPLE EXCEPTIONS SUPPORT THE ADMISSION OF EVIDENCE CONCERNING UNIVERSITY ADMISSIONS PRACTICES

The Court should also reject the government's sweeping, erroneous assertion that "much of" the subject evidence is inadmissible hearsay under Rule 802. *Id.* at 15. Even if there are hearsay issues with some of this evidence, there are ample, alternative grounds on which the Court should admit it, including the following.

*First*, Defendants may avoid any alleged hearsay problems by offering evidence of university admissions practices for purposes other than the truth of the statements that this evidence contains. *See, e.g.*, *United States v. Murphy*, 193 F.3d 1, 5 (1st Cir. 1999) ("So long as out-of-court statements are not offered for their truth, they are not hearsay. . . ."); 5 Weinstein's Federal Evidence § 801.11 (2021) ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted.") (quoting original advisory committee note to Fed. R. Evid. 801).

*Second*, these documents are business records of the central, day-to-day operations of USC's admissions process—the marketing and outreach to prospective applicants, including actual and nominal athletic recruits; fundraising; the evaluation of the various factors (including philanthropy) that routinely informed admissions decisions; and requests for input from individuals throughout the school about those factors. Fed. R. Evid. 803(b)(6); *see also, e.g.*, *Farnham v. Walmart Stores*, No. 1:13-cv-00305-JDL, 2015 U.S. Dist. LEXIS 88192, at *7-8 (D. Me. June 29, 2015) (admitting email under Fed. R. Evid. 803(6)).

*Third*, this evidence is probative of Defendants' and USC's state of mind and proof of USC's custom and practice—which the rules of evidence expressly exempt from the rule against hearsay. Fed. R. Evid. 803(b)(3); *see also, e.g.*, *McInnis v. Fairfield Cmtys., Inc.*, 458 F.3d 1129, 1143 (10th Cir. 2006) (reasoning that out-of-court statements by employees have been held admissible in a discrimination case to "show an employer's state of mind in making employment decisions").

*Fourth*, in some cases (not all), USC's documents comprise statements against interest—another exception to the rule against hearsay. Fed. R. Evid. 804(b)(3).

12

## CONCLUSION

For the foregoing reasons, the Court should deny the government's motion to exclude evidence of university practices.

Respectfully submitted,

By their counsel

/s/ Michael Kendall
Michael Kendall (BBO #544866)
Lauren Papenhausen (BBO# 655527)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
lauren.papenhause@whitecase.com

Andrew Tomback (pro hac vice)
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY 10016
Telephone: (212) 448-1100
ATomback@mclaughlinstern.com

*Counsel for John Wilson*

/s/ Brian T. Kelly
Brian T. Kelly (BBO # 549566)
Joshua C. Sharp (BBO # 681439)
Lauren M. Maynard (BBO # 698742)
NIXON PEABODY LLP
53 State Street
Boston, MA 02109
(617) 345-1000
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com
lmaynard@nixonpeabody.com

Robert Sheketoff (BBO # 457340)
One McKinley Square
Boston, MA 02109
(617)-367-3449

*Counsel for Gamal Abdelaziz*

Date: August 6, 2021

/s/ Cory S. Flashner
R. Robert Popeo (BBO # 403360)
Mark E. Robinson (BBO # 423080)
Eóin P. Beirne (BBO # 660885)
Cory S. Flashner (BBO # 629205)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1605
rpopeo@mintz.com
mrobinson@mintz.com
ebeirne@mintz.com
csflashner@mintz.com

*Counsel for Elisabeth Kimmel*

/s/ Michael K. Loucks
Michael K. Loucks (BBO # 305520)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
500 Boylston Street
Boston, MA 02116
(617) 573-4800
michael.loucks@skadden.com

Jack P. DiCanio (*pro hac vice*)
Emily A. Reitmeier (*pro hac vice*)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, CA 94301
(650) 470-4500
jack.dicanio@skadden.com

*Counsel for Marci Palatella*

## CERTIFICATE OF SERVICE

  I hereby certify that the above document is being filed on the date appearing in the header through the ECF system, which will send true copies to the attorneys of record.

              /s/ Michael Kendall
              Michael Kendall