UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREGORY COLBURN et al.,<br><br>            Defendants | No. 1:19-CR-10080-NMG |

**DEFENDANTS' OPPOSITION TO THE GOVERNMENT'S MOTION IN LIMINE
TO PRECLUDE ENTRAPMENT DEFENSE**

The government's motion to preclude Defendants from "asserting an entrapment defense or raising entrapment (or similar terms) before the jury" must be denied. As the government well knows, Defendants are not seeking a jury instruction on entrapment because Singer did not become a government cooperator until well after the Defendants allegedly joined his conspiracies. What **is** at issue is whether Rick Singer's recorded calls to Defendants in late 2019 and early 2020 were designed to create—and did in fact create—ambiguous and false inculpatory evidence that is not truly probative of Defendants' intent. In seeking to prohibit Defendants from "raising entrapment (or similar terms)," what the government is really trying to do is limit the Defendants' ability to present argument and evidence regarding the misleading nature of Singer's recorded calls. This would be a substantial violation of the defendants' Constitutional rights under the confrontation clause to contest evidence and witnesses.

The Court has already found:

> To the extent the defendants are dissatisfied with Singer's purported denials of any wrongdoing in connection with his rehearsed telephone calls, they will have ample opportunity to cross examine him if and when he testifies at trial…. Whether

1

Singer's calls in October, 2018, were consistent with his prior representations of his 'program' and whether they demonstrate that defendants believed their payments to be legitimate donations rather than bribes is an issue squarely for the jury after a trial on the merits.

Dkt. 1169 at 7-8. The government's motion should therefore be denied and the Court should not limit any argument or evidence regarding the nature of Singer's recorded calls.

## ARGUMENT

The real issue presented by the government's motion is Defendants' ability to counter what Defendants believe is the government's ambiguous and false inculpatory evidence of their intent: the meticulously scripted calls that Singer made to Defendants while acting as a government agent.  The recorded calls are in some cases the only evidence of the Defendants' intent, and Defendants expect the government to rely upon them heavily at trial (as they have throughout the pre-trial proceedings).  Defendants obviously have a right to a defense and require the flexibility to present argument and evidence which puts these calls in the proper context. This is not an "entrapment" defense—which is an affirmative defense to criminal liability—but a defense which focuses on the **weight** the jury should give to Singer's recorded, scripted calls.  Defendants are not arguing, in other words, that Singer (a government agent) tricked them into committing a crime, but that Singer (a government agent) tricked them into making statements that appear to be inculpatory after the fact.

The government's motion focuses on Singer's personal notes taken during the course of his cooperation with the government that—in a serious *Brady* violation—the government failed to disclose to the Defendants until approximately sixteen months after first reviewing them. These notes state:

Loud and abrasive call with agents. **They continue to ask me to tell a fib and not restate what I told my clients as to where there [sic] money was going –to the**

**program not the coach and that it was a donation and they want it to be a payment.**

I asked for a script if they want me to ask questions and retrieve responses that are not accurate to the way I should be asking the questions. **Essentially they are asking me to bend the truth** which is what they asked me not to do when working with the agents and Eric Rosen.

**Liz raised her voice to me like she did in the hotel room about agreeing with her that everyone Bribed the schools. This time about asking each person to agree to a lie I was telling them.**

Spoke to [Parent A] which is a referral from Gordon Caplon [sic]. They want to **nail Gordon at all costs**. [Parent A] told me his daughter is a good runner 19 minute 3 mile good enough for recruited walk on or walk on to Wash U and Cornell. Explained the side door but very late and I probably could not do it at this stage. The agents told me to get him to take another school I had a relationship **just to entrap him** despite him never asking for any other school.

When I told them Gordon texted me that [REDACTED] did not get extended time and the reasons why they still wanted me to ask him for a payment to take the SAT through WHCP even when he was not approved **just to nail him**. I said that is ludicrous as he will not entertain because she was not approved.

