## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>*v.*<br><br>GREGORY COLBURN, *et al.*,<br><br>Defendants. | Case No. 1:19-cr-10080-NMG<br><br>***Leave to file excess pages granted Aug. 6, 2021 (ECF No. 2026)*** |

## DEFENDANTS' OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE AND LIMIT DEFENDANTS' PROPOSED EXPERT TESTIMONY

Defendants Elisabeth Kimmel, Gamal Abdelaziz, Marci Palatella, and John Wilson ("Defendants") respectfully oppose the government's motion *in limine* to preclude and limit the proposed expert testimony of Kent A. Kiehl, Ph.D., Kent John Chabotar, Ph.D., William Tierney, Ph.D., and Richard Speier. *See* ECF No. 2006. Each of the Defendants' experts meets the standard for admissibility of expert testimony announced in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and accordingly their testimony should be allowed. Moreover, even if the Court were uncertain as to whether the anticipated testimony satisfies the *Daubert* standard, the proper measure is to conduct a *Daubert* hearing rather than excluding the testimony on a pre-trial motion *in limine*.

## I.      ARGUMENT

Under Federal Rule of Evidence 702, expert evidence is admissible so long as it will assist the trier of fact, the expert is qualified "by knowledge, skill, experience, training, or education" to testify on the subject, and the expert applies "reliable principles and methods" to the facts of the case. Fed. R. Evid. 702. As the *Daubert* Court noted, and as this Court has noted many times, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," not "wholesale exclusion." *Daubert*, 509 U.S. at 596; *see also Koninklijke Philips N.V. v. Zoll Med. Corp.*, 256 F. Supp. 3d 50, 52 (D. Mass. 2017) (Gorton, J.). Indeed, this Session has indicated a general inclination to allow expert testimony to reach the jury and allow the jury to "discern the truth" and "assess the reliability of expert testimony." *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 191-92 (D. Mass. 2012) (Gorton, J.) (noting that, "[u]ntil now, no expert has been precluded on *Daubert* grounds from testifying in this Session"). Thus, expert testimony should be excluded only when the challenging party can demonstrate that it is "so 'fundamentally unsupported that it can offer no assistance to the jury.'" *Sandoe v. Bos. Sci. Corp.*, 333 F.R.D. 4, 10 (D. Mass. 2019) (Gorton, J.) (quotations and citations omitted). The government has not done so here with respect to any of the experts it challenges.

### A.    Dr. Kiehl's Testimony Is Reliable and Highly Relevant to the Jury.

The government argues that the Court should exclude Dr. Kiehl's testimony, questioning Dr. Kiehl's qualifications, the acceptance and applicability of the Psychopathy Checklist Revised ("PCL-R"), and the relevance of Dr. Kiehl's application of the PCL-R to the facts in this case. Each of these arguments is without merit. Rather, Dr. Kiehl is a highly qualified and respected expert in his field; the PCL-R is the gold standard assessment instrument for psychopathy, routinely used by the government itself; and its application here is highly relevant, *not* to usurp the jury's role in assessing Mr. Singer's credibility, but rather in evaluating the credibility of the Defendants' defense that they were conned and manipulated by Mr. Singer.

### 1.    Dr. Kiehl is a highly qualified expert in his field.

Dr. Kiehl is a highly qualified and respected expert in his field. As noted in his curriculum vitae and in Mrs. Kimmel's expert disclosure, Dr. Kiehl is currently a tenured full professor in the

Department of Psychology with secondary appointments in the Department of Neuroscience and the School of Law at the University of New Mexico and was previously a clinical professor and lecturer in the Departments of Psychology and Psychiatry at Yale University. He is the author of more than 200 peer-reviewed studies in the field of psychology, and has a scientific citation index that places him at the very top of his field (more than 28,000 peer-reviewed citations to his work). He has been awarded more than $40 million in grants from the National Institutes of Health ("NIH") over the course of his career, also placing him at the top of his field. He has served as chair of the Psychopathy Working Group of the MacArthur Foundation's Law and Neuroscience Project and has served as a member of multiple NIH "study sections" regarding topics in psychology and neuroscience, including psychopathy. He is a guest editor of the Proceedings of the National Academy of Sciences. He has served as a lecturer in "Neuroscience Education for Federal Judges" at the Federal Judicial Center for nine years. He is one of only about a half-dozen people authorized to train and certify others on the PCL-R and he developed the training cases used for all PCL-R trainings, by all trainers. Dr. Kiehl is, by any reasonable, objective measure, an expert in his field by virtue of his "knowledge, skill, training, or education." Fed. R. Evid. 702.

