1                        UNITED STATES DISTRICT COURT
                          DISTRICT OF MASSACHUSETTS
2

3
     UNITED STATES OF AMERICA,              )
4                        Plaintiff          )
                                            )
5    vs.                                    )   No. 1-19-CR-10080
                                            )
6    GAMAL ABDELAZIZ, MARCI                 )
     PALATELLA, and JOHN WILSON,            )
7                        Defendants.        )
                                            )
8                                           )

9

10

                      BEFORE THE HONORABLE NATHANIEL M. GORTON
11                         UNITED STATES DISTRICT JUDGE
                              PRETRIAL CONFERENCE
12

13

14

15            John Joseph Moakley United States Courthouse
                            Courtroom No. 4
16                         One Courthouse Way
                       Boston, Massachusetts 02210
17

18                          August 18, 2021
                              11:00 a.m.
19

20

21                    Kristin M. Kelley, RPR, CRR
                          Official Court Reporter
22            John Joseph Moakley United States Courthouse
                       One Courthouse Way, Room 3209
23                     Boston, Massachusetts 02210
                        E-mail: kmob929@gmail.com
24
                  Mechanical Steno - Computer-Aided Transcript
25

```
 1    APPEARANCES:

 2

 3              Stephen E. Frank

 4              Ian J. Stearns

 5              United States Attorney's Office

 6              1 Courthouse Way

 7              Suite 9200

 8              Boston, MA 02210

 9              617-748-3208

10              stephen.frank@usdoj.gov

11              ian.stearns@usdoj.gov

12              for the Plaintiff.

13

14

15              Brian T. Kelly

16              Joshua C. Sharp

17              Lauren Maynard

18              Nixon Peabody LLP

19              100 Summer Street

20              Boston, MA 02110

21              617-345-1000

22              bkelly@nixonpeabody.com

23

24

25
```

```
 1    APPEARANCES:

 2

 3              Robert L. Sheketoff

 4              One McKinley Square

 5              Boston, MA 02109

 6              617-367-3449

 7              sheketoffr@aol.com

 8              for Gamal Abdelaziz.

 9

10              Jack P. DiCanio

11              Michael K. Loucks

12              Emily A. Reitmeier

13              Skadden, Arps, Slate, Meagher & Flom LLP

14              525 University Avenue

15              Palo Alto, CA 94301

16              650-470-4500

17              jack.dicanio@skadden.com

18              for Marci Palatella.

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2

 3            Michael Kendall

 4            Lauren M. Papenhausen

 5            White & Case, LLP

 6            75 State Street

 7            Boston, MA 02109

 8            617-939-9310

 9            michael.kendall@whitecase.com

10            for John Wilson.

11

12            Andrew E. Tomback

13            McLaughlin & Stern, LLP

14            260 Madison Avenue

15            New York, NY 10016

16            917-301-1285

17            atomback@mclaughlinstern.com

18            for John Wilson.

19

20

21

22

23

24

25
```

<pre>
                        P R O C E E D I N G S
          THE CLERK:  This is Criminal Action No. 19-10080, the
United States of America versus Gamal Abdelaziz, et al.
          Would counsel please introduce themselves for the
record.
          MR. FRANK:  Good morning, your Honor.  Stephen Frank
and Ian Stearns for the United States.
          THE COURT:  Mr. Frank and Mr. Stearns, good morning.
          MR. KELLY:  Good morning.  Brian Kelly, Josh Sharp and
Bob Sheketoff on behalf of Mr. Aziz is what he goes by.  It's a
lot simpler.
          THE COURT:  Mr. Aziz is how he goes by?
          MR. KELLY:  Yes.
          THE COURT:  Good morning.
          MR. KENDALL:  Good morning, your Honor.  Michael
Kendall and Lauren Papenhausen and, by Zoom, Mr. Tomback is
participating from Connecticut.
          THE COURT:  Good morning to him.
          MR. LOUCKS:  Good morning, your Honor.  Mike Loucks,
Jack DiCanio, and Emily Reitmeier on behalf of defendant
Palatella.
          THE COURT:  Good morning to you, Mr. Loucks, and
Mr. DiCanio and Miss Reitmeier.
          All right.  Before we start, I can just give you the
protocol for this.  You can wear a mask or not.  I'd prefer you
</pre>

1   don't wear a mask when addressing the Court, but it's

2   completely within your choice.

3           We're going to start now with this final pretrial

4   conference with respect to the September trial in the so-called

5   "Varsity Blues" case.  Before we begin, I'm going to state my

6   general attitude with this case, after which I will render my

7   rulings on the pending motions in limine, hear the parties in

8   response, and then discuss the empanelment process and the

9   trial procedures.

11:05 10         As a preliminary matter, counsel should understand

11  that this trial is not going to be about the general admissions

12  policy of the University of California or the method it uses to

13  admit students.  USC is not on trial here, and I will not have

14  this case devolve into multiple side trials.  Unless there's

15  evidence that a defendant was misinformed with respect to the

16  admission policy of the subject university and/or knew that USC

17  admitted a specific unqualified student whose parent made a

18  large donation to the school before that defendant entered into

19  the alleged conspiracy with Singer, evidence of what other

11:06 20  unrelated students and parents did has no bearing on the

21  defendants' state of mind and, thus, is irrelevant to the

22  requisite scienter that the government must prove in this case.

23          Second, this case is almost two and a half years old,

24  and we are now on the eve of trial.  Just yesterday, two of the

25  three defendants moved to continue the trial for COVID-19

1       related reasons.  The government has not had a chance to
2       respond, but I presume it opposes the motion.  Even if it does
3       not, I will deny that motion without prejudice because, as of
4       now, jury trials are proceeding in federal courts and this case
5       needs to be resolved.  I fully intend to begin jury empanelment
6       on September 8, 2021, and submit this case to the jury before
7       the end of October.
8              In the meantime, this Court will give short shift to
9       motions addressing the same issues that have already been
11:07 10  decided over the past 2 years and will not consider severances
11      of any kind.  In that regard, the motions to sever recently
12      filed by defendants Palatella and Wilson, dockets No. 2051 and
13      2080, are denied.
14             I will turn now to the 20 or so pending motions in
15      limine.  I will, for the most part, address those motions in
16      chronological order of the filings, and I will hear from the
17      parties once in the middle and once at the end.
18             Starting with Wilson's motion to exclude marital
19      privileged communications and the fruits of such communication,
11:08 20  that's docket No. 1988, it is denied without prejudice because,
21      first, the marital communications in government Exhibit 48 are
22      subject to the joint participant exception of that privilege.
23      Second, Wilson's objection to the admission of any undisclosed
24      exhibits containing marital communications is too broad and,
25      third, this Court has previously ruled that the fruit of the

1    poisonous tree doctrine does not apply to marital

2    communications.

3            Now, a little bit out of order, but with respect to

4    the government's mirror image motion, docket 2004, that is to

5    be permitted to introduce marital communications, that motion

6    is denied as to the government's Exhibit 131, but otherwise

7    allowed to the extent it seeks a finding from this Court that

8    the other government exhibits attached thereto fall outside of

9    the marital communications privilege.

11:09 10            The government has attached a 129 page exhibit under

11    seal, which includes several e-mails that communicate with

12    third parties, and thus fall outside of the scope of the

13    marital communications privilege.

14            With respect to the e-mail communications solely

15    between spouses, other than Exhibit 131, those spousal

16    communications appear to be in furtherance of the alleged

17    conspiracy.  Indeed, the e-mails discuss arrangements with

18    Singer and show that the spouses engaged in activities to

19    support that arrangement, including selecting photographs for

11:10 20    the fraudulent athletic profiles used to secure admission as

21    purported athletic recruits.

22            Although this goes beyond the scope of the in limine

23    motion, for the same reasons, the defendant Abdelaziz's

24    objection to government Exhibits 273, 315, and 330, on the

25    basis of marital privilege, is overruled.

1        As to Exhibit 131, the subject e-mail contains a

2   medical evaluation and other medical information about

3   Mr. Wilson's son following a concussion.  Nothing in the e-mail

4   indicates that the medical information was used to further the

5   conspiracy, but rather seemed to disclose, quote, nothing more

6   than the mundane incidents of the Wilson's marital

7   relationship, unquote, that is the health of their child and,

8   therefore, it will not be admitted.

9        Third, defendants' motion to preclude argument or

11:11  10   evidence contrary to black letter law concerning money

11   laundering, docket 1989, is denied as moot.  The money

12   laundering count has been dismissed from the Fourth Superseding

13   Indictment.  To the extent the defendants' motion also seeks to

14   preclude the government from arguing that the payments by

15   defendant to Singer's entities were intended to further an

16   elicit quid pro quo scheme and to conceal that scheme, the

17   request is denied.  The subject evidence, that is that

18   defendants wired money to or through Singer's organizations

19   rather than directly to the coaches and administrators, as the

11:12  20   government contends, is relevant to defendants' intent with

21   respect to the conspiracy, which is a central issue in this

22   case.

23        Fourth, defendants' motion to require the government

24   to proffer corroborating evidence of the alleged conspiracy

25   under United States versus Petrozziello before statements of

1    purported coconspirators are admitted, docket No. 1990, is

2    denied.  The Court finds no reason to depart from the procedure

3    outlined by the First Circuit Court of Appeals which prevents a

4    Court to admit provisional the statements of alleged

5    coconspirators under Federal Rule of Evidence 801(d)(2)(E),

6    subject to a determination at the close of the evidence as to

7    whether the proponent of the statement established by a

8    preponderance of the evidence, quote, that a conspiracy

9    embracing both the declarant and the defendant existed and that

11:13 10    the declarant uttered the statement during and in furtherance

11    of the conspiracy.

12         The Court, nonetheless, cautions the government as it

13    surely knows that it does not provide intrinsic evidence

14    establishing all of the required elements of any applicable

15    hearsay exception under 801(d)(2).  It risks the declaration of

16    a mistrial.

