# EXHIBIT A

### 1. Honest Services Mail and Wire Fraud – The Employer's Customs, Practices, and Policies

*Both Defendants request that the Court give the following instruction:*

As I have previously instructed, if the alleged victim condoned—or provided tacit approval for—the payment that the government contends was a bribe or kickback, then such payment was not a bribe or kickback. And, more generally, conduct by an agent that would otherwise constitute a breach of a fiduciary duty does not constitute a breach if the principal, i.e., the entity to which the agent owes a fiduciary duty, consents to the conduct.

In determining whether the university at issue condoned, provided tacit approval for, or consented to a payment or other conduct, ask yourself the following question: What were the services that the employee at issue owed to his or her employer? To answer this question, you must look to the customs, practices, and policies—whether written or unwritten—of the particular department or unit in which the employee worked.

More specifically, you must assess whether the employee worked in a department or unit that had the following custom, practice, or policy: where a person donated to a university account controlled by an employee, that employee may advocate for the person's relative to be admitted to the university, regardless of or aside from the applicant's merit. If such a custom, practice, or policy existed, then soliciting and accepting such donations, and advocating for the donor's relatives to be admitted to the university, would not constitute a breach of fiduciary duty. Rather, the employee's supervisors would expect the employee to engage in such conduct as part of his or her ordinary duties. Thus, this payment would not be a bribe or kickback, and the university at issue would not be defrauded.[1]

---

[1] *See United States v. Zangrillo*, Criminal No. 19-10080-NMG, 2020 U.S. Dist. LEXIS 36364, at *14, *18 (D. Mass. Mar. 3, 2020) (Kelley, M.J.):

> If Zangrillo can demonstrate that USC had a practice of admitting the children of wealthy or influential parents, not on merit, but because they were designated as special interest or VIP, and that is how his daughter was admitted, **then a jury may find that he did not cause Heinel to act in conflict with the wishes of her employer, and she did not breach her duty to USC.**
>
> . . .
>
> There is no doubt, given Zangrillo's defenses set out above, that he is entitled to obtain documents in the possession of USC in order to prepare for trial. First, any documents pertaining to the admission of his daughter are presumptively admissible, relevant, and specific. **Other documents, to the extent they establish that the VIP admissions process was legitimate, was accepted university-wide, and was endorsed by high-level administrators, and to the extent they demonstrate that it was commonplace for applicants who donated to the school, and who had influential persons advocating for their admission, to receive favorable consideration in the admissions process, also meet the test of** *Nixon*. **These materials are relevant to** Zangrillo's good-faith state of mind defense, **whether USC was defrauded, whether USC was deprived of Heinel's honest services, whether Heinel was bribed**, and whether any misrepresentations in Zangrillo's daughter's application were material to her admission.

(Emphases added). *See also* ECF No. 906, Transcript of February 28, 2020 Hearing, at 14:7-16:6 (Kelley, M.J.):

1

## 2. Count One: Conspiracy to Commit Mail and Wire Fraud: Defense of Pure Legal Impossibility

*Both Defendants request that the Court give the following instruction:*

The Defendants have raised the defense of pure legal impossibility with respect to the charge of conspiracy to commit honest services mail and wire fraud set forth in Count One.[2]

Pure legal impossibility occurs when the actions which the defendant performs or sets in motion, even if fully carried out as he desires, would not constitute a crime.[3] In other words, there is a defense of pure legal impossibility when what the defendant planned or agreed to do has not been made criminal.[4]

A conspiracy requires either an agreement to accomplish an unlawful goal or an agreement to accomplish a lawful goal through an unlawful means.[5] The defense of pure legal impossibility applies not only where there is no statute criminalizing the end-result envisioned by the defendant at issue, but also where the government fails to meet its burden of demonstrating that the goal or means of an alleged conspiracy violated some identifiable legal prohibition.[6] It is not enough for the government simply to assert that the goal or means of an alleged conspiracy

---

   THE COURT: If she's taking money for an account over which she has control, which, I know the government says that's a bribe, **you still have to prove that the school was not in on that**. . . . [The government is] going to say, oh, it's a bribe legally if she has money going into accounts she controlled. **That's going to be something for the jury to decide. It's not de facto a bribe. The school has to be ignorant of that**, and one might well ask, how could the school have been ignorant of that? . . . I just think the government stuck on this theory that, if the money is going into an account for the school in exchange for Heinel advocating for a student, then the defendants are guilty. Number one you do have to show that they knew that was happening; and, **number two, you have to show the school wasn't in on it, Right?**

   AUSA Wright: Yeah, yes Your Honor. And we intend to prove that.

