UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>GAMAL ABDELAZIZ, *et al.*, )<br>)<br>)<br>Defendants ) | Criminal No.: 19-10080-NMG |

**GOVERNMENT'S MOTION TO PRECLUDE DEFENDANTS' INTRODUCTION OF
WIRETAP CALLS AND E-MAILS TO ESTABLISH SINGER'S "STATE OF MIND"**

During the post-trial hearing on September 29, 2021, the defendants indicated that as part of their defense case, they will seek to introduce "a bunch of tapes" from the wiretap of Rick Singer's phone, and "a bunch of documents from USC and from the Singer organization." 9/29/21 Trial Tr. at 207:22–25. Attempting to evade Rule 802's prohibition on this obvious hearsay, the defendants asserted that the evidence is relevant to Singer's "state of mind," and thus admissible under Rule 803's exception for a declarant's then-existing mental condition. *See* Fed. R. Evid. 803(3). The defendants' argument is incorrect, and the government therefore moves to preclude the defendants from introducing such evidence. The government notes that the defendants have marked as exhibits for trial nearly 100 recorded telephone calls to and from Singer. *Not one* of the calls involves the defendants, and most are not even between Singer and co-conspirators in this case (either charged or unindicted).

Throughout this trial, the defendants have tried to shovel as much hearsay into the record as possible based on an ever-shifting series of arguments that have no limiting principle and no basis in the Federal Rules of Evidence. They have tried every avenue, from asserting that evidence was being offered merely "for the fact that it was sent," to maintaining that instant messages between low-level admissions employees are "business records," to conflating authenticity with

admissibility, to attempting to "impeach" witnesses with documents they had never seen, that were not inconsistent with their testimony, or that concern collateral matters.

The defendants' latest attempt to circumvent Rule 802 is to assert that essentially everything they seek to introduce is offered for a declarant's (or listener's) "state of mind" and thus admissible under Rule 803(3). *See, e.g.*, 9/21/21 Trial Tr. at 58 ("Your Honor, it's not for the truth of the matter asserted. . . . To state of mind." Court: "The objection's sustained."); *id.* at 90 (sustaining objection where defendants "state . . . that it is offered for the state of mind of the [USC] Department of Admissions"). The Court has correctly rejected these efforts. *See, e.g.*, 9/23/21 Trial Tr. at 108 (sustaining objection to "Starbucks video" when offered for Mr. Singer's state of mind); *see also* Dkt. 2265 at 7 (granting Ron Crawford's motion to quash because "Starbucks video" was not admissible).[1]

The defendants are resorting to Rule 803(3) because it is well-established that co-conspirator statements – such as statements by Singer to other parents involved in the conspiracy – are not admissible when offered by a defendant "because it [i]s not offered 'against' his position at trial." *United States v. Rivera-Hernandez*, 497 F.3d 71, 83 & n.5 (1st Cir. 2007) ("Thus, to qualify under the co-conspirator exception, a statement must be contrary to a party's position at trial."); *accord United States v. Milstein*, 401 F.3d 53, 73 (2d Cir. 2005) (excluding co-conspirator recording proffered by defendant: "The statement of a conspirator, offered for its truth by a co-conspirator, is not within this Rule."); *United States v. Kapp*, 781 F.2d 1008, 1014 (3d Cir. 1986) ("There is no authority for the proposition that the prosecution is a 'party' against whom such

---

[1] The government focuses in this brief on the wiretap calls, but the government's hearsay concerns extend to the "bunch of documents" that the defendants seek to offer as well. It is unclear how any of the unspecified "documents from USC and from the Singer organization" will be admissible, much less relevant or probative.

2

evidence can be offered. The rule is intended to allow for introduction of co-conspirators' statements as evidence against them as defendants."); *United States v. Abbas*, 74 F.3d 506, 511 (4th Cir. 1996) ("[T]he prosecution is not a 'party' against whom such testimony may be tendered.").

