<pre>
1                      UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2


3
   UNITED STATES OF AMERICA,          )
4                      Plaintiff      )
                                      )
5   vs.                               )   No. 1-19-CR-10080
                                      )
6   GAMAL ABDELAZIZ and JOHN          )
   WILSON,                            )
7                      Defendants.    )
                                      )
8                                     )

9


10
             BEFORE THE HONORABLE NATHANIEL M. GORTON
11                UNITED STATES DISTRICT JUDGE
                     JURY TRIAL - DAY 4
12


13
          John Joseph Moakley United States Courthouse
14                   Courtroom No. 4
                    One Courthouse Way
15             Boston, Massachusetts 02210

16


17                   September 13, 2021
                        9:25 a.m.
18

19


20
                 Kristin M. Kelley, RPR, CRR
21               Kelly Mortellite, CRR, RMR
                   Official Court Reporter
22       John Joseph Moakley United States Courthouse
                One Courthouse Way, Room 3209
23             Boston, Massachusetts 02210
                E-mail: kmob929@gmail.com
24
          Mechanical Steno - Computer-Aided Transcript
25
</pre>

```
1     APPEARANCES:

2

3          Stephen E. Frank

4          Ian J. Stearns

5          Leslie Wright

6          Kristen Kearney

7          United States Attorney's Office

8          1 Courthouse Way

9          Suite 9200

10         Boston, MA 02210

11         617-748-3208

12         stephen.frank@usdoj.gov

13         for the Plaintiff.

14

15

16         Brian T. Kelly

17         Joshua C. Sharp

18         Lauren Maynard

19         Nixon Peabody LLP

20         100 Summer Street

21         Boston, MA 02110

22         617-345-1000

23         bkelly@nixonpeabody.com

24         for Gamal Abdelaziz.

25
```

```
 1    APPEARANCES:

 2

 3           Robert L. Sheketoff

 4           One McKinley Square

 5           Boston, MA 02109

 6           617-367-3449

 7           sheketoffr@aol.com

 8           for Gamal Abdelaziz.

 9

10

11           Michael Kendall

12           Lauren M. Papenhausen

13           White & Case, LLP

14           75 State Street

15           Boston, MA 02109

16           617-939-9310

17           michael.kendall@whitecase.com

18           for John Wilson.

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2

 3            Andrew E. Tomback

 4            McLaughlin & Stern, LLP

 5            260 Madison Avenue

 6            New York, NY 10016

 7            917-301-1285

 8            atomback@mclaughlinstern.com

 9            for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

1

2        THE CLERK:  You may be seated.  Court is now if

3   session.

4        THE COURT:  I need to see counsel at sidebar about an

5   issue with a juror.

6              *** Beginning of sidebar ***

7        THE COURT:  Good morning, counsel.  Juror No. 69,

8   Mr. Kennie, in Seat No. 14, has informed the deputy clerk that

9   he cannot possibly serve.  He lives in Harwich.  It's a

09:25 10   terrible commute.  When asked why he didn't bring this up to us

11   in the prior three days under oath that he's been here, he said

12   nobody ever asked him specifically.  It's pretty clear he

13   doesn't want to sit on this jury.  So we have two alternatives:

14   We can excuse him and go with 15 jurors or we can cancel all of

15   today's scheduled events, call the six people back that we have

16   in reserve and go through the process of picking a fourth

17   alternate.

18        MR. KELLY:  Can you give us a moment to confer?

19        THE COURT:  Yes.

09:26 20        MR. KELLY:  Thank you, your Honor.

21        THE COURT:  Wait.  Do we have everyone represented?

22   Okay.  Go ahead.

23        MR. KELLY:  With respect to the defense's view, we'd

24   ask the Court to inquire if he insists and if, in the Court's

25   view, it is valid insistence and it's in the Court's view he

can't serve, we would like to proceed today with 15, but we would ask there be some inquiry to make sure it's not just the morning with the rain and he's annoyed about traveling from the Cape.  It's only a 3-week trial now.  It's obviously -- he agreed under oath that he could serve.

THE COURT:  We've also offered to put him up at a hotel.  He's refused that.  He said he'd have to eat all his meals out.  He answered all of the questions on the questionnaire, as you may remember.  Now, he even refused to tell us what his parents did for a living.  The guy was clearly evasive in his response to questions.

MR. KELLY:  We're prepared to have him.

MR. KENDALL:  We'd like to keep him as a juror.

THE COURT:  Okay.  Do you want to be present when I question him?

MR. KENDALL:  Whatever the Court feels is appropriate.

THE COURT:  I don't want to overwhelm him.  So what I would do is I would invite one each to my lobby where we'll have a court reporter and I will inquire of him as to whether he is adamant.  Is that what you want me do?

MR. KENDALL:  That would be fine, your Honor.

MR. FRANK:  Your Honor, we think at this point he needs to be stricken for cause.  He clearly doesn't want to serve.  Your Honor has been clear that you basically agree with that.  He's going to be disruptive.  He's going to not show up.

1    This is not somebody who is qualified to serve as a juror based

2    on his conduct.  It's the first day of trial.

3         MR. KELLY:  It may be first day butterflies, and if

4    the Court talks to him, he may decide otherwise.  He said he

5    could serve under oath.  He filled out a questionnaire.

6         THE COURT:  I'm going to invite one counsel, one

7    prosecutor, Mr. Kendall and Mr. Kelly to my lobby with my court

8    reporter.  We will inquire of him briefly.

9         Are you asking permission to question him yourselves

09:29 10   or do you want me to do the questioning?

11        MR. KELLY:  I'll defer to the Court.

12        MR. KENDALL:  I'll defer to you, your Honor.

13        THE COURT:  All right.  Then we're in recess for

14   five minutes.  We'll convene in my lobby.

15        MR. KENDALL:  Thank you, your Honor.

16                    *** End of sidebar ***

17        (Beginning of in camera conference in chambers.)

18        THE COURT:  Have a seat, Mr. Kennie, right there.

19   Good morning, sir.

09:43 20        JUROR NO. 69:  Good morning.

21        THE COURT:  I understand you have expressed concern

22   about serving on this jury.

23        JUROR NO. 69:  Surviving it, yes, the service.

24        THE COURT:  What is the problem?

25        JUROR NO. 69:  It takes me about three hours to get me

here in the morning.  It will probably take me at least three

and a half to get home.  I also drive an electric car, so I

have to stop for half an hour to get a charge on the way home

in Plymouth.  Originally, I thought you said the trial was

going to be five to seven days.

THE COURT:  When did I say that?

JUROR NO. 69:  When we first met you.  I figured I

could survive that.  With a 30-day, I could definitely not

survive it.

THE COURT:  You understand that the Court could, in an

extreme need, and we have in the past, put you up here at a

hotel during the course of the trial?

JUROR NO. 69:  Uh-hum.  Then I would have to go out

for every meal too.

THE COURT:  Are you asking to be excused from this

jury?

JUROR NO. 69:  I would like to be excused.

THE COURT:  Why didn't you bring this to our attention

during the three days of empanelment?

JUROR NO. 69:  Nobody asked me if I had any hardship,

and I did not think it was going to be a 30-day.

THE COURT:  Well, I said in this questionnaire it was

going to be four weeks and I asked specifically whether you had

any personal or business affairs that would make it difficult

for you to serve.  You said no.  Do you have any personal or

family responsibilities, et cetera?  You said no.  Then the
last question, is there any other matter or information you
feel that the judge and attorneys should know about not covered
in the questions?  You said no.

JUROR NO. 69:  There again, I was under the impression
it was going to be a much shorter period of time.

THE COURT:  You don't remember me saying it was going
to be four weeks in this?

JUROR NO. 69:  I thought you said four to five days.

THE COURT:  Anything else you'd like to tell us as to
why you should be excused?

JUROR NO. 69:  I also have some other issues, but I'm
in the middle of a really contentious divorce.  There are some
items scheduled for later in the month, possible settlement.

THE COURT:  You mean in the divorce matter?

JUROR NO. 69:  Yes.

THE COURT:  All right.  Thank you, Mr. Kennie.  I'm
going to ask you to withdraw for a minute.  I'm going to
consult with counsel.  I'll call you back.  Thank you.

*** Juror No. 69 exits ***

THE COURT:  Counsel?  Mr. Kendall?

MR. KENDALL:  It appears that the divorce is probably
more of the issue than the commute.  With an electric car where
I park across the street, they have the electric thing right
there.  You can charge them up every morning.  I don't think

```
  1    that's the issue.  We like him as a juror.  We'd like to keep
  2    him.  I don't know how much -- Abraham Lincoln said, "You can
  3    take a horse to water."  I don't know how much we can make him
  4    drink, but we'd like to keep him if we can and not waste a day.
  5            MR. KELLY:  First of all, I didn't know Lincoln said
  6    that, but thank you.
  7            Secondly, we are on the same page.  We'd prefer to
  8    have him as a juror.  He gave answers to the Court under oath.
  9    The reality is the reality.  If the Court concludes it's not
09:44 10    appropriate, the scheduling hardship is too much, we'll go with
 11    15 and start today.
 12            THE COURT:  Mr. Frank?
 13            MR. FRANK:  We think the hardship issues are genuine.
 14    Six hours round trip is really inappropriate and uncalled for.
 15    Staying in a hotel is a hardship in and of itself for the
 16    duration of the trial.  We also now think there are genuine
 17    credibility issues now with this juror.  What he just said
 18    about what the Court said is false.  The Court never suggested
 19    it was going to be a four or five-day trial.  Given all of
09:44 20    those issues, given his clear desire not to be here, we think
 21    he should be excused for cause, and we're prepared to go
 22    forward today.
 23            MR. KELLY:  The other point is it doesn't take
 24    three hours from Harwich.  It takes less than two.  I don't
 25    think the travel consideration is there.
```

```
 1              THE COURT:  I want to ask specifically, the government
 2      is prepared to go ahead with 15 rather than cancel today's
 3      procedures?
 4              MR. FRANK:  We're a little uneasy about it, but we're
 5      prepared to go ahead.
 6              THE COURT:  I'm going to excuse him.  We'll go forward
 7      with 15 jurors and hope we can be successful.
 8              I might add that in my last major big trial, which was
 9      20 something years ago, a mafia trial, the same thing happened
09:44 10     on the first day.  We had 18 jurors before excluding that one.
11      We went with 17.  Maybe I'm going to jinx something, but we
12      never had anybody miss a day during a four-month trial.
13      Seventeen jurors showed up every single day.  I'm hopeful
14      things haven't changed that much in 20 plus years and we will
15      be fine going forward with 15 jurors.
16              I'm going to call him back in, while you remain here,
17      and excuse him.  I don't know whether I'm going to thank him
18      for his service, but I'm going to excuse him because of
19      hardship reasons and leave it at that.
09:44 20              *** Juror No. 69 entered ***
21              THE COURT:  Good morning again, Mr. Kennie.  I have
22      decided after consultation with counsel to excuse you for
23      hardship.  Your service is excused for this jury.
24              JUROR NO. 69:  Thank you.
25              THE COURT:  You're excused.
```

1          *** Juror No. 69 excused ***

2          THE COURT:  All right, counsel.  We will go forward

3     with my opening remarks and swearing in of the jury in a couple

4     of minutes.  Thank you.

5          MR. KENDALL:  Your Honor, couple quick things.  We had

6     just wanted to clarify your preferred way for us to preserve

7     our objections.

8          THE COURT:  You have a written motion that I've read.

9     The government hasn't responded to it.

09:44 10          Does the government have a position?

11          MR. FRANK:  We think it's an appropriate way for them

12     to proceed preserving their objection.

13          MR. KENDALL:  When the first Isackson gets up, one of

14     us will say objection, your Honor, as we discussed earlier.  We

15     don't have to pop up each time that it's hearsay, that it's a

16     coconspirator?

17          THE COURT:  Yes.  The only subdivision of your motion

18     that I believe has not quite been dealt with by my earlier

19     rulings is with respect to Petrozziello and the conspiracy

09:44 20     issue.  I think it's the fifth bullet point where the

21     defendants object to the introduction of wiretaps without the

22     testimony of Mr. Singer, as the introduction of such evidence

23     violates the confrontation clause.  I'm going to reserve on

24     that one.  If that issue comes up today, you don't have a

25     standing objection.

```
 1            MR. KENDALL:  Okay.

 2            THE COURT:  I'd like to know the government's position

 3       in response to that one at some future date, or if you want to

 4       put it on the record now.

 5            MR. FRANK:  To the extent it was a court authorized

 6       wiretap, we don't see what the confrontation clause issue is.

 7       It's not testimony of hearsay, in any event.  It's a

 8       coconspirator statement.  To the extent the objection was the

 9       one they previously made about the consensual calls, we believe

09:44 10       the Court has already addressed that.  Those statements of

11       Mr. Singer come in for context and not for the truth.

12            THE COURT:  That's not likely something that's going

13       to be addressed in the next few days, right?

14            MR. FRANK:  Maybe in the next few days, but it will

15       not be today.  We also think we would not object to a limiting

16       instruction as to Mr. Singer's statements on those.

17            THE COURT:  I will entertain a limiting instruction by

18       the defendants if they want to give me one.  I will consider

19       it.  Other than that bullet point, the motion for the

09:44 20       continuing objection is allowed.

21            MR. KENDALL:  Thank you, your Honor.  Is it going to

22       come up with Mr. Brown?

23            MR. FRANK:  There are no consensuals that are going to

24       be introduced with Mr. Brown, only wiretaps.

