1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3

   UNITED STATES OF AMERICA,          )
4                       Plaintiff     )
                                      )
5   vs.                               )  No. 1-19-CR-10080
                                      )
6   GAMAL ABDELAZIZ and JOHN          )
    WILSON,                           )
7                       Defendants.   )
                                      )
8                                     )

9

10

              BEFORE THE HONORABLE NATHANIEL M. GORTON
11                 UNITED STATES DISTRICT JUDGE
                      JURY TRIAL - DAY 5
12

13

             John Joseph Moakley United States Courthouse
14                     Courtroom No. 4
                      One Courthouse Way
15               Boston, Massachusetts 02210

16

17                   September 14, 2021
                         9:12 a.m.
18

19

20

                   Kristin M. Kelley, RPR, CRR
21                  Kelly Mortellite, CRR, RMR
                     Official Court Reporter
22       John Joseph Moakley United States Courthouse
                  One Courthouse Way, Room 3209
23                Boston, Massachusetts 02210
                   E-mail: kmob929@gmail.com
24

              Mechanical Steno - Computer-Aided Transcript
25

```
 1     APPEARANCES:

 2

 3          Stephen E. Frank

 4          Ian J. Stearns

 5          Leslie Wright

 6          Kristen Kearney

 7          United States Attorney's Office

 8          1 Courthouse Way

 9          Suite 9200

10          Boston, MA 02210

11          617-748-3208

12          stephen.frank@usdoj.gov

13          for the Plaintiff.

14

15

16          Brian T. Kelly

17          Joshua C. Sharp

18          Lauren Maynard

19          Nixon Peabody LLP

20          100 Summer Street

21          Boston, MA 02110

22          617-345-1000

23          bkelly@nixonpeabody.com

24          for Gamal Abdelaziz.

25
```

```
 1    APPEARANCES:

 2

 3            Robert L. Sheketoff

 4            One McKinley Square

 5            Boston, MA 02109

 6            617-367-3449

 7            sheketoffr@aol.com

 8            for Gamal Abdelaziz.

 9

10

11            Michael Kendall

12            Lauren M. Papenhausen

13            White & Case, LLP

14            75 State Street

15            Boston, MA 02109

16            617-939-9310

17            michael.kendall@whitecase.com

18            for John Wilson.

19

20

21

22

23

24

25
```

1    APPEARANCES:

2

3            Andrew E. Tomback

4            McLaughlin & Stern, LLP

5            260 Madison Avenue

6            New York, NY 10016

7            917-301-1285

8            atomback@mclaughlinstern.com

9            for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

(Jury enters.)

THE CLERK:  You may be seated.  Court is now in session.

THE COURT:  Good morning, jurors.  Welcome back. We're ready to resume.

Mr. Isackson, you're reminded that you remain under oath.

And, Mr. Frank, you may continue with direct examination.

MR. FRANK:  Thank you, your Honor.

DIRECT EXAMINATION OF BRUCE ISACKSON (Continued)

BY MR. FRANK:

Q.   Good morning again, Mr. Isackson.

A.   Good morning.

Q.   If you could turn back to Tab 607 in your transcript binder, we had been reviewing the recording that Mr. Singer made of the meeting in your home.  Do you recall that from yesterday?

A.   Yes.

Q.   In or about December of 2018?

A.   Yes.

Q.   If I could direct you to page 88 of the transcript.  We will resume listening to the recording on page 14 at line 8.

MR. FRANK:  Miss Lewis, if you could pick up at

1    59 minutes and 8 seconds.

2              (Audio recording played.)

3    Q.   Mr. Isackson, at page 88, line 14, you said, "when I got

4    that fucking phone call my wife doesn't even know my heart just

5    fucking stopped, it was just like, you know, I'm thinking worse

6    case, if it comes through it just means you're gonna pay fines.

7    I think."

8              What was the phone call that you were referring to?

9    A.   The phone call that he had referred to from the IRS.

09:15 10   Q.   Could you please bring the microphone --

11   A.   I'm sorry.

12             THE COURT:  If you'd pull the microphone way over in

13   front of you and push the tab away.

14             THE WITNESS:  Is this better?

15             THE COURT:  Thank you.

16             THE WITNESS:  Okay.

17   Q.   What was the phone call you were referring to?

18   A.   The phone call that he received from the IRS.

19   Q.   That you received from the IRS?

09:15 20   A.   That he received from the IRS.

21   Q.   Okay.  And why did your heart stop?

22   A.   Well, there was a good chance that we'd be audited and the

23   whole scheme could be exposed.

24   Q.   And then you said at line 17, "I'm thinking worse case if

25   it comes through just means you're gonna pay fines.  I think."

1    What were you referring to there?

2    A.    The actual punishment, the end result of it.

3    Q.    Why did you say "I think"?

4    A.    I had no idea of how serious an offense it was.

5    Q.    At page 89, line 2, you said, "or worse case the *Wall*

6    *Street Journal* gets ahold of it and it's some story or

7    something like that, which would be much worse."

8            Why would you think it would be much worse if the

9    *Wall Street Journal* got ahold of the story?

09:16 10   A.    Because then it would be front page news.  It would be a

11   big story.

12   Q.    What would be front page news?

13   A.    The whole scheme, the whole process, my involvement, my

14   children, you know, having to leave school, everything.

15   Q.    You can put that aside.

16           Mr. Isackson, you testified yesterday that there came

17   a time when you were charged with a crime in connection with

18   your involvement in this scheme.  When was that?

19   A.    It was approximately two and a half years ago.

09:17 20   Q.    And after you were charged, did there come a time when you

21   pled guilty in connection with your involvement to securing

22   admission for your daughters to college and cheating on

23   standardized tests?

24   A.    Yes.

25   Q.    When was that?

1    A.   It was 2 months after -- it was 2 months after -- excuse

2    me.   It was -- the timing --

3    Q.   When did you plead guilty?

4    A.   When did I plead guilty?   I pled guilty pretty much after

5    we were arrested.

6              MR. FRANK:   Could we show the witness only Exhibit

7    674, please.

8    Q.   Mr. Isackson, do you recognize that document?

9    A.   Yes.

09:18 10   Q.   What is it?

11   A.   It's a Plea Agreement.

12             MR. FRANK:   Government offers 674.

13             THE COURT:   It will be admitted.

14             (Exhibit 674 admitted into evidence.)

15   Q.   Whose Plea Agreement is this?

16   A.   It's mine.

17   Q.   Could we look at page 7, please.   Do you recognize the

18   signature on the Plea Agreement?

19   A.   Yes.

09:18 20   Q.   Whose is it?

21   A.   It's mine.

22   Q.   And the date?

23   A.   April 7, 2019.

24   Q.   Have you been sentenced in connection with your

25   involvement in this scheme?

1   A.   No.

2   Q.   Have you spent any time in jail since pleading guilty?

3   A.   No.

4        MR. FRANK:  Could we look -- for the witness only,

5   could we look at Exhibit 675, please.

6   Q.   Do you recognize this document?

7   A.   Yes.

8   Q.   What is it?

9   A.   It's a Cooperation Agreement.

09:19 10        MR. FRANK:  The government offers 675.

11        THE COURT:  The date of it, please?

12        MR. FRANK:  The date is April 3, 2019.

13        THE COURT:  It will be admitted.

14        (Exhibit 675 admitted into evidence.)

15   Q.   Mr. Isackson, whose Cooperation Agreement is this?

16   A.   It's mine.

17        MR. FRANK:  Could be look at page 5, please.

18   Q.   Do you recognize that signature?

19   A.   Yes.

09:19 20   Q.   Whose is it?

21   A.   It's mine.

22   Q.   What is the date?

23   A.   April 7, 2019.

24   Q.   What is your understanding of what you have agreed to do

25   under the terms of this Cooperation Agreement?

1    A.   Tell the truth about exactly what happened.

2    Q.   What is your understanding of what will happen if you tell

3    the truth about exactly what happened?

4    A.   There's a chance that my sentence could be reduced.

5    Q.   What is your understanding of what will happen if you do

6    not tell the truth?

7    A.   It would be much worse.  I would get the most harsh

8    treatment there could be.

9    Q.   Is the judge who sentences you required to give you a

09:20 10   lower sentence if you testify truthfully?

11   A.   No.

12   Q.   Are you hoping to get a lower sentence as a result of your

13   cooperation?

14   A.   Yes, absolutely.

15   Q.   Who will decide your sentence?

16   A.   The judge.

17        MR. FRANK:  No further questions.

18        THE COURT:  Cross-examination, Mr. Kelly.

19             CROSS-EXAMINATION OF BRUCE ISACKSON

09:21 20   BY MR. KELLY:

21   Q.   Good morning, Mr. Isackson.

22   A.   Good morning.

23   Q.   So you just told us that, facing the prospect of paying

24   fines and a *Wall Street Journal* article, your heart stopped.

25   A.   Correct.

```
 1   Q.   So you were panicking about the idea of paying fines,
 2   right?
 3   A.   I was panicking about the whole situation.
 4   Q.   And I suspect you might be panicking even more once you
 5   learned you could actually go to prison, right?
 6   A.   That was a good thought, yes.  Correct.
 7   Q.   And you'd pretty much do anything to stay out of prison,
 8   wouldn't you?
 9   A.   I don't know what you mean.
10   Q.   You don't know what that means?  You'd pretty much do
11   anything to stay out of prison, wouldn't you?
12   A.   I don't know what -- where are you going with that
13   question?
14   Q.   Well, you'd lie to stay out of prison, wouldn't you?
15   A.   I would not do that.
16   Q.   You wouldn't do that?
17   A.   No.  I understand that --
18   Q.   I'm asking the questions here.  Would you lie to keep your
19   wife out of prison?
20   A.   No.
21   Q.   Would you lie to get your daughter into college?
22   A.   I did.
23   Q.   So you would lie to get your daughter into college, right?
24   A.   I did.
25   Q.   So you would lie to get your daughter into college,
```

1    wouldn't you?

2    A.   I'll repeat, I did.

3    Q.   Okay.  But you wouldn't lie to keep your wife out of

4    prison; is that your testimony?

5    A.   That's my testimony, yes.

6    Q.   Okay.  And prior to your testimony today, how many times

7    did you meet with either the prosecutors or the federal agents

8    on this case?

9    A.   I'm not sure the exact amount of times.

09:23 10    Q.   Did you meet with them last night?

11    A.   No.

12    Q.   How about over the weekend?

13    A.   Yes.

14    Q.   How many hours did you spend with the federal agents or

15    the prosecutors on this case over this past weekend?

16    A.   I'm not exactly sure.

17    Q.   More than one?

18    A.   Yes.

19    Q.   More than two?

09:23 20    A.   Yes.

21    Q.   More than three?

22    A.   I'd say approximately.

23    Q.   And where did you meet with the federal officers?

24    A.   At their office.

25    Q.   All right.  And this meeting over the weekend, was that

```
 1    the first time you'd ever met with the federal agents or
 2    prosecutors on this matter?
 3    A.   No.
 4    Q.   How many times before this weekend had you met with them?
 5    A.   I don't recall the exact amount of times.  I would say
 6    approximately three or four.
 7    Q.   And for each of those meetings, was it approximately a
 8    couple hours?
 9    A.   Yes, approximately.
10    Q.   During any of those meetings did you ever tell the
11    government that you knew Gamal Abdelaziz?
12    A.   No.
13    Q.   Because you don't know Gamal Abdelaziz, do you?
14    A.   No, I don't.
15    Q.   You'VE never spoken to him before, have you?
16    A.   I have not.
17    Q.   You've never agreed with him about anything, have you?
18    A.   Have I agreed directly with him?  No.
19    Q.   You had some indirect agreement with a man you don't know?
20    A.   I believe everyone that was involved, all the parents
21    involved in this.
22    Q.   And he's a man you never met before, right?
23    A.   That's absolutely correct.
24    Q.   You never spoke to him before?
25    A.   No.
```

```
 1    Q.    It's kind of an unusual name.  Do you know anyone else
 2    named Gamal Abdelaziz in California?
 3    A.    No, I do not.
 4    Q.    Let me ask you this.  How many times did you speak to Rick
 5    Singer over the years?
 6    A.    I'm not exactly sure how many times I've spoken with him
 7    to be exact.
 8    Q.    More than ten?
 9    A.    I don't think I've spoken with him more than ten times,
10    no.
11    Q.    How many times did you meet with him at your home?
12    A.    I believe only once.  Oh, excuse me.  Two times.  Two
13    times.
14    Q.    You met with him at your home, by the way, after he left
15    that threatening message to you and your wife, right?
16    A.    Yes.
17    Q.    So despite that threatening message, you still welcomed
18    him into your home, correct?
19    A.    We were engaging him.  We were working with him.
20    Q.    Right.  You were already knee deep in criminal activity
21    with him, weren't you?
22    A.    I don't understand your question.
23    Q.    Okay.  He threatened you and yet you still invited him to
24    your home, correct?
25    A.    That's correct.
```

| | |
|---|---|
| 1 | Q.   Because you were so eager to do this fraud scheme with |
| 2 | your wife, correct? |
| 3 | A.   I don't like those words, but yes, we wanted to continue |
| 4 | with him.  We thought about it. |
| 5 | Q.   You don't like those words, but those words reflect the |
| 6 | truth, don't they? |
| 7 | A.   I don't know the exact answer to tell you there. |
| 8 | Q.   All right.  So in all these conversations and meetings |
| 9 | with Rick Singer, did he ever say the name Gamal Abdelaziz? |
| 09:26 10 | A.   No, he did not. |
| 11 | Q.   That might be a name you'd remember, correct? |
| 12 | A.   Could be. |
| 13 | Q.   In all your meetings with Singer, how many lies do you |
| 14 | think he told you?  Can you estimate that? |
| 15 | A.   I would have no idea. |
| 16 | Q.   More than a dozen? |
| 17 | A.   I'd be guessing. |
| 18 | Q.   Can you estimate more than 20? |
| 19 | MR. FRANK:  Objection. |
| 09:27 20 | THE COURT:  Sustained. |
| 21 | Q.   In your view, Singer was a skilled liar, wasn't he? |
| 22 | A.   He definitely told some lies. |
| 23 | Q.   And he could change his tune on a dime, couldn't he?  He |
| 24 | could threaten you and then he could be nice, right? |
| 25 | A.   He kind of just -- his behavior, he was -- as I said, I |

```
 1    think initially he had an intimidating personality.  He's a
 2    very strong-willed guy.  It was kind of his way to do business
 3    or you're not going to get your program with him.
 4    Q.   Well, that's the way he treated you, right?
 5    A.   I believe that's what he -- I don't think he changed his
 6    routine for anyone.
 7    Q.   Really?
 8    A.   Yeah.
 9    Q.   How would you know that?
10    A.   I wouldn't know that, but I'm saying that was how it was
11    with me.
12    Q.   Sorry.  You would not know that, right?
13    A.   That's correct.  I would not --
14    Q.   You only know how he treated you, right?
15    A.   Yes.
16    Q.   And are you aware that he ever threatened other people?
17    A.   No.
18    Q.   Because he could, in fact, talk about legitimate things as
19    well, right?
20    A.   That's correct.
21    Q.   For instance, in front of your son, he could talk about
22    legitimate things?
23    A.   That's correct.
24    Q.   And you took great pains to keep your son out of this
25    scheme in dealing with Singer, correct?
```

```
 1   A.    I don't understand your question.

 2   Q.    Well, I think yesterday you said with respect to your son

 3   Ryan you tried to keep him out of discussions about the scheme

 4   with Singer, right?

 5   A.    We did not discuss the scheme in front of him, no.

 6   Q.    You didn't?

 7   A.    No.

 8   Q.    Because -- obviously, you're his father and you want to

 9   keep him out of it, right?

10   A.    Yeah.  I didn't want to involve my child in that part of

11   the discussions.

12   Q.    I'd like to play a portion of tape 607.  It is on page --

13   there's a section that I believe the prosecutor skipped over

14   yesterday.  It starts on page 65.

15         (Audio recording played.)

16   Q.    So that's all legitimate banter back and forth with just

17   you, your son, Singer, and your wife, right?

18   A.    Yes.

19   Q.    I'm sorry?

20   A.    Yes, yes.

21   Q.    There's no threatening -- he's not -- he's not using his

22   threatening tone there, is he?

23   A.    No, he's not.

24   Q.    Okay.  Proceed, please.

25         (Audio recording played.)
```

09:29  10
09:33  20

```
       1   Q.   Now, when he said you could be a practice player, you
       2   didn't think Singer was sucking your son into a crime right in
       3   front of you, did you?
       4   A.   He was talking about being a practice player.
       5   Q.   You thought that was legit, right?
       6   A.   I'm sorry?
       7   Q.   You thought that was legitimate, right?
       8   A.   I don't understand what you mean by your question.
       9   Q.   You don't know what the world "legitimate" means?
09:34 10   A.   I absolutely know what that means.  I don't understand
      11   your question.
      12   Q.   When Singer said in front of you and your wife to your son
      13   that he could be a practice player, you didn't understand that
      14   to mean your son was about to get involved in a crime in your
      15   presence, did you?
      16   A.   He asked that question to him.
      17   Q.   Sir, you have to answer the question if you understand it.
      18   A.   I will.
      19   Q.   You just testified moments ago and yesterday that you
09:34 20   never brought your son into anything legitimate -- illegal with
      21   Singer, right?
      22   A.   I think I -- pretty sure we said we didn't discuss the
      23   scheme in front of him, yeah.
      24   Q.   Okay.  So right here when he's talking to your son about
      25   being a practice player, you didn't see that as part of the
```

1  scheme, did you?

2  A.   He asked that question to him.

3  Q.   I know he asked the question.  And when he asked the

4  question, you didn't view it as part of the scheme, did you?

5  A.   Again, he asked that question to him.

6  Q.   I know, but you have to answer my question.  You didn't

7  view it as part of the scheme when he said that to your son

8  about being a practice player, did you?

9  A.   I'm still -- when you're saying "part of the scheme," he

09:35 10  asked him if he wanted to be a practice player.  He didn't get

11  into any kind of scheme discussions with him at all.  He asked

12  him if he wanted to be a practice player.  That was the

13  question he asked him.

14  Q.   Right.  And that seemed legitimate at the time to you,

15  correct?

16  A.   When you say it seemed legitimate, he asked him if he

17  wanted to be a practice player.

18  Q.   Did that sound like a crime he was trying to get your son

19  involved in?

09:35 20  A.   My son wouldn't know about that crime.

21  Q.   So it did not sound like a crime to your son, right?

22       MR. FRANK:  I'm going to object at this point.  It's

23  been asked and answered.

24       THE COURT:  Overruled.

25  Q.   When he said to your son you can be a practice player --

```
 1   A.    Yes.
 2   Q.    -- you didn't jump up and say, stop, this is a fraud, get
 3   my son out of here, did you?
 4   A.    No, I didn't.
 5   Q.    Because it sounded legitimate, reasonable that he could be
 6   a practice player if he had some experience with soccer, right?
 7   A.    Rick threw that out to him.
 8   Q.    Well, you're a sports fan, aren't you?
 9   A.    I enjoy sports.
10   Q.    Okay.  Some of these teams use practice players, don't
11   they?
12   A.    Yes.
13   Q.    Okay.  And when Singer said to your son you could be a
14   practice player, that did not strike you at the time as a
15   crime, right?
16   A.    He was discussing with him he wanted to be a practice
17   player.  He just was discussing soccer, yes.
18   Q.    Let's keep going, please.
19             (Audio recording played.)
20   Q.    So, again, in your mind, is this part of the scheme at
21   all?
22   A.    In my mind, I understood, yes, this was part of -- I don't
23   want to say the word "scheme," but I want to say in my mind I
24   understood what Rick was talking about.  I don't think my son
25   had any idea.
```

1    Q.   Well, you don't want to say the word "scheme," but you

2    used it about a dozen times in direct questioning, didn't you?

