1

2                          UNITED STATES DISTRICT COURT
                           DISTRICT OF MASSACHUSETTS
3

4
     UNITED STATES OF AMERICA,           )
5                        Plaintiff       )
                                         )
6    vs.                                 )  No. 1-19-CR-10080
                                         )
7    GAMAL ABDELAZIZ and JOHN            )
     WILSON,                             )
8                        Defendants.     )
                                         )
9                                        )

10

11
                    BEFORE THE HONORABLE NATHANIEL M. GORTON
12                       UNITED STATES DISTRICT JUDGE
                            JURY TRIAL - DAY 6
13

14
                 John Joseph Moakley United States Courthouse
15                          Courtroom No. 4
                           One Courthouse Way
16                    Boston, Massachusetts 02210

17

18                          September 15, 2021
                              9:15 a.m.
19

20

21
                       Kristin M. Kelley, RPR, CRR
22                     Kelly Mortellite, RMR, CRR
                         Official Court Reporter
23          John Joseph Moakley United States Courthouse
               One Courthouse Way, Room 3209
24                   Boston, Massachusetts 02210
                       E-mail: kmob929@gmail.com
25
                 Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2

 3           Stephen E. Frank

 4           Ian J. Stearns

 5           Leslie Wright

 6           Kristen Kearney

 7           United States Attorney's Office

 8           1 Courthouse Way

 9           Suite 9200

10           Boston, MA 02210

11           617-748-3208

12           stephen.frank@usdoj.gov

13           for the Plaintiff.

14

15

16           Brian T. Kelly

17           Joshua C. Sharp

18           Lauren Maynard

19           Nixon Peabody LLP

20           100 Summer Street

21           Boston, MA 02110

22           617-345-1000

23           bkelly@nixonpeabody.com

24           for Gamal Abdelaziz.

25
```

```
 1    APPEARANCES:

 2

 3            Robert L. Sheketoff

 4            One McKinley Square

 5            Boston, MA 02109

 6            617-367-3449

 7            sheketoffr@aol.com

 8            for Gamal Abdelaziz.

 9

10

11            Michael Kendall

12            Lauren M. Papenhausen

13            White & Case, LLP

14            75 State Street

15            Boston, MA 02109

16            617-939-9310

17            michael.kendall@whitecase.com

18            for John Wilson.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3          Andrew E. Tomback

 4          McLaughlin & Stern, LLP

 5          260 Madison Avenue

 6          New York, NY 10016

 7          917-301-1285

 8          atomback@mclaughlinstern.com

 9          for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

THE CLERK:  You may be seated.  Court is now in session.

THE COURT:  Good morning, counsel.  Before we begin, overnight we had a motion filed by the defendants to exclude a taped conversation between Rick Singer and Marci Palatella. The government filed an opposition this morning.  I haven't had a chance to read it carefully.  I've skimmed it, but my question for both counsel is, isn't the issue whether or not Mrs. Wilson is an unindicted coconspirator?

Mr. Frank.

MR. FRANK:  Yes, your Honor.  And she is an unindicted coconspirator.

THE COURT:  And is that the grounds on which you contend this tape is admissible?

MR. FRANK:  We do.  Marci Palatella is an indicted coconspirator.  She'd pled guilty.  She's speaking with another coconspirator, Rick Singer, about a third individual, an unindicted coconspirator, Leslie Wilson.  So it is a classic coconspirator statement relaying conversations among coconspirators.

THE COURT:  Why doesn't this come in, Mr. Kendall, subject to *Petruzziello*?

MR. KENDALL:  Your Honor, two things.  First, I don't -- if we ask the government for what its proffer is to

1    prove, which is typically what you do in *Petruzziello*, or what
2    you can do in *Petruzziello* --
3              THE COURT:  Say that again.  I'm sorry.
4              MR. KENDALL:  If the government has made a proffer of
5    what they think shows her being a coconspirator -- so I think
6    the Court has enough information before it today to make that
7    decision with her in particular.  They say she forwarded some
8    photos, she did a couple things.  Nothing -- but to make her a
9    coconspirator, they have to show she has knowledge that
09:16 10    fraudulent information is being submitted to the school.  The
11    only thing they have in that that they claim is fraudulent
12    information is that sports profile of the son, you know, with
13    the water polo picture.  There's nothing, absolutely nothing,
14    to connect her to that sports profile.  Everything else she
15    does is just a mother supporting her kid's application.
16              THE COURT:  Wasn't this the subject of the in limine
17    motion when we were talking about the marital exclusion?
18              MR. KENDALL:  Yes, your Honor.  We did discuss it
19    earlier, and you did rule against us on that.  I think it's
09:17 20    more ripe now that we're in court.  And the government made a
21    huge concession in their opening.  They don't tie us to any
22    bribery.  They don't claim we knew about bribes to any people.
23    So they certainly are not claiming she knows about a bribe to
24    anybody.  So the whole thing hangs on this one issue, can they
25    tie her to the false USC sports profile.  I've not heard

1    Mr. Frank or the government make any allegations she knew about

2    that profile or that they have any evidence to tie her to that

3    profile.

4              THE COURT:  Mr. Frank.

5              MR. FRANK:  Your Honor, the Court has already found

6    that she's an unindicted coconspirator.  For purposes of the

7    marital privilege, we did make a proffer that she's on e-mails

8    specifically discussing the side door in those words.  She's

9    referring to it as "the side door."  She's referring to the

09:18 10    purchase of a spot.

11             THE COURT:  I'm sorry.  She's referring to?

12             MR. FRANK:  She's explicitly referring to the purchase

13   of a spot on the water polo team from Jovan Vavic.  She sends

14   the photos that are used on the profile, which ultimately was

15   falsified.  And what Mr. Kendall says about the government

16   having conceded that there was no bribery or that his client

17   was not aware of bribery is simply not true, your Honor.  Our

18   whole case is built on the fact that there was a false profile

19   and a bribe, and a payment to the program is a bribe.

09:18 20             THE COURT:  All right.  I'm going to deny the

21   defendants' motion and admit it subject to *Petruzziello*, of

22   course, as all the other coconspirator statements are subject

23   to.  So if there is not anything else, I will call the jury.

24             Call the jury.

25             MR. FRANK:  Your Honor, would it be helpful to the

 1   Court to have a hard copy of the exhibits being introduced?

 2           THE COURT:  Yes.  In other words, they're not in this

 3   book?

 4           MR. FRANK:  I don't know which book that is.  That's

 5   our transcripts.  We also have hard copies of the exhibits.

 6           THE COURT:  Yes.  It would be helpful.

 7           (Jury enters.)

 8           THE CLERK:  Thank you.  You may be seated.

 9           THE COURT:  Good morning, jurors.  I just want to say

09:21 10   that we're starting a little late today, but when we start

11   late, it's not because we're idle.  We need to resolve issues

12   outside of your hearing and, actually, we're saving time.  So

13   some days or sometimes in the middle of testimony when we ask

14   you to recess so we can discuss matters of law it's so that we

15   can save time.  We're not wasting time.  Okay?

16           So we're ready to start again.

17           Mr. Brown, you're reminded that you remain under oath.

18           Mr. Frank, you may continue with direct examination.

19              MR. FRANK:  Thank you, Your Honor.

09:21 20           DIRECT EXAMINATION OF KEITH BROWN (Continued)

21   BY MR. FRANK:

22   Q.   Good morning again, Special Agent.

23   A.   Good morning.

24   Q.   Just give me one second to squeeze in here.

25              MR. FRANK:  Miss Lewis, if we could call up Exhibit

1   330 in evidence.  Unfortunately, it is now my monitor that is

2   not working.

3   Q.   Okay, Special Agent.  We took a look at Exhibit 330.  Just

4   to orient ourselves as to where we left off, Exhibit 330 was

5   the e-mail from Mr. Singer to Mr. Aziz, subject, "for me to

6   complete USC athletic profile".

7        Do you see that?

8   A.   Yes.

9   Q.   And who did Mr. Aziz forward Mr. Singer's e-mail to?

09:24 10   A.   He forwarded the message to Amal Felaya.

11   Q.   And, again, who is that?

12   A.   I believe that's his wife.

13   Q.   If you look at Exhibit 334 in evidence, and this is

14   updated July 17, 2017, and Exhibit 334 in evidence, what's the

15   date on this exhibit?

16   A.   July 27, 2017.

17   Q.   And this is where Mr. Singer says "Gamal, I need an action

18   photo or two of Sabrina playing basketball".

19        Do you see that?

09:25 20   A.   Yes.

21   Q.   And how does Mr. Aziz respond?

22   A.   "Got it".

23        MR. FRANK:  Okay.  Could we now look at exhibit -- for

24   the witness only, Exhibits 338 through 342, if we could just

25   scroll through those for the witness only.

```
 1              Do you recognize 338, Special Agent?
 2    A.    Yes.
 3    Q.    What is it?
 4    A.    An e-mail from Gamal Aziz to Rick Singer.
 5    Q.    Subject?
 6    A.    "Sabrina's action pictures on my iPhone".
 7    Q.    And if we could look at Exhibit 339, please?  Do you
 8    recognize this document?
 9    A.    Yes.
10    Q.    What is it?
11    A.    An e-mail from Gamal Aziz to Rick Singer.
12    Q.    Subject?
13    A.    "Sabrina".
14    Q.    E-mail 340, please.  What's this?
15    A.    An e-mail from Gamal Aziz to Rick Singer.
16    Q.    Subject?
17    A.    "Sabrina".
18    Q.    Thank you.  341, please.  What is this?
19    A.    Also an e-mail from Gamal Aziz to Rick Singer.
20    Q.    Subject?
21    A.    "Sabrina".
22    Q.    Thank you.  And 342, please.  What is this?
23    A.    Also an e-mail from Gamal Aziz to Rick Singer.
24    Q.    Subject?
25    A.    Also "Sabrina".
```

1    Q.    Thank you.

2          MR. FRANK:  The government offers Exhibits 338

3    through 342.

4          MR. KENDALL:  No objection.

5          THE COURT:  All of those exhibits are -- or all of

6    those e-mails are dated July 27, 2017?  Is that correct?

7          MR. FRANK:  Yes, your Honor.

8          THE COURT:  They'll be admitted.

9          (Exhibit 338, 339, 340, 341, 342 admitted into

09:26 10   evidence.)

11   Q.    Can we start with 338 in evidence, please.  Okay.  Special

12   Agent, again, refresh us what this is.

13   A.    An e-mail from Gamal Aziz to Rick Singer.

14   Q.    And it says "Sabrina's action pictures on my iPhone"?

15   A.    Yes.

16   Q.    Can we look at the attachment, please.

17         MR. FRANK:  Miss Lewis, if you could next to that

18   bring up 339 in evidence.

19   Q.    What is 339?

09:27 20   A.    An e-mail from Gamal Aziz to Rick Singer.

21   Q.    It also says "Subject: Sabrina"?

22   A.    Yes.

23   Q.    Can we look at the attachment on 339, please.

24         MR. FRANK:  And Miss Lewis, if you could take those

25   down and put up 340 and 341.

```
 1    Q.   If you could just take a look at the attachments.  What do
 2    those appear to be, Special Agent?
 3    A.   The image on the left appears to be a team photo of a
 4    women's basketball team and the photo on the right is a photo
 5    of young women playing basketball.
 6              MR. FRANK:  And if we could take those down and look
 7    at 342, please.
 8    Q.   You see again the subject is "Sabrina"?
 9    A.   Yes.
10    Q.   Can we look at the attachment?  What is this?
11    A.   A team photo of a women's basketball team.
12              MR. FRANK:  Can we show the witness only Exhibit 345,
13    please.
14    Q.   Do you recognize this document?
15    A.   Yes.
16    Q.   What is it?
17    A.   It is an e-mail from Rick Singer to Gamal Aziz.
18    Q.   What is the date?
19    A.   July 27, 2017.
20              MR. FRANK:  Government offers 345.
21              THE COURT:  It will be admitted.
22              (Exhibit 345 admitted into evidence.)
23    Q.   And what does Mr. Singer say to Mr. Aziz in this e-mail?
24              MR. FRANK:  Do the jurors have it on the screen?
25    Q.   Hold on just one second.
```

```
 1              What does Mr. Singer say to Mr. Aziz in this e-mail?
 2    A.    He writes, "we will use this one".
 3    Q.    Okay.  And is there an indication on this e-mail of which
 4    one he's referring to?
 5    A.    Yes.
 6    Q.    What is the number of the attachment to the prior e-mail?
 7    A.    The attachment is DSC_0123.JPG
 8              MR. FRANK:  Miss Lewis, if you could put this on the
 9    right -- or on the left of the screen and call up Exhibit 340
10    on the right.
11    Q.    What is the attachment number for Exhibit 340?
12    A.    DSC_ 0123.JPG
13    Q.    And how do those attachment numbers compare?
14    A.    They're the same.
15              MR. FRANK:  Miss Lewis, if you could, on the right,
16    put up the attachment to Exhibit 340.
17    Q.    Again, what is that photograph on the right?
18    A.    It's an image of young women playing basketball.
19              MR. FRANK:  Could we show the witness only
20    Exhibit 352, please.
21    Q.    What is this, Special Agent?
22    A.    An e-mail from Rick Singer to Gamal Aziz.
23    Q.    What's the subject?
24    A.    "Sabrina".
25    Q.    What's the date?
```

```
 1   A.    August 8, 2017.
 2              MR. FRANK:  The government offers 352.
 3              THE COURT:  It will be admitted.
 4              (Exhibit 352 admitted into evidence.)
 5   Q.    Special Agent --
 6              MR. FRANK:  Miss Lewis, if you could just enlarge that
 7   once more, please.
 8   Q.    Could you read the e-mail into -- the top e-mail into the
 9   record, please.
10   A.    "Gamal please answer below, profile for Sabrina... her
11   e-mail, phone, and parents' names need to be added in as I did
12   not have that.  Let me know if you want me to add any other
13   awards to her profile or if you think that is enough".
14   Q.    And if we could look at the e-mail that's being forwarded
15   below this one, do you see that there is that same text below
16   that you just read into the record?
17   A.    Yes.
18   Q.    And who is this forwarded message from?
19   A.    It's from Laura Janke.
20   Q.    Okay.  And can we take a look at the attachment to the
21   e-mail, please.  And Special Agent --
22              MR. FRANK:  If we could just Zoom in on the -- Miss
23   Lewis, on the top left.
24   Q.    What is the name on this profile?
25   A.    "Sabrina Abdelaziz".
```

```
 1   Q.   What does it say below that?

 2   A.   "Point guard".

 3   Q.   And what does it list as her height?

 4   A.   5 foot 8 inches.

 5   Q.   Okay.  And if we could look at the resume portion below in

 6   the box, could you read us the first couple entries under "Hong

 7   Kong International School Basketball"?

 8   A.   "Starting Point Guard, Team Captain, 48th Holiday

 9   Basketball Tournament Champions, 2016 China Cup Champions, APAC

09:33 10   Basketball Finals".

11   Q.   Okay.  Thank you.  If we could look at the photograph,

12   please.

13          MR. FRANK:  And if you could, Miss Lewis, put that on

14   the right and put up the attachment to Exhibit 3 -- I believe

15   it's 340.

16   Q.   Special Agent, how do the photographs on the profile and

17   the photographs that Mr. Aziz sent Mr. Singer compare?

18   A.   The photograph on the profile appears to be a cropped

19   version of the image that Mr. Aziz sent.

09:33 20          MR. FRANK:  And in -- on the left, in Exhibit 340, the

21   e-mail that Mr. Aziz sent to Mr. Singer, could you just go to

22   the cover e-mail, please.

23   Q.   Special Agent, what is the subject of that e-mail?

24   A.   "Sabrina".

25   Q.   Okay.  Thank you.
```

```
 1              MR. FRANK:  Miss Lewis, you can take down 340, and
 2     just put up 352, please.  If we can go back to the cover
 3     e-mail.
 4     Q.   You see -- if we can just go to the heading, what is the
 5     e-mail address to which Mr. Singer sent this e-mail?
 6     A.   GamalAziz@cox.net.
 7     Q.   And where did you obtain this e-mail?
 8     A.   I received this e-mail in the gamalaziz797@gmail.com
 9     e-mail returns.
10     Q.   So can you explain that?
11     A.   I cannot.
12     Q.   The e-mail was found in the search warrant returns for
13     GamalAziz797@gmail.com?
14     A.   It was.
15     Q.   Even though it was sent to gamalaziz@cox.net?
16     A.   Yes.
17     Q.   And are you familiar with auto-forwarding?
18     A.   Generally, yes.
19     Q.   And, generally speaking, what is auto-forwarding?
20              MR. KELLY:  Objection.  There's no evidence it was
21     auto-forwarded.
22              THE COURT:  He can explain what it is and, presumably,
23     you intend to tie this in, Mr. Frank?
24              MR. FRANK:  Your Honor, I can withdraw the question.
25     Q.   You found the e-mail in the Gmail search warrant returns?
```

```
 1    A.    Yes.

 2    Q.    Thank you.

 3          MR. FRANK:  Can we look at, for the witness only,

 4    Exhibit 363, please.

 5    Q.    Do you recognize this document?

 6    A.    Yes.

 7    Q.    What is it?

 8    A.    An e-mail from Rick Singer to Donna Heinel.

 9    Q.    And what's the date?

10    A.    August 15, 2017.

11    Q.    What's the subject?

12    A.    "American but in China basketball player".

13          MR. FRANK:  Government offers 363.

14          THE COURT:  It will be admitted.

15          (Exhibit 363 admitted into evidence.)

16    Q.    What is the attachment?

17    A.    Sabrina Abdelaziz's profile.doc.

18    Q.    And can we take a look at the attachment, please.  Special

19    Agent, do you recognize this attachment?

20    A.    Yes.

21    Q.    How does it compare with the attachment to the e-mail to

22    Mr. Aziz that we just looked at?

23    A.    It appears to be the same with the exception of e-mail,

24    phone and parents' information added in the top left corner.

25    Q.    Could we look -- and what is the date on the cover e-mail,
```

1    if we could look at that, please?

2    A.   August 15, 2017.

3         MR. FRANK:  Can we show the witness only Exhibit 362,

4    please.

5    Q.   Do you recognize this document?

6    A.   Yes.

7    Q.   What is it?

8    A.   An e-mail from Donna Heinel to Rick Singer.

9    Q.   And what is the subject?

09:37 10   A.   "American but in China basketball player".

11        MR. FRANK:  Government offers 362.

12        THE COURT:  It will be admitted.

13        (Exhibit 362 admitted into evidence.)

14   Q.   Does this appear to be a response to Mr. Singer's e-mail

15   to Miss Heinel?

16   A.   It does.

17   Q.   And how does Miss Heinel respond?

18   A.   She wrote, "We will need a better picture".

19        MR. FRANK:  Can we show the witness only Exhibit 361,

09:37 20   please.

21   Q.   Do you recognize 361?

22   A.   Yes.

23   Q.   What is it?

24   A.   An e-mail from Laura Janke to Rick Singer.

25   Q.   And what is the date?

```
 1  A.    August 16, 2017.
 2           MR. FRANK:  Government offers 361.
 3           THE COURT:  It will be admitted.
 4           (Exhibit 361 admitted into evidence.)
 5           MR. FRANK:  Miss Lewis, if you could just zoom out a
 6  little bit and go down to the forwarded e-mail -- I'm sorry.
 7  Go up a little bit and we're just going to zoom in on sort of
 8  the top third of the page.  Perfect.  Thank you.
 9  Q.    Special Agent, if you could just read for the record the
10  e-mail, the initial e-mail, on the bottom from Rick Singer on
11  August 15, 2017?
12  A.    "Donna sent back.  She needs a different picture for
13  Olivia and Sabrina.  I need to get an action photo for Gino
14  from mom".
15  Q.    And how does Miss Janke respond?
16  A.    "What kind of pictures does she want from them?"
17  Q.    And how does Mr. Singer respond?
18  A.    "For Sabrina clearer and Olivia different look than the
19  one we used".
20  Q.    And how does Miss Janke respond?
21  A.    "Yikes... you gave me the picture for Sabrina.  Do you
22  have a different one?"
23           MR. FRANK:  If we could put this on the right side of
24  the screen, Miss Lewis, please.  And if you could call up
25  Exhibit 323 in evidence on the left.  And can you -- exactly.
```

1   Thank you.

2   Q.   Exhibit 323 on the left, Special Agent, you introduced

3   that yesterday.  That was the Singer note "USC with Donna".  Do

4   you recall that?

5   A.   Yes.

6   Q.   Okay.  On the right --

7        MR. FRANK:  Miss Lewis, could you highlight the

8   reference to Olivia?  Could you highlight that e-mail actually?

9   Q.   Do you see there are three names in that e-mail?

09:40 10   A.   Yes.

11   Q.   What are the three names?

12   A.   Olivia, Sabrina, and Gino.

13   Q.   And do you see those three same names in the e-mail "USC

14   with Donna"?

15   A.   Yes.

16        MR. FRANK:  Miss Lewis, can you highlight those.  Can

17   you read those names from the USC with Donna e-mail for the

18   record, please.

19   A.   Gino Palatella, Olivia Giannulli, and Sabrina Aziz.

09:40 20   Q.   Thank you.

21        MR. FRANK:  Miss Lewis, you can take down 323 on the

22   left.  And if you can put Exhibit 361 back up.  Thank you.  And

23   if we could look at the bottom half of the chain now -- no.

24   Starting -- exactly, at the bottom half of that page.

25   Q.   And in the middle of the page, you see there is a

1  forwarded -- Mr. Singer has forwarded a message to Miss Janke?

2  A.    Yes.

3  Q.    And can you read that message, please?

4      MR. FRANK:  Miss Lewis, if you could highlight that.

5  Thank you.

6  A.    He wrote, "Did you do Matteo Sloane, Italian water polo

7  player that attends Buckley?"

8  Q.    And how did Miss Janke respond?

9  A.    "No.  I didn't have anything on him.  I will get it done".

09:41 10  Q.    And do you see that he has forwarded a message to

11  Miss Janke from another individual?

12  A.    Yes.

13  Q.    And who is that individual?

14  A.    Devin Sloane.

15  Q.    And what is the subject line of the e-mail that came

16  forwarded from Devin Sloane?

17  A.    "For me to complete USC athletic profile".

18      MR. FRANK:  And if we could go to the next page of

19  this exhibit, please.  Can you start -- thank you.

09:42 20  Q.    What is -- can you just read for the record the e-mail

21  that Mr. Singer sent Mr. Sloane?

22  A.    "High school - The Buckley School, cumulative unweighted

23  and weighted GPA and test score, (SAT or ACT and subject tests

24  if available), home address, e-mail, phone number, parents,

25  birthday, if they play the sport - water polo, position -

```
 1   perimeter player, Club LA Water Polo, Italian Junior National
 2   Team, accolades if they have them, action picture".
 3            MR. FRANK:  And if we can put that on the right and
 4   put Exhibit 330 in evidence on the left, please.
 5   Q.   You see Exhibit 330 on the left in evidence is an e-mail
 6   that Mr. Singer sent to Mr. Aziz?
 7   A.   Yes.
 8   Q.   And it's Exhibit 361 on the right is the e-mail he sent to
 9   Mr. Sloane?
10   A.   Yes.
11   Q.   How did the two lists of items to complete the USC
12   athletic profile compare?
13   A.   The information requested appears to be the same.
14   Q.   And what is the date of the e-mail to Mr. Aziz?
15   A.   July 16, 2017.
16   Q.   And what is the date of the e-mail to Mr. Sloane?
17   A.   Also July 16, 2017.
18            MR. FRANK:  Thank you.  You can take that down.
19   Miss Lewis, can we put 371 for the witness only, please.
20   Q.   What is 371?
21   A.   An e-mail from Rick Singer to Donna Heinel.
22   Q.   What's the date?
23   A.   August 18, 2017.
24            MR. FRANK:  Government offers 371.
25            THE COURT:  It will be admitted.
```

```
 1                  (Exhibit 371 admitted into evidence.)
 2      Q.   And if we could start on the bottom e-mail, what does
 3      Miss Heinel write to Mr. Singer on August 18, 2017?
 4      A.   "Matteo Sloane bio".
 5      Q.   And do you recognize the name Matteo Sloane from the last
 6      e-mail?
 7      A.   I do, yes.
 8      Q.   And can we look at the response from Mr. Singer.  What
 9      does Mr. Singer say in response?
09:44 10    A.   "Will forward this weekend.  Sabrina's pictures I got from
11      school and dad in Hong Kong are not closer than what I provided
12      already.  What should I do?  Also have a pole vaulter real good
13      grades and scores forwarding today - Tommy Kimmel from Bishops
14      in SD", San Diego.
15      Q.   Thank you.
16           MR. FRANK:  Can we look at Exhibit 372 for the witness
17      only, please.
18      Q.   Do you recognize this document?
19      A.   Yes.
09:45 20    Q.   What is it?
21      A.   It's an e-mail from Rick Singer to Donna Heinel.
22      Q.   What's the date?
23      A.   August 28, 2017.
24           MR. FRANK:  The government offers --
25           MR. KELLY:  Your Honor, to the extent we haven't
```

1    already with our continued objection, we continue to object on

2    confrontation clause grounds and 403 grounds.

3                THE COURT:  All right.  That's noted.

4                MR. FRANK:  Government offers 372.  Is that admitted,

5    your Honor?

6                THE COURT:  Yes.  372 is admitted.

7                MR. FRANK:  Thank you.

8                (Exhibit 372 admitted into evidence.)

9    Q.   Special Agent --

09:45 10                MR. FRANK:  Miss Lewis, if we could enlarge the bottom

11   e-mail.

12   Q.   Who is this e-mail from?

13   A.   Donna Heinel.

14   Q.   And I'm sorry, before we look at the e-mail, can we look

15   at the caption of the e-mail.  What is the subject of the

16   e-mail exchange?

