UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                    Plaintiff      )
                                   )
vs.                                )   No. 1-19-CR-10080
                                   )
GAMAL ABDELAZIZ and JOHN           )
WILSON,                            )
                    Defendants.    )
                                   )
                                   )


BEFORE THE HONORABLE NATHANIEL M. GORTON
UNITED STATES DISTRICT JUDGE
JURY TRIAL - DAY 7


John Joseph Moakley United States Courthouse
Courtroom No. 4
One Courthouse Way
Boston, Massachusetts 02210


September 17, 2021
9:13 a.m.


Kristin M. Kelley, RPR, CRR
Kelly Mortellite, RMR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3209
Boston, Massachusetts 02210
E-mail: kmob929@gmail.com

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2

 3          Stephen E. Frank

 4          Ian J. Stearns

 5          Leslie Wright

 6          Kristen Kearney

 7          United States Attorney's Office

 8          1 Courthouse Way

 9          Suite 9200

10          Boston, MA 02210

11          617-748-3208

12          stephen.frank@usdoj.gov

13          for the Plaintiff.

14

15

16          Brian T. Kelly

17          Joshua C. Sharp

18          Lauren Maynard

19          Nixon Peabody LLP

20          100 Summer Street

21          Boston, MA 02110

22          617-345-1000

23          bkelly@nixonpeabody.com

24          for Gamal Abdelaziz.

25
```

```
 1    APPEARANCES:

 2

 3            Robert L. Sheketoff

 4            One McKinley Square

 5            Boston, MA 02109

 6            617-367-3449

 7            sheketoffr@aol.com

 8            for Gamal Abdelaziz.

 9

10

11            Michael Kendall

12            Lauren M. Papenhausen

13            White & Case, LLP

14            75 State Street

15            Boston, MA 02109

16            617-939-9310

17            michael.kendall@whitecase.com

18            for John Wilson.

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2

 3              Andrew E. Tomback

 4              McLaughlin & Stern, LLP

 5              260 Madison Avenue

 6              New York, NY 10016

 7              917-301-1285

 8              atomback@mclaughlinstern.com

 9              for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

THE COURT:  May I see counsel at sidebar.

Good morning, counsel.  We have had another juror problem.  Mr. Diaz in Seat No. 6 has informed my deputy and the people in the Clerk's Office, not other jurors, that he is distraught, that he cannot continue to serve as a juror.  He is very nervous.  He doesn't like being in the courtroom and that he wants off this jury.  And when my deputy said, well, you're going to probably have to talk to the judge about it, he said, not in there I'm not.  He doesn't want to come back into the courtroom at all.

So I think what I have to do is have a meeting with him, as we did with the other juror that we dismissed, with counsel, if you choose to be there, and I'm certainly inviting you to be there, to ask him what the problem is, but I need to be very careful, as I'm sure counsel are aware, about not talking about the facts of this case.  It's only what is in his mind that has upset him, what is the cause of his deciding that he doesn't want to be a juror.

Any comments or suggestions from counsel?

MR. KELLY:  Seems like a reasonable approach.  And we'll just listen and then confer with counsel.

THE COURT:  I take it you agree that I have to caution him not to say anything to me or to you about his opinion of the facts of the case?

|  | 1 | MR. KELLY:  Yes, one hundred percent. |

```
 1            MR. KELLY:  Yes, one hundred percent.

 2            THE COURT:  We cannot -- we cannot get into that. We

 3   can only ask him what it is that's caused this problem without

 4   talking about the facts of this case.

 5            MR. KENDALL:  Yes, your Honor.

 6            MR. KELLY:  Could we confer for a moment?

 7            THE COURT:  Yes, you may.

 8            Yes, counsel?

 9            MR. KENDALL:  We would like to be present, your Honor.

10   We ask that after the gentleman speaks, before the Court makes

11   a decision, if counsel can talk with the Court before deciding.

12            THE COURT:  Of course.  What I'll do is just what I

13   did the last time: I'll hear him, I'll excuse him, I'll hear

14   comments from counsel, and then I'll call him back.

15            MR. KELLY:  And I'm concerned -- obviously, if this is

16   just a concern about work matters, rather -- he's concerned

17   more about work matters and missing work than he is about being

18   nervous in the courtroom.

19            THE COURT:  You think that's what it is?

20            MR. KELLY:  Yes.  I believe he noticed how long this

21   is going to go and he's probably trying to get off.  He works

22   on commission I think.

23            MR. KENDALL:  My past experience has been, including

24   our most recent juror, that often people think of their

25   convenience more than their obligations.
```

09:16 (line 10)
09:17 (line 20)

1          THE COURT:  Okay.  Any insight from the government?

2          MR. FRANK:  No, your Honor.  Thank you.

3          THE COURT:  All right.  So we're going to have one

4     counsel from each.  It will be Mr. Kelly and Mr. Kendall and

5     Mr. Frank.  Right?  All right.  We'll adjourn to my lobby.

6               (In camera conference in chambers.)

7          THE COURT:  Let the record reflect that we are in the

8     lobby with counsel, my law clerks, my deputy.  I'm going to now

9     invite Mr. Diaz, who is in Seat No. 6.  My deputy will bring

09:42 10    him in.

11         THE COURT:  Good morning, Mr. Diaz.  Have a seat.  I

12    understand you've spoken to my deputy clerk and to somebody in

13    the jury clerk's office that you are concerned about continuing

14    as a juror in this case.

15         JUROR NO. 6:  Correct.

16         THE COURT:  Without talking about the facts of this

17    case, which of course you cannot do, what is the problem that

18    you're facing?

19         JUROR NO. 6:  Being a part of the trial it's more than

09:42 20    I thought I could handle, like mentally.  I'm not sleeping

21    well.  I'm eating only one time a day because I'm thinking

22    about this.  I feel that if I can be removed or excused, I

23    would like that to happen because I don't want to, like -- I

24    don't want to feel like this.  I don't think I can be fair in

25    there or pay attention the way I need to be because it's too

1   much for me in my head to deal with this.  I didn't realize,

2   like, how much it would weigh on me like this.  I just -- I

3   just answered the summons to come.  I was truthful and I just

4   wanted to do the right thing, but I don't think I can do this.

5        THE COURT:  If it has anything to do with your

6   employment, I understand it's a big chunk of time away from

7   your job.

8        JUROR NO. 6:  Yeah.

9        THE COURT:  If it was something like your employer was

09:42 10   putting pressure on you because they need you back at work, the

11   Court would be willing to intervene and talk to your employer

12   and say how important this job is and that they can't hold this

13   against you in any way, because serving on a jury is a civic

14   duty, a very important civic duty, and, of course, now that

15   you've been constituted as a juror, it would be disruptive to

16   excuse you unless there is a real good reason to.  So I don't

17   know.  Is that part of the factor?

18        JUROR NO. 6:  No.  It's not my job.  It's just -- it's

19   me.  It's in my mind.  It's how it's making me feel.  I'm sorry

09:43 20   that I made it that far and I sat there for 3 days.  I just --

21   I don't want to be a part of it.

22        THE COURT:  It's an emotional thing?

23        JUROR NO. 6:  Yeah.  It's an emotional thing.  It's in

24   my mind.  I can't get it out.  It's controlling me, if that

25   makes sense.

THE COURT:  You've been working at a professional job

for some -- how long have you been at your current job?

JUROR NO. 6:  Since December 2016.

THE COURT:  So you've had about four, five years in

the commercial world.

JUROR NO. 6:  Yes.

THE COURT:  I'm sure you've had some pressure in the

commercial world.

JUROR NO. 6:  Yeah.

THE COURT:  Having to make sales and all that stuff.

Has that bothered you mentally to the point where you couldn't

do your job?

JUROR NO. 6:  No.  This is just different because,

like, I'm asked to judge someone's life.  They may go to prison

and something like that.  I just -- I realized now sitting

there I can't do that.

THE COURT:  So you're asking the Court to be excused

from further jury duty, and you don't think that there's any

way we could accommodate you such that we would be able to

alleviate your problem?

JUROR NO. 6:  Exactly.  The best thing, I just would

like to be removed, if that's the option.

THE COURT:  Okay.  What I'd like you to do is withdraw

for a few minutes and not go back into the jury room.  Just go

down -- my deputy will show you a place, an alcove, where you

 1    can have a seat.  I'll discuss the matter with the attorneys

 2    and then I'll invite you back.  Okay?

 3              JUROR NO. 6:  Thank you.

 4              THE COURT:  Thank you, Mr. Diaz.

 5              The record will reflect that Mr. Diaz has withdrawn.

 6              Comments from counsel?  Mr. Kelly?

 7              MR. KELLY:  We can't reward people when they get

 8    hypersensitive and under stress.  The juror needs to toughen

 9    up.  He can sit through the process he agreed to be part of.

09:43 10    It's his civic duty.  If we're going to let people out every

11    time they get nervous or stressed because it's a federal case,

12    we'll never get any jurors.  Respectfully, I'd admit while it's

13    a stressful process for everyone and everyone loses sleep and

14    doesn't eat as much, it's not as though he doesn't understand

15    what's happening.  It's not as though his job is in jeopardy.

16    He's stressed.  I'd suggest, as difficult as it may be, he

17    should sit there and fulfill his duty.

18              MR. KENDALL:  Your Honor, I'm glad Mr. Kelly didn't

19    coach my daughters.  I would have put it a little differently.

09:43 20    I have come to the same conclusion.  I think he's a pretty

21    straightforward, reasonable guy.  I think he wants to get out

22    of jury duty.  The way he put it, he didn't say -- if it could

23    be.  The court reporter will have the words better than I'll

24    remember him.  The last bit was he'd like to be excused if he

25    could be.  He's not seeking medical care.  He's not on

1    medication.  Maybe it is stressful.  Sitting on a jury could be

2    stressful to a lot of people.  I don't dispute that.

3         We've already lost one.  We lose two the first week,

4    that's not good, your Honor.  To be honest, Mr. Frank and I

5    have had this in a prior trial.  We're entitled to 12 jurors.

6    I don't want to be at the end that we have 10 or 11 jurors and

7    we're being asked after investing four weeks to let a jury

8    deliberate.  That's always bad for a defendant to have less

9    than 12.

09:43 10       I think we keep him.  If he comes back next week and

11   say he's got medical treatment or he's under issues, we can

12   revisit it.  I'd hate to lose two the first week.

13        THE COURT:  Mr. Frank.

14        MR. FRANK:  I think if he wanted to get out of jury

15   duty for hardship, he would have said it.  He's not just trying

16   to get out of jury duty in my view.  In my view, he's

17   distraught.  He said he's not sleeping, he's not eating.  My

18   concern is that he's not going to be able to deliberate in good

19   faith with the other jurors.  He effectively said as much.

09:43 20  We're only three days into the trial and he's having that

21   reaction.  I can't see how he can continue for the next couple

22   of weeks and then deliberate if he's already under this much

23   stress from the first couple of witnesses.  In my view, he is

24   being genuine and he should be excused.

25        I do share Mr. Kendall's concern because I don't want

1    to relive that experience.  My suggestion would be we consider

2    ways to expedite the proceedings so we can get through this.

3    If that means putting days back on the schedule, if that works

4    for the Court, or having longer days, if that works for the

5    Court, then we would be amenable to that so we can speed that

6    up.

7              MR. KELLY:  I'd speak to that.

8              THE COURT:  I'll let you speak in a minute.  What do I

9    realistically tell him he's facing as a remainder of the trial?

09:43 10   3 weeks?

11             MR. FRANK:  I think the government's case is plus or

12   minus another week.  I don't know what the defense case looks

13   like.

14             MR. KENDALL:  Your Honor, it's the issue we dealt with

15   yesterday.  If we can get rid of these witnesses by having a

16   full examination in the government's case, we'll save three,

17   four days.  Right now, if I'm limited on Mikaela Sanford, we've

18   already subpoenaed her.  She's coming back.  The same thing

19   will be with every witness basically that testifies.  We'll

09:43 20   save three or four days if we can have the full examination one

21   time with each witness, as opposed to how Mr. Frank has been

22   insisting and truncating it.

23             We're putting on a case.  We're putting on a case with

24   a bunch of witnesses.  A lot of time defendants say that.  We

25   are.  We've given a list of experts who we've retained to

1    testify.  We have fact witnesses that he knows we're preparing.

2    I haven't counted it up to give you a reliable answer.  I guess

3    the defense case is a week or so, and I say "or so" because I

4    don't know if it's four days or seven days.  If we could do a

5    full examination when the witness is on the stand for the first

6    time, we'll save time.

7        MR. KELLY:  Two things: First of all, I think perhaps

8    the Court could keep him for now.  He gets more acclimated

9    after another day, and next week, if he's still having this

09:43 10  problem, the Court can inquire and take some action then.  I'm

11   concerned if we lose another juror this quickly.  Secondly, I

12   don't think his convenience should inconvenience the rest of

13   the jurors and us so the whole schedule gets changed.  The

14   schedule is the schedule.  The Court has set the schedule.  I

15   think having the day off on Wednesday and the following week as

16   well, that's fine.

17       MR. KENDALL:  This trial will be three plus for

18   evidence is my estimate, plus deliberations.  So it's basically

19   a four-week trial is my guess, your Honor, and that's just a

09:43 20  guess.  Lose two in the first week is not a good thing.

21       THE COURT:  Anything else, Mr. Frank?

22       MR. FRANK:  No, just that if he's this distraught,

23   your Honor, he's going to be disruptive to the other jurors and

24   a negative force on the rest of the jury.  That, to me, is a

25   bigger concern than losing one when we have two more left who

 1    are spares.

 2           THE COURT:  What if I say you're going to have to, you

 3    know, live it out today?  This is Friday.  We're going to have

 4    a full day.  I want you to think about it over the weekend.

 5    We'll have another discussion on Monday.  Suck it up today.

 6    You're going to stay here today and be a juror.  You'll have

 7    the weekend to, hopefully, rest.  I'll talk to you Monday

 8    morning.

 9           MR. KENDALL:  If I may make one suggestion, your

09:43 10    Honor?

11           THE COURT:  Yes.

12           MR. KENDALL:  Give a little more dose of Mr. Kelly.  I

13    wouldn't want to encourage him that if you just come back a

14    second time you're gone.  Maybe just ask him to do his best

15    effort, and if he feels the need, he can raise this again, but

16    not tell him Monday's your day to come back with another story

17    on Monday and you're out.  I don't want to give him too much

18    encouragement.

19           As I said, your Honor, it's not as if he received

09:43 20    medical treatment or medication or things like that.  He

21    doesn't want to be a juror for whatever reason, whether it's

22    the emotional issue or other issues he doesn't want to tell us

23    about.

24           Remember the first guy that came in?  He talked all

25    about the commute and then he told us the divorce at the end.

         1   The Court said he'd give him a hotel and everything and it was

         2   the divorce.

         3          THE COURT:  I am concerned about Mr. Frank's comment

         4   about the effect on the other jurors.  If he's a negative

         5   force, that's bad.  Hopefully, he's keeping this to himself.  I

         6   don't know.  I'm hopeful that he is.

         7          MR. KENDALL:  He seems to be a very respectful person,

         8   your Honor.  He dresses very neatly and respectfully for court

         9   every day.  He's speaking in the most low key, not emotional

09:43  10   table pounding manner.  I think he's -- I think he appreciates

        11   the process.

        12          THE COURT:  Having considered your comments, what I'm

        13   going to do is call him back in and tell him I want him to stay

        14   today and do the best he can, and that if he feels the

        15   necessity to talk to me again on Monday morning, I will hear

        16   him, otherwise we'll go forward.

        17          MR. KELLY:  Thank you, your Honor.

        18          MR. KENDALL:  Thank you, your Honor.

        19          THE COURT:  Let's call him back.

09:43  20          Good morning again, Mr. Diaz.  Have a seat.  Thank you

        21   for being patient.  After talking over the matter and thinking

        22   about it, what I'm going to ask you to do is this: This is

        23   Friday.  I want you to, as they say in the vernacular, suck it

        24   up today, sit as a juror today, and if you feel after today and

        25   after the weekend when you've had a chance to rest up a little

1    bit that you need to talk to me again on Monday, I will hear

2    you.  I want you to understand how important your civic duty as

3    a juror is.  It's perhaps the most important civic duty that

4    citizens have is to serve on juries.  I do understand that lots

5    of people are under stress, lots of people have problems,

6    especially early on in jury trials, but they sometimes get

7    acclimated and get over that first hump.  I'm going to ask you

8    to work as hard as you can today.  We're going to go until

9    about 3 o'clock this afternoon.  Then we're going to be off

09:43 10   Saturday and Sunday.  You'll have a chance to rest up.

11        If you feel you need to talk to me about this problem

12   on Monday, I will hear you, otherwise I'm hoping that you will

13   get over that problem and that you'll be able to do your civic

14   duty.  Okay?

15        JUROR NO. 6:  I mean, am I allowed to refuse?  I

16   really don't -- my mind is made up and my heart is made up.  I

17   don't want to be a part of this.  I don't think sitting today

18   and having the weekend is going to change that, so I don't

19   know -- can I say no?  Am I allowed to?

09:43 20        THE COURT:  You know, I'm not going to put you in

21   shackles and force you to go back into the courtroom.  I'm

22   asking you as a federal judge to do your civic duty for one

23   more day to see if we can't get over this problem.  You know,

24   it's very, very important and very disruptive if we were to

25   excuse so many jurors that we wouldn't have a quorum to hear

1    this case at the end.  That would cause all kinds of trouble,

2    not only to the litigants who have spent lots and lots of

3    energy and time and money to get this case prepared, but to the

4    Court itself.  The whole system depends upon jurors that are

5    willing to serve, and none of them feel that it's a

6    convenience.  It's an inconvenience for every one of your

7    colleagues.  Every one of those jurors in that jury room is

8    inconvenienced and some are certainly feeling stress because

9    it's not an easy job.  Everybody knows that.  So I'm appealing

09:43 10    to you but I'm not going to physically force you to go into

11   that courtroom.

12        JUROR NO. 6:  I understand.  I don't mean to be

13   disruptive.  I know that this is causing an issue.  If you want

14   me to sit today, I will, but I know that Monday I'm going to

15   feel the same way so.

16        THE COURT:  All right.  Thank you.  I'm going to ask

17   you to withdraw one more time, talk this over with counsel, and

18   then we'll go from there.  Okay?

19        JUROR NO. 6:  Thank you.

09:43 20        THE COURT:  Thank you, Mr. Diaz.

21        Counsel?

22        MR. FRANK:  Your Honor, I think he said his mind is

23   made up.  He asked if he could refuse.  I personally think

24   there is a greater danger to the rest of the jurors from having

25   him sit than there is from excusing him at this point, but I do

1    think we should contemplate alternatives, like longer days.

2    I'm not going to concede to Mr. Kendall's request that he put

3    his case in during our case.  We just can't do that in good

4    faith.  I do think there are other alternatives.

5              THE COURT:  Let me hear from defense counsel.

6              MR. KELLY:  I think I've made my position perhaps more

7    clearer than I should have as to my thoughts on this juror.  I

8    think if he stays for the day what is the harm for one more

9    day.  If he really feels that way after getting a good night's

09:43 10   sleep over the weekend, he's going to, but I don't want his

11   concerns to inconvenience everyone else or require a change in

12   the schedule.  I think the schedule --

13             THE COURT:  I'm not going to change the schedule, at

14   least as of now.  I think we're making good progress.  I think

15   you, in good faith, tried to honor my instructions to move the

16   case along.  I'm not going to, at least at this point, change

17   the days that we've scheduled to have off, and that is one day

18   next week, one day the following week.  I haven't decided on

19   the first week in October.  We'll see how we're going at that

09:43 20   stage.  I'm convinced that the case is going to be completed by

21   the end of the first week in October at the latest.  I think it

22   might be completed before that.

23             In any event, I'm not going to deliberately alter the

24   schedule or make you try the case for eight hours a day because

25   of this.

1          Mr. Kendall, I haven't heard you comment.

2          MR. KENDALL:  I agree with Mr. Kelly's view.  I think

3    we should try to keep him.  I'm just loathe to lose jurors.

4          THE COURT:  Of course, I am too.  As you know, most of

5    the time on criminal cases, we generally go at 14.  Knock on

6    wood, we've been successful in avoiding mistrials because of

7    lost jurors.  Three more weeks with only two extras will be

8    problematic, although it has been my experience the more jurors

9    get invested in a case, the less likely they are to ask to be

09:43 10   excused.  This is unusual after three days in a very

11   interesting case that is high profile that somebody asks to be

12   out.  It's unusual.  You don't have jurors coming to me like

13   this.  This is not with precedence.

14         MR. KENDALL:  I understand.  In our prior case this

15   happened.  Our juror's wife had a brain tumor and had to have

16   surgery.  It was heartbreaking.  To lose two in the first week

17   makes me nervous.

18         THE COURT:  I don't want to take any more time out of

19   this day.  I am going to ask him to stay today.  I am going to

09:43 20   give him the option to see me again on Monday morning.  We'll

21   see what happens.

22         Any problem with that?

23         MR. KENDALL:  No, your Honor.

24         MR. KELLY:  No, your Honor.

25         MR. FRANK:  No, your Honor.

```
 1          THE COURT:  Call him in.  I'm going to ask him to stay
 2    today.  We'll excuse him at 3 o'clock.  We'll see what happens
 3    on Monday morning.
 4          Good morning once again, Mr. Diaz.  What I have
 5    decided to do, Mr. Diaz, is ask you to stay today for this day.
 6    If you have further problems that you want to talk to me after
 7    you've had a chance to rest up over the weekend on Monday
 8    morning if you want to see me, I will see you.  Okay?
 9          JUROR NO. 6:  Okay.  Thank you.
09:43 10      THE COURT:  I thank you for doing your civic duty.  I
11    want you to pay as close attention today as you can and do the
12    best you can and do your civic duty.  Okay?
13          JUROR NO. 6:  I will.
14          THE COURT:  Thank you very much.  Return to the jury
15    room.  Thank you.
16          Counsel, I do want to deal with the motion that was
17    filed over the evening.  I am now sensitive to what I deal with
18    outside the hearing of the general public and so I'm going to
19    adjourn this session, but when we go back, I'm going to go back
09:43 20  in, and we'll talk about the motion that was filed over the
21    night in open court.
22          MR. KENDALL:  Your Honor, there's been so many motions
23    filed.  I don't keep track of every.  I'm sure it's mine.
24          THE COURT:  It's your motion to exclude yearbooks.
25          MR. KENDALL:  That's his.
```

```
 1              THE COURT:  I'm sorry.  It's Mr. Kelly's motion.  I'm
 2    not going to do it here because this was in chambers and in
 3    private and, as you know, I have been criticized for that.
 4              MR. KENDALL:  Not by us.
 5              MR. KELLY:  I haven't had a chance to read the paper
 6    lately, but will do over the weekend.
 7              THE COURT:  Okay.  We'll see you back in open court.
 8              MR. KENDALL:  Thank you, your Honor.
 9              (End of in camera conference in chambers.)
10                        (Recess.)
11              THE CLERK:  You may be seated.  Court is now in
12    session.
13              THE COURT:  Good morning, counsel.  Before I call the
14    jury, I did want to address the motion that was filed overnight
15    by defendant Abdelaziz to exclude yearbooks.  The government
16    opposes that motion.  Apparently, there's going to be a witness
17    that is familiar with this issue, and I don't see there's a
18    hearsay problem, especially if a witness testifies and then is
19    shown a photograph that she can identify.  So I am going to
20    deny this motion without prejudice and revisit it if necessary
21    in context.
22              MR. KELLY:  Your Honor, I would only respectfully
23    request that the photos themselves go into the record and we
24    can exempt the yearbook and the rest be redacted.  These high
25    school yearbooks are usually filled with nonsense and I don't
```

1    know what relevance it has to these --

2          THE COURT:  You understand it's the whole yearbook

3    that's being offered?

4          MR. KELLY:  That's my impression.

5          THE COURT:  Is there any reason why it can't just be

6    the photograph?

7          MR. STEARNS:  I don't think so, your Honor.  If we

8    can, we'd like to use the yearbook with the witness, and then

9    we can enter in evidence copies of the pages of photos.

09:47 10          THE COURT:  As long as the yearbook doesn't go in as

11   an exhibit.  There's no need for that.

12          MR. STEARNS:  We'll provide copies of the photographs

13   from the yearbook.

14          THE COURT:  All right.  Fair enough.  All right.  Call

15   the jury.

16          (Jury enters.)

17          THE COURT:  Good morning, jurors.  Welcome back.  We

18   needed to resolve some issue outside of your hearing, but those

19   have been resolved and we will now proceed.

09:49 20          Mr. Brown, you're reminded you're under oath.

21          And Mr. Kendall, you may continue with

22   cross-examination.

23          CROSS-EXAMINATION OF KEITH BROWN (Continued)

24   BY MR. KENDALL:

25   Q.   Good morning.

1     A.    Good morning.

2     Q.    Thank you for joining us again.  I'd like to bring us

3     through some of the exhibits you read and just ask you to read

4     some additional parts and get your observations on a couple of

5     parts.

6     A.    Sure.

7     Q.    If we can start with Exhibit 38, please.

8           MR. KENDALL:  Mr. Carter, if we can highlight the top

9     e-mail that starts with "HB" and ends with with "BB".

09:50 10    Q.    So this is an e-mail from March 2013, correct?

11    A.    Yes, March 2, 2013.

12    Q.    The subject is "Potential trip - meet coaches if

13    possible", Correct?

14    A.    Yes.

15    Q.    Could you tell us -- well first, the prior e-mail that you

16    read from this chain at the very end, John Wilson refers to

17    AMS.  Do you understand AMS to be the designation for the

18    Amsterdam airport?

19    A.    I don't know that from the context of this e-mail, but I'm

09:50 20    familiar with Schiphol Airport.  I think AMS is the airport

21    code.

