```
 1

 2                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 3

 4
     UNITED STATES OF AMERICA,        )
 5                        Plaintiff   )
                                      )
 6   vs.                              )  No. 1-19-CR-10080
                                      )
 7   GAMAL ABDELAZIZ and JOHN         )
     WILSON,                          )
 8                        Defendants. )
                                      )
 9                                    )

10


11
               BEFORE THE HONORABLE NATHANIEL M. GORTON
12                  UNITED STATES DISTRICT JUDGE
                        JURY TRIAL - DAY 8
13


14
            John Joseph Moakley United States Courthouse
15                        Courtroom No. 4
                          One Courthouse Way
16                   Boston, Massachusetts 02210

17


18                      September 20, 2021
                            9:15 a.m.
19


20


21
                    Kristin M. Kelley, RPR, CRR
22                    Debra Joyce, RMR, CRR
                      Official Court Reporter
23          John Joseph Moakley United States Courthouse
               One Courthouse Way, Room 3209
24               Boston, Massachusetts 02210
                 E-mail: kmob929@gmail.com
25
              Mechanical Steno - Computer-Aided Transcript
```

```
 1    APPEARANCES:

 2

 3            Stephen E. Frank

 4            Ian J. Stearns

 5            Leslie Wright

 6            Kristen Kearney

 7            United States Attorney's Office

 8            1 Courthouse Way

 9            Suite 9200

10            Boston, MA 02210

11            617-748-3208

12            stephen.frank@usdoj.gov

13            for the Plaintiff.

14

15

16            Brian T. Kelly

17            Joshua C. Sharp

18            Lauren Maynard

19            Nixon Peabody LLP

20            100 Summer Street

21            Boston, MA 02110

22            617-345-1000

23            bkelly@nixonpeabody.com

24            for Gamal Abdelaziz.

25
```

```
 1   APPEARANCES:

 2

 3           Robert L. Sheketoff

 4           One McKinley Square

 5           Boston, MA 02109

 6           617-367-3449

 7           sheketoffr@aol.com

 8           for Gamal Abdelaziz.

 9

10

11           Michael Kendall

12           Lauren M. Papenhausen

13           White & Case, LLP

14           75 State Street

15           Boston, MA 02109

16           617-939-9310

17           michael.kendall@whitecase.com

18           for John Wilson.

19

20

21

22

23

24

25
```

1    APPEARANCES:

2

3            Andrew E. Tomback

4            McLaughlin & Stern, LLP

5            260 Madison Avenue

6            New York, NY 10016

7            917-301-1285

8            atomback@mclaughlinstern.com

9            for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2          THE CLERK:  You may be seated.  Court is now in

3     session.

4          THE COURT:  Good morning, jurors.  Welcome back.  I

5     hope you had a pleasant weekend and you're ready to go back to

6     work.

7          The government will call its next witness.

8          MS. KEARNEY:  Your Honor, before we call the next

9     witness, we wanted to read two stipulations into the record?

09:21 10          THE COURT:  Yes.

11          MS. KEARNEY:  The first is a stipulation regarding the

12     testimony of Don Hurley.

13          "The parties hereby stipulate and agree that, if

14     called to testify, Dawn Hurley, an Officer, Court Appearance

15     Analyst at Bank of America, would testify that:

16          On or about October 17, 2018, Bank of America received

17     a $500,000 wire transfer on behalf of its customer, The Key

18     Worldwide Foundation.  The wire was initiated from a First

19     Republic Bank account ending in 2343 in the name of Hyannis

09:21 20     Port Capital Inc. to a Bank of America account ending in 0486

21     in the name of the Key Worldwide Foundation.  The wire traveled

22     from First Republic Bank, through a clearinghouse in New York,

23     to the Key Worldwide Foundation's account in Massachusetts.

24     Exhibit 707 is Bank of America's record of this wire.

25          On or about December 11, 2018, Bank of America

1   received a $500,000 wire transfer on behalf of its customer,

2   The Key Worldwide Foundation.  The wire was initiated from a

3   First Republic Bank account ending in 2343 in the name of

4   Hyannis Port Capital Inc. to a Bank of America account ending

5   in 0486 in the name of The Key Worldwide Foundation.  The wire

6   traveled from First Republic Bank, through a clearinghouse in

7   New York, to the Key Worldwide Foundation's account in

8   Massachusetts.  Exhibit 708 is Bank of America's record of this

9   wire.

09:22 10        Bank of America employees who work in Bank of

11  America's wire department make records of wire transfers at or

12  near the time the Bank sends or receives wires.  It is the

13  regular practice of Bank of America to make records of wire

14  transfers it sends or receives.  Exhibits 707 and 708 were kept

15  in the course of Bank of America's regularly conducted business

16  activity.

17        The parties further agree that Exhibits 707 and 708

18  shall be deemed records of regularly conducted activity in

19  accordance with Federal Rule of Evidence 803(6)."

09:23 20        And this is signed by the government, as well as

21  counsel for Mr. Wilson.

22        THE COURT:  All right, then.  Exhibit 707 and 708 are

23  admitted.

24        (Exhibits 707, 708 admitted into evidence.)

25        MS. KEARNEY:  The second stipulation is regarding the

1   testimony of IRS revenue agent Roman Hernandez.

2          "The parties hereby stipulate and agree that, if

3   called to testify, Roman Hernandez, a Revenue Agent with the

4   Internal Revenue Service, would testify that:

5          Exhibit 157A is a certified official record of the

6   U.S. Income Tax Return for an S Corporation for Hyannis Port

7   Capital, Inc., including the Form 1120S and accompanying

8   schedules and statements, for the tax period ending

9   December 31, 2014.  This return was electronically filed with

09:24 10  the Internal Revenue Service, or IRS, on or about September 2,

11  2015.

12          Exhibit 174A is a certified official record of the

13  U.S. Individual Tax Return, including Form 1040 and

14  accompanying schedules and statements, for defendant John

15  Wilson and his wife Leslie Wilson for the tax period ending

16  December 31, 2014.  This return was filed by mail and received

17  by the IRS in Fresno, California, on or about December 29,

18  2015.

19          Exhibit 258A is a certified official record of the

09:24 20  Amended U.S. Individual Income Tax Return, including the

21  Form 1040X and accompanying schedules and statements, for

22  defendant John Wilson and his wife Leslie Wilson for the tax

23  period ending December 31, 2014.  This return was filed by mail

24  and received by the IRS in Fresno, California on or about

25  January 11, 2017.

1          Exhibit 501A is a certified official record of the

2    Amended U.S. Individual Income Tax Return, including the

3    Form 1040X and accompanying schedules and statements, for

4    defendant John Wilson and his wife Leslie Wilson for the tax

5    period ending December 31, 2014.  This return was filed by mail

6    and received by the IRS in Kansas City, Missouri on or about

7    March 30, 2018.

8          It is the regular practice of the IRS to keep copies

9    of tax returns, such as those in Exhibits 157A, 174A, 258A, and

09:25 10   501A, for a period of seven years.  Exhibits 157A, 174A, 258A,

11   and 501A were kept in the course of regularly conducted

12   activity of the IRS."

13         And the government moves to admit 157A, 174A, 258A,

14   and 501A.

15         THE COURT:  They are admitted.

16         (Exhibits 157A 174A, 258A, 501A admitted into

17   evidence.)

18         MS. KEARNEY:  And your Honor, would you like us to

19   mark these stipulations for identification?

09:26 20   THE COURT:  Yes.  They should be marked for

21   identification, I believe, perhaps A and B if we haven't used

22   those before.

23         (Exhibits A and B marked for identification.)

24         MS. KEARNEY:  At this time, the government calls

25   Mikaela Sanford.

```
 1              THE COURT:  Yes.

 2              (Mikaela Sanford, sworn.)

 3              THE CLERK:  Would you please state your name for the

 4      record, spelling your last.

 5              THE WITNESS:  Mikaela Sanford, S-a-n-f-o-r-d.

 6              THE COURT:  And Miss Sanford, if you'd move your chair

 7      closer to the bench and then the microphone closer to you so

 8      that we can all hear.  It moves -- the whole stand moves.

 9      Thank you.

09:27 10              Miss Kearney, you may examine.

11                  DIRECT EXAMINATION OF MIKAELA SANFORD

12      BY MS. KEARNEY:

13      Q.   Good morning, Miss Sanford.

14      A.   Good morning.

15      Q.   Where do you live?

16      A.   In Georgia.

17      Q.   Are you currently employed?

18      A.   Yes.

19      Q.   Where?

09:27 20      A.   I work for a nonprofit organization.

21      Q.   Where were you employed during the period of 2013 to 2019?

22      A.   At The Key Worldwide.

23      Q.   What was your title at The Key?

24      A.   Project manager and administrative assistant.

25      Q.   Let's take a step back for a moment.  Where were you born?
```

         1   A.    In Monterey Peninsula, in California.

         2   Q.    How far did you go in school?

         3   A.    A master's degree.

         4   Q.    In what?

         5   A.    In public administration with an emphasis in public

         6   management.

         7   Q.    Where did you go to school?

         8   A.    For undergrad, I went to Arizona State University and, for

         9   my master's, I went to California State University, East Bay.

09:28   10   Q.    And after you graduated, what kind of work did you do?

        11   A.    I went to work for a nonprofit association.

        12   Q.    How did you come to work for The Key?

        13   A.    I responded to an online ad seeking a project manager and

        14   administrative assistant.

        15   Q.    When did you start working for The Key?

        16   A.    In March of 2013.

        17   Q.    What were your initial job responsibilities?

        18   A.    Initially, I was hired because Rick was working on a

        19   number of projects and the managers that he put in place for

09:29   20   those projects, I was supposed to serve as somewhat of like a

        21   liaison between Rick and the people that were in charge of

        22   those projects.  I was supposed to keep them posted with any

        23   updates or kind of serve as a point of contact and then also

        24   keep Rick updated with anything that was coming up or anything

        25   that -- or with any updates.

1    Q.    When you say "Rick," are you referring to Rick Singer?

2    A.    Yes.  Rick Singer.

3    Q.    And what were the projects you were hired for?

4    A.    So at that time I was hired to -- at that time the

5    projects that he was working on included a reality show, a

6    Sirius Satellite radio show, a book, an athletic and academic

7    academy for student athletes, a series of summer camps, as well

8    as he also had a partnership with a bank where his services

9    would be offered to the kind of top tier clientele at that

09:30 10    bank.

11    Q.    And what became of the reality show?

12    A.    To my knowledge, that never happened.

13    Q.    How about the radio program?

14    A.    To my knowledge, that never happened.

15    Q.    What about his book?

16    A.    The book was self-published, but I don't think it really

17    sold much.

18    Q.    What became of the athletic academic academy?

19    A.    Never happened, to my knowledge.

09:30 20    Q.    What about the summer camps?

21    A.    The summer camps actually occurred in 2013 and 2014, and

22    the summer camps were actually offered before I came into the

23    picture and started working for Rick.

24    Q.    And you mentioned a partnership with a bank.  What became

25    of that?

1  A.   I believe a handful of clients actually came out of that

2  and started working with Rick.

3  Q.   Did your job responsibilities evolve over time?

4  A.   Yes.

5  Q.   And how so?

6  A.   Eventually, my duties or my day-to-day duties included

7  really working on the college application process for Rick's

8  clients.

9  Q.   And who was your boss?

09:31 10  A.   Rick.

11  Q.   How closely did you work with Mr. Singer?

12  A.   I would say if you're comparing it to like the traditional

13  idea of a personal assistant, I didn't really fit that mold.  I

14  didn't really interact with Rick face-to-face very much or

15  often at all.  Like, I think in the early years he was in the

16  office maybe twice a month and later on, for example, I didn't

17  see him at all between December 2017 and January of 2019.  And

18  I didn't really speak to him that frequently or really at

19  length very often.  And I didn't, like, manage his calendar.  I

09:32 20  didn't field his phone calls.  I wasn't present during

21  meetings, I wasn't taking notes, those kind of traditional

22  duties and functions that I think most people see as a personal

23  assistant is fulfilling.  Those weren't things that I did.

24  Q.   What was Mr. Singer like as a boss?

25  A.   He was pretty difficult, very demanding.  I would describe

```
 1    it as very much of a hurry up and wait, so everything was now,
 2    now, now, now, now, and then things just kind of -- or tasks
 3    just sat there.  Like nothing really happened.  So, yeah, just
 4    difficult overall.
 5    Q.   You mentioned an office.  Where was your office located?
 6    A.   Our office was located in Sacramento.
 7    Q.   Who else worked in that office?
 8    A.   Steve Masera, the accountant.  And then when he left, his
 9    replacement or the replacement accountant came and then worked
10    in the office.
11    Q.   Where did Mr. Singer work?
12    A.   Rick worked everywhere.  So he was always on a plane and
13    he worked -- or met with students in their homes.  I think
14    maybe a couple of students he worked with via Skype.
15    Q.   Did The Key have other employees?
16    A.   Yes.
17    Q.   How many?
18    A.   We had six academic advisors that we called master
19    coaches.  I would say about a dozen ACT and SAT tutors that
20    were independent contractors, and then we also had a series
21    of -- or included in that number we had a number of writing
22    coaches and essay coaches and then also subject test tutors.
23    Q.   And where did these other employees work?
24    A.   They worked either out of their homes or they met with
25    students around the country.
```

```
 1   Q.   Are you familiar with someone named Tatiana Forero?

 2   A.   Yes.

 3   Q.   Who is she?

 4   A.   She was a former master coach for The Key Worldwide.

 5   Q.   Where did she work?

 6   A.   She worked out of her home in the New York area.

 7   Q.   Who were The Key's clients?

 8   A.   Our clients were pretty high net worth clientele around

 9   the country and around the world.

10   Q.   Approximately how many clients did The Key have per year?

11   A.   I can't really say a whole number, but I know that I

12   worked with roughly 100 seniors each academic year.

13   Q.   What services did The Key provide to those seniors?

14   A.   Traditional college counseling services, so assistance

15   with navigating the application process, assistance with

16   completing the actual application and guidance as to which

17   schools the students should apply to.

18   Q.   What did The Key charge for those services?

19   A.   In -- during my first year the rate fluctuated based on

20   where a student was located.  So, during the early years, the

21   rate hovered around $5,000 per academic year and the academic

22   year went from August to June.  And then, by my last year, the

23   rate was $8,000 per student for academic year.

24   Q.   How did The Key advertise its business?

25   A.   Word of mouth.
```

```
 1   Q.   To what extent were you involved in the finances of the
 2   business?
 3   A.   Not at all.
 4   Q.   Did there come a time when Mr. Masera discussed payments
 5   to The Key with you?
 6   A.   Yes.  There was one specific incident --
 7           MR. KENDALL:  Objection, your Honor.
 8           THE COURT:  Sustained.  She can describe what she did,
 9   not what he said.
10   Q.   All right.  Did there come a time when Rick Singer asked
11   you to take classes for students?
12   A.   Yes.
13   Q.   When was that?
14   A.   Several months after I started working for him.
15   Q.   How did you respond to his request?
16   A.   My -- the words that came out of my mouth were "I don't
17   think I can get an A."  And he said that was fine.
18   Q.   What did you do when you took a class for a student?
19   A.   I secured the course information from the student,
20   including the log-in credentials, and I logged in and took over
21   the course for that student.
22   Q.   Where were the courses held?
23   A.   They were held online at various high schools or at
24   colleges around the country.
25   Q.   Approximately, how many students did you take classes for?
```

         1    A.    Between 10 to 15 over the course of my time at The Key.

         2    Q.    What was your understanding of why Mr. Singer asked you to

         3    take classes for the student?

         4    A.    Because the student was either incapable or just not

         5    interested in completing the work themselves.

         6    Q.    What was your understanding of how the grades from the

         7    classes that you took for students were used?

         8    A.    They would be used for -- they would be used on the

         9    student's transcript.

09:37   10    Q.    Did you have an understanding of whether the parents knew

        11    you were taking classes for their children?

        12    A.    From my understanding, they were aware.

        13    Q.    And what was that understanding based on?

        14    A.    They were part of the conversation in regards to me

        15    initiating the coursework or I secured information from the

        16    parents.  And, from my understanding, they also paid the fee

        17    for the course.

        18    Q.    Did you take any classes for any of John Wilson's

        19    children?

09:37   20    A.    No.

        21    Q.    Did you take classes for any of Gamal Abdelaziz's

        22    children?

        23    A.    No.

        24    Q.    Did there come a time when you heard the term "side door"?

        25    A.    Yes.

|   |   |
|---|---|
| 1 | Q.   Where did you hear that? |
| 2 | A.   That was a term that Rick used. |
| 3 | Q.   Did Mr. Singer ever sit you down and explain the side door |
| 4 | to you? |
| 5 | A.   No. |
| 6 | Q.   Did you come to your own understanding on what you thought |
| 7 | the term "side door" meant? |
| 8 | A.   Yes. |
| 9 | Q.   How did you come to that understanding? |

09:38 10    A.   It was through bits and pieces of information that I would

11    gather during the application process over the years working

12    with our students.

13    Q.   What did you think it meant?

14    A.   Initially, it was -- the side door was used to mean any

15    time a family was using connections to facilitate their

16    student's admission to college.  And over time that grew to

17    include athletics, at times the financial component, and at

18    times athletic recruitment.

19    Q.   And what was your understanding of the athletic piece of

09:38 20    it?

21    A.   That the student had to show participation in a sport.

22    Q.   Did you have an understanding as to whether the students

23    were, in fact, recruitable athletes?

24         MR. KENDALL:  Objection, your Honor.

25         THE COURT:  She can state whether she had an

1    understanding.  Overruled.

2    Q.    You can answer, Miss Sanford.

3    A.    Can you repeat the question?

4    Q.    Sure.  Did you have an understanding as to whether the

5    students were, in fact, recruitable athletes?

6    A.    On one specific -- or one specific occasion I did not

7    believe that the student was a recruitable athlete.

8    Q.    What about in other instances?

9    A.    In the other instances I was not knowledgeable of that.

09:39 10    Q.    What was your understanding of the financial component of

11    the side door?

12    A.    That it was a donation.

13    Q.    And what was that understanding based on?

14    A.    The term "donation" was used.

15    Q.    And again, what was your role in the finances of the

16    company?

17    A.    I didn't have a role in the finances for the company.

18    Q.    Let's turn to John Wilson.  Did you have direct

19    interaction with Mr. Wilson?

09:39 20    A.    No.

21    Q.    I'm going to show you what's been marked as Exhibit 644.

22          MS. KEARNEY:  For the witness only, please.

23    Q.    Miss Sanford, do you recognize the exhibit that's up on

24    your screen?

25    A.    Yes.

```
 1   Q.   What is it?
 2   A.   It's an e-mail exchange between myself, Rick, and Joel
 3   Margulies is cc'd on the e-mail.
 4   Q.   Who was Joel Margulies?
 5   A.   He was a business associate of Rick's.
 6   Q.   What's the date of this e-mail?
 7   A.   Friday, September 20, 2013.
 8           MS. KEARNEY:   Government offers Exhibit 644.
 9           THE COURT:   It will be admitted.
10           (Exhibit 644 admitted into evidence.)
11   Q.   Let's look at the first e-mail in this chain,
12   Miss Sanford.  It's dated September 19, 2013.  How long had you
13   been with The Key at this time?
14   A.   6 months.
15   Q.   You wrote to Mr. Margulies, "Rick would like to have you
16   put together an athletic profile for the following students
17   utilizing their SAT scores, photos, and transcript".  Why were
18   you asking Mr. Margulies to put together athletic profiles?
19   A.   That would have come at the request of Rick.
20   Q.   You continued, "I am going to assume that you have
21   completed this for Rick before".  Why did you write that?
22   A.   Because Rick hadn't given much direction, so when I was
23   asking Joel to complete this task, I just assumed that he had
24   the knowledge and information to complete it.
25   Q.   One of the names listed is John Wilson.  Who is that?
```

A.   That's Johnny Wilson.

Q.   Mr. Wilson's son?

A.   Yes, Mr. Wilson's son.

Q.   Let's look at the next two e-mails in the chain.  In that first response from Mr. Margulies, he writes, "Is this to be a document or a web page or ????? I have not done this for him before".

In your response, you wrote, "This will need to be a document.  I found a template online that I think can give you an idea as to how the profile should look".  How did you know what the profile should look like?

A.   I Googled it.

Q.   You also wrote "Rick, do you have any insight as to what you would like to see"?  And if we look at the response from Mr. Singer, he wrote "I will provide to Joel".  What did you understand Mr. Singer to mean?

A.   That Rick would provide the additional details needed to complete the task to Joel.

MS. KEARNY:  I would like to show the witness only Exhibit 80.

Q.   Miss Sanford, do you recognize this document?

A.   Yes.

Q.   What is it?

A.   It is an e-mail exchange between myself and Rick.

Q.   What's the date?

A.    Monday, September 30, 2013.

         MS. KEARNEY:  I offer Exhibit 80 into evidence.

         THE COURT:  It will be admitted.

         (Exhibit 80 admitted into evidence.)

Q.    Miss Sanford, in the cover e-mail of this exhibit, you
sent Mr. Singer information for the athletic profiles for Rio,
Johnny, and Amanda.  Who is the Johnny referenced?

A.    Johnny Wilson.

Q.    And attached to this e-mail, at page 2, is Johnny Wilson's
high school transcript.  And, at pages 4 and 14, are copies of
unofficial SAT score reports for Johnny Wilson.  Why did you
send these to Mr. Singer?

A.    Rick had requested those documents.

Q.    Do you recall doing anything else in connection with
Johnny Wilson's college applications aside from the e-mails
we've gone over this morning?

A.    No.

Q.    Did you do anything for Mr. Singer with respect to
Mr. Wilson's twin daughters?

A.    I believe I mailed test prep books to them in preparation
for SAT or ACT prep sessions.

Q.    Let's turn next to Gamal Abdelaziz.  Did you interact with
Mr. Abdelaziz about his daughter Sabrina?

A.    Yes.

Q.    How much did you interact with him?

```
 1   A.    A few times via e-mail.

 2         MS. KEARNY:  Look at, for the witness only,

 3   Exhibit 441.

 4   Q.    Miss Sanford, do you recognize this document?

 5   A.    Yes.

 6   Q.    What is it?

 7   A.    It's an e-mail exchange between Rick, Andrew, Gamal,

 8   myself, and Sabrina.

 9   Q.    Who is Andrew?

10   A.    Andrew was a -- he was an essay coach for The Key.

11   Q.    What's the date of this e-mail?

12   A.    December 7, 2017.

13         MS. KEARNEY:  Government offers Exhibit 441.

14         THE COURT:  It will be admitted.

15         (Exhibit 441 admitted into evidence.)

16   Q.    So let's go to the December 5, 2017, e-mail for Mr. Singer

17   at the bottom of this chain.  Mr. Singer wrote, "Andrew now

18   time to work on short answer questions for USC.  One question

19   has to be answered using playing basketball as a passion".

20         What did you understand Mr. Singer to mean?

21   A.    Rick was providing guidance as to the topic for Sabrina's

22   USC supplemental essays.

23   Q.    Let's go to the next e-mail up.  On December 7, 2017,

24   Mr. Abdelaziz wrote to Andrew, "Sabrina shared with me that you

25   were done with the USC essays but there was no discussion of
```

basketball, I've asked her to reach out to you as per Rick's

note below".

Did you have an understanding as to what note

Mr. Abdelaziz was referring to?

A.   He was referring to the previous e-mail where Rick was

providing guidance as to the -- what the topic of the essay

should be.

Q.   Let's look at the next two e-mails up in this chain.

First, Mr. Singer replies "basketball will go in her

activities", to which Andrew responded, "Hi Mr. Aziz, for USC

there are two short essays and then a number of short answer

questions.  I interpreted Rick's note to mean that Sabrina

needed to mention basketball in one or more of the short answer

questions.  Looking back, he may have meant that one of the

essays should be about basketball, but Sabrina had the three

cities idea, so we went ahead with that".

What did you understand him to mean by the "three

cities idea"?

A.   That was the essay topic that Sabrina went with.

Q.   Let's look at the top e-mail in this chain.  Mr. Singer

replies, "One can speak about her involvement in basketball and

her desire to continue to play.  The lessons she has learned by

playing in both the U.S. and China have helped her become a

stronger communicator both on and off the court".

What did you understand Mr. Singer to be suggesting?

```
 1   A.   He was giving additional guidance as to how to approach
 2   the essay.
 3         MS. KEARNY:  Let's look at Exhibit 442 for the witness
 4   only, please.
 5   Q.   Miss Sanford, do you recognize the document up on your
 6   screen?
 7   A.   Yes.
 8   Q.   What is it?
 9   A.   It's an e-mail exchange between Andrew, Gamal, Sabrina,
10   myself, and Rick.
11   Q.   What's the date?
12   A.   December 7, 2017.
13         MS. KEARNEY:  The government offers Exhibit 442.
14         THE COURT:  The date again?
15         THE WITNESS:  December 7, 2017.
16         THE COURT:  It will be admitted.
17         (Exhibit 442 admitted into evidence.)
18   Q.   Let's start with the e-mail from Andrew in the middle of
19   this page.  Do you see there, Miss Sanford, that this chain
20   picks up from the last chain we looked at where Andrew was
21   writing about the three cities idea?
22   A.   Yes.
23   Q.   And then Mr. Aziz responded, "Thank you Andrew, we'll go
24   with what Rick says.  So resolved".  What did you understand
25   him to mean?
```

```
 1    A.    That he wanted to go ahead with Rick's guidance in terms
 2    of the essay topic.
 3              MS. KEARNY:  Let's show for the witness only
 4    Exhibit 459.
 5    Q.    Miss Sanford, do you recognize this document?
 6    A.    Yes.
 7    Q.    What is it?
 8    A.    It is an e-mail exchange between Gamal, myself, Andrew,
 9    and Sabrina.
10    Q.    What's the date?
11    A.    January 5th of 2018.
12              MS. KEARNEY:  The government offers Exhibit 459.
13              THE COURT:  It will be admitted.
14              (Exhibit 459 admitted into evidence.)
15    Q.    And Miss Sanford, let's look at the top two e-mails in
16    this chain.  We see that the bottom e-mail in the screen is the
17    e-mail from Rick Singer suggesting how to incorporate
18    basketball into her essay that we looked at previously.
19    A.    Yes.
20    Q.    And what was the date of that e-mail?
21    A.    December 8, 2017.
22    Q.    And looking at the top e-mail in the chain on January 5,
23    2018, Mr. Aziz writes, "Please see below, just as reminder of
24    Rick's direction was on the essays to compare with what Sabrina
25    just sent".
```

1        What did you understand Mr. Aziz to mean?

2   A.   He was reiterating that Rick had provided guidance as to

3   how to approach the essay.

4        MS. KEARNEY:   Can we show, for the witness only,

5   Exhibit 461.

6   Q.   Miss Sanford, do you recognize this document?

7   A.   Yes.

8   Q.   What is it?

9   A.   It's an e-mail exchange between Sabrina, myself, and then

09:50 10  cc'd on it is Gamal and Andrew.

11  Q.   What's the date?

12  A.   January 5th of 2018.

13       MS. KEARNEY:   The government offers Exhibit 461.

14       THE COURT:   Admitted.

15       (Exhibit 461 admitted into evidence.)

16  Q.   Let's start with the e-mail at the bottom of the first

17  page of this exhibit.  On January 4, 2018, Mr. Abdelaziz wrote

18  to you "Mikaela, Happy New Year!  I haven't been copied on your

19  correspondence with Sabrina lately but wanted to make sure you

09:51 20  have everything you need to submit the USC application soon.

21  Please let me know if there's anything you need me to assist

22  with".

23       What did you understand Mr. Abdelaziz to mean?

24  A.   He was asking for an update on the status of the USC

25  application, and he was letting me know that if there was

1    anything I needed in order to submit the application to let him

2    know.

3    Q.   Let's look at the next two e-mails.  You responded to

4    Mr. Abdelaziz by asking about the status of Sabrina's essays,

5    to which Sabrina responded on January 5, 2018, "attached below

6    is the basketball essay supplement Rick asked for as well as

7    the academic pursuit supplemental essay".

8             And let's look at the first attachment on page 2 of

9    this exhibit.  What did Sabrina attach to the e-mail?

09:51 10   A.   The supplemental essay.

11   Q.   Can you please read the first sentence of the essay.

12   A.   "The basketball court is like my art studio".

13            MS. KEARNEY:  Can we show, for the witness only,

14   Exhibit 458.

15   Q.   Miss Sanford, do you recognize this document?

16   A.   Yes.

17   Q.   What is it?

18   A.   It's an e-mail exchange between Gamal, myself, Sabrina and

19   Andrew.

09:52 20   Q.   What's the date?

21   A.   January 5th of 2018.

22            MS. KEARNEY:  The government offers Exhibit 458.

23            THE COURT:  It will be admitted.

24            (Exhibit 458 admitted into evidence.)

