```
 1

 2                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 3


 4
     UNITED STATES OF AMERICA,          )
 5                        Plaintiff     )
                                        )
 6   vs.                                ) No. 1-19-CR-10080
                                        )
 7   GAMAL ABDELAZIZ and JOHN           )
     WILSON,                            )
 8                        Defendants.   )
                                        )
 9                                      )


10


11
                BEFORE THE HONORABLE NATHANIEL M. GORTON
12                   UNITED STATES DISTRICT JUDGE
                         JURY TRIAL - DAY 9
13


14
              John Joseph Moakley United States Courthouse
15                        Courtroom No. 4
                         One Courthouse Way
16                    Boston, Massachusetts 02210


17


18                       September 21, 2021
                              9:10 a.m.
19


20


21
                      Kristin M. Kelley, RPR, CRR
22                      Debra Joyce, RMR, CRR
                         Official Court Reporter
23            John Joseph Moakley United States Courthouse
                 One Courthouse Way, Room 3209
24                  Boston, Massachusetts 02210
                      E-mail: kmob929@gmail.com
25
              Mechanical Steno - Computer-Aided Transcript
```

```
 1   APPEARANCES:

 2

 3           Stephen E. Frank

 4           Ian J. Stearns

 5           Leslie Wright

 6           Kristen Kearney

 7           United States Attorney's Office

 8           1 Courthouse Way

 9           Suite 9200

10           Boston, MA 02210

11           617-748-3208

12           stephen.frank@usdoj.gov

13           for the Plaintiff.

14

15

16           Brian T. Kelly

17           Joshua C. Sharp

18           Lauren Maynard

19           Nixon Peabody LLP

20           100 Summer Street

21           Boston, MA 02110

22           617-345-1000

23           bkelly@nixonpeabody.com

24           for Gamal Abdelaziz.

25
```

```
 1    APPEARANCES:

 2

 3              Robert L. Sheketoff

 4              One McKinley Square

 5              Boston, MA 02109

 6              617-367-3449

 7              sheketoffr@aol.com

 8              for Gamal Abdelaziz.

 9

10

11              Michael Kendall

12              Lauren M. Papenhausen

13              White & Case, LLP

14              75 State Street

15              Boston, MA 02109

16              617-939-9310

17              michael.kendall@whitecase.com

18              for John Wilson.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3            Andrew E. Tomback

 4            McLaughlin & Stern, LLP

 5            260 Madison Avenue

 6            New York, NY 10016

 7            917-301-1285

 8            atomback@mclaughlinstern.com

 9            for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2          (Jury enters.)

3          THE CLERK:  Thank you.  You may be seated.  Court is

4    now in session.

5          THE COURT:  Good morning, jurors.  We're ready to

6    resume.

7          Miss Chassin, you're reminded that you remain under

8    oath.

9          Mr. Sheketoff, you may conduct cross-examination.

09:10 10          MR. SHEKETOFF:  Thank you.  I may have to wander a bit

11    to get over.

12                CROSS-EXAMINATION OF REBECCA CHASSIN

13    BY MR. SHEKETOFF:

14    Q.   Good morning, Miss Chassin.

15    A.   Good morning.

16    Q.   My name is Robert Sheketoff and I represent, along with

17    others, Mr. Abdelaziz.  You've never met him, correct?

18    A.   Correct.

19    Q.   You've never had a conversation with him?

09:11 20    A.   That's correct.

21    Q.   And you met his daughter on one occasion?

22    A.   Yes.  That's correct.

23    Q.   That was after people were indicted in connection with

24    this case?

25    A.   That's when she came to my office.

1   Q.   All right.  And you had some interaction with her and she

2   appeared to be surprised to you, correct?

3   A.   Yes.

4   Q.   When she looked at her file?

5   A.   Yes.

6   Q.   You weren't present when Mr. Abdelaziz saw that file for

7   the first time, were you?

8   A.   No.

9   Q.   You don't know what his reaction was when he saw it for

09:11 10   the first time, do you?

11   A.   I do not.

12   Q.   And you don't know when you saw it for the first time,

13   correct?

14   A.   That's correct.

15   Q.   And you certainly don't know what Mr. Singer told

16   Mr. Abdelaziz over the period of time that they knew each

17   other?

18   A.   I've never met Mr. Abdelaziz.

19   Q.   And you never met Mr. Singer either?

09:12 20   A.   I've never met Mr. Singer.

21   Q.   Okay.  Now, you were chosen by the prosecution to be the

22   representative for USC yesterday, correct?

23   A.   Yes.  They asked me to come testify.

24   Q.   Is there anyone else from USC that has been subpoenaed by

25   the prosecution?

| | |
|---|---|
| 1 | MR. FRANK:  Objection. |
| 2 | Q.   To your knowledge? |
| 3 | MR. FRANK:  Objection. |
| 4 | THE COURT:  Grounds?  She can say what she knows. |
| 5 | MR. FRANK:  Relevance. |
| 6 | THE COURT:  Overruled. |
| 7 | A.   I'm aware that some other folks in the Office of Admission |
| 8 | have been subpoenaed. |
| 9 | Q.   By the government or by the defense? |
| 09:12 10 | A.   Both. |
| 11 | Q.   Who else has been subpoenaed by the government? |
| 12 | A.   Tim Brunold and Kirk Brennan. |
| 13 | Q.   All right.  So you told us yesterday something about both |
| 14 | of those individuals, correct, Tim Brunold and Kirk Brennan? |
| 15 | A.   I think I told you their roles in our office. |
| 16 | Q.   Right.  So tell us again.  Who is Tim Brunold? |
| 17 | A.   Tim Brunold is the Dean of Admission. |
| 18 | Q.   So he's your boss, correct? |
| 19 | A.   He's one of my bosses, yes. |
| 09:13 20 | Q.   And Kirk Brennan is his right-hand person? |
| 21 | A.   The Director of Undergraduate Admission. |
| 22 | Q.   All right.  So he's your boss, also, correct? |
| 23 | A.   He's my direct supervisor, correct. |
| 24 | Q.   And did they come from California to Boston with you? |
| 25 | A.   They did not travel with me. |

1    Q.    Have you talked to them about this case?

2    A.    After the indictment came out, I certainly discussed

3    something that had happened to our office.

4    Q.    Right.  So it would be natural to talk about it with your

5    co-workers, correct?

6    A.    Yes.

7    Q.    All right.  And you did, did you not?

8    A.    Again, this was something that concerned our office and so

9    when the indictment came out, we certainly discussed it.

09:14 10    Q.    Right.  I'm not suggesting there's anything wrong with

11    that.  I'm just asking you if you did it.

12            MR. FRANK:  Objection.

13            THE COURT:  I'm sorry.  Give me the question again.

14    Q.    I'm not suggesting that you did anything wrong by doing

15    that.  I'm just asking you if you did it.

16            MR. FRANK:  Objection.

17            THE COURT:  On what grounds?

18            MR. FRANK:  It's a statement of counsel.

19            THE COURT:  All right.  Overruled.

09:14 20    A.    As I said, we discussed the case after the indictment came

21    out.

22    Q.    All right.  And as Dean of Admissions, Tim Brunold is in

23    charge of the VIP program for admissions, correct?

24    A.    I wouldn't describe the VIP process as a program, but yes.

25    He is somebody who will certainly consider all of the students

1   that are special interest to constituents across campus.

2   Q.   Right.  So there is a VIP program at USC, correct?

3           MR. FRANK:  Objection.  Relevance.  Beyond the scope.

4           THE COURT:  Overruled.

5   A.   There is a process by which students that are of special

6   interest to constituents around campus will receive a look

7   before their decision is finalized and they'll be reviewed by

8   the Dean of Admission.

9   Q.   Thank you.  Because you made it sound yesterday like money

09:15 10  has nothing to do with the admissions process at USC, correct?

11  A.   I stated that we don't make offers of admission in

12  exchange for money.

13  Q.   Right.  Well, what's the VIP list about?

14          MR. FRANK:  Objection.  Beyond the scope and contrary

15  to the Court's Order.

16          THE COURT:  I'm going to let him have that question,

17  but I am mindful of the prior Court Order.

18  Q.   What is VIP about?

19  A.   So there's several constituents across the campus, the

09:15 20  President, the Provost, different deans around the office or

21  around campus, as well as the University Advancement Office,

22  the folks who do fundraising for the University who may know

23  about students who are in our applicant pool.  They might know

24  about them through their work.  They might know about them

25  because they live in their neighborhood, but they're tracking

1  and they're interested in the, you know, final decision on

2  those students' applications.

3  Q.   They might know about them because they've given money to

4  the school and the school is interested in collecting money,

5  correct?

6         MR. FRANK:  Objection.  Relevance.

7         THE COURT:  Overruled.

8  A.   One of the reasons they may be tracking an applicant may

9  be due to fundraising efforts that the University Advancement

09:16 10  Office is doing, or other offices.

11  Q.   Right.  Would you agree or disagree with this statement?

12  The Admissions Department has no involvement with respect to

13  donations or potential donations.  The Admissions Department

14  does not track donations by an applicant's family.  Information

15  concerning donations by an applicant's family is not included

16  in the applicant's file.  If you had known that a prospective

17  student's family had donated 50 grand or a 100 grand to USC, it

18  would not have affected the Admissions Department decision

19  whether to admit that student or not.

09:17 20         Do you agree or disagree with that?

21  A.   We don't make admissions decisions with respect to --

22  Q.   Do you agree or disagree with that?

23         MR. FRANK:  I object and ask that the witness be

24  allowed to answer the question.

25         THE COURT:  Overruled.

```
 1    Q.   Do you agree or disagree with that?
 2    A.   I don't agree with all of those statements, so I guess I
 3    disagree with all of those statements as a group.
 4    Q.   Because you understand, do you not, that money makes a
 5    difference at USC in many, many ways, correct?
 6    A.   Like all nonprofit organizations, USC does fundraising.
 7    Q.   Yeah.  Well, when Sabrina Abdelaziz was applying for
 8    admission to USC, was USC in the middle of a $6 billion
 9    fundraising effort?
10    A.   I'm not sure of the exact dates of the campaign.
11    Q.   Okay.  Do you know that USC had a $6 billion fundraising
12    effort at some point while you were working there?
13    A.   Yes.  I'm aware there was a large capital campaign.
14    Q.   And $6 billion is a lot of money, correct?
15    A.   Yes.
16    Q.   And one of the ways USC -- by the way, giving donations to
17    private institutions is completely legitimate, correct?
18    A.   I believe so, but I'm not a lawyer.
19    Q.   Okay.  Would you agree or disagree with this?  Wealthy
20    people donating money to universities in the hope that their
21    children get preferential treatment in the admissions process
22    is not illegal.
23         MR. FRANK:  Objection.  Calls for a legal conclusion.
24         THE COURT:  Sustained.
25    Q.   Wealthy people donate money to your university all the
```

```
 1   time, don't they?
 2   A.    Yes.  As I said, like all nonprofits, we have an active
 3   fundraising arm of the University.
 4   Q.    And you are fully aware that many of these donors believe
 5   that it will help them get their children into school?
 6             MR. FRANK:  Objection to what others believe.
 7             THE COURT:  Sustained.
 8   Q.    Well, you believe that, don't you?
 9   A.    I'm sorry.  Can you repeat the question?
10   Q.    You believe that donations by wealthy donors help their
11   children get into USC?
12   A.    Not necessarily.
13   Q.    What do you mean by "not necessarily"?  What percentage of
14   the people on the VIP list get rejected?
15   A.    I'm not familiar.  I haven't done a data analysis of that.
16   Q.    Do you know if a data analysis has been done by USC?
17   A.    I'm not aware of that.
18             MR. SHEKETOFF:  For the witness only, your Honor.
19   Exhibit 1339, Mr. Carter.
20   Q.    You've never seen this before?
21   A.    No.
22   Q.    You don't know who prepared it?
23   A.    I'm not familiar with this document.  I don't know who
24   prepared it.
25   Q.    You're third in line at the Admissions Department and you
```

09:19 (line 10)
09:20 (line 20)

1    have no idea what number of VIP students get -- what the

2    percentage of VIP students that get tagged as VIP get in?

3             MR. FRANK:  Can we take the document down?

4             THE COURT:  The objection is sustained.  I don't

5    understand the question.  Let's take the document down.

6             MR. SHEKETOFF:  Can I repeat the document number?

7    1339?

8             Can I have it up again, your Honor, just for the

9    witness?

09:20 10         THE COURT:  Yes.

11   Q.   So there's a category, "athletic VIP".  Are you aware of

12   that category?

13   A.   I'm just not familiar with this document.

14   Q.   No, I'm not asking about this document now.  I'm asking

15   about a category on this document.  Are you aware of "athletic

16   VIP"?

17            MR. FRANK:  I object to counsel's characterization of

18   what's on the document.  I object to having a document in front

19   of the witness.

09:21 20         THE COURT:  She can look at the document.  Then take

21   it down and ask if it refreshes her memory.

22   Q.   Yeah.  Are you aware of something called "athletic VIP"?

23   A.   I'm not aware of anything that's called that.

24   Q.   So how many hours did you sit with the government?

25   A.   I met with them several times.

```
 1   Q.    Yeah.  I'm asking for your estimate of the number of
 2   hours.
 3   A.    Maybe 15 hours since January of 2019.
 4   Q.    Okay.  Was January of 2019 the first time you sat with the
 5   government?
 6   A.    Yes.  I gave an interview to the government at that time.
 7   Q.    And by the way, you have a lawyer in the courtroom,
 8   correct?
 9   A.    Yes, I do.
10   Q.    And he's paid for by USC, correct?
11   A.    I'm here on behalf of my university.
12   Q.    Right.  So I'm not suggesting that there's anything wrong
13   with that, but he's paid for by USC, correct?
14   A.    That's correct.
15   Q.    And at your first interview, how many lawyers from USC
16   were there?
17   A.    I believe there was one or two.
18   Q.    Or four?
19   A.    I don't remember.
20   Q.    Was the general counsel for USC there?
21   A.    No.
22   Q.    You sure about that?
23   A.    I don't recall the general counsel being present.
24   Q.    Do you know who the general counsel is?
25   A.    No.
```

Q.   Okay.  And all your legal bills are paid by USC, correct?

A.   Again, I'm here on behalf of my university.

Q.   Right.  I'm not suggesting there's anything wrong with that.  I'm just asking you.

     MR. FRANK:  Your Honor, I object to the continued statements.

     THE COURT:  Overruled.

A.   Yes.

Q.   Okay.  And USC has an official position that they published on the Worldwide Web about this quote/unquote scandal, correct?

A.   I'm not sure exactly what you're talking about.

Q.   Well, have you read any press releases or releases from USC about their position on this case?

A.   I believe there was a press release when the indictment came in March 2019.  I don't recall the contents exactly.

Q.   Did you read it?

A.   I read it at the time in 2019.

Q.   Did you think you were selected because -- from the Admissions Department because your personal views are closely aligned to USC's stated position?

     MR. FRANK:  Objection.

     THE COURT:  Sustained.

Q.   You still work at USC, correct?

A.   That's correct.

```
 1   Q.   So what are the categories of VIP that you know without
 2   looking at that document?
 3   A.   As I mentioned before, the President might have an
 4   interest in applicants, the Provost, deans at the University,
 5   the University Advancement Office, trustees of the University,
 6   as well as the Athletic Advancement Office.
 7   Q.   All right.  And by the way, that document that I just
 8   showed you, you were never shown that document by the
 9   government?
10   A.   No.
11   Q.   They never asked you to explain the difference between the
12   admissions rate on the VIP list and the admissions rate for
13   general applicants?
14   A.   No.
15   Q.   And you don't know the difference?  You don't know as you
16   sit here today what that difference is?  Is that what you're
17   telling us?
18   A.   As I mentioned before, students who were on the VIP are
19   given extra consideration.  They're given a sort of second
20   review by the Dean of Admission before final decision is made.
21   Q.   Okay.  But you don't know the difference in the rate.  Is
22   it three times more likely that you'll get admitted if you're
23   on the VIP list?
24   A.   Again, I haven't done the data analysis.
25   Q.   Well, what is your -- you've been with Admissions for how
```

1  long?

2  A.   20 years.

3  Q.   That's a chunk of change, even for an old man like me.

4  And you don't have an impression as to whether being on the VIP

5  list makes a huge difference in admissions to USC?

6          MR. FRANK:   Objection.   Relevance, and calls for

7  speculation.

8          THE COURT:   Sustained.

9  Q.   Do you believe, you, that for your children, if you gave a

09:25 10  donation to USC, you would be more likely to be -- have them

11  admitted?

12          MR. FRANK:   Objection.

13          THE COURT:   Sustained.

14  Q.   Do you believe that the wealthy have advantages in the

15  college admissions process that others don't?

16          MR. FRANK:   Objection.

17          THE COURT:   Sustained.

18  Q.   Now, you told us yesterday that part of your job is

19  overseeing staff, correct?

09:26 20  A.   Yes.

21  Q.   And you mentioned Kelsey Bradshaw yesterday as part of the

22  staff you oversee, correct?

23  A.   Yes.   She's an Associate Director and she's my direct

24  supervisee.

25  Q.   So you're directly responsible -- she reports directly to

1   you?

2   A.   She does now, yes.

3   Q.   Well, how about in 2017 when Sabrina Abdelaziz was

4   applying for admission to USC?  Did Kelsey Bradshaw report

5   directly to you?

6   A.   She was not my direct report at that time.  She was a

7   junior member of our staff.

8   Q.   So who did she report to?

9   A.   I don't -- we have a very large staff, 45, 50 people.  I

09:27 10   don't remember her direct supervisor.

11   Q.   Well, since then she's been promoted?

12   A.   Correct.

13   Q.   And you were still then one of her bosses, correct?

14   A.   Yes.  As I mentioned, I oversee the application review

15   process.

16   Q.   If something was going on with her, she had certain

17   suspicions, she would share them with you, correct?

18        MR. FRANK:  Objection to what Kelsey would do.

19        THE COURT:  Sustained.

09:27 20   Q.   Well, she was on SUBCO, wasn't she?

21   A.   Yes.  Again, she was one of the admission officers, a

22   junior member, who did a lot of administrative things,

23   paperwork and things regarding SUBCO.

24   Q.   Well, was she a voting member of SUBCO or not?

25   A.   Yes, she was.

1   Q.   So if three of you were there that day, her, you, and

2   somebody else, and she voted with the somebody else, the

3   student would be admitted, correct?

4   A.   That's correct.

5   Q.   All right.  So she wasn't that junior in 2017, correct?

6   A.   She was -- her -- her title was part of our junior staff

7   but she was a full voting member of the SUBCO.

8   Q.   Okay.  And SUBCO is just an abbreviation of what?

9   A.   The Athletic Admission Subcommittee.

09:28 10   Q.   Subcommittee.  SUBCO.  Subcommittee.

11   A.   Yes.

12   Q.   Okay.  Subcommittee is too long so you shorten it to

13   SUBCO?

14   A.   That's just what we've always called it.

15   Q.   Okay.  And I don't know if you mentioned him yesterday,

16   but was there someone named Alexander Alvendia on your staff?

17   A.   Yes.  He's also an admission officer.

18   Q.   And what was his title back in 2017?  Do you recall?

19   A.   He's had a couple of titles in our office.  I can't

09:29 20   remember if he was a Senior Assistant Director of Admission at

21   the time or an International Admission Officer.

22   Q.   Okay.  But he was clearly in the Admissions Department,

23   and anyone that suggested otherwise would be wrong, correct?

24   A.   Yes.  He's a member of our Admission Office.

25   Q.   Now, yesterday toward the end of your testimony the

1   prosecutor went over a number of e-mails between you and

2   Brunold and others, Brennan and others, and even ones that you

3   weren't on about the suspicions that had grown up around some

4   of these recruited walk-ons, correct?

5          MR. FRANK:  Objection.  Misstates.

6          THE COURT:  Well, she can answer if she recalls.

7   Overruled.

8   A.   I looked at some e-mails yesterday during my testimony,

9   that the government showed me, yeah, that were between Kirk and

09:30 10   Tim and myself.

11   Q.   Did you see any that weren't -- that didn't involve you

12   yesterday?

13   A.   I believe, in the chains, I was involved.

14   Q.   You mean at some point you got it?  It started somewhere

15   else and at some point you got it?

16   A.   I believe in the e-mails we looked at yesterday, yes.

17   Q.   Okay.  And they were about people not on trial in this

18   case, correct?

19   A.   That's correct.

09:30 20   Q.   And about suspicions that had been raised by guidance

21   counselors at various high schools, correct?

22   A.   The high school counselors had asked questions about those

23   applicants being admitted as athletic recruits.

24   Q.   Correct.  And you know that there was such a raising of

25   concern with Sabrina Abdelaziz's guidance counselor, correct?

1   You know that, don't you?

2   A.   I'm not aware of that.

3        MR. SHEKETOFF:  Can I have Exhibit 1288 just for the

4   witness.

5   Q.   This is an e-mail sent --

6        MR. FRANK:  I object to the characterization.

7        THE COURT:  Yeah.  It's not in, right?

8        MR. SHEKETOFF:  Right, your Honor.  Well, I'm going to

9   offer it, but it's not in yet.  I'm not going to talk about the

09:31 10   substance of it.  I'm just going to ask her if this is an

11   e-mail between Alexander Alvendia --

12        THE COURT:  You can ask her what it is and see if she

13   can tell us.

14   Q.   Okay.  Do you know what it is?

15   A.   It doesn't look like an e-mail.  It looks like an IM

16   transcript, like an IM exchange.

17   Q.   Okay.  Do you recognize the names of the two people that

18   have this IM exchange?

19   A.   Yes.

09:32 20   Q.   And they're both in the Admissions Department?

21   A.   That's correct.

22   Q.   And this exchange was on March 27th of 2018?

23   A.   That's what it says.

24   Q.   Okay.  You've never seen this before?

25   A.   No.

```
 1    Q.    The government never showed you this before?

 2    A.    No.

 3    Q.    Is it about Sabrina Abdelaziz?

 4          MR. FRANK:  I object, your Honor.  It's not in

 5    evidence.  She's never seen it before.

 6          THE COURT:  It's not in.  You can't question her about

 7    the document.

 8          MR. SHEKETOFF:  Well, I offer it.

 9          MR. FRANK:  I object.

10          THE COURT:  Grounds?

11          MR. FRANK:  It's hearsay, your Honor.

12          THE COURT:  Sustained.

13          MR. SHEKETOFF:  I'm not offering it for the truth,

14    your Honor.  I'm offering it for the fact that it took place

15    and that it was never shown to her.  And I would like to ask

16    her to explain why her underlings never talked about it with

17    her.

18          MR. FRANK:  She can't explain why somebody else did

19    something.  It remains hearsay.

20          THE COURT:  Yeah.  The objection is sustained,

21    Mr. Sheketoff.

22          MR. KENDALL:  All right.  I'm not offering it for the

23    truth of the matter, just for the fact that it happened.

24          THE COURT:  You want to respond?

25          MR. FRANK:  He is offering it for the truth of the
```

```
 1    matter.  She's never seen the document before.  She can't
 2    explain a document she's never seen before.
 3              THE COURT:  The objection is sustained.
 4    Q.  Do you know why the government would hide this document
 5    from you?
 6              THE COURT:  Sustained.
 7              MR. FRANK:  Objection, your Honor, and move to strike.
 8    Q.  If your less senior members of your staff were discussing
 9    Sabrina Abdelaziz and issues that they might have, would you
10    expect them to bring that to your attention?
11    A.  Not if they were able to resolve those issues themselves.
12    Q.  Well, what if they weren't able to resolve those issues
13    themselves?
14    A.  If they needed my guidance, they would bring it to me.
15    Q.  Your position yesterday was that you were shocked to find
16    out that walk-on spots at USC were being exchanged for
17    donations of any kind, correct?  You were shocked?
18    A.  I was shocked to learn that the athletic profiles were not
19    accurate and were lies and I was shocked that, yes, that people
20    at USC in the Athletics Department had accepted money in
21    exchange for presenting candidates who were not true athletes.
22    Q.  Well, do you know if Donna Hein el had accepted any money
23    from Mr. Singer at the time that Sabrina applied and was
24    granted admission?
25    A.  I don't know all the details of the money that was
```

1    exchanged.

2    Q.   You don't know that the government has conceded that she

3    did not take any money personally until after this period of

4    time?

5            MR. FRANK:  I object, your Honor.

6            THE COURT:  Sustained.

7    Q.   You have no knowledge about that?

8    A.   About what?

9    Q.   About when it was that it's alleged that Donna Heinel

09:35 10   started to take money personally.

11   A.   I don't know the exact timeline of all of it.

12   Q.   Did Donna Heinel have control over the Galen Center funds?

13           MR. FRANK:  Objection.  Foundation.

14           THE COURT:  Sustained.

15   Q.   Well, do you know about the Galen Center?

16   A.   I know it's our basketball and volleyball arena.

17   Q.   Okay.

18           THE COURT:  I'm going to ask to stop here.  I have an

19   equipment problem that maybe we can solve.

09:37 20          You may proceed.

21           MR. SHEKETOFF:  Can I have, just for the witness,

22   1567.

23   Q.   Do you recognize that?

24   A.   That's the Galen Center, the basketball and volleyball

25   arena.

