UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,            )
                    Plaintiff        )
                                     )
vs.                                  )  No. 1-19-CR-10080
                                     )
GAMAL ABDELAZIZ and JOHN             )
WILSON,                              )
                    Defendants.      )
                                     )
                                     )


BEFORE THE HONORABLE NATHANIEL M. GORTON
UNITED STATES DISTRICT JUDGE
JURY TRIAL - DAY 10


John Joseph Moakley United States Courthouse
Courtroom No. 4
One Courthouse Way
Boston, Massachusetts 02210


September 23, 2021
9:08 a.m.


Kristin M. Kelley, RPR, CRR
Kelly Mortellite, RMR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3209
Boston, Massachusetts 02210
E-mail: kmob929@gmail.com

Mechanical Steno - Computer-Aided Transcript

```
1    APPEARANCES:

2

3              Stephen E. Frank

4              Ian J. Stearns

5              Leslie Wright

6              Kristen Kearney

7              United States Attorney's Office

8              1 Courthouse Way

9              Suite 9200

10             Boston, MA 02210

11             617-748-3208

12             stephen.frank@usdoj.gov

13             for the Plaintiff.

14

15

16             Brian T. Kelly

17             Joshua C. Sharp

18             Lauren Maynard

19             Nixon Peabody LLP

20             100 Summer Street

21             Boston, MA 02110

22             617-345-1000

23             bkelly@nixonpeabody.com

24             for Gamal Abdelaziz.

25
```

```
1    APPEARANCES:

2

3            Robert L. Sheketoff

4            One McKinley Square

5            Boston, MA 02109

6            617-367-3449

7            sheketoffr@aol.com

8            for Gamal Abdelaziz.

9

10

11           Michael Kendall

12           Lauren M. Papenhausen

13           White & Case, LLP

14           75 State Street

15           Boston, MA 02109

16           617-939-9310

17           michael.kendall@whitecase.com

18           for John Wilson.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3           Andrew E. Tomback

 4           McLaughlin & Stern, LLP

 5           260 Madison Avenue

 6           New York, NY 10016

 7           917-301-1285

 8           atomback@mclaughlinstern.com

 9           for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                    P R O C E E D I N G S

 1

 2          (Jury enters.)

 3          THE CLERK:  You may be seated.  Court is now in

 4  session.

 5          THE COURT:  Welcome back, jurors.  We're ready to go

 6  back to work.

 7          Miss Keating, you're reminded you're under oath.

 8  Mr. Frank, you may continue with direct examination.

 9          MR. FRANK:  Thank you, your Honor.

09:09 10  BY MR. FRANK:

11  Q.   Good morning, Special Agent Keating.

12  A.   Good morning.

13  Q.   How are you?

14          MR. FRANK:  Miss Lewis, can we pick up with

15  Exhibit 582 in evidence, please.

16          THE COURT:  582?

17          MR. FRANK:  Yes, your Honor.

18          THE COURT:  Is it in the binder?

19          MR. FRANK:  I believe it is, your Honor.  It's not in

09:10 20  the transcript binder.  This was an exhibit that was the last

21  exhibit we had in evidence.  Are the monitors not -- thank you.

22  Q.   Special Agent Keating, you recall that this was the last

23  exhibit we looked at, the wire from Hyannis Port Capital from

24  the account ending in 2343 to the Key Worldwide Foundation in

25  the amount of $500,000?

1    A.    Yes.

2    Q.    And the reason that is given at the bottom of the exhibit

3    for the wire?

4    A.    "Donation."

5    Q.    Okay.  And what is the date of this e-mail?

6    A.    October 17, 2018.

7    Q.    Okay.  And that was two days after the last phone call

8    that we listened to on October 15?

9    A.    Correct.

09:11 10    Q.    Okay.  If we could proceed to Exhibit 591, I believe

11    there's a disk on the desk in front of you labeled Exhibit 591.

12    Do you see that?

13    A.    Yes.

14    Q.    And do you see your initials on that disk?

15    A.    Yes, I do.

16    Q.    And what is Exhibit 591?

17    A.    It's a recording of a call between Mr. Wilson and

18    Mr. Singer.

19          MR. FRANK:  Okay.  And if everyone could turn to the

09:12 20    tab in their binders for 591.

21    Q.    Special Agent Keating, if you could turn to the tab in

22    your transcript binder for 591 and let me know when you're

23    there.

24    A.    Yes.

25    Q.    Is this a fair and accurate transcription of the

1   recording?

2   A.   Yes, it is.

3   Q.   And are those your initials at the bottom?

4   A.   Yes.

5   Q.   And the date of this call?

6   A.   October 27, 2018.

7   Q.   Okay.  So that's about 10 days after that wire transfer?

8   A.   Yes.

9        MR. FRANK:   The government offers 591.

09:12 10        THE COURT:   It will be admitted.

11        (Exhibit 591 admitted into evidence.)

12   Q.   Special Agent, who called whom?

13   A.   Mr. Wilson called Mr. Singer.

14   Q.   And where was Mr. Singer on October 27, 2018?

15   A.   Mr. Singer was in Boston.

16        MR. FRANK:   Okay.  Could we start with the beginning

17   of the call.

18        (Audio recording played.)

19   Q.   Special Agent, I'd like to direct you to the bottom of

09:18 20   page 1 of the transcript.

21   A.   Okay.

22   Q.   At line 23, Mr. Singer says, "So I had a conversation with

23   the Stanford sailing coach and so I just gave the Stanford

24   sailing coach 160,000 for his program and while we were having

25   that conversation I said, 'Hey, I'm hoping that this 160 that

1    I'm helping you with helps secure a spot for next year.  Can I

2    be guaranteed a spot for next year?'  And said, um, 'yes.'"

3          And then Mr. Singer picks up, in sum and substance,

4    at line 14 and says, "So essentially if you're -- I wanted you

5    to have first dibs, like I told you.  So if you want I can

6    provide John Vandemoer, which I'm essentially -- I'm gonna

7    essential send John directly the check to the coach.  I can

8    send him your 500,000 that you wired into my account to secure

9    the spot for one of your girls."

09:19 10          Remind us again who is John Vandemoer?

11   A.   He is the Stanford sailing coach.

12   Q.   And Mr. Singer continues at line 20, "I asked him for a

13   second spot in sailing and he said he can't do that because he

14   has to actually recruit some real sailors so that Stanford

15   doesn't", and then at page 3 he continues, "catch on."

16          Do you see that?

17   A.   Yes.

18   Q.   And how does Mr. Wilson respond when Mr. Singer says, at

19   line 21, "he can't do that because he actually has to recruit

09:20 20   some real sailors?"  How does Mr. Wilson respond at line 24?

21   A.   "(Laughter)".

22   Q.   And then he continues, "So that Stanford doesn't catch

23   on."  And how does Mr. Wilson respond at page 3, line 2?

24   A.   "Right."

25   Q.   And then what does Mr. Wilson say at lines 4 and 6?

A.    "Yeah, no.  He's got to actually have some sailors.
Yeah."

Q.   And Mr. Singer says at line 3, "So", and then at line 5
"Stanford", and then at line 7, "yeah.  So that Stanford
doesn't catch on to what he's doing."

         And how does Mr. Wilson respond when Mr. Singer says
that the sailor -- the sailing coach needs to recruit some real
sailors so that Stanford doesn't catch on to what he's doing?

A.    "Right."

Q.   And then at line 12, Mr. Singer says, "It doesn't matter
if it's one of the girls who's not a sailor.  I can still put
her as a sailor."  Who were the girls again?

A.    His daughters, Maime Wilson and Courtney Wilson.

Q.   And then Mr. Singer continues, "or obviously the one that
is, I'll mark that she's a sailor cause he is, but not at the
level in which she can sail at Stanford."

         And how does Mr. Wilson respond to that at line 18?

A.    "Right, right."

Q.   You testified that Mr. Singer was in Boston at the time of
this call?

A.    Yes, he was.

Q.   Was there a subsequent consensual call between Mr. Singer
and Mr. Wilson?

A.    Yes.

Q.   If you could look at the disk on your desk marked 594 and

1     tell me if you see your initials.

2     A.   Yes, I do.

3     Q.   And what is 594?

4     A.   It's a recording of a call between Mr. Singer and

5     Mr. Wilson.

6     Q.   And if you could look at the tab in your transcript binder

7     marked 594, what is the date of that call?

8     A.   November 5, 2018.

9          MR. FRANK:   The government offers 594.

09:22 10         THE COURT:   It will be admitted.

11          (Exhibit 594 admitted into evidence.)

12    Q.   And is this transcript a fair and accurate transcript of

13    the recording?

14    A.   Yes, it is.

15    Q.   And are those your initials at the bottom?

16    A.   Yes.

17    Q.   Okay.  There's some introductory conversation, small talk

18    I'd like to pick up at page 2, line 20.  I'm sorry, line 24.

19    We'll begin at page 2, line 24.  That's 1 minute and 20 seconds

09:22 20    into the recording.

21          (Audio recording played.)

22          MR. FRANK:   Just stop it right there briefly.

23    Q.   Special Agent, if you could turn to page 3 of the

24    transcript.  At page 3, line 12, Mr. Singer says, "So the

25    sailing spot that we have, that we'll pay the coach, he doesn't

```
 1    care if it's a sailor or not."

 2           Who's the "he" in that sentence?

 3           MR. KENDALL:  Objection, your Honor.  I don't think

 4    she's --

 5           MR. FRANK:  I'll withdraw the question, your Honor,

 6    and rephrase.

 7    Q.    Who was the sailing coach at Stanford?

 8    A.    John Vandemoer.

 9    Q.    Okay.  And how does Mr. Wilson respond when Mr. Singer

10    says, "The sailing spot that we have, that we'll pay the coach,

11    he doesn't care if it's a sailor or not"?

12    A.    "Okay."

13    Q.    And then Mr. Singer says, "He doesn't care one bit.

14    One bit."  Do you see that?

15    A.    Yes.

16    Q.    And then if we could turn again to page 6, Mr. Singer says

17    at line 12, "Because if -- here's my point to him.  Help me get

18    another spot at Stanford and then I can give the second coach

19    less and give you the million.  Cause I'd like to stay around 1

20    and a half million to 1.7 million overall at Stanford."

21           Mr. Wilson responds, "For 2 slots you're saying", and

22    Mr. Singer responds, "correct."

23           And can you tell us how Mr. Wilson responds beginning

24    at line 4?

25    A.    "Is it some other coach?  How does that work for him?
```

```
 1   Does he -- is he screwing his colleagues?  Or (laughter) I
 2   don't know how that works.  He gets the lion's share and
 3   someone else gets less?"
 4        MR. FRANK:  Okay.  If we can pick up at line 18,
 5   please.
 6        (Audio recording played.)
 7   Q.   Special Agent, if you could turn to page 10 of the
 8   transcript, Mr. Singer says at line 10, on page 10, "if you
 9   want a guarantee and you want the first slot, you gotta -- you
10   gotta decide early."  Do you see that?
11   A.   Yes.
12   Q.   And how does Mr. Wilson respond at line 12 when Mr. Singer
13   says if you want the guarantee, you gotta decide early?
14   A.   "Right."
15   Q.   If I can direct your attention to page 11, line 16,
16   Mr. Wilson says on page 11 at line 16, "I know.  But if they
17   say, 'Oh, I really want to go to Harvard,' then oh, shit, you
18   know, I put all this money into Stanford."
19        Mr. Singer responds, "I get you.  I gotcha."
20        Mr. Wilson says at line 20, "That would be my luck,
21   right?"
22        Mr. Singer says at line 21, "I gotcha."
23        And what does Mr. Wilson says at line 22?
24   A.   "All right.  But still a high class problem, right?"
25   Q.   And then if I could direct your attention to page 12.  At
```

09:32 (line 10)
09:33 (line 20)

```
 1    line 7, Mr. Singer says, "I mean, you weren't going to get into
 2    either one let's just say based on the numbers that it takes to
 3    get in" -- and then there's a garbled reference and he says, at
 4    line 11, "admissions rate and they don't even play the sports,
 5    right?"
 6              And how does Mr. Wilson respond at line 13?
 7    A.   "Yeah.  They had a two percent shot or whatever taking the
 8    test, or whatever it comes out at."
 9    Q.   Special Agent, was there a subsequent consensual call
10    between Mr. Singer and Mr. Wilson later in November?
11    A.   Yes.
12    Q.   If you could look at the disk on your desk labeled 602.
13    Do you recognize your initials on that disk?
14    A.   Yes, I do.
15    Q.   What is it?
16    A.   It is a recording of a conversation between Mr. Singer and
17    Mr. Wilson.
18    Q.   And if you could look at the tab in your binder marked 602
19    and tell us what the date of that recording is.
20    A.   November 29, 2018.
21    Q.   And have you reviewed this transcript?
22    A.   Yes, I have.
23    Q.   Are those your initials at the bottom?
24    A.   Yes.
25    Q.   And is it a fair and accurate transcription of the
```

09:34   10
09:35   20

1    recording?

2    A.   Yes, it is.

3            MR. FRANK:   The government offers 602.

4            THE COURT:   It will be admitted.

5            (Exhibit 602 admitted into evidence.)

6            MR. FRANK:   And Miss Lewis, if you can start at the

7    beginning, please.

8            (Audio recording played.)

9    Q.   Special Agent, if I could direct your attention to page 2

09:39 10    of the transcript.  If you look at page 2 at line 12,

11    Mr. Singer says, "So I got the senior women's administrator at

12    Harvard is going to give us a spot.  What we have to do is

13    we'll have to give her $500,000.  That money, obviously, like

14    the others, will go through my foundation and then I will fund

15    the senior women's administrator at Harvard."

16            Was there an actual senior women's administrator at

17    Harvard?

18    A.   No, there was not.

19    Q.   Why did Mr. Singer tell Mr. Wilson that there was a senior

09:40 20    women's administrator?

21            MR. KENDALL:   Objection, you your Honor.

22    Q.   At whose direction did Mr. Singer tell Mr. Wilson that

23    there was a senior women's administrator at Harvard?

24    A.   The government's.

25    Q.   Why?

```
 1              MR. KENDALL:  Objection, your Honor.
 2              THE COURT:  Overruled.
 3   A.   It was a ruse to see if Mr. Wilson would make payment.
 4   Q.   And then at line 20, Mr. Wilson says, "Your total's going
 5   to be 1.5.  250 will come in the spring for Stanford and 250
 6   for Harvard in the spring and then we'll -- we'll be solid.
 7   We'll be done.  We'll apply like a normal student, but we'll
 8   know that we're getting in in the late fall of next year."
 9              And how did Mr. Wilson respond when Mr. Singer says
10   "we'll apply like a normal student, but we'll know that we're
11   getting in"?
12   A.   "Okay, great."
13   Q.   And then at page 3, line 9, Mr. Singer says, "Maybe she
14   won't have to sail, but we're going to put her through sailing
15   and John Vandemoer.  This is actually a better play at Harvard
16   because she will just get her in through athletics in one of
17   the sports but it won't matter.  It won't matter."
18              How does Mr. Wilson respond, beginning at line 15?
19   A.   "Yeah, but she is a -- she sailor actually -- so sailing
20   is actually a logical thing.  She could be even the mascot,
21   whatever, but she knows sailing."
22   Q.   And you see where Mr. Wilson says, you just read this,
23   "She could be the mascot, but she knows sailing"?
24   A.   Yes.
25   Q.   And earlier, on the prior page, he referenced the daughter
```

09:40 (line 10)
09:41 (line 20)

```
 1  who wanted to go to Harvard.  And which daughter was that, at
 2  page 2, line 9?
 3  A.   Courtney.
 4  Q.   And he says at line 17 on page 3, "She knows sailing."  Do
 5  you see that?
 6  A.   Yes.
 7  Q.   I'd like to direct your attention to the earlier
 8  transcript we looked at for -- called 571, if you could look
 9  back at 571.  And if you turn to page 5 of the transcript at
10  571, tell us what Mr. Wilson says about Courtney's sailing
11  ability beginning at line 14.
12  A.   "Courtney is not even that good competitively at sailing.
13  She just did sailing and did sailing in, you know, yacht club."
14  Q.   Thank you.  Did there come a time, Special Agent, after
15  the call on November 29th that we just listened to when
16  Mr. Wilson sent a second payment for $500,000 to the Key
17  Worldwide Foundation?
18  A.   Yes.
19       MR. FRANK:  If we could look at Exhibit 613 for the
20  witness only, please.
21  Q.   Special Agent, do you recognize Exhibit 613?
22  A.   Yes.
23  Q.   What is it?
24  A.   It is an e-mail between Mr. Singer and Mr. Wilson.
25  Q.   What is the date?
```

1    A.    December 11, 2018.

2              MR. FRANK:  Government offers Exhibit 613.

3              THE COURT:  It will be admitted.

4              (Exhibit 613 admitted into evidence.)

5    Q.    And if we look at the bottom of the chain to start, do you

6    see that there's an e-mail from Debbie Rogers to

7    burlingame@firstrepublic.com on December 11, 2018?

8    A.    Yes.  I see that.

9    Q.    And it copies John Wilson?

09:43 10   A.    Yes.

11   Q.    And what is the subject?

12   A.    "Wire from HPC Account ending 2343."

13   Q.    And what is First Republic?

14   A.    It is a bank.

15   Q.    And can you read us what it says below in the text?

16   A.    "Please wire $500,000 from Hyannis Port Capital Inc.'s

17   account ending 2343 to: The Key Worldwide Foundation."

18   Q.    And what does it give as the reason for the wire?

19   A.    "Donation."

09:44 20   Q.    And if we look up above, do you see that Mr. Wilson

21   forwards this text -- this e-mail to Mr. Singer?  Special

22   Agent, do you see that he forwards it to Mr. Singer?

23   A.    Yes.

24   Q.    And how does Mr. Singer respond?

25   A.    "Thank you."

```
 1   Q.   Did there come a time when there was a subsequent call

 2   between Mr. Singer and Mr. Wilson at the beginning of

 3   January 2019?

 4   A.   Yes.

 5   Q.   Is there a disk on your desk labeled 623?

 6   A.   Yes.

 7   Q.   What is it?

 8   A.   It's a recording of a call between Mr. Singer and

 9   Mr. Wilson.

10   Q.   And if I could direct you to the tab marked 623 in your

11   binder, can you tell us what the date of this call is?

12   A.   January 3, 2019.

13            MR. FRANK:  Government offers 623.

14            THE COURT:  It will be admitted.

15            (Exhibit 623 admitted into evidence.)

16            MR. FRANK:  Miss Lewis, if we can just start at the

17   top, please.

18            (Audio recording played.)

19   Q.   Special Agent, over the next few minutes of this phone

20   conversation, did Mr. Wilson and Mr. Singer discuss

21   Mr. Wilson's trip to Cuba?

22   A.   Yes.

23   Q.   We'll just skip over that for now.  It will be in

24   evidence, but if we could pick up at page 6 of the transcript,

25   line 10.
```

09:45 (line 10)
09:46 (line 20)

```
 1              MR. FRANK:  And Miss Lewis, page 6, line 10 is 4
 2    minutes and 5 seconds.
 3              (Audio recording played.)
 4              MR. FRANK:  Can you just stop it right there for a
 5    moment, Miss Lewis.  Thank you very much.
 6    Q.   If we can take a look at page 8, Special Agent.  Beginning
 7    at the end of line 7, Mr. Singer says at page 8, line 7, "We'll
 8    go through, kind of like what we did with Johnny.  We went --
 9    John went, you know, right to water polo.  And for the girls,
10    I'll probably just go to two sports, sailing and crew, and just
11    walk 'em right through as recruited walk-ons."
12              Do you see that?
13    A.   Yes.
14    Q.   And how does Mr. Wilson respond at line 13?
15    A.   "Okay."
16    Q.   And what is the name of Mr. Wilson's son?
17    A.   Johnny Wilson.
18    Q.   Okay.  And then at line 15, Mr. Singer says "My only thing
19    to you was I just want to make sure -- because, you know,
20    you're a known entity, a known family, and people know that
21    you're interested, and they're gonna say, "Hey, I can help
22    you," or people may call you and I just want to say -- you just
23    say, 'Hey, listen, we got -- we -- we're taking care of things
24    ourself.  We have it all.  Girls are great students.  We're
25    just gonna apply on our own'".
```

1          And how does Mr. Wilson respond at line 24?

2   A.   "Okay."

3   Q.   And how does he continue?

4   A.   "So just kind of -- just saying we're applying on our own,

5   nothing?"

6   Q.   And Mr. Singer responds at line 2, on page 9, "correct,

7   nothing, nothing -- no side doors.  We're not doing anything."

8          And how does Mr. Wilson respond at line 4?

9   A.   "Yeah, don't mention about that, right."

09:51 10   Q.   And Mr. Singer responds, "Where -- yeah -- where you're

11   making a payment to help the kids get into school."

12          And how does Mr. Wilson respond at line 7?

13   A.   "Right, okay.  That sounds good."

14          MR. FRANK:  If we can just conclude the call.

15          (Audio recording played.)

16   Q.   Special Agent, did there come a time when there was a call

17   after this January 3rd call between Mr. Singer and Mr. Wilson?

18   A.   Yes.

19   Q.   And if you could look at the disk marked 625 in front of

09:52 20   you.

21   A.   Yes.

22   Q.   What is 625?

23   A.   It is a recording of a phone call between Mr. Singer and

24   Mr. Wilson.

25   Q.   And if you could look at the tab in your binder marked 625

```
 1   and tell us what is the date of the call.
 2   A.    January 10, 2019.
 3   Q.    And is that transcript a fair and accurate transcript of
 4   the recording?
 5   A.    Yes, it is.
 6   Q.    Are those your initials at the bottom?
 7   A.    Yes.
 8              MR. FRANK:   The government offers 625.
 9              THE COURT:   It will be admitted.
10              (Exhibit 625 admitted into evidence.)
11              MR. FRANK:   And Miss Lewis, if we could start at the
12   beginning, please.
13              (Audio recording played.)
14   Q.    Special Agent, if I could direct your attention to page 2
15   of the transcript -- actually, I'll pick up at the bottom of
16   page 1.  Mr. Singer says at line 22, "So you know, it's a done
17   deal.  I'm gonna get you a spot and it will get done.  As far
18   as for you, as the family, you can tell your girls whatever.
19   If you flip 'em or swap 'em or whatever you can do, you can --"
20              And how does Mr. Wilson respond at line 3?
21   A.    "Put 'em on their heads."
22   Q.    And Mr. Singer picks up, "you can tell 'em, you know, if
23   one of 'em is a sailor and the other one's the crewer -- tell
24   'em whatever you want.  But we're getting the spot.  And it
25   won't matter to them that they won't know any difference."
```

```
 1              And how does Mr. Wilson respond at line 9?
 2    A.    "Okay.  Great."
 3    Q.    And then he says, "So they're indifferent that way."  Do
 4    you see that?
 5    A.    Yes.
 6    Q.    And then at page 3, Mr. Wilson says at line 9, "but is the
 7    sport determined?  That's all I'm asking -- is one of my
 8    daughters" -- at line 12, "the one who wants to go to Stanford
 9    has nothing do with sailing, hates sailing, like -- oh shit."
10              And how does Mr. Singer respond?
11    A.    "No, no, no.  It has nothing to do -- we're getting the
12    spot."
13    Q.    And what does Mr. Wilson say at line 16?
14    A.    "Okay."
15    Q.    And then Mr. Singer says at line 17, "and so.. and I know
16    they may not be athletes in that spot.  But we know that -- and
17    we know both not athletes at that level.  So it doesn't really
18    matter.  They're gonna take care of it with a spot in each
19    place, but it will go through athletics."
20              And how does Mr. Wilson respond at line 23?
21    A.    "Okay.  And the team specifically is still open."
22    Q.    And then page 4 at the top, Mr. Wilson says, "We'd like to
23    have something, if we had any influence on that, that actually
24    fits with their, at least, interests, so you don't have this,
25    kind of" -- and then at line 6, "God, I'm a failure -- I'm
```

1    no -- I'm an idiot in sailing.  I know nothing about sailing.

2    I'll look really stupid, even trying to be the, you know, bag

3    carrier of sailing."  And Mr. Singer responds, "I totally get

4    ya.  I totally get ya."

5         And how does Mr. Wilson respond at line 11?

6    A.   "Okay.  That's good news then.  Okay.  Great."

7    Q.   And then at line 12, Mr. Singer says, "and then the only

8    other thing I just want to remind you of is just staying away

9    from the people in admissions and the foundation" -- and at

09:59 10   line 17, "If anybody wants to reach you.  Because again, this

11   is not going through admissions, or it's going through the

12   foundation.  So I just want to make sure that we keep this

13   clean."

14        And how does Mr. Wilson respond when Mr. Singer says,

15   "I just want to make sure that we keep this clean."

16   A.   "Was there anything with -- with respect to any -- talking

17   to anybody there?  But they should still go ahead and meet on

18   campus and interview."

19   Q.   Thank you.

10:00 20        Special Agent, in addition to the calls with Mr.

21   Wilson, did there also come a time when you directed Mr. Singer

22   to call parents who had previously participated in the

23   side-door scheme?

24        MR. KELLY:  Objection to the characterization.

25        THE COURT:  All right.  The objection is sustained.

1   Q.   In addition to the calls with Mr. Wilson, did there also

2   come a time when you directed Mr. Singer to call parents who

3   had previously engaged with him in the side door?

4          MR. KELLY:  Same objection.

5          THE COURT:  No.  He can have that.  Overruled.

6   A.   Yes.

7   Q.   When was that relative to the notes that we saw from early

8   October?

9   A.   3 weeks later at the end of October.

10:00  10   Q.   For the purpose of those calls, did you give Mr. Singer

11   any instructions about what to say?

12   A.   Yes.

13   Q.   What were those instructions?

14   A.   To tell the parents that The Key Worldwide Foundation was

15   being audited and that he was not going to tell the IRS that

16   the payments made to his insider was to get their child in as

17   recruited athletes.

18   Q.   Why did you tell him to say that?

19   A.   To confirm a parent's understanding that there was a

10:01  20  payment made in exchange for their child being a recruited

21   athlete.

22   Q.   And to the extent that the parents were involved with USC,

23   did you tell him -- did you typically use a name in connection

24   with the insider?

25   A.   Yes.

```
      1    Q.    And what was the name?

      2    A.    Donna Heinel.

      3    Q.    Why?

      4    A.    To let the parent to have -- just to confirm that the

      5    parents knew there was an insider at the school.

      6    Q.    Okay.  And if we could take a look at Exhibit 587 in front

      7    of you, do you see the disk marked 587?

      8    A.    Yes.

      9    Q.    What is it?

10:02 10   A.    It is a recording of a call between Mr. Singer and

     11    Mr. Abdelaziz.

     12    Q.    Okay.  And what is the date of the call?

     13    A.    October 25, 2018.

     14    Q.    And if you look at the tab in front of you, is that a fair

     15    and accurate transcription of the recording at 587?

     16    A.    Yes.

     17    Q.    And are those your initials at the bottom of the

     18    transcript?

     19    A.    Yes.

10:02 20   Q.    And how did you confirm that this was Mr. Abdelaziz on

     21    this call?

