```
 1

 2                      UNITED STATES DISTRICT COURT
                          DISTRICT OF MASSACHUSETTS
 3


 4
     UNITED STATES OF AMERICA,          )
 5                       Plaintiff      )
                                        )
 6   vs.                                ) No. 1-19-CR-10080
                                        )
 7   GAMAL ABDELAZIZ and JOHN           )
     WILSON,                            )
 8                       Defendants.    )
                                        )
 9                                      )



10


11
                   BEFORE THE HONORABLE NATHANIEL M. GORTON
12                       UNITED STATES DISTRICT JUDGE
                             JURY TRIAL - DAY 11
13


14
                 John Joseph Moakley United States Courthouse
15                            Courtroom No. 4
                             One Courthouse Way
16                        Boston, Massachusetts 02210


17


18                          September 24, 2021
                                9:06 a.m.
19


20


21
                       Kristin M. Kelley, RPR, CRR
22                       Kathy Silva, RPR, CRR
                           Official Court Reporter
23             John Joseph Moakley United States Courthouse
                      One Courthouse Way, Room 3209
24                    Boston, Massachusetts 02210
                         E-mail: kmob929@gmail.com
25
                   Mechanical Steno - Computer-Aided Transcript
```

```
 1    APPEARANCES:

 2

 3            Stephen E. Frank

 4            Ian J. Stearns

 5            Leslie Wright

 6            Kristen Kearney

 7            United States Attorney's Office

 8            1 Courthouse Way

 9            Suite 9200

10            Boston, MA 02210

11            617-748-3208

12            stephen.frank@usdoj.gov

13            for the Plaintiff.

14

15

16            Brian T. Kelly

17            Joshua C. Sharp

18            Lauren Maynard

19            Nixon Peabody LLP

20            100 Summer Street

21            Boston, MA 02110

22            617-345-1000

23            bkelly@nixonpeabody.com

24            for Gamal Abdelaziz.

25
```

```
 1    APPEARANCES:

 2

 3           Robert L. Sheketoff

 4           One McKinley Square

 5           Boston, MA 02109

 6           617-367-3449

 7           sheketoffr@aol.com

 8           for Gamal Abdelaziz.

 9

10

11           Michael Kendall

12           Lauren M. Papenhausen

13           White & Case, LLP

14           75 State Street

15           Boston, MA 02109

16           617-939-9310

17           michael.kendall@whitecase.com

18           for John Wilson.

19

20

21

22

23

24

25
```

```
1    APPEARANCES:

2

3              Andrew E. Tomback

4              McLaughlin & Stern, LLP

5              260 Madison Avenue

6              New York, NY 10016

7              917-301-1285

8              atomback@mclaughlinstern.com

9              for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  You may be seated.  Court is now in
 3   session.
 4            THE COURT:  Good morning, jurors.  Welcome back.
 5   We're ready to go back to work.
 6            Miss Keating, you're reminded again that you remain
 7   under oath.
 8            Mr. Kendall, you may continue with cross-examination.
 9            MR. FRANK:  Thank you, your Honor.
10   BY MR. KENDALL:
11   Q.   Miss Keating, good morning.
12   A.   Good morning.
13   Q.   Yesterday you told us that, as part of your work in
14   preparing to have your investigative plan, you reviewed the tax
15   filings of the Key Foundation.  Do you remember that?
16   A.   Yes.
17   Q.   Okay.
18            MR. KENDALL:  Can we have Exhibit 9767 on the screen,
19   please.
20            MR. FRANK:  For the witness only?
21            MR. KENDALL:  Do you -- just for the witness only.
22   Q.   Do you recognize this document?
23   A.   Yes.
24   Q.   Okay.  And what is it?
25   A.   It is IRS "e-file Signature Authorization for an Exempt
```

1  Organization".

2  Q.  Okay.  And you don't have a paper copy.  We'll show you

3  the back here.  We'll show you the second page as well.  If you

4  could look at the top left corner.

5  A.  Yes.

6  Q.  And what is this document?

7  A.  It's a Form 990, Return Of Organization Exempt From Income

8  Tax.

9  Q.  And for what entity is it?

09:09 10  A.  The Key Worldwide Foundation.

11  Q.  And what year?

12  A.  2014.

13        MR. KENDALL:  Your Honor, I'd like to offer 9767 into

14  evidence, please.

15        THE COURT:  It will be admitted.

16        (Exhibit 9767 admitted into evidence.)

17        MR. KENDALL:  If we could show everybody.

18  Q.  Okay.  I'd like to start on the first page and have you

19  help us go through this tax form.  The first page is simply for

09:09 20  e-filing.  You can file electronically instead of via paper,

21  correct?

22  A.  Correct.

23  Q.  Okay.  And if we look in the middle of the first page

24  where it says "I authorize X", it says "Williams and Olds,

25  CPA", correct?

1    A.    Correct.

2    Q.    That's a CPA firm that did the accounting work for both

3    the foundation and Mr. Singer's business, correct?

4    A.    Correct.

5    Q.    Okay.  Could we then turn to page 2.  And this is the

6    actual Form 990 tax return, correct?

7    A.    Correct.

8    Q.    And whenever you say Form 990, that means it's a nonprofit

9    organization that is filing the document?

09:10 10    A.    Correct.

11    Q.    Only charities file this that are approved to get tax

12    deductible donations?

13    A.    Correct.

14    Q.    Like a business couldn't file it, correct?

15    A.    Correct.

16    Q.    Thank you.

17          And if we could go to the top right corner there, you

18    see the "2014"?  Is that the tax year?

19    A.    Yes.

09:10 20    Q.    Which is also the calendar year?

21    A.    I believe so, but --

22    Q.    It doesn't say?

23    A.    It doesn't specifically say.

24    Q.    But if we look under "A", it says, "for the 2014 calendar

25    year, or tax year beginning" and blank.  So, by default, you

1    would assume it's the calendar year, correct?

2    A.    Correct.

3    Q.    And then if we look right under the 2014 date under -- it

4    says "Open to Public Inspection".  These Form 990s are put on

5    the IRS website, correct?

6    A.    A portion of the forms.  A portion of the 990 is put on

7    the public, the IRS website, yes.

8    Q.    And the IRS does that, for one purpose, to make them

9    available to taxpayers and their tax preparers, correct?

09:11 10   A.    Correct.

11    Q.    It's a resource that the tax preparer and the taxpayer can

12    rely on when they're filling out their tax return?

13            MR. FRANK:  Objection to rely.

14            THE COURT:  Sustained.

15    Q.    Okay.  It's a statement that the entity that's filing the

16    990 is an approved 501(c)3 organization, or it has an

17    application pending, correct?

18    A.    Correct.

19    Q.    And the IRS will indicate whether it's approved or whether

09:11 20   it's pending, correct?

21    A.    Correct.

22    Q.    Thank you.

23            Now, if we could go down to "Part I Summary".

24            MR. KENDALL:  And if you could just, Mr. Carter is

25    highlight the typed in sentence beginning with "The Key

1  Worldwide".

2  Q.   And could you read that to us, please.

3  A.   "The Key Worldwide Foundation endeavors to provide

4  education that would normally be unattainable to

5  underprivileged students, not only attainable but realistic.

6  With programs that are designed to assist young people in every

7  day situations and educational".

8  Q.   They didn't finish the sentence?

9  A.   It appears that way.

09:12 10  Q.   If we can go to the bottom of that page and just show the

11  signature line, whose names are there?  We see it's Rick

12  Singer, Executive Director, and James B. Williams CPA, correct?

13  A.   Correct.

14       MR. KENDALL:  I'd like to go to page 3, please,

15  Mr. Carter, and if we could go to 4C at the bottom of the page

16  3 and if you could highlight the typed stuff.

17       It says "expenses of 1846."  And can you list the

18  entities down there?

19  A.   Better LA Program.

09:13 20  Q.   And then can you read the rest of that, please?

21  A.   "As a result of the efforts by Joel Margulies and Olga

22  Serverina, the foundation hosted 39 students at a one week

23  entrepreneurial program for high school students at UCLA.

24  These students were identified and placed by the 1736 Family

25  Crisis Center in Los Angeles.  There was no cost to the

1    students".

2    Q.    Okay.  If we could go to page 11, please.  Do you

3    understand what page 11 is, "Part IX Statement of Functional

4    Expenses"?

5    A.    It lists the expenses of the organization.

6    Q.    Okay.  And if we could go to line 13, Mr. Carter, and if

7    you can just highlight that, please.  That's "Office Expenses"?

8    A.    Correct.

9    Q.    And you agree with me that the organization doesn't list

09:14 10   anything for "office expenses"?

11   A.    Correct.

12   Q.    You know, people can make a contribution to a 501(c)(3),

13   such as this one, by writing a check, is that correct?

14   A.    Correct.

15   Q.    Can even give cash?  They can take greenbacks, correct?

16   A.    Correct.

17   Q.    They can also make a noncash contribution, correct?

18   A.    Correct.

19   Q.    You could say, pay the expenses of the office staff and

09:14 20   contribute the work of the office staff that you paid for,

21   correct?

22         MR. FRANK:  Objection, beyond the scope.

23         THE COURT:  Overruled.

24   A.    Correct.

25         MR. KENDALL:  Okay.  Could you bring up Exhibit 112,

1   please, Mr. Carter.

2   Q.   This is an e-mail that's in evidence.  If you can take a

3   look in the middle e-mail -- well, let's go to the bottom.

4        MR. KENDALL:  Work a little further up.  I'm sorry.

5   Let's go to the second e-mail.  If you can highlight March 31,

6   2014, at 7:03 p.m., the message from Debbie Rogers.

7   Q.   She says, "I contacted Rick and he directed me to Steve.

8   Per Steve 100K will be to his foundation, 100K an invoice from

9   The Key and 20K to Rick Singer.  Since you said 200K, we're at

09:15 10   220K, is this a moving target?"

11        MR. KENDALL:  Then if we can highlight the response

12   from Mr. Wilson.

13   Q.   What does he write?

14   A.   "Yes, I added $20,000 for his expenses".

15        MR. KENDALL:  Okay.  Could we have Exhibit 118 in,

16   please?  Excuse me.  Can you show, the witness, only 118?

17   Q.   This is an e-mail.  Have you seen this before?

18   A.   No.  I've not seen this e-mail.

19   Q.   Do you recognize this as an e-mail from Mr. Singer?

09:16 20   A.   Yes.

21        MR. KENDALL:  Okay.  Your Honor, I'd like to offer

22   this subject to our authenticity stipulation.

23        MR. FRANK:  The authenticity is not in dispute, but

24   it's a coconspirator statement.  It's not admissible to the

25   defense.

1          THE COURT:  Sustained.

2          MR. KENDALL:  Your Honor, this is on the government's

3    exhibit list.

4          MR. FRANK:  That's true, your Honor.  It's not

5    admissible to the defense.  It's hearsay.

6          THE COURT:  Sustained.

7          MR. KENDALL:  Okay.  I'd like to go back to

8    Exhibit 9767, please, and if we can go to page 23.  And you see

9    number three, if you could highlight that for us, Mr. Carter.

09:17 10   Q.   It lists a $100,000 donation from John Wilson at 2 Fleur

11   Place.  You see that?

12   A.   Yes.

13   Q.   Okay.  And then if we could go to page 26, please, and go

14   to Item 6.  And what does it list?

15   A.   USC Water Polo.

16   Q.   What's the amount of cash that it lists as a grant?

17   A.   $100,000.

18   Q.   So this filing with the IRS shows that Mr. Wilson gave

19   $100,000 to the foundation and the foundation claims it gave

09:18 20   $100,000 to USC Water Polo, correct?

21   A.   That is what's reported on the tax return.

22   Q.   But, in fact, you know from your investigation the

23   foundation didn't send the $100,000 to USC Water Polo, did it?

24   A.   Yes, it did.

25   Q.   Wasn't the $100,000 given through the for-profit company?

A.   Yes.  I believe it is, but -- you corrected me.  Yes, it was.

Q.   So there's $100,000 that Mr. Wilson gave to Mr. Singer, which Mr. Singer bought a cashier's check to his for-profit business, and he gave that to USC, correct?

A.   Correct.

Q.   And that's the one that gets back the letter from the Trojan Fund, thank you for your donation?

A.   Correct.

Q.   Okay.  He then gives a separate 100,000 that's supposed to go into the foundation, correct?

A.   He gets another $100,000, yes.

Q.   To the foundation.  And the foundation doesn't send $100,000 to USC to your knowledge, correct?

A.   Correct.

Q.   That's left for Mr. Singer to use for whatever purposes he chooses, correct?

A.   Correct.

Q.   Okay.

        MR. KENDALL:  And if we could keep going through here, I'd like to take us next to page 30.  And if we can go to the top typed section and highlight that entire paragraph that starts "The Key Worldwide Foundation".  Thank you.  Highlight that.

Q.   And if you can read that to us?

A.    "The Key Worldwide Foundation endeavors to provide
education that would normally be unattainable to
underprivileged students, not only attainable but realistic.
With programs that are designed to assist young people in every
day situations, and educational situations, we hope to open new
avenues of educational access to students that would normally
have no access to these programs.   Our contributions to major
athletic university programs may help to provide placement to
students that may not have access under normal channels".

Q.    Did the investigative team read this tax return before
they confronted Mr. Singer on September 21?

A.    I saw this tax return.

         MR. KENDALL:   And then can we turn to the next page,
please, and highlight 4d.

Q.    Could you read us what 4d states.

A.    "Financial Literacy Project: During 2013, the foundation
developed a program that can be presented to college students
and young adults that will assist them with the financial
aspects of responsible adulthood, such as the purchase of a
home, establishment and use of credit, retirement programs, et
cetera.   This program is currently on hold".

         MR. KENDALL:   Can we next go to Exhibit 7011 that's in
evidence, Mr. Carter.   And I'd like to go to page 7.   If you
could highlight that printing and call it out, please.

Q.    Could you read that to us, please?

```
 1   A.   "Dear Rick, I'm writing this e-mail today to simply say

 2   thank you.  I leave for SMU in 30 days, and I could not be more

 3   excited about moving to Dallas.  I'm positive that I would have

 4   never found such a perfect school for me if it wasn't for your

 5   guidance.  Not only did you help me through the college search

 6   and the application processes, you were also able to help me

 7   obtain a manager position on the basketball team.  I have

 8   already met some of the players and other managers and I am

 9   very excited to begin working with all of them.  I'm looking
```
09:22 10   forward to staying in touch as I go through my years as a
```
11   Mustang".

12        MR. KENDALL:  Can we go to the next page, please.  Can

13   you highlight the language under that photograph there.

14   Q.   Could you read that to us as well, please?

15   A.   "Hey Rick, I wanted to thank you personally for all your

16   help in getting me into the University of Texas in Austin and

17   for helping me secure a managers position with the UT

18   basketball team.  And, can you believe it, here is a picture of

19   me with basketball star Kevin Durant at the UT summer
```
09:22 20   basketball camp".
```
21        MR. KENDALL:  Can we go to the next page, please.

22   Next page, please.

23   Q.   And if you could -- at the bottom where it says "Dear

24   Rick", can you read that to us?

25   A.   "Dear Rick, I can't say thank you enough.  My team spent
```

1     most of the evening discussing the incredible value you

2     delivered.  Our CFO, Casey, is interested in speaking with you

3     further about his daughter.  I know you can help them as well.

4     Thanks again".

5     Q.   Who is the person who's sending it?

6     A.   Rick Nelson, CEO Director of Technology.

7          MR. KENDALL:  If we can go back in -- to the next

8     page, please.  And maybe a little further down, next page as

9     well.

09:24 10   Q.   Before -- had the investigative team read Mr. Singer's

11    website before it met with Mr. Singer on September 21?

12    A.   I read Mr. Singer's website.  I'm not sure if I read it

13    before or after.  I don't know if the team read it before or

14    after.

15    Q.   So you were -- fair to say you have no memory of being

16    aware about all these testimonials about helping people getting

17    manager positions at the time that you were directing

18    Mr. Singer on what to say to Mr. Wilson?

19    A.   At that time -- I'm not aware of when I read it.  I may

09:24 20   have read it beforehand.  I just don't recall.

21    Q.   I appreciate your candor, but I just want to be a little

22    more specific.  It would be correct to say you have no memory

23    of being aware of these manager testimonials at the time that

24    you were directing Mr. Singer's conversations with Mr. Wilson?

25    A.   I have no memory.

```
 1    Q.   You testified yesterday that Mr. Singer was reluctant to
 2    say the things we wanted him to say.  Do you remember saying
 3    that?
 4    A.   Yes.
 5    Q.   Could you tell us the things that he was reluctant to say
 6    that you wanted him to say?
 7    A.   Mr. Singer was reluctant to say, "a payment to a coach."
 8    In some situations, he was reluctant to say the word "bribe".
 9    Q.   What else?
10    A.   That's what I -- that was my -- what I recall the main
11    points were.
12    Q.   Would you agree with me that in all of the tapes with John
13    Wilson, Mr. Singer once never says something along the lines of
14    a fake profile or a false profile?
15    A.   Correct.
16    Q.   Was that his decision not to use that phrase, or was it
17    you simply didn't instruct him to use that phrase?
18    A.   Specifically with Mr. Wilson, I don't recall.  With other
19    parents, we asked Mr. Singer to say it was a payment to a
20    coach, and some of the other things we asked him to say was
21    that they would be recruited and didn't have to play,
22    admissions wouldn't know.
23    Q.   Did you have any written record of the instructions you
24    gave Mr. Singer of what to say to Mr. Wilson?
25    A.   No.
```

1    Q.    Do you have any written record of what Mr. Singer refused

2    to say to Mr. Wilson?

3    A.    No.

4           MR. KENDALL:  Your Honor, I'd like to put up

5    demonstrative K.  It's a demonstrative we have that's simply

6    verbatim quotes of government exhibits.

7           MR. FRANK:  Your Honor, may I look at it?

8           THE COURT:  Sure.  If you show it to counsel.

9           MR. KENDALL:  Yes.

09:27 10           MR. FRANK:  Is it a multipage document?

11           MS. PAPENHAUSEN:  Yes, it is.

12           THE COURT:  I need a technical break for a moment.

13           (Pause.)

14           THE COURT:  Thank you, counsel.  Go ahead.

15           MR. FRANK:  Your Honor, this is full of argument.

16    These are not simply excerpts.  There are actually headings on

17    here with defense arguments on them.

18           MR. KENDALL:  Your Honor, I have some titles, but

19    everything there is a verbatim quote.

09:29 20           THE COURT:  You want to do something like this, bring

21    it to the Court's attention before we have a jury.  I'm not

22    going to allow it in, but at a break, I'll look at it.

23           MR. KENDALL:  If I can have that back, Mr. Frank.

24    Q.    I'd like to next go to the September 15 conversation that

25    you monitored.  I'd like to just show you a couple of excerpts,

ver short excerpts from that conversations.  It's basically the

government transcript with a few statements written in red.

I'd just ask you if you can tell us if you agree with the red

corrections or not.

This is going to be exhibit -- excerpts from 561.

MR. FRANK:  Your Honor, I'd just point out, in the

interest of time, Exhibit 561 came through a different witness

who was cross-examined extensively about what was in 561.  This

witness did not testify about 561 and is now going to be

recross examined about that exhibit.  I'm just pointing it out

in the interest of time.

MR. KENDALL:  In the interest of time, I'm going to

meet the expectations, your Honor.  That's not going to be a

problem.  I'd like to just flip through a few corrections with

her in very short excerpts, your Honor, very short, two lines,

three lines.

THE COURT:  You can show her 561, but this redlined, I

don't know what you're talking about, red inserts.  You can

show her 561 and ask her about it.

MR. KENDALL:  Okay.  Well, I need to play the excerpt.

I don't have to show the jury.  I can just show her the excerpt

and then play -- I can play the excerpt and show her the

redline and see if she agrees with it.

MR. FRANK:  This is what we did with the other

witness.

```
 1              MR. KENDALL:  Your Honor, if I may proceed.
 2    Mr. Carter, could we go to 561, page 8, lines 9 through 21.  If
 3    you could just show the transcript only to the witness.  Then
 4    I'd ask that you play the excerpt.
 5              Your Honor, we have a version where we've slowed down
 6    the pace just a little bit.  We haven't altered anything.  We
 7    just played it at a slightly slower speed so people can listen
 8    better.
 9              If you'll just play those three lines, lines 19, 20,
10    21, from page 8 with the slowed down version.
11    Q.   And can you see the three line transcript?
12              THE COURT:  This is in 561?
13              MR. KENDALL:  Yes, your Honor.
14              THE COURT:  Is it in the binder?  It's not in
15    Miss Keating's binder.
16              MR. KENDALL:  It's not in Miss Keating's, no.
17    Q.   Miss Keating, do you see the three lines there with the
18    red on it?
19    A.   Yes.
20              MR. FRANK:  Our monitors are not working.
21              MR. KENDALL:  We can give the government a paper copy,
22    your Honor.
23              And if you can just play the three lines there.
24    Q.   I'd ask you to look at the red and tell us if you agree
25    with it or not.
```

```
 1              (Audio recording played.)
 2              MR. KENDALL:  I think you didn't start from the
 3     beginning, Mr. Carter.
 4              (Audio recording played.)
 5     Q.   Would you agree with me it states, "If they had a really
 6     good time, they could work on that"?
 7     A.   I'd have to hear that again.
 8     Q.   Okay.  Sure.
 9              (Audio recording played.)
10     A.   Yes.
11     Q.   Okay.  Next I'd like to go to page 16 and lines 3 to 15.
12     I'm going to play you the slowed down version and ask if you'd
13     just agree with the red words that have been typed in on top of
14     the government's transcript.
15              (Audio recording played.)
16     Q.   Do you agree that Mr. Wilson states, "That's more than
17     we'll want to go"?
18     A.   I'd like to hear that again, please.
19     Q.   Sure.
20              (Audio recording played.)
21     A.   I heard "we're willing".
22     Q.   That's probably more than?
23     A.   "We're willing to go".
24     Q.   "We're willing to go"?
25     A.   Yes.
```

```
 1   Q.   Okay.  And we'll play it one more time.  Whatever you

 2   hear, we're willing or we'll want, whatever.

 3             (Audio recording played.)

 4   A.   I hear, "willing to go".

 5   Q.   Can we just play it one more time and whatever you're

 6   comfortable with is fine.

 7             (Audio recording played.)

 8   A.   I still hear "willing".

 9   Q.   Okay.  So you hear "that's probably more than"?

10   A.   "We're willing to go".

11   Q.   "We're willing to go".  Okay.  And if we could go to the

12   page 19, lines 12 to 16.

13             (Audio recording played.)

14   Q.   Did you hear that "Are those numbers, are there anyway to

15   make those like tax deductible?  Are they donations to the

16   school and stuff?"

17   A.   Can we please play that one more time?

18   Q.   Sure.  As much as you'd like.  Whatever is good for you.

19             (Audio recording played.)

20   A.   One more time.

21   Q.   Sure.

22   A.   Thanks.

23             (Audio recording played.)

24   A.   "Are they", yes.

25   Q.   Yes.  Okay.  And did you hear, just to be grammatical,
```

```
 1    "is" versus "are"?

 2    A.    I'm sorry.  Can you repeat that?

 3    Q.    Did you also hear "is there anyway" as opposed to "are

 4    there anyway"?

 5    A.    I wasn't focusing on that.  If you want to play it again,

 6    I can listen.

 7    Q.    Sure.

 8          MR. KENDALL:  Just play that little section.

 9          (Audio recording played.)

10    A.    "Are there any way to make those".

11    Q.    Okay.  And then the last one, thank you, page 18, lines 1

12    to 8.

13          MR. KENDALL:  Excuse me.  Exhibit 571, page 18, the

14    last clip, Mr. Carter.

15    Q.    Line 8 I'm asking you to focus on.

16    A.    Sorry.  What line?

17    Q.    It will be starting on line 1.  We're going to play line 1

18    to line 8.

19          (Audio recording played.)

20    Q.    Did you hear that, "so you gotta get in there and get them

21    to try it"?

22    A.    Can you play that one more time, please.

23    Q.    Yes.  Be happy to.

24          MR. KENDALL:  You can just play line 7, 8, 9.

25          (Audio recording played.)
```

09:38 (line 10)
09:39 (line 20)

         1    A.   At the end, I hear "give it a try".

         2    Q.   "So you gotta get in there and give it a try"?

         3    A.   It's a little.

         4    Q.   Shall we play it again?

         5    A.   Yes.  Let's hear it one more time.

         6              (Audio recording played.)

         7    A.   I just hear "give it a try".

         8    Q.   "So you gotta get in there and give it a try"?

         9    A.   I just hear the "give it a try" at the end.

09:39   10    Q.   "You gotta give it a try."

        11    A.   Yeah.  They speak over each other so it's hard to hear the

        12    last part.

        13              MR. KENDALL:  Your Honor, I'd like to have a chance to

        14    adapt her to the fine points to what we presented and then

        15    offer this as an exhibit.

        16              THE COURT:  What is it?

        17              MR. FRANK:  Your Honor, transcripts are not exhibits.

        18              MR. KENDALL:  It's a chalk.

        19              THE COURT:  But they're not exhibits.

09:40   20              MR. KENDALL:  But I'd like to make this a chalk so the

        21    jury can see it later once it's adjusted.

        22              THE COURT:  Well, why don't you do that and we'll see

        23    it and talk about it outside the hearing of the jury.

        24              MR. KENDALL:  Thank you, your Honor.

        25    Q.   So the September 15th call with Mr. Wilson, which we've

|    |    |
|----|-----|
| 1 | just done some clips on.  Then there's the meeting with |
| 2 | Mr. Singer on September 21, 2018.  And you've testified about |
| 3 | that, correct? |
| 4 | A.   Yes. |
| 5 | Q.   You've seen the videotape of Mr. Meredith talking with |
| 6 | Mr. Singer, correct? |
| 7 | A.   Yes. |
| 8 | Q.   You actually were monitoring it as it was occurring, |
| 9 | correct? |

09:41 10  A.   Correct.

11  Q.   Okay.

12        MR. KENDALL:  Your Honor, I'd like to play the short

13  excerpt of that videotape from September 21 meeting with

14  Mr. Meredith and Mr. Singer.

15        MR. FRANK:  Objection.  No basis for it to come in,

16  your Honor.

17        MR. KENDALL:  Your Honor, it's not for the truth of

18  the matter asserted.  It's for the state of mind.

19        MR. FRANK:  Whose state of mind?

09:41 20        MR. KENDALL:  Mr. Singer's.  And if he's part of the

21  agreement, your Honor, the state of mind should be relevant.

22        MR. FRANK:  Objection, your Honor.

23        THE COURT:  Yeah.  We'll talk about it outside the

24  hearing of the jury, Mr. Kendall.

25  Q.   Okay.  I'd next like to turn to Exhibit 13.  We've gone

1    through some excerpts on page 1.  I'd like to actually go to

2    the page that's, if you see the number there where it says

3    "Singer-Phone".  I'd like to go to Singer-Phone 712.  If we

4    look at Singer phone 717 and look at entry 14 in the top left

5    column, and it states "created January 30, 2019" and modified

6    on the same day.  Do you see that?

7    A.    Yes.

8    Q.    So this would have been created after all of the

9    consensual calls had been made with Mr. Wilson, correct?

09:42 10   A.    Yes.

11   Q.    And if we could look there about midway down where it says

12   "John Wilson".  It says, "John Wilson 20k nothing to do with

13   USC plus donation to USC program for real polo player",

14   correct?

15   A.    Yes.

16   Q.    Now, you participated in an interview with Mr. Singer on

17   September 27, 2018, correct?

18   A.    Correct.

19   Q.    Was that the second day of the trip out to California or

09:43 20   the first day?

21   A.    The second.

22   Q.    Second day.  And you, in fact, took the handwritten notes

23   that time, correct?

24   A.    Yes.

25   Q.    And would it be fair to say when you met Mr. Singer in the

1    Marriott on September 21 through, let's say, November 1, 2018,

2    so that's really October -- the month of October.  The only

3    entry you have in any written interview report about Mr. Wilson

4    is two lines in the report from this day, correct?

5    A.   There were a lot of interview reports during that period.

6    I don't know if that's the only time we mentioned Mr. Wilson

7    off the top of my head.

8    Q.   Okay.  You can't remember any other time, correct?

9    A.   I can't remember.

09:44 10    Q.   Okay.  And you wrote in your notes for that interview

11    report what he told you, "Jovan Vavic got Johnny Wilson in, was

12    a real player and played", correct?

13    A.   That's what Mr. Singer stated.

14    Q.   He told you he was a real player and played, correct?

15    A.   That's what Mr. Singer stated, yes.

16    Q.   He also told you "Jovan got 150k, 100k to USC water polo,

17    50k to Rick", correct?

18    A.   Correct.

19    Q.   You would agree with me that for all the consensual calls

09:44 20    you did with Mr. Wilson starting in mid September, let's say go

21    up to December 1st, that's the only entry about Mr. Wilson in

22    your interview reports, correct?

23    A.   For -- like I said, I don't remember off the top of my

24    head if that was the only time he talked about Johnny, but I do

25    remember that interview.

1    Q.    Okay.  You don't remember anything else being said about

2    Mr. Wilson prior to December 1st, do you?

3    A.    I don't recall off the top of my head.  Again, we wrote a

4    lot of reports.

5    Q.    Okay.  I'd like to put some exhibits before you and ask

6    you if you can identify them.

7          MR. KENDALL:  Can we first put Exhibit 570 in front of

8    the witness.

9    Q.    Do you recognize Exhibit 570?

09:45 10   A.    Yes.

11   Q.    And what is it?

12   A.    It's an iMessage exchange between Mr. Singer and

13   Mr. Wilson.

14   Q.    Okay.  And this is at the time when Mr. Singer was working

15   under the direction of the agents as an informant?

16   A.    Correct.

17   Q.    Is he showing you copies of these messages?

18   A.    I've seen them on the extractions.

19   Q.    You see them on the extractions.  Did you discuss them

09:46 20   with him as he was having this dialogue with Mr. Wilson?

21   A.    I was not.  I'm not sure if anybody on the team was.

22   Q.    So you don't know if this was unsupervised or something

23   that was according to the government's instructions and

24   direction?

25   A.    I didn't discuss this, but based on the content, it was at

 1    the direction of the government.

 2    Q.   You don't have a memory of that?  You're just assuming

 3    that?

 4    A.   Correct.

 5    Q.   And it wasn't at the direction of you?  You're assuming it

 6    was at the direction of someone else?

