<pre>
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2


 3
     UNITED STATES OF AMERICA,        )
 4                       Plaintiff    )
                                      )
 5   vs.                              )  No. 1-19-CR-10080
                                      )
 6   GAMAL ABDELAZIZ and JOHN         )
     WILSON,                          )
 7                       Defendants.  )
                                      )
 8                                    )


 9


10


11          BEFORE THE HONORABLE NATHANIEL M. GORTON
                 UNITED STATES DISTRICT JUDGE
12                  JURY TRIAL - DAY 12


13


14        John Joseph Moakley United States Courthouse
                        Courtroom No. 4
15                     One Courthouse Way
                   Boston, Massachusetts 02210


16


17                    September 27, 2021
                         9:09 a.m.


18


19


20


21            Kristin M. Kelley, RPR, CRR
                 Debra Joyce, RMR, CRR
22                Official Court Reporter
         John Joseph Moakley United States Courthouse
23              One Courthouse Way, Room 3209
                Boston, Massachusetts 02210
24               E-mail: kmob929@gmail.com


25        Mechanical Steno - Computer-Aided Transcript
</pre>

```
 1    APPEARANCES:

 2

 3            Stephen E. Frank

 4            Ian J. Stearns

 5            Leslie Wright

 6            Kristen Kearney

 7            United States Attorney's Office

 8            1 Courthouse Way

 9            Suite 9200

10            Boston, MA 02210

11            617-748-3208

12            stephen.frank@usdoj.gov

13            for the Plaintiff.

14

15

16            Brian T. Kelly

17            Joshua C. Sharp

18            Lauren Maynard

19            Nixon Peabody LLP

20            100 Summer Street

21            Boston, MA 02110

22            617-345-1000

23            bkelly@nixonpeabody.com

24            for Gamal Abdelaziz.

25
```

```
 1   APPEARANCES:

 2

 3           Robert L. Sheketoff

 4           One McKinley Square

 5           Boston, MA 02109

 6           617-367-3449

 7           sheketoffr@aol.com

 8           for Gamal Abdelaziz.

 9

10

11           Michael Kendall

12           Lauren M. Papenhausen

13           White & Case, LLP

14           75 State Street

15           Boston, MA 02109

16           617-939-9310

17           michael.kendall@whitecase.com

18           for John Wilson.

19

20

21

22

23

24

25
```

```
1    APPEARANCES:

2

3              Andrew E. Tomback

4              McLaughlin & Stern, LLP

5              260 Madison Avenue

6              New York, NY 10016

7              917-301-1285

8              atomback@mclaughlinstern.com

9              for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

1

2        THE CLERK:  You may be seated.  Court is now in

3   session.

4        THE COURT:  Good morning, jurors.  Welcome back.  I

5   hope you had a pleasant weekend.  We're ready to resume.  The

6   government will call its next witness.

7        MS. WRIGHT:  The government calls Laura Janke.

8        (Laura Janke, sworn.)

9        THE CLERK:  And would you please state your name for

09:10 10   the record, spelling your last.

11        THE WITNESS:  Laura J-a-n-k-e.

12             DIRECT EXAMINATION OF LAURA JANKE

13   BY MS. WRIGHT:

14   Q.   Good morning, Miss Janke.

15   A.   Good morning.

16   Q.   Let's go into your background just a little bit.  Can you

17   tell us where you live?

18   A.   I currently live in North Hollywood, California, which is

19   part of Los Angeles County.

09:10 20   Q.   Do you work?

21   A.   Yes, I do.

22   Q.   What do you do?

23   A.   I do tax assembly and preparation, along with some

24   bookkeeping.  I also help a company doing scheduling and

25   appointments, and I also help coach a small soccer team for my

1    5-year-old daughter.

2    Q.    Where did you work prior to your current employment?

3    A.    I worked at Geffen Academy at UCLA.  It's a middle school

4    and high school.

5    Q.    Why did you leave that job?

6    A.    I left that job because I was fired due to -- I was fired.

7    Q.    Why were you fired?

8    A.    Due to my involvement in pleading guilty.

9    Q.    And when you say you pled guilty, what crime did you plead

09:11 10    guilty to?

11    A.    I pled guilty to RICO conspiracy.

12    Q.    When was that approximately?

13    A.    I pled guilty in May of 2019.

14    Q.    Can you tell the jury what you did that led you to plead

15    guilty.

16    A.    Yes.  During my time of working at USC, myself and my boss

17    were taking students from Rick and we were putting them in as

18    athletes into our program, even though they were not and they

19    were not going to play on our team.

09:12 20            After I finished working at USC, I still continued to

21    work for him and I helped other students get in as athletes and

22    I also created false profiles for him for his students and I

23    was paid in return for that.

24    Q.    When you say "Rick," that's Rick Singer?

25    A.    Correct.

```
 1   Q.   Okay.  We'll come back to that in a few minutes.  I want

 2   to just talk a little bit more about your background.  Can you

 3   tell us where you were born?

 4   A.   Yes.  I was born in Thousand Oaks, California.

 5   Q.   How far did you go in school?

 6   A.   I received my master's in kinesiology.

 7   Q.   And where did you go to school?

 8   A.   I went to California State University, Fullerton.

 9   Q.   How did you end up there?

10   A.   I ended up there -- I knew that I wanted to play soccer in

11   college and during my junior year I was going through the

12   recruiting process and the assistant coach at Fullerton, who

13   had been recruiting me, came out to actually watch one of my

14   high school games.  And he actually came to watch the other

15   keeper, goalkeeper.  I was -- my position was goalkeeper.  And

16   I ended up playing in that game, and he liked my talent level

17   and decided to recruit me, and I went through the recruiting

18   process and then decided to go and play athletics and be a

19   student at Cal State, Fullerton.

20   Q.   Who was the coach that recruited you to play at Cal State,

21   Fullerton?

22   A.   His name is Ali Khosroshahin.

23   Q.   Did you end up playing soccer all four years of college?

24   A.   I did, yes.

25   Q.   And after you graduated from Cal State, Fullerton, what
```

1    did you do?

2    A.   So after I initially graduated my undergraduate, I stayed

3    at Cal State, Fullerton as a graduate assistant coach for the

4    soccer program and received my master's.  After that I went

5    into a sales job just for a couple months.  I decided that

6    sales wasn't for me.  My passion was working with children and

7    I decided I was going to go to nursing school and started

8    applying to nursing schools.  I wanted to be a pediatric nurse.

9         And then I received a phone call from Ali, who I had

09:14 10   played for and worked for as a graduate assistant, and he told

11   me that he got the job at USC and asked me to come and be a

12   part of the staff there instead of going to nursing school.

13   Q.   And when you say Ali got the job at USC, what job was

14   that?

15   A.   He received the head women's soccer coaching position.

16   Q.   And he asked you to come join the staff?

17   A.   Yes, he did.

18   Q.   In what position?

19   A.   He asked me to come join the staff as an assistant head

09:14 20   coach -- sorry -- as an assistant coach, and I would work

21   primarily with the goalkeepers.

22   Q.   And when did you go to USC to join Ali?

23   A.   Ali asked me to join him in January of 2007, however, I

24   didn't join him until February of 2007 because I was coaching a

25   junior varsity high school team and I wanted to finish my

1    commitment to them.

2    Q.   So after you went to USC in February of 2007, can you just

3    tell us a little bit about what your role was on the coaching

4    staff?

5    A.   Yeah.  So my primary role was mostly just working with the

6    goalkeepers.  That was the position that I played.  And so

7    working with the goalkeepers, recruiting of some goalkeepers,

8    and then my biggest role was probably off the field doing all

9    the operations, from travel to working with the student

09:15 10   athletes off the field, checking out, making sure that they

11   were just being responsible student athletes.

12   Q.   And you mentioned having a little bit of involvement in

13   recruiting, primarily with goalkeepers, you said?

14   A.   That's correct.

15   Q.   At some point did you come to have more involvement in

16   recruiting on the team?

17   A.   Yes, I did.

18   Q.   Can you tell us a little bit more about that?

19   A.   Yeah.  So -- so, recruitment wise, I would, in the soccer

09:16 20   world, you can find tournaments every weekend to recruit at.

21   And so I was involved with the process from getting e-mails

22   from potential students that wanted to play at the University,

23   looking over their resumes, talking to club and high school

24   coaches about them, and then we would actually go to the field

25   and would go to tournaments on the weekends.  We would watch

1    the students play.  And we would decide if we -- we'd watch

2    them multiple times and decide if they might be a fit for our

3    program.  And we would continue that conversation with their

4    club coaches and would communicate with them, if we were

5    allowed to, by the NCAA guidelines, and communicate with them

6    and try to get them to want to commit to our university.

7    Q.   And did you recruit both scholarship soccer players and

8    walk-ons?

9    A.   Yes, we did.  We recruited anybody that was playing on our

09:17 10   team.  We went and recruited and watched them.

11   Q.   Can you tell us the difference between a recruited

12   scholarship athlete and a recruited walk-on?

13   A.   Yeah.  In my experiences for our team, the biggest

14   difference was that a scholarship athlete received money from

15   the university to play on the team and a recruited walk-on did

16   not receive any money to play for various reasons, but both of

17   them were still valued and could make an impact on our team.

18   Q.   Have you heard the term "practice player" before?

19   A.   Yes, I have.

09:18 20   Q.   What does that mean to you?

21   A.   So, for us, again, with my experience, we wouldn't -- we

22   would -- we would use the term "practice player" amongst

23   ourselves as coaches and -- but we never used it specifically

24   when talking to an athlete, but for us, whether you were --

25   even if we, as coaches, talked about you as a practice player,

1    it still meant for us that you were a recruited walk-on.  You

2    were still expected to be at every practice, at every game, at

3    every team event.  You were on the team and you were recruited

4    in our mind.

5    Q.   And when you coached at USC, did you ever recruit team

6    managers?

7    A.   No, I did not.

8    Q.   So once you had gone through this process and identified

9    your recruits for the year, what did you do next?

09:18 10    A.   So once we had identified our recruits and once they had

11    also made a commitment to us that they wanted to play for us,

12    we would put together information on them, such as we would get

13    all information together, test scores, transcripts, player

14    profiles, and we'd put that together so that we could then

15    present them to Admissions Subcommittee.

16    Q.   And who did you provide that information to?

17    A.   We would provide that information to Donna Heinel.

18    Q.   And you were talking a little bit about practice players

19    and walk-ons.  Did you ever present a player to SUBCO as a

09:19 20    practice player?

21    A.   No.  So our players would go as they were still recruited

22    walk-ons.  So, for us, it was the same thing.  We expected

23    everybody there to make an impact on our team.

24    Q.   At some point after you started coaching and you got more

25    involved in recruiting, did you become familiar with an

```
 1   individual named Rick Singer?

 2   A.   Yes, I did.

 3   Q.   Can you tell us a little bit about that?

 4   A.   Yeah.  So the head coach I worked for, Ali, had met Rick

 5   Singer and spoke with him, and Rick spoke with Ali about using

 6   soccer to help his students gain admittance into the

 7   university.

 8   Q.   Did Ali say that this was going on at USC?

 9   A.   Ali told me that there were other coaches that had been

10   doing it and so that it was -- it had been done, yes.

11   Q.   Did Ali mention any specific coaches?

12   A.   Yes.

13            MS. PAPENHAUSEN:   Objection.

14            THE COURT:  She can answer whether she mentioned any

15   specific coaches.  That question is all right.  She can answer

16   it.

17   A.   Yes, he did.

18   Q.   Who did he mention?

19   A.   He mentioned Jovan Vavic.

20   Q.   Who was that?

21   A.   That was the men's and women's water polo coach at USC.

22   Q.   What happened after Ali told you about this arrangement

23   with Rick Singer?

24   A.   So after that we would get possibly one or -- Rick would

25   reach out to us and give us one to two students of his and we
```

```
 1   would start the process to admit them as an athlete into our
 2   program despite the fact that we actually hadn't recruited them
 3   or spoke with them.
 4   Q.   And how -- if you had never seen them or spoken with them,
 5   how did you go about presenting them as recruits?
 6   A.   We basically would take a player profile that was given to
 7   us and we had to put it into the format that we used and gave
 8   to Donna Heinel for our other student athletes.  We would
 9   basically take bits of information from their profile, and then
10   we also had to write a paragraph on them.  So that paragraph
11   was made up by myself, and it was made up, and so we tried to
12   make it sound like they would be a benefit to the team and make
13   an impact on the team by certain verbiage we would use or
14   things within the paragraph.
15   Q.   And you mentioned that Rick would send you the initial
16   draft of the profile?
17   A.   Yes.
18   Q.   Did you have an understanding of where that came from?
19   A.   I did not, but once again --
20            MS. PAPENHAUSEN:  Objection.  Your Honor, she just
21   responded I did not.
22            THE COURT:  Yeah.  She answered the question.
23   Q.   Do you know whether the information in the profile that
24   Rick sent to you was true or false?
25            MS. PAPENHAUSEN:  Objection.
```

```
 1   A.   I did not.
 2          THE COURT:  She can answer whether she knew it was
 3   true or false.
 4   A.   No, I did not.
 5   Q.   And your mentioned that you hadn't spoken with these
 6   students or seen them play.  Did you know anything else about
 7   them?
 8   A.   No.
 9   Q.   Did you ever talk to their coaches?
10   A.   No.
11   Q.   Did you know if they even played soccer?
12   A.   No.
13   Q.   And did any of them end up playing on the USC women's
14   soccer team?
15   A.   No.
16   Q.   What did you and Ali Khosroshahin get in exchange for
17   doing this?
18   A.   We were paid money.
19   Q.   How much approximately?
20   A.   Approximately $50,000 every student.
21   Q.   And would you and Ali have recruited any of those students
22   but for the payments?
23   A.   I wouldn't have even known who the students were, so no.
24   Q.   Could you tell us a little bit about where that money,
25   that $50,000 per student, went and what you used it for?
```

A.   Yeah.  So, initially, that money went into -- for the women's soccer program, and we would use that money for -- we could use it for equipment, anything that was above our school budget.  So we could use it for that purpose, but, primarily, we did take our team on a European trip one summer and so we used that money to help fund that trip.

Q.   Was it part of your job as a coach at USC to fundraise for the soccer team?

A.   Ali always said to me there was two ways to keep your job at USC.  It was to win or it was to bring in money, but I never -- other than Ali, never specifically had conversations with anybody about fundraising.

Q.   And in your experience in recruiting soccer players, did fundraising play a role in recruitment?

A.   No.  We always looked at a student to see what kind of impact they could make on the team and if they could help us be successful on the team.

Q.   You mentioned that at first these payments from Rick went to the USC women's soccer program.  Did that change at some point?

A.   Yes, it did.

Q.   Can you tell us about that?

A.   Yeah.  So at one point the money stopped going to the women's soccer program and it transitioned over to what was called The Football Academy.  And the money would go into there

1    instead.

2    Q.   What was The Football Academy?

3    A.   The Football Academy was a separate business account that

4    was set up to -- for us to run camps during the summer and

5    throughout the year at USC and so it was a separate business

6    entity.

7    Q.   And can you explain a little bit about what the purpose of

8    the camps are?

9    A.   So, as a coach at USC, we would run summer camps and we

09:25 10   would run identification camps throughout the year.  There's

11   two purposes for the camps.  One is it can help you see

12   students.  It can help you get to know them and they get to see

13   your campus as well if you're recruiting them, and they get to

14   know you as coaches on a different level because they're

15   actually training with you at a camp.

16        The second purpose is the camps help coaches make

17   extra money and help pay volunteer assistants.  So it's also a

18   money maker.

19   Q.   So the money that Rick Singer paid to you and Ali that

09:26 20   went to the camp, what was that money used for?

21   A.   That was used to -- well, ultimately, it was used for Ali

22   and myself to make more money.

23   Q.   Did you have an understanding of whether others at USC

24   were aware of what you and Ali were doing?

25        MS. PAPENHAUSEN:  Objection.

```
 1              THE COURT:  Give me the question again.
 2   Q.   Did you have an understanding of whether others at USC
 3   were aware of what --
 4              THE COURT:  She can answer whether she has an
 5   understanding.
 6   A.   To my knowledge, nobody else did.
 7   Q.   Anyone in Admissions?
 8   A.   No.
 9   Q.   What did you understand your responsibility to be as a
10   coach with respect to recruiting?
11   A.   So my responsibility as a coach was to, first and
12   foremost, find student athletes that were going to make an
13   impact on our team; student athletes that could contribute to
14   our team, both on and off the field, and student athletes that
15   were going to come in and work hard for the team, represent the
16   university with pride, and just be responsible people.
17   Q.   Did there come a time when you left USC?
18   A.   Yes, I did.
19   Q.   Can you tell us how that happened?
20   A.   Yeah.  So Ali was eventually let go from the university
21   for various reasons and I was kept on for a few months.
22   Eventually, I was let go by the coach that they brought in to,
23   the new head coach of the team.  And, typically, in the college
24   coaching world, when a new head coach comes in, they bring
25   their coaches with them and so I was let go at that time.
```

1   Q.   And when was that approximately?

2   A.   January of 2014.

3   Q.   Did you continue to work with Rick Singer after you left

4   USC?

5   A.   Yes, I did.

6   Q.   How did that come about?

7   A.   So during the time, the last year that I was at USC, we

8   had two of Rick's students that we were trying to get into the

9   program still.  One of them had been admitted already and the

09:28 10   other had not been admitted yet.  So I continued to help get

11   that student in and then some future students also.

12   Q.   So let's start with the first student you mentioned that

13   kind of started the process.  What was her name?  Do you

14   recall?

15   A.   Are you referring to the first student that got in before

16   we left, or like after we left?

17   Q.   The one that you just mentioned who you had started the

18   process, but she had not yet made it through at the time you

19   left.

09:29 20   A.   Okay.  Her name was Amanda Feiwell.

21   Q.   And you said so you continued to work to try to get her

22   in.  Why did you do that?

23   A.   Ali had reached out to me and said that we really needed

24   to get her in still.  And so I felt like I owed it to him to

25   continue to help him and also, in return, we were still going

1   to get paid for doing this.

2   Q.   So if you were no longer at USC, how did you go about

3   trying to usher her through the process?

4   A.   So I had a relationship with Donna Heinel.  I reached out

5   to her and gave her the scenario that we had been trying to get

6   her in, we couldn't get her in, and if she got in, that her

7   family was going to be giving money to the women's soccer

8   program and asked if she could still help get her in.  Then the

9   funds could go to Donna Heinel instead.

09:30 10   Q.   And you say to Donna Heinel -- what do you mean?  The

11   funds go to Donna Heinel.  What do you mean by that?

12   A.   So they would go to Donna Heinel at USC to whatever

13   program or funds she wanted them directed to.

14   Q.   What was the outcome with Amanda Feiwell?

15   A.   She was admitted into USC and her parents did pay money.

16   Q.   Do you recall acting in this kind of liaison role with

17   Donna Heinel at any point after Amanda Feiwell?

18   A.   Yes.  I did with another student after that.

19   Q.   Can you tell us a little bit about that.

09:30 20   A.   Yes.  So I believe it was the following year that I got a

21   call from both Rick and Ali asking me to help with another

22   student named Jaeger Hodge.  His sister, Macall, had

23   previously --

24          MR. KELLY:  We're going to object again, your Honor.

25          THE COURT:  Sustained.

```
 1    Q.   Can you tell us how you became aware of Jaeger Hodge?

 2         MR. KELLY:  Objection.

 3         THE COURT:  No.  She can say that.

 4    A.   His sister Macall had previously come in under soccer as

 5    one of Rick's students.

 6    Q.   And who reached out to you about the younger brother,

 7    Jaeger?

 8    A.   Rick Singer.

 9    Q.   And what did you do for Jaeger Hodge?

10         MR. KELLY:  Objection.  Relevance.

11         THE COURT:  Overruled.

12         You may answer.

13    A.   I reached out to Donna Heinel and asked her if she would

14    be willing to put him through athletics to gain admissions, and

15    she said yes and started that process.

16    Q.   And how did he go through athletics?

17    A.   I sent her two player profiles of him, one for tennis and

18    one for football, and she ended up presenting him as a football

19    athlete, and he was admitted to the University as a football

20    athlete.

21    Q.   Were the profiles that you created for Jaeger Hodge

22    accurate?

23    A.   No.  I had falsified them.

24    Q.   And was there a financial discussion or agreement about

25    this, about Jaeger Hodge?
```

```
 1   A.   Yes.  So once he was in, his family gave money to the
 2   Women's Athletic Fund, which was run by Donna Heinel.
 3   Q.   And what did you get out of it?
 4   A.   I received money, as well.
 5   Q.   Do you remember how much?
 6   A.   There was approximately $50,000 that went to the Football
 7   Academy that Ali and I split.
 8          MS. WRIGHT:  Okay.  Miss Lewis, if we could pull up
 9   Exhibit 693, for the witness only, please.  Thank you.
09:33 10  Q.   Miss Janke, do you recognize this document?
11   A.   Yes.
12   Q.   What is it?
13   A.   It's a --
14          MR. KELLY:  Further objection under *Petruziello*, your
15   Honor.
16          THE COURT:  All right.  The objection is noted.
17   A.   It's an e-mail from myself to Rick Singer.
18   Q.   What's the date of the e-mail?
19   A.   March 17, 2015.
09:33 20  Q.   And the subject?
21   A.   "Jaeger."
22          MS. WRIGHT:  Government offers it.
23          THE COURT:  It will be admitted.
24          (Exhibit 693 admitted into evidence.)
25   Q.   So here you say, "Hey Rick, I just got this message from
```

Donna".  So you're passing on a message you received from Donna

Heinel?

A.   Correct.

Q.   "Jaeger's admission packet will be mailed on March 24th.

After the packet is received, please let the father know to

send the check directly to me at USC, make out to what we had

discussed before.  Thank you!"

When she says, "make out to what we had discussed

before," what had you discussed before?

A.   So, previously, she had discussed with me about having the

payment go to the Women's Athletic Fund, which was a fund that

she oversaw.

Q.   Do you recall any discussion with Donna as to whether

Jaeger Hodge would be joining the USC football team?

A.   No.

Q.   And to your knowledge, was the USC football coach involved

in this at all?

A.   No.

Q.   Did you continue to work with Rick Singer after getting

both Amanda Feiwell and Jaeger Hodge admitted to USC through

Donna Heinel?

A.   Yes, I did.

Q.   How did that come about?

A.   So there was one other student that he had asked me to

look into that I looked into for.  And then, after that, I

1    continued to create false profiles for students of his.

2    Q.   How did you make that arrangement with Rick to continue

3    making false profiles?

4    A.   So I spoke with Ali Khosroshahin and he had told me that

5    he had spoke with Rick and told Rick that I could make profiles

6    for him and received an e-mail from Ali also -- basically

7    saying that he had spoke with Rick and he wanted to continue to

8    use me to make profiles.  While I was working, Rick actually

9    came to my job and he spoke with me about helping him for a

09:36 10   different business that he wanted to try to set up.  And at the

11   end of that conversation, he asked me about continuing to

12   create profiles for him, and I said yes, just send me whatever

13   information I need.

14   Q.   And that other business idea that Rick Singer mentioned to

15   you, did that ever go anywhere?

16   A.   No, it did not.

17   Q.   And what did you get in exchange for agreeing to continue

18   making profiles?

19   A.   I received money.

09:36 20   Q.   Approximately how much, total?

21   A.   A couple thousand dollars.

22   Q.   Were all of the profiles that you created for USC?

23   A.   No, they were not.

24   Q.   What other schools did you create profiles for?

25   A.   I also created profiles for UCLA, Stanford, and Yale.

```
 1    Q.    And for Yale, do you recall what sport those profiles were
 2    for?
 3    A.    Yes.   They were for soccer.
 4    Q.    And what about UCLA?
 5    A.    UCLA was for soccer as well.
 6    Q.    Okay.  Can you just tell us a little bit about how it
 7    worked when Rick had a profile for you to create.
 8    A.    Yeah.  So Rick would send me an e-mail giving me basically
 9    the student's name and the sport and possibly the position that
10    he wanted me to create this profile for.  In the beginning, he
11    would sometimes give me a little bit more information, such as
12    maybe team or one or two awards, but even if he did that, I
13    still had to fill in and come up with other accolades for the
14    student.

15         And then, eventually, like I said, he would just give
16    me the name and the sport that he would want and I would
17    basically take the student's -- that sport information.  I
18    would always, on a profile, put the generic information, name,
19    address, GPA, test scores.  Then I would take -- from there I
20    would take the student's high school that they played at and I
21    would Google everything else.  And I would look at the high
22    school that they played for and I would try to match up --
23    basically, if the school was part of XY and Z conference, I
24    would try to find awards that correlated with that XY and Z
25    conference.  And I would take those that didn't pertain to that
```

1    student and I would still fill them in there.

2           And then I would do the same for the club sport.  I

3    would find a club team that was in the area where the student

4    lived and I would use that team.  And I would also try to find

5    tournaments or other awards that could be associated with that

6    club team, and I would once again take those, which didn't

7    pertain to that student, and I would put them all in the

8    profile.

9    Q.   You mentioned the high school that they played for.  Did

09:39 10   you have an understanding one way or the other whether these

11   kids played the sport in high school?

12   A.   I did not.  Sometimes I could Google -- I would Google the

13   student's name and no information would come up on that.  So

14   what I knew, regardless of whether they actually were playing

15   that sport or not, they weren't at the level to be able to play

16   at that division of athletics and I was going to have to fill

17   in and falsify information no matter what.

18   Q.   In addition to the athletic information you put on the

19   profiles, you put photos as well?

09:39 20   A.   That's correct.

21   Q.   And how did you get the photos?

22   A.   So sometimes a photo was forwarded to me from Rick and

23   other times I just Googled and found a photo of anybody doing

24   that sport online and I would put that photo in.

25   Q.   Of course, you had made these soccer profiles before in

1    your role as a coach.  How did you make the profiles for sports

2    you weren't as familiar with?

3    A.    So, initially, the sports I wasn't as familiar with is I

4    could find, like, sample profiles online and look at those to

5    kind of determine what needed to be used.  And as the process

6    went on and once I already had a profile for a sport, if I had

7    to use that sport again, I could go back and use a very similar

8    format to what I had already been using for that sport.

9    Q.    What did you do with the profiles once you completed them?

09:40 10   A.    I would take them and I would send them to Rick Singer and

11   see if there were any changes that needed to be made.

12   Q.    Did you have an understanding of what Rick Singer did with

13   the profiles once you sent them to him?

14   A.    No.

15   Q.    Then how did you know that they were being created for a

16   specific university?

17   A.    Because sometimes he would tell me the university that

18   they were for or sometimes in the e-mail to me, maybe in the

19   headline it would say "USC water polo" or he might say, "I need

09:41 20   this profile for Yale."  So a lot of times he would tell me.

21   Q.    Let's go through an example.

22         MS. WRIGHT:  Miss Lewis, if you could please pull up

23   Exhibit 694, for the witness only.

24   Q.    Miss Janke, do you recognize this document?

25   A.    Yes.

```
 1    Q.    What is it?

 2    A.    It's an e-mail from myself to Rick Singer.

 3    Q.    What's the date?

 4    A.    September 23, 2015.

 5    Q.    And the subject line?

 6    A.    "Waterpolo 3".

 7              MS. WRIGHT:  Government offers 694.

 8              THE COURT:  It will be admitted.

 9              (Exhibit 694 admitted into evidence.)

10              MS. WRIGHT:  Okay.  Miss Lewis, if we can go down to

11    the bottom e-mail in the chain, please, and pull that part up.

12    Q.    So, actually, the bottom e-mail appears to be an e-mail

13    that Rick Singer had forwarded to you from someone named

14    Lawrence Feiwell; is that right?

15    A.    Correct.

16    Q.    And attached there is a photo of what appears to be a girl

17    playing water polo?

18    A.    Correct.

19    Q.    And Rick says to you, "Laura, can you do a profile for

20    Vanessa Feiwell for water polo.  I will send info today.

21    Charge me whatever you want.  Jovan and I have already spoken".

22              Can you remind us who Jovan is?

23    A.    Jovan, at the time, was the water polo coach for men and

24    women at USC.

25              MS. WRIGHT:  Miss Lewis, if we can go to the top
```

1  e-mail, please.

2  Q.   You respond, "No problem.  I will make a regular profile

3  and also the type I used to make at USC so Jovan can have his

4  pick".

5          What did you mean by a regular profile and the type

6  you used to make at USC?

7  A.   So the regular profile was referring to is where you put

8  the student's generic information and then I would put just

9  their accolades from -- the accolades I found from high school

09:43 10  and club, and I was referring to the type I used to make when I

11  was at USC.  We would take the profile and put a little bit of

12  information, but then we would write a paragraph pertaining to

13  that person.

14  Q.   Here, you say, "Here is the info I will need", and you

15  list a number of items, including date of birth, phone,

16  address.  Down here, do you see where it says "Position:

17  Assuming GK (correct?)"

18          What did you mean by that?

19  A.   So based off of that picture that was forwarded, it looks

09:44 20  like a goalkeeper playing water polo, but I had no way to be

21  certain since I had never met this person or actually knew

22  anything about them.

23  Q.   Then you see where you say "club team if any"?

24  A.   Yes.

25  Q.   What did you mean by that?

