```
1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2


3
    UNITED STATES OF AMERICA,        )
4                      Plaintiff     )
                                     )
5   vs.                              )   No. 1-19-CR-10080
                                     )
6   GAMAL ABDELAZIZ and JOHN         )
    WILSON,                          )
7                      Defendants.   )
                                     )
8                                    )

9


10
             BEFORE THE HONORABLE NATHANIEL M. GORTON
11                 UNITED STATES DISTRICT JUDGE
                      JURY TRIAL - DAY 13
12


13
             John Joseph Moakley United States Courthouse
14                      Courtroom No. 4
                       One Courthouse Way
15                 Boston, Massachusetts 02210

16


17                     September 28, 2021
                          9:09 a.m.
18

19


20
                   Kristin M. Kelley, RPR, CRR
21                 Kelly Mortellite, RMR, CRR
                      Official Court Reporter
22      John Joseph Moakley United States Courthouse
                 One Courthouse Way, Room 3209
23              Boston, Massachusetts 02210
                 E-mail: kmob929@gmail.com
24
             Mechanical Steno - Computer-Aided Transcript
25
```

```
 1    APPEARANCES:

 2

 3           Stephen E. Frank

 4           Ian J. Stearns

 5           Leslie Wright

 6           Kristen Kearney

 7           United States Attorney's Office

 8           1 Courthouse Way

 9           Suite 9200

10           Boston, MA 02210

11           617-748-3208

12           stephen.frank@usdoj.gov

13           for the Plaintiff.

14

15

16           Brian T. Kelly

17           Joshua C. Sharp

18           Lauren Maynard

19           Nixon Peabody LLP

20           100 Summer Street

21           Boston, MA 02110

22           617-345-1000

23           bkelly@nixonpeabody.com

24           for Gamal Abdelaziz.

25
```

1   APPEARANCES:

2

3           Robert L. Sheketoff

4           One McKinley Square

5           Boston, MA 02109

6           617-367-3449

7           sheketoffr@aol.com

8           for Gamal Abdelaziz.

9

10

11          Michael Kendall

12          Lauren M. Papenhausen

13          White & Case, LLP

14          75 State Street

15          Boston, MA 02109

16          617-939-9310

17          michael.kendall@whitecase.com

18          for John Wilson.

19

20

21

22

23

24

25

```
 1   APPEARANCES:

 2

 3          Andrew E. Tomback

 4          McLaughlin & Stern, LLP

 5          260 Madison Avenue

 6          New York, NY 10016

 7          917-301-1285

 8          atomback@mclaughlinstern.com

 9          for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

1
2          THE CLERK:  Thank you.  You may be seated.  We're now
3     in session.
4          THE COURT:  Good morning, jurors.  Welcome back.
5          Mr. DeMaio, you're reminded that you remain under
6     oath.
7          Mr. Kendall, you may conduct cross-examination.
8          MR. KENDALL:  Thank you, your Honor.
9          Miss Kearney, can we give back that binder to
09:09 10   Mr. DeMaio?
11                CROSS-EXAMINATION OF JEFFREY DEMAIO
12   BY MR. KENDALL:
13   Q.   Good morning, Mr. DeMaio.
14   A.   Good morning.
15   Q.   My name is Mike Kendall.  I represent John Wilson.  Fair
16   to say we've never met before?
17   A.   Correct.
18   Q.   Never spoken before?
19   A.   Correct.
09:09 20   Q.   Okay.  I'd like to start off this morning by asking you to
21   go back to Exhibit 482 in that binder, which is the amended tax
22   return that you discussed yesterday?
23   A.   Yes.
24   Q.   If you could go to the second page of Exhibit 482, if we
25   could show this to the jury, please, you'll notice I put an

```
 1   empty pad of paper and pen to your right there.  I'd like you
 2   to walk through here and ask you to write down some numbers.
 3               Okay.  First --
 4               THE COURT:  I'm afraid I'm going to have to stop you
 5   for a technical problem.  My screen is not working today, so
 6   hold on a second, please.
 7               Thank you.  You may proceed.
 8   Q.   If we could go down here and look where it says "Tax
 9   Liability" to line 11, and we look in the far right column
10   where it says 230,231, $230,231, what does that indicate?
11   A.   The 230,231 number?
12   Q.   Yes.
13   A.   Total tax.
14   Q.   That's the total federal tax that's owed for this tax
15   return?
16   A.   Yes.
17   Q.   Okay.  Could you write that down on the sheet of paper
18   that I left to your -- the pad of paper there?  Just write
19   "federal tax 230,231".
20   A.   Would you scroll out so I can see the whole page?  I want
21   to make sure I don't misunderstand.
22   Q.   Sure.
23               THE COURT:  Mr. DeMaio, will you pull that microphone
24   closer to you so that we can all hear, please?
25               THE WITNESS:  Yes, your Honor.
```

1          MR. KENDALL:  You have your own copy of the tax

2     return, so feel free, if you need to --

3          THE WITNESS:  Yes.

4          MR. KENDALL:  -- read more than what is shown on the

5     screen.

6          THE WITNESS:  Okay.  Thank you.

7     Q.   So 230,231, if you could write that down, please.

8          MR. KENDALL:  Mr. Carter, if we could go to the bates

9     ending 3852 -- wait, excuse me, no.  3853, please.

09:12 10   Q.   If you see that, that's the Schedule A to the return,

11    correct?

12    A.   Yes.

13    Q.   And if we go to line 5A, we see state and local income

14    taxes paid 222,369, correct?

15    A.   Yes.

16    Q.   Could you write that, just state taxes underneath the

17    number you just wrote for federal taxes, so it's like a column?

18          (Witness complies.)

19          MR. KENDALL:  And then, Mr. Carter, if we could go

09:12 20   back one prior page that ends in 852.  Go to line 48.

21    Q.   Mr. DeMaio, do you see line 48?  It says "foreign tax

22    credit" $466,278?

23    A.   Yes.

24    Q.   That's the taxes Mr. Wilson had to pay because he worked

25    in Europe, correct?

A.   Well, that's the amount of foreign tax credit he received, and on this particular tax return in this particular year for taxes he paid in Europe.  I don't know what the total taxes were.

Q.   Thank you.  Okay.  Thank you.  That's the credit he gets against his U.S. taxes for what he's doing in Europe?

A.   On this return, yes.

Q.   Could you put that as the third number in the column, 466,278.  Then if you could add up the three numbers for me.  I get 921,894.

A.   I'm just working on it now.

Q.   Okay.  Sorry.  I've done it in advance.  Don't mean to cheat.

A.   What was the total you came up with?

Q.   Let me take a look.  Maybe mine aren't as good as I thought.  Excuse me.  I'm sorry.  I had to make a revision there.  Tell me what your number is.  I'm off by a digit I think.  What do you get?

A.   I think I did, too.  One second.  My apologies.  I came up with 914,878.

Q.   914 -- I don't think your columns.

A.   Yeah.

          THE COURT:  We're going to take judicial notice that it's been $918,000.

Q.   I was going to go to the dollar, but 918 is close enough

1    for what we need.  So it's about $918,000, right?

2    A.   That's correct.

3    Q.   So let's look at line 5 on the first page, the second page

4    of this exhibit, where it says "Taxable income".

5    A.   Yes.

6    Q.   What's the taxable income?

7    A.   The original amount or the corrected amount?

8    Q.   The corrected amount.

9    A.   2,127,769.

09:16 10   Q.   If one divides 918,000, using a slightly round number, by

11   2,127,769, what do you get?

12   A.   Almost 50 percent.

13   Q.   You're generous.  43 percent.

14   A.   43 percent.

15   Q.   Almost -- round numbers you could say almost 50.  So what

16   we see here is, on this tax return, Mr. Wilson paid 43 percent

17   of his taxable income in taxes.  That's within the range of the

18   tax bracket that, the federal income tax bracket for income for

19   that year?

09:16 20   A.   Yes.

21   Q.   You know the issue is a question of whether $220,000 in

22   deductions should have been treated as deductions or just put

23   in as income.  Would you agree with me, if we increased the

24   taxable income by $220,000, so instead of $2,127,000, it was

25   $2,347,000, and we divide it by 918, we'll hit about 38,

1  39 percent, correct?

2  A.   Correct.

3  Q.   Rough numbers?

4  A.   Correct.

5  Q.   I now want to go to some other topics that the government

6  asked you about yesterday.  I think you testified that John

7  became a client of AYCO back around 1999?

8  A.   Correct.

9  Q.   At the time he was a senior executive at The Gap?

09:18 10  A.   Correct.

11  Q.   The Gap is a clothing company?  They have stores and they

12  sell jeans and stuff like that, correct?

13  A.   Correct.

14  Q.   And The Gap paid for him to get tax preparation services

15  at AYCO?

16  A.   Correct.

17  Q.   Is it AYCO or AYCO?

18  A.   AYCO.

19  Q.   Would you agree with me senior executives like John often

09:18 20  have very demanding schedules?

21  A.   Yes.

22  Q.   They work long hours?

23       MS. KEARNEY:  Objection.

24       THE COURT:  Sustained.

25  Q.   With respect to John, did you observe he worked very long

```
 1   hours?

 2   A.   Yes.

 3   Q.   He had a lot of issues he had to manage?

 4   A.   Yes.

 5   Q.   At times, when you're an executive at that level, it can

 6   be very stressful?

 7        MS. KEARNEY:  Objection.

 8        THE COURT:  Sustained.

 9   Q.   The idea is you bring a level of expertise and

10   sophistication so people can do their job while you help them

11   manage the areas that you have expertise and sophistication in,

12   is that correct?

13   A.   Yes.

14        MR. KENDALL:  Could we show the witness only

15   Exhibit 9805, please.

16   Q.   Do you recognize this?

17   A.   Looks familiar.

18   Q.   It's your website, isn't it?

19   A.   Yes.

20        MR. KENDALL:  Your Honor, I'd like to offer 9805 into

21   evidence.

22        MS. KEARNEY:  Objection, your Honor.

23        THE COURT:  Grounds?

24        MS. KEARNEY:  Hearsay.  It's not for impeachment.  He

25   hasn't said anything contradictory.
```

```
  1              MR. KENDALL:  Your Honor, it's just a website
  2     describing their services.  He can be cross-examined on it.
  3              THE COURT:  I'll let it in.
  4              (Exhibit 9805 admitted into evidence.)
  5     Q.   If we can have Exhibit 9805 to the jury, please.  So this
  6     front page, it says "About Us".  It's about AYCO, correct?
  7     "Piece of mind is more than an expression.  It's our mission.
  8              We're the nation's preeminent leader and innovator in
  9     company-sponsored and individual financial counseling
 10     services".
 11              That's the type of services you do provide for
 12     someone like John Wilson, correct?
 13     A.   Yes.
 14     Q.   And among those services that you have is tax advice,
 15     correct?
 16     A.   Yes.
 17     Q.   And this sort of financial gifting that goes along with
 18     tax planning and tax issues, such as implications?
 19     A.   What do you mean by that?
 20     Q.   If you want to give money to a nonprofit, there are tax
 21     implications?
 22     A.   Yes.
 23     Q.   You provide that advice to John as well, correct?
 24     A.   About the tax implications?
 25     Q.   Yes.
```

1    A.    Yes.

2    Q.    So John became your client in 1999 and you were the

3    relationship manager, correct?

4    A.    Yes.

5    Q.    And as relationship manager, you're coordinating all the

6    services that AYCO would provide to John?

7    A.    Yes.

8    Q.    You're not a CPA yourself, correct?

9    A.    Correct.

09:21 10   Q.    You know a bit about taxes but you're not a person who

11   does tax preparation line by line, is that correct?

12   A.    Well, I'm a registered tax preparer, but I don't prepare

13   all the returns.

14   Q.    You have a team of people that help you do the tax

15   returns, correct?

16   A.    Correct.

17   Q.    As a business person, AYCO primarily does individual tax

18   returns, correct?

19   A.    Primarily.

09:22 20   Q.    Primarily.  So you would not do returns for a company like

21   HPC?

22   A.    There may be occasions where we prepare an LLC or an S

23   corporation return.

24   Q.    But you didn't with John.  He had to go to Nahmens to do

25   that?

```
 1   A.   He chose to.  Yeah.
 2   Q.   It's your typical business practice though that you focus
 3   on the individual return, correct?
 4   A.   Primarily.
 5   Q.   Okay.  Would you agree with me AYCO did an excellent job
 6   preparing John's tax returns for 20 years?
 7            MS. KEARNEY:  Objection.
 8            THE COURT:  Sustained.
 9   Q.   Okay.  Did you have -- was John very pleased with the --
09:22 10  did John tell you he was pleased with the work AYCO had done in
11   preparing his returns?
12            MS. KEARNEY:  Objection.  Hearsay.
13            THE COURT:  Sustained.
14   Q.   You prepared John's tax returns for 20 years, correct?
15   A.   Correct.
16   Q.   And he didn't go to anybody else to do his tax returns
17   over those 20 years, did he?
18            MS. KEARNEY:  Objection.
19            THE COURT:  If he knows.  Overruled.
09:23 20  A.   May I answer?
21   Q.   Sure.
22   A.   Not his personal returns.
23   Q.   Right.  When he was working in Europe, they needed a
24   second preparer to do the European returns, correct?
25   A.   Correct.
```

1    Q.    That was PWC?

2    A.    Correct.

3    Q.    And you coordinated with PWC because there's interactions

4    between the two different returns, correct?

5    A.    I coordinated to understand what his foreign taxes paid

6    were, to pick up those credits on his personal income tax

7    return.

8    Q.    Okay.  Over the 20 years that you worked with John, he at

9    times asked you to refer professionals for him to hire to

09:23 10   assist him in various measures, correct?

11   A.    On occasion he asked me for referrals, yes.

12   Q.    Do you remember one time he needed an executive coach and

13   he asked you if you could refer an executive coach for one of

14   his employees?

15   A.    I don't recall.

16   Q.    Okay.  Do you remember one time he wanted a contact in the

17   real estate industry and he asked you for a referral?

18   A.    I recall that, yes.

19   Q.    You recall that?

09:24 20   A.    Yes.

21   Q.    And it was somebody -- it was just kind of the

22   introductions or facilitation that you do as part of your job?

23   A.    I would put some of those into what I would call

24   non-central or courtesy referrals.

25   Q.    Yeah.  But it's part of having a good client relationship?

```
 1    A.    Just trying to help our clients, yes.
 2          THE COURT:   Mr. DeMaio, will you move the notebook out
 3    of the way and that microphone closer?
 4          THE WITNESS:   Yes, sir.
 5          MR. KENDALL:   Okay.   If we can show the witness only
 6    Exhibit 9821.
 7    Q.    If you could read this, just really the first paragraph or
 8    two, and tell us if that refreshes your recollection that John
 9    also asked you to refer to him an executive coach?
10          MS. KEARNEY:   Do you have a copy for us?   The screens
11    aren't working.
12    Q.    Does that refresh your recollection?
13    A.    I apologize.   It's not on my screen.
14          THE COURT:   We don't have it on the screen.
15    Q.    Okay.   We can bring you a paper copy, if that would be
16    helpful.
17    A.    Thank you.
18          MR. KENDALL:   Whatever's on the screen should not be
19    on the screen.   We have a different 9821.   We'll go with the
20    one we have a paper copy of.
21    A.    Okay.
22    Q.    Does that refresh your recollection you also referred him
23    to an executive coach to help with one of his employees?
24    A.    Yes.
25          MS. KEARNEY:   Can the witness be instructed to put the
```

1    document aside.

2              THE COURT:  Take the document away so that we --

3    Q.   If you can turn the document over so you can't read it.

4    Does that refresh your recollection that you -- he asked you

5    for an executive coach to refer to one of his employees to?

6    A.   Yes.

7    Q.   Okay.  Now, starting at about 1999 or so, John asked you

8    to refer to him -- to refer him to some lawyers that could do

9    trust and wills, correct?

09:26 10    A.   Yes.

11    Q.   Okay.  The first task was he wanted to set up educational

12    trusts for his niece and nephews, correct?

13    A.   I don't recall what the initial project was.

14    Q.   Okay.  But you recall that was one of the projects?

15    A.   I don't recall that specific project.

16    Q.   Do you recall he set up five separate trusts with $20,000

17    each for his nieces and nephews' education?

18    A.   20 years ago I don't remember that particular project.  I

19    apologize.

09:27 20    Q.   Do you have any memory of explaining to him that a gift to

21    an individual is not tax deductible, gifts to institutions are?

22    A.   No.  I don't remember about gifts to institutions being

23    tax deductible.  We have talked frequently over the years about

24    the annual exclusion gift that you can make to individuals to

25    make a gift to them and not have it be an estate or gift

```
 1    taxable event.
 2    Q.   Do you also recall giving him advice on drafting his will?
 3    A.   I worked with him and a third party attorney to work on
 4    his will, yes.
 5    Q.   You, in fact, referred him to Arnold Kahn, the third party
 6    attorney, correct?
 7    A.   Yes.
 8    Q.   Okay.  And you did several versions of that will from 1999
 9    to 2010, correct?
10    A.   I don't recall how many revisions or versions, but
11    perhaps.
12    Q.   Okay.  And you recall as part of that will he left
13    bequests to set up scholarship funds at two universities,
14    correct?
15    A.   I don't remember his bequests in his estate planning
16    documents.
17    Q.   Okay.
18              MR. KENDALL:  If we could show the witness
19    Exhibit 9809.  Actually, why don't we show the --
20              MS. KEARNEY:  Apologies, your Honor.  Did the witness
21    say that he did or did not remember?
22              THE WITNESS:  I don't remember his specific bequests
23    in his estate planning documents.
24              MS. KEARNEY:  Thank you.
25    Q.   Okay.  If you could take a look at Exhibit 9809.  Do you
```

1  recognize that as one of the trust components of the will that

2  you worked on?

3  A.   I recognize the title of this trust, yes.

4         MR. KENDALL:  Okay.  And I sort of blocked out some of

5  it.  I'd like to offer this document into evidence, your Honor.

6         MS. KEARNEY:  Objection, your Honor.  Relevance,

7  hearsay.

8         THE COURT:  Sustained.

9  Q.   If you could take a look --

09:29 10        MR. KENDALL:  If we could show the witness only

11  page -- starting on the one, two, three, fourth page of the

12  document.

13  Q.   I want you to read that paragraph just to yourself.  I'm

14  going to see if it refreshes your recollection.  Then I'm going

15  to ask you to go to the next page.

16  A.   Okay.

17        MR. KENDALL:  Actually, not the next page.  If we

18  could then go to the next page, please, Mr. Carter, and just

19  show the title and then go to the next page again after that.

09:30 20  Q.   If you can read paragraph 2.7.  Then we're going to drop

21  down to 2.7.d.

22  A.   Okay.

23  Q.   Read 2.7.d.  I'm going to ask you to read that and take a

24  moment to think, and then we'll turn the screen off, and I'll

25  see what refreshes your recollection.

1    A.   Would you mind just scrolling back so I can read that

2    first paragraph?  Thank you.

3    Q.   Would you prefer a paper copy to refresh your

4    recollection?

5    A.   No, thank you.

6    Q.   Okay.  Whatever is best for you.

7    A.   Yes.

8    Q.   Okay.  And if we can go to the top of page 19, please.  If

9    you could just read that double -- paragraph double ii.

09:31 10   Actually, read the whole of that page and then I'll ask you to

11   put the screen off and we'll go through it.

12   A.   Okay.

13   Q.   If we could turn -- does that refresh your recollection

14   that in the will and trust plan that you set up for Mr. Wilson

15   he left bequests to two different universities to set up

16   scholarship funds?

17   A.   This is the trust that I worked with an attorney to

18   prepare, yes.

19   Q.   Arnold Kahn was the attorney, correct?

09:31 20   A.   Yes.

21   Q.   And you referred Mr. Kahn to Mr. Wilson, didn't you?

22   A.   Yes.

23   Q.   Okay.  And in this trust structure you set up, the plan

24   was to leave two and a half million dollars to Rensselaer

25   Polytech and two and a half to Harvard University, correct?

|       |                                                                          |
|-------|--------------------------------------------------------------------------|
| 1     | MS. KEARNEY:  Objection as to who set up the trust.                       |
| 2     | THE COURT:  Sustained.                                                    |
| 3     | Q.   Okay.  Under the trust that was established with                     |
| 4     | Mr. Kahn's assistance and your assistance, Mr. Wilson was                 |
| 5     | planning to leave two and a half million dollars to Rensselaer           |
| 6     | Polytech, correct?                                                        |
| 7     | A.   Yes.                                                                 |
| 8     | Q.   And two and a half to Harvard, correct?                             |
| 9     | A.   Yes.                                                                 |

09:32 10   Q.   And that was to set up a scholarship fund for students
11   whose parents had not gone to college, correct?
12   A.   I don't recall what the specific scholarship was.
13          MR. KENDADLL:  If we could show the exhibit again to
14   see if we could further refresh his memory.  And if we can go
15   to page 18 of Exhibit 9809.  And I'd -- no.  The other
16   direction, please.  Right there.
17   Q.   Can you read that paragraph again and tell us if that
18   refreshes your recollection.  Then I'll ask him to turn off the
19   screen.  So read it for as long as you need to refresh.

09:32 20   A.   Yes.  Now I see.  Thank you.
21   Q.   Okay.  Do you recall that it was to set up scholarships
22   for people whose parents did not receive a college education?
23   A.   Yes.
24   Q.   They call them "first timers"?
25   A.   Yes.

```
 1    Q.   First generation.  And it was for people who would study
 2    science, engineering, or business?
 3    A.   Yes.
 4    Q.   And they had to have at least a B average, correct?
 5    A.   Yes.
 6    Q.   Okay.  And when Mr. Wilson was telling you he wanted to
 7    create a structure like this, do you remember having a
 8    conversation where he discussed with you his personal
 9    background and why he wanted to do this?
10    A.   I don't -- it was a long time ago.  I don't recall if he
11    worked with Arnold directly on that or we had a three-way call.
12    I don't recall.
13    Q.   Don't you remember raising with him that that was a sort
14    of new type of provision or unusual type of provision you saw
15    for a first generation bequest like that, or restricting it to
16    first generation students, and he explained to you what
17    education had done in his life?
18              MS. KEARNEY:  Objection, your Honor.
19              THE COURT:  Sustained.
20    A.   I just don't remember.
21    Q.   Okay.  You have no memory of ever discussing any aspect of
22    Mr. Wilson's background when you were doing the estate planning
23    or tax planning for him?
24    A.   It was 20 years ago.  I don't recall.  I apologize.
25    Q.   Well, these wills were refreshed all the way through 2010,
```

```
 1   correct?
 2   A.   I don't know what aspects of them were refreshed
 3   through 2010.
 4   Q.   Okay.  So you're telling us you have no memory of
 5   Mr. Wilson ever discussing his personal background with you?
 6   A.   Vaguely over the years.  I mean.
 7   Q.   Okay.  What do you remember?
 8             MS. KEARNEY:  Objection.  Hearsay.
 9             MR. KENDALL:  Your Honor, state of mind only.
10             MS. KEARNEY:  Relevance.
11             THE COURT:  Sustained.
12   Q.   Okay.  Mr. Wilson -- did Mr. Wilson explain to you why
13   education was so important to him?
14             MS. KEARNEY:  Objection.
15             THE COURT:  Sustained.
16   Q.   Did you ever have any conversations with Mr. Wilson about
17   his views on education?  Just yes or no.
18   A.   Yes.
19   Q.   Okay.  When did these conversations occur?
20   A.   I don't remember specific conversations.
21   Q.   Intermittently over the relationship?
22   A.   Not in recent years, but perhaps in years ago.
23   Q.   During the times that the will was being set up and
24   revised?
25   A.   I don't remember those specific conversations.
```

|  |  |
|---|---|
| 1 | Q.   Okay.  Can you tell us, did he say anything to you about |
| 2 | why he viewed giving to education to be so important? |
| 3 | MS. KEARNEY:  Objection. |
| 4 | Q.   Yes or no? |
| 5 | MS. KEARNEY:  Objection, your Honor. |
| 6 | THE COURT:  He can answer yes or no. |
| 7 | A.   Can you repeat the question, please. |
| 8 | Q.   Did he say -- do you remember him saying anything to you |
| 9 | about why he viewed education as so important? |
| 09:35 10 | A.   I feel I would be drawing -- you know, speculating or -- |
| 11 | you know, I don't have a specific conversation I can refer to. |
| 12 | Q.   But, in general, do you remember this being discussed |
| 13 | without remembering the specific conversation?  Just yes or no. |
| 14 | MS. KEARNEY:  Objection. |
| 15 | THE COURT:  Sustained. |
| 16 | Q.   Okay.  Mr. Wilson was your client for 20 years, correct? |
| 17 | A.   Yes. |
| 18 | Q.   Okay.  When this indictment came down involving |
| 19 | Mr. Singer, he stopped being your client, correct? |
| 09:36 20 | A.   Yes. |
| 21 | Q.   This is a major embarrassment for you, isn't it, that you |
| 22 | referred a client to Rick Singer? |
| 23 | MS. KEARNEY:  Objection. |
| 24 | THE COURT:  Sustained. |
| 25 | Q.   Would you agree with me -- strike that. |

```
 1              Do you view this as a negative to your career
 2    reputation that you referred a client to Rick Singer?
 3              MS. KEARNEY:  Objection.
 4              THE COURT:  Sustained.
 5    Q.   How many clients did you refer to Rick Singer?
 6    A.   Approximately four or five.
 7    Q.   If I were to suggest it's more like seven or eight, would
 8    you agree?
 9              MS. KEARNEY:  Objection.
09:36 10         THE COURT:  He can answer.
11    A.   I'd have to look at the exact number, but I believe that
12    some of those were one of my colleagues or more coming to me
13    and asking me a question about college, you know, prep advisers
14    and maybe I referred them to my colleague.  I don't remember
15    all the numbers.
16    Q.   Who first introduced you to Rick Singer?
17    A.   An HR professional, human resource professional.
18    Q.   And where did this human resources professional work?
19    A.   In Southern California.
09:37 20    Q.   What company?
21              THE WITNESS:  Your Honor, should I present the names
22    of the company or --
23              THE COURT:  You answer his questions and we'll go from
24    there.
25              THE WITNESS:  Okay.
```

1    A.    PIMCO.

2    Q.    PIMCO.  So PIMCO is a major investment management company,

3    correct?

4    A.    Yes, sir.

5    Q.    Okay.  And so you say an HR professional, somebody who

6    worked in the HR side of PIMCO?

7    A.    Yes, in that department.

8    Q.    And how did you meet this person?

9    A.    Just through our mutual work together.

09:37 10   Q.    And you say your mutual work together.  Did you provide

11   investment management work for this PIMCO person?

12   A.    No.

13   Q.    You provided investment management to other PIMCO

14   executives, correct?

15   A.    Yes.

16   Q.    Okay.  And so this HR professional knew about Rick Singer

17   because he was working with PIMCO executives, correct?

18          MS. KEARNEY:  Objection.

19          THE COURT:  Sustained.

09:38 20   Q.    Well, this HR professional worked with PIMCO executives,

21   correct?

22   A.    Yes.

23   Q.    He provided HR services to PIMCO executives, correct?

24   A.    Yes.

25   Q.    And some of those PIMCO executives were also your clients,

1    correct?

2    A.   Yes.

3    Q.   Okay.  So based upon that, this HR executive introduced

4    you to Rick Singer, correct?

5    A.   Not based on the certain fact that we had the same

6    clients, but just based on his familiarity with Rick.

7    Q.   Okay.  And did you go to some sort of event, a lunch and

8    learn, or something like that, to meet Mr. Singer?

9    A.   I went to a lunch with the HR executive.

09:38 10   Q.   And with Mr. Singer?

11   A.   I believe he was at the lunch.  I was trying to recall

12   that for a couple years now.

13   Q.   That was at The Ritz in Newport Beach?

14   A.   Correct.

15        MR. KENDALL:  Okay.  Could we show the Exhibit 9798 to

16   the witness?

17   Q.   And tell us if that refreshes your recollection that

18   Mr. Singer was also at that lunch at The Ritz.

19   A.   Yes.

09:39 20   Q.   Okay.  And so Mr. Singer, yourself, and this HR executive

21   from PIMCO all met at The Ritz and had lunch?

22   A.   Yes.

23   Q.   Okay.  Now, during that time did Mr. Singer describe his

24   business to you?

25   A.   Yes.

