<pre>
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2


 3
     UNITED STATES OF AMERICA,          )
 4                    Plaintiff         )
                                        )
 5   vs.                                )  No. 1-19-CR-10080
                                        )
 6   GAMAL ABDELAZIZ and JOHN           )
     WILSON,                            )
 7                    Defendants.       )
                                        )
 8                                      )

 9


10
                BEFORE THE HONORABLE NATHANIEL M. GORTON
11                   UNITED STATES DISTRICT JUDGE
                        JURY TRIAL - DAY 14
12


13
                John Joseph Moakley United States Courthouse
14                        Courtroom No. 4
                          One Courthouse Way
15                     Boston, Massachusetts 02210

16


17                      September 29, 2021
                             9:10 a.m.
18

19


20
                     Kristin M. Kelley, RPR, CRR
21                     Debra Joyce, RMR, CRR
                       Official Court Reporter
22        John Joseph Moakley United States Courthouse
                     One Courthouse Way, Room 3209
23                   Boston, Massachusetts 02210
                     E-mail: kmob929@gmail.com
24
                Mechanical Steno - Computer-Aided Transcript
25
</pre>

```
 1    APPEARANCES:

 2

 3            Stephen E. Frank

 4            Ian J. Stearns

 5            Leslie Wright

 6            Kristen Kearney

 7            United States Attorney's Office

 8            1 Courthouse Way

 9            Suite 9200

10            Boston, MA 02210

11            617-748-3208

12            stephen.frank@usdoj.gov

13            for the Plaintiff.

14

15

16            Brian T. Kelly

17            Joshua C. Sharp

18            Lauren Maynard

19            Nixon Peabody LLP

20            100 Summer Street

21            Boston, MA 02110

22            617-345-1000

23            bkelly@nixonpeabody.com

24            for Gamal Abdelaziz.

25
```

```
1    APPEARANCES:

2

3            Robert L. Sheketoff

4            One McKinley Square

5            Boston, MA 02109

6            617-367-3449

7            sheketoffr@aol.com

8            for Gamal Abdelaziz.

9

10

11            Michael Kendall

12            Lauren M. Papenhausen

13            White & Case, LLP

14            75 State Street

15            Boston, MA 02109

16            617-939-9310

17            michael.kendall@whitecase.com

18            for John Wilson.

19

20

21

22

23

24

25
```

1    APPEARANCES:

2

3             Andrew E. Tomback

4             McLaughlin & Stern, LLP

5             260 Madison Avenue

6             New York, NY 10016

7             917-301-1285

8             atomback@mclaughlinstern.com

9             for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2          THE CLERK:  You may be seated.  Court is now in

3    session.

4          THE COURT:  Good morning, counsel.  I understand

5    counsel wanted to talk to me about some evidentiary matters.

6          MS. WRIGHT:  Yes, your Honor.  We plan to introduce

7    six summary charts through summary witness Lauren George.

8    We've been in communication with the defense.  My understanding

9    is they have remaining objections to two of those.  I just

09:10 10   wanted to raise that with your Honor outside the presence of

11   the jury.

12         THE COURT:  What is the objection, Mr. Kelly?

13         MR. KELLY:  Yes.  We've gone back and forth.  Some of

14   them we don't object to anymore.  It's just two of the exhibits

15   we have 403 objections.  We believe, in our view, they're

16   misleading and confusing.  That's with respect to two of them.

17   We'll log the objection when they -- or I can articulate it now

18   if you wish.

19         THE COURT:  Well -- why don't I take a look at the

09:11 20   charts.

21         MS. WRIGHT:  Yes.  I have paper copies and Ms. Lewis,

22   if you could pull them up, too.

23         THE COURT:  Can you put them on the screen so we can

24   all see them at the same time?

25         MS. WRIGHT:  Yes.

1        MR. KENDALL:  And your Honor, we have separate

2    objections as well.

3        MS. WRIGHT:  It's what's been marked as Exhibit 718

4    and 720.

5        THE COURT:  Okay.  So I've been given Exhibit 718 and

6    720.

7        MS. WRIGHT:  Yes, your Honor.

8        THE COURT:  What is your objection, Mr. Kelly, to 718?

9        MR. KELLY:  Yes.  Under 403, we think it's unfairly

09:11 10    misleading and confusing.  There's been no evidence suggesting

11    that my client, Mr. Abdelaziz, has any knowledge of Gordon

12    Ernst, Rudy Merideth, John Vandemoer, Jorge Salcedo --

13        THE COURT:  Wait a minute.  I see Ernst.  Where are

14    the other names?

15        MR. KELLY:  They've got somebody -- at Georgetown,

16    they've got Ernst.  On Yale, they've got Meredith.  Stanford

17    they've got Vandemoer.  UCLA they've got Salcedo.  And there's

18    simply no connection with my client.  And you know, at the

19    heading at the top, you know, "payments to individuals/entities

09:12 20    associated with Georgetown, USC, Yale, Stanford, and UCLA". My

21    guy's not associated with any of these schools except USC.  So

22    we're objecting to that on the --

23        THE COURT:  Miss Wright?

24        MS. WRIGHT:  Your Honor, there's no suggestion about

25    intent or knowledge in this chart.  It's simply showing inflows

and outflows of money.  Each of these individuals and schools

is part of the charged conspiracy.  The chart makes it very

clear where the money is going, whether it's to the individual

or a fund at the school and the names listed there are simply

the payee line of the check.  There's nothing misleading about

that or inaccurate.

MR. KELLY:  The only other thing, your Honor, on this

particular one, 718, is under USC.  They've got Heinel's

private business, the Clearinghouse.  That's not USC's

business.  That's her private business.

MS. WRIGHT:  Yes.  That's affiliated with Donna

Heinel.

THE COURT:  Where are you referring?  I'm sorry.  USC

whereabouts?

MR. KELLY:  About -- after they go through the sports.

THE COURT:  Clear the Clearinghouse?

MR. KELLY:  Yes.

THE COURT:  What's that about, Miss Wright?

MS. WRIGHT:  That is a company affiliated with Donna

Heinel to which The Key Worldwide Foundation made payments.  It

is included there because it's clearly connected with Donna

Heinel.  We're simply showing the association.  The summary

witness will explain how she tied the Clearinghouse to Donna

Heinel, and that's simply based on bank records.

MR. FRANK:  Your Honor, there's actually -- if I just

could add, there's been evidence concerning Clear the
Clearinghouse already.  There was an invoice that is in
evidence that Donna Heinel submitted to Mr. Singer when he was
working for the government.  And it says Clear the
Clearinghouse right on it for the $20,000 monthly payment,
which we've already talked about at length in front of jury.

          MR. KELLY:  Well, the reason it's still misleading is
because Heinel, as they've agreed, wasn't taking money until
the summer of 2018.  So that cleared the clearinghouse because
of the personal bribe, and so they're trying to mix that in
with the USC aspect.

          MR. FRANK:  That's the scheme, your Honor.

          MS. WRIGHT:  And I will just note we have a separate
chart that clearly lays out each of the payments to the Clear
the Clearinghouse along with the time periods of each of those
checks.

          THE COURT:  All right.  Any objection from Mr. Kendall
on this one?

          MR. KENDALL:  Yes, your Honor.  Or actually --

          THE COURT:  Go ahead.  I'm talking about 718.

          MR. KENDALL:  Excuse me?

          THE COURT:  718.

          MS. PAPENHAUSEN:  Is that LG3?

          MR. KELLY:  Yes.  That would be LG3.

          MR. KENDALL:  Yes I do, your Honor, for 718.  A few

```
 1    things, your Honor.  First, if we go down to the USC category,
 2    there's USC water polo $150,000.  I assume that's $100,000 from
 3    John Wilson and $50,000 from someone else?
 4            MS. WRIGHT:  Yes.
 5            MR. KENDALL:  Who is the other person?
 6            MS. WRIGHT:  It's a check from KWF Foundation.
 7            MR. KENDALL:  But it's not related to Wilson.
 8            THE COURT:  Let's not have a conversation here about
 9    it.
09:15 10        MR. KENDALL:  Your Honor, so other than the $100,000
11    to John Wilson, none of these things have anything to do with
12    my client.  In particular, Gordon Ernst and Georgetown's got
13    nothing to do with my client.  Clear the Clearinghouse, Donna
14    Heinel.  Donna Heinel didn't meet Rick Singer until the year
15    after my client's son was admitted.  So everything with Donna
16    Heinel --
17            THE COURT:  Miss Wright?
18            MS. WRIGHT:  It's part of the charged conspiracy, your
19    Honor.
09:15 20        THE COURT:  I'm going to reserve on this.  If the
21    proper foundation is laid for this document, I'm going to allow
22    it to be used, but of course I will reserve until the testimony
23    of this witness lays a foundation.
24            MR. KENDALL:  May I refer to one specific entity, your
25    Honor?
```

1          THE COURT:  Yes.

2          MR. KENDALL:  Under Stanford, it says "Stanford

3     Sailing, John Vandemoer."  My understanding is that was a check

4     payable to Stanford Sailing.  It was given to John Vandemoer to

5     deposit into the Stanford bank account, but I think it's

6     misleading to put John Vandemoer's name there.

7          MS. WRIGHT:  That's incorrect.  John is a payee line

8     of a specific check.  It's Stanford Sailing, John Vandemoer,

9     and if you move over to the next column, deposit account

09:16 10     beneficiary, it clearly states the beneficiary account is

11     Stanford University.

12          THE COURT:  All right.  I'm going to do what I said

13     I'm going to do.  Of course I will allow you to cross-examine

14     neutrally, as I have throughout this trial.

15          MR. KELLY:  Yes, your Honor.

16          The only other one would be -- excuse me.  The only

17     other objection we would have to the charts would be, I think

18     it's Exhibit 720?  Is that?

19          THE COURT:  Yes.

09:16 20          MR. KELLY:  Okay.  Yes.  Again, we think that one is

21     unfairly misleading about Mr. Abdelaziz.  They have put these

22     two blocks here and not --

23          THE COURT:  Which two blocks?

24          MR. KELLY:  The $5,000 and the $300,000.

25          THE COURT:  Yes.

1           MR. KELLY:  To suggest that this wide disparity on how

2      his son was treated versus his daughter, and they bury in the

3      2018 the $7,000 that was for his daughter Sabrina, who's the

4      subject of the trial.  That should be in the side -- in that

5      block with the $5,000, if you really want to see what's going

6      on, they say because it's a credit card they've dropped it down

7      here at the bottom, the $7,000, and that's why they can't put

8      it up top.  So we think it's unfairly misleading and under 403

9      should be excluded.

09:17 10           THE COURT:  Miss Wright?

11           MS. WRIGHT:  Your Honor, I don't understand how

12      something is misleading when it's laid out there very clearly

13      in a chart.  If the placement of the boxes is the problem, I

14      really don't understand the objection.  The reason that the

15      credit card payments are laid out separately is not solely

16      because they're credit card payments.  It's because the records

17      that the summary witness relied upon are different.  For the

18      check and wire payments, she relied on bank records.  For the

19      credit card payments, she relied on Quickbooks, which is a

09:18 20      secondary source as opposed to a primary source, and that is

21      the only reason they are laid out differently like that.

22           MR. KELLY:  Well, your Honor, I think, again, we renew

23      our 403 objection.  And then we would ask to at least, to

24      counter this, be permitted to introduce Exhibit 1568 which

25      confirms that, in fact, he paid $7,000 in January for his

1    daughter Sabrina, so that -- this is not some mystery number

2    down at the bottom, $7,000.

3            THE COURT:  Well, when and if it comes in, if that

4    becomes relevant, as it has not been up to this point, I will

5    reconsider that ruling.

6            MR. KENDALL:  Your Honor, and then with respect to

7    721.

8            THE COURT:  I don't have 721.

9            MS. WRIGHT:  Miss Lewis, if we can pull it up.

09:18 10         MR. KENDALL:  They both go together, 721 and 722.  We

11   have the same issue on both.

12           MS. WRIGHT:  I will just note that we sent these

13   charts on Sunday evening and this is the first I've heard of

14   any objections from Mr. Kendall.

15           MR. KENDALL:  Your Honor, both of these are purely

16   Donna Heinel documents.  Seven -- the one with the green thing

17   on the bottom there, 721, these are payments in 2018 to Donna

18   Heinel.  That is four years after my client's son is admitted

19   to USC, and my client has no association of any kind with Donna

09:19 20   Heinel.

21           You may remember Agent Keating's testimony that the

22   government then disputes that Singer told them John Wilson was

23   always told he was making a donation, he was never told he was

24   making a bribe.  So to say that anything with Donna Heinel

25   that's a personal benefit to her is reasonably foreseeable to

```
 1    my client I suggest is misleading.  It's not within the scope
 2    of anything foreseeable to him because Singer told him that at
 3    the time they were dealing with USC, that he thought everything
 4    was a donation.
 5          And that would, I think, go over to 722 as well.
 6    These are things with Donna Heinel.  My client doesn't know who
 7    she is.  She's not associated with his son's admission.  It
 8    truly is only to mislead, your Honor.
 9          THE COURT:  Miss Wright?
10    MS. WRIGHT:  Your Honor, neither of these charts
11    indicate any association with Mr. Wilson at all.  The payments,
12    to whom they're made, is very clear.  The time period is very
13    clear.  Miss George will be testifying as to the time period of
14    these payments, and Mr. Kendall is free to cross-examine her.
15          THE COURT:  Same ruling.  I'm going to allow them in
16    if a proper foundation is laid and I will certainly allow
17    counsel to cross-examine liberally.  Anything else?
18          MR. KENDALL:  Your Honor, may we get a limiting
19    instruction on some of them with respect to what the government
20    has conceded that Donna Heinel has nothing do with my client,
21    that my client had no knowledge of the Vavic tuition payments?
22    We've discussed this before in motion practice, your Honor.
23          THE COURT:  Mr. Frank?
24    MR. FRANK:  Donna Heinel had everything to do with his
25    client, your Honor.  His client joined a conspiracy of which
```

1    Donna Heinel was a member and this continued argument is beyond

2    my comprehension.

3            THE COURT:  Yeah.  I'm not going to make a special

4    instruction.  I will, of course, instruct on conspiracy very

5    carefully at the time that I give the charge.  All right.  Call

6    the jury.

7            (Jury enters).

8            THE CLERK:  Thank you.  You may be seated.  Court is

9    now in session.

09:23 10         THE COURT:  Good morning, jurors.  We are ready to

11   resume.  We had some legal matters we had to dispose of outside

12   of your hearing, but we're ready now to continue with the

13   evidence.

14           The government will call its next witness.

15           MR. STEARNS:  Thank you, your Honor.  The government

16   calls Mark Deckett.

17           (Mark Deckett, sworn.)

18           THE CLERK:  Thank you.  You may be seated.  Will you

19   please state your name for the record, spelling your last.

09:24 20         THE WITNESS:  Mark, M-a-r-k, Deckett, D as in David,

21   e-c-k-e-t-t.

22           THE COURT:  Good morning, Mr. Deckett.  Would you

23   please pull your chair in and the microphone closer to you so

24   that we can all hear you.  Thank you.

25           MR. STEARNS:  May I proceed, your Honor?

|    |    |
|----|----|
| 1  | THE COURT:  Mr. Stearns. |
| 2  | DIRECT EXAMINATION OF MARK DECKETT |
| 3  | BY MR. STEARNS: |
| 4  | Q.    Good morning, Mr. Deckett. |
| 5  | A.    Good morning. |
| 6  | Q.    Where do you work? |
| 7  | A.    I work for the United States Department of Education, |
| 8  | Office of Inspector General. |
| 9  | Q.    What's your title? |
| 09:24 10 | A.    I'm employed as a Special Agent. |
| 11 | Q.    Okay.  How long have you been a Special Agent with the |
| 12 | Office of the Inspector General? |
| 13 | A.    Since 1999. |
| 14 | Q.    Okay.  What's your role as a Special Agent with the |
| 15 | Department of Education? |
| 16 | A.    To investigate allegations of fraud involving the U.S. |
| 17 | Department of Education programs. |
| 18 | Q.    Are you familiar with this investigation? |
| 19 | A.    Yes. |
| 09:24 20 | Q.    Okay.  Have you had substantive involvement in this |
| 21 | investigation? |
| 22 | A.    Limited involvement. |
| 23 | Q.    And what has been your limited involvement in the |
| 24 | investigation? |
| 25 | A.    To review Department of Education records related to grant |

1    programs and payments to certain institutions.

2           THE COURT:  Again, Mr. Deckett, please pull the

3    microphone closer because we're having a hard time.

4           THE WITNESS:  Sorry.

5    Q.    What's been your role?

6    A.    To review certain Department of Education records related

7    to grant payments to certain post-secondary institutions.

8    Q.    Okay.  Are you familiar with Pell grants?

9    A.    Yes.

09:25 10   Q.    Could you just explain a little bit what Pell grants are,

11   Special Agent Deckett.

12   A.    It's a form of student financial assistance offered to

13   many students as a benefit to pay for tuitions and costs for

14   colleges.

15   Q.    And who are Pell grants offered by?

16   A.    The U.S. Department of Education.

17   Q.    And who receives the Pell grants?  How are they

18   administered?

19   A.    They're administered by the U.S. Department of Education.

09:25 20   They're first disturbed to post-secondary institutions.  They

21   then credit student accounts for tuition and other educational

22   expenses.

23   Q.    Okay.  And how long have Pell grants been in existence?

24   A.    Since the 1970s.

25   Q.    Okay.  How do universities and colleges in the U.S. become

1    eligible to participate in the federal Pell grant program?

2    A.    So they first need to enter into a Program Participation

3    Agreement with the U.S. Department of Education.  It's

4    essentially an agreement that the schools will comply and apply

5    the laws and regulations to that specific program.

6    Q.    And then how do students become eligible to receive or

7    benefit from Pell grants?

8    A.    They first need to apply, submit the free application for

9    federal student aid.  It's more commonly known as the FAFSA

09:26 10    form.

11    Q.    And what's the maximum Pell grant award that a school can

12    receive from the Department of Education per student per year?

13    A.    Approximately $6,100.

14    Q.    And so, approximately, how many students receiving Pell

15    grants at a given university would a college need to have in

16    order to receive more than $10,000 in Pell grants?

17    A.    Two or three.

18    Q.    Now, you mentioned earlier in your role in this

19    investigation you conducted an analysis to determine -- to

09:27 20    evaluate Pell received by certain universities?

21    A.    Yes.

22    Q.    Okay.  And you reviewed records?

23    A.    Yes.

24    Q.    Can you just briefly explain what those records are?

25    A.    So, through my training and experience, I gathered

1   information from the program participation agreements, as well

2   as eligibility documents, as well as grant payments, both of

3   the certain post-secondary institutions, as well as payments to

4   the schools overall.

5   Q.   Okay.  And where were those payment records?  Where are

6   those maintained by the Department of Education?

7   A.   Yes.

8   Q.   Where are they maintained?  Are they maintained in the

9   database?

09:27 10   A.   They're maintained in various databases, yes.

11   Q.   Okay.  The records you reviewed, are they made at or near

12   the time by a Department of Education employee with knowledge

13   of their contents?

14   A.   Yes.

15   Q.   Okay.  And who are they maintained by generally?

16   A.   The federal student aid office.

17   Q.   Okay.  And those records are maintained in the regular

18   course of activity with the Department of Education?

19   A.   Yes.

09:28 20   Q.   Fair to say, Special Agent Deckett, the records you

21   reviewed in preparation for today were voluminous?

22   A.   Yes.

23   Q.   Okay.  I'm not going to go through all of them.  For what

24   schools did you conduct your review?

25   A.   The University of Southern California, Harvard University

1   and -- oh, my gosh -- Stanford University.

2          MR. STEARNS:  Miss Lewis, if you can please pull up

3   Exhibit 691, for the witness only at this point.

4   Q.   Do you recognize Exhibit 691, Special Agent Deckett?

5   A.   Yes.

6   Q.   Just generally what is it?

7   A.   It's a summary of Pell grant disbursements made to

8   Stanford University and University of Southern California, as

9   well as Harvard University.

09:29 10   Q.   For what years?

11   A.   2007 through 2020.

12   Q.   And what is this chart based on?

13   A.   It's based upon the information I obtained from the G5

14   grant payment system of the U.S. Department of Education.

15          MR. STEARNS:  Government offers 691 pursuant to

16   Rule 1006, your Honor.

17          THE COURT:  Say that again.

18          MR. STEARNS:  The government offers 691 as a summary

19   chart, your Honor.

09:29 20          THE COURT:  It will be admitted.

21          (Exhibit 691 admitted into evidence.)

22   Q.   Just a couple questions before we talk about the numbers

23   in this chart, Special Agent Deckett.  Do you see in the title

24   it says "Confirmed Deposits"?

25   A.   Yes.

```
 1   Q.   What does that mean?

 2   A.   That represents U.S. Department of Education payments to

 3   those particular universities.

 4   Q.   Okay.  So payments that the schools actually received?

 5   A.   Correct.

 6   Q.   And then you see the column entitled "Award Year"?

 7   A.   Yes.

 8   Q.   And there are two years in each row?

 9   A.   Yes.

10   Q.   Can you just explain what that means?

11   A.   So the U.S. Department of Education award year for

12   colleges and Pell program runs from July 1st from one year into

13   June 30th of the next year.

14   Q.   Okay.  And just to take a step back, we've been discussing

15   Pell grants, but fair to say that the Department of Education

16   provides other forms of federal money to -- in the forms of

17   grants and contracts and loans to universities?

18   A.   Yes.

19   Q.   Okay.  Let's look at Exhibit 691, let's focus on the

20   University of Southern California first, all the way on the

21   right.  Did USC receive more than $10,000 in Pell grants each

22   year from 2007 to 2020?

23   A.   Yes.

24   Q.   Approximately, how much did USC receive over the course of

25   those years in Pell grants?
```

|  |  |
|---|---|
| 1 | A.   At least $7 million each year. |
| 2 | Q.   Okay.  Turning to Harvard, did Harvard University receive |
| 3 | Pell grants from the Department of Education exceeding $10,000 |
| 4 | each year? |
| 5 | A.   Yes. |
| 6 | Q.   From 2007 to 2020? |
| 7 | A.   I'm sorry.  Yes. |
| 8 | Q.   Okay.  And directing your attention specifically to |
| 9 | 2018-2019 row, do you see that? |
| 09:31 10 | A.   Yes. |
| 11 | Q.   Again, what dates does that cover? |
| 12 | A.   That covers July 1, 2018 through June 30, 2019. |
| 13 | Q.   And how much in federal Pell grants did Harvard receive |
| 14 | that year from the Department of Education? |
| 15 | A.   At least $6 million. |
| 16 | Q.   And finally, Stanford, do you see in the middle, Special |
| 17 | Agent Deckett? |
| 18 | A.   Yes. |
| 19 | Q.   Did Stanford receive more than $10,000 in Pell grants each |
| 09:31 20 | year from 2007 to 2020? |
| 21 | A.   Yes. |
| 22 | Q.   And, again, 2018 to 2019, how much did Stanford receive in |
| 23 | Pell grants from the Department of Education? |
| 24 | A.   At least $5 million. |
| 25 | MR. STEARNS:  That's it, your Honor.  Thanks. |

```
 1              THE COURT:  Cross-examination.  Is it
 2   Miss Papenhausenen?
 3              MS. PAPENHAUSEN:  Yes, your Honor.
 4                  CROSS-EXAMINATION OF MARK DECKETTT
 5   BY MS. PAPENHAUSEN:
 6   Q.   Good morning, Agent Deckett.  My name is Lauren
 7   Papenhausen.  I represent John Wilson in this case.
 8   A.   Good morning.
 9   Q.   Is it fair to say, Agent Deckett, that in addition to
10   Harvard, Stanford and USC, which you've just gone through,
11   there are many other universities nationwide that participate
12   in the Pell grant program?
13   A.   Yes.
14   Q.   You understand that the Department of Education spends
15   billions of dollars on the Pell grant program each year,
16   correct?
17   A.   Yes.
18   Q.   There are -- fair to say there are extensive regulations
19   put forth by the Department of Education that apply to any
20   school that wants to participate in the Pell grant program,
21   correct?
22   A.   There are regulations to participate.
23   Q.   Well, there are extensive regulations, correct?
24   A.   There are many.
25   Q.   Fair to say that the program and the participation of
```

1    these schools in the program is heavily regulated, correct?

2    A.    It is well regulated.

3    Q.    In fact, you previously testified to the grand jury that

4    these regulations were extensive and that it was heavily

5    regulated, correct?

6    A.    I don't remember specifically, but it is well regulated.

7    Q.    Sure.  The regulations are pretty significant, correct?

8    A.    Correct.

9    Q.    Do you agree that nowhere in these significant regulations

09:33 10   does the Department of Education limit the ability of a

11   university to give a boost in admissions to the child of a

12   donor?

13           MR. STEARNS:  Objection, your Honor.  The Department

14   of Education doesn't regulate admission.

15           THE COURT:  Well, if he understands the question, he

16   can answer.

17   A.    I'm not familiar with that.

18   Q.    You're not familiar with any regulations anywhere in the

19   Department of Education's extensive regulations that has

09:33 20   anything to do with admissions consideration given to the child

21   of a donor?

22   A.    I'm not familiar -- I'm not that familiar with that

23   aspect, if it is there.  I don't -- I don't have extensive

24   experience in that area.

25   Q.    You can't point us to any regulation that has anything to

1    do with giving an admissions boost to the child of a donor,

2    correct?

3            MR. STEARNS:  Objection.

4            THE COURT:  Overruled.

5    A.   I cannot.

6    Q.   And fair to say that these extensive regulations, they

7    cover everything from copyright law to campus security to a

8    host of other requirements that the Department of Education

9    imposes on universities that participate in the Pell grant

09:34 10   program, correct?

11   A.   Again, I'm not familiar with every regulation for the

12   Department of Education.

13   Q.   You know they cover a wide range of topics, correct?

14   A.   Yes.

15   Q.   And the purpose of these extensive regulations, right, the

16   purpose of these extensive regulations for participating

17   schools is to ensure the integrity of these participating

18   schools, correct?

19   A.   In general and it may include other reasons as well.

09:35 20   Q.   And the Department of Education has the authority to

21   impose regulations to do that, correct?

22   A.   Yes.

23           MS. PAPENHAUSEN:  Thank you.  I have nothing further.

24           MR. KELLY:  Briefly, your Honor.

25           THE COURT:  Mr. Kelly.

```
 1              CROSS-EXAMINATION OF MARK DECKETT
 2    BY MR. KELLY:
 3    Q.   Good morning, Agent Deckett.  My name is Brian Kelly.  I
 4    represent Gamal Abdelaziz.
 5    A.   Good morning, sir.
 6    Q.   Now, you testified in the grand jury in this case, right?
 7    A.   Yes, sir.
 8    Q.   Back in July of 2019, July 23, 2019, correct?
 9    A.   Yes, sir.
10    Q.   And the prosecutor at the time who asked you questions was
11    an individual named Eric Rosen, right?
12    A.   Yes, sir.
13    Q.   And was your role in this case pretty much limited to your
14    appearance in the grand jury to talk about some of the things
15    you just talked about today?
16    A.   Yes, sir.
17    Q.   So subsequent to that grand jury appearance, you really
18    didn't do anything else on this case?
19    A.   No, sir.
20    Q.   All right.  Now, the government just had you testify about
21    Pell grants, right?
22    A.   Yes, sir.
23    Q.   There's no -- they're basically undergraduate student
24    loans, correct?
25    A.   They're undergraduate grants.  They do not have to be
```

1    repaid.

2    Q.    Okay.  So students in need, if they're eligible for these

3    grants, they can get a Pell grant and they don't have to pay

4    them back because it's a grant and not a loan, correct?

5    A.    If they're eligible, yes.

6    Q.    Sure.  But there's no Pell grant fraud alleged in this

7    case, right?

8    A.    I'm not familiar with any, if there is or is not.

9    Q.    Okay.  But you're not aware of any Pell grant fraud

09:36 10   allegations against Gamal Abdelaziz's daughter Sabrina, right?

11   A.    I'm aware of general allegations, but I'm not aware of

12   whether or not that includes that.

13   Q.    So the Pell grant issue is just really to establish

14   jurisdiction?  Is that your understanding of why you testified

15   to the grand jury?

16   A.    I was asked to provide the information related to the

17   funding to the schools.

18   Q.    Okay.  And you've been a federal agent for what, 20 years?

19   A.    Yes, sir.

09:37 20   Q.    And you know that USC is a private university, right?

21   A.    Yes.

22   Q.    And USC obviously doesn't need the federal government's

23   permission to accept kids at their private school, right?

24   A.    Could you repeat that, please?

25   Q.    Sure.  The federal government is very powerful, but it

```
 1    can't decide what student a private university lets in, right?
 2    A.   There are certain admission criteria for most schools.
 3    I'm not familiar exactly with what it is, so I can't speak to
 4    that.
 5    Q.   Well, you know USC's a private university, right?
 6    A.   Yes, sir.
 7    Q.   And they can give preferences to children of wealthy
 8    donors, can't they?
 9    A.   I guess they can.  I don't know.
10    Q.   You're not aware of any law that prohibits USC from
11    accepting donations and giving preferences to donors' children,
12    are you?
13              MR. STEARNS:  Objection.
14              THE COURT:  Overruled.
15    A.   I'm not familiar if they can or can't.
16    Q.   And you're not aware -- there's no law or regulations that
17    says parents can't give money to USC with the hope that it
18    helps their kids get into that school, right?  There's no
19    prohibition against that?
20    A.   I'm not familiar either way.
21    Q.   And people donate to private universities all the time,
22    right?
23    A.   Yes.
24    Q.   And in --
25              MR. KELLY:  Well -- nothing further.
```

```
 1            THE COURT:  Any redirect, Mr. Stearns?
 2            MR. STEARNS:  Very brief, your Honor.
 3                 REDIRECT EXAMINATION OF MARK DECKETT
 4   BY MR. STEARNS:
 5   Q.   Special Agent Deckett, you were asked a series of
 6   questions by both Miss Papenhausen and Mr. Kelly about
 7   donations to schools.  Do you recall those questions?
 8   A.   Yes, sir.
 9   Q.   And donations to schools in the hope that someone's
10   student could get in?
11   A.   Yes, sir.
12   Q.   And to give someone a boost with the Admissions
13   Department?
14   A.   Yes, sir.
15   Q.   Do you work in the Admissions Department of any of those
16   schools?
17   A.   I do not.
18   Q.   Okay.  You're familiar that there's a criminal
19   investigation in this case, correct?
20   A.   Yes, sir.
21   Q.   Okay.  And who was responsible for that investigation?
22   What agency?
23   A.   The FBI, IRS, and the Department of Justice.
24   Q.   Okay.  And you were asked a series of questions about
25   whether it was an illegal -- you knew whether it was illegal to
```

1    give a donation to a school, right?

