<pre>
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2


 3
     UNITED STATES OF AMERICA,         )
 4                        Plaintiff    )
                                       )
 5   vs.                               )   No. 1-19-CR-10080
                                       )
 6   GAMAL ABDELAZIZ and JOHN          )
     WILSON,                           )
 7                        Defendants.  )
                                       )
 8                                     )

 9


10

                   BEFORE THE HONORABLE NATHANIEL M. GORTON
11                      UNITED STATES DISTRICT JUDGE
                           JURY TRIAL - DAY 15
12


13
                  John Joseph Moakley United States Courthouse
14                            Courtroom No. 4
                             One Courthouse Way
15                       Boston, Massachusetts 02210


16


17                          September 30, 2021
                                3:42 p.m.
18


19


20
                        Kristin M. Kelley, RPR, CRR
21                        Official Court Reporter
                  John Joseph Moakley United States Courthouse
22                       One Courthouse Way, Room 3209
                         Boston, Massachusetts 02210
23                       E-mail: kmob929@gmail.com


24            Mechanical Steno - Computer-Aided Transcript


25
</pre>

```
 1    APPEARANCES:

 2

 3            Stephen E. Frank

 4            Ian J. Stearns

 5            Leslie Wright

 6            Kristen Kearney

 7            United States Attorney's Office

 8            1 Courthouse Way

 9            Suite 9200

10            Boston, MA 02210

11            617-748-3208

12            stephen.frank@usdoj.gov

13            for the Plaintiff.

14

15

16            Brian T. Kelly

17            Joshua C. Sharp

18            Lauren Maynard

19            Nixon Peabody LLP

20            100 Summer Street

21            Boston, MA 02110

22            617-345-1000

23            bkelly@nixonpeabody.com

24            for Gamal Abdelaziz.

25
```

```
 1    APPEARANCES:

 2

 3              Robert L. Sheketoff

 4              One McKinley Square

 5              Boston, MA 02109

 6              617-367-3449

 7              sheketoffr@aol.com

 8              for Gamal Abdelaziz.

 9

10

11              Michael Kendall

12              Lauren M. Papenhausen

13              White & Case, LLP

14              75 State Street

15              Boston, MA 02109

16              617-939-9310

17              michael.kendall@whitecase.com

18              for John Wilson.

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2

 3              Andrew E. Tomback

 4              McLaughlin & Stern, LLP

 5              260 Madison Avenue

 6              New York, NY 10016

 7              917-301-1285

 8              atomback@mclaughlinstern.com

 9              for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

1
2          THE CLERK:  Court is back in session. You may be
3    seated.
4          THE COURT:  Good afternoon, counsel.
5          Let me just say what the order of events will be this
6    afternoon.  I have received overnight the defendants' motion
7    for judgement acquittal under Federal Rule of Criminal
8    Procedure Rule 29, which includes a memorandum of 39 pages.
9    The government, I presume, has not had a chance to presume in
10   writing, but what I am going to do this afternoon is hear a
11   brief, I emphasize the word "brief", summary of the Rule 29
12   motion, say ten minutes.
13         I will then allow the government to respond equally
14   briefly, understanding that I am going, of course, to allow an
15   opportunity to respond in writing.
16         I am going to deny the motion without prejudice and
17   instruct the defendants to put on a case.
18          I will consider this matter in more detail once I
19   have a written response from the government.  Of course, the
20   defendants will be free to file this motion at a later time,
21   either after the end of all of the evidence or after a verdict.
22         So that's what we're going to start with, the ruling
23   or hearing a summary at least of the defendants' Rule 29
24   motion.
25         After that, we're going to talk about the defendants

1  expectations with respect to witnesses for tomorrow.  I will

2  hear a report on the status of the Haden deposition, if it

3  occurred, and we will talk about the Fifth Amendment claims of

4  Messrs. Garfio, Masera, Orr and Lopes, which will be done by

5  Zoom technology sometime tomorrow at an hour that will be less

6  inconvenient to those on the West Coast than it would be if we

7  did it at 9:00 a.m. Eastern Daylight Time.

8           Mr. Kelly, you rise to be heard.

9           MR. KELLY:  Yes.  Sorry, your Honor.  Just procedural

03:45 10  point.  Mr. Masera is here with counsel and is available for

11  inquiry in person today regarding the Fifth Amendment

12  invocation.  If that affects the Court's schedule, we're not

13  adverse to addressing that first, but whatever the Court needs

14  to do.  There's no need for Zoom tomorrow if he's here today.

15           THE COURT:  That's fair enough.  We can probably do

16  that -- that can be part of the agenda for this afternoon.

17           With that in mind -- I also -- you have, I think now,

18  it might be upwards of 20 pending motions.  I am doing my best

19  to quickly respond, and I will have responses to you with

03:46 20  respect to at least 12 of those motions and an explanation with

21  respect to some of them, but not all of them, by 5 o'clock this

22  afternoon.  So that will at least inform counsel with respect

23  to some of the pending motions.

24           Having said that, I will first hear now from the

25  defendants with respect to their motion under Criminal Rule 29.

