1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3

UNITED STATES OF AMERICA,          )
4                      Plaintiff    )
                                    )
5    vs.                            )   No. 1-19-CR-10080
                                    )
6    GAMAL ABDELAZIZ and JOHN       )
     WILSON,                        )
7                      Defendants.  )
                                    )
8                                   )

9

10

               BEFORE THE HONORABLE NATHANIEL M. GORTON
11                 UNITED STATES DISTRICT JUDGE
                       JURY TRIAL - DAY 16
12

13

             John Joseph Moakley United States Courthouse
14                       Courtroom No. 4
                       One Courthouse Way
15               Boston, Massachusetts 02210

16

17                      October 1, 2021
                          9:25 a.m.
18

19

20

                      Kristin M. Kelley, RPR, CRR
21                      Debra Joyce, RMR, CRR
                       Official Court Reporter
22          John Joseph Moakley United States Courthouse
                    One Courthouse Way, Room 3209
23                 Boston, Massachusetts 02210
                     E-mail: kmob929@gmail.com
24
             Mechanical Steno - Computer-Aided Transcript
25

1    APPEARANCES:

2

3         Stephen E. Frank

4         Ian J. Stearns

5         Leslie Wright

6         Kristen Kearney

7         United States Attorney's Office

8         1 Courthouse Way

9         Suite 9200

10        Boston, MA 02210

11        617-748-3208

12        stephen.frank@usdoj.gov

13        for the Plaintiff.

14

15

16        Brian T. Kelly

17        Joshua C. Sharp

18        Lauren Maynard

19        Nixon Peabody LLP

20        100 Summer Street

21        Boston, MA 02110

22        617-345-1000

23        bkelly@nixonpeabody.com

24        for Gamal Abdelaziz.

25

```
 1    APPEARANCES:

 2

 3            Robert L. Sheketoff

 4            One McKinley Square

 5            Boston, MA 02109

 6            617-367-3449

 7            sheketoffr@aol.com

 8            for Gamal Abdelaziz.

 9

10

11            Michael Kendall

12            Lauren M. Papenhausen

13            White & Case, LLP

14            75 State Street

15            Boston, MA 02109

16            617-939-9310

17            michael.kendall@whitecase.com

18            for John Wilson.

19

20

21

22

23

24

25
```

```
1    APPEARANCES:

2

3            Andrew E. Tomback

4            McLaughlin & Stern, LLP

5            260 Madison Avenue

6            New York, NY 10016

7            917-301-1285

8            atomback@mclaughlinstern.com

9            for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
  1                    P R O C E E D I N G S

  2          THE CLERK:  You may be seated.  Court is now in

  3    session.

  4          THE COURT:  Good morning, counsel.  The government has

  5    asked to see me with respect to a motion they filed overnight,

  6    which is a motion for a ruling on objections outside the

  7    presence of the jury.  It's docket No. 2332.  I have read the

  8    motion.  Do you wish to address it further, Mr. Frank?

  9          MR. FRANK:  Just briefly, your Honor, to supplement

 10    it.  We are very concerned about not just wasting the jury's

 11    time with the introduction of dozens of exhibits that the Court

 12    has already indicated a likelihood will be excluded on the

 13    basis of the government's various objections, but also that

 14    this is highly prejudicial to the government.  The entire

 15    narrative that the defense has been weaving throughout this

 16    case is that the government has been withholding evidence from

 17    the jury.  Now they propose to introduce dozens of exhibits,

 18    many of which the Court has ruled on time and again already to

 19    exclude and have the government stand up and object to each and

 20    every one and then have the objection potentially sustained and

 21    have the exhibits then not introduced into evidence, thereby

 22    portraying the government as withholding the evidence from the

 23    jury.

 24          This is compounded by the fact that, at 2 o'clock this

 25    morning, the defense identified another 40 new exhibits, many
</pre>

09:25 (line 10)
09:26 (line 20)

1    of which appeared to have previously been in the 9000 -- part

2    of the 9000 series of their exhibits which were previously

3    their impeachment exhibits that they did not -- deliberately

4    did not disclose to the government.  Around a quarter of them

5    were also produced last night as reciprocal discovery, even

6    though the deadline for exhibit lists and reciprocal discovery

7    was more than three months ago, and that the government has,

8    therefore, never seen before.

9             We've quickly gone through those new exhibits and they

09:27 10   are exactly the same as the exhibits we talked about yesterday,

11   all objectionable under hearsay grounds.  So this is going to

12   be an exercise, we fear, in wasting the jury's time but also

13   prejudicing the government with what is nothing more than

14   gamesmanship here.

15            THE COURT:  Mr. Kelly.

16            MR. KELLY:  Yeah, I didn't -- I'm not producing any

17   additional documents at all, so I'm not sure what he's talking

18   about.  I have not produced anything new.

19            MR. FRANK:  Mr. Kelly is right.  This was all from

09:27 20   Mr. Wilson.

21            MR. KELLY:  My approach today will be -- I'm not

22   dumping in dozens of documents that the Court's going to, if

23   they object, the Court's going to deny.  I've got five, a

24   video, four e-mails.  Actually, a video and four documents.

25   I'm hopeful I will have success on the four documents.  If I

1    don't, I don't, but I don't think that prejudices the

2    government if the defense tries to put in exhibits in our case.

3         If the Court sustains the objection, so be it.  I'm

4    not putting in dozens of documents for the sake of wasting

5    anyone's time.  I'm cutting to the chase.  I've got five

6    things, a couple stipulations that we've agreed to, and that's

7    about it, Judge.

8         THE COURT:  Mr. Kendall.

9         MR. KENDALL:  Okay.  Your Honor, first, my

09:28 10    understanding is we produced ten new documents to the

11    government yesterday.  We didn't dump a huge number on, some

12    things that were maybe for cross or for other reasons that

13    didn't get used, but it's ten documents.  It's a small number.

14         We have some things that your Honor has not yet ruled

15    on that we think they do come in and it's not to try to create

16    prejudice to the jury.

17         For example, Casey Moon disputed that Johnny Wilson

18    had a concussion.  We have the medical records that were marked

19    as a government exhibit, 133, that the government didn't choose

09:29 20    to offer.  We'd like to offer the medical records.  There's an

21    exception for medical records under the hearsay rules.  It's a

22    government exhibit we're offering.  I don't think that's

23    creating prejudice of the type he's talking about.

24         We do have some e-mails and things that the Court has

25    indicated that he does not want to admit.  We have to protect

1    the record and put those in, but there's other things that have

2    been yet -- been put before you that need to be dealt with and

3    that we think are not just challenging -- they're certainly not

4    challenging what you've already ruled.  Some of it we need to

5    sort of have an effective record, but other of it is new stuff

6    that is not things that anybody has dealt with, your Honor.

7         So for example, the medical record, it's a hearsay

8    exception to -- for medical errors for statements made.  All we

9    want to do is put in that the guy actually did have a

09:29 10    concussion and Moon sort of disputed that.  It's their exhibit

11    that shows it happened.  I don't think that's something

12    inappropriate to offer to the jury.

13         THE COURT:  Mr. Frank.

14         MR. FRANK:  Your Honor, he's focusing on one document,

15    which by the way is appended to an e-mail that is hearsay,

16    there is a cover note that is pure hearsay, and the medical

17    record has not been authenticated and is not pursuant to a

18    business record certification or anything like that.

19         But leaving aside the medical record, there are dozens

09:30 20    e-mails, Singer/Haden e-mails, Heinel e-mails, all sorts of

21    exhibits that the Court has already indicated its impression

22    of, some of which -- many of which the Court has explicitly

23    ruled on.  He can protect the record but he doesn't have to do

24    it in front of the jury.  It's a waste of the jury's time.

25    It's prejudicial.

 1          And by the way, the same is true of the Starbucks

 2     video.  That has been ruled on two or three times already.  To

 3     do that in front of the jury serves only one purpose, and that

 4     is to prejudice the government by having him identify the

 5     exhibit and then having us stand up and object to it.  There's

 6     no reason to do that in front of the jury.  The record can be

 7     protected and the jury's time saved by doing it outside the

 8     presence of the jury.

 9          MR. KENDALL:  Your Honor, Mr. Frank raises an issue

09:31 10     that he hadn't raised before, which is claiming that, for

11     certain records, there should be a record keeper from USC to

12     validate them.  We subpoenaed the record keeper to establish

13     the business records basis.  USC is refusing to send somebody.

14     There's motions to quash pending before you.  If this is an

15     issue about having a record keeper, your Honor, then I request

16     that the Court order USC to send someone here.  We have a

17     stipulation on authenticity, so there's no doubt these are USC

18     documents.  But to the extent that they're saying that we

19     haven't laid the basis for business records for the medical

09:31 20     records, which at least parts of them come within the hearsay

21     exception for medical records, then we subpoenaed that record

22     keeper.  USC won't send them.  That can be dealt with Monday if

23     the Court just orders USC to send the record keeper to show up

24     pursuant to a validly served subpoena that USC has received.

25          THE COURT:  Mr. Frank?

```
 1              MR. FRANK:  Mr. Kendall's a very experienced lawyer
 2      and he knew how to do this properly and he's not doing it
 3      properly.  There's no stipulation as to the authenticity of
 4      that record.  But more importantly, we're not talking about one
 5      document.  We're talking about dozens and dozens of documents.
 6      The Court can rule on those documents outside the presence of
 7      the jury, and if there is a few that do come in, then those can
 8      come in on Monday, but we don't need to sit here for hours
 9      wasting the jury's time and prejudiced to the government by
10      doing that in the presence of the jury.
11              MR. KELLY:  We will not be sitting here for hours.  In
12      my presentation, Judge, I have five.  And if they have a valid
13      objection, they should make it.  If the Court thinks it's
14      valid, I assume the Court will sustain it.  If they don't --
15      the Court doesn't think it's valid, you'll overrule it and I
16      can present the document.  That's it.
17              THE COURT:  Yeah.  I'm going to let the defendant
18      Abdelaziz move forward with five documents.
19              With respect to the defendant Wilson, it depends on
20      the amount of time that you expect that we are going to be at
21      this.  If it gets to the point where it's multiple documents
22      with multiple objections and multiple rulings, I'm going to
23      suspend the proceedings and do it outside the hearing of the
24      jury.
25              MR. KENDALL:  Okay.  Your Honor, I do have multiple
```

1     documents to deal with, but they're in different categories.

2               THE COURT:  I'm sorry?

3               MR. KENDALL:  I do have multiple documents to deal

4     with and they -- but they fall into different categories.  I

5     think some of them this Court has not ruled on, they're clearly

6     not hearsay, their authenticity has been stipulated to and, you

7     know, they have --

8               THE COURT:  They better be documents that I've not

9     already ruled on because I'm not going to change my rulings

09:33 10    just because you offer them three or four times, your Honor.

11              MR. KENDALL:  I understand, your Honor.  And for those

12    I'd ask that we be able to do those out of the jury, but have a

13    thorough record established of that.

14              THE COURT:  Yes.  You're entitled to make a record.

15    For sure.

16              MR. KENDALL:  Okay.  With respect to the issue of the

17    USC record keeper, if the Court thinks we need to have a USC

18    record keeper, which is a --

19              THE COURT:  Is this for the medical records?

09:34 20    MR. KENDALL:  That's probably the most significant

21    one, but there were some other e-mails as well from USC.  The

22    things that I'm thinking of in particular are there is a

23    medical record, government Exhibit 133, and then there is the

24    e-mails between Pat Haden and Rick Singer, which are not for

25    the truth of the matter, just to show that Haden knew Singer

| | |
|---|---|
| 1 | was involved with the Athletics Department and knew he was -- |
| 2 | THE COURT:  Haven't we dealt with that problem before? |
| 3 | MR. KENDALL:  I'm not sure if the Haden ones have been |
| 4 | offered or not, your Honor, yet.  A lot of the others have. |
| 5 | I'd have to look at the records to see if the particular Haden |
| 6 | ones -- but these are clearly not hearsay. |
| 7 | It just shows -- and your Honor, these are not -- your |
| 8 | concern of other admissions issues with nonSinger people, |
| 9 | that's not what these e-mails are.  These are e-mails central |
| 09:34 10 | to the whole issue, Pat Haden dealing with Rick Singer and |
| 11 | authorizing him to be part of the Athletics Department |
| 12 | fundraising.  That's very different than the issue of other |
| 13 | parents, other kids unrelated to Singer, and what was their |
| 14 | admission decisions. |
| 15 | MR. FRANK:  He could have deposed Mr. Haden.  He chose |
| 16 | not to depose Mr. Haden.  Now he's just trying to put in the |
| 17 | same documents that your Honor has already ruled on that we |
| 18 | previously called impeachment evidence.  And now he's calling |
| 19 | it evidence in his case-in-chief.  This is so tiresome.  This |
| 09:35 20 | keeps coming up and again and again with ever shifting grounds |
| 21 | for introducing the same documents that the Court has already |
| 22 | ruled on, and it's highly prejudicial. |
| 23 | MR. KENDALL:  Your Honor, I cannot think of a -- |
| 24 | THE COURT:  All right.  Enough.  Enough.  I'm going to |
| 25 | allow the defendant to put on a case.  And if I believe that it |

1

is being done for reasons other than to preserve the record, I

will call a halt to it and we'll do it outside the hearing of

the jury, but I will allow the defendant to commence to put on

their case.

        Call the jury.

        MR. FRANK:  Your Honor, one minor other issue.  We

have a curative instruction pending.  Defense asked us a bunch

of questions.  This is on the issue of the leftover funds in

the Key Worldwide Foundation and we haven't heard back from the

defense, but that instruction was -- the instruction that we

submitted is pending.

        THE COURT:  I'm losing you on that one.

        MR. FRANK:  Sorry, your Honor.  On Wednesday, there

was the issue of the proposed curative instruction that your

Honor said you were inclined to give on the money that is left

over, that was left over in the Key Worldwide Foundation

account.  Mr. Kendall was questioning the witness about these

leftover funds.  We believe that was misleading.  We proposed a

curative instruction.  Your Honor said you were inclined to

give it.  The defense asked to hold off until today, and now

we're here.

        MR. KENDALL:  Your Honor, if you take a look at the

transcript, I think you'll find it's not as the government has

represented it.  She said there was approximately 20 million

dollars that left the account, and she said there was six and a

1  half million in one bucket, 6.4 in the other --

2        THE COURT:  All right.  I remember the issue.  Let me

3  consult with my law clerk.

4        MR. KELLY:  And your Honor, just for the record, I

5  thought there was some back and forth between the government

6  and Mr. Wilson's team, and perhaps we can deal with it at the

7  break, because I thought there was something they agreed to.  I

8  need to see it and what it was finalized as.

9        (Pause.)

09:38 10        THE COURT:  Counsel, I have a memorandum and order

11  that deals with 11 pending motions that I'm going to sign right

12  now.

13        And I'm going to retain the curative instruction until

14  the break and then I'll look at it again.

15        MR. KENDALL:  Your Honor, we're against any

16  instruction, but if the Court is to give one, we have got a

17  revision on the government's suggestion, if we can hand that up

18  to the Court.

19        THE COURT:  You can hand it up to the Court.

09:39 20        MR. KENDALL:  But that's clearly an alternative.  Our

21  position is that the testimony was completely accurate and

22  within the scope of what was raised on the direct.  We're just

23  simply trying to find out where did the $20 million go that she

24  said had been withdrawn.

25        THE COURT:  All right.  Thank you.

 1                  Call the jury.

 2                  (Jury enters.)

 3            THE CLERK:  Thank you.  You may be seated.

 4            THE COURT:  Good morning, jurors, and welcome back.

 5      You'll notice we're starting a little late, but it's not that

 6      we've been idle.  We've been working on legal matters outside

 7      of your presence to, hopefully, shorten up the trial.

 8                  So, at this stage, you'll recall that when we last met

 9      on Wednesday, the government rested.  The defendants will now

09:41 10      put on their case.

 11                  Mr. Kelly.

 12            MR. KELLY:  Yes, your Honor.  Thank you.  Your Honor,

 13      for the record, I'm going to read a stipulation and then

 14      publish it to the jury afterwards; a stipulation regarding USC

 15      accounts.  It's Exhibit 9067.

 16                  "The parties hereby stipulate and agree as follows:

 17                  If called to testify, Brandon Loftus, USC Assistant

 18      Athletic Director for Budget and Financial Performance, would

 19      state that for the period January 1, 2014, to March 5, 2019,

09:42 20      based on his personal review of the relevant documents, he has

 21      no reason to believe there were any expenditures, debits, or

 22      transfers from:

 23                  The USC Women's Athletic Board Account; or the USC

 24      Galen Center Gift Account to any USC employee personally for

 25      any purpose unrelated to their employment at USC".

1          And I'd ask to publish that now to the jury.

2          MR. FRANK:  Your Honor, obviously we've stipulated to

3     this and we agreed to it, but we don't believe it comes in as

4     an exhibit.

5          THE COURT:  It does not come in as an exhibit, but

6     it's a stipulation.

7          MR. KELLY:  And next I'm going to publish to the jury

8     three exhibits in evidence which have not yet been published.

9          First, Exhibit 1540.  And I'd ask Mr. Carter to just

09:43 10    highlight who it's from, when it was sent, what time it was

11    sent, who it was to and what it's about, the subject.

12         Next, after that, Exhibit 1540, I'd like Mr. Carter to

13    publish --

14         THE COURT:  I thought that was 1540.

15         MR. FRANK:  That was 1540, correct.

16         THE COURT:  That will be admitted.

17         (Exhibit 1540 admitted into evidence.)

18         MR. KELLY:  I misspoke.  The next one is 1254.  I'll

19    publish that to the jury, as well.  Again, please highlight who

09:44 20    it is from, when it was sent, to whom, and what's it about, and

21    what was the attachment.

22         Publish that to the jury.

23         Move to admit that as well.

24         THE COURT:  That will be admitted, 1254.

25         (Exhibit 1254 admitted into evidence.)

          1          MR. KELLY:  Now to 1255.  I'd like to highlight who it

          2     was from, when was it sent, who it was to, what's the subject,

          3     what's the message.

          4               I'll move to admit that as well.

          5               THE COURT:  It will be admitted.

          6               (Exhibit 1255 admitted into evidence.)

          7          MR. KELLY:  Next, your Honor, I have a stipulation

          8     that I've previously marked as 9068 between the parties.  I'll

          9     read it into the record:

09:46    10               "The parties hereby stipulate and agree as follows:

         11               "Gamal Abdelaziz donated a total of $200,000 to

         12     Columbia University between October 4, 2013, and June 14, 2015.

         13     These donations occurred after his son was admitted to Columbia

         14     University".

         15               I would move this into evidence, although I recognize

         16     the Court's ruling.

         17               THE COURT:  It is a stipulation, but it's not marked

         18     as an exhibit.

         19          MR. KELLY:  Next, another stipulation I would read

09:46    20     into the record, your Honor, that I've previously marked as

         21     9065.

         22               "The parties hereby stipulate and agree as follows:

         23               "The records of the College Board reflect that Sabrina

         24     Abdelaziz received scores for SAT exams taken on three

         25     occasions: May 6, 2017, October 7, 2017, and December 2, 2017.

1       The records reflect that all tests were taken at the Hong Kong

2       International School".

3              Again, this is Exhibit 9065.  We'd move to admit,

4       recognizing the Court's ruling.

5              THE COURT:  Again, it is a stipulation acknowledged by

6       the Court, but it's not admitted as an exhibit.

7              MR. KELLY:  The next stipulation, your Honor, I'd like

8       to introduce or read to the jury is 9069.  It's a stipulation

9       regarding Chapman University.

09:47 10              "The parties hereby stipulate and agree as follows:

11              The records of Chapman University reflect that Sabrina

12       Abdelaziz attended a campus tour and participated in a campus

13       interview in Orange County, California on October 25, 2017.

14       Sabrina Abdelaziz was offered admission to Chapman University

15       for the fall 2018 semester".

16              Now, your Honor, that's the last of the stipulations.

17       I have five documents I'm going to reference in an attempt to

18       introduce.

19              Document 1374B, which we've previously discussed, it

09:48 20       is a video excerpt where Mr. Singer references the side door in

21       a public setting.  I'd offer it under Rule 806 of the Federal

22       Rules and existing law regarding state of mind evidence and the

23       other basis we discussed.

24              MR. FRANK:  Objections for the reasons previously

25       stated.

1        THE COURT:  And the objection is sustained as

2  previously.

3        MR. KELLY:  Yes.  And then, your Honor, we'd offer

4  Exhibit 1219, an e-mail dated 6/8/17, which is an e-mail to

5  Donna Heinel from the USC Athletic Compliance person Scott

6  Simon.

7        MR. FRANK:  Objection.  Hearsay.

8        THE COURT:  The objection is sustained.

9        MR. KELLY:  We would next offer an excerpt of a U.S.

09:49 10  Attorney filing in this case at docket 1104 dated 4/24/20 under

11  the *Kattar* case, Exhibit 1563, as an admission of a party.

12        MR. FRANK:  Objection for the reasons previously

13  stated.

14        THE COURT:  And the objection is sustained.

15        MR. KELLY:  Next, your Honor, we would offer a text

16  chat between two USC Admission Officers regarding Sabrina

17  Abdelaziz dated 3/27/18, Exhibit 1288.

18        MR. FRANK:  Objection.  Hearsay.

19        THE COURT:  The objection is sustained.

09:49 20        MR. KELLY:  Finally, your Honor, we would offer a

21  document dated 1/26/15 regarding Pat Haden.  It's Exhibit 1085.

22        MR. FRANK:  Objection.  Hearsay.

23        THE COURT:  The objection's sustained.

24        MR. KELLY:  And with respect to those last five

25  documents, your Honor, we will mark them for identification at

1    the appropriate time at a break.

2             THE COURT:  Yes.  Thank you.

3             MR. KELLY:  Nothing further, your Honor.

4             MR. FRANK:  Just to clarify the record, your Honor, I

5    thought Mr. Kelly would be offering Exhibit 714 that the

6    parties had agreed would come into evidence, but --

7             MR. KELLY:  Be glad to.  Be glad to.  In fact, I'll do

8    that right now.  Let's offer 714.  We offer 714 and direct

9    Mr. Carter's attention to October 2nd.  Let's have that

09:50 10   highlighted, please.  October 2nd, "loud and abrasive". Keep

11   going, please.  The whole first paragraph, please.  Highlight

12   that and then the next paragraph.  I'm going to read it.

13             "Loud and abrasive call with agents.  They continue to

14   ask me to tell a fib and not restate what I told my clients as

15   to where their money was going -- to the program not the coach

16   and that it was a donation and they want it to be a payment.

17             "I asked for a script if they want me to ask questions

18   and retrieve responses that are not accurate to the way I

19   should be asking the questions.  Essentially, they are asking

09:51 20   me to bend the truth, which is what they asked me not to do

21   when working with the agents and Eric Rosen".

22             And then, please, Mr. Carter, can you scroll down and

23   at the very end here.  Let's show the first part.  "Spoke to

24   Donna Heinel".  I just want that yellowed, that part there,

25   "spoke to Donna Heinel".  And then go at the very end, "as

 1   requested".

 2           "As requested by agents asked her to put detail on her

 3   20K invoices being sent to the foundation".

 4           Then, if you'll -- way back up again to the top, who

 5   is it?  Way up to the top.  Who is he sending -- who is it from

 6   and who is it to?

 7           Nothing further, your Honor.

 8           THE COURT:  714 will be admitted.

 9           (Exhibit 714 admitted into evidence.)

09:52 10        THE COURT:  Mr. Kendall?

11           MR. KENDALL:  Yes, your Honor.  We call Andrew Mericle

12   to testify.  Thank you.

13           (Andrew Mericle, sworn.)

14           THE CLERK:  Thank you.  You may be seated.  Would you

15   please state your name for the record, spelling your last.

16           THE WITNESS:  Andrew Mericle, M-e-r-i-c-l-e.

17           DIRECT EXAMINATION OF ANDREW MERICLE

18   BY MR. KENDALL:

19   Q.   Good morning, Mr. Mericle.  I'm Mike Kendall.  We've met

09:53 20   before, correct?

21   A.   Yes.

22   Q.   Okay.  How old are you?

23   A.   25.

24   Q.   Where do you currently live?

25   A.   Dallas, Texas.

