1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

   UNITED STATES OF AMERICA,           )
4                      Plaintiff       )
                                       )
5  vs.                                 )  No. 1-19-CR-10080
                                       )
6  GAMAL ABDELAZIZ and JOHN            )
   WILSON,                             )
7                      Defendants.     )
                                       )
8                                      )

9

10

                 BEFORE THE HONORABLE NATHANIEL M. GORTON
11                   UNITED STATES DISTRICT JUDGE
                       JURY TRIAL - DAY 17
12

13

               John Joseph Moakley United States Courthouse
14                      Courtroom No. 4
                       One Courthouse Way
15                 Boston, Massachusetts 02210

16

17                      October 4, 2021
                          9:26 a.m.
18

19

20

                    Kristin M. Kelley, RPR, CRR
21                   Kelly Mortellite, RMR, CRR
                     Official Court Reporters
22          John Joseph Moakley United States Courthouse
                   One Courthouse Way, Room 3209
23                 Boston, Massachusetts 02210
                   E-mail: kmob929@gmail.com
24

                 Mechanical Steno - Computer-Aided Transcript
25

1    APPEARANCES:

2

3           Stephen E. Frank

4           Ian J. Stearns

5           Leslie Wright

6           Kristen Kearney

7           United States Attorney's Office

8           1 Courthouse Way

9           Suite 9200

10          Boston, MA 02210

11          617-748-3208

12          stephen.frank@usdoj.gov

13          for the Plaintiff.

14

15

16          Brian T. Kelly

17          Joshua C. Sharp

18          Lauren Maynard

19          Nixon Peabody LLP

20          100 Summer Street

21          Boston, MA 02110

22          617-345-1000

23          bkelly@nixonpeabody.com

24          for Gamal Abdelaziz.

25

```
 1    APPEARANCES:

 2

 3            Robert L. Sheketoff

 4            One McKinley Square

 5            Boston, MA 02109

 6            617-367-3449

 7            sheketoffr@aol.com

 8            for Gamal Abdelaziz.

 9

10

11            Michael Kendall

12            Lauren M. Papenhausen

13            White & Case, LLP

14            75 State Street

15            Boston, MA 02109

16            617-939-9310

17            michael.kendall@whitecase.com

18            for John Wilson.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3           Andrew E. Tomback

 4           McLaughlin & Stern, LLP

 5           260 Madison Avenue

 6           New York, NY 10016

 7           917-301-1285

 8           atomback@mclaughlinstern.com

 9           for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1          THE CLERK:  Thank you.  You may be seated.  Court is

2     now in session.

3          THE COURT:  Good morning, counsel.  I need to see you

4     about the pending motions that have been filed over the weekend

5     before we recall the jury.

6          There were four by my count.  First is a motion by the

7     defendants to reconsider the submission of contextual e-mail,

8     or, in the alternative, to limit misleading argument.

09:28 9          I haven't received a response from the government.

10     Does the government have an opposition to that.

11          MR. FRANK:  We do, your Honor, for the same reasons

12     previously stated:  They don't come in under Rule 106.  They

13     are hearsay, they are being admitted for the truth of the

14     matter that they were about a different subject.

15          THE COURT:  What about the argument for completeness?

16          MR. FRANK:  It's a completely different series of

17     e-mails.  They're each independent of one another.

18          THE COURT:  You're saying they were contemporaneous.

09:29 19          MR. FRANK:  They were in the same time period.  We're

20     not arguing that he cut and paste the e-mail from the resume to

21     the e-mail to his wife.  We're not arguing, as the defendant

22     suggests in his motion, that there was an attempt to snip the

23     photograph out of the one document and put it in the other.

24     We're just arguing that he received the photograph and then he

1    subsequently sent the original version of the identical

2    photograph to his wife.  The jury can draw whatever inferences

3    it wants from that, but we're not arguing it's an actual cut

4    and paste.

5              THE COURT:  Mr. Kendall?

6              MR. FRANK:  Thank you, your Honor.  Rule 106 is not

7    limited to a single document.  If there is a sequence of

8    correspondence, which is what I think your question was looking

9    at, then it is relevant and it needs to be admitted.  They want

09:29  10   to argue and they want the jury to think that because he saw

11   the profile at 7:30, he picked up the same photograph and

12   circulated at 8:30.  The context is clear.  There's been two or

13   3 days of communications about getting pictures for the

14   yearbook photo page and the wife and Debbie Rogers and John are

15   all circulating pictures.  They're going to buy a page in the

16   yearbook to have things about Johnny, what photos would be good

17   at that.  This is just one of several photos being discussed.

18             This is what Rule 106 is written for, your Honor, so

19   that the context of the complete communication will not be lost

09:30  20   on the jury.  Thank you.

21             THE COURT:  All right.  I am going to allow the

22   admission of those -- what are there, three documents --

23             MR. FRANK:  Yes, your Honor.  Thank you very much.

24             THE COURT:  -- for the completeness of the subject

25   matter.

1          The second motion goes with the third actually, the

2     motion by the defendant to exclude irrelevant or prejudicial

3     testimony, which I assume was filed in anticipation of the

4     motion of the government to preclude testimony of Mr. Walters

5     for violation of the sequestration order.

6          Why don't I hear first from the government in that

7     regard.

8          MR. FRANK:  Your Honor, this is a situation of the

9     defendants' own making.  They didn't bother contacting the

09:31 10   witness until after Casey Moon had testified.  They then

11    disclosed to us only that he had read an article about Casey

12    Moon's testimony, but in our deposition sought to preclude us

13    from asking any questions about the fact that he actually went

14    on after being contacted by defense counsel to discuss not just

15    Casey Moon's testimony, to which he is responding here, but

16    also his own expected testimony and the expected testimony of

17    another witness who was on the defense witness list.

18         That is completely inappropriate and in violation of

19    the Court's sequestration order.  If, in fact, it appears the

09:31 20   defense didn't even bother notifying him of the sequestration

21    order last week, which is why he went on to see the discussion

22    of Casey Moon's testimony and the other witness's testimony and

23    speak with the other witness, then he's going to come in today

24    and testify about those very issues that he discussed with

25    another defense witness.  He's completely tainted, your Honor.

1    This is a sequestration order that the defense sought here,

2    repeatedly sought to enforce, and experienced counsel was well

3    aware of.

4           THE COURT:  Mr. Kendall.

5           MR. KENDALL:  Your Honor, we didn't have a chance to

6    prepare a written response but we're prepared to respond orally

7    today.  The first thing I'd like to do is mark as an exhibit

8    for the Court the complete deposition transcript so the Court

9    can look with its own eyes to see exactly what happened, what

09:32 10   questions were asked and make its own judgment.

11          THE COURT:  You can do that, but I'm not going to do

12   that now.

13          MR. KENDALL:  I'll summarize it for the Court then and

14   hand it up to the clerk.

15          This is the chronology of what happened.  Casey Moon

16   testified last week on Tuesday.  He testified even beyond what

17   we expected based upon his 302 and the extreme statements he

18   made during his testimony.  That was Tuesday.

19          There was some press coverage of it on Tuesday.  We,

09:33 20   Wednesday evening, the following day, called Mr. Walters for

21   the first time, never spoken to him, had no contact with him.

22   He didn't know who we were.  We introduced ourselves.  We said,

23   would you come to Boston this weekend and testify on Monday.

24   He said, fine.

25          We called a second member of the team, named McQuin

1    Baron, and asked him the same thing.  By coincidence, they said

2    we're good friends, we're having dinner tonight.  We said,

3    okay, you guys can fly out together, have the weekend together.

4         He never asked in the deposition, so he's making a

5    representation he has no foundation for, we told him you can't

6    talk about the case, don't read any press about the case, when

7    you come, we'll prepare you and we'll deal with things on

8    Saturday.

9         When -- because of scheduling things, the other guy

09:34 10   didn't come.  Just Walters came.  McQuin Baron didn't come.  He

11   had a scheduling order.  He had to drop out.  When we sit and

12   talk with Mr. Walters, he tells us.  We said, have you read

13   anything about the case.  It's in the deposition transcript.

14   He said, I saw an article about Casey Moon that said Johnny

15   wasn't on the team.  Then he goes on to say, but I didn't

16   subscribe to the publication so I couldn't read the whole

17   article and I wasn't going to pay them the money, so all I saw

18   was something on the internet.  I didn't read the whole

19   article.  It was just a sort of tease that they give you to try

09:34 20   get you to subscribe.

21        He has never discussed it with McQuin, Moon's

22   testimony, other than that.  When he and McQuin got together on

23   Wednesday night, the few minutes after we had called them, they

24   said to each either, they called me, they called you, we're

25   going out, can you imagine them saying Johnny wasn't on the

```
 1    team, and that was it.  There was no manipulating testimony.
 2    McQuin is not a trial witness.
 3          So what could be a violation of sequestration?  The
 4    exposure to the newspaper article occurred before he was asked
 5    to be a witness.  That's not a sequestration violation.  That
 6    may be a timing situation we don't like.  It was a
 7    nonsubstantive exposure, I suggest to you.  It didn't change
 8    his testimony in any way.  We spoke to him.  We gave him
 9    instructions.  He flew out here.  We disclosed it in the
09:35 10   deposition.  They had an hour to go through.  They went through
11    everything thoroughly.  They want to bring it up in trial
12    before the jury to impeach him that he spoke to McQuin.
13          THE COURT:  Why shouldn't they be allowed to if I
14    allow him to testify?
15          MR. KENDALL:  If they want to ask him about talking
16    about McQuin, I don't object.
17          I'm not finished, Mr. Frank.
18          They say there's a contact with Vavic.  That's
19    nothing.  Vavic sent the kid a text sometime last week saying
09:36 20   would you talk to my lawyer.  That was it.  Vavic has nothing
21    to do with us.  There was no discussion of substance.  You can
22    understand that Coach Vavic may ask a person if they'll talk to
23    his lawyer.  Whatever went on, that has nothing to affect the
24    integrity of his testimony in this courtroom.  That's why it's
25    described so vaguely.
```

```
 1              THE COURT:  Let me hear from you, Mr. Frank.
 2              MR. FRANK:  I'm amused that Mr. Vavic has nothing to
 3    do with Mr. Wilson.  Mr. Vavic is the individual that
 4    Mr. Wilson bribed.  The notion that McQuin Baron opted out,
 5    McQuin Baron has been on the witness list for months --
 6              I misspoke, your Honor.  McQuin Baron was identified
 7    last week as a witness.  He then opted out and, instead, they
 8    chose to call this other witness.  If they told the witnesses
 9    not to speak with each other, then it's a violation of a
10    sequestration order by the witnesses.  If they didn't tell the
11    witnesses not to speak with each other, then it's a violation
12    of the sequestration order by counsel.
13              Either way, the notion that this testimony has nothing
14    to do with -- that the violation has --
15              THE COURT:  Why isn't the resolution to allow him to
16    testify and allow the government to cross-examine him,
17    including all the conversations he's had before he testified,
18    which will come in?  They wouldn't normally because they're
19    hearsay, but because of bias and because of state of mind, they
20    will come in.
21              MR. FRANK:  That is a possible solution, your Honor.
22    If that is a solution the Court chooses, I think we should also
23    inquire about the fact that McQuin Baron was identified as a
24    witness and is not testifying here.
25              I think we should also be able to explore the Vavic
```

1    issue, which is central to this witness' bias.

2         THE COURT:  I will allow to you do that on

3    cross-examination.

4         MR. FRANK:  Thank you.

5         THE COURT:  I'm going to let Mr. Walters testify but

6    I'm going to let the government cross-examine about everything

7    that happened in the last week, including conversation and

8    exchange of e-mails with Vavic.

9         MR. KENDALL:  Your Honor, I understand the Court's

09:38 10  ruling.  We're fine with the Court's ruling.  I thank you for

11   it.  I want to clarify one thing.  If he wants to ask if you've

12   had any contact Vavic, that's one thing.  There should be no

13   reference to Vavic being arrested, Vavic going on trial, Vavic

14   having his own legal issues, your Honor.  He's not in this

15   courtroom.  His legal issues should not be before the jury.

16        MR. FRANK:  The whole issue of the bias is the fact

17   that Vavic is facing criminal charges.  That is not

18   prejudicial.  That's a fact that's essentially before the jury

19   already.  They know that he's the coconspirator, alleged

09:38 20  coconspirator of this defendant.

21        Your Honor gave a limiting instruction in the *Prange*

22   case that was upheld by the First Circuit on a very similar

23   matter.  We would not oppose a limiting instruction to this

24   one.  In this case, they're not allowed to consider Vavic's

25   guilt or inference with respect to Mr. Wilson, but they are

```
 1    allowed to consider this issue of bias in the witness'
 2    testimony.
 3              THE COURT:  Mr. Kelly?
 4              MR. KELLY:  We would object to that part, the criminal
 5    charges.  That's what we think, under the First Circuit Ackerly
 6    case, it's a violation, and we would object to that because it
 7    prejudices us too.  Other than that, we don't have.
 8              THE COURT:  One more.
 9              MR. FRANK:  He's not been adjudged guilty, your Honor.
10    We're not referencing a guilty plea.  We're not referencing a
11    conviction.  We're referencing the fact that, like these
12    defendants, he's facing criminal charges arising out of the
13    exact same investigation.
14              THE COURT:  With respect to the conviction or the
15    charges against Vavic, I'm going to reserve.  I want to see a
16    copy of the limiting instruction I gave in what you say is a
17    similar situation.  And I will cogitate on that until that
18    portion of Mr. Walters' cross-examination, at which point we'll
19    have a sidebar to further discuss it.
20              MR. KENDALL:  Thank you, your Honor.
21              MR. FRANK:  I appreciate that, your Honor.  We can
22    hand it up.  The one thing I would say is to leave out the fact
23    that he's facing criminal charges completely undermines our
24    ability to effectively cross-examine the witness on his bias.
25    It's the fact of the criminal charge that is pending, the fact
```

         1    that he is being called to testify as a witness for Vavic that

         2    goes directly to his bias.  It's the whole point --

         3              MR. KENDALL:  Your Honor --

         4              THE COURT:  Mr. Kendall?

         5              MR. KENDALL:  -- I think your suggestion is a wise

         6    one.  Hear the young man testify.  He's an earnest, sincere

         7    person.  Let him see if he's got a bias.  The kid testified in

         8    deposition.  He hasn't spoken to Vavic since he graduated USC.

         9    He hasn't had any contact with him.  He has no opinion on the

09:40   10    charges that have been brought.  I think the Court's suggestion

        11    that he wanted to see the witness and have something tactile in

        12    front of you before you made a decision is a good one.

        13              THE COURT:  All right.  I'm going to take that one

        14    under advisement.

        15              The last motion that was filed was by the government

        16    to exclude Exhibit 8131, a video excerpt from the Oprah Winfrey

        17    Show discussing Johnny Wilson at age 9.  This seems absolutely

        18    irrelevant and I'm not going to allow that to be introduced.

        19              MR. KENDALL:  We were not planning to play any video

09:41   20    from Oprah, your Honor.

        21              THE COURT:  Okay.  Well, in any event, that motion is

        22    allowed.

        23              I'm going to take a short recess.  Then we're going to

        24    call the jury in and proceed.

        25              Who will be the first witness?  Mr. Walters?

```
 1              MR. KENDALL:  It will be Mr. Walters, your Honor.

 2              THE COURT:  All right.

 3              MR. KENDALL:  May we get a copy of what the government

 4     handed to the Court?

 5              THE COURT:  Yes.  They will give you a copy.

 6     Absolutely.

 7              MR. KENDALL:  Thank you, your Honor.

 8              THE COURT:  We'll be in recess for five minutes.

 9              THE CLERK:  All rise.

10              (Recess taken 9:41 a.m. to 9:54 a.m.)

11              THE CLERK:  Thank you.  You may be seated.  Court is

12     now in session.

13              THE COURT:  Good morning, jurors, and welcome back.  I

14     hope you had a pleasant weekend.  We had business to conduct

15     outside of your hearing just now, so that's why we're starting

16     a little late, but these, as I have said before, these save

17     time.  We're not wasting time.

18              So the defendants will call their next witness.

19              Mr. Kendall.

20              MR. KENDALL:  Thank you, your Honor.  James Walters

21     will be our next witness.

22              (James Walters, sworn.)

23              THE CLERK:  Would you please state your name for the

24     record, spelling your last.

25              THE WITNESS:  James Walters, W-a-l-t-e-r-s.
```

```
 1              THE COURT:  Good morning, Mr. Walters.  Will you
 2   please pull that microphone in close and -- so that we can all
 3   hear you.  Thank you.
 4                 DIRECT EXAMINATION OF JAMES WALTERS
 5   BY MR. KENDALL:
 6   Q.   Good morning, Mr. Walters.
 7   A.   Good morning.
 8   Q.   Where do you live?
 9   A.   I live in Mission Viejo, California.
10   Q.   And what do you do for a living?
11   A.   I work in real estate development.
12   Q.   When did you first realize that you were going to be a
13   witness in this case?
14   A.   On Thursday or Wednesday of last week.
15   Q.   Okay.  Wednesday night Mr. Tomback called you?
16   A.   Yes.
17   Q.   And asked you to come testify?
18   A.   That's correct.
19   Q.   Came out this weekend?
20   A.   Yes.
21   Q.   Going back home today?
22   A.   Tomorrow morning.
23   Q.   Okay.  Good.  Where did you go to high school?
24   A.   I went to Mater Dei Catholic High School.
25   Q.   Where is that?
```

```
 1    A.   That's in Santa Ana, California.

 2    Q.   Okay.  Did you play water polo there?

 3    A.   Yes, I did.

 4    Q.   For those who do not know the high school water polo

 5    world, what is Mater Dei in water polo in high school?

 6    A.   We were -- when I was there, we were easily the best team

 7    in -- probably in the nation, although we never got to compete

 8    on the national stage, but we were one of the best out there.

 9    We had a 105 game win streak.

10    Q.   Okay.  And so they never lost when you were there, fair to

11    say?

12    A.   We won three CIF championships, but we did lose the fourth

13    year.

14    Q.   Okay.  And what club did you play for?

15    A.   Regency, which was the club team of Mater Dei.

16    Q.   Did you play water polo at USC?

17    A.   Yes, I did.

18    Q.   What was your freshman year when you went there?

19    A.   Could you repeat that?

20    Q.   When did you enter as a freshman to USC?

21    A.   2014 was my freshmen year.

22    Q.   September 2014?

23    A.   Yes.

24    Q.   And you graduated June of '18 or May of '18?

25    A.   That's correct, May of '18.
```

```
 1    Q.   I don't mean to embarrass you, but tell us some of the

 2    awards you got in high school as a water polo player, just the

 3    top ones.

 4    A.   I was most valuable player once in high school.  I had --

 5    this was a Mater Dei recognition.  I had most valuable

 6    defender, recognized by the CIF, which was our -- you know, our

 7    league, so to speak.  I was recognized as first team, second

 8    team, third team throughout my years in high school.

 9    Q.   Okay.  Would it be fair to say that you were ranked as one

10    of the best water polo players in high school in the country?

11               MR. FRANK:  I Object to the leading, your Honor.

12               THE COURT:  Sustained.

13               MR. KENDALL:  I'll rephrase, your Honor.  Sorry.

14    Q.   How were you ranked your senior year?

15    A.   I was certainly one of the better players in the nation,

16    yes.

17    Q.   Okay.  Did there -- was there all American or any type of

18    distinctions or anything like that when you were in high

19    school?

20    A.   Yes, there were.

21    Q.   And what did you get in that area?

22    A.   I believe in my senior year I was Second Team

23    All-American.

24    Q.   Okay.  How did you end up at USC?

25    A.   Ended up at USC, I always wanted to go to USC.  Their
```

```
 1    water polo team is just one of the best in the nation, it
 2    always has been, and that was where I dreamed of going.
 3    Q.    Okay.  Did you get a scholarship?
 4    A.    Yes.
 5    Q.    Freshman year, were you a redshirt or varsity?
 6    A.    I was varsity.
 7    Q.    Were you playing in games your freshman year?
 8    A.    Yes.
 9    Q.    When you were with Mater Dei, that's in Southern
10    California, correct?
11    A.    That's correct.
12    Q.    Okay.  And you know Johnny Wilson's high school, you know,
13    was in Northern California toward San Francisco?
14    A.    Yes.
15    Q.    Did you ever play his teams in any tournaments?
16    A.    Yes.
17    Q.    What teams of his did you play?
18    A.    We played Menlo, the high school team.  We had a
19    tournament where it's called North South Tournament where we
20    would go -- basically, the best teams in the south would travel
21    to north or vice versa and we would compete, and that's where I
22    would play him.
23    Q.    Fair to say we don't have to ask who won.
24    A.    That's correct.
25    Q.    Okay.  And you ever play the Stanford Club teams?
```

```
 1    A.   Yes.
 2    Q.   Okay.  What was your impression of the Menlo School and
 3    the Stanford Club teams as programs?
 4              MR. FRANK:  Objection.
 5              THE COURT:  Sustained.
 6    Q.   You played both teams, correct?
 7    A.   Yes.
 8    Q.   What did you observe about them?
 9              MR. FRANK:  I Object, your Honor.  It's the same
10    question.
11              THE COURT:  Sustained.
12    A.   They were good teams.
13              THE COURT:  There's no question before you.
14    Q.   I want to go to August 19, 2014, the first day of school
15    at USC.  What dorm were you assigned to?
16    A.   Fluor Tower.
17    Q.   What room number?
18    A.   208.
19    Q.   Who were your roommates?
20    A.   My roommates were McQuin Baron, Murphy Slater, Bryce
21    Hoerman, Grant Stein, Brock Hudnut, Matteo Morelli, and I may
22    be missing one.
23    Q.   Were these varsity players or redshirts?
24    A.   Mostly varsity.  One or two of them did not play that
25    year.
```

1    Q.   And then was there another suite in Fluor Tower of water

2    polo players?

3    A.   Yes.

4    Q.   What suite was that?

5    A.   307, I believe.

6    Q.   And who was in that suite?

7    A.   That suite was Johnny Wilson, Andrew Mericle, Tristan

8    Reinhardt, Steve Michaud, Zach Traversi, and I believe I'm

9    missing two or -- I believe I'm missing two in there.

10:00 10   Q.   Okay.  Were they mostly redshirts in the second suite?

11   A.   Mostly redshirts.  They were all redshirts.

12   Q.   Did you meet Johnny on August 19th, the first day?

13   A.   Yes, I did.

14   Q.   Okay.  Where did you meet him?

15   A.   At practice.

16   Q.   Okay.  Had you met him before?

17   A.   Not formally before, no.

18   Q.   Had you played against him in games?

19   A.   Yes.

10:00 20   Q.   Okay.  But I take it you don't really have introductions

21   in the water?

22   A.   No.

23   Q.   Okay.  Had you heard about anything about Johnny before

24   you met him?

25              MR. FRANK:   Objection.

|  |  |
|---|---|
| 1 | THE COURT:  Sustained. |
| 2 | Q.   Without telling us what was said, could you just tell us, |
| 3 | yes or no, had you heard anything about Johnny before you met |
| 4 | him?  Just a yes or no.  Don't say what was said. |
| 5 | A.   Yes. |
| 6 | Q.   And who was the person that said something about him? |
| 7 | Again, just the name.  I don't want to hear what was said. |
| 8 | A.   It was talked about with our coach, Jovan. |
| 9 | Q.   Jovan Vavic? |
| 10 | A.   Yes. |
| 11 | Q.   Okay.  During August 19th to 26, that first week of |
| 12 | practice, did you see Johnny Wilson in the water? |
| 13 | A.   Yes. |
| 14 | Q.   Okay.  How was practice organized?  Where were the varsity |
| 15 | guys and where were the redshirts?  Just tell us the layout. |
| 16 | A.   The first week of practice is very hectic.  And you know, |
| 17 | I was practicing with the varsity team and we were all together |
| 18 | in the same pool, but the way that it's organized is that the |
| 19 | guys who are redshirts or not on the traveling roster, so |
| 20 | basically they're not going to be suiting up for games, they're |
| 21 | on one end of the pool.  And the traveling team, so to speak, |
| 22 | not the redshirts, were on the other side, but you know, still |
| 23 | in the same pool.  So the way it's organized is that we have |
| 24 | the head coach on us and he's coaching us predominantly. |
| 25 | Q.   Okay.  Was there anything particularly noteworthy that you |

```
 1    saw about Johnny when he was in the water?
 2    A.    Nothing really noteworthy.
 3    Q.    Just another redshirt?
 4    A.    Just another redshirt.
 5    Q.    In late August, was there a problem at a particular
 6    practice?
 7    A.    Yes.
 8    Q.    Could you tell us what did you personally observe?  What
 9    did you do and what did you observe?
10:02 10    A.    As I mentioned before, I was on sort of the varsity side
11    of the pool.  Play stopped.  We were working on some drills.
12    Play stopped.  I don't know what happened, but Johnny was
13    basically swimming to the side slowly.  A couple teammates, I
14    don't remember which ones, were escorting him over.  There was
15    clearly some sort of problem, although I didn't know what it
16    was.  He was getting out of the pool and then we continued to
17    play.  You know, we were working on some things.  And so next I
18    see, he is leaving the pool.  He's got, like, sunglasses on and
19    a hoodie on and he had left and went to the hospital.
10:03 20    Q.    Who left -- who was physically accompanying him as he went
21    out of the pool area?
22    A.    My roommate, McQuin Baron.
23    Q.    McQuin Baron is a -- how long have you known McQuin Baron
24    at this time?
25    A.    At that time I had known him for about five years.
```

1    Q.    Okay.  He had played at Mater Dei as well?

2    A.    Yes.

3    Q.    Was he also on the varsity?

4    A.    Yes.  He was our goalie.

5    Q.    Okay.  One of the -- how would you describe his

6    accomplishments as a goalie?

7    A.    He was an Olympian in 2016 Rio de Janeiro.  And he was a

8    very accomplished athlete.  He was player of the year in

9    college with the Peter J. Cutino award.

10:04 10   Q.    Okay.  So McQuin and somebody else is taking Johnny out of

11   the pool.  Now, did McQuin have a car, to your knowledge?

12   A.    Yes.  McQuin was -- he had offered to take him to the

13   hospital because he had the parking structure --

14         MR. FRANK:  Objection, your Honor.

15         THE COURT:  Sustained.

16   Q.    Just answer my question.  Did McQuin have a car at school?

17   A.    Yes.

18   Q.    Did you see that car?

19   A.    Yes.

10:04 20   Q.    Do you know where he parked it?

21   A.    Yes.

22   Q.    What was noteworthy about the parking space of his car?

23   A.    He got the structure that was closest to the pool and the

24   dorms, so a convenient spot.

25   Q.    So McQuin left with Johnny from the pool area on this

```
 1    particular day, correct?

 2    A.    That's correct.

 3    Q.    That evening, did you see McQuin's car?

 4    A.    Yes.

 5    Q.    How did you end up seeing McQuin's car?

 6    A.    It was a mess.

 7    Q.    Well, tell me what did you do.

 8    A.    Well, apparently --

 9    Q.    Don't tell me apparently.  Just tell me I did this.  I did

10:05 10    that.  Just tell me what you personally did.

11    A.    I brought towels down and helped clean vomit off of it and

12    inside of it on the door and on the outside of it.

13    Q.    Okay.  So you cleaned vomit out of McQuin's car the

14    evening of the day Johnny was taken out of the pool?

15    A.    That's correct.

16    Q.    Have you ever had a concussion?

17    A.    Yes, I have.

18    Q.    One or more than one?

19    A.    Just one.

10:05 20    Q.    One.  And are you familiar with concussion symptoms and

21    concussion protocols for water polo players?

22    A.    Yes, I am.

23    Q.    Is vomiting part of a concussion symptom?

24    A.    Yes, it is.

25    Q.    Okay.  After this time when you cleaned the vomit out of
```

1    McQuin's car, is Johnny at practice the next day?

2    A.    No.

3    Q.    Okay.  Is there some period of time Johnny's not at

4    practice?

5    A.    Yes.

6    Q.    Okay.  Fair to say you're testifying from your memory?

7    A.    That's correct.

8    Q.    You weren't writing down the dates and times of these

9    events, correct?

10:06 10          MR. FRANK:  Objection to the leading, your Honor.

11          THE COURT:  Sustained.

12   Q.    Did you make any written record of these events?

13   A.    No.

14   Q.    Did you have any reason to?

15   A.    No.

16   Q.    Okay.  You're testifying based upon your memory of

17   seven years ago, correct?

18   A.    That's correct.

19   Q.    After this event with cleaning the car, do you know how

10:06 20   long Johnny's out of practice?

21   A.    He wasn't there for three weeks or so.

22   Q.    Okay.  Is this an estimate, or is this a precise?

23   A.    This is an estimate.  This is seven years ago.

24   Q.    So he's not there for a while.  And then when he comes

25   back, what do you observe?

```
 1   A.    He was still not cleared for contact.

 2   Q.    So what did you see him doing at the pool?

 3   A.    Well, at first he was just observing practice.

 4   Q.    And then did his role change and did his tasks evolve?

 5   A.    Yes, yes.

 6   Q.    What did you observe?

 7   A.    Then he was cleared to do light swimming in the diving

 8   well and later on then he was allowed to come back with us and

 9   contact.

10   Q.    Do you know the amount of time that passed before he was

11   doing light swimming?  Don't guess.  Just tell us what you

12   know.

13   A.    Four -- probably four weeks before he could do any of

14   that.

