1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

UNITED STATES OF AMERICA,          )
4                    Plaintiff     )
                                   )
5    vs.                           )   No. 1-19-CR-10080
                                   )
6    GAMAL ABDELAZIZ and JOHN      )
     WILSON,                       )
7                    Defendants.   )
                                   )
8                                  )

9

10

              BEFORE THE HONORABLE NATHANIEL M. GORTON
11                  UNITED STATES DISTRICT JUDGE
                      JURY TRIAL - DAY 18
12

13

          John Joseph Moakley United States Courthouse
14                    Courtroom No. 4
                      One Courthouse Way
15              Boston, Massachusetts 02210

16

17                    October 5, 2021
                        1:10 p.m.
18

19

20

              Kristin M. Kelley, RPR, CRR
21                 Official Court Reporters
          John Joseph Moakley United States Courthouse
22              One Courthouse Way, Room 3209
                Boston, Massachusetts 02210
23              E-mail: kmob929@gmail.com

24      Mechanical Steno - Computer-Aided Transcript

25

1      APPEARANCES:

2

3              Stephen E. Frank

4              Ian J. Stearns

5              Leslie Wright

6              Kristen Kearney

7              United States Attorney's Office

8              1 Courthouse Way

9              Suite 9200

10             Boston, MA 02210

11             617-748-3208

12             stephen.frank@usdoj.gov

13             for the Plaintiff.

14

15

16             Brian T. Kelly

17             Joshua C. Sharp

18             Lauren Maynard

19             Nixon Peabody LLP

20             100 Summer Street

21             Boston, MA 02110

22             617-345-1000

23             bkelly@nixonpeabody.com

24             for Gamal Abdelaziz.

25

```
 1   APPEARANCES:

 2

 3           Robert L. Sheketoff

 4           One McKinley Square

 5           Boston, MA 02109

 6           617-367-3449

 7           sheketoffr@aol.com

 8           for Gamal Abdelaziz.

 9

10

11           Michael Kendall

12           Lauren M. Papenhausen

13           White & Case, LLP

14           75 State Street

15           Boston, MA 02109

16           617-939-9310

17           michael.kendall@whitecase.com

18           for John Wilson.

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2

 3            Andrew E. Tomback

 4            McLaughlin & Stern, LLP

 5            260 Madison Avenue

 6            New York, NY 10016

 7            917-301-1285

 8            atomback@mclaughlinstern.com

 9            for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<div align="center">P R O C E E D I N G S</div>

THE CLERK:  You may be seated.  Court is now in session.

THE COURT:  Good afternoon, counsel.

We are here on a charge conference in this case.  What I'm going to do is a little out of order, but I'm going to start with the defendants' requests today because they seem to be more voluminous and I need to take more time to make my rulings on them.  What I'm going to do is go through starting with the defendants' proposed instructions, which were filed back in August in docket No. 2015.  I'm going to address each one of them.

Because there are so many, when I get halfway through, I will stop and hear objections of the defendants to my rulings, if there are any, and then objections from the government, if there are any with respect to the defendants' requests.  Then we'll go back and complete the defendants' requests, which number somewhere in the 90s, I think.  Then we'll turn to the government's requests and do the same thing.

When I say I'm going to give the substance of a request, it means just that.  It doesn't mean verbatim.  It doesn't even mean that I'm going to cover all of the items that are covered in the request, but I'm giving what I deem to be the substance.  Sometimes I say I'm going to give the rough substance of a request and other times I say I'm not going to

give it.  When I say I'm not going to give it, I'll explain
myself.  Please keep in mind that substance doesn't mean
verbatim.  It means what it says, substance.

So we will start with the defendants' original set of
requests.  Of course, there have been multiple supplements
since then.  We'll get to those.  They're numbered, and I'll
identify the number as we go.

Starting with number one, which is a request for
preliminary instruction, which is moot, I've already given
them.  They are what I would call boilerplate.  To the extent I
didn't give them as a preliminary instruction, I will give the
boilerplate of one.

Two, pretrial publicity, I will give the rough
substance of that.

Three is a preliminary instruction, so it's moot.  I'm
not going to give that again, the conduct of the jury, of
course.  I've already told them how they should behave.

Number four, yes, I will give the substance, the
nature of the indictment.  In fact, I do quote the indictment
at some length, so I give the substance of that.

Number five, again, the first part of that is
preliminary instruction, which is now moot.  I don't say the
presumption of innocence alone may be sufficient to raise a
reasonable doubt to require the acquittal.  That's not in my
general instruction, however, the bottom of that first page is

verbatim what I give, the paragraphs that starts "a reasonable
doubt may arise and the next one is not sufficient".  That
comes out of one of my previous charges.  You quoted well.

The last paragraph on the second page I think is
almost verbatim.  I believe there are a few words that I don't
use, but it's practically verbatim for what I give on the
presumption of innocence and proof beyond a reasonable doubt.

Number six I give the rough substance, not as detailed
of that one.

Number seven, that is verbatim.  It's right out of my
*DeNunzio* charge.

Number eight is verbatim, again, apparently out of the
*DeNunzio*.  I will give that.

Number nine is verbatim, the first and last
paragraphs.  Middle paragraph I'll give the substance of.
Apparently, it's not verbatim what I normally give.

Number ten, no.  I will not charge on spoliation.

There is no such evidence, nor failure to collect
evidence in number 11.  I will not give that.

Number 12, use of tapes and transcripts.  I was going
to talk about this with respect to the government, but I
suppose now is as good a time as any.

What is the position if the transcripts, which are not
exhibits, go into the jury room?  Has there been an agreement
of counsel on that or not?

1          MR. KENDALL:  There has been no agreement, your Honor.

2          THE COURT:  If they were to go in, I would allow the

3     defendants' alternate so-called corrected versions to go as

4     well, but I want to hear from counsel.  What do you feel?

5          MR. FRANK:  Your Honor, it's not customary in my

6     experience for those to go back.

7          THE COURT:  No, it isn't, but I have on occasion when

8     parties agreed to allow transcripts, although they are not

9     exhibits, to go to the jury.

01:15 10          MR. KELLY:  We object.

11          MR. KENDALL:  We object as well, your Honor.

12          THE COURT:  All right.  Then they will not go.  So I

13     will give the substance of that.

14          Stipulations, number 13, I give the substance of that.

15          Credibility of witnesses, that's verbatim, right out

16     of one of my prior charges, presumably *DeNunzio*.

17          I will not give missing witness because there's no

18     reason to give that instruction in my opinion, so I don't give

19     15.

01:15 20          16 is testimony of law enforcement agents and

21     employees.  Yes, I give the substance of that, substance.  I

22     don't give it verbatim.

23          On testimony of witnesses with immunity, I'm not going

24     to give that.  We haven't had any.

25          18, testimony of cooperating witnesses, I give the

1    substance of that one.

2         Inconsistencies in witnesses' testimony, this is

3    verbatim with exception of the first sentence.  "You should

4    remember that the law is not imposed on the defendant in a

5    criminal case.  The burden or duty of calling witnesses are

6    producing", I don't say that.  The rest of it is verbatim that

7    I give.

8         Number 20, I give the substance of that.

9         Number 21, no, I do not give that.  As far as I know,

01:16 10   there was no character evidence given about reputation, so I'm

11   not going to give that.

12        22, yes, I give the rough substance of that but not in

13   this form.  We charge with respect to good faith and we talk

14   about willful elsewhere in the charge, and we're not going to

15   repeat it several times during the course of the charge.  I see

16   it once but not multiple times.

17        23, collective knowledge.  This instruction

18   effectively eliminates private sector honest services fraud in

19   contravention of the Supreme Court decision in *Skilling* because

01:17 20   it imputes fraud of the employee to the employer and,

21   therefore, I won't give it.  The answer is no on 23.

22        24, I give the substance of other individuals who are

23   not defendants in this trial, yes.

24        25, basic elements of a conspiracy.  Well, I give the

25   substance of the first two paragraphs, but as to the conspiracy

in Count 1, I do not believe it is the law that an overt action must be proved, so I will not give that portion of this request in the third paragraph.

Number 26, I give the substance of that paragraph, but we will give it in a broader context and I'm not going to say that when Singer became the government's agent and cooperator and, therefore, could -- you asked me to say "could not be a coconspirator". If I say it at all, I won't say it this directly. I will say "no longer be a coconspirator" so there's no confusion. Can be a coconspirator up until September 21, 2018, but not thereafter. So I give the rough substance of that one.

On 27, I give the rough substance of that one but not as detailed. That goes on for a long time and I'm not going to give in much detail.

Number 28, first element, multiple conspiracies. We are not going to give the substance of this proposed instruction because it is lengthy, misleading, and not in conformance with the law, but I do, of course, charge on single and multiple conspiracies and cooperators and informants.

Number 29, I give the rough substance of this, but we instruct on motive elsewhere but talk about good faith here with respect to willfulness. So I give the rough substance of that one.

30, again, I do give the rough substance about good

1    faith, but we talk about it once, not about 12 times as I've
2    been requested to do by the defendants.  I give the rough
3    substance of that one.
4         On intent, yes, number 31.  I give the rough substance
5    of the first, second and fourth paragraphs, but not at this
6    point in the charge but rather where a charge on willfulness.
7    That third paragraph, "a conspiracy requires more than a
8    buyer/seller relationship", I don't give examples like that so
9    I'm not going to give that part of it at all.

01:21 10        Number 32, third element.  I dealt with that earlier,
11   number 25, I'm not going to charge on overt act.  I don't
12   believe it's required under the first conspiracy.
13        Number 33, I will give the sufficient substance, but I
14   do not comment directly on the evidence.  I charge generically
15   for the most part and, furthermore, this is too specifically
16   aimed at Mr. Singer, so I give rough substance but not in this
17   format.
18        Number 34, mail and wire fraud elements, yes.  I give
19   the substance of that one.

01:21 20        The substance of 35.
21        The rough substance of 36, we define materiality for
22   clarification rather than talking about materially false and
23   fraudulent pretenses.  We talk about materiality.
24        Number 37 is the same decision as 36.  It's
25   duplicative.  We give the rough substance of it, of the first

1  paragraph, but not the last paragraph.  "Alleged victim

2  regularly makes similar decisions", I don't give that.  I give

3  the rough substance.

4       Number 38, yes, rough substance, knowingly and

5  willingly.

6       39, rough substance of intent due to fraud, yes.

7       Number 40, I don't give this because I have

8  determined, to the contrary, an admission slot is intangible

9  property.  So I won't give the first part requested by

01:22 10  defendant Wilson, nor the second requested now by just

11  defendant Abdelaziz.  That's a question of law.  I'm not going

12  to instruct the jury on that.  That, I believe, is a question

13  of law for the Court.

14       Number 41, of course, is no longer relevant because

15  defendant Palatella is no longer a defendant.  I don't give

16  that one.

17       42, yes, I give the rough substance of conspiracy to

18  commit honest services mail and wire fraud, the introduction.

19       Number 43, I do not give the rough substance of this

01:23 20  because we have already decided and believe the Supreme Court

21  has decided as well that, under federal law, employees owe a

22  fiduciary duty to their employers, so I think this misstates

23  the law.  I will not give it.

24       Number 44, no longer relevant.  It refers to defendant

25  Palatella.

1        Number 45, I will give the rough substance of the

2    intent -- the first paragraph is certainly relevant, and I will

3    give the rough substance of that, but we don't give the rest of

4    this request because it is repetitive and we give a general

5    instruction on intent at the outset of our discussion of the

6    substantive charges or the law in this case.  So I give the

7    rough substance but not most of the rest of this.  The

8    paragraph on 56, second to last paragraph, does not make any

9    sense to me at all.

01:24 10        46, honest services, this is bribes and kickbacks.  I

11   will give the substance of this.  The second paragraph, except

12   for the word "personally", I give the substance of that, but

13   not the four caveats because I don't believe it's a fair

14   statement of the law and, in fact, this one I might as well

15   talk about bribes and kickbacks at this stage.

16        This refers to the defendants' request 46, 53, and a

17   supplemental request of instruction that was filed on

18   August 13th.  I'll get to it a little later.  With respect to

19   the defendants' proposed instructions, numbers 46 and 53 and

01:25 20   supplemental instruction on the meaning of bribe, the Court has

21   previously held, see docket No. 1334, that a payment to a

22   university account may be a bribe if the account is controlled

23   by a corrupt insider.  Payments to those accounts may still

24   constitute a benefit to the insider, not withstanding the fact

25   that they are University of Southern Cal accounts, therefore

1    the Court will not instruct on bribery in the manner requested

2    by the defendants.

3            The fourth caveat at the very end of that request, we

4    sort of give that at a different point, the rough substance of

5    that fourth caveat.

6            Number 47, official act, we'll give the rough

7    substance of that request.

8            Number 48, fourth element is representation.  We give

9    the rough substance of that but we only address materiality one

01:27 10   time and not here, but we do instruct on materiality.

11           49, honest services mail fraud.  This the fifth

12   element of foreseeable harm.  We do not give this request

13   because this is not a correct statement of the law and because

14   foreseeable harm is not an element of the crime charged.

15   Furthermore, the *Skilling* decision allows for the victim to

16   benefit from the bribe.  So we don't give this.

17           Number 50, honest services mail and wire fraud, the

18   sixth element, yes.  We give the substance of that.

19           Perhaps it's appropriate, we're about halfway through,

01:28 20   any comments from the defendants on my rulings on the first 50

21   requests?

22           MR. SHEKETOFF:  Your Honor, with respect to

23   Mr. Abdelaziz, we ask your permission to file written

24   objections at the end of the hearing since you're not going to

25   give your charge until 2 days from now.  That way we can gather

1    our thoughts and not waste as much time with the Court right

2    now.

3              I do have one comment on 46, however.

4              THE COURT:  On 46?  Let me go back to that.

5              MR. SHEKETOFF:  This has been an ongoing dispute

6    between the parties.  I know your Honor has ruled over our

7    objection that if an account is controlled by an insider,

8    that's sufficient.  We filed the supplemental pleading this

9    morning, I believe, where we pointed out that there's no

01:29 10   evidence in this case that Donna Heinel controlled any account

11   at USC and, therefore, while theoretically that might do the

12   trick, at least that's the Court's position and the

13   government's position, it's our position that it doesn't do the

14   trick here because there was just no evidence that she

15   controlled any account at USC.  So the charge on a theory

16   that's not supported by the evidence would be an issue.

17             THE COURT:  Government wish to respond to that?

18             MR. FRANK:  There was evidence that she oversaw that

19   account.  It was testified to by Laura Janke.  There was also

01:29 20   circumstantial evidence she was directing -- she's on tape

21   directing money to that account.

22             MR. SHEKETOFF:  Directing money to that account is not

23   circumstantial evidence that she controlled that account.

24   We've laid out in our pleading this morning, your Honor,

25   because we do have daily transcript, exactly what the evidence

1  was on this topic.  We say there's no way a reasonable juror

2  could find beyond a reasonable doubt that she controlled this

3  account based on the evidence that was produced at trial.

4       THE COURT:  Do you wish to respond?

5       MR. FRANK:  It's the same response, your Honor.  We

6  introduced witness testimony that she oversaw that account.

7  She directed money into that account.  We also saw evidence of

8  the fact that under a -- during a term of the conspiracy the

9  inflows to that account comprised a majority of funds from Rick

01:30 10  Singer's clients and that her salary increased over that same

11  period and that her performance reviews reflected that

12  fundraising of an important part of her performance review.

13       THE COURT:  Are you going to file a written response

14  to the pleading that was filed this morning that I haven't

15  seen?

16       MR. FRANK:  I haven't seen it, your Honor, but if it's

17  helpful to the Court, we can do that.

18       THE COURT:  Yes.

19       MR. SHEKETOFF:  Whether her salary increased or not is

01:31 20  not the same thing as whether she controlled that account.

21  That the university rewarded her in some sense for bringing in

22  money, which is one of the things that helped her keep her job

23  at USC, is not the same as controlling an account.  We pointed

24  out records that we saw from the daily transcript, and perhaps

25  the government in their written response will point to the

