1

2                        UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
3

4
      UNITED STATES OF AMERICA,          )
5                          Plaintiff      )
                                          )
6     vs.                                 )  No. 1-19-CR-10080
                                          )
7     GAMAL ABDELAZIZ and JOHN            )
      WILSON,                             )
8                          Defendants.    )
                                          )
9                                         )

10

11
                    BEFORE THE HONORABLE NATHANIEL M. GORTON
12                       UNITED STATES DISTRICT JUDGE
                           JURY TRIAL - DAY 19
13

14
                    John Joseph Moakley United States Courthouse
15                       Courtroom No. 4
                         One Courthouse Way
16                       Boston, Massachusetts 02210

17

18                       October 6, 2021
                         9:21 a.m.
19

20

21
                         Kristin M. Kelley, RPR, CRR
22                       Debra Joyce, RMR, CRR
                         Official Court Reporters
23            John Joseph Moakley United States Courthouse
              One Courthouse Way, Room 3209
24            Boston, Massachusetts 02210
              E-mail: kmob929@gmail.com
25
              Mechanical Steno - Computer-Aided Transcript

```
1     APPEARANCES:

2

3          Stephen E. Frank

4          Ian J. Stearns

5          Leslie Wright

6          Kristen Kearney

7          United States Attorney's Office

8          1 Courthouse Way

9          Suite 9200

10         Boston, MA 02210

11         617-748-3208

12         stephen.frank@usdoj.gov

13         for the Plaintiff.

14

15

16         Brian T. Kelly

17         Joshua C. Sharp

18         Lauren Maynard

19         Nixon Peabody LLP

20         100 Summer Street

21         Boston, MA 02110

22         617-345-1000

23         bkelly@nixonpeabody.com

24         for Gamal Abdelaziz.

25
```

```
 1    APPEARANCES:

 2

 3             Robert L. Sheketoff

 4             One McKinley Square

 5             Boston, MA 02109

 6             617-367-3449

 7             sheketoffr@aol.com

 8             for Gamal Abdelaziz.

 9

10

11             Michael Kendall

12             Lauren M. Papenhausen

13             White & Case, LLP

14             75 State Street

15             Boston, MA 02109

16             617-939-9310

17             michael.kendall@whitecase.com

18             for John Wilson.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3          Andrew E. Tomback

 4          McLaughlin & Stern, LLP

 5          260 Madison Avenue

 6          New York, NY 10016

 7          917-301-1285

 8          atomback@mclaughlinstern.com

 9          for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

1

THE CLERK:  You may be seated.  Court is now in

2

session.

3

THE COURT:  Good morning, counsel.

4

Before we call the jury and commence closing

5

arguments, I need to make some rulings.  I will first address

6

the two pending matters, the objection to the proposed verdict

7

form and the defendants' motion to exclude argument regarding

8

control of funds, docket 2353.

9

09:21 10

I will then briefly go back over some of the matters

that were discussed yesterday at the charge conference.  Then

11

we will commence oral argument.

12

I'm afraid I'm going to have to have that screen moved

13

so I can see everybody in the courtroom, including all counsel.

14

It's going to have to be moved about 5 feet back.  Keep going.

15

Right there.  Thank you.

16

MR. FRANK:  Do you want it there during closings as

17

well?

18

THE COURT:  If not, it's going to have to be brought

19

09:22 20

into such a position that I can see everybody in the courtroom.

First of all, with respect to the defendants'

21

objection to the proposed verdict form, docket 2363, that

22

objection is overruled because the Court finds that its

23

proposed verdict form is not an offending verdict form that

24

would be restricted by any case law.  It's not a special

25

1   verdict form.

2          Second, the defendants' motion to exclude argument

3   regarding control of funds, the Court sees this as an argument

4   about sufficiency of evidence and concludes that the government

5   has offered evidence sufficient to argue about it in its

6   closing, but it cautions counsel not to go beyond what the

7   evidence shows.

8          Third, with respect to matters that were discussed

9   yesterday at the charge conference, defendants requested that

09:23 10   the Court instruct on venue.  The Court will give an

11   instruction on venue, which will embody the substance of both

12   requests of the government and the defendants.

13          Attorney Sheketoff requested the Court further clarify

14   that willful blindness can only be used to prove knowledge and

15   not intent.  Because his concerns were specific to the context

16   of the government's proposed instruction, which differs from

17   our final charge, we will address the substance of defendants'

18   request in our version.

19          With respect to comments made by counsel during

09:24 20   openings and at other times during trial, I will instruct the

21   jury as follows:  What counsel say in their opening statements,

22   closing arguments, objections, and at other times during the

23   trial is intended to help you interpret the evidence, but it is

24   not evidence and sometimes counsel are mistaken.

25          Third, Attorney Kendall requested an instruction that

1    an official act is required for federal programs bribery citing

2    *U.S. vs. Martinez*, a First Circuit case this year.  The

3    government has filed a response arguing that the language in

4    *Martinez* is dicta and that federal programs bribery does not

5    require an official act.  This matter is retained under

6    advisement and the Court will charge accordingly after it makes

7    its conclusion.

8         Next, Attorney Kendall requested an instruction with

9    respect to materiality, in particular that a misrepresentation

09:25 10  or concealment in the context of honest services fraud had to

11   be of a material fact, not merely relate to a material fact.

12   Our charge adopts Attorney Kendall's request.

13        Attorney Kendall objected to use of the term

14   "omission".  Consistent with the pattern instructions,

15   "omission" has now been replaced with the word "concealment".

16        The instruction concerning expert witnesses has been

17   deleted.

18        The Court will neither instruct on nor use the term

19   "corrupt insider" in its charge.  The Court will instruct the

09:25 20  jury on the crimes charged and does not believe it is necessary

21   to further explain to the jury the concept of corrupt insider.

22        The Court will not provide a condonation instruction

23   because, under the standard expressed in *U.S. vs. Joslin,* the

24   Court finds there has not been sufficient evidence to warrant

25   it.  The Court will give the rough substance of the defendants'

1    proposed legitimate giving instruction.

2         Finally, the Court will not instruct on pure legal

3    impossibility because such an instruction is not warranted in

4    light of the charges and the evidence in this case.

5         Anything that needs to come to my attention before we

6    call the jury for oral argument?

7         Mr. Kelly.

8         MR. KELLY:  Your Honor, we can discuss it at the break

9    or later, but I do want to drill down a bit on the instruction

09:26 10   about mistaken.  It was clearly the government who was mistaken

11   when they objected in my opening about the USC admissions

12   people.  I don't want it being suggested that I was mistaken.

13   They were mistaken.  They conceded their mistake at sidebar.

14   That's why we asked for the clarification, that it was the

15   government's mistake.

16        THE COURT:  Did you submit a specific instruction?

17        MR. KELLY:  Yes, we did, your Honor.  I'll get the

18   docket number momentarily.

19        THE COURT:  I'll look at it.  All right.  Anything

09:27 20   else?

21        MR. KELLY:  No, your Honor.

22        THE COURT:  Call the jury.

23        (Jury enters.)

24        THE CLERK:  Thank you.  You may be seated.  Court so

25   now in session.

```
 1              THE COURT:  Good morning, jurors.  Welcome back.  I
 2    hope you're ready to go to work today.  As I told you before,
 3    what we're going to do is give closing arguments today.  They
 4    are going to be extensive.
 5              The order is that the government makes its closing
 6    first.  Then you'll hear from counsel for both of the
 7    defendants, after which the government has a short time for
 8    rebuttal.
 9              With that, I will invite Mr. Frank to make the closing
09:29 10    for the government.
11              MR. FRANK:  Thank you, your Honor.
12              May I proceed, your Honor?
13              THE COURT:  You may proceed.
14              MR. FRANK:  Good morning.
15              "I'll make them a sailor or something.  Because of
16    where you live".
17              "I'll make them a sailor or something.  Because of
18    where you live".
19              That is what Rick Singer told John Wilson when they
09:30 20    were discussing the side-door scheme for Wilson's daughters.
21    And how did the defendant respond?  He laughed.  And then he
22    asked if he could get a two for one special.
23              That exchange between John Wilson and Rick Singer was
24    intercepted on a court authorized wiretap on September 15,
25    2018, one week before the FBI approached Singer, at a time when
```

neither the defendant nor Singer knew that the FBI was
listening, caught red-handed, scheming to get Wilson's two
daughters into some of the finest universities in the country
as recruited athletes in exchange for money.

But you know that they were not athletes.  There was
no chance they were going to be legitimately recruited as
college athletes, and the defendant knew that as well.  In the
same call he asked, what sport would be best for them or is it
not going to even matter.

09:31   Here's what else you know:  This was not John Wilson's
first time doing a dirty deal to get his kids into college
through lies and bribery, the same deal that Gamal Abdelaziz
did to get his daughter into USC as a recruited basketball
player even though she didn't even make her high school's
varsity team and she hadn't played basketball for the last
two years of high school.

You heard him on tape as well.  How did Mr. Aziz
respond when Rick Singer told him that Donna Heinel wanted to
use that same fake athletic profile for anybody who isn't a
09:32   real basketball player?  "I love it".  Just like Mr. Wilson, he
thought it was funny.

At the beginning of this case, the government told you
the evidence would prove beyond a reasonable doubt that these
defendants conspired to get their children into college through
fraud and bribery to gain admission as recruited athletes based

1   on falsified credentials, to induce corrupt Athletic Department

2   insiders to fool their own colleagues in the Admissions

3   Department in exchange for money and to cover it up and to

4   cheat the IRS with a paper trail of bogus donation letters and

5   phony consulting invoices.

6            You now know that the evidence has shown exactly that,

7   and that evidence has given you remarkable insight into the

8   minds of these two defendants.  That's no accident.  The FBI

9   investigation that you've heard about over these last three and

09:33 10  a half weeks was designed to do exactly that, to make sure that

11  the evidence of the defendants' knowledge and intent was

12  captured on tape so that you, the jury, would be able to hear

13  these defendants in their own words scheming to trade money for

14  recruitment spots based on falsified credentials and lying to

15  cover it up and to make sure that they couldn't later hide

16  behind those phony documents that they used as a cover story

17  for their crime to make their payments look like legitimate

18  charitable contributions or even business expenses.

19            For their actions, the defendants are charged in two

09:34 20  counts, with conspiracy to commit mail fraud and wire fraud and

21  honest services mail fraud and wire fraud, and with conspiracy

22  to commit federal programs bribery.

23            Mr. Wilson is charged with three additional counts for

24  wire fraud and honest services wire fraud and two additional

25  counts of federal programs bribery in connection with payments

1    that he made and phone calls that he had to get his daughters

2    into Stanford and Harvard as recruited athletes, and he's

3    charged with one count of filing a false tax return for lying

4    on his taxes about the payments he made to get his son Johnny

5    admitted to USC as a water polo recruit.

6         Now, Judge Gorton is going to instruct you tomorrow on

7    the elements of those charges.  I'm now going to take you

8    through the evidence that establishes each of those elements.

9         First, I'm going to discuss the evidence of how the

09:35 10   scheme worked.  Next, I'm going to discuss these specific

11   defendants, the evidence of their knowledge and their intent to

12   join in that larger conspiracy.  Finally, I'm going to address

13   a few big picture points and legal issues.

14        First, you know from the evidence that there was a

15   scheme to defraud to get the defendants' children admitted to

16   college as recruited athletes based on falsified credentials in

17   exchange for money.  The scheme involved fabricating or

18   embellishing the student's athletic qualifications and making

19   payments that benefitted corrupt athletic department insiders

09:36 20   who misled their own colleagues in the admissions department

21   and secretly traded those recruitment spots for money.

22        The scheme was organized by Rick Singer.  He called it

23   his "side door", but it was a sweeping conspiracy that involved

24   dozens of others:  Corrupt coaches and athletic department

25   insiders, like Jovan Vavic and Donna Heinel at USC, Rudy

1    Meredith at Yale, John Vandemoer at Stanford, Jorge Salcedo at

2    UCLA, and Gordie Ernst at Georgetown; Singer's employees and

3    associates like Mikaela Sanford and Laura Janke; and parents,

4    including these defendants, Gamal Abdelaziz and John Wilson,

5    and dozens of others who would stop at nothing to get their

6    children admitted to the college of their choice.

7         You know that the scheme involved creating athletic

8    profiles that were either completely invented, like Sabrina

9    Aziz's, or falsified in other ways with fake honors and

09:37 10   fabricated times, like Johnny Wilson's.

11        Bruce Isackson, you'll remember him, he was the

12   government's first witness, he told you that he and his wife

13   e-mailed Singer an action photo of their daughter or, if they

14   didn't have one of those, a headshot, with the understanding

15   that Singer or one of his associates would use that photo to

16   create a falsified athletic profile.  For Lauren Isackson, it

17   was a soccer profile because she actually played a little bit

18   of soccer in high school.  For Audrey Isackson, it was a crew

19   profile, even though she had never rode in her life.

09:38 20        You know that corrupt athletic department insiders

21   then used those fake profiles to get those students admitted as

22   recruited walk-on athletes.

23        At USC, Donna Heinel was the Athletic Department

24   liaison who presented the profiles to the Subcommittee on

25   Athletic Admissions.  That is a unit of the Admissions

1    Department comprised of Admissions Officers.  It's also called

2    SUBCO.  And the Admissions Department, the SUBCO, relied on

3    those profiles and believed that those students had been

4    selected by USC's coaches based on their athletic

5    qualifications to be recruited on to USC's Division 1 teams.

6    Those are some of the finest, most competitive and elite

7    athletes, collegiate athletic teams in the country.  They have

8    actual Olympians among their ranks.

9         Here's how Singer described this part of the scheme to

09:39 10   Agustin Huneeus.  He's one of the parents who participated in

11   the conspiracy.  This call was captured on the court authorized

12   wiretap before agents approached Singer when neither of them

13   knew that anybody was listening.

14        (Audio recording played.)

15        MR. FRANK:  Now, you know that none of those students

16   were recruitable athletes at the USC level.  For example,

17   remember when Huneeus told Singer his daughter couldn't play

18   water polo.

19        (Audio recording played.)

09:40 20   MR. FRANK:  But that's not what Donna Heinel sold the

21   SUBCO.  Under "Assets to Our Women's Team", she wrote "Agustina

22   is a high caliber walk on in a much needed goalie position".

23   That is the fraud, lies about student's athletic qualifications

24   to have them admitted as recruited athletes.

25        And you know that after the Admissions Committee

1   signed off, students typically received letters letting them

2   know that they had been approved for admission as recruited

3   athletes, sometimes before they even applied.

4        And that is when the money came due.  Sometimes

5   parents made payments directly to athletic department funds

6   that were controlled or overseen by the corrupt insider, like

7   the Women's Athletic Board that Heinel oversaw or the Water

8   Polo Fund that Vavic oversaw as the coach of the water polo

9   team.

09:41 10        Here's how Singer explained that part of the scheme to

11   Agustin Huneeus.

12        (Audio recording played.)

13        MR. FRANK:  "It essentially goes right to her".

14   That's how Rick Singer described the scheme before he knew that

15   the FBI was listening.  Other times parents sent their money to

16   Singer's purported charity, The Key Worldwide Foundation, or

17   KWF, for him, in turn, to distribute to the insiders.  That's

18   what the Isackson's did.  Sometimes parents paid all at once

19   after their kids were admitted.  Other times they paid part of

09:42 20   the money when they received the admission approval letter and

21   the rest when the parent received final confirmation of

22   admission.

23        Here's how Singer described that to Huneeus.

24        (Audio recording played.)

25        MR. FRANK:  And that is the bribery.  They don't use

1    the word "bribe".  They don't use the word "fake profile"

2    because that's not how criminals talk.  What they do talk about

3    is sending money as a donation to a USC fund in exchange for

4    having an insider push an unqualified applicant past the

5    Admissions Department as a recruited athlete.

6           That is also called honest services fraud, because in

7    exchange for that so-called donation, the insider is lying to

8    their own colleagues in the Admissions Department.  They are

9    not providing their employer with their honest services.

09:44 10      Now, you know Singer did not always tell parents the

11   whole truth.  For example, with Sabrina Aziz, Singer didn't

12   actually send the money to USC.  Instead, a few months after

13   Aziz paid him, he began paying Heinel $20,000 a month

14   personally.  With Johnny Wilson, Singer sent part of the money

15   to the water polo team and he kept the rest for himself.

16          There's no honor among thieves, but I expect that

17   Judge Gorton will instruct you that, in a conspiracy, that does

18   not matter.  Conspirators don't need to know all of the

19   details.  They just need to know the essential features of the

09:45 20   conspiracy.  And in this conspiracy, there were two essential

21   features.

22          The first was fabricated athletic qualifications.  The

23   second was payments, wherever those payments went, to induce

24   corrupt athletic department insiders, like Vavic and like

25   Heinel, to lie to their own colleagues in admissions by

1  pretending to recruit students based on those fabricated

2  athletic credentials.

3  Each of those things independently is a crime.  The

4  defendants are guilty if you find that they participated in

5  even one aspect of the scheme:  Either the fraud or the

6  bribery.  You know they participated in both.

7  The government was able to intercept Singer's call

8  with Agustin Huneeus because it happened to occur while the FBI

9  was monitoring Singer's phone with a court authorized wiretap

09:46 10  in the summer of 2018.  Agents did not intercept Mr. Aziz on

11  the wiretap because his daughter Sabrina had already been

12  admitted to USC before the FBI even uncovered the scheme.

13  Similarly, Johnny Wilson was admitted to USC back in 2014, but

14  agents did intercept Wilson on the wire when he came back for

15  more and called Singer about his two daughters in September of

16  2018, about a week before the agents approached Singer.

17  We played the Huneeus call for you and the Caplan

18  calls, Gordon Caplan, because those calls are evidence of how

19  the scheme worked and how Singer pitched it to the parents who

09:47 20  were participants in the scheme before the FBI approached him.

21  And Bruce Isackson described that to you in the same way.

22  In fact, you know that Singer's pitch was so

23  consistent that, as Agent Keating told you, the FBI had trouble

24  shaking him from it even when they told him to use different

25  language.  Singer told the insiders -- I'm sorry -- Singer told

the parents that the money would go to the athletic program at
the schools, but Bruce Isackson told you that, despite what
Singer said, he thought the insiders must be pocketing some of
that money.

But wherever the money went, whether to the insider's
pocket or to their program, you know and the defendants knew
what it was for:  Admission as a recruited athlete based on
falsified athletic credentials, getting insiders to recruit the
defendants' children by lying to their own colleagues in
admission.  Wherever the money went, that's what it was for.
In plain English, we call that a bribe.  In legal terms, it has
a fancier Latin name, quid pro quo.  All that means is "this in
exchange for that".

And that's what Singer offered, a money back
guarantee.  You saw the e-mail in which he confirmed that the
Isackson's donation would be returned if Lauren's admission to
UCLA were reversed.  That's Exhibit 204.

Members of the jury, that is not a donation, no matter
what you call it, even if the money goes to a charity or even
if it goes to a university.  No matter where the money goes,
that is a payment to get an insider to give up a recruitment
spot based on falsified athletic credentials.  This in exchange
for that.  That's fraud.  And it's also honest services fraud.
And that was the scheme.

And it's the conspiracy to commit those two crimes

 1   that's charged in Count 1 of the indictment against these

 2   defendants.

 3         Count 2 charges the defendants with conspiracy to

 4   commit federal programs bribery, which is a form of bribery

 5   involving a federally funded program, but it's based

 6   essentially on the same conduct.

 7         You know from the evidence that these defendants

 8   joined in that scheme and that conspiracy knowingly and

 9   intentionally.  That's the second thing that you need to find,

09:50 10   that the defendants knew what they were doing and that they

11   intended to do it, and that they knew that what they were doing

12   is wrong.

13         One way you know that is because Bruce Isackson told

14   you that he knew it, from that witness stand.  Just like these

15   defendants, his daughter Lauren actually played some soccer but

16   not at a recruitable level.  He knew that Singer's scheme

17   required lying about her qualifications and paying money to get

18   an insider to recruit her based upon that lie.  Remember how

19   many times Bruce Isackson told you from the witness stand that

09:51 20   it was all common sense?  He knew, just as Huneeus knew, just

21   as these defendants knew that, without the money, their kids

22   were not getting recruited.  Without the money, the insiders

23   would never have lied to their colleagues in admissions.

24   Common sense.

25         And you have other evidence to back up what he told

1    you, including his own words captured on tape in realtime.

2         (Audio recording played.)

3         MR. FRANK:  How worried did Bruce Isackson sound on

4    that tape, worried that Singer's phone was tapped, worried that

5    if the IRS probed too deep, they'd find out what the money was

6    for, that it was not a donation, that it was a payment for

7    admission?  Bruce Isackson was worried because he knew that

8    what he was doing was wrong.  And the evidence shows that these

9    defendants knew that as well.

09:52 10       Let's start with Mr. Aziz.  This is Exhibit 330.  It's

11   the e-mail in which Singer asked him for information for

12   Sabrina's USC athletic profile.  Take a look at the subject

13   line of the e-mail.  It actually says "For Me to complete USC

14   athletic profile".  Then look what it says down below, "If they

15   play the sport", and basketball is filled in.

16        Now, of course you know that at the time Singer sent

17   this e-mail to Mr. Aziz, Sabrina didn't play basketball.  She

18   hadn't played basketball for nearly two years.  She never even

19   made her high school's varsity team, because that's what Rachel

09:53 20   Sih told you.

21        In this e-mail, Singer told Aziz that he was creating

22   a USC athletic profile.  That's a profile to be recruited to a

23   Division 1 school for Sabrina in a sport she no longer played

24   and she had never played particularly well.

25        Ladies and gentlemen, this e-mail alone, this e-mail

1    alone is powerful evidence that Aziz knew what he was doing,

2    which was lying to get his daughter admitted to USC as a fake

3    basketball recruit.

4         Here's the e-mail where Singer requests a photo or two

5    of Sabrina playing basketball, just like he requested photos of

6    Bruce Isackson of his daughters.  And here are some of the

7    photos that Mr. Aziz sent him.  The defense points out that he

8    later sent even more photos, but you saw the e-mail in which

9    Singer told him that this is the photo they were going to use,

09:54 10   a photo that you know, because Rachel Sih told you, doesn't

11   depict Sabrina Aziz.  It's not even her.  That's Exhibit 345.

12   Singer keeps his coconspirator in the loop by telling him, we

13   will use this one.

14        Here's that same photo on Sabrina's fake athletic

15   profile.  There is no dispute in this case that this profile is

16   fake.  And Laura Janke testified to you that she made it up.

17   And how do you know that the defendant knew that?  Well, for

18   one thing, because he sent Rick Singer that photo and Rick

19   Singer told him that's the photo he was going to use.  But also

09:55 20   because Singer sent him the fake profile.  That e-mail is

21   Exhibit 352.

22        Now, the defense wants you to believe that Mr. Aziz

23   never saw this e-mail because it was sent to his cox.net e-mail

24   address, but you know from Special Agent Keith Brown's

25   testimony that it was found in the Gmail account that the

1   defendant regularly used to correspond with Rick Singer and

2   many others.

3          Here's what else you know:  Bruce Isackson told you

4   that he knew his kids' profiles were fake even though Singer

5   never even sent him the profiles.  How did he know?  Because

6   they would have to be fake since his kids were not athletes at

7   the collegiate level.  And the whole point of the scheme, the

8   whole point, was to have them recruited as Division 1 athletes.

9   And the same is true of Gamal Aziz.

09:55 10        Members of the jury, you did not check your common

11  sense at the door with your cell phones when you came into the

12  courthouse, and you know, you know, just like Gamal Aziz knew

13  that Sabrina was not qualified to be recruited at the

14  Division 1 level as a practice player or as anything else.

15  Rachel Sih told you she didn't even make the varsity team at a

16  school that had never had anyone recruited to play basketball

17  at USC.  And you saw her high school yearbooks.  She didn't

18  even play basketball for the last 2 years of high school.

19  There was simply no possibility that she could ever be

09:56 20  recruited to play basketball anywhere, much less at USC.

21  That's common sense.

22          What happened next?  Singer e-mailed this fake profile

23  to Donna Heinel, and Heinel presented Sabrina to the SUBCO as a

24  basketball recruit.  Here is the packet of materials that the

25  SUBCO saw.  And here's Heinel's write-up.  Look what she says,

1       "Sabrina will be a great addition to our USC program".  That's

2       exactly what she wrote for Agustina Huneeus, but you know

3       that's true.

4            In fact, Donna Heinel wasn't even responsible for

5       recruiting athletes to the basketball team or any team.  That

6       wasn't her job.  She was just the liaison between the coaches

7       and the Subcommittee.  Rebecca Chassin told you she was the

8       member of the Subcommittee that testified.  She told you that

9       the subcommittee thought this profile came from the basketball

09:57 10   coach because that's who recruits basketball players.  But

11      Aaricka Hughes, who's the women's basketball coach, told you

12      she never heard of Sabrina Aziz and she certainly never

13      recruited her.

14           Look what else Donna Heinel did.  She took the fake

15      profile Singer sent her and she embellished it even more.  She

16      added more lies.  For one thing, she changed the photo.  She

17      took the photo that Singer sent and substituted a different

18      photo.  And Rachel Sih told you that photo isn't Sabrina Aziz

19      either.  That's a photo of a different player on the team that

09:58 20   was published in an online newspaper.  And look what else she

21      did.  She added 2 inches to Sabrina's height.  Laura Janke

22      testified she made up the height on the left, the 5'8".  Look

23      at the height Donna Heinel admitted to the SUBCO.  She added

24      2 inches.  It says Sabrina's 5'10".

25           Here's what else you know:  Sabrina Abdelaziz would

1    not have been admitted to USC without being an athletic

2    recruit.  Rebecca Chassin told you that the average unweighted

3    GPA of students who get accepted in the general population to

4    USC is 3.8, and none of the students in the SUBCO packets that

5    she looked at on that witness stand were qualified to get

6    admitted based on their academic qualifications alone.  But

7    Sabrina's weighted GPA was only 3.2.

8            Now, I want to be very clear.  We are not here making

9    fun of these kids.  These kids are not on trial today, but

09:59 10    their parents are on trial because they wanted their kids to

11    get into those schools no matter what their academic

12    qualifications were, no matter what their athletic

13    qualifications were.  These parents were not willing to take no

14    for an answer.  To get to yes, they crossed a line.  And in

15    crossing that line, they broke the law.

16            And you know what happened next.  SUBCO did, in fact,

17    approve Sabrina's admission because, as Rebecca Chassin told

18    you, they believed Donna Heinel.  They trusted her.  She was

19    their colleague.  They thought Sabrina Aziz was a legitimate

10:00 20    basketball recruit.

21            Here's the admission approval letter that Heinel sent

22    to Singer and here's the e-mail where Singer forwarded that

23    letter to the defendant.  It's Exhibit 390.  Take a look at

24    what it says.  "Your records indicate that you have the

25    potential to make a significant contribution to the

1   intercollegiate athletic program as well as to the academic

2   life of the University".  Just below that it requires Sabrina

3   to register with the NCAA.  There is no dispute in this case

4   that the defendant received this letter, and he could not

5   possibly have thought that it was true, that Sabrina could

6   contribute to the intercollegiate athletic program at USC.

7         Look at the date of the letter, October 2017.  Look at

8   what the defendant told the college counselor, another college

9   counselor who was advising Sabrina back in Hong Kong the

10:01 10   following month.  That counselor recommended that Sabrina

11   submit an application to USC in December.  What did Mr. Aziz

12   tell him?  "We're going to pass".

13         Think about that.  Sabrina had already been approved

14   for admission to USC by this point.  She was in as long as she

15   fulfilled basic requirements, like registering with the NCAA

16   and submitting a formal application.  But Aziz didn't tell the

17   counselor that.  Why do you think?  Because he knew that what

18   he was doing was wrong.  And he knew that if he told that

19   counselor that Sabrina had already been approved for admission

10:01 20   to USC, that would have given away that she had been recruited

21   as an athlete, and anyone who knew Sabrina knew that that was

22   preposterous.  Telling the counselor would have exposed the

23   lie, so Aziz couldn't tell him, so instead he just said, "We're

24   going to pass".

25         And you know what happened next.  Sabrina did submit

1    her formal application to USC, as required by the admission

2    approval letter.  You saw the e-mails in which the defendant

3    made sure that they followed the requirements of the admission

4    approval letter and Singer's instructions to answer one

5    question using playing basketball as a passion.  Those are

6    Exhibits 415 and 459.

7           He even overruled Sabrina, who had written an essay

8    about something else.  Common sense tells you why, because you

9    cannot be admitted as a division -- to a Division 1 school as a

10   basketball recruit without mentioning basketball in your

11   application.  That would raise red flags in the admissions

12   office.  In the same e-mail chain, Singer told the defendant

13   that basketball would go in Sabrina's activities on her

14   application.

15          Here's the essay that Sabrina e-mailed to Mikaela

16   Sanford, with a copy to her father.  Look at the first

17   sentence, "the basketball court is like my art studio", this

18   from a girl who didn't even play basketball at the time that

19   this essay was submitted and hadn't played for nearly 2 years.

20          Now, the defense wants you to focus on e-mails between

21   Mikaela Sanford and Rick Singer, e-mails that his client wasn't

22   on, that were sent months after she'd already been approved for

23   admission to USC as a recruited athlete based on that fake

24   profile.

25          I'm asking you to look at the e-mails he was on:  The

e-mail that he received and forwarded to his wife saying, "for me to complete USC athletic profile" and "if they play the sport"; the picture he sent to Rick Singer of other girls playing basketball; the fake profile with the picture that Rick Singer selected from that and told the defendant he was selecting; the fake profile that was found in the defendants' e-mail box; a lie to the other college counselor about passing on applying to USC; the essay about basketball as a passion; the e-mail telling him that basketball would go in the activities section of Sabrina's USC application; the admission approval letter telling him that Sabrina was admitted based on her athletic potential and requiring her to register with the NCAA.  That's just the CliffsNotes, folks, an avalanche of lies.  And that's the fraud.

Next came the bill, $300,000 for a so-called private contribution to KWF, and the bogus donation letter that the defendant received back.  Look what it says.  "This letter shall serve as formal acknowledgment of your contribution for which no goods or services were exchanged".  Another lie.  This bill only came due after Sabrina was admitted to USC.  It was explicitly in exchange for her admission to USC.  That's the only reason he received the bill.

Singer told the defendant the money would go to USC. There's no dispute about that.  The defense has focused you time and again on the fact that the payments to Donna Heinel

1   personally only started a few months after Mr. Aziz paid Rick

2   Singer.  They've even put into evidence an FBI affidavit and a

3   government brief making those same points.

4        We agree.  There's no dispute about that fact.  We

5   told it to you in our opening statement.  Singer's pitch was

6   that the money would go to the program in exchange for the

7   bogus recruitment.  It's still a quid pro quo wherever the

8   money goes.

9        And some of the money did, in fact, go to USC.  Look

10  at how much of the money flowing into the Women's Athletic

11  Board came over the period of the conspiracy from Rick Singer's

12  clients.  You heard testimony that Donna Heinel's salary went

13  up by about $100,000 over this same period.  And you saw that

14  fundraising was an important part of her annual performance

15  reviews, but the evidence also showed that Singer kept a lot of

16  the money for himself or invested it in businesses and ventures

17  held in the name of his foundation, and eventually, you saw the

18  evidence that Singer began paying Vavic and Heinel personally.

19       (Audio recording played.)

20       MR. FRANK:  Listen to what she said there.  She wants

21  to structure the payment for Sabrina because it's a larger

22  amount of money.  Now, initially, Heinel told Singer to have

23  the money sent to the Galen Center.  That's where the

24  basketball team plays.  That's Exhibit 439.

25       (Audio recording played.)

