## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

GREGORY COLBURN, et al.,

Defendants.

No. 19-CR-10080-NMG

## DEFENDANTS' RENEWED MOTION FOR JUDGMENT OF ACQUITTAL
## AND MOTION FOR NEW TRIAL

Defendants Gamal Abdelaziz and John Wilson (collectively, "Defendants") hereby renew their motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. In the alternative, Defendants hereby move for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. For the reasons set forth below, and in the various filings and transcripts that this motion incorporates by reference, the Court should enter a judgment of acquittal on all counts or, in the alternative, order a new trial on all counts.

## LEGAL STANDARD

A district court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Where a verdict has been rendered by the jury, "the inquiry focuses on whether 'a rational jury could have found that the government proved each element of the crime beyond a reasonable doubt.'" *U.S. v. Appolon*, 715 F.3d 362, 367 (1st Cir. 2013) (quoting *U.S. v. Mardirosian*, 602 F.3d 1, 7 (1st Cir. 2010)).

Although a district court must look at the evidence in the light most favorable to the jury's verdict, "juries do not have carte blanche" under the Rule 29 standard. *U.S. v. Spinney*, 65 F.3d 231, 234 (1st Cir. 1995); *see also U.S. v. Martin*, 228 F.3d 1, 10 (1st Cir. 2000) (noting that "the

jury verdict is not given a 'free pass'" under Rule 29). The court is required to "take a hard look at the record and to reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.'" *Spinney*, 65 F.3d at 234; *U.S. v. Ofray-Campos*, 534 F.3d 1, 31-32 (1st Cir. 2008). "If the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, th[e] court must reverse the conviction." *U.S. v. Morillo*, 158 F.3d 18, 22 (1st Cir. 1998). "This is so because . . . where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence . . . 'a reasonable jury must necessarily entertain a reasonable doubt.'" *U.S. v. Andujar*, 49 F.3d 16, 20 (1st Cir. 1995) (emphasis in original); *accord U.S. v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) ("[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt").

In addition, where the trial record lacks any evidence supporting an element of a particular count, the Court must enter a judgment of acquittal with respect to that count. *United States v. Fernandez*, 913 F.3d 244, 247-51 (1st Cir. 2019) (holding that the district court should have granted the defendants' Rule 29 motion where the trial record did not contain any evidence concerning one of the elements of federal programs bribery).

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "The rules do not define 'interests of justice,'" *U.S. v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) (internal quotation marks omitted), and whether to grant a motion for a new trial pursuant to Rule 33 "is ordinarily a 'judgment call,'" *U.S. v. Connolly*, 504 F.3d 206, 211 (1st Cir. 2007) (citation omitted), that "rests within the discretion of the trial judge," *U.S. v. Rodriguez*, 738 F.2d 13, 17

(1st Cir. 1984). The interests-of-justice standard encompasses more than what would constitute reversible error on appeal, *see United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994), and courts have granted new trials "in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial," *U.S. v. Cabrera*, 734 F. Supp. 2d 66, 87-88 (D.D.C. 2010) (internal quotation marks omitted), *aff'd in part sub nom. United States v. Vega*, 826 F.3d 514 (D.C. Cir. 2016) (per curiam). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (citing *U.S. v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).

A timely-raised trial error will also warrant a new trial, unless the government shows that the error was harmless. *See U.S. v. Curley*, 639 F.3d 50, 58 (2d Cir. 2011). Courts typically consider several factors in determining whether the error was harmless: (1) whether the error went to a critical issue in the case; (2) whether the government capitalized on the error in its arguments to the jury; and (3) the strength of the government's case. *Id.* Of these factors, the strength of the government's case is "[t]he most critical." *Id.* (internal quotation marks omitted); *see also U.S. v. Forrester*, 60 F.3d 52, 64-65 (2d Cir. 1995) ("Error going 'to the heart' of a critical issue is less likely to be harmless."). Even if a court finds each individual error harmless, it must grant a new trial if their "aggregate" effect was to deny the defendant a fair trial. *U.S. v. Sepulveda*, 15 F.3d 1161, 1195-96 (1st Cir. 1993).

## ARGUMENT

## I.   THE JURY'S VERDICT ON ALL COUNTS MUST BE REVERSED IN FAVOR OF ACQUITTAL.

For the reasons set forth below, in ECF Nos. 2330, 2342, 2351, and 2360, and in the 9/30/21 Tr. at 7:2-18:12 and the 10/5/21 Tr. at 15:5-17:1 and 62:21-69:18, each of which is incorporated herein by reference, the Court should enter a judgment of acquittal on all counts pursuant to Rule

29 of the Federal Rules of Criminal Procedure. Defendants fully reiterate and reassert each of the grounds for acquittal previously stated.

During its case-in-chief, the government failed to prove any of the elements of each of the charged crimes. *See, e.g.*, ECF No. 2330; 9/30/21 Tr. at 7:2-18:12. The evidence adduced during Defendants' case-in-chief did not fill any of the gaps in the government's case. Rather, this evidence confirmed what was already clear from the government's case-in-chief: that a reasonable jury could not convict Defendants of any of the charged crimes.

