UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG |
| | ) | |
| GAMAL ABDELAZIZ *et al.*, | ) | **Motion for Leave to File Excess Pages and** |
| | ) | **Partially Under Seal Granted [Dkt. 2422]** |
| | ) | |
| Defendants | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTIONS
FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL PURSUANT TO
FEDERAL RULES OF CRIMINAL PROCEDURE 29,  33 [DKTS. 2330, 2342, 2351, 2412]**

NATHANIEL R. MENDELL
Acting United States Attorney


KRISTEN A. KEARNEY
LESLIE A. WRIGHT
STEPHEN E. FRANK
IAN J. STEARNS
Assistant United States Attorneys

## TABLE OF CONTENTS

PRELIMINARY STATEMENT………………………………………………….…..……1

LEGAL STANDARD……………………………………………………………….…..……3

ARGUMENT……………………………………………………………………….…..……4

I.    Defendants' Motion for Judgment of Acquittal Pursuant to Rule 29 Should Be
Denied……………………………………………………………………….…....4

    A.    The Evidence Was Sufficient to Convict the Defendants of Conspiracy
to Commit Mail Fraud and Wire Fraud, and Wilson of Wire Fraud……………..4

        1.    Admission Slots Are Property under the Mail and Wire
Fraud Statutes……………………………………….…………………4

        2.    The Indictment Was Not Constructively Amended…....…………………8

        3.    Mail and Wire Fraud Conspiracy Does Not Require Tangible
Economic Harm……………………………………………………....10

        4.    The Evidence Was Sufficient to Convict Wilson on Count One………...12

    B.    The Evidence Was Sufficient to Convict the Defendants of Conspiracy to
Commit Honest Services Mail and Wire Fraud and Federal Programs
Bribery, and Wilson of Substantive Counts of Those Crimes …………………..14

        1.    The Evidence of *Quid Pro Quo* Payments Was Sufficient….…………..14

        2.    The Evidence of Official Acts Was Sufficient or Unnecessary…..……...17

        3.    The Defendants' Legal and Factual Sufficiency Challenges to
Their Honest Services Fraud Convictions Are Without Merit…………..21

        4.    Bribe Payments Need Not Be Made to a "Person"
under 18 U.S.C. § 666…………………………………………….....23

    C.    The Defendants' Remaining Assorted Arguments Are Insufficient
to Reverse the Jury's Verdict under Rule 29…………………………….…….25

II.    Defendants' Motion for a New Trial Pursuant to Rule 33 Should Be Denied..………...33

    A.    The Court's Evidentiary Rulings Were Proper and
Do Not Provide a Basis for a New Trial……………………….………………..33

    B.    The Defendants' Undeveloped Arguments Concerning All
of the Court's Decisions on Motions *in Limine* Are Meritless…………………42

    C.    The Court Did Not Err in Conducting Jury Selection
or in Providing the Jury With a Special Verdict Form…………………….…….43

D.      There Was No Constructive Amendment or Prejudicial Variance…………….....46

E.      The Jury Instructions Were Proper……………………………….………...48

F.      Wilson's Tax Conviction Does Not Provide a Basis for a New Trial…………..48

G.      The Court Did Not Err in Denying the Defendants'
        Motions for Severance………………………………………………………...50

III.    The Government Did Not Hide Exculpatory Evidence and the Wiretap
        Was Legally Authorized at All Times………………………………………...53

A.      Applicable Law…………………..……………………………………54

B.      The Fax Cover Sheet Was Neither Exculpatory
        Nor Improperly Withheld……………………………………………………54

CONCLUSION………………………………………………………………...57

# TABLE OF AUTHORITIES[*]

## Cases

Andrews v. United States,
817 F.2d 1277 (7th Cir. 1987)…………...……………………………...…..30

Black v. United States,
561 U.S. 465 (2010)……………….....………………………………..…...46

Burwell v. Hobby Lobby Stores, Inc.,
573 U.S. 682 (2014) …..................……………………………………..…..24

Fountain v. United States,
357 F.3d 250 (2d Cir. 2004)……………….....…………………..…………………....7

Griffin v. United States,
502 U.S. 46 (1991)……………….....…………………………………...…49

Griggs-Ryan v. Smith,
904 F.2d 112 (1st Cir. 1990)……………....…………….…………………...…50

Irvin v. Dowd,
366 U.S. 717 (1961) …..................………………………………….…..44

Kassel v. Gannett Co., Inc.,
875 F.2d 935 (1st Cir. 1989)……………..……………………………..…....39

Kotteakos v. United States,
328 U.S. 750 (1946) …………….....………..…………………………...…26

McDonnell v. United States,
136 S. Ct. 2355 (2016) ……………..……………………..…...17, 18, 20

Sabri v. United States,
541 U.S. 600 (2004) …………….....…………………………..…..50

Salinas v. United States,
522 U.S. 52 (1997) …..…………….....……..……………………..…..50

Skilling v. United States,
561 U.S. 358 (2010) …..................…….....…………………….…15, 21, 43, 46

United States v. Alfonzo-Reyes,
592 F.3d 280 (1st Cir. 2010) …..…………….....……..………....…………...46

United States v. Antunes,
419 F. Supp. 3d 139 (D. Mass. 2019) …..……………..…….…..……………....9

---

[*] Citations to the final pre-trial conference transcript, charge conference transcript, and trial transcripts appear as "Pre-trial Conf. Tr." (Dkt. 2108), "Charge Conf. Tr." (Dkt. 2405), and "[Date] Tr." (Dkts. 2338, 2387, 2388, 2387–2392, 2398–2407, 2413). The jury's verdict is located at Dkt. 2376. Unless otherwise noted herein, all internal quotation marks, alterations, and citations are omitted.

*United States v. Barrington*,
  648 F.3d 1178 (11th Cir. 2011)…………..……………………………..…..6

*United States v. Beauchamp*,
  986 F.2d 1 (1st Cir. 1993)…...………………………………………..…..38

*United States v. Bedini*,
  861 F.3d 10 (1st Cir. 2017) …...………..…..………………………..…..26

*United States v. Binday*,
  804 F.3d 558 (2d Cir. 2015) …………...……………………..………..…11

*United States v. Blastos*,
  258 F.3d 25 (1st Cir. 2001) …………..…..………………………..…..14

*United States v. Boylan*,
  898 F.2d 230 (1st Cir.1990) …………..…..………………..………..…..51

*United States v. Brandao*,
  539 F.3d 44 (1st Cir. 2008) …...………………………………..……..…10

*United States v. Brandon*,
  17 F.3d 409 (1st Cir. 1994) …...………………………………..……..…41

*United States v. Cadden*,
  965 F.3d 1 (1st Cir. 2020) …….…..…………………………………..…..42

*United States v. Chan*,
  981 F.3d 39 (1st Cir. 2020) …..………..……………...………………...8, 47

*United States v. Chin*,
  15 F.4th 536 (1st Cir. 2021) …...………..………...…..………………..…35

*United States v. Ciampaglia*,
  628 F.2d 632 (1st Cir. 1980) …...………..…..…...……..………………..28

*United States v. Colburn*,
  475 F. Supp. 3d 18 (D. Mass. 2020) …...………..…..………………..…..25

*United States v. Conley*,
  249 F.3d 38 (1st Cir. 2001) ……..…..……...………...……………..…..54

*United States v. Cordero*,
  668 F.2d 32 (1st Cir. 1981) …...………..…..………...…..………………..30

*United States v. Cruz-Ramos*,
  987 F.3d 27 (1st Cir. 2021)…...………..…..………………………..…..26

*United States v. de Castro*,
  843 F.2d 631 (1st Cir. 1988)……...…..…...…………………………..…..43

*United States v. DeCicco*,
  439 F.3d 36 (1st Cir. 2006)……..…..……...…………………………..…..10

*United States v. DeCologero*,
  530 F.3d 36 (1st Cir. 2008)……...…...………..………………...……….39, 51, 52

*United States v. DeLuca,*
    137 F.3d 24 (1st Cir. 1998)……...…………………………………...…...50

*United States v. DeNunzio,*
    2015 WL 5305226 (D. Mass. Sept. 9, 2015) …...……………………...…...11

*United States v. Dowdell,*
    595 F.3d 50 (1st Cir. 2010) …………………...……………………...…...10

*United States v. Dray*,
    901 F.2d 1132 (1st Cir. 1990)……………………………………...……...…..6

*United States v. Ernst,*
    No. 19-10081-IT (D. Mass. July 28, 2021)……………………...……………15

*United States v. Fanfan,*
    468 F.3d 7 (1st Cir. 2006)…...………………...…………………...…...45, 46

*United States v. Fattah,*
    914 F.3d 112 (3d Cir. 2019)…...………………………………….……...…..20

*United States v. Fisher*,
    981 F.3d 39 (1st Cir. 2020) …...………………………………...…...9, 47

*United States v. Foley*,
    73 F.3d 484 (2d Cir. 1996) …...………………………………...…...49

*United States v. Frost*,
    125 F.3d 346 (6th Cir. 1997)…...………………………………...……...…..6

*United States v. George*,
    761 F.3d 42 (1st Cir. 2014)…...………………………………...……...…..3

*United States v. Giry*,
    818 F.2d 120 (1st Cir. 1987)…...………………...……………………...…...11, 23

*United States v. Gobbi*,
    471 F.3d 302 (1st Cir. 2006)…...…………………...……………………...…...49

*United States v. Godfrey*,
    787 F.3d 72 (1st Cir. 2015) …...………………...……………………...…...10

*United States v. Gonzalez*,
    683 F.3d 1221 (9th Cir. 2012) …...………………...……………………...…...30

*United States v. Gorski*,
    880 F.3d 27 (1st Cir. 2018) …...………………...……………………...…...31

*United States v. Hatch*,
    434 F.3d 1 (1st Cir. 2006) …...………………...……………………...…...3

*United States v. Heidecke*,
    900 F.2d 1155 (7th Cir. 1990)…………………...……...………………...…...36

*United States v. Henderson*,
    2 F.4th 593 (6th Cir. 2021) …...………………...……………………...…...20

vi

*United States v. Iacaboni*,
363 F.3d 1 (1st Cir. 2004).………………………………………………….……..8

*United States v. Iacaboni*,
667 F. Supp. 2d 215 (D. Mass. 2009).…………………………………………...…..2

*United States v. Jain*,
1995 WL 9301 (W.D. Mo. Jan. 9, 1995).………………...………………………...24

*United States v. Jarigese*,
999 F.3d 464 (7th Cir. 2021) ….....................…………….……………………...…24

*United States v. Jimenez*,
507 F.3d 13 (1st Cir. 2007) …..............……………...……………………...……24

*United States v. Khoury*,
2021 WL 2784835 (D. Mass. July 2, 2021) …………….…………………….…...6, 11

*United States v. Lasanta-Sanchez*,
681 F. App'x 32 (1st Cir. 2017).………………..……………………………...…..7

*United States v. Leary*,
2019 WL 1584508 (D. Mass. Apr. 12, 2019).…....................…....…………...….31

*United States v. Lopez-Cotto*,
884 F.3d 1, 9 (1st Cir. 2018) ………………….…………………….…..……...10

*United States v. Lopez-Diaz*,
794 F.3d 106 (1st Cir. 2015) …………………………………………………..3

*United States v. Matthews*,
643 F.3d 9 (1st Cir. 2011) …………………….…………………….…..…...5

*United States v. Maggio*
862 F.3d 642 (8th Cir. 2017) …...………………………..……………………..…18

*United States v. Martinez*,
994 F.3d 1 (1st Cir. 2021) …...…………………….…………………….…...18

*United States v. Merlino*,
592 F.3d 22 (1st Cir. 2010)……………..…………………….……..…....4

*United States v. Moran*,
312 F.3d 480 (1st Cir. 2002)…………………..…………………………...…...3, 23

*United States v. Moran*,
393 F.3d 1 (1st Cir. 2004).………………………………………………....…...5

*United States v. Mubayyid*,
658 F.3d 35 (1st Cir. 2011).…………..…………………….…………….....…10

*United States v. Ng Lap Seng*,
934 F.3d 110 (2d Cir. 2019) …………..………………………….…....…18

*United States v. O'Brien*,
14 F.3d 703 (1st Cir. 1994)………………………………….……….....…3

*United States v. O'Bryant*,
   998 F.2d 21 (1st Cir. 1993)……………………………………………………50, 51

*United States v. Owens*,
   917 F.3d 26 (1st Cir. 2019)………………………………………………………...….…..3

*United States v. Pelisamen*,
   641 F.3d 399 (9th Cir. 2011) …...……………………….……..……………….…...…..46

*United States v. Percoco*,
   13 F.4th 180 (2d Cir. 2021) …...……………….………….…………….…17, 18, 20

*United States v. Perez-Melendez*,
   599 F.3d 31 (1st Cir. 2010)……...…………………………….……………………..….3

*United States v. Petrozziello*,
   548 F.2d 20 (1st Cir. 1977)  …..................……………………………...….26, 27, 28

*United States v. Polanco*,
   634 F.3d 39 (1st Cir. 2011)…..………………………………………...….…...…..3

*United States v. Ponzo*,
   853 F.3d 558 (1st Cir. 2017)...…………………………………………….....…..…..3

*United States v. Ponzo*,
   2014 WL 1364796 (D. Mass. Apr. 3, 2014)…………………………………...…..….3

*United States v. Porter*,
   886 F.3d 562 (6th Cir. 2018)...………………………………………………..…..18

*United States v. Potter*,
   463 F.3d 9 (1st Cir. 2006) …...………………….………...…...……………....…..23

*United States v. Prange*,
   771 F.3d 17 (1st Cir. 2014) …...…….……………………….………….…….…..25

*United States v. Renteria*,
   903 F.3d 326 (3d Cir. 2018) …..................………………………….…….…...…..30

*United States v. Repak*,
   852 F.3d 230 (3d Cir. 2017) …..................……………………………...……..20

*United States v. Rivera-Ortiz*,
   14 F.4th 91 (1st Cir. 2021)…....…..…………………………………….……...…..35

*United States v. Rivera Rangel*,
   396 F.3d 476 (1st Cir. 2005)…...…………………………………………...….……...4, 54

*United States v. Roberson*,
   998 F.3d 1237 (11th Cir. 2021) …..................……………….…….………….…..18, 24

*United States v. Rodriguez-Berrios*,
   573 F.3d 55, 69 (1st Cir. 2009)...……….……….……………………….………...…..35

*United States v. Rodriguez-Milian*,
   820 F.3d 26 (1st Cir. 2016)………………….…………………………….…...……..…..8

*United States v. Rommy*,
   506 F.3d 108 (2d Cir. 2007) …...…..…………………………..….…..…30

*United States v. Rosen*,
   130 F.3d 5 (1st Cir. 1997) …….....……………………………....…..…11

*United States v. Sandoval*,
   6 F.4th 63 (1st Cir. 2021)…...….……………………..……...…..….3

*United States v. Sawyer*,
   85 F.3d 713 (1st Cir. 1996)…..….……………………….….…...…21

*United States v. Santopietro*,
   166 F.3d 88 (2d Cir. 1999)…...……………..……………………....…50

*United States v. Scott*,
   270 F.3d 30 (1st Cir. 2001) …...……..….……………………..….…28

*United States v. Sidoo*,
   468 F. Supp. 3d 428 (D. Mass. 2020) …...………………………….…..*passim*

*United States v. Simon*,
   12 F.4th 1 (1st Cir. 2021)…………………………………….…...33, 51

*United States v. Slade*,
   980 F.2d 27 (1st Cir. 1992)……………………………………...…43

*United States v. Soto-Beniquez*,
   356 F.3d 1 (1st Cir. 2003)…...……………………………………....…50

*United States v. Spock*,
   416 F.2d 165 (1st Cir. 1969)…………………………...…….....…45

*United States v. Stepanets*,
   989 F.3d 88 (1st Cir. 2021)…………………………………….…....…31

*United States v. Taylor*,
   54 F.3d 967 (1st Cir. 1995) ……………………………………….…53

*United States v. Thrower*,
   746 F. Supp. 2d 303 (D. Mass. 2010) …………………………………………3, 4

*United States v. Torres-Rosario*,
   658 F.3d 110 (1st Cir. 2011)……………...……………………….….......…7

*United States v. Weyhrauch*,
   548 F.3d 1237 (9th Cir. 2008) …...……………………...……..…..22

*United States v. Valdes-Ayala*,
   900 F.3d 20 (1st Cir. 2018) ……...………………...……………....…47

*United States v. Valenzuela*,
   849 F.3d 477 (1st Cir. 2017) …..................………………….…...28, 30

*United States v. Zannino*,
   895 F.2d 1 (1st Cir. 1990)…..….…….….…………………….…..42, 43

*United States v. Zenon-Rodriguez,*
   289 F.3d 28 (1st Cir. 2002)…………..………..…….………………………....…..…7

*Woodward v. United States,*
   905 F.3d 40 (1st Cir. 2018) …………..……………………………….…...…..20

*Zafiro v. United States,*
   522 U.S. 52 (1997) …...…………….………...………………………….…...…..50

## Statutes and Other Authorities

1 U.S.C. § 1……………………………………………………..…24, 25

18 U.S.C. § 201……………………………………………………17, 18

18 U.S.C. § 666……………………………………………...…*passim*

18 U.S.C. § 1341……………………………………………..…...6

18 U.S.C. § 1343………………………………………………..…6

18 U.S.C. § 1346…………………………………………………...21, 22

18 U.S.C. § 1349……………………………………………..…...6

26 U.S.C. § 7206(1)………………………………….…………48, 50

## PRELIMINARY STATEMENT

"I love it."  Those were defendant Gamal Abdelaziz's words in responding to William "Rick" Singer when Singer told him that his daughter's fraudulent athletic profile was so convincing that corrupt USC athletics insider Donna Heinel wanted Singer to use it as a model to get other fake athletes admitted to USC in exchange for money.  During the same phone call, Abdelaziz agreed that Singer should lie to the IRS about the purpose of his $300,000 payment for his daughter's admission slot, and on a later call, Abdelaziz agreed to lie to USC's admissions department about a phony injury to explain why his daughter had not attended basketball practice.

