UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No.: 19-10080-NMG |
| ) | |
| JOHN WILSON, ) | |
| ) | |
| ) | |
| Defendant ) | |

# GOVERNMENT'S SENTENCING MEMORANDUM

The government submits this memorandum in connection with the sentencing of defendant John Wilson. Wilson was convicted of bribery, fraud, and conspiracy for paying more than $1.2 million to secure the admission of his three children to elite universities based on the lie that they were recruited Division I athletes. He was also convicted of tax fraud for falsely deducting some of his bribe payments as fake business expenses and a charitable donation.

Notwithstanding his conviction on all counts by a jury of his peers, Wilson's failure to accept responsibility remains strident, and his brazen disregard for the truth continues. Having chosen not to expose himself to cross-examination at trial, he submits self-serving polygraph results at sentencing that contradict both the evidence and the jury's unanimous verdicts. In his objections to the Pre-Sentence Report ("PSR"), he describes as "soft" and "ambiguous" the following exchange, during which he and William "Rick" Singer discussed in blatantly criminal terms their plan to secure his daughter's admission to Stanford as a fake sailor in exchange for a $500,000 bribe:

> Singer:   I asked [the Stanford sailing coach] for a second spot in sailing [for Wilson's other daughter] and he said he can't do that because he actually has to recruit some real sailors so that Stanford doesn't . . .
>
> Wilson:   [Laughter]

| | |
|---|---|
| Singer: | . . . catch on. |
| Wilson: | Right. . . . Yeah, no.  He's got to have some sailors . . . yeah. |
| Singer: | Yeah.  So that Stanford doesn't catch on to what he's doing. |
| Wilson: | Right. |

A graduate of Harvard Business School and an accomplished business executive, he contends that he thought he was engaging in a "legal side-door donation" — ignoring the fact that he laughed when Singer told him, "I'll make [your daughters] a sailor or something because of where you live." He even goes so far as to represent to the Court that he "does not have the ability to pay a lump sum fine," despite his nearly $18 million in assets, including a 15,500 square foot primary residence on the North Shore, a vacation mansion in Hyannis Port adjacent to the Kennedy compound, a multi-million dollar production company with dozens of employees in California that he owns outright, and hundreds of thousands of dollars of cash in the bank.

For these reasons, and the reasons set forth below, the government respectfully recommends that the Court impose the following sentence: 21 months of incarceration to run concurrently on all counts of conviction; 24 months of supervised release, with 500 hours of community service; a $250,000 fine; and restitution of $88,546.

## I.   THE OFFENSE AND RELEVANT CONDUCT

The Court is by now familiar with the facts of this case and Wilson's involvement in the charged fraud and bribery scheme. *See generally* PSR ¶¶ 24–72. Wilson was convicted following a four-week jury trial of all counts: (i) conspiracy to commit federal programs bribery; (ii) two counts of substantive federal programs bribery; (iii) conspiracy to commit mail fraud, wire fraud, and honest services mail and wire fraud; (iv) three counts of substantive wire fraud and honest services wire fraud; and (v) filing a false tax return. *Id.* ¶ 25. As the evidence proved beyond a reasonable doubt, Wilson agreed with Singer and others to pay a $220,000 bribe to secure his son's

2

admission to the University of Southern California ("USC") as an elite, Division I water polo recruit based on falsified credentials. *Id.* ¶¶ 44–56. Wilson then falsely deducted those payments from his tax return in two ways: first, as a phony donation to Singer's sham charity, the Key Worldwide Foundation ("KWF"); and second, as fake "business consulting" expenses. *Id.* ¶¶ 55–56. Several years later, Wilson agreed to pay, and did pay, two separate $500,000 bribes to secure his twin daughters' admission to Harvard and Stanford as fake Division I athletes. *Id.* ¶¶ 57–61.

### A. The Defendant's Side-Door Admission To USC For His Son

Wilson's corrupt agreement with Singer and others began in 2013, when he asked about the potential for a "side door" at various colleges for his son, and Singer told him that USC's water polo coach Jovan Vavic "is giving me 1 boys slot." *Id.* ¶ 46. Although Wilson's son played water polo in high school, Wilson understood that his son was not qualified to play for USC's elite Division I water polo team, and he worried that his son would be "a clear misfit" and "a lepper." *Id.* ¶ 48. Accordingly, as Wilson knew, Vavic directed Singer to falsify — "embellish" — his son's athletic credentials to present him to USC's admissions department as a recruit. *Id.* ¶ 49.

Singer fabricated an athletic profile and sent it to Wilson. *Id.* ¶ 50. He assured Wilson that "no payment of money" was required until Vavic secured his son's admission as a water polo recruit, but that his son would never actually have to "get in the pool." *Id.* Singer told him: "[T]he commitment is to be on the roster not attend all practices," and "frankly after the 1st semester he can move on." *Id.* ¶ 49.

