## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN WILSON<br><br>        Defendants | Cr. No. 19-10080-NMG<br><br>Leave to File Exhibit Partially Under Seal Granted February 10, 2022, in ECF 2521 |

### DEFENDANT JOHN WILSON'S SENTENCING MEMORANDUM

Defendant John Wilson deeply regrets that he agreed to participate in Rick Singer's side door, and he apologizes for that. He regrets the negative impact his actions have had on the level of trust and confidence that people across America have in the college admissions process, and on the system of higher education in general. Given his own background, as discussed below, Wilson is sorry for any impact his actions may have had on those without financial resources. Wilson also particularly regrets the tremendous pain and humiliation he has caused his family. His son, who dedicated thousands of hours to water polo and played on nationally-ranked teams for years, has been demeaned and dismissed as a fake athlete. Wilson's intelligent, industrious daughters, who received perfect and nearly-perfect scores on their college board exams and placed highly in multiple international academic competitions, have also been derided as undeserving. His daughters were only juniors in high school when Wilson was indicted. They had to complete their college applications while suffering public vitriol and trying to navigate the reality that their father faced criminal charges for trying to help them.

Wilson respectfully asks the Court to consider three things in deciding his sentence.

*First*, Wilson's extraordinary good deeds and character warrant a reduced sentence. Wilson has led an exceptional life of giving to others. He did not learn this life by example. He chose it for himself. Wilson was born into abject poverty and suffered years of extreme physical and emotional abuse as a child. Through hard work and education, he created a better life for himself and his children. Rather than destroying him, Wilson's difficult past made him a person who values

hard work, supports education, and gives generously to a variety of needs. Wilson's multi-year effort in support of autism charities is emblematic. Though he had no family member affected by autism, for over 15 years, Wilson immersed himself in multiple ways to make a difference on a broad scale. Those who worked with Wilson on this effort credit him with dramatically changing the landscape of autism research, funding, and advocacy. Over his lifetime, Wilson has donated millions to various charities, including hundreds of thousands for educational causes, and has bequests in his will for millions more. Wilson has not only been active in public philanthropy and giving of his time, but he also shares his generosity and empathy on a more individual, private level—quietly making a difference in the lives of many.

*Second*, Wilson's conduct is far less culpable than defendants who have received limited sentences. Both the government and this Court have used a consistent framework to consider the relative culpability of the 31 parents sentenced so far in the College Admissions investigation. Under that framework, Wilson is one of the least culpable parents charged. Among other things, Wilson: (1) never agreed to pay money to any college employee on a personal basis, and only intended to give funds to school programs; (2) never arranged for test-cheating or academic fraud; (3) never took fake photos or the like as part of a fabricated athletic profile; and (4) never told his children about the "side door," or had them knowingly participate in it. In contrast to virtually all of the other parents, Wilson's children had strong academic records appropriate for the schools they wanted to attend.  And his son was a bona fide water polo player who, unlike the children of other charged parents, played competitively at the national level throughout his middle and high school years and participated for the entire season on the university team as a red shirt freshman.

Wilson should not receive a sentence harsher than people who behaved worse. Of the 40 parents charged, the Court has now sentenced 31, and 15 of those were sentenced by this session. The sentences for the 15 have ranged from six weeks to 12 months and a day, with an average of about four and a half months. The Court sentenced Douglas Hodge, the parent who prosecutors described as the most culpable, to nine months' imprisonment. The highest sentence overall has been 12 months and a day for Gamal Abdelaziz. But Abdelaziz sent Singer photos for his

daughter's profile as a recruit for a sport she had stopped playing (basketball); agreed that Singer should lie to the IRS about his payments; and agreed with Singer that he would lie to USC about why his daughter did not show up to practice for its basketball team. Wilson did none of those things. Across all 31 parents, almost half received sentences from zero to six weeks, and the overall average is under three months. In this session, eight parents (over half) received sentences of four months or less, and four of those eight received sentences of six weeks. Wilson should receive a sentence consistent with those ranges and consistent with his conduct relative to those defendants.

*Third*, an appropriate sentence is one consistent with the Sentencing Guidelines. Wilson believes it is error to apply § 2C1.1 (aimed at bribery of public officials) and to apply enhancements based on the amount of money involved under §§ 2C1.1 and 2T1.1 (the tax Guideline) because— in line with Judge Woodlock's holding in a related case—the value of any bribe (or tax loss) in these unique circumstances is incalculable. Wilson incorporates herein by reference his Objections to the Presentence Investigation Report ("PSR"), which would result in an offense level of 7.[1]

Regardless, as Probation recognizes, even if the Court applies § 2C1.1, a downward departure is warranted. Section 2C1.1 contemplates particularly harsh punishments for corrupt payments to *public officials*, and, here, no public official (or school employee, for that matter) received any payment. For similar reasons, applying the 18 U.S.C. § 3553 sentencing factors, a downward variance from the Guidelines is also warranted.

For these reasons, Wilson asks the Court to impose the following sentence:

a.  Six months of imprisonment;

b.  12 months of supervised release; and

c.  A fine of no more than $25,000, given that the government has already seized $1,000,000 from him as a forfeiture, that Singer defrauded him of $120,000, and that his ability to pay a fine has been severely limited due to the loss of his employment.

---

[1]  *See* Def.'s Obj.'s, PSR at 59-91. Wilson notes that of his 68 Objections to the draft PSR, 48 are informational and 20 are non-informational. Objections Nos. 1-7, 11-17, 19-26, 28-35, 38, 41, 49-62, and 64-65. Objections Nos. 27, 36-37, 39-40, 42-48, 63, and 66-68 are the non-informational Objections that bear most directly on the Guidelines calculation.

Wilson also asks that the Court recommend to the Bureau of Prisons that it assign Wilson to FMC Devens to serve his incarceration so he can remain close to his family.

## I.   WILSON'S EXCEPTIONAL DEEDS AND CHARACTER WARRANT A REDUCED SENTENCE.

### A.   Wilson Overcame Trauma and Adversity with Hard Work and High Ethics.

Many defendants in this case were born with immense privilege. Wilson is a stark exception. He was born into a situation so grim it easily could have destroyed him. Wilson's mother became pregnant when she was a child herself—only 15 years old. Her father was a conservative man from Puerto Rico who disapproved of her pregnancy and kicked her out of the family. Over the next eight years, she had six children with several different fathers. Wilson does not know who his biological father is. He never met his maternal grandparents. His mother had only a ninth-grade education and suffered from severe but undiagnosed mental illness and occasional alcohol abuse. She abused Wilson and his siblings physically, emotionally, and verbally. For example, as a punishment, she would drive him to an orphanage miles from their home, and leave him there. Wilson suffered her frequent, violent beatings (often with a heavy frying pan) to protect his younger siblings. The family struggled financially. For years, they lived in a public housing project in Hartford, Connecticut. They subsisted on welfare. At age 12, Wilson started working full-time picking tobacco during the summers, putting in hours of backbreaking work alongside migrant farmworkers. He also has suffered his whole life from dyslexia.

Everything in Wilson's young life positioned him to repeat a cycle of poverty, or at least to become an embittered, closefisted person. But that has not been his outcome. Wilson refused to allow his circumstances to dampen his inherent graciousness, gentleness, and generosity of spirit. Wilson overcame his dyslexia and became an outstanding student. He graduated valedictorian from his public high school, received a scholarship to an engineering college, graduated in three and a half years while working full-time during much of those years, attained an MBA from Harvard Business School, and had a distinguished career as a consultant and executive for multiple companies. Most important to Wilson, he has a successful marriage and three wonderful children.