SINGER-PHONE-000495 (emphasis added).  As detailed in Defendants' motion regarding government misconduct (Dkt. 972), these notes raise significant questions about the truthfulness of Singer's statements to government agents, the accuracy of the statements he made to Defendants during the recorded calls, and Singer's intent to trick the Defendants into unwittingly making ambiguous comments that the government will argue are inculpatory.  The notes are corroborated by other evidence in the case which suggests that Singer surreptitiously inserted seemingly inculpatory statements into his recorded calls under pressure from the government in order to generate false evidence of Defendants' intent.

Two examples are helpful in understanding why the defense must be able to present argument and evidence regarding Singer's attempts to "trap" the parents into making false inculpatory statements.  First, with respect to Defendant Abdelaziz, Singer made his first recorded call to Abdelaziz on October 25, 2018, during which he tried to get Abdelaziz to agree that "$300,000, um, was paid to . . . Donna Heinel at USC to get [Abdelaziz's daughter] into

school." 10/25/18 Abdelaziz Tr. at 4.  But an FBI report shows that **the very same week that Singer made this call**, he told the government that "ABDELAZIZ did not know about HEINEL" and "knew the money was going to the school."  10/31/18 FD-1023.  The agent notes are even more stark: "Donna diverted some of the money. Gamal [Abdelaziz] didn't know about Donna." 10/31/18 Notes.  Singer's statements to the government are inconsistent with the statement he made to Abdelaziz on the recorded call—but consistent with the statement he made in his personal notes that the government was trying to get him to have the Defendants "agree to a lie" (Singer's words) and trick the Defendants into making a false confession.  Taken in context, the jury could conclude that Abdelaziz's responses should be disregarded because they did not reflect any prior agreement with Singer and are not truly indicative of Abdelaziz's intent.  Given the proper context, the jury might understand that Abdelaziz thought that Singer was referring colloquially to "Donna" as an athletic director receiving money *for the department* and not for her own *personal gain*.

The same is true for the other Defendants.  As explained in Defendants' misconduct motion, Singer's prior statements to Defendant Wilson were also inconsistent with what the government instructed Singer to say during the recorded calls.  *See* Dkt. 972 at 14-15.  Wilson will present evidence that Singer repeatedly told him that his payments were legitimate donations to athletic departments.  Following the government's instruction to Singer to "bend the truth," however, Singer began interjecting incriminating phrases on his recorded calls with Defendants.  The October 15, 2018 call in which Singer tried to "nail" Wilson included the following exchange:

> SINGER:      So I know when . . . we get the girls in, it's a done deal and you're gonna take care of your part of it, you're gonna make the payments *to the schools* and the – *to the coaches*. And that's what I need . . . so I'm not worried about that.

WILSON:      Uh, uh, help me understand the logistics? I thought I make the payment to you and you made the payment *to the school.*

SINGER:      Correct. That's correct.

WILSON:      Oh you said that *I* make the payments *to the schools*.

10/15/18 Wilson Tr. At 9 (emphasis added). As is clear from the transcript, Singer had repeatedly told Wilson that the payments would be donated to the *school,* but was now trying to get Wilson to agree unwittingly to an ambiguous statement that the payments were also going to the *coaches.* Based on its prior motion practice, the government apparently does not dispute that Singer's notes refer to a mischaracterization of Wilson's dealings with Singer.

The Defendants have a right to dispute the credibility and weight of any and all of the evidence the government offers. Defendants are absolutely entitled to use the notes and other evidence to attack the government's "proof" of their intent. "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted). This Constitutional guarantee includes the right of a defendant to present "competent, reliable evidence bearing on the credibility of [the prosecution's evidence]." *Id.* Here, the evidence at issue—Singer's notes, agent notes, scripts, and agent text messages and phone calls—speaks directly to the credibility of what the government believes is its marquee evidence against Defendants. The exclusion of this exculpatory evidence, or precluding argument regarding such evidence, would "deprive[] [Defendants] of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'" *Id.* at 690-91 (citations omitted).