The government acknowledges almost none of that—despite it being contained in Dr. Kiehl's CV, attached to their own motion. Instead, the government derides Dr. Kiehl as "the author of [a] website" and "a paid 'psychopath whisperer,'" as though he is merely a blogger or some kind of medium. ECF No. 2006  at 2, 6. But epithets are not evidence, and the government does not offer any evidence—articles, studies, anything—casting doubt on Dr. Kiehl's research or qualifications that would militate against his ability to provide expert testimony. As such, any challenge to his testimony on that basis must fail. *See, e.g.*, *United States v. Sampson*, No. 01-10384-LTS, 2016 WL 11726919, *7 (D. Mass. Sept. 2, 2016) ("[T]he government has not

advanced any meaningful basis upon which to question Dr. Gur's extensive experience or substantial qualifications as a noted expert in the field of neuropsychology and neuroimaging.").

### 2. The PCL-R is the gold standard assessment for psychopathic traits and behavior.

Similarly, the government suggests that the PCL-R is not sufficiently accepted by the scientific community to meet the requirements of *Daubert*, and questions the validity of its application without an interview of Mr. Singer. Neither of these arguments is availing.

First, the government cites only one case in which the court did not allow expert testimony based on the PCL-R, and even that court agreed that the PCL-R is the "gold standard" diagnostic assessment instrument for psychopathy—and it is, in fact, one of the most empirically validated assessment instruments for any psychological disorder. *United States v. Sampson*, No. 01-10384-LTS, 2016 WL 11726919, at *17 (D. Mass. Sept. 2, 2016).[1,2] Indeed, *the government itself* routinely seeks to admit expert testimony based on the PCL-R in civil commitment and sentencing

---

[1] The outcome in *Sampson* appears to have been driven by the conduct of the expert in question as much as by the court's concerns regarding the PCL-R and psychopathy as a diagnosis. *See id.* at 24-27. In any event, the case is distinguishable. There, the court was concerned with the admission of PCL-R evidence used as a predictor of future dangerousness as opposed to mere rebuttal of mitigation evidence of mental condition, which is not allowed under Rule 12.2. *Id.* at 17. The same concerns are not at play here. Moreover, some of the *Sampson* court's concerns with regard to psychopathy as a diagnosis were based on inaccurate information. For example, the court noted that psychopathy is not a diagnosis listed in the widely accepted manual of mental disorders, the DSM-V. *Id.* at 18. That is only partially true; psychopathy is instead subsumed within the definition of anti-social personality disorder. *See* DSM-V at 301.7 (5th ed. 2013) ("The essential feature of antisocial personality disorder is a pervasive pattern of disregard for, and violation of, the right of others that begins in childhood or early adolescence and continues into adulthood. This pattern has also been referred to as psychopathy . . . .").

[2] *See, e.g.*, Storey, J. E., Hart, S. D., Cooke, D. J., & Michie, C., *Psychometric properties of the Hare Psychopathy Checklist-Revised (PCL-R) in a representative sample of Canadian federal offenders*, 40(2) Law and Human Behavior, 136–146 (2016) ("The most widely used measure of psychopathy is the Psychopathy Checklist—Revised (PCL-R; Hare 1991, 2003) . . . . The PCL-R has demonstrated good internal consistency, test-retest, and interrater reliability across diverse populations. Moreover, the validity of the PCL-R is well established, in both basic and applied settings.") (citations omitted); Grann, M., Langstrom, N., Tenstrom, A., & Stalenheim, E.G., *Reliability of file-based retrospective ratings of psychopathy with the PCL-R*, 70 Journal of Personality Assessment 416, 417 (1998) ("Research indicates that the Psychopathy Checklist—Revised (PCL-R) is the most reliable and valid instrument for measuring psychopathy.") (citations omitted).

contexts, including in this district. In *United States v. Mahoney*, for example, the government opposed a *Daubert* challenge to the *government's* expert who used the PCL-R and two other assessment tools. In that case, the government argued that the PCL-R and the two other assessment tools "are admissible, as they have been peer reviewed and are generally accepted in the field. In support of this argument, they submitted a binder full of articles . . . ." 53 F. Supp. 3d 401, 412 (D. Mass. 2014). The Court agreed, acknowledging that "numerous articles and cases indicate that courts throughout the United States frequently use the PCL-R," and that "several state courts have admitted the . . . PCL-R after rejecting challenges under *Frye*, which requires the scientific principles underlying expert testimony to be generally accepted by members of the relevant field." *Id.* at 413 (collecting cases, articles) (citations omitted).