17         Fifth, defendants' motion to preclude evidence of

18    their income, wealth, spending or lifestyle, docket 1992, is

19    denied without prejudice.  The Court will not exclude all

11:13 20    evidence pertaining to defendants' financial wherewithal

21    because such evidence may be relevant to show, among other

22    things, motive, that is that the defendants were motivated to

23    have their children admitted into elite universities so that

24    they could maintain or improve their status in the community.

25         That said, the government will not be allowed to dwell

on this issue or to beat this horse or make inflammatory statements regarding defendants' wealth or lifestyle, and the Court will entertain proposed limiting instruction from the defendants in that regard.

Sixth, defendant Wilson's motion to exclude evidence concerning Internal Revenue Service agents' beliefs and/or opinions as to Wilson's state of mind or question of tax law, docket 1993, is denied as moot.  The government has stated that it does not intend to elicit testimony from the IRS agent on either topic, but rather testimony from the agent regarding her qualifications, tax terminology helpful to understanding her testimony, a summary of Wilson's relevant tax returns and deductions claimed, and a summary of how the IRS determined that various deductions claimed on Mr. Wilson's tax returns were improper, et cetera, all of which are permissible.

The government will not be permitted to elicit any testimony directly, addressing the ultimate question of whether Mr. Wilson intended to evade federal income taxes, which is inadmissible under Federal Rule of Evidence 704(b).

Seven, defendant Gamal Abdelaziz's motion to exclude reference to Steven Wynn, docket 1995, is denied as moot because the government has agreed it will not refer to Mr. Wynn at the trial.

Eight, defendants' motion to exclude evidence pertaining to other defendants who pled guilty, docket 1996, is

1    denied without prejudice.  The government has agreed that it

2    will not introduce evidence concerning the guilty pleas of

3    other defendants other than those who will testify at trial as

4    cooperating witnesses.

5           With respect to the other relief sought by defendants'

6    motion, namely the exclusion of all out-of-court statements and

7    related evidence pertaining to individuals who pled guilty in

8    this or a related "Varsity Blues" prosecution, there is no

9    basis for such a sweeping prohibition.  Furthermore, to the

11:16 10   extent defendants are concerned about the jury's exposure to

11   news stories pertaining to defendants who pled guilty, for

12   example, Miss Loughlin, that is a matter more properly

13   addressed at jury empanelment and through appropriate limiting

14   instructions about not being influenced by the guilty pleas of

15   others, which this Court intends to give during the trial

16   and/or in its charge.

17          In any event, should it become apparent at trial that

18   certain out-of-court statements are unduly prejudicial under

19   Federal Rule of Evidence 403, the defendants can renew their

11:17 20   motion to exclude such evidence.

21          Nine, defendants' motion to exclude evidence of

22   Mr. Singer's signed deals with Donna Heinel and Jovan Vavic,

23   docket No. 1998 and docket 2010, on the ground that the

24   defendants did not know and did not agree to those side deals

25   are denied without prejudice, although the Court will entertain

1    a limiting instruction composed by the defendants at the time

2    the government seeks to introduce such evidence, explaining

3    that the evidence is admitted de bene esse pending the

4    Petrozziello ruling at the end of the case.

5         It is well settled that each conspirator need not know

6    the details of the conspiracy or participate in every act in

7    furtherance thereof.  Thus, to the extent the government can

8    establish a single conspiracy, evidence as to how Heinel and

9    Vavic were paid is relevant to how the conspiracy operated and

11:18 10   need not be excluded on the basis that some of the defendants

11   were unaware of the arrangements.  Moreover, that Mr. Singer

12   was cooperating at the time he agreed to pay tuitions or the

13   children of Vavic, likewise, does not justify the exclusion of

14   evidence of the side deals.

15        As this Court has explained in docket No. 1399, the

16   Fourth Superseding Indictment properly alleges a single

17   overarching conspiracy that continued after Mr. Singer began

18   cooperating with the government.  Of course, in the event the

19   government fails to establish a single overarching conspiracy,

11:19 20   the Court will be compelled to give appropriate limiting

21   instructions to the jury or, perhaps more likely, declare a

22   mistrial.

23        At this stage, I will stop and hear counsel with

24   respect to any of my rulings on the first nine matters.

25        Yes.  Mr. Frank.

         1              MR. FRANK:  One question.  We understand your Honor's

         2    ruling on the first issue, our motion to exclude irrelevant

         3    evidence.  Your Honor, it's stated that this case will not be

         4    about the general admissions policies of USC.  We understand

         5    that ruling also embraces VIP lists and evidence concerning

         6    individual students who are not at issue in this case who may

         7    have appeared on VIP lists, and we just wanted to clarify that.

         8              THE COURT:  I'm not sure I understand what you're

         9    asking me.

11:20   10              MR. FRANK:  The defense has, as part of its motion,

        11    sought to introduce evidence about students who were not

        12    recruited but who appeared on VIP lists for various reasons

        13    that were forwarded to the admissions office.  My understanding

        14    of the ruling is that unless the defendants themselves were

        15    aware of those students and why they were considered for

        16    admission, it would not come in.

        17              MR. KELLY:  Your Honor, we would object to that.  I

        18    think the government here is urging the Court to commit what

        19    would be reversible error here.  We're not looking for a

11:20   20    hundred mini trials in all these other matters.  There is

        21    certainly a discrete amount of documents that we need to get

        22    into evidence to defend ourselves, which we obviously have a

        23    constitutional right to do.  They keep urging the Court to

        24    prevent us from putting on a defense here.

        25              Now, it's black letter law that in a case like this if

1  the defendant has a good faith belief that what he is doing is

2  appropriate, that's a defense on the fraud charge.  Now, the

3  reasonableness of his good faith is at issue.  For instance, if

4  he says he's got a good faith belief that the moon is made of

5  green cheese, well, objectively, it's not, but if he has a good

6  faith belief that, in fact, USC wants money to help facilitate

7  these kids get into school and designates them as walk-on

8  athletes, we need to be able to present that so the jury can

9  see he, in fact, has a good faith belief that's critical to his

11:21 10  defense.

11          They keep trying to cut it out because they know it's

12  part of the defense.  They've got USC policies on their exhibit

13  list.  So it bears the Court to keep an open mind on that on

14  how we present these at trial.  We're not looking to put on a

15  hundred of exhibits.  We'll narrow it down and put on what we

16  need to defend ourselves here and show he had a reasonable good

17  faith belief.

18          THE COURT:  We'll see what happens in the context of

19  the trial in that regard.

11:22 20          Mr. Kendall.

21          MR. KENDALL:  Your Honor, if I may add two things.

22  First, we believe, to follow what Mr. Kelly is saying, this

23  evidence goes to whether or not USC is a victim or not.  What's

24  important is there are recordings and other documents that show

25  Singer explicitly telling the exposed members of the conspiracy

1    USC has a VIP list, USC does this, I'm getting you into an

2    existing USC program.  So to the extent that he has represented

3    that to the supposed conspirators, I think they have a right to

4    show that he's telling the truth.  And it sort of rebuts any

5    thought that this is a fraud on USC.  It's actually a policy

6    that USC is endorsing, particularly for the honest services

7    charge.  If an employee is doing something to fulfill the

8    employer's goals or positions, that's not a theft of honor

9    services.  That's a provision of good services, and we need it

11:23  10    for that.

11           There's a second issue, your Honor, which is Wilson is

12    charged with a tax count.  We cited the Bowear case to the

13    Court in our pleadings.  They want to say that Wilson had no

14    right to deduct the amount of the donation on his tax return

15    and it's not a deduction under any scenario.  The case law is

16    clear that we have a right to put on an alternative tax

17    calculation to show that our tax calculation was correct.

18           Under the IRS code, whether or not Wilson's deduction

19    should be set aside depends upon how USC valued similar help to

11:23  20    other donors.  Let me give you an example.

21           THE COURT:  This is going into too much detail for

22    this case.

23           MR. KENDALL:  So I need to put that in for the tax

24    case.  As Mr. Kelly said, we're not going to put in thousands

25    of documents.  We have a few examples and we've got some

1  summary charts that can be done very efficiently, but we need

2  to show if this was a provision of honest services to USC, not

3  a theft of honest services, and how to value the benefit for

4  the tax charge.  Thank you, your Honor.

5           THE COURT:  Mr. Frank --

6           MR. DICANIO:  This is Jack DiCanio.

7           THE COURT:  I can't see you.

8           MR. DICANIO:  I'm on the Webex.  I should be visible.

9  I see you all.

11:24  10           THE COURT:  Who is it speaking now again?

11           MR. DICANIO:  Good morning, your Honor.  This is Jack

12  DiCanio.  First of all, your Honor, thank you very much for

13  allowing us to participate by Zoom.  I agree with the arguments

14  of co-counsel on this.  I'd like to adjust a few.

15           My client actually dealt directly with Donna Heinel,

16  who was an associate athletic director at USC, a very senior

17  person at USC.  We have evidence, and evidence will be

18  introduced at trial, that will talk about those communications

19  and will deal with what the USC athletic department was

11:25  20  communicating to my client, but I think one of the things I'd

21  like to reiterate, Judge, is what the government's going to do

22  is say USC had no knowledge of this and they are going to

23  portray them as the victim, when, in fact, the real evidence is

24  that USC very much understood what was going on.  The entire

25  athletic department very much understood what was going on.

1    In fairness to us, we should be able to produce enough
2    evidence to illustrate that to the jury.  Now, I agree with
3    co-counsel.  We'll be judicious about it.  We'll be limiting
4    about it, but this concept of USC not understanding what was
5    happening is just not true, and we should have the ability to
6    demonstrate that.  It's particularly important to my client
7    because my client dealt directly with people within the
8    athletic department.

9    Thank you, your Honor.

11:26 10    THE COURT:  Mr. Frank?