(Emphases added); *accord* Transcript of February 27, 2020 Hearing, at 16:15-22 (AUSA Rosen: "I believe that these payments to athletic programs are also payments in furtherance of a fraudulent scheme even though universities are receiving a portion of the money because I believe the universities are unaware that the coaches and/or administrators are recruiting those students in exchange for the monetary payments. We have disclosed this in charging documents."); Sealed Transcript of May 14, 2020 Hearing at 47:2-11 (Kelley, M.J.).

[2] *United States v. Conigliaro*, 384 F. Supp. 3d 145, 155 (D. Mass. 2019) (explaining that "[t]he First Circuit has embraced the pure form of legal impossibility in several cases," including *United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013)); *see also Fernandez*, 722 F.3d at 32 (finding that this defense applied where "Defendants were 'conspiring' to do something that [was not] prohibited by these Puerto Rico bribery laws on the date they planned to do it").

[3] *Conigliaro*, 384 F. Supp. 3d at 152 (citing *United States v. Oviedo*, 525 F.2d 881, 883 (5th Cir. 1976)).

[4] *Id.* at 155 (citing Kadish et al., Criminal Law and its Processes 646 (9th ed. 2012)).

[5] *Fernandez*, 722 F.3d at 32 ("[S]ince the conduct allegedly underlying the conspiracy was not a crime, no . . . conspiracy to commit that conduct can exist either." (quoting *United States v. Ali*, 561 F. Supp. 2d 265, 267 (E.D.N.Y. 2008)); *see also United States v. Driscoll*, 449 F.2d 894, 897-98 (1st Cir. 1971) ("However, since the conversation between the defendant and the Deputy District Director was an act directed towards obtaining a lawful result by a lawful means and since it was in no way connected to or in furtherance of the conspiracy, it cannot support a conviction for conspiracy.").

[6] *Conigliaro*, 384 F. Supp. 3d at 155-56 (citing *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000)).

violated an identifiable legal prohibition.[7] Rather, the government must introduce evidence which proves beyond a reasonable doubt that the goal or means of the alleged conspiracy did in fact violate an identifiable legal prohibition.[8]

Here, you must determine whether the government has proven beyond a reasonable doubt that the goal or means of the conspiracy set forth in Count One violated an identifiable legal prohibition—namely, the prohibition on depriving USC of the honest and faithful services of its employees. To do this, you must assess the customs, practices, and policies—whether written or unwritten—of the particular department or unit in which the USC employee at issue worked in order to determine what services actually were expected of the employee and whether the alleged conduct actually and fraudulently deprived the employer of those services. If you find that the government has failed to prove beyond a reasonable doubt both what services were expected and that the defendant deprived the employer of such services, then you must acquit the Defendants of the charge of conspiracy to commit honest services mail and wire fraud set forth in Count One.[9]

---

[7] *Id.* at 155-59.
[8] *Id.*
[9] *See* n.1, above.

### 3. Counts Six, Eight, and Nine: Honest Services Wire Fraud: Defense of Pure Legal Impossibility

*Defendant John Wilson requests that the Court give the following instruction:*

Defendant John Wilson has raised the defense of pure legal impossibility with respect to the charges of honest services wire fraud set forth in Counts Six, Eight, and Nine. As I have previously instructed, pure legal impossibility occurs when the actions which the defendant performs or sets in motion, even if fully carried out as he desires, would not constitute a crime. This defense applies not only where there is no statute criminalizing the end-result envisioned by the defendant at issue, but also where the government fails to meet its burden of demonstrating that the conduct at issue violated some identifiable legal prohibition.[10]

Here, you must determine whether the government has proven beyond a reasonable doubt that the conduct at issue violated an identifiable legal prohibition—namely, the prohibition on depriving Harvard and Stanford of the honest and faithful services of their employees. To do this, you must assess the customs, practices, and policies—whether written or unwritten—of the particular department or unit in which the employee at issue worked in order to determine what services actually were expected of the employee and whether the defendant fraudulently deprived the employer of those services. If you find that the government has failed to prove beyond a reasonable doubt both what honest services were expected and that the defendant deprived the employer of these services, then you must acquit Mr. Wilson of the charges of honest services wire fraud set forth in Counts Six, Eight, and Nine.[11]

---

[10] *See* Proposed Instruction No. 2, above.
[11] *See* n.1, above.