The defendants' interpretation of Rule 803(3) is contrary to law. The defendants are attempting to use Rule 803(3) as an end-run around Rule 802's prohibition on hearsay in order to introduce statements made by Singer to other parents for his "state of mind." But the entire "premise for admitting hearsay statements evidencing state-of-mind is that such statements are reliable because of their spontaneity and [the] resulting probable sincerity." *Horton v. Allen*, 370 F.3d 75, 85 (1st Cir. 2004). Indeed, the advisory committee notes to Rule 803(3) require a "substantial contemporaneity of event and statement" when admitting an out-of-court statement under the state-of-mind exception, similar to the basis for admitting present sense impressions. *See* Fed. R. Evid. 803(1), (3) advisory committee's note ("[Rule 803(3)] is essentially a specialized application of [Rule 803(1)], presented separately to enhance its usefulness and accessibility."). "This contemporaneity requirement is imposed to diminish the likelihood of fabrication or deliberate misrepresentation." *United States v. Rivera-Hernandez*, 497 F.3d 71, 81–82 (1st Cir. 2007). Where declarants have "had enough time to fabricate misrepresent [their] statement[s]," courts have refused to apply 803(3). *Id.* at 82 (affirming exclusion of defendant's proffered evidence under Rule 803(3)); *accord United States v. Cianci*, 378 F.3d 71, 106 (1st Cir. 2004) (holding that merely because "the statement was made at one point during the time of the charged conspiracy cannot be sufficient to mandate its admission" under Rule 803(3)); *see also United States v. Naiden*, 424 F.3d 718, 721–23 (8th Cir. 2005) (excluding defendant's statement to a friend that he did not believe his online victim was really fourteen because the statement was made a day

after the defendant met the victim and it was therefore "not made as an immediate reaction to his communication with her, but after he had had ample opportunity to reflect on the situation"); *United States v. Macey*, 8 F.3d 462, 467–68 (7th Cir. 1993) (excluding a statement justifying defendant's request for fraudulent invoices in part because "[t]he district court could have reasonably concluded that [the defendant] had time to fabricate a story in the four hours between his fraud and his statement to [the employee]").

The theory of the defendants' case has been that Singer was a "con man" who duped them into presenting their children as fake athletic recruits without their knowledge. Indeed, they called Singer a "con man" nine different times during their opening statements. *See, e.g.*, 9/13/21 Trial Tr. at 49 (Abdelaziz opening statement: "[Abdelaziz] had no inkling that Singer was a skilled con man. And make no mistake, that's what Singer is, an extremely skilled con man."); *id.* at 76 (Wilson opening statement: "Listen to him brag, what a great con man he is."). Now, however, they want to employ Rule 803(3) – a rule premised on the ***reliability*** of state-of-mind statements because they "diminish the likelihood of fabrication or deliberate misrepresentation" – to inject into the proceedings hearsay statements that same "con man" made to other parents. That not only makes no sense, but it is incongruent with Rule 803(3) and First Circuit precedent holding that Rule 803(3) is narrowly circumscribed and "not a sweeping endorsement of all state-of-mind evidence." *United States v. Sabean*, 885 F.3d 27, 41 (1st Cir. 2018).

Further, to the extent the statements of Singer that the defendants seek to introduce are statements of his belief, they are not admissible pursuant to Rule 803(3). *See, e.g.*, *Rivera-Hernandez*, 497 F.3d at 71 (quoting Fed. R. Evid. 803(3)) (explaining that Rule 803(3) does "not includ[e] a statement of memory or belief to prove the fact remembered or believed"). For example, during the proceedings today, counsel for defendant Wilson argued that the wiretap calls