25            MR. KENDALL:  One last thing, your Honor.  We forgot
```

|  |  |
|---|---|
| 1 | to put in the motion, I think it is pretty standard, an |
| 2 | objection for one will be an objection for both, so we don't |
| 3 | have to both pop up each time? |
| 4 | THE COURT:  Any problem with that? |
| 5 | MR. FRANK:  No, your Honor. |
| 6 | THE COURT:  That will be allowed. |
| 7 | MR. KENDALL:  Thank you. |
| 8 | THE COURT:  Thank you, counsel.  We'll see you in a |
| 9 | few minutes. |
| 09:44 10 | (End of in camera conference.) |
| 11 | (Recess taken 9:44 a.m. to 9:49 a.m.) |
| 12 | (Jury enters.) |
| 13 | THE CLERK:  You may be seated.  Court is now in |
| 14 | session. |
| 15 | THE COURT:  Good morning, jurors.  Welcome back.  I |
| 16 | hope you had a pleasant weekend and are ready to go to work. |
| 17 | There's two things I need to do before we start. |
| 18 | Actually, there's three.  Was everybody able to honor my |
| 19 | instructions about not talking about or doing any independent |
| 09:50 20 | research on this case?  Please raise your hand if you have |
| 21 | abided by my instructions. |
| 22 | Thank you.  That's a unanimous showing of hands, and I |
| 23 | appreciate it. |
| 24 | The second thing I need to do is to have you stand up |
| 25 | once more and be sworn in as the jury in this case. |

1          (Jury sworn.)

2          THE COURT:  Next thing I'm going to do is appoint

3    Mr. Ayles to be the foreman of this jury.  I need to take a

4    short recess to find my documents before we continue.

5          As you may have noticed, jurors, we did excuse one of

6    your colleagues for personal reasons so that we are going to go

7    forward with 15 jurors rather than 16.  In the process of that

8    hearing, I have misplaced remarks that I need to make to you

9    right now.  Actually, I think I've now located them.

09:52 10          Ladies and gentlemen, you've been chosen to be the

11    judges of the facts in this case.  Your responsibility in that

12    role is to listen carefully to the evidence so that you can

13    properly judge the facts.  You must decide this case only on

14    what you hear in this courtroom and only upon that information

15    which is presented to you as evidence.  That evidence will be

16    in the form of witnesses' sworn testimony, documentary

17    evidence, such as e-mails, tape recordings and other things

18    received as exhibits.  You are not to judge the facts based

19    upon what you have heard outside of this courtroom.  You're not

09:53 20    to base your decision on any bias, prejudice, or sympathy that

21    you may have.

22          With respect to your fellow jurors, feel free to get

23    to know one another, but please do not talk about the specifics

24    of this case with each other before you are asked to deliberate

25    at the end of the case.  What you say to each other based only

on some of the evidence could put a slant on this case that
would be unfair.  You must not form any opinion until all of
the evidence has been admitted. Keep an open mind until you
start your deliberations at the end of the case.

Now, during the course of the trial if at any time
there's something that could assist you in understanding the
case or anything that detracts from your understanding, please
raise your hand.  We will stop the proceedings and try to take
care of the problem.

For instance, if a lawyer steps between you and a
witness and you cannot see the witness, raise your hand, and
we'll have the lawyer move.  If you cannot hear a witness,
raise your hand and we'll have that witness repeat his or her
answer.  If you'd like a glass of water, let us know.  We'll
have one brought to you.  If you need a short break for any
reason, we will take a short break.

Now, at the end of the trial, you will make your
decision based on what you remember about the evidence.  You
will not have a written transcript of the testimony to read, so
I urge you to pay attention to the testimony as it is presented
to you at trial.

To that end, however, I am going to permit you to take
notes during the course of the trial to aid your recollection.
My deputy clerk will provide each of you with a notebook and a
pen.  The number on the cover of the notebook, if there is one,

should be your own jury seat number.  If there isn't one, I'd like you to put your own jury seat number on that notebook when you get it.  Just to remind you about the numbers of the seats, Mr. Boebeck is in Seat No. 1, down through Miss Roberts, who is in Seat No. 8.  Then Mr. Ayles is in Seat No. 9, down through No. 15, which is Mr. Callahan's seat.  So put the number of your seat on that notebook that you're going to keep and that should identify it as yours.

You, of course, are not obliged to take any notes at all.  If you do not take notes, you should not be influenced by the notes of another juror, but rely only upon your own recollection of the evidence.  You must not allow note taking to interfere with the ongoing nature of the trial or to distract you from what happens here in the courtroom.  One of your most important jobs, of course, is to observe the witnesses.  You can't do that while you're taking notes.  Notes taken by any juror, moreover, are not evidence in the case and must not take precedence over your or someone else's independent recollection of the evidence received in the case.  Notes are only an aid to recollection and are not entitled to any greater weight than actual recollection or the impression of each juror as to what is the evidence.

You cannot take your notes outside of this courtroom and the jury room.  You will leave your notebooks in the jury room at the end of each session and retrieve them on the

following morning.  So, again, I ask you to put your own seat

number on each of those notebooks.  They are for your use only.

Now, I'm the judge of the law of the case.  It's my

job to provide you with the law, and you must take the law from

me as I define it for you.  You must follow the law whether you

agree with it or not.  Occasionally, I will confer with the

lawyers in this case at sidebar where we will be discussing a

matter of law in the case.  It's not evidence and it's not

relevant to your deliberations.  We're not trying to keep

secrets from you.  We're talking about a matter of law about

which you need not be concerned.

The lawyers in this case are presenting to you the

views of things as their clients see it.  Let me caution you

that what a lawyer says here is not evidence of anything.

Statements, arguments and questions by lawyers are not

evidence.  The evidence comes from the witnesses, writings,

exhibits and any facts that the lawyers agree to or stipulate

to or that the Court may instruct you to find.

Now, with respect to the witnesses, you have broad

power.  You can believe everything a witness tells, you can

believe some of what a witness tells you, or you can

disbelieve what a witness tells you.

Certain things are not evidence and must not be

considered by you.  Again, statements, arguments and questions

by the lawyers are not evidence.

1          Objections to questions are not evidence.  You should

2    not be influenced by an objection or the Court's ruling on it.

3    If the objection is sustained, ignore the question.  If it is

4    overruled, treat the answer like any other answer.

5          Testimony that the Court has excluded or told you to

6    disregard is not evidence and must not be considered.

7          Anything you have seen or heard outside of this

8    courtroom is not evidence and must be disregarded.  You are to

9    decide this case solely on the basis of the evidence presented

09:59 10    to you in this courtroom.

11          Now, this is a criminal case and there are three basic

12    rules for you to keep in mind: First, the defendants are

13    presumed innocent until proven guilty.  The defendants start

14    this case as innocent.  You cannot draw any conclusions against

15    the defendants because they happen to be here in the Court with

16    us and the government has made some charges against them.  The

17    indictment only makes accusations, nothing more.  The

18    defendants, therefore, start out with a clean slate.

19          Second, the burden of proof is on the government

09:59 20    throughout the case.  The government must prove each and every

21    element of the offenses charged against the defendant then

22    under consideration.  The defendants do not have any burden to

23    prove their innocence or to present any evidence or to testify.

24    The defendants have the right to remain silent and the law

25    prohibits you from considering the fact that the defendants may

1    not have testified when arriving at your verdict.

2         Third, the government must prove its case against the

3    defendant then under consideration beyond a reasonable doubt.

4    This is a strict and heavy burden.  This standard requires the

5    evidence leaves no reasonable doubt concerning the defendants'

6    guilt.

7         Now, with respect to your conduct as jurors, first,

8    please do not discuss this case with anyone.  Until you're

9    retired to the jury room at the end of the case to deliberate

10:00 10    to your verdict, you simply are not to talk about this case

11    with anyone, including your family, your friends, or your

12    fellow jurors.

13         I know that many of you use cell phones, smartphones,

14    the internet, and other tools technology.  However, during this

15    jury trial you may not communicate with anyone about this case

16    using your cell phone, e-mail, smart phone, text messaging,

17    Twitter, blogs or websites, internet, chat rooms or social

18    networking websites, such as Facebook, Instagram, Twitter,

19    LinkedIn and YouTube.  If you did so, it would be a violation

10:01 20    of your oath as jurors, and might even cause a mistrial at

21    great expense to the parties and to the Court.  So I instruct

22    you, therefore, that as long as you are a juror on this case,

23    you are not to use these tools of technology in connection with

24    this case.

25         If you encounter the lawyers, witnesses or parties

1    involved in this case in the hallways, cafeteria or anywhere

2    else, please do not say anything to them.  Your talking with

3    them while the trial is ongoing would not only have the

4    appearance of being inappropriate, it would also be

5    inappropriate.

6              In addition, do not read or listen to anything in the

7    media which in any way relates to this case and do not try to

8    do any independent research or make any investigation about the

9    case on your own.

10:02 10          Finally, keep your mind open and do not form any

11    opinion until all of the evidence has been presented.  Keep an

12    open mind until you start your deliberations at the end of the

13    case.

14              Now, the trial will begin with opening statements of

15    the attorneys for the parties.  An opening statement is neither

16    evidence nor argument.  It is an outline of what that party

17    intends to prove and is offered to help you follow the

18    evidence.

19              Next, the government will present its witnesses and

10:02 20    the defendants may cross-examine them.  Then the defendants

21    will present their witnesses and the government may

22    cross-examine them.  After all the evidence is in, the

23    attorneys will present their closing arguments to summarize and

24    interpret the evidence for you, and then the Court will

25    instruct you on the law.  You will then retire to deliberate to

 1 | your verdict.

 2 | With that, I will invite the government to make its

 3 | opening.  Mr. Frank.

 4 | MR. FRANK:  Your Honor, Miss Wright will be opening

 5 | for the government.  May we have a moment to set up the

 6 | monitor?

 7 | THE COURT:  Yes, you may.

 8 | MR. FRANK:  Thank you, your Honor.  Your Honor, the

 9 | jurors can also follow along on their own screens.

10:04 10 | THE COURT:  Jurors, in the back row in between each

11 | seat, there is a little box.  If you open that box up, you can

12 | pull out a screen.  Technology is not always what it's set out

13 | to be.

14 | We're ready to proceed.

15 | MS. WRIGHT:  It was the fall of 2018 and defendant

16 | John Wilson was worried.  His twin daughters were juniors in

17 | high school getting ready to apply to college.  They were good

18 | students, but Wilson wanted them to go to top schools, like

19 | Harvard or Stanford, and he did not want to take any chances.

10:10 20 | He wanted to make sure they got in.  He wanted a guarantee.

21 | The evidence in this case will show that he knew just

22 | how to get one.  He called up a man named Rick Singer, a

23 | college counselor who had arranged for Wilson's older son to

24 | get into his top choice school just a few years earlier.

25 | Together, Wilson and Singer agreed on a plan.  They would pose

Wilson's daughters as elite athletes, even though neither one

of them was.  Singer suggested that they pose them as sailors

because Wilson had a home in Hyannisport near the water.  Then,

in exchange for what he called donations totalling

$1.5 million, Singer would arrange for insiders at Harvard and

Stanford to recruit Wilson's daughters on to their teams, and

that would effectively guarantee their admission to the

universities.  As Singer told Wilson, "It's a done deal."

Defendant Gamal Abdelaziz, the same thing.  The

evidence will show that, in exchange for $300,000, Mr. Aziz,

that's what he goes by, agreed to have Singer get his daughter

admitted to the University of Southern California, USC, as a

phony basketball recruit.  They used a fake athletic profile to

pose her as a top ranked basketball player.  In reality, she

did not even make her high school's varsity team.

What these two defendants did was criminal.  They

participated in a scheme to have their children admitted to

college as fake athletic recruits in exchange for money.

That's fraud.  It is also a form of bribery.  Those two crimes

are what this case is all about.

Good morning.  My name is Leslie Wright.  I'm an

Assistant United States Attorney for the District of

Massachusetts.  With me at counsel table over here are several

of my colleagues from the U.S. Attorney's office.  Together, we

represent the United States.  Our job is to present to you the

1    evidence that shows beyond a reasonable doubt that these two

2    defendants did exactly what they're charged with doing:  Lying

3    to get their children into college, using money to get corrupt

4    insiders to make it happen and violating the federal fraud,

5    bribery and conspiracy laws in the process.

6         Now, here is what defendant John Wilson did not know

7    when he called Rick Singer on that September day back in 2018.

8    The FBI was listening to that call.  They had been on to

9    Singer's fraud for months and had gotten court authorization

10   for a wiretap on his phone.

11        Later, Singer agreed to make recorded calls at the

12   FBI's direction.  You will learn that this is a lawful and

13   common investigative technique.  It's designed to catch a

14   person committing a crime and to gather evidence of crimes that

15   have already been committed.  You are going to hear those

16   recorded calls over the course of this trial.

17        You will hear defendant John Wilson in his own words

18   tell Singer that his daughters were not very good athletes, but

19   that maybe they could be the water girl or the mascot for the

20   Harvard and Stanford teams.

21        You will hear Singer tell Wilson that he could not get

22   both of his daughters into Stanford because the sailing coach,

23   he had to recruit some real sailors, some real sailors, so that

24   Stanford would not catch on.  When you listen to that call, pay

25   close attention.  You will hear defendant John Wilson actually

1    laugh in response to that.

2         You will also hear recordings that Singer made with

3    defendant Gamal Abdelaziz.  Now, you will learn by the time of

4    the FBI's wiretap on Singer's phone, Aziz's daughter had

5    already been admitted to USC, so the FBI directed Singer to

6    call Aziz with a ruse.  They directed him to tell Aziz that the

7    IRS was conducting an audit of Singer and asked about the

8    payment Aziz made to get his daughter into USC.

9         In another call, the FBI directed Singer to tell Aziz

10:14 10   that USC's admission officials were wondering why his daughter

11   had not shown up for basketball practice.  Neither of those two

12   things is true.  Both were made up by the FBI.  But defendant

13   Gamal Abdelaziz did not know that.  In those calls, you will

14   hear Aziz admit exactly what he had done, the fraud he had

15   committed, the bribes he had paid as part of the scheme, and

16   you will hear him agree to lie to cover it up.

17        So how did the scheme start?  The evidence will show

18   that it started with Rick Singer, who ran a college counseling

19   business out of California called The Key.  You will learn that

10:15 20   Singer offered his clients a whole suite of services.  Some

21   were totally legitimate, like tutoring, standardized test

22   preparation, and assistance with college applications.  But

23   some were not legitimate, like arranging for test proctors to

24   cheat on the SAT and ACT on behalf of students and bribing test

25   administrators to let that cheating happen, like having

1    Singer's employees pose as students and take online classes in

2    their names to improve their GPA and by fabricating athletic

3    credentials and getting college coaches and athletic department

4    insiders to pretend to recruit those students in exchange for

5    money.

6         Singer called that last part "the side door".  You

7    will learn it was a sprawling conspiracy that extended from

8    coast to coast.  It included coaches and athletic department

9    administrators who agreed to facilitate the admission of these

10:16 10  students as phony athletic recruits in exchange for money.  It

11   included employees and associates of Singer's organization who

12   created fake athletic profiles for these students and falsified

13   their college applications, who handled the money and issued

14   fake invoices and charitable deduction letters that allowed the

15   parents to write their payments off as business expenses or

16   donations, and it included the parents themselves, like these

17   two defendants and dozens of others who agreed to the lies and

18   the payoffs that made it all possible.

19        The parents did not come up with the scheme.  That was

10:17 20  Rick Singer, but without them it never would have happened.

21        Here is how the side door scheme typically worked:

22   First, Singer pitched the parents on the scheme, telling them

23   that he could get their kids into college as athletic recruits

24   in exchange for payments.  Singer typically called the payments

25   donations and said that they would go to the university

1    insider's program.  In the case of the coach, that usually

2    meant the team that that coach coached.  In the case of an

3    athletic department administrator, that typically meant a

4    university athletic fund under that administrator's control.

5          Second, once the parents had agreed to the scheme,

6    Singer had them send him an action photo of their kid playing a

7    sport.  In some cases, the kids actually played the sport.  In

8    others, they did not.  But make no mistake.  Whether they

9    played or not, none of these kids were getting recruited to

10:18 10   play collegiate sports without the money or the fake

11   credentials.  That was the third step in the scheme.

12         With the action photo in hand, Singer had his

13   associates create a fake athletic profile.  Sometimes it was

14   totally invented.  Other times, when the kids actually played

15   the sport, Singer would embellish the profile, add in fake

16   awards, improving times, making these kids look like legitimate

17   athletic recruits.

18         Fourth, Singer sent these fake athletic profiles to

19   his university insiders.  You will learn that there was a whole

10:19 20   network of corrupt coaches and athletic department

21   administrators at different schools who were part of the scheme

22   at USC, at UCLA, at Stanford, at Yale, and at Georgetown.

23         Step 5.  These insiders would use those fake profiles

24   to get the students admitted as recruited walk-on athletes.

25   You will learn that's a term for a recruit who does not receive

an athletic scholarship.  As recruited walk-ons, these students
bypassed the regular admission process and were typically
admitted before they even applied.

Here's what the admissions department at these schools
did not know, what the insiders did not tell them: These were
not real recruits.  They were never going to play.  Their
credentials were fabricated.  They were being recruited in
exchange for money.

Step 6 was the payment.  Once the students were
advised that they had been admitted, Singer's bookkeeper
invoiced the parents for the agreed-upon amount.  Typically,
that was around $250,000, sometimes more depending on the
student, depending on the school.  The evidence will show that
there were several ways in which the parents made their
payments.  Let's walk through them.

In some cases, the parents paid part of the money
directly to the insider's program or fund as a purported
donation, and they sent the rest to Singer, usually to a sham
charity that Singer set up called the Key Worldwide Foundation,
or KWF, which allowed the parents to write those payments off
as charitable contributions.  In a few cases, parents sent this
part of the money to Singer's for-profit business, The Key, and
wrote those payments off as business expenses.  In other cases,
when the parents didn't split their payments like this, they
would send all of the money to Singer and he took care of the

insiders.

Typically, Singer told the parents that this money that they paid to KWF, or The Key, would go to support the insider's program.  Sometimes some of it did.  Singer would make contributions to the coach's team or to the administrator's fund.  In other cases, Singer paid the coaches and administrators personally, money to their own pockets or to sports camps or companies they controlled, or he would pay expenses for them, like the private school tuition for a coach's children.

The evidence will show that Singer was not honest with the parents.  He did not tell them about these payments to the insiders' pockets, and he did not tell them that he kept a large chunk of their money for himself.  Over the course of this trial you will learn that those are not the only things Singer was not honest about.  He was dishonest with the parents in all sorts of things, about his background, his business, his connections, and other things as well.

Now, whichever way the money flowed, Singer made clear to the parents that, in exchange for their payments, the coach or athletic department insider would secure an athletic recruitment slot for their children, which would effectively guarantee their admission.

The evidence will show that Singer gave the parents a money back guarantee: No admission, no payment.  He told them

1    he had done it successfully for other parents many, many times

2    before.

3           Now, over the course of this trial, you will hear

4    about the admissions process for recruited athletes,

5    particularly at USC.  The key point is this: Elite

6    universities, like USC, give their athletic coaches the power

7    to recruit high school athletes they think will help their

8    teams win.  At USC, which is an athletic powerhouse, those

9    athletes, they include olympic champions and superstars who go

10:23 10   on to play professional sports.

11          You will learn that, at USC, coaches provide

12   information on their recruits to an athletic department

13   administrator who acts as a liaison between athletics and

14   admissions.  That liaison presents the coach's recruits to a

15   special athletic admissions subcommittee, called SUBCO for

16   short.  That committee is composed of admissions officers from

17   the admissions office, not the athletic department, who review

18   and approve the coach's recruits.  You will learn that the

19   overwhelming majority are recruits.

10:23 20          The upshot?  If you are talented and lucky enough to

21   be recruited by a USC coach, you are practically guaranteed

22   admission to the university, and that is even true even if your

23   grades aren't that high because the academic requirements for

24   recruited athletes are typically lower than for other

25   applicants.

1          You will learn that the athletic department's liaison

2    to the SUBCO used to be a senior administrator named Donna

3    Heinel.  The evidence will show that Heinel was one of Singer's

4    corrupt insiders.  She was not a coach.  Her job was not to

5    recruit athletes.  Her job was to just present to SUBCO the

6    athletes that coaches had recruited, but Heinel abused her

7    position and misled the committee by presenting phony recruits

8    that coaches had not actually recruited and denied knowing

9    anything about it.

10:24 10          You will learn that in her role as liaison to the

11   SUBCO, Heinel presented to the committee with recruitment

12   packets which contained basic information on each recruit, like

13   their GPA and their test scores.  That packet also included an

14   athletic profile that contained information on the recruit's

15   athletic ability, championships they had won, awards they had

16   received, and it described how they were expected to contribute

17   to USC athletics.  For the children of Singer's clients, that

18   information was fabricated.

19          You will see several of the phony recruitment packets

10:25 20   that Heinel presented to the SUBCO, like this one for defendant

21   Gamal Abdelaziz's daughter.  On the left-hand side, this is the

22   cover page of that recruitment packet.  You can see how it

23   lists the high school, her GPA, her SAT scores here.  Up above

24   under "Sport", it says "WBSK."  You will learn that's an an

25   abbreviation for women's basketball.  And here under

1    "Percentage Scholarship", "WO" for walk-on.

2           And this, this is the athletic profile that Heinel

3    presented to the SUBCO for Aziz's daughter.  You will learn

4    that Heinel took the falsified athletic profile that Singer

5    sent to her, embellished it even more, and presented Sabrina

6    Abdelaziz to the SUBCO as a basketball recruit, even though

7    USC's basketball coach had never even heard of her.

8           Here, it says Sabrina Abdelaziz is a starting point

9    guard and team captain on her high school's team.  You will

10:26 10    learn that she was not even on the team at the time.  She

11    stopped playing after her sophomore year.  You will also learn

12    that this photo that Donna Heinel presented to the SUBCO,

13    that's not even Sabrina Abdelaziz.  And here, it says "Sabrina

14    will be a great addition to our USC program."  Of course, the

15    real Sabrina did not go on to play basketball at USC.

16           Now, we expect that this document and others that I'm

17    about to show to you will be presented as exhibits during this

18    trial, so you'll see them again, and you will have them in the

19    jury room with you when you go to deliberate on a verdict.

10:27 20           One other thing to quickly note: Like here, you are

21    going to see and hear the names of the defendants' children

22    over the course of this trial.  You're going to see photos of

23    them, but this case is about what their parents did, the crimes

24    their parents committed.

25           Another of Singer's corrupt insiders was Jovan Vavic,

USC's head water polo coach.  The evidence will show that Vavic
agreed to recruit defendant John Wilson's son on to the water
polo team.  Wilson's son was a good water polo player, but he
was not good enough to play at USC.  That's not what Vavic told
the SUBCO though.

Here is what he told them in the recruitment packet he
submitted for John Wilson's son Johnny.  Now, this is a photo
of Johnny Wilson, and some of these accolades and credentials
are even his, but not all of them.  Some of them are
embellished.  For example, here Vavic told the SUBCO that
Johnny Wilson would have an immediate impact on USC's
championship water polo team.  That was false.  The reality,
Johnny never played in a single game.

Now, you will learn that the members of the SUBCO,
they were completely in the dark about all of this.  They had
no idea that Donna Heinel and Jovan Vavic were pulling the wool
over their eyes.  They believed them.  They trusted them.  They
had no reason not to.  Why did Heinel and Vavic do it?  Money,
money that these defendants and their coconspirators funneled
to Heinel and Vavic's programs through Singer, money that
helped bolster their careers at USC, and ultimately, money that
Singer funneled to Heinel and Vavic personally in the form of
^  fees and private school tuition payments.

You will learn that Singer did not share that last
part with defendants.  As I said earlier, he typically told the

parents the money was going to the insider's program.  In

Vavic's case, that was the water polo team he coached.  In

Heinel's case, that was usually an athletic fund that she

oversaw called the Women's Athletic Board.  That is where some

of the money went.

For example, here is a cashier's check that Singer

sent to the USC men's water polo team after Vavic agreed to

recruit defendant John Wilson's son, $100,000 from the Wilson

family.  Of course, Vavic did not tell the SUBCO that he had

recruited John Wilson in exchange for this money or that he had

done so based on embellished athletic credentials.

The evidence will also show that later, Singer made

tens of thousands of dollars in private school tuition payments

for Vavic's two sons.

Similarly, the evidence will show that in 2018 Singer

began sending $20,000 per month to Heinel in the form of fake

consulting fees.  That money, it ended up right in her pocket.

Here is a fake invoice that Heinel sent to disguise

the true nature of those monthly payments.  You will learn

that, at the direction of FBI agents, Singer asked Heinel to

add some detail to this invoice, but he did not tell her what

to write.

Here is what she came up with on her own: Consulting

services, interview, evaluation and assessments for prospective

students.  And look who she listed, Abdelaziz.  Again, Singer

1    did not let the parents in on this part of the scheme, but

2    whether the money went to the insider's pocket or to their

3    program, the important point is what the money was for, what it

4    was intended to do.  The evidence will show that here the money

5    was intended to get these university insiders to facilitate the

6    fraudulent admission of these students by deceiving the

7    admissions department into approving them as athletic recruits.

8    And that's exactly what happened.  Because of those payments,

9    Heinel and Vavic misled their USC colleagues and recruited the

10:31 10   defendants' children using falsified credentials.

11         The evidence will show that these parents knew that.

12   They knew that this scheme required them to pretend that their

13   children were recruitable athletes to falsify their

14   credentials.  That is fraud.  And wherever they thought the

15   money was going, the evidence will show that they knew it was

16   being used to get an insider to give up a recruitment slot

17   based on those phony credentials, and to mislead others to pull

18   it off.  That is a form of bribery, money to get corrupt

19   insiders to stage bogus recruitments using phony credentials.

10:32 20   That was the scheme and that is why we are here today.

21         For their actions, the defendants are charged with

22   several crimes.  At the conclusion of the trial Judge Gorton

23   will describe the charges to you and instruct you on the law.

24   For now I will give you a brief overview, but, of course, it is

25   the judge's instructions you should follow.

1          Both defendants are charged with conspiracy.

2     Conspiracy is simply a legal word for an agreement between two

3     or more people to commit a crime.  The agreement in this case

4     was among the defendants, Rick Singer, and all the other

5     participants in Singer's scheme, other parents, corrupt

6     insiders, like Donna Heinel and Jovan Vavic, and people who

7     worked for Singer to help make the scheme happen.

8          Now, the law does not require that all the members of

9     the conspiracy know one another or know all the details of the

10:33 10   conspiracy.  The evidence in this case will show that while the

11    defendants did not know all of the other participants, they did

12    know they were joining a larger scheme, a network, a network

13    that Singer created, and without that network, the scheme never

14    would have worked.

15         Both defendants are charged with conspiracy to commit

16    mail and wire fraud and honest services mail and wire fraud.

17    They are also charged with conspiracy to commit federal

18    programs bribery.

19         Mail and wire fraud are forms of fraud that involve

10:33 20   the use of the mail or the use of a wire communication, like a

21    phone call or an e-mail or a wire payment or transfer.  Honest

22    services fraud is another form of fraud that involves depriving

23    someone, typically an employer, of the honest services of its

24    employee.  Federal programs bribery is a form of bribery that

25    involves entities that receive federal benefits, which many

1    universities, including USC, do.

2          The defendants are charged with conspiring to commit

3    mail and wire fraud by making misrepresentations to get their

4    kids into college as something they were not, recruited

5    athletes.

6          They are charged with conspiring to commit honest

7    services fraud by getting those corrupt insiders to agree to

8    falsely present their children as athletic recruits and to lie

9    to university admission officials in exchange for money.

10:34 10          They are charged with conspiring to commit federal

11    programs bribery by giving something of value to those corrupt

12    insiders in exchange for facilitating the admission of their

13    children.

14          Defendant John Wilson is also charged with specific

15    instances of those crimes: Wire fraud, honest services wire

16    fraud, and federal programs bribery, and he is charged with

17    filing a false tax return for improperly writing off his

18    payments to Singer as business expenses and charitable

19    contributions in order to try to reduce the taxes he owed.

10:35 20          We will prove these crimes to you using several

21    different kinds of evidence.  As I noted before, the defendants

22    are two of many parents who participated in Singer's side door

23    scheme.  You will hear Singer describe the scheme to other

24    participants in his own words when the FBI had a wiretap on his

25    phone and he did not know anyone else was listening.

1          For example, you will hear a call between Singer and a

2     parent named Gordon Caplan.  During that call, Singer

3     introduced the side door scheme.  This is a transcript of that

4     call.  During trial you will have binders with copies of these

5     transcripts so that you can follow along as you listen to the

6     recordings.  Here, Singer tells Caplan, "There is a front door,

7     which means you get in on our own, based on merit."  Singer

8     says, "The back door is through institutional advancement,

9     fundraising, which is ten times as much money."  Singer says he

10:36 10     has created this side door in because the back door, there's no

11     guarantee.  They're just going to give you a second look.  And

12     Singer says his families, they want a guarantee.  In other

13     words, Singer presented his side door as a cheaper alternative

14     that provided parents with something they could not get

15     anywhere else, a guarantee of admission.

16          You will also hear a call in which Singer described

17     the scheme to Agustin Huneeus, another parent who participated

18     in the scheme, whose daughter was admitted to USC as a fake

19     water polo recruit.

10:36 20          This is a transcript of that call.  You will hear

21     Singer explain to Huneeus that Donna Heinel was going to

22     present his daughter to the SUBCO as a water polo recruit, and

23     that when she does, Singer says, "You will write a check for

24     $50,000.  It will go to Donna Heinel, senior women's athletic

25     director."  He says the check will be made out to USC Women's

1   Athletics.  Singer tells Huneeus, "That check, it goes right to

2   her."  Then you will hear Huneeus ask Singer, "So there's no

3   chance I give that $50,000 and she's not admitted?"  Singer

4   assures Huneeus that will not happen because he won't have to

5   send him money until he gets the admission letter.  That's that

6   money back guarantee.

7       These calls will take you behind the curtain of this

8   conspiracy and give you realtime insight into how it worked.

9       You will also hear directly from another parent who

10:37 10   participated in a scheme, a man named Bruce Isackson.  You will

11   learn that Mr. Isackson and his wife worked with Singer to get

12   their two daughters admitted to college as state athletic

13   recruits, their older daughter as a soccer player, even though

14   she wasn't great at soccer, and their younger daughter as a

15   crew recruit, even though she had never rowed crew in her life.

16       Mr. Isackson will explain how the fraud works and all

17   the steps along the way, the action photos, the fake athletic

18   profiles, the payments, and those phony charitable deduction

19   letters.

10:38 20       You will hear from other participants in the scheme as

21   well, including people who worked for Singer and helped

22   facilitate the fraud.  One of those witnesses is Laura Janke, a

23   former USC assistant soccer coach, who accepted bribes from

24   Singer when she coached at USC and later went to work with him

25   making fake athletic profiles, including this profile for

defendant Gamal Abdelaziz's daughter.  You will learn that this

profile was invented, made up from information Janke found on

the internet.  Janke will explain how she would Google

students' high schools and try to find club teams in the area

as well as tournaments and championships, things she could put

on these profiles to make them look plausible.  You will learn

that this photo on this profile, that's not Sabrina Abdelaziz

either.

Janke will also explain how Donna Heinel first got

involved in this scheme.  You will learn that once Heinel

figured out what Singer was up to with Vavic and the other

complicit USC coaches, she stepped in to facilitate the

fraudulent recruitment for herself in exchange for payments to

that fund that she oversees, oversaw.

Both Mr. Isackson and Ms. Janke pled guilty to

participating in this scheme.  They will be testifying about

their roles in it in the hopes of getting lighter sentences for

their crimes.  You will have the opportunity to evaluate their

testimony for yourselves and you will see how it is backed up

by other evidence presented to you.

For instance, you will be able to see Singer's

interactions with the defendants for yourselves because many of

their communications were by e-mail.  We are going to present

those e-mails to you in chronological order so you can see the

key milestones in the defendants' relationship with Singer.

1   Fair warning, there are a lot of e-mails.  Going through them

2   like that, it might be a bit of a slog, but we are going to ask

3   you to pay close, careful attention because those e-mails are

4   really important evidence of the scheme and of the defendants'

5   knowing participation in it.

6         For example, you will see this e-mail from March of

7   2013.  This is right around the time Singer first started

8   discussing the side door scheme with defendant John Wilson,

9   five years before those calls about Wilson's daughter.  About

10:40 10   his son, Wilson wrote "obviously his skill level may be below

11   the other freshmen".  He asks Singer, "In your view, will he be

12   so weak as to be a clear misfit at practice?"

13         That was followed a few months later by this e-mail in

14   which Singer told Wilson that Coach Jovan Vavic needed a player

15   profile so he could add Johnny to his recruit list and present

16   him to admissions in October.

17         And this one, two months after that, where Singer told

18   Wilson, "Jovan has Johnny's stuff and asked me to embellish

19   Johnny's profile more, which I am doing."  Singer also says,

10:41 20   "Jovan will provide Johnny's info to admission when he does

21   this other guy's over the next month.  No payment of money

22   until he gets a verbal and written from admissions."  Again,

23   that money back guarantee.

24         Here is the profile Singer promised, which he e-mailed

25   Wilson six days later.  You will learn that his profile, it

1    was, in fact, embellished, just like Singer said it would be.

2         Days later when Wilson asked, "What are the

3    expectations if Johnny gets into USC through this water polo

4    approach?"  Here's what Singer tells him, "Just be ready for

5    practice in the fall as a player on the roster or just a member

6    of the squad but not get in the pool."  Here, Singer is

7    assuring Wilson that his son would never need to get into the

8    pool.  He would not have to play.

9         And when his son did get admitted to USC as a water

10:42 10   polo recruit, Wilson asked Singer to send him the bill.  Here's

11   what he said:  "Thanks again for making this happen.  Please

12   give me the invoice."  He asks, "What are the options for

13   payment?  Can we make it for consulting or whatever so I can

14   pay it from the corporate account?"

15        You will learn that that's what Wilson did.  As shown

16   here, Wilson paid $100,000 from his company's account to The

17   Key.  He paid another $20,000 directly to Singer for his time.

18   The evidence will show that Wilson wrote these two payments off

19   as business expenses, and then he paid another $100,000 to

10:43 20   Singer's foundation, the Key Worldwide Foundation, and he

21   deducted that payment from his taxes as charity.

22        This is how they papered over it, with fake consulting

23   invoices and a fake donation letter saying that no goods or

24   services have been exchanged.  None of that was true.  None of

25   it.  The evidence will show that there were no consulting

services.  Of course, Wilson did receive something in exchange for his purported donation, an athletic recruitment slot for his son.

You are also going to hear from John Wilson's tax preparers who will tell you about how they unwittingly prepared the false tax returns that Wilson submitted based on these bogus documents.

You will see a similar pattern for defendant Gamal Abdelaziz.  First, an e-mail from Aziz to Singer with an action photo for his daughter's athletic profile, a photo not of his daughter, but of a different player on her high school's junior varsity basketball team.  And then an e-mail from Singer to Aziz attaching the fake profile that Laura Janke had created using that same photo.  Here is what Singer asked the defendant when he sent the profile: "Let me know if you want me to add any other awards to her profile or if you think that is enough."

Here is the admission approval letter that Singer sent to Aziz after Donna Heinel presented his daughter to the SUBCO and got her admitted to USC as a basketball recruit.  Note what it says here, "Your records indicate that you have the potential to make a significant contribution to the intercollegiate athletic program, as well as to the academic life of the university, and it requires her to register with the NCAA.

1          After his daughter was admitted to USC, Aziz received

2    this invoice from Singer's bookkeeper for what the invoice

3    refers to as his private contribution to the Key Worldwide

4    Foundation.  And, finally, that same fake donation letter

5    falsely attesting that no goods or services had been exchanged

6    for Aziz's $300,000 payment.

7          In addition to this evidence, you will hear from a

8    representative of the USC admissions department, a member of

9    the SUBCO, which was the target of the defendants' fraud, the

10:46 10   people to whom those fake athletic profiles were presented, the

11   people who were deceived.  The admissions official will tell

12   you about the trust that SUBCO placed in Donna Heinel and Jovan

13   Vavic and how Heinel and Vavic took advantage of that and

14   breached that trust.

15         As I have mentioned I think a few times now, we will

16   also present to you recordings of the defendants' calls with

17   Singer.  You will hear calls between Wilson and Singer when the

18   FBI put a wiretap on Singer's phone over four years after

19   Wilson got his son into USC through the side door, this time

10:46 20   discussing his twin daughters.

21         You will also hear calls with both defendants that

22   Singer later made at the FBI's direction.

23         You will learn that, initially, Singer was difficult

24   for the FBI agents to work with.  He agreed to make those

25   recorded calls but then he pushed back, and did he not follow

1    the agents' instructions in lots of ways, including by deleting

2    text messages.  He even accused the agents of all sorts of

3    wrongdoing.

4         The government does not intend to call Singer as a

5    witness at this trial, but you will hear his voice in recording

6    after recording.  You will see his words in e-mail after

7    e-mail.

8         You will also hear the defendants' voices and you will

9    see their words.  This trial is about them, John Wilson and

10:47 10  Gamal Abdelaziz, what they knew, what they intended and what

11   they agreed to do.  That you will hear from the defendants

12   themselves in their own words on tape when they did not know

13   anyone was listening.

14        On those calls you will hear Singer describe in detail

15   to Wilson telling him that he could pay up-front to have two

16   spots locked in for his daughters.  You will hear Singer tell

17   Wilson that it did not matter what sport they used because they

18   would not have to play.  Singer tells Wilson, "That's just the

19   path I'm going to get them in on."  Defendant John Wilson's

10:48 20  response?  "Gotcha."

21        Ultimately, you will hear Singer tell Wilson that he

22   had struck a deal with the sailing coach at Stanford and with

23   an athletic administrator at Harvard to admit Wilson's

24   daughters as athletic recruits in exchange for money.  In

25   reality, that was not true.  There was no Harvard

administrator.  That was a ruse concocted by the FBI, but

defendant John Wilson did not know that.  You will hear him

agree to pay over a million dollars to secure those recruitment

slots for his daughters at Harvard and Stanford, money he later

sent to an account Singer set up at the FBI's direction.

Wilson's worry, what to do if one of his daughters decided she

wanted to go to Harvard and he had already bought her a slot at

Stanford instead.  In Wilson's own words, "that would be a high

class problem."

10:49    You will also hear recordings of calls Singer made to

defendant Gamal Abdelaziz.  In those calls, you will hear Aziz

admit what he had done and agree with Singer to cover it up.

For example, here are excerpts of the calls where

Singer told Aziz that USC admissions officials were asking why

his daughter had not shown up for basketball.  Here, Singer

tells Aziz that Donna Heinel was asked by admissions as to why

Sabrina did not show up for women's basketball in the fall.

Singer says Donna told them that it was because Sabrina had

plantar fasciitis.  This too was a ruse devised by the FBI,

10:49 but, again, defendant Gamal Abdelaziz did not know that.  Here,

he agrees to give the same cover story.  "I will answer the

same should they call me."

He did not hesitate when presented with the choice to

lie.  That's what this case is about, lies, lies to obtain

athletic admissions slots that were bought and paid for.

1           This case is not about wealthy people donating money
2     to universities in the hope that their children get
3     preferential treatment in the admissions process.  The
4     defendants are not charged with crimes for having donated money
5     to USC.  If that was all they had done, we would not be here
6     today.  We are here today because these defendants made a
7     different choice to get their children admitted to elite
8     universities as state athletic recruits based upon falsified
9     credentials to corrupt university insiders to mislead their own
10:51 10   colleagues in order to exchange the recruitment slots for
11    money.
12          After you have seen and heard all of the evidence, the
13    government will have the opportunity to speak with you again.
14    When we do, we will ask you to return the only verdict
15    consistent with that evidence, that the defendants, John Wilson
16    and Gamal Abdelaziz, are guilty beyond a reasonable doubt as
17    charged.  Thank you.
18          THE COURT:  For the defendant, Abdelaziz, Mr. Kelly
19    may make his opening.
10:52 20   MR. KELLY:  All set?
21          THE COURT:  You may begin.
22          MR. KELLY:  Good morning.  My client is Gamal
23    Abdelaziz.  He is not only presumed innocent under the law, he
24    actually is innocent in this case.  There are only two charges
25    against Gamal.  The evidence in this case will show he didn't