3    A.   I don't know the exact amount.

4    Q.   Did you ever use the word "scheme" when you were meeting

5    with the agents those many hours?

6    A.   Sure.

7    Q.   You did?

8    A.   Uh-hum.

9    Q.   You think that's reflected in anything that the agents

09:38 10  took down, that you used the word "scheme," or is this a word

11   now you decided to use at this trial?

12   A.   No.

13   Q.   But when Singer again talked about being a practice player

14   in front of you and your son, you didn't view that as involving

15   your son in any illegal scheme, did you?

16   A.   Again, my son had no idea about it.

17   Q.   Because it sounds reasonable.  You can be a practice

18   player if you played the sport, right?

19   A.   I guess.

09:38 20  Q.   You guess?

21   A.   Yes.  I guess.

22        MR. KELLY:  Keep playing.

23        THE COURT:  Excuse me.  Where are we in the

24   transcript?

25        MR. KELLY:  We are -- your Honor, I think we stopped

```
 1   at page 70.
 2   Q.   Actually, before we begin, why don't we just stop.
 3   There's a reference to a Jorge.
 4   A.   Um-hmm.
 5   Q.   He's a soccer coach over at UCLA, right?
 6   A.   Correct.
 7   Q.   Did you know anything about him taking bribes at the time?
 8   A.   When you say did I know about him taking bribes, I assumed
 9   he was involved in it.  Absolutely.
10   Q.   But you let Singer go ahead and talk about this man you
11   knew to be taking bribes?
12   A.   Again, my son knew nothing about Jorge.
13   Q.   Well, did you?
14   A.   Yes.
15   Q.   And you didn't stop it, did you?
16   A.   Rick was doing his rap.  I let him talk.
17   Q.   Yeah.  And so you didn't keep your son out of any of this,
18   did you?  You just let it go?
19   A.   It was a short -- relatively short conversation.  They
20   just went through Rick asking him his questions.
21            MR. KELLY:  All right.  Please keep going.
22            THE COURT:  I want to know where you are, Mr. Kelly.
23            MR. KELLY:  Yes.  We had stopped at page 70, line 16 I
24   believe is where we left off.
25            THE COURT:  Thank you.
```

1           (Audio recording played.)

2    Q.    Now, yesterday there was a discussion of your daughter

3    Audrey.  Do you recall those questions?

4    A.    Yes.

5    Q.    You paid a test proctor to take -- to increase her ACT

6    score, right?

7    A.    That's correct.

8    Q.    And when you did that in your mind, obviously, you knew

9    that was fraud, right?

09:42 10   A.    Correct.

11   Q.    There was no question in your mind that was not only

12   inappropriate but illegal, right?

13   A.    Correct.

14   Q.    Okay.  Now, with respect to her, she went to USC, right?

15   She got into USC?

16   A.    Correct.

17   Q.    And there was an athletic profile of her created, right?

18   A.    Correct.

19   Q.    And she had never rowed crew, had she?

09:43 20   A.    No.

21   Q.    She had no interest in crewing or rowing, whatever the

22   term is, right, zero?

23   A.    Correct.

24   Q.    She had no interest in that sport at all?

25   A.    Correct.

Q.   That's why you had to give just a headshot, because there
was no instances of her ever participating in crew, right?

A.   I don't know that.

Q.   What do you mean?  You don't know if she ever participated
in crew?

A.   No.  You asked the question that's why you gave a
headshot, because she had no interest in the sport and she had
never done it, so I said I don't know why.  We just gave him a
headshot.

09:43 10  Q.   You were asked to give a picture?

A.   That's correct.

Q.   And that's what you provided, right?

A.   That's what we gave him.

Q.   You didn't create the athletic profile of Audrey, did you?

A.   We did not.

Q.   Singer had people do that, right?

A.   I assume.

Q.   Well, do you know?

A.   We gave him a headshot.  He took care of everything from
09:44 20  there.

Q.   And Singer had other people working with him, like Laura
Janke.  Did you ever hear that name?

A.   I believe so.

Q.   So Singer had people create these athletic profiles,
right?

```
 1    A.    Yes.

 2    Q.    And you never even saw it, did you?

 3    A.    No, we did not.

 4    Q.    Are you aware that my client's daughter, Sabrina

 5    Abdelaziz, also got into USC?

 6    A.    Only because I read the paper.

 7    Q.    Are you aware she's about to graduate from USC this

 8    spring?

 9    A.    I'm not, no.

10    Q.    You have no idea?

11    A.    I have no idea.

12    Q.    Is your daughter about to graduate from USC?

13    A.    No.

14    Q.    How did things work out for her at USC?

15    A.    What is your exact question there?

16    Q.    Was she expelled from USC?

17          MR. FRANK:  Your Honor, I object to this line of

18    questioning.

19          THE COURT:  Sustained.

20    Q.    Is your daughter scheduled to graduate from USC?

21          MR. FRANK:  Your Honor, I object.

22          THE COURT:  Sustained.

23    Q.    Your wife's name is Davina, right?

24    A.    Yes.

25    Q.    Did I pronounce that correctly?
```

```
 1   A.   You did.

 2   Q.   She has a friend named Lauren Whittam, correct?

 3   A.   I don't know if I'd call her a friend.

 4   Q.   Okay.  Would you -- does she know a woman named Lauren

 5   Whittam?

 6   A.   Yes, she does.

 7   Q.   And has she known Lauren Whittam for a long time?

 8   A.   When you say "a long time," what do you mean by that?

 9   Q.   More than a year.

10   A.   Yes, more than a year.

11   Q.   More than two years?

12   A.   I believe more than two years, yes.

13   Q.   More than three years?

14   A.   That I don't know.

15   Q.   And Lauren Whittam is a development person at USC,

16   correct?

17   A.   Yes, my understanding.

18   Q.   She's a fundraiser, right?

19   A.   She's in the development department, yes.  She raises

20   funds.

21   Q.   She raises money for USC, correct?

22   A.   That's correct.

23   Q.   And your wife is, if not friendly with her, certainly has

24   known her for a while?

25   A.   Like I said, I believe she's known her for two or
```

1   three years.  I'm not sure.

2   Q.   Are you aware Ms. Whittam offered to flag your daughter

3   Lauren at USC if you donated money to help her with the

4   admission process?

5   A.   I do remember some conversation about that.

6   Q.   Okay.  So it was no secret that USC was heavy on

7   fundraising, right?

8   A.   I don't know exactly what you want from that question.

9   Q.   Well, it's just a question.  You don't have to figure out

09:47 10   where I'm going.  You just have to answer it truthfully, if you

11   can.

12   A.   I will.

13   Q.   It was not unknown to you that USC did a lot of

14   fundraising, correct?

15   A.   Yes.  USC did a lot of fundraising.

16   Q.   It's a private school, right?

17   A.   Yes, it is.

18   Q.   And it raises funds all the time, right?

19   A.   Yes.

09:47 20   Q.   In fact, Lauren Whittam, an acquaintance of your wife,

21   told you and her if you donated to USC, she could flag Lauren's

22   application and it might help?

23   A.   I had no conversations with Lauren Whittam.

24   Q.   Well, did your wife ever tell you that?

25   A.   She briefly mentioned it to me, yes.

| | |
|---|---|
| 1 | Q.   Okay.  So you learned about that from your wife? |
| 2 | A.   That's correct. |
| 3 | Q.   Okay.  And did you learn that Ms. Whittam said it might |
| 4 | help, but there was no guarantee? |
| 5 | A.   That was my understanding. |
| 6 | Q.   That was your understanding? |
| 7 | A.   Correct, but when you say it would help -- it would |
| 8 | help -- |
| 9 | Q.   Hold on now. |
| 09:48 10 | MR. FRANK:  Can the witness answer the question? |
| 11 | THE COURT:  He's answered the question. |
| 12 | Q.   Now, you -- well, let's stick with Ms. Whittam.  Have you |
| 13 | seen any document in this case, a message from Ms. Whittam to |
| 14 | your wife? |
| 15 | A.   I do not recall. |
| 16 | Q.   What documents have you looked at before you came here |
| 17 | today to testify? |
| 18 | A.   I looked at all the recorded tapes that we've looked at. |
| 19 | Q.   Have you looked at anything besides the tapes and the |
| 09:49 20 | transcripts?  Any e-mails? |
| 21 | A.   I don't believe we looked at any e-mails with the |
| 22 | government. |
| 23 | Q.   I'm not asking you about you and your wife.  I'm asking |
| 24 | about you and the government only.  Okay?  Understand that? |
| 25 | I'm not asking about anything you may have done with your wife. |

```
 1    I'm asking about you and the government.  Okay?
 2    A.   Yeah.
 3    Q.   All right.  Well, did you listen to the tape between your
 4    wife and Singer about Ms. Whittam?
 5    A.   I don't believe that we did.
 6    Q.   Would you recognize your wife's voice?
 7    A.   I think I might.
 8    Q.   And how about Mr. Singer?  You'd recognize his voice, too,
 9    right?
10    A.   Yes.
11    Q.   I'm going to start Exhibit 1444.
12         MR. FRANK:  Objection, your Honor.  This is not a
13    recording that this defendant is on, that this witness is on.
14         MR. KELLY:  Well, they've stipulated to the
15    authenticity of the tapes and he can identify the speakers and
16    supposedly, according to the government, his wife is a
17    coconspirator and so is Singer.
18         MR. FRANK:  That does not make it admissible or
19    impeachment.
20         MR. KELLY:  It's relevant and it's pertinent to a
21    cross-examination topic about Ms. Whittam and his understanding
22    about donating.
23         THE COURT:  Let me see counsel at sidebar.
24             *** Beginning of sidebar ***
25         THE COURT:  What is it that you're --
```

1          MR. KELLY:  It's a two-page transcript, very brief, a

2     tape excerpt.

3          THE COURT:  Of what?

4          MR. KELLY:  Of his wife and Rick Singer talking about

5     her donation to USC.

6          THE COURT:  What date?

7          MR. KELLY:  It's dated October 8, 2018, right smack in

8     the middle of the conspiracy.  It's his wife trying to credit

9     her making a donation to USC, what she believes is legitimate.

09:51 10          THE COURT:  And the purpose for playing it for this

11     witness is what?

12          MR. KELLY:  To show the jury that, in fact, a lot of

13     things that they did was legitimate, not illegitimate.  That's

14     what they said when they make donations for their kids at

15     college.

16          MR. FRANK:  Well, he's not his wife.  It's his wife

17     testifying.

18          THE COURT:  You mean Mr. Isackson is not

19     Mrs. Isackson.

09:52 20          MR. FRANK:  Correct.  They're seeking to cross-examine

21     Mr. Isackson with statements that he's never heard that

22     Mrs. Isackson made on consensual recordings he says now is

23     smack in the middle of the conspiracy.  I understand the

24     defendants to be disputing that there is a conspiracy.  It's

25     not a coconspirator statement as to them, because they deny

1   there's a conspiracy.  It's not proper impeachment of this

2   witness.  He didn't say it.  It's his wife talking to the

3   Government's cooperating witness.  These are consensual

4   recordings that --

5              THE COURT:  Yeah.  And I don't see the relevance to

6   this witness, or to impeaching this witness.

7              MR. KENDALL:  Your Honor --

8              MR. KELLY:  The government is suggesting this is some

9   big massive conspiracy.  The government is suggesting that his

09:53 10   wife is a coconspirator.  He just testified that he -- that

11  Ms. Whittam was raising money for USC.  And this will show that

12  not only was she raising money, but the family's -- part of the

13  gift was legitimate.

14             MR. FRANK:  The family doesn't think.  Each witness

15  thinks for himself.

16             MR. KELLY:  Well, let me ask this.  Is Mr. Frank

17  calling the wife to the stand?

18             MR. FRANK:  We're going to decide at the conclusion of

19  this cross-examination.

09:53 20             THE COURT:  All right.  We'll reserve until that

21  point.  If they don't call and you want to bring this back up

22  before we dismiss Mr. Isackson, we'll talk about it then.

23                      *** End of sidebar ***

24  Q.   How many times have you spoken with Ms. Whittam?

25  A.   Maybe one time.

```
 1   Q.   When?

 2   A.   I'm not exactly sure where -- when it was.

 3   Q.   Was it at a USC event?

 4   A.   I'm pretty certain -- no.  I don't think it was at a USC

 5   event.

 6   Q.   You're not suggesting in any way that Ms. Whittam at USC

 7   was involved in any criminal activity, are you?

 8   A.   No, I'm not.

 9   Q.   You have to speak up.  No one can hear you.

10   A.   Sorry.  Sorry.

11            No, I'm not.

12   Q.   She's just a legitimate fundraiser at USC, right?

13   A.   She's a fundraiser at USC.

14   Q.   Is she legitimate or no?

15            MR. FRANK:  Objection.

16            THE COURT:  Overruled.

17   Q.   When the judge says overruled, you have to answer the

18   question.

19   A.   I understand.  Yes.  That -- yes, she's legitimate.  Yes.

20   Q.   At one point -- did your wife tell you at one point that

21   she called Singer and said, hey, we want to get credit for our

22   donation to get benefits at USC?  Did she tell you about that?

23   A.   No.

24   Q.   Where is your wife now?

25   A.   She's in Boston.
```

```
 1   Q.   Where?
 2            MR. FRANK:  Objection.  Relevance.
 3            THE COURT:  Sustained.
 4   Q.   Well, how far from the courthouse is she?
 5            MR. FRANK:  Objection.
 6            THE COURT:  Sustained.
 7   Q.   Have any promises been made to you that she doesn't have
 8   to testify if you do well for the government here today?
 9   A.   Absolutely not.
10   Q.   So your testimony is totally irrelevant to her status as a
11   witness in this case?
12            MR. FRANK:  Objection.  Foundation.
13            THE COURT:  Sustained.
14   Q.   So her status of testifying today is a complete mystery to
15   you?
16   A.   Repeat your question.  I don't understand it.
17   Q.   Has anyone told you whether your wife is testifying here
18   today?
19   A.   No.
20   Q.   And you haven't discussed it with her?
21   A.   Absolutely not.
22   Q.   You haven't discussed with your wife anything about
23   testifying?
24   A.   We were told we can't talk anything about the case with my
25   wife.
```

1    Q.   All right.  Now, we heard that tape earlier where Singer

2    referenced the phrase "practice player" in front of your son

3    Ryan, correct?  You remember that?

4    A.   I do.

5    Q.   He also used a term "team manager" about your daughter

6    Lauren, didn't he?

7    A.   Yes.

8    Q.   In fact, he told the FBI back in April of 2019 that you

9    thought your daughter Lauren was going to be a manager of the

09:57 10   UCLA soccer team.  Didn't you tell the FBI that?

11   A.   I could have.  I mean, that's what she ended up doing.

12   Q.   Well, my question is didn't you tell the FBI that in April

13   of 2019 you thought your daughter Lauren was going to be a

14   manager of the soccer team?

15   A.   I do not recall that conversation.

16   Q.   Well, do you -- do you think if the FBI wrote that down in

17   a report they would be mistaken?

18   A.   What was your question?

19   Q.   Do you think the FBI wrote that down wrong?

09:58 20        MR. FRANK:  Objection.

21        THE COURT:  Overruled.

22   A.   It's a fact when you read it like that if it's from a

23   report, absolutely.

24   Q.   So you did tell the FBI that your mindset, in your mind,

25   you thought Lauren was going to be a manager on the soccer team

1  because that's what Singer told you, right?

2  A.    That's correct.

3  Q.    So your basis of knowledge in your mind came largely from

4  Rick Singer's statements to you, right?

5  A.    You need to repeat that question.

6  Q.    All right.  Your mind is what matters in terms of whether

7  you're guilty or not, right?

8  A.    Yes.

9  Q.    You knew you were bribing someone to take a test or -- I'm

09:58 10  sorry -- to increase the test score for your daughter, right?

11  A.    That's correct.

12  Q.    So, in your mind, you knew you were guilty of that, right?

13  A.    Correct.

14  Q.    And you have no idea what's in other people's minds, do

15  you?

16  A.    Not exactly sure what your question is there either.

17  Q.    Well, you're not a mind reader, are you, sir?

18  A.    No.

19  Q.    And you don't know a man in Nevada who you don't even know

09:59 20  what was he thinking when he spoke to Rick Singer, do you?

21  A.    A man in Nevada?

22  Q.    Yes.  A man in Nevada named Gamal Abdelaziz.  You have no

23  idea what was in his head when he was speaking to Singer,

24  correct?

25  A.    I had no idea he lived in Nevada.

1    Q.    If Singer was talking to him about practice players and

2    team managers, you don't know what that meant to him, do you?

3    A.    No, I wouldn't.

4    Q.    How about this USC person named Donna Heinel?  I think you

5    testified yesterday that you heard about her a few times from

6    Rick Singer, right?

7    A.    That's correct.

8    Q.    And you heard about her well before you got arrested,

9    right?

10:00 10   A.    That is correct.

11   Q.    Okay.  Did he ever say to you I'm bribing this woman named

12   Donna Heinel at USC?

13   A.    Not outwardly.

14   Q.    Well, did he say it inwardly and you heard it?

15   A.    No.  He did not say it inwardly, obviously.  No, he did

16   not.

17   Q.    Okay.  So at least with respect to you, he did reference a

18   USC contact he had named Donna Heinel, right?

19   A.    He referenced her for sure.

10:00 20   Q.    And he referenced her well before you got arrested, right?

21   A.    That is correct.

22   Q.    Okay.  And even though he referenced her with you, he

23   never said to you she was being bribed, right?

24   A.    Again, not directly, no.  He did not.  Obviously not, no.

25   Q.    Now, I think you twice said yesterday that there was, in

1  your mind, some part of Singer's charity that was legitimate,

2  right?

3  A.   I assumed there would be.

4  Q.   You assumed there would be or you thought there was a

5  legitimate part of his charity?

6  A.   When you say "a legitimate part of his charity," his

7  charity was a fraud, but I assume he funneled some money to

8  charitable causes, places that, you know, did work.

9  Q.   Now that word "funnel", you never used that word "funnel"

10:01 10  with the FBI, did you?

11  A.   I don't recall.

12  Q.   It's not in any of their reports when they met with you,

13  that word "funnel", is it?

14        MR. FRANK:  Objection.

15        THE COURT:  Overruled.  If he knows.

16  A.   I do not recall.

17  Q.   Did anyone suggest to you that that word "funnel" would be

18  a good word to inject into a federal trial?

19  A.   Absolutely not.

10:02 20  Q.   All right.  But with respect to Singer's charitable works,

21  did you know or didn't you know that some of it was legitimate?

22  A.   You keep using the word "legitimate".  I assume some of

23  the money he took from -- he set out to his charity went to

24  organizations that were 501(c)(3) charitable entities, whether

25  it was schools or camps or whatever he did with it.

Q.   Well, didn't you know -- didn't you know there was a

basketball camp in Oakland connected with a very prominent AU

team named the Oakland Soldiers?  Did you know that?

A.   I know he had some involvement with a -- with a basketball

thing, yes.

Q.   In Oakland?

A.   Correct.

Q.   You know Oakland pretty well, don't you?

A.   I lived there 30 years ago for a couple years, for several

years.

Q.   All right.  You're in the Bay Area and you're a sports

fan.  You know Oakland pretty well, right?

A.   Yeah, generally I know it, but not specifically too well.

Q.   All right.  And you knew Singer had some sort of

charitable sports camp going in Oakland, right?

A.   He had referenced that with me, yes.

Q.   And that seemed legitimate to you, that part at least?

A.   Yeah.  It seemed like he was doing something there,

correct.

Q.   Now, we've heard a lot from this tape where Singer visited

your home on December 3rd of 2018.  At the time, Singer was

working for the government, right?