17   A.   "These are the athletes I have from you".

18   Q.   Thank you.  And what does -- can we now look back at

19   Miss Heinel's e-mail.  Special Agent, what is the list on the

09:46 20   left?

21   A.   It's a list of names.

22   Q.   And then if you could look at the third column, what is

23   that a list of?

24   A.   A list of college sports.

25   Q.   Okay.

```
 1            MR. FRANK:  And if we could put that up on the right
 2   and put Exhibit 323 in evidence on the left.
 3   Q.   Do you see the name "Olivia Giannulli" on the right?
 4   A.   Yes.
 5   Q.   What is the sport?
 6   A.   "Rowing".
 7   Q.   Do you see the name "Olivia Giannulli" on the left?
 8   A.   Yes.
 9   Q.   What's the amount listed next to it?
10   A.   250.
11   Q.   And if we could go down, do you see the name "Matteo
12   Sloane" on the right?
13   A.   Yes.
14   Q.   What is the sport?
15   A.   "MWP", which I believe refers to men's water polo.
16   Q.   And do you see the name "Matteo" on the left?
17   A.   Yes.
18   Q.   Do you see the name "Gino Palatella" on the list
19   Miss Heinel sent Mr. Singer?
20   A.   Yes.
21   Q.   What is the sport?
22   A.   "MFB", which I believe refers to men's football.
23   Q.   And do you see the name "Gino Palatella" on the left?
24   A.   Yes.
25   Q.   And what's the number Mr. Singer has next to it?
```

```
 1   A.   500.
 2   Q.   And do you see the name "Sabrina Abdelaziz" on the right?
 3   A.   Yes.
 4   Q.   And what is the sport next to it?
 5   A.   "WBSK", which I believe is an abbreviation for women's
 6   basketball.
 7   Q.   And do you see the name "Sabrina Abdelaziz" on the left?
 8   A.   Yes.
 9   Q.   What does it say next to it?
10   A.   "Sabrina Aziz - Gamal daughter - Trojan transfer".
11   Q.   Thank you.
12            MR. FRANK:  Could we look at 376 for the witness only,
13   please.
14   Q.   Do you recognize this document?
15   A.   Yes.
16   Q.   What is it?
17   A.   An e-mail from Gamal Aziz to Rick Singer.
18   Q.   What is the date?
19   A.   August 31, 2017.
20            MR. FRANK:  Government offers 376.
21            THE COURT:  It will be admitted.
22            (Exhibit 376 admitted into evidence.)
23   Q.   If you could look at the bottom e-mail in the chain, what
24   does Mr. Aziz write to Mr. Singer?
25   A.   "Rick, any update?  Sabrina is getting a recommendation
```

```
  1    letter from the director of the summer program at USC where she
  2    went for the last two summers and I want to make sure that any
  3    contact with USC is through you.  Please call when you can".
  4    Q.   How does Mr. Singer respond to the inquiry about the
  5    letter of reference from someone at USC?
  6    A.   "It has zero impact for me and my process.  We can add
  7    that person to her other recommenders on the common app if she
  8    wants".
  9    Q.   And how does Mr. Aziz respond?
 10    A.   "Ok".
 11         MR. FRANK:  Can we look at 381 for the witness only,
 12    please.
 13    Q.   Do you recognize this document?
 14    A.   Yes.
 15    Q.   What is it?
 16    A.   An e-mail from Donna Heinel to Katie Fuller.
 17    Q.   And what is the date?
 18    A.   October 3, 2017.
 19         MR. KELLY:  Same objection as before, your Honor.
 20         THE COURT:  Who is Miss Fuller?
 21    Q.   Special Agent, have you seen the name Katie Fuller before?
 22    A.   Yes.
 23    Q.   And where did you see that name?
 24    A.   In a USC e-mail production.
 25    Q.   And who is Miss Fuller?
```

1    A.   Based on a limited review, she appears to be an employee

2    of USC.

3    Q.   Does she have a USC e-mail address?

4    A.   She does.

5         MR. FRANK:   Government offers 381.

6         MR. KELLY:   We still object on confrontation grounds.

7    We understand they're not offering them as witnesses either.

8         THE COURT:   It will be admitted.

9         (Exhibit 381 admitted into evidence.)

09:50 10   Q.   What is the e-mail that Miss Heinel sends to her colleague

11   Miss Fuller on October 3, 2017?  What does the attachment say?

12   A.   "Sabrina Abdelaziz profile.doc".

13   Q.   And while we're on this e-mail, what is Miss Heinel's

14   title?

15   A.   "Senior Athletic Director, SWA" --

16   Q.   Senior Associate Athletic Director?

17   A.   Yeah.  "Senior Associate Athletic Director, SWA,

18   University of Southern California".

19   Q.   And again, the date is October 3, 2017?

09:51 20   A.   Yes.

21   Q.   Okay.  Can we look at the attachment Miss Heinel sent to

22   Miss Fuller.

23        MR. FRANK:   Now, Miss Lewis, if you could put this

24   attachment on the right of the screen, please, and put

25   Exhibit 363 in evidence on the left.  If we could just go to

1    the e-mail first.

2    Q.    Just to refresh us, Special Agent, the e-mail on the left

3    from Rick Singer to Donna Heinel, what's the date on that?

4    A.    August 15, 2017.

5    Q.    What is the attachment?

6    A.    "SabrinaAbdelazizprofile.doc".

7          MR. FRANK:  And now could we look at the attachment.

8    And Miss Lewis, if you could zoom in.

9    Q.    Do they appear generally the same, Special Agent?

09:51 10    A.    With a few exceptions, yes.

11    Q.    And if we could look at the top left, what is the height

12    listed for Sabrina Abdelaziz on the profile Mr. Singer sent to

13    Miss Heinel?

14    A.    5 foot, 8 inches.

15    Q.    What is the height listed for Miss Abdelaziz on the

16    profile Miss Heinel sent to her colleague?

17    A.    5 foot, 10 inches.

18    Q.    If we could zoom out, do you see there's a photograph on

19    the left in the profile Mr. Singer sent to Miss Heinel?

09:52 20    A.    Yes.

21    Q.    Can we zoom in on the photo on the right, please.  Is that

22    the same photo that's on the Sabrina Abdelaziz profile that

23    Miss Heinel sent to her colleague at USC?

24    A.    No.

25    Q.    Do those appear to be even the same individual?

```
  1    A.    No.

  2          MR. FRANK:  If we can zoom out, please.  You can take

  3    out 363 on the left.  Thank you.  And just to refresh on 381 --

  4    Miss Lewis, I'm sorry.  If you could just go back to the cover

  5    e-mail.

  6    Q.   What is the date that Miss Heinel sent this to her

  7    colleague?

  8    A.   October 3, 2017.

  9          MR. FRANK:  Could we show the witness only 387,

 10    please.

 11    Q.   Do you recognize this document?

 12    A.   Yes.

 13    Q.   What is it?

 14    A.   An e-mail from Donna Heinel to Rick Singer.

 15    Q.   And what is the date?

 16    A.   October 10, 2017.

 17    Q.   And how long is October 10th after October 3rd?

 18    A.   Approximately a week.

 19          MR. FRANK:  Government offers 387.

 20          MR. KELLY:  Same objection, confrontation clause.

 21          THE COURT:  It will be admitted.

 22          (Exhibit 387 admitted into evidence.)

 23    Q.   And what is the attachment name of the attachment that

 24    Miss Heinel sends to Mr. Singer on October 10, 2017?

 25    A.   "SAbdelaziz.PDF".
```

1   Q.   Can we look at the attachment, please.  What is the date

2   of this letter?

3   A.   October 9, 2017.

4   Q.   Could you read the introduction, please.

5   A.   "Dear Sabrina, congratulations!  I am pleased to inform

6   you that the Admission Committee, after careful review of your

7   credentials, has approved your admission to the University of

8   Southern California for the Fall 2018 semester.  Your records

9   indicate that you have the potential to make a significant

09:54 10   contribution to the intercollegiate athletic program, as well

11   as to the academic life of the university.  I can assure you

12   that the faculty and staff will do all that we can to support

13   you in achieving your goals as a student athlete at USC".

14   Q.   And could you read the next two sentences, please.

15   A.   "Please be advised that this letter of acceptance is based

16   upon a preliminary review of your academic records.  In order

17   to validate this acceptance, you must."

18   Q.   And could you read Item 1, please.

19   A.   "Complete in full an Undergraduate Application by

09:55 20   January 15, 2018".

21   Q.   Could you read Item 3, please.

22   A.   "Register with the NCAA Eligibility Center".

23   Q.   Okay.  And then what does it say below those items?

24   A.   "If these conditions are not met, your approval will be

25   revoked".

```
 1   Q.   And the final paragraph, please.
 2   A.   "On behalf of the University, I would like to express our
 3   pleasure with your commitment to USC.  We are delighted to
 4   welcome you to our community of scholars and to our athletic
 5   program.  We look forward to seeing you on campus next year".
 6   Q.   And who is it signed by?
 7   A.   Timothy Brunold, the Dean of Admission.
 8   Q.   And again, the date of this letter, Special Agent?
 9   A.   Dated October 9, 2017.
10   MR. FRANK:  Could we look for the witness only
11   Exhibit 427, please.  I'm sorry.  Before we look at 427, can we
12   look at 390.  I skipped one on accident.
13   Q.   Do you recognize 390?
14   A.   Yes.
15   Q.   What is 390?
16   A.   An e-mail from Rick Singer to Gamal Abdelaziz.
17   Q.   And what's the date?
18   A.   October 10, 2017.
19   Q.   What's the subject?
20   A.   "S Abdelaziz copy.PDF".  Oh, I'm sorry.  "FWD: USC
21   letter".
22   Q.   The attachment is "S Abdelaziz copy.PDF"?
23   A.   Yes.
24   MR. FRANK:  Government offers 390.
25   THE COURT:  It will be admitted.
```

1          MR. FRANK:  And can we look at the attachment, please.

2          (Exhibit 390 admitted into evidence.)

3     Q.   How does the attachment Mr. Singer sent to Mr. Abdelaziz

4     on October 10th compare to the attachment you just read in the

5     e-mail from Miss Heinel to Mr. Singer?

6     A.   It appears to be the same letter.

7     Q.   And if we could look back at the cover e-mail, what is the

8     e-mail address that Mr. Singer sent this to?

9     A.   GamalAziz797@gmail.com.

09:57 10   Q.   And how does that e-mail address compare to the e-mail

11    account where you found Sabrina Abdelaziz's profile that

12    Mr. Singer sent?

13    A.   I'm sorry.  I don't understand the question.

14    Q.   Mr. Singer -- you introduced into evidence an exhibit in

15    which Mr. Singer sent Mr. Aziz a profile of Sabrina?

16    A.   Yes.

17    Q.   How does this e-mail address compare to the account where

18    you found that profile?

19    A.   This is the same account where I found the profile.

09:57 20   Q.   Thank you.

21          MR. FRANK:  Could we now look, for the witness only,

22    at Exhibit 427, please.

23    Q.   Do you recognize this document?

24    A.   Yes.

25    Q.   What is it?

```
 1   A.    An e-mail from Gamal Aziz to Gary Keung.

 2   Q.    And again, what is the e-mail address from which Mr. Aziz

 3   sent this e-mail?

 4   A.    GamalAziz797@gmail.com.

 5   Q.    What is the date of this e-mail?

 6   A.    November 29, 2017.

 7         MR. FRANK:  Government offers 427.

 8         THE COURT:  It will be admitted.

 9         (Exhibit 427 admitted into evidence.)

10         MR. FRANK:  And if we could look at the e-mail, the

11   second half of the page, Miss Lewis, "Dear Mr. and

12   Mrs. Abdelaziz."

13   Q.    Could you read the first half of that e-mail, please.

14   A.    "Dear Mr. and Mrs. Abdelaziz, I just want to bring to your

15   attention of the application deadlines for USC and the pros and

16   cons that I have discussed with Sabrina.  As those who are

17   applying to the school may know, USC has a December 1st

18   deadline that is said to be for merit scholarship consideration

19   and programs in cinematic arts and architecture, as well as a

20   regular deadline on January 15th.  With that said, while the

21   December 1st deadline is not stated to give any edge/priority

22   in admissions, I have discussed with other counselors and would

23   like to list out the potential pros and cons to submitting the

24   application earlier."

25         MR. FRANK:  And Miss Lewis, if you could take us down
```

1    to the second page and the signature block.

2    Q.   How does Mr. Keung identify himself?

3    A.   His title is Admissions Consultant for The Edge Learning

4    Center in Causeway Bay, Hong Kong.

5         MR. FRANK:  Miss Lewis, if you could take us to the

6    top of the e-mail chain to Mr. Aziz's response.

7    Q.   How does Mr. Aziz respond to Mr. Keung's e-mail concerning

8    the application deadlines for USC?

9    A.   "Dear Gary, thank you so much for your extraordinary help

10:00 10   and support for Sabrina, we're going to pass on applying in

11   December.  Very best, Gamal".

12        MR. FRANK:  Can we show the witness only Exhibit 467,

13   please.

14   Q.   Do you recognize this document?

15   A.   Yes.

16   Q.   What is it?

17   A.   An e-mail from Rick Singer to Melissa Rail.

18   Q.   What's the date?

19   A.   January 26, 2018.

10:00 20   Q.   And Melissa Rail, what is her e-mail address?

21   A.   Melissa.Rail@TheKeyWorldwide.com.

22   Q.   And what's the subject?

23   A.   "Foundation billing".

24        MR. FRANK:  Government offers 467.

25        THE COURT:  It will be admitted.

```
 1                  (Exhibit 467 admitted into evidence.)
 2    Q.    Special Agent, if we could look at the e-mail on the
 3    bottom half from Miss Rail to Mr. Singer.  Could you read the
 4    introduction, please.
 5    A.    "Hi Rick, I have drafted all of the Foundation billing.
 6    Could you please review the list below and let me know of any
 7    changes prior to me sending them out?"
 8    Q.    And do you see an entry for Tommy Kimmel?
 9    A.    Yes.
10    Q.    What's the amount next to it?
11    A.    $200,000.
12    Q.    Do you see an entry for Olivia Giannulli?
13    A.    Yes.
14    Q.    What's the amount next to it?
15    A.    $200,000.
16    Q.    And then there's a note?
17    A.    "Please note that we billed them $200,000 in April 2017
18    and they paid it".
19    Q.    You see Gino Palatella?
20    A.    Yes.
21    Q.    Is there an amount?
22    A.    $400,000.
23    Q.    Is there a note?
24    A.    "We previously billed them for $75,000 in March 2017 and
25    they paid it".
```

```
 1   Q.   And do you see an entry for Matteo Sloane?

 2   A.   Yes.

 3   Q.   And is there an amount?

 4   A.   $200,000.

 5   Q.   And do you see there's a heading "other billing you said

 6   to hold"?

 7   A.   Yes.

 8   Q.   And what's the first name under that?

 9   A.   Sabrina Aziz.

10   Q.   And what's it say?

11   A.   "Got acceptance.  Waiting for next steps from USC".

12   Q.   If we could go to the top e-mail.  Do you see Mr. Singer's

13   response?

14   A.   Yes.

15   Q.   I want to direct your attention to the second sentence.

16   There's an entry for Olivia?

17   A.   Yes.

18   Q.   What does it say?

19   A.   "Olivia.  They paid 50 to USC already, bill 200 last year

20   was for the first daughter Bella".

21   Q.   There's an entry for Gino?

22   A.   Yes.

23   Q.   What does that say?

24   A.   "Gino's 75 was for testing - bill 400 as 100 of 500

25   already paid to USC".
```

1   Q.   And do you see there's an entry for someone named Audrey

2   Isackson?

3   A.   Yes.

4   Q.   And what does it say next to that?

5   A.   "Bill 250 for USC".

6           MR. FRANK:   Could we show the witness only

7   Exhibit 478, please.

8   Q.   Do you recognize this document?

9   A.   Yes.

10:03 10   Q.   What is it?

11   A.   An e-mail from Melissa Rail to Gamal Aziz.

12   Q.   And what's the e-mail address to which she sends this

13   e-mail?

14   A.   GamalAziz797@gmail.com.

15   Q.   And what's the date?

16   A.   March 16, 2018.

17   Q.   And what is the subject?

18   A.   "Invoice 1174 from The Key Worldwide Foundation".

19           MR. FRANK:   Government offers 478.

10:03 20           THE COURT:   It will be admitted.

21           (Exhibit 478 admitted into evidence.)

22   Q.   Could you read the e-mail for the record, please.

23   A.   "Dear Gamal, thank you for your generous donation.   Our

24   courtesy invoice is attached hereto and contains wire

25   information".

1    Q.   And if we would look at the attachment, who is the invoice

2    from?

3    A.   The Key Worldwide Foundation.

4    Q.   Who is it sent to?

5    A.   Gamal Aziz.

6         MR. FRANK:  And Miss Lewis, if you could highlight the

7    description and the amount.  Thank you.

8    Q.   What does it say under "description"?

9    A.   "Private contribution - letter of receipt will be provided

10:04  10    upon payment, $300,000."

11   Q.   I'm sorry?

12   A.   The amount is $300,000.

13        MR. FRANK:  If we could show the witness only

14   Exhibit 505, please.

15   Q.   Do you recognize this document?

16   A.   Yes.

17   Q.   What is it?

18   A.   An e-mail from Melissa Rail to Gamal Aziz.

19   Q.   And what is the e-mail address?

10:04  20    A.   GamalAziz797@gmail.com.

21   Q.   What's the subject?

22   A.   "Receipt letter".

23   Q.   And what is the date?

24   A.   April 6, 2018.

25        MR. FRANK:  Government offers 505.

```
 1                THE COURT:  It will be admitted.

 2                (Exhibit 505 admitted into evidence.)

 3                MR. FRANK:  If we could just expand that out just for

 4      a moment.

 5      Q.   Do you see at the bottom there's that e-mail you just read

 6      a moment ago from Miss Rail to Mr. Aziz, "thank you for your

 7      generous donation"?

 8      A.   Yes.

 9      Q.   And just up above that do you see that Mr. Aziz has

10      responded?

11      A.   Yes.

12      Q.   What did he say?

13      A.   "Wire sent today, thank you Melissa".

14      Q.   What e-mail address did he send that from?

15      A.   The GamalAziz797@gmail.com address.

16      Q.   And how does that compare with the account where you found

17      the Sabrina Abdelaziz profile that Mr. Singer sent Mr. Aziz?

18      A.   It's the same.

19                MR. FRANK:  Could we look at the attachment, please.

20      Q.   What's the letterhead say?

21      A.   "The Key Worldwide Foundation".

22      Q.   And can you read the introductory paragraph, please?

23      A.   "Thank you for your contribution of $300,000 to the Key

24      Worldwide Foundation.  Your generosity will allow us to move

25      forward with our plans to provide educational and
```

10:05  (line 10)
10:06  (line 20)

1  self-enrichment programs to disadvantaged youth.  We are very

2  excited about the impact that these programs will have in the

3  communities in which we will engage".

4  Q.   And what does the second paragraph say?

5  A.   "This letter shall serve as formal acknowledgment of your

6  contributions for which no goods or services were exchanged".

7  Q.   And who is the letter signed by?

8  A.   Rick Singer.

9       MR. FRANK:  Thank you.  Miss Lewis, you can take that

10:07 10  down.  Special -- give me one second.

11       If I could just have one minute, your Honor.

12       THE COURT:  Yes.

13       MR. FRANK:  Can we take a look at Exhibit 352 in

14  evidence, please.

15  Q.   And again, Special Agent, what is 352?

16  A.   An e-mail from Rick Singer to Gamal Aziz.

17  Q.   And this was sent to which e-mail address?

18  A.   The cox.net e-mail address.

19       MR. FRANK:  Could we show the witness only 415,

10:08 20  please.

21  Q.   And do you recognize this to be an e-mail from Mr. Aziz?

22  A.   Yes.

23  Q.   And who is it to?

24  A.   Mikaela Sanford.

25  Q.   And what is the date?

| | |
|---|---|
| 1 | A.    November 3, 2017. |
| 2 | Q.    What is the subject? |
| 3 | A.    "USC letter". |
| 4 | Q.    And what is the attachment? |
| 5 | A.    "S Abdelaziz copy.PDF". |
| 6 |      MR. FRANK:  The government offers 415. |
| 7 |      THE COURT:  It will be admitted. |
| 8 |      (Exhibit 415 admitted into evidence.) |
| 9 |      MR. FRANK:  And if we can just look at the attachment, |

10:08 10    please.

11    Q.    Do you recognize this attachment?

12    A.    Yes.

13    Q.    What is it?

14    A.    It appears to be the same October 9th letter of acceptance

15    from USC.

16    Q.    Okay.  And if we could look at the e-mail, do you see

17    there is a forwarded message?

18    A.    Yes.

19    Q.    And who is that forwarded message from?

10:09 20    A.    The forwarded message is from Rick Singer.

21    Q.    And who is it to?

22    A.    It's to Gamal Aziz.

23    Q.    And what address is it sent to?

24    A.    The GamalAziz@cox.net e-mail address.

25    Q.    Do you recall a moment ago I asked you and then withdrew a

```
 1    question about auto-forwarding?
 2    A.    Yes.
 3    Q.    Can we look at the response from Mr. Aziz.  What e-mail
 4    address does Mr. Aziz respond from?
 5    A.    The GamalalAziz797@Gmail account.
 6    Q.    Okay.  And if you could read the e-mail for the record,
 7    please.
 8    A.    "Mikaela, my name is Gamal Aziz, I've been working with
 9    Rick on my daughter Sabrina's college admission.  Rick asked
10:10 10    that we work with you to complete USC's application to make
11    sure it meets the exact requirements below.  We currently live
12    in Hong Kong so there's a time difference of 16 hours, please
13    let me know your availability and your preferred method of
14    communication.  Sabrina and I can be available for a call on
15    your Monday 5:00 PM if that works for you.  Very best, Gamal".
16              MR. FRANK:  If we could take that down, please.
17    Q.    Special Agent, as part of your preparation for testifying
18    today, did you have an opportunity to review an extraction of
19    an image of a cellular phone?
10:10 20    A.    Yes.
21    Q.    What is an extraction?
22    A.    An extraction is basically an export of the contents of a
23    phone that's copied by law enforcement that's what's referred
24    to as the image.
25    Q.    And whose phone did you review?
```

```
 1    A.   I reviewed an extraction of Rick Singer's phone.

 2    Q.   And what was the date of the extraction?

 3    A.   The extraction was conducted on October 5, 2018.

 4    Q.   In front of you there are several discs labeled Exhibit

 5    396, 439, and 508.  Do you see those?

 6    A.   Yes.

 7    Q.   Have you previously had an opportunity to review those

 8    exhibits?

 9    A.   Yes.

10:11 10   Q.   What are they?

11    A.   They are voicemails that were obtained through the

12    extraction of Mr. Singer's phone on October 5.  They're

13    voicemails from Donna Heinel to Rick Singer.

14              MR. FRANK:  Government offers 396, 439, and 508.

15              MR. KELLY:  Same objection as before.

16              MR. KENDALL:  Same as before, your Honor.

17              THE COURT:  All right.  They will be admitted over the

18    defendants' objections.

19              (Exhibits 396, 439, 508 admitted into evidence.)

10:12 20          MR. FRANK:  Could we look at Exhibit 387 in evidence,

21    please.

22    Q.   And again, Special Agent, this is the e-mail we introduced

23    a few moments ago from Donna Heinel to Rick Singer, forwarding

24    that -- attaching that letter of acceptance.

25    A.   Yes.
```

1    Q.    Do you recall that?  And what is the date of this letter?

2    A.    October 10, 2017.

3    Q.    And if we could now turn to the tab marked 396 in your

4    binder.

5          MR. FRANK:  And the jurors have this in their

6    transcript binders as well, 396.

7          Miss Lewis, can you leave 387 up on the screen, or is

8    that not possible?

9          (Discussion off the record.)

10:14 10    Q.    Okay.  Special Agent, again, what is the date of

11    Exhibit 387, the e-mail from Donna Heinel to Rick Singer?

12    A.    October 10, 2017.

13    Q.    And what is the date of this voicemail in Exhibit 396?

14    A.    The voicemail is October 19, 2017.

15    Q.    So it's nine days later?

16    A.    Yes.

17    Q.    Can we play Exhibit 396, please.

18          (Audio recording played.)

19    Q.    Special Agent, if I could direct your attention to line 11

10:16 20    of the transcript.  Who does Miss Heinel tell Mr. Singer to

21    have the clients make the checks out to?

22    A.    She instructs him to make the checks out to Women's

23    Athletic Board.

24    Q.    And who does she instruct him to have the checks sent to,

25    at the end of line 12?

```
 1    A.    And send those to her.
 2    Q.    And if I could direct your attention to line 15.  At
 3    line 14, she says "Then we'll talk about Sabrina since that's a
 4    larger amount of money and how we can structure that one".
 5    A.    Yes.
 6    Q.    Special Agent, you are assigned to which squad at the FBI?
 7    A.    Corporate and Securities Fraud Squad.
 8    Q.    And in your experience investigating corporate and
 9    securities fraud, are you familiar with the term "structure"?
10    A.    Yes.
11          MR. KELLY:  Objection, your Honor.  Objection.  He's
12    not charged with any obstruction count or money laundering
13    count.  He's not charged with that.
14          THE COURT:  I don't know what the question is.
15    Q.    Are you familiar with the context of a financial
16    transaction, what it means, the structure of a transaction?
17          MR. KELLY:  Objection.  Grounds.  He's not charged
18    with any.
19          THE COURT:  Mr. Frank, what's the relevance?
20          MR. FRANK:  I'm not suggesting the term in a legal
21    term of art.  I'm suggesting the --
22          THE COURT:  He can have it.
23    Q.    What does it mean to "structure" a financial transaction?
24    A.    Structuring generally means to break a larger transaction
25    up into smaller transactions for the purpose of evading
```

1  compliance, scrutiny, law enforcement scrutiny.