22    Q.    Great.  Thank you.  Could you just read to us this --

23          MR. KENDALL:  Can we highlight the HB to BB,

24    Mr. Carter?

25    Q.    If you can just read that to us this morning.

```
 1   A.   "Can't wait to see you at the airport!"
 2   Q.   If we could highlight the whole e-mail and then you can
 3   read it all at once, please.
 4   A.   Sure.
 5   Q.   Okay.  If you could read it to the jury, please.
 6   A.   "Can't wait to see you at the airport!  This morning I'll
 7   be racing from Johnny's swim meet to girls swim meet - if they
 8   finish on time, they will come with me to the airport.  Maybe
 9   we can call Rick about the one spot he has at USC - hate to
10   lose it if we want to go down this path.  Rick is meeting
11   Johnny next Saturday.  XOXOXOXO".
12   Q.   Okay.  So it's clear that the family is coming to see
13   Mr. Wilson at an airport, correct?
14   A.   It seems that Leslie is coming to the airport.  I'm not
15   sure about the family.
16   Q.   Okay.  Well, if they finish on time?
17   A.   Yes.
18   Q.   Okay.  And it's also a reference to the very last sentence
19   there is "Rick is meeting Johnny next Saturday", correct?
20   A.   Yes.
21   Q.   So looking at the date of this e-mail, that would assume
22   the first week of March he's meeting with Johnny, correct?
23   A.   Around first week of March, yes.
24        MR. KENDALL:  Okay.  Can we go to Exhibit 64, please.
25   Q.   You read part of this.  This is a June 4, 2013, e-mail
```

```
 1    from Rick Singer to Leslie Wilson.
 2              MR. KENDALL:  Could we go to the top paragraph,
 3    Mr. Carter, the three lines.  Highlight that.
 4    Q.   And if you could just read that to us, please.
 5    A.   "Leslie thank you.  Our business together is only between
 6    us.  We can have all three kids come and room together.  If you
 7    want to have the families or yourself call my office Mikaela
 8    can sign all three up 916489-8802.  If you want me to reach out
 9    to the families and provide college counseling help I will or
09:53 10    they can call me directly".
11    Q.   And do you recall that on Wednesday you read the bottom of
12    this e-mail that referred to an UCLA workshop/internship?
13    A.   Yes.
14    Q.   Okay.  Great.
15              MR. KENDALL:  If we could now go to Exhibit 63,
16    please.
17    Q.   And here I have to correct something.  It's really my
18    fault.  On Wednesday, I asked you a question and said that you
19    hadn't seen any e-mails from Jack Bowen, and I think you
09:53 20    agreed.
21    A.   I did not recall Jack Bowen, no.
22    Q.   Okay.  I want to correct.  The question I meant to ask was
23    you didn't see any e-mails between Jack Bowen and -- strike
24    that.
25              Let's just -- the mistake was mine, not yours.  I'd
```

|    |    |
|----|----|
| 1  | like you to start in on Exhibit 63 from the middle of the first |
| 2  | page where we see it goes from Jack Bowen.  Could you read that |
| 3  | all the way to the end of this e-mail chain.  And first, if you |
| 4  | can just tell me, you know that Jack Bowen has two e-mail |
| 5  | addresses?  One is at Menlo School and the other one is at |
| 6  | Yahoo.com, correct? |
| 7  | A.   Yes.  I see that. |
| 8  | Q.   And what is the subject of this? |
| 9  | A.   "Photos of Johnny". |
| 09:54 10 | Q.   And it's June 3, 2013? |
| 11 | A.   Yes. |
| 12 | Q.   Copies to John and Leslie Wilson? |
| 13 | A.   If you can start reading where it says "here's about" and |
| 14 | read to the end, please. |
| 15 | A.   Sure.  "Here's about 15 photos.  There's one where he's |
| 16 | out pretty high, too!" - with the dropbox URL -- "let me know |
| 17 | if any of these work or if we should have Leslie (or me) take |
| 18 | photos this week". |
| 19 | Q.   Signed "Best Jack", correct? |
| 09:54 20 | A.   Yes. |
| 21 | Q.   And that's indicating that this person by the name of Jack |
| 22 | Bowen is sending photos of Johnny, correct? |
| 23 | A.   Yes.  It appears so. |
| 24 | Q.   Okay.  You know, why don't we turn to the second page of |
| 25 | this, all the way at the end, please. |

```
 1              And why don't we read the e-mails from the earliest
 2    on up so we can see the sequence.
 3    A.    Okay.
 4    Q.    And just go up to where we read the Jack Bowen e-mail,
 5    please.
 6    A.    "I think Leslie already asked already but wanted to be
 7    sure (if we could) to get a couple of good photos of Johnny
 8    playing water polo.  I would love anything you have of him way
 9    out of the water with the ball passing or shooting.  I want it
10    for one of his apps, as well as my office in AMS as soon as
11    practical.  All we have are older shots from a couple of years
12    back.  I don't know if you are doing team action shots or if
13    Leslie or someone else like Joe could take some so he won't be
14    too embarrassed.  Let me know.  Have a great summer.  Let us
15    know about another giants game as well.  Thanks John".
16    Q.    And that's addressed to somebody named Jack?
17    A.    Yes.
18    Q.    Okay.  Now, the next e-mail actually starts at the bottom
19    of page 1.  Could you read that to us, on Sunday, June 2nd?
20    A.    Sure.  "Hi John, I've e-mailed Joseph Rozenfeld to see if
21    he has any of Johnny from last year.  Also, I don't think it
22    would be a problem at all for Leslie to come to workout
23    tomorrow or Wednesday and I announced that she's taking photos
24    for the Menlo athletics photo bank.  I could also take some
25    with my iPhone.  Not sure if that's good enough quality.  Best
```

1    Jack".

2    Q.    Okay.  And that's Jack Bowen at Menlo School?

3    A.    Yes.

4    Q.    Okay.  And then if you can read the e-mail above that on

5    Sunday, June 2 at 9:13 p.m.?

6    A.    He writes, "Here's one I found in my e-mail from Joseph

7    Rozenfeld from last year.  Will keep them coming if I find

8    more".

9    Q.    Okay.  And we know the prior -- the e-mail that -- the

09:57 10   first one you read that comes after that one in time shows he

11   sent a total of 15 photos, correct?

12   A.    That's what he said, yes.

13   Q.    Okay.  Now, I'd like us now to go to 65.  Well, one

14   second, please.  We're on 63 -- I'd like to go to 65.  Now,

15   Exhibit 65 is an e-mail from Leslie Wilson to John -- cc'd to

16   John Wilson at Staples.eu and to Rick Singer as the main

17   addressee, correct?

18   A.    Yes.

19   Q.    But, in the attachments, I noticed you used black and

09:57 20   white photocopies, not the original color photos.  Did you

21   select the pictures?

22   A.    I did not, no.

23   Q.    So you didn't even know that there was original color

24   photos in the original document, correct?

25   A.    I believe this is the only version I viewed.

```
 1    Q.    Okay.  I'd like to show you something we've marked as 65A.
 2    And do you agree with me that 65A is the same e-mail as in 65,
 3    correct?
 4    A.    I haven't done a side to side comparison, but I'll take
 5    your word for it.
 6    Q.    Okay.  I appreciate that.  And then if we could go to the
 7    first photos of 65A, you see it's a beautiful color photo,
 8    correct?
 9    A.    Yes.
10    Q.    Okay. If I were to suggest to you it's the same photo
11    that's the first photo in 65 that's black and white, would you
12    accept my representation?
13    A.    Again, not comparing them to side to side, yes, I accept
14    your representation.
15    Q.    And if we go to the third photo in 65 -- actually, if we
16    go to the second photo in 65A, you see -- you identified in the
17    black and white it's a man.  You see it's Johnny Wilson,
18    correct?
19    A.    I don't know what Johnny Wilson looks like.
20          MR. FRANK:  Your Honor, has this exhibit been offered
21    into evidence?
22          MR. KENDALL:  We'd like to offer it into evidence,
23    your Honor.
24          MR. FRANK:  I have no objection.
25          THE COURT:  It will be admitted.
```

| | |
|---|---|
| 1 | (Exhibit 65A admitted into evidence.) |
| 2 | Q.   And you don't know who Johnny Wilson is? |
| 3 | A.   I know from him from the context of the e-mails.   I |
| 4 | couldn't tell you what he looks like. |
| 5 | Q.   You said a man.   It's actually a boy, isn't it? |
| 6 | A.   It's a male. |
| 7 | Q.   All right.   Thank you.   And if you take a look at the |
| 8 | photo, you see that the hand holding the ball, he's palming it |
| 9 | right hand up? |
| 09:59 10 | A.   Yes. |
| 11 | Q.   And his thumb is over the blue stripe, and you can see the |
| 12 | little red dot where you fill the ball with air, correct? |
| 13 | A.   It's a black stripe and looks like a white dot, but |
| 14 | otherwise. |
| 15 | Q.   Yeah, white dot -- well, if it's black, I'll agree with |
| 16 | you.   Your eyesight is probably better than mine.   Okay.   So |
| 17 | you see that is 65A.   I'd now like you to just keep that in |
| 18 | mind. |
| 19 | And let's go to Exhibit 88.   You agree it's the same |
| 10:00 20 | photo? |
| 21 | A.   I don't see a photo. |
| 22 | Q.   Exhibit 88, second page? |
| 23 | A.   Yes.   Appears to be the same. |
| 24 | Q.   You see the thumb where that white dot is? |
| 25 | A.   I do. |

```
 1   Q.   Over the dark stripe?

 2   A.   Yes.

 3   Q.   So it looks like the photo we have here is something that

 4   a man by the name of Jack Bowen sent from the 15 in the

 5   Dropbox, correct?

 6   A.   I'm not sure I can say that.  I believe it's one of the

 7   pictures that Ms. Wilson sent to Mr. Wilson.  I don't know if

 8   it came from the Dropbox filed from Jack Bowen.  I can't say

 9   that.

10   Q.   Okay.  Fair enough.  I'd now like to ask you, looking at

11   Exhibit 88, do you see the address up in the top corner,

12   2 Fleur Street, Atherton, California?

13   A.   Yes.

14   Q.   When you were reviewing the exhibits, did you notice any

15   discrepancy about that address?

16   A.   No.  I believe that -- I did not review that address in

17   the document, but that address sounds familiar from another

18   exhibit.

19   Q.   Okay.  Let's go to those other two exhibits.

20        MR. KENDALL:  If we can go to Exhibit, first, 126,

21   please, Mr. Carter.  That's going to be the thank you letter

22   from the Trojan Fund.  If we go to the second page.

23   Q.   We see here July 28, 2014, Ron Orr of the Trojan Fund is

24   writing a thank you note to John and Leslie Wilson, correct?

25   A.   Yes.
```

1    Q.   But the address there is listed 2 Fleur Place, not 2 Fleur

2    Street.

3    A.   Okay.

4    Q.   Did you notice that before?

5    A.   I did not.

6    Q.   I take it you know your own address, don't you?

7    A.   I do.

8    Q.   Okay.  And you don't know which is the correct address in

9    Atherton, California, do you?

10:02 10   A.   I don't.

11   Q.   If we could go to Exhibit 710, please, and bring it in

12   next to the same address, please.  We see here Exhibit 710 is

13   from John Wilson to Rick Singer with a cc to Debbie Rogers and

14   it says "R awesome!  Hyannis Port Capital, Inc".  And what's

15   the address for Hyannis Port Capital, Inc.?

16   A.   He listed it as 2 Fleur Place.

17   Q.   Okay.  So you agree with me that we have two documents

18   here that show a different name for the Wilson address than

19   what appears on this document, correct, that appears on

10:02 20   Exhibit 88, the profile?

21   A.   Yes.

22   Q.   Okay.  If we could go back to the second page of

23   Exhibit 88, the profile, please.  If we go below the

24   photograph, we're going to see it says "Menlo School Water

25   Polo", correct?

1   A.   Yes.

2   Q.   And we saw in that earlier e-mail with the Dropbox that

3   Jack Bowen has a Menlo School e-mail address, correct?

4   A.   Yes.

5   Q.   But with respect to Stanford water polo club, you have not

6   seen anything that shows Jack Bowen is the coach of Stanford

7   water polo club, correct?

8   A.   I don't believe I have, no.

9   Q.   Okay.  So there's no document here that tells us whether

10:03 10   Bowen is part of Stanford or not, correct?

11   A.   I don't believe so, no.

12   Q.   Do you remember when we spoke on Wednesday we went through

13   Exhibit 89 that referred to some of the teams that Johnny was

14   on?

15   A.   I'd have to refresh.  I don't recall.

16   Q.   Sure.  Let's go to 89 then.  We'll pull that over.  Well,

17   we don't have to pull -- let's just look at 89, and then we'll

18   go back.  You see on 89 at the bottom where John Wilson asks,

19   and you read to the jury, "Does he have to play Stanford club

10:04 20   in addition to Sopen club and varsity swim team"?

21   A.   Yes.

22   Q.   Okay.  So there's a reference to two clubs here, Stanford

23   and Sopen, correct?

24   A.   Yes.

25   Q.   If we can go back to that second page of Exhibit 88, we

```
 1   see a reference to Menlo School water polo?
 2            MR. KENDALL:  No.  To Exhibit 88, please, to the --
 3   oh, yeah.  Thank you.  Thank you.
 4   Q.   We see a reference to the Menlo School water polo?
 5   A.   Yes.
 6   Q.   We see a reference to the Stanford water polo?
 7   A.   Yes.
 8   Q.   But we see no reference to the Sopen club, correct?
 9   A.   I don't see a reference to the Sopen club, no.
10   Q.   And finally, if we could go to the left side column in the
11   middle, do you see where the SATs are listed?
12   A.   Yes.
13   Q.   You've not seen any e-mails that describe his SAT or ACT
14   scores, have you?
15   A.   I don't believe so, no.
16   Q.   Okay.  So you don't know if that's accurate or his best
17   scores or anything else?
18   A.   No.
19   Q.   Okay.  And you'd agree with me you have not seen any
20   e-mail that shows John Wilson, the father, supplied any of the
21   information on Exhibit 88 to anybody, correct?
22   A.   I don't believe so, no.
23   Q.   Okay.  And you've not seen any e-mail in which he
24   acknowledges receipt of Exhibit 88?
25   A.   I don't recall, but I don't believe so, no.
```

1    Q.   And you have not seen any e-mail that indicates anybody

2    from the Wilson family correcting the address on Exhibit 88,

3    correct?

4    A.   No.  I have not seen that.

5    Q.   Or correcting the Stanford water polo coach's name,

6    correct?

7    A.   I have not seen that.  No.

8    Q.   Or asking for insertion of Sopen water polo, correct?

9    A.   Correct.

10:06 10   Q.   Or commenting on putting these particular SAT scores in

11   the document, correct?

12   A.   Correct.

13        MR. KENDALL:  I'm going to move off of that document.

14   I'd like to now go to Document 74, please.

15   Q.   And if we take a look, you read part of this e-mail, but I

16   want to read -- have you read the other part.  In the middle of

17   it, it says on August 11, 2013, at 2:20 p.m., it's John Wilson

18   sending an e-mail to somebody called R, which I suggest is Rick

19   Singer.  Do you see that?

10:07 20   A.   Yes.

21   Q.   Can you read the first two lines of that e-mail?  You

22   didn't have that when you read the other stuff.

23   A.   "I hope you are well.  Johnny now says that you are

24   filling out his applications except for the essays.  Is this

25   true?"

1    Q.    Okay.  And now if we could go see the response from Rick

2    Singer to Mr. Wilson.  If you could start with "we have

3    started" and read the three paragraphs of the entire e-mail.

4    A.    "We have started the common application.  I am waiting for

5    supposed work he did with his tutor this summer and the

6    assignments I provided.  All the apps will be done by me and

7    the editing of all the essays and short answers, too.  He just

8    has to get them to me and started.

9          Us -- Jovan and I meet in 2 weeks and at that time he

10:08 10   will give me his timeline for Johnny's stuff.

11          I am to see Johnny on the 24th afternoon".

12   Q.    Okay.  So he's saying he's going to meet with Johnny on

13   August 24th.  Is that correct?

14   A.    It doesn't say August, but that sounds correct.

15   Q.    Okay.  It's August 11th when he sends the e-mail and he

16   says on the 24th?

17   A.    That's a safe assumption.

18   Q.    Okay.  I appreciate that.

19          MR. KENDALL:  If we could turn to Exhibit 111, please.

10:08 20   Q.    Do you recall reading part of this e-mail to the jury that

21   refers to invoices?

22   A.    I do.

23   Q.    Okay.  You -- just one quick question.  You see the top

24   e-mail is between Debbie Rogers, Steve Masera, and Rick Singer,

25   correct?

1          MR. FRANK:  Is this exhibit in evidence?

2          MR. KENDALL:  I thought it was.  Did you not put it

3     in?

4          THE COURT:  Apparently, it's not in.

5          MR. KENDALL:  This is not in?  This is in the binder I

6     have from the government.  Then let's take it down then if it

7     isn't.  I thought it was.

8          Excuse me.  I may have the numbers mixed up.  Okay.

9     Never mind then.  I'd like to now go to Exhibit 122.

10:10  10          And, your Honor, Mr. Frank was kind enough to use a

11    redacted version when he put this in.  I'd like to unredact a

12    few of the numbers.  Just some of it is going to be relevant.

13          MR. FRANK:  I would just like the record to reflect

14    that the government redacted the exhibit at the request of the

15    defense and we've now assented to having the entire exhibit

16    unredacted, provided that it is unredacted in its entirety.

17          MR. KENDALL:  Your Honor, the only part that's

18    relevant is about the bottom five lines that deal with income

19    and below that and that's all I'm looking for.  It relates to

10:10  20    the tax issue.

21          MR. FRANK:  Your Honor, under 106, it's either

22    redacted or not.

23          THE COURT:  It's either all or none.

24          MR. KENDALL:  Okay.  So we'll put it all in.

25          THE COURT:  122 is admitted unredacted.

1          (Exhibit 122 admitted into evidence.)

2    Q.   Okay.  I'd like to take you down to the bottom of it where

3    it says "big incomes", and there are three listed.  Do you see

4    that?

5    A.   Yes.

6    Q.   If we could just show it.  It says "DGS net sales two

7    million", correct?

8    A.   Yes.

9    Q.   "Franklin 450k", correct?

10:11 10   A.   Yes.

11   Q.   "Staples 800k", correct?

12   A.   "With bonuses", yes.

13   Q.   Okay.  And then if you look at the line just below that,

14   it says "total about 2.3 million income".  Not quite sure how

15   they did the math, but I want you to look at the three inputs

16   there, DGS net sales 2, Franklin 450, and Staples 800.  If we

17   just add those up together, those three, we get 3.25 million,

18   correct?

19   A.   Not 2.5, but --

10:11 20   Q.   3.25.

21   A.   Yes.  Yes.

22   Q.   Those three, DGS, Franklin, and Staples, together,

23   combined 3.25.  It's just -- DGS makes up almost, but not quite

24   two-thirds of that amount.  Would you agree with me?

25   A.   Yes.

1   Q.   So the big income that year is DGS net sales, or at least

2   the projection at that time is about two-thirds of the income

3   that's listed in those three items?

4   A.   Okay.

5   Q.   Do you know anything about what DGS net sales is?

6   A.   I have no idea.

7   Q.   Do you know if DGS net sales has any relationship to HPC

8   Capital?

9        MR. FRANK:  Objection.  Foundation.

10:12  10        THE COURT:  Sustained.

11   Q.   I now would like to go to the tape that you played

12   yesterday of John Wilson on September 15th.  And what I've done

13   is -- if you remember, the call is broken up.  We have two

14   transcripts because they dropped the call in the middle.

15   A.   Yes.

16   Q.   Okay.  And I believe your transcripts were 561 and 562?

17   A.   Yes.

18   Q.   Okay.  I have transcripts I marked as 561A and 562A.

19   They've got a couple of small corrections in red.

10:13  20   A.   Okay.

21   Q.   I'd like to go through them with you.  If you agree with

22   the corrections, that's fine.  If not, say you don't, but I'd

23   like you to consider them.

24        MR. FRANK:  They are copies we haven't seen, your

25   Honor.

1          MR. KENDALL:  Sure.  We're pulling them up right now,

2     your Honor.

3          Mr. Carter, could you first go to 561A, page 1.  And

4     I'd like to play -- you can play it from the start at line 23.

5          (Audio recording played.)

6     Q.   Okay.  So you agree with me that's the opening of the

7     conversation, correct?

8     A.   Yes.

9     Q.   And the first thing Mr. Wilson is asking for is to have

10:14 10    some type of advisory, a structured relationship for Mr. Singer

11    to be talking to his daughters, correct?

12    A.   Yes.

13         MR. KENDALL:  Okay.  If we can go to page 2 and play

14    lines 3 to 6, please.

15         (Audio recording played.)

16    Q.   And Mr. Singer responds and he sets up an arrangement.

17    He's going to speak with his daughters monthly and more often,

18    if necessary, correct?

19    A.   Yes.

10:15 20    Q.   Okay.  And if we could continue playing down to line 19 on

21    that page.

22         (Audio recording played.)

23         MR. KENDALL:  Could we hold one second, please.  I

24    think I have an issue with the transcript.  May I confer for

25    one moment, your Honor?

|   |   |
|---|---|
| 1 | THE COURT:  Yes. |
| 2 | MR. KENDALL:  Excuse me, your Honor, we have got a few |
| 3 | corrections on the transcript.  We're not going to play the |
| 4 | voice.  We're just going to show you -- |
| 5 | Can you play the voice with the lines of transcript? |
| 6 | No?  Okay. |
| 7 | Q.   If we can go to 561A, page 2, lines 9 to 19.  Okay.  So |
| 8 | you see here the first thing Mr. Singer raises with Mr. Wilson |
| 9 | is test prep, correct? |

10:17 10  A.   Yes.

11  Q.   Okay.  And what Mr. Wilson tells them is they've done a

12  lot of test prep already.  They've been working on these exams

13  since they were freshman and now they're juniors, correct?

14      MR. FRANK:  Objection.  The witness has not had a

15  opportunity to compare the transcript with the audio.

16      THE COURT:  That's a fair -- an observation.

17      MR. KENDALL:  Your Honor, this is the transcript the

18  government gave us and is in evidence other than the red marks

19  that are just some changes.

10:18 20      MR. FRANK:  There's no transcript in evidence.

21      THE COURT:  The transcript is not.

22      MR. KENDALL:  Okay.  We'll go back to the other one if

23  that's what I should do, your Honor.

24      Can we go back to the other version, and we'll just

25  play the lines.

```
 1              THE COURT:  Okay.  We're now in 561?

 2              MR. KENDALL:  We'll go back to 561.  Yes, your Honor.

 3              THE COURT:  Page 2?

 4              MR. KENDALL:  Yes.

 5              (Audio recording played.)

 6    Q.   So we see here what the discussion is at the beginning of

 7    this conversation is Mr. Singer proposing test prep.  He wants

 8    to have a tutor meet with them every week.  He'll see them

 9    every fourth week and they'll have homework, correct?

10:20 10    A.   Yes, that's correct.

11              MR. KENDALL:  Okay.  If we can keep going, Mr. Carter.

12              (Audio recording played.)

13    Q.   You heard Mr. Wilson was the first one to bring up

14    engineering and science schools for his daughter, correct?

15    A.   Yes.  I believe that's correct.

16    Q.   And then Mr. Singer starts talking about how high the

17    scores is and how high the grades must be, correct?

18    A.   Yes.

19    Q.   You don't know whether what Mr. Singer is saying is true

10:23 20    or not?

21    A.   I have no basis.  No.

22    Q.   You don't know if that's what he's saying that to lull

23    someone into something or he's speaking the truth, correct?

24    A.   I have no basis to say.  No.

25              MR. KENDALL:  Okay.  Why don't we pick up at the next
```

```
 1    segment, please, Mr. Carter.
 2              (Audio recording played.)
 3              MR. KENDALL:  We'll stop there.
 4    Q.   You saw with a reference to a 35 or 36, Mr. Singer says,
 5    "That's what it's going to take to even play in the game on
 6    their own," right?
 7    A.   That's what it says, yes.
 8    Q.   You don't know what the daughters scored on their ACTs or
 9    SATs, do you?
10    A.   Mr. Wilson seems to imply they have a 32, but beyond that,
11    I don't know.
12    Q.   32 as a freshman.  You don't know what they've done as a
13    junior, do you?
14    A.   I don't.
15              MR. KENDALL:  Let's keep going here.  Please,
16    Mr. Carter, please keep playing.
17              (Audio recording played.)
18              MR. KENDALL:  If we can stop right there.
19    Q.   Now, you see that Mr. Singer is the first person to raise
20    Harvard and Yale in the conversation, correct?
21    A.   Yes.  That sounds correct.
22    Q.   Okay.  If we can keep going on.
23              (Audio recording played.)
24              MR. KENDALL:  If we can stop right there.
25    Q.   You see Mr. Wilson raises the issue of crew, correct?
```

```
 1    A.    Yes.

 2    Q.    But he talks about what time they can get, correct?

 3    A.    There's an unintelligible portion so it's not clear

 4    exactly what he's saying before that, but he's saying a really

 5    good time.

 6    Q.    "If they had a really good time, they could work on that

 7    and get a time of X," correct?

 8    A.    He says, "I can work on that and get a time of X", yes.

 9          MR. KENDALL:  Can we replay that, please.

10:27 10          (Audio recording played.)

11          MR. KENDALL:  Stop right there.

12    Q.    You see Mr. Singer is the first one to raise the issues of

13    doors, correct?

14    A.    Yes.

15          MR. KENDALL:  Okay.  If we could keep going, please.

16          (Audio recording played.)

17          MR. KENDALL:  Stop that, please.

18    Q.    Do you agree with me he says "if they had a really good

19    time, they could work on that"?

10:29 20    A.    I couldn't make out exactly what he says.  Whether it was

21    an "I" or something else.

22          MR. KENDALL:  Can you just play that one line earlier?

23          I'm sorry, your Honor.  We'll just leave it for the

24    jury's memory.  Just keep playing.

25          (Audio recording played.)
```

1          MR. KENDALL:  If we could stop right there.

2    Q.   Mr. Wilson, the first time he's talking about a money

3    issue refers to it as a contribution, correct?

4    A.   I'm not sure.  What's your question?

5    Q.   He uses the word "contribution"?

6    A.   Yes.

7    Q.   He doesn't use "bribe" or "cash" or anything else?  He

8    says "contribution"?

9    A.   He does.

10:30 10          MR. KENDALL:  Okay.  If we can keep playing, please.

11          (Audio recording played.)

12   Q.   You agree with me this is now the second time Mr. Singer

13   has raised Harvard, correct?

14   A.   Yes.

15   Q.   Okay.  And here he's talking about he's going to Harvard

16   next Friday because the President wants to do a deal with me.

17   In fact, it was Rudy Meredith who wanted to do a deal with him,

18   correct?

19   A.   I understand he was meeting with Mr. Meredith on the

10:31 20   15th -- on the 21st, yes.

21   Q.   Yes.  And so Mr. Singer is coming to Boston to meet Rudy

22   Meredith on September 21st, correct?

23   A.   Yes.

24   Q.   And 6 days prior to that on September 15th, he's telling

25   John Wilson he's coming to Harvard next Friday, the 21st,

1    because the President of Harvard wants to do a deal with him,

2    correct?

3    A.    That's what he says, yes.

4    Q.    And, in fact, the people who wanted to do a deal with him

5    were the FBI, correct?

6    A.    We were definitely part of his itinerary.

7    Q.    Okay.  And the President of Harvard was not?

8    A.    I don't know that.

9    Q.    Well, do you have any reason to believe that the President

10:32 10   of Harvard was meeting with him to do a deal with four

11   side-door --

12   A.    No.

13   Q.    -- donations?  Okay.  You're not meaning to imply that

14   that was even a remote possibility, are you?

15   A.    I am not.

16   Q.    Okay.  So -- and he's describing it that the President

17   actually is reaching out, wants to work with him.  "Why would

18   you go to somebody else if you could come to me?"  Correct?

19   A.    Yes.

10:32 20   Q.    What you testified earlier on Wednesday about con-men

21   using lulling stories to get their victims to believe them.

22   Would you agree with me that's an example of that?

23   A.    I don't know if "lulling" is the correct term for that.  I

24   would say that's maybe an exaggeration or a boast or a lie to

25   embellish his credentials.

1    Q.   Well, you'd agree with me there's a big difference between

2    an exaggeration and a flat out lie, correct?

3    A.   Yes, but again, I don't know if "lull" is the correct term

4    for that.

5    Q.   It's a flat out lie.  That you'll agree, correct?

6    A.   I have no basis to think that that's true.

7         MR. KENDALL:  Okay.  If we can keep on playing,

8    please.

9         (Audio recording played.)

10:33 10   MR. KENDALL:  If we can stop there.

11   Q.   So it's after Mr. Singer tells the exaggeration, the

12   embellishment of meeting the President of Harvard University to

13   discuss four side-door deals, that Mr. Wilson then asks would

14   it be something like water polo and a donation, correct?

15   A.   Yes.

16        MR. KENDALL:  Mr. -- so please keep on playing,

17   Mr. Carter.

18        (Audio recording played.)

19        MR. KENDALL:  You can stop right there.

10:35 20   Q.   So at this point in the call Mr. Singer has identified

21   Harvard, Stanford, Georgetown, BC, UCLA, and USC as all schools

22   that could do this door with a contribution, correct?

23   A.   Yes.

24   Q.   Six of the most respected and wonderful schools in the

25   country.  Would you agree?

```
 1   A.   Yes, however, he also noted --

 2   Q.   If you could just answer my question, please.

 3            MR. FRANK:  Your Honor, could the witness be allowed

 4   to answer the question?

 5            THE COURT:  Let him finish that question, the answer.

 6   A.   The part that gives me pause is he's noting the public

 7   schools can't do them because of scrutiny because everybody's

 8   watching them.

 9   Q.   Public schools are subject to legislatures and newspapers

10   and people with political agendas, correct?

11   A.   They're -- potentially they receive higher scrutiny, yes.

12   Q.   Okay.  And Mr. Singer has told him that the President of

13   Harvard University has decided to do this, correct?

14   A.   Which I think we both agree is probably a false.

15   Q.   No.  I'm asking you, correct, that's what Singer said?

16   A.   That is what Singer said.

17   Q.   Okay.  If you can just respond to my questions, please.

18   Okay.

19            So Mr. Singer has told him the President of Harvard

20   University, a private school, has formally approved this

21   program, correct?

22            MR. FRANK:  Objection.

23            THE COURT:  Sustained.

24   Q.   Has approved this program?

25            MR. FRANK:  Objection.
```

10:35 (at line 10)
10:36 (at line 20)

1          THE COURT:  Sustained.

2   Q.   Has approved these donations?

3          MR. FRANK:  Objection.

4          THE COURT:  Sustained.

5   Q.   Okay.  And he's listed five other private schools that

6   have participated in this situation, correct?

7   A.   He's listed other private schools, yes.

8          MR. KENDALL:  Okay.  If we could keep on playing,

9   please.

10:36 10          (Audio recording played.)

11          MR. KENDALL:  We can stop right there.

12   Q.   So now we hear that Mr. Singer's telling Mr. Wilson that

13   he's doing over 700 of these side-door contributions in this

14   year, correct, at 50 or 60 different schools?