25   Q.   Let's start with the middle of the first page with the

         1    e-mail from Sabrina.  Miss Sanford, is that the e-mail we just
         2    looked at where Sabrina sent her basketball essay supplement
         3    Rick asked for as well as the academic pursuit supplemental
         4    essay?
         5    A.   Yes.
         6    Q.   And let's look at the response in the next e-mail.  You
         7    wrote, "I have to confirm a few things with Rick before I can
         8    submit.  I will confirm when USC is in".  What were you
         9    confirming?
09:53   10    A.   That I don't remember.
        11    Q.   Let's look at the top e-mail in the chain.  Mr. Abdelaziz
        12    responded, "Thank you Mikaela, I read Sabrina's essays.  I
        13    noticed some minor grammar and spelling mistakes, but overall
        14    they're both good".  What essays did you understand
        15    Mr. Abdelaziz to be referring to?
        16         MR. KELLY:  Objection as to her understanding what
        17    someone else is thinking.
        18         THE COURT:  She can -- I'll let her answer the
        19    question.  Overruled.
09:53   20    A.   Can you repeat the question?
        21    Q.   Sure.  What did you understand Mr. Abdelaziz to be
        22    referring to?  What essays did you understand him to be
        23    referring to?
        24    A.   The essays that had been attached to the previous message.
        25    Q.   And he continued, "I will leave it to you and Andrew to

| | |
|---|---|
| 1 | correct.  Please keep me in the loop until we submit".  What |
| 2 | did you understand Mr. Abdelaziz to be directing you to do? |
| 3 | MR. KELLY:  Same objection. |
| 4 | THE COURT:  Overruled. |
| 5 | A.   To -- sorry.  Can you repeat the question? |
| 6 | Q.   Sure.  What did you understand Mr. Abdelaziz to be |
| 7 | directing you to do? |
| 8 | A.   To correct any of the grammatical errors that were present |
| 9 | in the essay and then to let him know when the application was |
| 09:54 10 | submitted. |
| 11 | MS. KEARNEY:  Can we show, for the witness only, |
| 12 | Exhibit 463. |
| 13 | Q.   Do you recognize the document on your screen, |
| 14 | Miss Sanford? |
| 15 | A.   Yes. |
| 16 | Q.   What is it? |
| 17 | A.   That is Sabrina's USC application. |
| 18 | MS. KEARNEY:  The government offers Exhibit 463. |
| 19 | THE COURT:  It will be admitted. |
| 09:54 20 | (Exhibit 463 admitted into evidence.) |
| 21 | Q.   Miss Sanford, who submitted this application to USC for |
| 22 | Sabrina Abdelaziz? |
| 23 | A.   I admitted her application. |
| 24 | Q.   Now, I want to direct your attention to page 12.  At the |
| 25 | top of the page is a USC essay.  Can you please read the first |

1  sentence?

2  A.   "The basketball court is like my art studio".

3  Q.   Miss Sanford, did there come a time when you became aware

4  that Rick Singer was being investigated?

5  A.   Yes.

6  Q.   How did you become aware of the investigation?

7  A.   I came across an e-mail with a series of notes in his

8  inbox.

9  Q.   Why did you have access to Mr. Singer's e-mail?

09:55 10  A.   Rick actually gave me access to his e-mail my first day on

11  the job.

12  Q.   What did you find in the e-mail regarding the

13  investigation?

14       MR. KENDALL:  Objection, your Honor.  Hearsay.

15       THE COURT:  Sustained.

16  Q.   Miss Sanford, did you have an understanding of what was

17  being investigated?

18       MR. KENDALL:  Objection, your Honor.

19       THE COURT:  She can state whether she has an

09:55 20  understanding.

21  A.   No.

22  Q.   Did you talk to Mr. Singer about what you saw in his

23  e-mail?

24  A.   No.

25  Q.   Why not?

A.    Because when things like wires and recorded phone calls

are being noted in a document, I don't think that's something

that I was supposed to know or be aware of.

Q.    Did there come a time when you were charged with a crime

in connection with the conduct you described today?

A.    Yes.

Q.    What crime?

A.    Conspiracy to commit racketeering.

Q.    What was your initial reaction to the charges against you?

A.    I was surprised.

Q.    Why?

A.    Because I didn't know or didn't realize that I had ever

done anything that could be constituted as a crime, let alone a

federal crime.

Q.    Did you plead guilty to the charge against you?

A.    Yes.

Q.    When was that?

A.    In October of 2020.

Q.    Why did you plead guilty?

         MR. KENDALL:  Objection, your Honor.

         MR. KELLY:  Objection.

         THE COURT:  Overruled.

A.    Based on the crime and my understanding of the crime, I'm

guilty of the crime.

         MS. KEARNEY:  I'd like to show, for the witness only,

```
 1    Exhibit 680.
 2    Q.   Miss Sanford, do you recognize the document on the screen?
 3    A.   Yes.
 4    Q.   What is it?
 5    A.   It is my Plea Agreement.
 6    Q.   And what's the date on it?
 7    A.   August 3, 2020.
 8         MS. KEARNEY:   The government offers Exhibit 680.
 9         THE COURT:   It will be admitted.
10         (Exhibit 680 admitted into evidence.)
11    Q.   And I'd like to look at page 7 of this exhibit.
12    Miss Sanford, do you recognize the signature on this Plea
13    Agreement?
14    A.   Yes.
15    Q.   Whose signature is it?
16    A.   That's mine.
17    Q.   What date did you sign this Plea Agreement?
18    A.   August 6, 2020.
19    Q.   Miss Sanford, have you been sentenced?
20    A.   No.
21    Q.   Have you spent any time in jail since pleading guilty?
22    A.   No.
23    Q.   In connection with your plea, did you enter into a
24    Cooperation Agreement with the government?
25    A.   Yes.
```

```
 1              MS. KEARNEY:  Can I show the witness only Exhibit 681,
 2      please.
 3      Q.   Do you recognize the document on your screen,
 4      Miss Sanford?
 5      A.   Yes.
 6      Q.   What is that?
 7      A.   That is my Cooperation Agreement.
 8      Q.   And what's the date?
 9      A.   August 3rd of 2020.
09:58 10              MS. KEARNEY:  The government offers 681.
11              THE COURT:  It will be admitted.
12              (Exhibit 681 admitted into evidence.)
13      Q.   Miss Sanford, looking at page 5 of this exhibit, do you
14      recognize the signature on that page?
15      A.   Yes.
16      Q.   Whose signature is it?
17      A.   It's my signature.
18      Q.   And when did you sign this Cooperation Agreement?
19      A.   August 6th of 2020.
09:58 20      Q.   What is your understanding of what the Cooperation
21      Agreement requires you to do?
22      A.   To provide assistance to the government in their
23      investigation and to tell the truth.
24      Q.   What is your understanding of what will happen if you do
25      those things?
```

1    A.    That I will receive a favorable recommendation when it

2    comes to my sentencing.

3    Q.    What is your understanding of what happens if you don't

4    tell the truth?

5    A.    I could receive an unfavorable recommendation and I could

6    also be charged with perjury or obstruction.

7    Q.    Is the judge required to give you a lower sentence based

8    on a favorable recommendation from the government?

9    A.    No.

09:59 10    Q.    Are you hoping for a lower sentence based on your

11    cooperation?

12    A.    Yes.

13    Q.    Who will decide your sentence?

14    A.    The judge.

15            MS. KEARNEY:  I have no further questions.

16            THE COURT:  Cross-examination.  Mr. Kelly?

17            MR. KENDALL:  Yes, your Honor.

18            THE COURT:  Or Mr. Kendall.

19            MR. KENDALL:  If I may have a moment to get organized.

09:59 20            THE COURT:  Yes, you may.

21                CROSS-EXAMINATION OF MIKAELA SANFORD

22    BY MR. KENDALL:

23    Q.    Good morning, Miss Sanford.

24    A.    Good morning.

25    Q.    Thank you for coming to Boston.  I want to start off with

|    |    |
|----|----|
| 1 | what you were discussing -- oh, by the way, my name's Mike |
| 2 | Kendall.  I represent John Wilson. |
| 3 | Fair to say you've never spoken to Mr. Wilson? |
| 4 | A.   No. |
| 5 | Q.   You never spoke to his son, correct? |
| 6 | A.   No. |
| 7 | Q.   I want to start off with what you described as your Plea |
| 8 | Agreement with the government.  The government is charging you |
| 9 | with you racketeering, a RICO enterprise, correct? |
| 10 | A.   Well, conspiracy to commit racketeering. |
| 11 | Q.   Right.  And that has a 20-year maximum sentence? |
| 12 | A.   Yes. |
| 13 | Q.   And they also charge you with two counts of theft of |
| 14 | honest services, wire fraud counts -- Count 2 and Count 9 of |
| 15 | the indictment I think? |
| 16 | MR. KELLY:  I object to that.  That's not what she's |
| 17 | charged. |
| 18 | Q.   I think those were dismissed as part of your Plea |
| 19 | Agreement.  Weren't two fraud counts dismissed?  You pled |
| 20 | guilty to the Count 1, the RICO racketeering conspiracy, but |
| 21 | they dismissed a -- I think it was fraud conspiracy and a fraud |
| 22 | substantive count? |
| 23 | A.   There were a series of charges that were part of a |
| 24 | superseding indictment that came about in the fall of 2019. |
| 25 | Those charges were dismissed, yes. |

10:01 (line 10)

10:01 (line 20)

```
 1    Q.   Right.  And the two charges that were dismissed were fraud
 2    charges, theft of honest services, and other things, correct?
 3    A.   Honestly, there are so many I don't even remember how --
 4    like the exact charges at that time.
 5    Q.   Okay.  And you understand that the racketeering charge is
 6    a charge against you for participating in an organization or a
 7    group, correct?
 8    A.   Yes.
 9    Q.   But would it be fair to say the only fraudulent activity
10    you were involved in was the -- taking the classes for about a
11    dozen people, correct?
12    A.   Yes.
13    Q.   You didn't know anything improper about the side door,
14    correct?
15    A.   No.
16    Q.   You worked for Mr. Singer for 6 years, and for that entire
17    6-year period you were actually involved in helping him with
18    the side door, correct?
19    A.   I had a very limited knowledge of the side door and I had
20    a very limited knowledge of Rick's activities outside of my
21    interactions with him and what I was tasked with doing.
22    Q.   But you would e-mail various parents about their
23    participation in the side door, correct?
24    A.   I don't believe so.
25         MR. KENDALL:  Okay.  If we could, Randall -- excuse
```

10:02 (line 10)
10:03 (line 20)

me, Mr. Carter, I'd like to put up on the screen just for the

witness, please, our first exhibit will be Exhibit 9716.

Q.   Do you see 9716?

A.   Yes.

Q.   And that's an e-mail that Mr. Singer sent to you?  It's

the top e-mail in the chain, correct?

A.   Yes.

Q.   And if we take a look --

MR. KENDALL:  If we could go to page 4, Mr. Carter, of

this e-mail chain, and if we look there in the middle, it

says -- the Georgetown -- we can highlight that.

The Georgetown -- I'd like to offer this into

evidence, your Honor.

THE COURT:  It will be admitted.

(Exhibit 9716 admitted into evidence.)

Q.   Mr. Singer wrote to this family, "The Georgetown, GW,

Fordham and NYU we are going to need to call on favors and may

have to use a side door so visiting is critical so I can work

on getting done early on".  Did I read that correctly?

A.   Yes.

Q.   In the course of your work with Mr. Singer, you would see

him frequently e-mailing and discussing the side door with

parents, correct?

A.   I don't know if I'd use the word "frequently", but I know

that the term "side door" was used.

```
 1              MR. KENDALL:  Okay.  If we could go to Exhibit 9691,
 2   please.
 3   Q.   And if you could tell us, is that another e-mail that you
 4   had with Mr. Singer and others?  Do you see that, June 13,
 5   2016?
 6   A.   Yes.
 7              MR. KENDALL:  I'd like to offer Exhibit 9691.
 8              MR. FRANK:  Hold on.  Our monitor is not working.
 9   Hold on.
10             THE COURT:  We have some electronic problems.
11             MS. KEARNEY:  Your Honor, I don't believe the witness
12   has been impeached yet on this document.
13             THE COURT:  What's the purpose of this?
14             MR. KENDALL:  Your Honor, I asked the witness if she
15   was involved in numerous e-mails with clients about the side
16   door, and she said she didn't have a memory or she didn't think
17   so.  I'm now going to show her this, which says otherwise.
18             MS. KEARNEY:  Is he going to be refreshing her
19   recollection?
20             THE COURT:  This is not in evidence, right?
21             MR. KENDALL:  Not yet.  I was going to ask if she can
22   identify it and recognize it.
23             THE COURT:  All right.
24   Q.   Do you recognize Exhibit 9691?
25   A.   Yes.
```

 1  Q.   Is that an e-mail Mr. Singer sent to you, parents, and

 2  other people concerning a side door?

 3  A.   Yes.

 4       MR. KENDALL:  Okay.  I'd like to offer that into

 5  evidence, your Honor.

 6       THE COURT:  It will be admitted, 9691.

 7       (Exhibit 9691 admitted into evidence.)

 8       MR. KENDALL:  Now, Mr. Carter, if we can go to the

 9  second paragraph in that -- well, actually, the first two

10:07 10  paragraphs, if you could highlight.

11  Q.   What Mr. Singer wrote was, in an e-mail that was addressed

12  to multiple people, "I will have Mikaela begin the process of

13  creating a Google doc and common application with the essays

14  needed to start the process of applying to college".

15       "Tenley Hardin" -- that's another employee of The

16  Key?

17  A.   Yes.  She was a master coach for The Key.

18  Q.   "Will connect to begin Skyping and going over school

19  choices and editing essays, et cetera.  If we are going to use

10:07 20  a side door then I will need to know before the summer is over

21  so I can try to connect the dots".  Did I read that correctly?

22  A.   Yes.

23       MR. KENDALL:  Okay.  I'd like to next go to Exhibit

24  9690, please.

25  Q.   And if you could tell us, do you recognize this as an

```
 1    e-mail between you and Tatiana Forero De Morais?  Do you
 2    recognize it?
 3    A.   Oh.  Yes.
 4         MR. KENDALL:  I'd like to offer 9690 into evidence,
 5    your Honor.
 6         MS. KEARNEY:  Your Honor, I object to this line of
 7    questioning with these exhibits.  He -- Mr. Kendall is trying
 8    to impeach this witness, but he can refresh her recollection
 9    with these, but they shouldn't be admitted.
10    MR. KENDALL:  Your Honor, I think I am allowed to
11    impeach the way I think most appropriate.
12         THE COURT:  You're asking her as to whether or not she
13    has had contact with the so-called side door.  Is that what
14    this line is about?
15         MR. KENDALL:  She had multiple -- I've asked her
16    whether she's had multiple e-mails discussing the side door
17    with families, and she said no or she didn't think so,
18    something along those lines.  So the issue is multiple, Your
19    Honor.
20         THE COURT:  Yeah, but that doesn't make the document
21    admissible.
22         MR. KENDALL:  She's identified it as an authentic
23    document that she used.
24         THE COURT:  Okay.  But that still doesn't make it
25    admissible just because she recognizes it.
```

1          MR. KENDALL:  I believe it's admissible for

2    impeachment, your Honor.

3          MS. KEARNEY:  Your Honor, the witness hasn't said

4    anything that's different than what's in this document.  If he

5    wants to refresh the witness' recollection about how frequently

6    she was involved in e-mails.

7          THE COURT:  I'm not going to have this one admitted,

8    but you can use it to refresh her memory.

9          MR. KENDALL:  Okay.

10:09 10   Q.   Does this document refresh your recollection that you were

11   discussing side doors about families with other employees even

12   without Mr. Singer being on the e-mail?  If you take a look at

13   the bottom there.

14   A.   Yes, however, I'd like to clarify that the term "side

15   door" is used.  There isn't necessarily a discussion or what I

16   would classify as a discussion of the side door.

17   Q.   Just a reference to a family using the side door?

18   A.   Correct.  There is a reference to the side door in each of

19   these e-mails that you've shown me.

10:10 20   Q.   And would it be -- and I think you testified that you had

21   access to Mr. Singer's e-mail box or inbox, correct?

22   A.   Yes.

23   Q.   How often would you review his inbox?

24   A.   It was really -- well, I wouldn't -- what do you mean by

25   "review"?

```
 1   Q.   How much would -- and I'm not suggesting you were doing
 2   anything improper or unauthorized, just how many times in the
 3   course of a month would you be needing to look at his inbox?
 4   A.   It was really on an as-needed basis.  Like if I needed to
 5   get a student's address, I would go in there to retrieve that
 6   information.  Or it was very rare when Rick would have me
 7   respond to an e-mail on his behalf, but it happened.  Not
 8   often, but it happened.
 9   Q.   Okay.  So you would be looking at his inbox and he would
10   direct you to a specific topic, or would you sometimes just
11   have to go there to find information to do your job, or both?
12   A.   Both.
13   Q.   Okay.  So you -- and that was fine with Mr. Singer that
14   you had access to the inbox and you could look up things to do
15   your job?
16   A.   I believe so.
17   Q.   Okay.  And would it be fair to say in the entire six years
18   you were working for him you never saw anything in that inbox
19   that made you think the side door was a fraud, correct?
20   A.   When I was going into -- or when I was accessing his
21   e-mail, I wasn't looking for any information about the side
22   door.
23   Q.   I'm just asking what you saw.  Okay.  You never saw
24   anything in there.  Whatever you were looking for, you never
25   saw anything that made you think that the side door was
```

1    improper, correct?

2    A.    I never saw any discussion of the side door in his inbox.

3    Q.    Fair to say in the entire six years you worked with him

4    you never heard any discussion, information, document, whatever

5    that suggested to you that a side door involved improper

6    bribery, correct?

7    A.    Well, I didn't have -- or I wasn't privy to conversations

8    that Rick was having with others outside of my presence in

9    regards to the side door.

10:12 10   Q.    Correct, but all the conversations in your presence, there

11   was never a reference to the side door involving anything

12   improper, correct?

13   A.    There weren't conversations in my presence about the side

14   door with parents.

15   Q.    There was certainly a bunch of e-mails, far more than I've

16   shown you so far, correct?

17   A.    I can't say how many additional e-mails there were, but in

18   these e-mails he's referencing the word "side door", but there

19   isn't a discussion about the side door.

10:13 20   Q.    Right.  And nobody ever had any discussion in front of you

21   that said the side door was improper, correct?

22   A.    There wasn't any conversation in my presence about the

23   side door other than the term "side door".

24   Q.    And facilitating -- and you're suggesting it to parents

25   and discussing it with parents, correct?

```
 1   A.   Do you -- sorry.  Can you clarify that question?
 2   Q.   Weren't there times when you would talk to a new family
 3   and be told that they're probably going to be doing a side
 4   door?
 5   A.   Yes.
 6   Q.   And you were informing other employees, Rick said this
 7   one's going to be a side door, correct?
 8   A.   Yes.
 9   Q.   Okay.  And fair to say you didn't have any knowledge in
10   the six years you worked there about any cheating on the ACTs
11   or SATs, correct?
12   A.   No.  I didn't have any knowledge about that.
13   Q.   So the only activity that got you into this problem with
14   the racketeering charge is taking classes for about a dozen
15   people, correct?
16   A.   Correct.
17   Q.   And that was a full-time job for the six years, correct?
18   A.   Yes.
19   Q.   Now -- and were you aware that sometimes side doors were
20   done for people who could be managers of a team and not
21   participate on the team?
22   A.   I recall one instance where a student was going to be a
23   manager, but I didn't equate that with the side door.  That was
24   very early on in my time working at The Key.
25   Q.   Okay.  Now, you also -- I'm going to switch topics.  You
```

```
 1   were also involved in working with The Key Foundation, correct?
 2   A.    No.  Well, define work for the Foundation.
 3   Q.    Did you help set up some of the summer camps in 2013 and
 4   2014 for The Key Foundation?
 5   A.    Yes.
 6   Q.    There was an environmental camp?
 7   A.    I don't believe that was the topic of either of the camps.
 8   Q.    What were the topics you remember of the camps?
 9   A.    The first year there was a writing camp that was over a
10   series of days, and then the first week was -- the theme
11   changed at the last minute, but I know it was a combination or
12   the attendees were a combination of Rick's students, as well as
13   students from the Family Crisis Shelter in the Orange County
14   area.
15   Q.    That was called 1736?
16   A.    Yes, 1736 Family Crisis Center.
17   Q.    Why don't you explain what the 1736 Family Crisis Center
18   is, please.
19   A.    It's a domestic violence shelter that's located in Orange
20   County, California.
21   Q.    The purpose of the summer camp was to get some of Rick's
22   students who were regular college coaching kids to be
23   participating in a program that would benefit 1736?  Weren't
24   they supposed to run some sort of fundraising run or a race or
25   something?
```

```
 1   A.   Yes.  The plan was for the students who participated to --
 2   they would focus on specific, like, roles.  I think one of them
 3   might have been marketing, logistics.  And then they would come
 4   together to put on a 5K run or walk or run, I think, in the LA
 5   area.
 6   Q.   Do you remember Johnny Wilson participated in that camp?
 7   A.   Yes.  He did participate in that camp.
 8   Q.   And you know, since this situation has become public with
 9   the court cases being brought, you've realized that there was a
10   lot of fraudulent activity going on at both the Foundation and
11   The Key that Mr. Singer never told you about, correct?
12             MS. KEARNEY:  Objection.
13             THE COURT:  Grounds?
14             MS. KEARNEY:  It's hearsay.
15             THE COURT:  Sustained.
16   Q.   Did you know of any improper activities going on at The
17   Key, at The Key Foundation at the time that you worked there?
18   A.   No, but also to clarify, I wasn't an actual employee of
19   The Key Worldwide Foundation.
20   Q.   But you'd help out with tasks there?
21   A.   Correct.
22   Q.   Okay.  It would be fair to say Mr. Singer was pretty good
23   at controlling information?
24   A.   I don't know if I would use the term "control
25   information".
```

```
 1   Q.   He never told you about the test cheating, correct?
 2   A.   That's correct.
 3   Q.   He never told you about any bribes to coaches at
 4   Georgetown or other schools, correct?
 5   A.   Correct.
 6   Q.   Now, he never told you about the tax evasion, correct?
 7   A.   Correct.
 8   Q.   And you were running the office for six years, correct?
 9   A.   I was in the office.  I don't know if I would say that I
10   ran the office.
11   Q.   Were you the closest person to being an office manager
12   that he had working for either the Foundation or the company?
13   A.   I can't speak on roles at the Foundation, but in terms of
14   the actual physical office when it was open from 2013 to 2018,
15   there were two people that were in that office, myself -- I was
16   one of those people.  And I would say that we both, you know,
17   were in there handling office affairs.
18   Q.   You and Mr. Masera?
19   A.   Mr. Masera and then, once Mr. Masera left, Melissa Rail.
20   Q.   Okay.  But Mr. Masera and Miss Rail, they dealt with the
21   checkbook and the monies, correct?
22   A.   From my understanding, yes.
23   Q.   Okay.  So putting aside the finances, you pretty much
24   managed everything else that went on in the office, correct?
25   A.   I answered phone calls.  I took out the trash from time to
```

10:18

10:19

1    time.

2    Q.    You supported Rick on his projects?

3    A.    Which projects in particular?

4    Q.    I think you said there was a book people were working on?

5    A.    The book was actually -- the book was essentially in the

6    process of being published when I started working for him.  So

7    one of the first tasks that occurred when I started working for

8    him was to read a manuscript of the book.

9            MR. KENDALL:  Okay.  Could we show the witness Exhibit

10:20 10   8092 and 9695.  Oh.  Excuse me.  969 -- okay.  8092 and I

11   believe the other one is 9695.

12           MS. KEARNEY:  Do you have a copy for us?

13           MR. KENDALL:  I have one copy of the book I was going

14   to ask the witness to look at, and then I was going to offer

15   the book into evidence.

16           MS. KEARNEY:  What's the basis for admission of the

17   book?

18           MR. KENDALL:  Excuse me?

19           MS. KEARNEY:  What's the basis for admission of the

10:21 20   book?

21           MR. KENDALL:  If I can ask a question, your Honor,

22   then we can deal with the objection.

23           THE COURT:  All right.  Go forward.

24   Q.    Okay.  Do you recognize 8092?

25           MR. KENDALL:  And can we also put up 9695, Mr. Carter?

1  Q.   Do you recognize these two as the book that he

2  self-published?

3  A.   Yes.

4  Q.   Okay.  And he used these books to promote himself,

5  correct, to give himself credibility?

6  A.   I honestly don't know.  Most of the copies I had just

7  collected dust in my closet.

8  Q.   Okay, but didn't he always describe himself as an author

9  or a best-selling author in his promotional materials?

10:22 10  A.   In the promotional material, there's one specific flyer

11  that I've seen that he used when he was going to give talks or

12  things like that, and I don't recall him saying that he was a

13  best-selling author in that.

14  Q.   But this is the book he published, correct?

15  A.   Yes.

16      MR. KENDALL:  Okay.  I'd like to offer this into

17  evidence.

18      MS. KEARNEY:  Objection, your Honor.  It's hearsay.

19      THE COURT:  Sustained.

10:22 20      MR. KENDALL:  It's not for the truth of the matter,

21  your Honor.  It's just that they exist.

22      MS. KEARNEY:  Your Honor, it is irrelevant.  First of

23  all, this witness --

24      THE COURT:  Yeah.  Sustained.

25  Q.   You talked about the number of clients that you dealt

1   with.  You said it was about a hundred a year, seniors?

2   A.   Correct, yeah.  Roughly 100 seniors each year.

3          MR. KENDALL:  If we can just show the witness

4   Exhibit 8189, please.

5   Q.   Do you recognize this document, please?

6          MS. KEARNEY:  Do you have a copy?

7          MR. KENDALL:  I believe this comes from the

8   government, but if you want us to see if we have a copy to give

9   you, yes.

10:23 10   Q.   Do you recognize Exhibit 8189, Miss Sanford?

11   A.   I've never seen this document before.

12   Q.   Do you know who would have kept a customer list at The

13   Key, if not you?

14   A.   I didn't keep the customer list and I believe that was

15   actually something the accountant handled, or had on record.

16   Q.   Jamie Manold?

17   A.   I don't know who that is.

18   Q.   William Manold, the accountant, his CPA firm?

19   A.   Oh.  I don't know who that is.

10:24 20   Q.   Okay.  So you never saw the actual customer list for the

21   company, correct?

22   A.   No.

23   Q.   Okay.  But you had 100 -- approximately, on average, 100

24   seniors per year to deal with, correct?

25   A.   Correct.

1    Q.   So for the 6 years you were there, that would be roughly

2    600 people, correct?

3    A.   Correct, at minimum.

4    Q.   At minimum.  So it could be a bit more than that?

5    A.   Well, because I'm only including my list of seniors, and

6    that was the only real tangible list of people I had of people

7    that I worked with, but I also worked with underclassmen as

8    well.  So that could have been freshman, sophomore, juniors,

9    and even as young as eighth graders.

10:24 10   Q.   Okay.  And how many total did you work with with all

11   grades in a typical year?

12   A.   That I don't know, or that I never calculated.

13   Q.   Did you have more underclassmen than you had seniors?

14   A.   In terms of my direct interactions, I mean, it was for the

15   most part the seniors so -- and that's the only, like, actual

16   list that I had on hand.

17   Q.   Okay.  Did you help Mr. Singer at all -- when you applied

18   for the job, you actually looked at the website, didn't you?

19   A.   Yes.

10:25 20   Q.   Okay.  And then afterwards did you ever look back at the

21   website for any purpose?

22   A.   Yes.

23   Q.   Okay.  And, obviously, the website was part of the

24   marketing effort that Mr. Singer did, correct?

25   A.   I can't really speak on the intent that -- in which the

```
 1   website was used for Rick because the website existed before I
 2   came into the picture.
 3   Q.   Okay.  But as soon as you had an interview to go meet with
 4   folks, you actually went in and looked at the website, correct?
 5   A.   Correct.
 6   Q.   And it was something that was there for anybody else to
 7   refer to if they needed it, correct?
 8   A.   Yes, that's correct.
 9        MR. KENDALL:  Could we show the witness Exhibit 7012
10   and 7010.
11        MS. KEARNEY:  Do you have a copy?
12        MR. KENDALL:  Yes.
13   Q.   Can you tell us, are these copies of the web pages that
14   Mr. Singer had for his business?  7012 and 7010.
15   A.   The one on the left, yes.  I have more of a memory of the
16   one on the left, 7012.
17   Q.   Okay.
18   A.   But 7010 isn't as familiar to me.
19        MR. KENDALL:  I'd like to offer 7012 into evidence,
20   please.
21        MS. KEARNEY:  Objection, your Honor.
22        THE COURT:  Grounds?
23        MS. KEARNEY:  Hearsay and relevance.
24        MR. KENDALL:  I'll ask a couple more questions to lay
25   a better foundation, your Honor.
```

|     |     |
| --- | --- |
| 1 | Q.   When you went for a job interview, you looked at the |
| 2 | website, correct? |
| 3 | A.   Yes. |
| 4 | Q.   And it informed your state of mind about what kind of |
| 5 | business it was and what Mr. Singer did, correct? |
| 6 | A.   Yes. |
| 7 | MR. KENDALL:  Okay.  I'd like to offer it into |
| 8 | evidence, your Honor. |
| 9 | MS. KEARNEY:  Objection, your Honor.  We haven't |
| 10 | established that this is the website that she looked at. |
| 11 | MR. KENDALL:  I think she just identified. |
| 12 | THE COURT:  Let's clarify that.  Is this the one that |
| 13 | she looked at? |
| 14 | Q.   After you got employed there, do you recall doing anything |
| 15 | to change the website for the business? |
| 16 | A.   In 2018, we did a website redesign. |
| 17 | Q.   Okay.  Did it still have this look and appearance? |
| 18 | A.   No.  It was a lot cleaner, in my opinion. |
| 19 | Q.   Okay.  So this is the website that was up there at the |
| 20 | time that you got the job and were working there for several |
| 21 | years, correct? |
| 22 | A.   Yes. |
| 23 | Q.   Okay.  I want to show you another version today. |
| 24 | MR. KENDALL:  Exhibit 7011, please. |
| 25 | Q.   Do you see this version of the website? |

10:27 (line 10)
10:28 (line 20)

1    A.   Yes.

2    Q.   It also -- it looks familiar to like the one you've seen

3    before, correct?

4    A.   Yes.

5    Q.   And you'll notice it has his book there, his latest book.

6    So this would obviously have been sometime after 2014?

7         MS. KEARNEY:  Objection, your Honor.  This is not in

8    evidence yet.

9         THE COURT:  Sorry?

10:28 10   MS. KEARNEY:  This is not in evidence yet and

11   Mr. Kendall is pointing out things.

12        THE COURT:  Yes.

13        MR. KENDALL:  Okay.  I'd like to offer Exhibit 7011

14   into evidence, your Honor.

15        MS. KEARNEY:  Same objection, your Honor.  It's

16   hearsay.  It's not relevant to this witness.  We don't know

17   when this website was created, and it's also beyond the scope

18   of the direct.

19        MR. KENDALL:  Your Honor, it informs the witness'

10:29 20   state of mind, and I think it impeaches other parts of the --

21        THE COURT:  I'm going to allow it to be admitted,

22   7011.

23        MR. KENDALL:  Thank you, your Honor.

24        (Exhibit 7011 admitted into evidence.)