```
 1                    MR. SHEKETOFF:  All right.  I'd offer it, your Honor.
 2                    THE COURT:  It will be admitted.
 3                    (Exhibit 1567 admitted into evidence.)
 4                    MR. SHEKETOFF:  And could I have 1566.
 5       Q.    Do you recognize what's depicted in 1566?
 6       A.    Yes.
 7       Q.    Is that the inside of the Galen Center?
 8       A.    Yes.
 9       Q.    A pretty impressive arena, yes?
10       A.    I don't go to that many arenas, so yes.  It looks like a
11       basketball arena.
12       Q.    Well, have you ever been inside the Galen Center?
13       A.    Yes.
14                    MR. SHEKETOFF:  I'd offer 1566.
15                    THE COURT:  It will be admitted.
16                    (Exhibit 1566 admitted into evidence.)
17       Q.    Is it a 10,000 seat arena?
18       A.    Oh, I don't know the capacity of the arena.
19       Q.    It's big time basketball, correct?
20       A.    We're a Division 1 basketball team.  We do okay.
21       Q.    Do okay?  Yesterday you were so proud of the USC athletes.
22       You told us that you had four national championships last year.
23       A.    We did in our women's teams.
24       Q.    Well, the women play here, too, correct?
25       A.    Yes.
```

1    Q.   The first time this arena was ever sold out it was for a

2    women's basketball game against UCLA, correct?

3    A.   I don't know.

4    Q.   You don't know much about women's basketball?

5    A.   I don't follow many sports or any sports very closely.

6    Q.   Okay.  You're on the Subcommittee for admission of student

7    athletes and you don't know anything about sports?

8    A.   I know a lot about admission.

9         MR. SHEKETOFF:  Okay.  We can take that down.

09:39 10   Q.   Let's talk about SUBCO for a minute.  Is there anyone on

11   that committee that knows anything about sports?

12   A.   Some of our members participated in high school sports,

13   but it's not a prerequisite to serving on the committee.

14   Q.   All right.  You told us yesterday 85 to 90 percent of the

15   people that are presented to SUBCO are granted admission?

16   A.   Yes.  These are highly talented athletes that the coaches

17   are very interested in recruiting.

18   Q.   Okay.  That's your view of it, they're highly talented

19   athletes that the coaches are interested in recruiting,

09:40 20   correct?  That's your view of it?

21   A.   Yes.

22   Q.   You've just -- you volunteered that in response to a

23   question that asks for a yes or no answer.

24        MR. FRANK:  Objection to the argumentative nature.

25        THE COURT:  Sustained.

| | |
|---|---|
| 1 | Q.   Do you know how many -- and SUBCO has two types of student |
| 2 | athletes that go through it, correct?  There are the recruited |
| 3 | scholarship athletes and there are the recruited walk-ons, |
| 4 | correct? |
| 5 | A.   Yes.  That's correct. |
| 6 | Q.   There is a huge difference between these two categories, |
| 7 | isn't there? |
| 8 | A.   Not necessarily. |
| 9 | Q.   Not necessarily?  What does -- does "not necessarily" mean |
| 09:40 10 | sometimes there isn't? |
| 11 | A.   The coaches may have a limited number of scholarships to |
| 12 | award, a limited amount of scholarship to award, so they may be |
| 13 | bringing a student that they'd love to give a scholarship to |
| 14 | but they don't have any athletic scholarship available, so |
| 15 | they're bringing them as a recruited walk-on. |
| 16 | Q.   All right.  So that's your view of how sometimes it's |
| 17 | works and sometimes it doesn't.  Do you know that the NCAA has |
| 18 | scholarship requirements for sports like women's basketball and |
| 19 | football? |
| 09:41 20 | A.   They regulate the number of athletic scholarships for each |
| 21 | type of sport or team. |
| 22 | Q.   Do you know that they regulate the roster size, too? |
| 23 | A.   I'm not sure of the details of that. |
| 24 | Q.   Do you know that the football coach -- do you know why the |
| 25 | football coach might have a much stronger interest in walk-ons |

1    than the basketball coach would?

2              MR. FRANK:  Objection.

3              THE COURT:  Overruled.

4    A.    Again, different coaches are managing their athletic

5    scholarship in different ways.

6    Q.    Well, could it be that the NCAA football roster allows 111

7    participants on the team roster and the football scholarships

8    are limited to 88 so that the football coach actually has to

9    have walk-ons that can play?  You don't know about that?

09:42 10            MR. FRANK:  Objection.  Calls for speculation.

11              THE COURT:  Overruled.

12   A.    Like I said, all the teams have limits on the number of

13   scholarships and so some -- you know, most teams will have some

14   recruited walk-ons as part of their team as well.

15   Q.    Well, so you don't know those numbers for football?

16   A.    Again, I'm not that familiar with all the NCAA

17   regulations.

18   Q.    Do you know what the numbers are for women's basketball?

19   A.    Again, I'm not familiar with the regulations with the

09:42 20   NCAA.

21   Q.    Do you know what the roster size is for women's

22   basketball?

23   A.    No.

24   Q.    Do you know that the NCAA limits women's basketball

25   rosters to 15?

1    A.    I'm not familiar.

2    Q.    Do you know how many -- do you know that the NCAA allows

3    the basketball coach for women's basketball to have 15

4    scholarship athletes?

5    A.    I'm not familiar with the details.

6    Q.    So if that was correct, what I just said, if it was, do

7    you see that the women's basketball coach might not care a darn

8    about walk-ons and the football coach would?

9          MR. FRANK:   Objection.   Hypothetical.

09:43 10          THE COURT:   Overruled.

11    A.    I'm just not familiar with how the coaches manage their

12    rosters.

13    Q.    All right.   Do you know who the coach of the women's

14    basketball team is today?

15    A.    I don't.

16    Q.    Do you know what -- do you know that when women basketball

17    players are recruited to a school like USC and competitors of

18    USC that organizations like ESPN and other sport organizations

19    sort of judge their recruiting class and give them a ranking?

09:44 20    A.    I'm not too familiar with that.

21    Q.    Do you know that USC's women's basketball recruiting class

22    for this year received a 7th best recruiting class in the

23    country ranking by ESPN?

24    A.    I'm not familiar with that ranking.

25    Q.    Well, if I were to suggest to you that the women's

basketball coach at the time Sabrina Abdelaziz applied for

admission to USC was Mark Trakh, does that name ring any bells

at all?

A.   I don't pay close attention to all the coaches.  I'm

sorry.  I'm not familiar.

Q.   All right.  Well, how many walk-on recruits did Mark Trakh

ask for the year that Sabrina Abdelaziz applied for admission?

A.   I don't have those data.

Q.   You don't know if she was the only one that he asked for?

A.   I don't know.

Q.   Do you know if he ever asked for a walk-on recruit the

year before Sabrina Abdelaziz applied?

A.   I can't remember.

Q.   How about the year after?

A.   I can't remember.

Q.   Did the USC's women's basketball's team have a full

complement of players freshman year for Miss Abdelaziz?  In

other words, were you down a spot?

A.   I don't know.

Q.   When you looked at her application, did you have any

reason to believe that a player, given that resume that was

presented to you, could walk on to the USC women's basketball

team?

A.   I believe the coach was interested in recruiting the

student as a walk on, not offering them an athletic

1    scholarship, but that they were talented and would contribute

2    to the team as the profile stated.

3    Q.    Okay.  So the 10 or 15 percent of the applicants that go

4    through SUBCO that get rejected, what are your grounds for

5    rejecting them?

6    A.    There are students we feel are too academically risky to

7    support.  That's primarily it.

8    Q.    Okay.  So the only reason somebody who gets to SUBCO would

9    be rejected is if their scores are pathetic?

09:47 10   A.    Not necessarily their scores, but the overall academic

11   preparation being very risky and, again, if we don't believe we

12   can support a student academically, we don't want to bring them

13   to the University.

14   Q.    So, basically, you think they have absolutely no chance of

15   succeeding academically at USC and that's why you reject them?

16   A.    Again, the student's very academically risky.  We don't

17   want to bring them to the University if we don't feel that they

18   can be supported by our academic support.

19   Q.    Even though they're great athletes?

09:47 20   A.    Even if they're exceptional athletes.

21   Q.    So basically -- by the way, USC has abandoned the SAT and

22   ACT scores as a requirement, correct?

23   A.    We are test optional, like many universities in the

24   country at this time.

25   Q.    And most universities have at least, if not completely,

```
 1    abandoned those scores and gone to test optional?
 2            MR. FRANK:  Objection, your Honor.  This is beyond the
 3    scope of the conspiracy.
 4            THE COURT:  Overruled.
 5            MR. FRANK:  If he could establish a time frame.
 6            THE COURT:  Her general knowledge as an admissions
 7    officer.
 8            MR. FRANK:  If he could establish a time frame, your
 9    Honor.
09:48 10        THE COURT:  Time frame, yes.
11    Q.   So when did you go test optional?
12    A.   So beginning with students who entered the University in
13    fall '21, we were test optional.  Many students were not able
14    to even sit for an SAT or an ACT due to the pandemic, and we
15    felt that it was most equitable to give students the option if
16    they have scores.  If they wanted to include those scores, they
17    could choose to do so.
18    Q.   All right.  So you're saying that the reason to go to test
19    optional was the pandemic and that all the other universities
09:48 20   in the country that went to test optional was because of the
21    pandemic.  Is that your suggestion?
22            MR. FRANK:  Objection.
23            THE COURT:  Sustained.
24    Q.   Well, what about this year?  Is USC still test optional?
25            MR. FRANK:  Objection.  Relevance.
```

1            THE COURT:  He can have that question.

2    A.    Yes.  We've extended the test optional policy.

3    Q.    Okay.  And that's because most college admissions officers

4    have concluded that these tests are nonsense?

5            MR. FRANK:  Objection.

6            THE COURT:  Sustained.

7    Q.    That these tests discriminate, correct?

8            MR. FRANK:  Objection.

9            THE COURT:  Sustained.

09:49 10   Q.    By the way, you weren't suggesting yesterday that Sabrina

11   Abdelaziz wasn't investigated by USC, were you, when you said

12   certain students were thrown out?

13   A.    I'm not sure what you're referring to.

14   Q.    Yeah.  You remember the prosecutor asking you whether or

15   not certain students were thrown out?

16   A.    Right.  After -- in -- after March 2019 when the

17   indictment was made public, there were students who were going

18   to be entering -- had been approved for admission for fall 2019

19   who were -- had their admission revoked.

09:50 20   Q.    Right.  And did the University investigate the other

21   students?

22   A.    I believe current students were -- went through a process

23   with the Student Judicial Affairs Committee.

24   Q.    All right.  And Sabrina Abdelaziz is still enrolled at

25   USC, isn't she?

```
 1   A.   I believe so.

 2   Q.   There are significant differences between recruited

 3   scholarship athletes and walk-on athletes in terms of money,

 4   correct?

 5   A.   Students who were receiving athletic scholarship have

 6   athletic scholarship and the recruited walk-ons are not

 7   receiving athletic scholarship.

 8   Q.   And if you're a recruited scholarship athlete and you

 9   don't show up for the team, you just blow it off for whatever

09:51 10   reason, injury, illness, lack of desire, too much partying,

11   whatever the reason, what happens?

12   A.   I don't know.  That's really beyond the scope of the

13   admission process.

14   Q.   You don't know that the scholarship is taken away?

15   A.   It's handled by Athletics and Athletics compliance.

16   Q.   So Athletics and Admissions are two completely different

17   departments?

18   A.   That's correct.

19   Q.   Who was the head of the Athletics Department when Sabrina

09:51 20   Abdelaziz was applying for admission to USC?

21   A.   I don't know the exact date.  It was either Pat Haden or

22   Lynn Swann.

23   Q.   And did Pat Haden have his own VIP list?

24   A.   No.  There were folks who were of interest to the Athletic

25   Advancement Office, but he didn't have a separate list.
```

```
 1   Q.   So you don't call the Athletic Advancement list from USC's
 2   Athletic Department Pat Haden's list, correct?
 3   A.   I don't follow Pat.
 4   Q.   Okay.  Do you know what Tim Brunold might call it?
 5             MR. FRANK:  Objection.
 6             THE COURT:  Sustained.
 7   Q.   Well, has he talked about it with you?
 8   A.   I've never heard anybody talk about Pat Haden's list.
 9   Q.   No.  Has he talked about the VIP list from the Athletic
10   Department with you?
11   A.   Not specifically.  I mean, I'm aware that the Athletic
12   Advancement Office is tracking applicants and are interested in
13   their outcome of the admission decision.
14   Q.   Okay.  Now, "advancement" is a fancy term at USC for
15   raising money, correct?
16   A.   Yes.
17   Q.   So the Athletic Department has its own Advancement Office,
18   fundraising office?
19   A.   Most of our schools and departments have Advancement
20   Officers who work within the school.
21   Q.   So the Athletic Department has its own Advancement Office?
22   A.   Athletics, like many of the schools across the University,
23   so the School of Art and Design, or the College of Letters,
24   Arts and Sciences would have Advancement Officers, folks doing
25   fundraising with -- as employees of that school, the same way
```

1    that folks are doing fundraising as part of the Athletics

2    Office.

3    Q.   Okay.  So they have an athletic -- the Athletic Department

4    has a fundraising office?

5    A.   Yes.

6    Q.   Do you know who the head of that is?

7    A.   I do not.

8    Q.   Do you know how many -- whether they have 12 employees or

9    20 employees or 2 employees?

09:54 10    A.   I'm not familiar with their setup.

11    Q.   And you don't know what they pay their employees?

12    A.   I do not.

13    Q.   Are employees in fundraising -- does Admissions have a

14    fundraising?

15    A.   No.

16    Q.   So walk-on athletes, do you know what happens to them if

17    they don't show up, they blow off their, quote unquote, team?

18    A.   Again, I'm not familiar with what happens after the

19    students matriculate and how they participate on their teams.

09:54 20    That's really the purview of the Athletics folks.

21    Q.   As you sit here today, you are telling us that you do not

22    know that there is no repercussion of any kind for a walk-on

23    student to not walk on?

24    A.   I guess it would really be up to Athletics and the coach.

25    Q.   Well, you can't take away his or her scholarship, correct?

1    A.    That's correct.  They're not receiving athletic

2    scholarship.

3    Q.    And you can't revoke their admissions at the University,

4    correct?

5    A.    The Athletics Office can't revoke anybody's admission to

6    the University.

7    Q.    Well, who can revoke someone's admission to the

8    University?

9    A.    The Admission Office and if it's an already matriculated

09:55 10   student, that may be a sanction of the Student Judicial Affairs

11   Committee.

12   Q.    All right.  Do you know if the Student Affairs Judicial

13   Committee has ever, in the history of USC, ever revoked the

14   admission of a walk-on, a recruited walk-on who doesn't show up

15   for the team?

16   A.    I'm not privy to the proceedings of SJACs.

17   Q.    Do you know how many walk-on slots Coach Trakh had for

18   Sabrina's matriculating class?

19   A.    As I said, I'm not familiar with the rosters and how the

09:56 20   coaches manage them.

21   Q.    So you can't say that she took a spot from anybody on the

22   team or on the walk-on list, can you?

23   A.    I don't know what you mean by "walk on list".

24   Q.    From Coach Trakh, if there even was one, the women's

25   basketball coach.  In other words, you can't tell us, can you,

1    that there were five walk-ons that Coach Trakh wanted and

2    because you took Sabrina Abdelaziz, the sixth one, who should

3    have been the fifth one, didn't get in.  You can't tell us

4    that, can you?

5    A.   Again, I'm not familiar with how the coaches manage their

6    rosters.

7    Q.   But you're familiar with admissions.  You've been there

8    for 20 years.  And you don't know how many walk-on recruits

9    Coach Trakh asked for in 2017?

09:56 10   A.   I don't review those data on a regular basis.

11   Q.   And the government never asked you to figure that out for

12   them?

13   A.   No.

14   Q.   Okay.  You gave us some numbers yesterday about the

15   classes at USC.  And you told us yesterday, I believe, that the

16   first year class is typically 32 to 3,300 students?

17   A.   Yes.

18   Q.   And you also told us that there were 19,000 undergraduates

19   at USC?

09:57 20   A.   Yes.  We admit a transfer class every year, as well.

21   Q.   Okay.  And is there a VIP list for transfers?

22   A.   In the same way that folks across campus might be

23   interested in freshman applicants, they may also be interested

24   in transfer applicants.

25   Q.   And is there a ranking on the VIP list, in other words,

1    are you first tier or second tier?

2    A.    Those were created by some of the offices.  I believe

3    Advancement wanted to let us know of folks who they were more

4    interested or less interested in.  That wasn't really

5    information that we used, but information that they, you know,

6    used in their internal process.

7    Q.    Well, would there be an e-mail with you about changing

8    someone from first tier to second tier?

9    A.    There might be.  This was more recordkeeping.  It wasn't

09:58 10   really something that was important to the Admissions Office.

11   We didn't ask for that information.

12   Q.    So why would you have been included on that e-mail?

13   A.    To maintain a spreadsheet.

14   Q.    Because you maintained a spreadsheet?

15   A.    I'm one of the people that can, you know, add and change

16   things in the spreadsheet.  We've since changed to tracking all

17   this information, rather than just on a spreadsheet, to a

18   database.  So depending on when that request was made, I maybe

19   was changing it in the database.

09:59 20        MR. SHEKETOFF:  Can I have Exhibit 1297 just for the

21   witness.

22   Q.    Do you recognize this e-mail?

23   A.    I don't remember it, but I can see that it's an e-mail and

24   I can see that --

25   Q.    All right.  Are you cc'd on this e-mail?

```
 1   A.   Can I see the rest of the e-mail, please?

 2   Q.   Yes.

 3             MR. KENDALL:   Mr. Carter.

 4   A.   Is that the end?   Thank you.

 5   Q.   All right.   Were you cc'd on this e-mail?

 6   A.   Yes.

 7   Q.   And why do you think you were cc'd on this e-mail?

 8             MR. FRANK:   Objection.   It's not in evidence.

 9             THE COURT:   Sustained.

10             MR. SHEKETOFF:   All right.   I offer it.

11             MR. FRANK:   I object.   It's irrelevant, beyond the

12   scope, hearsay.

13             THE COURT:   Sustained.

14   Q.   Well, you certainly know the difference between first tier

15   and second tier, correct?

16   A.   Again, this was something that the Advancement Office

17   wanted to separate their own list.   It wasn't something that

18   was significant to the Admission Office.

19             MR. SHEKETOFF:   Okay.   Can I have Wilson Exhibit 7358,

20   just for the witness.

21   Q.   Do you recognize this e-mail?

22   A.   Can I see the rest of the e-mail, please?

23   Q.   Sure.   All set?

24   A.   Is that the whole thing?

25   Q.   Yes.
```

1    A.    Thank you.

2    Q.    Do you recognize it?

3    A.    Yes.

4          MR. SHEKETOFF:  I'll offer it.

5          MR. FRANK:  Objection, your honor.  He needed to

6    refresh her recollection.

7          THE COURT:  The objection is sustained, but it can be

8    used to refresh her recollection.

9    Q.    Okay.  What's a s-c-i-o-n?  How do you pronounce that?

10:03 10         MR. FRANK:  Can we take the document down?

11         THE COURT:  I can't hear you.

12         MR. FRANK:  I was asking if we could remove the

13   document.

14         THE COURT:  Yes.

15   A.    So, at USC, we like a lot of words that start with SC, so

16   our legacy applicants are called scions.

17   Q.    So why would you care whether someone was a legacy

18   applicant or not?

19   A.    So something that we'll consider in the admission process

10:04 20   is students who have had grandparents, parents, or siblings

21   who've attended the University.

22   Q.    And who forwarded this particular e-mail to you?

23         MR. FRANK:  Objection.

24         THE COURT:  Grounds?

25         MR. FRANK:  It's not in evidence.

```
 1              THE COURT:  Yeah.  Sustained.
 2    Q.   Well, does this e-mail involve just the Admissions
 3    Department?
 4              MR. FRANK:  Objection to the e-mail.
 5              THE COURT:  Sustained.
 6    Q.   Do you believe that there are advantages for the wealthy
 7    at the University of Southern California?
 8              MR. FRANK:  Objection.  Relevance.
 9              THE COURT:  He can have that question.
10    A.   Advantages by attending USC?
11    Q.   No.
12    A.   I'm sorry.  I don't understand your question.
13    Q.   Well, do you use Twitter?
14    A.   Yes.
15    Q.   Do you ever retweet people's posts?
16    A.   Sometimes.  I'm not a very active user.
17    Q.   Do you ever retweet -- well, strike that.
18         Do you recall a retweet of a post concerning the
19    advantages of the wealthy?
20    A.   I don't remember all of the tweets.
21              MR. SHEKETOFF:  Could I have, just for the witness,
22    Mr. Carter, Exhibit 9038.
23    Q.   Do you recall this retweet?
24    A.   Yes.
25    Q.   And by re tweeting it, you were telling the world, or at
```

10:05 (line 10)

10:05 (line 20)

1    least people that have access to Twitter, that "everything

2    (save perhaps one thing) in the admissions process" --

3              MR. FRANK:  Your Honor, I object.

4              THE COURT:  It hasn't been admitted.  You can't read

5    from it.

6              MR. SHEKETOFF:  Okay.  Then I offer it.

7              MR. FRANK:  I object.  It can be used to refresh her

8    if she doesn't remember it, but it's not in evidence.

9              THE COURT:  Yeah.  What are you offering it for,

10:07 10    Mr. Sheketoff?

11             MR. SHEKETOFF:  For her bias.

12             MR. FRANK:  He can ask her about her bias, your Honor.

13             MR. SHEKETOFF:  I can also prove her bias.

14             THE COURT:  I'm going to allow him to offer this, and

15    I will admit it, 9038.

16             (Exhibit 9038 admitted into evidence.)

17    Q.   At least for this tweet, you didn't need statistical

18    evidence to agree with this, correct?  Anyone in Admissions

19    would know this?

10:07 20    A.   I think we're familiar with many ways in which affluent

21    students are advantaged in the admissions process, through the

22    schools they attend, the preparation that they get, the classes

23    they have access to, the test prep that they do.  There's a lot

24    of ways that affluent students are advantaged in the admissions

25    process.

1    Q.   But not by giving donations to universities?

2    A.   I wasn't specifically referring to that.

3    Q.   I apologize.  I'm not suggesting you were specifically

4    referring to that.  But you're taking this thing that was --

5    that you retweeted and you're limiting it to certain things.

6    And I'm asking you, did you also have in mind that their

7    parents can make donations to universities and that advantages

8    them?

9    A.   I don't remember what I thought while I was Tweeting.

10:08 10   Q.   Have you done anything at USC to stop this feeder school

11   concept where you just told us these kids are advantaged

12   because they go to these, you know, basically special private

13   schools?

14   A.   I think that we do really broad outreach.  We visit 2,000

15   high schools.  We try to be in all the places that we might

16   find students who might be a good fit for USC.  So I think we

17   actively work to make sure we're including as many students as

18   we can.

19   Q.   But you have close relationships with certain feeder

10:09 20   schools, correct?

21   A.   We've built relationships over the years with counselors

22   from all kinds of schools, including independent schools.

23   Q.   By the way, do you send -- USC admissions, do you send

24   recruiters to the Hong Kong International School every year?

25   A.   As I mentioned last year, we do have admission officers

1    who visit schools all over the country, all over the world, and

2    we do visit Hong Kong International School.  There's a lot of

3    students who are interested in hearing about USC.

4    Q.    Okay.  So the answer is yes, you send recruiters every

5    year to Hong Kong International School?

6    A.    We haven't gone the past couple years due to COVID, but

7    yes.  It is generally a school that we will visit.

8    Q.    Do you know that Kirk Brennan, the second in charge of

9    Admission, actually met Sabrina Abdelaziz at the Hong Kong

10:10 10    International School on one of these recruiting trips?

11    A.    I'm not aware of that.

12    Q.    He never discussed that with you?

13    A.    No.

14    Q.    When you guys talked about it right after the indictment

15    and you saw the name Abdelaziz, he didn't say to you, I met her

16    when I was at Hong Kong International School?

17    A.    I'm not aware of that.

18    Q.    So he never mentioned it to you?

19          MR. FRANK:  Objection.  Asked and answered three

10:10 20    times.

21          THE COURT:  Overruled.

22    A.    No.

23    Q.    So it's fair to say that your Admissions Department had a

24    very clear view of Hong Kong International School?

25          MR. FRANK:  Objection to clear view.

```
 1              THE COURT:  I don't understand it.  Sustained.
 2    Q.    You knew that it was an academic institution and not a
 3    sports institution, correct?
 4    A.    Like I said, I'm not familiar with what's happening in
 5    high school sports at all of the many high schools that we
 6    visit or don't visit and we receive applications from.  We
 7    certainly knew the academic profile and that they prepare
 8    students well.
 9    Q.    Did -- well, you've already told us Kirk Brennan never
10    talked to you about Sabrina Abdelaziz, correct?
11    A.    Correct.
12    Q.    Okay.  How does the Athletic Department go about its
13    fundraising?
14              MR. FRANK:  Objection.  Foundation.
15              THE COURT:  Sustained.
16    Q.    Well, do you know what direction Donna Heinel was given in
17    2016 and 2015 and 2017 about her obligations vis-a-vis
18    fundraising?
19              MR. FRANK:  Objection.  Foundation.
20              THE COURT:  Sustained.
21              MR. SHEKETOFF:  I'm just asking her if she knows, your
22    Honor.
23              THE COURT:  Well, she can have that if she knows.
24    A.    I don't know.
25    Q.    You don't know.  You don't know what directions, if any,
```

```
 1    she was operating under?
 2              MR. FRANK:  Objection.  Asked and answered.
 3              THE COURT:  Sustained.
 4    Q.   Do you know if she had control of any funds that were
 5    donated to USC sports?
 6              MR. FRANK:  Objection.  Foundation.
 7              THE COURT:  Sustained.
 8              MR. SHEKETOFF:  I'm just asking her if she knows.
 9              THE COURT:  Well, we've been over this, I think,
10    enough.
11    Q.   Okay.  Do you have any idea how many people were on the
12    VIP list in Sabrina Abdelaziz's matriculating class?
13    A.   I don't have those data.
14    Q.   So as you sit here today, you don't know if it was a
15    thousand or one?
16    A.   It was more than one.
17    Q.   Was it more than 500?
18              MR. FRANK:  Objection.
19              THE COURT:  If she knows.  Overruled.
20    A.   I just don't have those data.
21    Q.   Was it a thousand?
22    A.   I just don't have those data.
23    Q.   You know the government does.
24              MR. FRANK:  Objection.
25              THE COURT:  Sustained.
```

```
 1                MR. SHEKETOFF:  Thank you, Judge.

 2                THE COURT:  Mr. Kendall, cross-examination.

 3                MR. KENDALL:  Thank you, your Honor.  Please, if I may

 4     just have a moment to set up.

 5                THE COURT:  Yes.

 6                    CROSS-EXAMINATION OF REBECCA CHASSIN

 7     BY MR. KENDALL:

 8     Q.   Good morning, Miss Chassin.

 9     A.   Good morning.

10:15 10     Q.   My name's Mike Kendall.  I represent John Wilson, along

11     with some other folks.  Thank you for coming up from California

12     and staying over for us.

13                Would you agree with me USC kept a $100,000 donation

14     from Mr. Wilson and has never returned it, correct?

15                MR. FRANK:  Objection.  Foundation.

16                THE COURT:  Sustained.

17     Q.   Okay.  Do you have any -- as you sit here today, do you

18     have any reason to believe that USC has returned that donation

19     to Mr. Wilson?

10:15 20                MR. FRANK:  Objection.  Foundation.  Beyond the scope.

21                THE COURT:  Sustained.  Not for beyond the scope, but

22     for lack of foundation.

23     Q.   You've testified yesterday about a bunch of SUBCO files

24     that were all submitted on the same day by Donna Heinel and

25     supposedly associated with Mr. Singer.  Do you remember that?
```

1    A.    Yes.  I saw those SUBCOs that were on several different

2    dates and that had been presented by Donna.

3    Q.    Those were years after Johnny Wilson was admitted,

4    correct?

5    A.    Yes.

6    Q.    He was admitted in March of 2014, correct?

7    A.    I believe so.

8    Q.    And as you sit here today, you have no basis to say that

9    Mr. Wilson had any contact or association with those later

10:16 10    Donna Heinel submissions, correct?

11                MR. FRANK:  Objection.  Foundation.

12                MR. KENDALL:  I'm just asking her knowledge.

13                THE COURT:  She can answer that question.  Overruled.

14    A.    I'm sorry.  Can you repeat that question?

15    Q.    You have no knowledge to think that Mr. Wilson was

16    involved at all with these submissions that came in in 2016 and

17    '17 with Donna Heinel?

18    A.    They were not presented at the same time.

19    Q.    Right.  And you don't know of Mr. Wilson having any

10:16 20    involvement with those applications, correct?

21    A.    I don't think any of those --

22    Q.    It's a yes or no.  Do you have any knowledge that

23    Mr. Wilson was a participant in submitting applications for

24    Giannulli or anybody else?

25    A.    That Mr. Wilson was participating in other students'

1    admissions?

2    Q.    Yes.

3    A.    I don't know.

4    Q.    Of course not.  You have no knowledge of that, correct?

5    A.    Correct.

6    Q.    Okay.  And fair to say you have no knowledge of Donna

7    Heinel being involved with his son's submission?  It went

8    through with Coach Vavic's support, correct?

9    A.    I know that Donna presented his case and Jovan supported

10:17 10   his case.

11   Q.    Do you remember Donna saying anything about his case?

12   A.    I don't remember the discussion at the SUBCO from 2014.

13   Q.    As a matter of fact, you have no basis to claim that Donna

14   even knew Rick Singer back in early 2014, correct?

15   A.    I don't know when she met Singer.

16   Q.    Okay.  Now the SUBCO, did you say it met biweekly, every

17   2 weeks?

18   A.    Generally speaking, yes.

19   Q.    Did you physically gather in a place?

10:17 20   A.    Usually, yes.

21   Q.    Okay.  What if somebody couldn't make the meeting?

22   A.    So, as I mentioned, we only required three voting members

23   to be present.

24   Q.    Okay.  And how long did the meetings last?

25   A.    Couple of hours usually.

1    Q.    How would people communicate about SUBCO activities

2    outside of those meetings?

3    A.    What kind of activities?

4    Q.    If there was, you know, discussion about candidates coming

5    up, or if they needed further work on a candidate, you know, if

6    you needed to discuss actions with respect to SUBCO?

7    A.    Sometimes we would hold and we would bring back the

8    information to a future SUBCO meeting and sometimes we would

9    discuss it via e-mail or phone.

10:18 10    Q.    Okay.  Would it be fair to say using e-mail was a fairly

11    regular practice for members of SUBCO, correct?

12    A.    We use e-mail every day in our work.

13    Q.    And the Admissions staff, correct?

14    A.    Yes.

15    Q.    And with the folks at the Athletics Department that you

16    dealt with, such as Donna Heinel or Alex Garfield, correct?

17    A.    We would sometimes e-mail them and we could sometimes call

18    them, and they us.

19    Q.    Okay.  That was part of your regularly conducted business

10:18 20    on the SUBCO, correct?

21    A.    I think that's part of my every day at the University, to

22    talk to folks around the University.

23    Q.    And who was Katie Fuller?

24    A.    Alex -- after Alex was no longer in the role helping Donna

25    as a liaison to the Athletics Subcommittee, Katie Fuller was in

1       that role.

2       Q.   Could you explain what Katie's role was and what Alex's

3       role was.

4       A.   They were just associates of Donna's who also would

5       present cases to SUBCO.

6       Q.   Would they also help manage the paperwork?

7       A.   Yes.  I believe so.

8       Q.   Keep track of the decisions?

9       A.   I don't know what they did on their end.  We would keep

10:19 10      track of the decisions in the Admission Office.

11      Q.   Okay.  Obviously, the Athletics Department has to keep

12      track of decisions as well, don't they?

13      A.   I presume they would want to let coaches know about the

14      decisions coming out of SUBCO.

15      Q.   And to manage rosters and scholarships?

16      A.   I don't know how that's handled in the -- in Athletics.

17      Q.   Okay.  You said earlier, "We don't make offers of

18      admission in exchange for money."  Do you recall saying that

19      earlier today?

10:20 20      A.   Yes.

21      Q.   Who is the "we" you're referring to?

22      A.   The Office of Undergraduate Admission.

23      Q.   So -- and you're referring to yourself, correct?

24      A.   I'm referring to the authority that the Office of

25      Undergraduate Admission has in making admission decisions.

```
 1    Q.    Okay.  So that would include Tim Brunold, correct?

 2    A.    Yes.

 3    Q.    Okay.  So let's break that down a little bit.  You're not

 4    including the Athletics Department in that statement, correct?

 5    A.    We're the only ones authorized to make undergraduate

 6    admission decisions.  So all undergraduate admission decisions

 7    are made in our office.

 8    Q.    But the Athletics Department can recruit walk-ons to

 9    submit to SUBCO, correct?

10:20 10    A.    Yes.

11    Q.    And they can apply whatever criteria they want to submit

12    for a walk-on, correct?

13              MR. FRANK:  Objection.  Foundation.

14              THE COURT:  Sustained.

15              MR. KENDALL:  She's on the SUBCO, your Honor.  I'll

16    rephrase it.

17    Q.    Are you aware of any rules that restrict what a coach can

18    consider when submitting a walk-on candidate to SUBCO back in

19    2014?

10:21 20    A.    There are not rules.