     22    A.    Mr. Singer called Mr. Abdelaziz from his phone.  I went --

     23    during one of the extractions as the phone number linked to

     24    Mr. Abdelaziz.  I compared it to phone records we received for

     25    Mr. Singer's telephone and did public records checks for that
```

1    phone number and it came back to Mr. Abdelaziz.  And then

2    during this phone call Mr. Singer uses Mr. Abdelaziz's first

3    name and they talk about his children.

4           MR. FRANK:  Government offers exhibit 587.

5           THE COURT:  It will be admitted.

6           (Exhibit 587 admitted into evidence.)

7    Q.   And the date of this call again?

8    A.   October 25, 2018.

9           MR. FRANK:  And Miss Lewis, if we could start at the

10   top, please.

11          (Audio recording played.)

12   Q.   Special Agent, if I could direct you to page 4, line 13,

13   Mr. Singer says, "And so I just want you to know from the IRS,

14   you know, I'm not going to tell the IRS anything about the fact

15   that your $300,000 was paid to Donna -- Donna Heinel at USC to

16   get Sabrina into school even though she wasn't a legitimate

17   basketball player at that level.  So I'm not gonna -- I'm not

18   going to say that to the IRS obviously."

19          And how does Mr. Abdelaziz respond at line 21?

20   A.   "Okay."

21   Q.   And at line 22, Mr. Singer says, "You're okay with that,

22   right?"

23          And how does Mr. Abdelaziz respond?

24   A.   "Of course."

25   Q.   If I could direct your attention to page 6 of the

```
 1   transcript.  At line 6, Mr. Singer says, "I'll tell you a funny
 2   story.  Is that Donna Heinel, who is the senior women's
 3   administrator, she actually called me and said" -- and then
 4   he's interrupted by a fire alarm and picks up at line 12.  "She
 5   called me and says, hey Rick, that profile that you did for
 6   Sabrina, I loved it.  It was really well done and going
 7   forward, anybody who isn't a real basketball player that's a
 8   female, I want you to use that profile going forward."
 9           And how does Mr. Abdelaziz respond?
10   A.   "I love it."
11   Q.   Was it true that Donna Heinel had said that she wanted to
12   use Sabrina Abdelaziz's profile for anybody who isn't a real
13   basketball player that's a female?
14   A.   No.  That is not true.
15   Q.   Who instructed Mr. Singer to say that?
16   A.   The government.
17   Q.   Why?
18   A.   To see what -- how Mr. Abdelaziz would respond.
19   Q.   Did there come a time when you directed Mr. Singer to make
20   another phone call to Mr. Abdelaziz?
21   A.   Yes.
22   Q.   Directing your attention to the disk in front of you
23   marked 621, do you recognize that disk?
24   A.   Yes, I do.
25   Q.   What is it?
```

```
 1    A.    It is a recording of a call between Mr. Singer and
 2    Mr. Abdelaziz.
 3    Q.    And if you could look at the tab marked 621 in your
 4    binder, do you recognize that transcript?
 5    A.    Yes.
 6    Q.    Is it a fair and accurate transcript of the recording?
 7    A.    Yes, it is.
 8    Q.    What is the date of the call?
 9    A.    January 3, 2019.
10          MR. FRANK:  The government offers 621.
11          THE COURT:  It will be admitted.
12          (Exhibit 621 admitted into evidence.)
13          (Audio recording played.)
14    Q.    Agent Keating, I'd like to direct your attention to page 3
15    of the transcript.  At page 3, line 5, Mr. Singer says "Donna,
16    Donna Heinel, who's the Senior Women's Administrator at USC,
17    she called me" -- and at line 8 he continues, "to give me a
18    heads up, and asked -- she was asked by Admissions as to why
19    Sabrina did not show up for Women's Basketball in the fall."
20          And then he continues at line 12, "So she told them
21    that Sabrina had an injury" -- and at line 14, "and that it
22    happened over the summer" -- and then at line 16, "and that she
23    would be out for 6 to 8 months?"
24          Did Sabrina Abdelaziz actually have an injury?
25    A.    No, she did not.
```

10:12 (line 10)
10:17 (line 20)

```
 1   Q.   Who instructed Mr. Singer to say that?

 2   A.   The government.

 3   Q.   Why?

 4   A.   To gather evidence of Mr. Abdelaziz's response.

 5   Q.   And how did Mr. Abdelaziz respond when Mr. Singer said

 6   that Donna Heinel had told Admissions that Sabrina had an

 7   injury and would be out for 6 to 8 months at line 17?

 8   A.   "Okay."

 9   Q.   And then at line -- page 4 -- turn to page 4, line 5.

10   Mr. Singer says, "but they may ask you, is she okay, whatever.

11   So I think that Donna told them that she had plantar

12   fasciitis."

13            Was it true that Sabrina had plantar fasciitis?

14   A.   No.

15   Q.   Who made that up?

16   A.   Mr. Singer.

17   Q.   And what does Mr. Abdelaziz respond at line 8?

18   A.   "Okay."

19   Q.   And then at the bottom of page 4, Mr. Singer says at

20   line 23 -- actually, before we get to the bottom of the page,

21   in the middle of the page at line 14, do you see that

22   Mr. Abdelaziz says "Would they ask her, Rick?"

23            Mr. Singer responds, "No, they won't ask Sabrina."

24            And what does Mr. Abdelaziz say at line 16?

25   A.   "Do I have to prepare her?"
```

1    Q.   And then at the bottom of the page, Mr. Singer says at

2    line 23, "So I just -- but I have no idea if they're gonna call

3    or not.  I just wanted to give you a heads up.  They asked

4    about it and Donna replied" -- and at line 3, Mr. Singer says,

5    at line 3, "and I wanted you to know what her reply was."

6              And how does Mr. Abdelaziz respond?

7    A.   "That's fine.  I will answer the same, should they call

8    me."

9    Q.   And then at line 8, Mr. Abdelaziz says, "Great.  No

10:20 10   problem.  I appreciate it, Rick.  You know, this whole tax

11   issue, you called a few months ago, I got worried.  When I do

12   my taxes, should I mark this as a, you know -- as a charity, or

13   not, or use the 501(c)(3), or not, because you got me" -- and

14   then he continues at line 15, "concerned when you called the

15   last time."

16             Who was the first person to brings up taxes in this

17   phone call?

18   A.   Mr. Abdelaziz.

19   Q.   And do you see that he asks "When I do my taxes, should I

10:20 20   mark this as a charity?"  at line 10 through 12?

21   A.   Yes.

22   Q.   If I could direct your attention back to the prior call,

23   the transcript of 587 at page 5.  At page 5 of 587, lines 4

24   through 6, what does Mr. Abdelaziz say?

25   A.   "My intention was to donate the money to the foundation

1    and uh -- what -- you know, and then from there obviously -- I

2    don't think -- do they have the intention of reaching out to

3    the people that sent those payments?  Is that what you're

4    saying?"

5    Q.   And if I can direct you back to the transcript of 621 that

6    we were just listening to, Mr. Singer responds to

7    Mr. Abdelaziz's question at page 5, "When I do my taxes should

8    I mark this, you know, as a charity or not or use a 501(c)(3)

9    or not because you got me concerned when you called last time."

10:21  10          Mr. Singer responds at line 16, "Yeah, no, I mean,

11    your money went to our foundation" -- and at line 19, "So we're

12    a 501(c)(3), so I don't see where there should be any issue.

13    Because" -- at line 22, "that's what we are."

14          And what does Mr. Abdelaziz say at lines 23 and 24?

15    A.   "Okay.  Yeah, no, I just wanted to make sure that we're on

16    the same page."

17    Q.   Agent Keating, In addition to the calls with parents,

18    during this time that Mr. Singer was making calls at your

19    direction, did you also direct him to make calls to other

10:22  20    targets of the investigation?

21    A.   Yes.

22    Q.   Directing your attention to January 2019, did there come a

23    time when you had him call Jovan Vavic?

24    A.   Yes.

25    Q.   I'd like to direct your attention to the disk in front of

1    you marked 620.  Do you see that?

2    A.   Yes, I do.

3    Q.   What is 620?

4    A.   It's a recording of a call between Mr. Singer and

5    Mr. Vavic.

6          MR. KENDALL:  Your Honor, if you could just note the

7    continuing objection.

8          THE COURT:  Yes.

9    Q.   And if you turn to the transcript of that call in your

10:23 10   binder, what is the date of the call?

11   A.   January 2, 2019.

12         MR. FRANK:  The government offers 620.

13         THE COURT:  620 will be admitted.

14         (Exhibit 620 admitted into evidence.)

15         MR. FRANK:  If we can start at the beginning, please.

16   I'm sorry.  Withdrawn.

17   Q.   Is this a fair and accurate transcript of the recording?

18   A.   Yes.

19   Q.   Are those your initials at the bottom?

10:23 20   A.   Yes.

21         MR. FRANK:  If we could just pick up at the beginning,

22   please, Miss Lewis.

23         (Audio recording played.)

24   Q.   Agent Keating, this call was in January of 2019?

25   A.   Yes.

1    Q.    Approximately, how long was that after the admission of

2    Johnny Wilson to USC?

3    A.    Four years.

4    Q.    And actually, a little longer than that, right?

5    A.    2014.

6    Q.    Okay.  And at the bottom of page 2, Mr. Singer says at

7    line 23, "Obviously I've been able to go through Donna to help

8    us with getting some kids in, but if I come across somebody

9    that's a water polo player because I know that's what you --

10:28 10   they have to be a water polo player for you, then it -- it's

11   still okay for me to holler at you because essentially what

12   we've done in the past with the scholarships for your boys",

13   correct?

14           And how does Mr. Vavic respond?

15   A.    "Absolutely, absolutely."

16   Q.    Now, Special Agent, earlier the jury heard evidence

17   concerning Matteo Sloane and Agustina Huneeus.  Have you seen

18   any evidence that Mr. Vavic was involved in the admission of

19   Matteo Sloane or Agustina Huneeus?

10:29 20   A.    No, I have not.

21   Q.    Have you seen any evidence that he was paid in connection

22   with those admissions?

23   A.    No.

24   Q.    If I could direct your attention to page 3, line 10, he

25   says -- Mr. Vavic says at the end of the line, "The way SC is

1   now doing everything, Rick, is, um, um, when you get a walk-on,

2   I used to be able to get 'em in much easier, now the walk-on is

3   required to have decent grades and he has to have some kind of

4   a resume.  He can't just be a total nobody."  Do you see that?

5   A.   Yes.

6   Q.   And at line 11, he's referring to SC.  What does SC stand

7   for?

8   A.   University of Southern California.

9   Q.   Did you also direct Mr. Singer during this time period to

10:30 10   call Donna Heinel?

11   A.   Yes.

12   Q.   And at the time that Mr. Singer was approached by federal

13   agents, are you aware whether he was making payments to Donna

14   Heinel?

15   A.   Yes, he was.

16   Q.   How much was he paying Donna Heinel?

17   A.   $20,000 a month.

18   Q.   When did those payments begin?

19   A.   July 2018.

10:30 20   Q.   And after the approach did you direct him to continue with

21   those payments?

22   A.   Yes.

23   Q.   Why?

24   A.   To continue the payments so Miss Heinel did not think

25   there was anything unusual going on.

```
 1              MR. KENDALL:  Objection, your Honor.

 2              THE COURT:  Grounds?

 3              MR. KENDALL:  It's all hearsay what things are going

 4     on that he had participated, payments and the like.

 5              THE COURT:  Overruled.

 6     Q.   Sorry.  Did you finish your answer, Special Agent?

 7     A.   To continue Mr. Singer's payment arrangement with

 8     Miss Heinel so she would not know that there was something

 9     going on and Rick's working with the FBI.

10:31 10  Q.   If you could look at the disk in front of you marked 574,

11     do you see the disk marked 574?

12     A.   Yes.

13     Q.   What is it?

14     A.   It is a recording of a call between Mr. Singer and

15     Miss Heinel.

16     Q.   Okay.  And if you look at the transcript marked 574 in

17     front of you?

18     A.   Yes.

19     Q.   I'm sorry.  I directed you to the wrong call.  If we look

10:31 20  at 572 first.  Do you see the disk marked 572?

21     A.   Yes.

22     Q.   What is it?

23     A.   It is a recording of a phone call between Miss Heinel and

24     Mr. Singer.

25     Q.   And if you look at the transcript marked 572, what is the
```

1   date of that call?

2   A.   October 2, 2018.

3          MR. FRANK:   The government offers 572.

4          MR. KENDALL:   Your Honor, please note our continuing

5   objection.

6          MR. KELLY:   Same.

7          THE COURT:   I note your objection.

8          572 will be admitted.

9          (Exhibit 572 admitted into evidence.)

10:32 10   Q.   And again, the date, Special Agent?

11   A.   October 2, 2018.

12          MR. FRANK:   Miss Lewis, if you can start at the

13   beginning of 572.

14          (Audio recording played.)

15   Q.   At page 2 of the transcript, line 5 -- well, actually, at

16   page 1, I'm sorry, line 21, Miss Heinel says, "I mean really by

17   the second week of November, you know, we're going to be

18   probably hopefully getting almost all your people through."

19          And then at line 5 on page 2, she says, "Is there

10:35 20   anybody else?  And the water polo player, right?"  Do you see

21   that?

22   A.   Yes.

23   Q.   Who was the water polo player that was going through the

24   process at this point?

25   A.   Agustina Huneeus.

1    Q.   If I could direct your attention to the bottom of that

2    page, Mr. Singer says, "The other thing I -- I could, I could

3    use from you.  The next time you submit an invoice for the

4    20,000" -- at line 22, "Can put some detail into the invoice?"

5         And how does Miss Heinel respond at line 22, line 24?

6    A.   "Sure.  No problem."

7    Q.   Why did you ask Mr. -- why did you direct Mr. Singer to

8    ask Miss Heinel for more detail on the invoice?

9    A.   To gather evidence of Miss Heinel's understanding of the

10:35 10  $20,000 payment.

11   Q.   And did there come a time after this when -- this

12   October 2nd call that Mr. Singer and Miss Heinel had another

13   call?

14   A.   Yes.

15   Q.   And you previously identified the disk marked 574 as a

16   call between Mr. Singer and Miss Heinel, is that correct?

17   A.   Yes.

18        MR. FRANK:  The government offers 574.

19        THE COURT:  It will be admitted.

10:36 20  (Exhibit 574 admitted into evidence.)

21   Q.   And if we can look at the transcript for the call 574 in

22   your binder, are those your initials at the bottom of the

23   transcript?

24   A.   Yes.

25   Q.   And is that a fair and accurate transcription of this call

 1   between Mr. Singer and Miss Heinel?

 2   A.    Yes.

 3   Q.    What's the date of the call?

 4   A.    October 5, 2018.

 5   Q.    So that's approximately three days after the call we just

 6   listened to?

 7   A.    Yes.

 8            MR. FRANK:  If we can start at the top, please.

 9            (Audio recording played.)

10:38 10   Q.    Special Agent, if I could direct you to page 1 of this

11   call.  At line 20, Miss Heinel refers to two students.  What

12   are their names?

13   A.    Isabelle and Claire.

14   Q.    And then at line -- and do you know what their last names

15   are?

16   A.    Isabelle Janavs and Claire Altman.

17   Q.    If I could direct you to line -- page 2, at line 18

18   Miss Heinel says, "Are you going to tell the family?  Or I just

19   want to make sure --"

10:39 20            Mr. Singer says "I can hold" and Miss Heinel says,

21   "yeah, I just want to make sure that, you know, that doesn't

22   get out."  And then at line 24, she says, "You know, I'm always

23   worried about those counselors, you know --" and Mr. Singer

24   says, "No.  Absolutely."  And he then says at line 4, "We

25   already -- we already dealt with that."

```
 1              Are you familiar with the voicemail that Miss Heinel
 2    left for Mr. Singer about parents yelling at counselors?
 3    A.   Yes.
 4    Q.   And how long was that voicemail, approximately, before
 5    this call in October of 2018?
 6    A.   6 months.
 7    Q.   And then at line 20 on page 3, Mr. Singer says, "And what
 8    do you want -- do you want -- are you going to send me the
 9    letter or and do you want me to then -- then I'll get them to
10    forward the 50K."
11              Do you see that?
12    A.   Yes.
13    Q.   And how does Miss Heinel respond at line 24 and continuing
14    on to the next page?
15    A.   "Yeah, just -- let's hold on that right now.  I don't like
16    to do it so close."
17    Q.   And based on the context, do you have an understanding of
18    what "it" is?
19    A.   Receive the payment.
20    Q.   Did there come a time after this call when Miss Heinel
21    sent an invoice for the monthly $20,000 payment to Mr. Singer's
22    organization?
23    A.   Yes.
24              MR. FRANK:  Could we show the witness only Exhibit
25    596, please.
```

```
 1              MR. KELLY:  Your Honor, on this exhibit I'm going to
 2       object if it's being offered for the truth of the matter
 3       asserted on the invoice.  If it's just to provide context to
 4       the Heinel situation, I'm not going to object, but I just want
 5       to be clear.  If he's offering this for truth of the matter,
 6       I'll object on hearsay grounds.
 7              MR. FRANK:  It's a fraud case, your Honor.  We're not
 8       offering it for the truth of the matter asserted.
 9              MR. KENDALL:  I have a continuing objection, your
10:41  10  Honor.
11              THE COURT:  Your objection is overruled.
12       Q.    Special Agent, do you recognize 596?
13       A.    Yes.
14       Q.    What is it?
15       A.    It is an e-mail from Donna Heinel to
16       Danea@creatinganswers.com.
17       Q.    And do you understand that Creating Answers worked for
18       Mr. Singer's organization?
19       A.    Yes.
10:41  20  Q.    And what's the attachment label?
21       A.    "Counting Stars Invoice."
22       Q.    And the government -- what's the date, please?
23       A.    November 5, 2018.
24              MR. FRANK:  The government offers 596.
25              THE COURT:  It will be admitted.
```

```
 1              (Exhibit 596 admitted into evidence.)
 2   Q.   What does Miss Heinel write?  I'm sorry.  Can you just
 3   wait a minute until it's up on the -- there we go.  What does
 4   Miss Heinel write?
 5   A.   "Danea, here is my November invoice.  Thank you."
 6              MR. FRANK:  And Miss Lewis, if you could show us the
 7   attachment.  Miss Lewis, do we have a clearer copy of this
 8   attachment?  Is that 596A?
 9              Your Honor, the government offers 596A.
10   THE COURT:  596A is the attachment?
11              MR. FRANK:  It's the same e-mail with the attachment.
12   It's just a clearer copy.
13              THE COURT:  It will be admitted.
14              (Exhibit 596A admitted into evidence.)
15              MR. KELLY:  And again, Judge, for the record, 403
16   objection as well.
17              THE COURT:  Overruled.
18   Q.   What is this document, Special Agent?
19   A.   It is an invoice from Clear the Clearinghouse.
20   Q.   And can you tell us what it says under "Description"?
21   A.   "Consulting Services, interview, evaluation and
22   assessments for prospective students from 1. Hong Kong
23   International School, Abdelaziz; 2. The Bay School, Blake;
24   3. Cathedral Catholic, Bizak."
25   Q.   And what's the price?
```

1    A.    $20,000.

2    Q.    And what is the balance due?

3    A.    $20,000.

4    Q.    And if we look at the bottom, it says "Please make Checks

5    payable to: Clear the Clearinghouse."  Do you see that?

6    A.    Yes.

7    Q.    And at the bottom, it says, "Checks can be mailed to the

8    above address"?

9    A.    I see that.  Yes.

10:43 10   Q.    And what is the address?

11   A.    64 Savona Walk, Long Beach, California.

12   Q.    Who lived at that address at this time?

13   A.    Donna Heinel.

14   Q.    Thank you.

15         MR. FRANK:  No further questions, your Honor.

16         THE COURT:  Cross-examination.  Mr. Kelly?

17         MR. KELLY:  Yes, your Honor.

18              CROSS-EXAMINATION OF ELIZABETH KEATING

19   BY MR. KELLY:

10:45 20   Q.    Good morning, Agent Keating.

21   A.    Good morning.

22   Q.    Agent Keating, you spent hundreds of hours working on this

23   case, right?

24   A.    Yes.

25   Q.    And you've worked closely with the FBI on this matter as

```
 1   well, right?
 2   A.   Correct.
 3   Q.   You've talked to your fellow agents about this case many a
 4   time, right?
 5   A.   Yes.
 6   Q.   Talked to the prosecution team probably more times than
 7   you wanted to, right?
 8   A.   Yes.
 9   Q.   All right.  So it's fair to say you're a critical member
10   of this prosecution team, right?
11            MR. FRANK:  Objection.
12            THE COURT:  Sustained.
13   Q.   Do you view yourself as a critical member of this
14   prosecution team?
15            MR. FRANK:  Objection.
16            THE COURT:  Sustained.
17   Q.   Well, how long have you been working on it?
18   A.   Since 2018.
19   Q.   All right.  And you've spent a lot of time on this case,
20   right?
21   A.   Yes.
22   Q.   Now, did you work on the court ordered wiretap in the
23   summer of 2018?
24   A.   Yes.
25   Q.   And did you monitor some of the calls?
```

10:46 (line 10)
10:46 (line 20)

```
 1   A.   Yes.
 2          MR. FRANK:  This is beyond the scope of the direct,
 3   your Honor.
 4          THE COURT:  Overruled.
 5   Q.   And -- well, are you the lead IRS agent on this matter,
 6   ma'am?
 7   A.   Yes.
 8   Q.   And so when you monitored the wiretap, did you ever hear
 9   Gamal Abdelaziz intercepted?
10:46 10  A.   No.
11   Q.   And over the many hours of your work in this case, you're
12   not aware of any allegations that he or his daughter were
13   involved in any test cheating scams?
14   A.   Correct.
15   Q.   And you're not aware of any evidence that anybody ever
16   took classes for his daughter, right?
17   A.   Correct.
18   Q.   So you're aware there are basically two charges against
19   him, right?  One involving an allegation of bribery and one
10:47 20  involving an allegation of fraud based upon this athletic
21   profile, right?
22   A.   Yes.
23   Q.   Let me ask you, how many times have you met with Rick
24   Singer?
25   A.   I don't recall the exact number, but it's maybe 50 times.
```

```
 1    Q.   Okay.  Approximately 50 -- a lot, right?

 2    A.   A lot, yes.

 3    Q.   Okay.  And, approximately, those 50 meetings totaled how

 4    many hours?  I'm not looking for certainty here.  I'm looking

 5    for an estimate.

 6    A.   A hundred hours.

 7    Q.   So maybe 50 meetings over a hundred hours?

 8    A.   That's an estimate.  I can't.  I don't know how long or

 9    how often I met with Mr. Singer, but I met with Mr. Singer
10:48 10    often.

11    Q.   All right.  And how many times have you spoken by phone

12    with Mr. Singer?

13    A.   Majority, I would say maybe 30 times out of the 50,

14    where -- again, it's an estimate.  I'm not sure.  We

15    communicated with Mr. Singer a lot over the telephone because

16    he was in California and we were in Boston.

17    Q.   And how many hours in total do you think you spoke to him

18    over the phone?

19         MR. FRANK:  Your Honor, can I ask for clarification?
10:48 20    I think we're talking about in-person and by phone call.

21         THE COURT:  I believe these are meant to be part of

22    the 50 times, but 30 by phone?

23         MR. KELLY:  Yes.

24    Q.   Apologies if I confused that.  Would you estimate 50 times

25    you met with him, or 50 times you interacted with him either by
```

```
 1    phone or in person?
 2    A.   Both phone and in person.
 3    Q.   Okay.  So, collectively, between meeting with him and
 4    talking to him over the phone you had at least 50 interactions
 5    with him, right?
 6    A.   At least.
 7    Q.   Maybe more, right?
 8    A.   Yes.
 9    Q.   And when is the last time you saw Rick Singer?
10         MR. FRANK:  Objection.  Relevance.
11         THE COURT:  Sustained.
12    Q.   Are you aware Rick Singer was recently in Boston?
13         MR. FRANK:  Objection.  Relevance.
14         THE COURT:  He can have that question.
15    A.   I'm aware Mr. Singer was in Boston a couple weeks ago.
16    Q.   Okay.  And was he interviewed?
17         MR. FRANK:  Objection.
18         THE COURT:  Sustained.
19    Q.   Where in Boston was he?
20         MR. FRANK:  Objection.
21         THE COURT:  Yeah.  You can have that he was in Boston,
22    but you can't pursue it.
23    Q.   Would you recognize a photo of Mr. Singer if I showed it
24    to you?
25    A.   Yes.
```

1          MR. KELLY:  Let me show the witness only Exhibit 9021.

2     A.    That's Mr. Singer.

3          MR. FRANK:  Your Honor, I'm going to object on 403

4     grounds.

5          THE COURT:  Well, he hasn't offered it yet.

6          MR. KELLY:  I offer it now, your Honor.  It's

7     relevant.  It's an ID of the cooperating witness we've been

8     discussing.

9          MR. FRANK:  We're not disputing identity.  This is

10:50 10   objectionable on 403 grounds.

11          THE COURT:  I'm going to reserve on this.  We can talk

12     about it later.  It's not admissible now.

13     Q.    Okay.  Agent, Mr. Singer, he became a cooperating witness

14     for the government on September 21, 2018, right?

15     A.    He began cooperating with the FBI investigation on

16     September 21, 2018.

17     Q.    Okay.  So that's a yes, right?  He began cooperating with

18     the government on September 21, 2018, right?

19     A.    Yes.

10:51 20   Q.    And less than two weeks later he wrote a note to himself

21     saying that you were asking him to bend the truth.  Didn't he

22     do that?

23     A.    He wrote a note, yes.

24     Q.    And that was on October 2, 2018, correct?

25     A.    Yes.

1    Q.    And is it your experience that people lie to their own

2    diaries?

3    A.    I don't have experience with people lying in their

4    diaries.  People don't lie in their diaries.  They're usually

5    truthful, but I can't opine on what Mr. Singer was thinking at

6    the time.

7    Q.    Okay.  And if the government were to call Mr. Singer as a

8    witness in this trial, we could question him about that,

9    couldn't we?

10:52 10           MR. FRANK:  I object, your Honor.

11           THE COURT:  Sustained.

12   Q.    Well, back in April of 2020 you signed a four page

13   declaration to the Court about this Singer note, didn't you?

14   A.    Yes.

15   Q.    Was it accurate and truthful?

16   A.    Yes.

17   Q.    Do you recall it?

18   A.    Yes.

19   Q.    And among other things, did you indicate that when first

10:52 20   dealing with Singer you wanted him to be explicit that the

21   scheme involved bribes, right?

22   A.    Wanted Singer to be explicit, yes.

23   Q.    And that was to avoid possible confusion about the intent

24   of the targets of this investigation, right?

25   A.    Possible confusion of the intent for anybody on the

1    outside looking in.  There would be no confusion for them what
2    was happening.
3    Q.   No.  I'm not talking about people on the outside looking
4    in.  I'm talking about people who were talking to Singer about
5    the scheme.  You wanted Singer to be explicit so there would be
6    no possible confusion about the intent of those people talking
7    to Singer, right?
8    A.   No.
9    Q.   Well, didn't you say the purpose was to ensure for clients
10:53 10   who had not yet committed a crime or were still in the middle
11   of it, there would be no possible confusion about their intent?
12   A.   The point of that call was so it would be -- it was
13   explicit so the parents could not make the excuse that it
14   was --
15   Q.   I'm asking you a question about what you wrote in your
16   declaration to the Court.  Didn't you say, "The purpose was to
17   ensure that for clients who had not yet committed a crime or
18   were still in the middle of it, there would be no possible
19   confusion about their intent?"  Didn't you say that?
10:54 20   A.   No confusion about their --
21   Q.   Intent?
22   A.   -- intent and the --
23   Q.   I'm just asking, is that a sentence you wrote, or did
24   somebody else write that?
25   A.   Somebody else wrote that, but I signed it.