 7    A.   It was not at the direction of me.

 8    Q.   Okay.  And is there any interview report that would record

 9    who was giving the direction on these text messages?

09:46 10   A.   No.

11    Q.   Okay.  So if we take a look at the first entry, he

12    states --

13         MR. FRANK:  Your Honor, I'm don't object to this

14    coming into evidence.

15         MR. KENDALL:  I'd like to offer this into evidence,

16    your Honor.

17         THE COURT:  Are you objecting?

18         MR. FRANK:  We do not object.

19         THE COURT:  All right.  It will be admitted, 570.

09:47 20        (Exhibit 570 admitted into evidence.)

21    Q.   If we look at the first one, it's the time of 9:47 p.m.

22    That's from John Wilson to Mr. Singer, correct?

23    A.   Correct.

24    Q.   And he writes in the middle there, "Is there a side door

25    for nonathletes", correct?

1   A.   Yes.

2   Q.   And he states, "He would also be extremely concerned about

3   her not knowing he pulled springs if that's possible for

4   nonathlete".  He was referring to his friend at Brown, who the

5   friend's daughter is interested in Brown?

6   A.   Yes.

7   Q.   Okay.  At any point did the agents tell Mr. Singer, you

8   have to tell Mr. Wilson there's no program for nonathletes?  It

9   has to be an athlete whose credentials we falsify?  Did you

09:49 10   ever tell him to say that to Wilson?

11   A.   I don't recall.

12   Q.   If we look at the next line, he writes, "Rick, can we chat

13   this weekend?  Want to understand side door for my girls and

14   does it also require sports connection", correct?

15   A.   Correct.

16   Q.   And then we have -- we drop two down.  He writes "Rick I

17   can help you a lot on the 'value based' pricing front.

18   Seriously (I don't want to brag I am considered one of

19   McKinsey's world leaders in pricing strategy.)

09:49 20           Anyway, if you would like, let's set up an hour or

21   two and review your business model and pricing ".

22           You recall from your investigative report that

23   Mr. Wilson was repeatedly raising with Mr. Singer that he

24   wasn't getting paid to do these side-door donations and

25   Mr. Wilson thought he should be, correct?

```
 1    A.    Correct.
 2    Q.    And Mr. Wilson, as you know, has an MBA from Harvard?
 3    A.    Correct.
 4    Q.    And he has business experience in legitimate businesses?
 5    A.    Correct.
 6    Q.    And you would agree with me that, throughout this time of
 7    consensual calls, he keeps on saying the same thing, you're not
 8    getting paid and let me advise you on how to make this a more
 9    organized or better paying business, correct?
10    A.    Correct.
11    Q.    Did the agents ever tell Mr. Singer you have to tell them
12    this is not part of a legitimate business?
13    A.    No.
14    Q.    And you agree with me, Mr. Wilson raised this time and
15    time again from September to January and not once did you say
16    to Mr. Singer, correct his misinformation?
17          MR. FRANK:  Objection to misinformation.
18    Q.    Correct his understanding?
19          MR. FRANK:  Objection.
20          THE COURT:  Overruled.
21    A.    I'm sorry.  Can you repeat that, please.
22    Q.    I'll see if I can.  Would you agree with me that from
23    September 21 to the last call on January 10, 2019, the agents
24    never said to Mr. Singer tell him this is not a legitimate
25    business that can have pricing and operations like the type of
```

1   businesses he was?

2   A.   Correct.

3   Q.   If we can go to the next page, please.  If we look at the

4   second to the bottom there, "I -- we really should discuss".

5           So we can follow it, the green circles are

6   Mr. Wilson's messages, correct?

7   A.   Correct.

8   Q.   And the purple is Mr. Singer's?

9   A.   Yes.

09:52 10   Q.   So we see here Mr. Wilson saying September 30th -- it's

11   just the next day, correct?  "We really should discuss your

12   business and pricing model -- I believe some quick dialogue and

13   data exchanges could make a real difference for you".  Correct?

14   A.   Correct.

15   Q.   And then if we go to the next page.  And then Mr. Wilson

16   offers at the top there, "For example, added service fees for

17   side-door donations?  Top school intro fees?  Pricing

18   differently by geography?  Calibrating four different base

19   fees: School section assistance, test prep, application

09:52 20   support, admissions support, overall rates based on zip code,

21   income, et cetera".

22           Fair to say Mr. Wilson kept on trying to give

23   Mr. Singer help in how he could better run his business?

24   A.   He kept on discussing the pricing strategy with

25   Mr. Singer.

Q.   And you know that in the prior things you monitored
Mr. Singer had told Mr. Wilson he was doing 700 side doors a
year at 40, 50, 60 schools, correct?

A.   Yes.

Q.   He made it sound like it was a big national business?

A.   Yes.

Q.   And he told him always that he didn't get paid for it, he
just included it in his $6,000 fee?

A.   Yes.  He said he did not get paid for it.

Q.   And this business was at such a sophisticated level that
Mr. Singer could actually talk to the presidents of
universities to help deliver this service to people?

A.   Mr. Singer told parents that he knew presidents of
universities.

Q.   And that he was also reading files in admissions offices
to help make admissions decisions?

          MR. FRANK:  Objection.  Misstates.

          THE COURT:  Sustained.

Q.   Well, you recall that Mr. Singer told Mr. Wilson he was
reading files at Harvard, correct?

          MR. FRANK:  Objection.  Misstates.

          THE COURT:  Sustained.

Q.   Do you recall Mr. Singer saying anything to Mr. Wilson
about reading at Harvard?

A.   Mr. Singer stated that he was reading at Harvard.

1   Q.   Okay.  And do you know from your monitoring of the wiretap

2   that Mr. Singer frequently told parents he was reading

3   admission files at admissions offices?

4   A.   I recall Mr. Singer telling people that he read

5   applications at colleges.

6   Q.   And he would read different ones different years, correct?

7        MR. FRANK:  Objection.  Hearsay.

8        THE COURT:  Sustained.

9   Q.   Okay.  Did you -- did the investigative team ever tell

09:54 10   Mr. Singer, tell Wilson that you're not reading files at

11   Harvard?

12   A.   No.

13   Q.   Did you ever say to him, we want to be explicit with

14   Mr. Wilson that he doesn't think you have any official

15   connection to Harvard University?

16   A.   No.

17        MR. KENDALL:  If we could go to -- if we could have

18   Exhibit 597, please.

19   Q.   Could we -- do you recognize this?

09:55 20   A.   Yes.

21   Q.   What is it?

22   A.   iMessages between Mr. Singer and Mr. Wilson from 11/6/2018

23   to 1/10/2019.

24        MR. KENDALL:  Okay.  I'd like to offer these into

25   evidence, your Honor.

1                   MR. FRANK:  No objection.

2                   THE COURT:  Exhibit 597 will be admitted.

3                   (Exhibit 597 admitted into evidence.)

4                   MR. KENDALL:  We can show the jury.  If we can go to

5       the third one from the top.

6       Q.   "Rick.  How's it going?  Apps done?  Mamie's first choice

7       is Stanford; Courtney's is Harvard.  How would it work if Mamie

8       doesn't sail at all?  Any update on 750k?"

9                   You see that?

09:56 10     A.   Yes.

11      Q.   Were the agents monitoring this text message chain?  If

12      you have personal knowledge.  Please don't guess.

13      A.   I don't recall.  I'm not sure if some of the team did.

14      Q.   Was anybody in the team assigned to monitor text messages

15      with Mr. Singer?

16      A.   Agents and AUSAs discussed Mr. Wilson's communications and

17      phone calls with parents.

18      Q.   Was anybody assigned to monitor Mr. Singer's text messages

19      to see what he was saying to Mr. Wilson and to correct or

09:56 20     discuss it with him?

21      A.   I don't recall a specific person being assigned.

22      Q.   So as far as you know, Mr. Singer was able to do this

23      without any supervision?

24      A.   I was personally not supervising it, but someone on the

25      team was discussing this with Mr. Singer.

| | | |
|---|---|---|
| | 1 | Q.   Discussing with him after the fact or discussing with it |
| | 2 | as he's writing and drafting them? |
| | 3 | A.   As he's writing this. |
| | 4 | Q.   Okay.  And do you have a memory of who it is? |
| | 5 | A.   No, I don't. |
| | 6 | Q.   Is there an investigative report who identifies who plays |
| | 7 | that role? |
| | 8 | A.   No. |
| | 9 | Q.   So you're just assuming, I take it? |
| 09:57 | 10 | A.   Based on the response by Mr. Singer -- |
| | 11 | Q.   Yes or no.  You're just assuming it, correct? |
| | 12 | A.   Based on the investigation and my knowledge, the responses |
| | 13 | were Mr. Singer's from our communications with Mr. Singer. |
| | 14 | Q.   Are you doing it as he's writing them, or are you looking |
| | 15 | at it after the fact? |
| | 16 | A.   Looking at them after the fact. |
| | 17 | Q.   And did anybody ever tell him that text message created |
| | 18 | ambiguity and doubt about what was going on, you have to give a |
| | 19 | better ruse or a better story? |
| 09:58 | 20 | MR. FRANK:  Objection to his testifying. |
| | 21 | THE COURT:  Sustained. |
| | 22 | Q.   Did anybody ever correct his text messages and say they |
| | 23 | wanted them to be different? |
| | 24 | A.   We -- as a group, we discussed with Mr. Singer different |
| | 25 | strategies along the way during phone calls and text messages. |

1    Q.    Did you discuss different strategies with the text

2    messages to John Wilson?

3    A.    I did not personally.

4    Q.    And can you identify any agent you observed doing this?

5    A.    I don't specifically remember.

6    Q.    Or assigned to do this?

7    A.    I don't specifically remember.

8          MR. KENDALL:  If we can go to the second page, please.

9    Q.    We see Monday, January 7, 2019.

09:58 10         MR. KENDALL:  Do we have that?  Thank you.  It was

11   another page.

12   Q.    Now, January 7th, that's after he's given a million

13   dollars to Mr. Singer, correct?

14   A.    Correct.

15   Q.    Okay.  And he writes, "Rick Courtney PSAT was 1350.  740

16   verbal and 610 math.  She didn't do well in math -- it wasn't a

17   good day for her.  Is that good enough?  Obviously, she will

18   keep studying with your tutor.  John".

19          So fair to say that even after Mr. Singer has taken

09:59 20   the money from Mr. Wilson, Mr. Wilson thinks the girls had to

21   get good SAT scores?

22         MR. FRANK:  Objection to what Mr. Wilson thinks.

23         THE COURT:  Sustained.

24   Q.    Mr. Wilson is texting Mr. Singer for advice on the SAT

25   prep and scores of his daughters, correct?

```
 1              MR. FRANK:  Objection to what he's texting for.
 2              THE COURT:  Sustained.
 3    Q.   Not for.  About.  He's texting about his daughter's SAT
 4    scores and tutoring, correct?
 5    A.   Correct.
 6    Q.   Okay.  And then if we take a look at the bottom of that
 7    page, he writes, "When I look at bottom quartile of accepted
 8    students at Harvard versus Stanford -- I see she makes the
 9    Stanford 25th percentile cut with those scores, but Harvard's
10:00 10   much higher".
11              He wrote that as well, correct?
12    A.   Correct.
13              MR. KENDALL:  Next I'd like to go to Exhibit 580, your
14    Honor.
15    Q.   Do you recognize this?
16    A.   Yes.
17    Q.   What is it?
18    A.   iMessages between Mr. Singer and Mr. Wilson from
19    10/17/2018 to 10/22/2018.
10:00 20            MR. KENDALL:  I'd like to offer those into evidence as
21    well.
22              MR. FRANK:  No objection.
23              THE COURT:  580 will be admitted.
24              (Exhibit 580 admitted into evidence.)
25    Q.   At 580, let's go to the second page -- actually, the first
```

1    page, and look at the bottom one from John Wilson.  "R given

2    all the H admissions trial publicity is that still an option

3    for both girls?  If they get good test scores what are the odds

4    we get them in?"

5           Now, this is October 21st.  He's already sent some of

6    the money, correct?

7    A.   Yes.

8    Q.   "Given all of the H admissions trial", do you understand

9    that he's referring to a trial about the Harvard admissions

10:01 10   policies?

11   A.   Yes.

12   Q.   And then if we turn to the next page, we see Mr. Singer's

13   response.  "I would not worry about the decision on the Harvard

14   case affecting us.  We are going through the side door with

15   athletics and the rules and process is quite different.  Yes if

16   the girls get what they are capable of 31-34 no problem through

17   the side door".

18           Did the agents tell Mr. Singer to tell Mr. Wilson in

19   the middle of paying the money that the side door has rules and

10:02 20   process?

21   A.   I did not tell Mr. Singer to do that.  Someone on the team

22   may have.

23   Q.   Well, you said, "may have."  You're just guessing?  You

24   don't know?

25   A.   I don't know if someone told Mr. Singer to say that

1    specifically.

2    Q.   Because you have no idea who was supposed to be monitoring

3    his text messages before they went out?

4    A.   I don't know who was monitoring Mr. Singer's text

5    messages.

6    Q.   Would you agree with me, when somebody describes something

7    as having rules and process, it sounds like it's part of an

8    organization?

9         MR. FRANK:   Objection.

10:02 10        THE COURT:   Sustained.

11   Q.   Do you agree with me, universities have rules, correct?

12   A.   Correct.

13   Q.   And they have process?

14   A.   Correct.

15   Q.   Did anybody from the investigative team tell Mr. Singer,

16   after he sent that text message, you've got to tell John Wilson

17   this is not a part of any rules or process at Harvard

18   University?

19   A.   I don't recall that.

10:03 20   Q.   I'd like to turn the page, please.  Can we take a look at

21   the third from the top?  Mr. Wilson says again on October 21 --

22   this is in the middle of when the money is being transferred,

23   correct?

24   A.   Yes.

25   Q.   He writes, "When do you want to talk about your pricing

1    strategies?  I am on the west coast until Tuesday.  Then I fly

2    to Europe and the Mid East".

3              He's still asking about giving advice to Mr. Singer

4    on pricing, correct?

5    A.    Correct.

6    Q.    And if we look at Mr. Singer's response with the purple,

7    he says, "Let's wait to do pricing later", correct?

8    A.    Correct.

9    Q.    And then Mr. Singer responds, "Okay no rush -- let me know

10   when you are ready".

11             I'm going to ask the same questions I've asked

12   before.  Can you identify anybody from the investigative team

13   who was monitoring these e-mails before they went out?

14   A.    I don't know of the specific person monitoring these text

15   messages.

16   Q.    Can you identify anybody who was assigned as part of their

17   job responsibilities to monitor these text messages before they

18   went out?

19   A.    I don't recall somebody specific being assigned or an AUSA

20   being assigned to monitor text messages.

21   Q.    And did anybody say -- did anybody from the investigative

22   team say to Mr. Singer, you have to make it clear to Mr. Wilson

23   that this is not the type of business that has the MBA advice

24   that you're looking to give?

25   A.    No.

```
 1              MR. KENDALL:  If we can turn the page, please.
 2    Q.    And then we see Mr. Singer's comment -- page 4, I believe,
 3    the bottom one.  Okay.  We see Mr. Singer's comment.  "John you
 4    have to relax - based on the girls' desires, grades and scores
 5    you will have the choice of where the girls want to go based on
 6    what spots are open.  Give it a little time -- trying to finish
 7    this year's kids".
 8              Did anybody from the investigative team tell
 9    Mr. Singer, tell Mr. Wilson to stop worrying about grades and
10:06 10    test scores because this is being done through some type of
11    improper financial arrangement, they don't count?  Anybody tell
12    Mr. Singer to tell Mr. Wilson that?
13    A.    Not to my knowledge.
14    Q.    This whole three-month period Mr. Wilson is repeatedly
15    raising issues about text scores and tutoring and the girls'
16    performance in academics, correct?
17    A.    He is texting Mr. Singer about that, yes.
18    Q.    He's discussing it on the phone calls, too?
19    A.    Yes.
10:06 20    Q.    And not once in this three month period do you instruct
21    Mr. Singer to say something along the lines, it doesn't matter,
22    John, because we have a bribery or a corrupt payment that means
23    those things don't count?
24    A.    Correct.
25    Q.    Mr. Wilson thinks he still has -- his daughters still have
```

| | |
|---|---|
| 1 | to go through the admissions office, correct? |
| 2 | MR. FRANK:  Objection. |
| 3 | THE COURT:  Sustained. |
| 4 | Q.   You agree with me the admissions office looks at people's |
| 5 | grades and score tests, correct? |
| 6 | A.   Correct. |
| 7 | MR. KENDALL:  I'd now like to call up on the screen, |
| 8 | for the witness only, please, Exhibit 597. |
| 9 | MR. FRANK:  I believe it's in evidence. |
| 10:07 10 | MR. KENDALL:  Is it?  Okay.  Great. |
| 11 | THE COURT:  What's the number? |
| 12 | MR. KENDALL:  Oh.  597.  Excuse me.  That's what we |
| 13 | just did.  That's in evidence.  Okay. |
| 14 | And then I'd like to call up Exhibit 684 and 685. |
| 15 | Q.   Do you recognize both of those? |
| 16 | A.   Is there a date on those text messages? |
| 17 | Q.   They're prior to September 21, I believe.  I think that's |
| 18 | from the space you can see it. |
| 19 | A.   Yes.  I do recall those. |
| 10:08 20 | Q.   And what are they? |
| 21 | A.   Text messages from Mr. Singer to Mr. Wilson. |
| 22 | MR. KENDALL:  Your Honor, I'd like to offer 684 and |
| 23 | 685 and show it to the jury. |
| 24 | MR. FRANK:  No objection. |
| 25 | THE COURT:  It will be admitted, 684 and 685. |

1          (Exhibit 684, 685 admitted into evidence.)

2    Q.   These are the ones that were sent around September 7th or

3    so prior to the September 15th call?

4    A.   Correct.

5    Q.   Okay.  So the first substantive discussion that you pick

6    up on the wiretap between Mr. Wilson and Mr. Singer is

7    Mr. Singer saying, "Might be in Boston to meet with Harvard and

8    Tufts presidents Friday, September 21.  Might be able to meet

9    at 11:00 a.m.ish".

10:08 10          Now, of course, that's the meeting with Rudy Meredith

11   at the Marriott that -- is when you met Mr. Singer, correct?

12   A.   Correct.

13   Q.   He's meeting Rudy Meredith at what, 10:00 a.m. or so?

14   A.   I don't recall the exact time, but it was in the morning.

15   Q.   Now, the very first contact that you see with Mr. Wilson

16   and Mr. Singer is Mr. Singer saying he's going to meet with the

17   presidents of Harvard and Tufts?

18   A.   Correct.

19   Q.   The investigative team knew this was not correct?

10:09 20   A.   Correct.

21   Q.   Do you know who the president of Harvard was at the time?

22   A.   No, I don't.

23   Q.   If I suggest Larry Bacow, does that sound familiar?

24   A.   I don't recall.

25   Q.   Do you know who the president of Tufts was at the time?

A.    No.

Q.    If I suggest Anthony Monaco?

A.    That doesn't sound familiar.

Q.    Would you agree just based upon their positions they're probably two of the most respected in leading university presidents in the country?

MR. FRANK:  Objection.  Relevance.

THE COURT:  Sustained.

Q.    Would you agree with me Mr. Wilson is -- strike that.

Would you agree Mr. Singer is telling Mr. Wilson he's meeting with two very prominent and prestigious people in higher education, correct?

A.    Correct.  He's meeting with the Harvard and Tufts president.

Q.    And based on your investigation and listening to the wiretaps, you knew that Mr. Singer frequently would tell parents false statements that he was meeting with university presidents or provosts?

A.    Correct.

Q.    And you'll agree with me, from September 21, 2018 to January 10, 2019, not once did a member of the investigative team tell Mr. Singer you have to tell John Wilson you're not meeting with the president of Harvard, correct?

A.    Correct.

Q.    Not once did you say, you have to tell John Wilson you

```
 1    never met with the president of Tufts, correct?
 2    A.    Correct.
 3    Q.    You never once said, you have to let John Wilson know
 4    somehow that you have no authorization by Harvard or Tufts or
 5    any of these other schools?
 6    A.    Correct.
 7          MR. KENDALL:  If we could take a look at 8212, please.
 8    Q.    Do you recognize 8212?
 9    A.    Is there a second page, or if you go further down?  Yes.
10    Q.    What is it?
11    A.    It is an e-mail.
12    Q.    From who to who?
13    A.    If you go further up, it's between Mr. Singer and
14    Mr. Wilson.
15          MR. KENDALL:  I'd like to offer that, your Honor.
16          MR. FRANK:  Objection.  Hearsay.
17          THE COURT:  Sustained.
18          MR. KENDALL:  Your Honor, for state of mind, not for
19    the truth of the matter asserted.
20          MR. FRANK:  Self-serving hearsay, your Honor.
21          THE COURT:  Sustained.
22          MR. KENDALL:  Okay.  I'd like to put up, your Honor, a
23    demonstrative M, which is simply a quote from the witness'
24    testimony yesterday.
25          MR. FRANK:  Can I take a look, please?  No objection.
```

1           THE COURT:  It may be put up.

2    Q.   This is a quote -- do you remember testifying about this

3    yesterday?

4    A.   Yes.

5    Q.   And this is a quote from the affidavit you filed before

6    Judge Gorton under oath, correct?

7    A.   Yes.

8    Q.   Okay.  And you stated in your affidavit, "We wanted him to

9    be explicit that the scheme involved bribes.  The purpose was

10:13 10   to ensure that, for clients who had not yet committed a crime,

11   or were still in the middle of it, there would be no possible

12   confusion about their intent".  That's what you put in your

13   affidavit, correct?

14   A.   Correct.

15   Q.   And what you in fact told us is you didn't put it in the

16   affidavit.  One of the prosecutors put it in and you just

17   signed it, correct?

18   A.   I reviewed the affidavit for accuracy and then signed it.

19   Q.   Yesterday you were able to identify who drafted the

10:14 20   affidavit for you.  Can you tell us who you think was involved

21   in the drafting?

22   A.   Two AUSAs.

23   Q.   And who were they?

24           MR. FRANK:  I object, your Honor.  This is irrelevant.

25           THE COURT:  Sustained.

1    Q.   And two other people filed affidavits as well?

2    A.   Yes.

3    Q.   That was Mr. Rosen and Agent Smith?

4    A.   Yes.

5    Q.   Okay.  Did the same people draft all the affidavits?

6             MR. FRANK:  Objection.

7             THE COURT:  Sustained.

8    Q.   Did you read their affidavits?

9             MR. FRANK:  Objection.

10:14 10          THE COURT:  She can say whether she read them.

11   A.   I read them, yes.

12   Q.   They use similar language to this quote, don't they?

13            MR. FRANK:  Objection.

14            THE COURT:  Sustained.

15   Q.   Okay.  Do you know what the dictionary definition is of

16   "explicit"?

17   A.   The dictionary definition?

18   Q.   Yes.

19   A.   No.

10:14 20   Q.   Do you know what the dictionary definition is of "ensure"?

21   A.   No.

22   Q.   Okay.  If I were to show you a dictionary definition,

23   would you look at it and tell us if that's your understanding

24   of what these words mean?

25   A.   Yes.

1          MR. KENDALL:  Your Honor, I'd like to --

2          MR. FRANK:  Your Honor, I object.  She can tell him

3    what her understanding of the words is without using a

4    dictionary.

5          THE COURT:  Yeah.  Go ahead.

6          MR. KENDALL:  Okay.  Would you agree with me -- hold

7    one second, please.

8    Q.   Would you agree with me that the word "explicit" can be

9    defined as "leaving no question as to meaning or intent"?

10:16 10   A.   Can you repeat that?

11   Q.   Yes.  "Leaving no question as to meaning or intent".

12   A.   Yes.

13   Q.   It could also mean "fully revealed or expressed without

14   vagueness, implication or ambiguity"?

15   A.   Yes.

16   Q.   And for the word "ensure", would you agree with me that

17   means "to make sure, certain or safe, to guarantee"?

18   A.   I'm sorry.  Can you repeat that?

19   Q.   Yes.  "To make sure, certain or safe, to guarantee".

10:17 20   A.   I agree.

21   Q.   Okay.  So you wanted Mr. Singer to leave no question as to

22   the meaning or intent of what he was doing with Mr. Wilson,

23   correct?

24   A.   Can you repeat that?

25   Q.   You wanted Mr. Singer to use words that left no question

```
 1    as to the meaning or intent of what he was proposing to

 2    Mr. Wilson, correct?

 3    A.    Correct.

 4    Q.    Did Mr. Singer agree to do that?

 5    A.    Yes.

 6    Q.    And so it's your statement that the words on these tapes

 7    leave no question as to the meaning or intent of what was going

 8    on?

 9    A.    No.

10    Q.    There was ambiguity?

11    A.    No.  Mr. Singer said that he would say the, would be

12    explicit, but at times he would go back to his whole pitch and

13    go back to the old cover story as part of his just being used

14    to saying "donation" when we asked him to say payment.

15    Q.    I'm not asking what Mr. Singer told you he was going to

16    do.  I'm asking you, do you think in the tapes and consensual

17    monitoring that Mr. Singer accomplished what you wanted him to

18    do, to leave no question as to the meaning or intent of the

19    words?

20              MR. FRANK:  I object, your Honor.  It's irrelevant.

21              THE COURT:  Sustained.

22    Q.    Why don't we take a look at some of the transcript.  I'm

23    not going to play the tapes.  They've been played, but I do

24    want to go through the transcripts of some of the calls that

25    you've testified with with Mr. Frank.
```

```
 1              I'd like to turn first to tab 571, the transcript
 2      please.  That's the September 29, 2018 call.  I'd like us to go
 3      to page 4, and I'll start with lines 14 to 20.
 4              MR. FRANK:  I'm sorry.  This is not a transcript
 5      that's before the jury, your Honor.
 6              THE COURT:  I thought it was.
 7              MR. FRANK:  571.  We have a transcript that's before
 8      the jury.  This is an alternate transcript.
 9              MR. KENDALL:  Oh, no.  Excuse me.  We want to use the
10:20 10  government's transcript, certainly.  It is the government's.
11      We called it 571A to distinguish it as a transcript of a tape.
12              I'd like to show you, as a chalk, your Honor, the
13      government transcript for the October -- the September 29th
14      call, page 4, starting at line 14.
15      Q.   Mr. Wilson states, "And what were the schools in that, if
16      you did the side door?  And I'm interested about the side door
17      and that stuff".
18              So Mr. Singer says, "So the side door is gonna be --
19      gonna happen where you want 'em to happen".
10:21 20          Mr. Wilson asks, "It can happen anywhere?  Does it
21      have to be a sports side door?  I wasn't clear on that".
22              Did the agents tell Mr. Singer that he should tell
23      Mr. Wilson that the side door is going to happen where you want
24      them to happen?
25      A.   I don't recall specifically saying that.
```

1   Q.   Did you ever have -- did any of the agents ever have a

2   conversation with Mr. Singer and tell him you should not tell

3   Mr. Wilson that the side door is so commonly practiced that

4   there's over 700 at 50 different schools this year?

5   A.   No.

6   Q.   If you could turn to page 5, line 12, Mr. Wilson states,

7   "What if they're not really that good?  I mean, they can do

8   some crew, but I don't know that they're gonna be good.

9   Courtney's not even that good competitively at sailing.  She

10:21 10  just taught sailing and did sailing in, you know, yacht club".

11            And then Mr. Singer responds, "But at the end of the

12   day, by the side door, I may be able to go to the sailing coach

13   and say, 'hey, this family's willing to make the

14   contributions'".

15            Did the agents instruct Mr. Singer to use the word

16   "contributions"?

17   A.   No.

18   Q.   Did you instruct him to not use words like "donation" and

19   "contribution"?

10:22 20  A.   No.

21   Q.   So he's defying your instructions?

22   A.   No.

23   Q.   He's ignoring them?

24   A.   He's going back to his pitch that he was using for years

25   that it was a donation.

1    Q.    That wasn't my question.  Did he defy the agents'

2    instructions and do something different from what they told

3    him?

4    A.    Mr. Singer said something different than what we asked him

5    to say.

6    Q.    So he defied your instructions, correct?

7    A.    I wouldn't call it defying.

8    Q.    A defy?

9    A.    He misspoke.  We asked him to say "payment" and he said,

10:22 10   "contribution".

11   Q.    So you think he just misspoke here, correct?

12   A.    Yes.

13   Q.    Okay.  Do you know how many times in this tape he misspoke

14   and used the words "contribution" or "donation"?

15   A.    He did say that, at times, I don't know exactly how many.

16   He did use the word "contribution" rather than "donation" --

17   I'm sorry -- "payment".

18   Q.    So at any time from September 21, 2018, to January 10,

19   2019, did the agents tell Mr. Singer, you misspoke too many

10:23 20   times about contributions and donations, you've got to tell

21   Wilson this payment is neither?

22   A.    We spoke with Mr. Singer and told him not to say

23   "contributions" or "donations".

24   Q.    My question is different.  Did you tell him to correct his

25   language because he didn't carry out your instructions?  Did

1    you tell him to affirmatively tell Wilson it's not a

2    contribution and it's not a donation?

3    A.    Yes.

4    Q.    And he didn't do that, did he?

5    A.    Mr. Singer went back to his pitch that he's been using for

6    years with lots of parents that it was a donation to a program.

7    Q.    So what you're telling me is he's not following the

8    agents' instructions on what to say to Mr. Wilson, correct?

9    Yes or no.

10:24 10    A.    No.

11    Q.    Excuse me?

12    A.    No.

13    Q.    He is following --

14    A.    He's following our instructions and at times he misused

15    the word.

16    Q.    Well, if he misuses the word, is that following your

17    instructions to misuse the word, or is that not following your

18    instructions to misuse the word?

19    A.    That's a mistake that he made using a different word.

10:24 20    Q.    And did you ever ask him to correct his mistakes to

21    Mr. Wilson so that you could ensure that there was no ambiguity

22    or confusion?

23    A.    We asked Mr. Singer to say "payment".

24    Q.    Did you ever say to him, tell him explicitly it's not a

25    donation or a contribution?

1    A.    I did not say those exact words.  I said use the word

2    "payment".

3    Q.    Did any agent ever instruct him over that 3-month period,

4    tell him it's not a donation?

5    A.    Not specifically.  We told him to say "a payment".

6    Q.    And then it states, "She could be on your team.  She is a

7    sailor.  She may not be up to the level you are, but she can

8    comp you know.  You're going to get a benefit and the family's

9    gonna get a benefit".