```
 1   A.   So I just meant that if they were playing on a club team,
 2   could he provide me with that information because if they
 3   weren't, then I was going to have to Google and find a club
 4   team in that area.
 5   Q.   And then, at the bottom there, you say, "I can add in any
 6   awards, et cetera, if she does not have any"?
 7   A.   Yeah.  So, again, same thing if -- I didn't actually know
 8   if she played the sport or not, so if she played it at some
 9   sort of level, if there were any awards that she had, I could
10   add that into the profile along with anything else I was going
11   to add.  Or if she didn't, then that meant that I was going to
12   make up all of the awards and everything in it.
13            MS. WRIGHT:  Miss Lewis, if we can now pull up
14   Exhibit 695, again for the witness only.  Thank you.
15   Q.   Miss Janke, do you recognize this document?
16   A.   Yes.
17   Q.   What is it?
18   A.   That's an e-mail from myself to Rick Singer.
19   Q.   The date of the e-mail?
20   A.   September 30, 2015.
21   Q.   And the subject line?
22   A.   "Vanessa".
23            MS. WRIGHT:  The government offers Exhibit 695.
24            THE COURT:  It will be admitted.
25            (Exhibit 695 admitted into evidence.)
```

1  Q.   So here you say "Here are 2 profiles" -- you say to Rick,

2  "Here are 2 profiles for Vanessa.  They are similar, but

3  figured Jovan can choose which one he prefers.  If he needs

4  something different as well let me know".

5        So you had created two different versions of the

6  profile for Vanessa Feiwell?

7  A.   That's correct.

8        MS. WRIGHT:  Okay.  Let's take a look at the

9  attachments, please, Miss Lewis.  I have a paper copy with the

09:46 10  attachments not on it.  I have a paper copy.  I can use that

11  one.

12  Q.   So this is that same e-mail we were just looking at?

13  A.   Yes.

14  Q.   Okay.  And is this one of the profiles that you attached,

15  that you created for Vanessa Feiwell?

16  A.   Yes, it is.

17  Q.   And did you follow that same basic process you discussed

18  to create this?

19  A.   I did, yeah.

09:47 20  Q.   And these photos, they appear to be different than the one

21  that was in that original e-mail?

22  A.   Can I see that?  Can I see that again real fast?

23  Q.   Can we go back to it?  Yes.

24  A.   Yes.

25  Q.   Okay.  So here, Huntington Beach High School, that was the

1   high school information that you came up with?

2   A.   Yes.

3   Q.   And then Huntington Beach Water Polo Club, that's a club

4   team that you found?

5   A.   Yes.  I actually believe in the previous e-mail that was a

6   club team that was listed on there, but I still had to look for

7   that club team and come up with all of the stuff associated

8   with it.

9   Q.   Okay.  And this is the second attachment to that same

09:48 10   e-mail.  So this is just a slightly different version of that

11   same profile?

12   A.   That's correct.

13   Q.   And why did you create the two different versions?

14   A.   So I created one with two photos in case that was what

15   they wanted to use, and it was really just the two different

16   photos was the big thing.

17   Q.   And so based on your communications with Rick you believe

18   that you were creating these profiles for Jovan Vavic?

19   A.   That's correct.

09:49 20   Q.   At some point did you start creating profiles for Donna

21   Heinel instead of for coaches at USC?

22   A.   Yes, I did.

23   Q.   Can you tell us how that came about?

24   A.   Yes.  So I received an e-mail from Rick that said that he

25   had spoke with Donna Heinel directly and he was given the

```
 1    go-ahead to give her athletes and ask me to -- or give her
 2    students to present as athletes, and he asked me to create the
 3    profiles for them.
 4              MS. WRIGHT:  Okay.  Miss Lewis, if we can switch back
 5    to the monitor and pull up Exhibit 329, for the witness only.
 6    Q.   Miss Janke, do you recognize this document?
 7    A.   Yes, I do.
 8    Q.   What is it?
 9    A.   It's an e-mail from myself to Rick Singer.
10    Q.   What's the date?
11    A.   July 16, 2017.
12    Q.   So approximately two years after those e-mails about
13    Vanessa Feiwell we just looked at?
14    A.   Correct.
15    Q.   And had you continued making profiles for Rick Singer
16    during that two-year interim period?
17    A.   Yes, I had.
18    Q.   And what's the subject line of that e-mail?
19    A.   "A couple opportunities to help if you like".
20              MS. WRIGHT:  The government offers Exhibit 329.
21              THE COURT:  It will be admitted.
22              (Exhibit 329 admitted into evidence.)
23              MS. WRIGHT:  Okay.  Miss Lewis, if we can go to the
24    bottom e-mail in the chain and blow that up.  Thank you.
25    Q.   So this is from Rick to you.  "Laura I met with Donna this
```

1    week in her office and she gave the action items to create

2    profiles for all the kids I presented to her.  Would you be

3    willing to put the profiles together for pay?"

4              What did you understand him to mean by the kids he

5    presented to her?

6    A.   What I understood it to mean was he spoke with her about

7    these kids going in as, being presented as athletes, and that

8    he would give her all the information for these students.

9    Q.   Was it typical for Mr. Singer to ask you to create this

09:51 10   many profiles at one time?

11   A.   Previously before this, no.  It had just been for a few

12   students here and there, so no.

13   Q.   And did you end up -- we'll go through some of them, but

14   did you end up creating profiles for each of the students

15   listed here?

16   A.   To my knowledge, I believe that I did for everyone, yes.

17   Q.   And did you follow that same basic process you discussed

18   in order to create them?

19   A.   I did.

09:52 20   Q.   So were they all falsified?

21   A.   They were, correct.

22             MS. WRIGHT:  We can go to the next part of the e-mail

23   chain.

24   Q.   You say, "Yes I would be willing to do that.  When does

25   she need them by?  Did she say if the format I normally use is

1    fine, or did she want other items in it?"

2             What did you mean by the formatting you normally use?

3    A.   I just meant the format -- so on the profile we saw before

4    of Vanessa Feiwell, was that format okay or did she specify if

5    there was a different type of profile that she needed.

6             MS. WRIGHT:   Okay.   So if we can go to the top half of

7    the chain.   Thank you.

8    Q.   So Rick responds, "She would prefer by very early

9    August -- same format as the rest".

09:53 10          And then your response up here at the top, "Okay

11   sounds good.   Please send me the pertinent information and I

12   will get started".

13            And you list some items here similar to how you had

14   for Vanessa Feiwell?

15   A.   That's correct.

16   Q.   And then down here, you say, "If they play the sport --

17   position, club, accolades if they have them, picture".   What

18   did you mean by that?

19   A.   So, again, if they did play the sport at some sort of

09:53 20  level, I just wanted to get some of that information, or

21   information that they had so I could include that in there, and

22   then I could add -- falsify and add to that list of

23   information.

24   Q.   And here you say, "If they don't have the items pertaining

25   to the sport, let me know and I will create"?

A.   Yes.  So that meant if they hadn't played a sport or
didn't have enough accolades, then I was going to have to
Google and find information that could be used so that they
appear to be an athlete.

Q.   Did you have any direct contact with Donna Heinel in
relation to these profiles for these students?

A.   I did not.

Q.   Did you have any discussions with Donna about whether or
not these were legitimate recruits?

A.   I did not.

Q.   Did you have an understanding of whether they were
legitimate recruits?

A.   Well, based on the fact that I was the one creating these
profiles, I knew a couple things:

        One, if they were truly an athlete at the caliber of
playing there, they would have their own profile already.  And
also, if they were an athlete that could play at the college
level, they would have been going through the coach of that
sport at the university to be recruited.  They would not have
been going in through Donna Heinel, because in all of my
experiences recruiting when we had an athlete that we wanted,
we, as the coach, presented it to her, not somebody else coming
and giving the information to her.

Q.   Let's discuss some of the students that are listed in the
bottom e-mail in just a little bit more detail.

1         MS. WRIGHT:  Miss Lewis, if you could pull up

2    Exhibit 335, for the witness only.

3    Q.   Miss Janke, do you recognize this document?

4    A.   Yes.

5    Q.   What is it?

6    A.   It's an e-mail from Rick Singer to myself.

7    Q.   What's the date?

8    A.   July 27, 2017.

9         MS. WRIGHT:  Government offers Exhibit 335.

09:55 10        THE COURT:  It will be admitted.

11        (Exhibit 335 admitted into evidence.)

12   Q.   Here Rick has forwarded you an e-mail from Gamal Aziz and

13   writes, "For Sabrina Aziz - basketball player from China".

14         Do you recall whether Sabrina Abdelaziz was on that

15   list of students that we just looked at?  We can pull it back

16   up if you like.

17   A.   Yeah.  If you can pull it back up.  I believe she was, but

18   I just want to make certain.

19         MS. WRIGHT:  Sure.  If you can pull up Exhibit 329

09:56 20   again, Miss Lewis.  The bottom.  Perfect.  Thank you.

21   Q.   You see here where it says "Sabrina Abdelaziz -

22   basketball"?

23   A.   Yes.

24         MS. WRIGHT:  Okay.  If we can go back to 335.  Thank

25   you.  There's an attachment to this e-mail.  If we can go to

1   the attachment.

2   Q.   This appears to be Sabrina Abdelaziz's high school

3   transcripts?

4   A.   Yes.

5   Q.   What did you -- by Rick sending you this transcript and

6   saying basketball player from China, what did you understand

7   that to mean?

8   A.   That he needed me to come up with a profile for her and he

9   was basically telling me that she lives in China so I would

09:57 10   have to find accolades that seem realistic for somebody that's

11   playing in China.

12        MS. WRIGHT:  Miss Lewis, if you can now pull up

13   Exhibit 346, again for the witness only.

14   Q.   Miss Janke, do you recognize this document?

15   A.   Yes, I do.

16   Q.   What is it?

17   A.   It's an e-mail from Rick Singer to myself.

18   Q.   What's the date of the e-mail?

19   A.   July 27, 2017.

09:57 20   Q.   So the same date as that e-mail we just looked at?

21   A.   Correct.

22        MS. WRIGHT:  The government offers this exhibit,

23   Exhibit 346.

24        THE COURT:  It's admitted.

25        (Exhibit 346 admitted into evidence.)

1    Q.    Again, Rick Singer is forwarding you an e-mail from Gamal

2    Aziz?

3    A.    Correct.

4    Q.    And there's an attachment, but the subject line is "First

5    SAT score taking it again soon"?

6    A.    Yes.

7            MS. WRIGHT:  And if we just scroll down to the

8    attachment, please, Miss Lewis.

9    Q.    This appears to be a copy of Sabrina Abdelaziz's SAT

09:58 10   score?

11   A.    Yes.

12   Q.    Again, what was your understanding of why Rick Singer was

13   sending this information to you?

14   A.    Because, again, he wanted to -- me to come up with this

15   profile for her.  And when I was making these profiles, I

16   needed the pertinent information, such as SAT score and

17   transcript, to put on there, but also -- I also used this

18   information because as -- student athletes being presented, at

19   least at USC, they have a lot more leeway than in terms of

09:58 20   grades than the normal population of students has.  And so when

21   I was creating these, I have to look at the grades they have,

22   knowing that they possibly wouldn't get in if they were an

23   athlete based on their grades, but then I would also have to

24   come up with the accolades I was creating for basketball and I

25   had to make it believable enough so that you could look at them

|    | |
|----|--|
| 1  | and say that they would make an impact on the team, but without |
| 2  | raising any red flags as well to -- for them to say this person |
| 3  | is so good, why are they, you know, a walk-on or anything else. |
| 4  | MS. WRIGHT:  Miss Lewis, if you could pull up |
| 5  | Exhibit 344, for the witness only. |
| 6  | Q.   Miss Janke, do you recognize this document? |
| 7  | A.   Yes, I do. |
| 8  | Q.   What is it? |
| 9  | A.   It's an e-mail from Rick Singer to myself. |
| 09:59 10 | Q.   What's the date of the e-mail? |
| 11 | A.   July 27, 2017. |
| 12 | Q.   So the same date as those prior two e-mails we just looked |
| 13 | at? |
| 14 | A.   Correct. |
| 15 | Q.   And what's the subject line? |
| 16 | A.   "Sabrina". |
| 17 | MS. WRIGHT:  Government offers Exhibit 344. |
| 18 | THE COURT:  It's admitted. |
| 19 | (Exhibit 344 admitted into evidence.) |
| 10:00 20 | Q.   So, again, this is a forwarded e-mail that Rick sends you, |
| 21 | the original e-mail being from Gamal Aziz with this photo here. |
| 22 | What do you understand this photo to be? |
| 23 | A.   I understood that to be the photo that I needed to use in |
| 24 | the profile that I was creating. |
| 25 | Q.   Did you believe that to be a photo of Sabrina Abdelaziz |

1    playing basketball?

2    A.    I did.

3    Q.    Why did you believe that?

4    A.    Because it was forwarded from somebody and, also, any time

5    that Rick didn't have a photo, he wasn't -- I was Googling it

6    and trying to just find a photo of anybody online.

7          MS. WRIGHT:  Miss Lewis, if we could now pull up

8    Exhibit 658, please, for the witness only.

9    Q.    Do you recognize this document, Miss Janke?

10:01 10   A.    Yes, I do.

11   Q.    What is it?

12   A.    It's an e-mail from myself to Rick Singer.

13   Q.    What's the date of the e-mail?

14   A.    August 7, 2017.

15   Q.    And again, what's the subject line?

16   A.    "Sabrina."

17         MS. WRIGHT:  The government offers Exhibit 658.

18         THE COURT:  It will be admitted.

19         (Exhibit 658 admitted into evidence.)

10:01 20   Q.    So here you write "Profile for Sabrina.... her e-mail,

21   phone and parents names needed to be added in as I did not have

22   that.  Let me know if you want me to add any other awards to

23   her profile, or if you think that is enough".

24         MS. WRIGHT:  And then if we can go to the attachment,

25   please.  Thank you.

1    Q.   Is this the profile that you created for Sabrina

2    Abdelaziz?

3    A.   Yes, it is.

4    Q.   Okay.  Let's go through a few of the items on here.  This

5    picture, I know it's a little bit hard to see this copy, but is

6    this the same picture that Rick had forwarded to you?

7    A.   Yes, it is.  I just cropped it down to zoom in more on

8    certain players and the ball.

9    Q.   Okay.  And you see where it says "Point Guard" under

10:02 10   Sabrina Abdelaziz's name?

11   A.   Yes.

12   Q.   Did you know whether Sabrina Abdelaziz played point guard?

13   A.   I did not.

14   Q.   So how did you come up with that?

15   A.   Based on the picture, the individuals in the picture

16   didn't look very tall, height-wise, and I knew that to be the

17   other positions you had to be, you know, 6 feet or taller.  So

18   I knew that, as a point guard, you could be a little bit

19   smaller, and so I felt that that would be the most believable.

10:02 20   Q.   And then the height, 5'8".  Did you know whether Sabrina

21   Abdelaziz's height was 5'8"?

22   A.   I did not.

23        MS. WRIGHT:  If we could scroll down to the bottom

24   point of the profile.  Thank you.

25   Q.   Here under "Hong Kong International School Basketball",

1    where did this information come from?

2    A.    So that was the name of her school based off of the

3    transcript and then I basically Googled that school.  This one

4    was a little bit harder because I didn't know anything about

5    the way China ran their athletic programs and so I basically

6    had to Google about the school and then other schools in the

7    area so that I could try to find activities or conferences that

8    would align with where she was going to school.

9    Q.    And then under "Hong Kong Basketball Academy", did you

10:03 10   know what Hong Kong Basketball Academy was?

11   A.    No.  Again, that was just me Googling to try to find

12   something that would be believable enough to admissions and to

13   also make it look like she was a strong enough player to make

14   an impact on the team so she could be admitted.  In regards to

15   that as well, I know there's a couple things on there that I

16   would typically use for soccer profiles that I put in there

17   because I just -- I wasn't sure about athletics there.

18   Q.    You see up above where it says "Season Average" and then

19   it has those stats there, statistics?

10:04 20   A.    Yes.

21   Q.    Where did you get those?

22   A.    I just came up with those.  I looked to see on different

23   profiles what might be like an average points per game or

24   assists per game for a player that could look like they could

25   play at the college level.

```
 1    Q.   Did you have any direct communication with Gamal Aziz in
 2    relation to this profile?
 3    A.   I did not.
 4    Q.   Did you ever have any direct contact with the parents for
 5    whom you were creating these profiles?
 6    A.   No.
 7    Q.   Okay.  Just a few more documents to go through.
 8         MS. WRIGHT:  Miss Lewis, if we could pull up Exhibit
 9    361, which I believe is in evidence.  Sorry.  If we can start
10:05 10  at the top so we can see the subject line.
11    Q.   This is an e-mail from you to Rick Singer, dated
12    August 16, 2017, so close in time to when you had just sent
13    that profile for Sabrina Abdelaziz?
14    A.   Yes.
15    Q.   And the subject line is "For me to complete USC athletic
16    profile"?
17    A.   Yes.
18    Q.   Okay.
19         MS. WRIGHT:  Now, let's scroll down to the bottom,
10:05 20  please, Miss Lewis.  Thank you.
21    Q.   So you're not on these original e-mails, but it appears to
22    be a chain between Rick Singer and Devin Sloane that he then
23    forwards to you?
24    A.   Yes.
25    Q.   And you see here Rick says "did you do Matteo Sloane --
```

1    Italian water polo player that attends Buckley"?

2    A.   Yes.

3    Q.   Do you recall -- and again, we can pull it up side by side

4    if you like -- was Matteo Sloane one of the kids on that

5    original list that Rick had sent to you?

6    A.   I believe it was, but I would have to see the e-mail to be

7    sure.

8    Q.   Okay.

9         MS. WRIGHT:  Miss Lewis, if you could pull up 329.

10:06 10   Q.   You see here where it says "Matteo Sloane - Water Polo"?

11   A.   Yes.

12        MS. WRIGHT:  We can go back to 361, please.

13   Q.   You respond, "No.  I didn't have anything on him.  I will

14   get it done".

15        And then Rick responds back to you, "Donna sent back

16   she needs a different picture for Olivia and Sabrina and I need

17   to get an action photo for Gino from mom".

18        Who is Olivia?

19   A.   Olivia is Olivia Giannulli, who I had created a profile

10:06 20   for for rowing at USC.

21   Q.   And then do you recall who Gino is?

22   A.   Yes.  Gino Palatella.  And in the e-mail Rick had asked me

23   to create a profile for him for football.

24        MS. WRIGHT:  If we can scroll up, Miss Lewis.

25   Q.   And then you reply, "What kind of pictures does she want

1    from them?"

2         And then Rick replies, "For Sabrina clearer and

3    Olivia different look than the one we used".

4         What did you understand Rick to mean with respect to

5    Olivia by saying "different looks than the one we used"?

6    A.   So what I understood that to mean is when I was creating

7    Olivia's profile, I had Googled and found multiple pictures of

8    females that were rowing and I had sent him multiple pictures,

9    and we were trying to decide which one to use because we --

10:08 10   when looking for that picture, we didn't want it to be a

11   picture that was just dead on of their face because I didn't

12   necessarily know what she looked like, and also, we didn't want

13   to tip anybody off if -- to know that that wasn't actually her.

14   So yeah, I sent him multiple pictures.  And so I believe that

15   from this e-mail what he was saying was the one that we ended

16   up using wasn't going to work and now could we pick from a

17   different photo from all the ones that I had sent him.

18   Q.   And had you previously created a profile for Olivia

19   Giannulli's older sister?

10:08 20   A.   Yes, I had.

21   Q.   Do you happen to recall which school or sport?

22   A.   It was also for USC rowing.

23   Q.   And at the top of the e-mail chain, you say, "Yikes... you

24   gave me the picture for Sabrina.  Do you have a different one?"

25        What did you mean by that?

```
 1   A.    I just meant that he had initially forwarded me the e-mail
 2   with the picture that was being used for Sabrina.  So I was
 3   asking him if he had a different one to put on the profile.
 4            MS. WRIGHT:  Miss Lewis, if we can now pull up
 5   Exhibit 367, for the witness only.
 6   Q.    Do you recognize this document, Miss Janke?
 7   A.    Yes.
 8   Q.    What is it?
 9   A.    It's an e-mail from Rick Singer to myself.
10   Q.    What's the date of the e-mail?
11   A.    August 16, 2017.
12   Q.    The same day as that previous e-mail chain we just looked
13   at?
14   A.    Uh-hum.
15   Q.    And what's the subject line?
16   A.    "Tommy".
17            MS. WRIGHT:  The government offers Exhibit 367.
18            THE COURT:  It will be admitted.
19            (Exhibit 367 admitted into evidence.)
20   Q.    So down here, the first e-mail from you to Rick is "Here
21   is a profile for Tommy.  Let me know what you think of the
22   picture, et cetera.
23            "Also, any thoughts on the pictures for Olivia and
24   Sabrina?"
25            Who is Tommy?  Do you recall?
```

1    A.    Tommy is Tommy Kimmel, who I had also done a profile for

2    for him.

3    Q.    You say, "Let me know what you think of the picture, et

4    cetera".  Do you happen to recall what picture you were

5    referring to?

6    A.    Yeah.  So for him I also had to Google and just find a

7    picture online of a track athlete.

8          MS. WRIGHT:  Miss Lewis, if we can pull up Exhibit 384

9    quickly, which is already in evidence.  If you'll go to the

10:10 10   second page, please.  Thank you.

11   Q.    Is that the photo that you had put on the profile you

12   created for Tommy Kimmel?

13   A.    Yes, it is.

14          MS. WRIGHT:  Thank you.  If we can go back to 367,

15   please.

16   Q.    Rick responds, "Can we take one of the others for Olivia

17   that you provided?  Sabrina -- I will get another".

18          MR. KELLY:  I'll object, 401, 403 and all these

19   questions about other kids.

10:11 20          THE COURT:  Objection's overruled.

21   Q.    Do you recall ever receiving another photo or replacement

22   photo for Sabrina Abdelaziz?

23   A.    I do not.

24          MS. WRIGHT:  Miss Lewis, if you can pull up

25   Exhibit 383, which is in evidence, and go to the second page,

1    please.

2    Q.   If we can pull up the one that we already looked at that

3    you created for Sabrina Abdelaziz, but how does this compare to

4    what you had done?

5    A.   I know that the height is different than what I had put,

6    because I put 5'8", and in addition, that is not the picture

7    that I had put on the profile.

8         MS. WRIGHT:  Miss Lewis, if we can now pull up, for

9    the witness only, Exhibit 659.

10   Q.   Do you recognize this document, Miss Janke?

11   A.   Yes.

12   Q.   What is it?

13   A.   It's an e-mail from myself to Rick Singer.

14   Q.   And the date?

15   A.   August 21, 2017.

16   Q.   And the subject line?

17   A.   "Profiles".

18        MS. WRIGHT:  The government offers Exhibit 659.

19        THE COURT:  It will be admitted.

20        (Exhibit 659 admitted into evidence.)

21   Q.   This is an e-mail from you to Rick.  "Sorry, I just found

22   these in my outbox from over the weekend.  Olivia and Matteo".

23        And those are the students we had discussed from that

24   prior e-mail chain?

25   A.   That's correct.

1           MS. WRIGHT:  If we could go then to the attachments,

2      please, Miss Lewis.

3      Q.   Is this the profile that you had created for Matteo

4      Sloane?

5      A.   Yes.

6      Q.   And we won't go through it all, but did you follow that

7      same basic process we've discussed in creating this?

8      A.   I did, yes.

9      Q.   And here on the right-hand side where it says "Italian

10:13 10      Youth National Team", why and how did you come up with that?

11      A.   So in the previous e-mail, Rick had said Matteo Sloane,

12      Italian Youth National Team.  So I used that.  I don't know if

13      he actually did play for them or did not.  I didn't have the

14      information.  And so, once again, I looked up the Italian Youth

15      National Team and tried to come up with accolades that

16      pertained to the actual Italian national team and tried to use

17      those to make it look like he's a believable athlete.

18           MS. WRIGHT:  And if we could go to the next page,

19      please, next one.

10:13 20      Q.   And is this the profile you created for Olivia Giannulli?

21      A.   Yes.

22      Q.   And where did that photo come from?

23      A.   That's again a photo that I found online of a rowing

24      person.

25           MS. WRIGHT:  If we could now pull up Exhibit 414,

```
 1    which is in evidence.  Go to the second page, please.
 2    Q.   Here at the top, do you see it says "Matteo Sloane"?
 3    A.   Yes.
 4    Q.   Is that the photo that you had put on the profile you
 5    created for Matteo Sloane?
 6    A.   No.
 7    Q.   But there's Italian Youth National Team.  Is that the
 8    information that you had put for Matteo Sloane purportedly
 9    playing in Italy?
10:14 10    A.   Yes.
11    Q.   Did you continue creating false athletic profiles for
12    Mr. Singer after this point?
13    A.   Yes, I did.
14    Q.   Do you recall creating a profile for a girl named Audrey
15    Isackson?
16    A.   Yes.  I believe it was for rowing.
17    Q.   What about Agustina Huneeus?
18    A.   Yes.  I believe she was for USC water polo.
19    Q.   And others as well?
10:15 20    A.   Yes.
21    Q.   When you were doing all this, did you believe that you
22    were committing a crime?
23    A.   I know that lying is wrong and I was raised by my family
24    to be better.  I was raised to have morals and values and
25    raised to know that lying is wrong and is not appropriate and
```

1    I completely put all that aside and continued to lie throughout

2    this process, and that is wrong.

3    Q.   And who did you feel that you were lying to?

4    A.   I was lying to the universities.  I was lying to

5    admissions.  And even furthermore, I know what it takes to be a

6    Division 1 athlete.  It takes a lot of commitment, a lot of

7    dedication, and it's something that you don't take lightly,

8    because it's very hard to do and in doing this --

9              MR. KELLY:  Objection.  No question is pending, your

10:16  10   Honor.

11             THE COURT:  Overruled.

12   Q.   You may continue.

13   A.   In doing this and creating these profiles and lying about

14   that, I basically devalued and underscored the commitment that

15   it takes for an athlete to play and to be given the

16   opportunity.

17   Q.   When were you arrested for your participation in this?

18   A.   I was arrested in March of 2019.

19   Q.   You testified earlier that you pled guilty to racketeering

10:16  20   and conspiracy in about May of 2019?

21   A.   Yes.

22   Q.   In connection with your guilty plea, did you enter into

23   any agreements with the government?

24   A.   Yes.

25             MS. WRIGHT:  Miss Lewis, if you could first pull up

1    Exhibit 676, for the witness only.

2    Q.   Do you recognize this document?

3    A.   Yes.

4    Q.   What is it?

5    A.   It's my plea deal between myself and the government.

6            MS. WRIGHT:  And the government offers Exhibit 676.

7            THE COURT:  It will be admitted.

8            (Exhibit 676 admitted into evidence.)

9            MS. WRIGHT:  If you can go to page 7, please,

10:17 10   Miss Lewis.

11   Q.   Do you see where it says under "Acknowledgment of Plea

12   Agreement"?  Is that your signature, Miss Janke?

13   A.   That's my signature, yes.

14   Q.   What's your general understanding of what sentence the

15   government has agreed to recommend under the terms of this Plea

16   Agreement?

17   A.   They recommend 27 months.

18           MS. WRIGHT:  Miss Lewis, if you can please now pull up

19   Exhibit 677, for the witness only.

10:18 20   Q.   Do you recognize this document, Miss Janke?

21   A.   Yes.

22   Q.   What is it?

23   A.   It's a Cooperation Agreement between myself and the

24   government.

25           MS. WRIGHT:  The government offers Exhibit 677.

```
 1                THE COURT:  It will be admitted.

 2                (Exhibit 677 admitted into evidence.)

 3                MS. WRIGHT:  If we can go to page 5, please,

 4       Miss Lewis.

 5       Q.   And again, under "Acknowledgment of Cooperation

 6       Agreement", is that your signature there?

 7       A.   Yes.

 8       Q.   Can you tell the jury what your understanding is of what

 9       you've agreed to do under the terms of the Cooperation

10       Agreement?

11       A.   That I have agreed to tell the truth.  I have agreed to

12       tell exactly what I did and be truthful and, in exchange, they

13       could recommend a different sentencing.

14       Q.   Are you hoping for a lower sentence as a result of your

15       cooperation?

16       A.   I mean, yeah.  I don't want to go to jail and not be home

17       with my kids.

18       Q.   Who ultimately decides your sentence?

19       A.   The judge.

20                MS. WRIGHT:  No further questions.

21                THE COURT:  Cross-examination, Mr. Kelly.

22                MR. KELLY:  Yes, your Honor.

23                     CROSS-EXAMINATION OF LAURA JANKE

24       BY MR. KELLY:

25       Q.   Good morning, Miss Janke.  I represent Gamal Abdelaziz.
```

```
 1    A.    Good morning.
 2    Q.    Now, everything the prosecutor just asked you about, none
 3    of it you discussed with Gamal Abdelaziz, right?
 4    A.    Correct.
 5    Q.    And all of the fake stuff that you put into Sabrina
 6    Abdelaziz's athletic profile, none of it you discussed with
 7    Gamal Abdelaziz, right?
 8    A.    Correct.
 9    Q.    And you got that information from Rick Singer, right?
10:20 10   A.    Correct.
11    Q.    That's the man you and the prosecutor keep calling Rick,
12    right?
13    A.    Correct.
14    Q.    And Rick is the reason you're here today, right?
15    A.    The reason I'm here is because I allowed myself to
16    continue to lie and to do this, and I need to take
17    responsibility for that.
18    Q.    Okay.  Well, you didn't voluntarily drive down to the
19    federal U.S. Attorney's office and say, I'd like to confess to
10:20 20   lying and taking bribes, what can I do to help, did you?
21    A.    No, but I also didn't stand up for myself and stop it when
22    I knew it was wrong.
23    Q.    Right.  But you also got a call from Rick Singer when he
24    pretended there was some audit of his foundation, right?
25    A.    Yes.
```

|  | 1 | Q.   And that's what triggered this chain of events that lands |
|---|---|---|

Q.   And that's what triggered this chain of events that lands
you here today, right?

A.   That's what ultimately did, but again, it was me not being
truthful.

Q.   Well, you said you knew that lying was wrong.  You also
know that taking bribes is wrong, too, right?

A.   Yes.

Q.   Okay.  And Singer called you on December 3rd of 2018.  Do
you recall that?

A.   I recall him calling me, yes.

Q.   And do you recall that he twice just referred to a person
as Donna?

A.   I don't remember those specific details.

         MR. KELLY:  All right.  Let me just show the witness
then, please, 609A.

Q.   And direct your attention to page 2, lines 19 through 23.
And then I'm going to direct your attention to something else
in this document.  Okay.  And then go to page 3, lines 23 to
24.  Do you see a reference to a person named Donna?

A.   Yes.

Q.   And having seen that --

         MR. KELLY:  Please take it down.

Q.   Having seen that, does that refresh your recollection that
when Singer called you he twice referred to a person as Donna?

A.   Yes.

1    Q.    And you knew exactly who he was referring to, right?

2    A.    Correct.

3    Q.    He didn't have to tell you multiple times that she's the

4    Senior Women's Administrator of USC?  He didn't have to explain

5    who she was to you, right?

6    A.    Right.

7    Q.    You knew exactly who it was, right?

8    A.    Uh-hum.

9    Q.    And who was it?

10:23 10    A.    That was Donna Heinel, the Senior Women's Administrator at

11    USC.

12    Q.    Right.  And you knew that because you had worked at USC as

13    an assistant soccer coach and you were very familiar with both

14    Donna Heinel and the internal workings of the USC SUBCO

15    process, right?

16    A.    I knew the SUBCO process from my experience with them, but

17    I've never been in a SUBCO meeting to know the internal part of

18    it.

19    Q.    Okay.  Fair enough.  But you at least knew there was a

10:23 20    SUBCO process, you weren't part of it, but it existed at USC

21    and that's how the athletes got into USC, right?

22    A.    Yes.

23    Q.    Okay.  And you, at least, were a coach at USC.  You

24    weren't some outsider like a parent, right?

25    A.    Yes.