```
 1              MR. KENDALL:  Okay.  Your Honor, I'd like to offer the
 2    conversation, not for the truth of the matter stated, just to
 3    show Mr. DeMaios's state of mind.
 4              MS. KEARNEY:  Objection to how this witness' state of
 5    mind is relevant.
 6              THE COURT:  Sustained.
 7    Q.   Okay.  After this lunch with Mr. Singer and the HR
 8    executive, you reached an agreement with Mr. Singer to refer
 9    clients to each other, correct?
09:40 10    A.   There was no agreement, per se.
11              MR. KENDALL:  If we could take a look at Exhibit 9799,
12    for the witness only, please.
13    Q.   Is this, in fact, a series of e-mails that you and
14    Mr. Singer exchanged after that lunch meeting at The Ritz?
15              MS. KEARNEY:  Objection --
16    Q.   Excuse me.  I'll withdraw that.  Could you identify this
17    document for us, 9799?
18    A.   It's an e-mail.
19    Q.   An e-mail that you had -- chain with who?
09:40 20    A.   Rick Singer.
21    Q.   And it's following up from the lunch you had?
22              MS. KEARNEY:  Objection.
23              THE COURT:  Sustained.
24    Q.   It was a few days after the lunch, correct, about two,
25    three weeks after the lunch?
```

```
 1   A.   I don't remember the date of the lunch, so I can't.
 2          MR. KENDALL:  Okay.  Why don't we show the witness
 3   9798 and see if that refreshes his recollection as to the date
 4   of the lunch.
 5   A.   Thank you.
 6   Q.   Okay.  This is an entry in your calendar, correct, 9798?
 7   A.   I don't recognize how we -- what these printouts look
 8   like, but it looks like it is.
 9   Q.   Okay.  And this is a record that you use in your business
10   at AYCO, correct?
11   A.   Correct.
12   Q.   To keep your schedule, to make appointments, and to refer
13   you back to manage your responsibilities, correct?
14   A.   Yes.
15   Q.   And it's in the normal practice of AYCO to maintain these
16   type of documents, correct?
17   A.   Yes.
18          MR. KENDALL:  Okay.  Your Honor, I'd like to offer
19   Exhibit 9798 as a business record.
20          MS. KEARNEY:  Objection.  I mean, it's hearsay.  It's
21   a calendar reminder.  It's not a business record.
22          THE COURT:  We'll reserve on this one until -- you can
23   bring it back up at a conversation outside the hearing of the
24   jury, but it's not admitted now.
25          MR. KENDALL:  Is that -- if we can show it to the
```

1    client -- to the witness one more time.

2    Q.   Does that refresh your recollection that the meeting with

3    Mr. Singer was on November 6, 2007?

4    A.   Yes.

5    Q.   Okay.  Now, if we can go to Exhibit 9799.  Okay.

6    Exhibit 9799, if you could look at it -- and I think you

7    previously testified it's an e-mail exchange with Mr. Singer?

8    A.   Okay.  Yes.

9    Q.   And this e-mail exchange occurred about three weeks or so

09:43 10   or two and a half weeks after your lunch meeting with

11   Mr. Singer, correct?

12   A.   Yes.

13        MR. KENDALL:  Okay.  Your Honor, I'd like to offer

14   9799 into evidence.

15        MS. KEARNEY:  Objection, your Honor.  It's hearsay.

16   It can be used to refresh the witness' recollection.

17        THE COURT:  Sustained.

18   Q.   Okay.  Fair to say -- do you remember telling Mr. Singer

19   after your lunch meeting that you'd be speaking with some of

09:43 20   your associates about Singer's company and looking for

21   opportunities for Mr. Singer?

22   A.   I was responding to his courtesy e-mail after our lunch

23   with another courtesy e-mail.

24   Q.   But did you say that in your courtesy e-mail?

25   A.   I said that I would share my introduction to him with

```
 1   others just to inform them of his existence.
 2   Q.   And you said you'd be looking for some opportunities for
 3   him, correct?
 4   A.   I mentioned that if I saw a bid that might be worth
 5   exploring, I would bring it up.
 6   Q.   You said to him you'd be looking for some opportunities
 7   for you, correct?
 8   A.   Opportunities as in potential bids where our clients can
 9   help each other, or we can help each other as clients.
10   Q.   And you told him that you should keep in touch regarding
11   opportunities to work together with our mutual clients as
12   situations arise, correct?
13   A.   Correct.
14   Q.   You also told him you'd let him know when you'd have a
15   forum where he could do a presentation to some of the other
16   AYCO account managers, correct?
17            MS. KEARNEY:  Objection, your Honor.
18            THE COURT:  Sustained.
19   Q.   Did you, in fact, set up any presentations at AYCO for
20   Mr. Singer to do for any of the professionals there?
21   A.   No.
22   Q.   Okay.  But then, within a month, you referred him to
23   another client, correct?
24   A.   I had a client I inquired for ACT prep type services for
25   one of his clients.  Rick was just top of mind because of the
```

```
 1    lunch and I brought it up, but it never pursued -- got pursued.
 2    We never had a meeting.
 3    Q.   Well, you e-mailed the client and gave him Mr. Singer's
 4    name, correct?
 5    A.   I don't recall in that case if I gave him his name or
 6    contact info.
 7              MR. KENDALL:   Okay.  Could we show the witness
 8    Exhibit 9800.
 9    Q.   Do you recognize this document?
10    A.   Yes.
11    Q.   Is this a letter that you sent to a client?
12    A.   Yes.
13    Q.   And if we can take a look at paragraph 3 there.
14              MR. KENDALL:   Your Honor, I'd like to --
15    Q.   And so this is a letter you sent to a client, correct?
16    A.   Yes.
17              MR. KENDALL:   Your Honor, I'd like to offer 9800, not
18    for the truth of the matter asserted but just to show that the
19    letter was sent.
20              MS. KEARNEY:   Objection to relevance.
21              THE COURT:   Sustained.
22    Q.   Okay.  After looking at Exhibit 9800, does that refresh
23    your recollection that you referred him to a second client
24    within a month of the first referral?
25    A.   Like I said, it was top of my mind.  A client, ironically,
```

```
  1    had asked me about these type of services and I shared his
  2    contact info.
  3    Q.   Is that a yes?
  4    A.   Yes.
  5    Q.   Okay.  Before you testified in this case yesterday and
  6    today, did you prepare with anybody for your testimony?
  7    A.   Yes.
  8    Q.   How many times did you meet with the government?
  9    A.   Two meetings.
09:47 10   Q.   Okay.  And were there phone calls as well?
 11    A.   One Zoom conference call.
 12    Q.   Okay.  Did you also meet with Goldman Sach's attorney or
 13    AYCO's attorney?
 14    A.   Yes.
 15    Q.   How many times did you meet with AYCO's attorney to
 16    prepare your testimony?
 17    A.   I don't recall the specific number.
 18    Q.   Did you review these documents that I've shown you in any
 19    of your preparation?
09:47 20   A.   Some of them.
 21    Q.   And then do you recall that you referred Mr. Singer again
 22    to one of your colleagues at AYCO in 2010?
 23    A.   Do you have an exhibit you could show me?
 24    Q.   Sure.  9801, if it will refresh the recollection.
 25              Does this -- well, do you know who Erick Mccreight
```

```
 1   is?

 2   A.   One of my colleagues.

 3   Q.   Is he, like you, a relationship manager for AYCO?

 4   A.   Yes.

 5   Q.   Okay.  And you gave him Mr. Singer's credentials for him

 6   to refer to his clients, correct?

 7   A.   Erick reached out to our region to see if anybody had a

 8   referral for a college prep type of provider and we tried to

 9   work together to share resources, and I was one of the people

10   that responded to him.

11   Q.   And you responded with giving Rick Singer's name, correct?

12   A.   Yes.

13   Q.   Okay.  Now, when you gave that response, was it a reply

14   all or was it just to Mr. Mccreight?

15   A.   Just to Mr. Mccreight.

16   Q.   Okay.  And then he went off and referred Mr. Singer to one

17   of his clients, correct?

18        MS. KEARNEY:  Objection.

19        THE COURT:  Sustained.

20   Q.   Okay.  He copied you on an e-mail to his client referring

21   Mr. Singer, correct?

22        MS. KEARNEY:  Objection.

23   A.   I don't recall.

24   Q.   If you could take a look at 9801 and tell us if that will

25   refresh your recollection.
```

1    A.    I'm not copied on this e-mail.

2    Q.    So you don't have a memory of receiving it or not?

3    A.    No.

4    Q.    Okay.  Then, in 2010, you referred John Wilson to Rick

5    Singer, correct?

6    A.    Yes.

7    Q.    So this is probably the fourth referral you've made from

8    Mr. Singer that's documented in AYCO records?

9    A.    This is the third.

09:50 10   Q.    There's the two you made, the one you gave to

11   Mr. Mccreight --

12   A.    The first one was a husband and wife.  That was the same

13   referral.

14   Q.    Okay.  Thank you.  And you recall that you referred him

15   around September of 2010?

16   A.    Yes.

17   Q.    Okay.  And you describe Mr. Singer as very accomplished,

18   is that correct?

19   A.    That was my understanding.

09:50 20   Q.    And that was your sincere belief?

21   A.    My sincere belief.

22   Q.    And I'd like to show you Exhibit 9802.  Do you recognize

23   that?

24   A.    Yes.

25   Q.    What is it?

1   A.   A response to a request by John for college prep ACT prep

2   services, and I think I was responding in this e-mail to his

3   request.

4   Q.   And that's where you gave him Rick Singer's contact

5   information, correct?

6   A.   If you could scroll down, please.

7        MR. KENDALL:  Oh.  Excuse me.  Let me withdraw that

8   question.

9        I'd like to offer 9802 into evidence, your Honor.

09:51 10   Again, not for truth of the matter asserted, just to show the

11   introduction was made.

12        MS. KEARNEY:  Your Honor, I object.  The defense did

13   not provide the government with these exhibits on their exhibit

14   list.  They're springing them on us now.

15        MR. KENDALL:  It's cross-examination materials, your

16   Honor.

17        MS. KEARNEY:  This is not being used for impeachment.

18   It's being used for the defendant's case-in-chief.

19        THE COURT:  Yeah.  The objection is sustained.

09:51 20        MR. KENDALL:  Your Honor, these are records that the

21   government has.  There's no surprise here, your Honor.

22        THE COURT:  The objection is sustained.

23   Q.   And then after that, you were referring Mr. Singer to

24   clients as late as 2016, correct?

25   A.   Can you show me what you're referring to?

1    Q.    If you could take a look at Exhibit 9803.

2          Excuse me.  I got the date wrong there.  I misread

3    it.  It's 2012.  In 2012, you were referring Mr. Singer to

4    other clients, correct?

5    A.    This is a relative of a client who had asked if I knew

6    anybody that would have any comment on a ACT and college prep

7    firm that he was already working with, and Mr. Singer was the

8    only reference that came to mind.

9    Q.    Okay.  So you put him in touch with Mr. Singer, correct?

09:52 10   A.    Let me read the e-mail, please.

11         I put him in touch to indicate that he might be able

12   to provide some input regarding the firm he was already working

13   with.

14   Q.    Versus Rick's own firm, in case he wanted to go with Rick?

15   A.    Not necessarily, just answering my client's request.

16   Q.    But you did offer him to give insight versus -- for the

17   firm he was working with versus Rick's firm, correct?

18   A.    I would imagine that's what he would compare it to,

19   correct.

09:53 20         MR. KENDALL:  Okay.  Your Honor, I'd like to offer

21   9803 into evidence.

22         MS. KEARNEY:  Same objection.

23         THE COURT:  Sustained.

24         MR. KENDALL:  Again, your Honor, it's not for the

25   truth of the matter asserted, and we don't believe it's

1    hearsay.

2    Q.   You were -- I'd like to show you -- and then you made more

3    referrals to Mr. Singer after that with clients, correct?

4    A.   If would you like to show me another one, I'd be happy to

5    discuss it.

6    Q.   Okay.  If we can refresh his recollection with Exhibit

7    9804.  Do you recognize this document?

8    A.   Let me just read it, please, to refresh my memory.  Sorry.

9    There's a lot of redactions, so I'm trying to follow it.

09:54 10         Okay.  I think I recall this e-mail of this memo.

11   Q.   Do you recall making a reference of Mr. Singer to another

12   client in August of 2012?

13   A.   No.  I can explain this memo.

14   Q.   Okay.  What do you recall?

15   A.   This is a memo where I was following up on meetings I had

16   had, just refreshing -- or reminding myself of follow-up work

17   perhaps next time I saw the client or clients.  There was

18   multiple clients referenced in this memo.  And one of those

19   lines I think was referring to one of my clients mentioning

09:55 20   that he was starting to explore preparing for college and

21   college prep and ACT prep services.  So I just made a note to

22   myself to maybe add that to my future agenda, but it was never

23   followed up on, and that client never received a referral.

24   Q.   So Exhibit 9804 is a document you created in the course of

25   your work to write down certain information and to refer back

1    to it, correct?

2    A.   Yes.

3    Q.   And you wrote it?  It's your knowledge?  Your information?

4    A.   I believe my --

5    Q.   You dictated --

6    A.   -- my colleague, yes.

7    Q.   -- to Shannon, and she recorded it for you?

8    A.   Yes.

9    Q.   And that's the custom and practice you sometimes followed

09:55 10   there?

11   A.   In the past, yes.

12            MR. KENDALL:  Okay.  Your Honor, I'd like to offer

13   9804 as a business record.

14            MS. KEARNEY:  Your Honor, same objection.  The defense

15   did not include these documents on its exhibit list.

16            MR. KENDALL:  Your Honor, this is direct impeachment

17   of the number of people who are getting referrals, your Honor.

18            MS. KEARNEY:  No, your Honor, it's not impeachment.

19   The witness acknowledged that he referred a handful of clients.

09:56 20            THE COURT:  Yeah.  The objection is sustained.

21   Q.   I now -- and then you testified you, yourself, used

22   Mr. Singer's tutoring services for a period of six months or

23   so?

24   A.   A little bit more than six months.

25   Q.   And then, in 2016, you referred Mr. Singer over to a

1    company called Beacon Pointe, correct?

2    A.    It was a referral to a friend of mine that I've known for

3    about 29 years that works at Beacon Pointe.

4    Q.    Okay.  Is that person a financial adviser like yourself?

5    A.    Yes.

6    Q.    Okay.  What was the purpose of the referral to your friend

7    at Beacon Pointe?

8    A.    We had breakfast together on occasion and he had mentioned

9    to me that a friend of his son was preparing for college and he

09:57 10   wanted to know if I had anybody who did good ACT prep and

11   things of that nature.

12   Q.    Okay.  I'd like to show you Exhibit 8135, please.

13   Actually, we've got a couple of cover letters here that should

14   be excluded.  Let's just go down a little bit.  For the record,

15   8135 will start with the next page.

16          Do you recognize this as your e-mail with Beacon

17   Pointe?

18   A.    Yes.

19   Q.    Okay.  And this is something you sent over to them as part

09:57 20   of referring Mr. Singer, correct?

21   A.    This was my follow-up to his inquiry.

22          MR. KENDALL:  Your Honor, I'd offer Exhibit 8135,

23   please, not for the truth of the matter asserted, but just show

24   the referral.

25          MS. KEARNEY:  Objection, your Honor.  This is not in

1    the defendants' exhibit list.  Also, it's improper impeachment

2    evidence because it's --

3            THE COURT:  Objection is sustained.

4            MR. KENDALL:  Your Honor, it is on the exhibit list,

5    and I can give you the citation for where it appears on the

6    witness list.

7            MS. KEARNEY:  I apologize.  It is on the exhibit list,

8    but it is still improper impeachment, because it goes to

9    collateral matter and the witness acknowledged he did make the

09:58 10   referral.

11           MR. KENDALL:  Your Honor, it's to show the referral

12   being made and the relationship with Mr. Singer.  It's not for

13   the truth of the matter asserted.  It's on the exhibit list,

14   your Honor.

15           MS. KEARNEY:  Your Honor, he's acknowledged that --

16           THE COURT:  Yeah.  Objection is sustained.

17           MR. KENDALL:  May I understand the grounds, your

18   Honor, so I can try to do a better job?

19           THE COURT:  No.  We'll talk about it at a later time.

09:58 20   Q.   When you did this referral to Mr. Singer, you also saw

21   Mr. Singer's marketing credentials, correct?

22   A.   I believe I was copied on them when he sent them to my

23   acquaintance, yes.

24   Q.   And in his marketing credentials, he made various

25   statements about his expertise?

```
 1    A.    I don't remember or recall looking at it at the time.

 2    Q.    Would you like to refresh your recollection?

 3    A.    I'd be happy to look at it if you bring it up.

 4          MR. KENDALL:  If we could show the witness

 5    Exhibit 9057, please.

 6    A.    Yes.  I remember this vaguely.

 7    Q.    Okay.  And fair to say when you read Mr. Singer's

 8    descriptions of his credentials, you took it as being truthful,

 9    correct?

09:59 10  A.    Well, when he provided this copy back to my acquaintance,

11    I didn't look at it necessarily very, very closely because I

12    figured -- I know he's a thorough guy.  He would look at it

13    himself.

14    Q.    But you got a copy of it, correct?

15    A.    It appears I was copied on the e-mail when he was replying

16    to my friend.

17    Q.    Okay.  And you read it to some degree, correct?

18    A.    I read it more recently.

19    Q.    Okay.  Did you read it as well back in 2016?

10:00 20  A.    I don't recall.

21    Q.    Okay.  You knew -- what was your -- what was your

22    understanding of Mr. Singer's level of expertise as a college

23    counselor back at the time that you were making these

24    referrals?

25    A.    My understanding was that he was, you know, very
```

         1    experienced in this area and had a longstanding business, many

         2    client referrals.

         3    Q.    Representing some of the wealthiest and most successful

         4    people in California?

         5    A.    Yes.

         6    Q.    Who were some of the clients that he told you he

         7    represented that impressed you?

         8    A.    I don't remember specific ones.  I just remember he had a

         9    hard copy packet at the time, which had a fair amount of

10:01   10    materials about that.

        11    Q.    Had Steve Jobs of Apple listed?

        12    A.    I recall that name.

        13    Q.    Joe Montana, the quarterback?

        14    A.    Yes.

        15    Q.    A group of people who were Chip Rosenbloom, the owner of

        16    the St. Louis Rams?

        17    A.    I don't recall that one, but.

        18    Q.    Christopher Schaepe, the CEO of Lightspeed?

        19    A.    I don't recall that specific one, but perhaps.

10:01   20    Q.    A series of other senior executives at major companies?

        21    A.    Yes.

        22    Q.    John Door at Kleiner Perkins?

        23    A.    Yes.

        24    Q.    Okay.  What is Kleiner Perkins?

        25    A.    Private equity and venture capital firm.

```
 1    Q.   An immensely successful and respect one, correct?
 2              MS. KEARNEY:  Objection.
 3              THE COURT:  Sustained.
 4    Q.   How would you describe Kleiner Perkins?
 5    A.   A well known and recognized venture capital private equity
 6    firm.
 7    Q.   Also, Hollywood executives he listed?
 8    A.   I don't recall the Hollywood executives.
 9    Q.   Peter Guber?
10:01 10   A.   I don't recall that one.
11    Q.   Okay.  And he also listed various corporate clients,
12    correct?
13    A.   Companies?
14    Q.   Yes.
15    A.   You might have to refresh my memory.
16              MR. KENDALL:  If we could show the witness Exhibit
17    9057 and look at page 2.
18    Q.   If you could look at the first paragraph after the list of
19    names.
10:02 20   A.   Yes.
21    Q.   And who did that -- did that refresh you as to who he
22    listed among his various corporate clients?
23    A.   Yes.
24    Q.   And who were they?
25              MS. KEARNEY:  Can we take the document down?
```

```
 1              THE COURT:  Yes.  Take the document down.
 2   Q.   Okay.  If you could tell us what you remember.
 3   A.   Disney, Morgan Stanley, Wells Fargo.
 4   Q.   Oppenheimer?
 5   A.   Yes.
 6   Q.   Under Armour?
 7   A.   Yes.
 8   Q.   Sacramento Police Foundation?
 9   A.   I don't recall that one.
10:02 10   Q.   PIMCO?
11   A.   Yes.
12   Q.   Fair to say all highly respected corporate names in
13   California?
14   A.   Yes.
15   Q.   And Mr. Singer also talked about this sort of public
16   service and initiatives for low income and disadvantaged people
17   that The Key did, correct?
18   A.   I wasn't real familiar with that.
19   Q.   Okay, but it was in the credentials he was circulating,
10:03 20   correct?
21   A.   I don't recall.
22              MR. KENDALL:  Why don't we show him again Exhibit 9057
23   and go to page 3, please.  If we could scroll down a little bit
24   more, that's good.
25   Q.   I don't need specific examples, but in general, he was
```

```
  1   touting all this sort of public service and things he was doing
  2   for disadvantaged people, correct?
  3   A.   Yes.
  4   Q.   And I take it whatever you heard about Mr. Singer prior to
  5   2018 you believed?
  6   A.   Yes.
  7   Q.   You thought -- put it this way.  In the business you're
  8   in, your clients are your biggest asset, correct?
  9   A.   Yes.
10:04 10   Q.   And the quality of your client service is the most
 11   important thing in your job, correct?
 12   A.   Yes.
 13   Q.   You want to protect your clients, correct?
 14   A.   Yes.
 15   Q.   You want to give them the best services?
 16   A.   Yes.
 17   Q.   That's why AYCO and Goldman Sachs are so preeminent,
 18   correct?
 19   A.   Yes.
10:04 20   Q.   And in the 10, 11 years that you were -- from when you met
 21   Mr. Singer until his con artist stuff was exposed, you never
 22   had the slightest doubt about his integrity, correct?
 23   A.   I don't recall having any doubt about his integrity.
 24   Q.   You wouldn't have referred him to any of your clients or
 25   your professional contacts if you had the slightest doubt about
```

        1    his integrity, correct?

        2    A.   Correct.

        3             MR. KENDALL:   If I may have a moment, your Honor.

        4             THE COURT:   Yes.

        5    Q.   Now, the government showed you some of John's tax returns

        6    yesterday and some of them were redacted copies.  Do you

        7    remember that?

        8    A.   Yes.

        9    Q.   In fact, if you look at all the tax returns John got in

10:06  10    2014, would you agree he probably got close to 200 pages of

       11    various returns?

       12    A.   Yes.

       13    Q.   He had a federal tax return, correct?

       14    A.   Yes.

       15    Q.   He had a California state tax return?

       16    A.   Yes.

       17    Q.   He had a Massachusetts state tax return?

       18    A.   Yes.

       19    Q.   He had a Dutch tax return?

10:06  20    A.   Not in our package of tax returns.

       21    Q.   No.  I'm just talking about the whole circle of returns

       22    he's dealing with.

       23    A.   Yes.

       24    Q.   He's got a Dutch tax return.  And you're not aware of John

       25    speaking Dutch or reading Dutch?

1    A.    No.

2    Q.    Okay.  And in addition, he's got the corporate returns

3    that Jim Nahmens is taking care of, correct?

4    A.    Yes.

5    Q.    The HPC return and perhaps some other businesses

6    affiliated with HPC, like DGS2, or something like that?

7    A.    Yes.

8    Q.    Okay.  And so fair to say John gets, in the course of

9    calendar 2014, probably a couple of hundred of pages of tax

10:07 10   returns?

11   A.    Yes.

12   Q.    And someone even who has some knowledge about business and

13   taxes is not going to go through 200 pages line by line and

14   understanding everything, correct?

15          MS. KEARNEY:  Objection as to what someone might not.

16          THE COURT:  Sustained.

17   Q.    Okay.  You didn't go through these returns with John line

18   by line, did you?

19   A.    No.

10:07 20   Q.    Okay.  The person who was the main contact for providing

21   paperwork for these returns was Debbie Rogers, correct?

22   A.    For providing data, yes.

23   Q.    And for keeping the paperwork flowing back and forth?

24   A.    Yes.

25   Q.    And 2014 is a time where John is living in Amsterdam,

1    correct?

2    A.    Yes.

3    Q.    Now, I want to ask you a question that directly relates to

4    the 2014 return that was discussed yesterday.  In 2013, John

5    sent an e-mail to you asking about what should be his state of

6    residency for his state income taxes, correct?

7    A.    In 2013?

8    Q.    Yes.

9    A.    I don't recall it.

10:08 10          MR. KENDALL:  If we could show the witness

11    Exhibit 9831, please.  And if we could go to the last page, the

12    earliest e-mail in time?

13    Q.    Do you recognize 9813 as an e-mail chain that John sent to

14    you?

15          MR. KENDALL:  Excuse me.  9831, please.  I transposed

16    it --

17    Q.    Do you recall this as an e-mail chain that John sent to

18    you?

19    A.    I don't recall this particular e-mail.

10:09 20    Q.    Do you identify it though?  Do you recognize that it is a

21    valid e-mail chain between you and John?

22    A.    Yes.

23          MR. KENDALL:  Okay.  Your Honor, I offer 9831.

24          MS. KEARNEY:  Objection.  Hearsay.

25          THE COURT:  Sustained.

1          MR. KENDALL:  Your Honor, it's not for the truth of

2     the matter.  It's to show that a conversation occurred.

3          MS. KEARNEY:  That's hearsay, your Honor.

4          THE COURT:  The objection is sustained.

5     Q.   Does that refresh your recollection that in July of 2013

6     John asked you if he could stop paying California income taxes

7     because he was no longer a California resident?

8     A.   Like I said, I don't remember that specific inquiry.

9     Q.   You don't remember the specific inquiry, but would you

10    agree with me the topic came up in 2013?

11    A.   Based on the e-mail you just -- and showed me.

12         MS. KEARNEY:  Objection.

13         THE COURT:  Sustained.

14         MR. KENDALL:  Your Honor, if it's a failure of the

15    witness' recollection, I think I get to read it -- at least

16    read the document into the record.

17         THE COURT:  No.  The objection is sustained.  You

18    don't get to read it into the record.

19    Q.   Okay.  If you could take a look at the -- isn't what

20    happened is John raised a question to you about changing the

21    residency and you asked him some questions and John never

22    followed up?

23    A.   I don't recall that.

24    Q.   Okay.  Take a look at the first page of Exhibit 9831,

25    please, and tell us if that refreshes your recollection.

1    A.    I recall an e-mail of this nature.

2         MR. KENDALL:   Okay.  So if we could turn off the

3    screen, please.

4    Q.    You recall in 2013 you told John it might be a possibility

5    to change the residency, but he needed to respond to you with

6    some information, or get back to you in some details, correct?

7    A.    What refreshed my memory in that e-mail is that my

8    colleague provided him with a checklist of the steps that are

9    necessary or things that you would check to see if you would

10:11 10    qualify to make that change.

11   Q.    Okay.  And John never responded to that e-mail, correct?

12   A.    I don't recall.

13   Q.    Okay.  He raised it again three years later, correct,

14   2016?

15   A.    I believe so.

16   Q.    Okay.  And, in 2016, AYCO, in fact, went back and filed

17   for a bunch of refunds for John for the prior years' California

18   income taxes, correct?

19   A.    I remember doing some amended returns regarding that.  I

10:12 20    don't recall if it was that year or time frame.  I can respond

21   accurately if you show me something that shows me the year or

22   what have you.

23   Q.    Okay.

24        MR. KENDALL:   Your Honor, I'd like to refresh his

25   recollection.  I don't have this marked as an exhibit.  If I

1    can walk over and show it to him, we can call it exhibit

2    whatever is our next number.

3            THE COURT:  Provide counsel a copy.

4            MR. KENDALL:  I'll show them the copy I have, your

5    Honor.  I wasn't expecting to need to do this.

6    Q.   If you could just take a look at the document I'm going to

7    put in front of you.

8    A.   Yes.

9    Q.   Read through all three pages.  Look at the dates

10:13 10   highlighted.  And then put it down, please, and turn it over.

11   A.   One moment.

12           (Witness complies.)

13   Q.   Does that refresh your recollection that AYCO helped

14   provide requests for refunds from California for the years John

15   was in Amsterdam to get back the state income taxes?

16   A.   First of all, all three of those refund checks were dated

17   in 2020, so I did not see them, but it does not surprise me

18   that he received those three refund checks because we prepared

19   amended tax returns to reflect his updated domicile.

10:14 20   Q.   Yeah.  So bottom line, for 2014, he paid a California

21   state income tax and then later got a refund of the money

22   several years later, correct?

23   A.   Yes.

24   Q.   And AYCO handled the request for the refunds form

25   California, correct?

        1    A.    We prepared the amended tax returns.

        2    Q.    The amended tax returns, which is a way of asking for them

        3    to refund the money, correct?

        4    A.    Yes.

        5    Q.    And that mistake over the California residency of John not

        6    following up in 2013 involved several hundred thousands of

        7    dollars of income taxes paid to California, correct?

        8    A.    That was not a mistake.

        9    Q.    I'm not saying there was a mistake to do it.  I'm just

10:15  10    saying of John not following up to the e-mail of your colleague

       11    in 2013.

       12    A.    No.

       13    Q.    What does no mean?

       14    A.    No, that was not the facts and circumstances.

       15    Q.    Well, he got a refund -- you filed for a refund for 2014,

       16    correct?

       17    A.    Would you like me to explain how the rewind -- when the

       18    refund was prepared, or excuse me, the amended tax return was

       19    prepared?

10:15  20    Q.    The amended tax return was prepared in 2016, wasn't it?

       21    A.    Correct.

       22    Q.    Okay.  But it was for the year -- it included the year

       23    2014, correct?

       24    A.    Because in 2016, plus or minus, his employer prepared a

       25    corrected or amended W-2, which reflected his change in

```
 1   domicile based on an extensive set of data and a list of
 2   information and -- updated and new information that John
 3   provided to his employer who then issued the corrected W-2.
 4   And based on that new information, we all, as a group, agreed
 5   that he would amend his tax returns to reflect the domicile.
 6   Q.   Correct.  The point being John didn't get it done until
 7   2016, correct?
 8   A.   Because that's when the information was provided.
 9   Q.   Provided to his employer at Staples?
10   A.   Us and his employer at Staples.
11   Q.   I'm not criticizing AYCO for anything.
12   A.   I'm just clarifying for you.
13   Q.   If John had done that three years earlier and provided
14   that same information, he wouldn't have overpaid the taxes to
15   California, correct?
16   A.   Okay.  I'd have to look at all the circumstances again,
17   but perhaps.
18   Q.   Well, the same circumstances that were truthful in 2016
19   for calendar 2014 would have been truthful in 2014?
20   A.   Correct.
21   Q.   So if he had provided that information in 2014 to '15, he
22   could have done it without having to overpay the taxes and
23   refile, correct?
24   A.   Correct.
25   Q.   Okay.  And would you agree with me the amount of money at
```

 1    issue for all of the years you filed amended returns on the

 2    California taxes was in the hundreds of thousands of dollars?

 3    A.   Yes.  He also had to pay more taxes to the state of

 4    Massachusetts as well.

 5    Q.   Right.  He'd have to pay more taxes to Massachusetts.

 6    He'd have a lower federal deduction because the California

 7    taxes are higher than Massachusetts.

 8    A.   Correct.

 9    Q.   But he got a refund of several hundred thousand dollars

10    from California, correct?

11    A.   Correct.

12         MR. KENDALL:  Okay.  If I may have a moment, your

13    Honor.

14         THE COURT:  Yes.

15    Q.   When John was preparing his trust and estate plan to leave

16    these bequests for the scholarship funds, do you remember

17    telling John that because the money was going to a university

18    he would get a -- the estate would get a tax deduction, but

19    it's something that he would not realize until the money

20    actually was paid over at the time of his death?

21    A.   That would be something I might explain to a client in the

22    general course of business.  I don't remember that exact

23    conversation.

24    Q.   You don't remember that specific conversation with John,

25    but is setting up that type of trust and estate plan, that

1  would be in the ordinary course the type of things you would

2  explain?

3  A.   Yes.

4  Q.   You're giving a donation to a school.  It's tax

5  deductible, but you've got to pay it before you get the

6  deduction.

7  A.   Yes.

8  Q.   So he understood that he's making a bequest, but he's not

9  going to see any tax benefit or other benefit until the time of

10:19 10  it after his passing, correct?

11  A.   Correct.

12  Q.   And he still went with the provision in the will, correct?

13  A.   Yes.

14  Q.   Do you remember having any conversation with John why it

15  was important to him that the money be given to people whose

16  parents did not go to college?  Just yes or no?

17          MS. KEARNEY:   Objection.

18  A.   I don't recall.

19  Q.   I want to now move to 2018.  The government covered with

10:20 20  you yesterday John contacted you in 2018 about donations he was

21  going to make to Rick Singer's foundation, correct?

22  A.   John contacted me initially just to inquire about what

23  percentage of his income he could make a donation and deduct

24  it.

25  Q.   Okay.  But he also at some point sent you an e-mail that

 1   said the money was going to go to Rick Singer's foundation,

 2   correct?

 3   A.   I believe there was a threat at one point, or a later

 4   point that I saw that.  I don't recall exactly.

 5   Q.   Is that a yes, he sent you an e-mail telling you the money

 6   was going to Rick Singer's foundation?

 7   A.   I don't recall if John sent me an e-mail saying that.

 8         MR. KENDALL:  If we could take -- Mr. Carter, if you

 9   could show Exhibit 9830, please.

10:21 10   Q.   Do you recognize 9830 as an e-mail chain with Mr. Wilson

11   and Debbie Rogers and others?

12   A.   Yeah.  Can you just scroll all the way down, if I may ask?

13   Q.   If we could go to -- I'm going to jump a little bit ahead.

14         If we could go to page 14 and look in the middle

15   there -- excuse me, 8 of page 14.  I'm sorry.  My mistake.

16         I apologize.  Look at page 8.

17         MS. KEARNEY:  Do you have a copy for us?  Oh, it's

18   back.

19   Q.   Okay.  You see where it says "Hi Debbie".  This e-mail was

10:22 20   not addressed to you, but it was attached to the chain that was

21   sent to you, correct?  It's forwarded to you right above that?

22   A.   Yes.

23   Q.   And they tell you that John wanted to donate to a college

24   through Rick Singer's foundation, correct?

25   A.   Yes.  This was a follow-up to the general inquiry he made

1    I think around October 18th.

2    Q.   On October 18th, does John -- does he originally text you?

3    A.   In that general inquiry, yes.

4    Q.   And then at some point is there a phone call?

5    A.   I don't remember if there was a phone call, or if there

6    was an e-mail back.

7    Q.   At some point, he tells you that you should refer your

8    clients to Mr. Singer and his foundation, doesn't he?

9    A.   No.  I don't recall that.

10:23 10   Q.   Do you recall him saying something about referring Goldman

11   clients to Mr. Singer's foundation?

12   A.   To his foundation, no.

13   Q.   Or to Mr. Singer's business?

14   A.   I vaguely remember him saying he worked with a college

15   consultant that he thought was doing a good job or something.

16   Q.   And he suggested that you refer Goldman clients to him,

17   correct?

18   A.   I don't recall.

19   Q.   Well, let me see if we've got something that will refresh

10:23 20   your recollection.

21        You've been interviewed by the government several

22   times, is that correct?

23   A.   I was interviewed one additional time, as I recall.

24        MR. KENDALL:  Okay.  Again, I'd like to show you --

25   your Honor, I don't have this as an exhibit.  It's an FBI

1    report.  I'd like to show it to the witness and see if that

2    refreshes his recollection.

3            THE COURT:  You may do so.

4            MR. KENDALL:  It's August 11, 2021, the last page,

5    paragraph 17.

6    Q.  Do you remember in August of this year having a

7    conversation with the FBI agents and your lawyer present?

8    A.  I don't remember FBI agents per se, but.

9    Q.  Do you remember having a meeting with Miss Kearney, your

10:24 10    attorney Tony Lewis, another lawyer from Mr. Lewis's office at

11    the U.S. Attorney's office in Santa Ana?

12    A.  Yes.

13    Q.  Okay.  You sat down with them and you had an interview?

14    A.  Yes.

15    Q.  Okay.  And at the end of that interview, do you remember

16    telling them that you got a text message from Mr. Wilson on

17    October 20, 2018, correct?

18    A.  They presented that to me and I remember, yes.

19    Q.  And you told them that Wilson said that Singer was running

10:25 20    a successful educational foundation and he wanted to donate to

21    it?

22    A.  I don't remember him saying Singer was running a

23    successful foundation.  I thought it was an educational

24    foundation he was telling me about.

25    Q.  And you told them that you were not familiar with