2    A.    Yes.

3    Q.    Are you familiar whether Title 18 prohibits bribes,

4    Special Agent Deckett?

5    A.    Yes.

6    Q.    Okay.  And what about fraud?

7    A.    Yes.

8            MR. STEARNS:  Nothing further.

9            THE COURT:  Miss Papenhausen?

09:39 10         MS. PAPENHAUSEN:  Nothing further, your Honor.

11           THE COURT:  Mr. Kelly?

12                RECROSS EXAMINATION OF MR. DECKETT

13   BY MR. KELLY:

14   Q.    He just asked you whether you were familiar with whether

15   bribes or et cetera -- your role in this case was limited to

16   your grand jury appearance back in July of 2019, right?

17   A.    Yes.

18   Q.    You didn't work on this case the way these other agents

19   did, right?

09:40 20   A.    I did not.

21           MR. KELLY:  Thank you.  Nothing further.

22           THE COURT:  All right.  Thank you, Mr. Deckett.  You

23   may step down.

24           THE WITNESS:  Thank you, sir.

25           MS. WRIGHT:  The government calls Lauren George.

```
 1              (Lauren George, sworn.)
 2              THE CLERK:  Would you please state your name for the
 3       record, spelling your last.
 4              THE WITNESS:  My name is Lauren George, G-e-o-r-g-e.
 5              MS. WRIGHT:  May I inquire?
 6              THE COURT:  Yes, you may, Miss Wright.
 7                   DIRECT EXAMINATION OF LAUREN GEORGE
 8       BY MS. WRIGHT:
 9       Q.   Good morning, Miss George.
10       A.   Good morning.
11       Q.   Miss George, can you tell the jury how you're employed?
12       A.   I work for the U.S. Attorney's office here in Boston as an
13       auditor.
14       Q.   And how long have you been doing that?
15       A.   I've been doing it for the past two and a half years with
16       that title, approximately nine years total.  Prior to that I
17       was a contractor performing the same job function.
18       Q.   And can you briefly describe what you do as an auditor?
19       A.   Sure.  So I do the financial investigations associated
20       with certain ongoing criminal investigations.  So to the extent
21       that agents bring a target of investigation to me, I'll then do
22       a financial workup trying to identify assets and where funds
23       are coming in and out of and essentially analyze the financial
24       aspects of those targets and in some cases try to recommend
25       whether I think financial charges should be brought.
```

1   Q.   Where did you work before you became an auditor for the

2   U.S. Attorney's Office here in Boston?

3   A.   For one year I was a contractor under the U.S. Marshals'

4   Service where I worked on the Complex Asset Team.  And then

5   prior to that I was an auditor for the Northern District of

6   Georgia.  Prior to that I was a DEA Special Agent down in

7   Miami, Florida.  And prior to entering government service I was

8   in private industry, first as an auditor and then as a forensic

9   accountant in an investigative consulting practice.

09:42 10   Q.   Can you briefly describe your educational background.

11   A.   Sure.  I have an undergraduate degree in economics and

12   accounting from Holy Cross.  I have a law degree from Suffolk

13   University.  And I have two certifications:  One, a certified

14   public accountant, and the other a certified fraud examiner,

15   both of which require continuing professional education

16   requirements on an annual basis.

17   Q.   Okay.  Miss George, can you tell the jury just a little

18   bit about your involvement with and role in this case?

19   A.   Sure.  I was asked to review financial records for --

09:43 20   primarily for The Key Worldwide Foundation, The Key and Rick

21   Singer, and prepare summary charts based on what I reviewed.

22   Q.   And what is a summary chart?

23   A.   So, with financial records, they're usually very

24   voluminous, and so a summary chart is a way to concisely convey

25   what's going on in those financial accounts, kind of the ins

1    and outs and key categories of what's going on in those

2    financial records.

3          MS. WRIGHT:  Miss Lewis, if we could please pull up,

4    for the witness only at this point, Exhibit 716?

5    Q.   Miss George, showing you what has been marked as 716.  Can

6    you briefly describe what this is.

7    A.   Sure.  It's a summary chart that I prepared that

8    highlights the total dollar values going in and out of The Key

9    Worldwide Foundation and The Key business bank accounts.

09:44 10   Q.   What records did you review in preparing this?

11   A.   Primarily the underlying bank records from US Bank, Wells

12   Fargo, Bank of America, and Merrill Lynch.  That fed into it.

13   Q.   Does the chart accurately reflect your review of those

14   records?

15   A.   Yes, it does.

16          MS. WRIGHT:  The government would offer Exhibit 716 as

17   a summary chart.

18          MR. KENDALL:  Objection, your Honor.

19          THE COURT:  Grounds?

09:44 20          MR. KENDALL:  The things we discussed it earlier.

21   Relevance.  Prejudice.

22          THE COURT:  All right.  The objection's overruled.

23   716 is admitted over the objection of defendant Wilson.

24          MR. KELLY:  I join, your Honor, just for the record.

25          THE COURT:  And both defendants.

|     |     |                                                              |
| --- | --- | ------------------------------------------------------------ |
|     | 1   | (Exhibit 716 admitted into evidence.)                        |
|     | 2   | Q.    Okay.  Now that we have this up in front of the jury,   |
|     | 3   | Miss George, there's two different sections here on the chart? |
|     | 4   | A.    That's correct.                                        |
|     | 5   | Q.    With a few different columns, correct?                 |
|     | 6   | A.    Yes.                                                   |
|     | 7   | Q.    Can you just explain to the jury what it is they're    |
|     | 8   | looking at?                                                  |
|     | 9   | A.    Sure.  The top part of that is, in the gray shading, you |
| 09:45 | 10 | can see is The Key Worldwide Foundation.  And underneath that |
|     | 11  | there are four account numbers listed.  So I've listed the name |
|     | 12  | of the bank and the last four digits of the account numbers. |
|     | 13  | And then to the right of that I've listed the time period for |
|     | 14  | which the records that are reviewed and the figures on the   |
|     | 15  | right represent during that time period.  And then I have a  |
|     | 16  | deposit column and a withdrawal column.  And that's to show the |
|     | 17  | money coming into those accounts and the money going out of  |
|     | 18  | those accounts.                                              |
|     | 19  | Q.    Okay.  And same thing down here under The Key?         |
| 09:45 | 20 | A.    That's correct.                                        |
|     | 21  | Q.    Okay.  And then in full sections, do you see where it says |
|     | 22  | "same entity movement of funds"?                            |
|     | 23  | A.    Yes, I do.                                            |
|     | 24  | Q.    What does that mean?                                   |
|     | 25  | A.    So, for example, to take The Key Worldwide one up top, |

1    there's four bank accounts listed up there.  To the extent that

2    money went from one account held by KWF and went into another

3    account of KWF, I'm just showing that as backing out so that we

4    can get a better sense of net money coming in and out of the

5    account.

6    Q.    Okay.  And then below that where it says up top, it says,

7    "The Key, RWS Management Inc., and Rick Singer".  First, what

8    is RWS Management, Inc.?

9    A.    It's a management company controlled by Rick Singer.

09:46 10    Q.    And what do those rows show?

11    A.    Again, I was showing to back out related parties so

12    that -- if you look again as -- KWF as an example, the total 36

13    million in deposits, if we take out money that moved between

14    those same accounts and then we take out money that was from

15    Rick Singer or his related businesses, then we get to a net

16    number at the bottom that reflects money coming in and out from

17    third parties.

18    Q.    Okay.  And based on your review, what were the net

19    deposits into The Key Worldwide Foundation accounts between

09:47 20    January of 2013 and February of 2019?

21    A.    Approximately 27.6 million.

22    Q.    Can you tell the jury where -- in broad categories the

23    majority of that $27 million came from?

24    A.    The vast majority came from parents, approximately 26

25    million, a little bit above.  And by parents I mean they were

1    individuals that were clients of The Key, which is the business

2    below.  So they're a parent fund that go into KWF.

3    Q.   And what were the net withdrawals from the KWF accounts

4    during this time period?

5    A.   Approximately 20.6 million.

6    Q.   Where did the majority of that money go?

7    A.   So, in broad category, approximately six and a half

8    million went to various colleges and universities, or

9    individuals associated with those entities, and then another

09:48 10   approximately 6.4 million went into business investments that

11   The Key Worldwide Foundation had engaged in.  And then there

12   was additional funds that went to other business interests.

13   And I say that to distinguish from the business ventures for

14   which there were -- appeared to be formal contracts and

15   agreements versus there was another category of over a million

16   dollars where there seemed to be some sort of kind of offshoot

17   business venture.

18   Q.   And could you tell from your review approximately how much

19   of that 20 million went to charitable causes?

09:48 20   A.   I can't put an exact figure on it.  I would say very

21   little based on my ability to trace what money did go out to

22   other ventures.

23   Q.   Okay.  Moving on to the second section below, "The Key".

24   Based on your review, what were the net deposits of The Key

25   account in the time period depicted here, which is January 2012

1    to February of 2019?

2    A.    Approximately 15.5 million.

3    Q.    And same question here, where did the majority of that

4    money come from?

5    A.    Again, it was mostly from parent funds.  So approximately

6    8.9 million came directly from parents in the form of checks or

7    other wires.  And then there was another five million that came

8    into the account through a credit card processor, which based

9    on my review of other materials in the case, appears to

09:49 10    represent parent funds as well.

11    Q.    Okay.  And then what were the net withdrawals from The Key

12    accounts during this time period?

13    A.    Approximately 13.4 million.

14    Q.    Okay.  And then same question, where did the majority of

15    that $13 million go?

16    A.    The vast majority was in payroll related expenses,

17    approximately 5 million.  Some of that was in the form of the

18    traditional payroll processing that would go through a payroll

19    processor called Intuit.  And others of that was paid directly

09:50 20    to individuals, and in the reference line it would indicate a

21    certain pay period.  So it was those two kind of categories

22    combined as payroll.  And then there was additional money that

23    came out of that account for credit card payments.

24          So The Key had maintained credit card accounts with

25    Amex and other credit card companies.  And so a little over two

1    million went to those credit card payments.  And then, to a

2    smaller extent, there were some funds here out of The Key that

3    went to colleges and universities and individuals associated

4    with them.  That was roughly $800,000 or so.

5    Q.   And then down at the bottom, under "Combined Net Totals",

6    what does that show?

7    A.   That shows, between the two entities, approximately 43.1

8    million in deposits and 34.1 million in withdrawals.

9    Q.   And depicted in each section, which we talked about a

09:51 10   little bit, the backing out the transfers, is it fair to say

11   that there were significant transfers among all of these

12   accounts from KWF to The Key, from The Key to KWF, and to and

13   from Rick Singer's personal accounts?

14   A.   Yes.  That is correct.

15   Q.   Based on your review and backing out those transfers, can

16   you tell the jury approximately how much money went to Rick

17   Singer's personal accounts?

18   A.   Sure.  It was approximately 3.5 million.

19        MS. WRIGHT:  Okay.  For the witness only, can you

09:51 20   please pull up Exhibit 718, Miss Lewis.

21   Q.   Miss George, showing you what's been marked as

22   Exhibit 718, can you please describe generally what this is.

23   A.   It's a summary chart that I prepared that highlights flow

24   of funds out from The Key and the KWF accounts to certain

25   colleges, universities, and associated entities.

1    Q.   What records did you review in preparing this chart?

2    A.   The -- my primary source was the financial records that we

3    just discussed in the first exhibit, the underlying bank

4    account records.

5    Q.   And does this chart accurately reflect that review?

6    A.   Yes, it does.

7         MS. WRIGHT:  The government offers Exhibit 718, the

8    summary chart.

9         MR. KELLY:  Note our 403 objection, your Honor.

09:52 10         MR. KENDALL:  Same objection, your Honor.

11         THE COURT:  718 is admitted over the objections of the

12   defendants.

13         (Exhibit 718 admitted into evidence.)

14   Q.   Okay.  Now that we have it up for the jury, Miss George,

15   can you just explain what we're looking at in a bit more

16   detail.

17   A.   Sure.  On the left-hand side, I've listed five different

18   colleges and universities.  So that's how I've broken down the

19   payments.  And then, in the second column, you'll see a payee

09:53 20   and that would be who the -- the actual payment was directed to

21   in terms of the face of the payment, whether it be a check or a

22   wire.  And then the third column is marked as "Deposit Account

23   Beneficiary".  That's ultimately reflective of where the money

24   went to.  And then the last column is a total sub-totalling

25   each one of these categories.  And then --

1    Q.    What was -- oh, sorry.

2    A.    Oh, sorry.  I was going to say and then there's a small

3    box in the bottom that's in bold that just indicates, of the

4    figures that are detailed up above, how much came from KWF and

5    how much came from The Key.  So in total, this sheet is talking

6    about $5.7 million in payments.  And that box at the bottom

7    just breaks out which accounts they're coming from.

8    Q.    Okay.  So the 5.7 million, over 5 million came from KWF

9    accounts?

09:54 10    A.    That's correct.

11    Q.    How did you determine the association between -- and we'll

12    go through each, but how did you determine the association

13    between some of these individuals listed here and the

14    associated university?

15    A.    In the majority of cases, the association was written on

16    the face of the payment.  So it might reference the individual

17    name, or it references the University, or it references a name

18    in care of that university.  In other cases, I'd look through

19    discovery materials to identify e-mails or other bits of

09:54 20    information that would provide context to know that

21    association.  And, in some cases, looked at the underlying bank

22    records for those individuals.

23    Q.    Okay.  Let's walk through each section in a little bit

24    more detail.  Under "Georgetown", can you tell the jury what

25    we're looking at under "Georgetown"?

1    A.   Sure.  The first payee is Gordon Ernst.

2    Q.   Who is that?

3    A.   He was the former Georgetown tennis coach.

4    Q.   Okay.  And how much money went to him?

5    A.   Approximately 2.7 million.

6    Q.   And that's -- where it says "Deposit account beneficiary",

7    it says "Gordon Ernst."  What does that signify?

8    A.   That it was paid directly to him and it was endorsed by

9    him, and based on the review of the materials, it appears to

09:55 10   have been deposited into accounts controlled by him

11   individually.

12   Q.   Okay.  And then there's a separate $5,000 payment to

13   Georgetown Tennis?

14   A.   That's correct.

15   Q.   And those funds went to Georgetown?

16   A.   As far as I know, that was a single payment that was a

17   cashier's check.  And I wasn't able to look at the -- I wasn't

18   able to see the cleared copy of the check to see where it went,

19   but I -- I'm basing that on the fact that it was made payable

09:55 20   to the University itself.

21   Q.   Okay.  And moving on to USC, can you walk us through this

22   part of the chart?

23   A.   Sure.  I've broken them out into different subsections.

24   So this top part, there are four separate categories of

25   payments that went directly to USC.  So on the face of the

|  |  |
|---|---|
| 1 | checks, they would say women's athletic board or water polo or |
| 2 | baseball or women's volleyball.  So that was reflected on the |
| 3 | checks and they all were deposited into USC controlled bank |
| 4 | accounts. |
| 5 | Q.   Okay.  And then what about Clear the Clearinghouse? |
| 6 | A.   Those were a series of check payments that were made |
| 7 | payable to Clear the Clearinghouse and ultimately deposited |
| 8 | into a personal bank account maintained by Donna Heinel. |
| 9 | Q.   And why is Clear the Clearinghouse listed along with these |
| 09:56 10 | USC -- the payments that went directly to USC? |
| 11 | A.   Because Donna Heinel was an employee of USC and so I was |
| 12 | associating individuals connected to that university in this |
| 13 | summary. |
| 14 | Q.   Okay.  Moving on to the next client.  What is that? |
| 15 | A.   That says "Loyola High School."  Similar, that is an |
| 16 | outside entity that was receiving payments on behalf of -- on |
| 17 | the face of the payments, there was a reference to Vavic and |
| 18 | the individuals that were attending that high school. |
| 19 |      MS. WRIGHT:  Okay.  Miss Lewis, if we can pull up a |
| 09:57 20 | few exhibits and just show them one at a time to Miss George. |
| 21 | 156. |
| 22 | Q.   I've give you a moment to look at that. |
| 23 | A.   I see that. |
| 24 |      MS. WRIGHT:  And then 213, Miss Lewis. |
| 25 | A.   I see that. |

```
     1              MS. WRIGHT:  350, please, Miss Lewis.
     2    A.    Yes.
     3              MS. WRIGHT:  And then 534.
     4    Q.    What were those four exhibits?
     5    A.    Those four exhibits were checks made payable to Loyola
     6    High School, and there were notations on the checks that
     7    referenced tuition and specific individuals' names and amounts.
     8              MS. WRIGHT:  The government offers Exhibits 156, 213,
     9    350 and 534.
09:58 10              MR. KENDALL:  Objection, your Honor.
    11              THE COURT:  Grounds?
    12              MR. KENDALL:  Relevance, 403 prejudice.
    13              THE COURT:  Overruled.  They will be admitted.
    14              (Exhibit 156, 213, 350, 534 admitted into evidence.)
    15              MS. WRIGHT:  And then, Miss Lewis, if we could just go
    16    back to 156, please.
    17    Q.    And the jury will have these so we don't need to go
    18    through each one.  Let's just take a look at an example.  So
    19    this is a check from The Key Worldwide Foundation?
09:58 20    A.    Yes, it is.
    21    Q.    Made payable to Loyola High School?
    22    A.    Yes.
    23    Q.    In the approximate amount of $37,000?
    24    A.    That's correct.
    25    Q.    And then here on the notation, it says "Stefan Vavic and
```

1    Marko Vavic"?

2    A.    Correct.

3    Q.    And over here on the right "2015-2016 tuition"?

4    A.    Yes.

5    Q.    And then the next three exhibits were checks similar to

6    this for each of the following years?

7    A.    That's correct.

8          MS. WRIGHT:   Okay.  Miss Lewis, if we can go back to

9    the summary chart, which is Exhibit 718, please.

09:59 10   Q.    Okay.  So moving on from Loyola High School, what is this

11   next section under USC?

12   A.    They were payments that were made payable to these

13   entities, so they varied.  So SoCal, SC, Fullerton Football,

14   and Newport Football, all of those payments were made to one

15   variation of that payee, but all deposited into a single bank

16   account held by that entity, that soccer club.

17          And then the second category is -- were payments made

18   directly to Ali Khosroshahin and the last one was payments

19   directly to Laura Janke.

10:00 20   Q.    It's hard to say.  I know.

21   A.    It is.

22   Q.    And who are Ali Khosroshahin and Laura Janke?

23   A.    They were -- they are former soccer coaches at USC.

24   Q.    And is this total amount paid to them, does that include

25   payments that were made after Mr. Khosroshahin and Miss Janke

1    were no longer at USC?

2    A.    Yes.   That's correct.

3    Q.    Can you tell us what the total amount paid from either KWF

4    or The Key to individuals and/or these funds associated with

5    USC was?

6    A.    Approximately 1.2 million.

7    Q.    Okay.   Moving onto Yale, what does this section show?

8    A.    There was a number of payments made payable to "Summertime

9    Sports".

10:00 10    Q.    What is Summertime Sports?

11    A.    It's a separate entity that's controlled by Rudy Meredith.

12    Q.    Who was Rudy Meredith?

13    A.    He was the former soccer coach at Yale.

14    Q.    And what was the total amount paid to Summertime Sports?

15    A.    $860,000.

16    Q.    Okay.   Next, under Stanford, what does this section show?

17    A.    There were three separate payments made payable to

18    Stanford Athletics, Stanford University, Stanford Sailing John

19    Vandemoer, and all three of those were deposited into Stanford

10:01 20    University bank accounts.

21    Q.    Okay.   So although John Vandemoer's name is on the payee

22    line of this one check, the recipient of the actual funds was

23    Stanford University?

24    A.    That's correct, yes.

25    Q.    All right.   What does the section "UCLA" show?

         1    A.   There was two payments.  One was a wire transfer directed

         2    to an account, Princeville Enterprises, Jorge Salcedo, and the

         3    second one is a check payment directly to Jorge Salcedo.

         4    Q.   And who is Jorge Salcedo?

         5    A.   The former soccer coach at UCLA.

         6    Q.   And then just again looking at the total in this box in

         7    the bottom, what does this show?

         8    A.   In total, there's all the amounts reflected above, the

         9    total of approximately $5.7 million.

10:02   10         MS. WRIGHT:  For the witness only, please, Miss Lewis,

        11    can you pull up Exhibit 719.

        12    Q.   Miss George, showing you what has been marked as

        13    Exhibit 718.  Can you describe generally what this is?

        14    A.   It's a summary chart depicting the payments that went from

        15    John B. Wilson to --

        16         MR. KENDALL:  Objection, your Honor, again for the

        17    same prior reasons.

        18         THE COURT:  Overruled.

        19    A.   They're a chart depicting payments made from John B.

10:03   20    Wilson or his associated business to The Key, KWF, or to Singer

        21    individually.

        22    Q.   And again, what records did you review in preparing this

        23    chart?

        24    A.   My primary source was the underlying bank account records

        25    of the businesses, and then I also reviewed the Quickbooks

1   business records from The Key.

2   Q.   And does the chart accurately reflect your review of those

3   records?

4   A.   It does.

5        MS. WRIGHT:   The government offers Exhibit 719 as a

6   summary chart.

7        MR. KENDALL:   Objection.

8        THE COURT:   It will be admitted over the objection of

9   the defendant Wilson.

10:03 10        (Exhibit 719 admitted into evidence.)

11  Q.   Okay.   Now that we have this up in front of the jury,

12  let's walk through the summary chart.   It's divided up into

13  three sections, right?

14  A.   Yes, it is.

15  Q.   And what do those three different sections show?

16  A.   Their payment activity during three separate time periods.

17  So if we start with the one on the left during that time period

18  of 2012 and 2013, there are payments totalling $10,835 that

19  went directly into The Key bank account, and it was via 11

10:04 20  separate check payments.   And I reflect the date ranges of

21  those check payments between October of 2012 and November of

22  2013.

23  Q.   Okay.   And then if we can go down to the box in the

24  bottom, what does that reflect?

25  A.   So there were additional payments referenced in the

Quickbooks of The Key that indicated that there were additional

payments made from Mr. Wilson.  And they indicated that they

were credit card records for these 2012, 2013 and 2014.  And so

those additional funds are approximately $22,000 worth are

believed to have gone into The Key, but I did not have the

detail from the credit card records themselves to be able to

substantiate that.

Q.   Okay.  So for those of us who don't have the experience

that you do, what is Quickbooks?

A.   Quickbooks is a processing -- an accounting software

processing system.

Q.   So the top payments are based on bank records, whereas

this reflects what you saw in The Key's Quickbooks files?

A.   That's correct.

     MS. WRIGHT:  Okay.  You can zoom out of that,

Miss Lewis.

Q.   And then moving on to the 2014 section, what does this

show?

A.   On April 7, 2014, there was three separate wire transfers

that were made from the Hyannis Port Capital bank account.  In

total, they equal $220,000, but they were to three separate

entities.  So the first one on the left, The Key, there was a

transfer of $100,000.  And then in the middle I'm showing

another $100,000 that went to KWF.  And on the right, I'm

showing there was a wire of $20,000 to Mr. Singer's personal

 1   account.

 2          MS. WRIGHT:  Miss Lewis, if we could please pull up,

 3   for the witness only, Exhibit 117.

 4   Q.   Miss George, do you recognize this?

 5   A.   Yes, I do.

 6   Q.   What is it?

 7   A.   It's a wire advice.

 8   Q.   For those three wires that are depicted in the chart we

 9   just looked at?

10:06 10   A.   Yes.  That's correct.

11          MS. WRIGHT:  The government offers Exhibit 117.

12          THE COURT:  It will be admitted.

13          (Exhibit 117 admitted into evidence.)

14          MS. WRIGHT:  Okay.  Miss Lewis, if you can please go

15   back to the chart which is 719.

16   Q.   Okay.  Down below still in 2014 under The Key payment,

17   there's two other boxes under there.  Can you tell the jury

18   what those reflect?

19   A.   Yes.  From that Key bank account, which I've noted as US

10:06 20   Bank ending in 6275, there was a $100,000 cashier's check that

21   flowed out of that account, and it was made payable to "USC

22   Men's Water Polo", and in the remitter section of the cashier's

23   check it referenced "Wilson family".

24          MS. WRIGHT:  Miss Lewis, if we could please pull up,

25   for the witness only, Exhibit 121.

```
 1    Q.   Miss George, do you recognize this?

 2    A.   Yes, I do.

 3    Q.   What is it?

 4    A.   It's a withdrawal slip from the US Bank account ending in

 5    6275.

 6              MS. WRIGHT:  And if you could just flip through the

 7    next few pages, please, Miss Lewis.

 8    Q.   Do you recognize these two pages?

 9    A.   Yes.

10    Q.   What are those?

11    A.   Those were the cashier's checks that were processed via

12    that -- through the withdrawal transaction.

13              MS. WRIGHT:  The government offers Exhibit 121.

14              THE COURT:  It will be admitted.

15              (Exhibit 121 admitted into evidence.)

16    Q.   If we can go back to the first page, please, Miss Lewis.

17    You said this is the withdrawal used to purchase those two

18    cashier's checks?

19    A.   That's correct.

20              MS. WRIGHT:  Okay.  If we can go to the next page,

21    please, and blow that up a bit.  Thank you.

22    Q.   What is this?

23    A.   That's a $100,000 cashier's check made payable to "USC

24    Baseball".

25    Q.   And what's the purpose or remitter?
```

1    A.    It says "Driscoll family".

2    Q.    If we can go to the next page, please.  What is this?

3    A.    A $100,000 cashier's check made payable to "USC Men's

4    Water Polo".

5    Q.    And what's listed under "purpose/remitter"?

6    A.    "Wilson Family".

7    Q.    So this was that check that was reflected in your chart?

8    A.    That's correct.

9          MS. WRIGHT:  Sorry to keep switching things up on you,

10:08 10   Miss Lewis.  If we can go back to the chart, that's 719.

11   Q.    So that cashier's check we just looked at made payable to

12   "USC Men's Water Polo", when was that issued in relation to

13   Mr. Wilson's $100,000 wire transfer to The Key?

14   A.    Just over a week after that.

15   Q.    Okay.  Finally, we can move on to the last section of the

16   chart, the 2018 section.  What does this show?

17   A.    On the left, we -- it depicts that there was a check

18   written from John B. Wilson for $16,000.  The check was dated

19   10/16/18 and it was deposited into The Key bank account at

10:09 20   Wells Fargo, 7833.

21   Q.    Do you happen to recall the memo line of that check?

22   A.    Yes.  I believe I do.  It referenced "college prep

23   session, or services for C and M".

24   Q.    And then on the right-hand side, what does that reflect?

25   A.    That there were two wire transfers totalling $1 million

1  that occurred in 2018 from Hyannis Port Capital to the KWF

2  account Bank of America ending in 0486.  One occurred on

3  10/17/18 and another occurred on 12/11/18.

4          MS. WRIGHT:  Okay.  Miss Lewis, if we can pull up,

5  please, side by side, Exhibits 707 and 708, which are already

6  in evidence.

7  Q.   And Miss George, do you recognize Exhibit 707 and 708?

8  A.   Yes, I do.

9  Q.   And what are those?

10:10 10  A.   Those are the wire transmittals that reflect those two

11  $500,000 wire transfers.

12          MS. WRIGHT:  Miss Lewis, for one final time, can we go

13  back to Exhibit 719, please.

14  Q.   Miss George, if you look at these two different boxes

15  reflecting payments to The Key Worldwide Foundation or KWF,

16  there are different bank accounts listed there, is that right?

17  A.   That is correct.

18  Q.   What can you tell us about the Bank of America account

19  listed here?

10:11 20  A.   That account was opened in September 2018 at a branch

21  located in Massachusetts.

22          MS. WRIGHT:  For the witness only, Miss Lewis, can you

23  please pull up Exhibit 720.

24  Q.   Miss George, can you briefly describe what this exhibit

25  is?

A.   It's a summary chart that I prepared reflecting payments

from Gamal Abdelaziz to The Key and KWF.

Q.   What records did you review in preparing this chart?

A.   Again, the underlying bank records of The Key and KWF and

the Quickbooks of The Key.

Q.   Does the chart accurately reflect your review of those

records?

A.   It does.

         MS. WRIGHT:  The government would offer Exhibit 720,

the summary chart.

         MR. KENDALL:  Objection.

         MR. KELLY:  Same 403 objection, your Honor.

         THE COURT:  It will be admitted over the objections of

the defendants.

         (Exhibit 720 admitted into evidence.)

Q.   Miss George, can you please just walk the jury through

this chart.

A.   So the information above reflects the payments that came

from the bank accounts that went into the bank accounts of The

Key and the KWF.  On the left, we see there was a $5,000

payment dated July 25, 2012.  It was a check.  And on the memo

line, it referenced "Adam college counseling".  That was

deposited into The Key account.

         And then subsequently, on March 26, 2018, on the

right, we see a wire transfer for $300,000 that went into the

1    KWF account.

2    Q.    And that references an invoice?

3    A.    It does.  Invoice 1174 "Gamal Abdelaziz" was written on

4    the wire.

5    Q.    Okay.  And we'll get to that box in a minute.

6    A.    Okay.

7          MS. WRIGHT:  But first, Miss Lewis, can we please pull

8    up Exhibit 500 just for the witness.

9    Q.    Miss George, do you recognize this, the bottom section

10:13 10    specifically?

11   A.    Yes, I do.

12   Q.    What is it?

13   A.    It's the wire transmittal.

14   Q.    For that $300,000?

15   A.    For the $300,000 transfer.

16         MS. WRIGHT:  The government offers Exhibit 500.

17         MR. KELLY:  No objection.

18         THE COURT:  It will be admitted.

19         (Exhibit 500 admitted into evidence.)

10:13 20         MS. WRIGHT:  And then if we can just go back to the

21   chart, please, Miss Lewis, which is 720.

22   Q.    Okay.  So let's now talk a little bit about this box.

23   What did the Quickbooks show?

24   A.    That there were additional credit card payments made from

25   Mr. Abdelaziz that went into The Key's bank accounts in the

1    years of 2012, 2013 and 2018.

2    Q.    And did the Quickbooks have any references for what those

3    payments may have been for?