```
  1    Who wishes to be heard first?
  2          MR. KENDALL:  Your Honor, the brief is fairly detailed
  3    and substantive.  I will not do it justice in this hearing.  I
  4    will just highlight what I think are some of the major points.
  5    The first issue, it's an issue the Court has ruled on
  6    previously, but I think it's involved --
  7          THE COURT:  We're having feedback from some place.
  8          MR. KENDALL:  The first issue is -- I think we're
  9    still getting it.
03:47 10          THE COURT:  I don't know if it's on your mic or
 11    somewhere else.  We'll proceed.
 12          MR. KENDALL:  The first issue is for the property
 13    fraud, your Honor, have they alleged property that's recognized
 14    by the statute.  The Court has ruled on this.  As we know,
 15    there's a split in this district on how that's to be handled
 16    between yourself and Judge Talwani.
 17          THE COURT:  We've called IT, but maybe if you turn
 18    your microphone off, I can hear you just fine.  Maybe the Zoom
 19    folks are --
03:48 20          MR. KENDALL:  How does one turn these off?  Just by
 21    pressing?
 22          THE COURT:  Let's try it now.  He thinks he corrected
 23    the problem.
 24          MR. KENDALL:  The first issue is, your Honor, we don't
 25    think that what the government has presently defined as the
```

property is recognized by the statute and it's also changed

from what was originally alleged in the indictment.  It's not

that they're now saying that admission slots was the goal of

the property crimes or the fraud crimes.  They're saying

athletic recruitment slots.  The athletic -- what they call an

athletic recruitment slot is nothing more than a coach's

reference or suggestion that a person be admitted through SUBCO

at USC.  That is not a proper.  It's not an admission to a

university.  It's nothing more than a coach saying I'd like

this person in the pool of people that I'd like to be

considered by the SUBCO.  It's not defined enough to be a piece

of property.

　　　　　With respect to the Harvard and Stanford counts, there

it's even less defined.  At least with USC, the SUBCO adherence

to what the process is, there's no adherence to what is

Stanford's process, what is Harvard's process, what is the

property that you're going to get if the senior women's

director at Harvard or Stanford coach wants to designate you.

It's much too undefined, your Honor.

　　　　　Second, your Honor, there's a definition of how to

define what property is.  The athletic slots simply don't fit

that.  They're not something that's essentially saleable.  They

don't come with any type of intellectual type -- the issues

that have been previously discussed in the briefing that we

filed on this before, your Honor.

1           Very significant we think is the issue of bribe.

2   There's also an issue, your Honor, the government's theory has

3   evolved quite differently.  We have remained throughout that

4   the honest services expected of employees of the Athletics

5   Department at USC has not been defined.  I'm not looking to

6   reopen an issue, your Honor, but we've litigated heavily

7   because we believe we've not been allowed to put in a defense

8   as to what was the true definition of honest services expected

9   at the people at the Athletics Department with respect to

03:51 10   students whose parents would make contributions.

11           My understanding of some of the Court's recent rulings

12   is the Court has taken the position that the issue is one of

13   whether or not a false profile was submitted.  If the issue is

14   of fraud, a false profile, then bribery should be taken out of

15   this completely because it's undisputed that our clients --

16   I'll speak for my client.  I'll let Mr. Kelly speak for his.

17           My client, it's undisputed, was told these are

18   donations to the University.  Agent Keating was not happy to

19   give this testimony but she was quite clear that she was told

03:51 20   by Mr. Singer that Mr. Wilson's understanding was these are

21   donations.  It was never suggested to Mr. Wilson that anything

22   he gave would ever be of a personal benefit or for a personal

23   expenditure of a coach.

24           I do think the bribery claim falls apart, your Honor.

25   To say that giving a donation to go to the school's water polo

fund account is a bribe, it's just too far.  If the interests

of the coach and the interest of their employer are aligned,

then making a donation to the school is not corrupting the

process.  It's making the school more enriched for what it

wants to do, which is raise money.

Another issue we've raised in the brief, and I think

is a very important one, and the government has completely

avoided it, they're claiming the theft of honest services

becomes because of the corruption of a fiduciary.  Under both

Massachusetts and California law, which will define the

fiduciary relationship for the three universities at issue,

there's no basis to find that any of these coaches was a

fiduciary.  Fiduciary, under the state laws as we've presented

to the Court, is a trustee, a guide, somebody who has that type

of elevated level of care or trust.  With respect to Donna

Heinel and Vavic, they're employees of the University but

there's nothing there to indicate that it rises to the level of

a fiduciary.  More significantly, with the Harvard and Stanford

ones, we don't even know what these people's jobs are.

According to the testimony in this case, Vandemoer is

a coach at Stanford.  What does that mean?  Is he a full-time

employee?  Is he a volunteer?  Is he a consultant?  What is his

role?  Is he the head coach?  Is he the coach that is

independent authority of rules?  He's just described as a

coach.

1           The senior women's administrator at Harvard is a title

2   thrown out without any definition.  I don't see how the

3   government can argue to the jury that there's evidence to show

4   that these people are fiduciaries.  We don't even know if

5   they're full-time employees, if they're consultants or

6   volunteers or whatever else.  It's a complete lack of evidence

7   on that topic.

8           The bribery issue I've covered, your Honor.  I do

9   think that is equally compelling.  This case started out with

03:54 10  30 or 40 parents in the indictment.  There were serious

11  terrible bribery going on by some of these people.  We see from

12  some of the summaries Mr. Ernst gets $2 million, other people,

13  Janke and others, get money in their pocket.  None of that is

14  soaked with our clients in any way.  More importantly, none of

15  it is our clients ever saying they would even agree to such

16  behavior, that they would agree to pay anybody for personal

17  enrichment.

18          It's what is the scope of the agreement to join a

19  conspiracy.  If somebody's involved in a very far reaching

03:54 20  conspiracy and all sorts of elicit behavior, the person only

21  agrees to do one sliver of that with them -- you know, we see

22  typically in a drug case, let's say somebody's smelling

23  marijuana, cocaine, methamphetamine and is the largest dealer

24  in the city, if an individual comes by and says I'm having a

25  party with friends and would like to buy some marijuana with

1       you, they don't join the entire conspiracy.  They're involved

2       for a simple small little marijuana transaction.

3               Whatever our clients agreed to do, it was agreeing to

4       do something that never involved, never contemplated, never was

5       within the scope of their understanding that there would be a

6       payment to an individual to personally enrich them.  It was

7       always, as Mr. Singer told Agent Keating and others, they were

8       told that they were giving donations.  That was a consistent,

9       unchallenged view of the evidence I suggest, your Honor.

03:55 10               I covered the fiduciary relationship issue, your

11      Honor.

12              With respect to my client in particular, there

13      certainly is no evidence of falsity.  What the government

14      relies on is a profile was sent to Mr. Wilson on October 19th,

15      and there's no evidence that he ever opened it, responded to

16      it, commented on it, acknowledged its existence.  It's an

17      e-mail from Mr. Singer, attaching an e-mail from Mr. Margulies,

18      and Mr. Margulies's e-mail has it as an attachment.  It's sent

19      over to Mr. Wilson and that's where the trail ends.  It's dead.

03:56 20               So, first, there's no evidence that Mr. Wilson is

21      aware of this, but more important, there's no evidence of

22      falsity in the profile.  There are times Mr. Frank wants the

23      jury to think are not accurate, but there's no evidence to

24      which time is accurate, which time is inaccurate, if any time

25      is false.  The times were lowered.  Mr. Singer says, you know,

1    from 22 go to 20 seconds, but nobody has proven that either one

2    of those times is correct or incorrect.  There's nothing in the

3    record.  So they have to show that there's a material element

4    in that profile that Mr. Wilson observed that is false and

5    would have led to a significant impact with the material to

6    SUBCO.

7         Mr. Moon testified both of the times were good times

8    for recruiting.  20 was so fast you belong on the USC swim

9    team.  22 is as fast as the USC water polo team.  And for a kid

03:57 10   to do that in high school is a very impressive fast time to be

11   doing 22.  That was Mr. Moon's testimony.

12        So there's no evidence in the record, I suggest, to

13   show that Mr. Wilson knew that there was a false profile or

14   that there is falsity in that profile at a level that's

15   material to the jury or to SUBCO, for the jury to find was

16   material to SUBCO.  Just because Mr. Singer changes entries on

17   a profile doesn't mean one is true and one is false.

18        If I may have a moment, your Honor.

19        That issue of the profile goes to the whole issue of

03:58 20   conspiracy to make false statements, knowledge of false

21   statements, and the like.

22        An important issue to us is the Harvard and Stanford

23   counts.  There's a claim that Mr. Wilson aided and abetted

24   Mr. Singer to commit those violations.  Mr. Singer was working

25   as a government informant.  He is not someone who is committing

1   a crime.  You can't aid and abet a person whose not committing

2   a crime.  So I think that's an important issue for the aiding

3   and abetting counts, your Honor.

4   　　　　We had the *Kotteakos* issue on the rule of conspiracy.

5   The Court has ruled on that. We think it's very important,

6   particularly the way the evidence came in.  There's no way to

7   associate Mr. Wilson with any other member of this conspiracy

8   in terms of sharing a goal of its accomplishment sharing

9   efforts to have the means accomplished.  There is perhaps some

03:59 10   reference of a Palatella comment or phone call with Marci

11   Palatella, but she doesn't say Mr. Wilson told her anything or

12   she ever did anything with Mr. Wilson.  She's just asking

13   Leslie something and Leslie saying you'll have to ask John, and

14   there's no indication Mr. Wilson spoke to this woman.

15   　　　　There's no connection between him and any other parent

16   in trying to accomplish any of the goals of the overarching

17   conspiracy, your Honor.  That, I think, really creates a

18   significant *Kotteakos* issue.

19   　　　　For *Petriezzello*, it's really the same issue I

03:59 20   realize.  There's nothing to show Mr. Wilson is conspiring with

21   any of these other parents with anybody involved in test

22   cheating or other things.  We think that's also an issue.

23   　　　　Finally, your Honor, I think there's a lot in here

24   that will be covered better in the documents.  The one thing I

25   do want to raise on the tax issue with respect to Mr. Wilson,

1   they have to show that he made a false statement on a tax

2   return that was material.  The whole way they try to establish

3   the materiality of the false statement is to say that but for

4   that false statement he would have had to have paid $88,000

5   more in taxes.  The agent acknowledged that the IRS regulations

6   require, it's not optional, require that she put a value on the

7   benefit or goods and benefits received that can be offsetting

8   the charitable contribution.  She has no information to do

9   that.  There's no information in the record that any jury could

04:00  10   draw an inference from and, therefore, she's no basis to say

11   that the number is 88,000.

12          The government says it's a bribe so none of it should

13   be deductible.  Your Honor, it's clear.  It's not a bribe.

14   Mr. Singer told him, Mr. Wilson's state of mind was that it was

15   a donation.  What everyone wants to call it in reality,

16   Mr. Wilson's state of mind is he was making a donation.  He got

17   two thank you notes from the two different 501(c)(3)

18   organizations.  For her to say that it is an entire 220,000

19   that has to be set aside, there's simply nothing in the

04:01  20   evidence to support that.

21          If I may have one moment, your Honor.

22          Your Honor, Mr. Tomback points out to me.

23          THE COURT:  You're over your 10 minutes now,

24   Mr. Kendall, so please.

25          MR. KENDALL:  If I can summarize one last point.