```
 1    Q.    Where do you work?

 2    A.    Mr. Cooper.

 3          THE COURT:  Mr. Mericle, could you pull that

 4    microphone closer to you, so that we can hear?  Thank you.

 5          THE WITNESS:  Definitely.  Sorry about that.

 6    Q.    And what do you do at this place you refer to as

 7    "Mr. Cooper"?

 8    A.    I work in operations between sales and marketing, so tech

 9    systems.

10    Q.    Where did you go to college?

11    A.    University of Southern California.

12    Q.    When did you graduate?

13    A.    2018.

14    Q.    Did you play water polo?

15    A.    I did.

16    Q.    Okay.  Who was your roommate at USC?

17    A.    Johnny Wilson.

18    Q.    Okay.  How did you end up on the USC water polo team?

19    A.    I went through a recruitment process, as I did with a

20    couple other schools.  I played water polo since I was a young

21    kid.

22    Q.    Okay. Did you get a scholarship?

23    A.    One percent.

24    Q.    One percent.  What is a one percent scholarship?

25    A.    It's like they pay for your books.  So it's like 600
```

```
 1    bucks.
 2    Q.    Were you the first member of your family to go to USC?
 3    A.    No.  My father went there in the early 90s and my cousin
 4    went there and actually played on the water polo team, too.
 5    Q.    Okay.  When did your cousin play on the water polo team?
 6    A.    The late 90s.  He won a national championship with them in
 7    1998.
 8    Q.    Did he play with Coach Vavic?
 9    A.    Yes.
10    Q.    Okay.  Did your cousin stay the whole four years?
11    A.    No, he did not.
12    Q.    Why did he not play the whole four years?
13    A.    There's a lot of reasons, but eventually, you get burn out
14    of playing USC water polo.  Many people leave the team because
15    they don't either want to deal with the coach or the pressure
16    and they want to focus on --
17              MR. FRANK:  Objection.
18              THE COURT:  Sustained.
19    Q.    When did you first meet Johnny Wilson?
20    A.    First day of class, so middle of August.
21    Q.    Were you roommates freshman year?
22    A.    Yes.
23    Q.    Was it -- tell us what was the rooming situation where you
24    and Johnny were roommates.
25    A.    We lived in a suite in an athlete dorm.  So there was a
```

```
 1   main room and then four other rooms where two guys would live
 2   in each, so Johnny and I were in the same room.
 3   Q.   And the -- so there's four rooms with two people in each
 4   room?
 5   A.   That's right.
 6   Q.   So there's beds for eight?
 7   A.   That's right.
 8   Q.   And then there's a common room?
 9   A.   Yes.
10   Q.   Okay.  In each of those rooms of two, how many people were
11   assigned to the eight beds in those four rooms?
12   A.   Eight total.  The room was full.
13   Q.   Okay.  And were they all water polo players?
14   A.   Yes.
15   Q.   Okay.  So this was a place for all members of -- this was
16   a place for members of the water polo team, this suite?
17   A.   That's right.
18   Q.   How did that come about?
19   A.   We just were assigned by the coaching staff, but it was at
20   random.  You didn't get a choice on who you were rooming with.
21   Q.   Okay.  So it was just by chance you were assigned to be
22   Johnny's roommate in the water polo suite?
23   A.   That's right.
24   Q.   Okay.  Of the eight people in that suite, were they
25   redshirts, were they scholarship -- you know, more than
```

09:55 10
09:56 20

1    one percent scholarships?  How would you describe the group?

2    A.   So there was two water polo suites.  The suite that I was

3    in was like a redshirt suite.  No one played in matches and the

4    one below was others.

5    Q.   Okay.  Do you remember what was the date that you moved

6    in?

7    A.   It was like the 19th or the 20th of August.

8    Q.   Okay.  And did you start with practice right away?

9    A.   Yeah, we did.  There was no way Vavic was not going to

09:56 10   have us in the pool.

11   Q.   Okay.  What was the name of the dorm you lived in?

12   A.   Fluor Tower.

13   Q.   And how do you spell that?

14   A.   F-l-u-o-r.

15   Q.   What was the typical practice starting off in August, mid

16   August, August 19th, whatever, with the water polo team,

17   particularly for the freshmen redshirt?

18   A.   Sure.  So a typical practice was morning practice, so

19   sometime before 7:00 for a couple hours of swimming,

09:57 20   conditioning, just stuff to keep you in shape.  And then we

21   would go to class, and then around 3 o'clock we would go to the

22   weight room, be there for an hour.  And then from 4:00 to 7:00

23   4:00 to 8 o'clock, we were in the pool doing water polo

24   activity, so less swimming, more skills stuff.

25   Q.   Okay.  When you first started to go to practice that

August 19th/20th time frame, what did Johnny Wilson do?

A.    He went to practice with the rest of us.

Q.    And what did he do at practice?

A.    Same thing that we all did.

Q.    Did you -- and when did the water polo season run?

A.    It runs the same as football season, so August to December.

Q.    And you practiced what days of the week?

A.    We would practice every day with the exception of Sunday and days that we had matches, unless there was some other reason not to be practicing.

Q.    How many hours a week would it take?

A.    Well over 20, if you include matches as well.

Q.    Okay.  How would you characterize the schedule?  How demanding was it?  How tough was it?

A.    Rigorous.  When you play at a place like USC, you know, six time defending national champion, it was like a full-time job and then you're going to class, too, at the same time.  So everything was very structured and demanding.

Q.    Did Coach Vavic allow teammates or team members to have any activities outside of water polo?

A.    No.  And if he found out that you had them, that was a big problem.

Q.    What happened if you joined a fraternity?

A.    The punishment was you would swim one hundred 100s every

```
 1    day until you quit either the team or you quit the fraternity.
 2    Q.   And how was it decided who would be a redshirt?
 3              MR. FRANK:  Objection.  Foundation.
 4              THE COURT:  Sustained.
 5    Q.   Were you a redshirt?
 6    A.   Yes.
 7    Q.   Okay.  How was it decided for you to be a redshirt?
 8    A.   It's not like there's a total decision unless you're a
 9    fringe person.  They just select who is going to be the match
10    player.  And then if you're not competing, then you maintain
11    eligibility, so you're a redshirt.
12    Q.   Okay.  And does the coach decide, or does the student
13    decide?
14    A.   The coach decides.
15    Q.   Okay.  And was that true, to your knowledge, for all 12 or
16    13 redshirt your year?
17    A.   Yes.
18    Q.   What's the benefit of being a redshirt?
19    A.   You get to train with the full squad, follow the guys on
20    the starting team without losing that year of eligibility, so
21    you can continue to play for the full four years even though
22    you're already on the team.
23    Q.   You play for full four years after your redshirt year; is
24    that correct?
25    A.   That's right.
```

1   Q.   And what benefits do you get from being a redshirt?

2   A.   The same.  You get to train.  You're a part of the system.

3   You learn the offense, the defense, all that sort of stuff,

4   without having the pressure you're competing and, like I said,

5   without losing that eligibility.

6   Q.   And you have a year to develop physically?

7   A.   Exactly.

8   Q.   Okay.  Do redshirts get in the pool when they're on the

9   team?

10   A.   Yes.

11   Q.   How do they get in the pool?  What do you do?  What do you

12   do in the pool as a redshirt?

13   A.   The same as everybody else.  We swim.  We practice.  We

14   develop skills.  It's a normal practice.  You're just divided

15   up by, you know, what level you are basically.

16   Q.   And I take it you don't go to any of the games?

17   A.   We're at home competitions.

18   Q.   Excuse me.  You don't go in the pool at the games?

19   A.   Oh, no.  No.

20   Q.   Okay.  Is it fair to say that a redshirt can have one

21   second in a game?

22   A.   No.  You cannot be a redshirt and compete in a match.

23   Q.   Okay.  How many redshirts were there on the team your

24   year?

25   A.   About a dozen.

```
 1    Q.   Is that typical for the team?
 2              MR. FRANK:  Objection.  Foundation.
 3              THE COURT:  Sustained.
 4    Q.   Are you aware of what the rosters looked like either
 5    before or after that year?
 6    A.   I haven't looked at them, but I do recall when we were on
 7    the team, the redshirts would talk about how many of us there
 8    were.  I mean, there was 30 --
 9              MR. FRANK:  Objection.  Hearsay.
10              THE COURT:  Sustained.
11    Q.   Now, in August, you and Johnny, you were living in the
12    same room?  Is that what you told us?
13    A.   Yes.
14    Q.   There's two beds in a small room off this living room?
15    A.   Yes.
16    Q.   Okay.  And would you go to practice together?
17    A.   Yes, we would.
18    Q.   Okay.  Did you see Johnny in the water in August?
19    A.   I did.
20    Q.   Okay.  What did you observe about him at practice?
21    A.   Nothing out of the ordinary.  He was like the rest of us.
22    Q.   Okay.  Did you observe -- was there anything he was
23    particularly good at, or particularly weaker at?  What were his
24    strengths, what were his weaknesses that you observed in
25    practice?
```

1    A.    His strengths were his swimming and his shot.  I'd say his

2    weaknesses were his defenses, shot blocking, things like that.

3    Q.    Okay.  When you say his strengths were his swimming and

4    his shot, what do you mean by that?

5    A.    He was a fast swimmer, faster than me, and he had a hard

6    shot.

7    Q.    How could you tell who was a fast swimmer in the

8    redshirts?

9    A.    We basically were set up in lanes.  So if you were

10:02 10   swimming slow and somebody would be touching your feet, or if

11   someone was swimming faster than you, then they'd be

12   overlapping you.  So you would get a sense of who was fast, who

13   wasn't, who was about in the middle.

14   Q.    Okay.  And what was your observation about Johnny's speed

15   as a swimmer among the redshirts?

16   A.    Honestly, he was above average at swimming.

17   Q.    In terms of speed?

18   A.    Yes.

19   Q.    Okay.  How would he compare to the non-redshirts on the

10:03 20   team?

21          MR. FRANK:  I'm going to object to this.

22   Q.    Did you observe how his speed compared to the

23   non-redshirts on the team?

24   A.    Yes.

25   Q.    What did you observe?

A.   He was fast.  He kept up with some of the guys who had
been on the team longer than freshmen.

Q.   Okay.  In terms of his shot, what did you observe about
his shot?

A.   He had a hard shot.

Q.   And how do you know that?

A.   I would occasionally be in the goal because we didn't have
enough goalies on the team.

Q.   Okay.  Fair to say you were college roommates for several
years?

A.   Yes.

Q.   You're friends?

A.   Yes.

Q.   You're friendly with the Wilson family?

A.   I am.

Q.   Would that cause you to exaggerate anything you're saying
to this jury today?

A.   No.

Q.   Okay.  So -- and what's it like to be in practice that
first week or two in August?  Can you tell us what you were
thinking, what you were observing, what caused you to observe
how different people were performing?

A.   Sure.  So as a freshman on that team, I mean, it's a scary
thing.  And you realize I'm competing with guys who have been
here for years.  I'm competing with the best of the best.  This

1 isn't high school water polo anymore.  So there's an element of

2 I'm trying to survive and compete and do my best and manage

3 being away from all that sort of stuff.

4 Q. Okay.  Were you, at times, insecure about your skills?

5 A. Absolutely.

6 Q. Okay.  Did other team members express the same concerns?

7   MR. FRANK:  Objection.  Hearsay.

8   THE COURT:  Sustained.

9 Q. What kind of condition -- what did you observe about

10:05 10 Johnny's conditioning when he showed up for water polo in mid

11 August?

12   MR. FRANK:  Objection.  He's not testifying as as an

13 expert, your Honor.

14   THE COURT:  He can answer the question.  Yes.

15 Overruled.

16 A. He was in normal water polo shape.

17 Q. Okay.  Do you know from your -- in high school, were you

18 also on the swim team?

19 A. I was.

10:05 20 Q. Okay.  Do you know from your high school years what would

21 count as fast times for high school swimmers in standard

22 events?

23 A. A 24 or 25 would be varsity.  If you were fast, you were

24 swimming a 22.

25 Q. Talking about 50-yard freestyle?

```
 1   A.   Yes.
 2   Q.   Okay.  So go over that again with me.  What would be a
 3   fast time in high school for a 50-yard freestyle?
 4   A.   If you were swimming 50-yard freestyle and you swim 24 or
 5   25, then you would be above average, but if you were swimming
 6   22 or 23, then that's fast.
 7   Q.   Okay.  And how would that be fast in terms of water polo?
 8   A.   That would be -- water polo players aren't the same as
 9   swimmers.
10   MR. FRANK:  I object on foundation grounds.
11   THE COURT:  Sustained.
12   Q.   You were both on a water polo team and a high school swimm
13   team?
14   A.   Yes.
15   Q.   Okay.  So from your experience and observation, would
16   water polo players be as fast as swimmers in general in terms
17   of a 50-yard freestyle?
18   A.   No.
19   Q.   Okay.  What would something like about a mid-22 be for a
20   high school sophomore?
21   MR. FRANK:  Objection, your Honor.
22   THE COURT:  Sustained.
23   Q.   In your observations, what would a 22 second be considered
24   for a high school water polo player?  Would that be fast,
25   exceptional?
```

```
 1              MR. FRANK:  Objection.

 2              THE COURT:  The objection's sustained.

 3    Q.   Okay.  When you were a sophomore in high school, could you

 4    swim the 50 in 22 seconds?

 5    A.   No.

 6    Q.   Okay.  Did you know many people who could swim, water polo

 7    players, who could swim 50 yards in 22 seconds as high school

 8    sophomores?

 9    A.   No.

10    Q.   Okay.  Is speed, in your experience, important to

11    recruiting in water polo?

12              MR. FRANK:  Objection.  Foundation.

13              THE COURT:  Sustained.

14    Q.   How many different schools did you talk with with respect

15    to water polo recruiting?

16    A.   Three or four.

17    Q.   Okay.  In your experience, was speed an important factor?

18    A.   Yes.

19    Q.   Okay.  And why is that?

20    A.   As with any college level, professional level, the speed

21    of the game goes up.  So being fast and being in good shape and

22    having good conditioning are important.

23    Q.   Okay.  Is there a physical limit to how fast people can

24    get?

25              MR. FRANK:  Objection.  Foundation.
```

```
 1              THE COURT:  Sustained.
 2    Q.    Okay.  From what you observed by watching him swim during
 3    August, did you think Johnny had speed that made him an asset
 4    to the team?
 5    A.    Yes.
 6    Q.    I take it you got certain honors and awards when you were
 7    in high school water polo?
 8    A.    I did.
 9    Q.    Okay.  In your understanding, what does it mean to be
10:08 10  something like All Peninsula Athletic League?
11              MR. FRANK:  Objection.
12              THE COURT:  Sustained.
13    Q.    Okay.  Were you invited to participate in the United
14    States Olympic Development Program?
15    A.    No, I was not.
16    Q.    Do you understand what criteria it takes to be invited to
17    participate?
18    A.    You are under development to compete for the Olympic team
19    potentially.
10:08 20  Q.    Do you understand what it means to be a starter on a team
21    in the National Junior Olympics?
22    A.    Yes.
23    Q.    Were you a starter on the team in the National Junior
24    Olympics?
25    A.    I was.
```

1   Q.   Okay.  What does it mean to you?  What is your

2   understanding of what it means?

3   A.   It means that you're competing at a high level if you're

4   part of a Southern California or Northern California club.  If

5   you're at the Junior Olympics, that's the biggest event of the

6   year.

7   Q.   Okay.  And people with those credentials -- strike that.

8   The redshirts on the team that you were teammates with, did

9   they have those type of credentials?

10:09 10  A.   Yes.

11  Q.   Now, from what you were able to observe from the time that

12  Johnny was going to practices in August, was he able to keep up

13  with the other players during the conditioning work?

14  A.   Yes.

15  Q.   Did -- was there anything noticeable about him falling

16  behind other teammates in any way?

17  A.   No.

18  Q.   Roughly, how many players were on the water polo team that

19  year?

10:09 20  A.   Around 35.

21  Q.   How many traveled to games officially as part of the team

22  going to games?

23  A.   14, and then you could have two goalies, so 16.

24  Q.   Okay.  What did the rest of the 20 or so members of the

25  team do?