15   Q.    Do you know that, or is that an estimate?

16   A.    It's an estimate.

17   Q.    Okay.  So fair to say some period of time after he

18   returns, you eventually see him in -- you call it the diving

19   well?

20   A.    Yes.

21   Q.    What is the diving well and what is the point of him being

22   there?

23   A.    The point of the diving well is after you've had a

24   concussion, you're very prone to a much worse injury if you

25   were to get hit by a ball.  And so what we do is we would go
```

         1    and swim in the diving well so that if you're swimming and a
         2    ball comes over, you're far enough away to where if you get hit
         3    in the head, it's not going to be too big of a deal.
         4    Q.    Okay.  Before he went into the diving well, did you see
         5    him doing any type of tasks on the pool deck?
         6    A.    Yes.
         7    Q.    What type of tasks did you observe?
         8    A.    He would help clean up, you know, clean lines, put the
         9    covers on, put the balls away.
10:08   10    Q.    Did other injured athletes do those type of tasks?
        11    A.    Always.
        12    Q.    Okay.  Did you ever see him at any games or tournaments?
        13    A.    Yes.
        14    Q.    Okay.  And what did you observe there?
        15    A.    He was filming a lot of our games.  And there's a lot of
        16    tasks that go on like if you're not playing.  There's a lot of
        17    things that you have to do to help the team.
        18    Q.    Is that what redshirts typically do?
        19    A.    Yes.
10:08   20    Q.    Okay.  From the period that he starts returning after the
        21    incident at the pool where he's throwing up, once he starts
        22    coming back, is he at practice on a regular basis?
        23    A.    Yes.
        24    Q.    Okay.  And he's doing filming?  He's doing chores?  What
        25    else do you observe?

```
 1    A.    That's about it, I mean, just helping with organizational
 2    things.
 3    Q.    Okay.  By the -- as we're getting more closer towards
 4    Thanksgiving and the early December national tournament, or the
 5    NCAA finals, was he still around doing things as a member of
 6    the team?
 7    A.    Yes.
 8    Q.    Okay.  Are you close friends with the Wilson family?
 9    A.    No.
10    Q.    After Johnny left the team freshman year, did you have
11    much contact with him?
12    A.    I haven't talked to him.
13    Q.    Are you friendly with him?
14    A.    I know him, but I mean...
15    Q.    I mean, you're not enemies?  You just --
16    A.    Yeah.  If I saw him, I would say hi, we'd catch up for a
17    few minutes, but I don't suspect we'd have much to talk about.
18    Q.    Okay.  And I take it you've never been a guest of the
19    Wilson family for any vacations or trips --
20              MR. FRANK:  Objection to the leading, your Honor.
21              THE COURT:  Sustained.
22    Q.    Have you ever been a guest of the Wilson family at any
23    vacations?
24    A.    Never.
25    Q.    Okay.  In high school, how fast could you swim 50 yards?
```

| | |
|---|---|
| 1 | A.    Probably about 21 seconds, the high end of 21 seconds. |
| 2 | Q.    What's the high end mean? |
| 3 | A.    21.8, 21.9, something like that. |
| 4 | Q.    And you were one of the best in the country, correct? |
| 5 | A.    That's correct. |
| 6 | Q.    If somebody's swimming in the mid 22s, 22.5, 22.4, 22.7, |
| 7 | how would that -- what would that mean about their speed as a |
| 8 | high school water polo player? |
| 9 | A.    It means they're fast. |
| 10:10 10 | MR. FRANK:  Objection. |
| 11 | THE COURT:  Grounds? |
| 12 | MR. FRANK:  He's not an expert, your Honor. |
| 13 | MR. KENDALL:  Your Honor. |
| 14 | THE COURT:  I'll let him have the question. |
| 15 | Q.    Okay.  After your freshman year, did you assume a certain |
| 16 | role at USC? |
| 17 | A.    Yes. |
| 18 | Q.    What was that role? |
| 19 | A.    I was elected captain at the end of -- just after season |
| 10:10 20 | of my freshman year. |
| 21 | Q.    So how many years were you captain of the USC water polo |
| 22 | team? |
| 23 | A.    Three years. |
| 24 | Q.    And in addition, did -- in the most recent Olympics, did |
| 25 | you have an opportunity to join the Olympic team? |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | A.   I was asked to train with them, yes.                    |
|       | 2  | Q.   And what did you decide to do?                          |
|       | 3  | A.   I decided not to.                                       |
|       | 4  | Q.   Okay.  So going back to that question of somebody is a  |
|       | 5  | junior in high school is swimming in the 22s for a 50-yard   |
|       | 6  | sprint freestyle, what level does that put them at in high   |
|       | 7  | school in terms of speed for a water polo player?            |
|       | 8  | A.   That means they're fast.  They can -- they're a good    |
|       | 9  | swimmer.                                                     |
| 10:11 | 10 | Q.   Would that even be a fast time on the USC team?         |
|       | 11 | A.   Yes, depending on your position, it would be.           |
|       | 12 | Q.   Have you had any contact with Johnny Wilson in the last |
|       | 13 | year or two?                                                 |
|       | 14 | A.   No.                                                     |
|       | 15 | Q.   Do you know who his father -- have you ever met his     |
|       | 16 | father?                                                      |
|       | 17 | A.   No.                                                     |
|       | 18 | Q.   Okay.  Of the coaches at USC, who was the one that you  |
|       | 19 | were closest to?                                             |
| 10:12 | 20 | A.   Probably Casey Moon or Marko Pintaric.                  |
|       | 21 | Q.   Okay.  And in fact, in your sports profile, what did you |
|       | 22 | say about Casey Moon?                                        |
|       | 23 | A.   I don't recall.                                         |
|       | 24 | Q.   Do you recall saying that he was your sports hero?      |
|       | 25 | A.   Yes.  Now -- maybe I did say that.                      |

```
 1    Q.    Okay.  Have you had any phone calls or substantive

 2    conversation with Coach Vavic since you've graduated?

 3    A.    None.

 4          MR. KENDALL:  Okay.  If I may have one moment, your

 5    Honor?

 6          THE COURT:  Yes.

 7    Q.    That year 2014 that you played, were there any European

 8    recruits on the team?

 9    A.    Yes.

10:13 10   Q.    What are the Europeans like in terms of age and size

11    compared to the American redshirts?

12    A.    They are very good at water polo.  When they came in, they

13    had been -- it's just clear that they have more experience.

14    Q.    Are they -- do the Europeans come in at age 18, or do they

15    come at a different age?

16    A.    Typically older.

17    Q.    How many years older?

18    A.    For example, one of my teammates that came in from Serbia

19    was, when he came in, I believe he was either 20 or 21, as

10:13 20   opposed to 18 like myself.

21    Q.    And what's their heights of the Europeans for that year

22    2014?

23    A.    I think they were a couple inches taller, 6'2", 6'3",

24    something like that.

25          MR. KENDALL:  Okay.  No further questions.  Thank you,
```

1   your Honor.

2           THE COURT:  Cross-examination, Mr. Frank.

3           MR. FRANK:  Thank you, your Honor.

4               CROSS-EXAMINATION OF JAMES WALTERS

5   BY MR. FRANK:

6   Q.   Good morning, Mr. Walters.

7   A.   Good morning.

8   Q.   So you played water polo all four years in high school at

9   Mater Dei?

10:14 10   A.   Yes, I did.

11   Q.   And you were a starter all four years?

12   A.   Yes.

13   Q.   And just as in college, you were elected a captain of the

14   Mater Dei High School team during your sophomore year, correct?

15   A.   The end of my sophomore year, yes.

16   Q.   And then you also served as captain of the Mater Dei High

17   School team during your junior and senior years, correct?

18   A.   That's correct.

19   Q.   And you actually committed to going to USC and playing for

10:14 20   USC during your sophomore year in high school, correct?

21   A.   That's correct.

22   Q.   Coach Vavic was already familiar with your skills at that

23   point?

24   A.   Yes.

25   Q.   And he had come to your games?

```
 1   A.    Yes.

 2   Q.    And he had seen you play?

 3   A.    Most likely.  I don't know that he came specifically for

 4   me because my team had a lot of great players, so it was a

 5   recruiting opportunity for sure.

 6   Q.    But Coach Vavic saw you play?

 7   A.    Certainly, yes.

 8   Q.    And he saw you play more than once?

 9   A.    Yes.

10   Q.    And you didn't even apply to any other schools, correct?

11   A.    I did not.

12   Q.    And during your senior year in high school, you signed a

13   National Letter of Intent, correct?

14   A.    Yes.

15         MR. FRANK:  Can we show the witness only Exhibit 771.

16   Q.    Mr. Walters, do you recognize that document?

17   A.    I believe so, yes.

18         MR. FRANK:  Okay.  Can we look at the next page.

19   Q.    Is that your signature at the bottom?

20   A.    No.  I don't recall signing that.  That doesn't look like

21   my signature.  I don't recall signing it.

22         MR. FRANK:  Can we look at the prior page, please.

23   Q.    That's your name at the top, correct?

24   A.    Yes.  And my signature is below there.

25   Q.    Right.  And that's your signature down there?
```

|     |     |
| --- | --- |
| 1 | A.   Yes, with my number in it.  I put my cap number in there. |
| 2 | Q.   Okay.  And that's your mother's signature there? |
| 3 | A.   Yes, it is. |
| 4 | Q.   Okay.  And that's a National Letter of Intent? |
| 5 | A.   Yes. |
| 6 | MR. FRANK:  Can we look at the next page, please. |
| 7 | Q.   And that's your name at the top there, right? |
| 8 | A.   Yes, it is. |
| 9 | Q.   And do you recall getting a 50 percent scholarship? |
| 10:16 10 | A.   Yes. |
| 11 | Q.   Okay.  So this is, in fact, your National Letter of |
| 12 | Intent, correct? |
| 13 | A.   Yes. |
| 14 | MR. FRANK:  Okay.  Government offers 771. |
| 15 | THE COURT:  It will be admitted. |
| 16 | (Exhibit 771 admitted into evidence.) |
| 17 | Q.   So the 50 percent scholarship that you got to go to USC |
| 18 | and play at USC was in recognition of the fact that you had |
| 19 | tremendous skill, correct? |
| 10:17 20 | A.   I would say so. |
| 21 | Q.   You know that they only get four and a half scholarships |
| 22 | to award? |
| 23 | A.   Yes. |
| 24 | Q.   And getting a 50 percent scholarship when there are only |
| 25 | four and a half scholarships to award suggests that you're |

```
 1   going to have an immediate impact on the team, correct?
 2   A.   Yes.
 3   Q.   You didn't pay Coach Vavic to recruit you, did you?
 4   A.   No.
 5   Q.   You didn't agree to donate money to the team in exchange
 6   for your recruitment, did you?
 7   A.   No.
 8   Q.   You didn't lie on your application to get recruited, did
 9   you?
10   A.   No.
11   Q.   You submitted an athletic profile at some point in
12   connection with your recruitment?
13   A.   I assume so, but I don't recall.
14   Q.   But you didn't lie on any documents, did you?
15   A.   Never.
16   Q.   And you wouldn't do that?
17   A.   Correct.
18   Q.   And I believe you testified on direct you started playing
19   immediately your freshman year.  You were not a redshirt?
20   A.   That's correct.
21   Q.   And you played, in fact, at USC for all four years?
22   A.   Yes.
23   Q.   And you played in every single game your freshman year?
24   A.   Most every single game.  I mean, I had some injuries and
25   things like that, so maybe I missed a couple.
```

1           MR. FRANK:  Can we show the witness only Exhibit 8028,

2      please.

3      Q.   See all the games from freshman year, Mr. Walters?

4           MR. FRANK:  Actually, I believe this document is in

5      evidence so we can show the jury as well.

6      Q.   See all the games from your freshman year, Mr. Walters?

7      A.   Is this marking that I played in each game?

8      Q.   Does this refresh your recollection that you played in

9      each game freshman year?

10:18 10   A.   Yes.  Yes.  Okay.

11     Q.   And, in fact, you were a starter in most of those games,

12     correct?

13     A.   That is correct.

14     Q.   And you scored 34 goals during your freshman year?

15     A.   Sounds correct.

16     Q.   So it's fair to say you did, in fact, have an immediate

17     impact on the championship USC water polo team?

18     A.   Yes.

19     Q.   And, in fact, you played in just about every regular

10:19 20   season game during all four years that you were at USC?

21     A.   Yes.

22     Q.   And just like in high school, you were elected a captain

23     of the team during your sophomore year?

24     A.   Well, in college I was elected at the end of my freshman

25     year, as opposed to the end of my sophomore year.

```
 1   Q.   Even better.  And you served as a captain during your
 2   sophomore, junior, and senior years at USC?
 3   A.   That's correct.
 4   Q.   And you attended practices regularly?
 5   A.   Yes.
 6   Q.   And you attended strength training sessions?
 7   A.   Yes.
 8   Q.   And you attended team meetings?
 9   A.   Yes.
10:19 10  Q.   And by the way, those practices and other sessions were
11   limited to 20 hours a week under NCAA rules?
12   A.   Yes.
13   Q.   And Coach Vavic didn't exceed that number, did he?
14   A.   Not to my recollection.
15   Q.   If someone testified that he exceeded that number, that
16   would be inconsistent with your recollection, correct?
17   A.   I would need to hear more facts of which they're talking
18   about and when.
19   Q.   Well, you just testified that he didn't exceed that number
10:20 20  to your recollection, correct?
21   A.   To my recollection, but --
22   Q.   Okay.  So if somebody testified differently, that would be
23   different than your recollection; is that fair to say?
24   A.   Well, with all due respect --
25   Q.   Can you answer my question yes or no?  Would it be
```

```
 1   different than your recollection?

 2   A.   I don't know.

 3   Q.   You don't know?

 4   A.   Because if they're talking about in 15 minutes or like a

 5   de minimis amount, maybe.  But to my recollection, I think it

 6   was pretty much 20-hour weeks.

 7   Q.   Now, you testified that you recall Johnny practicing with

 8   the team before his concussion?

 9   A.   Yes.

10   Q.   And that was for about a week or two at the beginning of

11   the season, to the best of your memory?

12   A.   Yes.

13   Q.   And then you testified that you remember him practicing

14   with the team after his discussion (sic) just before the end of

15   the season?

16   A.   After his concussion you said?

17   Q.   After he recovered from his concussion just before the end

18   of the season.

19   A.   Oh.  Yes, yes.

20   Q.   Of the first season, correct?

21   A.   Uh-hum.

22   Q.   Now, you and I spoke yesterday, correct?

23   A.   That's correct.

24   Q.   And yesterday do you recall that I asked you if you

25   remembered him being there that first week and you told me that
```

1    he might have missed a day or two for class or something like
2    that?
3    A.   That's correct.  I said that.
4    Q.   Okay.  And you were testifying under oath yesterday as
5    well, correct?
6    A.   Yes.
7    Q.   And so that statement was true, correct?
8    A.   That's correct.
9    Q.   But you know that there's no class during the week of
10   August 19th at USC?
11   A.   I don't remember if there was or if there wasn't, but
12   there are orientations and things like that.
13   Q.   But there is no class during that first week, is there,
14   Mr. Walters?
15   A.   Maybe there's not.  Maybe not.
16   Q.   And you don't remember Johnny standing out in any way
17   during those classes -- during those sessions, correct?
18   A.   That's correct.
19   Q.   When I asked you about it yesterday, you said you didn't
20   think he was one of your passing partners at practice.  Do you
21   recall that?
22   A.   I recall, yeah.
23   Q.   Okay.  And then a few moments later you said he might have
24   been one of your passing partners, correct?
25   A.   Yes.  He may very well could have been.

1    Q.    But that was seven years ago?

2    A.    Yes.

3    Q.    So you couldn't distinctly remember passing the ball with

4    Johnny during those first two weeks, correct?

5    A.    Correct.

6    Q.    And Johnny was a redshirt, right?

7    A.    Yes.  I don't know if at the time -- I don't know when you

8    opt to redshirt, but it's prior to the first game.  So at that

9    time maybe he wasn't quite yet but he was going to be.  I don't

10:23 10   know.

11   Q.    You don't know one way or the other?

12   A.    I don't know.

13   Q.    Okay.  But in any event, in the pool you're divided up

14   based on your skill level?

15   A.    After warm up, yes.

16   Q.    And so the redshirts are on one end of the pool and the

17   traveling team is on the other end of the pool?

18   A.    Typically, unless they're needed for defense or offense in

19   certain situations to play against us, so we can practice plays

10:23 20   and things like that.

21   Q.    And you're aware, sir, that your practices are videotaped?

22   A.    Yes.

23   Q.    And you study those videotapes of practices?

24   A.    Yes.

25   Q.    And you can access them from the website when you want?

```
 1   A.   Yes.
 2   Q.   Have you seen any recordings recently of Johnny at
 3   practice?
 4   A.   Recently?
 5   Q.   Yes.
 6   A.   Like as in now?
 7   Q.   In preparation for your testimony today, have you seen any
 8   recordings of Johnny at practice?
 9   A.   No.  I haven't seen anything, any video.
10   Q.   So the defense hasn't showed you any recordings of Johnny
11   at practice?
12   A.   No.  I haven't seen anything, no.
13   Q.   But they are videotaped?
14   A.   Well --
15   Q.   Yes or no.  Are the practices videotaped?
16   A.   It's not a yes or no question.  Sometimes they are.  It's
17   when we have things that we need to study to work on plays.  So
18   we're not going to videotape our warmup or our swim sets.
19   Q.   Okay.  But practices are videotaped from time to time,
20   correct?
21   A.   From time to time, yes.
22   Q.   Okay.  And you're not aware of any videotape of Johnny at
23   practice?
24   A.   I didn't say that.
25   Q.   Are you aware of videotape of Johnny at practice?
```

```
 1   A.   There could be some.  I don't know.

 2   Q.   Are you aware of one?

 3   A.   I mean, he was at practice so he could have very well been

 4   videotaped.

 5   Q.   He could be made of green cheese, Mr. Walters, but are you

 6   aware of a videotape of Mr. --

 7              MR. KENDALL:  Objection, your Honor.

 8              THE COURT:  Sustained.

 9   Q.   -- of Mr. Wilson at practice?

10   A.   If there's --

11   Q.   Yes or no, are you aware of a videotape of Johnny Wilson

12   at practice?

13   A.   I haven't seen one.

14   Q.   Thank you.  Now, you testified that Johnny Wilson was

15   taken from practice to the emergency room after what you

16   witnessed in the pool, correct?

17   A.   Yes.

18   Q.   And you have a specific memory of him being accompanied to

19   the hospital by McQuin Baron?

20   A.   That's correct.

21   Q.   But you're the one testifying here today?

22   A.   That's correct.

23   Q.   And you remember that Johnny apparently vomited in the car

24   and you cleaned it up?

25   A.   Helped clean it up, yes.
```

 1    Q.    And you have a specific memory from seven years ago that

 2    Johnny left the pool wearing dark glasses and a hoodie,

 3    correct?

 4    A.    That's correct.

 5    Q.    You haven't spoken to Johnny in substance since January of

 6    2015, but you remember that on that day he was wearing a

 7    hoodie; is that your testimony?

 8    A.    That is.

 9    Q.    And you don't have any memory of any coaches with him when

10:26 10    he was taken from practice to the emergency room, correct?

11    A.    They didn't take him.  That's correct.

12    Q.    You don't remember Coach Vavic being with him?

13    A.    They may have seen him when he was out of the pool, but

14    they didn't go.

15    Q.    I'm asking what you observed.  Did you observe them with

16    him when he was taken from the pool?

17    A.    Yeah.  They saw him before he left and talked to him

18    probably.  I have a vague recollection of who talked to him.

19    Q.    You have a recollection of them being with him?

10:26 20    A.    On the pool deck, to walk out, they would have to pass by

21    the coaches.

22    Q.    I'm asking what you recall, not what you would have to

23    have happen.  Do you recall the coaches being with him when he

24    was taken from the pool deck?

25    A.    I recall the athletic trainer being with him.

```
 1   Q.   So you don't recall the coaches being with him?
 2   A.   That is correct.  I don't have a direct recollection of
 3   that.  Yeah.
 4   Q.   You don't recall Coach Vavic being with him when he was
 5   taken from the pool?
 6   A.   I recall -- I recall Coach Vavic talking to him briefly,
 7   just to see him before he left.  That -- I mean, it's a very,
 8   very vague recollection.
 9   Q.   Is that a new memory that you've recovered since yesterday
10   when we spoke?
11           MR. KENDALL:  Objection, your Honor.
12           THE COURT:  Overruled.
13   A.   It's -- now that I'm thinking about it, I mean, I can't
14   imagine --
15   Q.   I'm not asking for your imagination.  I'm asking for your
16   memory.
17   A.   Right.
18   Q.   Is it a new memory that you've recovered since yesterday
19   when we spoke and you were under oath?
20   A.   Yes.
21   Q.   Because you recall yesterday I asked you what were the
22   coaches doing.  Do you remember that question?
23   A.   Yes I do.
24   Q.   And do you remember answering me under oath "I don't
25   recall?"  Was that your testimony yesterday?
```

1   A.   Yes.

2   Q.   And I asked again, "Do you remember which coaches were

3   there?"

4   A.   I don't recall.

5   Q.   And you said, "I don't recall," correct?

6   A.   Correct.

7   Q.   And then I asked you again, "So you don't remember the

8   coaches attending to him at all?"  Do you recall that question?

9   A.   I believe I said I don't recall.

10:28 10   Q.   You said, "I don't have a specific recollection of it,"

11   correct?

12   A.   Yes.

13   Q.   So overnight you've recovered a memory of Coach Vavic

14   being there, correct?

15   A.   Well, you asked me a lot of questions.  I was thinking

16   about it a whole lot more after you'd asked.

17   Q.   And after we spoke, did you meet with defense counsel?

18   A.   No.

19   Q.   Really?  You haven't met with defense counsel since

10:28 20   yesterday?

21   A.   I said good morning to Andy this morning and that was all.

22   Q.   But after seven years your memory suddenly got better

23   overnight, correct, Mr. Walters?

24   A.   You could say that.

25   Q.   And do you remember Coach Moon being there?

```
 1    A.    No.  I don't recall.

 2    Q.    And you don't remember Coach Pintaric being there?

 3    A.    I don't recall.

 4    Q.    And you're aware that injuries at practice are documented,

 5    correct?

 6    A.    Yes.

 7    Q.    And you haven't seen any documentation --

 8    A.    I have not.

 9    Q.    -- about Johnny's injury at practice, have you?

10:29 10   A.    I have not seen any documentation.

11    Q.    And you're aware that vomiting after a concussion is a

12    pretty serious side effect, right?

13    A.    Yes, yes.

14    Q.    It indicates a pretty serious concussion, right?

15    A.    Yes.

16    Q.    And you haven't seen any medical records that mention

17    Johnny's vomiting, have you?

18    A.    I haven't seen any medical records.

19    Q.    And you haven't seen any records of Johnny being taken

10:29 20   from practice to the hospital, correct?

21    A.    Nothing documented.

22    Q.    But you're aware it would be documented?

23    A.    Yes.

24    Q.    Now, you're aware Andrew Mericle testified in this case

25    last week?
```

```
 1    A.    No.  I wasn't aware of when he testified.  I thought he --

 2    Q.    Are you aware he testified in this case?

 3    A.    I thought he was going to testify after me.  I didn't know

 4    he already testified.

 5    Q.    Who told you he was going to testify after you?

 6    A.    I believe -- I don't remember.  I don't know.

 7    Q.    Well, when did you find out he was going to testify?

 8    A.    There was talk when I spoke to --

 9    Q.    My question, sir, was when did you find out he was going

10    to testify?

11    A.    I'm trying to remember.  I don't remember when -- it must

12    have been after Wednesday of -- or around Wednesday of last

13    week, because it -- I don't know.

14    Q.    Mr. Walters, you remember what Johnny was wearing

15    seven years ago, but you can't remember a conversation you had

16    last week about finding out that Mr. Mericle was going to

17    testify?

18    A.    You wear sunglasses after a concussion because the lights

19    are really bright and --

20    Q.    I was asking about the hoodie.

21    A.    Oh.  Okay, well --

22    Q.    You remember the hoodie, right?

23    A.    Yes.

24    Q.    From seven years ago?

25    A.    Yeah.
```

1    Q.   But you don't remember when you found out that Andrew
2    Mericle was going to testify in this case?
3    A.   What I told you is it was sometime between Wednesday and
4    now.
5    Q.   And you don't remember who told you that?
6    A.   No.  I don't remember.
7    Q.   Was it Mr. Kendall?
8    A.   No.  It may be -- no.  It was not.
9    Q.   It was Mr. Tomback?
10:31 10   A.   No.
11   Q.   Was it Miss Papenhausen?
12   A.   I believe it was -- it may have been McQuin Baron.
13   Q.   May have been, but you're not sure?
14   A.   That's correct.
15   Q.   Well, who else have you been talking about your testimony
16   with?
17   A.   No one.
18   Q.   You're aware that Andrew Mericle was Johnny's roommate?
19   A.   Suitemate I knew, yes.
10:31 20   Q.   And you're aware that Andrew was also a redshirt on the
21   water polo team?
22   A.   Yes.
23   Q.   Do you know that he testified that he learned of Johnny's
24   concussion when he found him in his room with the lights off?
25   A.   I didn't know that, but okay.

```
 1   Q.   Do you know that he never mentioned anything in his
 2   testimony about Johnny being taken to the emergency room from
 3   practice?
 4   A.   Didn't know.
 5   Q.   Did you know that in his testimony he didn't mention
 6   anything about Johnny vomiting?
 7   A.   Didn't know.  I don't know his testimony.
 8   Q.   Fair to say that Andrew Mericle is closer to Johnny than
 9   you are?
10   A.   For sure.
11   Q.   And you testified that you haven't spoken with Johnny in
12   substance for seven years, correct?
13   A.   Since -- yeah.  Seven years, give or take, six years,
14   something like that.
15   Q.   And he never played in any games?
16   A.   That's correct.
17   Q.   And he practiced with the team for a few weeks at the
18   beginning of the season and a few weeks at the end of the
19   season?  That's your testimony?
20   A.   That's correct.
21   Q.   But you have specific memories of him being at practice
22   all those years ago?
23   A.   Yes, yes.
24   Q.   Now, yesterday, you recall I asked you who the other
25   freshmen on the team were?
```

10:32 (line 10)
10:33 (line 20)

          1    A.    Yes.

          2    Q.    And you gave me 14 names?  Do you recall that?

          3    A.    Yes.

          4    Q.    But, in fact, including you there were 22 freshmen on the

          5    team the first year, correct?

          6    A.    There were a lot of us, yes.

          7    Q.    So you didn't remember seven names?

          8    A.    Yes.

          9    Q.    And among the names that you forgot yesterday was Lachlan

10:33    10    Edwards, who played with you for four years.  Do you remember

         11    that?

         12    A.    Yes.

         13    Q.    Lachlan scored 31 goals as a freshman and was All-American

         14    as a senior?

         15    A.    Yes.

         16    Q.    But his name slipped your mind?

         17    A.    He didn't live in the dorms.  He lived off campus and was

         18    older and, you know, like 250 pounds, a huge guy.  I just never

         19    really looked at him as a freshman.

10:34    20    Q.    But you played with him for four years?

         21    A.    Yes.  I was close with Lachlan.

         22          MR. FRANK:  Your Honor, I object to the laugh track

         23    from the defense table.

         24          THE COURT:  Yeah.  Let's have no emotional reactions

         25    to questions.

```
 1    Q.    And you also forgot Ben Goncharenko?  Am I pronouncing
 2    that name correctly?
 3    A.    Something like that.  You did better than I would.
 4    Q.    Did better than you would, but you played with him for
 5    three years, correct?
 6    A.    He was a --
 7    Q.    Yes or no, you played with him for three years?
 8    A.    He left the team at some point.  I think it may have been
 9    two or three years.
10    Q.    Okay.  And he played 12 games as a freshman?
11    A.    Sounds right.
12    Q.    And you also forgot Chase Koplow, Steven Michaud, and Jake
13    Sanders, who all played on the team for two years, correct?
14    A.    That's correct.
15    Q.    But you remember practicing with Johnny Wilson even though
16    he missed most of the first season and quit the team after the
17    first semester and you haven't spoken with him since?
18    A.    Yes.
19    Q.    And you testified you're not close to Johnny or the
20    Wilson's, correct?
21    A.    That's correct.
22    Q.    But you're here today with a lawyer provided by
23    Mr. Wilson?
24    A.    That's correct.
25    Q.    That's Mr. Hoops over there?
```

```
 1    A.    That's correct.

 2    Q.    And you recall that yesterday when I asked you if you had

 3    any feelings about this case, Mr. Wilson's lawyers objected to

 4    the question --

 5          MR. KENDALL:  Objection, your Honor.

 6    Q.    -- and Mr. Hoops --

 7          THE COURT:  Overruled.

 8    Q.    -- instructed you not to answer that question about

 9    whether you had any feelings about this case.  Do you recall

10    that?

11    A.    I recall.

12          MR. KENDALL:  Objection, your Honor.  May we go to

13    sidebar?  This is the issue that --

14          THE COURT:  No.

15    Q.    Now you've known Coach Vavic for a very long time,

16    correct?

17    A.    Yes.

18    Q.    Since tenth grade in high school?

19    A.    Yes.

20    Q.    He coached your brother?

21    A.    Yes.  He's a celebrity in the sport.

22    Q.    Well, but you've known him since tenth grade personally,

23    correct?