```
 1    record where this evidence is from their point of view.
 2              THE COURT:  Anything further, Mr. Frank?
 3              MR. FRANK:  If you can just give me one moment, your
 4    Honor.
 5              THE COURT:  Yes.
 6              MR. FRANK:  I believe your Honor's prior ruling is it
 7    doesn't even need to be control over the account, it can be
 8    control or benefit from the account.  There was extensive
 9    evidence about the parties benefitting from that account,
10    notwithstanding the fact that the money went to USC.  It
11    clearly benefitted them.  There was evidence of that.
12              THE COURT:  All right.  I will wait until I see the
13    memorandum.  If the government wishes to respond, they should
14    do so promptly, otherwise the ruling is as previously
15    announced.  Apparently, the defendants want to file a written
16    response to all of these rulings, which they're entitled to do.
17    We can do that a little more orderly than having to go through
18    all of these at a charge conference.
19              Mr. Kendall?
20              MR. KENDALL:  With respect to Mr. Wilson, your Honor,
21    two issues.  On request No. 40, the Court correctly --
22              THE COURT:  Let me just get these in front of me
23    before you talk about them, please, Mr. Kendall.
24              Okay.  I have 40.  Yes.
25              MR. KENDALL:  That's the one with respect to the issue
```

```
 1    of the property.  We had not originally joined in on the
 2    request of Aziz, and I think maybe Palatella, that the issue be
 3    put to the jury, which you denied.  We would like to join in
 4    that request as well and just protect our rights under that
 5    equally to Mr. Aziz.  I don't think that requires any further
 6    argument or persuasiveness to the Court.
 7              THE COURT:  Fine.
 8              MR. KENDALL:  I just wanted to join in on that.
 9              THE COURT:  Yes.  You've saved your rights.
10              MR. KENDALL:  Thank you.
11              With respect to No. 46 and the issue of a payment can
12    go to -- the issue of a corrupt insider, is the Court going to
13    define what makes an insider corrupt if they don't get any
14    money for their personal benefit?  I mean, we have an issue
15    where the behavior that in many respects is considered
16    appropriate and legal is now being deemed as not so, you know,
17    raising money for an institution and not for a personal
18    benefit.  I think it's a very fuzzy line that the jury needs to
19    have some very sort of concrete guidance when somebody does
20    fundraising for their institution and gets no personal benefit
21    from the payment that they're somehow deemed to still be
22    corrupt.
23              THE COURT:  Well, I don't know.  I have the charge,
24    the draft of the charge here with respect to this, which you
25    will hear soon enough.  I'll give you an opportunity to respond
```

 1    to it at the appropriate time.

 2              MR. KENDALL:  Thank you, your Honor.

 3              THE COURT:  Going on, starting, I believe, with 51.

 4    We left off at 50.

 5              MR. FRANK:  Your Honor, could I just briefly respond?

 6              THE COURT:  Yes.  I'm sorry.  The government may

 7    respond to my rulings.

 8              MR. FRANK:  We just had two questions, your Honor.

 9    With respect to -- since we're on 46, I'll just ask about that

01:35 10   one first.  Your Honor indicated that you intended to sort of

11    give the rough substance of the fourth caveat, which concerns

12    whether the victim condoned or provided tacit approval for the

13    payment.  That have the defendants' request.

14              THE COURT:  Yes.

15              MR. FRANK:  Could you give us some clarity on what you

16    mean by "condoned or provided tacit approval"?

17              THE COURT:  I'm not sure whether I give that -- I'll

18    give you a preview of what I'm going to charge on this subject.

19    This is, of course, taken out of context, but it's in the

01:36 20   process of my charging on the subsequent counts.  I say, "the

21    breach of the fiduciary duty must be by participation and

22    bribery or kickback scheme, which involves the actual intended

23    or solicited exchange of a thing of value for something else,

24    in other words, a quid pro quo, which is a Latin phrase meaning

25    this-for-that or these-for-those.  The employee or fiduciary

and the individuals providing the thing or things of value need
not, however, state the quid pro quo in express terms, rather
the intent to exchange may be established by circumstantial
evidence based upon the defendants' words, conduct, acts and
all the surrounding circumstances disclosed by the evidence and
the rational or logical inferences that may be drawn from them.

Bribery and kickbacks require the intent to affect an
exchange of something of value for, as applicable here, an
official act, but each payment need not be correlated with a
specific action.  The requirement that there be payment of a
thing of value in return for action is satisfied so long as the
evidence shows a course of conduct of things of value flowing
to an employee or fiduciary in exchange for the repeated action
of the employee fiduciary.  All that must be shown is that
things of value were provided to the employee or fiduciary or
for his or her benefit with the intent of securing the action
of the employee fiduciary in return.

A bribe is simply a payment or other benefit given in
exchange for an employee's provision of influence or favorable
treatment from his employer.  Payments to third parties,
including even employer universities, may qualify as bribes or
kickbacks.

An official act is a decision or action or an
agreement to make a decision or take an action on any matter
within the scope of the employee's duties.  The act must be

1    specific and focused and involve a formal exercise of the

2    organization's power.  A decision or action constituting an

3    official act may include using one's official position to exert

4    pressure on another official to perform an official act or

5    advise another official, knowing that such advice will form the

6    basis for an official act.

7         The government need not prove that the scheme

8    succeeded or that anything of value was exchanged, rather, the

9    government must only prove that the defendant, then under

01:39 10   consideration, knowingly advised or participated in the scheme

11   to defraud the universities of their right to the honest

12   services of their employee or fiduciary through bribes or

13   kickbacks.

14        That's what I'm going to say on that subject in that

15   part of my charge.

16        MR. KENDALL:  Your Honor, if I may be heard.

17        THE COURT:  Yes.

18        MR. KENDALL:  Our concern is that that describes

19   perfectly legal behavior as well and it doesn't give the jury

01:39 20   direction of what is corrupt and what is not.  An organization

21   and its employees can do many quid pro quo exchanges that are

22   perfectly appropriate.  If you donate a building, we'll let

23   your children into the school.  That's perfectly fine.  There's

24   all sorts of things that the institution and its employees can

25   routinely exchange as a quid pro quo.  I'll sell you tickets to

1    a football game if you give me $100.  That's the face price of

2    the ticket.  Those are all quid pro quo.  A quid pro quo by

3    itself is perfectly appropriate.  It's every commercial

4    transaction in the world is a quid pro quo.  If I want to file

5    a complaint in this courthouse, I have to pay $100 or so for a

6    filing fee.  That's a quid pro quo.  Without some right lane

7    definition that it is truly corrupt and for the employee's

8    personal benefit so they're taking away things that belong to

9    the organization for their own personal use, we have no way to

01:40 10   really define an acceptable quid pro quo and an unacceptable

11   quid pro quo.

12         That was, in part, our concern about Agent Keating

13   testifying that this is a quid pro quo and the side door's not

14   correct.  I suggest, your Honor, it's not a clear legally

15   defined distinction of legal quid pro quo versus illegal quid

16   pro quo.

17         THE COURT:  Does the government wish to respond?

18         MR. FRANK:  Your Honor only read part of the

19   instruction, but what I took from the instruction is that it

01:41 20   has to be a deprivation of the honest services of the employee

21   in exchange for the quid pro quo, and that's what the

22   instruction is.  So we disagree with the defense's

23   characterization of that.  When you buy a ticket, you're not

24   depriving anyone of honest services.  If the employee is being

25   dishonest for the quid pro quo, that's where the problem

1    arises, so we don't share a concern.

2         I did have another question about another instruction.

3         THE COURT:  Mr. Sheketoff had a question.

4         MR. SHEKETOFF:  Yes, your Honor.  We asked for a

5    condonation instruction.  That's not in the instruction that

6    you just gave.  In other words, you said you're going to give

7    the substance of the fourth caveat, but I don't hear it there.

8    There is a Fourth Circuit case right on point, *Joslin*, that we

9    cite that says condonation is a defense.  We think there's

01:42 10   sufficient evidence of condonation in this case to raise it.

11   So we want an instruction on that.

12        Also, I join Mr. Kendall.  I mean, students pay

13   tuition.  That's a quid pro quo.  It has to -- there has to be

14   somewhat -- as the government said in its opening, giving money

15   to a university, a donation, in the hope that your child will

16   get a step up in the admissions policy is not a crime.  They

17   said that in their opening.  I think the jury has to understand

18   that, that it's not a crime to give money to a university in

19   the hope that your child will benefit from that.

01:43 20        So whatever the final instruction is from the Court,

21   it seems to me the jury has to be clear reading that

22   instruction of what the government conceded in its opening is

23   not a crime.  So when I hear that instruction, I think, well,

24   it's now a crime, what they conceded was not a crime.

25        MR. KENDALL:  Your Honor, I just want to make it

clear.  Obviously, we join in each other's instructions and
concerns, but to be clear, what the government said in the
opening I don't think is the legal floor.  I don't think
that -- what the government said in the opening is a
concession.  I think what the law requires is an even higher
level of corruption than what the government put in its
opening.  It has to be truly -- I mean, that's why -- I know
the Court has ruled on this.  I'm not trying to -- while I'd
like to, I'm not trying to persuade you to change, but when it
goes to their personal benefit, it's a clean cut line.
Everybody can see that's money that belonged in USC's bank
account and instead it's in your summer house down in Florida.
It's a clear delineation of stealing, taking way from the
university its property or its benefits.

          A lot of times employees cut some corners and break
some rules to try to do the overall goal of the organization.
Sometimes it's a small thing.  Sometimes it's a serious thing.
That's a much difficult thing for the jury to understand that
they're raising money for the university, they're fulfilling
the president's $7 billion program but there are some rules
that can be flexible and some rules that are inflexible, and
how are they to know when the money's going to the university
that that person is really acting with corrupt intent.

          The issue with Vavic and Heinel are particularly
difficult because there's a period of time where it's

1    undisputed they get no financial benefit.  That's when they're

2    dealing with our kids.  After they stop dealing with our kids,

3    they do get some type of financial benefit:  The tuition

4    payments and Heinel's 20,000 counting whatever payments.  The

5    jury has no clear delineation to say, you know, these are all

6    great quid pro quos that the university is delighted to get and

7    here is one that our clients are on notice and clearly

8    understand and have no good faith to believe should happen when

9    it's just money going into the same gift account that all the

01:45 10   other honest quid pro quo money goes into.

11        I think the government has dug a hole in this case

12   that I don't think we have a good solution with the proposed

13   instructions.

14        Your Honor, there are a few other issues.  We're

15   making a list.  I want to put my notes together succinctly.  If

16   I could come back in about five or 10 minutes of things you've

17   gone through with one to 50.  I want to note some concerns, but

18   I'd like to do it in an organized fashion.

19        THE COURT:  Does the government wish to respond?

01:46 20        MR. FRANK:  Briefly.  There's been no evidence of

21   condonation in this case.  In fact, the evidence was explicitly

22   to the contrary that the Admissions Department had no idea

23   there was money being exchanged for the recruitment of these

24   purported athletes.

25        The defense is conflating fraud, which is the

deprivation of money or property of the university, with honest

services fraud, which is the deprivation of the honest services

of the employee.  That's what's at issue here.  The employees

were lying about the fact that they were recruiting these

students in exchange for the money and were purporting

outwardly to the Admissions Department to be recruiting them

for their athletic abilities.  That is the deprivation of

honest services at the heart of the charge that the Court is

going to give.

01:47     The only other question the government had, your

Honor, was with respect to the Instruction 26.  Your Honor had

indicated that you intended to give the substance of the charge

that a government cooperator is no longer part of the

conspiracy, and our only question about that is we wanted to

make sure that the jury was not confused about the fact that

the allegation here is that the conspiracy encompass more than

just the defendants and the government cooperator.

     THE COURT:  Yeah.  I believe that's clear in my

instruction.

01:47     MR. SHEKETOFF:  Your Honor, just going back to the hot

topic, whether or not the Athletic Department lied to the

Admissions Department is not the issue for the jury.  That may

be one sub issue.  If the Athletic Department was doing -- if

the employees of the Athletic Department were doing what the

Athletic Department condoned, they weren't depriving USC

```
 1   whether they were lying to Admissions or not, the honest
 2   services of the athletic employees.
 3          USC is one entity.  If the Athletic Department
 4   participants, people like Heinel, were lying to Admissions, so
 5   what if they were following Athletic Department policy?  They
 6   weren't depriving USC of their honest services.
 7          THE COURT:  Do you wish to respond?
 8          MR. FRANK:  They were fired, Judge.
 9          MR. KENDALL:  Your Honor, if I could deal with some of
10   the other issues.
11          THE COURT:  We're talking about the first 50 requests?
12          MR. KENDALL:  Yes.  The first 50.
13          With respect to bribery -- first of all, the
14   termination after the event, your Honor, can relate to a
15   variety of issues.  We don't have in evidence why they were
16   terminated or what was the purpose of the terminated.  It could
17   be people covering their own mistakes or problems and blaming
18   people.
19          Also with the bribery issue, we have a federal bribery
20   charge, your Honor, federal program bribery.  That is not an
21   honest services issue.  That has to be -- for federal program
22   bribery, the bribery, I believe, has to be defined as a corrupt
23   payment to the individual.  So what we have really is two
24   different bribery theories with two different bribery
25   definitions in the same case.  I don't know if the government
```