```
 1              MR. FRANK:  Ultimately, Aziz's money didn't go there
 2    either.  Instead, beginning in July of 2018, he started paying
 3    Heinel $20,000 a month --
 4              MR. KELLY:  Objection.  He didn't start paying.
 5              MR. FRANK:  The checks were made out to her consulting
 6    company.
 7              THE COURT:  Overruled.
 8              MR. FRANK:  But you know that that was just another
 9    cover up.
10:09 10         In October of 2018, Singer, acting at the government's
11    direction, asked Heinel to put more detail on those invoices.
12              (Audio recording played.)
13              MR. FRANK:  And you saw the detail that Donna Heinel
14    put into that next invoice.  "Consulting Services", "interview,
15    evaluation and assessments for prospective students", and then
16    she lists three schools and three students.
17              The first name on the list, Abdelaziz, Singer didn't
18    tell her to put that name there.  You just heard the call in
19    which all he did was ask her to put some detail on the
10:10 20    invoices.  She chose to put that name there.
21              And the evidence showed that those checks were
22    deposited into Donna Heinel's personal bank account.  The money
23    was in exchange for getting Sabrina Aziz admitted to USC as a
24    basketball recruit based on a fake athletic profile, for
25    getting Heinel to violate her duty to her employer by
```

1   misleading her own colleagues in the Admissions Department.

2   That's honest services fraud.  And it's also federal programs

3   bribery.  This in exchange for that, or in legal terms, quid

4   pro quo.

5           And I expect that Judge Gorton will instruct you that,

6   under the law, whether the money went to Donna Heinel's pocket

7   or whether it went to her program doesn't matter.  What matters

8   is what the money was for.  In this case, the evidence of

9   "that" is similarly overwhelming.

10:11 10         Listen to what Heinel told Singer about the payments

11   for two other students Isabel Janavs and Claire Altman.  This

12   call happened, as Agent Keating told you, when Rick Singer was

13   in Boston.

14           (Audio recording played.)

15           MR. FRANK:  Singer says, "Are you going to send me the

16   letter", that's the admission approval letter, and "then I'll

17   get them to forward the 50K".  This in exchange for that.  It

18   could hardly be any clearer, clear as day.  And Heinel

19   responds, "Let's hold on that right now.  I don't like to do

10:12 20   it" so close.  So close to what?  To the admission.  That

21   $50,000 is money going to the program, not her pocket, to the

22   program, but she doesn't want to do it so close to the

23   admission and the admission approval letter.  Why?  Because

24   that would raise red flags because she might get caught.

25           Members of the jury, this is devastating evidence that

1    the money to the program was a quid pro quo that Heinel hid

2    from her colleagues, in plain English, a bribe, even though the

3    money did not go to her pocket.  There is no legitimate

4    explanation, none, for why Donna Heinel didn't want the money

5    to the program so close.  The only reason is because she wanted

6    to hide the connection between the money and the recruitment.

7           Under the law, it does not matter that Singer did not

8    specifically tell Aziz that the money went to her pocket

9    because what matters is not where the money went, but what he

10:13 10   understood it was for.

11          Of course, Donna Heinel did have good reason to have

12   concern about getting caught.  As you know, she almost did get

13   caught almost 6 months before this phone call putting fake

14   recruits through SUBCO.  You heard that, in April of 2018, the

15   USC Admissions Department heard from several private schools

16   about applicants who had been recruited to USC as athletes but

17   didn't participate in those sports in their high schools.

18          Take a look at Exhibit 511.  The Dean of Admission

19   writes "have we heard back from Donna on the cases where we

10:14 20   expressed concern?"  Another Admissions Officer responds, "I

21   heard back on one I gave her, Sloane, the Italian player

22   Buckley said was a small guy.  She says he really plays

23   internationally, met Jovan at a tournament in Serbia, and that

24   he's a solid talent".

25          Now you know that's not true because Laura Janke told

1      you that she invented the water polo profile for Matteo Sloane.

2      She simply made it up.  And it goes on from there.

3              Heinel responds with more lies about two students,

4      Olivia, that's Olivia Giannulli, and Tyler.  That's Tyler

5      Kornguth.  Laura Janke testified she made up their profiles as

6      well.

7              Look at what the Dean of Admissions wrote.  "Donna

8      also told the water polo coach the high school pushed back when

9      got back to the dad, who hollered at the counselors".

10:15 10         First of all, look at Exhibit 3772 on the right.  You

11     can see Olivia Giannulli and Tyler Kornguth were side door

12     candidates that Singer provided to Donna Heinel.

13             Then the dean writes the parents hollered at

14     counselors.  The date of that e-mail is April 13, 2018.  And

15     you heard the voicemail that Donna Heinel left for Rick Singer

16     one day earlier, April 12, 2018.

17             (Audio recording played.)

18             MR. FRANK:  Think about those words, "I don't want

19     anybody going into Buckley or Marymount", those are two private

10:15 20    schools in California, "yelling at counselors.  That'll shut

21     everything down".  What will it shut down?  The fraud scheme,

22     the steady stream of bribes from Rick Singer and his clients.

23     That's what it will shut down.

24             And look at what else Heinel told Singer to do.  You

25     can't see it here but you'll see it on the transcript or you'll

hear it on the audio, which is in evidence.  "Make sure that if
questioned at the school, they respond in an appropriate way
that they are walk-on candidates for their respective sports".
That's what else she tells him in that voicemail.

Members of the jury, this is more devastating evidence
of the fraud, to lie to the high schools, to lie to USC, to lie
to the Admissions Department, and to get students admitted to
USC as fake athletic recruits in exchange for money.

And here's how else you know that Gamal Aziz was in on
that scheme, because he told you so in his own words.  This is
what he told Rick Singer in a recorded call on October 25,
2018, while Singer was here in Boston.

(Audio recording played.)

MR. FRANK:  "Of course."

"Of course."

That's Gamal Aziz's words, "of course."  Of course
he's okay with not telling the IRS that the $300,000 was paid
to Donna Heinel to get Sabrina into school even though she
wasn't a legitimate basketball player at that level, because
why would you tell the IRS that the money was a quid pro quo?
Why would you tell the IRS that you were involved in a fraud
scheme?

The defense has focused on Singer's word choice here,
that he said the money was paid to Donna Heinel, rather than to
a program administered by Donna Heinel, and that Singer used

1    Heinel's name, which he hadn't used with Aziz before.

2         Again, there is no dispute about those things.

3    There's no dispute.  And they don't matter.  The defendant was

4    not confused.  He knew his daughter was recruited to play

5    basketball at USC even though she was not a legitimate

6    basketball player at that level.  He admitted it on the call.

7    That is fraud.

8         He also knew that somebody at USC pretended to recruit

9    her based on those fake credentials in exchange for the money,

10   whatever it was.  That's honest services fraud.

11        "Of course."  That's what the defendant responded when

12   Rick Singer said he would lie to the IRS by not telling them

13   those things.  Think about what Gamal Aziz did not say on that

14   phone call.  Rick, what are you talking about?  Rick, my

15   daughter is a legitimate basketball player at that level.

16   Rick, I thought you said she could be a practice player or a

17   manager.  He didn't say any of those things because he knew

18   exactly what Singer was talking about.

19        And here's what else he said.

20        (Audio recording played.)

21        MR. FRANK:  There's the cover story.  "My intention

22   was to donate the money to the foundation...  and then from

23   there obviously ... do they have the intention of reaching out

24   to the people that sent those payments".  You can actually hear

25   him stutter in that call.  The wheels are turning.  And if that

1    wasn't clear enough, here's what happened next.

2              (Audio recording played.)

3              MR. FRANK:  "Anybody who isn't a real basketball

4    player that's a female, I want you to use that profile going

5    forward".  How did the defendant respond?  "I love it".  "I

6    love it".

7              The defense tried to suggest that Mr. Aziz uses that

8    expression a lot.  Maybe he does, although there's certainly no

9    evidence of that in this case, but so what?  I love it is what

10:22 10   we say when we agree with something, when we're happy about it,

11   when we think it's funny.  Those are the defendant's words.

12   That's what he said when he was told that his daughter's fake

13   athletic profile was so good, that it worked so well, that it

14   was going to be used in the future to get other fake athletes

15   admitted to USC.

16             Throughout this case the defendants have tried to get

17   you to focus on what Rick Singer said and what Rick Singer did,

18   but this is the defendants' trial.  It's their words.  It's

19   their actions.  It's the choices that they made that are the

10:22 20   reason that we're here today.  And when you go back to the jury

21   room to think about those things, I'd ask you to think about

22   Mr. Aziz's next interaction with Rick Singer on January 3,

23   2019.

24             (Audio recording played.)

25             MR. FRANK:  Members of the jury, there is no innocent

1   explanation for that phone call.  Singer just told the

2   defendant that an insider at USC in the Athletic Department,

3   Donna Heinel, had lied to Admissions about why Sabrina wasn't

4   playing basketball.  He said that she had invented an injury,

5   plantar fasciitis, and had told Admissions that's why Sabrina

6   hadn't shown up.  And how did the defendant respond?  He wasn't

7   concerned or surprised about the fact that Sabrina hadn't shown

8   up for practice.  Of course not, because he knew she wasn't

9   going to show up.  That was the whole plan.  He knew that

10:25 10   already.  He was concerned that Admissions would call Sabrina

11   and ask her about it and then, without missing a beat, he

12   agreed to lie.  "That's fine.  I will answer the same should

13   they call me".

14        Lying is not what someone does when they're acting in

15   good faith.  People lie when they know they've done something

16   wrong, to cover their tracks, and that's why Gamal Aziz agreed

17   to lie when Singer told him that the USC Admissions Department

18   might call.  And listen to what he said next.

19        (Audio recording played.)

10:26 20        MR. FRANK:  "Should I mark this as a charity or not

21   because you got me concerned when you called me the last time?"

22   The defendant is referring to the call nearly 3 months earlier

23   when Singer told him that KWF was being audited, the call that

24   we just heard a moment ago when he said "my intention was to

25   donate the money to the foundation".  Think about that.  If

1    Mr. Aziz thought he had made a legitimate donation, why was he

2    worried and concerned about an audit of KWF, Singer's charity?

3    Those are his words.

4         He brought up the audit on this call out of the clear

5    blue.  He was worried for the same reason Bruce Isackson was

6    worried when Singer made the same call to him, because he knew,

7    just like Bruce Isackson knew, that it was not a legitimate

8    donation, that it was a payment in exchange for admission for

9    getting his daughter recruited to USC to basketball even though

10:27 10   she didn't play basketball.  This in exchange for that.  And

11   that is not charity.  That's a quid pro quo, wherever the money

12   goes, and you can't deduct it from your taxes.

13        And how does he respond when Singer reassures him that

14   the money went to a 501(c)(3)?  "I just wanted to make sure

15   we're on the same page".  Think about that.  When you donate

16   money to the American Cancer Society or to the Jimmy Fund, you

17   don't call them up to make sure we're on the same page.  That

18   is the language of conspiracy.  Those are the words of

19   conspirators getting their stories straight because they have

10:28 20   something to hide because getting a fake tax deduction for a

21   fake charitable donation for a fake athletic recruitment for a

22   fake athlete was the icing on the cake of this conspiracy.

23        And that brings us to John Wilson.  He joined the

24   conspiracy before Gamal Aziz and it worked so well that he came

25   back for more for his daughters.  Milestones of his involvement

1    are largely the same.  From the beginning, it was clear what

2    Wilson was buying a recruitment spot for an athlete that

3    wouldn't make it on his own as a way to get admitted to USC.

4         This is Exhibit 48, an e-mail dated February 12, 2013.

5    Singer says to Wilson, "Jovan is giving me 1 boys slot and as

6    of yet no one has stepped up to commit".

7         The defendant's wife Leslie responds with a question,

8    "is another candidate looking at USC also so we should be

9    pushing Johnny to decide if that's his number 1 choice - as I

10:29 10  mentioned hate to lose this due to us taking too long to decide

11   (Johnny is unaware of this arrangement)".

12        You know, just as the defendant knew, that Johnny was

13   not good enough to earn that spot based on merit.

14        This is Exhibit 49, March 26, 2013.  Singer tells him,

15   "at LMU they are not very interested in Johnny - same for

16   others".

17        And the defendant replies, "so, none of the teams

18   really, even LMU, want to meet with him on their campus"?

19        And later, "if swimming and water polo are not

10:30 20  realistic for Johnny, then what are the schools that he has a

21   realistic shot at (without help)".  Those are the defendant's

22   words, "swimming and water polo are not realistic for Johnny".

23   As good as Johnny was, he was not good enough to get recruited

24   by USC, which consistently has the best water polo team in the

25   entire country.

1          And the defendant's own witness Jack Bowen told you

2     the same thing.  As fond of Jack Bowen was of Johnny, he

3     testified Johnny was a B plus player and USC recruit A, A plus

4     players.  He told you that he did not think Johnny would get

5     admitted to USC as a water polo player.  That was their

6     witness.

7          Look at what else the defendant says in this e-mail.

8     "What would a bench warmer position mean?  Would the other kids

9     know he was a bench warmer side door person?"

10:31 10         Then in the very next e-mail, "obviously his skill

11    level may be below the other freshmen.  In your view will he be

12    so weak" that he will "be a clear misfit at practice"?  He was

13    worried that Johnny would stick out like a sore thumb, that it

14    would be obvious to his teammates that he had no business being

15    on the team, that his very presence, his very presence would be

16    a giveaway that he got in some illegitimate way because the

17    defendant knew that what he was doing was wrong and he was

18    worried that somebody else might figure it out.

19         And Singer told Wilson that Johnny would not have to

10:31 20   play, that the team was big enough that he could hide.  He

21    said, "the commitment is to be on the roster not attend all

22    practices", "frankly after the first semester he can move on".

23         You saw another e-mail in which Singer told Wilson

24    Johnny wouldn't even have to get in the pool.

25         And Casey Moon told you that is what happened.  Johnny

didn't practice with the team and he dropped off the roster

after just one semester.

Now, Johnny's friends testified that he did come to

some practices at the beginning of the semester and at the end

of the semester.  I leave it to you to judge their credibility,

but here's the point.  Whether he showed up for a few practices

or no practices, however many practices he showed up for, there

is no dispute that he was not an immediate impact player.  Once

again, the defendant's own witnesses told you that and he did,

in fact, move on after the first semester, just like Rick

Singer said that he could.

And you know what happened next.  First came the

falsified athletic profile.  Singer told the defendant that he

was sending Vavic "a transcript, test scores and player profile

so he could add Johnny to his recruit list and present him to

admissions in October".  A player profile to present to

admissions for the kid the defendant was just told wouldn't

have to get in the pool, the kid he was worried would be a

clear misfit on the team.

Look how the defendant responds.  "Great - let me know

when you have verified you have it all completed and into

Jovan.  Also when and where to wire money".  That's Exhibit 75.

And you know all about that player profile.  Here's

what Singer told Wilson about it in a subsequent e-mail.  This

is Exhibit 83.  "Jovan has Johnny's stuff and asked me to

1    embellish his profile more, which I am doing".  Singer is

2    literally telling the defendant that he is going to falsify the

3    profile at the direction of the water polo coach.

4         And he even tells him why.  "Jovan will provide

5    Johnny's info to admission when he does his other guys" next

6    month.  That is the fraud.

7         And then this, "no payment of money until he gets a

8    verbal and written from admissions and then 50 percent to a

9    saving account I set up.  Then the remainder upon an acceptance

10:34 10   letter in March with everyone else".

11        That is the bribery.  No talk of donations.  Payment

12   for admission to a savings account I set up based on an

13   embellished profile that Jovan will provide to admission for a

14   kid who would be a clear misfit and wouldn't have to play.

15        These e-mails alone are enough to convict Wilson of

16   the conspiracies charged in Counts 1 and 2, just these e-mails.

17        The defense spent a lot of time on the word

18   "embellish".  They want you to believe it has an innocent

19   meaning.  You know embellish is just another fancy word for

10:35 20   lie.  Days after this e-mail Singer sent Wilson the embellished

21   profile and the defendant's own witnesses told you it was full

22   of lies.

23        Coach Bowen told you Johnny was not a four time

24   varsity letterman and he was never, not once, cocaptain of the

25   team, and he hadn't even heard of many of these awards.

1          Andrew Maricle, Johnny's close friend and college

2     roommate, told you that he didn't even know if a swim time of

3     43 seconds on the short course was even possible.  And you saw

4     the e-mails where Singer simply invented those times.

5          Coach Bowen told you this profile made Johnny look

6     like a better player than he actually was.

7          And you know that the defendant sent this falsified

8     profile to Wilson.  There's the e-mail right there.  It's

9     Exhibit 88.

10:36 10          Now, the defense wants you to believe that he never

11     read it, because if he had, he would have corrected the address

12     in the top right corner where it says "Street" instead of

13     "Place".  You know that he was in this same e-mail account

14     barely 90 minutes later e-mailing another copy of the same

15     photo to his wife for Johnny's yearbook page.  And he also made

16     plans to meet with Rick Singer the next day.

17          Here's what else you know:  The fake profile worked.

18     Johnny was admitted as a water polo recruit because the members

19     of the SUBCO believed Coach Vavic.  They trusted him.  They had

10:37 20     no reason not to.  He was their colleague.

21          And here's what Coach Vavic told them:  That Johnny

22     was a top ten attacker in grad class.  Casey Moon told you what

23     that meant.  That meant he was one of the top 10 attackers in

24     the country that year and that he would be an immediate impact

25     player.  And Johnny Wilson's own friend, Andrew Maricle, told

you that was not true, he was not an immediate impact player.

And his high school coach, Coach Bowen, told you the same

thing, he had no chance of being an immediate impact player.

Those were the defendant's own witnesses.

Why did Coach Vavic lie to the Admissions Department?

Because of what happened next.  Wilson asks Singer to send him

the bill.  Look at the subject line of this e-mail.  It's

Exhibit 710.  "USC fees".  And he writes "thank for making this

happen!  Please give me the invoice.  What are the options for

the payment?  Can we make it for consulting or whatever from

The Key so that I can pay it from the corporate account?"

Singer's response, "yes we can send you an invoice for

business consulting fees" and you can write it off as a

business expense.

Where to begin?  First, look at the words the

defendant used, "invoice", "fees", "payment".  That's not the

language of charity.  That's how you talk when you buy

something.  That's how you talk when you pay someone a fee for

services that they've rendered.  And you know that is exactly

what happened here.  The defendant literally says "thanks for

making this happen".  "This" was Johnny's admission to USC as a

recruited water polo player.  The defendant was paying The Key

for making that happen.  He was asking for the bill for getting

Vavic to lie to the Admissions Department to recruit Johnny as

an immediate impact player when the defendant himself thought

1    he would be a clear misfit.  "This" in exchange for "that".  It

2    couldn't be any clearer from this e-mail.

3          Second, if you think you're making a legitimate

4    donation, you don't write it off from your business as a

5    consulting expense.  And this wasn't his assistant Debbie

6    Rogers' fault.  Here's the defendant telling her a month later

7    "charge it to business consulting".  Look at the dates on those

8    e-mails.  First is March 1st.  The second is March 2nd.  That

9    wasn't an accident.  This was the defendant telling her what to

10:39 10    do.  It wasn't a lie Rick Singer came up.  This was a lie the

11    defendant came up with all by himself.  This was his lie.  And

12    lying is not what somebody does when they're acting in good

13    faith.

14          And you know where the defendant's money ended up.

15    $100,000 went to the USC Men's Water Polo Fund.  That was the

16    quid pro quo payment Coach Vavic got for getting Johnny

17    admitted as a water polo recruit based on falsified

18    credentials.  The rest of the money stayed with Rick Singer

19    because, once again, there's no honor among thieves.

10:40 20          Here's what else you know:  Singer also paid year

21    after year for Vavic's kids to go to private school.  This

22    wasn't for Johnny specifically.  It started after a year after

23    he was admitted to USC, even a year after he quit the water

24    polo team, but it was part of the same conspiracy.

25          You heard Vavic admit it on tape at Exhibit 620.  For