Take, for instance, the charge against Defendant John Wilson for conspiracy to commit mail fraud, wire fraud, honest services mail fraud, and honest services wire fraud. To prove this charge, the government had to show (among other things) that the alleged misstatements on Johnny Wilson's profile were material. *See, e.g.*, ECF No. 2330 at 26-29. Practically speaking, this meant the government had to prove beyond a reasonable doubt that Johnny would not have been admitted to USC based on his true credentials. *See id.* But the government failed to prove this during its case-in-chief, *see id.*, and the evidence adduced during Defendants' case-in-chief did not fill this gap in the government's case. Indeed, as set forth below, this evidence confirmed that Johnny was qualified to be a recruit for the USC Men's Water Polo Program (the "Program"), such that any alleged misstatements on his profile were immaterial.

During the government's case-in-chief, Casey Moon—who was an assistant coach for the Program during Johnny's time at USC—testified that the Program valued players with certain key attributes. During Defendants' case-in-chief, Jack Bowen—who was Johnny's water polo coach while he was in high school—testified that Johnny had these attributes. For example, Mr. Moon testified that the Program sought players with a high water polo "IQ," 9/28/21 Tr. at 185:14-18, and Mr. Bowen testified that Johnny had a high "water polo IQ" such that "he could make a

4

contribution to a program like USC." 10/4/21 Tr. at 94:7-19, 115:3-10, 182:19-25. Mr. Bowen further explained that Johnny's "ability to earn inside water and his defensive ability to read the game and earn steals were his forte." *Id.* at 101:19-22. Similarly, Mr. Moon testified that the Program looked for players with "physical talent," 9/28/21 Tr. at 185:14-18, and Mr. Bowen testified that Johnny had "outstanding" stamina, "A plus speed," and was "one of the fastest in the league." 10/4/21 Tr. at 82:4-5, 172:18-21, 98:22-99:1. Mr. Moon also testified that the Program wanted recruits who were "selfless" and "hardworking," who could "take criticism," and who had positive interactions with their teammates. 9/28/21 Tr. at 96:19-97:5. Mr. Bowen testified that Johnny had all of these attributes, explaining that Johnny was "a quiet grinder" with an A or A plus work ethic, that Johnny was "the kind of guy who I couldn't get to crack," and that at one tournament "the team decided to vote on who was the most inspirational player of the tournament, and they chose Johnny." 10/4/21 Tr. 82:17-83:22, 102:8-25, 182:16-18.

In addition, during the government's case-in-chief, Mr. Moon testified that "a recommendation from a coach like Jack Bowen that a candidate was good enough to play at USC" would "carry weight." 9/28/21 Tr. at 180:18-21. During Defendants' case-in-chief, Mr. Bowen testified that he offered to write a letter of recommendation to USC in support of Johnny, and that he ultimately spoke on the phone with one of the Program's assistant coaches about Johnny and offered his support for Johnny's candidacy. 10/4/21 Tr. at 112:5-115:17. This evidence, and the other evidence discussed above, shows that any alleged misstatements on Johnny's profile were immaterial, as Johnny was qualified to be a recruit for the Program.

## II.   THE JURY'S VERDICT SHOULD, AT A MINIMUM, BE SET ASIDE FOR A NEW TRIAL.

In the alternative, for all of the reasons that Defendants are entitled to a judgment of acquittal on all counts under Rule 29 of the Federal Rules of Criminal Procedure, which

Defendants reassert, and for the additional reasons set forth below, Defendants are also entitled to a new trial on all counts under Rule 33 of the Federal Rules of Criminal Procedure.

*First*, throughout the case, the Court erred in refusing to allow Defendants to submit key evidence to the jury, including (without limitation) on relevance and hearsay grounds. *See, e.g.*, 9/30/21 Tr. at 29:5-10 (The Court: "You may have an appellate issue, Mr. Kelly, but the Starbucks presentation is not going to be submitted to this jury. If I get reversed on it and you are lucky enough to try the case again, maybe you can convince a different judge to admit that, but the Starbucks presentation is not going in."); *id.* at 24:7-8, 29:21-30:2 (The Court: "We need to discuss the government's motion to exclude hearsay wiretap calls and e-mails . . . . If you're planning to offer calls that are properly described by government's counsel, I am going to sustain objections to their admission. We might go through tomorrow and you can offer one hundred different calls, but if they're all as described by the government, the government's objection is going to be sustained."); *id.* at 42:22-43:5 (The Court: "I am going to sustain all of the objections of the government unless I'm missing something. . . . [S]o we may not have much to do tomorrow other than the defendants offering documents, the government objecting, and the Court sustaining the objection. So stand forewarned that that's what is likely to be done."); ECF No. 2265 at 5 (granting motion to quash trial subpoenas seeking evidence from USC and stating "[a]s the Court has ruled on previous occasions, testimony concerning the general fundraising practices of USC is not relevant"); ECF No. 2336 at 15-18 (denying Defendants' motion set forth in ECF No. 2309 to admit Exhibit 1219).[1] The Court erred in its rulings regarding hearsay and the admissibility and

---

[1] In ECF No. 2309 at 1-2, which is incorporated herein by reference, Defendants stated:

> The government continues to make baseless hearsay objections in this case. **Today, the government convinced the Court to commit legal error by denying the admission of Exhibit 1219 as evidence of the knowledge and state of mind of Scott Simon and Donna Heinel. The repeated objections to the admission of this document are depriving the Defendants of their constitutional right to present their defense.**

use of documents, including, but not limited to, its rulings that particular documents could be used only to refresh a witness's recollection and its repeated refusal to allow impeachment by contradiction. In addition, the Court allowed the government to present hearsay to the jury over Defendants' objections.