"Is there a two-for-one special if you've got twins?"  After paying $220,000 to get his son admitted to USC through the side door scheme years earlier, those were defendant John Wilson's words when Singer told him that he would make his daughters "a sailor or something because of where you live."  After Wilson paid Singer $500,000 to have the Stanford sailing coach purport to "recruit" one of his non-athlete daughters, Singer told Wilson that the coach had "to actually recruit some real sailors" so that "Stanford doesn't catch on to what he's doing."  Wilson laughed and agreed: "He's got to actually have some sailors."  Wilson later paid Singer an additional $500,000 to have his other daughter admitted to Harvard as a purported athletic recruit, and told Singer that his daughter "could be even the mascot."

The defendants' devastating admissions, captured on tape, constituted only a sliver of the overwhelming evidence of their guilt admitted during the four-week trial, including nearly 250 exhibits and testimony from 17 witnesses.  After considering that evidence, it took the jury barely a day of deliberations to return a verdict finding the defendants guilty on all counts.  During two-and-a-half years of pre-trial litigation, the defendants tried to delay that verdict by filing one unmeritorious motion after another.  Now convicted, they pick-up where they left off: In 65-plus

pages of briefing supporting their motions for judgment of acquittal and a new trial under Fed. R. Crim. P. 29 and 33, they assert that this a "misguided prosecution" that has "nothing to do" with fraud or bribery.  A jury of their peers unanimously disagreed.  Once again, the defendants' motions are without merit.

The defendants' Rule 29 motion should be denied because this Court has previously rejected nearly all of their legal arguments, and the remainder are contrary to precedent, and because their factual challenges fail to recount the evidence in the light most favorable to the verdict, as Rule 29 requires.

Their Rule 33 motion fares no better.  Without meaningfully developing any of their arguments, they challenge essentially every one of this Court's pre-trial and mid-trial rulings and "incorporate by reference" dozens of motions and briefs.  The defendants' motion is not a serious attempt to obtain a new trial under Rule 33 by showing a "miscarriage of justice."  Instead, it is a transparent and legally specious attempt to preserve appellate rights in bulk.  And for good measure, as they have throughout this case, the defendants throw in another frivolous attack on the government for a purported *Brady* violation.  This time, the "crucial exculpatory" evidence they accuse the government of withholding is a fax cover sheet that confirms the government sent Singer's telephone carrier his signed consent to record his phone calls on September 28, 2018, before the Court-authorized wiretap of his phone expired.

In short, "nothing substantive from [the defendants'] profuse filings warrants overruling the jury that this Court empaneled and charged with great care or reconsidering the Court's legal rulings." *United States v. Iacaboni*, 667 F. Supp. 2d 215, 218 (D. Mass. 2009) (Gorton, J.).  For these reasons, and the reasons set forth below, the defendants' motions should be denied.

## **LEGAL STANDARD**

The standard governing motions for judgment of acquittal under Fed. R. Crim. P. 29 imposes "daunting hurdles" for defendants, *United States v. Hatch*, 434 F.3d 1, 4 (1st Cir. 2006), and it is therefore "rare" for a court to reverse a conviction under Rule 29. *United States v. Lopez-Diaz*, 794 F.3d 106, 108 (1st Cir. 2015). Indeed, challenges to convictions under Rule 29 are "a tough sell," *United States v. Polanco*, 634 F.3d 39, 45 (1st Cir. 2011), and defendants seeking acquittal "face an uphill battle." *United States v. Perez-Melendez*, 599 F.3d 31, 40 (1st Cir. 2010). In considering such motions, courts must determine "whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir. 1994).

Accordingly, granting a motion for judgment of acquittal requires a court to find that "no levelheaded jury could have found the defendants guilty," *United States v. Sandoval*, 6 F.4th 63, 75 (1st Cir. 2021), and in applying Rule 29, a court must review the evidence in a "prosecution-friendly light" and make all "credibility choices in the government's favor." *United States v. George*, 761 F.3d 42, 48 (1st Cir. 2014). Further, it is "important[]" that courts "place no premium . . . upon direct as opposed to circumstantial evidence since both types of proof can adequately ground a conviction." *United States v. Owens*, 917 F.3d 26, 39 (1st Cir. 2019). "[A]s long as the guilty verdict finds support in a plausible rendition of the record, it must stand." *United States v. Moran*, 312 F.3d 480, 487 (1st Cir. 2002); *see also United States v. Ponzo*, 2014 WL 1364796, at *2 (D. Mass. Apr. 3, 2014) (Gorton, J.) (denying Rule 29 motion), *aff'd*, 853 F.3d 558 (1st Cir. 2017); *United States v. Thrower*, 746 F. Supp. 2d 303, 305 (D. Mass. 2010) (Gorton, J.).

Similarly, the First Circuit applies a demanding standard to Rule 33 motions for a new trial, which should be denied absent "exceptional circumstances." *United States v. Merlino*, 592 F.3d 22, 32 (1st Cir. 2010) (reversing district court's order granting new trial). A court may vacate a jury verdict and grant a new trial under Rule 33 only "if the interests of justice so require." *Thrower*, 746 F. Supp. 2d at 307 (quoting Fed. R. Crim. P. 33). The "interests of justice so require" a new trial "only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict." *Id.* (quoting *Merlino*, 592 F.3d at 32); *see also United States v. Rivera Rangel*, 396 F.3d 476, 486 (1st Cir. 2005) (reversing grant of new trial).

## ARGUMENT

### I.      Defendants' Motion for Judgment of Acquittal Pursuant to Rule 29 Should Be Denied

#### A.      The Evidence Was Sufficient to Convict the Defendants of Conspiracy to Commit Mail Fraud and Wire Fraud, and Wilson of Wire Fraud

The defendants advance four principal arguments in asserting that the jury's verdict convicting them of conspiracy to commit mail fraud and wire fraud in Count One and Wilson of wire fraud in Counts Six, Eight, and Nine should be reversed under Rule 29. Dkt. 2330 at 7–12, 26–29. They contend that: (i) admission slots are not property as a matter of law, and that there was no evidence that admission slots are property; (ii) the government constructively amended the indictment by referring to "athletic recruitment slots" in its opening statement; (iii) there was no evidence that the charged conspiracy caused tangible economic harm to the universities; and (iv) as to Wilson, there was insufficient evidence that he "conspired to make false statements" that were material. *Id.* These arguments are without merit.

##### 1.      Admission Slots Are Property under the Mail and Wire Fraud Statutes

The defendants' contention that "admission slots cannot, as a matter of law, constitute property," Dkt. 2330 at 7–9, is unavailing for at least two reasons.

4

<u>First</u>, this Court has previously decided, multiple times, that admission slots are property. Those rulings "should remain the law of th[e] case throughout the litigation, unless and until the decision is modified or overruled by a higher court." *United States v. Moran*, 393 F.3d 1, 7 (1st Cir. 2004); *see also United States v. Matthews*, 643 F.3d 9, 12 (1st Cir. 2011) ("[T]he law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."). The law of the case doctrine precludes previously rejected legal arguments in Rule 29 and 33 motions unless there exist "rare and narrowly circumscribed" "exceptional circumstances," such as where "controlling legal authority has changed dramatically," or if "the earlier decision is blatantly erroneous." *Matthews*, 643 F.3d at 14. More than a year ago, after extensive briefing, this Court concluded that "the definition of 'property' [under the mail and wire fraud statutes] extends readily to encompass admission slots." *United States v. Sidoo*, 468 F. Supp. 3d 428, 441 (D. Mass. 2020). The Court has since reaffirmed that holding in ruling on other dispositive motions, pre-trial evidentiary motions, and jury instructions.[1] The defendants do not, and cannot, suggest that "controlling legal authority has changed dramatically" since the Court reached that conclusion, and they therefore may not use Rule 29 to relitigate previously rejected arguments.

<u>Second</u>, even were the Court to consider the merits of the defendants' renewed argument, it should reach the same conclusion. As the government has previously argued,[2] the concept of

---

[1] *See, e.g.*, *United States v. Sidoo*, 471 F. Supp. 3d 369, 377 (D. Mass. 2020) ("For reasons previously explained, this Court has determined that so-called 'application slots' are property of a university [] under the mail and wire fraud statutes."); Pre-trial Conf. Tr. at 20 ("This Court has already concluded that admission slots . . . are both limited and highly coveted, are valuable because they are limited and, in fact, may constitute the object of the alleged conspiracy."); Charge Conf. Tr. at 12 ("I have determined, to the contrary, an admission slot is [] property.").

[2] The government incorporates by reference its prior briefing on this issue and all other previously raised issues that the defendants relitigate in their post-trial motions. *See, e.g.*, Dkt. 1170 at 25–35.

"property" under the mail and wire fraud statutes 18 U.S.C. §§ 1341, 1343, 1349 "is to be interpreted broadly." *United States v. Dray*, 901 F.2d 1132, 1142 (1st Cir. 1990). And courts have held—relying on logic that this Court found applied "neatly" to the allegations and evidence in this case, *see Sidoo*, 468 F. Supp. 3d at 441—that universities have property rights in their degrees and grading systems. *See United States v. Frost*, 125 F.3d 346, 367 (6th Cir. 1997) (holding that university had property right in unissued degrees); *see also United States v. Barrington*, 648 F.3d 1178, 1191 & n.11 (11th Cir. 2011) (A "[u]niversity certainly has an intangible property interest in the integrity of its grading system"); *United States v. Khoury*, 2021 WL 2784835, at *2 (D. Mass. July 2, 2021) (Casper, J.) (agreeing with this Court's conclusion in holding that university admission spots are property because they have "tangible value, not just from what [admission] offers to prospective students, but also from the limited nature of [admission]"). Consistent with this precedent, this Court's prior holding remains correct: "Admission slots at competitive universities, such as USC, are both limited and highly coveted," and "[t]he ability to grant admission is an asset of the university subject to its control." *Sidoo*, 468 F. Supp. 3d at 441.

Unable to evade the law of the case or offer new precedent, the defendants retreat to a fallback argument: that whether admission slots are property is a "mixed question of law and fact," and that there was no evidence at trial that such slots are property of universities like USC. Dkt. 2330 at 9–10. This assertion, offered without legal support, is meritless for at least four reasons.

First, the defendants have conceded—including in dispositive motions, proposed jury instructions, and even their Rule 29 motion itself—that this is a question of law for the Court to decide. *See, e.g.*, Dkt. 1042 at 7–23 (arguing that Count One should be dismissed because admission slots are not property as a matter of law); Dkt. 2015-1 at 45 (proposed jury instruction that admission slots are not property as a matter of law); Dkt. 2330 at 7–8 (contending that whether

admission slots are property is "a matter of law"). This "concession constitutes waiver," and the defendants cannot change their mind because the Court decided the question of law contrary to their position. *United States v. Lasanta-Sanchez*, 681 F. App'x 32, 35 (1st Cir. 2017) (quoting *United States v. Torres-Rosario*, 658 F.3d 110, 116 (1st Cir. 2011)).

Second, the Court has previously concluded that the question whether admission slots are property is "a question of law for the Court," and the law of the case doctrine therefore forecloses this argument as well. *See* Charge Conf. Tr. at 12 ("I have determined to the contrary, an admission slot is intangible property. . . . That's a question of law."); 10/7/21 Tr. at 39.

Third, whether admission slots are property of universities falling within the scope of the mail and wire fraud statutes is, indeed, a question of law. *See, e.g.*, *United States v. Zenon-Rodriguez*, 289 F.3d 28, 31 (1st Cir. 2002) (explaining that construing the reach of criminal statutes is a matter for courts and explaining that "[w]hether prosecutions under [a Title 18 statute] may include" certain acts is "a question of law").[3]

Fourth, even were the Court to reconsider and find that the issue is a mixed question of law and fact—which it should not—there was ample evidence supporting the jury's verdict, including testimony from USC admissions officer Rebecca Chassin that, among other things, admission slots at USC are limited, the university has an interest in admitting the most qualified students, and USC can revoke admission if a student lies during the application process. *See, e.g.*, 9/20/21 Tr. at 146, 148, 152, 158, 186, 202–04; 9/21/21 Tr. at 124, 128–29, 134; *see also Sidoo*, 468 F. Supp. 3d at

---

[3] Without citation or elaboration, the defendants assert that "the three factors [they] discuss[] [] are the only factors that bear on whether admissions 'slots' . . . are property." Dkt. 2330 at 10 n.9. That argument is waived for lack of developed argumentation and in any event lacks support in the law. *See, e.g.*, *Fountain v. United States*, 357 F.3d 250, 256 (2d Cir. 2004) (observing that *Cleveland*'s "particular selection of factors" did not establish "rigid criteria for defining property but instead . . . provid[ed] permissible considerations.").

440–42 (describing factors considered in holding admission slots are property, including that admission slots are "both limited and highly coveted").[4]

## 2.   The Indictment Was Not Constructively Amended

Because the government used the phrase "athletic recruitment slots" a few times in its opening statement, the defendants next assert that the government "abandoned" its original theory regarding "admission slots," resulting in an impermissible "constructive amendment" of the indictment. Dkt. 2330 at 8. The defendants' conclusory, one-paragraph argument is undeveloped and without legal support.[5] Accordingly, the Court should consider it waived. *See United States v. Chan*, 981 F.3d 39, 50 & n.4 (1st Cir. 2020) (undeveloped arguments without support are waived, collecting cases); *United States v. Rodriguez-Milian*, 820 F.3d 26, 32 n.2 (1st Cir. 2016) (constructive amendment argument waived where underdeveloped in briefing).

In any event, parsing two words in an opening statement does not establish a constructive amendment or justify vacating the jury's verdict. A constructive amendment (contrary to a variance), occurs only "when the charging terms of the indictment are altered, either literally or in

---

[4] As to the substantive wire fraud charges against Wilson relating to Stanford and Harvard in Counts Six, Eight, and Nine, his own recorded words are more than sufficient to sustain the jury's verdict finding that Wilson participated in a scheme to defraud those universities by obtaining admission slots by means of materially false pretenses. *See, e.g.*, Ex. 591 (Singer: "I can send [the Stanford sailing coach] your [$]500,000 that you wired into my account to secure the spot for one of your girls. I asked him for a second spot in sailing and he said he can't do that because he has to actually recruit some real sailors so Stanford doesn't . . . catch on." Wilson: "[Laughter] Right. . . . Yeah, no. He's got to . . . actually have some sailors. Yeah." Singer: "Yeah. So that Stanford doesn't catch on to what he's doing." Wilson: "Right."); Ex. 602 (Singer: "So I got the senior women's administrator at Harvard is going to give us a spot. What we have to do is we'll have to give, um, her, um, $500,000. . . ." Wilson: "Ok, great. . . . [S]ailing is actually a logical thing. She could be even the mascot, whatever . . . [laughter]."). Further, having established that admission slots are property of USC, the evidence leads to the same conclusion about two even more competitive schools.