Vavic used the falsified profile to secure the admission of Wilson's son, falsely telling USC's admissions department, among other things, that he was in the "top 10" nationally at his position, and would be an "immediate impact player." *Id.* ¶ 52. Days after his son's admission to USC based on fraud, Wilson thanked Singer for "making this happen" and asked him about "the

options for the payment": "Can we make it for consulting or whatever from the [K]ey so that I can pay it from the corporate account?" *Id.* ¶ 53.  Singer confirmed that he would send Wilson a fake "invoice for business consulting fees" so that he could take a "write off as an expense." *Id.*  Wilson replied, "Awesome!" *Id.*

Ultimately, in exchange for his son's admission to USC, Wilson paid Singer $220,000, comprised of a phony $100,000 "donation" to Singer's non-profit KWF, a $100,000 payment to Singer's for-profit college counseling company for fictitious "business consulting," and $20,000 to Singer personally. *Id.* ¶ 54.  Wilson falsely deducted the payments from his 2014 joint amended tax federal tax return as purported business expenses and a charitable donation, causing the IRS to sustain a tax loss of more than $88,000. *Id.* ¶ 55.  Singer, in turn, funneled Wilson's $100,000 "donation" to the USC water polo account controlled by Vavic. *Id.* ¶¶ 54, 56.  After one semester on the roster, Wilson's son quit the USC water polo team, just as Singer had promised he could. *Id.* ¶ 56.

   **B.** **The Defendant's Side-Door Payments Seeking Admission to Harvard and Stanford For His Twin Daughters**

Several years later, Wilson re-engaged Singer to secure the fraudulent admission of his twin daughters as purported athletic recruits. *Id.* ¶ 57.  Captured on a court-authorized wiretap before Singer was approached by the FBI in September 2018, Wilson asked Singer, "what sports would be best for them . . . or is it not gonna even matter?" *Id.*  Singer responded, "It doesn't matter. . . . I'll make them a sailor or something . . . [b]ecause of where you live." *Id.*  Wilson laughed and asked whether there was "a two for one special for twins." *Id.*  In a subsequent call, after Singer began cooperating with law enforcement, Wilson confirmed that he knew his daughters were not college-level athletes: "What if they're not really that good?  I mean, they can

4

do some crew, but I don't know they're gonna be good." *Id.* He added that one of his daughters was not competitive at sailing and only "did sailing in, you know . . . yacht club." *Id.*

In October 2018, Wilson confirmed that he wanted to pursue the fraudulent admission of his daughters to Harvard and Stanford as recruited athletes. PSR ¶ 59. Singer assured him that they "don't have to play," because "just—that's the path I'm gonna get 'em in on." *Id.* Wilson responded, "gotcha." *Id.* Even now, however, he insists that he did not understand "Singer was going to falsify athletic credentials for his daughters." Def. Obj. PSR ¶ 59.

Wilson caused his company to wire $500,000 to Singer's charity to secure an athletic recruitment slot at Stanford. PSR ¶ 59. During a consensually recorded call quoted *supra*, Singer told Wilson that the Stanford sailing coach had hidden the deal from the university "so that Stanford doesn't catch on." *Id.* ¶ 60. Despite laughing at the time and acknowledging that the coach had to have some "real sailors," the defendant objects to the PSR's conclusion that Wilson knew the deal would be hidden from the university, and asserts that "he trusted Singer as an expert." Def. Obj. PSR ¶ 60.

In November 2018, Singer advised Wilson that he had secured an admissions spot at Harvard through a (fictitious) "senior women's administrator," who would falsely designate Wilson's other daughter as an athletic recruit in exchange for $500,000. PSR ¶ 61. Shortly thereafter, Wilson caused his company to wire an additional $500,000 payment to KWF. *Id.*

## II. SENTENCING RECOMMENDATION

The government has elsewhere set forth its position on the Sentencing Guidelines. Regardless of how the Court ultimately calculates the Guidelines in this case, the government respectfully submits that the appropriate sentence is 21 months of incarceration, 24 months of supervised release (with 500 hours of community service), and a $250,000 fine. The government

recognizes that such a sentence would be the longest custodial term imposed by the Court in this case, but submits that it is a reasonable and just outcome that is sufficient but not greater than necessary to achieve the goals of sentencing under 18 U.S.C. § 3553(a) for this defendant. Moreover, as set forth below, the government's recommendation accounts for the Court's recent twelve-month sentence imposed on Wilson's co-defendant, Gamal Abdelaziz. By any measure, Wilson deserves a significantly longer sentence than Abdelaziz: his lack of remorse is more brazen; he paid four-times as much money in bribes and engaged in the side-door scheme for all three of his children; and he committed tax fraud.