**B.     Wilson's Core Values—Generosity, Hard Work, and Respect for Education—Guide His Life of Extraordinary Action.**

Many of the 77 people who wrote letters for Wilson refer to him as an inspiration and the embodiment of the American dream.[2] Wilson's friends, family, and colleagues identify the core values that helped him achieve the American dream and that continue to guide his life and define his character: generosity, hard work, and respect for education. They confirm that despite his success, Wilson has never forgotten his humble beginnings. Those who know him say he has "no ego" and that he perpetually puts others' interests ahead of his own.[3]

*1.     Wilson Is a Generous Person Who Focuses on Anticipating and Meeting the Needs of Others, Expecting Nothing in Return.*

Wilson's sister, Carol Rickless, shares that "[b]eing raised poor with abusive conditions," can make a person more "compassionate" and more "giving to others."[4] Wilson is a case in point. As Lorne Adrain notes, Wilson "has contributed and engaged in both large and small, strategic and simple ways to a variety of community needs."[5]

Though Wilson has made many meaningful philanthropic contributions to educational causes, his church, and other charities, his efforts on behalf of autistic persons are particularly notable. Wilson does not have an autistic family member. But he saw a great and underfunded need and felt compelled to help. He donated significantly (nearly $400,000) and opened his home for fundraising events (raising $1,500,000). He went beyond offering financial resources and invested his time and talents. He began serving on the board of Cure Autism Now (CAN) in 2000. He realized that if CAN merged with the other main autism charity in the U.S., Autism Speaks, it could increase research funds and advocacy and reduce costs. Wilson supported and guided the

---

[2]     The letters written on Wilson's behalf are organized into exhibits based on the type of letter writer: **Ex. A**—Family Members (20 letters); **Ex. B**—Non-Profit Colleagues (4 letters); **Ex. C**—Business Colleagues (20 letters); and **Ex. D**—Friends, Neighbors, and Classmates (33 letters). These exhibits are internally paginated, and the citations herein reflect the internal pagination.

[3]     **Ex. D** at 29-30 (Letter from Philip Dubuque (sharing that "[n]ever once, in almost thirty years, have I found John to put his interests above anyone else")); **Ex. C** at 5-7 (Letter from Guvarinder Grewal (describing Wilson as having "no ego" and being willing to literally get on his "hands and knees to see how [he] could help")); *id.* at 33-34 (Letter from Karl Blanchard (observing that whether he was "on the manufacturing floor or in a field shop, John greeted each employee with a smile and genuine interest in the person and what they did for our company. . . . I witnessed first-hand John's humility and genuine respect for people, regardless of their position or rank.")).

[4]     **Ex. A** at 4-5 (Letter from Carol Rickless).

[5]     **Ex. D** at 7 (Letter from Lorne Adrain).

merger, resulting in the largest and most impactful autism nonprofit in the world. This work was difficult, and Wilson's "leadership in this effort was the key that actually brought this collaboration to the finish line."[6] Wilson went on to serve on the board of the merged charity for years. Mark Roithmayr, the former President of Autism Speaks, describes that "John negotiated a tripling of private funds dedicated to research into the genetic causes and environmental triggers of autism . . . ."[7] Jon Shestack, the founder of CAN, writes that "[t]here are 1000 excellent scientists working in the field where there once were less than a dozen . . . . None of this would have been possible without John Wilson's help and guidance."[8]

Wilson brings the same generosity to business and is a selfless leader. His actions while working for Staples Europe exemplify his approach. Staples brought in Wilson to help lead a turnaround of its struggling European division. Wilson voluntarily took a 10% salary reduction his first year to share the pain his employees were experiencing. He then realized that Staples' financial difficulties severely limited the company's ability to fully reward employees for their extraordinary efforts. Wilson thus *personally* financed tens of thousands of dollars a year in work incentives and recognition rewards for high-performing employees at every level of the organization, including gifts for employees and their children and visits where he flew employees to the United States and hosted them and their families at his home in Hyannis Port. Patrick Legro, who worked with Wilson at Staples Europe, considers Wilson's actions to be "[s]omething unheard of in my professional life to come across somebody so generous with no personal gain from it."[9]

In his personal life, Wilson has also consistently aided those facing difficulty. Wilson's friend, Dr. Richard O'Keeffe, faced terror after a cancer diagnosis when he realized he could not afford the treatments he needed. Unsolicited, Wilson "stepped in" and helped with the costs of

---

[6]     **Ex. B** at 4-5 (Letter from Dr. Ricki Robinson).

[7]     *Id.* at 6-7.

[8]     *Id.* at 1-2.

[9]     **Ex. C** at 16-17 (Letter from Patrick Legro).

treatment.[10] Dr. O'Keeffe credits Wilson with saving his life. Similarly, the 2007 financial crisis was devastating to Wilson's cousin-in-law, Ken Quartermain, and Wilson helped keep Ken and his family afloat financially. Ken emphasizes that he "was not allowed to feel inadequate, to feel humiliated, to feel failure" because Wilson provided for his financial needs "in such a way that [Ken's] fragile ego was protected."[11]

Wilson for years has also cared for the elderly and vulnerable, without being asked. He checks in regularly on 91-year-old Anna Laughlin, who depends on him, especially during the pandemic.[12] Jacqueline Bastien recalls how Wilson cared for her elderly mother, Polly, through acts such as showing up with and personally installing air conditioners during a heat wave.[13] Wilson renovated his family's home so his mother-in-law, who was suffering from colon cancer, could live with them.[14] He personally helped nurse her for six years. When Wilson's nephew, Andrew, an Army infantryman, was disabled by an IED while serving in Afghanistan, Wilson rushed to Walter Reed to be with Andrew, who is "so thankful I had someone like my Uncle who dropped everything to just stand at my side and offer me support while my world had crumbled."[15]

### 2. *Wilson Built His Life and Career on Hard Work and Integrity and Instills Those Values in Others.*

The effort that Wilson puts into all of his endeavors astounds people who know him.[16] He not only consistently worked 60-80 hours per week, but also found time to coach Little League, serve as a Scout leader, and create scavenger hunts using math and science problems as clues for his children and their friends. Those who know Wilson best understand that he does things the right way even if it is the hard way.[17] Wilson has taught his children that there is no substitute for

---

[10]     **Ex. D** at 8-9.

[11]     **Ex. A** at 20-21.

[12]     *Id.* at 16.

[13]     *Id.* at 17.

[14]     **Ex. A** at 6-8 (Letter from Leslie Wilson).

[15]     *Id.* at 29.

[16]     **Ex. C** at 5-7 (Letter from Guvarinder Grewal (noting that he asked Wilson "why are you putting in all of this time, energy and personal sacrifice" and Wilson's answer was "his children . . . to ensure that [they] understood . . . nothing comes easy")).

[17]     *E.g.*, **Ex. C** at 12-13 (Letter from Michael Patriarca (explaining that when coaching Staples' team to sell its European division Wilson "stressed to our leadership team that we be completely honest in our presentation of the

hard work. Johnny Wilson, his son, believes that the work ethic his father instilled in him is what enabled him to achieve his world record swim at nine years old (from Alcatraz to the shore), as well as other successes throughout his life. Coach Jack Bowen described Johnny Wilson as a "quiet grinder," the kind of athlete "I couldn't get to crack."[18] His daughters similarly credit Wilson with inspiring them always to give their full effort. His nephew advises, "I recognize that to be successful requires tremendously hard work like how my Uncle John does it."[19]

### 3. *Wilson Values Education and Strives to Ensure Educational Opportunities for Others.*

Wilson's nephew, Chris Sagherian, notes that Wilson has "the highest regard for school and education. . . . given our past."[20] Knowing the doors that education opened for him, Wilson has used his time and resources to ensure that young people—not just those in his family—have educational opportunities and support. Wilson has provided financial support to a range of educational institutions and students. He donated to the public and private schools his children attended. Wilson's will, years before he met Singer, established gifts of millions of dollars to fund scholarships at Harvard and Rensselaer Polytechnic Institute (his undergraduate institution) for students whose parents did not attend college.[21] He also created trust funds in 1998 to help all of his nieces and nephews pursue their educational dreams. Wilson consistently makes great efforts to improve or facilitate learning opportunities for young people: opening his home to exchange students, coaching sports,[22] and even dressing up as Santa Claus at his children's elementary school. Many remark on Wilson's unique and personal investment in opportunities for children

---

[18]   Trial Tr., Day 17, at 82-83 (Oct. 4, 2021).

business and present both the strengths and weaknesses")); *id.* at 31 (Letter from Anthony LeWinter (providing that when representing Wilson's company, 2G Digital Post, Inc., Wilson insisted that a plan to assist another shareholder pass a "higher standard" than the IRS required "even though those plans would actually cost John more to assist the other shareholder")).