Moreover, this evidence will be directly relevant during cross-examination of Singer and the government agents. "The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'" *Davis v. Alaska*, 415 U.S. 308, 315 (1974). The "main and essential purpose of confrontation is to secure

for the opponent the opportunity of cross-examination." *Id*. at 315-16 ("Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested."). To deny Defendants the opportunity to effectively cross-examine Singer and the government agents with questions about false inculpatory evidence would be highly prejudicial and constitute reversible error. See *United States v. Lynn*, 856 F.2d 430, 434 (1st Cir. 1988) ("We find that by cutting off all cross-examination into a relevant and not fully explored area, the district court abused its discretion. The constitutional right to confront and cross-examine witnesses was impaired."). Indeed, this Court has already stated that "[t]o the extent the defendants are dissatisfied with Singer's purported denials of any wrongdoing in connection with his rehearsed telephone calls, they will have ample opportunity to cross examine him if and when he testifies at trial." Dkt. 1169 at 7.

The government claims that introducing argument and evidence regarding the generation of the false inculpatory evidence would "improperly appeal to juror sympathies and seek acquittal… because the jury disapproves of the manner in which evidence of the defendants' knowledge and intent was collected." Dkt 2003 at 5. This is simply not the case. The evidence at issue goes beyond showing the "manner in which evidence" was collected, and speaks *directly to* Defendants' knowledge and intent. Allowing the jury to see this evidence would not "appeal to emotions rather than to reason," but would in fact provide the jury with the context it needs to use "reason" to understand the recorded calls. Singer's notes and the related evidence cut straight to the heart of the credibility of the government's key witness and key pieces of evidence. Whether the doubts raised by the evidence provide a basis for acquittal is a question for the jury to decide. To the extent that jurors may disapprove of the government's tactics, the prejudice the government may face as a result is far outweighed by the probative value of this evidence with

respect to Singer's credibility, the agents' credibility, the weight to be given to the recorded calls, and—ultimately—Defendants' knowledge and intent.  The jury must be given the opportunity to see the full picture and weigh all of the evidence for itself.  *See Blake v. Pellegrino*, 329 F.3d 43, 47-48 (1st Cir. 2003) ("It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses . . . and draws the ultimate conclusions as to the facts." (citations omitted)).

With respect to the word "entrap," that is a word that Singer himself used when describing what he perceived the government was asking him to do.  He used the word "entrap" in a note to himself that he never thought would see the light of day.  Even if Singer used the word colloquially (which he appears to have done), the Defendants are more than entitled to question him as to its meaning, what the agents were pressuring him to do, and how he reacted to the agents' pressure.

Finally, an appropriate response to the government's Motion would be incomplete without making the following two points that bear on the proper determination of the Motion and the government's good faith in bringing it:

**First**, the government has not yet disclosed whether it will call Singer at trial, even though the trial will begin in just over a month.  Although Singer appears on the government's witness list, as recently as July 20, 2021 during a meet and confer conference, the AUSAs claimed that they genuinely did not know whether they would call Singer or not.  Of course, the trajectory and length of the trial would change substantially depending on whether or not the government uses Singer as a witness. And if Singer is not called, it is even more important for the Defendants to present argument and evidence regarding Singer's notes and his self-admitted

7

attempts to generate false inculpatory evidence because, although the recordings will probably be admitted, Singer may not be available for cross-examination.

**Second**, there is a strange quality to the government's entire endeavor to generate inculpatory evidence against Defendants that the payments were going *to the coaches* and their current attempt to hide argument and evidence of this endeavor from the jury.  Singer's personal note states—and the evidence confirms—that he tried to use the calls to get parents to acknowledge that their payments were going *to coaches* rather than *to schools*.  But Singer told the government, and the government agrees, that Singer generally told parents that their funds were going to the *school*.  *See, e.g.*, Sworn Declaration of Eric S. Rosen (Dkt. 1104-3) at ¶ 6 (noting that Singer "typically [told clients] that the money was a 'donation' to an athletic 'program' . . . .").  Moreover, an FBI agent filed a sworn affidavit before Judge Burroughs that "up until the summer of 2018 [**after all of the Defendants had completed dealings with USC**], I believe that all the money SINGER provided to HEINEL for her assistance went to USC athletic programs."[1]  And the government admitted to this Court last year that:

> The government was not attempting to build a case that the parents understood Heinel to be personally pocketing money, and the government has **never alleged that**. The government has alleged—and the calls, checks and emails prove—that the defendants knew that one or more complicit insiders at USC were facilitating the admission of their children as recruited athletes in exchange for payments **to a USC athletic program**….[T]he defendants understood they were making quid pro quo payments **to a USC fund** to induce a university insider to facilitate the fraudulent recruitment of their children."