The government also attempts to make great moment of Dr. Kiehl applying the PCL-R without having interviewed Mr. Singer. The attraction of this argument isn't even skin-deep. The PCL-R itself explicitly allows for its application by file review, with or without an interview. *See* PCL-R Manual at 19 ("A considerable amount of research (see chapters 4, 5, and 8) indicates that reliable and valid PCL-R ratings can be made solely on the basis of collateral information . . . .")[3]. Moreover, multiple peer-reviewed studies have tested the comparative reliability of the results of PCL-R applications conducted with and without an interview, and found the results to be acceptable or excellent.[4] In this case, moreover, Dr. Kiehl has access to dozens of hours of

---

[3] The manual also notes that, if anything, file review evaluations result in artificially *low* psychopathy scores. *See id.* ("Ratings based on file reviews are likely to result in lower PCL-R scores than otherwise would be obtained from an integration of interview and file information, particularly at the upper end of the spectrum.") (citations omitted).

[4] *See, e.g.*, Grann, *supra* (finding intra-class reliability between interview and file review, compared to file review only, to be 0.88, or excellent); Bolt, D.M., Hare, R.D., Vitale, J.E., & Newman, J.P, *A multigroup item response theory analysis of the Psychopathy Checklist-revised*, 16 Psychological Assessment 155 (2004); Wong, S., *Is Hare's Psychopathy Checklist reliable without the interview?*, 1988 Psychological Reports 62, 931 (1988).

recordings of Mr. Singer and years of his emails, collected by the government—Mr. Singer's own unfiltered words and conduct—a much more extensive documentary record than is typically available to researchers and clinicians.

This methodology clearly meets *Daubert*'s requirements. *See Sampson*, 2016 WL 11726919 at *13 ("[T]he Court would be hard-pressed to sustain a *Daubert* challenge where an expert administered a widely used test consistently with that test's instructions, scored the test appropriately, and then relied upon an interpretive report generated via a widely used program endorsed by the test's creators."). The government's challenges to the PCL-R and Dr. Kiehl's proposed method of application of it are without merit.

### 3. Dr. Kiehl's application of the PCL-R to Rick Singer is highly relevant and useful to the jury's fact determinations in this case.

Finally, Dr. Kiehl's testimony is not, as the government contends, "an attack on a co-conspirator's credibility dressed up as a psychological evaluation." ECF No. 2006 at 5. The fact that Mr. Singer is a liar is not in dispute. The government charged him with fraud and he pled guilty. What *is* in dispute is the Defendants' state of mind when they hired Mr. Singer and made payments to his foundation and their defense that Mr. Singer conned them into making what they believed to be bona fide donations to the universities which he then stole. Dr. Kiehl's expert testimony regarding the degree to which Mr. Singer exhibits psychopathic traits—particularly the so-called Factor 1, interpersonal traits of superficial charm, grandiosity, pathological lying, manipulativeness, lack of empathy—is highly relevant context for the jury in deciding whether to credit this defense.

If a world-class expert in psychopathy reviews an extensive documentary record using a generally accepted methodology and concludes that Mr. Singer demonstrates recognizable traits and behaviors that make him uniquely able to con and manipulate even sophisticated people—that