11    MR. FRANK:  Your Honor, I didn't mean to open up a can
12    of worms here.  All I wanted to clarify was your Honor's ruling
13    was that information, evidence about specific students who are
14    not on trial here should not come in unless the defendants can
15    prove that they were aware of it and it had an effect on their
16    good faith and their intent.  I just wanted to clarify.  Your
17    Honor had mentioned students recruited as athletes, that that
18    also encompassed other students regardless of how they got it.

19    THE COURT:  That's what my ruling on the subject in
11:26 20    limine motion is intended to convey.  I'm not going to resolve
21    all of the other issues at this time.

22    Anything else with respect to my first nine rulings
23    with respect to in limine motions?  If not, I will proceed with
24    number 10.

25    Defendant Abdelaziz's motion to limit the testimony of

1    a Ms. Velakachrla, I'm not sure how you pronounce that name,

2    but it's docket 2000, is denied without prejudice.  The

3    government has agreed that the only testimony it will list from

4    the subject person, Miss Velakachrla, is that which is

5    nonhearsay and of which the witness has personal knowledge.

6    Furthermore, the Court agrees with the government that the

7    opinion of a classmate as to how Miss Abdelaziz's basketball

8    skills compare to those of her teammates constitutes lay,

9    rather than expert, opinion, which Velakachrla can offer, so

11:28 10   long as her opinion is based upon her personal observations and

11   knowledge.  Although this again goes beyond the scope of the in

12   limine motion for the same reasons, defendants' objections to

13   the government's calling Miss Velakachrla as a witness is

14   overruled.

15         11, to the extent that there is evidence that the

16   University of Southern California admitted unqualified students

17   whose parents made large donations to the school before such

18   admissions and that the defendants knew about such admissions,

19   it would be relevant to the defendants' state of mind, that is

11:28 20   scienter and thus admissible, but if such alleged conduct was

21   not known to the subject defendant, it is irrelevant and thus

22   inadmissible.

23         Therefore, the government's motion to preclude

24   irrelevant evidence, docket 2001, will be allowed, but that

25   will not preclude defendants from proffering evidence of

1     University of Southern California's alleged corrupt admission

2     policy if it was known to the proffering defendant and somehow

3     impacted his or her state of mind, nor will it foreclose

4     defendants from introducing evidence of Southern Cal's alleged

5     special interest and VIP policy if the government first

6     proffers evidence of Southern Cal's admission policy in its

7     case-in-chief.

8            12, defendants' motion to exclude evidence regarding

9     taking an admission slot, docket 2002, is denied.  This Court

11:29 10     has already concluded that admission slots at competitive

11     universities are both limited and highly coveted, are valuable

12     because they are limited and, in fact, may constitute the

13     object of the alleged conspiracy.  Furthermore, evidence and

14     argument that any of the defendants took an admissions spot

15     from another student is directly relevant to the instant

16     charges in that it is probative of the fact that the University

17     of Southern California has a vested interest in admitting only

18     those students who are qualified.

19            13, because the term, quote, entrapment, unquote, is a

11:30 20     term of art, this Court will allow the government's motion to

21     preclude entrapment defense, docket 2003, to the extent it

22     seeks to prevent defendants from using that term in front of

23     the jury when challenging the recorded conversations with

24     Singer other than when quoting Singer.  To the extent the

25     motion seeks not to prevent defendants from attacking the

credibility -- I'm sorry.  I'll say that again.  To the extent
the motion seeks to prevent defendants from attacking the
credibility of the phone calls with Singer, however, that
motion will be denied.

Indeed, as this Court has stated in a prior memorandum
and order, to the extent the defendants are dissatisfied with
Singer's purported denials of any wrongdoing in connection with
his rehearsed telephone calls, they will have ample opportunity
to cross-examine him if and when he testifies at trial.
Whether Singer's calls in October of 2018 were consistent with
his prior representation of his program and whether they
demonstrate that defendants believed their payments to be
legitimate donations rather than bribes is an issue squarely
for the jury after a trial on the merits.

14, the Court will resolve the government's motion to
preclude and limit defendants' proposed expert testimony,
docket No. 2006, as follows:  With the government's motion to
exclude the testimony of Kent Kiehl, Ph.D., that motion is
allowed subject to reconsideration.  The Court does not
comprehend how expert testimony analyzing a witness's
psychological condition has any relevance to a defendants'
state of mind or the element of scienter.  If defendants choose
to pursue that argument, they may file a brief supplement to
this motion within a week to which the government may reply
within a week, limited to five pages each.

1      B, the government's motion to exclude the testimony of

2  Kent John Chabotar, Ph.D. and William Tierney, Ph.D. is denied

3  without prejudice.  How higher education in the United States,

4  a multi-billion dollar industry, operates is information not

5  necessarily obvious to a layperson and may help the jury assess

6  the defendants' state of mind in this case.  That said, the

7  Court will not permit a sideshow on this subject and will

8  sustain the government's objection if it goes too far.

9      Finally, regarding the government's motion to limit

11:33 10  but not foreclose the testimony of Richard Speier, that motion

11  is allowed.  While defendants may utilize expert testimony to

12  establish the proper investigative procedures that apply to the

13  work of federal agents, the Court will not permit an expert who

14  is not present during the investigation to offer an opinion

15  that agents attempted to influence Mr. Singer to provide

16  untruthful testimony.

17      15, the government's motion to preclude the

18  introduction of judicial statements regarding credibility,

19  docket 2007, is allowed, in part, and denied, in part.

11:34 20  Although defendants' cannot introduce extrinsic evidence of any

21  judicial statements regarding the credibility of Timothy

22  Brunold, Dean of the University of Southern California

23  Admissions, they will be permitted to inquire on

24  cross-examination whether the witness's credibility has been

25  questioned by a judicial officer without being allowed any

1    follow-up.  See Federal Rule of Evidence 608(b).

2         16, the government's motion to preclude defendants'

3    use of a coconspirator's statements other than for impeachment,

4    docket 2008, is denied without prejudice.  The government

5    requests an overbroad exclusion of evidence and makes the

6    request completely out of context, so the issue will be dealt

7    with at and within the context of the trial.

8         17, the government's motion to preclude evidence and

9    argument seeking jury nullification, docket 2009, is denied as

11:35 10   moot.  Its requested relief is sweeping and out of context and

11   the defendants concede they will not raise a jury nullification

12   defense.  Nevertheless, defendants are forewarned that this

13   Court will not allow any evidence or argument pertaining to the

14   health, details of arrest, or the collateral consequences of a

15   conviction of any defendant because none of that evidence is

16   admissible under Federal Rules of Evidence 401, 402, and 403.

17        Furthermore, while defendants may under certain

18   circumstances present evidence showing the general admissions

19   practice of the subject university, the Court will permit

11:36 20   neither, one, a collection of mini trials, nor, two, any

21   mention of selective prosecution, which, like entrapment, is a

22   term of art and should not be used arbitrarily.

23        18, defendants' motion to exclude evidence post-dating

24   Rick Singer's cooperation with the government, docket 2011, is

25   denied without prejudice.  The question whether the alleged

1   conspiracy ended when Mr. Singer began cooperating with the

2   government is a question of fact for the jury.  As I have said

3   before, the government has charged a conspiracy that continues

4   after Mr. Singer began cooperating.  If they prove it,

5   post-cooperation evidence is admissible.  If they can't, the

6   jury or the Court will tell you.

7        Finally, 19, defendant Wilson's motion to exclude

8   evidence of testing accommodations, docket 2013, is denied as

9   moot.  The government agrees that it will not introduce

11:37 10   evidence in its case-in-chief regarding such accommodations

11   because Mr. Wilson is not charged with participating in that

12   portion of the charged scheme.

13        To the extent the government seeks to reserve the

14   right to introduce such evidence, one, to respond if defendants

15   open the door by putting certain accommodations at issue

16   and/or, two, to show on cross-examination of the defendants

17   their knowledge of and involvement in their children's

18   education and college application process, the Court will hold

19   the motion in abeyance until it is in a better position to rule

11:38 20   on the admissibility of such evidence in the context of the

21   trial.

22        I will now hear from counsel on those latter rulings,

23   if any.

24        MR. KELLY:  Your Honor, two things.

25        THE COURT:  Mr. Kelly.

1          MR. KELLY:  Yes.  First of all, as the Court said from

2     the outset here, this case has been pending for two and a half

3     years.  The government had a court order to give us a witness

4     list in the middle of July.  Now they're telling the Court and

5     us they don't know if they're calling Rick Singer, their key

6     witness, their star witness, who they predicated this whole

7     investigation on.  They dropped a footnote.  It's going to

8     cause a lot of wheels spinning and a waste of time if we have

9     to prepare or and present evidence, and they won't tell us

11:38 10   whether they're calling their main witness.

11          So, I think, in fairness to the process and to

12     expedite matters, the Court should instruct them to make a

13     decision.  They've had two and a half years whether to call

14     this guy.  He's their key guy.  We should know.  I think, as

15     the Court just indicated, some of its rulings here today is

16     predicated upon the notion that we're going to have ample

17     opportunity to cross-examine him at trial.  That may well

18     inform the Court's rulings on some of these evidentiary matters

19     as we go forward.  So that's number one.