### 4. Tax-Exempt Organizations and Charitable Deductions

*Defendant John Wilson requests that the Court give the following instruction:*

The federal tax code generally allows taxpayers to take deductions on their income taxes for charitable contributions to qualified tax-exempt organizations, including 501(c)(3) organizations.[12] The Internal Revenue Service, which is more commonly known as the IRS, maintains a list of qualified tax-exempt organizations on its website.[13] Taxpayers may rely on this list in determining whether their contributions are deductible.[14]

An organization which receives a charitable contribution from a taxpayer has an obligation to tell the taxpayer if any goods or services were provided in exchange for that contribution.[15] More specifically, if the organization provides any goods or services in exchange for a contribution, the organization must do two things, and can be fined for the failure to do either of them.[16]

First, the organization must inform the taxpayer as follows: the amount of the contribution that is deductible is limited to the excess of the amount of the money contributed by the taxpayer over the value of the goods or services provided by the organization.[17]

Second, the organization must provide the taxpayer with a good faith estimate of the value of the goods and services it provided.[18] A good faith estimate of the value of goods or services that are not generally available in a commercial transaction may be determined by reference to the fair market value the organization has placed on similar or comparable goods or services.[19] A taxpayer has the right to rely on the organization's estimate of the value of the goods and services.[20]

As I have previously instructed, in order to convict Mr. Wilson of willfully filing a false tax return, you must find that he acted "willfully." "Willfully" means a voluntary, intentional violation of a known legal duty.[21] An act is done willfully if done voluntarily and intentionally, and with the specific intent to do something the law forbids; that is to say, with bad purpose

---

[12] *Strong v. Commissioner*, Docket No. 8861-90, 1994 Tax Ct. Memo LEXIS 358, at *14 (Jul. 14, 1994), *rev'd in part on other grounds*, No. 94-70818, 1996 U.S. App. LEXIS 6472 (9th Cir. Mar. 19, 1996); 26 U.S.C. §§ 170(a), (c)(2).

[13] *Strong*, 1994 Tax Ct. Memo LEXIS 358, at *14; Tax Exempt Organization Search Bulk Data Downloads, last reviewed or updated Aug. 2, 2021, https://www.irs.gov/charities-non-profits/tax-exempt-organization-search-bulk-data-downloads (publishing "Publication 78," a "[l]ist of organizations eligible to receive tax-deductible charitable contributions").

[14] Search for Tax Exempt Organizations, last reviewed or updated Aug. 2, 2021, https://www.irs.gov/charities-non-profits/search-for-tax-exempt-organizations (explaining that taxpayers "may rely on this list [i.e. Publication 78] in determining deductibility of their contributions").

[15] 26 U.S.C. § 6115.

[16] 26 U.S.C. §§ 6115, 6714.

[17] 26 U.S.C. § 6115.

[18] *Id.*

[19] *See* 26 C.F.R. § 1.6115-1(a).

[20] 26 C.F.R. § 1.170A-1(h)(6).

[21] First Circuit Pattern Criminal Jury Instruction 4.26.7206.

either to disobey or to disregard the law.[22] In considering whether Mr. Wilson acted willfully, you may consider, among other factors:

1. Whether, at the time of Mr. Wilson's contributions, the IRS listed both USC and The Key Worldwide Foundation as qualified tax-exempt organizations.

2. Whether these organizations informed Mr. Wilson that goods or services were provided in exchange for his contributions and, if so, whether these organizations:

    a. informed Mr. Wilson as follows: the amount of his contribution that is deductible is limited to the excess of the amount of the money contributed by Mr. Wilson over the value of any goods or services provided; and

    b. provided him with a good faith estimate of the value of the goods or services allegedly provided.

3. Whether USC provided such information to other donors whose relatives may have benefited in the admissions process because of their families' donations.

4. Whether the IRS ever fined USC for failing to provide such information to other donors whose relatives may have benefited in the admissions process because of their families' donations.

---

[22] *United States v. Monteiro*, 871 F.2d 204, 208 (1st Cir. 1989) ("An act is done willfully if done voluntarily and intentionally, and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law." (internal quotation marks omitted)).

### 5. Making Non-Cash Contributions to Tax-Exempt Organizations, and Contributions Made for the Benefit of Tax-Exempt Organizations

*Defendant John Wilson requests that the Court give the following instruction:*

The federal tax code generally allows taxpayers to take deductions on their income taxes for making non-cash contributions to qualified tax-exempt organizations. In addition, the federal tax code generally allows taxpayers to take a deduction on their income taxes not only for making a contribution to a qualified tax-exempt organization, but also for making a contribution to a third party that ultimately will be used to benefit the tax-exempt organization. Thus, one form of non-cash contributions that taxpayers may contribute is to pay for the overhead or administrative expenses of the charity. For instance, a taxpayer may pay for the credit card processing fees or for the administrative support staff of a charity, and make that part of their donation to a qualified tax-exempt organization.[23]

In this case, you have heard evidence that Mr. Wilson contributed certain funds to Rick Singer with the following intent and understanding: that Rick Singer would use the funds to hire administrative staff, and would then give The Key Worldwide Foundation the right to use their services. You may consider this evidence in determining whether Mr. Wilson acted willfully.