are admissible as state of mind evidence because "[h]ow can we conspire someone on the side door if he's saying the side door is legal and that's his state of mind[?]"  9/29/21 Trial Tr. at 208:16–18.  But it is black-letter law that a statement that something is legal is *not* state of mind evidence.  *See*, *e.g.*, *United States v. Sayakhom*, 186 F.3d 928, 937 (9th Cir. 1999) (holding that it is "improper" to use Rule 803(3) to "attempt to introduce statements of [declarant's] belief (that she was not violating the law) to prove the fact believed (that she was acting in good-faith)"); *United States v. Emmert*, 829 F.2d 805, 810 (9th Cir. 1987) ("If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition – 'I'm scared' – and not belief – "I'm scared because [person] threatened me.").  As the advisory committee's note makes clear: "The exclusion of statements of . . . belief to prove the fact . . . believed is necessary *to avoid the virtual destruction of the hearsay rule* which would otherwise result from allowing state of mind, provable by a hearsay statement, to serve as the basis for an inference of the happening of the event which produced the state of mind."  Fed. R. Evid. 803(3) advisory committee's note.

The following handful of illustrative examples, taken from the many dozens of wiretap calls on the defendants' exhibit list, are hearsay statements to other parents, not statements by Singer regarding a then-existing mental condition:

- Exhibit 1411 – July 18, 2018 wiretap call in which Singer describes the side door to a parent, after the parent describes his child's poor athletic ability: "So, at USC she can do whatever she wants.  She wants to be on the team, she can be on the team.  She doesn't want to be on the team, she doesn't have to be on the team."

- Exhibit 1422 – August 14, 2018 wiretap call in which Singer describes side door payments: "So what happens is you write your check, which would be a donation, to my non-profit 501(3)(c), and then – what [the coach] does, why he likes it, is [he] will want the check split.  Some of it will go to fund um, a trip, he'll take the whole team to Serbia to play.  Uh, part of it will be to enhance the pool.  Part of it will be – see, if it goes to [the school] directly, then the money ends up going to the general fund, and he doesn't see it.  So what all these coaches want me to do is – it

5

goes to me, the family's off the hook.  You get your write-off, the kid doesn't even know what happened, and then I fund the grant . . . That way it's clean."

- Exhibit 1526 – August 1, 2018 wiretap call in which Singer describes the side door in response to a parent's question about where the money goes: "So what, yeah, so what happens is it goes to [the] foundation, so that . . . so that it keeps everybody clean and away.  And then [the coach] tells me, so [he] . . . wants me to fund a bunch of his non-profits."

- Exhibit 1521 – July 29, 2018 wiretap call in which Singer describes the side door to parent: "So what happens is that I will take, you will send me his transcript and a pdf of his test scores. I will walk them in at what all the schools and the schools will take it to admissions immediately and they will tell me if they can take him. . . . Then as soon as they say they can take them, then they will tell us to start his applications and his essays. Okay? My staff will help him do his applications and his essays. . . . I am the guarantor so essentially If I give my word to a university that we are going to do this, and they accept your son. You have to pay, if you don't pay I have to pay. . . . So as soon as you get your letter of acceptance, . . . Okay? Then you are going to make a donation to my foundation, my 501(3)(C). Okay? . . . Then I will pay the university from my foundation so your name will not be a part of this process. . . . Because they don't want this to this seem like quid pro quo."

- Exhibit 1417 – August 6, 2018 wiretap call in which Singer describes side door to parent: "As a recruited walk-on yes. . . . Absolutely, because that's the way he has to sell it because there is no quid pro quo.  There is none of that."

These are not statements of a then-existing mental condition (*e.g.*, "I'm scared") remotely falling within the ambit of Rule 803(3).  Further, such calls are inadmissible under Rules 401 and 403 and will require a series of mini-trials in rebuttal about these parents that are irrelevant to this case (including, but not limited to, whether they actually went through with the side door; whether their children were talented athletes; whether parents made a payment; and, if so, where that payment went).

## CONCLUSION

For the foregoing reasons, the defendants should be precluded from introducing hearsay statements, including calls and e-mails to other parents, for Singer's "state of mind."

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By: */s/ Ian J. Stearns*
    KRISTEN A. KEARNEY
    LESLIE A. WRIGHT
    STEPHEN E. FRANK
    IAN J. STEARNS
    Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

    I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Date: September 30, 2021        */s/ Ian J. Stearns*
                                                    IAN J. STEARNS
                                                  Assistant United States Attorney