```
 1    do either one of them.

 2            Let me try this again.

 3            There are two charges against him.  He didn't do

 4    either one of them.  The two charges are what's called

 5    conspiracy counts, basically, as the prosecutor says, an

 6    agreement to do something illegal.  He never agreed to do

 7    anything illegal with Rick Singer.  Rick Singer is the center

 8    of this case.  The case revolves around Rick Singer, the whole

 9    investigation.  It's why we're here.  And now, in opening

10:53 10    statement, the government says, never mind, we're not calling

11    him.  Think about that when you eventually deliberate.  You're

12    allowed to consider what evidence is presented and what

13    evidence is not.

14            Before I move further, if I may introduce my client.

15    He's over at the client table with me.  He has three children,

16    Sarah, Adam, and Sabrina.  Much of the evidence you will hear

17    in this case is about his third daughter, Sabrina.  His wife is

18    sitting behind him today in the courtroom.  Sabrina is back in

19    California finishing her senior year at USC.

10:54 20            For Gamal, this case came about because of a

21    conversation he had with this Rick Singer, the government's

22    star cooperating witness, who apparently they're not going to

23    call.  He knew Singer for many years before his third daughter

24    Sabrina was going to school.  He knew him from his first two

25    kids, Sarah and Adam.  Adam actually hit it off really well
```

1    with Singer.  He was sort of a mentor to Adam.

2           So by the time his third child, Sabrina, was going off

3    to college, he knew Singer and he trusted him.  He had paid

4    Singer a little over $5,000 to help with the college consulting

5    application process for his kid Adam.  Adam eventually got into

6    Columbia University in New York City.  For Gamal, his

7    impression, his mind-set, which is what matters in a conspiracy

8    case, what was he thinking, he thought Singer was legit.  He

9    had no inkling that Singer was a skilled con man.  And make no

10:55 10   mistake, that's what Singer is, an extremely skilled con man.

11          He went to Gamal's home.  Gamal trusted him, thought

12   he was a very good friend.  So that's his mind-set when he has

13   this conversation with Singer in the spring of 2017.

14          At the time he was going back and forth, Gamal was, to

15   China for business.  His third daughter, Sabrina, was heading

16   to school, to college, and he had a conversation with Singer.

17   His daughter wanted to go to college in LA.  USC, of course, is

18   in LA.  It was Singer -- so the call starts, as it usually did,

19   with chatter about Adam because Singer and Adam were very good

10:56 20   friends.  When they got through speaking about Adam, the

21   subject of Sabrina comes up.

22          Singer asked him, Gamal, "Has she played any sports in

23   high school?"  He says, "Yeah, she's played basketball."  Now,

24   Singer -- excuse me -- Gamal, he thinks it's a legitimate

25   extracurricular activity when you apply to college.  He didn't

say she was a superstar.  He knew she wasn't a superstar.  She only played two years in high school.  She went to school because of his job.  It was a tremendous sacrifice.  He had to go over to Macau, China.  His wife and daughter lived in Hong Kong.  So she went to Hong Kong International School.  It's an academic school.  It's not a big sports school.  USC's probably never ever had a Division 1 recruit from this Hong Kong International School, nor was Gamal thinking that was the situation.

10:57    Singer tells him that USC has these walk-on spots, and if your kid wants to be a practice player or a manager and you make a big donation, it's an enormous boost to the application process, it really helps your kid get in.  Again, that's what Singer tells him.  If your kid has played a sport, which she had, basketball, she can be a practice player, team manager, and you write a big check, that helps your kid get in.

So Gamal was fortunate enough at that time to have the finances to do that.  In fact, you'll hear from most people, the amount of money, $200,000, which is what was requested, 10:58  $200,000, not $300,000.  Singer changed it later so he could pocket a hundred, but he originally asked for $200,000.  And Gamal had it.  In fact, he had donated in the past.  In fact, after, after his son Adam was at Columbia University, the Columbia people, the development people, approached him and asked him for a donation.

1        That's what these private schools do.  USC is a

2   private school.  It's not illegal to fundraise and it's not

3   illegal to give money to a school with the hope that it helps

4   your kid get in.  And that's Gamal's mind-set.  He thought it

5   would help his kid get in.  No one ever said bribery to him.

6   No one ever said it at all.  Singer certainly didn't say it to

7   him.

8        So that's his mind-set, because that's what matters in

9   a conspiracy count.  He had already given a lot of money to

10:59 10  Columbia, $200,000, coincidentally, and Singer asked him for

11  $200,000 for USC.  So he said okay.  In fact, he ultimately

12  told Gamal that it was for a specific place at USC, the Galen

13  Center.

14       Let me show you that photo.  It's a real place.  I

15  think that is slide 8.  There it is.  So it's a real place.  In

16  Gamal's mind, it was a real donation.  These private schools

17  can use donations for many reasons, build buildings, maintain

18  operations, give scholarships to children who do not have the

19  access that his child was blessed to have.  So that's part of

10:59 20  the reason he did this.

21       Now, the government has just spoken a lot about this

22  fake athletic profile.  Yeah, it was a fake athletic profile.

23  There were all these awards on her athletic profile that he

24  didn't put on there.  What the evidence is going to show in

25  this case, that e-mail, that e-mail that they sent on

August 8th, that's to an e-mail address he wasn't even using,
cox.net.  He never replies to this e-mail.  They have no
evidence that he opened the attachment with the fake profile.
There will be zero evidence that he looked at that fake profile
because he didn't.  He didn't.

That e-mail with the picture that was sent to Singer
by Gamal?  Yeah.  He sent that picture.  Singer asked him
earlier on, send me pictures of Sabrina's team.  Sabrina had
been the MVP of her team her sophomore year.  So Gamal got
pictures from his wife, sent five photos, her whole team
playing a game.  They're not really professional pictures.
Singer picks the one that's not even his kid.  Gamal knows what
his kid looks like, Sabrina.  Singer chooses that picture.  He
never sees which one he picks.

In fact, later, as the government just told you, this
woman Laura Janke, who's part of Singer's consulting crew, she
changed the profile again without his knowledge, without his
involvement, and put a second kid on there from the website of
the Hong Kong school.  He had no involvement in this athletic
profile.  The athletic profile did have fake awards.  He had
nothing to do with that.  He gave Singer photos that his wife
took.  His wife took all the photos.  As I said, for a period
of time, he was working over in China.  His daughter was in
Hong Kong at this school.  It's an American school.  It's a
better school than anything that was available to Macao, China.

1   So he couldn't go to any of the games.  The games were on the

2   weekend.  I'm sorry, during the week.  And he would travel a

3   couple hours from Macao to Hong Kong to see his wife and

4   daughter on weekends.  But he didn't make any games.  He knew

5   she played basketball and he was proud of her.  He was proud of

6   her.

7         The government can make fun of the fact she only

8   played JV, but he was a proud father.  When Singer asked if she

9   played any sports, he honestly said yes.

11:02 10         Slide 3.

11         In his mind, his daughter had played basketball.  She

12   had been the MVP.  When Singer says this school will take kids

13   as practice players or team managers because of these walk-on

14   slots that they set aside to raise money, Gamal said okay,

15   because USC, it was a fundraising machine.  Like other private

16   schools, it's permitted to fundraise.

17         In fact, at one point, they had a $6 billion

18   fundraising goal and the athletic department did its part,

19   raised a lot of money.  So it's not unusual that something like

11:03 20   that occurs.  People make donations to schools.  Sometimes it's

21   in gratitude because you went to the school.  Sometimes when

22   the money's big enough, like here, you hope it helps your kid.

23   That's what he did.  He was never told he was bribing a single

24   person.

25         You're going to hear all this stuff about Donna

Heinel.  Donna Heinel, he's never met her once.  The first time

he hears about her is in that set-up call after the fact.  The

calls that the government referred to are in late October of

2018.  The first one was two calls, two calls where Singer

calls out of the blue.  He hasn't talked to Singer in months.

Singer calls him.  He's driving his car.  He's in LA.  How you

doing?  They talk about Adam, like they always do.  That's when

this phony IRS is auditing me discussion comes up.  That's when

Singer tries to inject this name, Donna Heinel, into the

process.

He's never heard of her.  At the time he was dealing

with Singer for Sabrina's application, there was no mention of

Donna Heinel.  Singer makes, the government's cooperating

witness, at the behest of the FBI, throws in Donna Heinel is

taking the money.  He's never heard of her.

And this little invoice that they put up, this invoice

is created after his daughter had gotten into the school.  He

doesn't know about it.  It's between Singer and this person

Heinel.  It's not his doing.  It's not in his mind.

Again, he's charged with two things, two conspiracies,

agreements to do something illegal, and he never agrees with

Singer or anyone else to bribe anyone or to defraud USC.  Those

are the crux of the two charges on him, bribery and fraud.  He

didn't do either.

Now, you'll see -- in fact, when I say to you that he

1    had no knowledge that -- if Heinel was pocketing money, he

2    didn't know.  He didn't know that.  In fact, don't take my word

3    for it.  In this very case, there's evidence that there's no

4    evidence he thought Heinel was pocketing money.

5         A filing in this case, in this court, the government

6    was not attempting to build a case that the parents understood

7    Heinel to be personally pocketing money, and the government has

8    never alleged that.  We agree on that.  Gamal doesn't know

9    Heinel's pocketing money.  He didn't know anyone was pocketing

11:05 10  money at USC.  That's not the way it was explained to him by

11   Singer, the government's cooperating witness, because in a

12   conspiracy case, it's what Gamal was thinking and what Singer

13   would do.

14        As I said, giving money to a school with the hope it

15   helps your child get in is not a crime.  In fact, here, as I

16   said, Gamal had zero contact with the other parents, none.

17   This massive nationwide conspiracy that the government suggests

18   he's part of, it doesn't exist in his mind.  He's talking to

19   Singer.  He doesn't even know Mr. Wilson, never met him, never

11:06 20  talked to him, never seen him.  Nothing Wilson did or he did

21   affected each other.  Doesn't know the guy.  Wilson's from

22   Massachusetts.  Gamal's from Nevada.  Doesn't know him.

23        Yes, Gamal was fortunate enough to be able to make

24   this big donation, no doubt about it, but he's not a guy who

25   grew up with a lot of money.  He grew up in Egypt, one of eight

kids.  Like many people, he came to this country in his early
twenties.  He was dirt poor in Egypt.  He came here for more
opportunity.  When he came here legally, he became a United
States citizen.  He's been a U.S. citizen for over 35 years.
He started working in New York in the hospitality industry.  He
worked 14, 15 hours a day.  He made his money the old-fashioned
way.  He worked for it.  Then he was fortunate enough to go out
to Las Vegas, Nevada and got a high ranking job in the
hospitality industry.  So he made a lot of money, he did, but
that's not a crime, especially when a man like him worked hard
for it and he wanted to donate it where he thought it was
appropriate.

In fact, he had donated some to Columbia in the past.
So these big schools, these private schools, who are allowed to
fundraise, they want money, and it helps your child get in.

Now, this Rick Singer, cold con man, very smooth
talker -- the government has talked about how the side door was
almost, per se, illegal.  That's not the way Singer presented
it to the outside world, not at all.  He would be in public
talking about his fundraising ideas and the side door, other
donors can give money and it helps them get in.  He was a very
smooth talker.  It wasn't just Gamal who got sucked in by it.
Major corporations would listen to him.

Let me show you a tape of him talking to the Starbucks
company.

1          (Audio played.)

2          So that's Singer in action, the guy the government has

3   built this whole case upon.  The government has suggested he

4   has a sham charity.  Maybe he did.  In Gamal's mind, Gamal's

5   mind, it was a legit charity.  Remember, Gamal had three kids.

6   The second kid, Adam, had a great experience with Singer, ended

7   up at Columbia.  He paid Singer $5,000 for his services.  It

8   was test correcting, that sort of thing.  But part of it was

9   Gamal trusted Singer and thought it was a legitimate charity.

11:15 10   It wasn't a sham charity.

11          His kid Adam went on a trip to Atlanta to help

12   underprivileged children.  It was a mentoring trip for

13   underprivileged kids in Atlanta.  Gamal's son traveled from

14   Nevada to Atlanta with this guy, Singer, and a few other kids.

15   That's a picture of Rick Singer in the middle here at this

16   trip.  Gamal's son is in the black shirt.  Singer's with the

17   Bruins shirt, not Boston Bruins, that's a UCLA Bruins shirt.

18   So it's a legitimate trip in Gamal's mind.  His son

19   participated.

11:15 20          So when it's referred to as a sham charity, I'm not

21   here to debate whether the charity is a proper 501(c)(3)

22   foundation.  It's registered as such when you look at the

23   website.  His son had gone on a trip, thought it was

24   legitimate.  So that's his mind-set.

25          As the government says, there's two charges in this

case against him, conspiracy charges.  A conspiracy charge,
they have to prove specific intent, what's in Gamal's mind, not
what's in someone else's mind.  There's no guilt by association
in federal court.  All these other parents, he doesn't know
them, doesn't know Wilson, doesn't know the rest of them.  It's
what's in his mind that matters and what Singer told him.

When Singer told him if you make a donation to USC and
they have walk-on spots for practice players and team managers,
it sounded legit.  It did not sound like he was bribing anyone.
In fact, the government's first witness who will be called,
Bruce Isackson, Singer told him some of that too.  So this is
not just jargon that Singer threw around specific to Aziz.  He
threw around a lot, practice players and team managers.

For Gamal, he's not a college sports enthusiast.  All
he knows is that his daughter played basketball in high school
and it's a good extracurricular activity, and this guy Singer,
who helped his two older kids, was telling him it would really
help get into USC is she was a practice player.  So that's all
the bribery stuff.

As I talked to you about that athletic profile, no
evidence he replied to the e-mail, no evidence he forwarded the
e-mail, no evidence he opened the attachment with all these
phony awards.  He did not agree to send a picture that wasn't
even his daughter.  This woman, Laura Janke, who's part of
Singer's stable, who will testify, she did all the awards

1    without his input.

2         As a matter of fact, at a certain point, Singer got

3    fed up with the whole situation himself.  Even Singer, the con

4    man, got disgusted with what he was doing.  Now, when he became

5    a cooperating witness, you're supposed to abide by the law at

6    that point.  He didn't, of course.  He was charged and

7    convicted of obstruction of justice, but he also wrote a note

8    to himself.  He didn't like what was happening, what he was

9    being asked to do, like fill out that invoice months afterwards

11:18 10  that had nothing to do with Gamal.  He wrote a note to himself.

11        So this is his note to his iPhone.  He's talking about

12   a loud and abrasive call with agents.  "They continued to ask

13   me to tell a fib and not restate what I told my clients where

14   the money was going -- their money was going, to the programs,

15   not the coach.  And that it was a donation.  And they wanted it

16   to be a payment.  I asked for a script, if they want me to ask

17   questions and retrieve responses that are not accurate to the

18   way I should be asking questions.  Essentially, they are asking

19   me to bend the truth.  Liz raised her voice to me like she did

11:18 20  in the hotel room about agreeing with her that everyone bribed

21   the schools, this time about asking each person to agree to a

22   lie I was telling."

23        So there's the con man himself writing a little diary

24   note.  Even he is sick of the lying.  And these tapes that you

25   will hear contain lies.  In that first call that you'll hear

1  when he says something about this Donna Heinel person, bear in

2  mind, you will hear evidence, that a week later after Singer

3  pretends that Gamal's and his daughter hang out, he tells the

4  FBI a week later he doesn't know Donna Heinel.  He thought the

5  money was going to the school.

6          Think about that.  If you think somebody is going to

7  the school to help you, that's not bribery.  Okay?

8          I'm running out of time here, so I have to be careful.

9  Let me get to a suggestion here.

11:19 10          Actually, before I get to suggestion here, the

11  original request was 200,000 from Singer.  This gets switched

12  to 300,000 because Singer wants another hundred grand for his

13  foundation.  He tells Gamal, "I'm doing great thing overseas.

14  I have all these students overseas.  I need more money for the

15  foundation."  This was Gamal's last kid, no more college after

16  this.  Gamal acquiesced, "Okay.  300,000 to your foundation."

17  Singer says, "It enhances me as a counselor if the money comes

18  from me."  At all times, he thought 200,000 was going to USC,

19  but, as it turns out, Singer took all of it.  None of it went

11:20 20  to USC, none of it.

21          As you'll hear, these athletic departments, the money

22  was not stolen by someone at USC.  So listen to that evidence

23  carefully when you hear it.

24          Couple final points.  USC, they weren't duped by what

25  happened with Sabrina Abdelaziz, not at all.  The people in the

athletics department and that so-called SUBCO, they have their
feeder schools, feeder schools like -- some high schools are
good at football.  So a lot of kids go to play football at the
school.  Around here, St. Sebastian's, boys hockey, a lot of
boys go for hockey, or girls lacrosse, Westwood High School.  A
lot of girl lacrosse players go to Westwood.  But the Hong Kong
International School was not a feeder school for sports.  It
was a feeder school for academics.  Anyone reviewing her
application is going to know she's not a superstar.

11:21  10          In fact, you'll hear evidence that a member of that
SUBCO visited her school.  They know her school.  No one ever
said anything to USC about a superstar in basketball named
Sabrina.  In fact, you'll hear a little -- you'll see a little
text exchange between two admissions officers regarding
Sabrina, Gamal's daughter.  Let me see that one.

          So this is --

          MR. FRANK:  Your Honor, I apologize.  I have to
object.

          MR. KELLY:  It's about his daughter, your Honor.

11:22  20          MR. FRANK:  I apologize, your Honor, but this is --
he's misstating what this is.

          MR. KELLY:  This is a chat between two admissions
people at USC pertaining directly to Sabrina Abdelaziz.

          MR. FRANK:  It is not, your Honor.

          THE COURT:  I'm not going to exclude it now, but I

```
 1    will hear counsel after the opening.
 2              MR. KELLY:  Sure.  So the -- it's from a man named
 3    Alexander at USC, USC.edu, to Kelsey Bradshaw, another USC
 4    person.  What's it about?  Sabrina Abdelaziz.
 5              Let me read that.  So the name, Sabrina Abdelaziz.
 6              Kelsey, "Athlete."
 7              Alexander, "Yes.  What's her deal?"
 8              Kelsey, "She's admitted."
 9              Alexander, "Do you have any background?"
10              Kelsey, "Haha."
11              Alexander, "LOL.  Is she actually a B ball player?"
12              Kelsey, "She's supposedly the best B ball player in
13    the Asian International School League."
14              Alexander, "Ha.  Good to know."
15              Kelsey, "LOL."
16              Alexander, "Thanks."
17              Kelsey, "But yes, it appears she actually plays the
18    sport."
19              Alexander, "Ha."
20              Kelsey, "That's been a problem this year."
21              Alexander, "Good to know.  The counselor reached out
22    and was like, what's up with this admit."
23              Kelsey, "LOL."
24              Alexander, "This school sends us like 60, and she's
25    near the bottom.  This is a top feeder for us abroad, so I was
```

like, umm, athlete?  I hope this isn't a surprise."

Kelsey, "LOL.  Oh, athletes."

Alexander, "Right?  Keep doing the lord's work, Kelsey."

Kelsey, "head bang."

So that's his daughter's application being discussed about the fact she already got in and she's in the athlete camp.  LOL, which means laugh out loud, of course.  Here's what's not funny.  What's not funny is we have a man, Gamal Abdelaziz, who is innocent of these two charges and yet here he is in federal court.  He will defend himself.  He's being charged with crimes he did not commit.

Apparently, the man behind it all, Rick Singer, is not coming to court.  So, please, bear in mind who's got the burden of proof here.  It's always the government who bears the burden of proof.  I can sit down and say just prove it, wouldn't have to do anything.

At the end of this case, after you hear all the evidence, please keep an open mind, and I'll come back and I will ask you if, in fact, you will return a verdict of not guilty on the two charges he's facing.

Thank you very much for your attention.

THE COURT:  Now Mr. Kendall will make an opening for the defendant Wilson.

MR. KENDALL:  Your Honor, can we take a one or

```
 1    two-minute break for technical issues?