A.   I found that out afterwards, yes.

Q.   Well, you now know at least he was wired up, as they say,

right?

```
 1   A.    I do.

 2   Q.    And he ended up taping, obviously, both you and himself

 3   during that meeting, right?

 4   A.    Correct.

 5   Q.    And didn't he end up telling you that he didn't think any

 6   money went to individuals at USC?

 7   A.    I don't believe we talked about USC.

 8   Q.    Okay.  Let's play a portion of 607.

 9         MR. KELLY:  For the record, it's transcript 49,

10   line 20.

11         (Audio recording played.)

12   Q.    You're talking about USC, right?

13   A.    That's correct.

14   Q.    It looks like you do use the word "funnel" sometimes,

15   don't you?

16   A.    Correct.

17         MR. KELLY:  Okay.  Keep going.

18         (Audio recording played.)

19   Q.    All right.  So Singer right there said to you, at least on

20   that occasion, he didn't think any money was going to USC

21   people, right?

22   A.    Uh-hum.

23   Q.    Is that a yes, sir?

24   A.    Can you repeat the question one more time?  Tell me

25   exactly where we are.
```

```
 1   Q.   Sure.  If you're looking at page 51 of the transcript at
 2   line 15, you say to him, and this is right after there's a
 3   reference to SC football, "but none of it you're saying really
 4   went to, really went to individuals."
 5            Singer, "I don't think so."
 6            You say, "Ah-hah."
 7            And Singer says, "I don't think so."  Then you keep
 8   talking a little bit.  That's what I'm referencing.
 9            He says, "could have been."
10:07 10         But he's certainly not saying to you on tape, yeah,
11   we were bribing people at USC.  He didn't say that, did he?
12   A.   At that point he did not, no.
13   Q.   Pretty clear he tells you "I don't think so," right?
14   A.   Yes.
15   Q.   Okay.  And it's quite possible he was telling other
16   parents that as well, right, no one's being bribed?
17            MR. FRANK:  Objection to what's possible.
18            THE COURT:  Sustained.
19   Q.   Now, yesterday you tried to explain that little blurb by
10:08 20  suggesting what you were doing was really investigating where
21   the money went.  Is that what you were trying to suggest
22   yesterday?
23   A.   No.
24   Q.   You weren't playing Sherlock Holmes here.  You were just
25   asking the question, right?
```

1    A.    No.  I was trying to get him to admit to me that he had

2    bribed people.

3    Q.    Oh.  So you turned into the investigator at that moment;

4    is that what you're telling this jury?

5    A.    Not at all.

6    Q.    Okay.  You were trying to nail him down on an admission;

7    is that your testimony?

8    A.    No.  I wanted him to tell me, you know, admit on -- you

9    know, when he's talking to me that he actually gave money to

10:09 10  people.

11   Q.    This was a man --

12   A.    He was pretty clever about not doing that.

13   Q.    This was a man who both threatened you and your wife

14   before he came to your house, right?

15   A.    You're talking about what would happen on the tape that he

16   left on --

17   Q.    Yes.

18   A.    Yes.  He left a threatening message.

19   Q.    Despite that, you're saying you decided to ferret out what

10:09 20  was going on yourself?  Is that your suggestion here?

21   A.    I don't understand what the threatening message has to do

22   with ferreting.  No.  Can you explain that to me?

23   Q.    Well, if he was so intimidating, does it really make any

24   sense that now suddenly you were going to question him about

25   where this money was going?

A.   I don't even see the relevance of that.  I wanted him to
admit to me what he had done.  He was still cagey about it.
Q.   Right.  Right.  Even when you pressed him, he said I don't
think so.  Even when you pressed him, he didn't tell you anyone
was being bribed, right?
A.   I believe he said he could have.  That was his admittance.
Could have.
Q.   Hold on.  Let me see if I'm reading this correctly.
A.   Sure.
Q.   Don't you, on page 51, say, "but none of it you're really
saying went to -- really went to individuals?"
          Singer, "No, I don't think so."
          Then --
A.   I believe if you read through this transcript -- can I
finish my statement?
Q.   I'll continue my question.  Okay?  You're the witness.
A.   You asked me a question and I'm telling you an answer.
You're giving me a specific location and taking a one off.  I'm
telling you I believe somewhere in this document I do recall he
said "could have", the word "could have".
Q.   We'll get to that in a second, sir.  You're not disputing
he told you at that junction there he didn't think any money
was going to individuals.  He told that you on tape in this
transcript, didn't he?
A.   To me, when someone says "I don't think so", that's not a

```
 1   very definitive answer.
 2   Q.   So when someone says "no, I don't think so", that could
 3   mean, yes, people are getting bribed?
 4   A.   No.  It doesn't mean that.
 5   Q.   Of course it doesn't mean that.  It's ridiculous.
 6        MR. FRANK:  Objection.
 7        THE COURT:  Sustained.
 8   Q.   If someone said, "no, I don't think so", they're
 9   indicating to you the answer is no, they don't think so,
10   correct?
11   A.   Technically, yes.
12   Q.   Then it goes on to the next page where Singer says "but in
13   this time."
14        You say, "Yeah."
15        "There could have been."
16        "Yeah."
17        "Folks like that, right?"
18        "Right."
19        "Okay."
20        "Okay."
21        So he tells you, I don't think so, there could have
22   been, but certainly no definitive discussion with you about
23   anyone being bribed at that point, correct?
24   A.   No.  No.  I'm telling you that if someone says "could have
25   been," that, to me, implies he could have bribed some people.
```

```
 1   Q.   I see.  And at that point he had no -- you were knee deep
 2   in fraudulent activity with Singer, right?
 3   A.   We had committed crimes.  That's for sure.
 4   Q.   All right.  So he did let down his guard with you.  You're
 5   not a new prospect client, right?
 6        MR. FRANK:  Objection.
 7        THE COURT:  Overruled.
 8   Q.   When the judge says overruled, you have to answer it.
 9   A.   No.  I understand that.  You're going to have to repeat
10   the question.
11   Q.   All right.  So at that time, by this point, at this tape,
12   in this chronology, you were in cahoots with Singer, right?
13   A.   We had committed crimes for sure.
14   Q.   All right.  And so he could let down his guard and speak
15   freely with you, couldn't he?
16   A.   That's an assumption.  I don't know.
17   Q.   Okay.  And even though you've been committing crimes with
18   him, he was still cagey about whether anyone was getting money,
19   correct?
20   A.   That's for sure.
21   Q.   And you were not some new client of his.  You were an
22   individual client and different from anyone else, right?
23   A.   I was an individual client and what?
24   Q.   Yeah.  Your situation was unique to you, correct?
25        MR. FRANK:  Objection.
```

                1          THE COURT:  Give me the question again.

                2   Q.   Your situation was unique to you, correct?

                3   A.   In my discussion --

                4          MR. FRANK:  Calls for speculation.

                5          THE COURT:  No.  I don't think so.  You can answer

                6   that question.

                7   A.   So you're saying my discussions that I was having were

                8   just related to me; is that what you're saying?

                9   Q.   Your situation was unique to you, right?

    10:13  10   A.   I've asked you a question.  I'll ask it again.  Are you

               11   saying that my discussions with him were unique to me?  Is that

               12   what you were talking about?

               13   Q.   You know what the word "unique" means, right?

               14   A.   Of course I do.

               15   Q.   Okay.  You don't know what he was saying to other parents,

               16   do you?

               17   A.   I do not.

               18   Q.   You know what he was saying to you?

               19   A.   That's correct.

    10:13  20   Q.   And you know what your mindset was, right?

               21   A.   Yes.

               22   Q.   And you don't know what these other parents' mindset were

               23   when you weren't even present for the discussions with someone

               24   like Mr. Abdelaziz, right?

               25   A.   No, I would not know that.

```
 1   Q.   Now, you pled guilty back in May of 2019, correct?
 2   A.   Correct.
 3   Q.   And you were supposed to be sentenced for your crimes in
 4   July of this year, right?
 5   A.   I believe so.
 6   Q.   But that sentencing hearing got delayed, right?
 7   A.   Yes.
 8   Q.   It got moved until January of 2022, correct?
 9   A.   That's correct.
10:15 10   Q.   And that's so you can get credit for your testimony here
11   today, right?
12   A.   That's because I'm a cooperating witness.  Until I'm
13   finished, I won't be sentenced.
14   Q.   Right.  So you can get credit for your testimony, right?
15   A.   Yes.
16   Q.   I mean, you're obviously getting a reduction in your
17   sentence when you cooperate, right?
18   A.   That's -- it's not obvious that I'll get that.  I'm
19   hopeful of that.
10:15 20   Q.   That's why you're here, to get a credit, correct?  That's
21   the point.
22   A.   I'm here to do what I promised to do, tell the truth and
23   be present.
24   Q.   And the truth is you have no idea who Gamal Abdelaziz is;
25   isn't that the truth?
```

```
 1   A.    I think I've told you that three or four times.

 2   Q.    So it's the truth, right?

 3   A.    I know nothing about Gamal Abdelaziz -- I've forgotten his

 4   first name.  Gamal.  Gamal.

 5   Q.    And the truth is, you hope if you help the government

 6   convict Abdelaziz, you'll get a break on your sentence, right?

 7   A.    No.

 8   Q.    Well, isn't that why you're here today, to try to get a

 9   break?

10   A.    I'm here to tell the truth.  I'm here to be present and do

11   the best of my memory and tell you everything I know about the

12   case.

13   Q.    Right.  And the truth is, you're facing some serious

14   prison time, aren't you?

15   A.    When you say the word "serious" --

16   Q.    Well, would 37 months in prison be serious to you?

17   A.    Yes, but that's not what I'm anticipating.

18   Q.    It's not what you're anticipating?

19   A.    No, it's not.

20   Q.    Okay.  When you pled guilty before a different judge in a

21   different federal courtroom, isn't that what the prosecutor

22   said the government would recommend before you cooperated?

23   A.    Yes, is it.

24   Q.    So without cooperation, the government is going to

25   recommend 37 years -- 37 months.  That's bad enough.  37 months
```

1    in prison, right?

2         MR. FRANK:  Objection to what the government's going

3    to do.

4         THE COURT:  Overruled.

5    Q.   Right?  Didn't the government say that on the record when

6    you pled guilty, that they would recommend the low end of the

7    guideline range, and your low end is 37 months, right?

8    A.   Yes.  I believe that is correct.

9    Q.   Okay.  So it's a serious sentence hanging out there for

10   you?

11   A.   If that was the case, it would have been, yes.

12   Q.   Well, you haven't been -- you haven't spent a day in jail

13   yet, have you?

14   A.   I have not.

15   Q.   And you're hoping not to spend a day in jail, right?

16   A.   Of course I would not like to go to jail.

17   Q.   And you don't want your wife to go to jail either, right?

18   A.   I would hope she wouldn't go to jail either, yes.

19   Q.   And her low end that the government will recommend without

20   cooperation is 27 months in jail, right?

21   A.   I don't remember the exact amount, but yes.

22   Q.   All right.  She was there pleading guilty with you in

23   front of the same judge when the government said this on the

24   record in front of you, right?

25   A.   I'm trying to remember if she was there with me when we

1  both pleaded guilty.  I believe so.

2  Q.   Do you want me to show you the transcript of the hearing?

3  A.   No, no, no.  Yeah.  It was quite a while ago, yeah.

4  Q.   So she was there with you, right?

5  A.   I believe so.

6  Q.   And the low end for her was 27 months.  Do you recall that

7  being said?

8  A.   I do not remember the exact amount of time that she was

9  facing.

10:19  10  Q.   All right.  Let me show you --

11  A.   I'm sure if that's what it is in the record, that's what

12  it is, but I don't recall the exact number of months.

13  Q.   All right.  But does that sound in the ballpark of what

14  you think she's facing as well?

15  A.   Yes.

16  Q.   Okay.  So the crime that you've admitted to, those are

17  some serious sentences, right?

18  A.   Those are lengthy terms, yes.

19  Q.   But you said moments ago you don't expect to get that?

10:19  20  A.   I did.

21  Q.   And has someone promised you already that you're going to

22  get a sentence below the guideline range?

23  A.   No.

24  Q.   Then why don't you expect to get that?

25  A.   Because no one in this -- none of the other parents

1    involved got anywhere near that kind of sentence.

2    Q.   Okay, but your guideline ranges is 37 months, right?  Has

3    anyone said to you --

4    A.   I've told you, no one has said anything to me.  And,

5    again, I know what other parents have received.  It's quite

6    a -- substantially less.

7    Q.   I want to know what you think you're receiving.  Do you

8    think you're getting any time in jail after you testify here

9    today?

10:20 10   A.   I have no idea.

11   Q.   And the information you pled guilty to, three different

12   charges, right?

13   A.   Correct.

14   Q.   There was a money laundering conspiracy?

15   A.   Correct.

16   Q.   By the way, are you aware that Mr. Abdelaziz is not facing

17   any money laundering charges?

18   A.   I am not.

19   Q.   You don't know what he's charged with, do you?

10:20 20   A.   Not exactly.

21   Q.   Okay.  And you pled guilty to a conspiracy related to

22   taxes?

23   A.   That is correct.

24   Q.   Are you aware he's not facing any conspiracy related to

25   taxes?

A.    I'm not.

Q.    How about your honest services conspiracy that you pled

guilty?  Do you recall that charge?

A.    Yes.

Q.    In that charge, about ten different people are referenced:

Rick Singer, Mark Riddell, Igor Dvorskiy, Niki Williams.  They

all pertain to the test scheme, test fraud scheme you engaged

in, right?

A.    I don't know all those individuals' names.

Q.    Do you know who Mark Riddell is?

A.    I do now, yes.

Q.    All right.  So some of these names you don't -- you've

never heard of Igor Dvorskiy?

A.    I've heard that name.  I've never heard of Niki.

Q.    Was she employed at this test center in Houston?

A.    I don't know anything about the Houston test center.

Q.    All right.  Steven Masera, Donna Heinel, Ali Khosroshahin?

A.    I don't know that name.

Q.    Jorge Salcedo, Laura Janke and Gordon Ernst.  There's no

mention of Gamal Abdelaziz in the charges you pled guilty to,

is there?

          MR. FRANK:  Your Honor, I object.

          THE COURT:  Sustained.

Q.    Well, let me ask you this, sir.  Your testimony here

today, it's the government who controls whether or not a motion

1    is made to get you credit; isn't that true?

2    A.   Yes.

3    Q.   So if they're not happy with your performance here,

4    there's no motion for you to get credit, right?

5    A.   I don't believe that's the case.

6    Q.   Well, isn't the determination of whether defendant has

7    provided substantial assistance rest solely in the discretion

8    of the U.S. Attorney and is not subject to appeal or review?

9    Do you remember that line in your Cooperation Agreement?

10:23 10   A.   Yes, vaguely.

11   Q.   Let's bring that one up, Cooperation Agreement.  It's

12   Exhibit 675.  Let's go to Section 2, please.  Let's highlight

13   the first paragraph under Section 2 and the first sentence

14   there.  "Should the Defendant provide substantial assistance in

15   the investigation or prosecution of another person who has

16   committed a criminal offense, the U.S. Attorney agrees that, at

17   or before sentencing, the U.S. Attorney will file a motion

18   under the guideline section 5K1.1 to recommend that the Court

19   impose a sentence below the advisory Guidelines sentencing

10:24 20   range", which, in your case, was beginning at 37 months, right?

21   A.   Correct.

22   Q.   And the first sentence of the next paragraph, "The

23   determination whether Defendant has provided substantial

24   assistance rests solely in the discretion of the U.S. Attorney

25   and is not subject to appeal or review".

| | |
|---|---|
| 1 | Did I read correctly? |
| 2 | A.   You did. |
| 3 | Q.   All right.  So you had indicated earlier you thought it |
| 4 | was up to the judge to sentence you, right? |
| 5 | A.   Correct. |
| 6 | Q.   And again, it's not this particular federal judge.  It's a |
| 7 | different particular federal judge, correct? |
| 8 | A.   Correct. |
| 9 | Q.   But that judge in your case can't file this motion without |
| 10:24 10 | a government request, right?  It's up to the government to |
| 11 | determine whether or not this Substantial Assistance Motion |
| 12 | gets filed, right? |
| 13 | A.   Correct. |
| 14 | MR. KELLY:  Nothing further at this time, your Honor. |
| 15 | THE COURT:  Cross-examination, Mr. Kendall. |
| 16 | MR. KENDALL:  It will be Mr. Tomback, your Honor. |
| 17 | THE COURT:  I'm sorry? |
| 18 | MR. KENDALL:  It will be Mr. Tomback. |
| 19 | THE COURT:  Mr. Tomback. |
| 10:25 20 | CROSS-EXAMINATION OF BRUCE ISACKSON |
| 21 | BY MR. TOMBACK: |
| 22 | Q.   Good morning, Mr. Isackson.  My name's Andy Tomback.  I |
| 23 | represent John Wilson. |
| 24 | You've never met my client Mr. Wilson, John Wilson. |
| 25 | I'm pointing to him.  He's sitting there next to |

```
 1    Ms. Papenhausen.

 2    A.    I have met him before.

 3    Q.    When did you meet him?

 4    A.    I met him several times.  I've been to his home.

 5    Q.    You've been in his home for an Autism Speaks fundraiser,

 6    right, that he held?

 7    A.    That's correct.

 8    Q.    And you were there?

 9    A.    It was a school event, or -- yeah.  A public school event.

10    Q.    But he also had an Autism Speaks event that you attended,

11    correct?

12    A.    I don't remember the topic.

13    Q.    It was a fundraiser for a nonprofit, correct, that he

14    hosted?

15    A.    No, no.  I met him for a Hillsborough school function.

16    Q.    Okay.  And let me ask -- have you met their oldest son at

17    that event, Johnny Wilson, a graduate of USC?

18    A.    No.

19    Q.    Have you met either of their twin daughters, Mimi or

20    Courtney Wilson?

21    A.    No.

22    Q.    You haven't talked to any of the Wilsons in substantive

23    conversation or on the phone or e-mailed them, have you?

24    A.    No.

25    Q.    Somebody else made the arrangements for you to show up at
```

| | |
|---|---|
| 1 | the fundraiser, not Mr. Wilson himself directly with you? |
| 2 | A.    It was a school event. |
| 3 | Q.    That's not responsive.  Can you answer my question? |
| 4 | MR. FRANK:  Objection. |
| 5 | THE COURT:  Sustained. |
| 6 | Q.    Did Mr. Wilson invite you into his home or did you attend |
| 7 | a function at his home that was organized by somebody else? |
| 8 | A.    Yes.  I attended a school function that was organized by |
| 9 | someone else. |
| 10:27 10 | Q.    And you've spoken a fair amount about people that you |
| 11 | know.  You remember the conversation that was recorded where |
| 12 | you mentioned various people in the Hillsborough area?  How big |
| 13 | a town is Hillsborough? |
| 14 | A.    I believe the population's 10 or 11,000. |
| 15 | Q.    And you're -- you made a point that -- a point of pointing |
| 16 | out the people that you knew in Hillsborough.  You pointed out |
| 17 | you went to a fundraiser and tangentially, quote/unquote, know |
| 18 | Mr. Wilson, is that correct?  In your direct testimony, |
| 19 | Mr. Frank asked you questions and you answered them where you |
| 10:28 20 | indicated that you knew people in the Hillsborough area, |
| 21 | correct? |
| 22 | A.    I'm sorry.  Are you saying that I said I knew people, just |
| 23 | people in the Hillsborough area?  What is your question? |
| 24 | Q.    Correct.  Correct. |
| 25 | A.    Yes.  Of course. |

1   Q.   Okay.  You're an admitted test cheater, right, or you

2   arranged test cheating to the benefit of your children; is that

3   fair?

4          MR. FRANK:  I'm objecting to the question.

5          THE COURT:  I did not hear the question.

6   Q.   You're an admitted test cheater; is that fair to say?

7   A.   I paid to have scores altered for my daughter.

8   Q.   You're a tax evader?

9   A.   I took a write-off that was not appropriate, yes.

10:29 10  Q.   Yes, you're a tax evader?