2  Q.   So it's breaking the larger transactions into smaller

3  transactions?

4  A.   Yes.

5       MR. FRANK:   Could we look at Exhibit 439 in evidence,

6  please.   That's at Tab 439 in the transcript binder.

7  Q.   Special Agent, what is the date of this voicemail?

8  A.   December 4, 2017.

9  Q.   And who is this voicemail from?

10:18 10  A.   It's also from Donna Heinel.

11  Q.   And this was also on Rick Singer's phone?

12  A.   Yes.

13       MR. FRANK:   Could we play 439, please.

14       (Audio recording played.)

15  Q.   Special Agent, if I could now direct your attention to

16  Exhibit 508 in the transcript -- 508 in the transcript binder.

17  Does everyone have 508?   Special Agent, what is the date of the

18  voicemail at 508?

19  A.   It's dated April 12, 2018.

10:20 20  Q.   So that's about 5 months after the last voicemail?

21  A.   Yes, approximately.

22  Q.   And who is this voicemail from?

23  A.   It's also from Donna Heinel.

24       MR. FRANK:   Could we play 508, please.

25       (Audio recording played.)

```
 1              MR. FRANK:  Could we show the witness only
 2    Exhibit 701, please.
 3    Q.    Do you recognize this document?
 4    A.    Yes.
 5    Q.    What is it?
 6    A.    An e-mail from Rick Singer to Devin Sloane.
 7    Q.    What's the date?
 8    A.    April 1, 2018.
 9    Q.    What's the subject?
10    A.    "Hope all's well".
11              MR. FRANK:  Government offers 701.
12              MR. KELLY:  Same objection, your Honor.
13              THE COURT:  It will be admitted.
14              (Exhibit 701 admitted into evidence.)
15    Q.    If we could start with the bottom e-mail, you see there is
16    a forwarded message from someone named Julie Taylor-Vaz to
17    Devin Sloane?
18    A.    Yes.
19    Q.    And do you recognize the name Devin Sloane from the
20    earlier e-mails that we looked at?
21    A.    Yes.
22    Q.    And do you recognize below the name Matteo Sloane from the
23    e-mails that we looked at?
24    A.    Yes.
25    Q.    It says "reply to Julie Taylor-Vaz".  Do you see that?
```

1    A.    Yes.

2    Q.    And what is the e-mail domain name that she's writing

3    from?

4    A.    The e-mail domain is Buckley.org.

5    Q.    Okay.  And Matteo Sloane's domain name?

6    A.    It's Crossflo -- oh.  I'm sorry.

7    Q.    Matteo Sloane?

8    A.    Buckley.org, as well.

9    Q.    And can you read the e-mail at the bottom.

10:23 10   A.    "Hi, Matteo!  I hope you're enjoying spring break and that

11   you're recovering well from your surgery.  You've been on my

12   mind a great deal these past few weeks.

13          Please update Navience Family Connection with your

14   admission results when you get a chance.  I'd like to know how

15   everything has turned out for you".

16   Q.    And it's signed Miss Taylor-Vaz?

17   A.    Yes.

18   Q.    And do you see that up above that Devin Sloane has

19   forwarded that e-mail to someone else?

10:24 20          MR. FRANK:  Miss Lewis, if you could just zoom out for

21   just a moment.

22   Q.    Who has Mr. Sloane forwarded that e-mail from

23   Miss Taylor-Vaz to?

24   A.    It appears he's forwarded it to Rick Singer.

25   Q.    And what does Mr. Sloane write?

1    A.    "What do you think we should do?  Either we can list all

2    the non-USC acceptances and not include USC, or include

3    everything, or do nothing."

4    Q.    And what does Mr. Singer respond?

5    A.    "They know about USC.  One of the counselors questioned

6    Matteo getting in as a water polo player this week.  My folks

7    at SC called me so we could restate Matteo's playing in Italy,

8    as Buckley does not have a team".

9    Q.    And how does Mr. Sloane respond up above?

10:25 10   A.    "Any concerns?"

11   Q.    And how does Mr. Singer respond?

12   A.    "I believe all is covered.  The question was asked last

13   week and internally it was documented by our person and nothing

14   has been brought up since".

15   Q.    And what is the date?

16   A.    April 1, 2018.

17        MR. FRANK:  If we can have the witness only look at

18   Exhibit 509.

19        MR. KELLY:  Excuse me.  What was that exhibit number?

10:25 20        MR. FRANK:  That exhibit was 701.

21        If we can look at Exhibit 509 for the witness only.

22   Q.    Do you recognize Exhibit 509?

23   A.    Yes.

24   Q.    What is it?

25   A.    An e-mail from Mossimo Giannulli to Rick Singer, copying

```
 1   Mark Hauser.

 2   Q.   And what is the date?

 3   A.   It's dated April 12, 2018.

 4   Q.   And what is the subject?

 5   A.   "Olivia and USC".

 6            MR. FRANK:  The government offers 509.

 7            THE COURT:  It will be admitted, 509.

 8            (Exhibit 509 admitted into evidence.)

 9   Q.   Could we look at the e-mail at the bottom of the chain,

10   please.  Who is that from?

11   A.   Philip Petrone.

12   Q.   Who is that to?

13   A.   Mossimo Giannulli, copying Jacqueline Landry.

14   Q.   And what is the subject?

15   A.   "Olivia and USC".

16   Q.   And before we read the e-mail, I'd like to go to the

17   signature block.  Who is Mr. Petrone described as in the

18   signature block?

19   A.   The Co-Director of College Counseling at Marymount High

20   School.

21   Q.   Can we look at the e-mail, please.  Would you read that

22   for the record, please.

23   A.   "Mr. Giannulli, I wanted to provide you with an update on

24   the status of Olivia's admission offer to USC.  First and

25   foremost, they have no intention of rescinding Olivia's
```

admission and were surprised to hear that was even a concern

for you and your family.  You can verify that with Clay Busia,

Senior Assistant Director of Admission and the Marymount

representative for the last 5 years: Busia@USC.edu or

213-740-6635, if you would like.

I also shared with Clay that you had visited this

morning and affirmed for me that Olivia is truly a coxswain.

Again, I think so highly of all that Olivia has done as a

student and entrepreneur.  I know USC will only add to her

success and she to the Trojan family.  Best, PJ Petrone".

Q.   And who does Mr. Giannulli forward this e-mail to?

A.   He appears to have forwarded it to Mossimo Giannulli.

Q.   I'm sorry.  Who does Mr. Giannulli forward it to?

A.   To Rick Singer.

Q.   And what is the date again?

A.   April 12, 2018.

Q.   And referring back to the transcript of Exhibit 508 in

evidence, what was the date of that voicemail from Miss Heinel?

A.   Also on April 12, 2018.

Q.   Same date?

A.   Yes.

Q.   And directing your attention to the transcript of 508 at

line 12, what are the two schools that Miss Heinel references

she doesn't want anybody going in and yelling at counselors

because that will shut everything down?

1   A.    It's line 22.  She says "anybody going into Buckley or

2   Marymount".

3   Q.    Special Agent, I'm now going to ask you to read into

4   evidence a series of e-mails relating to defendant John Wilson.

5   Have you previously had an opportunity to review these

6   exhibits?

7   A.    I have.

8         MR. FRANK:  Your Honor, I've provided a binder of

9   these exhibits to the defense.  I would suggest that we could

10  perhaps speed things along by offering them in bulk.

11        MR. KENDALL:  Your Honor, we just got them a moment

12  before he got on the stand this morning.  So I can't do bulk.

13  I have to read them before we put them in.  I'll try to be

14  quick, but we can't do bulk.

15        MR. FRANK:  Okay.

16        THE COURT:  All right.

17        MR. FRANK:  Beginning with Exhibit 48 for the witness

18  only, please.

19        THE COURT:  Do you have a copy of the binder for the

20  Court?  Is that this binder here?

21        MR. FRANK:  I believe it is, Your Honor.

22  Q.    Special Agent, do you recognize Exhibit 48?

23  A.    Yes.

24  Q.    What is it?

25  A.    It's an e-mail from Leslie Wilson to John Wilson.

```
 1   Q.    And what's the date?

 2   A.    March 2, 2013.

 3   Q.    And what is the subject?

 4   A.    "Potential trip - meet coaches if possible".

 5             MR. FRANK:   Government offers 48.

 6             MR. KENDALL:   Objection, your Honor.  We have a prior

 7   objection on marital issues, but subject to that.

 8             THE COURT:   Subject to the ruling that was made by the

 9   Court earlier, it will be admitted.

10             (Exhibit 48 admitted into evidence.)

11   Q.    We can start at the very bottom of the chain, please.  Do

12   you see there's an e-mail on February 10th from Mr. Singer

13   "spring break trip"?

14   A.    Yes.

15   Q.    And if we can go up to the next e-mail in the chain, could

16   you read Mr. Wilson's response?

17   A.    "Rick, what is the deadline to decide on side door for USC

18   or BC or Georgetown, et cetera this year?  (Also please confirm

19   for which schools is side door option really viable).

20             Also, if Johnny went to AMS school for 2 years and

21   played club water polo there what is probability side door at

22   USC or other locations would be a realistic option then?"

23   Q.    Thank you.  And how does Mr. Singer respond?

24   A.    "USC and BC by mid July.  USC 95 percent chance - BC 50

25   until I have a face-to-face and his test scores are in,
```

         1    Georgetown need very good grades and no more than one B this
         2    semester and 1950+ by mid June then, depending on commitment,
         3    90 percent if all in".
         4         MR. FRANK:  If we can move up two e-mails to the
         5    February 12th e-mail from Rick Singer, you've got it right
         6    there.  Thank you.
         7    Q.   Special Agent, could you read the second sentence of that
         8    e-mail, beginning with "Jovan"?
         9    A.   "Jovan is giving me one boys slot and as of yet no one has
10:32   10    stepped up to commit, that is why it is later".
        11    Q.   Can we turn to the first page of the exhibit, please.  Do
        12    you see at the bottom there's an e-mail from Leslie Wilson to
        13    Mr. Singer?
        14    A.   Yes.
        15    Q.   Could you read that for the record, please?
        16    A.   "Hi Rick, is this spot still available for USC?  Should we
        17    decide before our Easter trip?  It would be such a shame to
        18    lose it because we didn't decide fast enough.  Thanks,
        19    Leslie.".
10:33   20    Q.   And how does Mr. Singer respond?
        21    A.   "It is still available".
        22    Q.   And how does Miss Wilson respond?
        23    A.   "Okay - is another candidate looking at USC also?  So we
        24    should be pushing Johnny to decide if that's his number 1
        25    choice?  As I mentioned hate to lose this due to us taking too

1    long to decide (Johnny is unaware of this arrangement)".

2    Q.    And how does Mr. Singer respond?

3    A.    There are five plus wanting in that are boys - 2 polo, 3

4    others".

5    Q.    And if we could look at the top e-mail in the chain, you

6    see that this is an exchange between Leslie Wilson and John

7    Wilson?

8    A.    Yes.

9    Q.    And could you read the last sentence of the e-mail,

10:34 10    please.

11    A.    "Maybe we can call Rick about the one spot he has at USC -

12    hate to lose it if we want to go down this path.  Rick is

13    meeting Johnny next Saturday".

14    Q.    Thank you.

15          MR. FRANK:  Could we look at Exhibit 49 for the

16    witness only, please.

17    Q.    Do you recognize this document?

18    A.    Yes.

19    Q.    What is it?

10:34 20    A.    An e-mail between John Wilson and Rick Singer, copying

21    Leslie Wilson.

22    Q.    What's the date?

23    A.    March 27, 2013.

24    Q.    What is the subject?

25    A.    John Wilson.

| | |
|---|---|
| 1 | MR. FRANK:  Government offers 49. |
| 2 | THE COURT:  It will be admitted. |
| 3 | (Exhibit 49 admitted into evidence.) |
| 4 | Q.   Could we -- this is a very long chain.  If we could look |
| 5 | at the bottom of the chain, do you see there's an e-mail from |
| 6 | Mikaela Sanford to Rick Singer, "Subject: John Wilson"? |
| 7 | A.   Yes. |
| 8 | Q.   And what is the heading? |
| 9 | A.   The heading is "itinerary for John Wilson". |
| 10:35 10 | Q.   And then there's a date, "Tuesday, April 2nd"? |
| 11 | A.   Yes. |
| 12 | Q.   Then there are two campus tours listed? |
| 13 | A.   Yes. |
| 14 | Q.   What are the two schools at which the campus tours are |
| 15 | listed? |
| 16 | A.   USC and LMU. |
| 17 | Q.   And if we could look at the next e-mail up, the response |
| 18 | from Mr. Singer, what does he say? |
| 19 | A.   "All intact.  I sent an e-mail to Jovan to see if he is on |
| 10:35 20 | campus to meet". |
| 21 | Q.   And then there's a response next up in the chain from John |
| 22 | Wilson.  Do you see that? |
| 23 | A.   Yes. |
| 24 | Q.   What does he say? |
| 25 | A.   "Rick, these are generic tours?  I thought we might be |

1    meeting with assistant water polo coaches et cetera".

2    Q.   And how does Mr. Singer respond?

3    A.   "There are no offices on campus at USC.  I asked Jovan to

4    come to campus to meet.  At LMU they are not very interested in

5    Johnny - more get in and then we can speak same for others.  I

6    can ask again but be prepared for their outlook".

7    Q.   And how does Mr. Wilson respond?

8    A.   "R, so, none of the teams really even LMU want to even

9    meet with him on their campus?"

10:36 10   Q.   And how does Mr. Singer respond after Mr. Wilson says none

11   of them, even LMU, want to meet with him?

12   A.   "They're in the top 8 in the country.  They want totally

13   dedicated polo players - Johnny has to put in more time and

14   decide he really wants to play or when they meet him they will

15   be disappointed and make my relationship sour.

16        Please let me know if Johnny is going to be totally

17   on board.  LMU may be delayed if Jovan comes to campus to meet

18   at noon on Tuesday as well".

19   Q.   Okay.  If we could look at the first page of the -- of

10:37 20   Exhibit 49, there's an e-mail from Mr. Wilson near the bottom

21   of the page on March 26, 2013.  Could you read that for the

22   record, please?

23   A.   "If water polo and swimming are not realistic for Johnny,

24   then what are the schools that he has a realistic shot at

25   (without help) in SoCal area, southwest, and east coast?"

```
 1    Q.    In response to Mr. Wilson's e-mail about water polo and
 2    swimming not being realistic for Johnny, do you see that
 3    Mr. Singer provides a list of schools?
 4    A.    Yes.
 5    Q.    And if we could then go up to the next e-mail on the
 6    chain, it's another e-mail from Mr. Wilson.  Could you read
 7    that, please.
 8    A.    "Johnny also was wondering if he did the side door at USC
 9    is it year round commitment?  For 2 years minimum?  Or one?
10    Will he be traveling with team or stay home for road meets et
11    cetera?
12          What would a bench warmer position mean?  Would the
13    other kids know he was a bench warmer side door person?"
14    Q.    And how does Mr. Singer respond to Mr. Wilson's inquiry
15    about whether the other kids would know he was a bench warmer
16    side door person?
17    A.    "Travel is only if he is playing so no -- the commitment
18    is to be on the roster not attend all practices, but he will
19    have to attend drug tests and other mandatory functions for
20    one year then walk away/frankly after the first semester he can
21    move on ".
22    Q.    If we could go to the next e-mail up in the chain,
23    Mr. Wilson's response, could you read that for the record?
24    A.    "I would love him to actually be committed and give it his
25    best.  I don't want to taint his meeting with USC coach.  I
```

1    know he was worried about his grades and practice time

2    commitment and travel year round.

3              So it sounds like even if he practices all the time,

4    et cetera, it will be known that he is a bench warming

5    candidate?  Obviously his skill level may be below the other

6    freshmen.  In your view, will he be so weak as to be a clear

7    misfit at practice et cetera?"

8    Q.   And how does Mr. Singer respond?

9    A.   "They have 42 guys - 20 plus do not travel but practice.

10:39 10   He will be fine.  Bench warming on the four time in a row

11   national champion is not bad as a freshman".

12   Q.   And how does Mr. Wilson respond?

13   A.   "Thanks.  Just want to be sure he is not a leper".

14             MR. FRANK:  Could we show the witness only Exhibit 63,

15   please.

16   Q.   Do you recognize this document?

17   A.   Yes.

18   Q.   What is it?

19   A.   An e-mail from Rick Singer to John Wilson, copying Leslie

10:40 20   Wilson.

21   Q.   What's the subject?

22   A.   "Photos of Johnny".

23   Q.   What is the date?

24   A.   June 3, 2013.

25             MR. FRANK:  The government offers 63.

| | |
|---|---|
| 1 | THE COURT:  It will be admitted. |
| 2 | (Exhibit 63 admitted into evidence.) |
| 3 | Q.   Could you read the second e-mail in the chain on June 3rd |
| 4 | from John Wilson? |
| 5 | A.   "Do any of these shots of Johnny look good enough or |
| 6 | should we get a specific one this week?" |
| 7 | Q.   And how does Mr. Singer respond? |
| 8 | A.   "They will work.  If you can get a close up in action |
| 9 | would be better, but not totally necessary". |
| 10:40 10 | MR. FRANK:  Could we show the witness only Exhibit 65, |
| 11 | please. |
| 12 | Q.   Do you recognize this document? |
| 13 | A.   Yes. |
| 14 | Q.   What is it? |
| 15 | A.   An e-mail from Leslie Wilson to Rick Singer, copying John |
| 16 | Wilson. |
| 17 | Q.   And what e-mail address is Leslie Wilson writing from? |
| 18 | A.   Leslie@leslieqwilson.com. |
| 19 | Q.   What's the date? |
| 10:41 20 | A.   June 11, 2013. |
| 21 | Q.   What's the subject? |
| 22 | A.   "H20 polo shots of Johnny Wilson". |
| 23 | MR. FRANK:  Government offers 65. |
| 24 | THE COURT:  It will be admitted. |
| 25 | (Exhibit 65 admitted into evidence.) |

1    Q.   Could you read the e-mail, please.

2    A.   "Hi Rick, here are some shots of Johnny playing water

3    polo.  My favorite is 7908, but please review and pass along to

4    USC the one you like the best.  Thank you, Leslie".

5         MR. FRANK:  Miss Lewis, if you could please flip us

6    slowly through the attachments.

7    Q.   Special Agent, what do these appear to be?

8    A.   A man playing water polo.

9         MR. FRANK:  I'd now like to show the witness only

10:42 10   Exhibit 64, please.

11   Q.   Do you recognize this document?

12   A.   Yes.

13   Q.   What is it?

14   A.   An e-mail from Rick Singer to Leslie Wilson.

15   Q.   What's the date?

16   A.   June 4, 2013.

17   Q.   Subject?

18   A.   "Johnny".

19        MR. FRANK:  Government offers 64.

10:42 20       THE COURT:  It will be admitted.

21        (Exhibit 64 admitted into evidence.)

22   Q.   Can we look at the e-mail at the bottom of the chain from

23   Leslie Wilson.  Again, what e-mail address is that from?

24   A.   Leslie@leslieqwilson.com.

25   Q.   And could you read the e-mail, please?

1    A.    "Johnny would like to sign up for UCLA

2    workshop/internship.  It's such a great experience you have

3    lined up - fabulous opportunity.  Johnny's two friends Wyatt

4    Driscoll (Johnny's friend who was severely hurt by football

5    injury) and another close friend of Johnny's, Elijah Glenn.

6          The 2 families would love to have their sons join

7    Johnny and are interested in making whatever financial

8    obligation... is necessary for the week plus your college

9    counseling.  They would not be looking at schools with a sports

10:43 10    angle, but would love your counseling for their essays...

11          They do not know about our financial discussions

12    regarding Johnny and USC and we'd like to keep this

13    confidential between you and I.  Please let me know if we can

14    make some type of arrangement for the three boys to attend your

15    internship and what dates they would fly into LA and what day

16    they would return.  Thanks so much, Leslie".

17    Q.    And how does Mr. Singer respond?  Can you just read the

18    first couple of sentences, please.

19    A.    "Leslie thank you.  Our business together is only between

10:43 20    us.  We can have all three" --

21    Q.    You can stop right there.

22          MR. FRANK:  And if we can look at 74 for the witness

23    only, please.

24    Q.    Do you recognize this document?

25    A.    Yes.

1   Q.   What is it?

2   A.   An e-mail from Rick Singer to John Wilson.

3   Q.   What's the date?

4   A.   August 11, 2013.

5   Q.   What's the subject?

6   A.   "Applications".

7         MR. FRANK:  Government offers 74.

8         THE COURT:  It will be admitted.

9         (Exhibit 74 admitted into evidence.)

10:44 10   Q.   You see at the bottom there's an e-mail from Mr. Wilson to

11   Mr. Singer?

12   A.   Yes.

13   Q.   Could you read the last line of the e-mail, please.

14   A.   "When do we make our first payment to USC?"

15   Q.   And if we look at Mr. Singer's response to the inquiry,

16   "When do we make our first payment to USC?"  Could you read the

17   second paragraph, please.

18   A.   "US - Jovan and I meet in two weeks and at that time he

19   will give me his timeline for Johnny's stuff".

10:45 20         MR. FRANK:  Could we show the witness only Exhibit 75,

21   please.

22   Q.   Do you recognize this document?

23   A.   Yes.

24   Q.   What is it?

25   A.   An e-mail from John Wilson to Rick Singer.

```
 1    Q.    What's the date?

 2    A.    August 24, 2013.

 3    Q.    What's the subject?

 4    A.    "Update on applications".

 5              MR. FRANK:  Government offers 75.

 6              THE COURT:  It will be admitted.

 7              (Exhibit 75 admitted into evidence.)

 8    Q.    If we can start at the bottom of the chain, you see

 9    there's an e-mail from John Wilson to Rick Singer?

10    A.    Yes.

11    Q.    And if we can just look at the very bottom, could you read

12    that e-mail?

13    A.    "Where do we stand on applications?  I assume they are all

14    out and can you please send me electric copies.  What progress

15    is Johnny making on the essays, et cetera?  Back up schools and

16    USC?

17              "When do I make first donation?"

18    Q.    And if we could look at Mr. Singer's response, if you

19    could just read the last couple of sentences, beginning with

20    "UC."

21    A.    "UC app not out until October 1st.  As they become

22    available we will input but need to see Johnny for info and a

23    final list of schools.  Jovan is in Greece.  He texted me

24    yesterday that he wants Johnny's material, not app, around

25    September 20th".
```

1   Q.   If we could look at Mr. Wilson's response, could you read

2   the last line, please?

3   A.   "What does Jovan need by September 20th?  Do you have what

4   we need?  Do I make the first payment to you then?"

5   Q.   And after Mr. Wilson inquires "Do I make the first payment

6   to you then," could you read Mr. Singer's response?

7   A.   "I believe I have everything.  Transcript, test scores,

8   and a player profile so he can add Johnny to his recruit list

9   and present him to admissions in October".

10:47 10   Q.   And after Mr. Singer says that he will add Johnny to his

11   recruitment and present him to admissions in October, how does

12   Mr. Wilson respond in the first line?

13   A.   "Great.  Let me know when you have verified you have it

14   all completed and into Jovan.  Also when and where to wire

15   money".

16   Q.   And how does Mr. Singer respond?

17   A.   "Will do".

18            MR. FRANK:  Could we look at Exhibit 81 for the

19   witness only, please.

10:47 20   Q.   Do you recognize this document?

21   A.   Yes.

22   Q.   What is it?

23   A.   An e-mail from Jovan Vavic to Rick Singer.

24   Q.   What's the date?

25   A.   October 4, 2013.

```
 1              MR. FRANK:  Government offers 81.

 2              THE COURT:  It will be admitted.

 3              (Exhibit 81 admitted into evidence.)

 4   Q.   You see there's an e-mail from Mr. Singer to Mr. Vavic at

 5   the bottom, subject "Johnny Wilson - water polo Menlo School -

 6   Stanford club polo" --

 7   A.   Yes.

 8   Q.   -- "per our conversation"?

 9   A.   Yes.

10   Q.   And how does Mr. Vavic respond?

11   A.   "Rick, I need his resume, needs to be a good resume.

12   Thanks, Jovan".

13              MR. FRANK:  Could we look at 83, please, for the

14   witness only.

15   Q.   Do you recognize this document?

16   A.   Yes.

17   Q.   What is it?

18   A.   An e-mail from John Wilson to Rick Singer, copying Leslie

19   Wilson.

20   Q.   What is the date?

21   A.   October 13, 2013.

22   Q.   This is another long chain.  I'm sorry.  What is the

23   subject line?

24   A.   "Johnny apps and USC et cetera".

25              MR. FRANK:  Government offers 83.
```

```
 1              THE COURT:  Admitted.

 2              (Exhibit 83 admitted into evidence.)

 3   Q.   This is a long chain.  I'm going to start at the bottom.

 4   There's an e-mail from John Wilson to Rick Singer on Saturday,

 5   October 12th.  Do you see that?

 6   A.   Yes.

 7   Q.   Could you read that into the record, please.

 8   A.   "Hope all is well.  I wanted to catch up on where the

 9   college app process stands (personal statement, USC, other

10   essays, the total application status, when J is taking the new

11   SAT and ACTs, et cetera.)  Is there a time we can chat today or

12   tomorrow?"

13   Q.   How does Mr. Singer respond?

14   A.   "Common application will be submitted between

15   December 1st-15th after next test dates and apps done.  Jovan

16   has Johnny's stuff and asked me to embellish his profile more,

17   which I am doing.  ACT signed up for October 26th, SAT

18   November 2nd".

19   Q.   After Mr. Singer tells Mr. Wilson that Jovan has Johnny's

20   stuff and asked me to embellish his profile more, which I am

21   doing, how does Mr. Wilson respond?  If you could look at line

22   2 of his response and read that for the record.

23   A.   "Also when is Jovan going to be able to give us decision

24   on USC?  And when do I pay you?  Was it 50 percent in November?

25   50 percent in February when we get final official notice?"
```

```
 1   Q.   And if we can just look at Mr. Singer's response in the
 2   second paragraph, can you read that for the record, please.
 3   A.   "Jovan will provide Johnny's info to admission and when he
 4   does his other guys over the next month.  No payment of money
 5   till he gets a verbal and written from admission and then
 6   50 percent to a savings account I set up.  Then the remainder
 7   upon an acceptance letter in March with everyone else".
 8              MR. KENDALL:  Your Honor, for the sake of
 9   completeness, could we have the preceding paragraph read, as
10   well?
11              MR. FRANK:  The preceding paragraph is in evidence.
12              THE COURT:  You can have him read it while we're here.
13              MR. FRANK:  Okay.
14   Q.   Could you read it, please.
15   A.   "First is to finalize the Personal Statement - this is all
16   about Johnny putting in time not me - my work is done quickly
17   or is done.  The profile I am assuming you are speaking about
18   Navience?  I have attached the Common to Navience, filled in
19   schools et cetera - all done.  The teacher rec part he will do
20   this week".
21   Q.   And after Mr. Singer told Mr. Wilson that Jovan will
22   provide Johnny's info to admission and no payment money until
23   he gets a verbal and written response from admissions, how did
24   Mr. Wilson respond?
25   A.   "Do you have his latest personal statement draft?  Can you
```

1    forward it and I will talk with him about it.  Does he have all

2    your feedback and clear on what additional improvements you

3    suggest?"