15   A.   That's what he says, yes.

16   Q.   Okay.  And you said you expressed some concern about

17   public schools, correct?

18   A.   I didn't express concern about public schools, but --

19   Q.   You noted the comment there about public schools, correct?

10:37 20   A.   I did, yes.

21   Q.   Are you aware that UCLA is the number one rated public

22   university in the United States?

23   A.   I am not.

24   Q.   Are you aware that UCLA is a public university?

25   A.   I am not.

```
 1              MR. KENDALL:  Okay.  If we could keep on playing,
 2     please.
 3              (Audio recording played.)
 4              MR. KENDALL:  Okay.  If we can then play the next
 5     section, please.
 6              (Audio recording played.)
 7     A.    I'm sorry.  Where did you skip to?
 8     Q.    Page 13, please.  Are you following it on the screen?
 9     A.    It seemed to jump ahead.
10:39 10   Q.    It did.  There are some excerpts.
11              MR. KENDALL:  Page 13, line 12, please.
12              (Audio recording played.)
13              MR. KENDALL:  If we can then go to page 15, start at
14     line 7.
15              (Audio recording played.)
16              MR. KENDALL:  If you could stop there.
17     Q.    You see where Mr. Singer says, "I'll make them a sale or
18     something, because of where you live"?
19     A.    Yes.
10:41 20   Q.    And then Mr. Wilson has a laugh, and then he says, "That's
21     probably more than we'll want to go".  He's referring up to
22     line 3 whether or not to to donate $1.2 million, correct?
23              MR. FRANK:  Objection to what he's referring to.
24              THE COURT:  Sustained.
25              MR. KENDALL:  I'll rephrase, Your Honor.
```

1    Q.   He says, "That's probably more than we'll want to go",

2    correct?

3    A.   He does, yes.

4    Q.   And if you look at line 3 and 4, he says "You're saying

5    that's the minimum of 1.2 on the side-door", correct?

6    A.   Yes.

7         MR. KENDALL:  Okay.  If we could keep on going.

8         (Audio recording played.)

9         MR. KENDALL:  If you could stop right there.

10:43 10   Q.   So when Mr. Wilson's asking him for schools where the

11   contribution is half or three hundred, you agree with me

12   Mr. Singer gives him a whole list of schools, correct?

13   A.   Yes.

14   Q.   Let's count them: Georgetown, Boston College, Georgia

15   Tech, USC, UCLA, Berkeley, Duke.  It's about seven schools?

16   A.   I wasn't counting, but that sounds correct.

17   Q.   And would you agree with me both Berkeley and UCLA are

18   public schools in California?

19   A.   I believe Berkeley is a public school.  Based on the name,

10:43 20   UCLA sounding like a public school, but again, I don't know for

21   sure.

22         MR. KENDALL:  Okay.  Why don't we keep on playing,

23   please.

24         (Audio recording played.)

25         MR. KENDALL:  Can you stop right there.

1    Q.   Mr. Wilson asks, "What would it have to be in terms of

2    crew I guess.  You'd have to be a good enough athlete?"  Is

3    that his question?

4    A.   Yes.

5            MR. KENDALL:  Okay.  We can keep on playing.

6            (Audio recording played.)

7            MR. KENDALL:  If we can stop right there.

8    Q.   And so you agree with me Mr. Wilson asks if it's tax

9    deductible, and Mr. Singer assures him that it is, correct?

10:46 10   A.   Yes.

11   Q.   And he refers to a nonprofit 501(3)(c).  Do you know what

12   a 501(c)(3) organization is?

13   A.   I believe it's a reference to the IRS code for a --

14   Q.   For a nonprofit charity?

15   A.   Yes.

16   Q.   Thank you.

17           MR. KENDALL:  Okay.  If we can keep on playing.

18           (Audio recording played.)

19   Q.   If we can go back to this little section.  You've done a

10:47 20   lot of work with financial institutions, correct?

21   A.   I've done some work for financial institutions, yes.

22   Q.   And you deal with securities?

23   A.   I do.

24   Q.   You know what Goldman Sachs is, don't you?

25   A.   Yes.

1  Q.   Why don't you describe what Goldman Sachs is.

2  A.   It's a large publicly traded investment bank.

3  Q.   Generally considered one of the most successful and

4  respected, based upon your expertise?

5  A.   They're certainly one of the largest, yes.

6  Q.   Okay.  One of the most successful?

7  A.   I don't have a basis to say that, but yes.

8  Q.   Okay.  And do you know of any association or relationship

9  that Mr. Wilson has with Goldman Sachs?

10:48 10  A.   I don't have a basis to say either way.  I don't know of

11  one.

12  Q.   Do you know of any relationship or association that

13  Mr. Singer has with Goldman Sachs?

14  A.   I'm not aware of one.

15  Q.   And he refers to "The guys from Goldman called me.

16  They've got four families that have seniors right now."  Do you

17  see that?

18  A.   Yes.

19  Q.   And then he refers to "They're being quoted by the

10:48 20  development office".  Do you know what a development office is

21  at a university, don't you?

22  A.   Yes.

23  Q.   Okay.  And you know that development offices raise money

24  for universities, correct?

25  A.   Yes.

```
 1    Q.   And based upon your investigation of Mr. Meredith, you
 2    know that development offices get involved in admissions in
 3    return for donations?
 4         MR. FRANK:  Objection.  Foundation.
 5         THE COURT:  Sustained.
 6    Q.   Okay.  Did you do a debriefing of Rudy Meredith?
 7    A.   I did.
 8    Q.   And, in that debriefing, did Mr. Meredith say things that
 9    were against his interest and admit things that were contrary
10    to his interest?
11         MR. FRANK:  Objection.  Beyond the scope.
12         THE COURT:  Sustained.
13         MR. KENDALL:  Okay.  Could we go back to the next tape
14    where the -- after the break.  Randall, let's start at page 1,
15    line 10, please.
16         (Audio recording played.)
17         MR. KENDALL:  If we could stop right there.
18    Q.   You hear Mr. Wilson say "Unless they can really get some
19    national times in", correct?  Referring to his daughters
20    getting national times in, correct?
21    A.   Yes.
22    Q.   He doesn't say anything about falsifying or faking times,
23    correct?
24    A.   My understanding of this is he's referring to --
25    Q.   I'm not asking your understanding.  I'm asking what the
```

1    tape says in the transcript, please.

2    A.   Well, I think the context is important, but yes.

3    Q.   It says "they can" -- "unless they can really get some

4    national times in crew you're saying it doesn't really matter".

5    Is that what the tape says?

6    A.   Again, I think that's out of context.

7    Q.   Fine.  Thank you.  I'm just asking what the tape says.

8    A.   That's what the tape says.

9    Q.   Thanks.

10:51 10        MR. KENDALL:  If we can then keep going.

11            (Audio recording played.)

12        MR. KENDALL:  Stop right there.

13   Q.   He says that for heavyweight versus lightweight crew for

14   women that a heavyweight is 150 pounds.  Do you know if that's

15   true or not?

16   A.   I don't.

17   Q.   Okay.  As far as your position is, it could be completely

18   made up, correct?

19   A.   Yes.

10:53 20        MR. KENDALL:  Okay.  Let's keep going.

21            (Audio recording played.)

22        MR. KENDALL:  Let's stop there.

23   Q.   And Singer says "So that's what they gotta be and then

24   they got to crush it and they gotta go to nationals and they

25   gotta really engage in the sport".

```
 1              That's what he said, correct?
 2    A.   That's what he said.
 3    Q.   And you know the expression "crush it" means when you do
 4    something really great in sports or some other activity?
 5    A.   Yes.
 6    Q.   There's no discussion here about fabricating times, is
 7    there?
 8    A.   Again, I think the context --
 9    Q.   I'm not asking for your context judgment.  I'm asking of
10:53 10   you what the tape says, please.  It talks about crushing it.
11    A.   The tape says it in context with the rest of the
12    conversation.
13    Q.   Okay.  He says you've got to crush it, correct?
14    A.   He does, yes.
15    Q.   "They got to crush it and they gotta go to nationals",
16    correct?  And "they gotta really engage in the sport".  That's
17    what he says, correct?
18    A.   Yes, which I think makes sense in the context of the
19    broader conversation.
10:53 20   Q.   Can I ask you, for the rest of my questions, to please
21    answer my questions and not give context?
22              MR. FRANK:  The witness is --
23              MR. KENDALL:  Your Honor, I've not asked for context
24    at all.
25              THE COURT:  Just go forward.
```

1              MR. KENDALL:  Okay.  Keep playing, please.

2              (Audio recording played.)

3              MR. KENDALL:  Why don't we stop.

4              And then if we could go --

5              I'm almost at the end, your Honor.

6    Q.    Would you agree with me this tape is September 15th?

7    A.    Yes.

8    Q.    And that's the week before Mr. Singer was arrested,

9    correct?

10:55 10   A.    I don't know that he was arrested.  I know he was

11   approached.

12   Q.    Excuse me.  I appreciate that.  Let me take back that

13   question.

14   A.    Sure.

15   Q.    Mr. Singer had an interaction with the FBI on

16   September 21st?

17   A.    That's my understanding, yes.

18   Q.    I don't mean to imply there's an arrest at all.  I'm sorry

19   I even said that.

10:55 20   A.    It's fine.

21   Q.    And you agree with me, in all of the tapes you looked at,

22   there never once was a statement about cheating on tests or

23   SATs for the Wilson children, correct?

24   A.    I don't recall ever hearing that.

25              MR. KENDALL:  If I may have one moment, your Honor.

```
 1              THE COURT:  Yes.
 2              MR. KENDALL:  No further questions, your Honor.
 3                    CROSS-EXAMINATION OF KEITH BROWN
 4    BY MR. KELLY:
 5    Q.   Good morning, Agent Brown.
 6    A.   Good morning.
 7    Q.   I think you -- I represent Gamal Abdelaziz in this matter.
 8    A.   Yes, sir.
 9    Q.   I think you indicated a couple times already that your
10    involvement in this case wasn't very extensive, right?
11    A.   Correct.
12    Q.   And you weren't the FBI case agent on this matter, were
13    you?
14    A.   I was not.
15    Q.   An FBI case agent generally has the most knowledge about a
16    particular case, right?
17    A.   The case team, yes.  I think equally, yes.
18    Q.   Well, the case agent is in charge of the case.  That's why
19    he or she is called the case agent, right?
20    A.   Yes.  We typically have one agent as the primary, but in
21    these types of large investigations, it's not as if the other
22    parties don't equally participate.  It's usually a team effort
23    with one person listed at the top.
24    Q.   Sure.  And who was the FBI case agent on this matter?
25    A.   Special Agent Laura Smith.
```

```
 1   Q.   And is she anywhere in the courtroom today?

 2   A.   Yes, she is.

 3   Q.   And where is she?

 4   A.   Agent Smith is right there (indicating).

 5   Q.   Okay.  Now, would it be fair to say she knows a lot more

 6   about this case than you do?

 7        MR. FRANK:  Objection.  Foundation.

 8        THE COURT:  He can answer the question.

 9   A.   Yes.

10   Q.   And it's not you, but it's the prosecution team who

11   decides whether to call her as a witness, right?

12   A.   Sure.

13   Q.   But you testified that you, of course, did do some work on

14   this case, right?

15   A.   Yes.

16   Q.   For instance, you -- I think you testified that you

17   monitored the wiretap in the summer of 2018 and then you did

18   some more work in September of 2018, correct?

19   A.   Very limited in September, but yes.

20   Q.   Okay.  Then you got busy on other FBI matters, right?

21   A.   I was busy throughout, yes.

22   Q.   All right.  You got busy on a matter that didn't pertain

23   to this case after September 2018?

24   A.   And prior to that, yes.

25   Q.   All right.  Well, so you personally did not do any
```

```
 1    investigation of Gamal Abdelaziz, right?
 2    A.    I did not, no.
 3    Q.    And the wiretap that's been of some discussion here, he
 4    wasn't intercepted on that wiretap, was he?
 5    A.    The Court authorized wiretap, I don't believe so, no.
 6    Q.    Right.  The Title III that the Court authorized the summer
 7    of 2018 Mr. Abdelaziz was never intercepted on, correct?
 8    A.    That's my understanding, but I haven't reviewed all the
 9    calls.
10    Q.    Okay.  Fair enough.  And is it your understanding that
11    there are only two calls involving Mr. Abdelaziz in this case?
12    A.    I don't know that.
13    Q.    Okay.  And do you -- is it your understanding that the two
14    calls occurred after his daughter was accepted at the school?
15          MR. FRANK:  Objection.  Beyond the scope.
16          THE COURT:  Sustained.
17    Q.    So you have no idea if there's one call involving him,
18    two?  You just don't know?
19          MR. FRANK:  Objection.
20          THE COURT:  Sustained.
21    Q.    All right.  Well, as one of the monitoring agents on the
22    wiretap, you have to do certain things like minimize calls,
23    right?
24    A.    Sure.
25    Q.    And minimization in the context of a wiretap is very
```

1    important, right?

2    A.   Absolutely.

3    Q.   You don't want to be intercepting conversations that are

4    irrelevant or private nature that don't pertain to the

5    investigation, right?

6    A.   Yes.

7    Q.   That's the general idea behind minimization, right?

8    A.   Yes.

9    Q.   And so before you participate as one of the monitors on

11:01 10   the wiretap, you look at the court order to see who you're --

11   what phone you're tapping, right?

12   A.   I believe I read the affidavit, yes.

13   Q.   Okay, because that gets you prepared to do the

14   minimization, right?

15   A.   The minimization instructions are part of that.

16   Q.   All right.   And do you recall on that affidavit that you

17   read that the federal court was told that up until the summer

18   of 2018 all the money Rick Singer gave to Donna Heinel went to

19   USC's athletic programs?

11:02 20        MR. FRANK:  I object to this as beyond the scope, your

21   Honor.

22        MR. KELLY:  He testified he read the affidavit.

23        THE COURT:  I think it is beyond the scope.

24   Sustained.

25   Q.   Well, in your discussions with your fellow agents in this

         1   case, did you ever learn that it was the FBI's position that up

         2   until the summer of 2018 all the money --

         3            MR. FRANK:  Objection.  Hearsay.

         4            THE COURT:  This is inappropriate.  If it's beyond the

         5   scope, you shouldn't be asking the question in which you put

         6   all the information that you want on the record.

         7            MR. KELLY:  All right.  Could I show the witness, just

         8   the witness, Exhibit 9025, please.

         9   Q.   Do you see that, sir?

11:02 10   A.   I do.

        11   Q.   Is that an affidavit in support of the wiretap?

        12            MR. FRANK:  This remains beyond the scope and it is

        13   also hearsay.

        14            MR. KELLY:  Judge, he just said he was a monitoring

        15   agent and he read the affidavit.  I'm trying to refresh his

        16   recollection as to what he saw.

        17            THE COURT:  You can show him the document to refresh

        18   his memory about something that he testified to earlier.

        19   Q.   Now looking at the -- if you'll keep scrolling, please, on

11:03 20   this document --

        21            MR. FRANK:  Your Honor, he was asked no questions

        22   about this document.

        23            MR. KELLY:  I'm seeing if it refreshes his

        24   recollection as to what he read in that affidavit before he

        25   became a monitor for the wiretap.

1          MR. FRANK:  He's not been asked the questions and he

2     does not remember.

3          THE COURT:  Ask him to read the affidavit, take the

4     affidavit down, and then ask him a question.

5     Q.   Sure.  Can you read this excerpt slowly to yourself?

6     A.   I'm sorry.  Which excerpt?

7     Q.   We'll begin at the top.  It's only 5 pages.

8     A.   One point that might be relevant.  This appears to be a

9     version of the affidavit from later in the summer.  I don't

11:05 10   know if I monitored the wire after that point.  I believe I

11    monitored it prior to this affidavit.

12    Q.   Why don't we scroll to the bottom and we'll see the date,

13    please.  And if we can keep going to the very end.

14    A.   It's referencing August 2018.

15    Q.   Is that the summer of 2018?

16    A.   It is, but I don't believe I monitored the wire in August.

17    Q.   So this is the one you recall not seeing?  Is that your

18    testimony?

19    A.   I can't say either way.  Based on this, it appears there

11:05 20   were multiple versions of the affidavit.  I would have reviewed

21    it prior to my first shift.

22    Q.   Well, let's see if you can read the part just above this

23    signature line, please.

24    A.   "I, Laura Smith" --

25    Q.   No.  I'm sorry.  To yourself, please.

```
 1              MR. KELLY:  Mr. Carter, above that, please.  Keep
 2    going.  Keep going.  Keep going.  Keep going.  Right there.
 3    Q.    Read paragraph C to yourself and see if it refreshes your
 4    recollection as to whether you ever read this or not.
 5              Have you had a chance to look at that, sir?
 6    A.    Down to the end of the page.
 7    Q.    Does that refresh your memory as to whether or not you
 8    read this particular affidavit that was submitted to the Court?
 9    A.    It doesn't.  It was in the summer of 2018.  I can't recall
10    what was in the affidavit at the time.  But again, I'm not sure
11    if I even reviewed this version of the affidavit based on the
12    sessions -- the wire dates that I did monitor.
13    Q.    Okay.  So the wire --
14              MR. KELLY:  We'll put this down, please.
15    Q.    The wire, as you testified, occurred in the summer of
16    2018, right?
17    A.    Yes.
18    Q.    And before you became a monitor, you did, in fact, read
19    the Court order and the affidavit to the application so you'd
20    have some sense of what was going on, right?
21    A.    Yes.
22    Q.    And you just don't recall as you sit there whether you
23    read that particular affidavit; is that fair?
24    A.    Yes.
25    Q.    Now -- and do you recall that Mr. Abdelaziz's donation was
```

1    in March of '18, not the summer?

2    A.    I don't recall.

3    Q.    Well, okay.  You do obviously know that Rick Singer was a

4    cooperating witness for the FBI in this case, right?

5    A.    I'm not authorized to confirm or deny who cooperated with

6    the government unless ordered to do so by the Court.

7    Q.    Well, okay.  We're in a trial here, and I'm asking you,

8    did Rick Singer make tapes for the government?

9    A.    I believe he did, but I wasn't involved in that.

11:08 10   Q.    Would that be considered a form of cooperation, if you

11   make tapes for the government?

12   A.    Yes.

13   Q.    And if you sat down with the government and allowed

14   yourself to be interviewed, would that be considered a form of

15   cooperation?

16        MR. FRANK:  This is well beyond the scope, your Honor.

17        THE COURT:  Well, he can have that question.

18   A.    Submitting to an interview doesn't necessarily indicate

19   whether someone's cooperating or not.

11:08 20   Q.    What if you repeatedly submit to interviews, does that

21   mean -- does that suggest you're cooperating?

22   A.    It can.

23   Q.    But you're not authorized to tell us now today whether he

24   was a cooperating witness for the FBI?

25   A.    Unless ordered by the Court, I cannot.

```
 1    Q.    And that's because of some FBI protocols?

 2    A.    That's what I was instructed, yes.

 3    Q.    And who instructed you on that?

 4    A.    The FBI Boston office.

 5    Q.    So it's the Boston FBI's position that if a federal agent

 6    testifies in court in a federal case, he can't confirm or deny

 7    whether someone is a cooperating witness?

 8    A.    Unless ordered by the Court, I can't confirm or deny if

 9    somebody is.

11:09 10    Q.    There's a difference between informants and cooperating

11    witnesses, right?

12    A.    Yes.  Mr. Singer cooperated with the government, yes.

13    Q.    Okay.  And handling cooperating witnesses and handling

14    informants is tricky business, right?

15    A.    It can be.

16    Q.    I mean, the FBI can locate Mr. Singer if the prosecution

17    team asked the FBI to do it, can't they?

18          MR. FRANK:  Your Honor.

19          THE COURT:  This is going beyond, I think, the scope

11:10 20    of this witness' testimony.

21    Q.    Well, are you aware of whether Mr. Singer is alive or not?

22          MR. FRANK:  I object.

23          THE COURT:  He can answer that question.

24    A.    I have no reason to think he's not.

25    Q.    And wasn't he recently here in Boston a month ago?
```

```
 1    A.   I understand that he was, but again, I wasn't involved in
 2    that.
 3    Q.   Okay.  Did you understand he was interviewed here in
 4    Boston about a month ago --
 5              THE COURT:  Sustained.
 6    Q.   And are you aware he's not being called as a witness in
 7    this case?
 8              THE COURT:  Sustained.
 9    Q.   Let me ask this.  It's not you but it's the prosecution
10    team who decides who the witnesses are for the government,
11    correct?
12    A.   Of course.
13    Q.   All right.  And are you aware that when Mr. Singer was
14    cooperating with the government he deleted hundreds of texts on
15    his phone?
16              MR. FRANK:  Objection.
17              THE COURT:  Sustained.
18              And we're going to take the morning recess at this
19    point.  Mr. Brown, you may step down, please.
20              (Jury exits.)
21              THE COURT:  Please be seated, counsel.
22              How much longer on your cross, Mr. Kelly?
23              MR. KELLY:  I suspect 45 minutes if I go -- it's hard
24    to judge on some of these questions.  But the way it's going,
25    it will probably be quicker than I thought.  So I would
```

11:10 (line 10)
11:12 (line 20)

```
 1   respectfully suggest --
 2            THE COURT:  Contrary to Mr. Kendall's half hour that
 3   was over an hour.
 4            MR. KELLY:  All right.  Well, I don't want to fall
 5   into that trap.  I'll say 45 minutes.
 6            MR. KENDALL:  We had tape issues.  It didn't go as
 7   smoothly as I hoped, and you are quite right.
 8            THE COURT:  So you think about a half hour?
 9            MR. KELLY:  I think it might go 45 minutes, your
10   Honor.
11            THE COURT:  All right.  And then if we get beyond
12   that, there will be redirect, I presume?
13            MR. FRANK:  It will be brief.
14            THE COURT:  All right.  And then we still have your
15   out of town witness, Mr. Frank?
16            MR. FRANK:  Yes, your Honor.
17            THE COURT:  All right.  We're going to go until --
18   we'll have a lunch break and then go to about three this
19   afternoon.  The Court has other afternoon business that I need
20   to attend to, but we will go to about three.
21            Is there anything else that needs to come to my
22   attention before we recess?
23            MR. KELLY:  No, your Honor.
24            MR. KENDALL:  No, your Honor.
25            THE COURT:  We're in recess for 15 minutes.
```

```
 1              (Recess taken 11:13 a.m. to 11:32 a.m.)
 2    THE COURT:  Good morning, jurors.  We're ready to resume.
 3         Mr. Brown, you remain under oath.  You're reminded.
 4         Mr. Kelly, you may continue with cross-examination.
 5         MR. KELLY:  Yes.  Thank you, your Honor.
 6    BY MR. KELLY:
 7    Q.   Good morning again, Agent Brown.
 8                   On direct, you were asked about an e-mail that
 9    Mr. Singer sent with a fake profile regarding Sabrina
11:32 10   Abdelaziz.  Do you recall those questions?
11    A.   Yes.
12    Q.   I'd like to show you that e-mail again and ask you a few
13    questions.  It's Exhibit 352 in evidence.
14    A.   Yes.
15    Q.   Now, this is a critical e-mail in this case regarding
16    Mr. Abdelaziz, isn't it?
17         MR. FRANK:  I object.
18         THE COURT:  Sustained.
19    Q.   Well, based upon your experience in this case, do you
11:32 20   think this is an important e-mail?
21         MR. FRANK:  I object.
22         THE COURT:  Sustained.
23    Q.   All right.  Well, let's talk about this e-mail, okay?
24              Look in the middle of the e-mail, please.  Originally
25    this was a message from Laura Janke to Rick Singer, correct?
```

```
 1    A.   Yes, correct.
 2    Q.   And she's attaching a profile for Sabrina, asking for
 3    various things, including telling Singer, "Let me know if you
 4    want me to add any other awards to her profile or if you think
 5    that's enough."
 6    A.   The only clarification, I don't know if there's an
 7    attached file to this.  It doesn't appear that there is.
 8    Q.   Well, I'll get to that in a second.  In fact, I'll get to
 9    it right now.  There's a second page to this, right, Mr. Brown?
11:33 10    A.   Okay.
11    Q.   Okay.  So let's go back to the other page, please.
12              So Laura Janke worked for Rick Singer, right?
13    A.   Again, I don't know what her relationship was with
14    Mr. Singer specifically.  I generally know that she had some
15    sort of business relationship with him, yes.
16    Q.   Are you aware she's the one who added awards to profiles?
17              MR. FRANK:  Objection.  Foundation.
18              THE COURT:  He can ask whether he's aware of it.
19    A.   Not specifically, no.
11:34 20    Q.   You don't know?
21    A.   No, I don't know what her relationship was.
22    Q.   So let's look carefully now at this e-mail.  Look at
23    the -- it's from Rick Singer, okay, right?
24    A.   Yes.
25    Q.   It shows to gamalaziz@cox.net?
```

```
 1    A.   Yes.

 2    Q.   It's going to him on August 8 at 1:20 and 47 seconds,

 3    right?

 4    A.   Yes.

 5    Q.   Sir, you have no evidence that my client ever replied to

 6    this, do you?

 7    A.   Not that I have seen personally, no.

 8    Q.   Do you think the prosecutor might have shown that to you

 9    before you testified if it existed?

11:35 10    A.   I think that's a safe assumption, yes.

11    Q.   If he had replied, "Looks great, add some more fake

12    awards," you might have seen that e-mail, right?

13    A.   Yes.

14    Q.   Okay.  So you've seen and know of no evidence that my

15    client ever replied to this e-mail, right?

16    A.   I have not seen that, no.

17    Q.   And you've seen and know of no evidence that he forwarded

18    this e-mail?

19    A.   I have not, no.

11:35 20    Q.   In fact, you have seen and know of no evidence that he

21    opened the attachment to this e-mail, right?

22    A.   No.

23    Q.   Not aware of any, right?

24    A.   Not that I've seen, no.

25    Q.   Okay.  And do you think that evidence would have been
```

```
 1    brought to your attention before you testified in Federal Court
 2    if such evidence existed?
 3    A.    Yes.
 4    Q.    Okay.  In fact, you know when Singer sent this to the
 5    cox.net e-mail address, you know that 13 seconds later he got a
 6    bounceback that says, "I'm not using this anymore.  Here is my
 7    new gmail address."  You know that, right?
 8    A.    I don't know that.  I haven't seen that e-mail.
 9    Q.    Are you testifying that you were never shown an e-mail
10    reflecting that this thing bounced back to Singer within 13
11    seconds --
12              MR. FRANK:  Objection.  Misstates.
13    Q.    -- and said --
14              THE COURT:  Well, you can ask the question.  Go ahead.
15    Q.    As part of this chain you weren't shown that, "Please be
16    advised I've change my e-mail address to gamalaziz797@gmail?
17    A.    I don't recall seeing that, no.
18    Q.    And do you recall seeing what Singer did next?  He tried
19    to forward this chain to the gmail address but he made a typo,
20    right?
21    A.    I don't recall seeing that.
22    Q.    That was never shown to you?
23    A.    I don't recall, no.
24              MR. KELLY:  Let's see if I can show you the rest of
25    the chain here.  Let me show you Exhibit 9024 here.  Just the
```

witness.  Just the witness.

Q.   Okay.  Do you recognize that e-mail bounceback away

message 13 seconds later on your screen?

A.   I haven't seen it -- I don't recall seeing it before, if

that's your question.

Q.   Can you tell me what it is?

A.   It appears to be an auto reply from gamalaziz@cox.net to

rwsinger@gmail.com.

Q.   What does the message say?

A.   "Please be advised that I've changed my e-mail address to

gamalaziz797@gmail.com."

Q.   What's it dated?

A.   Dated August 8, 2017, and the time is 1:21 a.m.

        MR. KELLY:  I offer this exhibit.

        MR. FRANK:  No objection.

        THE COURT:  It will be admitted, 9024.

        (Exhibit 9024 admitted into evidence.)

Q.   Okay.  So this is the second of the three e-mails in the

chain where it says, "Please be advised I've changed my e-mail

address to gamalaziz797@gmail.com, right?

A.   That what it says, yes.

Q.   And you weren't shown this before you came to court today

by the prosecutor?

A.   Not that I recall.

Q.   Okay.  And did you see the third and final part of the

1    chain where Mr. Singer tries to send it to this e-mail address?

2    Do you see that?

3          MR. FRANK:  I object to the characterization of it as

4    a chain.

5          THE COURT:  I can't --

6          MR. FRANK:  I object to the characterization as a

7    chain.