25   Q.   If we can now show that to everybody.

```
 1              MR. KENDALL:  I'd like to go to, I believe it's
 2     page 7.
 3     Q.   If you could look at page 7.
 4              MR. KENDALL:  And highlight that bottom paragraph.
 5     Q.   Okay.  I want to read this to you.  Do you remember
 6     they're -- this is a testimonial by one of the former customers
 7     or one of the clients.  Do you remember Evan Webb?
 8     A.   I remember the name, but I don't remember much about the
 9     student.
10:30 10 Q.   Okay.  "Dear Rick, I'm writing this e-mail today to simply
11     say thank you.  I leave for SMU" -- what is SMU?
12     A.   Southern Memphis University in Texas.
13     Q.   "In 30 days, and I could not be more excited about moving
14     to Dallas.  I'm positive that I would have never found such a
15     perfect school for me if it wasn't for your guidance.  Not only
16     did you help me through the college search and the application
17     processes, you were also able to help me obtain a manager
18     position on the basketball team.  I have already met some of
19     the players and other managers and I am very excited to begin
10:30 20 working with all of them.  I'm looking forward to staying in
21     touch as I go through my years as a mustang.  Thank you, Evan
22     Webb".
23              Do you remember anything further about Mr. Webb?
24     A.   No, and I actually wasn't aware as to where he went to
25     school or any of these other details mentioned in this
```

1   testimonial.

2   Q.   Okay.  And if we take a look at 711 on the first page, we

3   see here advertising the two books, Mr. Singer's latest book.

4   He does it singular, but it's the one you previously

5   identified, right, *Getting In*?

6   A.   Yes.

7          MR. KENDALL:  Your Honor, I'd like to admit 7012,

8   which is the other version of the website that the witness

9   identified.

10:31 10        MS. KEARNEY:  Same objection, your Honor.

11         THE COURT:  That one the objection is sustained.

12  Q.   Now, part of your tasks, I think you identified, were that

13  you would help them with the applications, correct?

14  A.   Yes.

15  Q.   I want to go back to the time period when you first

16  started in 2013 and 2014.  Okay?

17  A.   Uh-hum.

18  Q.   You started in March of '13?

19  A.   Yes.

10:32 20  Q.   In the early years, that first couple of years, you would

21  load the information into the internet link for the common

22  application, correct?

23  A.   Can you elaborate more on exactly what you're asking.

24  Q.   Yes.  Thank you.  I should do it a little bit better.

25         Back in 2013 and 2014 when your clients or customers

1   were applying to colleges, they typically would have to fill

2   out an application form that would be used for most of the

3   schools, correct?  It was called a common app or common

4   application?

5   A.   Correct.  The common app was used as the baseline for the

6   other application or the other application forms that any of

7   our students were going to apply to.

8   Q.   So the common app would have the core information that all

9   schools would get, correct?

10:33 10   A.   That's correct.  And then, if by chance a student applied

11   to a school that wasn't a common app school and it required

12   additional pieces of information that wouldn't be found in the

13   common app, then we would reach out to the student or the

14   parent in order to get that information.

15   Q.   And you handled the data entry for the college

16   applications at this time period, correct?

17   A.   Correct, with a team of people.

18   Q.   Okay.  And you did not, as a practice, have the families

19   read the application before it was submitted, correct, in 2013

10:33 20   and '14?

21   A.   At that time I did not have a personal practice in place

22   where I would have the families review the applications prior

23   to submission.

24   Q.   Okay.  So you submitted Johnny Wilson's application or

25   oversaw the submission of Johnny Wilson's application without

```
 1   ever asking him or his family to read it, correct?
 2   A.   I actually can't even confirm that I even oversaw Johnny
 3   Wilson's application at all.
 4        MR. KENDALL:  Okay.  If we can just have a moment,
 5   please.
 6        I'd like to show you -- if we can show the witness
 7   only Exhibit 9683.
 8   Q.   If you could take a look at 9683.  Tell us if that is, in
 9   fact, an e-mail that Mr. Singer sent to you in 2013.
10   A.   Yes.  That is an e-mail that Mr. Singer sent to me in
11   2013.
12        MR. KENDALL:  Your Honor, I'd like to offer this into
13   evidence, please.
14        THE COURT:  It will be admitted.
15        MS. KEARNEY:  Objection, your Honor.  He can use it to
16   refresh the witness' memory, but I don't know that it needs to
17   be admitted into evidence.
18        THE COURT:  What are your grounds for objecting?
19        MS. KEARNEY:  It's hearsay.
20        THE COURT:  Sustained.
21        MR. KENDALL:  Excuse me.  What was the basis of the
22   objection, your Honor?
23        MS. KEARNEY:  Hearsay.
24   Q.   This was a --
25        MR. KENDALL:  Your Honor, it's not offered for the
```

```
 1    truth of the matter.  It's offered for the obstruction, not for
 2    the -- a statement of the content.
 3              MS. KEARNEY:  Your Honor, he can refresh the witness'
 4    recollection.
 5              THE COURT:  Yeah.  I'm not going to admit it.
 6    Q.    Okay.  Does this refresh your memory that you submitted
 7    Johnny Wilson's applications in 2013 late in the year?
 8    A.    No.
 9    Q.    Does this refresh your recollection that Mr. Singer asked
10:35 10  you to submit his applications?
11    A.    Yes.
12    Q.    Okay.  But you just don't have a memory if you carried it
13    out or not, correct?
14    A.    Correct.  As I mentioned, I had a team of people that I
15    worked with at that point.  It was -- there were four of us and
16    so I don't know if -- what happened after this point.
17    Q.    Okay.  So it would be fair to say your best memory is that
18    your custom and practice was you oversaw a team filling out the
19    applications, correct?
10:36 20  A.    In 2013, yes.
21    Q.    Okay.  You didn't ask the families to review them,
22    correct?
23    A.    Correct.
24    Q.    And Mr. Singer asked you to submit Johnny Wilson's
25    application in November of 2013, correct?
```

```
 1   A.    Yes.  Rick asked me to submit Johnny Wilson's application.

 2   Q.    And then you were also involved in getting tutors for

 3   Mr. Wilson's daughters, correct?

 4   A.    That part I don't recall.

 5   Q.    I thought you testified --

 6   A.    I said that I sent test prep materials.

 7   Q.    Okay.  Do you remember Mr. Singer had a tutor by the name

 8   of Lily Ahn, A-h-n?

 9   A.    Yes.

10   Q.    A very capable young woman from Stanford?

11   A.    I don't actually recall where she went to school, but I do

12   remember Lily, yes.

13   Q.    She was a very good tutor, correct?

14   A.    I liked her on a personal basis, but I can't attest to her

15   abilities as a tutor.

16   Q.    Okay.  Do you recall that she was the tutor that was

17   assigned to the Wilson daughters?

18   A.    Yes.  I do recall that.

19   Q.    And she worked remotely, is that correct?

20   A.    Yes.

21   Q.    Okay.  So it would be fair to say that she would manage

22   her students and conduct her part of Mr. Singer's business by

23   remote communications, correct?

24         MS. KEARNEY:  Objection, your Honor.  This is beyond

25   the scope of direct.
```

1          THE COURT:  Sustained.

2     Q.    Now, we put into evidence Exhibit 80.  Do you remember we

3     looked at that just a few moments ago?

4          MR. KENDALL:  If we can get Exhibit 80 up on the

5     screen, please.

6     Q.    Do you remember taking a look at Exhibit 80?

7     A.    Yes.

8     Q.    Okay.  It's here that -- it's from you to Mr. Singer

9     providing various information that was in the files or in the

10:38 10    sort of resources of The Key to put together the profiles for

11    people, correct?

12    A.    Can you clarify what you mean by "resources" and "files".

13    Q.    That's a good question.  Let's look at what is attached to

14    this e-mail.  It says "Wilson_transcript.dat", correct?

15    A.    Yes.

16    Q.    "Wilson_SAT", correct, pdf?

17    A.    Yes.

18    Q.    Wilson_SATMarch.pdf", correct?

19    A.    Correct.

10:39 20    Q.    So you had Mr. Wilson's SAT scores that you forwarded, but

21    no ACT scores, correct?

22    A.    Correct.

23    Q.    Okay.  If we can take a look at Exhibit 80, I'd like to go

24    to page 4.  And this, you recognize, as a College Board SAT

25    report of scores, correct?

A.    Correct.

Q.    And see the scores are on the left column.  If we could go down there.  "Critical reading national percentile, 78 percent," correct?

A.    Correct.

Q.    And we see "mathematics national percentile, 83 percent"?

A.    Correct.

Q.    And then we see "writing national percentile, 90 percent"?

A.    Correct.

10:40 Q.    And then the student gets an overall percentage of where all of their scores combined put them, correct?

A.    Correct.

Q.    But it would be fair to say this student's percentile is going to be under 90 percent, correct?  He's got a 83 and a 78 and a 90 that need to be worked out or averaged, correct?

      MS. KEARNEY:  Objection.

      THE COURT:  Sustained.

Q.    You've worked with SAT scores for many years at The Key, correct?

10:40 A.    I was privy to students' SAT scores, but I'm not sure I get what you mean by "worked with SAT scores."

Q.    Well, you're aware that they get a percentile ranking for their overall score on the test?

A.    Yes.

Q.    Okay.  And the percentile ranking will be some sort of

1    average of the percentile for each individual component of the

2    test?

3              MS. KEARNEY:  Objection.

4              THE COURT:  Sustained.

5              MR. KENDALL:  If we can then turn to the Bates ending

6    in 9333 of the same exhibit.

7    Q.   This is a second test score for Mr. Wilson, correct?

8    A.   Yes.

9    Q.   And if we look at the percentiles there, we see a

10:41 10   73 percent, correct?

11   A.   Correct.

12   Q.   An 85 percent, is that correct?

13   A.   Correct.

14   Q.   And then if we look at the bottom one, 78 percent?

15   A.   Correct.

16   Q.   Now, you would agree with me that when one submits --

17   based upon your experience of filling out all these

18   application, a person only has to submit one score to these

19   colleges?  They don't have to submit every test they take,

10:41 20   correct?

21   A.   Well, I think it depends on the kind of exam that you're

22   taking.  In this case, more than likely one score would have

23   been submitted, but it would -- the super score would have been

24   used and only if the school that he was submitting scores to

25   accepted the super score.

1    Q.   And why don't you explain to the jury what a super score

2    is.

3    A.   So the super score is the highest combined score amongst

4    all of the tests, or all of the exams that a student has taken.

5    So, in this case, if Johnny had scored higher on math in March

6    versus his math score in September, then more than likely the

7    math score from March would have been -- or deemed the highest

8    score, and that's what the university would have seen.

9    Q.   That's done for all the tests taken from the specific

10:42 10   company that administers the test, correct?  You can super

11   score an SAT result because they're all from the College Board?

12        MS. KEARNEY:  Objection, your Honor.  This witness is

13   not an expert.

14        THE COURT:  If she knows, she can answer.

15   A.   Can you ask the question again?  I'm sorry.

16   Q.   Sure.  It's -- I'll give a little more background to make

17   it less confusing.  I'm sorry for that.

18        There's two type of college entrance exams.  There's

19   the SAT and ACT, correct?

10:43 20   A.   Correct.

21   Q.   And they're given by two different companies, correct?

22   A.   Correct.

23   Q.   Okay.  So you can submit your SAT scores and get a super

24   score for the SAT exams, correct?

25   A.   Correct, but again, only certain colleges and universities

1    accept super scores.

2    Q.   Right.  Thank you.

3         But also, if your ACT score was much better than your

4    SAT score, you could just submit the ACT and not worry about

5    super scoring or anything else, correct?

6    A.   That is correct, and that's, I guess, a personal

7    preference, but the ACT can also be super scored.

8    Q.   Okay.  Are you aware that Mr. Singer would send -- I think

9    you said earlier that Mr. Singer would use -- he had some type

10   of a relationship with a bank?

11   A.   Yes.

12   Q.   Okay.  What was the bank that he had the relationship

13   with?

14   A.   I don't -- I don't recall the name.

15   Q.   And he provided services to their senior executives?

16   A.   I don't believe that it was the senior executives.  From

17   my understanding it was -- his services were provided to the --

18   a small percentage of elite clientele at that bank.

19   Q.   Okay.  And was it an investment bank?

20   A.   I don't know.

21   Q.   Do you know if it was Morgan Stanley?  Does that ring a

22   bell?

23   A.   I mean, I know the name Morgan Stanley, but I don't know

24   if that was the bank in this case.

25   Q.   And so it was a bank where some of their elite clients

```
 1   would get the services, but you can't identify the bank by
 2   name?
 3   A.   I can't recall, no.
 4        MR. KENDALL:  If we could show the witness only
 5   Exhibit 9621.
 6   Q.   Do you recall working with a student named Lauren
 7   Isackson?
 8        MS. KEARNEY:  Your Honor, can we have a moment?  We
 9   don't have a copy of this.
10   THE COURT:  Yes.
11        MR. KENDALL:  I'm happy to give you my copy.
12   Q.   Did you work with Lauren Isackson?
13        MS. KEARNEY:  Objection, your Honor.  This is beyond
14   the scope.
15        THE COURT:  Overruled.
16   Q.   Did you work with Lauren Isackson?
17   A.   Yes.
18   Q.   Okay.  Is this an e-mail chain that you and she exchanged
19   at the time you were advising her?
20   A.   No.  This was actually after I had worked with her.
21   Davina -- in this situation, Davina, her mother, had reached
22   out to me, for instance, with creating a resume and CV for
23   Lauren so that she could apply for internships.
24   Q.   Was this when she was in high school or college?
25   A.   This was when she was in college.
```

Q.   Okay, but they came back to you because of your advisory

relationship at The Key, correct?

A.   Well, I had actually maintained a relationship with Davina

and we just got along, so she liked me and came to me for

assistance.

MR. KENDALL:  I'd like to offer 9621 into evidence,

your Honor.

MS. KEARNEY:  Objection, your Honor.  Hearsay.

Relevance.

THE COURT:  In this case, I will allow it to be

admitted.

(Exhibit 9621 admitted into evidence.)

MR. KENDALL:  Thank you, your Honor.

Q.   I'd like to go to the second page where we see -- I think

we're on the third page.  Second page on April 4th, it says --

actually, let me get the order.

MR. KENDALL:  If you could highlight the whole two

paragraphs there, Mr. Carter.  All the way to the bottom and if

you could highlight the salutation "Hi Mikaela".  Do

everything.  Leave it just like that.

Q.   And this is the message she sent to you on April 4, 2019.

"Hi Mikaela, this is an e-mail from my internship counselor and

she wants me to change my resume and cover letter to embellish

upon my interest in event planning.  I copied some of her

e-mail below.  Please let me know your thoughts/changes".

1              Do you see that there?

2    A.   Yes.

3    Q.   Okay.  And then if we look below, and her advisor is

4    asking for an updated -- we see underlined, "We will need an

5    updated cover letter and resume that has focus on your

6    interests and experience in Event Management.  I believe you

7    are currently working at The Wall Group".

8              What do you remember about her internship and her

9    work in this area?

10:49 10   A.   I'm actually not familiar with her work in that area.

11   Q.   Okay.  But she was calling you for advice.  You didn't

12   think you were committing any fraud, did you?

13   A.   Well, this was actually facilitated by Davina.

14   Q.   Okay.  But Lauren is the one that sent you the e-mail?

15   A.   Correct, but it was at the urging of Davina.

16   Q.   Yeah, but Lauren wrote the e-mail, correct?

17   A.   Yes.

18   Q.   I'd like to show you next Exhibit 913, please.  Actually,

19   wait a minute.

10:50 20            If we could -- okay.  Actually, can we go back to

21   9621.

22            MR. KENDALL:  I apologize, your Honor.

23   Q.   If we can go to the area just above this section and a

24   little bit before that, why don't we start at the top of the

25   e-mail.  Actually, that might be more organized.

     1          MR. KENDALL:  I apologize for the delay, your Honor.

     2   Q.   We can see here what Lauren writes to you, after the

     3   advice you gave her, "yes, this is great.  Can you just add on

     4   to gamma phi beta sisterhood chair that I am also external

     5   social chair and for sisterhood you can add that I coordinate

     6   trips to locations and plan itineraries for 300 plus girls and

     7   for the social chair I create relations among different

     8   sororities and fraternities to work with them to plan social

     9   events and philanthropy/charity events".

10:51 10          Does that sound like event management to you?

    11   A.   Yes.

    12   Q.   Okay.  And then below that we see she's responding to an

    13   e-mail from you.  "Hey Lauren - your updated Cover Letter and

    14   CV are attached.  Let me know what you think".

    15          So you actually helped her write all of this,

    16   correct?

    17   A.   Davina and I actually worked on her resume I think it was

    18   sometime before this, so I had an original copy on hand.

    19   Q.   Now if we can switch over to a different document, Exhibit

10:52 20   916, please.  I mean 913.  I'm sorry.  913.

    21          MS. KEARNEY:  Do you have a copy?

    22          MR. KENDALL:  Let's see if I do.

    23   Q.   Do you recognize 913 as an e-mail that Mr. Singer sent?

    24   A.   Yes.

    25   Q.   Do you remember who Nicholaus Johnson is?

1   A.   No, I don't.

2   Q.   Okay.

3   A.   And I'm also not on this e-mail I don't think.

4   Q.   Okay, but it's at a time you were working there, correct?

5   A.   Correct.  I had been there for 3 months.

6           MR. KENDALL:  Okay.  I'd like to offer this into

7   evidence, your Honor.

8           MS. KEARNEY:  Objection, your Honor.  As the witness

9   noted, she's not even on this e-mail.

10          THE COURT:  Sustained.

11  Q.   Okay.  If we could -- okay.  Were you involved at all with

12  Mr. Singer doing a presentation at Starbucks in 2018?

13  A.   No.  I was aware he was giving the presentation and I

14  have -- there's a recording of that presentation which I have

15  seen since, probably 2019 or 2020.

16  Q.   Okay.  And did you discuss with him -- without getting

17  into what he said, did you discuss with him the details of him

18  making that presentation?  You knew he was doing it.  That's my

19  point.

20  A.   Correct.

21  Q.   At the time that he did it, did you know he was doing it?

22  A.   Correct.

23  Q.   Okay.  Did you have any role in helping him book his plane

24  tickets or put together any of the logistics?

25  A.   No.  As I mentioned, when it comes to my role as an

```
 1   assistant, I think those are things that are more so common
 2   with traditional personal assistants, and I didn't do things
 3   like book his travel or, to my knowledge, prepare -- help him
 4   prepare for that.
 5   Q.   But you reviewed that speech, correct?
 6        MS. KEARNEY:  Objection, your Honor.
 7   Q.   You reviewed the video?
 8        MR. KENDALL:  She just testified to it.
 9        MS. KEARNEY:  She just reviewed the video in 2019 or
10   2020.
11        THE COURT:  That's not what she said.  Ask another
12   question.
13   Q.   Okay.  When did you review the video?
14   A.   At some point after March 12th of 2019.
15        MR. KENDALL:  Okay.  Your Honor, I'd like to offer
16   Exhibit 8115, a very short excerpt from the video.
17        MS. KEARNEY:  Objection, your Honor.  Hearsay, beyond
18   the scope and relevance.
19        THE COURT:  Sustained.
20        MR. KENDALL:  If I may have one moment to check my
21   notes, your Honor.
22        THE COURT:  Yes.
23        MR. KENDALL:  I just need to clean up one thing with
24   one document, your Honor, and then I'm done, a document that's
25   already in evidence.
```

1        9621, if we could have that back up on the screen,

2   please.  If we can go back to the second page of 9621, please,

3   under the April 4, 2018, date.  Yeah.  Right there.  And if we

4   can just highlight again that "Hi Mikaela" paragraph.

5   Q.   We have here Mikaela saying that her counselor wants her

6   to change her resume and cover letter to "embellish upon my

7   interest in event planning", correct?

8   A.   That was actually Lauren talking to me.

9   Q.   Yes.  That's what Lauren said to do.

10  A.   Well, no.  You said that it was Mikaela telling her.

11  Q.   Oh, she says "Hi Mikaela".  I'm sorry if I misspoke.  I

12  apologize.  "Hi Mikaela".  And then she tells you that's what

13  her intern counselor wants to do is to embellish upon her

14  interest in event planning, correct?

15  A.   That's what Lauren says, correct.

16  Q.   And then there's a back and forth series of e-mails that

17  end with that scripture we just went into about all the

18  specific things she was doing for the phi beta sisterhood and

19  the social chair and the 300 girls with the itineraries,

20  correct?

21  A.   Correct.

22       MR. KENDALL:  Thank you.  No further questions.

23       THE COURT:  Mr. Kelly.

24            CROSS-EXAMINATION OF MIKAELA SANFORD

25  BY MR. KELLY:

```
 1    Q.   Good morning, Miss Sanford.

 2    A.   Good morning.

 3    Q.   My name is Brian Kelly.  I represent Gamal Abdelaziz.

 4          You've never spoken to me before, have you?

 5    A.   No.

 6    Q.   You've never spoken to Mr. Gamal Abdelaziz before, have

 7    you?

 8    A.   No, well, outside of those e-mails, but we've never spoken

 9    on the phone or exchanged text messages.

10    Q.   Right.  You e-mailed him, but never actually spoke with

11    him, correct?

12    A.   Correct.

13    Q.   Same thing with his daughter Sabrina, correct?  You never

14    spoke with her, just e-mails, right?

15    A.   Correct.

16    Q.   Now the government asked you several questions about a

17    high school girl's college essay, right?

18    A.   Yes.

19    Q.   Was it your experience that teenagers sometimes exaggerate

20    in their college essays, ma'am?

21    A.   I can't actually say either way if they did exaggerate in

22    their essays.

23    Q.   So you worked in college counseling for a long time at The

24    Key, didn't you?

25    A.   For six years.  I actually wasn't hired to be a college
```

1   counselor.  That really wasn't my main role.

2   Q.   Did you see a lot of essays over the years?

3   A.   I did, but --

4   Q.   Don't you think -- did you see any exaggerations in these

5   college essays, ma'am?

6   A.   Well, I actually really didn't have any relationships with

7   the students prior to, you know -- it was rare I had any

8   interactions with students prior to their senior year and the

9   application process, so I don't really know much about the

11:00 10   students other than what was presented to me, so I can't say if

11   they were exaggerating or not.

12   Q.   Okay.  Now, in this situation, it was Rick Singer, as you

13   saw in those series of e-mails, that was pushing the basketball

14   essay, right?

15   A.   Rick was making suggestions about the content of the

16   essays, correct.

17   Q.   And by the way, do you know when Mr. Abdelaziz finally

18   found out that his daughter was not on a high school basketball

19   team?

11:00 20        MS. KEARNEY:  Objection.

21        THE COURT:  Sustained.

22   Q.   Well, do you have any idea of Mr. Abdelaziz's

23   communications with his family members?

24   A.   No.  Outside of those e-mails, no.

25   Q.   And you worked for Rick Singer over 6 years, right?

```
 1    A.    Six years and two weeks.

 2    Q.    And he lied a lot to you, didn't he?

 3    A.    I don't know if I can really say what was a lie or what

 4    wasn't.

 5    Q.    Right.  It was very difficult to tell with him, wasn't it?

 6    A.    I wasn't really in Rick's physical space very often so --

 7    Q.    Well, were you occasionally in his physical space speaking

 8    with him?

 9    A.    From time to time, yes.

11:01 10   Q.    And he hid a lot of things from you, right?

11    A.    Well, we didn't actually go into -- during the times I was

12    actually around him, we weren't really like having much

13    conversations.  Especially in the later years, I describe it as

14    he blew into the office and I didn't know he was actually

15    around.  He would say, you're good, you got everything you

16    need, yeah, you're the best, bye, see you later, and he was

17    gone.

18    Q.    He was a smooth talker, right?  He was a smooth talker?

19    A.    I wouldn't describe him as that personally.

11:02 20   Q.    No?

21    A.    Not from my --

22    Q.    He would say, hi, how are you doing.  That's not being a

23    smooth talker?

24    A.    That's being cordial, in my opinion.

25    Q.    Okay.  Did he hide from you the fact that there was a
```

1    bribery scheme going on, or were you in on that from the

2    beginning?

3    A.    Rick never shared with me there was any type of bribery

4    that was occurring.

5    Q.    Okay.  So he hid that from you, didn't he?

6    A.    Yes.

7    Q.    All right.  And then did he hide from you the fact that

8    there was all sorts of test cheating going on with some of his

9    clients?

11:02 10   A.    Rick never disclosed that there was any sort of test

11   cheating going on.  No, he did not.

12   Q.    He hid that from you, right?

13   A.    Yes.

14   Q.    Are you aware there's no test cheating allegations against

15   Mr. Abdelaziz?

16         MS. KEARNEY:  Objection.

17         THE COURT:  Sustained.

18   Q.    When you first began working with Mr. Singer, you thought

19   it was a legitimate job, right?

11:03 20   A.    Yes.

21   Q.    He hid the fact that it wasn't, correct?

22   A.    Correct.

23   Q.    There were, of course, some legitimate college counseling

24   activities going on, correct?

25   A.    Yes, there were.

```
  1    Q.   And when you first started with him, you didn't think you
  2    were joining some racketeering enterprise, did you?
  3    A.   Absolutely not.
  4    Q.   Your understanding of the situation changed over time,
  5    didn't it?
  6    A.   Can you elaborate?  What do you mean?  Understanding of
  7    what situation?
  8    Q.   The situation with Rick Singer, that's what I'm getting
  9    to.  Your understanding of what he was up to changed over time,
11:04 10   didn't it?
 11    A.   Specifically what part of the situation?
 12    Q.   Well, the more you learned, the less legitimate it seemed
 13    to be, right?
 14    A.   Well, I described -- I was never aware of anything that
 15    was illegal that was happening, nor -- but when I talk about,
 16    or when you say legitimate, I think things like lying on a
 17    college application or having somebody take classes for
 18    somebody else, or -- I mean, those things aren't legitimate.
 19    Q.   And you took classes for people, didn't you?
11:04 20   A.   Correct.
 21    Q.   And you added fake awards to people's common application,
 22    didn't you?
 23    A.   At the direction of Rick.
 24    Q.   At the direction of Mr. Singer, correct?
 25    A.   And/or a parent.
```

```
 1    Q.    Okay.  At the direction of Mr. Singer, right?  He told you

 2    to put some of these fake awards on all these applications,

 3    right?

 4    A.    Can you be more -- when you say "all of these."

 5    Q.    Well, actually, how about this?  Didn't you teach other

 6    people how to put fake awards on to these applications?

 7    A.    I wouldn't say that I taught anybody that.

 8    Q.    No?  Do you know a woman named Tatiana Puerta that was

 9    referenced earlier?

11:05 10  A.    Yes, I do.

11    Q.    Didn't you teach her how to put fake awards onto these

12    common applications?

13    A.    I wouldn't say that I taught her how to do that.

14          MR. KELLY:  Okay.  Let me show the witness only

15    Exhibit 132, please.

16    Q.    What's that at the bottom, please?  And then we'll read

17    all the way up.  Okay?  Do you see what it says there?  I'm not

18    asking you to read it out loud.  It's not in evidence yet.

19    A.    Yes.  I see it's an e-mail.

11:06 20  Q.    Okay.  Now let's scroll up.  And then you say something,

21    right?

22    A.    Correct.

23    Q.    And then Tatiana Puerta says something to you, if you

24    could read that, please.

25    A.    "Hi Mikaela" --
```

```
  1              MS. KEARNEY:  Objection.
  2    Q.   No, I'm sorry.  To yourself.  It's not in evidence.  I
  3    have to show it to you before it's in evidence, just
  4    procedurally.  Okay?
  5    A.   Oh.  Okay.
  6    Q.   So just please read that to yourself.
  7    A.   Okay.
  8    Q.   And then slide up, please.  Where you say on November 7th
  9    2014 at 1:03 p.m., can you read that to yourself, please.  And
11:07 10    then read Tatiana's response there.
 11              Okay.  Then let's slide up and then read your
 12    instructions there on November 10th.
 13    A.   Okay.
 14    Q.   And read Tatiana's response, please, to yourself.
 15    A.   Okay.
 16    Q.   Then keep going and you can see the top part and see what
 17    you're telling Tatiana, please, in the middle of November 10,
 18    2014, at 1:30 p.m.
 19    A.   Okay.
11:07 20    Q.   And this whole e-mail is a November 10, 2014, e-mail
 21    exchange between you and Tatiana, correct?
 22    A.   Correct.
 23              MR. KELLY:  I offer it, your Honor.
 24              THE COURT:  It will be admitted.
 25              (Exhibit 132 admitted into evidence.)
```

```
 1              MR. KELLY:  Now let's put this up for the jury and
 2     start at the bottom, please.
 3     Q.   A person named Nanette Tod is writing to you, "Hi Mikaela,
 4     could you use some awards/honors, do you have anything for
 5     him?"
 6              So she's asking you for some awards/honors for some
 7     male candidate obviously, right?
 8     A.   Correct.
 9     Q.   Slide up, please.  And then you say, "I think this is
10     something Tatiana will actually be taking care of".
11              And then Tatiana, who had just started recently,
12     right, said to you, "Hi Mikaela, I was hoping to get your help
13     with this.  I wasn't sure what Nanette meant by asking if you
14     had awards/honors for blank.  He doesn't have any... how might
15     you "have" awards for him?  Sorry, feeling a little lost".
16              Please scroll up.
17              Then you write back, "oooohhhhh.... I didn't catch
18     that in the message.  So sometimes Rick has a tendency to
19     embellish the awards and activities for the students utilizing
20     various programs and titles that The Key has put on in the
21     past.  If you need some ideas or examples as to what Rick has
22     done for his kids let me know".
23              Tatiana responds with "I've never done that or was
24     ever told to do that so I have zero experience about this.
25     Please enlighten me!"
```

         1          And then you enlighten her, don't you?  You say,

         2    "Sorry for the delay on this one... must have slipped through

         3    the cracks...", so you say, "so some of the honors/awards that

         4    Rick will enter are", and then you list a series of awards,

         5    right?

         6          You say, "These are all awards and organizations that

         7    fall under The Key and The Key Foundation umbrella.  Let me

         8    know if this helps".

         9          So you're giving her some ideas of fake awards to add

11:10  10    to the student's application, correct?