21    Q.    Okay.  There was nothing in writing that said you can't

22    consider a financial contribution, correct?

23    A.    I don't know what's in writing in the Athletics Office.

24    Q.    You're not aware of anything in writing anywhere that

25    restricted the coach's discretion and what to consider for a
```

1    walk-on recruit, correct?  Just asking what you're aware of.

2    A.   The Athletics Subcommittee is for athletic talent only, so

3    that's the only thing that would be considered in that process.

4    Q.   Is there a written document that says that?

5    A.   I don't know.

6    Q.   You said earlier, several times, "I'm just not familiar

7    with how the coaches manage their rosters."  That's a correct

8    statement?

9    A.   Yes.

10:22 10    Q.   You have no idea back in 2014 how Coach Vavic managed his

11    roster, correct?

12    A.   That's correct.

13    Q.   You have no idea if he considered athletic contributions

14    as a valid contribution to the team's benefit, correct?

15    A.   Again, cases that he was presenting to SUBCO would have

16    been based on the athletic talent alone.

17    Q.   What?  Did Coach Vavic tell you that?

18    A.   That was the expectation of SUBCO.  It was very clear.

19    Q.   Well, you say that expectation of SUBCO was very clear.

10:22 20    Did they give a written statement to Coach Vavic about that?

21    A.   I don't know.

22    Q.   Okay.  You're not aware of any written guidance given by

23    SUBCO in 2014 to Coach Vavic saying you cannot consider a

24    donation when looking at a walk-on candidate, correct?

25    A.   If we believe that was the basis for a coach recruiting a

 1    student, it would not have been appropriate for it to be in

 2    SUBCO.

 3    Q.   Okay.  You said, "we."  Are you including Tim Brunold in

 4    the "we" that you're talking about?

 5    A.   The Office of Admissions, yes, including Tim Brunold.

 6    Q.   Okay.  If I were to suggest to you that Pat Haden and the

 7    people that ran the Athletic Department often considered a

 8    donor's willingness to give when evaluating a SUBCO candidate

 9    that was related to that donor and they kept Mr. Brunold

10:23 10   informed about that, would your statement be, gee, they didn't

11    tell me?

12         MR. FRANK:  I object to the testifying by counsel and

13    the hypothetical.

14         THE COURT:  Sustained.

15    Q.   Well, you testified earlier you never saw a copy of Pat

16    Haden's special interest list, correct?

17    A.   Again, we received a list about athletic advancement

18    interests.  I never saw something that was specific to Pat

19    Haden.

10:23 20   Q.   Okay.  You never saw a list that was entitled Pat Haden's

21    special interest list or Pat Haden's VIP list.  You never saw

22    that?

23    A.   No.

24    Q.   Did Mr. Brunold ever tell you he got it?

25    A.   Not that I'm aware of.

```
1    Q.    Okay.  Would you agree with me, if Mr. Brunold got that
2    list, he might have different information about fundraising at
3    SUBCO than you do?
4    A.    I don't know.
5    Q.    Well, he might have information that would be such that
6    you shouldn't be speaking for him, correct?
7              MR. FRANK:  Objection.  Foundation.
8              THE COURT:  Sustained.
9    Q.    Fair to say you have no idea what Tim Brunold and Pat
10   Haden discussed by e-mail and telephone calls about fundraising
11   and SUBCO, correct?
12   A.    Correct.  I don't know why I would.
13   Q.    They never included you in their e-mail traffic, correct?
14   A.    No.
15   Q.    They never invited you to their phone calls, correct?
16   A.    Correct.
17   Q.    They never -- when the sports department would invite
18   Mr. Brunold to go fly on the football team's private jet to
19   games, they didn't invite you on those trips, correct?
20             MR. FRANK:  Objection.  Facts not in evidence.
21             THE COURT:  Sustained.
22   Q.    Were you ever invited to be on the private jet of the
23   football team to go to a game?
24   A.    No.
25   Q.    Do you know if Mr. Brunold was?
```

```
 1   A.   I don't know.
 2        MR. KENDALL:  Okay.  Could I have Exhibit 1085 on
 3   the -- just for the witness, please.
 4   Q.   You recognize this as an e-mail --
 5        MR. FRANK:  Objection to counsel describing the
 6   document.
 7        THE COURT:  If it's not in evidence, you can't
 8   describe it.
 9   Q.   You testified earlier that it was a routine practice of
10:26 10 the Admissions Department to use e-mail to conduct its
11   business, correct?
12   A.   Yes.
13   Q.   And part of that was to conduct SUBCO business, correct?
14   A.   Yes.
15   Q.   And who do you recognize this e-mail, the "to" and "from"?
16        MR. FRANK:  Objection.  There's not even a "from".
17        THE COURT:  Sustained.
18   Q.   Okay.  Is this an e-mail that's being sent in the regular
19   course of the admissions and SUBCO process?
10:26 20      MR. FRANK:  Objection.
21        THE COURT:  Sustained.
22        MR. KENDALL:  Your Honor, I'd like to offer it,
23   please.  There's no -- there's a stipulation as to its
24   authenticity, and I believe she's laid the foundation for a
25   business record.
```

```
 1              MR. FRANK:  She has not, your Honor.
 2              THE COURT:  No.  It's not going to be admitted.  The
 3      objection is sustained.
 4              MR. KENDALL:  May I approach sidebar, your Honor?
 5              THE COURT:  No.
 6              MR. KENDALL:  Your Honor, it's not for the truth of
 7      the matter asserted.  It's just for notice.
 8              MR. FRANK:  Not notice to this witness.
 9              MR. KENDALL:  To state of mind.
10:27 10        THE COURT:  Yeah.  The objection's sustained.
11      Q.   If it turned out -- if I were to suggest to you that
12      Miss Heinel would e-mail Mr. Brunold Pat's VIP list every
13      couple of weeks during the recruiting season, you would tell us
14      you're completely unaware of that, correct?
15              MR. FRANK:  Objection to facts not in evidence, and
16      he's testifying.
17              THE COURT:  Sustained.
18      Q.   Okay.  Do you know how often the Athletics Department send
19      Pat's VIP list to Mr. Brunold?
10:27 20        MR. FRANK:  I object to this entire continuing line.
21              THE COURT:  He can have that question.
22      A.   I'm sorry.  Can you repeat the question?
23      Q.   Do you know how often the Athletics Department would send
24      Pat's VIP list to Mr. Brunold?
25      A.   I wouldn't know anything about it.
```

1    Q.   And you've never seen the list, correct?

2    A.   That's correct.

3    Q.   Nobody's ever shown it to you and Mr. Brunold never

4    discussed it with you?

5    A.   No.

6    Q.   Okay.  But you're stating -- when you say we would never

7    take finances or donations in consideration, you're including

8    Mr. Brunold in that as well, correct?

9    A.   I didn't state that we wouldn't take them into

10:28 10    consideration.  I said that we don't make offers of admission

11    in exchange for money.

12    Q.   Well, what's the difference between taking it into

13    consideration and making an exchange for money?

14    A.   I think there's a big difference.

15    Q.   Well, if the student does not qualify to be in a SUBCO

16    team but the parent gives a donation and you voted to approve

17    them, is that an exchange for money, or is that just part of

18    the consideration?

19         MR. FRANK:  Objection.  Compound.

10:29 20         THE COURT:  All right.  It is a compound question.

21         MR. KENDALL:  Okay.  I'll rephrase it.

22    Q.   Do you remember voting to admit a SUBCO candidate walk-on

23    for the golf team whose father gave $3 million to the Athletics

24    Department at the same time?

25         MR. FRANK:  Objection.  This is contrary to the

 1    Court's Order.

 2              THE COURT:  Sustained.

 3              MR. KENDALL:  Your Honor, I'm trying to impeach the

 4    witness.

 5              THE COURT:  That's beyond.  Sustained.

 6    Q.   Okay.  Did you ever vote in favor of accepting SUBCO

 7    candidates who were not good enough to be on a USC team, but

 8    whose parents were making contributions?

 9    A.   If I voted to approve a student in the SUBCO, it was

10:29 10    because I was convinced that their athletic talent would

11    contribute athletically to the University.

12    Q.   Meaning you thought they could actually be an athlete that

13    would perform on the team and be someone who is playing in

14    matches and games?

15    A.   That's what was presented to us.

16    Q.   Okay.  And are you aware of that one time of someone whose

17    father gave $3 million?

18              MR. FRANK:  I object.

19              THE COURT:  She can say whether she's aware of it.

10:30 20    A.   We were not -- no. I was not aware of it and the Athletics

21    Subcommittee were focused only on the student's athletic

22    talent.

23    Q.   When I refer to a golf walk-on whose father gave

24    $3 million, do you know who I'm talking about?  Just yes or no.

25    A.   No.  No.

1    Q.    So if you voted on a golf walk-on and the father had

2    already agreed to give $3 million and Mr. Brunold knew that, he

3    didn't tell you that?

4              MR. FRANK:  I object, your Honor.

5              THE COURT:  Sustained.

6    Q.    Okay.  So would it be fair to say every time you voted on

7    a SUBCO candidate at meetings, you were unaware of any deals

8    being made about donations, correct?

9    A.    The focus of the athletic SUBCO is on the athletic talent

10:30 10   of the student, and that's the only thing that is under

11   consideration of whether or not they're approved as a student

12   athlete.

13   Q.    If you can answer my question, please.  I want to know

14   what you were aware of.  If at any time that you voted on a

15   SUBCO candidate, were you aware that there had been a

16   discussion about a donation with the parent?

17   A.    If we were aware of that, that was set aside for us to

18   focus on the athletic talent.

19   Q.    You didn't answer my question.  Were you aware of that?

10:31 20   A.    There have been cases where we have also known that a

21   student is of interest to the Advancement Office or of interest

22   to Athletic Advancement, but in the Subcommittee, we're focused

23   on the student's athletic talent alone.

24   Q.    Are you aware of anybody who was a SUBCO candidate for

25   golf that you were told the father was going to make a

1   donation?

2   A.   No.

3   Q.   Okay.  What about for tennis?  Were you ever told about

4   anybody who was going to make a donation for tennis and that

5   had been negotiated at the same time as their SUBCO application

6   was being submitted?

7   A.   I don't remember ever single student who's been presented

8   to me in SUBCO over, you know, many, many years, so I can't

9   recall every single instant of every single student and what

10:32 10   was told to me.  I can tell you that in the Athletics

11   Subcommittee we were solely focused on the athletic talent of

12   the student.

13   Q.   Were you aware of any tennis SUBCO candidate from the East

14   Coast whose father committed to give $500,000 at the time?

15        MR. FRANK:  Objection to him testifying.

16        MR. KENDALL:  Your Honor, I have a good faith basis

17   based upon documents I've been given.

18        THE COURT:  He can ask the question if she is aware of

19   that.

10:32 20   A.   I refer back to my previous response.  I don't remember

21   every single student from hundreds of SUBCO meetings that we

22   had and what information was, you know, available at the time

23   that we met.  In the Athletic Subcommittee, we're focused

24   solely on the student's athletic talent.

25   Q.   Do you remember a single candidate where Mr. Brunold told

```
 1    you that there had been a donation being discussed with the
 2    Athletics Department?  Can you recall a single time he gave you
 3    that information?
 4    A.   Not specifically, no.
 5    Q.   Generally?
 6    A.   Again, we were sometimes aware that there were students
 7    who were also of interest to other folks around the University,
 8    of interest to the Advancement Office, but in the Athletic
 9    Subcommittee, we were focused solely on the student's athletic
10:33 10    talent.
11          MR. KENDALL:  Mr. Carter, if you could do me a favor,
12    I'd like to put up, just for the witness, please, could you put
13    up Exhibit 7238, page 9.
14          MR. FRANK:  Can we have a copy, Mr. Kendall?
15          MR. KENDALL:  I think we're going to get you one right
16    now.  Yeah.  Tab 36.
17    Q.   Do you recognize this document?
18          MR. FRANK:  Your Honor, if he's going to impeach her
19    for it --
10:34 20          THE COURT:  I'm sorry?
21          MR. FRANK:  This document is not in evidence.
22          MR. KENDALL:  You're right.  It's for impeachment.  I
23    want to see if she'll identify it first.
24          THE COURT:  Okay.
25    A.   Yes.  This is a SUBCO document.
```

```
 1    Q.   And are those your initials there in the approval?

 2              MR. FRANK:  Objection, your Honor.

 3              THE COURT:  It's not in evidence, so you can't start

 4    examining her about the document.

 5              MR. KENDALL:  I just want to get her initials and then

 6    I was going to offer it, your Honor.

 7    Q.   Are those your initials on the document?

 8    A.   Yes, RJC.

 9              MR. KENDALL:  Okay.  I'd like to offer page 9 of 7238

10:35 10    into evidence.

11              MR. FRANK:  Objection.  Relevance.  Directly contrary

12    to the Court's Order.

13              MR. KENDALL:  It's direct impeachment, your Honor.

14    They've opened the door.

15              MR. FRANK:  And no impeachment --

16              THE COURT:  The objection is sustained.

17    Q.   Do you remember this candidate?

18              MR. FRANK:  Your Honor, could we wait until I have a

19    copy of the document?

10:35 20              THE COURT:  Yes.

21              MR. KENDALL:  We refer to this candidate as 843, so I

22    want to use the 843, not their actual name.

23    Q.   By looking at --

24    A.   I don't have anything on my screen.  Am I supposed to be

25    looking at something?
```

```
 1    Q.   When you looked at it before, did it refresh your
 2    recollection as to who the candidate was?
 3    A.   A document with no student's name on it?
 4    Q.   Okay.  We're working with a protective order.
 5              MR. KENDALL:  Your Honor, may I tell her who the name
 6    is, show her a document that will refresh the rest of the name?
 7              THE COURT:  You can show her anything to refresh her
 8    memory.  Then you take the document down and ask if it does.
 9              MR. KENDALL:  I have it here, your Honor.  May I walk
10    it over?
11    Q.   I'm going to show you a document that has a name on it.
12    Then I'm going to ask you if you recall being involved in that
13    SUBCO decision.  And if so -- this is 843.
14    A.   I don't recall that name.
15              MR. FRANK:  Okay.  May I see what the witness is being
16    shown?
17              THE COURT:  Yes.  Show counsel.
18              MR. KENDALL:  Sure.  I need to show it to her.
19    Q.   With that, do you recall who that is?
20    A.   I don't.
21    Q.   Okay.  So you have no memory of a golf walk-on in 2015
22    with what I've just refreshed your recollection?
23    A.   I don't have a -- I don't recall that student.
24    Q.   To assess the athletic talent in a golfer, do you know how
25    many strokes they should be hitting above par?
```

 1    A.    I rely on the information that's presented by the coach

 2    about how the student ranks among other high school golfers or

 3    among other members of the USC golf team.

 4    Q.    Do you remember in 2015 having a golf walk-on candidate

 5    whose scores were sometimes 20 strokes above par?

 6          MR. FRANK:   I object, your Honor.   This is beyond the

 7    scope, and it's directly contrary to the Court's Order.

 8          THE COURT:   He can have whether she remembers that

 9    specific case.

10    A.    I don't remember this specific student.

11    Q.    Okay.   And it'd be fair to say you don't evaluate whether

12    20 strokes or not is good, 20 strokes above par is good, for a

13    Division 1 golf team, because it's the coach's decision that

14    you defer to, correct?

15    A.    Yes.   We're looking to understand the student's athletic

16    talent in this -- you know, among other high school golfers in

17    this case or -- and/or among the USC golf team.

18    Q.    But you told us, I think earlier, that really the only

19    reason somebody gets rejected at SUBCO is for academics, not

20    for athletics, correct?

21    A.    That's primarily the reason, yes.

22    Q.    You refer to the coach's judgment?

23    A.    Yes.   We expect that the coaches are bringing athletically

24    talented students who will contribute to their team, contribute

25    athletically.

```
 1   Q.   Contribute to the team in a way that the coach has
 2   decided?
 3   A.   Athletically.
 4   Q.   Have you -- did you ever put that in writing, coaches, it
 5   has to be athletic only that you consider when you do a
 6   submission to SUBCO?  You never told them that, did you?
 7   A.   That was our clear expectation.
 8   Q.   That was your clear expectation, but you didn't make it
 9   clear to the Athletics Department now, did you?
10   A.   I believe coaches wanted to have students who would
11   contribute to their teams athletically.
12   Q.   Yes.  And if they include a financial contribution as part
13   of that consideration, it did not violate any rule that applied
14   to the Athletics Department, correct?
15        MR. FRANK:  Objection.  Foundation.
16        THE COURT:  Sustained.
17   Q.   Any rule that you're aware of and -- that you're aware of
18   at the Athletics Department, correct?
19        MR. FRANK:  Objection.  Foundation.
20        THE COURT:  He can have what she was aware of.
21   A.   I'm sorry.  Can you repeat the question?
22   Q.   And if they included contributions as part of their
23   assessment of what would be the contribution to the team, that
24   did not violate any rule that you're aware of that applied to
25   coaches in the Athletic Department?
```

```
 1    A.    I'm not aware of the rules in the Athletic Department.
 2    Q.    Okay.  You worked with Coach Vavic, didn't you?  Excuse
 3    me.  You didn't work with Coach Vavic.  You worked with SUBCO
 4    applications to the water polo team, correct?
 5    A.    Yes.
 6    Q.    Okay.  And do you recall that Vavic only had about four
 7    and a half scholarships a year to give out?
 8    A.    I don't remember the exact scholarship allocation to the
 9    water polo team.
10    Q.    Okay.  He had a small number of scholarships, fair to say?
11    A.    I don't know the exact number of scholarship to his
12    specific team.
13    Q.    Does four or five for water polo sound in the ball park?
14    A.    I just couldn't say.
15    Q.    Okay.  You never discussed with Jovan Vavic his recruiting
16    philosophy, correct?
17    A.    We wouldn't speak with coaches directly, no.
18    Q.    Or his coaching philosophy, correct?
19    A.    We didn't speak with coaches directly.
20    Q.    Do you know how many water polo players are in the pool in
21    a game at any one time?
22    A.    I'm not sure off the top of my head.
23    Q.    Do you know how many athletes play during a game?
24    A.    I'm not sure off the top of my head.
25    Q.    Do you know how many athletes he recruited in 2014, the
```

1    year that Johnny Wilson was recruited?

2    A.    I don't have those data.

3    Q.    Do you -- were you aware that there had been a tragedy in

4    2013 and a lot of the team members had left the team in the

5    prior year?

6    A.    I'm not aware of that.

7    Q.    You're not aware of one of the athletes having a tragic

8    death and a bunch of team members then leaving the team because

9    of it?

10:41 10    A.    I'm not aware of that.

11    Q.    So you don't know if Vavic needed a particularly large

12    class of recruits in 2014 or not, correct?

13    A.    I don't have any recollection of that time frame

14    specifically and his needs.

15    Q.    Do you know how many players were recruited in 2014?

16    A.    I don't have those data.

17    Q.    If I were to suggest 17, would that refresh your

18    recollection?

19    A.    You know, again, we look at the SUBCO athletes that are

10:42 20    presented at each meeting.  I haven't gone back to reconcile

21    the entire group of students for the whole year, and not every

22    student who is presented will ultimately enroll.

23    Q.    And would you agree with me there's a lot of reasons why a

24    water polo coach might want to have a large team?

25    A.    I don't know the details of -- I don't know how he decides

1    how many students to have on the team.

2    Q.    Players get injured, correct?

3    A.    I assume players get injured doing most sports.

4    Q.    And they need to be replaced when they're injured?

5              MR. FRANK:  Objection.  Foundation.

6              THE COURT:  Sustained.

7    Q.    And, also, with the quality of USC's coaching and

8    resources, they can often develop a player in to being a much

9    better athlete, correct?

10:42 10   A.    I believe most students, as they continue to play, will

11   develop and become stronger athletes while they're at USC.

12   Q.    But USC's got great coaches, correct?

13   A.    I believe so.

14   Q.    They know how to develop talent, correct?

15   A.    Sure.

16   Q.    And do you also know that a lot of the athletes recruited

17   for water polo were red shirts?

18   A.    I'm not aware of, you know, the decisions that are made

19   about red shirting.

10:43 20   Q.    So you don't know how many of the entering class in 2014

21   were red shirts and how many were not?

22   A.    I do not.

23   Q.    And do you know how Vavic runs practices and drills for

24   the team?

25   A.    I've never been to a water polo practice.

```
 1   Q.   So you don't know if it's beneficial to him to have a
 2   larger team to run practices and drills, correct?
 3   A.   I don't know.
 4   Q.   Okay.  Now -- and there's also attrition on the teams.
 5   People quit over time, correct?
 6   A.   I don't have the details of that.
 7   Q.   So you don't really know much at all about how the
 8   Athletics Department operates, do you?
 9   A.   I don't work in the Athletics Department.
10   Q.   And you don't talk to them about your SUBCO work at all,
11   correct?
12   A.   I speak to the liaisons to the SUBCO and get information
13   when we need more information.
14   Q.   And when Tim Brunold speaks to Pat Haden about his VIP
15   list, they don't tell you about that at all, correct?
16        MR. FRANK:  Objection.  Asked and answered.
17        THE COURT:  Sustained.
18        MR. KENDALL:  I'd like to put up on the screen, for
19   the witness only, Exhibit 7950.
20   Q.   Do you recognize that?
21   A.   Yes.
22   Q.   Okay.  You were talking earlier yesterday about grades and
23   scores and the number of people being admitted at USC, correct?
24   A.   Yes.  I referred to data from 2018.
25   Q.   Okay.  And what do you recognize Exhibit 7950 to be?
```

A.    Our freshman profile from the class that entered in fall

2013.

Q.    Is that something put together by the Admissions Office?

A.    Yes.

Q.    Okay.  And you put it on your website so people who were

applying would have a sense of where they fit in for the

applicant pool?

A.    Yeah, and letting folks know about, you know, how proud we

are of our class and what our class -- what the makeup of our

class looks like.

Q.    And this is on the internet for everybody to see, correct?

A.    Correct.

Q.    And what are the intended audiences of potential

applicants, correct?

A.    Potential applicants, their families, counselors, anybody

who's interested in sort of what's happening with the entering

class at USC.

        MR. KENDALL:  Okay.  Your Honor, I'd like to offer

Exhibit 7950 into evidence.

        THE COURT:  It will be admitted.

        (Exhibit 7950 admitted into evidence.)

        MR. KENDALL:  Okay.  If we can show the jury, please.

Q.    So if we look at the top, it says "University of Southern

California Freshman Profile and Admission Information",

correct?

1    A.    Yes.

2    Q.    And if we look into that gray box, we see that 47,000

3    people applied, about 9,400 were admitted, and about 2,922

4    enrolled, correct?

5    A.    Yes.  I see those numbers.

6    Q.    Okay.  And the SUBCO people are done in a category

7    separate from the nonathletes, correct?

8    A.    The admission process is different, but they're included

9    in these numbers.  They're a part of the freshman class.

10:46 10   Q.    Yes, but it's a different consideration and a different

11   bucket of people being decided on?

12   A.    Just a different process, not really a different bucket.

13   Q.    Okay.  And if we take a look further down where it says

14   the "The Middle 50 percent SAT composite" for those who are

15   enrolled, it's 29 to 33, correct?

16   A.    That's for the enrolled class.  The admits are usually a

17   little bit higher.

18   Q.    The applicants are a bit lower, correct?

19   A.    Correct.

10:47 20   Q.    Okay.  So for the people who actually show up and want to

21   go to USC, if you've got a 29 on your SAT, you're in that

22   middle 50 percent of the class, correct?

23   A.    Right, meaning 25 percent of our enrollees have above 33

24   and 25 percent of our enrollees have below a 29.

25   Q.    Right.  And the 25 percent above the 33, a lot of them get

```
 1    merit scholarships for academics, correct?
 2    A.    Some of them do.
 3    Q.    Trustee Scholars, Presidential Scholars?
 4    A.    Some of them do.
 5    Q.    It's a way to attract really gifted academic people to
 6    come to USC and not another school?
 7    A.    Sure.  That's part of our merit scholarship program.
 8    Q.    You could say, you know, I can either get a free ride to
 9    USC, or I can pay to go to UCLA.  I'll take the free ride.
10    Correct?
11    A.    It's just for tuition, but sure.
12    Q.    Okay.  And then those who fall in the bottom 25 percent
13    that are below the 29, that could be athletes, correct?
14    A.    It could be.
15    Q.    It could be the children of VIP donors?
16    A.    It could be any student who chooses to enroll who was
17    admitted.
18    Q.    But anybody who's got a 29, that's the middle of the
19    class, the middle 50 percent.  That's why you segregate out
20    that number, let people know what's the sort of middle of the
21    class score, correct?
22    A.    It's a fairly typical data point for colleges to present
23    and let folks know about.
24    Q.    Okay.  And then you have the "mean GPA (un-weighted)",
25    3.73, correct?
```

1    A.    That's for the enrolled class, correct.

2    Q.    Yes.  And that means -- that's not adjusting or giving

3    people a benefit for taking a lot of AP classes, correct?

4    A.    Right.  That's just the unweighted GPA based on their

5    academic coursework.

6    Q.    And a lot of people don't take AP classes and challenging

7    classes, correct?

8    A.    Many of our applicants will take more advanced coursework.

9    That's pretty typical for us to see that students have chosen

10:48 10    to challenge themselves in high school as they prepare for

11    college.

12    Q.    Many will, but many will not, correct?

13    A.    I would say the vast majority have taken advanced

14    coursework.

15    Q.    Okay.  But a lot of the athletes may not have, correct?

16    A.    Some of them have and some of them haven't.

17    Q.    Okay.  Well, you testified yesterday that one of the

18    things about the SUBCO process is the athletes usually have

19    lower academic numbers than the nonathletes, correct?

10:49 20    A.    As a group.

21    Q.    Yeah.  And also, the VIP, many of the VIP donor candidates

22    may not have the most challenging coursework, correct?

23    A.    Again, some of them may and some of them may not.

24    Q.    Okay.  And so with Johnny Wilson, the SUBCO added .5 to

25    his GPA because of the AP courses he took and the curriculum he

```
 1   took, correct?

 2   A.   Part of it was based on the preparation he was getting

 3   from the high school that he attended and part of it was based

 4   on the rigor of the coursework that he chose.

 5        MR. KENDALL:  Okay.  I'd like to put up on the screen

 6   Exhibit 1116, please.

 7        MR. FRANK:  For the witness only?

 8        MR. KENDALL:  For the witness only, of course, yes.

 9   Q.   Do you see Exhibit 1116?

10   A.   Yes.

11   Q.   Okay.  And you recognize the e-mails to and from?

12   A.   I know who those people are.

13   Q.   Yeah.  And without going into details, it concerns SUBCO?

14   A.   Yes.

15   Q.   Okay.  And if you take a look --

16        MR. KENDALL:  Your Honor, I'd like to offer it,

17   please.

18        MR. FRANK:  Objection.

19        MR. KENDALL:  It's a SUBCO document.

20        MR. FRANK:  Objection.

21        THE COURT:  Sustained.

22   Q.   Take a look at page 2.  Have you ever seen this type of

23   list before without the redactions?