```
 1   Q.   Okay.  So who wrote this declaration of yours?

 2   A.   I don't know.  One of the prosecutors.  I'm not sure which

 3   one.

 4   Q.   Okay.  So this is a declaration you signed, but it was

 5   written by the prosecutors?

 6   A.   After -- yes.  After I reviewed it, I signed it.

 7   Q.   Do you recall which one?

 8   A.   No, I don't.

 9   Q.   When you signed it, did you review it?

10:54 10   A.   Yes.

11   Q.   Okay.  And did you agree with its contents before it was

12   submitted to the Court?

13   A.   Yes.

14   Q.   And do you recall that it says, "We wanted him to be

15   explicit that the scheme involved bribes.  The purpose was to

16   ensure that, for clients who had not yet committed a crime or

17   were still in the middle of it there would be no possible

18   confusion about their intent."

19   A.   That is what's written there, yes.

10:55 20   Q.   And you signed it.  And do you still think that's true?

21   A.   The purpose of the call was to be explicit so there could

22   be no cover story.

23   Q.   Okay, but do you still think that sentence in that

24   declaration is true?

25   A.   I don't think there was any confusion about parents'
```

1   intent.

2   Q.   Okay.  But again, I understand you didn't write it, but

3   you signed this declaration.  So is this sentence true that the

4   purpose was to ensure that for clients who had not yet

5   committed a crime, or were still in the middle of it, there

6   would be no possible confusion about their intent?  That

7   sentence is in there, right?

8   A.   Yes.  That's in there.

9   Q.   Okay.  Because you wanted him to be explicit that the

10  scheme involved bribes, right?

11  A.   Correct.

12  Q.   Because he told you that previously when he was dealing

13  with parents, he wasn't so explicit, was he?

14  A.   Correct.

15  Q.   In fact, to quote your declaration, he said that he

16  usually told his clients that the money was a donation to an

17  athletic program, right?

18  A.   Correct.  That was his general pitch, yes.

19  Q.   And that doesn't sound so bad, does it?

20  A.   A donation to a program does not sound bad.

21  Q.   And so if someone was told that their money would be a

22  donation to a program, or a building like the Galen Center at

23  USC, that doesn't sound illegitimate or illegal, does it?

24        MR. FRANK:  Objection to how it sounds to third

25  parties.

```
 1                    THE COURT:  Sustained.
 2       Q.    Well, if someone donates money to USC Women's Athletic
 3       Fund, that's not illegal, is it?
 4       A.    No.
 5       Q.    And if someone donates money to maintain or build the
 6       Galen Center at USC, that's not illegal, is it?
 7       A.    No.
 8       Q.    And you're aware, or are you aware that's what Mr. Singer
 9       told Gamal Abdelaziz Delaware in February of 2017?  Are you
10:57 10  aware they had that conversation?
11       A.    I'm not aware of a conversation he had with Mr. Abdelaziz
12       at that time.
13       Q.    You're not aware that they spoke about USC and his
14       daughter Sabrina in February of 2017?
15       A.    I'm not aware of a conversation that Mr. Singer had with
16       Mr. Abdelaziz in 2017.
17       Q.    Are you aware of an e-mail between Singer and Abdelaziz in
18       February of 2017?
19       A.    I'm aware of numerous e-mails between Mr. Singer and
10:57 20  Mr. Abdelaziz regarding Sabrina's fake profile.
21       Q.    I'd like to show you exhibit --
22             MR. KELLY:  Just the witness.
23       Q.    -- Exhibit 272.  Do you see the date of that?
24       A.    Yes.
25       Q.    And is this one of the e-mails you're aware of in this
```

1   case?

2   A.   I have not seen this e-mail, but it is from Mr. Singer's

3   e-mail account.

4   Q.   And it is to Mr. Aziz, isn't it?

5   A.   Yes.

6   Q.   Is it your testimony that you were never shown this e-mail

7   before you came to court today?

8   A.   I have not seen it -- I haven't seen this e-mail.

9        MR. KELLY:   Okay.   Then take it down, please.

10:59 10   Q.   How many e-mails did you review before you came to court

11   today?

12   A.   I don't know exactly how many.   I reviewed e-mails

13   throughout this case and then reviewed e-mails in preparation

14   of trial.

15   Q.   Okay.   And who chose which e-mails for you to review

16   before you testified here today?

17   A.   For preparation of trial, the prosecutors.

18   Q.   All right.   And you're aware generally of the rules of

19   evidence, that if you don't see something, that maybe the jury

10:59 20   doesn't see it either, right?

21        MR. FRANK:   I object, your Honor.   Argumentative.

22        THE COURT:   Sustained.

23   Q.   Well, you're aware of the so-called Jencks Act, right?

24   A.   Yes.

25   Q.   Okay.   So you have to produce reports --

```
 1          MR. FRANK:  I object, your Honor, to the legal
 2    argument.
 3          THE COURT:  Yeah.  Sustained.
 4    Q.   Are you aware generally that Mr. Aziz back in February of
 5    2017 sent photos to Mr. Singer as they had discussed and noted
 6    that she had been the MVP and you can use ones you find
 7    suitable?  Do you know that, in general, that's what he said?
 8    A.   I know that Mr. Abdelaziz sent pictures to Mr. Singer.
 9    Q.   All right.  And do you know in -- way back in February of
11:00 10   2017 he told Singer here's some photos, she won MVP, use what
11    you find suitable?
12    A.   I don't recall that being said in e-mails.  I just recall
13    seeing e-mails sent to Mr. Singer with photos.
14          MR. KELLY:  I'm going to offer 272 as independently
15    admissible on the 8033 state of mind evidence of --
16          MR. FRANK:  No need for argument.  We don't object to
17    it.
18          THE COURT:  It will be admitted, 272.
19          (Exhibit 272 admitted into evidence.)
11:01 20         MR. KELLY:  Okay then.  Exhibit 272, let's go to that.
21    Let's look at the date on this.  I'm sorry.  Up top.
22    Q.   February 28, 2017, it's from Gamal Abdelaziz to Singer,
23    correct?
24    A.   Yes.
25    Q.   Let's go into the middle there on Tuesday, February 28,
```

2017.  See what it says?  "I've attached Sabrina's basketball

photos as discussed.  I'm sorry these are not professional

pictures, but you'll recognize Sabrina from her MVP picture and

you can use ones you find suitable.  I'm in the U.S. till

March 10th if you have any questions.  My cell number's" --

blah, blah, blah.

           And then it goes above that.  Singer tells him "the

file is too large.  It won't open."

           And he says, "okay, will send a smaller version."

11:02      And way below this at the bottom, he's getting the

pictures from his wife, right?

A.   Yes.

Q.   So this is the first evidence you have of the discussions

between Singer and Aziz about Sabrina, right?

           MR. FRANK:  Objection to the characterization.

           THE COURT:  Characterization of what?

           MR. FRANK:  This is the first evidence you have.

           MR. KELLY:  I'll rephrase, Judge.

           THE COURT:  Rephrase.

11:02 Q.   Do you have any other e-mails evidencing discussions

between Singer and Aziz about basketball and Sabrina besides

this?

A.   I've reviewed e-mails between Mr. Singer and Mr. Abdelaziz

discussing basketball and Sabrina.  I don't recall the dates on

those.

```
 1    Q.   All right.  But you're not aware as you sit there today
 2    that there's any e-mails prior to this, right?
 3    A.   I can't say for certain, but -- because I don't recall the
 4    dates.
 5    Q.   And you haven't seen this before today, right?
 6    A.   Correct.
 7    Q.   Now let's get back to this declaration again.  Didn't you
 8    also say in this declaration that "We asked Singer to be more
 9    explicit on the calls so there would be no confusion about the
10    parents' intent if they continued to go forward", right?  You
11    said that?
12    A.   Right.  It's in there, yes.
13    Q.   Okay.  And, again, I take it your concern because you
14    wanted to bring a conspiracy case, you know the intent --
15         MR. FRANK:  Objection.
16    Q.   Was your concern that some day you might have to prove in
17    a courtroom the intent of the people you could charge?
18         MR. FRANK:  Objection to her concern.
19         THE COURT:  Sustained.
20    Q.   Well, you were very focused on making sure it was explicit
21    so there was no confusion about the parents' intent.  You wrote
22    that, right?
23    A.   That's what -- we wanted Mr. Singer to be explicit so a
24    parent couldn't use the cover story that it was a donation
25    because it was a payment in exchange for an athlete being
```

1    recruited as a fake athlete.

2    Q.    Okay.  Do you have any evidence he paid off any coaches?

3    A.    I have evidence that the payment went to the coach.

4    Q.    Just answer the question, please.  Do you have any

5    evidence that Mr. Abdelaziz ever agreed to pay off a coach?

6            MR. FRANK:  Objection to "pay off a coach."

7            THE COURT:  Yes.  Sustained.

8    Q.    Okay.  Do you have any evidence that Mr. Abdelaziz ever

9    agreed to offer money to a person employed as a coach by USC?

11:05 10   A.    Mr. Abdelaziz offered money to a program directed by an

11   individual.

12   Q.    That's right.  He thought the money was going to a

13   program --

14           MR. FRANK:  I object to the speaking objections.

15           THE COURT:  We're going to take the morning recess

16   here.

17           You may step down for the time being, Miss Keating.

18           We're going to be in recess for 15 minutes, jurors.

19           (Jury exits.)

11:06 20   THE COURT:  Please be seated, counsel.  Approximately

21   how long do you think you're going to be on cross, Mr. Kelly?

22           MR. KELLY:  I think for sure an hour, Judge.  I'll try

23   to keep it to that.

24           THE COURT:  All right.  And Mr. Kendall?

25           MR. KENDALL:  Much longer, your Honor.  Mr. Frank, I

```
 1    think, took about 2 hours and 40 minutes.  I don't know if I'll
 2    be above that, but I'm in the range plus or minus.
 3              THE COURT:  Okay.  Anything else that needs to come to
 4    the Court's attention before we recess?
 5              MR. KELLY:  No, your Honor.
 6              MR. FRANK:  Not for the government.
 7              THE COURT:  We are in recess for 15 minutes.
 8              (Recess taken 11:06 a.m. to 11:23 a.m.)
 9              THE COURT:  Good morning, counsel.  Two things before
10    we call the jury back.  Over the break, the Court was
11    petitioned by the press to release copies of the phone call
12    transcripts.  I see no reason why they ought not to be
13    provided.  Do counsel have any reason to object?
14              MR. KELLY:  Defer to the Court, your Honor.
15              MR. KENDALL:  Your Honor, given the nature of the
16    publicity that we have with the Zoom access call, I am very
17    concerned about sequestration.  I have no problem with them
18    being released at the end of the trial, but while we're trying
19    to sequester witnesses scattered all over the country with this
20    sort of obsessive publicity on the case, I think it creates a
21    risk.
22              MR. KELLY:  I actually defer to Mr. Kendall, your
23    Honor.  I withdraw that.
24              MR. KENDALL:  As I said your Honor, I don't have a
25    problem with public access when this trial is over.  The rules
```

```
 1   are the rules and we respect them, but we've got a lot more
 2   witnesses coming forward.
 3              THE COURT:  This is just the transcripts that we've
 4   been reading from and obviously have been quoted from
 5   extensively to this point.
 6              MR. KENDALL:  I understand, your Honor.
 7              THE COURT:  The reasons given were so that if they
 8   were going to quote anything, they would quote it accurately
 9   and not misquote anybody.
11:28 10             MR. KENDALL:  Somehow I'm never enthused with the
11   quoting that they do, your Honor.  I'm just trying to be
12   practical.  I'm not citing a rule or pounding the table.  I'm
13   just a cautious person.
14              THE COURT:  I hear you.
15              Mr. Frank, what's the government's position?
16              MR. FRANK:  We don't have a position, your Honor,
17   other than to note that the exhibits themselves, the audio is
18   public record at this point once it's introduced, and so it's
19   not clear if the transcripts really do much more in terms of
11:28 20   publicity other than, as your Honor pointed out, making sure
21   that any quotations from the audio is accurate.
22              MR. KENDALL:  Your Honor, that's the point
23   Ms. Papenhausen was kind of enough to remind me.  We challenge
24   the accuracy of some of these transcripts.  You've heard us do
25   it already with Agent Brown.  We're going to continue it with
```

her.  I don't think -- the transcripts are not accurate.

Are they generally accurate?  Yes.  But there are some key statements in there that we contest and that we think are very important to the defense that they be done with the appropriate corrections.  So given that they are not the real evidence and they are not -- there are issues of inaccuracy that in good faith we've already shown with the red line transcripts that we used last week, I'd ask that we hold off, your Honor.

MR. FRANK:  Your Honor, if Mr. Kendall disputed the accuracy of the transcripts, all of them were provided to him well in advance of trial.  He didn't dispute them at that point.  He reserved until now so that he could do it in open court.  We believe the transcripts are sufficiently accurate and that they should be released.

MR. KENDALL:  They're not admit -- your Honor, you know our position.

THE COURT:  I will take the matter under advisement, but I did want to get the opinion of counsel before I did.

MR. KENDALL:  Thank you.

THE COURT:  The other issue, apparently you wanted to talk to me about the photograph of Mr. Singer that was proffered just before the break with his paddle board.

MR. KELLY:  Just to the extent, if I go back to it, I don't want to go to sidebar for sure.  I wanted to just ask the

```
 1    Court at some point I might go back to it because we do think

 2    it's relevant to be identifying the cooperator in the case.

 3             THE COURT:  What's the reason for the objection?

 4             MR. FRANK:  Your Honor, it's deliberately -- it's a

 5    photo of him at the beach.  It's a photo that is deliberately

 6    designed to be prejudicial given the nature of the photo.  If

 7    they want a photo of Rick Singer, there are many photos out

 8    there.  We can give them a photo.  There's no dispute about who

 9    he is or what he looks like.  But a photo of him in a wet suit
```
11:30 10    at the beach from the side, from the back, going
```
11    paddle-boarding is deliberately designed to be prejudicial.

12    There's no other explanation.

13             MR. KENDALL:  Your Honor, I'd say it's no less

14    prejudicial or no more than the palace at Versailles.  They're

15    putting in stuff about my client that way.  This is far less

16    prejudicial.

17             MR. FRANK:  We didn't put anything in about

18    Versailles.  He said it on a tape.  We played the entire tape,

19    your Honor.
```
11:31 20             THE COURT:  Yeah, I'm going to sustain the objection
```
21    but certainly that does not prevent the defendants from

22    proffering another photograph of Mr. Singer just to put a face

23    with the name that we have heard lots about.  But that

24    particular photograph is not going to go in.

25             So call the jury.
```

```
 1              (Jury enters.)

 2              THE COURT:  Good morning again, jurors.  We're ready

 3       to resume.

 4              Ms. Keating, again you're reminded you remain under

 5       oath.  Mr. Kelly, you may continue with cross-examination.

 6              MR. KELLY:  Yes, Your Honor.  Thank you.

 7       BY MR. KELLY:

 8       Q.   So before the break I was asking you a series of questions

 9       regarding what Singer generally told his clients and, in fact,

11:33 10  you testified two days ago, you were asked, "What was your

11       understanding of what he had previously said to parents before

12       he had been approached?"  And then your answer was, "Mr.

13       Singer's general pitch was that it was a donation to a

14       program."  That was your testimony, right?

15       A.   In exchange for a recruitment spot.

16       Q.   Really?  You think that was your testimony?  Let's look at

17       that transcript, please.  Page 188, line 4.  Question:  "What

18       was your understanding of what he had previously said to

19       parents before he had been approached?"

11:34 20             And there's a baseless objection there.  "Overruled."

21             Answer:  "Mr. Singer's general pitch was that it was

22       a donation to a program."

23             That's what you said, right?

24             MR. FRANK:  Taken out of context, your Honor.

25             THE COURT:  Overruled.
```

1    Q.   Well, it was in the context of a question from Mr. Frank,

2    right?

3    A.   That is part of his general pitch.

4    Q.   Okay.  And, in fact, Gamal Abdelaziz had his discussions

5    with Singer months before you approached Singer, correct?

6    A.   Sabrina's application and side door was done months

7    before.

8    Q.   Well, you keep throwing in the words "side door."  The

9    only evidence you had that "side door" was ever uttered to him

11:35 10   was on those two tapes, right?

11   A.   We had evidence of false profiles being submitted to --

12   Q.   Let's stick with "side door" that you keep injecting into

13   this.  Do you have any evidence that the phrase "side door" was

14   ever used to him before those two tapes?

15   A.   Not the specific words "side door."

16   Q.   Okay.  Okay.  So every time you keep using it with respect

17   to him, all you have are those two tapes, correct?

18   A.   For the specific words "side door," yes.

19   Q.   And as to those specific words, who is the one who spoke

11:36 20   those specific words, Abdelaziz or Singer?

21   A.   In the transcripts?

22   Q.   Yes.

23   A.   I'd have to go back and look at the transcripts.

24   Q.   Okay.  We'll get there in a moment.

25   A.   Okay.

Q.   But isn't it your recollection that "side door" was used

by Singer, not Gamal?

A.   I'd have to double-check the transcripts.

Q.   In fact, didn't you tell Singer to use this phrase "side

door" as much as he could?

A.   I don't recall saying to use the words "side door."  We

wanted Mr. Singer to be explicit and say it was a payment to a

coach in exchange for a recruitment spot.

Q.   Right.  And there's zero evidence that he ever agreed to

bribe a coach, right, zero?

A.   There's evidence that there was a false application

submitted to get Sabrina in as a fake recruit in exchange for a

payment to a program that was directed by an insider.

Q.   Right.  I know that's your theory of the case, but that

wasn't the question, was it?

          MR. FRANK:  I object.

          THE COURT:  Overruled.

Q.   Can you please just answer the question.  Do you have any

evidence that he ever agreed with Rick Singer or anyone to

bribe a USC coach, yes or no?

A.   The payment went to a program.  Specifically to a coach,

no.  But it went to a program.

Q.   So the answer is no, you have no evidence he ever agreed

to bribe a coach, right?

A.   A specific coach, no.

```
 1    Q.   All right.  How about Donna Heinel, you have no evidence
 2    that he ever knew of Heinel before those two calls either, do
 3    you?
 4    A.   Mr. Singer told us at some point that Mr. Abdelaziz did
 5    not know the name Donna Heinel.
 6    Q.   Correct.  Singer himself said he didn't know who Heinel
 7    was until he injects the name into those two tapes, right?
 8    A.   Correct.
 9    Q.   In fact, that's why he had to list her title when he said
11:38 10   her name, right?  She's Donna Heinel, senior women's
11    administrator, USC, blah, blah, blah, right?
12    A.   He explained what her title was, he stated her title.
13    Q.   Right.  So when he called up Bruce Isackson and referenced
14    the corrupt coach Jorge Salcedo, he just said Jorge.
15    Mr. Isackson knew who he was talking about, right?
16    A.   I don't know what Mr. Isackson knew.
17    Q.   Well, did you listen to the tapes between Singer and
18    Isackson?
19    A.   I've heard those tapes.
11:38 20   Q.   All right.  And do you recall that Singer referenced
21    Jorge?
22    A.   I don't recall specifically.  I haven't listened to that
23    call in a while.
24    Q.   All right.  Let's see if we can pull that one up.  I don't
25    know the exhibit number off the top of my head on that one.
```

1    We'll come back to that, okay?

2           Now, your declaration that you signed, albeit someone

3    else wrote it, right?

4    A.   Correct.

5    Q.   In your declaration you indicated that you wanted Singer

6    to be explicit going forward about bribes because you were

7    concerned about being able to show his client had criminal

8    intent, right?

9    A.   I don't recall saying the words "criminal intent."

11:39 10   Q.   Okay.  Well, that's what we're talking about, right, a

11   criminal investigation, right?

12   A.   This is a criminal investigation, yes.

13   Q.   Right.  And Singer, however, was resistant.  He told us

14   this was not what he typically told his clients.  He said that

15   he usually told his clients that the money was a donation to an

16   athletic program.  Did you sign that declaration under oath?

17   A.   Yes.

18   Q.   Now, there were two recorded calls you've played here

19   today involving Singer and Abdelaziz, right?

11:40 20   A.   Correct.

21   Q.   Now, the first one was on October 25 of 2018, correct?

22   A.   Correct.

23   Q.   Who called whom?

24   A.   Mr. Singer called Mr. Abdelaziz.

25   Q.   Okay.  So his role at that point was to set up

| | |
|---|---|
| 1 | Mr. Abdelaziz and see if he could get him to say stuff that you |
| 2 | could use, right? |
| 3 | MR. FRANK:  Objection to "set up." |
| 4 | THE COURT:  Sustained. |
| 5 | Q.   Was this part of an undercover operation designed to get |
| 6 | evidence of somebody committing a crime? |
| 7 | A.   This call was made to gather evidence of Mr. Abdelaziz's |
| 8 | understanding -- |
| 9 | Q.   Okay. |
| 11:41 10 | A.   -- of the agreement between him and Mr. Singer. |
| 11 | Q.   Right.  The agreement that they had discussed 18 months |
| 12 | previously, right? |
| 13 | A.   Related to Sabrina's application in 2017. |
| 14 | Q.   Now, you've seen that Exhibit 272.  They had a discussion |
| 15 | in February of 2017, right? |
| 16 | A.   Yes. |
| 17 | Q.   That's 18 months prior to this first call, correct? |
| 18 | A.   Correct. |
| 19 | Q.   You have -- he was never on some wiretap where you heard |
| 11:41 20 | him talking to Singer, correct? |
| 21 | A.   Correct. |
| 22 | Q.   So there's a difference.  There was a wiretap that's |
| 23 | authorized by a court, and then these are what you refer to as |
| 24 | consensual recordings because you have Singer basically doing |
| 25 | it on behalf of the government, correct? |

```
 1   A.    Correct.
 2   Q.    And with respect to the wiretaps that's authorized by a
 3   judge after the judge finds probable cause, there's zero
 4   wiretaps of his phone, correct?
 5   A.    Correct.
 6   Q.    Now, this first call from Singer to Abdelaziz was about a
 7   month after Singer began cooperating, right?
 8   A.    Correct.
 9   Q.    And you do know that at that time, October 2018, Sabrina
11:42 10   Abdelaziz was already enrolled at USC, right?
11   A.    Yes.
12   Q.    And you do know that when Singer called Abdelaziz in
13   October 2018, they hadn't spoken with each other in months,
14   right?
15   A.    I know based on the wire they hadn't spoken to each other
16   since at least before then.
17   Q.    Several months, correct?
18   A.    Yes.
19   Q.    And when Singer called Gamal, do you know where Gamal was?
11:43 20   A.    I do not.
21   Q.    Do you know he was in his car in L.A.?
22   A.    I was not aware of that.
23   Q.    That was never part of the investigation, to determine
24   where Gamal was at the time he took this call?
25   A.    No, it was not.
```

```
 1    Q.   Did you know when Singer placed this call that Singer had
 2    been a college counselor for his first two kids?
 3    A.   I know he was a college counselor for his son.  I'm not
 4    sure about his daughter.
 5    Q.   But you knew that his -- you knew that his son Adam, Adam
 6    Abdelaziz, had had a great relationship with Singer, correct?
 7    A.   I knew they had a relationship, yes.
 8    Q.   Okay.  And did you know that Adam attended Columbia
 9    University?
11:44 10   A.   Yes, I did.
11    Q.   An ivy league school, correct?
12    A.   I'm sorry?
13    Q.   An ivy league school in New York?
14    A.   Yes, yes.
15    Q.   And did you know that Abdelaziz, after Adam was already
16    there, was solicited for donations by Columbia?
17    A.   Yes, I was aware of that.
18    Q.   And did you know that after his son Adam was at Columbia,
19    he actually made donations totaling $200,000 ultimately?
11:44 20   A.   I was aware of that.
21    Q.   Did you know about his background?  Did you know he was
22    from Egypt?
23    A.   I don't know if I knew he was from Egypt.
24    Q.   Abdelaziz is not an Irish name, right?  Had you done any
25    background on his coming to this country?
```

```
  1   A.    I know he worked in Asia.
  2   Q.    All right.  Did you know he was legally here, correct?
  3             MR. FRANK:  Objection, relevance.
  4             THE COURT:  Overruled.
  5   A.    I don't know Mr. Abdelaziz's immigration status.
  6   Q.    You don't know he's been a U.S. citizen for over 35 years?
  7   A.    I'm not aware of his immigration status.
  8   Q.    You didn't check his immigration status before charges
  9   were brought in this case?
11:45 10   A.    No, I did not.
 11   Q.    You don't have any information to suggest he's not a U.S.
 12   citizen, do you?
 13             MR. FRANK:  Objection.
 14             THE COURT:  Sustained.
 15   Q.    Are you suggesting in any way he's not legally here?
 16             MR. FRANK:  Objection.
 17             THE COURT:  Sustained.
 18   Q.    You said you knew he worked for a time in Macau, China,
 19   right?
11:45 20   A.    Yes.
 21   Q.    He was helping open and operate an American-based casino,
 22   correct?
 23   A.    Correct.
 24   Q.    And while he was doing that, his wife and daughter Sabrina
 25   were in Hong Kong, correct?
```

```
 1    A.    Correct.
 2    Q.    And his daughter was attending a school called the Hong
 3    Kong International School, correct?
 4    A.    Correct.
 5    Q.    In fact, at one of your first meetings with Singer on
 6    October 31 of 2018, didn't Singer tell you that Gamal and his
 7    wife thought their money was going to the school?
 8          MR. FRANK:  Object to the hearsay, your Honor.
 9          THE COURT:  No.  She can answer that question if she
11:46 10   remembers.
11    A.    Can you repeat that question, please.
12    Q.    Yeah.  Isn't there a report of one of your first meetings
13    with Singer where Singer said Gamal and his wife thought their
14    money with respect to Sabrina was going to the school?
15    A.    I don't remember if it was one of the first reports, but I
16    remember Mr. Singer saying that the payment was going to USC.
17    Q.    The school, correct?
18    A.    Yes.
19    Q.    But then when -- and you also remember Singer had told you
11:47 20   Gamal didn't know who Donna Heinel was, correct?
21    A.    Correct.
22          MR. FRANK:  Objection.
23    Q.    But when you did the recorded call --
24          MR. FRANK:  Objection.  Can we have the date, for
25    clarification?
```

1          THE COURT:  Yeah, the date, please.

2    Q.  Well, prior to the first call in October of 2018, you knew

3    Gamal had no idea who Heinel was, right?

4          MR. FRANK:  Objection, misstates.

5          THE COURT:  The objection is overruled.  If she knows.

6    A.  Mr. Singer told agents that --

7    Q.  This is the question:  Before the first call in October of

8    2018, you knew he didn't know who Donna Heinel was; that's why

9    the title had to be put in the recording, right?

11:48 10  A.  No, that's incorrect.

11   Q.  Well, you didn't -- he didn't know who Donna Heinel was,

12   that's correct, right?

13   A.  We didn't find out until after the call.

14   Q.  Okay.  When you made that call, you knew for sure he had

15   never heard of Donna Heinel, right?

16   A.  No.  Mr. Singer didn't tell us until after the call.

17   Q.  Okay.  Okay.  After the call, like six days later he tells

18   you he doesn't know who Donna Heinel was, correct?

19   A.  Correct.

11:48 20  Q.  Okay.  So when Singer is in that call referring to a

21   payment to Donna Heinel, that's bending the truth, isn't it?

22   A.  Mr. Singer used Donna Heinel's name as the insider USC

23   that got Mr. Abdelaziz's child in as a basketball player.

24   Q.  He didn't say "insider."  He said "Donna Heinel," right?

25   A.  He used Donna's name.  She was the insider.

1    Q.   Right.  I know that "insider" is your theory here.  But

2    Donna Heinel has never been mentioned to him before this call,

3    correct?

4    A.   Correct.

5    Q.   And let's be clear on Donna Heinel.  You would agree that

6    she did not start personally taking money until the summer of

7    2018, right?

8    A.   July 2018, correct.

9    Q.   Correct.  Okay.  In fact, the wiretap affidavit in this

11:50 10   case says that up until the summer of 2018, all the money

11   Singer provided to Heinel for her assistance went to the USC

12   athletic program, right?

13   A.   I don't exactly know what it says in the affidavit.  I

14   don't recall.  But the money went -- she started receiving

15   payments personally in July 2018.

16   Q.   Right.  And you know Gamal's payment was in March of '18,

17   right?

18   A.   Yes.

19   Q.   Let me show you Exhibit 9025.

11:50 20           MR. KELLY:  Just the witness, please.

21   Q.   I'll ask you to read that to yourself and I'll ask you if

22   you recognize it in a moment.

23           MR. FRANK:  Your Honor, if he wants to refresh her

24   recollection, I believe she --

25           MR. KELLY:  I believe she said a moment ago she