10:25 10          Okay.  Then if we turn to the next page, page 6 at

11    line 6, Singer says, "Then I have to go to -- then I have to go

12    to the department chairs and, and, and get -- some schools have

13    a VIP list at the department chair level, so we can go that

14    route, and then you can help their program -- their program.

15    It just depends on which school you want to go to".

16          Did the agents tell Mr. Singer to say this or did he

17    do this on his own?

18    A.    He did that on his own.

19    Q.    Did you tell him at some point, you've got to tell Wilson,

10:26 20    this is not like a VIP program?  Did you ever tell Mr. Singer,

21    you have to explicitly tell Mr. Wilson this is not a VIP

22    program?

23    A.    No.

24    Q.    Did he just misspeak this time?

25    A.    Yes.  He went to his pitch about different programs.

```
 1   Q.   Did you at any point tell him no more pitch, do what we
 2   tell you, follow our instructions?
 3   A.   Yes.
 4   Q.   And he still did his pitch and ignored you, correct?
 5   A.   And he still went back to his pitch because that was what
 6   he was doing for a number of years.
 7   Q.   And who was in charge of this investigation?
 8   A.   The government.
 9   Q.   And he repeatedly is ignoring your instructions on how to
10   speak to Mr. Wilson, and you just let him keep going out and
11   making more of these misstatements?
12   A.   No.  He -- we asked Mr. Singer to say "payment to a
13   coach".  He would go back to his old pitch because he was doing
14   this for a number of years with many different parents.  We
15   would keep reminding Mr. Singer to use "payment to coach".
16   Q.   Be fair to say you couldn't control him, could you?
17   A.   That's not fair to say.
18   Q.   He would say what he wanted to say and you'd let him go
19   back out and do it again?
20   A.   Not correct.
21   Q.   Okay.  Let's keep going through here.
22        You agree with me that was the pitch he made to
23   Mr. Wilson about Johnny, that you're going to make a payment to
24   the water polo team and it will help your kid get in?
25   A.   I don't know exactly what Mr. Wilson said to -- I'm
```

1     sorry -- Mr. Singer said to Mr. Wilson at that time.

2     Q.   Okay.  Then we have, if we go to line 12 of page 6, "I

3     have this friend, you know.  One of the things I wanted to talk

4     to you about, too, is -- I don't know how -- I remember last

5     time I did this, you didn't really make any money on this, on

6     this side stuff.  You just charge and then you make a donation

7     to the school and that's it".

8             Nobody told Mr. Singer to correct those statements

9     and tell Mr. Wilson he did make money on it and it wasn't a

10    donation, correct?

11    A.   Can you repeat that, please.

12    Q.   Nobody told Mr. Singer to go back and correct this

13    statement and say that he does make money on this stuff and

14    it's not a donation?

15    A.   We told Mr. Singer to use the word "payment" specifically

16    for this call.  I don't recall if we had him go back.

17    Q.   He never did correct it, did he?

18    A.   He -- he would say "payment to a coach".

19    Q.   Okay.  We'll get to that in just a minute.

20            Then it says, in line 20, "You know, we did Johnny,

21    was that essentially now the money goes into my foundation, as

22    a donation".  Is that again just misspoken?

23    A.   Yes.

24    Q.   You didn't tell him to correct it?

25    A.   We told Mr. Singer -- we repeatedly told Mr. Singer stop

1    using "donation".

2    Q.    But he kept on doing it?

3    A.    He kept on going back to his old pitch.

4    Q.    Okay.  And you guys are in charge of the investigation?

5    A.    Correct.

6    Q.    If an informant doesn't follow your direction, aren't you

7    at some point supposed to stop using him?

8    A.    We kept working with Mr. Singer and throughout the

9    investigation we told him what to say.  And as the calls went

10:29 10    on, he was more explicit.

11    Q.    Okay.  You didn't answer my question.  If an informant

12    will not follow the directions of an agent, aren't you supposed

13    to stop using him under both IRS and FBI protocols?

14          MR. FRANK:  Your Honor, I believe the defense is

15    opening the door here to something he doesn't want to open the

16    door to.

17          THE COURT:  Overruled.

18    Q.    I'm just saying to stop sending him out there to get

19    conversations with Mr. Wilson.

10:30 20    A.    It depends on what an informant does.

21    Q.    Now, I want it keep going through this.  He says, on the

22    bottom of page 6, he says, "Now the money goes into my

23    foundation, as a donation".

24          And Wilson says, "Oh, to your foundation, not to the

25    schools".

```
 1              And Singer says, "yeah, then that way the kids don't
 2      know it happens".
 3              You agree with me during this three-month period
 4      Mr. Singer repeatedly said that one of the benefits of doing
 5      the side door is the kids wouldn't find out about it, correct?
 6      A.   Yes.  He said that.
 7      Q.   And he said another benefit of using the side door was
 8      that the other parts of the university, like the development
 9      office, wouldn't find out about it and come asking for
10:31 10 donations as well?
11      A.   He said that, yes.
12      Q.   Did at any time the agents say, you can't tell him
13      legitimate reasons for keeping this secret?  You've got to tell
14      him to keep it secret because it's illegal or it's improper?
15      A.   No.
16      Q.   Then if we can take a look at page 7, it's just what I
17      said starting at line 3.  "So -- and then the other part of
18      that is they don't chase you all the time for money.  Cause
19      once you -- you know, once you're -- they know you gave money,
10:31 20 it's a different story".
21              So part of the ruse Mr. Singer is using is that
22      people should not talk about this side-door donation because
23      other parts of the university will ask them for even more
24      money, correct?
25              MR. FRANK:  Objection, your Honor.
```

1         THE COURT:  Overruled.

2    A.   Can you repeat that, please?

3    Q.   Part of the reasons that Mr. Singer is giving Mr. Wilson

4    not to talk about the side door is so that other parts of the

5    university will not solicit him for even more donations?

6         MR. FRANK:  Objection to having her interpret what

7    he's saying, your Honor.  The words speak for themselves.

8         THE COURT:  She can answer it if she understands it.

9    A.   We directed Mr. Singer to tell parents that the schools

10:32 10   didn't know about the side door to gather evidence that the

11   parents knew that the admissions office did not know about the

12   side door and about their children being admitted as recruited

13   athletes.

14   Q.   My question is different.  Did you ever -- I'll rephrase

15   it a bit.

16        You never told Mr. Singer, you can't give him a

17   legitimate reason to keep this a secret, you have to give him

18   an improper reason to keep this a secret.  Did you ever tell

19   him that?

10:33 20   A.   I don't recall telling him that.

21   Q.   Okay.  And then we have here at page 7, line 6, "And then

22   what I can -- what I'll do is I'll split the money potentially

23   to the coach or the other pl -- parties that are at that school

24   that need the money, right?

25        "M-hm

1          "So -- or it may go right to the coach, that's
2     helping us.  It just depends on the school.
3          "Right.
4          "Okay, so you don't actually get credit for a
5     donation to the school, or get hounded for that.  You get your
6     donation to you, or your foundation, The Key or whatever --
7          "Right.
8          "And you get your write-off, and then you do your
9     thing.
10:34 10        "Ok".
11         Is that the instructions that the agents gave
12     Mr. Singer to say, that they pay the coach?
13     A.   Make a payment to the coach, yes.
14     Q.   And is it your view that that was both explicit and
15     ensuring that there would be a bribe?
16          MR. FRANK:  Objection.
17          THE COURT:  Overruled.
18     A.   Yes.
19     Q.   Okay.  Then let's go to top of page 8, start at line 2.
10:34 20     Mr. Wilson starts, "If it's all going to your foundation, you
21     can't take a share if it goes to your foundation.  You don't
22     get a fee on that, then".
23          Mr. Singer says, "I just do my fee for what I take
24     when I do your normal applications".
25          Did the agents tell Mr. Singer to say that?

1    A.   I don't recall.

2    Q.   Did they ever tell him to retract it?

3    A.   No.

4    Q.   Okay.  And then the next section is Mr. Wilson again

5    talking about giving business advice and how to charge better

6    for his business, correct?

7    A.   Correct.

8    Q.   Let's go to page 9.  They're talking about Mr. Wilson's

9    friend whose daughter is applying to Brown.  Let's start at

10:35 10  line 13.  Mr. Singer says, "I'd love to help -- you know, it is

11   late and all of that.  The president takes meetings all the

12   time from influential people.  She's a good gal.  And she --"

13           Mr. Wilson says, "of Brown?  Yeah, I don't know".

14           "Yeah, at Brown.  So what I would suggest is that, he

15   calls up her office -- they have a scheduling person for the

16   president -- and he sets up a meeting for he and his daughter

17   to go meet, and she kinda meets with them.  And then she'll

18   give".

19           Did the agents tell Mr. Singer to talk about his

10:35 20  knowledge of the president of Brown and that she's a good gal?

21   A.   I don't recall that specific -- having Mr. Singer say that

22   specifically.

23   Q.   Did you ever instruct him that he should correct

24   Mr. Wilson -- correct himself to Mr. Wilson and tell him he has

25   no relationship with the president of Brown?

1    A.    No.

2    Q.    And then let's go to page 11.  Start at page 10.  "What I

3    would do is I would still -- because them going to meet the

4    president isn't -- doesn't mean that she's gonna help him, but

5    that's a good starting point".

6             Then if we drop down to page -- to line 19, "So I

7    just had a family do that and essentially what they told me to

8    do was just, have, have my family call the scheduling

9    coordinator".

10:36 10           Did the agents tell Mr. Singer to say that about

11   scheduling this other family to meet the president of Brown?

12   A.    I don't recall specifically if we told them that.

13   Q.    Okay.  I'd now like to go to page 16, lines 3 to 12.

14   Mr. Singer says "your legacy means 0, because".

15             And Wilson says, "That's true for most of my life,

16   you know".

17             And Singer says, "John", and Wilson says, "unless

18   you're donating a building".

19             And Singer says, "You've done quite well for

10:37 20   yourself, for a guy that has no legacy, you're okay".

21             Are you aware that and Mr. Wilson and Mr. Singer had

22   discussed Mr. Wilson's background?

23             MR. FRANK:  Objection.

24             THE COURT:  Sustained.

25             MR. KENDALL:  I'm just asking for what you know, not

1  what was said.

2  Q.   Do you know if Mr. Singer understood Mr. Wilson's

3  background?

4  A.   I don't know.

5  Q.   Then Mr. Wilson says, "So legacy doesn't help at all,

6  huh?"

7          And Singer says, "Unless you're a big legacy, but

8  you".

9          Wilson says, "especially a big donor legacy, huh?"

10:38 10          Mr. Singer says, "You haven't -- you haven't done

11  that yet".

12          Did you discuss with Mr. Singer at all Mr. Wilson's

13  contributions for education?

14  A.   No.

15  Q.   Or his knowledge of Mr. Wilson's contributions for

16  education?

17  A.   No.

18  Q.   Or his knowledge of Mr. Wilson's will and trust plans?

19  A.   No.

10:38 20  Q.   Now, if we go to page 17, at the end of line 22, "No,

21  she -- no".  This is Mr. Singer talking.  "They, they may end

22  up getting in without even a donation".

23          That's the third time he misspoke using "donation" or

24  "contribution", correct?

25  A.   Correct.

1    Q.   And then he goes on, "But you -- you'll know at least this

2    route, we got an".

3            And Mr. Wilson says, "They've gotta get erg scores".

4            Now -- if we go to the bottom of page 18, line 22,

5    Mr. Singer states, "I just wanted to make sure I got back to

6    you.  I'm gonna be spending some time in Boston".

7            At any point did you tell Mr. Singer, stop telling

8    him that you're coming to Boston to read at Harvard?

9    A.   I don't recall saying that specifically.

10:39 10   Q.   It says, "Because I'm gonna be reading at Harvard this

11   year, so I'll be able to get together with you".  That's top of

12   line -- top of page 19.

13           Now I'd like to move next to -- and he never did

14   retract his statement about reading at Harvard, correct?

15   A.   Correct.

16   Q.   Or meeting the presidents of any of the Universities?

17   A.   Correct.

18   Q.   Okay.  And now I'd like to go to -- well, this call was

19   September 29th, correct?

10:40 20   A.   Correct.

21   Q.   Mr. Singer's notes that are in Exhibit 13 were originally

22   written on October 1st?

23   A.   Correct.

24   Q.   This is the call that precipitated the conversation that

25   he wrote about in his notes, correct?

1           MR. FRANK:  Objection.

2           THE COURT:  Sustained.

3    Q.    Did you have -- did the agents have a conversation with

4    Mr. Singer about this September 29th call?

5    A.    Yes.

6    Q.    Were you critical of the things he said?

7    A.    I don't recall getting critical.

8    Q.    Did you tell him that he was not following your

9    instructions and providing explicit language to ensure there

10:41 10   would be no ambiguity?

11   A.    I don't recall specifically what we said about this call

12   with Mr. Wilson.

13   Q.    You weren't particularly upset by it, were you?

14   A.    Generally, for the calls, we talked to Mr. Singer and

15   explained to him, stop using the word "donation" and

16   "contribution".  Use "payment to a coach".

17   Q.    Can you answer my question, please?

18   A.    Can you repeat your question?

19   Q.    You were not critical of this call, were you?

10:41 20   A.    I don't recall specifically what we said to Mr. Singer

21   about this call.

22   Q.    Were you animated about this call?

23   A.    I don't recall specifically.

24           MR. KENDALL:  If we could next go to exhibit -- not

25   exhibit.  If we could go to chalk 578, the transcript for the

1   October 15th call.

2   Q.   If we take a look at page 2, the top line starting at 1,

3   Mr. Wilson says, "Oh, I know, next year, exactly.  So, hey, uh,

4   there, were a couple topics.  One was, you know, my daughters,

5   and uh, making some donations now".

6          Mr. Wilson is still referring to donations, correct?

7   A.   Mr. Wilson says "donations".

8   Q.   Okay.  Was Mr. Singer instructed after this call, tell him

9   explicitly it's not a donation?

10  A.   We told Mr. Singer the words "payment to coach".  I don't

11  recall specifically what was said about this call.

12  Q.   But in the prior call, Mr. Singer said "donation" twice

13  and "contribution" once.  Did you tell Mr. Singer you have to

14  take it back and make it clear and explicit, your taking back

15  the use of the word "donation" and "contribution"?

16  A.   We told Mr. Singer to be clearer in the subsequent calls.

17  Q.   That's not my question.  My question was did you tell him

18  to take back those words to correct it, I didn't mean to say

19  that, John.  It's not a contribution.  It's not a donation.

20  A.   Not those specific words.

21  Q.   Okay.  If we take a look at page 3.  Actually, let's go to

22  page 5.  Page 5, line 13, Mr. Wilson testifies, "You have

23  multiples everywhere, it sounds like".

24          And Singer answers, "Correct".

25          "And they don't actually have to do that sport,

```
 1    you're saying.  They could just go in, in, correct, and -- be
 2    like the scorekeeper or -- correct -- water boy, water girl".
 3             And Singer says, "Manager or whatever you want to
 4    call 'em yeah".
 5             Wilson says, "Or manager, those things.  Okay".
 6             Now, did the agents instruct Mr. Singer to use the
 7    word "manager" there?
 8    A.   No.
 9    Q.   Did you after that call tell him, you can't tell them
10    they're going to be a manager?  You have to tell him they have
11    to come in as a fake athlete?
12    A.   I don't recall specifics, but that's the general
13    instruction we would give Mr. Singer.
14    Q.   Specifics -- you say the general.  Was the general you
15    can't tell them they can be a manager, you have to tell them
16    we're going to falsify their credentials to make them look like
17    the athlete they are not?
18    A.   I don't recall having that specific conversation with
19    Mr. Singer.
20    Q.   And you had -- and you have no memory of having read
21    Exhibit 7011, the website, where Mr. Singer brags about getting
22    people jobs as managers with the testimonials, correct?
23    A.   I remember seeing that website.  I don't recall the exact
24    date I saw that.
25    Q.   Okay.  Now, if we go to page 8, line 21, Mr. Singer says,
```

```
 1    "John, I've known you for years.  So I know when we get the
 2    girls in, it's a done deal and you're gonna take care of your
 3    part of it, you're gonna make the payments to the schools and
 4    the -- to the coaches.  And that's what I need".
 5              Did you tell him to use the phrase "to make payments
 6    to the school and the coaches"?
 7    A.   We told Mr. Singer to say payments to the coach.
 8    Q.   He, on his own, decided to put in school and coach,
 9    correct?
10    A.   He put in the word "schools".
11    Q.   Because he wanted to create ambiguity, correct?
12    A.   No.
13    Q.   So you thought this was being explicit to say payments to
14    school and coaches?
15    A.   No.  I think it was a mistake.  Again, he went back to his
16    old pitch because he had been doing that for years with
17    numerous parents, and so he, at times, would go back and say
18    "donation" and "contribution".
19    Q.   Okay.  And Mr. Singer says, starting at the bottom of
20    line 24, page 8, "You're gonna make the payments to the schools
21    and to the coaches.  And that's what I need".
22              And then Mr. Wilson says, at line 3, page 9, "I
23    thought I make the payment to you and you make the payment to
24    the schools".
25              Singer says, "Correct.  That's correct".
```

1           "Oh, you said I make the payment to the schools".

2           Do you think that was being explicit, that "payment

3    to the coach" meant a bribe?

4    A.   That was not being as explicit as we asked Mr. Singer to

5    be.

6    Q.   This is once again -- Mr. Singer is not listening to the

7    agents' instructions and doing what he wants to do and not what

8    you want him to do, correct?

9    A.   No.  I think it was a mistake where he went back to his

10:47 10   old pitch.

11   Q.   He makes a lot of mistakes, Mr. Singer, doesn't he?

12   A.   At this time, he went back to his old pitch.

13   Q.   Let's look over to page 16, line 17.  Mr. Wilson states,

14   "So I'll have the girls plan on meeting you sometime November 1

15   and 2.  Let me know the next time you're".

16           Singer says, "will do".

17           Wilson says, "Yeah.  I'd be happy to help you with

18   your business model.  So I think you're leaving a lot of money

19   on the table".

10:48 20           This conversation is on November 15th -- excuse me,

21   on October 15th, correct?

22   A.   Correct.

23   Q.   You know on October 20th Mr. Wilson reached out to his tax

24   preparers at Goldman Sachs, correct?

25   A.   I don't know.  I'm not aware of that.

1  Q.   Sure you do.  You spoke to Mr. DeMaio, didn't you?

2  A.   I was involved in some of the interviews with Mr. Wilson's

3  accountants.  I don't recall that one.  If you have it, you can

4  refresh my memory.

5  Q.   Were you involved at the most recent interview with

6  Mr. Wilson's accountants, Mr. DeMaio?

7  A.   When that was?

8  Q.   August 11, 2021.

9  A.   No, I was not.

10:49 10  Q.   Okay.  Did you read the report of that conversation?

11  A.   No, I did not.

12       MR. KENDALL:  If we could go to transcript 591, the

13  chalk that goes with the exhibit -- that number.  This is the

14  October 27, 2018 call.

15  Q.   This is after Mr. Wilson has made half or all of the

16  payment, correct?

17  A.   He made one payment.

18  Q.   $500,000?

19  A.   Yes.

10:50 20  Q.   So bottom of line 23 on page 1, Mr. Singer, "So I had a

21  conversation with the Stanford sailing coach and, so I just

22  gave the Stanford sailing coach 160,000 for his program".

23       Did the agents tell Mr. Singer to say "program" or

24  did he misspeak yet again?

25  A.   He misspoke on that as well.

1    Q.   You worked a lot with Mr. Singer, correct?  You spent a

2    lot of time in his presence?

3    A.   Yes.

4    Q.   He's an intelligent man, correct?

5    A.   Yes.

6    Q.   Did he misspeak or did he intentionally say these things

7    in your view?

8             MR. FRANK:  Objection.

9             THE COURT:  Sustained.

10:51 10   Q.   Well, you said he misspoke.  You don't know if he misspoke

11   or if it was intentional.  You just know he said a word

12   different than what you asked him to say, correct?

13   A.   We directed Mr. Singer to say "payment to a coach" and he

14   said "donation".

15   Q.   And he said "payment to program"?

16   A.   And program.  Yes.

17            MR. KENDALL:  I'd like to keep going through.  I'd

18   like to go to -- please look at the chalk 594 transcript that

19   goes with the exhibit with that number, the November 5, 2018

10:52 20   conversation.

21            One minute, your Honor.

22   Q.   If we could go to page 7, line 8, Mr. Singer states, "No,

23   so what happens is -- it's like -- I'll give an example.  Like

24   women's lacrosse is always looking for help.  Women's fencing,

25   looking for help.  This -- immediately they give us a spot,

1    guaranteed spot, you -- we pay the coach".

2         So he's talking about we pay the coach in the context

3    of a program needs help, correct?

4    A.   He's saying that women's lacrosse and fencing are looking

5    for help, and then further down, he says they pay the coach.

6    Q.   Did you tell him -- did the agents instruct him to say

7    that the team needs help in the same context of saying "pay the

8    coach"?

9    A.   No.

10:53 10    Q.   That was Mr. Singer's contribution, correct?

11   A.   Mr. Singer said that.

12   Q.   It's all mixed up, isn't it?

13   A.   Mr. Singer -- we directed Mr. Singer to say payment to a

14   program, and he would go back to his old pitch and say "payment

15   to a coach" or "donation to a program".

16   Q.   He repeatedly refused to do what you instructed him to do,

17   correct?

18   A.   I don't think he refused.

19   Q.   He repeatedly did not do what you instructed him to do,

10:54 20    correct?

21   A.   He would go back to his old pitch and he wasn't as

22   explicit as we directed him to be.

23   Q.   Is this because he keeps misspeaking?

24        MR. FRANK:  Objection.

25        THE COURT:  Overruled.

1    Q.   He just keeps misspeaking and it keeps happening?

2    A.   He keeps using his old pitch, yes.

3    Q.   Now, if we take a look at the next page, at line 15,

4    Mr. Wilson is talking about Stanford.  "So then there's the --

5    the value of money.  Does he care about budget this year versus

6    next year?"

7             You agree with me university programs have budgets?

8    A.   Yes.

9    Q.   And they have budgets each year?

10:55 10   A.   Yes.

11   Q.   Okay.  Did any of the agents tell Mr. Singer, you have to

12   go back and tell Mr. Wilson this money is not going into the

13   budget for the school program?

14   A.   We did not have that specific conversation.

15   Q.   You did not have that general conversation, correct?

16   A.   We did not tell Mr. Singer to go back and correct that

17   statement.  We told Mr. Singer, for future calls, be more

18   explicit and say "payment to a coach".

19   Q.   You agree with me, coaches taking bribes don't have

10:55 20   budgets like school programs, correct?

21             MR. FRANK:  Objection.

22             THE COURT:  Sustained.

23             MR. KENDALL:  Okay.  If we could go to Tab 602, which

24   is from the November 29, 2018, call.

25   Q.   And we start at line 17.  Mr. Singer again is, "Okay,

1    cool.  Well, I'm in Boston working on your pet project,

2    Harvard", correct?

3    A.    Yes.  He said that.

4    Q.    Okay.  And again, nobody has told him he needs to make

5    clear that his visits to Boston have nothing to do with reading

6    at Harvard, correct?

7    A.    Correct.

8    Q.    If we take a look at page 2, line 12, Mr. Singer states

9    "So I got the senior women's administrator at Harvard is going

10:57 10    to give us a spot.  What we have to do is we'll have to give

11    her $500,000.  That money, obviously, like the others, will go

12    through my foundation and then I will fund the senior women's

13    administrator at Harvard".

14          Do you agree with me, programs at universities have

15    funding?

16    A.    Programs have funding, yes.

17    Q.    Okay.  Did the agents instruct Mr. Singer to use the word

18    "fund"?

19    A.    No.

10:57 20    Q.    He did that on his own, correct?

21    A.    He used -- yes.  He used the word "fund".

22    Q.    Then if we look at line 3 -- excuse me -- page 3, line 15

23    to 17, Mr. Wilson says, "Yeah, but she is a -- a sailor

24    actually, so sailing is actually a logical thing.  She could be

25    even the mascot, whatever, but she knows sailing"?

```
 1              Again, nobody told Mr. Singer to say, Mr. Wilson,
 2    she's not going to be a manager, she's not going to be on the
 3    team, correct?
 4    A.   Mr. Singer told Mr. Wilson that they don't have to play
 5    the sport.
 6    Q.   Excuse me.  I'm just asking -- if you can answer my
 7    question.  Did anybody tell him they don't have to be a
 8    manager, they don't have to be part of the team?  Yes or no?
 9    A.   Specifically that?
10:58 10  Q.   Yes.
11    A.   No.
12    Q.   I'm trying to make all my questions specific so we have
13    specific answers and not general.  I'd appreciate that.
14              MR. FRANK:  Objection.
15              THE COURT:  Sustained.
16    Q.   Okay.  If we could go to transcript 620, this is the -- it
17    says it's January 2nd.  Is it January 2nd or January 3rd where
18    the call took place?
19    A.   This -- the transcript says January 2nd.  I don't
10:59 20  recall --
21    Q.   Okay.  Excuse me.  This is the Singer/Vavic call.  Now,
22    you had the ability to instruct Mr. Singer to say whatever you
23    wanted on this call with Coach Vavic, correct?
24    A.   Yes.
25    Q.   If you wanted to, you could have written out a script and
```

1   just said, read it just like we wrote it, correct?

2   A.   Yes.

3   Q.   Would you agree with me, he has this call with Coach Vavic

4   and there's absolutely no reference to Johnny Wilson's

5   application?

6   A.   Correct.

7   Q.   Did the agents instruct Mr. Singer to raise Johnny

8   Wilson's application with Coach Vavic?

9   A.   I don't recall.

10:59 10   Q.   And Mr. Singer certainly didn't on his own raise it,

11   correct?

12   A.   Correct.

13   Q.   And that's because -- would it be fair to say the agents

14   didn't instruct him because he'd already told you he was a real

15   polo player who played?

16   A.   No.

17   Q.   You knew -- he had told you that though, correct?

18   A.   Mr. Singer told us that Johnny Wilson was a water polo

19   player, yes.

11:00 20   Q.   Okay.  And then, if we go to -- at no point did you say to

21   Mr. Singer, ask Vavic if those tuition payments to Loyola

22   School have anything to do with John Wilson?  You didn't

23   instruct him to ask that, correct?

24   A.   Correct.

25   Q.   And, in fact, you know those tuition payments to Loyola

```
 1  have nothing do with John Wilson, correct?
 2          MR. FRANK:  I object.
 3          THE COURT:  Sustained.
 4  Q.   They were made 18 months after his son was admitted,
 5  correct?
 6  A.   They were made after Johnny was admitted, yes.
 7  Q.   It's like July or August of 2015, correct?
 8  A.   Correct.
 9  Q.   The boy was admitted around March 1st of '14?
10  A.   Correct.
11  Q.   17, 18 months after.  And you don't trace any of Wilson's
12  money paying those tuition payments, do you?
13  A.   I don't see Mr. Wilson, specifically Mr. Wilson's funds
14  going to the tuition payments.
15  Q.   And you don't see a shred of evidence that Mr. Wilson had
16  any understanding that Mr. Vavic -- his son's tuition would be
17  paid 18 months after his son's admission?
18          MR. FRANK:  Objection to Mr. Wilson's understanding.
19          THE COURT:  Sustained.
20  Q.   You don't see any evidence informing Mr. Wilson that
21  18 months after his son is admitted Mr. Singer is going to pay
22  some tuition for Mr. Vavic, correct?
23  A.   Correct.
24  Q.   And you could have asked Vavic any question you wanted
25  about Mr. Wilson's involvement with USC and you chose to ask
```

1    zero, correct?

2    A.   I don't recall exactly what we asked Mr. Singer to say,

3    but he said nothing about Johnny Wilson.

4    Q.   And after this call, you didn't say, Mr. Singer, you

5    forgot to ask about Johnny, we need another call with Vavic.

6    You didn't do that?

7    A.   We did not have another call about Johnny Wilson.

8    Q.   You didn't ask him to do another call about Johnny Wilson,

9    correct?

11:02 10   A.   Correct.

11   Q.   Okay.  And if we take a look at page 3, line 13, Vavic

12   says to Singer -- actually, let's start at line 12.  No.

13   Line 13.  "Now the walk-on is required to have decent grades".

14            Based upon your investigation, you know a 3.87 is a

15   decent grade for a walk-on at USC, don't you?

16            MR. FRANK:  Objection.  Foundation.

17            THE COURT:  Overruled.  If she knows.

18   A.   I don't know exactly what the criteria is for USC, but I

19   know that that's a pretty good GPA.

11:02 20   Q.   "And he has to have some kind of a resume.  He can't just

21   be a total nobody.  So he has to be a water polo player.  He

22   has to have a -- a somewhat decent resume and maybe, you know,

23   3rd team all-CIF, or you know, 4th or 5th team all American".

24            You know from your investigation that Johnny Wilson

25   was First Team All Peninsula Athletic League, don't you?

```
 1   A.    I don't recall specifically that.
 2   Q.    You know he participated in the U.S. Olympic Development
 3   Program, didn't he?
 4         MR. FRANK:  Objection to the testifying, your Honor.
 5         THE COURT:  Overruled.
 6   A.    I don't specifically know.  I know Johnny Wilson was a
 7   water polo player.
 8   Q.    Do you know if his teams were in the Junior Olympics, the
 9   regional, the sectional Junior Olympics?
10   A.    I don't know.
11         MR. KENDALL:  I want to go to Exhibit 623.
12   Q.    This is the chalk transcript of the January 3, 2019, call
13   between Mr. Wilson and Mr. Singer, correct?
14   A.    January 3rd transcript, yes.
15   Q.    Let's go to page 6, line 10.  Can we go to -- actually,
16   line 14.  Mr. Singer starts, "the money's all been paid" --
17   this is the second to last phone call, correct?
18   A.    Correct.
19   Q.    Mr. Singer states, at line 14, "Both at Stanford and
20   Harvard.  I mean, one of the things I just wanted to really
21   make sure, cause, this has kinda come back to me, not because
22   of you guys but for other families that we've gone through the
23   side door -- is that I just gotta make sure that you guys don't
24   get engaged at Harvard or Stanford with anybody in admissions
25   or development or anything, that you guys keep your name out of
```

1    the room.  Is that okay?"

2         And he states, "Yeah, so what does that mean, don't

3    get engaged?  Like".

4         "Yeah.  So".