```
 1   Q.   And you never discussed the internal USC SUBCO process
 2   with Gamal Abdelaziz, did you?
 3   A.   No.
 4   Q.   And again, you never spoke with Gamal Abdelaziz at all
 5   about any of this, right?
 6   A.   No.
 7   Q.   And you got all your information about the Abdelaziz
 8   family from Rick Singer, correct?
 9   A.   Correct.
10   Q.   And, of course, when Singer was calling you in December of
11   '18, he was hiding the fact that he was working for the
12   government, right?
13   A.   Yeah.  He didn't tell me that anything had happened.  I
14   don't know that -- the term working for the government.
15   Q.   Well, he at least hid the fact that he was taping your
16   call, right?
17   A.   Yes.
18   Q.   Okay.  And based upon your experience, he was an
19   especially good liar, wasn't he?
20   A.   I mean, from the instances of our interactions of him
21   having me create these profiles, then, knowing that they were
22   not truthful.
23   Q.   So he hid things, a lot of things from you, correct?  A
24   lot of his business, what he was actually doing?
25   A.   Yes.  He hid some.
```

```
      1  Q.   And all these forwarded messages, the prosecutor showed
      2  you from Singer that had earlier e-mails from Gamal Abdelaziz,
      3  Singer never connected you directly with Gamal, did he?
      4  A.   No.
      5  Q.   And you were the one making up the fake athletic profiles,
      6  right?
      7  A.   I created the fake athletic profiles.  Yes.
      8  Q.   With zero communication to Gamal Adelaziz, right?
      9  A.   Correct.
10:25 10  Q.   And let me show you, please, I think it's in evidence,
     11  344.  Yes.  That's it.  Now, Singer forwarded you that, right?
     12  A.   Yes.
     13  Q.   Okay.  Now, when he forwarded you that, did he ever tell
     14  you that there were four other photos that day from
     15  Mr. Abdelaziz?
     16  A.   No.
     17  Q.   He hid that from you?
     18  A.   Yeah.  He didn't -- I wasn't aware.
     19  Q.   Okay.  Did the government ever show you the four other
10:26 20  photos from that day?
     21  A.   No.
     22  Q.   So that was hidden from you --
     23            MS. WRIGHT:  Objection.
     24            THE COURT:  Sustained.
     25  Q.   Let's look at Exhibit 338 in evidence.  Let's go to the
```

```
 1    second page.  You ever seen that picture before in that e-mail?
 2    A.    No.
 3    Q.    Let's go to 339, please, Exhibit 339 in evidence.
 4             MS. WRIGHT:  Objection.  She's not on any of these
 5    e-mails.
 6             MR. KELLY:  It's in evidence.
 7             THE COURT:  Well, she can look at the pictures and see
 8    if it refreshes her memory.
 9    Q.    Have you seen this one before?
10    A.    No.
11    Q.    Let me show you 341, in evidence.  Have you ever seen this
12    one before?
13    A.    No.
14    Q.    How about Exhibit 342?  Let's go back to the top of this,
15    please.  Have you ever seen this one before?
16    A.    No.
17    Q.    And it's also dated July 27, 2017, right?
18    A.    Uh-hum.
19    Q.    I should have pointed out the dates of the others as well,
20    but would you -- did you happen to see that the others I just
21    showed you were also dated July 27th?
22    A.    No.  I didn't look at the dates of those pictures.
23    Q.    Yeah.  Sorry.  Let me do that real quickly.  341.  See the
24    date?
25    A.    Uh-hum.
```

```
 1    Q.    July 27th.

 2               Okay.  Let's see 339.  The date.

 3               Let's see 338.  The date.

 4               Let's go back to the one you were shown, 344.  Let's

 5    look at the date.  The date from Aziz.

 6               So you were unaware that there were four other

 7    pictures, correct?

 8    A.    Correct.

 9    Q.    Singer hid that from you, right?

10    A.    Yeah.  I did not -- I never saw them.

11    Q.    And in preparation for your testimony today, you never saw

12    them either, right?

13    A.    No.

14    Q.    How many hours of preparation do you think you did

15    approximately with the government before you testified here?

16    A.    Several.

17    Q.    More than five, less than ten or?

18    A.    Probably more than ten.

19    Q.    More than ten.  Okay.  In those more than ten hours, you

20    never saw those photos, right?

21    A.    No.

22    Q.    Now, are you aware that Singer hid things about you from

23    Abdelaziz?

24    A.    No.

25    Q.    Let me show you Exhibit 329, which is now in evidence.
```

1    Okay.  You were shown this earlier today.  Let's just look at

2    that line.  Well, first of all, let's look at the date,

3    July 16th.  Then let's look at the line where it says, "If they

4    don't have the items pertaining to the sport, let me know and I

5    will create".  You see that?

6    A.    Yes.

7    Q.    And above it there's a bunch of stuff you're trying to get

8    information, right?

9    A.    Uh-hum.

10:30  10    Q.    Now, let's put that side by side with what's in evidence

11    at Exhibit 330.  Let's look at the date on 330.  Let's go down,

12    further down, please, to where Singer, on July 16th, same day,

13    same day, look at all the stuff he's asking for.  It's the same

14    stuff you want, right?

15    A.    Uh-hum.

16    Q.    And below, the message from Singer to Aziz, there's

17    nothing from you, is there, in Exhibit 330?

18    A.    No.

19    Q.    It's being cut out where you say "If they don't have the

10:31  20    items +pertaining to the sport, let me know and I will create".

21    That's been deleted, correct?

22    A.    Correct.

23    Q.    So Singer is not telling Abdelaziz there's a young woman

24    named Laura Janke who's creating information about the profile,

25    is he?

1    A.    No.  He hasn't here.

2    Q.    All right.  Let's go to -- before we go to that, your

3    expertise is really soccer, right?

4    A.    Yes.

5    Q.    You played in college.  You coached.  So you know a lot

6    about soccer, right?

7    A.    Uh-hum.

8    Q.    How about basketball?

9    A.    I played basketball when I was younger and I never played

10:32 10    at a high level.  I've been around it from coaching and

11    speaking with coaches of basketball.

12    Q.    Right.  So you've actually coached some basketball over

13    the years?

14    A.    No.  I was saying I've spoke with coaches that have.

15    Q.    Right.  Are you familiar with all the numbers that certain

16    players do -- like in the old days, you got two guys, two

17    forwards, and a center.  Right?

18    A.    Uh-hum.

19    Q.    Now they use numbers.  Are you familiar with the number

10:32 20    system?

21    A.    I know they use numbers, but I'm not familiar with them.

22    Q.    Right.  Not everyone's familiar with the numbering system

23    of a player, right, including yourself who has some experience

24    in this area?

25    A.    Uh-huh.

1   Q.   Is that a yes?

2   A.   Yes.

3   Q.   Let's go to 658, please, that's in evidence.  Let's go to

4   the picture on the back of that, please, second page.

5        MR. KELLY:  Thank you, Mr. Carter.

6   Q.   And do you see the picture of a girl with glasses

7   dribbling the ball, right?

8   A.   Yes.

9   Q.   Let's put that next to --

10:34 10       MR. KELLY:  I'm sorry, Mr. Carter, I want to put that

11   next to Exhibit 381 in evidence.  Let's see it -- well, let's

12   first look at the front page of 381.

13   Q.   This is from Donna Heinel on 10/3/17, right before SUBCO

14   meets about Sabrina.

15   A.   Okay.

16   Q.   Okay?  And now let's look at the second page of that one.

17   Different girl, right?

18   A.   Uh-hum.

19   Q.   So all these questions about the girl with the basketball

10:34 20   and the glasses is not even the one that was presented to SUBCO

21   on behalf of Sabrina Abdelaziz's application, correct?

22   A.   Correct.

23   Q.   Did you have anything to do with finding this young woman

24   just jogging there, number five?

25   A.   No, I did not.

```
 1   Q.   All right.  Now let's go to --
 2        MR. KELLY:  Let's keep these two up, please, and let's
 3   go to I think it's 658, the one on the right.  The front page,
 4   please.
 5   Q.   Okay.  Here, you are asking Singer about the profile.
 6   First sentence you're saying you need her --
 7        MR. KELLY:  I'm sorry.  Just yellow that whole line.
 8   A.   "Her e-mail, phone" ... "as I did not have that".  You're
 9   telling Singer you don't have Sabrina's e-mail, phone, right?
10   Her e-mail, phone, and parents' names, correct?
11   A.   Yes.  I would always ask Singer to give that to me.  I
12   hadn't had it yet to put into the profile.
13   Q.   Okay.  So you wanted to put Sabrina's e-mail and Sabrina's
14   phone into the package, right?
15   A.   Uh-hum.
16   Q.   I'm sorry.  You have to say yes or no just for the record.
17   A.   Yes.  Sorry.
18   Q.   And are you aware that Singer never got her e-mail and
19   phone from Gamal Abdelaziz?
20   A.   No.
21   Q.   Well let's look at the Exhibit 381 that's in evidence to
22   the left.  Let's look at the phone and the e-mail line in the
23   top left.  It's her dad's phone and dad's e-mail that Singer
24   had at the time, right?
25   A.   Yes.
```

```
 1              MR. KELLY:  We can take that down, please.
 2     Q.   You've -- in addition to being prepared for today, you
 3     estimate that's over ten hours.  Is that separate from any
 4     discussions or meetings with the FBI?
 5     A.   What do you mean discussions with the FBI?
 6     Q.   I'm sorry.  In terms of just general amount of time you
 7     spent with the government, whether it's the FBI or prosecution
 8     team, is that what you were referring to when you said more
 9     than 10 hours, or were there additional meetings with the FBI
10     that you weren't counting?
11     A.   No.  I was referring to all of it.
12     Q.   The whole thing?
13     A.   Uh-hum.
14     Q.   Okay.  Now, didn't you tell the FBI that the USC soccer
15     team did not have a particular number of spots, it could vary
16     slightly year to year, right?
17     A.   Yes.  It can vary within reason of a soccer team.
18     Q.   Sure.  You can't have a hundred kids on a soccer team, but
19     you can have 13 or 20, 21 or 22, right?  It varies year to
20     year?
21     A.   Correct.
22     Q.   And didn't you also tell the FBI that, at USC, donations
23     were looked upon favorably, but did not create a guarantee?
24     Did you say that?
25     A.   I said donations were looked upon fairly, but in a --
```

1    Q.    Favorably?

2    A.    But in an honest way.

3    Q.    Favorably?

4    A.    I don't recall using that word specifically, but what I

5    would have meant by it is in an honest way they would have

6    wanted donations.

7          MR. KELLY:  Let me -- just for the witness only,

8    please.

9    Q.    Show you Exhibit 9032 and go to the second page, please,

10:39 10   and go to on the --

11          MR. KELLY:  Keep going, please where it says "USC

12   Development".

13   Q.    Can you look at the first sentence of that, please, and

14   just read it to yourself.

15          MR. KELLY:  Okay.  Please take it down.

16   Q.    And does that refresh your memory as to whether or not you

17   told the FBI that, at USC, it was looked upon favorably if a

18   student could donate to USC, but this was not a guarantee?

19   A.    I recall that, but that's not the full context that I

10:39 20   meant it to be.

21   Q.    All right.  So, like everything, there's always more

22   context, right?

23   A.    Uh-hum.

24   Q.    I'm sorry, but you have to say yes or no.

25   A.    Yes.  Sorry, sorry.

```
 1    Q.   But that is something you told the FBI, right?
 2    A.   Yes.
 3    Q.   Of course, you knew that USC is a private university,
 4    right?
 5    A.   Yes, they are.
 6    Q.   They, in fact, at one point had a $6 billion campaign to
 7    raise money?
 8    A.   Yes, they did.
 9    Q.   And a lot of wealthy kids do, in fact, go to USC?
10    A.   Yes.  There's -- there's kids of every economic background
11    there.
12    Q.   Including a lot of wealthy kids at USC, right?
13    A.   Yes.
14    Q.   And were you aware while you were there that the USC
15    Athletic Department had a whole group devoted to fundraising
16    called the Trojan Athletic Fund?
17    A.   Yes.  I've heard of it, but again, it's through proper
18    channels of donations.
19    Q.   Well, did you work for the Trojan Athletic Fund while you
20    were there?
21    A.   No.
22    Q.   Okay.  Did you know that a man named Ron Orr led the
23    Trojan Athletic Fund?
24    A.   I know who he is, yes.
25    Q.   Okay.  And how much interaction did you have with him?
```

```
 1    A.   Not a lot, just hi or hello.

 2    Q.   Do you know whether or not he used this SUBCO process as a

 3    means to raise money for USC?

 4    A.   I'm not aware of that.  From what I was always told, SUBCO

 5    was -- you use it to admit athletes that are going to play for

 6    your team.

 7    Q.   Well, I mean, this whole SUBCO process is what Rick

 8    Singer, with your assistance, exploited, right?

 9              MS. WRIGHT:  Objection to the argument.

10:41  10              THE COURT:  Sustained.

11    Q.   Well, didn't you help Rick Singer exploit the process at

12    USC so kids could get in that otherwise might not get in,

13    right?

14    A.   I did, and I'm not proud of it and --

15    Q.   But -- but Rick Singer did that with you, right?

16    A.   Yes.

17    Q.   He was the one asking you and providing you all the

18    information, right?

19    A.   Yes.  He was the one e-mailing me and forwarding me

10:42  20    e-mails.

21    Q.   Okay.  And based upon your discussions with him, he knew

22    there was a SUBCO process at USC, right?

23    A.   Yes.

24              MS. WRIGHT:  Objection to what he knew.

25              THE COURT:  Yeah.  Sustained.
```

1    Q.   Well, at some point during your many years in discussions

2    with him, did it appear to you that he knew there was a SUBCO

3    process at USC?

4    A.   He knew how the process worked for athletes to get in, in

5    my discussions with him or speaking to him about it.

6    Q.   Okay.  And in fact, didn't you tell the FBI that all of

7    Singer's kids went in through the walk-on process, right?

8    A.   Could I look at the document?

9    Q.   Sure.

10:43 10        MR. KELLY:  Let's go to Exhibit 9031, please, page 4,

11   just for the witness.  The middle paragraph where it begins

12   with "for kids being recruited".

13   Q.   And then look at the last sentence of that paragraph and

14   just read it to yourself, please.

15        MR. KELLY:  Okay.  Now please take it down.

16   Q.   Having read that, does it refresh your memory that, in

17   fact, you told the FBI that all of Singer's student athletes

18   were put forth as walk-ons?

19   A.   All the ones that we used with soccer were put through as

10:43 20   walk-ons.

21   Q.   So Singer exploited that walk-on process, right?

22   A.   He used that.

23   Q.   Right, because I think you told the FBI also that

24   recruited walk-ons, if they quit, they don't lose a

25   scholarship.  They don't have a scholarship, right?

A.    No.   Recruited walk-ons don't have a scholarship.   But on
my team, we still expected them to come and participate and be
an active member of the team participating.

Q.    But it was not unusual for recruited walk-ons to leave the
roster after a year, right?

A.    When recruited walk-ons, if they did leave, it was a very
hard decision for them because it was a sport that they loved.
They loved being a part of the team and they loved being around
it.   So while sometimes you would have one quit in a year, you
may not, and it was not a process that they took lightly to
just up and quit or leave the team.

Q.    Okay.   Didn't you tell the FBI it was not unusual for
recruited walk-ons to leave the roster after one year?

A.    Once again --

Q.    I'll show you Exhibit 9032.

        MR. KELLY:   Just the witness, please.

Q.    Top of page 2, the sentence that starts with "some".

        MR. KELLY:   Yellow that, please.   All right.   Please
take it down.

Q.    Having read that, does it refresh your recollection that
you told the FBI that some recruited walk-ons decided this may
not have been them and quit, so it's not unusual for recruited
walk-ons to leave the roster after a year?

A.    It does refresh my recollection.   And again, I was
referring to the athletes that we recruited in regards to

1    playing for us or making the decision not to play anymore.

2    Q.    Okay, but Singer did this because, as you told the FBI,

3    this made it easier to put Rick Singer's students as recruited

4    walk-ons because no one would ask questions at USC as to why

5    they were leaving the roster after one year, right?

6    A.    Uh-hum.

7    Q.    I'm sorry.  Again, you have say yes or no.

8    A.    Yes, yes.

9    Q.    It doesn't raise any red flags to do it this way with

10:46 10    these recruited walk-ons.  If you're going to make up phony

11    accolades and get kids who aren't the USC level, that's the way

12    to do it, right, to use the recruitment process?

13    A.    That's the way we did it, but from admissions or anybody

14    else's standpoint, it would not have been okay.

15    Q.    Well, did you ever work at the Admissions Office?

16    A.    No, but we were told to be truthful and employees of

17    character.

18    Q.    And did you know what Donna Heinel may have told about --

19    may have been told about her fundraising responsibilities for

10:46 20    USC?

21    A.    I do not know what she was told.

22    Q.    You don't know what Pat Haden -- do you know who Pat Haden

23    is, right?

24    A.    I know who Pat Haden is.

25    Q.    He was the athletic director of USC, right?

A.   Yes.

Q.   Do you know what Pat Haden may have told Donna Heinel she should be doing to raise money at USC?

A.   I do not, but again, I can just speak for my experiences there.  They always talked to us about making sure we're employees of character and being good role models for our student athletes.

Q.   Well, you do know what Coach Ali told you, right?

A.   Yes.

Q.   He said there's two ways to keep your job at USC?  I think you said win -- win or bring in money, right?  Isn't that what you just testified to with the prosecutor?

A.   Bring in money in an okay fashion, not by lying to the university or anybody else.

Q.   Well, that's certainly what Ali was doing, right?

A.   Yes.

Q.   And there was pressure on him to bring in money.  Either win or bring in money, right?

A.   But our first and foremost job was to recruit and win and be coaches.

Q.   Now you said you didn't recruit team managers, but you did, in fact, have team managers, correct?

A.   We did have one team manager to my recollection and we later had a student athlete who was no longer able to play because of injury, and she stayed on to help the team and be in

         1   that role.

         2   Q.   Okay.  And you were asked by the prosecutor about practice

         3   players.  And the question was, what does it mean to you.  Do

         4   you remember that question?

         5   A.   Uh-hum.  Sorry.

         6   Q.   Yes, you remember that question?

         7   A.   Yes.

         8   Q.   Okay.  So you were asked, what does it mean to you,

         9   correct?

10:48   10   A.   Correct.

        11   Q.   Now, you, obviously, have been an assistant soccer coach

        12   at USC and have a lot more knowledge about the system than most

        13   people, don't you?

        14   A.   Correct.

        15   Q.   You have no idea what a practice player meant to Gamal

        16   Adbelaziz, do you?

        17   A.   Sorry.  Can you --

        18   Q.   You have no idea what the term "practice player" means to

        19   Gamal Abdelaziz, do you?

10:49   20   A.   No.

        21   Q.   And you have no idea what Rick Singer told Gamal Abdelaziz

        22   about practice players at USC, do you?

        23   A.   I don't.

        24   Q.   And you have no idea what Rick Singer told Gamal Abdelaziz

        25   about team managers at USC, do you?

A.   I don't.

Q.   I'm not sure if I asked you this.  If I already asked you, I apologize.  Pat Haden, you knew who he was, right?

A.   Yes.

Q.   Did you know that Pat Haden met with Rick Singer at one point?

A.   Rick had told me that he was meeting with Pat Haden, but I don't know what was discussed or anything like that.

Q.   Are you aware that it was the athletic director Pat Haden who introduced Donna Heinel to Rick Singer?

A.   Yes.

Q.   And you have no idea, again, what Haden told Heinel about her responsibilities to raise money for USC, correct?

A.   I do not, but, again, in my seven years working there, there was never -- there was never so much pressure that we needed to lie and do things dishonestly in order to bring in money.

Q.   But you did anyway, right?

A.   I did, yes.

Q.   And are you aware that other coaches took walk-ons in exchange for contributions?

A.   No.  The only thing that I was ever told was that when Ali told me that water polo was doing the same thing.

Q.   Are you aware that USC itself kept data on practice players who were children of significant donors?

```
 1    A.    No.

 2    Q.    I'd like to show you Exhibit 1219, please.

 3              MR. KELLY:  I'd like to go to the second page.  I'd

 4    like to go to the box on the far right under "Notes".  I'd like

 5    to go to the second and third entry.  First one says

 6    "significant" -- yes.  That one there, yeah.  And the one above

 7    it.  Right there.

 8              MS. WRIGHT:  Can we take the document down now?  She

 9    already said she's unaware.

10:51 10          MR. KELLY:  Objection.  I haven't asked the question.

11              THE COURT:  He hasn't asked the question.

12    Q.    Now, have you had time to read that?

13    A.    I've read the parts in yellow.

14              MR. KELLY:  Okay.  And please take it it down.

15    Q.    Does that refresh your recollection as to whether or not

16    USC kept data about children of donors and how they could be

17    practice players?

18    A.    I've never seen that document before, but what I can tell

19    you is I didn't know that they -- I've never seen that, so I

10:52 20    didn't know they kept data.

21              And second, in my experiences, anybody that was on

22    our team, walk-on or practice player, because we didn't call

23    them practice players, but that was somebody who could be on

24    the team and make an impact and actually contribute.

25              MR. KELLY:  Now, your Honor, this has been agreed upon
```

1    as preauthenticated through stipulation.  I offer this

2    document, 1219.

3            MS. WRIGHT:  Objection.  Can we see it?  Just because

4    it's authentic, doesn't mean it's admissible.

5            MR. KELLY:  It's their document.  It's 1219.

6            MS. WRIGHT:  Okay.  She just said she's never seen it

7    before and wasn't aware.

8            THE COURT:  Are you objecting?

9            MS. WRIGHT:  Objection.

10:53 10         THE COURT:  The objection's sustained.

11           MR. KELLY:  One moment, your Honor.

12   Q.   Now with respect to the profile on Sabrina Abdelaziz, you

13   simply made up her statistics, like scoring 12 points a game,

14   right?

15   A.   Yes.

16   Q.   Okay.  And these athletic profiles, again, were created by

17   you based upon information provided by Rick Singer, right?

18   A.   He provided some of the information and the rest of it was

19   me Googling and finding information.

10:54 20   Q.   Okay.  And you had zero discussions with Mr. Abdelaziz

21   about this, correct?

22   A.   Correct.

23   Q.   You never met the man?

24   A.   Correct.

25   Q.   You never talked to the man?

```
 1   A.   Correct.

 2   Q.   You never met his daughter Sabrina?

 3   A.   No.

 4   Q.   Never talked to Sabrina?

 5   A.   No.

 6   Q.   Here, as the government brought out on direct, you've pled

 7   guilty to a racketeering conspiracy?

 8   A.   Correct.

 9   Q.   Are you aware that's not charged in this case?  There's no

10:54 10  racketeering RICO charges in this case?

11   A.   No.

12   Q.   And it's the government who is suggesting they could

13   recommend 27 months in prison for you, the mother of, at the

14   time, a 3-year-old?  That was your understanding?

15        MS. WRIGHT:  Objection.

16        THE COURT:  Sustained.

17   Q.   Well, you testified on direct that your child is 5 years

18   old, correct?

19   A.   Yes.

10:55 20  Q.   And two years ago when you pled guilty, obviously that

21   means your child was three, correct?

22   A.   Yes.

23        THE COURT:  Objection.

24        THE COURT:  Sustained.

25   Q.   Well, when you pled guilty, the government said it would
```

1    recommend 27 months in prison unless you cooperated, right?

2            MS. WRIGHT:  Objection to the characterization.

3            THE COURT:  Sustained.

4    Q.   Well, okay.  Let's look at Exhibit 676, page 2.  Line --

5    under "Sentence Recommendation", let's see how it's

6    characterized under A.  "Incarceration at the low end of the

7    Guidelines".  That's how the government characterized it,

8    right?

9    A.   Uh-hum.

10:56 10   Q.   I'm sorry.  You have to say yes or no.

11   A.   Yes.

12   Q.   And then let's go to Exhibit 9035, not in evidence, just

13   for the witness.  You've seen the face page.  Now let's go to

14   page 9, bottom sentence.

15           MR. KELLY:  Let's yellow that whole sentence.  There

16   you go.  And does -- take it down, please.

17   Q.   And does that refresh your recollection that the

18   government said the guidelines were 27 to 33 months?

19   A.   Correct.

10:56 20   Q.   And, under the Plea Agreement, they had said they'd

21   recommend the low end of the Guidelines, correct?

22   A.   Correct.

23   Q.   And that's how they characterized it, right?

24   A.   Correct.

25   Q.   And the low end is -- obviously 27 to 33, the low end is

1    27 months, right?

2    A.    Correct.

3    Q.    So unless they -- you cooperate with them, that's what

4    they were going to recommend for somebody like you, right?

5            MS. WRIGHT:  Objection.  Someone like you.

6            THE COURT:  Sustained.

7    Q.    Well, is that what they were going to recommend for you?

8    A.    On my document, that's what it says would be recommended.

9    Q.    Right.  And then there's a Cooperation Agreement where

10:57 10  it's up to the U.S. Attorney's office to decide whether to file

11   this substantial assistance motion, right?

12   A.    Are you referring to the --

13   Q.    Let me ask you what's your understanding.  It depends

14   upon -- the ultimate sentence, of course, depends on whatever

15   the judge who was assigned to your case wants to do, right?

16   A.    Yes.

17   Q.    Different case, different judge, right?

18   A.    Yes.

19   Q.    All right.  And, by testifying obviously you're hoping to

10:58 20  get some credit for assisting the government in this case,

21   right?

22   A.    I'm here testifying, because, first, I want to take

23   responsibility for what I did.  It was wrong.  Second, I know,

24   like I said, what I did was wrong and I'm here to tell the

25   truth and tell what I know happened.

1   Q.   Okay, but obviously, you don't want to go to jail, right?

2   A.   No.  Nobody wants to go to jail.

3   Q.   Right.  And the determination of who files a substantial

4   assistance motion to your judge is entirely up to the

5   prosecutors, right?

6   A.   From how I know is it's ultimately up to the judge what

7   happens to me.

8   Q.   Okay.  Let me show you Exhibit 677 in evidence, please.

9        MR. KELLY:  Go to page 2, Substantial Assistance

10:59 10  Motion, second paragraph, the first two lines.

11  Q.   You see where it says, "The determination whether

12  Defendant", that would be you, "has provided substantial

13  assistance rests solely in the discretion of the U.S. Attorney

14  and is not subject to appeal or review"?  You see that?

15  A.   Yes.

16  Q.   And then it says, "The U.S. Attorney will make this

17  determination based on the truthfulness and value of

18  Defendants' assistance, regardless of the outcome or result of

19  any proceeding or trial".  You see that?

10:59 20  A.   Yes.

21  Q.   So it's up to the U.S. Attorney to determine the value of

22  your assistance to them, right?

23  A.   Yes.  They recommend.

24  Q.   It says, "The U.S. Attorney will make this determination",

25  and then they talk about truthfulness and value of your

1    assistance, right?

2    A.   Yes.

3    Q.   They make the call.  They don't all collectively vote.

4    They make the call before they file a Substantial Assistance

5    Motion, right?

6    A.   Well, again, they make the call, but it's up to the judge.

7    I mean, I --

8    Q.   Well, if you can just read the first sentence, it says

9    "The determination whether Defendant has provided substantial

11:00 10   assistance rests solely in the discretion of the U.S. Attorney

11    and is not subject to appeal or review".  If they don't want to

12    file a motion, they don't have to, right?

13    A.   Right.

14    Q.   Okay, but ultimately, of course, it's up to the judge to

15    determine what's appropriate in your case, right?

16    A.   Yes.

17         MR. KELLY:  Okay.  Nothing further, your Honor.

18         THE COURT:  Before we go to the cross from

19    Miss Papenhausen, we will take a morning recess of 15 minutes.

11:01 20   We will be in recess for 15 minutes.

21         THE CLERK:  All rise for the jury.

22         (Jury exits.)

23         THE COURT:  Be seated, counsel.

24         You may step down, Miss Janke.

25         Miss Papenhausen, approximately how long on cross?