```
 1    Mr. Singer's foundation and Wilson suggested that you refer
 2    some clients to Singer.  Take a look and see if that refreshes
 3    your recollection, please.   Just that last paragraph in
 4    yellow.
 5    A.    I remember him referencing that there was a successful
 6    education foundation that he was going to donate to, and I
 7    don't remember it exactly being worded this way, but I remember
 8    him referencing something along these lines.
 9    Q.    What does "something along these lines" mean?
10          THE COURT:  Well, take the document down, please.
11    A.    I can't read it anymore?
12    Q.    No.  Tell us what you remember.
13    A.    I was trying to remember that situation.  I can't remember
14    it very clearly.  That's why I was trying to refresh my memory,
15    but even at that time I can't remember it clearly.
16    Q.    Do you remember that there was a Special Agent there
17    present named Julie Fitzpatrick?
18    A.    Yes.
19    Q.    And Miss Kearney was there as well?
20    A.    Yes.
21    Q.    And are you saying that -- do you dispute that you told
22    Miss Kearney and the agents and your own lawyer there at the
23    Santa Ana U.S. Attorney's office that he told you it was Singer
24    who was running a successful foundation, education foundation?
25    A.    I was saying that I remembered, I vaguely remembered a
```

1    conversation like that, but I didn't remember exactly how it

2    was worded, and that's what I explained at that time as well.

3    Q.   Okay.  Well, you -- I want to know exactly what you do

4    remember being told.  You remember that Mr. Wilson made

5    reference to Singer having a successful education foundation,

6    correct?

7    A.   No.  I remember in our initial conversations he just

8    referenced a successful education foundation.

9    Q.   And so you dispute that you told Miss Kearney and the

10:27 10   agents that it was Singer's foundation?   What I was explaining

11   was that, at a later point when I realized that it was Singer

12   involved in that foundation, I was trying to recall if John had

13   initially mentioned Singer was involved in that foundation or

14   not when he initially brought it up.  In both cases, I

15   explained that I was not familiar with the foundation.

16   Q.   So at one point either in this October call or a few weeks

17   later, you realized it's Singer's foundation that's the

18   successful education foundation, correct?

19   A.   Yes.

10:27 20   Q.   Okay.  And Mr. Wilson told you that you ought to refer

21   some of your clients to Mr. Singer, correct?

22   A.   I vaguely remember something about that.  It was like the

23   end of a conversation and it was more just chit chat.

24   Q.   Yeah.  He was kind of enthusiastic and positive about you

25   should refer your clients to Singer?

A.    Yes.

Q.    And the sort of enthusiasm that Mr. Wilson had was similar

to the type of enthusiasm you've seen everybody else express

with Mr. Singer up to that date?

A.    About his college prep.  I wasn't -- I never heard any

enthusiasm about his foundation.

Q.    Until Mr. Wilson mentioned it to you?

A.    Right.  That I recall anyways.

        MR. KENDALL:  Your Honor, I'd like to offer 9830,

10:28 which is this e-mail chain we had previously discussed, for

completeness.  The government has offered some of the e-mails

in this chain, but not all of them.

        MS. KEARNEY:  Do you have a copy of 9830?

        MR. KENDALL:  Oh, I'm sorry.  Yes, of course.

        MS. KEARNEY:  Your Honor, this appears to be multiple

e-mails.  I think the cover e-mail is a continuation of a chain

that's already in evidence, and pages 11 to 14 is already in

evidence, but I would object to the other pages.

        MR. KENDALL:  To which pages?

10:30 MS. KEARNEY:  So no objection to pages 1 and 2 and no

objection to 11 to 14, which is already in evidence, but

objections to pages 3 to 10 which are different chains.

        MR. KENDALL:  Your Honor, that's what --

        THE COURT:  We'll talk about this at a later time, but

it won't be admitted in its present form.

1    Q.   Okay.  I just want to make it clear.  You got an e-mail

2    saying John is considering donating to Rick Singer's foundation

3    and that they're going to -- they asked about the tax deduction

4    if John donates to a college through the foundation, correct?

5    A.   Correct.

6    Q.   Now, it'd be fair to say that some charitable foundations

7    can have, as part of their role, making grants to other

8    charities, correct?

9    A.   Yes, particularly a donor advised fund.

10:31 10   Q.   Okay.  So you can give a donation to one foundation and

11   then it can then distribute that money to, let's say, a private

12   university that's also a 501(c)(3)?

13   A.   Yes.

14   Q.   And that's certainly a tax-deductible donation if it

15   complies with the other regulations?

16   A.   Yes.

17   Q.   The mere fact that you're using somebody as a pass-through

18   to make the donation is okay?

19   A.   My experience is that you would use a 501(c)(3) as the

10:31 20   pass-through, yes.

21   Q.   Yeah.  A 501(c)(3) can be a pass-through to another

22   501(c)(3)?

23   A.   Yes.

24   Q.   Okay.  And some of those examples are like the United Way,

25   correct?

1    A.    Yes.

2    Q.    Okay.  There are various religious charities, like

3    Catholic charities or combined Jewish philanthropies, that

4    collect money and then distribute to other charities that do

5    things like that.  This is a common structure for a charity to

6    be a pass-through to other charities, correct?

7    A.    Correct.

8    Q.    You discussed with John him making donations in the range

9    of $500,000 or more to the pass-through charity that would go

10:32 10   to a college, correct?

11         MS. KEARNEY:  Objection.

12         THE COURT:  I didn't understand the question.

13   Q.    During this time period of October to December you're

14   having a series of calls and e-mails with John, correct?

15         THE COURT:  In 2018.

16         MR. KENDALL:  Yes, your Honor.  Thank you.

17   Q.    In 2018.

18   A.    Yes.

19   Q.    Okay.  And, as part of that, John tells you he's going to

10:33 20   make donations to this foundation.  At one point he tells you

21   $500,000, correct?

22   A.    Well, initially, there wasn't a specific amount.

23   Q.    But at some point he tells you 500 and then it goes to a

24   million, correct?

25   A.    At a later point, I learned that he had already made a

1    $500,000 contribution, and then I learned that he had made an

2    additional $500,000 contribution.

3    Q.   And he told you that it was to go to the foundation that

4    would then give it to the schools, correct?

5    A.   We didn't discuss what the intent was or what the ultimate

6    destination.  I knew that he was making some donations to some

7    schools over, I believe, one or two years.  I think that was

8    referenced yesterday.

9    Q.   Okay.  But it was to go to -- it was to go to the

10:33 10   foundation to one or two schools, correct?

11   A.   I don't recall the number of schools, but I think it was

12   one to two years that it was possibly going to be given to a

13   number of schools.

14   Q.   Okay.  And when he asked you that, he actually gave you

15   the name of the foundation, correct, or he gave one of your

16   people the name of the foundation?

17   A.   My recollection is that he did not know the exact name of

18   the foundation and I didn't know the name of the foundation,

19   and he had asked his assistant to provide us the Federal

10:34 20   Identification Number for the foundation so we could look it

21   up.

22   Q.   And someone in your office looked it up, correct?

23   A.   Somebody at our firm looked it up to see if they were

24   registered with the IRS.

25   Q.   And they were, correct?

A.   Yes.

Q.   And if the IRS registers a charity on its website, that's an indication it's approved to receive charitable contributions, correct?

A.   Yes.

Q.   That IRS website is a resource for people like you to look at and rely on, correct?

A.   Yes.

         MR. KENDALL:  One moment, your Honor.

         THE COURT:  Yes.

         MR. KENDALL:  Could we have Exhibit 8112, please.  If we could show that.

Q.   Do you -- take a look at 8112.  Do you recognize that --

A.   No.

Q.   -- as a part of the IRS website?

A.   No.

Q.   Do you do the search yourself?

A.   No.

Q.   So somebody else would have done the search?

A.   Yes.

Q.   So you wouldn't see the documents --

A.   Correct.

Q.   -- related to the search?

         Okay.

         MR. KENDALL:  I'd like to put in front of the witness

1  what was marked as a chalk, the transcript for the

2  September 15, 2018 telephone call between Mr. Singer and

3  Mr. Wilson.  The tape is already in evidence.  Is that 561A, I

4  believe?  If we could go to the second to last page, please.

5      If we can go further down, please.  Further down.

6  Q.  If we look at this last paragraph, and Mr. Singer -- this

7  is a transcript of a tape that's in evidence of a September 15,

8  2018 conversation.  So this is a little more than a month

9  before Mr. Wilson contacted you, correct?

10:37 10  A.  Yes.

11      MR. KENDALL:  Can we show this to the jury as well,

12  please, as a chalk only, your Honor.

13      MS. KEARNEY:  No objection.

14  Q.  And Mr. Singer states, "And they, and they can do it

15  because they think -- you know, so the guys from Goldman called

16  me yesterday, he got four families, they're seniors right now.

17  Its Lakeville because that's like compared to what they're

18  being quoted by the development office they're like --" and

19  then it ends.

10:37 20      MR. KENDALL:  And then can we go to 562A in the

21  beginning where the conversation continues.

22  Q.  And then if we start at line 13 where Mr. Wilson says,

23  "Okay, great.  Sorry you said something about the guys from

24  Goldman and then boom you dropped out".

25      Mr. Singer says, "Yeah they sent me four families on

1    Thursday saying they've been checking with development, they'll

2    pay the 1.2, 1.5, 2 million.  They don't care cause they're

3    being quoted over $30 million".

4            And Wilson says, "Oh because they have to donate a

5    whole building or something like that you're saying".

6            Would it be fair to say you never referred any four

7    people or four families over to Mr. Singer as described in that

8    transcript; correct?

9    A.   I have no idea what that transcript's talking about.

10:38  10   Q.   Okay.  You've never heard of such an event occurring,

11   correct?

12   A.   No.

13   Q.   As far as you know, it's probably a completely false

14   story, because you've heard nothing of four families from

15   Goldman being sent over like that, correct?

16           MS. KEARNEY:  Objection.

17           THE COURT:  Sustained.

18   A.   I don't know.

19   Q.   Do you have any reason to believe there's any truth to

10:38  20   that story?  Have you heard anything or seen any evidence to

21   indicate there could be any truth to that story?

22   A.   I don't even really follow this, so I can't even really

23   comment on it.

24   Q.   Okay.  Well, fair to say you've never heard of anybody

25   sending -- anybody at Goldman Sachs sending over four families

1    of their clients to Mr. Singer to make donations at schools,

2    correct?

3    A.    I'm not familiar with this.

4          MR. KENDALL:   Okay.  One moment, your Honor.

5    Q.    You agree with me it was a terrible mistake to refer Rick

6    Singer to any of your clients, correct?

7          MS. KEARNEY:   Objection.

8          THE COURT:   He can answer that.  Overruled.

9          THE WITNESS:   I can answer that, your Honor?

10   10:40    THE COURT:   Yes.

11   A.    I would not do it again if I could choose.

12   Q.    You did it with the best of intentions?

13   A.    Yes, sir.

14   Q.    He appeared to be a highly experienced college counselor

15   in your mind?

16   A.    Yes.

17   Q.    He deceived you, the way he deceived many others?

18   A.    Yes.

19   Q.    You're a highly experienced financial adviser, correct?

20   10:40 A.    Yes.

21   Q.    28 years in the industry?

22   A.    Yes.

23   Q.    You work at one of the most skilled and respected

24   financial advisory firms in the world, correct?

25   A.    Yes.

```
 1    Q.    Your clients are among the most successful people in
 2    business, correct?
 3    A.    Yes.
 4    Q.    AYCO is run by one of the most prominent investment banks
 5    in the world, correct?
 6    A.    Yes.
 7    Q.    And you, in good faith, thought you were doing all of your
 8    clients a favor by introducing them to Mr. Singer, correct?
 9    A.    Not all my clients, the clients I --
10    Q.    Introduced?
11    A.    -- responded to their requests for that, yes.
12    Q.    Mr. Singer deceived you for 12 years, correct?
13    A.    Yes.
14    Q.    He mixed lies and truth?
15    A.    In retrospect, yes.
16    Q.    It made him very effective as a con man?
17    A.    Yes.
18    Q.    And you didn't know he was a fraud until 2019, correct?
19    A.    Yes.
20         MR. KENDALL:  Thank you.  I have no further questions,
21    your Honor.
22         THE COURT:  Any cross, Mr. Kelly?
23         MR. KELLY:  Briefly.
24              CROSS-EXAMINATION OF JEFFREY DEMAIO
25    BY MR. KELLY:
```

10:40 (line 10)
10:41 (line 20)

```
 1   Q.   Good morning, sir.  I represent Mr. Abdelaziz.

 2        I'm not going to go through the questions that

 3   Mr. Kendall has just asked you about.  You just indicated to

 4   him that, in your business, your clients are the most important

 5   asset, right?

 6   A.   Yes.

 7   Q.   And you unwittingly introduced your own clients to

 8   Mr. Singer, right?

 9   A.   What do you mean by unwittingly?

10   Q.   You didn't know Mr. Singer was a con man committing crimes

11   outside your presence, did you?

12   A.   Correct.

13   Q.   And it's not just your clients, right?  They're your most

14   important asset, but your most precious asset are your

15   children, right?

16   A.   Yes.

17   Q.   And you trusted this man so much that you introduced him

18   to your own children, right?

19   A.   For tutoring, yes.

20   Q.   And you certainly had no intention of introducing a con

21   man to your own kids, right?

22   A.   Correct.

23   Q.   You had absolutely no idea that Singer was a con man who

24   was committing fraud outside your presence, correct?

25   A.   No.
```

|      |                                                                    |
|------|--------------------------------------------------------------------|
| 1    | MR. KELLY:  Nothing further.                                       |
| 2    | THE COURT:  Any redirect?                                          |
| 3    | MS. KEARNEY:  Yes, your Honor.                                     |
| 4    | THE COURT:  Miss Kearney.                                          |
| 5    | REDIRECT EXAMINATION OF JEFFREY DEMAIO                             |
| 6    | BY MS. KEARNEY:                                                    |
| 7    | Q.   Good morning, Mr. DeMaio.                                     |
| 8    | A.   Good morning.                                                 |
| 9    | Q.   Mr. Kendall was just asking you about your own experience     |
| 10:43 10 | as a business executive, correct?                             |
| 11   | A.   Yes.                                                          |
| 12   | Q.   Mr. Wilson, you would also describe, as an experienced        |
| 13   | business executive?                                                |
| 14   | A.   Yes.                                                          |
| 15   | Q.   And both Mr. Kendall and Mr. Kelly asked you about your       |
| 16   | referral of Mr. Singer to a handful of clients, as well as your    |
| 17   | use of him yourself?                                               |
| 18   | A.   Yes.                                                          |
| 19   | Q.   Did any of your other clients besides Mr. Wilson actually     |
| 10:44 20 | use Rick Singer's services?                                    |
| 21   | MR. KENDALL:  Objection, your Honor.                              |
| 22   | THE COURT:  Overruled.                                             |
| 23   | A.   Not that I'm aware of.                                        |
| 24   | Q.   Okay.  And you, yourself, you ceased using Mr. Singer's       |
| 25   | services, correct?                                                 |

1    A.    Yes.

2    Q.    When was that?  Or excuse me.  How old were your children

3    when you stopped using his services?

4    A.    Freshmen.

5    Q.    In high school?

6    A.    Yes.

7          MS. KEARNEY:  If Mr. Carter would be so kind as to

8    pull up Exhibit 9809, for the witness only, please.  And if we

9    can go down I think it was a couple pages in.  Right there,

10:45 10   please.

11   Q.    Mr. DeMaio, do you recall Mr. Kendall asking you questions

12   about this trust document?

13   A.    Yes.

14   Q.    For John and Leslie Wilson?

15   A.    Yes.

16   Q.    And is it fair to say that any of the money that was to be

17   distributed to Rensselaer Polytech or Harvard was only going to

18   be distributed after Mr. Wilson had died?

19   A.    In this document, yes.

10:45 20   Q.    And if you look at section 2.7.d, you were asked questions

21   about this section.

22   A.    Yes.

23   Q.    And do you recall whether the money that might go to

24   Rensselaer Polytech or Harvard would only be distributed after

25   any of the money distributed in the prior section that's

         1    blacked out was left over?

         2    A.   I don't recall how the language was written for this.

         3         MS. KEARNEY:   Mr. Carter, if you can zoom out for a

         4    one moment.

         5    Q.   You see there are sections ahead of the distributions to

         6    Rensselaer Polytech and Harvard that are blacked out, correct?

         7    A.   Yes.

         8    Q.   And you don't recall what was being distributed in those

         9    sections, correct?

10:46   10    A.   No.

        11    Q.   You were asked a number of questions this morning about

        12    the effective tax rate for Mr. Wilson in 2014.  Do you recall

        13    those questions?

        14    A.   Yes.

        15    Q.   Do you recall that Mr. Wilson had a tax equalization

        16    agreement with Staples?

        17    A.   Yes.

        18    Q.   And just generally, what is a tax equalization agreement?

        19    A.   If you agree to work overseas on an assignment, the

10:46   20    company, depending on how it's structured, will generally say

        21    that if you have to pay extra taxes in the foreign country,

        22    we'll equalize you so that you pay similar -- your net bottom

        23    line is similar to where -- what your taxes would be in the US.

        24    Q.   In other words, if your taxes are more because you're

        25    working and living in Europe than what you would have to pay if

1    you were living and working in the United States, the company,

2    such as Staples, will make up the difference for you?

3    A.    Yes.

4    Q.    Does paying a large percentage in taxes give you license

5    to claim false deductions on your return?

6           MR. KENDALL:   Objection, your Honor.

7           THE COURT:   Overruled.

8    A.    No.

9           MR. KENDALL:   Miss Lewis, can we look at Exhibit 667

10:47 10   in evidence, please.

11   Q.    Mr. Kendall asked you a number of questions about your

12   discussions with Mr. Wilson about the $1 million donation that

13   he was making to the Key Worldwide Foundation and his questions

14   about limitations on charitable deductions?

15   A.    Can you just repeat that one more time.

16   Q.    Sure.  Do you recall Mr. Kendall asking you questions

17   about discussions you had with Mr. Wilson about his donations

18   to the Key Worldwide Foundation in 2018?

19   A.    Yes.

10:48 20   Q.    And in Exhibit 667, this was the first communication about

21   that, correct?

22   A.    It's the first one I recall.

23   Q.    And Mr. Wilson is reaching out to you, correct?

24   A.    Yes.

25   Q.    And he's asking about a limit on tax deductions for

1    charity contributions?

2    A.   Yes.

3    Q.   So it's fair to say he was familiar enough with taxes to

4    even know that this was a question he should be asking,

5    correct?

6    A.   Perhaps, yes.

7    Q.   You recall Mr. Kendall asked you some questions about how

8    you were first introduced to Mr. Singer?

9    A.   Yes.

10:49 10   Q.   And you acknowledged that that was through a contact at

11   PIMCO?

12   A.   Yes.

13   Q.   Are you familiar with an individual named Doug Hodge who

14   used to work at PIMCO?

15   A.   Yes.

16   Q.   And are you aware that there's been evidence in this

17   case --

18         MR. KENDALL:   Objection -- withdrawn, your Honor.

19   Q.   -- regarding two of his children, Jaeger and Macall Hodge?

10:49 20   A.   Generally.

21   Q.   And you're aware that they were admitted to USC as fake

22   athletic recruits?

23         MR. KENDALL:   Objection, your Honor.

24         THE COURT:   Overruled.

25         MR. KENDALL:   This is all hearsay to this person.

```
 1            MS. KEARNEY:  It's evidence in this case, your Honor.
 2            THE COURT:  Overruled.
 3    A.   I don't remember the details of the case.
 4    Q.   Mr. Kendall asked you some questions about the volume of
 5    paperwork Mr. Wilson would have received with respect to his
 6    2014 taxes?
 7    A.   Yes.
 8    Q.   When his tax return for 2014 was amended the first time,
 9    did he get the same volume of paper, or would it have just been
10:50 10   the amended return?
11    A.   I believe with an amended return you receive, or you also
12    get the pages that were as originally filed as well.
13    Q.   You wouldn't receive the corporate returns again, would
14    you?
15    A.   No.
16    Q.   You wouldn't receive the state return again?
17    A.   Well, the state return would be prepared separately, and
18    that would be in a different package.
19    Q.   And same thing would apply with the second amended return
10:50 20   that Mr. Wilson received?
21    A.   Yes.
22    Q.   You were asked questions about Mr. Wilson's change in
23    residency?
24    A.   Yes.
25    Q.   And I just wanted to follow-up on something you had said.
```

1    I believe you indicated that despite the refund from

2    California, Mr. Wilson would have owed additional taxes in

3    Massachusetts?

4    A.   Yes.

5    Q.   And that would also affect his deductions on his federal

6    taxes, is that correct?

7    A.   Yes.

8    Q.   One of the --

9           MS. KEARNEY:  And, actually, Miss Lewis, if we can

10:51 10   pull up Exhibit 501A.  And go to page 4, I believe.  Excuse me.

11   I think it might be 8.  Keep going.  There we go.  And if you

12   can highlight the taxes you paid section, lines 5 through 9.

13   And can we keep this up on the right, please, Miss Lewis, and

14   pull up Exhibit 174A on the left, and go to page 4, I believe,

15   on this exhibit.  And I -- and then highlight the "Taxes you

16   paid" section.

17   Q.   Mr. DeMaio, on the left of your screen is Mr. Wilson's

18   original 2014 tax return and on the right is his second amended

19   return.  And his second amended return was filed after his W-2

10:52 20   was changed?

21   A.   Yes.

22   Q.   And the W-2 was changed, in part, because he changed his

23   residency?

24   A.   I believe that was part of it.

25   Q.   And one of the items that he took on his itemized

1   deductions was related to state and local taxes he paid,

2   correct?

3   A.   Yes.

4   Q.   And so the state and local taxes in the original return on

5   the left side of your screen were related to California,

6   correct?

7   A.   I don't know the make up of all of them but perhaps that

8   was the majority of it.

9   Q.   Because his residence was California at the time?

10:53 10   A.   Right.

11   Q.   And on the right side of your screen in the second amended

12   return, the state and local taxes would be largely made up of

13   taxes related to his residency in Massachusetts, correct?

14   A.   I'd have to, you know, dig into these details because

15   depending on when you paid the state taxes, you have to take

16   those deductions on a different year.

17   Q.   But it's fair to say that the deduction in the amended

18   return after he changed his residency was lower than the

19   deduction he took for state and local taxes in his original

10:54 20   return, correct?

21   A.   In this example, yes, but I was just saying that there

22   might be -- if the taxpayer pays state taxes at a different

23   point in time because they're paying them at a later point,

24   they might also be deducting those at a -- on a return in that

25   year.

Q.   Regardless though, it's still correct that the state and
local taxes used for his itemized deductions in his second
amended return after he had changed his residency were lower
than the state and local taxes used for his itemized deductions
in his original return?

A.   Yes.

Q.   You were asked a number of questions about your referral
of Mr. Singer to other clients.  Besides Mr. Singer, did you
know of any other college counselors in the area?

A.   At the time, not really, that I recall anyways.

Q.   Did you ever tell Mr. Wilson that you had referred
Mr. Singer to other clients?

A.   I don't recall.

     MS. KEARNEY:  Miss Lewis, can we pull up Exhibit 667
again.  Thank you.

Q.   Again, looking at this text message chain, Mr. Wilson is
asking if there's a limit on tax deductions for charity
contributions.  Is that -- well, let me rephrase that.

     Are charitable contributions always 100 percent
deductible on taxes?

A.   No.

Q.   And finally, Mr. DeMaio, if you knew that Mr. Singer was
posing students as fake athletes to get them recruited to
sports they did not play, would you have recommended him to any
of your clients?

```
 1              MR. KENDALL:  Objection.
 2              THE COURT:  Overruled.
 3     A.   No.
 4              MS. KEARNEY:  Thank you.
 5              THE COURT:  Recross, Mr. Kendall?
 6                   RECROSS-EXAMINATION OF JEFFREY DEMAIO
 7     BY MR. KENDALL:
 8     Q.   Mr. DeMaio, let's start with the tax equalization issue
 9     that Miss Kearney just raised.
10     A.   Yes.
11     Q.   Why don't you explain it again, what is tax equalization
12     and what it was with respect to Mr. Wilson working in Europe.
13     A.   Yes.  If you have an agreement with the company that you
14     agree to take an assignment with overseas and, generally
15     speaking, these agreements, the company that is employing you
16     overseas will tell you that they'll equalize you with your net
17     taxes due based on where you -- or what your taxes are going to
18     be in the United States.
19     Q.   So if working in Holland means you're going to pay an
20     extra $100,000 in taxes because Holland has higher taxes than
21     the United States, your employer will make it up to you so
22     you're not losing money by taking the foreign assignment?
23     A.   Yes.
24     Q.   Okay.  But you also have to pay taxes on this equalization
25     amount, don't you?
```

1   A.    No.  I mean, you do, but they -- most -- if I may?

2   Q.    Yes.

3   A.    Most tax equalization agreements, they will gross you up

4   for the tax impacted.

5   Q.    That's exactly my point.  So your income has to go high

6   enough so you can actually pay taxes on the equalization

7   amount, too?

8   A.    Correct.

9   Q.    And that's the phrase that you use, "grossing it up"?

10:58 10   A.    Yes.

11   Q.    Okay.  Second, Miss Kearney brought up the fact that you

12   stopped using Mr. Singer's services.

13   A.    Yes.

14   Q.    Fair to say, prior to the publicity in 2019, you never

15   heard anything to cause you to doubt Mr. Singer's integrity?

16   A.    No.

17   Q.    You decided not to use the tutor with your children after

18   six months or so, correct?

19   A.    Actually, we kept using the tutor.  We just decided just

10:58 20   to work with the tutor for a while.

21   Q.    Directly and not with Mr. Singer's group?

22   A.    Yes.

23   Q.    Okay.  But whatever you did with the tutor and your kids,

24   you heard nothing to cause to you be concerned about referring

25   Mr. Singer to any of your clients?

```
 1    A.    I don't recall anything at the time.
 2    Q.    And if you'd heard something ethically, you would have
 3    acted to warn your clients to do something, correct?
 4    A.    If I had substantial reasons, yeah.
 5    Q.    I mean, you wouldn't refer someone to a client, hear that
 6    person is an unethical person, and then not warn your client,
 7    correct?
 8    A.    Right.
 9    Q.    Okay.  Now, Miss Kearney also asked you about the
10:59 10   distributions in the will, and she actually showed you a copy,
11    though it's not in evidence.  Would it be fair to say there
12    weren't just distributions to the scholarship funds?  It was
13    also distributions to autism, the Cancer Society, and other
14    charities as well?
15    A.    I recall John being a supporter of those charities, yes.
16    Q.    Supporters of those for like most of the time you worked
17    with him, correct?
18    A.    Yes.
19    Q.    Okay.  Now, let's go back to that HR person at PIMCO.  You
10:59 20   met with this HR person.  They were a professional that you
21    respected?
22    A.    Yes.
23    Q.    Okay.  And in their description to you of the value of
24    working with Mr. Singer, did they say anything to indicate he
25    was unethical?
```

```
 1    A.    No.

 2    Q.    Or improper?

 3    A.    No.

 4    Q.    They gave a glowing reference, didn't they?

 5    A.    Well, he -- I just mentioned that other clients similar to

 6    like those we worked with seemed pleased with his work.

 7    Q.    Okay.  So they told that several very high level business

 8    people that you worked with and that they work with were very

 9    pleased with Mr. Singer's work?

10    A.    And/or that we were both familiar with, yes.

11    Q.    Yeah.  And would it be fair to say that in the business

12    you have, getting people to -- you provide referrals as part of

13    your professional services, correct?  A good lawyer, a good

14    business coach, a good college counselor?

15    A.    Yes.

16    Q.    And sometimes you rely on other people's recommendations

17    before you make your reference, correct?

18    A.    Yes.

19    Q.    If there's people whose judgment you trust and they say

20    someone is good, that carries a good bit of weight with you,

21    correct?

22    A.    Yes.

23    Q.    And then you -- you feel more comfortable giving a

24    referral if somebody says I've worked with him, he's quite

25    good, and you respect that person's opinion?
```

```
 1   A.    Yes.
 2   Q.    And when you met Mr. Singer, you found him very
 3   impressive?
 4   A.    Yes.
 5   Q.    He talked a good game, didn't he?
 6   A.    Yes.
 7   Q.    He had authority?
 8   A.    Yes.
 9   Q.    Confidence?
10   A.    Yes.
11   Q.    Great knowledge about college advising?
12   A.    Yes.
13   Q.    Could rattle off details about schools and sports and
14   tests and all of the other details of the college advisory
15   world, correct?
16   A.    Yes.
17   Q.    And he loved to drop names, correct?
18   A.    Yes.
19   Q.    The endless list of famous and successful people that were
20   his clients, correct?
21   A.    Yes.
22   Q.    And you thought to yourself, well, if he's at that level,
23   then he'd be an appropriate person for my clients?
24   A.    Yes.
25   Q.    Looking back on it, he was a very effective con man,
```

1  wasn't he?

2  A.   Yes.

3  Q.   He knew how to manipulate successful, sophisticated,

4  wealthy people?

5          MS. KEARNEY:  Objection to what he knew.

6          THE COURT:  Sorry.  What's the objection?

7          MS. KEARNEY:  To what Mr. Singer knew.

8          THE COURT:  Sustained.

9  Q.   His -- his speech and his pitch was effective at

11:02 10  manipulating wealthy and successful people, correct?

11          MS. KEARNEY:  Objection.

12          THE COURT:  Sustained.

13  Q.   The PIMCO HR executive, he didn't jump up at the lunch and

14  say, you're a liar, Rick Singer, did he?

15  A.   No.

16  Q.   He was proud to introduce him to you?

17          MS. KEARNEY:  Objection.

18          THE COURT:  Sustained.

19  Q.   He introduced him to you, correct?

11:02 20  A.   Yes.

21  Q.   And you walked away from that lunch being very impressed

22  by him, correct?

23  A.   I looked like -- I looked at him as an additional possible

24  resource.

25  Q.   Okay.  And the last thing is, with the stated taxes, back

1    in the 2014/15 period, California state income tax was running

2    around 13 percent for people in higher incomes like Mr. Wilson?

3    A.   12 or 13, yes.

4    Q.   12 or 13.  Massachusetts was five?

5    A.   Yes, in that range.

6    Q.   Okay.  Everybody in the courtroom will maybe feel more

7    authoritative than you?

8    A.   Yes.

9    Q.   But so the difference of getting this refund was about

11:03 10   seven to eight percent of Mr. Wilson's income each year?

11   A.   Yes.

12   Q.   And so if it's three, four years, if it's, you know,

13   several millions of dollars, it adds up to hundreds of

14   thousands of dollars that was overpaid, correct?

15   A.   You would pay more in the State of California, yes.

16           MR. KENDALL:  Okay.  Thank you, your Honor.  No

17   further questions.

18           THE COURT:  Mr. Kelly?

19           MR. KELLY:  Nothing for me.

11:04 20         THE COURT:  Thank you, Mr. DeMaio.  You may step down.

21           We're going to take the morning recess at this point,

22   15 minutes, jurors.  I'll see you back here in 15 minutes.

23           THE CLERK:  All rise for the jury.

24           (Jury exits.)

25           THE COURT:  Be seated, counsel.