4    A.    They were categorized under the various names of Adam and

5    Sarah and Sabrina.

6    Q.    And 2012 and 2013, that was for Adam and Sarah?

7    A.    That's correct.

8    Q.    And 2018 was for Sabrina Abdelaziz?

9    A.    That's correct.

10:14 10            MS. WRIGHT:  Miss Lewis, if we can please pull up

11   Exhibit 721 for the witness only.

12   Q.    Miss George, if you can just describe what Exhibit 721 is

13   briefly.

14   A.    It's a summary chart that I prepared depicting payments

15   that went from KWF to Donna Heinel via Clear the Clearinghouse.

16   Q.    What records did you review to put together this chart?

17   A.    The underlying bank records of KWF.

18   Q.    And does the chart accurately reflect that review?

19   A.    Yes.

10:14 20            MS. WRIGHT:  The government offers Exhibit 721 as a

21   summary chart.

22            THE COURT: It will be admitted.

23            (Exhibit 721 admitted into evidence.)

24   Q.    Okay.  We have it up for the jury.  Can you tell the jury

25   what this is in a bit more detail?

1    A.    Sure.  There was a series of payments that were made from

2    the KWF bank accounts and the box in the gray on the right

3    shows those listing of the check payments, and each of the

4    eight payments were for $20,000 and they were deposited into a

5    bank account held by Donna Heinel at Bank of America.

6          And I failed to mention when we were entering it, I

7    did review the Donna Heinel bank accounts to see the money

8    coming in strictly for that purpose, to just see that it was

9    going into those accounts.

10:15 10   Q.    Okay.  So the arrow here, the checks were made out to

11   Clear the Clearinghouse, but the arrow indicates that the funds

12   actually wound up in Donna Heinel's personal accounts?

13   A.    That's correct, yes.

14          MS. WRIGHT:  Okay.  And Miss Lewis, I'd now like to

15   show the witness only just a series of exhibits beginning with

16   533 and 548, 564, 573, 600, 611, 624.  And if you could go to

17   the next page of that one, please.  And then 628, please.

18   Q.    Miss George, do you recognize those documents?

19   A.    Yes, I do.

10:16 20   Q.    What are they?

21   A.    Those are the copies of the actual check payments that

22   were on my summary chart.

23          MS. WRIGHT:  The government would offer 533, 548, 564,

24   573, 600, 611, 624, and 628.

25          MR. KELLY:  Object to all of those.  They're not part

1   of this.

2              MR. KENDALL:  Objection, your Honor.

3              THE COURT:  They will be admitted over the objections

4   of the defendants.

5              (Exhibit 533, 548, 564, 573, 600, 611, 724, 628

6   admitted into evidence.)

7              MS. WRIGHT:  And if we could show, Miss Lewis, the

8   jury just the first one, 533.

9   Q.   So Miss George, this is that first check that was

10  referenced in your chart, the first $20,000 payment on July 3,

11  2018, from The Key Worldwide Foundation to Clear the

12  Clearinghouse?

13  A.   That's correct.

14  Q.   And then the rest of those exhibits are also the $20,000

15  check payments?

16  A.   Yes.  That's correct.

17             MS. WRIGHT:  If we can show the jury 628, please,

18  Miss Lewis, and blow up kind of the middle.  No.  Sorry.  Right

19  above that.

20  Q.   This is also a $20,000 check payable to Clear the

21  Clearinghouse?

22  A.   Yes, it is.

23  Q.   This one looks a bit different, though, than that first

24  one we looked at?

25  A.   Yes.

```
 1   Q.   Why is that?

 2   A.   This one came -- is a cashier's check and it came from

 3   Bank of America.

 4        MS. WRIGHT:  Okay.  Miss Lewis, if we can please go

 5   back to the summary chart, which is Exhibit 721.

 6   Q.   So under the "KWF" box, do you see how there are two

 7   different accounts listed there?

 8   A.   That is correct.

 9   Q.   Why is that?

10   A.   Because part of the payments came from the Wells Fargo

11   account ending in 2391, and the last three payments came from

12   the bank of America account ending in 0486.

13   Q.   Okay.  And can you tell the jury when this first payment

14   from KWF to Clear the Clearinghouse was in relation to

15   Mr. Aziz's $300,000 payment that we looked at in the prior

16   chart?

17   A.   It was approximately three months after.

18        MS. WRIGHT:  Okay.  For the witness only, please,

19   Miss Lewis, can you pull up Exhibit 722.

20   Q.   Miss George, can you briefly describe this.

21   A.   It's a summary chart that I prepared based on a -- records

22   produced by USC regarding the Women's Athletic Board Fund gift

23   account.

24        MR. KELLY:  Sorry.  Which exhibit number is this?

25        THE COURT:  722.
```

 1   Q.   And does this chart accurately reflect your review of

 2   those records?

 3   A.   It does.

 4        MS. WRIGHT:   The government offers Exhibit 722 as a

 5   summary chart.

 6        THE COURT:   It will be admitted.

 7        (Exhibit 722 admitted into evidence.)

 8   Q.   Okay.   We have it up for the jury.   So Miss George, can

 9   you explain what it is we're looking at?

10:19 10   A.   This is a bar chart that I recreated to reflect the

11   donations -- excuse me -- the total dollar amounts of money

12   that went into the USC Women's Athletic Board Fund during those

13   fiscal years.

14   Q.   You see the orange and the blue?

15   A.   Yes.

16   Q.   What does that signify?

17   A.   So, collectively, the orange and the blue total, the

18   amount of money that was deposited into the gift account per

19   fiscal year, but the blue is representative of the portion of

10:20 20   which -- the portion of the total that represents money that

21   came from Singer related individuals, or from The Key, or KWF

22   directly.

23   Q.   And how did you determine which payments were Singer

24   related?

25   A.   Well, in the case where it was drawn directly from The Key

1  or KWF accounts, I included those.  And then there were other

2  payments from parents that I was able to associate with Singer

3  because they had made payments or had correspondence with

4  Singer to indicate that they were clients of The Key or other

5  business relationships with Mr. Singer.

6  Q.   Fair to say that during this time period the funds given

7  by Rick Singer's clients comprised more and more of the total

8  amount given to the USC Women's Athletic Board Fund?

9  A.   Yes.  You can see the blue portion growing over the time

10:21 10  period.

11  Q.   Okay.  And how come it drops off like this in fiscal year

12  2019?

13  A.   Because we -- I only had records from the gift account

14  through January of 2019 and the fiscal year ends June 30th, so

15  we only had a partial year.

16       MS. WRIGHT:  Miss Lewis, if you can pull up, for the

17  witness only, Exhibit 2.

18  Q.   And there's some redactions here per agreement of the

19  parties, but if we could go -- it's a voluminous record, which

10:21 20  the jury will have.  If we can go to page 8, do you recognize

21  what this is, Miss George?

22  A.   Yes, I do.

23  Q.   What is it?

24  A.   It's the personnel file for Donna Heinel at USC.

25       MS. WRIGHT:  The government offers this exhibit

1    pursuant to the parties' business records stipulation.

2            MR. KENDALL:  Your Honor, there were some redactions

3    that needed to be done.  If they're being done, then I don't

4    think we have an issue, but reserving that right.  I object in

5    general on relevance.

6            THE COURT:  It will be admitted as redacted.

7            (Exhibit 2 admitted into evidence.)

8            MS. WRIGHT:  Okay.  If we could publish that.

9    Q.   Miss George, did you review these records in preparation

10:22 10   for your testimony here today?

11   A.   Yes, I did.

12   Q.   And was primarily to determine salary information for

13   Donna Heinel?

14   A.   Yes, it was.

15   Q.   Can you tell the jury in general terms how Miss Heinel's

16   salary changed over the time period that's depicted in that

17   summary chart?

18   A.   Yes.  It increased.  It started at approximately $150,000

19   and went just under $250,000.

10:23 20         MS. WRIGHT:  Miss Lewis, if you could please go to

21   page 27 of this exhibit.

22   Q.   I'm just going to have you read a few lines for the jury,

23   Miss George.  So the top, what does that say?

24   A.   It says "2013/2014 Year End Review for Donna Heinel".

25   Q.   Great.

1              MS. WRIGHT:  And then Miss Lewis, under "Overall", can

2    you please highlight number five.

3    Q.   What does that read?

4    A.   "Terrific job on admissions and relationship with

5    Admissions Office".

6              MS. WRIGHT:  And then under -- Miss Lewis, if you can

7    highlight number three.

8    Q.   What does that say?

9    A.   "Keep working on development".

10:23 10         MS. WRIGHT:  And then finally, Miss Lewis, if you can

11   go to page 23 of the same exhibit and highlight the top title

12   line.

13   Q.   What is this titled, Miss George?

14   A.   "2014/2015 Year-End Review for Donna Heinel".

15   Q.   So this is the following year?

16   A.   Correct.

17             MS. WRIGHT:  And then if you could highlight numbers

18   four and six under "Overall", please, Miss Lewis.

19   Q.   And Miss George, if you could just read those?

10:24 20   A.   "Strong relationship with admissions -- very important for

21   the department.

22             "Really improved her development efforts --

23   important".

24             MS. WRIGHT:  And then under "To Do", if you could

25   highlight just that first part of number one, please.

1    Q.    If you could read that, please, Miss George.

2    A.    "Continue development success".

3              MS. WRIGHT:  No further questions.

4              THE COURT:  Cross-examination, Mr. Kelly.

5              MR. KELLY:  Yes, your Honor.

6                   CROSS-EXAMINATION OF LAUREN GEORGE

7    BY MR. KELLY:

8    Q.    Good morning, Miss George.

9    A.    Good morning.

10:25 10    Q.    I represent Mr. Abdelaziz.

11             Those questions you were just asked about on those

12   charts about where Heinel's getting praised for her development

13   efforts, that means she was out raising money, correct?

14   A.    She was being acknowledged for her development efforts.

15   Q.    Right.  She was being praised for bringing in money to

16   USC, correct?

17   A.    They said it was important and they acknowledged that in

18   her yearly review that -- yes.

19   Q.    And her boss there, Pat Haden, the athletic director,

10:25 20   actually singled out her efforts in one of those, "keep working

21   on development", right?

22   A.    Right.  He's encouraging her to keep working on it, yes.

23   Q.    So she was doing what her USC superiors wanted her to do,

24   wasn't she?

25             MS. WRIGHT:  Objection.  Foundation.

1                THE COURT:  Sustained.

2    Q.   Well, this was her personnel file we just heard about,

3    right?

4    A.   It was, yes.

5    Q.   And she was getting praised by her superiors because she

6    was out raising money for USC, right?

7    A.   She appeared to be commended for her development efforts.

8    Q.   Right.  And you know that there's no suggestion at all in

9    this case that Ms. Heinel started personally pocketing money

10:26 10    until the summer of 2018, correct?

11   A.   Well, I know from reviewing the bank records that that's

12   when she started depositing funds.

13   Q.   Right.  You're not disputing that there's no evidence that

14   she started personally pocketing money before the summer of

15   2018, correct?

16   A.   I'm not aware of any evidence.

17   Q.   And before that, before the summer of 2018, the money was

18   going to USC, correct?

19   A.   It was going to athletic funds that appeared to be under

10:26 20    her direction.

21   Q.   Well, and she's being praised for bringing in money,

22   correct?

23   A.   Yes.

24   Q.   And, in fact -- let's go to a few of these charts, please.

25                MR. KELLY:  Let's go to Exhibit 718, Mr. Carter.  It

1   was LG3 before.  I believe this is in evidence.  Yes.

2   Q.   Now, you're not aware -- there's several schools here

3   listed -- you're aware that my client, Mr. Abdelaziz, has no

4   connection to Georgetown, right?

5        MS. WRIGHT:  Objection.

6   Q.   Well, you prepared this chart, right?

7   A.   I did.

8   Q.   Okay.  And in preparing this chart, you didn't see any

9   connection between my client, Mr. Abdelaziz, and Georgetown,

10:28 10  correct?

11        MS. WRIGHT:  Objection.  Foundation.

12        THE COURT:  Well, she can answer it if she understands

13   it.

14   A.   The purpose of this chart was to depict money that was

15   going from The Key or KWF to these universities.

16   Q.   Right.  And nothing of what you saw connected Abdelaziz to

17   Georgetown, right?

18        MS. WRIGHT:  Objection to the characterization of a

19   connection.

10:28 20        THE COURT:  Yeah.  Sustained.

21   Q.   You're not aware of any evidence that he has anything to

22   do with Georgetown or Gordon Ernst, are you?

23        MS. WRIGHT:  Same objection.

24        THE COURT:  Well, if she has such, she can answer that

25   question.

1    A.    I'm not aware of any connection.

2    Q.    Okay.  And you're not aware of any connection between

3    Abdelaziz and Yale and Rudy Meredith either, are you?

4    A.    No personal connection with Mr. Abdelaziz.

5    Q.    All right.  And you're not aware of any personal

6    connection between Abdelaziz and Stanford and John Vandemoer

7    either, right?

8    A.    I'm not aware of any.

9    Q.    And you're not aware of any personal connection between

10:28 10   Abdelaziz and UCLA and Jorge Salcedo, correct?

11   A.    Correct.

12   Q.    And much of your analysis that are in all these charts

13   came from bank records, right?

14   A.    That's correct.

15   Q.    And I assume you got those bank records by using a grand

16   jury subpoena for records, correct?

17   A.    That's correct.

18   Q.    Okay.  And a grand jury is a group of individuals who meet

19   in secret and analyze evidence that the government presents,

10:29 20   right?

21              MS. WRIGHT:  Objection.  Relevance.

22              THE COURT:  Sustained.

23   Q.    Well, all right.  You have access to a grand jury but a

24   private individual doesn't, right?

25              MS. WRIGHT:  Objection.

```
 1              THE COURT:  Sustained.
 2   Q.   Well, do you have any evidence that Mr. Abdelaziz saw the
 3   bank records of KWF?
 4   A.   I would have no reason to know that one way or another.
 5   Q.   All right.  But putting aside bank records, tax records
 6   are public of charities, aren't they?
 7   A.   Yes.
 8   Q.   So, for instance, if someone had bothered to look at the
 9   tax return of KWF or Key Worldwide Foundation, they would have
10   seen -- it always says "open to public inspection", right?
11              MS. WRIGHT:  Objection.  Foundation.
12   Q.   Well, let me show you Exhibit 3721.
13              MR. KELLY:  Just the witness, please.
14   Q.   I'll direct your attention to the top right corner.
15              MR. KELLY:  Then take it down, please.
16   Q.   Are you aware that tax returns of charities are open to
17   public inspection?
18   A.   Yes.
19   Q.   Okay.  So, unlike the grand jury, the public can see
20   what's happening with a charity's tax return, correct?
21              MS. WRIGHT:  Objection to the continued references to
22   the grand jury.
23              THE COURT:  Overruled.
24   A.   Could you repeat the question, please?
25   Q.   Sure.  Unlike a grand jury, which is a secret proceeding
```

1   closed to the public, the tax returns of KWF are open to the

2   public, correct?

3   A.   That's correct.

4   Q.   And if someone were to look at their KWF tax returns to

5   see if it was legit, they would see, in fact, donations to USC

6   baseball, USC water polo, USC women's soccer, NYU athletics,

7   things like that?

8   A.   I don't think they would have the ability to know by

9   reading the face of it what they were for, but they could

10  certainly see that they -- that's what they were reporting.

11  Q.   Sure.  If an outsider looking at the tax return filed by

12  the charity would see what appeared to be legitimate donations,

13  correct?

14  A.   Again, there would be no basis for knowing whether it's

15  legitimate or illegitimate.  It's -- that's the foundation

16  listing the entities that received payments.

17  Q.   Right.  And the foundation was a 501(c)(3) charity and so

18  is a university a 501(c)(3) charity, right?

19  A.   Correct.

20  Q.   And one -- one 501(c)(3) charity is entitled to and it's

21  permissible to send money to another 501(c)(3) charity, right?

22  A.   Yes.

23  Q.   And if a person gives $300,000 to one charity and then

24  that charity sends it to another charity, it's still just a

25  $300,000 donation.  It doesn't get diminished, it doesn't get

1   increased.  It's still just a $300,000 tax deduction for the

2   person who gave it, correct?

3   A.   It would only be that the first step in that scenario

4   that's relevant to that taxpayer, where they give it to.

5   Q.   Right, but it would still just be $300,000, right?

6   A.   Correct.

7   Q.   Now, let's look at -- well, let's go back to -- let's stay

8   with Exhibit 18.

9        MR. KELLY:  Mr. Carter, again, which used to be LG3.

10:33 10   Q.   And let's look at the middle there where it says "Clear

11   the Clearinghouse" "Donna Heinel".  You lumped it under USC,

12   correct?

13   A.   That's correct, yes.

14   Q.   And this, in fact, was Heinel's private business, right?

15   A.   It -- yes.  It was a business controlled by Heinel.

16   Q.   Right.  It wasn't part of USC, right?

17   A.   Well, as the title of the schedule says, it's payments to

18   individuals, entities, and funds associated with those

19   universities.

10:33 20   Q.   Okay.  So Heinel was working at USC, but this was her

21   private business, correct?

22   A.   That's correct.

23   Q.   Now, let's look at another one of these exhibits.  Let's

24   look at 721, please.  Now, here it's very clear upon your

25   review of the records, the first time Heinel's taking money in

1    her private business is on July 3, 2018?

2    A.   That's correct.  That's the first date of the deposit.

3    Q.   Right.

4    A.   Of the check.  Sorry.

5    Q.   And are you aware, in fact, that my client,

6    Mr. Abdelaziz's donation to KWF was in March, not July?  Are

7    you aware of that?

8    A.   Yes, I am.

9    Q.   And let's move to Exhibit 722, which, Mr. Carter, was LG7.

10:35 10   Here we see why Miss Heinel was being commended.  More and more

11   money was going to USC, correct?

12   A.   Yes.  This is limited to one specific fund within USC, but

13   yes, this -- USC Women's Athletic Board Fund, this one fund was

14   growing.

15   Q.   Right.  And you are aware, aren't you, that there is no

16   reason to believe that any money that went to the athletic --

17   Women's Athletic Board account was ever misappropriated or used

18   by any USC employee personally for any purpose unrelated to

19   their employment at USC?  You're aware of that, right?

10:35 20   A.   No, I'm not.

21   Q.   All right.  So if there were stipulation to that in this

22   case, you would be unaware?

23   A.   Yes.  That's correct.

24   Q.   How about in your review of the documents in this case?

25   Did you learn that of the $300,000 donated by Abdelaziz to KWF,

```
 1    $200,000 was supposed to go to USC?

 2          MS. WRIGHT:  Objection to "supposed to."

 3          THE COURT:  Sustained.

 4    Q.   Well, did you uncover any evidence that suggested $200,000

 5    to USC, the remaining to KWF?

 6    A.   I only saw the $300,000 payment that went to the bank

 7    account.

 8          MR. KELLY:  All right.  Let me show you, just the

 9    witness only, Exhibit 1564.

10    Q.   I'll direct your attention about --

11          MR. KELLY:  Keep going, please.  Highlight the Aziz

12    name, please.

13    Q.   Just read that to yourself.  Take a look.

14          MR. KELLY:  Take it down, please.

15    Q.   Having seen that document, does it refresh your

16    recollection as to whether or not you learned at any time

17    during your investigative work that $200,000 was going to USC,

18    $100,000 to KWF for Sabrina Aziz?

19    A.   No, it does not.

20    Q.   How about Exhibit 720, please?  Here these two boxes are

21    really apples and oranges, aren't they?

22          MS. WRIGHT:  Objection.

23    Q.   Apples should be the 5,000 and oranges should be the

24    300,000, right?

25          MS. WRIGHT:  Objection.
```

```
 1              THE COURT:  Overruled.
 2    A.    I don't know what you're characterizing apples and
 3    oranges.  One is a much a smaller amount and one is a much
 4    larger amount.
 5    Q.    Right.  And the suggestion is somehow this is nefarious,
 6    but, in fact, the $5,000 pertains to his son's -- Mr. Aziz's
 7    son Adam, right?
 8    A.    Yes, the middle reference "Adam College Counseling".
 9    Q.    Okay.  If you were just talking about Sabrina, that $7,000
10:38 10   at the bottom, 2018, should be in that box, not Adam.
11    Sabrina's in dispute in this case, right?
12    A.    Well, the box above just simply reflects activity that I
13    was able to observe through the bank account review.  The box
14    below is what I reviewed from the Quickbooks, so it's just a
15    matter of where I obtained the information.
16    Q.    Well, okay, and so the bottom one, $7,000, that was for
17    Sabrina's college counseling and was paid on January 5, 2018,
18    correct?
19    A.    Correct.
10:39 20   Q.    All right.  So if we were to move that up into a box,
21    whether it's cash or check or credit card, that would be next
22    to the $300,000, right, not $500,000 to Adam, $300,000 over
23    there?
24    A.    It wouldn't be next to the $300,000.  It would be on the
25    box in the left that went to The Key.
```

1    Q.   Right.  And this is -- the college counseling amount

2    changed from 5,000 in 2012 for Adam and then 7,000 for Sabrina,

3    correct?

4    A.   Correct.

5    Q.   And in fact, let me show you Exhibit 1568.

6         MR. KELLY:  Just the witness, please.  Go to the

7    second page, please.  Highlight up to where it says "Good

8    morning".

9    Q.   Okay.  And have you ever seen this document before?

10:40 10   A.   Yes, I have.

11        MR. KELLY:  Okay.  And I offer it, your Honor.

12        MS. WRIGHT:  No objection.

13        THE COURT:  It will be admitted.

14        (Exhibit 1568 admitted into evidence.)

15   Q.   All right. So there's no dispute that Mr. Abdelaziz paid

16   $7,000 for college consulting services for his daughter

17   Sabrina, right?

18   A.   No.  I reflected that on the chart.  I don't dispute.  I

19   just don't know that -- I did not have the actual credit card

10:40 20   records to be able to fully substantiate that activity.

21   Q.   Sure.  And with respect to the Galen Center at USC, are

22   you aware that there's no reason to believe there was any money

23   misappropriated from there?

24   A.   I'm not aware one way or another.  I have no knowledge of

25   that.

```
 1              MR. KELLY:  Okay.  One moment, your Honor.

 2              THE COURT:  Yes.

 3              MR. KELLY:  All set, your Honor.

 4              THE COURT:  Mr. Kendall?

 5              MR. KENDALL:  Yes.  Just a minute, your Honor.

 6              MR. KELLLY:  Actually, sorry.  Quick question.

 7              THE COURT:  All right.  One more question by

 8     Mr. Kelly.

 9     Q.   You testified regarding Miss Heinel's salary.  Do you

10     recall that question?

11     A.   Yes, I do.

12     Q.   Isn't it, in fact, the rate of increase of her salary

13     actually decreased over time?  That is, didn't she get an

14     8 percent raise in fiscal year '14, 5 percent in fiscal year

15     '15 and '16, and then 4 percent in fiscal year '17, and then

16     3 percent in fiscal year '18?  The big bump was not part of her

17     salary, but her salary increases were 8 percent, 5 percent,

18     5 percent, 4 percent, 3 percent.  That's decreasing, correct?

19     A.   And then I'd have to look at the math again, but I think

20     in the very last year for fiscal '19 it may have gone up again.

21     Q.   You're correct.  It went up to 5.5 percent, right?

22     A.   Yes.

23     Q.   So -- but over time, the fiscal year '14 was an 8 percent

24     bump.  Then it went down to 5 percent in fiscal year '15 and

25     '16, and then 4 percent in fiscal year '17, 3 percent in '18,
```

```
 1   and then back up to 5.5 in '19, right?
 2   A.   Yes.  That's my recollection.  Yes.
 3            MR. KELLY:  Thank you.  That's it.  That really is it.
 4            THE COURT:  Cross, Mr. Kendall.
 5            MR. KENDALL:  Yes, your Honor.  Thank you.
 6                 CROSS-EXAMINATION OF LAUREN GEORGE
 7   BY MR. KENDALL:
 8   Q.   Good morning, Miss George.
 9   A.   Good morning.
10   Q.   My name's Mike Kendall.  I represent John Wilson.  Thank
11   you for joining us this morning.  I have a few questions I'd
12   like to start with.
13            To do your work in this case on these summary charts,
14   did you listen to any of the evidence at trial?
15   A.   Yes, I did.
16   Q.   Okay.  Which witnesses did you listen to?
17   A.   Well, I listened to the trial.  I prepared these summary
18   charts prior to the start of trial and had -- obviously
19   produced them now, I mean, produced them prior to my testimony
20   here today, but I listened to the trial, yes.
21   Q.   Okay.  So for example, did you listen to the testimony of
22   Special Agent Keating?
23   A.   Yes.
24   Q.   Okay.  And So you're familiar with her testimony that
25   Mr. Singer told the agents that John Wilson always thought
```

```
 1    everything was a donation.
 2              MS. WRIGHT:  Objection.  This is beyond the scope.
 3              THE COURT:  Sustained.
 4    Q.   Are you familiar with the testimony that Agent Keating
 5    gave?
 6    A.   I mean, I listened to the trial over the course of the
 7    trial.  I obviously -- as much as I can remember what was going
 8    on.
 9    Q.   Okay.  Do you remember that Agent Keating testified that
10:44 10   prior to her work with the government she told John Wilson and
11    others -- he told John Wilson and others that these were
12    donations to the school and not bribes?
13              MS. WRIGHT:  Objection.
14              THE COURT:  Sustained.
15    Q.   Do you recall anything about Agent Keating's testimony of
16    what Singer told the agents he had told Wilson and the parents
17    prior to his cooperation?
18    A.   No.  I don't specifically recall specific testimony.
19    Q.   Okay.  You're not -- do you remember anything of her
10:45 20   testifying along the line that certain parents were told by
21    Mr. Singer prior to his becoming an informant that the money
22    was a donation to the program?
23              MS. WRIGHT:  Objection.
24              THE COURT:  Sustained.
25    Q.   Fair to say -- did you hear Miss Keating's testimony that
```

1    the agents didn't write any such comments down in their report?

2            MS. WRIGHT:  Objection.

3            THE COURT:  Sustained.

4    Q.   Okay.  Do you have any memory of what Miss Keating said

5    about what Mr. Wilson and other parents were told about the

6    monies prior to September 18th?

7    A.   No, I do not.

8    Q.   Okay.  And in order to organize these charts, did the

9    prosecutors tell you how they wanted the groupings done and

10:46 10   what they wanted to emphasize?

11   A.   Not necessarily the groupings.  And you know, for example,

12   for the specific schools, I was advised which schools to

13   reflect.

14   Q.   Okay.  And the decision that payments to individuals

15   personally and payments to schools would be grouped together,

16   was that your decision or the prosecutor's decision?

17   A.   That's how I prepared the chart and showed it to them.

18   That was my decision, I guess.

19   Q.   So you decided that without any direction or conversation

10:46 20   by them?

21           MS. WRIGHT:  Objection to our conversations.

22           THE COURT:  Yeah.  Sustained.

23   Q.   Did you decide that without any direction from the

24   prosecutors?

25   A.   Yes, I did.

Q.   And you understood how to group each individual with each
school based upon your own information and not any discussion
with the prosecutors?

A.   That's correct.

Q.   And how did you get that?

A.   As part of my review of the financial records, I was
trying to understand payment categories, whether it came from a
parent or a business venture or whatever.  So to the extent
that I was unclear as to who was -- belonged to what or their
affiliation, I would move through the discovery records and
look for -- in some cases, we had the underlying bank records
for some of these parties.  And then in other cases, it would
be e-mail communication between Mr. Singer where I would gain
an understanding of what this third party business was, or
entity.

Q.   So you've reviewed a lot of records that are not in
evidence at trial to put together your charts, correct?

A.   No.  I would wouldn't say a lot of evidence.  I would have
very directed searches where, if I came across a payment in a
particular name that I -- if it wasn't obvious on the face of
the payment as to what that was, then I would do a directed
search within the discovery to try to see if I could gain any
clarification.

Q.   But you don't know if that directed search was looking at
stuff that's been admitted to evidence or not admitted to

1    evidence, correct?

2    A.    I do not know that.

3    Q.    Okay.  And you prepared these charts before the trial was

4    even started, correct?

5    A.    Correct.

6    Q.    Okay.  So, as far as you know, a lot of these charts are

7    based upon things that are not in the evidentiary record,

8    correct?

9    A.    No.  That's not correct.

10:48  10    Q.    Well, you just said you were going through all sorts of

11    documents that you don't know if they were --

12    A.    You asked me if I knew if they were based on stuff not in

13    evidence.  When I -- at the time that I prepared this, I had no

14    idea what was going to be in evidence at the time that I was

15    asked to testify.

16    Q.    Right.  And you don't know if all of that material ever

17    got into evidence, correct?

18    A.    I don't know.

19    Q.    Okay.  I'd like to take a look at -- if we can have

10:48  20    Exhibit 716 up on the chart.  Okay.  Now, I believe when you

21    were testifying with the government, if we go to that

22    $27 million, 27.6 million in the middle, you said that was

23    about 26 million from parents, correct?

24    A.    Correct.

25    Q.    Okay.  And they had 20.6 million in the red.  That's money

```
 1    that's withdrawn and came out of the account, right?
 2    A.    That's correct, yes.
 3    Q.    And you told us there was about six and a half million
 4    that went to colleges or associated individuals?
 5    A.    That's correct.
 6    Q.    And about six and a half million that went to business
 7    investments?
 8    A.    Yes.  I think I referenced 6.4, but yes.
 9    Q.    Okay.  And was that like the soccer club that Mr. Singer
10    invested in?
11    A.    Correct.
12    Q.    And the food business?
13    A.    Yes.
14    Q.    Monies all going overseas for his investments?
15    A.    I don't know about that.  There was a basketball venture,
16    a basketball gym.
17    Q.    The gym was in California --
18    A.    Correct.
19    Q.    -- but wasn't the soccer team in Europe?
20    A.    Oh, yes.  Specific to the soccer team, yes.
21    Q.    Yeah.  And some of the money went up to Canada?
22    A.    I don't recall which entity he was at.
23    Q.    Was it Sharkeys or one of the food investments was up in
24    Canada?
25    A.    That wasn't reflected on the payment.  I saw a payment.  I
```

1    don't know --

2    Q.   So you saw from this about six and a half million went to

3    what you called colleges and associated individuals, but a

4    roughly equal amount of money went apparently to Mr. Singer's

5    own personal benefit and investments, correct?

6              MS. WRIGHT:  Objection.

7              THE COURT:  Sustained.

8    Q.   Well, the 6.4 million that you saw went to investments

9    that you connected to Mr. Singer, correct?

10:50 10   A.   They were investments that were engaged with The Key

11   Worldwide Foundation.

12   Q.   And did it appear to be that Mr. Singer was directing

13   them?

14   A.   In terms of like the term agreements, they were in the

15   foundation's name.