```
 1              THE COURT:  Yes.
 2              MR. KENDALL:  In 2265 in the document you ordered in
 3      our docket entries, you wrote at page 5, "as the Court has
 4      ruled on previous occasions, testimony concerning the general
 5      fundraising practices of USC is not relevant to whether
 6      admitting students through SUBCO with falsified athletic
 7      credentials deprive USC of the honest services of its
 8      employees".
 9              If the issue is the falsification of athletic
10      profiles, then I suggest, your Honor, the bribery issue falls
11      out.  If the whole issue is just up and down whether or not we
12      knew they were falsified credentials, I think the evidence is
13      clear that standard has not been met.
14              Thank you very much, your Honor.
15              THE COURT:  Thank you.
16              MR. SHARP:  Your Honor, I have 4 minutes.
17              THE COURT:  Yes.  You may have 4 minutes.
18              MR. SHARP:  Thank you.  Just two brief points.
19              First, on the meaning of bribe, they've had their case
20      to show now that there's been a bribe.  We filed a document,
21      docket 2077, on the meaning of bribe.  We would submit there's
22      never been a case anywhere in the federal courts where a
23      payment to a victim has been considered a bribe for purpose of
24      honest services fraud.  And there's a case where justice --
25      excuse me -- Judge Easterbrook wrote that "the United States
```

1   has not cited, and we have not found, any appellate decision

2   holding that an increase in official salary, or a psychic

3   benefit such as basking in a superior's approbation (and

4   thinking one's job more secure), is the sort of "private gain"

5   that makes an act criminal under under Sections 1341 and 1346".

6          So we submit that, under the *Skilling* case, which says

7   that honest services has to be a classic or core kickback or

8   bribe, that there is such no classic or core kickback or bribe

9   here, especially because the government has admitted that our

04:03 10   clients thought that the money was going to a program at the

11   school, and that's their theory.  Their theory is that payment

12   is a bribe, to the school, to a program at the school.

13          Secondly, very briefly on the venue issue, this was

14   briefed extensively last year.  There were motions to dismiss

15   practice over this issue.

16          On Count 2, even if there is a single conspiracy,

17   there is no venue.  That is because your Honor held that the

18   case could be tried if you didn't dismiss because there was an

19   allegation in the indictment that Rick Singer dropped the check

04:04 20   in a mailbox in Boston to Donna Heinel in California, however,

21   the government did not elicit any testimony about that and

22   there's been no proof of that.  So all that they really have

23   now is the fact that Mr. Singer was in Boston when he was

24   making these recorded calls.

25          And we briefed extensively at docket No. 1234, which

is easy to remember, that the consensual calls cannot create

venue.  And that is because they are narratives of past events,

as the government has admitted.

In one of their briefs, she said it was like calling

up a customer about a drug deal from years ago and saying,

remember when we did that drug deal.  By the time these calls

were made with defendants Wilson and Abdelaziz, their children

were already at USC or had -- I think Wilson's had graduated

from USC and they were simply not in furtherance of a

conspiracy.

So we submit Count 2 there is no venue.  Thank you,

your Honor.

THE COURT:  All right.  Mr. Frank?

MR. FRANK:  Thank you, your Honor.  To be completely

candid, I haven't fully read the brief yet.  The comments I'm

going to make now are very preliminary, but I'll just sort of

give your Honor the headlines of our response.

First of all, with respect to the argument that

admission slots are not property, the law of the case is that

admission slots are property.  The Court has already decided

this issue.  We have not changed our theory.  This is not --

the defense is playing something of a linguistic game here.

The defendants sought to gain admission to the University as

athletic recruits.  They did gain admission to USC as athletic

recruits.  They obtained admission approval letters, which

1      Becky Chassin testified, which effectively 100 percent

2      guaranteed admission.  They did that by going through the SUBCO

3      process as fake athletic recruits to obtain those admission

4      slots.

5              So that the Court already decided.

6              With respect to the second issue Mr. Kendall raised,

7      the notion that, and that counsel just raised again, the notion

8      that payments that went to the University cannot constitute

9      bribes, again, this Court has already decided that issue.  It's

04:07 10      the law of the case, and the Court has decided that even if the

11      victim, in this case the University, ends up profiting as a

12      result of a kickback scheme, there's still this actionable harm

13      in the denial of that party's right to the offender's honest

14      services.  It's the honest services that is the object of that

15      fraud and the money.  It matters not where the money goes.  It

16      matters what the purpose of the payment is.

17              There's also, by the way, evidence, your Honor, that

18      neither of these defendants saw those payments as donations to

19      the University.  Mr. Wilson, of course, instructed his

04:07 20      assistant to arrange for them and arrange with Mr. Singer to

21      arrange for them to be billed as consulting fees.  It was only

22      later that it was decided to split them between consulting fees

23      and a purported charitable donation.

24              Mr. Aziz was recorded on consensual calls expressing

25      concern when he was told of an audit that they would look back

1    and realize that this was not a donation and expressed concern

2    about whether he should take it as a deduction for that very

3    reason.

4           With respect to the fiduciary duty issue, the law is

5    clear, the Supreme Court law that this Court has already cited

6    that the existence of a fiduciary relationship between an

7    employer and employee is beyond dispute.

8           With respect to the claim to the argument about

9    falsehoods and the profiles, there is an abundance of evidence

04:08 10    on this topic, your Honor.  Mr. Singer, Mr. Vavic told

11   Mr. Singer to make it a good profile with respect to

12   Mr. Wilson's son.  Mr. Singer told Mr. Wilson that he was going

13   to be embellishing the profile pursuant to Mr. Vavic's

14   instructions.

15          There was evidence that the swim teams were completely

16   fabricated.  They went from 22 seconds to 20 seconds within the

17   space of 45 minutes.  There was evidence of other invented --

18   another invented award on that profile, the Asics award, which

19   was listed on that profile, and there was evidence that that

04:09 20    award was completely fabricated by Mr. Singer and used on

21   numerous students' profiles.

22          There was evidence that the difference in times is

23   extremely significant.  Mr. Moon testified those two times are

24   hugely significant.  There was evidence that if the

25   subcommittee knew there were fabrications on the profile, it

1  would not have admitted Mr. Wilson and, likewise, Johnny

2  Wilson, and, likewise, with respect to Sabrina Aziz.

3         There was evidence that additional lies, for example,

4  Mr. Vavic instructed Mr. Moon to put on the profile that was

5  submitted to the subcommittee in terms of Johnny Wilson being

6  an immediate impact player and top ten attacker in his

7  graduating class and, of course, the profile that Mr. Singer

8  and Mr. Margulies created was e-mailed to the defendant Wilson,

9  and there was evidence that he was actually in his e-mail that

04:10 10  very evening about 90 minutes after receiving that profile.

11         There was also, by the way, evidence that this whole

12  scheme was false.  The whole premise was false.  Mr. Wilson

13  himself, there's evidence called his son a clear misfit for the

14  USC water polo team and noted that obviously his talent was

15  below the level of the other players on the team.  And counsel

16  for Mr. Aziz has conceded repeatedly that that profile, which

17  was found in his client's e-mail box, was completely fabricated

18  and false.

19         With respect to the claims about a hub and spoke

04:10 20  conspiracy, your Honor, it's not a hub and spoke conspiracy.

21  This was a web of a conspiracy.  There were contacts between

22  the defendants and other parents, between Mr. Wilson and other

23  parents.  There were contacts between the defendants and other

24  participants in the conspiracy.

25         Mr. Wilson had, for example, direct contact about

Mr. Vavic.  There was contact about Mr. Masera.  There was

contact with Miss Sanford.  There was also extensive evidence

that the very nature of the scheme required it to be a

sprawling conspiracy.

          Mr. Isackson testified about that, about his relief

when he learned how many parents were involved in the scheme.

That was the reason he was drawn to the scheme, that it had

been successfully done with many parents before.  The

commingling of funds in the Key Worldwide Foundation was

significant to him, particularly with respect to the

concealment of the scheme.

          With respect to the tax issue, I'll just briefly note

that we briefed this issue.  We submitted a brief on this issue

to the Court today.  I will note that 7206 doesn't require any

tax loss calculation, much less a tax loss calculation that

relates to the materiality aspect of that crime.  In fact, the

jury instruction that we've proposed reads that a material

matter is one that is likely to affect the calculation of tax

due and oweable or to affect or influence the IRS in carrying

out the functions committed to it by law, such as monitoring

and verifying tax liability.  So we easily met that element.

          With respect to the venue argument, this is frankly

frivolous.  Venue needs to merely be proven by a preponderance.

There's an abundance of evidence of venue with respect to

Count 2.  There's evidence in Exhibit 64 and Exhibit 68 that

those checks were obtained in Massachusetts.  One of them
indicates Massachusetts -- actually, both of them indicate
Massachusetts.  One of them indicates it was purchased in
Seaport Square.  Another indicates it was an out-of-state
withdrawal in Massachusetts.  There's also consensual call with
Donna Heinel, Exhibit 574, in which Mr. Singer tells
Miss Heinel they're in Boston.  Miss Heinel updates him on the
approval of Isobelle Janavs and Claire Altman.  She also makes
him make sure that the family doesn't tell anyone about the
admission because she doesn't want it to get out.  She also
asks him to make sure that the payments are not made right away
to the Women's Athletic Board because she doesn't like it to be
so close.  That's a call in furtherance of the scheme.

        Miss Keating also testified that Mr. Singer was in
Boston at that time.  There were calls on the wire between
Mr. Wilson and Mr. Singer that we introduced, Exhibits 561 and
562, in which Mr. Wilson is again reaching out again to
reengage in the scheme.  At that point they're discussing a
number of schools.  One of the schools they're discussing is,
in fact, USC.  Mr. Wilson and Mr. Singer arrange, on the wire,
to meet in Boston.  Then Mr. Wilson, in fact, drives to Boston
to Logan Airport to meet with Mr. Singer, and there's a call
from Mr. Singer to Mr. Wilson on the consensual cancelling that
meeting when Mr. Wilson is already in Boston.  So there is