```
 1   A.   The expectation was that we were at competitions --
 2              MR. FRANK:  Objection to the expectation.
 3              THE COURT:  Sustained.
 4   Q.   What was the actual occurrence?  What -- did the rest of
 5   the team members go to the games or not?
 6   A.   We were all there, regardless of if we were competing.
 7   Q.   Did the school provide you transportation and housing?
 8   A.   No, they did not.
 9   Q.   And so you guys had to go on your own?
10   A.   Yes.
11   Q.   But everybody went?
12   A.   Yes.
13   Q.   Okay.  How many players are in the water at any one time
14   in a game?
15   A.   You can have six field players and one goalie.
16   Q.   Did Johnny go to the games that would go on during the
17   year when the redshirts would have to drive themselves?
18   A.   Yes, he did.
19   Q.   Okay.  Did he go to more than one?
20   A.   Yes, he did.
21   Q.   How many do you remember him going to?
22   A.   I don't have a number, but he was at the competitions like
23   the rest of us.
24   Q.   Okay.  Why was the team so big, 36, 38 people, if they
25   only had 14 or so playing?
```

1          MR. FRANK:  Objection.

2          THE COURT:  Sustained.

3    Q.   What is the benefit of a team being -- having so many

4    members?

5          MR. FRANK:  Objection.

6          THE COURT:  Sustained.

7    Q.   What would the other members of the team do who did not go

8    to play in games?

9    A.   If we weren't playing in the games, then we were at the

10:11 10   facility.  We were filming the varsity team playing.  Those who

11   were in the water, we were taking stats on who was passing to

12   who, who was scoring, plays that were being run, things like

13   that.

14   Q.   Okay.  At a certain time, did you come back to your dorm

15   room and notice something about Johnny?

16   A.   Yeah.  At the end of August, I came back from class or

17   practice and noticed that he was laying in a dark room.

18   Q.   And was this during day or in evening?

19   A.   It was both.

10:12 20   Q.   Okay.  And the dark room being your bedroom?

21   A.   That's right.

22   Q.   Okay.  And so for how long -- was it more than one day he

23   was just sitting in a dark room?

24   A.   Yes.

25   Q.   And this was at daytime and nighttime?

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Was he going to school? |
| 3 | A. | No. |
| 4 | Q. | Was he going to class? |
| 5 | A. | No. |
| 6 | Q. | Was he going to practice? |
| 7 | A. | No. |
| 8 | Q. | Okay.  At some point did you learn what happened to him? |
| 9 | A. | Yes. |
| 10:12  10 | Q. | What happened to him? |
| 11 | A. | I learned that he had had a concussion. |
| 12 | Q. | Okay.  And so do you remember how many days he was sitting |
| 13 | | in the dark room day and night? |
| 14 | A. | I don't remember the exact number of days, but it was a |
| 15 | | couple of weeks it seemed. |
| 16 | Q. | Couple of weeks he didn't go to class? |
| 17 | A. | Right. |
| 18 | Q. | When did he leave the room? |
| 19 | A. | The only time I ever saw him leave was to go get food, |
| 10:13  20 | | otherwise he was always there. |
| 21 | Q. | Was he doing the computer or watching TV or goofing off? |
| 22 | A. | No. |
| 23 | Q. | Okay.  He was just lying in a dark room? |
| 24 | A. | Yes. |
| 25 | Q. | Okay.  What did the water polo team do for athletes who |

1   were injured?  What was their role if they were injured and

2   couldn't be in the pool actually training?

3   A.   We were on the pool deck.  We were setting up clocks,

4   passing out balls, weight belts, basically facilitating

5   practice.

6   Q.   At some point were you injured during that season?

7   A.   Yeah.  I got sick and I was out for a period of time.

8   Q.   And what was your problem?

9   A.   I had strep throat.

10:13 10   Q.   And how long were you out there?

11   A.   A few weeks.

12   Q.   Okay.  Did there come a point in time where Johnny stopped

13   staying in the dark room by himself and actually was going back

14   to classes?

15   A.   Yes.

16   Q.   Okay.  What did he do with respect to water polo?

17   A.   He would do the normal things that somebody who was

18   injured would do, so all that stuff I described.

19   Q.   How frequently was he coming to practice after he was out

10:14 20   of the dark room?

21   A.   Every day.

22   Q.   He was there every day?

23   A.   Yes.

24   Q.   Okay.  And were there other injured people doing these

25   types of activities?

1   A.   Yes.

2   Q.   Okay.  Is it basically to say they were up on the pool

3   deck?

4   A.   Yes.

5   Q.   They're not in the water?  They're sort of in the area

6   around the water?

7   A.   That's correct.

8   Q.   Okay.  And did you participate in some of these activities

9   when you had strep?

10:14 10   A.   I did.

11   Q.   Did you do them with Johnny?

12   A.   Yes.

13   Q.   Were there other teammates there, as well?

14   A.   Yes.

15   Q.   Okay.  Tell us some of the tasks you did on the pool deck

16   that you saw Johnny doing, as well.

17   A.   So we would pull tarps at the end of practice.  We would

18   set up the clocks or run the scoreboard when they were

19   scrimmaging, pass out weight belts, pass out balls, things like

10:14 20   that.

21   Q.   Okay.  How many injured players would there be typically

22   during the season, the range, two, three, five, six?  What

23   would be the range of people who would be injured at any one

24   time?

25   A.   There was never normally a time where everyone was in the

pool.  I'd say usually there was two to four people who were
out of the pool doing those tasks.

Q.   Okay.  And is it your -- and I take it you and Johnny
lived together.  Did you walk to and from practice together?

A.   Yes.  We all walked from our doom to practice together.

Q.   Okay.  So you observed him on pretty much a daily basis
going to practice after he was out of the dark room?

A.   I did.

Q.   Okay.  Did Casey Moon have any interaction with you and
Johnny when Johnny was in this injured status on the deck?

A.   Yes.  He would be the one that generally would assign out
what we needed to be doing.

Q.   Are there particular events involving Casey that you
remember with him having interaction with Johnny at this
injured time?

A.   Yes.

Q.   What do you remember?

A.   He would tell Johnny and I, or whoever was injured to, you
know, go out, set up the clocks, run the scoreboard.  Hey, you
guys do this, basically.  So Johnny and I were sitting there
and kind of just watching practice.  Then he would have us do
something.

Q.   Do you remember a particular incident involving a Mexican
restaurant?

A.   I do.  There was a place that water polo players always

1    went.  It was like the go-to Mexican in LA and we had been

2    planning on going there after practice, and I was sick at the

3    time.  He was injured, so that's when we really started

4    talking.  And basically, the rest of the team was already

5    showering up, other redshirts were already leaving the pool

6    deck.  And we were still there being told by Casey, hey, you

7    guys do this.  So we were kind of singled out.

8              And we went to the restaurant afterwards and were

9    kind of like, you know, this isn't right.  We're doing all this

10:16 10   work and everyone else is leaving the pool.  The other

11   redshirts at least should be here with us helping, so it felt

12   like Casey kind of singled us out.

13   Q.   Okay.  For those who were -- did any freshman play in

14   games your season?

15   A.   Yes.

16   Q.   How many?

17   A.   I don't know the exact number, but I know some of the

18   names.

19   Q.   None of the redshirts, I take it, played, correct?

10:17 20   A.   No.

21   Q.   So a few non-redshirts played?

22   A.   Right.

23   Q.   Typically, for those playing in games, what grades were

24   they in?  What years were they?

25   A.   Usually a junior or a senior.  There was some sophmores, a

         1    few freshman.

         2    Q.   Okay.  And juniors and seniors, those would include people

         3    who had been redshirted, so they were actually a year extra?

         4    A.   Yes.

         5    Q.   Okay.  Who was Marko Pintaric?

         6    A.   He was the assistant head coach.

         7    Q.   Okay.  And he was helping to run the team as well?

         8    A.   That's right.

         9    Q.   Okay.  I want to just show you a couple of exhibits while

10:18   10    we're going through this.

        11           MR. KENDALL:  If we could show the witness only

        12    Exhibit 9911.

        13    Q.   Do you recognize it?

        14    A.   Yes.

        15    Q.   Is this a form document?

        16    A.   Yes.

        17    Q.   Okay.  Did you receive a copy of it?

        18    A.   Yes.

        19    Q.   On the same day that's indicated on 9911?

10:18   20    A.   Yes.

        21           MR. KENDALL:  Your Honor, I offer Exhibit 9911,

        22    please.

        23           MR. FRANK:  Objection.  Hearsay.  This is not

        24    addressed to this witness.

        25           MR. KENDALL:  Your Honor, it's not offered for the

1      truth of the matter asserted, just to show that it was sent.

2                MR. FRANK:  Objection.  Hearsay, your Honor.

3                THE COURT:  Sustained.

4                MR. KENDALL:  Okay.  Do you --

5                Your Honor, if we can just show the witness again,

6      only the witness, the 9911, please.

7      Q.    Do you know what Johnny Wilson's e-mail address was?

8      A.    Yes.

9      Q.    Do you recognize it on this document?

10:19 10    A.    I do.

11     Q.    Is that his school e-mail address?

12     A.    It is.

13               MR. KENDALL:  Your Honor, I'd reoffer it.

14               MR. FRANK:  Same objection.

15               THE COURT:  Sustained.

16               MR. KENDALL:  Okay.  For the record, your Honor, we're

17     not offering it for the truth of the matter asserted, just that

18     it was sent to him.

19     Q.    Next, I'd like to show the witness Exhibit 8005.  I

10:19 20    believe this is already in evidence, so we can show the jury,

21     please.

22               Do you recognize this e-mail from Marko Pintaric?

23     A.    I do.

24     Q.    And who are the group of people that got this e-mail?

25     A.    Those are all the redshirts, people not competing.

|     |                                                                        |
| --- | ---------------------------------------------------------------------- |
| 1   | Q.   Do you recognize the names?                                       |
| 2   | A.   I do.                                                              |
| 3   | Q.   And these were your teammates?                                    |
| 4   | A.   Yes.                                                               |
| 5   | Q.   Okay.  It also says to Casey Moon and Stefan Luedecke.            |
| 6   | Who is Stefan Luedecke?                                                 |
| 7   | A.   Stefan is another assistant coach.                                |
| 8   | Q.   Okay.  And then it says "SoCal schedule".  "Hi all,              |
| 9   | attached is SoCal schedule with scouting responsibilities".           |

10:20 10      What was SoCal and what is scouting responsibilities?

11   A.   SoCal was a tournament that happened every year that our
12   team would compete in.  And the scouting responsibilities were
13   the filming of the game, the responsibilities that we had to be
14   at the pool watching our games and taking those stats and
15   filming it.
16   Q.   Okay.  And if I notice in the two lists there, it says to
17   John B. Wilson, do you see that?
18   A.   Yes.
19   Q.   Okay.  Is your name in there, as well?

10:20 20   A.   It is.

21   Q.   A. Mericle about three lines above Wilson?
22   A.   Yes.
23   Q.   And you recognize the others as your teammates, correct?
24   A.   I do.
25   Q.   Who organized the filming for the scouting at this event?

```
 1   A.   I did.

 2   Q.   How did you get that responsibility?

 3   A.   Marko selected me, and so I would manage it for him

 4   basically.

 5   Q.   And you'd do this at more than one game, or more than one

 6   tournament?

 7   A.   Yes.

 8   Q.   Okay.  It became sort of your seasonal responsibility?

 9   A.   Exactly.

10:21  10        MR. KENDALL:  Okay.  If we can turn next to

11   Exhibit 8007, please.

12   Q.   Is this the schedule?

13   A.   Yes.  This is the schedule for the tournament.

14   Q.   Okay.  And what would you do with the schedule?

15   A.   We were supposed to have it filled out.  So we would write

16   the names and who was scheduled to be where and what they would

17   be doing.

18   Q.   Would you make the assignments?

19   A.   I would.

10:21  20   Q.   I mean, Marko Pintaric gave it to you to organize and then

21   you'd hand out who would do which game?

22   A.   Yes.

23   Q.   Okay.  Did Johnny participate in doing these tasks?

24   A.   He did.

25   Q.   Okay.  And what did you assign him to do?
```

| | |
|---|---|
| 1 | A.   He would either film, or he would be working that |
| 2 | iPod/computer and he would do whatever was open and what he |
| 3 | basically signed up for. |
| 4 | Q.   And who else would be doing this? |
| 5 | A.   All the other redshirts. |
| 6 | Q.   This was a redshirt responsibility, fair to say? |
| 7 | A.   That's right.  If you weren't competing, you were expected |
| 8 | to be contributing in this way. |
| 9 | Q.   And did the two of you do this for more than just the |
| 10:22  10 | SoCal tournament? |
| 11 | A.   Yes. |
| 12 | Q.   And you were organizing the other tournaments, as well, |
| 13 | for this filming? |
| 14 | A.   That's right. |
| 15 | Q.   And Johnny was participating at your direction? |
| 16 | A.   Yes. |
| 17 | Q.   Did Johnny ever refuse to do any of the redshirt tasks |
| 18 | that were assigned outside the pool? |
| 19 | A.   No. |
| 10:22  20 | Q.   Did he participate any less than the other redshirts in |
| 21 | the tasks assigned outside of the pool? |
| 22 | A.   No. |
| 23 | Q.   Okay.  Was Johnny a full fledged member of the team? |
| 24 | A.   Yes. |
| 25 | MR. KENDALL:  Okay.  I'd like to go to Exhibit 8028, |

         1    please.

         2    Q.   If you could look at the names in green, we can see that

         3    they don't have any Xs.  Do you see that?

         4    A.   Yes.

         5    Q.   Do you recognize them?

         6    A.   I do.

         7    Q.   Do you -- and who are the people in green?

         8    A.   The people in green are those who weren't competing.  They

         9    were redshirts.

10:23   10    Q.   And if we can just look at the top to show what the X or

        11    absence of an X means.  That list there, are those the games or

        12    tournaments that the team was playing in?

        13    A.   Yes, they were.

        14    Q.   So if you're green with no X, that means you didn't play

        15    in it?

        16    A.   Right.

        17    Q.   So all of the people in that group were not playing in any

        18    of these games, all the people in green?

        19    A.   Correct.

10:24   20         MR. KENDALL:  Okay.  Your Honor, I have a note here.

        21    I'm not sure if that's correct or not, but it may be that 8007

        22    wasn't actually -- I though it was offered in, but it may not

        23    have been offered in.  I'd like to offer in 8007, which was

        24    just the schedule that was attached to 8005, which is in.  I'd

        25    like to make sure both have been offered.  8005 and 8007.

```
 1              MR. FRANK:  No objection.

 2              THE COURT:  They'll be admitted, 8007.

 3              MR. KENDALL:  Thank you, your Honor.

 4              (Exhibit 8007 admitted into evidence.)

 5    Q.   What club team did you play for in high school?

 6    A.   I played for SET water polo.

 7    Q.   How is that spelled?

 8    A.   S-E-T.  It stands for Saddleback El Toro.

 9    Q.   Okay.  Was it a good club?

10    A.   Yes.

11    Q.   Did it have a good reputation?

12              MR. FRANK:  Objection.

13              THE COURT:  Sustained.

14    Q.   Did you know about the Stanford Club in Northern

15    California?

16    A.   I did.  We competed against them.

17    Q.   What was your opinion of the Stanford Club?

18              MR. FRANK:  Objection.

19              THE COURT:  Sustained.

20    Q.   Was the Stanford club a well-known tournament, or well

21    known club in high school tournaments?

22              MR. FRANK:  Objection.

23              THE COURT:  Sustained.

24    Q.   What did you know about the Stanford Club?

25    A.   They were a good club.  They were --
```

```
 1              MR. FRANK:  Objection.

 2              THE COURT:  Relevance?

 3              MR. KENDALL:  Your Honor, it goes to the qualification

 4     issue and the qualifications of Johnny that he played for a top

 5     club team.

 6              THE COURT:  Go ahead, but so far the objections are

 7     sustained.

 8     Q.   Okay.  For the redshirts who were on the team, did they

 9     play for club teams?

10     A.   Yes.

11     Q.   And what -- how were they -- what were the type of clubs

12     that they played for?

13              MR. FRANK:  Objection.  This is all based on hearsay.

14              THE COURT:  Sustained.

15     Q.   You played against the Stanford Club Team, correct?

16     A.   Yes.

17     Q.   Okay.  What did you observe about the Standford Club Team

18     when you played against them?

19     A.   They were a good water polo team.  They were one of our

20     main rivals, along with a handful of others.  So we always

21     expected a difficult game when we would compete against them.

22              MR. KENDALL:  Okay.  I'd now like to show the witness

23     Exhibit 9845.

24     Q.   Do you recognize this document?

25     A.   Yes.
```

1    Q.   Okay.  And if we could go down a little bit --

2         MR. KENDALL:  No.  To the top.  I'm sorry, Mr. Carter.

3    To the top.

4    Q.   It's from Stefan Luedecke, the assistant coach.  And who

5    is it addressed to?

6    A.   This looks like the full team to me.

7         MR. KENDALL:  Your Honor, I'd like to offer 9845 into

8    evidence.

9         MR. FRANK:  Objection.  Hearsay.

10:27 10        THE COURT:  Sustained.

11        MR. KENDALL:  Your Honor, it's not for the truth of

12   the matter asserted.  It's just to show that it was sent.

13        THE COURT:  Sustained.

14        MR. KENDALL:  Okay.  One moment, your Honor.

15   Q.   Did you get this document?

16   A.   Yes.

17   Q.   Okay.  And you read it at the time you got it?

18   A.   Yes.

19        MR. KENDALL:  I'd like to offer again 9845.  He has

10:27 20   personal knowledge.

21        MR. FRANK:  It's still hearsay, your Honor.

22        THE COURT:  Sustained.

23   Q.   Okay.  Was it the practice of the coaching staff to send

24   plays and sort of strategic documents to team members?

25        MR. FRANK:  Objection to what the practice of the

1    coaches was.

2          THE COURT:  Sustained.

3    Q.   During the season when you played there, did you get any

4    strategic type materials from the coaching staff?

5    A.   Yes.

6    Q.   What type of materials would you get?

7    A.   We had a playbook that we received.

8    Q.   Okay.  Did Johnny get the playbook?

9          MR. FRANK:  Objection.

10:28 10         THE COURT:  Sustained.

11   Q.   Did you observe Johnny get the playbook?

12   A.   Yes.

13   Q.   Okay.  Did you observe Johnny with the plays?

14   A.   Do you mean like practicing the plays?

15   Q.   No, have the physical description of the plays in his

16   hand.

17   A.   We all had one.

18   Q.   Okay.  And would you discuss it amongst yourselves?

19   A.   Yes.

10:28 20  Q.   Okay.  Was he part of those discussions?

21   A.   Yes.

22   Q.   Okay.  Was there any sort of chalkboard or classroom time

23   where they would go over plays and strategies?

24   A.   We would do that at the beginning of some practices.

25   Q.   Did Johnny attend those sessions?

```
 1   A.   Yes.
 2   Q.   Okay.  Based upon what you observed that year, did Johnny
 3   have the skills to develop into a varsity player?
 4             MR. FRANK:  Objection.
 5             THE COURT:  Sustained.
 6   Q.   Okay.  At a certain point did Johnny get back into the
 7   water?
 8   A.   Yes, he did.
 9   Q.   When did you observe him back in the water at a practice
10   with the team?
11   A.   Towards the end of the season.
12   Q.   Sometime in November?
13   A.   Yes.
14   Q.   Okay.  What did you observe him doing in the water?
15   A.   He was doing swimming conditioning, some skill drills, but
16   I don't recall him being in a full scrimmage or anything that
17   was full contact.
18   Q.   Okay.  Is that because of the concussion?
19   A.   Yes.  I would think so.
20             MR. FRANK:  Objection to the last part.  Move to
21   strike.
22             THE COURT:  Sustained.
23   Q.   Okay.  When people have concussions, do they make gradual
24   returns to practice?
25             MR. FRANK:  Objection.
```

| | |
|---|---|
| 1 | THE COURT:  Sustained. |
| 2 | Q.   In your experience in water polo, if somebody's had a |
| 3 | concussion, how do they reenter training? |
| 4 | MR. FRANK:  Objection. |
| 5 | THE COURT:  Sustained. |
| 6 | Q.   Describe Johnny's attitude that season. |
| 7 | MR. FRANK:  Objection. |
| 8 | THE COURT:  Sustained. |
| 9 | Q.   Did you observe Johnny's attitude that season? |
| 10:30 10 | MR. FRANK:  Objection to "attitude". |
| 11 | THE COURT:  Yeah.  Sustained. |
| 12 | Q.   Did Johnny ever refuse to do any of the tasks he was |
| 13 | assigned as part of the team? |
| 14 | A.   No. |
| 15 | Q.   Was he a slacker in terms of any responsibilities? |
| 16 | MR. FRANK:  Objection. |
| 17 | THE COURT:  Sustained. |
| 18 | Q.   Did he fulfill all of his responsibilities that you saw |
| 19 | assigned to him? |
| 10:30 20 | MR. FRANK:  Objection. |
| 21 | THE COURT:  He can answer that one. |
| 22 | A.   Yes. |
| 23 | Q.   Okay.  How would you describe his demeanor when he was at |
| 24 | the practices? |
| 25 | A.   The same as the rest of us, so waiting for direction from |