24    A.    I met him the first time in tenth grade.

25    Q.    And he coached your brother?
```

1    A.    Yes.

2    Q.    And he coached you for four years throughout college?

3    A.    Yes.

4    Q.    And for those four years during the season you saw him

5    six days a week, several hours a day?

6    A.    That's correct.

7    Q.    And Coach Vavic has been supportive of you and your

8    family, correct?

9    A.    Yes.

10:36 10   Q.    And your parents were very involved with the water polo

11   team?

12   A.    They helped out, yes.

13   Q.    Fair to say they were very involved?

14   A.    Yes.

15   Q.    And you're good friends with Coach Vavic's son Marko?

16   A.    Yes.  He was my teammate.

17   Q.    And you're good friends with him?

18   A.    Yes.

19   Q.    And you're aware that Coach Vavic was fired from USC and

10:37 20   arrested in connection with this investigation?

21          MR. KENDALL:  Objection, your Honor.

22          THE COURT:  Let me see counsel at sidebar.

23              *** Beginning of sidebar ***

24          MR. KENDALL:  Your Honor, I remember the Court saying

25   that your Honor would like to see things before he just blurted

1    out in front of the jury.  I apologize.  This is *Ackerly* all

2    over again.  The same thing with *Ackerly*, he blurts it all out

3    when he knows he's not supposed to, your Honor.  He was on

4    notice that this court wanted to hear the witness, see the

5    testimony before you would make a ruling, and instead he just

6    takes it upon himself to blurt it out in front of the jury.

7        MR. KELLY:  We object, too, your Honor.  It was

8    deliberate.  And I think the case that they cited to you is not

9    the same.  The case that they cited to you, *Prange*, involved a

10:38  10   submission of an indictment to the jury of the same defendant

11   in the same case.  This is a different fact pattern.  So A, it

12   was deliberate.  And B, the case they cite is not on all fours,

13   so to the extent this is the instruction, it has to be

14   different from what they're proposing.  We do object to what he

15   just did on the *Ackerly* grounds.

16        MR. FRANK:  The issue in *Prange* was a coconspirator

17   who was charged in the same series of events.  It's exactly the

18   same situation here.  He's been identified throughout this case

19   as a coconspirator.  The notion that he's been arrested and has

10:38  20   pled not guilty is absolutely not prejudicial.

21        THE COURT:  I'm going to allow the government to

22   question him about this.  I am going to give a limiting

23   instruction to the jury.  If you have some specific objection,

24   Mr. Kelly, as to the wording of that objection off of that

25   instruction, I'll hear you.

             1          MR. KELLY:  Yes.  I would object to where it says

             2   "based, in part, on allegations related to the charges in this

             3   case".  That case involves a co-defendant where the issue in

             4   dispute is whether the Court can give the indictment to the

             5   jury.  It's not this issue now.  It's misleading to suggest

             6   that that case is this case.  It's not.

             7          MR. KENDALL:  It's two separate indictments.

             8          MR. KELLY:  Yeah.  It's two separate indictments in

             9   this case.  And so they can't be throwing that line in there

    10:39  10   because it's not accurate.

            11          THE COURT:  The line?

            12          MR. KELLY:  Where it says "based, in part, on

            13   allegations related to the charges in this case", that needs to

            14   come out.  It's --

            15          THE COURT:  Wait.

            16          MR. KELLY:  -- different matter.

            17          THE COURT:  Wait.

            18          MR. KELLY:  It's a totally different scenario at issue

            19   in this case.  That needs to come out because in that case it

    10:39  20   was the same indictment, same co-defendants.  This is a

            21   different indictment, different case.  So he's trying to

            22   suggest to the Court that this is on all fours.  It's not.

            23          THE COURT:  Mr. Frank?

            24          MR. FRANK:  This case has a much closer set of facts

            25   than in the *Prange* case where some of the defendants had very

little relationship with each other.  In this case, Mr. Wilson
is charged with bribing Mr. Vavic and Mr. Vavic is charged with
receiving a bribe from Mr. Wilson.  The fact that they're
charged in two separate indictments is of absolutely no matter.
The fact is it rises out of the same operative facts, it is the
same charge that they are charged with.  It's identical.
Identical facts.

MR. KENDALL:  Your Honor, if I may be heard.  I think
Mr. Frank is playing with fire and pushing the Court to a
new -- to a position you don't need to take.  We're almost at
the end of this case.  They've gotten in their case.  This is
wholly prejudicial what he's doing.  Why are we creating an
issue like this, your Honor?  It doesn't go to the correlations
of this case.

It's just saying Vavic got indicted, therefore the
jury should think something less.  This guy has testified he
has had no contact with Vavic at all since he graduated.  Vavic
sent a text saying would you talk to my lawyer and nobody ever
followed up.  He never spoke to the lawyer.  He never spoke to
Vavic.  He's testified he's much closer to Casey Moon than he
is to Vavic.  Your Honor, there is no -- to put in Vavic's
indictment and arrest, your Honor, when there's no basis to
think that's influencing this kid, I suggest, your Honor, is
highly prejudicial.

THE COURT:  The wording that Mr. Kelly says is that he

1    wants to put in "previously indicted" rather than "based, in

2    part, on allegations related to the charges in this case",

3    correct, Mr. Kelly?

4              MR. KELLY:  Yes.  That's a more fair representation.

5              THE COURT:  What is your objection to that, Mr. Frank?

6              MR. FRANK:  I have no objection to that, your Honor.

7              THE COURT:  That's what I'm going to do.  Thank you,

8    counsel.

9                        *** End of sidebar ***

10:42 10           THE COURT:  All right.  Before we continue, jurors, I

11   have an instruction for you.  During this testimony of

12   Mr. Walters, you have heard and perhaps will hear that

13   Mr. Vavic was previously indicted.  Mr. Vavic has pleaded not

14   guilty.  I remind you that indictments are not evidence and

15   that Mr. Vavic, like all charged defendants, is presumed

16   innocent until -- unless and until proven guilty.

17              I instruct you that you are not to concern yourself

18   with the guilt or innocence of Mr. Vavic and that the fact that

19   Mr. Vavic has been charged is relevant only for context in

10:42 20   assessing the credibility of Mr. Walters.

21              You may continue with your cross-examination,

22   Mr. Frank.

23              MR. FRANK:  Thank you, your Honor.

24   BY MR. FRANK:

25   Q.   I believe the question pending to you, Mr. Walters, was

1   whether you were aware that Coach Vavic was fired from USC and

2   arrested in connection with this investigation.

3   A.   Yes.  I was aware.

4   Q.   And you are aware that the defendant, Mr. Wilson, is

5   charged in this case with bribing Coach Vavic to recruit Johnny

6   Wilson based on a fake athletic profile?

7   A.   I was vaguely aware.

8   Q.   Vaguely?

9   A.   Yes.  I didn't know any details, did not know any of the

10:43 10   charges.

11   Q.   Okay.  But they sound familiar?

12   A.   Somewhat.

13   Q.   And Coach Vavic reached out to you just last week,

14   correct?

15   A.   Yes.

16   Q.   Right around the time that Mr. Wilson's lawyers called you

17   last week?

18   A.   That's correct.

19   Q.   And Coach Vavic reached out to you to ask you to speak

10:43 20   with his attorneys, correct?

21   A.   That's correct.

22   Q.   And you agreed to do so?

23   A.   Yes.

24   Q.   And fair to say you don't want to see Coach Vavic

25   convicted?

```
 1   A.   If he's found guilty, then that's what's right.  I don't
 2   have an opinion on whether he should be or shouldn't be.  I
 3   don't know any of the facts.
 4   Q.   So you've known Coach Vavic since you were in tenth grade
 5   and you don't have an opinion one way or the other?
 6   A.   I don't know the facts.
 7   Q.   And you don't have an opinion one way or the other?
 8   A.   Not until I know the facts.
 9   Q.   And speaking of the facts, you are aware that Coach Moon
10   testified last week in this case, correct?
11   A.   Yes.
12   Q.   And, in fact, prior to coming here today, you read an
13   article about his testimony?
14   A.   I read about half of an article about his testimony, yes.
15   Q.   You're aware of what he testified to.  Is that fair to
16   say?
17   A.   I -- just the quotes in the press article, yes.
18   Q.   Okay.  And that's the only article about this case you've
19   read?
20   A.   That's correct.
21   Q.   So it just happens that all the articles about this case,
22   that's the one you read about Coach Moon's testimony?
23   A.   Not a lot of articles about it, yes.
24   Q.   And then you spoke about that article, about his
25   testimony, with McQuin Baron, correct?
```

```
 1    A.   Yes.
 2    Q.   And that was after Mr. Tomback called you last week?
 3    A.   Yes.  It was that night.
 4    Q.   And Mr. Tomback didn't tell you that you're not supposed
 5    to speak to other witnesses?
 6    A.   He did tell me that.
 7    Q.   Oh, he did?  And you went ahead and did it anyway?
 8    A.   The conversation was brief, but yes.
 9    Q.   I didn't ask you what the conversation was, but you
10:45 10  disregarded his instruction and spoke with McQuin Baron,
11    correct?  Is that your testimony?
12              MR. KENDALL:  Objection, your Honor.
13              THE COURT:  Overruled.  He can explain himself.
14    A.   If I'm explaining myself, it was just --
15    Q.   I remind you, sir, that you're under oath and I've asked
16    you a yes or no question.
17              MR. KENDALL:  Objection.
18    Q.   Did you disregard the attorney's instruction and speak
19    with McQuin Baron about your testimony?  Yes or no?
10:46 20         MR. KENDALL:  Objection.  If he may answer.
21              THE COURT:  Let him answer.
22    A.   Okay.  I did disregard in a sense, but it was a very brief
23    conversation that I asked him -- I said.
24              MR. KENDALL:  Objection.
25              THE COURT:  He's not going to testify as to what
```

| | |
|---|---|
| 1 | Mr. McQuin said. |
| 2 | A.   The conversation -- |
| 3 | Q.   I don't think there's a question pending. |
| 4 | MR. KENDALL:  Your Honor, let him finish his answer. |
| 5 | THE COURT:  I'll let you go over that on redirect, |
| 6 | Mr. Kendall. |
| 7 | Q.   Did Mr. Tomback tell you that brief conversations with |
| 8 | other witnesses were okay? |
| 9 | A.   No. |
| 10:46 10 | Q.   You just decided that yourself? |
| 11 | A.   It's a rare occurrence you're asked to go to federal court |
| 12 | to testify. |
| 13 | Q.   You decided it was okay to disregard his instruction and |
| 14 | speak with another witness about your testimony, correct?  Yes? |
| 15 | A.   The plan was we were going to fly out together. |
| 16 | Q.   So he was going to testify also, correct? |
| 17 | A.   I don't know.  Supposedly he was going to. |
| 18 | Q.   You don't know? |
| 19 | A.   Well, he told me he was going to testify as well. |
| 10:47 20 | Q.   Okay.  And you discussed his testimony as well, correct? |
| 21 | A.   Just that he was asked to testify. |
| 22 | Q.   You discussed the substance of his testimony, as well, |
| 23 | correct? |
| 24 | A.   Very briefly. |
| 25 | Q.   And he's not here today, correct? |

```
 1    A.    He's not here today.

 2    Q.    And you're aware the defense is not calling him?

 3    A.    I don't know.  The defense is not calling him?  What do

 4    you mean?

 5    Q.    But Coach Moon, who did testify and whose testimony you

 6    read about, he's a hero of yours, correct?

 7    A.    I think that athletic profile that you had read was, it

 8    was meant as -- I don't know when that was written or who wrote

 9    it.  I don't recall writing that he was my hero in that

10:47 10   profile.  I don't know where that came from.

11    Q.    Let's take a look.  It's Exhibit 751 in evidence.

12          MR. FRANK:  Miss Lewis, can you take us to page 17.

13    Q.    There's you at the top of the page and Johnny Wilson at

14    the bottom of the page, correct?  Do you see that?

15    A.    It's moving a lot.  Hang on.  Where's the part of?

16          MR. FRANK:  Miss Lewis, can you highlight the

17    sentence?

18          Exactly.  Thank you.

19    A.    I didn't even say why he's my biggest sports hero.  I

10:48 20   don't know --

21    Q.    Mr. Walters, if you could just wait until I ask a question

22    and then the defense can ask you questions on redirect.  Fair?

23    A.    Sure.  Yes.

24    Q.    Did you list Casey Moon as your biggest sports hero?

25    A.    It appears so.  I don't remember doing so, but yes.
```

```
 1    Q.   Okay.  And in fact, you think Casey Moon is a great guy,

 2    correct?

 3    A.   Yes, I do.

 4    Q.   And you have nothing but respect for Casey Moon?

 5    A.   That's correct.

 6              MR. FRANK:  No further questions.

 7              THE COURT:  Any redirect, Mr. Kendall?

 8              MR. KENDALL:  Yes, your Honor.

 9              Do you have a hard copy of the exhibit you just showed

10:49 10    the witness?

11              MR. FRANK:  Are you talking about the transcript or

12    the --

13              MR. KENDALL:  No, the USC document.

14              MR. FRANK:  I do not.

15                   REDIRECT EXAMINATION OF JAMES WALTERS

16    BY MR. KENDALL:

17    Q.   Mr. Walters, have you told the truth today?

18    A.   Yes.

19    Q.   Do you have any reason not to tell the truth?

10:50 20    A.   No.

21    Q.   This conversation with McQuin Baron, how long have you

22    been friends?

23    A.   Since we were little kids, like 12 or 13 years old.

24    Q.   You played water polo for over 10 years together?

25    A.   That's correct.
```

|     |                                                            |
| --- | ---------------------------------------------------------- |
| 1   | Q.   How would you describe the closeness of the friendship? |
| 2   | A.   Well, we're best friends.  We lived together four years. |
| 3   | I've been closest friends with him since freshman year of high |
| 4   | school. |
| 5   | Q.   When we called you Wednesday night, did you already have |
| 6   | existing plans with Mr. Baron? |
| 7   | A.   McQuin was driving to my house as I got the call, for |
| 8   | dinner. |
| 9   | Q.   He was coming over to see you for dinner? |
| 10:50 10 | A.   That's right. |
| 11  | Q.   Did we indicate any knowledge that we thought the two of |
| 12  | you were meeting that night? |
| 13  | A.   No. |
| 14  | Q.   Okay.  What exactly did you say to Mr. Baron and did he |
| 15  | say to you that Mr. Frank was asking questions about? |
| 16  |          MR. FRANK:  Objection.  Hearsay, your Honor. |
| 17  |          THE COURT:  Sustained. |
| 18  |          MR. KENDALL:  Your Honor, he opened the door, your |
| 19  | Honor. |
| 10:50 20 |          THE COURT:  No. |
| 21  | Q.   Did you do anything with Mr. Baron to try to coordinate |
| 22  | testimony? |
| 23  | A.   No. |
| 24  | Q.   Did you do anything with Mr. Baron to try to falsify |
| 25  | testimony? |

```
 1   A.    No.

 2   Q.    Now, he raised issues of Coach Vavic.  Since you've

 3   graduated from USC, have you ever spoken to Vavic on the

 4   telephone?

 5   A.    No.

 6   Q.    Have you physically seen him?

 7   A.    I have seen him.

 8   Q.    Where did you see him?

 9   A.    I saw him at one of my teammate's funerals.

10   Q.    It was sad.  One of the young men passed away?

11   A.    Yes.

12   Q.    So there was a large group of people there?

13   A.    Yeah, very big.

14   Q.    Vavic was there and you were there?

15   A.    Yes, the whole team was.

16   Q.    And a hundred or more other people?

17   A.    Yeah.  It was on the baseball field.  It was a big

18   ceremony.

19   Q.    Okay.  Other than that funeral, have you seen Vavic in

20   person at all since graduation?

21   A.    No.

22   Q.    Okay.  He sent you a text last week after Casey Moon's

23   testimony, correct?

24   A.    That's correct.

25   Q.    And he asked if you'd talk to his lawyer?
```

```
 1   A.   He asked if I would, yes.

 2   Q.   Did you speak to his lawyer?

 3   A.   No, I did not.

 4   Q.   Did you speak to Vavic?

 5   A.   No.

 6   Q.   So since graduation, which has been how many years?

 7   A.   I've been graduated for three years now.

 8   Q.   Okay.  So in three years you had one text message after

 9   Casey Moon's testimony and one unplanned -- being in the same

10   funeral with Vavic, correct?

11   A.   That's correct.

12   Q.   Okay.  Would you lie in a court to help Coach Vavic?

13   A.   No.

14   Q.   Okay.  One other thing I want to ask is you testified

15   yesterday that you saw Johnny being taken out of the -- you

16   testified today that you saw Johnny being taken out of the pool

17   and obviously looking like he's not in his best condition?

18   A.   That's correct.

19   Q.   You're not testifying the concussion happened there, did

20   you?

21   A.   No, I'm not.  I don't know when that happened.

22   Q.   You just know that he went in the pool and he wasn't doing

23   well and he had to be taken to the hospital?

24   A.   That's correct.

25   Q.   Okay.  If Coach Moon testified that Johnny only attended
```

1    one practice on the first day on August 19, would that be

2    accurate testimony?

3    A.   I don't think so, no.

4         MR. KENDALL:  No further questions.  Thank you.

5         THE COURT:  Any recross?

6         MR. FRANK:  Very briefly, your Honor.

7              RECROSS EXAMINATION OF JAMES WALTERS

8    MR. FRANK:

9    Q.   You're aware, Mr. Walters, that a federal criminal trial

10:53 10   is serious business, correct?

11   A.   Yes.

12   Q.   You were asked whether you coordinated your testimony with

13   McQuin Baron, correct?

14   A.   Yes.  I was asked that.

15   Q.   And you testified that you didn't?

16   A.   That's correct.

17   Q.   But he told you what he was going to say and you told him

18   what you were going to say, correct?

19        MR. KENDALL:  Objection.

10:54 20        THE COURT:  Overruled.

21   A.   That's -- no.  That's not how it happened.

22   Q.   You discussed your testimony and he discussed his

23   testimony?  Is that what you're testifying?

24   A.   We discussed --

25   Q.   I didn't ask you anything other than that.  Yes or no, did

```
 1    you discuss your testimony?

 2    A.   Not my testimony.  We discussed the contents of why we

 3    were asked to be here.

 4    Q.   Is that different from what you testified to a few moments

 5    ago, sir?

 6    A.   Well, it seems like there's a big difference because we

 7    weren't talking about what we would be speaking about.  We were

 8    talking about we were asked if we remembered Johnny Wilson

 9    being on the team.

10    Q.   Do you recall telling me yesterday that you discussed his

11    testimony and you discussed your testimony?

12    A.   That's not what I said.

13    Q.   But you knew you weren't supposed to talk to him, correct,

14    about the case?

15    A.   That's correct.

16    Q.   And you did it anyway, correct?

17    A.   Yes, correct.

18    Q.   And you testified that you haven't spoken recently other

19    than that text last week with Coach Vavic, correct?

20    A.   That's correct.

21    Q.   But you did agree to speak with his lawyers?

22    A.   That's correct.

23    Q.   And after all these years he chose you to reach out to,

24    correct?

25              MR. KENDALL:  Objection.
```

 1              THE COURT:  Overruled.

 2    A.   Yes, seems so.

 3              MR. FRANK:  No further questions.

 4              THE COURT:  Thank you, Mr. Walters.  You may step

 5    down.

 6              THE WITNESS:  Thank you, your Honor.

 7              MR. KENDALL:  Your Honor, we call as our next witness

 8    Jack Bowen.

 9              (Jack Bowen, sworn.)

10:56 10         THE CLERK:  Thank you.  You may be seated.

11              And would you please state your name for the record,

12    spelling your last, and you may remove the mask if you like.

13              THE WITNESS:  My legal name is John Bowen.  I go by

14    Jack.  Last name is B-o-w-e-n.

15                   DIRECT EXAMINATION OF JOHN BOWEN

16    MR. KENDALL:

17    Q.   Good morning, Mr. Bowen.

18    A.   Good morning.

19    Q.   Do you like to go by Mr. Bowen or Coach Bowen?

10:57 20    A.   Mr. Bowen is fine, thanks.

21    Q.   Where do you live?

22    A.   Redwood City, California.

23    Q.   You flew out to join us just this weekend?

24    A.   Yes.

25    Q.   You're going back tomorrow?

1    A.    Yes.

2    Q.    What do you do for a living?

3    A.    I'm a philosopher.  I teach philosophy and ethics.  I

4    coach water polo.  I'm a writer.  I write books.

5    Q.    Okay.  And for the teaching and the coaching, where do you

6    do that?

7    A.    Menlo School in Atherton.

8    Q.    And how long have you been speaking at the Menlo and

9    coaching at the Menlo School?

10:57 10   A.    I've -- I'm in my 22nd year of coaching and I've taught

11   there for 16 years.

12   Q.    Where did you grow up?

13   A.    Coronado, California.

14   Q.    Is that near San Diego?

15   A.    Yes.

16   Q.    And fair to say that California seems to be the center of

17   water polo, at least at the high school, if not the college

18   level?

19   A.    Yes.

10:58 20   Q.    What is your connection to water polo?

21   A.    I played in high school extensively.  I went on to play at

22   Stanford.  I trained with the national team.  I was an

23   alternate on the '96 Olympic team and then I've been coaching

24   high school since then.  I coached for a few years with the

25   national team as an assistant and I run goalie clinics.

1   Q.   At Stanford, how did your Stanford team do?  When you were

2   at Stanford, how did the team do?

3   A.   Pretty well.

4   Q.   Why don't you tell us, your junior and senior year, how

5   well it did.

6   A.   We won the national championships my junior and senior

7   year.

8   Q.   Okay.  Was Vavic coaching USC at the time?

9   A.   Yes.

10:58 10   Q.   So you beat Vavic's team two years in a row?

11   A.   Yes.

12   Q.   Who was the MVP of the NCAA tournament for those

13   two years?

14   A.   My senior year it was myself and Wolf -- sorry -- Frank

15   Schneider and Jeremy Lester.  I actually don't remember the MVP

16   my junior year.

17   Q.   Okay.  And as a coach, when you've been at the Menlo

18   School, what awards have you received for coaching?

19   A.   I was chosen as the Positive Coaching Alliance Coach of

10:59 20   the Year, National Coach of the Year.  United States Water Polo

21   honored me as the National Coach of the Year.  CIF chose me as

22   one of the top 13 coaches in the state.

23   Q.   What does "positive coaching" mean?

24   A.   The Positive Coaching Alliance is about winning but

25   winning in the right way and actually focusing on the character

1    of the athletes, so it's a character-focused method of

2    coaching.

3    Q.   Is that an important part of your coaching approach?

4    A.   Yes.

5    Q.   And can you give us a few examples of it.

6    A.   Since day one, our team's motto has been "be your best".

7    I actually would say I borrowed this from Aristotle, or it's my

8    way of condensing a thousand pages of Aristotle into

9    three words, and focuses on truly being your best, not

11:00 10  necessarily the best, although that -- there tends to be some

11   cross over, but the focus is really on being good people, and

12   that translates then into water polo.

13          So it's everything from honoring your teammates and

14   honoring your school and honoring your community, and we do a

15   lot of community service.  And it's really, I think, the

16   athletes come to realize water polo's a little bit of a

17   catalyst for what I consider much bigger more important things

18   than water polo.

19   Q.   Okay.  What grades does the Menlo School have?

11:00 20  A.   There's a middle school.  The middle school is grade 6

21   through 8.  And then the Menlo School, the upper school, is 9

22   through 12.

23   Q.   Back when Johnny Wilson graduated in 2014, was it a co-ed

24   school, or just a boys school?

25   A.   Co-ed.

```
 1    Q.    And how big is the school?  How many kids in each grade?
 2    A.    There's about 150 per grade.
 3    Q.    In addition to teaching and coaching, did you do anything
 4    else at the Menlo School in a -- as a particular
 5    responsibility?
 6    A.    For about the first ten years I was the aquatics director.
 7    And then for about ten years I was the college athletics
 8    recruiting counselor for the athletic -- sorry -- the college
 9    recruiting department.
11:01 10    Q.    Outside of the Menlo School, do you do any coaching?
11    A.    I run national level goalie clinics.
12    Q.    And do you have your own club that you do in conjunction
13    with Menlo?
14    A.    Yes.  It's not exactly in conjunction with Menlo.  It's
15    run out of Menlo School and it's comprised of about 80 percent
16    Menlo students.
17    Q.    What is that club called?
18    A.    South Peninsula Water Polo.
19    Q.    SoPen?
11:01 20    A.    SoPen is the short name for it.  Yes.
21    Q.    S-o-P-e-n?
22    A.    Yes.
23    Q.    And when they call it Southern Peninsula, is it the
24    peninsula that is part of the geography of the San Francisco
25    area, or -- just so we understand the reference?
```

 1    A.    Oh.  Yes.  It's -- yes.  That's correct.

 2    Q.    Okay.  And how long have you been coaching the SoPen Club?

 3    A.    Since year one, 22 years.

 4    Q.    What's the time that people are part of SoPen?

 5    A.    The high school season, which is the Menlo school season,

 6    is during the fall, so August, September, October, November,

 7    and then the SoPen season is in the winter, so the end of

 8    November through the end of January.  And then there's another

 9    slightly more intense season in the summer that starts mid May

11:02 10   and runs through late July.

11    Q.    And what is SoPen's focus?  Is it competition or training

12    or what?

13    A.    We don't actually compete.  It's sort of a unique approach

14    to -- in winter, the best analogy I can give is it's sort of

15    like playing pick-up basketball.  Like athletes go to the gym,

16    so to speak, or come to the pool.  We work on a specific skill

17    and then we run the Court, to borrow a basketball terms.  So

18    it's a way to train in a pressure free environment.  You're not

19    trying to make the team.  You're not trying to make the travel

11:03 20   team.  You're allowed to make mistakes and it's not held

21    against you.  So it's primarily -- it's actually not primarily.

22    It's the only skills focused and chance to improve without the

23    pressure of competition.

24    Q.    Did Johnny Wilson participate in SoPen?

25    A.    Yes.

1    Q.    Throughout high school?

2    A.    Yes.  Pretty much every Menlo player does.

3    Q.    Okay.  And in addition to being on SoPen, was Johnny on

4    another club?

5    A.    He participated with Stanford's -- the Stanford Water Polo

6    Club at Stanford.

7    Q.    Did you ever coach at Stanford?

8    A.    For one year I think in the early 2000s I did.

9    Q.    Okay.  What is the -- what is the sort of -- back in the

11:03 10    2010 to 2014 time period, what was the quality or the level of

11    play at the Stanford Club?

12    A.    Stanford's a high level club.  I mean, they've been

13    consistently -- we'll say top eight in the United States to be

14    safe.  Occasionally they win -- I mean, occasionally they're

15    number one.  It's hard for me to know exactly where they were

16    in 2010 to 2014.  Very high in level nationally ranked club.

17    Q.    Back in that time, 2010 to 2014, who were the coaches or

18    people running the Stanford Club that you're familiar with?

19    A.    Jon Barnea, who's the assistant coach of the Stanford

11:04 20    University team, has overseen the Stanford Club team and he has

21    coached it quite a bit, but they also hire out local high

22    school coaches.  So, again, it would be hard for me to know

23    exactly who the coaches were at the time, because they tend to

24    change year by year, but he would have overseen and likely

25    coached quite a bit at that time.

```
1    Q.    Do you know Clarke Weatherspoon?

2    A.    Yes.

3    Q.    Who is Clarke Weatherspoon?

4    A.    Clarke Weatherspoon, he teaches at a small private school

5    in San Francisco, but he has coached, up until very recently,

6    at Stanford's Club.  I would say a very respectable coach,

7    coaches similar style to the way that I do and he focuses a lot

8    on character, but he's also an exceptional water polo coach.

9    Q.    Do you look anything like that Jon Barnea?

10   A.    That's difficult.  Not really.

11   Q.    He has a full head of hair, doesn't he?

12   A.    He sure does.  Thank you.

13   Q.    Do you look anything like Clarke Weatherspoon?

14   A.    I do not.

15   Q.    Okay.  Clarke Weatherspoon is African-American, isn't he?

16   A.    He is.

17   Q.    There's no way anybody would mistake you for either one of

18   them, correct?

19   A.    Correct.

20   Q.    Now, how do you know Johnny Wilson and his family?

21   A.    Well, I know Johnny having been his coach for seven years.

22   Q.    What grade did you start coaching Johnny?

23   A.    Sixth grade.

24   Q.    And how did he come over to the water polo program?

25   A.    That would be hard to remember back to how or why he
```

1   started playing in sixth grade.  We have a middle school that's

2   a very robust athletic department in our middle school and it

3   offers swimming in the fall.  And then it's a four-quarter

4   system and then water polo for the remaining three quarters.

5   Q.   Do you recall if he was on the swim team first?

6   A.   I don't.

7   Q.   Okay.  But you started coaching him in sixth grade, his

8   first year at the Menlo School, correct?

9   A.   Yes.

11:06 10   Q.   And you coached him through his senior year?

11   A.   Yes.

12   Q.   Have you met Johnny's parents?

13   A.   Yes.

14   Q.   Do you see his father?

15   A.   He's right there, yes.

16        MR. KENDALL:  Let the record reflect he's correctly

17   identified John Wilson, your Honor.

18        THE COURT:  It may so reflect.

19   Q.   When Johnny was at the Menlo School, did you see his

11:06 20   parents often at water polo events?

21   A.   Yes.

22   Q.   Did they go to practices?

23   A.   No.

24   Q.   Did they go to games?

25   A.   Yes.