```
 1   is going to urge this Court to say that a federal program
 2   bribery the case law says a payment to the university where the
 3   money goes to the university's bank account satisfies federal
 4   program bribery.  It is not an honest services concept.  It's a
 5   flat out old, conventional bribery charge.  So I think there's
 6   an inconsistency there.
 7        Do you want to address these each by topic to respond
 8   or?
 9        THE COURT:  No.  I want to address by the number of
10   the requests that I have dealt with.
11        MR. KENDALL:  Okay.  I believe the bribery issue is at
12   number 40.  It's either 40 or 46.
13        MS. PAPENHAUSEN:  46.
14        MR. KENDALL:  It's 46, your Honor.  It is 46, but it
15   will bleed over to the federal program bribery count as well.
16   I'll get to that charge in just a minute.  That would be 52.
17        So I think 46 and 52 --
18        THE COURT:  We haven't got to 52 yet.
19        MR. KENDALL:  Fair enough.  46, they relate.  I can
20   wait on that if you would like.
21        With respect to the other issues, in number 43, we
22   believe there's no holding in Skilling that says "all employees
23   are fiduciaries".  I don't think it says that statement that
24   fiduciary duty law does not apply.
25        With respect to 40, we'd like to know what is the
```

1    exact property that's at issue.  Is it an admission slot?  Is

2    it the coach's recommendation?  What exactly is the specific

3    item of property that was taken?

4         THE COURT:  Mr. Kendall, I'm making rulings on your

5    requests for me to instruct the jury.  I've made the ruling and

6    you can put on the record why you object to my ruling, but this

7    is not an open forum for discussing legal matters.

8         MR. KENDALL:  I understand, your Honor.  We need to

9    know what to argue with the jury.  Are we going to argue that

01:52 10   it wasn't the coach's recommendation?  Are we going to argue it

11   wasn't the admission by SUBCO?

12        THE COURT:  Your argument is up to you, Mr. Kendall.

13        MR. KENDALL:  We also would suggest that for number

14   40, given that it's the heart of the case and such a

15   complicated issue, it would be appropriate to have another good

16   faith instruction with that to remind the jury.

17        With number 40, your Honor, we believe the

18   government's theory has changed.  The government indicted this

19   case saying it was an admissions slot that was the property.

01:52 20   We think at some point they've been arguing or saying to the

21   jury that it's the coach's recommendation.  We think it would

22   be a material variance of the indictment if they go from one to

23   the other, so we are concerned about that.

24        For request number 32 in our group, your Honor, we

25   believe the First Circuit has required an overt act for a fraud

1    conspiracy.  We'd ask the Court to consider that.

2                THE COURT:  What case do you have that suggests that?

3                MR. KENDALL:  I believe it's in the footnotes to our

4    request.  I can get a specific one if you'd like, your Honor.

5    I should say Miss Papenhausen will specifically.

6                THE COURT:  First Circuit case?

7                MR. KENDALL:  Excuse me.  I believe the First Circuit

8    may not have ruled on that.

9                THE COURT:  It has not.

01:54 10             MS. PAPENHAUSEN:  It is, I think, based on the pattern

11   of instructions, your Honor.

12               MR. KENDALL:  So I stand corrected.  It's not a First

13   Circuit decision, but we believe it's in the pattern

14   instruction that's being offered.

15               With respect to numbers 10 and 11, we believe there's

16   substantial evidence of spoliation.  Mr. Singer deleted all his

17   messages on the phone, which the government left with him for

18   two weeks.  We think, for 10 and 11, spoliation and failure to

19   collect evidence is directly relevant to this case.  And the

01:54 20   failure to record, excuse me, your Honor -- the government's

21   submission is that it did not record the September 28 call with

22   the Wilson family, which you know we filed affidavits in the

23   motion pleading saying Mr. Wilson was on that call.

24               THE COURT:  How is not recording something spoliation?

25               MR. KENDALL:  Because the agent testified if you start

1   to record somebody as part of an investigation, you should

2   record all of their calls, and they did not record Mr. Wilson

3   on that call.  That was the practice of the IRS agent that said

4   that was the practice.  Once you start to record something, you

5   have to record all the calls.  You can't pick and choose which

6   ones you record.

7           THE COURT:  Mr. Frank?

8           MR. FRANK:  That's not the IRS agent's testimony.

9   It's directly contrary to the case law which provides exactly

01:55  10   the opposite.  If Mr. Kendall now wants to point to his

11   client's affidavit that he was on that Facetime call when it

12   was physically impossible for him to have been on that Facetime

13   call and there's evidence directly to the contrary, his client

14   should have taken the stand to contradict that fact.

15           MR. KENDALL:  There's no evidence to the contrary.  My

16   client was on that call.  We gave you an affidavit outside of

17   this court.  It's trial, but in the pretrial stuff that firmly

18   states he was on it.  There were multiple witnesses he was on

19   that call.  I think we are entitled to both a failure to

01:56  20   collect evidence and a spoliation based on the destruction of

21   the phone information, as well as the failure to record that

22   call.

23           Finally, your Honor, with respect to the collective

24   knowledge issue, it's the issue that --

25           THE COURT:  Number what?

         MR. KENDALL:  23.  Mr. Sheketoff has raised.  The

issue is not that a corrupt individual hid information from

their employer, which I could understand would not warrant a

collective knowledge instruction, but if it's an entire

department that has a different approach to a practice than

what another department claims is the case after the fact that

does raise the collective knowledge issue in a way that's not

just one bad person hiding their bad acts.  Given what was

going on in the Athletic Department, I think Miss Janke

testified that there were several coaches taking donations in

return for promoting people within the SUBCO process in the

beginning and it wasn't for personal benefit.  I think there

was other evidence on that area as well in the discussion of

the VIP program.

         Thank you, your Honor.

         THE COURT:  Does the government have any response to

the defendants' objections to my rulings?

         MR. FRANK:  Nothing beyond what we've already stated,

your Honor.

         THE COURT:  All right.  Then we will continue, picking

up, I believe, with No. 51.

         I will give the rough substance of 51.

         52 is the federal programs bribery definition.  I will

give the rough substance of 52, with the exception of this

middle paragraph on page 66.  I don't give examples.

```
 1    "Defendant was unaware of his or her payments going to corrupt
 2    university officials", I don't give that middle paragraph, at
 3    least in rough substance.
 4         Number 53 is the definition of a bribe, which, of
 5    course, we've dealt with before.  I think I read to you my
 6    earlier definition.  That same one applies that I've read with
 7    respect to request No. 56 and it will apply again with the
 8    defendants' supplemental instruction on the meaning of bribe,
 9    so I don't give that one.
10    54, federal programs bribery does not require proof of
11    an official act so I will not give this instruction.
12         55, of course, is money laundering.  That's out of the
13    case, as is 56 and 57, 58 and 59.  They all have to do with
14    money laundering and is no longer in the case.
15         Turning to No. 60, I will give the rough substance of
16    honest services wire fraud general instruction.
17         I will give the rough substance of 61, but it's
18    shorter than that request and I don't give the last paragraph
19    on page 77 about factual impossibility.  I don't think I've
20    gotten to that one previously, but I will.  I'm not going to
21    instruct on factual impossibility.
22         62, I give the rough substance, but it's shorter and I
23    believe clearer than this.  We describe willful one time our
24    initial instructions.  We don't repeat it multiple times as
25    requested.
```

1          Number 63, I give the substance of that one, aiding

2     and abetting.

3          Number 64, I give the rough substance of that.

4          Number 65, we charge on aiding and abetting but not

5     twice.  We refer back to our earlier instructions about aiding

6     and abetting.  We don't go through the process twice.

7          Number 66, we give the rough substance of the top

8     portion of that, but we don't say what is described in the last

9     paragraph about the evidence may not establish deductions, et

02:01 10   cetera.  That's inconsistent with a prior ruling.

11          Number 67, I give the substance of that one.

12          68, the rough substance but in a shorter version, I'm

13     not going to say the last paragraph on that first page or

14     basically anything after the paragraph that starts with "in

15     determining whether Mr. Wilson intended to misstate anything on

16     his tax return".  I don't say that.  Deficiency is not

17     relevant.  Some of it's duplicative and we're not going to give

18     the rest of that instruction.

19          Number 69, this is commenting on the evidence.  It is

02:02 20   superfluous and I do not believe it's a correct statement of

21     law, so I'm not going to give 69.

22          Number 70, I'm not going to say this for lack of

23     supporting authority offered by the defendant.

24          Number 71, I don't give that for the same reason.

25          Number 72, I do not charge on factual impossibility.

1   This Court has previously ruled that impossibility is not a

2   defense to the substantive fraud or bribery counts against the

3   defendant Wilson.  I said that in docket No. 1438 at pages 10

4   to 13.

5           Further, in the *Dickson* First Circuit case, the First

6   Circuit held that the elements of the offense do not require

7   that the unlawful goal be achieved and factual impossibility is

8   irrelevant.  So I'm not going to charge on factual

9   impossibility as requested on 72.

02:03 10          73, I'm not going to give that because it comments on

11   the evidence, which is vigorously disputed.

12          Turning then to the supplemental instructions, and

13   it's hard to follow these because they're not sequentially

14   numbered, but I'm dealing first with docket No. 2077 filed on

15   August 13th.

16          It is a supplemental objection to the government's

17   jury instructions regarding the meaning of bribe.  This one, as

18   I've said before, with respect to bribery with respect to the

19   defendants' proposed instructions, the Court has previously

02:04 20   held in docket No. 1334 that a payment to a university account

21   may be a bribe if the account is controlled by a corrupt

22   insider.  Payments to those accounts may still constitute a

23   benefit to the insider, notwithstanding the fact that they are

24   Southern Cal accounts, therefore, the Court will not instruct

25   on bribery in the manner requested in this request.

1          With respect to the request in docket 2343, which was

2     filed on October 3rd, the Court will not instruct that

3     defendant Wilson's payment was not a bribe as a matter of law

4     because such an instruction is an incorrect statement of the

5     law and inconsistent with the Court's prior decision, see

6     docket 1334, nor will the Court instruct that the jury cannot

7     convict the defendant Wilson on the basis that he did not

8     offset any goods or services from his alleged donation to

9     Southern Cal.  The Court will thoroughly instruct the jury on

02:05 10     the tax charge and the defendants' additional instruction is

11     unnecessary and would serve only to confuse the jury.  That's

12     with respect to docket 2343.

13          Next, dealing with docket 2078, which was filed on

14     August 13th, it is with respect to an instruction about

15     legitimate giving.  The Court will not give the defendants'

16     proposed instruction on legitimate giving, docket 2078.  It

17     will instruct the jury that they must follow the law as it has

18     been given to them and that they cannot let any sympathy or

19     prejudice affect their decision.

02:06 20          Finally, the defendants' instruction, as drafted,

21     comments on the evidence beyond the Court's role and knowledge.

22     So I will not give that limiting -- legitimate giving request.

23          Turning then to docket No. 2149, which was filed on

24     September 3rd, there are I think six requested instructions

25     here.

1      The Court will not give a separate instruction on this

2  issue, this first request, because the Court's instructions on

3  the elements of honest services fraud addresses it.  So I'm not

4  going to give it a second time.

5      With respect to the second and third requests and

6  instructions in this group, I had previously instructed that

7  the Court will not rule on impossibility or it will not rule

8  that impossibility is not a defense to this substantive fraud

9  and bribery count against the defendant Wilson.  I previously

02:07 10  made that ruling.  That applies to the second and third

11  requests on this supplemental filing.

12      On the fourth request with respect to tax exempt

13  organizations and charitable deductions, and this applies to

14  the fourth and fifth of these requests, the Court will not

15  instruct on charitable deductions, noncash contributions, or

16  earmarking.  The Court will instruct on willfulness.  The

17  defendants' proposed instructions linking willfulness to these

18  three subjects may be appropriate for closing argument, but the

19  Court will not comment on the evidence in this matter.  So that

02:08 20  deals with four and five.

21      Then the sixth request, earmarking contributions

22  directly contributing to specific programs and routing

23  donations for charity, I'm not going to give that one for

24  reasons previously described.

25      Then I believe, finally, with respect to docket -- not

quite.  Docket No. 2348, conspiracy counts, falsified athletic
profiles.  This request and numbers two and three that follow
it relate to intent upon which the Court instructs in detail
elsewhere, so they are repetitive and won't be repeated here.
That deals with the first three in this group.

The fourth one, with respect to honest services wire
fraud and conspiracy to commit honest services wire fraud,
relevant customs, practices and policies, I have previously
rendered a ruling with respect to docket No. 2149.  We won't
give a separate instruction on that issue because the Court's
instructions on the elements of honest services fraud addresses
it.

The fifth and final request in this group we've
already instructed on materiality or we will have instructed on
materiality and don't need to do it again, thus I won't give
that one.

Then the final request has to do with a filing, docket
No. 2341, defendants' supplemental proposed jury instruction on
the subject of venue.  On this one, I invite the government's
response to this request and will take the matter under
advisement.

Mr. Frank, have you had a chance to look at that venue
request filed on October 3rd?

MR. FRANK:  Not sufficiently to argue on it, your
Honor.  We'll file something tonight.

1           THE COURT:  All right.  I would appreciate that.

2           That concludes my rulings on 51 through all of the

3     supplemental requests.  Any comments in that regard starting

4     with the defendants?

5           MR. SHARP:  Your Honor, just briefly, we filed a

6     supplemental instruction, one sentence, yesterday at 2350.

7     It's a sentence that wasn't in our proposed instructions but it

8     actually was in the government's proposed instructions that

9     proof that either of the defendants willfully joined the

02:11 10     conspiracy must be based upon evidence of their own actions

11     and/or words.  I believe it's typically given.

12           THE COURT:  I'm going to give that.

13           MR. SHARP:  Thank you.

14           THE COURT:  Any comments with respect to the second

15     set of requests?

16           Mr. Sheketoff.

17           MR. SHEKETOFF:  On the legitimate giving request, your

18     Honor.

19           THE COURT:  Which was?  One of the supplemental ones?

02:11 20           MR. SHEKETOFF:  Yes.  It's docket 2078.

21           THE COURT:  Yes.  I have it.

22           MR. SHEKETOFF:  So my concern, which I've expressed

23     earlier, is that the jury know from your instructions, whether

24     it's with this instruction or any other portion of the

25     instructions, that the concession that the government made in

1    its opening is a real concession and that the jury should not

2    consider donations for the purpose of hoping that it will

3    influence the institution to give your child a leg up.  What

4    I'm concerned about is the jury could think that that is a

5    crime charged in these indictments.

6         I think what the government said was "this case is not

7    about wealthy people donating money to universities in the hope

8    that their children get preferential treatment in the

9    admissions process.  The defendants are not charged with crimes

02:13 10   for having donated money to USC.  If that was all they had

11   done, we would not be here today".  That was the opening

12   statement.  And I think that's correct.

13        When you read the charge as a whole, I don't want a

14   juror to be able to come to the conclusion that just doing what

15   the government said is not a crime in its opening is, in fact,

16   a crime.

17        THE COURT:  Mr. Frank, do you wish to respond?

18        MR. FRANK:  Your Honor, I think the evidence is clear

19   on that point and the instruction is clear on that point that

02:13 20   there has to be a deprivation of honest services.  That's what

21   this case is about.  That's what the instruction makes clear.

22        THE COURT:  Any further comments on the rulings 51

23   through the supplements?  Mr. Kendall?

24        MR. KENDALL:  Yes, your Honor.  I'm checking the cite

25   to make sure I give you the right one.  I believe it's -- I'm