```
 1    that money, he was going to admit another kid that Singer sent
 2    his way, but he warned Rick Singer that things had gotten
 3    harder.
 4              (Audio recording played.)
 5              MR. FRANK:  "He can't just be a total nobody".  Why?
 6    Because Admissions would catch on.  Singer didn't tell the
 7    defendants that he was paying the insiders personally, and he
 8    didn't tell them that he was keeping a chunk of the money for
 9    himself, but the personal payments to Heinel and to Vavic were
10    part of the conspiracy, just as much as the payments to their
11    funds.  And wherever the defendants thought the money was
12    going, they knew what they were getting in exchange and they
13    were satisfied with what they got, so satisfied that John
14    Wilson came back for more.
15              Here he is, in his own words, on September 15, 2018,
16    when neither he nor Rick Singer knew that the government was
17    listening.
18              (Audio recording played.)
19              MR. FRANK:  John Wilson is the one who says on that
20    recording that the sport is not going to even matter.  And then
21    they literally make up the sport right there in the phone call
22    on the phone in the very same breath that they're talking about
23    how much it's going to cost to get his daughters into Harvard
24    and Stanford as fake athletes in that sport.  "I will make them
25    a sailor or something.  Because of where you live".
```

1          When you go back to the jury room, ladies and

2     gentlemen, listen to this exchange, and listen carefully to how

3     the defendant responds.  He laughs.  He thinks it's funny.

4     This is before the FBI approached Rick Singer.  This is

5     devastating evidence of the crime as it is happening.

6          And listen to what he has next:  "Is there a two for

7     one special?  If you got twins?"  This senior executive, this

8     Harvard School graduate, he isn't troubled over the fraud.

9     He's haggling over the price.

10:43 10          Kids work hard to be recruited athletes.  They devote

11     their lives to it.  Aaricka Hughes, Laura Janke, the

12     defendants' own witnesses tell you about the hours they spend

13     each day making enormous sacrifices to become elite athletes.

14     And as hard as they work, there are only so many who can make

15     it because there are only so many spots available.

16          The evidence showed that, at USC, 56,000 kids applied

17     in 2018 for admission and only about 15 percent got in.  Only

18     about 200 to 250 were presented to the SUBCO as recruited

19     athletes, but almost all of those kids got in through the

10:44 20     SUBCO.  And that's true even though their average grades and

21     test scores were below that of the general population.

22          For John Wilson, buying an admission spot for his

23     daughters who didn't play sports was funny.  It was as simple

24     as writing a check.  Here he is again in his own words.

25          (Audio recording played.)

1          MR. FRANK:  The mascot.  At another point he talks

2     about her being the scorekeeper or water girl because he thinks

3     it's funny, a joke, because he knows that Harvard doesn't

4     really recruit mascots.  That is fraud, ladies and gentlemen.

5     It is as raw as it gets.  And John Wilson knew it.

6          As Agent Keating told you, these calls were designed

7     to strip away the cover stories.  Now, did Rick Singer follow

8     the agents' instructions perfectly?  No.  He fell back on his

9     old pitch.  He sometimes used the word "donation" and "program"

10:45 10     instead of "payment" and "coach".  But what's happening in the

11     calls is completely unambiguous.  Wilson is agreeing to pose

12     his daughters as athletes in a sport they don't play.  That is

13     fraud.  And he's agreeing to induce the coaches of those sports

14     to recruit them in exchange for money.  That is honest services

15     fraud regardless of whether the money is going to the coach

16     personally or their program.  And listen to what else Singer

17     told Wilson.

18          (Audio recording played.)

19          MR. FRANK:  That's Exhibit 578 again.  "I can sell to

10:46 20     anybody that they're athletic enough to take 'em and there'll

21     be no question".

22          You know what "sell" means.  It means I can pose them

23     as elite athletes even though they aren't, and there will be no

24     question.  No question from who?  From Admissions.

25          And Wilson knew what this meant.  How did he respond?

1   "Even though they wouldn't play.  Ok".  Because he knew they

2   needed to be sold as athletes even though they wouldn't play,

3   just like with Johnny, only here it's even more blatant because

4   they don't even play the sport.

5          On those recorded calls, Singer told him again and

6   again and again that Admissions didn't know.  He said, stay

7   away from Admissions.  They're not involved in this.  This

8   isn't going through them.  Stay away from Development.  You

9   don't want them asking questions.  Those are Exhibits 623 and

10:47 10   625.

11          (Audio recording played.)

12          MR. FRANK:  "I just want to make sure that we keep

13   this clean".  Wilson didn't ask why they should stay away from

14   Admissions because he knew why.  He just wanted to know if they

15   should still go back on campus and interview or would that give

16   it away.

17          When you go back to the jury room, listen to

18   Exhibit 591.

19          (Audio recording played.)

10:48 20          MR. FRANK:  Listen to how slowly and clearly Singer

21   says it, not once, but twice.  He has to recruit some real

22   sailors so that Stanford doesn't catch on.  How does the

23   defendant respond?  He laughs.  He even repeats what Rick says,

24   "Yeah.  He's got to actually have some sailors.  Right".

25          Wilson thinks it is funny to buy a sailing spot at

```
 1    Stanford for a kid who can't sail, who will, in his own words,

 2    look really stupid even trying to be the bag carrier of

 3    sailing.  That's at Exhibit 625 again.  He's not bothered by

 4    the fraud.  His worry is making sure he buys an admission spot

 5    to a school his daughters actually want to attend.

 6                (Audio recording played.)

 7                MR. FRANK:  A high-class problem, Posing your kid as a

 8    fake athlete to get her admitted to Stanford in a slot reserved

 9    for an actual athlete in exchange for money.  And then finding

10    out, oh, geez, she wanted to go to Harvard instead.

11                But here's what John Wilson did not know.  He did not

12    know that the government was listening to those phone calls.