With respect to many rulings prohibiting Defendants from introducing key exculpatory evidence relating to USC, the Court stated: "The Court has previously ruled that such evidence will be admissible at trial only if defendants are able to show that they were aware of an alleged USC policy or practice prior to the events that are the subject matter of the indictment in this case." ECF No. 2335 at 3-4; *see also, e.g.*, 8/18/21 Tr. at 6:10-22 ("As a preliminary matter, counsel should understand that this trial is not going to be about the general admissions policy of the University of California or the method it uses to admit students. USC is not on trial here, and I will not have this case devolve into multiple side trials. Unless there's evidence that a defendant was misinformed with respect to the admission policy of the subject university and/or knew that USC admitted a specific unqualified student whose parent made a large donation to the school before that defendant entered into the alleged conspiracy with Singer, evidence of what other unrelated students and parents did has no bearing on the defendants' state of mind and, thus, is irrelevant to

---

The relevant excerpt of the document is just two pages—it shows Scott Simon, **the Associate Vice President for the Office of Athletic Compliance** sending an email to **Donna Heinel (the defendant's alleged co-conspirator)** containing a spreadsheet with a roster analysis. The spreadsheet states that for the Men's Golf team, "Significant donor's son on roster. Practices only. Unique scenario for this year." For the Men's Tennis team, it says "Two significant donor's sons on roster. Practice only. Unique scenario for this year." There is no need for mini-trials or to get into the particulars of any student, or to name any student. Defendants just want to show the jury that the Associate Vice President for Athletic Compliance at USC (Mr. Simon) sent an email to Ms. Heinel showing that USC had donors' children as practice players on their rosters . . . .

**The government chose to charge a conspiracy and must deal with the fact that the conspirators' state of mind is therefore relevant.** The defendants have a plethora of evidence showing that Heinel was doing what was expected of her (pre July 2018), but so far the Court has not permitted any of this evidence to be admitted. *See* Offer of Proof, Dkt. 2292. The Court should—at the very least—admit this single two-page document in evidence.

the requisite scienter that the government must prove in this case."). However, Defendants repeatedly set forth their theory that Mr. Singer told them that donations to athletic programs were welcomed by USC in exchange for preferential admissions treatment—therefore showing that Defendants **were aware** of these alleged USC policies and practices. Defendants also proffered multiple other bases for why such documents were relevant and admissible. *See, e.g.*, ECF Nos. 2283 and 2306, each of which is incorporated herein by reference. It appears that the only manner in which Defendants could satisfy the extraordinarily high evidentiary bar set by the Court would be to testify as to what Mr. Singer told them as well as other pre-existing knowledge they had. This created a significant Fifth Amendment issue in which Defendants were prohibited from introducing exculpatory evidence aligning with their theory of defense unless they testified at trial.

Taken together, the Court's evidentiary rulings effectively prevented Defendants from presenting a defense.

*Second*, the Court should have granted Defendants' motions-in-limine for the reasons set forth in ECF Nos. 1988, 1990, 1991, 1992, 1993, 1994, 1996, 1997, 1998, 2002, 2005, 2010, 2011, 2012, 2013, and 2083, each of which is incorporated herein by reference, and should have also granted Defendants' motions set forth or discussed in ECF Nos. 1967, 2022, 2080, 2098, 2119, 2121, 2128, 2136, 2156, 2190, 2212, 2237, 2272, 2273, 2275, 2283, 2289, 2293, 2295, 2303, 2309, 2319, 2321, 2322, 2344, 2345, 2353, 2360, and 2367, each of which is also incorporated herein by reference as additional grounds for a new trial. In addition, the Court should have ruled in Defendants' favor with respect to the Confrontation Clause and self-incrimination issues raised by Defendants. *See, e.g.*, ECF Nos. 2118, 2119, 2146, and 2258, each of which is incorporated herein by reference.

*Third*, the Court should have denied the government's motions-in-limine for the reasons set forth in ECF Nos. 2031, 2032, 2033, 2034, 2035, and 2047, each of which is incorporated herein by reference, and should also have denied the government's motions discussed in ECF Nos. 2118, 2146, 2258, 2329, and 2366, each of which is also incorporated herein by reference as additional grounds for a new trial.