[5] Indeed, the defendants cite no precedent about constructive amendments at all, save for one inapposite case in which the First Circuit found constructive amendment in a forfeiture order for a defendant who pleaded guilty. *See United States v. Iacoboni*, 363 F.3d 1, 7 (1st Cir. 2004).

effect, by prosecution or court after the grand jury has last passed upon them." *United States v. Fisher*, 3 F.3d 456, 462–63 (1st Cir. 1993).   As this Court has held, "[t]he existence of a constructive amendment is generally determined upon consideration of the *statutory elements of a crime* and an analysis of whether the crime charged has been altered between indictment by the Grand Jury and trial." *United States v. Antunes*, 419 F. Supp. 3d 139, 141 (D. Mass. 2019) (Gorton, J.) (emphasis added).

The government made clear in its opening statement, its closing argument, and the evidence adduced at trial[6] that "athletic recruitment slots" were *the means by which* the defendants used fraud and bribery to obtain "admission slots."  Belying even a non-prejudicial variance, much less a constructive amendment, the defendants did not conspire to obtain athletic recruitment slots *as opposed to* admission slots; rather, as charged in the indictment, they conspired to use fraud and bribery to (1) "secur[e] the *admission* of the defendants' children to selective colleges", (2) by "*using* . . . bogus academic and athletic credentials, falsified applications, and bribes," and "fabricating athletic 'profiles' containing falsified athletic credentials" and "bribing athletic coaches and university administrators to designate students as purported athletic recruits." FSI ¶¶ 65, 66(f), (g) (emphasis added).  And as the jury found beyond a reasonable doubt, that is exactly what the evidence proved.  At most, the government used "athletic recruitment slots" interchangeably with "admission slots," insofar as the evidence adduced at trial was that the overwhelming majority of recruited athletes were admitted, and that recruitment slots and

---

[6] *See, e.g.*, 9/13/21 Tr. at 26 (Opening statement: describing the conspiracy as involving "coaches and athletic department administrators who agreed to facilitate *the admission* of these students *as phony athletic recruits* in exchange for money") (emphasis added); 10/6/21 Tr. at 10–11 (Closing argument: summarizing the evidence that "the defendants conspired to get their children into college through fraud and bribery *to gain admission* as *recruited athletes* based on falsified credentials, to induce corrupt Athletic department insiders to fool their own colleagues in the Admissions Department in exchange for money . . .") (emphasis added).

admission slots were therefore effectively the same thing.  The First Circuit has rejected

constructive amendment arguments with far more weight than the defendants' retreat to semantics,

and the government's reference to athletic recruitment slots in its opening statement is not remotely

akin to those rare situations in which the First Circuit has found constructive amendments.

*Compare, e.g.*, *United States v. Brandao*, 539 F.3d 44, 56–57 (1st Cir. 2008) (finding constructive

amendment where the jury was instructed on elements of "the substantive crime of murder" even

though indictment "had only charged conspiracy to murder," but affirming on plain error review),

*with United States v. Dowdell*, 595 F.3d 50, 68 (1st Cir. 2010) ("no constructive amendment

present where the difference between the evidence presented and the text of the indictment does

not affect any element of the offense," and finding no constructive amendment where indictment

charged distribution of *different drug* than what evidence at trial proved).[7]

### 3.    Mail and Wire Fraud Conspiracy Does Not Require Tangible Economic Harm

Next, the defendants contend that their convictions for mail and wire fraud conspiracy must

be reversed because "the government had to prove that the alleged scheme (1) deprived USC of

potentially valuable economic information; and (2) caused tangible economic harm to USC."  Dkt.

2330 at 10–11.  That argument is not correct for at least two reasons.

---

[7] *See also United States v. Lopez-Cotto*, 884 F.3d 1, 9–10 (1st Cir. 2018) (no constructive amendment where "imperfect" jury instructions focused on "single benefit" theory in bribery scheme even though indictment charged "stream of benefits" theory); *United States v. Godfrey*, 787 F.3d 72, 78–79 (1st Cir. 2015) (no constructive amendment where, despite variance in evidence of material falsehoods, "the jury convicted [defendants] for precisely the mail and wire fraud for which they were charged"); *United States v. Mubayyid*, 658 F.3d 35, 52–53 (1st Cir. 2011) (same, despite change in object of conspiracy, because the First Circuit has "declined to parse the conspiratorial object so finely"); *United States v. DeCicco*, 439 F.3d 36, 46–47 (1st Cir. 2006) (no constructive amendment where indictment charged defendant with submitting false claims for "building loss insurance proceeds," but evidence centered on "demolition expenses").

<u>First</u>, the defendants were convicted on Count One for *conspiracy* to commit mail and wire fraud.  Accordingly, the government needed to prove only that: (1) the conspiracy charged in Count One existed between at least two people to commit mail or wire fraud; and (2) the defendants willfully joined in that agreement.  *See* Dkt. 2014 at 18; 10/7/21 Tr. at 35.  No tangible economic harm is required because the crime of conspiracy is complete upon the agreement's inception.  *See United States v. Giry*, 818 F.2d 120, 126 (1st Cir. 1987).

<u>Second</u>, and in any event, the First Circuit has made clear that the scope of the mail and wire fraud statutes is "broad," and such schemes "must, at a minimum, contemplate *either* some articulable harm befalling the fraud victim *or some gainful use of the object of the fraudulent scheme by the perpetrator*, regardless of whether this use is profitable in the economic sense." *United States v. Rosen*, 130 F.3d 5, 9 (1st Cir. 1997) (emphasis added).  Thus, as this Court has noted, it is "mistaken" to argue that economic harm or "intent to harm or financially injure is required for wire fraud" because "[t]he First Circuit has, on multiple occasions, held that in fraud cases the government must prove merely that the defendant had an intent to defraud," and "[o]ther circuits concur."  *United States v. DeNunzio*, 2015 WL 5305226, at *4 (D. Mass. Sept. 9, 2015) (Gorton, J.) (rejecting argument that harm or intent to harm was necessary for wire fraud conviction and assertion that victim "got what it bargained for," collecting cases); *see also Khoury*, 2021 WL 2784835, at *3 (explaining why university admission slots are also cognizable property under the "right to control theory" and how scheme of making payment in exchange for recruiting underqualified athlete, as alleged, caused "indirect" "tangible economic harm," such as by "providing the victim with lower-quality goods than it otherwise could have received").  The defendants' argument fails even based on the out-of-circuit precedent on which they rely but selectively quote.  Dkt. 2330 at 11–12; *United States v. Binday*, 804 F.3d 558, 570–71 & n.11 (2d

Cir. 2015) ("[N]o 'pecuniary harm' need be inflicted or intended, so long as the deceit goes to an essential element of the bargain.").

### 4.      The Evidence Was Sufficient to Convict Wilson on Count One

Finally, Wilson contends that there was no evidence that he "conspired to make false statements to USC" because the government "failed to prove that [his son's water polo] profile included any false or misleading statements, let alone any that are materially false or misleading." Dkt. 2330 at 26–29.  That is not true—nor, of course, was the government specifically required to prove material falsities on the "player profile" Singer sent Wilson.  Indeed, the defendant's own words about his son's water polo abilities were sufficient to sustain the verdict.  And the evidence was overwhelming regarding Wilson's agreement to obtain admission for his son as a water polo recruit through fraud, including but not limited to, the following:

- In March 2013, after Wilson confirmed with Singer that "none of the [Division I water polo teams he was interested in] . . . even want to meet with him on their campus" and college "water polo [was] n[o]t realistic for Johnny," he asked about the side door at USC and whether "the other kids [would] know he was a . . . side door person?"  Ex. 49.  Singer told Wilson his son would not even have to attend water polo practices and that "frankly after the 1st semester he can move on."  Wilson stated that "obviously" his son's abilities were "below the other freshmen" and worried that he would be a "clear misfit."  *Id.*

- After Wilson sent Singer pictures of his son playing water polo for a player profile, he asked "what does Jovan need by [September]?  . . . Do I make the first payment to you then?"  Singer responded, "I believe I have everything.  Transcript test scores and a player profile so he can add Johnny to his recruit list and present him to admissions in October."  Ex. 75.  Wilson was informed by his son's high school that, based on Johnny's academic credentials, it was highly unlikely he would be admitted to USC.  Ex. 87.

- Vavic told Singer, "I need [Johnny Wilson's] resume, needs to be a good resume."  Ex. 81.  About one week later, Singer told Wilson, "Jovan has Johnny's stuff and asked me to embellish his profile more, which I am doing."  Ex. 83.  Wilson responded, "Thx . . . When is Jovan going to be able to give us decision on USC?  And when do I pay u?  Was it 50% in nov?  50% in feb when we get final official notice?"  Singer told Wilson, "Jovan will provide Johnny's info to admission . . . No payment of money till

12

he gets a verbal and written from admissions and then 50 percent to a savings account I set up.  Then the remainder upon an acceptance letter." *Id.*

- Less than a week later, Singer sent Wilson the profile that Vavic had asked him to "embellish."  Ex. 88.  It was replete with falsities, even according to the testimony of Wilson's *own witnesses*.  Singer invented the swim times (*see* Exs. 84, 85)—times that former USC water polo player Andrew Mericle, a close friend of the Wilson family, testified he did not know were even "possible."  10/1/21 Tr. at 68–69.  And Jack Bowen, Johnny Wilson's high school coach, testified that (i) he was "surprised" that Johnny was admitted to USC as a water polo player and "did not think that [he] would get into USC as a water polo player," and that (ii) the credentials on the profile sent to Wilson and the profile submitted to USC's Subco were "mostly false," and that the "falsehoods" made him look like a "better player."  10/4/21 Tr. at 82, 125–28, 174–75, 178–82.

- After Singer sent Wilson the fake profile, Wilson responded from the same e-mail account asking about the "expectations" for this "WP [water polo] approach."  Singer told Wilson that his son would not even need to "get in the pool."  Ex. 89.

- When Vavic received the falsified profile, he added even more falsehoods that were submitted to USC's subcommittee on athletic admissions ("Subco"), including that Wilson was "top 10" in the country at his position, and would be an "immediate impact player" and the "fastest player on the team."  Exs. 105, 107.  Numerous witnesses, including Mericle, Bowen, and USC assistant water polo coach Casey Moon testified those representations were false.  *See* 9/28/21 Tr. at 110–12; 10/1/21 Tr. at 79–80; 10/4/21 Tr. at 180.

- After the Subco approved Wilson's son for admission based on those false credentials, in an e-mail titled "USC fees," Wilson told Singer, "Thanks again for making this happen!  Pls give me the invoice.  What are the options for the payment?  Can we make it for consulting or whatever from the [K]ey so that I can pay it from the corporate account?"  Ex. 710.  Wilson later wired $220,000 to The Key and Singer's sham charity KWF, and falsely deducted the payments from his taxes as a purported charitable donation and fake business expenses.  9/29/21 Tr. at 185; *see* Exs. 109, 110, 112.

From this evidence, the jury was easily justified in concluding that there were, in fact, falsehoods in the athletic profile Singer had prepared for Johnny Wilson; that Wilson knew of (and approved of) those falsehoods because, among other things, Singer e-mailed the fraudulent profile to him and Wilson knew that his son was not qualified to be recruited by USC; that Vavic caused those falsehoods, and additional lies, to be presented to USC's Subco to secure Johnny's admission (a fact Wilson does not seriously dispute); and that Wilson paid Singer to make that happen.

Confronted with that overwhelming evidence, Wilson now challenges the *materiality* of those false misrepresentations, asserting that Johnny would "have been admitted to USC based on his true credentials," that he was "qualified to be a recruit" for the USC water polo team, and that therefore any "misstatements . . . were immaterial." Dkt. 2412 at 4–5. This argument is frivolous. First, it is not true, as Wilson contends, that materiality could be proven only if Johnny "would not have been admitted to USC based on his true credentials," and Wilson fails to cite any case in which a court disturbed a verdict under Rule 29 on the fact-intensive issue of materiality. *See, e.g.*, *United States v. Blastos*, 258 F.3d 25, 29 (1st Cir. 2001) ("After review of the entire record, we hold that no jury could reasonably find that the false and fraudulent pretenses . . . made by the defendant were not material as they had the *natural tendency to influence the decisionmaker*.") (emphasis added). Second, USC admissions officer Chassin did, in fact, testify that (i) the admissions committee believed the falsehoods in Johnny Wilson's Subco packet, and (ii) Wilson's son was admitted as an athletic recruit, in reliance on those falsehoods, and would not have been admitted to USC on his academic credentials alone. *See* 9/20/21 Tr. at 161–69.

**B.     The Evidence Was Sufficient to Convict the Defendants of Conspiracy to Commit Honest Services Mail and Wire Fraud and Federal Programs Bribery, and Wilson of Substantive Counts of Those Crimes**

The defendants argue that their convictions for conspiracy to commit honest services mail and wire fraud in Count One and federal programs bribery in Count Two, and Wilson's convictions for substantive honest services wire fraud in Counts Six, Eight, and Nine and for substantive federal programs bribery in Counts Eleven and Twelve must be reversed for four reasons. This Court has previously rejected several of these arguments, and the remainder are equally meritless.

**1.     The Evidence of *Quid Pro Quo* Payments Was Sufficient**

First, the defendants contend that their convictions must be reversed because "a payment to an alleged victim cannot constitute a bribe or kickback, even where a coach or administrator

may receive some . . . benefit from the payment." Dkt. 2330 at 12–13. But this Court has, on several occasions, held otherwise: "Payments made to accounts controlled by university insiders, even if such payments were ultimately received by the universities, may still constitute a benefit to those insiders," and therefore a bribe, if "the payments were made to designated accounts that were either controlled by the corrupt insiders or that otherwise inured to their benefit professionally" such that the payments "represent a 'thing of value' to those insiders, even if the payments were not deposited directly into personal accounts." *Sidoo*, 468 F. Supp. 3d at 444–45; *see also* Charge Conf. Tr. at 14 ("[T]he *Skilling* decision allows for the victim to benefit from the bribe."). Accordingly, consistent with precedent from other courts,[8] "[e]ven if the victim, in this case the university, ends up profiting as a result of a [bribery] scheme, there still exists actionable harm 'in the denial of that party's right to the offender's honest services,'" and "[t]hat the payments made by defendants eventually went to USC does not thereby preclude such payments from constituting bribes." *Sidoo*, 468 F. Supp. 3d at 445 (quoting *Skilling v. United States*, 561 U.S. 358, 400 (2010)). In addition to the honest services fraud charges, "[t]his logic applies to the federal programs bribery charges as well." *Id.* at 445. Accordingly, the law of the case doctrine compels the denial of the defendants' motion on this basis. And even were the Court to reach the merits of their renewed argument, the "law is clear that payments to third parties, including even charities, may qualify as bribes or kickbacks . . . [s]o long as the money was paid with corrupt intent—as a *quid pro quo* for recruiting students as athletes based on fals[ified] credentials." Dkt.

---

[8] *See, e.g.*, *United States v. Ernst*, No. 19-10081-IT (D. Mass. July 28, 2021), Dkt. 733 at 3 ("The requirement that the government prove a 'private payment' or 'private gain' does not foreclose . . . a scenario where the Defendant agreed to have bribes paid to university accounts so long as the government proves that the defendant entered into a *corrupt or illegitimate* agreement to receive something 'of value' where a thing of value is defined broadly to include the value which the defendant subjectively attaches to the items received.").

1170 at 43 (collecting cases).  The Court correctly instructed the jury on this issue.  *See* 10/7/21
Tr. at 48, 54–55.

Next, the defendants challenge the sufficiency of the evidence of a corrupt *quid pro quo*,
but notably, do not dispute that the money they paid was in exchange for the admission of their
children as recruited athletes.  *See* Dkt. 2330 at 12–18, 39.  Instead, they simply assert, without
more, that there was "zero evidence" that their payments were made to "designated university
accounts over which the bribe recipients exercised discretion or that otherwise benefitd [*sic*] them
professionally."  *Id.* at 39; *see Sidoo*, 468 F. Supp. 3d at 444–45 ("[P]ayments [] made to designated
accounts that were either controlled by the corrupt insiders or that otherwise inured to their benefit
professionally" may serve as a "thing of value to those insiders even if the payments were not
deposited directly into personal accounts").  The Court correctly rejected this argument before
closing arguments.  *See* 10/6/21 Tr. at 6.  At trial, there was detailed testimony and other evidence
establishing that the payments from the defendants and other co-conspirators were "made to
designated accounts that were either controlled by the corrupt insiders or that otherwise inured to
their benefit professionally," including, *inter alia*, evidence that: (i) Vavic controlled and oversaw
the USC men's water polo fund, and money in the men's water polo fund benefited Vavic;[9]
(ii) Heinel controlled and oversaw the USC Women's Athletic Board fund;[10] (iii) Heinel directed

---

[9] *See, e.g.*, 9/28/2021 Tr. at 98 (Casey Moon testifying that Vavic controlled the account);
*see also, e.g.*, *id.* at 183–84; 9/27/2021 Tr. at 15, 72.