The seriousness of Wilson's crimes and his protracted involvement in the bribery and fraud scheme justify a meaningful term of incarceration. *See* 18 U.S.C. §§ 3553(a)(1), (2)(A). As the Court knows from dozens of e-mails admitted during trial, Wilson — unlike many parents who participated in Singer's side-door scheme — was intimately involved in both the fraud and the bribery at every step of the way. For example, Singer specifically told Wilson that Vavic had directed him to falsify the athletic resume that Vavic would use to present Wilson's son to admissions. Singer then e-mailed the defendant the falsified resume. Wilson's *own witnesses* testified at trial that nearly every water polo honor and credential on the profile was false.

Wilson was also closely involved in the bribery portion of the scheme, with detailed insight into how and when the money would be paid. And of course, not only did Wilson commit tax fraud by falsely representing that the $100,000 payment to KWF was a donation, but he came up with the idea of falsely deducting the remainder of the payments as fake business expenses.

Further, Wilson engaged in the side-door scheme again for his twin daughters. As the Court heard during the near-dozen recorded calls admitted at trial, Singer spelled out the fraud and bribery in painstaking detail. Wilson knew that his daughters were not college-level athletes but

6

would be presented as such; he knew that the money was being exchanged for slots from the Stanford sailing coach and a purported Harvard administrator; and he knew the deals were being hidden from the universities and their admissions departments.

Wilson's history and characteristics underscore his culpability. *See* 18 U.S.C. § 3553(a)(1). After overcoming what he describes as a difficult childhood to attend Harvard Business School and achieve success as a business executive, there was no compelling reason, and no excuse, for Wilson's behavior. Driven by arrogance, and motivated by self-aggrandizement, Wilson was willing to do whatever it took to get what he wanted.

A significant period of incarceration is necessary to promote respect for the law, to provide just punishment for Wilson's crimes, and to serve the interests of general and specific deterrence. 18 U.S.C. § 3553(a)(2). There is no defendant in this case for whom these sentencing interests are more acute. To conclude that Wilson fails to accept responsibility for his conduct significantly understates his lack of remorse. PSR ¶ 102. Over the course of his 33 pages of objections to the PSR, he minimizes his conduct, continues to blame USC, law enforcement agents, Singer, and others for his situation, and denies *any* culpability for *anything* — even the brazen tax fraud that he personally devised. In support of those objections, he submits the results of self-serving polygraphs conducted by hand-selected examiners he has paid, claiming that he believed his conduct was "legitimate." Def. Obj. PSR ¶ 28 & Ex. B. And despite possessing assets worth nearly $18 million (including two mansions), paying more than $1.2 million in bribes, and running up nearly $4 million in attorney's fees (some of which, presumably, funded his now-dismissed

defamation lawsuit against Netflix for producing a documentary about the college admissions scandal),[1] Wilson asserts that he does not have the ability to pay a lump sum fine.

Though a 21-month term of incarceration would be significant, the government's recommended sentence is less than half of the low-end of the Guidelines range as calculated by Probation, well below the national average for defendants convicted of federal programs bribery,[2] and far below the low-end of the Guidelines range as calculated by the government. It would, accordingly, avoid an "unwarranted" disparity relative to similarly situated defendants. 18 U.S.C. § 3553(a)(6).[3]

At the same time, Wilson warrants a sentence higher than any other defendant in this case. He is the only parent before this Court who stands convicted of multiple counts of federal programs bribery — a more serious offense with a higher base offense level than mail or wire fraud, as determined by the Sentencing Commission. *Compare* U.S.S.G. § 2C1.1, *with* U.S.S.G. §§ 2B1.1, 2B4.1. His sentence, unlike most other parent defendants, must also account for his tax fraud conviction, which is based on two separate lies about his payments. For these reasons, he is not

---

[1] *See Wilson v. Netflix, Inc.*, No. 2177-cv-00388 (Essex Super. Ct.) (voluntarily dismissed after the jury verdict in this case); *Wilson v. Netflix Worldwide Entm't LLC*, No. 21-cv-10894-MLW (D. Mass.).

[2] From 2015 to 2020, of the nearly 1,000 defendants with Criminal History Categories of I who were, like the defendant, convicted of federal programs bribery and sentenced under U.S.S.G. § 2C1.1 the average length of imprisonment was 32 months. *See* United States Sentencing Commission, Interactive Data Analyzer, *available at* https://ida.ussc.gov/analytics/saw.dll?Dashboard.