[18]   Trial Tr., Day 17, at 82-83 (Oct. 4, 2021).

[19]   **Ex. A** at 33.

[20]   *Id.* at 30.

[21]   Wilson's will has provided for $2 to $5 million for the scholarships, depending upon the time and his resources. A classmate from his MBA program also advises that Wilson supported scholarships making it "possible for students around the globe to attend Harvard Business School and make a difference in the world." **Ex. D** at 7 (Letter from Lorne Adrain).

[22]   **Ex. D** at 17 (Letter from Tracy Johnson (noting the uniqueness of Wilson's approach to coaching a youth baseball team, which was "all about the fun of the sport and not winning")).

and that he gives his time and attention even when his own children are not involved.[23]

Wilson has worked to instill his love of learning in his children. "He made nearly everything in [his children's] daily routines and interactions into teachable moments."[24] He worked to ensure that his children had every opportunity to succeed and required that his children "in turn work hard to achieve [their] full potential."[25] His children recall that he did not push them to collect academic accolades. He focused on their acquisition of knowledge and mastery of material.[26] Wilson's brother, Cliff Wilson, explains that "John wanted his children to get a good education and made sure they were good fits for their chosen schools. He was not trying to enhance himself . . . ." It is no surprise, given the influence of their father, that all three of Wilson's children had high scores on the ACT, strong grades, and many other impressive accomplishments.

### C. Wilson's Trusting Nature and Generous Character—Not Ego or Striving for Status—Contributed to the Offense Conduct.

It is natural to wonder how someone like John Wilson wound up at this point. Wilson did not seek out Singer for his "side door." Wilson respects the knowledge and expertise of others and relies on the advice of trusted experts to whom he often delegates.[27] When Johnny was in high school, Wilson wanted to find a counselor to guide his family through the college admissions process and to help Johnny achieve his goals. His advisors at a world-renowned financial firm recommended Rick Singer and told Wilson that Singer was an accomplished college counselor. For years, Singer provided legitimate counseling services to Johnny: arranging tutors, overseeing test preparation, and helping Johnny strategize how to balance his high school's rigorous curriculum and his grueling athletic commitments. He also got Wilson and his son involved in real community service activities tutoring inner-city children in Sacramento. When Wilson and his

---

[23]     *Id.* at 10-11 (Letter from Ted Kennedy, Jr. (explaining that in the Hyannis Port community "the children's programs could always count on John to volunteer and to help make things run more smoothly; notably, John even continued to volunteer for our community after his own kids had grown out of these activities")); *id.* at 46-48 (Letter from John Schneeberger (concluding Wilson "[h]as done more than anyone for children of Hyannis [P]ort")).

[24]     **Ex. A** at 11-12 (Letter from Courtney Wilson).

[25]     *Id.*

[26]     *Id.* at 13-15 (Letter from Mary Wilson).

[27]     *E.g.*, **Ex. C** at 27-28 (Letter from Debbie Rogers (explaining that Wilson makes his decisions on "recommendations from his trusted professional advisors")).

wife and daughters moved to Europe for his work, Singer assumed an even greater position of trust, checking in on and meeting with Johnny, who had remained in California to finish high school. Wilson did not enter into a relationship with Singer looking for illicit advantages or quick fixes. He wanted Singer to help his child become his best self. This is in great contrast to other defendants, such as Gordon Caplan (sentenced to one month), whose relationship with Singer was openly based on engaging in fraud from the outset,[28] and Augustin Huneeus (sentenced to five months), who became actively involved in Singer's fraud, even suggesting his own ideas.[29]

As Wilson's trust in Singer grew, so did Singer's knowledge of Wilson. Singer was aware that Wilson had donated to schools in the past and planned to leave millions to universities in his will. Wilson's friend, Matthew LeMerle, suggests:

> . . . I know that John would have wanted to support his own Alma Mat[er] and would have thought nothing of giving large amounts to support the institutions that might become the same for his children. . . . John's generous nature would have made it very easy for him to be taken advantage of.[30]

Singer exploited Wilson's generosity and history of donating. When discussing whether his daughters were "legacy" students at Harvard, Singer told Wilson that it would not help "[u]nless you're a big legacy but you . . . haven't done that *yet*."[31] Wilson's large planned gifts to universities before even meeting Singer distinguish him from many of the sentenced parents.

Wilson's main concern with college admissions was ensuring the schools his children attended were the right fit. When Singer first suggested that Johnny could play water polo at USC, Wilson raised concerns about whether Johnny (who was then a junior in high school) would fit in on the team—due to Singer's exaggerated descriptions that the team's freshman recruits were largely European semi-professional players in their twenties. To address his concerns, Wilson visited USC in person, met the water polo coach, and watched a practice. His observations and

---

[28]     Per the recorded call played at trial, Caplan was discussing cheating on college board exams within five minutes of his introduction to Singer.

[29]     Sentencing Tr. at 15, *United States v. Huneeus*, No. 1:19-cr-10117-IT (D. Mass. Oct. 4, 2019) (noting, as an example, that Huneeus suggested having one of his daughters take a college board test for another of his daughters).

[30]     **Ex. C** at 3-4.

[31]     Ex. 571A, at 16:3-12 (emphasis added).

conversations assured him that USC, and its water polo team, would be a good match. After that visit, and as he watched Johnny continue to develop during his senior year, he never raised concerns about his son's fit again.[32] He was confident Johnny could compete well with other national competitors at his age level, as he had done for years. Indeed, USC's water polo coach assured Wilson that someone like Johnny, who played for multiple highly regarded and nationally-ranked teams, was qualified. Jack Bowen, Johnny's renowned high school coach, supported his USC application. When Wilson's girls started planning for college, he focused on finding schools aligned with their goals—science, engineering, and math programs—and strong academics. He hired Singer to provide test preparation and counseling to help reach those goals.

## II.   WILSON'S CULPABILITY RELATIVE TO OTHER DEFENDANTS WARRANTS A SENTENCE COMPARABLE TO OTHER PARENTS' AND LOWER THAN THE MOST EGREGIOUS.

### A.   The Culpability of Other Parents Is Relevant to Wilson's Sentence.

Wilson's culpability should be evaluated in light of his specific conduct and relative to how the Court has sentenced other defendants. "[D]istrict courts have discretion, in appropriate cases, to align codefendants' sentences somewhat in order to reflect comparable degrees of culpability—at least in those cases where disparities are conspicuous and threaten to undermine confidence in the criminal justice system." *United States v. Martin*, 520 F.3d 87, 94 (1st Cir. 2008) (affirming district court's decision to impose a below-the-range sentence to align defendant's sentence with those imposed on his co-defendants). When sentencing defendants charged in this and related cases, judges have considered defendants' relative culpability to ensure sensible calibration of sentences. Judge Woodlock decried the "[p]rofoundly corrosive" effects of "disparate sentences," which are "[p]robably as corrosive as anything that can happen in the criminal justice system."[33] Even when some co-defendants have pled and others have gone to trial, courts should reduce sentences in order to avoid "gross disparities between co-defendants." *United States v. Cirilo-Munoz*, 504 F.3d 106, 134 (1st Cir. 2007) (per curiam) (remanding for resentencing defendant who

---

[32]     *See* Def.'s Obj. #22, PSR at 70-71 (detailing how Wilson gained comfort Johnny would be a good fit on USC's team).