Dkt. 1104 at 7, 9-10 (emphasis added).

---

[1] As the Court is aware, the government argues that "whether the payment went to Heinel personally or to USC is not legally relevant to whether it was a bribe." Dkt. 1304 at 5. Defendants vigorously dispute that payments to a purported victim can ever constitute "bribes or kickbacks supplied by a third party" under *Skilling v. United States* 561 U.S. 358 (2010).  There has never been another case—anywhere—in which such a payment has been a bribe or kickback.  But if the government believes what it represents to the Court, why did federal agents browbeat Singer into getting parents to falsely agree that their money was going to an individual and not the school?  There can be no possible reason other than to prejudice the jury against the Defendants.

If the government admits (and in fact submitted sworn statements to two federal judges and one unsworn brief stating) that Singer typically told parents they were making donations *to the school*, why do the notes reflect, and the evidence confirm, that Singer attempted to get parents to agree that they were making payments to *coaches*?  The answer is to prejudice the jury against the Defendants.  This is an additional reason that the Court should **deny** the instant motion and **grant** Defendants' Motion in Limine to Exclude Evidence or Reference to Donna Heinel Personally Receiving Any Money from Rick Singer (Dkt. 2010) and Motion in Limine to Exclude Evidence of Private School Tuition Payments (Dkt. 1998).

## CONCLUSION

For the reasons explained above, Defendants respectfully request that the Court deny the government's motion *in limine* to preclude Defendants from "asserting an entrapment defense or raising entrapment (or similar terms) before the jury."

Dated: August 6, 2021                         Respectfully submitted,

                                              */s/ Brian T. Kelly*
                                              Brian T. Kelly (BBO # 549566)
                                              Joshua C. Sharp (BBO # 681439)
                                              Lauren M. Maynard (BBO # 698742)
                                              NIXON PEABODY LLP
                                              53 State Street
                                              Boston, MA 02109
                                              (617) 345-1000
                                              bkelly@nixonpeabody.com
                                              jsharp@nixonpeabody.com
                                              lmaynard@nixonpeabody.com

                                              Robert Sheketoff (BBO # 457340)
                                              One McKinley Square
                                              Boston, MA 02109
                                              617-367-3449

*Counsel for Gamal Abdelaziz*

/s/ Cory S. Flashner
R. Robert Popeo (BBO # 403360)
Mark E. Robinson (BBO # 423080)
Eóin P. Beirne (BBO # 660885)
Cory S. Flashner (BBO # 629205)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1605
rpopeo@mintz.com
mrobinson@mintz.com
ebeirne@mintz.com
csflashner@mintz.com

*Counsel for Elisabeth Kimmel*

/s/ Michael K. Loucks
Michael K. Loucks (BBO # 305520)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
500 Boylston Street
Boston, MA 02116
(617) 573-4800
michael.loucks@skadden.com

Jack P. DiCanio (*pro hac vice*)
Emily Reitmeier (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
525 University Avenue
Palo Alto, CA 94301
(650) 470-4500
jack.dicanio@skadden.com
allen.ruby@skadden.com

*Counsel for Marci Palatella*

/s/ Michael Kendall
Michael Kendall (BBO # 544866)
Lauren M. Papenhausen (BBO # 655527)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
(617) 979-9300
michael.kendall@whitecase.com
lauren.papenhausen@whitecase.com

Andrew E. Tomback (pro hac vice)

MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-1100
atomback@mclaughlinstern.com

*Counsel for John Wilson*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically on August 6, 2021, and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing.

*/s/ Joshua C. Sharp*

Joshua C. Sharp

11