is, make him psychopathic—that testimony may "assist the trier of fact to understand the evidence or to determine a fact in issue": the veracity of the Defendants' defense and the credibility of their states of mind. Fed. R. Evid. 702. That is, essentially, the definition of relevance. Fed. R. Evid. 401 ("Evidence is relevant if (1) it has any tendency to make a fact more or less probable than it would be without the evidence; and (2) the fact is of consequence in determining the action."); *United States v. Gorski*, 880 F. 3d 27, 32 n.3 (1st Cir. 2018) ("If the defendant had a good faith belief that he was obeying the law, even if that belief was mistaken, he did not have the necessary knowledge and intent to commit the crime."). The government, of course, is free to put on evidence to the contrary. But the assessment of Dr. Kiehl's credibility and the weight of his testimony is soundly within the province of the jury. *See Daubert*, 509 U.S. at 596 (noting that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," not "wholesale exclusion"); *Koninklijke*, 256 F. Supp. 3d at 52 ("If an expert's testimony is within 'the range where experts might reasonably differ,' the jury, not the trial court, should be the one to decide among the conflicting views of different experts.") (internal quotes omitted).[5]

## B.   Dr. Chabotar's and Dr. Tierney's Testimony Will Provide Key Context for the Defense.

The government's attacks on the admissibility of Dr. Chabotar's and Dr. Tierney's expert testimony are likewise unavailing. Dr. Chabotar's and Dr. Tierney's testimony covers proper subjects for expert testimony and will demonstrate important and relevant context for the jury to

---

[5] Even if Dr. Kiehl's testimony were to have an indirect effect on the jury's assessment of Mr. Singer's credibility as a witness, that alone is not enough to exclude it. *See United States v. Shay*, 57 F.3d 126, 131 (1st Cir. 1995) ("[N]o constitutional provision, law, or rule requires the automatic exclusion of expert testimony simply because it concerns a credibility question."). Indeed, in *Shay*—a case the government itself cites—the First Circuit reversed the district court to allow expert testimony regarding the defendant's mental disorder and its bearing on the credibility of his statements as a witness. *Id.* at 132-34.

evaluate the Defendants' professed states of mind, the scope of the fiduciary duties owed by the university employees, and other essential elements of the crimes charged.[6]

### 1.    Dr. Chabotar's and Dr. Tierney's industry-specific testimony is a proper subject for expert testimony.

The government contends that Dr. Chabotar's and Dr. Tierney's testimony is essentially either common knowledge or common sense and, as such, is unnecessary, adding flippantly that "[t]he jury . . . does not need the aid of two professors to distinguish *quid pro quo* payments designed to facilitate fraud from legitimate donations." ECF No. 2006 at 8. That is a vast oversimplification and, of course, not why the Defendants offer this testimony. Higher education in the United States is a multi-billion dollar industry; university governance, financing, and fundraising are complicated and shaped by myriad social, structural, legal, and regulatory forces. Dr. Chabotar and Dr. Tierney have both made long careers in the study and practice of higher education administration—and between them have published dozens of books and articles on the subject, as evidenced by their CVs. An understanding of this complex world—which is likely unfamiliar to most jurors, regardless of whether they attended college—would "help the trier of fact . . . ." Fed. R. Evid. 702(a). Indeed, several of the opinions and topics of testimony to be offered by Dr. Chabotar and Dr. Tierney—such as the impact of utilizing a revenue-centered management model on the scope and strength of institutional oversight of individual fundraising

---

[6] Notably, the government does not challenge either expert's qualifications *or* the reliability of their testimony or the reliability of their application of the principles and methods of their training to the facts of the case. Where, as here, an expert is providing testimony that is not scientific, such as explaining an industry, "experience alone" may "provide a sufficient foundation for expert testimony." Fed. R. Evid. 702, Adv. Comm. Notes, 2000 Amendment; *see Den norske*, 75 F.3d at 57; *Ting Ji*, 538 F. Supp. 2d at 357 ("In non-technical areas, long experience in a field can confer expertise upon a witness." (citing *Den norske Bank*, 75 F.3d at 57). At any rate, not only do Dr. Chabotar and Dr. Tierney have extensive personal experience in university administration, it is also their field of academic study, evincing the kind of core indicia of reliability—peer review, etc.—identified by the *Daubert* Court. 509 U.S. at 593-95.

efforts—are well outside the realm of laypeople's knowledge, and, as discussed below, highly relevant to essential defenses.