11:39 20          Number two, I understand the Court's ruling on

21     Brunold.  608(b) is a clear rule.  We're not going to try to

22     present extrinsic evidence of the magistrate's ruling on

23     credibility.  Just so I'm clear, we can certainly inquire

24     whether or not he's aware that a court has made an adverse

25     finding about his credibility before this trial.  Is that the

```
 1  Court's ruling?
 2          THE COURT:  Is that the way you interpret my ruling?
 3          MR. KELLY:  I think I would clean up those questions,
 4  Judge.  It's clear that they did.  So if he denies it, we'll
 5  make a different motion.
 6          THE COURT:  Okay.
 7          MR. KELLY:  Thank you.
 8          THE COURT:  Mr. Frank.
 9          MR. FRANK:  Your Honor, as we indicated in our
10  pretrial memorandum, we have agreed, effectively, with the
11  defense's proposal that we give them 2 days heads up on who our
12  witnesses are going to be.  They want it by 4:00 p.m. of the
13  close of business 2 days before.  We suggested 6:00 p.m. to
14  give us a little time to get back from court and figure things
15  out.  We have not made a final decision about any particular
16  witness.  We have a witness list.  It's been prepared in good
17  faith.  We intend to call witnesses off that list, just like
18  they have a witness list that we assume they've prepared in
19  good faith and intend to call witnesses off that list.
20          As to any witness, we don't view one witness as
21  particularly different from another witness.  We will make a
22  game-time decision of who we're calling depending on how the
23  evidence is coming in.
24          MR. KENDALL:  Your Honor, if I could be heard briefly
25  on the topic.  When the government first gave us their witness
```

1   list, they said it was going to be a 6-week trial for their

2   case.  They now have told the Court that they think it's

3   somewhere in the range of 3 weeks.  They've clearly cut out a

4   lot of witnesses from their witness list or they couldn't in

5   good faith tell you 6 weeks and then move it to 3 weeks.  They

6   have a right to make game-time decisions and to have their

7   options open.  On the other hand, they clearly have eliminated

8   some witnesses.  If they could just give us what's their

9   present good faith witness list to comport with their change in

11:41 10   estimates of time, that would be very helpful, your Honor.

11              THE COURT:  All right.  Let Mr. Frank respond to that.

12              MR. FRANK:  Your Honor, two defendants have pled

13   guilty since we prepared that witness list, so obviously we're

14   not going to be calling witnesses relevant to those defendants.

15   We're also hoping that there will be some agreement as to the

16   authentication of documents so we don't have to call a half

17   dozen keeper of records to get those documents in, as to which

18   there's really no dispute as to authenticity.  Many of those

19   same type of records are on the defense exhibit list.  So we're

11:41 20   happy to provide an updated witness list.  We're happy to

21   provide an updated exhibit list.

22              We hope, in light of the Court's rulings, the defense

23   will also provide an updated and useful exhibit list given that

24   their exhibit list as is has 2,500 exhibits and serves no

25   practical value to anyone looking at it.

```
 1              THE COURT:  That's the purpose of a final pretrial
 2      conference, to focus the issues.  I expect that counsel will
 3      act in good faith and will make a serious effort to limit the
 4      amount of documents that are going to be introduced and to
 5      inform opposing counsel as to the current understanding as to
 6      witnesses without prejudice to being able to change in
 7      midstream because something has come up or some witnesses
 8      testified in a certain direction.  Nobody has to make an
 9      absolute final declaration of who they're going to call as
11:42 10 witnesses before trial.  We all know that.
11              On the other hand, it is necessary for opposing
12      counsel to prepare cross-examination, and you ought to act as
13      officers of this Court in good faith to see that this case is
14      tried properly and correctly under the Federal Rules of
15      Evidence.  Okay?
16              Mr. Kendall?
17              MR. KENDALL:  This is more of a courtroom etiquette in
18      light of your rulings.  You've made certain rulings that allows
19      the government to make arguments that, I assume, they'll raise
11:43 20 in their opening.
21              THE COURT:  Openings are not arguments.  I'm not going
22      to allow openings to be arguments.  I'm going to get to this at
23      a later point when we talk about how long you're going to have
24      to open.  If you can't say I expect the evidence will show, et
25      cetera, et cetera, then you shouldn't be saying it in an
```

1    opening.  An opening is not a second argument.  I tell the jury

2    that very clearly in my opening instructions to them.  Just in

3    response to, argument is not going to happen at an opening.

4         MR. KENDALL:  I misspoke.  I apologize, your Honor,

5    for sloppy language.  I expect they'll give a preview of the

6    evidence consistent with your rulings, some of which we have

7    opposed and objected to.  I just want to know how do we

8    properly preserve our objections without being discourteous.

9    Do you want us to object after the opening is all done?  I

11:44 10    don't want to stand up in an opening and object.

11         THE COURT:  First of all, you ought not be saying

12    things in your opening that are objectionable.  You ought to be

13    able to talk to one another about what it is that you're going

14    to say in your openings.  And if there is a problem, bring it

15    to my attention before the opening happens.

16         MR. KENDALL:  Your Honor, I'm asking something

17    slightly different.  I expect Mr. Frank will act consistent

18    with your rulings on the motions in limine.  We need to

19    preserve appellate rights.  We accept your ruling with respect,

11:44 20    but we just need to reserve our appellate rights.  I don't want

21    to interrupt his opening to preserve an appellate right.  I

22    want to know if I do it at side bar.

23         THE COURT:  You can do it at side bar after the end of

24    the opening or can object to my rulings on the in limine

25    motions.

1          MR. KENDALL:  You mean to object today to the Court's

2    rulings?

3          THE COURT:  If you want to.

4          MR. KENDALL:  To put it succinctly, we'd object to

5    everything you've ruled against us to preserve our rights.  I

6    don't want to be too clever about it.  We would object.  If

7    you'd like, we can file something in writing to preserve that.

8          THE COURT:  You can do that.

9          MR. KENDALL:  I don't want to take up your time with

11:45 10   it today, your Honor.  You've ruled and we respect that.  We

11   need to protect ourselves.

12         THE COURT:  Any way you think you need to preserve the

13   appellate record, you should.

14         MR. KENDALL:  We may ask to see you after.

15         MR. KELLY:  Respectfully, your Honor.  I'm not

16   agreeing to that, with my co-defense counsel here.  If there's

17   something in opening, which I don't anticipate, if the

18   government says something that's inappropriate, I'm going to

19   object then and there.  I'm not going to be discourteous.  I'll

11:46 20   try not to be discourteous, but I'm not going to go along with

21   we're not going to object if they do something improper in

22   opening.  I don't suspect they will.

23         THE COURT:  I don't think anybody is anticipating

24   improper conduct by either the prosecution or defense counsel.

25   That's the way I operate.  I don't expect it and I don't want

1    it to happen.  Okay?  Anything else with respect to the rulings

2    on the in limine motions?

3         MR. DICANIO:  Your Honor, this is Jack DiCanio.  I'd

4    like to just go back to the ruling on 202, the admissions slot

5    motion.

6         THE COURT:  Wait, Mr. DiCanio.  You mean 2002?

7         MR. DICANIO:  Yes.  My apologies.  It's the motion on

8    the admission slots.

9         THE COURT:  All right.  Yes.  Go ahead.

11:47 10    MR. DICANIO:  Your Honor, I just want to make sure

11    that we're all clear and, in particular, the government is all

12    clear, as to what you're allowing and what you're not allowing.

13    Based upon their proffer and their motion, I would expect that

14    the admission spots that they're talking about are not general

15    admission spots, meaning the applications that nonathletes

16    submit to USC.  These would be admission slots relating to

17    athletes, point number one.  Point number two, it would be

18    limited to admission spots on the teams that are relevant in

19    the case.  So, in this instance, it would be the football,

11:48 20    water polo and women's basketball team.  Your Honor, that's

21    what's at issue in the case.  If there is a limitation for

22    spots, it's certainly not the general admission pool.  I think

23    the government should be so limited.

24         Lastly, your Honor, you made a comment that USC has a

25    vested interest in admitting only qualified students.  I think

```
 1   that's the point that we're trying to make here, that USC is a
 2   private institution.  They made choices for admissions based on
 3   a number of different factors.  The generosity of parents was
 4   one.  That's what all of those athletic department documents
 5   that we're trying to get in show.  That's what the testimony
 6   we're trying to get in show.  It wasn't only interested in a
 7   certain type of qualification for the government, the academic
 8   or athletic qualifications, it was also with respect to
 9   donations.  That's going to be an issue for the jury to decide.
10   And we think the evidence we're trying to get in proves that in
11   spades.  Thank you for your consideration.
12            THE COURT:  Mr. Frank, do you wish to respond?
13            MR. FRANK:  Just briefly, your Honor.  We understand
14   your Honor's ruling to be that this case is about the
15   defendants' intent and their knowledge and that you are going
16   to constrain the evidence to evidence that is relevant to that
17   point.  If they didn't know something that was going on beyond
18   the scenes with respect to other people who were not at issue,
19   then it cannot have influenced their intent.
20            With respect to the admission spots, the evidence will
21   show that this was a scheme to obtain spots that were reserved
22   at the discretion of coaches for recruited athletes.  That's
23   what the evidence is going to show and that's what we're going
24   to argue.
25            THE COURT:  Mr. Kelly?
```

11:48 at line 10, 11:49 at line 20

1       MR. KELLY:  I think he's urging the Court to go places

2   it shouldn't go.  It will be reversible error if we're not

3   allowed to defend ourselves on the good faith process our

4   clients had.  The fact is, the reasonableness of that good

5   faith needs to be tested.  If, in fact, they thought A was

6   happening and A was happening, that's a defense.  So we're not

7   looking to put in thousands of documents to show that A was

8   happening, i.e. USC was funneling kids to school through this

9   process, rich kids.  We just need some examples to show the

11:50 10   good faith reasonableness of their beliefs.  I'd urge the Court

11   to consider that when we present the exhibits that we

12   ultimately present.

13       MR. KENDALL:  Your Honor, if I may add but not repeat.

14   There's a second line that's equally important, the defense

15   alluded to a little bit earlier, that has nothing to do with

16   our intent and good faith, which is an important consideration.

17   It's if we're stealing the honest services of USC, it means

18   we're getting the employees to do something that the university

19   does not want them to do.  We, therefore, have a right to show

11:50 20   that the university does want them to do this, that this is the

21   official policy of the athletic department, and it's been

22   approved by various people who work with it to show that these

23   people are not stealing their honest services.  They're doing

24   their job in a way that they're being commended and respected

25   for.  And that's directly relevant, your Honor.