---

[23] *See* 26 U.S.C. § 170(c) (defining charitable contribution as contribution "to or for the use of" charitable entity); *Bauer v. United States*, 449 F. Supp. 755, 758 (W.D. La. 1978) ("Section 170 of the Internal Revenue Code clearly provides that a charitable contribution includes a contribution or gift made either to or *for the use of* an exempt entity. The statute, therefore, on its face does not support the argument that the payment must be made directly to the exempt entity; it suffices if the payment is 'for the use of' such an entity."), *aff'd*, 594 F.2d 44 (5th Cir. 1979); *Winn v. Commissioner*, 595 F.2d 1060, 1065 (5th Cir. 1979) (following *Bauer* and recognizing that "donations ultimately used for charitable purposes are in fact made 'for the use of' a charitable institution"); *Rockefeller v. Commissioner*, 76 T.C. 178 (1981), *aff'd* 676 F.2d 35 (2d Cir. 1982) (permitted deductions for salaries taxpayers paid to employees who provided services to charities taxpayers supported, as well as for other unreimbursed expenses incurred by the employees in providing such services); Rev. Rul. 84-1 (where "[a] radio station entered into an arrangement with several hotels and airlines pursuant to which the station provided radio advertising time to the hotels and airlines in exchange for lodging and transportation provided by the hotels and airlines," and donated "the right to the lodging and transportation provided by the hotel and airlines" to a tax-exempt organization, the IRS concluded that the value of the right to receive such services is deductible as a charitable contribution); Rev. Rul. 68-113 (where taxpayer purchased dancing lessons from a dancing school and donated the right to receive the lessons to a tax-exempt organization, the IRS concluded that the value of the right to receive the dancing lessons is deductible as a charitable contribution).

### 6. Earmarking Contributions, Directly Contributing to Specific Programs, and Routing Donations for a Charity Through Another Charity

*Defendant John Wilson requests that the Court give the following instruction:*

The federal tax code generally allows taxpayers to earmark a contribution given to a qualified tax-exempt organization for a specific program or purpose. Taxpayers may take deductions on their income taxes for making such earmarked contributions.[24]

Similarly, the federal tax code generally allows a taxpayer to contribute directly to a particular program or fund that is run by, or is part of, a tax-exempt organization. Taxpayers may take deductions on their income taxes for making such contributions.[25]

In addition, it is well-established that a taxpayer may donate money to a qualified tax-exempt organization with the intent and understanding that the organization will disburse those funds to one or more other qualified tax-exempt organizations.[26]

In this case, you have heard evidence that Mr. Wilson contributed certain funds to Rick Singer and/or entities controlled by Rick Singer with the following intent and understanding: that some of these funds would be donated to USC and earmarked for USC's Water Polo Program, that some of these funds would be held by The Key Worldwide Foundation and used to pay various expenses of USC's Water Polo Program, and that some of these funds would be used to pay for the overhead or administrative expenses of a qualified tax-exempt organization. You may consider this evidence in determining whether Mr. Wilson acted willfully.

---

[24] *See Winn*, 595 F.2d at 1065 ("We also note that a donor can earmark a contribution given to a qualified organization for specific purposes without losing the right to claim a charitable deduction. Such a contribution still would be 'to or for the use of' a charitable entity despite the fact that the donor controlled which of the qualified entity's charitable purposes would receive the exclusive benefit of the gift." (citation omitted)).

[25] *See id.* (holding that taxpayers had properly taken a deduction where they donated directly to a particular charitable program).

[26] *See* Notice 2008–16 (recognizing that a taxpayer may take a deduction where it makes a contribution to "an organization described in § 170(c)" and that organization "distributes the amount received to one or more organizations described in § 170(c)"; *accord* Substantiation and Reporting Requirements for Cash and Noncash Charitable Contribution Deductions, 83 FR 36417, 36418 (Jul. 30, 2018) ("A donor may make a charitable contribution of cash, check, or other monetary gift to an organization that collects contributions and distributes them to ultimate recipient organizations (pursuant to the donor's instructions or otherwise).")