 2            THE COURT:  Yes.  We can take a short break at this

 3    time.  We'll take a break and let's be back at 11:35.

 4            (Jury exits.)

 5            THE COURT:  Counsel, be seated for a minute.  Does the

 6    government wish to elaborate on its objection?

 7            MR. FRANK:  Your Honor, we have a number of objections

 8    to the opening.  We don't believe that video is coming into

 9    evidence.  Neither of these defendants ever saw that video.  We

11:26 10   believe it's objectionable on those grounds.

11            We believe that the reference to somebody who has been

12    identified as a non-testifying cooperating witness, the

13    reference to his guilty plea was inappropriate and contrary to

14    the Court's order.

15            With respect to that last exhibit, your Honor,

16    Mr. Kelly specifically represented to the jury repeatedly that

17    that was an exchange between two admissions department

18    officials.  That is not true.  Neither of those individuals

19    works in the admissions department.  They are low ranking

11:27 20   assistants in the athletics department.  They have nothing to

21    do with admissions.  That was simply a false statement that was

22    planted in the jury's mind.  We think it's entirely

23    inappropriate.

24            We think Mr. Kelly should instruct the jury himself

25    that what he said was untrue, that they don't work in the
```

1    admissions department.

2           We also think the jury should be instructed that the

3    opening statements and the exhibits put in front of the jury

4    during opening statements are not evidence in this case.

5           THE COURT:  Mr. Kelly, do you wish to respond?

6           MR. KELLY:  Yes, your Honor.  I think perhaps the jury

7    should be instructed that his objection is not true because

8    Kelsey Bradshaw's on their website at USC as an Associate

9    Director as an admissions counselor.  So she does work in the

11:27 10   admissions office.  I don't know what that's about.

11          We didn't object to their opening where they talked

12   about all these other parents who have nothing to do with him.

13   We let it go.  The video references the side door that they

14   talked about in their opening.  They brought it up, the side

15   door, and how he's always talking about.

16          We do have Mr. Crawford under subpoena.  If we can't

17   get in through the agent, if we can't get in through Crawford,

18   we reserve the right to call Singer ourselves.  It's relevant

19   evidence.  It goes to the heart of the scheme that they say my

11:28 20   client is part of.

21          THE COURT:  I've heard enough.  Let me say this: If

22   counsel introduced matters in their opening which turns out is

23   not admissible, I am going to make an instruction to the jurors

24   to disregard what that particular counsel said at opening.  I

25   will entertain a short proposed instruction from the government

1    as to what it wants me to say to the jury about Mr. Kelly's

2    opening, and I'll reserve as to whether or not I will do it

3    primarily on the basis of whether it turns out what he talked

4    about was admissible or not admissible.

5         I strongly urge counsel to avoid introducing anything

6    in their openings that later turn out to be inadmissible.  If

7    that occurs, I will instruct the jury.  I think it is worse

8    than if you hadn't said it in the first place if it turns out

9    to be inadmissible evidence.

11:29 10        We're in recess for 10 minutes.

11        (Recess taken 11:29 a.m. to 11:45 a.m.)

12        (Jury enters.)

13        THE COURT:  Good morning again, jurors.  We're about

14    to hear opening for defendant, Wilson.

15        Mr. Kendall, you may proceed.

16        MR. KENDALL:  May it please the Court.

17        Good morning.  I'm Mike Kendall.  Lauren Papenhausen,

18    Andrew Tomback and I represent John Wilson.  On behalf of John,

19    we thank you for your jury service.

11:46 20        I'm going to put aside my prepared comments for a

21    minute because I want to respond to two things that Ms. Wright

22    said in her opening.  The first thing she said was, "None were

23    getting recruited without the money."  I want to show you two

24    e-mails that the government has and they knew about before they

25    made that statement.

1          Could we first have Exhibit 7255.  This is from Jack

2     Bowen, Johnny's high school water polo coach.  You don't know

3     the world of water polo.  Jack Bowen is royalty in that world.

4     Two-time MVP at the NCAA championship, he led his team to

5     victories both times, an alternate on the Olympic team.

6     Unbelievably successful high school water polo coach.  This is

7     what he wrote to the Wilsons.  "The Air Force Academy coach has

8     expressed a real interest in Johnny."

9          Can we have the next e-mail, please.  Then he's

11:47 10    reporting back to the Wilsons about Johnny.  "He continues to

11    be excited about both USC and BC and swimming at BC, and I

12    offered to write a non-academic recommendation for him if he

13    needs it, as I feel I would write a strong one on his behalf."

14    In fact, Coach Bowen did speak to the USC coaching staff and

15    told him they should recruit Johnny.

16          The next thing Ms. Wright said, "They were never going

17    to play," as if Johnny was never going to be on the team,

18    wasn't going to be at practice, wasn't going to be a part of

19    the team.

11:47 20          Could we have the photograph, please.  This is the

21    2014 USC water polo team, the official team picture.  If you

22    look in the last row on the left, the blond kid with the smile

23    is Johnny Wilson.  He was on the team.  He was what they call a

24    red shirt.  Yes, he didn't get to play in games.  There were 13

25    freshmen red shirts that year that didn't play in any games.

1   He was one of the 13, which is the backbone of the team's

2   recruiting, the red shirts, but there he is on the team.  He

3   was on the team.  He had to withdraw in January after the

4   season was over because he had a third concussion, and that was

5   enough, he thought.

6        So the other thing we have is, we agree with the

7   government.  They said John didn't know about any bribery.

8   We've just eliminated a huge part of this trial.  They

9   acknowledge that Singer never told John that whatever he was

11:48 10  doing, there was no bribery in any discussion with John.  John

11  thought he was making legal, legitimate donations, as you heard

12  Singer say in that tape, to IRS-approved charities.  Nothing

13  about improper -- why do you think we heard all this talk, Mr.

14  Huneeus, Mr. Kaplan, all these are people that have never met

15  John Wilson because he can't say anything about John Wilson

16  having any connection or knowledge that there was any bribery.

17  He made a donation to the USC water polo team that his son was

18  on.

19        Their whole case is going to boil down to can they

11:49 20  prove that a profile drafted by Mr. Singer and sent to USC is

21  somehow something John is responsible for and that it has

22  materially false statements.  No witness will say they ever

23  discussed it with John, that he ever read it or acknowledged

24  it.  No witness will support them on that.

25        There is no e-mail to show John ever commented on it

1    or discussed it with anybody.  And most importantly -- and I'm

2    not going to tell you all the evidence you're going to see --

3    you will see evidence at trial that shows why John never saw

4    that and why you can conclude he never saw that.  That's their

5    whole case.  They can't prove that he saw that profile and

6    understood what was on it.  They have nothing.

7         And so what John did know was that his children had

8    real accomplishments.  Johnny was a star high school water polo

9    player and swimmer who was qualified for USC.  He was on the

11:50 10  USC water polo team his freshman season and left because he had

11   a third concussion.  The twin girls scored really well on their

12   ACT tests for college entrance.  One got a perfect score.  The

13   other one got almost a perfect score.  He never talked about

14   misrepresenting their athletic abilities.  He said they weren't

15   as good an athlete as the boy.  They could be a team manager or

16   something like that because that's what Singer told him.

17        So let me introduce you to the Wilson family.  There's

18   John sitting there, his son Johnny, his wife Leslie, and his

19   daughters Maimi and Courtney.

11:51 20       So why is John on trial?  Because the evidence will

21   show Rick Singer is one of the great con men of our time.  He

22   specialized in stealing from rich people, and he stole over

23   half of John's donation to USC.  How could he defraud John and

24   such smart people for so many years?  Because he did what all

25   the good con men do, he mixed the truth with lies.

1          Mr. Singer was one of the most successful college

2     counselors in California.  Who did he advise?  Steve Jobs, the

3     founder of Apple computer, the CEOs of major Hollywood studios,

4     the CEOs of major corporations, the investment bankers.  The

5     very most successful people in California, many of them came to

6     him for advice.  And he was a family adviser to the Wilsons for

7     many years before he stole from them.  He exploited the

8     children's success and hard work to steal from their parents.

9          Why was John a perfect mark for Mr. Singer?  The

11:52 10    evidence will show John is book smart and engineering smart,

11    but Singer is a different kind of smart.  He's a master of

12    manipulation.  All of us in this court have the benefit of

13    hindsight.  We know the end of this story before you hear the

14    first piece of evidence.  But let's look at what John knew as

15    things unfolded, as things happened.

16          If we could have the timeline, please.  The relevant

17    time starts in 1998.  John became a client of Goldman Sachs,

18    one of the world's most respected investment banks.  This part

19    of Goldman specializes in the supporting senior executives who

11:52 20    are overscheduled.  CEOs and managers need people to give them

21    support.  They need teams and they delegate authority to

22    trusted advisers.

23          John asked Goldman for advice on how to make gifts to

24    support education.  The conversations he had with Goldman show

25    John's state of mind about his gift-giving and his donations

and taxes.  John told Goldman that education was his priority
for what turned out to be very generous donations over the
20-year period.  Goldman provided him with advisers and
referred him to lawyers to create trusts and make educational
gifts.

John told Goldman he was focused on education because
of the role education played in changing John's life.  John
later told Mr. Singer the similar background details about
John's life, how he was born, how he grew up, what education
had done for John and John's donations for education.  Singer
used this information to manipulate and cheat John.

I'll now tell you about John's background so you'll
understand how Singer sized him up and realized he could
manipulate him.  John was born in absolute poverty.  In the
late 1950s his mother got pregnant at 15.  Her father was from
a conservative family from Puerto Rico, and he threw her out of
the house.  She became a single mother with several children
and a ninth-grade education.

John started life in a public housing project in
Hartford, Connecticut.  He told Mr. Singer that the name
"Wilson" came from the father who adopted him.  To this day,
John has no idea who is his biological father.  He has a
23andMe test, that's it.  But John explained to Singer he had
been more book smart than street smart.  He was the kid who did
well in math and science, and he got a scholarship to an

engineering college called Rensselaer Polytech Institute.  Then
he went to Harvard Business School.

Goldman started giving John legal and tax advice on
educational gifts.  He got advice on trusts to pay for
education for five nieces and nephews.  Then he got tax advice
on making donations to a university.  Years before he ever met
Singer, he set up a will and a trust to leave $2 million to
Harvard and the engineering school to fund scholarships for
students whose parents did not go to college, to strangers,
like him.  They donated to other schools, too.  That's how Rick
Singer entered the picture.

Could I have the timeline, please.  John's adviser at
Goldman Sachs knew how John valued education.  In 2010, the
adviser recommended that John retain Rick Singer as Johnny's
college counselor.  The Goldman adviser had been recommending
Rick Singer to other Goldman clients for about three years.  At
the time it seemed like a great recommendation.  As I said
earlier, Mr. Singer was one of the most successful college
counselors in California.

Can we have the websites, please.  He had very slick
websites.  He eventually wrote two books on college counseling.
These are reprints from a later time.  And he got glowing
references.  When Goldman referred Mr. Singer to another
financial adviser, this was the biography that was presented.
"Read it, please.  Best-selling author Rick Singer is the CEO

1    and master coach.  The Key's offerings are delivered one-on-one
2    in the client's home or office."  Then look at the third
3    paragraph.  "A sampling of The Key corporate clients include
4    Morgan Stanley, Smith Barney, Wells Fargo, the Pacific
5    Institute, Disney Records," and various other respected
6    corporations.

7         Why did Singer drop these names and cite these things
8    to John and other people?  So they'd trust him, so that he'd
9    defer to their advice.  Mr. Singer's client list from the
11:56 10   company, there's well over a thousand, I think over 1500 names
11   on it.  A lot of these people are like John.  They hired
12   Mr. Singer for standard college advising.  They did not pay
13   anyone to cheat on tests, and they did not pay bribes.

14         In 2010, Mr. Singer started to advise Johnny Wilson.
15   Johnny was a star high school swimmer and water polo player.
16   That's him winning the championship in the butterfly, the
17   toughest stroke in swimming competition at the league
18   championship in high school.

19         Next one, please.  That's him taking a shot in a game
11:57 20   in high school.  His high school team I think won 14 league
21   championships out of 17 years, something like that.

22         Johnny was on multiple club and school teams.  Singer
23   was a sports fanatic and a good adviser for high school
24   athletes.  For three years he regularly came to the Wilson
25   house, once every three weeks, once every four weeks, whatever

1    was the schedule, and then he'd call Johnny during the

2    in-betweens of the meetings.  He gave advice on tutors and

3    writing coaches, sports and academics.  John wanted him to keep

4    track of the boy, so he'd focused on school and not all on

5    sports.  And they trusted him so much.  They let Singer meet

6    and talk alone with their son for three years.  John's not the

7    type of father who would leave his son alone to someone he

8    thought corrupt.

9            Then in 2012, the office supply retailer called

11:58 10   Staples hired John to be president of its European operations.

11   John had to move to Holland for the next four years.  It was a

12   great career opportunity for John, and John's internet sales

13   were crushing Staples, and Staples wanted a president to see if

14   they could fight Amazon and save the 12,000 jobs of the Staples

15   employees in Europe.  It was so stressful, John gained 40

16   pounds those years.

17           Johnny stayed in California to finish high school.

18   You can see that brings us up to about 2012, 2013.  And the

19   Wilsons asked Mr. Singer to help Johnny manage his college

11:58 20   applications.  The mom and girls were in Europe, too, with

21   their father.

22           While John was working in Holland, Mr. Singer

23   implemented the scheme to steal from John.  First he told John

24   several true facts.  He said water polo could help Johnny get

25   into college.  He said if Johnny worked hard with Mr. Singer's

tutor, he could get a strong result on his college boards.
Johnny did.  He also said that for students like Johnny who are
qualified to meet USC standards, making a donation could give
them a boost.  Mr. Singer said colleges give a preference to
the children of donors and that the coaches at USC could
support an applicant whose family would donate to the team.

Mr. Singer called the strategy and giving a donation
to a specific a team or university program a side door.  When
he explained it to John, he described the side door as a
completely legal fundraising strategy approved by USC and other
schools to raise funds for specific teams and programs.
Mr. Singer never told John that a side door included bribery or
fraudulent credentials.

USC recruited a few top water polo players and gave
them scholarships, but the team took a lot of freshmen and made
most of them red shirts.  Under NCAA rules in college sports, a
red shirt can only practice.  They are not allowed to play in
games.  There were 13 red shirts on the team Johnny's year.  He
was one of 13 kids that fit the e-mail that they showed you
that said he's not going to get into the pool for a game.  13
of them didn't get into the pool for a game that season.  And
that was John's concern.  He was going from being a high school
star on the team, all-league, the star of the high school team,
and he's going to be a red shirt.  But he was and he was there
for the season.

1          Mr. Singer said because Johnny was qualified for USC,

2     if John agreed to donate to the USC team, the coach would

3     support Johnny's application as a walk-on red shirt, and he

4     confirmed the donations would be tax deductible.

5          Now, of course the lie was he told them the donation

6     was $220,000.  $100,000 went to USC, and Singer stole the other

7     $120,000 for himself.  How could Singer steal this money so

8     easily and bamboozle John and other stuff?  We're going to show

9     you Singer tell this in his own words.  Watch this tape.  It's

12:01 10     made by the IRS and FBI agents of Mr. Singer with another

11     informant just before they confronted Singer and made him their

12     informant.  Listen to him brag, what a great con man he is.

13          (Video played.)

14     MR. KENDALL:  The evidence will show for three years

15     Mr. Singer went into John's home and smiled at his wife and

16     complimented his children.  He listened when John told him

17     about his early background in poverty and his later donations

18     for education and autism groups.  Mr. Singer knew the kid from

19     the projects would be generous and would trust Mr. Singer's

12:04 20     advice.  That's how he stole John's donation.  And once he

21     became an informant, that is how he manipulated John for the

22     IRS agents running the investigation.

23          The evidence will show that before and after he

24     started working for the government, Mr. Singer repeatedly told

25     John the side door was perfectly legitimate and exactly what

1  the schools wanted.  Here is a part of the tape the government

2  did not play.  In it Mr. Singer tells John that he negotiated

3  four side-door donations to Harvard.  Listen to how he

4  describes it, please.

5          (Video played.)

6          MR. KENDALL:  Mr. Singer convinced John the side-door

7  donations were so legitimate that Mr. Singer would negotiate

8  them with the President of Harvard University.  That's

9  obviously not true.  Mr. Singer doesn't know the President of

12:05 10  Harvard University.  In his eight years advising the Wilson

11  family, Mr. Singer never said the donation was a bribe.  He

12  said exactly the opposite, that it was an accepted fundraising

13  program.

14          We will present evidence of Mr. Singer's state of mind

15  to show when Mr. Singer proposed side-door donations to John,

16  he intended to propose to offer donations to school programs.

17  In a conspiracy, both sides' state of mind matters.  So it's

18  not just evidence of John's state of mind.  It's evidence of

19  Mr. Singer's state of mind that we will show you.

12:05 20          Earlier you heard Mr. Singer talking at Starbucks

21  about side-door donations.  Could we have the next exhibit,

22  please.  This is a proposal for a book.  You've heard him refer

23  to that in the Starbucks presentation.  It's an outline for a

24  book he was putting together.  "Getting Your Child Into College

25  - The Untold Story."  What was Chapter 14?  "Front, back and

1    side-door relationships.  Who you know does matter."  Then

2    there's an e-mail he sent to a parent that is exactly the same

3    information he told John.  "Okay, side door is not improper,

4    nor is back door.  Both are how all schools fund their special

5    programs or needs."

6         Mr. Singer repeatedly combined truth with lies.  He

7    was completely truthful when he explained that schools like USC

8    had a different admissions process for athletes than for

9    non-athletes.  He was lying when he talked about meeting with

12:06 10    the President of Harvard, but he was truthful in saying that

11    USC gave favorable admissions consideration to donors'

12    children.

13         The evidence will show this was part of the services

14    that the USC Athletics Department expected of its employees.

15    The employees would identify donors who would help the school

16    meet its fundraising needs, and then the employees would help

17    those donors' children get admitted.

18         Here are two e-mails from USC Athletic Department

19    discussing Mr. Singer.  The first comes from Pat Haden.  He is

12:07 20    the top of the athletics department.  He is the boss.  This is

21    what he does in May 2015.  What's interesting is he meets

22    Singer after Johnny has been admitted.  It's about a year and

23    change after the admission of Johnny.  And one of his

24    fundraising contacts, a lawyer named Chuck Kenworthy, is

25    setting up a relationship.  "I would like to introduce you to

1   my friend Rick Singer.  He has asked to meet you both."  Then

2   he gives the examples of all the fundraising people he's

3   brought to USC.  Rick has worked closely with the following

4   families."  There's about eight or nine there.  John Wilson of

5   Staples is one of them.

6          Could we have the next one, please.  Then Donna Heinel

7   sends an e-mail out to Ron Orr.  Mr. Orr is the head of

8   fundraising in the athletic department.  The athletic

9   department was so focused on fundraising, they had 14

12:08 10  fundraisers just in athletics reporting up to Mr. Haden.  14

11  people full-time raising money led by Mr. Orr.  What did he

12  write?  What did Ms. Heinel tell the head of fundraising?  "I

13  also will be receiving in the next two weeks a check for

14  $50,000 from the family.  The family came to me from Rick

15  Singer who was introduced to me from Pat Haden, the head of the

16  athletics department."

17          The evidence will show the schools created this system

18  of giving an admission boost to donors.  We're not defending

19  it.  The judge will instruct you.  And that is the most

12:08 20  important part of this case, that you follow the judge's

21  instructions.  He'll instruct you on which issues are relevant

22  to your verdict and what is the applicable law.  We're not here

23  to decide whether the college fundraising system could be

24  better.  It is what it is.  And you must follow the judge's

25  instructions on the law that you are sworn to do.

1          These were lawful donations John made to USC and the

2    foundation.  The IRS has a website that listed Mr. Singer's

3    foundation as an approved charity, so the IRS told anybody who

4    looked it up, including John's tax advisers, that it's okay to

5    take a deduction to The Key Foundation as well as to USC.

6          If we could have the thank-you notes, please.  These

7    are the thank-you notes that the school sent John, the

8    $100,000, and the other from The Key Foundation.  John had no

9    idea The Key Foundation was a fraud or a sham as the government

12:09 10    claims.  In fact, he used to drive his son Johnny to tutoring

11    programs in the inner city schools of Sacramento for programs

12    sponsored by The Key Foundation.  That was John's frame of

13    reference.

14          The government showed you some invoices that it said

15    were part of the tax case.  Nobody ever sent those invoices to

16    John.  They went to a bookkeeper who didn't understand how to

17    process them correctly and who missed the trojan fund letter.

18          What's the tax -- created?  John had a sub S

19    corporation, and you'll hear about tax advice that the sub S

12:10 20    corporation is called a passthrough entity.  It doesn't pay

21    taxes.  It's just a passthrough to the individual's own tax

22    return.  They mistakenly put it down as a deduction on business

23    expenses as opposed to a Schedule A deduction of a charitable

24    deduction.  Either way, it was a deduction.  It had no real

25    impact in any tax calculation.  They're just putting it in

1    there to try to dirty him up.  The same way Mr. Huneeus and Mr.

2    Kaplan and all these people he's never had contact with are

3    thrown into the case.

4         You'll see John's tax return.  In 2014 he had a

5    fabulous income.  2.5 million in adjusted gross income, 2.5.

6    He paid 953,000 in taxes.  That's about 39 percent at that

7    income rate.  He made over $300,000 in charitable

8    contributions.  So taxes and charity were about 49 percent of

9    the money he earned of two and a half million dollars.

12:11 10        He's not someone who is looking to cheat the system.

11   To say that this minor thing, the bookkeeper putting it in one

12   place as one kind of deduction instead of another place as

13   another kind of deduction as a motivation of tax evasion I

14   suggest to you is absurd.

15        I now want to move to when John hires Singer in 2018

16   to advise his daughters.  In 2018, John still did not know what

17   we know today, that Mr. Singer was a con man.  He had known and

18   trusted Mr. Singer for eight years.  Mr. Singer met John's

19   daughters at the home when they were nine years old.  They were

12:11 20   now juniors in high school, and John called Mr. Singer to hire

21   him to be an adviser to the girls.  This is where Mr. Singer

22   told him he was working with the President of Harvard on

23   side-door donations, and he was dealing with the presidents of

24   Brown and Tufts as well.  What more do you want for him to sort

25   of tell him this is an official university program than to be

1    citing all the presidents that are discussing it with him?

2         By 2018, Mr. Singer upgraded his pitch.  He told

3    Mr. Wilson that he was doing side-door donations for more than

4    50 schools.  He said the side door was so common you could use

5    it with non-athletes as well.  The daughters could be a team

6    manager or help the team in some other way.  Mr. Wilson trusted

7    Mr. Singer and believed he was telling the truth.

8         Mr. Singer had told John in 2014 that he never got

9    paid for the USC donation.  He just did it as part of the

12:12 10   friendship with John.  Of course he didn't tell him he stole

11   $120,000.  John repeated this in 2018 and said, "It's so great.

12   Why are you doing this for free?  Don't you think you should

13   get paid for helping somebody facilitate a donation?"  It shows

14   you how much he believed and trusted Singer.

15        Next slide, please.  At the same time John hired

16   Singer, the FBI recruited him to be their informant.

17   Mr. Singer told the government that sometimes he worked with a

18   cheater to pay bribes, but he told the government other parents

19   did not do these things.  They intended to make legitimate

12:13 20   donations to schools.  Mr. Singer told the government that

21   Mr. Wilson's son was a real water polo player, and they had

22   never discussed paying a bribe.  The government told Singer

23   that wasn't good enough, and they insisted he try and trick

24   Mr. Wilson.

25        This is Mr. Singer's note he wrote to himself about

John Wilson when the government was pressuring him.  "John
Wilson 20,000, nothing to do with USC, plus donation to USC
program for real polo player."  Right after Mr. Singer spoke to
John about his daughters, the government was so aggressive to
Mr. Singer, he wrote that note that Mr. Kelly showed you and I
want to show you again.

        This is written on October 2.  On October 1 is when
these events happened, and they happen in part because of a
conversation he had on September 29 with John Wilson.  And
what's interesting to note is the agents are supposed to write
reports any time they have an important event in an
investigation.  They wrote nothing down about this October 1
call.  The only reason we have it is because Mr. Singer was so
distrustful and frightened and surprised at the way they wanted
him to lie about John Wilson, he secretly wrote his own note.
I suggest to you most people, even Rick Singer, don't lie in
their diary.  That's what this was, a private note he'd have so
if it ever blew up on him and the agents made him lie and
falsify evidence, he can say, "I objected and they forced me to
do it."

        It's in there.  Take a moment to read it if you'd
like.  "They want me to tell a fib and not restate what I told
my clients as to where their money was going, to the program,
not the coach, and that it was a donation and they want it to
be a payment."  You'll see on the tapes they made of John how

they played cat and mouse with John.  "Oh, you got to make a
payment to the coach and to the school."  And John would say,
"Why would I have to make a payment to the school," not
realizing they had slipped in "coach" to make it sound like he
paid a bribe when Singer told him he never had, it had never
been discussed.

        Think about that.  One of the world's greatest con men
wrote that even he was upset with the way the IRS wanted to
manipulate John Wilson.  Plus, Mr. Singer is not going to be
here to testify, but we don't need him.  We have his note.  We
know his version of events.

        The government is supposed to follow rules in
investigation.  One of these is to avoid bringing -- one reason
for this is to avoid bringing an innocent person to trial.
Here you'll see the government ignored its rules in the
investigation.  They didn't write down all the negative things
Singer told them.  They didn't write down that October 1
meeting that caused all of these notes.  And they told Singer
that you had to talk to Wilson differently than the other
parents.  You can't be blunt.  You can't be explicit.  You
can't be direct because we know Wilson will not go for any of
it.

        So I want to show you the type of conversation they
had with a parent when they had no reservations.  Could we have
the next exhibit, please.

1             (Video played.)

2             MR. KENDALL:  That's not how they told Singer to ever

3       talk to John Wilson.  Never use the word "bribe."  They called

4       up all the parents of kids who got into USC and asked them

5       questions about it.  They have never asked John a single

6       question about USC.  "Oh, John, did you think we bribed Coach

7       Vavic?  John, do you remember that profile that was sent to

8       you?  You knew it was a false profile."  They made no

9       reference.  Three months they had undercover work with Singer

12:17 10      on John Wilson, three months, multiple phone calls, text

11       messages, e-mails.  Not once did they ever say, "Hey, John, do

12       you know that profile to USC, do you know that was a false

13       profile?"  They wouldn't go near it because they knew what

14       John's answer would be.

15             In sum, the evidence will show John Wilson did nothing

16       illegal.  He trusted a con man who stole his money.  That con

17       man knows how to play people better than anybody in this

18       courtroom.  He knows how to play an engineering nerd like John

19       Wilson.  He knows how to play some of the corrupt parents like

12:18 20      the Isacksons who may come in.  He even knows how to play FBI

21       and IRS agents.  That's what he did his whole life, played

22       people as easily as one would play a piano.

23             John Wilson did not break the law.  The government

24       concedes he had nothing to do with bribery.  They have no

25       evidence they can show you that he ever discussed and

1    acknowledged or did anything of a false thing to USC, and

2    there's a series of tapes that even Singer was uncomfortable

3    about.  So you'll have to hear his notes and not his testimony,

4    but the notes are all you need to understand what happened, and

5    that is why at the close of this case we will ask you to find

6    John Wilson not guilty of all of the charges.  Thank you.

7            THE COURT:  All right.  We will now proceed with the

8    evidence.  My deputy will move that screen so we --

9            MR. KELLY:  Your Honor, may I come to sidebar, please.

12:19 10          THE COURT:  Yes.

11                *** Beginning of sidebar ***

12           MR. FRANK:  Your Honor.

13           THE COURT:  We're not all here yet.

14           MR. KELLY:  Two things, your Honor.  First, I think we

15   preserved this, but under First Circuit law, apparently I'm

16   supposed to specifically note it on the record.  Object to

17   hearsay, relevancy and prejudice with the next witness, the

18   Isacksons.  I'm supposed to be specific, I guess, so that's

19   what I'm doing for the record.  We object to them calling him.

12:20 20          MR. KENDALL:  It's just a continuing objection we

21   discussed.  We can either stand up in court or just say it now

22   as the Court would like.

23           THE COURT:  Does the government have a position?

24           MR. FRANK:  No.

25           THE COURT:  You can do either one.

1          MR. KELLY:  I just think, I think we're required to,

2     so that's why --

3          THE COURT:  All right.

4          MR. KELLY:  Second, more important.  Mr. Frank has

5     told this Court these two people weren't at USC admissions.  I

6     want to mark these for identification purposes.  They're

7     admissions counselors.  He can't stand up to the Court and

8     accuse me of something we didn't do.  These people work in the

9     admissions office at USC.  He said they didn't.  I'm going to

12:20 10     object to the government doing that.  That's not appropriate.

11          THE COURT:  This was something that was done outside

12     of the hearing of the jury, and this will be taken care of

13     outside of the hearing of the jury when we don't have a jury

14     sitting here.  Okay?

15          MR. KELLY:  I just want to object on the record that

16     they are in fact admissions counselors.  When he stands up and

17     says something is not true, he shouldn't do that in front of

18     the jury.

19          THE COURT:  He didn't do it in front of the jury.

12:21 20          MR. KELLY:  He said something is not true and that --

21          THE COURT:  You're talking about what he said after I

22     dismissed the jury, so we'll talk about that when the jury is

23     not being held.  I'm not going to allow sidebars when the jury

24     is here about something that doesn't have to do with the jury.

25     So stay forewarned, this is the last time I'm going to do that.