11  A.   I committed tax evasion, correct.

12  Q.   And you're someone who readily agreed on two occasions to

13  submit a fake bio to a college, both of those -- actually, you

14  deceived for Lauren three colleges and you deceived for Audrey

15  one college; is that fair to say?

16  A.   We did not have three for Lauren.

17  Q.   I didn't hear the answer, Mr. Isackson.

18  A.   I said we did not do three for Lauren.

19  Q.   You're not counting UCSB?

10:29 20  A.   We didn't apply to UCSB.

21  Q.   Mr. Singer didn't create a profile for your daughter as a

22  basketball player?

23  A.   He did not, no.

24  Q.   You don't recall that?

25  A.   I know for a fact he did not create a file as a basketball

1    player for UC Santa Barbara.

2    Q.    And in terms of Hillsborough, it's made up of how many

3    people, 11,000 people?

4    A.    Like I said, 10 or 11,000 people.

5    Q.    And they're rich, poor and middle class people in

6    Hillsborough?

7              MR. FRANK:  Objection.  Relevance.

8              THE COURT:  Sustained.

9    Q.    There's honest and dishonest people in Hillsborough?

10:30 10              MR. FRANK:  Objection.  Relevance.

11              THE COURT:  Sustained.

12    Q.    You would agree that your daughter Lauren is an honest

13    person?

14    A.    Yes.

15    Q.    She wasn't involved in your and your wife's supplying a

16    photo to Singer to use to make her a fake athlete?

17    A.    I don't believe she was.

18    Q.    When she was at UCLA, she was involved in event

19    management, no?

10:30 20    A.    What do you mean by event management?

21    Q.    Did she participate or -- on her own or during her time in

22    college participate in event management?

23    A.    I don't believe she did.  I don't know exactly what that

24    term means.  What is event management?

25    Q.    Do you recall the fact that she had an interest in event

1    management, specifically in connection with the Gamma Phi Beta

2    sisterhood?

3    A.   I have no idea.

4    Q.   Have you heard of anything called The Wall Group?

5    A.   Yes.

6    Q.   What's The Wall Group?

7    A.   It's where she worked.

8    Q.   Do you understand her to have been involved or do you keep

9    track of what she did at that place?  What did she do at The

10:31 10   Wall Group, if you know?

11            MR. FRANK:  Objection.  Compound and relevance.

12            THE COURT:  Sustained.

13   Q.   Do you know if she was involved in event management at The

14   Wall Group?

15            MR. FRANK:  Objection.

16            THE COURT:  Overruled.  If he knows.

17   A.   I don't know her exact duties over there, no.

18   Q.   Do you know if she prepared a resume at some point in time

19   when she was at UCLA?

10:32 20   A.   A resume for what purpose?

21   Q.   Let me direct your attention -- let's put up on the

22   monitor VB-RECORDS-00535.

23            MR. FRANK:  Objection to this appearing in front of

24   the jury.

25            THE COURT:  Don't show it to the jury unless it's

 1    admitted into evidence.

 2            MR. TOMBACK:  Can we show to the witness

 3    VVB-RECORDS-00535 and 086.

 4            MR. FRANK:  Can we see a copy?

 5            THE COURT:  Show a copy to counsel, please.

 6            MR. TOMBACK:  For the record, that's Exhibit DX-9621.

 7            THE COURT:  Okay.  We just have exhibits.  We don't

 8    have letters in front of them.  What is it?

 9            MR. TOMBACK:  Trial Exhibit 9621.

10:33 10         THE COURT:  9621?

11            MR. TOMBACK:  Correct, Your Honor.

12            MR. FRANK:  I object to this document.  This

13    document -- this witness has never seen this document.

14            THE COURT:  He can show it to the witness to refresh

15    his memory, if that's what the purpose is.

16            MR. TOMBACK:  Your Honor, the purpose is just to

17    review the document to define the use of the word "embellish",

18    which is a word that the government used in its opening six

19    times and it --

10:33 20         THE COURT:  Show him the document, have him read it

21    and then we'll take the document down and see if it refreshes

22    his memory.

23            MR. TOMBACK:  Sure.  On the screen, or do you want me

24    to hand it to him?

25            THE COURT:  No, no, no.  He's got it on the screen, I

```
 1    presume.
 2            THE WITNESS:  I don't have it here.
 3    Q.   We'll scroll it from the bottom up here, and let him know
 4    if you need it to go slower.
 5    A.   Okay.
 6            MR. FRANK:  Your Honor, I believe Mr. Tomback's screen
 7    is visible to the jury.
 8    Q.   Are you done?
 9    A.   I've read a little bit of it.  It's going fast.
10    Q.   Let me make it easier for you.  Let me have Randall hand
11    you a copy of the document.
12    A.   Sure.
13    Q.   Here's a copy of Trial Exhibit 9621.  Directing your
14    attention to the top of the document, Mr. Isackson --
15    A.   Can I read through it?
16    Q.   Sure.  Take your time.  I thought you were done.
17    A.   Okay.
18    Q.   Going from the bottom up, Mr. Isackson, do you understand
19    this to be in substance and summary --
20            MR. FRANK:  Objection.
21            THE COURT:  You're not going to summarize the
22    document.  He's looked at it.  You can take the document away.
23    You can now ask whether it refreshes his memory about the line
24    of questioning.  If you're -- but you can't take him through
25    the document.  It's not in evidence.
```

```
 1   Q.   Do you recall now that your daughter was involved in event
 2   planning and sought to get a summer job?
 3   A.   Absolutely not.  I don't recall that.  I had nothing to do
 4   with this.  My wife had conversations with Mikaela.  I never
 5   spoke to the woman once.
 6   Q.   And with respect to your daughter Lauren -- you read the
 7   document, right, right, Mr. Isackson?
 8   A.   Yes.
 9   Q.   Do you recall on direct exam that you testified and you
10   used the word "embellished"?
11   A.   I don't recall the exact -- whether I said that exactly,
12   no, I don't recall that.  If you said I did, I'm sure I did.  I
13   don't recall.
14   Q.   Let's direct your attention to the transcript from
15   yesterday, page 96, line 1.
16             THE COURT:  This is in 607?
17             MR. TOMBACK:  Yes.
18             THE COURT:  Where is the page again?
19             MR. TOMBACK:  It's page 96, Your Honor, line 6.
20             MR. FRANK:  This is a trial transcript.
21             MR. TOMBACK:  It's 96 in the transcript, your Honor.
22   Sorry.  Trial transcript from yesterday, your Honor.
23             THE COURT:  I don't have it.
24             MR. FRANK:  Is this being shown to the witness only?
25             THE COURT:  Yes, just to the witness.
```

10:37 10
10:38 20

1          MR. TOMBACK:  It's yesterday's testimony, Mr. Frank.

2          MR. FRANK:  It's not in evidence.  It's a document.

3          THE COURT:  Mr. Tomback, you can show him a copy of

4      the transcript from yesterday, but it's not --

5          MR. TOMBACK:  I understand.

6      Q.   Does that refresh your recollection, line 6, specifically

7      line 8 in the middle, that you used the word "embellish" when

8      you testified yesterday in response to Mr. Frank's questions?

9      A.   I do see that, yes.

10:38 10   Q.   Now, that was early in your testimony, correct?

11     A.   Yes.

12     Q.   And the word "embellish" doesn't really describe what

13     happened with respect to your daughter or her bio, correct?

14          MR. FRANK:  Objection.  Actually, withdrawn.  Sorry.

15     A.   I think we're talking about Lauren, aren't we?

16     Q.   No.  I'm switching over to Audrey.  Audrey is the -- let's

17     be clear, Audrey is your daughter where all you submitted was a

18     headshot, correct?

19     A.   I know, but I thought I saw college here, so go ahead.  It

10:39 20   said soccer player and there was nothing about Audrey for

21     soccer.

22     Q.   Mr. Isackson, the transcript -- the important thing is the

23     appearance of the word "embellish", that Singer would embellish

24     her record, right, to convince the program she was capable of

25     being a Division 1 soccer player?  That's with respect to

1    Lauren.  I'm now switching to Audrey.

2    A.    Okay.  You confused me.  I believe this has to do with

3    Lauren and you're talking about Audrey and this has nothing to

4    do with Audrey.

5    Q.    Okay.  With Audrey's bio, if I could just stay with Audrey

6    for a moment, Mr. Isackson.  With Audrey's bio, you only

7    submitted to Mr. Singer a headshot, correct?

8    A.    That is correct.

9    Q.    He made her into an oarswoman.  Did you even know he was

10:40 10   making her into an oarswoman?  Did you know what sport he was

11   making her?

12   A.    He was taking her through the crew department, so I assume

13   it obviously had something to do with crew.

14   Q.    An oarswoman, a woman who rows, who uses an oar to row a

15   boat.

16   A.    Yeah.  I assume.

17   Q.    But you don't know anything else about Audrey's profile

18   and how it was created?

19   A.    No.

10:40 20   Q.    And he made them up entirely?  He, Singer, or one of

21   Singer's people, made up your daughter's credentials entirely,

22   correct?

23   A.    We provided him a headshot and his organization took it

24   from there.

25   Q.    That bio, in appearance, was a fiction?

```
 1   A.   Absolutely.  She was not a crewsman, whatever you call

 2   them, oarsman.

 3   Q.   When you testified before, you were trying to -- well, in

 4   fairness, Mr. Singer didn't embellish Audrey's skills as an

 5   oarswoman, he just made them up, correct?

 6   A.   Yes.  I guess the way you're phrasing it, I guess that's

 7   correct.

 8   Q.   Well, you need something to start with.  You need a

 9   foundation to embellish, correct?

10:41 10   A.   Yeah, but he exaggerated immensely, I'm sure, to make her

11   profile -- if she had to be a Division 1 crew person or

12   whatever you call it.  It would have to be, in my opinion,

13   blown up huge to be that kind of elite athlete.

14   Q.   So let me direct your attention back to the document.

15   Does it refresh your recollection that when she wanted to

16   get -- when Lauren wanted to get help when she was at college,

17   wanted to get help from Ms. Sanford --

18        MR. FRANK:  Objection, your Honor.

19   Q.   -- she asked her to embellish her resume?

10:41 20        MR. FRANK:  Objection, your Honor.  He has no

21   testimony of this.

22        THE COURT:  He can answer that question, if he

23   understands it.

24        MR. FRANK:  Can we take the document down?  It's back

25   up.
```

|    |                                                                    |
|----|--------------------------------------------------------------------|
| 1  | THE COURT:  Yes.  Take the document down.                          |
| 2  | A.   Can you repeat the question?                                  |
| 3  | MR. TOMBACK:  Can I have it read back.                             |
| 4  | (Reporter reads back as requested.)                               |
| 5  | A.   Yes.  That's what it says.                                    |
| 6  | Q.   Did you think she was being dishonest when she asked          |
| 7  | Mikaela Sanford to embellish her resume?                          |
| 8  | MR. FRANK:  I don't believe the witness was answering             |
| 9  | the prior question.                                               |
| 10 | THE COURT:  I don't know what the witness was              10:42  |
| 11 | answering, but ask the next question, Mr. Tomback.                |
| 12 | Q.   Do you think your daughter was being dishonest when she      |
| 13 | asked Ms. Sanford to embellish her resume?                       |
| 14 | MR. FRANK:  Objection to facts not in evidence.                  |
| 15 | THE COURT:  Overruled.                                            |
| 16 | A.   The way this is written, the text of this thing, it          |
| 17 | doesn't appear --                                                 |
| 18 | MR. FRANK:  Objection.                                            |
| 19 | THE COURT:  I don't know the nature of the objection.            |
| 20 | MR. FRANK:  There's a document in front of him that       10:43  |
| 21 | he's reading from.                                                |
| 22 | THE COURT:  Take the document down.  Ask him whether             |
| 23 | it refreshes his memory, and we'll go from there.  He can't      |
| 24 | testify from the document itself.                                |
| 25 | Q.   Does it refresh your memory that your daughter, when         |

         1    asked -- when she asked to improve her resume, she asked to

         2    have it embellished?

         3    A.    That's what is there.

         4          MR. FRANK:  Can we take the document away from the

         5    witness?

         6          THE COURT:  It's apparently off the screen.

         7          MR. FRANK:  He's got a copy up there in front of him.

         8    May I?

         9          THE COURT:  Somebody can retrieve the document.

10:44   10    Q.    Mr. Isackson, the word "embellish" can mean a person said

        11    truthful and positive things, correct?

        12    A.    Repeat that question again.

        13    Q.    The word "embellish" can be used in a manner where the

        14    person wants something -- wants -- the person wants something

        15    truthful and positive to happen to, say, a resume?

        16          MR. FRANK:  Objection to what a person wants.

        17    A.    It's very confusing.

        18          THE COURT:  If he understands the question, he can

        19    answer it.

10:44   20    A.    I don't.  It's very confusing to me.

        21    Q.    The word "embellish" can be used in a truthful and

        22    positive fashion?

        23    A.    You can embellish, you can enlarge something that's

        24    truthful, yes.

        25    Q.    You can also embellish it without enlarging it, can't you?

 1    You can just make it look better, as your daughter asked

 2    Mikaela Sanford for her resume, right?

 3            MR. FRANK:  Objection to facts not in evidence.

 4            THE COURT:  Overruled.

 5    A.    Okay.  Repeat the question again.

 6    Q.    I'll have it read back.

 7    A.    Sure.

 8            (Reporter reads back as requested.)

 9    A.    I believe in the context there she was making it to look

10:45 10    larger, yes.

11    Q.    In the context there, she wanted all of her

12    accomplishments to be included in her resume, correct?

13    A.    Yes.

14    Q.    She wanted her experience in the sisterhood planning

15    events to be included in her resume, correct?

16            MR. FRANK:  Objection to what someone else wanted.

17            THE COURT:  Sustained.

18    Q.    Again, your daughter used the word "embellish" in an

19    honest and truthful way, correct?

10:45 20            MR. FRANK:  I object to this, your Honor.

21            THE COURT:  Sustained.

22            MR. FRANK:  He's reading from a document again.

23    Q.    If Lauren were to use the word "embellish" to describe her

24    credentials, she would be using the word to describe a positive

25    description that was honest and truthful?

```
 1                MR. FRANK:  Objection.

 2                THE COURT:  He can answer that, it's a hypothetical

 3      question, if he agrees with it.

 4      A.   I don't.  I don't really understand the question.  To me,

 5      it's enlarging.

 6                MR. TOMBACK:  Can I have a moment, your Honor?

 7                THE COURT:  Yes.

 8      Q.   With respect to your daughter, when you say embellish

 9      means to enlarge things, are you testifying that when your

10:47 10 daughter used the word "embellish," she wanted to enlarge, in a

11      misleading way, her resume?

12                MR. FRANK:  Objection to what his daughter wanted.

13                THE COURT:  Sustained.

14      Q.   You know the government's seen your and your wife's

15      e-mails, correct?

16      A.   Correct.

17      Q.   They have your tax returns and related correspondence,

18      correct?

19      A.   Correct.

10:47 20 Q.   And from both you and Mr. Singer they have your and your

21      wife's e-mails, correct?

22      A.   Correct.

23      Q.   And they have a large number of tape recordings of Singer

24      and you and your children and your wife, correct?

25      A.   I don't know about a large recording.  I know they have
```

several.

Q.   They have the December 3rd recording.  They have the

October 24th recording from 2018.  They have a few from

September.  They have a few from August.  They have a bunch,

right?

A.   I only think there's two or three, but I don't know.  You

tell me how many there are.

Q.   I'll represent to you that there's more than two or three,

if you accept my representation.

A.   How many are there?

          MR. FRANK:  Objection to counsel testifying.

          THE COURT:  I did not hear the answer of the witness.

          THE WITNESS:  I'm sorry?

          THE COURT:  I did not hear the witness' answer.

A.   I don't know the exact amount.  I didn't think there was

many.

Q.   Will you accept my representation that in all those

recordings, all those documents and e-mails, that the

government produced to the defense in this case that you never

once used the word "embellish"?

          MR. FRANK:  I object, your Honor.

          THE COURT:  Overruled.

A.   I have no idea.

Q.   Will you accept my representation that it never occurred,

that we put the word "embellish" into the database with respect

```
 1    to the Isackson documents?
 2             MR. FRANK:  I object.
 3             THE COURT:  This is going too far.  Sustained.
 4    Q.   Do you accept my representation that the only documents
 5    that turned up --
 6             MR. FRANK:  I object to the acceptance --
 7             THE COURT:  He doesn't have to accept your
 8    representation.  So move forward, Mr. Tomback.
 9    Q.   Your lawyer, David Weinraub, is Mr. Frank's former boss,
10    correct?
11             MR. FRANK:  Objection.
12             THE COURT:  Sustained.
13    A.   Repeat that question?
14             THE COURT:  There's no question before you.
15             THE WITNESS:  Oh.  I'm sorry.
16    Q.   In your preparation sessions, Mr. Kelly went over with you
17    the number of times that you prepared your testimony and met
18    with the government, correct?
19    A.   I'm sorry.  Repeat that again.
20    Q.   Mr. Kelly went over with you the number of times that you
21    prepared your testimony and met with the government?
22    A.   We went through a bunch of documents.
23    Q.   Right.  How many times did you meet with the government
24    before you testified -- before your testimony here today?
25    A.   I'm not sure of the exact amount of times.
```

```
 1    Q.    Okay.  And you went over -- he covered -- I'd like to move

 2    through it, but he covered it.  There were meetings that were

 3    several hours long, correct?

 4    A.    Correct.

 5    Q.    And your counsel was in the room for those meetings,

 6    correct?

 7    A.    That's correct.

 8    Q.    How many of your counsel?

 9          MR. FRANK:  Objection.  Relevance.

10:50 10          THE COURT:  I didn't hear the question.

11    Q.    How many of your counsel were present?

12          THE COURT:  Overruled.

13    A.    Two, both my attorneys.

14    Q.    And how many government prosecutors and agents were

15    present, on average?

16    A.    I think it was maybe three.

17    Q.    In those meetings, did the word -- in those sessions when

18    you did your dry runs, do you recall whether you used the

19    word --

10:51 20          MR. FRANK:  Objection.

21          THE COURT:  Overruled.

22    Q.    Did you use the word "embellished" in your testimony in

23    the practices?

24          MR. FRANK:  Objection to --

25          THE COURT:  I didn't hear the question and I didn't
```

1   hear the objection because there were over each other.  So say

2   the question.  After the question, if you have an objection,

3   object.

4          MR. FRANK:  Yes, your Honor.

5   Q.   When you rehearsed your testimony, did you use the word

6   "embellish" in the dry runs?

7          MR. FRANK:  Objection to rehearsed, Your Honor.

8          THE COURT:  Overruled.

9   A.   I don't recall.

10:52 10          MR. TOMBACK:  Your Honor, we have a stipulation for

11   authenticity for all documents from The Key.  Government

12   exhibit -- sorry -- trial Exhibit 9621, the document that I put

13   in front of Mr. Isackson, is from The Key.  I offer it into

14   evidence.

15          MR. FRANK:  I object, your Honor.  The stipulation to

16   authenticity does not make it admissible.

17          THE COURT:  Sustained.

18   Q.   So to recap what was covered in your direct, you testified

19   that, quote, there's no way Lauren could have gained entry to

10:53 20   the school, USC, on her grades or test scores, correct?

21   A.   That is correct.

22   Q.   And you admitted she wasn't even close to being qualified

23   to play soccer at USC?

24   A.   That is correct.

25   Q.   She did not even intend to play the sport in college?

1    A.    That is correct.

2    Q.    Same goes for Audrey?

3    A.    She wasn't going to play soccer.  She was not going to

4    play a sport.