4    Q.   If we could look further up in the chain, do you see

5    there's a long essay there?

6    A.   Yes.

7    Q.   I'm not going to ask you to read that.  The jury will have

8    it.  But if you could just read the first couple of sentences

9    under Mr. Singer's e-mail.

10:52 10  A.   "I took the liberty of completing the essay.

11        Life lessons from the water!!"

12   Q.   And if we could look at Mr. Wilson's response, could you

13   read that for the record, please.

14   A.   "Rick, thanks so much.  Looks great.  Several quick

15   suggestions to wrap this up.  That I edited below.

16        "One, add a title like 'life lessons from the water!'

17   Maybe split the second to last paragraph so it ends with the

18   lesson (like the previous paragraphs).  Three, add a closing

19   sentence about the future with hints at playing in college".

10:52 20       MR. FRANK:  Can we show the witness only Exhibit 84,

21   please.

22   Q.   Special Agent, do you recognize Exhibit 84?

23   A.   Yes.

24   Q.   What is it?

25   A.   An e-mail from Rick Singer to Joel Margulies.

1    Q.    What's the date?

2    A.    October 14, 2013.

3    Q.    What is the subject?

4    A.    "Johnny Wilson profile - need ASAP".

5            MR. FRANK:   Government offers 84.

6            THE COURT:   It will be admitted.

7            (Exhibit 84 admitted into evidence.)

8    Q.    Special Agent, if you could read the first two lines of

9    this e-mail.

10:53 10    A.    "Johnny Wilson 6"1' 180 pounds position - driver - No. 6

11    swimming times - 50 freestyle 22.49 short course - 100

12    freestyle 49.45 short course".

13    Q.    And then under "Awards & Honors", can you read the first

14    two entries, please?

15    A.    "2010, 2011, 2012, 2013 - Varsity Letterman, 2011, 2012,

16    2013 - Cocaptain."

17    Q.    You see there's an ongoing list of awards after that?

18    A.    Yes.

19    Q.    And what is the last one on the list?

10:54 20    A.    "Asics National Sports Youth Leadership Council - 2012,

21    2013".

22            MR. FRANK:   Miss Lewis, if you could just put this up

23    on the right, please.  And put 83 in evidence on the left.  And

24    if we could go to page 3 of 83.  And if you could just enlarge

25    that e-mail at the bottom there on October 13th.

```
 1    Q.   What is the date of when Mr. Singer advised Mr. Wilson
 2    "Jovan has Johnny's stuff and asked me to embellish his profile
 3    more, which I am doing"?
 4    A.   That e-mail was sent on October 13, 2013.
 5    Q.   What is the date of Mr. Singer's e-mail to Mr. Margulies,
 6    Subject line, "Johnny Wilson profile"?
 7    A.   The next day, October 14, 2013.
 8    Q.   Thank you.
 9         MR. FRANK:  If we could take down Exhibit 83 on the
10:55 10    left.  And if we could show the witness only Exhibit 85,
11    please.
12    Q.   Who is this from?
13    A.   It's from Rick Singer to Joel Margulies.
14    Q.   What is the date?
15    A.   October 14, 2013.
16    Q.   What is the time -- or the subject?
17    A.   "Johnny Wilson".
18         MR. FRANK:  Government offers 85.
19         THE COURT:  Admitted.
10:55 20         (Exhibit 85 admitted into evidence.)
21         MR. FRANK:  Miss Lewis, if you could put 85 on the
22    right, please, and 84 on the left.  And if you could enlarge
23    the top of 84, please, just the first couple of lines.  Thank
24    you.
25    Q.   What is the date and time of Exhibit 84?
```

```
 1   A.    84 is October 14, 2013, at 11:43 a.m.

 2   Q.    What is the date and time of Exhibit 85?

 3   A.    October 14, 2013, at 12:27 p.m.

 4   Q.    So about 45 minutes later?

 5   A.    Yes.

 6         MR. FRANK:  Miss Lewis, if you could take down that

 7   enlargement.  Thank you.

 8   Q.    What are the swimming times listed for Johnny Wilson at

 9   11:43 a.m.?

10   A.    At 11:43, they're listed as 50 freestyle 22.49 seconds

11   short course, 100 freestyle 49.45 short course.

12   Q.    What are the swim times listed for Johnny Wilson at

13   12:27 p.m., approximately 45 minutes later?

14   A.    20.12 short course, 50 freestyle, and 43.98 100 freestyle.

15   Q.    Which ones are better?

16         MR. KENDALL:  Objection, your Honor.

17         THE COURT:  Sustained.

18   Q.    How do the swim times in Exhibit 85 compare to the swim

19   times in 84?  Are they longer or shorter?

20   A.    They are shorter.

21         MR. FRANK:  Can we look at, for the witness only,

22   Exhibit 88, please.

23   Q.    Do you recognize this document?

24   A.    Yes.

25   Q.    What is it?
```

1    A.    It's an e-mail from Rick Singer to John Wilson.

2    Q.    What is the date?

3    A.    October 19, 2013.

4    Q.    What's the subject?

5    A.    "Wilson."

6              MR. FRANK:  Government offers Exhibit 88.

7              THE COURT:  Admitted.

8              (Exhibit 88 admitted into evidence.)

9    Q.    Do you see that Mr. Singer is forwarding Mr. Wilson an

10:58 10  attachment?

11   A.    Yes.

12   Q.    And who is the forwarded message from?

13   A.    Joel Margulies.

14   Q.    And could we look at the attachment, please.  What does

15   that appear to be?

16   A.    A profile for John B. Wilson.

17             MR. FRANK:  Okay.  And could we put that on the right,

18   please.  And could we put Exhibit 84 on the left.  This is the

19   earlier e-mail to Mr. Margulies.  And then could we

10:58 20  put exhibit -- substitute Exhibit 85 for Exhibit 84.  And if

21   you could just enlarge those times and enlarge, please,

22   Miss Lewis, the swim times on the left under the photograph.

23   Q.    Special Agent, the swim times on the profile that

24   Mr. Singer sent to Mr. Wilson, how do they compare with the

25   swim times in Exhibit 85?

```
 1    A.    They're the same.

 2    Q.    And if we could just look back at Exhibit 88, the cover

 3    e-mail, what e-mail address does Mr. Singer send that to?

 4    A.    He sent it to John@Hyannisportcapital.com.

 5          MR. FRANK:  Can we look at Exhibit 87, please, just

 6    for the witness only.

 7    Q.    Do you recognize this document?

 8    A.    Yes.

 9    Q.    What is it?

10    A.    It's an e-mail from Debbie Rogers to Rick Singer.

11    Q.    What's the date?

12    A.    October 18, 2013.

13    Q.    What's the subject?

14    A.    "Menlo letter".

15          MR. FRANK:  Government offers 87.

16          THE COURT:  Admitted.

17          (Exhibit 87 admitted into evidence.)

18    Q.    What does the logo above Debbie Rogers' signature block

19    say?

20    A.    Hyannis Port Capital.

21    Q.    And there appears to be an image in the logo?

22    A.    Yes.

23    Q.    Do you see that?  What is the image?

24    A.    Appears to be the illustration of a sailboat, a sail from

25    a sailboat.
```

```
 1    Q.    You see that she's forwarding the e-mail to Mr. Singer?

 2    A.    Yes.

 3    Q.    There's another e-mail lower in the chain?

 4    A.    Yes.

 5          MR. FRANK:  And who -- Miss Lewis, if you could just

 6    zoom out.  Yeah.  Thank you.

 7    Q.    Who is the e-mail lower in the chain with?

 8    A.    It's from Debbie Rogers to John Wilson and Leslie Wilson.

 9    Q.    Okay.  And if we could just look at the attachment,

10    please.  What is the heading of the attachment?

11    A.    It's from Mark Clevenger, the Director of College

12    Counseling at Menlo School.

13    Q.    Can you read the first paragraph, please.

14          MR. KENDALL:  Again, your Honor, for completeness, can

15    we have the first two?

16          THE COURT:  Let him do his thing.  And then we'll see

17    if we can shortcut it.

18          MR. FRANK:  He can read the first two.  That's fine.

19    A.    "In an effort to provide maximum clarity and support for

20    Menlo seniors, our team has met and reviewed each senior's

21    college list.  Our goal is to ensure that the lists are, in our

22    view, balanced and appropriate.  You will find your senior's

23    list enclosed, along with our assessment of the likelihood of

24    admission at each school.  At the bottom of the list you will

25    see a brief summary statement about the list.
```

```
 1              The ultimate goal is to make sure that every senior
 2    is striving appropriately while remaining safe in this process.
 3    We are fully aware that in many cases, students have
 4    extenuating circumstances at certain colleges and universities
 5    - alumni ties, athletic recruitment, et cetera.  Our analysis
 6    does not factor in these circumstances and is based strictly on
 7    students' academic records, test scores, and extracurricular
 8    profiles".
 9    Q.   And if we could look at the next page, please, what's the
10    heading?
11    A.   "John B. 'Johnny' Wilson (class of 2014) Active College
12    Applications".
13    Q.   And do you see there is a list of colleges below that?
14    A.   Yes.
15    Q.   And there's a Menlo assessment on the right?
16    A.   Yes.
17    Q.   What is the second to last college on the list?
18    A.   It's the University of Southern California.
19    Q.   What is the Menlo assessment in the absence of factors
20    like athletic recruitment and alumni ties?
21    A.   They note it as an "RR", which in the table below is a
22    "Double Reach".
23              MR. FRANK:  Can we look at Exhibit 89 for the witness
24    only, please.
25    Q.   Do you recognize this document?
```

```
 1   A.    Yes.

 2   Q.    What is it?

 3   A.    It's an e-mail from John Wilson to Rick Singer, copying

 4   Leslie Wilson.

 5   Q.    What's the date?

 6   A.    October 23, 2013.

 7   Q.    What's the subject?

 8   A.    "Quick question on Johnny spring/summer".

 9         MR. FRANK:  And the government offers 89.

10         THE COURT:  Admitted.

11         (Exhibit 89 admitted into evidence.)

12   Q.    If we could look at the bottom e-mail in the chain from

13   Mr. Wilson to Mr. Singer, could you read the first line,

14   please.

15   A.    "What are the expectations if Johnny gets into USC through

16   this WP water polo approach?"

17   Q.    And how does Mr. Singer respond?

18   A.    "Just be ready for practice in the fall as a player on the

19   roster or just a member of the squad, but not get in the pool.

20   He has to be on the roster for a year one way or another".

21   Q.    And how does Mr. Wilson respond after Mr. Singer says that

22   Johnny does not have to get in the pool?

23   A.    "Thanks.  We are encouraging Johnny to focus on water polo

24   this spring and he will do Sopen and Stanford club.  (Not

25   varsity swimming - as that requires him to skip all senior
```

 1   trips - off).

 2           "That way he can take senior trip to Spain for a week

 3   and also spend 2 weeks in the spring coming to Europe to visit

 4   with us.

 5           "I strongly prefer he plays as hard as he can and at

 6   least suits up and scrimmages with the team.  Would it also

 7   make sense for him to try a week of camp at USC?

 8           When would he need to start this, August or

 9   September?"

11:05 10          MR. FRANK:  Can we show the witness --

 11          THE COURT:  No.  We're going to take the morning

 12   recess at this stage.  You can step down, Mr. Brown.  We'll be

 13   in recess for 15 minutes, jurors.

 14          (Jury exits.)

 15          THE COURT:  Be seated, counsel.  Approximately how

 16   much longer on direct of Mr. Brown?

 17          MR. FRANK:  I would estimate an hour, perhaps a little

 18   longer.

 19          THE COURT:  And the estimated cross-examinations?

11:06 20          MR. KENDALL:  We'll get started today obviously, but

 21   we'll go into Friday.

 22          MR. KELLY:  Your Honor, I'll cross a bit as well, your

 23   Honor.

 24          I also without -- we may submit a request for a

 25   limiting instruction because there's been a lot of evidence

about other parents and other coconspirators.  I think the
Court said in last year's ruling that whether such evidence
should be admitted in conjunction with a limiting instruction
to the jury is a question for another day.

I think that day is here.  So with the Court's
permission, we will submit a request for a limiting instruction
to the effect that, you know, evidence regarding other parents
should be considered only to the extent it bears on the nature
and scope of the conspiracy and that proof that the defendants
willfully joined must be based upon evidence in their own words
and actions.

I'll spell it out.  That's consistent with First
Circuit law.  There's been a lot of evidence coming in
regarding other parents.  I understand the context.  I
understand it's based upon the alleged conspiracy.  I think the
jury's got to be told.  They may not understand that, so we're
going to request that, please.

THE COURT:  All right.

Does the government have a position on that?

MR. FRANK:  Your Honor, typically those -- my
understanding is those limiting instructions are given at the
conclusion of the evidence when the case is submitted to the
jury.  I'm not sure that we object to a limiting instruction
now.  My only concern is, I don't know this for certain, but we
received a transcript from the defense last night concerning an

1   exhibit that relates to an uncharged parent who -- and my fear

2   is given the length of cross-examination that they're

3   estimating for Mr. Brown, who is really just reading records

4   into evidence, that they may be planning to seek to introduce

5   evidence regarding other uncharged parents.  And my concern

6   about that is, if we give a limiting instruction regarding

7   coconspirator parents, I don't want there to be confusion about

8   parents who are not part of the conspiracy, which I don't think

9   that evidence should come in at all.

11:08 10        THE COURT:  Mr. Kelly?

11        MR. KELLY:  I believe it's a voicemail that Singer

12   left for somebody, somebody who is referenced, I believe, in

13   the exhibit.  It's a separate issue.  I think the transcript

14   he's talking about is simply a voice message Singer left to

15   another parent who he's already referenced in this case.

16        I think that's a separate issue.  I'm more focused

17   upon all this other evidence coming in for all these other

18   parents who are alleged to be conspirators.  I understand the

19   Court's ruling.  I'm not so sure the jury does.  I just don't

11:09 20   want them to misunderstand that.

21        THE COURT:  Give a copy of your proposal to the

22   government, and we'll consider it when it's submitted.

23        MR. KELLY:  Thank you.

24        THE COURT:  Do counsel have a preference as to whether

25   we have an afternoon session today?

```
 1              MR. KENDALL:  I'd be happy to have it, your Honor, not
 2      too late.
 3              THE COURT:  We won't go after three.  We've said that
 4      before.
 5              MR. KENDALL:  Given how much he needs to cover, I
 6      think it would be great, your Honor.
 7              THE COURT:  We'll go to three.  Thank you.  We're in
 8      recess.
 9              (Recess taken 11:09 a.m. through 11:28 a.m.)
11:29 10        (Jury enters.)
11              THE COURT:  Good morning again, jurors.  And
12      Mr. Brown, you're reminded that you remain under oath.
13      Mr. Frank, you may continue your examination.
14              MR. FRANK:  If we could look at Exhibit 101 for the
15      witness only, please.
16      Q.   Do you recognize that document, Special Agent?
17      A.   Yes.
18      Q.   What is it?
19      A.   It's an e-mail from Rick Singer to Jovan Vavic.
11:30 20   Q.   And what is the date?
21      A.   January 21, 2014.
22      Q.   What is the subject?
23      A.   "Johnny Wilson, Water Polo Menlo School Stanford Club
24      Polo."
25              MR. FRANK:  The government offers 101.
```

```
 1              THE COURT:  It will be admitted.

 2              (Exhibit 101 admitted into evidence.)

 3              MR. FRANK:  If we could just start at the bottom of

 4    the chain.  Actually, one e-mail up.

 5    Q.   Do you see that there's an e-mail on January 21, from

 6    Jovan Vavic?

 7    A.   Yes.

 8    Q.   Could you read that for the record, please.

 9    A.   "Rick, is Johnny still interested in USC?  If so, we need
```
11:31
```
10    his fall grades, unofficial is fine, thanks, Jovan."

11    Q.   How does Mr. Singer respond?

12    A.   "Absolutely - family is ready to help.  I will forward

13    ASAP.  Thank you."

14    Q.   And after Mr. Singer responds "Family is ready to help,"

15    how does Mr. Vavic respond?

16    A.   "This will be a big class, we already have 12 verbal and

17    16 very interested, I cannot guaranty anything, he will go to

18    SUBCO after my top recruits, most likely in February/March.

19    But I will present him with my top walkons."
```
11:32
```
20    Q.   And how does Mr. Singer respond?

21    A.   "I really appreciate it.  The family is fully on board.

22    All your help is always very much appreciated.  Thank you."

23    Q.   What is the date of this e-mail?

24    A.   January 21, 2014.

25    Q.   And directing your attention to the second e-mail in the
```

1    chain, what is the date that Mr. Vavic says he will go to

2    SUBCO?

3    A.   Most likely in February or March.

4         MR. FRANK:   Could we show the witness only Exhibit

5    710, please.

6    Q.   Do you recognize that document?

7    A.   Yes.

8    Q.   What is it?

9    A.   An e-mail from John Wilson to Rick Singer copying Debbie

11:33 10   Rogers.

11   Q.   Subject?

12   A.   "USC fees."

13   Q.   What is the date?

14   A.   March 1, 2014.

15        MR. FRANK:   The government offers 710.

16        THE COURT:   Admitted.

17        (Exhibit 710 admitted into evidence.)

18   Q.   Special Agent, again, what was the date that Mr. Vavic

19   said he would go to SUBCO?

11:33 20   A.   In February or March.

21        MR. FRANK:   Could we look at the bottom e-mail on this

22   chain, please.

23   Q.   What is the date?

24   A.   March 1, 2014.

25   Q.   What does Mr. Wilson write?

1    A.   "Rick, thanks again for making this happen.  Please give

2    me the invoice.  What are the options for payment?  Can we make

3    it for consulting or whatever from the key so that I can pay it

4    from the corporate account?  J."

5    Q.   After Mr. Wilson asks, "What are the options for payment?

6    Can we make it for consulting or whatever from the key so that

7    I can pay it from the corporate account," how does Mr. Singer

8    respond?

9    A.   "Yes, we can send you an invoice for business consulting

11:34 10   fees and you may write off as an expense.  What is the name,

11   address, et cetera, you want the invoice to be made out to?"

12   Q.   And again, what is the subject line of this e-mail?

13   A.   "USC fees."

14   Q.   And what was the response from Mr. Wilson?

15   A.   "R.  Awesome.  Hyannis Port Capital, Inc.  2 Fleur Place,

16   Atherton, California  94027, Care of Debbie Rogers.  John."

17   Q.   And who is copied on this e-mail?

18   A.   Debbie Rogers.

19   Q.   And what e-mail address does Mr. Wilson send this e-mail

11:34 20   from?

21   A.   The john@hyannisportcapital.com e-mail address.

22        MR. FRANK:  Can we show the witness only Exhibit 109,

23   please.

24   Q.   Do you recognize this document?

25   A.   Yes.

1   Q.   What is it?

2   A.   It's an e-mail from John Wilson to Debbie Rogers.

3   Q.   What is the date?

4   A.   March 29, 2014.

5   Q.   What is the subject?

6   A.   "Wire to The Key."

7           MR. FRANK:   The government offers 109.

8           THE COURT:   Admitted.

9           (Exhibit 109 admitted into evidence.)

11:35 10   Q.   Could you read the first e-mail at the bottom of the

11   chain, please.

12   A.   "D.  Monday we will get an invoice and wiring instructions

13   for $250,000 to be paid by HPC Inc.  Thanks.  J."

14   Q.   How does Ms. Rogers respond?

15   A.   "And what is the account I'm charging this to?"

16   Q.   And how does Mr. Wilson respond?

17   A.   "Business consulting - the invoice will be for consulting

18   - please work with him to get an invoice correct."

19           MR. FRANK:   Can we show the witness only 110, please.

11:36 20   Q.   Do you recognize this?

21           MR. KENDALL:   Excuse me, we can't see the screen.

22           THE COURT:   Do we have electronic problems here?

23           MR. KENDALL:   We're getting snow, your Honor.

24           THE COURT:   Okay.  Let's see if we can help it.

25           (Pause.)

```
 1              THE COURT:  Well, we have IT on the way.  What do
 2     counsel propose?
 3              MR. FRANK:  Can the jurors see the exhibits?
 4              THE COURT:  Is the jury -- that's right.  This is only
 5     for the witness.
 6              MR. FRANK:  Could we look at 710 in evidence just to
 7     see if it shows up on the jurors' screens?
 8              It does, your Honor.  I think the jurors' screens are
 9     working.  If counsel are willing, they have hard copies, if we
10     could move ahead.
11              THE COURT:  Counsel, do you have hard copies?
12              MR. KENDALL:  We do but we'd have to locate things
13     given the volume as we go through each one.
14              MR. FRANK:  I think you have a binder of these
15     exhibits in order.
16              MR. TOMBACK:  Can you give us the exhibits so that we
17     can track just off of those instead of the binders?
18              MR. KENDALL:  They're not in numerical order, so
19     locating them --
20              MR. FRANK:  We just finished with 710.
21              MR. KENDALL:  What's the next one?
22              MR. FRANK:  109.  I'm sorry.
23              THE COURT:  110.
24              MR. FRANK:  You're right, your Honor, 110.  May I
25     proceed, your Honor?
```

```
 1                    THE COURT:  Do you have it?

 2                    MR. KENDALL:  Yes, I'm ready.  Yes, thank you.

 3                    THE COURT:  110.

 4                    MR. FRANK:  For the witness only, 110.

 5     Q.    Do you recognize that e-mail?

 6     A.    Yes.

 7     Q.    What is it?

 8     A.    An e-mail from John Wilson to Debbie Rogers.

 9     Q.    And what is the subject?

10     A.    "Wire to The Key."

11     Q.    The date?

12     A.    March 30, 2014.

13                    MR. FRANK:  The government offers 110.

14                    THE COURT:  It will be admitted.

15                    (Exhibit 110 admitted into evidence.)

16     Q.    And do you see at the bottom there of the enlarged section

17     there's Ms. Rogers' e-mail from March 29, "What is the account

18     I'm charging this to?"

19     A.    Yes.

20     Q.    That was the e-mail we previously saw?

21     A.    Yes.

22     Q.    And how does Mr. Wilson respond the next day?

23     A.    "By the way the amount is $200,000 not 250,000."

24                    MR. FRANK:  Could we show the witness only Exhibit

25     112, please.
```

1    Q.    Do you recognize this document?

2    A.    Yes.

3    Q.    What is it?

4    A.    An e-mail from John Wilson to Debbie Rogers.

5    Q.    What is the date?

6    A.    March 31, 2014.

7    Q.    What is the subject?

8    A.    "The Key."

9          MR. FRANK:  The government offers 112.

11:41 10        THE COURT:  It will be admitted.

11         (Exhibit 112 admitted into evidence.)

12         THE COURT:  We're going to stop just for a second and

13   see if we can get some technological help.  Come forward.  It's

14   counsel's screens.

15         INFORMATION TECHNOLOGIST:  Thank you, Judge.  I'm

16   going to go up through, I just need to visually verify first.

17   I will go up there first and come back to verify with you all.

18         COURTROOM CLERK:  Thank you.

19         MR. FRANK:  Should I proceed, your Honor?

11:42 20        THE COURT:  Do you have a copy of 112, Mr. Kendall?