8          THE COURT:  It's sustained.

9    Q.   Let me show you Exhibit 351.

11:38 10       MR. KELLY:  Just the witness.  Blow up the top,

11   please.

12   Q.   That's two minutes later, right?

13   A.   Yes.

14   Q.   What's the date?

15   A.   Same date, August 8, 2017.

16   Q.   And who is it from?

17   A.   Rick Singer.

18   Q.   All right.  And who is it to?

19   A.   It's gamalaziz797@gmail.com.

11:39 20  Q.   It's missing a letter, isn't it?

21   A.   Yes.

22         MR. KELLY:  I move to have Exhibit 351 admitted,

23   please.

24         MR. FRANK:  No objection.

25         THE COURT:  It will be admitted.

```
 1              (Exhibit 351 admitted into evidence.)
 2              MR. KELLY:  Mr. Carter, can you put these three up on
 3      the screen so I can ask question about them side by side.
 4              Let's put up 9024 and 351, please.
 5      Q.   On the right is Exhibit 9024 now in evidence and, Agent
 6      Brown, that's in response to the original e-mail from Singer to
 7      Gamal at his cox.net address, right?
 8      A.   I don't know for sure but that seems to make sense, yes.
 9      Q.   Okay.  And is the message telling Mr. Singer that the
11:40 10   e-mail address has been changed?
11      A.   Yes.
12      Q.   All right.  And then if you go to the one on the left,
13      which is Exhibit 351, look at the "To" line where Singer sends
14      this e-mail.  He forgets the letter "G," right?
15      A.   Yes, it appears so.
16      Q.   It's off in cyberspace, right?
17      A.   Yes.
18      Q.   And could that perhaps explain the mystery here as to why
19      there's never a reply to Exhibit 352?
11:40 20   A.   That is certainly an explanation.
21      Q.   All right.  So at least in August of 2017, when Singer
22      sent this e-mail, let me show you Exhibit 352, please, take
23      away -- just -- yeah, 352, please.
24              So that is the e-mail with the profile with all these
25      nonsense awards that weren't accurate, right?
```

```
 1    A.   Yes.
 2    Q.   And there's no reply to that e-mail by Mr. Abdelaziz at
 3    all, is there?
 4    A.   I haven't seen one.
 5    Q.   And again, you were prepared by the government to come in
 6    to this courtroom and talk about the relevant e-mails, right?
 7    A.   Yes.
 8    Q.   And they didn't show you the bounceback e-mail, did they?
 9    A.   I don't recall seeing that e-mail, no.
11:41 10    Q.   And they didn't show you the e-mail to the wrong address
11    either, did they?
12    A.   I don't recall that e-mail either, no.
13    Q.   Okay.  But it's clear that August 8, Mr. Singer's e-mail
14    never got to Gamal Abdelaziz, did it?
15         MR. FRANK:  Objection.
16         THE COURT:  Sustained.
17    Q.   All right.  Let me move to another e-mail situation.
18         On direct you were shown a series of e-mails with
19    photos attached to them.  Do you recall that?
11:42 20    A.   Yes.
21    Q.   The first one was Exhibit 334.  I'd like to put it up on
22    the screen.  It's in evidence.
23         Let's look first at the "From" line.  That appears to
24    be yet another e-mail address that Gamal Abdelaziz has used in
25    the past, correct?
```

1    A.    Yes.

2    Q.    All right.  And this one is dated July 27, right?  And

3    Singer below is asking Mr. Aziz, "Gamal, I need an action photo

4    or two of Sabrina playing basketball."

5    A.    Yes.

6    Q.    That's what it says, right?

7    A.    Yes.

8    Q.    It doesn't say, "I need an action photo of someone

9    else playing basketball," right?  And he says, "Got it," right?

11:44 10  In fact, are you aware that about an hour and a half later he

11   gave a quick update to Mr. Singer and said, "In progress"?

12   A.    I have not seen that e-mail, no.

13   Q.    You haven't seen that one?

14   A.    No.

15   Q.    All right.  Let's go through the five e-mails with photos

16   that are in evidence that my client did send.  They are -- I'll

17   go through one by one.  Just for the record, 338, 339, 340, 341

18   and 342.  Those are -- I'm sure you don't have those numbers

19   memorized, right?

11:44 20  A.    No.

21   Q.    All right.  It's hard to memorize numbers, right?

22   A.    It's a lot of numbers.

23   Q.    All right.  So I'm going to represent to you that those

24   are five e-mails in evidence that I'll ask you about that

25   Mr. Abdelaziz sent in the span of two minutes.  So let's go

```
 1    over the time to show that's accurate.  Let's look at 338
 2    first.  So this one, the cover page doesn't have a picture,
 3    does it?
 4    A.   It appears to be an attachment to the e-mail.
 5    Q.   Okay.  So this cover page just has that so-called jpeg
 6    number there that you were asked about before, right?
 7    A.   Yes.
 8    Q.   And let's look at the time here.  3:44.  And let's see
 9    what this picture was of.  All right.  Now, obviously a girls'
10    basketball game.  Can you tell who is the young girl with the
11    arm in her face obscuring her view?  Do you know who that is?
12    A.   I don't.
13    Q.   All right.  That was sent at 3:44.  Then let's move to
14    3:39.  Again, face page has nothing but jpegs and blank and the
15    attachment is a photo.  Can we see the photo?
16              A girl taking a free throw, yeah, looks like a free
17    throw, right?
18    A.   Yes.
19    Q.   Do you know who that girl shooting is?
20    A.   I don't.
21    Q.   Okay.  Let's go back to the face page.  Would you dispute
22    if I represent that was Mr. Abdelaziz's daughter?
23    A.   No.  The first letter on the jersey appears to be an A.
24    Q.   Okay.  Right.  And on the cover page, again this is a
25    second of the five photos that are sent from Gamal to Rick
```

1    Singer, right?

2    A.    I'm sorry.  The first --

3    Q.    Exhibit 339 is the second e-mail Gamal sent to Singer with

4    a photo, a basketball photo attached, right?  It has another

5    jpeg number?

6    A.    Yeah.  I don't know the sequence in which they were sent,

7    but --

8    Q.    Fair enough.  It's the second e-mail with another

9    basketball photo, right?

11:47 10   A.    Yeah.  Again, I don't know the order.  I can't confirm it

11   is the second, but it was one of the e-mails that were sent.

12   Q.    Yeah, there were a lot of e-mails.  This was the second

13   one I've just shown you.

14          Let me show you the third one, Exhibit 340.  Again,

15   let's look at the top first.  Gamal is sending it to Singer.

16   There's some jpeg number on it, and then attached to the

17   face -- sorry, at 3:45, a minute later, and let's see the

18   attachment.  This is of a girl dribbling a basketball.  If I

19   represent it's not his daughter, do you have any reason to

11:48 20   believe it's not his daughter?

21   A.    No.

22   Q.    In fact, she's wearing glasses, right?

23   A.    Yes.

24   Q.    Are you aware whether or not his daughter wears glasses?

25   A.    I'm not.

1    Q.   All right.  But it's the same game, right?  It looks to be

2    a picture, like the other two, from a game?

3    A.   It appears similar to the others.  I don't know whether

4    it's the same game or not.

5    Q.   All right.  So then let's go to Exhibit 340.

6         340, please.  Sorry.  We were just looking at 340?

7    A.   Yes.

8    Q.   Okay.  We're going to move off 340.  We're going to go to

9    341.

11:49 10        341, again, another e-mail from Gamal to Singer on

11   July 27 at 3:45.  This is the fourth of the pictures I've shown

12   you now, right?

13   A.   Yes.

14   Q.   Another jpeg number, right, on the face page that's it,

15   correct?

16   A.   Yes.

17   Q.   And then you've got a picture attached to this one as

18   well.  Looking at this picture, sir, looking at what's

19   obviously the coach, to his left, our right, do you recognize

11:50 20   that girl as being in the other photos we've just seen?

21   A.   It appears to be the woman who was taking the free throw

22   shot.

23   Q.   Okay.  And then let me show you 342 in evidence, please.

24        MR. FRANK:  It appears our monitors just went out,

25   Judge.

```
 1              THE COURT:  I'm sorry?

 2              MR. FRANK:  Our monitors just seem to have --

 3              THE COURT:  We have monitor problems?

 4              MR. FRANK:  Yes.

 5              MR. KELLY:  I think it's just at counsel table.  I

 6    think the jury can see it.  Can the witness see it?

 7              THE WITNESS:  Yes.

 8              MR. KELLY:  These are in evidence.  I think we have

 9    copies, your Honor.

10              THE COURT:  Do you need copies, Mr. Frank?

11              MR. FRANK:  No, not of this.

12              THE COURT:  All right.  Do you have problems?  The

13    jurors can see the picture?  Good.  Okay.

14              MR. FRANK:  It just came back.

15              MR. KELLY:  May I proceed, your Honor?

16              THE COURT:  Yes.

17    Q.   I believe we're on 342, right?

18    A.   Yes.

19    Q.   And again, that's from Gamal to Rick Singer, and there's a

20    jpeg number, and if you look above, that's at 3:46, right?

21    A.   Yes.

22    Q.   And sir, is there a photo attached to this one as well?

23    A.   Yes.

24    Q.   Okay.  And if you're looking at the back row at number 1,

25    does she appear to be the same girl in some of the previous
```

1    photos?

2    A.    Yes.

3    Q.    And do you know whether or not that's Sabrina Abdelaziz?

4    A.    I don't know for sure.  Based on your representation, I'll

5    take your word for it that it is.

6    Q.    Okay.  And these are five e-mails with photos attached

7    that are sent in the span of two minutes, correct?

8    A.    Yes.

9    Q.    All right.  And do you recall, what's the jpeg number of

11:52 10   the girl dribbling the ball?

11   A.    The -- with the profile?

12   Q.    The girl dribbling the ball with glasses.  Didn't you

13   memorize the --

14   A.    Yes, it's DSC_0123.

15   Q.    And you've had a long time to look at that, haven't you?

16   A.    Not a long time, but I looked at it.

17   Q.    You prepared for your testimony today, right?

18   A.    Yes, sir.

19   Q.    Do you think if someone looked at this, in two minutes

11:52 20   they could remember jpeg numbers?

21   A.    No.

22   Q.    It's not reasonable to think that at all, is it?

23   A.    No.

24   Q.    All right.  So showing you Exhibit 345 that's in evidence,

25   when Singer says to Gamal about an hour later -- well, no, I'm

1    sorry -- nine minutes later, nine minutes later, do you see the

2    time 3:54?  The last of the five photos had been at 3:46.  So

3    if my math is right, that's nine minutes later.  Singer says,

4    "We'll use this one."  Right?

5    A.    Yes.

6    Q.    And you don't have any evidence that Gamal replied to this

7    e-mail, do you?

8    A.    I haven't seen it personally, no.

9    Q.    All right.  And you're the agent who was prepared to

11:53 10   testify about this, right?

11   A.    About this e-mail, yes.

12   Q.    Yeah.  And on this one there's no attachment, right?

13   A.    There doesn't appear to be, no.

14   Q.    So unless someone was a modern-day rain man, they wouldn't

15   remember the numbers and how they go to the photos, right?

16   A.    Well, personally you could go back to your "sent" and very

17   quickly identify which photo he's referring to.

18   Q.    And do you have any evidence that Gamal Abdelaziz did

19   that --

11:53 20   A.    Of course not.

21   Q.    -- back in July of 2017?

22   A.    Personally, no.

23   Q.    In fact, that photo of the girl dribbling the ball, that's

24   not even the photo that was submitted to USC's SUBCO committee,

25   was it?

 1  A.   I have a vague recollection based on the exhibits.  I

 2  understand that the photo was changed.  I can't recall what it

 3  was changed to.

 4  Q.   Okay.  Well, let me show you Exhibit 381.  First of all,

 5  on the cover page, were both Donna Heinel and Katie Fuller USC

 6  employees at the time?

 7  A.   That's my understanding, yes.

 8  Q.   And it's dated October 3, 2017, correct?

 9  A.   Yes.

11:54 10  Q.   Do you know whether Sabrina's application was submitted

11  two days later on October 5 to the SUBCO?

12  A.   I don't recall.

13  Q.   All right.  And how about, let's see the attachment to

14  this, please.

15       Take a look at that picture that was attached to what

16  was submitted to USC.  Now we got an entirely different girl,

17  don't we?

18  A.   It appears so, yes.

19  Q.   And she's not dribbling the ball and she doesn't have

11:55 20  glasses, right?

21  A.   Definitely not, no.

22  Q.   In fact, when Singer followed the bounceback instructions

23  properly, he sent it to Gamal, right?

24  A.   Sorry, I don't understand the question.

25  Q.   Sure.  Let me show you Exhibit 390 in evidence.  First of

1  all, this is not the athletic profile, right?  This is the USC

2  letter?

3  A.   Correct.

4  Q.   And below it appears with Rick Singer the subject is "USC

5  letter."  He sent it to Gamal again at the cox.net address?

6  A.   Okay.

7  Q.   All right.  And then if you look above it, Singer is

8  sending it to the correct Gamal gmail address, right?

9  A.   Yes.

11:56 10  Q.   Are you aware that, as with the last trilogy I discussed

11  with you, there was an intervening bounceback message from

12  cox.net telling Singer that Gamal's e-mail address had changed?

13  A.   I haven't seen that, no.

14  Q.   No one showed that to you?

15  A.   No.

16       MR. KELLY:  Just for the witness, I'd like to put up

17  Exhibit 9027, please.

18  Q.   So this is also -- let's put the two of them back to back,

19  please.  Well, first of all, let me ask you about 9027 before

11:57 20  we put them back.  What is this?

21  A.   It appears to be a similar auto reply from

22  gamalaziz@cox.net to Rick Singer's email account.

23       MR. KELLY:  I offer it, your Honor.

24       MR. FRANK:  No objection.

25       THE COURT:  It will be admitted.

```
         1              (Exhibit 9027 admitted into evidence.)
         2              MR. KELLY:  So let's now put these two side by side.
         3      390 and what we just admitted as 9027, please.
         4      Q.   So does it appear to you anyway here when Singer sends it
         5      to cox.net on the left of 390, Mr. Carter -- I'm sorry.
         6      Speaking too quickly.
         7              On the left on the bottom, Singer sends it to
         8      cox.net, right?
         9      A.   Yes.
11:58   10      Q.   If you go to the right, the bounceback kicks in?
        11      A.   It appears so, yes.
        12      Q.   It says, "Please be advised that I have changed my e-mail
        13      address to gamalaziz797@gmail.com, right?
        14      A.   Yes.
        15      Q.   Then back to the other one, when you look at the top on
        16      390 there, Singer actually gets it correct this time when he
        17      sends it to Gamal.  He doesn't forget to drop the G, right?
        18      A.   Correct.
        19      Q.   So that one goes through during the USC letter, right?
11:59   20      A.   I believe so, yes.
        21      Q.   On the prior one we just discussed, all you know on the
        22      trilogy we just discussed, all you know when you served or the
        23      FBI served a search warrant in July of 2019, 11 months later,
        24      that's when Exhibit 352 was in the gmail, not in August, you
        25      didn't serve the search warrant until 11 months later, right?
```

  1   A.   I don't know exactly when the search warrant was served.

  2   I didn't serve it.

  3   Q.   All right.  That's the only thing you can say from the

  4   search warrant is Exhibit 352 we were discussing was in the

  5   gmail then, right?

  6   A.   Just to confirm, if you could put 352 on the screen.

  7   We've talked about many exhibits.

  8         MR. FRANK:   Sure.

  9   A.   Yes.  So --

12:00 10   Q.   So this one here I'm talking about, this was found in the

 11   search warrant that the FBI did in July of 2019, right?

 12   A.   Yes, I personally saw that e-mail in the search warrant

 13   return, yes.

 14   Q.   And the only thing that search warrant tells you is that's

 15   when they find it, right, July of 2019?  It doesn't tell you

 16   how it migrated into the gmail, does it?

 17   A.   Actually, in the metadata it does show when it was sent

 18   and when it was received.

 19   Q.   Yeah, but does it show how it got into the gmail?

12:00 20   A.   I'm not an expert in how e-mail headers work.  I can't say

 21   with certainty how it did get into the gmail account.  All I

 22   can tell you is that it was there and there's metadata

 23   reflecting that it was sent at a prior date.

 24   Q.   Yeah.  And you testified on direct that you can't explain

 25   it, right?

A.   There are possible explanations for how it got there, but

I can't say with certainty how it did.

Q.   Right.  There's a lot of possible explanations, right?

A.   For sure.

Q.   We'd be guessing though, wouldn't we?

A.   I can't say with certainty how it got there.

Q.   You'd be speculating right?

A.   I would, yes.

Q.   And, of course, you're aware that it's the government's

12:01  burden of proof in this case beyond a reasonable doubt?

           MR. FRANK:  I object to the argument, your Honor.

           THE COURT:  Sustained.

Q.   Well, do you build criminal prosecutions on speculation,

sir?

           MR. FRANK:  I object, your Honor.

           THE COURT:  Sustained.

Q.   Let's go to Exhibit 505, please.  Let's look at the

attachment that was discussed here in the middle, please.  This

is a letter to Gamal Aziz.  Let's look at the third paragraph.

12:02  There you go.  Okay.  I'll read it.  It's already in evidence.

           "The Key Worldwide Foundation was incorporated in the

State of California on December 14, 2012 as a nonprofit, public

benefit charitable organization and tax-exemption applications

for recognition as 501(c)(3) charitable status were approved as

of December 14, 2012."  That was sent to Gamal in March of

1    2018, right?

2    A.   Yes.

3    Q.   In fact, are you aware that it was a registered charity?

4    A.   I'm not.

5    Q.   You're not aware.  Are you aware that Gamal's son had gone

6    on a trip with this charity?

7    A.   No.

8    Q.   You're not aware of that?

9    A.   No.  I know there was some prior relationship with

12:03 10    Abdelaziz.  I don't know the details of it.

11    Q.   In this case there's no tax charges against Gamal

12    Abdelaziz, right?

13    A.   I don't know.

14    Q.   You don't know whether he's charged with a tax violation?

15             MR. FRANK:  Your Honor, this is argument.

16             THE COURT:  Sustained.

17    Q.   All right.  Let me ask you about Exhibit 427, please.  Do

18    you see the date of this one, November 29?

19    A.   Yes.

12:03 20    Q.   Okay.  You were asked about this on direct as well?

21    A.   Yes.

22    Q.   And you see where Gamal says, "We're going to pass on

23    applying in December."

24    A.   Yes.

25    Q.   Are you aware that his daughter took the SAT three days

1    after this letter?

2    A.    I am not.

3    Q.    How about Exhibit 330?  This is a -- if we start at the

4    top, this is an e-mail from Gamal to his wife, and it's on

5    7-17, and he's forwarding Singer's below.  Look at Singer's

6    below, please.  Go all the way to the bottom.  There's nothing

7    at the bottom, right?  And let's go further up, please.

8          And so Gamal is forwarding this Singer request to his

9    wife apparently?

12:04 10    A.    It appears so, yes.

11    Q.    All right.  And certain examples are given as to what is

12    needed, right?

13    A.    I don't know if they're examples or information Singer

14    already knows, I don't know.

15    Q.    Well, okay.  If you look at home address, China is a

16    pretty broad address, right?  He's obviously looking for

17    whatever the address is, right?

18    A.    Right.  I don't know the context of why that information

19    is there or how it got there.

12:05 20    Q.    Right.  But let's look at position three or four.  You

21    can't play both, right?

22    A.    I don't even know what position three or four is in

23    reference to.

24    Q.    Well, in basketball, if you have a three, that's a small

25    forward, and a four is a power forward.  Do you know that?

         1          MR. FRANK:  Objection to the testimony.
         2          THE COURT:  Sustained.
         3   Q.   Are you a basketball fan at all?
         4   A.   No.  Sorry.
         5   Q.   All right.  Point taken.  Not everyone's a basketball fan,
         6   right?
         7   A.   Sure.
         8   Q.   A lot of grown men don't know anything about basketball,
         9   right?
12:05   10          MR. FRANK:  Objection.
        11          THE COURT:  Sustained.
        12   Q.   With respect to this e-mail, if we can go to the top,
        13   please.  Do you see the e-mail that preceded this from Laura
        14   Janke to Rick Singer?
        15   A.   I don't recall the e-mail that preceded this.
        16   Q.   All right.
        17          MR. KELLY:  Just for the witness only, put up Exhibit
        18   329, please.
        19   Q.   Have you seen this e-mail before?  Let me start with, what
12:06   20   is it?
        21   A.   It's an e-mail from Laura Janke to Rick Singer.
        22   Q.   What's it dated?
        23          MR. FRANK:  Your Honor, this is not in evidence.
        24          THE COURT:  It's apparently not in evidence.  What's
        25   the number again?

1      MR. KELLY:  It's 329.

2  Q.   I'm not going to read it until it's in evidence, but what

3  is it, just looking at the top?

4  A.   It's an e-mail from Laura Janke to Rick Singer asking for

5  similar information to the prior e-mail.

6      MR. KELLY:  I offer this exhibit.

7      MR. FRANK:  No objection.

8      THE COURT:  It will be admitted, 329.

9      (Exhibit 329 admitted into evidence.)

12:07 10  Q.   Let's look at what Laura Janke said in the middle there to

11  Singer.  This is Janke to Singer, right?

12  A.   Yes.

13  Q.   Let's see what she says.  "If they don't have the items

14  pertaining to the sport, let me know and I will create."  Do

15  you see where she says that?

16  A.   Yes.

17      MR. KELLY:  Now, let's put up 330 next to that, if we

18  could, please.

19  Q.   Okay.  So when Singer is sending his e-mail on the same

12:08 20  date to Gamal, he's taken out the little line at the bottom

21  where Janke says, "If they don't have the items pertaining to

22  the sport, let me know and I will create."  That's not there

23  anymore, is it?

24  A.   No.

25  Q.   And with respect to this e-mail, 329, have you seen it

```
 1  before in preparing for your testimony, sir?
 2              MR. FRANK:  Your Honor, it's not the same document.
 3              MR. KELLY:  Well, he's got redirect.
 4              THE COURT:  Are you objecting?
 5              MR. FRANK:  I am objecting.
 6              THE COURT:  It's sustained.
 7              MR. KELLY:  Okay.
 8  Q.   So with respect to this document that's in evidence, 329,
 9  was it shown to you before you testified here today?
10  A.   Are you referring to the document on the left?
11  Q.   Yes, sir.
12  A.   I don't recall seeing that before, no.
13              MR. KELLY:  Take that down, please.  The prosecutor on
14  direct referred to a Singer note to self, Exhibit 323.  Can we
15  see that one again, please?  It's in evidence.
16  Q.   Do you see Aziz's daughter's name down below?
17  A.   Yes.
18  Q.   And up top it's Singer to himself, right?
19  A.   Yes.
20  Q.   All right.  Besides this particular note to self --
21              MR. FRANK:  This is also not in evidence, your Honor.
22              MR. KELLY:  Pardon me?
23              MR. FRANK:  This version of this document is not in
24  evidence.
25              MR. KELLY:  I'm sorry.  This is --
```

12:09 (line 10)
12:09 (line 20)

```
 1              THE WITNESS:  It appears to be a redacted version.
 2              MR. KELLY:  Well, okay.  Do you want the name of the
 3      person connected to the business school?
 4              MR. FRANK:  I think we should put the version --
 5              MR. KELLY:  Okay.  Let's do it.  Do we have it?
 6              THE COURT:  You're offering 323 in its redacted form?
 7              MR. KELLY:  Yes.  There's a name to the left of
 8      "Business School" deleted.  It's not Aziz.  It's not a
 9      defendant.  It's irrelevant to this matter.  If they want the
12:10 10      full version, I'll put it in at the break.
11              MR. FRANK:  I have no objection to a different version
12      coming in, your Honor, but it shouldn't be represented to be
13      the version that's in evidence.
14              THE COURT:  Yeah, it's a different version.  Do you
15      want to call it 323A?
16              MR. KELLY:  Yes.
17              THE COURT:  It will be admitted as 323A.
18              (Exhibit 323A admitted into evidence.)
19              MR. KELLY:  Let's look at what is not in evidence,
12:10 20      just the witness, please, 448.
21      Q.   What is this, just looking at the heading?
22      A.   It appears to be a similar e-mail as the prior e-mail.
23      Q.   So another note to self by Singer?
24      A.   Yes.
25              MR. KELLY:  I offer it.
```

1           MR. FRANK:  No objection.

2           THE COURT:  It will be admitted as a redacted version.

3           MR. FRANK:  Actually, your Honor, I withdraw that,

4    Your Honor.  I object to the redactions.  There is a version of

5    this that's unredacted, and that should come in.

6           THE COURT:  This is a redacted version.  Do you have

7    the unredacted one?

8           MR. KELLY:  I believe we provided it already to the

9    government.  The Bates number on the bottom right is the

12:11 10   government's Bates number.  They have it.

11          MR. FRANK:  We do have the document.

12          THE COURT:  Wait, wait.

13          MR. KELLY:  Sure.

14          THE COURT:  Just offer the unredacted document.  Is it

15   448?

16          MR. KELLY:  Yes.  Let me just -- may I confer with

17   counsel, your Honor?

18          THE COURT:  Yes.

19          (Pause.)

12:12 20   THE COURT:  So you're offering 448 in the unredacted

21   form, and it is an e-mail.  Do we have a date for it?

22          MR. KELLY:  December 15, your Honor.

23          THE COURT:  Of?

24          MR. KELLY:  2017, yes.

25          THE COURT:  It will be admitted.

```
 1              (Exhibit 448 admitted into evidence.)
 2    Q.   Okay.  On this one, note to Singer to himself on December
 3    15, again, "Subject:  USC with Donna."  Right?
 4    A.   Yes.
 5    Q.   It doesn't say "USC with Donna and Gamal," just "USC with
 6    Donna," right?
 7    A.   It says "USC with Donna."
 8    Q.   And in the middle, I think it's the middle, it says,
 9    "Sabrina Aziz 300-200."
12:13 10  A.   Yes.
11    Q.   Are you aware of the significance of that split, 300-200,
12    in this case?
13    A.   Not specifically, no.
14              MR. KELLY:  Okay.  You can take that down, please.
15    Q.   Now, I'm just going to refer to some of these tapes that
16    were played already on your direct.  Okay?  So we heard several
17    tapes involving some New York lawyer named Caplan, right?
18    A.   Yes.
19    Q.   And the gist of those tapes was that he was willing and
12:14 20  eager to pay for someone to take a test for his kid, right?
21    A.   Generally, yes.
22    Q.   All right.  And are you aware that there's no allegations
23    of any test-cheating issues against Mr. Abdelaziz?
24    A.   I'm not aware of any, no.
25    Q.   Okay.  And similarly, the call with Agustin Huneeus that
```

1    was played?

2    A.   Yes.

3    Q.   Another test-cheater, right?

4    A.   Yes.

5    Q.   And you don't have any evidence that Mr. Abdelaziz knows

6    either Mr. Caplan or Mr. Huneeus, do you?

7    A.   Not that I'm aware of, no.

8    Q.   Now, are you aware that Singer told Gamal 200,000 should

9    go to the Galen Center?

12:15 10   A.   I don't believe so, no.

11   Q.   You're not aware of that?

12   A.   Was that in one of the e-mails?  I don't recall seeing

13   that.

14   Q.   Well, if you don't recall, you don't recall, sir, but you

15   are unaware that Singer told Aziz that 200,000 should go to the

16   Galen Center?

17   A.   I don't recall hearing that.

18   Q.   Are you aware of what the Galen Center is?

19   A.   Based on the exhibits, it's something connected to USC.  I

12:15 20   don't know the relationship.

21   Q.   You don't know if it's a basketball stadium or not?

22   A.   I don't know.

23   Q.   There was a tape played where Heinel told Singer that the

24   money should go to the Galen Center.  Do you recall that tape?

25   A.   The voicemail, yes.

         1              MR. KELLY:  Exhibit 439, so I can play that again.

         2              (Audio recording played.)

         3    Q.   Now, this was dated December 4 of 2017, which is, of

         4    course, well before July 2018, correct?

         5    A.   Correct.

         6    Q.   And you don't -- you don't have any evidence to suggest

         7    that any of the monies that went to the Galen Center gift

         8    account went to any USC employee personally for any purpose

         9    unrelated to their employment at USC, do you?

12:17   10              MR. FRANK:  Objection, foundation.

        11              THE COURT:  Sustained.

        12    Q.   Do you know anything about the Galen Center gift account?

        13    A.   No.

        14              MR. KELLY:  One moment, your Honor.

        15              THE COURT:  Yes.

        16    Q.   I think you testified on direct that at some point you saw

        17    the FBI extraction report in this case?