        11    A.   I'm letting her know that -- or I'm giving her some

        12    guidance to what Rick had done in the previous year.

        13    Q.   Right.  Guidance on how Rick likes to add these fake

        14    awards, right?

        15    A.   Well --

        16    A.   It's a simple question, ma'am.

        17    A.   One of the awards is not a fake award.  And then,

        18    actually, a few of them were given at the camp in 2013.

        19    Q.   Okay.  Let me refine my question.  The award might be

11:10  20    real, but this kid did not earn it, right?

        21    A.   That's correct.

        22    Q.   So it might be a real award that somebody could earn, but

        23    you are adding them to some kid's application even though the

        24    kid didn't earn it, right?

        25    A.   In this situation, that's true.

1    Q.   Then Tatiana says, "ohhh ok.  Got it.  So "blank" is the

2    son of the CEO of some bank -- how many can I put in there?"

3    What do you tell her?

4         You say "I think 3 or 4 honors/awards would suffice".

5         So this exhibit shows you, in fact, taught Tatiana

6    how to do it, right?

7    A.   In this specific instance, correct.

8    Q.   Before you came here today you never met me, right?

9    A.   No.

11:11 10  Q.   You met with the government team, right?

11   A.   Yes.

12   Q.   Did they show you this exhibit?

13   A.   Yes.

14   Q.   They didn't ask you about this one on their direct, did

15   they?

16   A.   No.

17   Q.   Okay.  And how long did you spend with the government

18   preparing for this testimony?

19   A.   I believe five or six meetings.

11:12 20  Q.   Okay.  And how long typically were the meetings?

21   A.   Several hours.

22   Q.   Five, six meetings, several hours, right?

23   A.   Correct.

24   Q.   Did they show you a lot more e-mails than they've asked

25   you about here today?

```
     1    A.   Not as they pertain to -- not as it pertains to any
     2    individuals in the room.
     3    Q.   Okay.  Well, let's look at --
     4         THE COURT:  We're going to take the morning recess at
     5    this stage.
     6         You may step down for the time being, Miss Sanford.
     7         We're going to be in recess for 15 minutes, jurors.
     8         (Jury exits.)
     9         THE COURT:  Be seated, counsel.  How much more on
11:13 10   cross, Mr. Kelly?
    11         MR. KELLY:  I can keep it under an hour, your Honor.
    12         THE COURT:  Okay.  And then if we get beyond this
    13    witness, who will be the next witness?
    14         MR. FRANK:  Rebecca Chassin, your Honor.
    15         THE COURT:  All right.  Anything that needs to come to
    16    the Court's attention before we recess this morning?
    17         MR. KENDALL:  One small thing, your Honor.  As you
    18    know, we may -- we're planning to recall this witness in our
    19    case.  When she's finished, can you just remind her that she's
11:14 20   still in the subpoena and she may need to return?
    21         THE COURT:  Yes.
    22         MR. KENDALL:  Okay.  Thank you.  We've served her with
    23    our own subpoena.
    24         THE COURT:  You may need to remind me again at that
    25    stage.
```

```
 1              MR. KENDALL:  I'll pop up like a Jack in the box, your
 2    Honor.
 3              THE COURT:  We're in recess.
 4              (Recess taken 11:14 a.m. to 11:34 a.m.)
 5              THE CLERK:  All rise for the jury.
 6              (Jury enters.)
 7              THE CLERK:  Thank you.  You may be seated.
 8              THE COURT:  Good morning, jurors, we're ready to
 9    continue.
11:35 10        Ms. Sanford, you're reminded that you remain under
11    oath.
12              And, Mr. Kelly, you may continue with
13    cross-examination.
14              MR. KELLY:  Yes.  Thank you, your Honor.
15    BY MR. KELLY:
16    Q.   Good afternoon.  Good morning again, Ms. Sanford.
17              I think at the break I had asked you some questions
18    pertaining to e-mails that you've seen and haven't seen.  Do
19    you remember those questions?
11:35 20   A.   Yes.
21    Q.   All right.  And you had indicated that you met with the
22    government team five or six times to prepare for your
23    testimony, correct?
24    A.   Correct.
25    Q.   And your meetings lasted, did you say three hours or two
```

1   hours?  I honestly don't recall what you said.

2   A.   I said "several."

3   Q.   All right.  So let's take the low end of several and call

4   it three, and let's take the low end of meetings and call it

5   five.  So that would be 15 hours you spent with the government

6   to prepare for your testimony today, correct?

7   A.   Correct.

8   Q.   All right.  And you were shown lots of e-mails by them in

9   the course of that preparation, correct?

11:36 10   A.   Well, it depends on what you mean by "lots."  Like --

11   Q.   How about this:  You were shown more e-mails by them than

12   they put into evidence here today, correct?

13   A.   I don't know, I guess, exactly what was put into evidence

14   today or what classifies as what's been put into evidence

15   today.

16   Q.   Were you shown more e-mails than the ones you were shown

17   today by the government?

18   A.   Yes.

19   Q.   Okay.  And let me bring up Exhibit 458 in evidence,

11:36 20   please.

21        Let's start at the bottom where Mr. Gamal Abdelaziz

22   says, "I haven't been copied on your correspondence with

23   Sabrina lately."

24        Do you see that?

25   A.   Yes.

```
 1    Q.   You, of course, have no idea about his work schedule,
 2    right?
 3    A.   No.
 4    Q.   Let's scroll up a bit, and where -- you were asked about
 5    your statement on January 6th.
 6              MR. KELLY:  I think you have to keep going up,
 7    Mr. Carter.  Okay.
 8    Q.   You were asked, "I have to confirm a few things with Rick
 9    before I can submit."
10              Do you remember the prosecutor asked you what that
11    meant?
12    A.   Yes.
13    Q.   And you remember you said, "That I don't remember."
14    A.   Correct.
15    Q.   And you remembered a lot more about these e-mails, but
16    that you don't remember, correct?
17    A.   Correct.
18    Q.   And prior to coming here today in your 15 hours or so of
19    preparation with the government, did you tell them, I don't
20    remember what I meant when I said, "I have to confirm a few
21    things with Rick before I can submit"?  Did you tell that to
22    the government?
23    A.   I believe -- I'm not sure if I used those exact words, but
24    I'm pretty sure that I've maintained the same stance on that
25    specific piece of information this entire time.
```

```
 1   Q.   Okay.  And when you indicated that to the government at
 2   some point in these 15 hours, did they show you any documents
 3   to refresh your recollection as to what that possibly could
 4   mean?
 5             MS. KEARNEY:  Objection.
 6             THE COURT:  I don't understand the question.
 7             Sustained.
 8   BY MR. KELLY:
 9   Q.   Well, when you indicated to the government that you
10   couldn't remember this, did they show you any more e-mails to
11   perhaps refresh your memory as to what this meant?
12             MS. KEARNEY:  Objection.
13             THE COURT:  Grounds?
14             MS. KEARNEY:  Relevance.
15             THE COURT:  Sorry?
16             MS. KEARNEY:  Relevance.
17             MR. KELLY:  It's cross-examination, impeachment,
18   Judge.
19             THE COURT:  He can have that question if she
20   understands it.
21             THE WITNESS:  Can you repeat the question?
22   BY MR. KELLY:
23   Q.   Sure.  You've testified that you don't remember what that
24   meant, "I have to confirm a few things with Rick before I can
25   submit."  I think you just testified that you indicated to the
```

```
 1    government in your prep sessions that you maintained the same
 2    position with them, that you didn't remember what that meant.
 3    A.   Correct.
 4    Q.   Okay.  And when you indicated to the government in these
 5    prep sessions that you don't remember what this means, did they
 6    show you anything to try to refresh your memory?
 7    A.   No.
 8    Q.   Okay.  So if there were four or five e-mails directly on
 9    point to this, those weren't shown to you before you came here
10    today, correct?
11              MS. KEARNEY:  Objection.
12              THE COURT:  Overruled, if she understands the
13    question.
14    A.   I don't even know if those four or five e-mails actually
15    exist.
16    Q.   Right.  You weren't shown them, were you?
17    A.   I don't know if they exist.
18    Q.   Okay.  Well, let me show you one of them.
19              Well, but before I do, note where it says, "I have to
20    confirm a few things with Rick before I can submit."
21              And that -- okay.
22              Let's go to 1540 just for the witness, please.
23              Didn't you ask Rick Singer for an athletic profile for
24    Sabrina?
25    A.   I don't know if it's what profile is being referred to in
```

    1   this e-mail.  There's no -- it just says "profile."  There's no

    2   elaboration.

    3   Q.   And is it from you to Rick Singer on January 5th?

    4   A.   Yes.

    5           MR. KELLY:  We'd offer this, your Honor.

    6           MS. KEARNEY:  Objection, your Honor.  It can be used

    7   to refresh the witness' recollection, otherwise it's hearsay.

    8           THE COURT:  Yeah, I don't see how this is admissible,

    9   but it certainly can be used to refresh her memory.

11:41  10   BY MR. KELLY:

   11   Q.   Okay.  Well, did you on many occasions ask for an athletic

   12   profile from Rick Singer?

   13   A.   No, I never asked for a profile -- or an athletic profile

   14   from Rick Singer.

   15   Q.   No?  Well, after this e-mail, let me show you 1541,

   16   please.

   17           Is this from Mr. Singer to you?

   18   A.   Yes.

   19   Q.   This is also on January 5th and it says -- well, you can

11:42  20   read what it says.

   21   A.   Yes.

   22   Q.   Does this refresh your memory as to whether he sent you

   23   anything regarding a profile for Sabrina?

   24   A.   No.

   25   Q.   You've never seen this before?

```
 1   A.   Well, I don't -- I mean, it's an e-mail that's clearly

 2   sent -- or it was an e-mail that was clearly sent to me, but I

 3   don't have any recollection of this e-mail.

 4   Q.   All right.  Do you think you were never shown this before

 5   by the government before you got here today?

 6   A.   I have not seen this before -- I mean, since, I guess,

 7   January 5th of 2018.

 8   Q.   Okay.  How about -- let me show you Exhibit 1254.

 9        That's another e-mail from Singer to you, correct?

11:43 10   A.   Yes.

11   Q.   And you know who Laura Janke is, right?

12   A.   I have heard of her, yes.

13   Q.   And does this refresh your recollection as to whether

14   Singer sent you an athletic profile regarding Sabrina?

15        (Pause.)

16   A.   Yes.

17   Q.   Okay.  So it does refresh your recollection?

18        MR. KELLY:  I offer this one, your Honor.

19        MS. KEARNEY:  Objection, hearsay.

11:43 20        THE COURT:  Just because it refreshes her memory

21   doesn't make it admissible.  It's not going to be admitted.

22   BY MR. KELLY:

23   Q.   Well, on this particular document it refreshes your memory

24   that Singer sent you something pertaining to Sabrina Abdelziz

25   at your request, right?
```

```
 1    A.    That's what the e-mail said but I don't recall, like
 2    any -- I don't recall any of these things actually happening at
 3    the time.
 4    Q.    Okay.  Do you see where it says, "Let me know" -- the
 5    message is from Janke talking about awards to her profile?  Do
 6    you see that?
 7    A.    That -- that was correct, that was an e-mail that Laura
 8    Janke sent to Rick.
 9    Q.    So you don't remember whether or not this had to do with
10    Sabrina's Common App application with awards that were added?
11    A.    No, because I'm not seeing that mentioned in detail in the
12    actual e-mail exchange.
13    Q.    Okay.  Let's show you Exhibit 1255.
14          Do you see this e-mail?
15    A.    Yes.
16    Q.    After receiving an e-mail from Singer, are you advising
17    him that you intend to update Sabrina's app and thanking him?
18          MS. KEARNEY:  Objection.  Is this being used to --
19          THE COURT:  Sustained.
20    BY MR. KELLY:
21    Q.    Well, do you see that e-mail?
22          Is it from you to Singer?
23    A.    Yes.
24    Q.    Does it refresh your memory as to whether or not you
25    ever -- you ever updated Sabrina's application and then
```

1  submitted it with information provided by Singer?

2  A.   In the e-mail I responded and said that.

3  Q.   All right.  So you did add information to Sabrina's Common

4  Application, correct?

5  A.   According to the e-mail string, that's what that says.

6  Q.   And the information you added to Sabrina's application

7  pertained to sports, right?

8  A.   I'm not a hundred percent sure what I even added from --

9  or added to her application.

11:46 10  Q.   But whatever you added, you got it from Singer, right?

11  A.   It would have come from -- or -- I can't say -- I can't

12  say what I added to her actual application.

13  Q.   I'm not asking you what you actually added.  The basis of

14  your information, based on things I've just shown you, was you

15  got information from Singer and you added to people's

16  applications like Sabrina, right?

17  A.   I can't say in this instance what I added or if I actually

18  added the information to the application.

19  Q.   Okay.  Well, let's look at what I'll call 463A.

11:46 20       Now, this is a subset excerpt of a document that's

21  already in evidence.

22       You see how this is the USC application for Sabrina

23  Abdelaziz?

24       MS. KEARNEY:  Your Honor, I object to using this

25  version of the document.  There's a lot of --

```
 1              MR. KELLY:  The document's in evidence.
 2              MS. KEARNEY:  463 is the unredacted document that's in
 3    evidence.  This is a redacted excerpt.
 4              THE COURT:  What's your purpose here, Mr. Kelly?
 5              MR. KELLY:  I'm going to move to the second page very
 6    quickly.  It's an excerpt of a document that's already in
 7    evidence.
 8              THE COURT:  Why don't you use the document that's in
 9    evidence?
11:47 10              MR. KELLY:  Because it's about 75 pages and this is
11    two, so I just want to ask about one page.
12              THE COURT:  All right, go ahead.
13              MR. KELLY:  And I offer it.
14              THE COURT:  In its redacted version?
15              MR. KELLY:  Yes, your Honor.
16              THE COURT:  It will be admitted, 463A.  It is a
17    redacted version of 463 reduced to two pages, right?
18              MR. KELLY:  Yes, your Honor.
19              THE COURT:  All right.
11:47 20              (Exhibit 463A received into evidence.)
21    BY MR. KELLY:
22    Q.   So I think you said a moment ago you don't remember what
23    it is you may have added to Sabrina's application, correct?
24    A.   Correct, or if I added anything to the application at all.
25    Q.   You think somebody else did besides you?
```

```
 1   A.   I can't say either way.

 2   Q.   All right.  But that's one of the things you often did as

 3   part of your job with Singer's group, correct?

 4   A.   Can you clarify your question, please?

 5   Q.   Yes.  You often added not fake awards but awards that

 6   people didn't earn to your applications, correct?

 7   A.   No.

 8   Q.   Well, you did --

 9   A.   I'm sorry.

11:48 10  Q.   Did you ever add awards to people's Common Application?

11   A.   I did at times, but that wasn't, like, the default.

12   Q.   Okay.  Fair enough.  I'm not saying you did it every day.

13   But I'm just saying you did it at times and you did it at the

14   direction of Rick Singer, correct?

15   A.   Correct.

16   Q.   All right.  And on this particular exhibit, I want to

17   direct your attention to a couple of these awards.  Where it

18   says under "activities" and it lists 11 and 12, starting point

19   guard up top.

11:49 20       You put that in, didn't you?

21   A.   I don't know if I put that in there.  I can't say either

22   way if I did or if I didn't.

23   Q.   How about down below where it says "awarded academy MVP"?

24        You put that into Sabrina's application, didn't you?

25   A.   I can't say what I -- what or if I entered anything into
```

1    Sabrina's application, or, I'm sorry, her application.

2    Q.   But until a few moments ago you hadn't had a time review

3    those four e-mails I just showed you that you couldn't

4    remember, right?

5    A.   Correct.

6    Q.   Okay.  So in the 15 hours that you had to prepare with the

7    government, those weren't shown to you, were they?

8    A.   I had not seen -- or I hadn't seen those since, I guess,

9    January of 2018.

11:50 10   Q.   Right.  And for someone like yourself coming to federal

11   court, it might be helpful to see things in advance so it could

12   jog your memory, correct?

13           MS. KEARNEY:  Objection.

14           THE COURT:  Overruled.

15           THE WITNESS:  Can you repeat the question, please?

16   BY MR. KELLY:

17   Q.   Sure.  For someone like yourself who is coming to federal

18   court to testify, it might be helpful to show you documents in

19   advance so your memory can be refreshed, correct?

11:50 20   A.   It would be nice to be fully prepared for today.

21   Q.   Yes, yes.

22           And in the 150 hours of your preparation, you don't

23   recall seeing these communications between you and Singer, do

24   you recall?

25   A.   No, I don't recall.

 1    Q.    Okay.

 2          MR. KELLY:   Just one moment.

 3          (Pause.)

 4    Q.    And you've never testified in federal court before, have

 5    you?

 6    A.    No, I've never testified in court ever.

 7    Q.    All right.   I'm going to move to a new topic here, all

 8    right?

 9          Let's talk about this:   It's the government who chose

11:51 10   to charge you with a racketeering conspiracy, right?

11    A.    Correct, the government charged me with conspiracy to

12    commit racketeering.

13    Q.    Right.   And are you aware that's not a charge in this

14    case?

15    A.    Yes, I'm aware.

16    Q.    Okay.   And when you pled guilty, it was in front of a

17    different judge, correct?

18    A.    Correct.

19    Q.    Not Judge Gorton, a different judge.

11:52 20   A.    Right.

21    Q.    And it gets explained to you what the maximum penalties

22    for being a racketeer in a conspiracy that violates the RICO

23    statute, it's a 20-year maximum, right?

24    A.    Correct, that's my understanding of the maximum sentence.

25    Q.    And then there are what's called sentencing guidelines

```
 1   that are calculated using all sorts of data and a range is the

 2   end result that advises the court as to what the guideline

 3   range is, correct?

 4   A.   Yes, I have seen those guidelines.

 5   Q.   Okay.  And in your situation, the guideline range is

 6   approximately 15 to 21 months in prison, right?

 7   A.   Correct.

 8   Q.   And was it part of your plea agreement that the government

 9   would recommend the low end, 15 months of prison, if you did

10   not cooperate with them?

11   A.   I can't -- can you ask the question again?

12   Q.   Sure.

13        Did the government in its plea agreement say they

14   would recommend incarceration at the low end of the guideline

15   sentencing range?

16        Let me just -- I'll put it up real quickly, okay?

17   A.   Okay.

18   Q.   Let's put up Exhibit 680, please.  And go to page 2.

19        And I'd just like to direct your attention, ma'am,

20   where it says in section 4(a), "The U.S. Attorney agrees to

21   recommend the following sending to the court: incarceration at

22   the low end of the guideline sentencing range."

23        Do you see that there in 4(a)?

24   A.   Yes.

25   Q.   And it was your understanding that the guidelines were
```

1    approximately 15 to 21 months, right?

2    A.   Correct.

3    Q.   And the federal judge involved can do whatever he or she

4    wants, these are advisory?

5    A.   Correct, the judge ultimately decides the sentence.

6    Q.   Right.  And whether or not -- there's -- are you aware

7    that a motion can be filed with your judge saying that you have

8    provided substantial assistance to the government, and,

9    therefore, your sentence should be as low as zero?  Are you

11:55 10   aware of that?

11   A.   I've never heard it described in I guess -- in relation to

12   a motion, but I know -- or I've been told -- or the terms that

13   have been used have been a recommendation.

14   Q.   Okay.  So let me show you Exhibit 681, page 2, section 2,

15   please.

16        Could I direct your attention to the first --

17   actually, this first paragraph.

18        Now, this is your cooperation agreement separate from

19   your plea agreement.  Do you follow me with that?

11:55 20   A.   Yes.

21   Q.   Okay.  So under the plea agreement, you're looking at the

22   low end of the guidelines unless you cooperate, correct?

23        Here we're talking about a substantial assistance

24   motion that can be made by the government, right?

25   A.   Correct.

1   Q.   And do you see the beginning of the second paragraph where

2   it says, "The determination whether defendant has provided

3   substantial assistance rests solely in the discretion of the

4   U.S. Attorney and is not subject to appeal or review."  Isn't

5   that what it says?

6   A.   Yes, that's what it says.

7   Q.   So whether to file the motion is solely dependent upon the

8   government's discretion that's not subject to appeal or review,

9   correct?

11:56 10   A.   Correct.

11   Q.   The judge, of course, can do whatever he or she wants at

12   the time of the sentencing, correct?

13   A.   Yes, that's my understanding.

14   Q.   Let's move to Mr. Singer, briefly.

15        Now, Mr. Singer had a fairly impressive bio, didn't

16   he?

17   A.   Is there a specific -- or are you referring -- can you

18   clarify what you mean?

19   Q.   Do you recall that on occasion you would send his

11:57 20   so-called bio around to different companies?

21   A.   I don't believe I ever sent it to a company.

22   Q.   Okay.  Let me show you -- let me ask you this.  Back in

23   December of 2015, would Singer claim that he had all these

24   impressive clients, like Steve Jobs, the CEO of Apple, or Joe

25   Montana, the hall of fame quarterback?  Do you recall Singer

 1 | making claims like that?
 2 | A.   That's not something that Rick ever said or stated to me.
 3 | Q.   Okay.  Let me show you, if I could, please, Exhibit 1555,
 4 | just the witness.
 5 |      I'd like to -- well, why don't you just take a look at
 6 | the first part, see you're forwarding something here, correct?
 7 | A.   Correct.
 8 | Q.   Okay.  And then let's move to the second page.
 9 |      Okay.  Now let's move to the third page.
11:59 10 |      And let's go, if we can, this is just for the witness,
11 | see if I can refresh your recollection --
12 |      MS. KEARNEY:  I just want to clarify, I don't know
13 | that the witness received the third page.
14 | BY MR. KELLY:
15 | Q.   Is the third page in front you, ma'am?
16 | A.   Well, I guess what's on the third page -- or can you tell
17 | me --
18 | Q.   Does it say "with best selling author"?
19 | A.   Yes.
11:59 20 | Q.   So you've received it, right, it's right there?
21 |      MS. KEARNEY:  Objection.  The witness is not on the
22 | top e-mail of this chain where that was attached.
23 |      THE COURT:  Show her the address.
24 |      MR. KELLY:  Okay.  It's from you to some fellow named
25 | Joe Margolis.

1        MS. KEARNEY:  The very top of the chain where the

2    attachments are, this witness is not on it.

3    MR. KELLY:

4    Q.   Well, hold on now, what does that attachment say?  Doesn't

5    it say Rick's newest bio.docx?  Isn't that what that says?

6    A.   Yes but --

7    Q.   Okay, let me slide down.

8        MS. KEARNEY:  Can the witness finish the answer?

9        MR. KELLY:  I asked her:  "Doesn't it say Rick's new

12:00 10   bio?"  She said, "Yes."  She answered the question.

11        MS. KEARNEY:  It sounded like she was going to say

12    more, Judge.

13        MR. KELLY:  They can redirect, Judge.

14        THE COURT:  Yes.

15        MR. KELLY:  Keep sliding down, please.

16        MS. KEARNEY:  Your Honor, I don't think Mr. Kelly has

17    established that this witness is on the top e-mail of the chain

18    which has the attachments.

19        MR. KELLY:  I object to the continuing objections

12:00 20   while I'm doing cross.  They get a chance to do cross.

21        THE COURT:  The objection is that she didn't receive

22    this at all, and now you're implying that she did.

23        MR. KELLY:  Well, I'm using it to refresh her

24    recollection, which I believe I can use to refresh her

25    recollection as to anything, and I'm going to get to the

1    question quickly.

2           THE COURT:  You can refresh her memory but that

3    doesn't -- go ahead.

4           MR. KELLY:  Yes.

5    BY MR. KELLY:

6    Q.   Let's go to the middle of this document with a series of

7    names.  The second one down.  Do you see that name?

8    A.   Yes.

9    Q.   Okay.  And then within that list of names, let's look at

12:01 10    the second from the bottom.  All right.

11          Now, having seen that, does that refresh your

12   recollection as to whether or not Mr. Singer would sometimes

13   tell people that he had all these fancy clients like Joe

14   Montana and Steve Jobs?

15   A.   He's included that information in his bio.

16   Q.   Okay.  But is that something you would have seen on

17   occasion when you saw his bio?

18          MS. KEARNEY:  Can we take the exhibit down?

19          THE COURT:  Take the exhibit down.

12:01 20   BY MR. KELLY:

21   Q.   Do you recall in his bio he had all this -- these

22   important clients that he would list?

23   A.   Well, specifically this e-mail was from 2015, so I don't

24   actually even recall seeing this document -- or, you know, in

25   the flesh.

1    Q.    Okay.  Did you on occasion see some bios that Mr. Singer

2    would send around?

3    A.    He had a -- there was a flier that he would use when he

4    had a speaking engagement.

5    Q.    Okay.  And --

6    A.    But --

7    Q.    And would those sometimes list his credentials?

8    A.    I actually don't recall, like, what details were in that.

9    Q.    Okay.  Let me show you, please -- let me ask you this:

12:02 10   Getting off the bio issue for a moment, he sometimes made

11   presentations to big, important companies right?

12   A.    I know he made presentations, but I can't really speak on

13   if they were big, important companies.

14   Q.    Okay.  How about -- have you heard of a company called --

15   a financial company called Oppenheimer funds?

16   A.    I've heard the name, but I'm not familiar with, like, what

17   they do or anything beyond that.

18   Q.    Okay.  Do you remember that he gave a -- Rick Singer gave

19   a presentation to them while were you working there?

12:03 20   A.    No, I don't recall that.

21   Q.    All right.  Let me show you Exhibit 1560.

22         And do you see at the top the various names on this

23   e-mail trail?

24   A.    Yes.

25   Q.    And do you see what it's about?

```
 1                  Just read it to yourself.
 2      A.   Yes.
 3      Q.   Okay.  Now having seen that, does it refresh your
 4      recollection as to whether or not Singer ever made a
 5      presentation to Oppenheimer company?
 6      A.   Well, I mean, based on the e-mail --
 7                  MS. KEARNEY:  Objection, your Honor.
 8      BY MR. KELLY:
 9      Q.   I'm asking for your independent memory having seen this
10      document.  Does this document refresh your memory at all?
11      A.   No.  I wasn't privy or present -- I was never present when
12      Rick gave a speech or gave a talk or anything along those
13      lines.
14      Q.   Fair enough.  But you're on this e-mail and it doesn't
15      refresh your recollection as to what it was about; is that your
16      testimony?
17                  MS. KEARNEY:  Can we take the exhibit down, your
18      Honor?
19                  THE COURT:  Take the document down.
20      BY MR. KELLY:
21      Q.   How about this, let me ask you this.  You never saw that
22      document before?
23      A.   I was on the e-mail, so I saw it, I've seen it before.
24      Q.   Good point.  So you saw it at some point but you have no
25      memory of it now?
```

1    A.    Correct.

2    Q.    And in your 15 hours of preparation with the government,

3    you don't recall them showing you that one, do you?

4    A.    I have not seen that e-mail since, I guess, January of

5    2014.

6    Q.    Okay.  Do you remember sending a bio of Rick Singer to

7    Starbucks in April of 2018?

8    A.    No.

9    Q.    Let me show you Exhibit 1554, just the witness, please.

12:05 10          Please just take a look at who's it from, who's it

11   sent to, and what the companies that it's sent to and who's

12   being cc'd and what the subject is and what the attachment is

13   all about.

14          Okay.  Now, taking a moment to having just reviewed

15   that, does it refresh your memory at all as to whether or not

16   Mr. Singer made a big presentation to Starbucks at some point?

17   A.    Oh, I've never doubted or I don't think I've ever

18   testified that I wasn't aware that he made --

19   Q.    Okay.

12:06 20   A.    -- or made -- or had a speech at Starbucks.  I was aware

21   of that.