24        MR. FRANK:  Objection, your Honor.  He can ask her

25   impeachment questions about it.
```

1        MR. KENDALL:  Your Honor, I'm looking to use this for

2   impeachment.  I'm trying to lay a foundation.  That's all.

3        MR. FRANK:  He doesn't need to lay a foundation for

4   impeachment.

5        THE COURT:  Show her the document.  Take it down.  Ask

6   her whether it refreshes her memory.

7   Q.   Okay.  If we could --

8        MR. KENDALL:  May I just ask her if she's seen this

9   before, your Honor, this type of document before?

10:51 10       THE COURT:  You can ask that.

11  Q.   Have you seen this type of chart before without

12  redactions?

13  A.   No.

14       MR. KENDALL:  Okay.  If we could turn to, Mr. Carter,

15  where it says "spring".  I'm going to count pages.  1, 2, 3, 4,

16  5, 6, 7, 8, 9, 10, 11, 12, to 13, where it says "M. Water

17  Polo".

18  Q.   Does this document refresh you as to the --

19  A.   I don't have anything on my screen.

10:52 20  Q.   Oh.  I'm sorry.  I'm a little ahead of things.  Okay.  Do

21  you see the list there?

22  A.   No.

23  Q.   Do you see it now?

24  A.   Yes.

25  Q.   Does that refresh you as to the large size of the class?

                    MR. FRANK:  Take the document down, please.

                    THE COURT:  Take the document down.

                    MR. KENDALL:  Okay.  Take the document down.

Q.   Does that refresh you as to the size of the class that was
admitted in 2014 with Mr. Wilson?

A.   No.

Q.   Okay.  Mr. Wilson's suggested GPA was 3.87.  Would you
agree with me that's high for a water polo walk-on?

A.   I don't know off the top of my head.

Q.   Well, you've been doing SUBCO admissions for how many
years?

A.   Many.

Q.   How many?

A.   Probably 14 or 15.

Q.   And in your -- based upon your 14 or 15 years experience
reviewing SUBCO applicants for water polo candidates, would you
agree with me that 3.87 is a pretty high grade point average
for a water polo candidate?

A.   I wouldn't be able to speak to a specific sport, but yes.
3.87 would be a strong GPA among our student athletes.  It's
not a very competitive GPA among our overall applicant pool and
our students that we admit.

Q.   But for student athletes, put him up in maybe the top
20 percent or so for GPA's, rough numbers?

A.   I just haven't looked at those data.

1    Q.    Okay.  And if they had a 29 on the ACT, would you agree

2    with me that would be a high score as well for water polo

3    walk-on candidates, correct?

4    A.    Among all student athletes, that would appear to be a

5    stronger score, but, again, among our overall applicant pool,

6    it's not --

7    Q.    I'm asking you about the athletes.  Please limit your

8    answer to my question.

9          My question was for water polo walk-on candidates.  A

10:54 10   29 is a high -- is a relatively high ACT score, correct?  Yes

11   or no?

12   A.    I can't answer that question.

13   Q.    So after 15 years of looking at water polo walk-on files,

14   you have no memory of what's a good score or a not so good

15   score on the ACT for a water polo candidate?

16   A.    You asked me specifically about water polo walk-ons, and

17   that's very specific.  I don't feel comfortable, you know,

18   asserting something that I can't be sure of.  I haven't

19   reviewed those data specifically.

10:55 20   Q.    Okay.  So for general athletic walk-ons, is 29 a pretty

21   good score?

22   A.    I think it's fine.  I think we see, you know, again,

23   students with above and below that among our recruited

24   walk-ons.

25   Q.    But that's certainly in the top half, isn't it?

1    A.    I wouldn't be able to say.

2    Q.    After 15 years, you can't say?

3    A.    I wouldn't feel comfortable, you know, saying that without

4    looking at the data.

5              MR. KENDALL:  If we could go to Exhibit 107, please.

6    That was put into evidence yesterday.

7    Q.    Do you remember testifying about this profile yesterday?

8    A.    Yes.

9    Q.    Do you agree with me you want the information to be

10:56 10   accurate, correct?

11   A.    Yes.

12   Q.    So if somebody put down SAT scores that were not the

13   student's best numbers, you'd want to see the best numbers for

14   their college boards, wouldn't you?

15   A.    We'd be happy to see new scores if there were new scores

16   presented.

17   Q.    Or old scores that were just left off that were better

18   scores, correct?

19   A.    Sure.

10:56 20   Q.    And if somebody -- if these SAT scores are like the

21   86th percentile or lower and the ACT scores are in the

22   93rd percentile, it would be helpful for the SUBCO to see the

23   best scores, correct?

24   A.    We don't really look at the percentile range.  We mostly

25   are going to be focused on the individual scores, and we would

compare the SAT to the concorded ACT, concorded to an ACT score
and look at those two scores.  There can be differences in
scores that are not statistically significant.

Q.   You'd want to see the 29 if the person got a 29, wouldn't
you?

A.   We're happy to see any scores that the student wants
presented on their behalf.

Q.   Right.  And most students would want to give you their
best scores, correct?

10:57  A.   Sure.

Q.   Okay.  I'd next like to go to in Exhibit 107, the bates
ending in 9805, which is the Alejandro Garfio e-mail.  You
testified yesterday that you thought speed was an important
factor for water polo candidates.  Do you remember that?

A.   Based on the coach's assertion that that was something he
was very interested in.

Q.   Okay.  And let's take a look at this assertion.  "The kid
would be the fastest player on our team, he swims 50 yards in
20 seconds".  Okay.  That's a statement that the coaches made,

10:57  correct?

A.   Yes.

Q.   You don't know where he got that information from?

A.   I don't.

Q.   Okay.  You don't know if my client knew anything about
that representation, do you?

         1    A.    There's no way for me to know where Jovan got that

         2    information.

         3    Q.    And then he says, "My fastest players are around

         4    22 seconds".  Do you see that?

         5    A.    Yes.

         6    Q.    Do you agree with me somebody who is a high school

         7    sophomore could swim around 22, as the fastest player on the

         8    best water polo team in the country, would be a pretty good

         9    candidate, wouldn't you?

10:58   10    A.    I'm sorry.  Can you repeat the question?

        11    Q.    Yes.  If, in fact, this said he swims as fast as my

        12    fastest players, they're all around 22 seconds, that would be a

        13    very impressive credential, wouldn't it?

        14    A.    Again, I was trusting the coach in asserting that the

        15    student swam very fast, that that was important to this

        16    student's athletic talent and contribution to the team.

        17    Q.    Yes.  And if he expressed it as he swims very fast

        18    because, as a sophomore in high school, he can swim as fast as

        19    the fastest people on the USC water polo team, that would be an

10:59   20    impressive credential to the SUBCO, wouldn't it?

        21    A.    Yes, based on the coach's assertion that the swimming fast

        22    is important to him.

        23    Q.    Yes.  So whether he's the fastest on the team or just one

        24    of the fastest on the teams, either way it's a good athletic

        25    credential, correct?

1    A.    Yes.

2    Q.    And you're not here to dispute any of his athletic

3    credentials, are you?

4    A.    No.  I have now learned that the athletic credentials that

5    were presented to us --

6    Q.    Excuse me.  That's hearsay.  You don't have personal

7    knowledge of anything, do you, correct?

8    A.    I know that students who were recruited did not -- were

9    not recruited by coaches.

11:00 10    Q.    Excuse me.  You don't know anything about Johnny Wilson's

11    recruitment process and Coach Vavic's involvement.  You only

12    know hearsay that somebody told you, correct?

13    A.    I know what was presented to me.

14    Q.    Okay.  You know somebody told you a story, correct?

15    A.    I'm sorry?

16         MR. FRANK:  Objection.

17    Q.    You did not observe a witness, any of the interactions

18    with the coach and the involvement of Johnny Wilson's

19    recruitment?

11:00 20    A.    I did not observe that coach recruiting Johnny Wilson.

21    Q.    Do you know that the USC coaches called his high school

22    coach?

23         MR. FRANK:  Objection.  Foundation.  Background.

24         THE COURT:  Sustained.

25    Q.    You'd agree with me, if USC called a highly respected high

1   school coach and the coach gave a strong recommendation, that

2   would be an important consideration, wouldn't it?

3          MR. FRANK:  Objection.  Hypothetical.

4          THE COURT:  Sustained.

5   Q.   In the SUBCO process, is one of the factors you look at

6   recommendations from high school coaches?

7   A.   They're sometimes included, but very rarely.

8   Q.   Okay.  Well, if there's a very strong, highly successful,

9   top high school coach of his very successful teams, is that

11:01 10   something that the coaches are often talked to before they

11   submit their SUBCO request?

12   A.   I'm sorry.  Can you repeat your question?

13   Q.   Sure.  I probably should rephrase it and not repeat it.

14          Coaches have different ways to evaluate the talent

15   they're recommending for SUBCO, correct?

16   A.   Yes.

17   Q.   One of those ways they evaluate is to talk to the person's

18   high school coach, correct?

19   A.   I'm aware that's one of the ways that they might find out

11:01 20   about a student.

21   Q.   And would you agree with me there are certain high school

22   programs that are known for producing high quality athletes

23   year after year?

24   A.   I'm sure there's strong teams at certain high schools.  I

25   don't know the details of that.

1    Q.    Right, and I'm just asking the general proposition.   There

2    were some high schools that have great coaches and great

3    traditions, just like USC does?

4    A.    Sure.

5    Q.    And year after year they produce high quality teams?

6    A.    Sure.

7    Q.    And it's -- and based upon your 15 years at SUBCO, you

8    know one of the ways that a coach may evaluate a high school

9    athlete is to talk to a highly regarded high school coach?

11:02 10   A.    Yes.

11    Q.    Okay.  And if the highly regarded high school coach were

12    to give the person a strong recommendation, that, too, would be

13    an important factor to be considered in their admissions,

14    correct?

15    A.    It's not really considered by the Admission Office, but I

16    could see that that would be a basis by which a coach would

17    want to recruit a student.

18    Q.    Okay.  Would you agree that when you're discussing what

19    you think was the expectation of what SUBCO had with respect to

11:04 20   donations, the only person whose e-mails you're familiar with

21    to make that statement are your own, correct?

22    A.    I'm not sure what you're referring to.

23    Q.    Well, you testified earlier you did not see Mr. Brunold's

24    e-mails with Pat Haden, correct?

25    A.    Correct.

```
 1    Q.   And you didn't see Mr. Brunold's e-mails with Donna
 2    Heinel, correct?
 3           MR. FRANK:  Objection, your Honor.  We've been over
 4    this.
 5           THE COURT:  Overruled.
 6    Q.   And you didn't see Kirk Brennan's e-mails on the topic
 7    either, did you?
 8    A.   No.  My understanding of that being the expectation has to
 9    do with it being stated --
 10   Q.   Excuse me.  I asked you what e-mails you saw.
 11   A.   Okay.
 12   Q.   If you can just limit your answer to my question, please.
 13   I'd appreciate it.  Mr. Frank can ask you what he thinks
 14   appropriate.
 15          MR. KENDALL:  Your Honor, now might be a good time for
 16   the break, if it's convenient.
 17          THE COURT:  How much more do you have?
 18          MR. KENDALL:  I have a bit more, but I want to cut out
 19   some things.  So if I have 10 minutes, it will be shorter.
 20          THE COURT:  All right.  We'll take the morning recess
 21   here for 15 minutes.  Jurors, we'll be in recess for 15
 22   minutes.
 23          (Jury exits.)
 24          THE COURT:  Please be seated, counsel.
 25          You may step down, Miss Chassin.
```

1          Approximately, how much longer on cross?

2          MR. KENDALL:  That's what I want to look at and cut

3    down, your Honor.  My original plan would have been another

4    45 minutes to an hour.  I'm going to try to shorten that.

5          May I ask the Court for a little bit of guidance,

6    because I don't want to flounder and do things that are not

7    going to lead to productive testimony?  I'm trying to

8    understand what's going to be the acceptable form of

9    impeachment of this witness, your Honor.

11:06 10          I have a large number of documents that I think

11    directly contradict her testimony about "we didn't take money

12    into consideration at SUBCO."  Her boss did.  Her boss was

13    fully informed and was discussing it with Pat Haden and

14    coordinating admissions decisions based upon donations.

15          I have it all in the documents, your Honor.  I thought

16    that was appropriate impeachment because she's testified these

17    are business records.  She said the e-mails were of regularly

18    conducted activity for both the SUBCO and the Athletic

19    Department people that participated in SUBCO.  I would like to

11:07 20    use those documents with her to impeach that exact statement

21    that she made yesterday and today and I want to know if I'm

22    allowed to do that with the documents she's validated as

23    business records.

24          MR. FRANK:  She's done the furthest thing from

25    validating business records, your Honor.  She said that they

1    use e-mail in the course of their business, just like they use

2    the phone, just like they use an in-person meeting.  That

3    doesn't make something a business record.  That's number one.

4         Number two, she can't be impeached on something she's

5    never seen.  It's completely irrelevant to her.  It's a

6    communication between two other people.  She can be shown the

7    document.  She can be asked if it refreshes her recollection,

8    but it's not impeachment.

9         MR. KENDALL:  If I may respond, your Honor?

11:07 10       THE COURT:  Yes.

11        MR. KENDALL:  She's testified what "we" did.  And "we"

12    included Tim Brunold.  I think I have a right to impeach her

13    that she's testifying about things that she's factually wrong

14    on.  Whether it's good faith or bad faith, she should be

15    impeached if she's making a false statement to the jury.

16        THE COURT:  Well, you can show her a document and ask

17    if it refreshes her memory, but I'm not going to allow the

18    admission of these documents that she hasn't seen and that

19    she's not involved with, but -- so you can take what I've ruled

11:08 20    so far during your first 45 minutes of cross as guidance as to

21    what I'm going to let in and what I'm not.  I'm not going to

22    let in the documents, such as those you've offered thus far.

23    You can show documents to her and ask her if it refreshes her

24    memory about something that she has told you she doesn't

25    remember.

1          MR. KENDALL:  Your Honor, I'm not trying to impeach

2     her --

3          THE COURT:  I'm not going to have a further argument

4     on this now.  We're going to be in recess for 15 minutes.

5          MR. KENDALL:  May we speak when we come back, your

6     Honor?

7          MR. SHEKETOFF:  Can I show you the document we filed

8     this morning, which I'm not sure you've had a chance to see

9     yet, on this exhibit that I wanted in, and we can talk?

11:09 10          THE COURT:  Have you filed this?

11          MR. SHEKETOFF:  Yes.  We filed it.

12          THE COURT:  Then we have it, presumably. So this is a

13     second copy.

14          MR. KENDALL:  Your Honor, at the end of the break, may

15     I have 5 minutes to just get some guidance from the Court?

16          THE COURT:  You can have 2 minutes.

17          We're in recess.

18          (Recess taken 11:09 a.m. to 11:31 a.m.)

19          THE CLERK:  All rise.

11:31 20          (The Court entered the courtroom.)

21          THE CLERK:  Thank you.  You may be seated.

22          THE COURT:  You may step down for the time being,

23     Ms. Chassin, since we need to consider some matters before you

24     resume your testimony.

25          Just at the break the defendants submitted a motion to

introduce an exhibit, 1288.  Has the government had a chance to
review that motion?

          MR. FRANK:  We just read it, your Honor.

          One concern I have about the motion is that it appends
as an exhibit the text exchange -- on the public record the
text exchange that the defendant is seeking to introduce into
evidence.

          I haven't had a chance to look back at the protective
order, but I believe it violates the protective order to have
that document on the public record; and, in any event, it's not
in evidence, it should not be on the public record.  We ask
that the document be taken off of ECF.

          MR. KELLY:  That's incorrect, it doesn't violate the
protective order.  The student being named is his kid.
Everyone knows his kid is a subject of this public trial, so
there's no violation of a protective order.

          It's an attachment to a very brief motion about that
particular exhibit on the issue of its admissibility.  It's
Mr. Sheketoff's witness, he's going to argue that, but there's
no violation of any protective order here.

          THE COURT:  All right.

          You state at the bottom of the first page that it is
offered for the state of mind of the University of Southern
Cal's Department of Admission.

          The state of mind of the USC's Department of Admission

```
 1    is a policy, is it not?

 2           MR. SHEKETOFF:  So, this witness repeatedly says "we,"

 3    and she states the policy for the SUBCO.  And we have two

 4    admissions officers discussing this very applicant.

 5           THE COURT:  And you're offering this as what the

 6    policy of the Southern Cal's Department of Admissions is.  If

 7    that isn't for the truth of the matter, I don't know what is.

 8           MR. SHEKETOFF:  So more often --

 9           THE COURT:  This is not offered not for the truth.
```
11:33 10    It's offered for the defendants' case that the admissions
```
11    department at the University of Southern Cal wanted to take

12    money for spots.

13           MR. SHEKETOFF:  No, it's offered to show, because she

14    denies it, that admissions officers knew at the time in their

15    mind, other admissions officers, one of whom was actually on

16    SUBCO --

17           THE COURT:  Just because these are two admissions

18    officers doesn't mean that she endorses everything they say

19    just because they work for her.
```
11:34 20           MR. SHEKETOFF:  I agree, your Honor.  In fact, she's
```
21    testified that she didn't even know about it.  But this --

22           THE COURT:  So how can you impeach her on the basis of

23    what two of her fellow employees said that she didn't know

24    about?

25           MR. SHEKETOFF:  Because they knew, and if they knew,
```

1    how could she not know?  That's what I'm going to say to her.

2    If you're underling understood that she did not have athletic

3    credentials --

4            THE COURT:  Call the underlings and you might have

5    some impeachment, but I'm not going to allow this to be

6    introduced to impeach the witness on the stand, Ms. Chassin.

7            MR. SHEKETOFF:  So, your Honor, also, I think it's

8    independently admissible.  I think I could just read it,

9    whether she was here or not, because it shows what -- it's a

11:35 10  business record, and it shows what --

11           THE COURT:  How is it a business record?

12           MR. SHEKETOFF:  Because it's kept in the regular

13   course of business by USC; it's what they do.

14           The government already stipulated that it's authentic.

15   They had a reader read e-mails earlier in the trial.  And so,

16   in my view, this is independent evidence by itself of what the

17   admissions officers knew.

18           THE COURT:  Mr. Frank.

19           MR. FRANK:  It's not a business record.  Just because

11:35 20  two people in a business use a particular means of

21   communication to talk to each other about lunch, about what

22   they're doing after work, about business, that doesn't make it

23   a business record.

24           Business records are things like subcommittee packets

25   which are standardized in format, which are compiled in the

1    ordinary course of business which are maintained in a file.

2         The fact that there is clear black letter law, the

3    fact that e-mail is used in business all throughout the world

4    doesn't make every e-mail a business record.

5         By the way, these are not even e-mails, these are

6    texts.  It's the furthest thing from a business record and we

7    have not stipulated to that.

8         MR. SHEKETOFF:  Okay.  So it shows the state of mind

9    of the people that admitted Sabrina Abdelaziz, that's

11:36 10  independently admissible.

11        THE COURT:  Not through impeachment of this witness.

12        So there may be ways that you can get this in, but

13   it's not through Ms. Chassin.

14        MR. KENDALL:  Your Honor, if I may be heard briefly.

15        THE COURT:  Yes, briefly.

16        MR. KENDALL:  I cut my request down to a single

17   document, I want to impeach her for the truth of the matter she

18   stated.  I'm not looking to impeach her memory or refresh her

19   memory.  She said something on the stand that I maintain is

11:36 20  factually untrue and I have a document that will impeach the

21   truth of her representation.

22        It is a list, what she referred to as Pat's VIP list

23   or the VIP list that Mr. Haden had sent to Mr. Brunold.  She

24   said she was speaking for what Brunold knew and did and

25   understood, "we," "we don't do this," "my boss does not take

 1    money or accept money for admissions decisions."

 2           This directly impeaches -- she didn't have to speak

 3    for Mr. Brunold.  The government prepared her to speak for

 4    beyond her own knowledge.  Once they opened the door to

 5    Mr. Brunold's knowledge, I suggest it's fair impeachment.

 6           THE COURT:  What document is it, and have you shown

 7    the document --

 8           MR. KENDALL:  It's Exhibit 1085.  It's something the

 9    government produced to us.  It originally came from them.  USC

11:37 10    produced it to the government and then they gave it to us.

11           THE COURT:  Have you seen the document?

12           MR. FRANK:  I have, your Honor.  We produced 2.7

13    million documents to them, so that doesn't make it admissible.

14           The issue here is whether the witness can be impeached

15    on it.  He can try to put it front of her and impeach her on

16    it, but that doesn't make it admissible.  In fact, it's

17    extrinsic evidence of a collateral matter.  It's not admissible

18    pursuant to 608(b), it is not a business record.  There's no

19    reason that the document comes in.

11:38 20           He can refresh her on it.  He can try to impeach her

21    on it.  If she denies knowledge of it, that ends the inquiry.

22    It's not her e-mail.

23           MR. KENDALL:  Your Honor, it's not a collateral

24    matter.  It's directly what she testified to which is a central

25    issue what are the honorer services owed by the athletic

1   department.

2          THE COURT:  You can present it to her and ask her --

3   the preliminary question is:  Did you testify X, Y, and Z, and

4   put that in front of her and say, Does that refresh your memory

5   that that is not true.

6          MR. KENDALL:  Your Honor, I'm not -- she never had a

7   memory on this.  She just testified about something she knows

8   nothing about.

9          MR. FRANK:  I was objecting to her testifying about

11:38 10  anything about Mr. Brunold.  Counsel kept asking her questions

11  about it.  She was not speaking for Mr. Brunold, and if they

12  want to call Mr. Brunold, they're welcome to do so.

13          MR. KENDALL:  Your Honor, the transcript will reflect

14  she said, "We do not accept money for admissions."

15          I said, "Who does we refer to?"

16          She said, "SUBCO, Mr. Brunold, the admissions

17  department."

18          She put it into evidence, your Honor.

19          It's only one document, your Honor.  I can be quick

11:39 20  with it, I'll make my point, and I'll be finished quickly.

21          Your Honor, she's testified these things are kept in

22  the ordinary course.  It's a list.  It's something they're

23  relying on.  That's the whole point of it.

24          I'll be done with it in 10 minutes.

25          MR. FRANK:  There's not a brevity or one document

1    exception to the Rules of Evidence, your Honor.

2           It's one document that's not admissible.  They can

3    impeach her on it, they can ask her about it.  It doesn't come

4    in.

5           THE COURT:  You can impeach her, you can put it in

6    front of her if it becomes appropriate to refresh her memory,

7    but I'm not letting it in.

8           Call the jury.

9           (Pause.)

11:40 10      THE CLERK:  All rise for the jury.

11          (Jury entered the courtroom.)

12          THE CLERK:  Thank you.  You may be seated.

13          THE COURT:  Good morning again, jurors.

14          Our break was longer than we had anticipated, but it

15   was not because we were having an extended coffee hour.  We

16   needed to resolve certain legal matters outside of your

17   hearing, and, in essence, that saves time.  We're not wasting

18   time; it saves time for us to do that from time to time.

19   That's what we were doing.  We're now ready to resume.

11:41 20      Ms. Chassin, you're reminded that you remain under

21   oath.

22          And Mr. Kendall may continue with cross-examination.

23   BY MR. KENDALL:

24   Q.   Ms. Chassin, before we took the break, I asked you a

25   series of questions about some SUBCO candidates and asked if

1    you could recall that there was a fund-raising component to the

2    SUBCO application.  Do you remember that?

3    A.    Yes.

4    Q.    You said you had no memory of any such conversations or

5    discussions.  Do you remember that?

6    A.    I couldn't remember specific candidates.

7            MR. KENDALL:  I'd like to put on just for the witness,

8    your Honor, to see if we can refresh her recollection, Exhibit

9    1085.

11:42 10         And if we could go to page 2.

11   Q.    And I'm going to ask you to look -- it's a long list

12   there -- but I'm going to ask you to look at some specific

13   highlighted entries and tell us if that refreshes your

14   recollection.

15   A.    I've never seen this document.

16   Q.    I know that, I'm not suggesting you have.  I'm asking if

17   some of the information there refreshes your recollection about

18   SUBCO votes you made at an earlier time.

19           Do you see the one that's highlighted in yellow?

11:43 20         MR. FRANK:  Can we take the document down?

21           THE COURT:  Highlight everything you want to

22   highlight, have her look at it, and then take the document

23   down.

24   BY MR. KENDALL:

25   Q.    Do you notice that I've highlighted four entries there?

1    A.    I can see those highlights.

2    Q.    Could you look at them carefully, see if it relates to

3    anything you remember from your SUBCO or admissions work, and

4    after you've had the chance to study all four of those entries,

5    let us know, and then we'll take the document down.

6    A.    I don't recall any of this information.

7          MR. KENDALL:  Okay, if we could take that down.

8    Q.    So fair to say you were never told anything about

9    fund-raising being a part of SUBCO decisions, correct?

11:44 10   A.    As I mentioned before, rarely, but time to time there

11   would be information that a student, again, was also of

12   interest to the advancement office, something like that, and we

13   would set that aside as we considered the athletic talent.

14         But those specific things you showed me, I have no

15   recollection of knowing that information or being told that

16   type of information.

17   Q.    That type of information Mr. Brunold never told you,

18   correct?

19   A.    I don't have any -- I've never seen that information.

11:44 20   Q.    You've never seen it, you've never heard it, correct?

21   A.    Correct.

22   Q.    In fact, if Mr. Brunold would tell you that information,

23   would it surprise you?

24   A.    Again, it's possible for someone to have athletic talent

25   and also to be of interest to the advancement office of the

1    University, so they're just two separate things.

2    Q.    What if they have no athletic talent?

3    A.    I'm sorry, can you repeat your question?

4    Q.    What if they have no athletic talent and they're making

5    donations?

6    A.    Like I said, there was a list for the athletic advancement

7    office, folks that they were interested in, that was separate

8    from the SUBCO process.  Only students who were being

9    considered for their athletic talent were brought to SUBCO.

11:45 10   Q.    So your understanding based on your knowledge was all of

11   the SUBCO candidates were brought for issues unrelated to

12   finance, right?

13   A.    They were brought based on your athletic talent.

14   Q.    If they were brought based on financial contribution, that

15   was something hidden from you, correct?

16   A.    Again, it came up from time to time, but we would set that

17   aside and be focused on the student's athletic talent in our

18   consideration in the SUBCO process.

19   Q.    If they didn't have athletic talent but were making a big

11:45 20   contribution at the time that the admission was being decided,

21   that was something that was never disclosed to you, correct?

22   A.    If they were in SUBCO, it was because they had athletic

23   talent that they were demonstrating to us.

24         I don't know if that was accurate or not, but that was

25   the point of them being brought to SUBCO.

```
 1    Q.    And if Mr. Brunold -- Mr. Brunold never told you these

 2    kids don't have any talent, we're just bringing them in for the

 3    money.

 4    A.    No.

 5    Q.    He never said that to you?

 6    A.    No.

 7    Q.    So if that was going on, it was hidden from you, correct?

 8    A.    I had no knowledge of that.

 9    Q.    I had a different question.

11:46 10          If that was going on, it was hidden from you, correct?

11          MR. FRANK:  Your Honor, I object.  She had no

12    knowledge.

13          THE COURT:  Sustained.

14    BY MR. KENDALL:

15    Q.    If that was going on, then you would not include

16    Mr. Brunold when you said, "We do not take donations for

17    admissions."

18          MR. FRANK:  Objection to the hypothetical.

19          THE COURT:  He can ask that question.

11:46 20    A.    The work of the SUBCO was to consider students for

21    athletic talent alone.

22    Q.    That's your opinion.

23          MR. FRANK:  Objection.

24          THE COURT:  Sustained.

25    BY MR. KENDALL:
```

1    Q.   Do you have a written rule that says that?

2    A.   No, that is the expectations that all of the members of

3    the office of admission have around what happens at SUBCO.

4    Q.   Well, when you say that's the expectation of all the

5    admissions officers, was there a vote taken of the admissions

6    officers and what their expectations were?

7    A.   There were --

8    Q.   Just a yes or no, was there a vote?

9    A.   There was not a vote.

11:47 10   Q.   Is there a written rule that everybody was given and said

11   this is compliance department, sign it, this is how you're

12   going to do your job, you can never consider donations as part

13   of a SUBCO admissions?

14   A.   There is not a written rule.

15   Q.   Okay.  You agree with me this whole sort of college

16   admissions scandal has been a tremendous embarrassment to USC,

17   correct?

18   A.   I was very unhappy to learn about it.

19   Q.   I'm not asking your opinion.  It's an embarrassment to all

11:47 20   of USC, correct?

21   A.   Yes, I think that's fair to say.

22   Q.   And you'd agree with me the last thing the USC admissions

23   department wants the world to think is that it was willing to

24   sell slots to people for money, correct?

25   A.   The admission office was not willing to do that.

```
 1   Q.   I didn't ask you if you did it or not, I'm asking that's
 2   one of the last things the admissions office and your bosses
 3   want people to think, that they were selling slots, correct?
 4   A.   Correct.  I can't imagine an admission office that wants
 5   people to think they're selling slots.  That's not what we do.
 6   Q.   They didn't want people to think that they were working
 7   closely with the athletics department to bring in donors'
 8   children through SUBCO, correct?
 9        MR. FRANK:  Objection.  I can't follow that question.
10        THE COURT:  She can answer it.
11        Overruled.
12        THE WITNESS:  Can you repeat the question?
13        MR. KENDALL:  I don't know if I remember it myself.
14        May we ask the reporter court to --
15        THE COURT:  Yes, the court reporter will please repeat
16   it.
17        (Record read.)
18        MR. FRANK:  Use of the "they," objection, your Honor.
19        THE COURT:  Sustained.
20        MR. KENDALL:  I'll refine it.
21   BY MR. KENDALL:
22   Q.   Your bosses, meaning Mr. Brunold and Mr. Kirk (sic.), they
23   don't want the public to think that they were working with the
24   athletic department to bring in donors' children through SUBCO?
25        MR. FRANK:  Objection what other people want.
```

```
 1              THE COURT:  She can answer it.
 2              Overruled.
 3    A.   We don't want anyone to have the impression that we're
 4    selling slots in the admission process.  I --
 5    Q.   It would be fair to say if your donors were embarrassed
 6    that they were buying slots, it would make the success of the
 7    $7 billion fund-raising campaign tarnished, correct?
 8    A.   I'm sorry, if the donor -- can you --
 9    Q.   If it became public that many of the donors got admissions
11:49 10    slots in return for giving money, it would tarnish the success
11    for USC of its $7 billion fund-raising campaign?
12              MR. FRANK:  Objection, hypothetical.
13              THE COURT:  First of all, it's $6 billion, but who's
14    arguing about $1 billion.
15              MR. KENDALL:  I think it went up to 6.8 or 6.9 by the
16    time they finished.
17              THE COURT:  The objection is sustained by the way.
18    BY MR. KENDALL:
19    Q.   The goal of the fund-raising exceeded $6 billion, didn't
11:50 20    it?
21    A.   I believe so.  I don't have an exact figure.
22    Q.   I didn't ask for an exact figure.
23    A.   I believe it exceeded the $6 billion goal.
24    Q.   Exceeded substantially?
25    A.   I don't know.
```

1    Q.   6.7, 6.8, in that range?

2    A.   I don't know.

3    Q.   Well over 6 billion, that you know.

4    A.   I know they exceeded their goal.

5    Q.   Now, you talked earlier about the type of talent that

6    SUBCO thought it was admitting.  Would you agree with me SUBCO

7    admitted some people to be managers?

8    A.   Absolutely not.

9    Q.   Are you saying they never admitted someone to be a

11:50 10   manager?

11   A.   That was never known to us.  We were admitting students

12   based on their athletic talent with the expectation that they

13   were contributing athletically to our teams.

14   Q.   Go back to 2013, the same admissions cycle that Johnny

15   Wilson was a part of.

16        USC had a new basketball coach, Andy Enfield, was that

17   his name?

18   A.   I believe that was one of the basketball coaches.

19   Q.   Do you recall in that year there were five scholarship

11:51 20   athletes admitted and one walk-on with no scholarship through

21   SUBCO?

22   A.   I don't recall the specifics of a cycle.

23   Q.   Do you recall that there was somebody admitted and he was

24   the basketball manager because he was nowhere near the level of

25   talent to be on the USC men's basketball team?