```
 1    doesn't recall exactly what it says.  So I'm showing it to her.
 2    I jumped to a question in between, but I'm getting back to it.
 3             Please keep scrolling.  Keep scrolling, keep
 4    scrolling, yeah.  Keep scrolling, please.  Keep scrolling.
 5    Q.   Okay.  Have you had a chance to take a quick look at what
 6    this excerpt is?
 7    A.   Yes.
 8    Q.   Do you recognize what it is?
 9    A.   It's an affidavit.
11:52 10             MR. FRANK:  Objection.
11             THE COURT:  Yeah, it's not in evidence.  She shouldn't
12    be testifying about the document.
13             MR. KELLY:  Okay.
14    Q.   Do you recognize what the document is, Agent?
15    A.   It's an affidavit.
16             THE COURT:  Just do you recognize it, yes or no?
17    A.   Oh.  I read this document before, but I do not -- it's not
18    my signature.
19    Q.   Right.  But you read it before you came here today as part
11:52 20    of your investigative duties, right?
21    A.   Yes.
22             MR. KELLY:  Okay.  I offer this, your Honor.
23             MR. FRANK:  Just a moment, your Honor.  It's hearsay,
24    your Honor.  So we're going to object.
25             THE COURT:  Sustained.
```

```
 1    Q.   Well, is it your memory that a federal judge was, in fact,
 2    told that up until the summer of 2018 all the money Singer
 3    provided to Heinel for her assistance went to the USC athletic
 4    program?  Is that your memory?
 5    A.   I don't specifically remember that sentence, but I know
 6    Donna Heinel started receiving money personally in the summer
 7    of 2018.
 8    Q.   Okay.  And you also know that's several months after Aziz
 9    made any donation, right?
11:53 10   A.   That's after he made payment, yes.
 11   Q.   Okay.  And the payment was in March of 2018, and Heinel
 12   was not personally pocketing any money at that time, right?
 13   A.   Correct.
 14   Q.   In fact, let me show you, just for the witness, 1563A.
 15         MR. FRANK:  Is this being offered to refresh her
 16   recollection?
 17         MR. KELLY:  No.  This is being offered as an admission
 18   of a party, the United States of America.
 19         MR. FRANK:  We object to this, your Honor.
11:53 20         MR. KELLY:  It's First Circuit law, Qatar.
 21         THE COURT:  Are you showing this to the witness?
 22         MR. KELLY:  I was responding to the objection, but
 23   I'll show it to the witness now.
 24   Q.   Please take a look at 1563A, please.
 25         Have you had a chance to take a quick review of this?
```

```
 1   A.   Yes.
 2   Q.   If you look at the top of the document, the very top,
 3   direct your attention to the very top.
 4            MR. KELLY:  Could you yellow the top part, please,
 5   Mr. Carter.  Yes, right there.
 6   Q.   You see that, right?
 7   A.   Yes.
 8            MR. FRANK:  Your Honor, I object.
 9   Q.   This is an independently admissible admission of the
10   United States --
11            THE COURT:  It's not going to be admitted.  It's a
12   pleading in this case.  It's clearly not admissible.  The
13   objection is sustained.
14            MR. KELLY:  Just for the record, I respectfully
15   disagree.  I think this is all the First Circuit --
16            THE COURT:  All right.  Your objection is noted.  Move
17   on.
18   Q.   Has it been indicated previously that you have no evidence
19   that Donna Heinel was personally pocketing money before the
20   summer of 2018?
21            MR. FRANK:  She's answered this question about four
22   times, your Honor.
23            THE COURT:  She can answer it one last time.
24   A.   I have evidence that shows Donna Heinel received payments
25   personally in the summer of 2018.
```

1    Q.   And nothing before that, right?

2    A.   Correct.

3    Q.   In fact, you're aware that in May of 2018, Singer was

4    recorded telling the Yale soccer coach, Meredith, that Heinel

5    does not take any of the money for herself personally but maybe

6    down the road she may.  You're aware that Singer was recorded

7    saying that, right?

8    A.   I was aware Mr. Singer was recorded on a conversation with

9    Mr. Meredith.  I don't recall exactly that being said.

11:56 10   Q.   Let me show you Exhibit -- well, let me ask you this:

11   Does the IRS -- IRS has a lot of forms, right?

12   A.   Yes.

13   Q.   And a lot of the forms of the IRS having to do with a

14   criminal investigation is reported up to their superiors within

15   the department, correct?

16   A.   Some forms, yes.

17   Q.   Sure.  And do you recall whether on any of the forms in

18   this case where it was reported up the chain there was an

19   indication that Singer had been recorded by the Yale soccer

11:57 20   coach talking about Heinel not taking any of the money for

21   herself personally but maybe down the road?

22   A.   I recall submitting documents in this investigation to my

23   management.  I don't recall that specific statement.

24   Q.   Okay.  Let me just direct the witness's attention to

25   Exhibit 9014.  I'll show you the first page.  Let's show you

1    the last page.  Let's highlight the names.  Do you see the

2    first name there?  And then let's go to page 8.

3              MR. FRANK:  Your Honor, could we have --

4              MR. KELLY:  These are Bates numbers that I got from

5    the government, your Honor.  It's 1719862 through 1719877.

6    Again, this is just for the witness.  We go to where it talks

7    in the middle -- second paragraph where it starts on the one,

8    two, three, four -- the fifth line down, all the way to the

9    right where it starts with that sentence, yes.

11:58 10   Q.   Could you review that to yourself.

11             MR. KELLY:  Mr. Carter, please highlight the date

12   there.  Just the date, yes.  All right.  Now please take it

13   down.

14   Q.   Has that document refreshed your recollection as to any

15   communication within the IRS about Singer's conversation that

16   was recorded by Coach Meredith?

17   A.   Yes, it does.

18   Q.   So is it, in fact, accurate to say that at some point,

19   actually June 11 of 2018, it was reported that Heinel,

11:59 20   according to Singer, does not take any of the money for herself

21   personally but Singer believed that down the road she may

22   because she has been involved with Singer for four years and

23   she's kind of getting this whole thing.  That was reported up

24   the chain, right?

25   A.    Yes.

1    Q.   And that's in May of 2018?

2    A.   The call was in May 2018.

3    Q.   Right.  Okay.  Now, before we get to these calls, I think

4    you testified two days ago that there was no written script for

5    Singer on these calls.  Is that still your testimony?

6    A.   There was written scripts by one of the AUSAs at some

7    point during this investigation.  I'm not sure of the date, but

8    generally we just gave Mr. Singer verbal instructions.

9    Q.   Okay.  But there was a very explicit written script at one

12:00 10   point called the McGlashan script, right?

11   A.   I don't recall that specific script, but there were

12   scripts written by an AUSA.

13          MR. KELLY:  Please show just the witness Exhibit 1478,

14   please.

15   Q.   Do you recognize this document?

16   A.   I know what this document is.  I don't -- I didn't write

17   it.

18   Q.   All right.

19   A.   And I don't recall the specifics.

12:01 20   Q.   All right.  But it is, in fact, consistent with your

21   memory that there were on occasion written scripts?

22   A.   Correct.

23   Q.   Okay.  And in this particular instance, this was a script

24   written by an AUSA not at this table, right?

25          MR. FRANK:  Objection to what this is.

```
 1              MR. KELLY:  Well, I offer it, your Honor, Exhibit
 2    1478.
 3              MR. FRANK:  Hearsay, your Honor.
 4              THE COURT:  Objection sustained.
 5              MR. KELLY:  Judge, I'm not offering it for the truth
 6    of the matter asserted.  I'm just offering it that it exists.
 7    I don't care what's said in here.  It's not for the truth.
 8    It's not hearsay.  Just because he objects on hearsay doesn't
 9    mean it's hearsay.  It's not being offered for the truth, Your
10    Honor.
11              MR. FRANK:  It's not proper impeachment, your Honor.
12              MR. KELLY:  It's evidence in the case, your Honor.
13              THE COURT:  We can talk about it at a break at a later
14    time, but for the time being, the objection is sustained.
15    Q.   Well, let me show you what is an exhibit in the case,
16    Exhibit 13A, please.
17              MR. FRANK:  I don't believe 13A is in evidence.  13 is
18    in evidence.
19              MR. KELLY:  Okay.  Let's go to Exhibit 13 then and
20    let's please go to that -- actually, no.  Let's offer 13A.
21    It's a subset of a document already in evidence.
22              MR. KENDALL:  Your Honor, I hate to disagree with
23    Mr. Kelly, but if you remember, yesterday I raised an issue
24    that we needed to go through 13 and redact out some parts
25    because it was I think over 500 pages.
```

1           The government gave us 13A late last night.  I haven't
2      had a chance to review it.  I don't object to anybody using it,
3      but I don't want it to be said that we've agreed that it all
4      goes in just as it's been prepared.  We need to have a couple
5      of days.
6           MR. KELLY:  Just for the record, that 13A is mine.  I
7      prepared that.
8           MR. KENDALL:  Whatever it is, I haven't looked at
9      anything.  I'll be happy to get this resolved and not slow down
12:03 10   the process.
11           MR. KELLY:  I'll defer and go back to 13, Judge.  I'll
12      keep it moving.
13           THE COURT:  What is before the witness now?
14           MR. KELLY:  Let's put up Exhibit 13, please.
15           THE COURT:  Exhibit 13, which is in evidence?
16           MR. KELLY:  Yes, your Honor.
17           THE COURT:  All right.
18           MR. KELLY:  Let's see if we can't find where I had
19      that.  Yes.  Thank you.
12:03 20           Okay.  Can you highlight October 2 and that whole
21      first two paragraphs, please, and then the second paragraph as
22      well.  All right.
23      Q.   So this was on October 2 of 2018, correct?
24      A.   Correct.
25      Q.   Okay.  So this was about 26 days before the first of the

1    two calls to Abdelaziz, correct?

2    A.    Correct.

3    Q.    And this was Mr. Singer's mindset when he called

4    Abdelaziz, right?

5            MR. FRANK:  Objection to what was his state of mind.

6            THE COURT:  Sustained.

7    Q.    Well, as of October 2, 26 days beforehand, he wrote a note

8    to himself, right?  He said he had a loud and abrasive call

9    with agents.  "They continue to ask me to tell a fib and not

12:04 10   restate what I told my clients as to where the money" -- "where

11   here money was going to, to the program, not the coach, and

12   that it was a donation and they want it to be a payment."

13           Then it says, "I asked for a script if they want me

14   to ask questions and retrieve responses that are not accurate

15   to the way I should be asking the questions.  Essentially they

16   are asking me to bend the truth, which is what they asked me

17   not to do when working with the agents and Eric Rosen.

18           "Liz raised her voice to me like she did in the hotel

19   room about agreeing with her that everyone bribed the schools.

12:05 20  This time about asking each person to agree to a lie I was

21   telling them."

22           That's what it reads, correct?

23   A.    That's what Mr. Singer wrote.

24   Q.    And that was his perspective, right?

25           MR. FRANK:  Objection.

```
 1              THE COURT:  Sustained.
 2    Q.   Well, that wasn't your perspective, right?  You testified
 3    that you did no such thing.  You didn't yell at him?
 4    A.   That's what he wrote.
 5    Q.   Okay.  Well, did you yell at him?
 6    A.   No, I did not.
 7    Q.   Did you use a stern voice?
 8    A.    I was animated.  I repeated myself numerous times, but I
 9    did not raise my voice or yell at Mr. Singer in that hotel
12:06 10   room.
11    Q.   So how can you be animated without raising your voice?
12    A.    I'm generally a very quiet person.  So I was repeating
13    myself and using my hands because I usually talk with my hands
14    and I was not angry with Mr. Singer and I did not raise my
15    voice in the hotel room.
16    Q.   Okay.  Now --
17              MR. KELLY:  Let's go the transcript for Exhibit 587.
18    Q.   Now, again, Singer calls Aziz, right?
19    A.   Correct.
12:07 20   Q.   And they hadn't spoken in several months, right?
21    A.   They had not spoken since the wire.
22    Q.   And his daughter -- I'm sorry, Aziz was never intercepted
23    on a wire, was he?
24    A.   Correct.
25    Q.   So Aziz's daughter was already at USC, correct?
```

```
 1   A.   Correct.
 2   Q.   Any discussions he had with Singer had been months
 3   earlier, right?
 4   A.   Prior, correct.
 5   Q.   Okay.  Earlier, prior.  Sorry.  But it was definitely
 6   prior.  They hadn't spoken in months, correct?
 7   A.   Correct.
 8   Q.   So any discussions they had would have been months prior
 9   or earlier, correct?
10   A.   Correct.
11   Q.   And there's no wiretap of those discussions, right?
12   A.   Correct.
13   Q.   There's no recordings of any kind of those discussions,
14   right?
15   A.   Correct.
16   Q.   Now, when he says -- let's go to, look at lines 20 to 22.
17   Actually, make it 20 to 24.
18           When Singer asks him, "Did you guys go to parents
19   weekend last week or two weekends ago," do you understand that
20   to be a reference to USC parents weekend?
21           MR. FRANK:  Objection, your Honor.  Her understanding
22   is irrelevant.
23   Q.   Well, did you investigate --
24           THE COURT:  She can state what her understanding is.
25   Q.   You were one of the investigators in this case, right?
```

1   A.   Yes.

2   Q.   And you worked hundreds of hours on this case, right?

3   A.   Yes.

4   Q.   You listened to wiretaps, you looked at e-mails, right?

5   A.   Yes.

6   Q.   Okay.  So I'm sure you've looked at this transcript

7   before, right?

8   A.   Yes.

9   Q.   Okay.  And when Singer said to him, "Did you guys go to

12:09 10   parents weekend last weekend or two weekends ago," did you

11   understand him to be referring to USC's parents weekend that

12   all of these colleges have?

13   A.   Yes.

14   Q.   Okay.  And when Aziz said, "Yes, we did.  We loved it.  We

15   absolutely loved it.  Got to meet a lot of people."  Do you see

16   that?

17   A.   Yes.

18   Q.   Do you know which people he was referring to?

19   A.   No, I do not.

12:09 20   Q.   Did you investigate that at all, which people he met with

21   at USC during parents weekend?

22   A.   No, I did not.

23   Q.   Do you have any knowledge that he went to like a VIP event

24   where a USC president warmly welcomed him?

25   A.   I was not aware of that.

1    Q.   And do you think that might affect what was going on in

2    Aziz's mind at the time he was having this conversation?

3              MR. FRANK:   Objection.

4              THE COURT:   Sustained.

5    Q.   You don't know what was going on in Aziz's mind, do you?

6    A.   Correct.

7    Q.   Go to the second page, please, at the top.  The first

8    line, "Has Adam been on campus yet to see Sabrina?"  Do you

9    understand that to be a reference to his son Adam Abdelaziz?

12:10 10    A.   Yes.

11   Q.   I think you confirmed earlier that it was your

12   understanding, or it's your understanding now, that Adam had a

13   very good relationship with Singer.

14   A.   That Mr. -- that Adam Abdelaziz worked with Mr. Singer,

15   yes.

16   Q.   That his son Adam had been counseled by Singer previously,

17   right?

18   A.   Yes, yes.

19   Q.   And on line 8, the reference to Columbia by Aziz, that's

12:10 20   Columbia University where his son was going, correct?

21   A.   Yes.

22   Q.   And again, you're aware that over time he donated 200,000

23   to Columbia, right?

24   A.   Yes.

25   Q.   And you see where on line 13 Aziz starts talking about how

1    he was too busy in China?

2    A.    I see that, yes.

3    Q.    And is that consistent with your understanding that in

4    2017 he was spending a lot of time working in China?

5    A.    Yes.

6    Q.    All right.  And then below, lines 21 to 22, he again

7    referenced that he had just landed in China.  He didn't have

8    time to discuss it with his own son, right?

9    A.    Yes, he says that.

12:11 10   Q.    Well, do you have any basis to think that was inaccurate,

11   he was working hard in China, didn't have time to discuss these

12   things with his son?

13   A.    He stated he just landed in China.  "We didn't have time

14   to discuss it."

15   Q.    Okay.  Then there's further discussions.  Singer tells him

16   he's in Boston.  They were watching the game last night.

17   That's a Red Sox game reference, right?

18   A.    Yes.

19   Q.    Playoffs, right?

12:12 20   A.    Yes, World Series.

21   Q.    All right.  So then Singer tells him a lie, right?

22         MR. FRANK:  Objection to the characterization.

23         THE COURT:  Sustained.

24   Q.    Well, okay.  Singer tells him his foundation was being

25   audited.  Was that a lie?

A.   Mr. Singer's foundation was not being audited.

Q.   Okay.  So it's not true, right?

A.   Correct.

Q.   And typically things that aren't true are lies, right?

A.   We -- there was a ruse.  We told Mr. Singer to say that his foundation was being audited and it wasn't.  So it was not true.

Q.   I'm not saying you can't use a ruse, but that particular statement was a lie designed to further your investigation, right?

A.   Yes.

Q.   And at that point, starting at the bottom there, line 21, is it fair to say that Gamal kind of yeses him to death for a bit?

         MR. FRANK:  Objection.

Q.   Do you know what the phrase "yeses him to death" means?

A.   According to -- on the call Mr. Abdelaziz says "yes" when he answers.

Q.   I'm asking now in general.  Do you know what the phrase "yesing someone to death" means?

A.   No.

Q.   When someone says "Yes, yes, yes, yes."  You never heard that phrase?

A.   No.

Q.   Okay.  Well, does he, in fact, say "Yes, yes, yes, yes,"

```
 1    four different times?

 2    A.   He does respond "Yes."

 3    Q.   Okay.  So Singer tells him the Foundation -- let's look at

 4    the top of page 4.  I'm sorry, I'm jumping around here.  "We're

 5    getting audited right now."  He says "Yes."

 6              Then he says, "Looking at all my payments."  "Yes."

 7    "That have come into our Foundation, so they asked me, you

 8    know, about the $300,000 payment."  "Yes."  And then "that was

 9    made."  "Yes."
```

<span>12:14</span> 10    Now, there's no -- in this call, when he's talking

```
11    about the IRS audit, there's no panic by Abdelaziz, is there?

12              MR. FRANK:  Objection.

13              THE COURT:  Sustained.

14    Q.   Well, you heard that part of the tape, right?  He says,

15    "Yes, yes, yes"?

16    A.   I heard that, yes.

17    Q.   Doesn't sound like his heart is dropping, does it?

18              MR. FRANK:  Objection.

19              THE COURT:  If she can answer it.
```

<span>12:14</span> 20    A.   It sounds like he's listening to Mr. Singer and saying

```
21    "Yes."

22    Q.   Okay.  You know who Mr. Isackson is, right?

23    A.   Yes.

24    Q.   When he was told about the audit, his heart dropped and he

25    got all panicky, right?
```

```
 1    A.   I'm not exactly sure if that's his exact terms, but I know
 2    he was nervous.
 3              MR. KELLY:  Okay.  Let's see if we can pull that
 4    exhibit up, Mr. Carter.  I think it's 607 at page 88.  607 is
 5    in evidence.
 6              MR. FRANK:  Is that a transcript?
 7              MR. KELLY:  A transcript.
 8              MR. FRANK:  Okay.
 9    Q.   Let's look at line 14 where Isackson reports to Singer
10    what happened when he got that phone call.  "My wife doesn't
11    even know, my heart just f-ing stopped.  It was just like, you
12    know, I'm thinking worst case."
13              So Isackson knew he had done something wrong and
14    panicked, right?
15              MR. FRANK:  Objection.
16              THE COURT:  Sustained.
17              MR. KELLY:  Take that down, please, and go back to
18    587.
19    Q.   Now, okay.  Let's talk about that $300,000 payment.  You
20    know it was originally supposed to be 200,000, right?
21    A.   I was not aware of that.
22    Q.   During the course of your investigation you never learned
23    that the original discussion was about 200,000 from Aziz to
24    USC?
25    A.   No.  I was familiar with 250,000, not 200,000.
```

1   Q.   And you never heard that the 200,000 got bumped up to

2   300,000 at the end and the money then was supposed to go to The

3   Key Foundation.  You never learned that?

4   A.   I learned of the $300,000 payment.

5   Q.   But you're not familiar with that switch from 200 to 300?

6   A.   No, I am not.

7   Q.   And you spent hundreds of hours on this case, right?

8   A.   Yes.

9   Q.   Now, on lines 13 through 23, Singer tells him this tale

12:18 10   about Donna Heinel, right?

11   A.   Yes, he mentions Donna Heinel, yes.

12   Q.   And at the end of all that spiel, Abdelaziz is asked

13   "You're okay with that, right?"  "Of course."  Because it makes

14   no sense, right?  This whole fact pattern that gets thrown at

15   him while he's driving in his car in L.A. makes no sense, does

16   it?

17         MR. FRANK:  I object, your Honor.

18         THE COURT:  Sustained.

19   Q.   Well, you would agree he has no idea who Donna Heinel at

12:18 20   USC is at that point in time, right?

21   A.   Mr. Singer stated that Mr. Abdelaziz did not know Donna

22   Heinel.

23   Q.   Are you familiar with a place called the Galen Center?

24   A.   Yes.

25   Q.   That's a basketball arena on the USC campus, right?

1    A.    Yes.

2    Q.    And at a certain point in time Aziz was told some of his

3    money would be going to the Galen Center, right?

4    A.    I don't specifically recall him being told it would be

5    going to the Galen Center.  I know he was told it was going to

6    a USC program.

7    Q.    Right.  Initially he's told it would go into a program and

8    then Singer tells him later it's going to the Galen Center,

9    right?

12:19 10   A.    I don't recall specifically that it was going to the Galen

11   Center.

12            MR. KELLY:  All right.  If we could play Exhibit 439

13   in evidence.

14            (Audio recording played.)

15   Q.    Now, that call which is in evidence is in December of

16   2017, correct?

17   A.    Correct.

18   Q.    And so that is prior to when Aziz actually makes the

19   payment in March of 2018, right?

12:21 20   A.    Correct.

21   Q.    So does that call refresh your memory that at some point

22   Aziz is told 200,000 is going to the Galen Center?

23   A.    No.  That call just -- I remember that voicemail.  That's

24   going to Mr. Singer stating that Ms. Heinel wants the money

25   going to the Galen Center.  I don't know that Mr. Singer told

1    Mr. Abdelaziz the payment was going to the Galen Center.

2    Q.   You have no idea?

3    A.   No.

4    Q.   All right.  How about -- I'm going to show you Exhibit 448

5    which is in evidence.  I'd like to direct your attention down

6    most of the way until it references -- well, actually, before I

7    do that.

8          This is a note Singer wrote to himself on December

9    15, right?

12:22  10   A.   Yes.

11   Q.   And the subject is "USC with Donna."  Right?

12   A.   Correct.

13   Q.   And if you go further on down, you see "Sabrina Aziz,

14   300-200."

15   A.   Yes, I see that.

16   Q.   And were you aware that 200 was supposed to go to the

17   Galen Center and 100 was supposed to go to Singer's foundation?

18   A.   I was aware that there was -- Mr. Abdelaziz's payment was

19   going to a program at USC.

12:22  20   Q.   But you're just not sure which one?

21   A.   I'm not aware if he told Mr. Singer 300,000 or 200,000.

22          MR. KELLY:  All right.  Well, let me show just the

23   witness, please, Exhibit 1564.  Let's go down to the middle of

24   that document.  Mr. Carter, obviously the name I want is right

25   there and the amounts are to the right.