5         So let's drop down to line 7.  "No, no, no, that's

6    fine.  That's all good".  This is what Mr. Singer says.  "The

7    issue is like I've had families before that essentially have

8    gone through the side door and then because people found out

9    who they were, the development office calls them.  Admissions

11:05 10   will call them, all trying to get, you know, donations, and,

11   um, so as soon as your name is known amongst those other

12   groups, then people start saying, on the athletics side, since

13   we're going through the side door, and you've already made, you

14   know, two $500,000 contributions, they're going to say, so, you

15   know, so why are you going through athletics, um, you know,

16   when development has already been talking to you?"

17        Did the agents tell Mr. Singer to say that?  Just yes

18   or no.  Did the agents tell him what to say?

19   A.   It's hard to answer yes or no to this.  We directed

11:05 20   Mr. Singer to make this call, to gather Mr. Wilson's

21   understanding that the admissions office did not know about the

22   side door.  He wasn't as clear as we asked him to be.

23   Q.   Well, he wasn't as clear.  Did you tell him to say the

24   reason you have to keep this to yourself is because the

25   development office will come and want more money?

1    A.    We did not ask him to say that.

2    Q.    He's stating that it's going to be a tug of war between

3    two different fundraising arms of the university.

4          MR. FRANK:  Objection to what he's stating.  It's on

5    the page.

6          THE COURT:  Sustained.

7    Q.    Did you tell him -- after this call, did you tell him?

8    Did you say, you've got to call Wilson and tell him, this is

9    not about the two different offices looking for the money, it's

11:06 10   we've got to keep it secret because it's improper?  You didn't

11   tell him that, did you?

12   A.    No.

13   Q.    Okay.  So your first conversation you're aware of that

14   Wilson has with Singer is a text message in September of 2018

15   that says, "I'm coming to meet the presidents of Harvard and

16   Tufts," correct?

17   A.    Yes.

18   Q.    And the last conversation -- well, this is the second to

19   last.  I'm sorry.  The second to last conversation is, keep

11:07 20   your side-door donation quiet or otherwise the development

21   office people will want even more of a contribution.  That's

22   the word he uses, isn't it?

23   A.    That's what -- that's the word he uses.

24   Q.    So he's been misspeaking for now three months?

25   A.    He wasn't as clear in this call as we asked him to be.

1    Q.   You told us earlier, when he uses "contribution", that's

2    misspeaking, correct?

3    A.   Correct.

4    Q.   Okay.  So he's been misspeaking for three months and you

5    guys can't get him to speak correctly in the whole

6    three months, correct?

7    A.   Mr. Singer was doing the side door scheme for years and he

8    kept going back to his old pitch.  Sometimes it's hard for

9    cooperators to say or use other language that the investigators

11:07  10    ask.

11   Q.   Mr. Singer had known Mr. Wilson from 2010 to 2018 before

12   you met Mr. Singer, correct?

13   A.   Correct.

14   Q.   So Mr. Singer and Mr. Wilson had a way of talking and

15   dealing with each other that you're not aware of, correct?  You

16   weren't monitoring before September 15th?

17   A.   Correct.

18            THE COURT:  We're going to take the morning recess.

19            You may step down, Miss Keating.

11:08  20            We're going to be in recess for 15 minutes.

21            THE CLERK:  All rise for the jury.

22            (Jury exits.)

23            THE COURT:  Please be seated, counsel.

24            How much longer, Mr. Kendall?

25            MR. KENDALL:  May I look at my notes, your Honor?

 1    I'll give you a more reliable estimate.

 2            THE COURT:  Yes.

 3            MR. KENDALL:  Your Honor, I'd like to say roughly

 4    30 minutes, but I will have a minimal role in the rest of the

 5    witnesses for the day.  So we're very mindful of your desire to

 6    be done by 3:30.

 7            THE COURT:  Mr. Frank, plans for the day?

 8            MR. FRANK:  Well, I would guesstimate about a half

 9    hour on redirect, plus or minus.  I can't be sure.  We also

11:10 10   have Miss Janke here.  Her direct is about an hour and

11    15 minutes.  We have Miss Hughes here.  Her direct is about

12    20 minutes.  So we have, you know, another hour and a half of

13    direct examination, plus my redirect examination of this

14    witness.

15            THE COURT:  All right.  Anything that needs to come to

16    the Court's attention before we recess?

17            MR. KENDALL:  No, your Honor.

18            THE COURT:  We're in recess for 15 minutes.

19            THE CLERK:  All rise.

11:24 20        (Recess taken 11:10 a.m. to 11:31 a.m.)

21            THE CLERK:  All rise for the jury.

22            (Jury enters.)

23            THE COURT:  Good morning again, jurors.  We're ready

24    to resume.

25            Ms. Keating, again, you remain under oath.

1          Mr. Kendall, you may continue with cross-examination.

2          MR. KENDALL:  Thank you, your Honor.

3          Thank you, Ms. Keating.  I'm pretty much at the end.

4    I hope to be done in 15 minutes or so, maybe even a little

5    less.  I appreciate your patience.

6    BY MR. KENDALL:

7    Q.   I want to finish up with the transcript we were looking at

8    623, and if we go to line 7 -- excuse me, page 7, lines 17, 18,

9    19, 20.  This is the second-to-last college, January of 2019.

11:32 10    It's really at the end of the three-month period of consensuals

11    with Mr. Wilson.  And Mr. Singer says at line 17, "So you

12    know -- so why you going through athletics?"

13          Did the agents tell Mr. Singer to tell Mr. Wilson

14    after he paid the million dollars that he was going through

15    athletics, or was that Mr. Singer's choice of words?

16    A.   I don't recall if that was at our direction or his choice

17    of words.

18    Q.   "Athletics" is the athletics department, correct?

19    A.   Mr. Singer says "going through athletics" --

11:33 20    Q.   It's the athletics department, correct?

21    A.   He says going through athletics.  You could interpret it

22    that way.

23    Q.   Okay.  Did you tell him to say at the end, "Tell Wilson he

24    paid a coach, not the athletics department"?

25    A.   I don't recall the specifics on this -- what we directed

1   him to say on this conversation.

2   Q.   Okay.  So at the end of it all, Mr. Singer is still

3   telling Wilson that he's paying for a program, not for a coach,

4   correct?

5   A.   He doesn't say "coach," correct.

6   Q.   And no agent told Mr. Singer, "Call up Wilson and correct

7   that and let him know he's paying a coach, not a program"?

8   A.   Correct.

9   Q.   So if we could go then to the last transcript, which is

11:34 10   625, the chalk for the call of January 10, 2019.  This is the

11   final call, correct?

12   A.   Yes.

13   Q.   And if we go to page 4, starting at line 1, Mr. Wilson

14   says, "We'd like to have something if we had any influence on

15   that, that actually fits with their, at least, interests, so

16   you don't have this kind of" --

17         "God, I'm a failure I know -- I'm an idiot on

18   sailing.  I know nothing about sailing.  I'll look really

19   stupid even trying to be the bag carrier of sailing?"

11:35 20         The final call after three months, did you tell

21   Mr. Singer go back and tell Mr. Wilson there are not going to

22   be manager or support staff on the team?

23   A.   No.

24   Q.   Then if we go look at page 5, we see two things.

25   Mr. Wilson is still offering to give advice and pricing, at

1   line 17; isn't that correct?

2   A.   Yes.

3   Q.   "I'm just trying to help you, but, you know, I can only

4   offer so many times."

5        And then he asks at line 22 -- actually, lines 20 and

6   22, "When are you gonna be in Boston next?"  And that's because

7   you never retracted the statement that he's reading files at

8   Harvard, correct?

9   A.   We never retracted that statement.

11:36 10   Q.   And he asks, "When are you going to be in Boston next?"

11   Because if you look at line 24 of page 5, "Let me know.  I'd

12   love to see you.  And I know the girls would love to see you,"

13   correct?

14   A.   Correct.

15   Q.   And in addition to the consensual calls you made with

16   people like Mr. Wilson, you made what you called a series of

17   audit calls, correct?

18   A.   Correct.

19   Q.   Those were for people whose children's applications had

11:36 20   already been completed and done and they were in the past,

21   correct?

22   A.   Correct.

23   Q.   Johnny Wilson fell in that category, correct?

24   A.   Johnny Wilson was in the past, correct.

25   Q.   Is it fair to say in the three months of text messages,

1    phone calls, e-mails, voicemail messages, not once did you try

2    to ask Mr. Wilson about the details of Johnny's application to

3    USC, correct?

4    A.    On the phone calls?

5    Q.    Yes.

6    A.    Correct.

7    Q.    All the other people who got audit calls, you did not try

8    that same thing with Mr. Wilson, correct?

9    A.    Correct.

11:37 10   Q.    And that three months, whatever it was, 60, 70 electronic

11   communications, not once did you ever raise that there was

12   something Mr. Wilson knew about that was fraudulent about his

13   son's application?

14            MR. FRANK:  Objection, your Honor.

15            THE COURT:  Sustained.

16            MR. KENDALL:  Okay.

17            The last thing, your Honor, just a couple of minutes.

18            Could we have Exhibit 9736 just for the witness.

19            MR. FRANK:  Do you have a copy, Mr. Kendall?

11:37 20           MR. KENDALL:  These were produced to us by the

21   government, your Honor.

22            MR. FRANK:  Well, I'll need a copy.  Thank you.

23   Q.    Do you recognize this document?

24   A.    I have not seen this document.

25   Q.    Have you reviewed Jim Nahmens' work papers?

          1   A.   I did not.  There was another special agent assigned that

          2   looked at the John Wilson tax papers.

          3        MR. KENDALL:  Could we put up 9737, please.  Just for

          4   the witness, please.

          5   Q.   Do you recognize this document, this e-mail?

          6   A.   Can you scroll further down, please?

          7             No, I don't recognize that e-mail.

          8        MR. KENDALL:  Could I show you Exhibit 9738 just for

          9   the witness, please.

    11:39 10   Q.   Have you seen 9738 before?

         11   A.   No, I have not seen this.

         12        MR. KENDALL:  Could we show her 9746, please.

         13   Q.   Have you seen this before?

         14   A.   No, I have not.

         15   Q.   Could we see Exhibit 7974, and I ask you if you've seen

         16   that?

         17   A.   No.  I don't recall seeing this e-mail.

         18   Q.   During all the times you had conversations with Mr. Singer

         19   about his interaction with Mr. Wilson, did you ever suggest to

    11:40 20   him to say something along the lines, "You need to make the

         21   payment because the coach has got to make his mortgage" or "the

         22   coach is building a house?"  Did you ever suggest adding that

         23   extra detail to show personal use of the payment to the coach?

         24   A.   No.

         25   Q.   And you never said anything like, "The Stanford coach" --

1   did he ever tell him to say something along the lines, "The

2   Stanford coach doesn't have a budget.  He's just short on cash

3   and he's got to pay bills"?

4   A.   No, not that I recall.

5          MR. KENDALL:  Okay.  Thank you very much.  No further

6   questions.

7          THE COURT:  Redirect, Mr. Frank.

8          MR. FRANK:  Thank you, your Honor.

9          REDIRECT EXAMINATION OF ELIZABETH KEATING

11:41 10   BY MR. FRANK:

11   Q.   Good afternoon, Agent Keating.  Or good morning.

12   A.   It's still morning.

13   Q.   Still a few more minutes.

14   A.   Good morning.

15   Q.   Agent Keating, you were asked a whole series of questions

16   about the word choice -- Mr. Singer's word choice in the

17   consensually recorded calls.  Do you recall all those

18   questions?

19   A.   Yes.

11:42 20   Q.   You were asked questions about his use of the word

21   "donation" or "contribution" as opposed to "payment."  Do you

22   recall those questions?

23   A.   Yes.

24   Q.   And you were asked questions about whether the money was

25   going to the program or whether the money was going to the

| | |
|---|---|
| 1 | coach and what choice of words Mr. Singer made on those |
| 2 | consensually recorded calls, correct? |
| 3 | A.   Correct. |
| 4 | Q.   And he didn't always use the words that you instructed him |
| 5 | to use.  He sometimes fell back on his pitch.  I believe that |
| 6 | was your testimony? |
| 7 | A.   Yes. |
| 8 | Q.   The pitch that he'd been using for decades with the side |
| 9 | door scheme, correct? |
| 11:43 10 | A.   Yes. |
| 11 | Q.   And if you take a look at the transcript for 571, you were |
| 12 | asked questions on 571 at page 5. |
| 13 | A.   I don't see anything. |
| 14 | Q.   Oh, do you not have a transcript binder? |
| 15 | A.   Sorry.  I thought it was going to be on the screen. |
| 16 | Q.   I'm going to be referring to the transcript binders.  If |
| 17 | you look in the transcript binder under the transcript for |
| 18 | Exhibit 571, this is the consensually recorded call from |
| 19 | September 29, 2018? |
| 11:43 20 | A.   Correct. |
| 21 | Q.   And Mr. Kendall asked you questions about -- at page 5, at |
| 22 | the end of that page, page 5, line 19, where Mr. Singer says, |
| 23 | "But at the end of the day by the side door, I may be able to |
| 24 | go to the sailing coach and say, 'Hey, the family's willing to |
| 25 | make contributions.'"  Do you see that? |

```
 1   A.    Yes.

 2   Q.    And he asks you about Mr. Singer's use of the word

 3   "contributions."  Do you recall those questions?

 4   A.    Yes.

 5   Q.    And what Mr. Singer actually said there was, "I may be

 6   able to go to the sailing coach and say, 'Hey, the family is

 7   willing to make the contributions.  She could be on your team.

 8   She is a sailor.  She may not be up to the level you are, but

 9   she can -- you know, you're going to get a benefit and the
11:44 10   family's going to get a benefit.'  So are you interested in

11   doing that?"

12            MR. KELLY:  Your Honor, excuse me.  My monitor is not

13   working.

14            MR. FRANK:  It's not on the monitor.  It's in the

15   transcript binder.

16            THE COURT:  Only on the transcript, apparently.

17            MR KELLY:  Okay.

18   Q.    "You're going to get a benefit and the family's going to

19   get a benefit," is that what Mr. Singer said to Mr. Wilson on
11:44 20   September 29, 2018?

21   A.    Yes.

22   Q.    And Mr. Wilson responded, "Yeah, okay."  Do you see that

23   at line 3 on page 6?

24   A.    Yes.

25   Q.    You're going to get a benefit and the family's going to
```

```
 1  get a benefit.
 2          Have you heard the term "quid pro quo"?
 3  A.   Yes.
 4  Q.   What is a quid pro quo?
 5          MR. KENDALL:  Objection, your Honor, to the extent
 6  it's a legal term.
 7          MR. FRANK:  I'm not asking for a legal term, your
 8  Honor.
 9          THE COURT:  Overruled.
10  A.   This for that.
11  Q.   This for that.  You're going to get a benefit and the
12  family's going to get a benefit?
13          MR. KELLY:  Objection to the leading of his own
14  witness, your Honor.
15          MR. FRANK:  It's redirect, your Honor.
16          THE COURT:  Well, you can't direct, but -- I'll allow
17  you to have that question, but don't lead.
18  Q.   You're going to get a benefit and the family's going to
19  get a benefit.  How does that compare with "this for that"?
20          MR. KENDALL:  Objection, your Honor.
21          THE COURT:  Overruled.
22  A.   It's the same.
23  Q.   And right before this, Mr. Wilson has just said, in his
24  own words at page 5, line 14, "Courtney's not even that good
25  competitively at sailing.  She just taught sailing and did
```

11:45 at lines 10, 20

```
 1   sailing in yacht club."  Do you see that?
 2   A.    Yes.
 3   Q.    What is the sailing coach, according to Mr. Singer, going
 4   to be doing in exchange for the, quote-unquote, contribution?
 5   A.    Put her -- I'm sorry.  Can you repeat that?
 6   Q.    What's the sailing coach going to be doing for Courtney
 7   Wilson in exchange for that contribution?
 8   A.    He's going to get a payment.
 9   Q.    And what's he going to be doing for Courtney Wilson?
10   A.    Say that she's a sailor.
11   Q.    Put her on the sailing team?
12             MR. KELLY:  Objection, your Honor.
13             THE COURT:  Overruled.
14   A.    Yes.
15   Q.    And Mr. Kendall asked all these questions about
16   Mr. Singer's use of the word "contribution," right?
17   A.    Yes.
18   Q.    In the consensual calls?
19   A.    Correct.
20   Q.    Could we take a look at Exhibit 83, please.  And if you
21   could look at page -- I believe it's page 3.  If you look in
22   the middle of the page --
23             MR. FRANK:  Ms. Lewis, if you could highlight right
24   there.  Thank you.
25   Q.    -- that's Mr. Wilson talking about his son Johnny on
```

1   October 13, 2013.  Do you see that?

2   A.   Yes.

3   Q.   That is about five years before Mr. Singer began making

4   consensual recordings of Mr. Wilson?

5   A.   Correct.

6   Q.   And what does Mr. Wilson say in the second line, beginning

7   with "Also"?

8   A.   "Also, when is Jovan going to be able to give us a

9   decision on USC.  And do I pay you?  Was it 50 percent in

11:48 10   November or 50 percent in Feb when we get the final official

11   notice?"

12   Q.   Is there any reference to a donation or a contribution in

13   Mr. Wilson's e-mail of October 13, 2013?

14   A.   No.

15   Q.   Let's look at Mr. Singer's response.

16        Do you see where it says, "Jovan will provide

17   Johnny's info to admission when he does his other guys over the

18   next month"?

19   A.   Yes.

11:48 20   Q.   What does it say after that?

21   A.   "No payment of money till he gets a verbal and written

22   from admissions and then 50 percent to a savings account I set

23   up.  Then the remainder upon an acceptance letter in March with

24   everybody else."

25   Q.   Was Mr. Singer using the word "contribution" or "payment"

1    in October of 2013?

2    A.    "Payment."

3    Q.    Could we look at Exhibit 710, please.  This is March

4    of 2014, after Johnny was admitted as a recruited water polo

5    player to the University of Southern California.  If I could

6    direct your attention to the subject line of Mr. Wilson's

7    e-mail.  What does he call it?

8    A.    USC fees.

9    Q.    No mention of a donation or contribution?

11:49 10   A.    No.

11    Q.    And then let's look at what he says at the bottom.  "Rick,

12    thanks again for making this happen."

13          And then what does he say?

14    A.    "Please give me the invoice.  What are the options for the

15    payment?  Can we make it for consulting or whatever from The

16    Key so that I can pay it from my corporate account?"

17    Q.    Any reference to "donation" or "contribution"?

18    A.    No.

19    Q.    What does Mr. Singer respond?

11:49 20   A.    "Yes.  We can send you an invoice for business consulting

21    fees and you may write off as an expense."

22    Q.    Any reference to "donation" or "contribution"?

23    A.    No.

24    Q.    How many years was this before Mr. Singer started making

25    consensual recordings at the direction of the government?

```
 1   A.   Approximately four years.

 2   Q.   Could we look at -- I'm sorry -- the transcript for

 3   Exhibit 578, please, the 578 transcript.  That's in everyone's

 4   binders.

 5           If we look at transcript 578 at page 5 -- 578 at

 6   page 5, line 15, Mr. Wilson says, "And they don't actually have

 7   to do that sport you're saying.  They could just go in and be

 8   like the scorekeeper or water boy, water girl."

 9           And Mr. Singer responded, "Manager or whatever you
```
11:50 10   want to call them, yup."  Do you see that?
```
11   A.   Yes.

12   Q.   Now, Mr. Wilson isn't saying "manager," that's Mr. Singer?

13   A.   Correct.

14   Q.   What words is Mr. Wilson using?

15   A.   "Scorekeeper," "water boy," "water girl."

16   Q.   And do you know if universities recruit water boys and

17   water girls?

18   A.   No, they do not.

19           MR. KENDALL:  Objection, your Honor.  I don't think
```
11:51 20   she's got a foundation to know what universities do.
```
21           THE COURT:  Overruled.

22   Q.   And Mr. Kendall asked you about the use of the term

23   "manager."  Do you recall that?

24   A.   Yes.

25   Q.   Could we turn to page 7, please.  Page 7, line 11,
```

```
 1   Mr. Singer says, "With your girls because they're athletic and
 2   they're big and all of that, I can sell to anybody that they're
 3   athletic enough to be able to take them and there will be no
 4   question."  Do you see that?
 5   A.   Yes.
 6   Q.   Do you recall Mr. Kendall asking you any questions about
 7   that?
 8   A.   No.
 9   Q.   He didn't ask a single one about that, right?
11:52 10   A.   Correct.
11   Q.   He could have asked you anything he wanted in the many,
12   many hours he was up here asking you questions.  Not one
13   question about selling to anybody that the girls are athletic
14   enough to be able to take them and there will be no question.
15          And how did Mr. Wilson respond?
16   A.   "Yeah, their size and everything else."
17   Q.   Now, you were asked whether Mr. Singer ever told
18   Mr. Wilson that there would be a fake athletic profile, whether
19   he used the words "fake athletic profile."  Right?  He didn't
11:52 20   use those words in these calls, did he?
21   A.   No.
22   Q.   But he did say, "I could sell to anybody that they're
23   athletic enough to be able to take them and there will be no
24   question."  He did say that, right?
25   A.   Correct.
```

```
 1    Q.   Would you say that's explicit?

 2    A.   Yes.

 3    Q.   And if we could look at 597 in evidence, please.  These

 4    are the text messages that Mr. Kendall put into evidence.

 5    A.   Yes.

 6    Q.   Do you recall that?

 7              If we could look at page 3, the second text message.

 8              "Rick, for Mamie, what is the sport or angle I need

 9    to prep her for to help get in without her knowing?  Also, is

 10   it a 100 percent done deal after final payment in spring?"

 11             Now, Mr. Kendall put this exhibit in.  But do you

 12   recall him asking you any questions about this text?

 13   A.   No.

 14   Q.   And these are Mr. Wilson's words?

 15   A.   Yes.

 16   Q.   And is it possible to manage a sport without knowing it?

 17   A.   No.

 18   Q.   You can't manage without knowing what you're doing, right?

 19   A.   Correct.

 20   Q.   And what word does Mr. Wilson use to describe the money?

 21   A.   "Payment."

 22   Q.   Now, let's take a look at the next call, 591.  And

 23   Mr. Kendall asked you about page 2 at the top where Mr. Singer

 24   said that he could give the sailing coach, John Vandemoer,

 25   $160,000 for his program.  Do you recall those questions?
```

|      |     |                                                                       |
|------|-----|-----------------------------------------------------------------------|
| 1    | A.  | Yes.                                                                   |
| 2    | Q.  | At page 3, the very next page -- I'm sorry -- at page --               |
| 3    | yes, at page 3, the very next page, Mr. Singer says at line 12,        |
| 4    | "It doesn't matter if it's one of the girls who's not a sailor.        |
| 5    | I can still put her as a sailor."  Do you see that?                    |
| 6    | A.  | Yes.                                                                   |
| 7    | Q.  | Now, again, you were asked about fake athletic profiles.              |
| 8    | Can you put somebody as a sailor who's not a sailor without a          |
| 9    | fake profile?                                                          |
| 11:55 10 | MR. KENDALL:  Objection, your Honor.                              |
| 11   | THE COURT:  Overruled.                                                 |
| 12   | A.  | No.                                                                    |
| 13   | Q.  | And how does Mr. Wilson respond at line 18?                            |
| 14   | A.  | "Right.  Right."                                                       |
| 15   | Q.  | Do you recall Mr. Kendall asking you any questions about              |
| 16   | this?                                                                  |
| 17   | A.  | No.                                                                    |
| 18   | Q.  | And if you look at page 2, the very same page where                   |
| 19   | Mr. Kendall did ask you some questions, at line 20 Mr. Singer          |
| 11:55 20 | says, "I asked him for a second spot in sailing, and he said he    |
| 21   | can't do that because he actually has to actually recruit some         |
| 22   | real sailors so that Stanford doesn't catch on."                       |
| 23   | Did Mr. Kendall ask you any questions about that?                      |
| 24   | A.  | No.                                                                    |
| 25   | Q.  | And then Mr. Singer actually said it again, right, right              |

```
 1   below that?
 2          Mr. Wilson responds at line four, "He's got to
 3   actually have some sailors.  Yeah."
 4          And then Mr. Singer says, "So that Stanford doesn't
 5   catch on to what he's doing."
 6          And how does Mr. Wilson respond?
 7   A.   "Right."
 8   Q.   And what would the Stanford sailing coach be doing in
 9   exchange for the money?
10   A.   Putting the girls on the sailing team.
11   Q.   And that would be regardless of whether the money went to
12   the program or his pocket, right?
13   A.   Correct.
14   Q.   Mr. Wilson -- Mr. Singer has just talked about money going
15   to the program and he's also talked about Stanford not catching
16   on, correct?
17   A.   Correct.
18   Q.   And this was after Mr. Singer told Mr. Wilson that he'd be
19   meeting with the Harvard president, right?
20   A.   Correct.
21   Q.   And it was after he had told Mr. Wilson that he'd be
22   meeting with the Tufts president, right?
23   A.   Correct.
24   Q.   But he's talking about Stanford not catching on to what
25   the sailing coach is doing in exchange for money to his
```

```
 1    program?
 2    A.    Correct.
 3    Q.    Anything ambiguous or mysterious about that?
 4              MR. KENDALL:  Objection, your Honor.
 5              THE COURT:  Overruled.
 6    A.    No.
 7    Q.    It's explicit, right?
 8    A.    Yes.
 9    Q.    Dictionary definition or Agent Keating's definition, it's
10    explicit, right?
11    A.    Yes.
12    Q.    Could we look at Exhibit 594, please.  Mr. Kendall asked
13    you some questions about page 7, where Mr. Singer talked about
14    women's lacrosse is always looking for help, women's fencing is
15    looking for help.  Do you recall those questions?
16    A.    Yes.
17    Q.    He didn't ask you any questions about page 3, did he?
18    A.    No.
19    Q.    On page 3, Mr. Singer says, "Let me give you an update,"
20    at the top.  "We got the Stanford spot," line four.  "They want
21    to know if you want it because I have to pay the coach right
22    away."  Do you see that?
23    A.    Yes.
24    Q.    And then at line 12, he says, "So the sailing spot that we
25    have that we'll pay the coach, he doesn't care if it's a sailor
```

1    or not."  Line 16, "he doesn't care one bit."  Do you see that?

2    A.   Yes.

3    Q.   No questions about that from Mr. Kendall, were there?

4    A.   No.

5    Q.   Is that explicit?

6    A.   Yes.

7    Q.   And then at page 5.  I have the wrong page number.  I'm

8    going to withdraw that question and we'll come back to that.

9            Let's go to 602.  Mr. Kendall asked you some

11:59 10   questions about line -- page 2, line 16, about when Mr. Singer

11   said that he would be funding the senior women's administrator

12   at Harvard.  Do you recall that?

13   A.   Yes.

14   Q.   And if we look at the very next page, Mr. Wilson says --

15   Mr. Singer says at line 9, "Maybe she won't have to sail, but

16   we're going to put her through sailing and John Vandemoer.

17   This is actually a better play at Harvard because she'll go in

18   through athletics in one of the sports, but it won't matter.

19   It won't matter."

12:00 20         And then Mr. Wilson responds, "Yeah, but she's a

21   sailor, actually, so sailing is actually a logical thing.  She

22   could even be the mascot."

23         Now, during the course of your investigation into

24   recruiting for athletics at the University of Southern

25   California and elsewhere, did you ever come across a recruited

```
 1   mascot?
 2   A.    No.
 3              MR. KENDALL:  Objection, your Honor.
 4              THE COURT:  Overruled.
 5   Q.    It's absurd, right?
 6   A.    Correct.
 7   Q.    Whose words were those?  Who was talking about a recruited
 8   mascot?
 9   A.    Mr. Wilson.
10   Q.    And what had Mr. Wilson previously told Mr. Singer about
11   whether Courtney was any good at sailing?
12   A.    Mr. Wilson said Courtney does sailing at the local yacht
13   club and that she wasn't very good.
14   Q.    Can we look at transcript for 623, please.
15              Mr. Kendall asked you some questions about page 7 and
16   what Mr. Singer was saying about not talking to admissions.  Do
17   you recall those questions?
18   A.    Yes.
19   Q.    I'd like to direct your attention to the next page, at
20   line 7.  Mr. Singer says, "We'll go through kind of like what
21   we did with Johnny."
22              Who's Johnny?
23   A.    Mr. Wilson's son.
24   Q.    So he's talking about Mr. Wilson's son in these calls
25   after all, isn't he?
```

Line timestamps: 12:00 at line 10, 12:01 at line 20.

A.    Yes.

Q.    "We went -- Johnny went, you know, right to water polo.
And for the girls, I'll probably just go to two sports, sailing
and crew, just walk them right through as recruited walk-ons."
Do you see that?

A.    Yes.

Q.    And how does Mr. Wilson respond?

A.    "Okay."

Q.    And then further on, he says, "My only thing to you," at
line 15, "was I just want to make sure because, you know,
you're a known entity, a known family.  And they're going --
people know you're interested and they're going to say, "Hey, I
can help you.  Or people may call you.  And I just want to say
you just say, 'Hey listen, we got' -- we're taking care of
things ourselves.  We have it all.  The girls are great
students.  We're just going to apply on their own."

        And Mr. Wilson responds, "Okay just kind of -- just
say we're applying on our own.  Nothing."

        And Mr. Singer responds, "Correct.  Nothing.
Nothing.  No side doors.  We're not doing anything."

        And Mr. Wilson says, "Yeah, don't mention about that.
Right."

        And Mr. Singer responds, "Yeah, where you're making a
payment to help the kids get into school."

        And how does Mr. Wilson respond?

```
 1   A.    "Right, okay.  That sounds good."
 2   Q.    So in that instance, when Mr. Singer tells Mr. Wilson not
 3   to say anything about the side door to anyone who comes to him
 4   from admissions or elsewhere and Mr. Wilson agrees and
 5   Mr. Singer says where you're making a payment to help the kids
 6   get into school, was there anything lacking in explicitness
 7   about that?
 8   A.    No.
 9   Q.    You were asked a series of questions, Special Agent, about
10   the fact that Mr. Singer did not use the word "bribe" in these
11   consensual calls with Mr. Wilson.  Do you recall those
12   questions?
13   A.    Yes.
14   Q.    Prior to approaching Mr. Singer on September 21, 2018, did
15   you ever intercept a recording in which he -- a call in which
16   he used the word "bribe"?
17   A.    No.
18   Q.    Did you see it in his e-mails?
19   A.    No.
20   Q.    In your experience as a 20-year IRS employee and as a
21   criminal agent, do white-collar defendants typically use that
22   type of explicit language when they're talking to one another?
23              MR. KENDALL:  Objection, your Honor.
24              THE COURT:  Overruled.
25   A.    No, they do not.
```

1   Q.   Do they say to one another, "Now I would like to discuss

2   our fraud"?