```
 1              MS. PAPENHAUSEN:  No more than five to ten minutes,
 2    your Honor.
 3              THE COURT:  Five to ten minutes.  All right.  And then
 4    will the next witness be the order that we had on Friday,
 5    Mr. Frank?
 6              MR. FRANK:  The next witness is Mr. Nahmens, your
 7    Honor.
 8              THE COURT:  Mr. Nahmens.  So we're skipping Masera for
 9    the time being?
11:02 10         MR. FRANK:  Correct, your Honor.
11              THE COURT:  And then the order is as originally.
12              MR. FRANK:  And Mr. DeMaio after that.
13              THE COURT:  Anything that needs to come to the Court's
14    attention before we recess?
15              MR. FRANK:  No, your Honor.
16              MR. KELLY:  No, your Honor.
17              THE COURT:  We're in recess for 15 minutes.
18              (Recess taken 11:02 a.m. to 11:22 a.m.)
19              THE CLERK:  All rise for the jury.
11:22 20         (Jury enters.)
21              THE CLERK:  Thank you.  You may be seated.
22              THE COURT:  Good morning again, jurors.  We're ready
23    to resume.
24              Ms. Janke, you're reminded you remain under oath.
25              And, Ms. Papenhausen, you may conduct
```

1    cross-examination.

2              MS. PAPENHAUSEN:   Thank you.

3                   CROSS-EXAMINATION OF LAURA JANKE

4    BY MS. PAPENHAUSEN:

5    Q.    Good morning, Ms. Janke.   My name is Lauren Papenhausen.

6    I represent John Wilson.

7    A.    Good morning.

8    Q.    You testified on direct that Mr. Khosroshahin told you

9    that Jovan Vavic had been working with Rick Singer, correct?

11:23 10  A.    Correct.

11   Q.    Now, Mr. Khosroshahin told you that Jovan Vavic was in

12   fact one of at least five USC coaches who were working with

13   Rick Singer, correct?

14   A.    Sorry, can you repeat that again?

15   Q.    Mr. Khosroshahin told that you Jovan Vavic was one of at

16   least five USC coaches who were working with Rick Singer,

17   correct?

18   A.    I don't -- I don't recall that it was five other coaches.

19   Q.    You recall the tennis coach?

11:24 20  A.    Yes, he did tell me the tennis coach, yes.

21   Q.    The golf coach.

22   A.    Yes, I know he had spoke with the golf coach, but I don't

23   know for sure if he was working with Rick Singer.

24   Q.    Maybe some other coaches?

25   A.    I honestly don't recall who else he told me.  It was

1    mainly Jovan that Ali would always speak about.

2    Q.   When you heard that all of these coaches were working with

3    Rick Singer, the money was going to the program, correct?

4    A.   In terms of soccer, that's how it initially started, but

5    in terms of the other programs, I don't know.

6    Q.   So in terms of soccer, when the money was going to the

7    program, you mentioned that some of the money from a parent

8    went to fund a summer trip that the soccer team took, correct?

9    A.   That's correct.

11:25 10  Q.   Where was that summer trip to?

11   A.   The soccer team took a trip to Europe to compete.

12   Q.   What was the purpose of going to Europe to compete?

13   A.   So, at least for soccer, once every four years, at least

14   when I was coaching, you were allowed to take your team on a --

15   on a -- to play in other countries just to give the team more

16   experience, to allow them to come together as a team and just

17   compete internationally.

18   Q.   How expensive was that trip?

19   A.   It was very expensive.  I don't know off the top of my

11:25 20  head, but it was a large expense.

21   Q.   When you were at USC and working with Rick Singer to help

22   get his students admitted onto the soccer team, were any of

23   those students all-league players?

24   A.   I don't know for sure if any of them were.  I would

25   falsify documents or the profiles and say that students were

1    all league or this or that, but I don't -- I don't know if any

2    were, in fact, or not.

3    Q.   Were any of those students playing in a top school

4    program?

5    A.   Again, there could have been some that were playing, but I

6    don't know to the extent, and as far as I knew it was not

7    enough to be able to play at that level or else they would have

8    been being recruited by the coach of the university.

9    Q.   Were any of those students playing in a top club program?

11:27 10   A.   Again, there could have been some that were playing in the

11   club programs.  But, again, the information that I added to

12   their profile was to fill in any gaps or to falsify, to make

13   them seem that they were a strong enough athlete to, again,

14   play at that level.

15   Q.   Were any of those players supported by a top high school

16   coach?

17   A.   I don't know.

18   Q.   You didn't even talk to the high school coaches for any of

19   these players, correct?

11:27 20   A.   Correct.

21   Q.   As opposed to, as you were talking about what a normal

22   recruiting process would involve of course talking to the high

23   school coach, correct?

24   A.   Yes.  So the normal process I would have talked to the

25   high school coach or a club coach; and in a typical process if

an athlete is good enough to play at that school, they're being
admitted and recruited by a specific coach.

Q.   You also mentioned on direct that if somebody was an
athlete at the college level, that it would be going through
the coach, correct?

A.   Correct.

Q.   So if Johnny Wilson was going through the coach, that
would suggest that he could be an athlete at the college level,
correct?

11:28   MS. WRIGHT:  Objection, hypothetical.

THE COURT:  Well, she can -- I'll allow her to answer
that hypothetical.

A.   Can you repeat the question?

Q.   Sure.

If Johnny Wilson were, in fact, going through the
coach, that would suggest that he could be an athlete at the
college level, correct?

A.   Well, it depends if they were recruited or not.  We had
people going through Ali and I but they weren't recruited to be
11:28  on our team, they were just coming in through Rick.  So it
would just depend on, I guess, what you're referring to.

Q.   Sure.  But if they were going through the process where
the coach was talking to the high school coach, that would be a
normal recruitment process, correct?

A.   Yes.

```
 1    Q.   And that would suggest that they're an athlete who can
 2    compete at the college level, correct?
 3    A.   Correct.
 4    Q.   In your early dealings with Rick Singer, you initially
 5    believed that he was truthful, correct?
 6    A.   Yes, I believed, yes, that he was truthful.
 7    Q.   You trusted him.
 8    A.   I trusted him because I trusted Ali with my life and Ali
 9    trusted Rick and so I trusted him as well.
11:29 10   Q.   Ms. Janke, you never made a profile for Johnny Wilson,
11    correct?
12    A.   No.
13         MS. PAPENHAUSEN:  Thank you, I have nothing further.
14         THE COURT:  Any redirect?
15         MS. WRIGHT:  Very briefly.
16         THE COURT:  Yes, Ms. Wright.
17                    REDIRECT EXAMINATION
18    BY MS. WRIGHT:
19    Q.   Just a couple of questions for you, Ms. Janke.
11:30 20   A.   Okay.
21    Q.   Mr. Kelly asked you some questions about whether Rick
22    Singer hid things from you.  Do you remember those questions?
23    A.   Yes.
24    Q.   Did Rick Singer ever hide from you the way that he was
25    getting these kids into school?
```

A.   No, not at all.  I was part of that process for him to get

these students into school.

Q.   And he didn't hide the fake profiles aspect of that from

you, correct?

A.   No, because I was, especially at the end, the one creating

those profiles and supplying, giving them to him.

Q.   And Rick Singer didn't hide from you the fact that the

parents of these students were paying money to get their kids

in as recruited athletes, did he?

11:31     MR. KELLY:  Objection to leading the witness.

THE COURT:  Sustained.

BY MS. WRIGHT:

Q.   Was it clear to you that the parents of these students

were paying money to get these kids into school as recruited

athletes?

MR. KELLY:  Objection.

THE COURT:  She can have that question.

A.   Yes, because he always made it clear that if these

students did get in through athletics, myself and Ali would be

11:31 compensated; and also I knew that once it was -- when I had

helped facilitate it through Donna, I knew that she was being

compensated as well from the money.

Q.   Mr. Kelly also showed you a bunch of photos that Gamal

Abdelaziz had sent to Rick Singer of girls playing basketball.

Do you remember those e-mails?

```
 1  A.    The -- yes, I remember.
 2         MS. WRIGHT:  Ms. Lewis, if we could please pull up
 3  Exhibit 344, which is in evidence.
 4  Q.    And this is the photo that Rick Singer did forward to you
 5  from Gamal Abdelaziz, right?
 6  A.    That's correct.
 7  Q.    And this is the only photo that was attached to that
 8  e-mail?
 9  A.    That's correct.
10  Q.    And what's the subject line of this e-mail?
11  A.    "Sabrina."
12  Q.    Mr. Kelly also asked you some questions suggesting that
13  it's not unusual for a walk-on to leave the team and be taken
14  off the roster after one year.  Do you remember that set of
15  questions?
16  A.    I do.
17  Q.    Would it be unusual in your experience coaching soccer at
18  USC for a walk-on to not show up ever?
19  A.    The only scenario that we had that was with Rick's
20  students where they didn't show up; I never met them, I had
21  never spoke with them.  Any other player that -- even if they
22  had quit after a year was a player that we had recruited, we
23  had gone through the process with, we saw them play, we knew
24  them, and I believe, as I said before, it was -- if they did
25  choose to quit, it was not a decision that was taken lightly.
```

11:32 (lines 10, 20)

       1    There was a lot of conversations with them, a lot of them going

       2    back and forth in trying to decide if that's what they wanted

       3    to do because they had given their life to the sport.

       4    Q.   You were also asked some questions about fund-raising at

       5    USC, particularly in the athletics department.  Do you remember

       6    that?

       7    A.   Yes.

       8    Q.   Did anyone -- while you were coaching at USC, did anyone

       9    come out and explicitly tell you that you couldn't lie to get

11:33 10    recruited athletes in in exchange for money?

      11    A.   We were never told that we could do this, and outside of

      12    Ali, I didn't speak about it with anyone else anywhere within

      13    the department, because I knew at the end of the day that it

      14    wasn't -- it wasn't something that would be appropriate or okay

      15    to do.

      16    Q.   Was there any written policy saying you couldn't do it?

      17    A.   Well, we were always told as coaches and in our job

      18    descriptions that we needed to be good role models, set good

      19    examples, and our job was to recruit student athletes that

11:34 20    could make an impact on the team and help us win, help

      21    contribute to the team, and student athletes that could also do

      22    well in the classroom.

      23    Q.   And you've testified a little bit about how initially at

      24    USC when you were doing this for Rick Singer, the money went to

      25    the soccer program initially and then it went to the camp that

1    you and Ali Khosroshahin ran, correct?

2    A.   That's correct.

3    Q.   And whether -- in either instance, whether the money was

4    going to the soccer program or to your camp, did you believe

5    that it was wrong?

6    A.   Yes, I believe that it was wrong.  At the end of the day,

7    like I said, it was not a truthful way to be getting people

8    into school.  And I can tell you that if somebody that we maybe

9    knew slightly or didn't know at all had come up to us and said,

11:35 10  Hey, I have a student that I want to get into school, they will

11   never play on your team, they won't do anything and can you

12   just do it out of the goodness of your heart, we wouldn't have

13   presented them.

14   Q.   Say that a student was playing for a top club or top coach

15   and as a coach you had spoken to the high school coach or the

16   club coach, even in that instance would it be okay for you to

17   accept money in exchange for the recruitment?

18             MS. PAPENHAUSEN:  Objection.

19             THE COURT:  Grounds?

11:35 20            MS. PAPENHAUSEN:  It's a hypothetical, calls for

21   speculation.

22             THE COURT:  Well, she answered a hypothetical for you,

23   I'll let her answer a hypothetical for the government.

24   A.   Sorry, can you repeat that?

25   Q.   Sure.  In your experience coaching at USC, say that you

1    were recruiting a top player and you had spoken to a well-known

2    coach for that player and gotten a great recommendation, in

3    that case would it be okay to accept money in exchange for the

4    recruitment?

5    A.    No, not at all.  We were recruiting athletes because they

6    were athletes.  We had people on our team from all backgrounds

7    and we gave scholarships or offered spots based on what they

8    could contribute to the team on the field.

9    Q.    Mr. Kelly asked you some questions about it being the

11:36 10   government that decides whether to recommend a lower sentence.

11   Do you remember those questions?

12   A.    Yes.

13   Q.    In your meetings with the government, what did agents and

14   prosecutors tell you was the number one thing to focus on and

15   the number one thing that was the most important?

16          MR. KELLY:  Objection, vouching.

17          THE COURT:  Sustained.

18   BY MS. WRIGHT:

19   Q.    Do you have any vested interest in the outcome of this

11:36 20   trial?

21   A.    No, I'm -- I'm here solely to tell the truth, to take

22   responsibility.

23          Every day I feel ashamed and embarrassed for what I've

24   done, for the disappointment that I've caused family and

25   friends, and I have two daughters that they need their mom to

```
 1    be a role model and I need to show them you take responsibility
 2    even when you really messed up, which is what I've done.
 3              So, for me, however it turns out, it turns out.  I'm
 4    here because I need to tell the truth.  That's all I have left
 5    right now.
 6              MS. WRIGHT:  No further questions.
 7              THE COURT:  Mr. Kelly, recross.
 8              MR. KELLY:  Briefly, your Honor.
 9                    RECROSS-EXAMINATION OF LAURA JANKE
10    BY MR. KELLY:
11    Q.   Just a few questions, Ms. Janke.
12              The prosecutor asked you about whether something was
13    clear to you about the parents.
14              It is clear to you that you never spoke to
15    Mr. Abdelaziz, right?
16    A.   Yes.
17    Q.   And you can tell the jury what your intent was, right?
18    A.   Yes.
19    Q.   You have no idea what his intent was, right?
20    A.   I don't.
21    Q.   And you have no idea what Rick Singer may have told this
22    man, Gamal Abdelaziz, do you?
23    A.   No.
24    Q.   All right.  In fact, are you aware with respect to all
25    these questions about Donna Heinel, there's no evidence she was
```

11:37  10
11:38  20

```
 1   personally pocketing any money until the summer of 2018?  Are
 2   you aware of that?
 3   A.    No.
 4   Q.    And are you aware of what she may or may not have
 5   discussed with Pat Haden, the athletic director at USC?
 6   A.    I don't know what would have happened in both of their
 7   discussions.
 8   Q.    You are aware, of course, that USC had an athletic
 9   compliance department, right?
10   A.    Yes.
11   Q.    You're familiar with a man named Scott Simon?
12   A.    I know the name, yes.
13   Q.    And he was in the athletic compliance department, right?
14          MS. WRIGHT:  Objection, this is beyond the scope.
15          THE COURT:  How is this within the scope?
16          MR. KELLY:  Well, your Honor, I will get to it very
17   quickly.  I'm going to reoffer Exhibit 2019 (sic.).  I'd like
18   to hear the government's objection so I can respond to it.
19   It's preauthenticated -- I checked my notes, we have
20   preauthenticated Exhibit 1219 and they have not articulated,
21   all they said is she's not on it.  It's authenticated, so I'm
22   asking --
23          MS. WRIGHT:  It's hearsay as to this witness.
24          MR. KELLY:  Your Honor, it's a business record of USC.
25   This witness can be asked about non-hearsay business record;
```

```
 1    that's what I'm trying to do here.
 2              MS. WRIGHT:  As to her, she wasn't on it --
 3              THE COURT:  The objection on 1219 is sustained.
 4              MR. KELLY:  Fine, your Honor.
 5    Q.   I guess the last question, with respect to that photo that
 6    you did see, 344 with the girl dribbling the basketball, you
 7    were totally unaware that there were other photos that had been
 8    sent to Mr. Singer, right?
 9    A.   Correct.
11:40 10   Q.   And you were totally unaware that 30 more had been sent to
11    Singer by Aziz in the middle of August, right?
12    A.   Correct.
13              MR. KELLY:  Nothing further, your Honor.
14              THE COURT:  Ms. Papenhausen, any recross?
15              MS. PAPENHAUSEN:  No, your Honor.
16              THE COURT:  Thank you, Ms. Janke, you may step down.
17              Ms. Kearney.
18              MS. KEARNEY:  The government calls James Nahmes.
19              THE CLERK:  Would you please take the stand, sir, and
11:42 20   raise your right hand.
21              (James Nahmes, sworn.)
22              THE CLERK:  Thank you.  You may be seated.
23              And would you please state your name for the record,
24    spelling your last.
25              THE WITNESS:  James Nahmes, N-a-h-m-e-s.
```

```
 1              THE COURT:  Mr. Nahmes, you may remove your mask if
 2    you choose to.
 3              THE WITNESS:  Thank you, your Honor.
 4              MS. KEARNEY:  May I proceed?
 5              THE COURT:  Ms. Kearney, you may direct exam.
 6                 DIRECT EXAMINATION OF JAMES NAHMES
 7    BY MS. KEARNEY:
 8    Q.   Good morning, Mr. Nahmes.
 9    A.   Good morning.
11:42 10    Q.   Where do you live?
11    A.   In Santa Rosa, California.
12    Q.   Are you currently employed?
13    A.   Yes.
14    Q.   Where?
15    A.   I am self-employed.
16    Q.   What do you do?
17    A.   I'm a Certified Public Accountant.
18    Q.   Is that also known as a CPA?
19    A.   Yes.
11:42 20    Q.   How long have you been a CPA?
21    A.   Forty years this year.
22    Q.   Can you tell us your educational background?
23    A.   I have a Bachelor of Science in commerce degree from Santa
24    Clara University.
25    Q.   And how long have you been in business for yourself as a
```

1   CPA?

2   A.   Since about 1990.

3   Q.   Briefly, what did do you before that?

4   A.   I worked in public accounting for various firms for four

5   years, and then I worked in private industry for a

6   manufacturing firm leading an accounting department before I

7   went on my own.

8   Q.   What kind of accounting work do you do now?

9   A.   Primarily tax return preparation and bookkeeping.

11:43 10   Q.   Approximately how many tax returns have you prepared in

11   the course of your nearly 40-year career?

12   A.   I don't have an accurate number, but I would guess about

13   2,000.

14   Q.   And what kinds of tax returns have you prepared?

15   A.   Individual returns and a variety of business returns,

16   including corporations, partnerships, limited liability

17   companies.

18   Q.   I want to ask you some questions now about Hyannisport

19   Capital, but first let me ask you, are you familiar with John

11:44 20   Wilson?

21   A.   Yes.

22   Q.   Who is he?

23   A.   He was the president of Hyannisport Capital.

24   Q.   And how did you come to know John Wilson?

25   A.   I was introduced to the firm by a colleague of mine.

1    Q.   When you say "the firm," are you referring to Hyannisport

2    Capital?

3    A.   Yes.

4    Q.   And did you begin working for Hyannisport Capital?

5    A.   I did.

6    Q.   Approximately when did you work for Hyannisport Capital?

7    A.   That was March of 2011.

8    Q.   What work did do you?

9    A.   Bookkeeping and preparation of the tax return for the

11:44 10    corporation.

11    Q.   For how many years did you prepare Hyannisport Capital's

12    tax return?

13    A.   I worked for Hyannisport Capital until March 2019.

14    Q.   What kind of return did Hyannisport Capital file?

15    A.   It's an S corporation income tax return.

16    Q.   What is an S corporation?

17    A.   An S corporation is a -- what's known as a pass-through

18    entity.  The S corporation pays no federal tax itself, unlike a

19    regular corporation that would pay tax on its own income.

11:45 20    Instead, the income and deductions are passed through to the

21    shareholders and they pay tax on the income on their individual

22    return.

23    Q.   How many shareholders did Hyannisport Capital have during

24    the time you were preparing its tax returns?

25    A.   One.

| | |
|---|---|
| 1 | Q.   Who was that shareholder? |
| 2 | A.   Mr. Wilson. |
| 3 | Q.   On whose return was Hyannisport Capital income reported? |
| 4 | A.   Mr. Wilson's. |
| 5 | Q.   Did you ever prepare Mr. Wilson's personal taxes? |
| 6 | A.   I did not. |
| 7 | Q.   Why not? |
| 8 | A.   I wasn't hired to do that. |
| 9 | Q.   When it came time to prepare Hyannisport Capital's |
| 11:46  10 | returns, did you have a typical process that you followed? |
| 11 | A.   Yes, I did. |
| 12 | Q.   What was that process? |
| 13 | A.   I would either phone or e-mail the administrative |
| 14 | assistant for Hyannisport Capital and either discuss with her |
| 15 | or put in an e-mail a list of standard documentation that I |
| 16 | needed. |
| 17 |       I would also ask for a copy of the QuickBooks file, |
| 18 | the electronic accounting system, and I would prepare an |
| 19 | engagement letter to send to the client. |
| 11:46  20 | Q.   Who was the administrative assistant that you contacted? |
| 21 | A.   Debbie Rogers. |
| 22 | Q.   What was the standard documentation you requested? |
| 23 | A.   It was typically -- the most common documentation I |
| 24 | requested was backup for asset and liability accounts. |
| 25 | Q.   And you mentioned QuickBooks.  What is that? |