```
 1              Is the schedule the same as it was yesterday?  In

 2    other words, we next have -- is it Mr. Moon?

 3              MR. FRANK:  Yes, your Honor.

 4              THE COURT:  And that was a roughly 45 minutes of

 5    direct?

 6              MR. FRANK:  Approximately.

 7              THE COURT:  And then if we get beyond that, it would

 8    be Mr. Deckett, Miss Ranahan and your final witness is

 9    Miss George, right?

10              MR. FRANK:  Yes, your Honor.

11              THE COURT:  Okay.  Same schedule?

12              MR. FRANK:  Yes, your Honor.

13              THE COURT:  All right.  Is it the request of counsel

14    that we give the jury the afternoon off and discuss some of the

15    legal matters this afternoon?

16              MR. KENDALL:  Very much so, your Honor.

17              THE COURT:  Mr. Kelly?

18              MR. KELLY:  Yes, your Honor.  Yes.

19              MR. KENDALL:  It will help Friday and the rest go much

20    more efficiently.

21              THE COURT:  Mr. Frank?

22              MR. FRANK:  We don't object to that, your Honor.

23              THE COURT:  I'm sorry?

24              MR. FRANK:  We do not object to that.  We filed some

25    oppositions this morning.
```

|   |   |
|---|---|
|  | 1 |
|  | 2 |

                    THE COURT:  All right.  So I'm going to tell the jury

when they come back that we're not going to have an afternoon

session today, but it is still likely that the government will

be able to rest tomorrow.

                    MR. FRANK:  Barring extended cross examinations, that

should be possible, your Honor.

                    THE COURT:  All right.  Anything else that needs to

come to my attention before we recess?

                    MR. FRANK:  No, your Honor.

11:06           MR. KENDALL:  No, your Honor.

                    MR. KELLY:  No, your Honor.

                    THE COURT:  We're in recess.

                    (Recess taken 11:06 a.m. to 11:27 a.m.)

                    (Jury enters.)

                    THE COURT:  Good morning again, jurors.  Ready to

resume?

                    Mr. Moon, would you please stand.

                    MR. FRANK:  The government calls Casey Moon, your

Honor.

11:26           THE COURT:  All right.

                    (Casey Moon, Sworn.)

                    THE CLERK:  Would you please state your name for the

record, spelling your last.

                    THE WITNESS:  My name is Casey Moon.  Last name is

M-o-o-n.

```
 1              THE COURT:  You may remove your mask, Mr. Moon.  Thank
 2    you.
 3              Mr. Frank.
 4              MR. FRANK:  Thank you, your Honor.
 5                   DIRECT EXAMINATION OF CASEY MOON
 6    BY MR. FRANK:
 7    Q.    Good morning, Mr. Moon.  How are you?
 8    A.    Great.  Thank you.
 9    Q.    Where do you live?
10    A.    In Los Angeles, California.
11    Q.    And where do you work?
12    A.    At USC.
13    Q.    What do you do at USC?
14    A.    I'm a women's water polo coach.
15    Q.    How long have you worked at USC?
16    A.    For 13 and a half years.
17    Q.    And how long -- are you the head coach of women's water
18    polo?
19    A.    No.
20    Q.    What are you?
21    A.    I'm the associate head coach on the women's water polo
22    team.
23    Q.    How long have you held that position?
24    A.    For the past four years.
25    Q.    Before you became the associate head coach of women's
```

```
 1  water polo, what did you do?
 2  A.   I was an assistant coach for both programs, men's and
 3  women's.
 4  Q.   And so directing your attention to the period of 2007 to
 5  2014, was that the position that you were in?
 6  A.   Correct.
 7  Q.   And then at some point did you also serve in another
 8  function?
 9  A.   Yes.  After 2014 I was on the men's side, the director of
11:28 10  player personnel.
11       THE COURT:  Mr. Moon, would you pull that microphone a
12  little closer to you so we can all hear.
13       THE WITNESS:  Sure.  Yes, sir.
14  Q.   How far did you go in school?
15  A.   Bachelor's degree.
16  Q.   Where from?
17  A.   UC Santa Cruz.
18  Q.   And did you play sports in college?
19  A.   Yes.  I played water polo.
11:28 20  Q.   And what kind of division school is UC Santa Cruz?
21  A.   It's Division III.
22  Q.   What position did you play?
23  A.   I was a field player, attacker.
24  Q.   During the time that you were the assistant coach of men's
25  water polo, who was the head coach?
```

```
 1   A.   It was Jovan Vavic.

 2   Q.   Is he still the coach?

 3   A.   No.

 4   Q.   When did he stop being the coach?

 5   A.   2019.

 6   Q.   During the time that you've been working for the last 13

 7   years as a water polo coach and as director of operations for

 8   men's water polo at USC, have you been involved in recruiting

 9   student athletes?

10   A.   Yes, very much.

11   Q.   How familiar are you with the student athletes that the

12   men's water polo team recruited?

13   A.   Very familiar.

14   Q.   And just to give us some perspective, where does the USC

15   men's water polo program rank nationally?

16   A.   We're number one or two every year.

17   Q.   How many national championships has the USC men's water

18   polo team won since you became a coach on the team in 2007?

19   A.   We won seven.

20   Q.   And do you have a general familiarity with the other water

21   polo teams, men's water polo teams against which you compete?

22   A.   Yes.

23   Q.   How does the USC men's water polo program compare, for

24   example, to the program at Loyola Marymount?

25   A.   It is apples and oranges.
```

```
      1    Q.   What do you mean by that?

      2    A.   So the caliber for USC is every year number one or two in

      3    the country.  For example, for LMU, they fight to be in the top

      4    ten.

      5    Q.   In the top --

      6    A.   Ten in the country.

      7    Q.   What about USC versus UC Santa Barbara?

      8    A.   The same.  UC Santa Barbara fights every year to be in the

      9    top ten in the country.

11:30 10   Q.   What about USC versus the Air Force Academy?

     11    A.   It is similar.  The Air Force Academy probably is top 15

     12    in the country every year.

     13    Q.   So USC is a far superior program?

     14    A.   Absolutely.

     15    Q.   And that's not just you bragging?

     16    A.   No.

     17    Q.   Directing your attention to 2014, how many players were on

     18    the men's water polo team, if you remember, approximately?

     19    A.   We had about 30 plus.

11:31 20   Q.   And is that typical for the men's water polo team?

     21    A.   Yes.

     22    Q.   Has the team fluctuated in size over the years?

     23    A.   It has, yes, due to personnel.

     24    Q.   How many players, for those of us who are not as familiar

     25    with water polo, how many players are in the pool at any one
```

1   time?

2   A.   It's seven on seven.  So six field players, plus a goalie

3   on each side.

4   Q.   So if there are only seven players in the pool at any one

5   time representing USC, why do you have 30-plus players on the

6   team?

7   A.   Because the nature of our program is all about

8   competition, and the players that we have fight every day to

9   have an opportunity to play and push our top players per se.

11:32 10   Q.   Do you have practice players?

11   A.   No, we don't like to use that term.

12   Q.   Why don't you like to use that term?

13   A.   Because every player that we have, their primary objective

14   is to participate and contribute in games.  We never use the

15   term "practice player."

16   Q.   What about the players who aren't playing in games at a

17   particular period of time, what are they doing?

18   A.   So they compete against the other players who actually

19   have the opportunity to play in games.

11:32 20   Q.   And what is the long-term goal?

21   A.   The long-term goal is to contribute, you know, a minute,

22   two, a quarter of their opportunity to play in a game.

23   Q.   Generally speaking, on average how many players, freshmen,

24   do you recruit each year?

25   A.   About five to ten.

1  Q.   Directing your attention to 2013, do you recall that in

2  that year you recruited more players than usual?

3  A.   Yes.

4  Q.   Why did that happen?

5          Well, first of all, before I ask you that question,

6  do you recall how many approximately you recruited that year?

7  A.   It was about 20 plus.

8  Q.   Why did you recruit so many players in one year?

9  A.   So the previous year, due to graduation, as well as how

11:33 10  our system has consisted, we would like to have depth in each

11  position for personnel.

12  Q.   And did something else happen leading into that year that

13  caused you to lose a lot of players from the team?

14  A.   Yes.  We had a death, tragic death of one of our former

15  players right around New Year's Eve time.

16  Q.   And why did that cause so much attrition from the team?

17  A.   Well, a lot of his close friends -- hardship and they just

18  couldn't get over the tragic situation and make it through.

19  Q.   Tell us a little bit about what's involved in the

11:33 20  recruiting process for USC men's water polo.

21  A.   So the number one thing for USC water polo is talent

22  level.  You know, the involvement we have in recruiting is,

23  one, we go offsite to watch in person.  Second, we have

24  conversation with coaches, their specific coach, their

25  competing coaches, coaches in their federation.  And lastly, we

have an opportunity to review game film.

Q.   What about for students, student athletes who live far away, do you go to their games?

A.   Depending on demographics.  We're in Southern California. So depending on demographics, we have coaches that we chat with via phone.  We talk, again, with their opponents' coaches, their federations, their club coaches to get their perspective thoughts on the player.

Q.   What about for students who live overseas?

A.   So overseas we have the ability to speak with our federation coaches and we review game film.

Q.   You mentioned that your number one criteria is talent. Tell us a little bit more about what you're looking for in deciding who to recruit.

A.   Every year the players that we recruit, one, we look at our roster, depending on specific personnel, position players. You need to be talented to be able to compete and play for our program at USC.

Q.   Are there intangible factors that you look for besides what you can see in the pool?

A.   Absolutely.  The reason why we go in person to recruit players is, one, to see what their interaction is amongst their teammates; two, what their interaction is amongst their coach. Can they take direction?  Do they take criticism?  And lastly we try to see what their interaction is outside of the pool.

```
  1    Q.   What are you looking for?
  2    A.   So we want selfless, hardworking kids, both men's and
  3    women's, that strive for one goal, you know, an opportunity to
  4    play when they potentially get to USC but ultimately to win a
  5    championship.
  6    Q.   Do you have redshirts?
  7    A.   Yes, we do.
  8    Q.   What are redshirts?
  9    A.   So redshirts are incoming freshmen that don't have the
11:35 10   opportunity to play or contribute because of -- they just don't
 11    cut it to be our top 16, our top 20.
 12    Q.   So what is their role and function on the team?
 13    A.   So their function is to be at practice daily, to be able
 14    to push the players that contribute every day at practice.
 15    Q.   And then what?
 16    A.   And outside of -- outside of practice, when we travel,
 17    redshirts help to do other team functions, as in help set up
 18    the pool, as in help film games.  You know, they're pretty much
 19    a part of our team as much as our number one player is to
11:36 20   number 30 on the team.  Everybody has a role.
 21    Q.   After a redshirt year, what are your expectations for
 22    redshirts?
 23    A.   After that year, our expectation is, one, they get fit to
 24    learn the system and ultimately contribute in the pool.
 25    Q.   When you say "contribute in the pool," are you talking
```

1  about games?

2  A.   Yes.

3  Q.   The USC men's water polo team, how is it funded?

4  A.   We have an operating budget that is given to us by our

5  athletic department.

6  Q.   And beyond the operating budget given to you by the

7  athletic department, is there a fund that helps support the

8  team that people can donate to?

9  A.   Yes.

11:37 10  Q.   And what is that fund used for?

11  A.   It is used to supplement what our operating budget is.  So

12  that fund is used, again, to supplement travel, supplement

13  food, apparel for the team.  Our ultimate goal as a coaching

14  staff, as a program, we want our players to enjoy the

15  experience when they travel.

16  Q.   During the time that Jovan Vavic was the head coach of USC

17  men's water polo, who controlled the fund?

18  A.   Our head coach.

19  Q.   And who was that?

11:37 20  A.   Jovan Vavic.

21  Q.   At any time did Jovan Vavic tell you that he was accepting

22  money to the fund in exchange for recruiting certain

23  individuals?

24  A.   No.

25  Q.   Did you know that?

```
 1   A.   I did not.
 2   Q.   Are you familiar with something called the SUBCO process
 3   at USC?
 4   A.   Yes.
 5   Q.   Directing your attention to 2013, 2014, what was your role
 6   in that process for men's water polo recruits?
 7   A.   My primary role was to document upkeep, meaning make sure
 8   I have all the updated revised documents that the student
 9   athlete would send us that I would need to send to our athletic
10   department.
11   Q.   Were athletic resumes part of that process?
12   A.   Yes.
13   Q.   Did you have help prepare athletic resumes?
14   A.   Yes, because the subcommittee had their format that the
15   students resumes needed to be in.
16   Q.   So what was your function with respect to those?
17   A.   So I had two sources of information.  One was the actual
18   physical resume that the student athletic would send us.  It
19   would be forwarded to me by our head coach.  And my second
20   source would be the conversations I had with our head coach.
21   Q.   And what would you do with the information that you
22   received in the student's resume that they submitted and the
23   information that you received about the student athlete from
24   Coach Vavic?
25   A.   So I would transcribe what the actual physical resume
```

would be into the format the subcommittee requests, as well as
add anything that our head coach has told me about that player.

Q.   Did you at that time take any steps on your own to verify
the information in the profiles that you received from the
students?

A.   No.

Q.   Did you take any steps to verify the information that you
received from Coach Vavic?

A.   No.

11:39 Q.   Generally speaking, prior to preparing those SUBCO
packets, did you have some level of familiarity with the
individuals whose packets you were preparing?

A.   Yes.

Q.   How so?

A.   We would have discussion amongst our coaching staff about
so and so recruits that we are potentially recruiting,
depending on their personnel and their potential help for the
team.

Q.   And if a recruit was a particularly valued recruit, was
11:40 it -- would you discuss those with the coaching staff from time
to time?

A.   Yes.

Q.   Directing your attention to the 2013-2014 time period, did
there come a time when you became aware of a potential recruit
to the men's water polo team named Johnny Wilson?

1    A.    Yes.

2    Q.    How so?

3    A.    I had his information, resume forwarded to me by our head

4    coach.

5    Q.    Before that time do you recall having heard of Johnny

6    Wilson?

7    A.    No.

8    Q.    Do you recall having discussed him before that time with

9    Coach Vavic or any of the other coaches?

11:40  10    A.    No.

11    Q.    Do you know what, if any, research Coach Vavic did before

12    sending you Johnny Wilson's resume?

13    A.    I do not.

14          MR. FRANK:  For the witness only, if we could have

15    Exhibit 106, please.

16    Q.    Mr. Moon, do you recognize that document?

17    A.    It is an e-mail.

18    Q.    Who is it from?

19    A.    It's from Jovan Vavic to myself.

11:41  20    Q.    And what is the subject?

21    A.    It says, "Forward John Wilson resume."

22    Q.    And is there an attachment?

23    A.    Yes.  It says "Wilson.pdf."

24    Q.    What is the date of this e-mail?

25    A.    February 22 -- excuse me, February 26, 2014.

```
 1              MR. KELLY:  Excuse me one moment.  Somehow it didn't
 2     come up on our screen.
 3              THE COURT:  Do you still have a malfunction?
 4              MR. KELLY:  Just ours, Your Honor.  But we can proceed
 5     with the paper copy.
 6              THE COURT:  All right.
 7              MR. FRANK:  May we proceed?
 8              THE COURT:  Yes, you may.
 9              MR. FRANK:  Government offers 106.
10              THE COURT:  It will be admitted.
11              (Exhibit 106 admitted into evidence.)
12     Q.   Mr. Moon, if you take a look at this e-mail, you see that
13     the e-mail that you were sent by Jovan Vavic on February 26,
14     2014 was actually a forward of an e-mail that he sent to
15     someone named Alex Garfio.  Do you see that?
16     A.   Yes.
17     Q.   And he wrote "Alex, here is his resume"?
18     A.   Yes.
19     Q.   Who is Alex Garfio?
20     A.   Alex Garfio was a liaison between athletics and admissions
21     for the subcommittee process.
22     Q.   Are you familiar with somebody by the name of Donna
23     Heinel?
24     A.   Yes.
25     Q.   What was the relationship between Alex Garfio and Donna
```

1    Heinel?

2    A.   So Alex and Donna worked together.  If there was a

3    hierarchy, Alex would be right underneath Donna.

4    Q.   He worked for her?

5    A.   Correct.

6    Q.   Did you have an understanding when you received this

7    document as to why Coach Vavic was sending you a resume for

8    John Wilson?

9    A.   Yes, to prepare for the subcommittee process.

11:44  10           MR. FRANK:  If we can take a look at the next page.

11   Q.   Is that the resume you recall receiving?

12   A.   Yes.

13   Q.   Okay.  Taking a look at it generally, you see that there

14   are grades on the left-hand side and test scores.  Do you see

15   that?

16   A.   Yes.

17   Q.   And then there are awards and honors beneath that?

18   A.   Yes.

19   Q.   And there's a whole list of teams.  Do you see that?

11:44  20   A.   Yes.

21   Q.   And various other accolades?

22   A.   Yes.

23   Q.   And then on the right there is some additional

24   information, swim times, it says the school that he plays at

25   and it has a club listed, the Stanford Water Polo Club.  Do you

1    see that?

2    A.    Yes.

3    Q.    Generally speaking, how do the qualifications on this

4    resume compare to those of athletes that you would typically

5    recruit on the men's water polo team?

6    A.    Just looking at his academics, his test scores, you know,

7    accolades that are written on the left side is pretty similar

8    to all the kids, the men and women that we recruit.  By looking

9    on the left side, you know, it shows his swim times as well as

11:45 10   his high school and his water polo club, and his swim times

11   truly jumped out to us on the page.

12   Q.    I think you said the left side, but were you referring to

13   the right side?

14   A.    Oh, yes.  I apologize.

15   Q.    The other left?

16   A.    Yes.

17   Q.    Taking a look at the awards and honors, you see that he's

18   listed as a four-year varsity letterman?

19   A.    Yes.

11:45 20   Q.    And a three-year co-captain of the team?

21   A.    Yes.

22   Q.    Are those factors that you look at in evaluating water

23   polo talent?

24   A.    Yes, absolutely.

25   Q.    Why?

1    A.    One, to be a captain of your team is very important.  It

2    shows leadership skills, your accountability and understands,

3    you know, your ability to be the coach's extension for the

4    team.  Secondly, if you see a varsity letterman, it shows

5    obviously on your team that you represent, that you play for,

6    you're the best players on that team.

7    Q.    Do you know if it was true that Johnny Wilson was

8    co-captain of his team for three years?

9    A.    I do not.

11:46 10   Q.    Looking on the right side of the page, there are swim

11   times listed.

12   A.    Yes.

13   Q.    And it says 50 freestyle 20.12 short course, 100 freestyle

14   43.98 short course?

15   A.    Yes.

16   Q.    What is your understanding of -- the 50 freestyle and the

17   100 freestyle, is that yards, meters, what is that?

18   A.    When it says "short course" it's considered yards.

19   Q.    Okay.  And how does the time of 20.12 on the short course

11:46 20   for 50 yards and 43.98 for 100 yards compare with times of

21   players on the USC men's water polo team?

22   A.    20.12 in the 50 free is exceptional.  It's blazing fast.

23   If we see that time on a piece of paper, he's playing the wrong

24   sport.

25   Q.    When you say if you see that time, he's playing the wrong

         1    sport, what do you mean by that?

         2    A.    So 20.12 in short course, 50 free, he should be swimming

         3    for our swim team at USC.

         4    Q.    Why is that?

         5    A.    Because 20.12 is probably top ten on our men's team for

         6    swimming.  It's incredibly fast.

         7    Q.    And what if those times were a little slower?  What if it

         8    was 22 seconds for the 50 yards and 49 1/2 seconds for the 100

         9    yards?  How would that compare with the water polo team?

11:47  10    A.    That's pretty average for us.

        11    Q.    Okay.  So a few seconds can make a big difference?

        12    A.    Oh, absolutely.

        13          MR. FRANK:  For the witness only, can we take a look

        14    at Exhibit 105, please.

        15    Q.    By the way, Mr. Moon, those swim times we just looked at,

        16    do you know if those are true?

        17    A.    I do not.

        18    Q.    Do you recognize Exhibit 105?

        19    A.    Yes, it is an e-mail.

11:48  20    Q.    Who is it from?

        21    A.    From Jovan Vavic.

        22    Q.    Who is it to?

        23    A.    To myself.

        24    Q.    And what is the date?

        25    A.    February 26, 2014.

```
 1    Q.    So same date as the last one we just looked at?

 2    A.    Correct.

 3    Q.    And what's the subject?

 4    A.    It says, "Forward Johnny Wilson's last semester grades."

 5              MR. FRANK:  The government offers 105.

 6              THE COURT:  It will be admitted.

 7              (Exhibit 105 admitted into evidence.)

 8    Q.    You see, Mr. Moon, that Coach Vavic is again forwarding

 9    you an e-mail that he previously sent to Alex Garfio?

10    A.    Yes.

11    Q.    And it says, "Johnny Wilson's last semester grades," and

12    he writes, "Alex, this kid would be the fastest player on our

13    team.  He swims 50 yards in 20 seconds.  My fastest players are

14    around 22 seconds.  This kid can fly.  He was the captain of

15    his high school team as a sophomore, great work ethic, was all

16    CCS, he is a" -- I believe that should say "legit walk-on who

17    could end up playing for us very soon."

18              Did you have an understanding of why Coach Vavic was

19    sending you these grades and copying you on that write-up that

20    he sent to Alex Garfio?

21    A.    No.

22    Q.    You did not have an understanding?

23    A.    This understanding of this e-mail would have been to add

24    to --

25    Q.    I'm just asking if you had an understanding of why you
```

```
 1    were being sent this, for what purpose?
 2    A.    No, I do not.
 3    Q.    Were you at this time preparing a SUBCO packet for Johnny
 4    Wilson?
 5    A.    Yes.
 6    Q.    And how would you use grades in preparing a SUBCO packet?
 7    A.    So this would be my two sources of information to complete
 8    the SUBCO packet for his resume.  One would be his actual
 9    physical bio, resume, and second would be the information that
10    I had from our head coach in conversation.
11    Q.    Okay.  And in this write-up Coach Vavic wrote, "He is a
12    legit walk-on who could end up playing for us very soon."  Do
13    you see that?
14    A.    Yes.
15    Q.    What do you understand that to mean?
16          MR. KENDALL:  Objection, your Honor.  He didn't write
17    it.
18          THE COURT:  Well, he can state what his understanding
19    of it is.
20    A.    So to my understanding it would be, he would come to us,
21    join us, and contribute immediately right away.
22    Q.    Contribute immediately in what sense?
23    A.    To help us in playing games.
24    Q.    And is that typical for a walk-on?
25    A.    It's very rare.
```

```
      1    Q.   What did you do with the information that Coach Vavic

      2    provided you in terms of Johnny Wilson's grades, his test

      3    scores and the other information he provided?

      4    A.   So I compiled it in his SUBCO packet and sent it to Donna

      5    Heinel and Alex Garfio.

      6              MR. FRANK:   If we could bring up Exhibit 107 in

      7    evidence, please.

      8    Q.   Do you recognize this to be a SUBCO packet for Johnny

      9    Wilson?

11:51 10    A.   Yes.

     11    Q.   And if we look at the next page, do you see there's a

     12    different resume?

     13    A.   Yes.

     14    Q.   Do you know who prepared this athletic profile?

     15    A.   I did.

     16    Q.   And, again, what did you rely on to create it?

     17    A.   The actual physical copy of the student athlete's resume,

     18    as well as a conversation I had with our head coach.

     19              MR. FRANK:   If we could put this page from Exhibit 107

11:51 20    on the right, Ms. Lewis, and put the second page of Exhibit 106

     21    on the left.

     22    Q.   Now, Mr. Moon, it appears that there are more accolades

     23    listed on the right than there are listed on the left.  Do you

     24    see that?

     25    A.   Yes.
```

```
 1    Q.   Part of that appears to be that the ones on the left have

 2    been broken out by year on the right.  So, for example, on one

 3    line on the left, it has multiple years listed, California

 4    Scholar Athlete Award 2011, '12, and '13.  Do you see that?

 5    A.   Yes.

 6    Q.   And those are broken out into separate lines on the right?

 7    A.   Yes.

 8    Q.   Why is that?

 9    A.   This is just following the format that the subcommittee

10    requests.

11    Q.   Okay.  But there are also, it appears, additional

12    accolades listed on the right that are not listed in the

13    profile on the left.  Do you see that?

14    A.   Yes.

15    Q.   For example, on the right it says "four-year varsity

16    starter."  Do you see that?

17    A.   Yes.

18    Q.   And on the left, it lists four years but it just says

19    "varsity letterman."  It doesn't say anything about starter?

20    A.   Yes.

21    Q.   Where would you have gotten that additional information?

22    A.   In conversation with our head coach.

23    Q.   Now, I want to focus you on the bottom portion of the

24    resume.  It says "Assets" on the right, it says "Assets to our

25    men's team."  Do you see that?
```

1    A.    Yes.

2    Q.    It says "Top 10 attacker in grad class."  What does that

3    mean?

4    A.    So in his graduating class, he is one of the top ten in

5    the country.

6    Q.    Not just at his high school but in the country?

7    A.    In the country.

8    Q.    Where did you get that assessment of Johnny Wilson's

9    skills?

11:53 10   A.    Again, from conversation with our head coach.

11   Q.    And below that it says, "Exceptional leader.  Immediate

12   impact player due to his speed."  What does "immediate impact

13   player" mean?

14   A.    That when he joins us as a freshman, he'll play in games

15   and contribute right away.

16   Q.    Who gave you that assessment?  Where did you get that

17   assessment of Johnny as an immediate impact player?

18   A.    I got that information from the e-mail that he forwarded

19   to Alex Garfio that I was on.

11:54 20   Q.    How many players are immediate impact players that you

21   recruit?

22   A.    Very rare.  Potentially two or three.

23         MR. FRANK:  You can take this down, Ms. Lewis.

24   Q.    Was Johnny Wilson an immediate impact player on the men's

25   water polo team at USC?

```
 1   A.   No.

 2   Q.   Do you recall that he was on the roster his freshman year?

 3   A.   Yes.

 4   Q.   I'd like to show you what's been marked as Exhibit 751.

 5        MR. FRANK:  For the witness only, please.

 6        MR. KENDALL:  Your Honor, I don't know if we've seen

 7   this before.

 8        MR. FRANK:  I think we just marked this.  I believe

 9   it's a version of a document that the defense used at one
```
11:55 10  point.  We have a paper copy for them.  It's the -- well --
```
11   Q.   Mr. Moon, do you recognize this document?

12   A.   Yes.

13   Q.   What is it?

14   A.   It is our media guide.

15   Q.   And it's for the year 2014?

16   A.   Correct.

17   Q.   For men's water polo?

18   A.   Yes.

19   Q.   And what is a media guide?
```
11:55 20  A.   It states -- it has our team photo.  It states all the
```
21   members of the team, as well as little snippet bios of their

22   previous history with us.

23   Q.   And this is a USC publication?

24   A.   Yes.

25        MR. FRANK:  The government offers 751.
```

1          MR. KENDALL:  I'd object, your Honor.  I have not seen

2     this before.  I need a little bit of time to look at it.

3          THE COURT:  Well, you can look at it.

4          MR. KENDALL:  It was not on their exhibit list, your

5     Honor, that I'm aware of, or produced to us.  This is the first

6     time we've touched it.

7          MR. FRANK:  I believe Mr. Kendall introduced a

8     photograph from this guide.

9          MR. KENDALL:  I don't believe so.  If so, I didn't

11:56 10    have it from this document.  It may be the same photo.

11          MR. FRANK:  Well, why don't we just start with the

12     photo for right now.  If you could go to the back cover,

13     Ms. Lewis.

14          MR. KENDALL:  Your Honor, it's not in evidence.

15          MR. FRANK:  I'm not showing it to anyone other than

16     the witness.  And if you could zoom in on that photograph.

17     Q.   Mr. Moon, do you recognize that photograph?

18     A.   Yes.

19     Q.   What is it?

11:56 20    A.   It's a photo of our team.

21     Q.   And this is from 2014?

22     A.   Correct.

23          MR. FRANK:  Okay.  We'd offer it, your Honor.

24          MR. KENDALL:  Your Honor, no objection to the photo

25     itself, but the rest of the document we've never seen, and

         1    that's not the version of the photo we had.

         2          THE COURT:  We'll mark it as Exhibit 751A.  It will be

         3    admitted, the photograph of the team.

         4          MR. FRANK:  Okay.

         5          (Exhibit 751A admitted into evidence.)

         6    Q.   And Mr. Moon, looking at that photograph, I want to direct

         7    your attention to this individual in the top left corner.  Do

         8    you see that individual standing in the top left?

         9    A.   Yes.

11:57   10    Q.   Do you recognize that individual?

        11    A.   Yes.

        12    Q.   Who is it?

        13    A.   It's Johnny Wilson.

        14    Q.   Okay.  Do you recognize the other individuals in this

        15    photograph as well?

        16    A.   Absolutely.

        17          MR. FRANK:  And just for the witness only, if we could

        18    look at page 16 of this document -- I'm sorry, page 17.

        19          Ms. Lewis, if you could just scroll down, I'll direct

11:58   20    you.  It actually says page 15 at the bottom of the page.  Oh,

        21    you don't have it?

        22          Mr. Stearns, can you just show the witness a paper

        23    copy of the page marked 15 at the bottom -- there it is.  Thank

        24    you.

        25    Q.   Mr. Moon, do you see that page?

1   A.   Yes.

2   Q.   And generally speaking, these media guides that USC

3   publishes, they have short player profiles?

4   A.   Correct.

5   Q.   And they have photographs of each individual player?

6   A.   Yes.

7   Q.   And does this refresh your recollection that there was a

8   photograph of Johnny Wilson in the 2014 media guide and there

9   was a short player profile of him along with all the other

11:59 10   players on the roster that year?

11   A.   Yes.

12        MR. FRANK:   Okay.  And if we can now go back to the --

13   I believe, your Honor, we marked it 751A, the photograph.

14        THE COURT:   Yes.

15        MR. FRANK:   If we could go back to 751A in evidence.

16   Q.   This photograph of the team, when is it taken regularly in

17   the school year?

18   A.   So it's usually taken about three weeks into the season.

19   Q.   Okay.  And the photographs that appear inside the media

11:59 20   guide, the head shots that appear in the media guide, when are

21   those taken?

22   A.   Approximately the same time.

23   Q.   Beyond being on the roster and appearing in the media

24   guide and in these photographs, what do you remember, Mr. Moon,

25   about Johnny Wilson?

```
 1   A.   I don't remember him at all being at practice daily.

 2   Q.   Do you remember him ever being at practice?

 3   A.   Only on the first day, and after the first day I've never

 4   seen him again.

 5   Q.   What about all of the other individuals in this

 6   photograph?

 7   A.   Oh, I see them every day.

 8   Q.   They all came to practice?

 9   A.   Yes, and participated every day.

10            MR. FRANK:  If we could show the witness only Exhibit

11   129, please.