16   Q.   Correct, but from -- seeing who was directing it and

17   getting the benefit of it, it was Mr. Singer, correct?

18             MS. WRIGHT:  Objection.

19             THE COURT:  Sustained.

10:50 20   Q.   To the extent you know, who was the beneficiary of the

21   6.4 million in business investments?

22   A.   I -- I don't know.  I mean, I know -- I would say The Key

23   Worldwide Foundation is their investment, so I would have to

24   say that the foundation.

25   Q.   And so 6.5 and 6.4 gets us 12.9.  Where'd the other

1   7.7 million go?  I think you said other business investments?

2   A.   Yes.  There were several other business ventures.

3   Q.   What were the other business ventures?

4   A.   There were payments to individuals that appeared to be

5   doing -- there was one that was an outreach for an addiction

6   program.  There were other outreach programs that The Key

7   Worldwide Foundation appeared to be joining efforts with.

8   Q.   Well, would you give us some of the other things that were

9   joining efforts with something, for addiction issues and what

10:52 10   else?

11   A.   Right.  There was a -- I'm trying to recall -- I forget

12   the name of the entity, but there was a game on or -- I can't

13   recall the specific entity name, but there was --

14   Q.   Wasn't there over a million dollars going to China?

15   A.   I don't recall specifically.  Do you know what entity

16   you're referring to?

17   Q.   I did at one point and, I apologize, I forget the name.

18   But you're not aware of him financing some sort of business

19   school venture in China to bring Chinese students over?

10:52 20   A.   If you knew the name, I would be better to answer that.  I

21   can't recall at this moment.

22   Q.   All right.  Okay.  And then if we go down to the deposits,

23   it's 14.6 million in deposits.  And you said about five million

24   of that was credit card payments?

25   A.   Are we going to The Key now?

1    Q.   No.  We're still in 716.  Excuse me.  Yes.  Under The Key,

2    College and Career Network, deposits 14.6 million.

3    A.   Oh, that's only one single account, so really we're

4    talking --

5    Q.   The five million in credit card payments, what did that

6    refer to?

7    A.   In total, all of the -- I don't know how much the credit

8    cards went to which one of these accounts.  In total, there

9    were credit card deposits that were processed through Global

10:53 10   Payments and American Express that totaled approximately 5

11   million that went into the collection of these accounts held by

12   The Key.

13   Q.   And that -- those credit card payments, were they mostly

14   in smaller amounts in the hundreds or few thousands of dollars,

15   not in the hundreds of thousands of dollars?

16   A.   Correct.  I -- based on the -- my review of the Global

17   payments, there was one single credit card transaction for

18   $40,000, but otherwise there were generally in the few thousand

19   dollar range or lower.

10:54 20   Q.   And based upon your financial review, you know that

21   Mr. Singer charged people getting legitimate college counseling

22   work in that range of four, five, $6,000?

23            MS. WRIGHT:  Objection to legitimate and what he

24   charged.

25            THE COURT:  Sustained.

1    Q.    You know that Mr. Singer charged people who were getting

2    college counseling services an annual fee in the five to $7,000

3    range, correct?

4    A.    I am aware of that.

5    Q.    Or smaller amounts for tutoring and other special services

6    that might be charged as a few hundred or a couple thousand

7    dollars as well?

8    A.    I don't exactly know his model, his billing model, but

9    I -- in reviewing the payments, I would often see references to

10:54 10   tutoring or college prep, or testing.  That sort of thing, yes.

11   Q.    And that -- and there were five million credit card

12   payments in these smaller amounts, correct?

13   A.    Of deposits into The Key, correct.  Yes.

14   Q.    Now, if we could go to Exhibit 718, please.  You have

15   Gordon Ernst to Georgetown Tennis.  What did you rely on to do

16   that?

17   A.    Primarily references within e-mails that I looked at and

18   reviewed in trying to make that association.

19   Q.    Do you know if those e-mails are in evidence or not?

10:55 20   A.    I do not.

21   Q.    Okay.  Next -- and you see you attribute $2.7 million to

22   Mr. Ernst?  That went into his pocket, correct?

23   A.    They're made payable directly to him, yes.

24   Q.    No university or no school name on that.  2.7 million

25   payable to Mr. Ernst to enjoy as he likes, correct?

```
 1              MS. WRIGHT:  Objection to enjoy as he likes.
 2              THE COURT:  Sustained.
 3    Q.    2.7 million paid personally to Mr. Ernst?
 4    A.    That is correct, yes.
 5    Q.    And you see no connection of any funds from John Wilson
 6    going to Gordon Ernwst, correct?
 7    A.    I didn't review the bank account of Gordon Ernst or the
 8    bank account of Mr. Wilson.
 9    Q.    Okay.  And then -- and so that would be fair to say you
10:56 10   did not observe any connection between the two, correct?
11              MS. WRIGHT:  Objection to repeated references to
12    connection.
13              THE COURT:  I'm sorry.  I didn't hear you.
14              MS. WRIGHT:  Objection to the repeated references to
15    "connection".
16              MR. KENDALL:  I think that was the language Mr. Kelly
17    was allowed to use, your Honor.
18              THE COURT:  Go ahead.
19    Q.    Okay.  You didn't find any financial connection between
10:56 20   Mr. Ernst and Mr. Wilson, correct?
21    A.    I -- I would have no basis of saying one way or another.
22    I did not review financial records for either.
23    Q.    Okay.  We then go down to USC.  We see that there's four
24    entities that are listed with USC:  USC Women's Athletic Board,
25    USC Water Polo, USC Baseball, and USC Women's Volleyball.  I
```

1   total that up to about 525,000.  My math is not good, as people

2   found out yesterday, or the day before.

3   A.   Yes.

4   Q.   Is that right, 5.25?

5   A.   525,000.  Yes.

6   Q.   And the total down there you have is about 1.25 million

7   for all USC related entities, correct?

8   A.   Correct.

9   Q.   So there's 525 that goes to the school's bank accounts and

10:57 10  about 725,000 that goes somewhere else, correct?

11  A.   Correct.

12  Q.   Okay.  Now, for USC water polo you have $150,000, correct?

13  A.   Yes.

14  Q.   $100,000 of that is from John Wilson; am I correct?

15  A.   Yes.  That is correct.  Yes.

16  Q.   And that was for a bank check that said payable to USC

17  water polo -- or USC Men's Water Polo and had the Wilson's

18  family name on it, correct?

19  A.   That's correct.

10:57 20  Q.   Okay.  And it was just, from all appearances, a

21  conventional bank check that identified who was paying it and

22  who was receiving it, correct?

23  A.   Yes.  It was a traditional cashier's check.

24       MR. KENDALL:  Okay.  I'd like to show the witness

25  Exhibit 125.  Is 125 in evidence?  I'm not sure.  If not, I

1   only want to show the witness page 9 of Exhibit 125.  If we

2   could just turn that around.

3   Q.   Is that the bank check, a copy of the bank check that

4   you're referring to for the USC number you have there of

5   $150,000?

6   A.   Yes.

7       MR. KENDALL:  I'd like to offer this copy of the check

8   into evidence, your Honor.

9       MS. WRIGHT:  No objection.

10:58 10       THE COURT:  It will be admitted, 125.

11       (Exhibit 125 admitted into evidence.)

12       MR. KENDALL:  Thank you, your Honor.

13       If we could show the jury, please.

14       MS. WRIGHT:  Just this check, though, correct?

15       MR. KENDALL:  Just this check.

16   Q.   You see it says US Bank cashier's check pay $100,000 and

17   it's payable to the order of Usc Men's Water Polo, correct?

18   A.   Correct.

19   Q.   No individual's name there associated with USC, correct?

10:59 20   Not Donna Heinel, not a coach?

21   A.   Correct.

22   Q.   Just to the water polo team.  And then it says

23   "purpose/remitter".  That means -- the remitter is the person

24   who bought the check, or is supplying the funds?

25   A.   It doesn't always mean who bought it.  I mean --

 1    Q.    The purpose who was giving it?

 2    A.    It's the -- you can advise the bank to put a particular

 3    thing.

 4    Q.    Okay.  It says "Wilson Family", correct?

 5    A.    Yes, it does.

 6    Q.    Okay.  If you look and see those handwritten numbers at

 7    the top, 93-9101-6984, you know that to be the men's USC water

 8    polo gift account bank account number?

 9    A.    It's not the bank account number.

10:59  10    Q.    Is it the account number?

11    A.    It's -- my understanding is that is the general ledger

12    account number of the internal USC.

13    Q.    Thank you.  So it's how USC tracks the money that goes

14    into its gift account?

15    A.    That's right.

16    Q.    It may not actually be the bank's account number?

17    A.    Correct.

18    Q.    But it's the USC accounting entry to show it went into the

19    USC gift fund account, correct?

11:00  20    A.    That's correct.

21    Q.    Now, if we go back to 718, please.  We see the water polo,

22    which the 100,000 is connected to John Wilson.  Then you see

23    Clear the Clearinghouse with Donna Heinel of $160,000.  Do you

24    know those payments occur 4 years after Johnny Wilson is

25    admitted to USC, correct?

1  A.   Yes, I am aware.

2  Q.   You did not see any connection between the Clear the

3  Clearinghouse money and the admittance of John Wilson, correct?

4  A.   I only saw the payments from The Key or KWF to Clear the

5  Clearinghouse.

6  Q.   So the answer is yes, you did not see anything that would

7  connect funds from John Wilson to Clear the Clearinghouse?

8  A.   I guess it depends on how you want to answer that.  I saw

9  Wilson funds go into The Key or KWF and I saw funds from The

11:01 10  Key or KWF going out to Donna Heinel and Clear the

11  Clearinghouse, not close in time.  I'm saying in general.

12  Q.   4 years apart, correct?

13  A.   Yes, correct.

14  Q.   So you saw nothing that connected money from John Wilson

15  traceable to Clear the Clearinghouse, correct?

16  A.   There was -- there was no indication of Mr. Wilson on any

17  payments that went from The Key or KWF to Clear the

18  Clearinghouse.  There's no specific reference.

19  Q.   And what's the total amount you had in The Key Worldwide

11:01 20  Foundation for deposits?  $36 million?  Is that correct?

21  Excuse me.  After you netted out, it was $27 million, correct?

22  A.   Yes.  I believe that's correct.

23  Q.   So his 100,000 is part of $27 million?

24  A.   It is.

25  Q.   But you don't trace any money going directly from him to

1    Clear the Clearinghouse, correct?

2    A.    It came from the same accounts from which his money was

3    placed in.   That's the only connection.

4    Q.    Right.   Separated by 4 years and multimillions of dollars

5    of deposits?

6    A.    Absolutely, yes.

7    Q.    And then you see an entry for Loyola High School Jovan

8    Vavic, correct?

9    A.    Yes.

11:02 10   Q.    Based upon listening to the testimony at trial, you know

11   there's nothing about the Loyola High School payments that was

12   associated as funds coming from John Wilson, correct?

13          MS. WRIGHT:   Objection to associated with.

14          THE COURT:   Sustained.

15   Q.    Traced as funds coming from John Wilson.

16   A.    It would be the same answer with Clear the Clearinghouse.

17   Money goes into The Key or KWF accounts and at one time it goes

18   out and the Loyola High School payments are one of the payees,

19   the money coming out.

11:03 20   Q.    The money coming in from Mr. Wilson to that bank account

21   was about -- strike that.

22          The acceptance of Mr. Wilson's son was about 18 months

23   prior to the first check going out for a tuition payment,

24   correct?   His son's accepted around March 1st of '14.   The

25   first check is cut in August of '15.

1   A.   That's -- yes.  That's my.  -- yes.

2   Q.   16, 17 months separation?

3   A.   Yes.

4   Q.   And you see no document in your accounting work and your

5   thorough review of all of the records, you see no document that

6   attributed any Wilson funs as going for the Vavic tuition

7   payments, correct?

8   A.   There was no -- there was no direct reference on any of

9   the Vavic payments.  It would be on behalf of Mr. Wilson.

11:04 10   Q.   And you saw no reference where Mr. Wilson was ever

11   informed about the Vavic payments, correct?

12   A.   I would have no idea one way or another if he was

13   informed.

14   Q.   You've seen no evidence of it?

15   A.   In my review of the bank accounts, there was nothing to

16   indicate that.

17   Q.   But you watched the whole trial?

18   A.   I did.

19   Q.   You saw the government play the tape of Mr. Singer and

11:04 20   Jovan Vavic being recorded when Mr. Singer was an informant,

21   correct?

22   A.   Yes.

23   Q.   And you saw the government did not direct Mr. Singer to

24   ask any questions of Mr. Vavic relating to Johnny Wilson or the

25   Wilson family monies, correct?

```
 1              MS. WRIGHT:  Objection.
 2              THE COURT:  Sustained.
 3    Q.   You reviewed the tape, correct?
 4    A.   I heard it at trial, as you did.
 5    Q.   You saw nothing in that tape that caused you to associate
 6    Mr. Wilson's money as a source of funds for the Vavic payments,
 7    correct?
 8    A.   There was -- there was no discussion of that in the tape
 9    itself.
11:05 10 Q.   Thank you.
11             THE COURT:  We're going to take the morning recess at
12    this stage.  You may step down for the time being, Miss George.
13             THE WITNESS:  Thank you, your Honor.
14             THE COURT:  We'll be in recess for 15 minutes.
15             THE CLERK:  All rise for the jury.
16             (Jury exits.)
17             THE COURT:  Be seated, counsel.
18             How much longer, Mr. Kendall, on cross?
19             MR. KENDALL:  Let me take a quick look, your Honor.  I
11:06 20 could see 30, 40 minutes, maybe 45.
21             THE COURT:  Then we'll have redirect?
22             MS. WRIGHT:  Yes, your Honor.  I expect to be very
23    brief.
24             THE COURT:  Are we going to hear from the other
25    witness?
```

```
 1              MR. FRANK:  Agent Ranahan.  That is very much my hope,
 2       your Honor.
 3              THE COURT:  Her direct was how long?
 4              MS. KEARNEY:  I trimmed it down to probably about
 5       30 minutes.
 6              THE COURT:  She'll be the last witness.
 7              MR. FRANK:  Yes, your Honor.
 8              THE COURT:  Anything else that needs to come to my
 9       attention before we recess?
11:06 10              MR. KELLY:  No, your Honor.
11              MR. KENDALL:  No, your Honor.
12              THE COURT:  If not, we're in recess for 15 minutes.
13              (Recess taken 11:06 a.m to 11:26 a.m.)
14              THE CLERK:  All rise for the jury.
15              (Jury entered.)
16              THE CLERK:  Thank you.  You may be seated.
17              THE COURT:  Good morning again, jurors.  We're ready
18       to resume.
19              Ms. George, you are reminded that you remain under
11:26 20       oath.
21              THE WITNESS:  Yes, your Honor.
22              THE COURT:  You may continue with cross-examination,
23       Mr. Kendall.
24              MR. KENDALL:  Thank you, your Honor.
25       BY MR. KENDALL:
```

```
 1   Q.   Ms. George, before we took the break, I was asking you

 2   about that 6.5 million that went out of the foundation's

 3   accounts and went into all of those business investments.  Do

 4   you remember that?

 5   A.   Yes.

 6   Q.   Then there was another 6 million as well that went out for

 7   various ventures, a total of about 12.4 million.

 8   A.   The 6 million -- the two different buckets of 6 millions

 9   were one to colleges and universities and one is to the

11:27 10   business investments.

11   Q.   6.5 went to colleges and universities, correct?

12   A.   Yes.

13   Q.   6.4 went to soccer teams and food businesses and whatever?

14   A.   Yes.

15   Q.   And another, whatever the remainder is, 7, 8 million, went

16   to other things you called ventures or investments, correct?

17   A.   No, sir.  I didn't mean to imply that all the rest of that

18   money went to that sole thing.  Another large grouping of funds

19   went to some of those other ventures.  That was probably more

11:27 20   in the line of a million to million and a half.

21   Q.   Wait, a million to million and a half on top of the 6.4

22   went to Mr. Singer's business ventures?

23   A.   Correct.

24   Q.   So that would be about 8 million?

25   A.   Correct.
```

```
 1   Q.   And then --
 2   A.   But they were business ventures from The Key Worldwide
 3   Foundation.
 4   Q.   But you would agree with me The Key Worldwide Foundation
 5   is a tax deductible charitable foundation.
 6   A.   Yes.
 7   Q.   Okay.  Charitable foundations are not allowed to make
 8   investments in for-profit businesses.
 9           MS. WRIGHT:  Objection, foundation.
10           THE COURT:  Sustained.
11   BY MR. KENDALL:
12   Q.   You agree with me what was going on was a 501(c)(3)
13   foundation is investing in various for-profit ventures all
14   around the world.
15           MS. WRIGHT:  Objection to the characterization.
16           THE COURT:  Sustained.
17   BY MR. KENDALL:
18   Q.   Is investing in for-profit foundations both inside the
19   United States and outside the United States?
20   A.   What was the question of that?  I'm sorry, could you
21   please repeat?
22   Q.   You referred to the monies that went out of The Key
23   Foundation to these various business investments as investments
24   by The Key Foundation, and I just wanted to review with you The
25   Key Foundation is a 501(c)(3) charity, correct?
```

1   A.   That is correct, yes.

2   Q.   It's not-for-profit corporation?

3   A.   Correct.

4   Q.   But you've traced, I think we're now up to about 8 million

5   that went from that foundation into various business type

6   investments?

7   A.   Business ventures of some kind, yes.

8   Q.   And then there was another 6 or so million, you said, of

9   other types of business ventures that money went into as well,

11:29 10   correct?

11   A.   I'm not sure which category we're talking about right now.

12   Q.   I'm sorry.  Maybe we need to go back to the exhibit and

13   I'll try to be more helpful.

14        If we could go back to 716, please.

15        We see here under The Key Worldwide Foundation

16   withdrawals, 20.6 million in withdrawals, correct?

17   A.   Correct.

18   Q.   6.5 million is to colleges or associated individuals in

19   your view, correct?

11:29 20   A.   Correct.

21   Q.   6.4 is into business investments that we just discussed?

22   A.   Correct.

23   Q.   And I was raising with you, this is a 501(c)(3) charity

24   that you say has put 6.4 million into for-profit business

25   investments.

1    A.   That's correct.

2    Q.   Okay.  Then if we add 6.4 and 6.5, we get 12.9.  So we got

3    another 7.8, 7.9 million.  Where did that 7.8, 7.9 million go?

4    A.   Well, some of the -- probably a million and a half went to

5    these other types of business ventures, because we had talked

6    before about if we're combining those two categories, that's

7    about 8 million.

8    Q.   Okay.

9    A.   And then other types of expenses were payables for taxes,

11:30 10   payments --

11   Q.   Wasn't Mr. Singer also siphoning some of the funds out for

12   his personal expenses?

13        MS. WRIGHT:  Objection to "siphoning."

14        THE COURT:  She can answer it.

15   A.   I mean -- so I didn't go through a characterization of

16   whose -- in looking at the expenditures, I tried to gain an

17   understanding of the majority of the funds.

18   Q.   Okay.

19   A.   So I don't know the specific details associated with each

11:31 20   and every payment that went out.  As I stand here today, I

21   don't know the details associated with each one of them.

22   Q.   I think you've addressed about 14.5 million.  I'm trying

23   to run down that last 6.1 million.

24        Do you recall there being expenditures for Mr. Singer

25   renting a yacht called ILLUSIONS to go to the Bahamas?

1    A.   I don't have a specific memory of that.  I don't know for

2    sure if it went through the accounts or not.

3    Q.   You're not aware of him for one of The Key Foundation

4    accounts and another one for one of the eds. that he twice

5    rented a yacht called ILLUSIONS for around $16,000 or $17,000

6    to go on vacation in the Bahamas?

7    A.   I'm not aware.  That doesn't stick out in my memory of the

8    payments that I was --

9    Q.   Okay.  And you've not traced out the amount of monies that

11:32 10   Mr. Singer might have used for his own personal benefit I take

11   it?

12   A.   I did not.

13   Q.   Now, let's go back to Exhibit 718, please.

14        We were going through Loyola High School.  Now we're

15   down to this grouping of Ms. Janke and Mr. Khosroshahin, and

16   they get about 430,000, 440,000; is that correct?

17   A.   Yes.

18   Q.   Okay.  And that goes to various entities that you believe

19   were all affiliated with those two people, one or both of those

11:32 20   two people?

21   A.   Correct, based on the records I reviewed, yes.

22   Q.   You'd agree with me you do not trace any funds from

23   Mr. Wilson going to the Janke/Khosroshahin group at all.

24   A.   My answer would be similar to what we previously discussed

25   with Clear, the Clearinghouse, and Loyola High School.  I saw

1    money that went into the foundation and The Key from

2    Mr. Wilson, and at various points throughout the period that I

3    reviewed I saw money coming out of those same accounts going to

4    these entities.

5    Q.   Yes, so other than it being possibly commingled amongst

6    millions and millions and millions of dollars, you see no

7    tracing or association of Mr. Wilson's funds going to those

8    people, correct?

9    A.   I saw no reference to Mr. Wilson on any of the payments to

11:33 10   those specific entities that --

11   Q.   And the same with Summertime Sports, correct?

12   A.   Correct.

13   Q.   And the same with UCLA Principal Enterprises and Jorge

14   Salcedo?

15   A.   Correct.

16   Q.   Now, with respect to the 100,000 of the USC water polo

17   money that's there --

18            MR. KENDALL:   Could we have Exhibit 126, please, page

19   2.

11:34 20   Q.   Did you review this thank you note from USC to Mr. Wilson?

21   A.   I did see that while I was reviewing materials, yes.

22   Q.   So we know the only amount of money on 718 that you can

23   attribute to Mr. Wilson, it's a $100,000 bank check with his

24   name payable to USC that generates a thank you note from USC,

25   correct?

1    A.    That's correct, yes.

2    Q.    Okay.

3          Now, I'd like to go to the Stanford entries you have

4    on Exhibit 718.

5          You have three checks there, correct?

6    A.    Yes.

7    Q.    And you list one of those checks as Stanford sailing John

8    Vandemoer, correct?

9    A.    That's correct.

11:35 10    Q.    If we see the deposit, all three are for Stanford

11    University?

12    A.    That's correct, yes.

13    Q.    So for Stanford, $770,000, by your accounting, every

14    single penny went into the school's bank account; is that

15    correct?

16    A.    Correct.

17    Q.    Not a penny into Mr. Vandemoer's pocket, correct?

18    A.    They were deposited into the institution's bank account.

19    Q.    Now, I have the three checks but I have a different

11:35 20    numbering.  I have a different numbering than what you used for

21    the checks.  Do you have the three numbers for the exhibit

22    numbers for the checks that you called up earlier or should I

23    use my own exhibit numbers?

24          MS. WRIGHT:  We didn't show these checks as exhibits.

25          MR. KENDALL:  Oh, you didn't.

```
 1   BY MR. KENDALL:
 2   Q.   I'd like to show you first Exhibit 9870.
 3          Is that one of the checks that's in your sheet here?
 4   A.   Yes, it is.
 5          MR. KENDALL:  Could we offer that, your Honor?
 6          MS. WRIGHT:  No objection.
 7          THE COURT:  It will be admitted, 9870.
 8          (Exhibit 9870 received into evidence.)
 9          THE COURT:  And it is a check to Stanford.
11:36 10          MR. KENDALL:  Stanford Athletics Department, $500,000.
11   BY MR. KENDALL:
12   Q.   And then I'd like to show you Exhibit 9872 and ask you if
13   that is another one of the Stanford checks.
14   A.   Yes, it is.
15   Q.   And that's payable for $110,000?
16   A.   Yes, it is.
17          MR. KENDALL:  Your Honor, I'd like to offer 9872 into
18   evidence.
19          MS. WRIGHT:  No objection.
11:36 20          THE COURT:  It will be admitted.
21          (Exhibit 9872 received into evidence.)
22   BY MR. KENDALL:
23   Q.   And then I'd like to show you 9871, and if you could tell
24   us if that's the third check?
25   A.   Yes, it is.
```

```
 1              MR. KENDALL:  I'd like to offer that into evidence,
 2       too.
 3              MS. WRIGHT:  No objection.
 4              THE COURT:  I need the date.
 5              MR. KENDALL:  The date is October 25, 2018.
 6              THE COURT:  It will be admitted.
 7              (Exhibit 9871 received into evidence.)
 8              MR. KENDALL:  Now, can we put all three -- how best
 9       can we do it?  Can we put the first checks up, Mr. Carter, 9870
11:37 10  and 9872.
11       BY MR KENDALL:
12       Q.   Now, if we look at the first check, the $500,000 check, we
13       see it's paid to the order of Stanford Athletics Department,
14       correct?
15       A.   Yes.
16       Q.   It has underneath it a reference to Mr. Vandemoer of the
17       Stanford Athletics Department, but it's not payable to him,
18       correct?
19       A.   That is correct.
11:37 20  Q.   And it's for $500,000.
21       A.   Yes.
22       Q.   And it's dated August 24, 2017.
23       A.   Correct.
24       Q.   And you know from your work in this case, that's before
25       Mr. Singer became an informant, correct?
```

```
 1   A.    I am aware.
 2              MR. KENDALL:  Can we look at the next check, please,
 3   9872, please.
 4   Q.    And we see that's for $110,000, correct?
 5   A.    Yes.
 6   Q.    Payable to the order of Stanford University, correct?
 7   A.    Yes.
 8   Q.    The only person who could cash either of these checks
 9   would be Stanford University legally.
10   A.    Correct.
11   Q.    Okay.  There's no confusion at all that this is paying a
12   coach.  This is money to the school, correct?
13   A.    Correct.
14   Q.    Okay.  But we see underneath on this second check as well
15   that it's a reference to Mr. Vandemoer but the payee for both
16   is Stanford University or its athletics department?
17   A.    That is correct.
18   Q.    And if we look at the date of this check, it's May 9,
19   2018.  That's before Mr. Singer agreed to cooperate with the
20   government, correct?
21   A.    Yes, it is.
22   Q.    Okay.
23              Could we now call up check 9871.
24              And if we look at this check, we see the person -- the
25   name it's being payable to is a little bit different.  Payable
```

1     to the order of Stanford Sailing John Vandemoer.

2     A.    Yes, I see that.

3     Q.    Okay.  So we see that the coach's name is now being

4     included as the payee on the check, correct?

5     A.    Yes, as well as the university, yes.

6     Q.    Okay.  And the date of this check is October 25, 2018,

7     correct?

8     A.    Yes.

9     Q.    And that is after Mr. Singer has become an informant,

11:39 10    correct?

11    A.    Yes, that's correct.

12    Q.    And he's working at the direction of the government.

13    A.    Yes.  Well, he's working with the government.  I wasn't

14    part of that --

15    Q.    Okay.

16    A.    -- part of that investigation.

17    Q.    He's working with the government at the time the $160,000

18    check is made payable to the order of Stanford Sailing John

19    Vandemoer.  Okay.

11:40 20          So, in sum, every penny payable to Stanford, whether

21    it's before -- strike that.

22          In sum, all the amounts that relate to Stanford,

23    whether before or after Mr. Vandemoer starts to cooperate, go

24    into a Stanford bank account, correct?

25    A.    That is correct, yes.

Q.   And the only money you can attribute to Mr. Wilson goes

into a USC bank account, correct?

A.   I'm sorry, the money -- I see other money from Mr. Wilson

going into The Key and --

Q.   I'm talking about in this chart.  The only money on

Exhibit 718 --

A.   Understood, yes.

Q.   -- is what goes into the USC account on a bank check

payable to the water polo team that gets a thank you note.

A.   Right.  That's the only account for which Mr. Wilson's

name was specifically referenced.

Q.   Did you see any thank you notes for the Gordon Ernst

payments?

A.   I did not.

Q.   Did you see any thank you notes for the Janke/Khosroshahin

payments?

A.   In the bank records, in anything, no, I did not.

Q.   Did you see any thank you notes for the Rudy Meredith

payments?

A.   I did not.

Q.   Or the Jorge Salcedo payments?

A.   I did not.

Q.   Next --

     MR. KENDALL:  One moment, your Honor, please.

Q.   Okay.  If we can now go to Exhibit 719, please.  This is

```
 1    the chart where you look at various funds originating with

 2    Mr. Wilson or Hyannisport Capital, correct?

 3    A.    That is correct.

 4    Q.    In 2012, 2014 you see about $10,800 paid in 11 different

 5    checks; correct?

 6    A.    That's correct.

 7    Q.    It's about 900 to a thousand bucks on average per check --

 8    I'm not saying that's perfect averaging, but it's small checks

 9    in multiple times, correct?

11:42 10    A.    Correct.

11    Q.    And then if we look at the additional payments indicated

12    per QuickBooks, you've got some other amounts, 13,000 in 2011,

13    7,800, 404, 620.

14    A.    That's correct.

15    Q.    And so this would be -- is the 10,835 in addition to the

16    22,000?

17    A.    Correct, they should be added together, yes.

18    Q.    Okay.  So over a four-year time period, Mr. Wilson is

19    paying Mr. Singer about $33,000, correct?

11:43 20    A.    Correct.

21    Q.    It's about $8,000 a year.

22    A.    Yes.

23    Q.    And from your work on this case, you know that Mr. Singer

24    was providing college counseling services to Mr. Wilson's son.

25    A.    I am familiar.
```

1   Q.   And he was providing tutoring services, correct?

2   A.   That I don't know.  I didn't get into the detail of that.

3   Q.   Okay.  But we see there's about $32,000 to $33,000 over a

4   four-year period for various types of counseling, correct?

5   A.   Yes, that's my understanding of what they were for.

6   Q.   Then if we look at the middle one for 2014, we see there's

7   $100,000 that we've already reviewed, that's the bank check

8   payable to the water polo team, and it goes to the water polo

9   team, correct?

11:44 10   A.   It goes to the water polo, yes.

11   Q.   And then we see in the middle, $100,000 goes to The Key

12   Foundation, correct?

13   A.   Yes.

14   Q.   And we also see $20,000 is payable to Mr. Singer.

15   A.   Yes.

16   Q.   Okay.

17        MR. KENDALL:  Now, could we have Exhibit 118, please.

18   Q.   And have you seen Exhibit 118 before?

19   A.   No, I don't believe I have.

11:45 20   Q.   Okay.  If we could look at the middle of it where it says,

21   "I think the money."

22        It says -- Mr. Singer writes to Mr. Masera -- do you

23   know who Mr. Masera is?