abundant evidence of venue to satisfy that requirement, your

 1  Honor.

 2          THE COURT:  All right.  Thank you.

 3          As I say, the motion under Rule 29 of the criminal

 4  rules is denied without prejudice.  I will consider the matter

 5  further when I have both sides' written briefs in support and

 6  opposition to that motion.

 7          We need to discuss the government's motion to exclude

 8  hearsay wiretap calls and e-mails, docket 2324, and the

 9  defendants' opposition, which is 2329, because I am not clear

04:15 10  what it is that's intended to be introduced, so I can't make a

11  ruling in a vacuum.

12          Counsel wish to anticipate tomorrow's activities in

13  that regard?

14          MR. FRANK:  Your Honor, there are roughly a hundred

15  calls that defense has put on its exhibit list from the

16  wiretap.  Not a single one of those calls involves these

17  defendants.  Roughly 70 percent of them involve parents who are

18  not even charged or unindicted coconspirators in the scheme.

19          What the defense has asserted is that they intend to

04:16 20  introduce the statements, these calls, as evidence of Singer's

21  state of mind for that nonhearsay purpose.

22          Your Honor, we respectfully submit you've already

23  decided this issue with respect to the Starbucks video.  This

24  is simply more of the same.  These are calls to random other

25  parents that have nothing to do with these defendants.  It's an

1    effort to completely get around the hearsay rules as these

2    defendants have been trying from the beginning of this case

3    with an ever shifting series of arguments about why Singer's

4    statements or other people's statements to other people about

5    other parents and other children should be introduced in this

6    case.  It is a complete attempt to end run around.

7         801(d)2(E), the coconspirator statement rule, which

8    that provides that coconspirator statements are not admissible

9    by defendants themselves.  And so instead of calling them

04:17 10   coconspirator statements, they're calling them state of mind

11   evidence.

12        It would be an exception that swallows the rule.  We

13   found no case where defendants, not a single one, that we

14   found, nor one that they've cited, where defendants are allowed

15   to admit coconspirator statements like this on the basis that

16   basically anything the coconspirator says is admissible for

17   state of mind.  In fact, we've looked at some selection of

18   these calls.  We've cited them in our brief.  There's not even

19   remotely state of mind.  To the extent, if anything, it's a

04:17 20   statement of belief.  If he says the side door is not improper,

21   that's not state of mind evidence.  That's clearly a statement

22   of belief.  And there's explicit case law, black letter law, on

23   this topic.

24        It's not -- to the extent that they're arguing that

25   his statements are false, they're using them as a general

1    attack on the credibility of a nontestifying witness, which is

2    prohibited by Rule 608B.  So there's just no theory under which

3    these statements come in.  It's just an attempt to put in all

4    sorts of pure hearsay statements to other parents and other

5    individuals that have nothing to do with this case.

6          MR. KELLY:  Your Honor, I'll speak briefly and then

7    defer to my co-counsel about the tapes.  He raised this issue

8    about the Starbucks video.  The reason we're offering that, and

9    now it's down to 3 minutes, just the part about the side door,

04:18 10    they spent all this time about side door elicit, elicit,

11    elicit.  Under Rules of Evidence 806, we are allowed to impeach

12    a non-declarant like Mr. Singer.  They spent all this time

13    suggesting, especially in these recorded calls, that the side

14    door is nefarious.  We're allowed to impeach Singer on 806.

15    We've got the video down to 3 minutes where he talks about the

16    side door in a public way which suggests is totally

17    appropriate.  Not even if is it admissible under 4086 --

18          THE COURT:  Are we talking about the Starbucks?

19          MR. KELLY:  Yes, your Honor.  It's admissible as

04:19 20    Singer's state of mind.  There's two good cases I'd recommend

21    the Court consider.  It's a First Circuit case, DeSimone, 488 F

22    3rd 561 and 568 to 569.  It's a First Circuit case.  "Out of

23    court statements may be admissible as circumstantial evidence

24    of the speaker's state of mind at the time".

25          It's important here because they're suggesting Singer

is conspiring with our client.  If his state of mind in presenting to Starbucks about the side door is that it's legit, that's admissible under that state of mind.  State of mind is not just the Rule of Evidence 8033.  That's a separate type. This well-recognized exception is the effect on the listener as well as the and declarant.  It's admissible as Singer's state of mind, plus 806.  It's right on the money.

I just wanted to address the video because we think it's important and we think it's significant to help us defend our case here, which, of course, we have a right to do when they keep presenting the side door as something elicit when, in fact, there's evidence that it's not.  So that's all you'll hear from me on this point, the tapes themselves.

It's two separate bases for getting in the Starbucks video, 806 and the state of mind.  If that wasn't clear, I wanted to make sure that is clear to the Court.  That's why we're trying to get in the Starbucks video.

THE COURT:  You want to respond to that, Mr. Frank?

MR. FRANK:  Your Honor, as we briefed this issue, it's not an inconsistent statement.  In fact, what he says on that tape is exactly what he said in the tape that we put in with respect to Mr. Caplan.  So it's not a prior inconsistent statement.

Number two, the fact that he mentioned the side door without describing that it involved false athletic profiles,

1    that it involves bribes, he just mentioned the term "side door"

2    and said it was cheaper than other ways to get into college.

3    It has nothing to do with his state of mind.  It doesn't

4    suggest that it's one thing or another thing.  He just

5    mentioned it in this forum to other people who have nothing to

6    do with this case.  And it has nothing to do with his state of

7    mind.  We've provided your Honor in today's briefing a citation

8    to a case where it explicitly considers whether a statement

9    that something is not improper or not illegal is state of mind

04:21 10   evidence, and the Court clearly held that that was a statement

11   of belief.  It's not state of mind like I'm scared, I'm

12   worried, I'll -- a spontaneous statement that somebody doesn't

13   have a chance to consider.  It's a statement of belief and is

14   not statement of mind evidence.

15       MR. KELLY:  Respectfully, your Honor, they have put on

16   these recorded calls about the side door as if it's

17   illegitimate.  And they're going to argue that to the jury,

18   guaranteed.  It's per se improper.  This tape, in a public

19   setting by Singer, shows under 806 it's inconsistent, and we're

04:22 20   allowed on 806 to impeach an out of court declarant.  So that's

21   why it's critical to the defense, and they keep using it to

22   suggest it's improper.  They're going to argue that to the

23   jury.

24       We have evidence that, A, he said something

25   inconsistent in public and his state of mind, a supposed

coconspirator, was in front of Starbucks people.  He wasn't up

there bragging about something illegal he wanted all these

people to do.  We're entitled to show that and the jury gives

it weight.

THE COURT:  You may have an appellate issue,

Mr. Kelly, but the Starbucks presentation is not going to be

submitted to this jury.  If I get reversed on it and you are

lucky enough to try the case again, maybe you can convince a

different judge to admit that, but the Starbucks presentation

is not going in.  I don't know whether you want tomorrow to

offer it and have the objection by the government and have me

sustain an objection or whether we want to decide now what the

defendants are going to present.  You are free to do whatever

you want in terms of your defense.  That's the issue.

MR. KELLY:  Understood, your Honor.

THE COURT:  It's not going to be allowed into

evidence.

MR. KELLY:  Okay.  I'll lose the argument twice, here

now and I'll present it tomorrow too.  It will be objected to,

and I understand the Court's ruling.

THE COURT:  Okay.  So what do we do tomorrow?  If

you're planning to offer calls that are properly described by

government's counsel, I am going to sustain objections to their

admission.  We might go through tomorrow and you can offer one

hundred different calls, but if they're all as described by the

1    government, the government's objection is going to be

2    sustained.

3         MR. KELLY:  Yes.  That's right, your Honor.  I'll

4    defer to my co-counsel.  He does have witnesses.  I have

5    stipulations.  I have one exhibit I'm especially keen on.  It's

6    a two page exhibit, Exhibit 1219.  We briefed it.  There's been

7    a lot of briefs.  That's one we intend to offer.  It's from the

8    head of compliance to Ms. Heinel, and it clearly goes to her

9    state of mind.

04:24 10       We've got this honest services issue in play.  If

11   she's being told by her boss that this is -- here's the data

12   and it's a two pager and the data shows practice players are

13   being admitted to USC who are children of wealthy donors, is

14   goes to her state of mind.  We've briefed it.  We think it's

15   clear the First Circuit has said that the statements proffered

16   to show something in the accuracy of the content is an

17   analogous state of mind of the declarant for one conversation

18   are not considered hearsay.  They're quoting *Wigmore* on

19   evidence.

04:25 20       It's *Figueroa* at 18 F2nd 1020.  That's an exhibit we

21   intend to offer, including a few others, including the

22   government's pleading.  An admission is an admission.  If the

23   issue is they don't want the signature of the AUSAs on there,

24   fine. We don't care about that. It's the statement that they

25   put in their own brief in this case, which is an admission.

1          THE COURT:  Okay.  Outline to me, starting with

2     Mr. Kelly, and then Mr. Kendall, what is tomorrow's evidence

3     going to be?  Who is going to be called and what do you expect

4     to put into evidence?

5          MR. KELLY:  Mr. Kendall's going to call a couple

6     witnesses, which we can share momentarily.  My plan is to offer

7     in a few stipulations and a few of these exhibits.  I will try,

8     try again with the video.  In terms of live witnesses from me

9     tomorrow, none.  The live witnesses are from Mr. Kendall.

04:26 10          THE COURT:  All right.  Mr. Kendall.

11          MR. KENDALL:  Yes.  If I can go through what I think

12     would be the evidence we'd offer tomorrow in full.

13          We will have a live witness disclosed to the

14     government already.  His name is Andrew Mericle.  He was a

15     teammate of Johnny Wilson on the USC water polo team.  His

16     testimony's probably, his direct, is 30, 40 minutes, maybe plus

17     or minus.  He's not a very long complicated witness, like some

18     of those we've had.

19          In addition, we had planned to call Mr. Masera, who is

04:26 20     here in Boston, but given the Court's preliminarily views from

21     our discussion, my expectation is I probably will not prevail

22     in persuading the Court to order him to testify over his Fifth

23     Amendment.

24          His counsel is here.  I think the Court needs to rule.

25     If you rule in our favor, Mr. Masera will testify.  If you rule