```
 1   the coach, setting things up.  He was a full member of the
 2   team.
 3   Q.   How demanding was Coach Vavic?
 4   A.   Extremely.
 5   Q.   In what ways?
 6   A.   I would describe him as like the Bill Belichick of water
 7   polo, so you were expected to be, you know, full water polo all
 8   the time.  Water polo was priority number one.  If you were --
 9   he said to me one time, if you were getting As and Bs, then you
10   were not focused enough on water polo.  You should de getting
11   Cs and doing better in the pool.
12   Q.   Did you ever meet Johnny's parents freshman year?
13   A.   I did.
14   Q.   Did you ever see them at a game?
15   A.   I did.
16   Q.   Who did you see at the game?
17   A.   I saw Johnny's father at the game.
18   Q.   Do you see him here in court today?
19   A.   I do.
20   Q.   Okay.  Do you want to point him out to us?
21   A.   He's right here with the light blue tie.
22   Q.   Was it more than one game you saw him attend?
23   A.   Yes.
24   Q.   How many games?  Can you give us an estimate of the number
25   of games you saw him at?
```

1    A.    A handful.

2    Q.    Okay.  And what does a handful mean?

3    A.    Somewhere in the five range.

4    Q.    Okay.  Was there any particular thing the team used to

5    tease Johnny about?

6    A.    Yes.  I don't remember how we found out about it, but one

7    time Johnny told us that he had done a swim from Alcatraz to

8    the shore in San Francisco and he was on Oprah.

9    Q.    Okay.  And that became a joke?

10:33 10   A.    Oh, yeah.  He was ragged quite a bit for that, not so much

11   the swimming from Alcatraz, because that's impressive, but for

12   being on Oprah as a little kid.

13         MR. KENDALL:  If you could -- I'd like to show the

14   witness Exhibit 9527 for the witness only.

15   Q.    Do you recognize this photo?

16   A.    I don't recognize the photo, but I recognize people in it.

17   Q.    Do you recognize what event it's from?

18   A.    Yes.

19         MR. KENDALL:  Okay.  Your Honor, I'd like --

10:34 20   Q.    Can you tell us what event it's from?

21   A.    It's the national championships.

22   Q.    That year that -- your freshman year?

23   A.    That's right.

24         MR. KENDALL:  Okay.  Your Honor, I'd offer 9825 into

25   evidence.

1          MR. FRANK:  No objection.

2          THE COURT:  It will be admitted.

3          (Exhibit 9825 admitted into evidence.)

4          MR. KENDALL:  Okay.  And if could show the jury.

5    Q.    Could you tell us who do you recognize?

6    A.    I recognize some of my teammates.  I recognize Johnny

7    there.

8    Q.    Okay.  You say you recognize Johnny.  Is he the person in

9    the gray T-shirt closest to the fence?

10:34 10   A.    Yes.  That's right.

11   Q.    Okay.  Is that him circled?

12   A.    Yes.

13   Q.    Who's the person to his right?

14   A.    That's Charlie McBean, another member of the team.

15   Q.    Okay.  And who else do you recognize from the team there?

16   A.    I recognize Chase Cockwell.

17   Q.    Where is he?

18   A.    He's in the row below Johnny, in the gray, to the left

19   side.  Yes.

10:34 20   Q.    With the beard?

21   A.    Yes.

22   Q.    That's Chase Cockwell?

23   A.    Chase Cockwell.

24   Q.    Chase Cockwell.

25   A.    And then above him, that's Colby Watson.

|   | | |
|---|---|---|
| 1 | Q. | And were you at this tournament? |
| 2 | A. | I was. |
| 3 | Q. | Okay.  But you're not in this picture? |
| 4 | A. | No. |

5        MR. KENDALL:  Could we have Exhibit 8028, please, for

6    the witness only.  Excuse me.  We've already gone through that.

7    Can we go back to 8028, please?

8    Q.   For the people in the green, if we could just focus on

9    starting from the top green to the bottom green line.  When did

10:36 10   Johnny leave the water polo team?

11   A.   Sometime in January.

12   Q.   When did you leave?

13   A.   Sometime in March.

14   Q.   And why did you leave?

15   A.   To focus on school and to be out of that environment.

16   Q.   Okay.  Did you keep your As and Bs?

17   A.   I did for the most part.  I can't say they were all As and

18   Bs.

19   Q.   For the other freshmen redshirts on that team, how many of

10:36 20   them left the team your freshman or sophomore year, that you

21   can recall?

22   A.   You're saying out of the people in green here?

23   Q.   Yes.

24   A.   If I could just go down the list.  Jake Taburchlick left

25   in his first year.  Tyler left in the first semester.  Chase

1    Cockwell stayed for at least couple years.  Tim Leong was there

2    for I believe all four, but more than two years.  I left.

3    Steve Michaud also left after his first year.  And then

4    Tristan, Kyle, they remained on the team.  Colby left and

5    Johnny left.

6    Q.   Okay.  When did Colby leave, to your memory?

7    A.   First year.

8    Q.   After you and Johnny left the team freshman year, did you

9    remain friends with people who were still on the team?

10:38 10   A.   Yes, we did.

11   Q.   Okay.  Are you still friends today?

12   A.   Johnny and I?

13   Q.   And the other teammates.

14   A.   Yes.

15   Q.   Okay.  Do you currently work for USC?

16   A.   No.

17   Q.   You graduated and you've gone off and left the school,

18   correct?

19   A.   That's correct.

10:38 20   Q.   Did any USC lawyers prepare you to testify today?

21   A.   No.

22   Q.   Does USC have any financial control or influence over your

23   income?

24   A.   No.  They just ask me for donations all the time.

25            MR. KENDALL:  One moment, your Honor.  Okay.  No

```
 1    further questions, your Honor.
 2              THE COURT:  Cross-examination, Mr. Frank.
 3              MR. FRANK:  Thank you, your Honor.
 4                   CROSS-EXAMINATION OF ANDREW MERICLE
 5    BY MR. FRANK:
 6    Q.   Good morning, Mr. Mericle.
 7    A.   Good morning.
 8    Q.   You're up from Dallas?
 9    A.   I am.  Got to say that I like the crisp weather here
10    versus the scorching back home.
11    Q.   Mr. Mericle, you were an accomplished water polo player in
12    high school?
13    A.   Yes.
14    Q.   And you played all four years?
15    A.   Yes.  In high school?
16    Q.   Yes.
17    A.   Yes.
18    Q.   And I suspect you worked very, very hard at it?
19    A.   I did.
20    Q.   And getting recruited to USC was a big deal for you,
21    wasn't it?
22    A.   Yes.
23    Q.   And it was a long and arduous process for you, right?
24    A.   Yes.
25    Q.   And I believe you testified on direct examination that you
```

1    went through a recruitment process not just at USC, but at

2    other schools as well?

3    A.    Yes.

4    Q.    Tell us about that process.

5    A.    So the process for getting recruited in water polo is --

6    can be one of two things:  The coach might reach out or you

7    might reach out to the coach, submit a profile of some sort,

8    and try to get in contact.  So once you have contact with them,

9    you would either give them some film, or meet with them in

10:40 10   person.  For example, I met with the coach of Loyola Marymount,

11   then talk about your water polo past, basically, and see if

12   you'd be a good fit or contribute to the team in the future.

13   Q.    And so you submitted resumes as part of that process?

14   A.    Yes.

15   Q.    And you e-mailed the coaches?

16   A.    Yes.

17   Q.    And you submitted film as part of that process?

18   A.    Yes.

19   Q.    Okay.  And it was a long process you went through, right?

10:41 20   A.    Yes.

21   Q.    And you did that all personally?

22   A.    Me and my dad would work on stuff.

23   Q.    Okay.  And it took a lot of time, right?

24   A.    Yes.

25   Q.    Okay.  And then Coach Vavic called you to offer you a

```
 1    spot?
 2    A.    Yes.  So I met with Coach Vavic at a -- well, he was
 3    watching one of my games in Newport by coincidence.  I heard
 4    that he was interested.  I ran out to the parking lot to talk
 5    to him and met him again in San Diego and talked with him a few
 6    more times and at one point he called and asked me to be on the
 7    team.
 8    Q.    You met him again in San Diego?
 9    A.    Yes.
10:41 10   Q.    Where did you meet him in San Diego?
11    A.    I had gone down to a tournament there that I knew USC was
12    competing at in my senior year of high school.
13    Q.    And you searched him out there?
14    A.    Yes.
15    Q.    And he came and he saw you at a match, as well, at a game?
16    A.    He did. It was a Junior Olympic qualifying match.
17    Q.    So he saw you play?
18    A.    Correct.
19    Q.    And after seeing you play and reviewing your resume and
10:42 20   going through that process, he called to offer you a spot?
21    A.    That's right.
22    Q.    And he offered you a one percent book scholarship, as
23    well?
24    A.    Right.
25    Q.    And that, you understood, to be recognition of your skill
```

1    and your hard work, correct?

2    A.    Yes.

3    Q.    And you ultimately singed a National Letter of Intent,

4    right?

5    A.    I did.

6    Q.    And that was a big deal as well, correct?

7    A.    Yes.

8    Q.    There was a signing ceremony?

9    A.    There was.

10:42 10   Q.    And other student athletes were there from your school?

11   A.    That's correct.

12   Q.    Signing National Letters of Intent?

13   A.    Yes.

14   Q.    And the local newspaper was there?

15   A.    I believe so.  I don't remember.

16         MR. FRANK:  Can we show the witness only Exhibit 726,

17   please.

18   Q.    Does that refresh your recollection that the local

19   newspaper was there?

10:43 20   A.    Yes, it does.

21   Q.    And, in fact, that's your photo, correct?

22   A.    That is me with some long hair.

23   Q.    And the photo was published in the local newspaper?

24   A.    Yes.

25         MR. FRANK:  And can we show the witness 728, please.

```
 1   Q.   That's you with your high school classmates, all of whom
 2   were recruited?
 3   A.   Right.
 4   Q.   And you were all photographed for the local newspaper?
 5   A.   Yes.
 6   Q.   And it was published in the local newspaper?
 7   A.   Yes.
 8   Q.   So that slipped your mind earlier?
 9   A.   It's been a long time.
10        MR. FRANK:  Yeah.  Government offers 726 and 728.
11        THE COURT:  It will be admitted.
12        (Exhibit 726, 728 admitted into evidence.)
13   Q.   And you didn't offer Coach Vavic any money to recruit you,
14   did you?
15   A.   No.
16   Q.   You didn't make a payment to Coach Vavic --
17        MR. KENDALL:  Objection, your Honor.
18        THE COURT:  Overruled.
19        MR. KENDALL:  Not in the evidence.
20   Q.   You didn't make a payment to Coach Vavic?
21   A.   No.
22   Q.   You didn't make a payment to the water polo team to get
23   recruited, did you?
24   A.   No.
25   Q.   Your parents did not make a payment to Coach Vavic to get
```

10:43 (line 10)
10:44 (line 20)

```
 1   you recruited?
 2   A.    No.
 3   Q.    Your payments did not make a payment to the water polo
 4   team at USC to get you recruited?
 5   A.    No.
 6   Q.    You didn't offer payments to any other coaches to recruit
 7   you, did you?
 8   A.    No.
 9   Q.    You didn't offer payments to any other teams to recruit
10   you, did you?
11   A.    I did not.
12   Q.    You didn't seek to funnel payments through a charity to
13   any of those teams to recruit you, did you?
14   A.    No.
15   Q.    You didn't seek to offer funnel payments through a charity
16   to any coaches to recruit you, did you?
17   A.    No.
18   Q.    You didn't have a college counselor who made payments on
19   your behalf to get you recruited, did you?
20   A.    No.
21   Q.    You didn't make donations in exchange for getting
22   recruited, did you?
23   A.    I didn't.
24   Q.    And your parents didn't do that either?
25   A.    No.
```

1    Q.   You made a number of submissions to USC and other schools

2    as part of the recruiting process?

3    A.   I did.

4    Q.   You submitted a profile, an athletic profile?

5    A.   Yes.  First time, yes.

6    Q.   You didn't lie in those submissions to get recruited, did

7    you?

8    A.   No.

9    Q.   Because you know that lying is wrong?

10:45 10   A.   Yes.

11   Q.   You've known that since you were a kid, right?

12   A.   Yes.

13   Q.   Everybody knows that?

14   A.   I would assume.

15   Q.   And in fact, you knew that if you gave false information

16   to USC as part of your recruitment process, that would be

17   wrong, correct?

18   A.   Yes.

19   Q.   And you could face consequences for that, correct?

10:45 20   A.   Yes.

21   Q.   And you knew that you couldn't misrepresent yourself or

22   your abilities to USC, or any other school as part of the

23   recruitment process, correct?

24   A.   Yes.

25   Q.   You were cocaptain of your high school water polo team?

```
 1   A.   I was.

 2   Q.   And you were also on your high school swim team?

 3   A.   Yes.

 4   Q.   And Mr. Kendall asked you some questions about the 50-yard

 5   freestyle.  What was your time?

 6   A.   I don't recall what my time was for high school water polo

 7   or swim.  I didn't do the final semester, but it was probably

 8   somewhere in the 24, 22, 23, somewhere in that 25 range maybe,

 9   but not as fast as the top guys on my team.

10   Q.   What about in the 100-yard freestyle?

11   A.   I don't know if I ever had a match time because I never

12   swam varsity because I didn't particularly like swimming.

13   Q.   I thought you testified you were on your high school swim

14   team.  You were not the varsity swim team?

15   A.   No.  I was on the high school swim team, but I didn't swim

16   for our varsity squad.

17   Q.   But you know what good times are on the 100-yard

18   freestyle, correct?

19   A.   Sure.  Water polo players and swim aren't the same always,

20   so just because I didn't like swim didn't mean that I wasn't a

21   good swimmer.

22   Q.   And a swim time of 43, 44 seconds in a 100-yard freestyle?

23   A.   I don't know if that's possible.

24   Q.   It's exceptional, right?

25   A.   Yeah.
```

```
 1   Q.   What about 53 seconds?

 2   A.   It's good, really good.

 3   Q.   That's a decent time, right?

 4   A.   For sure.

 5   Q.   But 53 seconds versus 43 seconds or 44 seconds, that's a

 6   massive difference, correct?

 7   A.   Yes.

 8   Q.   For a hundred yards, right?

 9   A.   Uh-hum.

10   Q.   And you don't even know if 43 or 44 yards is possible,

11   correct?

12   A.   It's not possible for me.

13   Q.   And nothing about Johnny's swimming ability led you to

14   believe he could do 44 seconds, correct?

15   A.   I'm not sure, no.

16   Q.   You didn't see it, right?

17   A.   No.

18            MR. FRANK:  Could we show the witness and the jury

19   Exhibit 88 in evidence.

20   Q.   If we go to the next page, please, have you seen John

21   Wilson's water polo profile?

22   A.   I have not.

23   Q.   You prepared for your testimony today with Mr. Kendall?

24   A.   Yes.  We've spoken.

25   Q.   How many times have you spoken to Mr. Kendall?
```

```
 1    A.    Mr. Kendall, less than five times.

 2    Q.    Less than five times?

 3    A.    Yeah.  Probably two or three.

 4    Q.    Okay.  Was it two or was it three?

 5    A.    I'm not sure the exact number, but it probably was three.

 6    Q.    Okay.  By phone or in person?

 7    A.    A couple times by phone and then I spoke to him one time

 8    in person.

 9    Q.    How long were each of those sessions?

10    A.    The phone sessions were less than an hour.  And the

11    in-person was a bit over an hour, but less than two.  Probably

12    about an hour and 20, hour and 30.

13    Q.    So all told, three or four hours?

14    A.    Yes.

15    Q.    And in those three or four hours, he never showed you,

16    Exhibit 88, Johnny's swim profile?

17    A.    No, he did not.

18    Q.    But you see that on the profile, in the bottom right, it

19    says that his time on the 50-yard freestyle is 20.12, right?

20    A.    I do.

21    Q.    That is exceptional, right?

22    A.    Yes.  That's fast.

23    Q.    And the 100-yard freestyle, it lists his time as 43.98,

24    right?

25    A.    Yes.
```

Q.   And you testified you don't even know if that's possible?

A.   It's darn fast.

Q.   Okay.  In your conversations with Johnny and in your observations with Johnny, did he ever tell you what his actual times were for the 100-yard freestyle?

A.   No.  Would never discuss that type of stuff.  Guys on the team wouldn't really ask that stuff.

Q.   Do you recall what his time was in the 100-yard freestyle?

10:50  A.   I don't.

MR. FRANK:  For the witness only, could we have 8193, please.

Q.   And could we go -- you see that this is times from a game involving the Menlo School?

MR. KENDALL:  Objection.  It's not in evidence, your Honor.

MR. FRANK:  It's for the witness only, your Honor. I'm going to refresh his recollection.

MR. KENDALL:  The witness has never seen it.  I don't

10:51 know how he can refresh his recollection.

THE COURT:  He can be refreshed with a banana peel if that refreshes his memory.

Q.   And if we can look at page 3, please, of defense Exhibit 8193.  You see that in defense Exhibit 8193 there are times listed for the boys --

1          MR. KENDALL:  Objection, your Honor.  He can ask him

2     to read it.  He shouldn't be reading it to the jury.

3          THE COURT:  Yeah.  Correct.

4          MR. FRANK:  Yes, your Honor.  That's correct.

5     Q.   Can you take a look at the times for the boys 100-meter

6     freestyle?

7     A.   Yes.

8     Q.   You see that time listed there next to Johnny Wilson?

9          MR. KENDALL:  Objection.  Again, your Honor, he should

10:51 10     not be reading to the jury what's on the document.

11         THE COURT:  He can point out what he wants him to read

12    but not read it himself.

13    Q.   Do you see that time?

14    A.   Yes, I do.

15    Q.   Okay.  And if we can just take a look at the date.

16         MR. KENDALL:  Your Honor, the document is in meters,

17    not yards.  It's apples and oranges and it's misleading.

18         MR. FRANK:  I will address that.

19         THE COURT:  Go ahead.

10:52 20    Q.   You see the date?

21    A.   I do.

22    Q.   Does that refresh your recollection --

23         MR. FRANK:  Can we take that down, please.

24    Q.   Does that refresh your recollection that as of March of

25    2013 Johnny --

1          MR. KENDALL:  Objection, your Honor.  He has no

2   recollection of what Johnny did in March of 2013.

3          THE COURT:  He can ask him whether it refreshes his

4   memory and then ask the question.

5   Q.   Does it refresh your recollection that in March of 2013

6   Johnny's time --

7          MR. KENDALL:  Objection.  He never said he had a

8   failure of recollection.  He never said he had something that

9   he forgot.  He has to first get the witness to say he can't

10:52 10   remember before you can start suggesting things like that, your

11   Honor.

12          MR. FRANK:  These rules were not applied when

13   Mr. Kendall was asking cross-examination questions.

14          THE COURT:  Go ahead.

15   Q.   Does that refresh your recollection --

16          MR. KENDALL:  Objection, your Honor.

17          THE COURT:  Overruled.

18   Q.   -- that in March of 2013 Johnny's time in the 100-meter

19   freestyle was north of 59 seconds?

10:53 20   A.   I have not seen that and did not know Johnny at the time,

21   so this is the first time I'm seeing this document.

22   Q.   And Johnny never told you that his time in the 100-meter

23   freestyle at the time that he was applying to USC in 2013 was

24   north of 59 seconds?

25          MR. KENDALL:  Objection, your Honor.

```
 1          THE COURT:  Cross-examination.  Overruled.
 2     A.   I don't remember him telling me that.
 3     Q.   And a time of 59 plus seconds in the 100-meter freestyle
 4     would translate to north of 53 seconds in the 100-yard
 5     freestyle, correct?
 6     A.   I don't know the conversion.
 7     Q.   You don't know the conversion after all your years of
 8     swimming?
 9     A.   No.  Like I said, I don't -- I didn't like swimming, so
10:53 10     knowing meters to yards, one was just further than the other.
11     Q.   Yeah.  But a time of -- would you accept my representation
12     that a time of 59 plus seconds in the 100 yard -- meter
13     freestyle translates to north of 53 seconds in the 100 yard
14     freestyle?
15     A.   Yes.
16     Q.   And a time of north of 53 seconds in the 100 yard
17     freestyle is nowhere near the time that we saw on Exhibit 88,
18     Johnny's profile, correct?
19     A.   Yes.  They're different.
10:54 20     Q.   Well, they're not just different, right?
21          MR. KENDALL:  Objection.  It's not in evidence.
22          THE COURT:  Overruled.
23     Q.   They're not just different, right, Mr. Mericle?
24     A.   Well, they are different, and one is faster than the
25     other.
```

```
 1   Q.   One is vastly faster than the other, correct?

 2   A.   Yes.

 3   Q.   Apples and oranges you'd say?

 4   A.   I didn't say that.

 5   Q.   Would you?

 6   A.   Yes.  There's a big difference between 44 and 53.

 7   Q.   And you do seem fairly knowledgeable about Johnny and his

 8   swimming abilities.  Did he ever tell you that he was not

 9   cocaptain of his high school water polo team?

10   MR. KENDALL:  Objection, your Honor.

11   THE COURT:  Overruled.

12   MR. KENDALL:  It's hearsay.

13   A.   Not that I remember.

14   Q.   Did you know that he was not cocaptain of his high school

15   water polo?

16   A.   I did not.

17   MR. FRANK:  Could we show the witness only

18   Exhibit 733, please.

19   Q.   You see Exhibit 733, Mr. Mericle?

20   A.   I do.

21   Q.   Okay.  And if we go further down the page --

22   MR. FRANK:  Miss Lewis, if you could move it a little

23   further down.  Could you highlight the last paragraph, please.

24   Q.   Did Johnny ever tell you there was another John Wilson on

25   his high school water polo team?
```

```
 1   A.    No.

 2   Q.    John D. Wilson, who was recruited --

 3             MR. KENDALL:  Objection, your Honor.

 4             THE COURT:  Sustained.

 5   Q.    Could you read Exhibit 733 and then we'll take it down,

 6   the highlighted portion.

 7   A.    "Menlo's boys".

 8             MR. KENDALL:  I object, your Honor,

 9   Q.    Just to yourself --

10   THE COURT:  Read it to yourself.

11   A.    Oh, yes.

12             MR. FRANK:  We can take that down.

13   Q.    Does that refresh your recollection that --

14             MR. KENDALL:  Objection, your Honor.  He didn't say he

15   had a failure of recollection.  He's trying to put in things

16   the witness doesn't know by claiming it's a -- refreshing a

17   recollection when he doesn't have a recollection that's been

18   exhausted.

19             THE COURT:  Sustained.

20   Q.    Does that refresh your recollection that Johnny was not a

21   cocaptain of his high school water polo team?

22             MR. KENDALL:  Objection, your Honor.

23             THE COURT:  Overruled.

24   A.    I don't recall Johnny telling me whether or not he was a

25   captain.
```

1   Q.   But you knew Johnny well and were close friends with him,

2   correct?

3   A.   Yes.

4   Q.   And you roomed with him throughout college?

5   A.   Yes.

6   Q.   And you were water polo teammates, correct?

7   A.   Correct.

8   Q.   And the subject of Johnny's being captain or not being

9   captain of his high school water polo team never once came up?

10:56 10   A.   No.

11   Q.   You just have no idea?

12   A.   When you are -- if you were on the team --

13   Q.   Just yes or no, Mr. Mericle.  Yes or no.  Do you have any

14   idea whether Johnny was cocaptain of his high school water polo

15   team?

16   A.   No.

17   Q.   Because it never came up?

18   A.   Not that I remember.

19   Q.   And he never told you there was another John Wilson, John

10:57 20   D. Wilson, who was recruited to play at Hopkins who was

21   cocaptain of Johnny's high school water polo team?

22   A.   Not that I remember.

23   Q.   And did you know that Johnny was not a four-year starter

24   on his high school water polo team?

25   A.   I did not.

```
 1   Q.   Mr. Mericle, when you were recruited to USC, you viewed it

 2   as a great opportunity to play on a six-time national

 3   championship team, correct?