```
 1    Q.    Okay.  And were they often at games?

 2    A.    They came to a lot of games from what I recall.

 3    Q.    Okay.  And do you remember at some point the father moved

 4    to Europe --

 5    A.    Yes.

 6    Q.    -- and he was away a bit?  And Johnny was actually living

 7    with a family friend?

 8    A.    Yes.

 9          MR. KENDALL:  Okay.  I'd like to show the witness

11:07 10    Exhibit 7968A, please.

11    Q.    Do you recognize this exhibit?

12    A.    Looks like an e-mail from me.

13    Q.    Okay.  If you take a look at the date and the subject

14    line, can you tell us if you recognize this as something you

15    sent?

16    A.    Yes.

17    Q.    Okay.  And you sent it to -- who did you send it to?

18    A.    Looks like a team of parents that might have been like the

19    senior -- the parents of seniors or juniors.

11:08 20    Q.    Okay.  And is that Leslie Wilson's e-mail among the

21    people?

22    A.    Yes.

23          MR. KENDALL:  Okay.  Your Honor, I'd look to offer

24    Exhibit 7968A, please.

25          MR. FRANK:  Objection.  Hearsay.
```

1          MR. KENDALL:  Not for truth of the matter, just to

2     show it was sent, your Honor.

3          MR. FRANK:  Same objection.

4          THE COURT:  The objection is sustained.

5     Q.   Okay.  Did you ever have any contact with the Wilson's

6     apart from actual games and practices?

7     A.   Very little.  I mean, our water polo team I call our water

8     polo family, and so I do occasionally interact with parents and

9     we have -- they hosted a team dinner one night and the whole

11:08 10    team was at their home, so occasionally.

11    Q.   Do you remember they once -- Mrs. Wilson once helped

12    organize a baby shower for your wife?

13    A.   Yes.

14    Q.   Okay.  Once in a while, he gave you some tickets to a

15    baseball game?

16    A.   Giants games, yes.

17    Q.   Other than that, did you ever have any hospitality from

18    the Wilsons?

19    A.   Aside from the team dinner, no, and those things, no.

11:09 20    Q.   Okay.  How good was the Menlo School water polo team in

21    the 2010 to 2014 period?

22    A.   We won league, which is a relatively small league.  We won

23    league.  We were top five in CCS, which is a much larger

24    section.  I would put us roughly 25th to 15th in the country

25    depending on the year.

1    Q.    One of the top 15 to 25 teams in the country?

2    A.    Yes.

3    Q.    Okay.  And you said the CCS.  What is CCS?

4    A.    It stands for Central Coast Section.  It's the section of

5    teams from like Monterey up to San Francisco, all down the

6    peninsula.  It's about 150 schools.  I don't know the exact

7    number of schools, but it's the big section title that everyone

8    is essentially fighting for.

9    Q.    And there's 150 water polo teams in that CCS section

11:10 10    roughly?

11    A.    I don't know.  The reason I don't know is we only play the

12    top 20 of those teams, so I really don't know how many teams

13    are outside of the top 20.

14    Q.    And typically, how was the Menlo team doing in CCS from

15    2010 to 2014?

16    A.    Top five.  We finished top five whether it was quarter

17    finals, semifinals, finals at some point in all four of those

18    years.

19    Q.    Okay.  So you started coaching Johnny Wilson in sixth

11:10 20    grade on a middle school team, correct?

21    A.    Yes.

22    Q.    What did you observe about his skills and abilities during

23    his middle school years as a water polo player?

24    A.    He was exceptionally fast, which is a huge, especially

25    early on, when a lot of athletes are not so fast.  So he was

1      able to just separate himself completely from everyone.  I

2      think water polo was very easy for him initially because of

3      that.

4      Q.   How was his stamina, his ability to last in a game?

5      A.   Outstanding.

6      Q.   Is that important, speed and stamina for a water polo

7      player?

8      A.   Extremely.

9      Q.   Okay.  Was he both on the swim team and the water polo

11:11 10   team during middle school?

11     A.   I would be surprised if he wasn't on the swim team.  I

12     just can't remember because I wasn't so involved and I don't

13     have a recollection of that.  He was on the water polo team.

14     Q.   Okay.  And then you coached him through four years of high

15     school?

16     A.   Yes.

17     Q.   How would you characterize him as a high school player?

18     A.   Boy, so Johnny, who I have very fond memories of, was --

19     again, the speed factor, people start to catch up.  Athletes

11:12 20   start to catch up on speed, and despite that, he would still

21     continue to separate himself, even at this high level.  And in

22     part, because he was sort of a -- he was like a quiet grinder

23     is the best.  I would give guys -- and sometimes part of being

24     your best is being pushed to failure and seeing what you do.

25     Do you complain?  Do you yell at your teammates?  And Johnny

was the kind of guy who I couldn't get to crack.  I would say

do this impossible swim set and he would put his head down and

do it.

And so that sort of focus led to the way that he

played the game.  He was a -- sort of a nonstop constantly

moving -- he was a driver.  So that meant after you swim the

length of the pool, you then are expected to do this really

explosive drive, which I -- whether or not this is relevant, I

was the goalie and I feel like what Johnny and those athletes

do is just miserable.  It doesn't look like any fun to me at

all and Johnny was willing to do the really miserable part of

water polo and he kind of did it quietly.  So you know, quiet

grinder is the best way I could summarize him in a nutshell.

Q.   What does grinder mean?  What do you mean when you use the

word "grinder"?

A.   What do I mean?  I mean that he's got the fortitude to

just put your head down and swim these very challenging

difficult sets without stopping, without complaining, to just

get it done.  Whereas a lot of young players stop, they come up

with excuses, my goggles are loose, I need to get some water, I

forgot to call my mom, he just went in and did these sets

consistently.

MR. KENDALL:  Your Honor, this might be a good time

for the break.

THE COURT:  Yes.  We will take the morning recess for

|       |                                                                  |
|-------|------------------------------------------------------------------|
| 1     | 15 minutes.                                                      |
| 2     | Jurors, we will be in recess for 15 minutes.                    |
| 3     | THE CLERK:  All rise for the jury.                              |
| 4     | (Jury exits.)                                                   |
| 5     | THE COURT:  Be seated, counsel, please.                        |
| 6     | You may step down for the time being, Mr. Bowen.               |
| 7     | How much longer on direct?                                       |
| 8     | MR. KENDALL:  It will be past noon, your Honor.                 |
| 9     | Whether it's 40 minutes or an hour I can't predict, but we're   |
| 11:15 10 | going to take him past 12 o'clock certainly.  For the direct, I |
| 11    | expect I will be done by 1:00, but it will be sometime between  |
| 12    | 12:00 and 1:00                                                   |
| 13    | THE COURT:  And cross?                                          |
| 14    | MR. FRANK:  And based on what's happened so far, not           |
| 15    | that much, but I don't know what's going to happen.            |
| 16    | THE COURT:  And after Mr. Bowen, Mr. Kendall?                  |
| 17    | MR. KENDALL:  We have some documents to present, but           |
| 18    | no other witnesses.                                             |
| 19    | THE COURT:  And from the defendant Abdelaziz?                  |
| 11:15 20 | MR. KELLY:  Nothing further from Abdelaziz.                    |
| 21    | THE COURT:  So the defendants will be resting today?          |
| 22    | MR. KENDALL:  Hopefully.                                        |
| 23    | THE COURT:  Yes, Mr. Frank?                                     |
| 24    | MR. FRANK:  If the documents that Mr. Kendall is              |
| 25    | referring to are the ones that he marked as exhibits over the  |

1    weekend, we have the same objection to all of them that we've

2    had to all of the ones he's previously presented, your Honor.

3         THE COURT:  How many of them are there?

4         MR. KENDALL:  Well, there's a few that the Court

5    allowed in, so we need to present those, your Honor, from your

6    ruling earlier today.  And then most do not have to be done in

7    front of the jury, so I don't have a good number for you.  Most

8    of them we can just do without the jury's presence.

9         THE COURT:  All right.  We're in recess for

11:16 10   15 minutes.

11        THE CLERK:  All rise.

12        (Recess taken 11:16 a.m. to 11:41 a.m.)

13        (Jury enters.)

14        THE COURT:  Good morning again, jurors.  Are you ready

15   to resume?

16        Mr. Bowen, you are reminded you remain under oath.

17        THE WITNESS:  Yes.

18        THE COURT:  You may remove your mask if you choose to,

19   and Mr. Kendall you may continue with direct examination.

11:41 20        MR. KENDALL:  Thank you.

21   BY MR. KENDALL:

22   Q.   Mr. Bowen, before we took the break, you used the phrase

23   "a driver."  Can you tell us, what is a driver?

24   A.   In water polo you have a center, a center forward, center

25   defender, goalkeeper.  Essentially everyone else is a driver.

1    Sometimes left-handed players are just called left-handed

2    players.  The drivers do everything else.

3              In basketball it's somewhat akin to a point guard.

4    They're driving through the offense, trying to clear out space,

5    trying to earn what's called ejections where a defender attacks

6    you illegally, and if they can, get the ball close to the goal

7    for a goal-scoring opportunity.

8    Q.   What is a swim-off in water polo?

9    A.   We call it a sprint, and it's actually how every quarter

11:41 10  starts.  So the game starts and all four quarters start, the

11   referee has the ball at the edge of the pool, and six players

12   from each team are lined up at the goal line.  And on the

13   whistle, the players sprint -- the two players closest to the

14   edge of the wall where the referee is are the sprinters.  The

15   referee drops the ball, and the first person to get it, that's

16   how the game starts and they're on offense.

17   Q.   And did Johnny ever play that role of being the sprinter?

18   A.   Yes.

19   Q.   Did he do it his sophomore or junior year or senior year?

11:42 20  A.   He would have been our primary sprinter all three of those

21   years.  Again, I can't say exactly how many times he sprinted,

22   but he absolutely would have played that role.

23   Q.   Does that mean he was the fastest person on the team those

24   years?

25   A.   Not necessarily.  I happen to know he was the fastest

because I had his times.  Sometimes the sprinter is the one who
reacts better to the whistle.  But he happened to also be the
fastest.  It helps to be the fastest.

Q.   Did you keep records of how fast people were on the team
in their performances and various physical activities?

A.   Yes.

Q.   And what type of records did you keep and how did you make
them?

A.   So during our preseason we run a number of sets, and we
then rank all the players, and they get a power ranking at the
end.  So on day one we do a 200 freestyle, which is eight laps,
so 200 meters freestyle for time.  Then we do some -- we
actually do the same test sets that the Olympic team did when I
was on the Olympic team, again the field players not the
goalies, but I borrowed them from the Olympic team.  And we do
ten 25s, which is a one-length sprint on 30 seconds.  So you're
getting about ten seconds rest.  We would do sixteen 75s on
120.

        I'm happy to explain the intervals if you need me to,
but there's just different lengths of swimming where we would
take all the times and average them and then you would have
your power ranking at the end of the preseason.

        So it was -- it's a little bit of an internal
competition.  Players give them an external reward to push
themselves even more.  Bust it's also helpful for me to

1    understand where the various players' respective fitness levels

2    are.  Are they more endurance based?  Are they more speed

3    based?  Can I keep them in for an entire quarter?  So it played

4    a role of both internal competition, which actually helped them

5    condition optimally, as well as some information for me as

6    their coach.

7              MR. KENDALL:  Could we show the witness only Exhibits

8    9928, please, and since we can get two on the screen, we'll do

9    9929.

11:44 10   Q.    Do you recognize those?

11   A.    Yes.

12   Q.    And what are they?

13   A.    These are my excel spreadsheets that I used to track times

14   and rankings.

15   Q.    And are they from when Johnny was on the team?

16   A.    Yes and yes.

17             MR. KENDALL:  Your Honor, I'd like to offer

18   Exhibits --

19   Q.    And did you create these yourself?

11:44 20   A.    Yes.

21   Q.    Did you have personal knowledge of the times and rankings

22   that were entered there?

23   A.    I'm the only one who has access to these, so yes.

24   Q.    These are things you keep in the ordinary course of being

25   a coach at the Menlo School?

1    A.    Yes.

2          MR. KENDALL:  Your Honor, I'd like to offer 9928 and

3    9929 into evidence.

4          MR. FRANK:  No objection.

5          THE COURT:  They will be admitted.

6          (Exhibit 9928, 9929 admitted into evidence.)

7          MR. KENDALL:  If we could show the jury those two

8    copies, please, these two exhibits together.

9    Q.    If we take a look at 9929, at the top we see "Johnny."  Is

11:45 10   that John Wilson, Johnny Wilson?

11   A.    On the fourth line, yes, yes.

12         MR. KENDALL:  That's the 2013 preseason.  Can we go to

13   the other one first, please, Mr. Carter.

14   Q.    Do you see Menlo's water polo times?

15   A.    Yes.

16   Q.    You see "Johnny" at the top?

17   A.    Yes.

18   Q.    Is that Johnny Wilson?

19   A.    Yes.

11:45 20   Q.    You had another player on the team named John Wilson,

21   correct?

22   A.    Correct.

23   Q.    Was Johnny this John Wilson's son, and John was the other

24   person; is that how you kept them apart?

25   A.    That's correct.

|   | |
|---|---|
| 1 | Q.   You have them down as one under the 200.  What does that |
| 2 | mean? |
| 3 | A.   That's the 200 freestyle.  So when we come back, the very |
| 4 | first thing we do is a 200 freestyle.  That's the eight lengths |
| 5 | as fast as you can go. |
| 6 | Q.   Okay.  And what does the number one thing mean? |
| 7 | A.   He was the fastest on the team. |
| 8 | Q.   Okay.  And if we go all the way over to the right side |
| 9 | where it says "Ranked 4," what does that mean? |
| 11:46 10 | A.   So if you look and you see Johnny's averages, average to |
| 11 | 5.5.  So I guess on average that means he finished about fifth |
| 12 | or sixth in every test set that we did.  And only three players |
| 13 | had a better average than him. |
| 14 | Q.   Okay.  And this is his sophomore year? |
| 15 | A.   Let's see. |
| 16 | Q.   If you take a look the other exhibit, 2013.  Is '13 his |
| 17 | senior year? |
| 18 | A.   Boy, you're taxing my memory here. |
| 19 | Q.   If I suggest to you he graduated in May 2014. |
| 11:47 20 | MR. FRANK:  Your Honor, I object to coaching the |
| 21 | witness. |
| 22 | THE COURT:  Overruled. |
| 23 | MR. KENDALL:  Your Honor, that's in evidence already. |
| 24 | Q.   If we assume he graduated in May 2014 -- |
| 25 | A.   Yes, if he graduated in May 2014 -- I don't have my |

1    players' graduation dates memorized -- then 2013 would be his

2    senior year.

3    Q.    Okay.

4    A.    I don't see a date on this.

5    Q.    Okay.  I want to show you next Exhibit 9929 -- 9928.  9929

6    is 2013.  And 9930, if you could take a look at 9930.

7            Do you see that's 2012?

8            MR. KENDALL:  If we could take that down.

9    Q.    2012, we see "Wilson" down in one, two -- third, fourth,

11:48 10   correct?

11   A.    Correct.

12   Q.    So that's his junior year?

13   A.    Correct.

14   Q.    2013 is his senior year?

15   A.    Correct.

16   Q.    And that other document we had would be what?  He's on the

17   varsity three years?

18   A.    Correct.

19   Q.    So that would be the sophomore year?

11:48 20   A.    Sophomore or junior year.  I'd need my -- it's sophomore

21   or junior year for sure.

22   Q.    So 2012 is what year for him, if 2013 is his senior year?

23   A.    He graduated in 2014.

24   Q.    Right.

25   A.    So that means when we say the year he played would be

1    2013.

2    Q.    For the senior year?

3    A.    He would play in the fall.  That would be his senior year.

4          The fall of 2012 would be his junior year.  And the

5    fall of 2011 would be his sophomore year.

6    Q.    Okay.  So we have right in front of us right now 2012

7    stats for Exhibit 9930.  That's his sophomore year?

8    A.    By my math -- again, this is hard for me to do without

9    everything in front of me -- that would be his junior year.

11:49 10    Q.    Excuse me, his junior year.  I'm sorry, I confused it.

11    Yes.  Junior year.

12          So what do you see for this record on his junior year

13    2012 stats?

14    A.    So the way that I organized this --

15          MR. KENDALL:  Before I ask any more questions, I

16    should move to admit them.  I move to admit Exhibits 9928 --

17          THE COURT:  9928 and 29 have already been admitted.

18          MR. KENDALL:  9930, please, your Honor.

19          THE COURT:  9930 is admitted.

11:49 20          (Exhibit 9930 admitted into evidence.)

21    Q.    So what can you tell us about the statistics here in 9930

22    where it says "Wilson"?

23    A.    The way that I organize the statistics, tier one teams are

24    on the left.  You can see there were 19 tier one teams.  Then

25    tier two teams are on the right.  We, unfortunately, just by

       1    way of tournament seatings and leagues, sometimes we have to
       2    play teams where there's a great disparity.  We could
       3    essentially, if we went full throttle, beat them 50 to nothing
       4    and we don't.  And so I put those teams on the right as tier
       5    two teams.
       6          The remainder of tier one teams are teams that
       7    essentially we have to go at 100 percent all out.  These are
       8    the top teams in the country.  So these are the statistics that
       9    I'm most interested in.  And so what I see here against those
11:50 10    top teams -- so first of all, you see I keep track of every
      11    minute that every athlete plays.  So Johnny played the second
      12    most number of minutes.  That's the 467.  The team captain that
      13    year was a senior.  His name is Alexander Carlisle.  He's the
      14    only one who played more.  And then Chris Z there played for
      15    439 minutes.  He ended up playing and having a very nice career
      16    at Princeton.  So he played the second most number of minutes
      17    and --
      18    Q.   He's got 34 steals.  He's number two in steals.  What does
      19    that indicate?
11:51 20    A.   Yeah, so steals is, it's a defensive statistic, which it's
      21    actually one of my favorite statistics because it's typically
      22    not highlighted by the press, and it shows a commitment to our
      23    team defense.  All it means -- again, similar to basketball, if
      24    that's more familiar for most people.
      25          It means that you were marking your player.  You're

1    doing what's expected of you, but you're also aware of where

2    the ball is, where the other players are, where the other team

3    wants the ball to go.  So it requires that you're not just in

4    the correct position, but typically in water polo that you have

5    your hips in the correct position and that you're able to read

6    what the other player is doing to take the ball away from them.

7    Q.   So his junior year he's the player with the second highest

8    number of minutes in the game, correct?

9    A.   Correct.

11:51 10   Q.   And what does that indicate?

11   A.   Endurance for one, but, as I've said to my own team before

12   and when we're at preseason, being fast alone or having good

13   endurance alone doesn't mean you're good at water polo.  We've

14   had some phenomenal swimmers who didn't -- they just weren't

15   good at water polo.  They were just very fast.  So it's a

16   combination.  Absolutely it speaks to more of his endurance

17   than his speed but also his water polo IQ.  I mean, he wouldn't

18   play those minutes against that level of teams if he weren't

19   that level of player.

11:52 20   Q.   I take it it's your decision how many minutes each player

21   gets?

22   A.   Yes.

23   Q.   If we can go back to Exhibit 9928, please.  You see here

24   Johnny is their number one in the 200.  What do these other

25   metrics indicate?

1    A.   So these are test sets that I mentioned.  So I'm happy to

2    go through all of them or just use five 300s as an example.  So

3    the one adjacent to the 200 for time is five 300s.  So we swim

4    at 300, which is 12 laps, on a five-minute interval.  So you're

5    going all out.  As you can see here, Johnny got a time of 408.

6    So he would swim all out for about four minutes and then rest

7    for about a minute and do that five times and average it.

8    Q.   Okay.  And then 12 by 100, he's number two.  What does

9    that indicate?

11:53 10   A.   The interval on that is two minutes.  So you swim 100

11   yards, which is one, two, three, four laps, on a two-minute

12   interval.  So, as you can see, Johnny averaged a 110.  And that

13   means he swam about as hard as he could for a minute, ten

14   seconds, at basically a sprint pace and then would get about 50

15   seconds rest.

16   Q.   And he's the second best on the team on that?

17   A.   Yes.

18   Q.   And then the 10 by 25 where he's number one, what does

19   that indicate?

11:53 20   A.   That's more of a speed focus.  That is, it tests more the

21   anaerobic conditioning system.  We are swimming one lap, just

22   one sprint, and it's on 30 seconds.  So again here he's

23   swimming at about 13 seconds.  So he's getting about 16, 17

24   seconds rest and then going again, and it's ten of those.

25   Q.   Okay.  And based upon the other teammates that are on this

1   list, can you tell what year this is for Johnny?

2   A.   Boy, I would guess sophomore year.

3   Q.   And how many other sophomores his sophomore year were

4   playing in the varsity games?

5   A.   If I had -- I would say he's the only one on this list.

6   Q.   Okay.  And his senior year he got a concussion in the

7   middle of the year, didn't he?

8   A.   Yes.

9   Q.   And he was out for part of the season?

11:55 10   A.   Yes.

11   Q.   Even though he got a concussion, did he get any particular

12   awards his senior year?

13   A.   Well, our team, first of all, we don't -- I don't give

14   awards.

15   Q.   I'm talking about -- what's the Peninsula Athletic League?

16   A.   Oh, PAL, yes.  Thank you.  The Peninsula Athletic League

17   does give awards.  That's the league that oversees the play,

18   and then at the end of the year the coaches meet and they

19   discuss who the top players are, and that's how they determine

11:55 20   it.

21        The terminology is first team all league, second team

22   all league.  And what that means is it's not an actual team.

23   It's just a designation for, the first team are essentially the

24   top seven players and goalie.  It varies year to year.

25   Sometimes it's six players, sometimes it's eight, but the top.

1    And then the next best seven players are called second team,

2    and then sometimes there's a third team and there's an

3    honorable mention.

4         MR. KENDALL:  If we could show the witness only 8003,

5    please.

6    Q.   If you could look at this e-mail and go through it,

7    particularly the second page of it, and tell us if you

8    recognize it.

9    A.   It looks like an e-mail I had written, yes.

11:56 10   Q.   And who did you send this e-mail to?

11   A.   To Leslie and John, his parents.

12   Q.   Okay.  And this was back when Johnny was playing his

13   senior year?

14   A.   November of 2013 would be his senior year season, end of

15   his senior year season, yes.

16         MR. KENDALL:  Your Honor, I offer this into

17   evidence.

18         MR. FRANK:  Objection, hearsay.

19         THE COURT:  Sustained.

11:56 20   Q.   Okay.  What team did he make for all league at the

21   Peninsula Athletic League his senior year?

22   A.   First team.

23   Q.   First team.  So that means he was one of the top six or

24   seven players in the league?

25   A.   Yes.

Q.   And he made it even though he missed a significant amount

of playing time from his concussion?

A.   He missed playing time for his concussion and also earned

first team all league.

Q.   So he played fewer games than a lot of the other people,

but he was still one of the top players in the league?

A.   He played fewer games and was still selected to all

league, yes.

Q.   Who picks the all league at PAL?

11:57 A.   It's the coaches of the teams in the leagues.

Q.   So it's not just you; it's the coaches you're playing

against?

A.   Correct.

Q.   How important -- during Johnny's junior and senior year,

how important was his speed for him to be a water polo player?

A.   Speed in general is exceptionally important.  I mean,

it's -- again, I use basketball because people tend to be more

familiar with basketball, especially on the east coast.  If you

can get down the court faster than the defender next to you,

11:58 then you're closer to the basket.  So speed is exceptionally

important.

Q.   And how would you describe his speed up until the time he

got the concussion senior year?

A.   Well, thankfully we have the data to show that he was

arguably the fastest player on the team and also one of, I

```
  1    would say one of the fastest in the league.  I don't have
  2    evidence to prove that, but --
  3    Q.    That's what you observed --
  4    A.    Yes.
  5    Q.    -- from being at the games?
  6              And do college coaches give much weight to a player
  7    having that type of speed relative to others?
  8              MR. FRANK:  Objection, hearsay.
  9              THE COURT:  Sustained.
11:58 10   Q.    Have you been involved in much college recruiting in your
 11    water polo career?
 12    A.    Yes.
 13    Q.    Okay.  How many recruiting calls do you do in a typical
 14    year as a coach at Menlo?
 15    A.    I feel like in the last month I've had, I don't know, 50.
 16    Q.    Would that be typical for a season over the last ten
 17    years?
 18    A.    Yes.
 19    Q.    You have well in excess of 50 recruiting calls with
11:59 20   college coaches every year?
 21    A.    Oh, more than that.  I'm saying in the last month.
 22    Q.    Okay.  Typical season or typical year, how many recruiting
 23    calls do you have with coaches?
 24    A.    Including e-mails or just phone calls?
 25    Q.    Contacts where you're discussing candidates with coaches.
```

1   A.   500.

2   Q.   500 during a year?

3   A.   Yeah.

4   Q.   And is that with just about your athletes or about other

5   athletes as well?

6   A.   Both.

7   Q.   Coaches want your opinion of people you played against?

8   A.   Correct.

9   Q.   Okay.  Based upon all this experience, how important was

11:59 10   speed like Johnny's for recruiting?

11   A.   Exceptionally important.  The problem with -- it's not

12   fair to say "the problem."  The trick with going from high

13   school to college is the college game is just a much faster,

14   much more intense and, actually, at the time they were playing

15   30 meters at the college level, not 25 yards.  So high school

16   players, if you're not conditioned and you don't have the speed

17   required at the college level, you can actually have quite a

18   bit of success as a high school athlete.

19         If you're big and you're athletic and maybe you don't

12:00 20   have the greatest stamina or endurance or speed, you can get

21   away with it because it's a shorter pool and the players are

22   not national caliber.  That does not translate well to the

23   college level.  That is a huge part of making the jump from

24   going to high school to going to a national level in a college

25   program.

1    Q.    Did Johnny have the speed to make that jump?

2    A.    Yes.

3    Q.    Is there a phrase that water polo coaches use called

4    "inside game"?

5    A.    The term is "inside water."  I guess some may call it

6    "inside game."  "Inside water" would be more appropriate.

7    Q.    What does that mean?

8    A.    Inside water, if this Kleenex box is the goal, and here is

9    the defender, and here is the offensive player, if the

12:01 10    offensive player can find a way to get closer to the goal than

11    the defensive player, then they're said to have inside water.

12    That's not only important for the obvious reasons, because you

13    want to be closer to the goal without a defender in your way,

14    but if a defender fouls you in this situation, even if it would

15    have typically been a normal foul, this defender is either

16    excluded from the game or a penalty shot is awarded.  So in a

17    way, the high level athletes are more trying to get inside

18    water than to just throw the ball into the goal.

19    Q.    How was Johnny at inside water?

12:01 20    A.    Very strong.  I would say his ability to earn inside water

21    and his defensive ability to read the game and earn steals were

22    his forte.

23    Q.    Okay.  And were they at a level where he could play at a

24    good Division 1 team, or at least be a redshirt walk-on to a

25    good Division 1 team?

```
 1    A.   Oh, yes.

 2    Q.   Okay.  Are those qualities that Division 1 coaches look

 3    for in high school athletes?

 4    A.   Yes.

 5    Q.   Okay.  Would it be fair to say Johnny was playing varsity

 6    his sophomore year, correct?

 7    A.   Yes.

 8    Q.   Did his teammates give him any particular recognition

 9    sophomore year?

12:02 10   A.   Yeah.  So sophomore year was unique in that we run a

11    tournament in honor of a player that was unfortunately killed

12    in a car accident when he went off to play at Princeton.  It's

13    called the Scott Roach Invitational.  It honors his spirit.  It

14    turns out the kid was an amazing person in many ways, but

15    that's not necessarily relevant here.

16         So we host this tournament called the Scott Roach

17    Invitational.  And that year we won the tournament.  It's a

18    pretty high level tournament, and we won the tournament.  And

19    so typically there's a sponsor of the tournament, you get like

12:03 20   a suit or a bag or a shirt or something.  And the sponsor gave

21    me an extra, I think it was an extra sweatshirt, some extra

22    item.  And the team decided to vote on who was the most

23    inspirational player of the tournament, and they chose Johnny.

24    Q.   As a sophomore?

25    A.   Yeah.
```

```
 1   Q.   Could you take a look at Exhibit 7258, please.

 2           Do you recognize it?

 3   A.   It looks like an e-mail from me to Leslie and John, yes.

 4   Q.   And it's in 2011?

 5   A.   Correct.

 6   Q.   Is that the year of this tournament?

 7   A.   That would be the weekend after probably, yes, yes.

 8           MR. KENDALL:  Your Honor, I'd offer Exhibit 7258,

 9   please.

10           MR. FRANK:  Objection, your Honor.  Hearsay, and the

11   exhibit also appears to be redacted.

12           THE COURT:  The objection is sustained.

13           MR. KENDALL:  I don't think it's redacted, your Honor,

14   just to make the objection correct.

15   Q.   Did you tell Johnny's parents about that award?

16   A.   Yes.

17   Q.   If you could look at, just for the witness again, Exhibit

18   7258.  If you could read the last paragraph there.