```
 1    not finding it correctly.  I'll get it to you in a minute.  The
 2    issue of -- we raised in a supplemental pleading, I don't know
 3    if it was 2149 or 2049.  I'm just trying to confirm it.  2149,
 4    your Honor.  The issue of legal impossibility, you stated that
 5    you had already ruled on it in a prior request we had given you
 6    that was dealt in the earlier section.  In the previous one, we
 7    had raised factual impossibility as the issue.  In 2149, I
 8    believe it's request number two, two and three in 2149, legal
 9    impossibility is a different issue than the factual
10    impossibility we had raised earlier.  So we'd ask the Court to
11    consider 2149 requests two and three, the issue of legal
12    impossibility as different from factual impossibility.
13                THE COURT:  All right.  I will look at that again.
14                MR. KENDALL:  Your Honor, this was in the first 50 and
15    I forgot to raise it.
16                If I may?
17                THE COURT:  Yes.
18                MR. KENDALL:  Request No. 28, it's the conspiracy
19    instruction.  We do think it would be appropriate to have at
20    least a multiple conspiracy instruction given how vast and
21    overarching is the allegation of the conspiracy that we joined
22    and the different behaviors.
23                THE COURT:  I do charge on multiple conspiracies.
24                MR. KENDALL:  Thank you, your Honor.
25                MR. SHEKETOFF:  Your Honor, just for clarification, as
```

1   you've asked the government to respond, we filed a supplemental

2   memorandum regarding venue as a judgment of acquittal motion.

3   That was 2342.  Then we also filed, the same day, a request for

4   an instruction on venue.  So there are two separate --

5           THE COURT:  What's the docket number, Mr. Sheketoff?

6           MR. SHEKETOFF:  The venue request instruction was 2341

7   and the supplemental memorandum for judgment of acquittal was

8   2342.

9           THE COURT:  2342?

02:16 10           MR. SHEKETOFF:  Yes, your Honor.

11           THE COURT:  All right.  I'll look at that.

12           MR. SHEKETOFF:  Thank you.

13           THE COURT:  The government will get its response in

14   promptly.

15           MR. FRANK:  We were going to respond on the

16   instruction.  Does your Honor also want us to separately

17   respond on the motion for judgment of acquittal?

18           THE COURT:  No.  On the venue question.

19           MR. FRANK:  Yes.  On the instruction.

02:16 20           THE COURT:  Yes.

21           MR. FRANK:  Yes.  We will file something promptly.

22           THE COURT:  The government's comments on the final,

23   after 51?

24           MR. FRANK:  The only comments we have, your Honor, is

25   we would ask the Court not to instruct on aiding and abetting.

 1    We're not proceeding on that theory for the substantive counts.

 2              THE COURT:  Not to?

 3              MR. FRANK:  Instruct on the aiding and abetting theory

 4    as to the substantive counts against Mr. Wilson.

 5              THE COURT:  All right.  Let me write that down.

 6              MR. KENDALL:  Your Honor, if I may inquire.  So it's

 7    the government's position that Mr. Wilson is guilty as a

 8    principal and no aiding and abetting theory and all associated

 9    with those counts?

02:17 10          MR. FRANK:  The government's position is we are not

11    proceeding on an aiding and abetting theory on the substantive

12    counts against Mr. Wilson:  6, 8, 9, 11 and 12.

13              THE COURT:  Those are the counts that are involved,

14    right?

15              MR. FRANK:  Yes, your Honor.

16              Your Honor, with respect to -- I just wanted to point

17    the Court.  I had alluded to this earlier on the issue of the

18    definition of the bribe or kickback with respect to both honest

19    services fraud and federal programs bribery.  I just wanted to

02:18 20   point the Court to its own decision in this case 468 F.3rd 428

21    at 444 to 445.  In that decision, the Court wrote "the FSI

22    alleges that the payments were made to designated accounts that

23    were either controlled by the corrupt insiders or that

24    otherwise inured to their benefit professionally.  Those

25    payments, therefore, represent a thing of value to the insider

1    even if the payments were not deposited directly into their

2    personal accounts.  As the government notes in an honest

3    services fraud prosecution, a thing of value is defined broadly

4    to include the value to which the defendant subjectively

5    attaches to the items received".  The Court cited the *Renzi*

6    case out of the Ninth Circuit.

7         Then the Court went on to say "payments made to

8    accounts controlled by university insiders, even if such

9    payments were ultimately received by the universities, may

02:18 10   still constitute a benefit to those insiders who exercise

11   control over the accounts".

12        So we believe that, in that decision, the Court

13   recognized that a thing of value for purposes of both federal

14   programs bribery and the honest services fraud statute could be

15   a payment to an account that was either controlled by the

16   corrupt insider or that otherwise inured to their benefit

17   professionally.

18        THE COURT:  All right.  Thank you.

19        Let me reorder.  We need to turn to the government's

02:19 20   proposed jury instructions.  I don't think this is going to

21   take as long because most of them are boilerplate or come right

22   out of instructions that I've given before.  I think it might

23   be easier.  Unfortunately, the government hasn't numbered each

24   of theirs but at least we have pages to deal with.

25        I'm going to give basically the substance of all of

1   the requests of the government with the following exceptions:

2   On page 7 where you talk about motive in the middle paragraph,

3   "personal or familiar advance and financial gain, for example,

4   our two recognized motives", I do not say that.  I talk about

5   motive, but I don't include that middle paragraph.

6        With respect to the proposed instruction on page 9, I

7   give the rough substance of that but I don't recall using the

8   terms "stealth" and "deception" in the middle of that page or

9   that "the government may utilize a broad range of schemes and

02:21 10   ploys to ferret out criminal activity".  I don't say that.

11        We had previously decided with respect to transcripts

12   of the tapes are not going to the jury.  That was page 11 where

13   the government was talking about that.

14        Of course, one of the requests of the government in

15   the overview of the indictment talks about money laundering.

16   That charge has since been dropped.  Of course, I'm not going

17   to talk about other defendants who are no longer in the case.

18        I don't give examples of conspiracy, like on page 17,

19   talking about bank robbery.  That also was brought up on

02:22 20   page 20.  That I don't give.

21        Of course, I'm not going to talk about SAT or test

22   scores where it is included in this request that was drafted

23   back in August when that might have been relevant to one of the

24   defendants at the time.  It's no longer relevant.  Of course,

25   I'm not going to mention that.

1           Again, the government has asked me to charge on

2     willfully several times.  I charge once on willfully in the

3     beginnings of the dealing with the counts, but I don't go back

4     to it every time willfulness comes up in a particular count.

5           Page 38, in a request involving Count 2, the top

6     couple of lines, it says the "government does not have to prove

7     that the defendants have the authority to administer these

8     federal benefits".  I don't understand that.  Maybe it's the

9     parents.  That doesn't make sense to me, so I'm not going to

02:24  10    give that.

11          Of course, we have no money laundering anymore so

12    page 41 and 42 are out.

13          You did ask for aiding and abetting on page 43, but

14    now I understand you're asking that that go out, is that

15    correct?

16          MR. FRANK:  Yes, your Honor.

17          THE COURT:  Okay.  Other than that I give the

18    substance or rough substance of all of the requests, all of the

19    other requests of the government.

02:24  20          Any comments with respect to my rulings on the

21    government's request?  Mr. Frank?

22          MR. FRANK:  No, your Honor.  Thank you.

23          THE COURT:  Mr. Kendall?

24          MR. KENDALL:  Your Honor, a few things.  First, we

25    obviously have these differences between their requests and our

1    requests and you've already addressed a lot of the issues

2    you're not accepting from our request.  So I assume you don't

3    want me to.

4         THE COURT:  I don't think you need to.  I think we've

5    covered that ground.

6         MR. KENDALL:  Right.  I don't think I'll make friends

7    if I do that.  I just wanted to confirm that, your Honor.

8         Second, number 13 of the government's request deals

9    with expert witnesses.

02:25 10         THE COURT:  Page 13?

11         MR. KENDALL:  I guess it was page 13, yes.  There were

12   no experts in this case.  There were summary witnesses.

13   Ranahan, the revenue agent, testified as a summary witness.

14   They gave no expert disclosure for her.

15         MR. FRANK:  That's correct, your Honor.

16         MR. KENDALL:  And George --

17         THE COURT:  All right.  The expert comments, I just

18   had a short one, but that one will go out, right?

19         MR. FRANK:  Yes, your Honor.  That was in anticipation

02:25 20   of defense experts.

21         THE COURT:  Okay.  No expert testimony.

22         MR. KENDALL:  If I may have one moment to confer, your

23   Honor.

24         THE COURT:  Yes.

25         MR. KENDALL:  Miss Papenhausen has something she can

1        articulate better than me.

2                THE COURT:  She may do so.

3                MS. PAPENHAUSEN:  Yes, your Honor.  In our objections,

4        our response and objections to the government's proposed jury

5        instructions, there was several places where we said if the

6        Court intends to give an instruction, you know, on X topic as

7        the government has proposed, then here's what we would propose

8        be part of that instruction or be given as that instruction.  I

9        just wanted to make sure that the Court had seen and considered

02:26 10   those proposed instructions as well.

11                THE COURT:  I have, but I have to confess.  I

12        personally haven't read them, but somebody in my chambers has

13        and we will take it into account.

14                MS. PAPENHAUSEN:  Thank you, your Honor.

15                MR. SHEKETOFF:  This is government request for

16        instruction --

17                THE COURT:  They don't number them but they have

18        pages.

19                MR. SHEKETOFF:  I should have guessed that they

02:27 20   wouldn't number them.  Count 1, and this would be at page 26 of

21        their pleading on page 29 --

22                THE COURT:  Wait.  26?

23                MR. SHEKETOFF:  Of their pleading, your Honor, at 29.

24                THE COURT:  Their proposed requests?

25                MR. SHEKETOFF:  Yes.

           1              THE COURT:  Yes.

           2              MR. SHEKETOFF:  They talk about willful blindness, so

           3     we object to an instruction on willful blindness because there

           4     has to be some sort of red flag warnings.  I'm not sure what

           5     they're pointing to in the evidence would have been red flag

           6     warnings for a willful blindness instruction.

           7              If you were to give a willful blindness instruction,

           8     the First Circuit is very clear that willful blindness is

           9     contained, so to speak, to proving the knowledge of an

02:28    10     existence of a conspiracy, not to the intent portion of the

          11     conspiracy.

          12              THE COURT:  Say that again.

          13              MR. SHEKETOFF:  So I don't think there's any grounds

          14     for a willful blindness instruction, but if your Honor

          15     disagrees with me and intends to give an instruction on willful

          16     blindness, the First Circuit has said that it only goes to

          17     whether or not the defendant had knowledge of the conspiracy

          18     but not to the willfulness, the specific intent, to join or to

          19     commit the underlying offense.  Intent cannot be proved by

02:28    20     willful blindness.  And so if you're going to give that

          21     instruction, I think you have to confine it to the one topic

          22     that it's admissible.

          23              THE COURT:  All right.

          24              MS. PAPENHAUSEN:  Your Honor, that is one of the

          25     things that we actually proposed an instruction for in our

1   response to the government's instructions.

2        THE COURT:  You mean in opposition to a willful

3   blindness instruction?

4        MS. PAPENHAUSEN:  Yes, your Honor.  As Mr. Sheketoff

5   explained, we don't believe a willful blindness instruction

6   should be given, but to the extent the Court intends to give a

7   willful blindness instruction, we have proposed some language

8   that would cabin it to the issues that are relevant and not the

9   issues, i.e. intent, for which it is not relevant.

02:29 10       MR. SHEKETOFF:  And the cite for this proposition is

11   445 F.3rd 73 and 86.

12        THE COURT:  445 F.3rd.

13        MR. SHEKETOFF:  F.3rd 73 and 86, a case that I tried

14   and loss.  It was really my first loss.

15        THE COURT:  All right.  Mr. Frank?

16        MR. FRANK:  Your Honor, we think the instruction we

17   proposed is clear, that it goes to whether the defendants acted

18   knowingly.  It's a whole separate paragraph and it separately

19   defines willfulness.  We think that's clear.

02:30 20       THE COURT:  What about the comments that it be cabined

21   and not include intent?

22        MR. FRANK:  That's what I was suggesting, your Honor.

23   We believe that the instruction specifically defines that in

24   deciding whether the defendants acted knowingly, you may infer

25   that they had knowledge of particular facts if they

deliberately closed their eyes to the facts that would have
otherwise been obvious to them.  That is called willful
blindness, and it defines it further.  It's in a paragraph that
specifically begins by saying determining whether the
defendants acted knowingly.

The next paragraph talks about as to acting willfully.
An act is willful if done voluntarily and intentionally.  So we
think there is distinction between those two things.

THE COURT:  And, therefore, the instruction you've
requested is what I should give?

MR. FRANK:  Yes, your Honor.  I'm not sure what
else -- there could be a different heading perhaps, but I'm not
sure how that would help.  We believe that the instruction is
cabined to knowledge.  That is our intent, to cabin it to
knowledge.

MR. SHEKETOFF:  I think either the Court or someone in
chambers reads this, I think it has to be clear to the jury
what they can use it for.  It's just knowledge of the
conspiracy, not intent to join.  And they mix knowledge and
willfulness together in their instruction.  So I don't
understand the government's --

THE COURT:  Wait a minute, please.

MR. SHEKETOFF:  So I don't understand the government's
reluctance to make it clear to the jury that it only goes to
one possibility and not another.  I mean, willfulness is the