13    He did not know that the conspiracy had been uncovered and that

14    Rick Singer had started taking directions from government

15    agents.  He did not know that this e-mail asking Singer to bill

16    his bribe payment as a consulting fee or whatever so that he

17    could pay it from the corporate account or this e-mail

18    instructing his assistant to work with Singer to get the

19    invoice correct, he didn't know that those e-mails and these

20    calls would one day be placed before a jury of his peers in a

21    Boston courtroom.

22                Here are the fake consulting invoices that Debbie

23    Rogers had prepared at the defendant's direction.

24                And here's the e-mail in which she confirmed with the

25    defendant that they would report those payments as both
```

consulting fees and a charitable donation.

And here's the tax return which you can see was mailed from Lynnfield, Massachusetts in which he deducted the payment for Johnny Wilson's admission to USC, splitting it between $120,000 in fake consulting fees, which he wrote off as a business expense, and $100,000 as a fake charitable donation. His tax preparers relied on the information he provided them. What they didn't know was that there wasn't any consulting and there was no charitable donation. They didn't know that was in exchange for getting Johnny admitted to USC as a water polo recruit based on a fake profile.

John Wilson signed this tax return on penalty of perjury. He verified that it was true. He knew that it was not.

Agent Ranahan told you the IRS would not have allowed these deductions if they had known what the money was for and if he hadn't taken them, he would have owed close to $90,000 in additional taxes. The defense argued, well, he paid a lot of taxes already, but you can't lie on your tax returns just because you pay a lot of taxes. There's no exemption from the truth for rich people. And lying on your tax returns is not acting in good faith. If you think you're making a legitimate charitable donation, you don't write it off as a business expense. That's fraud.

Few final points. First, you know that this fraud

1   mattered.  You heard evidence that without it it was highly

2   unlikely that the defendants' children would have been admitted

3   to USC, but by posing as athletic recruits and getting

4   recruited, their admission was virtually guaranteed.

5          Second, the defendants have made much of the fact that

6   they don't know each other, that they weren't involved in any

7   larger conspiracy they say, but you know that that's not true.

8   This was not some one-off scheme that Rick Singer developed for

9   John Wilson or Gamal Aziz.  His whole pitch, his whole pitch

10:52 10  was that he had done it before, that it was tried and true.

11  You heard him explain that to Gordon Caplan and to Agustin

12  Huneeus.

13         Bruce Isackson testified that Rick Singer told him the

14  exact same thing.  And he told you why that was so important to

15  him, because he didn't want to be a guinea pig.  He wanted to

16  make sure that this scheme worked, that other parents had done

17  it before.  And the whole nature, the whole nature of the

18  scheme was that it would only work if there was a network of

19  corrupt coaches willing to admit kids as fake athletic recruits

10:52 20  in exchange for money and a whole network of parents who were

21  willing to participate.

22         That is the reason that Rick Singer was able to offer

23  his clients a network of different schools, all those different

24  options, UCLA, USC, Georgetown with Gordie Ernst, Yale with

25  Rudy Meredith.  Gamal Aziz and John Wilson didn't need to know

each other to know that they were joining in something that was

bigger, a conspiracy that extended far beyond Rick Singer and

involved other parents and other coaches and all of the other

people, like Laura Janke and Mikaela Sanford, who made it

happen.

And you saw evidence that the Wilson's were connected

to the Palatella's and to their son Gino, who's one of the

students that Heinel admitted to USC as a fake football

recruit.  Those were Exhibits 409 and 563.

And the Wilson's, in turn, introduced Singer to their

friends the Driscoll's, parents of Johnny's friend Wyatt

Driscoll, who was recruited to USC to play basketball.  That's

Exhibit 64.

Here are the checks from KWF to USC baseball and USC

water polo.  The baseball check says "Driscoll family" right on

top of the check.  The water polo check says "Wilson family"

right on the top of the check.  Look at the date, April 16th,

the very same date.

Once in, every parent was vested in the scheme's

success, not just in getting their own kid's admission into

college but continuing to make sure it worked so, like Bruce

Isackson and like John Wilson, they could come back for more

for their younger kids, and also so that the whole thing didn't

unravel, because if it unraveled as to one parent, there was

the threat that it would unravel as to all.

1        That's why Bruce Isackson told you he was so relieved

2   that there was all that money.  You heard him on tape talking

3   about all that money in KWF from all those different parents

4   and all the money going out of the KWF to all those different

5   places.  He was relieved about that fact because that fact

6   would make it harder for anyone to ever figure out what was

7   going on.  And that is just one way that these parents all

8   shared the same goal and were dependent on each other to

9   achieve that goal.

10:55 10        Finally, a quick word on Rick Singer.  The defense has

11   made much of the fact that the government didn't call him as a

12   witness in this trial, but as we told you at the outset, you

13   heard a lot about him and you heard a lot from him, in his

14   e-mails and in those recorded phone calls, and in the testimony

15   that you heard from all those witnesses.

16        You know a lot about Rick Singer, that he wasn't

17   truthful, that he didn't follow agents' instructions, that he

18   deleted text messages, and even that he tipped off some of the

19   parents that the government was investigating.

10:55 20        He took these notes accusing the agents of telling him

21   to lie and he e-mailed them, as you can see at the top, to his

22   lawyer.  That's Exhibit 714.  These weren't a diary.  These

23   were notes for his lawyer.  He accused Agent Keating of raising

24   her voice and trying to get his coconspirators to agree to a

25   lie about where their money was going, but you know exactly

what he said on those consensual recordings because we played
those recordings for you.  And you heard how the defendants
responded.

Here's what else you know:  The defendants made the
choice to join forces with Rick Singer and the other
participants in his scheme to get their kids into college
through fraud and bribery.  They chose Rick Singer.  We didn't
choose him.  They did.  He's their guy.  At the end of the day,
this trial is not about Rick Singer.  This trial is about them.
It's about the choices they made.  It's about their actions.
It's about their intentions.

Now I told you earlier that the defendants are charged
in Counts 1 and 2.  Count 1 charges conspiracy to commit mail
and wire fraud and honest service mail and wire fraud.  As the
judge will instruct you, a conspiracy is nothing more than an
agreement between two or more people to do something that the
law forbids.  It doesn't have to be explicit.  It doesn't have
to be written down.  It can be a common understanding.

Here, as you know, there was an understanding between
the defendants and Singer and many others to get their children
into college in two interconnected ways, by lying about their
athletic credentials, that's fraud, and by inducing corrupt
insiders in athletic departments to mislead their colleagues to
get those children admitted as fake recruits in exchange for
money.  That's honest services fraud.  And you know there was a

1   lot of mailings and a lot of wires and e-mails and phone calls

2   and admission letters sent through the mail as part of that

3   scheme.

4           Count 2 charges them with conspiracy to commit federal

5   programs bribery.  That's a form of bribery that involves

6   bribing an agent of a program that receives more than $10,000

7   in any one year from the federal government.  And you heard

8   evidence that USC and Harvard and Stanford all received

9   millions of dollars.

10:58 10         Mr. Wilson is charged with three additional counts of

11  wire fraud and honest services wire fraud and two additional

12  counts of federal programs bribery.  Those are for the wires he

13  sent to a Boston bank account, it's set forth there in Exhibit

14  707 and 708, in exchange for getting his daughters admitted to

15  Harvard and Stanford as fake athletes, as well as the

16  10/27/2018 phone call he had with Rick Singer in furtherance of

17  that scheme while Singer was in Boston.

18          I expect Judge Gorton will instruct you that it

19  doesn't matter that there wasn't actually an Harvard

10:58 20  administrator and we weren't actually going to let the Stanford

21  sailing coach get bribed.  Mr. Wilson didn't know that when he

22  agreed to make those things happened, when he tried to make

23  those things happened.

24          He's also charged with one count of filing a false tax

25  return for lying about the payment for Johnny's recruitment on

his taxes.  And you know that those lies mattered because they
inhibited the IRS from figuring out what he actually owed and
because it helped save him close to $90,000.

During the course of this trial, ladies and gentlemen,
you've heard a lot about the college recruitment process and
the admissions process.  You've seen hundreds of documents and
e-mails.  You've listened to numerous recorded phone calls.
You've heard from over a dozen witnesses, but at the end of the
day, the only thing you really need to decide this case is what
you walked into this courtroom with three and a half weeks ago,
and that's your common sense.

Common sense tells you that it is wrong to fake your
children's athletic qualifications to get them admitted to
highly competitive colleges as recruited athletes when they
aren't good enough to play and they don't intend to.  That is
fraud.

Common sense tells you that it is wrong to get
insiders at those schools to mislead their colleagues to
recruit those children using those falsified credentials in
exchange for money.  That is honest services fraud, bribery.

And common sense tells you it is wrong to lie on your
taxes by deducting the cost of those bribes as fake business
expenses and phony charitable contributions.  That is tax
fraud.

You don't need to be a senior corporate executive or a

1    graduate of the Harvard Business School like these two

2    defendants to know about those things.

3           All of the evidence in this case, the tapes, the

4    e-mails, the documents, the testimony, all of it leads to a

5    single inescapable conclusion:  These two defendants, John

6    Wilson and Gamal Aziz, are guilty beyond a reasonable doubt as

7    charged.

8           Thank you.

9           THE COURT:  All right, jurors.  Before we hear from

11:01  10    the defendants, we'll have a short recess.  It won't be a

11    complete recess.  About 10 minutes.  We'll be back.

12           THE CLERK:  All rise for the jury.

13           THE COURT:  We're in recess for 10 minutes.

14           (Recess taken 11:02 to 11:18 a.m.)

15                  (Pause in proceedings, court reporter had

16    technical difficulties.)

17           THE COURT:  Mr. Kelly.

18           MR. KELLY:  Thank you.  This is like icing the kicker

19    in a football game.

11:18  20           But good morning.

21           So let's get back to reality here, okay, not some

22    prosecutorial fantasy land where they're talking about corrupt

23    insiders, corrupt insiders, and they don't name them.

24           Look, he who must not be named, no, they must be

25    named; we're in federal Court.

1          The only corrupt insider you heard evidence about was

2     Donna Heinel, and she didn't go bad, apparently, until the

3     summer of 2018, well after Gamal Abdelaziz made his donation.

4     And it's beyond dispute he doesn't even know her.

5          The prosecutor wants to get up here and keep repeating

6     that phrase, "quid pro quo," "quid pro quo."  It means this for

7     that.

8          Okay.  A quid pro quo is not illegal unless there's

9     corrupt intent.  So, for instance, if you are lucky enough to

11:19 10     go to the Red Sox game last night, you paid the Red Sox money

11     for a ticket.  It's a quid pro quo.  You go to the grocery

12     store, you buy groceries, you pay money for groceries, that's a

13     quid pro quo.  There's nothing wrong with it.  It has to be a

14     corrupt intent.  And here, the two charges, and only two

15     charges against my client, are conspiracy charges.

16          The government has the burden of proving specific

17     intent, what was in his mind, not what was in the mind of all

18     these people in some supposed nationwide conspiracy.

19          They have to prove the conspiracy they charged in this

11:19 20     indictment, not some other conspiracy in some other indictment.

21     If they have mischarged this, it's not guilty.

22          There's no proof that Gamal Abdelaziz had specific

23     intent to join some nationwide conspiracy.  There simply isn't.

24          Now, the government keeps trying to suggest -- and

25     when you hear instructions from the Court tomorrow, you'll

1    learn that proof that a defendant willfully joined an agreement

2    must be based upon evidence of his own words and actions.  Not

3    Bruce Isackson, the guy he doesn't even know, the guy who tells

4    you he won't lie to you to avoid prison, although he lied to

5    get his daughter into school.  He has nothing to do with Gamal

6    Abdelaziz.

7         You'll hear from the Court that good faith, if he

8    thinks what he's doing is legitimate, he thinks he's dealing

9    with a trusted college counselor, that's a defense in this

11:20 10   case.  What's in his mind, not somebody else's mind, not some

11    lawyer in New York he doesn't even know.

12         And the reasonable doubt standard which applies to

13    them, it can arise not just from evidence that's produced in

14    this court but also from a lack of evidence.

15         You know, the government keeps trying to suggest that

16    Sabrina Abdelaziz stole a seat somehow from somebody at USC.

17    It's not true; it's not true at all.

18         You heard from Ms. Chassin from USC, they let in 8,500

19    kids her year with the expectation that only 3,200 or 3,300

11:21 20   were going to go there.  There's no -- USC did not lose a seat;

21    the basketball program was not affected.  So to the extent

22    they're waiving this around like some big harm, it's not true.

23         Coach Hughes, she said it best when I asked her:

24         "Now, when you were an assistant coach at USC, the

25    team had approximately 13 to 15 players, right?

 1          "Yes.

 2          "So the number varied year to rear, right?

 3          "Correct.

 4          "And if someone were to say that USC's women's

 5   basketball team used practice players and a team manager, that

 6   would be true, right?

 7          "Yes.

 8          "And when Sabrina Abdelaziz arrived on USC's campus in

 9   2018, she had not been recruited by you, correct?

10          "Correct.

11          "And the USC women's basketball that year wasn't short

12   a player because of Sabrina's presence on campus, was it?

13          "No."

14          So let's put aside that, put aside that there's

15   somehow some harm to USC by Sabrina going there.

16          Also, this was a crime without a motive.  They didn't

17   prove any motive.  This is not a murder case where the intent

18   is an evil intent.  This is a white collar case.  Usually you

19   have a motive of greed.  What's the motive here?  He gave away

20   his money.  He was lucky enough to have made a lot of money and

21   he gave it away.  He gave it away to Columbia, gave it away to

22   USC.

23          What are they going to say to him now?  Oh, it's

24   prestige.  Oh, he did it for prestige.  This guy had plenty of

25   prestige.  Successful executive; his son was at Columbia, an

1    Ivy League school.  USC, fine school, but it's USC, it's not

2    M.I.T.  He has no motive to commit fraud.

3         He has this conversation with his trusted counselor

4    who he had known for the guy's help with his son.  That's how

5    he gets involved in this.

6         So let me begin where I started this case, all right.

7    He is, in fact, presumed innocent, not just a figure of speech,

8    it's the law.  He's presumed innocent.  And he actually is

9    innocent in this case.  He never agrees with Rick Singer to

11:23 10   bribe anyone at USC, and he never agrees with Rick Singer to

11   defraud USC with some phoney athletic profile that he never

12   saw.

13        And that's what a conspiracy is, an agreement with two

14   or more people to do something illegally.  He didn't agree with

15   Singer on that.  Of course, we never heard from Singer.

16        The government has failed to meet its burden of proof

17   in this case.  They have the burden of proof, not the defense.

18   I don't have to present witnesses; they do.

19        The beyond a reasonable doubt standard is the highest

11:23 20   burden of proof in the law.  This is not some civil case where

21   people are fighting about money and it can be more likely than

22   not and people can recover money.  This is a criminal case.

23   It's the highest standard in the law.  It's not may be guilty,

24   it's not probably guilty.  No, no, no.  It has to be beyond a

25   reasonable doubt.  And they simply haven't proven that in this

1    case.

2         All they've got are these two setup tapes where

3    they're trying to frame the guy well after the fact that his

4    daughter is in school.  They don't have him on wiretaps.  They

5    have nothing.  That's why they're talking about these -- I'll

6    get to the exhibits in a moment and I'll get to the transcripts

7    in a moment.  But they're trying to cherry-pick things here and

8    there and make it look like he did something wrong, and he

9    didn't.

11:24 10        They're the ones -- they say Rick Singer is our

11   witness.  He's not our witness.

12        They have the burden of proof.  You heard from Agents

13   Brown and Keating, Singer was recently here.  This case is

14   about choices, and the government chose not to present him.

15        In fact, why don't we just count up the number of

16   government trial witnesses who actually spoke to my client.

17   Okay, let's count them up.

18        How about zero?  I mean, what kind of case is this?

19   What kind of prosecution is this, where the government brings

11:25 20   two felony charges against somebody and they don't have one

21   trial witness who met with or spoke with the supposed

22   perpetrator.  It's crazy.

23        They have these two little tapes from a guy they don't

24   call to trial.

25        I mean, they spent about -- there are four skilled

            1    prosecutors here trying to put Gamal Abdelaziz -- convict him
            2    of two crimes and they took the time and resources to locate a
            3    high school yearbook.  They chose to present a high school
            4    yearbook to you on an issue we don't even dispute.  We're not
            5    saying she was the next coming of Lebron.  That's not what he
            6    thought.
            7            He was asked:  "Does she play a sport?"
            8            USC has this thing, you can be a practice player, team
            9    manager; make a donation, it helps her get in.
    11:25  10            There's no guarantee.  In fact, that's why I showed
           11    you those stipulations from Chapman University and the SAT.
           12            Quickly look at those again.  Might not have been
           13    readily apparent why I was reading those to you the other day.
           14            You know, she goes and takes the SAT three different
           15    times.
           16            In December, he's saying, Oh, they're lying to a
           17    counselor about she doesn't want to apply in December.  She's
           18    still taking the SATs.  She took a third SAT.  The records of
           19    the College Board reflect that she took it three different
    11:26  20    times, okay.
           21            She also comes back to L.A.  They're out in Hong Kong,
           22    16 hours away.  She flies back to do a tour of Chapman
           23    University, also in Southern California; she gets in.  Who does
           24    that if you think you have a guarantee?  There's no guarantee.
           25    She gets this likely letter and they still come back, because

1    in his mind there's no guarantee.  He's not going to be some

2    crazy man, have his daughter take the SATs again, fly 16 hours.

3            So bear that in mind.  But also bear in mind this:

4            It is their burden of proof, and, you know, why don't

5    they call Singer?

6            Throughout this trial those empty chairs have been

7    over there.  Those empty chairs signify Singer.  There it is.

8    Empty chair.

9            What happens if Singer gets called as a trial witness

11:27 10  by the government?  You know what happens.  You know what

11   happens.

12           I get to cross-examine him.

13           I get to say to him, Good morning, Mr. Singer, nice of

14   you to join us.  Nice of you to take time off from surfing and

15   paddle boarding in Southern California, whatever you do this

16   time of year.

17           We're at a federal trial here.  A man's liberty is at

18   stake, so I'm going to ask you a few questions, Mr. Singer.

19           Mr. Singer, you never told Gamal Abdelaziz he had to

11:27 20  bribe someone, did you?

21           You never told Gamal Abdelaziz that he had to submit a

22   phony profile to USC, did you?

23           No.

24           You knew he trusted you, right?

25           You knew that he trusted you because you had helped

 1    his son, Adam.

 2              And you knew he was an easy mark.  He had donated

 3    $200,000 to Columbia.  You knew that, Mr. Singer, didn't you?

 4              Yeah, yeah.

 5              And you told him if he made a donation, it would help

 6    his daughter get in.  She could be a practice player, she could

 7    be a team manager, that's the type of thing you say, right,

 8    Mr. Singer?

 9              That's your old pitch, donate to the program.

11:28 10            You're not telling this guy, who's flying back and

11    forth to the United States, working 15 hours a day, you're not

12    telling him this is a bribery scheme, this is a nationwide

13    crime I'd like you to join.

14              No, no.  You took advantage of him, didn't you,

15    Mr. Singer?

16              You made a lot of money on this deal, didn't you?

17              Yes, I did.

18              Now, of course, they didn't call him.  Avoid questions

19    like that.  The case would fall apart.  It was bad enough as it

11:28 20    was.  They bring him in here, he'd get torn apart and he'd be

21    exposed.  He'd be exposed to what really happened between him

22    and Gamal.

23              Of course they don't have any interceptions of what

24    really happened in February 2017, that's when they had this

25    discussion, not 18 months later.

         1              In fact, let's look at some of these exhibits.

         2              I want to show you some exhibits to show his state of

         3     mind, Gamal's state of mind.  What's going on when he's talking

         4     to Singer, because, again, they have to prove that he joined,

         5     knowingly joined a conspiracy, the one they charged in this

         6     case, not some other situation.

         7              If the government can't -- the government has to prove

         8     what he did, what he was thinking, his state of mind, nobody

         9     else's.

11:29   10              This trial has gone on so long, my eyes have gotten

        11     worse; I'm going to use these.

        12              So let's go with Exhibit 272.

        13              Here it is.  Back in February of 2017.  They had this

        14     discussion.  I've attached Sabrina's basketball photos as

        15     discussed.  He apologized that they're not professional

        16     pictures, but you'll recognize Sabrina from an MVP picture.

        17     You can use ones you find suitable.  Okay.

        18              Now, this is not from a man who thinks he's in some

        19     scheme.  The government doesn't know when he found out that his

11:30   20     daughter wasn't playing hoops anymore.  The government doesn't

        21     know his daughter's medical history.  They don't know a lot of

        22     things.  They don't know what he did after that second phone

        23     call, whether he checked why didn't she show up, she's supposed

        24     to be a practice player, she's supposed to be a manager, you

        25     got to show up.

1          But here, you can see back in February of 2017, she's

2     getting pictures.  Singer asked him, Get me some pictures.

3          Now, what else is going on in Gamal's mind?

4          Well, he thinks it's a legitimate charity.  His son

5     had gone on a trip with Singer.

6          Look at picture 1364, Exhibit 1364.

7          This is why somebody like Gamal might actually think

8     it's a legitimate charity.

9          And for Gamal, busy guy, he's proud of his daughter.

11:31 10  When he's asked has she played a sport, yes, yes, she has

11    played a sport, it's called basketball.

12         Look at Exhibit 1168.  Okay.

13         As the government helpfully pointed out, I think

14    that's a most valuable player award she won, 10th grade.

15         So when he's having these discussions back in February

16    of 2017, it's not unreasonable for him to say, Yes, she's

17    played a sport in high school, basketball.  Get me some

18    pictures.  Okay, he gets some pictures.

19         And, as we've stipulated, agreed, look at 9068, or

11:31 20  call it up.  It's not in evidence, it's a stipulation.  This is

21    by agreement.  We all know he donated 200 grand to Columbia.

22    Now, that's a ton of money.  Most people give $100, $50 if

23    their college asks for money, but he was fortunate to have made

24    it.  That can't be held against him.

25         Okay.  That's also his mindset.  It doesn't seem crazy

when Singer says, You got to donate to USC, too.  Donated for
his son, okay, donate for my daughter.

There's no guarantee here.  There's no bribery scheme
that's explained to him.  He doesn't know what's going on in
USC's Subco process, some internal process.  How is he supposed
to know that?  He's a guy working all the time, talking to a
guy who he thinks is a friend, who he had experience with as a
good college counselor.

And that's why -- you know, that's his mindset back in
February of 2017.  They haven't proven otherwise.  Again, they
got no wiretaps.  They don't even have Singer to tell you what
was agreed to.  And they have to show what he agreed to with
Singer, not somebody else.  There's no agreements between him
and anybody else.

And let's be clear, there's no guilt by association
allowed here.  You can't just say, Oh, these other parents did
something, so he must have done it.  No, no.  It's what was in
his mind, not Bruce Isackson or some New York lawyer that was
paying someone to take a test.

There's no test cheating involved with him.  There's
no class taking involved with him.  It's totally separate from
what they're talking about, this nationwide conspiracy with
mysterious corrupt insiders that he doesn't know anything
about.

And let's not forget, what did Agent Keating say

1    multiple times, multiple times was the old pitch:  It would be
2    a donation to a program.  That doesn't sound so bad for a guy
3    like him.  Okay, it's a donation to a program.
4         What was he saying?  The kids could be practice
5    players or team managers.  That's what he said.
6         Look, look at 607.  Even on the Isackson tape he's
7    caught -- this is a thing he does, he says practice players,
8    practice players.  It's Exhibit 607.
9         And managers.  Look at Exhibit 711 (sic.), excerpt.
11:34 10       Exhibit 7011.  These are testimonials on his website,
11   kids thanking him for being managers.
12         So that's why -- that's why the agents were desperate
13   to say you have to be more explicit, because what you're
14   telling these people is legitimate.  When you're telling a guy
15   like him, it sounds legitimate, so it goes to his intent.
16         He has to have a corrupt intent for a quid pro quo to
17   be illegal.
18         Now, we know that Singer, at some point, he increases
19   his request from 200 grand to 300 grand.  Take a look at
11:35 20   Exhibit 448.
21         A little note he writes to himself.  "200 is going to
22   USC, the extra hundred is going to The Key, something Gamal, at
23   least from his perspective, thinks is legit.
24         And this is where Singer decides I can get another 100
25   grand out of the guy.  Of course he took all 300, unbeknownst

1    to Gamal.  Gamal never agreed to donate 300 grand to Singer's

2    pocket.

3              And when Singer tells him it's going to the Galen

4    Center, that's a real place.  It's not a made up place.  Donna

5    Heinel doesn't control the Galen Center.  Some corrupt insider

6    doesn't control the sports arena.  It's where they play hoops

7    at USC.  It seems legit.

8              So for a guy who is presumed innocent, that's not

9    proof beyond a reasonable doubt that he was involved in some

11:36  10    scheme.

11             And there was another stipulation that I read to you

12    where the parties agreed that nothing was misappropriated from

13    the Galen Center account or the women's athletic board account.

14    I read it to you.

15             This guy from USC, if he had been called to testify,

16    would have said there's no reason to believe there are any

17    expenditures, debits or transfers from the USC women's athletic

18    board account or the USC Galen Center gift account to any USC

19    employee personally for any purpose unrelated to their

11:36  20    employment at USC.

21             Nothing inappropriate, apparently, was done in these

22    accounts.

23             So what is the government talking about?  Heinel

24    didn't start taking money until the summer of '18, well after,

25    months after Gamal made his donation.

1           In fact, this whole thing with Heinel is a bit crazy.

2      They've conceded that he doesn't know Heinel, right, and

3      they've conceded that Heinel never took any money personally.

4           Look at Exhibit 1563A.  This is a pleading in this

5      case.

6           The government was not attempting to build a case that

7      parents understood Heinel to be personally pocketing money, and

8      the government has never alleged that.

9           Well, good, glad they cleared that up.  Sure sounded

11:37 10     like that was their theory at the beginning of this case.

11          How about Exhibit 9025.  This is under oath by an FBI

12     agent.  She was the case agent.  She was someone else they

13     couldn't bother to bring to court.  Actually, they brought her

14     to court, she was in the spectator section earlier in the

15     trial, she was in the spectator section for the government's

16     closing, but they don't put her on the stand; no, they put on

17     an agent who had very little to do with the case to read some

18     e-mails.  We'll get to that in a moment.

19          Anyway, we got this exhibit into evidence, and it

11:38 20     shows you that Agent Smith, when she's filling out a wiretap

21     application, she told the court, Up until the summer of 2018, I

22     believe that all the money Singer provided to Heinel for her

23     assistance went to USC athletic programs.  Okay.  Where's the

24     crime?

25          However, in July of 2018, Heinel creates this company

called Clear the Clearinghouse and bank records have shown that Singer, not Aziz, has directed $40,000 to this company in the last two months indicating that Heinel may now, may now be receiving bribe payments.

Okay.  That is a critical admission.  It is something that they are trying to gloss over because it shows Gamal couldn't have been bribing Donna Heinel, who he didn't know, if he wanted to; she wasn't taking bribes until the summer of 2018.  He has his discussion in February of 2017, doesn't know her.  She doesn't go bad, apparently, until the summer of 2018.

Now, you know, the government, you know, makes much ado about what's going on at USC.  What's he know about the internal workings of USC?  We know there was pressure at USC to raise money.  They had a $6 billion fund-raising campaign; that's serious money no matter how you cut it.  And we know that the USC athletic director, the guy in charge, was commending Heinel for raising money in 2014 and 2015, her performance reviews.  We know that.

And we know that Laura Janke told you at USC there were two ways to keep your job: win or bring in money.  Okay.

So what USC was telling one another, it's irrelevant to Abdelaziz.  Who knows what the real requirement was at USC athletic department.  If the USC athletic department is not telling the USC admissions department what is going on, how is he supposed to know?  He doesn't know anything about the Subco

1    process or the VIPs at the admissions office, so whatever is

2    happening at USC suggested at least that Heinel was doing --

3              (Court reporter interrupted, technical difficulties.)

4              THE COURT:  Okay, Mr. Kelly, you may continue.

5              MR. KELLY:  No problem.

6              By the way, the government pointed to one exhibit in

7    their opening -- I'm sorry, in their closing -- Exhibit 330, as

8    if that was in and of itself proof of a crime.

9              Well, if you're going to look at that when you

11:42 10   deliberate, look at 329 as well, because that's where Janke

11   wrote that note, If you don't have this, I'll create one.  And

12   he gets cut off when he sends 330 to Gamal.

13             So it's just proof Singer cuts it off because he's

14   keeping it from Gamal.  He's hiding it from Gamal because Gamal

15   is not on in this little side deal.

16             They talk about side door, side door.  No, Singer has

17   a side deal going that he doesn't tell Gamal about.  So bear

18   that in mind.

19             If you're going to look at 330, look at it in context

11:43 20   with at 329, what is cut off.  He could have forwarded 329 but

21   he doesn't, he doesn't because he knows that Gamal is not a

22   part of this.

23             Now, let's keep talking a little bit about Heinel,

24   okay.  This whole Heinel business is really outrageous.

25   They're trying to smear Abdelaziz and frame him for something

1   he didn't do.  I don't say that lightly.  Look at what goes on

2   here.

3           Singer, at the request of the agents, all right,

4   that's according to him, request of somebody -- look at 721.

5   Okay.  We know Heinel goes bad in the summer of '18, according

6   to the government's theory, right?  Again, months and months

7   after Gamal made his donation.

8           But that one I've got circled there, November 15th,

9   that's the one where Abdelaziz's name magically appears.  This

11:44 10  is backdating an invoice, backdating an invoice to set up

11   Gamal.  Gamal has got nothing to do with this invoice.

12           Let's look at the next exhibit, 596A.  Okay.  That's

13   where the name appears.  Singer, Heinel -- who knows who's

14   behind it, but that's not anything Gamal had anything to do

15   with it.  It's made to look -- it's designed to make him look

16   guilty of something he didn't do.  That right there, they're

17   backdating an invoice, sticking on Gamal Abdelaziz's name to

18   make it look like he did something, okay.

19           Because we know, we know at this trial -- look at the

11:44 20  date here, it's November 1st of 2018.  We know from this trial

21   that the day before, Halloween, Singer had told the agents that

22   Gamal didn't even know Donna Heinel.  We know that from the

23   testimony in the case.  There's multiple times where Agent

24   Keating said that in the transcript.

25           Let's go to that, please.

1          So here's some testimony.

2          All right.

3          "How about Donna Heinel?  You have no evidence that he

4   ever knew of Heinel before those two calls either, do you?

5          "A.  Mr. Singer told us at some point that

6   Mr. Abdelaziz did not know the name Donna Heinel.

7          Question to Keating:  "Yeah isn't there a report of

8   one of your first meetings with Singer where Singer said Gamal

9   and his wife thought their money with respect to Sabrina was

11:45 10   going to the school?

11          "A.  I don't remember if it was one of the first

12   reports, but I remember Mr. Singer saying that the payment was

13   going to USC.

14          "Q.  The school, correct?

15          "A.  Yes.

16          "Q.  But then when -- you also remember Singer told

17   you Gamal didn't know who Donna Heinel was, correct?

18          "A.  Correct."

19          "Well, he didn't know who Donna Heinel was, that's

11:46 20   correct, right?"

21          "We didn't find out until after the call."

22          Remember, the call is on October 25th, 25th.

23          "When you made that call, you knew for sure he had

24   never heard of Donna Heinel, right?

25          "No, Mr. Singer didn't tell us until after the call.

             1          So he's injecting this name, all this gibberish onto

             2   that first call, Abdelaziz doesn't even know who she is.

             3          "Okay, okay.  After the call, like six days later" --

             4   six days later, Halloween, 2018 -- "he doesn't know who Donna

             5   Heinel was, correct?

             6          "Correct."

             7          And yet, on November 1st, they're throwing the

             8   Abdelaziz name onto that invoice.  How is that fair?  How is

             9   that proof of anything beyond a reasonable doubt except that

    11:46   10   they're desperate to set up this guy, Gamal.  That's what

            11   they're doing here.

            12          In fact, look at Exhibits 13 and 714 side by side.

            13   Okay.  They're basically the same thing.  This is the Singer

            14   note, whether it's to himself like it's a diary or it's to his

            15   lawyer, I guess the theory he's lying to himself or he's lying

            16   to his lawyer, who cares?  What it shows is that it shows