*Fourth*, the Court erred in overruling (or effectively overruling) Defendants' objections with respect to jury selection set forth in the 9/8/21 Tr., the 9/9/21 Tr., and the 9/10/21 Tr., each of which is incorporated herein by reference, including (without limitation) by refusing to strike for cause all potential jurors who had seen the Netflix program concerning the "Varsity Blues" case—which led to at least one person who had seen this highly prejudicial, misleading, and inflammatory program serving on the jury—and by refusing to strike potential jurors for cause based on demonstrated bias. In addition, the Court erred by striking jurors for cause at the government's urging, even though there was not adequate cause to strike those potential jurors.

*Fifth*, as explained in ECF No. 2362, the 10/6/21 Tr. at 160:7-14, the 10/7/21 Tr. at 77:4-5, and the 10/8/21 Tr. at 5:18-13:18, each of which is incorporated herein by reference, the Court erred in providing the jury with a verdict form that contained multiple questions concerning Count 1.

*Sixth*, as explained in ECF No. 2330 at 8-9 and 21-22, the 10/5/21 Tr. at 29:17-23, and the 10/7/21 Tr. at 9:23-10:13, each of which is incorporated herein by reference, there was a constructive amendment of the indictment or a prejudicial variance from the indictment when the government presented the theories that: (1) the property at issue in this case is not admissions "slots," but athletic recruitment "slots," and (2) the victim at issue in this case is not USC as a whole, but the USC admissions department.

*Seventh*, as explained in ECF Nos. 2361 and 2363; the 10/5/21 Tr. at 14:22-32:15, 39:14-41:23, and 46:20-69:18; the 10/6/21 Tr. at 8:8-21 and 159:8-161:4; and the 10/7/21 Tr. at 6:2-10:23 and 61:3-82:21, each of which is incorporated herein by reference, the Court's jury instructions contained many errors. For the reasons set forth in these documents and ECF Nos. 2015, 2076, 2077, 2078, 2149, 2341, 2343, 2348, 2350, 2366, and 2369, each of which is incorporated herein by reference, the Court should have instead given the jury instructions proposed by Defendants.

*Eighth*, with respect to the tax charge against Mr. Wilson, the Court erred by allowing the jury to consider a theory that is deficient as a matter of law. In ECF No. 2328, the government explained that Mr. Wilson "is not charged with filing a false tax return for not offsetting the value of any positive admission's consideration from the $100,000 payment he claimed as a charitable donation on his 2014 tax returns," and that it had "charged Wilson with purchasing admission to USC by bribing Jovan Vavic, the coach of the USC Men's Water Polo team, to purport to recruit Wilson's son to the team." ECF No. 2328 at 1-2. In other words, the government's theory was that Mr. Wilson could not properly take deductions for bribes that violated the honest services fraud and federal programs bribery statutes. However, as explained in ECF No. 2343, this theory is deficient because, as a matter of law, the payments at issue cannot constitute a bribe. At this stage, it is impossible to know whether the jury convicted Mr. Wilson of willfully filing a false tax return based on this legally deficient theory or the government's alternative theory—namely, that Mr. Wilson took deductions for business expenses that were not true business expenses. Accordingly, even assuming this alternative theory is not deficient as a matter of law, the Court must reverse the jury's conviction on the tax charge and grant Mr. Wilson a new trial on this charge.[2]

---

[2] *See, e.g.*, *United States v. Foley*, 73 F.3d 484, 494 (2d Cir. 1996), where the court stated:

*Ninth*, for the reasons set forth below; the reasons set forth in ECF Nos. 995, 1034, 1202, 1215, and 1909, each of which is incorporated herein by reference; and for the reasons underlying Judge Talwani's decision to sever the trial of Jovan Vavic from that of Donna Heinel in *United States v. Ernst*, Docket No. 1:19-cr-10081, ECF No. 879 (Oct. 13, 2021), the Court should have severed Mr. Wilson's trial from that of Mr. Abdelaziz.

In this case, the Court ruled, over Defendants' objections, that the jury could hear evidence of personal payments that Rick Singer made to Jovan Vavic, even though those payments did not relate to Johnny Wilson's or Sabrina Abdelaziz's admission to USC. This evidence was unfairly prejudicial with respect to both Defendants, but especially with respect to Mr. Abdelaziz, as there was no connection whatsoever between Mr. Abdelaziz and Jovan Vavic.

---

In the present case, the jury was presented with two bases on which it could find that Foley had willfully aided in the preparation of a tax return that was false as to a material matter. First, the indictment, which the judge read to the jury as part of its instructions, and which the jury had with it during its deliberations, alleged that Foley had assisted in the taxpayers' deductions of the bribery payments, though they were "not a legitimate business expense." This facet of the instructions permitted the jury to convict on the theory that bribe payments were not "ordinary and necessary" business expenses.