[10] *See, e.g.*, 9/27/2021 Tr. at 20–21 (Laura Janke testifying that fund "was run by" Heinel);
*see also id.* at 19 (Janke testifying that side door bribe payments "would go to Donna Heinel at
USC to whatever program or funds she wanted them directed to"); *id.* at 22 (Janke testifying that
the Women's Athletic Board fund "was a fund that [Heinel] oversaw"); Ex. 555 (Singer telling co-
conspirator on wiretap: "[I]t will go to Donna Heinel Senior Women's Athletic Director.  It will
be made out to USC Women's Athletics. . . . [E]ssentially just it goes right in-right to her.  She
took care of that part.").

16

Singer's clients to send bribe payments to that fund;[11] (iv) Heinel's salary increased as payments to that fund increased, those increased payments were principally from Singer's clients, and Heinel's performance was evaluated based, in part, on her fundraising.[12] That evidence was more than sufficient to sustain the jury's verdict.[13]

### 2. The Evidence Regarding Official Acts Was Sufficient or Unnecessary

Second, the defendants contend that their convictions must be reversed because there was no evidence that coaches and administrators like Vavic and Heinel agreed to perform an "official act" by securing the admission of the defendants' children as recruited athletes using false pretenses in exchange for money.  Dkt. 2330 at 13–18.  "At most," the defendants maintain, the coaches' presentation of athletic recruits to Subco was "akin to writing a letter of recommendation . . . which is not an official act."  *Id.* at 17–18.  The defendants' argument is without merit for several reasons.

As an initial matter, and as this Court has correctly held, federal programs bribery under 18 U.S.C. § 666 and conspiracy to commit the same do not require proof of an official act.  *See* 10/7/21 Tr. at 5; Charge Conf. Tr. at 33.  Consistent with the text of 18 U.S.C. § 666, every court of appeals to address the issue, in the wake of the Supreme Court's decision in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), has held that federal programs bribery under that statute, unlike 18 U.S.C. § 201, does not require an official act.  *See, e.g., United States v. Percoco*, 13

---

[11] *See* Ex. 396 (voicemail from Heinel to Singer directing funds to Women's Athletic Board fund); 9/29/2021 Tr. at 41 (auditor testimony about source of money in that fund).

[12] *See* Exs. 2, 722; *see also* 9/29/2021 Tr. at 57–62 (Lauren George testifying, based on a review of financial and Heinel personnel records, about funds in Women's Athletic Board fund increasing over time, and Heinel's job performance being evaluated based on fundraising).

[13] Likewise, with respect to Counts Six, Eight, and Nine, the evidence demonstrated that Wilson knew the money was being paid for the benefit of the Stanford sailing coach and the Harvard athletics administrator.  *See, e.g.*, Exs. 591, 594, 623, 625.

F.4th 180, 190 n.2 (2d Cir. 2021) ("[A]s we have repeatedly explained, *McDonnell*'s 'official act' standard for the quo component of bribery as proscribed by § 201 does not apply to the more expansive language of § 666.").[14]

As to Wilson's convictions for honest services wire fraud and the defendants' convictions for conspiracy to commit honest services mail and wire fraud, the evidence was easily sufficient for the jury to conclude—after receiving the Court's legally correct instructions on what constitutes an "official act" (*see* 10/7/21 Tr. at 48)—that the defendants agreed to pay money in exchange for the corrupt insiders like Vavic and Heinel to perform an official act: secure their children's admission to USC as athletic recruits by presenting them to the Subco. An official act "is a decision or action on a question, matter, cause, suit, proceeding or controversy," and "may include" an employee using their "position to exert pressure on *another* official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *McDonnell*, 136 S. Ct. at 2371–72 (emphasis in original).

Here, the evidence, including the testimony of Subco member Rebecca Chassin and multiple USC coaches, established, *inter alia*, that: (i) athletic recruiting was the responsibility of USC coaches; (ii) coaches were expected to create athletic biographies for their recruits, and to be honest in creating those profiles; (iii) coaches sent those profiles to Heinel, whose job was to

---

[14] *Accord United States v. Roberson*, 998 F.3d 1237, 1247 (11th Cir. 2021) ("Consistent with the views of our sister Circuits, we hold that *McDonnell* does not disturb this court's holding . . . and we do not read into section 666 limitations unsupported by the language of the statute."); *United States v. Ng Lap Seng*, 934 F.3d 110, 133 (2d Cir. 2019) (same as *Percoco*); *United States v. Porter*, 886 F.3d 562, 565–66 (6th Cir. 2018) (holding that "[i]n *McDonnell*, the Supreme Court limited the interpretation of the term 'official act' as it appears in § 201, an entirely different statute than [§ 666]"); *cf. United States v. Maggio*, 862 F.3d 642, 646 n.8 (8th Cir. 2017) (explaining that *McDonnell* "had nothing to do with § 666"). As this Court previously explained, dicta in the First Circuit's decision in *United States v. Martinez*, 994 F.3d 1, 6–7 (1st Cir. 2021) does not directly address whether federal programs bribery requires proof of an official act.

present them to the Subco; (iv) admissions officers voted on the admission of recruits who were presented; and (v) approximately nine out of every ten recruits was approved for admission. *See* 9/20/21 Tr. at 144–59; 9/24/21 Tr. at 185–90; 9/28/21 Tr. at 89–122. Notably, the defendants do not appear to dispute that Heinel's presentation of athletic recruits to the Subco constituted an official act; indeed, Heinel is not mentioned once in their argument on this issue. *See* Dkt. 2330 at 13–18. Their failure to develop an argument as to Heinel amounts to waiver, and accordingly Abdelaziz's honest services fraud conspiracy conviction on Count One must stand.

Instead, the defendants focus on Wilson and Vavic, and analogize Vavic's fraudulent recruitment of Wilson's son in exchange for money to "writing a letter of recommendation." Dkt. 2330 at 18. That is not an accurate characterization of the evidence under any standard, much less Rule 29. As Singer told Wilson, Vavic agreed to "add [Wilson's son] to his recruit list and present him to admissions," *not* simply to write him a letter of recommendation, Ex. 75, and Vavic told Singer that Wilson's son would "go to subco after [his] top recruits." Ex. 101. Moreover, after receiving the false profile for Wilson's son from Singer, Vavic added even more lies, instructing his assistant coach Casey Moon to (i) create a Subco packet falsely representing to admissions that Wilson's son was a "top 10" player in the country and an "immediate impact player," and (ii) send it to be presented to Subco. Exs. 105, 106, 107; 9/28/21 Tr. at 100–12. Relying on Vavic's action to recruit Wilson's son and believing the falsified credentials he submitted, the Subco approved his admission. Ex. 107.

Viewed in the light most favorable to the verdict, Vavic's agreement to (i) accept the false athletic profile and purport to "recruit" Johnny Wilson in exchange for money, (ii) instruct his assistant coach to create a falsified Subco profile for Wilson's son, and (iii) cause that Subco packet to be presented to USC's admissions department to secure Johnny's admission, easily

amounts to taking "action on a question, matter, cause, suit, proceeding or controversy": Johnny Wilson's application to USC. *See McDonnell*, 136 S. Ct. at 2371–72; *Woodward v. United States*, 905 F.3d 40, 48 (1st Cir. 2018) ("carrying" or guiding a bill through the legislative process "qualifies as an official act"); *see also United States v. Henderson*, 2 F.4th 593, 599–600 (6th Cir. 2021) (prison guard who accepted bribes in exchange for smuggling contraband agreed to commit official act by lying to disciplinary board); *United States v. Fattah*, 914 F.3d 112, 157 (3d Cir. 2019) ("Official acts need not be momentous decisions—or even notable ones," and concluding that hiring "part-time, short term" employee was an official act).

Further, even if Vavic did not *himself* commit an official act, which he did, the evidence establishes that he agreed to use his "position to exert pressure on *another* official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official" by sending the false Subco packet for Johnny Wilson to USC's admissions officers and telling them that Johnny would be an "immediate impact player," knowing that they would then take an official act by voting on his admission. *See McDonnell*, 136 S. Ct. at 2372. As the Supreme Court held in *McDonnell*, "advising [another official], contrary to the truth, that the facts of the case warranted [a certain outcome]" was a "decision or action [that] fits neatly within our understanding of [official action]" because it "reflected a decision or action to advise another official *on* the pending question." *Id.* at 2371; *see also Percoco*, 13 F.4th at 200 (official act for executive branch aide to "push" another public official to take action, and rejecting defendant's argument that he merely "set up meetings"); *United States v. Repak*, 852 F.3d 230, 254 (3d Cir. 2017) (official act for executive director of organization to "make[] recommendations" to organization's board of directors regarding which contractors should receive grants, in exchange for bribes from contractor).

### 3.    The Defendants' Legal and Factual Sufficiency Challenges to Their Honest Services Fraud Convictions Are Without Merit

Third, the defendants contend (i) that the corrupt athletics insiders who facilitated their children's college admission as fraudulent athletic recruits in exchange for money did not owe their employer universities fiduciary duties under state law, and (ii) that there was not "any evidence showing that these employees owed fiduciary duties" or breached those duties by agreeing to lie to university admissions officers.  Dkt. 2330 at 18–26.  These arguments misstate the law and ignore the evidence supporting the verdict.

As an initial matter, the defendants have waived their argument on several occasions, having conceded in prior briefs that it "is beyond dispute" that employees owe employers fiduciary duties.  *See* Dkt. 1022 at 13; *see also* Dkt. 1232 at 11.  And, as the Supreme Court made clear in the context of an honest services fraud case, it is "beyond dispute" that "under any definition of" fiduciary duties, such duties are present in "employee-employer" relationships.  *Skilling*, 561 U.S. at 407 n.41; *see also Sidoo*, 468 F. Supp. 3d at 443 ("As the Supreme Court noted, the existence of a fiduciary relationship between employer and employee is 'beyond dispute.'").

Retreating from this precedent and their own concessions, the defendants contend that *state* law must form the basis of a fiduciary duty under 18 U.S.C. § 1346.  In other words, the defendants maintain, if two employees in different states are charged with honest services fraud for the same conduct, the defendant in State A may be guilty, while the employee in State B may be innocent as a matter of law, so long as State B's state legislature has circumscribed fiduciary duties more narrowly.  That is not the law.  *See, e.g.*, *Skilling*, 561 U.S. at 411 ("[O]ur construction of § 1346 establishes a uniform national standard."); *United States v. Sawyer*, 85 F.3d 713, 726 (1st Cir. 1996) ("[P]roof of a state law violation is not required for conviction of honest services fraud."); *United States v. Sawyer*, 239 F.3d 31, 41–42 (1st Cir. 2001) (reaffirming that "establishing honest

services mail fraud . . . does not require proof of a violation of any state law" and collecting cases);

*United States v. Weyhrauch*, 548 F.3d 1237, 1244 (9th Cir. 2008) (collecting cases and noting that

"[t]he majority of circuits . . . have held that the meaning of 'honest services' is governed by a

uniform federal standard inherent in §1346"), *vacated and remanded on other grounds*, 561 U.S.

476 (2010).  And because the Court rejected this argument during the parties' charge conference,

the law of the case doctrine forecloses the defendants' bid to reverse their convictions under Rule

29.  *See* Charge Conf. Tr. at 12 ("[I] have already decided and believe the Supreme Court has

decided as well that, under federal law, employees owe a fiduciary duty to their employers.").

Pivoting from a legal argument to a sufficiency challenge, the defendants contend that there

is "no evidence" that, in agreeing to lie to their admissions colleagues about the athletic credentials

of the defendants' children in exchange for money, the coaches and administrators violated their

duty of honest services to their employers.  Dkt. 2330 at 23–26.  Even the mere sampling of the

evidence below, including Heinel and Vavic's own words, is sufficient to support the verdict:

- Heinel told Singer that she did not like to collect bribe payments to her program "so close" to presenting the children of Singer's clients to Subco, because it would raise red flags.  Ex. 574.  Amid an inquiry by the USC admissions department regarding the athletic credentials of several side door students she presented to Subco, Heinel instructed Singer to have his clients lie about their athletic abilities "if questioned," and worried that the actions of several parents would expose the scheme and "shut everything down."  Ex. 508.  Heinel lied repeatedly to her colleagues in USC's admissions department when they began to suspect that she and coaches like Vavic were misrepresenting the athletic credentials of recruits.  9/20/21 Tr. at 188–206; Exs. 511, 513.  Vavic later told Singer that his side door candidates could not "be just a total nobody" any longer with "the way [U]SC's now doing everything."  Ex. 620.

- USC terminated Heinel and Vavic because of their conduct, withdrew admission for students involved in the scheme who had not yet matriculated, and subjected students who had matriculated to discipline depending on their level of involvement.  9/21/21 Tr. at 127–28, 188–206; 10/4/21 Tr. at 59; 9/21/21 Tr. at 124–33.

- Admissions officers on Subco expected that the information provided by coaches and Heinel about athletic recruits was truthful.  9/20/21 Tr. at 155.  Chassin testified that it was "unacceptable" to lie to admissions or for coaches or Heinel to solicit or accept

money for their programs or personally in exchange for recruiting an athlete, and that they "betrayed" the university.  *Id.* at 187–88, 203–04.

- USC coaches testified that it was "important" to be truthful with admissions in presenting athletic recruits to Subco.  9/24/21 Tr. at 189; 9/28/21 Tr. at 133.  Former USC women's soccer coach Laura Janke testified that in accepting bribe payments to her team's program from Singer in exchange for presenting unqualified athletes to the Subco, "I was lying to admissions."  9/27/21 Tr. at 12–17, 50–51.

- Singer told Wilson several times that Stanford's sailing coach could recruit only one of his daughters as a fake sailor in exchange for money because he had to recruit "some real sailors," so that the university "doesn't catch on."  Ex. 591.  Singer and Wilson discussed the need to hide from admissions their side door scheme with a Stanford coach and Harvard administrator, to "stay away" from admissions, and the need to "make sure that we keep this clean."  Exs. 623, 625.

These few examples are merely a sample of the evidence that administrators and coaches, like Heinel and Vavic, agreed to violate their duties to provide honest services to their employers by lying to admissions in exchange for money, and the evidence at trial is more than sufficient under Rule 29 to sustain the jury's verdict.  *See Moran*, 312 F.3d at 487 ("As long as the guilty verdict finds support in a plausible rendition of the record, it must stand.").[15]

### 4.    Bribe Payments Need Not Be Made to a "Person" under 18 U.S.C. § 666

Fourth, the defendants contend that their convictions for federal programs bribery and conspiracy to commit the same should be reversed because "bribery occurs only when a thing of value is given to '*a person*.'"  Dkt. 2330 at 35 (emphasis added).  But this contention is merely a recycled version of the same argument this Court and others have rejected.  *See Sidoo*, 468 F.

---

[15] In any event, the government had no obligation to prove that Heinel or Vavic actually breached fiduciary duties to USC to convict the defendants of *conspiracy* to commit honest services mail and wire fraud.  *See Giry*, 818 F.2d at 126 ("[T]he crime of conspiracy . . . is complete upon the agreement[.]").  And as to the substantive counts against Wilson, what matters is his *intent* to participate in a scheme to defraud Harvard and Stanford of their right to the honest services of their employees, and therefore, his belief that he was inducing a violation of their fiduciary duties is sufficient.  *See United States v. Potter*, 463 F.3d 9, 22 (1st Cir. 2006) (affirming convictions for wire fraud relating to scheme to bribe legislator, where "all that mattered for the crimes charged was whether the defendants *believed* that [legislator] possessed such power").

Supp. 3d at 445 ("Payments made to accounts controlled by university insiders, even if such payments were ultimately received by the universities, may still constitute a benefit to those insiders who exercise control over the accounts.  This logic applies to the federal programs bribery charges as well."); *see also, e.g.*, *Roberson*, 998 F.3d at 1243–44 (affirming convictions for federal programs bribery where payments were made to charitable organization); *United States v. Jarigese*, 999 F.3d 464, 468 (7th Cir. 2021) (affirming federal programs bribery conviction where payments were made to companies).[16]  The defendants' argument would legalize large swaths of bribery as long as the recipients of those bribes were careful to solicit *quid pro quo* payments, not to their pockets, but to companies, campaign funds, non-profits, or any other entities that benefitted them indirectly.  That is not the law.