[3] As the First Circuit has recognized, the best measure for avoiding unwarranted sentencing disparities on a national level is the applicable Guidelines range. *See Jimenez*, 946 F.3d at 16 (noting that below-Guidelines sentence did not impose unwarranted sentencing disparity); *United States v. King*, 741 F.3d 305, 310 (1st Cir. 2014) (same); *United States v. Floyd*, 740 F.3d 22, 39–40 (1st Cir. 2014) (same); *United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("[T]he [G]uidelines themselves are almost certainly the best indication of ordinary practice" and avoiding unwarranted disparities).

similarly situated to parents who were convicted of other offenses or sentenced in accordance with lower Guidelines ranges. *See, e.g.*, *United States v. Mena-Robles*, 4 F.3d 1026, 1035 (1st Cir. 1993) (where codefendants are convicted of different offenses, they are not "similarly situated"); *United States v. Butt*, 955 F.2d 77, 90 (1st Cir. 1992) (same); *see also United States v. Gozes-Wagner*, 977 F.3d 323, 337 (5th Cir. 2020) ("Nor are defendants similarly situated when they are convicted under different statutes."); *United States v. Contreras*, 108 F.3d 1255, 1271 (10th Cir. 1997) (same).

Moreover, Section 3553(a)(6) codifies only "the need to avoid *unwarranted* sentence disparities among *similarly situated* defendants," and Wilson is not similarly situated to any parent sentenced in this case to date. *United States v. Vazquez-Rivera*, 470 F.3d 443, 449 (1st Cir. 2006) (emphasis in original). Other than his co-defendant Abdelaziz — who participated in the side-door scheme once, paid one-quarter of the bribe amount that Wilson did, and was not convicted of tax fraud — Wilson is the only parent defendant who has refused to accept responsibility for his conduct, and who continues to blame others and mislead the Court even to this day. As the First Circuit has long held, defendants who accept responsibility and express remorse are not similarly situated to those, like Wilson, who do not. *See, e.g.*, *Vazquez-Rivera*, 470 F.3d at 449 ("a defendant who chooses to enter into a plea bargain is not similarly situated to a defendant who contests the charges"); *see also United States v. Navedo–Concepción*, 450 F.3d 54, 60 (1st Cir. 2006) (defendants who pled guilty were not similarly situated to defendant who did not, and affirming 151-month sentence for defendant even though leader of conspiracy who pled guilty received a 63-month sentence); *accord Davila-Gonzalez*, 595 F.3d at 49–50 ("no evidence" that defendant and co-defendant were "fair congeners" because co-defendant pled guilty and was not therefore "similarly situated to the appellant"); *United States v. Rodriguez-Lozada*, 558 F.3d 29, 45 (1st Cir.

9

2009) (same); *United States v. Brandao*, 539 F.3d 44, 65 (1st Cir. 2008) (same); *United States v. Martinez-Vives*, 475 F.3d 48, 56 (1st Cir. 2007) (same).[4] Wilson's continued lack of remorse underscores why his sentencing presents one of the most significant opportunities in this case for the Court to further the societal interests of general deterrence and promoting respect for the law.

### III. CONCLUSION

For the foregoing reasons, the government respectfully recommends that the Court impose the following sentence: 21 months of incarceration to run concurrently on all counts of conviction; 24 months of supervised release, with 500 hours of community service; a $250,000 fine; and $88,546 in restitution.[5]

> Respectfully submitted,
>
> RACHAEL S. ROLLINS
> United States Attorney
>
> By: */s/ Ian J. Stearns*
>    KRISTEN A. KEARNEY
>    LESLIE A. WRIGHT
>    STEPHEN E. FRANK
>    IAN J. STEARNS
>    Assistant United States Attorneys

---

[4] And of course, sentencing a defendant in accordance with a Guidelines range that does not include credit for acceptance of responsibility, when such credit is not warranted, is not an impermissible "trial penalty." *See, e.g.*, *United States v. Quejada-Zurique*, 708 F.2d 857, 861 (1st Cir. 1983) ("The defendant who opts to go to trial rather than negotiating a plea runs the risk of a harsher sentence than he would have received by pleading guilty."); *accord United States v. Rosario-Peralta*, 199 F.3d 552, 570 (1st Cir. 1999) (framing the relevant issue as granting defendants who accept responsibility and express remorse as "special leniency," rather than subjecting defendants who do not accept responsibility to harsher punishment); *United States v. Torres Santiago*, 729 F.2d 38, 40–41 (1st Cir. 1984) (same).

[5] Although the recommended fine is above the Guidelines ranges as calculated by the PSR, the government respectfully submits that a statutory maximum fine is appropriate here upon consideration of the relevant factors, including the need to reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and the defendant's ability to pay. U.S.S.G. §§ 5E1.2(c)(3), (d). This Court has not imposed a fine of less than $250,000 for any side-door parent defendant, except for defendant Zadeh (who was convicted of only a tax offense) and defendants who were spouses (whose combined fines were $250,000 or greater). *See* PSR ¶ 7.

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                           */s/ Ian J. Stearns*
                                           IAN J. STEARNS
                                           Assistant United States Attorney