[33]     Sentencing Tr. at 109, *United States v. Bizzack*, No. 19-CR-10222-DPW (D. Mass. Oct. 30, 2019).

went to trial but received a significantly greater sentence than his co-conspirator who pled).

        **B.    Wilson Is Far Less Culpable than Most Other Parents.**

In sentencing other parents, the government has argued and the Court has agreed that the following factors make parents more culpable: (1) participating in the side door multiple times; (2) involving themselves actively, including by pushing Singer to provide illicit options; (3) lying to their children's high schools; (4) allowing their children to become aware of Singer's actions or involving their children in fraudulent acts; (5) supplying false information or fake photographs for Singer to use in their children's athletic profiles; (6) clearly knowing that there were lies in their children's applications (for example, in application essays) and doing nothing; (7) dodging or lying to university officials, such as development officers; and (8) facilitating test-cheating.

As shown below, Wilson's actions are less culpable than most other defendants.

| PARENT | CULPABILITY FACTORS | | | | | | | | SENTENCE |
|---|---|---|---|---|---|---|---|---|---|
| | Multiple Side Doors | Active Participation | Lied to High School | Involved Child | Supplied Information for False Athletic Profile | Knew of Lies in Application | Dodged or Lied to Development | Cheated on Tests | |
| Gamal Abdelaziz | | ✗ | ✗ | | ✗ | ✗ | | | 12 months 1 day |
| Diane Blake | | | | | | | | | 6 weeks |
| Todd Blake | | ✗ | | | | | ✗ | | 4 months |
| Mossimo Giannulli | ✗ | ✗ | ✗ | ✗ | ✗ | | ✗ | | 5 months |
| Elizabeth Henriquez | ✗ | ✗ | | ✗ | | ✗ | | ✗ | 7 months |
| Manuel Henriquez | ✗ | | | ✗ | | ✗ | | ✗ | 6 months |
| Douglas Hodge | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | | | 9 months |
| Michelle Janavs | ✗ | ✗ | ✗ | ✗ | ✗ | | ✗ | ✗ | 5 months |
| Elizabeth Kimmel | ✗ | ✗ | | | ✗ | ✗ | | | 6 weeks |
| Lori Loughlin | ✗ | ✗ | ✗ | ✗ | | | | | 2 months |
| Toby Macfarlane | ✗ | ✗ | | ✗ | | ✗ | | | 6 months |
| William McGlashan | | ✗ | ✗ | | | ✗ | | ✗ | 3 months |
| Marci Palatella | ✗ | ✗ | ✗ | | | | | ✗ | 6 weeks |
| David Sidoo | | ✗ | | | | ✗ | | ✗ | 90 days |
| Homayoun Zadeh | | ✗ | | | | | | | 6 weeks |
| **John Wilson** | ✗ | | | | | | | | |

The lesser culpability of Wilson's conduct is best understood in comparison to those defendants who both the government and this Court have considered most culpable, e.g.:

- **_Douglas Hodge_** (nine months): Hodge participated in the side door a record five times. Sentencing Tr. at 21, _United States v. Hodge_, No. 1:19-cr-10080 (D. Mass Feb. 7, 2020). He was fully aware of the illicit nature of the side door, advising Singer "I know how this works" and "We don't have to talk in code." _Id._ at 23. Singer told Hodge his daughter must be presented as an Olympic-level tennis player, "though she did not play tennis competitively." _Id._ at 21. Hodge also allowed at least two of his children to be knowingly involved. When one of his daughters needed to obfuscate her side door admission, Hodge's only question was, "Can you handle this on your end without being too awkward." _Id._ at 25. To cover his side door involvement, Hodge lied to his children's high school. _Id._ at 24. He knew about his children's false athletic profiles and supplied information for them—by sending fake sports photos. And he was aware that false information was included in their applications—reviewing an entirely fanciful essay about one of his sons being a tennis player in Japan. _Id._ at 22, 24. He sent checks to Georgetown's tennis coach made out personally to the coach.

- **_Mossimo Giannulli_** (five months): Giannulli participated in the side door twice. He took fraudulent pictures of his daughters for Singer to use in their athletic profiles, thereby involving them in the process. Sentencing Tr. at 11, _United States v. Giannulli_, No. 1:19-cr-10080 (D. Mass Aug. 21, 2020). Moreover, Giannulli was dishonest with his daughters' high school and berated the guidance counselor for questioning whether his daughter was a coxswain. _Id._ at 11, 13. He avoided USC's development officers, evincing that he had no interest in donating to USC. _Id._ at 10-11. He also confirmed with Singer that he should say nothing about his daughter's admission when he met with USC's athletic director. _Id._ at 11.

- **_Michelle Janavs_** (five months): Janavs participated in the side door twice. She was aware of the mechanics of the side door and facilitated test-cheating for her children. Sentencing Tr. at 13-14, _United States v. Janavs_, No. 1:19-cr-10080 (D. Mass Feb. 25, 2020). At least one of her daughters was aware of the cheating. _Id._ at 14. Janavs lied to the school when moving her daughters' tests to a facility where Singer had arranged exam-cheating. _See id._ at 16. She supplied false information—fake athletic photographs of her children—to Singer for her daughters' athletic profiles. _Id._ When approached by a USC development officer, she dodged the officer to avoid "saying anything I'm not supposed to say." _Id._ at 17.

Wilson agreed to participate in the side door three times. Wilson's facts are otherwise materially distinguishable from these other defendants.

_First_, Wilson did not originally or solely retain Singer for an improper purpose. After years of advising the Wilsons appropriately, Singer initiated the side door conversation, stating it was a donation to a program to help the admissions prospects of academically qualified applicants.

_Second_, Wilson did not lie to any high school. To the contrary, Jack Bowen, his son's high

school water polo coach, personally recommended Johnny to the USC coaching staff.

*Third*, there is no allegation that Wilson involved his children or allowed them to have any knowledge of Singer's side door or any false representations made on their behalf.

*Fourth*, Wilson did not supply false information for Singer to use in his son's athletic profile. There were no fake photos of Johnny, as he was in fact a highly accomplished water polo player who was a starter on national-caliber teams, had played for the U.S. Olympic Development Program and was a fast swimmer even on USC's team.[34]

*Fifth*, Singer's staff completed and submitted Johnny's application to USC, and there is no allegation that Wilson was aware of any false statements in the college application itself. Johnny's essay was truthful. Wilson's daughters had not yet applied to college when Wilson was indicted.

*Sixth*, Wilson did not dodge or lie to university development officials or athletic department officials, or have his son lie to a university interviewer. To the contrary, in spring 2013, when Wilson, his wife, and Johnny visited USC, Wilson asked to meet with USC Athletics to discuss his potential donation. Wilson and his wife met with Assistant Athletic Director Alex Garfio.[35] Wilson told Garfio he planned to donate to USC's water polo team through Singer's organization. Garfio told Wilson this would be fine and that donation commitments would be viewed favorably by admissions. Regarding his daughters, Singer actually had to instruct Wilson not to approach development officers. Singer did not say to avoid approaching them because Wilson might say something he was "not supposed to say." Rather, Singer told Wilson that he risked universities soliciting even more donations, underscoring that Wilson understood that his payments were contributions to schools and not payments to coaches for personal use.