Courts (including this Session) routinely admit expert testimony regarding how businesses or industries typically operate, about which any particular expertise might not be considered scientific or technical. In *Den norske Bank v. First National Bank of Boston*, 75 F.3d 49 (1st Cir. 1996), for example, the First Circuit affirmed this Session's consideration of two expert witness affidavits submitted by the plaintiff at summary judgment to provide information on banking industry practices. These affidavits were from current and former commercial loan officers of the plaintiff based on their personal knowledge of banking industry practices. *Id.* at 56. The First Circuit agreed that these affidavits could properly be considered as expert testimony, and rejected the defendant's contention that the expert testimony regarding general behavior in the banking industry was not sufficiently probative, reasoning that "usage of trade" expert testimony is probative in helping a factfinder assess the likelihood that a given practice or method would be "observed with respect to the transaction in question." *Id.* at 58 (citation omitted). This Session has also explained that "testimony describing how an industry practice typically operates" is "admissible." *Ting Ji v. Bose Corp.*, 538 F. Supp. 2d 354, 358 (D. Mass. 2008) (Gorton, J.) (citing *Levin v. Dalva Bros. Inc.*, 459 F.3d 68, 79 (1st Cir. 2006)); *see Silva v. Milacron, Inc.*, 2004 U.S. Dist. LEXIS 33703, at *14-15 (D. Mass. Mar. 5, 2004) (Gorton, J.) (permitting expert testimony where expert did not have specific knowledge on particular product at issue, but instead had "general engineering expertise" sufficient to allow him to render an opinion); *Chapman v. Bernard's, Inc.*, 167 F. Supp. 2d 406, 422-23 (D. Mass. 2001) (Gorton, J.) (permitting expert testimony on industry standards for cribs, bunk beds, and toddler beds in a suit involving an alleged design defect in a daybed, because the proffering party could establish that use of the daybeds by

9

toddlers was foreseeable, in which case the standards for cribs, bunk beds, and toddler beds "might be relevant").[7] The expected testimony of Dr. Chabotar and Dr. Tierney is no different from any of these cases: it will provide context regarding a regulated industry and the business model or "product" at issue here.

The cases the government cites for the proposition that Dr. Chabotar's and Dr. Tierney's knowledge and opinions are "common sense" are not persuasive; all of them relate to subject matter that is considerably less specialized and more plainly unnecessary. *See United States v. Sebaggala*, 256 F.3d 59 (1st Cir. 2001) (affirming exclusion of expert testimony regarding cultural norms was unnecessary to prove that defendant did not understand customs form because he did not speak English); *United States v. Brien*, 59 F.3d 274, 276 (1st Cir. 1995) (affirming exclusion of expert testimony that eyewitness identification is unreliable where expert offered no scientific foundation except referring once to "the literature"); *United States v. Navedo-Ramirez*, 781 F.3d 563 (1st Cir. 2015) (affirming that expert testimony regarding Battered Woman Syndrome to explain defendant's fear of former partner was unnecessary where defendant testified that former partner had threatened her son's life and raped her).

### 2. Dr. Chabotar's and Dr. Tierney's testimony is relevant to the Defendants' defenses, including the Defendants' states of mind.

The government further argues that Dr. Chabotar's and Dr. Tierney's testimony regarding the inner workings of higher education and of USC in particular are completely irrelevant and an attempt to "blame the victim." ECF No. 2006 at 6-9. Not so. As the government has done several

---

[7] *See also Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 953-54 (D. Minn. 2018) (permitting expert testimony regarding "industry practice or standards" for Title IX gender-equity in intercollegiate athletics, and regarding other institutions' compliance with Title IX requirements); *Humphreys v. Regents of the Univ. of Cal.*, 2006 U.S. Dist. LEXIS 47822, at *4-5 (N.D. Cal. July 6, 2006) (permitting expert testimony regarding university human resources management best practices, and the expert's conclusion that the defendant university's "treatment of plaintiff [a former employee] was inconsistent with a number of those practices").

times in the course of this litigation, it justifies its position by assuming the guilt of the Defendants and arguing that evidence to the contrary is irrelevant. Trial is not a Rule 12 hearing, however— the Court is not obligated to assume the government's allegations are true for the purposes of determining whether to admit evidence. Similar to Dr. Kiehl's testimony, the Defendants offer the testimony of Dr. Chabotar and Dr. Tierney to provide context about their states of mind and to persuade the jury that they genuinely believed that they were paying bona fide donations to schools (and not bribes to coaches and officials). Here again, if two experts in higher education administration and fundraising testify that fundraising is of existential importance to universities for several structural reasons, and that schools leverage admissions and athletics in order to meet financial need, their testimony will "help the trier of fact to understand the evidence or to determine a fact at issue," i.e., whether the Defendants actually had a good faith belief that the universities would treat their children differently if they donated to the schools. Fed. R. Evid. 702.[8] Such testimony is relevant, and accordingly satisfies the *Daubert* standard. *See Daubert*, 509 U.S. at 591 ("Rule 702 further requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.' This condition goes primarily to relevance.").