1          THE COURT:  Mr. Frank.

2          MR. FRANK:  It's a conspiracy that's alleged, your

3     Honor.  It's a conspiracy to steal.  So the relevant question

4     is did the defendants have a knowledge and intent to join a

5     conspiracy to steal honest services from somebody else, not

6     even did it actually happen, but whether they inspired to make

7     it happen.

8          MR. KENDALL:  Your Honor, the documents we're looking

9     to show in this conspiracy, supposed conspiracy, include

11:51 10   something I think you're going to be dealing with later, Pat

11    Haden, the director of athletics.  They do not allege in their

12    filings he is a member of the conspiracy.  He is not identified

13    as an unidentified conspirator.  He is a person who is on the

14    board of trustees and on the athletic department and in charge

15    of the athletic department fundraising.  We will prove that

16    before he ever met Singer he was doing a side door type

17    operation where people could donate to get their kids in, both

18    on the VIP and the SUBCO list, and after he met Singer and knew

19    what Singer was doing, he had people to continue to work with

11:52 20   Singer as part of this overall fundraising scheme.

21          I actually have a couple of documents that are on

22    point.  May I hand them to the clerk?

23          THE COURT:  To what end?

24          MR. KENDALL:  It shows his role in fundraising and

25    having his people work with Singer.

1          THE COURT:  Relevant to any of the in limine motions

2    we've been discussing?

3          MR. KENDALL:  Yes, your Honor.  It shows that this was

4    the providing of honest services by doing the fundraising, so

5    it's separate from the state of mind of the defendants.  The

6    same evidence also shows he was fulfilling the honest services

7    of the university by doing the fundraising with Singer and

8    other people.  It was a widespread practice of which Singer was

9    only a small part of.  So we can't steal the honest services if

11:53 10   we're actually part of the fulfillment of the honest services

11   of the fundraising from parents of applicants.

12          THE COURT:  Mr. Frank?

13          MR. KENDALL:  May I hand them up to the clerk?

14          THE COURT:  Mr. Frank, do you object?

15          MR. FRANK:  I don't think your Honor has ruled on Pat

16   Haden.

17          THE COURT:  This is not before the Court today so I'm

18   not going to take those documents.  Mr. Frank?

19          MR. FRANK:  The other point is it's a conspiracy to

11:53 20   steal honest services.  Whether or not they could be stolen is

21   a different question.  It was a conspiracy to do so that's

22   alleged.  The defendants' intent is what's at issue.  If they

23   had a good faith basis for believing that Pat Haden did

24   something, then they'll be permitted, as I understand it, to

25   introduce evidence of what they knew with respect to what

1   somebody else was doing.  If they didn't know it, it can't be

2   relevant to their good faith.

3        MR. KENDALL:  Your Honor, if I may add one thing.  If

4   they put in evidence that they knew this was going on and they

5   thought it was going on, then they're certainly entitled to

6   show that they're not making it up but, in fact, their good

7   faith belief is an accurate belief and it is consistent with

8   what the university is doing.

9        THE COURT:  So this is something I rule on after

11:54 10  they've testified or there's been evidence introduced that they

11  knew about Mr. Haden's activities, right?

12       MR. KENDALL:  They knew about the university athletic

13  department activities.

14       THE COURT:  That's a question that's going to come up

15  at a point in trial and it will be in context, right?

16       MR. KENDALL:  Hopefully, your Honor.

17       THE COURT:  That's when I'll deal with it.

18       MR. KELLY:  One more point.  The Joselyn case in the

19  First Circuit case that we cited in our jury instructions, it

11:54 20  talks about the condonation defense is permitted in the First

21  Circuit.  I think a lot of exhibits we introduced goes to that,

22  so we would ask the Court to consider that as well.

23       MR. DICANIO:  If I could make one more point.  I know

24  we're harping on this issue because, as Mr. Kelly said, it is

25  critically important to our defense.  What the government's

1   trying to do is they're trying to show a process, an admissions

2   process at USC, but not the complete process, not a certain

3   element of the process.  What we're trying to do is show the

4   complete process, which includes consideration of donations.

5         Also, your Honor, we also have the ability and a right

6   to argue immateriality.  If the athletic department was

7   proceeding with full knowledge of who these students were and

8   whatever limitations they might have and still proceeded to

9   move for their admission, that certainly goes to the

11:55 10   materiality of whatever statements the government is trying to

11   prove is false.  So, your Honor, I think that also needs to be

12   considered.

13         THE COURT:  Wish to respond to that, Mr. Frank?

14         MR. FRANK:  We're not trying to show a process, your

15   Honor.  We're not putting on a case about USC's admission

16   policies.  We're putting on a case about these defendants'

17   knowledge and intent to secure their children's admission using

18   payments to facilitate their admission as something they were

19   not, which is recruited athletes.  It's about these defendants,

11:56 20   what they were trying to do, and not a process at USC.

21         THE COURT:  You've heard my comments and my rulings

22   and we're going to let it stand at that.  We'll now proceed to

23   some other issues.  I have reviewed the numerous objections

24   filed by each party to the other's witness and exhibit lists.

25         The defendants' objections to government's witnesses

1    who are associated solely with two individuals who were

2    defendants in this case at the time the witness lists were

3    filed but have since pled guilty is sustained.

4            The Court will also sustain defendant Abdelaziz's

5    objection to government's Exhibit 518, an e-mail attaching his

6    12 page Wells Fargo bank statement from March of 2018, unless

7    the government redacts all nonrelevant information.

8            All remaining objections are overruled because they

9    are conclusory and fail to provide the Court with adequate

11:57 10  context on which I can base any ruling.

11           We need to proceed to other scheduling matters.

12           MR. KENDALL:  May I address something you just ruled

13    on?

14           THE COURT:  Yes, Mr. Kendall.

15           MR. KENDALL:  Your Honor, as my notes have it, maybe I

16    got it wrong, I believe you ruled that for the two defendants

17    who have pled and left the case you're going to sustain the

18    objections to their exhibits?

19           THE COURT:  That's what I said.

11:57 20         MR. FRANK:  I thought you said witnesses.  They're

21    coconspirators in the case, so exhibits relevant to them may be

22    relevant.  We're going to evaluate that.

23           THE COURT:  You want me to read it again?

24           MR. KENDALL:  My notes were not good, your Honor.  It

25    would be very helpful to me.

1           THE COURT:  Defendants' objection to government's

2    witnesses who are associated solely with two individuals who

3    were defendants in the case at the time the witness lists were

4    filed but have since pled guilty is sustained.

5           MR. KENDALL:  I should be quiet and sit down.  Thank

6    you.

7           THE COURT:  Mr. Frank, you have recently changed your

8    estimate of time to two to 3 weeks, and that is with respect to

9    these three defendants, right?

11:58 10         MR. FRANK:  Yes, your Honor.

11          THE COURT:  Then it seems to me that I ought to be

12   able to tell prospective jurors that this is more in the nature

13   of a 4-week trial than a 6-week trial, correct?

14          MR. FRANK:  Correct.

15          THE COURT:  Do defendants agree with that?

16          MR. KELLY:  Your Honor, I hate to keep beating the

17   drum.  Singer is the key witness.  He could be on

18   cross-examination for a week and a half or 2 weeks if they call

19   him.  If they keep equivocating as to whether -- to make their

11:59 20   decision to call a witness, that affects the length of trial.

21          THE COURT:  They told me it's a two to 3-week case for

22   the government's case-in-chief.  I don't ask them what

23   witnesses it's going to be they think they need to call.  I'm

24   going to take that as a good faith estimate of what the

25   government thinks they need to put on their case-in-chief.

1          MR. DICANIO:  Your Honor, this is Jack DiCanio.  I'm a

2     little concerned with that estimate only because I know from

3     Mrs. Palatella's perspective, we have several witnesses that we

4     are likely to call from California.  I would ask maybe that the

5     estimate be more like 5 weeks than four, your Honor.

6          THE COURT:  I'll consider that.  I think parties

7     understand the way this session works is that we start at about

8     9:00 a.m. every morning.  We have a morning break somewhere

9     around 11, not exactly at 11, but at an appropriate time.  We

12:00 10    go to 1 o'clock, break for lunch until two.  Then usually we go

11    until three or 3:30, but never after. 3:30.  That is the

12    standard procedure.

13          We don't do that every day.  Sometimes the Court has

14    afternoon business I need to attend to so we don't have an

15    afternoon session.  And there will be days in September on

16    which we will not be in session.  One is the Jewish High Holy

17    Day of Yom Kippur, which I'm not sure the exact date, but it's

18    in the second week of this trial.  We will not be on trial that

19    day.  Then, at the very end of the month, the Court has duties

12:00 20    as a panelist on the judicial panel of multidistrict

21    litigation.  I will be out of the state on Thursday,

22    September 30th and Friday, October 1st.  There may be other

23    dates that I will advise counsel of, but the procedure will be

24    nine to three each day.  So you can kind of understand that.

25          Now we need to discuss the empanelment procedure,

1    including the anticipated length of opening statements.  I do

2    need to inquire one last time because, as we have determined

3    before, Wednesday, September 8th is the second day of Rosh

4    Hashanah.  I understand that everybody agrees that we are going

5    to start the process that day.  If there are any prospective

6    jurors that observe the second day, they will be postponed

7    until the third day because we're going to have 2 days where

8    we're going to be calling in jurors.  That is my understanding.

9    Is there any reason for me to not go forward in that regard?

12:02 10           MR. KENDALL:  Fine, your Honor.

11           MR. FRANK:  Same, your Honor.

12           THE COURT:  So we are going to submit a questionnaire.

13    You have a prepared questionnaire.  Before we adjourn today,

14    I'm going to try to get to those questions that you haven't

15    agreed upon.  You've agreed on most of the question.  I think

16    there are 45.  There about five each that you've proposed.