```
 1            MR. FRANK:  Your Honor, he was right, I was wrong
 2    about that.  I withdraw the objection to that exhibit.  I made
 3    a mistake.  But I will preserve my objection to any other
 4    issues I raised.
 5            THE COURT:  Okay.  Fair enough.
 6                * * * End of sidebar * * *
 7            THE COURT:  If the government would call its first
 8    witness.
 9            MR. FRANK:  Thank you, Your Honor.  The government
10    calls Bruce Isackson.
11            BRUCE ISACKSON, Sworn
12            THE CLERK:  Would you please state your name for the
13    record, spelling your last.
14            THE WITNESS:  Bruce Isackson, I-s-a-c-k-s-o-n.
15            THE COURT:  You may proceed.
16            MR. FRANK:  May I inquire of the witness, your Honor?
17            THE COURT:  Yes.  Mr. Isackson, will you pull the
18    microphone, the whole bottom moves so you can move it closer to
19    you.
20            THE WITNESS:  Got it.
21            THE COURT:  Thank you.
22                DIRECT EXAMINATION OF BRUCE ISACKSON
23    BY MR. FRANK:
24    Q.   Good afternoon, Mr. Isackson.
25    A.   Good afternoon.
```

```
 1    Q.   Can you tell us where you live.

 2    A.   Hillsborough, California.

 3    Q.   Is that in the Bay area?

 4    A.   Yes, San Francisco Bay area.

 5    Q.   Are you currently employed?

 6    A.   I am.

 7    Q.   What do you do?

 8    A.   I'm a commercial real estate investor.

 9    Q.   Do you work for yourself or are you employed by someone
10    else?

11    A.   I'm employed by W.P. Investments.

12    Q.   Was that previously your own company?

13    A.   I was a partner there, yeah.

14    Q.   Are you married?

15    A.   I am.

16    Q.   How long have you been married?

17    A.   29 years.

18    Q.   And to whom are you married?

19    A.   Davina Isackson.

20    Q.   Do you have children?

21    A.   I do.

22    Q.   How many children do you have?

23    A.   Four.

24    Q.   Can you tell us their names and their ages, please.

25    A.   Yes.  Evan, 25; Lauren, 23; Audrey, 21; and Ryan, 19.
```

|     |     |
|-----|-----|
| 1 | Q.   Mr. Isackson, have you ever pled guilty to a crime? |
| 2 | A.   Yes. |
| 3 | Q.   What crime have you pled guilty to? |
| 4 | MR. KENDALL:  Objection, your Honor, just for the |
| 5 | matter we discussed. |
| 6 | THE COURT:  Overruled. |
| 7 | A.   Conspiracy to commit money laundering, mail fraud and tax |
| 8 | evasion. |
| 9 | Q.   When did you plead guilty to those crimes? |
| 12:24 10 | A.   Approximately two and a half years ago. |
| 11 | Q.   Mr. Isackson, could you tell the jury in your own words |
| 12 | what you did that led you to plead guilty to those crimes? |
| 13 | A.   Yes.  I participated in a scheme to get my children |
| 14 | admitted to colleges, two of my children admitted to colleges |
| 15 | as fake athletic recruits, and I also paid to have one of my |
| 16 | daughter's test scores altered. |
| 17 | Q.   Who did you enter into that scheme with? |
| 18 | A.   Rick Singer.  And I mean, there's a lot of people that, |
| 19 | you know -- so let me give you my complete answer, I guess. |
| 12:25 20 | Rick Singer who was the mastermind, the ring leader of it, his |
| 21 | organization, The Key Foundation, his contacts at colleges in |
| 22 | the athletic department, among others, and parents like myself |
| 23 | and my wife Davina. |
| 24 | Q.   I want to return to that, but I want to take a step back |
| 25 | for a moment, sir.  Can you tell this jury where you were born? |

```
 1    A.    Yes.

 2    Q.    Where were you born?

 3    A.    San Francisco, California.

 4    Q.    And how far did you go in school?

 5    A.    Four years at UCLA.

 6    Q.    And did you graduate?

 7    A.    I did.

 8    Q.    What did you graduate with?

 9    A.    A degree in political science.

12:26 10    Q.    What did you do after you graduated from college?

11    A.    I became a commercial real estate broker.

12    Q.    Where was that?

13    A.    At Cushman & Wakefield.

14    Q.    That's a brokerage firm?

15    A.    It is.

16    Q.    And where did you work, what area?

17    A.    Oakland, California.

18    Q.    So back in the Bay area?

19    A.    I did.

12:26 20    Q.    You mentioned someone named Rick Singer.  Who is Rick

21    Singer?

22    A.    Rick Singer was someone we hired to be a college counselor

23    for two of my daughters.

24    Q.    How did you meet him?

25    A.    We met him, my wife was introduced -- my wife, my
```

```
 1   daughters -- my daughter horseback rides, as does a woman named
 2   Elizabeth Henriquez, and her daughters were at the same
 3   competition as my wife, and Lauren was riding.  Lauren had a
 4   bad fall, ultimately had a concussion.  And they spent a couple
 5   hours hanging out together.  The talk of colleges came up, and
 6   she talked highly of Rick Singer and said it was someone my
 7   wife -- we should consider.
 8   Q.   So this was at a horseback riding competition?
 9   A.   It was.
10   Q.   And what stage was your daughter -- your daughter Lauren?
11   A.   Mm-hmm.
12   Q.   What stage was she in in high school at that point?
13   A.   I believe it was in her senior year, close to her senior
14   year.
15   Q.   And what kind of student was Lauren in high school?
16   A.   She was above average but not a superior student.  Mostly
17   B's, some A's.
18   Q.   Did there come a time after Liz Henriquez recommended Rick
19   Singer to your wife that you hired him?
20   A.   Yes.
21   Q.   What do you recall about your initial interactions with
22   Rick Singer?
23   A.   Rick had a very strong personality.  I would say he was
24   almost intimidating.  He made it clear there was one way to get
25   into schools, and that was his way.  He made us feel that we
```

|       |                                                              |
|-------|--------------------------------------------------------------|
| 1     | needed him more than he needed us, even though we were paying |
| 2     | him for his services.                                        |
| 3     | Q.   What do you recall him telling you about your daughter   |
| 4     | Lauren's college prospect?                                    |
| 5     | A.   He made it clear that most of the difficult schools to get |
| 6     | into or all of the difficult schools she would consider, with |
| 7     | her grades and test scores, wouldn't be an option for her.   |
| 8     | Q.   Would be an option or would not?                         |
| 9     | A.   Would not, would not.                                    |

12:28 10   Q.   And what schools were those that she was interested in?

11     A.   Oh, there's a list of schools, but her top choice was USC

12     at the time.

13     Q.   USC, University of Southern California?

14     A.   Correct.

15     Q.   What if anything did Rick Singer tell you he could do for

16     you to help Lauren get in?

17     A.   He basically said he had a way to get her in, and he had

18     done it countless times, and it was pretty much bulletproof.

19     Q.   What do you recall Rick Singer telling you about how it

12:29 20   would work?

21     A.   He told us that she would come into the school basically

22     as a fake soccer player, and she could gain entry through that

23     way, as a recruit, and the admissions department would be

24     fooled and take her in that way.

25     Q.   Was he that explicit?

```
 1   A.   Well, he basically told us that she was going to come in
 2   as a soccer player, yes.  And she was not a college-level
 3   soccer player.
 4   Q.   Did she play soccer?
 5   A.   She played high school soccer somewhat.
 6   Q.   How long did she play soccer?
 7   A.   She didn't even play her senior year in high school.
 8   Q.   Did she play soccer competitively --
 9   A.   No.
10   Q.   -- when she played?
11   A.   No.  I mean, she was an average player, a little above
12   average player.
13   Q.   But she was on her high school's team until senior year?
14   A.   Yes.  Again, she did not play senior year.
15   Q.   Did she play outside of school?
16   A.   Yeah -- no.  She played when she was younger a little bit
17   of soccer.
18   Q.   Did Rick Singer say anything to you about money?
19   A.   Yes.
20   Q.   What did he tell you?
21   A.   He basically said there was a smorgasbord of money that
22   was given to different schools based on kind of the difficulty
23   and how hard the process was.
24   Q.   What did he tell you it would cost to get Lauren into USC?
25   A.   Initially he said it was between $250,000 and $300,000.
```

```
 1    Q.   Did he tell you what the money was for?
 2    A.   Yeah.
 3    Q.   What did he tell you?
 4    A.   Well, he just said that we'd be making a payment to his
 5    foundation and his foundation would funnel it through to the
 6    athletic departments of those schools -- that school.
 7    Q.   To the athletic department?
 8    A.   Correct.
 9    Q.   What did you think would happen if you didn't pay the
10    money?
11    A.   There's no way Lauren could have gained entry to the
12    school on her grades or test scores.
13    Q.   Did you think your daughter Lauren was qualified to play
14    soccer at the University of Southern California?
15    A.   Not even close, no.
16    Q.   Did she intend to play soccer in college?
17    A.   No.
18    Q.   Other than making that payment to Mr. Singer's foundation
19    that you said you understood would go to the athletic program
20    at USC, what if anything did Rick Singer tell you you needed to
21    do to make this scheme work?
22    A.   Well, she was going to be posed as a soccer recruit, so we
23    needed to get a picture of her playing soccer.
24    Q.   Did he tell you how that photograph of your daughter
25    playing soccer would be used?
```

```
 1    A.    Yeah.  He said he'd put together, you know, the necessary
 2    resume that would make her out to be, you know, a superior
 3    prospect for a college team.
 4    Q.    Did you have an understanding of why there needed to be a
 5    resume of your daughter's soccer skills?
 6    A.    Yeah.  I mean, she was not a college-level soccer player.
 7    She wasn't even an elite high school player, so he would
 8    obviously have to embellish her record quite a bit to convince
 9    the program that she was capable of being a Division I soccer
10    player.
11    Q.    Did he ever show you the resume?  Did you ever see it?
12    A.    No.
13    Q.    So how do you know that it was falsified?
14    A.    Well, she got in as a soccer player to a school she had no
15    ability to get in at, so it had to work.
16    Q.    You testified that Rick Singer told you he had done this
17    before?
18    A.    Yes.
19    Q.    What did he tell you about that?
20    A.    He told us he had done this countless times and it was
21    basically bulletproof.
22    Q.    Was it that important to you?
23    A.    Very important.
24    Q.    Why?
25    A.    We did not want to be guinea pigs and have this thing blow
```

1    up and have my daughter exposed.

2    Q.   You testified that he told you it was bulletproof.  What

3    do you understand that to mean?

4    A.   He said he had done it countless times.  Made it seem to

5    us that it had been dozens of students and many at USC.

6    Q.   Did he tell you which students or which families he worked

7    with?

8    A.   Not in particular, no.

9    Q.   Did you know of any families that he worked with?

12:34 10    A.   Yes.

11    Q.   What did you know about that?

12    A.   I knew that they were, a majority of them were from

13    wealthy families and they had kids, some of them that were

14    average students and were getting into good schools.

15    Q.   Did you believe this process to be legitimate?

16    A.   No.

17    Q.   Why not?

18    A.   Well, because my daughter was getting admitted as a fake

19    soccer player, and she had no athletic ability to be going to

12:34 20    college and be admitted as a recruit.

21    Q.   Did you ultimately pursue the process for your daughter

22    Lauren at USC?

23    A.   Yes, we did.

24    Q.   Did Lauren get accepted to USC?

25    A.   No, she did not.

1    Q.    What happened?

2    A.    According to Rick, he said that it came out that the

3    athletic department found out she had a concussion, and because

4    of that, she would be ruled out as eligible to play on the

5    team.

6    Q.    Did you believe him when he told you that?

7    A.    She did have a concussion, but we weren't convinced that

8    was the reason, but we went with it.

9    Q.    What happened next?

12:35 10    A.    So he went over his list of schools and he came up --

11    among them was University of Santa Barbara, UC Santa Barbara,

12    and that was the school she was excited about.

13    Q.    Did there come a time when Lauren visited UC Santa

14    Barbara?

15    A.    Yes.

16    Q.    Tell us about that.

17    A.    My wife took her down to visit the campus.  They went

18    around the school.  She actually had some friends there.  And

19    she came back and was pretty excited about it and decided

12:35 20    that's where she wanted to go next.

21    Q.    What happened next?

22    A.    We got a voicemail from Rick that he left on our machine

23    that was pretty disturbing.

24         MR. FRANK:  Your Honor, at this time if we may

25    distribute to the witness and jurors binders of transcripts?

1          THE COURT:  Yes.

2          MR. FRANK:  Thank you.

3          MR. KENDALL:  Objection, your Honor, hearsay.  And

4   this is not a continuing but a particular objection.

5          THE COURT:  As to what, a particular document?

6          MR. KENDALL:  The tape he wants to play now, your

7   Honor.  We don't think it's in furtherance of anything.

8          THE COURT:  Mr. Frank?

9          MR. FRANK:  Your Honor, it's admissible pursuant to

12:36 10   *Petrozziello*, it comes in de bene.

11          THE COURT:  I will allow it subject to a *Petrozziello*

12   ruling.

13          MR. FRANK:  Thank you, your Honor.

14          THE COURT:  Do you have copies for my clerks?

15          MR. FRANK:  May I proceed?

16          THE COURT:  Yes, you may.

17   BY MR. FRANK:

18   Q.   Mr. Isackson, if you could turn to the tab in your binder

19   marked 190.  If the jurors could turn to that tab as well.

12:38 20          THE COURT:  Before we go on, are you offering this as

21   an exhibit?

22          MR. FRANK:  I'm about to offer the audio as an

23   exhibit, your Honor.

24          THE COURT:  Okay.  Go ahead.

25   Q.   Prior to testifying today, did you have an opportunity to

1   review the disc marked as Government Exhibit 190?

2   A.   I did.

3          MR. FRANK:  And Ms. Lewis, do you have that disc and

4   could you show it to Mr. Isackson, please.

5   Q.   Do you recognize that disc?

6   A.   I do.

7   Q.   How do you recognize it?

8   A.   I've listened to it, and I've initialed it on the disc.

9   It's a recording of a voicemail that Rick left for us.

12:39 10          MR. FRANK:  The government offers 190.

11          THE COURT:  It will be admitted.

12          (Exhibit 190 admitted into evidence.)

13   Q.   And turning to the transcript in your binder marked 190,

14   prior to coming here today, did you have an opportunity to

15   review that transcript?

16   A.   I have.

17   Q.   And is it a fair and accurate transcript of the recording

18   that is Exhibit 190?

19   A.   It is.

12:40 20   Q.   And are those your initials and a date at the bottom of

21   the transcript?

22   A.   They are.

23   Q.   So Mr. Isackson, when was this recording -- first of all,

24   you testified this was a voicemail recording.

25   A.   Correct.

```
 1   Q.   Whose voicemail was this recording left on?

 2   A.   It was left on my wife Davina's phone.

 3   Q.   And did you have an opportunity to hear it?

 4   A.   I did.

 5   Q.   How did you hear it?

 6   A.   She played it for me.

 7   Q.   And that was in or about April of 2016?

 8   A.   That's correct.

 9   Q.   And the circumstances were, I believe you testified,

10   following your daughter's visit to UC Santa Barbara?

11   A.   Correct.

12            MR. FRANK:  Could we play Exhibit 190, please.

13        (Audio recording played.)

14   Q.   Whose voice was that on that voicemail?

15   A.   Rick Singer.

16   Q.   Mr. Isackson, what was your reaction to receiving that

17   voicemail?

18   A.   Both my wife and I were in shock.

19   Q.   Did you have any idea what Rick Singer was talking about?

20   A.   We had absolutely no idea.

21   Q.   What do you understand him to be telling you?

22   A.   He somehow was implying that we had gone behind his back

23   and talked to the coach and maybe mentioned something about

24   Rick.  And we did nothing, we had no conversations with anyone.

25   Q.   What did you do after you received that message?
```

```
 1    A.   Well, we picked up the phone and called Rick.

 2    Q.   What did you tell him?

 3    A.   We basically said we have absolutely no idea why you would

 4    say something like that.  We've never talked to the soccer

 5    coach.  And I said, "I don't even know the guy's name."  And

 6    all of a sudden, when I said "the guy's name," he goes, "The

 7    guy's name?  It's a woman there."  I said, "I don't know,

 8    Rick."  And then the game was back on.  He believed -- he

 9    understood we had no conversations with anyone at the school.

12:43 10   He was back working with us.

11    Q.   And even after receiving that voicemail from Rick Singer

12    you continued to work with him?

13    A.   We did.

14    Q.   Why?

15    A.   Well, we were far into the process, and to start things

16    out with someone else would have been pretty difficult at that

17    point in time.

18    Q.   Did your daughter Lauren apply to UC Santa Barbara?

19    A.   No.

12:43 20   Q.   Why not?

21    A.   Rick never told us, but basically it was too late at that

22    school, we felt, with what had transpired, but he never really

23    gave us an exact real reason.