5    Q.    Right.  She certainly wasn't going to row?

6    A.    That's correct.

7    Q.    Without Singer's help, your state of mind is clear, your

8    daughters could not get into colleges that you and Singer

9    focused on, correct?

10:53 10   A.    Can you repeat that question?

11   Q.    Without Singer's help, your state of mind at the time was

12   clear, your daughters could not get into the colleges that they

13   were applying?

14   A.    That is correct.  Well, those specific schools, correct.

15   Q.    Those specific schools.  Those specific schools were not

16   where they began their focus.  Lauren was focused on Miami,

17   right, University of Miami, where Davina went?

18   A.    She applied there and she was accepted.

19   Q.    That's not my question, Mr. Isackson.  Her focus to begin

10:54 20   with for colleges was the University of Miami -- withdrawn.

21           Her focus with colleges before Mr. Singer entered the

22   picture was not USC?

23   A.    That was one of the schools she wanted to go to.

24   Q.    But she wasn't eligible to go there.  Neither her grades

25   nor her test scores --

| | |
|---|---|
| 1 | A.   You're talking about Miami.  Miami is what you were |
| 2 | talking about.  You said her focus was Miami.  I said that's |
| 3 | where she wanted to go. |
| 4 | Q.   I got that. |
| 5 | A.   Okay. |
| 6 | Q.   When Mr. Singer entered the picture, she wanted to go to |
| 7 | USC when he was done with you and her, correct? |
| 8 | A.   He mentioned that was a school that he had influence and |
| 9 | she liked it. |
| 10:55 10 | Q.   Okay.  And she couldn't get in there without help? |
| 11 | A.   Absolutely.  On her test scores or grades, that's correct. |
| 12 | Q.   You've committed crimes with Mr. Singer? |
| 13 | A.   Did I what? |
| 14 | Q.   You committed crimes with Mr. Singer? |
| 15 | A.   Yes. |
| 16 | Q.   You didn't voluntarily turn yourself in?  You were |
| 17 | arrested? |
| 18 | A.   That's correct. |
| 19 | Q.   After you were caught, you quickly -- you testified, you |
| 10:56 20 | very quickly admitted that you were guilty of a crime. |
| 21 | April 3rd you signed your Plea Agreement, right? |
| 22 | A.   Correct. |
| 23 | Q.   You were very quick to become a cooperator, correct? |
| 24 | A.   We were very quick to admit our guilt and we agreed to |
| 25 | cooperate. |

1   Q.   You didn't have much choice because you had helped -- you
2   had helped one of your child become a test cheater, correct?
3   A.   Yes.
4   Q.   And you were on tape arranging to have a second child
5   become a test cheater?
6   A.   We were discussing it.
7   Q.   And Mr. Kelly covered a fair amount of the Plea Agreement
8   and the Cooperation Agreement.  Your minimum sentencing
9   guideline is 37 months.  You understand that much, right?
10:57 10   A.   Yes.
11          MR. FRANK:  Objection to the characterization of it.
12          THE COURT:  I'm not sure I understand it.
13          MR. FRANK:  I'll withdraw it, your Honor.
14   Q.   Unless the government makes a motion to your sentencing
15   judge, the Sentencing Guideline for you is 37 to 46 months,
16   correct?
17   A.   Technically that's correct, yes.
18   Q.   Right.  I don't want to get into technically.  You do
19   understand when you signed the Cooperation Agreement that the
10:57 20   Sentencing Guidelines that were agreed upon were 37 to
21   46 months?
22   A.   Yes.  That is correct.
23   Q.   And I heard your testimony.  You think you're going to get
24   less, right?
25   A.   Definitely hopeful of that, yes.

1   Q.   But the judge can't depart from that 37 to 46-month range

2   unless the government makes the motion.   Do you understand

3   that?

4            MR. FRANK:   Objection to what the judge --

5            THE COURT:   Sustained.

6   Q.   You're hoping the government makes that motion, aren't

7   you, Mr. Isackson?

8   A.   Absolutely.

9   Q.   You really want it?

10:58 10   A.   Of course I don't want to go to jail for a long time.

11   Q.   Okay.  And you testified on direct about your Cooperation

12   Agreement and your Plea Agreement and you emphasized a number

13   of times that it requires you to testify truthfully?

14   A.   Absolutely.

15   Q.   You're just here to testify truthfully, correct?

16   A.   Absolutely.

17   Q.   I won't repeat what Mr. Kelly covered with you about

18   whether you'll lie to save your wife jail time or lie to save

19   yourself jail time because you're going to testify truthfully

10:58 20   and you'll never lie, right?

21   A.   Yes.

22   Q.   You're here to tell the truth?

23   A.   I'm absolutely here to tell the truth.

24   Q.   Solemnly swear you're here to tell the truth?

25            MR. FRANK:   Objection.

```
 1    A.    Absolutely.
 2    Q.    I just want to understand.  As we sit here today, at the
 3    end of the day, who decides whether you've told the truth or
 4    not?
 5    A.    I'm not sure what your question is.
 6    Q.    Well, I'm not referring to a higher power.  I'm referring
 7    to whoever is in charge, responsible, to make the motion to
 8    allow the judge to depart from the Sentencing Guidelines down
 9    from 37 months for you, down from 27 months for Davina.  Who
10    makes that decision?
11    A.    The judge makes that decision.
12    Q.    Did you ever read a Cooperation Agreement?
13    A.    Yes.
14    Q.    Mr. Kelly put up on the screen for you the part in the
15    Cooperation Agreement that makes it clear that the government
16    has to recommend --
17    A.    Yes.  The government -- I thought you said who makes the
18    decision on that.  The judge makes the decision.
19    Q.    Fair enough, Mr. Isackson.  The judge makes the decision,
20    but the judge doesn't get to make that decision until the
21    government recommends it, right?
22    A.    That's correct.
23    Q.    You've got to go through that toll to get to the judge?
24    A.    Yes.
25    Q.    Again, who -- as far as you're concerned, whether it's a
```

1    greater power or the press or whatever, the party that you want

2    to satisfy that you've told the truth is the government, isn't

3    it, Mr. Frank and the other people sitting at the table?

4    A.   I'm here to tell the truth and that's what I'm doing, so

5    they know that.

6    Q.   I know that, Mr. Isackson.  I'm asking another question.

7    Who decides whether you're telling the truth for purposes of

8    your sentencing?

9    A.   I don't think the government decides whether I'm making

11:00 10   the truth, telling the truth.  I don't think it's for them to

11   decide.  I'm sworn to tell the truth, so I don't know what your

12   questioning is here.

13   Q.   Well, in terms of evaluating whether you have indeed told

14   the truth?

15   A.   They made it clear to me that if I don't tell the truth,

16   my punishment would be much worse, so I don't know where you're

17   going with these questions.

18   Q.   Well, at the end of this session, at the end of your

19   testimony, you're not going to get a report card from Judge

11:01 20   Gorton or from counsel.

21            MR. FRANK:  I object.  We've been over this.

22            THE COURT:  He hasn't asked a question yet.

23   Q.   Are you?

24            MR. FRANK:  Now I object.

25            THE COURT:  Overruled.

A.   So I'm sorry.  I got lost in that back and forth.  Repeat
the question, please.  You shouldn't be laughing.  It's really
hard to hear a lot of this stuff.  Really.  I don't find it
funny.

Q.   The reporter will read it back.  It will be better.

A.   Sure.  That's fine.

Q.   You keep asking me to repeat the question.  If you just
said you couldn't hear me, I would, but it's the seventh time
you asked.  I'll try to speak better into the microphone.

         MR. TOMBACK:  Read it back.

         THE COURT:  She'll read it back if I instruct her to
read it back.  She may read it back.

         (Reporter reads back as requested.)

A.   No.

Q.   The determination for your sentencing for the
recommendation to the judge of whether you're telling the truth
belongs to the government, yes or no?

A.   I still don't believe it's their decision to decide
whether I'm telling the truth.

Q.   If the government determines that you're not being
truthful, they won't make the motion, will they?

A.   If I'm not telling the truth and they determine that, I
think I'll be in a lot of trouble.

Q.   And they determine that, right?  They, the government,
determines that?

```
 1    A.    Yes.

 2            MR. TOMBACK:  One moment, your Honor.

 3            THE COURT:  Yes.

 4            MR. TOMBACK:  Can we take a break, your Honor?

 5            THE COURT:  How much more do you have?

 6            MR. TOMBACK:  A fair amount.

 7            THE COURT:  All right.  We'll take the morning recess

 8    at this point, jurors.  We'll be in recess for 15 minutes.

 9    I'll see you back here.

11:04 10        (Jury exits.)

11            THE COURT:  Be seated, counsel.  How much longer on

12    cross, Mr. Tomback?

13            MR. TOMBACK:  I believe I could go until the 1 o'clock

14    break, but I'll try to trim it down.

15            THE COURT:  Okay.  I am not going to allow you to ask

16    for the Court reporter to re-read questions unless I'm

17    convinced there's real evasiveness going on here.  You can

18    rephrase the question.  You can be clearer.  In some cases, you

19    can't be heard, because I couldn't hear you some of the time.

11:04 20   I don't like you instructing the court reporter to re-read

21    questions that you've asked when the witness can't understand

22    it.  You either rephrase the question or you ask it more

23    clearer.  All right?

24            MR. TOMBACK:  I understand, your Honor.  I understood

25    that when you told me that during the questioning.
```

```
 1                 THE COURT:  Okay.

 2                 If we get through the cross-examination, there will be

 3       redirect, I presume?

 4                 MR. FRANK:  Yes, your Honor.

 5                 THE COURT:  All right.  Okay.  Is there anything else

 6       that needs to come to my attention before we recess?

 7                 MR. FRANK:  No, your Honor.

 8                 MR. KELLY:  No, your Honor.

 9                 THE COURT:  We're in recess.

11:05 10                 (Recess taken 11:05 to 11:24 a.m.)

11                 (Jury enters.)

12                 THE COURT:  Ready to resume?  Again, Mr. Isackson,

13       you'll be reminded you remain under oath.  We will continue

14       with cross-examination.

15                 MR. TOMBACK:  Thank you, your Honor.

16       BY MR. TOMBACK:

17       Q.   Mr. Isackson, you first met Mr. Singer in August or

18       September of 2015?

19       A.   I did not meet him then, no.

11:24 20       Q.   When did you first meet him?

21       A.   In person, sometime in 2016.

22       Q.   And you met him at the Four Season's Hotel?

23       A.   I was not at that meeting.

24       Q.   Who was in that meeting?

25       A.   That was my wife.
```

```
 1   Q.   And who was in the second meeting with Mr. Singer?

 2   A.   I believe my wife was.

 3   Q.   And who was in the third meeting?

 4   A.   I don't know the order of the meetings.

 5   Q.   Okay.  In substance in those meetings Mr. Singer explained

 6   to you that he could help your daughter get into colleges?

 7   A.   Are you talking about when I was with him?

 8   Q.   Your first meeting, whenever it was, wherever it was, in

 9   substance, he said that he could help your daughter get into

10   colleges?

11   A.   Yes.

12   Q.   And he didn't say to you or to your wife that the primary

13   way he could help Lauren get into college was by tutoring her

14   at that time?

15   A.   No.

16   Q.   And he didn't say that he could help her train in order to

17   be a recruitable athlete, did he?

18   A.   No, he did not.

19   Q.   And it was kind of late for Lauren to do better on her

20   tests through Mr. Singer's tutoring services as well, leaving

21   aside the grades?

22   A.   That, I don't know.

23   Q.   In substance did you explain to Mr. Singer that you had a

24   short-term problem with Lauren in terms of her getting into

25   colleges?
```

A.   I don't understand where your question is going.

Q.   You weren't looking for a long-term solution to make Lauren a better candidate as an applicant to colleges, were you?

A.   I still don't understand your question.

Q.   You weren't looking for a long -- you weren't looking, when you met with Mr. Singer, for a long-term solution to help Lauren become a better candidate for colleges?

A.   I still don't understand, what are you saying about long term?  What are you implying there?

Q.   When was Lauren applying to college relative to when you met with Singer?

A.   When he got involved with her, it was relatively late in the process, correct.  Yeah.

Q.   Okay.  That's what I mean.  Excuse me.  So in terms of what you were looking for from Mr. Singer, you were looking for a short-term fix to Lauren's situation?

A.   You're putting words in my mouth.

Q.   I'm asking you a question.  Were you looking for a short-term way to improve her chances to be admitted to college?

A.   We were looking to have his assistance, help her get into the schools of her choice.

Q.   Were you present in the meeting when Mr. Singer said he needed a photo of Lauren with her foot touching a soccer ball?

```
 1    A.    Yes.  I don't think that's the way he put it, but he said
 2    a picture of her playing soccer.
 3    Q.    You testified that you understood he was going to take
 4    that and make her into a much better soccer player than she
 5    was, correct?
 6    A.    That's correct.
 7    Q.    She didn't play soccer her senior year at all, correct?
 8    A.    That is correct.
 9    Q.    She was mainly interested in equestrian; is that correct?
10    A.    That's correct.  That was her sport of choice.
11    Q.    Okay.  He didn't try to hide from you in any way that he
12    was going to use the photo of your daughter with a soccer ball
13    to build a fictional fake resume for her, did he?
14    A.    No.
15    Q.    He wasn't uncomfortable sharing that with either you or
16    your wife?
17    A.    You need to explain exactly what your question is, as far
18    as, what are you talking about, the resume?
19    Q.    Leaving aside whether it's the second, the third or the
20    fourth meeting, whatever the meeting was when you were present
21    with your wife, Mr. Singer said, in substance, "I need a
22    picture of your daughter with her foot touching a soccer ball.
23    I can help her get into college if you give me that."
24    A.    That was part of his process.
25    Q.    And you understood what that process was early on for Mr.
```

1    Singer, two, three, four meetings in?

2    A.   I don't recall exactly how many meetings in, but I do

3    recall the conversation for sure.

4    Q.   It didn't take months, it took days or weeks, right, in

5    terms of your meetings with Mr. Singer?

6    A.   Again, my wife had the initial meetings with Mr. Singer.

7    Q.   Well, she updated you, didn't she?

8    A.   Yeah.

9    Q.   Do you have any recollection?  I mean, through this

11:29 10   process, do you have a recollection of how the quote-unquote

11   "process" --

12   A.   Yeah, I mean --

13   Q.   -- proceeded?

14   A.   -- the initial meetings with him, I wasn't part of it.

15   Q.   Did he provide tutoring services to Lauren?

16   A.   I don't think so.

17   Q.   No.  He didn't provide testing tutoring services or

18   coursework tutoring services, did he?

19   A.   She took her own tutoring services.

11:30 20   Q.   And he didn't have somebody start working with her to

21   become a better soccer player, did he?

22   A.   No.

23   Q.   It didn't take long to get to the fake bio agreement with

24   Mr. Singer, did it?

25   A.   Again, I don't recall what meeting that was, how far in

1    the process it was, so I don't recall exactly.

2    Q.   Well, it sounds like most of the meetings were with your

3    wife, correct?

4    A.   Yes, the early meetings were, yeah.

5    Q.   Okay.  Leaving aside the precise timing when you made the

6    agreement with Singer to submit the fake bio, he had never seen

7    your daughter play soccer, correct?

8    A.   That is correct.

9    Q.   He had never tutored her?

11:31 10   A.   I believe not, correct.

11   Q.   Either in courses or in tests, correct?

12   A.   I believe so, yes, correct.

13   Q.   It wasn't a long romance between you and Mr. Singer, was

14   it?

15   A.   Exact period of time, I don't know.  It was several

16   months, many months.

17   Q.   You were asked by Mr. Frank about whether you ever made a

18   refundable donation, do you recall, with respect to a $250,000

19   payment from Lauren?

11:31 20   A.   I do.

21   Q.   That was the payment when you weren't positive she was

22   going to get into UCLA.  She had an e-mail acceptance, and you

23   were hoping that somehow the deal would be sealed, so to speak,

24   right?

25   A.   Yes, we were hoping she would get in.

```
 1   Q.    And eventually, by the way, that deal was sealed; she got
 2   in?
 3   A.    That's correct.
 4   Q.    And Mr. Frank played or showed you your wife Davina's
 5   enthusiastic e-mail thanking Rich in a heartfelt way and
 6   saying, in substance, we were a team and we got this done.  Do
 7   you recall that?
 8   A.    I do.
 9   Q.    You were a team with Mr. Singer, right?
10   A.    That's my wife -- what my wife wrote.
11   Q.    In the two to three years leading up to your dealings with
12   Mr. Singer, had you and your wife focused your charitable
13   giving on educational giving, educational institutions?
14            MR. FRANK:  Objection, relevance.
15            THE COURT:  How is this relevant?
16            MR. TOMBACK:  Your Honor, it's relevant to
17   Mr. Wilson's defense because Mr. Wilson's defense focuses on
18   his generosity to educational institutions.
19            THE COURT:  You can have that question.
20   A.    No, that's not true what you are saying.  We were giving
21   to educational institutions for a long time.  We gave quite
22   extensively to the Hillsborough School System.  We've given to
23   most all the schools in my -- the public school system,
24   Hillsborough, all the schools fairly substantially that my
25   children have gone to.
```

1   Q.   And you referred to those donations in your testimony with

2   Mr. Frank, correct?

3   A.   Yes, I spoke about some of them.

4   Q.   You spoke about something called the Federation, as I

5   recall?

6   A.   Jewish Federation, correct.

7   Q.   Jewish Federation.  What is that exactly?

8   A.   What do you mean, "What is that exactly"?

9   Q.   Well, is the Federation a nonprofit that provides services

11:33 10   to people, or is it a clearinghouse for contributions that are

11   then passed along to other nonprofits to perform the actual

12   services, if you know?

13   A.   I believe it's an institution that is involved in doing a

14   lot of charitable work.  Does that answer your question?

15   Q.   Do you understand the Federation, the United Federation

16   itself does the work, or does it fundraise --

17   A.   You said "the indicted Federation"?

18   Q.   Excuse me.  I'm not -- I'm familiar with the United Jewish

19   Appeal, but I'm not familiar with the Federation, so just

11:34 20   forgive me.  The Federation, does itself do the good works?

21   A.   It's -- it sends out money to all sorts of charitable

22   causes that do the work, correct.

23   Q.   It's a clearinghouse, if you will?

24   A.   No, it's not a clearinghouse.

25   Q.   It receives money and then it turns around and distributes

1  that money to other nonprofits that do good works, correct?

2  A.   It does a lot of work on its own.

3  Q.   Correct, but it also sends money to other nonprofits,

4  correct?

5  A.   Yes.

6  Q.   You're a major supporter, right?

7  A.   We give to them, yes.

8  Q.   So you have some knowledge of what it does?  I'm just

9  asking you.  Correct?

11:34 10  A.   No, but the way you're phrasing those questions, you're

11  flipping it around so it's confusing to me.

12  Q.   Okay.  Are you familiar with the United Way?

13  A.   I've heard the name, yes.  I've never given to them.

14  Q.   Is the Federation to your knowledge similar to the United

15  Way?

16  A.   I don't know how the United Way operates.

17  Q.   How about Catholic Charities?

18  A.   I've never given to Catholic Charities.  I don't know

19  anything about Catholic Charities.

11:35 20       MR. TOMBACK:  I'm going to direct your attention to

21  your tax return for the year 2016, DX9543, which I'd like to

22  put up, your Honor, with your permission for the witness to

23  see.