21         MR. KENDALL:  Yes, Your Honor.

22         THE COURT:  All right.  We'll proceed.

23         MR. FRANK:  You can start at the bottom of the chain.

24   Q.    Do you see the e-mail from Debbie Rogers to Mr. Wilson?

25   A.    Yes.

```
 1    Q.    What does she write?

 2    A.    "You realize if they are not incorporated, they will

 3    receive a 1099 if this is ran through the business...  They

 4    will also need to provide HPC a completed W-9 for tax reporting

 5    purposes. "

 6    Q.    How does Mr. Wilson respond?

 7    A.    He writes, "Yes, they are a legit business.  Please work

 8    with them on the right paperwork.  Thanks.  J."

 9    Q.    How does Ms. Rogers respond?

10    A.    "Who do I work with, Steve?"

11    Q.    How does Mr. Wilson respond?

12    A.    "Start with Rick Singer.  Thanks."

13    Q.    And then Ms. Rogers' response again?

14    A.    "I contacted Rick and he directed me to Steve.  Per Steve,

15    100,000 will be to his foundation, 100,000 an invoice from The

16    Key and 20,000 to Rick Singer.  Since you said 200,000, we're

17    at 220,000.  Is this a moving target?"

18    Q.    And how does Mr. Wilson respond?

19    A.    "Yes.  I added $20,000 for his expenses."

20    Q.    And Ms. Rogers' response to that?

21    A.    "And you want this invoiced to HPC as well?"

22    Q.    And how does Mr. Wilson respond?

23    A.    "Yes."

24          MR. FRANK:  Could we show the witness only Exhibit

25    120, please.
```

```
 1    Q.   Do you recognize 120?

 2    A.   Yes.

 3    Q.   What is it?

 4    A.   It's an e-mail from Rick Singer to Steve Masera.

 5    Q.   And what is the date?

 6    A.   April 15, 2014.

 7    Q.   And what's the subject?

 8    A.   "USC."

 9         MR. FRANK:  The government offers Exhibit 120.

10         THE COURT:  Admitted.

11         (Exhibit 120 admitted into evidence.)

12         MR. FRANK:  Can we start at the bottom of the chain.

13    Q.   What is Mr. Masera's e-mail at the bottom of the chain?

14    A.   "When do you want to pay USC water polo for John Wilson

15    and USC baseball for Rudy Driscoll?"

16    Q.   And how does Mr. Singer respond?

17    A.   "ASAP if we can afford it."

18    Q.   And how does Mr. Masera respond?

19    A.   "Yes, we can send now.  Do you have names and addresses

20    for each?"

21    Q.   And how does Mr. Singer respond?

22    A.   "I would like to deliver a cashier check to both this

23    week."

24         MR. FRANK:  Could we show the witness only Exhibit

25    122, please.  And we -- exactly.  Thank you, Ms. Lewis.
```

```
     1   Q.   Special Agent, do you recognize 122?

     2   A.   Yes.

     3   Q.   What is it?

     4   A.   It's a redacted e-mail between John Wilson and Debbie

     5   Rogers.

     6   Q.   What is the date?

     7   A.   July 14, 2014.

     8   Q.   And what's the subject?

     9   A.   "Rough thoughts on cash."

11:46 10        MR. FRANK:  The government offers 122.

    11          THE COURT:  In its redacted form?

    12          MR. FRANK:  In its redacted form, your Honor, by

    13   stipulation of counsel.

    14          THE COURT:  It will be admitted as redacted.

    15          (Exhibit 122 admitted into evidence.)

    16          MR. FRANK:  And I represent to you, sir, that the

    17   redactions are numbers and dollar amounts.

    18   Q.   Do you see it says "Rough thoughts on cash" at the top?

    19   A.   Yes.

11:46 20   Q.   If you could look at the top, he says, "D.  Sale of

    21   house," and there's a redacted number, "net."

    22   A.   Yes.

    23   Q.   Then it says, "Paid down," and there's a redacted number,

    24   "in HP."

    25   A.   Yes.
```

1   Q.   Do you know what "HP" refers to?

2   A.   I understand it to be a reference to Hyannis Port.

3   Q.   And below that it says "net," and there's a redacted

4   number, "cash."  Then it says, "Refinanced HP," and then

5   there's a redacted number, "mortgage."  Do you see that?

6   A.   Yes.

7   Q.   And then below that there's a section "Big uses."  Do you

8   see that?

9   A.   Yes.

11:47 10   Q.   And there's one item that is not redacted.  Can you read

11   the big use that is not redacted for the record.

12   A.   "Rick for USC $250,000."

13        MR. FRANK:  Could we show the witness only 124,

14   please.

15   Q.   Do you recognize this document?

16   A.   Yes.

17   Q.   What is it?

18   A.   An e-mail from Leslie Wilson to John Wilson.

19   Q.   What is the date?

11:48 20   A.   July 22, 2014.

21   Q.   What is the subject?

22   A.   "Johnny start at USC water polo."

23        MR. FRANK:  The government offers 124.

24        THE COURT:  Admitted.

25        (Exhibit 124 admitted into evidence.)

```
 1              MR. FRANK:  Could we start at the bottom of the chain,
 2      please.
 3      Q.   Do you see there's an e-mail from Mr. Wilson to
 4      Mr. Singer?
 5      A.   Yes.
 6      Q.   Could you read that for the record, please.
 7      A.   "Hope all is well.  Trying to book flights to California
 8      to get Johnny moved in, et cetera.  What is the start date for
 9      him for water polo?  I thought you mentioned August 14 or so.
11:48 10  USC policy says he cannot arrive before August 20 without a
11      written letter from a coach or teacher.  Johnny sent an e-mail
12      to Jovan but didn't hear back."
13      Q.   And how does Mr. Singer respond?
14      A.   "First practice is August 19.  He needs to call Jovan and
15      get what he needs.  He must create a relationship if wants to
16      be on the team.  Jovan is a great guy - rough at practice but
17      responds when called on."
18      Q.   And you see that there's an exchange at the top between
19      Leslie Wilson and John Wilson?
11:49 20  A.   Yes.
21      Q.   Could you read that, please.
22      A.   "Thank you honey.  I'll keep after Johnny to see Jovan
23      while he's there."
24              MR. FRANK:  Okay.  If we could show the witness only
25      126, please.
```

```
 1   Q.   Do you recognize this document?

 2   A.   Yes.

 3   Q.   Who is it from?

 4   A.   It's from Debbie Rogers.

 5   Q.   Who is it to?

 6   A.   John Wilson and Leslie Wilson.

 7   Q.   And what is the e-mail address for Leslie Wilson?

 8   A.   Leslie@leslieqwilson.com.

 9   Q.   And for John Wilson?

11:49 10  A.   John@hyannisportcapital.com.

11   Q.   What is the subject?

12   A.   "USC gift ACK," acknowledgment.

13   Q.   And what is the attachment called?

14   A.   "SC Trojan Athletic Fund, 7-28-2014.pdf."

15        MR. FRANK:   Government offers 126.

16        THE COURT:   Admitted.

17        (Exhibit 126 admitted into evidence.)

18        MR. FRANK:   You can enlarge that, Ms. Lewis, thank

19   you, for the jurors to see, and we will move to the attachment.

11:50 20  Q.   What is the heading of the attachment?

21   A.   "The Trojan Athletic Fund, USC Department of Athletics,

22   Los Angeles, California."

23   Q.   Okay.  Can you read the letter, please.

24   A.   "Dear John and Leslie, thank you for your generous gift to

25   USC athletics men's water polo in the amount of $100,000.
```

1    Maintaining state-of-the-art facilities is an essential part of

2    USC's commitment to excellence.  Through your contribution, you

3    are helping the university achieve this important goal.  On

4    behalf of the young student-athletes that will benefit from

5    your anonymous gift, thank you.  Fight on.  Ron Orr."

6              MR. FRANK:  I just want to quickly go back to Exhibit

7    124, Special Agent.  And Ms. Lewis, if you could enlarge the

8    e-mail, the second e-mail up from the bottom.

9    Q.    When does Mr. Singer tell Mr. Wilson first practice is?

11:51 10   A.    August 19.

11   Q.    And what's the year?

12   A.    2014.

13              MR. FRANK:  Okay.  Could we show the witness only

14   Exhibit 137, please.

15   Q.    Who is this from?

16   A.    It's from John Wilson.

17   Q.    What is the e-mail address?

18   A.    Johnbwilson@usc.edu.

19   Q.    And who is it to?

11:52 20   A.    Jovan Vavic.

21   Q.    What is the date?

22   A.    January 12, 2015.

23   Q.    How long is January 2015 after August of 2014?

24   A.    Approximately four months later.

25              MR. FRANK:  Government offers 137.

1              THE COURT:  Admitted.

2              (Exhibit 137 admitted into evidence.)

3    Q.   Could you read the e-mail for the record, please.

4    A.   "I hope you had a great break and wonderful holiday

5    season.  I wanted to thank you and illustrate how profoundly

6    appreciative I am for the incredible opportunity you have given

7    me here at USC as an individual member on the team as well as a

8    student at this school.  Unfortunately this was a much bigger

9    commitment than I had planned on making, and despite my best

11:53 10   efforts, my grades reflected my inability to balance my

11   academic and athletic life.  Along with my academic struggles,

12   I am also still very conscientious about my situation regarding

13   my head.  While water polo has gotten me very far in my life

14   and has always played a major role, I must start considering

15   being more careful with my head.  I already have three

16   diagnosed concussions, and with a very likely fourth concussion

17   looming in the near future I must start considering my future.

18   Because my body is already starting to burn out from water

19   polo, I need to make sure the same doesn't happen with my head.

11:53 20   I will need to use my brain for the next 70 years, and for this

21   reason, I need to be focusing more on my academic life and my

22   future over water polo.  For these reasons, I will not be

23   playing water polo this semester and will be focusing on my

24   academic life and my future career in the business world."

25              MR. FRANK:  Special Agent, I'd now like to

```
 1   fast-forward a few months.  If we could show the witness only

 2   Exhibit 154, please.

 3            MR. KENDALL:  Objection, Your Honor.

 4            THE COURT:  Grounds?

 5            MR. KENDALL:  I hate to say this, this may be

 6   something that would warrant a sidebar.  I don't want to speak

 7   in front of the jury.

 8            THE COURT:  All right.

 9               *** Beginning of Sidebar ***

10            THE COURT:  Mr. Kendall.

11            MR. KENDALL:  This is the e-mail about Singer paying

12   the tuitions for Vavic's children 18 months after my client's

13   son was admitted to USC.  And if you may remember --

14            THE COURT:  Try to keep your voice down.  Speak right

15   down into here.

16            MR. KENDALL:  If you may remember, the government,

17   when they raised this and we litigated it before you, said they

18   make no representation my client knew about this or it was his

19   money.  And in fact, the debriefings from Singer say the

20   purpose of this payment was if he needed future favors from

21   Vavic, not from a prior obligation.

22            When Mr. Frank went to these e-mails, he said we're

23   now going to do a bunch of Johnny Wilson e-mails.  And he's

24   juxtaposed this to give it the appearance that the Vavic e-mail

25   relates to Wilson.
```

1          I think we need some type of clarification that the

2    government makes no representation that my client knew about

3    this, that it was his money or it relates to his son's

4    admission.  It's just to show a separate Vavic/Singer

5    relationship.  That's why I didn't want to say it in front of

6    the jury.

7          THE COURT:  Yes, fair enough.

8          MR. FRANK:  We absolutely intend to make clear the

9    timeline, that this is long after Mr. Wilson -- that was going

11:56 10    to be my next question, actually.  This is long after Mr.

11    Wilson paid his funds and indeed after his son quit the team.

12          And we opened on the fact that these personal payments

13    were something that Mr. Singer did not tell the parents about.

14    That's in our opening statement.  We said it repeatedly.

15          THE COURT:  Okay.

16          MR. KENDALL:  If we could have that clarified when it

17    comes in.  Otherwise the juxtaposition is unfair.

18          THE COURT:  Well, put it in the prefix of your

19    question.  And if it isn't satisfactory to you, Mr. Kendall,

11:56 20    you can give me a draft instruction to the jury if you want,

21    but that will take some time.  We'll do it at the break.

22          MR. FRANK:  The only other issue, your Honor, with the

23    prefix is this witness is a reader.  He doesn't have all of the

24    information about Mr. Singer's statements, so we're going to

25    make clear the timeline, crystal clear.

1          THE COURT:  All right.

2          MR. FRANK:  And there will be no argument at any point

3     that Mr. Singer told Mr. Wilson about these payments.

4          MR. KENDALL:  Maybe it could just be, the witness

5     could be led by the government, and I wouldn't object to this

6     leading.

7          MR. FRANK:  He's not going to know what I'm talking

8     about.

9          MR. KENDALL:  If I may finish.  If he could just say,

11:57 10    "Agent, you make no representation that there's a connection

11    between these payments and Mr. Wilson in any way" --

12          MR. FRANK:  Well, that's not true.  There is a

13    connection.  It's part of the scheme.  It's part of the

14    conspiracy.

15          THE COURT:  Go forward.  And Mr. Kendall, after this

16    colloquy back and forth, if you feel you need some special

17    instruction, you draft one, and I'll consider it at the break.

18          MR. KENDALL:  Excellent.  Thank you your Honor.

19          THE COURT:  Okay.

11:57 20          *** End of sidebar ***

21          MR. FRANK:  Ms. Lewis, if we could once again show the

22    witness only Exhibit 154, please.

23    Q.   Do you see that document, Special Agent?

24    A.   Yes.

25    Q.   What is it?

1    A.    An e-mail from Rick Singer to Steve Masera.

2    Q.    What is the date -- excuse me -- the date?

3    A.    August 27, 2015.

4    Q.    What is the subject?

5    A.    "Loyola High School Tuition."

6          MR. FRANK:  The government offers 154.

7          THE COURT:  It will be admitted.

8          (Exhibit 154 admitted into evidence.)

9    Q.    Now, Special Agent, before we look at Exhibit 154, I'd

11:59 10   like to look back at Exhibit 112 in evidence, please.  Do you

11   recall Exhibit 112 was an e-mail exchange between Mr. Wilson

12   and Debbie Rogers discussing payments to The Key following the

13   admission of Johnny Wilson to USC?

14   A.    Yes.

15   Q.    Can you tell us what is the date of the e-mail exchange

16   between Mr. Wilson and Mr. Rogers discussing those payments?

17   A.    March 31, 2014.

18         MR. FRANK:  Thank you.  If we could look at 126 in

19   evidence.

11:59 20   Q.    That's the gift acknowledgment that Ms. Rogers sent Mr.

21   Wilson?

22   A.    Yes.

23   Q.    If we could look at the attachment.  What's the date on

24   the attachment, please, what is that date?

25   A.    July 28, 2014.

1    Q.    And how long is July 28, 2014 before August 27, 2015?

2    A.    Little over a year.

3          MR. FRANK:   Okay.  And if we could look at Exhibit

4    137, please.

5    Q.    Do you recall this is the e-mail where Johnny Wilson quits

6    the water polo team?

7    A.    Yes.

8    Q.    And what is the date on that e-mail?

9    A.    January 12, 2015.

12:00 10   Q.    And how long is January 12, 2015 before August 27, 2015?

11   A.    Little over eight months.

12         MR. FRANK:   Okay.  Could we now look at Exhibit 154,

13   please.

14   Q.    Do you see at the bottom there's an e-mail at the very

15   bottom from Lisa Vavic to Jovan Vavic?

16   A.    Yes.

17   Q.    And could you read the first paragraph, please.

18   A.    "Loyola High School does not have a system that generates

19   statements for the students.  If tuition has not been paid by

12:00 20   January, then they send out a statement.  For right now this is

21   what they have given me."

22   Q.    You see there are two names there below that?

23   A.    Yes.

24   Q.    What are the two names?

25   A.    Marko and Stefan.

```
 1   Q.   And what are the tuition amounts?

 2   A.   Junior tuition is $19,140.  Freshman tuition is $18,830.

 3   Q.   You see that Mr. Vavic forwards that e-mail?

 4   A.   Yes.

 5   Q.   Who does he forward it to?

 6   A.   He forwards it to Rick Singer.

 7   Q.   And what does he say?

 8   A.   "Rick, here are the amounts for Marko and Stefan and their

 9   ID numbers.  Thanks.  Jovan."

10   Q.   And Mr. Singer forwards that again?

11   A.   Yes.

12   Q.   Who does he forward it to?

13   A.   He forwards it to Steve Masera.

14   Q.   And what does he say?

15   A.   "Please pay these from our foundation as scholarships - in

16   a separate note.  Please make sure to put names and ID

17   numbers."

18   Q.   Now, you said "separate."  It actually says "deprecate,"

19   but you substituted the word "separate"?

20   A.   Correct.

21        MR. FRANK:  Could we look, for the witness only, at

22   Exhibit 212, please.

23   Q.   What is this document?

24   A.   An e-mail from Jovan Vavic to Rick Singer.

25   Q.   And what is the date?
```

1    A.    August 4, 2016.

2    Q.    So this is a year later?

3    A.    Yes.

4    Q.    And what is the subject?

5    A.    "Loyola tuition."

6              MR. FRANK:  The government offers 212.

7              THE COURT:  Admitted.

8              (Exhibit 212 admitted into evidence.)

9              MR. FRANK:  Again, if we could start at the bottom of

12:02 10   the e-mail from Lisa Vavic to Jovan Vavic.

11   Q.    What is the date of that e-mail?

12   A.    July 28, 2016.

13   Q.    And what is the subject?

14   A.    "Loyola tuition."

15   Q.    And what are the amounts that are listed?

16   A.    $19,875 and $20,025.

17   Q.    And the total?

18   A.    $39,9000.

19   Q.    Who does Mr. Vavic send that to?

12:02 20   A.    He sends that to Rick Singer.

21   Q.    And what does he say?

22   A.    "Hello Rick, here is the information you requested.

23   Thanks, Jovan."

24   Q.    And how does Mr. Singer respond?

25   A.    "I will ask my office to send by the end of this week.

```
 1    Thanks."

 2    Q.    And again, the date of this exchange?

 3    A.    August 3, 2016.

 4          MR. FRANK:  I'd now like to show the witness only

 5    Exhibit 238, please.

 6    Q.    Do you recognize this document?

 7    A.    Yes.

 8    Q.    What is it?

 9    A.    It's an e-mail from John Wilson to Rick Singer.

12:03 10    Q.    What is the subject?

11    A.    "Connecting on my daughters."

12    Q.    What is the date?

13    A.    December 9, 2016.

14          MR. FRANK:  The government offers 238.

15          THE COURT:  Admitted.

16          (Exhibit 238 admitted into evidence.)

17    Q.    Could you read the e-mail for the record, please.

18    A.    "Rick, I hope you are well.  Long time since we worked

19    together on Johnny.  Love to chat regarding my daughters and

12:04 20    high school et cetera.  We are still in Europe."

21    Q.    And signed "John B. Wilson"?

22    A.    Yes.

23          MR. FRANK:  Can we show the witness only Exhibit 409,

24    please.

25    Q.    Do you recognize this document?
```

```
 1    A.    Yes.

 2    Q.    What is it?

 3    A.    It's an e-mail from Marci Palatella to Leslie Wilson.

 4    Q.    What is the date?

 5    A.    October 27, 2017.

 6               MR. FRANK:  The government offers 409.

 7               MR. KENDALL:  Objection, your Honor, as we previously

 8    addressed.

 9               THE COURT:  It's admitted over the objection by the

12:04 10    defendant Wilson.

11               (Exhibit 409 admitted into evidence.)

12               MR. FRANK:  This is a long chain, somewhat long chain

13    the jury will have in evidence.

14    Q.    I just want to direct your attention to the second e-mail

15    in the chain to start from Leslie Wilson on October 27, 2017.

16               MR. FRANK:  It's the second from the top, Ms. Lewis.

17    Q.    Do you see she writes, "Marci, it was fabulous seeing you.

18    I love our visits together.  Thank you for lunch.  My treat

19    next time."

12:05 20    A.    Yes.

21    Q.    Could you read the last paragraph?

22    A.    "I had a few thoughts about Rick and USC.  Easier to talk

23    on the phone.  I'm boarding my plane now, so let's connect in

24    the next few days."

25    Q.    And how does Ms. Palatella respond to Ms. Wilson?
```

```
 1    A.   "Leslie, absolutely loved seeing you.  Only sorry to have

 2    our time cut so short.  You look fabulous.  Would love to talk,

 3    advice is always invaluable, likely on your flight but if you

 4    have a moment later today please call.  Love you, Marci."

 5    Q.   Do you recognize the name Marci -- the name Palatella?

 6    A.   Yes.

 7    Q.   How do you recognize it?

 8    A.   In prior exhibits there was a reference to Gino Palatella.

 9         MR. FRANK:  Could we just quickly call up Exhibit 372,

10    please.

11    Q.   Do you see the date here is August 28, 2017?

12    A.   Yes.

13    Q.   And this is the e-mail headed "Here are the students I

14    have from you so far."

15         MR. FRANK:  Could we just show the subject line.

16    Q.   "These are the athletes I have from you."  Do you see

17    that?

18    A.   Yes.

19    Q.   Do you see on Ms. Heinel's e-mail the name Gino Palatella?

20    A.   Yes.

21    Q.   There's a sport next to it?

22    A.   Yes.

23    Q.   What is the sport?

24    A.   It's listed as "MFB," which I understand to be men's

25    football.
```

1    Q.   So the date of this is what?

2    A.   August 28, 2017.

3    Q.   If we could go back to 409, the e-mail exchange between

4    Ms. Palatella and Leslie Wilson, what is the date there?

5    A.   October 27, 2017.

6    Q.   Thank you.  Special Agent, on the desk in front of you

7    there should be a disc labeled 563.

8    A.   Yes.

9    Q.   Have you had an opportunity to review that disc?

12:07 10    A.   Yes.

11    Q.   What is it?

12    A.   It's a call between Marci Palatella and Rick Singer.

13    Q.   And those are your initials on the disc?

14    A.   They are.

15         MR. FRANK:  The government offers 563.

16         THE COURT:  It will be admitted.

17         MR. KENDALL:  Same objection, your Honor.

18         THE COURT:  Over objection of defendant Wilson.

19         MR. KELLY:  And Aziz as well, your Honor.

12:07 20         THE COURT:  And the defendant Aziz.

21         (Exhibit 563 admitted into evidence.)

22         MR. FRANK:  If the jurors could turn to 563 in their

23    binders.

24    Q.   What is the date of this call, Special Agent?

25    A.   It's dated September 15, 2018.

1   Q.   So this is about a year later after that last e-mail?

2   October 2017 is the last e-mail?

3   A.   Yeah, approximately a year later.

4           (Audio recording played.)

5           MR. FRANK:  Can we have one moment, please, just so

6   the jurors can get there, please.  Thank you.

7           THE COURT:  It's at the very end of the first binder.

8           MR. FRANK:  Okay.  You can start from the top.  Thank

9   you, Ms. Lewis.

12:09 10         (Audio recording played.)

11          MR. FRANK:  Stop it right there.

12  Q.   Special Agent, I neglected to ask you, have you had an

13  opportunity to review this transcript?

14  A.   Yes.

15  Q.   And is it a fair and accurate transcription of the

16  recording?

17  A.   It is.

18  Q.   And are those your initials at the bottom?

19  A.   Yes.

12:09 20         MR. FRANK:  Can we turn to page 6 of the transcript.

21  We're going to jump ahead.  We're going to move to page 6, line

22  13.  And once the jurors get there, page 6 line 13, Ms. Lewis,

23  if you could pick up, Ms. Lewis, at 4 minutes and 28 seconds.

24          (Audio recording played.)

25          MR. FRANK:  We're going to stop it right there.

1    Q.   Special Agent, the date of this call was September 15,
2    2018?
3    A.   Yes.
4    Q.   Were there calls intercepted on that same date on Mr.
5    Singer's -- on the wiretap on Mr. Singer's phone with John
6    Wilson?
7    A.   Yes, there were.
8    Q.   On the desk in front of you are two discs labeled 561 and
9    552.  Do you recognize those discs?
12:11 10   A.   Yes, I do.
11   Q.   What are they?
12   A.   They're calls between John Wilson and Rick Singer on
13   September 15, 2018.
14   Q.   The same date as the call we just listened to?
15   A.   Yes.
16        MR. FRANK:  The government offers 561 and 562.
17        THE COURT:  It will be admitted.
18        (Exhibits 561 and 562 admitted into evidence.)
19        MR. FRANK:  If the jurors could turn to 561 in their
12:11 20   binders, please.
21   Q.   And while they do that, Special Agent, have you had an
22   opportunity to review this transcript?
23   A.   Yes, I have.
24   Q.   And is it a fair and accurate transcript of the recording?
25   A.   Yes, it is.

 1   Q.   Are those your initials at the bottom?

 2   A.   They are.

 3   Q.   Is the same true for the transcript of Exhibit 562; you

 4   reviewed that and it's fair and accurate?

 5   A.   Yes.

 6           MR. FRANK:  If we could start, Ms. Lewis, at the

 7   beginning of the recording at 561.

 8           (Audio recording played.)

 9           MR. FRANK:  We're going to stop it right there just

12:21 10   for a moment.

11   Q.   Special Agent, if you could turn to page 8 of the

12   transcript.  At line 9 on page 8 Mr. Singer says, "And, you

13   know this, that if you said you wanted to go somewhere like

14   Stanford or Harvard or Yale and go through a different door,

15   you can do that, but to go in directly, you got to be -- just

16   to play, you got to be 35, 36 plus essentially perfect grades."

17           Do you see that?

18   A.   Yes.

19   Q.   Then at line 17, Mr. Wilson responds, "On the other doors

12:22 20   that you have, certainly things like crew, can they try that?"

21           Who is the first person in that phone call to mention

22   athletics?

23   A.   Mr. Wilson.

24   Q.   And then on the next page at line 11 on page 9, Mr. Wilson

25   says, "So what kind of deals is it there?  Is it like, you

1    know, water polo and a donation?  Or what is it, like, you

2    know, if you get into that," who is the first person to mention

3    athletics and money in the same sentence?

4    A.   Mr. Wilson.

5    Q.   Then at line 18, Mr. Singer says, "Harvard is -- Harvard

6    is, it's usually about 1.2."  And how does Mr. Wilson respond?

7    A.   "Jesus."

8    Q.   Then Mr. Singer says, "Stanford is 1.2, but, you know, the

9    back door is -- Harvard is asking for 45 million."  And how

12:22 10    does Mr. Wilson respond?

11    A.   "Good God."

12       MR. FRANK:  If we could resume at page 11, I think

13    we're at line 5 or 6.

14       (Audio recording played.)

15       MR. FRANK:  Stop it right there, Ms. Lewis.

16    Q.   Special Agent, at page 16, line 3, they're talking about

17    Stanford, and Mr. Wilson says, "You're saying that's a minimum

18    of 1.2 on the side door?"  And Mr. Singer responds, "Yeah."

19       Do you see that?

12:28 20    A.   Yes.