        18    A.   Yes.

        19    Q.   And let me show you the face page of 1481A, please.

12:18   20              MR. FRANK:  This is not in evidence, your Honor.

        21              MR. KELLY:  Just the witness.  Just the witness, I'm

        22    sorry.

        23    Q.   Is this the -- I'll give you a moment to look at the top,

        24    please.

        25    A.   Yes.

```
 1   Q.   Is this the FBI extraction report that you were referring
 2   to that you've seen in the past?
 3   A.   It appears to be the same, the page is the same, yes.
 4   Q.   Okay.
 5        MR. KELLY:  Can you scroll down a little, please,
 6   Mr. Carter.
 7   Q.   Do see the date on the second line, 10-5-2018, correct?
 8   A.   Yes.
 9   Q.   Approximately two weeks earlier Mr. Singer had started to
10   cooperate with the government, right?
11   A.   I know he was approached on the 21st.  I don't know the
12   timeline beyond that.
13   Q.   Okay.  But shortly before this?
14   A.   Yes.
15   Q.   If you look at page 3 of this exhibit --
16        MR. KELLY:  Actually, I'd like to offer this, your
17   Honor.
18        MR. FRANK:  No objection.
19        THE COURT:  It will be admitted, 1481A.
20        (Exhibit 1481A admitted into evidence.)
21   Q.   So let me go back to the face page.  And so the jury can
22   see, it's dated 10-5-2018 in the second row, right?
23   A.   Yes.
24   Q.   An extraction report by the FBI is basically the FBI
25   taking all of the data out of the iPhone that a person has,
```

  1  right?

  2  A.   I can't say that.  An image is a copy of the iPhone.  An

  3  extraction, I believe certain aspects of it are chosen by the

  4  person doing the extraction, and that's what's removed as the

  5  extraction.

  6  Q.   Fair enough.

  7  A.   I don't know if it's a complete copy of everything on the

  8  iPhone.

  9  Q.   All right.  It certainly gets a lot of data, right?

12:20 10  A.   Depending on what you select, yes.

 11  Q.   If you go to the third page of this FBI extraction report,

 12  if you look in the middle under the contents where it says

 13  "iMessages," it says -- I'm sorry, it says "Chats."  Then it

 14  says "Facebook message," "iMessages."

 15  A.   As part of my review of the extraction, I didn't review

 16  any chats.

 17  Q.   Okay.  I'm just going to ask you about the document in

 18  evidence, not any particular review.

 19  A.   Sure.

12:21 20  Q.   You see where it says "iMessages," right?

 21  A.   Yes.

 22  Q.   That's one of those blue texts, right?  The iMessages are

 23  blue ones, whereas the SMS texts are the green ones, right?

 24  A.   I didn't review anything in this extraction report beyond

 25  contacts and voicemails, so I can't say with any certainty.

```
 1   Q.   Sure.  But in general you know iMessages are the blue
 2   ones?
 3            MR. FRANK:  This is well beyond the scope of the
 4   direct.
 5            THE COURT:  I'll let him have this if we're not going
 6   to get too bogged down.
 7            MR. KELLY:  I'll keep moving.
 8   Q.   The iMessages are the blue ones, correct, do you know?
 9   A.   I don't know.  I review extraction reports.  I don't pay
12:22 10  close attention to which color is which.
11   Q.   But the blue ones are the ones that can't be captured on a
12   wiretap, right?
13   A.   I have no idea.
14   Q.   Okay.  How about then, it does show, of these iMessages
15   1,342 deleted, right?
16   A.   It appears to, yes.
17   Q.   All right.  And that's in October of 2018, shortly after
18   Mr. Singer began to cooperate with the United States, right?
19   A.   Shortly after he was approached.  Again, I don't know
12:22 20  details beyond that.
21   Q.   Okay.  Did you see the extraction report --
22            MR. KELLY:  You can put this one down, please.
23   Q.   Did you see this extraction report in March of 2019?
24   A.   No.
25   Q.   So that's the only one you did see?  I'm sorry.
```

```
 1            So the one that I just showed you that's in evidence
 2    as 1481A from October is the one you saw?
 3    A.   Yes, for the limited purpose of preparing for today, yes.
 4    Q.   Fair enough.  And you never saw anything in March of 2019?
 5    A.   I don't believe so, no.
 6            MR. KELLY:  All right.  Your Honor, I should probably
 7    take this to the sidebar.  I have several remaining e-mails
 8    I'll speak to here.  I don't think I can represent that they
 9    are part of a chain but they are in the same time period.  I
 12:24 10    can question the witness about them now or later subject to the
 11    Court's ruling.
 12            THE COURT:  Why don't we discuss this at the break.  I
 13    take it the witness, Mr. Brown, will be still available at the
 14    break.  So let's do it that way.  Let's move along.
 15            MR. KELLY:  With that, your Honor, I have no further
 16    questions of Agent Brown.
 17            THE COURT:  Redirect, Mr. Frank.
 18            MR. FRANK:  Thank you, your Honor.
 19                REDIRECT EXAMINATION OF KEITH BROWN
 12:25 20    BY MR. FRANK:
 21    Q.   Special Agent, you were just asked a series of questions
 22    about deleting iMessages.
 23    A.   Yes.
 24    Q.   Have you ever deleted a message on your phone?
 25    A.   Sure.
```

1    Q.   When you did that --

2              MR. KELLY:  Objection, relevance.

3              THE COURT:  Overruled.

4    Q.   When you did that, did it also delete off the phone of the

5    person who received the message?

6              MR. KENDALL:  Objection, your Honor.

7              THE COURT:  Overruled.

8              MR. KENDALL:  This may be a sidebar, your Honor.

9              THE COURT:  No.  I will let him have the question.

12:25 10    A.   No.  My understanding is that when you delete it on one

11    device, it does not delete it on the other.

12    Q.   You were asked a series of questions about payments to the

13    Galen Center?

14    A.   Yes.

15    Q.   Do you recall to whom Gamal Aziz wrote his check?

16    A.   I don't.

17    Q.   Could you look at Exhibit 505, please.  At the top it

18    says, "Attached is your official receipt of your contribution

19    to the Foundation."  Do you see that?

12:26 20    A.   Correct.

21    Q.   Could we look at the attachment.  "Thank you for your

22    contribution of $300,000 to the Key Worldwide Foundation."

23    A.   Yes.

24    Q.   Now, you can write a check to the Galen Center, right,

25    that's possible to do?

```
  1   A.   I assume so, yes.

  2   Q.   But that's not what Mr. Aziz did?

  3   A.   It appears not, no.

  4   Q.   Could we look at Exhibit 330, please.  You were asked some

  5   questions about this document that was sent to Mr. Aziz at the

  6   gamalaziz797@gmail.com address?

  7   A.   Yes.

  8   Q.   Do you see that Mr. Aziz forwarded it to his wife?

  9   A.   Yes.

12:27 10  Q.   And the headline, the subject of this e-mail is "For me to

 11   complete USC athletic profile."

 12   A.   Yes.

 13   Q.   Is it fair to say that anyone receiving this would know

 14   that a USC athletic profile was being created?

 15        MR. KELLY:  Objection.

 16        THE COURT:  Overruled.

 17   A.   I think that's a safe assumption, yes.

 18   Q.   Can you create an athletic profile if you don't play a

 19   sport?

12:27 20  A.   Not a true one.

 21        MR. KENDALL:  Objection, your Honor.

 22        THE COURT:  Overruled.

 23        MR. FRANK:  Can we look at Exhibit 427, please.

 24   Q.   You were shown this document to a college counselor --

 25   from Gamal Aziz to a college counselor in Hong Kong.  Do you
```

1     recall that?

2     A.    I do.

3     Q.    "Dear Gary, Thank you so much for your extraordinary help

4     and support for Sabrina.  We're going to pass on applying in

5     December.  Very best, Gamal."

6     A.    Yes.

7     Q.    It doesn't say anything in this e-mail to the college

8     counselor about the fact that Sabrina has already been approved

9     for admission to USC, does it?

12:28 10    A.    It doesn't.

11               MR. FRANK:  Can we look at Exhibit 340.

12    Q.    You were asked some questions about these photos that

13    Mr. Aziz e-mailed to Rick Singer.

14    A.    Yes.

15    Q.    The subject line on this e-mail that Mr. Aziz sent to Rick

16    Singer is "Sabrina," right?

17    A.    It is.

18    Q.    It doesn't say "other players on Sabrina's team," does it?

19    A.    It does not.

12:28 20    Q.    It doesn't say "not Sabrina"?

21    A.    No.

22               MR. FRANK:  Can we look at the attachment.

23    Q.    Would you agree with me, sir, that if one of those people

24    were your daughter, you'd recognize her?

25    A.    For sure.

1  Q.   In any of those e-mails that counsel showed you of

2  photographs of Sabrina in 2017, did you see Mr. Aziz telling

3  Mr. Singer that Sabrina didn't actually play basketball in

4  2017?

5  A.   No.

6  Q.   And counsel asked you questions about whether someone

7  could remember the jpeg number, right?

8  A.   Yes.

9  Q.   Who sent this photo to Mr. Singer with the subject line

12:29 10  "Sabrina"?

11  A.   Mr. Aziz.

12  Q.   You'd remember if you did that, right?

13  A.   Yes.

14       MR. FRANK:   Could we look at 352, please.

15  Q.   You were asked some questions about the cox.net e-mail

16  account.

17  A.   Yes.

18  Q.   Did you search the cox.net e-mail account?

19  A.   Personally, no.

12:30 20  Q.   Where did you find this e-mail?

21  A.   In Mr. Aziz's gmail account.

22  Q.   And you were asked some questions about whether this

23  e-mail could have metaphysically transported itself into that

24  e-mail account months after it was sent.

25       MR. KELLY:   Objection, your Honor.  I believe I said

```
 1    "migrate."  I didn't say "metaphysically."
 2              MR. FRANK:  Withdrawn.
 3    Q.   You were asked some questions about whether this e-mail
 4    could have migrated to that e-mail account months and months
 5    after it was sent.  Do you recall those questions?
 6    A.   Generally, yes.
 7    Q.   Are you familiar with time travel, Special Agent?
 8              MR. KELLY:  Objection, argumentative.
 9              THE COURT:  What was the question?
10              MR. KELLY:  Is he familiar with time travel.
11              THE COURT:  What was the question?
12    Q.   Are you familiar with time travel?
13              MR. KELLY:  I think that's objectionable, your Honor.
14              THE COURT:  Overruled.
15    Q.   Are you familiar with time travel?
16    A.   As a concept, yes.
17    Q.   Do you know if it's possible in this day and age?
18    A.   As far as I'm aware, it is not.
19    Q.   But you found this e-mail in Mr. Aziz's gamalaziz797 gmail
20    account?
21    A.   I did.
22    Q.   And that wasn't speculation.  That's where you found it,
23    right?
24    A.   Yes.
25              MR. FRANK:  Could we look at Exhibit 415, please.
```

1     Q.   Do you see you were asked some questions about this

2     exhibit as well?

3     A.   Yes.

4     Q.   You see at the bottom this is another e-mail that

5     Mr. Singer sent in October of 2017 also to the

6     gamalaziz@cox.net e-mail account?

7     A.   I do.

8     Q.   And you see that Mr. Aziz forwarded the e-mail to Mikayla

9     Sanford.  Do you see that?

12:31 10   A.   I do.

11    Q.   There's no intervening e-mail there, is there?

12    A.   There doesn't to appear to be, no.

13    Q.   So the e-mail that Mr. Singer sent to the cox.net e-mail

14    account in 2017 was forwarded thereafter by Mr. Aziz from the

15    gamalaziz797 email account?

16    A.   It was.

17    Q.   And if we could take -- if you look at the e-mail, the

18    second sentence says, "Rick asked that we work with you to

19    complete USC's application to make sure it meets the exact

12:32 20   requirements below."  Did I read that accurately?

21    A.   Yes, you did.

22         MR. FRANK:  Could we look at what the exact

23    requirements in the attachment are?

24    Q.   Could you read item 3, please.

25    A.   "Register with the NCAA eligibility center."

Q.   Okay.  And could you read the sentence in the first

paragraph that begins, "Your records indicate."

A.   "Your records indicate that you have the potential to make

a significant contribution to the intercollegiate athletic

program, as well as to the academic life of the university."

Q.   What does your common sense tell you, Special Agent, about

whether you can make a significant contribution to the

intercollegiate athletic program at a Division 1 school when

you fail to make your high school's varsity basketball team?

A.   You cannot.

     MR. FRANK:  Okay.  We can take that down.  Can we look

at Exhibit 49, please.

Q.   You were asked some questions about this e-mail chain

involving John Wilson, Rick Singer and Leslie Wilson.  Do you

recall those questions?

A.   Yes.

     MR. FRANK:  My eyesight is not sufficient to read

that, so I'm going to refer to my hard copy.

Q.   Now, if we look at the e-mail --

     MR. FRANK:  If you could just move, Ms. Lewis, a

little further down.  Thank you.  If you could enlarge the

bottom two e-mails there.  Bottom two, sorry.  Thank you, yes.

Q.   Mr. Kendall asked you some questions about this exchange

where Mr. Wilson says, "If water polo and swimming are not

realistic for Johnny, what are the schools he has a realistic

1   shot at without help?"  Do you recall that?

2   A.   Yes.

3   Q.   And then there's a list of schools.  Do you recall that

4   Mr. Kendall asked you about USC in the harder category?

5   A.   Yes.

6   Q.   And do you recall that he suggested that this e-mail was

7   sent Johnny's junior year, but that people's academic records

8   are not set in stone, they can improve?

9   A.   Yes.

12:35 10   Q.   Do you recall that?

11   A.   I do.

12   Q.   And this was in March of 2013?

13   A.   Yes.

14   Q.   Could we look at Exhibit 87, please.  This is now October

15   of 2013, right?

16   A.   Yes.

17   Q.   So if you're a junior in March of 2013, then what are you

18   in October of 2013?

19   A.   A senior.

12:35 20        MR. FRANK:  If we could look at page 3 of the

21   attachment.

22   Q.   How many months is October after March?

23   A.   Approximately five.

24   Q.   It's actually seven, right?

25   A.   I'm sorry, seven.

1    Q.   And if we look at the Menlo School assessment of Johnny

2    Wilson and his chances at the University of Southern California

3    without help, it's listed as a double reach, correct?

4    A.   Yes.

5    Q.   And that's seven months later during his senior year?

6    A.   Yes.

7         MR. FRANK:  Could we look at Exhibit 101, please.

8    Q.   You were asked some questions about this document and in

9    particular the sentence in the second e-mail from the top in

12:36 10  which Mr. Vavic tells Mr. Singer, "I cannot guaranty anything."

11   Do you see that?

12   A.   Yes.

13   Q.   Although you weren't asked about the last sentence, "I

14   will present him with my top walk-ons," correct?

15   A.   Yes.

16   Q.   Now, this statement, "I cannot guaranty anything," this

17   was sent by Jovan Vavic to Rick Singer, correct?

18   A.   Yes.

19   Q.   Mr. Wilson is not on this exchange, is he?

12:36 20  A.   No.

21        MR. FRANK:  Could we look at Exhibit 83, please, and

22   at page 3.  If we could just enlarge the second e-mail in the

23   chain from the top.  Ms. Lewis, if you could highlight the

24   second sentence in the -- actually, if you could just highlight

25   the second paragraph.

1    Q.   Could you read that for the record, Special Agent.

2    A.   "Jovan will provide Johnny's info to admission when he

3    does his other guys over the next month.  No payment of money

4    until he gets a verbal and written from admissions and then 50

5    percent to a savings account I set up.  Then the remainder upon

6    an acceptance letter in March with everyone else."

7    Q.   Sounds like no payment until you get in, right?

8    A.   That's what it sounds like.

9    Q.   That's a guaranty, isn't it?

12:37 10         MR. KENDALL:  Objection, your Honor.

11         THE COURT:  Sustained.

12         MR. FRANK:  Could we look at the transcript.  If you

13   could flip in your binders to Exhibit 561, the transcript.

14   Q.   If I could draw your attention, Special Agent, to Exhibit

15   561 to page 18, line 13.  Mr. Singer says, "Well, yeah, if you

16   just try the athlete side, and you were using the side door

17   with the athlete, it's a done deal.  Just like with John."  Do

18   you see that?

19   A.   I do.

12:39 20   Q.   What does "a done deal" sound like to you?

21         MR. KENDALL:  Objection, your Honor.

22         THE COURT:  Sustained.

23         MR. FRANK:  Could we look at Exhibit 75, please.

24   Sorry, now I need to find my page again.  If we zoom into the

25   very bottom e-mail on the second page, the very last line.

         1    Q.   Mr. Kendall asked you about this statement -- this

         2    question, "When do I make my first donation?"

         3    A.   Yes.

         4    Q.   You recall that he asked you about the fact that

         5    Mr. Wilson used the word "Donation" and also the word "First,"

         6    implying there would be a second?

         7    A.   Yes.

         8         MR. FRANK:   Could we look two e-mails up, please.

         9    Q.   Could you read the last sentence of that e-mail, the last

12:40 10    sentence?

        11    A.   "Do I make the first payment to you then?"

        12    Q.   He's not using the word "donation" there, right?

        13    A.   No.

        14    Q.   If we go two e-mails up from that, could you read the

        15    first sentence of that e-mail?

        16    A.   "Great.   Let me know when you have verified you have it

        17    all completed and into Jovan."

        18    Q.   And the next sentence?

        19    A.   "Also when and where to wire money."

12:40 20    Q.   He's not using the word "Donation" there, is he?

        21    A.   He is not.

        22         MR. FRANK:   Could we look at Exhibit 83, please, if

        23    you go to page 3, could you, Ms. Lewis, highlight the e-mail to

        24    the right of where your cursor is right now.

        25    Q.   Could you read the second paragraph there.

1    A.    "Also, when is Jovan going to be able to give us decision

2    on USC?  And when do I pay you?  Was it 50 percent in November?

3    50 percent in February when we get the final official notice?"

4    Q.    Any reference to a donation?

5    A.    None.

6    Q.    And then Mr. Singer's response, one e-mail up.  Could you

7    read the second paragraph there.

8    A.    "Jovan will provide Johnny's info to admission when he

9    does his other guys over the next month.  No payment of money

12:41 10    until he gets a verbal and written from admissions and then 50

11    percent to a savings account I set up.  The remainder on

12    acceptance letter in March with everyone else."

13    Q.    Any mention of a charitable donation in that e-mail?

14    A.    None.

15    Q.    What does Mr. Singer mention?

16    A.    That no payment until he gets a written -- a verbal and a

17    written from admissions.

18    Q.    And then where will the money go?

19    A.    Into a savings account he sets up.

12:42 20    Q.    Does that sound like a donation?

21    A.    Not to me.

22          MR. FRANK:  Could we look at Exhibit 710, please.

23    Q.    What is the subject line of this -- do you see this is

24    from Mr. Wilson to Mr. Singer and Ms. Rogers?

25    A.    Yes.

```
 1    Q.   What is the subject line that Mr. Wilson put on this

 2    e-mail?

 3    A.   "USC fees."

 4    Q.   Do "fees" sound like a donation to you?

 5              MR. KENDALL:   Objection, your Honor.

 6              THE COURT:   Sustained.

 7    Q.   Is there any mention of "donation" in the subject line?

 8    A.   There is not.

 9    Q.   What word did Mr. Wilson choose?

12:42 10   A.   "Fees."

11    Q.   And if we look at the bottom e-mail, the first e-mail in

12    the chain, do you see any reference to a donation in

13    Mr. Wilson's e-mail?

14    A.   None.

15    Q.   What words does he use to describe it?

16    A.   Invoice for the payment, and to make it a consulting

17    invoice or whatever.

18    Q.   Does that sound like a donation?

19    A.   No.

12:43 20          MR. FRANK:   Could we look at Exhibit 109, please.

21    Q.   Another e-mail from Mr. Wilson?

22    A.   Yes.

23    Q.   What is the subject line that Mr. Wilson put on his

24    e-mail?

25    A.   "Wire to the key."
```

1   Q.   And do you see that Ms. Rogers asks in the second e-mail,

2   "What is the account I'm charging this to?"

3   A.   Yes.

4   Q.   And how does Mr. Wilson respond?

5   A.   "Business consulting.  The invoice will be for consulting.

6   Please work with him to get the invoice correct."

7   Q.   Does that sound like a donation to you?

8           MR. KENDALL:  Objection, your Honor.

9           THE COURT:  Sustained.

12:44 10  Q.   Does Mr. Wilson say anything here about his wire to The

11  Key being a donation?

12  A.   No.

13          MR. FRANK:  Could we look at Exhibit 89, please.  If

14  you could zoom in on the second e-mail.  Go a little lower.

15  That was my fault.  If you could just -- no, no.  Sorry.  If

16  you could zoom in on the second e-mail and the first line of

17  the e-mail below it, from October 23.  Exactly, thank you.

18  Q.   Do you see that Mr. Wilson asks, "What are the

19  expectations if Johnny gets into USC through this water polo

12:44 20  approach?"

21  A.   Yes.

22  Q.   And you were asked about Mr. Singer's response, "Just be

23  ready for practice in the fall as a player on the roster or

24  just a member of the squad but not get in the pool."  And

25  Mr. Kendall asked you whether or not "Get in the pool" means

```
 1    only for games and matches.  Do you recall that?
 2    A.    Yes.
 3    Q.    What Mr. Singer says here is, "Just be ready for practice
 4    as a player on the roster."  Correct?
 5    A.    Yes.
 6    Q.    Does he say anything in this e-mail about being a practice
 7    player?
 8    A.    Not specifically, no.
 9    Q.    Does he say anything about being a red shirt?
12:45 10    A.    No.
11    Q.    What does he say?
12    A.    "Just be ready for practice in the fall as a player on the
13    roster or just a member of the squad but not get in the pool."
14    Q.    Is it possible to be a water polo practice player if
15    you're not in the water?
16          MR. KENDALL:  Objection, your Honor.
17          THE COURT:  Sustained.
18    Q.    Can you play water polo outside of the water?
19          MR. KENDALL:  Objection, your Honor.
12:45 20          THE COURT:  He can answer that question.
21    A.    My understanding is you cannot.
22    Q.    It's in a pool, right?
23    A.    Yes.
24          MR. FRANK:  Could we look at Exhibit 137, please.
25    Q.    Mr. Kendall asked you a series of questions about this
```

1    e-mail from Johnny Wilson to Jovan Vavic in January of 2015.

2    Do you recall those questions?

3    A.    I do.

4    Q.    I want to direct your attention to the second sentence.

5    "I wanted to thank you and illustrate how profoundly

6    appreciative I am for the incredible opportunity you've given

7    me here at USC as an individual member on the team as well as a

8    student at this school."  Do you see that?

9    A.    Yes.

12:46 10   Q.    What is Mr. Wilson, Johnny Wilson, thanking Mr. Vavic for

11   giving him the opportunity to do?

12         MR. KENDALL:  Objection, your Honor.

13         THE COURT:  Sustained.

14   Q.    I want to direct your attention to the last sentence.

15   What does Johnny Wilson say?

16   A.    "For these reasons, I will not be playing water polo this

17   semester and will be focusing on my academic life and my future

18   career in the business world."

19   Q.    This was sent in January 2015?

12:47 20   A.    Yes.

21         MR. FRANK:  Ms. Lewis, if you could put this on the

22   right and put Exhibit 49 on the left.  Thank you.  And if we

23   could zoom in on that second email again from March 27 -- I'm

24   sorry, the third -- nope, a little lower down.

25   Q.    Could you read the part of it that says -- beginning with

1    "The commitment."

2    A.   "The commitment is to be on the roster, not attend all

3    practices, but he will have to attend drug tests and other

4    mandatory functions for one year.  Then walk away.  Frankly,

5    after the first semester he can move on."

6    Q.   The e-mail on the right in which Johnny Wilson resigned

7    from the water polo team, that was sent after the first

8    semester, right?

9    A.   I believe so, yes.

10   Q.   That's when he moved on?

11   A.   Yes.

12        MR. KENDALL:  Objection, your Honor.

13        THE COURT:  Well, the latter part, yes, it's

14   sustained.

15        MR. FRANK:  Could we look at Exhibit 83, please.  And

16   if we could look at the third page again.  If we look at the

17   second to last e-mail on page 3.

18   Q.   You were asked some questions about this e-mail in which

19   Mr. Wilson wrote, "Jovan has Johnny's stuff and asked me to

20   embellish his profile more, which I am doing."

21        MR. KENDALL:  Objection, your Honor.

22        THE COURT:  Overruled.

23        MR. KENDALL:  I think he misstated.

24        THE COURT:  Well, quote it again.

25   Q.   "Jovan has Johnny's stuff and asked me to embellish his

 1    profile more, which I am doing," that's what Mr. Singer said on

 2    October 13, correct?

 3    A.    Yes.

 4    Q.    And you were asked some questions about whether there was

 5    any confusion about which profile Mr. Singer was referring to.

 6    Do you recall those questions?

 7    A.    About Naviance, yes.

 8    Q.    Yes.   There was a suggestion that maybe he was referring

 9    to some other -- maybe Mr. Wilson misunderstood which profile

12:49 10    he was referring to.

11    A.    Yes.

12               MR. KENDALL:   Objection, your Honor.

13               THE COURT:   Overruled.   If that's what his

14    understanding is.

15               MR. FRANK:   Could we look at Exhibit 75, please.   If

16    we look at the e-mail in the middle to the right -- just the

17    one below that on August 24.

18    Q.    Could you read the second sentence, please.

19    A.    "Transcript, test scores and a player profile so he can

12:50 20    add Johnny to his recruit list and present him to admissions in

21    October."

22    Q.    What kind of profile does Mr. Wilson tell Mr. Singer --

23    I'm sorry.   Withdrawn.

24               What kind of profile does Mr. Singer tell Mr. Wilson

25    he is going to provide to Jovan Vavic in August of 2014?

1    A.    He refers to it as a player profile.

2    Q.    And what does Mr. Singer tell Mr. Wilson Mr. Vavic is

3    going to do with that player profile in October?

4    A.    He's going to add him to his recruit list and present him

5    to admissions.

6    Q.    Now, the e-mail that we looked at, Exhibit 83, in which

7    Mr. Singer referred to embellishing the profile, that was in

8    October of 2013, October 13.  Do you see that?

9    A.    Yes.

12:50 10   Q.    That's Exhibit 83, October 13, 2013?

11   A.    Yes.

12         MR. FRANK:  Could we look at Exhibit 88.

13   Q.    How many days is October 19 after October 13?

14   A.    Six days later.

15         MR. FRANK:  And can we look at the attachment.

16   Q.    What kind of profile is attached to Exhibit 88?

17   A.    It appears to be a player profile.

18   Q.    Now, you were asked some questions about this profile and

19   whether you have any idea whether those swim times on the right

12:51 20   there --

21         MR. KENDALL:  Objection, your Honor.

22         THE COURT:  He hasn't finished the question.

23         MR. KENDALL:  I didn't ask about that.

24   Q.    You were asked some questions about whether you had any

25   idea whether any entries are accurate or inaccurate on this

1    profile.

2    A.    Yes.

3    Q.    Do you recall those questions?

4    A.    Generally, yes.

5    Q.    And if we look at the swim times on the right, you see

6    that there's a time of 20 seconds, 20.12 seconds listed for the

7    short course and 43.98 listed for the 100 freestyle short

8    course?

9    A.    Yes.

12:51 10          MR. FRANK:  Could we look at Exhibit 84 side by side

11   with Exhibit 85, please.

12   Q.    Do you see that in Exhibit 84, sent at 11:43 p.m. there's

13   a time of 22.49 listed for the 50 freestyle and 49.45 listed

14   for the 100 freestyle?

15   A.    Yes.

16   Q.    And then in Exhibit 85 sent approximately 45 minutes

17   later, the times are changed to 20.12 for the 50 and 43.98 for

18   the 100?

19   A.    Yes.

12:52 20   Q.    Is it possible to improve your swimming time that much in

21   45 minutes?

22          MR. KENDALL:  Objection, your Honor.

23          THE COURT:  Sustained.

24   Q.    Do you have a reason to believe that the swim times on the

25   profile Exhibit 88 were falsified?

     1              MR. KENDALL:  Objection, your Honor.

     2              THE COURT:  Sustained.

     3              MR. FRANK:  If we could go back to 88, please.

     4    Q.   Mr. Kendall asked you whether there was any evidence that

     5    Mr. -- if we could go back to the cover e-mail -- that

     6    Mr. Wilson read this e-mail.  Do you recall those questions?

     7    A.   I do, yes.

     8    Q.   And he asked you a series of questions that suggested that

     9    Mr. Wilson was in Europe?

12:53 10    A.   I recall those questions, yes.