22   Q.    And you are aware that beforehand you sent his bio to

23   Starbucks?

24   A.    I couldn't recall that before a few seconds ago.

25   Q.    But having seen that now you remember you sent a bio of

```
 1    Mr. Singer to Starbucks, correct?
 2    A.   Correct, but I don't know what the untitled attachment is
 3    that's also there.
 4    Q.   Let's show that, too.  Please put 1554 back up.
 5         So you do remember sending this to Starbucks regarding
 6    Mr. Singer's bio, correct?
 7    A.   Well, I mean -- I don't remember from 2018, but I can see
 8    in front of my face that I e-mailed Starbucks and cc'd Rick and
 9    included his bio in there.
12:07 10  Q.   So let's go to page 2 of this.  And the third line about
11    how many U.S. cities and how many foreign countries he's
12    working in.  Does that refresh your recollection of what the
13    sort of things he would say on his bio?
14    A.   That he would say in his bio?
15    Q.   Yes.
16    A.   Yes.
17         MR. KELLY:  All right.  I offer this one, your Honor.
18         MS. KEARNEY:  Objection.
19         THE COURT:  Just because it refreshes her memory
12:07 20  doesn't make it admissible.  She's testified to it, the
21    document is not admissible.  The objection is sustained.
22    BY MR. KELLY:
23    Q.   Is this consistent with how Singer would present himself
24    to the world?
25    A.   I can't say speak on how Rick presented himself to the
```

```
 1  world because I wasn't present when Rick had conversations with
 2  other people.
 3  Q.   Okay.  Is this consistent from your experience in what
 4  Singer would say in front of you about his expertise?
 5  A.   Rick didn't say things in front of me about his expertise.
 6  Q.   All right.  Do you recall that the Starbuck presentation
 7  actually occurred?
 8  A.   Yes.
 9  Q.   Okay.  And do you recall that you were sent a video link
10  to the presentation?
11  A.   Yes.
12  Q.   And did you watch it?
13  A.   Yes, I actually testified earlier that I watched it at
14  some point in, like, 2019 or 2020, after March 12th of 2019.
15  Q.   Okay.  I'm going to show you -- well, actually, I need to
16  give the witness some -- just the witness only, some earphones
17  so she can both see and hear this exhibit before I move for its
18  admission.
19          MR. KELLY:  Don't play it out loud, its to be played
20  to her with her headphones before I move for admission of it.
21          THE COURT:  I don't understand the purpose.
22          MR. KELLY:  She just testified, your Honor, that she
23  saw this exhibit.
24          THE COURT:  Let me see counsel at sidebar.
25          *** Beginning of sidebar on the record. ***
```

```
 1                THE COURT:  Mr. Kelly.

 2                MR. KELLY:  Yes, your Honor.  So she has reviewed this

 3      video.  The video can be used in multiple ways that make it

 4      admissible in the federal rules of evidence.  For instance,

 5      806.

 6                I'm entitled to attack the character of Rick Singer.

 7      Identities ray video of Singer, she's seen it, I'm entitled to

 8      put it in in my defense.  I'm entitled to make a defense.  And

 9      there's no question she's seen it, she saw it.

12:10 10          It's relevant to this case because it goes to Singer's

11      state of mind.  This is how Singer presents himself to the

12      world.  He's a skilled con man, and a jury is entitled to hear

13      it.  With respect, I seek its admission.

14                MR. KENDALL:  If I may add, your Honor, I think the

15      most compelling issue is 803.  They're going to put on numerous

16      statements of Mr. Singer on the tape, his co-conspirator

17      hearsay, his e-mails.  We get to impeach Mr. Singer on 806 for

18      all the statements they have put in and they're going to put in

19      for the rest of the government case.  Thank you.

12:10 20          MS. KEARNEY:  Your Honor, the witness has testified

21      that she saw the video after her arrest in this case.

22                In terms of related 803, there's not a specific

23      statement that they're trying to impeach Mr. Singer on.

24      They're trying to just introduce evidence that's beyond the

25      scope of her direct, and that is not going to be suitable for
```

```
 1    impeachment of this witness.

 2         MR. FRANK:  If I could just amplify now, Judge, under

 3    806 there has to be a specific statement that they're trying to

 4    impeach.  There is no specific statement.  They're just using

 5    general character evidence on a different occasion before a

 6    general audience that no witness in this case has seen during

 7    the pendency of the conspiracy.

 8         The only time this witness ever saw this video was

 9    after she was arrested and indicted.  We have no evidence that

12:11 10    their clients ever saw the video or ever had any impact on

11    their state of mind.

12         And also, Mr. Singer's statements to an audience at

13    Starbucks doesn't say anything about his state of mind, just

14    what he said on a different occasion.

15         MR. KENDALL:  Your Honor, if I may address

16    specifically the issues they raised.  They're going to put in

17    all the tape recordings made of Mr. Singer at the direction of

18    the government.  This directly impeaches those recordings,

19    including, I think it's the October 5th or 15th and the whole

12:12 20    series.  So it's impeaching directly statements of Mr. Singer.

21         Second, your Honor, it is also relevant to, as

22    Mr. Kelly said, it shows Singer's state of mind that the side

23    door by itself is not illegal.

24         Remember all of the impeachment that Mr. Frank was

25    trying to offer, it's a contribution, it's a payment, a payment
```

1    is a bribe, trying to put in all these things that Mr. Singer

2    said.

3              This directly refutes that.  It shows that Singer's

4    state of mind was that he wasn't entering into a conspiracy

5    when he wanted to do a side door with my client.

6              They're trying to say a side door is a conspiracy.

7    This shows it's not.

8              THE COURT:  One last statement from you and one last

9    statement --

12:12 10         MR. KELLY:  One last statement.  Under 806, you're

11    allowed to attack and 806(b) goes to the truthfulness of the

12    side door, so we get to, respectfully, submit it.

13             MR. FRANK:  They still haven't offered a single

14    specific statement that they're trying to impeach more than

15    generically what he said when he was a cooperating witness

16    acting at the direction of the government, and his state of

17    mind there is completely irrelevant.

18             THE COURT:  I'm not going to let you play this before

19    this witness at this time.  This is a major argument that we

12:13 20    can have outside the hearing of the jury, but you're not going

21    to play it before this witness or ask her about that particular

22    Starbucks presentation.

23             MR. KENDALL:  We're not looking to challenge the

24    ruling.  She specifically authenticated, so not only relevance,

25    authenticity.

1        THE COURT:  I'm not talking about authenticity.

2        MR. KENDALL:  So if we raise it again with you, it's

3   not based on authenticity, it's related to relevance.

4        THE COURT:  You can come back later and we can talk

5   about it, but you're not going to put it before this witness

6   and ask her about this Starbucks presentation.  So the

7   objection is sustained.

8        MR. KENDALL:  Thank you, your Honor.

9        *** End of discussion at sidebar. ***

12:14 10        MR. KELLY:  May I proceed, your Honor?

11        THE COURT:  Yes, you may.

12   BY MR. KELLY:

13   Q.   Ms. Sanford, so you do recall there was, in fact, a

14   videotape presentation by Mr. Rick Singer in front of

15   Starbucks, correct?

16   A.   At the Starbucks corporate headquarters, yes.

17   Q.   And you've watched that video yourself, correct?

18   A.   Yes.

19   Q.   Are you aware that Mr. Abdelaziz paid $7,000 to Rick

12:15 20   Singer for college consulting services for Sabrina?

21   A.   No, I'm not aware of that.

22   Q.   Does that sound, based on your experience, like a number

23   that could be likely?

24   A.   That fits within the range of prices that occurred during

25   my time at The Key.

```
 1              MR. KELLY:  Let me show just the witness 1558, please.
 2              And let's go to the second page, have the witness read
 3         it to herself, please.
 4         Q.   And look in the middle there, right after it says, "Good
 5         morning."
 6         A.   Okay.
 7         Q.   Does that refresh your memory as to whether Mr. Abdelaziz
 8         paid $7,000 for college consulting services?
 9         A.   I didn't have anything to do with the finances of the
12:16 10    company, so I wouldn't have, like, processed payments --
11         Q.   Sure?
12         A.   -- processed a check or anything like that.
13         Q.   Well, would an individual named Steve Masera have
14         responsibilities for stuff like that?
15         A.   In this e-mail it's Melissa Rail.
16         Q.   If you know, do you know a man named Steve Masera?
17         A.   Yes.
18         Q.   Did he have at some point financial responsibilities for
19         Mr. Singer's operation?
12:16 20    A.   He was the accountant for the office, correct.
21         Q.   Right.  That's not something you did.
22         A.   No.
23         Q.   Do you recall that you are the one who got the receipt for
24         submitting Sabrina Abdelaziz's Common App to USC?
25         A.   Yes.
```

1          MR. KELLY:  Let me show the witness 1256, please.

2    Q.    And you see -- well, take a second to take a look at it.

3    A.    Yeah, I see it.

4    Q.    Okay.  And is this, in fact, the receipt that you received

5    for submitting her application?

6    A.    Yes, it is.

7    Q.    Okay.

8          MR. KELLY:  I offer Exhibit 1256.

9          MS. KEARNEY:  No objection.

12:17 10          THE COURT:  It will be admitted, 1256.

11          (Exhibit 1256 received into evidence.)

12   BY MR. KELLY:

13   Q.    Now, is this a document you had seen before coming here

14   today?

15   A.    Yes.

16   Q.    All right.  So this is one you were actually shown,

17   correct?

18   A.    Yes.

19   Q.    So, because you were shown it, you could remember it,

12:18 20   right?

21   A.    My memory was refreshed and this was confirmed that I had,

22   in fact, submitted the application.

23   Q.    Right.

24          MR. KELLY:  Just a moment, your Honor.

25          THE COURT:  Yes.

1              (Pause.)

2    BY MR. KELLY:

3    Q.    You got Sabrina's log in -- excuse me.  You received

4    Sabrina Abdelaziz's Common App login information in November of

5    2017, correct?

6    A.    I had her login information, but I can't confirm when I

7    received it.

8              MR. KELLY:  All right.  Let's show the witness Exhibit

9    1247, please.

12:19 10   Q.    Did you get a moment to read it?

11   A.    Yes.

12   Q.    Having reviewed this, does it refresh your memory that you

13   received Sabrina's Common App login information in November of

14   2017?

15   A.    I'm not actually seeing that reflected in the e-mail that

16   I'm seeing in front of me.

17   Q.    Well, how about where it says --

18             MS. KEARNEY:  Objection.

19   BY MR. KELLY:

12:19 20   Q.    And the second thing I'm asking you to read it to yourself

21   there, in the middle here, when it says, "can I," let's

22   highlight that, please.

23             If you could read that to yourself.

24   A.    Yes, I see that.

25   Q.    So does that refresh your memory that back in November of

```
 1   2017, you received Sabrina's login information for her Common

 2   App account?

 3   A.   No, because I'm not actually seeing that reflected in the

 4   e-mail.

 5   Q.   Well, let's look up above.

 6        What did you respond?

 7        MS. KEARNEY:  Objection.

 8        MR. KELLY:  I'm asking her to read it to herself, I'm

 9   not asking her to read it out loud, see how you refresh your

10   memory here.

11   A.   Correct, I see what's in the e-mail.

12   Q.   Okay.  Now having seen that, does that refresh your memory

13   that you asked for Sabrina's login information on the Common

14   App?

15   A.   I don't think that's what you asked before, but, yes, I

16   did ask her to send that information to me.

17   Q.   Okay.  And you got that login information, didn't you?

18   A.   That's not reflected in this e-mail.

19   Q.   Well, I'm not asking you about the e-mail.  You got the

20   login information from Sabrina, didn't you?

21   A.   I got the login information at some point.

22   Q.   Right.  Because there's a receipt in your name for her

23   application, correct?

24   A.   Correct.

25   Q.   And you submitted her application after getting false
```

1    awards for her from Rick Singer, correct?

2    A.   I don't know what I got from Rick or if I got anything

3    from Rick that was actually added to her application.

4    Q.   Because I showed you a series of e-mails that you've never

5    seen before, right?  You haven't had time to reflect upon that?

6    A.   I hadn't seen those e-mails since, I guess, 2018.

7    Q.   Right.  And obviously, you've met with the government

8    since 2018.  You met with them very recently, haven't you?

9    A.   Yes.

12:22 10   Q.   And you never had a conversation with Mr. Abdelaziz where

11   you told him, I'm putting fake awards on Sabrina's application,

12   did you?

13   A.   If you're, like, referring to a phone call or a text

14   message exchange, I've never had that communication with him.

15   Q.   Well, you've never had an e-mail telling him that either?

16   A.   Not that I'm aware of.

17   Q.   And the government didn't show you such a piece of

18   evidence before you testified, right?

19   A.   I have not seen that.

12:22 20   Q.   Right.  So if there was an e-mail from you to him saying,

21   Hey, I'm putting a bunch of fake awards on Sabrina's

22   application, they probably would have shown that to you, right?

23   A.   I can't say either way.

24   Q.   Right.  Now, you don't have any idea, do you, ma'am, about

25   what Rick Singer told Abdelaziz about the college admissions

```
 1   process, do you?
 2   A.   No, I was never present during any conversations that he
 3   would have had with Mr. Abdelaziz.
 4   Q.   All right.  And you have no idea whether Mr. Abdelaziz
 5   ever agreed to bribe anyone, do you?
 6   A.   I am not privy to any of that information or any of the
 7   conversations or anything along those lines.
 8   Q.   Okay.  One second, please.
 9        (Pause.)
10   Q.   You've heard of an organization called YPO, correct?
11   A.   That doesn't sound familiar to me.
12   Q.   All right.  Did you ever discuss a presentation by
13   Mr. Singer to an organization called YPO?
14   A.   Not that I can recall.
15        MR. KELLY:  Let me show just the witness Exhibit 9682.
16   Q.   Just take a moment to look at it yourself, please.
17   A.   I --
18   Q.   Well, have you had a chance to look at it?
19   A.   Yes --
20   Q.   Let me ask you -- I don't want to elicit testimony --
21        THE COURT:  Take the document down, please.
22   BY MR. KELLY:
23   Q.   Is there anything about that document that refreshes your
24   memory at all about a YPO presentation by Rick Singer?
25   A.   Well, no, because I didn't actually see where I was on
```

12:24 (line 10)
12:25 (line 20)

1    that e-mail.

2    Q.    But nothing about it refreshes your memory about that

3    situation, correct?

4    A.    No.   That appeared to be an e-mail exchange between Rick

5    and his former business associate.   I don't think I was on that

6    at all.

7    Q.    And did Singer ever talk to you about it?

8    A.    No.

9         MR. KELLY:   At this time, your Honor, I have nothing

12:25 10   further.

11        THE COURT:   Redirect examination, Ms. Kearney.

12                    REDIRECT EXAMINATION

13   BY MS. KEARNEY:

14   Q.    Ms. Sanford, on cross-examination, Mr. Kendall asked you

15   questions about whether you knew there was anything improper

16   about the side door.   Do you recall those questions?

17   A.    Yes.

18   Q.    And he showed you several e-mails where Mr. Singer was

19   using the term "side door"?

12:26 20   A.    Correct.

21   Q.    Is there anywhere in those e-mails that Mr. Singer

22   mentioned that he was presenting students as fake athletic

23   recruits through the side door?

24   A.    That's not -- I didn't see that reflected in those e-mails

25   that were presented to me.

1    Q.    And was there anywhere in those e-mails that Mr. Singer

2    said a parent had to make a payment for their children's

3    admission in order to go through the side door?

4    A.    No, I didn't see any e-mails where that was presented.

5    Q.    You testified on direct there was at least one instance

6    where you knew a 's athletic credentials were fake?

7    A.    Yes.

8    Q.    As to the other students, what was your relationship with

9    them in terms of whether you would know if their athletic

12:27 10   credentials were real or not?

11   A.    I didn't have the relationship with students prior to

12   the -- or I rarely had any sort of interaction or relationship

13   with students prior to the application process, so I didn't

14   have any knowledge as to kind of what they did in their free

15   time or what their activities were.  So if something was

16   presented to me, I would have believed or assumed it was, in

17   fact, accurate and true.

18   Q.    Did you have any understanding about whether Johnny

19   Wilson's athletic credentials were fabricated?

12:28 20   A.    I actually don't recall ever seeing anything about his

21   athletic credentials.

22   Q.    And how about Sabrina Abdelaziz, did you know whether she

23   even played basketball?

24   A.    No, I didn't know if she did or didn't.

25   Q.    At some point after you began working with Mr. Singer, you

1    figured out that he was doing some things improperly?

2    A.    Correct.

3    Q.    He asked you to take classes for students?

4    A.    Yes.

5    Q.    He asked you to put fake awards on their applications?

6    A.    Yes.

7    Q.    What was your understanding at the time as to whether what

8    he was doing was illegal?

9    A.    I didn't believe or even think that there was anything

12:28 10   that Rick was doing or that I was being asked to do that was

11   illegal.

12   Q.    Why did you stay with him after you realized what he was

13   doing was improper?

14   A.    Well, that's kind of -- so I think I was in more of a

15   unique situation than some other people I think in the

16   workforce, and in the fall of 2016 I had learned that I had

17   defaulted on my student loans, so in order to get current, I

18   borrowed $11,000 from Rick in order to pay that back or I was

19   told that the company was going to pursue legal action against

12:29 20   me.  And due to the terms of that loan or the repayment plan

21   that was -- that was agreed upon, I would essentially have to

22   pay back that loan in full or if I was -- if I was fired or if

23   I quit, then I would -- whatever amount was due on that final

24   day I would have to pay that back to Rick on that day.

25   Q.    Mr. Kendall also asked you questions about the camps that

1    the foundation ran.

2    A.    Yes.

3    Q.    And how many camps were there?

4    A.    There were a total of three over a two-year period that I

5    actually was present for.

6    Q.    How long were the camps?

7    A.    The first camp was a week long; the second camp, which

8    actually occurred in that first year, was maybe like two or

9    three days; and then the second year, in 2014, that camp, it

12:30 10    was less than a week but more than, like, three days.

11    Q.    And you mentioned that for at least one of those camps it

12    was attended by Mr. Singer's students as well as students from

13    a local domestic violence shelter?

14    A.    Correct.

15    Q.    Who paid for Mr. Singer's students to attend the camp?

16    A.    The parents -- the parents paid for their own -- the

17    parents paid for their student's own expenses.

18    Q.    And what was your understanding of Mr. Singer's

19    relationship with that domestic violence shelter following the

12:31 20    conclusion of the camp?

21    A.    That the relationship deteriorated and it was

22    non-existent.

23    Q.    You were asked on your cross-examination whether

24    Mr. Singer ever told you about tax evasion.  Do you recall

25    that?

```
 1    A.    Yes.

 2    Q.    And I believe you said that Mr. Singer never said that to

 3    you?

 4    A.    No.  Rick didn't discuss his finances with me or his

 5    taxes.

 6    Q.    Did Mr. Masera ever complain to you about the way things

 7    were billed at The Key?

 8    A.    About -- can you repeat that?

 9    Q.    Did Mr. Masera ever complain to you about the way parents

10    were billed at The Key?

11          MR. KENDALL:  Objection, hearsay.

12          MS. KEARNEY:  Your Honor, I think under *Petrozziello*

13    this would come in.

14          MR. KENDALL:  I don't think it's in furtherance --

15          THE COURT:  Ask the question again.

16    BY MS. KEARNEY:

17    Q.    Whether from Mr. Masera ever complained to you how things

18    were billed at The Key?

19          MR. KENDALL:  Objection, your Honor.

20          THE COURT:  Overruled.

21    A.    In one instance he did express frustration.

22    Q.    What did he say?

23    A.    He was frustrated that Rick had -- or that Rick's clients

24    or this particular client had been advised to -- or had been

25    told that he could actually charge Rick's services for college
```

1  counseling services to the business as a business expense.

2  Q.   You were also shown copies of Mr. Singer's book as well as

3  The Key's website.  Do you recall that?

4  A.   Yes.

5  Q.   Do you know if Mr. Wilson ever reviewed either of those

6  items?

7  A.   No, I couldn't say either way if he did or didn't.

8  Q.   Do you know if Mr. Abdelaziz ever reviewed either of those

9  items?

12:32 10  A.   The same, I can't say if they did or if they didn't.

11  Q.   Is there anywhere on The Key's website or in Mr. Singer's

12  book where he mentions posing students as fake athletic

13  recruits?

14  A.   I can't say either way.

15  Q.   Is there anywhere in The Key's website or in Mr. Singer's

16  book where he describes having --

17        MR. KELLY:  Objection to leading the witness.

18        THE COURT:  Well, ask the question and then we'll see

19  whether it's leading.

12:33 20        MS. KEARNEY:  I'll rephrase.

21  BY MS. KEARNEY:

22  Q.   Ms. Sanford, where in Mr. Singer's book or on his website

23  does he describe that parents had to pay hundreds of thousands

24  of dollars in exchange for admissions slots at schools?

25  A.   I have never seen that described anywhere on the website

1    or in the book.

2    Q.   And you were pointed to a review from Evan Webb on the

3    website?

4    A.   Yes.

5    Q.   Do you know if he was a side door student?

6    A.   No, I don't know.

7    Q.   Do you know if he was ever presented as a fake athletic

8    recruit?

9    A.   I don't know that.

12:33 10   Q.   Do you know if his parents ever made a payment to get

11   their child into school?

12   A.   I don't know that.

13          MS. KEARNEY:   Can we show for the witness only Exhibit

14   9683, which I don't think the government has a copy of, if

15   defense --

16          THE COURT:   What's the exhibit number?

17          MS. KEARNEY:   9683.

18   BY MS. KEARNEY:

19   Q.   Ms. Sanford, I believe on cross-examination you were shown

12:34 20   this e-mail?

21   A.   Yes.

22   Q.   And you were asked questions about whether Mr. Singer

23   instructed you -- whether you had a memory of whether

24   Mr. Singer instructed you to submit the applications for Johnny

25   Wilson?

1    A.    Yes.

2    Q.    And looking at the third sentence in that e-mail, does it

3    refresh your recollection as to whether --

4            MR. KENDALL:  Objection, your Honor, leading.

5            THE COURT:  Sustained.

6    BY MS. KEARNEY:

7    Q.    Ms. Sanford, what is your memory as to whether Mr. Singer

8    instructed you to submit Johnny Wilson's applications for all

9    schools but USC?

12:35 10    A.    That is reflected in the e-mail.

11    Q.    Do you have a memory?

12    A.    No, I don't.

13    Q.    Does the e-mail refresh your recollection?

14    A.    No, it doesn't.

15    Q.    Ms. Sanford, what do you know about conversations that

16    Mr. Singer had with Mr. Wilson about his son's application?

17    A.    I don't know of any conversations he had or could have had

18    or would have had with Mr. Wilson.

19    Q.    What is your understanding of conversations that

12:35 20    Mr. Singer had with Mr. Abdelaziz about his daughter's

21    application?

22    A.    I'm not aware of any conversations that he could have,

23    would have -- could have or would have had with him.

24            MS. KEARNEY:  Can we look at Exhibit 415 -- excuse

25    me -- 442, which I believe is in evidence.

1         And can we blow up the December 7, 2017 e-mail from

2    Mr. Singer towards the bottom of the page.

3         Thank you.

4    Q.   Ms. Sanford, who instructed that basketball would go on

5    Sabrina Abdelaziz's activities?

6    A.   Rick did.

7    Q.   And if we can pull out of the blowup there.

8         Who was on this e-mail where Mr. Singer directed that

9    basketball would go into her activities?

12:36 10  A.   Andrew Gamal, Sabrina, myself, and Rick.

11   Q.   And you are aware of whether Mr. Abdelaziz directed you to

12   remove basketball from Sabrina Abdelaziz's activities?

13        MR. KELLY:   Objection.

14        THE COURT:   Overruled.

15   A.   That's not something I can recall him ever advising me to

16   do.

17   Q.   And if we go to the e-mail from Mr. Abdelaziz, what does

18   Mr. Abdelaziz say there?

19   A.   "Thank you, Andrew, we'll go with what Rick says.

12:37 20  So-resolved."

21        MS. KEARNEY:   Can we look at Exhibit 458 in evidence.

22        And if we can blow up the top e-mail there from

23   Mr. Abdelaziz.

24   Q.   And, Ms. Sanford, who instructed you to submit the

25   application with basketball essays for Sabrina Abdelaziz?

 1   A.   Gamal did.

 2        MS. KEARNEY:   And if we can go to Exhibit 459 in

 3   evidence.

 4        Blow up the top message there, please.

 5   Q.   Ms. Sanford, who reminded you as to Rick's direction about

 6   the essays, that it needed to include basketball?

 7   A.   Gamal did.

 8        MS. KEARNEY:   Can we pull up Exhibit 681 in evidence,

 9   please.

12:38 10        Can we go to page 2.

11        And that section on substantial assistance motion.

12   Q.   You were asked some questions on cross-examination about

13   the favorable recommendation from the government?

14   A.   Yes.

15   Q.   And I think Mr. Kelly pointed out to you that the first

16   sentence of that second paragraph, "the determination whether

17   defendant has provided substantial assistance rests solely in

18   the discretion of the U.S. Attorney."

19   A.   Yes.

12:39 20   Q.   Can you read the second sentence, please?

21   A.   "The U.S. Attorney will make this determination based on

22   the truthfulness and value of the defendant's assistance,

23   regardless of the outcome or result of any proceeding or

24   trial."

25   Q.   You were asked some questions about whether Mr. Singer

1    told people that he had a list of prestigious clients.  Do you

2    recall that?

3    A.    Yes.

4    Q.    What are you aware of -- excuse me.  Are you aware whether

5    Mr. Singer ever shared those names with Mr. Wilson?

6    A.    No, I'm not aware of that, if he did or if he didn't.

7    Q.    And are you aware whether he shared that information with

8    Mr. Abdelaziz?

9    A.    No, I'm not aware if he did or didn't share that

12:40 10    information.

11    Q.    And finally, Ms. Sanford, you were shown Exhibit 9621,

12    which was admitted into evidence.

13          I don't believe the government has it, though.

14          And in the second page of this e-mail, Lauren

15    Isaacson -- how old was she at the time, approximately?

16    A.    She would have been in college already, but I don't know

17    an approximate age.

18    Q.    And in the e-mail on April 4th, she asked you -- excuse

19    me, she told that you her internship counselor wanted her to

12:40 20    change her resumé and cover letter to embellish upon her

21    interests in event planning.

22    A.    Correct.

23    Q.    With respect to your work for Mr. Singer, what did you

24    mean when you said the word "embellish"?

25          MR. KENDALL:  Objection, your Honor.

1          THE COURT:  Overruled.

2     A.   When I used the word "embellish," that was essentially a

3     nicer, friendlier way of saying lie.

4          MS. KEARNEY:  Nothing further.

5          THE COURT:  Recross, Mr. Kendall.

6                    RECROSS-EXAMINATION

7     BY MR. KENDALL:

8     Q.   Ms. Sanford, you'll agree with me the word "embellish" has

9     more than one definition, correct?

12:41 10    A.   I know my definition of the word.

11    Q.   Do you know the dictionary definition?

12    A.   I have not looked that up.

13    Q.   If I would to suggest to you "embellish" can also mean

14    just to add detail to make something look attractive, more

15    interesting, would you agree that's also the definition of

16    "embellish"?

17    A.   That's not the definition I use when I say the word.

18    Q.   Fair enough, but my question was are you aware of the

19    dictionary definition?

12:41 20    A.   Prior to you sharing it a few moments ago, no, I wasn't

21    aware.

22    Q.   So just because you have one intention when you use that

23    word, that doesn't mean the person who's reading it or hearing

24    it from you has the same understanding you do, correct?

25         MS. KEARNEY:  Objection.

```
 1              THE COURT:  Sustained.
 2    BY MR. KENDALL:
 3    Q.   Well, you agree "embellish" likely has more than one
 4    definition, correct?
 5    A.   Well, that's what you said, but I haven't seen that
 6    definition in the dictionary.
 7    Q.   Okay.  So you don't know the dictionary definition,
 8    correct?
 9    A.   No.
12:42 10   Q.   When you use the word "embellish," do you always say I
11    want you to hear the Ms. Sanford definition and I don't know if
12    that's the accurate definition in the dictionary?
13              MS. KEARNEY:  Objection.
14              THE COURT:  She can answer it.
15    A.   Can you repeat the question?
16    Q.   When you use the word "embellish," you don't tell people
17    you're using your own definition of it, do you?
18    A.   No, but if it's coming from my mouth or it's -- I'm typing
19    it out, then it's my interpretation and use of the word.
12:43 20   Q.   So when you use it, you use it to imply you're going to
21    mislead or be false about something, correct?
22    A.   Correct.
23    Q.   And you don't know what people who know the dictionary
24    definition are expecting that word to mean, do you?
25              MS. KEARNEY:  Objection.
```

```
 1              THE COURT:  Overruled.
 2    A.    I think it -- well, I think it's dependent on context.
 3    Q.    And in the context you saw with Lauren Isaacson, she was
 4    looking to use true details about her activities to give more
 5    context to what she's accomplished for her internship
 6    application, right?
 7    A.    That's what I took from the e-mail, correct.
 8    Q.    I'd now like to move to the discussion that the government
 9    had with you in their redirect about the side door.
12:43 10             Do you remember you were just asked:  "Did Mr. Singer
11    say that there were large payments for the side door on the
12    website?"  And you said, "No, there weren't"?
13    A.    I said that that's -- I don't recall seeing that.
14    Q.    You don't recall seeing it on the website you were asked,
15    correct?
16    A.    Correct.
17    Q.    And were you asked -- I forget what it was, you were asked
18    in some other context that you recall the side door involved
19    large payments, and you said, No, you didn't remember it in
12:44 20    that other context either?
21    A.    I was asked if I saw that in Rick's book, and I responded
22    I did not recall seeing that information in his book.
23    Q.    But you heard it in the Starbucks video, didn't you?
24              MS. KEARNEY:  Objection.
25              MR. KENDALL:  Your Honor, they opened the door.
```

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | THE COURT:  Sustained.                                             |
|       | 2  | MR. KENDALL:  Your Honor, if I may be heard, they've              |
|       | 3  | opened the door by raising this issue.                            |
|       | 4  | THE COURT:  I don't think they opened the door for               |
|       | 5  | that question.                                                    |
|       | 6  | The objection is sustained.                                       |
|       | 7  | BY MR. KENDALL:                                                    |
|       | 8  | Q.   Do you recall him saying it in any other context that the   |
|       | 9  | side door donation -- that the side door involved donations?     |
| 12:44 | 10 | A.   In -- I'm sorry, in -- can you clarify what you mean by      |
|       | 11 | "context" or --                                                   |
|       | 12 | Q.   In any other place other than the two things she asked      |
|       | 13 | you, do you recall Mr. Singer saying the side door involved       |
|       | 14 | donations?                                                        |
|       | 15 | A.   Rick had used the term "donation" with me, yes.             |
|       | 16 | Q.   With respect to the side door, correct?                     |
|       | 17 | A.   Correct.                                                     |
|       | 18 | Q.   He never used the word "bribe," he used "donation,"         |
|       | 19 | correct?                                                          |
| 12:45 | 20 | A.   Well, he used the term "bribe" on one occasion.             |
|       | 21 | Q.   Did you ever tell that to the FBI in any of your            |
|       | 22 | interviews prior to today?                                        |
|       | 23 | A.   Yes.                                                         |
|       | 24 | Q.   And they were writing things down and taking things down,   |
|       | 25 | do you remember that?                                             |

1   A.   That's my understanding of what was happening.

2   Q.   Do you remember on January 28, 2020, you were interviewed

3   by the FBI and they took notes?

4   A.   Correct.

5   Q.   Your lawyer was present?

6   A.   Yes.

7   Q.   Mr. Rosen was present?

8   A.   Yes.

9   Q.   Ms. Kearney was present?

12:45 10   A.   Yes.

11   Q.   Leslie Wright was present?

12   A.   That I don't recall.

13   Q.   And you remember telling them -- did you remember telling

14   them you knew at the time that the side door was a donation,

15   you thought everything went to the school or through the

16   foundation to the school.  You did not know that Singer took

17   some of the money.  Do you remember telling the FBI that at

18   that time?

19   A.   Yes, from my limited understanding of the side door and

12:46 20   the things that I saw over the years, that's what I believed to

21   be true.

22   Q.   And in that debriefing you never once said that you

23   thought the money was being used as a bribe, correct?