```
 1   A.    I can't recall.
 2           MR. KENDALL:  Your Honor, I would like to try to
 3   refresh her recollection, your Honor.
 4           If we could show the witness only Exhibit 9734.
 5           Again, the name has been redacted.  If she needs the
 6   name, I can show her and show the government.
 7   Q.    Take a look at this and see where -- I take it you have
 8   not seen 9734 before, have you?
 9   A.    No.
11:52 10  Q.    But if you could take a look at the list of six names
11   there, the top one blacked out.
12           Do you see that one of the candidates did not get a
13   scholarship and the others either did or their scholarship was
14   pending?
15   A.    Actually, the decision was pending; but, yes, I can see --
16   I can see that.
17   Q.    And do you see that the person who didn't get a
18   scholarship had the highest academics of any of the basketball
19   recruits?
11:52 20          MR. FRANK:  Objection, the document is not properly --
21           THE COURT:  Sustained.
22   BY MR. KENDALL:
23   Q.    Does that refresh your recollection, that there's somebody
24   who came through that SUBCO year who did not meet anywhere near
25   the criteria of your typical basketball player?
```

```
 1    A.    I can't see that from that document.

 2    Q.    Does it refresh your recollection of that?

 3    A.    It does not.

 4    Q.    That his father was a businessman from Florida --

 5              MR. FRANK:  Objection, your Honor.

 6              THE COURT:  Yes, sustained.

 7    BY MR. KENDALL:

 8    Q.    So if USC admitted someone to be a manager through SUBCO,

 9    that's, again, something they didn't tell you about, correct?

11:53 10    A.    They would have been presented for their athletic talent

11    and we would approved them based on the athletic talent and

12    academic preparation that we saw in the SUBCO meeting.

13    Q.    Did USC admit practice players?

14    A.    Not through the SUBCO process.

15    Q.    So it's -- to your knowledge nobody was ever put forward

16    before SUBCO as a practice player?

17    A.    Not expressly as a practice player.  We would have wanted

18    to see the athletic talent and expected they were going to

19    contribute athletically to our teams.

11:53 20    Q.    So, again, if the athletic department and Mr. Brunold and

21    Mr. Kirk were talking about admitting somebody as a practice

22    player, that would be totally kept from you, correct?

23              MR. FRANK:  Objection.

24              THE COURT:  She can answer the question.

25              If, it's a hypothetical question.
```

```
 1    A.   I don't recall any students being presented in SUBCO as

 2    practice players.

 3    Q.   What about a male tennis player?

 4    A.   What is the question?

 5    Q.   Do you recall male tennis players being proposed as a

 6    practice player?

 7    A.   Not through the SUBCO process.

 8              MR. KENDALL:  If I may have a moment, your Honor.

 9              THE COURT:  Yes.

11:54 10          (Pause.)

11    BY MR. KENDALL:

12    Q.   Do you recall donors' children being admitted as practice

13    players but not through SUBCO?

14    A.   I don't recall.

15              MR. KENDALL:  Your Honor, I'd like to show the witness

16    only Exhibit 1249 to see if it refreshes her memory.

17              MR. FRANK:  Your Honor, if we're talking about

18    somebody who is admitted not through SUBCO, I object on

19    relevance grounds.

11:55 20          MR. KENDALL:  She just testified she's not aware of

21    practice players.

22              THE COURT:  Let him show the witness the document.

23              MR. KENDALL:  Exhibit 1249.

24          (Pause.)

25              MR. KENDALL:  If you could read it, take time to see
```

1    if it refreshes your recollection, and then, when you're done,

2    please put it down.

3         And if you could look at the highlighted in yellow

4    section.

5         (Pause.)

6    A.   I've never seen this document.

7    Q.   I didn't ask you if you've seen it.

8         If you could put it down and just tell us, does that

9    refresh your recollection that USC was admitting donors'

11:56 10   children to be practice players on the golf and tennis teams?

11   A.   I don't recall any student being put through SUBCO as a

12   practice player.

13   Q.   My question was different.  Do you recall them being

14   admitted under any circumstances as practice players?

15   A.   The athletic piece of it isn't really relevant if they're

16   not in the SUBCO process.  We have lots of students who have

17   competed in athletics in high school.

18   Q.   My question, though, is you said that you didn't admit

19   practice players under any process.

11:57 20   A.   No, I said in the SUBCO process.

21   Q.   Were practice players admitted through the VIP process?

22   A.   Again, the practice player piece of it is irrelevant.

23   There are students who may have gone on to be practice players

24   who may have been admitted through the regular admission

25   process, through the VIP process, I don't know.

1          MR. KENDALL:  Your Honor, I would like to show her one

2    more document to refresh her recollection, and I'm going to

3    have to walk it over to her because I don't have it

4    electronically.

5          THE COURT:  For the record, the number of the exhibit.

6          MR. KENDALL:  I'm going to show her what I've

7    previously shown her was Exhibit 9734, and then there's a

8    document that doesn't have an exhibit number, but I'll show

9    Mr. Frank, it's dated January 30, 2015.

11:58 10          (Pause.)

11          (Discussion off the record.)

12    BY MR. KENDALL:

13    Q.   I'd like to show you to refresh your recollection Exhibit

14    9734 and this document dated January 30, 2015.

15          And I represent to you the blacked-out person is the

16    same as the name highlighted in yellow.

17          Does that refresh your recollection that you saw

18    coming through the SUBCO the year same as Mr. Wilson someone

19    that was going to be a manager of a team and not a player?

11:59 20    A.   No.  If someone was represented as a manager, we would not

21    have considered them in SUBCO.

22    Q.   Okay.

23          Now, would you agree with me you're not an officer of

24    USC; is that correct?

25    A.   I don't know that specific definition.

1    Q.    Well, it would be fair to say if you were a

2    university-wide officer of USC, you would know it, correct?

3    A.    I would know what?

4    Q.    You don't know whether or not you're an officer or

5    director of USC at large?

6    A.    I don't know.

7    Q.    Do you think you signed an affidavit in 2014 in a lawsuit

8    where you said under oath, "I am not an officer or director of

9    USC at large.  I also do not have responsibility for drafting

12:00 10   or establishing corporate policies for USC at large."

11         Do you remember signing that affidavit?

12   A.    I don't remember that specific affidavit.  I have -- I

13   have been called to deposition before.

14         MR. KENDALL:  Your Honor, I'd like to show the witness

15   only Exhibit 9705.

16   Q.    Do you recognize this document?

17   A.    Yes.  This was a deposition that I was called to.

18   Q.    Not a deposition.  It's an affidavit.

19         MR. FRANK:  I object to characterizing of the document

12:00 20   on the record, it's not in evidence.

21         THE COURT:  Yeah, you can't talk about it until it's

22   admitted.

23         MR. KENDALL:  Your Honor, I'd like to offer it into

24   evidence then.

25         MR. FRANK:  Objection, your Honor.  Entirely

1   collateral, it's not produced for impeachment.

2           MR. KENDALL:  It's used for impeachment, your Honor.

3           MR. FRANK:  It hasn't been used.  It's 608(b), your

4   Honor.

5           THE COURT:  Well, this is a declaration in another

6   case?

7           MR. KENDALL:  Yes, but stating what the limitation of

8   her authority which she says she doesn't remember and she

9   doesn't remember ever having said.

12:01 10         THE COURT:  I'll allow it to be admitted, 9705.

11          (Exhibit 9705 received into evidence.)

12          MR. KENDALL:  Thank you, your Honor.

13          If we could go to paragraph 10, and if we could look

14  at the first two sentences.

15          THE WITNESS:  Is the rest of the document relevant?

16          MR. KENDALL:  I'm just going to ask you about the

17  first two sentences.  I can't testify about what's relevant.

18  I'm just asking --

19          THE WITNESS:  Well, then can I review the document.

12:01 20         THE COURT:  Let her look at the entire document and

21  give a copy of counsel.

22          MR. KENDALL:  I can give you mine if you'll give it

23  back to me.

24          THE WITNESS:  Can I review the document, please?

25          (Pause.)

```
 1              MR. KENDALL:  I have a second one I'll give the
 2     witness.
 3              THE WITNESS:  Thank you.
 4              (Pause.)
 5              MR. KENDALL:  You can keep it, I've got an extra one.
 6              (Pause.)
 7     BY MR. KENDALL:
 8     Q.    Have you finished reading it?
 9     A.    Yes.
12:04 10     Q.    Okay.
11              So in paragraph -- well, first of all, if you look at
12     the bottom there, you signed this on September 22, 2014 in Los
13     Angeles, correct?
14     A.    Yes.
15     Q.    That's the same calendar year Johnny Wilson was admitted
16     by SUBCO, correct?
17     A.    I --
18     Q.    I suggest Exhibit 107 shows admission was done around
19     March of 2014.
12:05 20     A.    Yes, so he would have been a new student.
21     Q.    And you stated, "I am not an officer or director of USC at
22     large."  Correct?
23     A.    Yes.
24     Q.    You said that under oath?
25     A.    Yes.
```

1   Q.   Same oath you swore today.

2   A.   Yes.

3   Q.   And that's a true statement.

4   A.   Yes.

5   Q.   Okay.  You also wrote, "I also do not have responsibility

6   for drafting or establishing corporate policies for USC at

7   large."  Correct?

8   A.   Yes.

9   Q.   And that would also apply for the USC athletics

12:05 10   department, correct?

11   A.   I'm not responsible for establishing policies for the USC

12   athletics department, that's correct.

13   Q.   And back in 2014, Mr. Brunold, Mr. Brennan, and even

14   Ms. Harrington all would have had more responsibility for

15   establishing corporate policies for the admissions office than

16   you did, correct?

17   A.   Yes.

18   Q.   Next I'd like to go to page 2 of that document.  If we can

19   look at paragraphs 2 and 3.

12:06 20       "In my position as a senior associate director, I

21   oversee the evaluation process for all applicants."

22       And then the next paragraph, "In my position, I am

23   familiar with the recordkeeping procedures of USC's office of

24   admissions."  Do I have that there correct?

25   A.   Yes.

```
 1    Q.   And then in the next paragraph -- and then you actually
 2    further you have down there, "I am the person most qualified in
 3    the office of admissions to testify regarding the admissions
 4    process."
 5         You were not talking about SUBCO, you were talking
 6    about the general admissions process, correct?
 7    A.   Yes.
 8    Q.   And then you said in paragraph 3, The books and records
 9    maintained by USC are made at or around the time of said acts,
12:07 10  conditions, proceedings, events and transactions, or from the
11    information transmitted by persons who are responsible for
12    making and maintaining said books and records."
13         You stated that under oath to show that the e-mails
14    and documents that you work with in the admissions office were
15    made in the ordinary course of regularly conducted admissions
16    activity, correct?
17         MR. FRANK:  Objection, your Honor.  It doesn't refer
18    to e-mails or other documents.
19         THE COURT:  Sustained.
12:07 20  BY MR. KENDALL:
21    Q.   The books and records.  Do records include e-mails?
22    A.   I don't know.
23    Q.   Well, when you stated here, did you mean to exclude
24    e-mails when you said that?
25    A.   I believe this refers to things like our course catalog
```

1    that has academic policies in it, as well as the actual

2    application records.

3    Q.    You didn't limit it that way, did you?

4    A.    I did not.

5    Q.    You said "the books and records," correct?

6    A.    Yes.

7    Q.    Okay.  And you said "by persons who are responsible for

8    making and maintaining such books and records."

9         E-mails that convey decisions on application -- strike

12:08 10    that.

11         E-mails that convey questions or discussions about

12    candidates, that's part of the books and records of USC, isn't

13    it?

14         MR. FRANK:  Your Honor, I object to this line.

15         THE COURT:  Well, that question is objectionable.

16         Objection is sustained.

17         MR. KENDALL:  Okay.

18    BY MR. KENDALL:

19    Q.    The USC SUBCO uses e-mail to carry on its regularly

12:08 20    conducted activity, correct?

21    A.    From time to time we may talk about things over that, but

22    the official record of the SUBCO decision is in those SUBCO

23    packets.

24    Q.    I didn't ask for the official record.

25         You used e-mail to carry on the SUBCO business,

1    correct?

2    A.   We sometimes would use e-mail to discuss SUBCO candidates,

3    yes.

4    Q.   And people who send these mails would have knowledge of

5    the information they're sending to each other, correct?

6    A.   I'm not sure I understand your question.

7    Q.   I read X, Y, Z, could you tell me what this means?  And

8    the person responds -- they're talking about things that's

9    within the scope of their jobs and they have knowledge of in

12:09 10   general.

11         MR. FRANK:  Objection to what other people would know.

12         THE COURT:  Sustained.

13         MR. KENDALL:  Your Honor, this person said she's

14   qualified to be a record keeper; I think I'm qualified to ask

15   record keeper questions.

16   BY MR. KENDALL:

17   Q.   You certainly communicated with the athletics department

18   on SUBCO issues by e-mail, correct?

19   A.   From time to time we might ask questions or communicate

12:09 20   about decisions.

21   Q.   Or they might provide additional information about

22   candidates?

23   A.   They could.

24   Q.   And they could do that to any one of the five SUBCO

25   members, correct?

```
 1   A.    Yes.

 2   Q.    Okay.  And Donna Heinel would be one of the people doing

 3   that?

 4   A.    She could be.

 5   Q.    And Alexander Garfio would be?

 6   A.    She could be.

 7   Q.    And they would be often attaching spreadsheets and other

 8   documents of information to provide the SUBCO with additional

 9   data.

10        MR. FRANK:  Objection to what others would be doing.

11        THE COURT:  Sustained.

12   BY MR. KENDALL:

13   Q.    Do you have any knowledge -- do you have knowledge of

14   whether Mr. Haden ever met Rick Singer?

15        MR. FRANK:  Objection, foundation.

16        MR. KENDALL:  That's why I'm asking her, your Honor.

17        THE COURT:  That's overruled.

18        She can answer it.

19   A.    I don't know.

20   Q.    Did the government show you any e-mails that show

21   Mr. Singer and Mr. Haden corresponding?

22   A.    No.

23   Q.    Okay.  Do you have any reason -- do you have any knowledge

24   of whether or not Mr. Singer was authorized to do fund-raising

25   for the athletic department?
```

```
 1    A.   I don't know.

 2    Q.   And the government's never shown you any e-mails on that

 3    area?

 4              MR. FRANK:  Your Honor, this is well beyond the scope.

 5              THE COURT:  Overruled.

 6    A.   I don't know.

 7              MR. KENDALL:  If I may have one moment, your Honor.

 8              THE COURT:  Yes.

 9              (Discussion off the record.)

10              MR. KENDALL:  Thank you, your Honor.

11              THE COURT:  Redirect, Mr. Frank.

12              MR. FRANK:  Thank you, your Honor.

13                  REDIRECT EXAMINATION OF REBECCA CHASSIN

14    BY MR. FRANK:

15    Q.   Ms. Chassin, you were asked a bunch of questions about an

16    affidavit you submitted in a civil lawsuit filed in 2014.  Do

17    you recall those questions?

18    A.   Yes.

19    Q.   And that affidavit, that lawsuit has absolutely zero to do

20    with this case; isn't that true?

21    A.   Yes.

22    Q.   And in fact, that lawsuit was filed by a student who

23    claimed that he was denied reasonable accommodation for a

24    disability, correct?

25    A.   Yes.
```

```
 1   Q.   And it was dismissed on summary judgment.

 2   A.   Yes.

 3   Q.   I'll ask questions from here.

 4        You were asked questions about a portion of that

 5   affidavit where you attested that you were not an officer or

 6   director of USC at large.  Do you recall those questions?

 7   A.   That's correct, yes.

 8   Q.   USC comprises an undergraduate institution --

 9   A.   Yes.

10   Q.   -- and numerous professional schools, correct?

11   A.   As well as a healthcare enterprise.

12   Q.   Like a medical school?

13   A.   Like hospitals.

14   Q.   And you don't have anything to do with those other parts

15   of USC?

16   A.   No.

17   Q.   But you do know a lot about undergraduate admission?

18   A.   Yes.

19   Q.   And as you attested in that affidavit, you oversee the

20   evaluation process for all applicants for undergraduate

21   admission into USC.

22   A.   Correct.

23   Q.   And you swore that under oath.

24   A.   Yes.

25   Q.   And that's true or untrue?
```

```
 1    A.    True.

 2    Q.    You were asked questions about retweeting a tweet about

 3    advantages that wealthy people have in applying to college.  Do

 4    you recall those questions?

 5    A.    Yes.

 6    Q.    Do you believe that wealthy people have advantages in

 7    applying to college in many other things?

 8    A.    Yes.

 9    Q.    What kinds of advantages?

12:13 10          MR. KENDALL:  Objection, your Honor.

11          THE COURT:  Overruled.

12    A.    The schools they attend, the type of curriculum they might

13    have access to, perhaps having parents who may be more

14    educated, having the ability to hire tutors for school or for

15    test prep for things like the SAT or the ACT, a lot of help in

16    the application process, a lot of help just understanding how

17    the application works, the kinds of things that we in the

18    admissions office might be interested in in a student's

19    application.  There are a number of different things.

12:14 20    Q.    Is there anything wrong with having those kinds of

21    advantages?

22    A.    No.

23    Q.    What about misusing advantages, can that happen?

24          MR. KENDALL:  Objection.

25          THE COURT:  Overruled.
```

1    A.   We certainly don't believe that most affluent students are

2    misusing their advantages, but it's a problem if students are

3    misusing their advantages.

4    Q.   What about wealthy people paying money to get an insider

5    to lie to a subcommittee that you were a member of about

6    recruiting athletes based on falsified credentials?

7              MR. SHEKETOFF:  Objection.

8              THE COURT:  Overruled.

9    BY MR. FRANK:

12:14 10    Q.   Would that be a problem?

11    A.   Yes, that's a huge problem.

12    Q.   But that's not what you were talking about in the tweet.

13    A.   No, I was talking about the many, many students who apply

14    with no donations, no special treatment; they just have a lot

15    of advantages with a great upbringing with great education that

16    makes them look really outstanding to admission officers like

17    ours.

18    Q.   You were asked a whole series of questions about special

19    interest lists and -- sometimes called VIP lists.  Do you

12:15 20    recall those questions?

21    A.   Yes.

22    Q.   Are those the subcommittee?

23    A.   No.

24    Q.   Is that a wholly separate process?

25    A.   Yes.

```
 1   Q.   What does being on that list afford someone?
 2   A.   Extra consideration in the admission process that the dean
 3   of admission will review the final -- the decision before it is
 4   finalized.
 5   Q.   Does it mean you're going to get in?
 6   A.   No.
 7   Q.   If we could look at Exhibits 107 and 383 side by side.
 8        These are the subcommittee packets for Johnny Wilson
 9   and Sabrina Abdelaziz?
10   A.   Yes.
11             MR. SHEKETOFF:  Objection, your Honor.
12             THE COURT:  I'm sorry?
13             MR. SHEKETOFF:  Beyond the scope for me.  I did not
14   ask a single question about that.
15             MR. FRANK:  It's directly relevant, your Honor.
16             THE COURT:  The objection is overruled for the time
17   being.
18   BY MR. FRANK:
19   Q.   Do these documents have anything to do with the VIP
20   process?
21   A.   No.
22   Q.   Were these students admitted through any VIP
23   consideration?
24   A.   No.
25   Q.   And special interest, what counsel has referred to as the
```

1    VIP list, there can be special interest given to candidates for

2    all sorts of reasons, right?

3    A.   Yes.

4    Q.   What are some of the reasons unrelated to philanthropy

5    that someone might get a second look?

6    A.   It could be that they know a candidate directly and they

7    feel that student would be a good fit of USC and take advantage

8    of have we have to offer.

9            It could be that they just want a heads-up that the

12:16 10   student has been denied so when they run across that student or

11   their family, they're aware that they had a disappointing

12   decision.  So, in some cases, it's merely for tracking purposes

13   and reporting back to the interested party.

14   Q.   Somebody's neighbor?

15   A.   Somebody's neighbor.

16           MR. SHEKETOFF:  Objection.

17   A.   Somebody they know.

18           THE COURT:  Sustained for leading.

19   BY MR. FRANK:

12:17 20   Q.   What about things like coming from an underprivileged

21   background, could that be a consideration that would get

22   somebody on a special interest list?

23           MR. SHEKETOFF:  Objection.

24           THE COURT:  Sustained.

25   BY MR. FRANK:

1    Q.   Are there factors unrelated to wealth or potential status

2    as a donor that could get somebody on a special interest list?

3    A.   Absolutely.  A special interest list just has to do with

4    constituents across campus who are expressing a special

5    interest in a candidate.  The reason that they're interested in

6    a candidate doesn't necessarily have to do with money; it could

7    be, again, that they know the student, that they've met the

8    student, that they're interested in bringing more students from

9    an underrepresented background or from a lower socioeconomic

12:17 10   status and they're interested in promoting that at the

11   university.

12   Q.   You were asked some questions about your personal

13   knowledge of athletics.  When you're sitting on the

14   subcommittee and evaluating candidates like Johnny Wilson or

15   Sabrina Abdelaziz, whose judgment about their athletic talent

16   do you rely on?

17   A.   I'm trusting the athletic resumé that's been included in

18   the SUBCO packet which I believe has information from the coach

19   about their athletic talent and about the role they'll play on

12:18 20   the team when they come to USC.

21   Q.   You were asked a question about whether USC can revoke the

22   admission of somebody who doesn't -- who's admitted as a

23   recruited walk-on who doesn't show up.  Can USC revoke the

24   admission of somebody who lies in the application process?

25   A.   Yes.

```
 1    Q.   You were asked a series of questions about USC's official

 2    position on this case.  Do you recall those questions?

 3    A.   Yes.

 4    Q.   You were asked if you read a public statement that USC

 5    issued about this case.  Do you recall those questions?

 6    A.   Yes.

 7    Q.   Do you recall each and everything that was -- that USC

 8    announced in that statement?

 9    A.   No, it was a while ago.

10    Q.   Would it be helpful to you to see a copy of that statement

11    to refresh your recollection about what it contained?

12              MR. KENDALL:  Objection, your Honor.

13    A.   Sure.

14              MR. FRANK:  Can we show the witness only 1350, please.

15    Q.   And I just want to direct your attention in the first

16    place --

17              MR. FRANK:  Ms. Lewis, if you could just highlight for

18    the witness the second paragraph there.

19              Sorry, no, no.  If you go up just a little bit, the

20    second paragraph on the page.

21              There you go, "The university."

22    Q.   Ms. Chassin, if you could just read that paragraph.

23              MR. SHEKETOFF:  To herself?

24              MR. FRANK:  To herself.

25    BY MR. FRANK:
```

```
 1   Q.   And if you could read the next paragraph.

 2        MR. FRANK:  I'm sorry, "We first became aware."

 3        Lower down.

 4        (Pause.)

 5   Q.   And if you could read the next paragraph.

 6        (Pause.)

 7   Q.   Have you familiarized yourself with that document?

 8   A.   Yes.

 9        MR. FRANK:  Could we take it down, please.

12:20 10  Q.   Does that refresh your recollection that the university

11   completed an individual review of students who are alleged to

12   be involved in admissions deceit?

13        MR. KENDALL:  Objection, your Honor.  It's all

14   hearsay.  If that she read something else that she remembers

15   what she read, she didn't participate.

16        MR. FRANK:  She was asked about this on cross.

17        THE COURT:  He can ask her if it refreshes her memory

18   and inquire from there.

19        Overruled.

12:20 20  BY MR. FRANK:

21   Q.   Does it refresh your recollection that the

22   university completed an individual review of students --

23        MR. KENDALL:  Objection, leading your Honor.

24        THE COURT:  That part is sustained.

25   A.   I'm aware that the University investigated students --
```

```
 1              THE COURT:  There's no question before you at this
 2     point.
 3              THE WITNESS:  I'm sorry?
 4     BY MR. FRANK:
 5     Q.   Do you know whether the University conducted an individual
 6     review of students alleged to have been involved in admissions
 7     deceit?
 8              MR. KENDALL:  Objection, hearsay.
 9              THE COURT:  Overruled.
10     A.   Yes.
11     Q.   Do you know whether some students were found not to have
12     knowingly participated and others were found to have
13     participated?
14     A.   Yes.
15     Q.   And some students were disciplined and others were not.
16     A.   Yes.
17              MR. SHEKETOFF:  Objection.
18              THE COURT:  Overruled.
19     BY MR. FRANK:
20     Q.   Are you aware that some students were expelled?
21     A.   Yes.
22     Q.   Do you recall that USC, upon announcement of the Varsity
23     blues investigation promptly fired two individuals?
24              MR. KENDALL:  Objection, your Honor.
25              THE COURT:  Overruled.
```

```
 1   A.    Yes.

 2   Q.    Which individuals?

 3   A.    Donna Heinel and Johan Vavic.

 4   Q.    Are you aware that the University concluded that those

 5   individuals misled --

 6         MR. KENDALL:  Objection, your Honor.  That's truly

 7   hearsay, what the University concluded.

 8         THE COURT:  Yes, sustained.

 9   BY MR. FRANK:

12:22 10   Q.    Are you aware that those individuals misled the

11   subcommittee on athletic admissions?

12         MR. KENDALL:  Objection, your Honor.

13         THE COURT:  Sustained.

14   BY MR. FRANK:

15   Q.    You were asked some questions about whether you can say

16   that a recruitment slot given to one particular student took

17   away a spot from another particular student?

18   A.    Yes.

19   Q.    Are admissions slots unlimited?

12:22 20   A.    No.

21   Q.    What happens when you admit a student through the

22   subcommittee process who's unqualified?