```
 1    Q.   All right.  You recognize this document?
 2    A.   No, I have not seen this document.
 3    Q.   All right.  Does it refresh your recollection at all as to
 4    the 300-200 split?
 5    A.   No, it doesn't.
 6    Q.   And with respect to that document, you've never seen that
 7    before?
 8    A.   No, I have not.
 9    Q.   How about with respect to the one I just showed you, the
10    448 that's in evidence, Singer note to self.  Have you seen
11    that before coming here today?
12    A.   Yes, I've seen that.
13              MR. KELLY:  Okay.  Let's go back to the transcript of
14    that first call 587, please.  Let's go to page 5.
15    Q.   Do you see where Aziz says, "Is that what you're saying?"
16    Line 9?
17    A.   Yes, I see that.
18    Q.   So Aziz is trying to find out what Singer is saying,
19    right, "Is that what you're saying?"
20              MR. FRANK:  Objection to what Aziz is trying to do.
21              THE COURT:  Sustained.
22    Q.   Well, when you see that on your transcript, "Is that what
23    you're saying," to you, Agent, does that signify to you someone
24    doesn't know what the other person is saying?
25              MR. FRANK:  Objection.
```

```
 1              THE COURT:  Overruled.  If she agrees with it, she can
 2     say so.
 3     A.   Mr. Abdelaziz is saying, "Is that what you're saying?"
 4     Q.   Okay.  Then further on down, after being told about this
 5     IRS audit on line 19 -- I'm sorry, start with 17.  Aziz says
 6     "But Rick, you're a friend.  You've been a friend of my family
 7     for many years."
 8              MR. KELLY:  Can you highlight that, Mr. Carter,
 9     please.
12:25 10  Q.   "Is there anything I can do to help?"  It appears, doesn't
11     it to you, Agent, he thinks Singer is in trouble with the IRS?
12              MR. FRANK:  Objection to what he thinks.
13              THE COURT:  Sustained.
14     Q.   Well, let me ask you this:  If someone gives $300,000 to
15     USC, that can be a charitable donation, correct?
16     A.   Not if it's in exchange for --
17     Q.   I know, I know, I know.
18              MR. FRANK:  Your Honor.
19     Q.   But a donation to USC --
12:26 20             THE COURT:  Wait a minute.  There's an objection.
21     What's the objection?
22              MR. KELLY:  I'll rephrase it, Judge.
23              THE COURT:  Rephrase.
24              MR. FRANK:  He interrupted her before she was allowed
25     to answer his own question.  I object.
```

```
 1              MR. KELLY:  I think the judge told me to keep going.
 2              THE COURT:  We'll let you do that on redirect.
 3              MR. FRANK:  Thank you, your Honor.
 4    Q.   It's generally understood that people can make donations
 5    to 501(c)(3) charities, right?
 6    A.   Yes, they can make legitimate donations to 501(c)(3)
 7    charities.
 8    Q.   All right.  So it could be to a university, it could be to
 9    a cancer association, it could be to all sorts of things which
10    are 501(c)(3) organizations, correct?
11    A.   Correct.
12    Q.   And the person who gives the money, let's say it's
13    $300,000, if that person gives money in a particular year,
14    $300,000 to one charity, it's a $300,000 donation, and he or
15    she gets whatever credit you get in that situation, right?
16    A.   If it's a legitimate donation, yes.
17    Q.   And if a person gives it to two or three charities and it
18    totals 300,000, it's still a $300,000 donation for the giver,
19    right?
20    A.   If it's a legitimate donation, yes.
21    Q.   That's my hypothetical here.  So if there's three
22    legitimate or two legitimate charities, a person can donate
23    money to two legitimate charities?
24              MR. KELLY:  I see Mr. Frank is --
25              MR. FRANK:  He's asking a hypothetical.  She's not an
```

```
 1    expert witness.
 2              THE COURT:  No, she can answer that.
 3    A.   I'm sorry.  Can you repeat that.
 4    Q.   All right.  So you have an accounting degree from Bentley,
 5    right?
 6    A.   Yes.
 7    Q.   And you're an IRS agent, right?
 8    A.   Correct.
 9    Q.   If a person gives $300,000 to charity and claims that, as
12:28 10   a deduction, it doesn't matter how many charities it is, if
11    they're legitimate, it could be five charities, it could be one
12    charity, it's still just 300,000 bucks, right?
13    A.   Correct.
14    Q.   So if a person has in his mind that both a university
15    donation and a donation to The Key is to two charities, it's
16    still just 300,000, right?
17              MR. FRANK:  Objection to what a person has in his
18    mind.
19              THE COURT:  Well, she can answer it if she understands
12:28 20   it.
21    A.   If it was a legitimate donation to the charities, they can
22    be deducted, but it's not -- this isn't a donation.
23    Q.   So if Mr. Abdelaziz thought he had made a legitimate
24    donation to USC and to The Key, it's $300,000 either way,
25    right?
```

1    A.    The payment was in exchange for something.  That is not a

2    donation.

3    Q.    I know that's your position.  But if you're donating

4    $300,000 to two charities that you think are legitimate, it's

5    just a $300,000 deduction.  You don't get more or less because

6    it's to one charity or two, right?

7    A.    Right.  If you are making a legitimate donation, you can

8    deduct multiple payments to different charities.

9    Q.    So if Aziz is thinking, well, he can take the credit for

12:29 10   the foundation or the school, what does it matter to him

11   financially; it doesn't matter at all, does it?

12            MR. FRANK:  Objection.

13            THE COURT:  Sustained.

14   Q.    Well, I mean, The Key Worldwide Foundation was, in fact, a

15   501(c)(3) registered charity, correct?

16   A.    It was registered with the IRS, correct.

17   Q.    Okay.  So if a person like Mr. Abdelaziz Googled it and

18   checked out where it was incorporated, it was a registered

19   charity at the time, right?

12:29 20   A.    It was registered with the IRS at that time, yes.

21   Q.    And it was registered when Aziz was dealing with Singer in

22   2017, correct?

23   A.    Correct.

24   Q.    And, in fact, during the course of your investigation, did

25   you learn that his son went on some service trip with Singer as

1    part of the Foundation's work?

2    A.   Yes, I was aware of that.

3    Q.   Okay.  And are you aware that his son went with a group of

4    kids to Atlanta to help underserved kids?

5    A.   I was aware that he participated in the Foundation.  I'm

6    not aware -- I don't recall specifically Atlanta.

7    Q.   All right.  But you're aware that Singer went with his son

8    and some other boys on a trip as part of The Key's functions,

9    right?

12:30 10   A.   Correct.

11   Q.   I'm going to show you a photo of that, which the number

12   escapes me here.

13        MR. KELLY:  Can I have a moment, your Honor.

14        THE COURT:  Yes.

15        MR. KELLY:  I'll communicate by phone.  Got it.

16        Let me show just the witness, please.  I think it's

17   1364, Mr. Carter.  Is that what you said?  All right.  Okay.

18   Q.   Looking at that photo, do you see anyone you recognize

19   there?

12:31 20   A.   Yes.

21   Q.   Who do you recognize?

22   A.   I see Mr. Singer.

23   Q.   Okay.  And is he wearing anything in particular?

24   A.   He is wearing a Bruins shirt.

25        MR. KELLY:  I offer this photo, your Honor, 1364.

```
 1              MR. FRANK:  No objection.

 2              THE COURT:  It will be admitted.

 3              (Exhibit 1364 admitted into evidence.)

 4              MR. KELLY:  Publish it to the jury, please.

 5    Q.    So Mr. Singer is right in the middle there with the UCLA

 6    Bruins shirt, right?

 7    A.    Yes.

 8    Q.    And to our right there's a boy -- to Singer's left, two to

 9    the left, there's a boy wearing a black T-shirt.  Now there's a

12:32 10   red arrow pointing at him.  Do you recognize him?

11    A.    No, I do not.

12    Q.    Have you ever seen Adam Abdelaziz before?

13    A.    I've never seen a photo of Adam.

14              MR. KELLY:  Okay.  You can take that down.  Thank you.

15              At the end here -- let's go to the top of page 6,

16    please.  I'm still referring to the transcript.  Thank you.

17    Q.    Singer is still talking about the IRS.  "Everything is

18    great but, you know, when you're dealing with the IRS, you

19    never know where they're going to go."  That part is true,

12:33 20   right?

21    A.    Yeah, that's true.

22    Q.    Right.  Okay.  So then we get to the middle where Singer

23    says, "I'll tell you a funny story."  Do you follow me?

24    A.    Yes, I see that.

25    Q.    "Is that Donna Heinel, who is senior women's
```

1    administrator, she actually called me," and then he starts

2    talking about some fake fire alarm, right?

3    A.    No.  There was a real fire alarm.

4    Q.    Oh, okay.  Okay, that's real, too.

5              Then he continues with the story.  Aziz says, "Yeah,"

6    and then he tells it.  Supposedly this woman Heinel, who Aziz

7    doesn't know, praised Singer, right?  "The profile you did for

8    Sabrina, I loved it.  It was really well done.  And going

9    forward anyone who isn't a real basketball player as a female,

12:34 10  I want to use that profile going forward."  Aziz says, "I love

11   it."  He says, "Yeah, it was great, absolutely great."

12             So is Singer bragging about a compliment that he

13   received allegedly from Donna Heinel, right?

14             MR. FRANK:  Objection to what --

15             MR. KELLY:  Well, let's go above it, let's go above.

16             THE COURT:  Sustained.

17   Q.    "Donna Heinel," and he announces her title because Aziz

18   doesn't know who she is, "Donna Heinel, who is a senior women's

19   administrator, she called me and says, 'Hey, Rick, that profile

12:34 20  that you did for Sabrina, I loved it.  It was really well

21   done."  Isn't Mr. Singer fishing for a compliment from his

22   client Aziz here?  He's bragging about some compliment he

23   received from Heinel, right?

24             MR. FRANK:  Objection.

25             THE COURT:  Sustained.

1    Q.   All right.  So at the end, let's go to the end, 7.  Aziz
2    pivots back to his son, right?  He's still concerned about his
3    son Adam, right?
4    A.   Yeah, he talks about his son Adam.
5    Q.   Yeah.  He says, "If you ever have time for a quick call,
6    I'd appreciate it."  Right?
7    A.   Yes, I see that.
8    Q.   He's still thinking about his son because he knows his son
9    had this great relationship with Singer, right?
12:35 10    A.   It says -- asks Rick to make -- to have a call with Adam,
11    yes.
12    Q.   "I would really appreciate it.  He loves you, looks up to
13    you, and I think this is a moment where you reach out for five
14    minutes to the kid, I think he would appreciate it."  "I'll do
15    that.  I'll do that.  I'll do it this week."  And, of course,
16    he never did, right?
17    A.   Correct.
18         MR. KELLY:  Okay.  Let's take that down, please.
19    Q.   Now, during the course of your investigation, are you
12:36 20    aware that at one point Aziz sent Singer about 30 photos of his
21    daughter playing basketball?
22    A.   I recall a few photos.  I don't recall 30.
23         MR. KELLY:  All right.  Let me show just the witness,
24    please, Exhibit 549.  First to the top so the witness can see
25    the top part, please, who it's between, the date, and then just

1   kind of slowly scroll to get a sense of the number here.

2   Q.   So having seen that, does that refresh your

3   recollection -- take it down, please -- does that refresh your

4   recollection at all as to whether or not at some point you

5   became aware that Aziz sent Singer about 30 photos?

6   A.   I did not see that e-mail or those photos.  I saw other

7   photos.

8   Q.   All right.  But you've never seen this particular e-mail?

9   A.   Correct.

12:37 10        MR. KELLY:  Offering it now not for the truth of the

11   matter asserted, your Honor, but as evidence in this case.

12        MR. FRANK:  No objection.

13        THE COURT:  There is no objection.  The document will

14   be admitted, 549.

15        (Exhibit 549 admitted into evidence.)

16        MR. KELLY:  All right.  Let's publish that to the

17   jury, please.

18   Q.   Let's see who it's from.  All right.  And let's -- what's

19   the date, and what's the subject?  Okay.  And then see what

12:38 20   Gamal is telling Singer, "More from Hong Kong," "I know you

21   need a close-up action shot, but it seems we never really took

22   those."

23        And then it looks like he's forwarding from his wife

24   a bunch of pictures, a bunch of photos of a girls' basketball

25   team, right?

```
 1    A.   Yes, I see that.
 2         MR. KELLY:  And then slowly scroll through some of
 3    them, please.  Now, take that down, please.
 4    Q.   That first call, that first recorded call you had Singer
 5    do, that wasn't sufficient, was it?
 6         MR. FRANK:  Objection, your Honor.
 7         THE COURT:  Sustained.
 8    Q.   You had Singer make a second call months later, right?
 9    A.   We had Mr. Singer make another call.  I don't exactly
10    recall the date, if it was months later, but he made another
11    call.
12    Q.   About two months go by.  On January 3 of 2019 there's a
13    second call, right?
14    A.   Yes.
15    Q.   And in between that time period, there's no contact
16    between Singer and Abdelaziz, is there?
17    A.   No.
18    Q.   Aziz's daughter is still at USC during that time period,
19    right?
20    A.   Correct.
21    Q.   And you're aware she's about to graduate in the spring,
22    right?
23    A.   This coming spring?
24    Q.   Yes.
25    A.   Yes, I'm aware that.
```

```
 1   Q.   Now, in this call, January 3 of 2019, you decided to try

 2   to scare him about his daughter's status, right?

 3           MR. FRANK:  Objection.

 4           THE COURT:  Sustained.

 5   Q.   Well, you decided to try to have Singer suggest that his

 6   daughter was in trouble with USC, right?

 7           MR. FRANK:  Objection.

 8           THE COURT:  Sustained.

 9   Q.   Well, didn't you try to have Singer suggest to him that

10   his daughter was going to be in trouble with the USC admissions

11   office?

12           MR. FRANK:  Objection.

13           THE COURT:  Sustained.

14           MR. KELLY:  Well, let's look at transcript 621.

15   Q.   Let's look at page 3, please, and let's start on line 5.

16   Let me see if I read this correctly.  Singer says -- above it

17   on 2, he says, "I want to give you just a quick heads-up."  So

18   Aziz says, "Okay."  "Donna Heinel, who is a senior women's

19   administrator at USC" -- again, he announces her title -- "she

20   called me."  "Yeah, yeah."  "To give me a heads-up and asked --

21   she was asked by admissions as to why Sabrina did not show up

22   for women's basketball in the fall."

23           Now, isn't that an attempt to scare him about his

24   daughter's status with the admissions office?

25           MR. FRANK:  Objection.
```

1          THE COURT:  Sustained.

2    Q.    Well, would most parents, most fathers be worried and

3    distracted if his daughter's status was being asked about by

4    the admissions office?

5          MR. FRANK:  Objection.

6          THE COURT:  Sustained.

7    Q.    And here Singer says admissions is asking us why Sabrina

8    did not show up, right?

9    A.    Correct.

12:42 10   Q.    Aziz doesn't say, "What are you talking about?  We bribed

11   her way in.  She doesn't have to show up."  Right, he doesn't

12   say that?

13   A.    He responds, "Yeah."

14   Q.    Okay.  So if he thinks -- he thinks she has to show up,

15   whether it's for a practice player, team manager, or whatever,

16   she's supposed to show up, right?

17         MR. FRANK:  Objection --

18         THE COURT:  Sustained.

19   Q.    Then the phrase "side door" gets injected on line 20.

12:43 20   "Side door," who is the first one who used that?

21   A.    Mr. Singer.

22   Q.    In fact, if you go to the top of page 4, he says it again.

23   "Side door," right?

24   A.    Yes.

25   Q.    And not showing up for practice?

```
 1   A.    Yes.
 2   Q.    Suggesting to Aziz at least it was inappropriate for his
 3   daughter not to show up for practice?
 4              MR. FRANK:  Objection to what he's suggesting.
 5              THE COURT:  Sustained.
 6   Q.    Well, this double reference to the side door, it's
 7   Singer's double reference, right?
 8   A.    Mr. Singer said "side door."
 9   Q.    Twice, right?
10   A.    Yes.
11   Q.    And you're aware during the course of this investigation
12   Singer used the term "side door" differently with different
13   people, right?
14   A.    No, I'm not aware of that.
15   Q.    Well, are you aware that he made presentations in public
16   about how the side door was legitimate?
17   A.    I remember Mr. Singer making presentations and saying that
18   he had a side door.
19   Q.    Okay.  He never said, "I have this illegal" -- well, are
20   you aware that a video of a presentation he made at the
21   Starbucks company was seized from his laptop?
22   A.    Yes, I'm aware that there was a video from the Starbucks.
23   Q.    Okay.  And you saw that video, right?
24   A.    Yes.
25   Q.    Okay.  And he says -- he gives a description of the side
```

```
 1    door to all of these Starbucks employees, doesn't he?
 2            MR. FRANK:  Objection, hearsay.
 3            THE COURT:  Sustained.
 4            MR. KELLY:  Well, I'm going to offer that Starbucks
 5    video right now, your Honor.  It's Exhibit -- do you know the
 6    exhibit number?  I believe it's 1374A, your Honor, and it's
 7    independently admissible in this case given the extensive
 8    testimony about the phrase "side door," what it means, how it's
 9    presented by Singer, how it goes to the state of mind in the
12:46 10   803(3) exception to the hearsay rule of Mr. Singer, who is
11    alleged to be part of some conspiracy, and it's independently
12    admissible, and we respectfully request permission to play it
13    now.
14            MR. FRANK:  Objection.
15            THE COURT:  Sustained.
16    Q.   Okay.  But you are aware, Agent, that, in fact, Singer
17    discussed the side door with many different people in many
18    different contexts, right?
19    A.   I'm aware he discussed the side door with people.
12:46 20   Q.   And he had a -- he could sing a different tune for every
21    person, couldn't he, Mr. Singer?
22            MR. FRANK:  Objection to what he could do.
23            THE COURT:  Sustained.
24    Q.   He could take a different approach to different people,
25    couldn't he?
```

```
 1              MR. FRANK:  Objection.

 2              THE COURT:  Sustained.

 3   Q.   He could scream at Mr. Isackson and still be invited to

 4   Mr. Isackson's home, right?

 5              MR. FRANK:  Objection.

 6              THE COURT:  Sustained.

 7   Q.   Did he, in fact, scream at Mr. Isackson and still get

 8   invited to Mr. Isackson's home?

 9   A.   Yes.

12:47 10   Q.   Do you think -- well, was it your experience during the

11   course of this investigation that he screamed at all his

12   clients like that?

13   A.   I'm not aware of Mr. Singer -- I don't recall Mr. Singer

14   screaming at other parents or other people in this

15   investigation.

16   Q.   Right.  He took a different approach with different

17   people, right?

18              MR. FRANK:  Objection.

19              THE COURT:  Sustained.

12:47 20   Q.   Sometimes he became animated, sometimes not, right?

21              MR. FRANK:  Objection.

22              THE COURT:  Sustained.

23              MR. KELLY:  Well, let's move then to the Heinel

24   invoice that we have in evidence here.  One moment.  Yes, the

25   Heinel invoice, please.  That's Exhibit 596A, if I'm not
```

1    mistaken.

2    Q.    This is dated 11/5/2018, correct?

3    A.    Correct.

4    Q.    It's the Counting Stars invoice, correct?

5    A.    Correct.

6    Q.    And this is approximately, what, eight months, eight

7    months after Aziz had made his payment, correct?

8    A.    Correct.

9    Q.    And on the second page there's a reference to "Hong Kong

12:48 10   International School, Abdelaziz," right?

11   A.    Correct.

12   Q.    Singer had her put that on this invoice, didn't he?

13   A.    No, he did not.

14   Q.    You requested -- whether it was you or someone else on the

15   government team, requested that Singer have her put on more

16   detail, right?

17   A.    Mr. Singer requested that Ms. Heinel put more detail on

18   her invoice.

19   Q.    Okay.  So Singer requested of Heinel to put things like

12:49 20   this on her invoices, right?

21   A.    He asked for more information on the invoices for

22   Ms. Heinel, and that's what she put on there.

23   Q.    And he did so at the government's request, didn't he?

24   A.    We directed Mr. Singer to ask Ms. Heinel to put more

25   detail on her invoices.

1    Q.   Even though in this instance, it's eight months later,

2    right?

3    A.   The invoice is dated eight months later than the payment

4    Mr. Abdelaziz made, yes.

5         MR. KELLY:   Okay.  And, in fact, let's go back to

6    Exhibit 13A already in evidence.

7         MR. FRANK:   13A is not in evidence.

8         MR. KELLY:   I'm sorry.  13, please.  Right, this

9    October 2 note to self.  Could you scroll down to the bottom of

12:50 10    October 2, right before October 3.

11   Q.   Can you look at that last sentence that Singer writes to

12   himself, "Also as requested."  "Also as requested by agents,

13   asked her to put detail on her 20K invoices being sent to the

14   Foundation."  So Singer was asked to get Heinel to create this

15   invoice, right?

16   A.   Mr. Singer was asked to -- asked Donna Heinel to put more

17   detail in the invoices that she sent Mr. Singer.

18   Q.   Even if it made no sense from a chronology perspective?

19        MR. FRANK:   Objection.

12:51 20        THE COURT:   Sustained.

21        MR. KELLY:   Well, let's do a brief chronology then of

22   what's happening.  Just a chalk for the agent and the jury.

23   Q.   We've seen in Exhibit 11 in evidence here today an e-mail.

24        MR. FRANK:   Your Honor, could I see the chalk before

25   it's published to the jury?

```
 1              THE COURT:  Show it to counsel.
 2              MR. FRANK:  Can you take it down?  It's in front of
 3    the jury.
 4              THE COURT:  Yeah, take it down.
 5              MR. FRANK:  Do you have a copy, Mr. Kelly?
 6              MR. KELLY:  I think we can give you a copy.  It's
 7    right there.
 8              MR. FRANK:  We object to this chalk, your Honor.
 9              MR. KELLY:  Your Honor, it's consistent with what
10    evidence has gone in so far.
11              MR. FRANK:  It is, in fact, not consistent, your
12    Honor.
13              THE COURT:  We'll talk about it at the break, but
14    don't put it up now.
15              MR. KELLY:  Sure.  Let me -- you want me to keep
16    going, your Honor?
17              THE COURT:  Yes.
18              MR. KELLY:  Okay.  Let me show you then Exhibit 1381,
19    yes, Exhibit 1381.  Just the witness, please.
20              MR. FRANK:  Is it being offered to refresh the
21    witness's recollection?
22              MR. KELLY:  Well, okay.  Take it down, please.
23    Q.   Didn't Mr. Singer at some point text you with regard to
24    this invoice and say, "As requested" and attach a copy of the
25    invoice?
```

```
 1   A.    Yes.
 2   Q.    Okay.  Let me show you 1381, please.
 3            MR. FRANK:  There's no reason to refresh her
 4   recollection.
 5            MR. KELLY:  I'd like to get it into evidence, your
 6   Honor.  It's evidence in the case.
 7            THE COURT:  You can show her.
 8   Q.    Can you please look at 1381.
 9            MR. KELLY:  And scroll down.  Keep going.  Wait a
10   minute.
11            MR. SHARP:  It's 1381A.
12            MR. KELLY:  It's 1381A.  Sorry about that.  Can't
13   forget the A.  1381A.
14   Q.    Take a look at that, please.
15            MR. KELLY:  And then scroll to the second page.
16   Q.    You know what that is, right?
17   A.    Yes, that's the invoice.
18   Q.    All right.  And that's Singer communicating with you about
19   it, right?
20   A.    Mr. Singer sent the invoice to the case agents, yes.
21            MR. KELLY:  I offer 1381A.
22            MR. FRANK:  Objection.
23            THE COURT:  Grounds?
24            MR. FRANK:  The chain is hearsay, your Honor.  The
25   photograph can come in, but not the chain itself.
```

```
 1              MR. KELLY:  It's not hearsay.  I'm not offering it for
 2    the truth of the matter asserted.  It's evidence in the case.
 3    It's independently admissible.  He keeps saying "hearsay."
 4    It's not being for the truth.
 5              THE COURT:  Again, it's not going to be admitted now.
 6    If you want to talk about it at the break, you can.
 7              MR. KELLY:  Yes, your Honor.
 8    Q.   But you don't dispute, Agent, do you, that at some point
 9    Mr. Singer texts you a copy of that invoice we've been
10    discussing, right?
11    A.   Correct.
12    Q.   And he said "As requested," right?
13              MR. FRANK:  Objection, hearsay.
14              THE COURT:  Sustained.
15    Q.   Do you recall?  Do you recall what he said when he sent
16    you a copy of that?
17    A.   I don't recall specifically what he said, but I recall the
18    text message with the invoice.
19    Q.   Okay.  Let's show that exhibit again, just the witness
20    again, and see if it refreshes your recollection as to what he
21    specifically said.
22              Having seen that, is your recollection refreshed as
23    to what he said?
24              MR. FRANK:  Objection to the hearsay.
25              MR. KELLY:  Refreshing recollection.
```

```
          1              THE COURT:  He can ask her whether her memory has been

          2       refreshed by showing the document.

          3       Q.    Has your recollection been refreshed, Agent?

          4       A.    Yes.

          5       Q.    What do you recall him saying when he sent you that

          6       invoice?

          7              MR. FRANK:  Objection, hearsay.

          8              THE COURT:  Overruled.

          9       A.    "As requested."

12:56    10              MR. KELLY:  Just a moment, your Honor.

         11              THE COURT:  Yes.

         12              MR. KELLY:  I'm going through my little piles here,

         13       Judge.  Okay.

         14       Q.    You don't dispute, Agent, do you, that Mr. Singer deleted

         15       hundreds of iMessages on his phone when he was cooperating with

         16       the government, right?

         17       A.    I know Mr. Singer deleted text messages.  I don't know how

         18       many.

         19       Q.    Let me show you Exhibit 1481A in evidence, please.  Let's

12:57    20       go to the date of that on the front page.  That's October 5,

         21       2018, correct?

         22       A.    Yes.

         23              MR. KELLY:  Let's go to, I believe it's the second or

         24       third page.  It's the second -- no.  Third page, yeah, there we

         25       go.
```

```
 1   Q.   Under "Contents," about six lines down, it says,

 2   "iMessages."  To the right it says, "1342 deleted."  Do you see

 3   that?

 4   A.   I see that.

 5   Q.   Is it fair to say a lot of iMessages were deleted?

 6   A.   IMessages were deleted, but I don't know if they were all

 7   deleted within the time period of Mr. Singer's cooperation.

 8   Q.   Well, at this time he was cooperating, right?

 9   A.   This extraction was made while he was cooperating.

10   Q.   I'm sorry, what?

11   A.   The extraction of the phone was made when he was

12   cooperating.

13   Q.   Okay.  Well, there was another extraction made in March of

14   '19, right?

15        MR. KELLY:  You can take this one down, please.

16   A.   Yes.

17   Q.   And that extraction showed additional deletions, right?

18   A.   I don't recall the number -- the amount that it says there

19   were messages deleted.  I don't recall the number.

20        MR. KELLY:  Let's go to 1482A, please, just for the

21   witness.

22        MR. FRANK:  How many pages is this document?

23        MR. KELLY:  This is a cover page.  This is a two-page

24   document.

25        MR. FRANK:  Do we have a copy?
```

```
      1    Q.   Do you recognize what this document is, Agent?

      2    A.   Yes.

      3              MR. FRANK:  Could we have a moment, your Honor?

      4              THE COURT:  Yes.

      5              MR. FRANK:  Thank you, your Honor.

      6    Q.   Do you recognize this document, Agent?

      7    A.   Yes.

      8    Q.   It's a second extraction report of Singer's phone, right,

      9    in March of 2019?

12:59 10    A.   It's the extraction -- a page of the extraction report

     11    from March 11, 2019.

     12    Q.   Right.  So it's several months after the first one I just

     13    showed you, right?

     14    A.   Yes.

     15              MR. KELLY:  Okay.  Let's scroll down to the second

     16    page, please.  Go again to the "Contents" section.  Go again to

     17    "iMessages."

     18    Q.   Do you see now the number is higher, right?  1648 is

     19    higher than the previous number, correct?

01:00 20    A.   Yes.

     21    Q.   So many more iMessages have been deleted by Mr. Singer

     22    during the time he was cooperating with the government,

     23    correct?