3   A.   No, they do not.

4   Q.   Were you worried that using the word "bribe" would tip

5   Mr. Wilson off that Mr. Singer was cooperating?

6   A.   Yes.

7   Q.   Is that why you didn't instruct him to use the word

8   "bribe"?

9          MR. KENDALL:  Objection, your Honor.

12:04 10          THE COURT:  Sustained.

11   Q.   Why did you not instruct him not to use the word "bribe"?

12   A.   Because we thought it would tip Mr. Wilson off that there

13   was something going on such as an investigation.

14   Q.   You were asked questions about your affidavit in which you

15   wrote -- the affidavit that you signed under penalties of

16   perjury in which you noted that you asked Singer to be more

17   explicit on the calls so there would be no confusion about the

18   parents' intent?

19   A.   Correct.

12:05 20   Q.   Now, yesterday you started to answer a question by saying

21   something about outsiders looking in.  Do you recall that?

22   A.   Yes.

23   Q.   But you weren't allowed to answer the question.

24   Mr. Kendall interrupted you.  Do you recall that?

25   A.   Correct.

|     |     |
| --- | --- |
| 1 | Q.   Who were you concerned would be potentially confused about |
| 2 | the parents' intent if Singer used words like "donation"? |
| 3 | MR. KENDALL:  Objection, your Honor. |
| 4 | THE COURT:  Overruled. |
| 5 | A.   If it went to trial, jurors and other people that were |
| 6 | looking such as -- I should say jurors were probably the top |
| 7 | concern. |
| 8 | Q.   Not the parents themselves, right?  They knew what they |
| 9 | were doing? |
| 12:06 10 | A.   Correct. |
| 11 | MR. KENDALL:  Objection your Honor. |
| 12 | THE COURT:  Sustained on the leading. |
| 13 | Q.   In these calls with Mr. Singer and Mr. Wilson, these |
| 14 | consensual calls, was it explicit what Mr. Wilson's money was |
| 15 | buying? |
| 16 | MR. KENDALL:  Objection, your Honor. |
| 17 | THE COURT:  Overruled. |
| 18 | A.   Yes. |
| 19 | Q.   Was it explicit whether the girls would be admitted as |
| 12:06 20 | sailors or crew recruits without the money? |
| 21 | A.   They would not be admitted without the money. |
| 22 | Q.   Was it explicit that it didn't matter if they could sail |
| 23 | or row crew? |
| 24 | A.   Yes. |
| 25 | Q.   Was it explicit that they were not recruitable athletes at |

1    that level?

2    A.    Yes.

3    Q.    When Singer told Wilson that Stanford -- that the coach

4    needed to recruit some real sailors so that Stanford doesn't

5    catch on, was that explicit?

6    A.    Yes.

7    Q.    In any of those calls, did Mr. Wilson ever ask, "Why do we

8    have to sell the girls as athletes if they're just going to be

9    managers"?  Did he ever ask that?

12:07 10   A.    No.

11   Q.    Did he ever ask why Stanford shouldn't catch on for this

12   to work?

13   A.    No.

14   Q.    He did ask whether he'd be able to get his money back if

15   his kids changed their minds about schools.  Do you recall

16   that?

17   A.    Yes.

18   Q.    He referred to that as a high-class problem?

19   A.    Yes.

12:07 20   Q.    In your experience as an IRS agent, do people typically

21   get their money back when they make a donation to charity?

22   A.    No.

23   Q.    Do people typically ask for their money back to the

24   American Cancer Society if they don't get something in

25   exchange?

```
 1    A.    No.
 2    Q.    All of those other donations that Mr. Wilson purportedly
 3    made that Mr. Kendall asked you about, education and other
 4    causes, did you see any evidence that he asked for those
 5    donations back?
 6    A.    No.
 7    Q.    You were asked some questions about Mamie and Courtney
 8    Wilson's test scores.  Do you recall those questions?
 9    A.    Yes.
12:08 10    Q.    Could we look at Exhibit 580, please.  If you could go to
11    the next page, please.  Do you see at the top right, the last
12    sentence, Mr. Singer says, "If the girls get what they are
13    capable of, 31 through 34, no problem."  And what are the last
14    four words?
15    A.    "Through the side door."
16    Q.    And if we look at the transcript for Exhibit 602 on
17    page 4.  Page 4, line 18, Mr. Wilson says, "Well, hopefully
18    that's settled, right?  I'm always I'm on pins and needles here
19    because it's like, okay, they got to still get good test
12:09 20    grades, of course, and all that stuff."
21          How does Mr. Singer respond?
22    A.    "No, they've got to be -- they've got to be good.  They
23    don't have to be over the top."
24    Q.    How does Mr. Wilson responds when he says that the girls'
25    grades and test scores do not have to be over the top?
```

1    A.    "Okay."

2    Q.    I'd like to direct your attention to the transcript at

3    594, please.  At 594, page 12, Mr. Singer says --

4          Are you with me, Special Agent?

5    A.    Yes.

6    Q.    Mr. Singer says at line 7, "I mean, you weren't going to

7    get into either one, let's just say, just based on the numbers

8    it takes to get in."

9          Mr. Wilson says, "Yeah."

12:10 10        Mr. Singer says, "Admissions rate and they don't even

11   play the sports, right?"

12         And how does Mr. Wilson respond?

13   A.    "Yeah.  They had a 2 percent shot or whatever taking the

14   test, or whatever it comes out at."

15   Q.    You were asked some questions in Exhibit 5 -- transcript

16   571 about the president of Brown University.  Do you recall

17   those questions?

18   A.    Yes.

19   Q.    And at pages 9 to 10, Mr. Singer says at the bottom, 571,

12:11 20   page 9 at line 18, "So what I would suggest is that he calls up

21   her office.  They have a scheduling person for the president.

22   And he sets up a meeting for he and his daughter to go meet.

23   And she kind of meets with them and then she'll give an

24   indication and he'll get an idea of what it's going to need --

25   "what's going to need to be done to have her go to Brown."

```
 1              And then what does Mr. Wilson say, at line 2?
 2   A.    "The front door."
 3   Q.    Not "the side door," right?
 4   A.    No.
 5   Q.    What scheme is Mr. Wilson engaged in?
 6   A.    The side door.
 7   Q.    And then at line 15, Mr. Wilson says, "He wanted to do
 8   it -- so the other thing he had a concern was he wanted to do
 9   it in a way his daughter wouldn't know."
12:12 10              And what does Mr. Singer say at line 20?
11   A.    "Well, then that's a different path and then -- then I may
12   have to get involved in that."
13   Q.    You were asked a series of questions, Special Agent, about
14   Mr. Wilson's offer to help Mr. Singer develop a pricing
15   strategy.  Do you recall those questions?
16   A.    Yes.
17   Q.    Can criminals, in your experience, have a pricing
18   strategy?
19   A.    They do pricing.  They have -- some types of frauds
12:12 20   involve different types of pricing.
21   Q.    And you were asked questions about The Key Worldwide
22   Foundation tax form, the 990?
23   A.    Yes.
24   Q.    Can legitimate charities be used, in your experience, to
25   funnel bribe money?
```

```
 1   A.   Yes.
 2   Q.   And in fact, you were investigating Mr. Singer for just
 3   that, right?
 4   A.   Correct.
 5   Q.   By the way, that 990, did you see any evidence that either
 6   Mr. Abdelaziz or Mr. Wilson saw that document ever?
 7   A.   No.
 8   Q.   You were asked a series of questions by both counsel about
 9   Exhibit 13, Mr. Singer's notes.  Do you recall those questions?
10   A.   Yes.
11   Q.   And they were characterized to you as Mr. Singer's notes
12   to himself, correct?
13   A.   Correct.
14   Q.   They were analogized to his diaries.
15   A.   Yes.
16   Q.   Do you recall that question?
17   A.   Yes.
18   Q.   You were asked whether people lie to their diaries?
19   A.   Yes.
20   Q.   Do you know if these notes were written for Mr. Singer
21   himself or for someone else?
22            MR. KENDALL:  Objection, your Honor.  It's hearsay.
23            THE COURT:  Overruled.  She can answer as to
24   whether -- what she knows.
25   A.   They were written for his attorney.
```

             1              MR. FRANK:  Could we show the witness only

             2    Exhibit 714, please.

             3    Q.   Do you recognize Exhibit 714?

             4    A.   Yes.

             5    Q.   What is it?

             6    A.   It's a summary of the notes that were sent from Mr. Singer

             7    to his attorney.

             8    Q.   What is the date?

             9    A.   October 4, 2018.

    12:14 10              MR. FRANK:  The government offers 714.

            11              MR. KENDALL:  Objection, your Honor, hearsay.

            12              MR. FRANK:  It's not hearsay, your Honor.  It's the

            13    identical notes that are in evidence, and we're admitting it

            14    for the fact it was sent to his attorney on the same day.

            15              THE COURT:  I'm not going to admit it now.  I'll hear

            16    argument about it later.

            17    Q.   The bottom line --

            18              THE COURT:  The objection is sustained.

            19              MR. FRANK:  Thank you, your Honor.

    12:14 20    Q.   The bottom line, Special Agent, is that on the same day

            21    Mr. Singer drafted these notes, he sent them to his lawyer,

            22    correct?

            23    A.   He modified the notes on the 4th and then he sent them

            24    to --

            25              MR. KENDALL:  Objection, your Honor.  They're not in

1    evidence.

2            THE COURT:  Sustained.

3    Q.   Does this refresh your recollection that he sent the notes

4    to his lawyer on October 4, 2018?

5            MR. KENDALL:  Objection, your Honor.  It's hearsay.

6            THE COURT:  Sustained.

7    Q.   In your experience, do white-collar defendants always

8    admit their guilt right away when they're confronted?

9            MR. KENDALL:  Objection.

12:15 10            THE COURT:  Overruled.

11   A.   No.

12            MR. KELLY:  Objection to the suggestion that she knows

13   what they tell their lawyer.

14            THE COURT:  Well, she can testify from her experience

15   what they do.

16   Q.   Are you familiar with the term "minimize" in this context?

17   A.   Yes.

18   Q.   What's is minimizing?

19   A.   Not accepting responsibility.

12:15 20   Q.   In the early days after you approached Mr. Singer, was he

21   fully cooperative with you?

22            MR. KENDALL:  Objection, your Honor.

23            THE COURT:  Overruled.

24   A.   No.

25   Q.   Did he refuse to make phone calls that you asked him to

```
 1    make?

 2    A.    Yes.

 3    Q.    Did he deny he'd done anything wrong?

 4    A.    Yes.

 5    Q.    Mr. Kelly asked you some questions yesterday about whether

 6    donating money to the USC women's athletic fund or to the Galen

 7    Center was illegal.  Do you recall those questions?

 8    A.    Yes.

 9    Q.    What about making payment to those funds in exchange for

10    having a child recruited as a basketball player based upon

11    falsified credentials?

12              MR. KENDALL:  Object, your Honor.

13              THE COURT:  Sustained.

14    Q.    What did Mr. Abdelaziz get in exchange for his payment to

15    the women's athletic fund?

16              MR. KENDALL:  Objection, your Honor.

17              THE COURT:  Overruled.

18    A.    His daughter's admission to USC.

19    Q.    Are those donations?

20    A.    No.

21              MR. KENDALL:  Objection, your Honor.

22              THE COURT:  Overruled.

23    Q.    You were asked some questions about the transcript -- let

24    me just find the number.  587, the first call between

25    Mr. Abdelaziz and Mr. Wilson on the consensual.  Do you recall
```

1    those questions?

2    A.   Yes.

3    Q.   And you were asked about page 4 of the transcript, 587,

4    where Mr. Singer says at line 14, "I'm not going to tell the

5    IRS anything about the fact that your $300,000 was paid to

6    Donna Heinel at USC to get Sabrina into school even though she

7    wasn't a legitimate basketball player at that level."

8         Do you recall that question?

9    A.   Yes.

12:17 10   Q.   And you were asked about the fact that Mr. Singer had not

11   used the specific name Donna Heinel before with Mr. Abdelaziz?

12   A.   Yes.

13   Q.   Did Mr. Abdelaziz ask who Donna Heinel was?

14   A.   No.

15   Q.   Did he seem confused?

16        MR. KENDALL:   Objection.

17        THE COURT:   Sustained.

18   Q.   Did he ask questions indicating confusion?

19   A.   No.

12:18 20   Q.   Did he say to Mr. Singer, "Whatever you do, don't lie to

21   the IRS"?

22   A.   No.

23   Q.   You were asked questions about the exchange on page 6 of

24   that transcript, the ruse regarding using Sabrina's profile for

25   anybody who isn't a real basketball player?

1          MR. KELLY:  Objection again.  Mischaracterization.

2          THE COURT:  Overruled.

3  Q.   Mr. Singer says, at line 12, "Hey, Rick" -- "She called me

4  and says, 'Hey, Rick.  That profile that you did for Sabrina.

5  I loved it.  It was really well done.  And going forward,

6  anybody who isn't a real basketball player that's a female, I

7  want you to use that profile going forward.'"  Did I read that

8  correctly?

9  A.   Yes.

12:18 10  Q.   And how did Mr. Abdelaziz respond?

11  A.   "I love it."

12  Q.   Did he ask what profile Mr. Singer was talking about?

13  A.   No.

14  Q.   Did he say, "Hey, wait a minute I don't recall ever seeing

15  a profile"?

16  A.   No.

17  Q.   Does it sound like he's yessing him to death there?

18  A.   No.

19  Q.   You were asked whether Mr. Abdelaziz sounded like his

12:19 20  heart dropped in this first phone call when he was advised

21  there was an IRS audit.  Do you recall those questions?

22  A.   Yes.

23  Q.   Could we look at the transcript for 621, please, the next

24  call.

25          Now, that call we just looked at, that was

1    October 25, 2018, correct?

2    A.    Correct.

3    Q.    And this next call is January 3, 2019, correct?

4    A.    Correct.

5    Q.    So it's almost three months later, two and a half months

6    later?

7    A.    Yes.

8    Q.    I want to direct your attention to page 5.  Two and a half

9    months after Rick Singer called Gamal Abdelaziz and told him he

12:20 10   was being audited, Mr. Abdelaziz says, at page 5, line 8, "You

11   know, this whole tax issue, you called me a few months ago."

12         And then what are his next three words?

13   A.    "I got worried."

14   Q.    "I got worried.  When I do my taxes, should I mark this

15   as, you know, as a charity or not or use the 501(c) or not?"

16         And then what does he say next?

17   A.    "Because you got me concerned when you called me last

18   time."

19   Q.    Does that sound a little bit closer to his heart stopping?

12:20 20   A.    No.

21   Q.    Does it sound like he's concerned and worried?

22   A.    Yes.

23   Q.    You were asked -- Mr. Kelly represented to you

24   yesterday -- I believe his words were, "Typically things that

25   aren't true are lies."  Do you recall Mr. Kelly saying that?

```
 1   A.   Yes.

 2   Q.   Did Sabrina Abdelaziz have an injury that prevented her

 3   from playing basketball in January of 2019?

 4   A.   No.

 5   Q.   Did she have plantar fasciitis?

 6   A.   No.

 7   Q.   How do you know that for sure?

 8   A.   It was a ruse that Mr. Singer stated at our direction.

 9   Q.   At page 4 at the bottom, Mr. Singer says, "I just wanted

 10  to give you a heads-up, they asked about it, and Donna

 11  replied" -- and at line 3 of page 5 -- "and I wanted you to

 12  know what her reply was."

 13       And how does Mr. Abdelaziz respond?

 14  A.   "That's fine.  I will answer the same, should they call

 15  me."

 16  Q.   "Answer the same," meaning he would tell admissions what?

 17  A.   That Sabrina had plantar fasciitis.

 18  Q.   Now, that wasn't true, right?

 19  A.   Correct.

 20  Q.   So by Mr. Kelly's definition, that would be what?

 21  A.   A lie.

 22  Q.   Did Mr. Abdelaziz ask in this phone call why he needed to

 23  lie about his daughter having plantar fasciitis?

 24       MR. KELLY:  Objection.  He continues to lead his own

 25  witness.  Objection.
```

1          THE COURT:  With respect to the leading, the objection

2     is sustained.

3     Q.   Did Mr. Abdelaziz ask in this phone call why it would be

4     necessary to lie if his daughter was going in as a manager?

5     A.   No.

6     Q.   You were asked some questions about whether Mr. Abdelaziz

7     was captured on the wiretap.

8     A.   Correct.

9     Q.   Now, the wiretap was when?

12:22 10    A.   January -- I'm sorry.  June 2018 through September.

11    Q.   By June of 2018, had Sabrina already been admitted to USC?

12    A.   Yes.

13    Q.   You were asked some questions about whether you knew that

14    Mr. Abdelaziz was in Macao, China, while his wife and daughter

15    were in Hong Kong.  Do you recall that question?

16    A.   Yes.

17    Q.   Do you know how long the commuter ferry is from Hong Kong

18    to Macao?

19    A.   Approximately 50 minutes.

12:23 20    Q.   50 minutes?

21    A.   Yes.

22    Q.   Less than the time it takes from here to get to the Cape?

23    A.   When it's not rush hour, yes.

24    Q.   Could we take a look at Exhibit 415 in evidence, please.

25              This is from Mr. Aziz to Mikaela Sanford, forwarding

1   and e-mail that was sent to his cox.net account.  Do you see

2   that?

3   A.   Yes.

4   Q.   He says --

5        MR. FRANK:  Ms. Lewis, could you please highlight at

6   the bottom -- at the end of the second line of the e-mail, "We

7   currently live" to the end of that paragraph.

8   Q.   Could you read that for the record, Special Agent?

9   A.   "We currently live in Hong Kong, so there's a time

12:24 10   difference of 16 hours.  Please let me know your availability

11   and your preferred method of communication.  Sabrina and I can

12   be available for a call on your Monday, 5:00 p.m., if that

13   works for you."

14   Q.   It says, "We currently live in Hong Kong," right?

15   A.   Yes.

16   Q.   It says, "Sabrina and I can be available for a call,"

17   correct?

18   A.   Yes.

19   Q.   Nothing about Macao in this e-mail?

12:24 20   A.   No.

21   Q.   You were asked about a memo you wrote seeking

22   authorization to assist the FBI with its wiretap.  Do you

23   recall those questions?

24   A.   Yes.

25        MR. FRANK:  For the witness only because I don't

1    believe it's in evidence, Exhibit 9014, please.  I think we

2    might need the defense's assistance with this.  We don't have

3    this exhibit.

4            MR. KENDALL:  What exhibit?

5            MR. FRANK:  9014.

6            MR. KELLY:  They didn't ask us for it in advance.  I

7    don't know where --

8            MR. FRANK:  Mr. Carter, are you able to call up 9014?

9            Thank you so much.  I appreciate it.

12:25 10          If we could go to --

11           MR. KENDALL:  I don't think this is in evidence.

12           MR. FRANK:  It's not.  It's for the witness only.

13   Q.   This is the same exhibit that Mr. Kelly showed you

14   yesterday.  Do you recall that?

15   A.   Yes.

16   Q.   If I could direct --

17           MR. FRANK:  Mr. Carter, if you could go to page 8 of

18   that exhibit.  Thank you.

19   Q.   You were asked about that second paragraph.

12:25 20          MR. FRANK:  And Mr. Carter, if you wouldn't mind just

21   highlighting the second paragraph and the first sentence, "On

22   May 4," through the first sentence of the next paragraph.

23           MR. KENDALL:  Your Honor, I don't think she's

24   testified she's had a failure of memory.

25           MR. FRANK:  Your Honor, I'm doing exactly what

1    Mr. Kelly did yesterday.

2            THE COURT:  You may proceed.

3    Q.   You were asked, based on this paragraph, whether you

4    recalled that Mr. Singer told the Yale soccer coach in May that

5    Donna Heinel had not yet taken money personally.  Do you recall

6    those questions?

7    A.   Yes.

8    Q.   I'd like to have you read to yourself, please, beginning

9    with -- let's see if I can do this on my screen.  Do you see

12:26 10   that, Special Agent?

11   A.   Yes.

12   Q.   Could you read to yourself, beginning with "Singer then

13   explained," to the end of the first sentence ending in "Vavic,"

14   in the next paragraph?

15           MR. KENDALL:  Your Honor, he's going beyond the scope.

16   Nothing about Vavic was raised in this.

17           MR. FRANK:  I'm asking about the paragraph she was

18   asked about.

19           THE COURT:  Overruled.

12:26 20   Q.   Could you let me know when you're done.

21   A.   Yes.

22   Q.   Thank you.

23           MR. FRANK:  Mr. Carter, you can take that down.  I

24   appreciate it.

25   Q.   Special Agent, does this refresh your recollection that

```
 1   not only did Mr. Singer tell you that he believed Donna Heinel
 2   might yet take money personally, in May of 2018, but that he
 3   also explained that he could distribute money to the recipient
 4   of his bribes in three different ways.  If they want it
 5   directly to them for personal use --
 6                MR. KENDALL:  Objection, your Honor.  It's leading.
 7                THE COURT:  You can't read from the document.
 8   Q.   Does it refresh your recollection that he told you --
 9                MR. KELLY:  Objection.  He's still leading.
10                MR. FRANK:  I'm not going to lead.
11                THE COURT:  Well, ask the question, but you cannot
12   quota a document that's not in evidence.
13                MR. FRANK:  I will not.  Thank you, your Honor.
14   Q.   Does it refresh your recollection that he told you he
15   could distribute the money to coaches in three different ways?
16                MR. KENDALL:  Your Honor --
17                THE COURT:  Overruled.
18                MR. KENDALL:  -- it's hearsay.
19   A.   Yes.
20   Q.   Directly to them personally?
21   A.   Yes.
22   Q.   Is that one of the ways?
23   A.   Yes.
24   Q.   Was another way to their program?
25                MR. KENDALL:  Objection, your Honor.  It's hearsay.
```

```
 1              THE COURT:  Overruled.
 2    A.   Yes.
 3    Q.   Was the third way split between their program and
 4    themselves, if that's what they wanted?
 5    A.   Yes.
 6    Q.   And, Special Agent, wherever the money went, however it
 7    was allocated, what would the coach or athletic department
 8    insider be doing in exchange for the money?
 9    A.   Recruiting the student as an athlete.
12:28 10    Q.   Could we look at the transcript of 571, please, at page 7.
11    At 571, page 7, this is the call between Mr. Singer and
12    Mr. Wilson on September 29, 2018.
13              At line 6, Mr. Singer says, "And then what I can,
14    what I'll do is I'll split the money potentially to the coach
15    or other parties that are at the school that need the money.
16    Right?"
17              And Mr. Wilson says, "Mm-Hmm."
18              And then Mr. Singer says, "Or it may go right to the
19    coach that's helping us.  It just depends on the school."
12:29 20              Do you see that?
21    A.   Yes.
22    Q.   Was that consistent or inconsistent with your
23    understanding of how the scheme worked?
24              MR. KENDALL:  Objection, your Honor.
25              THE COURT:  Overruled.
```

```
 1              MR. KENDALL:  Her state of mind is not relevant.
 2    A.    Consistent.
 3    Q.    Special Agent, you were asked some questions about 439,
 4    the voicemail that Donna Heinel left for Rick Singer directing
 5    him to send money to the Galen Center.  Do you recall that?
 6    A.    Yes.
 7    Q.    Do you recall that?
 8    A.    Yes, I do.
 9              MR. FRANK:  And if we could quickly look at the
10    transcript of 439.  I hope it's still in the jurors' binders.
11    Is 439 still there?  No?
12              Can we have a clean copy?
13              If I could just use the Elmo for one moment.  If you
14    don't have it, that's all right.  We can use my marked-up copy.
15    That's all right, Ms. Kearney.  I'm all set.  This is that
16    transcript.
17    Q.    Do you see that, Special Agent?
18    A.    Yes.
19    Q.    Ms. Heinel said on that voicemail, "For the rest of the
20    people that owe money, could you please, uh, I need it to go to
21    the Galen Center gift account.  It just makes it better."
22              Do you see that?
23    A.    Yes.
24    Q.    And then she talks about Mr. Abdelaziz?
25    A.    Yes.
```

```
 1   Q.   Why did Mr. Abdelaziz owe money?

 2             MR. KELLY:  Objection.

 3             THE COURT:  Sustained.

 4   Q.   What was Mr. Abdelaziz getting for his money?

 5             MR. KELLY:  Objection.

 6             THE COURT:  Yes.  Sustained.

 7   Q.   Special Agent, in your experience, do people who make

 8   donations, is that typically referred to as owing money?

 9             MR. KENDALL:  Objection, your Honor.

12:31 10          THE COURT:  She can state her understanding.

11   A.   No.

12             MR. FRANK:  Can we look at Exhibit 549, please.

13             And I'm done with the Elmo.  Thank you.

14   Q.   Exhibit 549, were these photographs that Mr. Abdelaziz

15   sent to Mr. Singer on August 18, 2017.  Do you see that?

16   A.   Yes.

17   Q.   That was about a year and a half after Sabrina stopped

18   playing basketball?

19   A.   Yes.

12:32 20  Q.   And Mr. Singer said -- Mr. Abdelaziz says, "More from Hong

21   Kong," not Macao, right?

22   A.   Correct.

23   Q.   "I know you need a close-up action shot but it seems we

24   never really took those."

25             How did Mr. Singer use close-up action shots?
```

A.   For fake profiles.

Q.   And Mr. Abdelaziz says "it seems we never really took

those."  Do you notice that's in the past tense?

A.   Yes.

Q.   Is that how you talk about somebody who still plays?

A.   No.

Q.   Did Mr. Abdelaziz offer to get a shot at Sabrina's next

game?

       MR. KELLY:  Objection, your Honor.

       THE COURT:  Sustained.

Q.   You were asked some questions, Special Agent --

       MR. FRANK:  We can take that down, thank you.

Q.   -- about Exhibit 1482, deleted text messages.

A.   Yes, I recall that.

Q.   Was it possible to tell -- it's actually 1482A.

       MR. FRANK:  I'm sorry.  We don't need it up.  That's

all right.

Q.   Is it possible to tell from that extraction how many text

messages Singer deleted before you approached him on September

21 versus how many he deleted in the two weeks thereafter?

A.   No.

Q.   Did you and the other agents tell him not to delete text

messages?

A.   Yes.

Q.   Mr. Kendall asked you yesterday about whether leaving the

```
 1    phone in Mr. Singer's custody for two weeks after September 21
 2    was a colossal mistake.  Do you recall that?
 3    A.    Yes.
 4    Q.    Was Mr. Singer arrested on September 21?
 5    A.    No, he was not.
 6    Q.    Was he in custody?
 7    A.    No, he was not.
 8    Q.    Was he fully cooperative with you at that time?
 9    A.    He said -- Mr. Singer agreed to cooperate with the
10    investigation.
11    Q.    Was he fully cooperative in those first days?
12    A.    He was reluctant and did not follow our instructions fully
13    at that time.
14    Q.    Did he, in fact, refuse to make phone calls?
15    A.    Yes.
16    Q.    And did he return to California to meet with his lawyer?
17    A.    Yes.
18    Q.    And, in fact, did you meet with Mr. Singer and his lawyer
19    in the next few days?
20    A.    Yes.
21    Q.    Did you then image his phone the next time he returned to
22    Boston?
23    A.    Yes.
24    Q.    You were asked whether you took notes of what you said or
25    what the agents said to Mr. Singer.  Do you recall that?
```

```
 1   A.   Yes.
 2   Q.   Do you typically take notes of what law enforcement says
 3   to the witness?
 4   A.   No.
 5   Q.   Do you typically take notes when the witness tells you
 6   something substantive?
 7   A.   Yes.
 8   Q.   How many hundreds of pages of interview reports are there
 9   of Rick Singer in this case?
12:34 10   A.   I don't know the exact amount, but there are hundreds.
11   Q.   Binders full, right?
12   A.   Yes.
13   Q.   Those are notes that you and your fellow agents took of
14   what he said?
15   A.   Yes.
16   Q.   You were asked about what you told him to say on those
17   consensual calls?
18   A.   Correct.
19   Q.   How do we know to a certainty what he said on those
12:35 20   consensual calls?
21   A.   The calls themselves.
22   Q.   They're recorded, right?
23   A.   Correct.
24   Q.   You were asked -- I believe it took up seven transcript
25   pages yesterday -- about how you knew who was on the
```

1    September 28 FaceTime call.  Do you recall that?

2    A.   Yes.

3    Q.   And I believe Mr. Kendall called it a phone call but it

4    was actually a FaceTime?

5    A.   It was FaceTime, yes.

6         MR. FRANK:  Could we look at Exhibit 713 for the

7    witness only, please.

8    Q.   Do you recognize that, Special Agent?

9    A.   Yes, I do.

12:35 10   Q.   It's a page from an extraction report?

11   A.   Yes.

12   Q.   Could we look at the next page, please.  Do you recognize

13   that?

14   A.   Yes.

15        MR. FRANK:  The government offers 713.

16        THE COURT:  It will be admitted.

17        MR. KELLY:  No objection.

18        (Exhibit 713 admitted into evidence.)

19   Q.   Could we looked at the line marked 172.

12:36 20        Do you see there's an outgoing call marked?

21   A.   Yes.

22   Q.   Who is it to?

23   A.   Mamie Wilson.

24   Q.   On the far right, what does it say?

25   A.   FaceTime.

1   Q.   And how long is the call?

2   A.   33 minutes, 8 seconds.

3   Q.   And what is the date?

4   A.   September 28, 2018.

5   Q.   From this, do you know to a certainty that there was a

6   FaceTime call to Mr. Wilson's daughter at that time?

7   A.   Yes.

8   Q.   You were asked about how you knew who was on that call,

9   because you weren't present for it?

12:36 10   A.   Yes.

11        MR. FRANK:  Can we look at Exhibit 570, please.  This

12   is the exhibit that Mr. Kendall showed you.

13   A.   Yes.

14   Q.   Could we look at the top text.  This is a text from

15   Mr. Wilson to Mr. Singer on September 28?

16   A.   Yes.

17   Q.   That same day?

18   A.   Yes.

19   Q.   What does Mr. Wilson say at the top?

12:37 20   A.   "Heard girls had a good first session.  Can we debrief at

21   some point?"