```
 1   A.   QuickBooks is an electronic accounting system widely used
 2   in the United States.  In my situation, most of the clients
 3   enter bank transactions and credit card transactions and then I
 4   kind of take it from there.
 5        MS. KEARNEY:  Ms. Lewis, can we pull up for the
 6   witness only Exhibit 646, please.
 7   Q.   Mr. Nahmes, do you recognize this document?
 8   A.   I do.
 9   Q.   What is it?
11:47 10  A.   Is it an engagement letter.
11   Q.   To whom was it sent?
12   A.   To Hyannisport Capital.
13   Q.   And what's the date?
14   A.   The date is August 31, 2015.
15        MS. KEARNEY:  The government offers Exhibit 646.
16        MR. KENDALL:  No objection.
17        THE COURT:  It will be admitted.
18        (Exhibit 646 received into evidence.)
19   BY MS. KEARNEY:
11:48 20  Q.   And, Mr. Nahmes, if we can turn to the second page of this
21   engagement letter, section 2, the second service listed that
22   you provide concerns preparation for federal and California
23   corporation income tax returns for Hyannisport Capital.  For
24   what tax period was this engagement letter applicable to?
25   A.   For tax year 2014.
```

Q.   And in that first paragraph under section 2, you wrote, "I
will not audit or verify the data you submit for preparation of
your returns and I will perform my tax services under the
assumption that all the information you submit to me is true,
complete and accurate according to the documents and other
information retained in your files."

        What did you mean by that?

A.   I meant that I was not going to verify any documentation I
received from the client.

Q.   The last sentence of this paragraph reads:  "My work in
connection with the preparation of your income tax returns does
not include any procedures designed to discover fraud,
defalcations, or other irregularities, should any exist."

        What did you mean by that?

A.   I meant that the work that I was going to do was not
designed to discover fraud and other things listed in the
letter.

        MS. KEARNEY:  And let's go to the bottom of the
letter, please, Ms. Lewis.

Q.   And there's a signature there under the words "accepted
by."

        Whose signature is that?

A.   John Wilson.

Q.   I'd like to turn next to what's been marked as Exhibit 134
for the witness only, please.

1          And, Mr. Nahmes, this is a lengthy document, there's

2     also a hard copy in the binder in front of you.

3     A.    Okay.

4     Q.    Do you recognize this document?

5     A.    I do.

6     Q.    What is it?

7     A.    It's a copy of the work papers I used to prepare the 2014

8     tax return.

9     Q.    For which company?

11:50 10    A.    For Hyannisport Capital.

11    Q.    Who prepared these work papers?

12    A.    I did.

13          MS. KEARNEY:   The government offers Exhibit 134.

14          THE COURT:   They will be admitted -- it will be

15    admitted.

16          (Exhibit 134 received into evidence.)

17          MS. KEARNEY:   If we can turn to page 3, Ms. Lewis.

18    BY MS. KEARNEY:

19    Q.    And this is rather small print, but, Mr. Nahmes, generally

11:50 20    what information is contained on this page?

21    A.    This is a schedule that I use to reconcile the amounts

22    that are shown on the company's books to what is reported on

23    the tax return.

24    Q.    And if we can look at the line item titled "Consulting."

25    Underneath is an entry for "general business."  What does that

1    refer to?

2    A.    That refers to expenditures for general business

3    consulting.

4    Q.    What amount was attributed to general business consulting

5    for 2014?

6    A.    $120,000.

7    Q.    Did you receive backup documentation for this expense?

8    A.    I did.

9    Q.    And if I can direct your attention to page 95 of this

11:51 10   document.

11             What is reflected on this page?

12   A.    Give me just a moment.

13             Page -- what's the --

14   Q.    It's up on your screen and it's a page --

15   A.    Oh.   This was an invoice for general business consulting.

16   Q.    And who is the invoice from?

17   A.    Rick Singer.

18   Q.    Who is it to?

19   A.    Hyannisport Capital.

11:52 20   Q.    What's the amount?

21   A.    $20,000.

22   Q.    Were you familiar with Rick Singer at the time you were

23   preparing this tax return?

24   A.    No.

25   Q.    The description in the invoice states "Special consulting

1    income concept, design, and implementation of professional

2    development program for Hyannisport Capital associates."

3         What did you understand this invoice was for?

4    A.   General business consulting.

5    Q.   And how many employees did Hyannisport Capital have at

6    this time to your knowledge?

7    A.   One.

8    Q.   And who was that?

9    A.   Debbie Rogers.

11:53 10   Q.   And if we go to the next page, what is reflected on this

11   page?

12   A.   This is also an invoice for general business consulting.

13   Q.   And who is it from?

14   A.   The Key.

15   Q.   Who is it to?

16   A.   Hyannisport Capital.

17   Q.   What's the amount?

18   A.   $100,000.

19   Q.   Were you familiar with The Key at the time you prepared

11:53 20   this tax return?

21   A.   I was not.

22   Q.   And the description here states:  "Business consulting -

23   August-June 2014."

24         Are you familiar with what consulting was provided?

25   A.   I am not.

1   Q.   How were these payments to Mr. Singer and The Key

2   classified for tax purposes?

3   A.   As, again, business consulting services.

4   Q.   And I believe you testified that because Hyannisport

5   Capital is an S corporation, its income and expenses are passed

6   through to the shareholder here, Mr. Wilson.  How does having

7   an additional $120,000 in business consulting expenses affect

8   the amount of taxes that Mr. Wilson ultimately owes?

9   A.   It would reduce the amount of taxable income that was

11:54 10   reported on that return.

11   Q.   And how does that affect Mr. Wilson's taxes?

12   A.   That should reduce the amount of tax paid.

13          MS. KEARNEY:  If we go back to page 3, please,

14   Ms. Lewis.

15   Q.   There's a line item here for "Donations."  What does that

16   refer to?

17   A.   Those would have been the charitable contributions for the

18   company.

19   Q.   What amount was listed for donations for 2014?

11:55 20   A.   $195,000.

21   Q.   Are charitable donations tax deductible?

22   A.   Yes, they are.

23   Q.   What qualifies as a deductible charitable donation?

24   A.   Generally the donations need to be made to what's called a

25   501(c)(3) organization to be deductible, and there are quite a

1   few other requirements in order to have the deduction be

2   qualified.

3   Q.   What is a 501(c)(3)?

4   A.   It is a nonprofit organization.

5   Q.   Is there any documentation requirements for -- that the

6   IRS requires for donations to be deductible?

7   A.   Yes.

8   Q.   What are those?

9   A.   The substantiation requirements are that for donations

11:55 10   over $250 you need to have an acknowledgment from the

11   organization and that needs to show the date of the

12   contribution, the charitable organization's name, amount of the

13   contribution, and the acknowledgment needs to state whether any

14   goods or services were received in exchange for the

15   contribution.

16   Q.   Did you receive any backup documentation for these

17   donations totaling $195,000?

18   A.   I did.

19      MS. KEARNEY:   Can we turn to page 97, please,

11:56 20   Ms. Lewis.

21   Q.   Mr. Nahmes, what is reflected on this page?

22   A.   This is a printout from the QuickBooks accounting system

23   that shows the detail of the donations made during the tax

24   year.

25   Q.   One of the entries is dated April 7, 2014 for a wire to

1    The Key Worldwide in the amount of $100,000.  Were you familiar

2    with The Key Worldwide Foundation at the time you prepared this

3    return?

4    A.    I was not.

5    Q.    What were Hyannisport Capital's total donations for 2014

6    according to this page?

7    A.    $195,000.

8    Q.    I want to turn your attention to page 107 of this

9    document.

11:57 10         What is reflected on this page?

11   A.    This is an acknowledgment from The Key Worldwide

12   Foundation for $100,000 contribution.

13   Q.    To whom was it sent?

14   A.    Hyannisport Capital.

15   Q.    What's the date?

16   A.    April 7, 2014.

17   Q.    The first paragraph of this letter reads, "Thank you for

18   your contribution of $100,000 to The Key Worldwide Foundation.

19   Your generosity will allow us to move forward with our plans to

11:58 20   provide educational and self-enrichment programs to

21   disadvantaged youth."

22         And the next paragraph indicates that no goods or

23   services were exchanged.

24         What did you understand that to mean?

25   A.    The last part or all of that?

1    Q.   What did you understand the sentence about no goods or

2    services were exchanged to mean?

3    A.   Exactly what it says, that no goods or services were

4    exchanged in -- for the contribution.

5    Q.   And again, where Hyannisport Capital's income and expenses

6    are passed through to the shareholder, Mr. Wilson, how does

7    having a charitable contribution of $100,000 affect the amount

8    of taxes Mr. Wilson ultimately owes?

9    A.   Generally it would reduce the amount of taxes.

11:59 10         MS. KEARNEY:   We can take that down, Ms. Lewis.

11   Q.   Mr. Nahmes, are you familiar with what's called a 1099

12   miscellaneous form?

13   A.   Yes.

14   Q.   What is that?

15   A.   It's an annual information return that's required to --

16   that's used by businesses to report payments to independent

17   contractors.

18   Q.   Who is required to file a 1099 miscellaneous form?

19   A.   Anyone who makes certain payments over $600 in the course

11:59 20   of their business.

21   Q.   And when in the calendar year are these forms typically

22   filed?

23   A.   They are due to the recipients, the people who receive the

24   money, at the end of January.  They're due to the government

25   later in the year.

1   Q.   Do you recall a time when you were preparing Hyannisport

2   Capital's 2014 return that you realized that the company had

3   not filed 1099 miscellaneous forms for certain payees?

4   A.   Yes.

5   Q.   Which payees?

6   A.   That was Rick Singer and The Key.

7   Q.   What did you do when you realized this?

8   A.   I drafted an e-mail and sent an e-mail to Debbie Rogers

9   explaining the situation, that I felt that 1099 miscellaneous

12:00 10   needed to be completed for those payments to be in compliance

11   with tax law and suggested that I prepare them and file them.

12   Q.   And would you have completed 1099 miscellaneous forms for

13   Mr. Singer and The Key if you thought the payments to them were

14   charitable contributions?

15   A.   No.

16   Q.   Once Hyannisport Capital's tax return was prepared, what

17   did you do with it?

18   A.   I sent it to Debbie Rogers requesting that the return be

19   reviewed and the e-file authorization signed and returned to

12:01 20   me.

21        MS. KEARNEY:   And if we can look at, for the witness

22   only, Ms. Lewis, Exhibit 645.

23   Q.   Mr. Nahmes, do you recognize this document?

24   A.   I do.

25   Q.   What is it?

| | |
|---|---|
| 1 | A.   It's IRS form 8879-S.  It's the IRS e-file signature |
| 2 | authorization for form 1120S. |
| 3 | Q.   And there's a date at the bottom.  What is it dated? |
| 4 | A.   September 4, 2015. |
| 5 | MS. KEARNEY:  The government offers Exhibit 645. |
| 6 | THE COURT:  It will be admitted. |
| 7 | (Exhibit 645 received into evidence.) |
| 8 | BY MS. KEARNEY: |
| 9 | Q.   Mr. Nahmes, what is the purpose of a form 8879? |
| 12:01 10 | A.   This form authorizes me to e-file a company's tax return |
| 11 | on behalf of the client with the IRS. |
| 12 | Q.   And under Part II, declaration and signature authorization |
| 13 | of officer, it reads, "Under penalties of perjury, I declare |
| 14 | that I am an officer of the above corporation and that I have |
| 15 | examined a copy of the corporation's 2014 electronic income tax |
| 16 | return and accompanying schedules and statements and to the |
| 17 | best of my knowledge and belief, it is true, correct and |
| 18 | complete." |
| 19 | And below that is a line for officer's signature. |
| 12:02 20 | Whose signature appears there? |
| 21 | A.   John Wilson. |
| 22 | MS. KEARNEY:  And, Ms. Lewis, if we can pull up |
| 23 | Exhibit 157A, which is already in evidence. |
| 24 | Q.   Mr. Nahmes, I'm showing you a certified copy of the 2014 |
| 25 | Form 1120-S income tax return for an S corporation for |

1    Hyannisport Capital which has already been admitted into

2    evidence, and I'll note for the record that the identifying

3    number of the company has been redacted throughout this

4    document.

5            Who prepared this return?

6            MS. KEARNEY:  Ms. Lewis, if you can go to the second

7    page to show the witness, please.

8    A.    I prepared the return.

9    Q.    If we go to page 3, Mr. Nahmes, is that your information

12:03 10    under "paid preparer use only"?

11    A.    Yes, it is.

12    Q.    Who filed this return on behalf of Hyannisport Capital?

13    A.    I did.

14    Q.    How did you file it?

15    A.    Electronically.

16            MS. KEARNEY:  If we can go back to page 2, Ms. Lewis.

17    Q.    At the top of the form 1120S is that identifying

18    information for Hyannisport Capital?

19    A.    Yes, it is.

12:03 20            MS. KEARNEY:  If we can go just below this section,

21    please, Ms. Lewis.

22    Q.    Do you see there that below the identifying information

23    there is a line that says in bold, "caution, include only trade

24    or business income and expenses on lines 1a through 21."

25            What did you understand that to mean?

1    A.    That you were only supposed to put trade or business

2    expenses on those lines.

3    Q.    And what is your understanding of the types of expenses

4    that can be included on an S corporation's tax return?

5    A.    Business expenses.

6    Q.    Where are personal expenses reported on this kind of

7    return?

8    A.    They are not.

9    Q.    What effect does the fact that Mr. Wilson was the sole

12:04 10   shareholder of Hyannisport Capital have on whether Mr. Wilson

11   could report personal expenses on Hyannisport Capital's

12   corporate return?

13   A.    It has no impact because personal expenses are not

14   deductible.

15   Q.    If we look below, there's a section titled "Income" and

16   has lines 1 through 6.  How much income did Hyannisport Capital

17   report for tax year 2014?

18   A.    No trade or business income.  I believe there was other

19   types of income reported.

12:05 20   Q.    If we go down to lines 7 through 21, in a section titled

21   "Deductions" -- first, just generally what are deductions?

22   A.    Those are expenses of the company that qualify as tax

23   deductions.

24   Q.    And if we look at line 19 under "other deductions," and it

25   says "attach statement," and it lists an amount of $271,886.

1          MS. KEARNEY:  And I'd like, Ms. Lewis, to put this

2     page up on the left, and if we can pull up page 34 of this same

3     exhibit on the right.

4     Q.   Mr. Nahmes, you see on the right Ms. Lewis has pulled up

5     an "other deductions" schedule.  How do the items listed in the

6     "other deductions" schedule relate to the information listed

7     under "other deductions" on line 19 of the return?

8     A.   The schedule on the right should agree with the total of

9     the other deductions reported on line 19 on the screen on the

12:06 10    left.

11    Q.   And on the right there is an entry for consulting.  Does

12    that number include the $20,000 payment to Mr. Singer and the

13    $100,000 payment to The Key that we saw earlier?

14    A.   It does.

15    Q.   Why?

16    A.   Because it was classified on the books as such.

17    Q.   Whose expenses did you understand those invoices to relate

18    to?

19    A.   Hyannisport Capital.

12:07 20    Q.   And looking back on the left, there is line 21, ordinary

21    business income or loss of negative $383,987.

22          Does that include the $271,886 amount in other

23    deductions?

24    A.   Yes, it does.

25    Q.   And does that also then include the $120,000 in payments

1   to Mr. Singer and The Key?

2   A.   Yes.

3   Q.   How does having a business loss of $383,987 affect the

4   taxes that the shareholder of Hyannisport Capital, Mr. Wilson,

5   will ultimately owe?

6   A.   Generally it would reduce the amount of taxes owed.

7        MS. KEARNEY:  Ms. Lewis, if we can take those down and

8   turn to page 37 of this same document.

9   Q.   Mr. Nahmes, I'm showing you the Schedule K-1.  What is a

12:08 10   Schedule K-1?

11   A.   The Schedule K-1 is a schedule that's included within the

12   tax return.  It's also -- a copy is given to the shareholder

13   showing their portion of the income and deductions that flow

14   through to their individual return.

15   Q.   Who is this K-1 for?

16   A.   John B. Wilson.

17   Q.   And the K-1 indicates that Mr. Wilson was the 100 percent

18   shareholder.  What does that mean in terms of what is reported

19   on Mr. Wilson's personal tax returns?

12:08 20   A.   That all of the income and deductions from Hyannisport

21   Capital would be reported on Mr. Wilson's individual income tax

22   return.

23        MS. KEARNEY:  And, Ms. Lewis, if we can keep the K-1

24   up on the right and going back to page 2, line 21, on the left,

25   please.

1          And if you can call out box 1 on the K-1, please.

2     Q.   Mr. Nahmes, how does box 1 on the K-9, which lists an

3     amount of $383,987, relate to the ordinary business loss listed

4     in line 21?

5     A.   It's the same amount.

6          MS. KEARNEY:  And, Ms. Lewis, if we can now call out

7     box 12A of the K-1.

8     Q.   And if we can -- well, first let me ask this.

9          Mr. Nahmes, what is reflected in box 12A?

12:10 10   A.   That's the total charitable contributions that are

11    allocated to that shareholder.

12         MS. KEARNEY:  And leaving, Ms. Lewis, the K-1 up on

13    the right, can we pull up page 28 of this exhibit on the left.

14    Q.   And, Mr. Nahmes, what is reported in this schedule on the

15    left of your screen?

16    A.   It shows the detail of the charitable contributions,

17    indicating that they were cash contributions subject to a 50

18    percent limitation.

19    Q.   And does -- do these cash contributions of $195,000

12:10 20   include the $100,000 payment to The Key Worldwide Foundation

21    that we saw earlier?

22    A.   Yes.

23    Q.   Why?

24    A.   Because they were charitable contributions on the books of

25    Hyannisport Capital.

1    Q.    How would the K-1 for Mr. Wilson change if Hyannisport

2    Capital's business expenses had been reduced by $120,000?

3    A.    The loss, the $383,000 number, would have been lower.

4    Q.    And how would that effect the taxes that Mr. Wilson as a

5    sole shareholder would ultimately owe?

6    A.    That would generally increase the tax owed.

7    Q.    How would the K-1 for Mr. Wilson change if Hyannisport

8    Capital's charitable contributions had been reduced by

9    $100,000?

12:11 10   A.    That would increase taxable income.

11   Q.    And how would that affect Mr. Wilson's taxes?

12   A.    That would increase the amount of tax paid on the

13   individual return.

14   Q.    And when preparing a tax return, who do you rely on to

15   provide you with the information necessary to determine if a

16   payment should be deducted, either as a business expense or a

17   charitable contribution or in some other fashion?

18   A.    The client.

19              MS. KEARNEY:  I have nothing further.

12:12 20             THE COURT:  Cross-examination, Mr. Kendall.

21              MR. KENDALL:  Yes, your Honor.

22              Can I have just a minute to get organized?

23              THE COURT:  Yes, you may.

24                   CROSS-EXAMINATION OF JAMES NAHMES

25   BY MR. KENDALL:

1    Q.   Good afternoon, Mr. Nahmes.  How are you?

2    A.   Good afternoon.  I am well.

3    Q.   Good.

4         You flew out from California join us?

5    A.   I did.

6    Q.   Thank you.  I hope to get you done so you can get back

7    this afternoon.

8    A.   I would appreciate that.

9    Q.   You're a CPA, you told us that.

12:13  10     Do you want to explain what it means to be a CPA?

11   A.   A CPA is a Certified Public Accountant.  We are required

12   to have certain educational background, a college degree.  You

13   have to have two years of experience in public accounting, and

14   then you have to pass a five-part exam.

15   Q.   And what types of clients do you work with in your private

16   practice?

17   A.   I've worked with a variety of clients over the 40 years

18   from manufacturing companies, consulting businesses, real

19   estate developers, a variety of businesses.

12:14  20   Q.   Privately owned companies, not public, I take it?

21   A.   Correct, all privately owned.

22   Q.   In the past have you worked with sub S corporations?

23   A.   I have.

24   Q.   Exactly who referred you to Hyannisport Capital?

25   A.   It was a colleague of mine.

1    Q.    And who was your first contact?

2    A.    Debbie Rogers.

3    Q.    And who is Debbie Rogers?

4    A.    Debbie Rogers was the administrative assistant for

5    Hyannisport Capital.

6    Q.    And how did the process go of retaining you for HPC?  Who

7    did you meet first?  Who did you talk to?  What happened?

8    A.    We scheduled an appointment and I went to the home office

9    of Mr. Wilson where Debbie worked, and I believe I sat down

12:14 10  with Debbie first and had a discussion with her.  She explained

11   what types of services were needed and asked me some questions

12   that I don't remember what they were back then, and then I sat

13   down with Mr. Wilson.

14   Q.    Okay.  And this was back in March 2011?

15   A.    That's correct.

16   Q.    And you continued to work with HPC for the next eight

17   years?

18   A.    Yes.

19   Q.    After that first March 2011 meeting, how many times did

12:15 20  you meet Mr. Wilson face to face?

21   A.    I don't believe I met him face to face after that initial

22   meeting.

23   Q.    Did you meet Debbie Rogers face to face after that?

24   A.    Yes, I did.

25   Q.    How frequently did you meet Debbie?

1    A.    Not very frequently.  I would say maybe a half a dozen

2    times.

3    Q.    And of your contact over the next eight years, rough

4    percentages, how much was your contact with Debbie and how much

5    of it was with John Wilson?

6    A.    Rough percentages, 80/20.

7    Q.    Okay.  And did that ebb and flow over time?

8    A.    Yes.

9    Q.    When Mr. Wilson went to Europe and became the president to

12:16 10    Staples, did you notice his schedule was a little more hurried

11    or busy?

12    A.    Yes.

13    Q.    And he was nine hours away, correct?

14    A.    Correct.

15    Q.    So Debbie was even more active then?

16    A.    She was as active as she had been, but there was a little

17    less direct contact with Mr. Wilson.

18    Q.    Okay.

19    A.    Because of the time difference.

12:16 20    Q.    And when you first came to be introduced, was that at the

21    home in Hillsborough?

22    A.    That's correct.

23    Q.    John was working from home at that time?

24    A.    Yes.

25    Q.    Then he went to Europe in 2012.  Did you ever go to the

1    HPC address in Atherton, California?

2    A.    I did.

3    Q.    Two Fleur Place?

4    A.    Yes.

5    Q.    Could you describe to us what the office looked like for

6    HPC at 2 Fleur Place?

7    A.    It was in the back of the house.  I could characterize it

8    as a pool house, and --

9    Q.    It was a separate building, a separate structure?

12:17 10    A.    It was a separate structure from the main house.

11    Q.    And how big was it?

12    A.    Maybe 30 by 30.  I don't -- I don't recall an exact size.

13    Q.    One large room, was there also a smaller room and bathroom

14    off of it?

15    A.    Again, I don't recall exactly.  I know there was one large

16    room where Debbie had her office set up.

17    Q.    Okay.  And they vacated that by 2016; is that correct?

18    A.    That sounds right.  I don't know exactly when.

19    Q.    And Debbie moved to Nevada, and that's what became HPC's

12:17 20    headquarters after they left the Atherton location?

21    A.    That was their mailing address.  I believe their

22    headquarters was the Massachusetts address.

23    Q.    John's house in Massachusetts.

24    A.    Yes.

25    Q.    And during the time that Debbie was working out of the

1   Atherton, was that the normal corporate office for mail, for

2   her to sit and do work and take phone calls and things of that

3   nature?

4   A.   Yes, it was.

5   Q.   You told us you provided two services, you did bookkeeping

6   and you prepared the tax return, correct?

7   A.   That's correct.

8   Q.   What did the bookkeeping involve?

9   A.   The bookkeeping typically involved during the year from

12:18 10   time to time Debbie would have questions about how to record

11   certain transactions, but most of the work was done at the year

12   end.

13   Q.   And what would you do at year end?

14   A.   It's a typical process for accountants to what we call

15   clean up a client's books.  They will provide us with the

16   QuickBooks files and the underlying documentation that I would

17   request, and just as an example, I would compare an asset

18   account, say, some investment, to a balance shown on an

19   underlying document.  And if there was a discrepancy between

12:19 20   the two, I would record an adjustment so that the books matched

21   the underlying documentation.

22   Q.   Is that what you mean when you say you clean up the books?

23   A.   Yes.

24   Q.   And I take it "clean up" is not a negative concept, it's

25   just putting in organizational order, it's not like there's

1    something bad there?

2    A.    Correct, correct.

3    Q.    When you refer to QuickBooks, is that where the general

4    ledger is located?

5    A.    Yes.

6    Q.    Do you want to explain what a general ledger is?

7    A.    A general ledger is a document that lists all of a

8    company's transactions for the year.

9    Q.    And when you do this cleaning up the books, would Debbie

12:19 10   get involved at all to assist you with it?

11    A.    Yes, she would.

12    Q.    What would she do?

13    A.    She would generally answer questions that I had with

14    regard to certain transactions and then provide me with

15    additional documentation or clarification.

16    Q.    And how common is it that you provide that service to a

17    client of cleaning up the books at year end or, you know,

18    adjusting the books?

19    A.    It's very common.  I -- almost every business client I

12:20 20   perform that service for.

21    Q.    In the eight years that you worked with HPC, did you ever

22    observe Debbie Rogers try to withhold information from you?

23    A.    Not that I remember.

24    Q.    Or John Wilson?

25    A.    No.

```
 1   Q.   Did they follow your advice?

 2   A.   Not always.

 3   Q.   When they didn't follow your advice, did it involve an

 4   ethical issue or was it just a business decision?

 5   A.   I don't recall a specific example of when they didn't

 6   follow my advice, but it's common to have give and take between

 7   client and CPA.

 8   Q.   Okay.  You never had to refuse to sign a return for them,

 9   correct?

10   A.   Correct.

11   Q.   And that's a sign when a CPA finds there's an ethical

12   problem, correct?

13   A.   If they wouldn't sign the return?

14   Q.   Yes.

15   A.   Yeah, I'm not sure I would characterize it as an ethical

16   problem --

17   Q.   But a difference of opinion that was important to the CPA.

18   You never had that is my point.

19   A.   Correct.

20   Q.   Okay.  Now, if we could put up Exhibit 646, which the

21   government just showed you.  That's the -- that's your sort of

22   standard retention letter, fair to say?

23   A.   Yes, engagement letter.

24   Q.   It's the type you use with many clients?

25   A.   Yes.
```

```
  1   Q.   The language there isn't special to Mr. Wilson.

  2              If we could go to the very end of the last page.

  3              It says, "accepted by John Wilson," but it says

  4   "DocuSigned by John Wilson."  Fair to say you don't know if

  5   Debbie did the DocuSign or John did.

  6   A.   I assume John did.

  7   Q.   Okay.  But you don't know.

  8   A.   I do not know.

  9   Q.   You don't -- be fair to say that Debbie was the person who

12:22 10   ran the paperwork in the office and kept things moving?

 11   A.   Yes.

 12   Q.   Okay.  Now, I want to talk a little bit about a Sub S

 13   corporation that Ms. Kearney asked you about during her

 14   questioning.

 15              Please explain what is a sub S corporation.

 16   A.   Sub S corporation is what's known as a pass-through

 17   entity.

 18   Q.   Go ahead, please.

 19   A.   I was going to say, I stated it earlier, that rather than

12:22 20   paying tax itself as an entity, the income and deductions flow

 21   through to the shareholders and they pay tax on the income.

 22   Q.   Okay.  One thing about a sub S corporation is it gives the

 23   owner, from perhaps what lawyers or others have told you, legal

 24   protection, if you sue the company -- if I own a restaurant

 25   with a sub S corporation and somebody slips and falls, they can
```

1   sue the corporation but they can't sue the owner, correct?

2           MS. KEARNEY:   Objection, calls for a legal conclusion.

3           THE COURT:   He can have that one.

4   A.   I understand that that is the case, but I defer to legal

5   people for that.

6   Q.   Sure.  But it also means there's no double taxation,

7   correct?

8   A.   That is correct.

9   Q.   Could you explain to the jury what is the issue of double

12:23 10   taxation with a C corporation and how an S corporation

11   eliminates that.

12   A.   I will do my best.

13   Q.   Okay.

14   A.   A C corporation, or also known as a regular corporation as

15   opposed to an S corporation, pays tax on its own income.  Say a

16   corporation makes $100,000 profit for the year, and then later

17   they decide they're going to pay a dividend to their

18   shareholders.  Well, the company has already paid tax on that

19   $100,000, then they distribute the earnings to their

12:24 20   shareholders and the shareholders have to pay tax on that

21   income as well, and that's where the term "double taxation"

22   comes from.

23           MR. KENDALL:   If we could take a look at Exhibit 9777

24   to the witness only, please.  Exhibit 9777.

25           Do we need to do the ELMO?

```
 1              If we could have the ELMO please for the witness only.

 2   Q.    Do you recognize this document, Mr. Nahmes?

 3   A.    Give me just a moment.

 4              Yes -- well, it's an e-mail that I wrote.

 5   Q.    And who did you send it to?

 6   A.    To Debbie Rogers.

 7   Q.    And does it deal with sub S issues?

 8   A.    Give me an opportunity to read it here.

 9              Okay.

12:26 10   Q.    Do you recognize it?

11   A.    I do.

12              MR. KENDALL:  I'd like to offer that into evidence,

13   your Honor.

14              MS. KEARNEY:  Objection, your Honor, it's hearsay.

15              MR. KENDALL:  It's his own document.

16              MS. KEARNEY:  It doesn't make it not hearsay.

17              THE COURT:  Sustained.

18              MR. KENDALL:  Your Honor, he can be cross-examined on

19   it; it's not hearsay, your Honor.

12:26 20              MS. KEARNEY:  Your Honor, this is about a different

21   entity, first of all.

22              THE COURT:  It's hearsay.  The objection is sustained.

23              MR. KENDALL:  Okay.

24   BY MR. KENDALL:

25   Q.    Are you familiar with an entity called Discovery Gateway
```

1    Spectrum II, DGS II?

2    A.    Yes.

3        MS. KEARNEY:   Objection, your Honor.   This is beyond

4    the scope of the direct.

5        MR. KENDALL:   It is not at all, your Honor.

6        THE COURT:   I'll let him have that question.

7    BY MR. KENDALL:

8    Q.    What entity owned DGS II?

9    A.    Hyannisport Capital.

12:27 10    Q.    So Hyannisport Capital, a sub S, owned an entity called

11    DGS II, correct?

12    A.    I believe, if I recall correctly, that DGS II was owned by

13    the other LLC, DGS, Discovery Gateway Spectrum.

14    Q.    Thank you.

15        And that's owned by HPC, correct?

16    A.    That was owned by HPC.

17    Q.    And DGS II, like HPC, is also a Sub S corporation,

18    correct?

19    A.    I believe it was a limited liability company is my

12:27 20    recollection.

21    Q.    Thank you.

22        But it's also considered a disregarded entity,

23    correct?

24    A.    That is correct.

25    Q.    Now, was there a practice at HPC to use -- to make

1    charitable donations at the direction of John Wilson?

2              MS. KEARNEY:  Objection.

3              THE COURT:  Grounds?

4              MS. KEARNEY:  How does this witness know what the

5    practice is?

6              THE COURT:  Well, if he knows, he can answer it.

7    A.   I know that the company made charitable donations.

8    Q.   Okay.  You saw that there was a donation in 2014 for

9    $100,000 to The Key Foundation from HPC, correct?

12:28 10   A.   Correct.

11   Q.   During that year there were several other charitable

12   contributions made from HPC, correct?

13   A.   Yes.

14   Q.   Autism Speaks, $50,000?

15   A.   I don't recall the amount.  I'd have to look at it.

16   Q.   Sure.  And in prior years HPC made charitable

17   contributions, correct?

18   A.   Yes.

19   Q.   So the $100,000 from The Key Foundation was not the first

12:29 20   charitable contribution that came out of HPC, correct?

21   A.   Yes.

22   Q.   Okay.  And I'd like to show you Exhibit 9775, please.

23             MR. KENDALL:  To the witness only.

24   Q.   Can you see it?

25   A.   No.

```
 1              MR. KENDALL:  Can we have the ELMO just for the
 2      witness, please.
 3              MS. KEARNEY:  Do you have a copy for me, please?
 4              MR. KENDALL:  Yes, right here.
 5              If we could show the witness.
 6      BY MR. KENDALL:
 7      Q.   Do you recognize this?
 8      A.   Yes, I do.
 9      Q.   And what is it?
12:30 10 A.   It's an e-mail I wrote.
11      Q.   And who did you send it to?
12      A.   Joyce Wang.
13      Q.   At the IRS?
14      A.   Correct.
15      Q.   But also to John Wilson and Debbie Rogers?
16      A.   Yes, I copied them on the e-mail.
17              MR. KENDALL:  Your Honor, I'd like to offer the
18      exhibit for state of mind, not for the truth of the matter
19      asserted.
12:30 20        MS. KEARNEY:  Your Honor, this e-mail appears to
21      concern a matter that defense counsel asked the government to
22      keep out of its exhibits, so I'm concerned as to what
23      Mr. Kendall is doing with that.
24              On top of it, it is being offered --
25              MR. KENDALL:  I'll withdraw it, your Honor.  I'll just
```

1   go to the question.

2   BY MR. KENDALL:

3   Q.   When HPC makes charitable contributions, did you ever have

4   an issue of whether the paperwork was in John's name or the

5   paperwork was in HPC's name, whether the money came from an HPC

6   account or it came from John's account, so -- could you explain

7   if that issue came up and what was its significance?

8   A.   I recall at least one instance where the name on the

9   receipt was not in the name of the S corporation.

12:31 10   Q.   Okay.  And what does that mean?  What's the significance

11   of that?

12   A.   The charitable donation, I would like to see it in the

13   name of the corporation if the corporation paid the charitable

14   donation.

15   Q.   Okay.  In the end it's going to flow through to the

16   individual's return but in terms of paperwork, you want to have

17   it aligned in the books, correct?

18   A.   Yes.

19   Q.   Okay.  But in the end, if it's a donation, it's going to

12:31 20   show up on the Schedule A for Mr. Wilson's personal 1040,

21   correct?

22   A.   Yes.

23   Q.   I'd like to show you Exhibit 9778, please.

24        MR. KENDALL:  Just to the witness.

25   Q.   And do you recognize this e-mail?

```
 1   A.   Yes, I do.
 2   Q.   Okay.  Are you --
 3             MR. KENDALL:  Mr. Carter, are you okay to do things
 4   now?
 5             MR. CARTER:  Yes.
 6             MR. KENDALL:  I'll turn this off.
 7   BY MR. KENDALL:
 8   Q.   What is this?
 9   A.   It's an e-mail to Debbie Rogers.
12:33 10   Q.   Concerning what?
11             MS. KEARNEY:  Objection.  It's not in evidence.
12             MR. KENDALL:  Your Honor, I'd like to put it into
13   evidence.
14             MS. KEARNEY:  Your Honor, I object again.  This is
15   hearsay.  It also appears that Mr. Kendall is trying to put in
16   a number of exhibits not to impeach and these exhibits were not
17   provided to the government in advance.
18             MR. KENDALL:  Your Honor, cross-examination materials
19   don't have to be --
12:33 20             THE COURT:  Yes.
21             MR. KENDALL:  But this is to explain the testimony
22   that she brought out that has a broader base than what she's
23   given.
24             THE COURT:  The objection is sustained.  You can put
25   it in front of the witness to refresh his memory if that's what
```

1   you're trying to do, but the document itself will not be

2   admitted.

3         MR. KENDALL:   Okay.

4   BY MR. KENDALL:

5   Q.   Does this document refresh you that in 2013 you were

6   working with Debbie on this issue of getting the charitable

7   donations aligned so that the receipt and the account where it

8   came from were aligned, whether it would be John or the sub S

9   corporation?

12:34 10   A.   Yes.

11   Q.   If you have your own way to describe that process, it

12   might be clearer than what I'm using, if you want to phrase it

13   in your own words.

14   A.   As I stated before, I would like to see the underlying

15   documentation match the expend -- match the expenditure on the

16   books.  So if Hyannisport Capital made a contribution from its

17   bank account, I would like to see their name on the charitable

18   contribution receipt.

19   Q.   The -- what you described earlier was the process of

12:34 20   cleaning up the books or getting the accounting cleaned up, did

21   that sometimes involve the charitable contributions?

22   A.   I'm sorry, excuse me?

23   Q.   You discussed earlier the service you provided of getting

24   the accounting entries in order and correcting and updating

25   them from what Debbie had done.

```
 1   A.   Right.

 2   Q.   And you did that on an annual basis for HPC as well as

 3   other clients.

 4   A.   Yes.

 5   Q.   Okay.  Did that also involve doing those tasks for the

 6   charitable contributions?

 7   A.   Those were things I noted and brought up to Debbie's

 8   attention.

 9   Q.   And would she have to go get the paperwork from the

10   charitable contributions to give to you to finish the

11   correcting of the accounting detail?

12   A.   Yes, that did happen.

13        MR. KENDALL:  I'd like to show you a copy of Exhibit

14   9779 for the witness only.

15   Q.   Is this an e-mail that you recognize?

16   A.   Yes.

17   Q.   Okay.  And does this deal with running down the charitable

18   receipts?

19   A.   I believe so.

20        MR. KENDALL:  Your Honor, I'd like to offer this into

21   evidence.

22        MS. KEARNEY:  Same objection, your Honor.

23        THE COURT:  The objection is sustained.  Again, it can

24   be used to refresh memory.

25   BY MR. KENDALL:
```

1   Q.   Does that refresh your memory that in September of 2013,

2   Debbie for that year's tax returns was running down charitable

3   receipts so you could clean up the books as you've described?

4   A.   Yes.  It was not necessarily cleaning up the books as it

5   was having proper documentation in the work papers.

6   Q.   Now, in fact, when you were first retained, you had to do

7   this process of cleaning up all of the books and transactions

8   for years prior to when were you engaged.  Do you remember

9   doing a multiyear cleanup for HPC?

12:37  10   A.   Yes, for certain accounts on the books.  But that was not

11   something that I was hired to do at the inception of my

12   relationship.  It came upon later.

13   Q.   Do you remember finishing it in early 2015?

14   A.   I don't know the exact date, but that could very well be.

15   Q.   Okay.  Now, in preparing the 2014 tax returns, do you

16   remember there was problems with the receipts for some of the

17   charitable contributions?

18   A.   I believe there was.

19   Q.   Okay.  I'd like to show you -- the witness only -- Exhibit

12:38  20   9783.

21          If you could take a look at that, please.

22   A.   I don't see anything on the screen.

23          MR. KENDALL:  Why don't we give a copy to the witness

24   as well so he can look through the entire thing.

25          THE WITNESS:  It's up now.

```
 1            MR. KENDALL:  But it's three pages.  It will be easier
 2     for you to look through.
 3            MS. PAPENHAUSEN:  May I?
 4            THE COURT:  Yes.
 5            THE WITNESS:  Thank you.
 6     BY MR. KENDALL:
 7     Q.   If you could take a look at that and tell us after you're
 8     done reading it to yourself if that refreshes your recollection
 9     about a $50,000 receipt for Autism Speaks for the 2014 tax
12:39 10   year.
11     A.   Okay, I've read the document.
12     Q.   Does this refresh your recollection of what happened with
13     the Autism Speaks receipt for 2014?
14     A.   Yes.
15            MS. KEARNEY:  If the witness can be instructed to put
16     the document down, your Honor.
17            THE COURT:  Yes, yes.
18     BY MR. KENDALL:
19     Q.   If you could put the document down and tell us what you
12:39 20   remember about that receipt.
21     A.   I don't recall specifically what -- it appears that from
22     the document that that receipt was missing --
23            MS. KEARNEY:  Objection, your Honor.
24            THE COURT:  If it doesn't refresh your memory, then
25     you can't testify to it.
```

```
 1    BY MR. KENDALL:

 2    Q.   Would reading it a little more closely help you refresh

 3    your memory to it?

 4              This is an e-mail you sent, correct?

 5    A.   It was an e-mail --

 6              THE COURT:  No, no, put the document down, please.

 7              And then ask your question, Mr. Kendall.

 8    BY MR. KENDALL:

 9    Q.   Do you recall that there was a $50,000 donation to Autism

12:40 10    Speaks in 2014?