12   Q.   Mr. Moon, do you recognize this document?

13   A.   Yes, it is an e-mail.

14   Q.   And the top e-mail on the chain, who is that from?

15   A.   It's from myself.

16   Q.   Who is it to?

17   A.   Alex Garfio.

18   Q.   And who is copied?

19   A.   Our head coach.

20   Q.   And there are some other individuals as well?

21   A.   Yes.

22   Q.   And do you recognize them to work in compliance?

23   A.   Correct.

24   Q.   And what's the date?

25   A.   It is September 10, 2014.
```

1           MR. FRANK:  The government offers 129.

2           MR. KENDALL:  No objection, your Honor.

3           THE COURT:  It will be admitted.

4           (Exhibit 129 admitted into evidence.)

5           MR. FRANK:  Now if we could start with the bottom

6      e-mail in the chain.

7      Q.    Do you see there's an e-mail dated August 28, 2014 from

8      Alex Garfio?

9      A.    Yes.

12:01 10    Q.    And you're one of the individuals he sent it to?

11     A.    Yes.

12     Q.    What's the subject?

13     A.    "John Wilson eligibility center status."

14     Q.    What is the eligibility center?

15     A.    So that is connected with the NCAA, and the eligibility

16     center makes sure and verifies that all high school prospective

17     student athletes have valid test scores, transcripts and proof

18     of graduation.  You need to be registered with the NCAA in

19     order to participate in college athletics.

12:02 20    Q.    So on August 28, Mr. Garfio writes.  "Hi all.  Men's water

21     polo freshman John Wilson is still not certified academically

22     with the eligibility center.  The EC has not received his test

23     score and they will not evaluate him until they do.  I spoke

24     with his mother last week regarding the scores and advised her

25     to have them expedited.  Can we confirm that they were sent?

 1    Please let me know if you have any questions."

 2              Do you see that?

 3    A.   Yes.

 4    Q.   And the date is August 28?

 5    A.   Correct.

 6    Q.   If we could look at the next e-mail up in the chain, the

 7    date of this e-mail is not quite two weeks later, September 10?

 8    A.   Yes.

 9    Q.   And how long is September 10 into the water polo season?

12:02 10    A.   It's approximately -- it's about three weeks.

11    Q.   And Mr. Garfio writes, "Hi Casey.  John Wilson has still

12    not submitted his test scores to the NCAA.  This needs to be

13    taken care of ASAP if he plans on being on the team.  Can we

14    get his username and login so we can confirm that he has sent

15    them?"  Do you see that?

16    A.   Yes.

17    Q.   And how do you respond, if we could look at the next

18    e-mail up in the chain?

19    A.   Is that a question for me to answer?

12:03 20    Q.   Yes.  I'm sorry.  How did you respond?

21    A.   It says, "Morning.  I will text him right now and get that

22    info for you.  Thanks, Casey."

23              MR. FRANK:  Okay.  Could we show the witness only

24    Exhibit 128, please.

25    Q.   Mr. Moon, do you recognize this document?

```
 1    A.    Yes, it is an e-mail.

 2    Q.    Who is it from?

 3    A.    Myself.

 4    Q.    Who is it to?

 5    A.    To Johnny Wilson.

 6    Q.    And what's the date?

 7    A.    September 10, 2014.

 8    Q.    So the same date as the e-mail we just looked at?

 9    A.    Correct.

10          MR. FRANK:  Government offers 128.

11          THE COURT:  It will be admitted.

12          (Exhibit 128 admitted into evidence.)

13    Q.    And you write, "Johnny, morning.  This is very important

14    to be completed ASAP.  I just heard from our athletic

15    department saying you still have not submitted your SAT score

16    to the NCAA.  Can you please send me your username login

17    password for your NCAA account so we can try to check on our

18    end.  Do you know if and when your scores were sent to the

19    NCAA?  Please get back to me ASAP.  This is extremely important

20    for you being on the team.  Thanks."

21          What did you mean when you wrote, "This is extremely

22    important for you being on the team"?

23    A.    Because all of our athletes need to be registered and

24    validated through the NCAA.  If we have athletes that practice

25    with us that are not registered validated with the NCAA, it is
```

1      a violation on our end.  So every one of our players prior to

2      his or her admittance to USC physically being there needs to be

3      registered through the NCAA eligibility center.

4      Q.    In this e-mail --

5            I believe you testified a moment ago you don't

6      remember Johnny coming to practice.

7      A.    Correct.

8      Q.    And did you go to practice every day?

9      A.    Yes, I was there every day.

12:05 10   Q.    Did you know all the players?

11     A.    Absolutely.

12     Q.    In this e-mail, did you ask Johnny Wilson why he hadn't

13     been to practice?

14     A.    No.

15     Q.    Why not?

16     A.    I was just relaying the message from Alex Garfio regarding

17     his NCAA status.

18     Q.    Why didn't you ask where he was?

19     A.    I don't recall.  You know, when I received that e-mail

12:05 20   from Alex, you know, it was our job, my job at that point to

21     make sure this is all set and squared.  So I just relayed the

22     message.

23     Q.    Do you recall Johnny attending practices after this?

24     A.    No, I do not.

25     Q.    Do you recall him attending strength and conditioning

```
 1   training sessions?
 2   A.   No.
 3   Q.   Do you recall him attending team meetings?
 4   A.   No.
 5   Q.   Do you recall ever following up with him?
 6   A.   I do not.
 7   Q.   Why not?
 8   A.   Just, if he wasn't at practice every day, daily, you know,
 9   we figured, I figured, you know, his heart wasn't in it to be
10   with the team.  So if he wasn't there, then I had no bother
11   checking.
12   Q.   Did there come a time when you learned that Johnny Wilson
13   had formally quit the team?
14   A.   Yes, I've heard just kind of hearsay amongst the players.
15   Q.   And when was that?
16   A.   I believe it was about midseason.
17   Q.   Do you recall learning why he had quit the team, what
18   reason he had given?
19   A.   No.
20   Q.   Do you recall at any point hearing that he had had a
21   concussion?
22   A.   No.
23   Q.   Were you surprised when you found out that Johnny Wilson
24   had quit the team?
25   A.   No, because I had never seen him practice.  He was never
```

```
 1    there.
 2              MR. FRANK:  No further questions.
 3              THE COURT:  Cross-examination, Mr. Kendall.
 4              MR. KENDALL:  Yes, Your Honor.
 5                 CROSS-EXAMINATION OF CASEY MOON
 6    BY MR. KENDALL:
 7    Q.    Good afternoon, Mr. Moon.
 8    A.    Good afternoon.
 9    Q.    My name is Mike Kendall.  I represent John Wilson.  Thank
10    you for coming out from California.  We hope to get you done so
11    you can get back home this evening.
12    A.    Thank you.
13    Q.    I want to start first with your reference about the size
14    of the team.  You said that there was a death of one of the
15    athletes and that year they had to recruit a large number, an
16    unusually large class.  Do you remember talking about that?
17    A.    Yes.
18    Q.    The unfortunate young man was Jon Walters, wasn't it?
19    A.    Correct.
20    Q.    He died in January 2014, didn't he?
21    A.    Yes.
22    Q.    And about eight of the athletes quit the team just because
23    of, you know, a beloved star player died and a bunch of people
24    left the team separate from graduation, correct?
25    A.    Yes, just due to their hardship of the tragic incident.
```

1   Q.   You lost about eight good athletes that year in 2014,

2   correct?

3   A.   To my -- if I recall, yes.

4   Q.   So the big recruiting class to deal with this loss was the

5   class that was entering in September of 2014, correct?

6   A.   No.  How we recruit is based on player personnel, and we

7   want to have depth on our team.  So every year we recruit

8   anywhere from five to ten depending on the player personnel we

9   need.

12:09 10   Q.   But you testified earlier that there was, you said in 2013

11   I think you said there was about 20 people recruited and you

12   referred to the death of the athlete?

13   A.   Correct.

14   Q.   He died in 2014, not in 2013, correct?

15          MR. FRANK:  Misstates, your Honor.  I believe I said

16   2013-2014.

17          THE COURT:  All right.

18   Q.   Yes, but it wasn't the 2013 to '14 academic year.  It was

19   in 2014 that he died, correct?

12:09 20   A.   Correct.  That's when he passed away, but the 2013-'14 is

21   the same academic year.

22   Q.   Right.  But in 2014, a whole bunch of kids quit the team

23   in January or so, correct?

24   A.   Correct.  That was, again, due to potential hardship of

25   the tragic incident that everybody witnessed and was a part of.

 1    Q.   And do you recall how many were recruited to join the team

 2    as freshmen in September of 2014?

 3    A.   Again, I believe we had a pretty big class.  It was about

 4    20 plus.

 5    Q.   Okay.  Entering in September of '14?

 6    A.   Correct.

 7    Q.   And about 13 of them were redshirts?

 8    A.   Yes.

 9    Q.   Now, that document that Mr. Frank was just showing you

12:10 10   about Johnny registering with the NCAA, do you remember how the

11    situation got resolved?

12    A.   I do not.  After I sent him that e-mail, I don't recall

13    what happened after that.

14    Q.   Do you recall if you ever heard back from him?

15    A.   I don't recall.

16    Q.   You're not saying that he didn't get back to you.  You're

17    just saying it was eight years ago, seven years ago, whatever,

18    and I just don't remember, correct?

19    A.   I just don't recall.

12:11 20        MR. KENDALL:  Okay.  Could we show the witness Exhibit

21    9513, please.  I don't think that's 9513.  If it is, it's not

22    the one I have marked.

23        Your Honor, I'd like to use the Elmo.  I'll get the

24    exhibit number resolved as soon as someone can assist me, but

25    I'd like to show this document to the witness only at this

        1    point.

        2    Q.    Do you recognize this as an e-mail chain between you and

        3    Mr. Garfio concerning Johnny Wilson's eligibility?

        4            MR. FRANK:  May I see it, counsel?

        5            MR. KENDALL:  I apologize.  When we locate the

        6    number --

        7            MR. FRANK:  Can you shrink it?

        8            MR. KENDALL:  -- I'll tell you, but this is one of the

        9    documents you gave us.

12:12  10            MR. FRANK:  We gave you 2.7 million documents.

       11            MR. KENDALL:  I understand.

       12            MR. FRANK:  So that doesn't help.

       13            MR. KENDALL:  We're looking for our copy now.

       14    Q.    Do you recognize this as an e-mail that came after the

       15    e-mails that Mr. Frank just showed you, Exhibit 128, and the

       16    others.  This is a little later in the day, correct?

       17    A.    Correct, it is the same date, but if you say it's a little

       18    later in the day -- it says 6:56 p.m.  So I presume the other

       19    e-mails were prior to that.

12:12  20    Q.    Okay.  And then you see there's an e-mail here at

       21    10:45 a.m. from you as well, correct, on the same topic?

       22    A.    Yes, that is an e-mail.

       23    Q.    It's the same communications the same day on the same

       24    topic, correct?

       25    A.    Correct.

```
 1              MR. KENDALL:  For purposes of completeness, your
 2   Honor, I'd like to offer the subsequent e-mails that were not
 3   put in by the government.
 4              MR. FRANK:  No objection, your Honor.
 5              THE COURT:  It will be admitted.  We need a number.
 6              MR. FRANK:  I can't see the whole document, so I
 7   actually don't know --
 8              THE COURT:  How about showing him the whole document?
 9              MR. KENDALL:  I would love that, your Honor, if I
10   could do this.  Do we have the number?  9844.  Thank you very
11   much, Ms. Bovier.  If we could put 9844 on the screen.
12              MR. FRANK:  If I could see it first, your Honor, that
13   would be helpful.
14              THE COURT:  Let counsel see it, please.
15              MR. KENDALL:  If we could show it to the witness only
16   on the screen and at least let Mr. Frank look at it on the
17   screen until we get him a paper copy.  You don't have 9844?
18              MR. FRANK:  No.
19              MR. KENDALL:  Okay.
20   Q.   Okay.  What I want to suggest to you is -- when we get the
21   document we'll show it -- didn't Johnny Wilson get back to you
22   and the problem was he was using the name Johnny instead of
23   John and there was a mix-up with the records?
24   A.   I don't recall.
25   Q.   Okay.  We'll get you the document in just a minute and
```

1    we'll get back to that.

2           You say you have no memory of Johnny being at

3    practice after the first day, correct?

4    A.    Correct.

5    Q.    Did you take attendance?

6    A.    I did not, no.

7    Q.    So are you testifying he wasn't there or you just don't

8    remember it?

9    A.    I don't remember.

12:14 10   Q.    Okay.  And there's a lot of other team events that go on

11   in the year as well besides just showing up at practice,

12   correct?

13   A.    Well, if you come to USC to play water polo, coming to

14   practice every day is first and foremost.

15   Q.    Yes.  And there's also social events.  The team gets

16   together, correct?

17   A.    Yes, they do social events, but we don't take a role or we

18   don't know what those social events are.

19   Q.    Sure.  And even the redshirts who don't play, they go to

12:15 20   the games and they help assist putting up things, doing tasks

21   as you described earlier?

22   A.    Yes.

23   Q.    Sometimes scouting other teams, correct?

24   A.    Redshirts are not allowed to scout other teams.  They are

25   there daily to help us set up the pool, set up the game course,

1   help us film, but they're not allowed to scout other teams.

2        MR. KENDALL:   Okay.   If we could show the witness

3   Exhibit 8008, please, for impeachment.

4   Q.   Do you recognize this as an e-mail from one of the

5   assistant water polo coaches to Johnny Wilson in 2014?

6   A.   Yes, it is an e-mail.

7        MR. KENDALL:   I'd like to offer 8008, please, your

8   Honor, for impeachment.

9        MR. FRANK:   It's not inconsistent, your Honor, and

12:15 10   he's never seen it.   He's not on it.

11        THE COURT:   The objection is sustained.

12   Q.   Do you recognize the email --

13        MR. KENDALL:   If we could have 8008 up for the

14   witness, please.

15   Q.   Do you recognize -- what was Stefan Luedecke's role in

16   2014?

17   A.   I believe he was an assistant coach.

18   Q.   Okay.   And do you recognize that as his e-mail address?

19   A.   Yes, that is his e-mail address.

12:16 20   Q.   Do you recognize that as a student's e-mail address or a

21   team member's e-mail address and the form of it?

22   A.   Yes.

23   Q.   usc.edu, do you recognize that as Johnny Wilson's e-mail

24   address?

25   A.   I'm not sure if that's his actual e-mail address, but

1   every student athlete, every student at USC has an @usc.edu

2   email.

3   Q.   That's his name in 2014, correct?

4   A.   I don't recall; I'm not sure.

5   Q.   If you could read the document.

6   A.   Yes, it's an e-mail.

7   Q.   And it's about water polo uniforms, correct?

8   A.   Yes.  That's what the e-mail states and asks.

9   Q.   Okay.  And that's something that the team sets out in the

12:17 10   ordinary course, to get all the athletes' sizes and to order

11   their uniforms, correct?

12        MR. FRANK:  Your Honor, if the effort is to show that

13   an e-mail sent to a student is a business record, we object.  I

14   would also point out this document was sent on August 9, which

15   is before the water polo season.

16        THE COURT:  Objection sustained.

17   Q.   Does the team send out to the incoming members of the team

18   an e-mail asking them about their sizes for their uniforms?

19   A.   We do send e-mails or we discuss in person.

12:17 20   Q.   Okay.  And is Exhibit 8008 one of those?

21   A.   My screen is blank, but --

22        MR. KENDALL:  If we could show the witness again.

23   A.   This is an e-mail, yes.

24   Q.   And it's an e-mail to order a uniform, correct?

25   A.   It's just asking for sizes.

1    Q.   And if you could look further down, look at the top of the

2    second page.  "I hope all is well."

3    A.   Yes, I see that.

4         MR. KENDALL:  Your Honor, I offer this not for the

5    truth of the matter but just to show that there was an email

6    sent and responded to to order a uniform.

7         MR. FRANK:  Your Honor, we object and it's completely

8    irrelevant.  It was sent before the --

9         THE COURT:  The objection is sustained.

12:18 10    Q.   Do you dispute that Johnny Wilson ordered a uniform and

11    got a uniform to be on the team that season?

12    A.   I don't recall.  I didn't send that e-mail.

13    Q.   Okay.  When you saw him on the first day, he had a uniform

14    on, didn't he?

15    A.   No, we don't have our players wear team gear on the first

16    day.  They show up in normal clothes.

17    Q.   I'd like to show you now Exhibit 9844.  I think we have

18    copies that we can give out to people.

19         MR. KENDALL:  I think this has been admitted.  If we

12:19 20    can show it on the screen.

21         MR. FRANK:  Your Honor, this is the document I believe

22    I was going to review before it was admitted.

23         THE COURT:  Okay.  Take a look at it.

24         MR. FRANK:  No objection.

25         THE COURT:  It was previously admitted and it is now

 1 | admitted, 9844.
 2 |          (Exhibit 9844 admitted into evidence.)
 3 |          MR. KENDALL:  Thank you, Your Honor.  Can we put it on
 4 | the -- oh, we're going to use the Elmo.  Okay.  Could we show
 5 | the Elmo to everybody.  I want to move it up to the middle.
 6 | Q.   Okay.  So at 10:45 a.m. on the same day, September 10,
 7 | that Mr. Frank showed you that e-mail, you sent to Alex Garfio
 8 | "Just heard back from Johnny."  That's referring to Johnny
 9 | Wilson, correct?
12:20 10 | A.   Correct.
11 | Q.   "When I spoke to him, he said we sent his scores three
12 | weeks ago but he sent them as Johnny Wilson, not John Wilson.
13 | He also said he'll resend them right away.  Below is his
14 | username login password as requested.  Thanks."
15 |          Did you just forget about this e-mail address -- I
16 | mean, this e-mail response?
17 | A.   Yes, I don't recall.
18 | Q.   You don't recall it.
19 |          How long did you spend preparing with the U.S.
12:20 20 | Attorney's Office preparing your testimony?
21 | A.   We had two meetings and two meetings via Zoom.
22 | Q.   So a total of four meetings?
23 | A.   Yes.
24 | Q.   How long was each meeting?
25 | A.   Anywhere from two hours to four hours.

1    Q.   And so we've had maybe eight, ten, 12 hours in there of

2    preparation?

3    A.   Yes.

4    Q.   And in addition, you have USC lawyers that have helped you

5    prepare for your testimony, correct?

6    A.   Yes, I had conversations with them.

7    Q.   And none of those lawyers showed you this e-mail, correct?

8    A.   I don't recall.

9    Q.   Okay.  It wasn't your job to collect the e-mails, was it?

12:21 10        MR. FRANK:  Objection, your Honor.

11        THE COURT:  Overruled.  He can answer it.

12   A.   I don't understand the question.  It's not my job to?

13   Q.   You weren't assigned the responsibility of collecting

14   e-mails relevant to Johnny Wilson's role on the water polo

15   team, were you?

16   A.   No.

17   Q.   The lawyers gave them to you and they gave you things to

18   refresh your memory, correct?

19   A.   If they showed me things I had never seen before, I don't

12:21 20   recall, then I would tell them.

21   Q.   And if they don't show you things, it doesn't refresh your

22   memory, correct?

23   A.   I don't recall them.

24   Q.   And this is an example in Exhibit 9844.  You didn't recall

25   the conversation with Johnny Wilson?

1      MR. FRANK:  Objection to "example of," your Honor.

2      THE COURT:  Sustained.

3  Q.   You didn't recall the conversation with Johnny Wilson

4  until you saw 9844 just now, correct?

5  A.   I don't recall.

6  Q.   What do you mean you don't recall?

7  A.   I don't recall the conversation that you asked.

8  Q.   Okay.  You don't recall it, but you don't dispute it

9  occurred, correct?

12:22 10  A.   I don't recall.

11  Q.   Well, you wrote in an e-mail that you spoke to him.  Would

12  you have written a false e-mail?

13  A.   No.  That e-mail is sent 2014.  I don't recall everything

14  that I sent that year.

15  Q.   But was it your practice to write truthfully about topics

16  like this in your role on the team?

17  A.   Yes, part of my job, yes, everything that I've done is

18  truthful.

19  Q.   Yeah.  So as far as you know, this is a truthful statement

12:22 20  that you wrote in this e-mail that you spoke to Johnny?

21  A.   It is, yes.

22  Q.   Okay.  And then Alex Garfio responds to you, "Thanks,

23  Casey.  The NCAA found him under that name," I believe it's

24  supposed to be.  "He should be cleared by the end of the day.

25  He still needs to request his final amateurism."

1        That's the response Alex Garfio sent to you, correct?

2    A.   Yes, in the e-mail, yes.

3    Q.   And it would be fair to say practice starts sometime in

4    August, correct?

5    A.   In the end of August.

6    Q.   Yeah.  Okay.

7        Now, next I'd like to show you a copy of Exhibit 7316

8    only for the witness, please.

9        MR. KENDALL:  We have numbering problems here.  That

12:24 10   is not the 7316 I have.

11        Again, your Honor, if I can show this on the Elmo just

12    to the witness.  We'll get the numbers straightened out.  I

13    apologize for this confusion.

14    Q.   Do you recognize this --

15        MR. FRANK:  Can I have a copy, please?

16        MR. KENDALL:  Yes.

17        THE COURT:  Show counsel a copy.

18        MR. KENDALL:  I certainly will, your Honor, as soon as

19    I get one.  There's obviously a numbering problem here, and

12:24 20   it's left me a little bit less than perfectly prepared.

21    Q.   Do you recognize this document?

22    A.   Yes.

23    Q.   Okay.  And what is it?

24        MR. FRANK:  Your Honor, I object to it coming in

25    before I can examine it.

```
 1              THE COURT:  Yeah.  How about showing him a copy first.
 2              MR. KENDALL:  Okay.  I'm happy to give him my only
 3      copy, but then we can't put it on the screen.
 4      Q.   Can you tell us what it is.
 5      A.   It's just an IRL report, which states, one, if you were
 6      recruited, two, if you were not, and members of the team.
 7      Q.   It's a roster report, isn't it?
 8      A.   It states that on the top of the page, yes.
 9              MR. KENDALL:  9515, I guess page 7 of Exhibit 9515.
12:26 10         THE COURT:  Are you offering this?
11              MR. KENDALL:  Yes, Your Honor.
12              THE COURT:  And there's no objection?
13              MR. FRANK:  Well, if it's an impeachment exhibit, your
14      Honor, he needs to show an inconsistency.  I haven't heard one
15      yet.
16              MR. KENDALL:  Your Honor, it's to show the members on
17      the roster of the team as of October 2014.
18              MR. FRANK:  Again, I'm not hearing an inconsistency.
19              THE COURT:  You didn't object when he offered it at
12:26 20    first.
21              MR. FRANK:  Well, I hadn't seen it.  I just looked at
22      it, and I'm now objecting.
23              THE COURT:  So are you objecting?
24              MR. FRANK:  I'm objecting unless there's a ground
25      that's offered for its admission.  I haven't heard one yet.
```

 1              MR. KENDALL:  Your Honor, if we have to do this on

 2     Friday with him, I will, Your Honor.  I'm hoping to avoid that.

 3              THE COURT:  Well, go ahead and see if we can't resolve

 4     the problem.

 5              MR. KENDALL:  Okay.

 6     Q.   This roster report, is that something that the athletic

 7     department keeps to record who is on the team on a certain date

 8     relevant to their membership?

 9     A.   Yes, this is through our compliance department.

12:27 10     Q.   Yeah, it's a business record, correct?

11     A.   No.  It's a roster --

12              MR. FRANK:  Objection.

13     A.   It's a roster report.

14     Q.   It's a roster report that compliance requires you to keep?

15     A.   That they keep on their end.  We don't keep roster --

16     Q.   It's a compliance record for the compliance department to

17     do its job, correct?

18     A.   It's a roster report.

19     Q.   Yeah.  It's a roster report that the compliance department

12:27 20     assembles, correct?

21     A.   No, the compliance department doesn't assemble this

22     record.  The compliance department just compiles information

23     that shows who is present on our team.

24     Q.   Who creates this document?

25     A.   This is -- I believe this document is made within our

```
 1    department.

 2    Q.    By the athletics department?

 3    A.    Correct.

 4    Q.    Then it's given over to the compliance department?

 5    A.    For review.

 6    Q.    And it records the team members and certain information

 7    about the team members?

 8    A.    It records the members, yes.

 9              MR. KENDALL:  Okay.  Your Honor, I offer it.

10              MR. FRANK:  No objection.

11              THE COURT:  It will be admitted, 9515.

12              (Exhibit 9515 admitted into evidence.)

13              MR. KENDALL:  If we could show the jury, please.

14              MR. FRANK:  Just to clarify, this is just a one-page

15    document, right?

16              MR. KENDALL:  It's two pages.  There's a back page.

17              MR. FRANK:  Okay, yeah.

18    Q.    The roster report is dated October 3, 2014, correct?

19    A.    Correct.

20    Q.    And it lists various people's statuses on the team,

21    correct?

22    A.    Yes.

23              MR. KENDALL:  If we could keep it down to the top,

24    please, Mr. Carter.

25    Q.    Added to the team, quit, withdrew, cut, medical exception,
```

```
 1   whatever, on the top, correct?
 2   A.   Yes.
 3   Q.   If we turn on the second page, we see that John Wilson is
 4   listed, correct?
 5   A.   Yes.
 6   Q.   And it says -- if we look at the -- you see there's an "N"
 7   next to his name, correct?
 8   A.   Yes.
 9   Q.   If you look at the first page, it says "recruited status,"
10   and he and some of the other people are not listed as recruited
11   status.  They're N's not Y's, nos, not yes, correct?
12   A.   Yes.
13   Q.   And that indicates whether or not they were recruited
14   pursuant to certain NCAA regulations relating to contacts with
15   people?
16   A.   No.  That means recruited as if our coaching staff
17   recruited them to be members of the team.
18   Q.   Excuse me?
19   A.   They're recruited in regards for them being members of our
20   team.
21   Q.   Well --
22   A.   To be members of the team.
23   Q.   Doesn't it mean that the coach contacted them to recruit
24   them as opposed to them coming to the coach?  Isn't that an
25   NCAA regulation about coaches contacting athletes, when they
```

1    can do it, how they can do it?

2    A.    Yes, there are NCAA rules about that, yes.

3    Q.    Okay.  Now, I want to show you Exhibit 9515.  And tell us

4    if you recognize that.

5          MR. FRANK:  Was that not 9515?

6          THE COURT:  That was 9515.

7          MR. KENDALL:  Is it?  Okay.  Excuse me.  That actually

8    is a blowup from 9515.  I'm sorry.  No, they're different

9    documents.  Let's call this 9515A.  Make life easy.

12:31 10        If we could show the witness 9515, if we call it A.

11   Do you have it, Mr. Carter?  I believe so.

12   Q.    Do you recognize this document?

13         MR. FRANK:  Your Honor, I don't mean to be difficult,

14   but none of the 9,000 series of documents were marked as

15   exhibits.  We don't have them as exhibits.  So I don't know

16   what we're looking at.

17         THE COURT:  He needs a copy before we admit it or

18   before it's offered to be admitted.

19         MR. KENDALL:  Yes, Your Honor, but they're all for

12:31 20   impeachment and this is from the government's production as

21   well.

22         MR. FRANK:  Your Honor, they're not being offered for

23   impeachment.  They're being offered as evidence.

24   Q.    Do you recognize 9515?

25         MR. FRANK:  May I have a moment, Mr. Kendall?

```
 1              THE COURT:  Yeah, let him take a look at it.  And this
 2    is 9515A, right?
 3              MR. KENDALL:  Yes, please.
 4              MR. FRANK:  I have no objection to 9515 being shown to
 5    the witness.
 6              THE COURT:  No objection.  It will be admitted.
 7    9515A.
 8              (Exhibit 9515A admitted into evidence.)
 9              MR. KENDALL:  Okay.  If we could go to page 6 of the
10    exhibit, please.  If you could turn it around.
11    Q.    This is the freshman eligibility report.  Do you see that?
12    A.    Yes.
13    Q.    And would you agree with me there's 19 names on that list?
14    A.    Yes, 19.
15    Q.    Okay.  And Johnny Wilson is listed as being on the
16    eligibility report October 3, 2014?
17    A.    Yes.
18              MR. KENDALL:  Okay.  Go to the next document.
19    Q.    Was there a tradition at the team back in those days that
20    the freshmen had to go out and walk around the campus in their
21    little Speedo bathing suits?  Do you remember that, before one
22    of the tournaments they would have to go out to where the
23    sororities were and parade around in their Speedos?
24    A.    Yes, it's potentially a right of passage, you know, to be
25    a part of the team.
```

1    Q.   And they'd go out as a group to do it, correct?

2    A.   That I'm not sure.  We have family parents, team moms that

3    organize that.  So we don't know if they go singles, pairs.

4    Q.   Okay.  Can I show you a photograph that should be, I hope,

5    Exhibit No. 9517?  Do you see that?

6    A.   Yes.

7    Q.   And do you recognize that to be members of the freshmen

8    team in 2014?

9    A.   Yes.

12:34 10        MR. KENDALL:  I'd like to offer that into evidence,

11   your Honor.

12        MR. FRANK:  Your Honor, we don't have a date on this

13   document.

14        MR. KENDALL:  There's a date right on the top of it.

15        MR. FRANK:  But I don't know who took the picture or

16   whether that's the date.

17        THE COURT:  It will not be admitted until further

18   examination.

19   Q.   9517, can you identify the people who are in that

12:35 20   photograph?

21   A.   Yes.  Everybody in this photograph are players of our --

22   members of our team that were there every day practicing.  If I

23   start -- excuse me.

24   Q.   And they're freshmen, they're all freshmen?

25   A.   Yes.