24   A.   Yes, I do.

25   Q.   He's a person who does bookkeeping, accounting work for

```
     1    Mr. Singer?

     2    A.   Yes, I'm aware.

     3    Q.   For some period of years?

     4    A.   Yes.

     5    Q.   Mr. Singer tells Mr. Masera April 10, 2014 -- right around

     6    the time that the funds were sent over from Hyannisport

     7    Capital, correct?

     8    A.   Correct.

     9    Q.   Mr. Singer writes, "I think the money that came was from

11:45 10    Wilson's.  Did we charge both extra 20 for expenses?"

    11              I think he means, "If so, great.  If not, fine too."

    12              MS. WRIGHT:  Objection, sorry --

    13              MR. KENDALL:  Excuse me.

    14              MS. WRIGHT:  I don't believe this is in evidence, is

    15    it?

    16              MR. KENDALL:  I believe it is, 118.

    17              MS. WRIGHT:  That's not what we have in our records.

    18              THE COURT:  I don't know.

    19              MR. KENDALL:  Your Honor, then I'd like to offer it.

11:46 20              MS. WRIGHT:  We object.

    21              THE COURT:  Is there an objection?

    22              MS. WRIGHT:  Objection, hearsay.

    23              THE COURT:  On what grounds?

    24              MS. WRIGHT:  Hearsay.

    25              THE COURT:  Yes, the objection is sustained.
```

```
 1          MR. KENDALL:  Your Honor, it's not for the truth of
 2     the matter asserted.  I represent to you we don't believe it is
 3     a truthful statement.  We're offering it for a different
 4     purpose.
 5          THE COURT:  The objection is sustained.
 6          MR. KENDALL:  Okay.
 7          One moment, please.
 8          (Discussion off the record.)
 9     BY MR. KENDALL:
11:46 10 Q.   So the $100,000 that goes to The Key Foundation, you don't
11     see that specifically directed to any other place, do you?
12     A.   Obviously there's lots of payments that come out of the
13     foundation.  I didn't see any payments that specifically had
14     Mr. Wilson's name referenced on it.
15     Q.   Okay.  Do you know though that the -- do you know what a
16     990 tax return is for a charitable foundation?
17     A.   Yes, I'm aware.
18     Q.   Are you aware that the 2014 990 shows The Key Foundation
19     sending $100,000 to USC water polo?
11:47 20 A.   I did not review that.
21     Q.   Okay.  So I'm not saying -- I'm not trying to suggest in
22     my question that the money actually went.  I'm just saying the
23     990 claims that 100,000 went from The Key Foundation to USC
24     water polo.  You did not look up that record in your work,
25     correct?
```

```
 1    A.    I did not review the tax records, no.

 2    Q.    Okay.

 3          Next I'd like to show you Exhibit 112, which I do

 4    believe is in evidence.

 5          If we could take -- have you read this document

 6    before?

 7    A.    Yes, I have.

 8    Q.    Okay.  And if you could look in the middle where it says,

 9    "From John Wilson, March 31, 2014," and what Debbie writes to

 10   him in the bottom of the e-mail is, "I contacted Rick and he

 11   directed me to Steve.  Per Steve 100k will be to his

 12   foundation, 100k invoice from The Key, and 20k to Rick Singer.

 13   Since you said 200k, we're at 220k.  Is this a moving target?"

 14         And Mr. Wilson responds, "Yes, I added 20k for his

 15   expenses."

 16         Do you see that?

 17   A.    I do see that.

 18   Q.    Did you make any attempt to try to find out what expenses

 19   this was referring to?

 20   A.    No, I did not.

 21   Q.    Okay.  You just -- we showed you just a moment ago at

 22   Exhibit 118 that's not in evidence, but you saw Exhibit 118,

 23   correct?

 24   A.    Is that what you just showed me prior?

 25   Q.    Yes, that was the number.
```

         1              And Exhibit 118 is something you looked at in your

         2    investigation, correct?

         3    A.   I can't recall specifically.  I did directed searches, and

         4    I can't recall if that one came up in one of --

         5    Q.   I think you said you saw it at the time I showed it to

         6    you.  You had already seen it at the time I showed it to you,

         7    didn't you?

         8              MS. WRIGHT:  That misstates.  That's incorrect.  She

         9    said she had not seen the document.

11:49   10              THE COURT:  Sustained.

        11    BY MR. KENDALL:

        12    Q.   Did I ask you earlier if you had seen 118 before?

        13    A.   The document that was shown, I wasn't aware of that

        14    document.  I hadn't --

        15    Q.   You were not aware of that document, okay.

        16              So the prosecutors didn't give you a copy to look at,

        17    correct?

        18    A.   The prosecutors gave me access to the discovery and they

        19    did not identify anything specific for me to look at.

11:49   20    Q.   So going back to Exhibit 719, you have no idea what the

        21    $20,000 expenses refers to, correct?

        22    A.   There's no correlation with anything that I reviewed that

        23    would show a specific reference to these particular

        24    expenditures that were made after the time that that money came

        25    in was anything specific that Wilson directed for the payments

```
 1   to be.  I mean, I just saw payments going out from the account
 2   after the date in which that was deposited.
 3   Q.   And you made no effort to find out what the $20,000
 4   expenses were that were referenced in Exhibit 112.
 5   A.   No, sir.
 6   Q.   Okay.
 7          Now I'd like to go to the next column, 2018, in
 8   Exhibit 719.
 9          We see John B. Wilson, $16,000 on October 16 to The
11:50 10   Key, correct?
11   A.   Yes.
12   Q.   And I think you testified there was some memo or reference
13   there indicating it was payment for the counseling services for
14   his daughters?
15   A.   Yes, that's correct.
16   Q.   Okay.  $8,000 for each child?
17   A.   Yes, that was my understanding, yes.
18   Q.   Okay.  And then the Hyannisport Capital transfers you see
19   there, correct?
11:51 20   A.   Yes.
21   Q.   And there's a Bank of America account.  That was opened in
22   September of 2018?
23   A.   Yes, that's correct.
24   Q.   It was opened up specifically as part of Mr. Singer's work
25   as a cooperator with the government or an informant.
```

```
 1   A.   I don't know -- I don't know the circumstances by which
 2   that account was opened.  I just know it was opened in
 3   Massachusetts.
 4   Q.   Well, you'd agree with me the FBI and IRS wouldn't let
 5   Mr. Singer put a million dollars in his own account.
 6            MS. WRIGHT:  Objection.
 7            THE COURT:  Sustained.
 8            MR. KENDALL:  Okay.
 9   BY MR. KENDALL:
10   Q.   Next, if we could go to 721, please.
11            This is your analysis of checks that were payable to
12   an entity associated with Donna Heinel called Clear the
13   Clearinghouse?
14   A.   Yes, that's correct.
15   Q.   And the earliest check you had was July 3, 2018?
16   A.   Yes, that's correct.
17   Q.   You'd agree with me that's more than four years after
18   Johnny Wilson's admission to USC.
19   A.   Yes.
20   Q.   And I think you may have testified, but indulge me if I'm
21   redundant, you cannot trace any money from Mr. Wilson to any of
22   these checks, correct?
23   A.   His name was not referenced on any of these payments.
24   Q.   But you saw no accounting detail of any kind to associate
25   Mr. Wilson as being the source of funds for these payments or
```

1   being aware of these payments.

2   A.   I reviewed the account as a whole, so Mr. Wilson's money

3   had gone into the whole organization, and I didn't see anything

4   that came out that specifically referenced his name other than

5   that USC water polo check.

6   Q.   And finally, I'd like to you take a look at Exhibit 722.

7        And you have the blue and the orange.  And blue is you

8   have Singer related contributions to the women's athletic board

9   fund, and orange you have all other donors, correct?

11:53 10   A.   That's correct.

11   Q.   It would be fair to say that you don't trace any funds

12   from Mr. Wilson to the blue or orange on any of the entries on

13   Exhibit 722, correct?

14   A.   Well, this chart reflects only deposits into the women's

15   athletic board fund.  So the funds that went from the

16   foundation went to men's water polo.

17   Q.   So is that, yes, you don't have any association with

18   Mr. Wilson's funds with this chart?

19   A.   It would be similar -- my similar answer where money came

11:53 20   out of The Key or KWF and went into the women's athletic board

21   fund that was commingled with the money from Mr. Wilson that

22   had gone into the same bank account source.

23   Q.   You can say that about every dollar of the $27 million

24   that were spent out of those bank accounts?

25   A.   Yes, I can.

```
 1   Q.   So it's no more association than that?

 2   A.   Correct.

 3   Q.   Next I'd like to go to the behind employment records that

 4   were previously shown to you by the government.

 5            MR. KENDALL:  Is that Exhibit 2 or Exhibit 3, because

 6   I think there's two versions or two copies?  Is it Exhibit 3

 7   we're dealing with?

 8            MS. WRIGHT:  Sorry?

 9            MR. KENDALL:  The Donna Heinel folders.  We have two

10   versions, one Exhibit 2, one Exhibit 3.

11            MS. WRIGHT:  There are two different exhibits.  One is

12   in evidence.

13            MR. KENDALL:  Which one is that?

14            MS. WRIGHT:  2.

15            MR. KENDALL:  Okay.

16   BY MR. KENDALL:

17   Q.   Let's go to Exhibit 2, please.  And this is the employment

18   folder for Donna Heinel, correct?

19            MS. WRIGHT:  Apologies, but we actually introduced a

20   redacted version.

21            MR. KENDALL:  I don't think that's a problem for what

22   I'm going to be using it for right now.

23            If we could go to Bates 28763, VB records ending in

24   the Bates 28763, Mr. Carter.

25            Why don't we go to 28761.
```

1          Okay.

2    BY MR. KENDALL:

3    Q.   Do you see this document --

4    A.   Yes, I do.

5    Q.   -- Ms. George.

6         You see it says, "Employee Data Form, University

7    Payroll Services."

8    A.   Yes.

9    Q.   And we see in the top right there it says, "Athletics,"

11:56 10   and there's something "as something bonus," always a nice thing

11   to see in a person's payroll form.

12   A.   Correct.

13   Q.   If we could go to the bottom, please, bottom left, we see

14   it's dean director, does it look like Pat Haden to you, signing

15   it in July 2012?

16   A.   That's --

17   Q.   It's hard to read.

18   A.   -- a little tricky but I could see that.

19   Q.   You can see a "P," an "Ha," a "D."

11:56 20   A.   Yes.

21   Q.   Now, if we flip the page, we see at the top it says

22   "2011/2012 year end review for Donna Heinel."

23        Do you see that?

24   A.   Yes, I do.

25   Q.   And if we go to the next page again, it says, "Areas for

```
 1   improvement."

 2           Do you see that?

 3   A.   Yes, I do.

 4   Q.   And it says, "Donna has shown flashes of good development

 5   work.  AD," athletic director or athletic department "like to

 6   see some results in this area."

 7           And then it's signed Patrick C. Haden, February

 8   something 2012, and then signed Donna Heinel, correct?

 9   A.   Yes.

10   Q.   Okay.

11           MR. KENDALL:  Now, Mr. Carter, if we could go to Bates

12   ending in 28749, please.

13   Q.   And it says -- well, let's look at the top.  "2013/2014

14   Year-End Review for Donna Heinel."

15           And then we go "To Do."  These are the things for her

16   to do.

17           Number 3 says, "Keep working on development."

18           Do you see that?

19   A.   Yes, I do.

20   Q.   And that's also signed by Pat Haden and Donna Heinel in

21   July of 2014, correct?

22   A.   Yes, I see that.

23   Q.   If we next could go to the Bates ending 28745, please.

24           We see this the next year-end review for Donna Heinel,

25   correct?
```

1    A.    Yes.

2    Q.    And we see number 1, "I believe Donna to be the best

3    senior women's administrator in PAC 12.

4              "2.   Fantastic work ethic.

5              "3.   Gets things done!  No procrastination.

6              "4.   Strong relationship with admissions - very

7    important for the department.

8              "5.   Gives athletic director great advice, or AD."

9              And then "6.   Really improved her development efforts

11:59 10   - important."

11             That's the only task here of the seven in this group

12   or the four below that actually has "important" put at the end

13   to stress its importance, correct?

14   A.    Well, the word "important" is reflected above, but it's

15   the only one where it says it at the end.

16   Q.    Actually, excuse me.  It says it twice.  It says, "Strong

17   relationship with admissions very important for the

18   department," and the other important thing is development.

19   A.    Yes, I see that.

11:59 20   Q.    Okay.  And we see this is signed by Mr. Haden on June 2015

21   and Ms. Heinel signs as well?

22   A.    Yes.

23             MR. KENDALL:  If I may have one moment, your Honor.

24             THE COURT:  Yes.

25             (Discussion off the record.)

1           MR. KENDALL:  No further questions, your Honor.

2           THE COURT:  Redirect, Ms. Wright.

3           MS. WRIGHT:  Your Honor, there's just one issue that

4    I'd like to cover on redirect that I believe Mr. Kendall opened

5    the door to.  I'd ask for a very brief sidebar.

6           THE COURT:  All right.

7           (At sidebar on the record.)

8           MS. WRIGHT:  Mr. Kendall asked a series of questions

9    about how many millions were left over in The Key Worldwide

12:01 10   Foundation's accounts, and several million of that was paid in

11   forfeiture to the U.S. Marshals.  So I suggest it's misleading

12   to suggest that that money ended up and stayed with Rick Singer

13   when a very significant portion of it was paid to the

14   government.

15          I don't intend to ask anything about forfeiture

16   specifically.  I just want to ask one question about whether

17   she saw checks from the accounts to the U.S. Marshal service.

18          MR. KENDALL:  Your Honor, they opened the door by

19   having her testimony on this topic and putting out the category

12:01 20   of the last 6.5 million or whatever it is.

21          I think they're walking on very thin ice.  We've been

22   up before the First Circuit before and it did not turn out well

23   for the government when they start bringing in something

24   relating to a conviction for a person who's not testifying.

25   Singer has not testified.  Forfeiture is criminal forfeiture,

1    that tells the jury it's a conviction.  There's the Akami

2    (phon.) opinion.  I suggest we all read it before the

3    government opens up this door.

4         MR. FRANK:  Well, the door was opened when Mr. Kendall

5    suggested that Mr. Singer pocketed the money and asked specific

6    questions about whether that money went into Singer's pocket.

7    So at a minimum we would ask for an instruction to the jury to

8    disregard where the remaining money went that Mr. Kendall asked

9    about when he suggested --

12:02 10       THE COURT:  You prepare a limiting instruction.  I'm

11    not going to give it right now, but I'll give it at some point

12    soon.

13         MR. KENDALL:  Your Honor, the witness testified there

14    were three buckets of money.  I did not -- it was investments

15    he was making.  It may have been forfeited years later, but he

16    was making eight years' worth of investments with this money

17    for his own personal businesses.  That's all I raised.

18         MS. WRIGHT:  He testified to that, but you also raised

19    what was left over after that.

12:02 20       MR. FRANK:  He specifically --

21         THE COURT:  Only one counsel will talk at sidebar for

22    each party.

23         Ms. Wright.

24         MS. WRIGHT:  She covered those investments, that's

25    correct; and you asked a series of questions about what money

        1    remained left over after those investments.

        2           MR. KENDALL:  No.  I asked what was left over in

        3    calculation of the 20 million --

        4           THE COURT:  We're not going to argue it here.  The

        5    government will prepare a limiting instruction.  I will give it

        6    to the jury at an appropriate time in the near future.

        7           MS. WRIGHT:  Understood.

        8           MR. KENDALL:  Thank you, your Honor.

        9           (End of discussion at sidebar.)

12:03  10           MS. WRIGHT:  I don't have any redirect, your Honor.

       11           THE COURT:  All right.

       12           Thank you.  You may step down, Ms. George.

       13           THE WITNESS:  Thank you, your Honor.

       14           THE COURT:  Yes.

       15           MS. KEARNEY:  The government calls Agent Colleen

       16    Ranahan.

       17           THE CLERK:  Please raise your right hand.

       18           COLLEEN RANAHAN, having been duly sworn by the Clerk,

       19    was examined and testified as follows:

12:04  20           THE CLERK:  Thank you.  You may be seated.

       21           And would you please state your name for the record,

       22    spelling your last.

       23           THE WITNESS:  Colleen Ranahan, R-a-n-a-h-a-n.

       24           THE COURT:  Ms. Kearney, you may direct.

       25                  DIRECT EXAMINATION OF COLLEEN RANAHAN

BY MS. KEARNEY:

Q.   Good afternoon, Agent Ranahan.  Where do you work?

A.   I work at the Internal Revenue Service.

Q.   What do you do there?

A.   I am an Internal Revenue agent in the special enforcement program.

Q.   What is a Revenue agent?

A.   A Revenue agent examines and audits tax returns in order to determine if a taxpayer is compliant.

Q.   How long have you been a Revenue agent with the IRS?

A.   For 15 years.

Q.   You mentioned this Special Enforcement Program.  What's that?

A.   So a Special Enforcement Revenue agent works directly with IRS Criminal Investigation, the U.S. Attorney's Office, Department of Justice Tax Division in working tax aspects of criminal cases.

Q.   How long have you been a member of this Special Enforcement Program?

A.   Seven years.

Q.   What did you do at the IRS before joining the Special Enforcement Program?

A.   I was in a division called projects in special planning, and worked as a coordinator for our national research program and our report generation software.

```
 1    Q.   Have you ever been involved in the audits of taxpayers?

 2    A.   I have.

 3    Q.   Approximately how many?

 4    A.   A couple hundred.

 5    Q.   And in your experience of being an internal revenue agent

 6    for 15 years, are you familiar with the Internal Revenue Code?

 7    A.   I am.

 8    Q.   What did do you to prepare for your testimony today?

 9    A.   I reviewed the 2014 tax returns for John and Leslie

12:05 10    Wilson, Hyannisport Capital, including any amended returns that

11    were filed.  I reviewed some of the preparer records, and I

12    also have been listening to testimony.

13         MS. KEARNEY:  Ms. Lewis, can we pull up what's in

14    evidence as Exhibit 174A.

15              And can we look at pages 2 and 3.

16    Q.   Agent Ranahan, I'm showing you what's already been

17    admitted, which is the original Form 1040 U.S. Individual Tax

18    Return for John and Leslie Wilson.  Have you reviewed this

19    return?

12:06 20    A.   I have.

21         MS. KEARNEY:  And if we can look at line 17, please,

22    Ms. Lewis.

23    Q.   Agent Ranahan, do you see on line 17 it reports an amount

24    of negative $495,129.

25              Do you have an understanding of whether this entry
```

1 includes a $20,000 payment to Mr. Singer for consulting fees?

2 A.   I do.

3 Q.   What is that understanding?

4 A.   The understanding is that Hyannisport Capital wrote a --

5 wired $20,000 to Mr. Singer personally and deducted it as a

6 business consulting expense on Hyannisport Capital's return,

7 which would be included in this loss on the Form 1040.

8 Q.   Do you have an understanding as to whether this entry also

9 includes a $100,000 payment to The Key for consulting fees?

12:07 10 A.   I do.

11 Q.   What is that understanding?

12 A.   There was $100,000 wire from Hyannisport Capital to The

13 Key, Rick Singer's business, for-profit business, and it was

14 also deducted as a business consulting expense on Hyannisport

15 Capital return which, in fact, flows through to line 17.

16 Q.   And what makes a business expense deductible?

17 A.   So a business expense is ordinary and necessary to the

18 carrying on of a trade or business.

19 Q.   And what does that mean in lay terms?

12:08 20 A.   Lay terms is it has to be directly to -- related to the

21 trade or business that is, you know, why the business is in --

22 basically in effect.

23 Q.   Did you make any determination about whether the $120,000

24 in consulting fees that were reported in line 17 were, in fact,

25 deductible business expenses?

1    A.    I did.

2    Q.    What did you determine?

3    A.    I determined that they were not deductible business

4    expenses.

5    Q.    Why?

6    A.    Because they were personal.

7    Q.    How does having an additional $120,000 in business

8    expenses affect the amount of taxes that the Wilsons owed for

9    2014?

12:08 10    A.    It would reduce the tax due.

11    Q.    Why is that?

12    A.    Because any deductions on a business return that flows

13    through to the 1040 would reduce adjusted gross income, which

14    then reduces the taxable income, which reduces the tax.

15          MS. KEARNEY:  Ms. Lewis, if we can expand this out a

16    little to show line 22.

17    Q.    Agent Ranahan, what was the total income reported for the

18    Wilsons in 2014?

19    A.    $2,605,539.

12:09 20    Q.    Were the Wilsons taxed on this amount?

21    A.    They were not.

22    Q.    What happens before a tax is assessed?

23    A.    Before the tax is assessed, there's adjusted gross income

24    adjustments, which could be the deductible part of

25    self-employment tax or any self-employment health insurance,

         1    different types of deductions.  And then also there can be
         2    either a standard or an itemized deduction and some exemptions.
         3    Q.   What are itemized deductions?
         4    A.   Itemized deductions are personal expenses that a taxpayer
         5    is allowed to take on a tax return.  They include things such
         6    as state and local income taxes, real estate taxes, mortgage
         7    interest, charitable contributions, unreimbursed business
         8    expenses.  It's very limited.
         9         MS. KEARNEY:  Ms. Lewis, can we look at page 4.
12:10   10    Q.   Agent Ranahan, this is the Schedule A of itemized
        11    deductions.
        12         MS. KEARNEY:  And can we look at the gifts to charity
        13    section please, Ms. Lewis.
        14    Q.   Agent, do you have an understanding as to whether the
        15    $220,215 reported in charitable donations includes a $100,000
        16    payment to The Key Worldwide Foundation?
        17    A.   I do.
        18    Q.   And what is that understanding?
        19    A.   The understanding is that there was a wire, a $100,000
12:10   20    wire, from Hyannisport Capital to The Key Worldwide Foundation,
        21    and it was put on the Schedule K-1 as part of charitable
        22    contributions which, in fact, was able to flow through to the
        23    Form 1040.
        24    Q.   What makes a charitable contribution deductible?
        25    A.   It has to be given to a 501(c)(3) and no goods or services

1    can be received.

2    Q.   Did you make any determination about whether the $100,000

3    payment to The Key Worldwide Foundation was, in fact, a

4    deductible charitable contribution?

5         MR. KENDALL:  Objection, your Honor.  That's an issue

6    for the Court and the jury.  This is what we filed our motion

7    in limine on, and the Court granted it because the government

8    said it wasn't going to be an issue.

9         THE COURT:  Ms. Kearney.

12:11 10        MS. KEARNEY:  Your Honor, this falls within what is

11   acceptable summary witness testimony for an IRS agent.  She's

12   allowed to explain her analysis.

13        MR. KENDALL:  This is exactly what I raised in the --

14        THE COURT:  Well, for the time being the objection is

15   sustained.  We'll go forward.

16   BY MS. KEARNEY:

17   Q.   Agent Ranahan, was this $100,000 payment to The Key

18   Worldwide Foundation factored into the Wilsons' itemized

19   deductions for 2014?

12:11 20   A.   Yes.

21   Q.   And if we can go back to the bottom of page 4.

22        What were the total itemized deductions that the

23   Wilsons took for 2014?

24   A.   $489,952.

25   Q.

1          MS. KEARNEY:  And, Ms. Lewis, if we can go up to page

2    3, please.  And look at the top line 40.

3    Q.   Agent, how does including an additional $100,000 in

4    charitable donations in the Wilsons' itemized deduction

5    calculation affect the amount of taxes that the Wilsons owed

6    for 2014?

7    A.   It lowers the taxable income which, in effect, lowers the

8    tax.

9    Q.   As a result of these additional deductions, what was the

12:12 10   Wilsons' taxable income reported on line 43?

11   A.   $2,058,349.

12          MS. KEARNEY:  And, Ms. Lewis, can you go down and call

13   out the sections from other taxes through refund.

14   Q.   Agent, how much did the Wilsons owe in federal taxes for

15   2014 based on the information provided in this original return

16   that was filed?

17   A.   Their total tax was $202,622.

18   Q.   And what information is recorded in the refund section,

19   lines 75 through 77?

12:13 20   A.   That shows that the amount of refund that the Wilsons were

21   due was $246,634, which of that amount $146,634 was deposited

22   into their bank account and an additional $100,000 was applied

23   towards their 2015 estimated tax.

24          MS. KEARNEY:  Ms. Lewis, can we go to the last page of

25   this document, page 95.

1    Q.    Agent Ranahan, what appears on the last page of the filed

2    Form 1040?

3    A.    This is a photocopy of the envelope that the return was

4    mailed into the IRS.

5    Q.    And do you see what date it was shipped on?

6    A.    It was shipped on December 18, 2015.

7    Q.    And do you see in the left, just above that to the left

8    there's a return address?

9    A.    Yes.

12:14 10    Q.    What is the return address?

11    A.    It's a little cut off, but I think it's Amsterdam,

12    Netherlands.

13            MS. KEARNEY:  Ms. Lewis, can we look at Exhibit 501A

14    in evidence.

15            And can we go to the next page, please.

16    Q.    Agent Ranahan, I'm showing what's been admitted into

17    evidence as Exhibit 501A.  This is the second amended return

18    filed by the Wilsons for tax year 2014.  Are you aware that the

19    Wilsons filed a first amended return that made no changes in

12:14 20    terms of the financial information reported?

21    A.    I am.

22    Q.    Were there changes made between the original return and

23    this second amended return?

24    A.    There were.

25            MS. KEARNEY:  If we can blow up the middle of this

1    page, Ms. Lewis.

2    Q.   Agent, how does this second amended return differ from the

3    original return?

4    A.   The taxable income was increased by $69,420.

5    Q.   And why was that?

6    A.   There was a corrected W-2 from Staples that was given to

7    Mr. Wilson, and the itemized -- there was a state and local

8    income tax change, a very, very minor one.  So there was a

9    little bit of a change to the Schedule A as well.

12:15 10   Q.   Was there any change to the taxes that the Wilsons owed

11   for 2004 as a result of these changes?

12   A.   They did.  They owed an additional $27,609.

13          MS. KEARNEY:  Ms. Lewis, can we pull up the original

14   return, Exhibit 174A on the left, and keep this amended return,

15   second amended return up on the right of the screen, please.

16          If we can go to page 2 of the original and page 5 of

17   the second amended.

18          And can we look at line 17 on both returns, please.

19   Q.   Agent, has the business loss reported in line 17 of the

12:16 20   second amended return changed from the original return?

21   A.   It has not.

22   Q.   And does that amount reported in line 17 still include the

23   $120,000 in consulting fees paid to Mr. Singer and The Key?

24   A.   It does.

25          MS. KEARNEY:  And if we can look at page 4 of the

1   original return on the left and page 7 of the second amended

2   return, please.

3          And look at the charitable contributions or gifts to

4   charity section.

5   Q.   Agent Ranahan, has the amount reported as gifts to charity

6   changed between the original return and the second amended

7   return?

8   A.   It has not.

9   Q.   Does that amount still include the $100,000 payment to The

12:17 10  Key Worldwide Foundation?

11  A.   It does.

12         MS. KEARNEY:  And, Ms. Lewis, if we can go to page 3

13  in the second amended return and we can take down the first

14  return.

15         And can you blow up where it says "sign here," please.

16  Q.   Agent Ranahan, at the bottom of this page of the second

17  amended return there is a paragraph that states, "Under

18  penalties of perjury, I declare that I have filed an original

19  return and that I have examined this amended return, including

12:18 20  accompanying schedules and statements, and to the best of my

21  knowledge and belief, this amended return is true, correct, and

22  complete."

23         Whose name is signed under that statement?

24  A.   It appears to be John Wilson and Leslie Wilson.

25         MS. KEARNEY:  Can we look at the last page of this

1    return, please, Ms. Lewis.

2    Q.   What appears on the last page of this second amended

3    return?

4    A.   This is a copy of the envelope that the second amended

5    return was mailed to the Internal Revenue Service in.

6    Q.   And do you see in the upper right corner there's a stamp

7    from the U.S. Post Office?

8    A.   I do.

9    Q.   What does that say?

12:18 10   A.   It says, "U.S. postage paid, Lynnfield, Massachusetts

11   01940."

12   Q.   What date was it mailed?

13   A.   March 26, 2018.

14   Q.   Do you know what the Wilsons listed as their current

15   address in their 2017 tax return which was filed in 2018?

16   A.   If was a Lynnfield, Mass. address.

17          MS. KEARNEY:  We can take that down.  Thank you,

18   Ms. Lewis.

19   Q.   Agent Ranahan, have you calculated the tax that the

12:19 20   Wilsons would have owed had the $120,000 in payments to The Key

21   and Mr. Singer for consulting fees and the $100,000 payment to

22   The Key Worldwide Foundation not been taken as deductions in

23   2014?

24   A.   I have.

25          MS. KEARNEY:  Can we show for the witness only,

1  please, Exhibits 697 and 698.

2  Q.   Agent, starting with Exhibit 697, which is on the left of

3  your screen, do you recognize that document?

4  A.   I do.

5  Q.   What is it?

6  A.   It's a schedule of additional tax due and owing for tax

7  year 2014 for John Wilson.

8  Q.   Who prepared this chart?

9  A.   I did.

12:19 10  Q.   And looking at Exhibit 698, do you recognize that

11  document?

12  A.   I do.

13  Q.   What is it?

14  A.   It is a schedule of itemized deduction adjustments for tax

15  year 2014 for John Wilson.

16  Q.   Who prepared that chart?

17  A.   I did.

18       MS. KEARNEY:  The government offers 697 and 698.

19       THE COURT:  It will be admitted, 697 and 698.

12:20 20       (Exhibits 697 and 698 received into evidence.)

21  BY MS. KEARNEY:

22  Q.   We'll start with Exhibit 697.

23       Can you tell us what -- the first line reads, "Taxable

24  income per second amended return."

25       What is that?

1  A.    That is the income that was -- the taxable income that was

2  already included on the second amended return.

3  Q.    So you pulled that directly from Exhibit 501A, the second

4  amended return we've been looking at?

5  A.    Correct.

6  Q.    What appears on lines 2 and 3?

7  A.    That's the $220,000 that was wired to The Key, The Key

8  Worldwide Foundation, and Rick Singer that were disallowed for

9  tax purposes.

12:21 10  Q.    And then you get to itemized deduction adjustment in line

11  4.  What is that?

12  A.    So in certain tax years, itemized deductions are limited

13  based on a taxpayer's income.  In 2014, if the itemized

14  deductions were more than $305,050 and the adjusted gross

15  income of the taxpayer was over a certain limit, they were not

16  able to take the entire amount of itemized deductions.  So in

17  this case, it made an additional $3,600 adjustment to limit the

18  amount of itemized deductions.

19        MS. KEARNEY:  Ms. Lewis, can we look at Exhibit 698.

12:21 20  Q.    Agent Ranahan, does Exhibit 698 show your calculation of

21  how the itemized deduction limit was adjusted between the

22  second amended return and then your calculation with the

23  disallowed deductions?