```
 1   against us, he will not testify.
 2           With respect to the Haden deposition, we have
 3   cancelled it, your Honor.  We're not going to pursue Mr. Haden
 4   or Mr. Garfio.  We understand the Court's ruling has been made.
 5   We're not looking to reargue it.  We feel that makes it
 6   impossible for us to present either of those witnesses if we
 7   can't use documents and we also think it's a burden on our
 8   Fifth Amendment rights as well.  Bottom line is we're not
 9   putting on Haden's deposition and we're not calling Garfio.
10           THE COURT:  So let me understand.  Are we still on
11   schedule to, by Zoom, take statements out of the hearing of the
12   jury of Mr. Orr and Mr. Lopes and Mr. Garfio, that they are
13   going to --
14           MR. KENDALL:  I think Mr. Kelly may have been more on
15   top of that issue.  If you want me to finish.
16           THE COURT:  Yes. Go ahead.
17           MR. KENDALL:  On Monday, we will have three other
18   witnesses.  We've given the names to Mr. Frank already.  That
19   is Jack Bowen, the high school water polo coach of Johnny
20   Wilson, and two other of his teammates will also be coming.
21           THE COURT:  So Jack Bowen and then Johnny Wilson?
22           MR. KENDALL:  No.  Jack Bowen and then the other are
23   Quinn Barron and James Walters.
24           THE COURT:  What are they testifying about?
25           MR. KENDALL:  They're just teammates from the team.
```

1    We had had a coach of the team and another teammate listed.

2    They've dropped off.   Instead, there will be these two other

3    teammates.   They're giving the same testimony as the two

4    people we dropped off.

5          MR. FRANK:  We object to those two witnesses.  They

6    were not disclosed to us before today.  They were not on the

7    defendants' witness list that was due pretrial.  They were

8    sprung on us today.

9          MR. KENDALL:  Your Honor, we spoke with them yesterday

04:29 10   and they agreed to testify yesterday.  We had two other people

11   from the team on the list.  We've taken those two off.  One of

12   them is objecting through counsel.  The other one we're not

13   going to present.  We've got these two yesterday.  We told him

14   this morning as soon as we had it confirmed.  It's not as if we

15   delayed or playing games.  It's the same type of witnesses

16   they've already given notice of the two withdrawn.  We're

17   substituting two and they're fungible.  There's no change or

18   surprise.

19         MR. FRANK:  I don't know if it's fungible or not.  I

04:29 20   know there was a witness list due well pretrial in a case

21   that's been pending for several years and days before the

22   witnesses are being called we're being given names of

23   individuals who have never been identified to us as witnesses.

24   There's things that we do to research people that we do.

25   That's one of the reasons that witness lists are due pretrial.

1    We now don't have time to do things.  This is complete

2    sandbagging, your Honor.

3            MR. KENDALL:  It's not sandbagging.  Mr. Moon gave

4    testimony that went far beyond his field too.  I'll tell you

5    exactly what happened.

6            THE COURT:  I don't want an argument here.  Are those

7    witnesses available for a deposition by Zoom on Saturday?

8            MR. KENDALL:  I think they're flying out that day.  If

9    the issue is --

04:30 10          THE COURT:  You're planning to call them on Monday?

11           MR. KENDALL:  Put them on Monday morning, yes.  We're

12   planning to put on Bowen and the two other water polo players

13   Monday morning.

14           THE COURT:  Bowen has been known, correct?

15           MR. KENDALL:  Yes.

16           THE COURT:  I'm not concerned about Bowen.  How long

17   are you expecting the direct of those two players to be?

18           MR. KENDALL:  20, 30 minutes at most.

19           THE COURT:  You will make them available by Zoom or

04:31 20  otherwise to the government at the government's convenience,

21   which of course won't be convenient between now and Monday

22   morning, but at their less inconvenient for a deposition of

23   each of them to extend no more than 1 hour.  The defendants

24   will be responsible for paying for daily copies so they have

25   copies of those depositions at the time they are put on the

1   stand.

2          MR. KENDALL:  That's fine, your Honor.  In terms of

3   scheduling of it, these are people that we don't have control

4   over witnesses the way the government does.  We will get them

5   to be available.

6          THE COURT:  If you want them to testify, you'll make

7   them available to the government before they go on the stand.

8          MR. KENDALL:  Understood, your Honor.  I'm just saying

9   when may be a function of airplane flights and work

04:32 10   commitments, but we understand.

11          MR. KELLY:  Your Honor, one more point.  I want to

12   make clear what I was referring to about the admission.  I was

13   talking about Exhibit 1563A, the briefing.  We believe there is

14   binding First Circuit precedent.

15          THE COURT:  On what part of your argument does this

16   relate?  I'm sorry.

17          MR. KELLY:  Yes.  There's multiple motions pending.

18   One of them pertains to a government pleading where they state

19   something to the effect that they're not alleging that Donna

04:32 20   Heinel was personally pocketing money.  I don't have the exact

21   quote in front of me.  The exhibit that's discussed is 1563A,

22   and it's our position, your Honor, there's binding First

23   Circuit precedent on this vote that an admission is an

24   admission, and the cite is 840 F 2nd 118.  It's the Kattar,

25   K-a-t-t-a-r, case.