 4   A.   Yes.

 5   Q.   And you intended to play on that team, correct?

 6   A.   I did.

 7   Q.   You didn't set out to get recruited and then drop out

 8   after the first semester, correct?

 9   A.   No.

10   Q.   That wasn't your plan?

11   A.   No.

12   Q.   You had worked hard for years toward the goal of getting

13   recruited, correct?

14   A.   That's right.

15   Q.   You looked forward to playing in college, correct?

16   A.   Yes.

17   Q.   You attended practices, correct?

18   A.   Yes.

19   Q.   And they were rigorous, correct?

20   A.   Yes.

21   Q.   And you attended strength training sessions?

22   A.   I did.

23   Q.   And you attended team meetings?

24   A.   Yes.

25   Q.   I believe you testified that it was north of 20 hours per
```

1    week, correct?

2    A.   Yes.

3    Q.   In fact, you're aware that the NCAA restricts the time for

4    games and practices and team meetings to no more than 20 hours

5    per week?

6    A.   I am aware.

7    Q.   You're not contending that Coach Vavic broke the rules,

8    are you?

9    A.   We were --

10   Q.   Are you contending that Coach Vavic broke the rules?

11   A.   Yes.  We practiced -- we would be in team meetings on our

12   own going over the playbook.  I'm not saying that he broke the

13   rules.  What I'm saying is that --

14   Q.   So you're not saying he broke the --

15   A.   -- we were on the pool deck --

16   Q.   Mr. Mericle, if you could answer my question.

17        MR. KENDALL:  Let him finish.

18        THE COURT:  Let him finish the question, the answer.

19   A.   We were on the pool deck for more than 20 hours a week.

20   Q.   But not at Coach Vavic's instruction, correct?

21   A.   He didn't directly tell us to be on the pool deck, but I

22   mean, there was an unwritten thing, an unspoken thing.

23   Q.   And despite your one percent book scholarship and the

24   recruitment process you went through, fair to say you were not

25   an immediate impact player on that championship team, right?

|     |    |                                                          |
|-----|----|----------------------------------------------------------|
| 1   | A. | That is fair to say.                                     |
| 2   | Q. | Fair to say Johnny wasn't either?                        |
| 3   | A. | Yes.                                                     |
| 4   | Q. | Fair to say he was not?                                  |
| 5   | A. | Right.                                                   |
| 6   | Q. | You lived with Johnny all four years of college?         |
| 7   | A. | I lived with him for my first and then my third and      |
| 8   |    | fourth.  And we were still close during our second.      |
| 9   | Q. | And you're friends to this day?                          |
| 11:00 10 | A. | Yes.                                                |
| 11  | Q. | You're here today with an attorney?                      |
| 12  | A. | I am.                                                    |
| 13  | Q. | Mr. Hoops who is sitting right there?                    |
| 14  | A. | Yes.                                                     |
| 15  | Q. | And that was arranged for you by Mr. Wilson's counsel?   |
| 16  | A. | Yes.                                                     |
| 17  | Q. | And you're not paying for Mr. Hoops, are you?            |
| 18  | A. | No.                                                      |
| 19  | Q. | Mr. Wilson is paying for Mr. Hoops?                      |
| 11:00 20 | A. | To my knowledge.                                     |
| 21  | Q. | Did he pay for you to be here today?                     |
| 22  | A. | Yes.  He took care of the logistics of getting me here.  |
| 23  | Q. | And he is covering the cost of your legal representation? |
| 24  | A. | To my knowledge.                                        |
| 25  | Q. | And the Wilsons have been good to you throughout the     |

```
 1   years?
 2   A.   Yes.  Being friends with Johnny, we would go to dinner
 3   with them on occasion if they were in town or things like that,
 4   so they've always been kind.
 5   Q.   Dinner on occasion when they were in town?
 6   A.   Yes.
 7   Q.   And also family vacations, right?
 8   A.   We did go to visit them when they were living in Europe
 9   for our freshman and second semester of freshman year, and then
10   the following year we visited them over spring break.
11   Q.   So you went to Europe with the Wilson family on a couple
12   of occasions, correct?
13   A.   Two times, yes.
14   Q.   And they paid your way?
15   A.   Yes.  I paid for my flight.
16   Q.   Okay.  But they paid the rest?
17   A.   Yes.
18   Q.   And, in fact, you mentioned a spring break trip.  That was
19   in 2015?
20   A.   Yes.
21   Q.   And that wasn't just any spring break trip.  That was a
22   trip to Chamonix?
23   A.   That's correct.
24   Q.   That's C-h-a-m-o-n-i-x?
25   A.   That's right.
```

11:01 (lines 10, 20)

1    Q.    And that's a ski resort in France?

2    A.    That's correct.

3    Q.    And in fact, the Winter Olympics were held there in 1924,

4    correct?

5    A.    I think so, yes.

6    Q.    At Mount Blanc?

7    A.    Yes.

8    Q.    And you went skiing in the Alps?

9    A.    Yes.

11:02 10    Q.    With the Wilson family?

11    A.    Yes.

12    Q.    And that was amazing skiing, correct?

13          MR. KELLY:    Relevance here.

14          THE COURT:    Sustained.

15    Q.    And you considered that one of the top vacations you've

16    ever been on?

17    A.    Yes.

18    Q.    Fabulous meals?

19    A.    Yes.

11:02 20    Q.    All paid for by the Wilsons?

21          MR. KENDALL:    Objection, your Honor.

22          THE COURT:    Sustained.

23          MR. FRANK:    Goes to bias, your Honor.

24          MR. KENDALL:    Your Honor, I'm not objecting to too

25    much of this, but at some point.

```
 1              THE COURT:  Yeah.  The objection is sustained.
 2     Q.   And Johnny's sisters reminded you of your own sisters on
 3     that trip, correct?
 4     A.   Yes.
 5     Q.   And you also went to Amsterdam on that same trip?
 6     A.   We did.
 7     Q.   And you went to the Rijksmuseum?
 8     A.   We did.
 9     Q.   Could we show the witness only Exhibit 723, next page.
10              MR. FRANK:  First of all -- actually, I'm sorry,
11     Miss Lewis.  If you can go to the first page.
12     Q.   Do you see that e-mail?
13     A.   Oh.  Yes.
14     Q.   You see who it's from?
15     A.   Yes.
16     Q.   Okay.  If we can go to the next page, you see the
17     photograph?
18     A.   I do.
19              MR. FRANK:  Government offers 723, your Honor.
20              MR. KENDALL:  Objection, your Honor.
21              THE COURT:  Grounds?
22              MR. KENDALL:  Redundancy, irrelevance.
23              THE COURT:  Sustained.
24              MR. FRANK:  Can we show the witness only 724,
25     and the next page?
```

```
 1                MR. KENDALL:  Same objection, your Honor.

 2                MR. FRANK:  It's not in, your Honor.  Just showing it

 3       to the witness.

 4                And 725.

 5                MR. FRANK:  If we can take those down.

 6       Q.   Mr. Wilson, the defendant took photographs of you with

 7       Johnny on that trip?

 8       A.   Yes.

 9       Q.   And then he e-mailed you those photographs of you at the

11:04 10  Rijksmuseum and inside the Rijksmuseum in Amsterdam?

11       A.   Yes.

12       Q.   And the Wilson's paid for everything, correct?

13       A.   Yes.

14       Q.   And then you also traveled with Johnny to Las Vegas for

15       his 21st birthday in January of 2017, correct?

16                MR. KENDALL:  Objection.  Again, redundancy.

17                THE COURT:  Overruled.

18       Q.   And there were eight other friends on the trip?

19       A.   Yes.

11:04 20  Q.   Wyatt Driscoll was one of them?

21       A.   Yes.

22       Q.   You know that Wyatt was recruited to USC to play baseball?

23                MR. KENDALL:  Objection, your Honor.

24                THE COURT:  Sustained.  We're going to take the

25       morning recess at this point.
```

```
 1          Mr. Mericle, you may step down for the time being.
 2    We'll be in recess for the time being.
 3          THE CLERK:  All rise for the jury.
 4          (Jury exits.)
 5          THE COURT:  Be seated, counsel.
 6          You may step down, Mr. Mericle.
 7          How much longer on cross?
 8          MR. FRANK:  Five or ten minutes, your Honor.
 9          THE COURT:  And then what will we have after redirect?
11:05 10          MR. KENDALL:  We have a stipulation, your Honor.
11    There are some documents we'd like to offer that I don't think
12    the Court has yet ruled on or looked at, but I think are a
13    different category of the things that -- maybe we can do it at
14    sidebar later.
15          THE COURT:  Why at sidebar?
16          MR. KENDALL:  Well, I thought you wanted to -- you
17    thought there was too many documents of things you've already
18    ruled on.  Those should not be done in front of the jury -- I
19    said side bar.  I meant out of the presence of the jury, your
11:06 20    Honor, but I think there were some that were not of the
21    category that has been discussed and ruled on.
22          THE COURT:  All right.  Anything else that needs to
23    come to my attention before we recess?
24          MR. KELLY:  No, your Honor.
25          MR. FRANK:  No, your Honor.
```

| | |
|---|---|
| 1 | THE COURT:  We're in recess for 15 minutes. |
| 2 | (Recess taken 11:06 a.m. to 11:32 a.m.) |
| 3 | THE CLERK:  All rise for the jury. |
| 4 | (Jury enters.) |
| 5 | THE CLERK:  Thank you.  You may be seated. |
| 6 | THE COURT:  Good morning again, jurors. |
| 7 | Mr. Mericle will retake the witness stand, please. |
| 8 | Mr. Mericle, you're reminded that you remain under |
| 9 | oath. |
| 11:32 10 | Please be seated. |
| 11 | Mr. Frank, you may continue with cross-examination. |
| 12 | MR. FRANK:  Thank you, your Honor. |
| 13 | BY MR. FRANK: |
| 14 | Q.   Mr. Mericle, you know that when you're on |
| 15 | cross-examination you're not supposed to communicate directly |
| 16 | or indirectly with the party that called you to testify, |
| 17 | correct? |
| 18 | A.   I did not know that. |
| 19 | Q.   You weren't told that? |
| 11:33 20 | A.   No. |
| 21 | Q.   Mr. Kendall didn't tell you that during your preparation |
| 22 | sessions? |
| 23 | A.   No. |
| 24 | Q.   But during the break just now -- without telling me what |
| 25 | you discussed -- you spoke with your attorney, Mr. Hoops, |

1  correct?

2  A.   Yes, we were just chatting about --

3  Q.   I'm not asking what you were chatting about.  I just want

4  know just now on the break you spoke with your attorney?

5  A.   Yes.

6  Q.   And immediately before your attorney speaking to you, you

7  observed him speaking to Mr. Kendall, correct?

8  A.   I don't think I saw him talking to Mr. Kendall.  I wasn't

9  paying -- when?

11:33 10  Q.   Just now, out in the hallway, did you observe your

11  attorney speaking to Mr. Kendall immediately before you spoke

12  to your attorney?

13  A.   No, I didn't notice -- I didn't see that.

14  Q.   You're not sure --

15  A.   I'm not sure.

16  Q.   So it might have happened?

17       MR. KENDALL:  Objection, your Honor, calls for

18  speculation.

19       THE COURT:  Sustained.

11:34 20  BY MR. FRANK:

21  Q.   And no one told you that was not permitted, correct?

22       MR. KENDALL:  Objection, your Honor.  I passed him by

23  the men's room.  This is ridiculous.

24       THE COURT:  Sustained.

25  BY MR. FRANK:

```
         1    Q.   In addition to the preparation sessions you had with
         2    Mr. Kendall totaling several hours, you were also prepared by
         3    Mr. Hoops?
         4    A.   Mr. Hoops and I just handled, like, logistics, so getting
         5    here --
         6    Q.   Your attorney didn't prepare you at all for today?
         7    A.   Other than, like, general advice, like tell the truth.
         8    Q.   I don't want to hear what he told you.  But he didn't
         9    prepare you for your testimony, only Mr. Kendall did?
11:34   10    A.   That's right.
        11    Q.   Are you friends with Wyatt Driscoll?
        12    A.   Yes.
        13    Q.   And you know that Wyatt Driscoll was recruited to --
        14         MR. KENDALL:  Objection, your Honor, relevance and
        15    beyond the scope of the direct.
        16         MR. FRANK:  It's directly relevant, your Honor.
        17         THE COURT:  Overruled.
        18    BY MR. FRANK:
        19    Q.   You know that Wyatt Driscoll was recruited to USC to play
11:35   20    baseball?
        21    A.   I did know that.
        22    Q.   Do you know that Wyatt Driscoll was a close childhood
        23    friend of Johnny Wilson?
        24    A.   Yes.
        25    Q.   Do you know that Wyatt Driscoll was a client of Rick
```

1    Singer?

2    A.    No.

3    Q.    No one told you that?

4    A.    No.

5    Q.    Wyatt didn't tell you that?

6    A.    No.

7    Q.    Johnny didn't tell you that?

8    A.    No.

9    Q.    Mr. Kendall didn't tell that you?

11:35 10   A.    No.

11   Q.    Didn't come up in your preparation?

12   A.    No, it did not.

13   Q.    Before the break, I asked you about a trip for Johnny's

14   21st birthday to Las Vegas in January of 2017.

15   A.    Yes.

16   Q.    Do you recall those questions?

17   A.    I do.

18   Q.    And you were picked up in a chauffeured car and driven

19   from L.A. to Las Vegas?

11:35 20        MR. KENDALL:  Objection, your Honor.  I think we've

21   had enough of the Facebook.

22        THE COURT:  Overruled.

23   A.    Yes.

24   Q.    And you had a thousand dollars per night for room

25   incidentals?

```
 1    A.   I wasn't aware of that.

 2             MR. FRANK:  Could we show the witness only Exhibit

 3    732.  Page 2.

 4             Could you enlarge that?  Thank you.

 5             And Ms. Lewis, could you highlight beginning with the

 6    second bullet point.

 7    Q.   Could you read that, Mr. Mericle?

 8    A.   Yes.

 9    Q.   Have you read it?

11:36 10          THE COURT:  To yourself.

11    A.   Yes.

12    Q.   Have you read it?

13    A.   Yes.

14             MR. FRANK:  Ms. Lewis, can you take it down.

15    Q.   Does that refresh your recollection that there was a

16    $1,000 per night for room incidentals?

17    A.   I didn't know that there was.  That's the first time I'm

18    seeing this.

19    Q.   But you didn't pay for the room incidentals, did you?

11:36 20   A.   I did not.

21    Q.   There was a party at a place called Battlefield Vegas?

22             MR. KENDALL:  Objection, your Honor.  I think --

23             THE COURT:  Overruled.

24    A.   Yes, if that's the place we went to see the tank, yes.

25    Q.   Well, you did more than see the tank, right, you crushed a
```

| | |
|---|---|
| 1 | car with a tank with an M1 Abrams tank? |
| 2 | A.   Yes. |
| 3 | Q.   You rode around in the tank and you crushed an actual car? |
| 4 | A.   I wasn't the one riding, but I did watch it, yes. |
| 5 | Q.   Johnny was riding? |
| 6 | A.   Yes. |
| 7 | Q.   And you had dinner at Nobu, that's a very fancy sushi |
| 8 | restaurant? |
| 9 | A.   We did. |
| 11:37 10 | Q.   And then you went to a nightclub called Surrender? |
| 11 | A.   Yes. |
| 12 | Q.   VIP seating? |
| 13 | A.   Yes. |
| 14 | Q.   And you knew that there was a $3,000 per table minimum? |
| 15 | MR. KENDALL:   Objection, your Honor. |
| 16 | THE COURT:   Sustained. |
| 17 | BY MR. FRANK: |
| 18 | Q.   And all of that trip was paid for by Mr. Wilson, correct? |
| 19 | A.   Yes. |
| 11:37 20 | Q.   You were asked on direct examination about whether USC was |
| 21 | currently paying you.  Do you recall that question? |
| 22 | A.   Yes. |
| 23 | Q.   And you were asked whether USC has any financial control |
| 24 | over you.  Do you recall that question? |
| 25 | A.   I do. |

```
 1   Q.   Fair to say that the defendant, Mr. Wilson, has been
 2   extremely generous to you over the years?
 3   A.   Yes.
 4   Q.   European vacations?
 5   A.   Yes.
 6   Q.   Trips to Vegas?
 7   A.   That's correct.
 8   Q.   High-end hotels, restaurants, and nightclubs?
 9   A.   Yes.
10   Q.   All paid for by Mr. Wilson?
11   A.   Yes.
12   Q.   And you are very close to Johnny Wilson, correct?
13   A.   Yes.
14   Q.   Your college roommate.
15   A.   Yes, good friend of mine.
16   Q.   Good friend of yours, correct?
17   A.   Yes.
18   Q.   And is it fair to say, Mr. Mericle, you don't want to see
19   your good friend's dad convicted of a crime in this court?
20   A.   Yes.
21   Q.   And is it fair to say you are grateful to the defendant
22   for everything he's done for you over the years?
23   A.   Yes.
24            MR. FRANK:  No further questions.
25            THE COURT:  Any redirect?
```

```
 1              MR. KENDALL:  No, your Honor.
 2              THE COURT:  Thank you, Mr. Mericle, you may step down.
 3              THE WITNESS:  Thank you.
 4              MR. KELLY:  Your Honor, briefly --
 5              THE COURT:  Mr. Kelly.
 6              MR. KELLY:  Your Honor, pursuant to the Court's ruling
 7       today, Docket 2336 at page 9, I'm just offering two other
 8       documents.
 9              THE COURT:  And that's the most recent order the Court
11:39 10  entered?
11              MR. KELLY:  Yes, your Honor, from this morning, Docket
12       2366, page 9 I'm referencing.
13              THE COURT:  I don't have it in front of me.
14              MR. KELLY:  I can submit it, your Honor.
15              THE COURT:  I've got it.
16              MR. FRANK:  Your Honor, we have no objection to that.
17       There was a redaction that counsel had stipulated to
18       previously, and we would ask that that redaction be made before
19       this document coming in.
11:39 20              MR. KELLY:  I think I offered that and he rejected the
21       offer.
22              THE COURT:  The Court -- this is the document that the
23       Court has reconsidered and allowed to be admitted?
24              MR. KELLY:  Yes, your Honor; there's two of them.
25              THE COURT:  All right.  There was a redaction to it
```

```
 1    apparently, that should still be maintained?
 2               MR. KELLY:  Sure.
 3               The first one --
 4               THE COURT:  What is the exhibit that you're now
 5    offering?
 6               MR. KELLY:  There's two of them, 9025 --
 7               THE COURT:  Yes.
 8               MR. KELLY:  -- and 1563A, and I will redact --
 9               MR. FRANK:  We actually believe, your Honor --
11:40 10         MR. KELLY:  -- the last two pages.
11               MR. FRANK:  -- that everything should be redacted
12    except for the sentence that he wants to put in.
13               The entire pleading does not need to come in, your
14    Honor.
15               MR. KELLY:  Well, the face page identifies what it is.
16               THE COURT:  You need the face page plus the language
17    but nothing else.
18               MR. KELLY:  Fine, your Honor.
19               MR. FRANK:  With respect to the other affidavit, your
11:40 20    Honor, I'm not sure what the entire exhibit contains, whether
21    it's --
22               MR. KELLY:  It's a four-page document that we've
23    already provided --
24               THE COURT:  Well, we can discuss that outside the
25    hearing of the jury, but Exhibit 9025 and 1563A as redacted
```

 1    will be admitted.

 2              (Exhibits 9025 and 1563A admitted into evidence.)

 3              MR. KELLY:  Yes.  And with respect to Exhibit 9025,

 4    Mr. Carter, I'd like you to bring that up, please.

 5              Oh, he already did.  Thank you.

 6              I'd like you to highlight what it is, the affidavit.

 7              And then highlight whose affidavit it is on 1 there.

 8              I'll just read that for the record.

 9              "I, Laura Smith, Special Agent, Federal Bureau of

11:41 10    Investigation."

11              And then I'd like you to scroll down to -- keep going,

12    please, keep going, please -- keep going, please.

13              Okay, this paragraph here.

14              Paragraph c I'm referencing, and I want you to start

15    highlighting where it starts with, "Up until the summer."  And

16    I'm going to read that.

17              "Up until the summer of 2018, I believe that all the

18    money Singer provided to Heinel for her assistance went to USC

19    athletic programs.  However, in July 2018, Heinel created a

11:42 20    company called 'Clear the Clearinghouse,' and bank records

21    (including records from bill.com) have shown that Singer has

22    directed $40,000 to the company in the last two months,

23    indicating that Heinel may now be receiving bribe payments

24    herself."

25              And if you could go to the very end of this document,

1    please.

2         Let's highlight the last paragraph, "I, Laura Smith,

3    having signed this affidavit under oath as to all assertions

4    and allegations contained herein, state that its contents are

5    true and correct to the best of my knowledge, information and

6    belief."  Signature block, "Laura Smith, Special Agent FBI."

7         Second and final document, your Honor, is the one we

8    just discussed, 1563A.

9         Mr. Carter, we're only showing the first two pages,

11:43 10   please.

11        And second page, please.

12        And I'm going to read that sentence, if you can yellow

13   it, please.

14        The government was not attempting to build a case that

15   all the parents understood Heinel to be personally pocketing

16   money, and the government has never alleged that.

17        Let's go back to that first page, please.  I want to

18   make sure whose filing this is.

19        Could you please highlight the caption.  Just the

11:43 20   first two words.  "Government's sur-reply."

21        Nothing further on that document, your Honor.

22        And nothing further for those two documents.

23        MR. KENDALL:  Your Honor, we have a stipulation we'd

24   like to put in, please.

25        THE COURT:  Yes.

          1          MS. PAPENHAUSEN:  Your Honor, the stipulation has been

          2     marked as Exhibit 9070, if we could have that up on the screen,

          3     please, while I read it.

          4          "The parties hereby stipulate and agree as follows:

          5          "If called to testify, Brandon Loftus, USC Assistant

          6     Athletic Director for Budget and Financial Performance, would

          7     state that for the period January 1, 2014 to March 5, 2019,

          8     based on his personal review of the relevant documents, he has

          9     no reason to believe there were any expenditures, debits, or

11:44   10     transfers from the USC men's water polo accounts to any USC

         11     employee personally for any purpose unrelated to their

         12     employment at USC."

         13          THE COURT:  All right.  That is admitted as a

         14     stipulation.  It will not be admitted as an exhibit.

         15          MR. KENDALL:  Your Honor, I have a few documents I'd

         16     like to offer that the Court has not looked at or ruled on.

         17     And I will go through them somewhat briefly.

         18          Would you like us to put them up on the screen for the

         19     Court only to see?

11:45   20          THE COURT:  Yes, that would be fine.

         21          MR. FRANK:  We would just request that they not be

         22     described at length.

         23          THE COURT:  Yes.

         24          MR. KENDALL:  Okay.

         25          Mr. Carter, could you put up 9901, please, and maybe