19           THE COURT:  To yourself.

20   A.   "Pretty cool" --

21   Q.   Don't read it -- Read it to yourself.

22   A.   Sorry.

23           MR. KENDALL:  Now, if we could turn that off, please.

24   Q.   Does that refresh your recollection as to how many

25   sophomores were playing varsity that year on the Menlo team?
```

12:04 (line 10)
12:05 (line 20)

1    A.    Oh, I didn't read it.

2          MR. KENDALL:  Can we show the witness.

3    Q.    Just read it to yourself and see if that refreshes your

4    recollection.

5    A.    Yes, yes, it does.

6    Q.    Okay.  How many sophomores were playing varsity on the

7    Menlo team that year?

8    A.    One.

9    Q.    That was Johnny?

12:05 10   A.    Yes.

11   Q.    What's an assist in water polo?

12   A.    It is the pass immediately preceding a goal which leads to

13   the goal being scored.

14   Q.    Was Johnny good with assists?

15   A.    It would be hard for me to remember exactly.

16   Q.    Okay.  Why don't we see if we can help you with the

17   exhibit, please.

18          MR. KENDALL:  If we could show the witness Exhibit

19   9929.  Excuse me, not that one.  Yeah, 9930.  Thank you.

12:06 20        Everybody has seen this.  It's admitted.  If we could

21   show the jury as well, 9030.

22   Q.    He's got 11 assists on the tier one team.  What does that

23   indicate?

24   A.    That indicates that 11 times in those 19 games he threw

25   the pass that led immediately to a goal.

1    Q.   Okay.  Great.  And where does he rank in goals that year?

2    A.   Looks like he was third.

3    Q.   Okay.  How good was the Menlo team Johnny's junior year?

4    A.   Boy, 2012, '13 -- 2012, this year.  Very good.

5    Q.   Do you recall typically how was the team performing at the

6    sectionals tournament each year?

7    A.   Well, if I could see that again.  I have 22 years of

8    coaching.  It's really hard for me to rattle off what a team

9    did per year.  I'm having trouble trying to remember what our

12:07 10   team did last year.  But seeing that, I can tell you exactly

11   what's the national data.

12   Q.   I'll get to that in just a minute.

13            MR. KENDALL:  I'd like to show the witness Exhibit

14   7124.

15   Q.   Do you recognize that picture?

16   A.   I don't know if I've seen this picture before.  I

17   recognize what's going on.

18   Q.   Okay.  Do you recognize what it's a picture of?

19   A.   Yes.

12:08 20   Q.   Do you recognize the person with the cap that looks like

21   number -- with the blue cap with the ball in their hand?

22   A.   Number 3?

23   Q.   Yeah.

24   A.   Yes.

25   Q.   Who is it?

```
 1    A.    That's Johnny Wilson.

 2    Q.    And when he's playing for you?

 3    A.    Yes.

 4          MR. KENDALL:  Okay.  Your Honor, I'd like to offer

 5    Exhibit 7124 into evidence.

 6          MR. FRANK:  No objection.

 7          THE COURT:  It will be admitted.

 8          (Exhibit 7124 admitted into evidence.)

 9          MR. KENDALL:  If we can show the jury, please.

10    Q.    So the person holding the ball is Johnny, correct?

11    A.    Yes.

12    Q.    And that banner behind him where it says "Boys Water Polo

13    Champions League Menlo," could you tell us what all those years

14    there indicate?

15    A.    Yes, those are the years we won the league championship

16    and then the CCS, Central Coast Section championship.

17    Q.    Okay.  Now, at some point during his senior year, did you

18    learn that Johnny was hoping to get into USC as a water polo

19    player?

20    A.    I knew he had a list of schools that he was interested in.

21    Q.    Okay.  And was USC one of them?

22    A.    Yes.

23    Q.    And did you discuss that with his parents?

24    A.    Well --

25    Q.    Or e-mail them about it?  When I say "discuss," e-mail or
```

12:08 at line 10

12:09 at line 20

1   orally, either way.

2   A.   Again, as I mentioned, you're going back 6,000

3   conversations over eight years.

4   Q.   If we could show the witness Exhibit 7976, please.  I'd

5   ask you to read that document.

6          THE COURT:  To yourself.

7   Q.   To yourself, please.

8   A.   Yes, yes.

9   Q.   Okay.

12:10 10   A.   Yes.

11   Q.   And do you recognize Exhibit 7976?

12   A.   This e-mail?

13   Q.   Yes.

14   A.   Yes.

15   Q.   Okay.  And what is it?

16   A.   It references our work with the USC coach.

17   Q.   Okay.  And who is it from and who is it to?

18   A.   It's from me to Leslie Wilson and John Wilson, his father.

19          MR. KENDALL:  Your Honor, I'd offer 79 and 76 into

12:10 20   evidence.

21          MR. FRANK:  Objection.

22          MR. KENDALL:  Not for the truth of the matter.  Just

23   to show the communication with the family.

24          MR. FRANK:  Objection, hearsay.

25          THE COURT:  Objection sustained.

1    Q.    Okay.  After reading Exhibit 7976, does it refresh your

2    recollection that you e-mailed the Wilsons about Johnny's

3    applying to USC for water polo?

4    A.    Yes.

5    Q.    And what did you tell the Wilsons?

6          MR. FRANK:  Objection, your Honor.

7          MR. KENDALL:  It's for state of mind of my client,

8    your Honor.

9          MR. FRANK:  Your Honor, he can testify what he told

12:11 10   them generally but not in particular.

11         THE COURT:  He can testify as to what he told them

12   generally.

13   Q.    Generally, what did you tell the Wilsons?  Were you

14   supportive?  What was your position on his going to USC?

15   A.    So again, as I'm trying to be as exact as possible, it is

16   impossible for me to remember what I said to any parent seven

17   years ago.

18         So what I can say is with every athlete of mine,

19   regardless -- I have two seniors right now who aren't

12:11 20   interested in playing water polo and I sit with them and I talk

21   about -- what they want from their college experience.  So --

22   Q.    Why don't you -- if we could show the witness again 7976.

23   If you could tell us if that refreshes your recollection of

24   what you told the Wilsons generally.  I don't want you to read

25   this document out loud.  I want to see if it refreshes your

1    memory.

2    A.    Right.

3    Q.    If you could look at the one, two, third paragraph of the

4    e-mail.

5    A.    Yes.  So what I --

6          THE COURT:  Take the document down after he's had a

7    chance to read it.

8          THE WITNESS:  I saw it, thank you.

9    A.    What I would have told Johnny in this situation is how to

12:12  10    start the outreach with each of the coaches, which begins by

11    introducing himself, sending a cover letter, sending a resume,

12    which I look over, and that he reaches out to all the coaches.

13    In this case the USC coach was included in that.  And to

14    establish a relationship with those coaches because the

15    recruiting process isn't just one outreach, "I'd like to go to

16    your school," and the coach says, "We'd like you" or "We don't

17    want you."  They need a sense to understand what this athlete

18    is like, how serious are they taking this, how professional are

19    they, what's their coach saying about them, how are they

12:13  20    stacking up against all the other athletes.

21          So what I would have told Johnny to do here in this

22    case is to do that with the USC coach, and that's the work that

23    we were doing with all the coaches, including the USC coach.

24    Q.    Do you remember telling him that you supported him in the

25    process?

A.   Yes.

Q.   Okay.  And you were enthusiastic about him trying to do this?

A.   I'm enthusiastic about doing this process with all of my student athletes, and I would have been with Johnny, absolutely.

Q.   And you offered to do anything you could to help with his application, correct?

A.   "Anything I could" is strong.  But I --

Q.   If you could take a look at 7679 again, please, and tell us -- 7976, please.  And if we could leave it up for a minute and if you could read the third paragraph.

A.   Yes.

Q.   And after you've read that, could you tell us, does that refresh your memory --

A.   It does.

Q.   -- you told the Wilsons that you --

A.   I wanted the Wilsons to know if there was anything that I could do to help in the process, I am more than happy to do that.

Q.   Okay.  When Johnny had his concussion, did he remain part of the team for the rest of the season?

A.   Yes, he was with the team.  He couldn't -- he wasn't allowed to train during that specific time.

Q.   Okay.  Other than USC, did Johnny express interest in any

1    other teams for recruiting?

2    A.   So, yes.  The two that jump out -- typically I ask players

3    to at least get to a list of six, if not more, because of how

4    challenging the process is.  I know he got interest from the

5    Air Force Academy, although I don't remember him being super

6    interested in that.  He did get some interest from the Boston

7    College swim program, although they didn't have water polo.  He

8    would have, although I don't remember, have had other schools

9    on his list.

12:15 10    Q.   Okay.  I'd like to show you Exhibit 7960, and if you could

11    read that document and tell us if you recognize it.

12    A.   Yes.

13    Q.   And what is it?

14    A.   It's an e-mail from me to Leslie and John Wilson, Johnny's

15    father.

16    Q.   Is it during his senior year in high school?

17    A.   Yes.  It's right at the beginning of his senior year, yes.

18    Q.   And did you send this to them as part of your work as the

19    coach at the Menlo School?

12:16 20    A.   Yes.

21    Q.   As part of your college advising work?

22    A.   Not -- I mean, as part of my work with my athletes.

23    Q.   Yes?

24    A.   So, yes.

25         MR. KENDALL:  Your Honor, I offer 7960 into evidence

1    again to show state of mind of my client.

2         MR. FRANK:  Objection, hearsay.

3         THE COURT:  The objection is sustained.

4         MR. KENDALL:  Okay.

5    Q.   At some point did you agree to write a recommendation for

6    Johnny to USC?

7    A.   Yes.

8    Q.   Okay.  What type of recommendation did you offer to write,

9    an academic one, a nonacademic one?

12:16 10   A.   It would by definition be a nonacademic recommendation.

11   Schools typically require two academic and then allow for a

12   nonacademic.  So it would have been from his water polo coach

13   per se.

14   Q.   Okay.  Did you volunteer to a lot of parents to write

15   nonacademic recommendations?

16   A.   I don't typically do that.

17   Q.   And why did you offer it for Johnny?

18   A.   I think it was a way, especially with what he was going

19   through with concussion and then being out of town, and just

12:17 20   wanting to make sure that everything was being done for him to

21   help him get to the next step that he wanted to get to.

22   Q.   In fact, you didn't write a recommendation to USC,

23   correct?

24   A.   That's correct.

25   Q.   But did you have a phone call with the USC coach?

     1   A.   Yes.

     2   Q.   Okay.  Now, do you know Coach Vavic?

     3   A.   Yes.

     4   Q.   Okay.  Do you know Coach Moon, Casey Moon?

     5   A.   Yes.

     6   Q.   Did you know Coach Marko Pintaric at the time?

     7   A.   Yes.

     8   Q.   Do you remember specifically who called you about Johnny?

     9   A.   No.

12:17 10            MR. FRANK:  Objection, assumes facts not in evidence.

    11            THE COURT:  I didn't hear you.

    12            MR. FRANK:  The question was who called you.

    13            THE COURT:  Sustained.

    14   Q.   You had a telephone call with the USC coach, correct?

    15   A.   Correct.

    16   Q.   Do you remember which of those three coaches it was?

    17   A.   I would guess Pintaric.  He's the one that handles -- that

    18   I do almost all of the recruiting with.  Although Casey, when I

    19   send e-mails, gets carbon-copied.

12:18 20   Q.   Is it fair to say if it was Vavic, you would have

    21   remembered that?

    22   A.   Yes.

    23   Q.   So either Pintaric or Moon called you, correct?

    24   A.   I don't know who called who.

    25   Q.   Okay.  Strike that.  I appreciate that, and I'm not

1    looking to suggest anything.

2              There was a phone call between you and one of those

3    two coaches, correct?

4    A.   Correct, yes.

5    Q.   And you spoke to them about Johnny?

6    A.   Correct.

7    Q.   Do you remember exactly what you said?

8    A.   There's just -- no, I can't get to a call I made a year

9    ago about a player, so I can't get to seven years ago.

12:18 10  Q.   Do you remember being supportive of Johnny going to USC?

11   A.   I would have been.

12   Q.   When you get recruiting calls from college coaches, are

13   you always truthful with them?

14   A.   Painfully.

15   Q.   Do you ever exaggerate or misrepresent an athlete?

16   A.   I try my best not to.

17   Q.   So you spoke on the phone with one of those two coaches,

18   and after that did you hear that Johnny got into USC?

19   A.   At some point in time, yes, that's the chronology.

12:19 20  Q.   Okay.  What was your reaction when you heard that he was

21   admitted?

22   A.   I was a little surprised.  I wouldn't say shocked, but a

23   little surprised.

24   Q.   And what did you think had influenced them to accept him?

25   A.   I joked at the time to friends that what I had said on the

1  phone must have influenced the coach.  Like, I said, "That call

2  must have done it."

3  Q.   Okay.  And that's because you thought Johnny had speed for

4  the high level of college play?

5  A.   It's a combination of his speed, which you can't teach.

6  So the speed and the water polo IQ just by virtue of starting

7  for a team, a national caliber team for three years, that is

8  enough to confidently say by your junior year, maybe senior

9  year, you could contribute to a high-level program like USC.

12:20  10  Not as a freshman or a sophomore but later in the career.

11  Q.   Okay.  At the time this happened, you knew how good the

12  USC team was, correct?

13  A.   Yes.

14  Q.   You knew how tough Coach Vavic was, correct?

15  A.   Yes.

16  Q.   And you thought Johnny could find a place in that program?

17  A.   Yes.

18  Q.   Did your conversation with the USC coach take place before

19  or after Johnny had his concussion, if you can remember?

12:21  20  A.   I cannot remember that chronology.

21  Q.   Okay.  Are you aware of the honor given to some high

22  school athletes of being all-CCS?

23  A.   Yes.

24  Q.   What does that mean?

25  A.   It's very similar to the all-league.  It's a bigger award

1    because it's a much bigger section.  There are about 11 leagues

2    in the section.  So like the Peninsula Athletic League is one

3    of those leagues that we talked about previously.  And then

4    there are about 11 -- ten other leagues.  So about 11 leagues

5    total in the CCS, which is the section.

6    Q.   Okay.  And what does it mean to be tier one versus tier

7    two in the CCS section?

8    A.   Division 1.  Division I versus Division 2?

9    Q.   Thank you.  Division 1 versus Division 2.

12:22 10  A.   It's a little misleading.  The way they separate the

11   divisions is at the end of the season the committee puts

12   together what they believe to be the -- let's see, there's a

13   quarter final -- the top sixteen teams in all of CCS.

14        So they say after the entire regular season is over

15   and the league playoffs are over, they say here are the top 16

16   teams in all of CCS.  But then what they do is they break them

17   up by school size.  So they say, okay, the eight biggest

18   enrollment sizes from these 16 are Division 1, and then the

19   eight smallest by enrollment are Division 2, and then those two

12:23 20  groups of eight have a playoff, a quarter final, a semifinal

21   and then a final.  And then the winner of those are the

22   respective Division 1 and Division 2 champions.

23   Q.   Though the Division 2 schools are smaller, which ones back

24   in that 2010 to '14 time period actually had the better water

25   polo team?

```
 1    A.    Like I said, it's a little misleading.  I would say most

 2    of the time the Division 2 teams were quite a bit stronger than

 3    Division 1.

 4    Q.    And Menlo is in Division 2?

 5    A.    Always, we're very small.  We'll never be in the big

 6    school division.

 7    Q.    Okay.  I'd like to ask you to take a look at Exhibit 7255,

 8    please.  Do you recognize that?

 9    A.    It's an e-mail from me to Leslie Wilson.

10    Q.    Okay.  And it's during Johnny's senior year?

11    A.    This is December --

12    Q.    Excuse me, during his junior year?

13    A.    Correct.

14          MR. KENDALL:  Thank you.  Your Honor, I'd like to

15    offer 7255 into evidence.

16          MR. FRANK:  Objection.

17          MR. KENDALL:  Again, it's for notice to my clients,

18    not for the truth of the matter asserted.  It's for state of

19    mind.

20          THE COURT:  Sustained.

21          MR. KENDALL:  Okay.

22    Q.    Did SoPen have an alumni game every year?

23    A.    Yes.

24    Q.    And what was the alumni game?

25    A.    So the alumni game is essentially all of the alumni come
```

```
 1   back.  We do it the Saturday prior to Christmas, and the alumni
 2   forms a team and they play the sort of current Menlo team.  And
 3   at the end of that game we give the alumni the seniors from the
 4   Menlo team.  It's an unofficial -- it's a game.  We play but
 5   it's unofficial.
 6   Q.   Do you have a memory that the Wilsons attended some of the
 7   alumni games?
 8   A.   There are so many parents and people that come to this
 9   game, it's impossible to remember.
10   Q.   If you could take a look at Exhibit 7255, please, and look
11   at the third page and just tell us if that refreshes your
12   recollection where we could start --
13          MR. KENDALL:  Further down, Mr. Carter.
14   Q.   If you could just read that e-mail that's in front of you.
15          MR. KENDALL:  It should not be in front of the jury.
16   Q.   Does it refresh your recollection that the Wilsons came to
17   some of the alumni games?
18   A.   It does.  It looks like they attended.
19   Q.   Okay.  It's fair to say that John Wilson knew his son was
20   in the SoPen Club, correct?
21   A.   Yes.
22   Q.   I'd like to show you what's been marked as Exhibit 8192.
23   Do you recognize this document?
24   A.   Yes.  Yes.
25   Q.   What is it?
```

A.   So these are the trials, the preliminary races for the

championship swim meet, excuse me, hosted by the league in

which Menlo School participated.

Q.   Is this part of the CCS?

A.   Yes.  Yes.  WBAL is again another league under the

auspices of CCS.  So this is a league within CCS, yes.

Q.   Do you have a role with CCS, or do you play some sort of

position with CCS?

A.   No.  I was for a while one of the chairpersons to help

12:27 10   with the seeding but not formally.

Q.   Okay.  But you participate in CCS events in water polo,

correct?

A.   Menlo can only -- well, CCS is also under the auspices of

CIF, the California Interscholastic Federation.  We're a

section amongst other sections under the CIF.  So all of our

games are under the banner of CIF.  Occasionally we play teams

outside of our section.

Q.   Okay.  Do you recognize 8192 as records of the CCS

tournament swim times?

12:28 20   A.   So this is the league championships, it says at the top.

I'm only reading what I see.

MR. FRANK:  I object to this, Your Honor.  This

witness is not familiar with this document.  It's from a

different school, and he's testified he doesn't know anything

about --

```
 1                    MR. KENDALL:  It's not from a different school.

 2                    THE WITNESS:  It's not from a different school.

 3                    MR. FRANK:  It says it at the top, your Honor.

 4                    THE COURT:  Are you offering this document?

 5                    MR. KENDALL:  I wanted to lay a foundation with the

 6         witness, and then I would, your Honor.

 7                    MR. FRANK:  The witness testified he is not involved

 8         with swimming, your Honor.

 9         Q.   Do you recognize this document?

12:28 10   A.   Yes.

11         Q.   Without telling us the times in it, can you tell us what

12         this document is?

13         A.   This is the document that tracks the swim times of every

14         athlete who participated in the WBAL championship swim trials

15         hosted by Sacred Heart Prep School.

16                    MR. KENDALL:  Your Honor, I'd like to offer this into

17         evidence.

18                    MR. FRANK:  Objection.

19                    THE COURT:  The objection is sustained.

12:29 20   Q.   Are these kept in the ordinary course of business -- the

21         ordinary course of the league's work?

22         A.   Yes.

23         Q.   And it's recorded by people who are actually at the meets

24         and they put down the times?

25         A.   Yes.
```

```
 1              MR. KENDALL:  Your Honor, I'd like to reoffer it.

 2              MR. FRANK:  Objection, foundation, your Honor.

 3              THE COURT:  The objection is sustained.

 4    Q.   What was Johnny's --

 5              MR. KENDALL:  Your Honor, I have Exhibit 8191 I would

 6    offer as well.  I'd ask the Court if I could reoffer it, if I

 7    could show the Court Exhibit 8194 for the Court, as well as for

 8    the government.  We have a certification of regularly conducted

 9    activity from the league itself.  So in addition to him

10    being -- in addition to a Coach Bowen being a record-keeper, we

11    have the league certification.  I'd like to offer it pursuant

12    to Exhibit 8194, the certification.

13              MR. FRANK:  Objection, your Honor.

14              THE COURT:  The objection is sustained.

15              MR. KENDALL:  Your Honor, is it based on the

16    certification or is there some other --

17              THE COURT:  We've been over this a number of times.

18    Mr. Kendall.  The objection is sustained.

19              MR. KENDALL:  We have not offered this document

20    before, your Honor.

21    Q.   Did Johnny compete in other events as well?  Strike that.

22              Do you know what strokes Johnny did in high school?

23    A.   Definitely freestyle.  I recall him doing butterfly.

24    Q.   I'd like to show you Exhibit 8024.  Do you recognize this

25    picture?
```

A.    Yes.

Q.    What is it?

A.    It is Johnny Wilson swimming butterfly.

MR. KENDALL:  Your Honor, I'd like to offer this into evidence.

MR. FRANK:  No objection.

THE COURT:  It will be admitted.

(Exhibit 8024 admitted into evidence.)

MR. KENDALL:  If we could show it to the jury, please.

Q.    Is that -- the swim cap he has on, for what school or what club is that?

A.    Menlo School.

Q.    It's the Menlo Knights.  Is that why we see the "K"?

A.    Correct.

Q.    Okay.  What's particularly noteworthy about swimming the butterfly, particularly for a water polo player?

A.    It requires a lot of upper body strength for one, a lot of power.  And there's a sense of flexibility too in the way that you're controlling your body to do -- to time the dolphin kick correctly with the arm strokes so that it's fluid instead of causing you to slow down when you combine the kick to the stroke.

Q.    How much in your experience, physically how much do athletes develop in those years from, let's say, their junior, senior year of high school until their first couple of years of

1    college, that 17 to 18 to 20, 22?

2    A.   On the one hand, this is a question for a developmental

3    biologist, so it varies.  But there really is, there's a

4    massive leap.  And this is why you see many athletes, certainly

5    water polo players, redshirting, especially because the

6    experience required to play water polo where essentially your

7    eyes are about this high off of the playing field, so you don't

8    really have the view that you would typically have in the rest

9    of your life.  It really takes some time.  And then the speed

12:33 10    of the college game and the strength and the quickness that

11    happens at the college game is just on another level compared

12    to what happens in the high school game.

13          So typically -- not always -- there are a handful of

14    freshmen who have success, but very often it's the case that

15    freshmen need at least a year to acclimate to the quantum leap

16    that happens from high school to college.

17          MR. KENDALL:  I'd like to show the witness -- I'd

18    actually like to show everybody, because it's in evidence,

19    Exhibit 88, please.  If we could go to page 2.

12:33 20    Q.   Have you seen this document prior to today?

21    A.   Yes.

22    Q.   You saw it in preparation with us, correct?

23    A.   Correct.

24    Q.   You did not see this at the time it was submitted to USC,

25    correct?

```
 1    A.    Correct.

 2    Q.    Do you have any knowledge of who prepared it?

 3    A.    Pardon me?

 4    Q.    You don't know who prepared this, correct?

 5    A.    I don't.  I wasn't -- no, I wasn't involved.

 6    Q.    You weren't involved, and you don't know if Mr. Wilson or

 7    anybody else prepared it.  You have no opinion on that topic;

 8    fair to say?

 9    A.    Yes.

10          MR. FRANK:  Objection to "opinion," your Honor.

11          THE COURT:  Sustained.

12    Q.    I'd like to just go through some of the entries here.  It

13    says, "John B. Wilson 2014, Menlo School, Atherton,

14    California."  He did go to the Menlo School and he was in

15    Atherton, California, correct?

16    A.    Correct.

17    Q.    Then we have some grades, if we could go further down.  We

18    see there are a couple of SATs there.  In your experience, is

19    it best for people applying to college to put down their best

20    scores?

21          MR. FRANK:  Objection.

22          THE COURT:  Sustained.

23    Q.    Do people -- do you usually recommend to your students to

24    put their best scores down and not leave them off?

25          MR. FRANK:  Objection, your Honor.
```

 1              THE COURT:  Sustained.

 2    Q.   Okay.  Are you aware of the practice, do people typically

 3    put their best scores down when they're applying to college?

 4              MR. FRANK:  Objection.

 5              THE COURT:  Sustained.

 6    Q.   Based upon your experience advising people in college

 7    admissions, do you know of any reason why they would not put

 8    their best score down for an application?

 9              MR. FRANK:  Objection.

12:35 10              THE COURT:  Sustained.

11              MR. KENDALL:  Okay.

12    Q.   If we could go down to awards and honors there.  It says

13    varsity letterman for four years.  How many years was he a

14    varsity letterman?

15    A.   From my records, he earned a varsity letter for three

16    years.

17    Q.   Okay.  It says "Co-captain."  Was he co-captain?

18    A.   No.

19    Q.   Okay.  And then it says "Central Coast Section --

12:35 20    A.   No.

21    Q.   -- 2011, 2012, 2013, All Section."  Is that accurate?

22    A.   Again, I'd have to -- I'd be very surprised.  He wasn't in

23    2011.  I'd be surprised if he was in 2012, but I'd have to

24    see --

25    Q.   Okay.

1    A.    -- the records.

2    Q.    If we actually go above the Awards and Honors, do you see

3    anywhere on this document an ACT score of 29?

4    A.    No.

5    Q.    Okay.  Let's go back to the Awards and Honors.  Then it

6    says, "Team, CCS 2012, offensive most valuable player."  Did

7    Johnny get such an award?

8    A.    That's not an award.

9    Q.    And the California Scholar Athlete Award, did he get that?

12:36 10    A.    I don't know what that is.  There might -- I've never

11    heard of it.

12    Q.    If you don't know, that's all you have to say.

13          U.S. National Water Polo qualifier, do you know if he

14    got that?

15    A.    I don't, I don't know.

16    Q.    Would that be through Stanford?

17    A.    It would be through Stanford.  Well, high school doesn't

18    have a national water polo qualifier.

19    Q.    And specific zone water polo qualifier, would that be

12:36 20    through Stanford as well?

21    A.    That -- yes, yes.

22    Q.    Where it says down at the bottom there "Asics National

23    Sports Youth Leadership Council," I take it you've never heard

24    of that, correct?

25    A.    Correct.

1    Q.    Do you see it lists him as a varsity letterman on the swim

2    team?

3    A.    That would make sense.

4    Q.    Okay.

5    A.    But I don't know.

6    Q.    Do you know if he swam his senior year?

7    A.    I don't.

8    Q.    Do you know if he was captain of the swim team?

9    A.    For -- I don't.

12:37 10    Q.    Do you know if he was captain one year?

11    A.    I really don't.

12    Q.    Okay.  And you would agree with me, to your knowledge, he

13    was not an all-American swimmer?

14    A.    I don't know that either.

15    Q.    Or Central Coast Section high point scorer?

16    A.    That we can find out.

17    Q.    Okay.  But you're not aware of that, correct?

18    A.    Correct.

19    Q.    Okay.  And U.S. Junior Olympic Swimming Championships, you

12:37 20    have no reason to believe he went there either, correct?

21    A.    I don't know.

22    Q.    Okay.  Now let's look at the other side.  Six-one, 180

23    pounds.  Does that sound right?

24    A.    I would have guessed six feet.

25    Q.    Okay.  Driver?

```
 1    A.    Yes.
 2    Q.    Now, 50 freestyle 20.12 short course.  Do you know if
 3    that's an accurate time?
 4    A.    I don't.
 5    Q.    You know he's fast, correct?
 6    A.    I do.
 7    Q.    But you're not claiming he's that fast?
 8    A.    I just never timed him.  We don't have a short course pool
 9    at Menlo.  We have a long course -- a meters pool.
10    Q.    And the 100 freestyle 43.98 short course, do you know if
11    he ever swam that speed?
12    A.    I don't.
13    Q.    Okay.  You have no basis to suggest that he would,
14    correct?
15    A.    I don't.
16    Q.    Okay.  Menlo School Water Polo, that is you, correct?
17    A.    Yes.
18    Q.    Is that your phone number?
19    A.    At school, yes.
20    Q.    Okay.  Then Stanford Water Polo Club, is that a mistake?
21    A.    I wouldn't -- I did not coach Stanford.
22    Q.    Okay.  Now, we see a lot of awards there that you're not
23    familiar with or aware of.  Are there awards he got that are
24    not there that you are familiar with?
25    A.    Well, we talked about first team all league, which I
```

1    don't --

2    Q.    So he was --

3    A.    -- see here.

4    Q.    -- first team Peninsula Athletic League 2013, correct?

5    A.    Yes.

6    Q.    And did he get like lower things than first team in the

7    prior years?

8    A.    I would have to look at my notes.

9    Q.    Okay.  We'll get to that in a minute.  Was he all CCS

12:39 10    Division 2 at some point?

11    A.    His senior year -- oh, boy.  I strongly recollect that he

12    was.

13    Q.    Okay.  And All Daily News Prep Water Polo?

14    A.    That would make sense because the Daily News just takes

15    what the coaches do and prints it.

16    Q.    And they print their own?

17    A.    Yes.

18    Q.    What's the KAP7 International Tournament Team?

19    A.    KAP7 International Tournament is a club tournament.  So

12:39 20    it's not a Menlo tournament.  It's run by USA Water Polo, and

21    it's one of the top club tournaments.  That would be what I

22    mentioned earlier, the top players would make the

23    all-tournament team, meaning the coaches had selected them as

24    being one of the top players in that particular tournament.

25    Q.    Okay.  And he certainly was a member of the SoPen Water

 1    Polo Club, correct?

 2    A.    Correct.

 3          MR. KENDALL:  Okay.  Your Honor, I'd like to show the

 4    Court Exhibit 31 -- excuse me -- Exhibit 8130, 8130.

 5          We have a certified record from the Peninsula Athletic

 6    League I'd like to offer into evidence.

 7          MR. FRANK:  Objection, your Honor.

 8          THE COURT:  The objection is sustained.

 9          MR. KENDALL:  May I understand the basis of the

12:40 10   objection?

11          THE COURT:  We've been over this a number of times.

12          MR. KENDALL:  We have not offered these before, your

13    Honor.

14          THE COURT:  I'm not talking about this particular

15    document but the reasons why these are not admissible.

16          MR. KENDALL:  If we could show the witness only page 3

17    of Exhibit 8130.  If we could look down to number 7 there.

18    Q.    If you could read that.

19    A.    Yeah.

12:41 20   Q.    Read that and then if we could turn it off, please.

21          Does that refresh your recollection if Johnny was

22    first team PAL, 2013?

23    A.    Yes, he was.

24    Q.    And then do you recall exactly where he was ranked in

25    2012?