```
 1    real issue in this case.  I don't think the jury should be
 2    confused that willful blindness goes to willfulness.
 3            THE COURT:  Do you want to respond to that, Mr. Frank?
 4    We're talking about page 26 your request, right?
 5            MR. FRANK:  Yes, your Honor.  We're not -- we believe
 6    it does go to knowledge and we believe that's clear.  We cited
 7    the Court's decision in Prange, which, in contrast to
 8    Mr. Sheketoff, is a case that I won, and we believe -- we're
 9    trying to look it up right now.  We believe the instruction is
02:33 10  verbatim from the Prange instruction that this Court gave.
11            MR. SHEKETOFF:  Unfortunately, I did not go to Harvard
12    Law School so I would lose to Mr. Frank at every opportunity.
13    I went to a smaller school in a smaller town.
14            There is a First Circuit case that makes it clear that
15    the jury can't use it for the wrong purpose.
16            THE COURT:  All right.  I'll look at that case that
17    you cited, Mr. Sheketoff.
18            MR. SHEKETOFF:  Thank you.
19            THE COURT:  We will take this matter under advisement.
02:34 20  We are going to charge on willful blindness, but I will look at
21    it again.
22            MR. SHEKETOFF:  Understood.
23            THE COURT:  Anything else, Mr. Kendall, with respect
24    to the government's requests?
25            MR. KENDALL:  Yes.  Page 48, your Honor, impossibility
```

not a defense.  The government puts in language about a

defendant may be guilty of intent to engage in criminal

activity.  I do not believe federal program bribery has the

intent language in it like other statutes do.  I don't think

there's a basis to charge my client or convict my client on

intent.  I don't think intent language should be included.

The other one is on page 22 --

THE COURT:  Where is the intent language?  I see.  In

the last sentence?

02:34  MR. KENDALL:  The last sentence, yes, and really sort

of the preceding sentence too.  I think any type of intent is

not appropriate, your Honor.

I also believe -- I'll wait for you to finish your

notes, your Honor.

THE COURT:  Okay.

MR. KENDALL:  22 to 24 of the government's instruction

on Count 1.

THE COURT:  Wait a minute.  22 to 24, underlying

offenses?

02:35  MR. KENDALL:  Yes.  I believe there's language in

there that talks about the government can prove a defendants'

guilty by omission.  I think we're being charged with

affirmative misrepresentations.  I don't think there's been any

evidence or proof of omission as being a theory to convict

anybody, so any reference to omission in those pages I think

```
 1    should be taken out.
 2            THE COURT:  Where does it say "omission"?  Oh, I see
 3    it.  On page 23.
 4            MS. PAPENHAUSEN:  I believe it also appears on pages
 5    22 and 24, your Honor.
 6            THE COURT:  I found one on 23.  Where are the others?
 7            23 in the second element.
 8            MS. PAPENHAUSEN:  And then page 24, the paragraph that
 9    begins with the term "false or fraudulent pretenses", the
10    second sentence talks about "half truths, knowing concealment
11    of facts and omission of material facts".
12            THE COURT:  All right.  I'll look at that.
13            MR. FRANK:  Your Honor, that's straight out of the
14    pattern instruction.  We have not abandoned that theory.
15            THE COURT:  It's in the pattern instruction?
16            MR. FRANK:  Yes, your Honor.
17            MS. PAPENHAUSEN:  I would say it's not charged here,
18    your Honor.  It's not what's at issue here in this case.
19            MR. KENDALL:  Another issue with page 22, your Honor,
20    the same instruction, it says in the third line on page 22, "so
21    you can determine whether a conspiracy between at least two
22    people to commit one of these crimes existed".  The
23    government's theory is that there was far more than two people,
24    so I think we should take out the "two".
25            THE COURT:  The law is that the conspiracy can be
```