            17   Singer's state of mind.  It shows he's saying, Spoke to Donna

            18   Heinel.

            19          Look at this -- I'm pointing to the bottom -- as

    11:47   20   requested by agents, asked her to put detail on her 20K

            21   invoices being sent to the Foundation.

            22          They concoct this little side deal to set up Gamal,

            23   and they stick Gamal Abdelaziz's name on an invoice.  He's got

            24   nothing to do with it.  They're backdating the invoice to frame

            25   him, okay?

1        And then you have up above on the same note -- this is
2    a very important note, whether you look at 13 or 714 in the
3    jury room when you deliberate, this is like the little decoding
4    device, the top one.  This is how you look at what he's doing
5    when he made those two calls to Gamal, because, in Singer's
6    mind, look what he says.
7        He says -- he claims he had a loud and abrasive call
8    with agents.  They continue to ask me to tell a fib and not
9    restate what I told my clients as to where their money was
11:48 10   going, to the program, not the coach, and that it was a
11   donation, and they wanted it to be a payment because it makes
12   it look like something illegal.
13       I asked for a script if they want me to ask questions
14   and retrieve questions that are not accurate to the way I
15   should be asking the questions.
16       Essentially, they're asking me to bend the truth,
17   which is what they asked me not to do when working with the
18   agents and Eric Rosen.
19       Liz raised her voice to me like she did in the hotel
11:48 20   room this time about asking each person to agree to a lie I was
21   telling them.
22       This is his mindset.  What he's telling Gamal is all
23   nonsense, and he's trying to frame him and set him up.
24       So the government goes back to those two tapes, but of
25   course they only show you a little bit, they cherry-pick.  You

1    guys can listen to the whole thing.

2         That first tape is October 25th of 2018.  He's in --

3    Gamal hasn't heard from Singer in months.  His daughter is

4    already at USC where, apparently, she's doing quite well,

5    getting As and she's due to graduate in the spring.

6         So he gets called out of the blue and there's a lot of

7    talk initially about general chitchat two friends or a trusted

8    adviser would have.  This is all about Adam.  He's concerned

9    about his son, Adam, and some of the difficulties he's had.

11:49 10   And he references Columbia.  Again, Singer knows this guy gave

11   a lot of money to Columbia.

12        Gamal goes back and forth, how he's too busy in China,

13   he just landed in China, didn't even have time to discuss

14   things with his own son about some business proposition.

15        But that's the context of this quick call out of the

16   blue to Gamal.  Right?

17        And then, what does he do?  Singer tells him this

18   audit thing.  Oh, my foundation is being audited.

19        Now, Gamal doesn't panic.  His heart isn't dropping

11:50 20   like Mr. Isackson.  He yeses him to death, yes, yes, yes, yes.

21   There's a series of questions.  Listen to it in there.

22        My foundation, we're getting audited right now.  Yes.

23        It's typical, they're looking at all my payments.

24   Yes.

25        They've come into my foundation, they asked me about

     1    the $300,000 payment.  Yes, that was made, yes.

     2          Okay.  He's not driving off the road because Singer's

     3    foundation is getting audited.  He's worried about his friend.

     4    Is his friend in trouble with the IRS?

     5          Then Singer drops this nonsense statement into the

     6    record.  You can listen that, too.  There's a pause.  He's

     7    like, what is he talking about?

     8          Then he says, You're okay with me not telling that to

     9    the IRS.  Of course.

11:50 10          Of course because it makes no sense.  He's never heard

    11    of this woman; he doesn't know what he's talking about.  Why

    12    would he say that to the IRS?  If Singer is being audited, it

    13    does make no sense.

    14          And then they go back to the Foundation.  His intent

    15    was to donate to the Foundation obviously.

    16          And from there, from there obviously USC.

    17          But, apparently, Singer's in trouble for -- he wants

    18    to claim the whole 300.  Singer is getting audited.

    19          So, okay.  So if Singer is in trouble, you know -- for

11:51 20    Gamal it's a 300,000 donation either way.  They're both

    21    501(c)(3)s.  If they're split up, it's a donation.  So that's

    22    the context of this conversation.

    23          He says -- Gamal says to him, Is there anything I can

    24    do to help?  He doesn't think he's in trouble for anything.

    25          So -- and he's not charged with any tax crimes.

1          So this tax business is just a nonsense rouse, as they

2    say, or trick, to try to get him to say something that doesn't

3    make sense.

4          Then Singer goes back to Donna Heinel, gives her a

5    title because he's never heard of her.

6          And then he says they ran a fire alarm.  It's a very

7    confusing message.

8          In the middle.

9          Well, she called him, Singer, to compliment him on the

11:51 10    profile he did for Sabrina.  So he's fishing for a compliment

11    from his client, Gamal.

12          He says, I love it.  He does say I love it a thousand

13    times a day, ten times a day, whatever it may be.

14          So this is not proof beyond a reasonable doubt of

15    anything.  He goes back to his son again.

16          You know why it's not proof beyond a reasonable doubt,

17    they have to go back two-and-a-half months later.

18          Gamal doesn't call Singer, but the government was

19    desperate to get some evidence; they don't have it.  So they

11:52 20    get back with this new -- this second call in January of 2019.

21    Again, Sabrina is already in school, it's well after the fact.

22    As a matter of law, you cannot conspire with a government

23    agent.  At this time he's a government agent.  So the

24    government is saying, Well, this is not the conspiracy, it's

25    evidence of a past conspiracy.

          1              Well, here, they do panic him a little bit.  They tell

          2     him his daughter's in trouble, that the admission's person

          3     called.  But, again, they first start talking about Adam, it's

          4     always about Adam.  That's the focus.  Listen to the whole

          5     thing.

          6              Again, a second call out of the blue.

          7              And what happens?  He's worried and distracted about

          8     his daughter.  He starts -- and Singer starts dropping side

          9     door, side door into it, because, apparently, they think that's

 11:53 10     per se illegal, some magic phrase.  It's not.  He never heard

         11     it before; there's no evidence he had.

         12              So he gets worried when they talk about why are they

         13     asking her to show up?  He doesn't say -- you know, Mr. Frank

         14     suggested all these things he could have said.  He didn't say,

         15     Wait a minute, he thinks she has to show up.  He thinks she has

         16     to be a practice player or team manager and to do that you got

         17     to show up.  So why is he worried?  She didn't show up.

         18              If he thought he bribed USC, why would she have to

         19     show up?  Why doesn't he say, What are you talking about?  This

 11:53 20     was a big scam, Rick.  Because in his mind it's not, he thinks

         21     it's legit; he thinks his daughter is in trouble.

         22              And the government doesn't show what Gamal did after

         23     this call, what investigation he made because he thought she

         24     had to show up.  They haven't presented evidence like that.

         25              And so that's why these two tapes don't do it for

 1    them.

 2              So they start talking about these e-mails that mean

 3    nothing.

 4              Let's go through some of these e-mails.

 5              First e-mail is Exhibit 334.  Okay.  This is Singer in

 6    July telling Gamal, I need an action photo or two of Sabrina

 7    playing basketball.  He says, Got it.  All right, that's on

 8    July 27th.

 9              Then there are five e-mails in a row.  Okay.  One 338,

11:54 10    339, 340, 341, 342.

11              Take a look at those.  There are five pictures in two

12    minutes.

13              So he's just flipping pictures to the guy.  Right?

14              And then they think -- the government thinks they have

15    their big moment, Exhibit 345.

16              Let's see the actual 345, please.

17              It's a blank page.  Look at the top.  The whole thing

18    is blank.

19              Singer:  We'll use this one.

11:54 20    Gamal doesn't reply.

21              There's no picture attached to this one.

22              He doesn't say, Wow, that's a beautiful picture of my

23    daughter, what a smile.

24              There's nothing there.  It's just this JPEG that the

25    agent talked about.

1             No one memorizes JPEG numbers.  It's crazy.

2             You flip through five pictures.  Singer says, We'll

3     use this one because the girls happens to be dribbling the

4     ball.

5             She's got glasses on; it's not even his kid.  But he's

6     not looking at JPEG numbers and have them memorized.

7             So they're trying to suggest this is somehow sinister;

8     it's not.

9             In fact, what happens a little while later, Exhibit

11:55 10     549.  Gamal sends him a whole bunch of pictures from Hong Kong,

11     about a month later.  Amateur photos a parent would take of a

12     kid playing hoops.  There's no intent to give phony pictures of

13     someone else playing basketball.

14             Singer chose a girl with glasses.  He didn't say, Use

15     somebody different.

16             And look what happens -- so look what happened at

17     Subco.  Exhibit 381.

18             They use a different girl altogether.  So it's not

19     even material, it doesn't even matter the girl with glasses.

11:56 20             It's all smoke and mirrors.  They're trying to

21     buttress a weak case.  They know these two setup calls don't do

22     it, so they're trying to suggest this e-mail stuff matters.

23             Look on this thing that went to Subco, the e-mail and

24     the phone, those are her dad's.  They're not hers.  When Janke

25     asked for the daughter's e-mail and phone, Singer never got it

1    because he never talked to Gamal about it.

2         That's what leads us to the big e-mail with the

3    athletic profile.  It's the key to the government's fraud part.

4         Let's go to 352.

5         This is the whole ball game for the government, and

6    they've botched it badly, and here's why.

7         Look at Exhibit 352.  It's on August 8th.  This is

8    from Janke to Singer.

9         See, look below.  They're looking for Sabrina's

11:57 10  e-mail, phone; as you just saw, they never got it.

11         It goes to Singer, sends it to Gamal at the cox.net

12    address.  Okay?  Remember that.  It goes to the cox.net

13    address.

14         But then, there were two more e-mails, two more that

15    the government chose not to show the FBI agent.

16         The FBI agent takes the stand.  They hide it from him.

17    Because if they hide it from him, you're not going to see it

18    either.

19         Here's the other two -- so all they show the FBI agent

11:57 20  is this one, okay?  There are two more you have to look at in

21    context.

22         And the poor FBI agent.  He's caught unaware.  He's on

23    the witness stand.  He hasn't been shown this by the

24    government.  The defense lawyer has got to show it to him.

25    It's nuts.

1          So look at this.  9024 is the away message or the

2    bounce back I was calling it.

3          But it says, Please be advised I've changed my e-mail

4    address to gamalaziz797.  So that's up top there.  That's the

5    auto reply from cox.net, that's what Singer gets.

6          So what does Singer try to do?  He tries to send it to

7    the new e-mail address, gamalaziz797.  But he doesn't.  He

8    makes a typo.

9          Look below at Exhibit 351 there.  "Amalaziz."

11:58 10          It's to nowhere.  It's to cyberspace.  No one gets it.

11          Gamal doesn't get it.  They don't show that to the

12    FBI.

13          If they show that to the FBI, he might have to

14    testify.

15          I brought it out on cross-examination:  Why are they

16    hiding this from you?  Let me just tell you what really

17    happened.  No, because they've got a weak case, and they're

18    trying to dress it up with this e-mail from August 8th.

19          In fact, here's what they say to you:

11:58 20          They say, Oh, but we did a search warrant.

21          So what?  They did a search warrant in July 2019,

22    almost two years after that thing was sent.  And the only thing

23    the government can say with any certainty about that cox.net

24    e-mail is that they found it in the Gmail two years later, July

25    2019.

1          They don't have any proof that Gamal ever replied to

2     it.  They don't have any proof that he ever opened it, and they

3     don't have any proof that he replied.

4          In fact, I'll show you what Agent Brown said.

5          All he testified to is:

6          "The only thing you know is that on July 1st of 2019,

7     the FBI served a search warrant and Google reported as of July

8     2019 there was this e-mail in Gmail.

9          "But you don't know how it got there, right?

11:59 10          "That's a fair statement, right.

11          "Right."

12          Even the FBI could draw no conclusions, and they want

13     you, a jury, to draw conclusions.

14          The agent, Agent Brown, he said he consulted with the

15     FBI forensics team.  That's probably the best in the world.

16     They can't figure it out.

17          How does the government expect you to convict a man

18     beyond a reasonable doubt based upon this supposed fraud?

19          It never got to him.

12:00 20          They want to you speculate and convict this man for a

21     fraud, even though the FBI can't draw any conclusions.  It's

22     crazy.

23          I mean, they have guesses.

24          You know what, here's a guess, too.  How about when a

25     man gets indicted in March of 2019, months -- several months

before the search warrant, he checks all his devices.  I bet he

checks all his e-mail addresses and then things migrate into

your Gmail account.

How about that for a guess?  That's probably a pretty

good guess.

But you shouldn't be out here guessing.  The

government wants you to guess -- first they don't show it to

you, then they want you to guess.

Look at excerpt to what Agent Brown said.

I asked him:

"You have no idea how that ended up in his Gmail, do

you?

"We have thoughts on how it could have, but I do not

know with certainty how it did, no.

"Right.  A lot of different thoughts or ideas but no

certainty, correct?

"Discussed two possibilities with our forensics team,

but they're just possibilities, I don't know for sure.

"Right.  No conclusions have been drawn, right?

"Correct.

"There's no evidence he ever replied to this, right?

"No.

"And there's no evidence that he's ever forwarded

this, right?

"Not that I've seen, no.

1          "Okay.  There's no evidence that he ever posed the

2     attachment to this, is there?

3          "No."

4          By the way, do you remember that little question the

5     government asked of him:  Do you know what auto forwarding is?

6          And I objected.

7          He said, Oh, I withdraw that question.

8          Why was he asking that question if there's no evidence

9     he ever forwarded?  Why is he trying to mislead the jury in

12:01 10    this case?  Because their case is weak, and he didn't do the

11    crimes he's charged with.

12          There's no fraud here.

13          So let's not forget who's got the burden of proof

14    here.  Not me; they do.

15          They chose not to call Singer as a trial witness.

16    They chose not to call the FBI agent, the case agent who was

17    here as a spectator.

18          They chose not to call any of them from the athletic

19    department except two coaches who don't know anything about

12:01 20    fund-raising.

21          They didn't call anyone from the Trojan Athletic Fund

22    either, which raises money for USC.

23          And they hid evidence from Agent Brown in an effort to

24    hide it from you.

25          But that's not all.  That's not all.

1          They also hid evidence from that Mikaela Sanford in an

2    effort to keep that from you.  That's also part of the side

3    deal they wanted to keep from you.

4          Let's walk through that.  Remember that little fiasco

5    with Ms. Sanford?  She spent 15 hours prepping with the

6    government.  We didn't get 15 seconds; they had 15 hours.

7    Okay.

8          And at first on direct exam she appeared to have an

9    answer for every question about every e-mail, spitting out

12:02 10   those answers.  Very well prepared.  Fifteen hours will do

11   that.  Okay.

12         Then there was this one little line on one e-mail.

13   Quick question, quick answer:  "That I don't remember."  Mmm.

14   That's when the red flags go off, when the government witness

15   who's been with them for 15 hours says, "That I don't

16   remember."

17         That's Exhibit 458.

18         That little line in the e-mail:  "I have to confirm a

19   few things with Rick before I can submit."

12:03 20   Prosecutor asked:  Let's look at the response to the

21   next e-mail.

22         You wrote, "I have to confirm a few things with Rick

23   before I can submit."

24         I'm sorry, he asked:

25         "What were you confirming?

1          "A.  That I don't remember."

2          Okay.  Well, people have failures of memory, but their

3     memories can be refreshed, as you've seen in this trial.

4          You can show them the relevant e-mails, how about

5     that?  How about being refreshed in memory in 15 hours.

6          No, no, they didn't do it.

7          She told you, I've been consistent with my position in

8     court and with the government, I don't remember.

9          So they choose not to refresh her memory.

12:03 10          But guess what?  What was going on on the side that

11    Gamal did not know about?

12          Well, let's take a look.  Okay.

13          Let's look at 1540.  This is a side e-mail that

14    Sanford doesn't remember; it wasn't shown her.

15          From her to Singer.  "Please send profile for Sabrina

16    Aziz."

17          Okay.  She forgot about that.

18          Let's go to 1254.

19          Singer flips to her, Mikaela, without Gamal being

12:04 20    present, the August 7th profile.  He still hasn't got a new

21    one, it's the same one, it's off in cyberspace, that he sent to

22    Gamal months ago.

23          So here we are in January.  Singer to Mikaela, no

24    Gamal.

25          He's sending it to Mikaela.

1        What does she do?  Does she send it to Gamal to make

2   him check for accuracy before it gets submitted to USC?

3   Negative.

4        What happens is 1255.  Boom.

5        Sanford says, "Thanks, will update her app and

6   submit."

7        She's going to update the app with the phony

8   information.

9        Not Gamal.  Gamal is not on this chain.

12:05 10        Why did they cut him out.  If he's involved in some

11   nationwide conspiracy, why not just include him?

12        You know why.  This is a side deal Singer has with his

13   people; this is the way they make money.  Gamal has been

14   suckered.  He doesn't know this is going on.

15        Look at the next exhibit.  The receipt goes right back

16   to Mikaela.  She's the one who did that, not Gamal.

17        And so this is another example of how Singer is

18   exploiting both Gamal in this whole process at USC, this crazy

19   Subco process that Gamal has nothing to do with.

12:05 20        Now, in this case -- let me reference a couple more

21   points here.

22        You know, remember, the proof that Mr. Abdelaziz

23   joined a nationwide conspiracy must be based on evidence of his

24   words and actions, not somebody else, not all these other

25   characters they're talking about; it's got to be him.  It's an

1  individual specific.  He doesn't know anyone else in this case.

2  You've got to judge him alone.  All they got are these two

3  flimsy setup tapes, which they effectively concede are not

4  enough because they're trying to pepper you with this e-mail

5  nonsense, this photo nonsense, stuff that goes into cyberspace

6  that he doesn't see, side deals that is being cut with Sabrina.

7  And they keep talking about quid pro *quos*.

8      Again, a quid pro quo is not illegal in and of itself.

9  There has to be corrupt intent in Gamal's skull.  And you have

12:06 10  to determine if the facts establish that, if there's anything

11  in these e-mails that suggest he's guilty of anything except

12  being a sucker for a guy who is an excellent con man.  Okay.

13  And a guy he trusted and who he thought had a legit charity who

14  helped his own son, a guy who is over there in the empty chair

15  who never bothers to show up as a government trial witness,

16  never gives us a chance at cross-examining him.

17      So I urge you on those two transcripts, don't just

18  cherry-pick the one section they want you to listen, listen to

19  the whole thing.  This guy is caught off guard out of the blue

12:07 20  by a con man who is injecting all sorts of gibberish on this

21  phone call.  There's not multiple wiretaps.  They have those

22  two narrow setup calls.

23      These two charges have been hanging over

24  Mr. Abdelaziz's head like the sword of Damocles for too long

25  here.

1      They don't have the evidence to prove him guilty of

2  these two charges.

3      He did not agree to do anything illegal with Rick

4  Singer.

5      He did not agree to bribe anyone at USC.

6      He did not agree to defraud anyone at USC with some

7  phony baloney athletic profile that he never saw and that he

8  never put together.

9      You're the jury.  You're the only thing that stands in

12:08 10  between the government, who is trying to convict a citizen

11  based upon flimsy evidence like this.  Don't let them do it.

12  Don't let Rick Singer in the empty chair fool you, too.

13      The evidence is not there.  They have not met their

14  burden of proof.  It's their burden, highest burden in the law.

15  Again, not some civil case, not a may be guilty.  This has to

16  be definite, and there's no evidence to suggest he's part of

17  these two nationwide conspiracies.

18      I'm running out of time here, but a couple more points

19  that the Court, not me, will instruct you on the law.  Because

12:08 20  I think I said from the outset, the reasonable doubt can arise

21  from a lack of evidence, not just the evidence you've seen, but

22  the evidence -- a lack of evidence as well.

23      A defendant is never to be convicted on suspicion or

24  conjecture alone, and that's what we have here.  Proof that a

25  defendant like Abdelaziz willfully joined in a criminal

1    agreement must be based upon evidence of his own words and

2    actions, not someone else.

3         And there's two words you need to listen to when the

4    judge gives you these instructions.  Those two words are "good

5    faith."  Because those two words, "good faith," lead to even

6    two better words, "not guilty."  Because if somebody has good

7    faith, if they act in good faith, that's a defense to the

8    charge, because that's in their mind, they think it's legit.

9    That's -- a good faith defense is a defense to the two

12:09 10   conspiracy charges.  Because my client, Mr. Abdelaziz, had no

11   specific intent to do anything wrong.  He just didn't.  He was

12   presumed innocent, and he is innocent.

13        I ask you to be fair when you consider the evidence,

14   consider the exhibits that you have seen, there's a lot of

15   them, take a look at the ones I've pointed to.  I appreciate

16   it, and thank you for your time serving on this jury and your

17   attention.

18        Appreciate it very much.

19        THE COURT:  All right.  For the defendant Wilson,

12:10 20   Mr. Kendall may make his closing arguments.

21        MR. KENDALL:  Your Honor, just to confirm, I believe

22   Mr. Kelly has given me a small gift.

23        THE COURT:  Yes.

24        MR. KENDALL:  About six minutes.

25        THE COURT:  About that, yes.

1           MR. KENDALL:   Thank you.

2           (Pause.)

3           MR. KENDALL:   Good afternoon.   On behalf of John

4    Wilson, his family and his legal team, I want to thank you for

5    your jury service and your patience.

6           The first thing I want to do is, as I did with my

7    opening, not go with my remarks, I want to call up -- if we

8    could have the Chassin exhibit, please.

9           Mr. Frank gave this whole speech, quid pro quo, as if

12:11 10   it were some terrible, horrible thing, a quid pro quo.   It's

11   this for that.

12          Every government employee in this room is here on a

13   quid pro quo.   They give their time, and they get paid for it.

14   You got a cup of coffee this morning, it was a quid pro quo.

15   You paid for parking, it is a quid pro quo.   A this for that by

16   itself is not a legal problem for my client.

17          That's why I ask you to look at Ms. Chassin's

18   testimony.

19          If you recall, she doesn't work for the athletic

12:12 20   department, but they brought her in to talk about what was the

21   obligation that the coaches would owe, though she never spoke

22   to the coaches, she never spoke to Pat Haden, she didn't know

23   what Pat Haden discussed with Tim Brunold about the VIP list

24   and how all the donors' kids were handled.   She knows zero on

25   that topic.

1          But what did she testify:

2          "Q.  Are you aware of any rules that restrict when a

3    coach can consider when submitting a walk-on candidate to SUBCO

4    back in 2014?

5          "A.  There are no rules.

6          "Q.  There is nothing that prohibits Coach Vavic from

7    taking into consideration will the parents donate.  If they

8    want to factor that in, like every school does when they're

9    raising money, there's nothing against that."

12:12 10        And what is her response on the VIP questions?

11         "A.  Many of the students are on there because of the

12   hope that they will, you know, contribute to the university

13   financially.  Some are not there for that reason."

14         You know most of the VIPs are there for money and it's

15   taken into consideration.

16         So the mere fact that Mr. Frank likes to use those

17   sort of sinister terms, a quid pro quo, and imply there's

18   something wrong with it, that's not the law.  That's not the

19   facts.

12:13 20        And as he referred to, that's not your common sense in

21   life.

22         So after hearing this case, I think you can see why

23   trial by jury is so fundamental to our legal system and to our

24   freedom in this country.

25         The agents and prosecutors can pick and choose who to

indict.  They can use informants to manipulate taped

conversations.  They can sanitize their reports to hide

exculpatory evidence.  But it's the jury, it's you, who decide

if they've truly proven their case beyond a reasonable doubt,

whether the evidence is so strong that it excludes all

reasonable doubt, a doubt based upon reason, a doubt based upon

evidence, a doubt based upon common sense.

This burden is particularly important here because, as

we'll see, the government picked so many of its witnesses based

upon what the witness did not know.  Chassin had no idea what

Brunold and Haden discussed about fund-raising.  She has no

idea about the athletic department rules on coaches'

recruitment and fund-raising.  We'll get to Casey Moon, him not

knowing virtually anything, or at least claiming he didn't

know.

The prosecutors and agents took one of the most

deceptive con men in the country and they let him spend three

months on recorded calls and unsupervised texts telling John

the side door was a way to make donations that the school

presidents approved and he better be careful because if the

development office has heard he made a side door donation,

they'd be after him for even more money.  As if we're supposed

to believe you're getting a bribe, you're involved in bribes

and then the development office will want more money from you.

That wasn't John's attitude, and that wasn't his understanding.

1          There is no proof that John ever said false things to

2     any school, only Rick Singer did.

3          The government's case is riddled with contradictions.

4     Even though the evidence shows that Singer repeatedly conned

5     John, made him believe he was running a national side door

6     business and stole his money, the government nevertheless

7     contends that John twice agreed to bribe college officials.

8     John is not part of Singer's con.  There is no evidence, not

9     even a hint, that John figured out Singer's scam.  The truth is

12:15 10    quite simple.  John is Singer's victim not once but twice.

11          What the government claims is that Mr. Singer fooled

12     bankers, businessmen, universities, accountants, the IRS, the

13     FBI, lawyers, even prosecutors, but somehow John figured it out

14     before any of these other people did.

15          You heard from Agent Keating about how the government

16     trusted Singer.  They let him keep his phone so he could delete

17     1,300 text messages.  And you heard from Jeff DeMaio, a

18     sophisticated and honorable financial adviser, about how he

19     trusted Singer, too.

12:16 20          As you review the evidence, I suggest you do two

21     things:  First, as you discuss it in the jury room, start with

22     the facts that are not in dispute.  Take an inventory of things

23     that everybody agrees upon and use that undisputed set of facts

24     as your foundation to make decisions on more disputed issues.

25          And then, second, look at the evidence from John

1    Wilson's perspective.  Before you judge him, you have to look

2    at things as he saw them.  All of the charges require that the

3    government prove beyond any reasonable doubt that John intended

4    to commit fraud and bribery, that he acted knowing he was

5    committing a crime so you must look at things the way he did.

6    Pay particular attention to what John said, not what Singer

7    said, but what did John say.

8         Good faith is a complete defense to every one of these

9    charges.  Rick Singer manipulated and deceived John Wilson for

12:17 10   eight years.  You may think John was naive, even foolish to

11   believe Rick Singer's claims that the presidents of Harvard and

12   Tufts and Brown all endorsed his national side door business

13   and that they were even working with him on it and that the

14   side door had grown to 50 schools across the country with over

15   700 donations and 700 families a year.

16        But if John Wilson believed the stories Mr. Singer

17   told him, and he clearly did, that proves he acted in good

18   faith and you must find him not guilty on every charge.

19        One undisputed fact is that Mr. Singer was a highly

12:18 20   successful college adviser.  Lots of honest people hired him.

21        A second undisputed fact is that when Johnny applied

22   to USC, Mr. Singer always told John that John would be making a

23   legal donation to a university program.

24        Remember Exhibit 13, Mr. Singer's notes that Mr. Kelly

25   just showed you?  Remember what Agent Keating told us on

cross-examination?  This was told to the agents repeatedly by
Mr. Singer, that the parents, including John Wilson, did not
intend to make bribes, were not told they were making bribes,
they thought they were making donations.  But the agents
refused to write it down in their reports.  They made no
written record of it.  You may remember the cross-examination.

"Q.  In fact, to quote your direct -- your
declaration, he said that he usually told clients that the
money was a donation to an athletic program?

"A.  Correct.

"Q.  Not once did any agent write in a report that
Mr. Singer said he didn't tell the parents it was a bribe, he
always told them it was a donation?

"A.  I don't recall that specific statement written
down.

"Q.  Not once in hundreds of pages of interview
reports, correct?

"A.  Correct."

John Wilson never bribed anyone.  As much as they kept
it out of their reports, as much as they didn't write it down,
there is no evidence Mr. Wilson paid money personally to a
coach or knew money was being paid into any coach's pocket.

If he made a donation to USC where there was no rule
prohibiting a parent of an applicant to make a donation, that's
not an illegal quid pro quo.  It may be a legal quid pro quo,

1    but not an illegal one.

2         And remember what they put in the Keating affidavit

3    talking about what they wanted Singer to do:  "We wanted him to

4    be explicit," and that's the word, "explicit," without any

5    doubt, without any ambiguity, without anything hidden, without

6    anything disguised.  "We wanted him to be explicit that the

7    scheme involved bribes.  The purpose was to ensure" -- remember

8    the dictionary definition -- "ensure" means to guarantee -- "we

9    wanted him to be explicit and guarantee for clients who had not

12:20 10   yet committed a crime or were still in the middle of it there

11   would be no possible confusion about their intent."

12         That is not the way they made the tapes with John

13   Wilson.  What Mr. Singer said to John is wholly different from

14   what he said to other parents.  They played the Janavs tapes

15   for you, they played the Isackson stuff.  Mr. Singer never

16   talked to Mr. Wilson that way.  He talked to them in a

17   qualitatively different way.

18         And why is that?  Because, as he told the government,

19   Mr. Wilson always thought he was making a donation to a program

12:20 20   that is undisputed, that's what Keating testified, and his son

21   was a real water polo player who played.

22         So the prosecutors and agents let Mr. Singer

23   repeatedly tell John the side door was legitimate.  They never

24   gave John a fair chance.  All they had to do was one time, just

25   one time all they had to say is, "John, send the money ASAP.

The coach needs to pay his mortgage."  All they had to say to John was, "We need head shots of your daughters so we can make a false sports profile for your daughters.  Is that okay?"

Three-and-a-half months, dozens and dozens of electronic communications, close to 60 minutes of phone calls, they wouldn't ask that question once.  That's the way they spoke to Gordon Kaplan, Nazie Saffari, Bruce Isackson, and so many others.  But they wouldn't dare talk to John that way.

They had one of the world's greatest con men working under their control.  They could have scripted Mr. Singer's comments any way they wanted.  The prosecutors and agents never had Mr. Singer ask John Wilson those explicit questions because they were afraid of the answer.  They were afraid that John would say, No.  And so was Mr. Singer.  He knew John had never put a cent in a coach's pocket, and he knew John would never agree to do that.

That's why I want to call your attention to -- look how much they played tapes of and they talk about people that John never met, that John never agreed to do anything with, that did cheating on tests and other things that John never did.  Why are they bringing in Janavs, and Isackson.

Isackson, isn't he a creep?  A rich, arrogant guy who gets caught and then does anything the government wants him to do to try to keep himself and his wife out of jail.

With that as a context for my remarks, I'd now like to

1   review the evidence in this case in three sections.

2       First, Johnny's application to USC and John's

3   eight-year relationship with Mr. Singer as a trusted family

4   advisor.

5       Second, John's 2014 tax return.

6       And third, the 2018 tape recordings and other

7   communications.

8       You heard from Jeff DeMaio how John had a great

9   relationship with Ayco, the Goldman Sachs company.  It's a

12:23 10   world renowned tax adviser.  It's a place known for integrity,

11   for quality, for conservatism, the type of place you can rely

12   on and have security in what they do.

13       They provide teams to help high-level executives

14   manage their overscheduled lives.

15       Mr. DeMaio worked on the will and trust where John set

16   up $5 million to go to scholarships for kids at Rensselaer and

17   Harvard whose parents did not go to college, who wanted to

18   study science and math and who had a B average, people that

19   John identified with.

12:23 20       And in addition to setting up this $5 million worth of

21   trust, you heard how he discussed a college counselor with him

22   and Jeff DeMaio recommended Rick Singer because he was one of

23   the best in California.

24       This is the guy that advised Steve Jobs, the founder

25   of Apple; Joe Montana, the Hall of Fame quarterback; various

executives at Disney; Under Armour; PIMCO, and many of the most
respected businesses in the country.

No one was looking for a shortcut when they introduced
John to Rick Singer.

And Rick Singer did a great job for the family for
three years.  The tutors worked with Johnny and he got a 29 on
the ACT, which puts him right in the middle 50 percent for
non-athletes being admitted to USC.  His board scores were good
enough without any athletic consideration for admission to USC.

His grades were from a school that was very tough and
he took a lot of AP courses, so his grades were treated as like
a 3.87 because of the rigor of the classes he took.

You'll recall John e-mailed Mr. Singer twice about the
ACT scores, and you see from the tapes, John is very fixated on
the kids' scores, their tutoring, what numbers they're getting,
what the schools expect.

And then John goes to Amsterdam in 2012 to work in
Europe, and he leaves Johnny behind.  And Johnny is there after
the wife and daughters leave living with friends.

What does he do?  He asks Rick Singer to check in on
him, to go visit him, to see how he's doing, to keep him on
track with school, to keep him on track with practice.

Do you ask a con man, a fraudster, somebody you know
is a cheat, to check in on your child, the most precious thing