The second basis related to the impermissibility of a deduction for bribes that were illegal. In this connection, the district court instructed the jury that "[m]oney paid to a public official for a corrupt purpose is not a legitimate expense and a taxpayer is not allowed to deduct such payments as business expenses." (October 28 Tr. at 93.) Assuming that use of the phrase "for a corrupt purpose"—a phrase that suggests a subjective test—was a sufficient surrogate for the objective requirement that the bribe or kickback be "illegal," the court's instruction appears plainly to have been premised on the bribery having come within the scope of § 666(a)(1)(B). There is no indication that the government invoked any provision of state law, such as Conn.Gen.Stat. § 53a–147 (1994), which provides that "[a] person is guilty of [the felony of] bribery if he promises, offers, confers or agrees to confer upon a public servant . . . any benefit as consideration for the recipient's decision, opinion, recommendation or vote as a public servant . . . ." *See also id.* § 53a–148 (1994) ("A public servant . . . is guilty of [the felony of] bribe receiving if he solicits, accepts or agrees to accept from another person any benefit for, because of, or as consideration for his decision, opinion, recommendation or vote."). The only basis for illegality presented to the jury was § 666(a)(1)(B).

Since we have concluded that the conduct alleged and proven with respect to the bribery count was not an offense under § 666(a)(1)(B), the only section under which Foley was charged with bribery, and since we are unable to determine whether the jury's general verdict was based on the view that the bribe payments were not ordinary and necessary expenses or instead was based on the premise that the deduction was impermissible because the bribe payments were illegal under § 666(a)(1)(B), we vacate Foley's convictions on the tax-fraud counts and remand for a new trial on those counts.

*Accord United States v. Fernandez*, 722 F.3d 1, 33 (1st Cir. 2013).

Similarly, in this case, the Court ruled, over Defendants' objections, that the jury could hear evidence of personal payments that Rick Singer made to Donna Heinel, even though they post-dated the admission of Sabrina Abdelaziz to USC by several months and the admission of Johnny Wilson to USC by four years, and there was no evidence that either Defendant was aware of these payments. This evidence was unfairly prejudicial with respect to both Defendants, but particularly with respect to Mr. Wilson, as there was no connection whatsoever between Mr. Wilson and Donna Heinel. Indeed, Rick Singer did not even meet Donna Heinel until after Johnny Wilson was admitted to USC.

There can be no question that the evidence concerning the personal payments to Jovan Vavic and Donna Heinel was deeply prejudicial. Indeed, in severing the trial of Jovan Vavic from that of Donna Heinel, Judge Talwani recognized that it would be unduly prejudicial to have evidence against Donna Heinel presented in the same trial as Jovan Vavic, and vice versa. It follows, *a fortiori*, that the Court should not have admitted evidence of these payments in the present case, particularly where neither Defendant had any knowledge of these payments and given that Rick Singer made the payments to Donna Heinel well after Defendants' children were admitted to USC. Indeed, the Court's decision to admit this evidence itself constitutes a basis for a new trial. But to the extent the Court was nevertheless committed to admitting this evidence, it should have at least severed the trials of Mr. Wilson and Mr. Abdelaziz, admitted the evidence of payments to Jovan Vavic only in the trial against Mr. Wilson, and admitted the evidence of payments to Donna Heinel only in the trial against Mr. Abdelaziz.[3]

In addition, the Court's failure to sever was particularly prejudicial in light of the government's rebuttal closing. In its rebuttal argument, the government blatantly exploited the

---

[3] In making this alternative argument, Defendants do not waive, and expressly maintain, their argument that the Court should have excluded all of the evidence concerning the personal payments to Jovan Vavic and Donna Heinel.

joint trial, arguing, in essence, that each Defendant was more likely to be guilty because of the defense presented by the other Defendant. Specifically, the government exploited the fact that each Defendant had raised the following defense: that there was no proof that the Defendant at issue had opened the email from Rick Singer containing the athletic profile at issue. The government argued:

> So the upshot, as you begin your deliberations, what is not seriously in dispute in this case is that there was a fraud, that because of that fraud these kids got into USC, and that the insiders did it because of the money. That is not seriously in dispute.
>
> So now the only question becomes whether the defendants knew and intended for that fraud to happen. Well, here's what else is not in dispute: Singer e-mailed those fake profiles to both of these defendants. The fake profiles were found in the e-mail boxes of both of these defendants. It's not in dispute. So the argument that the defendants are making is that they didn't read those e-mails, that it slipped by, they slipped by him. Why? Because, of course, they can't admit that they read those e-mails. If they admit that they read the e-mails, it is game over. It is game over. So they admit that the e-mails were sent to them because they can't deny that, can they? They admit that the e-mails are in their inboxes, but they missed them. They admit what they can't deny, and they deny the one thing, the one thing that they cannot admit, because if they admit that, it's game over.
>
> **It's amazing when you think about it. Two men, two sophisticated business executives, two men who are so intimately involved in getting their kids into college, they're in every detail. Mr. Kendall told you that about his client. These two men on opposite sides of the world, and they both missed the exact same e-mail. They both missed it. Think about the chances of that. They must be the two unluckiest men in the entire world. They must be the two unluckiest men in the entire world to have had their kids admitted to USC as fake athletes or based on fake athletic profiles, they both paid hundreds of thousands of dollars to Rick Singer to get their kids admitted to USC as athletic recruits, the fraudulent profiles are e-mailed to them, and both of these men on opposite sides of the world somehow missed it. They missed that one e-mail. That is some incredible unbelievable bad luck.**