Finally, the defendants contend that because 18 U.S.C. § 666 does not define "person," the rule of lenity requires a narrow construction of that term.  Dkt. 2330 at 35.  This argument is contrary to the very first statute in the United States Code, and to Supreme Court precedent, which establish that when Congress uses "person" without further specification, the meaning of the term includes corporations, non-profit entities, etc.  *See* 1 U.S.C. § 1; *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 707–08 (2014) ("RFRA applies to 'a person's' exercise of religion, and RFRA itself does not define the term 'person.'  We therefore look to the Dictionary Act," which provides a "quick, clear, and affirmative answer" that "person" encompasses "corporations" and "nonprofit" entities); *see also United States v. Jimenez*, 507 F.3d 13, 19–21 (1st Cir. 2007) (explaining

---

[16] The defendants' lone authority for their argument is a case from the Western District of Missouri that was reversed by the Eighth Circuit and has never been cited by a court for the proposition that Section 666 prohibits bribes only if they are paid to a "person."  *United States v. Jain*, 1995 WL 9301 (W.D. Mo. Jan. 9, 1995), *rev'd*, 93 F.3d 436 (8th Cir. 1996).

definition of "person" under The Dictionary Act and rejecting "rule of lenity" argument because it applies only "if there is a *grievous* ambiguity in the statute") (emphasis in original).

### C.    The Defendants' Remaining Assorted Arguments Are Insufficient to Reverse the Jury's Verdicts under Rule 29

Finally, the defendants adopt a shotgun approach, taking aim at reversing the verdicts with a panoply of arguments whose only merit is that they are brief.

First, Wilson contends that no rational jury could find him guilty of the aiding and abetting charges in Counts Six, Eight, Nine, Eleven, and Twelve.  Dkt. 2330 at 29.  But the government requested that the Court not instruct the jury on an aiding and abetting theory for those counts, the Court did not instruct the jury on aiding and abetting, and there were no references to aiding and abetting in the verdict form or the redacted indictment submitted to the jury.  *See* Charge Conf. Tr. at 43; 10/7/21 Tr. at 11–61.  Accordingly, there is no possibility that Wilson was convicted on an aiding and abetting theory.

Second, Wilson contends that the government "failed to overcome" his "factual impossibility" defense to the wire fraud, honest services wire fraud, and federal programs bribery counts based on Singer's status as a government cooperator.  Dkt. 2330 at 29–30.  This argument is meritless for two reasons.  To start, the law of the case doctrine forecloses it because the Court, in deciding Wilson's motion to dismiss, concluded more than a year ago (and several times since) that factual impossibility is not a defense to those crimes, which "require proof of intent to defraud or bribe but [not] that the fraud or bribe accomplish the intended goal."  *United States v. Colburn*, 475 F. Supp. 3d 18, 26 (D. Mass. 2020); Charge Conf. Tr. at 34–35 ("This Court has previously ruled that impossibility is not a defense to the substantive fraud or bribery counts against the defendant Wilson.").  And even were the Court to reconsider Wilson's argument under Rule 29, it remains incorrect.  *See, e.g.*, *United States v. Prange*, 771 F.3d 17 (1st Cir. 2014) (affirming

25

convictions for substantive wire fraud in a sting operation); *see also* Dkt. 2073 at 47–48 (collecting cases holding that factual impossibility is not a defense to those charges).

Third, the defendants contend that the evidence failed to prove the existence of a single "hub and spoke" conspiracy under *Kotteakos v. United States*, 328 U.S. 750 (1946), and that the co-conspirator statements admitted by the Court pursuant to Fed. R. Evid. 801(d)(2)(E) did not satisfy *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977). Dkt. 2330 at 30–32. But the defendants' first assertion is meritless for several reasons. To start, it merely regurgitates an argument the Court has rejected numerous times. *See* Dkt. 1334 at 7–10 ("The question of whether [defendants] participated in a single conspiracy or multiple conspiracies is properly left to the jury."); Dkt. 1414 at 3–4 (noting that this argument "has previously [been] considered and rejected"); Dkt. 1438 at 5–6 (rejecting Wilson's *Kotteakos* argument that "has been previously addressed by this Court and found to lack force"). Further, the Court gave the jury a multiple conspiracy instruction at the defendants' request. *See* 10/7/21 Tr. at 34 (multiple conspiracy instruction); *see also, e.g.*, *United States v. Cruz-Ramos*, 987 F.3d 27, 39 (1st Cir. 2021) (affirming a similar instruction and explaining that "[q]uite a number of our cases have found instructions of this sort sufficient"). And finally, the defendants' argument amounts to a mere sufficiency challenge that wilts under the weight of the evidence considered by the jury. *See United States v. Bedini*, 861 F.3d 10, 14 (1st Cir. 2017) ("The question whether [the] evidence is indicative of a single conspiracy, multiple conspiracies, or no conspiracy at all is ordinarily a matter of fact; a jury's determination in that regard is subject to review only for evidentiary sufficiency."). After following the Court's correct legal instructions, based on four weeks of testimony and nearly 250 exhibits, the jury found a single overarching conspiracy, encompassing Singer, his employees and associates like Mikaela Sanford and Laura Janke, a network of corrupt athletics coaches and

administrators like Heinel, Vavic, Yale soccer coach Rudy Meredith, Georgetown tennis coach Gordon Ernst, Stanford sailing coach John Vandemoer, and USC soccer coach Ali Khosroshahin, and a web of largely interconnected parents like Bruce Isackson,[17] who testified that the scheme's past success, network of coaches, involvement of other wealthy parents, and large amount of money "coming in the pot" to Singer's sham charity KWF and The Key was "very important" not only because he and his co-defendant wife did "not want to be guinea pigs and have this thing blow up," but also it would make the scheme "a tough thing to figure out" by law enforcement. *See, e.g.*, 9/13/21 Tr. at 96–97, 138–64.[18]  And, of course, as the government argued in closing, the very nature of the scheme was such that it "it would only work if there was a network of corrupt coaches willing to admit kids as fake athletic recruits in exchange for money and a whole network of parents who were willing to participate." 10/6/21 Tr. at 51.

As to the Court's admission of co-conspirator statements pursuant to *Petrozziello* and Rule 801(d)(2)(E), the argument is waived for underdevelopment.  Indeed, the defendants' motion does

---

[17] *See, e.g.*, Ex. 64 (Wilson's spouse referring other parents to Singer, including parents of Wyatt Driscoll); Ex. 120 (Singer and Masera discussing making payments to USC for Wilson and Driscoll from same account); Ex. 121 (Wilson and Driscoll checks to USC water polo and baseball); 9/13/21 Tr. at 161 (Isackson testifying that he knew Singer worked with the Palatella family); Ex. 323 (Singer note to himself about "USC with Donna" listing families and monetary amounts, including Gino Palatella and Sabrina Abdelaziz); Ex. 409 (e-mail from Wilson's spouse to Marci Palatella: "I had  a few thoughts about Rick and USC.  Easier to talk on the phone."); Ex. 563 (recorded call between Singer and Palatella in which Palatella says "Everyone lies.  One of my very best friends the Wilsons," and then tells Singer "I knew you were gonna work with [Wilson's daughters] cause [Wilson's spouse] told me."); Exs. 107, 229, 383, 384, 413, 414, 420, 592, 661, 662, 663 (USC Subco packets for Singer's side door clients, including Abdelaziz, Wilson, and Palatella); 9/20/21 Tr. at 143–206 (Chassin testifying that all of Singer's side door clients were considered during USC Subco meetings); 9/27/21 at 6–53 (Janke testifying how she created fake athletic profiles for side door clients, including Abdelaziz and Palatella); 9/29/21 Tr. at 29–62 & Exs. 716, 718 (Lauren George testimony and summary charts showing finances of KWF and The Key and payments from parents for side door).

[18] The defendants' assertion that the government was obligated to prove a specific "hub and spoke" conspiracy is a strawman; the government had the burden to prove the conspiracy charged *in the indictment*, which the jury found.

not cite a single specific co-conspirator statement admitted at trial that failed to satisfy *Petrozziello*'s requirements.  Dkt. 2330 at 32; *see also, e.g.*, *United States v. Ciampaglia*, 628 F.2d 632, 637 (1st Cir. 1980) (explaining that *Petrozziello* merely requires that it be "more likely than not that the declarant and the defendant were members of a conspiracy . . . and that the statement was in furtherance of the conspiracy").  Their argument is also without merit.  After considering four weeks of testimony and reviewing hundreds of exhibits, the Court found that the government had satisfied its burden under *Petrozziello* "fully" to prove by a preponderance of the evidence the single conspiracy charged.  Charge Conf. Tr. at 71.  Finally, the defendants' hyperbolic assertion— that absent admission of unspecified co-conspirator statements, "the government's entire case against Defendants collapses"—ignores the weight of the evidence.  The most damning evidence against Wilson and Abdelaziz was the avalanche of their *own words* in e-mails and phone calls.

Fourth, the defendants challenge venue of the conspiracies charged in Count One and Count Two.  Dkt. 2330 at 36–38.  Venue is not an element of the offense, a defendant's venue challenge in the context of Rule 29 is a sufficiency challenge, and the government must prove merely by a preponderance of the evidence that an act in furtherance of the conspiracy took place in Massachusetts.  *See, e.g.*, *United States v. Valenzuela*, 849 F.3d 477, 487 (1st Cir. 2017) (explaining that government agents may influence where a crime occurs, and thus where venue lies, and that venue may be established in a conspiracy even if a particular co-conspirator was not himself physically present in that district); *accord United States v. Scott*, 270 F.3d 30, 35 (1st Cir. 2001) ("We review the evidence on venue in the light most favorable to the government.").  Here, the Court instructed the jury on venue at the defendants' request (*see* 10/7/21 Tr. at 32, 52), but the defendants neglected to even mention venue to the jury during their closing arguments.  *See* 10/6/21 Tr. at 57–137.

Now, however, they assert that there was "zero evidence" of venue.  Dkt. 2330 at 37.  That is not correct.  The jury's venue finding was supported by, *inter alia,* the following facts: (i) Singer and Wilson arranged to meet in Boston in September 2018, before Singer began cooperating, to discuss the side door scheme, and during the same call, they discussed the side door scheme at USC; (ii) Singer called Wilson, while both were in Boston, to postpone that meeting; (iii) Singer flew to Boston to meet with Yale soccer coach Rudy Meredith at a Boston hotel in September 2018, in furtherance of the conspiracy charged in Count One; (iv) Singer obtained a check for his $20,000 monthly bribe payments to USC insider Heinel from a bank in Boston's "Seaport Square,"[19] and that check was drawn on a bank account opened in Massachusetts and deposited by Heinel into her bank account in California (from which the jury could also have concluded that it was mailed from Boston); (v) Singer withdrew funds from that same Massachusetts bank account for other bribe payments to Heinel; (vi) Singer was in Boston during an October 5, 2018 recorded phone call in which Heinel instructed him to not have parents make side door payments "so close" to the admissions approval letters; and (vii) Singer told Abdelaziz that he was in Boston during a recorded phone call when Abdelaziz agreed that Singer should lie to the IRS about the true nature of his side door payment for a USC admission slot.  *See* Exs. 561, 562, 665, 574, 624, 628, 587;

---

[19] As an example demonstrating the lengths to which the defendants will go to evade the Rule 29 standard, they attempt to explain away a cashier's check that Singer obtained from a Bank of America branch in the Seaport district of Boston, Massachusetts, which literally reads "Seaport Square" at the top of the check.  Ex. 624.  Straining credulity, the defendants argue in a supplemental Rule 29 motion on venue: "Maybe all Bank of America cashier's checks from a certain group of states simply say 'Seaport Square' on the top of the left corner." Dkt. 2342 at 3. Maybe.  But the defendants (correctly) chose not to make this argument to the jury (constituting waiver), and the jury was certainly entitled to conclude, by a preponderance of the evidence and consistent with the testimony of Special Agent Elizabeth Keating, that Singer obtained that check from a "Seaport Square" branch that is one block away from where the jury deliberated in a courthouse located in Boston's Seaport district.

9/21/21 Tr. at 150–53, 178–79 (testimony of Agent Keating that Singer was in Boston on October 5, 2018).

Under well-established precedent in the First Circuit and elsewhere, that evidence— particularly Exhibit 574, the October 5, 2018 call between Singer and Heinel when Singer was in Boston—is easily sufficient to sustain the jury's verdict.  *See Valenzuela*, 849 F.3d at 487 (rejecting arguments of "manufactured venue" or "venue entrapment"); *United States v. Cordero*, 668 F.2d 32, 43–44 (1st Cir. 1981) (Breyer, J.) ("[Co-conspirators] spoke to [undercover agent] while he was in Puerto Rico and provided him with key information . . . [t]he fact that [undercover agent] placed the calls to [co-conspirators] who were outside the Commonwealth, does not change the fact that [they] transmitted this information [to undercover agent] who was inside Puerto Rico."). As Judge Raggi correctly explained, in citing then-Judge Breyer's decision in *Cordero*:

> We agree with the First and Seventh Circuits that a telephone call placed by a government actor within a district to a conspirator outside the district can establish venue within the district provided the conspirator uses the call to further the conspiracy.  Indeed, we conclude that the critical factor in conspiracy venue analysis is not whether it is a conspirator or a government actor who initiates the call; nor does it matter whether the conspirator is communicating with someone who is a knowing confederate, an undercover agent, or an unwitting third-party. What is determinative of venue . . . is whether the conspirator used the telephone call to further the objectives of the conspiracy. . . . When a conspirator uses a telephone call—by whomever initiated—to further a criminal scheme, the conspirator effectively propels not only his voice but the scheme itself beyond his own physical location into that of the person with whom he is speaking. . . . [T]he conspirator's commission of an overt act does not depend on whether the listener rather than the conspirator initiates the conversation.  Nor does it matter whether the listener is a confederate, an innocent third party, or an undercover agent.

*United States v. Rommy*, 506 F.3d 108, 122 (2d Cir. 2007) (Raggi, J.); *accord United States v. Renteria*, 903 F.3d 326, 331–32 & n.35 (3d Cir. 2018); *United States v. Gonzalez*, 683 F.3d 1221, 1226 (9th Cir. 2012); *Andrews v. United States*, 817 F.2d 1277, 1279 (7th Cir. 1987).

<u>Fifth</u>, the defendants contend that "the evidence of [their] good faith is so strong that a rational jury could not find that the government has met [its] burden."  Dkt. 2330 at 32–35.

Relatedly, Abdelaziz advances a more specific argument that he acted in good faith because there was "no forensic evidence" that he "saw or opened" his daughter's self-admitted "phony" basketball profile. *Id.* at 38–39. But a Rule 29 motion is not a means to recycle good-faith arguments that were rejected by a properly instructed jury. *See, e.g.*, *United States v. Leary*, 2019 WL 1584508, at *2 (D. Mass. Apr. 12, 2019) (summarily rejecting good-faith argument in denying Rule 29 motion because "this same argument was made to a jury properly instructed that good faith was a complete defense to the mail fraud charges"), *aff'd sub nom. United States v. Stepanets*, 989 F.3d 88 (1st Cir. 2021); *see also United States v. Gorski*, 880 F.3d 27, 37 (1st Cir. 2018) (rejecting sufficiency challenge to jury's verdict based on good-faith defense). Here, the Court instructed the jury, several times, that good faith was a complete defense to all of the charges. *See* 10/7/21 Tr. at 42, 58–59. And the defendants heavily relied on a good-faith defense, emphasizing "good faith" nearly ten times during their closing arguments. *See, e.g.*, 10/6/21 Tr. at 59, 94 ("Those two words, 'good faith,' lead to even two better words, 'not guilty.'"), 99 ("Good faith is a complete defense to every one of these charges."), 133. The jury rejected that defense in finding them guilty on all charges.

Even were the Court to consider whether the defendants' good faith was "so strong" that it mandates acquittal, the evidence does not come close to supporting that conclusion. As summarized above, the evidence undermining Wilson's purported good faith and establishing his willfulness, including nearly an hour of recorded calls with Singer, is overwhelming. *See supra* at Part I.A.4; Exs. 561, 562, 571, 578, 665, 591, 594, 602, 623, 625. As to Abdelaziz, the evidence of his intent summarized below is more than sufficient to sustain the jury's verdicts—whether or not he ever "saw or opened" his daughter's athletic profile (which the evidence establishes he did):

- Abdelaziz's daughter played two years of junior varsity basketball in high school, but she did not play basketball during her junior and senior years, and she never played for

her high school's varsity team.  9/17/21 Tr. at 165–84; Exs. 702–05.