*Seventh*, there has never been any allegation that Wilson was involved in test-cheating. Wilson's children studied hard at school for years and worked with tutors for months to earn their excellent test scores. Each was well-qualified to be in the applicant pool of the schools at issue.

There is no reason for Wilson to receive a higher sentence than defendants such as Hodge,

---

[34]     *See* Def.'s Obj. ##17, 22, 24, PSR at 67-69, 70-72 (detailing Johnny's qualifications and Wilson's understanding).

[35]     *See* Def.'s Obj. #8, PSR at 63-64 (providing further detail on Wilson's meeting with Garfio).

Giannulli, or Janavs, who engaged in more culpable conduct but pled guilty. Going to trial is not sufficient to sustain such a dramatic sentencing disparity because "a sentence based on retaliation for exercising the constitutional right to stand trial is invalid." *See United States v. Mazzaferro*, 865 F.2d 450, 460 (1st Cir. 1989) (remanding for resentencing when defendant who went to trial received sentence twice as long as co-defendants who pled guilty).[36]

Wilson should certainly not receive a sentence higher than the one other parent who went to trial, Gamal Abdelaziz.  The government recommended that Abdelaziz receive 14 months. This Court sentenced Abdelaziz to 12 months and a day. The factors the government emphasized as warranting a heavy sentence for Abdelaziz were the same culpability factors used when sentencing parents who pled. And the factors, once again, show Wilson should receive a lower sentence. The issues the government argued to support a high sentence for Abdelaziz do not apply to Wilson.[37]

**C.    Wilson's Tax and Federal Programs Bribery Charges Do Not Alter His Relative Culpability.**

Wilson was charged with tax and federal programs bribery offenses while many of the other defendants were not. But that does not reflect that Wilson has greater culpability. As the Probation Office explained, the government manipulated its charging decisions to obtain a desired sentencing result, and Wilson's conduct is no different than parents who were charged differently:

> [T]he government pursued the federal programs bribery charges to obtain a desired result and a higher advisory sentencing range for defendants. The federal programs bribery charges were only included in superseding indictments after the Court (Judge Talwani) agreed with the Probation Office's analysis of the guidelines on the fraud counts, finding no loss or gain, thereby resulting in a less desirable guideline sentencing range from the government's perspective of 0 to 6 months. . .

---

[36]    The Guidelines properly account for acceptance of responsibility, not by creating substantial penalties for trial, but by providing a 2-3 level decrease for individuals who plead.

[37]    The government argued that Abdelaziz's lies were repeated and blatant. Abdelaziz sent Singer photographs for his daughter's athletic profile that were not recent—because there were no recent photographs of his daughter playing basketball. Gov't Sentencing Mem. at 2, ECF No. 2516. In contrast to Johnny Wilson, Abdelaziz's daughter had only briefly played basketball in high school, she was never on the varsity team, and her school's basketball team was not highly ranked. *Id*. Abdelaziz also approved a false admission essay that Singer prepared for his daughter. *Id.* at 5. Abedelaziz lied to his daughter's high school to hide her side door admission. *Id.* at 4. And there were also calls between Abdelaziz and Singer—and none between Singer and Wilson—in which Abdelaziz agreed to lie to the IRS about payments to USC and to USC about why his daughter did not show up to participate on the team. The government also referred to findings by Probation that even at the sentencing phase Abdelaziz said things that were "not credible" and "not believable." Sentencing Tr. at 14, *United States v. Abdelaziz*, No. No. 1:19-cr-10080 (D. Mass Feb. 9, 2022).

. The defendant's conduct is no different than many of the other defendants who were never charged or convicted of federal programs bribery . . . .[38]

The Court has also acknowledged the government's attempted manipulation.[39]

Wilson's conduct is distinguishable from other defendants charged with federal programs bribery. For example, Xiaoning Sui sent $100,000 to Singer that went directly to the pocket of Jorge Salcedo, the soccer coach of UCLA, a public university. Sui knew the money would go to Salcedo and would secure her son's admission for a sport he did not play and result in a temporary 25% tuition scholarship award. Sui was sentenced to the five months she had already served. In contrast, Wilson's money did not go to a USC employee's pcoket, and he had no knowledge of such a plan.

Similarly, there is no culpability-related basis for sentencing Wilson more harshly than the many other parents who took tax deductions on payments they made to Singer's non-profit foundation or to universities, yet avoided tax charges.[40] Parents sentenced before this Court have deducted amounts far greater than the $220,000 that Wilson deducted and received sentences much lower than the sentence the government suggests and the Guidelines range that Probation provides. For example, Toby MacFarlane deducted $400,000 in side door payments as business consulting expenses and was sentenced to six months.[41] And Marci Palatella deducted the $475,000 she paid Singer for the side door as a charitable donation and was sentenced to six weeks.[42]

## III.   AN APPROPRIATE GUIDELINES ANALYSIS PUTS WILSON IN LINE WITH OTHER SENTENCED DEFENDANTS.

### A.   The Government Relies on Arguments This Court Has Already Rejected

This Court already has held—repeatedly—that § 2B1.1 is the appropriate Guidelines

---

[38]     Def.'s Obj.'s ##42-48, PSR at 77-88.

[39]     *See* Sentencing Tr. at 22-24, *United States v. Salcedo*, No. 19-CR-10081-IT (D. Mass. Mar. 19, 2021) (criticizing government's attempt to manipulate sentencing by charging "the same crime" under a different statute); *see also* Sentencing Tr. at 46, *United States v. Bizzack*, No. 19-CR-10222-DPW (D. Mass. Oct. 30, 2019) ("[T]he government has this evolving understanding of what can be charged and what will be charged, how it will be charged and how this question will be teed up.").

[40]     These parents include: Greg Abbott, Marcia Abbott, Jane Buckingham, Gordon Caplan, Robert Flaxman, Felicity Huffman, Agustin Huneeus, Bruce Isackson, Todd Blake, Diane Blake, Toby MacFarlane, Robert Zangrillo, Mossimo Giannulli, Lori Loughlin, Douglas Hodge, and Devin Sloane.

[41]     *See* Sentencing Tr. at 37, *United States v. MacFarlane*, No. 1:19-cr-10080 (D. Mass Nov. 13, 2019).

[42]     *See* Aff. in Support of Criminal Compl. at 19-21, ECF No. 3-4.

section for the mail and wire fraud and honest services mail and wire fraud counts.[43] In arguing that the Court should instead apply § 2B4.1 (the commercial bribery Guideline), the government has stated the obvious: this case does not involve any public official and "must" be considered as commercial bribery rather than as offenses that "involve officials of federal, state, or local governments."[44] The Probation Office agrees "[t]here was no public official involved."[45] But the government now contradicts itself, arguing that the Court should ignore the absence of any public official and calculate the Guidelines as if a public official had been bribed. *See infra*, Part III.B.

## B.    Section 2C1.1 Is Not Applicable.

The Sentencing Commission deliberately directed U.S.S.G. § 2C1.1 toward "Offenses Involving Public Officials,"[46] which this is not.[47] In amending § 2C1.1 in 2004, the Commission stated that the purpose of the amendments was to "ensure[] that punishment levels for *public corruption offenses* remain proportionate to those for closely analogous offenses sentenced under § 2B1.1."[48] The Commission sought to ensure that public corruption offenses involving a public official would start at a higher base offense level and be subject to additional enhancements, i.e., be sentenced more harshly, than cases where no public official was involved, such as this one. The point is sharper here, where the government charged the *exact same alleged bribery conduct* under the mail and wire fraud statutes—for which the Court has determined the appropriate guideline is § 2B1.1—and 18 U.S.C. § 666.[49] While the PSR correctly states that U.S.S.G. Appendix A

---

[43]    *E.g.,* Sentencing Tr. at 11, *United States v. Henriquez*, No. 19-CR-10080-NMG (D. Mass. Mar. 31, 2020).