The cases the government cites to the contrary are distinguishable. In *United States v. Brandon*, for example, the First Circuit affirmed the exclusion of expert evidence regarding an industry practice of not requiring down payments in commercial real estate transactions, noting "[t]he defendants . . . have not demonstrated any relationship between the proffered evidence that no down payment financing was a common practice and the likelihood that [the lender] directed

---

[8] Analogously, the First Circuit has "admitted expert testimony [proffered by the government] regarding the operation of criminal schemes and activities in a variety of contexts, finding such testimony helpful to juries in understanding some obscure or complex aspect of the crime." *United States v. Montas*, 41 F.3d 775, 783 (1st Cir. 1994) (collecting cases). The converse should also be true—that testimony offered by a criminal defendant regarding the operation of legitimate schemes and activities is admissible and relevant to a defendant's intent or beliefs regarding his or her conduct.

[the defendants' company] to falsify paperwork to misrepresent the existence of down payments that were never made." 17 F.3d 409, 444 (1st Cir. 1994). Here, by contrast, there is significant evidence in the government's own productions of documents from USC, for example, that USC regularly admitted students who *were not* USC-caliber athletes but *were* development prospects as athletic recruits.[9] Expert testimony regarding the context in which USC engaged in that practice and why is relevant to the jury in assessing the good faith beliefs of the Defendants, among other defenses. This is not blaming the victim—it is evidence showing that the Defendants did not believe they were committing a crime, and therefore that there was no victim, or at least, that the universities were not intended victims of the Defendants.

### 3. Dr. Tierney may permissibly testify as both an expert and a lay witness.

Finally, the government claims that Dr. Chabotar's and Dr. Tierney's opinions are inadmissible under Federal Rule of Evidence 403, but it argues only that permitting Dr. Tierney to share his lay opinions about USC while also providing expert testimony would provide him with prejudicial "enhanced credibility." ECF No. 2006 at 8-9. The law does not support this argument. As a threshold matter, Mrs. Kimmel disclosed Dr. Tierney as a mixed witness who would offer both expert and lay testimony. Dr. Tierney's testimony regarding USC that is based on his personal knowledge as an employee of USC is admissible under Federal Rule of Evidence 701. The First Circuit permits witnesses to provide both lay and expert testimony—including lay and expert opinions—when they are qualified to do so. *See United States v. Valdivia*, 680 F.3d 33, 50 (1st Cir. 2012) (a single witness may provide both lay and expert testimony in the same case); *United States v. Munoz-Franco*, 487 F.3d 25, 35 (1st Cir. 2007) ("lay witnesses [may] express opinions

---

[9] The Defendants incorporate by reference their Opposition to the Government's Motion *in Limine* [D.E. 2001; Under Seal] to Preclude Irrelevant Evidence Concerning Uncharged Third Parties (ECF No. 2032), which addresses this issue and the government's arguments regarding relevance more directly.

about a business based on the witness's own perceptions and knowledge and participation in the day-to-day affairs of [the] business" (citation and internal quotation marks omitted; alteration in original); *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 322, 336 n.10 (D. Me. 2017) (whether testimony falls within Rule 701 or Rule 702 depends on "the nature of the testimony itself" rather than "the identity of the witness" (citation omitted)).[10] The government's request to limit Dr. Tierney's testimony on this basis is unfounded.