17    We'll talk about those.

18           I have the jury clerk.  I'm not going to put him on

19    right at the minute.  He is going to help explain how we are

12:02 20    going to do the process.  We are going to summons in roughly

21    two groups of 100 on that first Wednesday, September 8, one

22    group in the morning and one group in the afternoon.  Once the

23    morning group arrives, I will give the prospective jurors a

24    brief summary of the case and hand out the questionnaire.  Of

25    course counsel may be present, and probably should be present.

1    We're going to do that in the jury assembly lounge down on the

2    second floor.

3            The clerk's office will then copy the completed

4    questionnaires and give the answers to the parties somewhere

5    around noon.  The parties will have until about 4:00 p.m. to

6    review the questionnaire to determine whether they agreed to

7    strike any jurors for cause, at which point they will inform

8    the Court of their decisions.  Then the Court will inform the

9    clerk's office which jurors to call in the following day.

12:04 10          To interrupt for a moment, what that means is you're

11   not going to get a list four or 5 days in advance.  That is not

12   the way our system works.  You will get all of their

13   questionnaires in time to review them and over night to

14   determine whether or not you have some reason to object to

15   their continuing to sit as jurors.

16           As to the second group, they will arrive at around

17   1:00 p.m. on that first day.  The Court will provide them the

18   same sort of an opening, give them the questionnaire, give them

19   a chance to answer the questions, and then we will get their

12:04 20   answers somewhere in the late afternoon.  The parties will have

21   until the following morning to review those answers.

22           Then, the following day, that is Thursday,

23   September 9th, the parties and the Court will convene in one of

24   the large courtrooms, it won't be this courtroom, and conduct

25   an individual voir dire of the prospective jurors that remain

1    from the first group.  Empanelment -- we're hoping but we don't

2    know out of the 100 that we get 60 back out of each group of

3    100.  Empanelment will continue until roughly 40 prospective

4    jurors are so-called cleared.  Then the Court will bring the 40

5    cleared jurors back and give the parties an opportunity to use

6    their peremptory strikes until 16 jurors are selected, four of

7    whom will be alternates.  I've decided that we will go with 16

8    rather than 18, just simply because I think that number is

9    sufficient.

12:05 10         Under the rules, the defendants will have 12

11   peremptory challenges.  The government will have eight.  With

12   respect to the selection of alternates, I have empanelled for

13   many, many years in a way that's slightly different than called

14   for by Federal Rule of Criminal Procedure 24.  In other words,

15   I empanel all 16 under one system and I don't require counsel

16   to exercise their peremptory challenges the first 12 and then

17   have a separate empanelment of the four alternates.  I do that

18   because I like to have the 16 jurors participate as equals

19   during the course of the trial.  We know who the alternates are

12:06 20  but they don't.  The four alternates are the ones who are

21   seated last, that is the 13, 14, 15, and 16th jurors will be

22   respectively the first, second, third and fourth alternates.

23         So when we get to the point where we have 40 cleared

24   jurors, we come back into this courtroom and my deputy clerk

25   chooses the jurors at random out of a hat, if you will, and

1   they are seated in the jury.  Then, if peremptory challenges

2   are exercised against any of those 16, of course they are

3   replaced.  As they are replaced, we keep track of who is there

4   first.  The four last persons are the four alternates.  They

5   are not designated as alternates from day one, but you and I

6   know who they are and know their order of all the alternation,

7   if you will, alternatees.

8         That is a system slightly different than that called

9   for in Rule 24.  It does allow counsel to exercise any of their

12:07 10   peremptory throughout the process rather than ten and six for

11   the jurors and two whatever it is that go with the alternates.

12         Is that acceptable to counsel?  Mr. Frank?

13         MR. FRANK:  It is, your Honor.  Quick question.  My

14   understanding is we'll get the questionnaires back in the late

15   afternoon and then have over night to review them?

16         THE COURT:  You'll get them in two separate tranches,

17   if you will.  We're going to give the first questionnaire out

18   at about 9 o'clock in the morning.  We expect to get it back at

19   12.  You'll have that first at 12.  You'll have until 4 o'clock

12:08 20   to agree amongst yourselves as to who we'll excuse just on the

21   basis of written questions and who we will invite back the next

22   day.

23         Then the second group comes in and their

24   questionnaires won't be available until about 4 o'clock.

25   You'll have those questionnaires overnight.  Then you'll be

1    able to tell us as to which ones you will agree to call in.  At

2    this point, I think maybe Mr. McAlear better be put on so he

3    can correct me where I've made a mistake, if I've made some.

4         Mr. McAlear.

5         MR. MCALEAR:  Hello, your Honor.  Everything sounds

6    exactly as we had discussed it earlier.

7         THE COURT:  So the second group of questionnaires

8    counsel will get at about 4:00 in the afternoon on Wednesday

9    afternoon, is that right?

12:09 10         MR. MCALEAR:  That's been how the process has worked

11    in the past.  We're always subject to the few straggling jurors

12    that want to write more than others, but we should have them by

13    4 o'clock.

14         THE COURT:  Counsel will have them overnight and be

15    able to determine which ones they agree should be excused and

16    which ones should not.  How is that second group notified as to

17    coming in on Friday?  Oh, that's right.  That's Thursday.  They

18    would be summonsed to come in on Thursday.

19         MR. MCALEAR:  That's right.

12:10 20         THE COURT:  We're working with 3 days, not two,

21    Wednesday, Thursday and Friday of that first week.

22         MR. FRANK:  Would your Honor like us to be here first

23    thing Wednesday morning or?

24         THE COURT:  I'm going to be greeting jurors, so I

25    think it would be appropriate for you to be here.

1      MR. FRANK:  I didn't understand if they were being

2  handed questionnaires.

3      THE COURT:  I'll make brief remarks.  Mr. McAlear may

4  supplement what I say as to how to do the questionnaires and

5  how to turn them in.  Then they will be set free to write their

6  answers and we will be excused.  Then we'll do the same thing

7  at 1 o'clock.

8      MR. FRANK:  Thank you, your Honor.  The other question

9  I have is whether the government would be permitted to run

12:10  10  criminal history checks on those jurors, provided we share

11  results.

12      THE COURT:  I would think both sides may want to do

13  that.  I think that's the concern of all counsel.  They'd like

14  to have a little time to run that information.  Is that

15  correct?

16      MR. KELLY:  Yes, your Honor.  Once they're seated in

17  the box, if I change my mind, can I go back and strike one?

18      THE COURT:  We have a rule that after the first round

19  of strikes, you can't strike somebody.  In other words, there

12:11  20  are no back strikes.  In the first round, let's say, for

21  instance, we put 16 in the box and we exercise the challenges

22  outside the hearing of the jury.  I don't know exactly how

23  we're going to do that in these circumstances, but they're

24  exercised outside the hearing of the jurors.  I allow

25  peremptory to be exercised one at a time.  If the government

1   has a peremptory challenge, they'll exercise it.  Then we'll go

2   to the defendants.  They'll exercise one.  We go back and forth

3   until both sides are satisfied that first round.

4        For instance, maybe the government has challenged

5   three and the defendants have challenged five.  We've gotten

6   rid of eight of the 16.  Those eight cannot be challenged in a

7   later round.  They're there.  But you can exercise your

8   peremptories at any point in the process.  You can use those

9   five challenges with that 16 or you can use eight or ten with

12:12 10  that first 16, understanding that you only have so many for the

11  second round.  It's only the newly replaced eight that have

12  replaced the eight stricken before as to which you can use your

13  subsequent strikes.

14        MR. KELLY:  Thank you, your Honor.

15        THE COURT:  Everybody understand that?  Is that

16  agreeable to defense counsel?  I didn't get the agreement of

17  Mr. Kendall.

18        MR. KENDALL:  Yes.  Agreeable, your Honor.

19        THE COURT:  Mr. Loucks?

12:12 20  MR. LOUCKS:  Yes.

21        THE COURT:  Mr. Kelly?

22        MR. KELLY:  Yes, your Honor.

23        THE COURT:  As you know, the alternates may end up in

24  seats 3, 11, 9 and 14.  You will know who they are.  At the end

25  of the trial, if we had to replace one of the jurors, those

1    four alternates are excused but allowed to stay in a separate

2    room in case we need to utilize their attendance later.

3         Openings.  I see no reason why we can't go with a

4    45-minute opening with the government and each defendant having

5    30 minutes.  As I said before, openings are not alternate

6    arguments and they're not to be used as such.  They should

7    respond to that preamble I said, the evidence will show.  If

8    you have anything beyond that, you shouldn't say that.  So

9    45 minutes for the government and 30 for each defendant for

12:14 10    openings.

11         The Court intends to try this case in this courtroom,

12    that is Courtroom 4, with two overflow courtrooms likely,

13    Courtrooms 6 and 7.  The trial will also be streamed via Zoom

14    and we have yet to hear back from our folks as to extra space

15    for attorneys.  I expect that we will have roughly 50 people in

16    this courtroom.  The way I get there is 16 jurors, roughly

17    seven court personnel.  That's me, my courtroom deputy, the

18    courtroom reporter, about three of my clerks.  With the

19    parties, it will be three prosecutors, two counsel at table

12:15 20    with the defendants.  If I'm right, that's 12 people in the

21    well.  12 and 16, 23.  Am I right?  Maybe I'm missing something

22    here.  Anyway, it -- that's not correct.  16, 7 is 23.  12 is

23    35.  That will leave roughly 15, well, a witness, 36, will

24    leave roughly 14 people for the gallery.  That can be --

25         We're going to have to have some availability for the

1    public to be in the courtroom, but there will be satellite

2    courtrooms both for extra counsel, paralegals, family members,

3    whatever.  Counsel can make proposals to me about that if they

4    wish.  I think that's where we're headed, roughly 50 people in

5    the courtroom.  Any comments on that?

6            MR. FRANK:  Your Honor, I think your Honor said three

7    prosecutors at the table.  There are actually four on the case.