24    Q.   Did there come a time when Singer suggested another school

25    for your daughter?
```

| | |
|---|---|
| 1 | A.   Yes. |
| 2 | Q.   Which school? |
| 3 | A.   UCLA. |
| 4 | Q.   University of California at Los Angeles? |
| 5 | A.   Correct. |
| 6 | Q.   Did Singer tell you how the process would work with |
| 7 | respect to UCLA? |
| 8 | A.   Yes. |
| 9 | Q.   What did he tell you? |
| 12:43 10 | A.   She would be admitted as a soccer player to the school. |
| 11 | Q.   Was there going to be a payment? |
| 12 | A.   Yes. |
| 13 | Q.   Do you recall the amount? |
| 14 | A.   I do. |
| 15 | Q.   How much? |
| 16 | A.   $250,000. |
| 17 | Q.   Did you believe that your daughter was qualified to be |
| 18 | recruited to play soccer at UCLA? |
| 19 | A.   No, not even close. |
| 12:44 20 | Q.   Did you believe that your daughter would be admitted to |
| 21 | UCLA without being posed as a soccer recruit? |
| 22 | A.   No.  She did not have the grades or the test scores to do |
| 23 | that. |
| 24 | Q.   Did you have an understanding of what would happen if you |
| 25 | didn't agree to pay the money? |

1    A.    Yeah.  She wouldn't have got into UCLA.

2    Q.    Did you have an understanding of how the process would

3    work at UCLA?

4    A.    Yes.

5    Q.    What was your understanding?

6    A.    He would create a resume posing her as a fake soccer

7    player.  He would walk through the athletics department, his

8    contact there would walk it through the admissions, and she

9    would be accepted as a recruit.

12:45 10          MR. FRANK:  Could we show the witness only, please,

11   200.

12   Q.    And before we look at this exhibit, Mr. Isackson, did you

13   agree to pursue the scheme with respect to UCLA?

14   A.    We did.

15   Q.    Do you recognize 200?

16   A.    Yes.

17   Q.    What is it?

18   A.    It's an e-mail.

19   Q.    Who is the e-mail from?

12:45 20   A.    Rick Singer.

21   Q.    Who is it to?

22   A.    It's to my wife, Davina, cc'ing myself and my daughter

23   Lauren.

24   Q.    What's the date?

25   A.    June 29, 2016.

         1              MR. FRANK:  The government offers 200.

         2              THE COURT:  It will be admitted.

         3              (Exhibit 200 admitted into evidence.)

         4              MR. FRANK:  Can the members of the jury see that on

         5    their screen?

         6              THE COURT:  It's on the screen.  Not in the book.

         7              MR. FRANK:  Yes, on the screen.  If we could direct

         8    Mr. Isackson to the bottom e-mail in the chain, the first

         9    e-mail in the chain.

12:46   10    Q.   Do you see there's an e-mail there from Amy King,

        11    Aking@athletics.UCLA.edu to Josh Walters,

        12    jwalters@athletics.UCLA.edu, dated June 29, 2016?

        13    A.   I do.

        14    Q.   What is the subject?

        15    A.   Lauren Isackson.

        16    Q.   She writes, "Hi Josh.  Gavin, Petrina and Christina

        17    reviewed all the info and are fine moving forward with Lauren.

        18    The admissions committee approved her at the meeting yesterday

        19    so you can let her know."  Do you know who Amy King is?

12:46   20    A.   No.  I see that she's involved in athletics, though.

        21    Q.   Do you know who Josh Walters is?

        22    A.   I do.

        23    Q.   Who is Josh Walters?

        24    A.   He was the assistant women's soccer coach.

        25    Q.   Ms. King wrote, "The admissions committee approved her at

1   the meeting yesterday so you can let her know." Do you have an

2   understanding of what that refers to?

3   A.   Yeah, that the athletic department had walked her

4   athletic -- you know -- application through and admissions

5   bought off on it.

6        MR. FRANK:   If we could look at the next e-mail up in

7   the chain.

8   Q.   Do you see that Mr. Walters forwarded that e-mail to

9   somebody named Jorge Salcedo, jsalcedo@athletics.UCLA.edu?

12:47 10   A.   Yes.

11   Q.   Do you know who Jorge Salcedo is?

12   A.   I do.

13   Q.   Who is Jorge Salcedo?

14   A.   He was the men's soccer coach at UCLA.

15   Q.   Did there come a time when you had an opportunity to meet

16   Jorge Salcedo?

17   A.   Yes.

18   Q.   Who introduced you to Jorge Salcedo?

19   A.   Rick Singer did.

12:47 20   Q.   Do you have an understanding of the relationship between

21   Mr. Salcedo and Mr. Singer?

22   A.   Yes.

23   Q.   What is your understanding?

24   A.   He was Mr. Singer -- he was Rick's, you know, inside track

25   with the athletic department at the UCLA men's soccer team.

1           MR. FRANK:  If we could look at the next e-mail up in

2     the chain.

3     Q.   You see that Mr. Salcedo forwarded this e-mail to Rick

4     Singer.

5     A.   Mm-hmm.

6     Q.   And then it's cc'd to alikhosro13@gmail.com.  Do you have

7     any idea who that is?

8     A.   I do not.

9     Q.   If we could look at the next e-mail up in the chain.  Do

12:48 10    you see that Mr. Singer forwarded this on and wrote "Congrats.

11    Finally"?

12    A.   Mm-hmm, I do.

13          MR. FRANK:  If we could look at the next e-mail up in

14    the chain.

15    Q.   Do you see that your wife Davina Isackson responded,

16    "Rick, I know it's been a rough ride but I thank you from the

17    bottom of my heart and soul for your persistence, creativity

18    and commitment toward helping Lauren.  She is a great kid with

19    a wonderful potential.  I am so excited for her to enter her

12:49 20    next phase.  Now let the adventure begin."

21          Did you have an understanding of why your wife was

22    thanking Rick Singer?

23    A.   Yes.

24    Q.   What was your understanding?

25    A.   It was clear through his process, getting her in as an

| | |
|---|---|
| 1 | athlete, that she was accepted to UCLA. |
| 2 | Q.   She writes.  "PS - Audrey would like to meet with you |
| 3 | soon.  When are you around?"  Can you remind us who Audrey is? |
| 4 | A.   That's my younger daughter. |
| 5 | Q.   Did you have an understanding of why your wife was |
| 6 | referencing your daughter Audrey in this e-mail? |
| 7 | A.   Yes. |
| 8 | Q.   Why? |
| 9 | A.   She wanted to do the process, you know, the college |
| 12:49 10 | process with Rick again with my daughter. |
| 11 | MR. FRANK:  Could we show the witness only Exhibit |
| 12 | 203, please. |
| 13 | Q.   Mr. Isackson, do you recognize Exhibit 203? |
| 14 | A.   Yes. |
| 15 | Q.   What is it? |
| 16 | A.   It's an e-mail. |
| 17 | Q.   And who is it from? |
| 18 | A.   It's from myself to Rick Singer. |
| 19 | Q.   And what's the date? |
| 12:50 20 | A.   July 16, 2016. |
| 21 | Q.   July 16? |
| 22 | A.   July 11.  Excuse me. |
| 23 | MR. FRANK:  The government offers 203. |
| 24 | THE COURT:  It will be admitted. |
| 25 | (Exhibit 203 admitted into evidence.) |

```
 1   Q.   If we could, do you see the subject line of the e-mail?
 2   A.   Yes.
 3   Q.   It says "Invoice 1107 from The Key Worldwide Foundation."
 4   A.   Yes.
 5        MR. FRANK:  Ms. Lewis, could we look at the
 6   attachment, please.
 7   Q.   What is this attachment?
 8   A.   It's an invoice for Rick's services.
 9   Q.   It says "Private contribution, letter of receipt will be
10   provided upon payment."
11   A.   Yes.
12   Q.   It provides some wiring instructions below that.
13   A.   Mm-hmm.
14   Q.   And there's an amount of $250,000.
15   A.   Yes.
16   Q.   Prior to receiving this invoice, what did you know about
17   The Key Worldwide Foundation?
18   A.    Not a lot.  I mean, Rick had told us that it was an
19   accredited 501(3)(C) corporation and that he provided
20   charitable stuff to underprivileged kids as well as helped out
21   at programs at universities that needed funding.
22   Q.   Did you believe him?
23   A.   I knew that -- I shouldn't say "I knew."  I mean, I
24   thought that a small portion of what he was doing would go to
25   these legitimate charitable causes to cover up his scheme.
```

1    Q.   Did you have an understanding of why you were being sent

2    this invoice?

3    A.   Yes.

4    Q.   What was your understanding?

5    A.   It was the payment that he had told us from the beginning

6    was the amount it took to get Lauren in as a fake athlete to

7    UCLA.

8         MR. FRANK:  Ms. Lewis, if we could look again at the

9    cover e-mail, and if we could look at the second e-mail in the

12:52 10   chain.

11   Q.   You wrote, "Hi Rick.  I'm in motion getting the payment

12   processed and in that regard had a question for you.  Can you

13   please give me a call today to discuss."

14        Do you recall what you wanted to discuss?

15   A.   Yes.

16   Q.   What was that?

17   A.   I wanted to make sure that if Lauren actually didn't get

18   into the school finally, that we would potentially -- we would

19   get our money back.

12:52 20   Q.   Why were you concerned about getting your money back if

21   her admission was not finalized?

22   A.   Well, I didn't want to pay $250,000, to make a $250,000

23   gift to his charity for no reason.

24   Q.   You called it a gift?

25   A.   Excuse me.  I wouldn't want to spend $250,000, make a

1   payment of $250,000 to his organization.

2   Q.   Why did you call it a gift?

3   A.   That was a Freudian slip.  It's not a gift.  It was a

4   payment.

5   Q.   Did Mr. Singer tell you it was a donation?

6   A.   Oh, yeah.  He said it was a donation to his charity,

7   correct.

8        MR. FRANK:  If we could look at the next e-mail up in

9   the chain.

12:53 10   Q.   You wrote, "Rick, thanks for the follow-up call regarding

11   the attached Key Worldwide Foundation invoice.  Per our

12   discussion, can you please send me an e-mail confirming that if

13   Lauren is not admitted to UCLA as a freshman for the fall 2016

14   class that The Key Worldwide Foundation will refund our

15   $250,000 gift."  And again, you refer to it as a gift there.

16   A.   Mm-hmm.

17   Q.   Had you previously made charitable donations, sir?

18   A.   Yes.

19   Q.   Have you ever asked for one of them back if you didn't get

12:53 20   something in exchange?

21   A.   Never.

22        MR. FRANK:  Could we show the witness only Exhibit

23   204, please.

24   Q.   Do you recognize Exhibit 204?

25   A.   I do.

```
 1    Q.    What is it?

 2    A.    It's an e-mail.

 3    Q.    Who is it from?

 4    A.    Rick Singer.

 5    Q.    Who is it to?

 6    A.    Myself, Steve Masera and Steve Masera cc'ing my wife

 7    Davina.

 8    Q.    What's the date?

 9    A.    July 11, 2016.

12:54 10          MR. FRANK:  Government offers 204.

11                THE COURT:  It will be admitted.

12                (Exhibit 204 admitted into evidence.)

13    Q.    Mr. Singer wrote to you -- first of all, before I get to

14    the text, it's sent to you, your wife and Steve Masera.  Did

15    you have an understanding of who Steve Masera was?

16    A.    Yes.

17    Q.    Who was Steve Masera?

18    A.    He was in the accounting department at The Key Foundation.

19    Q.    And did you ever have interactions with him?

12:54 20    A.    E-mails.

21    Q.    Mr. Singer wrote, "Bruce, this is to confirm that your

22    donation of $250,000 to The Key Worldwide Foundation supporting

23    educational initiatives we have created to help those who need

24    it most will be returned if Lauren's admission to UCLA is

25    reversed from the e-mail acceptance she has already received."
```

1          Did you believe that your money was going to support

2     educational initiatives to help those who need it most?

3     A.    Absolutely not.

4     Q.    Did you pay this invoice?

5     A.    I did.

6     Q.    Why did you pay it?

7     A.    Well, I knew that if I didn't pay it, Rick would find a

8     way to have Lauren's admission revoked.

9          MR. FRANK:  Could we show the witness only Exhibit

12:55 10   208, please.

11    Q.    Do you recognize this document?

12    A.    Yes, I do.

13    Q.    What is it?

14    A.    It's basically, they say there's a receipt of the donation

15    to The Key Worldwide Foundation coming.  They're going to send

16    me a hard copy of it.

17         MR. FRANK:  The government offers 208.

18         THE COURT:  It will be admitted.

19         (Exhibit 208 admitted into evidence.)

12:55 20   Q.    Do you see that it's an e-mail from Steve Masera to you

21    and your wife copied to Rick Singer dated July 21, 2016,

22    Subject:  Receipt Letter?

23    A.    I do.

24    Q.    He writes, "Hello Bruce and Davina.  I have attached a

25    copy of your receipt letter for the donation made to The Key

1    Worldwide Foundation.  Hard copy will be mailed today also.

2    Thank you for your generosity.  Steve Masera, Director of

3    Finance at The Key."

4         MR. FRANK:  And Ms. Lewis, if we could look at the

5    receipt letter that's attached.

6    Q.   It says, "Dear Bruce and Davina.  Thank you for your

7    contribution of $251,159.51 to The Key Worldwide Foundation."

8         Sir, why is the amount different from the $250,000

9    that you were invoiced?

12:56 10   A.   Because we made this gift with stock, and selling shares

11   you couldn't equate it to an even $250,000.

12   Q.   The next sentence reads, "Your generosity will allow us to

13   move forward with our plans to provide educational and

14   self-enrichment programs to disadvantaged youth.  We are very

15   excited about the impact these programs will have in the

16   communities in which we will engage."

17        Did you believe that to be true or untrue?

18   A.   I believed that to be untrue.

19   Q.   The next sentence says, "This letter shall serve as formal

12:57 20   acknowledgment of your contribution for which no goods or

21   services were exchanged."

22        Did you believe that statement to be true or untrue?

23   A.   Totally untrue.

24   Q.   Why did you believe it to be totally untrue?

25   A.   Because the payment got our daughter admitted into UCLA,

1   so we totally had something we received.

2   Q.   Did you believe you were entitled to take a tax deduction

3   for that payment of $251,000?

4   A.   No.

5   Q.   Why not?

6   A.   Because it was an illicit gift that didn't end up going to

7   a charity, and the cost was completely illegal and we did it to

8   participate in the scheme.

9   Q.   Did you take the tax deduction?

12:58 10   A.   I did.

11   Q.   Why did you do that?

12   A.   I wanted to get the write-off.

13   Q.   Prior to this time had you previously made payments either

14   to The Key Worldwide Foundation or to Mr. Singer's for-profit

15   entity, The Key?

16   A.   I believe we had made some tutoring -- he billed us I

17   think approximately $7,000 for college counseling services

18   before this.

19   Q.   And again, that $7,000 was for what?

12:58 20   A.   For helping her with the application process, guiding her

21   through the schools and those kind of things.

22   Q.   Did you deduct those payments?

23   A.   No.

24   Q.   What happened after Lauren was admitted to UCLA?

25   A.   Approximately two and a half months after she was

admitted, the soccer program found out that she wasn't out on
the field, and it ultimately led to them to finding out that
she had had a prior concussion which happened during horseback
riding.  And, you know, they wanted -- they said that basically
now she couldn't be on the team.  You can't play with a
concussion.

Q.   What did that mean for her admission?

A.   It would have been revoked.  She would have to leave the
school.

Q.   When you said they were concerned, did you have an
understanding who was concerned that she wasn't on the field?

A.   Yeah.  It was the --

MR. KENDALL:  Objection, your Honor, hearsay.

THE COURT:  Sustained.

Q.   What happened as a result of this discovery?

A.   She basically was told that, you know, she had a
concussion, she couldn't be on the team, and she would have to
leave the school.

Q.   Did you meet with anybody as a result of that?

A.   We did.

Q.   Who did you meet with?

A.   We met with quite a few people at the school.  We met with
Gavin Crew, Christina Rivera.  We met with the head of
admissions, I believe his name is Gary Clark.

Q.   What happened at those meetings?

A.   Basically we explained to them that Lauren did have a
concussion but that we had met with doctors and that she could
go through rehab and could be a participating soccer player in
a relatively short time, probably 60 days.

Q.   During the time that you were meeting with those
officials, were you being counseled by anyone about how to
engage in those meetings?

A.   Yes.

Q.   Who was counseling you?

A.   Jorge Salcedo.

Q.   What do you recall about what he told you?

A.   He basically knew all the inner workings of what was going
on behind the scheme -- behind the scenes.  And he told us, you
know, what to expect and what was the best way to approach it.

Q.   Did you have an understanding of why he was giving you
that advice?

A.   Sure.

Q.   What was your understanding?

A.   He was involved in the scheme, and I think if Lauren left
the school, there's a good chance Rick would have taken his
money back.

Q.   You testified that at the meeting -- was there one meeting
or more than one meeting?

A.   There was only one meeting at the school.

Q.   You testified that the director of admissions was there?

1    A.    Yes.

2    Q.    Did you have an understanding from that meeting of whether

3    the director of admissions was aware that your daughter never

4    intended to play soccer at UCLA?

5    A.    He clearly didn't have any idea.

6    Q.    Did you have an understanding of whether he was aware that

7    your daughter was not qualified to play soccer at UCLA?

8    A.    No, he had no idea.

9    Q.    Did you have an understanding of why the people at that

01:01 10   meeting were so concerned that your daughter had had a

11   concussion and wasn't able to play soccer?

12   A.    Yeah, because she couldn't be a player at that point.

13   Q.    Was Lauren ultimately permitted to stay at UCLA?

14   A.    Yes.

15   Q.    How did that happen?

16   A.    They agreed to do a protocol with UCLA doctors that would

17   actually -- you know, she would have to go through and pass,

18   and it took approximately 60 days, and she was able to get

19   approvals that her concussion was subsided and she would be

01:02 20   okay to play.

21   Q.    Did she end up playing soccer at UCLA?

22   A.    No.

23   Q.    What happened?

24   A.    She actually became a team manager on the team.

25          MR. FRANK:  Your Honor, we're going to switch gears at

```
 1   this point.  Would it be an appropriate time to take a break?

 2        THE COURT:  Yes, we'll take the lunch break.  You may

 3   step down for the time being, Mr. Isackson.  We'll be in recess

 4   for one hour, jurors.  Normally lunchtime is 1:00 to 2:00.

 5   Sometimes we'll go over a few minutes, sometimes maybe a few

 6   minutes short, but I'll ask you to be back at 2:00.  We will

 7   not go after 3:30 today, and we may end a little bit before,

 8   somewhere around 2:30.  So I'll see you back here at 2:00.  You

 9   can leave those notebooks on your chairs.  You can take your

10   own notebooks if you want to.

11        (Jury exits the courtroom.)

12        THE COURT:  Be seated, counsel.  Mr. Frank,

13   approximately how much longer on direct for this witness?

14        MR. FRANK:  I was just discussing that with Mr.

15   Kendall, your Honor.  I believe he's going to take us the rest

16   of the day and possibly into tomorrow.

17        THE COURT:  All right.  Fair enough.

18        MR. TOMBACK:  Your Honor, when they opened, they

19   mentioned one witness pretty clearly, one Isackson.  Can we

20   have some clarity as to whether Davina is going to testify or

21   not, or is that still up in the air?

22        MR. FRANK:  We're waiting to conclude Mr. Isackson's

23   testimony.  We mentioned one because we didn't want to promise

24   a second if we weren't --

25        THE COURT:  I'll allow him to make that choice after
```

1     the conclusion of the examination of Mr. Isackson.

2               We're in recess until 2:00 p.m.

3               (Recess taken 1:04 p.m. to 2:03 p.m.)

4               THE CLERK:  You may be seated.  Court is now in

5     session

6               THE COURT:  Good afternoon, jurors.  We're ready to

7     resume.

8               Mr. Isackson, you're reminded you're still under oath.

9               You may continue with direct examination, Mr. Frank.

02:04 10               MR. FRANK:  Thank you, your Honor.

11                 EXAMINATION OF BRUCE ISACKSON (Continued)

12     BY MR. FRANK:

13     Q.    Good afternoon again, Mr. Isackson.

14     A.    Good afternoon.

15     Q.    When we left off, we had been talking about your daughter

16     Lauren and her admission to UCLA.  Do you recall that

17     testimony?

18     A.    Yes, I do.

19     Q.    I want you to switch gears now and talk about your younger

02:04 20     daughter Audrey.

21     A.    Okay.

22     Q.    Did there come a time where you engaged Rick Singer to

23     pursue this scheme for a second time with your daughter Audrey?

24     A.    Yes.

25     Q.    What kind of student is your daughter Audrey?  Let me

1    rephrase that question.  What kind of student was she in high

2    school?

3    A.    She was a good student, above average, mostly Bs and As.

4    Q.    Mr. Isackson, if you could bring the microphone closer to

5    you.  I think we may be having trouble hearing you.  If you can

6    speak directly into the microphone, maybe even closer if you

7    can.

8    A.    Yes.  Is that better?

9    Q.    Could you answer that question again?  What kind of high

02:05 10   school student was your daughter Audrey?

11    A.    Yeah.  She was slightly above average, mostly Bs, some As.

12    Q.    Was she an athlete in high school?

13    A.    Not at all.

14    Q.    Did you ultimately decide with Mr. Singer -- well,

15    withdrawn.

16          What college did you ultimately decide with

17    Mr. Singer to pursue admission to for her?

18    A.    To USC.

19    Q.    What, if anything, did Mr. Singer tell you about how she

02:06 20   would be admitted to USC?

21    A.    At USC, he said she would come in as a crew recruit.

22    Q.    Crew?

23    A.    Crew.

24    Q.    Did your daughter row crew?

25    A.    No.