24       THE COURT:  Just for the witness?

25       MR. TOMBACK:  Yes, your Honor.

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | THE COURT:  Yes.                                             |
|       | 2  | MR. FRANK:  Is there a copy for the government?             |
|       | 3  | THE COURT:  Do you have a copy for counsel?                 |
|       | 4  | Q.  Are you familiar with the tax return, 954523?          |
|       | 5  | A.  I don't have it on my screen.                          |
|       | 6  | Q.  000302463.  It should be on your screen now, Mr. Isackson. |
|       | 7  | A.  Yes, it is.                                             |
|       | 8  | Q.  Do you recognize that tax return?                      |
|       | 9  | A.  Yes.                                                   |
| 11:37 | 10 | Q.  It's your tax return that you filed jointly with your wife |
|       | 11 | Davina for the year 2014, correct?                         |
|       | 12 | A.  Correct.                                               |
|       | 13 | Q.  Directing your attention to the "Gifts to Charity" line, |
|       | 14 | in 2014, on page 00302469 --                               |
|       | 15 | MR. FRANK:  Your Honor, is this document being used to     |
|       | 16 | refresh the witness's recollection?                        |
|       | 17 | THE COURT:  Is it in evidence?                             |
|       | 18 | MR. TOMBACK:  Your Honor, I didn't offer it into           |
|       | 19 | evidence.  It's Mr. Isackson's tax return.  It goes to his |
| 11:38 | 20 | credibility.                                               |
|       | 21 | MR. FRANK:  It does not go to his credibility, your        |
|       | 22 | Honor.  There's no impeachment on this issue.  It's his tax |
|       | 23 | return.                                                    |
|       | 24 | THE COURT:  What question -- are you going to ask him      |
|       | 25 | a specific question about charitable donations?            |

```
 1              MR. TOMBACK:  I'm going to ask him two questions about
 2     charitable donations, how much he gave generally and how much
 3     he gave to educational institutions.
 4              MR. FRANK:  I have no objection to those questions,
 5     your Honor.  The document is full of personal identifying
 6     information.
 7              THE COURT:  Yeah, I don't think we need to enter the
 8     entire document, but I will allow you to question him about
 9     that.
11:39 10         MR. TOMBACK:  Absolutely, your Honor.  Thank you.
11     We'll just redact out everything but the parts I'm focused on.
12              MR. FRANK:  I don't believe it's an admissible
13     document that's being used for impeachment.
14              MR. TOMBACK:  I can work without the document, your
15     Honor.
16              THE COURT:  Go ahead.
17              MR. TOMBACK:  I'd like to leave the document up for
18     the witness, though, if that's okay.
19              THE COURT:  It can be used to refresh his memory.
11:39 20    That can be done.
21              MR. FRANK:  He hasn't denied a memory yet.
22     BY MR. TOMBACK:
23     Q.   Sir, in 2014, do you recall that your overall gifts to
24     charity were $4,252?
25     A.   That's what it says here, but that is not how it works.
```

1    Q.   This is your tax return, isn't it?

2    A.   Absolutely it is.

3    Q.   What's your --

4    A.   I think I know where you're going but --

5    Q.   I'm not interested in what you think, Mr. Isackson.  I

6    just want to ask you questions if that's okay.  Okay?

7         My next question, my next question for you is what's

8    your overall income?

9    A.   Is that --

11:40 10       MR. FRANK:  Objection, relevance.

11   Q.   What was your overall income for 2014?

12   A.   I want to back up.  I want to make something very clear.

13   When I made charitable gifts, in any one year I will give to

14   the Federation, and they have a -- I don't know what the entity

15   of it is.  It's the same thing you can do with all sorts of

16   companies, Charles Schwab, they set up a charitable fund.  So I

17   may give a half million dollars, $400,000 in one year, and from

18   that I can distribute out gifts.  So that one year that I give,

19   it will not show up on my return here.

11:40 20       Do you understand that?  Does that make sense to you?

21   Q.   That wasn't the question pending, Mr. Isackson.  We can go

22   through more than one year.

23   A.   We don't need to do that.  My point is --

24   Q.   We can go through 2014, 2015 and 2017.  You subtract out

25   the money that you gave to KWF, you don't get very far.  You

get to ten grand total for those three years.  Is that true,
Mr. Isackson?  That's the total for those three years that I'm
looking at, 2014, '15 and '17?
A.   But then the year before I probably gave 400 grand,
$400,000, and I took that as a charitable gift, which it was.
And it goes into a fund that can grow, and you can distribute
it.  Do you understand that?
Q.   I'm asking the questions.  I just note, we don't have to
review each year, but if we ran the percentages for any one of
these given years, it would be less than .001 percent giving?
A.   You're forgetting the fact that in two or three years
prior to that I might have given a gift of $400,000.  Does that
make sense?
Q.   I want to direct your attention back to the $250,000
payment you made to Mr. Singer, KWF, for Lauren, your daughter
Lauren.  Do you recall that?
A.   Yes.
Q.   I want to direct your attention to tab 16.  Withdrawn.
     Do you recall that you used Facebook stock to make
that gift?
A.   Yes, I do.
Q.   You understand -- well, with the Facebook stock, it had
appreciated a substantial amount, correct?
A.   Yes.
Q.   The stock that you used to fund Lauren's entrance into

```
 1    UCLA, you paid roughly $60,000 for it, and it had appreciated
 2    to a point where you were able to pay Mr. Singer $251,000 and
 3    change.  Do you recall that?
 4    A.   That's correct.
 5    Q.   And if you had sold that stock on the open market, you
 6    would have had to take a capital gains tax, correct?
 7    A.   That's correct.
 8    Q.   Because you used the stock to pay Mr. Singer to get your
 9    daughter into UCLA, you were able to get -- you were able to
10    avoid that capital gains tax entirely, correct?
11    A.   Yes, that's correct.
12    Q.   And that normally would be perfectly legal if you really
13    were making a charitable donation, right?
14    A.   That's correct.
15    Q.   You understand that.  You seem to be well-versed in the
16    charities, right?
17    A.   When you say I'm "well-versed in the charities" --
18    Q.   You understand that you took advantage of this opportunity
19    to take appreciated stock and avoid a capital gains tax?
20    A.   Yes, yes, I did.
21    Q.   And that tax would have been substantial, correct?
22    A.   That is correct.
23    Q.   Somewhere in excess of 20 percent federal in addition to
24    state tax, correct?
25    A.   Yes.
```

Q.   Which aren't low in California.  You avoided all of that?

A.   That is correct.

Q.   And that would have been legal, but it wasn't legal here, was it?

A.   No, it was not.

Q.   It wasn't legal because, as you testified, you understood -- I want to combine them all because I'm mindful of the time, so I'm going to combine all of your daughters.

    You understood with respect to Lauren and with respect to Audrey, some of the money that went in -- went out of KWF to in your mind help your child get into those schools, correct?

A.   You're going to have to ask that question again.

Q.   It wasn't -- withdrawn.  I'll come back to that.

    Let me move on to the $75,000 payment that you owed Mr. Singer for the test-cheating.  Do you recall that amount?

A.   Yes.

Q.   I want to put up diagram number -- I want to put up diagram number 2?

        MR. FRANK:  We don't have any diagrams, your Honor.

        THE COURT:  Where are the diagrams?

        MR. TOMBACK:  Let me hand the diagram to Mr. Frank.

        MR. FRANK:  Is this being used as a chalk or a summary chart?

        MR. TOMBACK:  It's a summary chart.

```
 1              MR. FRANK:  We were supposed to receive summary charts

 2       in advance, your Honor.

 3              MR. KENDALL:  He doesn't know the local language, your

 4       Honor.

 5              MR. TOMBACK:  It's a chalk.

 6              THE COURT:  All right.  Give a copy to Mr. Frank.

 7              MR. TOMBACK:  To help Mr. Frank review, I've given him

 8       all four of the ones I may use.

 9              THE COURT:  I can't hear you when you both talk.

11:46 10       Mr. Frank?

11              MR. FRANK:  May I have a moment to review these?

12              THE COURT:  Yes, you may.

13              MR. TOMBACK:  I just want to tell him the one I want

14       to use now is the second one.

15              MR. FRANK:  Your Honor, these look like closing

16       argument slides to me.  They don't look like they're

17       appropriate for cross-examination.  I can hand them to the

18       Court.

19              MR. TOMBACK:  Your Honor, I can get it done without

11:46 20       the diagrams.

21              THE COURT:  Let's go forward.

22              MR. TOMBACK:  Okay.

23       Q.   With respect to the 75,000 that you owed Mr. Singer for

24       the test-cheating for Audrey, do you recall that?

25       A.   Yes.
```

| | |
|---|---|
| 1 | Q.   There came a time when you also wanted to save taxes on |
| 2 | that 75 grand, right? |
| 3 | A.   Correct. |
| 4 | Q.   Your idea which you gave to Mr. Singer was, if you gave |
| 5 | that money for the test-cheating arrangements for controlling |
| 6 | the room to KWF, then you could take a tax deduction, right? |
| 7 | A.   Actually, it was his idea. |
| 8 | Q.   I apologize.  But the two of you came to a pretty quick |
| 9 | understanding, right, that he would allow you to contribute the |
| 11:47 10 | 75,000 to KWF, correct, and he would back that up with a gift |
| 11 | letter if the IRS came and audited you, right? |
| 12 | A.   That is correct. |
| 13 | Q.   And what was his demand in return for letting you do that |
| 14 | in backing up your deduction? |
| 15 | A.   When you say "what was his demand" -- |
| 16 | Q.   Didn't you then pay $100,000 to KWF, not just 75? |
| 17 | A.   Yes, yes, that is correct. |
| 18 | Q.   He raised you 25, right? |
| 19 | A.   That is correct. |
| 11:47 20 | Q.   You didn't testify about that on direct, right?  Did you |
| 21 | forget that? |
| 22 | A.   I don't think I was asked that question. |
| 23 | Q.   No, I know you weren't asked that question.  I just asked |
| 24 | you, did you forget it?  Did you cover it with the government? |
| 25 | A.   I'm trying to think.  We probably did discuss that. |

Q.   There can be no doubt in your mind if you go to somebody
and say, "I owe you 75 grand for test-cheating, I want to avoid
the taxes on that, so I'll pay it to a nonprofit" -- and it's
his idea, so I apologize.  But he says that, "You got to pay me
25 grand extra and then you can get the tax savings, I'll take
the 25."  Is that what happened in substance?

A.   He charged more for that service, correct, he did.

Q.   No, he didn't charge more for the service, Mr. Isackson,
did he?  He charged to --

A.   I --

Q.   -- your tax --

A.   For me to take a write-off that was not appropriate, which
I admitted to, he asked for an additional $25,000.

Q.   And did you think that $25,000 was going to help
underprivileged youth or contributing to a college?

A.   No.

Q.   It was going to go into his pocket, right?

A.   I assumed so.

Q.   Just like the 100 grand that was paid to Mr. Salcedo to
help your daughter Lauren get into -- can't keep track -- to
get into UCLA, the second or third school that you tried for
her, correct?

A.   I didn't know the exact amount until later that we paid
him.

Q.   As you sit here today, you know he got 100 grand, right?

```
 1    A.    I believe that's the amount.

 2    Q.    You interacted with him in your daughter's admission.  You

 3    didn't know the number, but you knew he was with Singer in

 4    helping her get in, right?

 5    A.    As I said before, I knew it was obvious that he was paying

 6    people that were helping with the scheme.

 7    Q.    He was open with you about that?

 8    A.    He was open with me about what?

 9    Q.    What you just said.

10    A.    No, he wasn't open.  Until the very last tape he was still

11    covering it up to give to people directly.

12    Q.    But it was clear to you --

13    A.    I've told you the whole time that I believe you'd have to

14    be a fool to think that money was not going to people that were

15    helping with this scheme.  That's what I have to say on it.

16          MR. TOMBACK:  One moment, your Honor.  I'm close to

17    done.

18          THE COURT:  Yes.

19    Q.    You didn't introduce Mr. Singer to any of your business

20    associates, did you?

21    A.    I did not.

22    Q.    You didn't introduce him to any of your friends, did you?

23    A.    I did not.

24    Q.    That wouldn't be smart because then Mr. Singer might stray

25    into tax evasion or test-cheating or getting them -- getting
```

1    their children in through fake bios, correct?

2    A.   That really wasn't the purpose of why I didn't introduce

3    him, no.

4    Q.   Well, you didn't want your friends to know that your

5    children had gotten into schools based on fake credentials?

6    A.   I didn't -- I made the decision not to talk about it to

7    anybody else.  That's clear.  The reasons you're giving aren't

8    really the reasons.

9         MR. TOMBACK:  Hold on one second, your Honor.  May I

11:52 10   have just a moment, your Honor?

11        THE COURT:  Yes.

12   Q.   Mr. Isackson, did the government at any point in time

13   threaten to indict any of your children?

14   A.   I don't believe so.

15   Q.   Your daughter Lauren was aware that she was being

16   submitted -- she was -- her application was being submitted to

17   USC as a fake oarswoman, correct?

18   A.   Did you say Lauren or Audrey?

19   Q.   If I misspoke, I apologize.  I meant your second child,

11:53 20   Audrey.

21   A.   Yes.

22   Q.   Your second daughter, Audrey.

23   A.   That's okay.

24   Q.   Did she know that her application was being submitted with

25   her being characterized as a fake oarswoman?

```
 1    A.    She knew she was getting in through the athletic

 2    department.  There is a sort of correlation with the athletic

 3    department.  She didn't know the inner workings of it.

 4    Q.    Did Singer ever tell you that he was working with the

 5    Harvard president to do side doors?

 6    A.    No.

 7    Q.    Did Singer ever tell you that he knew the Brown president?

 8    A.    We never discussed Brown or Harvard as a school that our

 9    daughters were ever interested in.

11:54 10    Q.    Did he tell you that he was reading applications for

11    multiple ivy league schools?

12    A.    I'm sorry, he was doing what for multiple of schools?

13    Q.    He never told you he was reading applications for

14    admissions departments in multiple ivy league schools, did he?

15    A.    I don't believe so.  That he was reading applications?

16    Q.    Correct.

17    A.    I don't believe so.

18    Q.    He never used the term "side door" with you, did he?

19    A.    I don't believe he did.

11:55 20          MR. TOMBACK:  That's all I have, your Honor.

21          THE COURT:  Redirect, Mr. Frank?

22          MR. FRANK:  Thank you, your Honor.

23              REDIRECT EXAMINATION OF BRUCE ISACKSON

24    BY MR. FRANK:

25    Q.    Mr. Isackson, you were asked a number of questions about
```

1    your meetings with the government.

2    A.    Yes.

3    Q.    Did you memorialize lines when you were meeting with the

4    government?

5    A.    No.

6    Q.    Did you rehearse or practice testimony when you were

7    meeting with the government?

8    A.    No.

9    Q.    Did you review documents and listen to audio recordings

11:56 10    when you were meeting with the government?

11    A.    I did.

12    Q.    What did the government tell you in each and every one of

13    those meetings was your number one obligation?

14    A.    To tell the truth and relay things as accurately as I can

15    remember them.

16    Q.    You were asked some questions by Mr. Kelly about a

17    conversation your wife had about flagging your daughter, her

18    application at USC.

19    A.    Yes, yes.

11:56 20    Q.    Other than the scheme that you've talked about here today,

21    did anyone from USC offer to have your daughter admitted as a

22    fake athlete in exchange for a contribution?

23    A.    Repeat that one more time.

24    Q.    Other than the scheme we've talked about here today --

25    A.    Yes.

1    Q.    Did Lauren Whittam or any development official at USC

2    offer to have your daughter recruited as a fake athlete in

3    exchange for money?

4    A.    No.

5    Q.    Did Lauren Whittam or any other USC official offer you a

6    guaranty of admission in exchange for money?

7    A.    No.

8    Q.    You were asked some questions about the mindset of other

9    parents.  You don't know the mindset of any other parents, do

11:57 10    you, sir?

11    A.    No.

12    Q.    What was your mindset when you sent Rick Singer a

13    photograph of your daughter Lauren playing soccer?

14    A.    It was pretty clear that he was putting together some sort

15    of resume that would make her out to be an incredible athlete

16    for a high school-level player.

17    Q.    What was your mindset when you sent Rick Singer a

18    photograph of your daughter Audrey?

19    A.    He would put together something similar with her in the

11:57 20    crew department that her abilities would be superior as well.

21    Q.    What was your mindset when you paid those invoices to The

22    Key Worldwide Foundation after your two daughters were admitted

23    as fake athletic recruits to college?

24    A.    I'm not sure what you mean by what was my mindset.

25    Q.    What was your mindset?  What did you feel about that?

1   A.   Obviously didn't feel great.  I knew I was doing something

2   wrong.

3   Q.   You were asked a whole long series of questions about what

4   your teenage daughter meant when she used the worked

5   "embellish" in an e-mail to someone.

6   A.   Mm-hmm.

7   Q.   Do you have any idea what your teenage daughter meant when

8   she used the word "embellish"?

9   A.   I don't, no.

11:58 10   Q.   You testified that you would have to -- you understood you

11   would have to embellish Lauren's record quite a bit to convince

12   USC she was a legitimate soccer player.  When you, sir, used

13   the word "embellish" --

14   A.   Mm-hmm.

15   Q.   -- what was that a fancy word for?

16   A.   Disguise, make something that's not accurate, enlarge

17   something beyond reasonable proportions.

18   Q.   Lie?

19   A.   Yes.

11:59 20   Q.   You were asked some questions about that audio recording,

21   that wire recording that Mr. Singer made of you when he visited

22   you in your home in December of 2018.  You were asked about a

23   discussion in your son's presence of whether he wanted to be a

24   practice player when he went to college.  Do you recall those

25   questions?

1    A.    Mm-hmm, I do.

2    Q.    Was there any discussion in front of your son on that

3    occasion about creating a fake athletic profile?

4    A.    No.

5    Q.    Was there any discussion in front of your son on that

6    occasion about using money to induce a university insider to

7    lie to their colleagues about your son's athletic

8    qualifications?

9    A.    No.

11:59 10    Q.    Was there any discussion at all in that conversation in

11    front of your son about fake recruitment?

12    A.    No.

13    Q.    Did you understand, sir, when Mr. Singer was asking about

14    whether your son wanted to be a practice player, where he was

15    going with that?

16    A.    Well, I knew he was asking questions that would be, you

17    know, something that he wanted to see if he could pull the same

18    thing off for Ryan.

19    Q.    Did you know what would happen if he went down that road?

12:00 20    A.    Absolutely.

21    Q.    You were asked a series of questions about whether Singer

22    admitted to you in that recording that he was bribing

23    individuals personally.  Do you recall those questions?

24    A.    I do.

25    Q.    Wherever the money went, Mr. Isackson, whether to an

1   athletic program or to an individual's pocket, did you believe

2   that what you were doing in this scheme was legitimate?

3   A.   No.

4   Q.   Why?

5   A.   Because the payments we were -- the payments we made were

6   for services to get our kids into schools or to have a test

7   score altered.

8   Q.   Why were you more concerned in the context of what you

9   believed was an IRS audit about payments to individuals than

12:01 10   payments to programs?

11   A.   If you're referring to the fact that I thought there was a

12   lot of people involved and that made me feel better about it,

13   is that --

14   Q.   I'm asking you a different question.

15   A.   Okay.

16   Q.   You believed Mr. Singer's foundation was being audited,

17   correct?

18   A.   Correct.

19   Q.   Why were you more concerned in that context about payments

12:01 20   he made to individuals than to programs?

21   A.   Oh, because I knew that the testing score was clearly

22   something that would be harder to disguise.  It was a payment

23   for services unrelated to any university or anything like that.

24   Q.   What about payments to universities?

25   A.   Payments to universities would be harder to dig up.

1    Q.   You were asked a series of questions about your

2    obligations under the terms of your cooperation agreement.  Do

3    you recall that line of questioning?

4    A.   Yes.

5         MR. FRANK:  Could we call up Exhibit 675 in evidence,

6    please.  Can we look at -- does the jury have that?  Could we

7    look at page 2, please.

8    Q.   Do you see the section under "Substantial Assistance"?

9    A.   Yes.

12:02 10   Q.   If you look at the second paragraph -- Ms. Lewis, could

11   you highlight the second sentence beginning with, "The U.S.