21    Q.   And then Mr. Wilson says, "What sports would be best for

22    them?  Is crew the best, even you're talking about the ivies

23    and stuff like that, or is that not going to even matter?"

24    Mr. Singer responds, "They -- for me, it doesn't matter.  I'll

25    make them a sailor or something because of where you live."

```
 1              Special Agent, what is the name of Mr. Wilson's

 2   company?

 3   A.   Hyannis Port Capital.

 4   Q.   And do you recall we looked at the logo earlier?

 5   A.   Yes.

 6   Q.   What was the logo of Hyannis Port Capital?

 7   A.   Illustration of a sail from a sailboat.

 8   Q.   This call was made from a cell phone for Mr. Wilson?

 9   A.   Yes.

10   Q.   Have you reviewed the billing records for that phone?

11   A.   Yes.

12   Q.   And where does the billing statement come back to?

13   A.   To Hyannis Port, Massachusetts.

14        MR. FRANK:  Thank you.  Could we pick up at line 16,

15   please.

16        (Audio recording played.)

17   Q.   Special Agent, the call terminated there.  Do you know

18   what happened?

19   A.   I don't.  The call was disconnected for some reason.

20        MR. FRANK:  If we could turn to page 18 of the

21   transcript.

22   Q.   At line 13, Mr. Singer said, "Well, if you just try the

23   athlete side and you were using the side door with the athlete,

24   it's a done deal, just like with John."

25             What is the name of Mr. Wilson's son?
```

 1    A.    John.

 2    Q.    And then Mr. Wilson says, "Right, but you're saying

 3    athlete side even as an alumni is essentially 1.2."  Mr. Singer

 4    says, "Absolutely.  We got --"  Wilson says, "But if you're --"

 5    And then how does Mr. Singer respond at line 20?

 6    A.    "Guy is giving up their spot.  He's -- they're not a good

 7    enough athlete to compete with."

 8    Q.    And if we turn to page 19, at line 13, in the middle of

 9    the line, Mr. Wilson says, "Are those numbers -- are there any

12:34 10   way to make those like tax deductible as like donations to the

11    school and stuff?  How does that work?"

12          And Mr. Singer responds, "They're all tax -- it's all

13    tax deductible.  It's going into a nonprofit 501(c)(3).  It's

14    all tax deductible, every one, every piece of it."

15          Who is the first person to ask about making these

16    payments tax deductible in this call?

17    A.    Mr. Wilson.

18    Q.    Did the call resume?

19    A.    It did.

12:34 20          MR. FRANK:  Could we turn to Exhibit Transcript 562,

21    please.  Ms. Lewis, if you could start at the top.

22          (Audio recording played.)

23          MR. FRANK:  If we could turn to page 6 of the

24    transcript.

25    Q.    At line 17, Mr. Wilson says, "I mean, their scores are

```
 1   already good enough to get into anyplace a side door, I assume
 2   with the athletes, right?"
 3           And how does Mr. Singer respond?
 4   A.   He says, "Uh, not really.  They're okay.  I still got to
 5   fight for it because we don't have --"
 6   Q.   And if I could turn your attention to page 4.  Mr. Singer
 7   refers at line 10 to a meeting at 10:00 and at something called
 8   the Marriott Wharf, and Mr. Wilson responds "Marriott Long
 9   Wharf, that's downtown Boston."  Do you see that?
10   A.   Yes.
11   Q.   The following Friday was September 21?
12   A.   Yes.
13   Q.   That was six days after this call?
14   A.   Yes.
15   Q.   Are you aware of what happened on September 21 in the
16   FBI's investigation of Mr. Singer?
17   A.   Yes, I am generally aware because I assisted in obtaining
18   rooms for the meeting in the Marriott Long Wharf.
19   Q.   What happened?
20   A.   My understanding is that there was a consensually recorded
21   meeting with Mr. Singer after which Mr. Singer was approached.
22   Q.   Approached by?
23   A.   FBI agents.
24   Q.   And what is an approach?
25   A.   An approach is basically when we attempt to interview
```

1   typically a subject of an investigation by confronting them

2   with evidence and seeking to obtain a statement from them

3   typically in the hope of soliciting their cooperation.

4   Q.   Did you have any involvement in the approach of Mr. Singer

5   on September 21, 2018 at the Marriott Long Wharf in Boston?

6   A.   I did not, beyond helping them obtain the hotel rooms.

7           MR. FRANK:   Thank you, Special Agent.  I have no

8   further questions.

9           THE COURT:   Cross-examination, Mr. Kendall?

12:44 10        MR. KENDALL:   Yes, Your Honor.  I just need a minute

11  to get my papers organized.

12          THE COURT:   Yes, of course.

13              CROSS-EXAMINATION OF KEITH BROWN

14  BY MR. KENDALL:

15  Q.   Good afternoon, Agent Brown.

16  A.   Good afternoon.

17  Q.   Other than passing you in the hallway yesterday, we've

18  never met before, correct?

19  A.   I don't believe so, no.

12:45 20  Q.   Okay.  And you've been an agent for seven years?

21  A.   Yes, approximately.

22  Q.   I take it you take pride in your FBI service?

23  A.   Absolutely.

24  Q.   And you believe that the FBI provides thorough training to

25  its agents, correct?

1    A.    Yes.

2    Q.    Okay.  You agree it sets high standards for how to conduct

3    investigations, correct?

4    A.    Yes.

5    Q.    And one of the purposes of those high standards that the

6    FBI puts in is to make sure they can be effective in finding

7    out who committed a crime, correct?

8    A.    Sure.

9    Q.    And another purpose of those standards is to protect false

12:46 10    -- to protect innocent people from false accusations, correct?

11    A.    Sure.

12    Q.    And you agree with me with the job as an agent doing a

13    thorough investigation to protect people from false accusations

14    is as important as catching the bad guys, correct?

15    A.    Yes.  Certainly in my experience I strive to do as

16    thorough an investigation as I can.

17    Q.    And you take great pride in that, that that's what the

18    Bureau wants you to do, correct?

19    A.    I take pride in my work, yes.

12:47 20    Q.    Yes.  And part of the pride in your work is that you take

21    pride in making sure that innocent people are protected from

22    false accusations, correct?

23    A.    For sure.

24    Q.    And that's why you think people have to follow many of the

25    standard rules the FBI sets for investigations, correct?

```
 1    A.    Sure.

 2    Q.    That's why it's important for agents to gather all of the

 3    evidence, whether it's good or bad, for the prosecutors,

 4    correct?

 5    A.    Absolutely.

 6    Q.    And that's why agents want to make sure that everybody can

 7    see the full story and see all of the evidence and not just one

 8    sliver of it, correct?

 9    A.    Sure.

12:47 10    Q.    Okay.  You didn't pick all the e-mails that were presented

11    with you this morning, did you?

12    A.    No.

13    Q.    Mr. Frank picked every one.

14    A.    Yes.

15    Q.    Okay.  And you can't sit here today and tell us that's a

16    complete picture of the story, correct?

17    A.    That's not what I was asked to do, no.

18    Q.    Right.  You were not asked to use your training and your

19    experience and your sense of fair play in picking the evidence,

12:48 20    correct?

21    A.    That was not my role here today, no.

22    Q.    The government cherry-picked it?

23    A.    They presented evidence that they think is relevant to

24    their case.

25    Q.    Okay.  And you from your own perspective as an agent want
```

1  to make sure that the jury sees all the relevant evidence,

2  correct?

3  A.   I understand that's your position, your job.

4  Q.   Isn't it your position, too, that you want the jury to see

5  all the relevant evidence?

6  A.   That's the purpose of the trial, sir.

7  Q.   Yeah.  And that's the FBI, too; they want everybody to see

8  a complete story of all the relevant evidence.  They don't want

9  to cherry-pick, correct?

12:48  10       MR. FRANK:  Objection.  He's not testifying as to the

11  FBI's view.

12       THE COURT:  Yes, sustained.

13       MR. KENDALL:  I'd like to have you take a look at two

14  exhibits.  If we could start with Exhibit 8126.

15       MR. FRANK:  Your Honor, I object.  This is not in

16  evidence.

17       MR. KENDALL:  You're right.  If we could show the

18  witness, please.  This is documents the government gave me,

19  your Honor.

12:49  20       MR. FRANK:  That doesn't make them admissible.

21       THE COURT:  What's the purpose?  Do you want to

22  refresh his memory about something?

23       MR. KENDALL:  No.  I want to ask him if he can

24  identify these two e-mails as he's done with all the e-mails

25  with Mr. Frank.  These are more of the same stream of

1    communication.  And then I want to put them in to impeach some

2    of the documents that have been put in.

3            MR. FRANK:  There's been no impeachment, your Honor.

4            MR. KENDALL:  May I show him the documents, your

5    Honor?

6            THE COURT:  Yes, show him the document.

7            MR. KENDALL:  If you could take a look at Exhibit

8    8126, just for the witness, please.

9            MR. FRANK:  Could we have a copy of these exhibits?

12:49 10        THE COURT:  How about copies for counsel?

11           MR. KENDALL:  Sure.

12   Q.   I'm going to show you a document dated July 29, 2013.  Do

13   you see there it has the --

14           MR. FRANK:  Your Honor, I'm going to object to this

15   line of cross.

16           THE COURT:  Before the document is admitted --

17           MR. KENDALL:  I'm trying to lay the foundation for it

18   now, your Honor.

19           THE COURT:  Go ahead.

12:50 20        MR. FRANK:  May I approach?

21           THE COURT:  Approach?

22           MR. FRANK:  I have an objection to what's about to

23   happen.

24           THE COURT:  All right.  I'll see counsel.

25               *** Beginning of sidebar ***

1          MR. FRANK:  Your Honor.

2          MR. KENDALL:  These are the two documents.  If you

3     notice, they both have the U.S. Attorney's Office Bates number

4     on them.  They are having some of the same e-mail addresses

5     that he's just identified and testified for.

6          MR. FRANK:  I'm not disputing their authenticity, your

7     Honor.

8          MR. KENDALL:  Your Honor, the issue is, he's put in

9     part of a dialogue between my client.

12:51  10          THE COURT:  Try to keep your voice down, please.

11          MR. KENDALL:  He's put in part of a dialogue between

12     my client and Mr. Singer.  For both completeness and for state

13     of mind, I want to have the complete e-mail exchange that was

14     going on at the relevant time and not just cherry-picked ones.

15          MR. FRANK:  Your Honor, he's entitled to put on a case

16     when he puts on a case, but he's only entitled right now to

17     impeach this witness, not to use him as his own summary witness

18     to put in evidence that he wants to put in.  That's in the

19     defense case.  This witness is here to read evidence into the

12:51  20     record.  That's what he did.

21          MR. KENDALL:  Your Honor, they had this witness put in

22     the profile which they're trying to create an impression that

23     my client saw the profile.  This directly impeaches what

24     they're trying to communicate to the jury, and I think I have a

25     right to do it in a timely and effective way.

1          MR. FRANK:  I don't see how this impeaches --

2          THE COURT:  Tell me about what this document is that

3     you're -- that's document 7785A.  What is it?

4          MR. KENDALL:  These are e-mails that my client sent to

5     Mr. Singer about the ACT scores that his son got.  They just

6     put in a sports profile that they claim my client saw that has

7     the wrong ACT scores.  These are much higher scores.  So if my

8     client saw the sports profile they're trying to tell the jury

9     he saw, he clearly would have corrected that you put in the

12:52 10    wrong scores because I already told you what the right scores

11    are and you didn't put them in.

12         It directly impeaches the single most important piece

13    of evidence they have in this case, which is the sports profile

14    that they say my client saw, which this proves he didn't.

15         MR. FRANK:  The e-mail we put in, first of all, the

16    special agent didn't testify that anyone saw anything.  He

17    simply testified that it was to an e-mail address that the

18    defendant later responded from.  That was the sum total of his

19    testimony.  He can't be impeached on something he didn't

12:52 20    testify about.  If they want to put this in in their direct

21    case and argue from it, they're welcome to do that.

22         MR. KENDALL:  Your Honor --

23         THE COURT:  Wait, wait, wait.

24         MR. KENDALL:  Your Honor, they put up this witness to

25    create the impression that my client received a false profile.

1    I have a right to rebut that impression with the witness they

2    did it with.  This case is being sanitized.  They're putting up

3    witnesses who don't know any of the facts and saying we can't

4    put in documents to rebut their documents.

5            MR. FRANK:  If I may briefly respond.  The government

6    intends to call a case agent as well as one of its next

7    witnesses.  This agent was here to read certain evidence into

8    the record and that's all.  I'm concerned because Mr. Kendall

9    has said that he wants to spend several hours with this agent,

12:53 10   that he wants to use him as his own summary witness, and that's

11   inappropriate.

12           He has a summary witness on his witness list.  He's

13   entitled to put in whatever evidence is appropriate to put in

14   at that time, but he's not entitled to use the government's

15   case in chief to put in his defense case unless he's impeaching

16   the witness, which he's not doing.  He's just putting in

17   evidence.

18           MR. KENDALL:  I'm further -- the witness puts in half

19   the dialogue, your Honor.  We're entitled to put in the rest of

12:53 20   the dialogue.

21           MR. FRANK:  This is not part of the same document.

22           THE COURT:  I'm going to allow you to cross-examine

23   this witness on what he testified to on direct examination.

24   I'm not going to let you put on your defense with this witness.

25           Now, go forward with your cross-examination.  If you

1    want to argue about this further at the break, which is very

2    shortly about to come, we'll do it, but I'm not going to let

3    you put your case in against this witness.  You can

4    cross-examine him on what he testified to on his direct but not

5    beyond that.

6                    * * * End of sidebar * * *

7    BY MR. KENDALL:

8    Q.    Agent Brown, I think you testified you played no real role

9    in the investigation of Rick Singer and the people he was

12:55 10    involved with, correct?

11    A.    For the most part I monitored the wire and was involved in

12    some of the very early stages of the Singer investigation.  But

13    yes, that's generally correct.

14    Q.    So Mr. Frank selected you to be a person to read a bunch

15    of e-mails, but you didn't participate in the investigation of

16    those e-mails, correct?

17    A.    Correct.

18    Q.    You didn't investigate any witnesses, correct?

19    A.    No.

12:55 20    Q.    You didn't interview witnesses?

21    A.    I did not.

22    Q.    There have been hundreds of interviews in this case.

23    Would it be fair to say you didn't really participate in any

24    one or any significant one?

25    A.    Yes.

1   Q.   Okay.  And you're reading e-mails that you don't even

2   understand, correct?

3   A.   I don't know all the context of the e-mails, that's

4   correct.

5   Q.   To be -- no disrespect to you, Agent --

6   A.   None taken.

7   Q.   -- because I have great respect for you, but we could have

8   pulled somebody in off the street to read the e-mails the same

9   way you did.

12:56 10   A.   Sure.  I'm sure you can appreciate, when asked to testify,

11   that my response would be yes.

12   Q.   Okay.  And there are other agents in this case that have a

13   lot more information about it than you do, correct?

14   A.   Correct.

15   Q.   You were selected because you didn't have this

16   information, correct?

17          MR. FRANK:  Objection.

18          THE COURT:  Sustained.

19   Q.   Well, you agree with me, you don't any information where

12:56 20   many others could have testified and they do have the

21   information, right?

22   A.   My understanding is others with that information will be

23   testifying.

24   Q.   Okay.  But for you to sit here and read e-mails, you're

25   the person who doesn't know anything about the context of the

1    interviews, correct?

2    A.    Sure.

3    Q.    And for example, that sports profile that you put in on an

4    e-mail, that is the sports profile of Johnny Wilson --

5    A.    Yes.

6    Q.    You have no idea what the entries are on that, if they're

7    accurate or not accurate?

8    A.    I don't, no.

9    Q.    You have no idea if there's entries on there that hurt his

12:56 10   chances of admission, correct?

11   A.    That's true.

12   Q.    But you do know John Wilson never responded to that

13   e-mail, correct?

14   A.    Without refreshing and looking at the document, I'm not

15   sure I can answer that question.

16   Q.    Mr. Frank never found a document to show you and read that

17   showed John Wilson ever acknowledged that e-mail, correct?

18            MR. FRANK:  Objection --

19            THE COURT:  Sustained.

12:57 20   Q.    Nobody from the prosecution ever selected an e-mail for

21   you to look at that showed Mr. Wilson ever responded to that

22   e-mail, correct, the October 19 one?

23   A.    Again, without seeing the document, I couldn't tell you if

24   there was a reply to it or not.  I did not --

25   Q.    As you sit here today, you cannot identify a single reply

1    to that e-mail, correct?

2    A.    I haven't looked for one, and I haven't been provided one.

3    Q.    So you cannot represent to this jury that such an e-mail

4    exists, correct?

5    A.    I'm not sure I follow your question.  It was entered into

6    evidence as an exhibit.

7    Q.    The October 19 e-mail was entered into evidence.  You

8    agree with me you cannot cite any e-mail to show that John

9    Wilson ever acknowledged receiving it.

12:57 10   A.    I don't believe so, no.

11   Q.    And you can't cite to this jury any e-mail that indicates

12   John Wilson ever read it or discussed it with anybody, correct?

13   A.    No.

14   Q.    "Correct," meaning you agree with me?

15   A.    Yes, yes.

16   Q.    Yes.  There was no evidence that you're aware of to show

17   that John Wilson ever read that e-mail or responded to it,

18   correct?

19   A.    That I'm aware of, no.

12:58 20   Q.    Okay.  And whatever wiretaps you've looked for in this

21   case, you've never seen anything where John Wilson was ever

22   asked about that profile by any government agent or by

23   Mr. Singer, correct?

24   A.    I personally did not do the search of all calls related to

25   Mr. Wilson.  I reviewed the calls that we discussed today.

1    Q.    But the calls you reviewed, you had no memory of there

2    being any reference to that profile in any of the calls you

3    reviewed, correct?

4    A.    No.

5    Q.    Okay.  We've only got a few minutes before the break.  I'd

6    like to go a little bit into the training you've had as an

7    agent.

8    A.    Sure.

9    Q.    What training have you had on investigating white-collar

12:59 10   crime?

11   A.    We received limited training in white-collar crime during

12   the academy.  The bulk of it happens through a training agent

13   process where, during our probationary period as a new agent,

14   we're assigned a senior agent to work with, and you learn

15   primarily by working closely with them and other senior agents

16   on the squad.

17   Q.    And as part of the training or work you've had over the

18   last seven years, have you dealt with con men?

19   A.    Sure.

12:59 20   Q.    And fraudsters?

21   A.    Absolutely.

22   Q.    That's sort of one of your specialties, correct?

23   A.    Absolutely.

24   Q.    And would you agree with me some of these con men that you

25   dealt with are extremely skilled?

```
 1    A.    Yes.
 2    Q.    They have wonderful stories and abilities to deliver them,
 3    correct?
 4    A.    For sure.
 5    Q.    They're almost like a musician, the way they can spin
 6    their story and present it so effectively to the audience,
 7    correct?
 8             MR. FRANK:  I object, your Honor.  This is not
 9    impeachment.
10             THE COURT:  Sustained.
11    Q.    And you would agree with me that one of the things that
12    con men do is they lull their victims into believing a false
13    story.
14             MR. FRANK:  Objection.
15             THE COURT:  He can answer that if he understands it.
16    A.    Yes, lulling is often present in fraud cases, yes.
17    Q.    And your experience has been that these con men often
18    develop their lulling stories over time until they perfect
19    them.
20    A.    I don't know if I would agree with that, but yes, they are
21    skilled at lulling their victims, yes.
22    Q.    And they sometimes develop a certain type of story or
23    presentation to carry out the fraud that they use with more
24    than one victim, correct?
25    A.    Yes.
```

12:59 (line 10)
01:00 (line 20)

1    Q.    Okay.  In your securities fraud work that led to this case

2    did you find that that's what that group was doing?

3    A.    Not exactly.  I think that type of approach is more common

4    at least in my experience in investment adviser-type frauds,

5    Ponzi schemes, things of that nature.

6    Q.    Okay.  Where people have sort of a fraudulent presentation

7    they use to cheat innocent victims, correct?

8    A.    In the context of lulling, it's usually because they've

9    run out of their ability to pay back victims who are asking for

01:01 10   redemption, so they'll come up with stories as to why they

11   can't provide requested wires.

12   Q.    And what types of training have you had in handling

13   informants?

14   A.    Again, primarily through limited experience at the academy

15   and then mainly through working with more senior agents.

16   Q.    Okay.  And it would be fair to say one of the things

17   you've learned about in dealing with informants is that it's

18   important to memorialize every substantive event with the

19   informant in a written report.

01:01 20        MR. FRANK:  Your Honor, this is not impeachment of his

21   testimony.

22        THE COURT:  I'm not sure he has the foundation for

23   this, but in any event, we are going to break for lunch at this

24   point.  You may step down for the time being, Mr. Brown.

25        Court will be in recess until 2:00.  We're going to

have a short afternoon session.  We are going to recess at 3:00

or maybe a few minutes before 3:00, so it will be just one

hour.  I'll see you back here at 2:00.

(Jury exits.)

THE COURT:  All right.  Be seated, counsel.

Approximately how long on cross-examination of this witness,

Mr. Kendall?

MR. KENDALL:  We'll finish the day, your Honor, and go

into Friday for sure.

THE COURT:  All right.

MR. KELLY:  I'll follow him afterwards, your Honor.

THE COURT:  All right.  Anything else that needs to

come to the Court's attention before we recess?

MR. KENDALL:  If I may get some guidance from the

Court, I want to be on track and not be wasting the jury's

time.  My view, Your Honor, is under Rule 106, related

writings, remainder of related writings, there's an issue of

completeness here.  There's a dialogue that's going on between

my client and Mr. Singer by e-mail.  My client is in Europe

most of this time.  And they put in some of the parts of that

e-mail dialogue but not all of it.

I'd like to put in some of the other e-mails that I

think fill in the holes of what's there.  And I think if he can

read them for the government, he can read the rest of them for

us, your Honor.  And I think it's important for the jury to

1    hear it together as one package as opposed to they hear half

2    the dialogue here and then a week later they hear the other

3    half of the dialogue.

4         So my request to the Court is can I put in the e-mails

5    that fill in the holes of what the government has left in the

6    dialogue that it's presented?

7         MR. KELLY:  We would join in that request, your Honor,

8    under both the rule of completeness and the ability to impeach

9    him on what he's just put into evidence.  So it's just totally

01:04 10   inefficient to have to recall him to read in some others while

11   he's here.  It makes no sense.  So we would like the

12   opportunity to do that as well.

13        THE COURT:  Mr. Frank.

14        MR. FRANK:  Your Honor, the rule of completeness

15   doesn't allow him to put in months and months of conversations

16   in the hopes of recreating an entire relationship over a period

17   of time.

18        We put in complete e-mail chains.  If there's a part

19   of a chain that they believe is missing, then they can put that

01:04 20   in under the rule of completeness, arguably.  But not a

21   relationship that spans months and years, which is what they're

22   trying to do.  They have a summary witness on the record.  It's

23   entirely efficient for them to put on their case when they put

24   on their case.  But so far, nothing that's happening here

25   has --

1          THE COURT:  Yes, that's the ruling of the Court.  If

2     there's something in a chain that was introduced on direct

3     examination that you want to fill in, I will allow you to do

4     that.  I'm not going to allow you to put on the defense's case

5     in the government's case-in-chief.  We're in recess until 2:00.

6          (Recess taken 1:05 p.m. to 2:08 p.m.)

7          (Jury enters.)

8          THE CLERK:  Thank you.  You may be seated.  Court is

9     now in session.

02:08 10         THE COURT:  Good afternoon, jurors.  We're ready to

11     resume.

12          Mr. Brown, again, you're reminded that you remain

13     under oath.

14          Mr. Kendall, you may continue with cross-examination.

15          MR. KENDALL:  Thank you very much, your Honor.

16          Mr. Carter, could we go to Exhibit 525 that is in

17     evidence.  Yes, please.

18     BY MR. KENDALL:

19     Q.   Mr. Brown, I'm going to replay just a portion of the tape

02:08 20     with Rick Singer, Gordon Caplan, and Scott Treibly that you

21     were kind enough to introduce to us yesterday.  Do you remember

22     that tape?

23     A.   Yes, sir.

24          MR. KENDALL:  Randall, if we can start at the

25     beginning, and I'd like to stop at line 14 on page 2.  Include

1    line 14, not 15.  Actually, I may tell you to stop earlier than

2    that.  I'll probably stop after -- at the end of page 1.  Play

3    from the beginning to line 24 on page 1.

4              (Audio recording played.)

5              MR. KENDALL:  Stop it now.

6    Q.   Okay.  I want to go through this first page of the

7    transcript.  We see here that Mr. Treibly is introducing

8    Mr. Caplan to Mr. Singer for the first time, correct?

9    A.   Yes.

02:10 10   Q.   And Mr. Singer tries a joke that falls flat, correct?

11   A.   It does.

12   Q.   You agree with me?

13   A.   Yes.

14   Q.   Okay.  And then he pivots very quickly, correct?

15   A.   Yes.

16   Q.   Okay.  And what Mr. Caplan states is his wife has told him

17   something about Mr. Singer, but they've never really met or had

18   a conversation directly, correct?

19   A.   That's my understanding, yes.

02:10 20        MR. KENDALL:  If we can then start picking up where

21   you stopped, Mr. Carter, and then we'll go for about another

22   12, 15 lines.  I'll note where we should stop.

23              (Audio recording played.)

24              MR. KENDALL:  Stop, please.

25   Q.   Okay.  Now you recall later on in this tape Mr. Caplan

1   introduces himself as a corporate M&A lawyer from New York

2   City?

3   A.   I believe that might be on the next call, about 26.

4   Q.   Fair enough.  Whatever it is.

5   A.   Yes.

6   Q.   The point is Mr. Caplan introduces who he is?

7   A.   Correct.

8   Q.   He's the chairman -- I think he said co-chairman of an

9   international law firm based in New York City?