    11              MR. KENDALL:  Objection, your Honor.  Misstating the

    12    record quite a bit.

    13              THE COURT:  Well, I'm not aware of that.  The

    14    objection is overruled.

    15              MR. FRANK:  Your Honor, if I could grab some

    16    documents.

    17              THE COURT:  Yes.

    18              MR. FRANK:  Thank you.

    19              MR. KENDALL:  Your Honor, this is beyond the scope and

12:54 20    I would ask to be heard, your Honor.

    21              THE COURT:  No, I'm not going to let you be heard now.

    22    We're almost at the lunch break.  You can be heard then.

    23              MR. FRANK:  Could we show the witness only Exhibit

    24    711, please.

    25    Q.   Now, Exhibit 88 --

          1            MR. KENDALL:  Your Honor, I don't even think -- I'm

          2    not sure this is even on the government's exhibit list.

          3            MR. FRANK:  We just added it, your Honor.  These are

          4    two exhibits.

          5            THE COURT:  All right.  Proceed.

          6    Q.   Exhibit 88 was sent on October 19, 2013, correct?

          7    A.   Yes.

          8    Q.   And Mr. Kendall asked you a series of questions suggesting

          9    that Mr. Wilson didn't see that e-mail.  Do you recall those

12:55  10    questions?

         11    A.   Generally, yes.

         12    Q.   What is the date of the e-mail at Exhibit 711?

         13    A.   October 19, 2013.

         14    Q.   Who is it from?

         15    A.   John Wilson to Rick Singer, copying Leslie Wilson.

         16    Q.   What's the subject?

         17    A.   "Connecting in person."

         18            MR. FRANK:  Government offers 711.

         19            MR. KENDALL:  No objection, your Honor.

12:55  20            THE COURT:  It will be admitted.

         21            (Exhibit 711 admitted into evidence.)

         22    Q.   Do you see the bottom e-mail in the chain, Mr. Wilson

         23    writes at 9:45 p.m. on October 18, "R.  Leslie and I are in

         24    California this week.  Can we meet this weekend or next

         25    Saturday?  John."

1    A.    Yes.

2    Q.    And how does Mr. Singer respond on October 19?

3    A.    He writes "Coming over at 3:30 tomorrow."

4    Q.    And how does Mr. Wilson respond?

5    A.    "Fantastic."

6    Q.    And what's the date?

7    A.    October 19, 2013.

8    Q.    And how does that compare with the date on Exhibit 88?

9    A.    I'd have to see 88 to refresh, I'm sorry.

12:56 10        MR. FRANK:  Could we put Exhibit 711 on the right and

11   Exhibit 88 on the left.

12   A.    It's the same date.

13   Q.    So based on Exhibit 711, it appears that Mr. Wilson was

14   not in Europe on October 19, 2013, was he?

15   A.    It appears not, no.

16   Q.    Who does it appear he was meeting with on October 19?

17   A.    Rick Singer.

18   Q.    And he was also in his e-mail, the

19   john@hyannisportcapital.com account, on October 19, correct?

12:56 20   A.    Yes.

21        MR. FRANK:  Could we show the witness Exhibit 712,

22   please.

23   Q.    What is this?

24   A.    An e-mail from John Wilson to Leslie Wilson.

25   Q.    What's the date?

1   A.   The same day, October 19, 2013.

2   Q.   What's the time?

3   A.   8:53 and 47 seconds p.m.

4   Q.   What is the subject?

5   A.   Water polo shot.

6        MR. FRANK:  The government offers 712.

7        THE COURT:  It will be admitted.

8        MR. KENDALL:  No objection, your Honor.

9        (Exhibit 712 admitted into evidence.)

12:57 10      MR. FRANK:  Could we put Exhibit 712 on the right and

11  88 on the left.

12  Q.   Special Agent, what is the time that Exhibit 88, the water

13  polo profile, was sent by Rick Singer to John Wilson?

14  A.   It was sent at 7:30 p.m.

15  Q.   What is the time that Mr. Wilson accessed that same

16  john@hyannisportcapital.com e-mail account to send a water polo

17  shot to his wife?

18  A.   Same day at 8:53 p.m.

19  Q.   Approximately one hour and 23 minutes later?

12:57 20  A.   Yes.

21       MR. FRANK:  Could we look at the attachments to both

22  e-mails.

23  Q.   Special Agent, do you see any similarity between those

24  photos?

25  A.   The photo on the left appears to be a cropped image of the

1    same photo on the right.

2    Q.   In fact, Special Agent, we've looked at many, many e-mails

3    together in which John Wilson is using the

4    john@hyannisportcapital.com account, have we not?

5    A.   Yes, we have.

6    Q.   If we can just quickly look at some of those e-mails.

7    Exhibit 83, which we just looked at a moment ago in which

8    Mr. Singer told Mr. Wilson that he would be embellishing the

9    profile just like Jovan Vavic wanted --

12:58 10          MR. KENDALL:  Objection, your Honor.

11          THE COURT:  Grounds?

12          MR. KENDALL:  He's characterizing the document.  He's

13   supposed to read documents, not --

14          THE COURT:  Yeah, all right.  Sustained.

15   Q.   What does Mr. Singer tell Mr. Wilson he was doing to the

16   profile in Exhibit 83?

17   A.   He writes --

18          MR. FRANK:  If we look at the bottom, page 3, and if

19   you zoom in on that e-mail, thank you Ms. Lewis.

12:59 20   Q.   What does Mr. Singer tell Mr. Wilson he's doing to the

21   profile?

22   A.   He writes that "Jovan has Johnny's stuff and asked him" --

23   "me to embellish his profile more."

24   Q.   And what does he say after that?

25   A.   "Which I am doing."

```
 1                MR. FRANK:  Okay.  If we go back to the cover.

 2     Q.   What e-mail account does Mr. Wilson respond from?

 3     A.   The john@hyannisportcapital.com e-mail address.

 4                MR. FRANK:  Could we look at Exhibit 48, please.

 5     Q.   What account is Mr. Wilson using in Exhibit 48?

 6     A.   The same john@hyannisportcapital.com account.

 7                MR. FRANK:  Could we look at Exhibit 49.

 8     Q.   What account is Mr. Wilson using in Exhibit 49?

 9     A.   The same account.

01:00 10                MR. FRANK:  Could we look at Exhibit 63.

11     Q.   What account is Mr. Wilson using in Exhibit 63?

12     A.   The same account.

13                MR. FRANK:  Could we look at Exhibit 65.

14     Q.   What account is Mr. Wilson using in Exhibit 65?

15     A.   Both the Hyannis Port Capital account and the staples.eu

16     account.

17                MR. FRANK:  Could we look at Exhibit 74.

18     Q.   What account is Mr. Wilson using in Exhibit 74?

19     A.   The hyannisportcapital account.

01:00 20                MR. FRANK:  Could we look at Exhibit 89.

21     Q.   What account is Mr. Wilson using in Exhibit 89?

22     A.   The hyannisportcapital account.

23                MR. FRANK:  Could we look at Exhibit 710.

24     Q.   What account is Mr. Wilson using in Exhibit 710?

25     A.   The same hyannisportcapital account.
```

```
 1              MR. FRANK:  Could we look at Exhibit 109.
 2    Q.    What account is Mr. Wilson using in Exhibit 109?
 3    A.    The same.
 4              MR. FRANK:  Thank you.  Should I continue, your Honor?
 5              THE COURT:  How much longer do you have?
 6              MR. FRANK:  Ten minutes.
 7              THE COURT:  All right.  We're going to take the lunch
 8    break at this stage, jurors, for an hour.  We'll be back at
 9    2:00.  We're going to go to 3:00 today, not to 3:30.  So we'll
10    have a relatively short afternoon session.  I'll see you back
11    here at 2:00.
12              (Jury exits the courtroom.)
13              THE COURT:  All right.  Please be seated, counsel.
14              Again, approximately how much longer on redirect,
15    Mr. Frank?
16              MR. FRANK:  Ten minutes or less, your Honor.
17              THE COURT:  And recross?
18              MR. KENDALL:  Probably 15, 20 minutes, your Honor.
19              MR. KELLY:  Ten minutes, your Honor.
20              THE COURT:  So we may get to another witness this
21    afternoon.
22              MR. KELLY:  Yes.  And may I just put something on the
23    record.  I was walking over.  I failed to object in a timely
24    fashion.  Mr. Kendall objected in a timely fashion.  I believe
25    I would like to join in the objection as to this:  When the
```

prosecutor asked the witness about "aren't texts on both
people's phones," in my view that's objectionable,
burden-shifting, and we ask you to instruct the jury that the
burden is on the prosecution, not the defense.  We don't have
to produce anything.  So when he asked the witness, the FBI
agent, who they're all listening to, doesn't these texts exist
on other people's phones, that's classic burden-shifting.  So
we object and ask for an instruction.

MR. FRANK:  There was no discussion of whose texts.
He asked him questions about 1,300 texts on the phone that were
deleted, and I simply asked whether those texts would exist on
the phones -- whatever phones -- they were deleted from, the
other phones.

MR. KENDALL:  Your Honor, I would like to amplify
this.  I think it's directly raising a Fifth Amendment issue.
It's not our relevance or our issue if there are texts on other
people's phones or somewhere out of this courtroom that they
have phones.  1,300 texts were deleted.

THE COURT:  This is something that doesn't need to be
resolved at this moment.  We're about to enter into a weekend,
at which time I expect there will be several motions filed.
One of them can be this and I will consider it.

MR. KENDALL:  Thank you, your Honor.

THE COURT:  We're in recess until 2:00.

THE CLERK:  All rise.

```
     1              (Recess taken 1:04 p.m. to 2:06 p.m.)
     2              THE COURT:  Good afternoon, jurors.  We're ready to
     3    continue.
     4              Mr. Brown, again, you remain under oath.  You're
     5    reminded.
     6              And, Mr. Frank, you may continue with redirect
     7    examination.
     8              MR. FRANK:  Thank you, your Honor.
     9    BY MR. FRANK:
02:06 10   Q.   Mr. Brown, if I could direct your attention to the
    11    transcript for Exhibit 561, please.
    12    A.   Yes.
    13    Q.   Special Agent Brown.  Sorry.  You recall that Mr. Kendall
    14    asked you with respect to Exhibit 561 whether it was Mr. Singer
    15    who first mentioned Harvard as a possibility for Mr. Wilson's
    16    daughters?  Do you recall that -- those questions?
    17    A.   I do.
    18    Q.   If you look at page 5 of the transcript, at line 5 on
    19    page 5, Mr. Singer asks which schools the girls are going to be
02:07 20   looking at.  Do you see that?
    21    A.   Yes.
    22    Q.   And how does Mr. Wilson respond at line 9?
    23    A.   "You know, they'd love to go to, you know, some top
    24    schools."
    25    Q.   Top schools, right?  And then at line 18, he says "I think
```

1    Courtney's looking at, you know, the top schools whether it's

2    ivy or whether that's, you know, they're kind of, you know, the

3    Cornells or the Princetons".  Do you see that?

4    A.    I do.

5    Q.    And then at page 7, if I could direct your attention to

6    line 20, who's the first person in this call to mention going

7    to Stanford?

8    A.    It appears to be Mr. Wilson.

9    Q.    And then, at page 8, Mr. Kendall asks you some questions

02:08 10    about Mr. Wilson's statement at line 20 concerning getting a

11    really good time.  You see that?  Mr. Wilson says, at line 17,

12    "On the other doors you have certain things like crew they can

13    try.  They can try that.  Is that still your number one, your

14    [unintelligible] a really good time?  I can work on that and

15    get a time of X".  Do you see that?

16    A.    Yes.

17    Q.    But at page 9, at line 11, Mr. Wilson says what at

18    line 11?

19    A.    "So what kind of deals is it there?  Is it like, you know,

02:09 20    [unintelligible,] water polo and donation or what is it like,

21    you know, if you get into that".

22    Q.    Had Mr. Singer previously defined the side door in this

23    conversation to your recollection?

24    A.    Not to my recollection, no.

25    Q.    Mr. Wilson's defining the side door:  Water polo and a

1    donation, correct?

2    A.   Yes.

3    Q.   He's the first person to mention athletics and money in

4    the same sentence in this call?

5    A.   Yes.  I believe that's the first reference.

6    Q.   And if I could direct your attention to page 16,

7    Mr. Wilson says, at line 3, "You're saying that's a minimum of

8    1.2 on the side door".  Do you see that?

9    A.   I do.

02:10 10   Q.   And then what does he say in the paragraph beginning at

11   line 6?

12   A.   "What sports would be best for them?  Is crew the best

13   even if you are talking about the ivies and stuff like that or

14   is that not gonna even matter?"

15   Q.   Who's the first person in this call which suggests that

16   what sport for Mr. Wilson's daughter is not even going to

17   matter in the context of the side door?

18   A.   Mr. Wilson.

19   Q.   And if we could take a look at page 18, what does

02:11 20   Mr. Singer say at line 20?

21   A.   "Guy's giving up his spot.  He's -- they're not a good

22   enough athlete to compete with".

23   Q.   There's no mention there of getting a better time, is

24   there?

25   A.   No.

1    Q.   And Mr. Kendall also --

2         MR. KENDALL:   Your Honor, I object to using the

3    transcript which is not in evidence.  I'd rather go with the

4    tape if he's going to be asking questions, because we have

5    differences on the tape.

6         MR. FRANK:   I don't think there's differences of

7    significance that have been identified on the transcript.  Your

8    Honor, it's ten after 2:00.  I'm trying to expedite.

9         THE COURT:   I'm going to let him proceed.  But if you

02:11 10   have a place, Mr. Kendall, where you believe the tape is

11   different than the transcript, you can bring it up on recross.

12        MR. KENDALL:   Thank you.

13   Q.   You were asked about page 8, line 23, Mr. Wilson's

14   reference to a contribution.

15   A.   Yes.

16   Q.   If I could direct your attention to page 19, what does

17   Mr. Wilson say at the beginning in the middle of line 13?

18   A.   "My God.  And is that a -- are those numbers -- are there

19   any way to make those like tax deductible as like donations to

02:12 20   the school and stuff?  How does that work?"

21   Q.   "Are there any way to make those like tax deductible as

22   like donations?"  Is that what he says?

23   A.   Yes.

24   Q.   Special Agent, have you ever made any charitable

25   contribution?

```
 1              MR. KENDALL:  Objection, your Honor.

 2              THE COURT:  Sustained.

 3   Q.   You were asked some questions about Exhibit 525.  Remember

 4   the call involving Mr. Caplan?

 5   A.   Yes.

 6   Q.   And whether there was any beating around the bush about

 7   fraud in those conversations?

 8   A.   Yes.

 9   Q.   Do you recall those questions?

10   A.   I do.

11   Q.   Mr. Wilson -- Mr. Singer asks you whether in that

12   conversation Mr. Caplan and Mr. Singer were discussing fraud

13   with, I believe his words were "exquisite frankness"?

14   A.   I don't recall that term, but yes.

15   Q.   Okay.  I'd like to direct your attention to page 10 of the

16   transcript of 561, the one we're in.

17   A.   Sorry.  One more time.  Page 10?

18   Q.   Transcript of 561, page 10, line 12.  Mr. Singer says,

19   "USC hasn't changed.  UCLA can be done for about three.  You

20   know, public schools are really hard in California because

21   everybody's watching them".

22   A.   Yes.

23   Q.   Any beating around the bush there?

24              MR. KENDALL:  Objection, your Honor.

25              THE COURT:  He can answer that.
```

1    A.    No.   The intention of that statement seems clear to me.

2          MR. KENDALL:  Objection, your Honor.

3          THE COURT:  Overruled.

4    Q.    Page 16.  Would you take a look at page 16, Special Agent.

5    At page 16, line 10, Mr. Singer says, in response to

6    Mr. Wilson's question about whether it's not going to even

7    matter, he says, "For me, it doesn't matter.  I'll make them a

8    sale or or something because of where you live."  Any beating

9    around the bush there?

02:15 10   A.    No.

11   Q.    And how does Mr. Wilson respond when Mr. Singer says he'll

12   make them a sale or or something because of where you live?

13   A.    He laughs and says, "That's probably more than I want to

14   go for.  Is there a two for one special if you've got twins?"

15   Q.    He appears to think it's funny?

16   A.    Yes.

17         MR. KENDALL:  Objection, your Honor.

18         THE COURT:  Sustained.

19   Q.    Can I direct your attention to page 18.  At line 13,

02:15 20   Mr. Singer says, "If you just try the athlete's side and you

21   were using the side door with the athlete, it's a done deal,

22   just like with John".  Mr. Wilson responds, "right, but you're

23   saying at the side, even as an alumni, is essentially 1.2."

24         Mr. Singer says at line 18, "Absolutely."  And then

25   at line 20, "Guy's giving up his spot.  He's -- they're not a

```
 1   good enough athlete to compete with."
 2              Any beating around the bush there?
 3   A.    No.
 4              MR. KENDALL:  Objection, your Honor.
 5              THE COURT:  Overruled.
 6   Q.    And at page 19 once again, Mr. Singer -- Mr. Wilson says,
 7   at line 10, "And they only get so many spots you get to fill."
 8   And at line 12, "yeah, yeah, that is a big issue".  And then he
 9   laughs and says, "oh, my God, and is that -- are those numbers,
10   are there any way to make those like tax deductible as like
11   donations to the school and stuff?  How does that work?"
12              Any beating around the bush there?
13   A.    No.
14   Q.    Special Agent, you were asked a series of questions about
15   Exhibit 525.  That was the call with Gordon Caplan?
16   A.    Yes.
17   Q.    And do you recall when Mr. Kendall asked you whether there
18   was anything in that call with Mr. Caplan about establishing a
19   multi-year relationship to advise Mr. Caplan's daughter?  Do
20   you recall that question?
21   A.    Generally, yes.
22              MR. KELLY:  I continue to object to the admission of
23   this against my client, your Honor.
24              THE COURT:  All right.  The objection is noted.
25   Q.    Was there anything in the call between Mr. Singer and
```

1   Mr. Caplan about posing Mr. Caplan's daughter as a sailor

2   because she lived near the water?

3   A.   I don't recall that, no.

4   Q.   Was there anything in the call with Mr. Caplan about

5   getting a two for one special on buying an athletic recruitment

6   spot?

7   A.   No.

8        MR. KENDALL:  Objection, your Honor.

9        THE COURT:  Overruled.

02:17 10  Q.   Was there anything in the call with Mr. Caplan about

11  deducting payments for an athletic recruitment spot as like a

12  donation?

13  A.   No.

14  Q.   Or as a business expense?

15  A.   No.

16  Q.   How many of those things do you recall coming up in

17  Mr. Wilson's calls and Mr. Wilson's e-mails with Mr. Singer?

18       MR. KENDALL:  Objection, your Honor.

19       THE COURT:  Sustained.

02:18 20       MR. FRANK:  No further questions, your Honor.

21       THE COURT:  Recross, Mr. Kendall?

22       MR. KENDALL:  Yes, your Honor.

23            RECROSS-EXAMINATION OF KEITH BROWN

24  BY MR. KENDALL:

25  Q.   I'd like to start with one of the e-mails that was brought

1    up on -- excuse me.  I'd like to start with one of the e-mails

2    that was brought up on redirect for the first time.

3            MR. KENDALL:  If we could -- Randall, could you pick

4    up Exhibit 711, please.  Yeah.  Oh, excuse me.  Okay.  If I

5    could ask the government, since we just got it, could you put

6    up 711, please?

7    Q.   Now, if we take a look at this, we see this is from -- did

8    you pick this e-mail?

9    A.   Did I pick it?  No, I did not.

02:19 10   Q.   I'm going to get to the point.  There's two versions of

11   this e-mail in the government's possession.  You've got one

12   here right now, and it starts with a chain from John Wilson.

13   If we look at it from the bottom, we see John saying on

14   October 18, 2013, at 9:45 p.m. that he and Leslie are coming to

15   California.  Do you see that?

16           MR. FRANK:  Objection.  That's not what it says.

17   A.   That's not what it says.

18   Q.   "Leslie and I are in California this week."  Thank you

19   very much.  "Leslie and I are in California this week.  Can we

02:19 20   meet this weekend or next Saturday?"  Correct?

21   A.   Yes.

22   Q.   And so do you have a pen and paper there?

23   A.   No.

24   Q.   I can't put these up next to each other because they're

25   going to be in different systems.  So if you can just remember

1   that.

2          October 18 at 9:45 p.m. Mr. Singer responds on

3   October 19, 2013, at 6:49, "coming over at 3:30 tomorrow".

4          And is it your point that this is implying that he's

5   coming over on 3:30 on the 20th?

6          MR. FRANK:  Objection.  He's not making a point.

7          THE COURT:  Yeah.  He's not making a point.  You can

8   ask him about what he sees in the e-mail.

9   Q.   You see it says "coming over at 3:30 tomorrow," correct?

02:20 10   A.   Yes.

11   Q.   And the date of that is October 19th at 6:49?

12   A.   Yes.

13   Q.   Correct?  And Mr. Wilson's response is "Fantastic," and

14   his response is at October 19, 2013, at 12:58 a.m.?

15   A.   Okay.

16   Q.   Well, my first question is if Mr. Singer sends a message

17   at 6:49 on October 19th, how does Mr. Wilson respond at 12:58

18   a.m. on the same day?

19   A.   I can't say it with certainty, but my suspicion is that

02:21 20   given Mr. Wilson, as you said, resided in Europe, there might

21   be an issue with the time code for each e-mail.  That could be

22   a possible explanation.

23   Q.   Okay.  So were you aware of that before my question?

24   A.   No.  You just pointed out the times to me.

25   Q.   Okay.  So in your preparation with the government, nobody

 1    pointed out this time issue.  Is that fair to say?

 2    A.   I don't recall reviewing this e-mail in preparation for

 3    today.

 4    Q.   Okay.  So you're just reading it blind, correct?

 5    A.   Yes.

 6    Q.   I mean, you're just reading it without prep?

 7    A.   Yes.

 8    Q.   Okay.

 9         MR. KENDALL:  Can we then have Exhibit 96 and 98,

02:21 10   Randall.

11    Q.   Okay.  This is something the government hasn't shown you,

12    correct?

13    A.   I don't see it.

14         MR. KENDALL:  Your Honor, I'd like to offer

15    Exhibit 9698.  It's the same --

16         THE COURT:  It's not on the screen.

17         MR. KENDALL:  Okay.

18    Q.   Can you see it now for the witness only?

19    A.   Yes.

02:22 20   Q.   It's the same e-mail chain, correct, but this is

21    Mr. Singer's version of it, or it appears to be, correct?

22    A.   I can't say that.  I'm just seeing this now.  I don't know

23    what it is.

24    Q.   Okay.  It's the same chain with one additional message,

25    correct?

```
 1              MR. KENDALL:  Your Honor, I can't put them --

 2    A.   Yes.  It appears to be.

 3    Q.   Okay.  And if you notice, if we go down to the second

 4    page, at the top of the second page, you'll see there's a bates

 5    number there to show it was produced by the government,

 6    correct?  USAO-VB.

 7    A.   I'll take your word that that's what that means.

 8              MR. KENDALL:  Your Honor, I'd like to offer this in

 9    for completeness of the chain.

02:22 10              MR. FRANK:  No objection.

11              THE COURT:  It will be admitted.

12              (Exhibit 9698 admitted into evidence.)

13    Q.   Now, let's start from the bottom up and read this.  Again,

14    we see on October 18th at 9:45 p.m. John Wilson saying "R,

15    Leslie and I are in California this week.  Can we meet this

16    weekend or next Saturday?" Correct?

17    A.   Yes.

18    Q.   And then the response is October 19, 2013, at 6:49.  Rick

19    Singer writes, "Coming over at 3:30 tomorrow", correct?

02:23 20    A.   Yes.

21    Q.   He doesn't say what 3:30 is tomorrow, whether it's a

22    Saturday or Sunday, correct?

23    A.   Correct.

24    Q.   And then we see on October 18, 2013, Mr. Wilson responds,

25    correct?
```

```
 1    A.    Yes.
 2    Q.    So if we're just going by the days, he's sending a
 3    response the day before the e-mail was sent, correct?
 4    A.    Yes.  Again --
 5    Q.    And if you could just let me lead the questions.
 6              MR. FRANK:  Your Honor, I object, if the witness
 7    hasn't answered.
 8              THE COURT:  He needs to be able to answer the
 9    question.
02:23 10              MR. KENDALL:  I've just asked if you could see that
11    the date was a day earlier, correct?
12              MR. FRANK:  That's not what he asked actually.
13              MR. KENDALL:  I'll rephrase it, your Honor.
14    Q.    You see October 18th is the day of the response, correct?
15    Just yes or no.
16    A.    Yes.
17    Q.    And you agree with me, just yes or no, that's a day
18    earlier than October 19th?
19    A.    Yes.
02:24 20    Q.    Correct?  And then he says, "See you tomorrow".  That's
21    Mr. Singer, correct?
22    A.    Yes.
23    Q.    You agree with me that it appears to be that we have times
24    from different continents, correct?
25    A.    That's a likely explanation, yes, but I can't confirm
```

 1   that.

 2   Q.   And if I suggested to you that Mr. Wilson flew from

 3   Amsterdam that morning on the 19th to San Francisco, that would

 4   be a logical explanation, correct?

 5   A.   He did what?

 6   Q.   If he flew from Amsterdam on the morning of October 19th

 7   from AMS to San Francisco, that could be a logical explanation,

 8   correct?

 9   A.   Meaning his phone was in Europe during part of the e-mail

02:25 10   chain?  I don't understand.

11   Q.   No.  His phone was on an airplane not getting messages for

12   nine or ten hours of flight.

13   A.   I'm not sure what that's an explanation for but.

14   Q.   You agree there has to be some explanation how somebody

15   can respond on the 18th to a message on the 19th?

16   A.   And I'm sure it's present in metadata, an explanation as

17   to why it's there and the header information.

18   Q.   I'm just asking you there has to be an explanation.  I'm

19   not asking you to speculate, correct?

02:25 20   A.   Well, you are asking me to speculate.

21   Q.   I'm not asking you to speculate.

22   A.   I don't know why the dates.

23   Q.   Okay, but that's not what I'm asking you.  You don't know

24   why?