24   A.   No, but that's also not what I said previously, a few

25   moments ago.

```
 1   Q.   Did you ever tell the FBI at your January 28, 2020
 2   debriefing that you knew at the time you worked for Mr. Singer
 3   that bribery was part of the side door?
 4   A.   I did not know that or -- nor did I think that, nor was I
 5   aware of that, so that's not information that I would have
 6   shared or stated.
 7   Q.   And did you also tell the FBI at that January 28, 2020
 8   debriefing you did not think that students got in as fake
 9   athletes?
12:47 10  A.   I don't recall saying that specific statement.
11   Q.   Is it consistent with what your understanding was at the
12   time that you did not think that students got in as fake
13   athletes?
14   A.   That's correct.
15            MR. KENDALL:  If I may have one moment, your Honor.
16            THE COURT:  Yes.
17            MR. KENDALL:  I think I'm done, your Honor.
18            THE COURT:  Recross, Mr. Kelly.
19            MR. KELLY:  Briefly, your Honor.
12:48 20                    RECROSS-EXAMINATION
21   BY MR. KELLY:
22   Q.   The prosecutor just showed you a series of e-mails again,
23   right?
24   A.   Yes.
25   Q.   And there's a reference to activities on one of the
```

1   e-mails, right?

2   A.   Is there a specific e-mail you're referring to?

3   Q.   There was an e-mail that the prosecutor put up and said,

4   Isn't Gamal on an e-mail that references activities?

5   A.   Yes.

6   Q.   You've never seen any e-mail which says, Gamal, we're

7   going to put some fake awards on your daughter's Common App.

8   You never saw an e-mail like that, right?

9   A.   No.

12:49 10   Q.   And in fact, you hid the fake awards that you were adding

11   to his daughter's Common App, didn't you?  You hid that from

12   him.

13   A.   I haven't even been able to state -- or I can't even state

14   what I added to the application, if I added anything to the

15   application or anything along those lines.

16   Q.   Ms. Sanford, you know you hid activities from him, don't

17   you?

18   A.   No, I don't know that.

19   Q.   Okay.  Let's look at 458, please.

12:49 20        In the middle where you say -- by the way, this is a

21   big, long chain of e-mails.  You're going back and forth with

22   them, and you're going back and forth with Singer, too, right?

23        You've seen multiple e-mails today involving this

24   subject matter, right?

25   A.   Correct.

 1    Q.    Okay.  So that's commonly referred to as a chain of

 2    e-mails, right?

 3    A.    Yes.

 4    Q.    And here you say, "I have to confirm a few things with

 5    Rick before I can submit."

 6              Right?

 7    A.    Yes --

 8    Q.    That is something you are telling Sabrina and Gamal,

 9    right?

12:50 10    A.    Yes.

 11    Q.    And you don't tell them, I'm going to check with Rick and

 12    get some fake awards to add to her application.  You didn't say

 13    that, did you?

 14    A.    No, that's not what I said in any e-mail exchange.

 15    Q.    Right.  But that is what did you, correct?

 16    A.    As I've said previously, I don't know if I added anything,

 17    what I added, if I added anything, or anything beyond what's

 18    expressed in these e-mail exchanges.

 19    Q.    Okay.  Let me show you 1540, witness only again.

12:50 20              Didn't you immediately ask Singer for a profile on

 21    Sabrina without copying Gamal?

 22    A.    Correct.  I asked Rick for a profile without copying

 23    Gamal.

 24              MR. KELLY:  I offer 1540.

 25              MS. KEARNEY:  Objection.

```
 1              THE COURT:  Sustained.
 2              MR. KELLY:  It's part of the chain.  It's
 3     independently admissible.  It's not hearsay and it's direct
 4     impeachment of the credibility of the witness, your Honor.
 5              MS. KEARNEY:  Your Honor, it is hearsay.  He's putting
 6     it in for the truth of whether or not a profile was requested.
 7              THE COURT:  Yes, the objection is sustained.
 8              MR. KELLY:  That was Exhibit 1540, for the record.
 9     BY MR. KELLY:
12:51 10     Q.   Let me show you 1541 for the record.
11              Didn't you request a profile from Singer about Sabrina
12     and didn't he send it to you?
13     A.   Yes.  I requested a profile from Rick in regards to
14     Sabrina, and according to this e-mail --
15              MS. KEARNEY:  Objection.
16              THE COURT:  Sustained.
17     BY MR. KELLY:
18     Q.   You didn't copy Gamal, did you?
19     A.   He's not copied on this e-mail.
12:52 20              MR. KELLY:  I offer 1541.
21              MS. KEARNEY:  Objection.
22              THE COURT:  The objection is sustained.
23     BY MR. KELLY:
24     Q.   Take a look at Exhibit 1255.
25              Didn't after -- didn't you thank Rick and indicate
```

 1   that you would update Sabrina's application?

 2   A.    That is what is said in this --

 3         MS. KEARNEY:  Objection, your Honor.  I think the

 4   witness has testified --

 5         THE COURT:  Yes, not what was said -- what's the

 6   number of this again?

 7         MR. KELLY:  1255, and I again would respectfully

 8   submit it's not hearsay.  The declarant is in court right

 9   there.  I'm impeaching the witness.

12:52 10       MS. KEARNEY:  Your Honor, I think she's testifying

11   from the document, not from her memory, so if we want to take

12   the document down and he wants to ask it.

13         MR. KELLY:  Well, that's a separate point, your Honor.

14   I'm offering this as non-hearsay, direct impeachment, Rule 106

15   completeness, that's why it's being offered.  It's part of the

16   whole chain going back and forth.

17         THE COURT:  We can talk about this later out of the

18   hearing of the jury.  For the time being the objection is

19   sustained.

12:53 20       MR. KELLY:  All right.

21   BY MR. KELLY:

22   Q.    And isn't the subject matter of your discussions with

23   Singer on the side without Gamal, doesn't it have to do with

24   the phony athletic profile?

25   A.    I can't even say or could I have said back then if the

1    profile was even phony.

2    Q.   Okay.  Let me show you Exhibit 1254 for the record.  Just

3    the witness.

4         MR. KELLY:  Slide on down.  Mr. Carter, slide on down,

5    please.  Keep sliding.  Okay.

6         Keep going back up, I'm sorry.

7    Q.   Isn't it true you got athletic awards for Sabrina from

8    Rick Singer?

9    A.   I can't say if I did.

12:54 10   Q.   And isn't it true that when you communicated with Singer

11   via e-mail about Gamal, you didn't copy Gamal, did you?

12   A.   In those previous e-mails that I saw, he was not copied on

13   those e-mails.

14   Q.   Right.  So when you were getting information about Sabrina

15   from Singer, he's cut out, right?

16   A.   In those specific e-mails, Gamal was not cc'd on those

17   e-mails.

18   Q.   And that's -- go back to 458, please, in the middle,

19   because you had to confirm a few things with Rick before I can

12:54 20   submit, correct?

21   A.   That is what I said in this e-mail, correct.

22        MR. KELLY:  Thank you.

23        Nothing further, your Honor.

24        THE COURT:  Thank you.

25        You may step down, Ms. Sanford.

          1              MR. KENDALL:  Your Honor, you had asked me to remind
          2    you about --
          3              MR. FRANK:  Any reminder, your Honor, we would ask be
          4    at sidebar.
          5              MR. KENDALL:  Fine with me, your Honor.
          6              THE COURT:  All right.  Then we'll do it at sidebar.
          7              *** Beginning of sidebar on the record. ***
          8              THE COURT:  Mr. Kendall, come in first over here, and
          9    you're over here.
12:55    10              Mr. Kendall, what is it that you want to remind me?
         11              MR. KENDALL:  Just that she is under subpoena, she may
         12    be recalled in the defense case, and she still has to be
         13    sequestered from any publicity about it.  She may need to come
         14    back under the subpoena.
         15              THE COURT:  Ms. Sanford, do you understand?
         16              THE WITNESS:  Yes, I understand.
         17              THE COURT:  Anything else?
         18              MR. KENDALL:  No, thank you.
         19              THE COURT:  Anything from the government?
12:56    20              MR. FRANK:  No.
         21              THE COURT:  Ms. Sanford, you may step down.
         22              THE WITNESS:  Thank you.
         23              *** End of discussion at sidebar. ***
         24              THE COURT:  All right, jurors, we're a few minutes
         25    early, but we're going to break for lunch.  I'll ask you that

|   |   |
|---|---|
| 1 | be back at 2:00.  We will go until 3:00 or a little bit after |
| 2 | 3:00, hopefully we'll be breaking before 3:30 today.  So I'll |
| 3 | see you back here at 2:00. |
| 4 | THE CLERK:  All rise for the jury. |
| 5 | (Jury exits.) |
| 6 | THE COURT:  All right.  Be seated, counsel. |
| 7 | The government's next witness will be? |
| 8 | MR. FRANK:  Rebecca Chassin. |
| 9 | THE COURT:  Who is Rebecca Chase? |
| 12:57 10 | MR. FRANK:  Chassin, Chassin.  She is an Admissions |
| 11 | Officer at the University of Southern California. |
| 12 | THE COURT:  And how long will her direct be? |
| 13 | MR. FRANK:  I estimate about 45 minutes, maybe a |
| 14 | little less. |
| 15 | THE COURT:  And the cross-examination? |
| 16 | MR. KENDALL:  Longer, your Honor, longer than the 45 |
| 17 | minutes. |
| 18 | MR. FRANK:  Your Honor -- |
| 19 | MR. KELLY:  Same, much longer. |
| 12:57 20 | MR. KENDALL:  For impeachment, your Honor. |
| 21 | MR. FRANK:  There's been a lot of cross-examination |
| 22 | that we submit is not being for impeachment purposes.  This |
| 23 | witness was on for over two hours of cross-examination based on |
| 24 | a half hour of direct examination. |
| 25 | It's making it very complicated for us to schedule |

1   witnesses coming in from out of state because the

2   cross-examinations are far, far longer than the direct

3   examinations, and a lot of it is retreading the same ground, a

4   lot of it is trying to get evidence in through the government's

5   witnesses that is not for impeachment purposes.

6           MR. KELLY:  Your Honor, the defense, of course, is

7   allowed to present a defense and vigorously cross-examine the

8   government witnesses.  Mr. Frank might not like that but those

9   are the rules, and we've been complying with the rules.

12:58 10          To the extent he wants to limit how much we can

11   cross-examine the witness, we would respectfully ask the Court

12   not to take that suggestion.  We'll be reasonable, we haven't

13   gone on all day, but there are issues that have come up --

14          MR. KENDALL:  Your Honor, if I may add, Chassin is the

15   critical witness on the honor services theory, and she didn't

16   even work for the athletic department where the honor services

17   arose.  So, yes, we have to impeach her testimony.  They're

18   trying to put the whole honor services case through her.  She

19   didn't work, she wasn't their supervisor, she doesn't have

12:59 20   knowledge.  So there will be extensive impeachment of her, your

21   Honor, not putting in our case, but impeaching her.

22          THE COURT:  Finally, Mr. Frank.

23          MR. FRANK:  The Admissions Department was the victim

24   of the fraud, to say she doesn't have knowledge of the honor

25   services fraud is absurd.

1        What I'm simply saying, I've just said that her

2   testimony is going to be 45 minutes or less, and before they've

3   seen heard a word of that testimony, the defense has already

4   announced they're going to go on for hours and hours of

5   cross-examination.

6        THE COURT:  All right.  To the extent it is for

7   impeachment, it will be allowed.  To the extent it goes beyond

8   that and tries to get into the defendants' case in chief, the

9   objections will be sustained.  So we're in recess --

12:59 10        MR. KELLY:  One procedural matter, your Honor.

11        THE COURT:  Yes.

12        MR. KELLY:  Just for the appellate record, I need to

13   mark these four exhibits for identification purposes:  1540,

14   1541, 1255, and 1254.  We can argue the admissibility later,

15   but at a minimum, I don't want to forget to mark those four.

16        THE COURT:  And they will be marked C, D, E, and F

17   because I believe we've already used A and B, right?

18        (Exhibits C, D, E and F marked for identification.)

19        MR. KENDALL:  Your Honor, we may have a number to the

01:00 20   Starbucks video, we can use that with a number or you can make

21   that the next letter, whatever is your custom.

22        THE COURT:  We'll make that the next letter, which

23   would be what?

24        MR. KENDALL:  G.

25        THE COURT:  G, all right, that's G.

```
 1              (Exhibit G marked for identification.)
 2              MR. KENDALL:  Thank you, your Honor.
 3              THE COURT:  All right.  We're in recess until 2:00.
 4              THE CLERK:  All rise.
 5              (Recess taken 1:00 p.m. to 2:07 p.m.)
 6              THE CLERK:  You may be seated.  Court is now in
 7       session.
 8              THE COURT:  Good afternoon, jurors.  We're ready to
 9       resume.
02:07 10        The government will call its next witness.
11              MR. FRANK:  Thank you, your Honor.  The government
12       calls Rebecca Chassin.
13              (Rebecca Chassin, sworn.)
14              THE CLERK:  Would you please state your name for the
15       record, spelling your last.
16              THE WITNESS:  My name is Rebecca Chassin,
17       C-h-a-s-s-i-n.
18              MR. FRANK:  May I inquire, your Honor?
19              THE COURT:  You may.
02:08 20        MR. FRANK:  Thank you.
21                   DIRECT EXAMINATION OF REBECCA CHASSIN
22       BY MR. FRANK:
23       Q.   Good afternoon, Miss Chassin.
24       A.   Good afternoon.
25       Q.   Can you tell us where you live?
```

```
 1    A.    I live in Los Angeles, California.

 2    Q.    And are you currently employed?

 3    A.    Yes.

 4    Q.    What do you do?

 5    A.    I'm an admissions officer at University of Southern

 6    California.

 7    Q.    What's your title?

 8    A.    I'm the assistant dean of undergraduate admissions.

 9    Q.    How long have you worked in admissions at the University

 10   of Southern California?

 11   A.    20 years.

 12   Q.    What are your responsibilities as the assistant dean of

 13   undergraduate admissions?

 14   A.    I do a lot of same things that most officers do in terms

 15   of talk with students and reading applications, but my own area

 16   of responsibility is in processing applications and helping

 17   with the evaluation process for undergraduate applications.

 18         Mr.  Frank:  Just slow down slightly.  It might help

 19   the court reporter.

 20   Q.    Could you tell us a little bit about your educational

 21   background and where you worked prior to joining USC.

 22   A.    Sure.  I have a bachelor's degree from Pamona College in

 23   sociology and I have a master's degree in communication

 24   management from USC.  Before starting at USC, I was working at

 25   a nonprofit for a couple of years and then came to USC in 2001.
```

1    Q.    How many students attend as undergraduates at USC?

2    A.    Currently, it's around 19,000 undergraduate students.

3    Q.    How many apply to the college each year?

4    A.    It can vary a little bit.  It we're going back a few years

5    to kind of the time frame, these kind of applications, if I

6    take 2018, we had about 56,000 applications in that year.

7    Q.    Okay.  And it's gone up since then?

8    A.    Yes.  It continues to grow each year.

9    Q.    And directing your attention to the -- that sort of 2013

02:10 10   to 2018 time frame, about how many of those applicants were

11   admitted?

12   A.    So, again, in 2018 it was about 8,600 students who we

13   offered admission to.

14   Q.    Okay.  So somewhere in the neighborhood of 15 percent?

15   A.    15, 16 percent, correct.

16   Q.    How are those admission decisions communicated to

17   students?

18   A.    So we mail students an admission packet that has a letter

19   of admission and other information about enrolling at the

02:11 20   institution, and we also will release information

21   electronically through an online portal.

22   Q.    You also send it out by U.S. mail?

23   A.    We do send it out by mail, yes.

24   Q.    Okay.  And when do you do that?

25   A.    We typically do it at the end of March.

1  Q.   Of the roughly 8,600 that you said who were admitted in

2  that time period annually, how many actually attend?

3  A.   So, typically, the first year class will be around 32 or

4  3,300 incoming first year students.

5  Q.   If a student wants to apply to USC, what do they do?

6  A.   We use the common application, which is an online

7  application maintained by a nonprofit organization.  It's used

8  by 80 or 90 colleges for students to fill out information about

9  themselves and then apply to college.

02:12 10  Q.   What's involved with the common application?

11  A.   The common application includes a variety of different

12  materials, some demographic information, where the student goes

13  to school, but would also include a college essay, a chance for

14  students to tell us about activities that they've been involved

15  with, letters of recommendation from teachers or counselors at

16  their school, high school transcripts, test scores, if they

17  want to include information about that.

18  Q.   And when is the application typically submitted?

19  A.   So our first year application deadline is December 1st for

02:12 20  scholarship consideration for merit based scholarships and

21  January 15th is the final first year deadline.

22  Q.   Who reviews all those tens of thousands of applications?

23  A.   Really hardworking staff of admission officers in our

24  office.

25  Q.   And is every application reviewed?

A.   Yes, all completed applications.

Q.   Directing your attention to the 2013 to 2018 time period,
if you know, what was the average GPA of an admitted student?

A.   So we use an unweighted average, so on a four-point scale,
not giving any extra weight to grades earned in advanced
coursework.  The average GPA is typically a 3.8 on a four point
scale.

Q.   What about the average standardized test score?

A.   It's typically about 1450, 1460, in that range.

Q.   That's an SAT score?

A.   SAT score out of a possible 1600.  If students have
submitted ACT scores, we use an accordance table to concord
those to the SAT score.

Q.   Okay.  And what was the average ACT score?

A.   If we look at students' ACT scores, it's about a 33.

Q.   Okay.  And you said 1450?

A.   Around that.  It changes from year to year a little bit,
but yes.

Q.   That's on a 1600 point scale.  Was there a time when the
SAT was on a 2400 point scale?

A.   Yes.  So several years ago there were three parts to the
SAT, each scored out of 800, so the total score was out of
2400.

Q.   And what was the average score out of a 2400 score?

A.   In the mid 2100s.

1    Q.    Are you familiar with the process for the admission of

2    recruited athletes at USC?

3    A.    Yes.

4    Q.    Taking a step back, to what extent, if at all, are

5    athletics an important component of life at the University of

6    Southern California?

7    A.    It's an important part.  A hallmark of a student's

8    experience is the athletic tradition at USC.  We're proud of

9    our athletes.  We have a number of national championship teams.

02:14 10   We compete at the very highest level.  We're really excited

11   that this year we're going to see so many USC athletes

12   competing at the Olympics this year.

13   Q.    In addition to the Olympics, do USC athletes also go on to

14   careers at the professional level?

15   A.    Yes, some do continue on at the professional level.

16   Q.    Where does USC typically rank nationally in terms of

17   athletics?

18   A.    Depends on the sport.  We won four national championships

19   last years in women's sports.  And we typically are competitive

02:15 20   in nearly all of our sports most years.

21   Q.    Are you familiar with the term "Division 1"?

22   A.    Yes.

23   Q.    What is Division 1?

24   A.    Division 1 is sort of the highest level of competition in

25   the NCAA conference and has to do with both the size of the

1   school, but also the level of competition, which would be sort

2   of the most competitive level.

3   Q.   And is USC a Division 1 school?

4   A.   Yes.

5   Q.   How is the athletic admissions process at a general level

6   different from the general admission process at USC?

7   A.   So we do have an athletic subcommittee for admission.

8   This is a group that meets throughout the year.  Most of the --

9   some of the reasons around why the athletic process is a little

02:16 10  bit different has to do with timing.  So coaches are recruiting

11  students.  They are -- there are nationally defined signing

12  dates by which student will commit to sports that happen well

13  before our usual admission process timeline, and so because of

14  that we meet kind of yearlong on athletic recruits that the

15  coaches are interested in in order to render decisions.

16  Q.   So do I understand you correctly that students can be

17  recruited to USC before the typical regular admissions process?

18  A.   That's correct.  In some cases, they may have been talking

19  to a coach even prior to their senior year and a coach may have

02:16 20  expressed an interest on having a student on a team for a long

21  time.

22  Q.   And when do recruited athletes actually submit an

23  application?

24  A.   Again, it depends a little bit on the student and then

25  where we are in the cycle, but it is possible that we would

1    have reviewed a student in the athletic subcommittee prior to a

2    student submitting an application.  Sometimes they've already

3    submitted an application.

4    Q.   When you say it's possible you've reviewed them prior to

5    them submitting an application, what do you mean by that?

6    A.   So the athletic subcommittee meets typically on a biweekly

7    basis.  It's made up of admissions officers, myself included,

8    as well as liaisons from the athletic offices who present the

9    students.  And so they will bring information to us in order to

02:17 10   make an admission decision that may come prior to a student

11   actually submitting their formal common application.

12   Q.   So are there instances where you approve an applicant for

13   admission through the athletics admission subcommittee prior to

14   their actually submitting an application to USC?

15   A.   Yes, but it would be based on materials that were reviewed

16   as part of the SUBCO process.

17   Q.   But you can be admitted before you apply?

18   A.   You can be approved for admission prior to actually

19   submitting the common application.

02:18 20   Q.   And how many students are presented to that subcommittee

21   typically?

22   A.   I would get 200 to 250 students in a cycle.

23   Q.   And how many of those are approved for admission

24   typically?

25   A.   Probably 85 to 90 percent of those students approved.

1    Q.    So 85 to 90 percent of recruits who are presented to the

2    subcommittee are approved for admission compared to 15 percent

3    or so of the applicants in the general pool, is that correct?

4    A.    Correct.

5    Q.    And are there limits to how many students can be admitted

6    through the subcommittee?

7    A.    There's some limits, but you know, it's fairly constant

8    from year to year.  So coaches are looking to replenish

9    students who graduated on their teams, so it's not like they're

02:18 10   looking for an unlimited number of athletes.

11   Q.    So that number of 200 to 250 is pretty constant?

12   A.    It is.

13   Q.    And is that in any way linked to athletic rosters?

14   A.    It does have to do, again, with space available on a given

15   team.

16   Q.    You mentioned that the Athletic Admissions Subcommittee is

17   composed of admissions officers.  Does anyone vote on admission

18   other than admissions officers?

19   A.    No.  So the only voting members of the SUBCO are the folks

02:19 20   in the Office of Admission.

21   Q.    And how many of those folks vote?

22   A.    So there's typically five or six members from the Office

23   of Admission who are the voting members, and then the liaisons

24   who are there from Athletics are merely presenting the cases,

25   bringing us information, but not voting on members.

1    Q.    So the athletic liaisons do not vote on admissions?

2    A.    They do not.

3    Q.    And the subcommittee, that's often called SUBCO; is that

4    right?

5    A.    It is.

6    Q.    Are the academic standards for student athletes different

7    than for students submitted through the general application

8    process?

9    A.    We consider every student's academic preparation and we

02:20 10   are weighing any special talents or contributions that they'll

11   make to the campus and the community, and so certainly their

12   athletic talent is also weighted, as well as their academic

13   preparation.

14   Q.    How do their test and grade scores compare to those in the

15   general process?

16   A.    Generally, I would say their grades and test scores are

17   far below our general students we admit.

18   Q.    Who decides which student athletes get recruited and

19   presented to the subcommittee for admission?

02:20 20   A.    So the coaches will decide who they want to recruit, who

21   they're either going to offer athletic scholarship to or who

22   they want to recruit as a recruited walk-on if they don't have

23   any more athletic scholarships available, and then those are

24   the cases that are presented to us.

25   Q.    Which coaches?

1   A.   The USC Athletics coaches for the various teams.

2   Q.   And then you mentioned that there's a liaison from the

3   Athletics Department who presents to the subcommittee?

4   A.   Yes.

5   Q.   Directing your attention to the 2013 to 2018 time frame,

6   who was the lead primary liaison from the Athletics Department?

7   A.   Donna Heinel.

8   Q.   And what was her role?

9   A.   She was a Senior Administrator in the Athletics Department

02:21 10   and one of her responsibilities was to present the cases at

11   SUBCO.

12   Q.   Was she a coach?

13   A.   No.

14   Q.   Was -- to your knowledge, was she responsible for

15   recruiting student athletes?

16   A.   Not to my knowledge.

17   Q.   So, again, what did she do exactly?

18   A.   She was the liaison to the SUBCO.  She would bring the

19   cases that coaches wanted to recruit in order to see if they

02:21 20   would be admitted or not.

21   Q.   Do coaches themselves ever present candidates to the

22   subcommittee?

23   A.   No.

24   Q.   Why not?

25   A.   They have lots of other things that they're responsible

1   for, and we don't want to confine them to our process, so they

2   typically will have a write-up, some information that they've

3   shared about the student and their interest in the student, and

4   we use that to make our decisions.

5   Q.   So there's a set of materials that you review?

6   A.   That's correct.

7   Q.   And tell us about that.  What's included in that?

8   A.   So a SUBCO packet will typically have the sort of athletic

9   resume of the student, the athletic accomplishments, things

02:22 10   that they've been involved with, any information that helps us

11   to understand the strength of their athletic accomplishments,

12   and then also will include a high school transcript and any

13   test scores that are being presented.

14   Q.   Do members of the subcommittee from the Admissions

15   Department verify the accuracy of those materials?

16   A.   Not independently.

17   Q.   Why not?

18   A.   We believe that, you know, that all of this information is

19   accurate from the coaches and that the transcripts and test

02:22 20   score information is accurate as well.

21   Q.   Do you have an understanding of how coaches identify the

22   student athletes that they recruit and present, submit to

23   SUBCO?

24           MR. KENDALL:  Objection, your Honor.  Hearsay.  Her

25   understanding of what other people do.

1          THE COURT:  That question is objectionable and it's

2    sustained.

3    Q.    Do you work with the athletic department on the admission

4    of student athletes on a regular basis?

5    A.    Yes.

6    Q.    And based on your work, is it important for you to know

7    how students are identified for presentation to the

8    subcommittee?

9    A.    Yes.  I would want to know, you know, how a coach has come

02:23 10   to learn about a student's athletic talent.

11   Q.    And over the 20 years that you've worked in admissions at

12   USC, have you developed an understanding of how student

13   athletes are identified?

14   A.    Yes.

15          MR. KENDALL:  Objection, your Honor.  Still no

16   foundation.  It's hearsay.

17          THE COURT:  Well, no.  She can have that question.  He

18   can have that question.  She can answer it.

19          MR. FRANK:  Thank you, your Honor.

02:24 20   A.    Yes.  I understand it.

21   Q.    And what's your understanding?

22   A.    That coaches may have identified students from following

23   high school athletics and knowing about stand-out athletes from

24   various teams or sports.  They may have met students through

25   the recruiting process.  There's camps and competitions and

1    different things that they might scout at and learn about

2    students.  And students themselves can fill out questionnaires

3    for coaches to get their attention, so they have online

4    questionnaires for students to share their athletic

5    accomplishments to see if coaches would be interested in

6    recruiting them.

7    Q.   Now you mentioned a moment ago that some student athletes

8    are offered scholarships?

9    A.   Yes.  That's correct.

02:24 10   Q.   Are all student athletes offered scholarships?

11   A.   Not all recruited athletes are offered scholarships.

12   Q.   Which recruited athletes are offered scholarships?

13   A.   It's up to the coach to determine how they will use their

14   scholarship allocation.  The NCAA has guidelines about how many

15   scholarships each team or sport will have.  Some of those

16   sports required that the scholarships remain whole with a head

17   count, so you either have 100 percent scholarship or nothing.

18   Other sports it will be proportional, so you can break up

19   scholarships over different members of the team.  Really it's

02:25 20   at the discretion of the coaches how they want to do that.

21   Q.   Have you heard the term "recruited walk-on?"

22   A.   Yes.

23   Q.   What is a recruited walk-on?

24   A.   A recruited walk-on is a student who's being recruited for

25   their athletic talent, but who is not being awarded an athletic

1    scholarship.

2    Q.    So they go through the subcommittee process?

3    A.    That's correct.

4    Q.    Just like a scholarship athlete?

5    A.    Yes.

6    Q.    What criteria do you on the admissions subcommittee look

7    for in recruited walk-on athletes?

8    A.    Really it's not any different.  We're still trying to

9    understand the student's athletic talent, what they will bring

02:25 10    to the team athletically, you know, and, again, look at their

11    academic preparation.

12    Q.    What are expectations for recruited walk-on athletes once

13    they are admitted to USC?

14    A.    That they will contribute to -- contribute athletically to

15    the teams for which they've been recruited.

16    Q.    What do you mean by that?

17    A.    I mean, I guess I expect that the coach recruited them so

18    that they could play.

19    Q.    Are you familiar with the term "admission approval

02:26 20    letter"?

21    A.    Yes.

22    Q.    What is an admission approval letter?

23    A.    Because the timeline of athletic recruiting can be out of

24    sync with our general admission timeline, we may approve a

25    student for admission, meaning they have conditions of

1    admission, things that we want to see from a student during

2    their senior year of high school.  And we want to let the

3    student know about these conditions or that they've approved

4    for admission at the time of the initial decision, even if

5    we're not ready to mail them an official packet.

6    Q.   If you receive an admission approval letter -- those are

7    also sent through the mail?

8    A.   That's correct.

9    Q.   If you receive an admission approval letter, what are the

02:27 10   odds that you'll be admitted to USC?

11   A.   100 percent.

12   Q.   In the binder in front of you, there are a number of

13   documents.  If you could just take a look at those documents,

14   which I'm about to offer.  They are Exhibits 107, 383, 384,

15   413, 414, 420, 592, 661, 662, 663, and I neglected to mention

16   229.  Do you see those documents in front of you?

17   A.   I do.

18   Q.   And what are they?

19   A.   These are athletic SUBCO packets.

02:28 20         MR. FRANK:  The government offers those exhibits.

21         MR. KENDALL:  Objection, your Honor.  We don't object

22   to 107, which relates to my client's son, but we object to all

23   of the others.

24         MR. KELLY:  Join the objection.

25         MR. FRANK:  Your Honor, this is all admissible as

1    evidence of the charged conspiracy.

2           THE COURT:  Grounds for the objection?  Mr. Kendall

3    first.

4           MR. KENDALL:  Relevance, your Honor.  We don't think

5    there's been a sufficient showing of *Petrozziello* to get all

6    these in as relevant to my client.

7           MR. FRANK:  Your Honor, there's been evidence

8    concerning each and every one of these students that's already

9    been submitted.  There's been evidence in the form of e-mails

02:28 10   between Rick Singer and Donna Heinel about these students.

11   There have been phone calls that have been submitted.  It's all

12   part of the evidence of the scheme.

13          MR. KENDALL:  Donna Heinel had nothing to do with my

14   client.