23         MR. KENDALL:  Objection, your Honor.

24         THE COURT:  Overruled.

25   A.    It's part of the overall number of admissions that we're
```

1   going to make for that year's class, so it means other students

2   are not able to be admitted.

3   Q.   You were asked some questions about Johnny Wilson's

4   qualifications.  Do you remember those questions?

5   A.   Yes.

6        MR. FRANK:  Ms. Lewis, if we could just call up 107

7   again, please.

8   Q.   You were asked whether that grade point average as

9   adjusted, 3.87, was high for a water polo walk-on?

12:23 10   A.   Yes.

11   Q.   Did your answer assume that the water polo walk-on was

12   legitimately recruited for athletic talent?

13   A.   Absolutely.

14   Q.   And that the credentials reflected on the subcommittee

15   packet are legitimate?

16   A.   Yes.

17   Q.   If you knew that this -- that -- withdrawn.

18        You were asked some questions about having an ACT

19   score of 29.

12:23 20   A.   Yes.

21   Q.   How many students who apply to USC get rejected with an

22   ACT score of 29?

23   A.   I have to imagine it's thousands and thousands.

24   Q.   Does an ACT score of 29 guarantee you admission to USC?

25   A.   No.

1   Q.   What about going through the subcommittee as a recruited

2   athlete?

3   A.   No.

4   Q.   What are your odds if you're recruited as an athlete and

5   put through subcommittee?

6        MR. KENDALL:  Objection.

7        THE COURT:  Overruled.

8   A.   As I mentioned before, the admit rate for students who are

9   presented is high, probably 85 or 90 percent of those students

12:24 10   are admitted.

11   Q.   You were asked whether students can develop into stronger

12   players.  Do you recall those questions?

13   A.   Yes.

14   Q.   Do you know what it means to be an immediate impact

15   player?

16   A.   That a student would come and be contributing to the team,

17   maybe even starting on the team right away.

18   Q.   Were you asked some questions about whether somebody's

19   speed, whether it was 20 seconds versus 22 seconds, would have

12:24 20   mattered to you.  Do you recall those questions?

21   A.   Yes.

22   Q.   Would lies matter to you?

23   A.   Yes.

24   Q.   If you knew that Jovan Vavic was lying to you about a

25   student's qualifications, would that have mattered in the

```
 1   subcommittee's process?
 2   A.   Absolutely.
 3         MR. FRANK:  If we can call up 107 again, please.
 4   Q.   Is there anything in Johnny Wilson's profile -- and we can
 5   look at it if you'd like -- that talks about financial
 6   contributions?
 7   A.   I'll take a last look at it, please.
 8         MR. FRANK:  Ms. Lewis, if you could flip to the next
 9   page.
10   Q.   Anything on that page talking about financial
11   contributions?
12   A.   No.
13   Q.   Next page.
14         Anything on that page?
15   A.   No.
16   Q.   Next page.
17         That page?
18   A.   No.
19   Q.   Next page.
20         Anything on his report card?
21   A.   No.
22   Q.   Anything on this part of his report card?
23   A.   No.
24   Q.   Next page.
25         Anything there?
```

1    A.    No.

2    Q.    Next page.

3          Anything in Coach Vavic's e-mail talking about

4    financial contributions?

5    A.    No.

6    Q.    If Johnny Wilson was admitted based on financial

7    contributions and not based on his athletic talent, would that

8    have been hidden from you?

9    A.    Yes.  By virtue of going through SUBCO, we believe he had

12:26 10   the athletic talent that was presented.

11   Q.    You were asked some questions about written guidance.

12   A.    Yes.

13   Q.    Are you aware of any written guidance not to lie at USC?

14   A.    No.

15   Q.    Are you aware of any written guidance not to submit

16   falsified athletic profiles to the subcommittee?

17   A.    No.

18   Q.    Are you aware of any written guidance not to add fake

19   awards to athletic profiles?

12:26 20   A.    No.

21   Q.    You are aware of any written guidance directing coaches

22   not to call somebody an immediate impact player when they're

23   not?

24   A.    No.

25   Q.    Are you aware of what common sense tells you about those

1  things?

2          MR. KENDALL:  Objection.

3          THE COURT:  Sustained.

4  BY MR. FRANK:

5  Q.   Were are you aware of whether those things are right or

6  wrong?

7          MR. KENDALL:  Objection.

8          THE COURT:  Sustained.

9  BY MR. FRANK:

12:26 10  Q.   Are you aware of whether doing any of those things would

11  violate USC's written or unwritten policies?

12          MR. KENDALL:  Objection, compound.

13          THE COURT:  She can answer that one.

14  A.   Yes, I believe they would violate the expectations about

15  what SUBCO was for.

16          MR. FRANK:  No further questions.

17          THE COURT:  Any recross, Mr. Sheketoff?

18          MR. SHEKETOFF:  Yes.

19              RECROSS-EXAMINATION OF REBECCA CHASSIN

12:27 20  BY MR. SHEKETOFF:

21  Q.   At this time, good afternoon.

22          The prosecutor just asked you about slots, and you

23  said something along the lines of if Sabrina Abdelaziz was

24  admitted, somebody else would not have been admitted.

25          Did you say that?

1    A.    Right, so the --

2    Q.    No, the question was:  Did you say that?

3    A.    It wasn't specific to Sabrina.

4    Q.    So how many people were admitted by USC on the year that

5    she applied?

6    A.    I believe it was about 8,500.

7    Q.    About 8,500.  You mean it might have been 8,516 or 8,600?

8    A.    That number I don't have at the ready.

9    Q.    You knew Sabrina Abdelaziz had already been admitted,

12:28 10   correct, when you decided to give admission letters to over

11   8,000 students, correct?

12   A.    Yes.  By being approved, she had already taken one of the

13   admission spaces that we had for that year.

14   Q.    Yeah, that's what you told us yesterday.  Once you get

15   that letter, it's not a maybe, you're in.

16   A.    Right.  She had already been reviewed and approved for

17   admission.

18   Q.    So is there somebody that you wanted to give an admissions

19   letter to from USC, number 8,212, that you didn't do that

12:28 20   because Sabrina Abdelaziz had taken a slot already?

21   A.    There's always students that we'd like to admit if we had

22   more space.

23   Q.    Well, who limited the amount of students you could give

24   letters of admission to?

25   A.    So it's based on --

1   Q.   No, who did that?  Who?  You?

2   A.   Our admit targets are created by our dean of admissions,

3   Tim Brunold.

4   Q.   So you don't have a clue whether or not he was going to

5   admit 8,000 that year or 8,200 or 8,300.  It was totally up to

6   him?

7   A.   No, I had a specific number that was given that was

8   calculated based on the yield expectation that we had for the

9   number of students we expected to enroll.

12:29 10   Q.   All right.  So what was that number that you had that you

11   magically --

12   A.   I just don't have the exact number at the ready, I

13   apologize.

14   Q.   Well, when the prosecutor asked you on direct yesterday,

15   didn't you say something like 82 to 83 hundred?

16   A.   I believe I said 8,500, that was rounded.  I didn't give

17   you the exact number; I just don't have it at the ready.  It's

18   available.

19   Q.   Really?  Is it also available what the percentage of

12:30 20   students who make it onto the VIP list are admitted versus the

21   number of students who are just regular applicants?  Is that

22   ready -- readily available, too?

23   A.   That's not published information.

24   Q.   But it's readily available to you?

25   A.   No, it's not any information I've ever put together.

1    Q.   You know that if you get out to the VIP list, you're four

2    times more likely to be admitted than you are if you're a

3    regular applicant, don't you?

4    A.   I haven't looked at those data.

5    Q.   You haven't looked at those data.

6         Does anyone on the outside of USC know the difference

7    between the VIP list and SUBCO?

8         MR. FRANK:  Objection, foundation.

9         THE COURT:  Sustained.

12:30 10   BY MR. SHEKETOFF:

11   Q.   Is that published USC information, the difference between

12   the VIP list and SUBCO?

13   A.   No, that's our internal process.

14   Q.   Do you think my client, Mr. Abdelaziz --

15        MR. FRANK:  I object, your Honor.

16        THE COURT:  Wait.  He hasn't asked the question.

17   BY MR. SHEKETOFF:

18   Q.   -- had any way of knowing whether his daughter was going

19   go through SUBCO or the VIP list?

12:31 20        MR. FRANK:  Objection, foundation.

21        THE COURT:  Sustained.

22   BY MR. SHEKETOFF:

23   Q.   You don't have a clue what Mr. Singer told him, do you?

24   A.   I've never met Mr. Singer.

25   Q.   So the answer is, correct, you don't have a clue.

1    A.    Correct.

2    Q.    And you don't have a clue about how he could learn the

3    difference between SUBCO and VIP as an outsider to USC?

4    A.    I object to the closing argument, your Honor.

5          THE COURT:   Sustained.

6    BY MR. SHEKETOFF:

7    Q.    Well, there's nothing he could read online that tells the

8    difference between SUBCO and VIP, is there?

9    A.    It is not published online.

12:31 10   Q.    It's an internal policy, correct?

11   A.    Yes.

12   Q.    I mean, you know about it, Donna Heinel knows about it,

13   correct?

14   A.    Yes.

15   Q.    Because you work with it.

16          Now, you -- were you suggesting to the prosecutor that

17   most or many of the people that made it onto the VIP list were

18   not on there because of donor possibilities?

19   A.    I didn't suggest the ratio.

12:32 20   Q.    Well, what do you think the ratio is, about 90 percent of

21   them?

22          MR. FRANK:   Objection, foundation.

23          THE COURT:   If she knows, she can answer.

24          Overruled.

25   A.    Many of the students are on there because of the hope that

 1    they will, you know, contribute to the University financially,

 2    some of the students are not on there for that reason.  We

 3    don't really separate that out in the admissions office, we

 4    just know that someone around campus is interested in the

 5    student.

 6    Q.   When you say, We don't sort that out in the admissions

 7    process, you mean you don't know that information.  You don't

 8    know what Tim Brunold knows, correct?

 9    A.   I don't have that information.

12:33 10   Q.   And you don't know why Tim Brunold has not been called by

11    the government and instead has picked you.

12              MR. FRANK:  Objection, your Honor.

13              THE COURT:  Sustained.

14    BY MR. SHEKETOFF:

15    Q.   There is no ceiling on the number of slots that USC can

16    send admissions letters to, correct?

17    A.   No, there definitely is.

18    Q.   What is that ceiling?

19    A.   Depending on the number of students that we expect to

12:33 20   enroll and the yield expectations we have, we calculate an

21    admit target for each cycle.

22    Q.   A target, you can add 10, 20 or 50 or 80 on that target

23    and still be off who comes there, correct?

24    A.   That's not our practice.

25    Q.   Well, you don't have a clue how many of the 8,500 you

 1   accept are actually going to come there, do you?

 2   A.   We have good data that helps us to understand the

 3   likelihood that a student will enroll.

 4   Q.   Is that one of the factors you use in deciding whether to

 5   give an admission letter, whether a student is likely to

 6   enroll?

 7   A.   It's not part of our admission decision process, no.

 8   Q.   So how many enrolled in Sabrina Abdelaziz's class?

 9   A.   I believe it was about 3,300 students.  I don't have the

12:34 10   exact number.

 11   Q.   Well, was it -- did it hit right on target or was it 15 or

 12   20 more or less or in between?

 13   A.   I don't recall.  I don't have those data in front of me.

 14        MR. SHEKETOFF:  Could I have 1565 just for the

 15   witness.

 16   Q.   Do you recognize this document?

 17   A.   Yes.

 18   Q.   Did you receive a copy of this document?

 19   A.   Yes.

12:35 20        MR. SHEKETOFF:  Offer it.

 21        MR. FRANK:  Objection, it's hearsay, your Honor; it's

 22   also beyond the scope.

 23        THE COURT:  Sustained.

 24   BY MR. SHEKETOFF:

 25   Q.   Well, did you tell Mr. Kendall when he was cross-examining

1   you that you had not seen a VIP list?

2            MR. FRANK:  Objection, beyond the scope of the

3   redirect.

4            MR. SHEKETOFF:  Your Honor, when I go first in cross,

5   I think I have the right to address things.

6            THE COURT:  Yes, you do.  So overruled.

7   A.   He was referring to Pat Haden's VIP list, which I was not

8   familiar with.  In the Office of Admission, we have a list of

9   all the students who are of interest to all the various

12:36 10  constituents that are being tracked so that we can do our work.

11  Q.   What do you mean "so you can do your work"?  Why would you

12  need that list?

13  A.   So we can make recommendations for the dean of admission

14  to review.

15  Q.   Why would you need a list of who other people in the

16  University consider to be VIPs when you're just making an

17  admissions decision?

18  A.   Again, this was just to expedite the work so he'd have

19  time to review them before our decision-making process ended.

12:36 20  Q.   Wasn't it because you could factor in whether or not

21  somebody was a donor in deciding to give a letter of admission?

22  A.   No.  We specifically instruct our staff to just simply

23  make a recommendation based on the application file and not to

24  consider the special interest.  That's already being considered

25  by the dean of admission in his review.

 1    Q.    Okay.  So whatever your staff recommends, the dean of

 2    admissions decides whether there's going to be a letter of

 3    admit or not.

 4    A.    He has the authority to admit students to the University,

 5    yes.

 6    Q.    So you just want your staff to know about the students

 7    that the dean of admit will have to consider who are on the VIP

 8    list.

 9    A.    We just need to get the work done so we need them to put

12:37 10    in the recommendations in enough time for him to do his review.

11    Q.    It doesn't reflect in any way, shape or form that your

12    institution is interested in raising money.

13    A.    That's not the work of the office of admission.

14    Q.    Is it the work of Mr. Brunold?

15    A.    No.

16    Q.    Then why does he need this list?

17              MR. FRANK:  Objection.

18              THE COURT:  Sustained.

19    BY MR. SHEKETOFF:

12:38 20    Q.    Everyone saw your retweet about rich people having

21    advantages, and the prosecutor asked you about those

22    advantages.  You had volunteered many of them to me, too.  Do

23    you remember that?

24    A.    Yes.

25    Q.    They go to good schools, they get counselors, they get

1    help with tests, et cetera, et cetera, correct?

2    A.    Yes.

3    Q.    All right.  And one of the advantages that they have and

4    one of the advantages that you recognized when you made that

5    retweet was they can give donations to schools and that changes

6    the school's mind about whether or not they're decent

7    candidates.

8    A.    I think that happens very rarely with most wealthy

9    students who are applying to college.  I think most of the

12:38 10   other advantages are a much bigger overall boost in the

11   application process to selective colleges.

12   Q.    So -- but you recognize that as something that you tweeted

13   about, their ability to give donations, correct?

14   A.    I wasn't specifically targeting that.

15   Q.    Nothing is specific in that, but you had a specific memory

16   with the prosecutor about all those things.  I'm asking was

17   this in the general background of your mind when you retweeted

18   that?

19   A.    I don't recall.

12:39 20   Q.    Do you know how much money the athletic department raised

21   in the year that Sabrina Abdelaziz was admitted?

22   A.    No.

23   Q.    Do you know how they raised it?

24   A.    Not specifically.

25   Q.    Do you know what direction they gave to their coaches

 1    about raising money?

 2          MR. FRANK:  Objection, beyond the scope of the

 3    redirect.

 4          THE COURT:  Overruled.

 5    A.    No, I don't work in the office of athletics.

 6          MR. SHEKETOFF:  Thank you.

 7          THE COURT:  Mr. Kendall, recross.

 8          MR. KENDALL:  A few minutes, your Honor, thank you.

 9                RECROSS-EXAMINATION OF REBECCA CHASSIN

12:40 10   BY MR. KENDALL:

 11   Q.    Mr. Frank asked you about people -- students who were

 12   expelled from USC.  Johnny Wilson wasn't expelled, was he?

 13   A.    I believe he had already graduated.

 14   Q.    And he graduated with a degree, correct?

 15   A.    I don't know the specifics.

 16   Q.    Okay.  You said the dean of admissions reviews the --

 17   personally the VIP list, that's Mr. Brunold?

 18   A.    Yes.

 19   Q.    He's been doing it for years.

12:40 20   A.    Since he's been the dean of admission, yes.

 21   Q.    And that goes back before 2014, correct?

 22   A.    I don't remember the exact date when he became dean.

 23   Q.    And you also spoke with Mr. Frank that Ms. Heinel and

 24   Mr. Vavic left USC in 2019.  Do you remember that?

 25   A.    Yes.

```
 1    Q.    Katherine Harrington, the head of all admissions, had to

 2    resign as well that year, didn't she?

 3    A.    No, she left the University in 2020.

 4    Q.    She left in 2020, but she left after all this became

 5    public as well?

 6    A.    She left the University, yes.

 7    Q.    And finally, you said at the very beginning in answering

 8    questions for Mr. Frank that VIP lists are not part of the

 9    SUBCO process.  Didn't you testify that to that earlier today?

10    A.    Yes.

11    Q.    You know that's not a true statement, don't you?

12    A.    It is a true statement.

13          MR. KENDALL:  I'd ask if we could show the witness

14    again Exhibit 1085 and see if that refreshes her recollection.

15          If we could start with just page 2 of Exhibit 1085.

16    Q.    If you could take a look at it and take a look at the

17    column that says status, just go down there and look at the

18    thoughts next to "status" and tell us if that refreshes your

19    recollection that the VIP lists do have some part in the SUBCO

20    process.

21    A.    Nope.

22    Q.    And if you could -- you see the yellow highlight, if you

23    could look above the yellow highlighted.

24    A.    I don't know about this document.  I don't know what it

25    is.  I've never seen it.  I don't know who made it.
```

1    Q.   Well, you just made a statement about VIP lists where you

2    thought you had some authority to say what they're involved in,

3    and you've never seen a VIP list --

4    A.   This is not a VIP list that is made in the office of

5    admission.  I don't know --

6    Q.   I agree with you -- well, if you take a look at the front

7    page of it, you can identify the e-mail, can't you?  In the

8    signature block.

9    A.   I can see that she sent it.  I don't know who made the

12:42 10   list.  It's just not an admission list.

11   Q.   Well, you see what it's entitled and what it's called,

12   correct?

13   A.   Yes.

14        MR. KENDALL:  Your Honor, I'd again offer Exhibit 1085

15   as impeachment from her redirect testimony that she just gave.

16        MR. FRANK:  I object, your Honor, on the same grounds.

17   And also, it's an unsent e-mail.

18        THE COURT:  The objection is sustained.

19        MR. KENDALL:  Thank you, your Honor.  No further

12:43 20   questions.

21        THE COURT:  Thank you, Ms. Chassin, you may step down.

22        THE WITNESS:  Thank you.

23        THE COURT:  The government may call its next witness.

24        MR. FRANK:  Thank you, your Honor.  The government

25   calls Special Agent Elizabeth Keating.

```
  1              (Pause.)

  2              MR. FRANK:  Your Honor, we have transcript binders.

  3              THE COURT:  Yes.

  4              (Discussion off the record.)

  5              (Pause.)

  6              MR. FRANK:  Just to expedite things, all we need for

  7    right now is the transcript 665, and then I think we can fix

  8    the binders.

  9              MR. KELLY:  Your Honor, perhaps we can use this time

12:47 10   giving our objection, and that would be to the playing of these

 11    contentions on the grounds that it violates the confrontation

 12    clause of my client, Mr. Abdelaziz, if I don't get the

 13    opportunity to cross-examine Mr. Singer.

 14              MR. KENDALL:  I join in as well, your Honor.

 15              THE COURT:  All right.  For the reasons stated in

 16    other -- on other occasions, the objection is overruled.

 17              MR. FRANK:  Your Honor, we have submitted a proposed

 18    limiting instruction.  We've actually proposed it for these

 19    purposes.

12:47 20          THE COURT:  Bring that to my attention later because

 21    I'm not aware of it.

 22              MR. FRANK:  Yes, your Honor.

 23              (Elizabeth Keating, sworn.)

 24              THE CLERK:  Thank you.  You may be seated.

 25              And would you please state your name for the record,
```

1    spelling your last.

2          THE WITNESS:  Elizabeth Keating, K-e-a-t-i-n-g.

3             DIRECT EXAMINATION OF ELIZABETH KEATING

4    BY MR. FRANK:

5    Q.    Good afternoon, Special Agent Keating.

6    A.    Good afternoon.

7    Q.    Can you tell us where you work.

8    A.    I work at the Internal Revenue Service.

9    Q.    How long have you worked at the IRS?

12:48 10   A.    For approximately 18 years.

11   Q.    And what have you done -- what roles have you had over the

12   course of your 18 years at the IRS?

13   A.    I was a customer service representative, a revenue agent,

14   and I am currently a special agent.

15   Q.    How long were you a customer service representative?

16   A.    Approximately a year and a half.

17   Q.    What did you do in that role?

18   A.    I provided customer service.  People would call me with

19   questions and I would answer those questions.

12:48 20   Q.    And then how long were you a revenue agent?

21   A.    Approximately three years.

22   Q.    What did you do as a revenue agent?

23   A.    As a revenue agent I audited small businesses and

24   self-employed individuals.

25   Q.    And how long have you been a special agent?

1    A.   Approximately 13 years.

2    Q.   What is the difference between a revenue agent and a

3    special agent?

4    A.   A revenue agent audits individuals.  A special agent

5    investigates individuals for violating criminal violations of

6    the Internal Revenue Code.

7    Q.   Can you tell us a little bit about your educational

8    background.

9    A.   I received a bachelor's degree in accounting from Bentley

12:49 10   College.

11   Q.   And where did you work after graduating Bentley and before

12   joining the IRS?

13   A.   I was a bank teller and then I was hired -- while I was in

14   college I was hired as an intern at the IRS.

15   Q.   So you basically worked for the IRS virtually since

16   graduating college?

17   A.   Yes.

18   Q.   What kind of training did you receive upon becoming a

19   special agent?

12:49 20   A.   I received six months of training in Georgia at the

21   federal law enforcement training academy.

22   Q.   What kind of training was that?

23   A.   It consisted of training in law enforcement techniques,

24   such as search warrants, writing search warrants, making

25   arrests, also firearms training, and I also had additional

1    training in tax law.

2    Q.   Did there come a time after becoming a special agent when

3    you were assigned to work with the FBI?

4    A.   Yes.

5    Q.   And when I say "assigned to work with the FBI," did you

6    work for the FBI or were you assigned to work with the FBI?

7    A.   I'm assigned to work with the FBI.

8    Q.   And when was that?

9    A.   Approximately 2015.

12:50 10   Q.   What does it mean to be assigned to work with the FBI as

11   an IRS special agent?

12   A.   I assist the FBI on -- with their investigation of their

13   cases.

14   Q.   Are you currently assigned to work with any particular

15   squads at the FBI?

16   A.   Yes, I'm assigned to the healthcare fraud squad and the

17   securities fraud squad.

18   Q.   And how long have you been assigned to each of those

19   squads?

12:51 20   A.   Healthcare fraud since 2015, securities fraud since 2017.

21   Q.   Did there come a time after you were assigned to work with

22   the securities fraud squad when you were assigned to an

23   investigation involving Rick Singer?

24   A.   Yes.

25   Q.   Approximately when was that?

1   A.   March 2018.

2   Q.   So about how long had you been with the securities fraud

3   squad before you were assigned to assist with that

4   investigation?

5   A.   Less than a year.

6   Q.   Were you the lead agent on the case?

7   A.   No, I was not.

8   Q.   What were your responsibilities?

9   A.   I was assigned to the case as the IRS case agent.  My

12:51 10  focus was to investigate the financial aspects of the case.

11  Q.   Who was the lead case agent?

12  A.   FBI Special Agent Laura Smith.

13  Q.   As part of the investigation did there come a time when

14  you participated in an approach of Rick Singer?

15  A.   Yes.

16  Q.   What was the date of that approach?

17  A.   September 21, 2018.

18  Q.   Where did the approach occur?

19  A.   At the Long Wharf Marriott Hotel in Boston.

12:52 20  Q.   Is that right down here on the harbor?

21  A.   Yes.

22  Q.   I'm pointing, but I actually have no idea which direction

23  that is.

24       What happened at the Long Wharf Marriott?

25  A.   Mr. Singer came to meet with the Yale soccer coach,

1    Mr. Meredith, for a meeting.

2    Q.   How did that meeting get set up?

3    A.   The FBI directed the -- Mr. Meredith to set up that

4    meeting.

5    Q.   What happened at that meeting?

6    A.   At some point in the middle of the meeting, IRS and FBI

7    agents went into the room and, as a rouse, we arrested

8    Mr. Meredith and then we approached Mr. Singer.

9    Q.   As a rouse you arrested Mr. Meredith?

12:52 10   A.   Yes.

11   Q.   Why did you stage an arrest of Mr. Meredith?

12   A.   We did not want Mr. Singer to know that Mr. Meredith set

13   up the meeting.

14   Q.   At the direction of agents?

15   A.   Yes, at the direction of the FBI.

16   Q.   What happened after you approached Mr. Singer?

17   A.   We explained to the -- the special agents explained to

18   Mr. Singer that he was under investigation and asked if he

19   would like to speak with us.

12:53 20   Q.   And did he agree to speak with you?

21   A.   Yes, he did.

22   Q.   How long approximately did you speak with him on that day?

23   A.   Spoke to Mr. Singer for a couple of hours.

24   Q.   And that day, September 21st, that was a Friday?

25   A.   Yes.

```
 1    Q.   Who led the interview of Mr. Singer?

 2    A.   Agent Laura Smith led that interview.

 3    Q.   And did you participate in it?

 4    A.   Yes, I did.

 5    Q.   Without telling me what Mr. Singer said, what was his

 6    demeanor during that interview?

 7    A.   Mr. Singer appeared nervous.  He was sitting in his chair

 8    and he was shriveled up in his chair, he had this look, a very

 9    scared look in his eye.

12:53 10    Q.   You said that went on for a few hours?

11    A.   Yes.

12    Q.   What happened when the interview ended?

13    A.   Agents left and Mr. Singer contacted his attorney.

14    Q.   How long was Mr. Singer in Boston on that occasion?

15    A.   He was in Boston for a couple of days.  He went home that

16    Monday.

17    Q.   So the meeting was on Friday and he went home on Monday?

18    A.   Correct.

19    Q.   Did you meet with him again during this time?

12:54 20    A.   Yes.

21    Q.   When?

22    A.   Agents met with him the next day on Saturday.

23    Q.   Okay.  And what was the purpose of that?

24    A.   Agents wanted to talk to Mr. Singer.  So we interviewed

25    Mr. Singer, and he made a few phone calls for us.
```

```
 1   Q.   At your direction?

 2   A.   Yes.

 3   Q.   And did you meet with him again after that?

 4   A.   Yes.

 5   Q.   And similar purpose?

 6   A.   Yes.

 7   Q.   And what happened on Monday?

 8   A.   On Monday, I and Special Agent Cedrone escorted Mr. Singer

 9   to the bank to open up a bank account.

10   Q.   And the bank account was in the name of what entity?

11   A.   The Key Worldwide Foundation.

12   Q.   And did the FBI have access to that bank account?

13   A.   Yes.

14   Q.   Prior to -- and then what happened after that?  Did

15   Mr. Singer leave Boston?

16   A.   Yes, Mr. Singer went home.

17   Q.   To where?

18   A.   California.

19   Q.   Prior to approaching Mr. Singer on September 21st, did you

20   intercept -- well, withdrawn.

21        Are you aware that there was a Title III wiretap of

22   Mr. Singer's phone?

23   A.   Yes.

24   Q.   Prior to approaching Mr. Singer on September 21st, did you

25   intercept any calls in which he set up a meeting in Boston?
```

```
 1   A.    Yes.

 2   Q.    Who did he set up a meeting with?

 3   A.    Mr. Wilson.

 4   Q.    Did Mr. Singer meet with Mr. Wilson while he was in

 5   Boston?

 6   A.    No, he did not.

 7   Q.    Why not?

 8   A.    Agents directed Mr. Singer not to meet with Mr. Wilson.

 9   Q.    And how did Mr. Singer cancel that meeting?

10   A.    We directed Mr. Singer to call Mr. Wilson to cancel the

11   meeting.

12   Q.    Did he do that?

13   A.    Yes, he did.

14         MR. FRANK:   Could we -- Ms. Lewis, could you show the

15   witness Exhibit 665?

16         Thank you.

17   Q.    Prior to coming here today, special agent, did you have an

18   opportunity to review the disk marked as 665?

19   A.    Yes.

20   Q.    And are those your initials on the disk?

21   A.    There's no initials on the disk.

22   Q.    Are you familiar with Exhibit 665?

23   A.    Yes.

24   Q.    What is it?

25   A.    It is a call between Mr. Singer and Mr. Wilson.
```

 1   Q.   If you could turn toward --

 2              MR. KELLY:   Objection.   She hasn't reviewed this one.

 3   There's no foundation for this one.

 4              MR. FRANK:   She's reviewed Exhibit 665, and she's

 5   familiar with it, your Honor.

 6              MR. KELLY:   She hasn't initialled it.   Maybe she saw

 7   something else.

 8              MR. FRANK:   If counsel would like to have me take a

 9   break, it's a --

12:57 10           THE COURT:   Do you have something else to do for five

11   minutes?

12   BY MR. FRANK:

13   Q.   Could you look at the tab in your binder that's marked as

14   665?

15   A.   Yes, I see that.

16   Q.   And have you had an opportunity to review that transcript?

17   A.   Yes.

18   Q.   And did you compare that transcript with a disk that was

19   marked as 665?

12:57 20   A.   Yes.

21   Q.   And is that a fair and accurate transcript of the

22   recording that you listened to that was marked as Exhibit 665?

23   A.   Yes.

24   Q.   And are those your initials and date at the bottom of that

25   transcript?

```
 1   A.   Yes, it is.
 2              MR. FRANK:  The government offers 665.
 3              THE COURT:  It will be admitted.
 4              MR. KENDALL:  Objection as we've previously disclosed,
 5   your Honor.
 6              THE COURT:  Yes, subject to the defendants' prior
 7   objection.
 8              (Exhibit 665 received into evidence.)
 9              MR. FRANK:  Ms. Lewis, could you play 665, please.
10              (Played recording.)
11   BY MR. FRANK:
12   Q.   Do you recognizes the voices on that call, special agent?
13   A.   Yes.
14   Q.   Whose voices are they?
15   A.   Mr. Singer and Mr. Wilson.
16   Q.   And the date of this call was September 23, 2018?
17   A.   Yes.
18   Q.   So that was the Sunday?
19   A.   Yes.
20   Q.   And I believe you testified that Mr. Singer made that call
21   at the direction of law enforcement agents?
22   A.   Correct.
23   Q.   Did Mr. Singer also agree to make other recorded phone
24   calls at the government's direction?
25   A.   Yes, he did.
```

1   Q.   During the calls that Mr. Singer -- and are those calls

2   known as consensuals, consensual calls?

3   A.   Yes.

4   Q.   During the consensual calls that Mr. Singer made at the

5   direction of agents, was there a plan for those calls or a

6   script?

7   A.   There was no written script, but we did direct Mr. Singer

8   on what to say.

9   Q.   And who came up with that plan?

12:59 10   A.   Agents and prosecutors.

11   Q.   Were any of the phone calls -- other than the one we just

12   listened to in the days immediately after the approach of

13   Mr. Singer, were any of those calls with either Mr. Wilson or

14   Mr. Abdelaziz, again, with the exception of the one we just

15   listened to?

16   A.   Sorry, can you repeat that?

17   Q.   Sorry, it was a long question.

18        With the exception of the call we just listened to,

19   were any of the calls that Mr. Singer was directed to make in

01:00 20   the days immediately after the approach with either Mr. Wilson

21   or Mr. Abdelaziz?

22   A.   No.

23        MR. KENDALL:  Your Honor, minor objection.  Just days

24   immediately after, can we get a precise time period.

25        THE COURT:  Yes.