     24    A.   iMessages were deleted when Mr. Singer was cooperating

     25    with the government.
```

1    Q.    Right.  And those are the ones, those iMessages are the

2    ones that you can't capture in a wiretap, right?

3    A.    Correct.

4    Q.    And I think you testified yesterday, I'm sorry, two days

5    ago, that you didn't find out about these deletions until

6    February of 2020?

7    A.    Some of the deleted text messages I found out about in

8    February, approximately February 2020, and then other iMessage

9    deletions I did not find out about until I was preparing for

01:01 10   trial.

11   Q.    All right.  Is there anything in particular which

12   triggered your finding out that these had been deleted in

13   February of 2020?

14   A.    The AUSA asked me to look at the deleted -- the iPhone

15   extraction for deleted text messages.

16   Q.    Okay.  And are you aware if that was triggered by a

17   defense request or this was some sort of government

18   determination?

19   A.    I'm aware of the defense allegation that there were

01:01 20   deleted text messages.

21   Q.    And it's because of that then the government determined

22   deletions had been made, right?

23   A.    And at that point -- and then I was asked by an AUSA to

24   look through the phone images for deleted text messages.

25   Q.    Right.  There was a request from the defendant's counsel

```
 1    in this case about deletions?
 2              MR. FRANK:  Objection.  He's testifying.
 3    Q.   That's when it was discovered.
 4              THE COURT:  Sustained.
 5    Q.   Now, I believe you testified --
 6              MR. KELLY:  Judge, apologies, but I probably have 15
 7    to 20 minutes.
 8              THE COURT:  All right.  We're going to take the lunch
 9    break.  You may step down for the time being, Ms. Keating.
10              We'll be in recess for one hour.
11              (Jury exits.)
12              THE COURT:  All right.  Be seated, counsel.
13              Mr. Kelly, how much longer?
14              MR. KELLY:  I'm trying to move this, your Honor.  I
15    would certainly hope I can get this done in a half an hour.
16              THE COURT:  And then I take it, Mr. Kendall, you'll be
17    the rest of the afternoon?
18              MR. KENDALL:  Into tomorrow morning sometime, your
19    Honor.
20              THE COURT:  Okay.  Anything else that needs to come to
21    the Court's attention before we recess for lunch?
22              MR. FRANK:  No, your Honor.
23              MR. KELLY:  No, your Honor.
24              MR. KENDALL:  No, thank you, your Honor.
25              THE COURT:  We're in recess then until 2:00.
```

01:02 (line 10)
01:03 (line 20)

```
 1              (Recess taken 1:03 p.m. to 2:07 p.m.)
 2              (Jury enters.)
 3              THE CLERK:  You may be seated.  Court is now in
 4    session.
 5              THE COURT:  Good afternoon, jurors.  We're ready to
 6    resume.
 7              Miss Keating, again, you're reminded that you remain
 8    under oath.
 9              Mr. Kelly, you may continue with cross-examination.
10              MR. KELLY:  Thank you, your Honor.
11    BY MR. KELLY:
12    Q.   I believe one of the things I asked you about recently was
13    1482A, just for the witness.  I don't think I put that into
14    evidence yet.  Agent, that's the second extraction -- so-called
15    extraction report, right?
16    A.   That's the extraction report from 3/11/2019.
17    Q.   All right.  And that's the one we talked about earlier.
18    If you scroll to the second page, under "Contents", the
19    iMessage deletions have increased, right?
20    A.   Yes.
21              MR. KELLY:  Okay.  I offer this exhibit, your Honor.
22              MR. FRANK:  No objection.
23              THE COURT:  It will be admitted, 1482A.
24              (Exhibit 1482A admitted into evidence.)
25    Q.   Now I believe you --
```

```
 1              MR. KELLY:  Take that down, please.
 2    Q.   I believe you testified a couple days ago that all of
 3    Mr. Singer's calls were recorded.  You testified that way,
 4    right?
 5    A.   The calls on his 8802 from a certain time period were
 6    recorded.
 7    Q.   Let me show you Exhibit 9051, a transcript from two days
 8    ago, exhibit -- page 185 at line 24.  You were asked at the
 9    bottom, "And were -- to what extent were his calls on the phone
10    recorded on the phone that he was using?"
11              Answer, "all the calls that Mr. Singer made on his
12    phone were recorded".
13              Now, you didn't mean to imply he didn't have other
14    phones, right?
15    A.   Mr. Singer had an unauthorized telephone during this
16    period.
17    Q.   Okay.  And that wasn't recorded, was it?
18    A.   No, it was not.
19    Q.   And, in fact, he had a second so-called burner phone that
20    the government gave him, right?
21    A.   He had a phone that the government gave him to call agents
22    and his attorney.
23    Q.   Did the government refer to it as a burner phone?
24    A.   I -- I didn't -- I don't refer to it as a burner phone,
25    but I'm not sure if anyone on the team did.
```

1    Q.    Now there's a lot of calls on that phone that were not

2    recorded, right?

3    A.    We did not record the conversations on that phone.

4    Q.    And the unauthorized phone he had, I assume because it was

5    unauthorized, that wasn't recorded either, right?

6    A.    That was not -- correct.  That was not recorded.

7    Q.    And the phone call that Singer references in his note to

8    himself about where he claims he was told to bend the truth.

9    That was on an unrecorded phone, right?

02:10 10   A.    The phone with his notes --

11   Q.    Let me be more clear.  He writes this note to himself that

12   we've gone over repeatedly, right?

13   A.    Correct.

14   Q.    He writes that note referencing a call he had had with

15   you, right?

16   A.    Correct.

17   Q.    And that call he had with you, that wasn't recorded, was

18   it?

19   A.    I don't recall a call on that date with Mr. Singer, but

02:11 20   the calls we had with Mr. Singer on the phone that he called

21   just agents was not recorded.

22   Q.    All right.  Now, a few more items I want to get to.

23        During the course of your investigation you never

24   found any evidence that money was misappropriated from the

25   Galen Center at USC, did you?

```
 1              MR. FRANK:  Objection.  Foundation.

 2              THE COURT:  Well, overruled.

 3   A.   My -- I did not focus that.  That was not my focus of the

 4   investigation.

 5   Q.   Did anyone investigate whether money from the Galen Center

 6   was somehow misappropriated?

 7              MR. FRANK:  Objection.  Foundation.

 8              THE COURT:  She can answer it.

 9   Q.   You're an agent on this case, right?

10   A.   Yes.

11   Q.   And you've talked to your fellow agents hundreds of times,

12   right?

13   A.   Yes.

14   Q.   And you've reviewed e-mails.  You've reviewed wiretaps.

15   You're very familiar with this case, right?

16   A.   Yes.

17   Q.   Okay.  And are you aware of anyone investigating whether

18   money was misappropriated from the Galen Center?

19   A.   No, I'm not.

20   Q.   Then you're not aware of any evidence that it was

21   misappropriated, right?

22   A.   I'm not aware.

23   Q.   Okay.  And in fact, are you aware that Mr. Abdelaziz's

24   $300,000 never made it to USC?

25   A.   Yes.  I'm aware of that.
```

```
 1   Q.   Not one penny of what he agreed to donate went to USC,

 2   correct?

 3   A.   The payment did not go to USC.

 4   Q.   So he got suckered by Singer, didn't he?

 5        MR. FRANK:  Objection, your Honor.

 6        THE COURT:  Sustained.

 7   Q.   If Singer had told him the money's going to USC and the

 8   money's going to the foundation, none of it went to USC, right?

 9        MR. FRANK:  I object to the argument.

10        THE COURT:  Sustained.

11   Q.   How about during the course of your investigation?  Did

12   you find out what the Trojan Athletic Fund was?

13   A.   No, I did not.

14   Q.   You're not aware that's the fundraising arm of the

15   Athletic Department at USC?

16   A.   I'm aware of that, but I did not investigate further into

17   that.

18   Q.   Okay.  How about the chief fundraiser for USC Athletics,

19   Ron Orr?  Did you ever interview him?

20        MR. FRANK:  Objection.  Beyond the scope.

21        THE COURT:  Overruled.

22   A.   Mr. Orr was interviewed.

23   Q.   Mr. Orr was interviewed?

24   A.   Yes.

25   Q.   By whom?
```

1   A.    I recall Mr. Orr was interviewed.  Maybe I'm mistaken.  I

2   thought Mr. Orr was interviewed, but I may be mistaken.  We

3   interviewed a lot of people in this investigation, a lot of

4   people from USC.

5   Q.    All right.  But you, yourself, did not interview Mr. Orr,

6   did you?

7   A.    I don't recall.  There were a lot of people interviewed

8   and I don't recall interviewing him.

9   Q.    All right.  Is it fair to say you're not sure?

02:14 10   A.    Correct.

11   Q.    Now during the course of your investigation you learned

12   who Mikaela Sanford was, right?

13   A.    I'm sorry.  Can you repeat that?

14   Q.    During the course of your investigation on this case, you

15   learned who Mikaela Sanford was, right?

16   A.    Yes.

17   Q.    All right.  And did you, in fact, learn that she submitted

18   Sabrina Abdelaziz's application to USC?

19   A.    Yes.

02:14 20   Q.    In fact, did you learn that she included on that

21   application fake athletic awards?

22   A.    I'm aware she included basketball on the application.

23   Q.    All right.  And are you aware she got information directly

24   from Rick Singer to include on that application?

25   A.    I'm aware she got information from Mr. Singer.

```
 1    Q.   Let me show you Exhibit 458 in evidence.  And I want to
 2    highlight where Mikaela says to Gamal, "I have to confirm a few
 3    things with Rick before I can submit".
 4         Do you see that?
 5         MR. FRANK:  Your Honor, we've been over this with
 6    another witness and this is well beyond the scope of this
 7    witness' direct.
 8         THE COURT:  Overruled.
 9    Q.   You see that, right?
10    A.   Yes, I do.
11    Q.   And are you aware then, after this, Ms. Sanford got
12    information directly from Singer without copying Abdelaziz?
13    A.   Yes.
14    Q.   All right.  Let me show you Exhibit 1540.  And do you
15    recognize this document?
16    A.   Yes.
17    Q.   And what is it?
18    A.   It is an e-mail from Mikaela Sanford to Rick Singer.
19    Q.   Is there anybody else on this?
20    A.   No.
21         MR. KELLY:  I offer 1540.
22         MR. FRANK:  Your Honor, this is part of the issue
23    that's before the Court.
24         MR. KELLY:  This is a request.  It's non-hearsay.
25         THE COURT:  Are you objecting to its admission?
```

```
 1              MR. FRANK:  On the basis that it's pending, your
 2    Honor.
 3              THE COURT:  I'm sorry?
 4              MR. FRANK:  Yes, your Honor.  On the basis that it's
 5    pending on the brief that we submitted to the Court.
 6              MR. KELLY:  It's nonhearsay.  He has no valid basis to
 7    object.  We respectfully say it's central to the defense.
 8    She's just getting --
 9              THE COURT:  I'm not going to allow it in now.  If you
10    wish to be heard outside the hearing of the jury later, I will
11    hear you.
12              MR. KELLY:  Yes, your Honor.
13    Q.   Let me show you Exhibit 1541.
14              MR. FRANK:  Your Honor, this is all part of the same
15    issue.
16              THE COURT:  Yeah.  There are three or four of these,
17    right?
18              MR. KELLY:  There's four, your Honor.  I believe the
19    agent just testified she was aware Mikaela Sanford got
20    information directly from Singer without Aziz on the e-mail.
21              THE COURT:  Yes.  Same ruling.  The objection is
22    sustained, but subject to further discussion at a later time.
23              MR. KELLY:  Okay.  Well then, just for the record,
24    it's 1540, 1541, 1254 and 1255 I'd like to inquire of this
25    agent about while she's on the stand, your Honor.
```

1          THE COURT:  All right.  Same ruling.

2    Q.   How about, as part of your investigation, did you

3    interview anybody from USC's SUBCO committee?

4    A.   I know I interviewed people from USC.  I don't recall if

5    the individuals were on the SUBCO committee.

6    Q.   Did you ever interview a woman named Kelsey Bradshaw in

7    the Admissions Department at USC?

8    A.   I don't recall specifically her.

9    Q.   In the course of your investigation, did you learn that

02:18 10   she was joking around with another member of the Admissions

11   Department regarding Sabrina Abdelaziz's application?

12         MR. FRANK:  Objection to the hearsay.

13         THE COURT:  Sustained.

14   Q.   As part of your investigation, did you learn anything

15   about how Kelsey Bradshaw viewed Sabrina Abdelaziz's

16   application?

17         MR. FRANK:  Objection.  Hearsay.

18         THE COURT:  Sustained.

19   Q.   Are you aware of anybody on the investigative team, agent

02:18 20   or prosecutor, who interviewed Miss Bradshaw about this?

21   A.   I don't recall.

22         MR. KELLY:  One moment, your Honor.  Nothing further,

23   your Honor.

24         THE COURT:  Cross-examination, Mr. Kendall.

25         MR. KENDALL:  Yes.  Thank you, your Honor.  I need a

```
 1    moment to set up, please.

 2              THE COURT:  Yes.

 3                    CROSS-EXAMINATION OF ELIZABETH KEATING

 4    BY MR. KENDALL:

 5    Q.    Good afternoon, Agent Keating.

 6    A.    Good afternoon.

 7    Q.    My name's Mike Kendall.  I represent John Wilson.

 8              Fair to say we've never met before, have we?

 9    A.    Correct.
```

02:20  10    Q.    Okay.  I want to start off by asking you some questions

```
11    about the investigation and the evidence you found and I'd like

12    to just clarify.  I'm not seeking your opinion on the law, just

13    about the events that occurred in the past.  Okay?

14    A.    Okay.

15    Q.    Okay.  As part of your work in this case, did you review

16    the Wilson calls on the wiretap?

17    A.    I listened to the Wilson calls on the wiretap.

18    Q.    The September 15th call?

19    A.    Yes.
```

02:21  20    Q.    And the prior text message?

```
21    A.    I reviewed text messages and the wiretap calls.

22    Q.    Okay.  With Mr. Wilson?

23    A.    With Mr. Wilson, yes.

24    Q.    Okay.  Did you review calls from other parents on the

25    wiretap?
```

1    A.    Yes.

2    Q.    And I take it you reviewed a lot of Mr. Singer's e-mails

3    that were gathered during the investigation?

4    A.    I reviewed some of Mr. Singer's e-mails gathered during

5    the investigation.

6    Q.    Okay.  When you were with us on Tuesday, you said, "My

7    focus was to investigate the financial aspects of the case."

8    Did that include money laundering by Mr. Singer?

9    A.    Yes.

02:21 10    Q.    Okay.  And did that mean you reviewed the financial

11    records of The Key Foundation?

12    A.    Yes.

13    Q.    And their tax filings?

14    A.    Yes.

15    Q.    Did you review The Key Foundation's Wells Fargo account

16    that ends in the numbers 391?

17    A.    I reviewed Mr. Singer's -- The Key Worldwide Foundation

18    accounts.

19    Q.    At Wells Fargo?

02:22 20    A.    Not entirely -- I don't recall reviewing everything, but I

21    did review some of that information from that account.

22    Q.    Some Wells Fargo account information?

23    A.    Yes.

24    Q.    And would you agree with me the IRS trains agents to

25    follow certain rules and procedures in their investigations?

```
 1    A.    Yes.
 2    Q.    And one of the most important things you're taught in your
 3    job is to go through the evidence objectively, correct?
 4    A.    Correct.
 5    Q.    You should always try to gather evidence that is truthful,
 6    correct?
 7    A.    Correct.
 8    Q.    And accurate?
 9    A.    Correct.
02:22 10    Q.    And you should accept the evidence as you find it and not
11    try to change it, correct?
12    A.    Correct.
13    Q.    Or misrepresent it?
14    A.    Correct.
15    Q.    You know that tax laws can be very complex, correct?
16    A.    Correct.
17    Q.    And a person's intent is often an important issue in a tax
18    case, correct?
19    A.    Willfulness, yes.
02:23 20    Q.    So it's important to get reliable evidence of intent,
21    correct?
22    A.    Correct.
23    Q.    Not to make it confusing or ambiguous?
24    A.    Correct.
25    Q.    And you agree with me that you should treat all taxpayers
```

1    the same?

2    A.    Correct.

3          MR. FRANK:  Your Honor, this witness hasn't testified

4    about taxes on her direct examination.  So if we're going to

5    now embark on a tax exploration with her, I object to that.

6          THE COURT:  Well, I'm going to let him explore this as

7    it goes thus far.

8          MR. KENDALL:  Thank you, your Honor.

9    Q.    For example, the IRS expects its agents to take accurate

02:23 10   notes of any significant meeting with its confidential

11   informants, correct?

12   A.    IRS informants?

13   Q.    Yes.

14   A.    Accurate -- accurate notes, correct.

15   Q.    And they should take notes of any significant meeting with

16   an informant, correct?

17   A.    Yes.

18   Q.    Okay.  And you should write complete reports, correct?

19   A.    Correct.

02:24 20   Q.    Okay.  Now the FBI -- are you aware the FBI called its 302

21   reports something that should be written up or something that

22   should contain the subject of testimony that could be in a

23   case, that that's the purpose of a 203 report, to write up

24   something that could be the subject of testimony in a case?

25   A.    Not -- not -- I'm not -- specifically that terminology,

1    but I know the 302 is to memorialize an interview that's

2    conducted.

3    Q.   And would you agree with me that IRS and the FBI have

4    similar standards of trying to memorialize any significant

5    aspect of a case?

6    A.   It's important to memorialize significant interviews.

7    Q.   And to do that completely and thoroughly, correct?

8    A.   Correct.

9    Q.   And would you also agree with me that when conducting

02:25 10   electronic surveillance of a person's telephone calls you

11   should record all of their calls in the investigation, not just

12   some of them, correct?

13   A.   We -- for the wire -- wire tapped calls, we record those.

14   Q.   Okay.  And if you're conducting consensual monitorings,

15   you should not selectively record the consensual calls.  You

16   should record all of them with a particular target of the

17   investigation, correct?

18   A.   The consensual calls that we -- we recorded the consensual

19   calls from Mr. Singer's 8802 number.

02:25 20   Q.   Okay.  And if you fail to record a call, you should

21   immediately write a report that describes the contents of the

22   call, correct?

23   A.   I don't know if that's policy or not.

24   Q.   You don't know if that's in the IRS manual?

25   A.   I don't know if that's in the IRS manual.

1    Q.   Do you know if that's good practice in general, if you

2    fail to record a call to write it up at least so that there's

3    some record of what happened?

4    A.   I think it depends on the type of call it is.

5    Q.   Okay.   If there's anything of substantive impact on the

6    case, should that be recorded?

7    A.   Yes.   If there's a consensual wiretap and the conversation

8    is substantial, then yes, it should be recorded.

9    Q.   And when you debrief a confidential informant, you should

02:26 10    also write a complete report, correct?

11    A.   When we interview cooperators, we write -- it's practice

12    to write a report.

13    Q.   I said a complete report.

14    A.   Yes.   It's important the report to be complete.

15    Q.   You can't selectively exclude information that's bad for

16    the government's side of the case, correct?

17    A.   Correct.

18    Q.   And the importance of these practices and rules is, in

19    part, to protect innocent people.   You understand that,

02:27 20    correct?

21    A.   Correct.

22    Q.   And so if an informant like Mr. Singer gives you

23    information that's helpful to the defendant, it's important

24    that you include that in the report, correct?

25    A.   Correct.

```
 1    Q.   And that's particularly important when dealing with
 2    someone who's a confidential informant like Mr. Singer when
 3    they're generally known to be untrustworthy, correct?
 4            MR. FRANK:  Objection.
 5            THE COURT:  Sustained.
 6    Q.   There are heightened standards for care that law
 7    enforcement applies when handling confidential informants,
 8    correct?
 9    A.   Correct.
10    Q.   That's because law enforcement recognizes there's greater
11    risks when dealing with a confidential informant, correct?
12            MR. FRANK:  Objection.
13            THE COURT:  You can have that.
14    A.   It's important to be accurate and document some sort of
15    conversations with cooperators and witnesses.
16    Q.   Okay.  And if you give a confidential informant specific
17    instructions on how to speak to a target on a wire, shouldn't
18    that be recorded?
19            MR. FRANK:  Objection to what should and shouldn't.
20            THE COURT:  Sustained.
21    Q.   Okay.  Would you agree with me it's good investigative
22    practice to record the instructions you give a confidential
23    informant in how to go after a target on a consensual
24    monitoring?
25            MR. FRANK:  Objection.
```

1        THE COURT:  Sustained.

2   Q.   Based upon your experience, is it good investigative

3   practice to memorialize the instructions you give a

4   confidential informant about what to say on the wire?

5        MR. FRANK:  Objection.

6        THE COURT:  Sustained.

7   Q.   In this case, you'd agree with me you did not memorialize

8   the instructions you gave Mr. Singer when speaking in the

9   consensual monitorings, correct?

02:28 10   A.   We documented periodically.  We documented our

11   communications with Mr. Singer.

12   Q.   You documented the fact that you met with him, correct?

13   A.   Correct.

14   Q.   You didn't document the content of what you said to him,

15   correct?

16   A.   We did not document the specific discussion, but we

17   documented -- summarized our communications with Mr. Singer on

18   a periodic basis.

19   Q.   You summarized the fact that you met with him.  You didn't

02:29 20   summarize what you said to him, correct?

21   A.   The specifics of what we discussed was not documented.

22   Q.   Okay.  So one could read those reports and have no idea

23   what you said to him when giving him instructions on how to

24   speak on the wire, correct?

25   A.   Correct.

```
 1   Q.   Would you agree with the statement "When giving
 2   instruction, direction and active support in a monitoring
 3   situation, the criminal investigative division inherits
 4   additional responsibility and risk through the use of the
 5   confident -- cooperating witness or confidential informant"?
 6             MR. FRANK:  Objection, your Honor.
 7             THE COURT:  Grounds?
 8             MR. FRANK:  For one thing, Mr. Singer was not a
 9   confidential informant of the IRS so this is completely
10   irrelevant.
11             THE COURT:  Sustained.
12   Q.   This was a joint investigation, correct?
13   A.   It was a joint investigation.  Mr. Singer was cooperating
14   on the FBI case, his FBI-led case.
15   Q.   But he was cooperating on a joint investigation of which
16   the IRS was a part of, correct?
17   A.   I was assigned to the case, but it was an FBI-led case.
18   Q.   And you know that quote I just read you is from the IRS
19   manual, isn't it?
20   A.   It sounds like it is.  I don't know exactly.
21   Q.   So the IRS Criminal Investigation Division manual, the
22   rules you're supposed to follow are IRS regulations, correct?
23   A.   On -- with an IRS cooperator on an IRS investigation.
24   Q.   So the fact that Mr. Singer was working primarily --
25   strike that.
```

```
 1              The fact that Mr. Singer was designated a confidential
 2      informant controlled by the FBI meant the IRS standards for
 3      investigations didn't apply?
 4      A.   The policy of the cooperator was -- the IRS policy was of
 5      a cooperating agent -- excuse me -- the cooperator does not
 6      apply to FBI cooperators.
 7      Q.   Okay.  Who wrote all of the investigative reports of the
 8      interviews of Mr. Singer?
 9      A.   Agent -- the agents wrote the reports.
10      Q.   FBI or IRS?
11      A.   FBI agents wrote reports.  I wrote some reports.
12      Q.   Okay.  How did you decide who would write a report of
13      which event?
14              MR. FRANK:  Objection.  Relevance.
15              THE COURT:  Overruled.
16      A.   We split it up.  There was no specific rule.  It was just
17      whoever was available and whoever -- we took turns.
18      Q.   If no report got written at all of an event, who decided
19      that?
20      A.   All substantive conversations with Mr. Singer were
21      documented.
22      Q.   What about the October 1, 2018, conversation that led to
23      his notes in Exhibit 13?  There's no report of that
24      conversation, is there?
25      A.   I don't recall that conversation.
```

1   Q.   Do you recall being on a phone call that was recorded by

2   Mr. Singer?

3   A.   You have to be more specific.  Mr. Singer was on a lot of

4   recorded phone calls.

5   Q.   Okay.  We'll get to this in more detail, but you remember

6   playing a September 29 tape of a conversation between

7   Mr. Singer and Mr. Wilson earlier with Mr. Frank?  You remember

8   that?

9   A.   Yes.

02:32 10  Q.   Okay.  Do you remember -- that was September 29.  Do you

11  remember on October 1 Mr. Rosen and the rest of the agents had

12  a call with Mr. Singer to go over his calls with John Wilson

13  and other targets of the investigation?

14  A.   I do remember that, yes.

15  Q.   And do you remember that after a few minutes you realized

16  that Mr. Singer had called you on the phone that records the

17  conversation, correct?

18  A.   I personally didn't realize that, but one of the AUSAs

19  did.

02:32 20  Q.   And Mr. Rosen immediately stopped the call because he

21  didn't want to be recorded giving instructions to Mr. Singer,

22  correct?

23        MR. FRANK:  Objection.

24        THE COURT:  Sustained.

25  Q.   Okay.  Mr. Rosen stopped the call, correct?

A.    Correct.

Q.    And that prevented anybody from recording the instructions that you gave to Mr. Singer, correct?

A.    Correct.

Q.    And you then reconvened on a conference call that wasn't being recorded, correct?

A.    Correct.

Q.    And nobody wrote up a report to discuss what happened in that conference call, correct?

A.    Not specifically with that, that operational conversation.

Q.    Is that a yes?

A.    No one -- no one wrote a report specifically based on that phone call.

Q.    The only person who wrote a report was Rick Singer, correct?

        MR. FRANK:  Objection.

        THE COURT:  Sustained.

Q.    The only person who wrote a written record of what happened in that October 1 call was Mr. Singer, correct?

        MR. FRANK:  Objection.  This wildly misstates.

        THE COURT:  Sustained.

Q.    Mr. Singer wrote up a note that -- on October 1st, correct?

A.    Correct.

Q.    And he referred to the call that he had with you folks,

1   correct?

2   A.   He referred to a call, correct.

3   Q.   It was the call of October 1st, wasn't it?

4        MR. FRANK:   Objection to what Mr. Singer was referring

5   to.

6        THE COURT:   Sustained.

7   Q.   Okay.  Well, the only note -- the only call you're aware

8   of that agents had with Mr. Singer on October 1st is the one

9   we've just been discussing for the last few minutes, correct?

02:34 10  A.   Can you repeat that?

11       MR. FRANK:   Your Honor, can we approach for a minute?

12       THE COURT:   No.

13  Q.   The only call that you had with Mr. Singer on October 1st

14  is the one that we've just discussed for the last few minutes,

15  correct?

16  A.   There may have been other calls with Mr. Singer that day.

17  I don't recall, but --

18  Q.   You don't recall more than this -- well, there were two

19  calls, the one that was recorded, and then there was a

02:34 20  conference call that wasn't recorded, correct?

21  A.   I don't recall if that was the specific date, but there

22  were -- we had calls, one call that was recorded that Mr. Rosen

23  ended the call.

24  Q.   Okay.  If you accept my representation, that was

25  October 1st.