22   Q.   Does that sound like somebody who was on the call?

23        MR. KENDALL:  Objection, your Honor.

24        THE COURT:  Overruled.

25   A.   No.

```
        1    Q.   Could we look at the transcript for 571, please, back in
        2    the transcript binder.  Do you have that in front of you?
        3    A.   Yes.
        4    Q.   At the very top of the transcript, page 1, line 11,
        5    Mr. Wilson says, "Hey, Rick.  How you doing?"
        6              Mr. Singer responds, "Hey, John.  How are you?"
        7              Then what does Mr. Wilson say?
        8    A.   "Good.  You're feeling better?"
        9    Q.   Now, this is the day after the FaceTime call?
12:38  10    A.   Yes.
       11    Q.   Do you recall when Mr. Singer told Mr. Wilson at the
       12    government's instruction that he couldn't meet because he
       13    wasn't feeling well?
       14    A.   Yes.
       15    Q.   When was that?
       16    A.   September 23.
       17    Q.   September 23.  And on this call on September 29,
       18    Mr. Wilson asks, "You feeling better?"  Do you see that?
       19    A.   Yes.
12:38  20    Q.   Does it sounds like they've talked between those dates?
       21              MR. KENDALL:  Objection, your Honor.
       22              THE COURT:  Sustained.
       23    Q.   Then on the rest of -- the next few lines, Mr. Singer
       24    talks about what?
       25    A.   The call with his girls, the FaceTime call.
```

```
 1   Q.   And Mr. Wilson's asking questions about it, right?

 2   A.   Yes.

 3   Q.   Does that sound like somebody who was on the call?

 4   A.   No.

 5   Q.   You were asked some questions about Exhibit 13,

 6   Mr. Singer's notes.  And Mr. Kendall asked you --

 7            MR. FRANK:  And if we could just call that up,

 8   Ms. Lewis.  And if you could just enlarge from note No. 2 down

 9   a ways.  No, no, from note No. 2 from the beginning, just up at

10   the top there.  Thank you.  Exactly.

11   Q.   Now, you see that this note was created on October 1 and

12   then modified, right?

13   A.   Yes.

14   Q.   And the first entry is actually September 29?

15   A.   Yes.

16   Q.   And Mr. Kendall suggested that the note from October 2

17   actually refers to a call on October 1.  Do you see that?

18   A.   Yes.

19   Q.   But there are separate entries for October 1, October 2,

20   there's an entry for October 3, and then there's an entry for

21   October 4.  Do you see that?

22   A.   Yes.

23   Q.   And under October 1, he describes other calls, correct?

24   A.   Correct.

25   Q.   And the first call he describes was, "Called Laura.
```

1    Update on weekend text and call with John Wilson on side door."

2         Do you see that?

3    A.   Yes.

4    Q.   And that's on October 1, right?

5    A.   Yes.

6    Q.   And then there's an entry for October 2, and that's where

7    he refers to a loud and abrasive call with agents.  Do you see

8    that?

9    A.   Yes.

12:40 10   Q.   Now, Mr. Kendall asked you whether the October 2 entry

11   referred to a call with agents on October 1.  Do you recall

12   that?

13   A.   Yes.

14   Q.   You do recall a call on October 1, correct?

15   A.   Yes.

16   Q.   And on that call, there was also an assistant United

17   States Attorney on the call, correct?

18   A.   Yes.

19   Q.   AUSA Rosen?

12:40 20   A.   Yes.

21   Q.   Was Mr. Wilson's attorney -- I'm sorry.

22         Was Mr. Singer's attorney also on that call?

23   A.   I don't recall if he was on that call.

24   Q.   Okay.  But if he was on that call, there'd be no reason to

25   send him notes -- withdrawn.

```
  1            October 2, there's no reference to an AUSA being on
  2   the call, is there?
  3   A.   No.
  4   Q.   There's no reference to Mr. Singer's attorney being on the
  5   call, correct?
  6   A.   Correct.
  7   Q.   And there would be no reason to send your attorney notes
  8   of a call your attorney was on?
  9   A.   Correct.
12:41 10   Q.   You were asked, and I've asked you a bit today, about
 11   whether there were any references on the consensual calls to
 12   false profiles or falsifying erg times.  Do you recall that?
 13   A.   Yes.
 14            MR. FRANK:  Could we look at Exhibit 561.  We'll wrap
 15   up momentarily.  561 was the transcript of the September 15
 16   call.  I'm not sure that's still in the jurors' binders.  No?
 17   Okay.  We'll use mine.  If I could just have the Elmo back.
 18            If I could just have one moment.
 19   Q.   Now, Special Agent, September 15, 2018, was six days
12:43 20   before you approached Rick Singer, correct?
 21   A.   Correct.
 22   Q.   And on this call, which was intercepted on the Title III,
 23   Mr. Singer couldn't have known you were listening, correct?
 24   A.   Correct.
 25   Q.   And Mr. Wilson couldn't have known you were listening,
```

1    correct?

2    A.    Correct.

3    Q.    And you weren't telling Mr. Singer what to say on this

4    call, were you?

5    A.    No.

6    Q.    And you weren't telling Mr. Wilson what to say?

7    A.    Correct.

8    Q.    And Mr. Wilson says at line 6, "What sports would be best

9    for them?  Is crew the best, even, you're talking about the

12:43 10   ivies and stuff like that, or is it not gonna even matter?"

11             Do you see that?

12   A.    Yes.

13   Q.    It's Mr. Wilson who asks whether the sport is not going to

14   even matter, right?

15   A.    Correct.

16   Q.    Just to be clear, they're talking about the side door,

17   right?

18   A.    Yes.

19   Q.    And Mr. Singer responds, "They -- oh, for me?  It doesn't

12:44 20   matter.  I'll make them a sailor or something because of where

21   you live."  Right?

22   A.    Yes.

23   Q.    And then there's some dispute about whether Mr. Wilson

24   says "That's probably more than I want to go for or whether we

25   are going to go for."  Right?

```
 1    A.    Yes.
 2    Q.    There's no dispute that he said, "Is there a two-for-one
 3    special if you got twins?"  Right?
 4    A.    Correct.
 5    Q.    Does making the girls a sailor or something because of
 6    where you live sound like telling the truth?
 7    A.    No.
 8    Q.    Does making them a sailor or something because of where
 9    you live sound like doing something like lying?
10    MR. KENDALL:  Objection, your Honor.
11    MR. KELLY:  He continues to lead, your Honor.
12    THE COURT:  Sustained.
13    Q.    What does Mr. Wilson say?
14    A.    On --
15    Q.    -- line 13.
16    A.    13?
17    "That's probably more than I want to go for.  Is
18    there a two-for-one special if you've got twins?"
19    Q.    After this call, did Mr. Wilson make two $500,000 payments
20    to the Key Worldwide Foundation?
21    A.    Yes, he did.
22    Q.    Is it fair to say he went for it?
23    A.    Yes.
24    MR. FRANK:  No further questions.
25    THE COURT:  Recross, Mr. Kelly.
```

```
 1              MR. KELLY:  Yes.
 2                   RECROSS-EXAMINATION OF ELIZABETH KEATING
 3    BY MR. KELLY:
 4    Q.   Good afternoon, Agent.
 5    A.   Good afternoon.
 6    Q.   Let's be clear about a couple things first, can we?
 7    You're not Sabrina Abdelaziz's medical doctor, are you?
 8    A.   No.
 9    Q.   You have no idea what her medical history is, do you?
10    A.   No.
11    Q.   How about this exhibit he just showed you, 549.
12              MR. KELLY:  Can you bring that up, please.
13    Q.   It's a series of photographs that Aziz -- Gamal forwarded
14    to Singer, right?
15    A.   Yes.
16    Q.   And Mr. Frank tried to suggest --
17              MR. KELLY:  Go to the top, please.
18    Q.   -- about the past tense of the words.  Do you remember
19    those questions?
20    A.   Yes.
21    Q.   Can you look at the date when these photos were sent,
22    August?
23    A.   August 18, 2017.
24    Q.   Right.  That's not basketball season, is it?
25    A.   Generally basketball season is in the winter, correct.
```

Q.   Now, he keeps bringing up Donna Heinel.  So let me ask you

a few questions again about her.  Okay?

A.   Yes.

Q.   It's undisputed that she did not start taking money

personally until the summer of 2018, correct?

A.   Correct.

Q.   And it's undisputed that Mr. Abdelaziz's money was sent in

March of 2018, right?

A.   Correct.

Q.   So that's -- I don't know even how many months apart, but

his money was sent before she started taking money, right?

A.   Correct.

Q.   July is not March, right?

A.   Correct.

Q.   And in fact, the invoice that she wrote was on

November 1st, right, of 2018?

A.   Yes.

Q.   All right.  So -- and the day before, Halloween, Singer

had told agents, Abdelaziz doesn't know who Heinel is, right?

A.   Yes.

Q.   Okay.  So this little invoice situation is between Singer

and Heinel.  Abdelaziz doesn't even know about it, right?

A.   He doesn't know who Donna Heinel is.

Q.   Right.  They have a side deal, right?

MR. FRANK:  Objection.

1    THE COURT:  Sustained.

2   Q.   Well, they keep talking about a side door.  Doesn't this

3   appear to be a side door between Singer and Heinel?  Because

4   this man doesn't even know her, right?

5    MR. FRANK:  Objection.

6    THE COURT:  She can answer it if she understands it.

7   A.   Mr. Abdelaziz did not know Donna Heinel's name.

8   Mr. Singer and Ms. Heinel allocated his payment to Ms. Heinel

9   for $20,000 a month.

12:49 10  Q.   And Mr. Frank showed you one e-mail involving Mikaela

11   Sanford.  Do you remember that one he just put up?

12   A.   Yes.

13   Q.   Apparently there were a series of other e-mails involving

14   Mikaela Sanford and Rick Singer he has not shown you, has he?

15   A.   Correct.

16   Q.   Those e-mails did not include my client, Mr. Abdelaziz, on

17   them, did they?

18   A.   No.

19   Q.   And they were right about the time Sanford was submitting

12:50 20  his daughter's application to USC, right?

21   A.   Correct.

22   Q.   So he asked you about whether you knew the term

23   "minimize."  Have you heard the term "hide evidence"?

24    MR. FRANK:  Objection, move to strike.

25    THE COURT:  No, she can answer that.  Overruled.

1    A.    Yes.

2    Q.    So you've testified that with respect to the need to be

3    more explicit to show the intent, you weren't concerned about

4    the parents being confused and stumbling into a situation like

5    this.  You were concerned about the jurors being confused,

6    right?

7    A.    The calls and the evidence we had were pretty clear that

8    the parents were not confused on what their payments were going

9    in exchange for a recruitment spot.

12:51 10   Q.    Well, Mr. Abdelaziz's conversation in February of 2017,

11   that wasn't recorded, was it?

12   A.    No, it was not.

13   Q.    So you don't know what was said in February 2017 between

14   Singer and Abdelaziz, do you?

15   A.    Correct.

16   Q.    The prosecution team doesn't know either, does it?

17   A.    No.

18   Q.    Mr. Singer knows, doesn't he?

19   A.    Mr. Singer knows.

12:51 20   Q.    And your concern about this confusion, you don't want it

21   to go to the jury, but are you concerned that these four

22   e-mails are not being presented to the jury?

23         MR. FRANK:  Your Honor, I object.

24         THE COURT:  Sustained.

25   Q.    Well, you were asked a series of questions about, you

know, whether Singer ever talked about a manager -- I'm not
going to get into that, in the interest of time.  I'll cut to
the chase.

You're also aware he sometimes referenced the parents
that their kids would be practice players, right?

A.   I remember him mentioning that one -- two or three times.

Q.   And do you recall him mentioning that to a witness in this
case, Bruce Isackson?

A.   No.

MR. KELLY:  Let's play 607, please, evidence in the
case.

MR. FRANK:  Your Honor, this is well beyond the scope
of redirect.  There was not a single question about it.

THE COURT:  How is this --

MR. KELLY:  It's quick and it's on point because it
was raised in redirect about managers and what Singer said to
parents.

MR. FRANK:  I didn't ask about it.

MR. KELLY:  It's evidence in the case already.  I'm
not asking to admit it.

THE COURT:  You can have it.

MR. KELLY:  Exhibit 607.  Play it, please.  Page 68,
line 22.

THE COURT:  What is it, Mr. Kelly, just for the
record?

1            MR. KELLY:  It's a tape and corresponding transcript

2       of Mr. Isackson's discussions with Singer, page 68, line 22,

3       through page 70 through line 18.  We'll play it real quick.

4            (Audio recording played.)

5       Q.   All right.  So that is consistent with your general

6       understanding that he sometimes told people their kids could be

7       practice players, right?

8       A.   Yes.

9       Q.   And there are other messages he left with parents.

12:55 10            Are you familiar with one where he told a parent

11      whose kid wanted to go to Stanford, "We'd love to have him be a

12      practice player for us"?

13      A.   I don't recall that specifically.

14      Q.   Let me show you, witness only, Exhibit 1452, please.

15            MR. FRANK:  Objection to other parents, your Honor.

16            MR. KELLY:  The transcript only.

17            We've had lots of evidence what happened with other

18      parents in this case, your Honor.  I think I'm trying to rebut

19      some of the things that were suggested.

12:55 20            MR. FRANK:  Your Honor, this is not appropriate.

21            THE COURT:  This is not in evidence, right?

22            MR. KELLY:  No.  I'm just showing the witness to

23      refresh her recollection and then I'll move on.

24            MR. FRANK:  We object, your Honor.

25            THE COURT:  Overruled.

1    Q.   Please read that to yourself, Agent, where Singer starts

2    talking.

3    A.   I see what it says.  I don't recall this.

4    Q.   It doesn't jog your memory at all as to whether Singer

5    would ever tell a Stanford-bound parent that his kid would be a

6    practice player?

7           MR. FRANK:  Object, your Honor.  This is very

8    misleading.

9           THE COURT:  Well, if it refreshes her memory, she can

12:56 10   say it does.  If it doesn't, it doesn't.

11   A.   I don't recall this.

12          MR. KELLY:  Okay.  Put it down, please.

13   Q.   Mr. Frank asked you a bunch about Singer's iPhone notes,

14   right, Exhibit 13?

15   A.   Yes.

16   Q.   I'm not going to get all into that again.  But you're

17   aware there were other notes, right, by Singer?

18   A.   Can you be more specific?

19   Q.   On that iPhone.

12:56 20   A.   I'm aware the notes --

21   Q.   Are you aware of the notes where he says, "I am a liar,

22   face it.  Let's not lie today.  Let's go back and stop lying

23   for a day"?

24   A.   I don't recall that.

25          MR. KELLY:  Let me show you Exhibit 1474B, please,

1   witness only.

2   Q.   Please read that to yourself.

3        MR. KELLY:  And, Mr. Carter, if you could highlight

4   the fourth line down.  And then the seventh line down -- eighth

5   maybe.  Keep going.  There you go.

6   A.   I don't recall seeing this.

7   Q.   Does it appear also to be coming from his iPhone?

8   A.   Yes.

9        MR. KELLY:  All right.  Stipulate that it's authentic,

12:57 10   your Honor.  We're offering it into evidence now.

11        MR. FRANK:  Your Honor, it is well outside the scope

12   of even the cross in this case.

13        THE COURT:  The objection is sustained.

14   Q.   No dispute saying he was a big liar?

15   A.   He's lied to us, yes.

16   Q.   He's lied to a lot of people, hasn't he?

17   A.   Yes.

18   Q.   Now, you were very specific in your response as to it

19   being a 50-minute ride from Macao to Hong Kong.  You were on

12:58 20   cross-examination yesterday and you remained on

21   cross-examination this morning.

22        In between yesterday and this morning, did you confer

23   with government counsel at all?

24   A.   No.

25   Q.   Okay.  So you just happen to know it's a 50-minute ride

1   between Macao and Hong Kong?

2   A.   Yes.

3   Q.   Have you ever lived in Asia?

4   A.   No.

5   Q.   Okay.  Do you know anything about the fact that sometimes

6   Division One women's basketball programs do use practice

7   players?

8   A.   I'm aware that some --

9   Q.   Some do, right?

12:58 10   A.   Some do, yes.

11   Q.   Some even use men, right?

12   A.   Yes.

13   Q.   But to somebody who doesn't know anything about

14   basketball, that may not be obvious, right?

15        MR. FRANK:  Objection to what would be obvious to

16   someone who doesn't know.

17        MR. KELLY:  Strike that.

18   Q.   You've investigated this case, right?

19   A.   Yes.

12:59 20   Q.   So you know that some of the programs use practice

21   players.  Right?  Or was that just from general sports

22   knowledge?

23   A.   General knowledge, yes.

24   Q.   Okay.  But not everyone has the same general sports

25   knowledge as you do.  Is that a fair statement?

1    A.    Yes.

2    Q.    And let me see, Mr. Frank asked you about something

3    Abdelaziz said in his transcript.  He highlighted where he

4    said, "I love it."  Do you remember where he asked you that, "I

5    love it"?

6    A.    Yes.

7    Q.    Have you ever talked to Mr. Abdelaziz?  You never have,

8    right?

9    A.    No.

12:59  10    Q.    Are you aware he says "I love it" about ten times a day?

11          MR. FRANK:  Objection.

12          THE COURT:  Overruled.

13    A.    I'm not aware of that.

14    Q.    People do have favorite expressions, and that appears to

15    be one of his.  Are you aware of that?

16          MR. FRANK:  Objection.  Counsel is testifying.

17          THE COURT:  Sustained.

18          MR. KELLY:  One moment, your Honor.

19          I'm going to show the witness only, lastly, just four

01:01  20    exhibits.

21    Q.    I want you to look at them again, please, and advise

22    whether it refreshes your recollection as to whether or not

23    you've seen them or not.

24          MR. FRANK:  Your Honor, we've been over this ad

25    nauseam.

1           MR. KELLY:  It involves Mikaela Sanford.  He raised it

2   on redirect.  I'm just seeing if it refreshes her recollection.

3           MR. FRANK:  I did not raise it on redirect.

4           MR. KELLY:  He raised the subject of Mikaela Sanford

5   with 549, which is -- it's to her, it's in evidence --

6           THE COURT:  He can show the witness the four exhibits

7   again and ask if they refresh her memory.

8           MR. KELLY:  So please start with 1540.  And then show

9   her 1541, please.  And show her 1254, please.  And show her

01:01 10   1255.

11  Q.   Now, having seen those four exhibits, does that refresh

12  your recollection as to whether or not you've ever seen them

13  before today? -- or yesterday, I should say.

14  A.   Yes, I've seen these.

15  Q.   You have?

16  A.   Yes.

17          MR. KELLY:  We move to admit, your Honor.

18          MR. FRANK:  Objection for the same --

19          THE COURT:  Objection sustained.

01:02 20  Q.   Do you know what they are?

21          MR. FRANK:  Objection.

22  A.   They're --

23          THE COURT:  Well, the answer is yes or no.

24  A.   They're e-mails, yes.

25          THE COURT:  No, no.  The answer is yes or no.  Do you

 1   know what they are?

 2          THE WITNESS:  Yes.

 3   Q.   What are they?

 4          MR. FRANK:  Objection.

 5          THE COURT:  Sustained.

 6          MR. KELLY:  No further questions, your Honor.

 7          THE COURT:  All right.  Before we have Mr. Kendall's

 8   recross, we're going to break for lunch.

 9          You may step down, Ms. Keating.

01:02 10        We'll be recessed for one hour.  I'll see you back

11   here at 2:00.

12          THE CLERK:  All rise for the jury.

13          (Jury exits.)

14          THE COURT:  Be seated, counsel.  Mr. Kendall.

15          MR. KENDALL:  Your Honor, I'm going to need some time

16   for recross-examination.  Mr. Frank took an hour and fifteen

17   minutes.  I'll take less than that, but I can't --

18          THE COURT:  I actually had an hour and five minutes.

19          MR. KENDALL:  I'll take less than an hour and five,

01:03 20   your Honor, I promise you that.  But how much less, I've got to

21   put it together and see what I've got to do.

22          MR. KELLY:  I suspect for the witness who is the

23   basketball coach, it's going to be a quick witness, your Honor.

24   I don't anticipate extensive cross.

25          MR. KENDALL:  I don't object to putting them out of

1    order, if that's a courtesy to them.  But I feel like I'm sort

2    of being squeezed here by the government.

3           THE COURT:  Mr. Frank, do you want to put the shorter

4    of the two -- I can't remember what her name was -- on and off?

5           MR. FRANK:  We do not, your Honor, and I am not

6    squeezing anyone.  Mr. Kendall has had ample time for his

7    examinations.

8           THE COURT:  Okay.  So you think you're going to take

9    the afternoon, which is about an hour and a half?

01:04 10        MR. KENDALL:  I don't think I'm going to take the full

11   afternoon, but I'm going to take --

12          THE COURT:  All right.  You'll be prepared to put on a

13   witness if we conclude?

14          MR. FRANK:  We are.  And the issue is Ms. Janke's

15   testimony is longer.

16          THE COURT:  What about the short one, the shorter of

17   the two witnesses?

18          MR. FRANK:  Her testimony is short.

19          THE COURT:  Fifteen minutes, I thought you said.

01:04 20        MR. FRANK:  15, 20.

21          THE COURT:  And the cross?

22          MR. KELLY:  Five.

23          MR. KENDALL:  Nothing for me, your Honor.

24          THE COURT:  All right.  Why don't we put her on after

25   we get through with Ms. Keating and at least she can go back to

1   California.

2          MR. FRANK:  Yes, your Honor.

3          THE COURT:  All right.  Anything else from your side

4   before we recess?  Because I have one thing I want to ask you.

5          MR. KENDALL:  Nothing, your Honor.

6          THE COURT:  I want to tell the jury where we are.  And

7   I am inclined to tell them that I believe the government will

8   rest next week and the defendants will rest the week after

9   that.  Is there any reason why I can't say that?

01:05 10        MR. KENDALL:  I'd put it a little differently, your

11  Honor.  Could you tell them that you think the case will go the

12  week after next?  We're planning to put on a case, but until he

13  rests, we're not going to make the final decision on how long.

14         THE COURT:  Okay.  All I want to tell them,

15  Mr. Kendall, is that the government is going to rest next week

16  and that the defendants will rest no later than the following

17  week; that is, by October -- whatever the Friday is -- 8th.

18         MR. KENDALL:  That's the point, your Honor.  I'd ask

19  the Court just tell them it expects the case will go to about

01:06 20 October 8th and not say whether we're putting on a case or not.

21  We're not going to make that final decision until they rest.

22         THE COURT:  All right.  I'll say I expect the

23  government to rest next week and the case to be completed by

24  the following Friday.

25         MR. KENDALL:  That's, again, telling them that there's

1    likely to be a defense case.  Why do we have to say when the

2    government's going to rest?  Can't we just say that the case

3    should be completed by around October 8th and nothing else?

4            THE COURT:  Yes, we can say that.

5            MR. KENDALL:  I'd request that, if it's okay with the

6    Court.

7            THE COURT:  Any problem with that from the

8    government's side?

9            MR. FRANK:  No, your Honor.

01:06 10         THE COURT:  All right.  That's what I intend to tell

11   them at the end of this session, that this case is going to be

12   completed two weeks from today.

13           MR. KENDALL:  Thank you, your Honor.

14           THE COURT:  All right.  We're in recess until 2:00.

15           (Recess taken 1:07 p.m. to 2:06 p.m.)

16           THE CLERK:  Court is now in session.

17           THE COURT:  Good morning -- rather, good afternoon,

18   jurors.  We're ready to resume.

19           Miss Keating, again, you're reminded that you remain

02:06 20  under oath.

21           Mr. Kendall, you may conduct recross examination.

22           MR. KENDALL:  Thank you, your Honor.

23             RECROSS-EXAMINATION OF ELIZABETH KEATING

24   BY MR. KENDALL:

25   Q.   Could we have Exhibit 710, which is already in evidence.

1    I'm going to show you a document that Mr. Frank showed you when

2    he was asking you questions just before the break.  Do you see

3    this e-mail from John Wilson to Rick Singer and a CC to Debbie

4    Rogers?

5    A.    Yes.  I see that.

6    Q.    You know Debbie Rogers is Mr. Wilson's bookkeeper and

7    office manager for Hyannis Port Capital?

8    A.    Yes.

9    Q.    HPC?

02:07 10          I'd like to go down to the bottom e-mail.  It's

11   March 1, 2014.  And he says, "Rick, thanks again for making

12   this happen!"  That's his son's admission to USC, correct?

13   A.    Yes.

14   Q.    "Please give me the invoice".  Would you agree with me

15   when companies write checks and issue money, they typically

16   have an invoice for it, correct?

17   A.    Companies give invoices, yes.

18   Q.    Okay.  "What are the options for payment?  Can we make it

19   for consulting or whatever".  He says whatever -- he says

02:08 20   consulting or whatever.  He doesn't care what it's called,

21   correct?

22          MR. FRANK:  Objection to what he cares about.

23          THE COURT:  Sustained.

24   Q.    He lets Mr. Singer have complete discretion what to call

25   it, consulting or whatever, correct?

1          MR. FRANK:  Objection.

2          THE COURT:  Sustained.

3    Q.   He writes "consulting or whatever", correct?

4    A.   Correct.

5    Q.   "From The Key so that I can pay it from the corporate

6    account".

7          Now, in the course of your work in this case, you

8    know the Key is a -- excuse me.  Not the Key.  You know that

9    HPC is a sub S corporation, correct?

02:08 10   A.   Yes.

11   Q.   And the $100,000 that was paid to the for-profit business

12   that Mr. Singer had is 100,000 that went directly to USC,

13   correct?

14   A.   Yes.

15   Q.   And a few months later the thank you note for the

16   charitable deduction came, correct?

17   A.   Yes.

18   Q.   And you would agree with me a sub S corporation is

19   sometimes called a disregarded entity, correct?

02:09 20   A.   Yes.

21   Q.   Also called a flow-through entity, correct?

22   A.   Yes.

23   Q.   Because with a sub S corporation, there's no federal

24   corporate income tax on the sub S, correct?

25   A.   Correct.

1    Q.   That's different than a sub C corporation, which does pay

2    corporate income taxes, correct?

3    A.   Correct.

4    Q.   And so by paying this out of the sub S corporation, it

5    means any charitable deductions should be reported on

6    Mr. Wilson's personal return on the Schedule A, correct?

7              MR. FRANK:   Objection.

8              THE COURT:   Grounds?

9              MR. FRANK:   What should happen.

02:09 10              THE COURT:   Okay.  Yeah.  That part is objectionable.

11    The rest of it is not.

12    Q.   You would agree with me, the Schedule A on the personal

13    return has a place to put charitable contributions, correct?

14    A.   Yes.

15    Q.   So if a sub S corporation writes a donation for $100,000

16    to USC, it's going to show up on his personal return, not any

17    corporate return at the end of the day, correct?

18    A.   Yes.  It flows through to his personal return.

19    Q.   And let me correct that.  It will show up on the sub S

02:10 20    return, but the tax consequences are taken out on his personal

21    return, correct?

22    A.   Correct.

23    Q.   So if for some reason you reduce the income on the sub S

24    corporate return as a business expense or as a charitable

25    contribution, either way the same amount is going to come out

1   on the personal return and reducing the income by the same

2   amount, correct?

3          MR. FRANK:  Objection to the hypothetical, and it's

4   beyond the scope of the redirect.

5          THE COURT:  Well, if she understands, she can answer

6   it.

7   A.   Can you rephrase the question?

8   Q.   If you treat something as a business expense in a sub S

9   corporation, it's going to reduce the owner's taxable income

02:10 10  by, let's say, $100,000, correct?

11  A.   Yes.

12  Q.   If the person treated that as a charitable contribution on

13  the Schedule A, it also would reduce their personal taxable

14  income by $100,000, correct?

15         MR. FRANK:  Objection.  Misstates.

16         THE COURT:  She can answer it.  It's a hypothetical

17  question, but she can answer it.

18  A.   It depends on some factors in it, how much income he has.

19  Some Schedule A deductions are limited based on your AGI.

02:11 20  Q.   Okay.  There might be some slight difference on the

21  computation, but both have the same impact of reducing income

22  by $100,000 somewhere in the computation, correct?

23         MR. FRANK:  Objection to the testifying of what the

24  impact would be.

25         THE COURT:  Overruled.

1    A.   There's many factors.  It doesn't just come straight out

2    of a -- it wouldn't just be straight out of $100,000.  There

3    are other factors.  There's a -- you can deduct charitable

4    contributions that you take on an S corp.

5    Q.   Okay.  And, in fact, in your investigation of the

6    financial transactions, you're aware that in 2014 most of his

7    cash was in the sub S corporation, wasn't it?

8    A.   I didn't investigate Mr. Wilson's tax return.  That was

9    another Special Agent, so I am not familiar with what was on

02:12 10   his tax returns.

11   Q.   You're not aware that two million out of the three million

12   cash he had was in the sub S corporation in 2014?

13          MR. FRANK:  Objection.  Asked and answered.

14          THE COURT:  Overruled.

15   A.   No.

16   Q.   Okay.  Next I'd like to go to the term "side door" and

17   "back door".  Do you remember there was discussion Mr. Singer

18   had with Mr. Wilson about Mr. Wilson's friend whose daughter

19   wanted to go to Brown?

02:12 20   A.   Yes.

21   Q.   And Mr. Singer gave his whole talk about his knowledge of

22   how to deal with the president of Brown and go in and make a

23   back-door donation, correct?

24   A.   I don't know if he used the word "back door", but he was

25   speaking -- telling Mr. Wilson that his friend should talk to

1    someone.

2    Q.    To go speak to the president?

3    A.    Speak to the president, yes.

4    Q.    "She's a good gal" is what Mr. Singer said, correct?

5    A.    Correct.

6    Q.    As if he knew her, correct?

7    A.    That's what he said.

8    Q.    And he talks about he could go in, discuss with the

9    president, maybe even offer to make some business lectures or

02:13 10   some business programs at the school to really be part of the

11   school, correct?

12   A.    That's what Mr. Singer said, correct.

13   Q.    And it's being done with the president so it's not being

14   hidden from the school, correct?

15            MR. FRANK:   Objection.

16            THE COURT:   Sustained.

17   Q.   He talks about disclosing it to the president of the

18   university, correct?

19   A.   He talks about having the friend meet with the president

02:13 20   of the university.

21   Q.   And the president of the university is the single highest

22   person in university administration, correct?

23   A.    Correct.

24   Q.   Okay.  And so at the end of that conversation, Mr. Wilson

25   says, well, he doesn't want his daughter to get embarrassed.

1    Do you remember that in the tape?

2    A.   I don't recall embarrassed, but he didn't want his

3    daughter to know.