11    A.   I would have to look at the work papers.

12    Q.   For the amount.  You recall there was a contribution,

13    though, for Autism Speaks?

14    A.   Yes.

15    Q.   And John made contributions to Autism Speaks for many

16    years, correct?

17    A.   Yes.

18    Q.   It was one of the common charities he supported.

19    A.   I recall that.

12:40 20    Q.   And you recall in 2014 there was some problems with the

21    receipts, that Debbie had to run down additional paperwork for

22    the Autism Speaks donation.

23    A.   Yes.

24    Q.   Okay.

25              For the $100,000 donation listed to The Key
```

1  Foundation, when you saw that, did you do anything in

2  particular?

3  A.   I read the document, and I was not familiar with that

4  organization, so I looked it up on the -- there is an IRS

5  website that lists 501(c)(3) organizations.  And I looked -- I

6  looked it up and recall finding it there.

7  Q.   You found The Key Foundation on the IRS website.  And what

8  was the purpose of you looking it up?

9  A.   To ensure that it had been -- or it was in the process of

12:42 10  being approved by the IRS.

11  Q.   And so, therefore, it was authorized to take charitable

12  contributions?

13  A.   Yes.

14  Q.   Okay.

15       MR. KENDALL:  Could we show the witness what's already

16  in evidence Exhibit 126, please?

17       If we could show him page 2.

18  Q.   Would it be fair to say that the standard practice was for

19  Debbie to send you copies of the receipts for charitable

12:42 20  contributions?

21  A.   Yes.

22  Q.   Okay.  Did you ever get this one?

23       MS. KEARNEY:  Objection, your Honor, to the

24  characterization of this as a receipt.

25       THE COURT:  Yes, sustained.

```
 1              MR. KENDALL:  I'll rephrase, your Honor.
 2    BY MR. KENDALL:
 3    Q.   Did you ever get a copy of the letter that's Exhibit 126?
 4    A.   I did not.
 5    Q.   Okay.  It says, "Thank you for your generous gift to USC
 6    athletic men's water polo in the amount of $100,000.
 7    Maintaining state-of-the-art facilities is an essential part of
 8    USC's commitment to excellence.  Through your contribution, you
 9    are helping the University achieve this important goal.
10              "On behalf of the young student athletes that will
11    benefit from your anonymous gift, thank you.
12              "Fight on!
13              "Ron Orr."
14              Was it your practice if you received gift notices or
15    documents referring to gifts or contributions in the range of
16    $100,000 you would look at them in the accounting books and
17    check them?
18    A.   Yes.
19    Q.   And if you had found this and found that had it been
20    booked as a business consulting instead of a charitable
21    contribution, would you have raised it with Debbie?
22    A.   Yes.
23    Q.   And because you never got this letter, you never had the
24    reminder to raise it with Debbie, fair to say?
25    A.   Yes.
```

```
 1   Q.    Okay.

 2              I'd like to show you next Exhibit 9776.

 3              Do you recognize that document?

 4              MR. KENDALL:  For the witness only.

 5   A.    I do.

 6   Q.    And what is it?

 7   A.    These are my notes that I make while preparing the books

 8   and tax return for Hyannisport Capital.

 9              MR. KENDALL:  I'd like to offer this into evidence,

10   your Honor.

11              MS. KEARNEY:  No objection.

12              THE COURT:  It will be admitted without objection.

13              (Exhibit 9776 received into evidence.)

14              MR. KENDALL:  If we could show the jury Exhibit 9976.

15   BY MR. KENDALL:

16   Q.    I take it it's your handwriting?

17   A.    Yes, it is.

18   Q.    Did they teach you in CPA school to have such fine, small

19   handwriting?

20   A.    No, it came to me somehow.

21   Q.    And is this a list of tasks that you made for yourself to

22   follow up on after looking at the books and records that had

23   been sent over to you by Debbie?

24   A.    That's correct.

25   Q.    And I can see there's checks -- we can see there's checks
```

1    on some of the numbers or lines drawn through them.  Is that

2    you marking taking care of that task?

3    A.   My system has changed over the years.  That may have meant

4    that I asked Debbie for those documents.

5    Q.   Okay.  I want to you take a look now at Exhibit 122,

6    please, which is already in evidence.

7         Now, this is an e-mail from Mr. Wilson to Debbie

8    Rogers on July 2014.  It's just a couple of months after the

9    date of those invoices you were shown for consulting.

12:46 10       MR. KENDALL:  I want to go to the bottom of this

11   document, if we can, Mr. Carter.

12   Q.   And you see "big incomes" there.

13        MR. KENDALL:  Can we do the next three lines?

14   Q.   DGS net sales $2 million, Franklin $440K, Staples $800K

15   with bonus.

16        "DGS net sales," is that the LLC or whatever it is

17   that HPC owns?

18   A.   I believe that's what it's referring to.

19   Q.   And what is Franklin $450,000?  Was that a response -- was

12:46 20   that a board membership Mr. Wilson had?

21        MS. KEARNEY:  Your Honor, I'm going to object to this

22   line of questioning.  This witness is not on this e-mail and he

23   has testified he did not prepare Mr. Wilson's personal tax

24   returns to have a foundation for this.

25        MR. KENDALL:  Your Honor, I need two questions.

1           Just simply --

2           THE COURT:  If he knows, he can answer.

3    BY MR. KENDALL:

4    Q.   Do you know if Mr. Wilson had some involvement with the

5    Franklin Templeton Funds as a board member?

6    A.   Yes, I was aware of that.

7    Q.   And you know he worked at Staples, correct?

8    A.   Yes.

9    Q.   So if we do the math there, basically a little bit less

12:47 10   than two-thirds of his big income is in DGS net sales, correct?

11   A.   Correct.

12   Q.   Which is captured within HPC, correct?

13   A.   Yes.

14   Q.   So when he is writing -- or he's transferring money for

15   $100,000 checks to various things, that's the largest source of

16   cash he appears to have available, correct, something in HPC?

17           MS. KEARNEY:  Objection, your Honor.

18           THE COURT:  Sustained.

19   BY MR. KENDALL:

12:48 20   Q.   Okay.  I'd now like to go to your work papers, Exhibit

21   134, please.

22           And there is the exhibit you just went through with

23   Ms. Kearney.  Do you remember that?

24   A.   Yes.

25           MR. KENDALL:  Mr. Carter, I'd like to go to page 3

1   where that fine print is again.

2          And if we could go to the middle of the page where it

3   says "gross profit expenses," and blow that up a bit so that we

4   can read it.

5          And if you could raise that.

6   Q.   It says "gross profit" at the top, and then if we drop

7   one, two, three, four, five lines down, it says "consulting

8   general business $120,000," correct?

9   A.   Yes.

12:48 10   Q.   Okay.  So that's the $120,000 expense that was booked as a

11   general business expense.

12          If, in fact, that was a charitable contribution, that

13   should be lowered down on this list but under -- still under

14   "expense," correct?

15   A.   On the company's books, yes.

16   Q.   Okay.

17          MR. KENDALL:  If we could go further back down this

18   list, and if you just go a little bit lower and just do that

19   next section.

12:49 20          And if we see here -- it's hard to -- you see "total

21   DGS expenses" and under that "donations," correct?

22   A.   Correct.

23   Q.   So if that was a charitable contribution and not a

24   business expense, that 169 would go down by 120,000 and

25   donations would go up by 120,000, correct?

1    A.   I'm not sure the consulting is included in that 169.

2    Q.   You know what, you're absolutely right.  I'm sorry about

3    that.

4         Let's go up a little higher.  I appreciate you

5    pointing that out.

6         If we take a look here, the total consulting of 133,

7    that would go down 120,000 and then the donations would go up

8    120,000, correct?

9    A.   Could you repeat the question as you started it?

12:50 10   Q.   If we see where it says "consulting general business

11   120,000" --

12   A.   Yes.

13   Q.   -- if that was improperly or incorrectly booked and it

14   really is a charitable contribution, that total consulting

15   number should go down by 120,000, correct?

16   A.   Correct.

17   Q.   And the donations should go up by 120,000.

18   A.   Correct.

19   Q.   Okay.  Now, these numbers carry over to the personal tax

12:51 20   return, correct?

21   A.   Right.

22   Q.   So what it would mean on the tax return is that the income

23   number would go up by $120,000 because you reduce the loss by

24   $120,000, correct?  Taxable income would go up 120,000?

25   A.   Yes.

```
 1    Q.   But then, on the Schedule A for charitable contributions,
 2    the deductible charitable contribution would go up $120,000,
 3    correct?
 4    A.   Yes.
 5    Q.   So what you're doing is you're increasing -- when do you a
 6    tax return, it's a series of computations, correct?
 7    A.   Yes.
 8    Q.   You add things, you subtract things, you multiply things,
 9    and you do these computations so you get the final number,
10    correct?
11    A.   Yes.
12    Q.   So what we're talking about here is the income number
13    should have been a little higher in the beginning, but if it's
14    a charitable contribution, the deduction is bigger towards the
15    end, correct?
16    A.   Yes.
17    Q.   And they're both by the same gross number of $120,000,
18    correct?
19    A.   Yes.
20    Q.   But you can't tell what impact it will have on the
21    computation until you know all the numbers, correct?
22    A.   Yes.
23    Q.   So if I were -- no person in March of 2014 could predict
24    if those numbers move, would you save money or not save money
25    on your taxes because you need all the numbers at year end to
```

1    do the calculation, correct?

2           MS. KEARNEY:  Objection as to what someone could

3    predict.

4           THE COURT:  Yes, that part is sustained.

5    BY MR. KENDALL:

6    Q.   In order to calculate if you could have had any positive

7    impact by putting a charitable contribution as a business

8    deduction, what numbers would you need to do the calculation?

9    A.   What impact it would have on the individual return?

10   Q.   Yes, on the person's 1040.

11   A.   You would need all items of income and deductions for that

12   year.

13   Q.   And are those numbers available in March of 2014?

14   A.   No.

15   Q.   Okay.  I'd like to go to in the same exhibit to Bates --

16   the Bates number ending 3407.

17          It's a long exhibit.

18          3407, please.

19          Perfect.

20          Okay.

21          Could you tell us what is this "W-1"?

22          I take it that's your handwriting.

23   A.   Yes, that's just a reference number, a sequence number for

24   the work papers.

25   Q.   Okay.  And this is a list of the donations that were put

1   down for Hyannisport Capital.  One is the Menlo School for

2   $35,000.

3   A.   Right.

4   Q.   Do you know that to be where Johnny went to high school?

5   A.   I did know that.

6   Q.   Okay.  Then it says Society For the Preservation of Theta

7   XI at RPI.  Do you understand "RPI" is Rensselaer Polytechnic

8   Institution?

9   A.   I'm not aware of that.

12:54 10   Q.   You're not aware it's Mr. Wilson's college?

11            Okay.  But there's a $10,000 donation there.

12            And then there's the $100,000 to The Key Worldwide,

13   and then there's $50,000 for Autism Speaks.

14            And if, in fact, that $120,000 business consulting was

15   a mistake and a true charitable donation, we would have

16   included it here, correct?

17   A.   Yes.

18   Q.   Okay.

19            Now, that letter I showed you earlier, the letter that

12:55 20   said, Thank you for the $100,000 to USC, that did not have that

21   language, no goods or services were delivered or no goods or

22   services were exchanged.

23            Are you familiar that sometimes charities give that

24   language in a separate document, not in the thank you note

25   itself?

```
 1    A.    Yes.
 2    Q.    They can do it any way they want, correct -- strike that.
 3          They can put them all in one document or they can
 4    separate them in two documents.
 5    A.    I've seen them in two documents, yes.
 6    Q.    So if a person were to get a thank you note without that
 7    language, it wouldn't necessarily be alarming because the
 8    charity may just be sending a separate document.
 9    A.    That's possible.
12:56 10    Q.    But you'd have to run it down when you're doing the tax
11    returns.
12    A.    Correct.
13    Q.    Okay.  Now, if we could go to the next page, please.
14          We see that's a March 6 letter to the Wilsons from the
15    Menlo School.  And it says, "Thank you so much for your recent
16    gift of $35,000 through Discovery Gateway Spectrum II LLC to
17    Menlo School."
18          This is on the HPC return, but the $35,000 came out of
19    DGS II which we saw had the $2 million, correct?
12:57 20    A.    That's what it indicates in the letter.
21    Q.    Okay.  And if we look at the bottom of this letter, it has
22    that language: "For tax purposes we acknowledge no goods or
23    services."
24          So they put it all in one document, correct?
25    A.    Yes.
```

```
 1              MR. KENDALL:  Now, if we could go over two pages,
 2   Mr. Carter, to the Bates ending 3410 -- Denise McAdoo there.
 3   Q.   Now, I want to go to the middle of that page.
 4              You see there it says, "Wilson documentation."  And
 5   this relates to the $35,000 amount from the -- that was given
 6   to the Menlo School.
 7              Actually, let's go to the top so we can see the top of
 8   the e-mail, it's the Menlo School.
 9              You see that, it's Denise McAdoo of the Menlo School
12:57 10  talking about Wilson documentation for the gift, correct?
11   A.   Yes.
12   Q.   Now, could we go to the bottom of that page, and look at
13   that line right there.
14              It says, "Debbie, the last installment was made on
15   2/12/13.  No payments have been received in 2014."
16              Based upon your 40-plus years or around 40 years as a
17   CPA, is there anything inappropriate about referring to a
18   charitable contribution as a payment?
19   A.   Not in an e-mail like this.
12:58 20  Q.   Okay.  It's just the monies got to go from one person to
21   another place for the charitable contribution, correct?
22   A.   Say that again?
23   Q.   "Payment" just means you're giving them the money,
24   correct?  It means it's common understanding, correct?
25   A.   If you're using the term that way.
```

```
 1    Q.   Okay.

 2    A.   I could understand it.

 3    Q.   If we could go to the top of the next page, please.

 4         And if we look there it says, February 28, 2014 where

 5    Debbie writes to the person at the Menlo School, "Hi Denise,

 6    before I send the $35,000 I want to make sure there have been

 7    no payments received this year."

 8         Did I read that correctly?

 9    A.   Yes.

10    Q.   Okay.

11         And if we drop down to the next e-mail message, going

12    back and forth where she writes, "Going back and forth with

13    John this morning, he seems to think he made a payment this

14    year, can you double check.  I just want to be sure we have all

15    payments towards this commitment accounted for."

16         Did you see that?

17    A.   Yes.

18    Q.   Okay.

19         MR. KENDALL:  If you could turn the next e-mail,

20    please, and go down to the next page, actually, Mr. Carter.

21    Right there.

22    Q.   It says, "Good morning, Denise" -- and again, they're

23    using the word "payment" and "payable" for a charitable

24    donation, correct?

25    A.   Yes, they are.
```

```
 1              THE COURT:  All right.  We're going to break for lunch
 2     at this stage.
 3              You may step down for the time being, Mr. Nahmes.
 4              We'll be in recess for one hour, jurors.  I'll ask you
 5     to return then.
 6              THE CLERK:  All rise for the jury.
 7              (Jury left the courtroom.)
 8              THE COURT:  Be seated, counsel.
 9              You may step down, Mr. Nahmes, for the time being.
10              THE WITNESS:  Thank you.
11              THE COURT:  How much longer on cross, Mr. Kendall?
12              MR. KENDALL:  I'd guess, your Honor, 25 to 40 minutes,
13     somewhere in that range.  I've got to flip through my notes,
14     but I'm more than halfway through.
15              THE COURT:  All right.  And then we are going to go to
16     Mr. Masera; is that right?
17              MS. KEARNEY:  Mr. DeMaio.
18              THE COURT:  All right, Mr. DeMaio.  Then we will not
19     get through his testimony this afternoon.
20              MS. KEARNEY:  I don't think so.
21              THE COURT:  Is there anything else that needs to come
22     to my attention before we recess?  If not, we are in recess
23     until 2:00.
24              THE CLERK:  All rise.
25              (Recess taken 1:02 p.m. to 2:05 p.m.)
```

```
 1            THE CLERK:  Thank you.  You may be seated.  Court is
 2   now in session.
 3            THE COURT:  Good afternoon, jurors.  We're ready to
 4   pick up again.
 5            Mr. Nahmens, you're reminded that you remain under
 6   oath.
 7            Mr. Kendall, you may continue with cross-examination.
 8            MR. KENDALL:  Thank you, your Honor.
 9   BY MR. KENDALL:
10   Q.   Mr. Nahmens, I want to continue going through Exhibit 134,
11   your work papers.  Just to clarify a couple of points, if you
12   had gotten that thank you letter from USC at the time you were
13   putting together these work papers, you would have raised it
14   with Debbie, correct?
15   A.   Would have raised?
16   Q.   If you got that letter that said thank you for the
17   $100,000, you would have said something to Debbie, correct, and
18   to ask her to explain to you what it was for and figure out
19   what it was for?
20   A.   Yes.
21   Q.   Okay.  And would it be fair to say Debbie is the one who
22   did all of the Quickbooks classifications?  John wasn't there
23   putting in the entries to Quickbooks.
24   A.   That's my understanding.
25   Q.   Yeah.  And when you would send back corrections for the
```

1   Quickbooks, you'd send them to Debbie for her to adopt,

2   correct?

3   A.   Yes.

4   Q.   As a general practice for forwarding your paperwork and

5   e-mails and receipts, that was Debbie, correct?

6   A.   Mr. Wilson forwarded me e-mails as well, from time to

7   time.

8   Q.   Excuse me.  Let me take back e-mails.  Receipts,

9   documents, backup accounting detail.

02:07 10  A.   Yes.

11   Q.   That would be Debbie, correct?

12   A.   Yes.

13   Q.   John wasn't in Amsterdam at Staples headquarters e-mailing

14   you a receipt for a $500,000 charitable contribution?

15   A.   That's correct.

16   Q.   I'd like to show you exhibit --

17        MR. KENDALL:  If we can put up Exhibit 118 for a

18   minute.  It's already in evidence.

19   Q.   I want to show you -- this is an e-mail you've never

02:07 20  received, but it's in evidence.  This is from Rick Singer, the

21   man who got that $20,000 that you discussed doing the tax form

22   for.

23        MR. KENDALL:  If we can go up to the middle of it.

24   Q.   It says -- in the middle, we see Rick Singer, April 10th,

25   at 2:14 p.m.  He says, "I think the money that came was from

1    Wilson's?  Did we charge both extra 20 for expenses?" I think

2    it's supposed to say, "If so great, if not fine, too".

3           If you had been informed that that $20,000 payment

4    that was eventually sent to Rick Singer was supposed to cover

5    expenses of the Key Foundation, would that be an appropriate

6    thing to put down as a donation?  If you're going to pay the

7    expenses of a 501(c)(3) organization.

8    A.   You're saying would it make a valid charitable

9    contribution?

02:09 10   Q.   Yes.

11   A.   If it met the IRS standards for such.

12   Q.   Sure.  You know, you see when you make a contribution to

13   somebody by credit card, they sometimes say could you pay an

14   extra $5 to cover the credit card expense.  Are you familiar

15   with that?

16   A.   Yes.

17   Q.   There's nothing wrong with, in addition to your donation,

18   to pay part of the expenses of the charity as well to help

19   cover their overhead?

02:09 20   A.   Nothing wrong with that.

21   Q.   Thank you.

22          I'd like to go back then into Exhibit 134.  And let's

23   go further to past where we were to the bates ending in 3416.

24   You see here there's a -- do you recognize this from your work

25   papers?  You see the W-10 up at the top?

1    A.   Yes.

2    Q.   Okay.  Now, if we go to the top, it says "for good and

3    valuable consideration."  It says the Theta Xi Association of

4    Troy, New York.  Are you aware that Rensselaer Polytechnic

5    Institute is in Troy, New York?

6    A.   No.

7    Q.   Okay.  Well, whatever it is.  This is a bill from a

8    charitable organization using the word "payable", correct?

9    A.   Yes.

02:10 10            MR. KENDALL:  And if we go to the bottom of this page,

11   Mr. Carter, to the left side.

12   Q.   It says "make checks payable" and for a tax-deductible

13   purpose, correct?

14   A.   Yes.

15   Q.   Now, if we could go flip one, two pages, actually,

16   three pages, please, to receipt of the letter from The Geier

17   Group.  You see The Geier Group.  It's dated December 12, 2014.

18   "Dear John, I want to personally thank you for your generous

19   gift of $50,000 to Autism Speaks".

02:11 20            Now, if we look at this letter in its entirety,

21   there's no language that says no gifts or services.  Do you see

22   that?  No gifts or services were provided in exchange?

23   A.   Correct.

24   Q.   So that's an example of a thank you letter for a

25   charitable contribution that doesn't have the language,

1    correct?

2    A.    It's -- it's a -- yes, a thank you letter.

3    Q.    Okay.  And it's the response -- and under the Internal

4    Revenue Code, it's the responsibility of the charity to send

5    the letter saying whether there are no goods or services

6    exchanged, or what's the value of the goods and services

7    exchanged?

8    A.    Yes.

9    Q.    So, for example, if -- let's say the Cancer Society is

02:12 10    having a fundraiser dinner and it's $1,000 a ticket and it's at

11    a very fancy restaurant where the meal costs $100, they're

12    going to send a receipt saying, you gave us $1,000, but the

13    cost of your meal was $100, so your donation was $900, correct?

14    A.    Right.

15    Q.    And the Internal Revenue Code puts the obligation to send

16    that notice on the charity receiving the donation, correct?

17    A.    Yes.

18    Q.    Now --

19    A.    Let me restate.  I'm not sure it's the Internal Revenue

02:13 20    Code, but it could be the regulations.

21    Q.    Thank you very much.  The regulations is sort of another

22    part of the IRS.

23    A.    Yes.

24    Q.    I appreciate the clarity.

25              Now, anywhere -- and they have to put a value on the

1    meal, correct?

2    A.    Correct.

3    Q.    They have to do a market value, like you know, that's what

4    it is on their menu so they know it's $100?

5    A.    Yes.

6    Q.    Or they have to look at a comparable transaction if there

7    isn't a market price?

8    A.    Correct.

9    Q.    Is there anywhere in these work papers a deduction for the

02:13 10   rental expense of HPC's headquarters?

11    A.    I would have to go back through it, but my recollection is

12    that for this year it was not.

13    Q.    Okay.  Didn't John raise that issue with you, whether or

14    not he could take a deduction for the rent?

15    A.    He raised it to Debbie, who forwarded me that request.

16    Q.    Okay.  And you -- can you tell us what happened on that

17    issue of the rent for the 2014 year?

18    A.    The best I recall, I responded that -- initially, that it

19    would be possible to have a reimbursement arrangement whereby

02:14 20   the corporation would reimburse a portion of the rent that

21    applied to the office.

22    Q.    John never followed up in pursuing rent for HPC, correct?

23    A.    Not that I was aware of.

24    Q.    For '14, '15 and '16 when they were renting the Atherton

25    house, correct?

1    A.    Not that I recall.

2    Q.    Okay.  I want to now turn to the last page, I think we're

3    going to cover in Exhibit 134.  Could we go to the bates ending

4    in 3434.  It says "Hyannis Port Capital, Inc. Journal".

5          MR. KENDALL:  If we could turn that around.  Thank

6    you, Mr. Carter.

7    Q.    What does this document show?

8    A.    These are the journal entries that I made to, as we

9    discussed before, to clean up the books.

02:15 10   Q.    These are corrections you're making in Debbie's entries or

11   bookings of various transactions?

12   A.    It's beyond that.  Some of them are corrections.  Some of

13   them are entries to record transactions that are more technical

14   than would be recorded, you know, just recording transactions

15   from a bank account or a credit card.

16   Q.    Okay.  If we could go to the next page, 2, these are more

17   of those corrections we just discussed?

18   A.    Yes, corrections and original entries.

19   Q.    Okay.  If I were to suggest to you they count up to about

02:16 20   61 lines in those two pages, would that seem reasonable to you?

21   A.    Well, that seems somewhat close.

22   Q.    And are these the type of corrections or additional

23   entries you would recommend each year?

24   A.    Yes.  They -- they tend to be similar from year to year.

25   Q.    And if you had discovered that they had booked a -- they

1    had booked a charitable deduction mistakenly as a business

2    deduction, would that have been sort of reclassified in these

3    pages?

4    A.    Most likely.

5    Q.    If we can take a look at Exhibit 164.  I'm not sure if

6    that's -- maybe we don't need an exhibit.

7          Who would you send the tax returns to, to Debbie,

8    didn't you?

9    A.    For signature?

02:17 10    Q.    Yes.

11    A.    Yes.

12    Q.    Okay.  And then she'd arrange it with John to get it done?

13    A.    To sign and e-file.

14    Q.    Sign and take care of them.

15          Now, the last thing I want to cover with you, it's

16    only going to take us a couple of minutes is, in 2018, John

17    contacted you about the million dollars he was donating to the

18    Key Foundation, correct?

19    A.    It was either John or Debbie contacted me.

02:17 20    Q.    Yeah.  But they e-mailed you wanting your tax advice and

21    then that issue was really referred over to Mr. DeMaio,

22    correct?

23    A.    They didn't want my tax advice about the contribution

24    itself.  It was, I believe -- if I remember correctly, it was a

25    technicality related to the receipt, the acknowledgment.

```
 1              MR. KENDALL:  Okay.  If I may have just one moment,
 2     your Honor.
 3              THE COURT:  Yes.
 4              MR. KENDALL:  Thank you, your Honor.  No further
 5     questions.
 6              THE COURT:  Mr. Kelly.
 7              MR. KELLY:  No questions.
 8              THE COURT:  Miss Kearney, any redirect?
 9              MS. KEARNEY:  Yes, your Honor.
10                    REDIRECT EXAMINATION OF JAMES NAHMENS
11      BY MS. KEARNEY:
12     Q.   Good afternoon, Mr. Nahmens.
13     A.   Good afternoon.
14     Q.   During his questioning, Mr. Kendall asked you whether
15     Hyannis Port Capital had a practice to make donations.  Do you
16     remember that question?
17     A.   I'm not sure those were the exact words, but there was a
18     question similar to that.
19     Q.   Do you recall that Hyannis Port Capital had made no
20     charitable contributions in 2013?
21     A.   I don't recall specifically.
22     Q.   Would it refresh your recollection to look at the 2013
23     return?
24     A.   Yes.
25              MS. KEARNEY:  May I approach, your Honor?
```

```
 1              THE COURT:  Yes.
 2    Q.    Mr. Nahmens, I handed you the 2013 Hyannis Port Capital
 3    return.  Do you want to take a minute to look at that?
 4    A.    With regard to the charitable contributions?
 5    Q.    Yes, please.
 6    A.    Okay.
 7    Q.    Having looked at that return, is your memory refreshed as
 8    to whether Hyannis Port Capital had any charitable
 9    contributions in tax year 2013?
02:21 10   A.    It appears there were none.
11    Q.    And then do you recall whether Hyannis Port Capital had
12    any charitable donations in 2015?
13    A.    I do not recall.
14    Q.    Okay.  In front of you is the 2015 tax return.  Do you
15    want to take a look at that and see if that refreshes your
16    recollection as to whether Hyannis Port Capital had any
17    charitable donations in 2015?
18    A.    It appears not.
19    Q.    Do you recall whether Hyannis Port Capital had only
02:22 20   $10,000 worth of donations in 2016?
21    A.    No.
22    Q.    Would it refresh your recollection to look at the 2016
23    return that's also in front of you?
24    A.    Yes.
25    Q.    Could you take a look at that and see if looking at the
```

1   2016 return refreshes your recollection as to whether Hyannis

2   Port Capital had only $10,000 in donations in 2016?

3   A.   Yes.   That's correct.

4   Q.   And do you recall whether Hyannis Port Capital had any

5   charitable donations in 2017?

6   A.   I do not.

7   Q.   Would it refresh your recollection to look at the 2017

8   return?

9   A.   Yes.

02:22 10   Q.   And that is also in front of you.

11   A.   It appears there is none.

12   Q.   Mr. Nahmens, Mr. Kendall asked you a number of questions

13   about a letter from USC regarding a $100,000 donation?

14   A.   Yes.

15   Q.   And he suggested that you sometimes had to work with

16   Miss Rogers to get tax receipts cleared up?

17   A.   Yes.

18        MS. KEARNEY:   Miss Lewis, if we can pull up

19   Exhibit 134 in evidence, and go to page 96.

02:23 20   Q.   Mr. Nahmens, was there anything to clear up about that

21   $100,000 payment, given that you had a copy of an invoice that

22   corresponded to that payment?

23   A.   No.   Based on the document that I've seen, I've got it

24   documented as showing an expenditure on the books.

25        MS. KEARNY:   And if we can look at page 95,

1    Miss Lewis.

2    Q.   Mr. Nahmens, was there anything to clear up given that you

3    had a copy of an invoice that corresponded to a $20,000 payment

4    to Rick Singer?

5    A.   No.  Same as the other one.  I forgot to mention the 1099

6    miscellaneous issue, that that was something that I believe

7    once I saw these it reminded me of that as well.

8    Q.   Once you saw the invoices, it reminded you --

9    A.   I can't remember if it was when I saw these invoices or I

02:24 10   saw the expenditure on the general ledger.  It was one or the

11   other most likely.

12   Q.   And would you have completed 1099s for charitable

13   donations?

14   A.   No.

15   Q.   Let's look at Exhibit 134 on page 3.  If we can blow up

16   under the "Expense" category, Miss Lewis.

17          Mr. Nahmens, Mr. Kendall asked you a number of

18   questions about whether or not the consulting fees had been

19   reduced and the donations had been increased, it would all wind

02:25 20   up under expenses, correct?

21   A.   The way I remember the question is -- yes, that's correct.

22   It would be an expense of the corporation on the books.

23   Q.   But what is the -- let me rephrase that.

24          If an amount was moved from consulting to donations,

25   those donations could not be taken as business expenses on the

1    tax return, correct?

2    A.    Correct.  I was just stating that they would be

3    reclassified on the books.

4    Q.    And is it -- is there any difference between reporting a

5    deduction as a business expense versus a charitable donation?

6    A.    Yes.

7    Q.    What's that difference?

8    A.    The business expenses go into the calculation of ordinary

9    business income, whereas the charitable contributions are

02:26 10    considered what's called a separately stated item and are

11    reported separately from the net business income.

12    Q.    They're reported on a Schedule A of itemized deductions?

13    A.    Once they get to the individual return, yes.

14    Q.    And business expenses are, fair to say, 100 percent

15    deductible from income?

16    A.    Generally.

17    Q.    Are there limits on itemized deductions?

18    A.    Yes.

19    Q.    Such that once the taxpayer surpasses a certain limit,

02:27 20    deductions for expenses above that amount are phased out?

21    A.    In certain years that was true.

22    Q.    And in March of -- or April of 2014, a taxpayer would

23    understand that a business expense would be a hundred percent

24    deductible, but wouldn't yet know whether a charitable

25    deduction would be 100 percent deductible?

            1           MR. KENDALL:  Objection.

            2           THE COURT:  Overruled -- well, what's the objection?

            3           MR. KENDALL:  Speculation.  A taxpayer would know?

            4    Who knows what taxpayers know, your Honor?

            5           THE COURT:  Well, to the extent he has expertise, I'll

            6    let him answer that.

            7    A.   I believe some taxpayers would know.  Others would not.

            8    Q.   Mr. Kendall asked you some questions about making a

            9    payment to Mr. Singer and being able to deduct that as a

02:28  10    charitable donation.  Do you recall those questions?

           11    A.   Somewhat.

           12    Q.   Is there a difference between sending funds to a private

           13    entity or a private person compared to sending funds to a

           14    501(c)(3) charity?

           15    A.   Yes.

           16    Q.   Are you -- in your experience, your 40 years of

           17    experience, have you ever had a client who tried to take a

           18    charitable deduction for a payment to an individual?

           19    A.   Not that I recall.

02:28  20           MS. KEARNEY:  Miss Lewis, can we pull up Exhibit 134

           21    again.  And if we can go to I think it's around 97.  We can

           22    actually go a few more pages down, please.  Keep going.  Keep

           23    going.  Right here.

           24           And Miss Lewis, can you blow up the bottom where it

           25    says "Make checks payable to".