```
 1  Q.   And this looks like one of the buildings on USC's campus,
 2  correct?
 3  A.   From the picture, I can't tell which building that is.
 4  Q.   And in October of the season, October 2014, is that when
 5  this right of passage usually takes place?
 6  A.   That I'm not sure.  That happens usually -- it's up to the
 7  team.
 8  Q.   Okay.  And do you recognize Johnny Wilson in this photo?
 9  A.   Yes.  He is in the lower right.  He is the furthest right
12:36 10  member.
11       MR. KENDALL:  Your Honor, I'd like to offer it into
12  evidence.
13       MR. FRANK:  Your Honor, I don't object to the photo as
14  long as the writing and other photos on the left are redacted.
15       MR. KENDALL:  Certainly the photos on the left should
16  be redacted.
17       THE COURT:  It will be admitted as redacted.
18       MR. KENDALL:  We'd like to keep the date on it, Your
19  Honor.
12:36 20       MR. FRANK:  The witness was unable to authenticate
21  that date, your Honor.
22       THE COURT:  I'll let the date stay.
23       MR. KENDALL:  Thank you.
24       (Exhibit 9517 admitted into evidence.)
25  Q.   You know, part of the right of passages in the beginning,
```

1  they all have their head shaved, correct?

2  A.   Yes.

3  Q.   And so now that we've shown it to the witness -- to the

4  jury, you can see here their hair was grown in, correct?

5  A.   Yes, it looks so, yes.

6  Q.   So it was taken sometime after the team photo was taken

7  that Mr. Frank showed, correct?

8  A.   That I'm not sure, depending on when the team photo was

9  taken and when this photo was taken.

12:36 10  Q.   Okay.  So, okay.  Well, if it's an October date, 2014,

11  that indicates it's after the team photo, correct?

12  A.   Usually the team photo is taken potentially the first

13  three weeks of the season.

14  Q.   Yeah, so this is about a month later or so?

15  A.   So it is after.

16  Q.   Okay.  Now, if we could show the witness 9623.  This is a

17  glossier version of the photo that Mr. Frank showed you,

18  correct?

19  A.   Correct, that is the photo of the team.

12:37 20  Q.   Okay.  And you can see the shaved heads to show it was

21  taken a bit earlier in the season, correct?

22  A.   Correct.

23  Q.   And it's the freshmen with the shaved heads?  The upper

24  classmen --

25             MR. FRANK:  Your Honor, I object to the "earlier in

1    the season" because the witness testified he wasn't clear on

2    that.

3              THE COURT:   Sustained.

4    Q.   This is earlier in the entire season.  I'm not saying

5    anybody's season.

6    A.   Usually it's in the first three weeks of when school

7    starts.

8    Q.   Now, what was your specific title in the fall of 2014?

9    A.   It was assistant coach.

12:38 10   Q.   When were you director of player personnel?

11   A.   I believe the year following.

12   Q.   In 2015?

13   A.   Yes.

14   Q.   Are you sure what year you became director of player

15   personnel?

16   A.   I'm pretty certain that it is 2015.

17   Q.   Did you check any records for that?

18   A.   No.

19   Q.   Okay.  Why is that significant, whether or not you're

12:38 20   director of player personnel?

21   A.   So the reason being for the title change is at that point

22   there was an NCAA ruling that there would not be allowed

23   combined programs.  Combined programs ultimately comes down to

24   the number of coaches that are allowed to coach one team.

25   Q.   Okay.  And so when you were director of player personnel,

 1    you were not allowed to coach the men's team, correct?

 2    A.   Correct.  But I was there every day at practice.

 3    Q.   Okay.  And one of your interviews with the government you

 4    said was by Zoom, correct?

 5    A.   Correct.

 6    Q.   And Mr. Frank was participating in that, as well as

 7    Mr. Stearns, correct?

 8    A.   Correct.

 9    Q.   And that was when you were in the Gibson Dunn law office

12:39 10    in Los Angeles, correct?

11    A.   I believe so, yes.

12    Q.   And you told the agent and prosecutors that from 2012 to

13    2019, you were director of player personnel?

14    A.   I don't recall.

15         MR. KENDALL:  Let me show you a document, and let's

16    see if that will refresh your recollection.  Your Honor, it's

17    an interview report of August 26, 2021.  If I may just approach

18    the witness to show him to refresh his recollection.

19    Q.   If you could look at the yellow highlighted part and read

12:40 20    it and then we'll ask if your memory has been refreshed or not.

21    A.   I don't recall.

22    Q.   Okay.  You don't recall if you said that or not?

23    A.   I don't recall that I said that or not.

24    Q.   Okay.  So you have no -- you're testifying you have no

25    memory of telling Mr. Frank, Mr. Stearns and the agents that

1   were with them that from 2012 to 2019, you worked with the

2   men's water polo team as the director of player personnel?

3   A.   I don't recall.

4   Q.   You don't dispute you said that, you just don't have a

5   memory if you said it or not?

6   A.   No, I don't recall what I said.

7   Q.   You don't recall what you said.  So again, you don't

8   dispute that you said it.  You just don't have a memory of what

9   you said?

12:41 10           MR. FRANK:  Objection, Your Honor.

11           THE COURT:  Sustained.

12   Q.   And you'd agree with me that for every year that you were

13   director of player personnel, you were not allowed to

14   participate in the men's practices, correct?

15   A.   So the role of director of player personnel, you can't do

16   any physical coaching.

17   Q.   Okay.  So you can't --

18   A.   But in participating with practice, I could help set up

19   practice and do other things to help the coaching staff, but I

12:41 20   cannot verbally coach one on one with an athlete.

21   Q.   Okay.  So that was an NCAA rule, correct?

22   A.   Correct.

23   Q.   And that rule, would you agree that that rule was passed

24   because a lot of the other teams didn't like how Vavic had so

25   many players and so many coaches on his team?

```
 1              MR. FRANK:  Objection.

 2              THE COURT:  Sustained.

 3    Q.   Did you have the perception that that rule was direct in

 4    the part against the USC team?

 5    A.   No.

 6    Q.   Okay.  It was adopted --  okay.  But you'd agree with me

 7    for whatever time period you were director of player personnel,

 8    you were not allowed to coach the team, correct?

 9    A.   Correct, yes, me physically I cannot coach the team.

12:42 10             MR. KENDALL:  Okay.  I'd next like to show the witness

11    Exhibit 8005.

12    Q.   Do you recognize this document?

13    A.   It is an e-mail.

14    Q.   Okay.  And it's an e-mail being sent to the team?

15    A.   To members of the team, yes.

16    Q.   Including you?

17    A.   Yes.  I was cc'd on the e-mail.

18    Q.   And if you look at it, is it the entire team or is it just

19    a subset of the team?

12:43 20    A.   It's just a group of the team.

21    Q.   Okay.  And is it the freshmen on the team?

22    A.   Yes, so that group is the redshirts.

23             MR. KENDALL:  Okay.  I'd like to offer it into

24    evidence, Your Honor.  It goes directly to impeachment.

25             MR. FRANK:  There's been no impeachment, Your Honor,
```

```
 1   and it's extrinsic evidence, if that.
 2           THE COURT:  Objection sustained.
 3           MR. KENDALL:  Your Honor, I think the statement was
 4   that freshmen redshirts were not used for scouting
 5   responsibilities, and this is impeachment of that, Your Honor.
 6   That was the testimony.
 7           MR. FRANK:  Well, he can use it to refresh his
 8   recollection, Your Honor.
 9           THE COURT:  Yeah, it may refresh his recollection, but
12:43 10   it's not going to be admitted.
11   Q.   Do you remember testifying earlier that freshmen redshirts
12   were not used for scouting?
13   A.   Yes.
14   Q.   If you could take a look at Exhibit 8005, please, and read
15   the first part, who it's addressed to, and then if you could
16   read the paragraph that starts under "Hi all."
17   A.   So it is addressed to a group of freshmen.
18   Q.   And does that refresh -- I'm not asking you to read the
19   document out loud.  I want you to read it to yourself, and then
12:44 20   I want to ask you a question.  Okay?
21   A.   Okay.
22   Q.   Have you read that yellow highlighted paragraph?
23   A.   Yes.
24   Q.   Okay.  Does that refresh your recollection that freshmen
25   redshirts were given scouting responsibilities in 2014?
```

A.   That is a mistake.  Scouting responsibilities, the list of
names that are on that e-mail was filming responsibilities.

        MR. KENDALL:  If we could show the witness again
Exhibit 8005.  Then I want to show you the attachment to it,
which is Exhibit 9516.

Q.   Do you see freshmen listed on the attachment?

A.   Yes.

Q.   And that's assignments for scouting?

A.   No.  On the top it says, "Morning setup, 8:30 to 11:30."
This is not assignments for scouting.  It says "flag," you
know, "tee flag setup, check in."  That is not considered
scouting.

Q.   So this isn't scouting, but this is other assignments --
the cover e-mail says "scouting" but these are other
assignments?

A.   Yes, not to do with scouting a game.

Q.   Okay.  Would you agree with me that Johnny Wilson was one
of the people given an assignment on this schedule?

A.   So first of, for the redshirts, you can't mandate an
assignment.  It's all by voluntary base, and if they want to be
part of the team, they sign up themselves.

Q.   So would this indicate Johnny Wilson signed up for a task
with the team?

A.   Yes, his name is highlighted.

        MR. KENDALL:  Your Honor, I'd like to offer Exhibit

 1    8005 and the attachment 9516.

 2              MR. FRANK:  No objection.

 3              THE COURT:  It will be admitted.

 4              (Exhibit 8005, 9516 admitted into evidence.)

 5    Q.   If we could just show the jury the attachment, please.

 6    Actually, let's show him the first page.  Okay.

 7              So this is Marko Pintaric.  Who is he at that point?

 8    A.   He was our associate head coach.

 9    Q.   Okay.  What is he now?

12:47 10    A.   He's the head coach of our program.

 11    Q.   Okay.  And then a lot these names underneath are the

 12    freshmen redshirts, correct?

 13    A.   Correct.

 14    Q.   And then the cc is you and Stefan, the two assistant

 15    coaches?

 16    A.   Correct.

 17    Q.   Then the date is October 9, 2014, correct?

 18    A.   Yes.

 19    Q.   And it says "SoCal Schedule."  What does "SoCal Schedule"

12:47 20    mean?

 21    A.   So "SoCal Schedule," SoCal is the name of a water polo

 22    tournament, and the attachment that is connected to this is

 23    incorrect.

 24    Q.   Okay.  So it's a Southern California water polo

 25    tournament?

1    A.    Yes, it's hosted by UC Irvine.

2    Q.    It says, "Attached is a SoCal schedule with scouting

3    responsibilities.  Please meet as a group and organize best

4    possible.  We need to do a great job with minimal mistakes.

5    Plan to come 30 minutes before practice tomorrow for a quick

6    training and discussion about the weekend.  Thank you."

7           Now, if we then go to the attachment of 9516, these

8    are the various assignments that are given, and your point is a

9    lot of these are not scouting assignments.  They're other

12:48 10   responsibilities, correct?

11   A.    Correct.

12   Q.    But if we look at that green in the top corner, 8:30 to

13   11:30, we see John Wilson has got a task.  And what would his

14   task be?

15   A.    So I believe to the left it says "morning setup."

16   Q.    Okay.  And underneath it it says "check-in, four players."

17   Would he be one of the four players doing check-in, or would he

18   just be somehow in morning setup?

19   A.    That I'm not sure.

12:49 20   Q.    Okay.  And I think you just said a moment ago that if

21   freshmen are doing these type of actions, they volunteer for

22   it?

23   A.    Correct, because we can't mandate redshirts to do things.

24   Q.    Okay.  I want to show you --

25           MR. KENDALL:  Your Honor, I think there's actually an

1    issue with that document.  I will correct it after we take our

2    break.

3    Q.   9623 you identified earlier.  I don't think we showed it

4    to the jury.  I'd like to show them a copy of it.  That's the

5    glossy photo of the team taken you believe in October, correct?

6    I mean, not in October, September.

7              THE COURT:  I don't have that document as being

8    admitted.

9              MR. KENDALL:  9623, I thought it was, your Honor.  If

12:50 10   not, I'd like to offer it at this point.

11             MR. FRANK:  No objection.

12             THE COURT:  It will be admitted.

13             (Exhibit 9623 admitted into evidence.)

14   Q.   I'd like to show you a document we'll identify as Exhibit

15   8004.

16             MR. KENDALL:  If we could just show the witness,

17   please.

18   Q.   Okay.  Do you see the series of e-mails at the top for

19   8004?  Do you recognize them as all or at least three of them

12:51 20   as USC e-mails?

21   A.   I've never seen this e-mail.

22   Q.   I know you've never seen the e-mail.  I'm just asking if

23   you recognize the e-mail addresses.

24   A.   Yes.  If it is @usc.edu, it is -- you know, you're

25   connected with USC.

```
 1    Q.   And do you recognize John Wilson's e-mail address as the
 2    same one we've seen on the prior team e-mails that have been
 3    circulated?
 4    A.   Yes.
 5            MR. KENDALL:  Your Honor, I'd like to offer this
 6    e-mail.
 7            MR. FRANK:  Complete hearsay, Your Honor, objection.
 8            MR. KENDALL:  It's not for the truth of the matter
 9    asserted, Your Honor.  It's just to show that it was sent.
10            MR. FRANK:  We object.
11            THE COURT:  The objection is sustained.
12    Q.   I'd like to show you an exhibit that's 7956.
13            MR. KENDALL:  Actually, these numbers are not right,
14    your Honor.  I apologize.
15            Okay.  Could we show the witness Exhibit 9822.
16    Q.   Do you recognize that?
17    A.   I've never seen that photo.
18    Q.   But do you recognize what event it is?
19    A.   Well, on the back side of the picture it says -- it states
20    "NCAA men's water polo championship."
21    Q.   Did you go to that championship?
22    A.   Yes.
23    Q.   You were there in San Diego where it happened?
24    A.   Yes.
25    Q.   So is this a picture of the tournament that you attended?
```

```
 1   A.   I was a part of the coaching staff, and yes, that's a
 2   tournament that I went to.
 3             MR. KENDALL:  Your Honor, I'd like to offer this into
 4   evidence, 9822, please.
 5             MR. FRANK:  Could we have a relevance proffer, your
 6   Honor?
 7             THE COURT:  How is it relevant?
 8             MR. KENDALL:  The photos that are going to follow,
 9   your Honor, will show Johnny Wilson there.
12:53 10          MR. FRANK:  No objection.
11             THE COURT:  It will be admitted without objection.
12             (Exhibit 9822 admitted into evidence.)
13   Q.   So this you recognize, 9822, as the championship
14   tournament at the end of the 2014 season?
15   A.   Correct.
16   Q.   Is that probably early December?
17   A.   Yes.
18             MR. KENDALL:  Now, if we could show the witness 9824,
19   please.
12:54 20  Q.   Do you recognize those two people?
21   A.   I've never seen this picture.
22   Q.   I didn't ask you if you saw the picture.  Do you recognize
23   the two people?
24   A.   Yes.
25   Q.   Who are they?
```

A.   To my left is Tristan Reinhardt and to the right is Johnny

Wilson.

Q.   Okay.  Is this at the San Diego tournament?

A.   I believe so.  I can't tell the background, but it looks

like those are the bleachers that are behind the pool.

Q.   And it would be accustomed for the freshmen redshirts to

show up in T shirts like that?

A.   Yes, to support the team.  It's an NCAA tournament.

          MR. KENDALL:  Your Honor, I'd like to offer 9824 into

12:54  evidence.

          MR. FRANK:  No objection.

          THE COURT:  It will be admitted.

          (Exhibit 9824 admitted into evidence.)

Q.   I'd like to next show the witness 9823.  That's also

another picture of Johnny Wilson at the NCAA tournament, isn't

it?

A.   Again, I've never seen this photo, but I believe it is,

yes.

          MR. KENDALL:  Your Honor, I'd like to offer 9823 into

12:55  evidence.

          MR. FRANK:  No objection.

          THE COURT:  It will be admitted.

          (Exhibit 9823 admitted into evidence.)

          MR. KENDALL:  If we could show the jury, please.

Q.   You see there that's Johnny in the T-shirt on the left?

1    A.    To myself --

2    Q.    My left, the photo's right.  Do you see Johnny is there

3    with the T-shirt "Trojans SC," correct?

4    A.    Correct.

5    Q.    And do you see that's John Wilson, his father, sitting

6    right over there, next to him at the tournament, correct?

7    A.    I've never met his father.

8    Q.    But it's the gentleman sitting right over there.  He has a

9    mask on.  Would you like him to take his mask off?

12:55 10            MR. FRANK:  We'll stipulate, your Honor.

11            THE COURT:  It's so stipulated.

12            MR. KENDALL:  Okay.

13    Q.    Now, you testified that you thought Johnny had quit in the

14    middle of the season, correct?

15    A.    Yes, via hearsay from the players.

16    Q.    Well, you see him, he's at the NCAA tournament with the

17    team, correct?

18    A.    But he is on -- he came on his own.

19    Q.    Just answer my question.  You see him at the NCAA

12:56 20    tournament with the team, correct?

21    A.    He is there with the other freshmen separate from the team

22    because we're only allowed to travel 16 members to the NCAA

23    tournament and everybody else needs to travel on their own.

24    Q.    Yeah.  So he and a bunch of other redshirts traveled on

25    their own to come down to the tournament, correct?

1    A.    To support the team, yes.

2    Q.    And that's what they're supposed to do, correct?

3    A.    They're not supposed to.  We can't mandate redshirts to

4    travel or be --

5    Q.    You can't mandate them, but it's a nice thing to do for

6    the team, correct?

7    A.    Well, if you want to be part of the team and show where

8    your heart is, sure.  Regardless, if you contribute or are a

9    redshirt, you want to be with the team.

12:57 10          MR. KENDALL:  Could we show the witness Exhibit 9835.

11   Q.    Do you recognize this document?

12   A.    I have never seen this.

13   Q.    Have you ever seen this kind of form before, though?

14   A.    No, I've never seen this.

15   Q.    You're not aware of the freshmen redshirts having some

16   form to sign up?

17   A.    No, I'm not aware.

18   Q.    Okay.  Well, when the freshmen want to go to a tournament

19   or an event and they can't travel as part of the team, do they

12:57 20   have to -- how do they get their tickets and how do they sign

21   up to do that?

22   A.    So it depends on the tournament.  We cannot pay for any,

23   you know, travel.  We cannot pay for their tickets.  Certain

24   tournaments we could get -- allow via a pass list, ticket list,

25   but other tournaments they need to pay for themselves.

```
 1    Q.    What is the MPSF tournament?

 2    A.    MPSF is the acronym for our conference.

 3    Q.    What does it stand for?

 4    A.    Mountain Pacific Sport Federation.

 5    Q.    Okay.  And there was a tournament there in November of

 6    2014, correct?

 7    A.    Yes, so it states.

 8    Q.    And where would that tournament have been held?

 9    A.    I don't recall.

10    Q.    Okay.  And any of the freshmen going would have to sign up

11    for tickets to attend the tournament if they wanted to go

12    support the team, correct?

13    A.    Again, it just depends, it depends on the actual

14    tournament.  Some tournaments we're allowed to use a ticket

15    list.  Even if the prior year they used a ticket list,

16    sometimes that is taken away the year after.

17    Q.    You recognize the e-mail address here as Johnny Wilson's,

18    correct?

19    A.    Yes, I see it, his e-mail there.

20    Q.    And do you know what NMNathletics.com is?

21    A.    I do not.

22          MR. KENDALL:  Your Honor, I'd offer 9835.

23          MR. FRANK:  Objection.

24          THE COURT:  Sustained.

25          Let me see counsel at sidebar.
```

```
 1              * * * BEGINNING OF SIDEBAR * * *

 2          THE COURT:  Counsel, it's 1:00.  I would like to get

 3     this witness off the stand.  How much longer do you have on

 4     cross?

 5          MR. KENDALL:  My apologies, your Honor.  The exhibit

 6     numbering is all messed up, and I am embarrassed and humiliated

 7     that happened, and I want to get this done quickly.  May I make

 8     a suggestion?  Can we take a lunch break, do him for a half

 9     hour and then he's gone, he's done, and then we're --

01:00 10         MR. SHEKETOFF:  I have cross.

11          MR. KENDALL:  Oh, you do?

12          MR. SHEKETOFF:  Yeah.

13          MR. KENDALL:  Okay.  I mean, if I can straighten out

14     the --

15          THE COURT:  You have cross-examination of this

16     witness?

17          MR. SHEKETOFF:  Yes.

18          MR. KENDALL:  If we want to go a little this afternoon

19     or we can do him tomorrow morning, whatever the Court would

01:00 20    prefer.

21          MR. FRANK:  The witness is from California, your

22     Honor.

23          THE COURT:  We're going to get him off, but it's not

24     going to end now because Mr. Sheketoff has cross-examination.

25     So we're going to take a lunch break.  I thought we were going
```

```
 1    to let the jury go, but we're not, and we're not going to have

 2    that conference.

 3            MR. KELLY:  Can we do that tomorrow morning, your

 4    Honor?

 5            THE COURT:  We'll see.  I don't know.

 6            MR. KENDALL:  I'll get this straightened out.  I'm

 7    sorry, Your Honor.

 8                    * * * END OF SIDEBAR * * *

 9            THE COURT:  All right it's 1:00.  Mr. Moon, you may

10    step down for the time being.  We're going to be in the recess

11    for lunch for one hour.  I'll ask you to be back here at 2:00.

12            (Jury exits.)

13            THE COURT:  Be seated, counsel.

14            You may step down, Mr. Moon, for the time being.

15            How much longer on this cross, Mr. Kendall?

16            MR. KENDALL:  Your Honor, if I can straighten out this

17    confusion, I hope to get it done in 30 minutes, maybe a few

18    minutes less.

19            THE COURT:  All right.  And how long for you,

20    Mr. Sheketoff?

21            MR. SHEKETOFF:  I believe 20 minutes or less.

22            THE COURT:  All right.  And then there will be some

23    redirect.

24            MR. FRANK:  Briefly.

25            THE COURT:  So it will be an hour before we get this
```

1    witness off the stand, right?

2              MR. FRANK:  It appears that way.

3              THE COURT:  All right.  Do you have Mr. Deckett here?

4              MR. FRANK:  We do.  He's a very brief witness, your

5    Honor.

6              THE COURT:  All right.  We may get through him, but

7    it's unlikely we're going to have a conference because we're

8    not going to be able to review this.  We'll see, and I have

9    also afternoon business as well.

01:02 10            MR. FRANK:  Your Honor, just one brief issue.

11             THE COURT:  Yes.

12             MR. FRANK:  The e-mail, the so-called scouting e-mail

13   with the attachment, we're still investigating it, but it

14   appears that that e-mail did not correspond with the attachment

15   that was submitted.  So we would ask that the e-mail be

16   withdrawn as an exhibit and that matter be clarified for the

17   jury.

18             MR. KENDALL:  Your Honor, I think he may be correct.

19   You may remember I said in the middle of my examination I have

01:03 20   to straighten out the exhibits.

21             THE COURT:  Why don't you resolve that amongst

22   yourselves and if we need to correct it before the jury, we

23   will do so.

24             We're in recess until 2:00.

25             (Recess taken 1:02 p.m. to 2:06 p.m.)

1           (Jury enters.)

2           THE CLERK:  Thank you.  You may be seated.  Court is

3      now in session.

4           THE COURT:  Good afternoon, jurors.  We're ready to

5      resume.

6           Mr. Moon, you're reminded that you remain under oath.

7           Mr. Kendall, you may continue with your

8      cross-examination.

9      BY MR. KENDALL:

02:06 10    Q.   Good afternoon, Mr. Moon.  I owe you and everybody else in

11     the courtroom an apology.  I got some of the exhibit numbers

12     mixed up, and I want to go correct that, if that's okay.  To

13     the extent there's some confusion, I want you to take the time

14     to undo whatever confusion I've done.  Okay?

15          MR. KENDALL:  Mr. Carter, if we can show the witness

16     Exhibit 8005.

17     Q.   I'm going to start with the e-mail, and it's the

18     attachment I want to straighten out.  This is the e-mail we

19     discussed earlier.  It was sent on October 9, 2014, from the

02:07 20   Assistant Coach Marko Pintaric to a group of, looks like mostly

21     freshmen, correct?

22     A.   Correct.

23     Q.   And it says "SoCal schedule". Then it says "attached is

24     SoCal schedule with scouting responsibilities". And your

25     testimony was that freshmen shouldn't be -- freshmen redshits

1    shouldn't be doing scouting, is that correct?

2    A.    Correct.

3    Q.    But this is addressed to a group of redshirt freshmen,

4    including Johnny Wilson, correct?

5    A.    Correct.  The term "executing responsibility" is game

6    film.

7    Q.    Excuse me?

8    A.    They go to film games.

9    Q.    So they would go and just take video of the USC game or

02:08 10   other people's games?

11   A.    Our games, USC, as well as other games.

12   Q.    So they tape USC playing another team, but they'd also be

13   taking it of two competitors playing as well?

14   A.    Correct.  And once they have that game footage, they give

15   it to the coaching staff.

16   Q.    And fair to say -- is that something they volunteer to do

17   or they can be required to do?

18   A.    So for redshits, it's not mandatory that we tell them it's

19   not mandated.  It's all by a volunteer basis.

02:08 20   Q.    We take a look -- I want to show you Exhibit 8007.  I hope

21   this is going to come out right.  This looks like a scouting

22   schedule, filming schedule, for the Southern California

23   tournament, correct?

24   A.    Correct.

25   Q.    It has the various games listed?

A.   Correct.

Q.   And there's no people signed up for it yet, but it is a schedule for people who want to do filming responsibilities, correct?

A.   Correct.

Q.   And so this was sent to Johnny Wilson on October 9, 2014, correct?

A.   As well as the other names that are on that e-mail.

Q.   I want to then go back to Exhibit 9524.  And just straighten out the attachments.  Again, this is --

        MR. KENDALL:  I believe this is in evidence, your Honor.  I just need to straighten out.

        MR. FRANK:  I don't believe so.

        MR. KENDALL:  Then let's not show the jury quite yet.

Q.   This is an e-mail from Marko Pintaric, correct?

A.   This is my first time seeing this e-mail.

Q.   Who's on the cc's?

A.   My name is on there but this is the first I'm seeing this.

Q.   First time you've ever seen it in your life or preparing for today's testimony?

A.   Just for today.

Q.   Fair to say if it was addressed to you back in 2014, you expect you would have received it and read it as part of your coaching responsibilities?

A.   I don't recall.

1   Q.   I'm not asking if you remember it.  Would the ordinary

2   practice of you being a coach be that you would have read the

3   e-mail sent to you as part of your coaching job?

4   A.   Yes.  It's part of my responsibilities, but I receive 50,

5   75 e-mails a day so.

6   Q.   Do you try to read all of them, even if you can't remember

7   them?

8   A.   I try to, yes.

9   Q.   You agree with me this e-mail was sent to you and a large

02:10 10   number of people on the team, correct?

11   A.   Correct.

12   Q.   And it is with respect to assignments for a golf schedule?

13   A.   Correct.

14   Q.   And it would be fair to say that part of the fundraising

15   that the water polo team did was to have a golf tournament?

16   A.   Correct.

17        MR. KENDALL:  Your Honor, I'd like to offer 9524 into

18   evidence.

19        MR. FRANK:  I'm not sure -- it's not impeachment and

02:11 20   it's hearsay.

21        THE COURT:  Are you objecting?

22        MR. FRANK:  Yes.  Sorry, your Honor.

23        THE COURT:  Objection's sustained.

24   Q.   If we can take a look at 9516, which is one of the

25   attachments to this exhibit, you see this is the attachment I

1   got confused with earlier?  You see that green box?

2   A.   Yes.

3   Q.   If a freshman redshirt is going to help with the

4   fundraising golf tournament on October 6, 2014, is that

5   something required or is that something they volunteer for?

6   A.   They volunteer for.

7            MR. FRANK:  May I inquire, Mr. Kendall?  Is this in

8   evidence?

9            MR. KENDALL:  I'm about to reoffer it.

02:12 10          THE COURT:  It's not in evidence.

11            MR. KENDALL:  9516 was mistakenly offered with the

12   wrong cover e-mail.

13            MR. FRANK:  You're offering it in conjunction with

14   9524?

15            MR. KENDALL:  I believe that's the appropriate

16   attachment.

17            MR. FRANK:  Then I have no attachment.

18            THE COURT:  As well as to 9524.

19            MR. FRANK:  Yes, your Honor.

02:12 20          THE COURT:  All right, 9524 and 9516 are both

21   admitted.

22            (Exhibit 9524 admitted into evidence.)

23   Q.   If we could show the jury first 9524, we see at the top

24   from Marko Pintaric, sent on October 6, 2014.  If we look at

25   the bottom of the "To" list, johnbwil@usc.edu, that's Johnny

 1   Wilson's e-mail address at USC?

 2   A.   Yes.

 3   Q.   That's the e-mail address the team would send all

 4   communications to him with?

 5   A.   Correct.

 6   Q.   If we look at the cc's, it includes Stefan and yourself,

 7   correct?

 8   A.   Yes.

 9   Q.   It says "RE: Golf Schedule".  The attachment is "2014

02:13 10   water polo roster".  Do you see that?

11   A.   Yes.

12   Q.   It has another reference to a roster.  Then it says

13   "palyers golf schedule", I assume players, is another

14   attachment as well?

15   A.   Yes.

16   Q.   If we look at the e-mail message, it says "Hi all,

17   attached please find the work schedule for tomorrow.  People

18   highlighted in red responded to our e-mail and plan to work.

19   Thank you for your effort and help!  If you see any of the guys

02:13 20   not highlighted and they plan to come please let them know to

21   kindly contact us so we can include them to the schedule".

22           You see that?

23   A.   Yes.

24   Q.   Let's go to 9516.  We see in the block in the top right

25   corner in the green, Johnny Wilson is highlighted in red,

```
 1   correct?
 2   A.   Yes.  I see his name, yes.
 3   Q.   So that indicates, as of October 6, 2014, he's
 4   volunteering to participate in one of the fundraising events
 5   for the team, correct?
 6   A.   Correct.
 7        MR. KENDALL:  I'd now like to show the witness
 8   Exhibit 9845.
 9   Q.   Do you recognize this as one of the e-mail addresses one
10   of the coaches sent to the team?
11   A.   Yes.  It's an e-mail.
12   Q.   And it's sent to the team?
13   A.   To the team, yes.
14   Q.   And if you look at the date?
15        MR. FRANK:  Copy of this exhibit, Mr. Kendall?
16        MR. KENDALL:  Your Honor, I'd like to offer 9845.
17        MR. FRANK:  May I have a moment.
18        THE COURT:  Let counsel see it.
19        MR. FRANK:  At this point, I object on hearsay
20   grounds.
21        MR. KENDALL:  It's not for truth of the matter, just
22   that it was sent, your Honor.
23        THE COURT:  The objection is sustained.
24   Q.   Was it a practice during the season for the coach to send
25   diagrams of plays to the team?
```

```
 1    A.    To the entire team, yes.

 2    Q.    Would you agree with me plays were sent to Johnny Wilson

 3    as well during the season?

 4    A.    Yes.  We had -- we had an e-mail program that sends blast

 5    e-mails to the entire team.

 6    Q.    I'd like to show you next Exhibit 1116.

 7    Q.    You testified this is an e-mail.  It's not addressed to

 8    you?

 9    A.    Correct.  This is the first time I'm seeing this.

02:16 10   Q.    Alex Garfio is who?

11    A.    He is our liaison that works under Donna Heinel with the

12    Athletic Deparment and Admissions for the SUBCO process.

13    Q.    Did he handle a lot of the paperwork for the SUBCO?

14    A.    Yes.

15    Q.    Would you also keep track of the decisions and results on

16    the SUBCO process so you'd know who got in and who didn't?

17          MR. FRANK:  Objection.  Foundation.

18          THE COURT:  Sustained.

19    Q.    Did you work with Mr. Garfio at certain points on SUBCO

02:17 20   issues?

21    A.    If you're asking working, then the documents that I select

22    I forward it to him.

23    Q.    Okay.  Would he, at times, let you know the results of the

24    SUBCO decisions?

25    A.    The first result would always be to our head coach, and
```

         1   then the head coach would let the rest of the coaching staff

         2   know so and so has been admitted, so and so has not been

         3   admitted.

         4   Q.   And Donna Heinel was his boss in charge of the SUBCO

         5   process?

         6   A.   Donna was Alex's boss, yes.

         7   Q.   I'd like to show you what is I believe page 14 of

         8   Exhibit 1116.  Just for people's privacy, I've blacked out the

         9   names of everybody other than one.  Do you recognize this as a

02:17  10   list of these --

        11        MR. FRANK:  I object to the description, your Honor.

        12   If it's being used to impeach, he can look at it.

        13        THE COURT:  Yes.  Sustained.

        14   Q.   Do you recognize this document?

        15   A.   This is the first time I'm seeing this.

        16   Q.   I'm going to show you a redacted version of it.

        17        MR. KENDALL:  Do you have the unredacted version of

        18   it, Mr. Carter, or should I use a paper copy?

        19        Do you have one, Mr. Carter?  You do not?

02:18  20        If I may approach the witness, your Honor.

        21        THE COURT:  Yes.

        22        MR. KENDALL:  We're trying to do this under the

        23   protective order as required.

        24   Q.   I want to show you this document and ask you if you

        25   recognize this.

A.    Yes.  This is a list of the players that go through the
subcommittee process.

Q.    For the 2014 season, correct?  If you look at the name on
the bottom, maybe that will help you.

A.    There are 20 other names on here.

Q.    Right.

A.    Yes.

        MR. KENDALL:  Your Honor, I'd like to offer this into
evidence.

        THE COURT:  You haven't said what this is or put a
number on it or anything.

        MR. KENDALL:  It's a one -- it's a two page excerpt
from Exhibit 1116.

        MR. FRANK:  Your Honor, we don't object to the list.
We object to the cover e-mail, which is hearsay.

        MR. KENDALL:  That's fine.  If we get the list, I'm
not worried about the e-mail.

        THE COURT:  All right.  So this is a list that is part
of 1116?

        MR. KENDALL:  Yes, your Honor.

        THE COURT:  It will be admitted as 1116A.

        MR. KENDALL:  Thank you, your Honor.

        (Exhibit 1116A admitted into evidence.)

Q.    If we can show the jury the redacted version of 1161A, the
green sheet -- would it be more helpful for you if I left you

```
 1  the one with the names on it or?