24  A.    Yes.

25  Q.    And what appears at the top of this chart?

1    A.   So at the top of the chart is what is actually in the

2    Schedule A of the second amended return.

3         So if you look at the "per return" line, it lists the

4    amounts that were listed on the second amended return for every

5    deduction that was taken.  The "corrected" column, the only

6    adjustment that was made was the disallowance of the $100,000

7    cash charitable contribution.

8    Q.   And then below that are a series of calculations.  Is that

9    the calculations necessary to figure out what part of the total

12:22 10   itemized deductions would actually be allowed since they both

11   exceed the $305,050 limit you mentioned?

12   A.   Correct.  So both the original and the corrected itemized

13   deductions exceed the $305,050.  We also adjusted -- gross

14   income also increased in the tax computation.  So even though

15   the amount of the charitable contribution -- or the total

16   itemized deductions was reduced because the income went up for

17   adjusted gross income, it created an additional limitation.

18   Q.   And what was the result of your calculations?

19   A.   There was an additional limitation of $3,600.

12:23 20        MS. KEARNEY:  Can we go back to Exhibit 697, please,

21   Ms. Lewis.

22   Q.   So, Agent Ranahan, after you started with the taxable

23   income from the second return, disallowed the $220,000 in

24   payments to Mr. Singer, The Key, and The Key Worldwide

25   Foundation and factored in your itemized deduction adjustment,

1  what was the corrected taxable income for 2014 for the Wilsons?

2  A.   $2,351,369.

3  Q.   What did you do next?

4  A.   I then calculated the income tax due on that $2,351,369.

5  Q.   And then there's a line that reads "credits and additional

6  taxes from second amended return."

7       What is that?

8  A.   Those are the original tax credits.  There was a foreign

9  tax credit, there was a general business tax credit, and there

12:24 10  was also some additional taxes, as in self-employment tax and

11  tax on additional Medicare.  So I took those directly from the

12  filed amended return.

13  Q.   And that resulted in a corrected tax liability.  What is

14  that?

15  A.   $318,777.

16  Q.   So, in other words, that's the tax that the Wilsons would

17  have owed had the payments to Mr. Singer, The Key, and The Key

18  Worldwide Foundation not been deducted?

19  A.   Correct.

12:25 20  Q.   And what did do you after that?

21  A.   I took that corrected tax liability and I reduced it by

22  the tax that was already reported on the second amended return

23  to determine the additional tax due and owing as $88,546.

24  Q.   That's about a third more in taxes than the Wilsons paid

25  for 2014?

```
 1    A.    Correct.
 2              MS. KEARNEY:  Nothing further.
 3              THE COURT:  Cross-examination, Mr. Kendall.
 4              MR. KENDALL:  Yes, your Honor.
 5              I'm going to need a couple of minutes to set up, your
 6    Honor, if I may.
 7              THE COURT:  Yes.
 8              MR. FRANK:  Your Honor, while we're waiting, we do
 9    have a proposal for the Court.  It's being printed.  I could
12:27 10   also e-mail to the Court's deputy if that's easier.
11              THE COURT:  Either one is fine.
12              MR. FRANK:  Thank you.
13                    CROSS-EXAMINATION OF COLLEEN RANAHAN
14    BY MR. KENDALL:
15    Q.    Good afternoon.
16    A.    Good afternoon.
17    Q.    My name is Mike Kendall.  I represent John Wilson.  Thank
18    you for joining us today.
19              I think the point you were making when you started out
12:28 20   is that you're qualified to testify about the tax return based
21    upon your work as a revenue agent doing civil audits.
22    A.    Correct.
23    Q.    And you were in the IRS, what was it, 15 years?  Was that
24    the number?  I'm not sure if I wrote it down correctly.
25    A.    Yes, 15.
```

1    Q.   Of those 15 years, how many years did you actually spend
2    doing audits as a revenue agent?
3    A.   As a revenue agent?
4    Q.   Yes.
5    A.   Personally I did three years.  The other programs, I
6    helped other agents in the field with high -- with technical
7    tax stuff.
8    Q.   So you've only done audit work for three years, and that
9    was back -- the last time was about 12 years ago?
12:29 10    A.   Yes.
11    Q.   Okay.  What particular group of the IRS were you doing
12    audits for?  Was it a particular industry or business or some
13    organizational assignment?
14    A.   Yes.  I was a small business, self-employed revenue agent.
15    Q.   Okay.  Have you ever heard of a part of the IRS called
16    exempt organizations?
17    A.   I think it's referred to as TEGE, which is tax exempt
18    government entities.
19    Q.   Yes, okay.  Tax exempt government entities.  That's the
12:29 20    group that regulates nonprofits like universities, correct?
21    A.   Correct.
22    Q.   Did you ever work with TEGE?
23    A.   I did not.
24    Q.   Okay.  And they're the ones that look over donations by
25    501(c)(3) organizations, correct?

```
 1   A.   I would assume.  I honestly don't know.

 2   Q.   In your three years as a revenue agent, did you ever do an

 3   audit of an exempt organization?

 4   A.   I did not.

 5   Q.   I take it you had no association with TEGE at all in your

 6   years with the IRS?

 7   A.   I actually taught a special enforcement class to one of

 8   the TEGE groups.

 9   Q.   But you weren't teaching them about TEGE tax issues, you

10   were teaching them more about general enforcement stuff?

11   A.   Correct.

12   Q.   Have you ever read the audit manual for exempt

13   organizations?

14   A.   I have not.

15   Q.   Do you even know if they have one?

16   A.   Like an -- like an internal manual revenue?

17   Q.   Yeah, an internal manual that everybody working at TEGE

18   gets to tell them how to do their work?

19   A.   I have not read it in full, no.

20   Q.   Have you read it at all?

21   A.   I've read bits and pieces of it over the past seven years.

22   Q.   Recently?

23   A.   A couple of years ago probably the last time.

24   Q.   Okay.  And would you agree with me that one goal that the

25   IRS wants to accomplish during its audits is to have an
```

1   equitable process for all taxpayers, correct?

2   A.   Correct.

3   Q.   And as part of the equitable process, the IRS wants to

4   apply the same tax rules in the same way to all taxpayers.

5   A.   Correct.

6   Q.   And that's an important part of what they teach the

7   revenue agents, correct?

8   A.   It's very important.

9   Q.   Okay.  And of the thousands of people who have donated

12:31 10   billions of dollars to USC in the past ten years, do you know

11   anybody whose donation was set aside because of an admission

12   benefit or boost?

13          MS. KEARNEY:  Objection, foundation.

14          THE COURT:  Sustained.

15   BY MR. KENDALL:

16   Q.   As part of an equitable audit process, a revenue agent

17   will give the taxpayer credit for items which the taxpayer

18   overpaid, correct?

19   A.   Yes.

12:32 20   Q.   Did you do a thorough look at the tax return to look for

21   overpayments?

22   A.   I don't understand.

23   Q.   Did you do a full review of the tax -- a full audit of

24   Mr. Wilson's tax returns to look if there were any items that

25   were -- which he overpaid?

```
 1   A.    I did not do a full audit of 2014.

 2   Q.    And you heard Mr. Nahmens testify that Hyannisport Capital

 3   didn't take any deductions for the rent it paid for 2014 and

 4   other years, correct?

 5   A.    I heard that, yes, there was no deduction paid for rent.

 6   Q.    Okay.

 7         So if you haven't done a full audit of his tax

 8   returns, you really can't say if he owes money or not, you can

 9   just say there's one item that you challenge, correct?

10         MS. KEARNEY:  Objection, your Honor.

11         THE COURT:  Sustained.

12   BY MR. KENDALL:

13   Q.    I mean, you haven't done a complete audit of his tax

14   return, correct?

15   A.    I have not completely audited the 2014 return or

16   Hyannisport Capital.

17   Q.    And you don't know if there are offsets that might erase

18   that tax obligation to any degree, correct?

19         MS. KEARNEY:  Objection.

20         THE COURT:  I didn't hear the whole question.

21         MR. KENDALL:  She has not looked to see if there are

22   any offsets to the amount of tax due and owing that she claims.

23         MS. KEARNEY:  Objection, relevance.

24         THE COURT:  Sustained.

25   BY MR. KENDALL:
```

1    Q.   When did you first get involved in this case?

2    A.   August of this year.

3    Q.   Okay.  That's about two months ago, maybe less, six weeks?

4    A.   Approximately.

5    Q.   Okay.  And you weren't part of the investigation, correct?

6    A.   I was not.

7    Q.   Okay.  When the decision was made to bring tax charges,

8    you weren't part of the analysis that gave rise to that

9    decision, correct?

12:33 10   A.   I was not.

11   Q.   You were just brought in to give this testimony, correct?

12   A.   I redid a tax computation, yes, and was brought in to

13   testify.

14   Q.   In fact, you were the fourth revenue agent brought in to

15   do the analysis to testify, correct?

16          MS. KEARNEY:  Objection.

17          THE COURT:  Sustained.

18   BY MR. KENDALL:

19   Q.   And you're just -- you're following the same analysis that

12:34 20   the prior agents did, correct?

21   A.   I did my own analysis based on the testimony.

22   Q.   And you came to the exact same conclusion these three

23   prior agents did, correct?

24   A.   I did.

25   Q.   Okay.  Did you participate -- have you listened to this

1    whole trial record?

2    A.   Yes.

3    Q.   Okay.  You heard the testimony of James Nahmens?

4    A.   Yes.

5    Q.   And you testified that for charitable deduction, there can

6    be no goods or services received.  That's verbatim from your

7    testimony, correct?

8    A.   I believe that's what I said.

9    Q.   Okay.  Do you remember Mr. Nahmens talking about

12:35 10   charitable deductions where one has to offset the value of

11   goods and services?

12   A.   The organization has to offset.

13   Q.   Yes.

14   A.   Yes, I recall.

15   Q.   So let's take for an example a person buys a

16   thousand-dollar ticket to a charity dinner run by the cancer

17   society and they have it in a fancy hotel and the cost of the

18   meal by the menu in the hotel is $100.  That would mean the

19   goods and services received were $100 and $900 would be tax

12:36 20   deductible, correct?

21   A.   Correct.

22   Q.   So a charitable deduction can be a payment that has both

23   some goods and services received and something that's above

24   that, correct?

25   A.   Correct.

1    Q.   Okay.  And what you just mentioned is the donation -- the

2    charity is required under the Internal Revenue regulations or

3    code to tell the donor what's the value of any goods or

4    services received, correct?

5    A.   Correct.

6    Q.   And with respect to my example of the dinner, if they had

7    this fund-raising dinner for a thousand dollars a ticket at

8    McDonald's and all they served was a hamburger and French

9    fries, the value of the goods and services received would be

12:37 10    $5, let's say, correct?

11    A.   I don't know McDonald's prices, but it sounds -- it's

12    definitely not a high-end hotel.

13    Q.   My kids have grown up and I don't know them either.  But

14    you get my point.

15    A.   I do.

16    Q.   You have to use the fair market value of any goods or

17    service received if you want to reduce the value of the

18    donation, correct?

19    A.   Correct.

12:37 20    Q.   Okay.  And for some things it's easy to see the fair

21    market value, we look at the menu of McDonald's or we look at

22    the menu of the fancy hotel, correct?

23    A.   Correct.

24    Q.   If it's something that doesn't have an easily available

25    fair market value, you have to look for comparables, correct?

```
 1    A.   Correct.
 2    Q.   Okay.  And in this case, there is no evidence of any
 3    comparable for the value of an admission boost at USC, correct?
 4            MS. KEARNEY:  Objection.
 5            THE COURT:  Do you want -- give me the question again.
 6            MR. KENDALL:  Excuse me?
 7            THE COURT:  Give me the question again.
 8            MR. KENDALL:  I'll see if I can.
 9    BY MR. KENDALL:
12:38 10   Q.   In this case, you do not have any information on a
11    comparable transaction to assign a value to the goods and
12    services that you claim were received for the donation,
13    correct?
14            MS. KEARNEY:  Objection.
15            THE COURT:  Sustained.
16            MR. KENDALL:  Your Honor, this goes right to the tax
17    case, your Honor.  I'd ask if I could have a sidebar.
18            THE COURT:  No.  Not now.
19            MR. KENDALL:  Okay.
12:38 20   BY MR. KENDALL:
21    Q.   So you're disallowing the 100,000 donation, correct?
22    A.   Correct.
23    Q.   You're also disallowing $120,000 that was written as
24    consulting fees.
25    A.   Correct.
```

1    Q.   And it would be your position that they could not be

2    reclassified as part of the donation.

3    A.   Correct.

4    Q.   Did you make any effort to determine what's the value of

5    the goods and services received so you would know the proper

6    amount to offset the $220,000 you want to set aside?

7         MS. KEARNEY:   Objection.

8         THE COURT:   Sustained.

9    BY MR. KENDALL:

12:39 10   Q.   You know that the IRS instructs its revenue agents that

11   they're supposed to look for a fair market value or a

12   comparable transaction to determine the value of the goods and

13   services, correct?

14   A.   Correct.

15   Q.   Okay.  You didn't do that, correct?

16   A.   I relied on the one -- an e-mail that was put in evidence

17   that the $220,000 was not payable until Johnny Wilson was

18   guaranteed admission into USC.

19   Q.   But you don't know what the value of that admission boost

12:39 20   was, do you?

21        MS. KEARNEY:   Objection.

22        THE COURT:   Sustained.

23   BY MR. KENDALL:

24   Q.   If someone tells me the thousand-dollar ticket is not

25   payable until I eat my dinner at McDonald's, I still get a $995

1    write-off and a $5 goods and value received, correct?

2         MS. KEARNEY:  Objection.

3         THE COURT:  She can answer that if she understands it.

4    A.   Could you repeat it?

5    Q.   Yes.  If I pay a thousand dollars for a ticket for the

6    cancer society fund-raiser and I don't have to pay it until I

7    eat my meal at McDonald's, we have a $5 goods and services

8    received to offset the thousand-dollar ticket price, correct?

9    A.   One would assume.

12:40 10   Q.   So I still get a $995 tax deductible deduction even though

11   I don't have to pay the ticket until after I've shown up for

12   the meal, correct?

13   A.   Correct.

14   Q.   Okay.  And fair to say you've got no evidence to say how

15   likely Johnny Wilson would have been admitted into USC anyways?

16   A.   Can you just repeat that?

17   Q.   You're not relying on any evidence to determine how much

18   of a boost he got to get into school?

19        MS. KEARNEY:  Objection.

12:41 20        THE COURT:  Sustained.

21        MR. KENDALL:  Your Honor, may we have a sidebar?  This

22   is, I suggest, important enough to merit it.

23        THE COURT:  All right.

24        (At sidebar on the record.)

25        THE COURT:  Mr. Kendall.

1          MR. KENDALL:  Thank you for the sidebar.

2          We have briefed this extensively.  We've cited the

3    Supreme Court case of Boulware, B-o-u-l-w-a-r-e.  We have a

4    right to put in an alternative tax calculation.  Both

5    Mr. Nahmens, as well as this witness, have testified that under

6    the IRS procedure she is supposed to value what the goods or

7    services received are and use that to offset the amount of the

8    donation.

9          We suggest that there is no evidence in this record to

12:42 10    value what's that admission boost worth, and in particular, we

11    have with a subpoena to you to rule on with USC, USC has never

12    given a value to an admission boost to anybody in any tax

13    donation in history, and they told us that and they told you

14    that in the briefing that they filed.  If they don't have a

15    value for the goods and services received, they can't challenge

16    the deduction.

17          If we're not allowed to put in an alternative tax

18    calculation on the case, I suggest that's reversible error on

19    the tax charge.  We've briefed this.  It's not a surprise to

12:42 20    the government.  We briefed it extensively to them.

21          MS. KEARNEY:  Your Honor, Mr. Kendall is talking about

22    a boost, and Johnny Wilson did not receive a boost.  The

23    evidence is that it was in exchange for his admission.

24          Also, the payment that went to The Key Worldwide

25    Foundation that Mr. Kendall would suggest we offset was never

1    passed on to USC.  That was kept within The Key Worldwide

2    Foundation.  So he's mischaracterizing the evidence as well.

3         MR. KENDALL:  Your Honor, good faith is a defense to a

4    tax charge.  If Mr. Wilson thinks he's making a $220,000 tax

5    deductible donation, even if it can be set aside in a civil

6    audit, he has good faith.  We have the right to put in that

7    good-faith defense and to show that they failed to prove the

8    most essential element to set aside a deduction.

9         Mr. Nahmens gave them the testimony.  This is not a

12:43 10    surprise to them at all.

11         THE COURT:  All right, Ms. Kearney.

12         MS. KEARNEY:  Your Honor, that's a different issue.

13         This has do -- Boulware has to do with an alternative

14    tax calculation based on the -- based on the evidence.

15    Mr. Kendall is trying to put in information that's not in

16    evidence and it's not supported by the evidence.

17         MR. KENDALL:  Your Honor --

18         THE COURT:  Okay.  All right.  I'm not going to

19    continue this argument now.  I'm not going to let you -- I'm

12:44 20    going to sustain the objection now.  We'll talk about it at the

21    break when we have time when the jury is not waiting around.

22         MR. KENDALL:  Sure.  I'll do other stuff.

23         THE COURT:  Yeah.

24         MR. KENDALL:  I'll take us to 1:00.  If I can't, I'll

25    let the Court know.

```
 1              THE COURT:  Okay.

 2              (End of discussion at sidebar.)

 3     BY MR. KENDALL:

 4     Q.   In doing your analysis, you, I take it, accept that

 5     $100,000 that Mr. Wilson gave actually did go to the USC water

 6     polo bank account, correct?

 7     A.   From Mr. Singer's for-profit business.

 8     Q.   Mr. Wilson sent $100,000 to Mr. Singer's for-profit

 9     business.  They turned around and bought a $100,000 bank check

12:45 10    and delivered it.

11     A.   Correct.

12     Q.   They didn't charge any administrative fee or anything

13     else, it was $100,000 that just went through a bank check to

14     the water polo fund.

15     A.   There's the additional $20,000 charged.

16     Q.   That's separate.  I'm talking about the $100,000 that was

17     sent, they bought a $100,000 bank check, correct?

18     A.   If it was the same money.  Obviously I don't know.  I

19     didn't see the bank records.

12:45 20    Q.   And you agree with me there's no allegation that money in

21     the USC water polo fund gift account went to the personal

22     benefit of any coach, correct?

23     A.   I do not know if that occurred.

24     Q.   And then there's $100,000 that went to The Key Foundation,

25     correct?
```

1    A.    Correct.

2    Q.    And there's $20,000 that was described as expenses that

3    actually went as personal payments to Mr. Singer.

4    A.    Correct.

5    Q.    Have you listened to the entire trial?

6    A.    I have.

7    Q.    Okay.  So you heard the playing of the tapes, the

8    consensual tape recordings with Agent Keating, correct?

9    A.    Yes, I heard it, yes.

12:46  10    Q.    And you heard Mr. Wilson say on several occasions in those

11    tapes that Mr. Singer did not make any money when he did the

12    donation or the whatever you want to call it with USC for

13    Johnny, correct?

14    A.    I don't recall that particularly.

15    Q.    You don't recall Mr. Wilson repeatedly saying, "You don't

16    make any money on this.  Let me give you advice for pricing.

17    You should do this in a more sophisticated business way"?  You

18    don't remember all those conversations that Agent Keating

19    testified --

12:47  20    A.    Yes, I remember those conversations, but I don't remember

21    the exact wording of you don't make any money.  It could have

22    been you don't make enough money.

23    Q.    Well, is that your testimony, that you heard the

24    transcript say, "You don't make enough money"?

25    A.    I just said I don't remember exactly.  It could have been

1    "any."  It could have been "enough."  I do not remember

2    exactly.

3    Q.   Okay.  So I want you to assume for purposes --

4              (Court reporter interrupted - technical

5    difficulties.)

6              THE COURT:  You may continue.

7    BY MR. KENDALL:

8    Q.   It would be fair to say you don't disagree with anything

9    Mr. Nahmes testified to about the idea of offsetting the value

12:49 10   of the goods and services by fair market value or comparable

11   transactions, correct?

12   A.   That I don't disagree with him?

13   Q.   Yes.

14   A.   No, I don't disagree with offsetting for goods and

15   services.

16   Q.   But you didn't do it in this case?

17   A.   I did not.

18   Q.   And you don't have the information to do it if you wanted

19   to.

12:50 20         MS. KEARNEY:  Objection.

21              THE COURT:  Sustained.

22   BY MR. KENDALL:

23   Q.   I'd like to -- now, if we could have Exhibit 9864, please.

24              Other than my -- excuse me.

25              Actually, why don't we take that exhibit off, because

 1    I've got to adjust it somewhat.

 2              MR. KENDALL:  I'd like you to go back to the --

 3    Mr. Carter, could we have the transcript for September 29,

 4    2018.

 5              (Discussion off the record.)

 6              MR. KENDALL:  If we could go to the transcript of

 7    Exhibit 571A.

 8              (Discussion off the record.)

 9              MR. KENDALL:  Can you do a word search or scroll down

12:51 10   to the word "foundation"?

11              Okay.  Could you keep going further, more to the

12    next -- if you could do a search for the next "foundation."

13              Okay, perfectly, where it says, "And then the kids get

14    into school, line 23.

15    Q.   You see Mr. Singer says, "And then the kids get in the

16    school.

17              MR. KENDALL:  Can we highlight the next seven or eight

18    lines, please?

19    Q.   Mr. Wilson says, "I assume" -- he says, "So, my

12:53 20   colleagues -- so, so you c -- you I assume take a share of that

21    or something.  If it's all going to your foundation, you can't

22    take a share if it goes your foundation.  You don't get a fee

23    on that, then."

24              Mr. Singer says, "Um-Hmm, I just do my fee for what I

25    take when I do your normal applications."

1          Does that refresh your memory there was discussion on

2    more than one occasion that Mr. Singer told Mr. Wilson he was

3    not charging for the side door donations?

4    A.   Can you scroll up just so I can start again at the top

5    where it says --

6    Q.   Please.

7    A.   Thank you.

8          Yes, he cannot take a share out of the foundation, but

9    the $20,000 check was written directly to Mr. Singer.

12:54 10   Q.   But if you take -- if you -- but you know Mr. Wilson

11   wasn't on the e-mails that discussed that the money would go to

12   Mr. Singer personally?

13          MS. KEARNEY:   Objection.

14          THE COURT:   Sustained.

15   BY MR. KENDALL:

16   Q.   Have you seen any e-mails that indicate that Mr. Wilson

17   was told that the $20,000 would go as income to Mr. Singer?

18   A.   He said to Rick for expenses, I think.

19   Q.   Thank you.  For expenses.

12:54 20        You agree with me expenses is different than income.

21   A.   Yes, I agree with you that it's different.

22   Q.   Okay.  And so you agree with me Mr. Singer says here at

23   lines 5 and 6, "I just do my fee for what I take when I do your

24   normal applications."

25          Correct.

A.   Correct.  But this conversation is also in 2018.  I don't know what the context would be in 2014.

Q.   I'm asking are you aware of any evidence where Mr. Singer said that he was getting paid to do any part of the side door donation?

A.   I am not aware of him saying that.

Q.   Okay.  And so -- okay.

If we could, I'd like to do this on the ELMO, it's a little bit cleaner that way.

I want to show you Exhibit 9864, please.

MR. KENDALL:  If we could show the witness first.

Q.   Do you recognize 9864?

A.   It looks like a copy of the website where you can search for tax exempt organizations.

Q.   Thank you.

MR. KENDALL:  I'd like to offer that into evidence, your Honor.

MS. KEARNEY:  No objection.

THE COURT:  It will be admitted, 9864.

(Exhibit 9864 received into evidence.)

BY MR. KENDALL:

Q.   If we take a look -- this is an official IRS publication, right?

A.   On the website, yes.  It's official IRS website, yes.

Q.   And this is what the IRS puts out there so tax preparers

1    and taxpayers can check whether tax-exempt organization has

2    been certified by the IRS, correct?

3    A.   Correct.

4    Q.   And if we take a look here, it says, "tax-exempt

5    organization search helps users find information about a

6    tax-exempt organization's federal tax status and filings."

7         It states, "You can find:

8         "Organizations eligible to receive tax-deductible

9    charitable contributions."

12:56  10         And they state, "Users may rely on this list in

11    determining deductibility of their contributions."

12         Is that correct?

13    A.   That's what it says.

14    Q.   So what the IRS is telling people, if you make a

15    contribution, you can look it up on our website and if we tell

16    you we've certified that charity as an approved registered

17    charity, you can rely on us when taking a deduction.

18    A.   Correct.

19    Q.   Now, I'm going to -- this form -- we actually have the

12:57  20    search attached to it, and you see tax-exempt organizations

21    search bulk data downloads.  That's the database that's on the

22    website where you can look up all the different charities,

23    correct?

24    A.   Correct.

25    Q.   And you see this one states that its last update was

1   December 9, 2019.

2   A.   Correct.

3   Q.   Almost two years ago.

4   A.   Yes.

5   Q.   Okay.  And if we flip the page, we see that The Key

6   Worldwide Foundation, here highlighted in blue, is still listed

7   as an approved charity.

8   A.   I cannot read that.  I'm sorry.

9   Q.   Let's see if we --

12:58 10   A.   Okay, I got it now, thank you.

11   Q.   So in December 2019, which is about eight, nine months

12   after this case became public, the IRS was still listing The

13   Key Worldwide Foundation as a valid charity.

14   A.   It appears so.

15   Q.   And you'd agree with me with respect to Mr. Wilson's

16   $100,000 to USC, there's no evidence in this case that USC has

17   ever refunded it to him, correct?

18   A.   Not that I'm aware of.

19   Q.   And no evidence that USC ever sent him a gift notice

12:59 20   saying that there was goods or services received, correct?

21   A.   There was no gift receipt ever sent from USC from what I

22   know.

23   Q.   Right.  It's USC's obligation to send it to Mr. Wilson,

24   and they never did.

25   A.   The Wilsons didn't pay USC directly, The Key did.  So The

1    Key most likely got the gift letter.

2         I don't know that, but from -- it came out of The Key,

3    so -- and I understand that "The Wilson Family" was written on

4    the top, but it still came from The Key.

5    Q.   So you're assuming that USC sent a thank you letter or

6    thank you note to The Key Foundation?

7    A.   A gift receipt.  I cannot say whether they did or not, but

8    what was received by the Wilsons was a thank you letter.  So

9    the goods or services didn't have to be included in that

01:00 10   letter, it was to be included in a gift receipt.

11   Q.   Right.  But sometimes we know charities will send a thank

12   you note separate from a gift receipt.

13   A.   Oh, absolutely.

14   Q.   Do you know what the USC practice was?

15   A.   I have no idea.

16   Q.   And do you have -- are you just guessing that USC sent

17   something to The Key?

18   A.   Yes.

19   Q.   Okay.  So you're just making it up.  There's no evidence

01:00 20   in the case for that.

21        MS. KEARNEY:  Objection.

22        THE COURT:  Sustained.

23   BY MR. KENDALL:

24   Q.   You're guessing, correct?

25   A.   I didn't say that it was definitely sent.  I said if it

1   was, it probably would have went to The Key because that's

2   where the check came from.

3   Q.   Well, the check doesn't say "The Key Foundation".  It says

4   "The Wilson Family," correct?

5   A.   Yes.

6   Q.   And they tracked down the Wilson family and sent them a

7   letter to their address, correct?

8   A.   I think the athletic fund did.

9   Q.   Yes.  And did you see anything to indicate that USC ever

01:00 10   sent anything to The Key for that $100,000 donation?

11   A.   No.

12   Q.   So you had no evidence to base that statement on that you

13   just made.

14        MS. KEARNEY:  Objection.

15        THE COURT:  Sustained.

16        MR. KENDALL:  Your Honor, would you like to --

17        THE COURT:  Yes, we're going to take the break.

18        Ms. Ranahan, you can step down for the time being

19   here.

01:01 20        We're going to recess for one hour.  We'll see you at

21   2:00.

22        THE CLERK:  All rise for the jury.

23        (Jury exits.)

24        THE COURT:  Be seated, counsel.

25        Approximately how much longer on cross, Mr. Kendall?

1          MR. KENDALL:  Your Honor, I expect 30 to 45 minutes,

2     maybe 50 minutes.

3          MR. KELLY:  I expect nothing from me, your Honor.

4          THE COURT:  All right.

5          And redirect?

6          MS. KEARNEY:  Depends on what comes out in the rest of

7     the cross.

8          THE COURT:  Okay.

9          First of all, I have received a proposed curative

01:02 10     instruction from the government.  The government will give a

11     copy of that to defendants.  We'll talk about it at 2:00 before

12     we bring the jury back in.

13          I certainly am inclined to give such an instruction,

14     but I'll hear the defendants if they have any objections to

15     this particular instruction.

16          Is there anything more that needs to be said with

17     respect to the sidebar that we had a few minutes ago?

18          MR. KENDALL:  Yes, your Honor.

19          This is central to our tax defense.  There's 100

01:03 20     percent aligned with both the testimony of Mr. Nahmes, as well

21     as the witness' own testimony of what the IRS standard is.

22          If they want to disallow a charitable deduction for

23     goods and services, they have to give a value to the goods and

24     services and offset.  That's my example, if you go to

25     McDonald's or the Four Seasons --

1          THE COURT:  Are you intending to offer an expert

2     that's going to say this for the defendant?

3          MR. KENDALL:  Your Honor, we're discussing now whether

4     we put on a tax expert, but I don't have to, your Honor.  It's

5     the law.

6          THE COURT:  I understand that.  I'm just asking

7     whether you intend to do it.

8          MR. KENDALL:  Given the testimony of Mr. Nahmes and

9     her, I don't think I have to, your Honor.

01:03 10          But it's in our proposed jury instructions, it's in

11     the briefs we filed, your Honor.  This is black letter law.

12     They need -- the charity -- USC has to determine what's the

13     fair market value of the offset or deduction or reduction of

14     the deduction, and there's no evidence that they have it here.

15     And she didn't consider it, your Honor, so she's not complied

16     with the Internal Revenue Code.

17          THE COURT:  Ms. Kearney.

18          MS. KEARNEY:  Your Honor this is a tax fraud case, not

19     a tax evasion case.  So the actual amount of the tax loss is

01:04 20     not relevant.  It's not an element of this charge.

21          On top of that, Mr. Kendall is arguing about a

22     donation to The Key Worldwide Foundation that was never passed

23     on to USC.  The fraud here was related -- related to the

24     payment to USC was deducted as a business expense, not a

25     charitable contribution.