```
 1              THE COURT:  What is 1563A?

 2              MR. KELLY:  That is -- I'll get it in a moment.

 3              MR. FRANK:  It's a pleading in this case.

 4              MR. KELLY:  It's a pleading in this case where the

 5     government said X.  It's an admission.  They've tried to

 6     distinguish Kattar by saying Kattar was somehow something in

 7     dispute.  Kattar is clear.  It says, "we first must determine

 8     what the government, the party opponent for purpose of this

 9     rule".  Then they agree with a prior case.  "We can find no

10     authority to the contrary.  Whether or not the entire federal

11     government calls capacity shall be deemed a party opponent in

12     criminal cases, the Justice Department certainly should be

13     considered such".

14              First Circuit law.  It's admissible.  They made it.

15     We respectfully suggest we should be able to present it to the

16     jury.

17              THE COURT:  Have you submitted a brief on this?

18              MR. KELLY:  Yes, your Honor.

19              THE COURT:  Docket No. What?

20              MR. KELLY:  That one is --

21              MR. FRANK:  You've ruled on this, your Honor.

22              MR. KELLY:  2276.

23              MR. FRANK:  You ruled on this from the bench, your

24     Honor.  I would point out that we briefed this as well.  In the

25     Kattar case, the pleading was admitted because it was
```

1    inconsistent with the government's arguments at trial.  There's

2    been in inconsistent argument at this trial.  We've argued from

3    the open that the defendants were told the money was going to

4    the University.  That's not consistent with what's in the

5    pleading.

6            MR. KELLY:  We respectfully disagree with his analysis

7    of that First Circuit case and simply ask the Court to

8    reconsider the motion pending.

9            THE COURT:  I'll look at it.

04:34 10        MR. KENDALL:  Your Honor, you want me to finish

11    previewing the evidence for tomorrow?

12           THE COURT:  Yes.

13           MR. KENDALL:  There are some tapes we do want to play.

14    One is the Marriott hotel video where Mr. Singer is describing

15    how he defrauds parents by befriending them going to their

16    house while advising their children.  That's directly relevant

17    to our defense that Mr. Singer defrauded Mr. Wilson as there is

18    plenty of evidence in this case that Mr. Singer repeatedly

19    visited his son and visited the Wilson's family at their house

04:35 20    and that he stole at least $120,000 from them.

21           So, your Honor, that's one video --

22           THE COURT:  That's a video of what?

23           MR. FRANK:  If you recall the testimony of Agent

24    Keating, on September 21, 2018, the undercover informant

25    invited Mr. Singer to Boston, had a conversation with him in a

1    hotel room at the Marriott Long Wharf here in Boston, and then

2    the agents came in and persuade him to become an informant.

3          This is his discussion just before the agents come in

4    where he explains how he defrauds families that are working

5    with his college advisory service.  It's directly relevant to

6    what we say happened with Mr. Wilson.  It's admissible.  It's

7    admissible.  It's a statement of interest.  It's a statement of

8    intent.  There's many reasons why it's admissible.  It's a

9    short tape.  We're going to play an excerpt of it, just a few

04:36 10   minutes.

11          Second, there is the call that Agent Keating testified

12   about with the woman Nazie Saffari that shows how they could

13   get Mr. Singer to make explicit statements about bribery to

14   some parents, but they didn't do that to Mr. Wilson.  That

15   shows the sort of contradiction of the way he was treated and

16   he was treated differently than others.

17          The third thing is we have some calls of Mr. Singer

18   trying to defraud other parents similar in the way that he

19   defrauded Mr. Wilson.  This is admissible to 404B.  This is his

04:36 20   pattern of defrauding innocent parents telling them that their

21   donation is going to go pay for the water polo trip to Serbia

22   or things of that nature.  These are short, small clips.  We're

23   not going to play the whole tapes, just snippets of them.

24          We have three calls that have, not a hundred, your

25   Honor, three calls, a few minutes of each.  As I say, I believe

          1    it's all admissible for 404B and state of mind.  This is the

          2    exact same fraud we're alleging was perpetrated on Mr. Wilson.

          3            In addition to that, we have some e-mails we'd like to

          4    put in.  There are e-mails between Mr. Wilson and Mr. Singer

          5    that go to Mr. Wilson's state of mind that detail the

          6    representations that Mr. Singer said to him.  It's not more the

          7    truth of the matter.  We probably can stipulate that a lot is

          8    untruthful, but it's part of the fraud that was said to him.

          9    These e-mails have been stipulated to by the government.

04:37    10    There's no foundation issues with them.

         11            There are some e-mails that we'd like to offer, not

         12    for the truth.  These are with respect to USC.  I don't expect

         13    you'll want to admit them given your recent ruling but we do

         14    need to offer them to preserve our rights.  There's an e-mail

         15    between Mr. Singer and Mr. Masera not for the truth of the

         16    matter, just for that topic was discussed.  In fact, the topic

         17    they're discussing is a line of fraud and Mr. Wilson, but the

         18    fact that they acknowledge to each other that these words were

         19    said is all we want to put in.  We don't say it's truthful at

04:38    20    all.

         21            Finally, we have a USC medical report of Johnny

         22    Wilson's concussion.  It is admissible to the hearsay exception

         23    for medical records stated by a medical provider.  We think

         24    it's admissible under 8033, 8034, 8036.

         25            Finally -- not finally.  Next, we have Mr. Singer in

various e-mails describing to define the side door as a
legitimate business and a legitimate way to make donations.  To
us, it's a bit like a drug case when agents get on the stand
and try to explain what a term means.  If you've got an XYZ
agent, what does that mean?  This is a disputed issue for the
jury.  They have their view.  We have our view.  The jury has
to decide a disputed issue of fact, is a side door a code name
for some sort of fraudulent transaction or is the side door
Mr. Singer's way to defraud parents and to get them to do
legitimate donations.  We're entitled to put in evidence, give
our view of it.

Agent Keating testified on the stand that this was a
side-door scheme, a side-door scheme.  We have a right to give
Mr. Singer's repeated statements to people that the side door
was not a scheme.  It's not what he says.  It's the fact that
he says it publicly, that he wants to put it in a book, that he
wants to put it in a speech.  How can they say this is some
secret criminal event when he uses it as one of his main
marketing tools?  It's not that he's saying it privately.  He's
saying it publicly and openly.  It's really the audience that's
relevant, not the words that he's speaking.

We also have some e-mails showing Mr. Wilson
introducing Mr. Singer to a client, again showing Mr. Wilson's
state of mind, that he would not be introducing a person who is
committing fraud to one of his clients.  He'd only be

1    introducing honest persons.  We also have personal records for

2    his daughters' SAT result.  That seems pretty straightforward

3    business records.

4              I think that's the list of stuff we have, your Honor.

5              THE COURT:  Mr. Frank?

6              MR. FRANK:  Almost nothing of what Mr. Kendall has

7    just described is admissible on any grounds, your Honor.

8              Mr. Singer's statements on a Marriott televideo are

9    pure hearsay, your Honor.  They do not go to his state of mind.