```
 1   if you could put next to it 9899.
 2          There's actually three in this group, but we can only
 3   get two on the screen, your Honor.
 4          The government put in Exhibit 712, which is dated
 5   October 19, 2013.  That was just one part of a chain of e-mail
 6   exchanges.  So we would like for completeness to put the rest
 7   of the e-mails that were part of that chain of communications.
 8          MR. FRANK:  Your Honor --
 9          THE COURT:  This is 9901 we're talking about?
11:46 10        MR. KENDALL:  9901 and 9899 that are in front of you
11   are two of the four e-mails that were in that chain of
12   exchanges.
13          And, your Honor, we don't need it for the truth of the
14   matter.  We just want to have the context there was a chain of
15   communications, and we're happy to have an instruction that
16   nobody is to consider it to be truthful of the matter asserted.
17          MR. FRANK:  We object.  It's not a chain, your Honor,
18   and we object on hearsay grounds.
19          THE COURT:  Hearsay grounds, the objection is
11:46 20   sustained.
21          MR. KENDALL:  Just for the record, your Honor, Exhibit
22   9902 would go in that chain as well, subject to --
23          THE COURT:  9902.
24          MR. KENDALL:  Yes, would also be part of that.
25          Second, your Honor, there is a document we have
```

referenced but the Court has not ruled on yet, Exhibit 133,

which is we offer as a -- not for -- we offer it under three

different rules of evidence, 803(3), statement of physical

condition for certainly parts of the record, 803(4), statement

for medical diagnosis or treatment, and 803(6), records of

regularly conducted activity.

        If the Court thinks we need a record keeper, we're

happy to arrange for the USC person to testify, but we think

this could go without that given the stipulation of

authenticity and the various rules that apply.

        This is a medical record from Keck Medical Center at

USC.

        MR. FRANK:  Your Honor, we object at a minimum to the

-- I haven't seen the entire document here, but this page we

certainly object to.

        MR. KENDALL:  It's the government's exhibit, your

Honor.  They're the one who put it on their list.

        MR. FRANK:  Your Honor, I object to the --

        THE COURT:  Yes, it's not the government's exhibit.

        MR. KENDALL:  The government has seen it, your Honor.

They've assembled it.

        MR. FRANK:  We object to the first page, your Honor.

        We object to the second page.

        THE COURT:  The objections to the first and second

pages is sustained.

 1          MR. FRANK:  Is there more?

 2          MR. KENDALL:  Yes, if we could show the third page.

 3          MR. FRANK:  So to the extent that this is the

 4    remainder -- if you could just flip through it.

 5          MR. KENDALL:  There's one paragraph here that relates

 6    to unrelated medical issues that we would propose to redact,

 7    but we can work that out together.

 8          MR. FRANK:  We object to that, your Honor.  It's

 9    either coming in, which we would not object to this portion of

11:48 10   it coming in, but for completeness, then the entire thing comes

11    in.

12          THE COURT:  I can't hear you.

13          MR. FRANK:  I'm sorry, your Honor.  We object to the

14    first two pages.

15          THE COURT:  Yes, and the objection has been sustained

16    to the first two pages.  We're talking about everything else.

17          MR. FRANK:  Everything else we do not object to

18    provided it all comes in and not -- provided that the rest of

19    the document comes in in its entirety for completeness.

11:49 20         THE COURT:  All right.  So other than pages 1 and 2,

21    the document is admitted in its entirety.

22          MR. KENDALL:  Your Honor, may I represent pages 1 and

23    2 with a keeper of the records from USC to establish the

24    business records foundation?

25          THE COURT:  I don't believe the objection was

1    sustained on business record grounds.

2         MR. KENDALL:  I don't know what the objection was to

3    the first two pages.  If it's hearsay, then the business

4    records would answer --

5         THE COURT:  We can talk about this outside the hearing

6    of the jury --

7         MR. KENDALL:  Very well, your Honor.

8         THE COURT:  -- Mr. Kendall.  But as of now, 133 is

9    admitted with the exception of pages 1 and 2.

11:49 10        (Exhibit 133 admitted into evidence.)

11        MR. KENDALL:  May I read sections of the parts that

12   are in?

13        THE COURT:  Yes.

14        MR. KENDALL:  Thank you, your Honor.

15        And if we could put up page 3 of the exhibit and start

16   from there and show the jury, your Honor.

17        "Keck Medical Center of USC, Re: Johnny Wilson,

18   confidential, report of neuropsychological assessment.  Chief

19   complaint, referral question.

11:50 20        "Mr. Wilson is an 18-year-old right-handed USC water

21   polo player with a history of concussion.  Assessment is

22   requested to evaluate neuropsychological status."

23        If we drop down to "relevant history."

24        "A neurological report by Dr. Liu (9/31/14) indicated

25   that Mr. Wilson suffered from a head trauma when a friend

1    accidentally elbowed him in the right temple.  No loss of

2    consciousness was reported.  Subsequent to the head trauma

3    Mr. Wilson reported difficulty participating in class,

4    dizziness and headaches, localized to the right side of the

5    head."

6              If we may have -- if I may have one minute, your

7    Honor.

8              THE COURT:  Yes.

9              MR. KENDALL:  And then if we could go to page 7,

11:51 10   please.

11             "Summary, Mr. Wilson is an 18-year-old right-handed

12   USC freshman water polo player.  Baseline verbal abilities were

13   estimated to be in the high average range."

14             Okay.  If we could drop down to recommendations and

15   number 7.

16             "Just prior to the discussion of the

17   neuropsychological assessment results, today's impact test

18   results were received from Mr. Wilson's athletic trainer Sandra

19   Olsen."

11:52 20             Okay.  Thank you, your Honor.  That's all I have to

21   read from this exhibit.

22             THE COURT:  All right.

23             MR. KENDALL:  Next, your Honor, I'd like to offer in

24   two e-mails, we can put them side by side for your Honor, 8116

25   Exhibit, and 7993.  We offer them, again, not for the truth of

1  the matter asserted, but just show the action that the e-mail

2  was sent and certain steps were taken.  We do not care for

3  anything to assert the truth of what is actually stated in

4  there, only the act of sending the e-mails.

5          MR. FRANK:  We object on 401, 403 and hearsay grounds.

6          THE COURT:  The objections are sustained.

7          MR. KENDALL:  And we maintain it's relevant to his

8  state of mind, your Honor, but thank you.  Our client's state

9  of mind.

11:53 10          Next is an e-mail, 9848.  Again, it's not for the

11  truth of the matter asserted.  It's just to show that

12  Mr. Wilson sent this e-mail and to show his state of mind,

13  particularly in the 2018 time period.

14          MR. FRANK:  Objection, hearsay.

15          THE COURT:  The objection is sustained.

16          MR. KENDALL:  Again, your Honor, we are happy to have

17  an instruction that it's not for the truth of the matter

18  asserted, just that it was sent.

19          THE COURT:  The objection is sustained.

11:54 20          MR. KENDALL:  Okay.

21          Next, your Honor, Exhibit 8184.  This may have been

22  presented earlier, your Honor, with a witness, I'm not sure.

23  We again present this not for the truth of the matter asserted,

24  just to show that it was sent to Mr. Wilson and it influenced

25  his state of mind.

```
  1              MR. FRANK:  This was previously offered and the
  2     objection was sustained.
  3              THE COURT:  The objection is sustained again.
  4              MR. KENDALL:  Okay.
  5              Your Honor, Exhibits -- there are six e-mails, I'll go
  6     through them quickly.  Exhibit 8119, Exhibit 8123, we can put
  7     those up together.  These are two -- and there's a group of six
  8     e-mails all between Mr. Wilson and Mr. Singer.
  9              MR. FRANK:  Your Honor, we object to the
11:55 10  characterization of the documents, it's unnecessary.
 11              THE COURT:  Yes.
 12              MR. KENDALL:  I don't offer anything more than that.
 13              And they're for state of mind of my client only, your
 14     Honor, not for the truth of the matter asserted.
 15              THE COURT:  These are both in May of 2013, right?
 16              MR. KENDALL:  Yes, your Honor.  One's May and one is
 17     September.
 18              THE COURT:  Are they objected to?
 19              MR. FRANK:  On hearsay grounds, your Honor.
11:55 20         THE COURT:  The objection is sustained.
 21              MR. KENDALL:  Your Honor, of a similar vein, I'll just
 22     give you the numbers, Exhibit 86, Exhibit 8220 --
 23              THE COURT:  Wait a minute, 86, just 86.
 24              MR. KENDALL:  86 and 8220, they're separate exhibits.
 25     They're more of the same type, your Honor, for state of mind
```

        1    only, not for the truth of the matter asserted.

        2            MR. FRANK:  Same objection.

        3            THE COURT:  Again, both -- the objections are

        4    sustained as to both documents.

        5            MR. KENDALL:  And then, your Honor, again, Exhibit 103

        6    and Exhibit 9627.

        7            MR. FRANK:  Same objection.

        8            MR. KENDALL:  And again, same representation, it's not

        9    for the truth of the matter asserted, just to show state of

11:56  10    mind of my client.

       11            THE COURT:  Again, the objections are sustained.

       12            MR. KENDALL:  Your Honor, next, to finish out this

       13    group, Exhibits 9652 and Exhibit 9619 to show my client's state

       14    of mind, your Honor, and not for the truth of the matter

       15    asserted.

       16            MR. FRANK:  Same objection.

       17            THE COURT:  And the objection is sustained.

       18            MR. KENDALL:  And then the last one, your Honor, is --

       19    we have certified records from the entity or the organization

11:56  20    that created them, and I have the certification in my hand.  If

       21    we could show the Court Exhibits 8243 and 8244.  These are both

       22    business records that have been certified, and as I say, your

       23    Honor, I have the written certification available.

       24            MR. FRANK:  We object to the certification.  We object

       25    on relevance grounds, your Honor.

```
 1              THE COURT:  The objections are sustained.
 2              MR. KENDALL:  Your Honor, if there's something
 3     deficient about the certification, I'd ask that the government
 4     tell us that, otherwise if it's just objecting in general, just
 5     so we understand exactly where we stand.
 6              MR. FRANK:  We object.
 7              THE COURT:  The objection is sustained.
 8              MR. KENDALL:  That's all I have to do at this moment,
 9     your Honor.  The others will be dealt with separately.
11:57 10              THE COURT:  I'm sorry?
11              MR. KENDALL:  That's all I have to do at this moment,
12     your Honor.  The others will be dealt with separately.
13              THE COURT:  All right.  Let me see counsel at sidebar.
14              *** Beginner of sidebar on the record. ***
15              THE COURT:  All right.  Counsel, I do understand
16     that's all the evidence that the defendants have to put on
17     today?
18              MR. KENDALL:  This morning, yes, your Honor.
19              THE COURT:  And what do we have beyond that for
11:58 20     Monday?
21              MR. KENDALL:  For Monday we have Coach Bowen, we
22     have -- I mentioned two water polo players yesterday from the
23     team, Mericle's teammates, one of them is Waters, he's coming.
24     The other one I'm not sure of.  We may only have one of the
25     two; I'll get that confirmed today.
```

1            In addition, we may want to play some excerpts of

2    tapes that have already been admitted into evidence in the

3    government's case.  We may want to replay some of them.  And

4    then we have to make the decision about our clients.

5            THE COURT:  Okay.

6            Mr. Kelly.

7            MR. KELLY:  For Mr. Abdelaziz, at this point, subject

8    to his determination he is going --

9            (Court reporter interrupted.)

11:59 10            MR. KELLY:  For Mr. Abdelaziz, subject to his

11   determination over the weekend as to whether he is going to

12   testify, I don't think there's any actual live witnesses I'm

13   going to bring.  There may be one or two exhibits I may reenter

14   into the record, but other than that --

15            THE COURT:  Okay.

16            MR. KENDALL:  Your Honor, I want to clarify one thing.

17   I think you told us yesterday you wanted us to indicate by

18   tonight if our clients were going to testify.

19            Can we have until tomorrow morning, like 11:00

11:59 20   tomorrow?  This is a big decision to make, and it takes some

21   time to sit and talk.

22            THE COURT:  Yeah, but you got to give the government

23   some heads-up.  They need a couple of days to prepare his

24   cross.

25            MR. KENDALL:  I think it's all prepared, your Honor,

1    but I understand.

2           So if we may tell them tomorrow morning, if Mr. Wilson

3    testifies, his daughter Mary Wilson will also testify.  If he

4    doesn't testify, then she doesn't testify.

5           MR. FRANK:  Your Honor, we would object to that

6    testimony happening on Monday if he's not going to let us know

7    until tomorrow.  The rule was today, and that's a big deal for

8    us.

9           We also have depositions this weekend that --

12:00 10     MR. KELLY:  Respectfully, I think there is a Supreme

11   Court case, Brooks v. Tennessee, where the defendant can wait

12   until the close of the evidence to make a decision, so there's

13   that.

14          MR. FRANK:  That's fine and all well and good but then

15   the Court has the discretion to give us time to prepare for it.

16          THE COURT:  Are you expecting that if your client

17   testifies, he'll do so on Monday?

18          MR. KENDALL:  He'll do so whenever you tell him to

19   start.

12:00 20     We could start on Monday, yes, your Honor.

21          THE COURT:  Well, you let the government know no later

22   than tomorrow morning --

23          MR. KENDALL:  Sure.

24          THE COURT:  -- as to what you're going to do on that.

25          I'm going to tell the jury that they're excused for

1    the day, that they're coming back on Monday, they will hear

2    testimony on Monday, and I guess I better be obscure in terms

3    of when this case is going to end, but that it is still going

4    to end next week.

5              MR. KENDALL:  Yes, your Honor, excellent.

6              MR. KELLY:  Yes.

7              MR. FRANK:  Your Honor, there's a couple of issues but

8    I think they can wait until the jury is excused.

9              THE COURT:  All right.  One of the issues is the Zoom

12:01 10  conference with respect to the Fifth Amendment, right?

11             MR. KENDALL:  Yes, your Honor.

12             MR. FRANK:  We also have the issue of a curative

13   instruction.

14             THE COURT:  Yes.  Are you asking me to give that now?

15             MR. FRANK:  I would prefer it as close in time to the

16   actual --

17             THE COURT:  I'm ready to give a compromised

18   instruction to the jury right now.  So I'll do that before I

19   excuse the jury for the weekend.

12:01 20            MR. KENDALL:  Please note our objection, your Honor.

21   I was doing cross-examination of what the woman said and just

22   wanted to follow through on her numbers.  I did not raise

23   anything about money being given to Mr. Singer after

24   cooperation status.

25             THE COURT:  I understand.

```
 1              MR. KELLY:  I would object, too.  I just don't know

 2      where it stands right now.  So what is the proposal to the

 3      Court?

 4              COURT:  All right.  This is what I intend to instruct

 5      the jury:

 6              "During the cross-examination of Lauren George on

 7      Wednesday, September 29th, there were a series of questions

 8      concerning several million dollars remaining in the accounts of

 9      The Key Worldwide Foundation after payments had been made to

12:03 10      colleges and universities, individuals associated with them,

11      and various business ventures and expenses.

12              "I instruct you to disregard any questions or

13      testimony regarding the ultimate disposition of those funds.

14              "You should not consider those questions or that

15      testimony in any way."

16              MR. KENDALL:  May I make one request, your Honor?

17              I think it was both the direct and cross-exam that

18      raised that issue.  Could we just say during the testimony of

19      Lauren George as opposed to attributing it all to the

12:03 20      cross-exam?

21              MR. FRANK:  There was no implication on the direct

22      examination concerning the disposition of the remaining $6.1

23      million, your Honor, that was only on cross-exam.

24              THE COURT:  Yes, that's my memory.

25              I'm going to give it the way I drafted it.
```

1          MR. KENDALL:  We'll note our objection.

2          THE COURT:  Note your objection.

3          MR. KENDALL:  Thank you.

4          THE COURT:  But after that, I'm going to excuse the

5     jury for the weekend and give them the instructions I've just

6     mentioned to you.

7          MR. KENDALL:  And can we go through the rest of the

8     evidentiary issues that we need to make a record on out of the

9     jury's presence?

12:04 10          THE COURT:  Yes.

11          MR. KENDALL:  Okay, thank you.

12          *** End of sidebar. ***

13          THE COURT:  All right, jurors.

14          We need very often to discuss matters outside of your

15     hearing.  It's not that we're trying to keep secrets from you.

16     We're talking about legal matters about which you need not be

17     concerned.

18          One thing I need to tell you before I dismiss you for

19     the weekend is that during the cross-examination of Lauren

12:05 20     George on Wednesday, September 29th, that's two days ago, there

21     were a series of questions concerning several million dollars

22     remaining in the accounts of The Key Worldwide Foundation after

23     payments had been made to colleges and universities,

24     individuals associated with them, and various business ventures

25     and expenses.

1        I instruct you to disregard any questions or testimony

2   regarding the ultimate disposition of those funds.  You should

3   not consider those questions or that testimony in any way.

4        So having given you that instruction, I'm now going to

5   dismiss you for the weekend.  And I will just forewarn you that

6   we are on schedule to complete this case next week.  We don't

7   know exactly when, but at some point next week all of the

8   evidence and testimony will be completed.  We will probably

9   then have a break between the end of the testimony and the

12:06 10   closing arguments and my charge to you.  I don't know whether

11   the break will be half a day or a day or whatever.  After that,

12   you will hear the closing arguments of the government and the

13   defendants, and then you'll hear my instructions to you on the

14   law, after which the case will be submitted to you for your

15   deliberations.

16        So hang in there.  We've got one more week, give or

17   take, and I can't tell you exactly when any of this is going to

18   happen until after we get going on Monday.  We're going to have

19   some testimony, some witnesses on Monday, and from there the

12:06 20   rest of the week is a little bit up in the air, but it's

21   going -- this case is going to be submitted to you next week.

22        Again, you're on now a longer break.  It's a weekend

23   break.  The temptations are there.  Your friends, I'm sure, are

24   still very curious.  They're going to ask you about the case

25   and they're going to offer their opinions of the case, and

they're going to offer suggestions about what you should and
shouldn't do.  You are to resist that.  You cannot take anybody
else's suggestion because they haven't heard all the evidence.
Only you have heard the evidence, almost all of it, not all of
it, but almost all of it, and only you, after you've heard all
the evidence, after you've heard closing arguments, after
you've heard my instructions on the law, then you and you alone
will decide this case during your deliberations.

It would be entirely inappropriate for you to do any
independent research or to talk to anybody or read anything
about this case.

So please don't do it because it could have very dire
consequences.

Have a pleasant weekend.  Don't worry about this at
all over the weekend.  Be ready to come back and work hard next
week because it is going to be a big week.

Have a pleasant weekend, and I'll see you Monday
morning at 9:00 a.m.

THE CLERK:  All rise for the jury.

(Jury exits.)

THE COURT:  All right.  Be seated, counsel.

As I understand it, we have a schedule, roughly now,
to deal with the Fifth Amendment invocation of several
witnesses, including Mr. Lopes, Mr. Orr, and perhaps
Mr. Masera.  Is there a fourth one?

 1          MR. KENDALL:  Your Honor, I don't know if he's filed a

 2   motion or he just sent a letter, but I thought Mr. Garfio was

 3   raising this as well.

 4          THE COURT:  Mr. Garfio.

 5          Do counsel know what the schedule is now with respect

 6   to the attorneys for these particular potential witnesses and

 7   how we are to proceed?

 8          MR. SHARP:  I believe that Mr. Orr and Lopes'

 9   attorneys are on Zoom right now and we can pull up -- pull them

12:09 10   up if that's the right --

11          THE COURT:  And it is the expectation of counsel that

12   we're going to do at least the initial reference here in the

13   courtroom?

14          MR. SHARP:  Yes, we talked about it last night and

15   agreed, if it's okay with the Court, that we would ask a couple

16   of questions.  The witness could invoke their Fifth Amendment.

17   We would ask if they intend to continue to invoke their Fifth

18   Amendment as to all questions.  They might say yes.  And then

19   we would request that the Court compel them to answer because

12:10 20   we don't believe they have a valid Fifth Amendment right or in

21   the alternative that the Court inquire of them in camera to

22   determine why they have a Fifth Amendment right.

23          THE COURT:  And you want me to do that outside the

24   hearing of counsel?

25          MR. SHARP:  Yes.  To be clear, Mr. Frank didn't agree

1    to that latter part, I'm sure he was going to say.

2         MR. FRANK:  What I was going to say, your Honor, is

3    that we defer to the Court as to whether the Court feels it's

4    necessary to have an *ex parte* hearing on whether the invocation

5    was proper.

6         MR. SHARP:  But we would suggest that would be in your

7    chambers.  You could call them or however Ms. Lima --

8         THE COURT:  It wouldn't be in my chambers.  It would

9    be in my lobby, which is right behind the courtroom.

12:11 10        All right.  Why don't we proceed to that since it is

11   the hour at which these gentlemen and their counsel have

12   scheduled and presumably are available right now.

13        MR. SHARP:  Yes.

14        MR. KENDALL:  Is Mr. Masera's counsel here as well?

15        MR. KELLY:  He's physically here.

16        MR. KENDALL:  There's also Mr. Masera's counsel.

17        THE COURT:  So we have Mr. Masera's counsel in the

18   courtroom?

19        MR. KELLY:  I saw him the morning.  I assume he can

12:11 20   wait until we do the Zoom matter and then bring him back in.

21        THE COURT:  You're expecting me to do these one at a

22   time; is that right?

23        MR. KELLY:  Yes, your Honor.

24        THE COURT:  All right.

25        And we don't know about Mr. Garfio?  Has he not been

1    in the loop?

2         MR. FRANK:  I may have missed something, but I

3    understood counsel yesterday to suggest that they were no

4    longer pursuing Mr. Garfio in light of the Court's order on the

5    impeachment materials.  Maybe I misunderstood.

6         MR. KENDALL:  It's an issue that we're trying to sort

7    through, your Honor, but I would like to get a ruling --

8    Mr. Garfio is different because he was directly involved with

9    Mr. Wilson's son's application, and so he's different than the

10:12 10   others.  He's more directly relevant.

11        Mr. Masera's counsel is right here, your Honor, if you

12   wanted to address him.

13        THE COURT:  Mr. Masera, have you heard what we're --

14        Mr. Masera's counsel, identify yourself for the

15   record, please.

16        MR. THOMAS:  From the lectern?

17        THE COURT:  Yes, please.

18        MR. THOMAS:  Your Honor, may it please the Court, Dave

19   Thomas on behalf of Steve Masera.

12:12 20        THE COURT:  Mr. Thomas, have you heard what we're

21   planning to do?

22        MR. THOMAS:  Yes.  So I was in the overflow courtroom,

23   so I missed about 20 seconds of it.

24        THE COURT:  Why don't you repeat what you had said

25   previously.  Mr. Sharp, right?

1          MR. SHARP:  Yes, your Honor.  We'll call the witness,

2     we'll ask him a few questions, he may assert his Fifth

3     Amendment right.  We'll ask if he intends to continue doing so

4     on all questions on that topic.  At that time we'll suggest

5     that the Court either compel the witness to testify or to hold

6     an in-camera hearing and the Court may choose whatever it

7     wishes to do at that time.

8          Thank you, your Honor.

9          THE COURT:  All right.  Thank you.

12:13 10          So why don't we proceed first with Mr. Lopes and his

11     counsel, if that's --

12          MR. SHARP:  Yes.  And his counsel's name is Daniel

13     Nixon.  It might be coming up as that on Zoom.  Do you see him?

14          THE COURT:  Daniel --

15          MR. SHARP:  Nixon, N-i-x-o-n.

16          MR. NIXON:  Good morning, your Honor.  My name is

17     Daniel Nixon.  I'm the counsel for Mr. Lopes and Mr. Orr but

18     I'm based in Los Angeles.  Local counsel, Mark Smith and Payal

19     Salsburg, are also on the line, and they are admitted members

12:13 20     of the District Court in Massachusetts.  I am admitted in the

21     District of California -- Central District of California and

22     other places but not Massachusetts.  So they would be the -- I

23     guess the speaking voice.

24          I can -- I have Mr. Lopes available to testify, and if

25     the Court would like, I can go bring him before the Court right