```
 1    A.    I don't.
 2          MR. KENDALL:  If we could, just to refresh his
 3    recollection, show 8130, page 4.
 4    Q.    And tell us where in the bottom he was.  If you could look
 5    at the bottom.
 6          Does that refresh your recollection of where he was
 7    ranked in 2012?
 8    A.    Yes, it does.
 9    Q.    And what does it refresh you?
10    A.    Honorable mention.
11    Q.    Okay.  If we could then turn, do you recall where he was
12    ranked his sophomore year, when he was the only sophomore on
13    varsity?
14    A.    I do not.
15    Q.    Okay.  If we could show the witness page 5 of Exhibit
16    8130, and if you could look at that and tell us if that
17    refreshes your recollection.
18    A.    Yeah.  Yes, it does.
19    Q.    What was he ranked his sophomore year?
20    A.    Honorable mention.
21    Q.    Were there any other sophomores ranked at all that year by
22    PAL?
23    A.    Could I see that refresher?
24    Q.    Yeah, if we could refresh his recollection again with page
25    5, the exhibit.
```

1    A.    No.   Sorry.   Yes, there's one other honorable mention.

2    There are two sophomores.

3    Q.    Okay.   Out of first team, second team and honorable

4    mention, there's only two sophomores, correct?

5    A.    Correct.

6    Q.    And that's close to 20 players?

7    A.    21.

8    Q.    What does it mean to be honorable mention?   How much of a

9    ranking is that?

12:43 10   A.    It's essentially, the designators that I gave earlier, it

11   would be better termed third team.   So the first team all

12   league are the top seven.   Second team all league are eight

13   through 14.   And honorable mention is 15 through 21.   So the

14   coaches, if you earn honorable mention early, the coaches

15   believe that you are somewhere in the 15th best to the 21st

16   best player in the league.

17   Q.    As a sophomore?

18   A.    Correct.

19   Q.    And if you're in first team as a senior, that means you're

12:43 20   in the top six or seven in the whole league?

21   A.    Top seven, yes.

22   Q.    Okay.   And how good are the teams in that league?

23   A.    This league is exceptionally strong.   Menlo Atherton tends

24   to be very strong and Burlingame and Woodside are up and down

25   but not exceptionally strong.   There are a handful of teams

```
 1  considerably weaker.  So it's a mid-range league.
 2  Q.   Are there some strong teams in that league besides Menlo
 3  School?
 4  A.   Yes.
 5  Q.   What are those teams?
 6  A.   Menlo Atherton and then Woodside and Burlingame tend to be
 7  up and down.  It's hard to know.
 8  Q.   Okay.  It's not as high a recognition, but do you remember
 9  that Johnny was also recognized as the All Daily News -- in the
12:44 10  All Daily News Prep teams?
11  A.   Yes.
12  Q.   Do you recall exactly what he got for those teams?
13  A.   I do not.
14       MR. KENDALL:  If we could show the witness Exhibit
15  7071, please.
16  Q.   And if you could look down towards the bottom there.  For
17  2011, does that refresh your recollection of where he was
18  ranked?  About midway, about six, seven up there,
19  alphabetically.  Right above there, just a line below.  Does
12:44 20  that refresh your recollection where he was his sophomore year?
21  A.   Yes.
22  Q.   What was that?
23  A.   He was honorable mention.  This isn't all league, though.
24  This is a bigger --
25  Q.   All Daily News?
```

1    A.    Yes.

2          MR. FRANK:  Your Honor, the witness is simply reading

3    from documents at this point.

4          THE COURT:  Yeah.

5    Q.    You knew this at the time, correct?

6    A.    Yes.

7    Q.    Okay.  And if we could -- do you know how he ended up with

8    All Daily News Prep in his junior year; do you remember?

9    A.    I don't know.

12:45 10   Q.    But you knew at the time, correct?

11   A.    Yes.

12         MR. KENDALL:  If we could show the witness 8265,

13   please, page 3 at the top.  Actually, maybe you could start at

14   page 2 to see where the title is.  If you go down to page 2 at

15   the bottom and then go to the top of page 3.

16   A.    Yes, he earned honorable mention as a junior.

17   Q.    Do you recall if he got some recognition from the All

18   Central Coast section in water polo?

19   A.    I do recall that he did.  I don't know exactly what it

12:46 20   was.

21   Q.    Okay.  What does All Central Coast section mean?

22   A.    So that's the one that -- CCS comprises all 11 leagues

23   throughout the entire peninsula.  So it's essentially all the

24   teams in that section.  It's the best players selected by the

25   coaches.

1    Q.    And if I were to show you Exhibit 7069, just for the

2    witness, please.

3              For 2012, which would have been his junior year, if

4    you could look at page 3, does that refresh your recollection

5    as to what you remember him being?

6    A.    Yes, he was -- sorry, not that one -- honorable mention.

7    Q.    His junior year?

8    A.    Yes.

9    Q.    And then for his senior year, if we could show the witness

12:47 10   7070 and see if that refreshes his recollection, looking at

11   page 3.

12   A.    He was the number 3 player selected for second team.

13              MR. KENDALL:   Okay.   Your Honor, we have --

14   Q.    And do you remember his senior year who was selected for

15   the all-star game for Division 2 teams at the CCS all-star

16   game?

17   A.    I don't.

18   Q.    Okay.   I'd like to ask you to take a look at Exhibit 7959,

19   please.   Tell us if you can identify that.   Just yes or no, do

12:48 20   you recognize it?

21   A.    Oh, yes.   Yes.   Sorry.

22   Q.    And what is the document?

23   A.    Excuse me.   It's an e-mail from me to the parents of Ryan

24   Hammarskjold.

25   Q.    Don't read all the names.

1    A.    Oh, I'm sorry.

2    Q.    Including the Wilsons?

3    A.    Including the Wilsons.

4          MR. KENDALL:  Your Honor, I'd offer 7959, please.

5          MR. FRANK:  Same objection, your Honor.

6          THE COURT:  The objection is sustained.

7    Q.    Do you recall if Johnny was selected for the CCS all-star

8    game?

9    A.    He was.

12:49 10    Q.    And what does that mean?

11    A.    So the same meeting, what the coaches do is they select

12    the top 18 seniors from the CCS section, and then we have an

13    unofficial all-star game with the North Coast Section, which is

14    across the bay in the Bay area.  And so it's the top 18 seniors

15    from CCS selected by the coaches and they play a game against

16    the top 18 seniors of the NCS, which is another very

17    competitive section across the bay, and we have, like I said,

18    an informal all-star game.

19    Q.    So if he's one of the 18 best from the CCS group, roughly

12:49 20    how many water polo teams are in that group?

21    A.    I really -- someone could find that out.

22    Q.    How many schools are in that group?

23    A.    It could be 100, it could be 200.

24    Q.    Somewhere between 100 and 200 schools?

25    A.    I'm not comfortable -- it's me guessing.  I'd love for

1    someone to look that up and we could tell you in 30 seconds.

2    Q.    There's a CCS tournament each year, correct?

3    A.    Correct.

4    Q.    Do you recall how your team did in 2011 --

5    A.    Semifinals?

6    Q.    -- sophomore year.

7    A.    I'd have to see -- 22 years.

8    Q.    I'd like to show you Exhibit 7002.  Do you recognize it?

9    A.    It is the official CCS document of the tournament.

12:50 10   Q.    And did you get it back at the time from the tournament

11   that you participated in?

12   A.    Did we what, sorry?

13   Q.    Are these the results they gave you?

14   A.    These would be the correct results, yes.  They're posted

15   by CCS when they're happening.

16   Q.    And that's something they do in the regular course of

17   their running the tournament is post these results?

18   A.    Correct.

19   Q.    And give them to the coaches who participate?

12:50 20   A.    They're posted on their website.

21         MR. KENDALL:  Your Honor, I'd like to offer 7002 into

22   evidence.

23         MR. FRANK:  I object, your Honor.  I also object to

24   having the witness read from documents that he obviously

25   doesn't remember.

```
 1            THE COURT:  Yeah, the objection is sustained, and I
 2    think you ought to cease this line.
 3            MR. KENDALL:  Your Honor, we have a certified copy,
 4    certification for this document under Exhibit 8185.  May I
 5    offer it pursuant to the certification?
 6            MR. FRANK:  I object, your Honor.
 7            THE COURT:  The objection is sustained.
 8            MR. KENDALL:  Okay.
 9    Q.   Does this document refresh your recollection as how your
12:51 10   team did in the CCS tournament in 2011?
11            MR. FRANK:  I object, your Honor.
12            THE COURT:  Sustained.
13    Q.   Did you know at the time how your team did?
14            MR. FRANK:  I object.
15    A.   Yes.
16            THE COURT:  You can answer that question.
17            THE WITNESS:  Sorry.
18    Q.   Is there a document that could help refresh your
19    recollection as how the team did from what you once knew?
12:51 20   A.   I keep very accurate documents of exactly how many wins
21    and losses we've had each year, how far we made it in CCS, how
22    far we made it in the league, how many goals and minutes and
23    who scored which goal in which situation, and I can't do this
24    by memory.
25    Q.   Exactly.  Could a document help refresh your memory of
```

```
 1   what you knew back --
 2   A.   Absolutely, yes.
 3          MR. KENDALL:  I'd like to show the witness Exhibit
 4   7002.
 5   Q.   Does that refresh you as to how well your team did at the
 6   tournament?
 7          THE COURT:  Show him the document, take the document
 8   down, and ask him if it refreshes his memory.
 9   Q.   Have you had a chance to look at the document?
10   A.   Yeah, yes.
11   Q.   Do you need to look at it longer?
12   A.   I would take three more seconds so I get it right.
13          MR. KENDALL:  If you could show it to him.
14   Q.   Tell us when you've had enough time to look at the
15   document.
16   A.   Yes.
17          MR. KENDALL:  Okay.  And if we could take it down.
18   Q.   Does that refresh your memory as to how you did at the
19   tournament?
20   A.   Yes.
21          MR. FRANK:  Your Honor, I object to this.  This is
22   obviously just reading from documents.
23          THE COURT:  Well, I'm going to let him answer that
24   question.
25   A.   We made it to the semifinals, and it looks like we lost to
```

        1    Los Altos 11 to 8.
        2            MR. FRANK:  Objection, move to strike.
        3            THE COURT:  Sustained.  It's stricken.
        4    Q.   If you could just tell us how far you went in the
        5    tournament.  Would this refresh your memory of how far you made
        6    it in the tournament?
        7            MR. FRANK:  Objection, your Honor.
        8            THE COURT:  Yeah.  That question is objectionable, and
        9    the objection is sustained.
12:53  10            MR. KENDALL:  Okay.  Your Honor, I would like to do
       11    this for the next two years.  Is the Court's ruling going to be
       12    the same?
       13            THE COURT:  Yes.
       14    Q.   Would it be fair to say that your teams were finishing
       15    towards the top of those tournaments each year?
       16    A.   Absolutely.  I can say from memory, without telling you
       17    exact years, that we have made it to the semifinals at least
       18    every year but one, which is the top four in that CCS
       19    tournament.
12:54  20            MR. KENDALL:  Your Honor, I have some certified
       21    records from the Stanford Water Polo Club.  Am I to assume that
       22    it will be the same ruling?
       23            THE COURT:  Yes.
       24            MR. KENDALL:  And we should deal with those
       25    separately?

1          THE COURT:  Yes.

2          MR. KENDALL:  Okay.  And we also have the same from

3     the West Bay Athletic League.  I assume it should be treated

4     the same way, your Honor?

5          THE COURT:  Yes.

6          MR. KENDALL:  Your Honor, USA Water Polo records would

7     fall into the same category, I believe.

8     Q.   Did your team ever do any special practices with any

9     military or other groups?

12:55 10    A.   Yes.

11    Q.   What was the special practice you had?

12    A.   So every year we took a training trip to Coronado, and we

13    would stay with Coronado families.  I grew up in Coronado and

14    played water polo there, and my parents live there.

15          So we would stay with water polo families, and we

16    were training two to three times a day and doing a lot of other

17    activities.  And the four- to five-day training would culminate

18    with us training with a Navy Seal or a team of Navy Seals, and

19    they would put us -- they would do the workout with them, put

12:55 20    us through essentially Navy seal training drills.

21    Q.   Did Johnny participate in that group?

22    A.   Yes.

23    Q.   Did the whole team go?

24    A.   It's the top 14 because it's a 15-passenger van, and I

25    drive it, so it's the top 14.

1    Q.    Is that something that would be of relevance to a college

2    coach?

3              MR. FRANK:  Objection.

4              THE COURT:  Sustained.

5    Q.    Are you familiar with Johnny having done the Alcatraz

6    swim?

7    A.    Yes.

8    Q.    He did that when he was --

9              MR. FRANK:  I object to this, your Honor.

12:56 10              THE COURT:  It's an unclear question.  Sustained.

11    Q.    What is the Alcatraz swim?

12              MR. FRANK:  Your Honor, this was addressed by the

13    Court's ruling this morning.

14              THE COURT:  Sustained.

15              MR. KENDALL:  I don't think it was addressed by your

16    ruling this morning, your Honor.

17              I'm moving quickly, your Honor.  I just need another

18    moment to check my notes, please.

19    Q.    What is the KAP7 Tournament?

12:57 20    A.    It's a club tournament, one of the top club tournaments in

21    the country.

22    Q.    When you say "one of the top club tournaments," what do

23    you mean by that?

24    A.    They select clubs based on club strength.  So it's not a

25    tournament that any club can sign up for.

1    Q.   And how does that tournament stand in terms of national

2    status or competition?

3    A.   It's considered very top tier, in a group of four, five,

4    six.  There's probably six or seven tournaments that would be

5    considered top tier national club tournaments.  That would be

6    one of them.

7              MR. KENDALL:  If I may have just a moment, your Honor.

8              THE COURT:  Yes.

9    Q.   Johnny's junior and senior year, were there other members

12:58 10   of the Menlo team that went to Division 1 college programs?

11   A.   Yes.

12   Q.   What were some of the programs the kids went to?

13   A.   Am I allowed to look at -- I don't know how -- I've had so

14   many players.  I don't know how -- am I expected to do this by

15   memory?

16   Q.   Do you remember any players going to Princeton?

17   A.   It would be very easy to find out.

18   Q.   Do you remember any of your players going to Princeton

19   that year?

12:59 20   A.   Two, Chris Z -- can I say names?

21   Q.   Yes.

22   A.   Chris Z and Ryan Hammarskjold.  There may be more.

23   Q.   If we could take you back, we'll go to the list of stats

24   you have for the team that are in evidence.

25   A.   Nick Bisconti was on that team.  He went to UC Berkeley,

         1    national champion.

         2    Q.    How did Berkeley end up doing?

         3    A.    National champion, Nick Bisconti.

         4    Q.    Then if we take a look at Exhibit 9929, please.

         5    A.    That's helpful.

         6    Q.    From this team, who else went on to significant Division

         7    One teams?  Nick Z, is that the person that went to --

         8    A.    That's Nick Bisconti.  He went to play at UC Berkeley.  He

         9    was the national champion.  Ryan played at Princeton and

01:00   10    actually earned some award I don't know the name of his senior

        11    year at Princeton.  Chris Z played at Princeton.  Nikhil,

        12    Nikhil Andreas started for three years at Johns Hopkins.  Tegan

        13    went to Johns Hopkins.  John Wilson, the goalie, went to

        14    Johnson Hopkins, actually, I think set the record for the most

        15    saves in a career.  Spencer went to Johns Hopkins.  That's it

        16    from that list.  That's a good team.

        17              MR. KENDALL:  May I have a moment, your Honor?

        18              THE COURT:  Yes.

        19              MR. KENDALL:  No further questions, and thank you.

01:01   20              THE COURT:  All right.  Before we have cross, we'll

        21    break for lunch.  Mr. Bowen, you may step down for the time

        22    being.

        23              We'll be in recess for one hour.

        24              (Jury exits.)

        25              THE COURT:  Be seated, counsel.  You may step down,

1    Mr. Bowen.

2           MR. FRANK:  Your Honor, may I request that the witness

3    be instructed to comply with the sequestration order?

4           MR. KENDALL:  I don't know what that means, but if

5    he's accusing me of planning to talk to the witness, you don't

6    need to instruct me, your Honor.  I know the rules.

7           THE COURT:  How long on cross-examination, Mr. Frank?

8           MR. FRANK:  I'm guessing about 30 minutes, your Honor.

9           THE COURT:  All right.  And then what is the remainder

01:02 10   of the defendant's case?

11          MR. KENDALL:  Your Honor, we have those documents you

12   ruled earlier today that can be admitted.  We'd like to read

13   those for the jury.  We have a document or two that's already

14   in evidence we wanted to read to the jury.  We have some

15   documents we'd like to offer.  Some I think can be outside of

16   the presence of the jury, given the Court's prior rulings.

17   Some I don't believe the Court had made prior rulings on.  So I

18   would consider those a foregone conclusion.

19          THE COURT:  How long do you think it will take you?

01:02 20   Because I want the defendants to rest in front of the jury.

21          MR. KENDALL:  Okay.  I think -- I'm hoping we can do

22   that in 15, 20 minutes.

23          THE COURT:  You mean outside of the hearing of the

24   jury will take 15 to 20 minutes?

25          MR. KENDALL:  No.  I was thinking in front of the

```
 1    jury, to read the things we wanted to read, things you've
 2    allowed, and then to offer some things and see what the Court's
 3    rulings are.
 4         THE COURT:  And how long -- you say you have some
 5    materials to offer outside of the hearing of the jury.  How
 6    long will that take?
 7         MR. KENDALL:  15 minutes, ten, 15 minutes.
 8         THE COURT:  So you want me to hold the jury 15
 9    minutes, bring them back in and then rest?
10    MR. KENDALL:  If that's what the Court would like.  We
11    need to present some stuff to them they're going to see.  So
12    that will be either after the cross-examination or whatever.
13    We can put stuff in front of them.  We can take them out, we
14    can do a few things with you, your Honor, and then bring them
15    back.
16         MR. FRANK:  Your Honor, I would propose that anything
17    that the Court has not yet approved should be done outside of
18    the presence of the jury given the nature of the documents that
19    defense has tried to put in in front of the jury and the number
20    of objections that we've had to make that have been sustained.
21         I think it's prejudicial to the government to have to
22    keep doing that in front of the jury.  If we're going to meet
23    outside of the presence of the jury anyway before they rest, we
24    might as well do it all then, and then if there's anything that
25    comes in, it can come in in front of the jury without an
```

1    objection from the government.

2              MR. KENDALL:  Your Honor, there are some things that

3    are unquestionably either already admitted or the Court has

4    ruled are admitted and we can offer.  So we don't have to do

5    those in front of the jury.

6              MR. FRANK:  That I have no objection to, your Honor.

7              THE COURT:  All right.  What I may do is out of order,

8    take these matters up before the cross-examination of Mr. Bowen

9    at 2:00 and then call the jury back and have them in the

01:04  10    courtroom while the defendant completes whatever they're going

11    to do in the courtroom in front of the jury and then rest.

12              MR. FRANK:  Yes, your Honor.

13              MR. KENDALL:  Do you want the cross first before the

14    documents, your Honor, or do you want the documents?

15              THE COURT:  No.  I'm going to talk to you all at 2:00.

16    You're going to put in everything and talk about everything

17    outside the hearing of the jury.  I'm going make rulings, and

18    then we're going to call the jury back, complete the

19    cross-examination of Mr. Bowen and any further evidence the

01:05  20    defendants have to offer.

21              And then I understand the defendants will rest in

22    front of the jury.  Is that right?

23              MR. KELLY:  Correct.

24              MR. KENDALL:  Yes, your Honor.

25              THE COURT:  Okay.  We're in recess until 2:00.

```
 1            (Recess taken 1:05 p.m. to 2:03 p.m.)

 2            THE CLERK:  Thank you.  You may be seated.

 3            THE COURT:  Good afternoon, counsel.

 4            MR. KENDALL:  Good afternoon, your Honor.

 5            THE COURT:  I would like defendants now, Mr. Kendall,

 6     to proffer what he believes should be proffered outside the

 7     hearing of the jury.

 8            MR. KENDALL:  Okay.  Your Honor, I have them.  I'll go

 9     through them.  Just so I understand it, we've done a few
02:03
10     already and we're going to add a few more.  We want those to be

11     part of the record if there is an appeal in this case.  How do

12     you want things that have not been admitted treated?  Do you

13     want a separate list of them, or do you want something

14     indicating them?  Or how would you want them accepted into --

15            THE COURT:  We usually mark things for identification

16     with letters.  I think we have six or eight already marked with

17     letters for identification.

18            MR. KENDALL:  Okay.  Do you want us just to add a

19     letter to each number, so it can be A7120, A7220?  This is a
02:04
20     large number and they've been -- they're referred to in the

21     transcript by numbers.  It might be helpful to keep that.

22            THE COURT:  Well, you mean a letter before the number?

23     As you know, we have a number of exhibits that are four numbers

24     and a letter A usually.

25            MR. KENDALL:  We can do a Z.  We can just call them Z
```

1  with a number to follow.

2         THE COURT:  Does the government have any position in

3  this regard?

4         MR. FRANK:  No, your Honor.  Whatever the Court

5  thinks.

6         THE COURT:  Okay.  All right.  We can do that. You can

7  put a letter in front of the numbers to indicate that it has

8  not been admitted into evidence, but it is marked for

9  identification.  We do already have, I believe, maybe my deputy

02:04 10  knows how many we have lettered.

11         THE CLERK:  I don't know.

12         THE COURT:  Okay.  We odn't know, but I think it's

13  been six or eight.

14         MR. KELLY:  I think the Court is right.  We had four

15  that we needed to mark for identification from before and I can

16  talk to the clerk at the break for that purpose.

17         MR. KENDALL:  Your Honor, we have a large number.  I

18  would suggest just putting a Z in front of all the ones I'm

19  putting, Z1, Z2, Z3, Z4.

02:05 20         THE COURT:  That's fine.

21         MR. KENDALL:  Okay.  Thank you, your Honor.

22         For the ones that we'd like to offer, your Honor, the

23  first is Exhibit 125.  We offered a check, one page of that

24  exhibit, which was not objected to by the government.  We'd

25  like to offer the rest of the exhibit.  It shows the fact of

1    communications among USC people, including Vavic, Garfio, and

2    others, around Wilson's $100,000 donation.  It shows USC's

3    knowledge of the donation connected to a student who had just

4    been admitted as part of the water polo team.  It's to show

5    knowledge, not the truth of the matter asserted, and it

6    directly refutes the honest services violation and it shows the

7    openness of the donation, your Honor.  That is Exhibit 125.

8            THE COURT:  So that will be marked for identification

9    Z125.

02:06 10            MR. FRANK:  For the record, we object to it on hearsay

11    grounds and dispute the characterization of it for those

12    reasons.

13            MR. KENDALL:  Next, your Honor, 8195 is an e-mail

14    exchange between Mr. Singer and Mr. Wilson.  It shows Wilson's

15    state of mind with respect to the USC application of his son.

16    It's not for truth of the matter asserted.

17            MR. FRANK:  Same objection, your Honor.

18            THE COURT:  It will be marked for identification,

19    Z8195.  And all of these matters, the objections of the

02:06 20    government has been sustained, so I don't believe the

21    government needs to object each time.

22            MR. KENDALL:  Okay.  Your Honor, 8014 that will now be

23    Z8014.  Okay.  It's just an e-mail from Mr. Wilson and Debbie

24    Rogers in reacting to the ACT scores of his son and again to

25    show state of mind.  This has not previously been offered.

 1          THE COURT:  Marked for identification, Z8014.

 2          MR. FRANK:  Your Honor, I'm not seeing these on my

 3     screen, so I actually don't know if these are ones that the

 4     Court has previously ruled on or if Mr. Kendall is introducing

 5     these for the first time.

 6          MR. KENDALL:  Mr. Carter, can we put these up as we go

 7     through them, please?

 8          MR. FRANK:  If they've not been previously ruled on,

 9     then I think I do need to object.

02:07 10          THE COURT:  Yes.

11          MR. KENDALL:  None of these have been previously

12     marked, your Honor, so the government should state its position

13     with each one of them.  If we can start with -- if you want us

14     to show the government Z125.

15          Exhibit 125, Mr. Carter.

16          MR. FRANK:  We object on hearsay grounds, your Honor.

17          THE COURT:  Objection sustained.

18          MR. KENDALL:  Okay.  Your Honor, then 8195 again

19     offered for a non-hearsay basis to show state mind of our

02:08 20     client and the communication.

21          MR. FRANK:  Same objection.

22          THE COURT:  Objection sustained.

23          MR. KENDALL:  Then, your Honor, 8014, now Z8014, again

24     not to show the truth of the matter, to show my client's

25     knowledge and state of mind.

```
 1              MR. KELLY:  Your Honor, just for the record, all these

 2      Z exhibits, we'll join as well.

 3              THE COURT:  Join for what?

 4              MR. KELLY:  We'll join for the record in offering as

 5      well.

 6              MR. FRANK:  Same objection, your Honor.

 7              THE COURT:  8014 objection sustained.

 8              MR. KENDALL:  Okay.  Then 9924, now Z9924, a

 9      November 1, 2012 e-mail from Leslie Wilson to Rick Singer.  It

02:09 10      shows John's state of mind with respect to the son's visit to

11      the USC campus.

12              MR. FRANK:  Same objection and also on the 403

13      grounds, your Honor.

14              THE COURT:  Okay.  Objection sustained.

15              MR. KENDALL:  Your Honor, Exhibit 9937, which is a

16      text message of November 29, 2018, during the time of the

17      interception of the consensual monitoring after the wiretap

18      ended and they were doing consensual monitoring, this is one of

19      the consensually monitored text messages.  It shows Mr. Wilson

02:09 20      and his wife discussing the side-door application of their

21      daughters in wholly innocent, noncriminal ways, to show their

22      state of their mind that they did not think they were being --

23      whatever.