```
 1    between two or more, right?
 2              MR. KENDALL:  That's generally the law but, as charged
 3    in this case, the government's made it specific that it's an
 4    overarching conspiracy that brings in all this evidence and all
 5    this behavior.  It may underscore the need for a multiple
 6    conspiracy charge that we discussed earlier.  It's clearly
 7    contrary to the government's theory that there were two people
 8    in this conspiracy.
 9              THE COURT:  It doesn't say two.  It says "at least
10    two".
11              MR. KENDALL:  Yes.  If the jury were to find there
12    were two people in the conspiracy, it would be a different one
13    by the way it's charged, just by the way the government has
14    charged it.
15              THE COURT:  Mr. Frank?
16              MR. FRANK:  I think we should stick with the law.  We
17    didn't raise the burden on ourselves in the way that we charged
18    this case.  We think the law is the law and that's what the
19    Court has charged.
20              With respect to the material omission point, it is
21    straight out of the pattern instruction.  There were material
22    omissions in this case.  Among other things, there was a
23    material omission of the fact that the recipients of the bribes
24    failed to disclose those bribes to their employers, failed to
25    disclose that they were acting in exchange for those bribes.
```

02:38 (line 10)
02:39 (line 20)

 1    There was also material omission of the fact that, for example,

 2    Sabrina Abdelaziz hadn't played basketball for 2 years.  So

 3    there were both affirmative statements and material omissions.

 4          THE COURT:  All right.  I will think about that one

 5    again.

 6          Anything else?

 7          MS. PAPENHAUSEN:  Just one point in response to

 8    Mr. Frank's comment.  In terms of the omission, I believe it's

 9    required that there needs to be a duty to speak.

02:39 10          THE COURT:  A duty?

 11          MS. PAPENHAUSEN:  A duty to speak in order to be held

 12    liable to be charged with an omission.  I don't believe that's

 13    been either charged or proven here.

 14          THE COURT:  Anything else?

 15          MR. KENDALL:  Yes, your Honor.  On page 25 of the

 16    government's set, the language says, at the bottom of page 25

 17    under element to materiality, "the second element of mail fraud

 18    and wire fraud is that the false representation or fraudulent

 19    failure to disclose related to a material fact".  I believe the

02:40 20    fact or representation itself has to be material.  Being

 21    related to a material fact is not sufficient.  What they claim

 22    is the factor representation that is false, that itself has to

 23    be what is material.  Related to material fact is kind of an

 24    ambiguous connection that could mean something false was said

 25    and it may be related to a material fact but the falsity itself

1    wasn't material.

2         I believe, your Honor, that relates to an issue that

3    arises from one of your rulings recently that in defining what

4    evidence we could bring into the case and what we could not,

5    the Court focused on that.  It viewed this case as being did

6    the defendants knowingly submit falsified profiles to get their

7    kids into college.  I think, based upon the Court's ruling of

8    what evidence is relevant and admissible and what is not, that

9    should be the focus of what is the material misrepresentation

02:41 10   is the false profile.  To have a material fact related to, that

11   has something related to a material fact is quite attenuated

12   and disconnected.  The Court's ruling was that the charge of

13   this case that we had to -- that defined what evidence we could

14   present was submitting a falsified profile.  I think the

15   government substantially deviates from that.  It's mentioned in

16   25, your Honor.

17         THE COURT:  Do you wish to respond?

18         MR. FRANK:  Not really, your Honor.  We didn't limit

19   the case to the false profiles.  We don't believe that the jury

02:42 20   instructions should be used as a way of arguing the defense

21   case.  We believe the instructions are what the law sets forth

22   and that's what the instructions should be.

23         THE COURT:  Anything else?  Mr. Kendall?

24         MR. KENDALL:  Yes, your Honor.  I don't know the

25   relevant page from the government's charge.  We can look for

1     it.  It relates to the tax charge.  I believe based upon Agent

2     Ranahan's testimony the government's theory is that the tax

3     charge is based upon what was called a deduction or a business

4     expense was a bribe, and the only way they can prove their tax

5     charge is if they prove that the money deducted was a bribe and

6     my client knew it.  I believe that relates to docket entry

7     2343, request No. 1.

8          THE COURT:  Wait a minute.  That's your request?

9     We're talking about the government's requests.

02:43 10        MR. KENDALL:  I don't have the cite at my hand.  We're

11    looking for it now.  I think to the extent the two overlap,

12    it's going to be the same.

13         THE COURT:  What's again the reference to your

14    request?

15         MR. KENDALL:  It's Document 2343 and it's request

16    No. 1.  I believe the government's theory, through Agent

17    Ranahan, if you remember, we argued a good bit about did she

18    meet the definition of an offset for a charitable contribution

19    in her calculation.

02:44 20        THE COURT:  2341 --

21         MR. KENDALL:  2343.  I'm sorry, your Honor.  I

22    misspoke.  2343.  It was filed just a couple days ago, I

23    believe.

24         THE COURT:  Okay.

25         MR. KENDALL:  2343, request No. 1.

                1          THE COURT:  There was only one request in that

                2     document anyway, right?

                3          MR. KENDALL:  I believe so, your Honor.  The issue is

                4     the government's evidence was that the tax return was false.

                5          THE COURT:  So you want me to rule as a matter of law

                6     that the payment wasn't a bribe, right?

                7          MR. KENDALL:  I would like that, but that's not what

                8     I'm asking, your Honor.

                9          THE COURT:  That's what it seems to ask.

      02:45    10          MR. KENDALL:  I think we requested that and you

               11     indicated you weren't going to go that way, but the issue is

               12     the way it's presented to the jury, they have to decide whether

               13     it's a bribe or something else.  If it's a bribe, it could

               14     support the tax charge.  If they find it wasn't a bribe,

               15     there's no basis to find that there was a tax violation.  With

               16     the way the government's charged this is, they've got to prove

               17     if this was a bribe and that was what was improper to put on

               18     the tax return.

               19          THE COURT:  Any response to that?  Mr. Frank?

      02:45    20          MR. FRANK:  Your Honor, that's not what we charged.

               21     In fact, our charge is very complicit.  In Count 13, "among

               22     other things, the tax return was not correct because the lines

               23     for adjusted gross income and itemized deductions and the

               24     attached Form 1040 includes losses and gifts to charity based

               25     on payments from HPC to KWF Singer and The Key as reported

1    charitable contributions or business expenses".  The charge

2    says nothing about bribe and does not limit itself.  It says

3    "among other items".

4         THE COURT:  Do you know where it occurs in your

5    requests?

6         MR. FRANK:  It's page 49 and 50, your Honor, of our

7    requests.

8         MR. KENDALL:  Your Honor, I think the relevant

9    discussion would be in the government's filing.  That's docket

02:46 10    entry 2328, which was their memorandum opposing our position on

11    the tax issue.  In their opposition concerning whether or not

12    the Court should strike Agent Ranahan's testimony, they made it

13    very clear their theory is it's a bribe, that's why it can't be

14    deducted and Ranahan does not have to take into account any

15    other tax issues with respect to offsets of quid pro quo things

16    in a charitable contribution.

17         So the evidence in the case and the way the government

18    has presented it to you is it's a bribe, you can't deduct it.

19    You need no further analysis or calculation of the tax.  So I

02:47 20    think they should be held to that for the jury instruction.

21         MR. FRANK:  Your Honor, we're asking for a

22    straightforward tax instruction like the Court has previously

23    given.

24         THE COURT:  All right.  Thank you.  Anything further?

25         MR. SHARP:  Yes.  One thing.  Are we past the jury

 1  instructions, your Honor?  We filed a motion this morning.

 2          THE COURT:  We're done with the jury instructions.

 3  Let me just clear my desk.

 4          MR. SHARP:  Yes.

 5          MR. FRANK:  Your Honor, can I ask one additional

 6  question on the instructions?

 7          THE COURT:  Yes.

 8          MR. FRANK:  You had previously suggested you would

 9  give an instruction regarding materials discussed in opening

02:48 10  that did not come into evidence.  I don't know if that's part

11  of the Court's preliminary instructions about opening

12  statements.

13          THE COURT:  Say that again.

14          MR. FRANK:  You had previously indicated you would

15  instruct the jury that evidence discussed in opening statements

16  that did not come into evidence during the case is not, in

17  fact, evidence.  I just wanted to know -- I imagine that's part

18  of the Court's preliminary instructions.

19          THE COURT:  This is with respect to the playing of the

02:48 20  tape?

21          MR. FRANK:  That's the principal example of it but

22  there were other examples of it.  There was the text chain

23  between two low level admissions officials.  There was a whole

24  series of statements about defendant Wilson's growing up, the