in your life, or do you ask somebody you trust, you respect to

1    do that work, not somebody who is running a major national

2    criminal enterprise.

3         In 2014, USC was taking a large class of red shirt

4    walk-ons for its water polo team.  A lot of athletes had

5    graduated and several had quit after the death of a teammate.

6    They recruited over 20 candidates and 13 were red shirts.  Most

7    were like Andrew Mericle and Johnny, red shirts who had talent

8    but needed time to develop.

9         Remember what Rebecca Chassin said:  The Subco

12:26 10   deferred to the coaches to pick who they wanted to bring in.

11   The Subco mainly was concerned about academic issues.  Johnny

12   was number three in the Subco class for water polo, academics

13   were not an issue.

14        And so what did the government do?  They called Casey

15   Moon.  But let's look at what Casey Moon had to say compared to

16   Johnny's high school coach.

17        Casey Moon gave the list of issues that they looked

18   for, and what did Bowen say?  Bowen was probably the most

19   scrupulously honest witness you had in this whole trial.  You

12:26 20   saw how careful he was, how thoughtful he was.  He didn't want

21   to overstate anything.  He's a grinder with an A-plus speed.

22   If there's one characteristic that's going to catch a water

23   polo coach's eye, if a candidate has A-plus speed and a great

24   work ethic, that's someone worth having as a red shirt on the

25   team to see if you can develop.

1        Johnny wasn't as fast as James Walters, but he was
2   close, and a kid with that speed, with that unassuming grinding
3   work ethic of doing what the coach told him and never
4   complaining is a reasonable person to apply to USC.  Bowen, one
5   of the best high school coaches in the country, supported the
6   application and thought he'd fit in with the team.

7        What did Moon say?  He doesn't remember him.  He
8   thought he had quit the team.  After the first day, he knew
9   nothing about that.  Sounds like Moon was well prepared by the
10  USC lawyers.

11       But what did you hear from Mr. Mericle and what did
12  you hear from Mr. Walters?  He came, he practiced, he was fast,
13  he kept up with the team.  He got a concussion outside of
14  practice, and he still came to practice and tried to swim, and
15  he got so sick they had to take him to the hospital.  And
16  Walters remembers it because he cleaned up the vomit in the car
17  later that night.

18       Now, maybe Casey Moon doesn't remember that and
19  doesn't remember what Mericle and Walters testified to, that
20  Johnny was there after he recovered from the worst parts of the
21  concussion, that he was there with the injured players doing
22  all the things during the season, he was with the team
23  continually, and at the end of the season, he was cleared to
24  get back in the pool and starting out with non-contact work but
25  swimming.

1          He was part of the team the whole season.  Why do they
2     put on a coach who's going to say something that's so contrary
3     to what the teammates will say?

4          If we could have the next slide, please.

5          And you have Coach Bowen.  Read his -- remember his
6     testimony.  Look at the slide, what it says here.  He tells you
7     he was good enough to be on that team, there was nothing
8     inappropriate about recruiting Johnny for that team.  He had
9     A-plus speed, he had a great work ethic and a great attitude.

12:29 10          The government's whole case really turns on Exhibit
11     88, the profile Mr. Singer submitted to USC.

12          They have to prove John knew the profile was false,
13     knew Singer submitted it, and they have to prove that Vavic
14     relied on it knowing it was false, that Vavic was part of the
15     fraud.

16          They can't show that at all, and they certainly can't
17     prove that beyond a reasonable doubt.

18          First, it's undisputed, John didn't supply any
19     information in that profile, 88, other than the photograph,
12:29 20     which is a genuine photograph.

21          Second, Mr. Singer gave his own false information to
22     Joel Margulies and asked him to write up the profile.

23          So what does the government do?  They cite Exhibit 83.
24     Please write that down and look at it when you're in the jury
25     room.  You know, that's the embellished e-mail.  Jovan has

1    Johnny's stuff and asked me to embellish his profile.

2         Look at John Wilson's response.  He isn't talking

3    about the content of the embellished profile.  He's saying,

4    When is the application going to be done?  When is the profile

5    going to be done?  When is the date you're going things

6    completed?  No discussion of the content.

7         And when he refers to the profile, Singer responds to

8    him in Exhibit 83 on page 3:  "The profile, I am assuming you

9    are speaking about Naviance.  I've attached the comment to

12:30 10   Naviance, filled in schools, et cetera."

11        John responds to his comment on a profile being

12   embellished and Singer, for some reason, changes it to a

13   Naviance profile, not a sports profile.

14        There's nothing to put him on notice that

15   "embellished" means something sinister.

16        "Embellished" has two definitions in the dictionary.

17   You can make something look better.  There's embellished blue

18   jeans, you put little embroidery and sparkle on them, that's

19   not a fraud.  Or it can be used to exaggerate things

12:31 20   incorrectly.  But do you think that your trusted family adviser

21   that you trust with your kids is going to use "embellish" in a

22   fraudulent way without any forewarning or without any notice?

23   It's not a good inference.

24        You know, in the law we have a phrase to use when the

25   government tries to rely on a word that has two meanings and

1        can't show which one applies.  We call that reasonable doubt.

2               If there's two different ways to define "embellish"

3        properly and they have no reason to show that the bad one is

4        known to John and understood by John, that is reasonable doubt.

5               The next issue is they cite Exhibit 49.  And that's

6        where John's, you know, asked what exactly would Johnny have to

7        do on the team, what is to be expected.  This is March 27th,

8        before the plan visit to see Vavic and meet the USC team the

9        first week of April.

12:31  10               And so John does have some concerns.  You've heard

11        they had some hulking European guys that are 21-year-old

12        freshmen.  But they also have a bunch of red shirts like Andrew

13        Mericle where Johnny would fit in perfectly.

14               So what does Singer tell him?

15               "They have 42 guys, 20 do not travel but practice, he

16        will be fine.  Bench warming on the fourth time in a row

17        national champion is not bad as a freshman."

18               And what does John say?

19               "I would love him to actually be committed and give it

12:32  20        his best.  I don't want to taint his meeting with USC coach."

21               It's a father's normal concerns and questions, and

22        Rick Singer, for once, tells the truth and gives him an honest

23        explanation.

24               Now, Mr. Frank said something that is flatly wrong,

25        and I suggest he knows the evidence that contradicts what he

1    said.

2         It's Exhibits -- I ask you to write them down -- 711

3    and the 9698.  Those are the e-mails, you may remember, they

4    put 711 before Agent Brown and tried to create the impression

5    that the meeting between John and Mr. Singer when John is

6    flying home from Amsterdam was going to be scheduled for 3:30

7    on Sunday.

8         We had to put in Exhibit 9698, which is the mirror

9    image e-mail, one is from Singer's e-mail set, the other is

12:33 10   from Wilson's e-mail set.  What 9698 shows, which you may

11   remember and Agent Brown testified, is that the dates don't

12   line up.  We have a European date and an American date.

13        So Mr. Frank is trying to make it look like the

14   meeting was on Sunday, but if you look at 9698, you'll remember

15   that the meeting was on Saturday before the profile was sent to

16   John Wilson, before the profile I think was even sent to

17   Mr. Singer.

18        So what is the point of that?  There was no meeting

19   between the two of them when the profile had been sent to John

12:33 20   Wilson.  There's no reason to think that they sat down and

21   discussed it.

22        He does send the e-mail on October 19 with an FYI.

23   John never responds.  And you know when it comes to his

24   children, John sends text messages, he sends e-mails, he is on

25   top of anything Singer sends him.  He's back and forth, back

and forth.  You'll see in the September call Singer even teases

him that he gets so many text messages from John.

There is zero response to the profile, not an e-mail,

not a text message, not a reference to a phone call.  And why

is that so important?

If we could have the profile, please.

There were too many errors in there for John to have

missed if he had read it.  It's got his wrong -- first of all,

it's got the wrong SAT scores.  It doesn't have the 29 ACT.

That's what John was e-mailing Singer about, calling out

percentile, celebrating the 29 is the 93rd percentile.  That's

a magic number for USC admissions.  It puts him in the middle

50 percent.

It lists Jack Bowen as a Stanford coach when he's not.

It doesn't list Jack Bowen's SoPen club, and it has the wrong

street address.  It doesn't have the Alcatraz swim that's a

very big thing in the Wilson family.

The point being, if John Wilson had seen this, he

would have recognized at least one of these errors.  He

probably would have recognized all of these errors, and he

wasn't going to let it go out without correcting errors.

And it doesn't have a lot of the true credentials that

Johnny has.  Johnny is somebody who got CCS recognitions.  He

got all-league recognitions both before and after the date of

this e-mail.  You know, Johnny's credentials are not as good as

on that profile, but they're good enough to get into USC with
Jack Bowen's support.

You heard Casey Moon say if Jack Bowen supported
somebody, that would be a substantial impact on USC recruiting.
And you heard Jack Bowen testify he spoke to probably Coach
Pinterik, maybe Coach Moon, and he was very supportive of
Johnny going to USC, A-plus speed, great work ethic, a real
grinder.  He supported Johnny getting in.

So bottom line, that creates, I suggest, substantial
reasonable doubt that John ever saw it, that he would let
something go out with so many obvious errors that -- and
particularly the ACT scores.  It hurts him to put the lower SAT
on the document without the higher SAT.  There would be no
reason to do that.  There would be no reason to put Jack Bowen
down for a club that he doesn't coach.

Finally -- so when you look at the evidence, keep in
mind the Wilson family has no secrets.  They took every e-mail
the family had over a five-year period, they grabbed all their
tax returns.  They wire-tapped, they had recordings.  They put
a vacuum cleaner on this family's communications and data, and
they haven't come up with anything better.  They haven't come
up with a single response or comment on that profile.  If they
had a document, you know that they would have brought it to you
and shown you something to corroborate that.

The last comment I want to say of that profile is the

government showed Exhibit 712 during Agent Brown's testimony.
It shows that on October 19, about two -- about an hour after
the profile was sent to John, he sent out an e-mail that had
the same picture of the profile.  The government didn't put in
the exhibits, a week later we did, 9901, 9899, and 9902.  The
government didn't want you to see those.  They wanted you to
think there was something special about that e-mail on October
19 with the photo in it from John.  It was part of a whole
series of correspondence about the yearbook page they were
purchasing for Johnny and looking for pictures, wholly
unrelated to the issue of the profile.

        And so perhaps the most damning thing and the greatest
source of reasonable doubt on the profile is what happened in
2018.  Think of it from the prosecutor's perspective.  Singer
agrees to be their informant.  They can have him talk to
whoever they want.  They can have him talk as many times as
they want.  They can have them say whatever they want.  For
lots of parents, they had Singer discuss bad acts in the past,
fraudulent things, Isackson, Kaplan, others.

        Can we have slide 11, please.

        But with respect to John Wilson, they never asked him
anything about Johnny's profile.  They never asked him anything
about false credentials to USC.  All those tapes, all those
text messages, everything that occurred during 2018, not a
reference once to Johnny's profile, to false credentials, to a

1    bribe to Vavic.  They avoided that topic like the plague, and

2    they did it because Singer was so adamant, Wilson never thought

3    he was giving a bribe, he always thought it was a donation.

4    The kid was a real polo player who played.

5         You know, they could have just settled this whole case

6    with one question about that profile in all their tapes.  They

7    didn't leave it out by mistake.  They didn't leave it out

8    because they didn't have budget.  They left it out because they

9    knew they would get an answer that they didn't want, an answer

10   that would be showing innocence, not guilt.

11        And even in Exhibit 620, they take Coach Vavic, they

12   have Singer call Vavic.  Again, they don't mention anything

13   about Johnny Wilson to Vavic.  If they thought they were going

14   to catch a fish, don't you think they'd try?

15        Coach Vavic, remember that thing we did for Johnny

16   Wilson?  Not much of a kid and he never showed up and it was a

17   good thing you got the money for your quid pro quo.

18        They said nothing about John Wilson to Vavic.  We have

19   a expression in the legal community when the government avoids

20   asking a question that could lead to an innocent statement:

21   reasonable doubt.

22        If they thought they could get anything of John Wilson

23   on that profile, don't you think they would have asked Vavic or

24   Wilson sometime during those tapes?  It's the most basic issue

25   in this case, it's the most important issue for them, and they

1    didn't even try.

2         In sum, if the government cannot prove beyond a

3    reasonable doubt that John knew Mr. Singer had exaggerated or

4    lied about Johnny's credentials, then Mr. Wilson had no reason

5    to believe Coach Vavic had done anything wrong.  There's no

6    theft of honest services, there's no deception of the Subco

7    that he'd be aware of, and there's no reason to think that

8    Mr. Singer is committing bribery.

9         Now I want to turn to the issue of the tax returns.

12:41 10        What happens, Singer tells John he wants to pay the

11   money through Singer's organizations.  You know he always does

12   that.  Oh, there won't be publicity, your kid won't find out.

13        John has a Sub S corporation, he can take the money

14   out of that, you've heard enough testimony.  A Sub S means

15   it's, in effect, his money for tax purposes.  There's no

16   skimming out of a corporate account.

17        We gave you Exhibit I think it's 122 that shows John

18   had $2 million in a Sub S corporation.  Anybody who ever

19   manages cash knows you go to the account where the cash is if

12:41 20   you need it.

21        So he says -- what does he say to Singer?  Send me a

22   receipt for consulting or whatever.  He doesn't care what it's

23   called, whatever.  He needs a receipt when he's in Europe to

24   give Debbie Rogers to direct where the money should be

25   transferred, $220,000 out of the Sub S corporation.  It's a

receipt for accounting purposes, not tax purposes.

The only way the government can prove a tax offense is they have to make a particularly high standard that Judge Gorton will instruct you on.  Taxes are complicated.  People make mistakes all the time on a tax return.  In order to make a mistake something criminal, they have to prove more than it's a mistake.  They have to show it's a violation of a known legal duty.  That's a higher level standard of intent than any other charge in this case, a violation of a known legal duty.  They have to show that John actually knew he had paid a bribe for $220,000, that he was not entitled to deduct that, and he purposefully put it on his tax return deducting it knowing that he was not entitled to do so.

If there is negligence or there's mistake, the IRS can go chase him for money in a civil audit, but to make a criminal tax case, they have to show there was a violation of a known legal duty.

What do we know?  John filed five different tax returns in 2014:  Holland, California, the U.S., HPC, everything.  He had to file amended returns for several of those years.  He probably filed nine tax returns for 2014, several hundred pages long.  He had the finest tax preparers you could find doing the work.

So what happened?

If we could show slide 12, please.

1       John's going to give $100,000 to The Key Foundation,

2  and he does.  He's going to give -- excuse me, going to give

3  $120,000 to The Key Foundation that's going to be used for the

4  benefit of the USC team.  They admit, that's the money Singer

5  stole, John had no idea about it.  And he gives $100,000 to The

6  Key.

7       If we could have the next slide, please.

8       He gets a thank you -- what happens is, he steals the

9  money, he gets a thank you note from USC, the Trojan Athletic

12:44 10  Fund.  He gets a thank you note from The Key Worldwide

11  Foundation.

12       And look at the check that's being used that was

13  invoiced through the expression of consulting.  It's paid to

14  the order of USC men's water polo from the Wilson family.  And

15  he gets a thank you letter.

16       There would be no purpose to intentionally and falsely

17  report this on a tax return as a business expense if you could

18  take it as a charitable deduction.

19       The issue of motive is critical on this tax issue.

12:44 20       There was no tax saving or benefit to John to have it

21  recorded as a business deduction when it was simply a

22  charitable contribution paid to USC with a thank you note from

23  USC.

24       You remember the agent testified that because of some

25  calculation issues it actually might result in a saving of

1    $1,425 on a tax bill that was $966,000.

2         Now, during that year, John missed his deduction for

3    the HPC office rent, he overpaid the California income tax and

4    had to get refunds for $500,000 years later.  What that shows

5    is John's not real attentive to his taxes.  He makes mistakes.

6    He was in Europe running around as a CEO of a major company,

7    and he made some errors.  It doesn't allow him to make false

8    statements, but it explains that something is not a violation

9    of a known legal duty.

12:45 10        It was a mistake a busy executive who was not

11   following -- could we have the next slide, please -- what was

12   going on.

13        $20,000 of it, that was for expenses.  And you know it

14   was for expenses because in the 2018 tapes, Singer and Wilson

15   specifically discuss Singer was never personally paid for any

16   work for Johnny's donation.  Singer may have taken that $20,000

17   for himself, but John thought it was for expenses.  He never

18   knew it was a payment to Singer.  That's why he keeps saying:

19   You don't get paid for this.  You just do it for your $7,000 a

12:46 20   year fee.  Take my Harvard Business School advice, I can tell

21   you how you can make a better cost and production out of this

22   national business that you're running.

23        If we could have the next slide, please.

24        And the next one after that, please.

25        Okay.  And you can see, Debbie Rogers is the one who's

doing the paperwork on the invoices.  None of the invoices the government focuses on were ever sent to John.  It was all done by Debbie in California when John is working in Europe.  He's delegated it to his bookkeeper.

And what do we see?

If we could have the full slide, please.

He asked her to deal with Singer's bookkeeper to do it, and then the green is all the sort of tax preparation work done by tax preparers that John's not involved in.

If we could have the next slide, please.

The whole problem was, and you heard James Nahmes testify, every year Nahmes cleans up the books at HPC.  He would go through the audit work and he would reclassify all the entries.  You may remember we went through his work papers, Exhibit 134, and these papers you see are the 61 corrections he made in 2014 to the accounting entries in HPC's books.  And he testified if somebody had had a copy of that Trojan fund thank you letter in the records, it would have raised questions, he would have run it down, and he would have classified it properly.

Debbie sent a copy of it to John, she did not send a copy of it to Nahmes.  It was an oversight.

The same year Mr. Nahmes testified he had to reconcile a $50,000 charitable contribution to Autism Speaks because of paperwork issues.  It's something he did every year.  This one

1    got overlooked.

2          And you may be skeptical, why this one gets

3    overlooked, this one is the one the government says is the most

4    suspicious.  My response is, what is the motive?  There's no

5    tax benefit to calling this a business deduction when it can so

6    easily be called a charitable deduction.

7          And we know that the only way the government can show

8    that there is a crime, that there's a known violation of a

9    legal duty is if they can show that John actually thought it

12:48 10   was a bribe, knew he couldn't deduct it, and falsely described

11   it on his tax return.  That's the violation of the known legal

12   duty that Agent Ranahan was trying to testify to.

13         But the problem is that conflicts directly with what

14   Agent Keating told us, that Singer kept on telling the

15   government John always thought it was a donation.

16         It's unambiguous, it's undisputed, they

17   repeatedly told -- Singer repeatedly told the government John

18   always thought it was a donation.

19         And what does that mean?  There's no intentional

12:49 20   violation of a known legal duty.  There may be a mistake.  The

21   IRS can bring a civil audit and collect money.  But to have

22   that high level of intent necessary for a criminal tax charge,

23   if John believes it's a donation and doesn't think that it's a

24   bribe, then they cannot show a violation of a known legal duty.

25         And so now we want to turn to the issue of the tapes

1   that were made in 2018 and that give rise to the claim of

2   violations involving Stanford and Harvard.

3        The prosecutors charge John with eight felony counts,

4   a lot more than Bruce Isackson ever faced, Mikaela Sanford,

5   Laura Janke.  Five of these counts are solely about discussions

6   in the consensual phone calls and text messages in 2018.  And

7   the question for you is:  Did Rick Singer con, manipulate, and

8   deceive John only one time when he stole the $120,000 or did he

9   do it twice?

12:50  10        The best evidence that Mr. Singer had conned John

11   about USC comes from Singer's and John's own words.  Mr. Singer

12   was emphatic in his notes, that's Exhibit 13, which you've seen

13   many times.  John was a real player who played.  He always told

14   John that he gave a donation to a program, not a coach.

15        You can see how sincerely John believed Mr. Singer

16   from the wiretap communications before September 21.

17        Mr. Frank focused on that September 15 call.  Let's

18   start out with the text messages before that, September 6 or 7,

19   where Mr. Singer is saying, I'm coming to meeting the president

12:51  20   of Harvard and Tufts.

21        If they're part of a nationwide fraud, if John is a

22   cynical crook like Bruce Isackson or a cynical guy like Gordon

23   Kaplan, you need to lie to him and get the credibility that

24   you're meeting the presidents of Harvard and Tufts to try to

25   get him to do business with you?

1          Look at the September 15 call.

2          Mr. Singer -- whatever Mr. Singer says, what does John

3    say?  When they talk about his daughter doing crew, John is

4    talking about, Well, they're going to have to get good times.

5    He's talking about what could they realistically expect they'll

6    get for erg scores to show a coach.  He's not talking about

7    falsifying anything.

8          At some point they're talking about being a manager of

9    the team, and John says in many of the tapes, Well, you know,

12:51 10   the one who's a sailor should go to Stanford because she'll

11   know how to be the sailing manager.

12         The little clip that Mr. Frank showed you of him

13   saying a mascot or water boy, he cut off the bottom where they

14   said a manager.  Maybe they bantered about what it would be,

15   but it's repeatedly discussed as being a manager and that the

16   girl who is best equipped to do sailing would be appropriate

17   for Stanford because she would know how to be a manager of a

18   team.

19         How do we know that that's realistic?  Look at

12:52 20   Singer's website.  Do you see -- remember the two testimonials

21   from the two students at UT Austin and SMU thanking Singer for

22   arranging them to be a manager of teams at their colleges?

23         It's not a made-up story.  That was a standard part of

24   what Singer did.

25         Listen to the entire September 15 tape.  Listen to

what John says and you'll see John is not proposing to falsify credentials, to falsify records.  Singer makes a flip comment or two, but it's not John's statements.

Also look at the October 15 and the November 29 calls where John talks about they don't have to be athletes.

Can we have the next slide, please.

Perhaps one of the most compelling things is 10 times during this three months' period John is offering Singer business in how he can make more money.  It's a little bit comical I will admit, but that is what John's perspective, he can give Singer better advice on how to run his business.

He talks about a pricing model, added service fees, manage your overall pricing.  He's talking to him like he runs a legitimate business.  Seven hundred side doors at 50 schools around the country.  This man has an amazing network of connections, he ought to run it like a proper business and make some money on it and not do it for free like John thinks he's done it for John Wilson.

John is not having conversations like Gordon Kaplan or Janavs or the others about controlling a room or falsifying or lying to the IRS or challenging an audit.

And when we pressed Agent Keating about that, why didn't you treat John like the other parents?  Why did you have conversations that were not explicit, that do not ensure clear evidence?  She said, Well, you know, we were concerned that if

1    we did it that way, John would realize Singer was under

2    investigation and it would spook him and scare him off.  That's

3    made up, wholly made up.

4         Do you think John would ever think that the guy he

5    trusted with his teenage children was going to be under

6    investigation?  He simply would have said, No.

7         And to be honest, it doesn't matter what excuse the

8    government comes up with.  It doesn't matter what sort of

9    rationalization they have.  They purposefully treated John

12:54 10   differently.  They never asked him an explicit question, they

11   allowed Singer for three months to keep him talking, the

12   president of Harvard, reading admission files at the admissions

13   offices at Harvard and other schools, you know, pricing for

14   this, donation, donation, donation.

15        And what's the issue?  Once in a while he can slip in

16   a little word, he can say donation, donation ten times in a row

17   and then slip in something like, Oh, a real sailor, and if John

18   doesn't catch him every time, that's not an agreement to join a

19   conspiracy.  That means they know how to play with him.  A

12:55 20   great con man and a bunch of agents can play with a guy and

21   never give him a straight-up, direct question.  Do you want to

22   join the conspiracy?  Do you want us to control the room and

23   cheat, like they said to Gordon Kaplan?  Do you want us to

24   create fake profiles, like they said to Bruce Isackson?  Or do

25   they keep on saying, you know, it's legit, it's legal, we'll

discuss pricing later.  The president this, the president of

Brown, the president of Harvard, reading at the files, and then

slip in a little word.

That doesn't show an agreement.  That doesn't show

somebody willfully on his own words on his own behavior joining

a criminal conspiracy.

I suggest to you if Rick Singer and the FBI and the

IRS targeted anybody to play games with, and there was an

eight-year relationship of trust and respect and reliance and

12:56 affection and friendship, they could slip in a few words on

anybody.

They never made it a drop dead, easy, clearcut

question:  Do you want to join a criminal conspiracy?  Yes,

they could use different words.  We've got to pay the coach

some cash.  The coach needs money for a mortgage.  The coach

wants to go on vacation.  We're going to have to falsify the

credentials, is that okay with you?

They never once put it in those terms.

If I could have the next slide, please.

12:56 The payment to the coach, is there a better example

than that?  What did they say?  First of all, they say you

can't use the word "bribe."  Tell him you want to pay a coach.

So what does Singer do?  We got to pay the coach in the school.

And Wilson responds, "I thought you paid the school.

What do you want me to pay the school for?"

1          And then later when the issue comes up, he says,

2     "Well, the side door has rules and procedures.  If they wanted

3     to make John pick which side he was on, did he want to join a

4     criminal conspiracy or was he going to keep on doing what he

5     thought, just making a donation that was legal and lawful, they

6     should have given him a straightforward choice.  They shouldn't

7     be sort of sneaking around, reassuring him constantly and then

8     every once in a while slip in a little word.

9          We've all had friendships, relationships that go eight

12:57 10     years where we trust people, maybe it's a doctor, maybe it's a

11     car mechanic, maybe it's anybody you deal with at work.  But if

12     you have someone you trust who's been good to your family and

13     you respect for eight years, if they say an oddball comment, if

14     they say something inappropriate, what do you do?  You go back

15     to the eight years of relationship you've had.

16          Remember what Agent Keating said:  We kept on trying

17     to get him to say things more explicit but he'd always go back

18     to the way he had done things in the past, talking about

19     donation, treating it as legal.

12:58 20          Well, don't you think John Wilson did the same?  Don't

21     you think John Wilson was in an eight-year relationship and an

22     eight-year type of communication and set of expectations and

23     didn't have his antenna up?

24          And so why would you expect him to be looking for the

25     one phrase here or there when Singer was constantly reassuring

him?

Here are some of the excerpts we've given you.

Yes, Singer says on October 15th, "I can sell them to somebody.  They're athletic enough to be able to take them."

But then look at all the things on the other side.

"And they don't actually have to do the sport, you're saying?"  Wilson is asking questions, he's not conspiring.

"They can just go and be like the score keeper or water boy or water girl."  Singer says, "Manager, or whatever you want to call them."

Manager, those things, that's what Mr. Frank cut out of the stuff he was showing you, the discussion that they're actually discussing.  They can be manager of the team.

John is never saying, What do I have to make up?  What time are we going to falsify for the erg scores?  What are we going to falsify for this?

And he's saying even though they wouldn't play, he's asking that, he's confirming that.  He's not conspiring with it.

If we could have the next slide, please.

Yes, he has to recruit some real sailors so that Stanford doesn't catch on.  It slipped by John, what can I say? It's not a good phrase, it's not a good expression, but I suggest to you there's not enough notice and intent and discussion and awareness to say that someone joins a criminal

1    conspiracy because somebody purposefully slips in that phrase

2    amidst all of the other discussions of Harvard approving it,

3    the president of Brown, the president of Tufts, reading

4    admission folders.

5            And if we could go to the next slide, please.

6            And here is him telling him why he has to keep it a

7    secret.  "So you don't get hounded for more donations."  And

8    Singer says, "Don't go to development."

9            This, I think, is perhaps one of the most important

01:00 10   calls because the one on the bottom occurs on January 3rd,

11   after the money has been paid.

12           Look at the highlighted.  "I've had families before

13   that essentially have gone through the side door and then

14   because people found out who they were, the development office

15   calls them, admissions will call them, all trying to get, you

16   know, donations."

17           And then you go further down.  "Then people start

18   saying on the athletic side that since we're going through the

19   side door and you've already made, you know, two $500,000

01:01 20   contributions, they're going to say so, you know, so why are

21   you going through athletics, you know, when development has

22   already been talking to you?"

23           Could we have the next slide, please.

24           This is what the government wants us to think John

25   Wilson was thinking.

1          Look at the left side.  Their story is Mr. Singer is

2     telling him, "Don't tell them about the bribe you just paid

3     because they'll come back and development will ask for

4     legitimate donations."

5          It's ridiculous.

6          Look at the blue side.

7          What are they telling him on January 3rd to further

8     mislead him that it's a legitimate operation?

9          "Don't tell them about the donation you've made

01:01 10   through the side door, a legitimate donation, they will ask for

11     more donations and they will come after you."

12          Why is Singer spinning that story on January 3rd?

13          And more importantly, as Agent Keating told us, why

14     did they never correct it?

15          Do you remember how many times I asked her -- I was

16     probably a bit redundant but I had to make the point -- why

17     didn't you ever correct any of the lulling stories that

18     Mr. Singer said?  Why didn't you ever go in and tell John,

19     "John, this is not authorized by the presidents of

01:02 20   universities.  John, this is not a charitable contribution.

21     John, you didn't make a donation in years past, it was a

22     bribe."

23          Why didn't they ever sort of undo the things that

24     Singer was saying?

25          Keating tried to disown Singer.  You may remember she

said, "We wanted him to be more explicit but he wouldn't listen

us."

My first question is:  Who runs the investigation?  Is

it the FBI or is it Mr. Singer?  Or was it, more importantly,

they liked what Singer was doing?  They wanted Singer to give

the lulling stories because John could fall asleep and they

could slip in a word here or there.  Because if Singer had ever

said to John, "John, I got to admit, we've been friends for

eight years, I'm sorry, John, but the president of Harvard

doesn't approve this, I'm going to have to grease somebody and

bribe somebody, the president of Harvard has nothing to do with

this," what do you think the answer they would have gotten from

John?  And why do you think they didn't ask that question?  And

why do you think they kept so much stuff out of their reports

that Singer told them?

You know, the notes we have, that's from an October

1st phone call that they had with Singer when they yelled at

him over the September 29th phone call with John Wilson.  Why

do you think they sort of danced this fine line, slip in a word

but never tell John what's really going on?

Is that proof beyond a reasonable doubt?  Is that sort

of ensuring explicit statements where there will be no doubt

about a person's intent?  Or is that just manipulating the same

chump that Singer has been manipulating for the last eight

years?

1          I'd like to quickly finish up.

2          With respect to the witnesses, I talked about Chassin.

3    You know, she's not the boss, she doesn't talk to anybody.

4    They picked her because she knew nothing.

5          What do we say about Casey Moon?  He doesn't know

6    anything, that's why he was picked.  Either he doesn't know

7    anything or he'll say he doesn't know anything.  He's the guy

8    that prepared the witness -- the athletic profile that had the

9    times they say were so obviously unrealistic anybody should

01:04 10   know.  Casey Moon is the guy that typed that up.  Casey Moon is

11   the guy that typed up he's the number 10 attacker in the

12   country when Casey Moon knows who the top ten attackers are in

13   the country.

14         What's going on with Casey Moon?  I'm not sure.  USC

15   wants to deny any knowledge of anything, wants to pretend they

16   have a pristine clean admissions process.

17         The bottom line is, when Casey Moon says Johnny was

18   not there after the first day, we know that's not true, and

19   that's what they called to bring him in for.  Anything else

01:05 20   they say about Casey Moon is a retreat from their original

21   position.  They brought Casey Moon in to say he wasn't there.

22         Remember they showed him that September 10 document

23   when Johnny wasn't responding to the e-mails?  That's when he's

24   in the dark room and he can't get out and he finally responds.

25   I put in the document that has the response.  They just leave

1  it like Casey Moon never got an answer from Johnny on getting

2  his stuff for NCAA clearance.

3          You heard the testimony.  He's sitting in a

4  blacked-out room and he can't use the computer.  They had both

5  of those documents.  Why did they give you the one that didn't

6  have Johnny's answer?

7          I'd like to now go into the issue of the indictment.

8  There is two conspiracy counts against us: conspiracy to commit

9  mail, wire, property and fraud and honest services; and