10/26/21 Tr. at 143:3-144:9 (emphasis added). If the Court had severed Mr. Wilson's trial from that of Mr. Abdelaziz, the government would have been unable to make this improper and prejudicial argument.[4]

---

[4] Alternatively, as set forth in ECF No. 2080—which is incorporated herein by reference—the Court should have at least severed the tax charge against Mr. Wilson. The Court's failure to sever the tax charge was particularly prejudicial in light of the government's closing. The government's closing advanced novel legal theories on the bribery and fraud

Each of the errors discussed in this motion, and in the various filings and transcripts that this motion incorporates by reference, constitutes a basis for a new trial. And, collectively, their aggregate effect was to deny Defendants a fair trial. Thus, the Court should grant Defendants a new trial on all counts pursuant to Federal Rule of Criminal Procedure 33.

## III.   THE COURT SHOULD GRANT A NEW TRIAL BECAUSE HIDDEN GOVERNMENT EVIDENCE PROVIDES FURTHER REASON THAT THE SO-CALLED "CONSENSUAL WIRETAPS" SHOULD HAVE BEEN SUPPRESSED.

The present section of the Argument is based on newly discovered evidence that is the result of a substantial *Brady* violation. "A defendant who seeks to premise his motion for a new trial on a *Brady* violation must satisfy the first (unavailability) and second (due diligence) elements of the conventional test [for new evidence]. But the third and fourth elements [of the new evidence test] . . . are merged and replaced with the unitary requirement that the defendant only demonstrate a reasonable probability that, had the evidence been disclosed to the defense in a timely manner, the result of the proceeding would have been different." *United States v. Peake*, 874 F.3d 65, 69 (1st Cir. 2017) (citations omitted). In other words, "the defendant need only point to something sufficient to undermine confidence in the outcome of the trial." *Id.* Given that the *Brady* violations here go to the heart of the government's key evidence—the so-called "consensual" wiretaps—it is clear that a new trial must be granted.

---

counts that have no precedent in the case law and that blur the border between well-accepted practices and alleged criminal conduct, and thereby confused the jury's consideration of the tax count. *See, e.g.*, 10/26/21 Tr. at 30:6-7 (AUSA Frank: "[U]nder the law, whether the money went to Donna Heinel's pocket or whether it went to her program doesn't matter."). In addition, the government's closing inflamed the jury by asserting that Defendants diverted college admission offers from less affluent applicants and that Defendants callously used their wealth to get preferential treatment at the expense of others. *See, e.g.*, *id.* at 46:10-24 (AUSA Frank: "Kids work hard to be recruited athletes. They devote their lives to it. Aaricka Hughes, Laura Janke, the defendants' own witnesses tell you about the hours they spend each day making enormous sacrifices to become elite athletes. And as hard as they work, there are only so many who can make it because there are only so many spots available. . . . For John Wilson, buying an admission spot for his daughters who didn't play sports was funny. It was as simple as writing a check."); *id.* at 49:7-10 (AUSA Frank: "A high-class problem, Posing your kid as a fake athlete to get her admitted to Stanford in a slot reserved for an actual athlete in exchange for money. And then finding out, oh, geez, she wanted to go to Harvard instead.").

Defendants request a new trial because the government disclosed just last week (*after the verdict*) that it withheld crucial exculpatory evidence, in violation of the United States Constitution, *Brady v. Maryland*, and this Court's Local Rules. The so-called "consensual wiretaps" therefore should have been suppressed for two independent reasons: (1) because the new evidence further demonstrates that the "consensual" wiretaps were unlawful; and (2) even if the "consensual" wiretaps were lawful, the Court should have suppressed the wiretap recordings based on a course of government misconduct. Defendants thus suffered extreme prejudice from the faulty admission of the government's most important evidence, thereby "undermin[ing] confidence in the outcome of the trial." *United States v. Raymundi-Hernandez*, 984 F.3d 127, 159 (1st Cir. 2020) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985).

On August 31, 2021, Defendants Abdelaziz and Wilson moved for an order suppressing the so-called "consensual wiretap" calls because such wiretaps were illegal under 18 U.S.C. § 2511. *See* ECF No. 2128, which Defendants incorporate herein by reference and which itself provides sufficient grounds for the exclusion of this evidence and, hence, the granting of a new trial. The motion was based, in part, on an August 17, 2021 Declaration filed by the government (ECF No. 2099-1) which stated that the same "wire" was up on Mr. Singer's phone from June 5, 2018 to March 14, 2019 and that the wiretap "collections [were] performed through the assistance of a wireless telecommunications provider (Provider) pursuant to the Communications Assistance for Law Enforcement Act (CALEA)." However, the government had previously represented to Judge Burroughs that court-authorized monitoring had ceased at midnight on September 27, 2018, and it appears that the government had only sealed wiretaps through September 27, 2018. *See* ECF No. 2128 at 2.