- In July 2017—more than a year after his daughter stopped playing basketball in high school—Abdelaziz forwarded his wife an e-mail from Singer, with the subject "For me to complete USC athletic profile," which requested information for the falsified athletic profile, including "if they play the sport."  Ex. 330.  During the same month, Singer told Abdelaziz that he "need[ed] an action photo or two of Sabrina playing basketball," and Abdelaziz replied "got it," sending Singer several photographs to use on the athletic profile, including an e-mail with the subject "Sabrina" attaching a photograph of a girl who was *not Abdelaziz's daughter*.  Exs. 334, 340.  Singer replied to Abdelaziz to tell him that he would use that photograph.  Ex. 345.

- Singer e-mailed Abdelaziz the fake basketball profile, which co-conspirator Laura Janke invented from information she found on the internet, stating "let me know if you want me to add any other awards to her profile or if you think that is enough."  Ex. 352.  The falsified basketball profile contained the photograph of a different girl, which Abdelaziz had previously sent Singer, falsely stated that Abdelaziz's daughter was a "starting point guard" and "team captain," and included numerous other fabricated awards, honors, and credentials.  9/17/21 Tr. at 165–84; 9/27/21 Tr. at 36–42.  Abdelaziz received the e-mail in an account he regularly accessed and from which he later forwarded e-mails.  Exs. 352, 415.

- After Heinel presented Abdelaziz's daughter to USC's Subco as a basketball recruit, Heinel e-mailed the conditional acceptance letter to Singer, and Singer sent it to Abdelaziz.  Exs. 387, 390.  The letter informed Abdelaziz that his daughter had been provisionally admitted as a recruited athlete with "the potential to make a significant contribution to the intercollegiate athletic program" at USC.  Abdelaziz forwarded that letter to co-conspirator Mikaela Sanford, instructing her to complete the USC application in accordance with "the exact requirements" in the letter, including his daughter's registration with the NCAA.  Ex. 415.

- When the Hong Kong college advisor for his daughter asked if she wanted to apply to USC in December 2017, Abdelaziz did not disclose to the counselor that his daughter had already been admitted to USC as a phony basketball recruit two months earlier, and instead told him that "we're going to pass on applying in December."  Ex. 427.

- Abdelaziz exchanged several e-mails with Singer, Sanford, and others in which they discussed that basketball would be included in the "activities" section of his daughter's application to USC, and that one of her college essays for USC would focus on basketball.  Exs. 441, 442, 458, 459.  The first sentence of that essay, which Abdelaziz reviewed and edited in January 2018—two years after his daughter stopped playing basketball—stated, "the basketball court is like my art studio."  Exs. 461, 463.

- In March 2018, Abdelaziz's daughter was formally admitted to USC.  The same month, an employee of KWF e-mailed Abdelaziz an invoice for $300,000, thanking him for his "generous donation."  Ex. 478.  One week later, Abdelaziz wired $300,000 to KWF.  Ex. 505.  Shortly thereafter, Abdelaziz received a purported donation receipt letter from

KWF falsely stating that his donation would "provide educational and self-enrichment programs to disadvantaged youth" and that "no goods or services were exchanged" for his payment. *Id.*

- During an October 2018 consensually recorded phone call with Singer, Abdelaziz stated that "of course" he agreed that Singer should not "tell the IRS anything about the fact that [Abdelaziz's] $300,000 was paid to Donna—Donna Heinel at USC to get Sabrina into school even though she wasn't a legitimate basketball player at that level." During the same call, Abdelaziz said "I love it" in response to Singer telling him that Heinel thought his daughter's fake athletic profile was so "well done" that "going forward, anybody who isn't a real basketball player that's a female, [Heinel] want[ed] [Singer] to use that profile going forward." Ex. 587.

- During a January 2019 call, Abdelaziz told Singer that he was "worried" about the IRS audit of KWF. And when Singer told him that Heinel had lied to USC's admissions department by inventing a fake injury to explain why Abdelaziz's daughter had not shown up for basketball practice, Abdelaziz agreed to lie to USC's admissions department too: "I will answer the same, uh, should they call me." Ex. 621.

## II. Defendants' Motion for a New Trial Pursuant to Rule 33 Should Be Denied

### A. The Court's Evidentiary Rulings Were Proper and Do Not Provide a Basis for a New Trial

The defendants' contention that they should be granted a new trial because the Court erred in denying the admission of certain defense exhibits, Dkt. 2412 at 6, is without merit. "It hardly bears repeating that a trial court enjoys considerable discretion with respect to its evidentiary rulings." *United States v. Simon*, 12 F.4th 1, 40 (1st Cir. 2021). Here, the Court acted within its broad discretion in rejecting the defendants' pretextual explanations for the admission of irrelevant and inadmissible evidence, and precluding its admission on, *inter alia*, relevance, hearsay and Rule 403 grounds. Moreover, as with the rest of their brief, the defendants speak only in generalities, and fail to cite examples of the "key exculpatory evidence" they contend was improperly excluded, *id*. at 7, or how that exclusion prejudiced them. Accordingly, they fail to meet their burden of demonstrating that the Court abused its discretion in excluding any evidence, much less that the exclusion of such evidence resulted in a miscarriage of justice, particularly in light of the overwhelming evidence of their guilt.

At trial, the defendants offered a series of shifting reasons for their effort to introduce reams of irrelevant hearsay, including that the exhibits were being offered simply for the fact that they were sent, or as business records, or to impeach witnesses (including with documents they had never seen, that were not inconsistent with their testimony, or that concerned collateral matters), or as evidence of the state of mind of the declarant or recipient. The Court properly rejected these transparent attempts to confuse and mislead the jury and circumvent the rules of evidence.

As one example, during opening statements, counsel for defendant Abdelaziz played a lengthy excerpt from a video recording of Singer presenting to an audience of Starbucks employees (the "Starbucks video"). Counsel advised the jury that Singer was "a very smooth talker," adding: "It wasn't just Gamal who got sucked in by it. Major corporations would listen to him." 9/13/21 Tr. at 56. Abdelaziz thus sought to suggest that the video was evidence of how Singer presented his scheme to Abdelaziz, and of Abdelaziz's state of mind—even though Abdelaziz was not present for Singer's presentation, and there was no evidence he knew or heard about it until after it was produced in discovery following his arrest. Wilson's counsel referred to the same video during his opening as evidence "of *Mr. Singer's* state of mind." *Id.* at 77 (emphasis added).[20] Counsel thus suggested, without any foundation, that these out-of-court statements to third parties—that their clients neither heard nor knew about—were evidence of what Singer told them, what they believed, and what he believed.

Abdelaziz first sought to introduce the Starbucks video into evidence during the cross-examination of a cooperating witness who had not testified about it, and had not seen it until it was produced in discovery after her arrest. 9/20/21 Tr. at 70–71. Counsel argued that the video was

---

[20] Wilson's counsel similarly referenced a book proposal Singer drafted, and an e-mail between Singer and an uncharged parent, and suggested, without foundation, that they were "exactly the same information he told John." *Id.* at 78.

admissible to "attack the character of Rick Singer" pursuant to Rule 806, and because "it goes to Singer's state of mind." *Id*. at 108.

The Court saw these efforts for what they were—attempts to confuse and mislead the jury with irrelevant hearsay. As an initial matter, the Starbucks video was irrelevant because neither of the defendants attended Singer's presentation, or knew what he said, and because, although Singer used the term "side door" in passing, he neither defined the term nor elaborated on it in the course of his roughly 90-minute presentation. *See* Dkt. 2336 at 5. The video was substantially more prejudicial than probative for the same reasons: to the extent Abdelaziz sought to use it as evidence of what Singer told him, or what he understood about the scheme, the video had no probative value and its introduction for that purpose would have confused, misled, and distracted the jury. *See United States v. Chin*, 15 F.4th 536 (1st Cir. 2021) (district court has "wide latitude" in making determinations pursuant to Fed. R. Evid. 403, and will be overturned "only in exceptional circumstances"); *United States v. Rivera-Ortiz*, 14 F.4th 91, 101 (1st Cir. 2021) ("The Federal Rules of Evidence allow a district court to exclude even relevant evidence if its 'probative value is substantially outweighed by a danger of . . . confusing the issues [or] misleading the jury.'" (citing Fed. R. Evid. 403)). To the extent the defendants sought to use the video as impeachment evidence, pursuant to Rule 806, they failed to cite a single instance in which Singer's statements on the video were inconsistent with any statements the government introduced at trial. That is because, as the Court recognized, there was no inconsistency. *See* Dkt. 2336 at 5. *See also, e.g.*, *United States v. Rodriguez-Berrios*, 573 F.3d 55, 69 (1st Cir. 2009) (no error in denying admission of audio recordings as impeachment evidence pursuant to Rule 806 where "their contents did not contradict the statements appellant sought to impeach"). And to the extent the defendants sought to use the video as evidence of Singer's state of mind, Singer's rehearsed and prepared statements

in a public forum were not probative of his state of mind in private communications, at different times, with the defendants. Indeed, the defendants themselves argued at length that Singer was a "con man" who could not be trusted.[21] Yet by their argument, his every out-of-court utterance would be admissible as "state of mind" evidence, and therefore admissible merely by recasting it "as probative evidence of [his] thoughts." *United States v. Heidecke*, 900 F.2d 1155, 1163 (7th Cir. 1990); *see also* Dkt. 2309. The Court was well within its discretion in precluding the defendants from circumventing the rules of evidence by labeling otherwise inadmissible statements as evidence of the "state of mind" of whoever made them or whoever heard them— and, in the case of the Starbucks video, even those who did not hear them.

That the defendants' "state of mind" arguments were pretextual and devoid of any limiting principle was evident from their effort to invoke the state-of-mind exception to justify the introduction of dozens of internal USC e-mails and documents, and wiretap recordings of calls between Singer and third parties, including parents who were not charged. For example, they repeatedly sought to admit a June 8, 2017 e-mail from a USC athletics compliance employee, Scott Simon, to Donna Heinel, marked as Exhibit 1219 (as well as a similar document, marked as Exhibit 1249). *See* 9/21/21 Tr. at 107; 9/27/21 Tr. at 76, 95; 9/28/21 Tr. at 204–05. The Simon e-mail attached an undated scholarship analysis spreadsheet that included a note referencing a "unique scenario for this year": that three students, whose parents were donors to USC, were included on the rosters of two athletic teams for "practice only." The defendants argued that these exhibits were admissible either for the fact that they were sent, or as evidence of Simon's or Heinel's state

---

[21] *See*, *e.g.*, 9/13/21 Tr. at 49 (Abdelaziz opening statement: "[Abdelaziz] had no inkling that Singer was a skilled con man. And make no mistake, that's what Singer is, an extremely skilled con man."); *id*. at 76 (Wilson opening statement: "Listen to him brag, what a great con man he is.").

of mind.  The Court properly excluded them for, among other reasons, the same reason that the video of Singer speaking to an audience of strangers was inadmissible:  the fact that they were sent did not make them relevant to the *defendants*, who knew nothing about them; nor were they probative of Simon's or Heinel's state-of-mind any more than *any* e-mail, or *any* utterance, is probative of the state-of-mind of the declarant or recipient; nor was Simon's state of mind even relevant.  Moreover, to the extent they had any probative value, the Court correctly concluded that it was substantially outweighed by the likelihood that the exhibits would confuse, mislead, and distract the jury, and result in mini-trials about individuals not on trial.[22]  *See* Dkt. 2320.

As a final example, the defendants sought to introduce Exhibit 1288, a March 27, 2018 instant message exchange between two low-level admissions office employees, Kelsey Bradshaw and Alexander Alvendia, referencing defendant Abdelaziz's daughter.  In the exchange, Bradshaw stated that Sabrina Abdelaziz had been admitted to USC, and Alvendia stated that Sabrina's high school counselor had inquired about the admission, noting, "This school sends us like 60 and [she is] near the bottom."  *Id.*  Bradshaw also noted that Sabrina was a basketball player and "it appears she actually plays the sport!"  *Id.*

After reading the exchange to the jury in his opening statement, 9/13/21 Tr. at 62–63, Abdelaziz's counsel sought to introduce it during the cross-examination of *another* USC admissions official, Rebecca Chassin, who testified that she had never seen it before.  9/21/21 Tr. at 21–22.  In so doing, counsel argued that the instant message exchange was admissible "for the fact that it took place and that it was never shown to her," and because he sought to ask Chassin

---

[22] For example, Simon's e-mail was sent several years after Wilson's son was admitted to USC, and several months after Abdelaziz began the side-door process for his daughter.  The spreadsheet it attached was undated and there was no evidence of who authored it.  It made no reference to admissions, or whether the students it referred to had been admitted as recruited athletes, or even who the students were.

"to explain why her underlings never talked about it with her."  *Id*. at 22.  But Chassin had no foundation to testify about why two third parties chose not to include her in a conversation, and why she had not been shown instant messages between them—presumably by government counsel[23]—and the Court properly sustained the government's hearsay objection.  Abdelaziz then sought to introduce the exhibit as evidence of the "state of mind of USC's Department of Admissions," Dkt. 2251 at 1, while arguing that he sought to impeach Chassin with the document by demonstrating that her "underling[s] understood that [Sabrina] did *not* have athletic credentials," and that "if they knew, how could she not know?"  9/21/21 Tr. at 91–92 (emphasis added).  But of course, nothing on the face of the document suggested that Sabrina did *not* have athletic credentials; instead, Bradshaw specifically advised Alvendia that she *did*.  Counsel thus sought to argue that—contrary to the assertions within the instant messages—the declarants were being sarcastic.  *See, e.g.*, Dkt. 2275 at 2 (noting that "[t]he two admissions officers appear to be joking around about Ms. Abdelaziz's basketball skills").  He thereby sought to impeach Chassin with a document she had not seen, reflecting out-of-court statements by third parties she had not heard, that on their face were *consistent* with her testimony.  Once again, the Court acted within its discretion in precluding the defense from introducing, as extrinsic impeachment evidence, an otherwise inadmissible document the witness had not seen and about which she had no knowledge.  *See United States v. Beauchamp*, 986 F.2d 1, 3 (1st Cir. 1993) (noting "well established" rule "that a party may not present extrinsic evidence to impeach a witness by contradiction on a collateral matter," and that "extrinsic evidence to disprove a fact testified to by a witness is admissible when it satisfies the Rule 403 balancing test and is not barred by any other rule of evidence"); *see also*

---

[23] Defense counsel's next question was:  "Do you know why the government would hide this document from you?"  *Id*. at 23.

*United States v. DeCologero*, 530 F.3d 36, 60 (1st Cir. 2008) ("Evidence is collateral if it is relevant only because it contradicts the in-court testimony of another witness.").[24]  Abdelaziz's counsel next shifted to arguing that the exhibit was admissible as a business record (presumably now for its truth), but failed to adduce any evidence that it satisfied the threshold requirements for the admission of such records pursuant to Fed. R. Evid. 803(6).  9/21/21 Tr. at 92–93.  He then returned to the argument that the exchange was admissible as evidence of the "state of mind of the people that admitted Sabrina Abdelaziz."  *Id*. at 93.  The Court properly excluded the exhibit on that basis, finding that Abdelaziz "failed to present evidence that an informal text exchange between Admissions Officers is evidence of the institutional belief of the Admissions Department as a whole."  Dkt. 2336 at 7.  Indeed, by Abdelaziz's argument, *any* conversation between employees of whatever seniority would be admissible as evidence of their employer's state of mind, and a litigant would be able to circumvent the rule against hearsay simply by labeling it as relevant to "state of mind."[25]  Moreover, even assuming, *arguendo*, that a group of "people," or an admissions department, can have a collective "state of mind," the Court was within its discretion in finding that a single instant message chain between two low-level employees was not probative

---

[24] The Court advised Abdelaziz to "[c]all the underlings and you might have some impeachment." *Id*. at 92. Tellingly, Abdelaziz did not do so, despite the fact that Bradshaw was on his witness list. *See* Dkt. 2202. Instead, counsel asked an FBI agent, on cross-examination, whether she had asked Bradshaw how she "viewed Sabrina Abdelaziz's application," 9/23/21 Tr. at 128, a question that on its face sought to elicit a third party's out-of-court statement for its truth. The Court again properly sustained the government's hearsay objection.