[44]    Gov't Objs. to Draft PSR, Ex. A at 3 ("[G]iven that § 2B4.1 'covers commercial bribery offenses and kickbacks that do not involve officials of federal, state, or local government, foreign governments, or public international organizations," § 2B4.1 must apply here."); *id.* n.1 (emphasizing that the universities are "commercial enterprises" not governmental entities; *see* Gov't Obj. #5, PSR at 51 (incorporating by reference its arguments in Exhibit A).

[45]    PSR at 58.

[46]    U.S.S.G. Part C (containing § 2C1.1 and titled, "Offenses Involving Public Officials and Violations of Federal Election Campaign Laws").

[47]    *See supra*, Part III.A.

[48]    69 Fed. Reg. 28994-01, 2004 WL 1102144 (May 19, 2004) (emphasis added) (explaining that amendment to increase the base offense level and provide offense level increases for certain other aggravating factors "reflects the Commission's conclusion that, in general, public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses").

[49]    Trial Tr., Day 20, at 46 (instructing the jury that "[w]ithout a bribe or kickback, there cannot be an honest services fraud").

references § 2C1.1 for 18 U.S.C. § 666(a)(2) offenses, the Guideline section Commentary and Background Notes, and even the Part C title, make clear that § 2C1.1 is meant to apply only to offense conduct involving bribery of a public official.[50]

Public funding provides a jurisdictional trigger for § 666(a)(2).[51] Here, the evidence was that the private universities received federal funds under the Pell grant program, but "the offense had nothing to do with the universities' receipt of federal funds."[52] Because § 666(a)(2) has been used merely as a jurisdictional basis for the prosecution of another offense, namely, the same offense as the bribery conduct charged under the mail and wire fraud statutes, the Court should use the Guideline that the Court has already found applicable for the actual offense: § 2B1.1.[53]

The mismatch is particularly pronounced between the sort of conduct § 2C1.1 seeks to address—bribing a public official to influence an official government action—and the offense conduct here. Here, not only was there no "public official," but there also was no payment to any individual.[54] The jury instructions indicated that the jury did not need to find, and the jury was not

---

[50]       *See* Def.'s Obj. #44, PSR ¶ 79-80. The fact that § 2C1.1 has different base offense levels for defendants who are public officials and those who are not has no bearing on the inquiry, *see* PSR, at 82, as the section certainly applies to defendants who are not themselves public officials but who bribe public officials. Moreover, the *Gracie* case Probation cites is not binding authority and is not contrary to Wilson's position. *See id.* (citing *United States v. Gracie*, 731 F.3d 1 (1st Cir. 2013)). The discussion of § 2C1.1 in that case is non-binding dicta. And all the court noted was that § 2C1.1 can apply when the defendant himself was not sentenced as a public official. The case did not consider, nor did the defendant argue, that no public official was involved in the case at all.

[51]       *See* PSR, at 59 (agreeing federal funding component is "jurisdictional in nature").

[52]       PSR, at 58.

[53]       Application Note 17 to § 2B1.1 states:

In certain other cases, the mail or wire fraud statutes, *or other relatively broad statutes*, are used primarily as jurisdictional bases for the prosecution of other offenses. For example a state employee who improperly influenced the award of a contract and used the mails to commit the offense may be prosecuted under 18 U.S.C. § 1341 for fraud involving the deprivation of the intangible right of honest services. Such a case would be more aptly sentenced pursuant to § 2C1.1 . . . .

(Emphasis added). Here, the converse is true: even though the conduct fit jurisdictionally under § 666(a)(2), because it did not involve a government official, it would be—as the Court has already decided based on equivalent conduct— "more aptly sentenced" pursuant to § 2B1.1.

[54]       The government proceeded entirely on a theory that money paid to a university could be deemed a bribe to a university employee if it benefited the employee indirectly. *See, e.g.,* Trial Tr., Day 4, at 29 (government conceding in its opening that Singer did not tell parents about "payments to the insiders' pockets"); Gov'ts Sur-Reply in Opp. to Defs.' Mtn. to Dismiss Indictment or in Alternative for Suppression of Evid. and for Disc. and an Evidentiary Hr'g, at 2, ECF. No 1104. ("The government was not attempting to build a case that the parents understood Heinel to be personally pocketing money, and the government has never alleged that. The government has alleged—and the calls, checks and emails prove—that the defendants knew that one or more complicit insiders at USC were facilitating the admission of their children as recruited athletes in exchange for payments to a USC athletic program.").

presented with evidence to allow it to find, that Wilson ever made or intended to make a payment that went into a university employee's pocket.[55] Making a donation that benefited a private university—even if there was an improper quid pro quo purpose—is not in the same realm of wrongdoing as bribing a mayor or legislator. In suggesting that the Court should consider whether § 2C1.1 "truly fits with the conduct involved in this case and properly represents the defendant's culpability," the Probation Office explains that "cases typically prosecuted under this statute maintain some connection between the federal program funding/benefits and the bribery conduct":

> For example, there may be cases in which agents of government programs were paid bribes so that individuals could receive subsidized housing or other government benefits to which they were not entitled. The background commentary to USSG §2C1.1 notes that in some cases, the fraud involves the improper use of government influence in a way that harms the operation of government programs.[56]

The Court should not apply § 2C1.1 here.

### C.    If the Court Applies § 2C1.1, It Should Depart Downward.

Alternatively, if the Court finds that § 2C1.1 is applicable, the Court should exercise its discretion to depart downward because, as Probation suggests, the offense conduct here is far outside the "heartland" of what the Sentencing Commission intended § 2C1.1 to cover.[57] The Court may depart from the Guidelines under U.S.S.G. § 5K2.0(a)(1) because this case presents one of those exceptional cases in which there are circumstances present not contemplated by the Commission, specifically, that "USC's status as a recipient of federal funding was not related to the motivations behind the defendant's specific fraud and bribery conduct."[58] This case is far different from the typical § 2C1.1 case because, among other reasons, there was no public official, the payment went to the alleged victim of the bribe (a 501(c)(3) non-profit organization), the

---

[55]    *See, e.g.,* Def.'s Obj. #8, PSR at 63-64; *see also* Def.'s Objs. to Draft PSR, Ex. D (stipulation as to USC testimony that funds from USC water polo team's gift account, where Wilson's $100,000 was deposited, were not transferred "to any USC employee personally for any purpose unrelated to their employment at USC").

[56]    PSR, at 58-59 (finding that§ 2C1.1 should apply but that the Court should consider a downward departure).

[57]    PSR ¶ 179 & 58-59 ("[T]he Probation Office does not believe that the Sentencing Commission anticipated or considered a Varsity Blues fact pattern in the drafting or application of USSC §2C1.1 in determining the overall guideline range."); U.S.S.G. Ch. 1 Pt. A(4)(b); *see United States v. Koon,* 116 S. Ct. 2035 (1996) (unless the Guidelines proscribes consideration of a factor, any factor that takes a case "outside the heartland of the applicable guideline" may be the basis for a downward departure).

[58]    PSR ¶ 178.

payment was used for the victim's benefit, there was no public corruption, and there was no intended or actual effect on public funds. As discussed *supra*, the Commission's intent under § 2C1.1 was to punish *public corruption offenses* harshly and because this case involves the *private sector* and not public corruption, the Guidelines do not accurately capture Wilson's culpability.