### C.     Mr. Speier's Testimony Constitutes Permissible Expert Opinion.

The government does not contest Richard Speier's expertise in federal investigative procedures. Mr. Speier worked as a federal investigator for the IRS for nearly three decades. Between September 2003 and April 2006, he was the IRS's Acting Chief of Criminal Investigation and its Deputy Chief of Criminal Investigation. In those roles, Mr. Speier managed all of the IRS's investigations, including those involving confidential and cooperating witnesses. The government does not challenge, and expressly concedes, that Mr. Speier may offer his expert opinion on the very subject matters that the Defendants have disclosed:

- The proper investigative procedures that apply to the work of federal agents;

- The investigating agents' failure, in this case, to adequately control, direct, and supervise Singer; and

- The investigating agents' failure, in this case, to adequately document what they instructed Singer to do once he became the government's agent.

Instead, the government speculates that Mr. Speier may not "establish facts," and asks the Court to limit his testimony. No such order is necessary. Defendants do not intend to have

---

[10] The case to which the government points to argue the risk of confusion for mixed fact and witness testimony related to the "overview" testimony of a law enforcement officer about aspects of an investigation about which he had no personal knowledge, and the risk that his status as a law enforcement officer would sway the jury to give his testimony undue weight—a concern which plainly is not present here. *See United States v. Flores-De-Jesus*, 569 F.3d 8, 20-22 (1st Cir. 2009).

Mr. Speier establish facts; he will testify on the evidence presented at trial. His reliance on the anticipated trial evidence distinguishes his expert testimony from the testimony excluded in the case the government cites in this section of brief, *United States v. Wilson*, 798 F.2d 509 (1st Cir. 1986). There, the expert's opinion relied on an "*assumption*" for which there was no evidence in the record. *Id.* 517 (emphasis in original). Mr. Speier will be relying on trial evidence from the agents themselves that the government's own brief expressly notes that the Defendants may (and will) elicit at trial. ECF No. 2006 at 10. Any risk that the trial record will not support those opinions is an issue for another day. The Court, therefore, should deny the government's motion.

## II.    CONCLUSION

For the reasons above, the Defendants respectfully request that the Court DENY the government's motion *in limine* to exclude the testimony of their experts. In the alternative, should the Court be inclined to allow the motion, the Defendants respectfully request the opportunity for a *Daubert* hearing.

Respectfully submitted,

/s/ Eóin P. Beirne
R. Robert Popeo (BBO No. 403360)
Mark E. Robinson (BBO No. 423080)
Eóin P. Beirne (BBO No. 660885)
Cory S. Flashner (BBO No. 629205)
MINTZ, LEVIN, COHN, FERRIS,
       GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1707 (telephone)
(617) 542-2241 (fax)
rrpopeo@mintz.com
merobinson@mintz.com
epbeirne@mintz.com
csflashner@mintz.com

Counsel for Elisabeth Kimmel

/s/ Brian T. Kelly
Brian T. Kelly (BBO # 549566)
Joshua C. Sharp (BBO # 681439)
Lauren M. Maynard (BBO # 698742)
NIXON PEABODY LLP
53 State Street
Boston, MA 02109
(617) 345-1000
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com
lmaynard@nixonpeabody.com

Robert Sheketoff (BBO # 457340)
One McKinley Square
Boston, MA 02109
617-367-3449

Counsel for Gamal Abdelaziz

/s/ Michael K. Loucks
Michael K. Loucks (BBO # 305520)
SKADDEN, ARPS, SLATE,
       MEAGHER & FLOM LLP
500 Boylston Street
Boston, MA 02116
(617) 573-4800
michael.loucks@skadden.com

Jack P. DiCanio (pro hac vice)
Emily Reitmeier (pro hac vice)
SKADDEN, ARPS, SLATE,
       MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, CA 94301
(650) 470-4500
jack.dicanio@skadden.com
emily.reitmeier@skadden.com

Counsel for Marci Palatella

/s/ Michael Kendall
Michael Kendall (BBO # 544866)
Lauren M. Papenhausen (BBO # 655527)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
(617) 979-9300
michael.kendall@whitecase.com
lauren.papenhausen@whitecase.com

Andrew E. Tomback (pro hac vice)
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-1100
atomback@mclaughlinstern.com

Counsel for John Wilson

Date: August 6, 2021

## <u>CERTIFICATE OF SERVICE</u>

I, Eóin P. Beirne, hereby certify that on August 6, 2021, I filed the foregoing with the United States District Court for the District of Massachusetts using the CM/ECF system and caused it to be served on all registered participants via the notice of electronic filing.

/s/ *Eóin P. Beirne*
Eóin P. Beirne