8    We can either squeeze or perhaps somebody can sit in the back.

9            THE COURT:  I think somebody would be able to sit in

12:16 10   the back.  Prosecutors have three.  Each defendant has two

11   counsel plus the defendant.  So there are going to be three

12   people at each of the tables.  That's 12.

13           MR. FRANK:  And paralegals.

14           THE COURT:  Paralegals may have to be in the satellite

15   courtroom.  You make a proposal to me as to how you feel the

16   gallery ought to be handled and I'll consider it.

17           MR. FRANK:  Typically, there's a paralegal operating

18   the trial director.

19           THE COURT:  Consult with one another.  If you can

12:16 20   unanimously come to me with a proposal, I will give it serious

21   consideration.  Mr. Kelly?

22           MR. KELLY:  We'll do that.  We'll talk to the

23   government and see if we can't get an agreeable proposal.

24           MR. KENDALL:  Your Honor, the one thing I think is

25   related to this, the government listed a large number of agents

1    that it wanted to have present in the courtroom.  We move to

2    sequester all of the witnesses.  I believe it's standard

3    practice for the summary IRS revenue agent to be able to be in

4    the courtroom because he's got to summarize the testimony.  I,

5    myself, may have a summary fact witness that's comparable.

6    They can be in the satellite courtroom, otherwise we would move

7    to have everybody sequestered.

8              THE COURT:  The government has filed a motion to

9    unsequester the case agents.  Enlighten me again, Mr. Frank, as

12:17 10    to who you have asked to not be sequestered.

11             MR. FRANK:  Case agent, revenue agent, summary

12    witnesses.

13             THE COURT:  How many people is that?

14             MR. FRANK:  Five people.

15             MR. KENDALL:  We object.  Particularly the case agent,

16    Miss Keeting, is a particular witness, particularly if

17    Mr. Singer is not testifying.

18             THE COURT:  Are they going to be witnesses?

19             MR. FRANK:  One case agent may be a witness, your

12:18 20    Honor, yes.

21             THE COURT:  Usually, prior to the testimony, the case

22    agent is sequestered, but after the testimony they are not.

23    Why don't you see if you can work out an agreement with counsel

24    on that one.

25             MR. KENDALL:  It sounds unlikely, but we will try.

1          MR. KELLY:  For the record, we join the sequestration

2     request.

3          MR. DICANIO:  Your Honor, may I be heard on the

4     opening statements?

5          THE COURT:  Yes.  This is Mr. DiCanio.

6          MR. DICANIO:  Yes.  We have requested for

7     Miss Palatella 45 minutes for the opening, so an additional

8     15 minutes.  I ask the Court to consider that. I understand

9     it's not a time for argument.  This is going to be the first

12:19 10    time that the defendants have told their story and what the

11    trial is going to look like.  There's an awful lot of media

12    coverage, a lot of statements by the government about what this

13    case is about.  Even a former prosecutor appeared in a

14    documentary talking about what this case is about.  This will

15    be the first time they hear it from us.  We shouldn't be unduly

16    limited in telling them what they're going to hear in this

17    trail.  We're only asking for an additional 15 minutes.  My

18    client has two different types of conspiracy we have to deal

19    with.  I think it's important we get our message early so the

12:19 20    jury can understand where we're coming from.

21          THE COURT:  Mr. DiCanio, in jury trials, stories are

22    told by witnesses, not by counsel.  30 minutes is enough for

23    counsel to summarize what he or she thinks the evidence will

24    show.  30 minutes is enough for each defendant.  That means the

25    defendants actually get twice as long as the government to make

1    their openings.  30 times three is 90.  That's twice 40.  The

2    government will get 45 minutes.  Each defendant will get 30.

3    If the defendants want to trade time with one another, they can

4    do that, but the total amount of time from the defendant side

5    will be no more than 90 minutes.

6                MR. DICANIO:  Your Honor, with all due respect, this

7    is a case where the government doesn't need much time at all.

8    The talking has been done by the media, who has a perspective

9    on this case.  I understand what you're saying.  It's time for

12:20 10   telling what the jury is going to hear, but it is a story, a

11   story of what happened.  We should have an opportunity to

12   outline that in sufficient detail so when the case starts, the

13   jury understands where the government is going and they

14   understand where we are going.  An additional 15 minutes is not

15   going to put us so far behind it will jeopardize the overall

16   timing the Court would like for the case.  So I ask that you

17   reconsider.

18                THE COURT:  The motion is denied.  You'll get

19   30 minutes.

12:21 20               Turning to your pretrial memoranda, the defendant has

21   asked about document admissibility issues.  They contend that

22   they have made several attempts to reach agreement with the

23   government regarding document admissibility issues, including

24   proposing a stipulation to the government that certain broad

25   categories of documents be deemed as authentic and/or business

1    records.  Has there been any progress on this admissibility

2    issue?  Mr. Frank?

3         MR. FRANK:  It's not entirely clear, your Honor.  We

4    responded to the defense proposal.  We agreed to the

5    authenticity, to stipulate to the authenticity of some records,

6    in particular, records we haven't seen.  The defense has

7    indicated to us that they will only stipulate to the

8    authenticity of certain records if we call Mr. Singer and if we

9    commit to that now.  It's not clear to us, since there's no

12:22 10   serious dispute, that the calls on the wire are the calls on

11   the wire, that the e-mails that we obtained by searches are the

12   e-mails that we obtained by searches, that the voicemails from

13   Mr. Singer's phone are the voicemails on his phone, why a

14   stipulation to authenticity but not admissibility would be

15   conditioned on which witnesses we call, but that's the

16   situation we're in right now.  That's why we've moved to

17   preauthenticate all of those records based on certificates of

18   authenticity submitted by the keepers of those records.

19        THE COURT:  Is the defense going to oppose that

12:22 20   motion?

21        MR. KENDALL:  Yes, your Honor.  With respect to the

22   issue of the authentication of the tapes, we have filed motions

23   and affidavits at the time of the motions to dismiss where we

24   raised two issues: First, Singer did not record all of the

25   conversations that he had with my client, possibly others, and

1    other people the government told him to tape record.  So the

2    tape recording was selective.

3          Second, Singer's notes indicate that he was told to

4    lie and say false things on the tapes.  We maintain that's

5    quite true, that a lot of the things he's saying are false

6    representations of prior events that the agents told him to do.

7    We don't think these tapes can be validated without having

8    Singer there to validate them because it's not just a question

9    of whose voice it is.  It's a question of whether or not the

12:23 10    tape, all the tapes have been kept and made or were some things

11    not recorded for certain purposes, and did Singer purposely put

12    in false, misleading information as he recorded in the written

13    notes that you said we'd have ample time to cross-examine

14    about.

15          So we think, your Honor, either the government tells

16    us they're going to call Singer to validate the tapes at trial

17    or there should be a hearing outside of trial to validate the

18    tapes, and we'll call Singer then as part of the evidentiary

19    hearing to decide whether or not the tapes are accurate and

12:24 20    reliable.

21          MR. FRANK:  All of those arguments go to weight, not

22    authenticity, of the recordings that were made.  There's no

23    serious dispute that those recordings are those recordings.

24    That's the only issue.

25          THE COURT:  Get your oppositions in sooner rather than

1      later, Mr. Kendall.  I'll decide the motion on the papers.

2              MR. KENDALL:  We got their papers late yesterday.  If

3      we could have until next Friday to get to you, would that be

4      convenient with the court?

5              THE COURT:  Yes.

6              We've talked about jury selection, which was another

7      subject matter of the defendants' pretrial memorandum.  We've

8      talked about lengths of openings.  We haven't talked about the

9      protocol as to parties providing each other with their

12:25 10  witnesses on a particular day.  I think the only difference is

11     4:00 p.m. and 6:00 p.m.  I'll split the difference and say by

12     5:00 p.m., two business days in advance, each side will provide

13     to the other side the list of witnesses they intend to call.

14             Mr. Frank?

15             MR. FRANK:  Just briefly, your Honor.  There was a

16     slightly bigger difference.  The defense proposed business

17     days.  We proposed days.  Business days would require we tell

18     them on Thursday.  We were calling on Monday.

19             MR. KENDALL:  Your Honor, we want some semblance of a

12:25 20  decent weekend.  If they could tell us Friday 12 o'clock who we

21     have on Monday, he wanted to tell us Saturday night at

22     6:00 p.m., which I didn't think was that convenient. Friday at

23     12.

24             THE COURT:  What about that, Mr. Frank?  I think you

25     ought to be able to do that.

1         MR. FRANK:  12 is the middle of the court day, your

2   Honor.  We'd like to assess what happens on trial, if we could

3   tell them after court at five.

4         THE COURT:  3 o'clock, close of the session, you tell

5   them.

6         MR. FRANK:  Thank you, your Honor.

7         MR. KENDALL:  Thank you, your Honor.  That's very

8   gracious.

9         THE COURT:  All right.  Summary charts, I think you

12:26 10   had a difference on summary charts.  The government was going

11   to say 5 days.  The defendants said 2 days.  Has that been

12   resolved?

13         MR. FRANK:  It has not.

14         MR. KENDALL:  The issue we have, your Honor, is we

15   don't know if we're going to put on a defense until they're

16   resting or close to resting.  So to say that we do it 5 days

17   before they rest, it just raises a Fifth Amendment issue that

18   we just can't deal with.  They need to have charts in

19   sufficient time so they can review them and understand them and

12:26 20   they can deal with them competently.  We thought 2 days would

21   give us enough play time to decide are we putting on a defense,

22   what are we putting on in that defense, and to get them the

23   chart.

24         THE COURT:  Mr. Frank?

25         MR. FRANK:  They're drafts, your Honor, that we're

1     requesting.  We're going to provide them.  We think they should

2     provide them as well.  I understand Mr. Kendall to say earlier

3     he already has summary charts.  I don't understand the issue

4     with drafts.

5            THE COURT:  This is something I shouldn't have to

6     resolve.  I'm going to say 3 days both ways provide charts

7     going to be used, 3 days hence.