```
 1    Q.    Had she ever rowed crew?
 2    A.    No.
 3    Q.    What, if anything, did he tell you about how much that
 4    would cost?
 5    A.    It was $250,000.
 6    Q.    What was your understanding of whether Audrey would have
 7    been admitted to USC on her own merit?
 8    A.    She didn't have the grades or the test scores to get in.
 9    Q.    Other than paying the $250,000, what, if anything, did
10    Rick Singer tell you you had to do in order to get her admitted
11    to USC as a crew recruit?
12    A.    He asked us for a headshot of her.
13    Q.    A headshot?  A photograph?
14    A.    Correct.
15    Q.    Did he tell you how the photograph would be used?
16    A.    He told us that he would be putting together information,
17    a resume, making her out to be a high level high school recruit
18    for colleges as a crew person.
19    Q.    Was he that specific or was that something you understood
20    from what he told you?
21    A.    Yeah.  That's -- yes.  That's what I understood from him.
22    He said he would put together everything that was needed to
23    handle the application.
24    Q.    What was your understanding of what the athletic profile
25    would say about your daughter?
```

1    A.   Well, make her out to be an athlete, Division 1 athlete,

2    for a sport she'd never entered in her life and never been in a

3    crew boat or anything.

4    Q.   What, if anything, did Mr. Singer tell you Audrey would

5    have to do at USC once admitted pursuant to the scheme?

6    A.   He was pretty clear.  He said she didn't have to do

7    anything, she didn't even have to go to -- around the crew area

8    at all.

9    Q.   What did he tell you about the money?

02:08 10    A.   That we'd make a payment to his foundation, and it would

11    be funneled to the athletic program at USC.

12    Q.   What was your understanding of what would happen if you

13    didn't pay the money?

14    A.   She wouldn't have gotten into the school on her grades or

15    her test scores.

16    Q.   Could we show the witness -- well, before I do that, did

17    you agree to pursue this scheme with respect to your daughter

18    Audrey?

19    A.   Yes, we did.

02:08 20    Q.   Could we show the witness only Exhibit 447.  As that's

21    being pulled up on your screen, Mr. Isackson, did you, in fact,

22    send a photograph of your daughter to Mr. Singer for use in an

23    athletic profile?

24    A.   We did.

25    Q.   Do you recognize Exhibit 447?

| | |
|---|---|
| 1 | A.   Yes. |
| 2 | Q.   What is it? |
| 3 | A.   It's an e-mail. |
| 4 | Q.   Who's it from? |
| 5 | A.   From Rick Singer. |
| 6 | Q.   Who is it to? |
| 7 | A.   To my daughter Audrey, my wife, Davina, and myself. |
| 8 | THE COURT:  Mr. Isackson, I'm going to ask you to |
| 9 | please move the microphone so that the microphone can come |
| 02:09 10 | closer to your mouth, please. |
| 11 | THE WITNESS:  Is this better?  Sorry about that. |
| 12 | Q.   What is the date of this e-mail? |
| 13 | A.   It's December 15, 2017. |
| 14 | MR. FRANK:  The government offers Exhibit 447. |
| 15 | THE COURT:  It will be admitted. |
| 16 | (Exhibit 447 admitted into evidence.) |
| 17 | Q.   Do you see that the e-mail appears to be forwarding an |
| 18 | attachment? |
| 19 | A.   Yes. |
| 02:09 20 | Q.   And the name of the attachment, it says "Aubrey"? |
| 21 | A.   Yes. |
| 22 | Q.   Is that a typo? |
| 23 | A.   I assume so, yes. |
| 24 | Q.   What's your daughter's name? |
| 25 | A.   Audrey, A-U-D-R-E-Y. |

1    Q.    It says, "Please attached letter.  Please keep this hush

2    hush till late March."

3            Can we look at the attachment, please.  Do you

4    recognize the attachment?

5    A.    Yes.

6    Q.    What is it?

7    A.    The acceptance from the Dean of Admissions at USC.

8    Q.    It reads in the first paragraph, "Dear Audrey,

9    Congratulations!  I am pleased to inform you that the Admission

10   Committee, after careful review of your credentials, has

11   approved your admission to the University of Southern

12   California for the fall 2018 semester.  Your records indicate

13   that you have the potential to make a significant contribution

14   to the intercollegiate athletic program, as well as to the

15   academic life of the university.  I can assure you that the

16   faculty and staff will do all that we can to support you in

17   achieving your goals as a student athlete at USC."

18           Mr. Isackson, did you believe that your daughter

19   Audrey had the potential to make a significant contribution to

20   the intercollegiate athletic program at the University of

21   Southern California?

22   A.    No.

23   Q.    Did you believe she would be a student athlete at USC?

24   A.    No.

25   Q.    If we look at the second paragraph, it reads, "Please be

1    advised that this letter of acceptance is based upon a

2    preliminary review of your academic records.  In order to

3    validate this acceptance you must: One, complete in full an

4    undergraduate application by January 15, 2018."

5          The date of this letter is December 14, 2017.  As of

6    the date of this letter, had your daughter even applied to USC?

7    A.   No.

8    Q.   If we look at point three, it says "Register with the NCAA

9    Eligibility Center."  Did you have an understanding as to why

02:11 10   your daughter needed to register with the NCAA Eligibility

11   Center?

12   A.   Yeah.  That's where the athletes went to go to sign up.

13   Q.   Below the numbered points, it says, "If these conditions

14   are not met, your approval will be revoked.  On behalf of the

15   university, I would like to express our pleasure with your

16   commitment to USC.  We are delighted to welcome you to our

17   community of scholars and to our athletic program."

18         Who is it signed by?

19   A.   The Dean of Admissions, Timothy Brunold.

02:12 20   Q.   Could we look at the cover e-mail, please.  Now, you see

21   that this e-mail was forwarded to Mr. Singer before he sent it

22   to you.  If we could just enlarge that.  Who was it forwarded

23   from?

24   A.   Rick Singer.

25   Q.   Who was it sent to Mr. Singer by?

1    A.    Donna Heinel.

2    Q.    Can you read into the record Ms. Heinel's signature block,

3    please?

4    A.    Sure.  Donna C. Heinel, Ed, Senior Athletic Director/SWA,

5    Associate Professor-Rossier School of Education, University of

6    Southern California.

7    Q.    I believe that's a senior associate director?

8    A.    Senior associate director, yes.

9    Q.    Did you have an understanding of why Donna Heinel was

02:13 10   sending this letter of preliminary acceptance to Mr. Singer?

11   A.    Yes.

12   Q.    What was your understanding?

13   A.    That was Rick's contact at USC that he had a relationship

14   with.  She was letting him know that Audrey had been accepted

15   early.

16   Q.    Prior to receiving this e-mail, had you heard the name

17   Donna Heinel?

18   A.    Yes.

19   Q.    Who had you heard it from?

02:13 20   A.    Rick Singer.

21   Q.    Again, what was your understanding from Mr. Singer of who

22   she was?

23   A.    He had mentioned her several times as his contact in the

24   athletic department at USC.

25   Q.    Mr. Singer wrote to you at top, "Please attached letter.

```
 1    Please keep this hush hush till late March."
 2              Did you have an understanding of why you needed to
 3    keep your daughter's admission to USC hush hush until late
 4    March?
 5    A.   Yes.
 6    Q.   What was your understanding?
 7    A.   She hadn't applied to the school.  Her high school -- you
 8    know, college people that helped her out at her high school
 9    would have no idea that she had an application that had not
10    been submitted and now she's already accepted.  It would have
11    been awfully strange.
12    Q.   What was your understanding of what would have happened if
13    you told people she had been admitted?
14    A.   They would have figured out that something was awry.
15              MR. FRANK:  Could we show the witness only, please,
16    Exhibit 450.
17    Q.   Do you recognize Exhibit 450?
18    A.   Yes.
19    Q.   What is it?
20    A.   It's an e-mail.
21    Q.   Who is it from?
22    A.   My wife Davina.
23    Q.   Who is it to?
24    A.   Rick Singer, cc'ing my daughter Audrey, myself, and then
25    Steve Masera at the Key Worldwide Foundation.
```

1             MR. FRANK:  Government offers 450.

2             THE COURT:  It will be admitted.

3             (Exhibit 450 admitted into evidence.)

4             MR. FRANK:  Ms. Lewis, if you can just enlarge a

5      little more so we can see what Mr. Isackson is responding to.

6      Thank you.

7      Q.    Mr. Isackson, do you see that your wife is responding to

8      Mr. Singer's forwarding that acceptance letter?

9      A.    I do.

02:15 10    Q.    She says "Rick, thank you for your e-mail.  Very exciting

11     news.  We will definitely lay low until March, satisfy the

12     requirements in the letter, as well as continue through the

13     regular application process and deadlines on Audrey's other

14     colleges."

15             Why was Audrey continuing to apply through the

16     regular process to other colleges if she'd already been granted

17     preliminary approval to go to USC?

18     A.    I think I mentioned before, her high school, as most do,

19     helped her with the application process.  She had to keep the

02:15 20    ruse going.  We had to keep the ruse going that she was doing

21     it the traditional way to get into schools.

22     Q.    What did you think would happen if you told Audrey's high

23     school that she was not continuing with the regular application

24     process to other colleges?

25     A.    They wouldn't understand any reason for that.

```
 1              MR. FRANK:  Could we show the witness only, please,
 2    Exhibit 506.
 3              Mr. Isackson, do you recognize Exhibit 506?
 4    A.   Yes.
 5    Q.   What is it?
 6    A.   It's an e-mail.
 7    Q.   Who is it from?
 8    A.   It's from Melissa Rail from The Key Worldwide Foundation.
 9    Q.   You see she forwards it to you and your wife?
02:16 10   A.   Correct.
11    Q.   What's the date?
12    A.   April 9, 2019 -- 2018, excuse me.
13              MR. FRANK:  The government offers Exhibit 506.
14              THE COURT:  It will be admitted.
15              (Exhibit 506 admitted into evidence.)
16    Q.   Do you see at the top it says "Forward invoice 1167 from
17    the Key Worldwide Foundation"?
18    A.   Yes.
19    Q.   At the bottom, it's from Melissa Rail.  Do you know who
02:17 20   Melissa Rail was?
21    A.   No.
22    Q.   It says "Dear Davina, thank you for your generous donation
23    to the Key Worldwide Foundation.  Attached is a courtesy
24    invoice which includes our wire instructions," and then it goes
25    on from there.
```

1          Can we take a look at the attachment, please.

2          What is the attachment?

3    A.   It's an invoice.

4    Q.   Who's the invoice from?

5    A.   The Key Worldwide Foundation.

6          MR. FRANK:  Ms. Lewis, if you could highlight the

7    description and the amount.

8    Q.   It says "Private Contribution - letter of receipt will be

9    provided upon payment," "Amount," "$250,000".  Did you know,

02:18 10   sir, why you were receiving this invoice?

11   A.   Yes.

12   Q.   Why?

13   A.   It was our payment to get Audrey admitted as a fake

14   athlete to USC.

15   Q.   Did you know where that money would go?

16   A.   Yes.

17   Q.   What did Rick Singer tell you about where that money would

18   go?

19   A.   Rick said it would be funneled to the USC athletic

02:18 20   program.

21   Q.   Did you know, sir, who would ultimately decide on your

22   daughter's admission to USC?

23   A.   Yes.

24   Q.   Who would decide on her admission?

25   A.   The admissions department.

Q.   Did you know why you needed to lie on Audrey's application
about her athletic abilities?

A.   Yeah.

Q.   Why?

A.   She would not have gotten into school on her grades or her
test scores.

Q.   Did you know if the admission department -- did you have
an understanding about whether the admission department knew
that?

A.   No.  There would be no reason to lie if the admissions
department knew about it.

          MR. FRANK:  We can take that down.

Q.   As a part of Audrey's application process, did there come
a time when you also engaged Mr. Singer in connection with her
standardized college admission tests?

A.   Yes.

Q.   Tell us about that.

A.   He said he had a controlled environment in LA where he
would have a proctor administer the test with her one-on-one
and had the ability to change the score after she took the
test.

Q.   Let's break that down a little bit.  First of all, you
said he told you he had a controlled environment in LA.  What
did you understand him to mean by "a controlled environment in
LA"?

```
 1   A.   That it was something that he oversaw and he was
 2   responsible for and he knew exactly the process of the test
 3   taking and how it started from beginning to end.
 4   Q.   What, if anything, did he tell you you would need to do to
 5   have Audrey take the test in the controlled environment?
 6   A.   That she would have to have testing shown that she needed
 7   additional time to do the test.
 8   Q.   How would she get additional time?
 9   A.   Well, basically, if you have -- if it's determined that
10   you have, I would say, below standard -- you just need more
11   time to process the questions than the average student, then
12   they'd allow you to have more time.
13   Q.   And once she got more time, what did you understand would
14   happen?
15   A.   She was able to go to Rick's testing center with the
16   proctor that he had placed in there.
17   Q.   What did you understand would happen there?
18   A.   Audrey would take the test, and when she was finished, the
19   proctor would review it and change the scores to get the score
20   that Rick felt was needed to get her into the school.
21   Q.   Was there a cost associated with that?
22   A.   Yes.
23   Q.   How much?
24   A.   Two hundred -- oh, for that.  Excuse me.  That was
25   $100,000.
```

1    Q.   Did you agree to participate in that part of the scheme?

2    A.   We did.

3    Q.   Did Audrey ultimately -- did there come a time when Audrey

4    ultimately went to Los Angeles to take the test at Mr. Singer's

5    controlled facility?

6    A.   Yes.

7    Q.   Where do you live?

8    A.   We live in Hillsborough, California.

9    Q.   How far is Los Angeles from Hillsborough?

02:21 10    A.   It's about a six- or seven-hour car ride.

11   Q.   Where would Audrey have taken the test if she had not --

12   if you had not pursued the scheme?

13   A.   Most likely at her high school.

14   Q.   How far is that from your house?

15   A.   15 or 20 minutes.

16   Q.   What happened when Audrey took the test in LA?

17   A.   She finished the test and told us that she thought she did

18   really well.  When she came home --

19   Q.   Sorry?

02:22 20    A.   When she came home, she told us she thought she did really

21   well.

22   Q.   What happened after that?

23   A.   We called Rick to see how the test went.  I remember his

24   words exactly.  He said, excuse my language, "She did shit."

25   Q.   What was your reaction when he told you that?

```
 1   A.    We were surprised because Audrey studied pretty hard for
 2   the test and thought she had done well on her own.
 3   Q.    So what happened?
 4   A.    Rick said that they had to change the score.
 5   Q.    Did he tell you what he thought they should change the
 6   score to?
 7   A.    Yes.
 8   Q.    What did he tell you?
 9   A.    It was a 31 on the ACT test.
10   Q.    Did you agree?
11   A.    We did.
12   Q.    What score did Audrey ultimately receive on the ACT?
13   A.    She got a 31.
14   Q.    Did you make a payment in connection with that scheme?
15   A.    We did.
16   Q.    How much?
17   A.    $100,000.
18   Q.    Where did you make that payment to?
19   A.    To the Key Worldwide Foundation.
20   Q.    Did you believe that that payment was going to charity?
21   A.    No.
22   Q.    How did you think the money was being used?
23   A.    Only one way it could go.  It would be to Rick and to his
24   proctor that administered the test.
25   Q.    Did there come a time when you took a tax deduction in
```

1    connection with that purported donation?

2    A.    Yes.

3    Q.    Did you think it was a legitimate deduction to which you

4    were entitled?

5    A.    No.  I knew it wasn't.

6    Q.    Why did you take the deduction?

7    A.    I wanted to get the write-off.

8    Q.    Mr. Isackson, did there come a time when you engaged with

9    Rick Singer again with respect -- actually, withdrawn.

02:23 10         Do you know whether that test score you obtained

11   through this scheme was used in connection with your daughter's

12   college applications?

13   A.    Yes.

14   Q.    How it was used?

15   A.    It was part of her application process that was sent into

16   her -- sent into the school.

17   Q.    Was it sent into one school or more than one school?

18   A.    I know I sent it to USC.  I don't recall where else it was

19   sent to.  That was the score that was used for testing.

02:24 20   Q.    Did there come a time when you engaged Mr. Singer again

21   with respect to your son Ryan?

22   A.    Yes.

23   Q.    How so?

24   A.    We started the process of talking with him about working

25   with Ryan.

1  Q.   What did you intend to do with Rick Singer with respect to

2  your son Ryan?

3  A.   Used him in the same process for college as we used for

4  our two daughters.

5  Q.   I want to direct your attention now to October of 2018.

6  Do you have that time in mind?

7  A.   Okay.

8        MR. KELLY:  I'm sorry.  What time?

9        MR. FRANK:  October of 2018.

02:24 10  Q.   Mr. Isackson, do you recall receiving a telephone call

11  from Mr. Singer in October of 2018?

12  A.   I do.

13  Q.   What did he tell you in that call?

14  A.   He said his foundation was being audited by the IRS.

15  Q.   Prior to coming here today -- well, on your -- on the desk

16  in front of you, there's a disc labeled Exhibit 671.  Do you

17  see that disk?

18  A.   I do.

19  Q.   Do you recognize it?

02:25 20  A.   I do.

21  Q.   How do you recognize it?

22  A.   I've listened to it and I've initialed it as well.

23  Q.   Prior to coming here today, you had an opportunity to

24  listen to it you said?

25  A.   I have.

```
 1    Q.    What is it?

 2    A.    It's a recording of conversation, a telephone call between

 3    Rick and me and his foundation being audited.

 4          MR. FRANK:  The government offers 671.

 5          THE COURT:  It will be admitted.

 6          (Exhibit 671 admitted into evidence.)

 7          MR. FRANK:  If the jurors could turn in their binders

 8    to the tab labeled 671.

 9    Q.    Mr. Isackson, if you could do the same.  Prior to coming

10    here today, have you had an opportunity to review that

11    transcript?

12    A.    I have.

13    Q.    Is it a fair and accurate transcript of the recording?

14    A.    Yes, it is.

15    Q.    And are those your initials at the bottom of the page?

16    A.    Yes.

17          MR. FRANK:  Ms. Lewis, if we could start at the

18    beginning.

19          (Audio recording played.)

20    Q.    Mr. Isackson, I just want to ask you a few questions.

21    First of all, do you recognize Mr. Singer's voice on that call?

22    A.    I do.

23    Q.    If I could direct your attention to page 2 of the

24    transcript at line 6, Mr. Singer said, "So they asked about

25    your payments."  Did you have an understanding of who "they"
```

1    was?

2    A.    Yes.

3    Q.    What was your understanding?

4    A.    It was the IRS.

5    Q.    He said one of them was for when Mark took the test for

6    Audrey.  Had you heard the name Mark before this phone call?

7    A.    No.

8    Q.    Did you have an understanding of who that referred to?

9    A.    Yes.

02:28 10    Q.    Who did it refer to in your understanding?

11    A.    Would have been the proctor in the test who changed the

12    results.

13    Q.    You responded, "Okay."  Was that because you knew what he

14    was talking about?

15    A.    It was just shorthand for the process that took place.

16    Q.    Did you have an understanding of what he was talking

17    about?

18    A.    Yes.

19    Q.    At line 9, he says "The payment that we made to Jorge to

02:29 20    help Lauren get into UCLA through soccer."  You again responded

21    "Okay."  Did you have an understanding of who he was referring

22    to there?

23    A.    Yes.

24    Q.    Who?

25    A.    The payment that we made to get Audrey admitted as a fake

```
 1   athlete at UCLA.

 2   Q.   Who was Jorge?

 3   A.   Jorge was the men's soccer coach.

 4   Q.   Then he says, at line 12, "and then the payment that we

 5   made to Donna Heinel at USC to help Audrey get in through

 6   crew."

 7            Did you have an understanding of what he was

 8   referring to there?

 9   A.   Yes.

10   Q.   What did you understand him to be referring to?

11   A.   Again, Donna Heinel helped Audrey in her admissions

12   process at USC.

13   Q.   When he said to you "The payment that we made to Donna

14   Heinel," did you understand him to be suggesting to you that

15   the payment had gone to Donna Heinel personally?

16            MR. KELLY:  Objection.  Leading.

17            THE COURT:  Sustained.

18   Q.   What was your understanding of what he was telling you

19   about where the payment was going when he said "Payment that we

20   made to Donna Heinel"?

21   A.   He was just talking about the process of how he did it

22   through the athletic department.

23   Q.   Did you have an understanding of where that money -- what

24   did he tell you about where that money was going?

25   A.   He told us the money was going to the USC athletic
```

1  program.

2  Q.   Did you have an understanding of whether or not he was

3  telling you anything different in this call?

4  A.   It was just the process, shorthand, so to speak, how it

5  took place, how he sent the money in.

6  Q.   At line 15, he says, "Of course, I'm not going to tell the

7  IRS this is where the money went, how the money was.  So I

8  just -- I just want to make sure that what I've told them so

9  far is that that 600K plus has actually gone to pay to our

02:31 10  foundation for underserved kids," and you responded, "Uh-huh."

11        Why did you respond "uh-huh"?

12  A.   Because I wanted to be on board with him in that program

13  keeping it disguised.

14  Q.   Was it true, in your understanding, that the money was

15  going to pay for underserved kids?

16  A.   Absolutely not.

17  Q.   Could we pick up at line 24, please.

18        (Audio recording played.)

19  Q.   You heard yourself say "Sure, sure"?

02:32 20  A.   Yes.

21  Q.   If we could go back to page 3, at the top of the page,

22  line 1, Mr. Singer asks you, "Did you take a write-off for

23  those," and you responded, "I did take a write-off for those,

24  yes."  What did you mean by that?

25  A.   I took a tax deduction for all those checks that I wrote.

1    Q.   At line 12, you said, "You know, if we do get audited or

2    something, we would need a letter or something like that."

3              What were you talking about?

4    A.   If we did get audited, we'd have to have some proof saying

5    we made a gift to a charitable 501(c)(3), so we'd asked for

6    that letter.  We had only gotten it for the first one, not the

7    last two.

8    Q.   You had not gotten it for your daughter?

9    A.   Yeah.  We didn't get it for Audrey for USC, nor for the

02:33 10  test taking.

11   Q.   Why did you want the letter?

12   A.   To keep the ruse going with the IRS that we had made a

13   charitable gift.

14   Q.   At line 17, Mr. Singer says, "so I just wanted to make

15   sure our stories are aligned," and you responded, "Yeah".

16             Why did you respond "yeah"?

17   A.   Because I wanted to be on the same page as him.  I did not

18   want to have the scheme blown up in our face.

19   Q.   At page 4, at line 3, Mr. Singer says, "I'm just saying

02:34 20  that everything went to our foundation to help underserved

21   kids, right?"  And you respond at line 6, "But how -- what do

22   they -- do they track that, Rick, though or how do they? Will

23   they?"

24             Who is the "they" you're referring to?

25   A.   The IRS.

 1    Q.    When you said "do they track that", what were you

 2    concerned about the IRS tracking?

 3    A.    The flow of money and where it went.

 4    Q.    Why were you concerned about that?

 5    A.    Because it would be fairly hard for him to hide all that

 6    money going into the foundation and going from there to USC

 7    when I knew a good portion of that money was going into his

 8    pockets and the people who helped him.

 9    Q.    When you said you knew a good portion of that money was

02:35 10   going into his pocket and the people that helped him, was that

11    anything that he ever told you?

12    A.    No.

13    Q.    So why did you have that belief?

14    A.    Well, I did not think that Rick was in the business of

15    working full-time for charitable causes.

16    Q.    If we could pick up line 17, please.

17          (Audio recording played.)

18    Q.    You said at line 4 on page 5, "I'm assuming that we're not

19    the only people they're asking about."

02:36 20          What other people were you referring to?

21    A.    Well, Rick had told me that tons and tons of parents, and

22    I would think there would be a lot of people that would be

23    going through their returns.

24    Q.    At line 8, Mr. Singer says, "Tons, tons of people".  And

25    you respond at line 9, "Okay.  Okay.  Good".  Why was that good

1    in your view that there were tons of people involved?

2    A.    If there was a lot of people, there would be a lot of

3    returns to go through.  Most of these people have very

4    complicated returns.  It would be pretty hard to figure things

5    out.

6    Q.    Who would it be hard -- who would have a hard time

7    figuring things out?

8    A.    The IRS.

9          MR. FRANK:  Could we pick up at line 9, please.

02:38 10         (Audio recording played.)

11   Q.    Mr. Isackson, if I could direct your attention to the

12   bottom of page 5 at line 23, you said at line 23, "But you

13   don't think that they would look at the paper trail on it and

14   try to dig deeper or what's your feeling on it?"

15         What paper trail were you referring to?

16   A.    The flow of money from this foundation out.

17   Q.    What was your concern?

18   A.    It was pretty obvious that Rick wasn't doing this all for

19   charitable causes and was helping people --

02:39 20         THE COURT:  I'm having a hard time hearing you.  Pull

21   it over closer to you, please.

22   A.    It was pretty clear that Rick had a lot of people helping

23   him with this scheme, and they would have to be compensated, as

24   well as himself.

25   Q.    At the top of page 7, Mr. Singer says, "He was asking if I

1    had a boy candidate that wanted to get in through UCLA soccer,

2    make the payments, and I didn't know if, you know, potentially

3    Ryan would be one of those".

4              Again, sir, were you considering the scheme at this

5    point for your son Ryan?

6    A.    Yes.

7    Q.    Did he play soccer?

8    A.    He did play soccer.

9    Q.    Did he play at a level that, in your view, was sufficient

02:40 10   to be recruited at the collegiate level?

11   A.    No, not even close.

12   Q.    At line 14 on page 7, you said, "Well, I'm wishing you the

13   best in this thing for both of us here".

14              Why were you wishing Mr. Singer the best for both of

15   you?

16   A.    I was just trying to be nice, but my goal was that we

17   would both be okay in this, so I would be okay in this.

18   Q.    Were you concerned that he wouldn't be?

19   A.    Absolutely.

02:40 20   Q.    At the time of this phone call, sir, did you have any idea

21   that you were being recorded?

22   A.    No.

23   Q.    What was your reaction to receiving this phone call?

24   A.    I was in shock.

25   Q.    I want to direct your attention now to a few months late

1    in December of 2018.  Do you recall a time in or about December

2    of 2018 when Rick Singer visited you at your home?

3    A.    I do.

4    Q.    What were the circumstances of that visit?

5    A.    He came to meet with Ryan and started the process,

6    interview colleges.

7    Q.    Could you bring the mic even close?

8    A.    I'm really sorry.

9              He was beginning the process of college with Ryan.

02:41 10   Q.    Was he going to meet with you or was he going to meet with

11   Ryan?

12   A.    Both of us.  He met with me and Ryan.

13   Q.    Did he meet with you independently?

14   A.    We talked first, yes.

15   Q.    Did there come a time when you learned that Rick Singer

16   was wearing a wire during that visit?

17   A.    Yes.

18   Q.    When did you learn that?

19   A.    After the fact.

02:41 20   Q.    At the time you were not aware of it?

21   A.    No.

22   Q.    On your desk in front of you is a disk marked Exhibit 607.

23   Have you had an opportunity to review Exhibit 607?

24   A.    Yes, I have.

25   Q.    Do you see your initials and the date on there?