12   Attorney will make this determination."

13        Do you see that says, "The U.S. Attorney will make

14   this determination based on the truthfulness and value of the

15   defendant's assistance regardless of the outcome or result of

16   any proceeding or trial."  Do you see that?

17   A.   I do.

18   Q.   Mr. Kelly didn't ask you about that sentence, did he?

19   A.   No.

12:03 20   Q.   Do you have a dog in this fight, Mr. Isackson?  Do you

21   have any vested interest in the outcome of this proceeding?

22   A.   I'm here to tell the truth, and my sentence hopefully will

23   be reflective of that and get it lower.

24   Q.   You were asked a series of questions about the deductions

25   you took from your taxes for the payments you made to Mr.

1    Singer's charity.  Do you recall those questions?

2    A.    Yes.

3    Q.    Why did you take those deductions?

4    A.    Because it benefited me from a tax standpoint.

5    Q.    Did you believe they were legitimate deductions?

6    A.    No.

7    Q.    Did you believe that, instead of taking them as charitable

8    deductions, it would have been okay to take them as business

9    expenses?

12:03 10   A.    No.

11   Q.    Did you believe that it would have been okay to call them

12   business consulting?

13   A.    No.

14   Q.    Why not?

15   A.    Because they were not such.

16   Q.    I'm sorry?

17   A.    Because they weren't business consulting.

18   Q.    You were asked a series of questions about how much

19   charitable giving you engaged in as reflected on your personal

12:04 20   income tax returns.  Do you recall those questions?

21   A.    Yes.

22         MR. FRANK:  I'd like to direct your attention, if we

23   could just use the transcript rather than the audio at this

24   point, to Exhibit 607 and to page 85 of that exhibit, of that

25   transcript.  I'm sorry, I have the wrong date.

```
 1              Could I have one moment, your Honor, to get the right
 2    page number?
 3              THE COURT:  Yes.
 4              MR. FRANK:  Sorry.  It's 83.
 5              THE COURT:  Okay.
 6    Q.   Do you see on page 83, Mr. Isackson, at line 13, you said,
 7    "I had done it aside from --
 8    A.   Yes.
 9    Q.   -- "I've done some big gifts in some big years."  Do you
10    see that?
11    A.   I do.
12    Q.   And then you said on line 16, "We do the Jewish stuff, and
13    yeah, I give, actually, I give to the Jewish Federation."  Do
14    you see that?
15    A.   I do.
16    Q.   And then you said at line 22 -- line 21, "Besides you, but
17    I'm trying to think in time, I've definitely, like, when my mom
18    had cancer and stuff like that, in a bunch of years we gave
19    hundreds of thousands of dollars."  Correct?
20    A.   Correct.
21    Q.   Was that true?
22    A.   Yes.
23    Q.   And you did that through a charitable remainder trust?
24    A.   That's what it is called, yes.
25    Q.   And that wouldn't appear on your personal tax returns,
```

 1   would it?

 2   A.   That's correct.

 3   Q.   And you've also, I believe you testified, given to

 4   educational institutions for a long time.

 5   A.   Correct.

 6   Q.   Did you get anything in return for those gifts?

 7   A.   Nothing, no.

 8   Q.   What educational institutions have you given to, sir?

 9   A.   We've given substantial amounts every year to the public

12:06 10   school system, Hillsborough Public Schools.  We've given to

11   really every private school my kids attended.

12   Q.   And in fact, your name was at one point inscribed in a

13   wall at your children's school, isn't that true?

14   A.   That's correct.

15   Q.   Is your name still on that wall, Mr. Isackson?

16   A.   I don't know.  I told them they could take it down

17   actually.

18   Q.   Why did you tell them to take your name down from the

19   wall?

12:07 20   A.   Because I was embarrassed.

21             MR. FRANK:  No further questions.

22             THE COURT:  Any further questions, Mr. Kelly or --

23             MR. KELLY:  Briefly.

24             THE COURT:  Mr. Kelly, recross.

25                  RECROSS-EXAMINATION OF BRUCE ISACKSON

BY MR. KELLY:

Q.   You were embarrassed because you were caught red-handed committing a crime, right?

A.   I was embarrassed because I didn't want to have my name on the wall because of the affiliation that came out after the fact that I was involved in this scheme, and I didn't want it to appear that the school, which they clearly had no involvement, would be part of it.  I didn't want to soil their wall.

12:07

Q.   Mr. Frank said to you, your mindset was a guilty mindset, wasn't it?  He asked you about your mindset, right?

A.   My mindset when?

Q.   He said to you, you don't know the mindset of other parents, correct?

A.   Yes, he asked me that question.

Q.   That's a true question and a true answer, right?  You don't know the mindset of these other parents, do you?

A.   I don't.  I could only guess.  No, I don't know.

Q.   Right.  You could guess and you don't even know what your own daughter meant when she said "embellish" versus what you meant, right?

12:08

A.   I was not familiar with that document at all.  I had never seen it before.

Q.   The point is, people use words differently, right?  Your daughter who was a teenager might use the word "embellish"

1    differently than you, correct?

2    A.    Could be.

3    Q.    And Singer took a different approach with your son around

4    than he did with you, correct?

5    A.    Yes.

6    Q.    All right.  So Singer could sing different tunes depending

7    upon who he was dealing with, right?

8    A.    Yeah.  I don't know exactly what you're trying to say

9    here.

12:09 10    Q.    Well, did he ever tell you he was reading applications or

11    helping in the admissions offices of all these schools?

12    A.    No, he did not.  I told you that before.

13    Q.    Okay.  So he may have taken a different approach with

14    other parents, correct?

15    A.    I have no idea.

16    Q.    And you testified that he never referenced the side door

17    in front of you, right?

18         MR. FRANK:  Beyond the scope, your Honor.

19         THE COURT:  Overruled.

12:09 20    Q.    Right?  He never referenced this side door term with you,

21    right?

22    A.    I said I don't believe he did.

23    Q.    All right.  So he had a different approach once he sized

24    up who he was dealing with, right?

25    A.    I have no idea what he did with other parents.

1   Q.   Okay.  And he sized you up as somebody who would in fact

2   commit fraud with him, right?

3   A.   I don't know what his mindset was as far as sizing me up.

4   Q.   Well, okay.  And you were also asked, Did you practice

5   your testimony with the government.  You said no.

6   A.   That's correct.

7   Q.   Well, how much time did you spend with the prosecutor,

8   Mr. Frank?

9   A.   I thought we went through all of these questions before.

12:10 10   Q.   Yeah, I'm going to ask you again.  How much time did you

11   spend with him?

12   A.   I don't know the exact amount of time.

13   Q.   More than an hour or two?

14   A.   These same questions were asked from before, and we went

15   through this, and I gave all the answers before.

16   Q.   This is called recross-examination.  Did you spend more

17   than an hour or two with Mr. Frank?

18   A.   Yes, I did.

19   Q.   Did he ask you questions about your situation?

12:10 20   A.   Yes.

21   Q.   And it's your testimony to this jury that that's not

22   practicing in any way?

23   A.   No.  A lot of it had to do with clarification.  We went

24   over tapes to listen to the words several times to make sure

25   everything I signed for was accurate.  It took a lot of time.

```
 1   Q.   So preparing but not practicing, correct?

 2   A.   Wasn't preparing.  It was to make sure my answers were

 3   clear.

 4   Q.   All right.  Mr. Frank went back to Exhibit 675 and read

 5   the -- if we could put that up briefly, please.  He read

 6   paragraph 2, the second sentence.  Whereas I had read the first

 7   sentence, "The determination whether the defendant has provided

 8   substantial assistance rests solely in the discretion of the

 9   U.S. Attorney," then he read the second sentence, correct?

10   A.   That is correct.

11   Q.   And who's making the determination in that second

12   sentence, the defense attorney, the Court, who?  What does that

13   say?  The U.S. Attorney would make that determination, correct?

14   A.   That's correct.

15   Q.   They would decide if you were truthful, right?

16   A.   That's correct.

17   Q.   And you don't think it matters one bit what happens in

18   this case as to whether they determine whether you've been

19   truthful or not?

20   A.   Yeah.  If they determine I haven't been truthful, I would

21   be in a lot of jeopardy.

22   Q.   And you wouldn't lie to stay out of prison, would you?

23   A.   I wouldn't lie on anything that has to do with this, my

24   defense here.

25   Q.   But you did lie repeatedly about trying to get your kid
```

1    into school, right?

2    A.    I did.

3              MR. KELLY:  Nothing further.

4              THE COURT:  Recross, Mr. Tomback?

5              MR. TOMBACK:  Nothing further, your Honor.

6              THE COURT:  All right.  Thank you.  You may step down,

7    Mr. Isackson.  Government's next witness?

8              MR. FRANK:  The government calls Special Agent Keith

9    Brown.

12:13 10            KEITH BROWN, Sworn

11             THE CLERK:  Would you please state your name for the

12   record, spelling your last.

13             THE WITNESS:  It's Keith Brown, B-r-o-w-n.

14             THE COURT:  You may remove your mask, Mr. Brown.

15             THE WITNESS:  Thank you, your Honor.

16             MR. FRANK:  Ms. Lewis, could you show the witness

17   Exhibits 525, 526 and 555, please.

18                   DIRECT EXAMINATION OF KEITH BROWN

19   BY MR. FRANK:

12:14 20   Q.    Good afternoon, Special Agent Brown.

21   A.    Good afternoon.

22   Q.    Would you please tell us where you work.

23   A.    I'm a special agent with the FBI in Boston.

24   Q.    How long have you worked at the FBI?

25   A.    I started with the FBI in July of 2014.

1  Q.   And are you assigned to a particular squad at the FBI in

2  Boston?

3  A.   Yes.  I'm assigned to the Corporate and Securities Fraud

4  squad in Boston.

5  Q.   How long have you been with the Corporate and Securities

6  Fraud squad?

7  A.   Since I arrived in the Boston office, which was in

8  December of 2014.

9  Q.   Can you tell us a little bit about your educational

12:15 10  background.

11  A.   Sure.  I'm a graduate of Hamilton College in New York,

12  class of 2000.

13  Q.   And you have a degree from Hamilton?

14  A.   Yes, in world politics and international relations.

15  Q.   After graduating from Hamilton, did you have a job?

16  A.   Yes.  I spent most of my time before the FBI with a

17  company called Marsh McLennan.  I worked for various divisions

18  of Marsh.  And when I left Marsh to join the FBI, I left as a

19  vice president.

12:15 20  Q.   What kind of company is Marsh McLennan?

21  A.   It's a global insurance services and professional services

22  firm.  The core business is insurance brokering.  Most of my

23  time at Marsh was spent within client facing software division.

24  Q.   What kind of training did you receive upon joining the FBI

25  in 2014?

```
 1    A.    Trained in a variety of matters, firearms, defensive
 2    tactics, tactical training, legal training, investigative
 3    training.  It covers quite a bit in a short amount of time.
 4    Q.    Since being assigned to the Corporate and Securities Fraud
 5    squad, what kind of cases have you worked on?
 6    A.    Most of my time has been devoted to market manipulation
 7    cases, more commonly known as pump and dump schemes.  In
 8    addition to that I've worked on investment adviser frauds.
 9    I've assisted with insider trading cases and Ponzi schemes.
10    Q.    Did there come a time, special agent, when you were
11    assigned to a securities fraud investigation that involved a
12    search of a residence in the Los Angeles area?
13    A.    Yes.
14    Q.    When was that?
15    A.    The search occurred on February 14, 2018.
16    Q.    Following that search did there come a time when you
17    interviewed the individual whose home you searched?
18    A.    Yes.  We interviewed the individual that day.  The
19    individual shortly thereafter came to Boston and participated
20    in proffer interviews with the government.
21    Q.    What are proffer interviews?
22    A.    Proffer interviews are essentially where the subject of an
23    investigation, along with their attorneys, agrees to be
24    interviewed, and they're provided some protection by the
25    government, mainly that their statements won't be used directly
```

1  against them.

2  Q.   Without telling me what you were told during any of those

3  interviews, did there come a time after the interviews that you

4  began to investigate someone else?

5  A.   Yes.

6  Q.   Who did you begin to investigate?

7  A.   We began to investigate the head coach of a prestigious

8  university's soccer team.

9  Q.   Who was that?

12:18 10  A.   Rudolph Meredith.

11  Q.   And where was Rudolph Meredith a soccer coach?

12  A.   At Yale University.

13  Q.   In broad strokes tell me some of the investigative steps

14  you took when you investigated Rudolph Meredith.

15  A.   Sure.  We obtained business records related to

16  Mr. Meredith.  Consensual recordings were made with

17  Mr. Meredith, including recordings with an undercover FBI

18  employee.  Financial -- at least one financial transaction

19  occurred with Mr. Meredith, and he was again recorded, both

12:18 20  audio and video.

21  Q.   You referred to something called "consensual recordings."

22  What are consensual recordings?

23  A.   Consensual recording is basically what people commonly

24  think of as wiring somebody up against a target of an

25  investigation.  It typically entails one -- well, it does

1    entail one party to that conversation consenting to the

2    government recording.  We do that both with body recorders,

3    with the phone, using video as appropriate.

4    Q.   As a result of that investigation did there come a time

5    when you began to investigate yet another individual?

6    A.   Yes.

7    Q.   Who was that?

8    A.   The additional individual was Rick Singer.

9    Q.   At that point did you handle the investigation of Rick

12:19 10   Singer, or was it assigned to someone else?

11   A.   I was involved in some of the initial steps related to

12   Rick Singer, but myself and my partner on the securities fraud

13   investigation were both due to be out of the division for quite

14   a period of time.  I was scheduled to leave for initial SWAT

15   certification in Quantico, which was a three-week course.

16        My partner on the investigation was scheduled to go

17   on a three-month temporary assignment in Europe.  Both of us

18   were not going to be able to devote the time that was apparent

19   would be needed to kick off the investigation of Mr. Singer,

12:20 20   and other agents on my squad were brought in to basically take

21   the lead.

22   Q.   Did you assist?

23   A.   In the initial stages, yes, and I did stay in touch with

24   members of the case team while I was at Quantico, but again, I

25   had very limited time when I was there to do that.  And then

after that, my participation was fairly limited.  I assisted

with monitoring the wire and assisted with some operational

actions related to a meeting in September.

Q.   You testified that you assisted in monitoring a wire.

What are you referring to?

A.   We had a Title III up for the summer of 2018 for Mr.

Singer's phone.

Q.   What is a Title III?

A.   A Title III is authorization granted to the government by

a U.S. District Court judge basically to monitor all

communications with a target telephone.

Q.   It's a wiretap?

A.   Yes.

Q.   And whose phone was wiretapped?

A.   Mr. Singer's phone was wiretapped.

Q.   And that was in the summer of 2018?

A.   Yes.

Q.   Are you familiar with what an e-mail search warrant is?

A.   Yes.

Q.   What is an e-mail search warrant?

A.   An e-mail search warrant is permission granted to the

government by a U.S. magistrate judge for the government to

seize and review e-mail communications for a target e-mail

address.

Q.   And are you aware of whether e-mail searches were used as

1    part of this investigation?

2    A.   Yes.

3    Q.   Have you had an opportunity to review some of the results

4    of those searches?

5    A.   Yes.

6    Q.   Which e-mail accounts are you aware of being searched as

7    part of the investigation?

8    A.   I've personally reviewed e-mail search warrants related to

9    Rick Singer's e-mail, Gamal Aziz's e-mail, John Wilson's e-mail

12:22 10   and e-mails including Donna Heinel from USC.

11   Q.   I want to talk about the wiretap for just a moment.

12   A.   Sure.

13   Q.   Before coming here today did you have an opportunity to

14   review the discs in front of you that have been marked as

15   Exhibits 525, 526 and 555?

16   A.   Yes.

17   Q.   What are those?

18   A.   525 is a three-way call between Rick and an individual

19   named Scott Treibly and Gordon Caplan.  526 is a follow-up call

12:22 20   to 525 between Mr. Caplan and Mr. Singer, and 555 is a call

21   between Rick Singer and Agustin Huneeus.

22   Q.   How do you know those are the other individuals on those

23   calls?

24   A.   I've confirmed it with a variety of steps.  The U.S.

25   Attorney's Office obtained subscriber records for the numbers.

1    The numbers matched those in the case of Mr. Treibly and

2    Mr. Huneeus.  I've also reviewed an extraction of Mr. Singer's

3    phone that was taken on October 5, 2018.  And the phone numbers

4    for the individuals are stored.

5              MR. KENDALL:  Objection, your Honor.  I think this is

6    a lot of hearsay.  These are out-of-court documents.

7              MR. FRANK:  He's testifying for his basis for

8    authenticating.

9              THE COURT:  Let him answer the question.

12:23 10  A.   So reviewing the extraction report from the October

11   extraction, I was able to identify the contact information for

12   these individuals, and all the contact information included the

13   phone number for the calls.

14             MR. FRANK:  The government offers 525, 526 and 555.

15             MR. KELLY:  We renew our *Petrozziello* objection to

16   these.

17             MR. KENDALL:  And we have a continuing objection, your

18   Honor.

19             THE COURT:  *Petrozziello* objection is noted and

12:24 20  overruled for the time being.  525, 526, 555 will be

21   conditionally admitted.

22             (Exhibits 525, 526, 555 admitted into evidence.)

23             MR. KELLY:  Just for the record, we renew the

24   confrontation clause objection as well.

25             THE COURT:  Yes.

1          MR. KENDALL:  Your Honor, I gave an expansive one.  As

2    long as it's picked up by the court reporter, I don't mean to

3    disrupt you.

4          THE COURT:  Yes.

5    BY MR. FRANK:

6    Q.   If we could look in your transcript binder to the marked

7    525.

8    A.   Yes.

9    Q.   Have you had an opportunity to review this transcript?

12:24 10   A.   I have.

11   Q.   Is it a fair and accurate transcription of the recording?

12   A.   It is.

13   Q.   Are the voices identified accurately to the best of your

14   ability?

15   A.   Yes, they are.

16   Q.   What is the date of this call?

17   A.   The date of the call is June 15, 2018.

18   Q.   And who are the participants in the call?

19   A.   Rick Singer, Scott Treibly, and Gordon Caplan.

12:25 20        MR. FRANK:  Could we play the call from the start,

21   please.

22          (Audio recording played.)