02:11 10   A.   Correct.

11   Q.   And he's a deal maker, M&A work, things of that nature?

12   A.   Correct.

13   Q.   Fair to say he's a very sophisticated, accomplished person

14   with that type of background?

15        MR. FRANK:  Objection, your Honor.

16        MR. KENDALL:  It's right on the tape, Your Honor.

17        THE COURT:  Overruled.

18        MR. KENDALL:  Thank you.

19   Q.   And here we have Mr. Singer's introduction of himself that

02:12 20   he has a $290 million company with a thousand employees,

21   correct?

22   A.   Yes.  That's what he says.

23   Q.   And 280 internationally.  "And what we do is help the

24   wealthiest families in the U.S. get their kids into school, so

25   we have the Gates', the Jobs'.  We have every NBA owner, every

1    NFL  owner.  We get everybody".

2            Now, you're not saying those statements are true,

3    correct?

4    A.   I have no basis to say those statements are true.

5    Q.   Okay.  You don't know what part of that statement may be

6    true and what part may be false, correct?

7    A.   Correct.

8    Q.   Okay.  In your experience, though, in investigating

9    fraudsters, you know they often combine truth and lies

02:13 10   together, correct?

11   A.   They can, yes.

12   Q.   It wouldn't surprise you if that were the case here,

13   correct, if some was true and some was untrue?

14   A.   It wouldn't surprise me, no.

15   Q.   Okay.  And we see from these two tapes that Mr. Caplan

16   proceeds within three, four pages to do fraudulent acts with

17   Mr. Singer, correct?

18   A.   Correct.

19   Q.   After three, four pages of transcript, he's happy to

02:13 20   falsify medical tests to get his daughter extended time,

21   correct?

22   A.   Correct.

23   Q.   He agrees to do some sort of arrangement with a controlled

24   room or controlled test so he can get a false score on his

25   daughter's test?

```
 1   A.   Yes.
 2   Q.   And you agree with me these are discussed -- the
 3   dishonesty is discussed with exquisite frankness, correct?
 4   A.   Yes.
 5   Q.   No beating around the bush?
 6   A.   No.
 7   Q.   Okay.  It is explicit to anybody here to see what the
 8   state of mind is of the two participants, correct?
 9   A.   I'd agree, yes.
02:14 10  Q.   Okay.  And you'd agree with me nowhere here does
11   Mr. Caplan say I want you to be an advisor to my family,
12   correct?
13   A.   Without reviewing the transcript again, I can't tell you
14   where it pivots, but I'll take your assertion that it's page 4
15   where it pivots.
16   Q.   Okay.  But nowhere does he say that I want to have a
17   multi-year relationship of you advising my children?
18   A.   They seem to get down to business pretty quick.
19   Q.   Right.  And the business does not include a multi-year
02:14 20  relationship to be advising the children, correct?
21   A.   That seems to be the case.
22   Q.   No place in this tape do they schedule visits for
23   Mr. Singer to meet every two to three, four weeks with the
24   children, correct?
25   A.   That seems to be the case, yes.
```

```
 1   Q.   Nowhere do they discuss that they trust Mr. Singer so much
 2   that they're going to let him meet with the children alone?
 3             MR. FRANK:  Objection.
 4             THE COURT:  Well, if he recalls, he can answer that.
 5   A.   Again, I don't -- without expanded context in the
 6   relationship between Mr. Singer and Mr. Caplan, my only basis
 7   would be these two calls.
 8   Q.   Right, and that's all I'm asking you about is what's in
 9   these two calls.  I'm --
10   A.   In these two calls --
11   Q.   -- only focusing on what's in these two calls right now.
12   A.   By my recollection, they don't discuss that in the calls.
13   Q.   Okay.  And they certainly don't discuss getting a tutor,
14   correct, for SAT or ACT scores?
15   A.   If my memory's correct, they do discuss a woman named
16   Tatiana, I believe, in the second call.
17   Q.   Tatiana works in the office.  She's not a tutor, correct?
18             MR. FRANK:  Objection.
19             THE COURT:  Sustained.
20   Q.   What page is Tatiana on?
21   A.   Page 8 of the second exhibit, 526.
22   Q.   Of 526?
23   A.   Actually, if you look at line 19.
24   Q.   What page?
25   A.   Page 8.
```

```
 1   Q.   Yeah.

 2   A.   They actually do talk about --

 3   Q.   Wait.  What exhibit are you on?

 4   A.   526, the second call.

 5   Q.   Give me just one second.  I want to organize my papers.

 6   And what page are you talking about?

 7   A.   Page 8, line 19.  They're talking about meeting on a

 8   weekly basis with Tatiana.

 9   Q.   You don't know what Tatiana's role is, do you?

10   A.   I have no idea who Tatiana is.

11   Q.   You don't know her last name?

12   A.   No.

13   Q.   Tatiana Forero means nothing to you, correct?

14   A.   It does not.

15   Q.   You have no idea what her role in this -- is in the Key,

16   correct?

17   A.   Correct.

18   Q.   There's no discussion here that Tatiana is going to be

19   tutoring, correct?

20   A.   There's not, but in terms of meeting with them on a

21   regular basis, they're clearly discussing that.

22   Q.   Not Mr. Singer, Tatiana?

23   A.   Correct, who I presume is an employee of Mr. Singer.

24   Q.   Yes.  And it doesn't -- Tatiana's going to meet.  You

25   don't even know where Tatiana is located, correct?
```

```
 1   A.   I believe they say she's in New York up above on the same

 2   page.

 3   Q.   Where?

 4   A.   Line 10.

 5   Q.   Line 10.  Correct.  Thank you very much.  "Talk to my

 6   person who lives in New York, Tatiana, and she'll start working

 7   with Tatiana on a weekly basis."

 8        It doesn't say what the work is for?

 9   A.   I have no basis to say what the work is for.

10   Q.   And you don't know what Tatiana's skillset is?

11   A.   No.

12   Q.   You know what the point of this call is, correct, that

13   they're going to cheat on this test, correct?

14   A.   That seems to be the gist of it.

15   Q.   It doesn't make much sense to have a tutor for a young

16   woman who doesn't do well on tests if you're going to cheat on

17   a test, correct?

18        MR. FRANK:  Objection to what makes sense.

19        THE COURT:  I'm sorry.  The objection is based on

20   what?

21        MR. FRANK:  Speculation.

22        THE COURT:  Sustained.

23   Q.   And certainly there's no discussion of having Mr. Singer

24   meet with the children face-to-face in the house, correct?

25   A.   Again, it didn't come up in this call, but I don't know
```

1    the relationship between them.

2    Q.    We're just talking about these two calls.  That's all.

3    A.    Yeah.  It didn't come up in their initial conversation.

4    Q.    Mr. Caplan, you'd agree with me, is very transactional?

5    A.    He seemed to be direct.  I think he says he's a direct

6    person.

7    Q.    Yeah.  And he's been prepped by his wife, correct?

8    A.    I believe he mentioned that at the beginning.  Yes.

9    Q.    It appears he's been prepped by Mr. Treibly, as well?

02:18 10   A.    Mr. Treibly, yes.  It sounds like there was some prior

11   discussion.

12   Q.    Okay.  And at no point did Mr. Singer talk about meeting

13   and working with the President of Harvard University, correct?

14   A.    In this call, he did not.

15   Q.    No place did he talk about working with the President of

16   Tufts?

17   A.    Not in this call.  No, he did not.

18   Q.    And in no place did he talk about meeting and working with

19   the President of Brown, correct?

02:19 20   A.    Not on this call, no.

21   Q.    At no place did he talk about reading admission files at

22   two of the major universities in the United States every year?

23   A.    I don't recall him saying that in these calls, no.

24   Q.    And specifically saying that he's reading admission files

25   at Harvard, correct?

1    A.   Harvard did not come up in this call.

2    Q.   So you agree with me there is nothing in the calls with

3    Gordon Caplan where Mr. Singer's trying to establish himself as

4    a person authorized by the universities to provide the service

5    he's trying to sell to Mr. Caplan, correct?

6    A.   I don't recall, but that sounds correct.

7    Q.   Okay.  Nowhere does he say Harvard says I can have people

8    cheat on the test and they'll take the scores.  Doesn't say

9    anything like that, correct?

02:20 10    A.   No.

11    Q.   He's not trying to establish credibility for himself that

12    he's authorized to do something on behalf of a major

13    university, correct?

14    A.   Correct.

15    Q.   And at the -- and that's for both of the calls with

16    Mr. Caplan?

17    A.   Yes.

18    Q.   And he certainly didn't talk about looking for a rigorous

19    engineering school to have his children take tough math and

02:20 20    science classes, correct?

21    A.   That did not come up in those calls, no.

22    Q.   He wanted a shortcut?  Is that a yes?

23    A.   A degree, yes.

24    Q.   And he wanted to cheat?

25    A.   He wanted to improve his daughter's grades by cheating,

1    yes, her scores rather.

2    Q.   And you agree you have no basis to connect anything

3    Mr. Caplan did with anything of Mr. Wilson, correct?

4           MR. FRANK:  I object, your Honor.

5           MR. KENDALL:  I'll rephrase, your Honor.

6    Q.   There's nothing in this tape to say that Mr. Wilson is

7    involved with Mr. Caplan's test cheating, correct?

8    A.   Correct.

9    Q.   And there's nothing in the tape that was played of

02:21 10    Mr. Wilson where he talks about test cheating, correct?

11    A.   Correct.

12           MR. KENDALL:  Next I'd like to go next to Exhibit 49,

13    which is in evidence.

14    Q.   First, before we go into the exhibit itself, you testified

15    about a bunch of e-mails that were selected by the prosecutors

16    for you to read, correct?

17    A.   Yes.

18    Q.   Did you read every e-mail they showed you, or did you only

19    read some of the ones that you've seen?

02:22 20    A.   I read at least once every single e-mail that I've read

21    today.

22    Q.   No.  I'm asking a different question.  I'm sorry if I

23    wasn't clear.  Did the prosecutors in the selection of e-mails

24    they gave you to look over, are some of the ones you looked

25    over not -- you didn't read today?

1    A.    Yes.  The exhibit list was refined with time, yes.

2    Q.    Okay.  So how many total e-mails did they give you to

3    read?

4    A.    I don't recall.

5    Q.    Rough estimate percentage wise, you read half of what they

6    gave you?  You read a quarter?  You read a third?

7    A.    The -- I didn't read the prefinalized exhibit list.  I

8    didn't read every e-mail that was provided to me by the U.S.

9    Attorney's Office, if that's your question.

02:22 10   Q.    Let me see if I can ask it a better way and be more

11   helpful.

12         Do you have an estimate of the number of e-mails they

13   gave you to start with?

14   A.    I don't recall.

15   Q.    Can you tell us by how many inches of paper, rough

16   estimate of the number, 50 to 60, whatever in your good faith

17   you think?

18   A.    I don't recall.  It was broadly similar to the final list

19   of exhibits.  I don't know for certain how many were removed.

02:23 20   Q.    Okay.  Who decided to remove certain exhibits?

21   A.    The prosecutors.

22   Q.    Okay.  And if we start with that total set you started

23   with, was it -- I want to focus on just the things that deal

24   with John Wilson.  Were there John Wilson e-mails that was in

25   the starting set with you and they took them out at some point

1    so you were given a subset of the John Wilson e-mails shown to

2    you?

3    A.    Yes.   There were some that were removed.

4    Q.    Do you know how many were removed?

5    A.    I don't.  I believe it was a handful.

6    Q.    Okay.  And does a handful mean -- handful can mean

7    different things.  Can a handful mean five, a handful mean 10,

8    15?

9    A.    Again, I don't recall with certainly, but I would estimate

02:24 10   no more than five to ten.

11   Q.    Okay.  And were they e-mails in that time frame of 2013

12   and 2014?

13   A.    I don't recall.

14   Q.    Okay.  But they were e-mails between John Wilson and

15   Mr. Singer?

16   A.    I believe the e-mails that were primarily removed were

17   related to concussions is my recollection.

18   Q.    Okay.  Were there other e-mails there that were removed?

19   A.    I don't recall.

02:24 20   Q.    Were there e-mails with the high school coach Jack Bowen

21   that were removed?

22   A.    I don't remember seeing e-mails with Jack Bowen.

23   Q.    So it's fair to say your best memory is when the

24   government made a selection of e-mails to show you, they didn't

25   include any of the Jack Bowen ones, correct?

```
 1    A.    I don't know who Jack Bowen is.

 2    Q.    Okay.  And so you've certainly not seen any of his

 3    e-mails, correct?

 4    A.    Not that I recall.

 5    Q.    Okay.  And so you'd agree with me that the e-mails you

 6    read from even your exposure and limited understanding is not

 7    the complete dialogue between John Wilson and Rick Singer in

 8    the 2013 and 2014 time period?

 9    A.    Without a doubt.

10    Q.    Okay.  And you don't know if there were important e-mails

11    kept out or unimportant ones, correct?

12    A.    Correct.

13    Q.    And you don't know if there are e-mails about test scores

14    that were kept out, correct?

15    A.    Correct.

16    Q.    You don't know if there are e-mails that are relevant to

17    the sports profile of that October 19th e-mail, correct?

18    A.    Correct.

19    Q.    Okay.  And so it would be fair to say you did not

20    represent to this jury that what you've shown is a complete and

21    accurate picture of what was discussed in 2013 and '14?

22          MR. FRANK:  I object, your Honor.

23          THE COURT:  Grounds?

24          MR. FRANK:  He's not representing anything to the

25    jury.  He's here to read documents.
```

1      THE COURT:  All right.  He can answer that question,

2  if he understands it.

3  A.   Again, entering a limited number of exhibits in, my

4  understanding is that my testimony is not the government's

5  entire case.

6  Q.   Excuse me.  I'm not asking for the government's entire

7  case.  I'm asking for your -- what you're representing to this

8  jury.  You're not representing that this is the entire picture

9  of the correspondence John had with Mr. Singer, correct?

02:26 10  A.   I have no basis to say one way or another.

11  Q.   Okay.  Well, you know some of the stuff wasn't there.  You

12  just don't know how much existed that was presented?

13  A.   Yes.  Certain exhibits were not presented.  Yes.

14  Q.   But you don't know the volume that were not presented?

15  A.   I don't.

16  Q.   Okay.  I'd like to go then to Exhibit 49, which we've put

17  up.

18      MR. KENDALL:  Is this shown to everybody, Mr. Carter?

19  Thank you.

02:27 20  Q.   Why don't we go to the back of it to the bottom of page 2.

21  We see where you started.  It says "Forwarded:

22  MikaelaSanford@thekeyworldwide.com."

23      And from -- the work you've done preparing for

24  today's testimony, you know Mikaela Sanford is an employee of

25  Mr. Singer, correct?

1  A.   I know that generally.  Beyond that, I have no

2  recollection of what her role was at The Key.

3  Q.   But you see from that e-mail address it's a Key e-mail

4  address?

5  A.   Yes.

6  Q.   And you participated in the search warrants and the things

7  related to The Key e-mails?

8  A.   My participation with the search warrants was limited to

9  confirming the exhibits that I presented today were present

02:27 10  within the search warrants.  I didn't do any investigative

11  search beyond that.

12  Q.   But you know the e-mail address?  That you recognize.  You

13  recognize Mikaela's is a Key?

14  A.   The Key Worldwide, I believe, is one of the e-mail search

15  warrants.  I don't even know if that was a chain.  I reviewed

16  Rick Singer's Gmail account.

17  Q.   Okay.  And do you know if there's an involvement of Rick

18  Singer with The Key Worldwide?

19  A.   I understand that to be his company, his organization.

02:28 20  Q.   Okay.  Is it his foundation or his business?  Do you know?

21  A.   I don't know.

22  Q.   Okay.  And then it says "itinerary for John Wilson",

23  correct?

24  A.   Yes.

25  Q.   And it lists four separate schools all in the Los Angeles,

         1    Southern California area, correct?  USC?

         2    A.   Yes.  Southern California, yes.  I would say that's

         3    correct.

         4    Q.   LMU, UCSB, University of California Santa Barbara, and

         5    USD,  University of San Diego, correct?

         6    A.   Correct.

         7    Q.   So they're going to look at a bunch of schools, correct?

         8    A.   Yes.

         9    Q.   Okay.  Now, if we go back to page 2.

02:28   10         MR. KENDALL:  Mr. Carter, if you'll look at the middle

        11    where it states for Mr. Singer "there are no offices".

        12    Q.   Mr. Singer informs Mr. Wilson, "There are no offices on

        13    campus at USC.  I asked Jovan to come to campus to meet.  At

        14    LMU they are not very interested in Johnny - more get in and

        15    then we can speak same for others.  I can ask again but be

        16    prepared for their outlook".

        17         So it's clear here that Mr. Wilson and his son are

        18    going to meet the water polo coach, Jovan, correct?  That's the

        19    plan at least?

02:29   20    A.   He requested that Jovan meet them there.  That doesn't

        21    that there was a meeting set up.

        22    Q.   If we look at the top of page 2 at the third line, it

        23    states "Jovan just texted me" --

        24         MR. KENDALL:  Third line from the top, please,

        25    Mr. Carter.

1   Q.   "Jovan just texted me.  He will meet you all at 3:30 p.m.

2   on Tuesday on the pool deck.  You will have to leave LMU

3   early", correct?

4   A.   Yes.

5   Q.   So there certainly is an intention to meet Jovan from this

6   e-mail.  You obviously can't say whether or not they did meet

7   him?

8   A.   Correct.

9   Q.   Okay.  Now, in the e-mails that you looked at but didn't

02:30 10  testify about, were there any e-mails -- did you see the

11  e-mails that described the meeting with Jovan?

12  A.   I don't recall.

13  Q.   Okay.  And then I'd like to read again something that

14  Mr. Frank covered with you, but I'd like to add a little bit

15  more to what's being read.  If in the middle of page 2,

16  Mr. Carter, if we could go about a quarter of the way down the

17  page.

18  Q.   "R", which obviously is Rick Singer, "if water polo and

19  swimming are not realistic for Johnny, then what other schools

02:31 20  that he has a realistic shot at (without help) in Southern

21  California area, southwest, and east coast".

22           You see that?  So this --

23  A.   It's not up on the screen, so could you repeat your

24  question?

25  Q.   Sure.  You see there where Mr. Wilson's message on

1    March 26, 2013, is "If water polo and swimming are not

2    realistic for Johnny, then what are the schools that he has a

3    realistic shot at (without help) in the SoCal area, southwest,

4    and east coast."

5            You see that?

6    A.   Yes.

7    Q.   You see there's a parenthetical, "a realistic shot

8    (without help)".

9    A.   Yup.

02:31  10    Q.   You understand that to be a reference to a side-door

11    donation?

12    A.   That's my interpretation of it, yes.

13    Q.   Okay.  And we hear Mr. Singer's response right above it,

14    "SMU, TCU" -- that's Texas Christian, to your understanding?

15    A.   Sounds correct.

16    Q.   "LMU, SDSU", San Diego, "UCSC, Cal Poly, SLO, CU",

17    Colorado University Bolder, Indiana, Oregon, Arizona, Rollins".

18            And then he writes in response to the question

19    "harder" -- "University of Miami, Santa Clara, USC,

02:32  20    Northeastern, BU, George Washington, Wisconsin, Tulane, and

21    USC".

22    A.   Yes.

23    Q.   So Mr. Singer describes USC as a realistic but harder

24    school for Johnny, correct?

25    A.   That seems to be the case.  Yes.

```
 1    Q.    And that's in March of 2013, correct?
 2    A.    Yes.
 3    Q.    And you understand Johnny's a junior in high school at
 4    that point?
 5    A.    That's correct, based on the timeline, yes.
 6    Q.    I take it the time you went to college is a lot more
 7    recent than the time I went to college?
 8    A.    I'm not sure it's that different.
 9    Q.    It is a good bit.  I assure you.
```
02:33 10           And you would accept that people's academic records
```
11    are not set in stone in their junior year?  They still have
12    more college exams to take, correct?
13    A.    Sure.
14    Q.    And so if they get a really good score on a college exam
15    after March of 2013, that can increase their likelihood of
16    getting in, correct?
17    A.    Sure.
18    Q.    If their grades are good and hold up and do well, that can
19    also change things?
```
02:33 20    A.    I'm not an expert on the admissions process, but sure.
```
21    Q.    This is an answer in a snapshot in time, correct?
22    A.    Yes.
23    Q.    Okay.  Then if we look just above that, John -- clearly
24    John is -- he's the kind of person who asks a lot of questions,
25    looks like from this e-mail.  You agree with me?
```

```
 1    A.   He asks questions, yes.

 2    Q.   He's looking to Mr. Singer to be the expert to answer

 3    questions, correct?

 4    A.   Yes.  He's asking questions of him.

 5    Q.   About the college admissions process?

 6    A.   Yes.

 7    Q.   Okay.  It's not like Mr. Caplan, how do you cheat and can

 8    you guarantee a result?  It's like how does this process work,

 9    how do these things happen, correct?

02:34 10   A.   Actually, taking a step back, what you put on the screen,

11    he's not asking about the college admissions process in

12    general.  He's asking specifically about the side door and what

13    commitment Johnny would have.

14    Q.   Yes.  And that is part of the college admissions process.

15    A.   Wasn't part of my college admissions process.

16    Q.   It may not have been.  And you shouldn't be making

17    expressions on your face to the jury.

18              MR. FRANK:  I object to that.

19              THE COURT:  No comments like that.

02:34 20   Q.   Okay.  You're just here to read documents, correct?

21    A.   Answering your questions.

22    Q.   Thank you.

23              And he says, "Traveling is only if he is playing so

24    no".  Do you know what a bench warmer is, somebody who doesn't

25    play in a game, correct?
```

1    A.    Correct.

2    Q.    Do you know what a "red shirt" is?

3    A.    I don't.

4    Q.    Okay.  So you have no idea what a red shirt is in college

5    sports?

6    A.    I know it's a term in college sports.  I don't really have

7    time to watch college sports.

8    Q.    Okay.  So if any of this e-mail in Exhibit 49 is talking

9    about the role a red shirt has on an NCAA Division 1 team,

02:35 10   you're clueless on that.  And that's not being disrespectful.

11   It's just not something you're know.

12   A.    Correct.

13   Q.    Okay.  So to understand and interpret what Mr. Singer says

14   in this e-mail, it may be necessary to have someone who

15   understands the red shirt process, correct?

16   A.    Sure.

17   Q.    Okay.  You'll see there at the top, the one, two, three,

18   fourth line from the top, Mr. Singer states "They have 42

19   guys".  Do you know anything about water polo?

02:36 20   A.    Not much.

21   Q.    Okay.  You don't know if that's an exceptionally large

22   collegiate team or not, correct?

23   A.    No.

24   Q.    Do you know at least that it's a very rough sport?

25   A.    From watching it in the Olympics many years ago, yes.  It

1    seems like a fairly contact intensive sport.

2    Q.   It's like ice hockey in a swimming pool, correct?

3    A.   I don't know.

4    Q.   It's a very --

5         MR. FRANK:  Your Honor, I object to the testifying

6    that's happening here.

7         THE COURT:  Well, yes.  Ask him questions.

8    Q.   Okay.  It states "they have 42 guys and 20 plus do not

9    travel but practice," correct?

02:37 10   A.   That's what it says, yes.

11   Q.   So we know at least 20 out of the 42 are bench warmers,

12   correct?

13   A.   I don't know if bench warmers is the correct term, but

14   maybe reserve players, players who don't travel.  I don't know

15   what the correct term is.

16   Q.   It says twenty plus.  So more than 20 of the 42 do not

17   travel, which you understand means travel to a game?

18   A.   Yes.

19   Q.   I mean, they don't travel for tourism.  They travel to go

02:37 20   to games.

21   A.   Sure.

22   Q.   Okay.  So close to half or more than half do not travel

23   but practice, correct?

24   A.   Based on what Mr. Singer's saying, yes.  That seems to be

25   the case.

1   Q.   Okay.  Does that indicate 20 plus are bench warmers?

2   A.   Again, I don't know if they're bench warmers or younger

3   players that don't travel with the team.  I don't have a basis

4   to say one way or the other.

5   Q.   Or maybe both?

6   A.   I don't know.

7   Q.   Okay.  "But he will be fine".  And then Mr. Singer says,

8   "bench warming on the four-time in a row national champion is

9   not bad as a freshman", correct?

02:38 10   A.   Correct.

11   Q.   So he's, apparently, equating bench warming with being

12   part of the 20 plus that do not travel, but practice, correct?

13   A.   That seems to be the case, yes.

14        MR. FRANK:  Your Honor, I object to asking the witness

15   to interpret e-mails he read into the record.

16        THE COURT:  Let's go forward.

17   Q.   Okay.  I'd now like to next to go to Exhibit 75, please.

18   If we could go to the last line of Exhibit 75, please,

19   Mr. Wilson asks Mr. Singer "When do I make first donation?",

02:39 20   correct?

21   A.   Correct.

22   Q.   He uses the word "donation"?

23   A.   Yes.

24   Q.   And he modifies it with "first"?

25   A.   Correct.

1   Q.   So you agree with me that implies there's going to be at

2   least a second donation?

3   A.   Yes.

4   Q.   Okay.  This e-mail is dated August 2013.  Are you aware

5   where Mr. Wilson is living at this time?

6   A.   I'm not.

7   Q.   Okay.  If you take a look at the top of page, that second

8   page we're at, he states "Where do we stand on applications?  I

9   assume they are all out and can you please send me electronic

02:39 10   copies.  What progress is Johnny making on the essays et

11   cetera?  Back up schools and USC?"

12        You agree with me Mr. Wilson is asking Mr. Singer to

13   update him on what his son Johnny is doing?

14   A.   Yes.  I agree.

15   Q.   "What progress is Johnny making on the essays et cetera?

16   Back up schools and USC?".  You see what I'm referring to?

17   A.   Yes.

18   Q.   Okay.  And if we take a look at the last line on page 75,

19   we see Mr. Wilson is e-mailing from John.Wilson@staples.eu.