25   A.   I personally don't.

```
 1   Q.   And you don't know if 3:30 tomorrow refers to Saturday or

 2   Sunday, correct?

 3   A.   No.

 4   Q.   Okay.  The next document I'd like to go to is Exhibit 711

 5   and 712.  Well, first of all, when Mr. Frank started his

 6   direct, he stated that I had said Mr. Wilson was in Europe on

 7   October 19th in his question.  And I believe you agreed with

 8   it.

 9            MR. FRANK:  I don't believe that's what I said, your

10   Honor.

11            MR. KENDALL:  As long as we have an agreement that I'm

12   not being accused of saying that, then we're fine.

13            MR. FRANK:  No.  What you said --

14            May I, your Honor?

15            THE COURT:  Yes.

16            MR. FRANK:  What you said was you asked a series of

17   questions suggesting that Mr. Wilson works in Europe.

18            MR. KENDALL:  Yeah.  He works in Europe.  He lives in

19   Europe.  I'm not disputing that.

20            MR. FRANK:  Yes.  That's what I said.

21   Q.   Okay.  So let's take a look at exhibit -- actually, let's

22   start first at Exhibit 65.

23            MR. KENDALL:  Can we have that up on the screen,

24   please.

25   Q.   You've looked at this before, correct?
```

```
 1    A.    Yes.

 2    Q.    It's dated June 11, 2013, from Leslie Wilson to Rick

 3    Singer and John Wilson, correct?

 4    A.    Yes.

 5    Q.    And it says "water polo shots of Johnny Wilson"?

 6    A.    Yes.

 7    Q.    And do you see that one of the JPGs there is the second

 8    one in and ends in the numbers 7905?

 9    A.    I do.

02:27  10   Q.    So we know that Leslie Wilson has sent Rick Singer a JPG

11    7905 on June 11, 2013, correct?

12    A.    Correct.

13          MR. KENDALL:   If we take a look and go through the

14    pictures and get that same one we had before, Mr. Carter, with

15    the thumb by the little white spot.  65A.  I'm sorry.  Yes.

16    65A.

17    Q.    So you see that picture there with the thumb and the white

18    spot?

19    A.    Yes.

02:28  20         MR. KENDALL:   Can we now go to Exhibit 88, please.

21    Q.    You see it's the same picture, correct?

22    A.    Yes.

23    Q.    If we can go to the first page of the e-mail, we see Rick

24    Singer forwards it to John Wilson at 7:30 p.m. on October 19th,

25    correct?
```

```
 1   A.    Forwards the profile.  Yeah.

 2   Q.    Yeah.  The profile that had the picture he got on

 3   June 11th, correct?

 4   A.    Correct.

 5   Q.    Okay.  And we see Mr. Margulies sent it to Mr. Singer at

 6   4:26 p.m., correct?

 7   A.    Yes.

 8   Q.    So it's not forwarded for at least 3 hours if the times

 9   are aligned and we don't even know that, correct?

10   A.    Correct.

11         MR. KENDALL:  Okay.  Now, could we go to Exhibit 712.

12   And I'd ask the government if you'd be kind enough to put it up

13   because we don't have it in our system yet.

14   Q.    We see John Wilson sends to Leslie a water polo shot that

15   has the JPG 7905?

16   A.    Correct.

17         MR. KENDALL:  Okay.  If we could look at the next

18   picture, please.

19   Q.    It's the same photo, correct?

20   A.    Yes.

21   Q.    Okay.  And so Leslie Wilson is the person that had those

22   photos.  It's already in the profile before Mr. Wilson sends

23   it, correct?

24   A.    Yes, based on a review of the prior exhibits, yes.

25   Q.    So there's no assumption that he's sending anything to
```

```
 1    Mr. Singer, correct?

 2              MR. FRANK:  Objection about what there's an assumption

 3    about.

 4              THE COURT:  Sustained.

 5    Q.   Next I'd like to go to -- you were asked some questions

 6    about some of the exhibits and whether there was an issue about

 7    an academic situation getting better.  Do you recall that?

 8    A.   Asked by whom?

 9    Q.   Mr. Frank, in his redirect.

10    A.   I'm not sure exactly what you're referring to.

11              MR. KENDALL:  Okay.  Let me just call up -- if we

12    could go to Exhibit 87.

13    Q.   Remember he showed you a document from March of 2013,

14    Johnny's junior year, and then showed you this document

15    October 18, 2013, and asked you to count the months and if

16    anything had gotten better?

17    A.   Is -- could you show me --

18    Q.   Do you want -- we can look at the third page if that will

19    refresh you.

20    A.   Yes.

21    Q.   Do you remember he asked you about this, and about

22    5 months had passed and did any academic things get better?

23    A.   Yes.

24              MR. KENDALL:  Okay.  I'd like to -- if you could just

25    show the witness, please, Exhibit 7785A and 7785.  It's an
```

1    e-mail and an attachment.

2    Q.   Do you agree with me that this appears to be another

3    e-mail between Mr. Wilson and Mr. Singer, correct?

4    A.   Yes.

5    Q.   And it's July 29th, which is in between the date of the

6    two exhibits that Mr. Frank showed you when asking about a

7    change in academic situation, correct?

8    A.   Yes.  I don't recall that he was asking about a change in

9    academic.  I think he was asking what year of school Johnny was

02:32 10   in.

11   Q.   No, he asked you from the junior year to the senior year

12   if things got better.  And then he showed you that letter and

13   you said, well, he got a statement from the school that showed

14   things didn't get better.

15   A.   I don't recall the discussion of things getting better.

16        MR. KENDALL:  Your Honor, I'd like to offer this into

17   evidence as direct impeachment, if I may.

18        MR. FRANK:  We have no objection to that coming in.

19        THE COURT:  Which one?  7785?

02:32 20        MR. KENDALL:  7785A and the attachment, which is 7785.

21        THE COURT:  It will be admitted.

22        MR. KENDALL:  If we could show that to the jury,

23   please.

24        (Exhibit 7785, 7785A admitted into evidence.)

25   Q.   It's John Wilson at Hyannis Port Capital July 29, 2013, to

1    Johnny's coach, Rick Singer.  And it says "Fwd: ACT".  You see

2    that?

3    A.   Yes.

4    Q.   And then John says, "R how do we view or percent rank

5    Johnny on his score?"  And if we turn to the first page of

6    7785, we see it's an ACT Plus Writing Student Report.

7         MR. KENDALL:  And, Randall, can you just highlight the

8    composite score and then the percentiles to the right of that.

9    Q.   He gets a 29.  You see that?

02:33 10   A.   Yes.

11   Q.   It puts him in the 93rd percentile of the United States,

12   correct?

13   A.   Yes.

14   Q.   That means for every 100 people who take the test, he did

15   better than 92 and seven did better than him, correct?

16   A.   Not an expert on percentiles, but that sounds correct.

17   Q.   Okay.  And then, if we could take that off and I'd like to

18   show you 8126, which is part of this e-mail chain that comes

19   about 27, 28 minutes later.

02:34 20        Could you just tell me if you recognize that.  Again,

21   it's an e-mail from John Wilson to Mr. Singer.

22   A.   Yes.

23   Q.   And remember from the first e-mail he asked, "How do we

24   view a percent range on Johnny's score"?  And then here he

25   follows up "ACT - I saw the percentiles - no need to reply".

```
 1   A.   Okay.

 2   Q.   If we could go to Exhibit --

 3            MR. KENDALL:  I'd like to offer that into evidence,

 4   your Honor.

 5            MR. FRANK:  No objection.

 6            THE COURT:  It will be admitted.

 7            (Exhibit 8126 admitted into evidence)

 8            MR. KENDALL:  If we could -- oh.  We haven't shown the

 9   jury.  I'm sorry.  Can we show the jury, please.

02:34 10   Q.   You can see there, "I saw the percentiles - no need to

11   reply".  So he's seen that his son hit the 93rd percentile on

12   the ACT, correct?

13   A.   Yes.

14            MR. KENDALL:  Okay.  If we can go back to Exhibit 88,

15   please.

16   Q.   This, of course, is the cover e-mail on the profile,

17   correct?

18   A.   Yes.

19   Q.   Let's go to page 2.  What we know on this profile is it's

02:35 20   got the wrong street, correct, 2 Fleur Street?

21   A.   Correction, with a typo.  Yes.

22   Q.   Not a typo.  It's 2 Fleur Street instead of 2 Fleur Place.

23            MR. FRANK:  I object.

24            THE COURT:  Sustained.

25   Q.   It's got the wrong name for the street, correct?
```

```
 1   A.   It's got the correct name for the street.  It describes
 2   the street as a street instead of a place.
 3   Q.   Do you know if you live on a street or an avenue or a
 4   place?
 5            MR. FRANK:  Objection.
 6            THE COURT:  Sustained.
 7   Q.   Okay.  It says 2 Fleur Street, when the correct name is 2
 8   Fleur Place, correct?
 9   A.   Correct.
10   Q.   Okay.  And then it lists Jack Bowen as the Stanford water
11   polo club, correct?
12   A.   Correct.
13   Q.   And it lists the SAT scores, but it doesn't list the ACT
14   score?
15   A.   That appears to be correct, yes.
16   Q.   If I were to suggest to you the ACT scores are a much
17   higher percentile, would you accept that representation?
18            MR. FRANK:  Objection, unless Mr. Kendall wants to
19   testify.
20            THE COURT:  Sustained.
21   Q.   And you agree with me there is no e-mail you're aware of
22   where John Wilson told Mr. Singer it's 2 Fleur Place, not 2
23   Fleur Street, correct?
24   A.   Cna you repeat the question?
25   Q.   There is no e-mail that the government picked to show you
```

| | |
|---|---|
| 1 | that has John Wilson telling Mr. Singer it's 2 Fleur Place not |
| 2 | 2 Fleur Street, correct? |
| 3 | A.    No. |
| 4 | Q.    And there's no e-mails from Mr. Wilson to Mr. Singer |
| 5 | saying Jack Bowen is not the coach of Stanford water polo. |
| 6 | Nobody showed you that e-mail, did they? |
| 7 | A.    They did not. |
| 8 | Q.    And nobody showed you the e-mail that said -- an e-mail |
| 9 | that said, you know, you forgot the Sopen water polo club.  You |
| 02:37 10 | never saw an e-mail like that, did you? |
| 11 | A.    I did not. |
| 12 | Q.    And you never saw an e-mail that said after all the money |
| 13 | I spent in tutoring, you didn't even put down the ACT scores? |
| 14 | You never saw anything like that either, did you? |
| 15 | A.    I did not, no. |
| 16 | MR. KENDALL:  Can I have one moment, your Honor? |
| 17 | THE COURT:  Yes. |
| 18 | MR. KENDALL:  I would now like to go to the tape.  And |
| 19 | Randall, if we can play the excerpt on Exhibit 561A on page 8. |
| 02:38 20 | I'm trying to get us down to about line 16 to line 22. |
| 21 | (Audio recording played.) |
| 22 | MR. KENDALL:  Stop there. |
| 23 | Q.    The tape says, "If they had a really good time, they could |
| 24 | work on that", correct? |
| 25 | A.    I'd have to hear it again.  It's hard to differentiate |

1    that word.

2    Q.    Okay.  You testified earlier for a transcript that says,

3    "I can work on that".  My question is, it really says

4    "differentiator.  If they had a really good time, they could

5    work on that".

6              MR. KENDALL:  Can we play that line over again?

7              (Audio recording played.)

8              MR. KENDALL: Stop.

9    Q.    They could work on that.  Is that it?

02:39 10    A.    Play it one more time.

11              MR. KENDALL:  Sure.

12              (Audio recording played.)

13    A.    He steps over the word "fast".  It's hard to tell.

14    Q.    It sounds like "they".  It doesn't sound like "I",

15    correct?

16    A.    I can't say that.

17    Q.    Would you like it a third time?

18    A.    Sure.

19    Q.    Okay.

02:40 20              (Audio recording played.)

21    A.    Again, it's very -- it's a stepped on sentence.  It's hard

22    to differentiate the word.

23    Q.    Do you agree he didn't say "I can"?  Is it your testimony

24    after hearing it three times that he said "I can"?

25    A.    Can I hear it one more time?

```
 1   Q.   Sure.
 2              (Audio recording played.)
 3   A.   Again "they" is a possibility, but I can't say with
 4   certainty.
 5   Q.   It's a better possibility than "I," isn't it?
 6   A.   I think it's possible.
 7   Q.   Well, let me play it one last time, let the jury hear it,
 8   and then we'll leave it be.
 9   A.   Sure.
10              (Audio recording played.)
11   Q.   Okay.  Does that change your testimony at all?
12   A.   I can see how "they" can be a possibility for that, yes.
13              MR. KENDALL:  Okay.  Next if we could go to page 19.
14   I'd like to get as close as we can to line 12.
15   Q.   You testified that John Wilson said, "Is there anyway to
16   make those like tax deductible as like donations".  My question
17   to you, didn't he say "Is there anyway to make those like tax
18   deductible?  Are they donations to the school?"  I want you to
19   listen to the tape and see if you'd go with the first or the
20   second version.
21              (Audio recording played.)
22   A.   I can hear a pause for the question mark there.
23   Q.   Do you hear, "Are they donations to the school"?
24   A.   I certainly don't hear a pause at the question.  That
25   sounds like a continued statement.  I'd have to hear it again,
```

1    if we're differentiating between "are" and "as".

2    Q.   Yeah.  Sure.

3         MR. KENDALL:  Why don't we play it again, please,

4    Randall.

5         (Audio recording played.)

6    Q.   "Are they donations to the school and stuff"

7    A.   No disrespect.  That sounds like "as" to me.  Maybe my

8    hearing's not as good as yours.  It sounds like --

9    Q.   My hearing doesn't matter.  We'll let the jury's hearing

02:42 10   decide.

11   A.   It sounds like "as" to me.

12        MR. KENDALL:  No further questions.  Thank you, your

13   Honor.

14        THE COURT:  Recross, Mr. Kelly.

15        MR. KELLY:  Yes.

16             RECROSS-EXAMINATION OF KEITH BROWN

17   BY MR. KELLY:

18   Q.   Okay.  Good afternoon again.

19   A.   Good afternoon.

02:44 20   Q.   All right.  Now, on redirect, the prosecutor asked you a

21   few times about Exhibit 352.  Can I have that put back up,

22   please.  See the top part here?  This is the e-mail, the

23   critical e-mail with the attachment that had the fake profile,

24   right?

25   A.   Yes.

1    Q.   And you have no idea how that ended up in his Gmail, do

2    you?

3    A.   We have thoughts on how it could have, but I do not know

4    with certainty how it did, no.

5    Q.   Right.  A lot of different thoughts or ideas, but no

6    certainty, correct?

7    A.   Discussed two possibilities with our forensics team, but

8    they're just possibilities.  I don't know for sure.

9    Q.   Right.  No conclusions have been drawn, right?

02:44 10   A.   Correct.

11   Q.   There's no evidence that he ever replied to this, right?

12   A.   No.

13   Q.   And there's no evidence that he ever forwarded this,

14   right?

15   A.   Not that I've seen, no.

16   Q.   Okay.  There's no evidence that he ever opened the

17   attachment to this, is there?

18   A.   No.

19   Q.   And, in fact, when Mr. Singer sent it along on 8/8/2017,

02:45 20   it bounced back.  Let's see the bounceback again, please.

21        MR. FRANK:  Your Honor, are we just retreading the

22   same ground?

23        MR. KELLY:  No.  I'm addressing his redirect.

24        So please put up 1924.

25   Q.   This is the one you didn't see before coming to court

1    today, right?

2    A.    Yes.  And the only correction I'd make to your statement

3    is it's not necessarily a bounceback.  It's an advisement that

4    he's changed his e-mail.  It's not that it wasn't delivered.

5    Q.    Fair enough.  But it says, "I have changed my e-mail

6    address to GamalAziz797@gmail," right?

7    A.    Correct.

8    Q.    And then we saw Exhibit 351.  Please show that.  And

9    that's the one with the typo.  Singer sent it to the wrong

02:46 10   address, right?

11    A.    Yes.

12    Q.    Off in cyberspace time traveling somewhere, right?

13    A.    All through cyberspace, yes.

14    Q.    And this is also one you didn't get a chance to review

15    before you testified, right?

16    A.    I don't recall seeing this e-mail, no.

17    Q.    Okay.  So that's also one the government did not show you

18    before you came to court, right?

19           MR. FRANK:  Objection, your Honor.

02:46 20          THE COURT:  Sustained.

21    Q.    The only thing you know is that on July 1st of 2019 the

22    FBI served a search warrant and Google reported that, as of

23    July 1, 2019, there was this e-mail in Gmail, but you don't

24    know how it got there, right?

25    A.    That's a fair statement, yes.

```
 1    Q.   All right.  And the prosecutor asked you about the concept
 2    of time traveling.
 3    A.   Yes.
 4    Q.   Are you familiar with the concept of a defendant reading
 5    his old e-mails when he's indicted?
 6    A.   I'm sorry.  Doing what?
 7    Q.   Would it surprise you that after a man is indicted in
 8    March of 2019 he might go back and look at all his old e-mails
 9    on all his different devices, sir?
10         MR. FRANK:  Objection to the testifying and
11    speculation.
12         THE COURT:  I'll let him answer that question.
13    A.   Yes, with the caveat that I don't know either way if that
14    e-mail was read or not.
15    Q.   Right.  You have no idea?
16    A.   No idea.
17    Q.   Fair enough.  And you were asked whether Sabrina Abdelaziz
18    could make a significant contribution to a college basketball
19    program, right?
20    A.   Yes.
21    Q.   Do you think team managers make significant contributions
22    to basketball teams?
23    A.   I assume so.  I guess.
24    Q.   How about practice players?  Do you think they make
25    significant contributions to a team?
```

02:47 (line 10)
02:47 (line 20)

1   A.   Relative to a starting player?  No.

2   Q.   Well, are you aware that some of the best women's

3   basketball programs in the country use practice players?

4   A.   No.

5   Q.   You're not aware of that?

6   A.   I'd have no basis either way.

7   Q.   Are you aware that Rick Singer told Mr. Abdelaziz that his

8   daughter could be a team manager or a practice player?

9         MR. FRANK:  Objection.

02:48 10         THE COURT:  Sustained.

11   Q.   You have no idea what Rick Singer told Mr. Abdelaziz, do

12   you?

13   A.   No.

14         MR. KELLY:  Your Honor, I have seven discrete e-mails.

15   I'd like to offer quickly with this witness.  I've given the

16   numbers to the government.  If I can put them in now, I will.

17   If they won't agree, I'll have to recall the witness.

18         MR. FRANK:  He can have his own reader and chance to

19   put the exhibits in during his examination.

02:49 20         MR. KELLY:  Well, under the rule of completeness,

21   under 106, I would suggest they're admissible.  And under

22   Rule 102 in the ascertainment of truth, which the rules are

23   supposed to be interpreted as, I suggest these --

24         THE COURT:  All right.  We've discussed this at

25   sidebar before.  You can introduce them in your case-in-chief,

```
 1    but not at this point.

 2              MR. KELLY:  Thank you, your Honor.  That would be it

 3    then.

 4              THE COURT:  All right.  Thank you.  You may step down,

 5    Mr. Brown.

 6              THE WITNESS:  Thank you, your Honor.

 7              THE COURT:  Call your next witness.

 8              MR. STEARNS:  The United States calls Rachel Sih.

 9              THE COURT:  Is it Mr. O'Connell?

10            MR. STEARNS:  Stearns, your Honor.

11            THE COURT:  Mr. Stearns.  Excuse me.  Mr. Stearns.

12            Rachel Sih, sworn.

13            MR. KENDALL:  Your Honor, just a continuing objection.

14            THE COURT:  Yes.

15            MR. KENDALL:  Thank you.

16            THE CLERK:  And would you just please state your name

17    for the record, spelling your last.

18            THE WITNESS:  Yes, Rachel, middle name Q-i, last name

19    S-i-h.

20            THE COURT:  And you pronounce that Sih?

21            THE WITNESS:  Yes.

22            THE COURT:  Sih.  If you'd pull the chair closer in so

23    that you can speak right into the microphone without having to

24    lean.  Thank you.

25            THE WITNESS:  Okay.
```

```
 1              THE COURT:  Mr. Stearns.

 2                 DIRECT EXAMINATION OF RACHEL SIH

 3    BY MR. STEARNS:

 4    Q.   Good afternoon, Miss Sih.

 5    A.   Good afternoon.

 6    Q.   How old are you?

 7    A.   I'm 21 years old.

 8    Q.   Where do you live?

 9    A.   I live -- currently live at Wellesley College.

10    Q.   You go to school at Wellesley College?

11    A.   Yes.

12    Q.   What year are you?

13    A.   I'm a senior.

14    Q.   What are you studying?

15    A.   I'm double majoring in economics and music.

16    Q.   Do you know Sabrina Abdelaziz?

17    A.   Yes.

18    Q.   How did you know Miss Abdelaziz?

19    A.   We were classmates in high school together in the same

20    grade.

21    Q.   How else do you know Sabrina Abdelaziz?

22    A.   We played together in my freshman year on the JV

23    basketball team.

24    Q.   Okay.  And after your freshman year, what team did you

25    play on?
```

```
 1   A.    I played on the varsity basketball team through my
 2   sophomore and senior year, through my sophomore to my senior
 3   year.
 4   Q.    And did Sabrina Abdelaziz ever play on the varsity
 5   basketball team with you?
 6   A.    No.
 7   Q.    We'll come back to that.  Where did you grow up, Miss Sih?
 8   A.    I grew up in Hong Kong.
 9   Q.    And how long did you live in Hong Kong?
10   A.    For around 18 years.
11   Q.    And where did you go to school?
12   A.    I went to Hong Kong International School.
13   Q.    What is the Hong Kong International School?
14   A.    It's a private American educated school.
15   Q.    And how long did -- does Hong Kong International School
16   also go by another name sometimes?
17   A.    Yes.  We go by HKIS.
18   Q.    And how long did you attend HKIS?
19   A.    I attended HKIS for 14 years.
20   Q.    From what grade to what grade?
21   A.    From pre-k to 12th grade.
22   Q.    Okay.  And what year did you graduate from HKIS?
23   A.    2018.
24   Q.    The spring of 2018?
25   A.    Yes.
```

1    Q.    Okay.  When did you begin playing basketball

2    competitively?

3    A.    I began playing basketball competitively around sixth

4    grade.

5    Q.    Okay.  And did you play basketball at HKIS?

6    A.    Yes.

7    Q.    What teams, if you could just remind us, what teams you

8    played on at HKIS in high school and what years?

9    A.    In high school, I played on the JV women's basketball team

02:53 10   in my freshman year, and then through my sophomore to senior

11   years I played on the varsity team.

12   Q.    Okay.  Can you explain how trying out for the varsity

13   women's basketball team at HKIS worked?

14   A.    Yeah.  So it's usually three days of tryouts in October.

15   On the first day, we'll have like combined tryouts.  So all the

16   girls trying out for varsity and JV play together.  And then on

17   the second and third day, we'll split off into who's trying out

18   for varsity and who's trying out for JV.

19   Q.    Okay.  Then if you were a junior and you were cut from the

02:53 20   varsity team, can you play junior varsity at HKIS?

21   A.    If you are a junior, no, you can not.

22   Q.    Okay.  If you're a freshman or sophomore and you're cut

23   from varsity, can you play JV?

24   A.    Yes.

25   Q.    Now, when you were on the JV team your freshman year with

1    Sabrina Abdelaziz, were you aware of who was on the varsity

2    team at HKIS?

3    A.    Yes.

4    Q.    Can you just tell us how you're aware of that?

5    A.    Yeah.  Sure.  So we -- the varsity and JV teams practice

6    on the same court, but we split the court so we can also just

7    look over and see who is on the team.  We'd share locker rooms

8    and we'd travel to away games together.

9    Q.    And, conversely, when you made varsity your sophomore year

02:54 10   through your senior year, were you aware of who was on the

11   junior varsity team?

12   A.    Yes.

13   Q.    Okay.  Did you also play basketball competitively in high

14   school outside of HKIS?

15   A.    Yes.

16   Q.    Where did you play?

17   A.    I played for a club basketball team called Flight, and

18   later it was called Impact.

19   Q.    It's a club team?

02:54 20   A.    Yes.

21   Q.    Now I want to go back to your freshman year at HKIS.  How

22   did you meet Sabrina Abdelaziz?

23   A.    I met Sabrina Abdelaziz through the JV basketball team my

24   freshman year.

25   Q.    Okay.  And on the JV team, what position did you play?

A.    I played point guard and shooting guard.

Q.    And for those of us who are less basketball inclined, can

you just explain to us what a point guard is?

A.    Yeah.  So a point guard is usually sort of the shortest

person on the team because I guess the closer to the ground,

they can dribble better, and they're faster so they can weave

through sort of the bigger players.

Q.    And what position did Sabrina Abdelaziz play on the JV

basketball team?

A.    Sabrina played center.

Q.    Okay.  Similar to a point guard, what's a center?

A.    A center is usually the tallest person on the team because

we need people to get our rebounds when we miss our shots and

so the center's job is mainly to do that.

Q.    Okay.  You mentioned that you played club basketball

outside of HKIS.  Did you know whether your teammates at HKIS

also played club basketball outside of school?

A.    Yes.

Q.    And how did you know that?

A.    In Hong Kong --

       MR. KELLY:  Objection.  Relevance.

       THE COURT:  Overruled.

Q.    You may answer.  How did you know whether your teammates

at HKIS also played basketball outside of school?

A.    So, in Hong Kong, there weren't a lot of opportunities for

1    playing basketball outside of school for women specifically, so

2    when Flight opened up, most of the people -- actually, the

3    majority of us went over to Flight.

4    Q.   Okay.  And based on your observations and interactions,

5    did Sabrina Abdelaziz play club basketball outside of HKIS?

6    A.   Based on my observations, no.

7    Q.   Okay.  Now I'd like to turn to show you a few books,

8    Miss Sih.

9          MR. STEARNS:  If I could use the Elmo for this.  Just

02:56 10  for the witness at this point.

11          MR. KELLY:  I'm sorry.  I didn't hear that.

12          MR. STEARNS:  I'm going to use the Elmo.

13          MR. KELLY:  Yes.  And I'm going to object to

14    anything -- the photos, fine.  Anything else, writings, we

15    object to.

16    Q.   Do you recognize this book, Miss Sih?  Exhibit -- it has a

17    sticker on it, Exhibit 702?  You see that?

18    A.   Yes.

19    Q.   What is Exhibit 702?

02:57 20  A.   It's my freshman year yearbook from high school.

21    Q.   And how do you know that?

22    A.   Because there's writings inside that are addressed to me.

23    Q.   Okay.  Turning to page 233 of Exhibit 702.  Do you see the

24    photograph there?

25    A.   Yes.

```
 1   Q.   What is that a picture of?

 2   A.   It's a picture of the women's JV basketball team from my

 3   freshman year.

 4        MR. STEARNS:  The government offers page 233 of

 5   Exhibit 702, your Honor, into evidence.

 6        MR. KELLY:  Again, we don't object to the photos, but

 7   not the roster and the hearsay in it.

 8        MR. STEARNS:  Your Honor, there's a quote that's been

 9   redacted from the bottom.  There's a picture.  None of the

10   words on the page are being offered.

11        THE COURT:  And it just shows names.  I will allow it

12   to be admitted, that page, without any other material.  What's

13   the page number again?

14        MR. STEARNS:  Page 233 of 702.

15        THE COURT:  It will be admitted.

16        (Exhibit 702 admitted into evidence.)

17   Q.   I apologize, Miss Sih.  It's a little bit bright.  There's

18   like a sun spot in the middle here that we will try to work out

19   as we continue.

20        What is this a picture of?

21   A.   A picture of the women's JV basketball team from my

22   freshman year.

23   Q.   Okay.  And do you see yourself in that picture?

24   A.   Yes.

25   Q.   Where are you?
```

1    A.    In the front most row sitting down on the left side.

2    Q.    Okay.  And do you see Sabrina Abdelaziz in the picture of

3    the women's JV basketball team your freshman year?

4    A.    Yes.

5    Q.    Where is she?

6    A.    In back most row on the very left.

7    Q.    What number is she wearing?

8    A.    Number one.

9    Q.    Okay.  Now, turning -- do you see a picture in the bottom

02:59 10    row in the center with a woman or a girl dribbling a basketball

11    wearing glasses?

12    A.    I don't think we can see the photo.

13    Q.    Well, my apologies, let's see.  Do you see the picture in

14    the bottom row in the middle with the girl dribbling the

15    basketball?

16    A.    Yes.  Yes.

17    Q.    Is that Sabrina Abdelaziz?

18    A.    No.

19    Q.    Who is it?

02:59 20    A.    Shayla Sandoval.

21    Q.    Who was Miss Sandoval?

22    A.    Miss Sandoval was a point guard on our team who was in the

23    year above both Sabrina and I.

24    Q.    And if you just turn back to the team picture at the top

25    of page 233, can you point out where Miss Sandoval is in the

| | |
|---|---|
| 1 | team picture? |
| 2 | A.    Yeah.  She's in the middle row, the third from the left. |
| 3 | Q.    Wearing number 16 in glasses? |
| 4 | A.    Yes. |
| 5 | Q.    Turning to your sophomore year, Miss Sih, did you try out |
| 6 | for the varsity team at HKIS? |
| 7 | A.    Yes. |
| 8 | Q.    Did you make it? |
| 9 | A.    Yes. |
| 03:00 10 | Q.    Did Sabrina Abdelaziz try out for the varsity team at HKIS |
| 11 | during her sophomore year? |
| 12 | A.    No. |
| 13 | Q.    Okay.  What team did she play on her sophomore year? |
| 14 | A.    She played on the JV team. |
| 15 | Q.    Okay.  I'm going to turn to Exhibit 703.  Do you recognize |
| 16 | this? |
| 17 |        MR. STEARNS:  Just for the witness at the moment. |
| 18 | A.    Yes. |
| 19 | Q.    What is Exhibit 703? |
| 03:00 20 | A.    It's my sophomore year yearbook. |
| 21 | Q.    Okay.  If we turn to page 231, what is that a picture of? |
| 22 | A.    It's a picture of the women's varsity basketball team from |
| 23 | my sophomore year. |
| 24 | Q.    And page 233? |
| 25 | A.    A picture of the women's JV basketball team from my |

1    sophomore year.

2            MR. STEARNS:  The government offers pages 231 and 233

3    as Exhibit 703, your Honor.

4            THE COURT:  They will be admitted without any written

5    material other than the names.

6            (Exhibit 703 admitted into evidence.)

7    Q.   So just looking at the picture of the varsity team on

8    page 231, Miss Sih, if we could -- if the jurors can see that,

9    again, this is a picture of the varsity team your sophomore

03:01 10   year?