15          THE COURT:  Mr. Sheketoff?

16          MR. SHEKETOFF:  401 and 403, your Honor.

17          THE COURT:  I'm going to admit them *de bene* subject to

18   the *Petrozziello* ruling at the end of the case.  For the

19   record, I need to go over the numbers.  107, 383, 384, 413,

02:29 20   414, 420, 592, 661, 662, and 663.  Is that all?

21          MR. FRANK:  229. I think.

22          THE COURT:  229.  All right.  They are all admitted

23   per my earlier comment.

24          (Exhibit 107, 229, 383, 384, 413, 414, 420, 592, 661,

25   662, 663 admitted into evidence.)

1    Q.   So tell us again, Miss Chassin, what is a SUBCO packet?

2    A.   A SUBCO packet is information that is presented at the

3    SUBCO meeting.  It will include an athletic resume, information

4    about the student's athletic talent, as well as the student's

5    high school transcript and test scores.

6    Q.   And that's a standardized set of materials that you look

7    at when you're evaluating student athletes?

8    A.   Yes.  That's correct.

9    Q.   Okay.  Can we take a look at Exhibit 107, please.  So this

02:30 10    is the cover page of a SUBCO packet?

11   A.   Yes.

12   Q.   Okay.  And if we look at the top, there's a date, 2/28/14.

13   Do you see that?

14   A.   Yes.

15   Q.   What does that represent?

16   A.   The date that the student was presented to the SUBCO, so

17   the date of the SUBCO meeting.

18   Q.   Okay.  And then there's a name?

19   A.   Yes.

02:30 20   Q.   John Wilson, do you see that?

21   A.   John Wilson.  Yes.

22   Q.   And there's an X where it says "fresh"?

23   A.   Indicating the student is a first year applicant, not a

24   transfer.

25   Q.   Then is says "Sport: MH2O".  What is that?

A.    Men's water polo.

Q.    Then it says "Percent scholarship: WO".  What does that

mean?

A.    Walk-on.

Q.    So that means they're not getting a scholarship, but

they're being recruited?

A.    They're a recruited walk-on.

Q.    And then down below, it says "Course Curriculum Factor: 1,

Institutional Factor: 4".  What does that mean?

02:30 A.    So we use unweighted GPAs and we just calculate the

academic coursework a student has done.  We do adjust their GPA

using the curriculum factor, which goes from zero to three, to

account for advanced coursework that a student may have taken

on, additional rigor at their school.

And then there's an institutional factor that's also

-- it's based on research that we've done about how students

from individual high schools fair when they come to USC.  And a

student at an institutional factor 4 school is a school that

the baseline curriculum is preparing students very well when

02:31 they come to USC.  So those also range from zero to four.

Q.    So academically rigorous curriculum, pretty light

coursework; is that fair to say?

A.    The high school's preparing the student well, lighter

curriculum than, yes, many other students from the school.

Q.    And then there's a "High School Core GPA" below that.  Is

1    that a weighted or unweighted GPA?

2    A.    It's what we call an adjusted GPA.  So again, we've

3    calculated the unweighted GPA based on their academic

4    coursework and then we've adjusted it with the curriculum

5    factor and the institutional factor, each representing tenths

6    of GPA points.  So this student has a 3.3 unadjusted GPA and a

7    3.8 adjusted GPA.

8    Q.    So you say 3.8 adjusted GPA.  Earlier, you testified that

9    the average GPA of a student admitted to USC is 3.8.  Is that

02:32 10    the same 3.8?

11    A.    No.  That would be an unweighted GPA.  This student's 3.3

12    would be the unweighted GPA.

13    Q.    Okay.  And then there's an SAT score below there, 590 on

14    the left and then 650 and then 650 again.  Do you see that?

15    A.    Yes.

16    Q.    And so that's a total of about 1900?

17    A.    1890, yeah.

18    Q.    1890.  Okay.  Your math is better than mine, probably your

19    SAT score.  How did those numbers, the 3.87 adjusted GPA and

02:32 20    the 1890 SAT, compare with applicants who were typically

21    accepted to USC outside of the subcommittee process?

22    A.    They're well below the averages, and this is a less

23    competitive student academically.

24    Q.    If you saw an ACT score for this student instead of the

25    SAT score of 1890, if you saw an ACT score of 29, would that

```
 1   change your analysis?
 2   A.   Not really.  That's still well below our average.
 3   Q.   Do you correlate the ACT with the SAT?
 4   A.   We do.
 5   Q.   And how would an ACT score of 29 compare with an 1890 SAT
 6   score at this time?
 7   A.   ACT comports to about a 1940 on the three-part SAT.  An
 8   1890 and 1940 are not actually statistically significant in
 9   terms of a difference in scores.
10   Q.   Do you look at percentiles?
11   A.   Percentiles?
12   Q.   Percentile like how they -- percentile -- the ACT or SAT
13   percentile score.
14   A.   We don't.  We look at the actual score.
15   Q.   So percentiles, why do you not look at percentiles?
16   A.   Percentiles are comparing students -- they're national
17   percentile ranks, so they're comparing students to the whole
18   population of test takers of that test for that given year.
19   And so it would include anyone in the United States who had
20   taken that test during the year.
21        We're concerned with how students compare to our
22   applicant pool, which is really much stronger than the national
23   pool of test takers.
24   Q.   And are there different populations that typically take
25   the SAT or ACT that may factor into those percentiles?
```

A.    There can be.  The ACT, especially during this time, was
doing a lot of statewide testing, so they would be -- a state
would contract with the ACT to offer it to all public high
school students in the state as their statewide testing in high
school.  So that would have a lot more students who maybe
weren't college bound who were still taking the ACT as part of
statewide testing.

Q.    And what might that mean for the ACT score and SAT?

A.    It means the overall pool of test takers is probably lower
and so a student's score relative to the overall pool might
look like they're a higher percentile rank, but the group of
students is not all college bound.

Q.    And then on the left there at the bottom, there's a series
of initials and dates.  What does that reflect?

A.    So those are sort of the record of our votes.  So we had
voted to admit the student, and then that's a record of the
folks who were present who voted to admit the student.

Q.    And how many Admissions Department members are required to
admit a student?

A.    We only require three members to hold a meeting, to hold a
SUBCO meeting, and it's majority rules, but in -- I would say
in the vast majority of cases, we're in consensus to admit or
deny a SUBCO applicant.

Q.    And whose initials are those at the top there?

A.    Those are mine, RJC.

 1    Q.   And again, Donna Heinel, would she have had a vote here?

 2    A.   No.  This is -- the only folks who have voting rights are

 3    admissions officers.

 4    Q.   Can we look at the next page, please.  What are we looking

 5    at here?

 6    A.   So this is the athletic resume or information about the

 7    student's athletic talent.

 8    Q.   And looking at this particular athletic resume, what is

 9    your understanding of who prepared this document?

02:36 10    A.   Given that it has information on the bottom that's

11    consistent with a lot of the profiles that would come from the

12    water polo coach, this was prepared by the coaching staff of

13    the water polo team.

14    Q.   And that's because at the bottom it says "assets to our

15    Men's Team"?

16    A.   Yes.

17    Q.   So at the top under "Athletic Bio", there's a list of

18    accolades.  It says, "Four-year varsity starter; three-year

19    Varsity Team Captain, in 2013, 2012 and 2011; 2013 California

02:36 20    Scholar Athlete Award; 2013 Asics National Sports Youth

21    Leadership Council," and it goes on from there.

22             To what extent is that significant to you on the

23    subcommittee in your evaluation of a candidate?

24    A.   It's helpful to us to see, you know, that a student is

25    competing at a high level, that they're competing and doing

1   well, that they're -- you know, things like being first team or

2   selected all division and things like that that are signs that

3   the student is a strong athlete in the pool of high school

4   athletes for the sport.

5   Q.   At the bottom, under "assets to our Men's Team", it says

6   "top 10 attacker in grad class".  Then it says "extremely

7   fast/quick player, will be the fastest player on our team now".

8   What is your understanding of where that information was coming

9   from?

02:37 10  A.   That was coming from the coaching staff and evaluating the

11  student relative to the current members of the USC water polo

12  team.

13  Q.   And in 2014, who was the water polo coach at USC?

14  A.   Jovan Vavic.

15  Q.   So you thought that was coming from him?

16  A.   Him or one of his coaching staff, yes.

17  Q.   What did you understand "will be the fastest player on our

18  team now" to mean?

19  A.   That he swam faster than anyone on the current USC water

02:38 20  polo team.

21  Q.   Is that significant?

22  A.   It seems significant.  They're typically a contender for

23  national championships.

24  Q.   At the bottom there, it says "exceptional leader".  And

25  then it says "immediate impact player, due to his speed".  What

1    is your understanding of what it means to be an immediate

2    impact player on USC's championship team?

3    A.   This would be a student who would be playing in games

4    right away.

5    Q.   If we look at page 7 of the packet, please, who is

6    Alejandro Garfio?

7    A.   He was an associate in the USC Athletic Department who

8    would help Donna with the liaisonship to the athletics

9    subcommittee.

02:38 10   Q.   So he worked for Donna Heinel?

11   A.   I believe so.

12   Q.   It says -- this is an e-mail to him from Jovan Vavic.  I

13   believe you testified that he was the head water polo coach?

14   A.   Correct.

15   Q.   And Vavic writes, "Alex, this kid would be the fastest

16   player on our team, he swims 50 yards in 20 seconds, my fastest

17   players are around 22 seconds, this kid can fly, he was the

18   captain of his high school team as a sophomore, great work

19   ethic, was all CCS, he's a legit walk on who could end up

02:39 20   playing for us very soon".

21        That kind of a write-up from Coach Vavic, what do you

22   understand it to mean?

23   A.   The student is very fast compared to current members of

24   the USC water polo team and that he expected to have him

25   playing in games right away.

1    Q.   And would that be important to you in evaluating this

2    recruit?

3    A.   It would help if a student had a very strong level of

4    athletic talent.

5         MR. FRANK:  Can we look at Exhibit 383, please.  And

6    actually, I'm sorry, Miss Lewis.  I skipped one thing.  If we

7    can just go back to 107 for one moment, the very last page,

8    page 8.

9    Q.   Earlier, you had testified that the athletic profile we

02:40 10   looked at you understood to be prepared by the coach or his

11   staff.  What about this athletic profile?

12   A.   This looks like something that the student --

13        MR. KENDALL:  Objection, your Honor.  Speculation.

14        MR. FRANK:  She's testifying as to her understanding.

15        THE COURT:  I'll let her continue to answer.

16   Overruled.

17   A.   My understanding is this is a document that a student

18   would give to a coach to let the coach know about their

19   athletic talent and obviously wanted to share information about

02:40 20   his academic work as well.

21        MR. FRANK:  If we could look at Exhibit 383, please.

22   Q.   This is a SUBCO packet for Sabrina Abdelaziz?

23   A.   Yes.

24   Q.   What was the date of this subcommittee meeting?

25   A.   October 5, 2017.

1    Q.    And do you see the initials at the bottom?

2    A.    Yes.

3    Q.    Whose initials are those in the second set of initials

4    there?

5    A.    Those are mine, RJC.

6    Q.    Why did you sign this?

7    A.    I voted to admit Sabrina.

8    Q.    Okay.  And if we look at the top, it says "Sport: WBSK".

9    What does that mean?

02:41 10   A.    Women's basketball.

11   Q.    And then below that, it says "High School: Hong Kong

12   International School".  Are you familiar with the Hong Kong

13   International School?

14   A.    Yes.

15   Q.    How are you familiar with it?

16   A.    Through my work as an admissions officer, it is one of the

17   many schools that -- you know, where students apply to USC, so

18   I'm familiar with the school.

19   Q.    What do you know about HKIS?

02:41 20   A.    It's an international school.  They have a strong

21   curriculum for students, and we typically get a good group of

22   applicants from that school each year.

23   Q.    And do you send admissions officers there?

24   A.    Yes.  We travel all over the country and all over the

25   world, going to high schools, talking to students, letting them

1    know about USC and answering those questions.  And Hong Kong

2    International is one of the schools that we regularly visit.

3    Q.    What's the purpose of those visits?

4    A.    To let students know about USC, to help them, you know,

5    through the application process, make sure they know they can

6    ask us questions, to educate them about USC and, hopefully,

7    they will apply.

8    Q.    What, if anything, did you know about athletics at HKIS?

9    A.    I don't really know too much about athletics at the high

02:42 10   school level or really at any level in general.

11   Q.    You're not a sports fan?

12   A.    Not so much.

13   Q.    Looking down at the "Course Curriculum Factor",

14   "Institutional Factor", and "High School Core GPA", what can

15   you tell us about what those indicate?

16   A.    So this is a student who doesn't really have much in the

17   way of advanced or rigorous coursework.  She is attending a

18   high school that prepares students generally well when they

19   come to USC, so her adjusted GPA is a 3.2.  Her unweighted GPA

02:43 20   would be a 2.8.

21   Q.    And what about her test score?

22   A.    And she has a 640 and a 520.  This was moving back from a

23   three-part score to a two-part score.  So on a scale of 1600,

24   she has an 1160.

25   Q.    Would this student have been a competitive applicant for

```
 1  USC outside of the athletic recruitment process?

 2  A.   She does not appear to be a competitive applicant

 3  academically.

 4        MR. FRANK:  Could we take a look at page 2.

 5  Q.   What is this document?

 6  A.   So this is an athletic resume telling us about a student's

 7  athletic talent.

 8  Q.   And you see at the top it says "SC Women's Basketball"?

 9  A.   Yes.

10  Q.   What is your understanding of who would have prepared this

11  document?

12  A.   This would have been prepared by the women's basketball

13  coaching staff.

14  Q.   And there's a photograph there.  What is your

15  understanding of who is in that photograph?

16  A.   This could be a photograph of Sabrina.

17  Q.   And then below there's a write-up.  It says, "Sabrina

18  Abdelaziz is a starting point guard and team captain at the

19  Hong Kong International School basketball team.  They were the

20  48th Holiday Basketball Tournament Champions and 2016 China Cup

21  Champions.  She made it to the APAC basketball finals and was

22  part of the International School Sports Federation of Hong Kong

23  Select Team.  For club, Sabrina played for Hong Kong Basketball

24  Academy and was named 15U and 16U champions back to back

25  years".
```

1          What is your understanding of the significance, if at
2     all, of that information?
3     A.    I think it's evidence of her athletic talent, that she is
4     playing at a competitive level, both in school and with a club
5     team, and is doing very well.
6     Q.    And what is your understanding of what it means that she's
7     the starting point guard and team captain at HKIS?
8     A.    That she's one of their best players.
9     Q.    At the very bottom, it says "As part of the Asia Pacific
02:45 10    Conference All Star Team matched with her rigorous academic
11    curriculum, Sabrina will be a great addition to our USC
12    program".
13          What is your understanding of what the coach is
14    telling you there?
15    A.    They're very excited to have Sabrina playing on their
16    team.
17    Q.    If we can go back to page 1 of this document, the date of
18    this subcommittee meeting again?
19    A.    October 5, 2017.
02:45 20    Q.    Can we look at Exhibit 384, please.  What is the date of
21    this subcommittee meeting for this applicant?
22    A.    Also October 5, 2017.
23    Q.    So you would have considered Thomas Kimmel at the same
24    meeting that you considered Sabrina Abdelaziz?
25    A.    That's correct.

1    Q.    And taking a look under "Sport", it says "MTRA".  What

2    does that mean?

3    A.    Men's track and field.

4    Q.    Under "High School", it says "Bishop's School".  What do

5    you know about the Bishop's School?

6    A.    It's an independent school in San Diego.  Again, prepares

7    students well.  We typically will get a number of applicants

8    from Bishop's.

9    Q.    The course curriculum factor and institutional factor is

02:46  10   2.  And the adjusted GPA is 4.0.  What does that mean?

11   A.    So he has some rigor in his curriculum.  He goes to a

12   school that's preparing students well relative to coming to

13   USC.  His unweighted GPA would be a 3.6 and an adjusted of 4.0.

14   Q.    What about his SAT scores?

15   A.    It looks like he has a 1370 on the SAT.

16   Q.    So would this student, Thomas Kimmel, have been

17   competitive academically with other applicants at USC outside

18   of the athletic recruitment process?

19   A.    He would not have been terribly competitive academically.

02:47  20   We see much stronger applicants from his high school every

21   year.

22   Q.    At the bottom, are those your initials?

23   A.    Yes, RJC.

24   Q.    Why did you vote to approve this applicant for admission

25   to USC?

1  A.   Based on the information that had been presented, we

2  believe that he would contribute athletically to the

3  university.

4  Q.   Who did you understand that to be coming from?

5  A.   I don't remember what his --

6  Q.   It says "WCRA" at the top -- or "MTRA", sorry.

7  A.   Oh, that he was being recruited by the men's track and

8  field team.

9       MR. FRANK:  Can we look at page 2, please.

02:47 10  Q.   And again, your understanding of who prepared this?

11  A.   This was prepared by the coaching staff of the track and

12  field team.

13  Q.   What's your understanding of who's depicted in that

14  photograph?

15  A.   That's a picture of Tommy Kimmel.

16  Q.   If we look at Exhibit 661, please, what is the date of

17  this subcommittee meeting?

18  A.   October 5, 2017.

19  Q.   So the same date as which you voted on Sabrina Abdelaziz

02:48 20  and Thomas Kimmel?

21  A.   Yes.

22  Q.   Okay.  And the sport here is listed as "MBAS".  What do

23  you understand that to be?

24  A.   Men's baseball.

25  Q.   Okay.  And then the school is Harvard-Westlake.  What do

1    you know about Harvard-Westlake?

2    A.    Harvard-Westlake is an independent school in Los Angeles

3    that sends us very strong applicants every year and is

4    academically rigorous.

5    Q.    Under course curriculum factor and institutional factor,

6    there's a two and four.  Under core GPA, there's a 4.04.  Under

7    SAT, there's a 760 and 760.  How do those numbers stack up?

8    A.    So this is a student who's taking some rigor in his

9    coursework, although we'll regularly see students from his

02:48 10   high school taking more rigor.  Again, it's a school that

11   prepares students well when they come to USC.  His unweighted

12   GPA would be 3.4 GPA and his SAT score is a 1520.

13   Q.    So would this student be competitive outside of the

14   athletic recruitment process?

15   A.    He's not a very competitive applicant based on the grades

16   that he's received and the coursework that he's taken.

17   Q.    You voted for this student as well?

18   A.    Yes.

19   Q.    Why?

02:49 20   A.    I voted to approve the student based on his -- the

21   strength of his athletic talent and that he'd contribute

22   athletically to USC.

23         MR. FRANK:  Can we look at Exhibit 413, please.

24   Q.    What's the date of this subcommittee meeting?

25   A.    November 2, 2017.

1    Q.   And the candidate here is Audrey Isackson?

2    A.   Yes.

3    Q.   And the sport is WROW?

4    A.   Yes.

5    Q.   What does that mean?

6    A.   Women's rowing, or crew.

7    Q.   Crew?

8    A.   Women's crew or women's rowing, yes.

9    Q.   And the high school is Woodside Priory?

02:49 10   A.   Yes.

11   Q.   What do you know about that school?

12   A.   It's a parochial school in Northern California.  Again,

13   rigorous academic school that prepares students well and,

14   typically, will send many applicants to USC.

15   Q.   Looking at the course curriculum factor of one and the

16   institutional factor of three and the high school core GPA of

17   3.43, what is your assessment of how this student would fair in

18   the general admissions pool?

19   A.   This student's unlikely to be competitive academically

02:50 20   with an unweighted GPA of 3.0, hasn't taken as much rigor as

21   we'll see as many of her classmates and hasn't earned very

22   strong grades compared to classmates.

23   Q.   What about the ACT score of 31?

24   A.   It's fine.  It's below our averages.

25   Q.   What's your understanding of, based on looking at this,

```
 1  who took the ACT?

 2  A.    That it was taken by Audrey Isackson.

 3  Q.    If we look at page 2, the very bottom, it says "Audrey is

 4  a high caliber walk on that could vie for a seat in our varsity

 5  4 boat within a year.  She has been rowing four years at a

 6  smaller club program but has huge potential once given the

 7  training and resources of a Division 1 program".

 8         What is your understanding of what that means?

 9  A.    That although she was presented without athletic

10  scholarship that she would be a -- you know, a strong

11  contributor with very little training from USC, that she's been

12  involved with rowing for a long time, and that they're excited

13  to have her as part of their program.

14  Q.    What, if at all, is the significance of the fact that

15  she's been involved with rowing before?

16  A.    There aren't that many students who have rowing

17  experience, so to see that a student has had experience with

18  that, is bringing that experience to our team, is valuable.

19         MR. FRANK:  Could we look at Exhibit 414, please.

20  Q.    What's the date of this subcommittee meeting?

21  A.    November 2, 2017.

22  Q.    So that's the same date as the subcommittee meeting for

23  Audrey Isackson that we just looked at?

24  A.    Yes.

25  Q.    This one is for Matteo Sloane?
```

```
 1   A.   Yes.

 2   Q.   The sport is listed as MWP?

 3   A.   This is men's water polo.

 4   Q.   And the school again is the Buckley School?

 5   A.   Yes.

 6   Q.   And then course curriculum factor of 2, institutional

 7   factor of 4, GPA of 3.82, and ACT score of 25.  Would this

 8   student have been competitive outside of the athletic admission

 9   recruitment process?

10   A.   The student is not competitive academically.

11   Q.   And taking a look at page 2 --

12        MR. FRANK:  Miss Lewis, if you could highlight the

13   paragraph at the bottom, "asset to our Men's Team".

14   Q.   It says, "Matteo brings the knowledge of international

15   experience which makes him extremely valuable to the team along

16   with experience in the playing style and plays that Coach Vavic

17   teaches.  He has superior moves as a perimeter/attack player

18   and has the ability to get free for shots and to draw foul that

19   create 6 on 5 opportunities for his team.  He participates on

20   LA Water Polo Red Team coached by Stephan Pillion and Dustin

21   Litvak during the school year and travels to Italy during the

22   summers.  Both coaches talk about his tremendous talent,

23   smarts, and work ethic.  His high school does not have a water

24   polo team so he stays in shape by participating on their co-ed

25   swimming team".
```

```
 1              What is your understanding of the significance, if
 2    any, of the international experience that's referenced in this
 3    profile?
 4    A.   Many of our full athletic scholarship water polo players
 5    are students from abroad, from Eastern Europe, and so, you
 6    know, they compete at a very high level.  If there was a
 7    student who was competing among that group of students, we
 8    would believe that student is also very talented athletically.
 9              MR. FRANK:  Can we look at Exhibit 662, please.
10    Q.   Again, the date of this subcommittee meeting?
11    A.   November 2, 2017.
12    Q.   So, again, the same date as Audrey Isackson and Matteo
13    Sloane?
14    A.   Yes.
15    Q.   This student is also from the Harvard-Westlake School?
16    A.   Yes.
17    Q.   And the sport is "MTEN".  What does that stand for?
18    A.   Men's tennis.
19    Q.   Okay.  And looking at the academic credentials, how do you
20    assess those relative to the general admission population?
21    A.   The student would not be academically competitive in our
22    pool of applicants.
23              MR. FRANK:  Could we look at Exhibit 663, please.
24    Q.   What's the date here?
25    A.   November 2, 2017.
```

1   Q.   So the same subcommittee meeting as Audrey Isackson,

2   Matteo Sloane and  Jordan Tuchin?

3   A.   Yes.

4   Q.   And this student is Olivia Giannulli?  Do you see that?

5   A.   Yes.

6   Q.   And the sport is "WROW".  Again what does that stand for?

7   A.   Women's rowing or women's crew.

8   Q.   The school is Marymount High School.  What can you tell us

9   about Marymount High School?

02:55 10   A.   Marymount High School is an all girls Catholic high school

11   in Los Angeles.  Again, it prepares their students well.  We

12   typically have a great group of women that will apply from that

13   school each year.

14   Q.   The course curriculum factor is zero and the institutional

15   factor is 2.  What do those mean?

16   A.   So she wasn't taking much in the way of advanced or

17   rigorous coursework.  She's at a school that prepares its

18   students fairly well for USC.  Her unweighted GPA would be a

19   3.6.

02:55 20   Q.   And her SAT score is 560 and 510.  Again, how does that,

21   all of that academically stack up with students admitted to USC

22   outside of the athletic recruitment process?

23   A.   She would not be competitive academically in our process.

24   Q.   If we look at page 2, it says "Olivia Giannulli coxswain"

25   at the top?

1    A.    Yes.

2    Q.    And at the very bottom, it says "USC has four boats which

3    require 4 coxswains along with 2 backups.  Olivia would fill

4    the position of our number 3 boat.  Her sister is currently on

5    our roster and fills the position of our number 4 boat.

6    Division 1 rowing programs use scholarships for the oarsmen but

7    rarely with scholarship a coxswain.  Although Olivia is

8    nonscholarship she is highly talented and has been successful

9    in both men's and women's boats".

10          What is your understanding of that discussion about

11   scholarship versus nonscholarship?

12   A.    This is the coach letting us know why a student may not be

13   receiving athletic scholarship, but is still a valuable and

14   talented contributor to the team.

15   Q.    What is your understanding of what it means where it says

16   that "she has been successful in both men's and women's boats"?

17   A.    That she has experience being a coxswain for both men and

18   women's crew teams during high school.

19   Q.    There's also a reference to her sister who is currently on

20   your roster or on the USC roster.  What, if any, is the

21   significance of that?

22   A.    I'm not sure there's any specific significance other than

23   letting us know that, you know, this student, who has been a

24   coxswain, her sister has been a coxswain.  She knows what it

25   means to come to the USC team and is interested in coming and

1    participating on the team.

2         MR. FRANK:  If we look at Exhibit 229, please.

3    Q.   You see that this is a recruitment SUBCO packet for

4    Isabella Giannulli?

5    A.   Yes.

6    Q.   And the date is approximately one year earlier, 10/27/16?

7    A.   Yes.

8    Q.   Who do you understand Isabella Giannulli to be in relation

9    to Olivia Giannulli?

02:57 10   A.   Her older sister.

11   Q.   Okay.  And the sport here is listed "WROW".  Is that

12   women's rowing again?

13   A.   Yes.

14   Q.   And again, if you could take a look at the course

15   curriculum factor, the institutional factor, the GPA, and the

16   test scores, how do those compare competitively with other

17   students who are admitted to USC outside of the athletic

18   recruitment process?

19   A.   This student would not be competitive academically in our

02:58 20   process.

21   Q.   Okay.  Let's look at page 2.  It says "Bella is an

22   earnest, outspoken, incredibly positive minded coxswain" in the

23   first line.

24   A.   Yes.

25   Q.   And then, at the bottom, it says, "It is essential that we

 1    have athletes like Bella join our team to give us more depth in

 2    the coxswain department without costing us a scholarship at

 3    this time, since there are so few scholarships becoming

 4    available next year".

 5            What is your understanding of what that discussion

 6    means?

 7    A.    Again, the coach explaining that though the student is not

 8    receiving athletic scholarship, they're very talented in the

 9    coxswain position that they fill.

02:58 10    Q.    If we could look at Exhibit 420, please.  The date of this

11    subcommittee meeting?

12    A.    November 16, 2017.

13    Q.    The applicant is Gino Palatella?

14    A.    Yes.

15    Q.    The sport is "MFOO".  What does that mean?

16    A.    Men's football.

17    Q.    The school is Sacred Heart Atherton?  What do you know

18    about that school?

19    A.    Catholic school up in Northern California.  Looks like

02:59 20    they prepare students fairly well for USC.  We would definitely

21    have applicants each year from Sacred Heart.

22    Q.    Here the course curriculum factor is zero.  The GPA is

23    2.85, and the SAT score is 1410.  How does that stack up?

24    A.    The student has an unweighted GPA of 2.6 with not really

25    rigor to speak of, which is far below what most of our

1   applicants are doing.  So he would not be academically

2   competitive at USC.

3   Q.   Would this student have been admitted outside the SUBCO

4   process?

5   A.   No.

6        MR. FRANK:  Could we look at Exhibit 592, please.

7   Q.   What is the date of this SUBCO meeting?

8   A.   August 1, 2018.

9   Q.   And who is the candidate?

03:00 10   A.   Agustina Huneeus.

11   Q.   What is the sport?

12   A.   Women's water polo.

13   Q.   The school?

14   A.   Marin Academy.

15   Q.   Do you know anything about Marin academy?

16   A.   An independent school up in Northern California, good

17   rigor, and prepares students well for USC.

18   Q.   And what is your assessment of this student's academic

19   qualification outside of the athletic recruitment process?

03:00 20   A.   This student has an unweighted 3.1 GPA, and really not

21   much rigor.  We would not -- this student would not be

22   competitive academically in the USC process.

23   Q.   If we look at page 2, it says in the first line, "Agustina

24   is a high caliber walk on in a much needed goalie position".

25   Do you see that?

1    A.    Yes.

2    Q.    And I just want to direct you about three lines down from

3    there in the middle of the line.  It says, "She is a brick wall

4    when it comes to penalty shots.  No one can get the ball by

5    her.  She is a leader in the pool and controls her defense, she

6    is a constant communicator which is a valuable skill".

7          Then at the end there, it says, "She has the ability

8    to pay on her own and comes from a good school.  She has

9    verbally committed to us and will be a great Trojan!"

03:01 10          What's your understanding of all of that?

11   A.    Sounds like she's a very talented goalie and someone who

12   will be very valuable to the team.  They're not awarding

13   athletic scholarship for this student.  I mean, most of the

14   teams do not have enough scholarships for all the students on

15   the team to receive scholarships, so they would have to decide

16   where they'll use their scholarship most effectively.  The

17   coach will have to decide.

18   Q.    Okay.  You just looked at 11 subcommittee packets for 11

19   different students.  Would any of these students have been

03:01 20   competitive applicants to USC outside of the athletic

21   recruitment process?

22   A.    No.  None of them are academically competitive students.

23   Q.    Did you follow-up with the coaches of any of these sports

24   about their interest in any of these applicants?