```
 1    BY MR. FRANK:
 2    Q.   Between September 21st and September 28th, 2018, other
 3    than the call we have just listened to, did agents direct
 4    Mr. Singer to make any phone calls to Mr. Wilson?
 5    A.   No.
 6    Q.   Between September 21, 2018 and the end of October 2018,
 7    did agents direct Mr. Singer to make any calls to
 8    Mr. Abdelaziz?
 9    A.   No.
01:00 10   Q.   And are you aware of any calls during that period with
11    Mr. Abdelaziz?
12    A.   No.
13             THE COURT:  All right.  We're going to stop here for
14    the lunch break.
15             Ms. Keating you may step down.
16             We're going to recess for one hour, jurors.  We're
17    going to have an afternoon session today, between 3:00 and 3:30
18    we will recess, so we'll see you back here at 2:00.
19             THE CLERK:  All rise for the jury.
01:01 20          (Jury left the courtroom.)
21             THE COURT:  All right.  Be seated, counsel.
22             So I take it the direct of Ms. Keating will take the
23    rest of the day.
24             MR. FRANK:  I believe it will continue into Thursday,
25    your Honor.
```

```
 1              THE COURT:  Into Thursday, okay.
 2              Anything else that needs to come to my attention
 3    before we recess --
 4              MR. FRANK:  We have submitted, I believe by ECF, a
 5    proposed limiting instruction for the consensual recordings.
 6              And we could -- I believe the deputy has it as well,
 7    so perhaps --
 8              THE COURT:  All right.  I will -- and you expect that
 9    both sides would like me to give that now.
10              MR. FRANK:  It was our proposed limiting instruction.
11              MR. KENDALL:  We need to look at it.
12              THE COURT:  Of course, I thought you had.
13              MR. KENDALL:  I don't believe what he's filed we've
14    looked at.
15              THE COURT:  All right.  You can let me know after the
16    break as to, A, whether you agree to it; and two, when it is
17    you would like me to give it.
18              MR. KENDALL:  The one other thing we could get, could
19    we find out what the schedule is for the rest of the week and
20    the expected stop date?  We've got to line our people up.
21              THE COURT:  Yes.  Today it will be Keating on direct.
22    We will not have a session tomorrow.
23              Thursday, Mr. Frank.
24              MR. FRANK:  I believe Keating will take the balance of
25    Thursday.  I hope we will get to the next witness and be able
```

```
 1   to complete the next witness by the end of the week, that's
 2   Lauren Janke.
 3          THE COURT:  But Ms. Keating's direct will be finished
 4   sometime Thursday.
 5          MR. FRANK:  Yes.
 6          MR. KENDALL:  When do you expect the government to
 7   rest next week?
 8          MR. FRANK:  Again, that depends on the pace of
 9   cross-examination.  If the pace of cross-examination is
01:03 10   consistent with our original expectations, perhaps by midweek,
11   but if it drags longer, it will be longer.
12          MR. KENDALL:  Thank you.
13          THE COURT:  We're in recess until 2:00.
14          THE CLERK:  All rise.
15          (Recess taken 1:03 p.m. to 2:10 p.m.)
16          THE CLERK:  You may be seated.  Court is now in
17   session.
18          THE COURT:  Good afternoon, counsel.  I have
19   considered the defendant -- or the government's response to the
02:10 20   defendants' confrontation clause objections in which they have
21   suggested a limiting instruction for me to give to the juror --
22   jury and the defendants' proposed amendment to that
23   instruction, and I've come up with what I believe is a hybrid
24   of the two, and I will tell what I intend to instruct the jury
25   on right now when they come in.
```

1          You have heard and will hear evidence of certain phone

2     calls between Rick Singer and the defendants and others after

3     September 21, 2018, which Mr. Singer made at the direction of

4     law enforcement.  While you must not consider Singer's

5     statements during those calls for the truth of anything they

6     assert, you may consider them for the context that they provide

7     in evaluating the defendants' statements on the phone calls.

8     By context I mean what Singer's statements may provide -- by

9     context I mean that Singer's statements may provide meaning to

02:12 10    the defendants' responses, if any.

11          Counsel?

12          MR. FRANK:  No objection from the government, your

13     Honor.

14          THE COURT:  Mr. Kelly?

15          MR. KELLY:  Yes, your Honor.  Again, just for the

16     record, we don't think a limiting instruction would cure the

17     confrontation clause issue, but understanding the Court's rule,

18     understanding that's the instruction, could you just read the

19     part back again where you say, "while you".

02:12 20    THE COURT:  Yes.  While you must not consider Singer's

21     statements during those calls for the truth of anything they

22     assert, you may consider them for the context that they provide

23     in evaluating the defendants' statements on the phone calls.

24          MR. KELLY:  Again, keeping in mind my objection,

25     that -- if the Court's going to give an instruction, it sounds

1    like something that's accurate for us.

2         THE COURT:  Mr. Kendall had something else he wanted

3    to bring to my attention.

4         MR. KENDALL:  Do you want to just add to the

5    instruction -- we think that instruction is better than what

6    the government offered.  We're not waiving any rights obviously

7    in our objections.  Two things -- by making those suggestions,

8    we're not waiving any rights on the issue, but two things we

9    wanted to raise.

02:13 10         The Court had said that you thought you had ruled on

11    the confrontation clause issue with respect to the tapes.  It's

12    our memory that you reserved on that issue and you have not

13    actually ruled on the confrontation clause issue on the tapes.

14         THE COURT:  Well, I'll review that, but I'm not going

15    to stop the testimony this afternoon to do that.  I'll do it

16    after we recess.

17         And where is it that you think I said that, at the in

18    limine motion stage?

19         MR. KENDALL:  At the part when you ruled on the

02:14 20    motion, so it was the authentication motion, not the in limine

21    motion.

22         THE COURT:  In the authentication motion?

23         MR. KENDALL:  Yeah.  The long list of issues for

24    authentication.  I think.

25         THE COURT:  Is that the government's memory?

1          MR. FRANK:  That is the government's memory, your

2     Honor.

3          THE COURT:  Then I reserved.

4          MR. FRANK:  You reserved.

5          THE COURT:  All right.  I will review that overnight

6     over the break and we'll discuss it later.

7          MR. KENDALL:  Okay.  Your Honor, the last issue, and I

8     appreciate the courtesy of raising this, Exhibit 578 is a tape

9     the government's going to play this afternoon with my client

02:14 10    and Mr. Singer.  In it, there's an aside.  My client mentions

11    that he's planning to have a birthday party in France.  The

12    Versailles Museum is a function hall and you can rent out rooms

13    there.  So he's renting out a room there.

14          THE COURT:  This is Versailles?

15          MR. KENDALL:  Versailles.  You can check it on the

16    website.  Any room there in Versailles is available to rent as

17    a function hall, rooms for 20 to rooms for 200, all at

18    different prices.  He tells Mr. Singer, I'm going to invite you

19    to my party, and it has nothing to do with this case.  It's

02:15 20    only a salacious detail to make the jury think how wealthy my

21    client is and how he spends money.  I've asked the government

22    to just not play that little section.  They insist on playing

23    it.  I think it's unnecessary, your Honor.  I think it's

24    actually prejudicial under 401 and 403, both prejudicial and

25    not relevant.

1          THE COURT:  Mr. Frank.

2          MR. FRANK:  First of all, your Honor, to raise this

3    now when we're about to play a recording that has been marked

4    as an exhibit for literally months is, in our view, belated.

5          Second of all, we think it's directly probative of the

6    nature of the relationship between the defendant and his

7    coconspirator.  It is highly unusual, we would submit, to

8    invite your child's college counselor to a black tie party in

9    France, so it is probative of the nature and closeness of the

02:16 10   relationship between the defendant and his alleged

11   coconspirator.

12         And finally, the notion that it's prejudicial when the

13   defense has put in evidence that the defendant paid over

14   $2 million a year in taxes we think doesn't hold any water.  So

15   it's certainly not more prejudicial than that fact.

16         MR. KELLY:  For the record, we object as well, your

17   Honor.

18         MR. KENDALL:  Your Honor, the tax issue, they're

19   putting the tax return into evidence.  Those numbers are before

02:16 20   the jury.  I do think the amount of tax that a reasonable

21   person would claim was evaded or missed versus the overall

22   amount of tax paid goes to --

23         THE COURT:  Well, I'm going to overrule the objection

24   but I wouldn't be averse at some point to allowing you to tell

25   the jury that he didn't rent all of Versailles, only a room.

```
 1              MR. FRANK:  That's actually not what he says, but.

 2              MR. KENDALL:  Thank you, your Honor.

 3              THE COURT:  Okay.  Let's go.  Call the jury.

 4              (Jury enters.)

 5              THE CLERK:  Thank you.  You may be seated.

 6              THE COURT:  Good afternoon, jurors.  Before we begin,

 7    I have a limited instruction, what we call a limited

 8    instruction, that I'm going to give you with respect to what

 9    you're about to hear.

10              You have heard, and will hear, evidence of certain

11    phone calls between Rick Singer and the defendants and others

12    after September 21, 2018, which Mr. Singer made at the

13    direction of law enforcement.  While you must not consider

14    Singer's statements during those calls for the truth of

15    anything they assert, you may consider them for the context

16    that they provide in evaluating the defendants' statements on

17    the phone calls.  And by context I mean that Singer's

18    statements may provide meaning to the defendants' responses, if

19    any.  So keep that in mind.

20              Now, Miss Keating, you're reminded that you remain

21    under oath.

22              Mr. Frank, you may continue with direct examination.

23              MR. FRANK:  Thank you, your Honor.

24    BY MR. FRANK:

25    Q.   Good afternoon again, Miss Keating, Special Agent Keating.
```

```
 1    A.    Good afternoon.
 2    Q.    At the time that law enforcement agents approached Rick
 3    Singer on September 21, 2018, did you give Mr. Singer any
 4    instructions with respect to the continued operation of his
 5    college counseling business?
 6    A.    Yes.
 7    Q.    What instructions did you give him?
 8    A.    We told Mr. Singer to continue with his college counseling
 9    business.
02:20 10    Q.    Why?
11    A.    We wanted Mr. Singer to continue with his business to make
12    things appear that everything was fine and that there was no --
13    he wasn't working with the FBI.
14    Q.    Now, you testified a moment ago, or a little while ago
15    that Mr. Singer returned home to California on the Monday of
16    that weekend.  So that was September 24th?
17    A.    Yes.
18    Q.    Did there come a time when you met with him again after
19    that first weekend in Boston?
02:21 20    A.    Yes.
21    Q.    When was that?
22    A.    The -- September 26th, a few days later.
23    Q.    So that was the Wednesday of the following week?
24    A.    Yes.
25    Q.    And where did you meet with him?
```

```
 1    A.    In California.

 2    Q.    Where in California?

 3    A.    Santa Anna, California.

 4    Q.    And what was the purpose of that meeting?

 5    A.    To interview Mr. Singer.

 6    Q.    How long were you with him on that occasion?

 7    A.    For three days.

 8    Q.    And were all of those three days in Santa Anna,

 9    California?

10    A.    No.  We went to Sacramento for two days.

11    Q.    Why did you move to Sacramento?

12    A.    Mr. Singer's attorney had another commitment, so we went

13    to Sacramento.

14    Q.    I want to direct your attention to the meeting that you

15    had with him on the third day of that meeting, September 28th.

16    A.    Yes.

17    Q.    Did there come a time when you took a break during that

18    meeting?

19    A.    Yes, we did.

20    Q.    What happened during that break?

21    A.    Mr. Singer had a Facetime call with Mr. Wilson's

22    daughters.

23    Q.    Did you or your colleagues record that call?

24    A.    No, we did not.

25    Q.    Why not?
```

1    A.    We had no reason to believe, based on the evidence, that

2    Mr. Wilson's daughters were aware of the side door.

3    Q.    After the call, were you able to confirm that the Facetime

4    call was, in fact, with Mr. Wilson's daughters?

5    A.    Yes.

6    Q.    How?

7    A.    Mr. Singer's --

8          MR. KENDALL:  Objection, your Honor.  Hearsay and move

9    to strike the prior answer based --

02:22  10          THE COURT:  Overruled.  She can't say what she learned

11    as a result of conversations with those daughters.

12    Q.    Without telling us what Mr. Singer or anyone else told

13    you, were you able to confirm that the call, the Facetime call,

14    was, in fact, with Mr. Wilson's daughters?

15          MR. KENDALL:  Objection, your Honor.  It's hearsay.

16    She didn't participate.

17          THE COURT:  Overruled.

18    A.    There was a prior call where Mr. Singer and Mr. Wilson

19    discussed Mr. Singer meeting with Mr. Wilson's daughters and

02:23  20    there was a conversation the next day to confirm that call.

21    There was also a -- on Mr. Singer's phone, there was a listing

22    that said that he had a Facetime call with Mamie Wilson for 33

23    minutes.

24    Q.    Did there come a time after that Facetime call when

25    Mr. Wilson and Mr. Singer spoke again?

```
 1    A.    Yes.

 2    Q.    When was that?

 3    A.    The next day.

 4    Q.    And did you record that conversation?

 5    A.    Yes.

 6    Q.    Were you present for the conversation?

 7    A.    No.

 8    Q.    Why not?

 9    A.    I was flying home from California to -- back to Boston.

02:23 10    Q.    So the call was intercepted on the wire?

11    A.    On the consensual wire, yes.

12    Q.    If I could ask you to turn to the transcript marked 571 in

13    your binder.  On the desk in front of you, Special Agent, there

14    is a disk labeled 571.  Could you also take a look at that

15    disk.

16          Do you have the disk marked 571?

17    A.    Yes, I do.

18    Q.    Does this one have your initials on it?

19    A.    Yes, it does.

02:24 20          MR. FRANK:  Thank God.

21          MR. KELLY:  No objection.

22          MR. FRANK:  Withdrawn, your Honor.

23    Q.    Do you recognize that disk?

24    A.    Yes.

25    Q.    What is it?
```

1    A.    It is a call between Mr. Wilson and Mr. Singer.

2    Q.    And is the date of that call September 29, 2018?

3    A.    Yes.

4          MR. FRANK:  Government offers 571.

5          THE COURT:  It will be admitted.

6          (Exhibit 571 admitted into evidence.)

7          MR. FRANK:  And if everyone could turn to the tab

8    marked 571 in their binders, we'll begin at the beginning of

9    that call.

02:25 10          (Audio recording played.)

11   Q.    So this was how long after the Facetime call with

12   Mr. Wilson's daughters?

13   A.    The next day.

14   Q.    And at line 20 on page 1, at line 17, Mr. Wilson says he's

15   been out of town, been traveling.  Then, at line 20, Mr. Singer

16   says, "ok, cool.  So the girls".  And then at line 22, "were

17   great".

18          How many daughters does Mr. Wilson have?

19   A.    Mr. Wilson has two daughters.

02:26 20   Q.    What are their names?

21   A.    Mamie and Courtney.

22   Q.    And then, at line 23, Mr. Wilson says, "I still didn't get

23   a full debrief from them, but talked to Leslie".  Who is

24   Leslie?

25   A.    Mr. Wilson's wife.

1   Q.   Okay.  If we can pick up on page 2 where we left off.

2        (Audio recording played.)

3   Q.   Special Agent, I'd like to direct you back to page 4 of

4   the transcript.  At line 14 on page 4, Mr. Wilson says, "And

5   what were the schools in that, if you did the side door?  And

6   I'm interested about the side door and that stuff".

7        Do you see that?

8   A.   Yes.

9   Q.   Who was the first person on this phone call to mention the

02:30 10   side door?

11  A.   Mr. Wilson.

12  Q.   And Mr. Singer goes on to say, at line 24, "because all of

13  the coaches have... you know, they have guaranteed spots".  And

14  at line 4, "potentially there's a sailing option, potentially

15  there's a crew option.  I mean, I don't know how good of

16  athletes they are."  And then at line 13, he says -- I'm sorry.

17  At line 12, Mr. Wilson responds, "What if they're not really

18  that good?  I mean, they can do some crew, but I don't know

19  they're gonna be good.  Courtney's not even that good

02:31 20  competitively at sailing.  She just taught sailing and did

21  sailing in, you know" -- and then at line 18, "yacht club".

22       Who again is Courtney?

23  A.   Courtney is Mr. Wilson's daughter.

24  Q.   And then Mr. Singer responds, "but at the end of the day,

25  by the side door, I may be able to go to the sailing coach and

```
 1   say, 'hey, this family's willing to make the contributions.

 2   She could be on your team.  She is a sailor.  She may not be up

 3   to the level you are, but she can come -- you know, you're

 4   gonna get a benefit, and the family's gonna get benefit.  So

 5   are you -- are you interested in doing that?'"

 6            And how does Mr. Wilson respond at line 3?

 7   A.   "Yeah.  Okay".

 8   Q.   And back on page 5, Mr. Singer, at line 20, mentions going

 9   to the sailing coach.  And prior to this call, had you been

10   investigating any sailing coaches?

11   A.   Yes.

12            MR. KENDALL:  Objection, your Honor.

13            THE COURT:  Grounds?

14            MR. KENDALL:  This is Mr. Singer's words.  Whatever

15   they've been doing separately is not a part of Mr. Singer's

16   conversation.

17            MR. FRANK:  It's relevant to the investigation, your

18   Honor.

19            MR. KENDALL:  It's not relevant to my client's

20   conversation.

21            THE COURT:  Overruled.  He can have that question.

22   Q.   Prior to this conversation had you been investigating any

23   sailing coaches?

24   A.   Yes.

25   Q.   Who?
```

1    A.   John Vandemoer, the Stanford sailing coach.

2    Q.   Okay.  And Mr. Wilson says, at line 14, "I remember the

3    last time I did this, you didn't really make any money on

4    this -- the side -- on this -- on the side, this stuff.  You

5    just charge and then you make a donation to the school, and

6    that's it"?

7    A.   I'm sorry.  What page are you on?

8    Q.   I'm sorry.  It's page 6, line 14.

9         THE COURT:  We haven't heard this, right?

02:32 10        MR. FRANK:  Oh.  I apologize, Judge.  I got ahead of

11   myself.

12        If we can continue where we left off.

13        (Audio recording played.)

14        MR. FRANK:  Let's stop it right there, please.

15   Q.   All right.  Going back to page 6, at line 14, Mr. Wilson

16   says -- Special Agent, are you with me, page 6, line 14?

17   A.   Yes.  I see that.

18   Q.   Mr. Wilson says, "I remember last time I did this, you

19   didn't really make any money on this, on the side, this stuff.

02:35 20   You just charge, and then you make a donation to the school and

21   that's it".

22        Who's the first person on this call to mention "the

23   last time"?

24   A.   Mr. Wilson.

25   Q.   And was it true that when Mr. Wilson previously engaged in

1   the side door with Mr. Singer that Mr. Singer didn't make any

2   money on this?

3   A.   That is not true.

4   Q.   What happened in that instance?

5   A.   Mr. Singer kept some of the money for himself.

6   Q.   And then, at line 20, Mr. Singer says, "when, you know, we

7   did Johnny, that was essentially now the money goes into my

8   foundation as a donation".

9        What is the name of Mr. Wilson's son?

02:36 10  A.   Johnny Wilson.

11  Q.   Okay.  And then, if we look at page 7 at line 6,

12  Mr. Singer says, "And then what I can -- what I'll do is I'll

13  split the money potentially to the coach or other parties that

14  are at that school that need the money, right".  And then at

15  line 11, "so -- or it may go right to the coach that's helping

16  us.  It just depends on the school".

17       And how does Mr. Wilson respond to that at line 13?

18  A.   "Right".

19  Q.   And then Mr. Wilson continues, "okay, so you don't

02:36 20  actually get credit for a donation to the school, or get

21  hounded for that.  You get a".  And at line 17, "your donation

22  to you, or your foundation, The Key or whatever ".

23       And then how does Mr. Singer respond?

24  A.   "Right, and you get your write-off, and then you do your

25  thing".

```
 1   Q.   And what is a write-off, Special Agent?

 2   A.   A tax deduction.

 3   Q.   And how does Mr. Wilson respond at line 22?

 4   A.   "Ok".

 5        MR. FRANK:  Can we pick up at page 8 at

 6   approximately -- where we left off, at approximately line 20.

 7        (Audio recording played.)

 8        MR. FRANK:  Let's stop there.

 9   Q.   And Special Agent, if we can turn back to page 8,

10   Mr. Wilson says, at line 20, on page 8, "I have this close

11   friend of mine here who works at McKinsey with me, and he's

12   very well off.  He's the head of one of these big areas in

13   McKinsey for a lot of years".

14        What is McKinsey?

15   A.   McKinsey is a consulting company.

16   Q.   And if we turn to page 10 -- I'm sorry.  The bottom of

17   page 9, Mr. Singer says, "what I would" -- at line 18, "What I

18   would suggest is that he calls up her office, they have a

19   scheduling person for the president -- and he sets up a meeting

20   for he and his daughter to go meet, and she kinda meets with

21   them, and then she'll give an indication and he'll get an idea

22   of what it's gonna need -- what's going to need to be done to

23   have her go to Brown.  That's".  And then Mr. Wilson interrupts

24   and says, "the front door," and then at line 4, "like, like,

25   $10 million kind of thing".
```

1           Had Mr. Wilson use the term "front door" in this

2    conversation?

3    A.    No.

4    Q.    And then, at line 15, Mr. Wilson says "He wanted to do it,

5    so the other thing that he had a concern was he wanted to do it

6    in a way his daughter wouldn't know.  His daughter's already

7    said, 'dad, don't help me with this, don't help me with that'.

8    She's very kind of".  And then Mr. Singer interrupts at line 20

9    with "well, then that's a different path, and then -- then I

02:43 10   may have to get involved in that".

11           And how does Mr. Wilson respond?

12   A.    "Right".

13   Q.    And then at page 11, line 11, Mr. Singer says, "because

14   them going to meet the president isn't -- doesn't mean that

15   she's gonna help him, but that's a good starting point".

16           And how does Mr. Wilson respond at line 14?

17   A.    "Mm-hum".

18   Q.    We can pick up at page 15 where we left off, approximately

19   line 8.

02:45 20           (Audio recording played.)

21   Q.    Special Agent, if I could direct your attention back to

22   page 14.  Page 14, line 18, Mr. Wilson says, in the middle of

23   the line, "They would love to go to Stanford or Harvard".  And

24   then if you turn to page 15, Mr. Wilson says, at line 20, "so

25   those are the two that are on the top.  It's, it's the strategy

1   to kind of get into those two".  And then he says, "is Harvard

2   easier cause I'm a", at line 24, "legacy".

3          What does the term "legacy" refer to?

4   A.   Alumni.

5   Q.   And then at page 16 at line 15, Mr. Singer says "like

6   what's your -- like how much do you give to Harvard".  How does

7   Mr. Wilson respond?

8   A.   "Nothing.  Like a couple hundred grand over the years".

9   Q.   What does a couple hundred grand refer to?

02:48 10   A.   A couple hundred thousand dollars.

11   Q.   And then at page 17, line 22, Mr. Singer says, "No, she --

12   they -- they may end up getting in without even a donation,

13   but, but you'll know at least this route, we got an", and

14   Mr. Wilson interrupts."  You see that?

15   A.   Yes.

16   Q.   And what does he say at page 18, line 1?

17   A.   "They gotta get erg scores".

18   Q.   And what does he say at line 3?

19   A.   "First, though, right?"

02:48 20   Q.   And then Mr. Singer interrupts and says, "We got the side

21   door route, too".  At line 4.  "Yeah, yeah."

22          And then how does Mr. Wilson respond at line 5?

23   A.   "But they're not really playing crew much.  They're not

24   doing crew, rowing crew".

25   Q.   At line 23 on that page, Mr. Singer says, "I'm gonna be

| | |
|---|---|
| 1 | spending some time in Boston, because I'm gonna be reading in |
| 2 | Harvard this year, so I'll be able to get together with you". |
| 3 | Do you see that? |
| 4 | A.   Yes. |
| 5 | Q.   Was it true Mr. Singer was going to be reading at Harvard? |
| 6 | A.   No.  It was not true. |
| 7 | Q.   Was it true that he was going to be spending some time in |
| 8 | Boston? |
| 9 | A.   Yes. |
| 02:49  10 | Q.   Why? |
| 11 | A.   Meeting with agents and making phone calls. |
| 12 | Q.   This call was on September 29, 2018? |
| 13 | A.   Yes. |
| 14 | Q.   Moving ahead a few days, did there come a time in early |
| 15 | October when you met with Mr. Singer again in Boston? |
| 16 | A.   Yes. |
| 17 | Q.   When was that? |
| 18 | A.   October -- I'm sorry. |
| 19 | Q.   Was it in the first few days of October? |
| 02:49  20 | A.   Yeah, the first week of October. |
| 21 | Q.   And on that occasion, did there come a time when |
| 22 | Mr. Singer gave you his cell phone? |
| 23 | A.   Yes. |
| 24 | Q.   Why? |
| 25 | A.   To image his phone. |

```
 1   Q.   What does it mean to image somebody's phone?

 2   A.   To make a copy of someone's telephone.

 3   Q.   And is that what happened?

 4   A.   Yes.

 5   Q.   Was that the only time agents imaged Mr. Singer's phone?

 6   A.   No.

 7   Q.   Between October 2018 and March of 2019 how many times did

 8   agents image Mr. Singer's phone?

 9   A.   Eight times.

02:50 10  Q.   And after imaging the phone the first time on October 5,

11   what did you do with the image?

12   A.   Made a copy of the image on a DVD and gave it to the

13   AUSAs.

14   Q.   And what was your understanding of what they were doing

15   with it?

16   A.   My understanding was they were going to review the images.

17   Q.   And did there come a time when you were contacted about

18   what was on the phone?

19   A.   Yes.

02:50 20  Q.   When was that?

21   A.   October 28.

22   Q.   And what happened on October 28?

23   A.   I received an e-mail from an AUSA stating that Mr. Singer

24   wrote notes on his phone.

25   Q.   Wrote what on his phone?
```

1    A.    Notes on his phone.

2    Q.    And did you see any of those notes?

3    A.    I saw a portion of those notes.

4          MR. FRANK:  I want to show now, the agent only,

5    Exhibit 13.

6    Q.    Special Agent, do you recognize Exhibit 13?

7    A.    Yes.

8    Q.    What is it?

9    A.    The notes from Mr. Singer's phone.

02:51 10   Q.    And I'll note that this is a very large exhibit, several

11   hundred pages.  Are there multiple copies of the notes from

12   different extractions?

13   A.    Yes.

14         MR. FRANK:  Okay.  And I want to direct --

15         The government offers Exhibit 13.

16         MR. KENDALL:  Your Honor, objection.  I don't object

17   to the first few pages, but it's about, I don't know how to

18   estimate it, maybe four or 500 pages.  Most of that is not --

19   he's out of the conspiracy at this point, so there's no

02:51 20   coconspiracy --

21         MR. FRANK:  I object to the speaking objection.

22         MR. KENDALL:  Okay.  Your Honor, I object.  I don't

23   think it's a *Petriezzello* issue at this point.  I think that

24   issue has passed.  I'm happy to work with Mr. Frank for the few

25   things that are relevant to my client, but the hundreds of

```
 1    pages that are not --
 2           MR. FRANK:  We have no objection to that, your Honor.
 3    I'm happy to work with Mr. Kendall on that.
 4           THE COURT:  All right.  That's fine.  Thank you.
 5           (Exhibit 13 admitted into evidence.)
 6    Q.   If we look at the first page of Exhibit 13, if we can zoom
 7    in on the note there at the top, do you see that this was
 8    created on October 1, 2018?
 9    A.   Yes, I see that.
10    Q.   And then it says, "modified on October 4, 2018"?
11    A.   Yes.  I see that.
12    Q.   At the top of the note, it says "September 29"?  Do you
13    see that?
14    A.   Yes.  I see that.
15    Q.   And it says, "Summary: Call with John Wilson about the
16    side door plus intro to his friend about helping at Brown for
17    2019"?
18    A.   I see that, yes.
19    Q.   And it says that again just below in the body of the note?
20    A.   Yes.
21    Q.   Do you know what that refers to?
22    A.   The call we just heard between Mr. Wilson and Mr. Singer.
23    Q.   And then it says, under October 1, "called Laura -- update
24    on weekend text and call with John Wilson on side door".
25           Who's Laura?
```

1   A.   Special Agent Laura Smith.

2   Q.   And then it says, "Called Michelle Janavs, confirmed

3   Isabel going through SUBCO and 50K payment made once she gets

4   her initial letter of acceptance and the rest of the process".

5        Who is Michelle Janavs?

6   A.   She's a parent.

7   Q.   Okay.  And then I want to jump down to where it says

8   October 2nd.  And it says, "loud and abrasive call with agents.

9   They continue to ask me to tell a fib and not restate what I

02:53 10  told my clients as to where the" -- I believe that should be

11  their money -- "was going -- to the program not the coach and

12  that it was a donation and they want it to be a payment.

13        "I asked for a script if they want me to ask

14  questions and retrieve responses that are not accurate to the

15  way I should be asking the questions.  Essentially they are

16  asking me to bend the truth which is what they asked me not to

17  do when working with the agents and Eric Rosen.

18        "Liz raised her voice to me like she did in the hotel

19  room about agreeing with her that everyone bribed the schools.

02:54 20  This time about asking each person to agree to a lie I was

21  telling them".

22        I'm going to ask you a series of questions about

23  this, Special Agent.  First of all, there's a reference to

24  someone named Eric Rosen.  Who is that?

25  A.   Is it --

1    Q.   Oh.  I'm sorry.  I did not realize this was not up on the

2    juror's screen.  This should be up on the juror's screen.

3             MR. FRANK:  It's in evidence, correct?

4             THE COURT:  It was admitted.

5             MR. KELLY:  I would ask him to re-read it so the jury

6    can see it.

7             MR. FRANK:  I'm happy to re-read it, your Honor.

8    Q.   Okay.  So you testified it says, "call with John Wilson

9    about the side door plus intro to his friend about helping at

02:54 10   Brown for 2019"?

11   A.   Yes.  I see that.

12   Q.   And again, who does that -- what does that refer to?

13   A.   The call with Mr. Wilson.

14   Q.   And then, under October 1, it says "called Laura -- update

15   on weekend text and call with John Wilson on the side door".

16   Who is Laura?

17   A.   Special Agent Laura Smith.

18   Q.   And then it says, "called Michelle Janavs confirmed Isabel

19   going through SUBCO and 50K payment made once she gets her

02:55 20   initial letter of acceptance and the rest of the process".

21             Who is Michelle Janavs?

22   A.   She is a parent.

23   Q.   And then I want to jump down to October 2nd.  It says,

24   "loud and abrasive call with agents.  They continue to ask me

25   to tell a fib and not restate what I told my clients as to

1     where their money was going -- to the program not the coach and
2     that it was a donation and they want it to be a payment.
3            "I asked for a script if they want me to ask
4     questions and retrieve responses that are not accurate to the
5     way I should be asking the questions.  Essentially they are
6     asking me to bend the truth which is what they asked me not to
7     do wither working with the agents and Eric Rosen.
8            "Liz raised her voice to me like she did in the hotel
9     room about agreeing with her that everyone bribed the schools.
02:56 10    This time about asking each person to agree to a lie I was
11    telling them".
12           First of all, who is Eric Rosen?
13    A.    He was an AUSA assigned to the case.
14    Q.    And there's a reference to Liz.  Do you know who that
15    refers to?
16    A.    It's referring to me.
17    Q.    And just starting at the top under October 2nd, it says
18    "loud and abrasive call with the agents".  Do you recall having
19    a loud and abrasive call with Mr. Singer on October 2, 2018?
02:56 20    A.    No, I do not.
21    Q.    Do you recall ever having a loud and abrasive call with
22    Mr. Singer?
23    A.    No, I do not.
24    Q.    And do you typically get loud and abrasive?
25           MR. KENDALL:  Objection, your Honor.