```
 1              MR. FRANK:  Objection.
 2              THE COURT:  She can.  She can.  If she doesn't want
 3      to, she doesn't have to.
 4      Q.   Will you accept my representation that that call was
 5      October 1st?
 6      A.   I don't recall if it was October 1st.
 7      Q.   Okay.  You know the government gave us a copy, don't you?
 8      A.   I don't know what the government gave you.  I'm not part
 9      of the discovery process.
02:35 10 Q.   Okay.  Will you accept my representation that this call
11      that Mr. Rosen stopped the recording of occurred on
12      October 1st?
13      A.   If you can refresh my memory if there's something that I
14      can see.
15      Q.   Sure.
16              MR. KENDALL:  What's the number for the -- could we
17      have up Exhibit 8182, please?  8182A would be the transcript.
18              MR. FRANK:  Your Honor, if he's intending to play this
19      call, we'd object.
02:36 20         MR. KENDALL:  I'd first ask if the agent could read
21      this and if that refreshes her recollection.
22      A.   Yes, it does.
23      Q.   Okay.  Does that refresh your recollection that this call
24      that was being recorded by Mr. Singer occurred on October 1st?
25      A.   Yes.
```

1    Q.   Have you ever listened to a copy of the tape?

2    A.   No.

3    Q.   Okay.  But you know it was recorded, correct?

4    A.   Yes.

5         MR. KENDALL:  Your Honor, I'd like to offer

6    Exhibit 8182.

7         MR. FRANK:  Objection.

8         MR. KENDALL:  Your Honor, this goes directly to

9    Exhibit 13 in the notes.

02:36 10         MR. FRANK:  It does not actually.

11         THE COURT:  No.  The objection is sustained.

12   Q.   In that call, you remember that Mr. Rosen told Mr. Singer

13   that they were going to review his calls with Donna Heinel,

14   John Wilson, and others?  Do you recall that being the case?

15   A.   I don't recall specifically those names, but I do recall

16   the conversation that we talked with Mr. Singer.

17        MR. KENDALL:  Okay.  Could we show the witness again

18   8182A, please, to refresh her recollection?

19   Q.   Okay.  If you would take a look about two-thirds of the

02:37 20   way down on the first page, and if you could read that and tell

21   us does that refresh your recollection that one of the calls

22   being discussed today -- being discussed that day was with John

23   Wilson?

24   A.   Yes.  It does refresh my memory.

25   Q.   Okay.  Thank you.  Now, you'd agree with me that prior --

```
 1    okay.  Does that refresh your memory that Mr. Wilson's call was
 2    part of the ones to be discussed that day?
 3                After you reviewed the transcript and saw what you
 4    read, does that not refresh your memory that Mr. Wilson's call
 5    was one of the ones being reviewed on October 1st?
 6    A.    Yes.
 7    Q.    Okay.  Prior to Mr. Singer's cooperation, there was --
 8    there was about a four-month wiretap?
 9    A.    Yes.
10    Q.    Okay.  And would you agree with me that during the
11    four months of that wiretap you and the other agents were
12    developing an investigative plan, correct?
13    A.    Yes.
14    Q.    Okay.  And part of that investigative plan was you wanted
15    to confront Mr. Singer and persuade him to become an informant,
16    correct?
17    A.    Part of our plan was to discussing, approaching Mr. Singer
18    to talk to him.
19    Q.    And getting him to cooperate?
20    A.    That was part of our plan.
21    Q.    Okay.  And in order to -- and you intended to get him to
22    do just what you did, go out, do consensual monitoring and try
23    to get evidence against other people that he knew, correct?
24    A.    We -- yes.  Have Mr. Singer make phone calls to gather
25    additional evidence.
```

 1   Q.   Okay.  And you spent several months planning that approach

 2   and planning to implement that goal, correct?

 3   A.   I don't know how long we planned that.  I don't know if it

 4   was a couple months or couple weeks, but that was our plan.

 5   Q.   The wiretap was up for four months, so was it for most of

 6   the wiretap you were working towards getting Mr. Singer's

 7   cooperation?

 8   A.   We were gathering evidence on the individuals on the call

 9   and other individuals.

02:39 10   Q.   Okay.  And you were doing various types of evidence

11   gathering so you could know how to use Mr. Singer properly when

12   he's making consensual monitorings, correct?

13   A.   Can you repeat that, please.

14   Q.   Sure.  You wanted to use Mr. Singer effectively, correct?

15   A.   Correct.

16   Q.   And so you wanted to gather information and do an

17   investigation before the approach so you would know how to make

18   the best use of his services, correct?

19        MR. FRANK:  Objection to "use of his services".

02:40 20        THE COURT:  Sustained.

21   Q.   To make the best use of his cooperation with you.

22   A.   We were gathering evidence on a number of individuals,

23   including Mr. Singer, and we decided to approach Mr. Singer and

24   ask him to make phone calls for us.

25   Q.   Right.

1    A.    Yes.

2    Q.    And you had done several months of investigation to get

3    the proper understanding of how to approach him and how to make

4    proper use of his cooperation, correct?

5    A.    Yes.

6    Q.    Okay.  Now, by the time you approached him on September

7    21, you had had only one substantive call on the wiretap

8    between Mr. Singer and Mr. Wilson, correct?

9    A.    Correct.

02:41 10  Q.    It was a couple of small calls of like scheduling and

11   logistics, but the September 15th is the only substantive one,

12   correct?

13            MR. FRANK:  There were two on September 15th.

14            MR. KENDALL:  Excuse me?

15            MR. FRANK:  I object.  There were two.

16            THE COURT:  Sustained.

17   Q.    There was a call that was dropped and then immediately

18   recommenced?

19   A.    Correct.

02:41 20  Q.    Okay.  So the September 15th conversation, that was the

21   only substantive call with Mr. Singer and Mr. Wilson prior to

22   September 21?

23   A.    Correct.

24   Q.    And then you had consensually recorded calls between them

25   from September 22nd to January 2019?

```
 1   A.   Correct.
 2   Q.   Okay.  If -- and you'd agree with me that over that
 3   three-month period there were phone calls, correct?
 4   A.   With who?
 5   Q.   Between Wilson -- Mr. Wilson and Mr. Singer.
 6   A.   During that period, yes.
 7   Q.   There were phone calls, correct?
 8   A.   Yes.
 9   Q.   There were voicemail messages?
10   A.   Yes.
11   Q.   There were text messages?
12   A.   Yes.
13   Q.   Even a few e-mails?
14   A.   Yes.
15   Q.   Would you agree with me that that added up to about 87
16   electronic contacts between Mr. Singer and Mr. Wilson over that
17   three-month period?
18   A.   I'm not sure how many contacts, but we had -- we had
19   Mr. Singer make numerous contacts with Mr. Wilson.
20   Q.   In the dozens, fair to say?
21   A.   At least eight phone calls, a little over a dozen, yes.
22   Q.   There were about eight calls and three voicemails,
23   correct?
24   A.   I don't recall how many voicemails, but I recall eight
25   calls with Mr. Wilson.
```

1   Q.   And there were numerous text messages?

2   A.   Yes.

3   Q.   And a few e-mails?

4   A.   Correct.

5   Q.   Now, Mr. Frank raised with you a September 28 telephone

6   call that occurred from -- by Mr. Singer when he was in an FBI

7   office in California.

8   A.   He was in a U.S. Attorney's office in California.

9   Q.   Okay.  Was he in San Jose?

02:43 10   A.   That was Sacramento.

11   Q.   Sacramento that day.  And he was being debriefed by, I

12   think there were four agents, a data analyst, and a prosecutor

13   that had flown out from Boston?

14   A.   There were three agents, forensic accountant, and two

15   prosecutors.

16   Q.   Okay.  You were one of the people present?

17   A.   Yes.

18   Q.   And you debriefed Mr. Singer for much of the day?

19   A.   Yes.

02:43 20   Q.   Okay.  And at some point you folks took a break, correct?

21   A.   Correct.

22   Q.   And Mr. Singer made a phone call to the Wilson family,

23   correct?

24   A.   To Mr. Wilson's daughters.

25   Q.   You say to Mr. Wilson's daughters.  Did you monitor

1    Mr. Singer's phone call?

2    A.    It was specifically to Mamie, according to his contacts.

3    Q.    Okay, but I'd ask you to just tell us what you personally

4    observed.  You're quoting what a telephone record shows the

5    contact between two phones, correct?

6    A.    Yes.

7    Q.    You don't know who was speaking on those phones, do you?

8    A.    I know that it went to Mamie's phone.

9    Q.    Okay.  You don't know who was speaking, correct?

02:44 10   A.    Mr. Singer was speaking on the government side and it was

11   a call on Mamie Wilson's phone.

12   Q.    Who was in the room with Mr. Singer when he made that

13   call?

14   A.    He was by himself.

15   Q.    So no agent monitored him when he's making a call to the

16   Wilson family?

17   A.    There was no agent in the room.  There was no -- we had no

18   evidence that his daughters were involved in the scheme, so we

19   decided to have him speak with Mr. Wilson's daughters.

02:44 20   Q.    Okay.  Well, you know that this call on September 8th was

21   a rescheduling of a meeting that was supposed to take place

22   face-to-face when Mr. Singer was in Boston earlier?

23           MR. FRANK:  I'd need you to say the date again.

24           MR. KENDALL:  This phone call was September 28.

25           MR. FRANK:  You said September 8.

```
 1              MR. KENDALL:  Thank you.
 2    Q.   You know this call on September 28 was rescheduled from a
 3    face-to-face meeting that had been scheduled earlier in
 4    September, correct?
 5    A.   There was a meeting between Mr. Singer and Mr. Wilson that
 6    was scheduled earlier.
 7    Q.   Well, Mr. Wilson, his wife and his two daughters, they
 8    were going to meet Mr. Singer on September 21, correct?
 9    A.   Mr. Wilson was going, and his wife, were going to meet
02:45 10    Mr. Singer at a hotel and they were going to Facetime
11    Mr. Wilson's daughters or Skype or electronically.
12    Q.   You weren't part of any of the conversation on the
13    September 21 call, were you?  I'm talking --
14              Mr. Singer told Mr. Wilson he was coming to Boston on
15    September 21 to meet the president of Tufts and Harvard,
16    correct?
17    A.   Yes.
18    Q.   That was in the September 15 phone call, correct?
19    A.   Yes.
02:45 20    Q.   And that was in a prior text message that Mr. Singer had
21    sent around September 6 to 7th, correct?
22    A.   Yes.
23    Q.   Okay.  So Mr. Singer twice tells Mr. Wilson, I'm coming to
24    Boston to meet the president of Harvard and Tufts, and then he
25    says in the September 15 call, I'm negotiating side doors
```

1    directly with the president of Harvard, correct?

2              MR. FRANK:  Objection.

3              THE COURT:  Sustained.

4    Q.   He says that the president of Harvard invited him to

5    negotiate side door deals.  Do you remember that?

6              MR. FRANK:  Objection.  Misstates.

7              THE COURT:  Sustained.

8    Q.   Do you remember the September 15th call that refers to the

9    president of Harvard's supposed conversation with Mr. Singer,

02:46 10   correct?

11   A.   I remember the call that Mr. Singer referenced Harvard.

12   Q.   Okay.  And then Mr. Wilson was coming in on September 21

13   to see Mr. Singer, correct?

14   A.   Correct.

15   Q.   You don't know who was in the car with Mr. Wilson, do you?

16              Unless you were in that car, you don't know who was

17   in there?

18   A.   If I recall, the transcripts says Leslie Wilson --

19   Q.   I'm not asking you what somebody else said.

02:47 20   A.   From what I remember from the call, Mr. Wilson was with

21   his wife.

22   Q.   Okay.  I'm not asking you what you heard on a call.  I'm

23   asking what did you observe or see.

24   A.   Yeah.  I was not in Mr. Wilson's car so I did not know if

25   it was true that Mrs. Wilson was in his car.

```
 1    Q.   You don't know who was or wasn't in that car, correct?
 2    Just yes or no.
 3    A.   Correct.
 4    Q.   Okay.  And I ask you -- unless I say otherwise, if we
 5    could limit your answer to just things you personally observed
 6    and not things that you think may have happened.  Is that okay?
 7    A.   I'm answering the question how I'm going to answer it.
 8    Q.   Okay.  And then it got rescheduled for Mr. Wilson to come
 9    back after the 21st, correct?
02:47 10    A.   It did -- I don't -- I don't recall it being rescheduled
11    at the exact date that it was being rescheduled, but they did
12    discuss having a meeting.
13    Q.   Don't you remember Mr. Singer calling Mr. Wilson and
14    saying he was sick and he couldn't meet with him and Mr. Wilson
15    saying, you know, I hope you get better?
16    A.   Yes.  I recall that.
17    Q.   And isn't he driving in with his family to meet with
18    Mr. Singer at that time?
19              MR. FRANK:  Objection.
02:48 20              THE COURT:  Sustained.
21    Q.   Okay.  Are you aware that Mr. Singer had scheduled to meet
22    with Mr. Wilson and his family at that time?
23    A.   I don't -- I don't recall that there was an exact date
24    that they were going to schedule another meeting, but I do
25    remember them saying that it was going to be -- they would try
```

1    to reschedule with his daughters.

2    Q.    Okay.  So Mr. Singer has some cancelled meetings with the

3    Wilson's around September 21, 22, and then there's this call

4    that's booked for September 28th, correct?

5    A.    There's a call with Mr. Wilson's daughters scheduled for

6    the 28th.

7    Q.    And Mr. Singer goes into the room by himself and makes a

8    call to the Wilson family, and the six agents and prosecutors

9    and investigators are all in other rooms and leave him there

02:49 10  alone to speak with the Wilson's, correct?

11         MR. FRANK:  Objection to the Wilson family.

12         THE COURT:  Sustained.

13   Q.    They leave him there to make the phone call unsupervised,

14   correct?

15   A.    We leave -- agents and the rest of the team and

16   prosecutors broke for lunch, and Mr. Singer stayed in the room

17   and made the phone call.

18   Q.    Okay.  And the call lasted about 34 minutes, 33, 34

19   minutes?

02:49 20  A.    Yes.

21   Q.    Okay.  And then you folks came in and you resumed,

22   correct?

23   A.    Yes.

24   Q.    And in the FBI report of that day, it makes no reference

25   to a call with anybody from the Wilson family, correct?

1  A.   Correct.

2  Q.   The interview report simply says "a break was taken",

3  correct?

4  A.   Correct.

5  Q.   So we know now from the report taking here there was no

6  report written to summarize a September 28th call that was

7  unsupervised, correct?

8        MR. FRANK:  Objection to what we know.

9  Q.   Excuse me.  To what you know.  There was no report written

02:50 10  that refers to the September 28th call that you assume was with

11  some members of the Wilson family, correct?

12  A.   I'm sorry.  Can you repeat that, please?

13  Q.   There's no reference in any report anywhere to indicate

14  that Mr. Singer had a call with some members of the Wilson

15  family when he was in the U.S. Attorney's office, correct?

16  A.   There was no report written that Mr. Singer had a Facetime

17  call with Mamie Wilson and Courtney Wilson.

18  Q.   You don't know who the call was with.  You keep repeating

19  names, but you don't know because you didn't supervise that

02:51 20  call, correct?

21  A.   I was not in the room when that call was made.

22  Q.   Okay.  So you would agree with me you have no basis to say

23  who was on that call, correct?  Other than Mr. Singer.

24        MR. FRANK:  Objection.

25        THE COURT:  Sustained.

1    Q.   Okay.  You'd agree with me when you said it was Mamie and

2    Courtney and you're trying to limit it, you have no personal

3    knowledge of that?

4            MR. FRANK:  Objection to what she's trying to do.

5            THE COURT:  Sustained.

6            MR. KENDALL:  I didn't ask what she's trying to do,

7    your Honor.  I'm just asking if she agrees that she doesn't

8    have personal knowledge of what she just testified to.

9            THE COURT:  You can ask her that.

02:51 10   Q.   You don't have personal knowledge as to who from the

11   Wilson family was on that call, correct?

12   A.   I was not in the room with Mr. Singer so I did not witness

13   who was on the call.

14   Q.   Nobody from federal law enforcement was in the room with

15   Mr. Singer so nobody from federal law enforcement is a witness

16   to who was in the conversation with Mr. Singer, correct?

17   A.   Correct.

18   Q.   And the report that was written that day just said "a

19   break was taken".  It makes no reference to any call with the

02:51 20   Wilson family, correct?

21   A.   Correct.

22   Q.   Okay.  Now, the first report you wrote of any interaction

23   with Mr. Singer, face-to-face conversation with agents, is of

24   the September 21 meeting, correct?

25   A.   Yes.  That was the first face-to-face contact with

1    Mr. Singer.

2    Q.    Okay.  And one of the agents there wrote up that

3    debriefing, correct?

4    A.    Correct.

5    Q.    And in Mr. Singer's October 1, October 2 note in

6    Exhibit 13, he refers to what he claims is you are raising your

7    voice with him and giving him certain instructions and telling

8    him certain things.  Which you -- do you recall him saying that

9    in his note?

02:52 10    A.    That was written in his note, yes.

11    Q.    Okay.  Would you agree with me that the sequence of

12    September 21st is as follows:  Mr. Singer's meeting with Rudy

13    Meredith in the hotel room, correct?

14    A.    On the 21st, correct.

15    Q.    And Mr. Meredith asks Mr. Singer questions and Mr. Singer

16    is talking and being recorded, correct?

17    A.    Correct.

18    Q.    The tape is then shut off and the agents all come into the

19    room and confront both Mr. Singer and take away Mr. Meredith,

02:53 20    correct?

21    A.    Correct.

22    Q.    And then four agents go into a different -- do you stay in

23    that room or do you go to a different room?

24    A.    We stayed in that room.

25    Q.    So three or four agents sit with Mr. Singer in that room,

```
 1   correct?
 2   A.   Correct.
 3   Q.   And you're one of the agents?
 4   A.   Yes.
 5   Q.   Who else was there with you?
 6   A.   FBI Special Agent Laura Smith, FBI Special Agent Kaitlyn
 7   Cedrone and Supervisory Special Agent from the FBI John Keelan.
 8   Q.   And there's some conversation with Mr. Singer about there
 9   being an investigation and does he want to cooperate, correct?
02:53 10  A.   Yes.
11   Q.   And how long does that conversation go where you explain
12   to him the investigation and discussing with him whether he'd
13   cooperate?  Is that five minutes, a half hour, whatever?
14   A.   I don't recall the time.
15   Q.   More than 20 minutes?
16   A.   I don't recall the time.
17   Q.   You don't know if it's one minute or an hour?
18   A.   It was more than one minute.  I don't recall exactly how
19   long it took.
02:54 20  Q.   Okay.  And fair to say of the interview report written up
21   of that day, none of this conversation is recorded, correct?
22   A.   Correct.
23   Q.   You didn't record anything the agent said to Mr. Singer
24   about why he should cooperate, correct?
25   A.   We did not record our meeting with Mr. Singer that day.
```

1   Q.   No.  I'm not talking recording.  I'm talking writing it

2   down to put it into an interview report.  You debriefed him

3   that day about some of the parents, correct?

4   A.   Correct.

5   Q.   And you had a report to write-up of the debriefing of the

6   parents?

7   A.   Correct.

8   Q.   But you did not write down any of the things you said to

9   him before he started the debriefing and talking about the

02:55 10   parents, correct?

11   A.   Correct.

12   Q.   And so Mr. Singer in Exhibit 13 makes certain statements

13   about you shouting at him in a hotel room and giving him

14   certain instructions on the law, correct?

15         MR. FRANK:  Objection to the shouting.

16         THE COURT:  Sustained.

17         MR. KENDALL:  He says that.  I'm not saying it

18   happened.

19         MR. FRANK:  Objection.

02:55 20   Q.   Mr. Singer, in Exhibit 13, makes certain statements about

21   what happened in the hotel room, correct?

22   A.   Correct.

23   Q.   And you disagree with Mr. Singer's description of what

24   happened in the hotel room on September 21, correct?

25   A.   Correct.

1    Q.   But this is another time where the agents did not write

2    down the conversation of that event, correct?

3    A.   The -- we wrote down the interview of Mr. Singer that

4    happened on September 21.

5    Q.   But you didn't write down what you said to him during that

6    time period that he describes in his Exhibit 13 notes, correct?

7    A.   What I told Mr. Singer what a donation was was not written

8    down.

9    Q.   Okay.  The whole sort of level of conversation you had

02:56 10   explaining why he should cooperate, what problems he might have

11   with the law, whatever you said to him, there's no record of

12   that of what you said to persuade him to cooperate and give a

13   debriefing, correct?

14   A.   We did not write down what we said to Mr. Singer.  We

15   wrote down the substance that he gave us.

16        MR. KENDALL:  Okay.  Could we have Exhibit 13, please,

17   up in evidence on the first page to show the jury.  It's

18   already in evidence.

19   Q.   So if we go down to -- if we look at the far left column

02:56 20   where it says "2", and we see it's created on October 1, 2018

21   and then it's modified a few days later on October 4th.  You

22   see that, correct?

23   A.   Yes.

24   Q.   Okay.  If we could go down to October 2nd, please, where

25   it starts "loud and abrasive call with agents".  And I just

1    would like us to stick with the first paragraph -- no.  The two

2    paragraphs, please.

3         It says, "Loud and abrasive call with agents.  They

4    continue to ask me to tell a fib and not restate what I told my

5    clients as to where the money -- as to where here money was

6    going -- to the program not the coach and that it was a

7    donation and they want it to be a payment".

8         You agree with me the agents had a call with

9    Mr. Singer on October 1?  We just went through that a few

02:57 10    moments ago, correct?

11   A.   Yes.

12   Q.   There's no interview report of any call with Mr. Singer on

13   October 2nd, correct?

14   A.   Correct.

15   Q.   So would you agree with me this loud and abrasive call

16   with agents is referring to an October 1 call?

17   A.   No.  I don't know what it refers to.

18   Q.   Well, it's on or before October 2nd, correct?

19   A.   That's what Mr. Singer's saying, correct.

02:58 20   Q.   Can you -- based upon the number of meetings you had with

21   Mr. Singer and the dates, is there any other date this call

22   could have occurred on other than October 1st?

23   A.   I don't recall this loud and abrasive call, however, we

24   had calls with Mr. Singer on a daily basis.

25   Q.   Well, did you record all of those calls on a daily basis?

1  A.   We did not record our operational conversations with

2  Mr. Singer on -- during this investigation.

3  Q.   Well, you say "operational."  If you're telling him how

4  he's supposed to speak on a consensual wire and he's

5  disagreeing, is that something operational that doesn't have to

6  be recorded or is that something significant that should be

7  memorialized?

8          MR. FRANK:   Objection to "should".

9          THE COURT:   Sustained.

02:59 10  Q.   Is that something that is substantive and could be

11  memorialized?

12  A.   Could be.  Could be, but it wasn't.

13  Q.   Okay.  Would it be fair to say that the agents made a

14  decision every time they told him how to talk on a wire they

15  were not going to write down the instructions in a typed

16  report?  Correct?

17  A.   Our communication with Mr. Singer was documented on a

18  periodic basis and it was submitted and approved by the

19  supervisor.

02:59 20  Q.   Did you answer my question?

21  A.   The conversations were not specifically documented every

22  single day.

23  Q.   You never recorded the substance of the conversations

24  where you were giving him instructions, correct?

25  A.   We did not write down the -- what we told Mr. Singer to

1    say.

2    Q.   Okay.  So the only person who wrote down their version of

3    what Mr. Singer was told to say is Mr. Singer with Exhibit 13,

4    correct?

5    A.   Mr. Singer wrote these notes, correct.

6    Q.   Do we have -- do you know of any other version of the

7    agents' instructions to Mr. Singer other than Exhibit 13,

8    instructions on what to say in a consensual call?

9    A.   There was nothing written down.  We didn't write

03:00 10   specifics, but -- I did not tell Mr. Singer to tell a fib.  I

11   did not say that to Mr. Singer.

12   Q.   I'm not asking you what you told him.  I'm just asking you

13   what -- if you could give me the courtesy of just answering my

14   question and not adding it.  I asked you whether --

15             MR. FRANK:  I object.

16             THE COURT:  Sustained.

17   Q.   Okay.  My question was, are there any other notes of

18   instructions given by the agents on what to say in consensual

19   calls?  That's a yes or no answer.  Could you give us a yes or

03:01 20   no answer, please?

21   A.   Written notes, no.  Not that I recall.  I don't.

22   Q.   What other notes are there other than written?

23   A.   The scripts from the AUSA.  I wasn't sure if you were

24   referring to that.

25   Q.   Okay.  There's a -- we've got one copy of a script

| | |
|---|---|
| 1 | Mr. Rosen wrote with respect to Mr. McGlashan.  Is there any |
| 2 | other -- |
| 3 | MR. FRANK:  I object to the testifying. |
| 4 | THE COURT:  Sustained. |
| 5 | MR. KENDALL:  Strike that.  I'll rephrase, your Honor. |
| 6 | I'm sorry. |
| 7 | Q.   Other than a script to Mr. McGlashan, are there any other |
| 8 | scripts you're referring to? |
| 9 | A.   I don't recall. |
| 03:01 10 | Q.   I want to move to another report.  You testified both with |
| 11 | Mr. Frank and with Mr. Kelly that Mr. Singer deleted a large |
| 12 | number of iPhone or whatever they are messages, iMessages from |
| 13 | his iPhone.  Do you remember talking about that? |
| 14 | A.   I remember saying that Mr. Singer deleted iMessages. |
| 15 | Q.   Okay.  And when you testified on direct with Mr. Frank, |
| 16 | you actually said that you had instructed Mr. Singer not to |
| 17 | delete anything.  Do you remember testifying about that? |
| 18 | A.   Yes. |
| 19 | Q.   When did you give him that instruction?  Let me take that |
| 03:02 20 | back. |
| 21 | Did you personally give that instruction or another |
| 22 | agent? |
| 23 | A.   It was another agent and we -- and she told Mr. Singer |
| 24 | toward the beginning not to delete any text messages. |
| 25 | Q.   Who was the agent that gave that instruction? |

```
 1    A.    Agent Smith.

 2    Q.    And what day did she give that instruction?

 3    A.    I don't recall.

 4    Q.    Okay.  Because if I were to -- can you identify a single

 5    interview report written from September 21 to October 5, 2018,

 6    that memorializes an agent giving Mr. Singer that instruction?

 7    A.    Specifically with a text, no, I don't.

 8    Q.    Okay.  So you agree with me you took his phone on

 9    October 5, correct?

10    A.    Yes.

11    Q.    You had left it in his custody for two weeks, correct?

12    A.    We imaged Mr. Singer's phone on October 5.

13    Q.    Okay.  And he deleted some number of text messages prior

14    to October 5, correct?

15    A.    Yes.

16    Q.    The extraction report shows 1,300, correct?

17    A.    That's what it says, yes.

18    Q.    Okay.  And you cannot identify a single interview report

19    that actually corroborates your statement that he was

20    instructed prior to October 5th not to delete things from his

21    phone, correct?

22    A.    I don't recall -- I don't recall there -- I feel like

23    there is an interview report where we instructed Mr. Singer not

24    to delete things, but I don't recall exactly.

25    Q.    Do you recall there's one in March of 2020, a year and a
```

1    half later, correct?

2    A.    I recall that interview.

3    Q.    Do you recall any prior to October 5, 2018?

4    A.    No.  I don't recall before that time.

5    Q.    Okay.  So are you testifying about something that occurred

6    and was not memorialized in a report, or are you testifying

7    this instruction happened after October 5th?

8    A.    We told Mr. Singer to be honest.

9    Q.    I'm not asking that.  I'm asking you, are you referring to

03:05 10   something that occurred after October 5th or before

11   October 5th?

12   A.    I don't recall the date.

13   Q.    Okay.  So you don't know if you gave him the instruction

14   not to delete text messages prior to October 5th, correct?

15   A.    I don't recall the date.

16   Q.    Okay.  And is it your view that the interview reports

17   written in this case are thorough and contain all the relevant

18   information stated at the events?

19   A.    Yes.

03:05 20   Q.    So if it's not in the report, would it be your view it

21   didn't happen?

22         MR. FRANK:  I'll object, your Honor.  He asked about

23   the interview reports.

24         THE COURT:  Sustained.

25   Q.    Okay.  And whether you instructed him or not, looking back

1    on it, do you agree with me it was a colossal mistake to leave

2    Mr. Singer with his phone for two weeks and not to copy it?

3    A.    There was no reason to believe that Mr. Singer was going

4    to delete messages, so there was no reason to believe that he

5    was going to delete any messages, so we didn't image his phone

6    at that time and we imaged it the next time he came to Boston.

7    Q.    Was it a conscious decision not to image his phone or was

8    it just overlooked?

9    A.    I don't know why we didn't image his phone the first day,

03:06 10   the first weekend he was here, but we imaged his phone the next

11   time he came to Boston.

12   Q.    You were with him multiple times on his trip to Boston and

13   your trip to California, correct?

14   A.    Correct.

15   Q.    At no point in that two week period did anybody take

16   custody of his phone, correct?

17   A.    Correct.

18   Q.    And you're testifying there was no reason to think that

19   you needed to secure that phone from Mr. Singer's possession?

03:06 20   A.    We did not secure the phone until October.

21   Q.    That's not my question.  My question is, you just

22   testified you didn't think there was any reason that you needed

23   to secure the phone.

24   A.    We had no reason to believe that Mr. Singer was deleting

25   text messages.