4    Q.   She said, daddy, don't get involved, and he didn't want

5    the daughter to know that he was trying to do something to help

6    his daughter.

7         MR. FRANK:  Objection.

8    Q.   And that's when Mr. Singer says, well, that's when you may

9    have to come to me and go through me, correct?

02:14 10   A.   Correct.

11   Q.   So he's treating the side door and the back door as

12   basically the same except the side door lets you hide it from

13   your child, correct?

14        MR. FRANK:  Objection to what he's doing.

15        THE COURT:  Sustained.

16   Q.   He immediately tells someone to move from making a

17   contribution through the president to working with Mr. Singer

18   only when it's raised that he wants to hide it from his

19   daughter, correct?

02:14 20   A.   In that phone call?

21   Q.   Yes.

22   A.   Yes.

23   Q.   Okay.  You're not aware of any communication where

24   Mr. Singer ever said, you know, the side door is not like the

25   back door, it's not legitimate, it's not accepted?  You never

```
 1    heard anything where he distinguished and said, the side door

 2    was a scheme and the back door was something acceptable,

 3    correct?

 4    A.   Not in that explicit language.

 5    Q.   And, in fact, you've used the word side-door scheme,

 6    side-door scheme.  You've never heard Mr. Singer ever use the

 7    word "scheme" when he was talking to Mr. Wilson, do you?

 8    A.   No.

 9    Q.   Okay.  And you know every time he talked about the back

10    door he said the people would get help with admissions if they

11    did a back door donation, correct?

12         MR. FRANK:  Objection to what he did every time.

13         THE COURT:  Sustained.

14    Q.   You heard him refer to the back door donation as something

15    that would get you help with admissions, correct?

16         MR. FRANK:  Objection.  In what context?

17         MR. KENDALL:  Any context.

18         THE COURT:  It's unclear.

19    Q.   Okay.  You heard Mr. Singer describing the conversation

20    with the president of Brown and making a donation as part of it

21    is to get help with admissions, correct?  That's the whole

22    point of him going to see the president of Brown, is to make a

23    donation and help his daughter get in, correct?

24         MR. FRANK:  Objection to what the point is.

25         THE COURT:  Sustained.
```

```
 1    Q.   Okay.  That's part of the conversation of why he's
 2    suggesting that the friend go to the president of Brown
 3    University and make a donation, to help his daughter get
 4    admitted to Brown, correct?
 5    A.   That was one point.  He also mentioned about helping with
 6    the school.
 7    Q.   Yes, but one point was to get help to get his daughter
 8    admitted, correct?
 9    A.   Yes.
10    Q.   That's the same quid pro quo for a back door as there is
11    with a side door, correct?
12              MR. FRANK:  Objection.  Misstates.
13              THE COURT:  Sustained.
14    Q.   He's getting help for admissions in return for giving a
15    donation.  That's what he says about the Brown situation,
16    correct?
17    A.   Not that explicit, saying that he could talk to the
18    president and they could -- he could talk with the president
19    about doing things with the school.
20    Q.   And making a donation?
21    A.   And making a donation.
22    Q.   And that would help get his daughter in?
23              MR. FRANK:  Objection.  That's not what he said.
24              THE COURT:  Sustained.
25    Q.   Okay.  Did you ever hear Mr. Singer ever discuss a back
```

```
       1    door?
       2    A.   He's mentioned --
       3    Q.   Just yes or no, did you ever --
       4         MR. FRANK:  Objection, your Honor.  If it wasn't with
       5    this defendant, I don't see the relevance.
       6         THE COURT:  Well, she can answer the question.
       7    A.   Sorry.  Can you repeat the question, please?
       8    Q.   Did you ever hear Mr. Singer discuss the back door
       9    donations?
02:17 10    A.   Yes.
      11    Q.   Okay.  And in it, he would describe people as getting
      12    admissions benefits for large donations to schools, correct?
      13         MR. FRANK:  Objection.
      14         THE COURT:  If you're -- no.  Overruled.
      15    A.   Yes.
      16    Q.   Okay.  And in return for this large donation, you would
      17    get that level of help with admissions, correct?
      18         MR. FRANK:  Objection.  This is so vague as to be.
      19         THE COURT:  Yeah.  That's a vague question.
02:18 20    Sustained.
      21    Q.   The whole point being one of the benefits of a back door
      22    donation was to get help with admissions for more than
      23    one person in the family, correct?
      24         MR. FRANK:  Objection.
      25         THE COURT:  Overruled.
```

1   A.   I don't recall more than one person in the family.

2   Q.   At least one person?

3   A.   Mr. Singer in some calls suggested that it would cost 40

4   to $50 million to go and do the back door to get someone in at

5   some of the schools.

6   Q.   Okay.  And so they're getting a this-for-that with a back

7   door donation?  They're getting admissions help in return for

8   the back door donation, correct?

9           MR. FRANK:  Objection.

02:19 10        THE COURT:  Overruled.

11  A.   Mr. Singer is saying that, but there's a difference

12  between --

13  Q.   I'm not asking the difference.  That's what he said.  I'm

14  just asking what he said, not your explanation of what it

15  means.

16          MR. FRANK:  Actually, he did say what it means, and

17  she's trying to answer the question.

18          THE COURT:  All right.  Let her finish the answer and

19  then go on.

02:19 20 A.   There's a difference between making the donation the back

21  door, which was just donating to the school in hopes of getting

22  the children in, as compared with the side door, which is

23  making a payment to a program in exchange for a child being a

24  recruited athlete.

25  Q.   Well, he didn't always restrict the side door to being a

```
 1   recruited athlete, did he?

 2   A.   Can you be specific, please?

 3   Q.   Well, he said -- didn't he just describe the side door as

 4   how they fund their special programs?

 5   A.   I don't recall specifically.

 6        MR. KENDALL:  Can we have Exhibit 1043, please, just

 7   for the witness.

 8   Q.   Do you recognize this as an e-mail?

 9        MR. FRANK:  Your Honor, it's redacted.  We have no

10   idea what this is.

11        MR. KENDALL:  I'll give you the name if you want.

12   It's not a person whose in this case.

13        MR. FRANK:  Well, then it's irrelevant.  Objection.

14        THE COURT:  Are you showing it to her to refresh her

15   memory?

16        MR. KENDALL:  I'm going to start with that, your

17   Honor.

18        THE COURT:  I'm sorry?

19   Q.   Does that refresh your memory that Mr. Singer would tell

20   people he would define the term "side door" as a way that is

21   not improper and how schools fund their special programs?

22        MR. FRANK:  I object, your Honor.  What he told

23   people.

24        THE COURT:  She can be shown the document to refresh

25   her memory.  Then take the document down and see if it does.
```

```
 1              MR. KENDALL:  Okay.  If we can take it down.

 2   Q.   Does that refresh your memory that Mr. Singer would tell

 3   people that the side door was an appropriate way to fund

 4   special programs at schools?

 5   A.   No, it doesn't.

 6              MR. KENDALL:  Okay.  Your Honor, I'd like to offer

 7   Exhibit 1043 into evidence.  It's subject to an authenticity

 8   stipulation.

 9              MR. FRANK:  Objection, your Honor.

10              THE COURT:  Sustained.

11   Q.   Okay.  Nowhere in any of these tapes does Mr. Singer

12   actually define what a side door is, correct?  He never said a

13   side door does this and it does that and it does this.  He

14   talks about a side door, but he doesn't give a specific

15   definition, a side door has the following components or

16   elements, correct?

17   A.   He explains that he has a side door and he has people in

18   schools that will --

19   Q.   That got in through side doors?

20   A.   He explains the difference between side doors and -- I

21   guess -- can you repeat that?  I don't understand.

22   Q.   You don't know how Mr. Singer defined a side door to John

23   Wilson, do you?

24   A.   I do not.

25   Q.   At no time during the three months when you were having
```

these consensual calls did you ever tell Mr. Singer, I want you
to go in and tell Wilson that the side door requires deception,
it requires fraud, and it's not approved by the university
administration?  At no time did you say that in maybe more
subtle terms -- no.  Strike that.

         At no time did you say that in explicit terms,
correct?

A.   Not explicitly, correct.

Q.   Okay.  And you recall at those January tapes Mr. Singer
told Wilson that if the development office knew about his
side-door donation to athletics, they would solicit him for
more money?  Do you remember that?

A.   That is what Mr. Singer said.

Q.   You never instructed Singer to say, don't tell them
because if they find you did a side-door donation, they'll run
from you and think you're a terrible person?  You never told
him to say something like that, correct?

A.   No.  We never told him to say that.

Q.   You let him pick his own words and his own words were,
if -- one, if they heard you made a side-door donation to
athletics, they're going to want to do business with you and
get even more donations, correct?

         MR. FRANK:  Objection.

         THE COURT:  Sustained.

         MR. FRANK:  This wildly misstates.

```
 1    Q.    Okay.  He stated in there that if the development office

 2    finds out you made a side-door donation to athletics --

 3              MR. FRANK:  Objection.  That's not what he said.

 4              THE COURT:  He hasn't finished the question.

 5    Q.    You've never told him to -- you never told Mr. Singer to

 6    tell Mr. Wilson that if people hear you did a side-door

 7    donation, they'll think you did something improper or illegal?

 8    You never instructed Mr. Singer to tell Mr. Wilson that,

 9    correct?

02:23 10   A.    Not as explicit language.

11    Q.    I want to now turn to the September 28th Facetime call.

12    That's the call that Mr. Singer made to Mamie Wilson's phone of

13    33, 34 minutes.  All the agents are out to lunch when

14    Mr. Singer makes that call without anybody supervising or

15    monitoring, correct?

16    A.    Correct.

17    Q.    Okay.  You don't know who was on that call, correct?

18    A.    I was not present for the call.

19    Q.    So does that mean you do not know who was on the call?

02:24 20   A.    He made a call to Mamie Wilson.

21    Q.    He made a call to Mamie Wilson's phone.  You don't know

22    who was in the room when the call was taken, do you?

23    A.    Based on the --

24    Q.    Do you know -- are you a witness?  Do you have personal

25    knowledge of who was in the room when that call was received in
```

1  the Wilson household?

2  A.   I was not in the room when that call was received.

3  Q.   And you were not on the other end of the call to hear who

4  was speaking?

5  A.   Correct.

6  Q.   And you don't know if Mr. Wilson was on that call for

7  one minute or five minutes or longer, do you?

8          MR. FRANK:  Or at all.  Objection, your Honor.

9          THE COURT:  She can answer the question.

02:24 10  Q.   You don't know if he was on that call for one minute or

11  five minutes or some other time, correct?

12  A.   He was not on that call.

13  Q.   Were you on the call?

14  A.   No, but based on his --

15  Q.   I'm not asking what your --

16  A.   Based on the recorded conversation, he was not on that

17  call on the conversation on the 29th.

18          MR. KENDALL:  Your Honor, I move to strike.  I'm

19  asking for her personal knowledge.

02:25 20          THE COURT:  Well, she is entitled to answer a

21  question.

22  Q.   Okay.  Did you hear any of the voices that were on that

23  call?

24  A.   No.

25  Q.   So you're making your interpretation of a transcript of a

1   different day's call, correct?

2   A.   And -- and the text messages.

3   Q.   Okay.  So you're interpreting documents about something

4   you did not observe because you had gone to lunch and you

5   didn't supervise Singer, correct?

6   A.   I'm basing it on other evidence, yes.

7   Q.   Okay.  Six people there from the Boston investigation team

8   and they all go to lunch and let Singer make a call unescorted,

9   correct?

02:25 10   A.   He made a call with Mr. Wilson's daughters because, as

11   evidence showed, they were not involved in the side-door

12   scheme.

13   Q.   Okay.  You made a -- you allowed Mr. Singer to make a call

14   unsupervised while the six of you went to lunch?  Yes or no?

15   A.   He made a call while we went to lunch, yes.

16   Q.   Okay.  Now, you made some discussion about quid pro quo

17   and this-for-that.  Do you understand that there is a

18   difference between giving a coach money to put in their pocket

19   and giving a donation to a school program?

02:26 20   A.   Yes.

21   Q.   And you know, for example, Rudy Meredith got paid money by

22   Mr. Singer to put in his pocket that he used to build a home

23   down in Florida, correct?

24   A.   Correct.

25   Q.   Okay.  And you also know that the Yale Development Office

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | told Mr. Meredith to put donors' kids on the roster --       |
| 2   | MR. FRANK:  Objection.                                        |
| 3   | THE COURT:  Sustained.                                        |
| 4   | Q.   -- and he didn't get any money?                         |
| 5   | MR. KENDALL:  Your Honor, they specifically asked            |
| 6   | about her knowledge about college fundraising in the redirect. |
| 7   | They opened the door.                                         |
| 8   | MR. FRANK:  That is not true.                                 |
| 9   | THE COURT:  The objection is sustained.                       |

02:27 10   Q.   You made some comments about the use of the words

11   "payment", "donation", and "contribution".  Do you remember

12   that with Mr. Frank asking you questions?

13   A.   Yes.

14   Q.   People can make a payment for a variety of reasons,

15   correct?

16   A.   Correct.

17   Q.   You can make a payment to pay your taxes, correct?

18   A.   Correct.

19   Q.   You can make a payment to fulfill a pledge you've made to

02:27 20   a charity, correct?

21   A.   A payment for a charity as a donation, yes.

22   Q.   Yes.  I mean, a payment just means one person is

23   transferring funds to another recipient, correct?

24   A.   Yes, a payment is --

25   Q.   So when a person says they are making a payment, they can

1    be doing it for perfectly appropriate and legal reasons,

2    correct?

3    A.    Correct.  When a payment is made it could be for

4    legitimate reasons.

5    Q.    Okay.  And do you know that the e-mails the government has

6    and Mr. Wilson's tax papers and others show that he and his

7    bookkeeper routinely used the word "payment" for charitable

8    contributions?

9              MR. FRANK:  Objection.  Facts not in evidence.

02:28 10             THE COURT:  Overruled.

11   A.    I'm not aware.

12   Q.    So you're testifying on the use of the word "payment"

13   versus "contribution", and you haven't even looked at the tax

14   preparer's records that were the basis of the return at issue

15   in this case, correct?

16   A.    I was not the agent responsible for investigating

17   Mr. Wilson's tax crimes.

18   Q.    You were the IRS agent on the case, correct?

19   A.    Yes, but there was another IRS agent that assisted

02:28 20   investigating numerous parents' tax returns.

21   Q.    And so -- but for Mr. Wilson, you did not review any of

22   the tax preparers' papers, correct?

23   A.    I did not.

24   Q.    But yet you're giving testimony on the difference between

25   "payment" and "contribution" and "donation", correct?

 1            MR. FRANK:  She's not actually.  She read words on the

 2     on a paper.

 3            THE COURT:  Overruled.

 4     A.   I answered the question that Mr. Frank asked about payment

 5     and donation.

 6     Q.   Do you think it would have been better preparation for you

 7     if -- strike that.

 8            Mr. Frank did not show you the Wilson tax papers using

 9     the words "donation" and "payment" in the same transaction, did

02:29 10    he?

11     A.   I did not see those.

12     Q.   Okay.  And he didn't pick them out and give them to you,

13     correct?

14     A.   No.

15     Q.   Now, you also testified in redirect about the hundreds of

16     pages of interview notes that the agents took of the things

17     that Mr. Singer said to them, correct?

18     A.   Yes.

19     Q.   But just to clarify, none of those notes have anything of

02:29 20    what the agents said to Mr. Singer, correct?

21     A.   No.  We did not document our operational communication

22     with Mr. Singer, correct.

23     Q.   You say "operational".  You didn't document what you told

24     Mr. Singer about what to say to Mr. Wilson, correct?

25     A.   We did not document that.  We documented substantial

1  comments that Mr. Singer made to us as part of the interview

2  process.

3  Q.   But you -- and so it's basically a one-way mirror.  It

4  shows what he said to you, but not what you said to him,

5  correct?

6  A.   We were collecting evidence and we documented the

7  substance that Mr. Singer told us about different people and

8  about his schemes.

9  Q.   Could you answer my question, please?

02:30 10       MR. FRANK:  Objection, your Honor.  She just did.

11            THE COURT:  Yeah.  Sustained.

12  Q.   It shows what he said to you, nothing of what you said to

13  him, correct?

14  A.   I did not write down what I said to Mr. Singer.

15  Q.   Okay.  The only person who purports to have done that is

16  Mr. Singer in Exhibit 13, correct?

17            MR. FRANK:  Objection to what Mr. Singer purports.

18            THE COURT:  Sustained.

19  Q.   But even when you say that you wrote down what Mr. Singer

02:31 20  told you, you didn't write down everything, correct?

21  A.   Can you be specific?

22  Q.   Yes.  He told you on multiple occasions he didn't use the

23  word "bribe" with Mr. Wilson and other parents, and you didn't

24  put that in the reports, correct?

25  A.   I don't recall if that's in the reports or not.

```
 1    Q.   Can you identify a single time you put in a report,
 2    Mr. Singer told us he did not use the world "bribe" with
 3    Mr. Wilson?
 4    A.   The reports summarize what Mr. Singer said.  I don't
 5    recall if he used -- if the exact word "bribe" is in the
 6    reports.
 7    Q.   Well, you told us you had this ongoing dialogue with him
 8    of giving him instructions and him misspeaking and not
 9    following them.  Do you remember that testimony?
10    A.   Yes.
11    Q.   You didn't record any of that in your notes that you had
12    repeatedly told him to use certain words and he repeatedly
13    misspoke and didn't use those words or used the wrong words,
14    correct?
15    A.   I did not document that, correct.
16    Q.   Okay.  It's an ongoing conversation with him for the
17    entire three months that he's recording consensuals with
18    Mr. Wilson and not once did you put it in an interview report,
19    correct?
20    A.   An interview report is what Mr. Singer tells us, not what
21    we tell Mr. Singer.
22    Q.   Well, he's telling you that he's never used a bribe with
23    Mr. Wilson, the word "bribe" with Mr. Wilson, and you don't put
24    that in a report?
25    A.   I don't recall the specific word that is in the report.
```

1    Q.   You don't put anything in there of what he told you about

2    how he spoke to Mr. Wilson, correct?

3    A.   I don't recall that.  I recall putting down what

4    Mr. Singer told us that he did the side door with Mr. Wilson

5    and the specifics.

6    Q.   You never even put down there that Mr. Singer told you

7    that his pitch to Mr. Wilson for the prior eight years had been

8    that the side door took donations?

9    A.   That was not -- I don't recall that being documented

02:33 10    specifically like that.

11    Q.   He told you that on more than one occasion, correct?

12         MR. FRANK:  Objection.  I'm not sure how counsel could

13    be testifying to that.

14         THE COURT:  Sustained.

15    Q.   Did he tell you that on more than one occasion?

16    A.   Specifically with Mr. Wilson, I'm not -- I don't recall,

17    but his general pitch was that it was a payment to a -- excuse

18    me -- a donation to a program.

19    Q.   Okay.  And nowhere in your interview reports did you write

02:33 20    down that Mr. Singer told us his general pitch to many of his

21    parents was to tell them it is a donation to a program and not

22    of any personal benefit to the coach, correct?

23         MR. FRANK:  Objection to the last part.

24         THE COURT:  Overruled.

25    A.   I don't recall if he used that specific term, but we did

1    document what Mr. Singer did with parents and discussed the --

2    wrote down the side door and the SAT scheme in the reports.

3    Q.   Could you answer my question, please?

4         MR. FRANK:  Objection, your Honor.

5    Q.   Not once did any agent write in a report that Mr. Singer

6    said he didn't tell the parents it was a bribe.  He always told

7    them it was a donation.

8    A.   I don't recall that specific statement written down.  We

9    documented what the side door was, the SAT scheme, and the

02:34 10   communication -- what Mr. Singer told us that he did with the

11   parents.

12   Q.   Not once in hundreds of pages of interview reports,

13   correct?

14   A.   Correct.

15        MR. FRANK:  I'm not sure what that question was.  Not

16   once what?

17   Q.   And it says nowhere in those interview reports what you

18   said to him to get him to cooperate, correct?

19   A.   I did not document those -- that specific comment or those

02:35 20   specific part of the meeting with Mr. Singer.

21   Q.   And you didn't document any of your criticisms of how he

22   made the consensual tapes, correct?

23   A.   Operational discussion --

24        MR. FRANK:  Objection to the term "criticisms".

25        THE COURT:  Sustained.

```
 1   Q.   Okay.  You testified with Mr. Frank that your concern
 2   about getting things to be explicit was not worrying about
 3   Mr. Wilson's state of mind, correct?
 4   A.   Correct.
 5   Q.   You were worried about how it would look to the jury,
 6   correct?
 7   A.   Correct.
 8   Q.   Because it wouldn't look like it was enough evidence to
 9   convict anyone, correct?
10       MR. FRANK:  Objection, your Honor.
11       THE COURT:  Sustained.
12       MR. KENDALL:  Your Honor, she's opened this door.
13       MR. FRANK:  That is not true, your Honor.
14       THE COURT:  No.
15   Q.   You were concerned that if Mr. Singer used the same
16   approach that he used with Mr. Wilson, that wouldn't be good
17   enough for the jury, correct?
18       MR. FRANK:  Objection.  That's not what she said.
19       THE COURT:  Sustained.
20   Q.   You were concerned that Mr. Singer was using the standard
21   approach that he had used with Mr. Wilson for the prior
22   eight years, correct?
23   A.   That he was using the general pitch, yes.
24   Q.   Okay.  And you thought the general pitch wouldn't be clear
25   enough for the jury, correct?
```

```
 1              MR. FRANK:  Objection.

 2              THE COURT:  Sustained.

 3   Q.   When Mr. Singer was cooperating during those three months,

 4   did you believe he was trying to fulfill your instructions?

 5              MR. FRANK:  Objection to what she believed.

 6              THE COURT:  Sustained.

 7              MR. KENDALL:  Your Honor, I want to know her state of

 8   mind, if I may inquire.

 9              MR. FRANK:  Objection to her state of mind.

10              THE COURT:  Sustained.

11   Q.   Okay.  When Mr. Singer was cooperating, he was supposed to

12   be trying to follow your instructions, correct?

13   A.   Yes.

14   Q.   And you view it -- and you described in your prior

15   testimony that he repeatedly made mistakes in carrying out

16   these instructions?

17   A.   He wasn't as clear and explicit with the wording that we

18   asked him to be.

19   Q.   And he went back to his old pitch saying "donation",

20   correct?

21   A.   Correct.

22   Q.   And he used "program", not "coach"?

23   A.   Correct.

24   Q.   And he talked about university presidents and reading

25   admission files, correct?
```

1    A.    That's what he said on some of his calls, yes.

2    Q.    When you trained as a revenue agent, one of the things the

3    IRS taught you was to look for patterns, correct?

4    A.    Can you be specific?

5    Q.    Yeah.  When you look at someone's tax return, if something

6    happens three times, you view that as a pattern?  Isn't that

7    part of the IRS training?

8    A.    We look at other years while we're auditing for the same

9    activity, to see if they occur in other years.

02:38 10   Q.    And if it keeps on happening over and over, the IRS trains

11   you that that is a pattern and may not be a mistake, correct?

12   A.    I don't recall my training, my training as a revenue agent

13   because it was so long ago.

14   Q.    But you'd agree with me here we have a pattern of

15   Mr. Singer repeatedly not following your instructions, correct?

16   A.    No.  Mr. Singer misspoke.  He would -- we asked him to say

17   "payment to a coach".  He kept going back to his old pitch.  It

18   was a mistake.  He wasn't as explicit as we asked.  And we

19   asked him, after each call, if he could be more explicit and to

02:38 20   say "payment to a coach".

21   Q.    Okay.  And you testified earlier that you didn't want to

22   use the word "bribe" because supposedly Mr. Wilson would become

23   suspicious there was an investigation, correct?

24   A.    Yes.

25   Q.    Mr. Wilson, you'd agree, trusted Mr. Singer quite a bit?

1           MR. FRANK:  Objection.

2           THE COURT:  Sustained.

3    Q.   Mr. Wilson had been working with Mr. Singer for

4    eight years on and off, correct?

5    A.   Correct.

6    Q.   He wanted him to be an adviser to all of his children,

7    correct?

8    A.   He hired him to be -- for college counseling services.

9    Q.   Yes.  And when he's away in Europe, Mr. Singer is visiting

02:39 10   his son Johnny as part of the college counseling service,

11   correct?

12   A.   Correct.

13   Q.   He wants his daughters to meet him face-to-face, correct?

14   A.   Correct.

15   Q.   And he wants his daughters to have Facetime calls with him

16   too, correct?

17   A.   Correct.

18   Q.   And he wants to give him advice so he can make more money

19   from his business of 750 side door deals at 50 schools,

02:39 20   correct?

21           MR. FRANK:  Objection to what Mr. Wilson wants.

22           THE COURT:  Sustained.

23   Q.   He's giving him business advice on how he can make money

24   from a service that Mr. Singer describes as being for free,

25   correct?

```
 1   A.   He tells Mr. Singer that he can offer him pricing
 2   strategies.
 3   Q.   For a business that Mr. Singer describes as having over
 4   700 side doors at about 40 to 50 schools, correct?
 5   A.   Yes.
 6   Q.   Okay.  And if you couldn't have used the word "bribe", did
 7   you ever tell Mr. Singer just to say something more subtle,
 8   like the coach needs the money for his house in Florida?  Did
 9   you ever say that to Mr. Singer?
02:40 10  A.   No.  It was a payment to the coach.
11   Q.   The coach wants money for a vacation.  You never told him
12   to say that?
13   A.   No.  "Payment to the coach" was what we had him say.
14   Q.   And then he said "payment to the coach or the school",
15   correct?
16   A.   And then, at times, he would go back to his old wording.
17   Q.   Okay.  And you never told him to tell Mr. Wilson simply
18   it's not for the school, it's for the coach's pocket?  You
19   never told Mr. Singer to tell Mr. Wilson that, did you?
02:41 20  A.   We briefed -- debriefed Mr. Singer after each call and
21   said, can you be more explicit, say "coach to the program".
22   Q.   But he repeatedly misspoke, correct?
23   A.   And as I said before, Mr. Singer's been doing this a long
24   time and he would go back to his old pitch.  And each time we
25   would try and talk to him and ask him to be more explicit.
```

1    Q.   And so Mr. Singer would decide what would be said to

2    Mr. Wilson, not the agents, correct?

3              MR. FRANK:  Objection.

4              MR. KENDALL:  Excuse me.  Did the Court rule?

5              THE COURT:  I didn't hear an objection.

6              MR. FRANK:  I did object, your Honor.

7              THE COURT:  Grounds?

8              MR. FRANK:  What Mr. Singer would want.

9              THE COURT:  Sustained.

02:41 10   Q.   Okay.  In the final analysis, Mr. Singer ended up

11   determining much of what was said in those tapes, correct?

12   A.   No.  We asked Mr. Singer -- we asked Mr. Singer to say

13   certain things on the call, and Mr. Singer had spoke to the

14   parents.

15   Q.   But every time he misspoke, you didn't make him -- you

16   didn't require him to go correct it and take it back, did you?

17             MR. FRANK:  Your Honor, we've been over this so many

18   times.

19             THE COURT:  Sustained.

02:42 20            MR. KENDALL:  Okay.  I'm all done.  Thank you, your

21   Honor.

22             THE COURT:  Mr. Kelly?

23             MR. KELLY:  I'd like to go again, but I don't think

24   I'm entitled to.

25             THE COURT:  Thank you.

         1              Miss Keating, you may step down.

         2              Next witness.

         3              MR. STEARNS:  The government calls Aaricka Hughes.

         4              (Aaricka Hughes, sworn.)

         5              THE CLERK:  And would you please state your name for

         6    the record, spelling your last.

         7              THE WITNESS:  Can I take my mask off?

         8              THE COURT:  Yes, you may take your mask off.

         9              THE WITNESS:  Okay.  Thanks.  Aaricka Hughes,

02:43 10    H-u-g-h-e-s.

        11              THE COURT:  And Miss Hughes, if you'll pull closer to

        12    the microphone and then pull it in so that we can all hear you.

        13    Thank you.

        14              MR. STEARNS:  May I inquire, your Honor?

        15              THE COURT:  Yes, you may, Mr. Stearns.

        16                   DIRECT EXAMINATION OF ARRICKA HUGHES

        17    BY MR. STEARNS:

        18    Q.   Good afternoon, Miss Hughes.

        19    A.   Hello.

02:44 20    Q.   Where do you live?

        21    A.   Marina del Ray, California.

        22    Q.   Okay.  Are you presently employed?

        23    A.   Yes.

        24    Q.   Where do you work?

        25    A.   Loyola Marymount University.

1    Q.   And does Loyola Marymount go by another name sometimes?

2    A.   Yes, LMU.

3    Q.   LMU.  How long have you worked at LMU?

4    A.   From the spring of 2021.

5    Q.   And what's your title?

6    A.   Head women's basketball coach.

7    Q.   Okay.  Where did you work immediately prior to becoming

8    the head women's coach at LMU?

9    A.   USC.

02:44 10   Q.   Okay.  And if you could just briefly describe how long you

11   worked at USC and what titles you held.

12   A.   I worked there from 2017 until 2021.  I was a recruiting

13   coordinator, assistant coach, and associate head coach over the

14   four years.

15   Q.   What years were you the recruiting coordinator?

16   A.   Around 2017 to '18.

17   Q.   During your time as the recruiting coordinator and on the

18   coaching staff for the USC women's basketball program, how

19   would you describe your level of involvement in recruiting?

02:45 20   A.   As the recruiting coordinator, my sole priority was to be

21   active and present in recruiting.

22   Q.   Okay.  Let's back up.  Where did you -- did you graduate

23   from college?

24   A.   Yes.

25   Q.   Where did you go to school?

```
  1   A.    USC.

  2   Q.    What year did you graduate?

  3   A.    2010.

  4   Q.    And did you play basketball in college?

  5   A.    Yes, I did.  I was also a -- I clearly played for

  6   four years.  I was also a captain the last two years that I was

  7   there.

  8   Q.    Okay.  What did it take for you to achieve the level of

  9   basketball ability to be recruited by USC?

 10   A.    Countless hours in the gym working on skills, going to

 11   camps, practicing, lot of sacrifice socially while in high

 12   school.

 13   Q.    Now, going to when you became the recruiting coordinator

 14   and coach at USC, how would you describe the overall strength

 15   of the women's basketball program?

 16   A.    It's a Division 1 level, very highly sought after,

 17   probably anywhere from top 25 to top 50 in the nation.

 18   Q.    And, similarly, how would you describe the level of

 19   athletes that you recruited to the team?

 20   A.    The same, the top in the country.

 21   Q.    Okay.  Directing your attention to the fall of 2017, that

 22   was a few months after you joined USC, correct?

 23   A.    Yes.

 24   Q.    Could you just walk us through, at a high level, what was

 25   involved in the recruiting process as a coach and the
```

02:45 (line 10)
02:46 (line 20)

1    recruiting coordinator.