```
 1   Q.   Mr. Nahmens, do you see here that checks made to the
 2   Society for the Preservation of Greek Housing were considered
 3   tax-deductible, whereas payments to the Theta Xi Association of
 4   Troy, New York are non tax-deductible?
 5   A.   I see that.
 6   Q.   Is it your understanding that the difference there is one
 7   of those payments would be made to a 501(c)(3), whereas the
 8   other would be made to a private entity?
 9   A.   I would assume the one that says tax deductible is to a
10   501(c)(3).  I don't know about the other one.
11            MS. KEARNEY:  Miss Lewis, if we can go two pages above
12   that.  Excuse me, three pages above that.
13   Q.   You see here, Mr. Nahmens, there was a thank you letter
14   received from the Society for the Preservation of Greek
15   Housing?
16   A.   Yes.
17   Q.   And this letter includes that language you were talking
18   about earlier that no goods or services were provided in return
19   for the gift?
20   A.   Correct.
21            MS. KEARNEY:  And Miss Lewis, if you'd go to the next
22   page.
23   Q.   There is a separate thank you letter for that same
24   donation and here there's actually an indication the foundation
25   will provide an acknowledgment for tax receipt purposes?
```

02:29 10

02:30 20

```
 1   A.   I see that.
 2   Q.   And is it your experience that entities that receive
 3   donations often send a thank you letter and sometimes a
 4   separate gift receipt for tax purposes?
 5   A.   That does happen.
 6        MS. KEARNY:  And if we can go, Miss Lewis, a few pages
 7   down to the letter from The Geier Group that Mr. Kendall showed
 8   you.
 9   Q.   Do you recall looking at this, Mr. Nahmens?
10   A.   I'm sorry.  What?
11   Q.   Do you recall looking at this letter with Mr. Kendall?
12   A.   Yes.
13   Q.   And this appears to be a thank you letter.  It does not
14   include that language about whether goods or services were
15   exchanged.  Do you see that?
16   A.   Yes.
17   Q.   So it does not include that language, correct?
18   A.   Correct.
19        MS. KEARNEY:  And Miss Lewis, if we go up one page.
20   If we can make sure we get the bottom of the letter, please,
21   Miss Lewis.
22   Q.   Do you see that this letter also concerns that same
23   donation, but includes the tax receipt language that no goods
24   or services were exchanged, correct?
25   A.   Yes.
```

```
 1    Q.   Mr. Kendall asked you some questions about a potential

 2    reimbursement arrangement for Hyannis Port Capital's office

 3    space?

 4    A.   Yes.

 5    Q.   And you don't prepare Mr. Kendall's -- excuse me --

 6    Mr. Wilson's personal tax returns, correct?

 7    A.   That's correct.

 8    Q.   And you don't know what his personal tax advisers advised

 9    him with respect to any deduction for the office space,

10    correct?

11    A.   There was a discussion at one time about it, but it had

12    been for prior years.

13              MS. KEARNEY:  Miss Lewis, can you pull up Exhibit 710,

14    which is in evidence.

15    Q.   Mr. Nahmens, I understand you're not on this e-mail.  Do

16    you see in the bottom e-mail from John Wilson, he writes,

17    "Rick, thanks again for making this happen!  Please give me the

18    invoice.  What are the options for the payment?  Can we make it

19    for consulting or whatever from the Key, so that I can pay it

20    from the corporate account?"

21              Do you see that?

22    A.   Yes.  I see that.

23    Q.   And if you look at the e-mail above, there's a response

24    from Rick Singer.  He says, "Yes.  We can send you an invoice

25    for business consulting fees and you may write-off as an
```

1   expense.  What is the name, address, et cetera that you want

2   the invoice to be made out to?"

3            Do you see that?

4   A.   Yes.

5   Q.   And Mr. Wilson responds, "R awesome!"  And then he

6   provides the name and address for Hyannis Port Capital.  Do you

7   see that, Mr. Nahmens?

8   A.   Yes.

9   Q.   Does this e-mail look like a charitable contribution being

02:34 10   discussed?

11            MR. KENDALL:  Objection, your Honor.

12            THE COURT:  Sustained.

13   Q.   Mr. Nahmens, had you seen this e-mail in preparing the

14   2014 tax returns, would you have asked questions about those

15   payments?

16   A.   Give me a moment to read it again.

17            Honestly, it's tough to say what I would have done

18   under those circumstances.  I would have to give that some

19   further thought.

02:35 20   Q.   Mr. Nahmens, I just want to point one other thing out on

21   this document.  Do you see the subject line there?

22   A.   I do.

23   Q.   It says "USC fees".  Do you see that?

24   A.   Yes.

25   Q.   And Mr. Kendall asked you a number of questions about

1    using the word "payment", but in your experience do you refer

2    to donations as "fees"?

3            MR. KENDALL:  Objection, your Honor.

4            THE COURT:  Overruled.

5    A.    I do not.

6    Q.    And Mr. Nahmens, can a taxpayer deduct a payment to his

7    son's college counselor as a business expense?

8    A.    No.

9            MS. KEARNEY:  Thank you.

02:35 10            THE COURT:  Recross, Mr. Kendall.

11            MR. KENDALL:  Yes, your Honor.

12              RECROSS-EXAMINATION OF JAMES NAHMENS

13    BY MR. KENDALL:

14    Q.    I just want to go through a few things.  If Debbie is

15    transferring amounts of, let's say, $100,000 or more out of the

16    HPC, proper accounting or proper bookkeeping would be to have

17    some type of invoice for the amount, correct?  You just don't

18    send a $100,000 bank transfer without an invoice, correct?

19    A.    Correct.  Assuming it's for an expenditure, yes.

02:36 20    Q.    Okay.  And if Mr. Singer is saying, I'm going to be the

21    delivery boy for the $100,000 donation to USC, send me the

22    $100,000, I'll buy the bank check and I'll drop it off to them,

23    the charitable thank you is going to come sometime after that

24    $100,000 is transferred out of HPC, correct?

25    A.    An acknowledgment would follow a payment.

1    Q.   And you -- the document that Miss Kearney just showed you

2    is Mr. Wilson saying, consulting or whatever, correct?

3    A.   That's what that document said.

4    Q.   He's indifferent, consulting or whatever.  He needs a

5    receipt for Debbie to make the transfer, correct?

6         MS. KEARNEY:  Objection, your Honor, as to what

7    Mr. Wilson.

8         THE COURT:  Sustained.

9    Q.   The language he uses is "consulting or whatever", correct?

02:37  10    A.   That's what was on that e-mail.

11    Q.   And it gives an invoice just so Debbie knows where to send

12    the $100,000, correct?

13    A.   Was it $100,000 or?

14    Q.   It was $100,000 even.

15    A.   Okay.

16    Q.   And then, a few months later, USC sends a thank you note

17    for the donation, correct?  That was the letter I showed you.

18    It came in July.

19    A.   You did show that to me.

02:38  20    Q.   And then, if you, yourself, checked the IRS website to

21    make sure that The Key Foundation was a recognized certified

22    charity, correct?

23    A.   I did.

24    Q.   And if the head of an IRS approved and certified charity

25    says, can you make another $20,000 contribution to cover the

1    expenses of the foundation, that, too, can be a charitable

2    donation, correct?

3          MS. KEARNEY:  Objection, your Honor.  It's assuming

4    facts not in evidence.

5          THE COURT:  Sustained.

6    Q.   A $20,000 donation to cover the expenses of an IRS

7    approved charity is also a donation, correct?

8    A.   Assuming it makes -- it meets IRS standards.

9    Q.   And if you do it as a cash contribution, or as a noncash

02:39 10   contribution, they're both tax deductible, correct?

11   A.   Yes.

12   Q.   And a cash contribution would be to, say, to the charity,

13   here's $20,000, I'm donating it to the charity.  That's a cash

14   contribution, correct?

15   A.   Right.

16   Q.   And if you also go to the head of the foundation and say,

17   here's $20,000 to cover the expenses, I assume you'll take care

18   of it to pay the bookkeeper, to pay whatever, that could be a

19   non-cash contribution, correct?

02:39 20         MS. KEARNEY:  Objection.  Misstates the evidence.

21         THE COURT:  Sustained.

22   Q.   A $20,000 payment to the head of a foundation to buy

23   resources, you know, personnel, supplies, whatever, for the

24   expenses of the foundation can be a non-cash contribution,

25   correct?

1    A.   A payment to the head of the organization, or a payment to

2    the organization?

3    Q.   If you give the head of the organization $20,000 to go out

4    and buy the -- to go out and buy the resources for the place.

5    We don't have a car.  We don't have paper.  We don't have

6    computers.  I'll pay for the computers for the foundation.

7    Here's the cash.  Go get them.

8             MS. KEARNEY:  Objection.

9    Q.   That's a non-cash contribution?

02:40 10          THE COURT:  If he understands it as an expert in that

11   area, I'll allow him to answer.

12   Q.   That's a non-cash contribution, correct?

13   A.   You're saying a payment to the head of an organization?

14   Q.   No.  Let me correct it.  If the person says, I will pay

15   for the computers of the organization, I'll pay for the

16   secretarial help, here is the money, you can go buy them with

17   my money and it's my contribution to the organization, I'm

18   paying for the expenses of the organization, can that be a

19   contribution?

02:40 20   A.   By making a charitable contribution to the organization.

21   Q.   Yes.  Fair enough.

22             And all the documents you had about the $20,000 to

23   Mr. Singer and requiring tax stuff, that was all e-mails for

24   Debbie Rogers.  It wasn't with John Wilson, correct?

25   A.   That's correct.

```
 1   Q.   The last issue.  There's -- I want to clarify the home
 2   office issue that Miss Kearney just raised with you.  There was
 3   an issue -- there is an issue common that people want to deduct
 4   a part of their expenses for their personal home as a home
 5   office deduction.  You're familiar with that concept?
 6   A.   Yes.
 7   Q.   Okay.  There was a separate and distinct issue that Debbie
 8   Rogers had her office in a house that was only being used for
 9   the HPC office, because the Wilson family had gone to Europe,
10   correct?
11   A.   I'm not aware of how the house was being used.  I only saw
12   the office.
13   Q.   You saw the office and you know John and his wife and his
14   daughters were in Europe?
15   A.   Yes.
16   Q.   So if they're paying rent on this house and the only
17   person using it is Debbie using it for an office, that's not a
18   home office deduction.  That's just a rental expense.
19              MS. KEARNEY:  Objection.
20              THE COURT:  Sustained.
21   Q.   Do you understand the difference of what I'm trying to
22   point out?  Let me rephrase that.
23              Didn't John raise with you whether or not he could
24   take part of the rent expense for the house and just have it as
25   an office expense, not a home office expense, just an office
```

1    expense, and then he never followed up on it?

2    A.   Debbie raised it with me by forwarding an e-mail from

3    John.

4    Q.   And then John just never followed up on it, correct?

5    A.   I was not aware of any follow-up on that.

6         MR. KENDALL:  Thank you very much.  No further

7    questions.

8         MR. KELLY:  Still nothing, your Honor.

9         THE COURT:  All right.  Thank you, Mr. Nahmens.  You

02:43 10   may step down.

11        THE WITNESS:  Thank you, your Honor.

12        THE COURT:  Miss Kearney?

13        MS. KEARNEY:  The government calls Jeff DeMaio.

14        THE CLERK:  Thank you.  You may be seated.  Would you

15   please state your name for the record, spelling your last.  You

16   can take that off.

17        THE WITNESS:  Jeffrey DeMaio, D-e-m-a-i-o.

18        MS. KEARNEY:  May I proceed?

19        THE COURT:  Miss Kearney, you may.

02:44 20        DIRECT EXAMINATION OF JEFFREY DEMAIO

21   BY MS. KEARNEY:

22   Q.   Good afternoon, Mr. DeMaio.

23   A.   Good afternoon.

24   Q.   Where do you live?

25   A.   Irvine, California.

1    Q.    Are you currently employed?

2    A.    Yes, ma'am.

3    Q.    Where?

4    A.    The AYCO Company, AYCO Financial Planning Division,

5    Goldman Sachs.

6    Q.    What is AYCO?  What does it do?

7    A.    Personal financial management.

8    Q.    What do you do at AYCO?

9    A.    I'm a financial planner.

02:44 10   Q.    What does that involve?

11   A.    Working with mostly individuals in the areas of tax and

12   investment planning, retirement planning, benefits and

13   compensation planning, mortgage planning, debt management,

14   things of that nature.

15   Q.    How long have you been a financial planner?

16   A.    28 years.

17   Q.    What's your educational background?

18   A.    I have a Bachelor of Science in finance and an MBA in

19   finance.

02:45 20   Q.    In the course of your career, have you been involved in

21   the preparation of tax returns?

22   A.    I have.

23   Q.    What role have you played in the preparation of tax

24   returns?

25   A.    Various roles over the course of my career, whether it's

1    gathering data and helping prepare the tax return, reviewing

2    tax returns, of course signing tax returns.

3    Q.    Approximately, how many returns have you been involved in

4    preparing over the course of your career?

5    A.    In one form or another, probably 4 or 5,000.

6    Q.    What kind of returns have you prepared?

7    A.    Mostly personal returns.  Sometimes I'll get involved in a

8    trust income tax return, or a partnership return, sometimes a

9    gift tax return, estate tax return.

02:46 10   Q.    I'm going to ask you some questions about John Wilson.  Do

11   you know him?

12   A.    Yes.

13   Q.    How do you know him?

14   A.    He's a former client.

15   Q.    When did Mr. Wilson become a client?

16   A.    Approximately January of 1999, I believe.

17   Q.    What work did you do for him?

18   A.    Tax work and financial planning work over the course of

19   our relationship.

02:46 20   Q.    Did that involve preparing his personal tax returns?

21   A.    Yes, ma'am.

22   Q.    For how many years did you prepare Mr. Wilson's tax

23   returns?

24   A.    Our entire relationship.

25   Q.    So nearly 20 years approximately?

1    A.    Yes.

2    Q.    I want to ask you some questions now about Rick Singer.

3    Do you know Rick Singer?

4    A.    I do.

5    Q.    How do you know him?

6    A.    I was introduced to Rick Singer by an HR professional

7    in -- around 2006 or '07 at a lunch meeting, I believe.

8    Q.    Did there come a time when you recommended Mr. Singer to

9    some of your clients?

02:46 10    A.    Yes.

11    Q.    How many of your clients did you refer to Mr. Singer?

12    A.    I'd say four or five over the course of about 10 years.

13    Q.    Why did you refer clients to Mr. Singer?

14    A.    If it came up in a meeting that a client was inquiring

15    about if I knew of anybody that did ACT prep and tutoring and

16    things of that nature, a person that might be pursuing college,

17    did I know anybody.  That was really the only name I knew of at

18    the time.

19    Q.    Are you aware whether any of the clients to whom you

02:47 20    referred Mr. Singer ever used his services?

21    A.    The only one I'm aware of is John.

22    Q.    And when did you recommend Mr. Singer to Mr. Wilson?

23    A.    Right around 2010, around three years after I had been

24    introduced to him.

25    Q.    What did you discuss with Mr. Wilson about Mr. Singer?

```
 1   A.   It was a fairly limited conversation.  I just vaguely

 2   recall that one of his children were going to be preparing for

 3   college soon and that they were looking at ACT prep and

 4   tutoring services and things of that nature, so Rick came to my

 5   mind from the earlier introduction.

 6   Q.   What did you know about Mr. Singer at the time you gave

 7   his name to Mr. Wilson?

 8   A.   I knew that he worked with clients up and down the western

 9   United States.  He definitely had significant tutoring staff.

10   The person who introduced us mentioned that we had a number of

11   mutual clients because of his role.  He knew of the clients

12   that Rick worked with and he knew the clients that I worked

13   with.  He didn't get into specifics, but he mentioned that we

14   had some mutual clients and that he had heard that Rick had

15   done good work.

16   Q.   Did you discuss with Mr. Wilson that you had referred

17   Mr. Singer to any of your other clients?

18   A.   I believe in the e-mail I sent back to John when he had

19   requested his contact information, I mentioned that we had some

20   mutual clients.

21   Q.   Did there come a time when you hired Mr. Singer yourself?

22   A.   I did.  Approximately --

23   Q.   When was that?

24   A.   I did, yes.

25   Q.   When was that?
```

A.   Around 2015, about 5 years after I introduced him to John.

Q.   And what did you hire Mr. Singer for?

A.   Tutoring services, ACT prep type services for around six or seven months trying out the services.  We were looking for some tutors and I recall that he had a pretty good tutoring staff, or at least had a number of them, and we tried his services for about six or seven months, and then discontinued it after that.

Q.   How old were your children at the time you used Mr. Singer's services?

A.   They were starting their freshman year.

Q.   What did you pay for Mr. Singer's services?

A.   It worked out to about 6 or $700 a month per student.

Q.   And I want to back up a second.  When you said "freshman year," freshman year of high school?

A.   Yes.

Q.   Did you use Mr. Singer for any other services?

A.   No.

Q.   Why not?

A.   We just -- at the time, there wasn't real good chemistry between him and my kids and my wife.  We were still exploring different resources and perhaps maybe started a little early with them and decided to go in a different direction.

Q.   I want to turn now to the preparation of Mr. Wilson's tax returns.  Did you and your team have a regular set of steps

1  that you followed in preparing Mr. Wilson's returns?

2  A.   Yes.

3  Q.   Typically, what was that process?

4  A.   Our process involved sending out a tax data collection

5  package, which involves a number of checklists and reminder

6  notices and instructions to pull together your tax data.  And

7  it also included an organizer reflecting a number of data

8  points from the prior year to help remind the client of things

9  to pull together, different envelopes, things of that nature.

02:50 10  Q.   What did you do after you collected all of the materials

11  you needed?

12  A.   If there was sufficient data to begin work on the return,

13  we'd complete a draft of the returns, and then we would compile

14  a list of open items or questions.  There would usually be a

15  number of people involved in the preparation of the return, for

16  example, a tax preparer, a reviewer from our CPA staff, myself,

17  perhaps another member of the team to work on it as a team.

18  Between all of us, we had a list of items that were missing and

19  we approached the client in order, or the client's

02:51 20  representatives, for the missing information.

21  Q.   And who did you contact if you had a question about

22  missing information?

23  A.   Often -- for John, we had contacted his assistant Debbie

24  Rogers.

25  Q.   What about if a substantive question came up?  Who did you

 1   contact?

 2   A.   Often, we would suggest a conference call with John

 3   through Debbie.  That might be one course.

 4   Q.   And what happened once Mr. Wilson's return was prepared

 5   and you had all your questions answered?  What happened next?

 6   A.   We had all of the missing items or items we thought were

 7   missing.  We then would finalize the tax return.  We would

 8   collate it, contact the client or Debbie perhaps in this

 9   situation for John, and we would confirm where to send the data

02:52 10   -- or excuse me -- the tax return for review and filing

11   purposes.

12   Q.   And did there come a time when Mr. Wilson asked you

13   questions about a return after you sent it to him?

14   A.   Over the course of our relationship?

15   Q.   Yes.

16   A.   Of course.

17   Q.   How often did that happen?

18   A.   Periodically.  I'd say at least once on average per tax

19   year.

02:52 20   Q.   What kinds -- excuse me.  Did you have more to say?

21   A.   We would also discuss questions during the course of the

22   year, perhaps if we were doing quarterly tax preparing, as

23   well.  But I think you're focussing on just on the tax

24   preparation process.

25   Q.   Well, let me ask you this.  What kind of questions did you

1   discuss with Mr. Wilson?

2   A.   Well, after the return was completed?

3   Q.   Let's start with that, after the return was completed.

4   What kind of questions did you ask?

5   A.   Usually, we would be answering questions that -- at that

6   point in time, that the client might have, or John would have.

7   So, for example, how did a return turn out compared to your tax

8   projection, or if I have a refund, why aren't you applying it

9   and how much, what's the rationale behind that, what's the

02:53 10   strategy, things like that.

11   Q.   What about during the course of the year?  What kinds of

12   questions did you discuss with Mr. Wilson?

13   A.   If there's any income or deduction changes that we should

14   be aware of just to take into account while we're working on

15   estimated payment planning, the tax projection that we try to

16   update on a quarterly basis.

17        MS. KEARNEY:  Miss Lewis, can we pull up Exhibits 170

18   and 172 for the witness only?

19   Q.   Mr. DeMaio, these are also in the binder in front of you,

02:53 20   if it's easier to look at them in hard copy.

21        Mr. DeMaio, do you recognize the documents up on the

22   screen, Exhibits 170 and 172?

23   A.   I do.

24   Q.   What are they?  Let's start with 170.  What is that?

25   A.   That is a draft cover letter of a tax package that we

 1   would send out to a client when the return was finalized.

 2   Q.   And what do you recognize the document on the right to be?

 3   A.   That is the final cover letter of a tax return that's

 4   going to be sent out to the client.

 5   Q.   And what year are these both dated?

 6   A.   2015.

 7        MS. KEARNEY:   The government offers Exhibits 170 and

 8   172.

 9        THE COURT:   It will be admitted.

02:54 10        (Exhibit 170, 172 admitted into evidence.)

11   Q.   So Mr. DeMaio, starting with Exhibit 170, dated

12   November 25, 2015, to whom was this document addressed?

13   A.   John and Leslie Wilson.

14   Q.   And at what address?

15   A.   2 Fleur Place, Atherton, California, 94027.

16        MS. KEARNEY:   And Miss Lewis, if we can zoom out.

17   Q.   It doesn't appear that this letter was printed on any kind

18   of letterhead, correct?

19   A.   Correct.

02:55 20        MS. KEARNEY:   Can we go to page 3 of this document,

21   Miss Lewis.

22   Q.   These appear to be instructions for filing a Form 1040.

23   What is a Form 1040?

24   A.   Personal income tax return.

25        MS. KEARNEY:   And Miss Lewis, can we pull up the last

```
 1    paragraph of the instructions.

 2    Q.   This paragraph states, "These returns were prepared from

 3    information provided by you or your representative.  The

 4    preparation of tax returns does not include the independent

 5    verification of information used.  Therefore, we recommend you

 6    review the returns before filing to ensure there are no

 7    omissions or misstatements.  If you note anything which may

 8    require a change to the returns, please contact us before

 9    filing them".

02:56 10           What did you mean by that?

11    A.   These are our filing instructions, and this is where we

12    are advising a client that we're depending on the data that

13    they provided to us, but we're not auditing their data and

14    we're relying on it to prepare an accurate return.

15    Q.   And did you send these instructions to Mr. Wilson?

16    A.   Yes.

17           MS. KEARNEY:  Miss Lewis, can we go to page 22.

18    Q.   Is the remainder of this document the 1040 and

19    accompanying schedules and statements?

02:56 20    A.   I only see the first page, but --

21    Q.   It's also in the binder in front of you, if that's easier,

22    at tab 170.

23    A.   Thank you.  Would you scroll down, please.  Yes.

24    Q.   And you'll see there's some redactions on this exhibit.

25    The government has redacted any social security numbers or bank
```

1    account numbers.

2           MS. KEARNEY:  Can we go to Exhibit 172, please,

3    Miss Lewis.

4    Q.   This is a cover letter dated December 4, 2015.  To whom is

5    it addressed?

6    A.   John Wilson.

7    Q.   At what address?

8    A.   1101BE Amsterdam, The Netherlands.

9           MS. KEARNEY:  And Miss Lewis, if we can zoom out for a

02:58 10    moment.

11    Q.   This appears to be on AYCO letterhead and there's a

12    signature on the page.  Do you see that?

13    A.   Yes.

14    Q.   Whose signature is that?

15    A.   That's mine.

16    Q.   Why -- was this mailed to Mr. Wilson?

17    A.   Yes.

18    Q.   Why was it mailed to him in The Netherlands?

19    A.   Because after we finalized the tax return on the 25th, we

02:58 20    contacted John's assistant.  I think it might have been a

21    weekend or some vacation time in between there and we confirmed

22    where the return should be sent.  So instead of Atherton, John

23    was working in the Netherlands, and we were directed to send it

24    to the Netherlands.

25    Q.   And Mr. DeMaio, I'll ask you to just slow down a little

1    bit so we don't give the court reporter a headache.

2    A.    Okay.  Sorry.

3          MS. KEARNERY:  If we can look at page 4 of this

4    document, Miss Lewis.

5    Q.    This appears to be an excerpt of the tax return for

6    Mr. Wilson, is that correct?

7    A.    Yes.

8    Q.    And in the bottom, there's a signature?

9    A.    Yes.

02:59 10   Q.    Whose signature is that?

11   A.    That is mine.

12   Q.    And the Wilson's signatures were not yet on this tax

13   return?

14   A.    Correct.

15         MS. KEARNEY:  Can we look at what's already in

16   evidence as Exhibit 174A, please, Miss Lewis.

17   Q.    Mr. DeMaio, this is a certified copy of the Form 1040

18   individual -- U.S. individual tax return for John and Leslie

19   Wilson for tax year 2014, which has already been admitted into

02:59 20   evidence.  And again, the government has redacted social

21   security numbers and bank account information from this return.

22         MS. KEARNEY:  Can we look at page 2, Miss Lewis, and

23   highlight the top, please.

24   Q.    Who are the taxpayers identified at the top of the page?

25   A.    John and Leslie Wilson.

1          MS. KEARNEY:  If we can look at page three, please,

2     Miss Lewis, and highlight the bottom.

3     Q.   Is this the same signature we saw previously in the copy

4     from AYCO's files that has your signature in the "preparer's

5     use only" section?

6     A.   Yes.  That's my signature.

7     Q.   And it now bears the signatures of John and Leslie Wilson

8     as well?

9     A.   Are you asking me?

03:00 10   Q.   Yes.

11    A.   Yes.

12    Q.   And right above John Wilson's signature, it reads, "Under

13    penalties of perjury, I declare that I have examined this

14    return and accompanying schedules and statements, and to the

15    best of my knowledge and belief, they are true, correct, and

16    complete".  And then, again, whose signatures appear underneath

17    that?

18    A.   John and Leslie Wilson's and mine.

19         MS. KEARNEY:  Miss Lewis, can we jump to page 93,

03:00 20   please.

21    Q.   Mr. DeMaio, is this a copy of the instructions that we

22    just looked at in the previous exhibit, which was from AYCO's

23    files?

24    A.   Can you scroll down, please?  Yes.

25    Q.   It appears the Wilson's actually filed the instructions

1    with their return as well, correct?

2    A.    It appears that way, yes.

3    Q.    So going back to page 2, in the middle of the page there's

4    a section titled "Income".  Just at a high level, can you

5    explain what information is reported in the Income section in

6    an individual tax return?

7    A.    Yes.  This section makes up the clients' earned income,

8    interest, dividends, business income, capital gains and losses,

9    miscellaneous income, and pass through income from other

03:02 10   entities, such as an investment they might be in, or a business

11   that they operate.

12   Q.    And I want to direct your attention to line 17, which

13   reads "rental real estate, royalties, partnerships, S

14   corporations, trusts, et cetera.  Attach Schedule E".  And

15   there's an amount of negative $495,129.  Are you familiar with

16   whether Mr. Wilson was a shareholder in any S corporations?

17   A.    Yes.

18   Q.    And line 17 says "attached Schedule E".

19         MS. KEARNEY:  I'd like to turn to page 18, please,

03:02 20   Miss Lewis.

21   Q.    Mr. DeMaio, what is at page 18?

22   A.    This is the first page of Schedule E.

23   Q.    And if we can go to the next page of the Schedule E at

24   Part II.  This section is entitled "income or loss from

25   partnerships and S corporations" and there are entries for

1  Hyannis Port Capital and 2G Digital Post.  And then if you go

2  down to line 32, it reports total S corporation losses of

3  negative $495,129.  What is the source for this number?

4  A.   That number right there is the total of the two losses

5  reported above from those two businesses.

6  Q.   And where does that information come from?

7  A.   That information comes from a form called a K-1 form,

8  which summarizes the gains and losses of that other -- of those

9  two other entities, those entities' tax returns.

03:03 10  Q.   So you would have looked at the K-1s from Hyannis Port

11  Capital and 2G Digital Post in order to pull that information

12  out of the K-1 and put it into Mr. Wilson's personal tax

13  return?

14  A.   Yes.

15       MS. KEARNEY:  Can we go to page 64, please,

16  Miss Lewis?

17  Q.   And this is a supplement to Schedule E.  And do you see

18  that there is a K-1 named Hyannis Port Capital and then a

19  second one for 2G Digital Post?

03:04 20  A.   Yes.

21  Q.   And what is the amount recorded under "ordinary loss" from

22  Hyannis Port -- "ordinary income or loss" from Hyannis Port

23  Capital?

24  A.   Negative 383,987.

25       MS. KEARNEY:  Miss Lewis, if we can keep this up on

1    the right and go back to page 2 on line 17 on the left.

2    Q.   Mr. DeMaio, is the $383,987 of business loss from Hyannis

3    Port Capital included in the negative $495,129 number in

4    line 17?

5    A.   Yes.

6    Q.   And how does having a loss of negative $495,129 affect the

7    total income calculation for the Wilsons for 2014?

8    A.   It reduces the total adjusted gross.

9    Q.   And how does reducing the total adjusted gross income

03:05 10   affect the amount of taxes that they would owe?

11   A.   It reduces the taxable income and, therefore, reduces the

12   taxes.

13          MS. KEARNEY:  Miss Lewis, we can take the pages on the

14   right down and go to page 3 of the Exhibit 174A.  Excuse me,

15   page 4.  Sorry.  You were right the first time.  And can we

16   look at line 40, please.

17   Q.   Mr. DeMaio, line 40 reads "itemized deductions (from

18   Schedule A)" and lists an amount of $489,952.  First, just

19   generally, what are itemized deductions?

03:06 20   A.   Itemized deductions are the various sources of deductible

21   items that reduce your income, which are complied on Schedule

22   A.  They're comprised of things like mortgage interest,

23   investment interest expense, charitable contributions, real

24   estate taxes paid, miscellaneous deductions.

25   Q.   And let's look at page 4 of the Schedule A, and

1    specifically the "Gifts to Charity" section.  Lines 16 through

2    19 report gifts to charity of $220,215.  How does making

3    $220,215 in gifts to charity affect the Wilson's itemized

4    deduction calculation?

5    A.    It increases the itemized deductions.

6    Q.    And how does that affect the amount of taxes that they

7    would owe?

8    A.    It would reduce the taxable income and, therefore, reduce

9    the amount of state and federal income taxes.

03:07 10          MS. KEARNEY:  If we can keep this page up on the left,

11    Miss Lewis, and look at page 56 of this exhibit on the right.

12    If you can blow up "Cash Contributions".  Thank you.

13    Q.    So on the right is the supplemented Schedule A, which

14    lists cash contributions, and below that it says "partnership/S

15    corporation/estate and trust", and the first entity listed is

16    Hyannis Port Capital, $195,000.  What does that indicate?

17    A.    That indicates a charitable contribution that passed

18    through on the K-1 form I was referring to earlier from that

19    particular business entity.

03:08 20    Q.    And below that are other cash contributions.  What are

21    those?

22    A.    Those are cash contributions that John and Leslie would

23    have paid -- or made personally and reported on Schedule A.

24    Q.    And combined, the donations from the two S corporations

25    and the personal donations total $220,215?