 2  A.   This is fine.  Thank you.

 3       MR. FRANK:  Your Honor, I didn't see that there was an

 4  "A-8".  I believe that needs to be redacted.

 5       THE COURT:  What?

 6       MR. FRANK:  There's a redaction that has a letter and

 7  a number on it.

 8       MR. KENDALL:  We can redact that later, your Honor.

 9       THE COURT:  It should be redacted.

10       MR. KENDALL:  We've redacted all of the names.  We'll

11  take that up as well.

12  Q.   If we take a look at the group of SUBCO approvals for

13  2014, we see Johnny Wilson at the bottom, correct?

14  A.   Correct.

15  Q.   Now let's go -- and you see it says "sport" "MH20".  That

16  means men's water polo?

17  A.   Correct.

18  Q.   And what does "Eth" stand for?

19  A.   I don't see that.

20  Q.   The column next to sport, it says "Eth".

21  A.   Oh, yes.  I see that.  I'm not sure.

22  Q.   Then it says scholarship, "SCHL", correct?

23  A.   Yes, that's the next column.

24  Q.   Johnny Wilson is one of the ones that's "WO", walk on?

25  A.   Yes.
```

```
 1   Q.   And the number's 50 or 1.  That's the number of
 2   scholarship that he may be getting?
 3   A.   I don't see that.
 4   Q.   You see "SCHL"?
 5   A.   Yes.
 6   Q.   What are those numbers, 50 or 1 or FA?
 7   A.   So those are the scholarship amounts.
 8   Q.   One percent means you get a book scholarship.  It's an
 9   honorary scholarship?
02:21 10  A.   It's a book scholarship.
11   Q.   It's like $500?
12   A.   I'm not sure the amount.  You get your books paid for.
13   Q.   It's in the range of that amount, several hundred dollars?
14   A.   I'm not certain.  You get your books for your semester.
15   Q.   "WO" means a walk on, correct?
16   A.   I'm uncertain of that, but -- I'm uncertain of the
17   abbreviation "WO".
18            MR. KENDALL:  If we can go to the next column,
19   Mr. Carter, to where it says GPA.  Let's call out GPA.
02:22 20  Q.   That's grade point average, correct?
21   A.   Correct.
22   Q.   If we look at John Wilson's, his is 3.87 as adjusted by
23   the SUBCO, correct?
24            MR. FRANK:  Objection.  No foundation.
25            THE COURT:  If he knows, he can answer.
```

```
 1    Q.    You see his GPA's 3.87, correct?

 2    A.    I see that there, but this is not the information that I

 3    inputted into this Excel sheet.

 4    Q.    I didn't ask if it was.  I'm just going through this list

 5    here.  You see in terms of GPA, there's only two higher than

 6    him, correct, 4.16 and 4.11?

 7    A.    Yes.

 8    Q.    So in terms of GPA of the 17 SUBCO candidates, he's number

 9    three, correct?

02:23 10    A.    On that number scale, yes.

11    Q.    Go to the next column, please.  Actually, jump over to

12    "Test Scores".  If we look at the test scores there, his test

13    scores for his SAT is 1880, correct?

14    A.    Correct.

15    Q.    There's no 29 for an ACT listed there, is there?

16    A.    It's not listed, but for the subcommittee you have either

17    the SAT score or the ACT score that you can submit to use for

18    admission.

19    Q.    But if you take a look at it in terms of SAT scores, he's

02:23 20    number four in that list, correct?  There's a 1940, a 1980 and

21    a 2040, correct?

22    A.    Correct.

23    Q.    If you look at that 1940, that person has a 29 on the ACT,

24    correct?

25    A.    If that's what that number represents, yes, it is 29.
```

```
 1   Q.    Okay.  So if Johnny had a 29 on the ACT, he'd actually be
 2   tied for number three, correct?
 3            MR. FRANK:  Objection to this, your Honor.
 4            THE COURT:  Sustained.
 5   Q.    Would you agree with me one of the issues that's important
 6   to the SUBCO is to have candidates who have strong enough
 7   academics for USC?
 8            MR. FRANK:  Objection.  Foundation
 9            THE COURT:  Sustained.
10   Q.    Based upon your years of experience of working in
11   recruiting and working with the SUBCO, have you learned that
12   academics is an important factor that's used to evaluate
13   candidates?
14            MR. FRANK:  Objection.  Foundation.
15            THE COURT:  If he understands it, he can answer it.
16   A.    Yes.  Absolutely, and with talent ability of every water
17   polo player.
18   Q.    But there is some of the best -- there's two things SUBCO
19   is looking for.  They're looking for people who can meet their
20   academic standards and they're looking for people who can meet
21   athletic standards, right?
22            MR. FRANK:  Objection to the testifying, your Honor.
23            THE COURT:  Sustained.
24   Q.    If somebody has strong academics, does that make them a
25   more attractive candidate to the SUBCO?
```

1                MR. FRANK:  Objection.  Foundation.

2                THE COURT:  Sustained.

3    Q.   Based upon your years of experience working with SUBCO, if

4    a candidate has strong academics, does that help their

5    admissions?

6    A.   If hand-in-hand if they're a strong water polo talent.

7    Q.   Would you agree with me sometimes the strongest water polo

8    talents have very low academics, correct?

9    A.   No.  We have a handle of players on our team that have

02:25 10   exceptional academic grades and are exceptional water polo

11   players.

12   Q.   There's somebody here that has a 2.4 GPA, correct, and

13   they got a 70 percent scholarship?  Correct?

14   A.   Yes.  That's stated there, yes.

15   Q.   So that would indicate that the 70 percent scholarship is

16   that's a very strong recruit, correct?

17   A.   Yes.  By the number, yes.

18   Q.   So would you agree that there's a range of talent you get

19   in on the walk on class, correct?

02:26 20   A.   No.  I don't understand the range of talent.  Every talent

21   that we presented at subcommittee is talent based and we expect

22   them to contribute every year when they come as a freshman.

23   Q.   But some of those people are getting high scholarship

24   numbers, correct?

25   A.   Depending upon their talent ability, yes.

1    Q.   Yes.  The more talent you have, the higher scholarship you

2    typically get, correct?

3    A.   Well, that depends because we only have four and a half

4    scholarships to work with.  That was across the board.  For

5    example, if we're going to field a 30 plus roster, we can't

6    give one full scholarship on on athlete.  We're not going to

7    have enough players to play a game.

8    Q.   Right, but you also have to compete for the best players

9    to give them an attractive scholarship or another school will,

02:27 10   correct?

11   A.   Yes.

12   Q.   My point being all 17 members of this walk on -- excuse

13   me -- all 17 members of this SUBCO group, they're not all

14   exactly equal in water polo skills, correct?

15   A.   Correct.

16   Q.   Some are better than others, correct?

17   A.   Yes.

18   Q.   Okay.  And if some are not as strong on water polo but are

19   very strong academically, they can be a candidate that the

02:27 20   SUBCO will accept, correct?

21             MR. FRANK:  Objection.

22             THE COURT:  Sustained.

23   Q.   You only have four and a half scholarships to give out to

24   what was here, 17 kids, correct?

25   A.   Yes, four and a half scholarships across the board.

Q.   And USC, at the time in 2014, was about 50, $60,000 a year
to go to?

A.   I'm uncertain, but yes.  It's about that.

Q.   So a walk-on candidate that didn't need a scholarship that
had high academics and had good water polo credentials was an
attractive walk-on candidate, would you agree?

          MR. FRANK:  Objection, your Honor.  Speculation.

          THE COURT:  Sustained.

Q.   You testified earlier about times in swimming or
candidates, and you said 20 seconds would be an exceptionally
fast swimmer and belongs on the USC swim team, correct?

A.   Correct.

Q.   22 seconds though is somebody who is a fast member of the
water polo team, correct?

A.   Yes.

Q.   Okay.  That was Vavic's e-mail, my fastest guys are in the
22s, or something like that, correct?

A.   Correct, but to explain the difference between a 20 second
swimmer and a 22 second swimmer is we -- our conversion is one
second is 3 yards.  So if you're 2 seconds slower, that's
potentially 6 yards, which is about half the pool length, so
20 seconds is exceptionally fast.

Q.   But 22 seconds is still quite fast on the USC team?

A.   Yes.  It's fast, but not a 20.125.

Q.   I understand your point.  If somebody's swimming in 22

1    when they're a sophomore in high school, that's a pretty fast

2    high school kid, wouldn't you agree?

3    A.   Yes, and he should be swimming in college.

4    Q.   Well, I'm not asking what he should be doing.  If

5    somebody's swimming 22s his sophomore and junior year of high

6    school, you would view him as a fast water polo player,

7    correct?

8    A.   Yes.

9    Q.   Because in high school he can keep up with the USC team at

02:29 10   just swimming speed, not in the other skills, correct?

11   A.   There's a handful of players that we recruit and they send

12   us resumes.  Their swim teams are as good.

13   Q.   If you can just answer my question, please.  I just asked

14   you a question about --

15        MR. FRANK:  I object, your Honor.  He was answering

16   the question.

17        THE COURT:  Let him answer his question.

18   Q.   Okay.  Do you know Jack Bowen?

19   A.   I do, yes.

02:30 20   Q.   Have you spoken to him?

21   A.   Recently, no.

22   Q.   Have you ever spoken to him about recruiting?

23   A.   We've only chatted as in passing.

24   Q.   And he's the coach of the Menlo School?

25   A.   Yes.

```
 1    Q.    He's also the coach at the Sopen Club?

 2    A.    The Sopen Club I've never heard of.

 3    Q.    The Southern Peninsula Club?  You've never heard of Jack

 4    Bowen's club?

 5    A.    Never heard of Sopen Club.

 6    Q.    You agree with me Jack Bowen is a respected water polo

 7    coach?

 8    A.    Yes.  In the high school community, absolutely.

 9    Q.    Do you know his accomplishments as a college player?

10    A.    Yes.  He's an Olympian.  He was a goalie at Stanford.

11    He's a great water polo player.

12    Q.    MVP 2 years in a row at the NCAA tournament?

13    A.    That I'm not certain.

14    Q.    His Stanford team won 2 years in a row at the NCAA

15    championship, correct?

16    A.    I believe so.  That was before my time at USC.

17    Q.    But he's somebody you would view as a highly regarded,

18    highly successful high school water polo coach, correct?

19    A.    Correct.

20    Q.    And would a recommendation from a coach like Jack Bowen

21    that a candidate was good enough to play at USC, would that

22    carry weight?

23    A.    Yes.  Behind his name, yes.

24    Q.    The Stanford Water Polo Club, do you know that?

25    A.    Yes.
```

```
 1   Q.   Jack Barnaigh or John Barnaigh is the guy who runs it?
 2   A.   Correct.
 3   Q.   Jack Bowen has nothing to do with Stanford to your
 4   knowledge, correct?
 5   A.   To my knowledge regarding the club?
 6   Q.   Yes.
 7   A.   To my knowledge, no.
 8   Q.   If somebody was a well regarded player at the Stanford
 9   Water Polo Club, would that carry weight with you in terms of
10   recruiting?
11   A.   Yes.
12   Q.   And that's a club that has serious athletes, correct?
13   A.   Correct.
14   Q.   They do well in tournaments?
15   A.   Yes.
16   Q.   They have good coaching?
17   A.   Yes.
18   Q.   The Menlo School, you know, for a long time was dominating
19   its league in water polo, correct?
20   A.   That I'm not a hundred percent sure, but I know the school
21   has a great program.
22   Q.   If somebody was one of the stars at the Menlo School, that
23   also would be a good credential to evaluate as a walk on,
24   correct?
25   A.   If I would have known the name, yes.
```

```
 1    Q.   If somebody was All Peninsula Athletic League First Team,
 2    that would be a good credential, correct?
 3    A.   I think that's objective because that's voted within
 4    coaches within the conference.  If that's an accolade a player
 5    has, if you're all conference, all area, sure.  That has some
 6    clout.
 7    Q.   That carries some clout with you if you were recruiting,
 8    correct?
 9    A.   Sure.
02:32 10    Q.   If somebody's playing in U.S. Olympic Development team
11    events, would that carry some weight with you?
12    A.   The U.S. Olympic Development Team is, you need to pay
13    money to be a part of.  Yes.  They help you beef up your name
14    per se to put you out there.  You have more opportunities to
15    play, but for us, if we look at water polo players, you can
16    play high school, you can be a great high school player, a
17    great club player, and not involve yourself with the U.S.
18    Olympic Development Program and have the same ability to play
19    at USC.
02:33 20    Q.   Sure, but playing there is also a good experience, isn't
21    it?
22    A.   Sure.
23    Q.   And the National Junior Olympics Tournament Team, being
24    part of that several years in a row, that's also very good
25    experience, isn't it?
```

A.   Yes.  Junior Olympics is the biggest club tournament of

the year.

Q.   And so playing in there many years with a solid team like

Stanford, that would be a good credential, wouldn't it?

A.   It would be great of ultimately what your outcome is.  If

you're winning that tournament, if you're always playing for a

medal, then great.  That Junior Olympic tournament is the one

tournament that's for all club sports teams for the entire

country, so everybody comes together.  You play potentially

nine games in 4 days.

Q.   Did the water polo team ever do trips to Europe?

A.   Yes.  Through NCAA rule, we're allowed one, four and two

every 4 years.

Q.   Typically, Coach Vavic would take the team to Europe and

you'd do a tour of some European countries to train and play?

A.   Every 4 years the entire team goes, yes.

Q.   Now, you testified, I think, about some of the finances

involved in the water polo team.  The team has a budget it has

to live within, correct?

A.   Operating budget, yes.

Q.   If they go outside that budget, they have to raise the

money to pay the difference, correct?

A.   To supplement, yes.

Q.   The funds -- the school actually has several different

bank accounts to control the funds for the team, correct?

1    A.    That I have no clue about.

2    Q.    Are you familiar with a water polo gift account?

3    A.    I know the name, yes.

4    Q.    And that's while the coach may have some influence on how

5    the money's spent, there's actually a business office that

6    controls the bank account and writes the checks, correct?

7    A.    That I have no knowledge of.

8    Q.    You don't know the procedures for approvals for

9    expenditures?

02:35 10    A.    No.

11    Q.    I want to go through a few other things.

12             Under the NCAA, can you tell us what's the definition

13    of a redshirt?

14    A.    I'm not a hundred percent certain, but the definition of a

15    redshirt is you show up every day at practice but you cannot

16    compete in games.  The coaching staff did not pay for any

17    travel expenses.  That is all on your own.

18    Q.    And be fair to say a redshirt does not play one second in

19    any game during their redshirt year?

02:36 20    A.    Correct.

21    Q.    And the whole idea is they have 4 years of eligibility

22    under NCAA rules, correct?

23    A.    You're allowed 4 years in a 5-year window.

24    Q.    So your first year you don't play in any games, you don't

25    use up any eligibility, correct?

1   A.   Correct.

2   Q.   And so an athlete can develop both physically and skill

3   wise in that redshirt year and they start their first of

4   4 years when they're a sophomore at USC, not a freshman,

5   correct?

6   A.   Correct.

7   Q.   They're bigger?

8   A.   Yes.

9   Q.   They've had a lot of the advantages of the level of

02:36 10   college coaching that can develop them better?

11   A.   That's not an advantage.  They're there every day

12   competing with their teammates so.

13   Q.   You agree with me that the USC program's good at

14   developing the athletes?

15   A.   We're the best.

16   Q.   Being the best, you can take a high school kid and develop

17   them quite well over their redshirt year, correct?

18   A.   That depends on the player, does that player buy into our

19   system, does that player understand what we're about, how's his

02:37 20   IQ, how's his physical talent.  There's a lot of things that go

21   into it, but ultimately our goal is every redshirt that's there

22   freshman year that doesn't play, it's our job as coaches to

23   develop them to play to ultimately give them the opportunity to

24   play.

25   Q.   In that time frame, Jovan was known for running some of

 1    the most physically demanding water polo practices in the NCAA,

 2    correct?

 3    A.    Correct.

 4    Q.    That's his coaching style?

 5    A.    Carries an iron fist for sure.

 6    Q.    He's one of the toughest coaches around?

 7    A.    He's the toughest.

 8    Q.    He's the toughest.  Some of the athletes would quit

 9    because they didn't want to have that level of physical demand

02:37 10   on them, correct?

11    A.    Some of them do, but that's on them.

12    Q.    Jovan also at that liked to have big rosters, correct?

13    A.    Yes.

14    Q.    36 to as many as 50 athletes on the team?

15    A.    Yes.  The reason why we have big teams and rosters is the

16    nature of our program is all about competition, so you want to

17    make sure you push the person in front of you, and if they

18    don't perform, obviously there's people behind you that are

19    itching to play.

02:38 20   Q.    And you can run lots of drills and lots of scrimmages and

21    lots of activity with a big roster having this constant level

22    pushing?

23    A.    Yes.

24    Q.    You testified, I think, earlier with Mr. Frank that the

25    coach controlled the gift account or the coach controlled the

```
 1  bank account.  Do you remember saying that?
 2  A.    Yes.  That was to my knowledge, yes.
 3  Q.    To your knowledge, they control what it's supposed to be
 4  spent for, but you're not saying there were no checks and
 5  controls on it?
 6  A.    I have no idea what goes along with that.
 7  Q.    You're not testifying that the coach can just spend the
 8  money any way they want, correct?
 9  A.    I don't know.
02:39 10  Q.    In addition to being members of the team developing as
11  athletes, the freshmen walk-ons, they do provide a lot of
12  support for the team, don't they?
13  A.    Support as in?
14  Q.    They help set up the games?
15  A.    Yes.
16  Q.    They do the filming?
17  A.    Yes.
18  Q.    They're there as a cheering section?
19  A.    Yes.
02:39 20  Q.    Do they do other tasks?  We saw they help run the golf
21  tournament?
22  A.    Yes, but that's the entire team.
23  Q.    What else do the freshmen help out with?
24  A.    At practice, they're there every day to participate in the
25  pool, two, to help little tasks are are on the pool deck, to
```

```
 1   set up the pool, pump up balls, set up balls, set the game
 2   course, help practice, film.  They're there to help.  If it's
 3   not there in the pool helping drills, they're on the outside
 4   helping.
 5   Q.   Do you recall that Johnny Wilson got a concussion early in
 6   his season at USC?
 7   A.   I was never aware.
 8   Q.   So you know nothing about the concussion?
 9   A.   No.
10   Q.   You have no idea of what impact that had on his ability to
11   be in the pool during practices in September or early October?
12   A.   I have no idea.
13   Q.   And you don't know if he was in the weight room or
14   elsewhere doing things when he couldn't be in the pool?
15   A.   No.
16        MR. KENDALL:  I'd like to show the witness Exhibit 79.
17   Excuse me.
18   Q.   Who was the team's trainer?
19   A.   Sandy Olsen.
20   Q.   Would he be -- is it a he or she, Sandy?
21   A.   She.
22   Q.   Would Sandy be the person if somebody had a concussion
23   that would help them deal with it and help bring them back to
24   be practicing as a team?
25   A.   She would be the first point of contact, yes.
```

```
 1   Q.   I'd like to show you Exhibit 7967.

 2        MR. KENDALL:  I'd like to show you Exhibit 7967, the

 3   witness only, please.

 4   Q.   If we look at the very top, do you know who Minette Carden

 5   is?

 6   A.   Yes.  She's our team mom.

 7   Q.   That would be one of the parents who would help with

 8   organizational tasks to assist the coaches?

 9   A.   Yes, outside the pool.

02:41 10   Q.   And do you recognize this as an e-mail that she would send

11   out in that capacity?

12   A.   Yes.  It is an e-mail.

13   Q.   And what is the MPSF Tournament?

14   A.   MPSF is the name of our conference.  So that's Mountain

15   Pacific Sports Federation.  The tournament, Minette is

16   referring to the conference tournament.

17   Q.   Long Beach happens to be the location of this particular

18   tournament?

19   A.   Correct.

02:42 20        MR. KENDALL:  Your Honor, I'd like to offer this into

21   evidence.

22        MR. FRANK:  Objection.  Hearsay.

23        THE COURT:  Sustained.

24        MR. KENDALL:  Your Honor, it's not for the truth of

25   the matter.  It's to show who it was sent to.
```

```
 1              MR. FRANK:  Still object, your Honor.
 2              MR. KENDALL:  It's also impeachment, I think, your
 3     Honor.
 4              THE COURT:  Still sustained.
 5     Q.   I'd like to show -- did Coach Vavic have a tradition of
 6     inviting the team to his house for Thanksgiving?
 7     A.   Yes.
 8     Q.   That's, in part, because they're going to be there
 9     practicing that week?
10     A.   Yes.  We practice before the Thanksgiving team meal, yes.
11     Q.   And everybody was invited, redshits, everybody?
12     A.   Correct.
13     Q.   If you could take a look at Exhibit 7972, please.  Can you
14     identify that?
15     A.   It is an e-mail.
16     Q.   Is it an e-mail -- what is the e-mail for?
17     A.   The subject reads "Fwd: You are invited to a Trojan" --
18              MR. FRANK:  Objection, your Honor.
19     Q.   Is it an e-mail to the team?
20     A.   The team is cc'd.
21              MR. KENDALL:  Your Honor, I'd offer 7972 and the
22     attachment, 7973, into evidence.
23              MR. FRANK:  Same objection, your Honor.
24              THE COURT:  Objection is sustained.
25     Q.   Do you have a memory whether or not Johnny Wilson was
```

 1   invited to Coach Vavic's house for Thanksgiving?

 2   A.   I don't recall.

 3   Q.   If we could take a look at Exhibit 7972 and tell us if

 4   that refreshes your recollection, if you look in the middle of

 5   it.

 6   A.   Yes.  I see his e-mail in there, but that e-mail is to the

 7   entire team.

 8   Q.   So does it refresh your recollection that he, as well as

 9   the entire team, were invited to Coach Vavic's Thanksgiving

02:44 10   event?

11   A.   The entire team could receive this e-mail, but I don't

12   recall who actually was there.

13   Q.   I didn't ask you who was there.  I asked you who got their

14   invitation.

15           MR. FRANK:  Objection to the argumentation.

16           THE COURT:  Overruled.

17   Q.   You agree with me he was invited to Coach Vavic's house?

18   A.   He was included in the e-mail, yes.

19   Q.   I'd like to show you Exhibit 8027, please.  This is a --

02:44 20   do you recognize the e-mail?

21   A.   This is the first I'm seeing this.

22   Q.   If you could take a look on the cc's, do you see your name

23   there?

24   A.   Yes.

25   Q.   Is this an e-mail that was sent to you in January 2015?

```
 1            MR. FRANK:  Can I have a copy, Mr. Kendall?
 2   Q.   Was this an e-mail sent to you in July of 2015?
 3   A.   Yes.  I was cc'd on the e-mail.
 4            MR. KENDALL:  Can we show Mr. Moon the second page,
 5   please.
 6   Q.   Do you recognize the attachment?
 7   A.   Yes.  This is considered a competition record.
 8   Q.   And is this one of the records that the team keeps?
 9   A.   At the end of the year, Compliance asks the coaches to
10   review so they know who played in games.
11   Q.   Is this part of keeping track of the redshits?
12   A.   The entire team is listed under the student athletes, yes.
13            MR. KENDALL:  Your Honor, I'd like to offer 8027 and
14   8028 into evidence.
15            MR. FRANK:  Which is 8028?
16            MR. KENDALL:  8028 is the attachment.
17            MR. FRANK:  No objection, your Honor.
18            THE COURT:  8027 and 8028, which is the attachment to
19   8027, is that right?
20            MR. KENDALL:  8028 is the attachment.
21            THE COURT:  They'll both be admitted.
22            (Exhibit 8027, 8028 admitted into evidence.)
23            MR. KENDALL:  Thank you, your Honor.
24   Q.   If we can show the jury the first page, please.  It says
25   it's from Marko Pintaric, dated July 21, 2015, -- excuse me --
```

1    January, not July.  January 2015.  If we look at the

2    attachment, it says "MWP".  I take it that's men's water polo?

3    A.    Yes.

4    Q.    "Competition record" for 2014 and 2015.  Then it says

5    Brad.  Who is Brad?

6    A.    He's an assistant compliance director.

7    Q.    "Enclosed are signed and excel copies of 2014 Men's Water

8    Polo Competition record".

9         MR. KENDALL:  Can we look at the second page, the

02:47 10   attachment, please.  If we can blow it up a little bit.  We

11   don't need that top section with the name of the games, just

12   where it says "Student-Athlete", across there.

13   Q.    This is a list of all of the members of the team, correct?

14   A.    Correct.

15   Q.    The greens indicate that they're red shifts, correct?

16   A.    That they haven't played any games in the season.

17   Q.    Does that mean they're redshits?

18   A.    Correct.

19   Q.    And there's 13 of them, correct?

02:47 20   A.    Correct.

21   Q.    Johnny Wilson's the one listed last alphabetically,

22   correct?

23   A.    Yes.

24   Q.    Now, I'd like to show you Exhibit 137, please.  Have you

25   seen this document before?

A.   No.

Q.   Mr. Frank and the government didn't show it to you?

A.   Never seen this document.

Q.   The lawyers that represent USC have never shown it to you?

A.   I've never seen this document.

Q.   So when you testified that somebody on the team's told you Johnny had quit mid season, you had not seen this document when you gave that testimony, correct?

A.   I have not seen it, yes.

Q.   I jut want to go through it with you.  It says "Hello Jovan, I hope that you had a great break and wonderful holiday season.  I wanted to thank you and illustrate how profoundly appreciate I have I am for the incredible opportunity you have given me here at USC as an individual member on the team as well as a student at this school."

        Then he says, "unfortunately this was a much bigger commitment than I had planned on making and despite my best efforts, my grades reflected my inability to balance my academic and athletic life.  Along with my academic struggles, I am also still very conscience about my situation regarding my head.  While water polo has gotten me very far in my life and always played a major role, I must start considering being more careful with my head.  I already have 3 diagnosed concussions".

        So you had no memory that he got a concussion during the season?

1    A.    No.

2    Q.    And then he says, "with a very likely fourth concussion

3    looming in the near future I must start considering my future".

4           Concussions are a part of water polo, correct?

5    A.    Yes.

6    Q.    Players get them?

7    A.    Players, yes.

8    Q.    Sometimes they get them more than once?

9    A.    Yes.

02:49 10   Q.    And at a certain point, they have to decide they've

11   reached their limit of how many concussions they can risk?

12   A.    Yes.   Depending on the severity, yes.

13   Q.    Then he wrote, "because my body is already starting to

14   burn out from water polo, I need to make sure the same doesn't

15   happen with my head".   Then at the bottom, he says, "for these

16   reasons, I will not be playing water polo this semester and

17   will be focusing on my academic life and my future career in

18   the business world".

19          You were not aware of any of these comments that he

02:50 20   had expressed to Coach Vavic prior to getting on the stand

21   today, correct?

22   A.    Fair, unaware.

23   Q.    I'd like to next turn to the topic -- you said that USC

24   does not have any practice players?

25   A.    Yes.   We don't use the term "practice player".   We never

1    used it.

2    Q.   Didn't Coach Vavic use the term "practice players"?

3    A.   No.  We don't recruit players for practice players.

4         MR. KENDALL:  If we can show the witness only

5    Exhibit 7080.

6    Q.   I'd like you to read its first half of this page just to

7    yourself and see if it refreshes your memory.

8    A.   No.  This is the first time I'm seeing this.

9    Q.   I understand.  I want you to read the document.  I'm going

02:51 10   to ask if it refreshes your memory and a question I'm going to

11   ask you.

12   A.   Okay.

13   Q.   Does that refresh you that Coach Vavic would use the

14   phrase "practice goalies"?

15   A.   No.

16   Q.   So it's your testimony that you've never heard him use

17   that term?

18   A.   We never used the term "practice", "practice goalie".

19   Q.   If he put it in an e-mail, is that something you're saying

02:51 20   never could have happened?

21   A.   "Practice goalie", "practice player", never used that

22   term, because we have -- everybody who we recruit comes to our

23   team that wants to play and compete.

24        MR. KENDALL:  Your Honor, I'd like to offer the first

25   page of Exhibit 7080 as direct evidence for impeachment.

```
 1              MR. FRANK:  Objection, your Honor.
 2              THE COURT:  Objection's sustained.
 3    Q.   I'd like you to take a look at Exhibit 9833.  Would you
 4    agree with me that's a roster for a different sport for the
 5    swim team?
 6              MR. FRANK:  Objection to the description, your Honor.
 7    Q.   Strike that.
 8              Do you recognize this document?
 9    A.   It's the team roster.
10    Q.   Is it -- for what team?
11    A.   It's 2013 -- excuse me -- "2012-13 Men's Swimming and
12    Diving Roster".
13              MR. KENDALL:  Your Honor, I offer it into evidence.
14              MR. FRANK:  Objection, your Honor.
15              THE COURT:  Sustained.
16              MR. KENDALL:  If I may have one moment, your Honor.
17              THE COURT:  Yes.
18    Q.   Marko Pintaricis now the head coach at USC for the men's
19    team, correct?
20    A.   He's the head coach for both men's and women's.
21    Q.   How long was he an assistant coach before he was head
22    coach?
23    A.   The years I couldn't tell you.  He's been there since '97
24    as a player and he's moved up the ranks of coaching.
25    Q.   The two of you have coached together for many years,
```

1    correct?

2    A.    Correct.

3    Q.    He's now your boss?

4    A.    He's our head coach, yes.

5    Q.    Are you aware that the FBI interviewed Coach Pintaric

6    about this case?  Just yes or no.

7    A.    No.

8    Q.    Are you aware that Coach Pintaric has a better memory

9    about Johnny Wilson's participation than you?

02:54 10          MR. FRANK:  Objection, your Honor.

11          THE COURT:  Sustained.

12          MR. KENDALL:  No further questions, your Honor.  Thank

13    you.

14          THE COURT:  Cross-examination, Mr. Sheketoff?

15          MR. SHEKETOFF:  Yes, your Honor.  Thank you.

16                CROSS-EXAMINATION OF CASEY MOON

17    BY MR. SHEKETOFF:

18    Q.    Good afternoon, Coach Moon.

19    A.    Good afternoon.

02:55 20    Q.    As I understand your testimony, you've been with USC water

21    polo for over a decade?

22    A.    Correct.

23    Q.    That's been your sole job at USC?

24    A.    As a coach, yes.

25    Q.    How big is the USC Athletic Department?

```
 1    A.    Are you referring to staff members or athletes?

 2    Q.    Staff I'm talking about.

 3    A.    I couldn't tell you a number, but we have a pretty

 4    extensive staff.

 5    Q.    So how big is just the water polo staff?

 6    A.    We have potentially four coaches: A volunteer coach,

 7    strength staff, our trainer.  So it could be, say, four to 7

 8    people.

 9    Q.    And how many other sports does USC field teams in besides

10    water polo?

11    A.    Excuse me?

12    Q.    How many other teams does USC field teams in besides water

13    polo?

14    A.    You just mean other sports, correct?

15    Q.    Correct.

16    A.    So there's -- I believe that we have 19 varsity sports.

17    Q.    Right.  So -- and besides coaches for those 19 sports, and

18    those are men and women, correct?