1          So the value that he wants to attribute to that is not

2     relevant to the fraud related to deducting it as a business

3     expense.

4          MR. KENDALL:  Your Honor, if I may be heard.

5          First, her testimony should be set aside if it

6     violates the Internal Revenue Code and is against law.

7          She's trying to calculate a damage.  Good faith is an

8     absolute defense to a tax charge.  They have to show violation

9     of a known legal duty.

01:05 10          If Mr. Wilson in good faith believed he was making a

11    $220,000 charitable contribution, which I suggest Agent

12    Keating's testimony establishes in the record basis for us to

13    argue that in good faith, then she cannot argue that there's

14    any tax loss which is -- it is an essential fact for them to

15    make the case attractive to the jury.

16          It's not just a line mistake on a tax return that had

17    no consequence.  They're trying to prove that Mr. Wilson

18    intentionally evaded $88,000.

19          Her testimony should be struck if she's violating the

01:05 20    Internal Revenue Code in her calculation.

21          THE COURT:  All right, Ms. Kearney.

22          MS. KEARNEY:  She's not violating the Internal Revenue

23    Code in her calculation.

24          The evidence that she saw during the trial is that

25    Mr. Wilson tried to first put all of the money as business

consulting expenses, so she, based on that, determined that the business expenses, as well as the charitable donation where it did end up in The Key Worldwide Foundation, are not allowed deductions, and she based her analysis based on that.

THE COURT:  All right.  I'm going to give you an opportunity, Mr. Kendall, to put this in writing and submit a motion to this effect by 5:00 tonight and I'll hear the matter between now and the time you commence your case.

MR. KENDALL:  Okay, your Honor.

THE COURT:  The government will be allowed to respond to it, but I'm not going to either exclude her testimony or allow to -- or sustain the effort to do what you're expecting to do before the end of the government's case.

MR. KENDALL:  Your Honor, my only request is if we could have a little bit more than 5:00.  I expect we're going to be this afternoon finishing up this witness and then perhaps having a conference with you.  Can we have a little bit more time --

THE COURT:  How many lawyers do you have working on your case?

MR. KENDALL:  Not too many on the tax issue.

THE COURT:  Four in the courtroom.  5:00 tonight.

MR. KENDALL:  Thank you, your Honor.

THE CLERK:  All rise.

(Recess taken 1:07 p.m. to 2:07 p.m.)

 1          THE CLERK:  You may be seated.  Court is now in

 2   session.

 3          THE COURT:  Counsel, before the break the government

 4   submitted a proposed curative instruction, which I instructed

 5   counsel to look at.

 6          Has there been any agreement on this, Mr. Kelly?

 7          MR. KELLY:  No, your Honor.  I would respectfully

 8   suggest the Court, as it's done with these other requests for

 9   curative instructions, take it under advisement and give it an

02:08 10   appropriate time and not now.  I'd like to determine further

11   whether the numbers, in fact, add up.  The exhibit that I think

12   was a subject of discussion was 716.  It was about $9 million,

13   and I'm looking at the Plea Agreement of 3.4 million, and -- as

14   well as all funds on deposit as of the Plea Agreement's date of

15   2/6/19.

16          THE COURT:  No.  I'm talking about the curative

17   instruction with respect to the examination of Miss George.

18          MR. KELLY:  Yes, so am I, your Honor.  Maybe I'm not

19   being clear enough.

02:08 20          THE COURT:  Okay.

21          MR. KELLY:  I don't know if this is entirely accurate.

22   Their question was about several million dollars that were in

23   account, and it's being stated unequivocally here by the Court,

24   which the jury will believe, that he wasn't allowed to keep any

25   of it.  And I'm trying to look through Singer's Plea Agreement

1    and his Cooperation Agreement.  There's a reference to he has

2    to cooperate with respect to something under Swiss law.  I

3    don't know if there's a Swiss account.  We've raised it with

4    the government earlier in the discovery phase about -- it was

5    in September he had a $1.4 million account.  And when he signed

6    his affidavit, it was -- his financial affidavits, it was down

7    to 1.1.  I just want to confirm all the money he no longer

8    really does -- didn't get any, wasn't allowed to keep any.  So

9    my point is that I would like to pursue it a little further

02:09 10    after I analyze the documents, discuss it further with the

11    government, and it's a timing thing from my perspective.

12            THE COURT:  All right.

13            MR. KENDALL:  Friday morning, your Honor, if that's

14    convenient.

15            THE COURT:  Government's position, Mr. Frank?

16            MR. FRANK:  Well, first of all, the account that

17    Mr. Kelly is talking about is a different account, not the KWF

18    account.  But we believe the instruction should be given now

19    when it's fresh in the jury's head.  What I would suggest, your

02:10 20    Honor, is if we strike the last sentence of the proposed

21    instruction and simply instruct the jury to disregard any

22    suggestion that he was permitted to keep that money.  Then the

23    Court is not affirmatively stating other than that they should

24    disregard the suggestion.

25            MR. KENDALL:  Your Honor, I have a different issue

1    than Mr. Kelly.  I don't think they've quoted me accurately and

2    I would like to get the transcript today to provide you with

3    the exact question and answer that I put so you can make a

4    decision whether this is warranted or not.  I think if we get

5    it to you tonight or tomorrow morning, you can give any

6    instruction you think appropriate Friday morning, but I

7    strongly suggest, your Honor, I don't think they've quoted me

8    accurately.  And I think the Court should have the benefit of

9    the transcript before it makes a decision.

02:10  10           THE COURT:  All right.  I am going to reserve on it.

11    I'm not going to give any instruction at this time and we're

12    going to go forward with the testimony at this point, hoping to

13    end the government's case today.

14           MR. FRANK:  One very brief issue, your Honor.  Earlier

15    today, Mr. Kendall put up Exhibit 118 and suggested it was

16    evidence.  We quickly noted it was not in evidence and it was

17    taken down.  That caused us to go back and check the record.

18    On Friday, the 24th, he offered that exhibit through Agent

19    Keating.  The Court sustained our objection to it coming in.

02:11  20    On Monday, he put it in again with Mr. Nahmens and asserted

21    twice on the record that it was in evidence.  That was not

22    true, and there was about a page of cross-examination about the

23    exhibit that was in front of the jury.  We would ask that that

24    page of cross-examination be stricken from the record.

25           MR. KENDALL:  Your Honor, I'll take a look at the

1    transcript.  There are two documents that are very similar.

2    Mr. Frank is correct that I mistook one for the other.  They

3    both discussed the 20,000 as being expenses.  I'll look at the

4    transcript and I'll respond to it, your Honor.

5            THE COURT:  All right.  I'm not going to do anything

6    immediately on that or the other issue that was discussed at

7    the end of this morning's testimony, but I've given defendants

8    an opportunity to brief that, if they want to, by 5 o'clock,

9    and  I'm going to reserve all those issues until later in the

02:12 10   trial.

11           So call the jury and hopefully we can complete the

12   testimony of the last witness with cross-examination.

13           MR. KENDALL:  Your Honor, we will brief it by five as

14   the Court instructs.  We are not giving up any rights we have,

15   though, to cross-examine this witness in the government's case

16   on that topic.

17           THE COURT:  Fair enough.

18           MR. KENDALL:  Thank you.

19           THE CLERK:  All rise for the jury.

02:14 20       (Jury enters.)

21           THE CLERK:  Thank you.  You may be seated.  Court is

22   now in session.

23           THE COURT:  Good afternoon.  Once again, jurors, we're

24   ready to proceed.

25           Miss Ranahan, you're reminded that you remain under

1   oath.

2          And Mr. Kendall, you may continue with

3   cross-examination.

4          MR. KENDALL:  Thank you, your Honor.

5   BY MR. KENDALL:

6   Q.   Miss Ranahan, I only did half of the section.  So I want

7   to go back to Exhibit 571A, the transcript that we went through

8   before lunch.  Do you remember that's where there's the

9   discussion about Singer and the fee?  We started on page 7,

02:14 10  line 24.  Do you remember that?

11  A.   I do.  I think we started at line 23, when it says, "then

12  the kids get in the school".

13  Q.   23, "and then the kids get in the school.  Yes.  So my

14  colleagues" -- and then if you can turn to page 8, please.

15         MR. KENDALL:  If you can highlight, Mr. Carter, all

16  the way down to line 18.  And why don't we start at the top of

17  the page and we'll work our way down.

18  Q.   So lines 1 through 6, you remember we went through that

19  where Mr. Singer says "You can't take a share if it goes to

02:15 20  your foundation.  You don't get a fee on that, then."

21         Mr. Singer said, "Um, I just do my fee for what I

22  take when I do your normal applications".  Correct?

23  A.   Correct.

24  Q.   And you saw that the fees for normal applications were in

25  the area of five to $8,000 a year?

1    A.   I thought that was for tutoring or prep.  I didn't realize

2    that they were like, you know, his fees.  I just thought they

3    were related to something different.

4    Q.   Okay.  Well, you saw there was two $8,000 fees for

5    Mr. Wilson's two daughters for a total of $16,000?

6    A.   In 2018?

7    Q.   Yes.

8    A.   Yeah.  Okay.  Yup.

9    Q.   Okay.  You saw the prior witness go through that on the

02:16 10   charts, didn't you?

11   A.   I did.

12   Q.   Okay.  And so do you understand that to be the normal

13   application fee?

14   A.   I do not.

15   Q.   Okay.  Then let's look further starting at line 7.

16        "Yeah, that's, like terrible.  I, I think, from a

17   business model point of view, again, I advised you last time".

18        Do you recall that "last time" is when his son

19   applied to USC?

02:16 20        MS. KEARNEY:  Objection.

21        THE COURT:  Sustained.

22   Q.   "I still advise you, this is worth a lot to people, and

23   so, you know, to the extent you want to make more money, I

24   would think you would have some kind of fee for that.  It's

25   about.... it's 350 to the foundation, plus another 20 percent

1    for me for using my leverage and my relationships.

2              "Yeah.

3              "Or something, no?"

4              And Mr. Singer responds, "well, I'm gonna use your

5    business model going forward."

6              You see that?

7    A.   I do.

8    Q.   So you see there at lines 11 and 12, Mr. Wilson says, "I

9    would think you would have some kind of fee for that".  You see

02:17 10   he's referring to making side-door donations, correct?

11   A.   Yes.

12   Q.   Okay.  Now we can put that down.  Thank you.

13              Are you familiar with the -- strike that.

14              With respect to the IRS website, they have the

15   Form 99s from all the charitable entities, correct?

16   A.   Yes.

17   Q.   Like The Key foundation's tax returns put up on the

18   website every year?

19   A.   I believe so.

02:17 20   Q.   And you can look at the data and see where the money is

21   reported as going, correct?

22   A.   Correct.

23   Q.   And one of the things that allows people to do is to see

24   how efficient the charity is, correct?

25   A.   I would assume so.

Q.    Yeah.  And you can look and see does this charity give

10 percent overhead and 90 percent to people who are

underprivileged, or does this charity give 60 percent to

overhead and only 40 percent to people who are underprivileged

or in need of assistance.  Do you understand my point?

A.    I do.  As an accountant myself, that's what I would do.  I

can't speak for people who are not a numbers person.

Q.    Okay.  And for donors, they can look up a charity and say,

this charity is going to give most of my money to the

beneficiaries versus this charity's going to pay a lot of

salaries and overhead and have fancy offices.  You understand

that concept?

A.    Yes, I do.

Q.    Are you familiar with the website Charity Navigator?

A.    I am not.

Q.    Okay.  But you understand that people who donate money

sometimes look up on the IRS website or other websites to see

how efficient the charity is in distributing the funds for the

intended purpose?

A.    I would hope so.  I can't say what the public does.

Q.    But you know that that's what those websites are there

available for, correct?

            MS. KEARNEY:  Objection.

            THE COURT:  Sustained.

Q.    Okay.  And so when Mr. Wilson is told that the $20,000 is

1    going for expenses, did you consider that Mr. Singer told him

2    that's expenses for the foundation?

3              MS. KEARNEY:  Objection.  Mischaracterizes the

4    evidence.

5              THE COURT:  Sustained.

6    Q.   You'd agree with me, a $20,000 contribution to cover the

7    expenses of a 501(c)(3) charity can be a deductible payment,

8    correct?

9    A.   It was deducted as business consulting, so it was not a

02:19 10   contribution.

11   Q.   I'm not asking you what was deducted.  I'm asking you for

12   the principle.  If a person is expecting to pay $20,000 with

13   the expenses of a 501(c)(3) organization, that can be a $20,000

14   deduction?

15   A.   If they donate it to the charity.

16   Q.   Yes, or if they pay for the services and the services are

17   provided to the charity?

18   A.   If they pay directly for the services.

19   Q.   Okay.  So you understand a person can give $20,000 to buy

02:20 20   noncash contributions for the charity?

21   A.   Directly to the charity.

22   Q.   Or they could say the charity says we need secretaries and

23   bookkeeping help to administer a travel grant for a sports

24   team, here's the money to pay for the secretary that will work

25   for the charity.  I'll pay the secretary.  That's a

1   contribution, correct, the secretary's salary, the bookkeeper's

2   salary?

3   A.   If it was paid to the charity.

4   Q.   If it's paid to the bookkeeper and the bookkeeper shows up

5   to work at the charity, that's a noncash contribution.  Don't

6   you remember Mr. Nahmens talking about that?

7   A.   I don't recall his exact wording.

8   Q.   Well, you'd agree with me, if I provide a noncash benefit

9   to a charity, that, too, is deductible?

02:21 10   A.   Under a different line in cash contributions it would be

11   deductible, yes, if it's for a good.

12   Q.   Yeah.  So you know a charity has no bookkeeping help, they

13   have to administer a hundred thousand dollar grant, I'll give

14   $20,000 to hire a bookkeeper to administer the grant.  That's a

15   noncash contribution.  I'm giving $20,000 of bookkeeping

16   services to the charity.

17   A.   It would go directly to the charity and the charity would

18   pay the bookkeeper.

19   Q.   No.  You can also pay the bookkeeper and the bookkeeper's

02:21 20   services are the contribution, correct?

21        MS. KEARNEY:  Objection.

22        THE COURT:  Sustained.

23   Q.   You'd agree with me you can do a noncash contribution of

24   someone's professional services or work, not your own, but

25   somebody you pay to do the work?

1  A.   Can you repeat that?

2  Q.   You agree with me that a person can make a noncash

3  contribution to a charity by paying a third party to provide

4  services to the charity?

5          MS. KEARNEY:  Objection.

6          THE COURT:  Grounds?

7          MS. KEARNEY:  Assuming facts not in evidence.

8          THE COURT:  Well, it's a hypothetical.  If she knows

9  the answer, she can answer it.

02:22 10  A.   I do not know a hundred percent so I don't feel

11  comfortable answering.

12  Q.   I'd next like to go to the tax return, the second amended

13  return.  Now, I want to show you Exhibit 482.  It's in

14  evidence.  Are you familiar?  This is the -- what AYCO gave to

15  Mr. Wilson that became the, that was electronically filed.

16  It's the same return.

17          MS. KEARNEY:  Objection.  It was not electronically

18  filed.

19          THE COURT:  Sustained.

02:23 20  Q.   Excuse me.  That was filed -- you understand that 482 is

21  the same copy of the return as the blue ribbon you have, except

22  the blue ribbon is from the IRS and this is from the preparer?

23  A.   Yes.

24  Q.   Okay.  I'd like to go through 482 with you and ask you a

25  few questions.  Can you go to line 63?  I put a piece of paper

1    and a pen right next to you there.  I'm going to ask you to

2    write down some numbers.  I'd like you to go to line 63 of the

3    1040.  If you could go to the bates ending in 852, line 63.

4    And do you see line 63?

5    A.    Yes.

6    Q.    What is that?

7    A.    It is the total tax on the second amended return.

8    Q.    Okay.  That's the total federal income tax, correct?

9    A.    Correct.

02:24 10   Q.    And what is -- if we go up to line 48, you see line 48,

11    $466,278?

12    A.    I do.

13    Q.    And that's a foreign tax credit.

14    A.    Correct.  Am I supposed to be writing these numbers down?

15    Q.    You can.  I would appreciate that.

16    A.    Okay.

17    Q.    Last time Judge Gorton had to correct the math, but this

18    time I'll try to get it right.

19    A.    I will, too.

02:25 20   Q.    And we've had testimony about a foreign tax credit.

21    That's a foreign credit Mr. Wilson gets for taxes he's paid

22    overseas that the internal revenue code will give him an offset

23    for, correct?

24    A.    Correct.

25    Q.    He's paying taxes in Holland.  The government isn't going

1    to tax him twice in two different countries and tax him on the

2    same income, so the US will give him a credit for what he pays

3    in Holland?

4    A.    Correct.  This was not for all of 2014, though.  There was

5    some carry forward from 2012 and 2013.

6    Q.    Okay.  But the foreign tax credit he's getting is

7    $466,278, correct?

8    A.    Not all for 2014.  That's the total, including the

9    carryforward.

02:25  10    Q.    But that's what's being applied to this return?

11    A.    Yes.

12    Q.    Okay.  So he's got a credit of 466,278.

13          And then if we go to Schedule A, line 5, which is the

14    next page, bates ending in 853, we see the state line 5A.

15    State local income taxes are 222,369, correct?

16    A.    Correct.

17    Q.    And if you were here with us when I did this before, I

18    left out one number, which is why I'm troubling you.  If we

19    could go to the W-2, which is in the bates ending 850.

02:26  20          MR. Kendall:  If we can look at Box 6, "Medicare tax

21    withheld", 47,000 -- the other one, "Corrected Information",

22    not previously reported, but to the right.  Thank you.

23    Q.    Medicare tax withheld, $47,942.  47,942.60.  We'll round

24    it up to 943.  Would you agree with me those are the taxes

25    being paid for 2014?

```
 1    A.    Correct.
 2          MR. KENDALL:  I want to show an exhibit, just for the
 3    witness, 9849, page 1 of 1.
 4    Q.    Do you recognize that as the numbers we just went through
 5    and the total taxes paid?
 6    A.    The foreign tax is different.
 7    Q.    The foreign tax credit was 468,278, I believe.
 8    A.    I have 476 -- can I see the return again?
 9    Q.    Sure.  466 -- you're right.  You're correct.  My math.
10    I'm not going to call it a typo.  I'm just going to call it my
11    error.  It's off by $2,000.  So it's -- the total would be
12    966,821.
13    A.    Yes.
14    Q.    Okay.  And you agree with me the taxable income is
15    $2,131,369?
16    A.    I'd have to see it.
17    Q.    Okay.  Why don't we go back to Exhibit 482.  Let's look at
18    line 43, please, of the 1040, which would be at bates 852,
19    line 43.
20          Well, actually, hold on a second.  I may be off by a
21    fraction.
22          MR. KENDALL:  One minute, your Honor?
23          THE COURT:  Yes.
24    Q.    So taxable income would be what?
25    A.    Is $2,127,769.
```

1    Q.   So $2,127,769.  If we divide $2,127,769 -- excuse me -- if

2    we decide 966,821, the amount of tax paid, by the taxable

3    income, it will get us about 45 percent.  Is that correct?

4             MS. KEARNEY:  Objection.

5             THE COURT:  Grounds?

6             MS. KEARNEY:  The witness testified that not all the

7    foreign tax credit was paid in 2014.

8             THE COURT:  Sustained.

9    Q.   The foreign tax credit was applied to the return, correct?

02:30 10   A.   There was a carry forward from 2012 and 2014.  It wasn't

11   paid in 2014 though.

12   Q.   So using the carry forward, we would see that the carry

13   forward in taxes paid are about 45 percent of the taxable

14   income, correct?

15   A.   All of the foreign tax credit wasn't paid in 2014, so I

16   can't.

17   Q.   I'm not saying it's paid.  I'm agreeing with you it wasn't

18   all paid.

19   A.   Okay.

02:30 20   Q.   I'm saying the foreign tax credit applied and the other

21   taxes paid equal 45.5 percent of the taxable income.

22            MS. KEARNEY:  Objection, your Honor.

23            THE COURT:  Well, if she understands, she can answer.

24   A.   I understand.  I just don't agree with that percentage,

25   because it's not 45 percent of the taxable income, because the

1    taxable income for this year relates only to 2014, whereas the

2    credit that he's getting for foreign tax credit was not all

3    from 2014.  So, to get a percentage, I don't feel comfortable

4    doing that.

5    Q.   I'm just asking you to do the math and the government can

6    ask you questions to explain your view of it later.

7           MS. KEARNEY:  Objection.

8           THE COURT:  Overruled.

9    Q.   My question is simple.  If we take the line, the numbered

02:31 10   line 43, and divide it by 966,821, we get about 45 percent,

11   correct?

12          MS. KEARNEY:  Objection.  Relevance.

13          THE COURT:  She can answer the question.  Overruled.

14   A.   I'm trying to do some long division here.  It might take

15   me a minute.

16   Q.   Would you like a calculator?

17   A.   That would be awesome.  It would go a lot quicker.

18   Q.   Promise me you won't read my e-mails.

19   A.   I promise.

02:32 20   Q.   Would you like a simple calculator?

21   A.   That would be perfect.  It should be a simple calculation.

22   Thank you.  Yeah.  45.4 percent.

23   Q.   Okay.  So that 966 of foreign tax credits and taxes paid

24   is 45 point -- what did you say, 6 percent?

25   A.   Four.

1   Q.   45.4 percent of the taxable income.

2   A.   Correct.

3   Q.   Next, I'd like to show you your chart, Exhibit 697.  This

4   is a calculation you made assuming that the $220,000 should be

5   disallowed as deductions?

6   A.   Correct.

7   Q.   Disallow the $120,000 as a consulting fee and disallow

8   $100,000 as a charitable contribution?

9   A.   Correct.

02:33 10   Q.   Did you do a calculation of what it would be if someone

11   expected that the entire $220,000 would be a charitable

12   contribution?

13   A.   I did not.

14   Q.   Okay.

15        MR. KENDALL: I'd like to show you, only as a chalk,

16   trial Exhibit 9836, your Honor, if I may.  And I'd just like to

17   walk the witness through the calculation.  If we can show this

18   to the jury.  It's only a chalk for the moment, your Honor.

19        MS. KEARNEY:  Can I -- do you have a hard copy I can

02:33 20   take a look at, please?

21        MR. KENDALL:  Sure.

22        MR. FRANK:  Your Honor, this should not be in front of

23   the jury.  It is already.

24        THE COURT:  I can't hear you.

25        MR. FRANK:  I don't know if this is in front of the

```
 1    jury, but it should not --

 2            MR. KENDALL:  It shouldn't be in front of the jury

 3    until you rule.

 4    Q.   I'd like to show you this as a chalk.

 5            MR. FRANK:  Can we have a moment, please?

 6            THE COURT:  Yes.

 7            MR. KENDALL:  May I just explain the sources, your

 8    Honor?  It may put everybody at comfort.  The right column is

 9    from her exhibit that she put into evidence, 6907 or whatever

10    it was.  The far right column is from Exhibit 482, which is in

11    evidence.  And the middle column is just the calculation I've

12    just asked her if she could do and walk through with me.  So

13    two-thirds of this is already in evidence.  It's only the

14    middle column I want to question her about that's not in

15    evidence.

16            MS. KEARNEY:  I'm sorry.  What's the source of the

17    middle column?

18            MR. KENDALL:  The middle column is just making the

19    assumption that the 220 would be deductible as a charitable

20    expense, as opposed to 120 as a business expense and 100 as a

21    charitable expense.  That's the only difference between that

22    and the others, the assumption that it could be treated as a

23    220 charitable donation.

24            THE COURT:  Go ahead.

25    Q.   If we can take a look at this, Miss Ranahan, do you see
```

1   under "government", those are your numbers, lines 1 through 11,

2   correct?

3   A.   Correct.

4   Q.   Do you want to check them?  Or -- never trust my math, I

5   assure you.

6   A.   Can we put up my copy just to make sure that they're

7   exactly the same?

8   Q.   That's an excellent suggestion.

9        MR. KENDALL:  Can we have 687 alongside that, please.

02:36 10  697, please.

11  A.   Yes.  It matches.

12  Q.   Faithful to your numbers.  I even did the numbering

13  correctly.  The only addition was 3A, additional charitable

14  contributions, which is zero in your list, correct?

15  A.   Correct.

16        MR. KENDALL:  Mr. Carter, if we can put them back side

17  by side in full.

18  Q.   Okay.  And then the 1040X is just off the Exhibit 482.

19  Does that look right to you, same taxable income number,

02:37 20  nothing disallowed, nothing added, because it's the baseline?

21  A.   Yes.

22  Q.   Okay.  So now let's look at the middle column for

23  Mr. Wilson.  We start out with the same taxable income number

24  that you had, correct?

25  A.   Yes.

1    Q.    Okay.  And that's line 43 of the 1040, correct?

2    A.    Yes.

3    Q.    We agree with you that the consulting fee for $120,000

4    should be disallowed.  Do you see that?

5    A.    Yes.

6    Q.    But we disagree that there should be a charitable

7    contribution disallowed.  So there's a $100,000 difference in

8    line 3, correct?

9    A.    Correct.

02:37  10    Q.    And then, in line 3A, which you didn't have, I added

11    line 3A.  We add back the $120,000 as an additional charitable

12    contribution, correct?

13    A.    Correct.

14    Q.    And we -- both calculations have the itemized deduction

15    adjustment of $3,600.  And would it be fair to say if we're

16    doing something to raise the adjusted gross income, we've got

17    to give back a little bit of the deduction adjustment?  You

18    lose a little in your deductions, right?

19    A.    If you raise adjusted gross income, you lose a little bit

02:38  20    of your deduction, yes.

21    Q.    And you lose 3,600 bucks, correct?

22    A.    Correct.

23    Q.    Okay.  So the income tax and the corrected taxable income

24    with our calculation would be about $678,492.  It's just a

25    little bit more than what's on the Form 1040X, correct?

1          MS. KEARNEY:  Objection to "a little bit more".

2          THE COURT:  Sustained.

3   Q.   Okay.  Would you agree with me, we've got to pay an

4   additional tax on that $3,600?

5   A.   Taxable income went up, so yes.  You would have to.

6   Q.   The taxable income went up by $3,600, so there's a tax due

7   and owing on $3,600, correct?

8   A.   Yes.

9   Q.   Okay.  And it would be about 39 point something for that

02:39 10   year at his income level?

11   A.   I don't know the rates off the top of my head, but it's a

12   higher rate.

13   Q.   Okay.  My point being, if you treat it that the taxpayer

14   had the expectation that it was all tax deductible and it was

15   just misclassified, the only adjustment that would have any

16   impact on the tax calculation would be $3,600 for the itemized

17   deduction adjustment, correct?

18   A.   If it was allowed as a charitable contribution.

19   Q.   Yes.  And that would result in a total tax increase of

02:40 20   $1,425, correct?

21   A.   Correct.

22          MR. KENDALL:  Okay.  Thank you.  Your Honor, I would

23   like to offer this into evidence given that the witness has

24   validated the calculation.

25          MS. KEARNEY:  Objection, your Honor.

1            THE COURT:  Sustained.

2    Q.    Now, you heard testimony earlier about sub S corporations?

3    A.    Correct.

4    Q.    You heard Mr. Nahmens talk about it?

5    A.    Yes.

6    Q.    Perhaps Miss Keating talk about it?

7    A.    I think so.

8    Q.    And you agree with the testimony that a sub S corporation

9    in 2014 did not have an federal corporate income tax, correct?

02:40 10   A.    In any year it doesn't, correct.

11   Q.    Okay.  It's a pass-through entity?

12   A.    Correct.

13   Q.    And if a sub S corporation had $220,000 in charitable

14   deductions in 2014, that would show up as properly recorded on

15   the Schedule A for the owner of the business, correct?

16   A.    Correct.

17            MR. KENDALL:  If I may have one moment, your Honor.

18   I'm pretty much at the end.

19            No further questions, your Honor.  Thank you.

02:41 20           THE COURT:  Any cross, Mr. Kelly?

21            MR. KELLY:  No, your Honor.  No cross.

22            THE COURT:  All right.  Any redirect?

23            MS. KEARNEY:  Briefly, your Honor.

24            THE COURT:  Miss Kearney.

25                 REDIRECT EXAMINATION OF COLLEEN RANAHAN

```
 1   BY MS. KEARNEY:
 2   Q.   Good afternoon again, Agent Ranahan.
 3   A.   Good afternoon.
 4   Q.   Before the lunch break, Mr. Kendall asked you several
 5   questions about other deductions, hypothetical deductions
 6   Mr. Wilson could have taken?
 7   A.   Yes.
 8   Q.   Does that affect your analysis as to whether the
 9   deductions in this case were allowable?
10   A.   No.
11   Q.   And what is your analysis?
12   A.   That the $220,000 is not deductible on the tax return.
13   Q.   And why is that?
14        MR. KENDALL:  Objection, your Honor.
15        THE COURT:  Overruled.
16        MR. KENDALL:  I think it should be phrased as a
17   hypothetical, not her opinion on the law.
18        THE COURT:  No.  She can answer that question.
19   A.   $120,000 of it was deducted as business consulting
20   expenses, and $100,000 of it was deducted as charitable
21   contributions when goods or services were received.
22   Q.   Mr. Kendall also asked you several questions about whether
23   taxpayers can rely on information on the IRS website?
24   A.   Yes.
25   Q.   And he pointed out that The Key Worldwide Foundation was
```

1  still listed on the IRS website as of December 2019?

2  A.   Yes.

3  Q.   Are you aware that the Key Worldwide Foundation was shut

4  down in March of 2019?

5  A.   I am not.

6  Q.   Can you donate to a shuttered entity?

7  A.   You cannot.

8  Q.   Just because an entity is listed as a tax exempt

9  organization on the IRS website, does that mean all payments to

02:43 10  that entity are charitable?

11  A.   No.

12  Q.   Does that mean that all payments to that charity are

13  deductible?

14  A.   No.

15  Q.   Can charitable organizations be used to commit fraud?

16  A.   Yes.

17  Q.   Even if they're listed on the IRS website?

18  A.   Yes.

19  Q.   Mr. Kendall asked you to do some calculations about

02:43 20  Mr. Wilson's effective tax rate.  First you started to say

21  something about carry forward.  Can you just explain what you

22  meant by that?

23  A.   So there are certain line items in a 1040 return, or

24  actually, a lot of different types of returns, that if the

25  entire amount, in this case it's a credit, so if the entire

1    amount is not allowed in the year that it was paid, it can be

2    carried forward to be used against income in future years.

3    Q.   So not all those taxes were paid in 2014, correct?

4    A.   Correct.

5    Q.   And are you aware that Mr. Wilson received a refund in

6    2012 for some of his Dutch taxes?