04:40 10   They are, at most, his statements of belief.  They are

11   completely irrelevant to this case.  They have nothing to do

12   with these defendants.  These defendants never heard the calls

13   of Mr. Singer and other parents.  We've just discussed that.  I

14   don't know whether it's 404B or whatever it is, but it's not --

15   it's hearsay.  It's pure hearsay.

16             The Nazie Saffari call is a call that Mr. Singer made

17   at agents' direction to a different person.  The defendants

18   didn't know about it.  It has nothing to do with this case.

19   Singer describing the side door in other e-mails is pure

04:41 20   hearsay.  It has nothing to do with these parents.  It was

21   statements to other parents.  They're trying to admit it for

22   improper purpose, your Honor.

23             Certified business records, there are rules around

24   certified business records.  We don't have -- there's no

25   stipulation that these records come in.  There's no keeper of

1   records who's been called.  I don't know what records they're

2   even talking about.  This is the first I'm hearing they intend

3   to introduce purported business records pursuant to a

4   certification that is not allowed.

5          This is just an effort to dump stuff.  USC e-mails,

6   again, the Court has ruled on that time and again that these

7   are hearsay and that the defendants didn't know anything about

8   them.  So they're just trying to dump stuff in in circumvention

9   of the laws of evidence, the rules of evidence, and this

04:42 10   Court's prior rulings.

11          MR. KENDALL:  If I may respond to one thing, your

12   Honor.  A lot of things we're talking about is on the exhibit

13   list they've had for a period of time.  The ACT scores are

14   certified records.  They have that.  That's 8242, 8243, 8244

15   from the exhibit list. This is not a question of surprise

16   sandbagging.

17          THE COURT:  Are you saying when you put it on an

18   exhibit list that it's automatically admissible?

19          MR. KENDALL:  No.  I'm saying they've had notice.

04:42 20   We're not sandbagging them.  They have copies.

21          THE COURT:  Counsel, defendants can put on a defense

22   as they have a right to do, but from what I have heard, I am

23   going to sustain all of the objections of the government unless

24   I'm missing something.  Whether it's for planning purposes or

25   not, you can understand that if the evidence is as described by

1    the government, I have already ruled that it is not going to be

2    admissible if it's hearsay, so we may not have much to do

3    tomorrow other than the defendants offering documents, the

4    government objecting, and the Court sustaining the objection.

5    So stand forewarned that that's what is likely to be done.  You

6    have to do what you have to do to preserve the record.  I

7    understand that.  For planning purposes, that's a heads up.

8            MR. KELLY:  Your Honor, I think I noted this yesterday

9    that we have reached agreement on four e-mails anyway, 1540,

04:44 10   1254, 1255 and 714.

11           THE COURT:  You noted that and it was recorded by the

12   Court and those documents are admitted.

13           (Exhibits 1540, 1254, 1255, 714 admitted into

14   evidence.)

15           MR. KELLY:  Thank you, your Honor.  I'm sorry.  I

16   forgot I specified.

17           THE COURT:  Refresh my memory.  Do you want to present

18   Mr. Masera now, his argument that he will claim the Fifth

19   Amendment?

04:44 20          MR. KENDALL:  Happy to.  Counsel is here.

21           MR. KELLY:  I would respectfully suggest on the Fifth

22   Amendment invocation, typically it's done question by question.

23   Here with Mr. Masera, I have one substantive question and then

24   two or three procedural questions which follow on one

25   particular document.  That's it.  I don't have any other

1    questions that I'd like the Court to ask to see if he has a

2    valid Fifth Amendment privilege on that one question.

3          I would respectfully suggest he doesn't because he

4    pled guilty to a RICO conspiracy.

5          THE COURT:  How are you expecting this hearing to

6    proceed?  What role do you expect the judicial officer to play?

7          MR. KELLY:  I would like to submit to the Court the

8    document I'm talking about and ask him one question.  If he

9    invokes the Fifth, the Court can determine for itself whether

04:45 10    he has a valid Fifth Amendment privilege on that one question

11    because I don't think he does.  If he doesn't have a valid

12    privilege on that and says what the document is, and it's a

13    business record, it comes into evidence.  If the Court wishes

14    to do it ex parte, fine by us.  It doesn't have to to it in

15    open court.

16          THE COURT:  What I'm going to do today is going to be

17    here.

18          MR. KELLY:  Then I'd like to submit, if I can

19    approach, the actual document I'd like the Court to ask.

04:45 20          THE COURT:  I'm not going to ask the witness anything.

21          MR. KELLY:  Okay.  If the Court wishes, I can ask.

22          THE COURT:  Yes.

23          MR. KELLY:  Can I still give the Court a copy?  I

24    can't pull it up on the screen.  The IT guy's not here.  I'd

25    like to ask a question about the document I'd like to show the

 1   government and the Court.

 2          THE COURT:  Mr. Frank?

 3          MR. FRANK:  If the witness is going to get up on the

 4   stand, counsel's going to ask him a question.  His counsel, the

 5   witness' counsel has advised that he will invoke.  I don't

 6   quite understand what's supposed to happen next.  If there's

 7   going to be a judicial inquiry into the bases of his invocation

 8   and whether they are valid, that I don't think is supposed to

 9   happen in open court.

04:46  10          MR. KELLY:  The jury's not here.  If the document

 11   is --

 12          THE COURT:  The government is here.  If he's going to

 13   be inquired of as to his bases for taking the Fifth Amendment,

 14   I don't think that can happen.

 15          MR. KELLY:  I think it's typically done at sidebar.  I

 16   can show him the document.

 17          THE COURT:  Folks, you can get together and decide

 18   overnight how you want to do this and if you can agree I'll do

 19   it, I'm not going to do it today.  There's obviously too much

04:47  20   disagreement.  I want to know, are we going to do anything with

 21   the absent, those who are in California, Mr. Orr and Mr. Lopes?

 22   Are they going to be inquired of with respect to Fifth

 23   Amendment rights?

 24          MR. SHARP:  We would like them to be.  If I can

 25   arrange with their attorneys and the deputy clerk, when would

1    your Honor like to do that with them?

2         THE COURT:  For planning purposes, I think everybody

3    ought to be on the same page, tomorrow morning at 9:00 a.m. is

4    6:00 a.m. California time.  I don't think that would be a good

5    time to do it, but maybe noon, 9:00 a.m. Pacific Time would be

6    appropriate.

7         Counsel, get together and decide when and if you want

8    to do that.

9         With respect to Mr. Masera who is going to be here,

04:48 10   give me proposed procedural direction as to how you want it to

11   proceed but I will consider.  I'm not going do it tonight

12   because there's obviously no agreement on that.

13        Is there anything else that needs to come to my

14   attention before we adjourn for the day?

15        MR. FRANK:  Just briefly, your Honor.  It would be

16   hopeful to know if the defense case is going beyond Monday just

17   for planning purposes.

18        THE COURT:  Yes.  Is it going beyond Monday?

19        MR. KENDALL:  Your Honor, in terms of witnesses, not

04:48 20   our clients, I expect it will be done Monday.  I gave you the

21   three water polo witnesses we're putting on.  There may be a

22   tax witness, Mr. Spire, who's already been disclosed.  I think

23   not.  I just need to confirm that with the government.

24        With respect to our clients, that's something that's

25   going to be discussed over the weekend and we probably won't