```
 1   now.
 2          THE COURT:  Mr. Nixon, please give me the names of
 3   local counsel.  I didn't get them.
 4          MR. NIXON:  Yes, thank you, your Honor.  Mark Smith
 5   and Payal Salsburg, and I'll spell it.  First name is
 6   P-a-y-a-l, second name is S-a-l-s-b-u-r-g.
 7          THE COURT:  All right.
 8          Mr. Smith and Mr. Salsburg.
 9          MR. NIXON:  It's Ms. Salsburg, your Honor.
10          THE COURT:  I'm sorry, Ms. Salsburg.
11          Okay.  Why don't you bring your client to the screen,
12   if you will, and we'll proceed from there.
13          MR. NIXON:  Very well.  I'm going to turn the video
14   off for just one moment briefly, your Honor, to get him, and be
15   right back.  It should be a minute.
16          THE COURT:  Fair enough.
17          MR. NIXON:  Your Honor, I'm going to place before you
18   right now Steven Lopes, who is the witness that's been called.
19          THE COURT:  All right, thank you.
20          Normally we ask the witness to stand to be sworn, but
21   under these circumstances, I would say just remain seated,
22   Mr. Lopes.  But would you please respond to my deputy who is
23   going to swear you in.
24          THE CLERK:  Mr. Lopes, would you please raise your
25   right hand.
```

12:14 10

12:15 20

```
 1              STEVE LOPES, having been duly sworn by the Clerk, was
 2     examined and testified as follows:
 3              THE CLERK:  Thank you.
 4              And would you please state your name for the record,
 5     spelling your last
 6              THE WITNESS:  Steve Lopes, L-O-P-E-S.
 7              THE COURT:  Mr. Sharp, do you wish to examine?
 8              MR. SHARP:  Yes, your Honor.
 9                   DIRECT EXAMINATION OF STEVE LOPES
12:16 10     BY MR. SHARP:
11     Q.   Good afternoon, Mr. Lopes.
12              Were you the chief financial officer and chief
13     operating officer for the athletic department at the University
14     of Southern California?
15     A.   On the advice of my counsel, I assert my Fifth Amendment
16     right to remain silent.
17     Q.   Were walk-on students sometimes admitted through the
18     subcommittee on athletic admission for reasons other than
19     athletic talent?
12:16 20     A.   On the advice of my counsel, I assert my Fifth Amendment
21     right to remain silent.
22     Q.   Was one of those reasons that their parents would donate
23     money to the University of Southern California?
24     A.   On the advice of my counsel, I assert my Fifth Amendment
25     right to remain silent.
```

1    Q.    Did the USC athletic department exchange preferential

2    admissions treatment for donations to the University of

3    Southern California?

4    A.    On the advice of my counsel, I assert my Fifth Amendment

5    right to remain silent.

6    Q.    Mr. Lopes, do you intend to assert the Fifth Amendment in

7    response to all of my questions on this topic?

8    A.    Yes, I do.

9          MR. SHARP:  Your Honor, for the reasons discussed in

12:17 10  our briefing, we do not believe that the witness has a valid

11   Fifth Amendment right.  He was simply a member of the USC

12   athletic department doing his job, which included fund-raising.

13   I respectfully request the Court to compel the witness to

14   testify or otherwise hold an in-camera hearing to determine

15   this witness has a valid Fifth Amendment right.

16         THE COURT:  All right.  I will hold an in-camera

17   hearing, not at this very moment because we're going to go

18   through the other witnesses --

19         MR. SHARP:  Yes.

12:17 20        THE COURT:  -- but within a few minutes I will hold

21   such a hearing, and, of course, I'll have Mr. Lopes and his

22   counsel present, but not counsel for the defendants or the

23   government.

24         So let's proceed now to Mr. Orr.

25         (Pause.)

```
 1              THE COURT:  While we're waiting for Mr. Orr, I want it
 2    on the record that counsel agree with this procedure that the
 3    Court has outlined.  Let me hear first from the government.
 4              MR. FRANK:  We do, your Honor.
 5              THE COURT:  From the defendant Abdelaziz.
 6              MR. KELLY:  We agree, yes.
 7              THE COURT:  And from the defendant Wilson.
 8              MR. KENDALL:  Excuse me, your Honor?
 9              THE COURT:  I want to hear from counsel for the
10    defendant Wilson as to whether or not he agrees to this
11    procedure --
12              MR. KENDALL:  Yes, your Honor --
13              THE COURT:  -- that the Court has --
14              MR. KENDALL:  -- of course.
15              THE COURT:  Mr. Orr.
16              THE WITNESS:  Yes.
17              THE COURT:  Do we have counsel for Mr. Orr present?
18              MR. SMITH:  Yes, your Honor.
19              THE COURT:  Would you please identify yourself for the
20    record.
21              MR. SMITH:  Mark Smith, Loredo & Smith for Daniel Orr.
22    Joining me is Payal Salsburg from my office.
23              THE COURT:  Okay.  So the same attorneys that
24    represented Mr. Lopes also represent Mr. Orr under these
25    proceedings; is that correct?
```

 1              MR. SMITH:  That's correct, your Honor.

 2              THE COURT:  And Mr. Nixon is California counsel?

 3              MR. NIXON:  Yes, that's right, your Honor.  I'm poking

 4      my head on the screen to say "yes."

 5              THE COURT:  Thank you, Mr. Nixon.

 6              All right.

 7              Mr. Orr, do we have -- Mr. Orr is on the screen now.

 8              THE CLERK:  Yes.

 9              THE COURT:  Mr. Orr, would you please raise your hand

12:20 10    and be sworn by my deputy clerk.

11              RONALD ORR, having been duly sworn by the Clerk, was

12      examined and testified as follows:

13              THE CLERK:  And would you please state your name for

14      the record spelling your last.

15              THE WITNESS:  Ronald Orr, O-r-r.

16              THE COURT:  All right, Mr. Sharp for the defendant

17      Abdelaziz.

18                      DIRECT EXAMINATION OF RONALD ORR

19      BY MR. SHARP:

12:20 20    Q.   Good afternoon, Mr. Orr.

21              Were you the head fund-raiser for the athletic

22      department at USC for over a decade?

23      A.   On the advice of my counsel, I assert the Fifth Amendment

24      right to remain silent.

25      Q.   Were walk-on students sometimes admitted through the

1    subcommittee on athletic admission for reasons other than

2    athletic talent?

3    A.   On the advice of my counsel, I assert the Fifth Amendment

4    right to remain silent.

5    Q.   Was one of those reasons that their parents would donate

6    money to the University of Southern California?

7    A.   On the advice of my counsel, I assert my Fifth Amendment

8    right to remain silent.

9    Q.   Did the University of Southern California athletic

12:21 10   department exchange preferential admissions treatment for

11   donations to USC?

12   A.   On the advice of my counsel, I assert my Fifth Amendment

13   right to remain silent.

14   Q.   Do you intend to assert the Fifth Amendment in response to

15   all questions on this topic?

16   A.   Yes.

17       MR. SHARP:  Your Honor, for the reasons I previously

18   discussed, the same apply to Mr. Orr.  We request the Court

19   compel the witness to testify or hold an in-camera hearing to

12:21 20   determine the validity of his Fifth Amendment rights.

21       THE COURT:  All right.  The Court will, in fact, hold

22   an in-camera hearing within a few minutes, but not exactly

23   right now, at which point, of course, the witness and counsel

24   will be in attendance but counsel for the government and the

25   defendants will not be.

1          All right.  We now need to do the same with respect to

2     Mr. Masera, and I take it we'll do that in the courtroom; is

3     that right?

4          I'm sorry, I've lost the name of Mr. Masera's counsel

5     again.

6          MR. THOMAS:  It's David Thomas, your Honor.

7          THE COURT:  Mr. Thomas.  Is that what we are going to

8     do at this point?

9          MR. THOMAS:  I defer to the Court, but that was my

12:22 10   understanding.

11          Would you like me to bring him in?

12          THE COURT:  Yes, please.

13          MR. KELLY:  May I approach the lectern, your Honor?

14          THE COURT:  Yes.

15          Good afternoon, Mr. Masera would you please remain

16     standing.

17          STEVE MASERA, having been duly sworn by the Clerk, was

18     examined and testified as follows:

19          THE CLERK:  Thank you.  You may be seated.

12:23 20   And would you please state your name for the record,

21     spelling your last.

22          THE WITNESS:  Steve Masera, M-a-s-e-r-a.

23          MR. KELLY:  Do you want him to -- it's up to him.

24          THE COURT:  You may remove your mask, Mr. Masera.

25          THE WITNESS:  Thank you.

```
 1              THE COURT:  Thank you.
 2                 DIRECT EXAMINATION OF STEVE MASERA
 3   BY MR. KELLY:
 4   Q.   Good afternoon, Mr. Masera.  My name is Brian Kelley.  I
 5   represent Mr. Gamal Abdelaziz.
 6            I'd like to direct your attention to what has been
 7   marked as Exhibit 1564, it will appear before you.
 8            And I'm asking Mr. Carter to highlight one section
 9   only.
10            Do you see where that's been yellowed?
11   A.   Yes.
12   Q.   The question then is:  Is that your handwriting?
13   A.   Based on advice from my counsel, I will assert my Fifth
14   Amendment and not answer that question.
15   Q.   And, sir, were you employed by The Key Worldwide from
16   approximately 2008 to 2017 as an accountant?
17   A.   Based on advice from my attorney, I will assert the Fifth
18   Amendment and not answer that question.
19   Q.   And that document I just showed you, was that part of a
20   record kept by The Key in the regular course of business?
21   A.   Based on advice from my attorney, I will not answer that
22   question based on my privilege of the Fifth Amendment.
23   Q.   And with respect to that document I just showed you, was
24   it the regular practice of The Key to collect and record such
25   information?
```

1   A.   Based on the advice from my attorney, I will assert my

2   Fifth Amendment privilege and not answer that question.

3   Q.   And does this -- was this record made at or near the time

4   of the recorded events by you based upon your personal

5   knowledge of the information contained therein?

6   A.   Based on the advice of my attorney, I will assert my Fifth

7   Amendment privilege and not answer that question.

8   Q.   And does that notation, 300,000 with 200,000 to USC, in

9   fact represent a $300,000 donation from Gamal Abdelaziz with

12:25 10   $200,000 going to the USC and $100,000 going to The Key?

11   A.   Based on advice from my attorney, I will assert my Fifth

12   Amendment privilege and not answer that question.

13   Q.   Sir, is it your intention to keep asserting the Fifth

14   Amendment with each question I pose to you?

15   A.   Yes, sir.

16        MR. KELLY:  Your Honor, with respect to this witness,

17   we respectfully submit he does not have a valid Fifth Amendment

18   privilege and the Court should order him to testify.

19   Alternatively, the Court should make an inquiry to determine if

12:26 20   he does have a valid Fifth Amendment privilege with respect to

21   those few questions I just asked him.

22        MR. KENDALL:  Your Honor, I have some separate

23   questions from my client's perspective, if I may ask.

24        THE COURT:  Yes, you may ask those questions,

25   Mr. Kendall.

```
 1              MR. KELLY:  Does the Court wish me to present the
 2    clerk with a copy of that document?
 3              THE COURT:  The document that you offered?  I suppose
 4    for the record --
 5              MR. KELLY:  Yes.
 6              THE COURT:  Did you identify it?
 7              MR. KELLY:  I marked it as 1564, 1-5-6-4.  And I
 8    yellowed the portion in the middle.
 9              THE COURT:  For identification it will be docketed but
10    it's not admitted as an exhibit.
11              MR. KELLY:  Yes, your Honor.
12              (Exhibit 1564 marked for identification.)
13              THE COURT:  Mr. Kendall.
14              MR. KENDALL:  Thank you, your Honor.
15                    DIRECT EXAMINATION OF STEVE MASERA
16    BY MR. KENDALL:
17    Q.   Good afternoon, Mr. Masera.
18    A.   Good afternoon.
19    Q.   My name is Mike Kendall.  I represent John Wilson.
20              Fair to say you've never met my client, correct?
21    A.   Correct.
22    Q.   And you've never spoken to him, correct?
23    A.   Based on advice from my attorney, I will assert my Fifth
24    Amendment privilege and not answer that question.
25    Q.   Okay.  I'd like to show the witness Exhibit 118, please.
```

1            Do you recognize this document as an e-mail chain

2    between you and Rick Singer?

3    A.   Based on advice from my attorney, I will assert my Fifth

4    Amendment privilege and not answer that question.

5    Q.   There's a reference in this e-mail in Exhibit 118 about

6    $20,000 for expenses.  Do you see that?

7    A.   Based on advice from my attorney, I will assert my Fifth

8    Amendment privilege and not answer that question.

9    Q.   You're aware that Mr. Wilson was told by Mr. Singer that

12:28 10   the $20,000 was for the expenses of The Key Foundation,

11   correct?

12   A.   Based on advice from my attorney, I will assert my Fifth

13   Amendment privilege and not answer that question.

14   Q.   Is it fair to say that you were at one point on the

15   government's witness list as testifying on the government's

16   behalf?

17   A.   Based on advice from my attorney, I assert my Fifth

18   Amendment privilege and will not answer that question.

19   Q.   And if the government had called you to testify, you would

12:28 20   have testified pursuant to your plea agreement with the

21   government?

22   A.   Based on advice from my attorney, I assert my Fifth

23   Amendment privilege and will not answer that question.

24            MR. KENDALL:  I think that's it for me, your Honor.

25            Would you like me to leave you a copy of Exhibit 118,

     1    please?

     2            THE COURT:  If you want it to be preserved for the

     3    record, yes.

     4            MR. KENDALL:  And if the Court needs it for the

     5    in-camera inquiry, your Honor.

     6            THE COURT:  All right.

     7            (Exhibit 118 marked for identification.)

     8            THE COURT:  Thank you.

     9            You may step down for the time being, Mr. Masera.

12:29 10    Actually, for good.

    11            All right.  What I'm going to do now -- I take it

    12    Mr. Garfio is not present or counsel on the other end?

    13            MR. KENDALL:  No, he's not, your Honor.

    14            MR. KELLY:  No, your Honor.

    15            THE COURT:  All right.  So what I intend to do now is

    16    to adjourn to my lobby where I will have a phone contact, it

    17    will not be a Zoom contact, it will be just by phone, on which

    18    each of the witnesses who just testified, Mr. Lopes, Mr. Orr,

    19    and then after that Mr. Masera, with counsel will be with me.

12:30 20    I will have a court reporter taking down the information, and

    21    after I have listened to the witness and counsel, I will return

    22    with a finding to make -- that I will publish to counsel.

    23            Anything that I have missed?

    24            MR. KELLY:  That's fine, your Honor.

    25            And I just respectfully submit I think the Court's

1    inquiry with the witness is question by question that was posed

2    to the witness as to whether or not there's a valid Fifth

3    Amendment privilege for each question.

4         MR. FRANK:  We believe the Court has discretion to do

5    that inquiry as the Court sees fit, your Honor, under the

6    caselaw.

7         THE COURT:  All right.  Thank you.  We're in recess

8    for roughly 15 or 20 minutes.

9         THE CLERK:  All rise for the court.

12:30 10      (Discussion off the record.)

11        THE COURT:  And I will instruct Mr. Thomas to be

12   available.  I'm going to do the other two first, but then

13   Mr. Masera after that.

14        MR. THOMAS:  Judge, should I wait here in the

15   courtroom?

16        THE COURT:  Sure.

17        (Recess taken.)

18        (Discussion in the lobby is sealed and has been

19   removed from this transcript.)

12:58 20              * * * * * * * * * *

21        THE CLERK:  All rise.

22        (Court entered.)

23        THE CLERK:  Thank you.  You may be seated.

24        THE COURT:  Good afternoon, counsel.

25        The Court has conducted telephone interviews with the

1    three witnesses from whom we heard testimony, Mr. Lopes,

2    Mr. Orr, and Mr. Masera in the attendance of their counsel.

3            With respect to Mr. Lopes and Mr. Orr, their counsel,

4    Attorneys Nixon, Smith and Salsburg, participated in the phone

5    conversation, and then in person Mr. Masera was joined by his

6    counsel, Mr. Thomas.

7            I have inquired of Mr. Lopes, Mr. Orr, and Mr. Masera

8    and their attorneys, and as to the basis for those individuals'

9    invocation of their Fifth Amendment rights not to testify in

12:59 10   this case, each witness has satisfied the Court that there is

11   at least a reasonable probability that they would face some

12   authentic danger of incrimination were they to testify.

13           Further, I have determined that none of these three

14   witnesses will offer any relevant, non-privileged testimony.

15   Therefore, they will not be required to take the stand in this

16   case.

17           Is there anything else that needs to come to the

18   Court's attention in that regard, Mr. Frank?

19           MR. FRANK:  No, your Honor.

01:00 20        THE COURT:  Mr. Kelly?

21           MR. KELLY:  No, your Honor.  At the appropriate time

22   we may seek an instruction with respect to Mr. Masera given his

23   status as a government witness, but we'll leave that until

24   later.

25           THE COURT:  All right.

```
 1              Mr. Kendall?