24              Excuse me.  This was not picked up by the monitoring,

25      but it was during the time of the monitoring and so it shows
```

1    their state of mind.

2          MR. FRANK:  Your Honor, just to be clear, this was not

3    on the government's wiretap.  We object to it on authenticity

4    grounds.  We also object to it on 403 grounds and on hearsay

5    grounds.

6          THE COURT:  Objection sustained.

7          MR. KENDALL:  Okay, your Honor -- may I have

8    one moment, your Honor?

9          THE COURT:  Yes.

02:10 10          MR. KENDALL:  So then next would be Exhibit 8230,

11    three text messages from -- certified records of a regularly

12    conducted activity.  The tutor from the Singer tutoring company

13    or the Singer college consulting company, Lily Ann, has

14    completed her certification that she normally communicates with

15    her customers at the time by text, and these were sent in the

16    regular course of her business.  It's certified under 803(6).

17    It's not for the truth of the matter, to show the Wilsons'

18    insistence of hard work for his daughters for test preparation

19    and his state of mind.  There's a total of three exhibits.

02:11 20    They bear the numbers Z8230, Z8231, Z8232, and then the

21    certification, Z8241.

22          MR. FRANK:  We object to the certification as invalid.

23    We object to these on authenticity grounds.  There is no

24    evidence that these were sent to the defendant.  We object to

25    them on 401, 403 grounds, and hearsay grounds.

1          THE COURT:  The objection is sustained to those three.

2          MR. KENDALL:  Your Honor, Exhibit Z9738, an e-mail

3    from John Wilson to Debbie Rogers and others.  It is with

4    respect to Hyannis Port Capital making a charitable donation.

5    It shows John Wilson's state of mind, a donation e-mail with

6    fees in the subject line.  The government is claiming that the

7    use of fees or payment is indicative that an item is not a

8    charitable contribution.  This is to refute that government

9    allegation and the contribution is made from HPC Capital.

02:12 10          MR. FRANK:  So the record is clear, this exhibit

11   appears to shows that the defendant had paid fees, rental fees,

12   which he then did not use and then donated the money

13   subsequently.  We object to it on 401, 403, and 802 grounds.

14          THE COURT:  Objection is sustained.

15          MR. KENDALL:  Your Honor, next would be Exhibit 9836.

16   This is a summary chart that Revenue Agent Ranahan went through

17   with me.  She validated the entries for the government in --

18   for Exhibit 482, the left and the right columns.  And we went

19   through with the middle column, under John Wilson, to show

02:12 20   that's just the defense's difference of opinion with her on the

21   calculation.  It's -- and she went through the calculation and

22   validated it if the assumptions we suggested were held that

23   this would be the correct calculation, the tax due, and owing.

24          MR. FRANK:  Your Honor, I believe the witness

25   testified there were errors in this chart and we object to it

```
 1    on those grounds and also on 401 grounds.
 2            THE COURT:  Objection sustained.
 3            MR. KENDALL:  Next, your Honor, we have Exhibit 9031A.
 4    This was discussed the other day.  The Court said we shouldn't
 5    offer it in the present form, but we could discuss it later.
 6    It's an e-mail between Jeff DeMaio, Debbie Rogers, and other
 7    people working with DeMaio, informing them about Wilson's
 8    intent to take a deduction on the donation in 2018 for Stanford
 9    and Harvard.  And then it's going to help to get to -- it's
10    going to go through a college through Rick Singer's foundation.
11    It goes to state of mind.  It goes to intent.  It goes to an
12    action, but it's not for the truth of the matter asserted.
13            MR. FRANK:  We object on hearsay and 403 grounds and
14    would also note this is -- as presented, this was a compilation
15    of multiple e-mails, so we object to it on those grounds, as
16    well.
17            MR. KENDALL:  It's 98 --
18            THE COURT:  Objection.  Sustained.  Go ahead.
19            MR. KENDALL:  This document, just for the record, your
20    Honor, on 9830A, is how the document was produced to us.
21    That's how we're presenting as an exhibit.
22            Exhibit 614, it's an e-mail showing the due diligence
23    John and his tax preparation team were doing with respect to
24    the 2018 donations, not for the truth of the matter asserted.
25    It's an e-mail chain.  At the top, it's with Debbie Rogers and
```

1    various people, Jeff DeMaio, John Wilson, and others.

2         MR. FRANK:  We object to the characterization of the

3    document.  We object on 403 and 802 grounds.

4         THE COURT:  The objection is sustained.

5         MR. KENDALL:  Your Honor, the next is Exhibit 111.  It

6    was originally on the government's exhibit list.  It shows a

7    chain of events for how invoices were introduced and came to be

8    created with respect to the tax charge.  It shows John was not

9    involved in this invoicing process, that Mr. Singer, Mr. Masera

02:15 10  were the people who were doing this.  It's for the fact that it

11   was sent, not for the truth of the matter asserted, that we

12   offer it, your Honor.

13        MR. FRANK:  I would note that the defendant is not on

14   this e-mail chain, and we also object to it on 802 grounds.

15        THE COURT:  Objection sustained.

16        MR. KENDALL:  Okay.  Your Honor, we had offered this

17   document before in the government's case.  I didn't know if the

18   issue was whether we had to reoffer it in our case because it

19   wasn't really for impeachment.  It's Exhibit 8189, which is the

02:15 20  customer list taken off of the sources of information from

21   Mr. Singer's company and produced to us by the government, I

22   believe.

23        MR. FRANK:  Object on 401, 403 and 802 grounds.

24        THE COURT:  Objection is sustained.

25        MR. KENDALL:  Your Honor, next would be Exhibit 1409

    1    and 9668.  They're both explanations of Mr. Singer explaining

    2    that the side door is an appropriate and legally correct thing.

    3    It's a 404(b), as well as to show Mr. Singer's state of mind.

    4    It's not for the truth of the matter asserted, but it directly

    5    refutes the testimony of Agent Keating and others that side

    6    door means a scheme and something illegal, as opposed to the

    7    way Mr. Singer uses it, that side door is an appropriate way to

    8    make a donation.

    9            MR. FRANK:  So we object to 9668 on 401, 403, and 802

02:16 10    grounds and also there are redactions that we object to, but I

   11    believe 614, which is not on my screen, may be in evidence

   12    though.  I need to look at that.

   13            THE COURT:  I thought it was 104 that we were

   14    referring to.

   15            MR. KENDALL:  The one I was just referring to about

   16    side door was Exhibit 1049, Exhibit 9668.

   17            THE COURT:  Okay.  You said 140.  It's 1049.

   18            MR. KENDALL:  My apologies, your Honor.  1049.  And

   19    it's redacted only to keep the person's name out.  I'm happy to

02:17 20    put the person's name back in if that's the issue for the

   21    government.

   22            MR. FRANK:  That's not the issue.  There were many

   23    issues.  We object to both of these on the same grounds, your

   24    Honor.

   25            614, I don't know --

         1              THE COURT:  I haven't heard about 614 yet.  Wait a

         2      minute.  Yeah.  That was in the last group.

         3              MR. FRANK:  I withdraw my objection.  614 is in

         4      evidence, your Honor.

         5              THE COURT:  Well, he offered that just a few minutes

         6      ago.

         7              MR. FRANK:  It was previously in evidence, I believe.

         8              THE COURT:  All right.  So that's not going to be part

         9      of this offering, right, Mr. Kendall?  614 is already in.

02:17   10              MR. KENDALL:  If 614 is in, that's fine, your Honor.

        11      Then we do not need to include it in the batch we've just done.

        12              MS. PAPENHAUSEN:  No.  This is the few pages that were

        13      not in, I believe, your Honor.

        14              MR. KENDALL:  I think these are two pages that were

        15      not part of 614 that were --

        16              MS. PAPENHAUSEN:  If I may, there was a 14 page

        17      document and the government objected to it in its present form

        18      as the compilation, which was how it was produced to us.  They

        19      didn't object to I think two pages at the beginning and

02:18   20      two pages at the end coming in.  This is the additional

        21      three pages in the middle that we're now offering.

        22              MR. FRANK:  Then I renew my objection.

        23              THE COURT:  All right.  614, the middle, objection to

        24      it is sustained.

        25              MR. KENDALL:  Your Honor, just for the record, I'll

 1    give the Bates numbers so there will be no confusion.  It has

 2    the bates USA-OBB01718787, 788, 789.

 3         THE COURT:  1049 the objection is sustained and 9688

 4    the objection is sustained.

 5         MR. KENDALL:  9668, your Honor.

 6         THE COURT:  I beg your pardon.  9668.

 7         MR. KENDALL:  Your Honor, Exhibit 9833 is a copy of a

 8    swimming roster off of the USC website.  It's undisputed in

 9    terms of its authenticity.  It's for the purpose of only one

02:19 10   point.  Mr. Singer used an e-mail we offered that showed a man

 11   named Nick Johnson writing to him and Singer wrote back and

 12   said you should talk about embellishing your description of

 13   your swimming.  This shows embellishing was being used in a

 14   perfectly honest and non-misleading way, because the man is a

 15   star of the USC swimming team.  So if he's going to embellish

 16   on his swimming, it shows the word "embellish" does not mean

 17   fraud.

 18        MR. FRANK:  We dispute that's what this document shows

 19   and we object on 401, 403 and 802 grounds.

02:19 20        THE COURT:  Objection is sustained.

 21        MR. KENDALL:  Okay.  Your Honor, with respect to the

 22   issue of the definition of honest services and USC's practice

 23   of using SUBCO to raise funds from candidates, as well as VIP,

 24   we have a series of exhibits.  You've already ruled on this

 25   concept.  We just want to put the exhibits on the list.  It

1  would be 7389, 7223, 7387, 7492, 1088, and 7242, all of which

2  would get the Z prefix, your Honor.

3      MR. FRANK:  We object on 403 and 802 grounds, your

4  Honor, and to some of these we object on 401 grounds.  There

5  was a --

6      THE COURT:  All six of them the objections are

7  sustained.

8      MR. KENDALL:  Okay.  We have two more things to go

9  through and it will be -- we're about past the halfway, your

02:20 10  Honor.  We would like to mark a copy of the complete transcript

11  of Mr. Walters' deposition yesterday given our objection to

12  Mr. Frank stating Vavic's arrest and the information related to

13  that.  We think there would be no basis given the deposition

14  and what the man testified to yesterday how Vavic had no impact

15  on him.  If we can just mark the transcript as whatever letter

16  you would like.

17      THE COURT:  What's the next one?

18      MR. FRANK:  Your Honor, the transcript is actually

19  appended to a pleading that we filed this morning in its

02:21 20  entirety, so we don't believe it needs to be marked.

21      MR. KENDALL:  Is it in its entirety?

22      MR. FRANK:  Yes.

23      MR. KENDALL:  Okay.  We don't have a copy of the

24  entire document.

25      THE COURT:  If it's already a part of a pleading in

1    its entirety, it doesn't need to be marked.

2            MR. KENDALL:  We agree, your Honor, if it's in its

3    entirety.  We'll take a look at the pleading if there's an

4    issue.

5            And then Miss Papenhausen has the list of exhibits

6    that the Court did not want us to go through with respect to

7    Coach Bowen, so we can just quickly list the exhibits that the

8    Court ruled we should not go through.

9            THE COURT:  All right.

02:21 10         MS. PAPENHAUSEN:  And your Honor, that is Exhibit 7003

11   and 7004, which are certified by Exhibit 8185.  And all of

12   these I should say, your Honor, we understand essentially that

13   your Honor has already ruled that the objections are sustained,

14   so this is for purposes of putting into the record.

15           THE COURT:  All right.  So I don't need it to make

16   rulings on these.  They've already been ruled on, correct?

17           MS. PAPENHAUSEN:  We didn't quite get to the point of

18   introducing all of these, your Honor.

19           THE COURT:  If they haven't been so ruled, I will rule

02:22 20   en masse that the objections are sustained.  Why don't you read

21   the numbers.

22           MS. PAPENHAUSEN:  Thank you, your Honor.

23           7069 and 7070, which are certified by Exhibit 8255.

24           Then we have Exhibit 7071 and 7072, which are

25   certified by Exhibit 8264.

1          Then we have Exhibit 7076, 7077, and 7078, which have

2   been certified as business records by Exhibit 8194.

3          Then we have Exhibit 8030 and 8031, which have been

4   certified by Exhibit 9750.

5          Then, finally, we have Exhibits 8144, 8157 and 8163,

6   which have been certified by Exhibit 8142.

7          MR. FRANK:  And just for the record, we object on

8   authenticity, 802 and 403 grounds to all of those exhibits.

9          THE COURT:  The objections are sustained with respect

02:23 10   to all of those exhibits.

11          MR. KELLY:  Your Honor, separate and apart from those

12   Z exhibits are the four you referenced earlier.  The Court

13   already ruled and has sustained objections, and for ease of

14   reference later, I'll coordinate with the deputy clerk with the

15   next letters in line, but it's Exhibits 1219, Exhibit 1288,

16   Exhibit 1085, and Exhibit 1374B.  They've already been

17   objected to and --

18          THE COURT:  What was the last number?

19          MR. KELLY:  1374B.

02:24 20          THE COURT:  And they -- all right.  Do we happen to

21   know how many letters we've used?

22          MR. KELLY:  I was struggling to figure that out, but I

23   don't know what's the next letter.

24          THE COURT:  All right.  We will use -- my best memory

25   is we got up to about H.  So let's start with J.  19 will be J.

```
 1  1288 will be K.  1085 will be L.  1374 will be M.
 2          MR. KELLY:  Yes.  Your Honor, 1374B.
 3          THE COURT:  I'm  sorry.  1374B will be M.
 4          MR. KELLY:  Thank you.
 5          (Exhibit J, K, L, M marked for Identification.)
 6          MR. KENDALL:  Your Honor, for purposes of, I hope,
 7  consistency and convenience, we've offered some documents prior
 8  to today that the Court similarly ruled would not be
 9  admissible.  I think it would be easier if we made all of those
10  Z prefixes and then quickly to identify those as one category.
11          THE COURT:  You mean instead of letters?
12          MR. KENDALL:  No, the Z plus the letter, like we've
13  done today.  We'll do that for the stuff that we offered last
14  week.
15          THE COURT:  Any problem with that?
16          MR. FRANK:  No, your Honor.
17          THE COURT:  All right.  We'll do that.
18          MR. KENDALL:  Your Honor, that now leaves we have
19  three documents you've ruled are admissible, that you ruled
20  this morning, so given your ruling, we'd like to read those to
21  the jury later today.
22          THE COURT:  Those will be read to the jury.
23          MR. KENDALL:  And then there's one document that's
24  already in evidence.  That's exhibit -- I think it's 49.  Let
25  me take a look.  Exhibit 49's already been admitted.  We wanted
```

1    to read that to the jury, and those are the only things that we

2    would read to the jury before we close.

3         THE COURT:  That will be done after we call the jury.

4         MR. KENDALL:  Thank you, your Honor.

5         MR. FRANK:  Just briefly, your Honor, I want to

6    inquire about the Court's intention with regard to inquiring of

7    the defendants about their decision not to testify and also

8    with respect to the *Petriezzello* rule.

9         THE COURT:  Well, *Petriezzello* will come after the

02:26 10   close of the evidence and that can be this afternoon if we have

11   time.  Why do I need to inquire of the defendants that they

12   choose not to testify?

13        MR. FRANK:  We just think it would be a good idea to

14   put it on the record, your Honor, but we defer to the Court.

15        MR. KELLY:  It's -- objection, your Honor.  We don't

16   call the witnesses.

17        MR. KENDALL:  Our clients are present and we're not

18   calling them.  I think that it's obvious.

19        THE COURT:  All right.  Fair enough.

02:26 20   MR. FRANK:  Thank you, your Honor.

21        THE COURT:  Call the jury.

22        (Jury enters.)

23        THE CLERK:  Thank you.  You may be seated.

24        THE COURT:  Good afternoon, jurors.  Once again, we

25   needed to use time outside of your hearing to talk about legal

 1    matters.  We're ready to proceed now with the defendants' case.

 2            Mr. Kendall, do you have other evidence to --

 3            MR. KENDALL:  I believe it's cross of Mr. Bowen, your

 4    Honor.

 5            THE COURT:  I'm sorry.  I beg your pardon.  We're

 6    going to do that first and then do the rest of it.

 7            MR. KENDALL:  Yes, your Honor.

 8            THE COURT:  So we're going back to the

 9    cross-examination of the witness.

02:28 10            You are reminded that you remain under oath,

11    Mr. Bowen.

12            THE WITNESS:  Yes.

13            THE COURT:  Cross examination by Mr. Frank.

14            MR. FRANK:  Thank you, your Honor.

15                    CROSS-EXAMINATION OF JOHN BOWEN

16    BY MR. FRANK:

17    Q.   Good afternoon, Mr. Bowen.

18    A.   Good afternoon.

19    Q.   You've been a water polo coach for quite some time.  I

02:29 20    think you said 22 years?

21    A.   That's correct.

22    Q.   And you've also been a teacher for a very long time.  I

23    think you said 16 or 17 years?

24    A.   22, but for five years in college, then 16 at Menlo.

25    Q.   And you've taught philosophy and ethics?

 1    A.    Yes.

 2    Q.    And you've actually written and spoken about ethics in

 3    sports, correct?

 4    A.    Yes.

 5    Q.    And you've written a book entitled *Sports Ethics and*

 6    *Leadership*?

 7    A.    Yes, co-authored.

 8    Q.    And in those writings, you've analyzed moral issues in

 9    athletics?

02:29 10    A.    Yes.

11    Q.    You've written and spoken about a topic called "flopping"?

12    A.    Yes.

13    Q.    What is flopping?

14    A.    The technical term is simulation, but flopping is most

15    common in soccer.  It happens in all sports where a player

16    simulates a foul that did not actually occur with the hopes and

17    intent to earn a foul that he otherwise did not deserve.

18    Q.    And you called that immoral and unethical?

19    A.    That is my position.

02:30 20    Q.    And you said it's deceiving the referee?

21    A.    Amongst other criteria, yes.

22    Q.    And taking something you don't deserve?

23    A.    Amongst other things, yes.

24    Q.    And I believe you said that, in normal secular life, we

25    call that stealing?

A.   Well, there's a third criteria that involves -- I mean,
I'm happy to break down all the criteria.

Q.   I believe you spoke at the Fifth Annual Institute of
Sports Law and Ethics Symposium at Santa Clara University in
2014?

A.   Yes.

Q.   And you said there that flopping is immoral.  "You're
deceiving the referee and you're taking something you don't
deserve.  In normal secular life, we call that stealing."

02:30 A.   Yes.  That was the end of a long argument.

Q.   That's what you said, right?

A.   It's really hard to remember exactly what I said.  I've
given a lot of talks.  It sounds like something I would have
said, I guess, to be accurate.

Q.   And you've also written that when a player intentionally
breaks a rule intending to avoid detection in order to gain an
advantage, the player has cheated?

A.   With deception.  Are you including that criteria?  I'm
just trying to understand.

02:31 Q.   I'm just reading what you've written and asking you if you
remember writing that "when a player intentionally breaks a
rule intending to avoid detection in order to gain an
advantage, the player has cheated".

A.   Yes.  That sounds like something I've written.

Q.   And when college coaches -- when you speak with them about

1    potential recruits, you give them an honest assessment, is that

2    correct?

3    A.   Yes.

4    Q.   And you understand that recruiting is very important for

5    colleges?

6    A.   For their sports programs?

7    Q.   Yes.

8    A.   Yes.

9    Q.   And you've written that "successful recruiting provides

02:32 10   the lifeblood for college athletics"?

11   A.   Where did I write that?  I'm sorry.  I've written a lot.

12   Q.   I understand.

13          MR. FRANK:  Can we show the witness only Exhibit 767,

14   please.

15   Q.   This is Chapter 4 of your book.  Does that refresh your

16   recollection that you wrote "successful recruiting provides the

17   lifeblood for college athletics"?

18   A.   Yes.

19   Q.   And that "to produce winning sport programs, coaches and

02:32 20   administrators must find student-athletes with outstanding

21   abilities."

22   A.   Yes.

23   Q.   You recall writing that?

24   A.   Yes.

25   Q.   And that's your view, correct?

```
 1    A.   Yes.
 2         MR. FRANK:   Okay.  We can take that down.
 3    Q.   Now, in 2013, there were two John Wilsons on the Menlo
 4    water polo team, correct?
 5    A.   Correct.
 6    Q.   The other John Wilson, John D. Wilson, was an exceptional
 7    goalie?
 8    A.   Yes.
 9    Q.   And goalies are more recruitable than other positions?
10    A.   It's situational.  The benefit of being a specific
11    position -- so a team knows they either do not need a goalie or
12    absolutely.  It's much more cut and dry and black and white.
13    Q.   Typically, they're more recruitable in your view, correct?
14    A.   No.  Well, last -- this current year, actually if you
15    wanted to go to the school where John Wilson attended and you
16    were a goalie, you would not get in because they have two very
17    strong freshmen due to not having freshmen goalies the previous
18    year.  So, actually, this would be a terrible year for someone
19    who is a goalie wanting to attend Johns Hopkins.
20    Q.   Do you recall speaking to FBI agents and government
21    attorneys on October 29, 2018?
22    A.   I know we spoke.  I don't know the date.
23    Q.   And you know they were taking notes during that
24    conversation?
25    A.   I -- I have no idea what they were doing.
```

1    Q.   And you were attempting to be truthful in that

2    conversation, correct?

3    A.   Yes.

4         MR. FRANK:  Can we show the witness only the 10/29/19

5    302 at page 2.

6         MR. KELLY:  Objection.  There's no evidence he wrote

7    it.

8         THE COURT:  I take it you're showing it to him to

9    refresh his memory?

02:34 10        MR. FRANK:  To refresh his recollection.

11        THE COURT:  You can do that.

12        MR. FRANK:  And Miss Lewis, if you could --

13        MR. KENDALL:  Your Honor, I don't think he said he's

14   forgotten anything.  I don't think Coach Bowen, Mr. Bowen, said

15   he had a failure of memory.

16        THE COURT:  All right.

17        Go ahead, Mr. Frank.

18        MR. FRANK:  If you could highlight, Miss Lewis, just

19   above the middle of the page, the short paragraph there, the

02:34 20   very short paragraph, the second sentence.

21   Q.   Do you recall saying that goalies are more recruitable

22   than other positions?

23   A.   I don't.  I stand by what I just said about two minutes

24   ago.  It's the exact answer.  This, I'm not sure.  What I just

25   said is, really, if anyone is looking to be recruited as a

```
 1    goalie, what I just said is the best advice and the most true
 2    statement I can say about being recruited as a goalie.
 3              So last year the goalie --
 4    Q.   There's not a question pending.
 5    A.   Pardon?
 6    Q.   There's not a question pending for you right now.
 7              But John D. Wilson was an exceptional goalie,
 8    correct?
 9    A.   Yes.
10    Q.   And he was recruited to Hopkins?
11    A.   Johns Hopkins, yes.
12    Q.   And that's a Division 3 school, correct?
13    A.   Yes.
14    Q.   Now, you don't recall any USC coaches coming to watch
15    Johnny Wilson, Johnny B. Wilson, play water polo, do you?
16    A.   I don't recall it.
17    Q.   And you testified earlier that you offered to help Johnny
18    with his admission process and write a letter for him.  Do you
19    recall that testimony?
20    A.   Yes.
21    Q.   And I believe counsel asked you if you would do anything
22    you could to help and you testified that was too strong a
23    statement.  Do you recall that?
24    A.   Yes.
25    Q.   Because you wouldn't lie, correct?
```

1    A.   Correct.

2    Q.   And you wouldn't pass a bribe?

3    A.   Correct.

4    Q.   And you testified earlier that you spoke with a coach at

5    USC and you thought it must have been Coach Pintaric?

6    A.   That was my best guess.

7    Q.   Right.  It was a guess?

8    A.   It was not Vavic and Pintaric is the one I speak to mostly

9    on the phone.  Casey Moon is often carbon copied on e-mails.

02:36 10   Q.   So fair to say, sir, that you don't remember who you spoke

11   to?

12   A.   I couldn't be exact.  That's fair to say.

13   Q.   And you don't remember what you said?

14   A.   Correct.

15   Q.   Okay.  But you were always, I believe you said, painfully

16   truthful?

17   A.   Yes.

18   Q.   Okay.  And the truth is that Johnny B. Wilson was a B plus

19   player in high school, correct?

02:36 20   A.   It's really hard to put a grade on him.  He had A plus

21   speed.  He was a B shooter.  He had A minus ability to steal.

22   He had B plus ability to split the gap.  I'm not happy with the

23   grading system.  I've never really used it before, but I have

24   used to try and frame it in the past, so I don't know what the

25   average grade would be.

1    Q.   Well, do you recall telling the government when we first

2    interviewed you that you thought Johnny was a B plus player?

3    A.   I've been saying B plus/A minus as a way to frame how USC

4    recruits player.  They recruit A's.  Johnny was a B plus, A

5    minus if you put together all the pieces.

6    Q.   Well, when you spoke to the government in October of 2019,

7    do you recall saying he was a B plus player?

8    A.   I read that I did, yes.

9    Q.   Okay.  And then after that you spoke with Mr. Wilson's

02:37 10   counsel, correct?

11   A.   Correct.

12   Q.   And, in fact, you spoke with Mr. Wilson's counsel about

13   once a month for at least six months between that interview and

14   the time we spoke to you again?

15   A.   Sounds about right.

16   Q.   Okay.  And then in a second interview you told us that

17   Johnny was an A minus water polo player, correct?

18   A.   Sounds correct.

19   Q.   But then you thought about it some more and then said

02:38 20   Johnny was, in fact, a B plus water polo player?

21   A.   Like I said, this is not a system I'm used to using.

22   Q.   But those were your grades, right?

23   A.   Yes.

24   Q.   Okay.  And your testimony -- I believe you told us that

25   USC recruits A, A plus players, correct?

```
 1    A.    If we're sticking with this unfortunate grading system,

 2    yes.

 3    Q.    Well, the unfortunate grading system is one you came up

 4    with, correct?

 5    A.    It's not one that I use.  It was my way of -- the FBI

 6    called me for the first time in my life and started asking me

 7    questions, and I tried to immediately explain in laymen's terms

 8    what had gone on in a way I've never -- language I've never

 9    used before.  I'd prefer to use the common language, but yes.

02:38 10    That's correct.  B plus, A minus, B plus.

11    Q.    The upshot was you didn't think Johnny would get into USC

12    as a water polo player, correct?

13    A.    No, I don't -- did I think at the time he would get in?

14    Q.    You did not think?

15    A.    I'm trying to remember seven years ago what I thought.

16    Q.    I'm actually asking you for your memory of what you told

17    us two years ago.

18    A.    I don't.

19          MR. FRANK:  Could we show the witness the 10/29 302 at

02:39 20    page 4, please.  If you could highlight the first two sentences

21    of the second -- of that full paragraph.  No, no.  I'm sorry.

22    Miss Lewis, that -- exactly.  Thank you.

23    A.    Oh, yeah.  Surprised, not shocked, yes.

24    Q.    Do you see the top sentences that are highlighted?

25    A.    Yes.
```

1    Q.   Does that refresh your recollection that you told the

2    government that you did not think that John B. would get into

3    USC as a water polo player?

4    A.   Yes.

5    Q.   That was truthful when you said it?

6    A.   Yes, given the circumstances at the time.

7    Q.   It was truthful, correct?

8    A.   It was as truthful as I could be, absolutely.

9    Q.   And I believe you testified this morning that when he did

02:40 10   get in, you thought your phone call must have done it.  Do you

11   recall that testimony?

12   A.   Oh, yeah.

13   Q.   Okay.  Did you know that Johnny was working with an

14   outside college counselor named Rick Singer?

15   A.   I did not.

16   Q.   And you testified that Johnny was living with another

17   family his senior year?

18   A.   Yes.

19   Q.   That was the Driscoll family?

02:40 20   A.   Yes.

21   Q.   Wyatt Driscoll was Johnny's friend?

22   A.   Yes.

23   Q.   Rudy Driscoll was his father?

24   A.   Yes.

25   Q.   And did you know that Wyatt Driscoll was working with the

1    same college counselor, Rick Singer?

2    A.    No.

3          MR. FRANK:  And if we could show -- if we could call

4    up Exhibit 83 in evidence at page 3.  And if you could,

5    Miss Lewis, in the October 13th e-mail below that -- no --

6    that -- from Rick Singer, if you could highlight just that

7    e-mail from Rick Singer.

8    Q.    Directing your attention, Mr. Bowen, to the second

9    sentence of that e-mail, do you see where it says, from Rick

02:41 10   Singer, "Jovan has Johnny's stuff and asked me to embellish his

11   profile more, which I am doing"?

12   A.    Yes.

13   Q.    Have you seen that e-mail before?

14   A.    Boy, I don't remember.

15   Q.    Have you seen an e-mail from Rick Singer to John Wilson,

16   the defendant?

17   A.    I don't remember.

18   Q.    But you see what it says, "Jovan has Johnny's stuff and

19   asked me to embellish his profile more, which I am doing"?

02:41 20   A.    Yes.

21          MR. FRANK:  And then, Miss Lewis, if you can move two

22   e-mails up.  If you could enlarge -- if you could highlight the

23   second paragraph.

24   Q.    Do you see, Mr. Bowen, where it says "Jovan will provide

25   Johnny's info to admission when he does his other guys over the

1    next month.  No payment of money till he gets a verbal and

2    written from admissions and then 50 percent to a savings

3    account I set up.  Then the remainder upon an acceptance letter

4    in March with everyone else"?  Have you seen that e-mail

5    before?

6    A.   I don't think so.

7         MR. FRANK:  And if you -- Miss Lewis, if you back out

8    of that.

9    Q.   You see that that e-mail was exchanged with John Wilson at

02:42 10   John@HyannisPortCapital.com?

11   A.   Yes.

12   Q.   And that's the same e-mail address that you used to

13   communicate with Mr. Wilson, correct?

14   A.   I recall him having two e-mail addresses.

15   Q.   Do you recall using that e-mail address to communicate

16   with him?

17   A.   I'm sure I had at some point, yes.

18        MR. FRANK:  If we can show, the witness only,

19   Exhibit 752, please.

02:42 20   Q.   Does that refresh your recollection, Mr. Bowen, that you

21   e-mailed Mr. Wilson at John@HyannisPortCapital.com?

22   A.   Yes.

23        MR. FRANK:  If we can show the witness only

24   Exhibit 88 -- I'm sorry.  If we can pull up Exhibit 88 in

25   evidence.

1    Q.   And this is the profile that you went through with

2    Mr. Kendall earlier?

3    A.   Yes.

4    Q.   You recall going through this and discussing that these

5    honors are mostly false?

6    A.   Yes.

7    Q.   And Johnny wasn't on the varsity team for four years?

8    A.   He didn't earn a varsity letter for four years.

9    Q.   And he was not cocaptain ever?

02:43 10    A.   Correct.

11    Q.   He was never cocaptain, correct?

12    A.   Correct.

13    Q.   Okay.  And then you went through a bunch of honors with

14    Mr. Kendall that Johnny did win.  Do you recall that?

15    A.   Yes.

16    Q.   Including some various honorable mention awards?

17    A.   Yes.

18    Q.   Would you agree that this profile makes him look like a

19    better player than the player you described?

02:44 20    A.   Yes.

21         MR. FRANK:  And if we could go back to the cover page.

22    Q.   Mr. Kendall didn't show you this part, but do you see that

23    this profile was made to John Wilson at -- mailed to John

24    Wilson at John@HyannisPortCapital.com?

25    A.   Yes.

```
 1    Q.   And that's the same e-mail address that you used when

 2    communicating with Mr. Singer?  I'm sorry.  With Mr. Wilson?

 3    A.   Yes.

 4    Q.   And this e-mail was six days after the last e-mail that we

 5    looked at?  Do you recall that?

 6    A.   I can go back and look at the date.

 7    Q.   Can we show -- you see this is October 19, 2013?

 8          MR. FRANK:  Miss Lewis, can you show Mr. Bowen

 9    Exhibit 83.

02:45 10    A.   Six days, yes.

11          MR. FRANK:  Could we show -- could we call up

12    Exhibit 107 in evidence, please.

13    Q.   Have you seen this document before, Mr. Bowen?

14    A.   It doesn't look familiar.

15    Q.   And if we look at the second page, have you seen this

16    profile before?