25  circumstances of his childhood and growing up, the playing of

1    the tape regarding Nazzi Saffori, an unindicted coconspirator

2    who was on the wiretap and on the consensual recordings that

3    was also played during opening.  There was a whole series of

4    potential exhibits that were played in opening that did not

5    come into evidence.

6                THE COURT:  If you want me to so instruct, give me a

7    proposed instruction with respect to statements made in

8    openings.

9                MR. KELLY:  Your Honor, there's also a request from us

02:49  10   for a curative instruction for the prosecutor's false statement

11   in front of the jury that I had falsely represented someone to

12   be an Admission Officer, which he conceded at sidebar but not

13   the jury.  We had asked for that earlier.  If the Court's going

14   to be taking that into account.

15               THE COURT:  Give me a proposed instruction in that

16   regard.

17               MR. KELLY:  Thank you, your Honor.

18               THE COURT:  By 5 o'clock.  You have more lawyers than

19   I do.

02:50  20               MR. SHARP:  He won't be writing it, your Honor.

21   Docket No. 2353, which was a --

22               THE COURT:  3663?

23               MR. SHARP:  2353, which was a motion to exclude

24   argument regarding some things that Mr. Frank mentioned

25   yesterday.  It was also mentioned in the opening that Donna

1    Heinel controlled the funds and that she benefitted

2    professionally from them.  It's mentioned in the indictment.

3    It's mentioned in the opening.  It is the theory on which your

4    Honor decided not to dismiss that charge that the funds she

5    controlled or benefitted professionally from them.

6           So it goes to the jury instructions, to Rule 29, and

7    to their closing.  We don't think they should be able to

8    reference this or argue this in closing because there hasn't

9    been any evidence of it.  Maybe it's somewhere in the record

02:50 10   but we couldn't find it anywhere other than in the opening

11   statement that Donna Heinel controlled the Women's Athletic

12   Board or that she benefitted professionally from it.  No

13   witness has testified to that.

14          MR. KENDALL:  Your Honor, I think that applies to some

15   extent with Mr. Vavic as well.  There may have been some

16   testimony that he would oversee an account and then there was

17   testimony he built a business office and others to manage it,

18   but there was no testimony it benefitted him anyway.

19          MR. SHARP:  With respect to Heinel, they proved the

02:51 20   salary went up year after year, but no connection to that

21   account.  There was no testimony.  Nobody was brought in who

22   could testify to that.

23          MR. KENDALL:  Your Honor, with us --

24          THE COURT:  Is this a tag team effort?

25          MR. SHARP:  I hope not.

 1          MR. KENDALL:  I'll be quiet until you're ready, your

 2     Honor.

 3          THE COURT:  Go ahead.

 4          MR. KENDALL:  With us, it's two issues, your Honor,

 5     three if you want to call it that way.  There's the issue they

 6     raised with USC and respect to Vavic.  There's no testimony

 7     that he got salary increases, benefits, or whatever else that

 8     somebody was depositing into a bank account.

 9          With respect to the count relating to the Stanford and

02:52 10     Harvard ruse that the government perpetrated, there was no

11     description of what's going to benefit who are these people,

12     the Stanford coach and the senior women's administrator at

13     Harvard.  There's no description of who they were, what their

14     job status was, how this would affect their job, what was the

15     custom, practice or expectations of honest services at their

16     place of employment.  So there, your Honor, there's no evidence

17     to say what was going on or how these people would benefit.  I

18     think it's a much more magnified problem for the two imaginary

19     counts.

02:52 20          MR. SHARP:  I want to focus more on 2353, which

21     relates specifically to precluding the government from

22     mentioning this during their closing.  I know it's kind of a

23     late hour but we did this motion based on the *Petriezzello*

24     transcript from yesterday where Mr. Frank said that Donna

25     Heinel benefitted in a professional capacity from the funds and

1    that she controlled the Women's Athletic Board.  So to the

2    extent the Court could rule on that, I guess before the

3    closing, it would be necessary unless the government can point

4    us to some evidence that shows this in the record.

5            THE COURT:  Let's hear from Mr. Frank.

6            MR. FRANK:  Your Honor, there was direct evidence that

7    Mr. Vavic controlled the water polo fund.  That is testified to

8    by Casey Moon.  The fact that there are checks and balances on

9    his accounts, which the defense tried to argue, doesn't mean

02:53 10    that he didn't control the money in that account.

11            There was also direct evidence that Donna Heinel

12    directed -- certainly evidence from which a jury could conclude

13    that Donna Heinel benefitted from the flow of funds into the

14    Women's Athletic Board.  She specifically directed funds into

15    the Women's Athletic Board.  They heard her doing that on tape.

16    We showed that there was an increase over that period in the

17    flow of funds into that account, specifically from Rick

18    Singer's clients.  We demonstrated that her salary increased

19    substantially over that same period, and we demonstrated that

02:54 20    her performance was reviewed based on that.  Laura Janke also

21    testified she oversaw that fund.

22            For all those reasons, we think there's substantial

23    evidence from which a jury can conclude both that there was

24    control and also there was personal benefit to both of these

25    individuals.

         1           MR. SHARP:  Respectfully, those are just conclusions.

         2    The fact her salary went up during this time period and more

         3    money went into this fund during this time period, the fact

         4    that she directed money to go into this fund, that does not

         5    prove their theory, which is it's a bribe because it went to a

         6    program and she controlled the account or benefitted

         7    professionally from it.  They need to bring somebody in to say

         8    that and nobody said that.

         9           THE COURT:  All right.

02:55   10           MR. FRANK:  Just to be specific, your Honor, Janke

        11    specifically testified that the Women's Athletic Fund was run

        12    by Donna Heinel.

        13           THE COURT:  That was testimony of Janke?

        14           MR. FRANK:  Yes.

        15           MR. KENDALL:  Your Honor, I have a very distinct one

        16    separate from those raised.

        17           THE COURT:  The government?

        18           MR. KENDALL:  The government's requests, yes.  Page 35

        19    of the government's request that deal with a federal program

02:55   20    bribery, I believe under the First Circuit decision in *Martinez*

        21    994 F.3rd page 1 in 2021 that an official act is required.  I

        22    don't think the government's instruction acknowledges that.

        23    They have to prove that the bribery was to influence an

        24    official act.

        25           THE COURT:  Didn't I just, in going through this, on

1    the federal count say no official act is required?  I thought I

2    said that some place.

3             MR. KENDALL:  Your Honor, I ask that the Court

4    consider the *Martinez* decision.  I haven't read it myself, but

5    part of my team has read it.

6             THE COURT:  It's a First Circuit decision?

7             MR. KENDALL:  *Martinez* First Circuit 994 F.3rd 1.  As

8    I said, I have not read it, but I'm representing others have

9    that told me it would be relevant.

02:56 10          THE COURT:  With respect to the official act?

11            MR. KENDALL:  Yes.

12            THE COURT:  Applying to the second conspiracy?

13            MR. KENDALL:  Yes, your Honor.  And the substantive

14   counts that are also based on federal bribery.

15            THE COURT:  I'll look at it.

16            MR. KENDALL:  The other issue, your Honor, is on pages

17   17 and 22 of the government's requests.  They need to

18   establish -- let me check those pages.

19            The falsified athletic profile issue on pages 17 and

02:57 20   22, they don't narrow the issue to honest services fraud that

21   Vavic knew that the profile was fraudulent.  If my client knows

22   it's fraudulent but Vavic doesn't, there's no honest services

23   fraud.  It has to be that Vavic knows he's committing a fraud

24   on his employer, not my client.  I think that would relate to

25   pages 17 and 22.

1            THE COURT:  Mr. Frank?

2            MR. FRANK:  It was direct evidence that Vavic

3    personally directed lies to the subcommittee based on

4    falsehoods that he directed concerning Johnny Wilson.

5            THE COURT:  Say that again.

6            MR. FRANK:  Sorry.  That was unclear.  Vavic

7    personally directed Casey Moon to lie to the subcommittee by

8    giving Casey Moon false information that Casey Moon

9    incorporated in the athletic profile about Johnny Wilson that

02:58 10   secured his recruitment.

11           For example, there was direct evidence that Vavic

12   directed Casey Moon to write that Johnny Wilson was an

13   immediate impact player, that he was one of the top ten

14   attackers in the graduating class.  So there was direct

15   evidence of Vavic's knowing complicity in lying to the

16   subcommittee.

17           MR. KENDALL:  Your Honor, I'm not debating the

18   evidence.  It's just not in his instruction.  It has to say

19   that Vavic knew it was false and Vavic intended to mislead.  He

02:59 20   just needs an instruction to follow what he's saying is the

21   evidence.

22           MR. FRANK:  There doesn't need to be an instruction as

23   to Mr. Vavic.  There needs to be a conspiracy instruction, and

24   there is.

25           THE COURT:  All right.