01:06 10  conspiracy to commit federal program bribery related to USC.

11          Count One is this big, national conspiracy.  That

12  means to convict John of Count One, you've got to find he

13  agreed, shown by his own words and his own actions, to conspire

14  with Janavs, Kaplan, Bruce Isackson, test cheating, taking

15  classes for people, things he didn't know about, things he

16  never heard about, things that were never within the scope of

17  his agreement or knowledge or intent.

18          In order to show him guilty of any of these charges,

19  the government has to show that he acted willfully.

01:06 20          The judge will instruct you "willfully" means to act

21  voluntarily and intelligently and with the specific intent that

22  the underlying crime be committed.

23          Do you think John acted with the specific intent for

24  this nationwide conspiracy to be committed?

25          That's to say he acted with a bad purpose, either to

disobey or disregard the law.  If the government fails to prove

beyond a reasonable doubt that John was acting in bad faith

with the intent to disobey the law, then you must find him not

guilty as to each of the charges.

That makes sense.  Before someone can face serious

consequences of being found guilty of a felony, you have to

decide beyond a reasonable doubt that he truly intended to

commit the crime.

It's not enough if you think John should have been

shrewder.  Look, let's face it, John was the math nerd in high

school.  He wasn't the guy who was the cool kid or the street

smart kid.  He's an engineer, a guy whose life is math and

taking standardized tests and making his kids take standardized

tests.  So you've got to stand in his shoes.  It's not enough

if you think he was gullible or too trusting.  He certainly

was.  But you have to show that he intended and knowingly and

wanted to join a criminal conspiracy.

He didn't act out of ignorance, accident or mistake.

You have to find that he acted willfully, knowingly or

corruptly.

Count One is the conspiracy charge we've just

discussed.

Count One has two separate parts.  One is a property

fraud and the other is honest services fraud.  The government

hasn't proven either beyond a reasonable doubt.

1          Honest services fraud would mean he had to corrupt

2     Vavic and intentionally done so.

3          Property fraud would mean he had to have known that

4     that profile was fraudulent, that he was going to get some

5     property out of the school.

6          To prove mail fraud or wire fraud with regard to

7     property, they have to prove each of these elements.  John

8     entered a scheme to cheat a university out of its property.

9     It's clear Singer said he was there to make donations.  That

01:09 10    alone ends the issue.

11          In terms of whether any misrepresentation was

12    material, the government has to prove beyond a reasonable doubt

13    that if the Subco had been presented with an accurate profile

14    for Johnny Wilson, they would have not let him in.  The Subco

15    deferred to the coaches' decisions, they would have let him in.

16    He had the academic standards, he had the athletic abilities.

17    Maybe he wasn't A-plus in every category, but you heard Bowen,

18    he was A-plus in speed, and that's going to catch the eye of a

19    good college coach, including a USC coach.

01:09 20         He fit in with the team, he was able to keep up at

21    practices.  He clearly belonged to get in.

22          With respect to John's daughters, the government

23    hasn't proven any misstatement.  John never said, "We're going

24    to file a false profile.  We're going to fake some times.

25    We're going to pull things off the internet and give some

1  regattas and titles and championships."

2        All you had was Singer slipping things in here and

3  there without John ever agreeing that he was going to defraud

4  Harvard or Stanford.

5        The heart of the claim is whether John knowingly and

6  willfully participated in a scheme to defraud a university,

7  that he knew false information would be presented for Johnny,

8  and he intended to break the law by doing so.

9        Where does the government have evidence here?  The

01:10 10  embellished e-mail, that's reasonable doubt.  An e-mail that

11  was sent to him that had all the errors he didn't correct,

12  that's zero evidence.

13        For honest services, they have to show he participated

14  in a scheme to defraud the university of the honest services of

15  its employees.  There's nothing about that with respect to

16  Harvard or Stanford.  He's not agreeing to defraud the school

17  of their honest services.

18        And you heard Rebecca Chassin's testimony.  There was

19  no limits on what Vavic could consider for admissions through

01:10 20  Subco.  If Vavic wanted to consider a donation, he's perfectly

21  allowed to do that.

22        With respect to the bribery element of honest

23  services, we have Singer's testimony and Agent Keating.  John

24  always thought it was a donation, always thought it was a

25  donation.  That's why Singer's not testifying in this

courtroom, and that's why his notes in Exhibit 13 are so important.

Finally, the government has to prove a misrepresentation of a material fact or matter.  They haven't proved Johnny wouldn't be admitted.  Bowen, Walters, and Mericle showed that he belonged on the team as a red shirt.  He may not have been the best athlete on the team, but with his speed, his sense of the game, he was qualified enough to be a red shirt.

I don't need to go through the rest of these 6, 8, 9, 11 and 12, they are the same issues, just substantive counts.

But Count Two, the federal program bribery, they have to show John intended to bribe somebody.  And Singer's testimony -- Singer's statements repeatedly that John never intended to pay a bribe, he always thought he was giving a donation to a program, deals with each one of those briberies.

With respect to the tax charge, I've already spoken to you about that.  They have to show violation of a known legal duty.  John thought he made a donation.  He thought he could get a deduction for it.  He had all the statements from the IRS-approved charities telling him it was an approved donation.  If there's a small difference in the tax calculation, the government can get it.  But there is not proof beyond a reasonable doubt of a known violation of a known legal duty.

In sum, I'm going to finish up and thank you for your

1    time and thank the Court for its indulgence.

2         Agent Keating admitted that Singer never took back all

3    the lulling statements he had been making to John for eight

4    years.  He didn't take back the Harvard president wanting to

5    partner up with Singer, the four Goldman Sachs clamoring to do

6    side doors.  And you heard Jeff DeMaio testify John was so

7    enthusiastic about his work with Singer that he told Mr. DeMaio

8    in October 2018, You should send the Goldman clients to

9    Mr. Singer, he's got this great foundation, you should be

01:13 10   working with him.  He wanted to share the opportunities, not

11   hide it like it was a crime.

12        In sum, we appreciate your attention to this case.  We

13   ask that you find John Wilson not guilty on all of the charges.

14        Thank you very much.

15        THE COURT:  All right, jurors.  Normally we'd be

16   breaking for lunch, but we just have the rebuttal of the

17   government left, so I'm going to ask you to take a short break,

18   we'll have the rebuttal, and then I'm going excuse you for the

19   day.  Right now we'll have a ten-minute break and then come

01:13 20   back.

21        THE CLERK:  All rise for the jury.

22        (Jury exits.)

23        THE COURT:  All right, we're in recess for 10 minutes.

24        (Recess taken 1:14 p.m. to 1:27 p.m.)

25        THE CLERK:  All rise for the jury.

1              (Jury enters.)

2              THE CLERK:  Thank you.  You may be seated.

3              THE COURT:  Good afternoon, jurors.  We're ready to

4       hear the government's rebuttal.

5              Mr. Frank.

6              MR. FRANK:  Thank you, your Honor.

7              Good afternoon, ladies and gentlemen.

8              I am acutely aware as I begin that I am the only thing

9       that stands between you and your freedom from this courtroom

01:28 10      for the day and your lunch, and that is the last place any

11      lawyer wants to be.  You've been so incredibly attentive for

12      the last three-and-a-half weeks.  I'm asking you for 30 more

13      minutes of your attention before we let you go.

14             I just want to start off with a couple of quick things

15      that Mr. Kendall said right at the end of his closing argument.

16             First, he said there was no evidence of a scheme to

17      defraud Stanford or Harvard.

18             He was explicitly told he has to recruit some real

19      sailors so that Stanford doesn't catch on.  He was told that

01:29 20      twice in very slow, very plain, very clear English.  He

21      repeated it.  He has to actually recruit some real sailors.

22      Listen to that section of the tape.  It's not insignificant;

23      it's very significant.  It's clear evidence that he was told

24      Stanford was not in the loop, that the coach was doing this so

25      that Stanford wouldn't catch on.  That is honest services

1    fraud, ladies and gentlemen.

2         He told you that we haven't proved that Johnny

3    wouldn't have been admitted on his merit.  Ladies and

4    gentlemen, his own witness, Jack Bowen, sat up there on the

5    witness stand and said Johnny, for all his fondness for Johnny,

6    was a B-plus player who was recruited onto an A, A-plus team.

7    And from that witness stand Jack Bowen told you he did not

8    think Johnny would be recruited to USC for water polo.  That

9    was his own coach.

01:30 10         And Rebecca Chassin, the subcommittee member, the

11   member of the admissions department, she testified that neither

12   of these students would have made it into USC based on their

13   academic credentials if they had not been recruited athletes if

14   the subcommittee did not think that the coaches wanted them for

15   their athletic qualifications to play on those teams.  That's

16   what the Subco thought, and without that edge, without that

17   thought that these were recruited athletes, recruited onto

18   these teams for their athletic ability, that they were in that

19   highly coveted group of 200 to 250 people, almost all of whom

01:30 20   get into USC, they would not have made it.  They would have

21   been among the 85 percent of applicants to USC who don't make

22   it.

23         And then the last point I wanted to just quickly

24   address was on the tax point, that you have to somehow conclude

25   that this was a bribe in order to hold him accountable of the

tax charge, that there was no known violation of a legal duty.

Actually, that's not true.  For one thing, it was the defendant who told his assistant to bill this as business consulting.  He told her that.  He asked Singer, "Can we bill it as consulting or whatever so I can deduct it from the corporate account?"  Look at Singer's response.  He says, "Yes, I can invoice you for business consulting so that you can deduct it from your taxes."  And the defendant says, "Awesome." And then a month later he tells his assistant, "Make sure to get the invoice right so that we can deduct this as business consulting."  Whether or not you conclude it's a bribe, and for many reasons that we'll discuss you should, but whether or not you do, he is guilty of tax fraud based on those e-mails alone, taking it as a business expense when he knew it was not. Whatever he thought it was, whether he thought it was a donation, which he didn't, or whether he thought it was college counseling for his kid, you cannot deduct it from your taxes as a business expense.

And whether you pay $900,000 in taxes, which, p.s., is not what he paid that year in taxes, you can look at his tax return, or whether you pay $200,000 a year in taxes, you cannot lie on your taxes about what it is, because that obstructs and impedes the IRS in its calculation of the taxes due and owing. And whether he saved $90,000, which is what he did save by lying, or whether he saved $1,400, it doesn't matter.  He was

1    obstructing and impeding the IRS in order to save money on his

2    taxes.

3         Mr. Kendall suggested that you begin your

4    deliberations by focusing on what is not in dispute.  Now, I

5    think that is an excellent suggestion.  I encourage you to do

6    that.

7         What is not in dispute in this case is that there was

8    fraud in the admission of Sabrina Abdelaziz and Johnny Wilson.

9    There is no dispute that those athletic profiles were full of

01:33 10  lies.  There is no dispute that Sabrina's profile was totally

11   made up.  There is no dispute, in fact, the defendant's own

12   witness told you, that Johnny's profile made him look better

13   than he was.

14        There is no dispute in this case that Vavic and Heinel

15   both lied to the subcommittee on athletic admissions about

16   these two individuals.  There's no dispute about that.  You

17   actually saw what they submitted to the subcommittee and it was

18   completely false.  It was false about Sabrina Abdelaziz.  It

19   was false about Johnny Wilson.  There was no way he was one of

01:33 20  the top ten attackers in the graduating class in the in the

21   entire country, and he was not an immediate impact player.

22   Again, the defendant's own witnesses told you that.  The

23   profiles that Vavic and Heinel submitted to the subcommittee

24   were false.

25        There's no dispute that those lies worked and that

these two kids were admitted to USC because of those lies, that
Subco approved those admissions because they thought that these
were legitimate recruits for the basketball team and the water
polo team.  They believed the credentials and the
qualifications that they thought came from the coaches, and
that the students would not have been admitted otherwise.
That's what Rebecca Chassin told you.

And there is no serious dispute, ladies and gentlemen,
that Vavic and Heinel did that in exchange for the money.
Vavic got that $100,000 to the water polo team, that's why he
did it.  And later on, Singer started paying for his kids' high
school tuition, and he agreed to do it again in the future.
That is why he did it.  There's no serious dispute about that,
nor is there any serious dispute why Heinel did it.  In fact,
you heard her on tape, there can't be serious dispute about
that.  She did it in exchange for the money.  First money she
took into the women's athletic board that she oversaw, and you
saw the increase in those funds during the time of the
conspiracy and the increase in her salary over that same period
of time because she benefitted from that, from that
fund-raising that everyone thought she was doing, and next
because eventually she started taking the money personally.

So the upshot, as you begin your deliberations, what
is not seriously in dispute in this case is that there was a
fraud, that because of that fraud these kids got into USC, and

1    that the insiders did it because of the money.  That is not

2    seriously in dispute.

3         So now the only question becomes whether the

4    defendants knew and intended for that fraud to happen.

5         Well, here's what else is not in dispute:  Singer

6    e-mailed those fake profiles to both of these defendants.  The

7    fake profiles were found in the e-mail boxes of both of these

8    defendants.  It's not in dispute.  So the argument that the

9    defendants are making is that they didn't read those e-mails,

01:36 10   that it slipped by, they slipped by him.  Why?  Because, of

11   course, they can't admit that they read those e-mails.  If they

12   admit that they read the e-mails, it is game over.  It is game

13   over.  So they admit that the e-mails were sent to them because

14   they can't deny that, can they?  They admit that the e-mails

15   are in their inboxes, but they missed them.  They admit what

16   they can't deny, and they deny the one thing, the one thing

17   that they cannot admit, because if they admit that, it's game

18   over.

19        It's amazing when you think about it.  Two men, two

01:36 20   sophisticated business executives, two men who are so

21   intimately involved in getting their kids into college, they're

22   in every detail.  Mr. Kendall told you that about his client.

23   These two men on opposite sides of the world, and they both

24   missed the exact same e-mail.  They both missed it.  Think

25   about the chances of that.  They must be the two unluckiest men

in the entire world.  They must be the two unluckiest men in

the entire world to have had their kids admitted to USC as fake

athletes or based on fake athletic profiles, they both paid

hundreds of thousands of dollars to Rick Singer to get their

kids admitted to USC as athletic recruits, the fraudulent

profiles are e-mailed to them, and both of these men on

opposite sides of the world somehow missed it.  They missed

that one e-mail.  That is some incredible unbelievable bad

luck.

Of course they saw the e-mails, ladies and gentlemen.

They both used those e-mail accounts regularly.  They were

intimately involved in this process every step of the way.

Wilson was in his e-mail account within 90 minutes of receiving

the e-mail.  Yes, he was sending his wife that same photo so

they could use it in the yearbook profile, just happens to be

the same photo that was on the fake athletic profile.  But he

was in his account within 90 minutes.  And he had just been

told six days earlier that Singer was embellishing that profile

at Vavic's direction.

But the bigger point, ladies and gentlemen, is this:

Don't miss the forest for the trees.  Whether or not they saw

the e-mail doesn't actually matter.  It actually doesn't

matter.  The defendants want you to believe, they have asked

you in their closing arguments to believe that Rick Singer

perpetrated this fraud scheme totally behind their backs, that

1    they were duped, that they were not in on it, that they didn't

2    know what he was doing with those fake profiles, that he didn't

3    tell Gamal, that's what Mr. Kelly asked you to believe.

4         Here is how you know to a certainty, to a certainty

5    you know that that is not true:  Because this master con man

6    that they've been telling you about for the past

7    three-and-a-half weeks, what a master con man he is, he

8    e-mailed the fake profile to the very people he was supposedly

9    trying to con.  Who does that?  He actually wrote "FYI" on the

01:39 10   e-mail to Mr. Wilson and sent him the fake profile.  If he's

11   trying to con him, he wouldn't send him the fake profile, and

12   the same is true of Gamal Abdelaziz, whether they looked at it

13   or not.

14        By the way, Bruce Isackson he never got an e-mail.  He

15   never was sent an e-mail by Rick Singer, and he knew that his

16   daughter wasn't qualified to be recruited at the Division I

17   level, both of his daughters.

18        So he knew that there was a profile being prepared, as

19   both of them knew, for me to create a USC athletic profile,

01:40 20   that's an e-mail that Mr. Aziz definitely received, he

21   definitely saw, he forwarded it to his wife.  Right?  They knew

22   that the profiles were being -- he wants an embellished

23   profile, he's asked me to embellish it more, which I am doing.

24   That was Mr. Wilson's e-mail.  So they know that profiles are

25   being prepared.  Right?

1    And Bruce Isackson told you he knew the same thing,

2  and even though he never saw the profile, he knew it could not

3  be real, it had to be fake, because his kid wasn't getting

4  recruited at the Division I level based on her actual truthful

5  athletic qualifications.  And the same is true of both of them.

6    But whether or not they saw the e-mail, what you know

7  to a certainty is that he sent them that fake profile.  He sent

8  them each the fake profile.  And if they weren't in on it, he

9  would not have sent them the fake profile.  He wouldn't have

01:41 10  sent it to them unless they knew and were involved in the

11  fraud.

12    So I submit to you, ladies and gentlemen, do not

13  believe that they didn't look at the e-mail.  Of course they

14  looked at the e-mail.  They both looked at the e-mail.  But

15  whether or not they looked at the e-mail, they were in on it,

16  and the fact that he sent them the e-mail is enough for you to

17  reach that conclusion to a certainty.

18    And once you reach that conclusion, it is, in fact,

19  game over.  They are guilty of the fraud conspiracy in Count

01:41 20  One.  They are in on the fraud.  And that's regardless of what

21  you find about the bribery.

22    If you conclude that he sent them the e-mail and that

23  they were in on it, whether or not they saw it, they are

24  guilty.

25    Now, let's talk about the bribery.

1           They want you to believe that they thought this was

2   legitimate, these were legitimate donations.  Again, let's

3   begin with what is not in dispute.

4           What is not in dispute is that they paid the money,

5   $220,000 for Johnny, $300,000 for Sabrina, a million dollars

6   for the Wilson daughters.

7           What is not in dispute is that they paid that money to

8   have their kids admitted to those schools.  That was the only

9   reason they paid that money.  There's never been any serious

01:42 10  dispute about that.

11          What is not in dispute is that they only paid the

12  money once they were guaranteed admission.  Right?  Once Singer

13  told him, "If you put up the $500,000" -- listen to the

14  tapes -- "If you put up the 500 and the 500 for your daughters,

15  it's a done deal."  That's when he paid the money.

16          With Johnny Wilson, with Sabrina Abdelaziz, they

17  didn't pay until the admission was done, 50 percent upon verbal

18  and written from the subcommittee, and then 50 percent when you

19  get the final letter.  That's what Mr. Wilson was told, and

01:43 20  that is, in fact, when he paid.

21          And so the argument then goes, well, they thought it

22  was a legitimate donation and quid pro quo, that's the same

23  thing like when you go to the Red Sox game and you buy tickets,

24  that's a quid pro quo.  Well, ladies and gentlemen, the judge

25  will instruct you what an illegal quid pro quo is.  Right?

1    It's not going to the Red Sox game to buy tickets.

2         But paying money to get somebody to admit your kid as

3    a fake athletic recruit, paying money to get someone who's

4    employed by a university to lie to their colleagues, that is an

5    illegal quid pro quo.  That is honest services fraud.  That is

6    federal program bribery, and it's not like going to the Red Sox

7    game to buy tickets.  Or presumably buying the tickets before

8    you go to the Red Sox game.

9         The judge is also going to instruct you on a concept

01:44 10   called willful blindness.  Pay attention to that instruction.

11   That means you can infer that the defendants have knowledge of

12   something if they deliberately closed their eyes to a fact that

13   should have been obvious to them if they stuck their heads in

14   the sand.

15        Here it was abundantly clear that that money was in

16   exchange for admission as recruited athletes, that the kids

17   were not getting in without the money.  That was abundantly

18   clear from all of the evidence you've seen.

19        But here's how you know to a certainty, once again,

01:45 20   that they didn't think this was a legitimate quid pro quo, that

21   they didn't think this was a legitimate donation, because they

22   both lied about it.  Repeatedly.

23        You saw the e-mails, we've discussed them at length,

24   in which Mr. Wilson asked Mr. Singer if he could deduct the --

25   if he could invoice the USC fees -- he calls them that in the

1    e-mail -- as consulting expenses so that he can pay them from

2    the corporate account.

3           And then he instructs his assistant to do just that.

4           And Singer responds, You can do that -- "I can do that

5    so you can deduct it as an expense," and Wilson replies,

6    "Awesome."

7           There is no legitimate explanation -- despite the many

8    heroic efforts of defense counsel, there is no legitimate

9    explanation for deducting the USC fees as a business consulting

01:46 10   expense.  That was the defendant's idea.  If he thought it was

11   a donation, he would never have sent that e-mail.  That tells

12   you everything you need to know.

13          You also heard the call in which Gamal Aziz agreed for

14   Singer to lie to the IRS in which he said he was worried and

15   concerned about the audit of The Key Worldwide Foundation, he

16   wanted to make sure he and Singer were on the same page, and in

17   which he agreed to lie about a fake injury to explain why his

18   daughter hadn't shown up for practice.

19          If it was a legitimate donation in his mind, why agree

01:46 20   to lie to the IRS when Singer told him there was an audit?  Why

21   did he agree that Singer should lie to the IRS?  Why be worried

22   and concerned that KWF was being audited?  You're not worried

23   and concerned if you find out the Jimmy Fund is being audited

24   and you gave them money.  It doesn't make sense.  People lie

25   when they have something to hide, when they are not acting in

1    good faith.  Lying is not good faith.

2         They argue that they didn't know about the personal

3    payments to Heinel or to Coach Vavic.  Those weren't connected

4    to their kids.  Under the law, as the Judge will instruct you,

5    that doesn't matter.  It doesn't matter where the money goes.

6    Listen to those instructions, ladies and gentlemen.

7    Conspirators doesn't need to know all the details.  What

8    matters is what they thought the money was for.  If they

9    thought the money was to get their kids in as recruited

01:47 10   athletes based on those falsified profiles to get an insider to

11   misrepresent to their colleagues what the true situation was,

12   why they were actually recruiting those kids, that's honest

13   services fraud.  That's an illicit quid pro quo.

14        They knew that the money -- without the money their

15   kids were not getting in, that the money was getting somebody

16   on the inside to recruit them as athletes, that it was in

17   exchange for admission.  The evidence of that is simply

18   overwhelming.

19        There was a lot of argument about the extent to which

01:48 20   Johnny showed up for practice.  Was it one day, was it more

21   than one day, was it at the beginning of the season, was it

22   also at the end of the season?  Now, the first point on that is

23   the defendants have no obligation to put on a case, right, they

24   do not carry any burden.  We carry the burden.  It is our

25   burden to prove their guilt beyond a reasonable doubt.  We

1    embrace that burden, that's ours.

2         But when the defendants choose to put on a case, you

3    can look at the case that they put on.  You can look at the

4    credibility of the witnesses they chose to put up on that

5    witness stand.

6         Their own witnesses testified there was video of

7    practices, right, but what did you see?  You saw a photograph

8    of Johnny Wilson running around Sorority Row in his Speedo to

9    try to gin up interest for a game, a social event.  You saw a

01:49 10   photograph of Johnny in the bleachers with the rest of the fans

11   watching the NCAA championship game.

12        You didn't see Johnny at practice, even though there's

13   video of the practice.

14        But, again, it's all beside the point.  It doesn't

15   matter whether he showed up for practice or whether he didn't

16   show up for practice.  Frankly, it doesn't matter if he was the

17   Tom Brady of water polo or whatever the equivalent is in water

18   polo.  Or the Lebron James of water polo.  It doesn't matter.

19   Here's why: Because Count One charges the defendants with

01:50 20   conspiracy.  That is an agreement to do something the law

21   forbids, and that crime charged in Count One was complete the

22   moment the defendant agreed to it.  And the evidence in this

23   case is that he agreed to it months before Johnny even showed

24   up at USC, months before the first water polo practice.  It

25   doesn't matter if his kid was the Tom Brady of water polo

because if he paid money to get someone on the inside to

mislead their colleagues about why they were recruiting him, if

he lied about his athletic qualifications or agreed to have his

qualifications misrepresented to get him in, he could have been

Tom Brady or Lebron James, or whatever you want to call him,

but the lies and the payment of the money make him guilty, no

matter how qualified his kid is, no matter whether he showed up

to practice or not.  Count One is the agreement, and that was

done months before.

01:51    Count Two, same thing.  It was the agreement.  But for

Count Two you have to find there was an overt act, some step

taken by some member, any member of the conspiracy to make it

happen.  And here there are dozens and dozens, hundreds of

overt acts: wires that were sent, e-mails that were sent, phone

calls that were made, wire transfers that were done, admission

letters that were received.  All of these overt acts are

enough.  You only need one.

And he's guilty of Count Two before his kid ever

showed up for practice, or didn't show up, as the case may be.

01:52    The defendants spent much of their closing arguments

attacking the FBI investigation, that this was a giant FBI plot

to frame their clients.  I'm not going to respond point by

point.  Whether the agents wrote down everything that Singer

said or didn't write down or wrote down everything they told

him -- by the way, there is no evidence in this case that there

1   is any FBI or IRS rule that requires the agents to write down

2   what they said to a person cooperating.  There's no evidence of

3   that.  That's all insinuations in questions of defense counsel,

4   and insinuations in questions of counsel are not evidence.

5           Your job is to consider the evidence.  But the fact is

6   that what Singer actually said, more importantly, what the

7   defendants said back to him, that evidence is on tape and you

8   have it and you've heard it and you can listen to it in the

9   jury room.

01:53 10         And the same is true about Singer's notes, which, by

11   the way, are not diary entries, they weren't notes to himself,

12   they were notes taken by somebody who had not accepted

13   responsibility for what he had done in the early days after he

14   was approached by FBI agents.  They were notes for his lawyer

15   at a time when he was actively obstructing the investigation,

16   including by not just deleting his text messages but by tipping

17   people off that the investigation was happening.

18           They want to present to you that this guy is the

19   world's most amazing con man, but the one thing they want you

01:54 20   to believe is that he was telling the truth in his notes to his

21   lawyer on that one day when he accuses the FBI of trying to

22   encourage him to lie and says that the FBI were the bad guys.

23   That's the one thing that the con man was telling the truth

24   about.

25           It's all a distraction.  Why?  Because they don't want

1    you to look at what they did and what they said.  That's the

2    evidence in this case, ladies and gentlemen.  And by the way,

3    you have plenty of evidence to convict them of these crimes

4    before you even get to the consensual recordings that Singer

5    made at the FBI's direction.  You can convict them on the

6    e-mails alone.  You can convict John Wilson based on those

7    September 15th phone calls alone.

8              And, of course, blaming the investigation doesn't

9    explain why Wilson laughed when Singer told them that the coach

01:54 10   had to recruit some real sailors so Stanford doesn't catch on.

11   That was on September 15th, before the FBI ever knocked on

12   Singer's door or the hotel room.

13             And it doesn't explain -- I'm sorry, I misspoke about

14   that.  I'm sorry.

15             The September 15th call is when he told them they

16   would make them a sailor because of where you live, and that's

17   where the defendant laughed.

18             And then on the consensual call he said Stanford has

19   to recruit some real sailors so that the -- the coach has to

01:55 20   recruit some real sailors so Stanford doesn't catch on.  And

21   you can listen to defendant's response.  Listen to the

22   defendant's response to that and listen to what the defendant

23   said on the September 15th call before the FBI approached him

24   when Singer said that we'll make them a sailor because of where

25   you live.  Right?  There's no innocent explanation for that

line.  The defense wants you to believe the second line slipped

by him somehow even though Singer repeated it twice slowly and

the defendant repeated it back to him.  He asked him "actually

recruit some real sailors," but the first line, they don't have

an explanation for that one, when Singer said, "We'll make them

a sailor because of where you lived."  And the defendant

laughed and said, "Can we get a two-for-one special because

they're twins."

It's a blame everyone defense that you've heard,

ladies and gentlemen.  Blame the agents, the investigation was

shoddy.  They didn't say to Singer -- they didn't have Singer

say, "Do you want to join a criminal conspiracy?"  Seriously.

That is not how criminals talk.  They don't say, "Do you want

to join a criminal conspiracy?"  It's the prosecutor's fault,

we hid all the evidence from you, even though you've been

sitting here for three-and-a-half weeks looking at dozens and

dozens of e-mails and documents, listening to phone call after

phone call, listening to more than a dozen witnesses testify.

They want you to imagine what else is out there.  Imaginary

evidence, imaginary cross-examination of witnesses, that's not

evidence, ladies and gentlemen, that is speculation.  That is

designed to distract you from the evidence.  But it's the

evidence you have to consider.

They want you to believe that it was Rick Singer's

fault.  He was the consummate con man.  That it was USC's

1    fault, they were desperate for money.  John Wilson is even

2    blaming his long-time secretary, Debbie Rogers.  That one takes

3    the cake.  It's the FBI's fault, it's the prosecutor's fault,

4    it's Rick Singer's fault, it's USC's fault, it's Debbie Rogers'

5    fault.  Follow the actual evidence, ladies and gentlemen, not

6    the imaginary evidence.  Look at what the defendants did and

7    what the defendants said.  It's in their e-mails, it is on

8    tape.  This isn't Rick Singer's trial.  It's not the FBI that's

9    on trial.  It's not USC that's on trial.  Certainly it's not

01:57 10   Debbie Rogers that's on trial.  And Debbie Rogers isn't the one

11   who said, "Let's bill it as a business consulting expense,"

12   that was John Wilson.

13          THE COURT:  You need to wrap up, Mr. Frank.

14          MR. FRANK:  I will, your Honor.  Thank you.

15          The only people they have to blame for their actions

16   is themselves.  They have a million different arguments about

17   who was responsible, each more ridiculous than the last.  Was

18   he wearing a hoodie, was he not wearing a hoodie when he was

19   throwing up at practice?  Was he throwing up at practice or was

01:58 20   he passed out in his dorm room?  They're all more ridiculous

21   than the last.

22          We end, ladies and gentlemen, where we started, with

23   the defendant's own words.  John Wilson knew his son was a

24   clear misfit for the USC water polo team, he paid the money as

25   a fee only when admission was confirmed, he directed his

1    assistant to lie and call it a business consulting expense, and

2    those are all his own words black on white.

3         You heard him laugh when Singer told him he'd make the

4    girls a sailor because of where they live and laugh again when

5    Singer told him they needed to recruit some actual sailors so

6    that Stanford doesn't catch on.  Those were his words, his

7    responses.

8         Same with Gamal Abdelaziz.  He sent Rick Singer a

9    photograph of a different girl for a USC athletic profile.  He

01:59 10   directed Sabrina to submit an essay about her love for

11   basketball, a sport she hadn't played for two years and was

12   never veery good at.  You heard him say, "I love it" when

13   Singer told him that Donna Heinel would use that same fake

14   profile for another fake basketball player and agreed to lie to

15   admissions to say that she had plantar fasciitis and that's why

16   she hadn't shown up.  And by the way, that doesn't stop you

17   from being a manager.  If you think you're going to be a

18   practice player, you got to show up to practice.

19        The defendants' own words, members of the jury,

01:59 20   convict them in this case.

21        And this case is important.  College admissions is

22   important.  These defendants used lies and money --

23        MR. KELLY:  Objection, your Honor --

24        MR. FRANK:  My final two sentences, your Honor -- to

25   steal admission spots their kids couldn't earn on their own.

1    They crossed a line, and they broke the law.

2         And just because it's an important case does not mean

3    it's a close case.  The evidence in this case is overwhelming.

4    That evidence and your common sense, the common sense that you

5    walked into this courtroom with three-and-a-half weeks ago

6    tells you that these defendants are guilty beyond a reasonable

7    doubt as charged.

8         We ask you to hold them accountable.

9         Thank you.

02:00  10         THE COURT:  All right, jurors.

11         Rather than give you my charge on the law and then ask

12    you to deliberate after a long day, it would be inappropriate,

13    so that's why we're going to break for the day and ask you to

14    come back tomorrow morning at 9:00 when you will hear my

15    instructions to you on the law, after which the case will be

16    submitted to you for your deliberations.

17         It is extremely important now that you honor my

18    instructions.  You've heard everything except my closing

19    instructions on the law, but you haven't heard them, and they

02:01  20    are necessary before you go to deliberate.

21         So please do not discuss this case with anybody, that

22    is members of your family, friends or anyone who wants to talk

23    to you about it, and say that you'd be glad to talk to them

24    about it after you have deliberated and after you have come to

25    a verdict but you can't do it before.  That would be