Defendant's Motion (ECF No. 2128) explained the significant issues with the government's "consensual wiretap" of Rick Singer's phone:

- First, 18 U.S.C. § 2511(2)(a)(ii) states that a telecommunications provider such as AT&T can only provide "technical assistance" to law enforcement if the government furnishes the provider with a court order. In this case, the government never procured a court order for the "consensual" monitoring of Mr. Singer's phone—therefore violating the plain language of the statute.

- Regardless of whether the government obtained the required court order, the "consensual wiretap" violated Title III because there was no valid consent, and to the extent the government argued *implied* consent, there was no *evidence* (such as sworn testimony) from which the Court could make such a finding. The consent form executed by Singer stated that law enforcement could monitor any phone "provided to or made available to me by law enforcement." But the government received technical assistance in monitoring Singer's *personal phone*, which was not provided to him by law enforcement. Law enforcement provided Singer with a different phone that was not monitored.

As explained at ECF No. 2128, suppression of the "consensual" wiretaps was required pursuant to 18 U.S.C. § 2515. The Court thereafter denied Defendants' Motion on September 10, 2021. *See* ECF No. 2211 at 3-4. That was the end of the matter until last week.

Then, last week, six days **after** the jury verdict in this case, the government disclosed on the public docket in 1:19-CR-10081 (the "coaches case") two critical documents related to the "consensual" wiretap that were never provided to Defendants. The documents are: (1) a fax "cover sheet" purporting to send Singer's so-called "consent" form to AT&T (attached hereto as Exhibit A); and (2) a fax response cover sheet (attached hereto as Exhibit B).

- The fax cover sheet, which was filled out by the government and submitted to AT&T, is dated 9/28/2018. Under the heading "Judges Name," it states "AUSA Eric Rosen." In the remarks section, the government wrote, "Existing court ordered intercept being converted to Consensual intercept (effective 9/27 – 12/26/2018). This is a renewal."

- The fax response cover sheet is dated 9/28/2018. For "request received," the date is 9/28/2018. The document further states, "AT&T has calculated the end date of your request as 12/26/2018 11:45:00 PM."

These two documents—which were not disclosed until *after* Defendants' conviction—provide critical support for Defendants' argument that the so-called consensual wiretaps should be suppressed.

*First*, the documents prove that AT&T was not sent (and did not receive) Singer's consent form on September 27, 2018, as was originally represented to Defendants. Rather, Singer's consent form was sent to and received by AT&T on September 28, 2018. **This is new information that was not previously disclosed to Defendants.** The one-day difference is significant in light of three representations the government made to this Court and to Judge Burroughs:

- First, on October 2, 2018, AUSA Eric Rosen told Judge Burroughs that "the monitoring of TARGET TELEPHONE 1 began on August 30, 2018 and ceased at midnight of September 27, 2018." *See* ECF No. 2128 at 2.

- Second, AUSA Stearns recently told this Court, "the consensual interceptions did not begin until after AT&T received the consent form." *See* ECF No. 2151.

- Third, Special Agent King's declaration stated that Mr. Singer's phone was continuously monitored from June 2018 to March 2019. *See* ECF No. 2099-1.[5]

If all of these representations are true, then regardless of whether the Court accepts Defendants' argument regarding 18 U.S.C. § 2511, there was at least some time on September 28, 2018 when the United States was monitoring Mr. Singer's phone without *any* lawful authority. That is, there was some period of time on September 28, 2018 when the government was no longer operating under Judge Burroughs's Title III order (and therefore was not complying with the monitoring, minimization, and other requirements of Title III), but also *had not yet furnished* Mr. Singer's consent form to AT&T. During that time period, the government was operating what was unquestionably an illegal wiretap. This illegal wiretap taints the entire "consensual" monitoring

---

[5] Of course, if any of these statements are not to be believed, that is a more serious issue because there has been a fraud on the Court that resulted in an unfair trial of these Defendants. For that reason, Defendants request an evidentiary hearing on the *Brady* issues and these potential misstatements to the Court.

phase under 18 U.S.C. § 2515, requiring suppression of all of the "consensual" wiretaps. It also provides further support for the argument that Congress intended that providers can only furnish technical assistance to law enforcement when they have been ordered to do so by the Court—not when they are simply cajoled into doing so by an AUSA's "say so" that sufficient consent has been obtained. Defendants were not able to make any of these arguments prior to their convictions because the government withheld the critical evidence upon which these arguments are made. The resulting prejudice is clear because, with this additional evidence, the calls should have been suppressed, and therefore Defendants did not "receive[] a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

*Second* (and more importantly), the documents show the government only requested technical assistance from AT&T up until December 26, 2018, and AT&T only agreed to provide technical assistance through that date. In other words, the "consensual" wiretap was valid only through December 26, 2018. This is new evidence that was not available to Defendants before they were convicted. Unless AT&T was furnished with a new consent form (and there was no evidence that it was), *even if* the Court rejects Defendants' argument that a Court Order is required for "technical assistance," there was no valid basis for AT&T to provide technical assistance to law enforcement in intercepting Mr. Singer's communications after December 26, 2018. **At the very least, this means that all so-called "consensual" calls past December 26, 2018 should have been suppressed because AT&T provided technical assistance to law enforcement in intercepting those calls without any lawful authority.** Even had AT&T received Singer's "consent" before the court-ordered wiretap expired, any consent was at best effective to December 26, 2018, and not after. **The Abdelaziz call on January 3, 2019 (Exhibit 621) would therefore be suppressed, showing the extreme prejudice of the *Brady* violation, and entitling Defendant**