[25] Abdelaziz's reference to *Kassel v. Gannett Co., Inc.*, 875 F.2d 935, 945 (1st Cir. 1989), is inapposite. In that case, the Court concluded that the "conclusions and recommendations" of a formal investigative report issued by a Veterans' Administration board of inquiry were properly admissible as state of mind evidence of the Veterans' Administration. *Id*. Here, by contrast, Abdelaziz attempted to argue that the purported beliefs of two low-level employees as set forth in a single instant message exchange could be attributed to the department generally, even as he also suggested that the employees did *not* believe what they were saying. *See* Dkt. 2297 at 4.

of it and would have confused and misled the jury—particularly where, as here, Abdelaziz sought to argue that the employees did *not* actually believe what they were saying.[26]

The upshot of these examples is that there were multiple evidentiary grounds—relevance, hearsay, improper impeachment, and Rule 403—to exclude this evidence, and the defendants' retreat from one poor justification for admission to the next revealed that they did not have a single one with merit by which to stand.  Finally, even assuming that the Court erred in excluding any of the defendants' exhibits—which it did *not*—the defendants do not even attempt to meet their burden of demonstrating how any such error prejudiced the outcome of the case or resulted in a miscarriage of justice under Rule 33.  Instead, they simply argue in conclusory fashion that the evidence was admissible to bolster "their theory that Mr. Singer told them that donations to athletic programs were welcomed by USC in exchange for preferential admissions treatment," and that the Court's evidentiary rulings prevented them from "introducing exculpatory evidence aligning with their theory of defense unless they testified at trial."  Dkt. 2412 at 8.  But that is not true.

First, the defendants were not charged with making donations to athletic programs "in exchange for preferential admissions treatment," as the government noted at the outset of the trial.  *See* 9/13/21 Tr. at 47.  Instead, the defendants were charged with lying to secure the admission of their children to elite universities as athletic recruits based upon falsified credentials, and bribing corrupt university insiders to mislead their own colleagues to admit those students based on those falsified credentials.  *See id.*  Accordingly, evidence that Singer told the defendants that USC accepted money for "preferential admissions treatment," or that USC *in fact* did so, was not exculpatory, because—as the government stipulated in its opening—that is neither fraud, nor

---

[26] Abdelaziz later offered the exhibit in his case-in-chief, without a witness or further explanation.  10/1/21 Tr. at 19.  Once again, the Court acted within its discretion in sustaining the government's hearsay objection.  *Id.*

bribery, and it is not what the defendants did.  *See United States v. Brandon*, 17 F.3d 409, 443–44 (1st Cir. 1994) (excluding defense evidence that victim bank provided no-down-payment financing to other lenders where defendants were charged with lying about fake down payments).

Second, the Court's requirement that the defendants introduce evidence that they knew "what other unrelated students and parents did" before admitting such evidence did *not* require that the defendants testify in their own defense, as they contend.  Dkt. 2412 at 7 (quoting Pre-trial Conf. Tr. at 6).   For example, the defendants could have called Singer—whom they subpoenaed and listed on their witness list—to testify about what he told them.  Dkt. 1955.  Indeed, the defendants thanked the government "for helping out" in facilitating service of that subpoena for Singer through Singer's attorney.  *See* Exs. B, C, D (attached hereto).  Alternatively, they could have called other members of their families, including their spouses and children, who were included on communications with Singer.  Wilson, for example, specifically identified his wife and two daughters as witnesses to at least one discussion with Singer where he purportedly described the side door as legitimate, and identified all three of these family members, and his son, as potential witnesses in his case-in-chief, yet chose not to call any of them.  *See* Dkt. 972-43 (Aff. of John B. Wilson in Support of Def. Motion to Dismiss Indictment with Prejudice) at 2 (describing Singer's purported statements during a FaceTime call with Singer and defendant Wilson's "family"); Ex. A (identifying Leslie Wilson, John Wilson, Jr., Courtney Wilson, and Mary Wilson as potential defense witnesses) (attached hereto); 10/1/21 Tr. at 108 (Wilson counsel noting that Wilson's daughter Mary Wilson may testify).  The defendants chose to do none of these things.

Third, the Court did not, in fact, preclude the defendants from introducing evidence concerning USC's preferential treatment of students whose parents donated money to the university—and they did so.  As just one example, the Court permitted the defense, over the

government's objection, to elicit testimony from Chassin, the USC admissions official, that the university tracks so-called "VIP" applicants "due to fundraising efforts that the University Advancement Office is doing." 9/21/21 Tr. at 10.[27]  The Court also permitted the defense to ask Chassin whether wealthy individuals "can give donations to schools and that changes the school's mind about whether or not they're decent candidates," to which Chassin responded:  "I think that happens very rarely with most wealthy students who are applying to college." *Id.* at 142.

Fourth, the defendants fail to develop any meaningful argument as to how the exclusion of any evidence prejudiced them, much less resulted in a miscarriage of justice.  Absent any such explanation, their claim necessarily fails.  *See United States v. Cadden*, 965 F.3d 1, 31 (1st Cir. 2020) (affirming denial of Rule 33 motion where defendant failed to develop "any of the arguments or their prejudicial effects in sufficient detail, either in front of the District Court or in front of us"); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *United States vs. Green*, No. 09-10183-GAO, 2011 WL 2847537 at *1 (D. Mass. July 14, 2011) (noting that where defendants "fail[ed] to elaborate on any particular arguments in support of a new trial, it cannot be said that the jury's verdict constitutes a miscarriage of justice").

**B.   The Defendants' Undeveloped Arguments Concerning All of the Court's Decisions on Motions *in Limine* Are Meritless**

In their second and third arguments in support of their motion for a new trial, the defendants simply list nearly 50 defense motions by docket number that they contend, without explanation, the Court should have granted, and another nearly dozen government motions they contend—

---

[27] Chassin further testified:  "[T]he President might have an interest in applicants, the Provost, deans at the University, the University Advancement Office, trustees of the University, as well as the Athletic Advancement Office."  *Id.* at 16; *see also id*. at 35 ("I'm aware that the Athletic Advancement Office is tracking applicants and are interested in their outcome of the admission decision.").

again, without explanation—the Court should have denied.  Dkt. 2412 at 8–9.  "Passing allusions

are not adequate to preserve an argument in either a trial or an appellate venue." *United States v.*

*Slade*, 980 F.2d 27, 30 (1st Cir. 1992) (citing *Zannino*, 895 F.2d at 17 (rejecting defendant's "ploy"

to incorporate arguments by reference given "settled appellate rule that issues adverted to in a

perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed

waived" (citing cases))).  The defendants' listing of docket numbers, without more, leaves the

Court (and the government) "to do counsel's work, [that is, to] create the ossature for the argument,

and put flesh on its bones."  *Id.*  But they have "an obligation 'to spell out [their] arguments

squarely and distinctly,' or else forever hold [their] peace."  *Id.* (quoting *Rivera–Gomez v. de*

*Castro*, 843 F.2d 631, 635 (1st Cir. 1988)).  Without notice of the bases for the defendants'

arguments, the government cannot meaningfully oppose them beyond incorporating by reference

its responses and the Court's prior rulings on these motions.[28]

### C.    The Court Did Not Err in Conducting Jury Selection or in Providing the Jury With a Special Verdict Form

Similarly, the defendants' incorporation of every objection they made during three days of

jury selection does not develop any objection sufficiently for the government to respond or for the

Court to consider the argument.  The defendants make only one specific argument—that one of

the jurors seated had seen the Netflix program concerning the "Varsity Blues" case.  Dkt. 2412 at

9.  As an initial matter, "[n]o hard-and-fast formula dictates the necessary depth or breadth of *voir*

*dire*." *Skilling*, 561 U.S. at 386–91 (finding defendant failed to show *voir dire* fell short of

constitutional requirements where court screened prospective jurors with comprehensive

questionnaire drafted largely by defendant, examined each prospective juror individually and

---

[28] *See* Dkts. 2001, 2003, 2004, 2006, 2007, 2008, 2036, 2038, 2039, 2040, 2045, 2046, 2048, 2049, 2050, 2056, 2090, 2099, 2101, 2150, 2151, 2162, 2191, 2211, 2215, 2219, 2239, 2241, 2265, 2296, 2297, 2320, 2323, 2324, 2328, 2335, 2336, 2347, 2352, 2357, 2359.

allowed attorneys to ask follow up questions, and selected only those jurors who responded that they could be impartial, despite that "many expressed sympathy for victims of Enron's bankruptcy and speculated that greed contributed to the corporation's collapse"). The Court has broad discretion in assessing jurors' impartiality. *Id.* at 386 (explaining that trial judge's appraisal of prospective jurors "is ordinarily influenced by a host of factors impossible to capture fully on the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty"). Jurors "need not enter the box with empty heads in order to determine the facts impartially. 'It is sufficient if the jurors can lay aside their impressions or opinions and render a verdict based on the evidence presented in court.'" *Id.* at 398–99 (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)). The Court's *voir dire* process here was thorough, including (i) screening several hundred jurors with a detailed questionnaire (largely agreed to by the parties) containing dozens of questions, and (ii) leading individual questioning over two days.

Notably, the defendants did not object to *any* of the jurors that deliberated in this case, for cause or otherwise, including the deliberating juror ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████  Given the

Court's thorough inquiry and the juror's responses, the defendants' ability to ask follow-up questions if they had concerns about the juror's answers, and their failure to even lodge an objection, there is no basis to order a new trial on this ground.

The defendants' recycled argument that the Court erred in providing the jury with a verdict form, which contained multiple questions concerning Count One, is equally undeveloped and thus waived. *See* Dkt. 2412 at 9 (citing Dkt. 2362 and trial transcript excerpts, without more). To address the defendants' unspecified arguments, the government incorporates by reference its prior response. *See* Dkt. 2364; *see also supra* at Part I.A.1 (law of the case). The defendants' argument is waived for the additional reason that they proposed an alternate verdict form that separately listed each object of the conspiracy, Dkt. 2370, which the Court found was not substantively different from the verdict form used. 10/7/21 Tr. at 5:15–20.

The defendants' argument fails for the further reason that neither their current motion nor earlier briefing and arguments to the Court identify any prejudice from the use of the verdict form here. Contrary to the verdict form used in *United States v. Spock*, a case on which the defendants earlier relied, the verdict form here did not exert "judicial pressure" on the jury to reach a certain result. 416 F.2d 165, 180–83 (1st Cir. 1969) (noting that, because charges stemming from Vietnam War protest raised free speech issues, special verdict form that suggested a particular outcome was "peculiarly" disfavored). Since its decision in *Spock*, the First Circuit has recognized that special verdict forms do not necessarily pose a risk of suggesting "through progressive steps a particular outcome," and can have a "permissible purpose." *United States v. Fanfan*, 468 F.3d 7, 13 (1st Cir.

2006) (finding no error in use of special verdict form to determine whether conspiracy encompassed 500 grams or more of cocaine); *see also United States v. Alfonzo-Reyes*, 592 F.3d 280, 293 (1st Cir. 2010) (approving use of special verdict form that asked jury to consider sentencing enhancement, which necessarily "assumed guilt," where court instructed jury to consider question only after finding defendants guilty and "there was strong evidence of guilt"). As detailed above, *supra* at Parts I.A.4, I.B.1–3, and I.C, there was overwhelming evidence of Wilson and Abdelaziz's guilt on Count One.  Further, the verdict form did not assume their guilt in asking the jury to consider each object of the conspiracy separately.  And, the verdict form served a permissible purpose: to avoid appellate ambiguity. *See, e.g.*, *United States v. Pelisamen*, 641 F.3d 399, 407 (9th Cir. 2011) ("In the wake of *Skilling*, several district courts have also considered cases involving special verdict forms providing for conviction on either a pecuniary fraud theory or an honest-services theory, similar to that used here.  Those courts have concluded, as we do here, that convictions for mail or wire fraud remain valid, as long as the special verdict form shows that the jury found the defendant guilty on the pecuniary fraud theory.").[29] Accordingly, there was no error in the Court's use of a special verdict form here.

### D.    There Was No Constructive Amendment or Prejudicial Variance

The defendants next contend that they are entitled to a new trial because "there was a constructive amendment of the indictment or a prejudicial variance from the indictment when the government presented the theories that: (1) the property at issue in this case is not admissions 'slots,' but athletic recruitment 'slots,' and (2) the victim at issue in this case is not USC as a whole, but the USC admissions department."  Dkt. 2412 at 9.  Neither is true and the defendants once

---

[29] The defendants' reliance on *Black v. United States*, 561 U.S. 465 (2010), is misplaced. There, the Court ruled that the defendant need not acquiesce to the use of a special verdict form in order to preserve an argument and objection to the government's alternate theory of guilt; it did not hold that special verdict forms are impermissible or even disfavored. *Id.* at 468.

again fail to develop their argument in any meaningful way.  "Merely stating th[e] issue without any developed argument is insufficient" to warrant any relief.  *Chan*, 981 F.3d at 55.

In any event, the defendants' claims are meritless.  As set forth above, a constructive amendment occurs only "when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them."  *Fisher*, 3 F.3d at 462–63.  "A variance arises when the proof at trial depicts a scenario that differs materially from the scenario limned in the indictment."  *United States v. Valdes-Ayala*, 900 F.3d 20, 37 (1st Cir. 2018).  "A variance is grounds for reversal if it affected the defendant's substantial rights—*i.e.*, the rights to have sufficient knowledge of the charge against him in order to prepare an effective defense and avoid surprise at trial, and to prevent a second prosecution for the same offense."  *Id*.

The defendants do not spell out how the facts proved at trial differed from those alleged in the indictment, much less how they were materially prejudiced thereby.  For all the reasons set forth above with respect to the defendants' Rule 29 motion, the government's occasional use of the phrase "recruitment slots" did not constitute either a constructive amendment or a prejudicial variance.  So, too, with respect to the evidence that the defendants induced corrupt insiders at USC to lie to their colleagues in the USC admissions department.  The indictment charged the defendants with, *inter alia*, agreeing to bribe corrupt insiders in the USC athletics department to mislead their colleagues in the admissions department by purporting to recruit the defendants' children as athletes, based on falsified credentials, in violation of their duty of honest services to USC.  That is what the evidence at trial proved.  That the members of the admissions department were the immediate "victims" of the insiders' lies, and that the "recruitment slots" were the mechanism by which the insiders secured the admission of the defendants' children, neither

"alter[ed] the charges against [the defendants] in the indictment," nor did it "show a materially different sequence of events than that depicted in the indictment." *Id*.

### E.      **The Jury Instructions Were Proper**

With respect to the defendants' contentions concerning jury instructions, the government and the Court are again left in a position to guess at the defendants' argument, where they simply incorporate by reference more than a dozen prior docket entries and more than 75 pages of trial transcripts.  Indeed, after hundreds of pages of proposed jury instructions and responses and a lengthy charge conference, their argument is that the instructions contained "many errors."  Dkt. 2412 at 10.  The government cannot meaningfully respond and incorporates by reference its responses.  *See* Dkts. 2014, 2079, 2358, 2372; *see generally* 10/5/21 & 10/7/21 Tr.; 10/6/21 Tr. at 6:8–8:4, 159:19–22.  The government further notes that the jury instructions the Court gave closely tracked the First Circuit pattern instructions.

### F.      **Wilson's Tax Conviction Does Not Provide a Basis for a New Trial**

Wilson argues that his conviction on Count Thirteen, for willfully filing a false tax return in violation of 26 U.S.C. § 7206(1), is invalid because it is unclear whether the jury convicted on the basis that (1) he could not properly deduct an illegal bribe as a business expense, or (2) he took deductions for business expenses that were not true business expenses.  Dkt. 2412 at 10.[30] Wilson's argument is premised on his contention that "the payments at issue cannot constitute a bribe."  *Id.*  As described, *supra* at Part I.B.1 & 4, the evidence overwhelmingly supports the jury's finding that the payments to The Key, Singer, and KWF constituted bribes.  Because the jury could convict on either theory—that Wilson deducted an illegal bribe as business and charitable deductions, or because he deducted payments to The Key, Singer, and KWF that were not in fact

---

[30] Wilson inexplicably omits that the evidence at trial also demonstrated that he took deductions for charitable contributions that were not true charitable contributions.

charitable contributions or business expenses—his conviction on Count Thirteen should stand. The fact that Wilson willfully lied on his tax return in multiple ways does not justify a new trial.