### D. The Value of the Purported Bribe Is Incalculable and Thus Not a Basis for Increasing the Offense Level.

The government cannot meet its burden[59] of proving the value of any bribe payment. If the Court uses § 2C1.1, the Court should not increase the offense level because any attempt to value the bribe amount is purely speculative.[60] Section 2C1.1(b)(2) provides for an increase in the base offense level "[i]f the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or other acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $6,500." Here, of course, there was no public official. Moreover, the Court has already ruled, in related cases, that there is no calculable loss to the government,[61] and other sessions of the Court have held that there is no way to value the benefit received, i.e., the value of the admission slot.[62]

In *Bizzack*, Judge Woodlock held that there was no way to calculate any alleged bribery amount "by means of how much money is spent."[63] The same is true here. Judge Woodlock rejected the government's argument that the entire amount Bizzack paid to Singer could be considered a bribe because there was no evidence Bizzack could reasonably foresee the portion of the total payment he made that would go to a faithless employee of USC.[64] And he rejected the argument that the $50,000 Bizzack paid to USC's Galen Center could be tallied as a bribe to a

---

[59]     *See United States v. Ortiz*, 966 F.2d 707, 717 (1st Cir. 1992) (government has the burden of demonstrating that any upward adjustment of the base offense level is appropriate).

[60]     *See* Def.'s Obj. #45, PSR at 83-84.

[61]     *See, e.g.,* Sentencing Tr. at 5, *United States v. Kimmel*, No. 19-CR-10080-NMG (D. Mass. Dec. 9, 2021).

[62]     *See* Sentencing Tr. at 56-57, *United States v. Bizzack*, No. 19-CR-10222-DPW (D. Mass. Oct. 30, 2019) (government conceding that the admission spot cannot easily be assigned a value).

[63]     Sentencing Tr. at 62, *United States v. Bizzack*, No. 19-CR-10222-DPW (D. Mass. Oct. 30, 2019); *see also id.* at 62-63 ("[E]ven if we could calculate it in some fashion, it's meaningless because of all the various unknowns and estimates and speculations that are involved.").

[64]     *Id.* at 20-25.

USC employee.[65] Ultimately, he found that none of the payments, including a payment that went personally to Donna Heinel, was "a bribery that can be recognized under the sentencing guidelines because it's too speculative, at best too speculative."[66]

Here, similarly, there is no way to calculate what portion of the payment intended for the university could be considered as value that went to a university employee, much less the value that Wilson could have foreseen would go to the individual. Because, here, no payment went personally to a faithless employee, it is particularly speculative to assign a value to the "psychic benefit" or other diffuse benefit such an employee would have received from the payment to the university program. As other courts have noted, "[w]hen calculating the value of an in-kind bribe, the appropriate 'value' to employ is the value to the recipient of the bribe, not the cost to the one who pays the bribe."[67] Certainly the value to the individual was less than if the money had been paid personally to the individual, and the government has not met its burden to offer a principled way to calculate that lower value.

### E.    The Tax Loss Is Not Calculable So It Should Not Be Used to Increase the Tax Offense Level.

Similarly, the tax loss also is not calculable so it cannot be used to increase the offense level.[68] The government has the burden of proving the tax loss at sentencing.[69] The jury instructions did not require the government to prove, or the jury to find, the amount of the tax loss.[70] Pursuant to U.S.S.G. § 2T1.1(c)(1), the tax loss is "the total amount of loss that was the object of the offense." As noted, *supra* at 20, the government has conceded and the Court has held that the admission spot—to the extent it is considered the "object of the offense"—cannot be assigned a value. Alternatively, the government has offered two theories for why the $220,000 should not have been deducted on Wilson's tax return: (1) because it was a bribe; and (2) because

---

[65]     *Id.*

[66]     *Id.* at 56.

[67]     *United States v. Ring*, 811 F. Supp. 2d 359, 378-80 (D.D.C. 2011).

[68]     *See* Def.'s Obj. #46, PSR at 86-87.

[69]     *United States v. Buchanan*, 987 F. Supp. 56, 62 (D. Mass. 1997).

[70]     Trial Tr., Day 20, at 57-58 (Oct. 17, 2021).

no portion of the $220,000 could have been deducted as a charitable donation, given that the amounts paid to USC were a quid pro quo offered in exchange for an admission spot.[71] In order to find the amount of tax loss from improperly deducting a bribe payment, the Court must be able to calculate the amount of the bribe, which, as discussed above, is not calculable. Similarly, under the quid pro quo theory, the government must be able to prove that Wilson did not intend any amount of the payments as a donation or for some purpose other than a quid pro quo payment, which it has not done and cannot do.[72] Because there is no way to reasonably estimate the tax loss, the base offense level is 6.[73]

### F. All Counts Should Be Grouped Together Because They Are Closely Related and of the Same General Type.

Wilson's tax, fraud, and bribery counts satisfy the requirements for grouping under the Guidelines.[74] First, § 3D1.2(d) identifies the relevant Guidelines sections as appropriate for grouping. Second, the counts satisfy the standard outlined in Commentary, Application Note 6, to § 3D1.2, which provides that "[c]ounts involving offenses to which different offense guidelines apply are grouped . . . if the offenses are of the same general type and otherwise meet the criteria." The criteria for grouping include "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss." U.S.S.G. § 3D1.2(d). The offenses here are all of the same general type, that is, they are property crimes. Indeed, the Commentary to § 3D1.2, Application Note 6, "provides that most property crimes . . . are to be grouped together." Courts have used this standard in order to group fraud and tax counts together.[75] And the offense level under §§ 2B1.1, 2C1.1, and 2T1.1 is each determined almost exclusively based on the total amount of calculable

---

[71]  Gov't Opp. R. 29 & R. 33 Mots., at 48-49.

[72]  *See, e.g., United States v. Am. Bar Endowment*, 477 U.S. 105 (1986) (holding that a taxpayer may partially deduct a payment made to a tax-exempt organization that had a dual charitable and beneficial purpose, to the extent the payment amount exceeded the value of goods or services received); *see also* 26 U.S.C. § 6115(a)(1).

[73]  *See* U.S.S.G. § 2T1.1(a); *United States v. Scholl*, 166 F.3d 964, 981 (9th Cir. 1999).

[74]  Def.'s Obj. #43, PSR at 77-78.

[75]  *E.g., United States v. Fitzgerald*, 232 F.3d 315, 320 (2d Cir. 2000) (grouping fraud conviction for taking money from a welfare fund and tax evasion conviction for failing to pay any taxes on the funds illegally taken because they were both frauds and property crimes of the same general type); *see also, e.g., United States v. Petrillo*, 237 F.3d 119, 124-25 (2d Cir. 2000) (holding tax evasion and mail fraud should be grouped under § 3D1.2(d)); *United States v. Lamonda*, No. 6:05-cr-131, 2008 WL 68744 (M.D. Fla. Jan. 2, 2008) (grouping tax and fraud offenses because they are "offenses of the same general type").

loss. Third, the offense conduct under each count is closely related. As noted above and in Wilson's objections to the PSR, the federal programs bribery counts address the same conduct as the honest services mail and wire fraud counts. The government also charged that the offense conduct for the tax charge—misrepresentation to the IRS regarding the side door payments—was necessary to disguise the alleged bribe payments and to complete the fraudulent scheme.[76]

*United States v. Martin*, 363 F.3d 25 (1st Cir. 2004), which the Probation Office cites for the proposition that fraud and tax offenses should not be grouped,[77] is readily distinguishable. There, the court emphasized that the two counts caused "different harms to different victims." *Martin*, 363 F.3d at 44. Here, the Court already has held "there are no identifiable victims" for the fraud offense, and no separate calculable harm.[78] And Probation acknowledges that the victim is the *same* for the federal programs bribery count and the tax count: the federal government.[79]

### G.    The Government Has Not Come Close to Proving Obstruction of Justice.

The government has not met its burden of proving that Wilson submitted a false affidavit in connection with the September 28, 2018, FaceTime call with Singer and thus obstructed justice. To the extent the Court intends in any way to consider the government's baseless accusation in the sentencing, Wilson requests an evidentiary hearing to address this issue.[80]

### IV.    UNDER THE SENTENCING STATUTE, AN APPROPRIATE SENTENCE WOULD BE FAR LOWER THAN WHAT THE PROSECUTION SUGGESTS.

Section 3553(a)(2) requires the Court to impose a sentence "sufficient, but not greater than necessary," (1) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" (2) "to afford adequate deterrence to criminal conduct;" and (3) "to protect the public from further crimes of the defendant."[81] The Court must also consider the history and characteristics of the defendant, the nature and circumstances of the offense, the need to avoid unwarranted sentencing disparities, and any mitigating factors "not adequately taken

---

[76]    Aff. Supporting the Criminal Compl. at 4, 1:19-CR-10080-NMG, ECF No. 3-2 (D. Mass. Mar. 11, 2019).