8            Logistics, we're going to be, as I said before, in

9     this courtroom.  We're trying to provide other backup space for

12:27 10   attorneys.  The Wi-Fi information, that's all got to come from

11    the folks in the clerk's office that we will give you

12    information as soon as we have it.  Those are matters that I'm

13    not going to resolve here.  The government's pretrial

14    memorandum, we've already talked about their change in the

15    length of the case-in-chief, the two to 3 weeks.

16           I think we've covered all the other matters that are

17    mentioned in this one.  The government expects to provide jury

18    binders.  We've talked about case agents and the sequestration

19    order and Power Point presentations and overflow courtrooms.  I

12:28 20   think we have discussed each of those matters.

21           That leaves us then with the jury proposed

22    questionnaire.  You have agreed on 45 questions, some of which,

23    if you had not been in agreement, I would think is beyond what

24    you need to inquire of prospective jurors.  Like, for instance,

25    what magazines or newspapers they read, I would never authorize

 1    that unless you both agree to ask that question.

 2          Question No. 20, that this trial is expected to last

 3    approximately 4 weeks, I'm not going to say four to 6 weeks.

 4    I'm going to do everything I can to make it happen.

 5          I normally do not ask jurors whether they have

 6    problems with the law, as you have in question No. 22.

 7    Prosecution has the burden of proving the defendant is guilty

 8    beyond a reasonable doubt.  A defendant does not have to prove

 9    that he is innocent.  Do you disagree in any way with that

12:30 10    principle?

11          I wouldn't ask that question because I instruct the

12    jury on what the law is.  I don't ask them whether they agree

13    or not with the law.  If you want to do that question and you

14    both agree to it, I will let it be asked.

15          On question 35, this is something that may have been

16    resolved already where you say, "Attached to this questionnaire

17    is attachment A, is a list of people who may testify at this

18    trial".  Then you ask the question, "Do you personally know any

19    of those people", answer yes or no.  They haven't told you

12:30 20    which ones they know.  So the question has got to be, if yes,

21    please describe who it is that you know and how you know them,

22    right, otherwise they can check the box yes and we wouldn't

23    know which of the 50 people they know?

24          MR. KELLY:  I think that was Mr. Frank's question.

25    We'll fix that up.

```
  1            THE COURT:  38, which refers to the case itself,
  2   nobody, at least in this questionnaire, has identified this
  3   case as the so-called "College Admission" or "Varsity Blues"
  4   case.  I had suggested, have you ever commented on this case,
  5   sometimes referred to as the "Varsity Blues" case or the
  6   "College Admissions" case, in a blog, et cetera, et cetera.  I
  7   think that ought to be added, although I will in my initial
  8   remarks to the jury explain that.  So maybe it's not necessary.
  9   They will have heard this an hour before I commented, so I
12:31 10  think it ought to be included in the written.
 11            MR. FRANK:  Our concern was only "Varsity Blues" is an
 12   FBI operational name.  The press has latched on to that name.
 13   We understand your Honor would be describing the case to them,
 14   so regardless of whatever name is in the media, it's whether
 15   they've heard about this case.  We don't think they need to
 16   hear the names "Varsity Blues".
 17            MR. KENDALL:  For once, Mr. Frank and I both agree.
 18   I'm afraid people will start Googling things.
 19            THE COURT:  Fair enough.  Do the other defendants
12:32 20  agree?  Mr. Kelly?
 21            MR. KELLY:  The documentary that we're concerned about
 22   is called "Varsity Blues".  I'll discuss with my colleagues and
 23   we'll submit something quickly to the Court on this issue.
 24            THE COURT:  All right.  If you are in agreement at not
 25   using certain terminology, then the Court will give it very
```

1    serious consideration.  It's where you're in disagreement that
2    I have to make a call.  If you're in agreement, let me know and
3    we'll address it that way.
4            Turning to the exhibits, the differences of opinion.
5    Question one on both of yours refer just exactly to this
6    subject matter, the publicity of this case.  The question
7    offered to me by the defendants, you do use the term "Varsity
8    Blues" and "College Admissions", whereas the government does
9    not.  In the defendants' question, you ask for a more nuanced
12:33 10   amount of information that the prospective juror has, that is
11   whether it's none, a little, a moderate amount, or every TV
12   mentioned.
13           I think it might be appropriate to find out from each
14   potential juror how much of an involvement with this case
15   they've had.  So I would be leaning toward the defendants'
16   proposal, but I certainly won't use the term "Varsity Blues"
17   and "College Admissions" if that is agreed.
18           Any comments on that first question?
19           MR. KENDALL:  I need to discuss with Mr. Kelly.  As we
12:34 20   said, we'll get back to you.
21           THE COURT:  Fair enough.  Do it sooner rather than
22   later.
23           MR. KENDALL:  Much sooner, your Honor.  Thank you.
24           THE COURT:  With respect to the second question of the
25   defendants' supplemental, I'm not going to ask people what

1    organizations.  I think that's too invasive of their right to

2    privacy.  I am not going to allow question number two.

3         Question No. 3 is whether or not they've been in the

4    military.  What does that add?  Why do we need to ask them

5    whether they or somebody in their family is in the military?

6    Mr. Kendall?

7         MR. KENDALL:  I'm not the one handling the

8    questionnaire.

9         THE COURT:  Mr. Kelly or whoever it was that proposed

12:35 10   that question?

11        MR. KELLY:  Yes, your Honor.  This one came from a

12   defendant who is no longer in the case.  I won't blame

13   Mr. Frank, but.

14        THE COURT:  I'm not going to ask that one, nor am I

15   going to ask do you believe that if the government indicts a

16   corporation of committing a crime that corporation probably did

17   something illegal.  I'm not going to ask them that.

18        I will ask the equivalent of the question about

19   wealthy, whether they have something against rich people,

12:35 20   because I'm going to give defendants that one, and I'm going to

21   give the government number four of their requests that some

22   witnesses in the case cooperated with the government in hope of

23   receiving a more lenient sentence.  The trade off is, if I ask

24   the rich guy question, I'm going to ask the cooperated question

25   too.

1         So that covers the supplemental questions of the

2    defendants.  The plaintiff's, rather the government's, I will

3    ask a particular question about knowledge of this case.

4         With respect to the second and third questions, I

5    think I will ask a combined question of have you ever had

6    management or supervisory responsibility on your job or started

7    or owned your own business in one question.  So I would ask the

8    fourth question.  I don't think I need to ask about the

9    Internal Revenue Service, so I'm not going to ask them to file.

12:36 10      Those are my rulings on the supplemental questions

11   offered by the defendants and the government.

12        Any comments?  Mr. Frank?

13        MR. FRANK:  Briefly, your Honor, the last question on

14   the Internal Revenue Service because there's a tax fraud issue

15   in this case.  We believe it's relevant whether a juror has had

16   an issue and has a beef with the IRS.

17        MR. KENDALL:  Your Honor, it's way too broad.  People

18   have all sorts of civil audits, interactions, whatever else.  I

19   think you're going to ask quite thoroughly whether people have

12:37 20  any antipathy towards law enforcement or antipathy towards the

21   government.  I think that covers it.  The IRS has so many

22   interactions with so many people.

23        THE COURT:  I agree with defendant on that one.

24        I believe we have covered all of the matters that I

25   had anticipated covering.  Of course, each time we get together

```
 1    I would be derelict in my obligation of not asking at this 11th
 2    hour whether there is any prospect of further changes of plea
 3    or resolutions of the remaining cases.  Is there any chance of
 4    that happening?  Mr. Frank?
 5         MR. FRANK:  We are hopeful, your Honor, but I can't
 6    say that there's a guarantee of that.
 7         MR. KENDALL:  Not at all, your Honor.
 8         THE COURT:  Mr. Kelly?
 9         MR. KELLY:  The Court should prepare for trial.
12:38 10         THE COURT:  The Court is prepared for trial.
11         Mr. Loucks?
12         MR. LOUCKS:  I'll defer to Mr. DiCanio.
13         MR. DICANIO:  I think we're ready to go forward.
14         THE COURT:  So are we.
15         Are there any other matters that need to come to the
16    Court's attention before we adjourn for the day.  Mr. Loucks?
17         MR. LOUCKS:  Nothing, your Honor.
18         THE COURT:  Mr. Kendall?
19         MR. KENDALL:  One small matter.  To keep things moving
12:38 20    quickly in the courtroom, if we're limited in the people we can
21    have in the main court, we're obviously going to have to be
22    communicating with the paralegals and attorneys to come back
23    and forth bringing things, getting copies of exhibits so
24    there's no slow down in the movement.  Could the Court issue an
25    order allowing our nonattorney paralegals to bring their cell
```

1   phones into the courthouse?  That's the only way we can e-mail
2   them, please bring Exhibit 42, we need it right away.  We can't
3   lean over the rails to speak to them.  We've got to e-mail
4   them.
5          THE COURT:  You have a form to fill out.  You can
6   contact my deputy.  We'll accomplish that.
7          MR. KENDALL:  That's great, your Honor.  Thank you
8   very much.
9          THE COURT:  Anything else?
12:39 10        MR. FRANK:  Nothing for the government.
11         THE COURT:  Thank you, counsel.  If we don't
12  communicate between now and then, we'll see you all on the
13  morning of Wednesday, September 8th to empanel a jury and
14  resolve this case.  We're adjourned.
15          (Whereupon, the proceedings adjourned at 12:43 p.m.)
16
17
18
19
20
21
22
23
24
25

1                   C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8              I, Kristin M. Kelley, certify that the foregoing is a

9    correct transcript from the record of proceedings taken

10   August 18, 2021 in the above-entitled matter to the best of my

11   skill and ability.

12

13

14        /s/ Kristin M. Kelley                 August 18, 2021

15        Kristin M. Kelley, RPR, CRR              Date
          Official Court Reporter
16

17

18

19

20

21

22

23

24

25