```
 1    A.    I do.

 2    Q.    What is that?

 3    A.    It's a recording of the visit between Rick and myself.

 4          MR. FRANK:  Government offers 607.

 5          THE COURT:  It will be admitted.

 6          (Exhibit 607 admitted into evidence.)

 7    Q.    If I could direct you and the jury to Tab 607 in your

 8    transcript binders.  Do you have that in front of you, sir?

 9    A.    I do.

10    Q.    Mr. Isackson, the jury's going to have the entire audio

11    recording in evidence, but I'm only going to refer you to

12    certain parts right now.

13    A.    All right.

14    Q.    I'm going to start on page 1 at line 20.

15          MR. FRANK:  Miss Lewis, if we can start at 1 minute,

16    37 seconds.

17          (Audio recording played.)

18    Q.    What happened in the next few pages of this recording?

19    A.    Rick wanted me to go throughout our remodel, and that's

20    what I did.

21    Q.    You showed him around the house?

22    A.    Yes.

23    Q.    During the conversation with Mr. Singer, did there come a

24    time when you discussed investments in business ventures?

25    A.    Yes.
```

```
 1   Q.   Tell us about that.

 2   A.   Rick told me he was involved in a development in Tahoe and

 3   he had homes and he wanted my advice and the best way to market

 4   it because he was trying to get out of his investment.

 5   Q.   Did he tell you about what other investments he had?

 6   A.   Yes.

 7   Q.   What, if anything, did he tell you about a gym in Oakland?

 8   A.   He said that he invested in a gym in Oakland, and they

 9   were putting on basketball games, and he was running that, and

10   it was pretty profitable.

11   Q.   What, if anything, did he tell you about Sacramento Kings?

12   A.   He told me he was a part owner in the Sacramento Kings.

13   Q.   Did you believe him when he told you those things?

14   A.   No.

15   Q.   Why not?

16   A.   Well, to be a part owner of the Sacramento Kings would be

17   a multimillion dollar investment.  I didn't think Rick had

18   anywhere near those kind of resources.

19   Q.   I want to direct you now to page 25 of the transcript at

20   line 24.

21        MR. FRANK:  Miss Lewis, could you start the audio at

22   18 minutes and four seconds.

23        (Audio recording played.)

24        MR. FRANK:  We can stop there.

25   Q.   Mr. Isackson, if you'll turn to page 26.  At line 10, you
```

```
 1   said, "I'm so paranoid about this F'ing thing you were talking
 2   about.  I don't even like talking about it on the phone".
 3          What thing were you referring to?
 4   A.   The IRS auditing his foundation.
 5   Q.   Why were you paranoid and why did you not want to talk
 6   about it on the phone?
 7   A.   I thought there was a chance they could be taping his
 8   phones, and if they hear our conversation about it, I was
 9   talking clearly that I knew about the scheme.
10   Q.   If we could turn to page 28, at line 15, Mr. Singer says,
11   "Money's going to Georgetown over here.  It's going to USC over
12   here."
13          At line 18, "It's going, and then it's going to the
14   we have the place in Oakland.  It's going to fund that."
15          At line 22, "It's taking kids to camp."
16          At line 24, "it's doing this.  It's doing that."
17          Did you believe Mr. Singer's money from his
18   foundation was going to all those different places?
19   A.   I knew he was filtering a little bit of his money to cover
20   up his scheme.  I knew that the majority of it was not going to
21   anything other than his pockets and people who were involved
22   with him.
23   Q.   If we can pick up at page 29, line 10.
24          (Audio recording played.)
25          MR. FRANK:  We can stop it there.
```

1    Q.   Mr. Isackson, if you can turn back to page 29 of the

2    transcript, at line 22.  You said, "For example, when we did

3    the testing thing."  What were you referring to?

4    A.   That was a test that Rick had his proctor administer for

5    Audrey.

6    Q.   At the top of page 33, you asked, "That was as a gift,

7    right?"  What did you mean by that?

8    A.   I wanted to confirm he put that down as a gift.

9    Q.   What do you mean by a gift?

02:53 10   A.   Well, it was a payment for the testing, but I wanted to

11   make sure that he had shown it as a charitable gift to his

12   foundation.

13   Q.   At line 3, you said, "And they're not -- there's no way

14   they could correlate and say that wasn't for a gift.  That

15   would only be if they would talk to you about that and say,

16   where did that go, right?  You know what I'm saying?"

17        What did you mean by that, there was no way they

18   could correlate and say that wasn't for a gift?

19   A.   Unless he said something, I was hoping they would not be

02:53 20   able to figure it out.

21   Q.   If you could turn to page 34 at line 2, Mr. Singer said,

22   "It's part of a lot of other, right?"  And at line 5, "Well,

23   because a lot of other money is in the pot."  And you said,

24   "Coming in the pot, right?"

25        What pot were you referring to?

1    A.    All the other parents had given money.  There was a lot of

2    money coming in and going through the foundation, so it would

3    be difficult to figure things out.

4    Q.    What parents did you have an understanding had put money

5    into the foundation?

6    A.    I thought it could be hundreds of them.

7    Q.    What was your understanding of why parents were putting in

8    the foundation?

9    A.    They were doing the same thing I was.

02:54 10    Q.    Did you know which specific parents?

11    A.    Not exactly.

12    Q.    Why did it matter to you that other parents were putting

13    money in the same pot as you?

14    A.    Well, if there was a lot of parents doing that, that would

15    make the whole scheme a lot more complicated.  Those would be

16    very difficult returns to go through, pretty thick process with

17    tens and tens of people.  It would be a tough thing to figure

18    out.

19    Q.    At line 23, Mr. Singer said, "Put it this way:  There's

02:54 20    lots of people that have done it."  At page 35, line 1, you

21    said, "Oh, no.  I know.  Oh, oh, Goddamn it.  I know that".

22          What did you know?

23    A.    I knew that a lot of other parents had done the same thing

24    I had done.

25    Q.    If we could turn back to page 36 and pick up again at line

1    2.

2              (Audio recording played.)

3    Q.   At the bottom of page 37, line 22, you said, "I don't know

4    where, how your money goes.  Obviously people are getting, you

5    know, so you're -- they'll be only be able to track maybe, you

6    know, a third of it going out to, so to speak, charity stuff.

7    Will they -- does that sound like something that's going to be

8    a big red flag or what do you think?"

9              What did you mean when you said they'd only be able

02:57 10   to track maybe, you know, a third of it going out to charity?

11   A.   I was giving a rough percentage of the amount I thought he

12   was trying to hide by giving it to charitable entities at the

13   colleges and whatnot, and two-thirds of it or more would be

14   going to himself and his people involved in this scheme.

15   Q.   When you say to himself and people involved in this

16   scheme, what did you mean by that?

17   A.   Again, Rick wouldn't do this with tons and tons of parents

18   just to try and get charity -- to sort of --

19             MR. KENDALL:  Objection, your Honor.

02:58 20            THE COURT:  Sustained.

21   Q.   What was your understanding of why a third of the money

22   would be going to charity?

23   A.   It was just commonsense.

24   Q.   At line 9, Mr. Singer said, "There's stuff going to

25   universities".

1           At line 18, he said, "You could see -- you'd have to
2    understand college to understand the correlation that money
3    went to the school to help the kid get in?"
4           At line 23, he said, "You'd have to know dates.
5    You'd have to be able to figure out."
6           Did you have any idea what he was talking about
7    there?
8    A.    Yes.
9    Q.    What did you think he was talking about?
02:59 10   A.    He was saying if they dug really deep, they could see the
11   year they wrote a large check, their child got into a large
12   university, and they would put those two and two together and
13   it would be pretty peculiar.
14   Q.    Can we pick up at page 39 at the top.
15           (Audio recording played.)
16   Q.    Mr. Isackson, at page 41 -- first of all, line 8, there's
17   a quiet moment on the recording.  There's a barely audible
18   voice that says "Why don't you send a PDF."  Do you have an
19   understanding of what was happening there?
03:02 20   A.    Yeah.  I think Rick was just typing on his phone while we
21   were having our meeting for some reason.  That was him talking
22   as he was doing it.
23   Q.    At line 13, you said, "I don't even take the write-offs,
24   you know, for taking people out to lunch and those kind of
25   things because, to me, just as I said to my accountant, for me

```
 1   the ten or 15 grand off my statement and have them come back
 2   and say show me those receipts or do this or that, I'd just
 3   rather do it, so I really -- everything I do is clean."
 4           Was it really true that everything you did was clean?
 5   A.   No.
 6   Q.   What wasn't clean?
 7   A.   This process with my children and the process of the test
 8   taking and that taking that deduction as well too, the college
 9   payments.
10   Q.   Was it true when you said "I don't take write-offs for
11   taking people out to lunch and those kind of things"?
12   A.   Yes.
13   Q.   Do you think you would actually be entitled to those kind
14   of deductions for actual business expenses?
15   A.   Yeah.
16   Q.   I'm sorry?
17   A.   Yes.  You take people out to lunch, you can write that off
18   if it's business related.
19   Q.   Did you think that because you didn't take those
20   deductions you were entitled to take these deductions?
21   A.   No.  Not at all.  It had nothing to do with it.
22   Q.   At page 42, you said, at line 3, "That's all in your, in
23   your, in your 10 years, 50.  Okay."
24           Then, at line 6, you said, "Okay, but so -- and
25   there's some big people."
```

```
 1              He said, "Huge people, right?  Big, big people."
 2              What was your reaction when Mr. Singer told you he
 3     had done this for about 50 people?
 4     A.   I was surprised.
 5     Q.   Why were you surprised?
 6     A.   I figured he'd average five people a year, the way he
 7     described this scheme.  I thought there was a lot more have
 8     gone their kids take the test that way.
 9     Q.   Did you want there to be more people involved?
10     A.   Absolutely.
11     Q.   Why?
12     A.   Again, the more people involved, the more returns the IRS
13     would go through, the much more complicated it would be to
14     figure this out.
15              MR. FRANK:  Can we pick up at page 42, line 11.
16              (Audio recording played.)
17              MR. FRANK:  We can stop there, please.
18     Q.   Mr. Isackson, if you can turn back to page 24 of the
19     transcript.  At line 17, you said, "you know, if they get into
20     the meat and potatoes, this could be the -- the front page
21     story with everyone from Kleiner Perkins through whatever
22     getting these kids into school".
23              First of all, who's Kleiner Perkins?
24     A.   It's a large venture capital firm in Silicon Valley.
25     Q.   A large venture capital firm?
```

```
 1    A.    Correct.
 2    Q.    What was your understanding about Kleiner Perkins?
 3          MR. KENDALL:  Objection, your Honor.
 4          THE COURT:  We can have what his understanding of it
 5    was.  Overruled.
 6    A.    Rick had told me he had done college counseling for some
 7    of the partners there.
 8    Q.    And you said, "If they get into the meat and potatoes,
 9    this could be the -- the front page story."
10          What would be a front page story?
11    A.    The whole scheme of his.
12    Q.    And then he said "well, the person who would be the front
13    page", and he didn't finish that sentence.  Who did you think
14    he was going to --
15          MR. KENDALL:  Objection, your Honor.
16          THE COURT:  Sustained.
17    Q.    At page 45, line 2, you said "meat and potatoes guy they
18    would love to have is -- it's so hard for these kids to get
19    into college and here's -- look what's going on behind the
20    schemes."
21          Why did you use the word "schemes"?
22    A.    Because that's what it was.
23    Q.    What were you concerned about?
24    A.    The fact that it would be a front page news story.
25    Q.    At page 46, line 8, you said "I'm so paranoid about
```

```
 1   Davina.  I go, I really don't want you talking on the phone to
 2   Rick about this.  I'm thinking, you know, are they -- I can't
 3   imagine they'd go to the trouble of tapping my phone, but I
 4   don't -- would they tap someone like your phone?".
 5            Who are you referring to?
 6   A.   Tapping Rick Singer's phone.
 7   Q.   Who?
 8   A.   Sorry?
 9   Q.   Who were you concerned would be tapping Rick Singer's
10   phone?
11   A.   I'm sorry.  The IRS.
12            MR. FRANK:  Can we pick it up at page 46, line 18.
13            (Audio recording played.)
14            MR. FRANK:  If we could stop it there, please.
15   Q.   If you could turn back to page 48.  At line 7, you said,
16   "Like with Ryan, the question is, should we be taking the
17   write-off on that thing, you know, when we do it with Ryan.
18   You know, I don't know."
19            What were you referring to there?
20   A.   Because he had been audited, it seemed like the IRS was on
21   top of this, I should not be taking deductions on it.
22   Q.   On what?
23   A.   On these payments I was making if we used Rick to do the
24   process.
25   Q.   With Ryan?
```

A.   Correct.

Q.   At page 49, at the bottom, line 21, you say -- actually, line 20, you say, "How did that -- how does that work?  When you say I'm making a gift to the school, is that a legitimate gift or is there actually people that are at school that get some dough out of the thing?"

What were you asking Mr. Singer there?

A.   I wanted him to admit to me that good portions of the money were going to himself and others.

Q.   When you say "others," who do you mean by that?

A.   The other people that are involved in the scheme.

Q.   Why did you think money was going to individuals involved in the scheme?

MR. KELLY:  Objection.  Leading.

THE COURT:  He can have that question.  Overruled.

A.   It's complete commonsense.

Q.   You also said, "when you say I'm making a gift to the school, is that a legitimate gift."

Did you think that a gift to the school under these circumstances would be a legitimate gift?

A.   Absolutely not.

Q.   Why not?

A.   Because we're making payments to get our children in as fake athletes and having their test score altered.  It wouldn't have been a legitimate.

```
 1    Q.    Why would it matter to you whether the money went to the
 2    school or the individual?
 3    A.    Because if it went to -- if portions of it went to the
 4    school, it would hide the scheme.  It would be going to a,
 5    quote unquote, charitable entity.
 6    Q.    And if it went to an individual?
 7    A.    It would be black and white, payment to someone that
 8    received money from him or his foundation.
 9    Q.    At page 50, line 6, Mr. Singer said, "So some people, I'll
10    say to them, so it's your program".  At line 9, "How do you
11    want the money?"  At line 11, "They'll send it to -- line 13,
12    "USC women's soccer."  Line 15, "Others will say send it to me
13    and I have to create a discretionary fund to raise extra money.
14    So what I do is just say you're helping me out.  I'll send it
15    to you."
16          Is that scenario he was describing there in your
17    understanding a legitimate scenario?
18    A.    No.
19    Q.    Why not?
20    A.    Because, again, it was this payment we made getting our
21    kids into the school.
22    Q.    At page 51, line 8, Mr. Singer says, "So let's say --
23    let's say -- let's use an example.  Let's say I'm going to --
24    we're using women's soccer.  So the women's soccer coach may
25    say to me, hey, send it to my camp fund, SC football, right?"
```

```
 1              And you respond at line 13, "That's cool.  That's
 2    school."
 3              Why was that cool?
 4    A.   Because that money was being funneled to the school's
 5    thing, which would have been a charitable thing.  It would have
 6    been difficult to figure out.
 7    Q.   Then, at line 20, you said, "Oh, really, because I was
 8    thinking that some type of -- there has to be a little bit of
 9    play or some of", and then you trailed off.  What were you
10    talking about there?
11    A.   I wanted Rick to just admit to me on the phone and in
12    black and white that he was lining his pockets and paying
13    people but he was beating around the bush again on this phone
14    call too.
15    Q.   This was a phone call?
16    A.   Sorry.  I'm sorry.  In our meeting that took place at our
17    house.
18    Q.   After this point in the conversation, did there come a
19    time when your son joined the conversation?
20    A.   Yes.
21    Q.   Did you discuss the scheme in his presence?
22    A.   No, I did not.
23    Q.   Why not?
24    A.   Well, we didn't want him to know about the process.
25    Q.   I want to direct your attention to page 80, if you could
```

1    just jump ahead to page 80 in the transcript at line 11.

2         MR. FRANK:  Is everyone at page 80, line 11?

3    Miss Lewis, if you could pick up at 54 minutes even.

4         (Audio recording played.)

5    Q.   Mr. Isackson, if I could direct your attention back to

6    page 80.  At line 11 on page 80, Mr. Singer says "I've got to

7    go see the -- I've got to go see the Demerline's.  At line 15,

8    he says, "right across the street from the Palatella's.  They

9    live on Lincoln."

03:21 10         Did you know the Palatella's?

11   A.   Yes.

12   Q.   Who are the Palatella's?

13   A.   They had some children that were the age of our kids, so

14   we knew them socially.

15   Q.   Did you know they were working with Mr. Singer?

16        MR. KENDALL:  Objection, your Honor.

17        THE COURT:  Overruled.

18   A.   Yes, I did know that.

19   Q.   How did you know that?

03:21 20   A.   Rick told us.

21   Q.   In what context?

22   A.   He said he was counseling their son.

23   Q.   At page 81 -- let me ask you this.  Did he ever tell you

24   they were involved in the scheme with him?

25   A.   No, he did not.

1    Q.   At page 81, line 8, you said, "we'll just -- we'll just

2    kind of deal with this as it comes.  If we have to have you do

3    the testing, I think we'll definitely pay cash this time."  And

4    at line 13, "and not, not rush through the other way.  You

5    know, just kind of take -- I just do get uptight about talking

6    on the phone."

7         Why did you want to pay cash this time if you did the

8    testing?

9    A.   I was saying cash, but what I was referring to is I

03:22 10   wouldn't be taking the write-off on it.

11   Q.   Why not?

12   A.   Because he was being audited and, to me, clearly the test

13   taking portion would be impossible to hide.

14   Q.   Then, at line 13, you said, "not run it through the other

15   way".

16        What would you have to run it through in order to

17   take the deduction?

18   A.   Well, you'd have to take a -- you'd have to claim it as a

19   charitable deduction for something he didn't receive anything

03:22 20   for.

21   Q.   Who would you have to make the check out to in order to

22   make a deduction?

23   A.   In his case, I'd have to write it to the Key Foundation.

24   Q.   Bottom of the page, you said, "it's got to be so over --

25   it's got to be so overly fair.  The only reason I said to

1    Davina, this is almost like a TV drama, you know, when you look

2    at the who's who of people there".  What were you referring to

3    by the who's who?

4    A.   Well, Rick had dropped some pretty heavy names, and I knew

5    that a majority of his clients were wealthy individuals and big

6    people in the business community, so it would be a very

7    interesting story.

8    Q.   Was it comforting to you to know those people were his

9    clients?

03:23 10    A.   Absolutely.

11    Q.   Why?

12    A.   Well, those people would have really, really thick returns

13    and most of them would be giving a lot of money to chatter, so

14    it would be much more difficult to figure things out.

15    Q.   At page 83, line 7, you said, "Yeah, yeah, I'm sure with a

16    lot of these charities too, you know -- and it probably helps.

17    It's tougher too with the returns of the people if they look at

18    that and they say, well, he's never given, and now he's giving.

19    I mean, with me, I have done it aside from you.  I've done some

03:23 20    big gifts in some big years".

21         What did you mean by that?

22    A.   I was concerned that there were some people that just

23    didn't give to charity and in the years their children got

24    admitted, they wrote a large check to Rick Singer's foundation,

25    and if the IRS looked at that the same year their child got in,

1    that would be a pretty big flag.

2    Q.    If we could move ahead --

3         THE COURT:  We're going to break at this stage in the

4    day.  Mr. Isackson, you may step down.  We're a few minutes

5    earlier than normal.  I have some other afternoon business.

6    I'm going to let you go a few minutes early.

7         Jurors, this is the first night that you have been a

8    constituted jury.  You will be going home to get questions from

9    all of your friends and members of your family.  Please

03:24 10   remember my instructions.  Do not talk about this case or about

11   any of the evidence you've heard.  You've only heard just the

12   beginning.  You have lots more evidence to hear.  It would be

13   inappropriate for you to talk about this case with anyone or do

14   any independent research.  I think you understand the reasons

15   for that.  What somebody else says to you about some similar

16   case they know about has absolutely nothing to do with this

17   case and you're not to discuss it or talk about it.  So get

18   into the habit of deflecting questions that will be in your

19   direction.

03:25 20        I'll see you back tomorrow morning.  Tomorrow will be

21   a little bit different.  We'll be recessing at one, and may go

22   a few minutes later than one, maybe as late as 1:30.  We will

23   not have an afternoon session.  I'll see you at 9:00 a.m.

24   tomorrow morning.

25        MR. FRANK:  Your Honor, if the jurors could leave

1    their transcript binder.

2         THE COURT:  Yes.  If you could leave your transcript

3    binders.  You may take your notebooks back with you into the

4    jury room.

5         (Jury exits.)

6         THE COURT:  Please be seated, counsel.

7         Approximately how much longer on this direct

8    examination?

9         MR. FRANK:  Very little.

03:26 10        THE COURT:  Half an hour?

11        MR. FRANK:  Less.

12        THE COURT:  Any idea now as to a rough estimate of

13   cross-examination from defendants?  Mr. Kelly.

14        MR. KELLY:  Roughly, 2 hours.

15        THE COURT:  Mr. Kendall?

16        MR. TOMBACK:  Your Honor, it's Andy Tomback.  I

17   believe it will be roughly the same.  I know you want me to say

18   less, but it will be roughly that.

19        THE COURT:  If we complete the testimony of

03:27 20   Mr. Isackson tomorrow, who will be the next witness?

21        MR. FRANK:  Your Honor, depending on what happens on

22   cross-examination, it could be Davina Isackson.  If it's not

23   Davina Isackson, it will be Special Agent Keith Brown.

24        THE COURT:  And you told me the examination of

25   Mr. Brown is in the several hours category?

1          MR. FRANK:  Yes.

2          THE COURT:  What about Wednesday now?  The government

3     is required to inform the defendants who you will be calling

4     Wednesday if you are through with Agent Brown.

5          MR. FRANK:  Given what we just heard, it seems

6     unlikely that will be the case.

7          THE COURT:  What if?

8          MR. KENDALL:  Then it would likely be Special Agent

9     Liz Keating.

03:27 10          THE COURT:  Her direct examination will be

11     approximately how long?

12          MR. FRANK:  Also in the several hour duration.

13          THE COURT:  Anything else that needs to come to my

14     attention before we adjourn for the day?

15          MR. KELLY:  No, your Honor.

16          MR. KENDALL:  If I can clarify.  Are the consensual

17     tapes going to be played with Miss Keating?

18          MR. FRANK:  Yes.

19          MR. KENDALL:  Thank you, your Honor.

03:28 20          THE COURT:  We're in recess until tomorrow morning at

21     nine.  I have other business.  If counsel could exit the

22     courtroom, it would be appreciated.

23          (Whereupon, the proceedings concluded at 3:29 p.m.)

24

25

1                          I N D E X

2     Witness                              Page

3     BRUCE ISACKSON

4     Direct Examination by Mr. Frank        88

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    E X H I B I T S

2    NO.                      ADMIT

3    190  .....................   100

4    200  .....................   105

5    203  .....................   108

6    204  .....................   112

7    208  .....................   113

8    447  .....................   124

9    450  .....................   129

10   506  .....................   130

11   607  .....................   138

12   671  .....................   147

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8              We, Kristin M. Kelley and Kelly Mortellite, certify

9    that the foregoing is a correct transcript from the record of

10   proceedings taken September 13, 2021 in the above-entitled

11   matter to the best of our skill and ability.

12

13

14       /s/ Kristin M. Kelley              September 13, 2021

15       /s/ Kelly Mortellite               September 13, 2021

16       Kristin M. Kelley, RPR, CRR            Date
         Kelly Mortellite, RMR, CRR
17       Official Court Reporter

18

19

20

21

22

23

24

25