23          MR. FRANK:  Can we stop right there, please.

24   Q.   And again, special agent, there's indications that there's

25   Mr. Singer's voice, Mr. Treibly's voice and Mr. Caplan's voice?

```
 1   A.   Yes.

 2   Q.   And have you verified that with other recordings as well?

 3   A.   I have.

 4        MR. FRANK:  If we could pick it up at that point.

 5        (Audio recording played.)

 6   Q.   Special agent, did there come a time when there was a

 7   follow-up call between Mr. Singer and Mr. Caplan?

 8   A.   Yes.

 9        MR. FRANK:  Could you turn to the tab marked 526 in

10   your transcript binder.  Ms. Lewis, can we start it again.

11        (Audio recording played.)

12        MR. FRANK:  Can we pause it there for just a moment.

13   Q.   Special agent, what was the date of this call?

14   A.   It was the same day, on June 15, 2018.

15        MR. FRANK:  Thank you, you may resume.

16        (Audio recording played.)

17   Q.   Special agent, I'd like to ask you now to turn to the

18   transcript marked 555 in your binder.

19   A.   Yes.

20   Q.   What is the date of the call at transcript 555?

21   A.   It's August 30, 2018.

22   Q.   And who was this call with?

23   A.   Rick Singer and Agustin Huneeus.

24   Q.   And this was also intercepted over the Court-authorized

25   wiretap?
```

```
 1   A.    It was.

 2           MR. FRANK:  Can we begin.

 3           (Audio recording played.)

 4           MR. FRANK:  Okay.  Let's just stop it right there.

 5   The jury will have the rest of the exhibit in evidence, but I

 6   just want to fast-forward for a moment to page 23 of the

 7   transcript, at line 3.

 8           (Audio recording played.)

 9           MR. FRANK:  Let's stop it right there.  Your Honor,

01:00 10  I'm about to switch gears to another topic.

11           THE COURT:  Switch gears, we'll go about 15 more

12   minutes.

13           MR. FRANK:  Yes, your Honor.

14   Q.    Special agent, I want to now take you through a series of

15   e-mails that were obtained as part of this investigation, and

16   I'm going to begin by asking you to read into evidence a series

17   of e-mails relating to defendant Gamal Aziz.

18           MR. KELLY:  Can we have copies, your Honor, please?

19           THE COURT:  Do you have copies?

01:01 20         MR. FRANK:  We've marked all of these as exhibits and

21   provided copies previously.  We don't have a hard copy of the

22   entire set.

23           THE COURT:  Well, why don't you tell him the numbers

24   you're going to be using.

25           MR. FRANK:  I'm happy to do that, your Honor.  I was
```

```
 1   actually going to offer them in bulk.
 2           MR. KELLY:  Maybe I'll object.  I just want to see
 3   them and see what they are.  Maybe I won't.
 4           THE COURT:  Go ahead and make the offer.
 5           MR. FRANK:  It's Exhibit 9, Exhibit 315, Exhibit 323,
 6   Exhibit 330, Exhibit 334, Exhibits 338 through 342, Exhibit
 7   345, Exhibit 352, Exhibit 363, Exhibit 362, Exhibit 361,
 8   Exhibit 371, Exhibit 372, 376, 381, 387, 390, 427, 467, 478 and
 9   505.
01:02 10         MR. KELLY:  Your Honor, I don't have these memorized.
11   If I could have a moment to look at them.
12           MR. FRANK:  We can go one by one, your Honor.
13           THE COURT:  We'll go one by one.
14           MR. KELLY:  9, 315 -- what was the next?
15           MR. FRANK:  You want me to read the list again?
16           MR. KELLY:  No.  Your colleague just helpfully handed
17   it to me.  Hold on.  We'll pull them up electronically, your
18   Honor.
19           THE COURT:  All right.  Let's go one at a time.
01:03 20   BY MR. FRANK:
21   Q.   Special agent, those exhibits that I just listed, what are
22   they?
23   A.   They're a series of e-mails between primarily Rick Singer
24   and Gamal Aziz.
25   Q.   And are there others on those e-mails as well?
```

```
 1    A.    Yes.  Amal Felaya, who I believe is Gamal's wife is also
 2    in this chains, and I believe there's an e-mail from Donna
 3    Heinel as well.
 4    Q.    And who selected these e-mails for you to read into the
 5    record today?
 6    A.    U.S. Attorney's Office did.
 7               THE COURT:  I'm sorry, I didn't hear.
 8               THE WITNESS:  The United States Attorney's Office did.
 9               MR. FRANK:  If we could show the witness only Exhibit
01:03 10   9, please.
11    Q.    Special agent, what is Exhibit 9?
12    A.    It's an e-mail dated December 12, 2011 from William Powers
13    to Rick Singer and Gamal Aziz.
14    Q.    What's the subject?
15    A.    Adam Aziz.
16               MR. FRANK:  The government offers Exhibit 9.
17               THE COURT:  It will be admitted.
18               MR. KELLY:  No objection, your Honor.
19               MR. KENDALL:  Your Honor, notwithstanding our
01:04 20   continuing objection.  Thank you.
21               THE COURT:  Yes.
22               (Exhibit 9 admitted into evidence.)
23               MR. FRANK:  Ms. Lewis, could we start on page 2 with
24    the e-mail from Gamal Aziz to William Powers.  Not that e-mail.
25    On page 2.  There we go, thank you.
```

1    Q.   You see this is an e-mail from Mr. Aziz to William Powers?

2    A.   Yes.

3    Q.   Could you read for the record Mr. Aziz's signature block.

4    A.   "Gamal Aziz President Chief Executive Officer MGM

5    Hospitality."

6    Q.   And could you read the e-mail for the record, please?

7    A.   "Hi Bill, I hope you're well and able to manage this

8    market's volatility in good spirit.  I need your advice.  My

9    son Adam, junior high, has set his eyes on going to Stanford

01:05 10   and will be applying next year.  He's got the grades, the SAT,

11   athletics, basketball, trilingual and above all a really good

12   kid.  I wanted to know if you can advise me with your

13   experience with Stanford, if there's anyone that can guide Adam

14   or anything that Adam can do to increase his odds at being

15   accepted.  Sorry for imposing, and my very best to you and your

16   family for the holidays."

17   Q.   And how does Mr. Powers respond in the e-mail right above

18   it?

19   A.   "Gamal, I am happy to help and suggest that you retain

01:05 20   Rick Singer, best private college advisor for Adam, and hence

21   you.  Rick is a friend and I have relied on him successfully

22   for our four children who have gone through this process."

23   Q.   You can stop right there.  And if we could just go to the

24   e-mail above it.  You see there's an e-mail from Mr. Singer?

25   A.   Yes.

1    Q.    And how does he respond?

2    A.    "Bill, thank you for the introduction and kind words.

3    Gamal, please feel free to call me anytime."

4    Q.    You don't have to read that into the record.  That's his

5    phone number.

6    A.    "I will be in LV," which I understand to be Las Vegas,

7    "next week visiting Joan and Jim Hammer, two very philanthropic

8    people in LV to work with their second child, Taylor."

9    Q.    And what does Mr. Powers say at the top?

01:06 10   A.    He writes, "Gamal, prioritize meeting Rick.  You will

11   thank me, WCP."

12   Q.    And again, the date of this e-mail?

13   A.    Is December 12, 2011.

14         MR. FRANK:  2011.  Thank you.  Could we show the

15   witness only Exhibit 315, please.

16   Q.    Do you recognize this document?

17   A.    Yes.

18   Q.    What is it?

19   A.    It's an e-mail between Gamal Aziz and Amal Felaya.

01:07 20   Q.    What's the subject line?

21   A.    "Senior retainer for Sabrina from Dr. Bedor."

22   Q.    What's the date?

23   A.    The date of May 21, 2017.

24         MR. FRANK:  The government offers 315.

25         THE COURT:  It will be admitted.

```
 1              (Exhibit 315 admitted into evidence.)
 2    Q.   And this is about six years after the e-mail we just
 3    looked at?
 4    A.   Approximately, yes.
 5              MR. FRANK:  Could we start at the bottom of the first
 6    page, please.  And Ms. Lewis, if you could highlight the
 7    signature block there at the bottom.
 8    Q.   Who is the bottom e-mail from?
 9    A.   Victor Urbach, CTO College Admission Central, LLC in New
10    York, New York.
11              MR. FRANK:  If we could go to that e-mail, the
12    introductory part there.  Thank you.
13    Q.   Do you see that that's an e-mail from Victor Urbach to
14    Amal Felaya?
15    A.   Yes.
16    Q.   Based on your review of these e-mails, who is Amal Felaya?
17    A.   I understand Amal to be Gamal Aziz's wife.
18    Q.   What is the date of this e-mail?
19    A.   May 31, 2017.
20    Q.   "Subject"?
21    A.   "Senior retainer for Sabrina."
22    Q.   Could you read just the introductory paragraph, please.
23    A.   "Sabrina's junior year retainer ends tomorrow, May 31, and
24    Dr. Bedor has set aside a senior retainer slot for her
25    beginning June 1."
```

```
 1   Q.   And can we go up to the top, you see it's been forwarded
 2   by Amal Felaya to Gamal Aziz?
 3   A.   Yes.
 4   Q.   What is Gamal Aziz's e-mail address in this e-mail?
 5   A.   Gamalaziz797@gmail.com.
 6   Q.   And in fact did you review other e-mails that were seized
 7   pursuant to a search warrant from that account?
 8   A.   I did, yes.
 9   Q.   And could you read that response of Mr. Aziz for the
10   record, please.
11   A.   "Don't you think it would be better to hire Rick at this
12   point?"
13           MR. FRANK:  Can we show the witness only Exhibit 323,
14   please.
15   Q.   So that was May 31 we just looked at?
16   A.   Yes.
17   Q.   Do you recognize this e-mail?
18   A.   Yes.
19   Q.   What does the "From" line say?
20   A.   "From Rickwsinger@gmail.com.
21   Q.   And what is the date?
22   A.   July 2, 2017.
23   Q.   And does it appear to have been sent to anyone?
24   A.   There's no "To" recipient.
25   Q.   Where did you find this e-mail?
```

A.   This e-mail was found in the e-mail search warrant returns
for Mr. Singer's e-mail.

          MR. FRANK:  The government offers 323.

          MR. KELLY:  We object to this.  There's no evidence
this went to Mr. Aziz.

          MR. FRANK:  We're not suggesting it did, your Honor.

          MR. KELLY:  You are suggesting it did.

          THE COURT:  How is it relevant?

          MR. FRANK:  It's directly relevant.  Mr. Aziz's
daughter is mentioned in it.  It's an email that was saved in
Rick Singer's e-mail account and note to himself.

          MR. KELLY:  So this is another out-of-court statement.

          THE COURT:  Well, I will take this de bene subject to
an argument out of the hearing of the jury.

          MR. FRANK:  Can it be shown to the jurors, your Honor?

          THE COURT:  Yes, it can, for the time being.

          (Exhibit 323 admitted into evidence.)

Q.   What is the -- the prior e-mail is May 31, 2017?

A.   Yes.

Q.   What is the date of this e-mail?

A.   July 2, 2017.

Q.   So a little over a month later?

A.   Yes.

Q.   What is the "Subject" line?

A.   "U.S.C. with Donna."

1    Q.    And do you see that there's a list of names and numbers?

2    A.    Yes.

3    Q.    Could you read the first four names, please, and numbers?

4    A.    Matteo 300, Jordan Tuchan 250, Gino Palatella 500, Olivia

5    Giannulli 250.

6    Q.    And at the very bottom do you see a name?

7    A.    I do.

8    Q.    Could you read that for the record, please?

9    A.    "Sabrina Aziz, Gamal daughter, Trojan transfer."

01:11 10          MR. FRANK:  Could we show the witness only Exhibit

11   330, please.

12   Q.    Do you recognize this e-mail?

13   A.    Yes.

14   Q.    What is it?

15   A.    It's an e-mail from Gamal Aziz to Amal Felaya.

16   Q.    What's the date?

17   A.    July 17, 2017.

18   Q.    About two weeks later?

19   A.    Approximately, yes.

01:11 20          MR. FRANK:  The government offers 330.

21          THE COURT:  It will be admitted.

22          (Exhibit 330 admitted into evidence.)

23   Q.    And what is the -- if we go to the bottom e-mail in the

24   chain, who is that from?

25   A.    It's from Rick Singer.

1    Q.    And who is it to?

2    A.    It's to Gamal Aziz.

3    Q.    What is the subject?

4    A.    "For me to complete U.S. athletic profile."

5    Q.    Can you just read the categories that are listed?

6    A.    "High school, cumulative unweighted and weighted GPA and

7    test score, home address, e-mail, phone number, parents,

8    birthdate, if they play the sport, position, club, accolades if

9    they have them and action picture."

01:12 10   Q.    What does it say next to "if they played a sport"?

11   A.    "Basketball."

12   Q.    And what does it say next to "club"?

13   A.    "Beijing Junior National Team."

14         MR. FRANK:  If we could just back out of the close-up.

15   Q.    Who is this e-mail forwarded by and who is it forwarded

16   to?

17   A.    It was forwarded from Gamal Aziz to Amal Felaya.

18   Q.    And which e-mail address was it forwarded from?

19   A.    The Gamalaziz797@gmail.com address.

01:13 20        MR. FRANK:  Can we show the witness only Exhibit 334,

21   please.

22   Q.    Do you recognize this document?

23   A.    Yes.

24   Q.    What is it?

25   A.    An e-mail from Gamal Aziz to Rick Singer.

```
 1   Q.   What's the date?

 2   A.   July 27, 2017.

 3            MR. FRANK:   Government offers Exhibit 334.

 4            THE COURT:   It will be admitted.

 5            (Exhibit 334 admitted into evidence.)

 6   Q.   What's the subject?

 7   A.   "Sabrina."

 8   Q.   And if you could look at the first e-mail in the chain at

 9   the bottom, what does Mr. Singer write?

10   A.   "Gamal, I need an action photo or two of Sabrina playing

11   basketball, transcript 9-11, senior classes, and PDF of test

12   scores ASAP."

13   Q.   And how does Mr. Aziz respond?

14   A.   "Got it."

15            MR. FRANK:   Could we look at Exhibit 338, please.

16   Q.   Who is that from?

17            MR. FRANK:   I'm sorry, this is for the witness only.

18   Your Honor, if we could just show the witness, we can flip

19   through Exhibits 338 --

20            THE COURT:   No.   We're going to need to break at this

21   point.   So you may step down for the time being, Mr. Brown.

22            As I said yesterday, you are not going to have an

23   afternoon session.   We went a little bit over time on our late

24   morning sessions, but we're going to have a session tomorrow

25   which will be also slightly abbreviated.   I'm not sure exactly
```

1   whether we'll be breaking at this time but we will be breaking

2   at or before 3:00 tomorrow, so it will be a little bit of a

3   shortened day.

4         Again, you're reminded don't talk about the case to

5   anybody.  It's going to sound like a broken record when I say

6   this so many times, but it is important that you honor my

7   instructions and not try to do any independent research, not

8   try to talk anybody or allow them to talk to you, more

9   importantly.

01:15 10        So have a pleasant rest of the day.  I'll see you

11  tomorrow morning at 9:00 a.m.

12              (Jury exits the courtroom.)

13              THE COURT:  All right.  Be seated, counsel.

14  Approximately how much longer on direct of Mr. Brown?

15              MR. FRANK:  I would estimate a couple of hours, your

16  Honor.

17              THE COURT:  Couple of hours?

18              MR. FRANK:  I would estimate that, yes.

19              THE COURT:  And the cross, about the same?

01:16 20        MR. KENDALL:  Your Honor, I'll be doing -- excuse me.

21  I'll be doing the cross.  If a couple hours means two --

22              THE COURT:  Not Mr. Kelly at all?

23              MR. KELLY:  No.  I'll be doing my own, your Honor.

24              MR. KENDALL:  I'll be doing the first cross.  If he

25  thinks a couple of hours, that will be the minimum of what I'll

1    need perhaps.

2            THE COURT:  Mr. Kelly?

3            MR. KELLY:  Maybe an hour.

4            THE COURT:  So he's likely to take all of tomorrow.

5            MR. KELLY:  Yes, in my view.

6            THE COURT:  And since we're talking about it, actually

7    there will be no session Thursday, but we will have a session

8    on Friday.  Who is likely to be the following witness?

9            MR. FRANK:  Special Agent Keating, your Honor.

01:17 10         THE COURT:  Keating.  And the approximate length of

11   direct?

12           MR. FRANK:  Close to three hours I would estimate.

13           THE COURT:  So it looks like the rest of the week is

14   taken up.  We know what's going to happen, right?

15           MR. KENDALL:  Will Friday be a full afternoon, your

16   Honor?

17           THE COURT:  I'm sorry?

18           MR. KENDALL:  Will Friday go to 3:30?

19           THE COURT:  We may be able to break a little early.

01:17 20  Why?  Do you have a problem?

21           MR. KENDALL:  No.  I just want to --

22           THE COURT:  We're going to have an afternoon session,

23   but we might end a little earlier on Friday.

24           MR. KENDALL:  At the Court's pleasure.

25           THE COURT:  All right.  Anything else that needs to

1  come to my attention before we adjourn for the end of the day?

2          MR. FRANK:  There's one housekeeping matter.  We can

3  bring it up now or tomorrow morning.  It concerns the timing of

4  the deposition that your Honor --

5          THE COURT:  What deposition is that?

6          MR. FRANK:  Defense deposition of Mr. Haden.

7          THE COURT:  I don't have a preference as to when it's

8  taken.  It's up to counsel to take it at a time when it's

9  appropriate.  And if it's going to be offered at the trial,

01:18 10  certainly you're going to have to have daily copy so that

11  everybody will have copies of the transcript sooner rather than

12  later, but that's not an issue that I'm going to get involved

13  in.

14          MR. FRANK:  Yes, your Honor.  And he's in California,

15  so should I assume we're going to be doing this by Zoom?

16          MR. KENDALL:  Your Honor, I've discussed it with

17  Mr. Haden's attorney as recently as last night.  We would like

18  to do it by Zoom.  Mr. Haden may make some sort of arrangement.

19  It will probably be at his attorney's office.  I'm trying to

01:18 20  schedule with the government and Mr. Haden's counsel.  I'm

21  thinking maybe this Sunday.  If not this Sunday, it will be

22  sometime next week.  It was my hope to record the deposition

23  and then edit it to a shortened version and play that shorter

24  version to the jury.

25          THE COURT:  And obviously going over the redactions

 1    with counsel.

 2            MR. KENDALL:  Of course.  I assume it will go both

 3    ways.  We'll work it out.

 4            THE COURT:  That's fine with the Court.

 5            MR. FRANK:  The issue for us is timing.  It's in the

 6    middle of our direct case, so we prefer to do the deposition

 7    later in the week or weekend.

 8            MR. KENDALL:  The problem is we need time to do just

 9    what you said, redact it, cut it down and edit it, get it

01:19 10    physically prepared.

11            THE COURT:  Well, counsel, try to work that out

12    overnight.  You've been working together now for two years.

13    You should be able to resolve this issue.  If you can't, I'll

14    resolve it, but I want you to work at it overnight, and we'll

15    talk about it tomorrow.

16            MR. KENDALL:  What may help us, your Honor, is there

17    any afternoon next week you think we will not be sitting, if we

18    break at 1:00?

19            THE COURT:  That's a good question.  I'm hoping to,

01:20 20    since we've sort of got a tradition here running four-day

21    weeks, our first week was four days, this week is four days,

22    the week after next is four days already scheduled.  So I am

23    hoping maybe to not have a session on a week from Friday, so

24    that might be an appropriate time, a week from whatever the

25    date is.

1          THE CLERK:  24th.

2          THE COURT:  24th I would not have a session.

3          MR. KENDALL:  Okay.  We'll e-mail all of this, your

4    Honor.

5          THE COURT:  Okay.  I think that might be the best

6    time.  We're in recess until tomorrow morning at 9:00 a.m.

7          (Whereupon, the proceedings adjourned at 1:20 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

Witness                                    Page


BRUCE ISACKSON

Direct Examination by Mr. Frank          5

Cross-Examination by Mr. Kelly          10

Cross-Examination by Mr. Tomback        53

Redirect Examination by Mr. Frank      101

Recross Examination by Mr. Kelly       110


KEITH BROWN

Direct Examination by Mr. Frank        115

```
1                        E X H I B I T S

2

3      No.                      ADMIT

4      674   ....................     8

5      675   ....................     9

6      525   ....................   122

7      526   ....................   122

8      555   ....................   122

9      9     ....................   127

10     315   ....................   130

11     323   ....................   132

12     330   ....................   133

13     334   ....................   135

14

15

16

17

18

19

20

21

22

23

24

25
```

1   C E R T I F I C A T E

2

3

4   UNITED STATES DISTRICT COURT )

5   DISTRICT OF MASSACHUSETTS    )

6

7

8          We, Kristin M. Kelley and Kelly Mortellite, certify

9   that the foregoing is a correct transcript from the record of

10  proceedings taken September 13, 2021 in the above-entitled

11  matter to the best of our skill and ability.

12

13

14      /s/ Kristin M. Kelley          September 14, 2021

15      /s/ Kelly Mortellite           September 14, 2021

16      Kristin M. Kelley, RPR, CRR            Date
        Kelly Mortellite, RMR, CRR
17      Official Court Reporter

18

19

20

21

22

23

24

25