02:40 20   You understand enough about the internet to agree that "eu"

21   indicates it's an e-mail account in Europe?

22   A.   Again, I don't have the basis to say that but that seems

23   to make sense.

24   Q.   You've never seen "eu" on a European e-mail account.

25   A.   .eu?  I don't think so.  I've seen country specific

1    domains, but not .eu.

2    Q.   Okay.  And then, if we could go to the middle of that

3    page, you see where it says "I believe", if we could highlight

4    that line?  He writes -- so Mr. Singer writes to John, who's at

5    Staples.eu, "I believe I have everything.  Transcript, test

6    scores, and a player profile so he can add Johnny to his

7    recruit list and present him to admissions in October".

8            You see there's a reference to player profile,

9    correct?

02:41 10   A.   Yes.

11   Q.   And Mr. Singer says he has everything.  So that includes a

12   player profile?

13   A.   That seems to be the implication.

14   Q.   Okay.  And then if we could then put that aside and go to

15   Exhibit 83.  And if we could go to the third page, please, at

16   the bottom, we see there at the second line from the bottom

17   Mr. Wilson is -- bottom of the second -- of the third page,

18   please, starting on October 12th.  Okay.

19           On October 12, 2013, Mr. Wilson sends an e-mail to

02:42 20   Mr. Singer.  And this time he's sending it from a Hyannis Port

21   Capital e-mail account, not the Staples one, correct?

22   A.   Right.

23   Q.   And he writes "Hope all is well.  I wanted to catch up on

24   where the college app process stands," and then we go to the

25   next page, "the total application status and when J is taking

1    the new SAT and ACTs et cetera.  Is there a time we can chat

2    today or tomorrow?  John".

3            Again, he's asking Mr. Singer to update him on what

4    his son is doing, correct?

5    A.    Yes.

6    Q.    Okay.  And he's referring to retaking the SAT and ACTs

7    again, correct?

8    A.    Yes.

9    Q.    Okay.  Let's go back to the third page, the response

02:43 10   that's just above this e-mail exchange.  It starts with "common

11   application".  He wrote, "common application will be submitted

12   between December 1st and 15th after the next test dates and

13   apps done.  Jovan has Johnny's stuff and asked me to embellish

14   his profile more, which I am doing".

15           Okay.  So he's referring to embellishing a profile,

16   correct?

17   A.    Yes.

18   Q.    If we look up a couple lines above that where it says "R,

19   thanks", John then writes to Mr. Singer, "When is Johnny going

02:44 20   to have his profile and teacher recs done?  What about other

21   essays?  Also, when is Jovan going to be able to give us a

22   decision on USC?  And when do I pay you?"

23           Okay.  Now, if we take a look just above that to

24   Mr. Singer's response, "First is to finalize the Personal

25   Statement - this is all about Johnny putting in time not me -

1    my work is done quickly or is done".  Then he responds, "The

2    profile I am assuming you are speaking about Navience".

3            So we have Mr. Singer refers to a profile.  John asks

4    when's the profile going to be done.  Then Singer says, I

5    assume you're referring to a Navience profile, correct?

6    A.    Yes.

7    Q.    Do you know what a Navience profile is?

8    A.    No idea.

9    Q.    From the days when you applied to college, they didn't

02:45 10   have Navience as the --

11   A.    No.

12   Q.    -- system?  You're not here testifying that Navience is

13   referring to a sports profile for USC, are you?

14   A.    I don't know what a Navience profile is.

15   Q.    Okay.  All we know is, when John Wilson is, from wherever

16   he is, is trying to connect with Mr. Singer and say what about

17   this profile you've just mentioned, Mr. Singer focuses him on a

18   Navience profile, correct?

19           MR. FRANK:  I object to "all we know".

02:46 20          THE COURT:  Sustained.

21   Q.    Excuse me.  Excuse me.

22           You see in the e-mail when Mr. Wilson asks about

23   when's the profile going to get done, Mr. Singer tells him, I

24   assume you're talking about a Navience profile?

25   A.    That's what the e-mail says, yes.

```
 1    Q.    Nowhere does Mr. Singer say, I assume you're talking about
 2    a USC sports profile, correct?
 3    A.    That's not what he says, no.
 4    Q.    Okay.  And you have no idea what's the difference between
 5    the two, correct?
 6    A.    No.
 7    Q.    Okay.  If we could take a look at the very bottom of
 8    page 2, he writes "Do you have his latest" -- it starts October
 9    13, 5:20 a.m.  John Wilson at Hyannis Port Capital writes to
10    Mr. Singer.
11              Then we go to the top of page 3.  "Do you have his
12    latest personal statement draft?  Can you forward it and I will
13    talk with him about it.  Does he have all your feedback and
14    clear on what additional improvements you suggest?"
15              Here he's focusing on the son's essay, correct?
16    A.    Yes.  That appears to be.
17    Q.    And then Mr. Singer responds, "I sent it to you and Leslie
18    last week".  You see that at the bottom of page 2?
19    A.    Yes.
20    Q.    And then John says, "ok that's still the latest"?
21    A.    Yes.
22    Q.    Okay.  And if we go to page -- top of page 1, about a
23    third of the way down, on October 13, 2013, e-mail from Rick
24    Singer, who writes "I took the liberty of completing the
25    essay".  And we see the title is "Life Lessons From The Water".
```

02:47 (lines 10, 20)

1    Do you see that?

2    A.   Yes.

3    Q.   So if we look at the top e-mail in this chain, we see

4    Mr. Wilson's response is "Rick, thanks so much.  Looks great.

5    Several quick suggestions to wrap this up.  That I edited

6    below".  And then he proposes a title.  He wants to split the

7    second to last paragraph.  He proposes some edits, correct?

8    A.   Yes.

9    Q.   So, in this one chain, we have Mr. Wilson doing multiple

02:48 10   e-mails with Mr. Singer just about the essay, correct?

11   A.   Yes.  They mentioned it many times.

12   Q.   Okay.  If we can go to the Exhibit 89, which we discussed.

13   Okay.  If we could go to the bottom third of Exhibit 89,

14   please.  It's Wednesday, October 23, 2013,

15   JohnWilson@Hyannisportcapital.com.  "R, what are the

16   expectations if Johnny gets into USC through this water polo

17   approach?"  Do you see that?

18   A.   Yes.

19   Q.   "Does he have to play Stanford club in addition to Sopen

02:49 20   club and/or varsity swim team?"

21          Do you know what the Stanford club team is?

22   A.   No.

23   Q.   Do you know what the Sopen club team is?

24   A.   No.

25   Q.   You certainly know what a varsity swim team is, high

```
 1  school varsity swim team, correct?
 2  A.   Yes.
 3  Q.   So you don't know how many even club teams and school
 4  teams Johnny is on, do you?
 5  A.   No.
 6  Q.   But this, apparently, is referring to two club teams and a
 7  varsity swim team on top of the school water polo team.
 8  A.   Not sure where it mentions the school water polo team, but
 9  it definitely mentions those three.
02:50 10  Q.   Okay.  So it's those three, not counting a school water
11  polo team, correct?
12  A.   Yeah.  There doesn't appear to be a mention of a school
13  water polo team.
14  Q.   And then Mr. Singer responds, "Just be ready for practice
15  in the fall as a player on the roster or just a member of the
16  squad, but not get in the pool."
17       Now, you don't know what the phrase "not get in the
18  pool" means?
19  A.   No, not necessarily.  I assume it means not to get in the
02:50 20  pool.
21  Q.   But you don't know what it means not to get in the pool
22  for what?
23  A.   I assume for water polo, but I don't know.
24  Q.   You don't know did what -- do you know if red shirts get
25  in the pool for games and matches?
```

```
 1          MR. FRANK:  Your Honor, the witness is not here to
 2    interpret documents.
 3          THE COURT:  Sustained.
 4    Q.   Okay.  You don't know what that phrase refers to, correct?
 5    A.   No.
 6    Q.   You don't know if there's any special language relating to
 7    water polo that relates to it?
 8          MR. FRANK:  Objection.  Asked and answered.
 9          THE COURT:  Sustained.
02:51 10    Q.   Okay.  Then we see the response is "Thanks we are
11    encouraging Johnny to focus on water polo this spring and he
12    will do Sopen and Stanford club", correct?
13    A.   Yes.
14    Q.   "Not varsity swimming - as that requires him to skip all
15    senior trips".  Then it says, "That way he can take senior trip
16    to Spain for a week and also spend two weeks in the spring
17    coming to Europe to visit with us".  Do you see that?
18    A.   Yes.
19    Q.   So Mr. Wilson is saying that when his son goes to Europe
02:52 20    he can visit with John?
21    A.   Yes.
22    Q.   That appears to indicate John is in Europe and the boy is
23    in California?
24    A.   Yes.
25    Q.   And then he says, "I strongly prefer he plays as hard as
```

1   he can and at least suits up and scrimmages with the team.

2   Would it also make sense for him to try a week of camp at USC",

3   correct?

4   A.   Yes.

5   Q.   And do you understand that if somebody suits up and

6   scrimmages, they'll be in a swimming pool?

7   A.   If that's for water polo, yes.

8        MR. KENDALL:   Next, if we could have Exhibit 101,

9   please.   Okay.

02:53 10   Q.   This is an e-mail between Mr. Singer and Mr. Vavic in

11   January 2014.   We see in the middle of the line "Rick, is

12   Johnny still interested in USC, if so we need his fall grades

13   (unofficial is fine)".   You see that?

14   A.   Yes.

15   Q.   Okay.   So these -- we're talking about grades that are in

16   the fall, really in the middle of his senior year of high

17   school, correct?

18   A.   Yes.   That sounds correct.

19   Q.   Okay.   And then Singer's response is "absolutely, family's

02:53 20   ready to help.   I will forward ASAP.   Thank you".

21        And then Mr. Vavic writes "this will be a big class".

22   You see that?

23   A.   Yes.

24   Q.   "We already have 12 verbals and 16 very interested".   You

25   don't know what verbals or very interested mean, I take it?

```
 1    A.    I assume a verbal is someone who has given --

 2    Q.    Please don't assume.  If you know specifically --

 3          MR. FRANK:  Your Honor, this entire testimony he's

 4    asking him to assume.

 5          THE COURT:  He is assuming.  He can answer that.

 6    A.    I assume verbal -- verbals refer to verbal commitments to

 7    attend and 16 would be potentially people interested in the

 8    program.

 9    Q.    Okay.  And it states -- and Vavic wrote, "I cannot

02:54  10    guarantee anything", correct?

11    A.    Yes.

12    Q.    Okay.  Then I'd like to go to Exhibit 126, please.  Okay.

13    If we could -- we see this is an e-mail from

14    DebbieRogers@hyannisportcapital.com?

15    A.    Yes.

16    Q.    Fair to say that indicates she has some employment or

17    other affiliation?  She's using Hyannis Port Capital as her

18    e-mail address?

19    A.    Yes.

02:55  20    Q.    And it's to John Wilson and to Leslie Wilson both,

21    correct?

22    A.    Yes.

23    Q.    And it's dated July 31st, and it says "USC gift

24    acknowledgment", correct?

25    A.    Yes.
```

1    Q.    And it's from the "SC Trojan Athletic Fund", correct?

2    A.    Yes.

3    Q.    Okay.  So we turn to page 2.  It's John and Leslie Wilson

4    at 2 Fleur Place, Atherton.  And they get a letter that says

5    "Thank you for your generous gift to USC athletic men's water

6    polo in the amount of $100,000", correct?

7    A.    Correct.

8    Q.    "Maintaining state-of-the-art facilities is an essential

9    part of USC's commitment to excellence.  Through your

02:56 10    contributions, you are helping the University achieve this

11    important goal."  It says, "On behalf of the young athletes

12    that will benefit from your anonymous gift, thank you.  Ron

13    Orr".  It says it's anonymous, but they know it's from the

14    Wilson's, correct?

15    A.    The school seems to know, yes.

16    Q.    And it's from a man named Ron Orr, correct?

17    A.    Yes.

18    Q.    And his title is Associate Athletic Director?

19    A.    Yes.

02:56 20    Q.    So he's obviously an employee of USC?

21    A.    Appears to be, yes.

22    Q.    Okay.  And he has some sort of management role if he's got

23    the title of Associate Athletic Director, correct?

24    A.    That would be the assumption, yes.

25    Q.    Okay.  And there's a cc: to Jovan Vavic?

```
 1    A.    Yes.

 2    Q.    Okay.  Then we have Exhibit 137.  That's dated January 12,

 3    2015, correct?

 4    A.    Yes.

 5    Q.    And if you take a look at the e-mail address, it's

 6    JohnBWil@USC.edu.  I take it as part of your preparation you've

 7    determined that's Johnny Wilson's e-mail account at USC,

 8    correct?

 9    A.    It appears to be, yes.  I don't believe I independently

10    verified that's his e-mail address.

11    Q.    Well, "edu" indicates a school, correct?

12    A.    It does.

13    Q.    USC is the school he was attending, correct?

14    A.    Yes.

15    Q.    Okay.  And this father and son are similar names, but this

16    is JohnBWil@USC, correct?

17    A.    Correct.

18    Q.    You have no reason to believe that my client Mr. Wilson

19    was at USC, do you?

20    A.    No.

21    Q.    Okay.  So -- and it's addressed to Jovan Vavic with an

22    e-mail address there.  And he writes, "Hello Jovan, I hope that

23    you had a great break and wonderful holiday season.  I wanted

24    to thank you and illustrate how profoundly appreciative I am

25    for the incredible opportunity you have given me here at USC as
```

 1    an individual member on the team as well as a student at this

 2    school".

 3             So he writes he's a member of the team, correct?

 4    A.   Yes.

 5    Q.   Okay.  And then he says, "it's a bigger commitment than I

 6    had planned", and his grades reflected his inability to balance

 7    sports and athletic life?

 8    A.   Yes.

 9    Q.   Okay.  And he also notes he had a third concussion,

02:58 10   correct?

11    A.   Yes.

12    Q.   Obviously, based upon the e-mails you've read, it hasn't

13    shown where that third concussion took place, correct?

14    A.   No.  I don't know the details of that.

15    Q.   Okay.  And so he states he's going to resign from the

16    water polo team as a result of these issues, correct?

17    A.   Yes.

18             MR. KENDALL:  Your Honor, there's a couple of

19    scheduling things we need to discuss.  This might be a good

02:59 20   time, and I can tighten up.

21             THE COURT:  You may step down for the time being,

22    Mr. Brown.

23             We are going to be in recess, jurors, as I said.

24    Tomorrow we do not have a session, so you're off until Friday

25    morning.  Friday morning at ten of 9:00 a.m. we'll return.

```
 1   You'll have a full day on Friday.
 2          Next week I'm hopeful that one of the days we're going
 3   to be able to not have a session.  We're going to talk about
 4   that a little bit today, but I'll let you know on Monday.
 5          So it is important now.  You're going to have a full
 6   day where you don't have to think about this case and where
 7   people will no doubt ask you about the case.  Again, honor my
 8   instructions about not talking about this case with anyone else
 9   or doing any independent research.  That would be
10   inappropriate.
11          Have a pleasant rest of this day and a pleasant day
12   tomorrow off.  I'll see you on Friday morning at 9:00 a.m.
13          (Jury exits.)
14          THE COURT:  On Friday morning, how much longer on the
15   cross, Mr. Kendall?
16          MR. KENDALL:  Not sure.  I think it could be a half
17   hour to an hour, but I've got to go through things and
18   reorganize and tighten up.
19          THE COURT:  And Mr. Kelly?
20          MR. KELLY:  I'd say the same thing.
21          THE COURT:  Half an hour to an hour.
22          MR. KELLY:  Half an hour to an hour, and I've got to
23   reorganize as well.
24          THE COURT:  Okay.  And then after Mr. Brown?
25          MR. FRANK:  Your Honor, given the way things are
```

1    going, I think we're going to change our witness order for

2    Friday.  We have two witnesses -- I'm sorry.  We have one

3    witness who's flying in from out of town, so we'd like to get

4    her on and off.  So our current intention is to call Mikaela

5    Sanford after Special Agent Brown, and then two short

6    witnesses, Rachel Sih and Mark Deckett, and then Special Agent

7    Keating.

8            THE COURT:  Rachel, how do you spell her last name?

9            MR. FRANK:  S-i-h.

03:02 10          THE COURT:  I'm sorry?

11            MR. FRANK:  S-i-h.

12            THE COURT:  And then who was after her?

13            MR. FRANK:  Mark Deckett.

14            THE COURT:  And those are short direct exams?

15            MR. FRANK:  Yes, your Honor.

16            THE COURT:  And then after that?

17            MR. FRANK:  Special Agent Keating.

18            THE COURT:  The one who was going to go forward.

19            MR. FRANK:  Yes, your Honor.

03:02 20          THE COURT:  All right.

21            MR. KELLY:  I'm not sure I heard correctly.  They're

22    taking those three out of order, or we're going to complete

23    Agent Brown?  Did I mishear that?

24            THE COURT:  We're going to complete Agent Brown first.

25            All right.  Counsel, with respect to next week, it

1  would be better for the Court to have the day that we're not

2  going to have a session on Wednesday rather than Friday.  Does

3  that create any problems for anybody?

4          MR. KENDALL:  Your Honor, that may help solve some,

5  because Mr. Haden's lawyer told me he was not available for the

6  deposition on Friday.  I can go back and check with him on

7  Wednesday.

8          THE COURT:  Wednesday will be the day that we will not

9  have a session next week.  We will have a session on Friday.

03:03 10          MR. KENDALL:  May I ask another scheduling issue, your

11  Honor?

12          THE COURT:  Yes.

13          MR. KENDALL:  My instincts tell me that the

14  government's case may be going more quickly than we

15  anticipated, but it also indicates to me that to follow the

16  Court's preferences, we're going to probably have to put more

17  people in our case for things that we can't do in the

18  government's case.

19          Could we get an estimate from the government when they

03:03 20  realistically think they're going to rest, because I don't want

21  to be cut short and I need things to be lined up and ready to

22  go?

23          THE COURT:  Can you estimate that at this stage,

24  Mr. Frank?

25          MR. FRANK:  Well, I will tell you that this

1    cross-examination is far longer than I anticipated for a

2    reader.  I guesstimate that we will fill the week next week,

3    and  whether we bleed over into the following week is not clear

4    to me.

5            MR. KENDALL:  Thank you.

6            THE COURT:  Fair enough.

7            All right.  There were two matters that the defendants

8    asked me with respect to limiting instructions to the jury.

9    Has the government had a chance to review those?

03:04 10           MR. FRANK:  Yes, we have, your Honor.

11           THE COURT:  And do you have a position on either or

12   both?

13           MR. FRANK:  We oppose both of them and we don't

14   believe either one is -- in fact, we don't feel a limiting

15   instruction is necessary in either event, but we certainly

16   oppose these limiting instructions.

17           We -- with respect to the Jovan Vavic limiting

18   instruction, I made crystal clear the timing in my direct

19   examination.  I was very, very careful about it.  We were

03:04 20   explicit repeatedly in opening argument, in opening statements

21   about it, and we will continue to be explicit about it.  So

22   there's really no need for the Court to give a characterization

23   of the facts, which is what the defense is essentially asking

24   for here.

25           With respect to the original instruction, we believe

1    that will be covered with the closing instructions.  Those

2    recordings that we introduced are essentially it in terms of

3    recordings of conversations involving other parents.  So there

4    will be other additional scheme evidence of a limited nature,

5    but nothing that I think would warrant this kind of

6    instruction.  I think the First Circuit case law is clear that

7    this kind of instruction is not necessary.

8              THE COURT:  All right.  Mr. Kelly.

9              MR. KELLY:  With respect to that last point, yes, I

03:05 10    think it's very necessary.  It's hard to unring the bell, as

11    the Court well knows, when something like that is being put

12    into the record.  And the jury's sitting there listening to all

13    this testimony about other parents.  I understand the Court's

14    ruling, it goes to the context of the conspiracy, but as a lay

15    jury hearing it, I think they need to be informed that proof

16    that the defendants willfully joining the conspiracy must be

17    based upon the evidence of their own words or actions, not all

18    these other parents that they don't know.  And that's the

19    suggestion he's trying to get into the jury box now well before

03:05 20    the Court instructs the jury.  And it's clear First Circuit law

21    that willful joinder must be based upon evidence of the

22    defendant's own words.

23              It's dry in here.  I'm not getting emotional.  I

24    apologize.  It's very stuffy.

25              So I think an instruction now is appropriate, your

 1    Honor, and we would request it.

 2          THE COURT:  All right.  I will take the matter under

 3    advisement.  We'll see you all --

 4          MR. KENDALL:  One last?

 5          THE COURT:  Yes.

 6          MR. KENDALL:  Miss Sanford, who they're calling on

 7    Friday, we subpoenaed her for our case as well.  She's a

 8    witness that we will present testimony we want to do, and I

 9    just need the Court's guidance.  If you want me to have a tight

03:06 10    limited cross with her just to everything he touches and

 11    nothing more, then we're going to have this woman fly back

 12    across the country in another week.  If the Court would have --

 13          THE COURT:  What will the nature of your direct part

 14    of the exam be --

 15          MR KENDALL:  We would --

 16          THE COURT:  -- and how long?

 17          MR. KENDALL:  How long?  I can get it done in, soup to

 18    nuts, 60 to 90 minutes.

 19          THE COURT:  Mr. Frank, what's the government's

03:07 20    position?

 21          MR. FRANK:  Well, this is the first I'm hearing of it,

 22    your Honor.  I think we should take it as it goes.  I can't --

 23    first of all, she's not flying from across the country.  She's

 24    in Atlanta.  We hope to get here out of here Friday.  I don't

 25    want to be unreasonable about it, but it's also awkward and

1    disruptive to have the defendants' case in the middle of the

2    government's case.

3              THE COURT:  Yeah.  I think if it was going to be

4    something limited, 60 to 90 minutes doesn't sound like it's

5    very limited, that counsel should be able to agree on this, but

6    if push comes to shove, I'm not going to force the government

7    to allow the defendants to put in -- their case in the middle

8    of the government's case if it's just a matter of relatively

9    unimportant material.

03:08 10             MR. KENDALL:  It's not, your Honor.

11             THE COURT:  Then, you know, I'd like to save her a

12   trip.

13             MR. KENDALL:  Then I just wanted to be clear, your

14   Honor, we're going to do whatever the Court tells us.  We're

15   going to have to call her back and put her on the defense case.

16   And so it may take more time from the jury overall if we split

17   it up.  If that's the Court's order, we'll certainly follow it.

18             THE COURT:  I commend counsel to try to work something

19   out, but if they can't, I'm not going to force the government

03:08 20   to allow a defendant -- a witness that the defendant is going

21   to call in their case-in-chief in the middle of the

22   government's case.

23             MR. FRANK:  It would certainly be helpful if we had a

24   proffer of the expected testimony.

25             THE COURT:  Yeah.  If you want to talk to Mr. Frank

1    about the proffer of what is expected to be said, perhaps you

2    can work it out.

3            MR. KENDALL:  It's all in the 302s, your Honor.  It's

4    pretty much all in the 302s.

5            THE COURT:  It's time to start the journey homeward,

6    and I don't know whether it's polite to say, but have a good

7    Yom Kippur.

8            MR. KENDALL:  You've been very gracious, your Honor.

9    Thank you.  They say have a gentle fast.

03:09 10        THE COURT:  Have a gentle fast.

11          (Whereupon, the proceedings adjourned at 3:09 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2    Witness                         Page

3    KEITH BROWN

4    Direct Examination by Mr. Frank        8

5    Cross-Examination by Mr. Kendall      116

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       E X H I B I T S

 2    NO.                         ADMIT

 3    338   ...................    11

 4    339   ...................    11

 5    340   ...................    11

 6    341   ...................    11

 7    342   ...................    11

 8    345   ...................    12

 9    352   ...................    14

10    363   ...................    17

11    362   ...................    18

12    361   ...................    19

13    371   ...................    23

14    372   ...................    24

15    376   ...................    26

16    381   ...................    28

17    387   ...................    30

18    390   ...................    33

19    427   ...................    34

20    467   ...................    36

21    478   ...................    38

22    505   ...................    40

23    415   ...................    42

24    396   ...................    44

25    439   ...................    44
```

```
 1                        E X H I B I T S

 2    No.                          ADMIT

 3    508   ....................    44

 4    701   ....................    48

 5    509   ....................    51

 6    48    ....................    54

 7    49    ....................    57

 8    63    ....................    61

 9    65    ....................    61

10    64    ....................    62

11    74    ....................    64

12    75    ....................    65

13    81    ....................    67

14    83    ....................    68

15    84    ....................    71

16    85    ....................    72

17    88    ....................    74

18    87    ....................    75

19    89    ....................    78

20    101   ....................    83

21    710   ....................    84

22    109   ....................    86

23    110   ....................    88

24    112   ....................    89

25    120   ....................    91
```

```
1                              E X H I B I T S

2      No.                          ADMIT

3      122  ....................    92

4      124  ....................    93

5      126  ....................    95

6      137  ....................    97

7      154  ....................    101

8      212  ....................    104

9      238  ....................    105

10     409  ....................    106

11     563  ....................    561

12     561  ....................    110

13     562  ....................    110

14

15

16

17

18

19

20

21

22

23

24

25
```

1    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8            We, Kristin M. Kelley and Kelly Mortellite, certify

9    that the foregoing is a correct transcript from the record of

10    proceedings taken September 15, 2021 in the above-entitled

11    matter to the best of our skill and ability.

12

13

14        /s/ Kristin M. Kelley          September 15, 2021

15        /s/ Kelly Mortellite           September 15, 2021

16        Kristin M. Kelley, RPR, CRR               Date
         Kelly Mortellite, RMR, CRR
17        Official Court Reporter

18

19

20

21

22

23

24

25