11   A.   Yes.

12   Q.   Okay.  Are you in this picture?

13   A.   Yes.

14   Q.   Where are you?

15   A.   In the front row on the very right.

16   Q.   Wearing number seven?

17   A.   Yes.

18   Q.   Okay.  Is Sabrina Abdelaziz in this picture?

19   A.   No.

03:01 20   Q.   Why not?

21   A.   Because she --

22           MR. KELLY:  Objection.  Relevance.

23           THE COURT:  Sustained.

24   Q.   Turning to page 233, what is that a picture of?

25   A.   It's a picture of the women's JV basketball team from my

```
 1    sophomore year.
 2    Q.    Okay.  And is Sabrina Abdelaziz in that picture?
 3    A.    Yes.
 4    Q.    Where is she?
 5    A.    She's in the back row, third from the left.
 6    Q.    Okay.  Wearing number one?
 7    A.    Yes.
 8    Q.    Okay.  Who was the captain of the JV team at HKIS your
 9    freshman year, Miss Sih?
10    A.    My freshman year it was Miss Jodi Cheung and Miss Sonja
11    Scheller.
12    Q.    And who were the captains of the JV team at HKIS your
13    sophomore year?
14    A.    My sophomore year it was Eileen Kim.
15    Q.    Okay.  Turning to your junior year, Miss Sih, did Sabrina
16    Abdelaziz try out for the varsity team?
17    A.    Yes.
18    Q.    Did she make the team?
19    A.    No.
20    Q.    What happened?
21    A.    She got cut from the team.
22    Q.    Okay.  And what happened after that?
23    A.    Because you get cut on the team at HKIS we don't allow
24    juniors to play -- or juniors or seniors to play on the JV
25    team, so she wasn't allowed to play basketball for HKIS.
```

1    Q.   Let's move to Exhibit 704, just for the witness at this

2    point.  Do you recognize the book marked as Exhibit 704,

3    Miss Sih?

4    A.   Yes.

5    Q.   What is it?

6    A.   It's my junior year yearbook.

7    Q.   Okay.  We're going to turn to page 215.

8         MR. STEARNS:  The government is going to offer pages

9    215 and 217, consistent with the previous exhibits.

03:03 10        THE COURT:  It will be admitted, again without any

11   written material other than the names.

12        (Exhibit 704 admitted into evidence.)

13   Q.   What is on page 215 of Exhibit 704, Miss Sih?

14   A.   It's a picture of the women's varsity basketball team from

15   my junior year.

16   Q.   Are you in this picture?

17   A.   Yes.

18   Q.   Where are you?

19   A.   I am in the front row on my knee on second from the right.

03:03 20   Q.   With the number seven on your arm?

21   A.   Yes.

22   Q.   Okay.  Do you know a girl named Nitya Velakacharla?

23   A.   Yes.

24   Q.   Who was Nitya Velakacharla?

25   A.   She was our captain during my junior year on the women's

1    varsity basketball team, and she was in the year above me.

2    Q.   Okay.  And is Miss Velakacharla in the picture in

3    Exhibit 704?

4    A.   Yes.

5    Q.   Where is she located?

6    A.   She is fourth from the left in the back row.

7    Q.   Okay.  The tallest girl with the long brown hair?

8    A.   Yes.

9    Q.   Okay.  Is Sabrina Abdelaziz in the picture in Exhibit 704?

03:04 10    A.   No.

11    Q.   Okay.  Turning to page 217, which is in evidence, of

12    Exhibit 704, what is that a picture of?

13    A.   Of the women's JV basketball team from my junior year.

14    Q.   Is Sabrina Abdelaziz in that picture?

15    A.   No.

16    Q.   Finally, turning to your senior year, Miss Sih, did

17    Sabrina Abdelaziz try out for the varsity basketball team

18    during her senior year?

19    A.   No.

03:04 20    Q.   Do you recognize the book that's been marked as

21    Exhibit 705?

22    A.   Yes.

23    Q.   What is it?

24    A.   It is my yearbook from senior year in high school.

25    Q.   Okay.  Again, just for the witness, we'll turn to

1    page 207.  Can you see that, Miss Sih?

2    A.   Yes.

3    Q.   What is on page 207 in Exhibit 705?

4    A.   It's a picture of the women's varsity basketball team from

5    my senior year.

6    Q.   And what is on page 209 of Exhibit 705?

7    A.   It's a picture of the women's JV basketball team from my

8    senior year.

9          MR. STEARNS:  The government offers pages 207, 209 of

03:05 10   Exhibit 705, your Honor.

11          THE COURT:  Again they will be admitted without

12   written material.

13          MR. STEARNS:  Thank you.

14          (Exhibit 705 admitted into evidence.)

15   Q.   Turning back to page 207 of Exhibit 705, Miss Sih, you

16   testified this is a picture of the women's varsity team your

17   senior year?

18   A.   Yes.

19   Q.   Are you in this picture?

03:05 20   A.   Yes.

21   Q.   Where are you located?

22   A.   I'm in the front row, third from the right.

23   Q.   Okay.  Is Sabrina Abdelaziz in this picture?

24   A.   No.

25   Q.   Okay.  Turning to page 209, again, you testified this is a

1    picture of the women's JV team your senior year at HKIS.

2    A.    Right.

3    Q.    Is Sabrina Abdelaziz in this picture?

4    A.    No.

5    Q.    So Miss Sih, when is the last time that Sabrina Abdelaziz

6    played basketball at HKIS?

7    A.    At the end of the sophomore season, so it was late

8    January, early February 2016.

9    Q.    Okay.  If we could switch back over to the computer

03:06 10    system, we're going to look at a few documents that are already

11    in evidence.

12          THE COURT:  Counsel, do you expect to finish shortly,

13    because if not, we're going to have to recess and call her back

14    on Monday?

15          MR. STEARNS:  I anticipate being done with direct,

16    Your Honor, in -- I think I can do it in 5 minutes.

17          THE COURT:  All right.  Then we'll have to call her

18    back for cross-examination.

19          MR. KELLY:  I can be quick.  I don't know if I can be

03:07 20    that quick.  I can go 10 minutes maybe, but I'll do whatever.

21          THE COURT:  Mr. Kendall?

22          MR. KENDALL:  Oh.  I have nothing, your Honor.  Thank

23    you.

24          THE COURT:  All right.  Jurors, I'm going to violate

25    my promise to let you go by three, but in order to save having

1    to call this witness back, I hope you'll bear with us and

2    we'll try to finish this up in ten or 15 minutes.

3            So go forward.

4            MR. STEARNS:  Thank you, your Honor.  We'll go forward

5    quickly.

6    Q.   Can we please look at Exhibit 340, which is in evidence.

7    Do you see that this is an e-mail from Gamal Aziz to an

8    individual named Rick Singer?

9    A.   Yes.

03:07 10   Q.   Okay.  And do you see that the subject is "Sabrina"?

11   A.   Yes.

12   Q.   What's the date of this e-mail, Miss Sih?

13   A.   July 27, 2017.

14   Q.   Approximately how long after Sabrina Abdelaziz stopped

15   playing basketball at HKIS is the date of this e-mail?

16   A.   Around 1.5 years.

17           MR STEARNS:  Okay.  Can we just click out of that,

18   Miss Lewis, and turn to the attachment.

19   Q.   Do you see the photograph, Miss Sih?

03:08 20   A.   Yes.

21   Q.   Who is that a picture of?

22   A.   The person dribbling the ball is Shayla Sandoval.

23   Q.   And are you in that picture?

24   A.   Yes.

25   Q.   Where are you?

1    A.    I'm in the back, my head is cut off, wearing number seven.

2    Q.    Okay.  Is Sabrina Abdelaziz in this picture anywhere?

3    A.    No.

4    Q.    Okay.  This is the same picture as the photograph we

5    looked at in Exhibit 702, your freshman yearbook, correct?

6    A.    Yes.

7          Mr. Stearns:  All right.  Can we pull up Exhibit 352,

8    Miss Lewis.

9    Q.    Do you see this is an e-mail from someone named Rick

03:08 10   Singer to Gamal Abdelaziz with the subject "Fwd: Sabrina"?

11   A.    Yes.

12   Q.    Okay.  What's the date?

13   A.    August 8, 2017.

14   Q.    Okay.  Again, that's about a year and a half after Sabrina

15   stopped playing basketball at HKIS?

16   A.    Yes.

17   Q.    It says, "Gamal please answer below profile for Sabrina...

18   her e-mail, phone and parents' names needed to be added in as I

19   did not have that.  Let me know if you want me to add any other

03:09 20   awards to her profile or if you think that is enough".

21         And do you see that there's an attachment?

22   A.    Yes.

23   Q.    What is the name of the attachment?

24   A.    SabrinaA.doc.

25         MR. STEARNS:  And can we turn to the attachment of the

Exhibit, Miss Lewis.

Q.   In the top left, you'll see under Sabrina Abdelaziz's name, do you see where it says "Point Guard"?

A.   Yes.

Q.   Was it true or untrue that Sabrina Abdelaziz was the point guard?

A.   It was untrue.

Q.   Okay.  Do you know the height?  What's the height?

A.   5'8".

03:09      MR. STEARNS:  Okay.  And we can click out of that, Miss Lewis, and turn to the picture in the top right.

Q.   Is that Sabrina Abdelaziz?

A.   No.

Q.   Okay.  Who is that a picture of?

A.   Shayla Sandoval.

        MR. STEARNS:  Okay.  Can we click out of that, Miss Lewis, and go to the bottom, Exhibit 352, the attachment, the bottom square, bottom box.

Q.   Do you see under "Hong Kong International School

03:10 Basketball" a number of items listed?

A.   Yes.

Q.   We'll just quickly walk through these.  Was it true or untrue that Sabrina Abdelaziz was a starting point guard for HKIS?

A.   Untrue.

```
 1   Q.   Was it true or untrue that Sabrina Abdelaziz was a team

 2   captain of the women's basketball team at HKIS?

 3   A.   Untrue.

 4   Q.   Do you see where it says "48th Holiday Basketball

 5   Tournament Champions"?

 6   A.   Yes.

 7   Q.   Are you familiar with that tournament?

 8   A.   Yes.

 9   Q.   Did Sabrina Abdelaziz ever play in that tournament?

10   A.   No.

11   Q.   How do you know that?

12   A.   Because the tournament was a varsity only tournament and

13   Sabrina didn't play on varsity.

14   Q.   Okay.  Do you see two lines down where it says "APAC

15   Basketball Finals"?

16   A.   Yes.

17   Q.   What is that?

18   A.   That is -- APAC is our like final varsity tournament at

19   the end of the season.

20   Q.   Did Sabrina Abdelaziz ever play in the APAC basketball

21   finals?

22   A.   No.

23   Q.   Okay.  Do you see two lines down it says "ISSFHK runner

24   up"?

25   A.   Yes.
```

```
 1   Q.   What does ISSFHK stand for?

 2   A.   It stands for the International School Sports Federation

 3   of Hong Kong.

 4   Q.   Okay.  And was it true or untrue that Sabrina Abdelaziz

 5   was a runner up in the ISSFHK?

 6   A.   Untrue.

 7   Q.   How do you know that?

 8   A.   Because in my freshman year we got third place together

 9   and then in the sophomore year where Sabrina played, they got

10   fifth place.

11   Q.   Going up one item, do you see where it says "International

12   School Sports Federation of Hong Kong Select Team"?

13   A.   Yes.

14   Q.   Have you ever heard of that?

15   A.   No.

16   Q.   Was Sabrina Abdelaziz on that select team?

17   A.   No.

18   Q.   Do you see where it says "Asia Pacific Activities

19   Conference All Star Team"?

20   A.   Yes.

21   Q.   Was it true or untrue that Sabrina Abdelaziz made that all

22   star team?

23   A.   Untrue.

24   Q.   How do you know that?

25   A.   Because APAC is a varsity only tournament so she wouldn't
```

```
 1   have been able to play or make the all star team.
 2   Q.   Okay.  And then the bottom box, we'll go more quickly
 3   through that.  Do you see that says "Hong Kong Basketball
 4   Academy"?
 5   A.   Yes.
 6   Q.   What is Hong Kong Basketball Academy?
 7   A.   It's a club basketball team.
 8   Q.   Okay.  And did Sabrina Abdelaziz ever play for the Hong
 9   Kong Basketball Academy?
10   A.   No.
11   Q.   How do you know that?
12   A.   Because when I was in high school, HKBA didn't have
13   opportunity for girls to play basketball, so it was only for
14   men's basketball.
15            MR. STEARNS:  If we can look at Exhibit 381,
16   Miss Lewis, which is already in evidence.
17   Q.   Miss Sih, do you see that this is an e-mail from someone
18   named Donna Heinel to Katie Fuller?
19   A.   Yes.
20   Q.   And the date is October 3, 2017?
21   A.   Yes.
22   Q.   And there's an attachment?
23   A.   Yes.
24   Q.   What's the name of the attachment?
25   A.   Sabrina Abdelaziz profile.doc.
```

```
 1              MR. STEARNS:  And if we could turn to the attachment,
 2     Miss Lewis.
 3     Q.   Do you see under the height, Miss Sih, what does it say
 4     now?
 5     A.   5'10".
 6     Q.   If we go to the picture in the top right, Miss Lewis,
 7     Exhibit 381, who is that a picture of, Miss Sih?
 8     A.   It's a picture of Nichia Velakacharla.
 9     Q.   And remind us who she was again?
 10    A.   She was our captain from my junior year.
 11    Q.   Are you familiar with that picture?
 12    A.   Yes.
 13    Q.   How are you familiar with that picture?
 14    A.   Because if you uncrop the picture, I'm in it.
 15    Q.   Okay.  Where have you seen that picture?
 16    A.   It was in the South China Morning Post, which was a Hong
 17    Kong based newspaper, as well as our school newspaper online.
 18    Q.   Okay.  And where was that picture taken?
 19    A.   At the holiday basketball tournament in November 2016.
 20    Q.   Your junior year?
 21    A.   Yes.
 22    Q.   Was Sabrina Abdelaziz playing basketball for HKIS then?
 23    A.   No.
 24    Q.   Okay.  Just a few more questions, Miss Sih.  How many
 25    years did you play varsity basketball at HKIS
```

```
 1    A.    I played varsity basketball for 3 years.
 2    Q.    How many Division 1 U.S. college basketball programs were
 3    you recruited by?
 4    A.    None.
 5    Q.    How many Division 2 U.S. basketball programs were you
 6    recruited by?
 7    A.    None.
 8    Q.    How many Division 3 U.S. basketball programs were you
 9    recruited by?
10    A.    None.
11    Q.    And did Sabrina Abdelaziz ever practice with the varsity
12    team at HKIS?
13    A.    No.
14    Q.    Was she ever a practice player on the varsity team at
15    HKIS?
16    A.    No.
17              MR. STEARNS:  Nothing further, your Honor.
18              THE COURT:  Cross-examination, Mr. Kelly.
19              MR. KELLY:  Yes, your Honor.
20                   CROSS-EXAMINATION OF RACHEL SIH
21    BY MR. KELLY:
22    Q.    Good afternoon, Miss Sih.
23    A.    Good afternoon.
24    Q.    Hope school's going well so far.
25    A.    Yeah.  Thank you.
```

1    Q.   Have you ever met Mr. Abdelaziz?

2    A.   No.

3    Q.   Never spoken to him, right?

4    A.   No.

5    Q.   All these documents you were just shown with the profile

6    and the awards, you don't know who put them together, do you?

7    A.   No.

8    Q.   This high school yearbook that the prosecutor asked you so

9    many questions about, did you have it with you at college?

03:15 10   A.   No.

11   Q.   Okay.  So did the government, the federal government, have

12   you go look and search for this high school yearbook to bring

13   to federal court?

14   A.   Yes.  My parents.

15   Q.   All right.  Now you don't know Mr. Abdelaziz, but you know

16   his daughter, right?

17   A.   Yes.

18   Q.   I'd like to show you, just the witness only, Exhibit 1335.

19   Do you recognize the people in that photo?

03:16 20   A.   Yes.

21        MR. KELLY:  I'd offer it.

22        MR. FRANK:  No objection.

23        THE COURT:  It will be admitted.

24        (Exhibit 1335 admitted into evidence.)

25   Q.   And who's the player in the middle there with the number

```
 1   one on?

 2   A.   That's Sabrina.

 3   Q.   Okay.  And that's obviously a basketball team, right?

 4   A.   Correct.

 5   Q.   How about Exhibit 1168?  Do you recognize that?

 6   A.   I've never seen this photo.

 7   Q.   Do you know who it is in the photo?

 8   A.   Yes.

 9            MR. KELLY:  Okay.  I'd offer it.

10            THE COURT:  It will be admitted.

11            (Exhibit 1168 admitted into evidence.)

12   Q.   And who's that in the photo?

13   A.   Sabrina.

14   Q.   That would be the daughter of Gamal Abdelaziz, right?

15   A.   I wouldn't know that.

16   Q.   All right.  Well, all right.  So let's talk briefly,

17   quickly, about your high school, HKIS.  It's pretty much an

18   academic based school, right?

19   A.   I wouldn't say that.

20   Q.   Well, would you say it's a basketball powerhouse?

21   A.   Oh, no.

22   Q.   No.  So it's not a school -- I mean, on direct you kind of

23   laughed at the idea that people were getting recruited for

24   basketball from HKIS, right?

25   A.   Yes.
```

1    Q.    Now anybody who knows anything about HKIS would know it's

2    not a basketball powerhouse, right?

3                MR. STEARNS:  Objection.

4                THE COURT:  Overruled.

5                THE WITNESS:  So do I answer the question?

6                THE COURT:  Yes.  You can answer.

7    A.    Okay.  Well, we were pretty good in Asia but we're not a

8    basketball powerhouse.

9    Q.    All right.  So anyone from a Division 1 school here in

03:17 10   America would know you're not going to get a lot of great

11   Division 1 women's players from HKIS, correct?

12                MR. STEARNS:  Objection as to what a lot of people

13   know.

14                THE COURT:  Sustained.

15   Q.    Well, are you aware of anyone from HKIS ever playing

16   Division 1 women's basketball?

17   A.    No.

18   Q.    And HKIS, a lot of kids who go there are from wealthy

19   backgrounds?

03:18 20   A.    Yes, the majority.

21   Q.    The majority.  And they send a lot of kids every year to

22   USC, right?

23   A.    It's one of the more popular schools, yes.

24   Q.    All right.  And USC, like many other schools, send

25   representatives to campus on occasion, right?

1    A.    Yes.

2    Q.    And in fact, USC goes to HKIS on occasion, right?

3    A.    Sorry.  Can you repeat the question?

4    Q.    Yeah.  That was a terrible question.  Sorry.

5          You said USC, like other colleges, sometimes visit

6    your old high school, right?

7    A.    Yes.  They send, like, college admission representatives.

8    Q.    All right.  And for USC, would you happen to recall a man

9    named Kirk Brennan?

03:19 10   A.    No.

11   Q.    Would you happen to recall the name of anyone from USC who

12   went to your old high school?

13   A.    Like the administration, or are you talking about like

14   student wise?

15   Q.    I'm sorry.  People from USC who go to your school to, you

16   know, recruit students, that sort of thing, representatives of

17   USC, would you remember now years later any of their names?

18   A.    No.

19   Q.    All right.  But if a USC representative went to HKIS and a

03:19 20   lot of kids were going to USC, they might also know it's not a

21   basketball powerhouse, right?

22         MR. STEARNS:  Objection to what might other people

23   knew.

24         THE COURT:  Sustained.

25   Q.    Was it certainly well known to you that your high school

 1    was not a basketball powerhouse, right?

 2    A.    I wouldn't know.

 3    Q.    Okay.  But like you said, you never had anybody get

 4    recruited from your old high school for Division 1 women's

 5    basketball, right?

 6    A.    No.

 7    Q.    And if you were back in high school and someone said to

 8    you has Sabrina Abdelaziz ever played sports with you, what

 9    would your answer be?

03:20 10           MR. STEARNS:  Objection to the hypothetical.

11           THE COURT:  Sustained.

12    Q.    You played sports with Sabrina, didn't you?

13    A.    Yes.  I played JV basketball with her my freshman year.

14    Q.    Right.  And basketball's a sport, isn't it?

15    A.    Yes.

16           MR. KELLY:  Okay.  All right.  Thank you.  That's it.

17           THE COURT:  Any cross from Mr. Kendall?

18           MR. KENDALL:  No, your Honor.

19           THE COURT:  Any redirect?

03:20 20           MR. STEARNS:  Thank you.  Just a couple questions.

21                  REDIRECT EXAMINATION OF RACHEL SIH

22    BY MR. STEARNS:

23    Q.    Can we pull up Exhibit 1168, I believe.  Miss Sih, did you

24    attend a banquet for HKIS at the end of your sophomore year for

25    athletics?

```
 1    A.    Yes.

 2    Q.    Okay.  And was Miss Abdelaziz at that banquet as well?

 3    A.    Yes.

 4    Q.    And did she win an award?

 5    A.    Yes.

 6    Q.    And what did she win?

 7    A.    The MVP of the JV basketball team.

 8    Q.    And based on your observations of interactions with

 9    Miss Abdelaziz over the years, what was your evaluation of her

10    as a basketball player?

11              MR. KELLY:  Objection.

12              THE COURT:  Sustained.

13              MR. STEARNS:  No further questions, your Honor.

14              THE COURT:  Redirect -- or recross?

15              MR. KELLY:  No, your Honor.

16              THE COURT:  Thank you, Miss Sih.  You may step down.

17              THE WITNESS:  Thank you, your Honor.

18              THE COURT:  We're going to now break for the week.

19    Jurors, we will be in recess today.  We're going to have a full

20    week next week, but I am able to tell you that we're not going

21    to have a session on Wednesday.  We're going to have Monday,

22    Tuesday.  We're going to have Wednesday off.  Then we'll have

23    Thursday and Friday next week.  I'm trying to allow us to have

24    a day off once a week.  It's important not only for you but for

25    the Court and for all of the rest of the business we have to
```

conduct.

It is especially important now that you're going to be in recess for a weekend, that's two days you're not going to have to worry about this case or think about it even if you don't want to, but very important for you to honor my instructions about not talking about the case with anybody else.

Again, as I told you, I sound like a broken record, but the reason for that is not what's going on here is a secret.  Anybody who wants to come in can.  And in this case, there's an overflow courtroom where people can watch our proceedings, but the people you talk to have not seen this case, have not seen all the evidence.  And what they say to you about a case or about something they think is similar to this case would be entirely inappropriate for you to consider because you're going to decide this case solely on the basis of the evidence that comes into this courtroom and not on the basis of anything else, what anybody else says about a case or that they think is similar, and so on and so forth.  You can understand that.

So again, you can use me as the foil.  Say I'll talk to you about this case all you want after the end of the case, but I cannot talk to you about the case during -- while the evidence is still going on.  Because you shouldn't be making up your mind until you've heard all the evidence and you've heard

```
 1    closing arguments at the end of the case and you've heard my
 2    instructions on the law.  Then you're going to go deliberate
 3    and that's when you're going to decide this case.
 4           So have a pleasant weekend.  I'll see you at 9:00 a.m.
 5    Monday morning and that's -- what's the date of that?
 6           THE CLERK:  20th, I believe.
 7           THE COURT:  The 20th of September.  I'll see you then.
 8    Have a nice weekend.
 9           (Jury exits.)
10           THE COURT:  Please be seated, counsel.
11           Monday's lineup?
12           MR. FRANK:  Our current intention, your Honor, is to
13    pick up with Mikaela Sanford, followed by Special Agent
14    Keating.
15           THE COURT:  Sanford will be a relatively short direct
16    and Keating be long.
17           MR. FRANK:  That's correct.
18           THE COURT:  How many hours did you think?
19           MR. FRANK:  Hopefully, under three.
20           THE COURT:  All right, but in any event, there won't
21    be another witness after her on Monday.
22           MR. FRANK:  No.
23           THE COURT:  If -- right now what are your plans for
24    Tuesday?
25           MR. FRANK:  Our current intention is Laura Janke.
```

1          THE COURT:  And her direct would be?

2          MR. FRANK:  Maybe an hour.

3          THE COURT:  And if we get beyond her, the next one?

4          MR. FRANK:  We're not expecting to get beyond her on

5     Tuesday, your Honor, given the length of cross-examination.  We

6     have witnesses flying in but they're not going to be flying in

7     at such time.

8          THE COURT:  All right.  Any business that needs to

9     come to my attention before we adjourn for the week?

03:25 10          MR. KELLY:  Does this mean the Department of Ed.

11     witness is off the list?  I thought that was for today.

12          MR. FRANK:  He's local and he's short, so we're going

13     to save him for later.

14          MR. KENDALL:  Okay.  Your Honor, if we're having full

15     days Monday and Tuesday, it might be good to know who would go

16     Tuesday late in the day if we get there.

17          THE COURT:  Can you give us an idea of if we get

18     beyond Miss Janke who would be the next witness?

19          MR. FRANK:  Your Honor, I'm reluctant to fly in a

03:26 20     witness from out of town given we're not having court on

21     Wednesday.  It's highly unlikely that we're going to get

22     through anybody additional on Tuesday.

23          THE COURT:  Well, okay, but I don't want to go silent

24     when I've told this jury we're going to have a full session

25     Monday and Tuesday.  I don't want to get to Tuesday at noon and

1  you tell me you don't have a witness.

2       MR. FRANK:  We can always call Special Agent Deckett

3  who's local, but otherwise we would be flying in a witness who

4  would just be sitting here.

5       THE COURT:  Well, then plan to have another somebody

6  local and tell the defendants who it will be if, in the unusual

7  event, if we get through with Miss Janke midday Tuesday.  I do

8  not want to recess before 3 o'clock or 3:30 on Tuesday.  Okay?

9       MR. FRANK:  Yes, your Honor.

03:26 10       THE COURT:  Anything further from counsel?

11       MR. KENDALL:  Your Honor, we had raised you were going

12  to take under advisement the suggested instruction, the

13  limiting instruction with respect to Mr. Vavic.  I don't know

14  if that's ripe for the Court to consider.

15       THE COURT:  I'm going to try to consider that over the

16  weekend.

17       MR. KENDALL:  Great.

18       MR. FRANK:  Your Honor, if there's any motion practice

19  over the weekend given that ECF is down, should we just be

03:27 20  e-mailing those?

21       THE COURT:  That's not my union.  I think it would be

22  e-mailing my deputy clerk would be the best way to do it.

23       MR. KENDALL:  Very good.

24       THE COURT:  And I'm not sure, it's supposed to be down

25  the whole weekend, I believe.

1          MR. FRANK:  I believe so.

2          THE COURT:  All right.  I do have other business that

3     I need to conduct from the courtroom, so if you could depart

4     fairly quickly, thank you.

5          THE CLERK:  Court is in recess.

6          (Whereupon, the proceedings adjourned at 3:28 p.m.)

1                           I N D E X

2     Witness                              Page

3     KEITH BROWN

4     Cross-Examination by Mr. Kendall        22

5     Cross-Examination by Mr. Kelly          58

6     Redirect Examination by Mr. Frank      102

7     Recross-Examination by Mr. Kendall     138

8     Recross-Examination by Mr. Kelly       156

9

10

11    RACHEL SIH

12    Direct Examination by Mr. Stearns      162

13    Cross-Examination by Mr. Kelly         184

14    Redirect Examination by Mr. Stearns    189

15

16

17

18

19

20

21

22

23

24

25

```
 1                          E X H I B I T S

 2     NO.                            ADMIT

 3     65A     ....................    30

 4     122     ....................    38

 5     9024    ....................    73

 6     351     ....................    75

 7     9027    ....................    86

 8     329     ....................    92

 9     323A    ....................    94

10     448     ....................    96

11     1481A   ....................    99

12     711     ....................   124

13     712     ....................   126

14     9698    ....................   142

15     7785    ....................   149

16     7785A   ....................   149

17     8126    ....................   151

18     702     ....................   168

19     703     ....................   171

20     704     ....................   173

21     705     ....................   175

22     1335    ....................   185

23     1168    ....................   186

24

25
```

1    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8            We, Kristin M. Kelley and Kelly Mortellite, certify

9    that the foregoing is a correct transcript from the record of

10   proceedings taken September 17, 2021 in the above-entitled

11   matter to the best of our skill and ability.

12

13

14       /s/ Kristin M. Kelley            September 17, 2021

15       /s/ Kelly Mortellite             September 17, 2021

16       Kristin M. Kelley, RPR, CRR           Date
         Kelly Mortellite, RMR, CRR
17       Official Court Reporter

18

19

20

21

22

23

24

25