25   A.    No.

```
 1    Q.    Why not?

 2    A.    We believe we had the information that we need from the

 3    coach.  If we thought we didn't have enough information, we

 4    would ask our Athletic liaison to get us more specific

 5    information, but in these cases, it looks like we had all the

 6    information that we needed to make an admissions decision.

 7    Q.    Based on your experience in USC admissions, what's the

 8    likelihood that these applicants would have been committed if

 9    they weren't walk-on athletes?

10             MR. SHEKETOFF:  Objection.

11             THE COURT:  Overruled.

12    A.    It's highly unlikely.  I don't think any of them would be

13    admitted without their athletic talent.

14    Q.    Did Donna Heinel tell you that the parents of these

15    students were making payments in connection with their

16    admission?

17    A.    No.

18    Q.    Did you know that payments were contingent on their

19    admission?

20    A.    Absolutely not.

21    Q.    Would that information have mattered to you in evaluating

22    these students?

23    A.    Absolutely.  That would have been a huge problem.

24    Q.    Why?

25    A.    Because we don't offer admission in exchange for money.
```

```
 1   Q.   What would you have done if you had known that Donna
 2   Heinel or anyone in the Athletic Department was taking money in
 3   exchange for their program or for themselves in exchange for
 4   the admission of these students?
 5   A.   We would have, you know, definitely gone to our vice
 6   president.  We would have elevated this to look into what was
 7   going on and really done a review of students who were being
 8   represented to us.  That would have been totally unacceptable.
 9   Q.   At the time of their admission, did you know that any of
10   these students were working with an outside college counselor?
11   A.   No.
12   Q.   Miss Chassin, I want to direct your attention to 2018.
13   Did there come a time when you began to have concerns that some
14   student athletic recruits to USC were not legitimate athletic
15   recruits?
16   A.   Yes.
17   Q.   What happened?
18   A.   In the spring of 2018 --
19        MR. KELLY:  What's the time frame?
20        MR. FRANK:  She said spring of 2018.
21        MR. KELLY:  I didn't hear.
22        MR. FRANK:  Spring of 2018.
23   A.   So, in the spring of 2018, we began to hear from some high
24   school counselors who were surprised that students were being
25   admitted to USC based on their athletic talent, based on
```

1    playing, you know, these sports.  And we heard from various

2    high school counselors.  It wasn't all coming from one school,

3    and that started to raise red flags.

4    Q.   What did you do?

5    A.   I spoke to Donna Heinel about it because I believed

6    that --

7         MR. SHEKETOFF:  Objection.  She spoke to Donna Heinel

8    about it.

9         THE COURT:  You can say what you said to her.

03:04 10       MR. FRANK:  Your Honor, the response is directly

11    relevant.  It's a coconspirator statement in furtherance.

12         THE COURT:  This is an 801?

13         MR. FRANK:  (d)(2)(e), yes, your Honor.

14         MR. SHEKETOFF:  She started to say what was on her

15    mind.  The reason why she spoke with Donna Heinel, that's

16    irrelevant.

17         THE COURT:  Sustained to that extent.

18    Q.   What did you do?

19    A.   I wrote an e-mail to Donna Heinel asking her about

03:05 20   specific students and telling her that we heard that they may

21    not be athletic recruits.

22         MR. FRANK:  For the witness only, if we could look at

23    Exhibit 511, please.

24    Q.   What is Exhibit 511?

25    A.   An e-mail.

```
 1    Q.    Whose it from?

 2    A.    From Kirk Brennan.

 3    Q.    Whose Kirk Brennan?

 4    A.    He's the Director of Undergraduate Admission.

 5    Q.    He's your boss?

 6    A.    Yes.

 7    Q.    It's sent to whom?

 8    A.    Tim Brunold and myself.

 9    Q.    Who's Tim Brunold?

03:05 10   A.    Tim Brunold is the Dean of Admission.

11    Q.    He's Kirk Brennan's boss?

12    A.    That's correct.

13    Q.    The date?

14    A.    April 13, 2018.

15    Q.    The subject?

16    A.    "Regarding independent counseling concerns".

17          MR. FRANK:   Government offers 511.

18          THE COURT:   It will be admitted.

19          (Exhibit 511 admitted into evidence.)

03:06 20   Q.    If you look at the bottom of the chain --

21          MR. KENDALL:   Your Honor, just a continuing objection

22    to 511.

23          THE COURT:   Yes.

24    Q.    You see there's an e-mail from Clay Busia to you, copied

25    to others at USC?
```

1   A.   Yes.

2   Q.   Who's Clay Busia?

3   A.   He is one of our -- at the time, he was one of our

4   admission officers.

5   Q.   And it's to you and then copied to Aaron Brown and Kelsey

6   Bradshaw.  Who are they?

7   A.   Aaron Brown and Kelsey Bradshaw were two admission

8   officers who also sat on the Athletic Subcommittee at that

9   time.

03:06 10   Q.   Where did they rank in the hierarchy of USC admissions?

11   A.   Aaron Brown was an Associate Director and Kelsey Bradshaw

12   was a junior member of our office.

13   Q.   And Clay Busia writes on April 11th, "Hi, everyone!  I

14   just shared this information with Aaron.  Have you heard of

15   this group before?"  And then there's a link to

16   Thekeyworldwide.com.

17        Had you heard of The Key Worldwide before?

18   A.   No.

19   Q.   And it says, "I had a conversation with a counselor at

03:07 20   Woodside Priory in Northern California that was too similar to

21   the conversation I had with Marymount High School a few weeks

22   ago about one of their students of interest to women's crew.  I

23   was able to get this group's information from the counselor at

24   Priory.  I just called Marymount and they confirmed this is the

25   same group and counselor they have had concerns about

1    (Georgetown called them out on a similar case).

2           "He allegedly charges over $80,000 per client and has

3    worked some magic on tennis, baseball, crew, and several other

4    athletic teams across the country.  I am concerned".

5           What was your understanding of what Clay Busia was

6    telling you?

7    A.   That he was hearing from counselors that some students

8    were using an independent counselor who seemed to be doing

9    illegitimate things in the admission process.

03:08 10   Q.   There's a specific reference in the e-mail to a

11   conversation with Marymount High School about one of their

12   students of interest to women's crew.  Did you have an

13   understanding of which student Clay Busia was talking about?

14   A.   He was talking about Olivia Giannulli.

15   Q.   If we look up in the chain, you forwarded this e-mail with

16   an "FYI" to your two bosses, Tim Brunold and Kirk Brennan.  Why

17   did you do that?

18   A.   I wanted to let them know that this is what we were

19   hearing from counselors and the additional information that

03:08 20   Clay had received.

21   Q.   Tim Brunold responds to you and Mr. Brennan, "Wow, the

22   plot thickens.  Have we heard back from Donna on the cases

23   where we expressed concern?"

24          And what did you understand Mr. Brunold to be

25   referring to?

1   A.   So I had written the e-mail to Donna asking her questions

2   about student athletes who had been approved and who we had

3   received questions about from the high school counselors.

4   Q.   Mr. Brennan writes, "I heard back on one I gave her,

5   Sloane, the Italian player Buckley said was a small guy.  She

6   says he really plays internationally, met Jovan at a tournament

7   in Serbia, and that he's a solid talent".

8        Who's Jovan?

9   A.   Jovan Vavic, the men's water polo coach at the time.

03:09 10   Q.   And what was the -- what was your understanding of what

11   Mr. Brennan was relaying to you there?

12   A.   That he had spoken to Donna about the concern and that she

13   had given him information that helped him to know that he was a

14   legitimate recruit.

15   Q.   Then he writes, "Becky heard about a couple others; I'll

16   let her answer.  The tall coxswain seems like BS to me".

17        Who's Becky?

18   A.   That's me.

19   Q.   And what did you understand him to be referring to about

03:09 20   the "tall coxswain"?

21   A.   Coxswains are generally very small and very light.  That

22   is valuable to their position in the boat.

23   Q.   He writes, "I'm beginning to think we need to reconcile

24   the rosters to the SUBCO docket.  Fred used to provide this and

25   it was a good way to see who was contributing.  Or maybe we

```
 1    need statements from high schools about athletic talent for
 2    walk-ons.  I dunno.  This service seems nuts".
 3              What did you understand Mr. Brennan to be saying?
 4    A.   That he wanted to begin to go back and look at the
 5    students enrolled in the university to see that they continued
 6    to play the sport for which they were recruited and presented
 7    to SUBCO.  I think that "this service seems nuts" is referring
 8    to The Key Worldwide.
 9    Q.   He said in his e-mail that you had heard about a couple of
10    others.  By the time of this e-mail on April 13th, had you
11    reached out to Miss Heinel?
12    A.   Yes.  I reached out to her before that.
13              MR. FRANK:  If we can show the witness only
14    Exhibit 513, please.
15    Q.   Do you recognize this document?
16    A.   Yes.
17    Q.   What is it?
18    A.   An e-mail.
19    Q.   Who is it from?
20    A.   Kirk Brennan.
21    Q.   Who is it to?
22    A.   Me and Tim Brunold.
23    Q.   And what is the date?
24    A.   April 13, 2018.
25    Q.   What is the subject?
```

```
 1    A.    "Regarding walk-ons".

 2              MR. FRANK:  Government offers 513.

 3              THE COURT:  It will be admitted.

 4              MR. KENDALL:  Objection, your Honor.

 5              MR. KELLY:  Objection.  Hearsay.

 6              MR. KENDALL:  Your Honor, my issue is my client's son

 7    was admitted 4 years before this.

 8              MR. FRANK:  Your Honor, I object to the speaking

 9    objection.

10              MR. KENDALL:  Your Honor, objection to time.

11              THE COURT:  Well, I'm going to admit it but I'll hear

12    you.  It will be admitted de bene depending on a discussion

13    outside the hearing of the jury.

14              (Exhibit 513 admitted into evidence.)

15    Q.    If we look at the first e-mail in the chain, you wrote an

16    e-mail to Donna Heinel with a copy to Tim Brunold.  Do you see

17    that?

18    A.    Yes.

19    Q.    "Subject: Walk-ons".  Do you see that?

20    A.    Yes.

21    Q.    And you wrote, "Hi Donna, here are a couple students whose

22    high schools were quite surprised to hear they were being

23    admitted as athletic recruits.  Thanks for looking into it.

24    Thanks, Becky".

25              And then you listed three students, Olivia Giannulli,
```

1    Tyler Kornguth, and Jordan Tuchin.  We just looked at their

2    athletic profiles?

3    A.   Yes.  That's correct.

4    Q.   And why did you list those three students in your e-mail

5    to Donna Heinel?

6    A.   They were three students that we had heard from high

7    school counselors that they were surprised that they were being

8    admitted as athletic recruits.  They didn't believe that their

9    athletic talent warranted admission to a Division 1 program.

03:12 10   Q.   Next to Olivia Giannulli, it says "Marymount High School

11   Women's crew".  And then it says, "sister was also recruited

12   for women's crew last year".  Who is that?

13   A.   Bella Giannulli.

14   Q.   Then it says, "school doesn't think either of the students

15   are serious crew participants.  Sister Isabella is not on the

16   online crew roster for this year.  They are daughters of the

17   actress Lori Loughlin".

18          Under "Tyler Kornguth", it says "school reports that

19   he is not a starter on their baseball team.  Seems to be second

03:12 20   tier player".

21          And under "Jordan Tuchin", you wrote "school reports

22   that he does not play for their school team which is very

23   competitive.  His packet indicated USTA play, but not tons of

24   travel that would preclude his participation on the school

25   team".

1          Why did you provide that information to Miss Heinel?

2   A.   I wanted to let her know the things that were raised that

3   brought doubt to whether or not these students were

4   athletically talented, whether they were strong enough athletes

5   to contribute to our Division 1 teams.

6   Q.   If we look up at the next e-mail in the chain, it's dated

7   March 29, 2018.

8   A.   Yes.

9   Q.   She writes, "Becky, Isabella was on crew in the fall of

03:13 10  last year but did not continue in spring due to the coach

11  (Zenon).  At the end of the year we fired Zenon and hired Josh

12  Adams.  Olivia was on the list of novice prospects that Josh

13  inherited.  He was seen her cox for the men's team during the

14  fall and thinks she has talent.  Her MAC club is competitive on

15  both the men's and women's side.  He honored the invitation

16  that was extended to Olivia from the past staff and is

17  welcoming her to be a walk on and to earn a spot.

18          "Tyler Kornguth does not start for Harvard-Westlake

19  but is a highly talented baseball player.  Harvard-Westlake is

03:14 20  very political and Tyler is behind the son of a donor that gave

21  $1 million to the baseball program.  Tyler plays with Pacific

22  Baseball Academy during the summer which is where USC saw his

23  talent.  He can play multiple positions 2B, INF, have a good

24  bat, has great baseball IQ, smart in the classroom, and offered

25  to come to USC.  These were all the factors that baseball

 1    looked at.

 2            "This is the feedback thus far."

 3            What was your understanding of Ms. Heinel's response?

 4    A.   That she had explanations for why the school might not be

 5    familiar with the student's athletic talent but that the

 6    athletic talent was, in fact, legitimate.

 7    Q.   Did you believe her?

 8    A.   I did believe her.

 9    Q.   Why?

03:14 10  A.   I found her to be a very trustworthy colleague, somebody

 11   that I trusted and somebody I knew would want to follow the

 12   rules, would want to follow-up on these things if anything was

 13   not as it should be.

 14   Q.   If we look at the next e-mail up in the chain, you

 15   forwarded this to Mr. Brunold and Mr. Brennan.  Do you see

 16   that?

 17   A.   Yes.

 18   Q.   You said, "Haven't heard anything about Tuchin"?

 19   A.   Yes.

03:15 20  Q.   And then Mr. Brennan responded, "On my water polo student,

 21   Buckley confirmed that the water polo player I gave Donna is

 22   also a client of this new Worldwide consultancy.  They also now

 23   know more about his talent, so they are less concerned about

 24   it".

 25            What was your understanding of what Mr. Brennan was

1  telling you?

2  A.   That he had relayed Donna's information about the student

3  to the high school and the high school conceded that there may

4  be information about the student's water polo that they weren't

5  aware of.

6  Q.   And did you have an understanding of why Mr. Brennan was

7  telling you this?

8  A.   That he was closing the loop, letting us know that we

9  shouldn't be concerned about Matteo Sloane.

03:15 10  Q.   He writes, "Julie at Buckley mentioned that a D1 school

11  recently put their tennis coach on leave for pushing a

12  talentless kid (who didn't play tennis) who came from this

13  shady outfit.  I will listen for news articles on this".

14         What shady outfit did you understand this to be

15  referring to?

16  A.   The Key Worldwide.

17  Q.   He wrote, "Something's real fishy on this program.  It's

18  starting to catch on at high schools."

19         He wrote, "FWIW, Donna also told the water polo coach

03:16 20  the high school pushed back".

21         Who's the water polo coach?

22  A.   Jovan Vavic.

23  Q.   "Which wasn't the case; they were surprised, though, which

24  got back to the dad, who hollered at the counselors.  That also

25  sounds like the story Becky heard about PJ at Marymount.  This

1   kind of intimidation is not cool".

2          What did you understand him to be referring to there?

3   A.   That the fathers of these students had heard that we were

4   asking about their athletic talent, doubting their athletic

5   talent, and they had gone to the high school to holler at the

6   high school counselor for interfering in the process.

7   Q.   He writes, "it sounds like the story Becky heard about PJ

8   at Marymount".  What student did that relate to?

9   A.   Olivia Giannulli's father also had gone in and yelled at

03:17 10   the high school counselor.

11          MR. KENDALL:  Objection, your Honor.  Hearsay.

12          THE COURT:  Sustained.

13   Q.   What did you do as a result of receiving this e-mail?

14   A.   We wanted to look further into -- we looked further into

15   the legitimacy of the student's athletic talent.  We did

16   compare rosters with students who had been presented.

17   Q.   And did you confer with Donna Heinel?

18   A.   And we talked to Donna Heinel about our concerns with the

19   parents yelling at the counselors for us asking questions and

03:17 20   trying to verify information about the student's athletic

21   talent.

22   Q.   And what happened as a result of Heinel's response to you?

23   A.   I'm not sure I understand your question.

24   Q.   Did you do anything further after Heinel responded to you?

25   A.   No.  She gave us, you know, really helped us feel at ease

1    that these were legitimate recruits, the student's athletic

2    talent was as presented, and there was nothing further to do.

3    Q.    Did there come a time when you withdrew offers of

4    admission for any student admitted through the Subcommittee on

5    Athletic Admission during the 2019 admission process?

6              MR. KENDALL:  Objection, your Honor.  It's beyond the

7    scope of the alleged conspiracy.  It's hearsay.

8              THE COURT:  What's the relevance?

9              MR. FRANK:  It's actually been directly addressed by

03:18 10   counsel for Mr. Abdelaziz with regard to his client's daughter

11   and the fact that she remains enrolled in university.  It's

12   directly responsive to that.

13             MR. KELLY:  She does remain enrolled.

14             THE COURT:  All right.  You can have the question.

15   Objection is overruled.

16   Q.    Did there come a time when you withdrew offers of

17   admission for any student admitted to the Subcommittee on

18   Athletics Admission cycle in 2019?

19   A.    Yes.

03:19 20   Q.    Why did you do that?

21             MR. SHEKETOFF:  Objection.

22             THE COURT:  Overruled.

23   A.    When we learned that there were students who had been

24   presented with fake athletic resumes and were not legitimate

25   athletes but had been approved through the SUBCO process, we

1    did not want to let their admission stand, and so we rescinded

2    our admission.

3    Q.    Which students were those?

4    A.    Agustina Huneeus, Claire Altman.  I don't remember the

5    last student.  There were three.

6    Q.    As a result of that process that you undertook, did there

7    come a time when you learned that Donna Heinel had misled you?

8              MR. KENDALL:  Objection, your Honor.

9              THE COURT:  Grounds?

03:19 10              MR. KENDALL:  Again, it's a hearsay statement.  What

11    Donna was thinking or what she did is different than

12    information that was conveyed to her.

13              THE COURT:  She can state if she -- if she learned

14    that Heinel was disciplined.

15              MR. KENDALL:  Objection, your Honor.  I think that

16    raises a true hearsay issue.

17              MR. FRANK:  She's testifying, your Honor --

18              THE COURT:  Objection's noted.

19              MR. FRANK:  Thank you.

03:20 20    Q.    Did you learn that Donna Heinel had misled you?

21    A.    Yes.

22    Q.    How did you learn that?

23              MR. KENDALL:  Objection.

24              THE COURT:  Overruled.

25    A.    First --

         1    Q.   Based on what you did, did there come a time when you

         2    learned that she had misled you?

         3    A.   Yes.  I was asked questions by our --

         4    Q.   Without telling me what anyone asked you and what you

         5    spoke about.  You just testified that you learned -- that you

         6    ultimately withdrew offers of admission for some students?

         7    A.   Yes.

         8    Q.   And based on your -- based on that, did you learn that

         9    Miss Heinel had misled you?

03:21   10              MR. KENDALL:  Objection.

        11              THE COURT:  Overruled.

        12    A.   I learned that Donna Heinel had misled us and that the

        13    information in the athletic resumes that had been presented was

        14    false.  We talked to the coaches --

        15              MR. SHEKETOFF:  Objection, your Honor.

        16              MR. KENDALL:  Objection, your Honor.

        17              THE COURT:  Not what the coaches told you.

        18    Q.   Without telling us what the coaches told you, did that

        19    inform your opinion?

03:21   20    A.   Yes.

        21    Q.   What was your reaction to learning that?

        22              MR. SHEKETOFF:  Objection.

        23              MR. KENDALL:  Objection, your Honor.

        24              THE COURT:  Well, she can state her reaction.

        25    A.   I felt truly betrayed by a colleague, somebody that I had

1    trusted.  I came to find out she had been lying to me and, when

2    confronted, continued lying to me.

3            MR. KENDALL:  Objection, your Honor.  Move to strike.

4    It's full of hearsay.

5            THE COURT:  Overruled.

6    Q.   Are you aware of whether Donna Heinel remains employed at

7    USC?

8            MR. KENDALL:  Objection.

9            THE COURT:  Overruled.

03:22 10    A.   She's no longer employed.

11    Q.   Since when?

12    A.   March of 2019.

13    Q.   Are you aware of whether Jovan Vavic remains employed by

14    USC?

15            MR. KENDALL:  Objection.

16            THE COURT:  Overruled.

17    A.   He's no longer employed.

18    Q.   Since when?

19    A.   March of 2019.

03:22 20    Q.   Are you aware of whether the university investigated any

21    of the students who were admitted through the subcommittee

22    process that you were involved in?

23            MR. KENDALL:  Objection, your Honor.  That's truly

24    hearsay.

25            THE COURT:  How do you --

```
          1              MR. FRANK:  I'm just asking if she's aware of the
          2    investigation.
          3              THE COURT:  She can state whether she's aware of the
          4    investigation.
          5    A.   I'm aware that current students were referred to the
          6    student Judicial Academic Committee.
          7    Q.   Did there come a time when Sabrina Abdelaziz came to your
          8    office?
          9    A.   Yes.
03:22    10    Q.   When was that?
         11    A.   June of 2019.
         12    Q.   And why did she come to your office?
         13              MR. SHEKETOFF:  Objection, your Honor.
         14              THE COURT:  Sustained.
         15    Q.   What happened?
         16    A.   I showed her her admission record, her admission file,
         17    which contained her application and her SUBCO packet and she
         18    reviewed it in my office.
         19    Q.   What -- you showed her the SUBCO packet?
03:23    20    A.   As part of her admission record.
         21    Q.   And what was included in that packet?  All of the things
         22    that we just looked at?
         23    A.   Correct.
         24    Q.   And did you observe -- did she say anything to you about
         25    it?
```

1    A.   She didn't really say much.  She mostly looked at the

2    documents.  She looked a little surprised to see the SUBCO

3    packet.

4    Q.   Do you know if Sabrina Abdelaziz remains enrolled at USC?

5    A.   She does.

6    Q.   Miss Chassin, has the Admissions Department made changes

7    to the subcommittee process in the wake of Donna Heinel's

8    departure?

9              MR. KENDALL:  Objection, your Honor.  Relevance.

03:23 10              THE COURT:  What's the relevance?

11              MR. FRANK:  The relevance is that, in response to all

12   the things that the witness just testified about there's been a

13   series of reforms to prevent it from happening again.

14              THE COURT:  The objection is sustained.

15              MR. FRANK:  No further questions.

16              THE COURT:  All right.  Before cross-examination,

17   we're going to break for the day.  You may step down for the

18   time being, Miss Chassin.

19              We're going to be in recess until tomorrow morning.

03:24 20   We have a full day tomorrow, as you've previously been told,

21   but Wednesday we have no session.  So we're going Monday,

22   Tuesday, Thursday, Friday this week.

23              It's important to maintain your -- follow my

24   instructions about not talking about this case or about the

25   evidence with anybody.  The reasons are clear to you by now,

```
 1    I'm sure.  I will see you tomorrow morning at 9:00 a.m.  Have a
 2    pleasant rest of the day.
 3              (Jury exits.)
 4              THE COURT:  Please be seated, counsel.
 5              Approximately, how long for the cross-examination of
 6    Miss Chassin?  Is it going to be Mr. Sheketoff?
 7              MR. SHEKETOFF:  Yes, your Honor.  I'll take the same
 8    45 minutes that the prosecutor took, and it will take me about
 9    an hour and 20 minutes to take that 45 minutes.
10    03:25  THE COURT:  I'm not sure I understand that answer.
11              MR. FRANK:  I think he's making fun of me, your Honor.
12              MR. SHEKETOFF:  I'm saying if I say 45 minutes, do I
13    get an hour and 20 minutes?
14              THE COURT:  Okay.  I see.  All right.  Mr. Kendall?
15              MR. KENDALL:  I'll be in the same range, an hour and
16    20, plus or minus that.
17              THE COURT:  All right.  Anything else that needs to
18    come to my attention?
19              MR. KELLY:  Yes, your Honor.
20    03:26  MR. KENDALL:  If we can know the schedule for tomorrow
21    and Thursday.
22              THE COURT:  Fair enough.  What is the schedule after
23    Miss Chassin?
24              MR. FRANK:  Special Agent Keating and then Laura
25    Janke, if we get through that.
```

1          THE COURT:  Keating again, the direct?  I've forgotten

2     what you told me.

3          MR. FRANK:  Somewhere in the two and a half to three

4     hour range.

5          THE COURT:  Janke?

6          MR. FRANK:  An hour.

7          THE COURT:  And are we looking toward the government

8     resting at that stage?

9          MR. FRANK:  Not quite, your Honor.

03:26 10          MR. KENDALL:  Can we get an estimate, your Honor, of

11     when they will rest because we've got to line our people up and

12     get travel organized?

13          THE COURT:  Assuming cross of equal length of direct,

14     approximately when does the government expect?

15          MR. FRANK:  Can I have a moment, your Honor?

16          THE COURT:  Yes.

17          MR. KENDALL:  Thank you, your Honor.

18          MR. FRANK:  Your Honor, given the pace of

19     cross-examination, I would say mid to late next week.  If the

03:27 20     cross-examination -- the directs are not long after

21     Miss Keating.  So if the cross-examination were quicker, we

22     could finish earlier.

23          THE COURT:  All right.  Anything else?  Yes,

24     Mr. Kelly?

25          MR. KELLY:  Quickly, your Honor.  We would renew again

1   a request that we made earlier.  The government continues to

2   put in a lot of evidence about other parents, ostensibly

3   because the nature, scope, and operation of conspiracy, but a

4   central issue in this case is the intent of this defendant,

5   Mr. Abdelaziz.  And the jury -- we respectfully request that

6   the jury be told now while it's all piling in, all these other

7   parents' activities, that such evidence is not evidence of the

8   defendant's intent, and proof that the defendant joined a

9   conspiracy must be based upon evidence of his words and

03:28 10   actions, not these other parents.

11       It's coming flying into the record.  Again,

12   ostensibly, for the nature, scope and operation of the

13   conspiracy, but as it's coming in now, it's unduly prejudicial

14   and forgery and we believe and we request that they should be

15   warned that this other parent evidence is for the nature and

16   scope of the conspiracy, not the intent of him.

17       THE COURT:  Mr. Frank?

18       MR. FRANK:  We briefed this issue, your Honor.  The

19   First Circuit law is clear that there's no limiting instruction

03:28 20   required in this situation.  I'd direct the Court to *US v.*

21   *Campbell* 268 F 3rd 1, a 2001 First Circuit case.  We are

22   proving the existence and the nature of the conspiracy.  We are

23   doing that in a limited way by putting in evidence about who

24   Rick Singer's other clients were that were engaged in the side

25   door scheme and what happened with their subcommittee

1   applications at or around the exact same time as these

2   individuals.  It's in limited evidence, but it is directly

3   relevant to our burden.

4         The First Circuit said there's no instruction required

5   in those circumstances, certainly not the kind of instruction

6   that the defense has requested, which brings up this issue of

7   intent.  We've not suggested anything -- that this evidence

8   suggests anything about intent.

9         If the Court were to give a mid trial instruction,

03:29 10   which we submit would be highly unusual in these circumstances,

11   we submit it should be a complete instruction on conspiracy,

12   such as the one that the Court will likely give at the end of

13   the case.  We think the kind of sort of excerpted instruction

14   with a couple of add-ons about intent that the defense has

15   requested would not be appropriate.

16         MR. KELLY:  I did not suggest it was required.  We're

17   requesting it out of fairness to the defendants because they

18   are shoveling in all this other evidence that has nothing to do

19   with his intent, so the jury, as they hear it, should have the

03:30 20   proper context, and it's not reflective of the defendants'

21   intent.  The reason it's a discrete instruction is because I'm

22   not asking for a long conspiracy instruction in the middle of

23   trial.  It's discrete, and that's an important issue in the

24   case.

25         THE COURT:  I will take the matter under advisement.

1    In fact, it's been under advisement for a couple of days now.

2    We'll see you tomorrow morning at 9:00 a.m.

3            (Whereupon, the proceedings concluded at 3:34 p.m.)

1                    I N D E X

2    Witness                          Page

3    MIKAELA SANFORD

4    Direct Examination by Ms. Kearney        9

5    Cross-Examination by Mr. Kendall         34

6    Cross-Examination by Mr. Kelly           72

7    Redirect Examination by Ms. Kearney     118

8    Recross-Examination by Mr. Kendall      129

9    Recross-Examination by Mr. Kelly        134

10

11   REBECCA CHASSIN

12   Direct Examination by Mr. Frank         144

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          E X H I B I T S

 2     NO.                          ADMIT

 3     707    ....................    6

 4     708    ....................    6

 5     157A   ....................    8

 6     174A   ....................    8

 7     258A   ....................    8

 8     501A   ....................    8

 9     644    ....................   19

10     80     ....................   21

11     441    ....................   22

12     442    ....................   24

13     459    ....................   25

14     461    ....................   26

15     458    ....................   27

16     463    ....................   29

17     680    ....................   32

18     681    ....................   33

19     9716   ....................   37

20     9691   ....................   39

21     7011   ....................   54

22     9621   ....................   67

23     132    ....................   79

24     463A   ....................   93

25     107    ....................  160
```

```
 1                    E X H I B I T S

 2    NO.                     ADMIT

 3    229    ....................  160

 4    383    ....................  160

 5    384    ....................  160

 6    413    ....................  160

 7    414    ....................  160

 8    420    ....................  160

 9    592    ....................  160

10    661    ....................  160

11    662    ....................  160

12    663    ....................  160

13    511    ....................  190

14    513    ....................  195

15

16                    E X H I B I T S

17    NO.                     For Identification

18    A      ....................   8

19    B      ....................   8

20    C      ....................  143

21    D      ....................  143

22    E      ....................  143

23    F      ....................  143

24    G      ....................  144

25
```

```
 1   C E R T I F I C A T E

 2

 3

 4   UNITED STATES DISTRICT COURT )

 5   DISTRICT OF MASSACHUSETTS    )

 6

 7

 8           We, Kristin M. Kelley and Debra Joyce, certify that

 9   the foregoing is a correct transcript from the record of

10   proceedings taken September 20, 2021 in the above-entitled

11   matter to the best of our skill and ability.

12

13

14       /s/ Kristin M. Kelley          September 20, 2021

15       /s/ Debra Joyce                September 20, 2021

16       Kristin M. Kelley, RPR, CRR          Date
         Debra Joyce, RMR, CRR
17       Official Court Reporter

18

19

20

21

22

23

24

25
```