```
 1            THE COURT:  Overruled.
 2   A.   No, I do not.
 3   Q.   Did you document your calls or did you or your fellow
 4   agents document your calls with Mr. Singer during this time
 5   frame?
 6   A.   Yes.  Special Agent Katie Cedrone documented, periodically
 7   documented, communications we had with Mr. Singer.
 8   Q.   And when you say "periodically documented communications
 9   with Mr. Singer", what do you mean by that?
10   A.   We didn't -- she didn't document every single call we had
11   with Mr. Singer, but in every few weeks she documented that we
12   had communications with Mr. Singer.
13   Q.   If Mr. Singer made substantive communications to you, if
14   he told you about things that had happened that were --
15            MR. KELLY:  Objection to leading.
16            THE COURT:  Sustained to that extent.
17   Q.   What, if at all, did you do when Mr. Singer told you
18   something substantive?
19   A.   When we had communications that had substance, we
20   documented that in the report.
21   Q.   What about when you told him operational things or he told
22   you operational things he had done, like make a phone call?
23   A.   Specific operational things we did not document for each
24   call, but we summarized it periodically.
25   Q.   And were -- to what extent were his calls on the phone
```

 1   recorded on the phone that he was using?

 2   A.   All the calls that Mr. Singer made on his phone were

 3   recorded.

 4   Q.   It says, "Liz raised her voice to me like she did in the

 5   hotel room about agreeing with her that everyone bribed the

 6   schools.  This time about asking each person to agree to a lie

 7   I was telling them".

 8         Do you recall meeting with Mr. Singer in a hotel

 9   room?

02:58 10   A.   Yes, I do.

11   Q.   When was that?

12   A.   Met with Singer, Mr. Singer, the first day when we

13   approached him and then periodically that weekend.

14   Q.   And do you recall raising your voice at him on those

15   occasions?

16   A.   No.  I did not raise my voice.

17   Q.   I'm sorry?

18   A.   No.  I did not raise my voice to Mr. Singer.

19   Q.   What did you do?

02:58 20   A.   I explained to Mr. Singer what a donation was.

21         MR. KENDALL:  Objection, your Honor.  It's hearsay.

22         THE COURT:  She can say what she said.

23         MR. KENDALL:  What she tells Singer is not relevant.

24   It's just hearsay.

25         THE COURT:  It's not hearsay.  She can say what she

1    said to him.  Overruled.

2    A.    I explained to Mr. Singer that a donation is a gift and

3    you don't get anything else in return for it, and I also

4    explained to Mr. Singer that a payment in exchange for someone

5    being recruited as a fake athlete is not a donation.

6    Q.    Do you recall if you used the word "bribe"?

7    A.    I don't recall if I used the word "bribe".

8    Q.    You might have?

9    A.    I may have, yes.

02:59 10          MR. KELLY:  Object to the leading.  She said she

11    didn't recall.  She said she may have.

12          THE COURT:  Overruled from that point, but don't lead

13    the witness.

14          MR. FRANK:  Yes, your Honor.

15    Q.    He says, under October 2nd, "after loud and abrasive call

16    with agents, they continue to ask me to tell a fib and not

17    restate what I told my clients as to where their money was

18    going -- to the program not the coach and that it was a

19    donation and they want it to be a payment".

02:59 20          Did you instruct Mr. Singer to tell a fib?

21    A.    No, I did not.

22    Q.    What did you instruct him?

23    A.    I instructed Mr. Singer to tell the parents that it would

24    be a payment to a coach in exchange for their child to be

25    recruited as a false athlete.

1    Q.   Did you tell him not to use the words "donation" or

2    "program"?

3    A.   Yes.  We told Mr. Singer to use the "payment to a coach,"

4    not "donation to a program."

5    Q.   What was your understanding of what he had previously said

6    to parents before he had been approached?

7              MR. KELLY:  Objection.

8              THE COURT:  Overruled.

9    A.   Mr. Singer's general pitch was that it was a donation to a

03:00 10   program.

11   Q.   Why did you tell him to use the word "payment" instead of

12   "donation"?

13   A.   We wanted to, as we were gathering evidence, make sure

14   that the parents understood that -- understood what was

15   happening with the side door and there would be no confusion if

16   they continued with the side door and they had the intent to do

17   so.

18   Q.   What were you -- what was the reason not to use the word

19   "donation"?

03:01 20   A.   We wanted to make sure that Mr. Singer was explicit so the

21   parents could not use that it was a donation as a cover story.

22   Q.   What about to the coach and not the program?

23   A.   Excuse me?

24   Q.   Why tell him to say to the coach and not the program?

25   A.   That -- because we want to make sure that the parents

1   could not use the excuse that it was going to -- that it was a

2   legitimate donation, when it was a bribe.

3          MR. KELLY:  Object to her giving legal advice.

4          THE COURT:  Overruled.

5   Q.   At this time at the beginning of October, these notes are

6   from the first few days in October, who were the parents that

7   you were instructing Mr. Singer to call?

8   A.   At this period of time, it was parents that were in the

9   middle of the side-door scheme.

03:01 10   Q.   When you say in the middle of the side-door scheme, what

11   do you mean by that?

12          MR. KENDALL:  Objection, your Honor, to "scheme".  I

13   think she's supposed to be an objective witness.

14          THE COURT:  I didn't hear the first part of the

15   objection.

16          MR. KENDALL:  I object to her saying "side-door

17   scheme".  She can say a "side-door conversation".  Using

18   pejorative language is arguing to the jury, your Honor.

19          THE COURT:  She can use whatever she believes is

03:02 20   appropriate.  Your objection is overruled.

21   Q.   Which parents were you having him call?

22   A.   The parents that were in the middle of discussing the side

23   door with Mr. Singer.

24   Q.   And how did you determine which parents those were?

25   A.   From the wiretap.

1  Q.   It says, "Essentially they are asking me to bend the truth
2  which is what they asked me not to do when working with the
3  agents and Eric Rosen".
4       Had you -- what, if anything, had you said to
5  Mr. Singer in your prior meetings about bending the truth?
6  A.   We told Mr. Singer not to lie.
7  Q.   Did you tell him that once or more than once?
8  A.   More than once.
9  Q.   Below the highlighted section, it says, "Spoke to Scott
03:03 10  Lawler which is a referral from Gordon Caplan.  They want to
11  nail Gordon at all costs".  Did you -- first of all, who is
12  Gordon Caplan?
13  A.   Gordon Caplan is a parent.
14  Q.   Okay.  And had Mr. Caplan been intercepted by this point
15  on the wiretap?
16  A.   Yes.
17  Q.   Okay.  And did you want to nail Gordon Caplan?
18  A.   I did not want to nail Gordon Caplan.
19  Q.   What did you want to do?
03:03 20  A.   Gather evidence and see if he would do the side-door
21  scheme or the SAT scheme.
22  Q.   Now, had Mr. Caplan called Mr. Singer prior to the
23  approach on September 21, 2018?
24  A.   Yes.
25  Q.   What about John Wilson?  Had he called Mr. Singer prior to

1    the approach on September 21?

2    A.   Yes, he did.

3    Q.   These notes, it says, "created on October 1, 2018," and

4    "modified on October 4, 2018."  How long was this after the

5    approach of Mr. Singer?

6    A.   10 days.

7    Q.   What was Mr. Singer's demeanor at this time in your

8    interactions with him?

9    A.   Mr. Singer was minimizing his conduct.  He wasn't fully

03:04 10   accepting responsibility.

11         MR. KENDALL:  Objection, your Honor.  She's

12   characterizing as opposed to saying what happened.

13         THE COURT:  Sustained.

14         MR. KENDALL:  And move to strike that bit of the

15   answer, your Honor.

16   Q.   What was his demeanor, Special Agent?  I'm sorry.  Yes.

17   What was his demeanor?

18   A.   He was not following direction.

19   Q.   Other than what we see in the notes, how else was he not

03:04 20   following directions?

21   A.   There was a few ways, including getting an unauthorized

22   telephone, deleting text messages, and telling parents about

23   the investigation.

24   Q.   When you say getting an unauthorized telephone, what do

25   you mean by that?

1    A.   Mr. Singer purchased a phone that agents didn't know

2    about.

3    Q.   When you say, "Telling parents about the investigation,"

4    what do you mean by that?

5    A.   Mr. Singer told six people, most of whom were parents,

6    that the FBI was monitoring his telephone.

7    Q.   Were either of the defendants in this room among those

8    six?

9    A.   No.

03:05 10   Q.   You mentioned deleting text messages.  Had you instructed

11   Mr. Singer not to delete text messages?

12   A.   Yes.

13   Q.   And you learned that he had?

14   A.   Yes.

15   Q.   Did you attempt to determine whether he -- and when did

16   you determine that?

17   A.   Approximately February 2020.

18   Q.   Okay.  So that was sometime after he gave you the phones?

19   A.   Yes.

03:05 20   Q.   Did you attempt to determine whether he deleted text

21   messages with either of these defendants after the time he

22   began taking direction from agents in late September?

23   A.   I determined that he did not delete text message -- well,

24   I determined -- what I looked at, he did not delete text

25   messages at that point.

1    Q.   And what did you look at to make that determination?

2    A.   I went through Mr. Singer's image between the period of

3    10/5/2018 to March 11, 2019.  And on the phone images, there's

4    a column that says "deleted".  And if it said "yes", I looked

5    at the number to determine who the contact was, the name of the

6    contact.

7    Q.   And when you did that, what did you see with respect to

8    these two defendants?

9    A.   I did not see their names on the deleted text messages.

03:06 10   Q.   Did you determine -- at some point did you learn that he

11   had deleted text messages with either of these defendants from

12   the period before he was approached by federal agents?

13   A.   Yes.

14   Q.   What did you determine?

15   A.   I determined that he deleted text messages with

16   Mr. Abdelaziz in -- the text message was dated June 2017.

17   Q.   And do you know when he deleted those messages with

18   Mr. Abdelaziz?

19   A.   I do not.

03:06 20   Q.   Did there subsequently come a time when you learned more

21   recently that he had, in fact, deleted text messages with

22   Mr. Wilson during the period that he was taking directions from

23   federal agents?

24   A.   Yes.

25   Q.   How did you make that determination?

1    A.    While I was preparing for trial I was reviewing the phone

2    images and I saw -- I looked at the last phone image on -- at

3    the iMessages and compared them to the other images that we

4    took and there were iMessages that were missing.

5    Q.    So just so I understand, you compared messages that were

6    on a later extraction of the phone with messages that were on

7    earlier extractions?

8    A.    Yes.

9    Q.    And what did you see?

03:07  10    A.    There were some missing.  There were text messages in

11    certain extractions that were not on the last extraction.

12    Q.    So there were messages that were preserved on earlier

13    extractions that didn't show up on later extractions?

14    A.    Yes.

15    Q.    Had you done that analysis initially?

16    A.    No.

17    Q.    At the time of these notes in early October 2018, had

18    Mr. Singer had any -- made any consensually recorded calls to

19    Mr. Abdelaziz at the direction of law enforcement?

03:07  20    A.    No.

21    Q.    Other than the calls we've just listened to on

22    September 3rd -- I'm sorry -- September 23rd and

23    September 29th, had he had any consensually recorded calls with

24    Mr. Wilson?

25    A.    No.

1    Q.   Do you know if there are other references in these notes

2    to Mr. Wilson?

3    A.   Yes.

4         MR. FRANK:   Could we show the witness page -- and the

5    jury, page 218, please.

6         MR. KENDALL:   Page 218?

7         MR. FRANK:   Page 218 is the document.  It's got the

8    Bates number Singer phone 712 at the bottom and it's also got

9    the number 4950 on it.

03:08 10         And Miss Lewis, if you can go to the top of the page.

11   Thank you.  And if you could highlight in the middle of that

12   box the reference to John Wilson.

13        MR. KENDALL:   Excuse me.  Can you tell me from the

14   Singer phone bates number?

15        MR. FRANK:   Yes.  The bates number on this exhibit are

16   4950.  It's also Singer phone 712 and it's also on the screen

17   in front of you.

18   Q.   Can you read what is highlighted in yellow, Special Agent.

19   A.   "John Wilson 20 thousand nothing to do with USC plus dona

03:09 20   to USC program for real polo player".

21   Q.   Does that say "plus donation"?  Is there a T missing

22   there?

23   A.   Oh, yes.  "Plus donation".

24   Q.   And what is the date of this note?

25   A.   January 30, 2019.

1   Q.   And how much had Mr. Wilson paid to Mr. Singer for the

2   side door with Johnny Wilson?

3   A.   Total 220,000.

4   Q.   And of that 220,000, who did 20,000 go to?

5   A.   20,000 went directly to Mr. Singer.

6   Q.   And it says, "nothing to do with USC plus donation to USC

7   program for real polo player".  Was Johnny Wilson, to your

8   knowledge, a real polo player?

9   A.   Yes, he was.

03:10 10   Q.   Did there come a time when there was another consensually

11   recorded call after these notes were taken between Mr. Singer

12   and Mr. Wilson?

13   A.   Yes.

14   Q.   Could you take a look at Exhibit 578 on the table in front

15   of you.  And if you could turn to the transcript for call 578.

16        Special Agent, do you see your initials on the disk

17   marked 578?

18   A.   Yes, I do.

19   Q.   What is Exhibit 578?

03:11 20   A.   It's a recording of a call between Mr. Wilson and

21   Mr. Singer.

22   Q.   And if you look at the transcript in your binder, do you

23   see your initials on that transcript?

24   A.   Yes.

25   Q.   Is that a fair and accurate transcription of the call

1    between Mr. Singer and Mr. Wilson, that is Exhibit 578?

2    A.    Yes.

3    Q.    And what is the date of the call?

4    A.    October 15, 2018.

5    Q.    How long is that after the notes we just read on

6    October 4th?

7    A.    Approximately 15 days.

8              MR. FRANK:  Okay.  And the government offers 578.

9              THE COURT:  It will be admitted.

03:11 10            (Exhibit 578 admitted into evidence.)

11   Q.    Who called who?

12   A.    Mr. Wilson called Mr. Singer.

13             MR. FRANK:  Okay.  Can we begin at the beginning?

14             (Audio recording played.)

15             MR. FRANK:  We could stop it right there, Ms. Lewis.

16   Q.    Special Agent, who placed this phone call to whom?

17   A.    Mr. Wilson to Mr. Singer.

18   Q.    Mr. Wilson called Mr. Singer?

19   A.    Yes.

03:16 20   Q.    And if I could direct your attention to page 2, Mr. Wilson

21   says at the very top, line 1, in the middle of the line "So,

22   hey, there were a couple topics.  One was, you know, my

23   daughters, and I'm making some donations now, whatever -- how

24   that can work".

25              Who is the first person on this call to mention money

1    in connection with admission?

2    A.    Mr. Wilson.

3    Q.    And then at the bottom of that page -- well, actually, at

4    line 15, Mr. Singer says, "so like I have opportunity with

5    Stanford in sailing and I can do other Stanford sports

6    potentially too.  And we have Yale and we have Harvard".

7            And then, at the bottom of the page, line 24.  He

8    says, "Stanford sailing, got Yale soccer, Harvard".

9            Who was the Yale soccer coach at this time?

03:16 10   A.    Rudy Meredith.

11   Q.    And who was the Stanford sailing coach?

12   A.    John Vandemoer.

13   Q.    And if you could move ahead to page 4, at line 2, at the

14   end of the line -- well, at the beginning of the line,

15   Mr. Singer says, "we can, you know, always do women's lacrosse.

16   And again, you know, they don't have to play.  They just -- I

17   just -- that's the path I'm gonna get them in on".

18           And how does Mr. Wilson respond at line 5?

19   A.    "Gotcha".

03:17 20   Q.    Excuse me.  At line 7, Mr. Singer says sail -- in response

21   to the question "anything else?"  Mr. Singer says "sailing,

22   crew, sometimes tennis.  The key to her is that, if I were to

23   get a deposit, you know, like, half a million dollars in the

24   bank, then it's -- you know, we can figure out where they want

25   to go".

```
 1              Why did Mr. Singer ask Mr. Wilson if he wanted to
 2      make a deposit?
 3              MR. KELLY:  Objection.
 4              THE COURT:  Sustained.
 5      Q.   What, if any, instructions did agents give Mr. Singer
 6      about asking Mr. Wilson for a deposit?
 7      A.   Agents instructed Mr. Singer to ask Mr. Wilson for a
 8      deposit.
 9      Q.   Why?
10              MR. KENDALL:  Objection.  Your Honor, the thinking of
11      why is not relevant.
12              THE COURT:  Objection is sustained.
13              MR. KENDALL:  Thank you, your Honor.
14              MR. FRANK:  Your Honor, I believe it is relevant in
15      light of the defense.
16              THE COURT:  Well, you're asking her why the agents
17      instructed Mr. Singer?
18              MR. FRANK:  To offer --
19              THE COURT:  I'll let her have that question.
20      A.   To see if Mr. Wilson would make the down payment.
21      Q.   At page 5, line 15, Mr. Wilson says, "and they don't
22      actually have to do that sport, you're saying.  They could go
23      in and" -- at line 18, "be like the score keeper or" -- and at
24      line 20, "water boy, water girl".
25              And how does Mr. Singer respond at line 20?
```

1    A.    Line 21?

2    Q.    I'm sorry.  Line 17.

3    A.    "Correct".

4    Q.    And what does he say at line 21?

5    A.    "Manager or whatever you want to call 'em.  Yeah."

6          MR. FRANK:  And then if we can pick up at line 22.

7          (Audio recording played.)

8          MR. FRANK:  Stop it right there, Miss Lewis.

9    Q.    At page 6, Special Agent, line 12, Mr. Singer says, "and

03:21 10   let's say we're doing two girls in one place.  Then they're

11   gonna say to me, we're gonna give up a spot for you.  Are you

12   are you guaranteeing me that's she's coming?  And is the family

13   guaranteeing me that they're gonna ante up and they're gonna

14   make a payment, because they don't want to give up a spot.  And

15   the earlier I do it, the better".

16         And how does Mr. Wilson respond at line 20?

17   A.    "Gotcha".

18   Q.    And at page 7, Mr. Wilson says, at line 22, "and same

19   kinda deal, any sport?  You don't have to really play the

03:21 20   sport?"

21         And what does Mr. Singer respond?

22   A.    "That's correct."

23   Q.    And then at line 11, Mr. Singer says, "with your girls,

24   because they're athletic and they're big and all of that, I can

25   sell to anybody that they're athletic enough to be able to take

1    'em and there'll be no question".

2         And how does Mr. Wilson respond at line 15?

3    A.   "Yeah".

4    Q.   And then what does he say at line 18?

5    A.   "Even though they wouldn't play.  Ok".

6         MR. FRANK:  Can we pick it up at line 20, please.

7         (Audio recording played.)

8    Q.   Special Agent, if I could direct your attention to page 9.

9    At page 9, line 15, Mr. Wilson says, "Now, um, uh, how does

03:28 10   that actually work?  What if they don't actually get in?"

11   Mr. Singer says, "oh, no, no, no.  You don't have to worry

12   about it.  They're -- it's a done deal.  And I'll know

13   beforehand if it's gonna be done or not".

14        And how does Mr. Wilson respond?

15   A.   "M-hum".

16   Q.   Special Agent, did there come a time after this call that

17   Mr. Wilson sent $500,000 to the Key Worldwide Foundation?

18   A.   Yes.

19        MR. FRANK:  If we could show the witness only

03:28 20   Exhibit 581.

21   Q.   Do you recognize this document?

22   A.   Yes.

23   Q.   What is it?

24   A.   It is an e-mail between Mr. Wilson and Debbie Rogers.

25        MR. FRANK:  Government offers 581.

```
 1              THE COURT:  It will be admitted.

 2              (Exhibit 581 admitted into evidence.)

 3   Q.   An if we look at the bottom of the exhibit, first e-mail

 4   in the chain, Ms. Rogers, from the e-mail address

 5   debbie@Hyannisportcapital, writes "I just received a text with

 6   bank info for The Key Worldwide Foundation.  What is this for?"

 7              And if you could look at Mr. Wilson's response, he

 8   writes, "It's a 500,000 donation I am going to make this year,

 9   tax writeoff, and help getting into colleges".

10              And Ms. Rogers responds, "Okay, so I'm assuming you

11   will let me know when this is to be wired, so I'll wait for

12   further direction".

13              And how does Mr. Wilson respond?

14   A.   "Yes".

15   Q.   And how many days is October 17th after the October 15th

16   call?

17   A.   Two days.

18              MR. FRANK:  And if we could show the witness only

19   Exhibit 582.

20              MR. KELLY:  I'm sorry.  What number?

21              MR. FRANK:  582.

22   Q.   Do you recognize this document?

23   A.   Yes.

24   Q.   What is it?

25   A.   It is an e-mail from Mr. Wilson to Debbie Rogers and cc'd
```

```
 1   burlingame@firstrepublic.com.
 2            MR. FRANK:  Government offers 582.
 3            THE COURT:  It will be admitted.
 4            (Exhibit 582 admitted into evidence.)
 5   Q.   And what is First Republic?
 6   A.   It is a bank.
 7   Q.   And Debbie Rogers writes at the bottom, "please wire
 8   $500,000 from Hyannis Port Capital Inc.'s account ending 2343
 9   to The Key Worldwide Foundation Bank of America".  Do you see
10   that?
11   A.   Yes, I see that.
12   Q.   And what does she write under reason?
13   A.   "Donation".
14   Q.   And how does Mr. Wilson respond?
15   A.   "Yes.  Thanks".
16            MR. FRANK:  Your Honor, this might be a good point.
17            THE COURT:  Yes.  We have to break here.
18            You can step down, Ms. Keating, for the time being.
19   We will be in recess tomorrow.  We will be back here Thursday
20   morning at 9:00 a.m.  Have a pleasant day off.
21            Please honor my instructions on not doing any
22   independent research and talking to anybody about this case,
23   over this little hiatus in this case.  It's very important that
24   you not do that because you're going to decide this case solely
25   on the basis of the evidence that comes into this courtroom and
```

1    not under anything else.  See you day after tomorrow, that is

2    Thursday, the 23rd of September at 9:00 a.m.  Have a pleasant

3    day.

4            THE CLERK:  All rise for the jury.

5            (Jury exits.)

6            THE COURT:  Please be seated, counsel.  Again,

7    Mr. Frank, approximately how much longer on direct?

8            MR. FRANK:  I'd estimate an hour, maybe a bit longer.

9            THE COURT:  Sorry?

03:32 10           MR. FRANK:  An hour to an hour and 15 minutes, I would

11   estimate.

12           THE COURT:  All right.

13           And then defendants expect the cross-examination to

14   take the rest of Thursday?

15           MR. KENDALL:  It's hard to predict.  There might be

16   some time left over Thursday afternoon.  We don't know when

17   he's really finishing or what he's covering.

18           THE COURT:  All right.  And if we get through this

19   witness, the next witness will be?

03:32 20           MR. FRANK:  Laura Janke.

21           THE COURT:  Janke.  And she's a long witness on

22   direct?

23           MR. FRANK:  Her testimony -- well, it definitely

24   wouldn't be completed on Thursday.  It's not a terribly long

25   direct.

1    MR. KENDALL:  Could we have Friday's witnesses, your

2  Honor?

3    THE COURT:  Yes.  Friday's witnesses.

4    MR. FRANK:  At this point, your Honor, it would be

5  Special Agent Mark Deckett.

6    THE COURT:  And who is he?

7    MR. FRANK:  He's with the Department of Education.

8    THE COURT:  How do you spell the last name?

9    MR. FRANK:  D-e-c-k-e-t-t.  And we need to assess,

03:33 10  your Honor.  I'm skeptical if we're going to get that far, but

11  we'll --

12    THE COURT:  And his direct would be how long?

13    MR. FRANK:  Brief, your Honor.  It's about 15,

14  20 minutes.

15    THE COURT:  And if we get beyond him, who would the

16  next be?

17    MR. FRANK:  We're trying to figure that out, your

18  Honor.  We did not expect to get there.

19    THE COURT:  Well, figure it out by 5 o'clock and let

03:33 20  opposing counsel know.

21    MR. FRANK:  Yes, your Honor.

22    MR. KENDALL:  Thank you, your Honor.

23    THE COURT:  Okay.  Anything else?

24    MR. SHARP:  Your Honor, we filed a motion this

25  morning.  There were about four exhibits marked for ID

```
 1   yesterday.
 2              THE COURT:  About?
 3              MR. SHARP:  Four exhibits marked for ID yesterday.
 4   There was a hearsay objection and it was sustained, but we
 5   provided the Court with some law on these.  We would like to
 6   use them perhaps with Special Agent Keating.  So you know, I
 7   think these are fairly black letter issues without writing a
 8   memorandum.  If we could get a ruling on that prior to her
 9   testimony so that we would know whether we can use them with
10   her.
11              THE COURT:  You'll get a --
12              Go ahead, Mr. Frank.
13              MR. FRANK:  Your Honor, we intend to respond.  We got
14   that at 7 o'clock this morning.  We didn't have a chance to
15   respond yet.  I would note that, with respect to Special Agent
16   Keating, it's beyond the scope of her direct.
17              THE COURT:  You respond by noon tomorrow.
18              MR. FRANK:  Yes, your Honor.
19              MR. SHARP:  Your Honor, these issues are fairly black
20   letter about somebody's intent of what they're going to do not
21   being hearsay.  It's not an assertion.  I'm going to file the
22   application is not an assertion.  That is hearsay.
23              THE COURT:  All right.  I will review the motion and
24   the opposition tomorrow and let you know before the end of the
25   day tomorrow.
```

1          MR. SHARP:  Thank you.

2          MR. KENDALL:  Just to let you know what else is

3     coming, your Honor, I believe the government filed -- I haven't

4     read any of this, but I'm being told this.  I believe the

5     government filed a brief yesterday in the confrontation clause

6     issue.  If we may have until tomorrow 2 o'clock or so to get

7     our response to you on that.

8          THE COURT:  Noon.

9          MR. KENDALL:  Noon it will be.  Thank you.

03:35 10          THE COURT:  All right.  We're in recess until Thursday

11    morning at 9 a.m.

12          (Whereupon, the proceedings adjourned at 3:35 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2    Witness                          Page

3    REBECCA CHASSIN

4    Cross-Examination by Mr. Sheketoff        5

5    Cross-Examination by Mr. Kendall         48

6    Redirect Examination by Mr. Frank       118

7    Recross-Examination by Mr. Sheketoff    133

8    Recross-Examination by Mr. Kendall      143

9

10

11   ELIZABETH KEATING

12   Direct Examination by Mr. Frank         147

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        E X H I B I T S
 2      NO.                      ADMIT
 3      1567   ....................    25
 4      1566   ....................    25
 5      9038   ....................    43
 6      7950   ....................    72
 7      9705   ....................   111
 8      665    ....................   156
 9      571    ....................   170
10      13     ....................   181
11      578    ....................   197
12      581    ....................   202
13      582    ....................   203
14
15
16
17
18
19
20
21
22
23
24
25
```

1   C E R T I F I C A T E

2

3

4   UNITED STATES DISTRICT COURT )

5   DISTRICT OF MASSACHUSETTS    )

6

7

8           We, Kristin M. Kelley and Debra Joyce, certify that

9   the foregoing is a correct transcript from the record of

10  proceedings taken September 21, 2021 in the above-entitled

11  matter to the best of our skill and ability.

12

13

14      /s/ Kristin M. Kelley            September 21, 2021

15      /s/ Debra Joyce                  September 21, 2021

16      Kristin M. Kelley, RPR, CRR              Date
        Debra Joyce, RMR, CRR
17      Official Court Reporter

18

19

20

21

22

23

24

25