```
 1    Q.   Well, you know he's engaged in fraud, correct?

 2    A.   Correct.

 3    Q.   You know he's engaged in bribery, correct?

 4    A.   Correct.

 5    Q.   You know he's engaged in tax evasion, correct?

 6    A.   Not specifically tax evasion, but tax crimes.

 7    Q.   Tax crimes.  You know he's defrauding many of the parents

 8    that work with his company, correct?

 9    A.   No.

10    Q.   Your position is he didn't defraud anybody?  He didn't

11    defraud any of the parents?

12              MR. FRANK:  Objection to her position.

13              MR. KENDALL:  Okay.  Strike that.

14              THE COURT:  Sustained.

15    Q.   Your knowledge after listening to that wiretap for

16    four months and doing your investigation was Mr. Singer had not

17    defrauded any of the parents?

18    A.   He kept some of the money for himself and didn't tell the

19    parents.

20    Q.   Is that called fraud?

21              MR. FRANK:  Objection to the legal definition.

22              THE COURT:  Sustained.

23    Q.   Okay.  I'm not asking for a legal definition, just a

24    practical definition.  If you take money from people and keep

25    it for yourself and not use it for the purpose you told them,
```

 1    would you call that a fraud, a theft, a something?

 2              MR. FRANK:  Objection.

 3              THE COURT:  She can have that question.

 4    A.   I would call it a lie.

 5    Q.   Okay.  It's a lie that got him money, correct?

 6    A.   A lie.  He kept some of the money, yes.

 7    Q.   Well, no.  He lied to people to get their money and kept

 8    it for himself, correct?

 9              MR. FRANK:  Objection.

03:08 10          THE COURT:  Overruled.

11    A.   Mr. Singer conspired with parents to describe --

12    Q.   I'm not asking you that.  Answer my question and not just

13    give your own view of the overall case.

14              MR. FRANK:  Your Honor, he asked a question.  She's

15    entitled to answer it.

16              MR. KENDALL:  I'll retract it and rephrase it.

17    Q.   Do you agree with me Mr. Singer took money from parents

18    under false pretenses and kept it for himself?

19    A.   Mr. Singer kept some --

03:08 20     Q.   Can you tell me yes or no?

21    A.   Mr. Singer kept some of the money, yes.

22    Q.   Okay.  So you're saying -- how long have you been an

23    agent, a CID agent?

24    A.   Approximately 13 years.

25    Q.   So you're -- back at that time it was 11 years?

```
  1   A.    Yes.
  2   Q.    So you're telling us, based upon your 11 years of
  3   experience, knowing Mr. Singer's activities, you didn't think
  4   there was any reason to be concerned that he might delete some
  5   text messages if you left him with the phone for two weeks,
  6   correct?
  7            MR. FRANK:  Objection.
  8            THE COURT:  Overruled.
  9   A.    At that point there was no reason to believe Mr. Singer
 10   was deleting his text messages, or if he was going to delete
 11   text messages.
 12   Q.    And you trusted him?
 13   A.    At that point Mr. Singer said he would work with the
 14   government and we trusted him.
 15   Q.    Okay.  And you know at that time Mr. Singer was involved
 16   in money laundering with his brother Cliff Singer, correct?
 17            MR. FRANK:  Objection.
 18            THE COURT:  Sustained.
 19   Q.    During -- when you were doing the wiretap and Rudy
 20   Meredith was recording calls with Mr. Singer, he admitted that
 21   he was doing money laundering with his brother, correct?
 22            MR. FRANK:  Objection.
 23            THE COURT:  She can answer that question.
 24   A.    I don't recall the specific conversation that Mr. Singer
 25   had.
```

1    Q.   Do you recall generally that he discussed that with Rudy

2    Meredith?

3    A.   I don't recall that.

4    Q.   Okay.  Would you like us to -- if we showed you the

5    transcript of the tape, would that help refresh your

6    recollection?

7    A.   Yes.  It might.

8         MR. KENDALL:  Okay.  If we could do that, please.

9    Q.   Because you would agree, one of your jobs in this case was

03:10 10   to investigate money laundering as part of the case, correct?

11   A.   Yes.

12   Q.   And that's money laundering by Mr. Singer, correct?

13   A.   Correct, and others.

14   Q.   Okay.  And you're telling us, given that that was part of

15   the job that you explained when Mr. Frank had you on direct,

16   you'd have no memory of a tape in which Mr. Singer is

17   describing money laundering activities?

18   A.   I don't recall after all these years.

19   Q.   Would it be fair to say then if you don't recall it, you

03:11 20   certainly never investigated it, correct?

21   A.   No.  This happened in 2018.  I don't recall every single

22   conversation Mr. Singer had and everything that he said in the

23   conversations.

24   Q.   You agree with me, though, that when agents bring in a

25   person to make them a confidential informant, they're supposed

1    to debrief them about all of the criminal activity that they

2    know about, correct?

3    A.    Debrief about criminal activity that they know about, yes.

4    Q.    So you want the informant to tell you everything that

5    they're involved in criminal activity so you know what the

6    issues are with the informant, correct?

7    A.    Yes.   That's important.

8    Q.    So that's important protocol for both the IRS and the FBI,

9    correct?

03:11 10   A.    Yes.

11   Q.    You can't turn a blind eye to some of the informant's

12   criminal activity, correct?

13   A.    That's correct.

14   Q.    Okay.   That would be a violation of both IRS and FBI

15   regulations on investigations, correct?

16            MR. FRANK:   Objection.

17            THE COURT:   Overruled.

18            MR. FRANK:   I object at least to the FBI regulations.

19            MR. KENDALL:   I'll rephrase, your Honor.

03:12 20   Q.    Okay.   That certainly would be a violation of IRS

21   regulations on how to handle an informant, correct?

22   A.    Yes.   You want to know the criminal activity of the

23   informant.

24   Q.    You want the informant -- you want to debrief the

25   informant on it, correct?

1    A.    Yes.

2    Q.    And you don't want the informant to think that you're

3    going to turn a blind eye and let him get away with it,

4    correct?

5    A.    Correct.

6    Q.    You've got to keep control of the informant, correct?

7    A.    We want to find out what the criminal activity of the

8    informant has been a part of.

9    Q.    And you don't want them doing things that you haven't

03:12 10   authorized?

11    A.    That's correct.

12    Q.    Okay.  Could you take a look at Exhibit 1491 -- excuse

13    me -- 1491A, this transcript and read it and tell us --

14          MR. FRANK:  Can we have a copy, Mr. Kendall?

15          THE COURT:  Copy for counsel.

16    Q.    If we could go to pages five to six, please.  If we go to

17    the bottom of page 5, please, and go over to six then.  Okay.

18          MR. KENDALL:  Page 6 in the middle, if you could

19    highlight that, Mr. Carter, where it says "RM how".  And if you

03:13 20   could go down the rest of that page.

21    Q.    If you could read that and tell us if that refreshes your

22    recollection.  Tell us when you're finished with that, and

23    we'll go further down so you can read the rest of it.

24    A.    This refreshes my memory, yes.

25    Q.    Okay.  So you were on notice at the time you debriefed

        1    Mr. Singer in September that he had been discussing he was

        2    involved in money laundering with his brother, correct?

        3    A.    I recall that conversation that he had with Mr. Meredith.

        4    Q.    Okay.  And do you recall another one he had with somebody

        5    up at the basketball facility in Oakland, Mark Olivier?

        6    A.    You have to be more specific because he's had a lot of

        7    calls with him.

        8    Q.    How he was going to pay for three to $400,000 worth of

        9    renovations in the locker room?

03:15  10    A.    I don't recall that specific.

       11    Q.    Okay.  But you'd agree with me you were on notice as of

       12    September 21 that Mr. Singer had been discussing money

       13    laundering with his brother, correct?

       14    A.    He was discussing the credit card fraud that his brother

       15    was running.

       16    Q.    Credit card fraud is a credit card processing for gambling

       17    overseas.

       18    A.    That's what he was discussing on the phone.

       19    Q.    Yeah.  His brother would run a credit card processing

03:16  20    company for --

       21          MR. FRANK:  I object to the testimony.

       22          THE COURT:  Sustained.

       23    Q.    That's your understanding, that his brother was running --

       24          MR. FRANK:  I object, your Honor.

       25          THE COURT:  Sustained.

```
 1              MR. FRANK:  If this line of inquiry is going to go
 2       further, I object on the basis that it's misleading and would
 3       request a sidebar.
 4              THE COURT:  Go forward.
 5       Q.   Okay.  So you testified just a few moments ago that as
 6       part of bringing a person in as an informant, the expected
 7       practice is to brief them -- to debrief them about all their
 8       criminal activities, correct?
 9       A.   Yes.
03:16 10  Q.   You never debriefed Mr. Singer about what he discussed in
11       that phone call with Rudy Meredith, correct?
12       A.   Correct.
13       Q.   So Mr. Singer discussed being involved in money laundering
14       with his brother --
15              MR. FRANK:  Objection.
16       Q.   -- and you never debriefed him on it?
17              MR. FRANK:  Objection.
18              THE COURT:  Sustained.
19       Q.   Do you think that was the correct way to prepare somebody
03:17 20  to become an approved informant for law enforcement?
21              THE COURT:  Sustained.
22       Q.   Okay.  Was it purposeful that you didn't ask him these
23       questions?
24              MR. FRANK:  Objection.
25              THE COURT:  Sustained.
```

1    Q.    Okay.  Could you tell us why didn't you ask him about this

2    activity?

3              MR. FRANK:  Objection.

4              THE COURT:  Sustained.

5              MR. KENDALL:  Your Honor, if I may be heard?

6              THE COURT:  Move forward.

7              MR. KENDALL:  Okay.

8    Q.    Now, I want to go to the few weeks prior to the

9    September 21 initial discussion with Mr. Singer.  You had

03:18 10    understood that many of Mr. Singer's clients were not involved

11    in criminal activity, correct?

12    A.    Mr. Singer had clients that were not involved in the

13    criminal activity, correct.

14    Q.    As part of your investigation of this case, did you see

15    the customer list from The Key Foundation?

16    A.    Can you be more specific on that?

17    Q.    There's a list of 1,700 names and it's called "Customer

18    List."  Did you see it?

19              MR. FRANK:  Objection to the testifying.

03:18 20              THE COURT:  Sustained.

21    Q.    Did you see a document that was called "Customer List"?

22    A.    I don't recall off the top of my head.  I've seen a lot of

23    documents in this investigation.

24    Q.    Well, as part of your investigation, would it be important

25    for you to look for the customer list and to see who the

1    customers were?

2    A.   I didn't see the documentation.  Someone on my team could

3    have seen that document.

4         MR. KENDALL:  If I can just have Exhibit 8189 and see

5    if this refreshes her recollection.

6    Q.   You see 8189?  All the subsequent pages are not much

7    different.  Looking at this, does this refresh your

8    recollection that you've ever seen this document before?

9    A.   No.  I've not seen this document.

03:19 10  Q.   Okay.  So it would be fair to say, in the three years

11   you've been investigating Mr. Singer, you never made it a point

12   to look for his customer list, correct?

13   A.   I specifically did not look for a customer list.

14   Q.   Okay.  And you never asked anybody on your team if they

15   ever looked for a customer list?

16   A.   I never discussed the customer list with anybody on my

17   team.

18   Q.   Okay.  Would you agree with me that he has at any one time

19   more than 100 customers a year?

03:19 20  A.   I don't recall the exact amount, but he had legitimate

21   customers as part of his college counseling business.

22   Q.   Okay.  And based upon your investigation, you know that he

23   told parents that the side-door donations were going to a

24   program at the school, correct?

25   A.   That was Mr. Singer's pitch, that there was donations

1   going to a program.

2   Q.   Okay.  And he told you that for many of the parents he

3   never said that there was a bribe going to anyone, correct?

4             MR. FRANK:  Objection.  Hearsay.

5             THE COURT:  Sustained.

6             MR. KENDALL:  I just want the state of mind, your

7   Honor, for the consensual instructions.

8   Q.   The point being you spoke to Mr. Singer about what types

9   of things he should say to John Wilson on the consensual wires,

03:20 10   correct?

11   A.   We gave instructions to Mr. Singer to say to a number of

12   parents, including Mr. Wilson.

13   Q.   Okay.  And he told you with respect to Wilson that he had

14   never used the word "bribe" with him, correct?

15   A.   I don't remember him specifically saying specific to

16   Mr. Wilson.  I do know Mr. Singer did not use the word "bribe"

17   when he was discussing the side door.

18   Q.   And he told you that he did not want to use the word

19   "bribe" in the consensuals because he had never talked like

03:21 20   that with Mr. Wilson before, correct?

21   A.   That he had not talked to parents using the word "bribe".

22   Q.   Well, he spoke -- on the consensuals, he used the word

23   "bribe" with some parents, didn't he?

24   A.   One parent in particular at our direction he used the word

25   "bribe".  It was a parent that he never worked with before.  It

```
 1   was the first time.  They were working on the side door
 2   together.
 3   Q.   That was Nazie Saffari, correct?
 4   A.   Yes.
 5   Q.   And he said explicitly to her, this is a bribe for the
 6   coach, correct?
 7   A.   Correct.
 8   Q.   "The coach needs the money.  It's a bribe for the coach."
 9   A.   Correct.
10   Q.   And she said, "Okay.  What are the wiring instructions",
11   correct?
12   A.   Correct.
13   Q.   You never told him to talk like that to John Wilson,
14   correct?
15   A.   Mr. Singer's relationship with John Wilson in the past
16   with the side door, they did not talk explicitly "bribe," so we
17   instructed Mr. Wilson to use "payment to a coach."
18   Q.   He had never paid a coach either, correct?
19   A.   The payment -- the payment he made for Johnny went to the
20   water polo program.
21   Q.   Except for the amount of money that Mr. Singer kept for
22   himself, correct?
23   A.   Correct.
24   Q.   And so when you're introducing the phrase "pay the coach",
25   did you think that would show a willingness to pay a bribe to a
```

```
 1   coach?
 2              MR. FRANK:  Objection to what she thought.
 3              THE COURT:  Sustained.
 4   Q.   Okay.  What was the purpose of picking the phrase "payment
 5   to the coach"?
 6   A.   Mr. Singer was reluctant to use the word "bribe", so we
 7   said "payment to a coach" so he then would be explicit and the
 8   parents could not use the cover story that it was a donation.
 9   Q.   Well, you can't give the donation check to the coach?
10   A.   You can give a donation check to a coach.
11   Q.   Yeah.  And then the coach can give it to the school and
12   deposit it into the school account?
13   A.   Correct.
14   Q.   And that would be a payment to the coach, correct?
15   A.   The purpose of this call --
16   Q.   If you could just answer my question.  That would be a
17   payment to the coach, correct?
18   A.   You could make a payment to a coach that the coach puts
19   into a program.
20   Q.   You could make that payable to the USC Water Polo Fund to
21   the coach.  The coach can give it to the business office and
22   that could be a payment to the coach, correct?
23   A.   That's not what --
24   Q.   Answer my question, please.
25   A.   -- what the instructions were, but that could be one
```

```
  1   interpretation.
  2   Q.   Okay.  And you knew -- strike that.
  3        And the fact that Mr. Singer in this three months of
  4   conversations and three months of communications never once
  5   said the word "bribe" is because you told him he shouldn't use
  6   that word, correct?
  7   A.   That's not correct.
  8   Q.   He said he didn't want to use it and you agreed with him?
  9   A.   That's not correct.
03:24 10   Q.   You could have at any time told Mr. Singer lay it out
 11   there, tell Wilson it's a bribe to get his kids into school,
 12   use the B word.  You could have instructed to him any time to
 13   use the bribe, correct?
 14   A.   Mr. Singer was reluctant to use the word "bribe."
 15   Q.   I'm not asking what he's reluctant.  I'm asking what you
 16   could have instructed him if he -- using law enforcement
 17   enforcement.
 18            MR. FRANK:  I object to the yelling.
 19            THE COURT:  Sustained.
03:24 20            MR. KENDALL:  Okay.  I'll try to be softer, your
 21   Honor.
 22            THE COURT:  Sustained.
 23   Q.   But if you could answer my question, please.  You were
 24   telling him what to say to various parents, correct?
 25   A.   Yes.
```

```
 1    Q.   In the law enforcement/informant relationship, you could
 2    have told him on a call to John Wilson, I want you to say we're
 3    going to pay a bribe to the coach.  You had the authority to do
 4    that, correct?
 5    A.   We could have told Mr. Singer to say that.
 6    Q.   And you never did?
 7    A.   We told Mr. Singer to say "bribe" --
 8    Q.   If you could answer my question.
 9    A.   No.  That's not correct.
10    Q.   You never did.
11         You told Mr. Singer to say "bribe" to Mr. Wilson?
12    A.   We told Mr. Singer to use the word "bribe" in some
13    conversations and he was reluctant to do so, so it was "payment
14    to the coach".
15    Q.   Well, who's running this investigation, Mr. Singer or the
16    FBI and IRS?
17    A.   We're running the -- the FBI and the IRS are running the
18    investigation.  Mr. Singer was very reluctant to say the things
19    that we wanted him to say.
20    Q.   So you let him veto who would hear the word "bribe" and
21    who wouldn't?
22    A.   We directed Mr. Singer to make calls and say "payment to
23    the coach", and he did.
24    Q.   But that's not my question.  That's not the question I was
25    asking.  You have the authority to direct him to say what you
```

1    want to each parent, correct?

2    A.    Yes.

3    Q.    You knew from the wiretap that you had a September 15th

4    call that showed how Mr. Wilson discussed things with

5    Mr. Singer, correct?

6    A.    Yes.

7    Q.    And in that September 15th call, there's no use of the

8    word "bribe", correct?

9    A.    Correct.

03:26  10    Q.    There's no use of the word "false profile", correct?

11    A.    Correct.

12    Q.    There's no use of the phrase "fake athlete", correct?

13    A.    Not that specific term, but there was a reference to one

14    of his daughters was a sailor, even though she didn't sail.

15    Q.    Mr. Singer made some reference along those lines.

16    Mr. Wilson never used those words, correct?

17    A.    Mr. Singer said that.

18    Q.    Okay.  So when you told Mr. Singer, we want you to use the

19    word "bribe", he wouldn't do it with Mr. Wilson, correct?

03:26  20    A.    He was reluctant to do it with any of the parents.

21    Q.    Well, he certainly wouldn't do it with Mr. Wilson,

22    correct?

23    A.    He did not do it with Mr. Wilson.

24    Q.    Okay.  Did you tell him we make the decisions in this

25    investigation, we're instructing you, go in and use the word

```
 1   "bribe" with Mr. Wilson?  Did you ever say that to him?
 2   A.   Not directly say that to Mr. Singer, but we also wanted
 3   his calls to sound -- not sound rehearsed and not sound like
 4   Mr. Singer was forced to say something.
 5   Q.   And not sound criminal?
 6           MR. FRANK:  Objection.
 7           THE COURT:  Sustained.
 8   Q.   You know, in all the calls that you had Mr. Singer do with
 9   Mr. Wilson, he never once used the word "bribe", correct?
10   A.   Correct.
11   Q.   He never once said, "I am going to make a fake profile",
12   correct?
13   A.   He never said the term "fake profile".
14   Q.   He never said, "We're going to have to falsify erg times
15   for your daughters", correct?
16   A.   Correct.
17   Q.   He never said, "I'm going to create false credentials and
18   make them look like championship sailors when they're not",
19   correct?
20   A.   He made references that he was getting them admitted as
21   fake athletes and that he was going to sell them as athletes.
22   Q.   Did he use the word "fake athletes"?  Does that appear in
23   any of the tapes?
24   A.   "Sell them as athletes."
25   Q.   He talked about the girls being a manager, correct?
```

1    A.    He mentioned a manager in one of the calls.

2    Q.    More than one of the calls?

3    A.    I recall one of the calls.

4    Q.    Okay.  And Mr. Wilson raised that several times, didn't

5    he?  You know, the girl who's a sailor would be better at

6    Stanford so she won't look like a fool and be embarrassed that

7    she doesn't know anything about sailing when she's there as

8    part of the team?  He's talking along that way, isn't he?

9    A.    He mentions that his daughter was a sailor at the yacht

03:28 10   club.

11   Q.    No.  He mentioned that she was -- the daughter who knew

12   about sailing would be a better fit to be part of the sailing

13   team as a manager?

14   A.    I'd have to look at the transcript.

15              MR. FRANK:  Objection.  Misstates.

16              THE COURT:  Sustained.  And we're going to take a

17   break at this stage.

18              Miss Keating, you may step down.

19              We're going to recess for the day, jurors.  I'm going

03:29 20   to see you tomorrow morning.  We'll have a full day tomorrow.

21   I'm hopeful at the end of the day I'll be able to give you some

22   guidance about the remainder of this trial.  I'm going to talk

23   to the attorneys about that and, at the end of the session

24   tomorrow, I think I'll have some better information to further

25   inform you.

```
 1              Just for your information, we will have a full week

 2    next week, but we will not have a session on Thursday.

 3    Thursday will be our day off.  I have other business that I

 4    have, preplanned judicial business that I have to attend to.

 5    So we'll go Monday, Tuesday, Wednesday and Friday next week.

 6              Now we're off until tomorrow morning 9:00 a.m.  Please

 7    don't talk about the case with anybody else, or do any

 8    independent research.  You know the reasons why.  I'll see you

 9    tomorrow morning at 9:00 a.m.  Have a pleasant rest of the day.

03:30 10            THE CLERK:  All rise for the jury.

11              (Jury exits.)

12              THE COURT:  Be seated, counsel.

13              Approximately, how much longer on cross, Mr. Kendall?

14              MR. KENDALL:  It's hard for me to say, your Honor, but

15    I expect I will go at least to the break tomorrow.

16              THE COURT:  You mean until 11 o'clock?

17              MR. KENDALL:  At least until 11 o'clock.  I may go

18    past that.  I've got to just look at things and try to trim

19    things.

03:31 20            THE COURT:  All right.  And then if we get that far?

21              MR. FRANK:  Your Honor, we have a concern about that

22    because we have a witness who's been here from California away

23    from her 5-year-old daughter all week waiting to testify.  We

24    actually brought in an additional witness from California

25    yesterday because we were advised by counsel that we might be
```

1    done by the end of the day today.  Our time has not gone longer

2    than we predicted with this witness.  Now we're way into the

3    day tomorrow, and it's not clear that these witnesses are going

4    to get on, much less at all, which is a concern.

5              THE COURT:  You have two witnesses from California?

6              MR. FRANK:  Yes, your Honor.

7              THE COURT:  And their direct exams will be how long?

8              MR. FRANK:  One will be an hour and 15 minutes

9    approximately.  One will be shorter than that.

03:31 10             THE COURT:  Ad who are they?

11             MR. FRANK:  They are Laura Janke and Aaricka Hughes.

12             THE COURT:  I'm sorry?

13             MR. FRANK:  Aaricka, A-a-r-i-c-k-a, Hughes.

14             THE COURT:  Miss Hughes.

15        Well, I am perfectly agreeable to taking witnesses out

16   of order if they're in the government's case.

17             MR. FRANK:  I understand that and I appreciate that,

18   your Honor.  We prefer not to do that.  We prefer to be done

19   because it would be quite disruptive to be out of order.

03:32 20             MR. KENDALL:  Your Honor, Mr. Frank said 45 minutes --

21             THE COURT:  What's that?

22             MR. KENDALL:  Mr. Frank predicted 45 minutes.  Then he

23   took an hour and 45.  I don't dispute that.  He has to put on

24   his case, but I've got to respond to something of that length.

25   He went through every tape.  I've got to go through every tape.

```
 1    I've got to match him for whatever he covers.
 2           MR. FRANK:  To be clear, I said this witness would be
 3    two and a half to three hours, and she was 2 hours and
 4    40 minutes -- Defense said they would be an hour and 15
 5    minutes, and it's been precisely an hour and 15 minutes.
 6           MR. KELLY:  Your Honor, I'm not going to get into a
 7    back and forth about time, but look, the government blocked us
 8    from finishing up Miss Sanford.  She's got to come back from
 9    Georgia.  The government blocked us from a few questions of one
10    of the agents.  He's got to come back.  We'll try to move this
11    as expeditiously as possible and we'll try to move it forward
12    quickly tomorrow as well.
13           MR. KENDALL:  Your Honor, my understanding is
14    Miss Hughes is probably a very short witness.  I have to
15    discuss with Mr. Kelly.  Miss Janke is someone who is in a Plea
16    Agreement and is in much more control of the government.
17           THE COURT:  Meaning what?  You'll have a shorter
18    cross?
19           MR. KENDALL:  She'll come exactly as they want because
20    she has to curry favor with the government under the Plea
21    Agreement.
22           THE COURT:  She's from California though, right?
23           MR. KENDALL:  Yes, she is.
24           THE COURT:  All right.  I want Miss Janke to get on
25    and off tomorrow.  And if we have to go longer in the day,
```

1    maybe we'll have to do that.  You're not going to make a jury

2    very happy if you push them beyond 3:30 on a Friday afternoon,

3    but if necessary, that's what's going to happen.  So stand

4    forewarned we may have a long day tomorrow, but I'm going to

5    get Miss Janke on and off and Miss Hughes on and off tomorrow.

6    Okay?

7              We're in recess.

8              MR. FRANK:  One other slight issue, your Honor.  We

9    can discuss this at a later point if your Honor prefers.  I'm

03:34 10   concerned about an implication that Mr. Singer was allowed to

11   get away with money laundering.  In fact, Mr. Singer, as

12   counsel knows, pled guilty to money laundering conspiracy.  We

13   can't elicit that, our hands are tied, but there was certainly

14   an implication given to the jury that we let him get away with

15   it.

16             MR. KENDALL:  Your Honor, it's a different issue I'm

17   raising.  The agent testified they're supposed to have a

18   complete debriefing of the informant's criminal activities

19   before they take him on as an informant.

03:34 20             THE COURT:  Well, if you go too far, I'm going to give

21   a limiting instruction to the jury that will be drafted by the

22   government that will explain that.  So that's enough for today.

23   We're in recess.  We'll be back tomorrow morning at 9 a.m.

24             (Whereupon, the proceedings concluded at 3:34 p.m.)

25

1                          I N D E X

2     Witness                              Page

3     ELIZABETH KEATING

4     Direct Examination by Mr. Frank           5

5     Cross-Examination by Mr. Kelly           42

6     Cross-Examination by Mr. Kendall        129

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      E X H I B I T S
 2    NO.                        ADMIT
 3    591    ....................      7
 4    594    ....................     10
 5    602    ....................     14
 6    613    ....................     17
 7    623    ....................     18
 8    625    ....................     21
 9    587    ....................     26
10    621    ....................     28
11    572    ....................     32
12    620    ....................     32
13    574    ....................     36
14    596    ....................     37
15    596A   ....................     41
16    272    ....................     41
17    1364   ....................     54
18    549    ....................    100
19    1482A  ....................    120
20
21
22
23
24
25
```

1    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8            We, Kristin M. Kelley and Kelly Mortellite, certify

9    that the foregoing is a correct transcript from the record of

10   proceedings taken September 23, 2021 in the above-entitled

11   matter to the best of our skill and ability.

12

13

14       /s/ Kristin M. Kelley          September 23, 2021

15       /s/ Kelly Mortellite           September 23, 2021

16       Kristin M. Kelley, RPR, CRR          Date
         Kelly Mortellite, RMR, CRR
17       Official Court Reporter

18

19

20

21

22

23

24

25