2    A.    Recruiting prospect student athletes involve us going out

3    on the road, identifying student athletes in the gym, camps,

4    assessing them in practice, high school games, also having

5    conversations with them and the prospects, their high school

6    coaches, their parents, while also watching film.

7    Q.    Did you consider financial contributions in deciding whom

8    to recruit to the women's basketball?

9    A.    No.

02:47 10    Q.    What was the most important thing that you considered in

11    deciding whom to recruit?

12    A.    Making sure that they were at a level that could help us

13    win games at the highest level of basketball.

14    Q.    Are you familiar with the SUBCO process at USC,

15    Miss Hughes?

16    A.    Yes.

17    Q.    What was your role in that process when you were the

18    recruiting coordinator and an assistant coach at USC?

19    A.    To recruit prospect student athletes and create bios, or

02:47 20    profiles, that we would then turn in to SUBCO.

21    Q.    Okay.  And to whom did you give those bios for recruiting?

22    A.    To my sports supervisor, and at the time that was Donna

23    Heinel.

24    Q.    And what did Miss Heinel do with those profiles and SUBCO

25    packets?

1    A.    To my knowledge, she then took those and presented them on

2    behalf of our program.

3    Q.    To whom?

4    A.    To SUBCO, which I believe is admissions.

5    Q.    Okay.  Did you have an understanding as to whether, when

6    you were putting together those SUBCO bios and packets, whether

7    it was important to be truthful?

8              MR. KENDALL:  Objection, your Honor.

9              THE COURT:  Overruled.

02:48 10   A.    Yes.  I believe that at that point that was what they were

11   relying on to be able to get kids into school, so yes, being

12   truthful when turning in those packets was important.

13   Q.    Did anyone other than you and members of your coaching

14   staff have the authority to recruit women's basketball players

15   for the team?

16   A.    No.

17   Q.    Okay.  Did Donna Heinel have the authority to recruit

18   members for the basketball team?

19   A.    No.

02:48 20   Q.    Are you familiar with the term "practice players" in the

21   context of the women's basketball team at USC?

22   A.    Yes.

23   Q.    Who were practice players?

24   A.    They were male current students that were already enrolled

25   in the university.

1    Q.    So did they go through the SUBCO process for recruiting?

2    A.    No.

3    Q.    Are you familiar with managers of the women's basketball

4    team?

5    A.    Yes.

6    Q.    What did managers do generally?

7    A.    They helped assist, water, sweeping the floor, helping set

8    up for practice.

9    Q.    Did you recruit managers through the SUBCO process?

02:49 10    A.    No.

11    Q.    During your time as head -- as recruiting coordinator and

12    assistant coach for the USC team, did you ever recruit an

13    individual named Sabrina Abdelaziz?

14    A.    No.

15    Q.    Did you ever watch any film on Miss Abdelaziz?

16    A.    No.

17    Q.    Did you ever speak with her high school coach?

18    A.    No.

19    Q.    Did Sabrina Abdelaziz ever become a member of the USC

02:49 20    women's basketball team?

21    A.    No.

22    Q.    Did she ever become a practice player on the USC women's

23    basketball team?

24    A.    No.

25    Q.    Did she ever become a manager of the team?

```
 1    A.    No.

 2    Q.    Did she ever attend any practices?

 3    A.    No.

 4    Q.    Now, you were interviewed by FBI agents in the summer of

 5    2019, Miss Hughes?

 6    A.    Yes.

 7    Q.    Before that interview had you ever heard of Sabrina

 8    Abdelaziz?

 9    A.    No.

10          MR. STEARNS:  Miss Lewis, if we can pull up

11    Exhibit 383, which is already in evidence.

12    Q.    Miss Hughes, do you see the date at the top here of this

13    student profile October 2017?

14    A.    Yes.

15    Q.    Are you generally familiar with what this type of document

16    is?

17    A.    Yes.

18    Q.    What is it?

19    A.    It would be a profile or bio that would be created for

20    SUBCO.

21    Q.    Okay.  Can we go to page 2.  Now, in the fall of 2017,

22    Miss Hughes, did anyone -- who wrote the profiles for SUBCO for

23    the women's basketball team?

24    A.    I did.

25    Q.    Did anyone else?
```

1  A.    Not to my recollection, no.

2  Q.    Okay.  During 2017 or 2018 did you ever see this SUBCO

3  profile packet for Sabrina Abdelaziz?

4  A.    No.

5  Q.    Did you write any of the material in this bio?

6  A.    No.

7  Q.    During your time at USC did you ever recruit an athlete

8  for the women's basketball team who had played exclusively

9  junior varsity basketball?

02:51 10  A.    No.

11  Q.    Did you ever recruit an athlete for your team who did not

12  play basketball the last two years of high school?

13  A.    No.

14  Q.    Why didn't you recruit those types of individuals?

15  A.    They would not have been at the level that we were looking

16  for to add to our roster.

17  Q.    Would that type of basketball player be able to practice

18  with a Division 1 basketball team like USC?

19  A.    No.

02:51 20  Q.    Did you ever accept any money either personally or to a

21  women's basketball fund in exchange for recruiting an athlete?

22  A.    No.

23  Q.    Did you ever lie to admissions?

24  A.    No.

25  Q.    Why not?

```
 1    A.   Because it's the wrong thing to do.
 2              MR. KELLY:  Objection.
 3              MR. KENDALL:  Objection, your Honor.
 4              THE COURT:  Well, she can answer that question
 5    briefly.  Go ahead.
 6    A.   Because it's the wrong thing to do.
 7    Q.   Are you aware -- have you ever seen any formal written
 8    policy forbidding you from accepting money for recruiting a
 9    student athlete?
10    A.   No.
11    Q.   Have you ever seen any formal written policy at USC
12    forbidding you from lying to your colleagues?
13    A.   No.
14    Q.   So how did you know not to do those things?
15    A.   Common sense.
16              MR. STEARNS:  That's all I have.
17              THE COURT:  Cross-examination, Mr. Kelly.
18              MR. KELLY:  Sure.
19                   CROSS-EXAMINATION OF AARICKA HUGHES
20    BY MR. KELLY:
21    Q.   Good afternoon, coach.
22    A.   Hello.
23    Q.   How's your team?
24    A.   Doing okay.
25    Q.   Good.  There are, in fact, NCAA regulations about
```

1    accepting monies and meals and things of value that coaches

2    can't do, right?

3    A.    Yes.

4    Q.    Okay.  Now, when you were an assistant coach at USC, the

5    team had approximately 13 to 15 players, right?

6    A.    Yes.

7    Q.    And so the number varied year to year, right?

8    A.    Correct.

9    Q.    And if someone were to say that USC's women's basketball

02:53 10   team used practice players and had a team manager, that would

11   be true, right?

12   A.    Yes.

13   Q.    And when Sabrina Abdelaziz arrived on USC's campus in

14   2018, she had not been recruited by you, correct?

15   A.    Correct.

16   Q.    And the USC women's basketball that year wasn't short a

17   player because of Sabrina's presence on campus, was it?

18   A.    No.

19   Q.    And you've worked as a women's basketball coach at three

02:54 20   different universities, right?

21   A.    This would be my fourth.

22   Q.    Fourth.  Okay.  So you are very familiar with the

23   recruiting process, right?

24   A.    Yes.

25   Q.    And have you ever recruited a player from the Hong Kong

1    International School?

2    A.    I have not personally, no.

3    Q.    Are you aware of any Division 1 women's basketball player

4    coming out of the Hong Kong International School?

5    A.    I am not aware, no.

6    Q.    Are you familiar with the fact that USC accepted lots of

7    students from the Hong Kong International School every year?

8            MR. STEARNS:  Objection.  Foundation.

9            THE COURT:  Well, she can say if she's familiar.

02:55 10   Overruled.

11   A.    I'm not involved with the admissions process, nor did I

12   really pay attention to that portion of what was going on at

13   the school.

14   Q.    Your focus was the basketball?

15   A.    Yes, sir.

16   Q.    And as the basketball coach, you had no experience with

17   the Hong Kong International School, right?

18   A.    Correct.

19   Q.    And there was a reference to a woman named Donna Heinel in

02:55 20   the direct questioning.  Did you ever talk to her about Sabrina

21   Abdelaziz?

22   A.    No.

23   Q.    Do you know a man named Rick Singer?

24   A.    No.

25   Q.    I assume then you have no idea what Donna Heinel and Rick

```
 1  Singer may have discussed between the two of them?
 2          MR. STEARNS:  Objection.
 3          THE COURT:  Overruled.
 4  A.   No.
 5  Q.   All right.  And you don't have any idea what this man Rick
 6  Singer might have said to my client, Gamal Abdelaziz, about
 7  USC, do you?
 8  A.   No.
 9  Q.   And when you were at USC, was the athletic director a man
10  named Pat Haden?
11  A.   No.
12  Q.   Who was the athletic director then?
13  A.   In those years?  What years are you asking?
14  Q.   Let's go with 2017-2018.
15  A.   Lynn Swann.
16  Q.   Lynn Swann.  Former Pittsburgh Steeler player, right?
17  A.   Yes, sir.
18  Q.   All right.  Did he have a VIP list for students he could
19  get in?
20          MR. STEARNS:  Objection.
21  Q.   If you know.
22          THE COURT:  Well, if she knows.
23  A.   I don't know about a VIP process.
24  Q.   Have you ever heard about a VIP list that various upper
25  management would have?
```

```
 1  A.   No.
 2  Q.   Okay.  How about when you were at USC?  Was the head of
 3  the Trojan Athletic Fund a man named Robert Orr?
 4  A.   Yes.
 5  Q.   And the Trojan Athletic Fund raised money for USC
 6  athletics, right?
 7  A.   I believe so.
 8  Q.   You, yourself, didn't play any role in the fundraising
 9  process, right?
10  A.   Correct.
11  Q.   Now, let me direct your attention to the time period
12  before the summer of 2018, before the summer of 2018.  Do you
13  know whether Donna Heinel used the athletic admissions process
14  to raise money for USC?
15            MR. STEARNS:  Objection.
16            THE COURT:  If she knows, she can answer.
17  A.   I do not know.
18  Q.   All right.  Do you know whether those above you in the
19  hierarchy at USC were instructed to raise money for USC
20  athletics by recruiting walk-on athletes?
21  A.   No.
22  Q.   You don't know?
23  A.   I don't know.
24  Q.   All right.  So any discussions like that did not involve
25  you?
```

```
 1    A.    Correct.

 2    Q.    Now, if a recruited scholarship athlete quits playing the

 3    team, she loses her scholarship, right?

 4    A.    If she quits?

 5    Q.    Quits the team.  Maybe you recruit her, she gets a

 6    scholarship.  She decides, I want to study chemistry instead of

 7    play hoops.  She loses her scholarship, right?

 8    A.    No.

 9    Q.    She doesn't?

10    A.    No.

11    Q.    She gets to keep it?

12    A.    It just depends.

13    Q.    Depends on what?

14    A.    It could be -- like for us, we're not -- we could pull the

15    scholarship as a coaching staff after talking with

16    administration, but I've never experienced that as the coach

17    personally.

18    Q.    Have you ever had a scholarship athlete quit and keep the

19    scholarship?

20    A.    Not me personally, no.  I don't recall.

21    Q.    All right.  But the coaching staff had the authority to

22    revoke the scholarship if some young woman comes, quits midway

23    through the season, doesn't want to play basketball anymore,

24    right?

25    A.    Yes.  I believe so.
```

1   Q.   Whereas a walk-on recruited player, there's no consequence

2   because the person has no scholarship, right?

3         MR. STEARNS:  Objection on "no consequence".

4         THE COURT:  Well, if she can understand the question.

5   Q.   Okay.  I'll rephrase it.  A recruited walk on doesn't get

6   a scholarship, right?

7   A.   Correct.

8   Q.   So if the recruited walk on stops playing mid season for

9   whatever reason, that young woman does not lose the scholarship

03:00 10   because she doesn't have one, right?

11   A.   Correct.

12   Q.   So the consequences to the recruited walk on are less

13   significant than the scholarship athlete, right?

14   A.   Yes.

15   Q.   Okay.  Now, do you know if this recruited walk-on process

16   was ever used by people at USC to raise money for the Athletic

17   Department?

18   A.   I don't know.

19   Q.   And you don't know what authority Donna Heinel had prior

03:00 20   to the summer of 2018 with respect to how she did her job, do

21   you?

22         MR. STEARNS:  Objection.  Misstates.

23         THE COURT:  Well, if she -- overruled.  If she

24   understands the question.

25   A.   Can you repeat the question, please.

```
 1    Q.   Sure.  Sure.  Prior to the summer of 2018 you have no idea

 2    what Donna Heinel's authority was to do as instructed by her

 3    superiors to raise money for USC, do you?

 4    A.   No, I do not.

 5             MR. KELLY:  One moment, your Honor.

 6             THE COURT:  Yes.

 7    Q.   You've never, of course, spoken or interacted with my

 8    client, Gamal Abdelaziz, at all, have you?

 9    A.   No.

10    Q.   And you've never spoken or interacted at all with his

11    daughter Sabrina, have you?

12    A.   No.

13             MR. KELLY:  Okay.  Good luck with your season.

14             THE WITNESS:  Thank you.

15             THE COURT:  Mr. Kendall, any cross?

16             MR. KENDALL:  No, thank you, your Honor.

17             THE COURT:  Any redirect?

18             MR. STEARNS:  Just a couple questions.

19             THE COURT:  Mr. Stearns?

20             MR. STEARNS:  Just a few questions.

21              Miss Lewis, can we have Exhibit 383, please.

22                 REDIRECT EXAMINATION OF ARRICKA HUGHES

23    BY MR. STEARNS:

24    Q.   Miss Hughes, you weren't asked any questions about this,

25    but if we can turn to page 2.
```

         1              MR. KELLY:  That's beyond the scope of cross, Judge.

         2    Q.   Miss Hughes, does it say anywhere on Exhibit --

         3              THE COURT:  How -- is this something that came up on

         4    cross?

         5              MR. STEARNS:  Yes.  It has to do with practice

         6    players, your Honor.

         7              THE COURT:  All right.

         8    Q.   Were you asked questions on cross-examination about

         9    practice players?

03:02   10    A.   Yes.

        11    Q.   On this profile here, Exhibit 383, page 2, does it say

        12    anywhere that Sabrina Abdelaziz is going to be a practice

        13    player?

        14    A.   No.

        15    Q.   What's the first sentence of the first paragraph?

        16    A.   "Sabrina Abdelaziz is a starting point guard and team

        17    capital at the Hong Kong International School basketball team".

        18    Q.   And what's the last sentence of the last paragraph,

        19    beginning with "Sabrina will be"?  What's that say?

03:02   20    A.   "Sabrina will be a great addition to our USC program".

        21    Q.   You were asked questions about whether you knew anything

        22    about a VIP process at USC.  Do you recall those questions?

        23    A.   I do recall those questions.

        24    Q.   To be clear, what is this?  What type of packet is this?

        25    A.   This is a profile for a SUBCO packet.

```
 1   Q.    Okay.  Can you be a practice player without going to
 2   practice, Miss Hughes?
 3   A.    No.
 4              MR. STEARNS:  Okay.  Nothing further.
 5              THE COURT:  Any recross?
 6              MR. KELLY:  Yes, your Honor.
 7              THE COURT:  Mr. Kelly.
 8                    RECROSS EXAMINATION OF AARICKA HUGHES
 9   BY MR. KELLY:
10   Q.    With respect to that athletic profile that the prosecutor
11   just put up, you had nothing to do with that, did you?
12   A.    Nothing to do with what?
13   Q.    You didn't create that, did you?
14   A.    I did not create that profile, no.
15   Q.    Okay.  So -- and you don't know what a man named Rick
16   Singer may have said to my client, Gamal Abdelaziz, about
17   practice players at USC, do you?
18   A.    I do not.
19   Q.    You don't know what a man named Rick Singer may have said
20   to Gamal Abdelaziz about managers at USC either, right?
21   A.    Correct.  I do not know.
22   Q.    All right.  So bearing in mind you're in front of a Boston
23   jury, my last question.  In your experience, who is the better
24   player, Larry Bird or Magic Johnson?  You're under oath.
25   A.    I know I may have to sprint out of here, but I'm going to
```

         1    have to go with Magic on that one.  I'm sorry.  I have to tell
         2    the truth.
         3             MR. KELLY:  Okay.  I may bring you up on impeachment.
         4    Thank you.
         5             THE COURT:  Thank you, Miss Hughes.  You may step
         6    down.
         7             THE WITNESS:  Thank you.
         8             THE COURT:  Next witness.
         9             MR. FRANK:  Your Honor, we sent her back to the hotel.
03:04   10             THE COURT:  All right.  So you don't have another one.
        11             MR. FRANK:  Not right now.
        12             THE COURT:  All right.  Sometimes this happens,
        13    jurors.  You get a half an hour off today.
        14             Did you want to say anything else, Mr. Frank?
        15             MR. FRANK:  No, your Honor.  I was just reading a
        16    note.
        17             THE COURT:  All right.  So we are done for the week,
        18    and I'm going to ask you to come back on Monday morning.  I do
        19    want to give you a heads up on where I think we are.  I have
03:05   20    talked to counsel.  Of course, there are no guarantees in jury
        21    trials.  I'm sure you know that, but I am confident that this
        22    case will be completed not next week but the following week.
        23    It will be completed before that long weekend so that you're
        24    going to be able to have a little respite for the long October
        25    weekend.  That's my best judgment.  It's not infallible, but I

am confident that this case will be completed not next week,
but the following week.

So we're now essentially halfway through the trial
because we've been at this just about two weeks, and we have
maybe that long, maybe a little less than two weeks, to go.  It
is extremely important that you remember my instructions about
not talking about this case with anybody.  Members of your
family I'm sure will be curious.  If you haven't had it
already, I'm sure somebody's going to say, let me tell you
about a case that I've heard about that's similar to the one
that you're hearing and so on and so forth.  It would be
entirely improper for you to listen to that conversation.  You
have to say, tell me about it after the end of the case.  I'll
talk to you all you want after the end of the case, but I
cannot, because of this ornery judge in Boston, I cannot talk
to you about this case.  It would be inappropriate.  It may end
up resulting in a mistrial if you don't follow my instructions.
So please hang in there.  I'm sure you've had temptations up to
this point and I hope you've resisted them and continue to do
that.

And you're going to base your decision on all of the
testimony.  You haven't heard all the testimony yet.  You're
going to base your decision in this case on all of the
testimony that comes into this case and only on the evidence
that comes in in this courtroom, not on the basis of anything

1    you may see or hear in the media, or somebody else might talk

2    to you about.

3           So I'll see you on Monday morning.  Remember, next

4    week we will have sessions on Monday, Tuesday, Wednesday, and

5    Friday.  Not Thursday.  The following week I'm not sure about,

6    but I'm hopeful the case is going to end in that week.

7           So have a pleasant weekend.  I'll see you on Monday

8    morning at 9:00 a.m.

9           THE CLERK:  All rise for the jury.

03:07 10              (Jury exits.)

11          THE COURT:  All right.  Be seated, counsel.  Monday's

12   schedule, Mr. Frank?

13          MR. FRANK:  One moment, your Honor.

14          Your Honor, it will be Laurie Janke, Steven Masera.

15          THE COURT:  Wait a minute.  Janke's direct is about an

16   hour and 15?

17          MR. FRANK:  Hour and 15.

18          THE COURT:  Hour and 15.  Yes?

19          MR. FRANK:  Steven Masera, M-a-s-e-r-a.  He's about a

03:08 20   half an hour.

21          THE COURT:  All right.

22          MR. FRANK:  Jim Nahmens.

23          THE COURT:  How do you spell that?

24          MR. FRANK:  N-a-h-m-e-n-s.

25          THE COURT:  And his direct?

```
 1              MR. FRANK:  45 minutes.

 2              THE COURT:  And if we get that far, the next one?

 3              MR. FRANK:  Jeff DeMaio.

 4              THE COURT:  How do you spell that?

 5              MS. KEARNEY:  D-e-m-a-i-o.

 6              THE COURT:  Okay.  Mr. Demaio's direct?

 7              MS. KEARNEY:  About 45 minutes, your Honor.

 8              THE COURT:  Okay.  And if we get into Tuesday?

 9              MR. FRANK:  Casey Moon.

03:09 10        THE COURT:  Last name?

11              MR. FRANK:  M-o-o-n.

12              THE COURT:  And her direct?

13              MR. FRANK:  His direct --

14              THE COURT:  His.

15              MR. FRANK:  -- is 30 minutes.

16              THE COURT:  Okay.  And one more?

17              MS. KEARNEY:  Colleen Ranahan.

18              THE COURT:  Ranahan?

19              MS. KEARNEY:  Yes.

03:09 20        THE COURT:  And her direct?

21              MS. KEARNEY:  About, I would say, 45 minutes.

22              THE COURT:  Okay.

23              MR. KENDALL:  Your Honor, if I may just inquire?

24              THE COURT:  Yes.

25              MR. KENDALL:  My guess is that's close to the end of
```

        1    the government's case.  Could we just ask the government to

        2    tell us what else there is because we just need to know when to

        3    have people on deck ready to come in as soon as they're done?

        4            MR. FRANK:  After that it's just a summary witness,

        5    your Honor.

        6            THE COURT:  A summary witness after Miss Ranahan?

        7            MR. FRANK:  Yes.

        8            THE COURT:  Okay.

        9            MR. KENDALL:  So could the government tell us when

03:10  10    they think they'll rest given --

       11            THE COURT:  Before they do that, you tell me roughly

       12    how long you'll have Janke on cross.

       13            MR. KENDALL:  Wilson will have her very little.

       14            THE COURT:  Sorry?

       15            MR. KENDALL:  Wilson will have her on cross very

       16    little.

       17            THE COURT:  By little, 15?

       18            MR. KENDALL:  Maybe.

       19            THE COURT:  Okay.  And why don't you go through the

03:10  20    rest.

       21            MR. KENDALL:  Masera will be a substantial cross.

       22            THE COURT:  By substantial, you mean one hour,

       23    four hours, two and a half days?

       24            MR. KENDALL:  Maybe more in the range of the first, an

       25    hour, plus or minus, but in that range.

1          THE COURT:  Okay.

2          MR. KENDALL:  Nahmens and DeMaio, an hour, hour plus.

3     Moon, maybe a half hour, 45 minutes.  And Ranahan -- those, if

4     it's not obvious, your Honor, most of those are all Wilson

5     witnesses.

6          THE COURT:  Okay.  Ranahan you didn't tell me.  How

7     much?

8          MR. KENDALL:  I'm going to guess an hour, but I

9     haven't finished putting it together.  I doubt that there will

03:11 10   be very little, if any, from Mr. Kelly.

11         THE COURT:  Why don't we hear from Mr. Kelly in that

12    regard on all those witnesses.

13         MR. KENDALL:  But Nahmens to Ranahan are all the tax

14    people, your Honor.  Not Moon, but Nahmans, DeMaio, and Ranahan

15    are all tax people.

16         THE COURT:  Okay.

17         MR. KELLY:  Yes, your Honor.  There will be

18    cross-examination from me on Janke and Masera.

19         THE COURT:  About how much?

03:11 20   MR. KELLY:  I can't see myself going more than an hour

21    and change.

22         THE COURT:  Okay.  Masera?

23         MR. KELLY:  Same thing.

24         THE COURT:  Yeah.

25         MR. KELLY:  Nahmens, DeMaio, Moon and Ranahan, unless

1   I've been wildly inattentive in my reading, I don't think they

2   pertain to me.

3            THE COURT:  Okay.

4            MR. KELLY:  I'll double check and if they don't

5   pertain to Abdelaziz, I'll probably keep quiet.

6            THE COURT:  All right.  With that in mind, Mr. Frank,

7   when is your best estimate as to when the government might

8   rest?

9            MR. FRANK:  Wednesday.

03:12 10           THE COURT:  Wednesday.  All right.

11           Counsel, I do, if you intend to submit, I do not think

12  I have opposed verdict forms, and I would like them.  In fact,

13  I'd like them earlier.  But in any event, I want them by the

14  end of Monday, no later than the end of Monday if -- of your

15  intent.  If you don't care what the verdict form says, then

16  I'll draft my own, but if you expect me to consider yours, it

17  will be in by Monday at five.  Okay?

18           MR. KENDALL:  Sure.

19           THE COURT:  Anything else that needs to come to my

03:12 20  attention?

21           MR. FRANK:  Just one brief matter, your Honor.  We had

22  scheduled with defense counsel and with counsel for the witness

23  Mr. Haden's deposition for Sunday.  We'd all reserved that all

24  week long.  We were just informed late last night that

25  Mr. Wilson's team is cancelling that deposition without a new

1  date.  We don't know what the new date, whether they intend to

2  take the deposition, what the new date would be, but we're all

3  ready to go on Sunday.  And we don't see a reason why if that

4  deposition is going to happen, given that everyone's available,

5  it shouldn't happen on Sunday.

6       MR. KENDALL:  Your Honor, we do not want to do it on

7  Sunday.  I spoke with Mr. Haden's counsel about Thursday, our

8  day off.  He's available.  That was discussed in the e-mail

9  chain as a possibility.  Assuming we're off on Thursday, I'd

03:13 10  prefer to do it then.

11       MR. FRANK:  Your Honor, we will have just found out on

12  Wednesday who the defense is calling on Friday.  We have no

13  idea who they're calling.  We have no idea if they're calling

14  anyone.  So to jam in Mr. Haden, who they were prepared to

15  depose last week on the day before a cross that we will have

16  found out about the night before, seems to us to be an attempt

17  to jam us up.

18       THE COURT:  Yeah.  Haden should be taken before next

19  Thursday.  You can take another day, but it shouldn't be that

03:14 20  long.

21       MR. KENDALL:  Your Honor, if I may ask on that?  The

22  whole sort of list we have here, Masera, Nahmens, DeMaio, Moon,

23  Ranahan, those are all my witnesses.  Most of -- except for

24  Moon, they're all heavily tax related witnesses.  Nobody else

25  can pick them up.  I'm also supposed to do Mr. Haden.  Thursday

```
 1   is plenty of time.  We agreed to give the government two days

 2   advance notice of who our witnesses will be.  So if we're

 3   starting our case on Friday, they'll have advanced notice of

 4   who we'll have, if we are going to put anybody on.  So we're

 5   not going to catch them.  We're going to show them the same

 6   courtesy you've had them show us, your Honor.  So they'll have

 7   plenty of time to prepare --

 8            MR. FRANK:  It's a little different, your Honor.  We

 9   don't have any Jencks material.  We have nothing about these

03:14 10   witnesses.  Mr. Kendall was prepared to go last Sunday for

11   Mr. Haden.  All of a sudden last night he can't.  We will

12   have -- Wednesday night is when we're going to find out who

13   they're calling on Friday, and now they want to have most of

14   the day Thursday taking Mr. Haden's deposition.  That, I would

15   submit, is unfair.

16            THE COURT:  Well, his deposition is limited to

17   three hours, right?

18            MR. KENDALL:  Yes.

19            MR. FRANK:  Three hours on direct, which we assume

03:15 20   includes redirect, but that doesn't include cross.

21            MR. KELLY:  I think the whole thing is three hours,

22   your Honor.  I think --

23            MR. KENDALL:  It's three hours for us, for the

24   defense.  But your Honor, I can't get it done properly on

25   Sunday.  I wish I could.  I just can't.  Thursday we have a day
```

1    off.  We're all available to do it.  We can do it then.  I've

2    raised it.  Mr. Haden's counsel is available on Thursday.  He's

3    already told me he's available that day.  I don't think it's --

4    I've never told Mr. Frank when I was prepared to do it.  I

5    talked about scheduling to do it.  I am not prepared to do it

6    and I have to do all of the tax case early next week.

7          MR. FRANK:  Well, then perhaps Mr. Kendall would be

8    prepared to tell us now who he's calling on Friday.

9          MR. KENDALL:  I'll tell him that Wednesday, your

03:15 10   Honor.

11          THE COURT:  Well, Counsel, you know, this is why I

12   don't like to get involved in discovery disputes, but it does

13   seem to me, you know, there's some quid pro quo.  I think I

14   heard that term --

15          MR. KENDALL:  Fine, your Honor.

16          THE COURT:  -- today.  Some quid pro quo ought to be

17   shown.  I think at this stage if you want the prosecutor to

18   give you a break, you ought to give him a break and tell him

19   who you're going to call on Friday.  You know, what's the

03:16 20   secret?

21          MR. KENDALL:  There isn't, your Honor.  I'm happy to

22   do it.

23          THE COURT:  All right.  Do that and we'll delay the

24   taking of the deposition, but the defendants will tell the

25   government exactly who they intend to call on all of Friday

1    next week.

2              MR. KENDALL:  Certainly.

3              THE COURT:  And in return, Mr. Haden's deposition will

4    be taken on Thursday.

5              MR. KENDALL:  Thank you.

6              THE COURT:  We're adjourned.

7              (Whereupon, the proceedings concluded at 3:17 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2     Witness                          Page

3     ELIZABETH KEATING

4     Cross-Examination by Mr. Kendall        5

5     Redirect Examination by Mr. Frank      90

6     Recross-Examination by Mr. Kelly      140

7     Recross-Examination by Mr. Kendall    154

8

9     AARICKA HUGHES

10    Direct Examination by Mr. Stearns     185

11    Cross-Examination by Mr. Kelly        193

12    Redirect Examination by Mr. Stearns   200

13    Recross-Examination by Mr. Kelly      202

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        E X H I B I T S

 2     NO.                        ADMIT

 3     9767   ....................      6

 4     570    ....................     29

 5     597    ....................     35

 6     580    ....................     38

 7     684    ....................     44

 8     685    ....................     44

 9     713    ....................    132

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8            We, Kristin M. Kelley and Kathy Silva, certify that

9    the foregoing is a correct transcript from the record of

10   proceedings taken September 24, 2021 in the above-entitled

11   matter to the best of our skill and ability.

12

13

14       /s/ Kristin M. Kelley          September 24, 2021

15       /s/ Kathy Silva                September 24, 2021

16       Kristin M. Kelley, RPR, CRR            Date
         Kathy Silva, RPR, CRR
17       Official Court Reporter

18

19

20

21

22

23

24

25