```
 1    A.    Correct.

 2    Q.    And how does that correspond to the gifts to charity in

 3    Schedule A on the left?

 4    A.    That number carried over to line 19 on Schedule A.

 5          MS. KEARNEY:   Thank you, Miss Lewis.   We can take that

 6    down.

 7    Q.    Mr. DeMaio, did Mr. Wilson amend his personal tax return

 8    for 2014?

 9    A.    Yes.

10          MS. KEARNEY:   Can we look at Exhibit 235, please, just

11    for the witness.

12    Q.    Do you recognize this document, Mr. DeMaio?

13    A.    Yes.

14    Q.    What is it?

15    A.    This is the cover page for a set of amended tax returns.

16          MS. KEARNEY:   The government offers Exhibit 235.

17          THE COURT:   It will be admitted.

18          (Exhibit 235 admitted into evidence.)

19    Q.    And to whom was this cover letter addressed?

20    A.    John and Leslie Wilson.

21    Q.    At what address?

22    A.    155 Irving Avenue, Hyannis Port, Massachusetts 02647.

23          MS. KEARNEY:   If we go to page 8, please, Miss Lewis.

24    Q.    These are the instructions for filing Form 1040-X.   What

25    is a 1040-X?
```

1   A.   That's an amended personal federal income tax return.

2   Q.   And the last paragraph of these instructions, is that

3   consistent with the instructions we already looked at?

4   A.   Yes.

5        MS. KEARNEY:  If we can go to page 9, please,

6   Miss Lewis, and highlight the middle of the page.

7   Q.   Mr. DeMaio, what changes were made between the original

8   2014 return and this amended return?

9   A.   No financial changes.

03:10 10      MS. KEARNEY:  If we can go to the next page,

11   Miss Lewis, and highlight part 3.

12   Q.   Mr. DeMaio, why was this amended return filed if there

13   were no financial changes to it?

14   A.   The returns were filed to file what's called a protective

15   claim, which basically just allows the taxpayer to make a

16   future amendment to the tax return if there was like a tax law

17   change or some other occurrence that would merit such.

18        MS. KEARNEY:  Thank you.

19        Miss Lewis --

03:11 20   Q.   Let me back up.  Mr. DeMaio, did Mr. Wilson amend his 2014

21   returns a second time?

22   A.   Yes.

23        MS. KEARNEY:  And can we pull up, for the witness

24   only, Exhibit 482.

25   Q.   Do you recognize this document?

1    A.    Yes.

2    Q.    What is it?

3    A.    This is the filing instructions for the amended tax return

4    for 2014.

5          MS. KEARNEY:  The government offers Exhibit 482.

6          THE COURT:  It will be admitted.

7          (Exhibit 482 admitted into evidence.)

8    Q.    And at the bottom of this first page, Mr. DeMaio, has been

9    digitally signed by John O'Neil.  Who is John O'Neil?

03:11 10   A.    He's one of the CPAs in our tax department.

11   Q.    And when did he sign this?

12   A.    March 21, 2018.

13   Q.    If we look at the last paragraph on this page, are these

14   instructions consistent with the instructions we've looked at

15   already today?

16   A.    Yes.

17         MS. KEARNEY:  If we could go to page 2, please,

18   Miss Lewis, and highlight the middle of the page.

19   Q.    Were there changes between the prior returns that we've

03:12 20   looked at and this second amended return?

21   A.    Yes.

22         MS. KEARNEY:  Can we go to page 3, please, Miss Lewis,

23   and highlight Part III.

24   Q.    Why were changes made in this second amended return?

25   A.    John's employer issued a corrected form W-2 regarding his

1     wages or earned income.

2         MS. KEARNEY:  And Miss Lewis, can we pull up

3     Exhibit 174A, the original tax return, on the left and then

4     this amended return, Exhibit 482, on the right.  And can we go

5     to the "Income" section on the filed original return.  And if

6     we go to page 5, I believe, of the second amended return.

7     Q.   Mr. DeMaio, were there any changes made in the business

8     losses reported on line 17 between the original return and the

9     second amended return?

03:13 10    A.   No.

11    Q.   If we can look at page 4 of the original return on the

12    left and look at the "Gifts to Charity", and then page 7 of the

13    second amended return "Gifts to Charity".  Mr. DeMaio, were

14    there any changes made in the gifts to charity reported between

15    the original tax return and the second amended return?

16    A.   No.

17        MS. KEARNEY:  Thank you, Miss Lewis.  We can take

18    those down.

19    Q.   Mr. DeMaio, during the decade of so you that provided --

03:14 20    or excuse me -- two decades that you provided tax planning

21    services to Mr. Wilson, how often did you communicate with him?

22    A.   It would vary year to year, quarter to quarter, but four

23    to five times a year I would estimate.

24    Q.   How did you typically communicate with him?

25    A.   Telephone conference and e-mail.

1    Q.   Did Mr. Wilson have a familiarity with taxes when you

2    spoke with him?

3              MR. KENDALL:  Objection, your Honor.

4              THE COURT:  He can answer that question, familiarity.

5    A.   Similar to many clients.

6              THE REPORTER:  Could you say that again?

7              THE WITNESS:  Similar to most clients.

8    Q.   How would you describe Mr. Wilson's level of business

9    sophistication?

03:15 10   A.   I thought John was very sophisticated, very sharp.

11             MS. KEARNEY:  If we look at Exhibit 667, just for the

12   witness, please.

13   Q.   Mr. DeMaio, do you recognize this exhibit?

14   A.   Yes.

15   Q.   What is it?

16   A.   This is a text message.

17   Q.   Between who?

18   A.   John and myself.

19   Q.   What's the date?

03:15 20   A.   October 20th.

21             MS. KEARNEY:  The government offers Exhibit 667.

22             THE COURT:  October 20th of?

23   Q.   Do you recall the year?

24   A.   2018.

25             THE COURT:  It will be admitted.

1          MR. KEARNY:  Can we show it to the jury?

2          (Exhibit 667 admitted into evidence.)

3  Q.   Mr. DeMaio, there's lighter color bubbles on the left and

4  dark colored bubbles on the right.  Whose texts are the lighter

5  colored bubbles on the left?

6  A.   John's.

7  Q.   And whose are the darker colored bubbles on the right?

8  A.   Mine.

9  Q.   And if we look at the last text on that chain on

03:16  10  October 20th, I think you said of 2018, there's a text from

11  Mr. Wilson that says "Jeff.  Is there a limit on tax deductions

12  for charity contributions?"

13          What did you understand Mr. Wilson to be asking you?

14  A.   It was a generic question, basically.  If you gave or

15  donated money to charity, could the deduction be limited by

16  things such as your level of income, or other factors.

17          MS. KEARNEY:  Could we look at Exhibit 669, for the

18  witness only, please.

19  Q.   Do you recognize Exhibit 669?

03:17  20  A.   Yes.  It's an e-mail exchange.

21  Q.   From whom?

22  A.   Debbie Rogers.

23  Q.   To whom?

24  A.   Myself and John Wilson.

25  Q.   What's the date?

1    A.    October 22, 2018.

2    Q.    So two days after the text message we just looked at?

3    A.    Yes.  Or four days, right?  Four days.

4    Q.    Do you need to see the date of the text message again?

5    A.    Yeah.  I apologize.  I thought it was the 18th.  Maybe it

6    was 2018.  My apologies.  It was October 20th.  My apologies.

7    You're right.  I stand corrected.

8          MS. KEARNEY:  If we can go back to Exhibit 669, the

9    government offers Exhibit 669.

03:17 10          THE COURT:  It will be admitted.

11          (Exhibit 669 admitted into evidence.)

12   Q.    And if we go to the bottom of page 2, there's an e-mail

13   from you on October 22, 2018, where you wrote "Also, in

14   response to your question about charitable gift limitations,

15   the limits range from 20 percent to 50 percent of your AGI",

16   and Mr. Wilson responded.

17          MS. KEARNEY:  If we can look at that, please,

18   Miss Lewis.

19   Q.    "Giving half million cash to a 401(c)(3) educational

03:18 20   foundation this year.  Possibly more this year and a similar

21   amount next year".

22          What did you understand Mr. Wilson to mean?

23   A.    That he was planning some charitable contributions over

24   the course of one to two or more years.

25   Q.    And he references a 401(c)(3).  Do you understand that to

```
 1   be a typo?

 2   A.   I thought he might be referring to a 501(c)(3).

 3   Q.   And if we look up at your response, you ask for the name

 4   and tax ID number of the charity.  And let's look at -- what

 5   did Mr. Wilson reply?  What was his reply?

 6   A.   He says, "Yes.  Debbie please follow-up".

 7        MS. KEARNEY:  Let's look at Exhibit 670 for the

 8   witness only, please.

 9   Q.   Do you recognize this document?

10   A.   Yes.  That's an e-mail.

11   Q.   From who?

12   A.   Debbie Rogers.

13   Q.   To whom?

14   A.   To myself.

15   Q.   And who's copied?

16   A.   Debbie Rogers and John Wilson.

17   Q.   What's the date?

18   A.   October 22, 2018.

19        MS. KEARNEY:  The government offers Exhibit 670.

20        THE COURT:  It will be admitted.

21        (Exhibit 670 admitted into evidence.)

22   Q.   So on the same day as the e-mail we just looked at,

23   Miss Rogers wrote "Hi Jeff... below is the company and FEIN

24   number in which HPC donated 500 thousand last week and you are

25   going to check to see what category they fall under".
```

```
 1              What did you understand her to be referring to when
 2   she said "HPC"?
 3   A.   Hyannis Port Capital.
 4   Q.   And below that is a reference to the Key Worldwide
 5   Foundation.  Were you familiar with that entity at this time?
 6   A.   I do not recall that foundation at the time.
 7              MS. KEARNEY:  Can we look at Exhibit 614, for the
 8   witness only, please.
 9   Q.   Do you recognize this document, Mr. DeMaio?
10   A.   Yes.
11   Q.   What is it?
12   A.   It's a follow-up e-mail.
13   Q.   And who is it from?
14   A.   Debbie Rogers.
15   Q.   Who is copied on this e-mail?
16   A.   Myself, Justin Kessler, one of my team members, Christine
17   Kapp, one of my team members, Debbie Rogers, and John Wilson.
18   Q.   What's the date?
19   A.   December 11, 2018.
20              MS. KEARNEY:  The government offers Exhibit 614.
21              THE COURT:  It will be admitted.
22              (Exhibit 614 admitted into evidence.)
23   Q.   At the top of this chain, on December 11, 2018,
24   Miss Rogers references The Key Worldwide Foundation, and she
25   writes "A total of one million in cash donations in 2018.  See
```

1    Jeff's reply from October regarding this donation as well".

2            What reply did you understand her to be referring to?

3    A.   So the context of this is my team members were inquiring

4    as to where John's charitable contributions stood for 2018 for

5    fourth quarter tax projection planning purposes.

6    Q.   And do you see that -- below that e-mail she has copied an

7    e-mail from you on November 7, 2018?

8    A.   Yes.

9    Q.   And in that e-mail, you wrote that you and John had

03:22 10   discussed the deductibility of charitable contributions.  Who

11   did you mean by "John"?

12   A.   John Wilson.

13   Q.   What did Mr. Wilson say during that discussion?

14   A.   That he was planning some charitable contributions and

15   wanted to know if there would be limitations based on how much

16   he'd donated, and I said that that can vary depending on the

17   type of charitable organization and whether you're donating it

18   in cash or you're donating securities, things like that.

19   Q.   And you continue that your company had looked up the name

03:22 20   of the foundation.  And it appeared they were a qualified

21   charity in good standing, but that you don't do due diligence

22   on charities.  What did you mean by that?

23   A.   Well, just to provide some context, I was following up on

24   the earlier e-mail thread that you provided where I had

25   initially responded to John's text explaining that, in that

1    e-mail, I didn't reply via text.  I don't think I ever replied

2    to that.  There are limitations and it depends on your level of

3    income, and we needed to know more information about the

4    charity to understand if it's a 501(c)(3), public charity, so

5    that we could determine if -- whether the percentage

6    limitations would apply.

7    Q.   Why were you adding in a caveat that you don't necessarily

8    do due diligence on charities if your charity group had already

9    looked up the foundation and saw that it was a qualified

03:23 10   charity in good standing?

11   A.   Well, because after I had provided that original reply, I

12   explained that we needed to understand at least if the charity

13   was a public charity, and I needed the name and information for

14   the charity to have our charitable services group look it up

15   and see if it was registered with the IRS.  And that's when I

16   obtained the information and confirmed that they were a

17   qualified charity with the -- public charity with the Internal

18   Revenue Service.  So then when I was providing that answer

19   back, I just wanted to be clear that that was the response or

03:24 20   the inquiry that we were responding to.

21        In the earlier e-mail, Debbie had requested that we

22   look up the category that would fall under, so I was explaining

23   that that was what this reply was pertaining to, that it was --

24   I didn't want it to be construed as us that we had done due

25   diligence on the charity, for example, looking into, you know,

 1    their books or their causes, what did they support, things of

 2    that nature.

 3    Q.   You add at the end "If John and Leslie are concerned with

 4    that particular organization qualifying as a charity and/or the

 5    funds getting donated exactly to and how they wish to the

 6    designated charity or school, then another advisable option

 7    would be to directly donate".

 8         When you say "John and Leslie," who are you referring

 9    to?

03:25 10   A.   John and Leslie Wilson.

 11        MS. KEARNEY:  Miss Lewis, can we look at Exhibit 174A

 12   again and go to page 2, line 17?

 13   Q.   Mr. DeMaio, how would the Wilson's tax return have changed

 14   if the business expenses reported in line 17 had been reduced

 15   by $120,000?

 16   A.   Their taxable income would have gone up by $120,000.

 17   Q.   And how would that affect the taxes that they owe?

 18   A.   They would owe additional income tax.

 19        MS. KEARNEY:  And then if we can go to page 4,

03:25 20   Miss Lewis, and the "Gifts to Charity".

 21   Q.   How would the Wilson's tax return have changed if the

 22   charitable contributions had been reduced by $120,000?

 23   A.   Their charitable contributions would have gone down by

 24   $120,000.

 25   Q.   And how would that have affected their taxes?

 1    A.    It would reduce their taxable income and their further

 2    income taxes for federal and state purposes.

 3    Q.    Did Mr. Wilson ever discuss these deductions with you, the

 4    $120,000 deductions for business expenses, or a $100,000

 5    charitable deduction?

 6    A.    On the 2014 return?

 7    Q.    Yes.

 8    A.    No, not that I recall anyway.

 9    Q.    If you had known that, in exchange for the payments that

03:26 10    were reported in those deductions, that the USC water polo

11    coach had agreed to recruit Mr. Wilson's son to the team so he

12    would be admitted to the university as an athletic recruit,

13    would you have done anything differently with Mr. Wilson's tax

14    return?

15            MR. KENDALL:  Objection, your Honor.

16            THE COURT:  Overruled.

17    Q.    Can you repeat the question?

18    A.    Sure.  If you had known that, in exchange for the payments

19    that were deducted as business expenses and as as charitable

03:26 20    contribution, that the USC water polo coach had agreed to

21    recruit Mr. Wilson's son to the team so that he would be

22    admitted to the university as an athletic recruit, would you

23    have done anything differently with Mr. Wilson's tax return?

24            MR. KENDALL:  Objection.

25            THE COURT:  Overruled.

```
 1   A.   Well, I certainly would have probably done some more
 2   inquiries as to what the background of the situation was and
 3   had an understanding better before, you know, we could both be
 4   comfortable filing the return.
 5   Q.   Would you have taken a deduction for a business expense in
 6   that situation?
 7   A.   No.
 8   Q.   Would you have taken a deduction for a charitable
 9   contribution in that situation?
10   A.   No.
11   Q.   Why not?
12   A.   Well, I thought in your example that the coach received
13   the payment.  I didn't understand exactly what you meant.
14   Could you repeat it, please.
15        MR. KENDALL:  If you could finish, please, your Honor.
16        THE COURT:  Go ahead.  Finish your answer.
17   A.   I was saying that I would probably need to inquire more
18   about the nature of the contribution and draw more attention to
19   understanding it and determining if that was a contribution or
20   not.
21   Q.   When preparing a tax return, do you -- who do you rely on
22   to provide you with the information necessary to determine if a
23   payment should be deducted as a business expense or charitable
24   contribution or some other deduction?
25   A.   The taxpayer.
```

```
 1              MS. KEARNEY:  Nothing further.
 2              THE COURT:  I take it you have more than a few
 3      minutes?
 4              MR. KENDALL:  More than two minutes, your Honor, yes.
 5              THE COURT:  Okay.  We will break for the day.
 6              Mr. DeMaio, you may step down for the time being.
 7              We'll be in recess until tomorrow morning at 9:00 a.m.
 8      Jurors, we'll have a regular day tomorrow, Tuesday.  Have a
 9      pleasant evening.  I'll see you tomorrow morning at 9:00 a.m.
03:28 10              THE CLERK:  All rise for the jury.
11              (Jury exits.)
12              THE COURT:  Be seated, counsel.  You may step down,
13      Mr. DeMaio.
14              Mr. Kendall, approximately how much on cross?
15              MR. KENDALL:  Not sure, your Honor.  Ballpark an hour
16      plus or minus.
17              THE COURT:  All right.  And then after Mr. DeMaio, do
18      we have the same order as we were planning before, Mr. Frank?
19              MR. FRANK:  Roughly, your Honor.  We have Mr. Moon,
03:29 20      Mr. Deckett.  I don't believe I mentioned Mr. Deckett on
21      Friday.  I neglected to mention him.
22              THE COURT:  And how long approximately is Mr. Deckett?
23              MR. FRANK:  He's a very short witness of about
24      15 minutes.
25              THE COURT:  All right.
```

1           MR. FRANK:  Miss Ranahan and Miss George.

2           THE COURT:  Miss George.  I have not heard her name

3    before.

4           MR. FRANK:  Lauren George, the government's summary

5    witness.

6           THE COURT:  Oh.  She's the summary witness.

7           MR. FRANK:  Yes, your Honor.

8           THE COURT:  But we're not going to go back and pick up

9    Mr. Masera?

03:30 10         MR. FRANK:  I think that's unlikely, your Honor.

11          THE COURT:  All right.  And the cross-examinations,

12   approximately what were estimated last week?  Is that fair to

13   say?  Mr. Kendall?  Mr. Kelly?

14          MR. KENDALL:  I don't remember exactly what I said,

15   your Honor.  Mr. Moon, I expect, will be about 45 minutes, plus

16   or minus a bit, maybe a little more than 45.  Miss Ranahan, I

17   don't know how long she's going to go so I don't know how long

18   I'll go.  She's the IRS summary witness.

19          THE COURT:  All right.  And Mr. Deckett and

03:31 20   Miss George.

21          MR. KENDALL:  Deckett is being handled by

22   Miss Papenhausen.

23          MS. PAPENHAUSEN:  I believe incredibly short, your

24   Honor.

25          THE COURT:  And George?

1          MR. KENDALL:  I'm not sure exactly, your Honor.

2     Mr. Kelly and I have to discuss how we're dividing that up.

3          THE COURT:  All right.  Mr. Kelly?

4          MR. KELLY:  I think my crosses of those four witnesses

5     will be relatively short, but I want to just understand on the

6     record.  I think the government has advised that they are not

7     calling Masera at all, or is this just for tomorrow and

8     Tuesday?

9          MR. FRANK:  I think our inclination is not to call

03:31 10   him.  We're going to make a final decision shortly, but as I

11    advised you yesterday or the day before, I think our

12    inclination is probably not.

13         THE COURT:  Okay.  And George is your last witness?

14         MR. FRANK:  Yes, your Honor.

15         THE COURT:  So we may -- the government may be

16    completed by tomorrow, but it will depend on the

17    cross-examinations?

18         MR. FRANK:  It will depend on the crosses.  Possible

19    if they're quick.  More likely they'll bleed into Wednesday.

03:31 20        THE COURT:  Okay.

21         MR. KENDALL:  Your Honor, we're ready to go Friday as

22    we've discussed.  We've given the names as we understand them

23    today to Mr. Frank who we're going to call on Friday.

24         We wanted to make one request, your Honor.  We filed a

25    few motions that came in this morning.  We also have some

issues we need to resolve with you.  We also need to deal with

the confrontation clause ruling that the Court has not yet

issued.  We were hoping we could book a little time with you

maybe tomorrow afternoon to go through the motions we filed

today and give us some guidance on how to proceed in our own

case in terms of what's going to be allowed in and how to

proceed.  So we were hoping we might get some time tomorrow

afternoon.

THE COURT:  You mean to replace the afternoon hearing?

MR. KENDALL:  I don't know if we -- I'll be greedy.  I

would love that, your Honor.  I don't know how much time the

Court can book with us.  But if we could get a half hour,

40 minutes.

THE COURT:  The Court is in the process of making

rulings on all of the motions.  Of course, we just got the last

six or seven early this morning, so we haven't turned around on

those, but yes.  We can spend some time tomorrow dealing with

some out of hearing of jury matters.

MR. KENDALL:  Okay.  When would the Court like to do

that?

THE COURT:  It would be best probably in the

afternoon, so we may give the jury the afternoon off tomorrow.

MR. KENDALL:  So we would start at one -- we would

start at 2:00 then.

THE COURT:  2:00, yes.

 1          MR. KENDALL:  The other thing is, your Honor, we do

 2    think the Rule 29 motion is going to raise some interesting

 3    issues for the Court.  And given that we're planning on putting

 4    on a defense case, we were hoping it might be possible to even

 5    discuss the Rule 29 with you, and if there's anything you're

 6    interested in granting before we put on our witnesses.  Most

 7    times there's not a defense case so it doesn't really matter.

 8    Here there is.

 9          THE COURT:  All right.  Do I understand that if the

03:33 10    government rests either tomorrow, which would be unusual, or

11    midday Wednesday, that the defense does not want to start its

12    case in any event even after a Rule 29 motion until Friday?

13          MR. KENDALL:  We have -- we've got people coming in

14    from out of town, so we had booked them on that assumption,

15    your Honor.

16          THE COURT:  Mr. Kelly?

17          MR. KELLY:  I think there are certainly some

18    stipulations we could read into the record, perhaps some

19    document that we could offer in as well, but in terms of live

03:34 20    witnesses, probably Friday would be best.

21          THE COURT:  All right.  Any problem with that from the

22    government's point of view?

23          MR. FRANK:  No.  We've been advised of the names of

24    three witnesses, one of whom has just sent us correspondence

25    indicating that he intends to exercise his Fifth Amendment

1    rights, and we have not been advised of any names of witnesses

2    by Mr. Kelly, so I don't know what he has in mind.

3         MR. KENDALL:  Well, it's joint representation, Steve.

4    I was writing about both of us.

5         MR. FRANK:  Okay.  We've been advised of three names,

6    one of which.

7         MR. KELLY:  There's one more thing.  I think it may be

8    on the Court's radar screen and there has been a blizzard of

9    motions, so I apologize if this one is not on the radar screen,

03:35 10    but we asked or we suggested that there at least be a Zoom

11    inquiry of several of these witnesses who are refusing to come

12    based upon their Fifth Amendment privilege.  We've offered to

13    do it by Zoom rather than -- as a courtesy rather than making

14    them come all the way here, but that's just something that's

15    percolating.

16         THE COURT:  Is that among the motions that have been

17    filed?

18         MR. KELLY:  Yes.

19         THE COURT:  All right.  I will look at them.

03:35 20         MR. KENDALL:  And what's not in the motions, your

21    Honor, I hate to burden you too much, but you had ordered

22    Mr. Garfield.  You denied his motion to quash and told him he

23    should come testify.  He's just informed us early this morning

24    I think it was, that he's going to claim the Fifth to try to

25    get out of testifying, and that's something we'll need to

1    discuss as well, how to deal with that.  We don't think it's a

2    valid assertion, so we'll look forward to it tomorrow.

3              THE COURT:  All right.  I have another hearing, so if

4    counsel could vacate the courtroom as soon as possible.  Thank

5    you.

6              MR. KENDALL:  Thank you, your Honor.

7              THE CLERK:  All rise.

8              (Whereupon, the proceedings concluded at 3:35 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         I N D E X

2       Witness                          Page

3       LAURA JANKE

4       Direct Examination by Ms. Wright       5

5       Cross-Examination by Mr. Kelly        53

6       Cross-Examination by Ms. Papenhausen  83

7       Recross-Examination by Mr. Kelly      93

8

9       JAMES NAHMENS

10      Direct Examination by Ms. Kearney     96

11      Cross-Examination by Mr. Kendall      116

12      Redirect Examination by Ms. Kearney   159

13

14      JEFFREY DEMAIO

15      Direct Examination by Ms. Kearney     174

16

17

18

19

20

21

22

23

24

25

```
 1                    E X H I B I T S

 2    NO.                        ADMIT

 3    693    . . . . . . . . . . . . . . . . . .      21

 4    694    . . . . . . . . . . . . . . . . . .      27

 5    695    . . . . . . . . . . . . . . . . . .      29

 6    329    . . . . . . . . . . . . . . . . . .      32

 7    335    . . . . . . . . . . . . . . . . . .      36

 8    346    . . . . . . . . . . . . . . . . . .      37

 9    344    . . . . . . . . . . . . . . . . . .      39

10    658    . . . . . . . . . . . . . . . . . .      40

11    367    . . . . . . . . . . . . . . . . . .      46

12    659    . . . . . . . . . . . . . . . . . .      48

13    676    . . . . . . . . . . . . . . . . . .      52

14    677    . . . . . . . . . . . . . . . . . .      53

15    646    . . . . . . . . . . . . . . . . . .     100

16    134    . . . . . . . . . . . . . . . . . .     102

17    645    . . . . . . . . . . . . . . . . . .     110

18    9776   . . . . . . . . . . . . . . . . . .     139

19    170    . . . . . . . . . . . . . . . . . .     183

20    172    . . . . . . . . . . . . . . . . . .     183

21    235    . . . . . . . . . . . . . . . . . .     192

22    482    . . . . . . . . . . . . . . . . . .     194

23    667    . . . . . . . . . . . . . . . . . .     197

24    669    . . . . . . . . . . . . . . . . . .     198

25
```

```
                          E X H I B I T S
NO.                          ADMIT
670   ....................   199
614   ....................   200
```

1    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8           We, Kristin M. Kelley and Debra Joyce, certify that

9    the foregoing is a correct transcript from the record of

10   proceedings taken September 27, 2021 in the above-entitled

11   matter to the best of our skill and ability.

12

13

14       /s/ Kristin M. Kelley              September 27, 2021

15       /s/ Debra Joyce                    September 27, 2021

16       Kristin M. Kelley, RPR, CRR              Date
         Debra Joyce, RMR, CRR
17       Official Court Reporter

18

19

20

21

22

23

24

25