19    A.    Yes.

20    Q.    So there are 38 different varsity teams?

21    A.    No. It's 19 all in all.

22    Q.    Including men and women?

23    A.    Yes, the same.

24    Q.    So in that 19, you're counting as men's basketball and

25    women's basketball?  Those are two of the 19?
```

1    A.    Correct.

2    Q.    And your best estimate of the number of coaches in all 19

3    sports?

4    A.    I'd say 50 plus.

5    Q.    Is it common knowledge in the USC coaching group that

6    there are two ways to keep your job?  You either win or you

7    bring in money?

8    A.    I've never heard that.

9    Q.    Do you have anything at all to do with fundraising?

02:57 10    A.    No.

11    Q.    Do you know who does do fundraising for the water polo

12    team?

13    A.    I know our head coach helps with that, but besides that,

14    no.

15    Q.    Do you know if the Athletic Department has a group called

16    the Trojan Fund whose sole responsibility is to raise money for

17    the Athletic Department?

18    A.    I've heard of the name, but I'm not really aware of what

19    their responsibilities are.

02:57 20    Q.    So you've never interacted, to the best of your knowledge,

21    with anyone from the Trojan Fund?

22    A.    Correct.

23    Q.    Do you know Pat Haden?

24    A.    He was our athletic director.

25    Q.    Have you ever heard of Pat's VIP list?

1    A.    I have not.

2    Q.    So putting aside the coaches and the fundraising arm of

3    USC athletics, how many administrators does USC have in the

4    Athletic Department?

5    A.    I couldn't give you a solid number but we definitely have

6    quite a few.  30 plus would be my guess.  I'm not certain.

7    Q.    And the head of that entire organization would be Pat

8    Haden?

9    A.    Pat Haden runs our Athletic Department.  He's our athletic

02:58 10   director, yes.

11   Q.    So USC have an Athletic Compliance office?

12   A.    Yes.

13   Q.    What -- do you know what the Athletic Compliance office

14   does?

15   A.    Fairly well, yes.  The Athletic Compliance is separated

16   from our Athletic Department.

17   Q.    It's a separate entity?

18   A.    Yes.

19   Q.    And they're in charge of making sure the Athletic

02:59 20   Department lives up to NCAA rules and regulations?

21   A.    Per sport, yes.

22   Q.    At each sport there's different rules and regulations,

23   correct?

24   A.    Each sport does, yes.

25   Q.    So water polo, for instance, you told us the men get four

```
 1   and a half scholarships, correct?
 2   A.   Yes.  That's not just USC.  That's all Division 1 water
 3   polo.
 4   Q.   And the Compliance Office is there, in part, to make sure
 5   that you only give out four and a half scholarships, correct?
 6   A.   Yes.
 7   Q.   Do you know how many scholarships women's basketball gets?
 8   A.   I do not.
 9   Q.   Does the NCAA regulate the number of team members you can
10   have on water polo?  You told us that only -- I think you said
11   16 can go to a tournament, correct?
12   A.   So that 16 was referring to conference only.
13   Q.   So when you go to a conference game, you can only bring 16
14   players, correct?
15   A.   Correct.
16   Q.   Does the NCAA regulate the number of players you can
17   actually have participate on the team as long as they don't go
18   participate in the actual meets?
19   A.   So you're referring to the number of players we have on
20   the team, correct.
21   A.   I'm not hundred percent certain the NCAA does that.
22   Q.   Do you know whose in charge of deciding, let's say, how
23   many players are going to be on the water polo in any given
24   year?  Is it the head coach or the Athletic Department?
25   A.   I'm pretty sure it's the Athletic Department.
```

```
 1   Q.    And what is the largest number in your experience that the
 2   Athletic Department has allowed on the men's water polo team?
 3   A.    Incoming recruits you're speaking?
 4   Q.    No.  The entire team.
 5   A.    Oh, we've had 30 plus, at some point 40 plus players on
 6   the team.
 7   Q.    So it varies.
 8         Out of curiosity, if I gave you an action picture of
 9   me playing water polo, would that have any meaning to, an
10   action picture?
11         MR. FRANK:  Objection, your Honor.
12         THE COURT:  Overruled.  If he understands the
13   question, he can answer.
14   Q.    Let me back up.  If you were going to recruit somebody
15   like me, you would actually want to see film of me competing,
16   right?
17   A.    Yes.
18   Q.    Or a game of me competing, correct?
19   A.    Yes.
20   Q.    An action picture wouldn't tell you much of anything,
21   correct?
22   A.    An action picture, no.
23   Q.    Do you have an understanding of why SUBCO required an
24   action picture to be on the application for a scholarship or
25   walk on athlete?
```

```
 1    A.    No.
 2    Q.    Did that strike you as silly?
 3          MR. FRANK:  Objection.
 4          THE COURT:  He can answer it.
 5    A.    No.
 6    Q.    Why would you want an action picture on an application if
 7    you were on SUBCO?
 8    A.    Just to validate that so and so plays that respective
 9    sport.
10    Q.    But it wouldn't tell you anything about how good or bad
11    they were, would it?
12    A.    No.
13    Q.    I mean -- okay.
14          MR. SHEKETOFF:  Can I have Exhibit 1219 just for the
15    witness.
16    Q.    Do you know who Scott Simon is?
17    A.    Yes.
18    Q.    And who is Scott Simon?
19    A.    He's the director of the Compliance Department.
20    Q.    So his concern would -- his field of concern would include
21    scholarship athletes?
22    A.    As he oversees all compliance of a sport.  Yes, that's
23    something he would check.
24          MR. SHEKETOFF:  I would offer this, your Honor.
25          MR. FRANK:  Objection.  Hearsay.
```

1          MR. SHEKETOFF:  I'm not offering it for the truth of

2     the matter.  I'm offering it for the fact that this was Scott

3     Simon's state of mind and also for the fact that since it's to

4     Donna Heinel, what she understood from Scott Simon, not the

5     truth.  This is what he told her.

6          MR. FRANK:  Your Honor, Scott Simon's state of mind is

7     not at issue.  This is an irrelevant document and this witness

8     has never seen it.

9          THE COURT:  The objection's sustained.

03:04 10          MR. SHEKETOFF:  Just for the witness, can I have 1219

11    back.

12    Q.   You've never seen this e-mail?

13    A.   I've never seen this.

14          MR. SHEKETOFF:  Can I go to the next page portion of

15    the document.

16    Q.   Have you ever seen any spreadsheet like this where there's

17    a discussion of the recruited athletes?

18    A.   No.  I've never seen anything like this.

19          MR. SHEKETOFF:  Please take it down.

03:04 20          Can I have Exhibit 105, government's Exhibit 105.

21    Q.   This is something Mr. Frank showed you during your direct

22    examination.  Do you recall that?

23    A.   Yes.

24    Q.   Mr. Frank suggested to you that the word "legid" is

25    actually legit.  Do you recall that?

1    A.   He didn't suggest.  He stated that it was legit.

2    Q.   Do you know a word -- do you know the meaning of the word

3    "legid"?  Do you agree with Mr. Frank that that's actually

4    legit?

5    A.   I don't know the word "legid".  I would agree with

6    Mr. Frank that he was getting to legit, yes.

7    Q.   Mr. Vavic, Coach Vavic, said -- he wrote "legid".  But you

8    agree with Mr. Frank that you think he meant legit, correct?

9    A.   Yes.

03:06 10   Q.   And this is to Alex Garfio.  You already explained Alex

11   Garfio worked for the Athletic Department under Donna Heinel as

12   a coordinator with SUBCO, which is the Admissions Department?

13   A.   Correct.

14   Q.   Do you have an understanding why your former Coach Jovan

15   Vavic would tell Alex Garfio that someone was a legit walk on?

16   A.   I do not.

17   Q.   Are there illegitimate walk-ons that Mr. Vavic would talk

18   to Mr. Garfio about, to your knowledge?

19   A.   No.  Every recruited athlete, walk on or not, scholarship

03:06 20   or not, was a water polo player.

21   Q.   So you don't have an understanding of why of all the words

22   that he could have picked he described this walk on as legit?

23   A.   I have no clue.

24        MR. SHEKETOFF:  Thank you, sir.

25        THE COURT:  Any redirect, Mr. Frank?

```
 1            MR. FRANK:  Briefly, your Honor.
 2                REDIRECT EXAMINATION OF CASEY MOON
 3   BY MR. FRANK:
 4   Q.   Mr. Moon, have you ever heard the expression "that guy is
 5   legit"?
 6   A.   Yes, if you were talking about exceptional players, yes.
 7   Q.   So legit can be exceptional?
 8   A.   Legit could be the real deal.  Obviously, it's a
 9   subjective term, but if you were speaking of athletes or
10   players that are legit, you would hear they're the real deal
11   for sure.
12   Q.   You were asked some questions by Mr. Kendall about Jack
13   Bowen and the Stanford Water Polo Club.  Do you recall those
14   questions?
15   A.   Yes.
16            MR. FRANK:  Can we take a look at Exhibit 107 at
17   page 2, please.
18   Q.   Now, this write-up was based on Johnny Wilson's athletic
19   profile that had been sent to you and on what Coach Vavic told
20   you, correct?
21   A.   Correct.
22   Q.   Did Coach Vavic tell to you put anything in there about a
23   reference from Jack Bowen?
24   A.   No.
25   Q.   Did he tell you anything about Jack Bowen recommending
```

1    Johnny Wilson?

2    A.    No.

3    Q.    If we can take a look at 1116A.

4          MR. FRANK:  Mr. Kendall, that was in evidence?

5          MR. KENDALL:  1116A I believe is.

6          MR. FRANK:  Thank you.

7    Q.    1116A, you were asked some questions about the grade point

8    averages and test scores of these water polo recruits relative

9    to Johnny Wilson?

03:09 10    A.    Yes.

11    Q.    The other water polo recruits were all recruit, right?

12    A.    On this list, there are some legitimate real deal water

13    polo players, absolutely.

14    Q.    And the other water polo players who were recruited in the

15    fall of 2014, they all showed up for practice, correct?

16    A.    Yes, every day.

17    Q.    Only Johnny Wilson didn't?

18    A.    I only recall meeting him on the first day.

19    Q.    So grade point averages, would you agree with me, of water

03:09 20    polo players or athletic recruits generally tend to be lower

21    than the general population at USC?

22    A.    In the general population, you mean the other --

23    Q.    Nonathletes.

24    A.    Nonathletes, yes.

25    Q.    So having a high grade point average or test score

1    comparable to other athletes doesn't mean a whole lot if you're

2    not an athlete, right?

3    A.   Yes.

4    Q.   And it's easier to get in as an athlete than as a

5    nonathlete, right?

6    A.   No.

7    Q.   If you're an exceptional athlete?

8    A.   And you've got to be great in the classroom.

9    Q.   You were asked some questions about whether you were aware

03:10 10   of Johnny Wilson having a concussion.  Do you recall those

11   questions?

12   A.   Yes.

13   Q.   You were asked whether you knew whether he was in the

14   weight room when you were at practice.  Do you recall that?

15   A.   Yes.

16   Q.   Do you ever recall seeing him in the weight room?

17   A.   Never.

18   Q.   You go to the weight room?

19   A.   Yes.

03:10 20   Q.   Does the team go to the weight room?

21   A.   Yes.  As a whole, yes.

22   Q.   Are you around the team when they're in the weight room?

23   A.   Yes.

24   Q.   Ever see Johnny there?

25   A.   No.

1    Q.   Have other players on the water polo team suffered

2    concussions during your time there?

3    A.   Yes.  We currently have one of our players who has a

4    concussion now, but he doesn't help us in the pool due to his

5    concussion, but he's there helping around the pool deck every

6    day.

7    Q.   So players with concussions still show up to practice?

8    A.   Yes.

9    Q.   You were asked some questions about whether you had been

03:11 10  shown an e-mail that you weren't on from Johnny Wilson to Coach

11   Vavic quitting the water polo team in January 2015.  Do you

12   recall those questions?

13   A.   Yes.

14   Q.   And he quit the water polo team, according to that e-mail,

15   after the first semester of his freshman year?

16   A.   To my knowledge, yes.

17   Q.   I didn't show you that e-mail, right?

18   A.   No.

19   Q.   You weren't on that e-mail, right?

03:11 20  A.   No.

21   Q.   Were you aware that Johnny Wilson's father was told by

22   Rick Singer that he only needed to stay on the team for

23   one semester after he was recruited as a walk-on athlete and

24   then he could just walk away?

25   A.   I was never told that.

```
 1   Q.   I didn't show you that e-mail either?

 2   A.   No.

 3        MR. FRANK:  If we could, Mr. Carter, if you wouldn't

 4   mind, call up 8028, please.

 5   Q.   Do you see 8028, Mr. Moon?

 6   A.   Yes.

 7   Q.   Mr. Kendall asked you some questions about the players

 8   highlighted in green who didn't play in any games.  Do you

 9   recall those questions?

10   A.   Yes.

11   Q.   It means very little that a redshirt doesn't play in any

12   games, right, in their freshman year?

13   A.   Yes.  They show up to practice every day.  This list just

14   showed that they participated in games or not.

15   Q.   As a redshirt, they're not allowed to play in games,

16   right?

17   A.   They're not allowed, yes.

18   Q.   They're still required to go to practice?

19   A.   Absolutely.

20   Q.   Besides Johnny Wilson, did the other redshits in green

21   show up to practice?

22   A.   Absolutely.

23   Q.   By the way, would you refer to a redshirt as an immediate

24   impact player?

25   A.   No.
```

```
 1   Q.    Why not?

 2   A.    Because if you're an immediate impact player, you join our

 3   team, you have the ability to contribute and play games right

 4   away.

 5   Q.    You were asked some questions about what your status was

 6   on the water polo staff in 2014.  Do you recall those

 7   questions?

 8   A.    Yes.

 9          MR. FRANK:  Could we, for the witness only, take a

10   look at 751, please.

11   Q.    Mr. Kendall was suggesting that you were, in fact, not an

12   assistant coach, but the director of player operations in 2014.

13   Do you recall that?

14   A.    Yes.

15   Q.    Do you see the media guide for 2014?

16   A.    Yes.  This is the cover.

17          MR. FRANK:  Miss Lewis, could you go to page, I think

18   it's 9.

19          MR. KENDALL:  I don't think this is in evidence, your

20   Honor.

21          MR. FRANK:  It's for the witness only.  I'm sorry.

22   Can you go to the prior page and the page before that.  I'm way

23   off.  Can you go to the page before that and before that and

24   before that and before that.  There we go.

25   Q.    You see this page from the 2014 Men's Water Polo Media
```

```
 1   Guide?
 2   A.    Yes.
 3   Q.    And it lists the staff of the water polo team?
 4   A.    Yes.
 5   Q.    In 2014?
 6   A.    Correct.
 7   Q.    Does this refresh your recollection that you were, in
 8   fact, the assistant coach on the team in 2014?
 9   A.    Yes.
10   Q.    And not the director of player operations?
11   A.    Correct.
12            MR. FRANK:  Your Honor, the government now offers 751.
13            MR. KENDALL:  No objection, your Honor.
14            THE COURT:  It will be admitted.
15            (Exhibit 751 admitted into evidence.)
16            MR. FRANK:  If we can show that page to the jury.
17   Q.    It shows you as assistant coach, right?
18   A.    Correct.
19   Q.    And, as the assistant coach, you're on the pool deck every
20   day and working with the players each and every practice,
21   correct?
22   A.    Correct.
23   Q.    6 days a week?
24   A.    6 days a week every day, yes.
25            MR. FRANK:  Can we look at 9516, please.  Sorry I keep
```

```
 1    going back and forth.  That's for you, Mr. Carter.  We can show
 2    this to the jury as well.  I believe this is in evidence.
 3    Q.   Do you recall, Mr. Moon, Mr. Kendall asking you questions
 4    about this sign up to work at a golf tournament?
 5    A.   Yes.  The sign up is all volunteer.
 6    Q.   You don't actually know who showed up for the golf
 7    tournament, right?
 8    A.   No.
 9    Q.   Fair to say that a golf tournament is not a water polo
10    practice?
11    A.   Correct.
12         MR. FRANK:  Mr. Carter, if we can look at 9517,
13    please.
14    Q.   Mr. Kendall showed you this photograph which suggested, I
15    believe, members of the water polo team when they run around
16    campus in their bathing suits?
17    A.   Yes.
18    Q.   And this conclusively shows that Johnny Wilson purchased a
19    men's water polo bathing suit, correct?
20    A.   He has the suit on, yes.
21    Q.   He's got it on, right?
22    A.   Correct.
23    Q.   He's sort of standing a little bit apart from the other
24    members of the team in this photo?
25    A.   Yes.
```

```
 1   Q.   This isn't a practice either, right?

 2   A.   No.

 3   Q.   Just a social event?

 4   A.   Yes.

 5        MR. FRANK:  Could we look at 9822.  Thank you.

 6   Q.   This was a photograph of the NCAA Men's Water Polo

 7   Championship?

 8   A.   Correct.

 9        MR. FRANK:  I think it was 9823 was the next.

10        What was the other photo with the other student?

11   Q.   In any event, this photo conclusively shows that Johnny

12   Wilson went to the NCAA Championship at the end of the program,

13   right?

14   A.   Yes.

15   Q.   A festive event would you say?

16   A.   Yes.  Every member that is not traveling on that 16-man

17   roster, if you're a part of the team, you want to go support

18   your team win a national championship, absolutely.

19   Q.   He's wearing a water polo shirt?

20   A.   Yes.

21   Q.   But he's not playing, right?

22   A.   No.

23   Q.   And it's not a practice, right?

24   A.   No.

25   Q.   And he's there with his dad, right?
```

```
 1   A.    Appears to be, yes.

 2         MR. FRANK:  Could we look at 9623, please.

 3   Q.    By the way, Mr. Kendall asked you a bunch of questions

 4   about a series of e-mails that were sent out to the men's water

 5   polo team.  Do you recall those questions?

 6   A.    Yes.

 7   Q.    Those were blast e-mails, right?

 8   A.    Correct.  We have an e-mail program, yes.

 9   Q.    So if your name's on the roster, you get the e-mail,

10   right?

11   A.    Correct.

12   Q.    If your name's on the roster, you get invited to

13   Thanksgiving, right?

14   A.    Correct.

15   Q.    It doesn't mean you go to practice, right?

16   A.    No.

17   Q.    And if we look at this photograph, again, this is not a

18   practice?

19   A.    No.

20   Q.    Do you know each of the players in this photograph?

21   A.    Absolutely.

22   Q.    Do you know their names?

23   A.    Yes.

24   Q.    Do you know where they're from, where they went to school?

25   A.    Yes.
```

```
 1   Q.   You know what position they play?

 2   A.   Fairly well, yes.

 3   Q.   And you know whether or not you saw them when you were at

 4   practice?

 5   A.   Yes, absolutely.  If they were there every day in the

 6   pool, I would recognize them a hundred percent.

 7   Q.   Let's go through the back row, starting from the back row

 8   right.  This individual, who is that?

 9   A.   That's Tyler Heffernan from Santa Barbara.  He went to

03:19 10   Santa Barbara High School.

11   Q.   And that whole back row, those are redshirt freshmen?

12   A.   Yes.

13   Q.   And did Tyler Heffernan show up for practice?

14   A.   Yes, every day.

15   Q.   And who is this gentleman?

16   A.   That's Andrew Mericle from Coto de Caza.

17   Q.   Did he go to practice?

18   A.   Every day.

19   Q.   Who's this gentleman?

03:20 20   A.   Next to him is Tristan Reinhardt from Murrieta,

21   California.

22   Q.   Did he go to practice?

23   A.   Every day.

24   Q.   Who's this gentleman?

25   A.   Colby Watson from Newport Beach.
```

```
 1   Q.   Did he go to practice?

 2   A.   Every day.

 3   Q.   What about this guy?

 4   A.   That's Jake Sanders from Santa Ana.  He went to Mater Dei

 5   High School.

 6   Q.   What about this guy?

 7   A.   Zach Traversi from Rancho Palos Verdes.  He went to Loyala

 8   High School.

 9   Q.   Did both of those guys go to practice?

10   A.   Every day.

11   Q.   What about this guy?

12   A.   Tim Leong from Honolulu, Hawaii.  I believe he went to

13   'Iolani High School.

14   Q.   Did he go to practice?

15   A.   Every day.

16   Q.   By the way, could you answer that question for all the

17   other players on the team?

18   A.   All the other players sitting there, yes.

19   Q.   What about this guy in the back left, Johnny Wilson?  Did

20   he go to practice?

21   A.   I just remember seeing him on the very first day.

22   Q.   Did he have an immediate impact on the USC men's water

23   polo team?

24   A.   No.

25            MR. FRANK:  No further questions.
```

```
 1              THE COURT:  Recross?  Mr. Kendall?
 2                 RECROSS-EXAMINATION OF CASEY MOON
 3    BY MR. KENDALL:
 4    Q.   You say you have no memory of Johnny Wilson after the
 5    first day, correct?
 6    A.   Correct.
 7    Q.   And you have absolutely no knowledge of him being out with
 8    a concussion and not cleared to play until sometime in October,
 9    correct?
03:21 10   A.   No knowledge.
11    Q.   You have no knowledge of Sandy Olsen taking care of him
12    and dealing with him until he could get cleared to return to
13    play to water polo?
14    A.   No knowledge.
15              MR. KENDALL:  I'd like to show the witness an exhibit
16    marked as 9700.  I don't think that's the correct exhibit.
17    Give me one second, please.
18              I'd like to show for the witness only -- I think I
19    should do it from the Elmo?
03:22 20   Q.   What is the Keck Medical Center?
21    A.   This is the first time seeing this.
22    Q.   I'm not asking you anything about this document.  I'll
23    turn it off for a moment.  What is the Keck Medical Center?
24    A.   That is our umbrella medical school, medical hospital.
25    Q.   Okay.  And do injured water polo players with concussions
```

1    go to Keck Medical Center?

2    A.    After all of our athletes get evaluated in house through

3    our athletic trainer, as well as our athletic medicine

4    department, and depending on the severity of any injury, they

5    get referred to the Keck Medical Center, yes.

6    Q.    And do you know if Dr. McCleary was one of the doctors who

7    took care of people with concussions?

8    A.    I do not.

9    Q.    Do you know if Leslie Weiner -- strike that.

03:23 10        Do you know Leslie Weiner Neurologic Care and Research

11   Center is where a lot of the people with concussions went from

12   the team?

13   A.    I do not.

14   Q.    I'd like to show you this document marked as Exhibit 9970.

15        MR. KENDALL:  For the witness only, please.

16   Q.    I want you to read the section that I'm going to point out

17   to you.  Just read it to yourself, not out loud.

18        Sandy Olsen is the athletic trainer to the team?

19   A.    Yes.  This is the first I'm seeing this.

03:24 20   Q.    If you can just read down here in the bottom.  Does that

21   refresh your memory that Johnny Wilson had a concussion and

22   wasn't cleared to return to play until well into the season?

23   A.    No.  I have no recollection.

24   Q.    You're not disputing that that occurred, did you?  You're

25   just saying you don't remember?

```
 1              MR. FRANK:  I object to the "not disputing".  He said
 2    he had no recollection.
 3              THE COURT:  Sustained.
 4    Q.    You just have no recollection of whether he had a
 5    concussion, correct?
 6    A.    Correct.
 7    Q.    And you have no recollection that Sandy Olsen was
 8    overseeing his concussion care until he could return to play?
 9    A.    I have no recollection.
03:25 10   Q.    And you have no recollection of the coaches informing the
11    medical staff at Keck Medical Center that they wanted to know
12    when Johnny would be cleared because they wanted him to come
13    back to practice once he was cleared from his concussion?
14    A.    I have no recollection.
15    Q.    And fair to say that to the extent that Johnny had any
16    concussion or other issues in that fall season, you just had no
17    involvement with it, correct?
18    A.    If there was injuries to our players that showed up every
19    day, our coaching staff would know.  I would see it.
03:26 20   Q.    If you could answer my question, please.
21              MR. FRANK:  He was answering the question.
22              THE COURT:  Let him finish.
23    Q.    My question is --
24              MR. FRANK:  He was answering the question.
25              THE COURT:  Let him finish.  Are you finished with
```

1    your answer?

2    A.   So if there's player that's show up every day at practice

3    and they, God forbid, have an injury, if they show up every day

4    at practice, us coaches can see that something's happened, but

5    I have no recollection of Johnny Wilson and his concussion.

6    Q.   You have no recollection of his concussion or Sandy

7    Olsen's involvement with his treatment or requesting the

8    medical staff when would he be cleared to return to play.  You

9    just don't know anything about that topic, correct?

03:26 10    A.   I have no recollection of his concussion.  He was never at

11    practice.  If he was at practice and something happened, then I

12    would have seen it, but I've never seen him at practice so I

13    have no recollection of his concussion.

14    Q.   I'm not saying he got the concussion at practice.  I'm

15    saying the -- I'm asking you whether or not there was a

16    concussion that kept him from practice.

17    A.   I have no recollection he even had a concussion.

18         MR. KENDALL:  May I have one moment, your Honor.

19         THE COURT:  Yes.

03:27 20         MR. KENDALL:  I have no further questions.

21         THE COURT:  Mr. Sheketoff.

22         MR. SHEKETOFF:  Thank you, Judge.

23              RECROSS-EXAMINATION OF CASEY MOON

24    BY MR. SHEKETOFF:

25    Q.   Could I have Exhibit 105 up again.

         1              So is it your testimony that the former head coach,

         2    Mr. Vavic, said legit walk on because he was puffing him up?

         3    A.   No.  I'm just reading what his e-mail said.

         4    Q.   Well, Mr. Frank suggested to you that legit means really

         5    really something, right?

         6    A.   He was just saying it in his own words.

         7    Q.   The opposite of legitimate is illegitimate, correct?

         8    A.   Correct.

         9    Q.   Why would Jovan Vavic tell Alex Garfio that a walk on --

03:28   10              MR. FRANK:  Objection, your Honor.

        11              THE COURT:  Finish the question.

        12    Q.   -- that a walk on was actually legit?

        13              MR. FRANK:  Objection.

        14    Q.   Why would he do that?

        15              THE COURT:  Sustained.

        16    Q.   Do you have an understanding of why he would do that?

        17    A.   No.

        18    Q.   I thought you told this jury that all your walk-on

        19    recruits were exceptional athletes?

03:28   20    A.   They are, that participate in practice every day to vie

        21    for a spot to play in a game.

        22    Q.   That's what your walk-ons are, because you only have four

        23    and a half scholarships to give out, correct?  I mean, water

        24    polo relies on walk-ons, correct?

        25    A.   Due to the number of scholarships, yes, because we only

```
 1    have four and a half to work with.
 2    Q.   And you're allowing to take 16 to a conference game,
 3    correct?
 4    A.   Per rule, yes.
 5    Q.   So you need walk-ons.  Four and a half is not 16, correct?
 6    A.   Correct, yes.
 7    Q.   So why in the world would Vavic pick the word "legit" to
 8    tell the liaison with SUBCO about any walk on?
 9             MR. FRANK:  Objection.
10             THE COURT:  Sustained.
11    Q.   Do you know if the Athletic Department top administrators
12    permitted coaches to raise money by getting donations for
13    walk-on recruits?
14    A.   I have no idea.
15             MR. SHEKETOFF:  Thank you.
16             THE COURT:  Thank you, Mr. Moon.  You may step down.
17             We are going to break for the day, jurors.  I'm going
18    to ask you to be back here at 9:00 a.m. tomorrow morning,
19    however, the good news is that it may not be a full day for
20    you.  We may be able to give you a part of tomorrow off.  It
21    will depend on the way the case goes in, but we have some legal
22    business that we are going to need to work on tomorrow outside
23    of your hearing.  I'm hopeful that we will not have a full day
24    tomorrow.  I can't be held to any promises, but I am very
25    confident that we will not be going for a full day tomorrow.
```

         1              As we get closer to the end of the evidence, it is

         2     more and more important each day that you honor my instructions

         3     about not talking about this case with anybody else, not trying

         4     to do any independent research because you haven't heard all

         5     the evidence yet.  You almost have, but not all of it.  You

         6     haven't heard closing arguments.  You haven't heard my

         7     instructions to you on the law, all of which are important

         8     before you retire to deliberate on this case.

         9              So please honor my questions as we get closer to end

03:31   10     of this case.  It's more and more important each day.

        11              I'll see you back here tomorrow morning at 9:00 a.m.

        12     Have a pleasant rest of the day.

        13              THE CLERK:  All rise for the jury.

        14              (Jury exits.)

        15              THE COURT:  Be seated, counsel.  Tomorrow's outlook

        16     will be what?  Mr. Deckett, Miss Ranahan and Miss George, is

        17     that correct?

        18              MR. FRANK:  Yes, your Honor.  In theory, we could

        19     avoid Mr. Deckett's testimony if there were a stipulation that

03:32   20     the three relevant universities received more than $10,000 in

        21     federal funding in any one year, but if not, that will be about

        22     15 minutes of testimony.

        23              THE COURT:  All right.  Remind me again of

        24     Miss Ranahan's direct was going to be how long?

        25              MS. KEARNEY:  About 45 minutes plus or minus.

```
 1              THE COURT:  And Miss George's?

 2              MS. WRIGHT:  About an hour, plus or minus.

 3              MR. KELLY:  Your Honor, we have conveyed to the

 4   government certain objections about those charts.

 5              THE COURT:  About those what?

 6              MR. KELLY:  The charts that Miss George apparently

 7   intends to testify about.  We'll try to go back and forth with

 8   the government before tomorrow on it.

 9              THE COURT:  All right.  We are still confident that

10   we're going to finish the government's case tomorrow?

11              MR. FRANK:  Well, based on the length of the direct,

12   yes.

13              THE COURT:  Okay.  Anything else needs to come to my

14   attention before we adjourn for the day?

15              MR. KELLY:  No, your Honor.

16              MR. KENDALL:  Your Honor?  It was unfortunate things

17   got bumped today and we lost the chance to have the conference

18   with you on the various evidentiary and other issues, which we

19   need guidance in order for us to start Friday.

20              THE COURT:  We're going to have that tomorrow, if the

21   government rests.

22              MR. KENDALL:  Thank you, your Honor.

23              THE COURT:  Okay?  We're in recess until tomorrow

24   morning.

25              (Whereupon, the proceedings ended at 3:34 p.m.)
```

```
 1                    I N D E X
 2    Witness                          Page
 3
 4    JEFFREY DEMAIO
 5    Cross-Examination by Mr. Kendall        5
 6    Cross-Examination by Mr. Kelly         70
 7    Redirect Examination by Ms. Kearney    72
 8    Recross-Examination by Mr. Kendall     81
 9
10    CASEY MOON
11    Direct Examination by Mr. Frank        90
12    Cross-Examination by Mr. Kendall      122
13    Cross-Examination by Mr. Sheketoff    198
14    Redirect Examination by Mr. Frank     206
15    Recross-Examination by Mr. Kendall    218
16    Recross-Examination by Mr. Sheketoff  222
17
18
19
20
21
22
23
24
25
```

```
 1                        E X H I B I T S

 2      NO.                        ADMIT

 3      9805    ....................   12

 4      106     ....................  102

 5      105     ....................  107

 6      751A    ....................  114

 7      129     ....................  117

 8      128     ....................  119

 9      9844    ....................  131

10      9515    ....................  137

11      9515A   ....................  140

12      9517    ....................  142

13      9516    ....................  150

14      8005    ....................  150

15      9623    ....................  152

16      9822    ....................  154

17      9823    ....................  155

18      9824    ....................  155

19      9524    ....................  166

20      1116A   ....................  171

21      8027    ....................  192

22      8028    ....................  192

23      751     ....................  213

24

25
```



1    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8            We, Kristin M. Kelley and Kelly Mortellite, certify

9    that the foregoing is a correct transcript from the record of

10   proceedings taken September 28, 2021 in the above-entitled

11   matter to the best of our skill and ability.

12

13

14       /s/ Kristin M. Kelley            September 28, 2021

15       /s/ Kelly Mortellite             September 28, 2021

16       Kristin M. Kelley, RPR, CRR           Date
         Kelly Mortellite, RMR, CRR
17       Official Court Reporter

18

19

20

21

22

23

24

25