7    A.   I am not aware of that.

8    Q.   Does paying a high effective tax rate give you license to

9    take fraudulent deductions?

02:44 10   A.   No, it does not.

11   Q.   And Mr. Kendall showed you just before he sat down a chart

12   he had prepared showing your calculation and then his version

13   of the calculations of what taxes Mr. Wilson might owe?

14   A.   Yes, he did.

15   Q.   Is it still false to claim a charitable deduction as a

16   business expense?

17        MR. KENDALL:   Objection, your Honor.

18        THE COURT:   Overruled.

19   A.   Yes.

02:45 20   Q.   And that calculation that Mr. Kendall showed you, that

21   assumes that the $220,000 were legitimate charitable donations,

22   correct?

23   A.   Correct.

24   Q.   And even with that, Mr. Wilson would still owe more in

25   taxes?

A.   Yes.

MS. KEARNEY:  Miss Lewis, can we pull up Exhibit 710 in evidence, please.

Q.   Agent Ranahan, you've seen this e-mail before?

A.   Yes.

Q.   And if we look at the subject line, it's "USC fees". There's no discussion of donations in this e-mail, is there?

A.   There is not.

Q.   And the bottom e-mail from Mr. Wilson says "Rick, thanks again for making this happen!  Please give me the invoice. What are the options for the payment?  Can we make it for consulting or whatever from The Key so that I can pay it from the corporate account?"

And Mr. Singer responds, "Yes.  We can send you an invoice for business consulting fees and you may write-off as an expense.  What is the name and address et cetera you want the invoice to be made out to?"

Mr. Wilson replies "R, awesome!" And gives the contact information for Hyannis Port Capital?

A.   Yes.

Q.   And again, they're still not discussing any charitable contributions, correct?

A.   Correct.

Q.   And when Mr. Singer writes you can -- he can send an invoice for business consulting fees "and you may write-off as

1    an expense", there's not a discussion of charitable deductions,

2    is there?

3    A.    There is not.

4    Q.    And Hyannis Port Capital is who paid the fees for "making

5    it happen", correct?

6    A.    Yes.

7          MS. KEARNEY:  Miss Lewis, can we look at Exhibit 109,

8    please, that's in evidence.

9    Q.    Agent Ranahan, you've seen this e-mail before as well?

02:47 10   A.    Yes.

11   Q.    And Mr. Wilson, in the first e-mail, says to his assistant

12   Debbie Rogers, "Monday we will get an invoice and wiring

13   instructions for $250,000 to be paid by HPC Inc."

14          And Miss Rogers asks in response, "What is the

15   account I'm charging this to?"

16          And Mr. Wilson replies, "business consulting -- the

17   invoice will be for consulting -- please work with him to get

18   invoice correct".

19   A.    Yes.

02:48 20   Q.    So was the full $250,000 expected to be for business

21   consulting?

22          MR. KENDALL:  Objection, your Honor.  I don't think

23   she can testify to what Mr. Wilson expected.

24          THE COURT:  Sustained.

25   Q.    I'll rephrase that.  Ms. -- excuse me.  Agent Ranahan,

1    does this e-mail reference $250,000 for business consulting?

2    A.   Yes.

3    Q.   And that's what Mr. Wilson was willing to pay to get his

4    son recruited to the USC water polo team, to facilitate his

5    admission?

6         MR. KENDALL:  Objection.  She can't testify.

7         THE COURT:  Sustained.

8    Q.   That's what Mr. Wilson agreed to pay?

9         MR. KENDALL:  Objection, your Honor.

02:48 10       THE COURT:  The question is confusing.  Sustained.

11   Q.   Agent Ranahan, did you rely on this e-mail in coming to

12   your conclusions that the deductions that Mr. Wilson took for

13   the $220,000 in payments were not allowable deductions?

14   A.   This is one of them that I relied on.

15        MS. KEARNEY:  Thank you.

16        THE COURT:  Recross?

17        MR. KENDALL:  Thank you, your Honor.

18        THE COURT:  Mr. Kendall.

19             RECROSS EXAMINATION OF COLLEEN RANAHAN

02:49 20   BY MR. KENDALL:

21   Q.   Miss Ranahan, if my memory is correct, 12 years ago is the

22   last time you did an audit as a revenue agent?

23   A.   So --

24   Q.   Yes or no?  You did the audit?

25        MS. KEARNEY:  Objection, your Honor.

1          THE COURT:  Let her answer the question.

2     A.   So being in the Special Enforcement Program, we -- the

3     whole reason that I am a revenue agent in the Special

4     Enforcement Program is to do the tax side to help CI.  So I

5     have done specific item audits on tax returns almost my entire

6     career.

7     Q.   Okay.  The last time you did an audit as a revenue agent

8     during a standard civil audit for the IRS was 12 years ago,

9     correct?

02:50 10    A.   Correct.

11    Q.   Okay.  So that -- my math is terrible.  That was 2009?

12    A.   It was actually the beginning of 2010 I think is when I

13    went to projects and special planning.

14    Q.   And in the thre years that you did civil audits, did you

15    ever have a taxpayer whose credits and taxes were $966,000 and

16    you referred them over to a fraud case for $1,450?

17          MS. KEARNEY:  Objection.

18          THE COURT:  Sustained.

19    Q.   Did you -- when you would typically do your civil audit

02:50 20    work, if somebody had called a deduction -- one form of

21    deduction and it was better classified as another type of

22    deduction, you just reclassified in the audit, correct?

23          MS. KEARNEY:  Objection.

24          THE COURT:  Sustained.

25    Q.   You had never worked as a person doing audits or tax

1    examinations for the Exempt Organization Group, correct?

2    A.   Correct.

3    Q.   You don't know what their standards are for looking at

4    donations where somebody gets an admission boost, correct?

5           MS. KEARNEY:  Objection.

6           THE COURT:  Sustained.

7    Q.   You agree with me it is a standard well-known rule in the

8    IRS that when people make donations for buildings to

9    universities, it is treated as no goods or services received to

02:51 10    have your name on the building, correct?

11           MS. KEARNEY:  Objection.

12           THE COURT:  Sustained.

13    Q.   Are you familiar -- without asking what they are, are you

14    familiar with the standards that the IRS has for people who

15    donate buildings to universities?  Just yes or no.  Do you know

16    the standard?

17    A.   I do not.

18    Q.   Okay.  You don't know any of the practices that exempt

19    organizations have when they review universities, correct?

02:51 20    A.   No.

21    Q.   No, it's not correct, or no, I don't know?

22    A.   No.  I don't know.  I'm sorry.

23           MR. KENDALL:  Okay.  Thank you very much.  Oh.  Wait a

24    minute.

25           Your Honor, may I have one more moment?

```
 1   Q.    Is it a crime to misclassify a deduction?

 2             MS. KEARNEY:  Objection.

 3             THE COURT:  Sustained.

 4             MR. KENDALL:  Thank you, your Honor.

 5             THE COURT:  Thank you, Miss Ranahan.  You may step

 6   down.

 7             THE COURT:  Mr. Frank?

 8             MR. FRANK:  The government rests, your Honor.

 9             THE COURT:  All right.  Let me see counsel at sidebar.

10                   *** BEGINNING OF SIDEBAR ***

11             THE COURT:  All right, counsel.  I'm going to excuse

12   the jury for the rest of this day and for tomorrow, of course,

13   as I've told them I would.  I will tell them I want them to

14   come back on Friday morning, at which point the defendants will

15   be presenting a defense.

16             MR. KENDALL:  Yes, your Honor.

17             MR. KELLY:  Yes.  We will deal with the 29 motion this

18   afternoon shortly.

19             THE COURT:  Okay.  We can do lots of things outside

20   their hearing.  But I just -- before I excused them, I want to

21   tell them when they're coming back and if the defendant is

22   going to put on a defense and then I'm still hopeful that this

23   case is going to be completed next week.

24             MR. KENDALL:  You know me, your Honor.  I'm always

25   very careful.  We are putting on a case.  We are putting on
```

1  witnesses.  I prefer you say just that they'll come back on

2  Friday and the case will be over by sometime middle of next

3  week.  If something happens between now and then, I'd rather

4  not tell them something.

5      THE COURT:  And how is that different than what I just

6  said?

7      MR. KENDALL:  Just not saying we're putting on a

8  defense.  Just say the case will continue on Friday and,

9  respectfully, will be concluded in the middle of the week.  We

02:54 10 are putting it on.  I'm not playing games.

11      THE COURT:  Okay.  Thank you.

12                  *** END OF SIDEBAR ***

13      THE COURT:  All right, jurors.  What that means is

14  that the government is through with presenting their part of

15  the case and I'm going to excuse you about a half an hour early

16  today.  And as you already know, we're not having a session

17  tomorrow, but we will have a session on Friday.  The case will

18  continue.  And I am now very confident that we are going to be

19  able to complete the case next week.  I don't know exactly

02:55 20 when.  I don't know how many days, but I think next week the

21  case is going to be completed.  You're going to hear closing

22  arguments, my charge to you on the law, and the case is going

23  to be delivered to you for deliberation before the end of next

24  week.

25          So take my instructions about not talking about the

1    case or doing any independent research and multiply by about

2    five.  That's how important it is now not to do anything that

3    would jeopardize this case.  That means don't do any

4    independent research.  Don't talk to anybody else about the

5    case.  You have heard almost all the evidence, not all of the

6    evidence.  You've heard most of it.  You haven't heard closing

7    arguments.  You haven't heard my instructions on the law, all

8    of which is important, therefore, please honor my instructions.

9         Have a pleasant day off from the case.  I'll see you

02:56 10   back here on Friday, the date of which is October 1st, I

11   believe.  October 1st I'll see you back here and we'll continue

12   then.  Take care.

13         THE CLERK:  All rise for the jury.

14         (Jury exits.)

15         THE COURT:  Be seated, counsel.  So we have several

16   issues that are outstanding, but I don't think the Court is in

17   a position to address them at this stage unless there's

18   something else that we have not discussed earlier today that

19   you wish to bring to my attention.

02:57 20        Mr. Kelly.

21         MR. KELLY:  No.  I just think, as a housekeeping

22   matter, there's been a lot of motions going back and forth.  It

23   does appear we have some agreement on Exhibits 1254, 1255, and

24   1540.  The government has withdrawn its objection to the

25   admission those.

1          THE COURT:  Why don't you give me those numbers again,

2    Mr. Kelly.

3          MR. KELLY:  1254, 1255, and 1540.  They have also

4    suggested that, in a similar vein, they are entitled to submit

5    Exhibit 714 over a previous objection by the defense.  I agree

6    with them.  They're right on that.  And so we won't oppose the

7    admission of that one either, 714.

8          And it's really -- I don't know if the Court wants to

9    hear any argument on the Rule 29 issues, but we will file

02:58 10    something with the Court in writing, but there's one particular

11    issue I'd ask that the Court give attention to with respect to

12    Count 2.

13          Even if the Court concludes there's a single

14    conspiracy, which we're going to object to, but even if the

15    Court finds a single conspiracy, with Count 2 there's a serious

16    venue problem and we think it should be dismissed.

17          Count 2 is the USC federal programs bribery

18    conspiracy.  It relates only to USC.  The government in this

19    case has presented evidence that Mr. Wilson was in

02:58 20    Massachusetts when discussing Harvard and Stanford for his

21    daughters in 2018, but with respect to his conduct on the USC

22    bribery conspiracy, 2013 to 2014, the evidence presented showed

23    Wilson lived in California and the Netherlands during that

24    time.  There was zero evidence that Wilson did anything in

25    furtherance of the conspiracy, the USC conspiracy in Count 2,

1     and that's pretty clear.  There's zero evidence that Aziz did

2     anything in Massachusetts, so it's in furtherance of the USC

3     conspiracy in Count 2.

4            We've made this motion before in a motion to

5     dismiss docketed at 1020 and 1234.  We -- the Court ruled at

6     the time that venue was proper because the Court found that

7     Singer -- the Court alluded to that Singer had mailed the check

8     for Donna Heinel from Massachusetts.  That was docket 1402 at

9     page 7, Judge Gorton's order.  That's what you referred to as

02:59 10   giving venue.

11           Now, here, in this trial, the government hasn't

12    offered any evidence that showed Singer mailed this check from

13    Boston to Heinel.  That was the venue hook the Court based its

14    ruling upon earlier.  We suggest it's not been established

15    here.  So while there are a series of legal issues that we will

16    raise under Rule 29, we would respectfully ask the Court to

17    look carefully at that one with respect to Count 2 as to both

18    defendants.  There's no venue, in our view, that's been

19    established.

03:00 20         So we'll flesh it out more in our motion, but I

21    thought I'd bring that to the Court's attention.

22           THE COURT:  All right.  Fair enough.  Thank you,

23    Mr. Kelly.

24           Mr. Kendall?

25           MR. KENDALL:  Your Honor, a couple things.  We're

1    filing a tax memo at 5 o'clock, as the Court has instructed.

2    Just as Mr. Kelly wanted to highlight or peak your interest for

3    the Rule 29 analysis, I do think the shortcoming on the fair

4    market value basis to offset the deduction really is death to

5    their tax account, and I'd like to focus the Court on that.

6              But more importantly, we have a case to put on on

7    Friday.  There are so many things up in the air.  We do need a

8    little guidance from the Court on what we can expect to do and

9    what's going to happen because we want to fill the day and not

03:01 10   sort of leave it empty.  So if we could have a few of your

11   moments now, could I just go through a couple of things?

12             THE COURT:  Yeah, a few.  I have other business.  I

13   have a Rule 11 at 3:30, which I need to attend to, but I'll

14   give you a few minutes now.

15             MR. KENDALL:  Here's the two main issues, your Honor,

16   for this week.

17             First, we've got on for witnesses -- and we've told

18   the government this back on Monday or whenever, Mr. Maricle,

19   Mr. Masera, and Mr. Garfio.

03:01 20             THE COURT:  What was the first name?

21             MR. KENDALL:  Mr. Andrew Maricle, M-a-r-i-c-l-e.

22   Mr. Masera, who is in a government Plea Agreement that the

23   government dropped from their witness list, but we're wanting

24   to present in our case.  And then Mr. Garfio, a former employee

25   of the USC Athletic Department.  We also have the issue of

1    Mr. Haden's deposition tomorrow that's related to what I'm

2    going to raise.

3           Maricle is fine, no wrinkles.  We're going to put him

4    on.  He's going to testify.  He'll be great.

5           With respect to Mr. Masera, he's raised a Fifth

6    Amendment claim.  He's pled guilty and has a cooperation

7    agreement with the government for precisely the issues in this

8    case and was prepared to testify for the government.  When the

9    government dropped him, we subpoenaed him and said we want you

03:02 10   to come as our witness.  His lawyer is now raising an issue of

11   a Fifth Amendment claim.  We don't see a valid Fifth Amendment

12   claim if he has a Plea Agreement and an immunity provision for

13   his cooperation with the government on this particular case.

14          If the Court was inclined to recognize his Fifth

15   Amendment claim, that leaves a hole for us on Friday and we'd

16   have to deal with it.  I don't know if the Court is prepared to

17   deal with Mr. Masera's Fifth Amendment assertion given that he

18   has a Plea Agreement and a Cooperation Agreement with the

19   government.  I don't see what Fifth Amendment exposure he has.

03:03 20          THE COURT:  Let me hear from the government in

21   response to that.

22          Mr. Frank.

23          MR. FRANK:  Your Honor, that's Mr. Masera's decision

24   raised in conjunction with his counsel.  His counsel has filed

25   a brief on that.  We have nothing to do with that decision.  We

1    spoke to his counsel.  We made --

2         THE COURT:  Was this the subject matter of the request

3    that I grant immunity to --

4         MR. FRANK:  It was not, your Honor.

5         THE COURT:  This is different?

6         MR. FRANK:  It was not.  Neither Mr. Garfio nor -- I

7    don't think Mr. Garfio was part of that.  No.

8         MR. KELLY:  That dealt with Mr. Orr and Mr. Lopes and

9    another person we're not concerned with.

03:03 10         MR. FRANK:  Right.  So neither Mr. Masera's invocation

11   of the Fifth Amendment, nor Mr. Garfio's, were the subject of

12   that motion.  Both individuals have addressed this issue

13   through counsel.  They've filed briefs on the issue.  They've

14   raised that issue with the Court and it's pending for the Court

15   right now.  I don't think I have anything to add to that.

16        THE COURT:  Yeah.  Do you want me, by Zoom, to make

17   them in, quote, open court claim the Fifth Amendment not before

18   the jury?  Is there some issue that they perhaps, when

19   confronted with the questions, will not claim the Fifth?

03:04 20        MR. KENDALL:  Your Honor, I expect he'll take the

21   Fifth if he can to try to get out of testifying, but the point

22   we have is, your Honor, I think this --

23        THE COURT:  I'm supposed to order him to testify

24   notwithstanding his claim of a Fifth Amendment immunity or

25   Fifth Amendment?

1            MR. KENDALL:  This the unique situation, because he

2       has a cooperation and immunity agreement with the government

3       for exactly the same activities that would give rise to the

4       Fifth.  Given that he's pled guilty and he has immunity from

5       the government, he no longer has Fifth Amendment exposure.

6       This is the unique situation we agreed about in the law school

7       exam, your Honor.

8            So yes, I think for this -- and the others I see are

9       different.

03:05 10        And maybe the government can tell us, will the

11      government agree that his corporation and immunity agreement

12      will apply to his testimony in this trial, but I don't think

13      the government wants to -- they certainly would take that

14      position if they were calling him.  So can the government

15      simply agree that he's going to testify in our case the same

16      way he testified in their case subject to the cooperation and

17      immunity agreement?  That would eliminate the whole Fifth

18      Amendment issue.

19            MR. FRANK:  It would actually not.

03:05 20        MR. KENDALL:  Your Honor, I think you can make a

21      finding that there's no good faith basis to assert it, but as a

22      second backup issue, I think the government could give us that

23      acknowledgment.

24            THE COURT:  Mr. Frank?

25            MR. FRANK:  We cannot, your Honor.  As counsel knows,

the Fifth Amendment right lasts at least until sentencing and

perhaps beyond.  This defendant has not been sentenced.  What

Mr. Kendall characterizes as a cooperation and immunity

agreement is no such thing.  It's a cooperation agreement.

It's a standard cooperation agreement that allows us to call

him to testify as a witness.  It provides no immunity from

prosecution if he were to lie under oath.  It provides no

immunity from prosecution for crimes we haven't charged him

with, and it certainly provides no immunity from prosecution,

03:06 as his counsel points out in his own filing, from state

prosecution or from prosecution by other federal authorities.

It's not an immunity agreement.

THE COURT:  Yeah.  Can you cite me a case,

Mr. Kendall, in which a court in my position has ordered

somebody to testify against his right to claim the Fifth

Amendment?

MR. KENDALL:  I don't have one at my fingertips, your

Honor.

MR. KELLY:  I do think, your Honor, they have to

03:06 put -- we're fine with Zoom.  With respect to Mr. Orr and

Mr. Lopes, you know, if they're going to claim the Fifth

Amendment for doing their jobs as fundraisers, I think it

should be on the record that's why they're saying they can't

testify in this case.  We've given them subpoenas, and if it's

by Zoom, if the Court has time on Friday to memorialize it on

 1    the record, we're fine with Orr and Lopes invoking to the

 2    Court, outside the presence of the jury, which is the way it's

 3    usually done.  If they claim they have a valid Fifth, well, I

 4    think the Court should inquire to determine what they're saying

 5    is accurate.

 6           THE COURT:  All right.  I'll take that under

 7    advisement.

 8           MR. KENDALL:  The other issue we have, your Honor, is

 9    during the past couple of weeks when we've been trying to

03:07 10   cross-examine in the government's case, the Court has excluded

11    numerous documents that we've wanted to bring up that we

12    thought directly impeached the witness, and the Court sustained

13    the government's objections to us trying to introduce these

14    documents.  It was with Miss Chassin, with Mr. Moon, and

15    others.  The issue I have is we're scheduled to depose

16    Mr. Haden tomorrow.  Based upon his 302 and my conversations

17    with his lawyer, I expect Mr. Haden to give testimony that

18    directly contradicts the documents we have to cross-examine him

19    with.  And so, for me, it's fabulous impeachment.  The

03:08 20   documents are great.  If he testifies contrary to the

21    documents, I want to use the documents to impeach him.

22           If the Court is going to maintain its rulings on

23    documents for Mr. Haden that it has been in the past, I don't

24    want to take his deposition, have the documents excluded, and

25    then I have testimony that directly conflicts with the

     1    documents.  That's the brief we filed with you for both

     2    Mr. Haden and Garfio, as well as Miss Chassin and others.

     3         These people are coming -- the Court made a ruling

     4    that it didn't want us to go through individual admissions

     5    issues to question USC.  The government has taken advantage of

     6    that by having several witnesses testify directly contrary to

     7    the documents in our possession.  And we need to know before we

     8    depose Mr. Haden will the documents come into evidence if it's

     9    only Mr. Haden's testimony.  Then we can't depose him if we

03:09 10    can't impeach him with the documents.

    11         THE COURT:  Mr. Frank?

    12         MR. FRANK:  Your Honor, the Court's ruling was

    13    explicit and repeated that USC is not on trial, that this case

    14    is not about other practices in the Athletic Department, and

    15    the defendants took that ruling and recharacterized the same

    16    evidence as impeachment material.  It has absolutely no

    17    relevance to this case.  Mr. Haden has no relevance to this

    18    case.  This was a fraud on the Admissions Department.  No

    19    evidence that Mr. Haden can provide is relevant to that issue

03:09 20    and -- or to these defendants who he doesn't know.  It is

    21    absolutely categorically addressed by your Honor's prior

    22    rulings and they're now trying to come at it through the back

    23    door.

    24         MR. KENDALL:  If I may explain our position, your

    25    Honor?  Our position is simple.  My client did not normally

1    participate in any fraud on USC.  He disclaims all knowledge of

2    the profile and the government doesn't have a strong case to

3    show he read that profile and understood its contents.  In

4    fact, when Mr. Singer started his cooperation, he never

5    referenced a profile or Mr. Wilson having a fraudulent

6    submission for his son.

7         So, for us, the case comes down to no fraud on his

8    credentials that can be attributed to him, simply the thought

9    that if you make a contribution to the school, it helps your

03:10 10    kid get in.  Mr. Haden can testify, he won't like it, but the

11    documents will show that he repeatedly got people admitted in

12    return for donations.

13         And so they want to say, if the government is -- the

14    government wants to say that a donation to get somebody in

15    without fraud is a bribe or a violation or something like that.

16    Mr. Haden's documents show that was the common practice at USC

17    and it's not an honest services fraud.  That's why the issue is

18    so relevant to us, your Honor.  And we just need the Court's

19    guidance of what we can do.

03:10 20         THE COURT:  I have that motion under advisement.  The

21    order is in draft.  So you will have an answer probably before

22    5 o'clock on that motion.

23         MR. KENDALL:  Thank you, your Honor.

24         MR. KELLY:  Final point, your Honor, is -- at least a

25    final point for me, as I see Mr. Frank stand up.

1          You know, they charged a conspiracy.  They've insisted

2     that Heinel is a coconspirator.  Her state of mind is relevant.

3     We have documents showing that what she did was what was asked

4     of her by USC up until the summer of 2018.  And, you know, we

5     dispute that there can be fraud on the one part of USC but not

6     the other part.  USC's an entity.  So either there's fraud on

7     USC or there isn't.  So that's why it's relevant to Heinel's

8     honest services.  And that's why we're trying to use a handful

9     of these documents, not a million of them, just a handful.

03:11 10          MR. FRANK:  Your Honor, I'll just point the Court to

11     the fact that we briefed the issue Mr. Kendall was raising in

12     docket number 2296, and that's before the Court.

13          THE COURT:  Say that again?

14          MR. FRANK:  We briefed the issue with respect to the

15     impeachment materials that Mr. Kendall is raising at 2296 on

16     the docket.  We filed that yesterday.  I just wanted to draw

17     that.

18          THE COURT:  2296?

19          MR. FRANK:  Yes.  For the Court's attention.  Finally,

03:12 20     your Honor, Mr. Masera has invoked, Mr. Garfio has invoked.

21     That leaves only Mr. Maricle as a witness on Friday.  Assuming

22     that Mr. Masera and Mr. Garfio don't testify on Friday, which

23     unless the Court rules differently is our current assumption,

24     that leaves only Mr. Maricle.  We've been given the names of no

25     other witnesses who would testify on Friday.

1          THE COURT:  Let me confirm that.

2          Mr. Kelly, you were asking for a Zoom conference with

3    respect to the Fifth Amendment on Orr and Lopes, not Masera and

4    Garfio, is that right?

5          MR. KELLY:  Yes.  I was speaking about Orr and Lopes.

6    They've invoked the Fifth.

7          THE COURT:  What about Masera and Garfio?

8          MR. KELLY:  And I'm sorry.  With respect to Masera I

9    did as well.  I did request that -- you know, he's invoking the

03:13 10   Fifth.  He has -- he pled guilty to a racketeering conspiracy.

11         THE COURT:  I understand your argument.  But you're

12   asking the Court to examine, outside the hearing of the jury,

13   three witnesses now?

14         MR. KELLY:  Yes, sir.

15         THE COURT:  Garfio, Lopes, Orr.

16         MR. KELLY:  And I guess Masera would be the fourth.

17         THE COURT:  So there are four now.

18         MR. KELLY:  Yes, so that would consume time on Friday.

19   If, in fact, they have valid a Fifth, I think the Court needs

03:13 20   to determine, or if they're just using it as an excuse not

21   comply with a federal subpoena for a federal trial.

22         MR. KENDALL:  Your Honor, Mr. Frank is correct in that

23   Mr. Masera is not required to attend and the others are not

24   required to testify.  We have Maricle for Friday.  We were

25   planning to play a bunch of tapes from the wiretap and to put

1    in a bunch of documents from USC and from the Singer

2    organization.  I don't know if that fills all of Friday if we

3    lose all our witnesses with all these claims of the Fifth

4    Amendment.  We can go Friday and fill the day as much as we can

5    with those things, or we can put it all on Monday and we'd have

6    another witness who will be in on Monday and we'll fill up

7    Monday that way.

8              THE COURT:  Mr. Frank?

9              MR. KENDALL:  We've got five, six different subpoenas

03:14 10   out there and everybody's claiming the Fifth.  It's not like

11   we're not trying to bring people in.

12             THE COURT:  Mr. Frank.

13             MR. FRANK:  I don't know how they're going to play

14   wiretap evidence, your Honor.  It's complete hearsay as to

15   them.

16             MR. KENDALL:  Your Honor, it goes to -- it's part of

17   what's in front of the Court now in the motions.  It goes to

18   Singer's state of mind.  How can we conspire someone on the

19   side door if he's saying the side door is legal and that's his

03:14 20   state of mind?

21             THE COURT:  All right.  I've heard enough.  I will

22   make an effort to make findings on some of the pending motions.

23   There's another matter that's going to be briefed by the

24   defendants by 5 o'clock this afternoon.  I will give the

25   government an opportunity to respond to that.

```
 1              I have other business, as you're probably aware.  The

 2     MDL panel meets tomorrow morning virtually.  That's going to

 3     take half of my day, but I'm hopeful that I will be free in the

 4     afternoon, so reserve a time to meet tomorrow afternoon.  I

 5     don't know whether I'll take advantage of it, but I want you to

 6     plan on being here at, let's say, 3:30 tomorrow afternoon for a

 7     hearing on any matters that need to be discussed.

 8              Mr. Frank?

 9              MR. FRANK:  The only issue is, your Honor, the Haden

10     deposition was scheduled by video to occur beginning at noon.

11     The defense has three hours for direct and redirect and does

12     not include our cross.  I don't imagine we're going to have a

13     long cross, but I imagine it might go past 3:30.

14              THE COURT:  How many attorneys from the government

15     will be involved in that deposition?

16              MR. FRANK:  That's a good point, your Honor.  We

17     hadn't really thought about that.

18              THE COURT:  Every one of you have multiple attorneys

19     working on this case.  Some of them will be taking a deposition

20     tomorrow.  Others will be in this courtroom at 3:30.  You can

21     pick who it is.  Okay?

22              MR. FRANK:  Yes, your Honor.

23              THE COURT:  3:30 tomorrow.

24              THE CLERK:  All rise.

25              (Whereupon, the proceedings concluded at 3:16 p.m.)
```

```
 1                        I N D E X

 2     Witness                        Page

 3

 4     MARK DECKETT

 5     Direct Examination by Mr. Stearns      15

 6     Cross-Examination by Ms. Papenhausen   22

 7     Cross-Examination by Mr. Kelly         25

 8     Redirect Examination by Mr. Stearns    28

 9

10     LAUREN GEORGE

11     Direct Examination by Ms. Wright       30

12     Cross-Examination by Mr. Kelly         62

13     Cross-Examination by Mr. Kendall       74

14

15     COLLEEN RANAHAN

16     Direct Examination by Ms. Kearney      120

17     Cross-Examination by Mr. Kendall       136

18     Redirect Examination by Ms. Kearney    184

19     Recross-Examination by Mr. Kendall     190

20

21

22

23

24

25
```

```
 1                    E X H I B I T S

 2    NO.                         ADMIT

 3    691    ....................    19

 4    716    ....................    33

 5    718    ....................    38

 6    156    ....................    42

 7    213    ....................    42

 8    350    ....................    42

 9    534    ....................    42

10    719    ....................    46

11    117    ....................    48

12    121    ....................    49

13    720    ....................    52

14    500    ....................    53

15    721    ....................    54

16    533    ....................    56

17    548    ....................    56

18    564    ....................    56

19    573    ....................    56

20    600    ....................    56

21    611    ....................    56

22    724    ....................    56

23    628    ....................    56

24    722    ....................    58

25    2      ....................    60
```

```
1                          E X H I B I T S

2      NO.                        ADMIT

3      1568   .....................   72

4      125    .....................   86

5      9870   .....................   100

6      9872   .....................   100

7      9871   .....................   101

8      697    .....................   132

9      698    .....................   132

10     9864   .....................   154

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8            We, Kristin M. Kelley and Debra Joyce, certify that

9    the foregoing is a correct transcript from the record of

10   proceedings taken September 29, 2021 in the above-entitled

11   matter to the best of our skill and ability.

12

13

14       /s/ Kristin M. Kelley            September 29, 2021

15       /s/ Debra Joyce                  September 29, 2021

16       Kristin M. Kelley, RPR, CRR              Date
         Debra Joyce, RMR, CRR
17       Official Court Reporter

18

19

20

21

22

23

24

25