```
 1   know until fairly late.
 2           MR. FRANK:  Well, your Honor, so that means that other
 3   than the defendants, the only issue is Mr. Spire, right?  So
 4   there's going to be no family members testifying?
 5           MR. KENDALL:  That -- it may be sort of all rolled up
 6   together.
 7           THE COURT:  You have an obligation to inform the
 8   government.  Is it 2 days in advance?
 9           MR. FRANK:  Yes, sir.
10           THE COURT:  I think that was the rule at the beginning
11   of the case.  So you're going to have to notify them by the
12   conclusion of tomorrow who you're going to call Monday and/or
13   Tuesday.
14           MR. KENDALL:  Okay.
15           MR. KELLY:  Your Honor, for planning purposes, your
16   Honor, I would respectfully submit that Tuesday we should be
17   closing unless the defendants decide to testify.
18           THE COURT:  I am not going to close immediately after.
19   If the defendants rest on Monday, I'm going to give the jury
20   Tuesday off and we're going to have closings and charge on
21   Wednesday.
22           MR. KENDALL:  Would the Court do its charge
23   conference?
24           THE COURT:  Either Monday or early Tuesday.
25           For planning purposes before I decide the matter, what
```

```
 1    does the government believe it needs for closing time?

 2              MR. FRANK:  Ball park, 90 minutes, your Honor.

 3              THE COURT:  Total?

 4              MR. FRANK:  No.  That would be closing and then a

 5    rebuttal on top of that.  We had 45 minutes for the opening, so

 6    I'm doubling that.

 7              THE COURT:  Defendants, what do you think you need?

 8              MR. KELLY:  I think I need an hour, your Honor.  Lot

 9    of things to go over.  I think I can maybe beat the hour, but I

04:50 10   would like the hour.

11              THE COURT:  Mr. Kendall?

12              MR. KENDALL:  Your Honor, I have a lot more counts and

13    a lot more issues.  I was hoping 70 minutes.  I won't go above

14    that.

15              THE COURT:  What?

16              MR. KENDALL:  70 minutes.

17              One thing I may ask, your Honor.  Mr. Frank and I have

18    had the pleasure of two prior trials.  I find his rebuttal

19    often goes longer than his closing.  I'd ask the Court to set a

04:51 20   time for his rebuttal.

21              THE COURT:  There will be time limits on all.  You

22    said 90 as an argument and then a rebuttal?

23              MR. FRANK:  Yes, your Honor.  I would guesstimate 20

24    to 30 minimums on rebuttal.

25              THE COURT:  It's likely to be 90 government, 60 each
```

1    defendant, 30 rebuttal.   That's 2 hours each.   That will be a

2    maximum.

3            We're in recess until tomorrow morning at nine a.m.

4            (Whereupon, the proceedings concluded at 4:52 p.m.)

```
1                        E X H I B I T S

2    NO.                         ADMIT

3    1540   ....................    43

4    1254   ....................    43

5    1255   ....................    43

6    714    ....................    43

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8         I, Kristin M. Kelley, certify that the foregoing is a

9    correct transcript from the record of proceedings taken

10   September 30, 2021 in the above-entitled matter to the best of

11   my skill and ability.

12

13

14       /s/ Kristin M. Kelley___                September 30, 2021_

15       Kristin M. Kelley, RPR, CRR             Date
         Official Court Reporter
16

17

18

19

20

21

22

23

24

25