 2              MR. KENDALL:  Your Honor, one thing I'm not fully

 3    understanding is, is it your position that you don't think

 4    Mr. Masera would offer any relevant evidence to this case or

 5    simply that his privilege is such that there's no way that we

 6    can compel him to offer any evidence?

 7              THE COURT:  The latter.

 8              MR. KENDALL:  Thank you.

 9              THE COURT:  All right, counsel.  Then we are going to

01:00 10  adjourn for the week, but just for planning, why don't we hear

11    one more time who actually we're going to have as witnesses on

12    Monday, at least as of now.

13              MR. KENDALL:  Your Honor, we have two.  One is the

14    water polo player we've identified to the government.

15              THE COURT:  And his direct will be approximately half

16    an hour?

17              MR. KENDALL:  I think less than Mericle.

18              THE COURT:  Okay.

19              MR. KENDALL:  And then Coach Bowen.

01:01 20          THE COURT:  And his direct?

21              MR. KENDALL:  Probably around what Mericle was, could

22    be a fraction longer.

23              THE COURT:  And then from the government?

24              MR. FRANK:  Probably comparable to today.

25              Your Honor --
```

1        THE COURT:  Wait, Mr. Kelly rose behind you.

2        Are you going to examine?

3        MR. KELLY:  We have previously subpoenaed two FBI

4    agents, Brown and Smith, and we're releasing them from their

5    subpoenas.  We had previously indicated on the record on behalf

6    of Abdelaziz we were going to call back Mikaela Stanford, we're

7    not going to.

8        THE COURT:  Thank you for that notification.

9        If we get through all of the witnesses that the

01:02 10   defendant Wilson intends to call, does the defendant Abdelaziz

11   intend to call any more witnesses?

12       MR. KELLY:  I think we had also subpoenaed an agent

13   named Cedrone, we're not going to pursue that either.

14       THE COURT:  All right.  So the answer is --

15       MR. KELLY:  So subject to our own consideration about

16   whether or not the defendant himself will testify, we do not

17   anticipate calling any live witnesses next Monday.

18       THE COURT:  All right.

19       So --

01:02 20   MR. KENDALL:  Your Honor, we do have the issue of the

21   exhibits you wanted to handle out of the presence of the jury

22   for us to offer and to make the record you discussed earlier

23   today.

24       We can do that today or Monday.  Whatever is the

25   Court's preference.

 1          THE COURT:  What exhibits are those?

 2          MR. KENDALL:  There's a series of exhibits we want to

 3     offer that we don't think -- some have not been ruled on, some

 4     may have been, but we just wanted to have a record of what was

 5     the basis for denying their admission and we wanted to state --

 6     they're all -- I think virtually all of them are non-hearsay,

 7     we're offering for non-hearsay purposes.

 8          You said earlier you didn't want it all done in front

 9     of the jury, that some should be done outside the presence, so

01:03 10    we divided it up that way.

11          THE COURT:  So how long do you expect this to take?

12          MR. KENDALL:  Ten minutes.

13          THE COURT:  Why don't we do it now.

14          MR. FRANK:  There's also a couple of housekeeping

15     matters that we have, your Honor, that should be very brief.

16          THE COURT:  Okay, let's go.

17          MR. KENDALL:  Mr. Carter, if we could put up Exhibit

18     118.

19          Your Honor, this is an exhibit between Mr. Singer and

01:03 20    Mr. Masera we did as part of the inquiry earlier on the Fifth

21     Amendment issue.  It is not for the truth of the matter

22     asserted.  It's just to show that they were discussing how they

23     were defrauding my client of $20,000.  It's, in fact, not for

24     the truth of what they say.  We want to admit it for not for

25     what is said in there, but just to show that it was exchanged.

1      MR. FRANK:  Your Honor, we've been over this exhibit

2  multiple times, and we continue to object on the same grounds.

3          The other issue we have with this particular exhibit

4  is Mr. Kendall asserted incorrectly on Monday during the

5  cross-examination of Mr. Nahmens that it was in evidence and

6  used it as basis for cross-examination for about a page and a

7  half of cross-examination, and we would move to strike that

8  portion of the cross-examination.

9      MR. KENDALL:  Your Honor, I did confuse 118 with 112,

01:04 10  they both deal with the same topic, the $20,000 in expense.

11          I think there were six lines that refer to this

12  exhibit.  I don't mind the six lines being struck, but then

13  there was general discussion of a topic that wasn't tethered to

14  the exhibit which should not be struck.  But for the six lines

15  where I refer to 118, I have no problem with that being struck.

16      THE COURT:  The six lines that refer to 118 are

17  stricken.

18      MR. KENDALL:  Thank you, your Honor.

19      THE COURT:  The objection is sustained.

01:05 20      MR. KENDALL:  Okay.

21          Your Honor, I think you've already ruled on the

22  Marriott -- the Marriott tape, Exhibit 8141A of the September

23  21 conversation.  We do want to offer it in our case.  If it

24  was found to be beyond the scope of the government's case, we

25  do believe it's directly relevant to the fraud that was

1    perpetrated on our client.  It's not hearsay, it's Mr. Singer

2    saying things that are against his interests, which would also

3    be a hearsay exception.

4         MR. FRANK:  We object, your Honor.  First of all, the

5    witness has to be unavailable for that exception to even apply,

6    and we've had no offering on that front, it's not true; and

7    also we object on hearsay grounds and relevance grounds.

8         THE COURT:  The objection is sustained.

9         MR. KENDALL:  It's also various state of mind, your

01:05 10   Honor, as well.

11        We have a group of e-mails, your Honor, in which

12   Mr. Singer has given descriptions of the side door, some of

13   these have been offered to you, but not all of them have.  So I

14   expect you'll be consistent in how you approach them, but I

15   just need of need to put them all into the record.

16        1043 may have already been offered, if we could show

17   that, but there's also 8197, 9721, 9672.  We offer these --

18        THE COURT:  I'm sorry, 9721.  What was the last one?

19        MR. KENDALL:  Sorry, your Honor, 9672.

01:06 20        THE COURT:  Okay.

21        MR. KENDALL:  These are four mails in which Mr. Singer

22   discusses the meaning of the side-door term with parents.

23        Given Agent Keating's testimony that he had a set

24   pitch he used with parents and her attempt to describe it is a

25   side-door scheme, we think this both impeaches her testimony

         1    and shows a 404(b) purpose Mr. Singer's practices, intent,

         2    understanding of what he was doing with the parents when he

         3    described the side door.

         4         And so it's not for the truth of the matter asserted,

         5    but for these other reasons, your Honor.

         6         MR. FRANK:  Your Honor, first of all, she's not here

         7    to be impeached.  She testified and was cross-examined, that

         8    was the appropriate time to attempt to impeach her.  She can't

         9    be impeached on somebody else's statements.  And we also object

01:07   10    on 401, 403, and hearsay grounds.

        11         MR. KENDALL:  I think we can impeach her at any time,

        12    your Honor.

        13         THE COURT:  The objections are sustained to those four

        14    exhibits.

        15         MR. KENDALL:  Okay.

        16         Your Honor, again, this may have been offered before

        17    in the government's case, but I offer it in our case, a case

        18    that's an important issue, Exhibit 9564, and Exhibit 9682 where

        19    Mr. Singer is in two different contexts discussing making

01:07   20    public discussions of the side door and disclosing it widely

        21    and publicly.  9564 is a book proposal and 9682 is a speech to

        22    the Young Presidents Organization.  Again, we think it goes to

        23    what was the meaning of the side door and Mr. Singer's state of

        24    mind, that it was not something that was criminal but something

        25    that could be discussed in numerous public settings.

1          MR. FRANK:  We object on 403 and hearsay grounds, your

2     Honor.

3          THE COURT:  The objection is sustained.

4          MR. KENDALL:  Your Honor, Exhibit 8135A is Mr. Singer

5     presenting his credentials to Mr. DeMaio in January of 2016.  I

6     suggest, your Honor, very little of this is truthful.  We're

7     not offering it for the truth of the matter asserted, rather,

8     we're showing how Mr. Singer was able to defraud and con

9     Mr. DeMaio, who is Mr. Wilson's adviser in taxes, the person

01:08 10    who referred Mr. Wilson to Mr. Singer and was giving tax advice

11    to him about Mr. Singer in 2018.

12          It clearly goes to the issue of how Mr. DeMaio was

13    beguiled by Mr. Singer and how that Mr. Singer was able to

14    perpetrate the fraud.

15          None of this is being offered for the truth of the

16    matter asserted, your Honor.

17          MR. FRANK:  To the extent it's general character

18    impeachment, your Honor, it's not admissible on those grounds.

19    We also object on 401, 403, and hearsay grounds.

01:09 20    THE COURT:  The objection is sustained.

21          MR. KENDALL:  There are a few calls from the wiretap,

22    your Honor, that we would like to offer.  They are to show how

23    the fraud was perpetrated on parents, and we suggest it's the

24    same fraud that Mr. Wilson was a victim of.

25          There's Exhibit 1422A, a tape and transcript of a

1    conversation where Mr. Singer is telling the parents that their

2    money would go to his foundation to pay for a team to go to

3    Serbia for their summer training.  We all know Coach Vavic is

4    from Serbia and did a lot of his recruiting there.

5         There's a second one, Exhibit 1497A, where Mr. Singer

6    is talking to another parent describing his connections to

7    university presidents and university provosts.

8         And then there is another tape, 9591A, where

9    Mr. Singer -- I believe this is one he's describing his

01:10 10   relationships with the senior management at Brown University

11   and how he's, again, defrauding another parent.

12        We think these are not for the truth of the matter

13   asserted but for 404(b) and other purposes to show how

14   Mr. Singer perpetrated the fraud on parents, the types of

15   stories he would tell to beguile them, to lull them into

16   trusting him, and we offer them for those purposes.

17        MR. FRANK:  Your Honor, it's not an inconsistent

18   statement so it doesn't come in under 806.  It doesn't -- it's

19   also hearsay and objectionable on 403 grounds, so we object on

01:10 20   all of those grounds.

21        THE COURT:  Objection sustained.

22        MR. KENDALL:  We would maintain that they are

23   consistent with the government's interpretation of the

24   consensual tape, your Honor.

25        Exhibit -- I believe you may have ruled on these

          1    already, but I don't know if all of them were before you when

          2    you ruled, your Honor, so I need to put all the numbers in.

          3         The series of e-mails between Haden and Rick Singer

          4    showing how Mr. Singer got introduced to Mr. Haden and how

          5    Mr. Haden allowed him to do fund-raising or at least not

          6    prohibit him from doing fund-raising at USC.  That would be

          7    Exhibit the 8032, 9707, 7360.  And as I suggest, your Honor,

          8    it's not to show the truth of the matter asserted, but it's to

          9    show the relationship, the introduction, the failure to stop

01:11    10    and to prohibit contacts with him, those types of acts.

         11         I may be missing a number here, your Honor, I don't

         12    know if I've read them all correctly.  Just to be sure, 8032,

         13    7816 --

         14         THE COURT:  I didn't get that one first time, 7816.

         15         MR. KENDALL:  Yeah, I missed it, that's what caught

         16    me.  9707 and 7360, I'm sorry about those.

         17         THE COURT:  I got those, all four of them.

         18         MR. KENDALL:  We're towards the ends of this.

         19         THE COURT:  I haven't made a ruling on those.

01:12    20         Is there an objection?

         21         MR. FRANK:  There is, your Honor.  As an initial

         22    matter, Mr. Kendall forfeited his opportunity to depose

         23    Mr. Haden, he declined do so.

         24         These exhibits are not relevant to Mr. Wilson in any

         25    way; they were years after Johnny Wilson was admitted to USC.

1      So we object on 401, 403, and hearsay grounds.

2           THE COURT:  Objection sustained.

3           MR. KENDALL:  If I may address, just so our position

4      noted, your Honor.  The introduction did come a year or so

5      after Mr. Wilson's son's admission; however, we're alleged to

6      be part of this universal overarching conspiracy.  These

7      directly go to Mr. Haden and Mr. Singer's relationship, the

8      expectation of honest services and other issues of fraud and

9      deceit with respect to Mr. Singer arose with the athletic

01:12 10    department.  I think it's directly relevant to Counts One and

11     Two.

12          We did not forfeit anything, your Honor.  Given the

13     Court's ruling on the documents, we had to make an appropriate

14     strategic decision of whether or not Mr. Haden would testify

15     truthfully.

16          With respect to the next group, your Honor, we have

17     four e-mails that describe the Pat Haden VIP or special

18     interest list.  The Court has ruled on these before.  We

19     suggest these relate to honest services issues, as well as

01:13 20    bribery issues and would, thus, be also relevant to the tax

21     case:  Exhibits 1085, 7572, Exhibits 79 -- let me get all these

22     numbers correctly.  1058, 7572, 7923, 7331, which is the

23     attachment to 7923, 7332, and then -- yes, I'm just trying to

24     check the numbering here.  If I can have the Court's patience

25     for a minute.

 1          And then 1129 is both the cover and the attachment,

 2     and then 7333 is also one of the attachments, your Honor.

 3          All of those exhibits we would offer to show those

 4     issues.

 5          And as I said, the Court has ruled on these before,

 6     and I'm not looking to reargue them.

 7          MR. FRANK:  We renew our objection on the same

 8     grounds.

 9          THE COURT:  The objection is sustained once again.

01:15 10     MR. KENDALL:  Your Honor, to show the -- to impeach

11     Ms. Chassin and to show that the Subco was aware of finances

12     being considered as part of Subco decisions separate from

13     Singer to show the honest service expectations, we'd offer

14     Exhibit 1187 which is an e-mail between Heinel and Haden and

15     references to Tim Brunold.

16          MR. FRANK:  We object on the grounds that this is

17     hearsay.  We also object on the grounds that she cannot be

18     impeached with extrinsic evidence when she's not here to

19     respond and have an opportunity to respond, and we also object

01:15 20     on the grounds that she cannot be impeached on somebody else's

21     e-mail.

22          THE COURT:  Objection sustained.

23          MR. KELLY:  Just for the record, I want to make it

24     clear, we're joining in the offering of all of these exhibits.

25          THE COURT:  All right, Mr. Kelly.

1          MR. KENDALL:  And, your Honor, it's again to show the

2     contact, the discussion, the knowledge.  It isn't to show the

3     truth of the matters actually stated.

4          Next would be Exhibit 1208.  It's the organizational

5     chart of the athletic department, and it shows all the people

6     they have for fund-raising.

7          MR. FRANK:  We object, 401, 403, and hearsay, your

8     Honor.

9          THE COURT:  Objection sustained.

01:16 10          MR. KENDALL:  Exhibit 7939 is an e-mail to Donna

11     Heinel.  It relates to the issue of managers being admitted as

12     walk-on players.

13          MR. FRANK:  Same objection.

14          THE COURT:  Objection sustained.

15          MR. KENDALL:  Again, your Honor, on issues that the

16     Court has already dealt with but we just want to have the

17     record complete, we would offer a series of documents that

18     relate to admissions of Subco candidates or VIP candidates

19     through athletics where money was a determining factor, and

01:16 20     I'll just read the exhibit numbers to the Court.

21          1024, 7862, 7341, 9735, 9503A, 9503, 7648, 9734,

22     7219 --

23          THE COURT:  Wait a minute, you're a little too fast.

24     The last two.

25          MR. KENDALL:  9734.

1          THE COURT:  Yes.

2          MR. KENDALL:  7219, 7235, 7490, 7504, 7502, 8045,

3    8082, 7525, 7524, 7565, 7409, 8066, 7358.  That's that

4    category.

5          We have then a series of other ones that also

6    relates -- excuse me, I need to wait for the Court's ruling and

7    then we'll go through the others.

8          MR. FRANK:  We object, 401, 403, and hearsay.

9          THE COURT:  Objection sustained.

01:18 10          MR. KENDALL:  Okay.  The others would be on the same

11   topic, your Honor, of showing for the same issues based upon

12   admissions of non-Singer people for fund-raising purposes

13   through Subco and VIP.  7862, 7341, 9735, 9503A, and 9503.

14          THE COURT:  They just went in in the other group.

15          MR. KENDALL:  That so have I double-counted something,

16   your Honor?

17          THE COURT:  9503A and 9503 were in the last group.

18          MR. KENDALL:  So we have duplication?

19          MS. PAPENHAUSEN:  Yes.

01:19 20          MR. KENDALL:  Sorry, your Honor.  I was repeating them

21   twice --

22          THE COURT:  All the ones you read were in the other

23   group.

24          MR. KENDALL:  Then the last one, your Honor, which I'm

25   sure you're all happy to hear is simply the tape, 9566A.  It is

a consensual recording of Rick Singer and Nazie Saffari.  It
was referenced by Agent Keating in her testimony.  It is not
for the truth of the matter, but just to show that at times the
agents did direct Singer to make tapes with explicit statements
such as bribery and payments of money going to the coach
personally to show that Wilson was treated differently.  Not
for the truth of the matter at all, just to show the different
instructions and results they got with Singer with different
people.

01:20
            MR. FRANK:  401, 403, and hearsay, we object, your
Honor.

            THE COURT:  Objection sustained.

            MR. KENDALL:  That may be it, your Honor, if I may
just confer for one moment.

            THE COURT:  Yes.

            MR. KENDALL:  And I thank you for your patience.

            (Discussion off the record.)

            MR. KENDALL:  That's it, your Honor.  If we have
anything on Monday, we'll let you know, but I think this is the
01:20 bulk of it.

            THE COURT:  Is there anything that needs to come to
the Court's attention before we adjourn for the week?

            MR. FRANK:  Briefly, your Honor.  With respect to the
testimony of the additional water polo player, Mr. Walters, two
issues:  One, as the Court may recall, Mr. Walters is a water

polo player who's older brother was tragically -- died

tragically during the season.  We would object to any testimony

about the older brother on 403 grounds.  We don't think that

it's relevant, and we also think that it's more prejudicial,

substantially more prejudicial than probative.

We also have an issue with the scheduling of the

deposition which may or may not have been resolved.  We asked

for it to happen tomorrow, if he arrives, tomorrow in person at

our offices or --

01:21  THE COURT:  This is the new witness?

MR. FRANK:  Yes.  Or Sunday morning.  And the only

response that we've gotten so far is he won't be available

until Sunday afternoon, which is too late for it to have

practical value for us.

MR. KENDALL:  Your Honor, if I may respond.

Two things:  I'm not going to raise the death of the

poor brother at all, I'm shocked that Mr. Frank thinks he needs

to raise that in court.  That has nothing to do with what the

young man is coming to testify to.  He's just coming to refute

01:21  Casey Moon's testimony that Johnny Wilson wasn't on the team.

With respect to his deposition, your Honor, you know, he's

coming in sometime on Saturday.  We wanted to meet with him.

We're happy to make him available for a deposition.  I'd

suggest we do it Sunday morning, give the government plenty of

time.  They have a one-hour deposition for this guy, that's

1    what they're asking for.  I mean, he's not a very complicated

2    witness; he's basically going to be a shorter version of

3    Mericle.

4              MR. FRANK:  Sunday morning at 10:00 would be fine with

5    the government, your Honor.

6              THE COURT:  10:00 a.m. Sunday morning.

7              MR. FRANK:  At the government's offices.

8              THE COURT:  At the government's offices.

9              MR. KENDALL:  Your Honor, you had originally said it

01:22 10    would be a Zoom deposition.  They just need to ask the kid the

11    questions.  Can we have the convenience of the Zoom --

12              THE COURT:  No, in person, 10:00 in the government's

13    office.

14              MR. KENDALL:  Okay.

15              MR. FRANK:  Thank you, your Honor.

16              Anything else?

17              MR. FRANK:  Not for the government.

18              THE COURT:  We're adjourned until Monday at 9:00 a.m.

19              THE CLERK:  All rise.

01:22 20              (Whereupon, the proceedings adjourned at 1:22 p.m.)

21

22

23

24

25

1                         I N D E X

2     Witness                              Page

3

4     ANDREW MERICLE

5     Direct Examination by Mr. Kendall      21

6     Cross-Examination by Mr. Frank         61

7

8     STEVE LOPES

9     Direct Examination by Mr. Sharp       119

10

11    RONALD ORR

12    Direct Examination by Mr. Sharp       122

13

14    STEVE MASERA

15    Direct Examination by Mr. Kelly       125

16    Direct Examination by Mr. Kendall     127

17

18

19

20

21

22

23

24

25

```
 1                    E X H I B I T S

 2    NO.                      ADMIT

 3    1540   ....................     16

 4    1254   ....................     16

 5    1255   ....................     17

 6    714    ....................     21

 7    8007   ....................     50

 8    9825   ....................     58

 9    726    ....................     65

10    728    ....................     65

11    9025   ....................     95

12    1563A  ....................     95

13    133    ....................    101

14

15

16    NO.                      FOR IDENTIFICATION

17    1564   ....................    127

18    118    ....................    129

19

20

21

22

23

24

25
```

1   C E R T I F I C A T E

2

3

4   UNITED STATES DISTRICT COURT )

5   DISTRICT OF MASSACHUSETTS    )

6

7

8         We, Kristin M. Kelley and Debra Joyce, certify that

9   the foregoing is a correct transcript from the record of

10  proceedings taken October 1, 2021 in the above-entitled matter

11  to the best of our skill and ability.

12

13

14      /s/ Kristin M. Kelley          October 1, 2021

15      /s/ Debra Joyce____            October 1, 2021

16      Kristin M. Kelley, RPR, CRR          Date
        Debra Joyce, RMR, CRR
17      Official Court Reporter

18

19

20

21

22

23

24

25