17    A.   I see so many of these resumes.  That doesn't -- I don't

18    know.

19    Q.   This is the Subcommittee packet for Johnny Wilson.  This

02:45 20    is what was presented to the USC Subcommittee on Athletic

21    Admissions.  Do you believe you've ever seen this?

22    A.    It's really hard for me to say accurately.  I've seen

23    thousands of sports resumes.

24    Q.   But you don't typically see the internal working documents

25    of the USC Subcommittee on Athletic Admissions, do you?
```

1    A.    No.

2    Q.    Okay.  And a lot of those same falsehoods that you looked

3    at on Exhibit 88 are on this resume, correct?

4    A.    There are -- yes.

5    Q.    For example, it says four-year varsity starter.  That's

6    not true, correct?

7    A.    He did not start as a freshman.

8    Q.    And it says three-year varsity team captain?

9    A.    That's not correct.

02:46 10   Q.    That's not correct either.

11         And then if we look at the bottom, there are some

12   additional things on this resume, you see that, that we didn't

13   see on the other resume?

14   A.    Yes.

15   Q.    Under "Assets to our Men's Team"?

16   A.    Yes.

17   Q.    "Top 10 Attacker in Grad Class".  Johnny was not amongst

18   the top ten attackers in the entire country that year, was he?

19   A.    No.

02:47 20   Q.    Okay.  And then it says below that, second from last,

21   "Exceptional Leader".  Do you see that?

22   A.    Yes.

23   Q.    You never told, whichever coach you spoke with at USC,

24   that Johnny was an exceptional leader, did you?

25   A.    I don't remember saying that.

```
 1   Q.    It wasn't true, was it?

 2   A.    I don't know if I'm capable of saying that's true or

 3   false.

 4   Q.    Well, do you recall telling the FBI when you spoke with

 5   the FBI that John was not a strong enough leader to be elected

 6   captain?

 7   A.    Yes.

 8   Q.    And that was true, correct?

 9   A.    Yes.

10   Q.    And then it says "Immediate impact player".  Do you see

11   that?

12   A.    Yes.

13   Q.    And you testified earlier that you thought Johnny could

14   contribute later in his career.  He was a quiet grinder,

15   correct?

16   A.    Correct.

17   Q.    But you did not expect him to be an immediate impact

18   player on the championship USC water polo team, did you?

19   A.    Correct.

20   Q.    And would you agree that this profile is deceptive?

21   A.    It has falsehoods in it.

22   Q.    Would you agree that makes it deceptive?

23   A.    If they were intentional.

24   Q.    And would you agree that someone lying -- as someone

25   relying on this profile, would be misled about Johnny's
```

```
 1   abilities?
 2           MR. KENDALL:  Objection, your Honor.  Can't speak to
 3   what other people were thinking would happen with other people.
 4           THE COURT:  Sustained.
 5   Q.   Would you agree, sir, that lying on a profile is not being
 6   your best?
 7   A.   Yes.
 8           MR. FRANK:  No further questions.
 9           THE COURT:  Redirect, Mr. Kendall?
10           MR. KENDALL:  One moment, your Honor.
11                   REDIRECT EXAMINATION OF JOHN BOWEN
12   BY MR. KENDALL:
13   Q.   Mr. Bowen, I think when you were under examination you
14   said he had A plus speed?
15   A.   Yes.
16   Q.   Did you also say he had an A or A plus work ethic as a
17   grinder?
18   A.   Yes.
19   Q.   Okay.  Did -- was it your view that he could make a -- if
20   he had joined the USC program and stuck with it, he would make
21   a meaningful contribution to it?
22   A.   The way I've consistently framed it as I did believe,
23   given his speed and his water polo IQ, that at some point by
24   his junior or senior year he could make a contribution to a
25   program like USC.
```

 1              MR. KENDALL:  Okay.  Thank you very much.

 2              THE COURT:  Any recross?

 3                    RECROSS EXAMINATION OF JOHN BOWEN

 4    BY MR. FRANK:

 5    Q.   He was not an immediate impact player, correct?

 6    A.   Correct.

 7              MR. FRANK:  No further questions.

 8              THE COURT:  Thank you, Mr. Bowen.  You may step down.

 9              MS. PAPENHAUSEN:  Your Honor, at this point we have

02:49 10   some documents we'd like to put up.

11              THE COURT:  Yes.  Miss Papenhausen.

12              MS. PAPENHAUSEN:  Thank you, your Honor.

13              First, I would like to formally move into admission

14    the three exhibits that we previously discussed today, your

15    Honor.  They are 9901, 9899, and 9902.

16              THE COURT:  For the record, will you describe them,

17    please?

18              MS. PAPENHAUSEN:  Sure.  Exhibit 9901 is an e-mail

19    chain.  The top e-mail is from Debbie Rogers to John Wilson,

02:50 20   dated October 17, 2013.

21              THE COURT:  That will be admitted, 9901.

22              (Exhibit 9901 admitted into evidence.)

23              MS. PAPENHAUSEN:  Exhibit 9899 is an e-mail with an

24    attachment from Leslie Wilson to John Wilson, dated October 19,

25    2013.

1         THE COURT:  That will be admitted.

2         (Exhibit 9899 admitted into evidence.)

3         MS. PAPENHAUSEN:  Then Exhibit 9902 is an e-mail from

4    John Wilson to Leslie Wilson, dated October 19, 2013.

5         THE COURT:  And that will be admitted.

6         (Exhibit 9902 admitted into evidence.)

7         MS. PAPENHAUSEN:  And your Honor, at this point I

8    would like to read in some parts of both of these documents and

9    some other documents that are already in evidence.

02:51 10         THE COURT:  You may do so.

11         MS. PAPENHAUSEN:  Thank you, your Honor.

12         If we could first, please, put up Exhibit 712.

13         And if you could enlarge the top, please, Mr. Carter,

14    and if you could highlight, please, who this e-mail is from and

15    who it is to, and the date of 10/19/2013 and the time of

16    8:53:47 p.m.  And the subject line, please, "water polo shot".

17    And then could you please turn to page 2, which is the

18    attachment.  Thank you, Mr. Carter.

19         And if we could next please put up Exhibit 9901, which

02:51 20    has just been admitted.  Excuse me.  9901.  Thank you.

21         And if we could start please at the last e-mail of the

22    chain on the second page.  If we could highlight, please, who

23    this e-mail is from, just John Wilson, who it's to, Debbie

24    Rogers, the date, please, of October 17, 2013, and -- oh, I'm

25    sorry.  We're not at the very bottom one.

     1              If we could look, please, at the very bottom one and
     2    highlight the -- who it is from, which is Debbie Rogers, and
     3    the date, which is October 17, 2013.  And then this e-mail
     4    reads "For Johnny's senior page, there is no limit on words for
     5    tribute.  More words equals smaller print".
     6              And if we could look at the e-mail just above this.
     7    And at this point, Mr. Carter, if you could please highlight
     8    who it's from and who it's to and the date, which is
     9    October 17, 2013.  Then the text is "I know nothing of this.
02:53 10   What is it?"
    11              And then if we could flip, please, or move up, scroll
    12    up, to the next e-mail sequentially, and if you could note
    13    below that -- if you could highlight from Debbie Rogers.  Thank
    14    you.  On October 17, 2013 is the date.  And then the text is
    15    "yearbook page for Johnny.  I have samples you can look at when
    16    you get here".
    17              And then if we can look, please, to the e-mail
    18    immediately above that, which is from John Wilson to Debbie
    19    Rogers, dated October 17, 2013, and the text is "Is it an ad
02:53 20   that we buy?"
    21              And if you could go, please, to page 1 of this
    22    document -- sorry.  The bottom of page 1.  Flip further down,
    23    please.  Sorry.  Top of page 2.  From Debbie Rogers,
    24    October 17, 2013.  And she writes, "You pay 250 for the page,
    25    provide up to five pictures, and write a tribute to Johnny if

1    you want to".

2         And then if we could flip, please, to page 1, and

3    let's go all the way to the second e-mail from the top, which

4    is -- yes, October 17, 2013, 2:41 p.m. from John Wilson to

5    Debbie Rogers.  The text is "D don't see examples".

6         If we could look, please, at the e-mail at the top

7    from Debbie Rogers to John Wilson, October 17, 2013, and then

8    the text is "I have the examples printed out to show you when

9    you get here".

02:54 10         Now, Mr. Carter, if we could please go to

11   Exhibit 9899.  And if you could -- thank you.  And can we

12   actually put that next to Exhibit 88.  If we could look at

13   Exhibit 88, perhaps blow it up a little bit, the date there we

14   see is Saturday, October 19, 2013.  Then if we could look,

15   please, over at 9899, the date there is October 19, 2013, 11:46

16   a.m. from Leslie Wilson to John Wilson.  The subject is senior

17   page.

18        And then if we could look at Exhibit 9899.  I think we

19   can get rid of Exhibit 88.  If we can look at Exhibit 9899 in

02:56 20   the text of the e-mail, please.  It says, "This is one photo I

21   really like from a game this year showing Menlo's championship

22   banner in the background".

23        And then could we turn to page 2, please, of

24   Exhibit 9899, page 3?

25        Next could we pull up Exhibit 9902, please.  And if we

 1   could highlight it's from John Wilson to Leslie Wilson, date

 2   October 19, 2013, 3:32:24 p.m., subject "Johnny year book".

 3   Then the text is "Johnny yearbook, every year you make us

 4   prouder!  From a wonderful baby to a delightful child to an

 5   accomplished young man!  Best wishes as you pursue your

 6   dreams".

 7        Next, please, Mr. Carter, if we could put up

 8   Exhibit 49.  And let's start here, please, at the bottom of

 9   page 2.  The very bottom e-mail there, if we can highlight

02:57 10   is -- who it's from and who it's to and the date.  And if we

11   can un-zoom so we can see at the bottom there?  It says

12   "itinerary for John Wilson".

13        And then if we can turn to page 3, continuing the

14   e-mail, we see "Tuesday, April 2nd, USC, 9 o'clock a.m. campus

15   tour".

16        If we go down to the next bullet point, it says "LMU,

17   1 o'clock p.m. to 2:30 p.m. campus tour".

18        Then we see "Wednesday, April 3rd".  We see "UCSB"

19   under that.

02:58 20        Further down, we see "Thursday, April 4th" and "USC"

21   under that.

22        Then if we can go back to page 2, please.  It's an

23   e-mail about two-thirds of the way down the page, which is

24   March 26, 2013, at 1:27 p.m.  And if you could highlight who

25   that e-mail is from.  And then the text is "Rick, these are

1    generic tours?  I thought we might be meeting with assistant

2    water polo coaches et cetera, John."

3              And then if we can go next, please, to the bottom of

4    page 1, the e-mail there, if we can highlight who it's from,

5    perfect, and who it's to and the date, please.  And then the

6    third paragraph of that e-mail says "Jovan just texted me.  He

7    will meet you all at 3:30 p.m. on Tuesday on the pool deck.

8    You will have to leave LMU early".

9              And then if we could back out of that, and above the

02:59 10   e-mail we just read, we can see it says "begin forwarded

11   message".  If you can highlight, we see that forwarded message

12   is from Leslie Wilson.

13             Then if you could go up, please, to the e-mail above

14   that, which we see is from John Wilson.  That e-mail reads, in

15   part, starting at the middle of the first line "What are the

16   schools that he has a realistic shot at (without help)".

17             And if we can go up, please, to the e-mail above that.

18   We can highlight, please, who it's from, Rick Singer.  Then if

19   you could highlight, please, on the second line of the e-mail

03:00 20   where it says "USC".

21             Thank you, your Honor.  That's all.

22             THE COURT:  All right.  Defendant Abdelaziz's counsel?

23             MR. KELLY:  Your Honor, we rest.

24             MR. KENDALL:  We rest as well, your Honor.

25             THE COURT:  Defendant Wilson's counsel?

1          MR. FRANK:  We rest.

2          THE COURT:  All right.  What that means, jurors, is

3    the evidentiary part of this case is concluded.  The defendants

4    have rested.

5          As I told you last week, I thought we would get to

6    this point.  We need tomorrow to prepare all of the legal

7    issues that we have to go over, so we're not going to have a

8    session tomorrow, Tuesday.  And I'm going to ask you to come

9    back on Wednesday morning at 9:00 a.m., at which point you will

03:01 10    hear closing arguments.  You will hear first from the

11    government.  Then you will hear from both of the defendants.

12    Finally, the government has an opportunity to say a rebuttal.

13          So again, you've heard all of the evidence, but you

14    have not heard closing arguments.  You've not heard my

15    summation and my instructions to you on the law.  I'm going to

16    do that not on Wednesday, because Wednesday may be a full day

17    just hearing the closing arguments.  And rather than give you a

18    charge mid to late afternoon and ask you to start deliberating

19    late afternoon, I'm not going to do that.  We --

03:02 20          After the closing arguments by counsel on Wednesday,

21    we will recess.  I don't know exactly what time that will be.

22    It will be somewhere around the middle of the day, 1:00 to

23    1:30, somewhere around that.  But I'm going to let them let you

24    off for the rest of Wednesday to come back on Thursday morning,

25    at which point you will hear my charge on the law, which won't

be quite as long as both sets of arguments, but it will be long

and detailed.  And then after that, sometime mid morning on

Thursday, the case will be submitted to you.

All of this is for your planning and for your

understanding, but I need to urge you even more urgently than I

have before not to try to do any independent research in this

time that you have off, not to talk to anybody about this case,

not to refer to anything in the media about this case.  All of

that would be inappropriate and might put something in your

head that's not the evidence, the evidence you have heard.

You haven't heard closing arguments.  You haven't

heard my instructions on the law, but you have heard the

evidence.  You're the only ones that have, not anybody else out

there who's going to talk to you informally about this case or

a newspaper article or anything else has seen and heard all of

the evidence you have.  So that means that you are to keep to

yourself until after all this is done.

And then after my charge to you, you'll go into the

jury room and then you will deliberate, and that is the

appropriate time to express your opinions and hear what all the

other jurors have to say.  So please honor those instructions.

I will see you day after tomorrow.  That's -- my deputy will

give me the date just so I don't mess up.

THE CLERK:  That is Wednesday the 6th.

THE COURT:  Wednesday, October 6th.  So that's

1   two days from now, and then my charge will be to you on

2   Thursday, October 7th.  Have a pleasant day off.  I'll see you

3   back here on Wednesday morning at 9:00 a.m.

4        THE CLERK:  All rise for the jury.

5        (Jury exits.)

6        THE COURT:  Be seated, counsel.

7        *Petriezzello*.

8        MR. FRANK:  Your Honor, we would move to have all the

9   coconspirator statements admitted pursuant to *Petriezzello*.

03:04 10      THE COURT:  Do you have any argument to make in that

11  regard?

12        MR. FRANK:  I certainly can if the Court would like,

13  your Honor.  We believe there's been extensive evidence in this

14  case about the nature of the scheme, about the fact that it

15  involved fraudulent athletic profiles that were falsified that

16  were accompanied by payments of money to USC athletic programs,

17  other athletic programs, and then ultimately to individuals at

18  those universities in exchange for the admission of those

19  students as recruited athletes.

03:05 20      We also believe there was extensive evidence of the

21  defendants' participation in that scheme.  We submitted e-mail

22  evidence showing them receiving each of those fraudulent

23  athletic profiles, which contained all sorts of falsified

24  information.  There's really no dispute about the fact that the

25  profiles were falsified, that they were sent to the defendants'

1    e-mail accounts.  They were sent to and received in e-mail

2    accounts that the defendants actually used and that defendants

3    thereafter made substantial payments to The Key Worldwide

4    Foundation with the understanding that that money would be

5    passed on to the athletic programs at the Universities where

6    their students were being recruited, their children were being

7    recruited, based upon those falsified athletic profiles.

8         The payments were styled as donations.  Although the

9    defendant Wilson deducted them, in part, as a donation and, in

03:06 10   part, as a business expense, there was extensive evidence that

11   they were neither, but that they were quid pro quo payments in

12   exchange for the admission of those students based -- as

13   recruited athletes, based on those falsified profiles.

14        There was also evidence from the Subcommittee on

15   Athletic admissions that they relied on those profiles.  They

16   believed that that came from the coaches.  They were unaware of

17   the fact that there were payments being made in connection with

18   those and that those students would not otherwise have been

19   admitted.

03:06 20        And there was evidence that, for example, Sabrina

21   Abdelaziz, never showed up.  There was also evidence that

22   Johnny Wilson didn't show up, and even if he did show up, he

23   dropped off after one semester, which is exactly what Rick

24   Singer told his father he could do at the outset of his scheme.

25        There was evidence on the consensual calls that the

defendants knowingly and intentionally participated in this
scheme, in addition to all of the other evidence we presented.
The consensual calls with respect to Abdelaziz showed that he
was aware of the deception.  He was aware that his daughter was
not a legitimate basketball recruit at that level.  He was
aware that the payment was made in exchange for that
recruitment.  He was aware that his daughter hadn't shown up to
practice.  He was aware that the Admissions Committee had been
lied to.  In fact, he agreed to further lie to the Admissions
Committee in that call and to further deceive them about the
reason that his daughter hadn't shown up for practice by
telling them that she had plantar fasciitis.  So we submit that
all of that shows additional evidence of his knowledge and
intent to join in the scheme.

In addition, there was extensive evidence with respect
to defendant Wilson on the consensual calls and on the wiretap
about his knowledge of how the side door worked, that it was --
that there were payments being made in exchange for admission
in those calls.  There was evidence that the defendant Wilson
was aware that his daughters were not sailors at all.  They
didn't row crew at a collegiate level and yet they would be
presented, they would be sold as a crew recruit or as sailors
and that's how they would gain admission to the universities in
exchange for payments.  And there was evidence that he, in
fact, went ahead and made payments, two $500,000 payments, to

1    ensure their admission to Stanford and Harvard in connection

2    with that.

3          There was extensive evidence of the fact that this was

4    a unified conspiracy, a unified conspiracies in Count 1 and

5    Count 2.  And, in particular, there was evidence with respect

6    to Wilson that Wilson knew other participants in the conspiracy

7    and even introduced other participants in the conspiracy.

8          There was evidence with respect to the Driscoll family

9    and their participation in the scheme.  There were calls and

03:09 10   e-mails introduced with respect to Marci Palatella, who

11   participated in the scheme.  There was evidence of her son

12   Gino's fraudulent recruitment to USC based on a falsified

13   athletic profile through Donna Heinel as a football player, and

14   we introduced phone calls and e-mails to show that defendant

15   Wilson was aware of the fact that Marci Palatella -- and that

16   Marci Palatella and the Wilson's were aware that they were

17   working with Rick Singer in connection with that.

18         There was also evidence presented through Laura Janke

19   and others about the way that this scheme worked, that these

03:09 20   falsified profiles were fabricated by Janke and by others

21   working for Rick Singer, sort of with consistent -- by a

22   consistent methodology and that the profiles were submitted to

23   Donna Heinel where they were voted on by the subcommittee in

24   bulk.

25         There was evidence that multiple profiles submitted by

1    Rick Singer that were falsified submitted to Donna Heinel were

2    submitted to the Subcommittee and voted on at those

3    Subcommittee meetings.

4           There was evidence that Rick Singer's payments, the

5    payments of the parents through Rick Singer to the women's

6    athletic board, and by payments directly to the women's

7    athletic board, comprised an increasing percentage of the

8    revenues derived by the women's athletic board, and that Donna

9    Heinel benefitted from that in her professional capacity.

03:10 10    There was also evidence that she controlled the women's

11    athletic board.

12           There was also evidence that Jovan Vavic controlled

13    the water polo team and that the funds associated with the

14    water polo team and that's where money was sent in exchange for

15    these recruitments, and that he also received money personally

16    in exchange for recruitment.

17           There was also evidence that it was -- that the very

18    nature of this scheme was only possible because it was such a

19    large conspiracy that involved multiple parents, multiple

03:11 20    coaches at different universities, and all sorts of different

21    players.

22           We presented evidence, for example, from Bruce

23    Isackson testifying that it was the very nature of the scheme

24    that it was tried and true that made it appealing to him.

25           There was other additional evidence on that point in

1    the form of recorded phone calls.  And we presented evidence

2    that the scheme benefitted all of the participants by virtue of

3    the fact that all of the money flowed through The Key Worldwide

4    Foundation and was distributed from The Key Worldwide

5    Foundation, which would make it easier to conceal and harder to

6    trace.

7         So we believe all of that shows both the nature of the

8    scheme and the conspiracy and the defendants' participation in

9    the scheme and the conspiracy and that all of the statements

03:12 10  that we introduced by coconspirators, including Rick Singer,

11   including the other parents who participated in the scheme,

12   were statements in furtherance of that scheme and of that

13   conspiracy, the very conspiracy that Janke and Isackson and

14   Mikaela Sanford testified to and that the e-mails and the phone

15   calls of the defendants showed that they, too, were part of

16   that conspiracy and were benefitting from that broader

17   conspiracy, understood its nature, and knowingly and

18   intentionally joined in it to obtain the admission of their

19   children to universities based on fraudulent athletic profiles

03:12 20  in exchange for quid pro quo payments.

21        THE COURT:  All right.  Thank you, Mr. Frank.

22        Mr. Kelly.

23        MR. KELLY:  Yes, your Honor.  I think it's black

24   letter law that evidence of an agreement to join in a

25   conspiracy must be based on defendant Abdelaziz's own words and

1    own actions.

2         There is zero evidence that this man joined one

3    nationwide conspiracy.  They presented tapes of people from New

4    York who were involved in cheating on tests.  What's that got

5    to do with him?  Those should not have been admitted, nor

6    should statements of the Huneeus fellow, also a test cheater,

7    nothing to do with Aziz.

8         At worst, the two tapes they played, those consensual

9    recordings, were a discussion between him and Singer.  There

03:13  10   was zero evidence that he was involved with other people or

11   knew of other people or was part of some nationwide conspiracy.

12        So with respect to Abdelaziz, we think the

13   *Petriezzello* finding has not been established by the government

14   and those statements that were admitted should not have been

15   admitted and they prejudice our clients, and we think they

16   should be thrown out.

17        THE COURT:  Thank you, Mr. Kelly.

18        Mr. Kendall.

19        MR. KENDALL:  Your Honor, along the way Mr. Kelly

03:13  20   approached it, I think we need to focus on what was the scope

21   of my client's agreement and what is the best that the

22   government could argue that he knowingly agreed to participate

23   in.

24        We know he had nothing to do with test cheating.  He

25   had nothing to do with people taking classes.  And very

1    importantly, it was Agent Keating's testimony about the Singer

2    notes, Exhibit 13, what Singer told them and what was not

3    disputed, and Singer said that he thought he was making a

4    donation.  I always said donation.  I never said payment.  It

5    was a donation to a program, not a payment to a coach.  If we

6    -- that's uncontested.  It was the scope of any understanding

7    or expectation of Mr. Wilson.  Anything involving bribery,

8    anything involving the test cheating or taking classes, is far

9    beyond the scope of that agreement.

03:14  10        Furthermore, Mr. Wilson made his donation through

11    Mr. Singer in 2014 to Coach Vavic.  Donna Heinel had not been

12    introduced to Rick Singer at that point.  The sort of Donna

13    Heinel activity that was the focus of much of the evidence was

14    really 2017, 2016, years after my client's son's admission.

15    There's no way that Bruce Isackson, Gordon Caplan, Huneeus can

16    be associated with my client anyway, particularly all of those

17    whose admissions was going through Donna Heinel.

18        Thank you, your Honor.

19        THE COURT:  Do you wish to respond, Mr. Frank?

03:15  20        MR. FRANK:  Your Honor, it was clear from the evidence

21    that Heinel and Vavic knew and were aware of each other.  Janke

22    testified about that fact.  Janke testified that Singer started

23    putting people increasingly through Heinel rather than through

24    Vavic, but then there was a Vavic phone call that we also

25    played that was in evidence in which Vavic was aware of the

fact that that was happening and was willing to do additional
bogus recruitments in exchange for the money he was receiving
personally.

There was extensive evidence of these defendants'
knowledge and intent to join that conspiracy, not just from the
nature of the e-mails that we submitted, which we introduced
into evidence in which they're talking about how they were
going to get into the University of Southern California with
Rick Singer in exchange for these payments and falsified
profiles, but also extensive evidence on the wiretap in the
form of Wilson's calls and in the consensual calls with
Abdelaziz.

With respect to Huneeus, there was evidence on both
the Huneeus and Caplan calls of how Singer presented his scheme
to coconspirators.  Both of those conspirators clearly
willingly joined in the scheme on those calls and then there
was additional evidence with respect to Agustina Huneeus, with
respect to her admission to USC, in fact, through the side door
based on a falsified profile through Donna Heinel.

And so all of that is evidence, not just of the nature
of the scheme and the conspiracy and the fact that those
statements were in furtherance of it, but evidence that these
defendants knowingly and intentionally joined that scheme and
their statements were, likewise, directed toward that scheme
and in furthering it.

1          THE COURT:  All right.  Thank you, counsel.  What I'm

2    going to do is I'll take that matter under advisement and

3    advise you tomorrow at the charge conference.

4          I need some time to get ready for the charge

5    conference, so we're not going to have that starting in the

6    a.m.  We'll have the charge conference at 1:00 p.m.  And I will

7    make -- the way that we do that is I will go through both of

8    your requests for instructions and give you my rulings as to

9    how I am going to go, that is whether I will give the

03:17 10   substance, and I emphasize the word "substance" of a proposed

11   request or not.  And if I'm not going to give it, I'll tell you

12   why.

13         I will then hear, first from the government, on my

14   potential rulings on its requests, followed by the defendants'

15   response to the government's arguments.  Then we'll do the same

16   for the defendants' instructions, giving first the defendants a

17   chance to respond and then the government.

18         It's not going to take all afternoon, so be prepared.

19   If I were to specifically answer all of the requests that I

03:18 20   have so far, I believe the defendants are over 100 pages, the

21   government's not quite that long, but if I were to answer each

22   and every one in detail, we would be here all tomorrow

23   afternoon and into Wednesday.  So it's not going to take that

24   long, but I will give you ample opportunity to respond to my

25   rulings on the requests.

1          Then what we're going to do is, as I've told the jury,

2    we are going to hear closing arguments on Wednesday, but not my

3    charge.  I'm not going to charge after roughly four hours of

4    closing arguments, which would be somewhere in the middle of

5    the day to the afternoon.  My charge is not going to be short.

6    It would mean I would be submitting this case to the jury mid

7    to late afternoon on Wednesday.  And I much prefer to give the

8    jury the afternoon off, have them come back in on Thursday

9    morning, hear my charge, and get this case submitted to them

03:19 10   sometime mid to late morning on Thursday.  So those are my

11   plans.

12          And responses or comments from counsel?  Mr. Kelly?

13          MR. KELLY:  None.  No responses.

14          THE COURT:  Mr. Kendall?

15          MR. KENDALL:  Will we get a written copy of your draft

16   charge?

17          THE COURT:  No, not before I give it.

18          MR. KENDALL:  Okay.  When you give it, will we get a

19   written copy?

03:19 20       THE COURT:  If you ask for it, you will be given it.

21          MR. KENDALL:  I'm asking for it now, if I may, your

22   Honor, so we can follow you as you give it.

23          THE COURT:  Well, I'm not going to give it to you

24   before I give the charge.  After I give the charge, I will give

25   you a copy if you request it.

1          MR. KENDALL:  Okay.  Thank you, your Honor.

2          MR. FRANK:  Nothing from the government, your Honor.

3          THE COURT:  All right.  Thank you.  I will see you

4     tomorrow at 1:00 p.m. in this courtroom for a charge

5     conference.

6          THE CLERK:  All rise.

7          (Whereupon, the proceedings adjourned at 3:21 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                      I N D E X
 2     Witness                           Page
 3
 4     JAMES WALTERS
 5     Direct Examination by Mr. Kendall       16
 6     Cross-Examination by Mr. Frank          33
 7     Redirect Examination by Mr. Kendall     64
 8     Recross-Examination by Mr. Frank        68
 9
10     JOHN BOWEN
11     Direct Examination by Mr. Kendall       70
12     Cross-Examination by Mr. Frank          165
13     Redirect Examination by Mr. Kendall     182
14     Recross-Examination by Mr. Frank        183
15
16
17
18
19
20
21
22
23
24
25
</pre>

```
 1                         E X H I B I T S

 2     NO.                             ADMIT

 3     771    ....................      35

 4     9928   ....................      89

 5     9929   ....................      89

 6     9930   ....................      92

 7     7124   ....................     106

 8     8024   ....................     122

 9     9901   ....................     183

10     9899   ....................     184

11     9902   ....................     184

12

13

14                         E X H I B I T S

15     NO.                             FOR IDENTIFICATION

16     J      ....................     163

17     K      ....................     163

18     L      ....................     163

19     M      ....................     163

20

21

22

23

24

25
```

1    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS     )

6

7

8              We, Kristin M. Kelley and Kelly Mortellite, certify

9    that the foregoing is a correct transcript from the record of

10   proceedings taken October 4, 2021 in the above-entitled matter

11   to the best of our skill and ability.

12

13

14        /s/ Kristin M. Kelley          October 4, 2021

15        /s/ Kelly Mortellite           October 4, 2021

16        Kristin M. Kelley, RPR, CRR              Date
          Kelly Mortellite, RMR, CRR
17        Official Court Reporter

18

19

20

21

22

23

24

25