```
 1              MR. SHARP:  One more point, your Honor.  If they're
 2    going to hang their hat on this sentence by Janke that the
 3    Women's Athletic Fund was run by Donna Heinel, this theory they
 4    have of a donation going to a school being a bribe, it's the
 5    first time in the history of the federal courts that we've been
 6    researching this case for 2 years where they have to have a
 7    bribe going to the purported victim.  We understand your ruling
 8    that there has to be a personal benefit that has to be
 9    controlled by or personally benefit from the fund in order for
02:59 10  it to be a bribe.
11              The fact that somebody runs a fund, this offhand can
12    comment made by Janke, we do not think is sufficient to say
13    that she controlled it.  We do not know anything about the
14    outflows from that fund other than there was no
15    misappropriation.  Nobody said she was spending it on things
16    that were good for her personally.  There's simply no
17    testimony.
18              Thank you, your Honor.
19              THE COURT:  All right.  With respect to tomorrow, let
03:00 20  me understand.  It is the intention of the government to argue
21    for 90 minutes or less on the case-in-chief, if you will, and
22    then 30 minutes or less for rebuttal?
23              MR. FRANK:  Yes.
24              THE COURT:  Each defendant gets one hour, right?
25              MR. KELLY:  Yes, your Honor.  Is there a break after
```

 1    the 90 minutes?

 2         THE COURT:  Probably there will be.  We're not going

 3    to go 4 hours without a break.  We're also not going to try to

 4    do the charge after 4 hours of -- we're going to break for the

 5    day at the end of the closing arguments.

 6         MR. FRANK:  Does your Honor anticipate a break before

 7    the rebuttal?

 8         THE COURT:  It depends on whether the defendants use

 9    all their time.  We'll see.  I'm not going to force people to

03:01 10    hang in longer than they did during trial.

11         MR. FRANK:  Yes, your Honor.

12         MR. KENDALL:  Your Honor, we understand we have an

13    hour each.  I've been talking with Mr. Kelly.  If he uses less

14    than his hour, can I take some of that time?

15         THE COURT:  Yes, you may.

16         MR. KELLY:  If I use more, can I take some of his?

17         MR. KENDALL:  No.

18         Thank you.

19         THE COURT:  You understand, I don't want you closer

03:01 20    than 10 feet from the jury box.  You can use this portable

21    lectern if you want.  You can stand in the well without a

22    lectern, but not closer than 10 feet and no wandering during

23    closings.  If you need to retrieve a document, that's fine,

24    otherwise no wandering.

25         I need to enter a formal decision with respect to

```
 1    Petriezzello.  Evidence has been conditionally admitted in this
 2    case pursuant to the Petriezzello case because the Court is
 3    satisfied that the government has met its evidentiary burden to
 4    show a single conspiracy and that the statements at issue were
 5    in furtherance of that conspiracy.  The evidence conditionally
 6    admitted under Petriezzello is fully admitted.
 7              Anything else that needs to come to the Court's
 8    attention before we adjourn for the day?
 9              MR. FRANK:  Thank you, your Honor.  We were going to
10    submit a proposed redacted indictment for the Court --
11              THE COURT:  It must be redacted with all of the counts
12    with respect to defendants who are not before the jury.
13              MR. FRANK:  Right.  So that led to a second question,
14    which was how do we number the counts as to these defendants.
15              THE COURT:  I'm going to make a statement that they're
16    to disregard the numbers in the indictment.
17              MR. FRANK:  So when we're arguing to the jury, should
18    we use the numbers of the counts as they are in the indictment?
19              THE COURT:  Yes.
20              MR. FRANK:  Thank you, your Honor.
21              THE COURT:  There will be holes in the numbers.  I
22    think you go one to -- two to six or something.
23              MR. FRANK:  That's right, your Honor.
24              THE COURT:  That's fine.
25              Anything else that needs to come to my attention
```

1    before we adjourn for the day?

2              MR. FRANK:  No, your Honor.

3              MR. KELLY:  No, your Honor.

4              THE COURT:  We are adjourned.  Thank you.

5              (Whereupon, the proceedings adjourned at 3:04 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )

DISTRICT OF MASSACHUSETTS    )


        I, Kristin M. Kelley, certify that the foregoing is a

correct transcript from the record of proceedings taken

October 5, 2021 in the above-entitled matter to the best of my

skill and ability.


    /s/ Kristin M. Kelley            October 5, 2021

    Kristin M. Kelley, RPR, CRR            Date
    Official Court Reporter