```
 1    inappropriate, and I'm asking you not to do it.
 2            So I'll see you tomorrow morning at 10:00 a.m.  Have a
 3    pleasant rest of the day.  And we'll get the case to you
 4    tomorrow.
 5            (Discussion off the record.)
 6            THE COURT:  Did I say 10:00?  Nine.  9:00 a.m.
 7            (Jury exits.)
 8            THE COURT:  We are in recess until 9:00 a.m.
 9            MR. KENDALL:  Your Honor, may we raise one issue,
02:02 10    please?
11            THE COURT:  Quickly.
12            MR. KENDALL:  We are concerned about an improper
13    burden shifting in the government's rebuttal.
14            The government referred to videos of practices from
15    the 2014 season.  We don't believe such videos exist.  Does the
16    government have a good-faith basis to say such videos exist and
17    are available or did they just make that up and mislead the
18    jury?
19            MR. FRANK:  The defense witness testified the videos
02:03 20    were made, your Honor.
21            THE COURT:  That's my recollection, is there were
22    videos made of the practices.
23            MR. TOMBACK:  But, your Honor, the issue isn't whether
24    they were made.  It's seven years ago --
25            THE COURT:  If you want to file a motion in this
```

1    regard, file a motion and I'll deal with it tomorrow.

2         MR. KELLY:  Your Honor, I have a procedural matter.

3    The Court asked about the curative instruction.  We filed it

4    yesterday, we gave it to the clerk, it's in.

5         If I have an issue on the verdict form or jury

6    instruction, can we just file something?

7         THE COURT:  Do you have an issue on the verdict form?

8         MR. KELLY:  Yes.

9         THE COURT:  You've had it since last night.

02:03 10         MR. KELLY:  Yes.  Our position was we wanted a general

11   verdict that's as was suggested, but as proposed, when it

12   refers to Count One, there's four questions, almost like

13   there's four counts when there really should be one for Count

14   One with four subdivisions is my only request.  So that it

15   goes --

16         THE COURT:  Do you want to submit something?

17         MR. KELLY:  Yes, I do.  I do.

18         THE COURT:  Do so by 5:00 p.m.

19         MR. KELLY:  Yes, we will.

02:04 20         THE COURT:  We'll deal with it.

21         MR. KELLY:  The only other request on jury instruction

22   was on the willful blindness piece, we respectfully ask the

23   Court make sure it shows that willful blindness does apply to

24   intent to join a conspiracy.

25         I think the Court said that yesterday, but given the

1    argument we respectfully ask -- it's black letter law, *Lizardo*

2    445 F.3d at 73, willful blindness does not apply with someone's

3    intent to join a conspiracy.

4              THE COURT:  Thank you.  It's on the record.

5              (Whereupon, the proceedings adjourned at 2:04 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS     )

6

7

8            We, Kristin M. Kelley and Debra Joyce, certify that

9    the foregoing is a correct transcript from the record of

10   proceedings taken October 6, 2021 in the above-entitled matter

11   to the best of my skill and ability.

12

13

14        /s/ Kristin M. Kelley            October 6, 2021

15        /s/ Debra Joyce                  October 6, 2021

16        Kristin M. Kelley, RPR, CRR              Date
          Debra Joyce, RMR, CRR
17        Official Court Reporters

18

19

20

21

22

23

24

25