**Abdelaziz to a new trial. Similarly, the calls involving Defendant Wilson on January 3, 2019 (Exhibit 623) and January 10, 2019 (Exhibit 625) would likewise be suppressed, showing the extreme prejudice of the *Brady* violation, and entitling Defendant Wilson to a new trial.**

Finally, even if the Court disagrees with the substantive reasons for why the calls should have been suppressed in light of this new evidence, the calls should have nonetheless been suppressed based on a course of government misconduct. That is: for over two years the prosecution team has suppressed two plainly exculpatory documents. *Brady* requires that the prosecutors disclose information that is inconsistent with or tends to negate a defendant's guilt as to any element of the offenses, as well as information that casts doubt on the admissibility of evidence that the government anticipates using in the prosecution. Local Rule 116.2(b) also requires the government to disclose any "information that would tend directly to negate the defendant's guilt concerning any count in the indictment or information" and any "information that would cast doubt on the admissibility of" certain government evidence, including the calls at issue here. These two documents plainly cast doubt on the admissibility of evidence that the government used over and over again at trial. But the government failed to disclose them until **after** Defendants were convicted.

Nor is this the first serious *Brady* violation connected to Singer's "consensual" calls. As the Court is aware, the government previously withheld a highly exculpatory "note" that Singer wrote to himself about federal agents pressuring him to lie. The Court previously stated, with respect to that misconduct, "[a]lthough the government has a continuing obligation to produce exculpatory information pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and Local Rule 116.2, it did not produce Singer's iPhone notes until February, 2020, 16 months after an AUSA became aware of their existence. The government has since admitted that this late disclosure was a mistake

and that the notes should have been provided much earlier." *See* ECF No. 1169 at 3. This Court described the prosecutors' conduct as "irresponsible and misguided." *Id.* The failure to produce these two documents to and from AT&T until **after** Defendants' were convicted is also (at the very least) "irresponsible and misguided." It is even more so because the government was already on notice that it had committed one serious *Brady* violation with respect to the "consensual" recordings. It should have done everything in its power to ensure that all *Brady* material was disclosed to Defendants (at least prior to trial) but utterly failed to do so. The government's actions represent a course of misconduct that the Court should not permit.

The government's failure to disclose these documents violated Defendants' constitutional rights. The Court has inherent supervisory authority to formulate remedies to address the "violation of a recognized right, preserve judicial integrity, and deter illegal conduct." *United States v. Osorio,* 929 F.2d 753, 763 (1st Cir. 1991). The First Circuit has made clear that it will "consider unleashing the supervisory power in criminal cases when confronted with extreme misconduct and prejudice, in order to secure enforcement of better prosecutorial practice and reprimand of those who fail to observe it." *United States v. Horn,* 29 F.3d 754, 760 (1st Cir. 1994). These powers include broad discretion to impose sanctions and formulate remedies, including "suppression of tainted [records]." *Id.* at 766. In this case, the Court should remedy the violation by granting a new trial at which the "consensual" phone calls will be suppressed, either in whole or in part.

## CONCLUSION

For the reasons stated herein, and in the various filings and transcripts that this motion incorporates by reference, the Court should enter a judgment of acquittal on all counts or, in the alternative, order a new trial on all counts.

Dated: October 22, 2021

Respectfully submitted,

GAMAL ABDELAZIZ

By his attorneys,

*/s/ Brian T. Kelly*
Brian T. Kelly (BBO # 549566)
Joshua C. Sharp (BBO # 681439)
Lauren A. Maynard (BBO # 698742)
NIXON PEABODY LLP
53 State Street
Boston, MA  02109
617-345-1000
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com
lmaynard@nixonpeabody.com

Robert Sheketoff (BBO # 457340)
One McKinley Square
Boston, MA  02109
(617) 367-3449
Robert Sheketoff (BBO # 457340)
One McKinley Square
Boston, MA 02109
617-367-3449

JOHN WILSON

By his attorneys,

*/s/ Michael Kendall*
Michael Kendall (BBO # 544866)
Lauren M. Papenhausen (BBO # 655527)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
(617) 979-9300
michael.kendall@whitecase.com
lauren.papenhausen@whitecase.com

Andrew E. Tomback (pro hac vice)
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-1100
atomback@mclaughlinstern.com

## LOCAL RULE 7.1(A)(2) CERTIFICATION

The undersigned counsel hereby certifies that I have conferred with counsel for the government and attempted in good faith to resolve or narrow the issues raised by this motion.

*/s/ Michael Kendall*
Michael Kendall

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on October 22, 2021 this document, filed through the CM/ECF system, will be sent electronically to all registered participants in this matter as identified on the Notice of Electronic Filing (NEF).

*/s/ Michael Kendall*
Michael Kendall

22