Even if there were insufficient evidence on the first theory, as Wilson contends, "[t]he law is crystalline that, when the government has advanced several alternate theories of guilt and the trial court has submitted the case to the jury on that basis, an ensuing conviction may stand as long as the evidence suffices to support any one of the submitted theories." *United States v. Gobbi*, 471 F.3d 302, 309 (1st Cir. 2006) (citing, *inter alia*, *Griffin v. United States*, 502 U.S. 46, 49–51, 55–60 (1991) (explaining that general verdicts in which there was insufficient proof of one of the theories of liability will be upheld, while those based on an illegal or unconstitutional theory may be set aside)). While Wilson calls the government's theory deficient "as a matter of law," he cites Dkt. 2342, which in turn relies on Dkt. 2330, in which he argues that the "evidence shows that Mr. Wilson did not intend to pay money into the pockets of any coaches or administrators." Dkt. 2330 at 33; *id*. at 12–13 (arguing that there is no evidence of a bribe).[31]

Wilson's reliance on *United States v. Foley*, 73 F.3d 484, 494 (2d Cir. 1996), which he quotes at length, ignores that that decision is no longer good law. In *Foley*, the Second Circuit overturned a defendant's conviction under 18 U.S.C. § 666(a)(1)(B) after holding that the government was required (but failed) to prove that the "business, transaction, or series of transactions"—namely, state legislation—involved anything of value of $5,000 or more *to the entity receiving federal funds*—there, the State of Connecticut. *Id*. at 493. Where it was not clear the jury had found the defendant guilty of deducting an illegal bribe (which basis the court had overturned) or a legal bribe that was not an ordinary and necessary business expense, the court

---

[31] To the extent Wilson also makes legal arguments about whether a payment to a victim can constitute a bribe, that argument is without merit. *See supra* at Part I.B.1.

vacated the Section 7206 charges. *Id.* at 493–94. Wilson neglects to note that *Foley* was overruled in part by *Salinas v. United States*, 522 U.S. 52 (1997), and further abrogated in relevant part by *United States v. Santopietro*, 166 F.3d 88, 92–93 (2d Cir. 1999) ("to the extent that *Foley* required the Government to plead and prove that the transaction involved something of value *to the governmental entity that received the requisite amount of federal funds*, that narrowing construction of the statute must be discarded") (emphasis in original); *see also Sabri v. United States*, 541 U.S. 600, 605–06 (2004) (affirming *Santopietro* and holding that proof of link between federal funds and alleged bribe not required for conviction under § 666(a)(2)). Thus, under the subsequent case law that Wilson ignores, the Section 666 conviction in *Foley* was not legally erroneous. So too here. There is no basis to order a new trial on Wilson's Section 7206 conviction.

### G.        The Court Did Not Err in Denying the Defendants' Motions for Severance

The defendants next seek to assign error to the Court's denial of their motions to sever their trial from one another, or to sever Wilson's tax charge from the remaining charges. Dkt. 2412 at 11. These contentions, too, are without merit.

As an initial matter, the law is clear that where, as here, defendants are indicted together, they should as a general rule be tried together, because joint trials "prevent inconsistent verdicts and . . . conserve judicial and prosecutorial resources." *United States v. Soto-Beniquez*, 356 F.3d 1, 29 (1st Cir. 2003) (citing *United States v. O'Bryant*, 998 F.2d 21, 25 (1st Cir. 1993)). Moreover, "[b]ecause conspiracy cases often involve evidence that is admissible against all members of the conspiracy, 'in the context of conspiracy, severance will rarely, if ever, be required.'" *Id.* (quoting *United States v. DeLuca*, 137 F.3d 24, 36 (1st Cir. 1998)). Accordingly, severance is warranted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Indeed, now that the defendants have been tried, their

burden is still higher:  to make "a strong showing *that prejudice resulted* from the denial of severance, and prejudice in this context 'means more than just a better chance of acquittal at a separate trial.'"  *DeCologero*, 530 F.3d at 52 (quoting *United States v. Boylan*, 898 F.2d 230, 246 (1st Cir.1990) (emphasis added)).  "This is a difficult battle for a defendant to win."  *Boylan*, 898 F.2d at 246.

In their motion, the defendants do not even attempt to meet their burden of identifying any prejudice that *actually* resulted from their joint trial, or how the jury was confused.  Instead, they complain generically of prejudicial spillover based on the introduction of evidence concerning "personal payments" that flowed as part of the charged conspiracy to Jovan Vavic and Donna Heinel, the two individuals they were charged with bribing.  That is not enough.  They do not explain *how* they were unfairly prejudiced, or *how* the jury's judgment was undermined.  This is unsurprising, because there was no prejudice that resulted from the denial of severance.

As this Court properly concluded, where defendants are charged as coconspirators, "almost all of the evidence properly admitted against other coconspirators [is] relevant to and independently admissible against" each of them. *See Simon*, 12 F.4th at 44 (citing *O'Bryant*, 998 F.2d at 26).  And where such evidence is independently admissible against each defendant—as it was here, to prove, *inter alia*, the nature, scope, operation and evolution of the conspiracy, and the relationships among the conspirators—they "hardly can be heard to complain about an untoward spillover effect." *Id*.

At trial, the government made clear that Singer did not apprise the defendants of the personal payments, and that this evidence was relevant to show how the conspiracy worked.  *See* 9/13/21 Tr. at 29 (noting that Singer did not tell parents "about these payments to the insiders' pockets"); *id*. at 33–34 (same).  Indeed, the evidence at trial proved that the conspiracy involved

multiple complicit university insiders, and neither defendant was markedly more or less culpable than the other simply because one bribed Vavic and the other bribed Heinel. And, in any event, "disparity between the relative culpability of co-defendants does not entitle a defendant to severance. . . . Prejudice must be shown." *DeCologero*, 530 F.3d at 55. The defendants do not, because they cannot, even attempt such a showing. Nor is it clear how Abdelaziz could have been prejudiced by evidence of personal payments to Vavic, or how Wilson could have been prejudiced by evidence of personal payments to Heinel, insofar as the government never argued that Abdelaziz bribed Vavic or that Wilson bribed Heinel, and the Court instructed the jury, *inter alia*, that it was required to "assess the evidence against each defendant individually" with respect to each charge, 10/7/21 Tr. at 25, and that "[p]roof that the defendant willfully joined the agreement must be based upon evidence of his own words and actions," *id*. at 36–37. Likewise, the defendants fail to argue how the evidence unfairly prejudiced them when the government made clear that it did not matter whether the money went to the USC insiders' pocket or to their program, provided that the payments were in exchange for lying to their colleagues to secure the children's admission to USC as recruited athletes based on falsified credentials. 9/13/21 Tr. at 35 ("[W]hether the money went to the insider's pocket or to their program, the important point is what the money was for, what it was intended to do."); 10/6/21 Tr. at 30 (same).[32]

Nor was there anything improper about the government's reference in rebuttal to the fact that both defendants argued in closing that they did not open an e-mail from Singer attaching the fraudulent profile of their child. As an initial matter, the defendants did not object to the

---

[32] At the same time, the defendants' contention that "there was no connection whatsoever between Mr. Abdelaziz and Jovan Vavic," and "no connection whatsoever between Mr. Wilson and Donna Heinel," Dkt. 2412 at 11–12, is untrue. They willfully joined the same conspiracy.

government's argument at the time, thereby waiving this argument.[33]  *United States v. Taylor*, 54 F.3d 967, 977 (1st Cir. 1995) ("When a defendant defaults on this obligation by failing to make a contemporaneous objection to [] comments in the prosecution's closing argument, the raise-or-waive rule applies").  The defendants have also never previously argued that the Court should have severed them because their defenses were *the same*, which makes no sense.  The government was entitled to argue, in rebuttal, that the defendants' explanations were implausible.

Likewise, Wilson's contention that the Court should have "at least severed the tax charge" against him, Dkt. 2412 at 13 n.4, and that this failure was "particularly prejudicial in light of the government's closing," is undeveloped.  His argument, which is confined to a single footnote, fails as a matter of law because he does not explain how the failure to sever the tax charge actually prejudiced him at trial, much less how it resulted in a miscarriage of justice.  His contention that the government "advanced novel legal theories on the bribery and fraud counts . . . confused the jury's consideration of the tax count," *id.*, is wholly conclusory.  It also makes no sense insofar as his conviction on the tax charge was not contingent on the jury's finding that the improper deductions he took were bribes, as set forth above (although the jury properly found they were).

## III.   The Government Did Not Hide Exculpatory Evidence and the Wiretap Was Legally Authorized at All Times

The defendants next contend that they are entitled to a new trial because the government "withheld crucial exculpatory evidence"—namely, a fax cover sheet indicating that Singer's consent to the interception of his phone calls was faxed to AT&T on September 28, 2018.  Dkt.

---

[33] The government's references in closing to the fact that other applicants to college "work hard to be recruited athletes," and to Wilson's use of the phrase "high-class problem" were hardly inflammatory, as the defendants' contend, and the defendants did not object to the government's closing on this ground at trial.  Dkt. 2412 at 14 n.4.  The government simply cited the witness testimony, and Wilson's own statements.  It did not argue that Wilson's actions deprived specific students of admission.

2412 at 15–20.  The defendants' argument is frivolous.  The fax cover sheet is not exculpatory and simply confirms what the discovery produced to the defendants more than two years ago makes apparent—that the government intercepted Singer's phone calls pursuant to the Court's authorization, and with Singer's consent, and that the wiretap of Singer's phone was legally authorized at all times.

### A.    Applicable Law

A defendant seeking a new trial based on a claim of newly discovered evidence that purportedly should have been produced under *Brady* "must establish that (1) the evidence at issue is material and favorable to the accused; (2) the evidence was suppressed by the prosecution; and (3) the defendant was prejudiced by the suppression in that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Conley*, 249 F.3d 38, 45 (1st Cir. 2001) (reversing grant of new trial based on *Brady*); *accord Rivera Rangel*, 396 F.3d at 486 (same).

### B.    The Fax Cover Sheet Was Neither Exculpatory Nor Improperly Withheld

The fax cover sheet referenced in the defendants' new trial motion was produced to the defendants in a related case, *United States v. Heinel*, No. 19-cr-10081-IT, on October 14, 2021, in response to the court's order in that case to provide evidence as to *when* AT&T received Singer's consent form.  *See United States v. Heinel*, No. 19-cr-10081-IT, Dkt. 885-1.  The cover sheet, which is devoid of any substantive content, shows that the government faxed the consent—which Singer signed on September 27, 2018—to AT&T on September 28, 2018.  The defendants contend that this is exculpatory for four reasons:  <u>first</u>, because "the government had previously represented to Judge Burroughs that court-authorized monitoring had ceased at midnight on September 27, 2018, and it appears that the government had only sealed wiretaps through September 27, 2018,"

Dkt. 2412 at 15; second, because, as a result, "there was at least some time on September 28, 2018 when the United States was monitoring Mr. Singer's phone without any lawful authority," *id*. at 17; third, because "the documents show the government only requested technical assistance from AT&T up until December 26, 2018, and AT&T only agreed to provide technical assistance through that date," *id*. at 18; and <u>fourth</u>, because the failure to disclose the cover sheet was a *Brady* violation that should have resulted in the suppression of the consensual calls.  The defendants' arguments are factually incorrect and legally frivolous.

First, the fax cover sheet is not exculpatory for a number of reasons—not least, that the Court-authorized wiretap did not expire until September 29, 2018, *after* Singer consented to the consensual recording of his calls on September 27, 2018, and after that consent was faxed to AT&T on September 28, as the defendants themselves have acknowledged to this Court.  Dkt. 972 at 24–25 (noting that the government recorded Singer's calls "pursuant to a Title III wiretap between June 5, 2018, and September 29, 2018, and with his consent between September 27, 2018 and March 11, 2019").  The defendants have had Singer's signed consent, bearing the September 27 date, for more than two years, since it was produced in automatic discovery in April 2019, and have even appended it to a motion they filed in this case.  See Dkt. 972-39 at 34.  The fax cover sheet simply shows that the FBI faxed that consent to AT&T on September 28, 2018.

The defendants contend that the Court-authorized wire expired between the time Singer signed the consent and AT&T received it, because in a motion to seal the wiretap on October 2, 2018, the government mistakenly stated that the monitoring "began on August 30, 2018 and ceased at midnight of September 27, 2018."  But the reference to September 27 was simply an error, which the defendants have known for more than two years, because the government disclosed it in a filing *in this case* on April 30, 2020.  In that filing, the government explained:  "Although Singer

consented to a wiretap on September 27, the 30-day period for the non-consensual wiretap did not

expire until midnight on September 28. . . . Accordingly, the date listed in the government's sealing

motion—September 27—was incorrect." *See* Dkt. 1138 at 29 n.22. Likewise, it is not true, as the

defendants contend, that the government only sealed the intercepted calls through September 27.

Instead, the calls were sealed through September 29. *See United States v. Heinel*, No. 19-cr-10081-

IT, Dkt. 969 at 2, 6–7; *id*., Dkt. 969-1 at 11–12.

Second, there was no period of time on September 28 when the government intercepted

calls without lawful authority. To the contrary, throughout September 28, the government was

operating pursuant to the Court's valid authorization to intercept Singer's phones. It *also* had

Singer's consent, which it faxed to AT&T that morning. *Id*., Dkt. 969 at 1–2; *id*., Dkt. 969-1 at 8–

9. Accordingly, on September 28, 2018, the government was authorized to intercept Singer's calls

pursuant to both the Court's order and Singer's consent—as the government's automatic discovery

makes clear, and as the government advised the defendants again in a letter dated March 13, 2020,

that the defendants themselves cited in motion practice to this Court in which they acknowledged

that, as the government noted in the letter: "[Singer's] telephone was intercepted pursuant to a

Court-ordered wiretap between June 5, 2018 and September 29, 2018. Between September 27,

2018 and March 11, 2019, calls made to and from this telephone were consensually recorded."

*See* Dkt. 972 at 30–31; Dkt. 972-33 at 4. And, in any event, the first pertinent call on the wire on

September 28, 2018 occurred *after* the FBI faxed Singer's consent form to AT&T. *See United*

*States v. Heinel*, No. 19-cr-10081-IT, Dkt. 969 at 2, 6–7; *id*., Dkt. 969-1 at 9.

Third, the defendant's contention that the government was only authorized to intercept

calls until December 26, 2018—based on a fax receipt confirmation indicating that AT&T

regarded Singer's consent as valid until that date—is similarly frivolous. In April 2019, as part of

automatic discovery, the government produced to the defendants a consent form signed by Singer on December 20, 2018, authorizing the continued interception of his phone, and the defendants' included *this very consent form* as an exhibit to their own March 25, 2020 motion to dismiss. *See* Dkt. 972-39. The FBI faxed that form to AT&T on December 21, 2018, five days *before* Singer's prior consent expired. *See id.*, Dkt. 969 at 2, 6–7; *id.*, Dkt. 969-1 at 16–17. Thus, the government continued to intercept calls after that date with Singer's consent.

Fourth, the government has not hidden any evidence, and there was nothing to hide. To the contrary, the government's automatic discovery, and its letter to the defendants in March 2020, both made clear that the Court-authorized and consensual wiretaps overlapped, and the defendants have acknowledged those facts in their own filings before this Court. AT&T received Singer's signed consent before the Court order expired, and that order was, by its express terms, valid until September 29, 2018. The defendants' attempt to manufacture a *Brady* violation out of these events—and from that, to secure a new trial—is frivolous and contradicted by their own filings.[34]

## **CONCLUSION**

For the foregoing reasons, the defendants' motions for judgment of acquittal and a new trial should be denied, and the jury's verdict finding them guilty of all charges should be upheld.

---

[34] The fax cover sheet is, in any event, irrelevant. Even if the Court-authorized wiretap had expired before AT&T received the fax of Singer's consent, the government had that consent, and there has never been any dispute in this case that it is valid. And, of course, even without a signed consent form, Singer's actions in making the consensual calls at the government's direction, over a phone he knew was being intercepted, is evidence that he consented to that interception. *See, e.g.*, *Griggs-Ryan v. Smith*, 904 F.2d 112, 116–17 (1st Cir. 1990) ("In the Title III milieu . . . consent inheres where a person's behavior manifests acquiescence or a comparable voluntary diminution of his or her otherwise protected rights," and that implied consent may be "inferred from surrounding circumstances indicating that the party knowingly agreed to the surveillance").

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney


By: */s/ Ian J. Stearns*
    KRISTEN A. KEARNEY
    LESLIE A. WRIGHT
    STEPHEN E. FRANK
    IAN J. STEARNS
    Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants. I further certify that unredacted copies will be served on counsel for the defendants.

*/s/ Ian J. Stearns*
IAN J. STEARNS
Assistant United States Attorney