[77]    PSR, at 79.

[78]    Sentencing Tr. at 7, *United States v. Blake*, No. 19-CR-10080-NMG (D. Mass. Nov. 17, 2020).

[79]    PSR, at 78.

[80]    Def.'s Req. for an Evidentiary Hr'g, ECF No. 2523.

[81]    18 U.S.C. § 3553(a)(2). There certainly is no need to protect the public from further crimes by Wilson.

into consideration by the Sentencing Commission."[82] Like the Guidelines, *see supra* Part III.C, applying the § 3553 sentencing factors also weighs in favor of a substantial downward departure from the recommended Guidelines sentencing range.

Here, at the tail end of the massive set of College Admissions prosecutions, the Court has already established the range of sentences that are necessary to address the factors in § 3553(a)(2). Those sentences (setting aside Gamal Abdelaziz) have ranged from home confinement to nine months' imprisonment, with this session sentencing parents to an average of approximately four months in prison. What is new for this Court are Wilson's history and characteristics, the nature and circumstances of *his* offense, and whether there are any mitigating factors in *his* case "not adequately taken into consideration by the Sentencing Commission."

Wilson's history and personal characteristics warrant a lower sentence for him. His case represents an aberration in an otherwise praise-worthy life marked by extraordinary generosity, service, and integrity. The tax charge, for example, is aberrational. Both of Wilson's tax preparers testified at trial that in general and over the years Wilson was a taxpayer who always paid his fair share and was never looking to do anything inappropriate. Indeed, he failed to follow up on or delayed by years two significant deductions he was entitled to take. Wilson respectfully asks the Court, as it has with other defendants, to take into account his overall character.

Moreover, the nature and circumstances of Wilson's offense demonstrate that he is less culpable than many, if not most, of the other parents, regardless of the government's charging decisions. He certainly is far less culpable than Douglas Hodge (sentenced to nine months), who used the side door five times, involved his children in the fraud, wrote two checks made out personally to a coach, supplied false information Singer used, and lied to cover up his conduct. He is also less culpable than university insiders, such as Jorge Salcedo (sentenced to eight months), who accepted money into their own pockets. The only deterrence value served by sentencing Wilson more harshly than Hodge, Salcedo, and others would be deterring future defendants from exercising their constitutional right to a jury trial.

---

[82]     18 U.S.C. § 3553(a); 18 U.S.C. § 3553(b)(1).

Nor should Wilson receive a higher sentence merely because of the amount of money involved. As the Probation Office recognizes, under these facts, "the amount of money paid by the defendant . . . is not necessarily the best measure of relative culpability":[83]

> [T]he Guidelines likely did not contemplate a Varsity Blues fact pattern, one in which the value of the defendant's payments was set solely by Singer, a middleman cooperator who pocketed a portion of those payments, and the amount of the payments had little to do with the defendant's culpability. The amount of the payment was a mere reflection of how much Singer demanded, and how much the defendant was willing to pay. This notion is highlighted in the instant offense in which during a sting operation, Singer demanded payments of $500,000 for each of the defendant's daughters' admission. . . . The fact that Singer arbitrarily increased the payment to $500,000 per side door admission for the defendant's daughters may be a reflection of what the defendant was willing to pay, but it is not necessarily tied to his culpability.[84]

Under the Sentencing Guidelines and taking into account his Objections, Wilson believes the appropriate offense level is 7. However, even if the Court agrees with Probation that the offense level under the Guidelines is 23, this is a quintessential case for a downward departure from the Guidelines because the Sentencing Commission never contemplated a fact pattern like this in designating the harsh penalties for bribing a public official—including the enhancements for the value of a bribe to a public official—when no public official is involved and the funds are in fact being contributed to a charitable institution.[85]

The Court should follow Probation's recommendation and not allow the prosecution to use its charging discretion to usurp the Court's function of determining a fair sentence. Wilson respectfully submits that the Court should make a significant downward departure that considers his character and appropriately aligns his sentence with other defendants. Specifically, the Court should sentence Wilson to no more than six months' imprisonment. This is above the sentence of most parents and positions his sentence as less than Hodge's and Salcedo's and comparable to Giannulli's and Janavs's.

---

[83]   PSR, at 52.

[84]   *Id.* at 56.

[85]   *See* 18 U.S.C. § 3553(b)(1) (instructing courts to consider any mitigating circumstances "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described").

## V.    NO MORE THAN A MODEST FINANCIAL PENALTY IS WARRANTED.

No more than modest fine is warranted here because Wilson has already paid $1,000,000 to the government and $100,000 to USC—far more than any fine imposed in this and related cases. There is no victim in need of restitution. The government has stipulated that the $100,000 USC received and kept from Wilson was used for university purposes. The $1,000,000 Wilson sent to Singer for Stanford and Harvard was in response to a government ruse and was seized and retained by the government.[86] No other parent forfeited an amount even close to this magnitude as a result of the government sting.[87]

Paying a large fine would be a hardship for Wilson and his family. Unlike many other parents, the financial impact of the charges has been heavy for Wilson. He has lost most of his income and a substantial portion of his savings. For most of his working life, he worked for large businesses as an employee or consultant. Now that a jury has convicted him, these options are gone; thus, he has forever lost the source of over 70-80% of his income. The possibility of him establishing a new career as a convicted felon in his sixties is dim. He owns a small company with unpredictable returns and large expenses. His liquidity is weak, which a prison sentence would exacerbate. Wilson is the sole source of support for his wife (a homemaker in her sixties) and their two college-aged daughters who are not financially self-sufficient. If the Court does impose a fine, Wilson asks that it be no more than $25,000 to account for the above.

## VI.    CONCLUSION

In short, three considerations support a reduced sentence for Wilson: his character; his conduct relative to other defendants; and his conduct as viewed by the Guidelines, as appropriately applied. Wilson respectfully asks the Court to take them into account in deciding his sentence.

---

[86]     As Probation notes, the government in fact "was enriched by the offense" given its seizure of the $1,000,000. PSR, at 56.

[87]     The only other sentenced parent to have forfeited money as a result of government undercover operations was Michelle Janavs, who paid $50,000 in connection with Singer's test-cheating scheme. *See* Aff. in Support of Criminal Compl. at 156, ECF No. 3-4.

Respectfully submitted,

*Counsel for John Wilson*

/s/ Michael Kendall
Michael Kendall (BBO #544866)
Lauren Papenhausen (BBO# 655527)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
lauren.papenhause@whitecase.com

Andrew Tomback (pro hac vice)
McLaughlin & Stern, LLP
260 Madison Avenue
New York, NY 10016
Telephone: (212) 448-1100
ATomback@mclaughlinstern.com

Date February 11, 2022

## **CERTIFICATE OF SERVICE**

I hereby certify that the above document is being filed on the date appearing in the header through the ECF system, which will send true copies to the attorneys of record.

/s/ Michael Kendall
Michael Kendall