<pre>
1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2


3
    UNITED STATES OF AMERICA,        )
4                    Plaintiff       )
                                     )
5   vs.                              )  No. 1-19-CR-10080-NMG-17
                                     )
6   JOHN WILSON,                     )
                     Defendant.      )
7                                    )
                                     )
8                                    )


9


10


                 BEFORE THE HONORABLE NATHANIEL M. GORTON
11                    UNITED STATES DISTRICT JUDGE
                             SENTENCING
12


13
             John Joseph Moakley United States Courthouse
14                        Courtroom No. 4
                         One Courthouse Way
15                   Boston, Massachusetts 02210


16


17                       February 16, 2022
                            3:34 p.m.
18


19


20
                    Kristin M. Kelley, RPR, CRR
21                     Official Court Reporter
             John Joseph Moakley United States Courthouse
22                  One Courthouse Way, Room 3209
                    Boston, Massachusetts 02210
23                  E-mail: kmob929@gmail.com


24         Mechanical Steno - Computer-Aided Transcript


25
</pre>

```
 1    APPEARANCES:

 2

 3            Stephen E. Frank

 4            Ian J. Stearns

 5            Leslie Wright

 6            Kristen Kearney

 7            United States Attorney's Office

 8            1 Courthouse Way

 9            Suite 9200

10            Boston, MA 02210

11            617-748-3208

12            stephen.frank@usdoj.gov

13            for the Plaintiff.

14

15

16            Michael Kendall

17            Lauren M. Papenhausen

18            White & Case, LLP

19            75 State Street

20            Boston, MA 02109

21            617-939-9310

22            michael.kendall@whitecase.com

23            for John Wilson.

24

25
```

1    APPEARANCES:

2

3            Andrew E. Tomback

4            McLaughlin & Stern, LLP

5            260 Madison Avenue

6            New York, NY 10016

7            917-301-1285

8            atomback@mclaughlinstern.com

9            for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S
 2           THE CLERK:  All rise.
 3           (The Honorable Court entered, 3:34 p.m.)
 4           THE CLERK:  This is Case No. 19-10080, the United
 5    States of America versus John Wilson.
 6           Would counsel please introduce themselves for the
 7    record.
 8           MR. STEARNS:  Good afternoon, your Honor.  Ian
 9    Stearns, Leslie Wright, Kristen Kearney, Steven Frank for the
10    government.
11           THE COURT:  Good afternoon, Mr. Stearns, Ms. Wright,
12    Ms. Kearney, and Mr. Frank.
13           MR. KENDALL:  Good afternoon, your Honor.  For
14    defendant John Wilson, Michael Kendall, Andy Tomback and Lauren
15    Papenhausen.
16           THE COURT:  Good afternoon, Mr. Kendall, Mr. Tomback,
17    and Ms. Papenhausen.
18           And we have Miss Victoria from Probation here as well.
19           We are here on the sentencing of Mr. John Wilson.  I
20    have received and read the presentence report, the government's
21    memorandum, the defendant's Sentencing Memorandum and an
22    extensive list of letters submitted in support of the
23    defendant, including 20 letters from members of his family,
24    four from what I would call philanthropic acquaintances, 20
25    from professional acquaintances and 33 from friends, a total of
```

1    77 letters.  Those are all of the writings I have received.

2          Is there anything I haven't mentioned that I should

3    have received?  Mr. Stearns?

4          MR. KELLY:  Not from the government's perspective.

5          THE COURT:  Mr. Kendall?

6          MR. KENDALL:  You may have included it when you

7    referred to sentencing memos.  There were some supplementary

8    materials on the request for obstruction from the government.

9          THE COURT:  Yes.  I have read all of that and received

03:35 10   it.

11         MR. KENDALL:  Thank you.

12         THE COURT:  Before we start, however, counsel, I note

13   that counsel will be well advised to use their time today to

14   argue why a particular sentence that they propose is

15   appropriate, rather than to argue about what I view as esoteric

16   and academic issues pertaining to the calculation of the

17   guideline range from which both parties urge the Court to

18   depart and which the Court plans to do.

19         In addition, the Court does not consider it necessary

03:36 20   to hold, nor will it hold, an evidentiary hearing concerning

21   whether Mr. Wilson obstructed justice with respect to an

22   affidavit he submitted to Court and, therefore, defendant's

23   request for evidentiary hearing, docket 2523, is denied.  The

24   Court will consider all of the pleadings which have been

25   submitted to the Court by the defendant and by the government

1    when imposing a sentence in this case, but I will not apply an

2    obstruction of justice enhancement when calculating the

3    guidelines applicable to this case.

4         So I understand there are multiple objections filed

5    with respect to the Presentence Report.  I'm going to deal with

6    them first.  I will announce my rulings on the government's

7    objections and then a response if the government wishes to make

8    it and hear from the defendant as well in that regard.  Then I

9    will turn to the defendant's objections and do the same thing.

03:37 10       Starting with the government's objections, the first

11   three of the eight objections registered by the government do

12   not need attention.  Objection No. 1 corrects a Scribner's

13   error.  Objection No. 2 corrects the date of Mr. Wilson's

14   arrest.  Objection 3 is informational.

15        The fourth objection by the government is to the

16   Probation Officer's determination that a two-level enhancement

17   for obstruction of justice relating to an affidavit submitted

18   by Mr. Wilson should not be applied.  Probation states that it

19   believes that the issue is a close call but defers to the

03:38 20   Court.  This dispute is largely academic because again, as I've

21   said before, both parties are recommending a substantial

22   downward departure from the guideline range and the Court

23   agrees that one should be adopted.  The Court, therefore,

24   considers the issue moot and will not apply a two-level

25   enhancement for obstruction of justice but will consider the

```
 1    arguments of both parties when imposing a sentence.  The
 2    government's objection is, therefore, overruled as moot.
 3            Objection No. 5, the fifth objection by the
 4    government, is to the Probation Officer's determination that
 5    there is no calculable loss or gain for purposes of an
 6    enhancement under the fraud guideline with respect to the
 7    offense level computation under Counts 1, 6, 8 and 9.  This
 8    objection has been addressed many times before.  The Court has
 9    overruled that objection as to numerous co-defendants, and in
10    this case it does so again.
11            The fraud and deceit guideline, Section 2B1.1, is
12    deemed by this Court to be applicable in this case rather than
13    the commercial bribery guideline, which is 2B4.1.  There is no
14    specific gain or loss to be applied under the guidelines.  It
15    is clear to this judicial officer that Mr. Wilson's actions
16    caused harm, not only to the University of Southern California,
17    but also to the system of higher education in this country.
18    That harm, because of its conjectural nature, however, cannot
19    be calculated in terms of financial gain or loss sufficient to
20    determine an enhancement under the loss tables in guidelines
21    Section 2B1.1.  Therefore, consistent with the prior rulings of
22    this Court, government's objection No. 5 is overruled.
23            The government's sixth objection is to the Probation
24    Office's determination that the total amount of the bribes paid
25    by the defendant for the purpose of the Sentencing Guidelines,
```

1     Sections 2C1.1 and 2B1.1, was $100,000, and a resulting

2     increase of the offense level ought to be eight.  The

3     government submits that the amount was $1.22 million dollars

4     and that the offense level should accordingly be increased by

5     14 levels pursuant to subsection B1(h) of the same guideline.

6          This dispute is also academic because the sentences

7     recommended by the parties are substantial below the low end of

8     the guideline range regardless of whether the base offense

9     level is increased by 8 or by 14.  The Court finds that the

03:41 10     defendant intended that some portion of the $1 million dollars

11     that he paid to Singer concerning his daughters be directed to

12     persons he believed were corrupt insiders at Stanford and

13     Harvard and agrees with the Probation department, that on the

14     evidence before it, the bribe amount cannot be reduced to a

15     specific figure as is required to calculate a guideline

16     enhancement.  It appears with the Probation Officer's

17     determination that $100,000 of the $220,000 payment the

18     defendant made to Singer in connection with the admission of

19     his son to University of Southern California was a bribe for

03:42 20     the purpose of calculating the applicable offense level.

21          The government's objection, therefore, is overruled.

22     Nevertheless, it is clear to this judicial officer that

23     Mr. Wilson intended to bribe individuals whom he believed to be

24     corrupt insiders at Stanford and Harvard with a huge sum of

25     money to secure his daughters' admissions to those schools.

1        Objection No. 7 of the government is derivative of its

2   earlier objections 4 and 6 and concern the Probation Officer's

3   calculation of the total offense level.  For the same reasons

4   that the earlier objections were overruled, government's

5   objection No. 7 is overruled.

6        Finally, the eighth and final objection of the

7   government is to the Probation Officer's recommendation that

8   the Court consider a downward departure on the basis of the

9   guidelines section for federal programs bribery, that is 2C1.1,

10  may not properly address the defendant's culpability because

11  the status of the University of Southern California as a

12  recipient of federal funds did not bear on his motivations for

13  engaging in the conduct for which he has been convicted under

14  Count 2 of the Superseding Indictment.

15       The Court has previously overruled a similar objection

16  by the government with respect to the defendant Abdelaziz.  The

17  Court will consider a downward departure or variance from the

18  guideline range as is recommended by both parties on the basis

19  of the defendant's culpability, which the Court considers to

20  include whether his conduct was of the sort anticipated by the

21  Sentencing Commission in promulgating Section 2C1.1 and,

22  therefore, the government's objection is overruled.

23       I'll hear from the government with respect to my

24  rulings on the government's objections if they wish to be

25  heard.  Mr. Stearns.

1        MR. STEARNS:  No, your Honor.  Thank you.

2        THE COURT:  Do the defendants wish to be heard in that

3   regard?

4        MR. KENDALL:  No, your Honor.

5        THE COURT:  Then we'll turn to the defendant's

6   objections.  I note that, pursuant to footnote No. 1 on page 3

7   of the defendant's Sentencing Memorandum, the defendant

8   concedes that most, that is 48 of his 68 objections to the

9   Presentence Report, are informational and, in my opinion,

03:45 10   and/or support his arguments and, therefore, they are overruled

11   as not pertinent to the guideline calculations.

12        I will address the other objections which the

13   defendant contends are noninformational as follows:

14        First, objection No. 27, which pertains to the

15   defendant's tax liability, it also raises previous rejected

16   factual and legal arguments and it is overruled.

17        Objections 36 and 37 concern the construction of the

18   obstruction of justice issue which the Court will not address

19   for reasons discussed when addressing the government's

03:45 20   objection just now.

21        Objection No. 39, which pertains to the alleged impact

22   on the University of Southern California, is mostly

23   informational and, to the extent it is not, it is overruled.

24        Objection No. 40 adopts the argument made in objection

25   No. 27 and it is overruled for the same reasons.

1          Objection No. 42 disputes the Probation Officer's

2    calculation of an adjusted offense level of 22 based upon the

3    application of the bribery guideline, that is 2C1.1, to

4    determine the base offense level as well as the Probation

5    Officer's application of an 8 level enhancement.  The Court

6    agrees with the Probation Officer's and the defendant's

7    objection No. 42 is overruled.

8          Objection No. 43, disputes the Probation Officer's

9    finding that Count 13 of the Superseding Indictment cannot be

03:46 10    grouped with the other counts for the purpose of calculating

11    the guideline range.  The Court agrees that the count cannot be

12    grouped and, therefore, objection No. 43 is overruled.

13          Objection No. 44 concerns the application of

14    Sentencing Guidelines Section 2C1.1 to determine the base

15    offense level, which defendant contends is incorrect.  The

16    Court agrees again with the Probation Officer's determination

17    that 2C1.1 applies and defendant's objection 44 is overruled.

18          Objection No. 45 disputes the Probation Officer's

19    application of an eight-level enhancement under 2C1.1(b)(2)

03:47 20    because the value of the payment exceeded $95,000.  Defendant

21    asserts that because no public official was involved and

22    because the Presentence Report misstates the, quote, value of

23    the payment, unquote, he made, no enhancement applies.  For the

24    reasons stated with respect to the government's objection

25    No. 6, the Court agrees with the Probation Officer's

1    calculation of the enhancement and the defendant's objection

2    No. 45 is overruled.

3          Objection No. 46 concerns the recommendation that the

4    tax loss in this case was $88,546.  Defendant contends that

5    some portions of the $220,000 could have been claimed as a

6    charitable deduction.  The Court agrees with the Probation

7    Officer's conclusion that because the entire payment was

8    fraudulent, it could not have been taken as a deduction and,

9    therefore, defendant's objection 46 is overruled.

03:48 10          Objection No. 47 concerns the Probation Officer's

11    calculation of the multiple count adjustment per Section 3D1.4.

12    It is derivative of objection No. 43, which the Court overruled

13    and, therefore, objection No. 47 is overruled.

14          Objection No. 48 is also derivative of the earlier

15    objections and, therefore, is overruled.

16          Objection No. 63 has to do with the defendant's net

17    worth and the value of his assets, which the Probation Officer

18    has amended to state that his net worth is at 3.5 million plus.

19    The Court, therefore, acknowledges that at least part of that

03:49 20    objection was sustained and part of it is overruled.

21          Finally, with respect to objections 66, 67, and 68,

22    they are derivative of the defendant's objections to the

23    calculation of the offense level which has been overruled and,

24    therefore, they are also overruled.

25          I will hear from the defendant if they have any

1    comments with respect to the Court's ruling on his objections

2    to the Presentence Report.

3              MR. KENDALL:  None, your Honor.  We just wanted to

4    preserve our rights to everything.

5              THE COURT:  Your rights are preserved, Mr. Kendall.

6              Does the government have any response in that regard?

7              MR. STEARNS:  No, your Honor.

8              THE COURT:  We turn to the Presentence Report and the

9    recommendations made in that report by the Probation Officer

03:50 10   with respect to the calculation of the guidelines, albeit that

11   they are in large part not controlled in this case.  I am

12   advised that the 2021 Guideline Manual applies.  That's the

13   most recent manual.  Within that manual, because we need to

14   consult with three separate guidelines by virtue of the

15   superseding indictment for fraud, bribery and false tax

16   returns, we go to the conspiracy guideline, 2X1.1.  That refers

17   us to the base offense level of the substantive offense.  We

18   are going to have to group these counts so that under the fraud

19   and bribery counts, that's 2B1.1, applies to the fraud counts

03:51 20   and 2C1.1 to the bribery counts.  It is recommended that I

21   group those two but not the two with the false tax return

22   counts, which is controlled by guidelines 2T1.1.

23              Considering all three of those guidelines, and because

24   the offense level for the most serious of the counts comprising

25   the groups of the fraud counts and the bribery counts is the

1    bribery count itself, we go to that to determine the first base

2    offense level for those groups.  Again, 2X1.1, the conspiracy

3    guideline, refers us to the substantive count, which in this

4    case is 2C1.1.

5         The offense involved convictions for more than one

6    bribe and, therefore, under Count 11 of the superseding

7    indictment, that was a $500,000 wire transfer in October of

8    2018.

9         Count 12 of the superseding indictment was for a wire

03:52 10   transfer to the KWF Foundation account in December of 2018.

11        The defendant paid Singer $220,000 in March of 2014.

12   That comprised of $100,000 to KWF and $100,000 to the Key and

13   $20,000 to Singer personally.  Accordingly, a two level

14   enhancement is applied to the base offense level of 12 and,

15   furthermore, because the monetary value of the benefit to be

16   received by the defendant cannot be determined, the value of

17   the payment that went to the Southern Cal men's water polo

18   account controlled by Coach Vavic as a bribe of $100,000 is the

19   determinative figure.

03:53 20        Therefore, under Section 2C1.1(b)(2), since the value

21   of the payment made by the defendant exceeded $95,000 but did

22   not exceed $150,000, the offense level is increased by 8 levels

23   under guidelines Section 2B1.1(b)(1)(F).  That all means that

24   the adjusted offense level of the first group is 22.

25        Do counsel have any comments with respect to those

1    findings?  Mr. Stearns?

2            MR. STEARNS:  No, your Honor, just subject to our

3    prior objections.

4            THE COURT:  Mr. Kendall?

5            MR. KENDALL:  Same, your Honor.

6            THE COURT:  All right then.

7            As to the second group, which was for the filing of

8    the false tax return, we turn to Section 2T1.1.  The base

9    offense level is corresponding to the tax loss from the tax

03:54 10   table under Section 2T4.1.  Because the tax loss is 88,000 plus

11   dollars, that falls between $40,000 and $100,000.  The base

12   offense level is 14 pursuant to guideline Section 2T4.1(E).

13           Do counsel agree with that calculation?

14           MR. STEARNS:  Yes, your Honor.

15           MR. KENDALL:  Same, your Honor.

16           THE COURT:  The Court so finds.  Therefore the

17   adjusted offense level on the tax count is 14.

18           Then turning to the multiple count adjustment under

19   guideline Section 3D1.4, count group one calls for one unit and

03:55 20   the count group two calls for a .5 unit.  That's a total of 1.5

21   units.  Pursuant to 2D1.4, that means I should add one offense

22   level to the number assigned to the amount of the highest

23   offense level.  That was 22.  That means that the combined

24   adjusted offense level is 23 and the total offense level is 23.

25           Do counsel agree with those calculations? Mr. Stearns?

1          MR. STEARNS:  Yes.

2          MR. KENDALL:  Yes, your Honor, subject to our

3     objections.

4          THE COURT:  Yes.

5          Turning to the defendant's criminal history, he has no

6     prior convictions and falls in Criminal History Category I.

7     That means that with a total offense level 23 and a Criminal

8     History Category I, the guideline range applicable in this case

9     is 46 to 57 months.

03:56 10          Do counsel agree with those calculations?

11     Mr. Stearns?

12          MR. STEARNS:  Yes, your Honor.

13          THE COURT:  Mr. Kendall?

14          MR. KENDALL:  Yes, your Honor.

15          THE COURT:  The Court so finds.  And, of course, I

16     have carefully considered the recommendations made in both of

17     the Sentencing Memorandums, but I will hear recommendations for

18     sentencing, starting with the government, Mr. Stearns.

19          MR. STEARNS:  Thank you, your Honor.  A week before

03:56 20     the FBI approached Rick Singer in this case, he and the

21     defendant John Wilson were captured on a court authorized

22     wiretap.  When they thought no one else was listening, they ban

23     to discuss the side-door scheme for the defendant's daughters.

24          The defendant asked Singer, "What sports would be best

25     for them or is that not even going to matter?"

1          Singer responded, "It doesn't matter.  I'll make them

2     a sailor or something because of where you live."

3          In response to that, the defendant laughed and asked

4     if he could have a two-for-one special because he had twins.

5          And the response to that, Singer laughed along with

6     him.

7          Later, the defendant was captured on a consensually

8     recorded phone call and by then the sailing plan had developed

9     to focus on a specific school, Stanford.  Singer told the

03:57 10    defendant that he could get one of his daughters admitted to

11    Stanford as a fake sailor in exchange for half a million dollar

12    bribe, but the defendant would need to bribe someone else at

13    another top school to get his second daughter admitted because,

14    as Singer told John Wilson, the Stanford coach actually had to

15    recruit some real sailors so that Stanford doesn't catch on to

16    what he's doing.  And the defendant again laughed, and he

17    confirmed his understanding. "He's got to actually have some

18    real sailors, right."

19          John Wilson did not just commit fraud and bribery like

03:57 20    the other parents in this case.  He did it brazenly, and he

21    laughed while doing it.  He didn't just lie on his taxes

22    either.  With respect to the side-door payments for his son at

23    USC years earlier, in an email to Singer, he described the tax

24    fraud as awesome, awesome that he could deduct some of the

25    bribe payments as fake consulting services and awesome that he

1    could deduct the rest as fake charitable donation.  Those are

2    just some of the things that John Wilson did and said and

3    thought in private, things that he didn't expect a jury, the

4    government, or this Court to hear at sentencing.

5          And now, having been convicted of eight crimes from a

6    jury of his peers, he resorts to minimization, finger pointing,

7    and excuses throughout his informational objections in the PSR

8    and his Sentencing Memorandum.

9          For example, in his objections to the PSR, he claims

03:58 10   that the language I just quoted to the Court, the coach

11   actually has to have some real sailors so that Stanford doesn't

12   catch on, he says that that language was soft and ambiguous.

13   In other words, this Harvard educated executive who described

14   himself on tape to Rick Singer as one of McKinsey's foremost

15   thought leaders on pricing strategy, he just didn't get it,

16   just like he claims he didn't get or he didn't read the fake

17   water polo profile for his son that Singer sent him and was

18   sitting in his inbox during a night when he was actively

19   sending emails.  And just like he tried to suggest at trial,

03:59 20   and continues to suggest, that it was his secretary's innocent

21   oversight that he deducted part of the bribe payments as a

22   business expense, even though on the face of the emails that

23   made it crystal clear it was his own idea.

24          To this day, this defendant continues to declare that

25   he is not only innocent but that he and his family were

1   exploited by Rick Singer, that they are victims of the very

2   co-conspirator that he was caught on tape laughing with about

3   lies that he told and agreed to tell schools.

4           At sentencing, he submitted a letter from his wife

5   asserting that there were misleading statements during the

6   trial in this courtroom during the trial.  He submitted a

7   letter from his son who refers to the facts underlying the

8   jury's verdict as allegations, and then calls those allegations

9   preposterous.  Preposterous.  But they're not allegations any

04:00 10  more and they're certainly not preposterous.

11          Here's what is preposterous though: Asserting that the

12  defendant is one of the least culpable parents in this case.

13  That's a quote from his Sentencing Memo.  We don't have time to

14  compare the defendant's actions to all the other parents who

15  have been convicted today, your Honor, but I would like to

16  discuss Gamal Abdelaziz, the defendant who was just sentenced

17  last week.

18          The defendant suggests that he is far less culpable

19  than Gamal Abdelaziz.  Mr. Abdelaziz did the side door for one

04:00 20  of his three children.  The defendant did it for all three of

21  his children.  Mr. Abdelaziz paid a $300,000 dollar bribe.

22  This defendant paid four times that amount, 1.2 million dollars

23  in three separate bribes.  Mr. Abdelaziz was convicted on two

24  counts of conspiracy.  John Wilson was convicted on both of

25  those counts, plus five more substantive counts of fraud and

1    bribery.

2            Then the defendant tried to distinguish himself from

3    Mr. Abdelaziz.  He says on page three, quote, Abdelaziz agreed

4    that Singer should lie to the IRS about the payments, and then

5    it says that Wilson purportedly didn't do that.

6            The defendant didn't need Rick Singer to agree to lie

7    to the IRS.  The defendant did that all by himself.  He was

8    convicted of tax fraud, of lying on the same tax return in not

9    one, but two ways.  And one of those ways, the fee consulting

04:01 10   services that were purportedly performed by Singer for his

11   company, Hyannis Port Capital, that was the defendant's own

12   idea.

13           At page 12 of his Sentencing Memo, he suggests that

14   himself, Diane Blake, and one other parent are the only three

15   parents in this scheme who are not actively involved, but as

16   the evidence at trial established, your Honor, there were

17   dozens, dozens of emails and nearly a dozen recorded phone

18   calls in which this defendant was captured in realtime

19   discussing both of the bribes and the lies in painstaking

04:02 20   detail.  The defendant was intimately involved in the scheme,

21   and the evidence shows that he insisted on knowing the details.

22           Stripped of the minimizations, the excuses, and the

23   finger-pointing, the defendant's conduct makes him one of the

24   most culpable defendants in this case.  And when the Court

25   considers his strident refusal to accept responsibility for

1    anything, he deserves the longest sentence of all the parents

2    in this case.

3         I'd like to briefly address two other themes in the

4    defendant's sentencing submission, your Honor.  First, his

5    charitable work.  To be sure, like many of the defendants in

6    this case, the defendant has given generously to charity, but

7    the government respectfully submits that his charitable giving

8    was not so unusual in comparison to other defendants,

9    particularly given his enormous wealth to warrant a further

04:03 10   reduction in his sentence.

11        Second, the defendant cites his difficult upbringing.

12   The defendant's rise to academic and business success, your

13   Honor, is noteworthy, but it doesn't explain or justify or

14   excuse his conduct.  John Wilson was a man in his mid 50s,

15   decades removed from his childhood, when he decided to

16   participate in the scheme involving lies and payoffs to get his

17   three children into college, and those three children, unlike

18   him, they didn't have the opportunity to go to private school.

19   I mean they did have the opportunity to go to private school.

04:03 20   They had private tutoring.  They had every other opportunity

21   that money could buy.

22        The defendant did not commit his crime out of want or

23   need and he was not driven to a life of crime in his teenage

24   years or his early 20s because of his childhood.  Far from

25   that.  By the time the defendant decided to participate in this

1    conspiracy, he had already achieved the American dream and he

2    threw it all away, and his childhood had nothing to do with

3    that.

4            The bottom line is this:  The defendant may have had a

5    humble beginning, but he is not humble and he has not yet been

6    humbled.  He stands before this Court regretful that he was

7    caught, regretful that he was convicted, but he's not actually

8    regretful for his conduct, and he accepts not an ounce of

9    responsibility for his actions.  The 21 month sentence that the

04:04 10   government is recommending in this case, your Honor, reflects

11   all these things.  We acknowledge it's not an insufficient

12   sentence but it's a fair one.  It's significantly below his

13   applicable guidelines range, however the Court calculates it,

14   and it's firmly within just the guideline range for his tax

15   fraud count alone, setting aside the multiple fraud and bribery

16   convictions.

17           By contrast, the defendant's request for a six month

18   term, that's half of what the Court sentenced to Gamal

19   Abdelaziz to last week, a less culpable defendant.

04:05 20          And that brings me back to the word "preposterous",

21   because then the defendant suggests that he cannot afford and

22   does not deserve to pay a fine of more than $25,000.  The Court

23   will recall this is the same defendant who was caught on tape

24   bragging about and inviting Rick Singer to a birthday party he

25   was going to throw himself at Versailles.  Now he seeks credit

1   for the fact that the one million dollars in bribe payments for

2   his daughters to get into college was seized by the government

3   as proceeds of a crime.  It is, to say the least, tone deaf.

4        The defendant would have the Court believe that he

5   does not have the ability to pay a meaningful financial

6   penalty, unlike every other defendant in this case, because he

7   has to cover mortgages on not one mansion but two, and this is

8   in a case where privilege and entitlement were the driving

9   forces of the conspiracy.

04:06 10        For all those reasons, your Honor, the government

11   respectfully recommends that the Court sentence John Wilson to

12   21 months in prison, to run concurrently on all counts of

13   conviction, two years of supervised release, 500 hours of

14   community service, a $250,000 fine, and restitution as set

15   forth in the PSR.

16        Thank you.

17        THE COURT:  Thank you, Mr. Stearns.

18        Mr. Kendall.

19        MR. KENDALL:  Yes.  Thank you, your Honor.

04:06 20        When determining John Wilson's sentence, I suggest to

21   you the single most important thing for you to consider is his

22   character.  The government wants you to think of his character

23   through one series of events, the events that led to his

24   conviction in this courtroom and his involvement in the side

25   door.  They say that's it, that's all you need to look at.  I

1    suggest to you the way you judge a person's character is to

2    look at what they did their whole life and see what values they

3    have practiced and lived by, values that they have helped

4    others with.

5          You've used a very apt and effective phrase from

6    Yiddish, chutzpa, to describe the behavior here that you've

7    seen here and been offended by.  I'd like to take another

8    concept from Jewish learning.  It's called The Golden Ladder of

9    Charity.  It was something written 900 years ago by the

04:07 10   foremost scholar in the history of the Jewish people, Rabbi

11   Maimonides.  He gave a list of criteria to use to evaluate the

12   charitable works of a person.  He said, these are the ways you

13   can sort of rank and evaluate them.

14         Among the things he talked about was did the person

15   give to people that they didn't know.  Did the person give to

16   the people who had no idea who they were?  Did they give when

17   they will not get any recognition or benefit?  And did they

18   give even though no one asked them to give?  I'd like to review

19   a little bit of the charitable accomplishments and

04:08 20   contributions Mr. Wilson made.

21         And one thing I agree with Mr. Stearns.  For a rich

22   person to write a check and to give some money, that's very

23   nice, but that's not a measure of character.  That's a measure

24   of fitting in with social conventions and sort of expectations.

25   I suggest to you if we look at the contributions Mr. Wilson has

1    made, it's far more than somebody just opening up a checkbook.

2    It's somebody giving their time, their skill, and their effort,

3    and I suggest to you giving time is a very precious thing.

4    Rich or poor, we never have enough time in our lives.

5           The first thing, of course, is Mr. Wilson's

6    contribution for the autism charities.  What you see from the

7    letters that were sent by those people is he got involved

8    because he saw such a pressing need for people afflicted with

9    autism and for their families.  There's over five million

04:09 10   autistic adults in the United States, plus numerous children.

11   Nobody in his family was afflicted by it but he thought it was

12   a charity and an area where he could help.

13          And what do we see in the letters?  He came in as a

14   CEO and the first thing he said was you need to do a merger.

15   You've got two small little charities that compete with each

16   other and don't have a lot of impact.  Let's put them together.

17   And Dr. Robinson, Ricky Robinson from USC, describes how John

18   came up with the merger idea and spent a year negotiating that

19   merger to put it together.  He spent a year convincing doctors

04:09 20   and scientists and emotionally effected parents that they had

21   to merge these organizations.  And like a good CEO, he also

22   told them, you have to change your strategy.  You're talking

23   about public education, awareness.  We need to lobby the

24   federal government and other sources to get research money to

25   find a scientific cure.

1          And what do we have in here?  We look at

2    Dr. Robinson's letter.  His leadership in this effort was the

3    key that actually brought this collaboration to the finish

4    line.  I am convinced his efforts made a huge difference, not

5    just in the life of our organizations but for the lives of so

6    many living with development disabilities.

7          Then you have Jon Shestack, one of the leaders of the

8    autism groups whose family was personally effected.  He

9    describes it.  "John took on his volunteer position as if it

04:10 10  were his job.  He met families and scientists and completely

11   mastered the field.  He helped us grow from over 5 million a

12   year in revenue to over 20 million a year.  There are thousands

13   of excellent scientists working in the field when there were

14   once less than a dozen.  And the federal government now spends

15   over 200 billion a year on autism research when they once spent

16   under 5 million.  None of this would have been possible without

17   John Wilson's help and guidance.  It's really hard to

18   communicate what a super human force for good John was in our

19   lives.  He had the energy and talent of five men and gave it

04:11 20  freely".

21         That's not writing a check to attend some fancy dinner

22   and be with your rich friends.  That was a 15 year commitment,

23   providing leadership and vision that turned them around from a

24   small group that raised funds to educate people to be more

25   sensitive to be a major force in developing scientific research

1    to cure a terrible affliction.

2         The second major philanthropic thing he's done

3    addresses an issue that this Court has highlighted,

4    appropriately so, throughout his discussion of the side-door

5    activities.  The Court has raised specifically the problem of

6    economic inequality, the impact that the side door would have

7    on people who did not have financial resources to compete that

8    had to compete upon their grades and hard work only.

9         Ten years before John Wilson ever met Singer you heard

04:12 10   from the testimony of his tax preparer.  He created a trust and

11   bequest in his will to give five million dollars to his college

12   and to Harvard, his other alma mater for college scholarships

13   to endow for students whose parents didn't go to college, for

14   students in engineering math with good grades.  This is exactly

15   the same type of people the Court has been concerned about

16   being left behind by the side door.

17         So while it doesn't excuse his conviction, and his

18   conviction should not be erased, the values you're concerned

19   about he put his money where his mouth is and he made

04:13 20   commitments for a large amount of money to take care of that

21   issue of social inequity.  John didn't know the people who

22   would get these scholarships.  They'll never know him.  He

23   didn't get any benefit from himself or his children from the

24   schools that he attended to make a bequest for.  He made it the

25   largest charitable contribution of his life because he shared

1    the values you're concerned about, the issue of economic

2    inequality in children getting into college.

3            There's an old saying that good character is what you

4    do when nobody else is watching, so I want to turn to some of

5    the letters from his friends that told you that, in addition to

6    the large acts, being on boards taking major roles, what does

7    he do in his every day life.

8            You have a letter from a Richard O'Keefe, a retired

9    physician, who described how John, in fact, is not the arrogant

04:14 10   person they describe but an incredibly humble person.  As

11   Dr. O'Keefe wrote to you, "He has worked very hard throughout

12   his life and has become quite successful.  In my experience,

13   many people who share the same type of story tend to possess a

14   great deal of braggadocio, but John is very humble and a very

15   genuine person".

16           You also have him describing how when he was diagnosed

17   with cancer, he had to go out of state for treatment, and

18   because of some craziness in our insurance laws, it wasn't

19   covered.  John gave him the money to get his out-of-state

04:14 20   cancer treatment.  And what he says is he never raised it with

21   John.  He never asked.  John somehow heard of the need and John

22   gave him the money to get his treatment.  And what does he say?

23   "I am convinced that he is one of the reasons that I am still

24   here today".

25           Finally, on a personal level, there's a letter from

1    Jacqueline Bastien.  You may remember when you read this letter

2    she had a mother who was living on Cape Cod who had had

3    dementia that was eventually overtaking her.  When the woman

4    tried to live independently, John was the person to come down

5    and fix the house, fix the fence, deal with the landscaping.

6    If it was too hot, he'd buy a couple of air conditioners and

7    install them for her during a heat wave.  Never asked to do

8    this.  Never solicited.  He did it just because he wanted to

9    help someone who needed him.  And, in fact, when the family

04:15 10   wanted to move her into a dementia care unit, they didn't have

11   the money and he lent them $30,000 so they could get proper

12   care for her.

13          Finally, your Honor, you have the letter from his

14   childhood friend, Fred Lukens, who describes the difficulties

15   John grew up with, the sheer poverty, growing up in a housing

16   project with violence, with alcohol and mental health issues.

17   And from the earliest of age John was the one who shielded his

18   siblings.  John was the one that became valedictorian at his

19   high school, overcoming some disabilities by always having good

04:16 20   ethics and good values.

21          Finally, what was he like as a corporate leader?  We

22   live in an age when CEOs love to be greedy and everybody

23   celebrates the more money they can grab for themselves, the

24   bigger the yachts they can buy.  What did the employees of

25   Staples tell you in their letters?  When John came into

1    Staples, the first thing he did was take a ten percent cut.

2    The company was doing poorly and he was going to share the

3    pain.  After that, he spent thousands of dollars every year

4    giving rewards and bonuses in support out of his pocket, it was

5    after tax money, this was not tax deductible stuff, to

6    encourage his team and the middle management folks to stick

7    with the company and work as a team.

8            And what did they tell you?  He treated everybody the

9    same, the union people, the midlevel workers, the low level

04:17 10   workers.  He has a tremendous sense of humility and he's not

11   someone who's caught up in hierarchy.  This is somebody who

12   started off working his first job in life working in tobacco

13   fields alongside migrant farm workers.  He is not a person of

14   arrogance and contemptuousness.  Maybe he spends his money, but

15   he spends it generously, sharing with many.

16           So, your Honor, I now want to turn to the sentencing

17   issue.  In terms of the issue of general deterrence, the

18   sentences in this case are known nationwide.  They're known

19   internationally.  The college admissions prosecutions in this

04:17 20   courthouse have shown the world that people of wealth, of

21   celebrity, of influence, are all subject to the same rules and

22   the same punishment as the rest of the world.  Giving him the

23   sentence in line with the other defendants reinforces general

24   deterrence.  It doesn't undercut it.

25           As for specific deterrence, John has been a

1    businessman for over 40 years.  He has an unblemished record,

2    not a single regulatory ethical problem in his entire career

3    outside of the side door.  The government brought a tax charge.

4    He's been convicted on it, but you also know they went through

5    probably a dozen or more of his tax returns.  They combed his

6    tax returns over several years, and this is the only issue they

7    found.  You remember from the trial, here is a guy who spends

8    38 to 42 percent of his income either in paying taxes or making

9    charitable donations unrelated to Rick Singer.  This is not

04:18 10    somebody who is nickel and diming the government or cheating

11    the government as a general practice, putting aside Count 13.

12    This is somebody that has paid his fair share in taxes and,

13    when they reviewed his taxes, they found nothing else to raise.

14         So, your Honor, their recommendation says he should

15    get almost two times higher than the next sentence, four times

16    more -- more than four times the average sentence that you have

17    given in this case.  You've sentenced, I believe, 15 people in

18    this case.  Other judges in this courthouse have sentenced

19    others as well.  We suggest to you, treating John somewhere in

04:19 20    the middle of the group of the defendants is appropriate, above

21    the average of four, four and a half months for the sentences

22    you give, and we recommend six.  Our point is simply, Judge, he

23    is not the outlier that the government wants to make him out to

24    be.  You and other judges in this courthouse have noted several

25    characteristics that warrant a longer sentence in this case.

1    I'd like to review some of those now and how they apply to

2    John.

3            Agent Keating of the IRS testified at trial.  I'm sure

4    you remember that, your Honor.  She testified that Singer spoke

5    to John Wilson differently than to the other parents.  He had

6    never used the word "bribe" to him.  He had always told him all

7    the money was going to a school program.  We're not disputing

8    the Court's ruling and the Court's instruction that that can be

9    a corrupt bribe, but I suggest to the Court there is a

04:20 10   difference in the corrupt bribe that goes to the school program

11   and gives some benefit to the corrupt insider than putting cash

12   directly in the pocket of the insider, which many of the

13   parents did and got a far lesser recommendation than what the

14   government does.  I'm not challenging whether that can be a

15   violation, but it's a difference in the degree of the violation

16   is what I'm suggesting to you, your Honor.

17            He never took fake pictures of his children.  He did

18   not lie to his children's high school teachers and counselors,

19   as many of the parents did.  In fact, Coach Bowen was told he

04:21 20   was applying and Coach Bowen supported Johnny's application to

21   USC.  Singer called other parents and described this fictitious

22   IRS audit and got them to agree to participate in deceiving the

23   IRS in the audit.  Singer never even tried that with John

24   because he knew John would never agree to it.

25            Singer never called John to get him to lie to USC

1    about his child having an ankle injury or lie to the schools

2    for any other purpose.  In fact, John, unlike many of the

3    parents, including Mr. Abdelaziz, never had one of his children

4    write a phony college essay that claimed they were playing a

5    sport that they didn't play.

6         There's a lot of behaviors in this case that the Court

7    is rightfully indignant over and rightfully critic of.  I

8    suggest one of the behaviors that's the most egregious, if not

9    the most egregious, is when people made their children active

04:22 10   participants in the behavior, getting them to knowingly pose

11   for phony pictures they knew were going to be used improperly,

12   getting for them or ghost writing for them essays that were

13   false and misleading and having the children read it and help

14   put it together.

15        To dirty your own children's hands with actual

16   fraudulent conduct I suggest, your Honor, is the worst behavior

17   that you'll find in this case.  Many of the defendants who got

18   lower sentences than the government recommendation did that.

19   John Wilson's children knew nothing about the side door.  He

04:22 20   never had them involved and participating in it, and that is

21   uncontested in this case, your Honor.  That alone, I suggest,

22   makes him not an outlier and the worst defender but somewhere

23   in the mix of the defendants.

24        And if you look at what he taught his children, they

25   scored incredibly high on the ACTs, all three of them.  He

1  hired tutors from Rick Singer who would grill these kids and

2  make them work for months on end to prepare for those tests and

3  get honest scores.  His son was an honest athlete, who actually

4  was on the USC team for a season even if he was out for a lot

5  for concussion.  His daughters had wonderful activities,

6  champions in debate and math team.

7          These are the practices and the way he taught his

8  children to be.  He never involved them in any of the behavior

9  of the side door, which so many of the other defendants who

04:23 10  have been sentenced actively did.

11          The sad irony of John's conviction is his kids didn't

12  need a side door.  They were qualified, capable kids that could

13  have got into highly competitive schools without the side door.

14  That is his problem, that he made judgment, but I'm just

15  pointing out, your Honor, he taught his children values that

16  you would admire and respect, unlike many of these defendants

17  who taught their children to cut corners.

18          The government's sentence is excessive, your Honor.

19  We ask that he be sentenced more in line with the other

04:24 20  defendants.  The sentence recommendation they make will cause

21  not just John but his wife and children to suffer far more than

22  is necessary.

23          I want to address briefly the issue of the

24  obstruction.  I'm grateful you found the government did not

25  carry its burden of proof and it wasn't relevant to the

1   guideline calculation.  I do not want any aspect of that to

2   influence the Court.  We have put together four affidavits.

3   They control Rick Singer and they won't say what Rick Singer's

4   view on it was.  They would not disclose anything what the

5   other witness to that phone call would say.  I suggest you can

6   draw an adverse inference against the government if they're

7   hiding Rick Singer's statements on that when four people have

8   put in affidavits and two of them are willing to testify in

9   court.

04:24 10        You can say many things about John Wilson, your Honor,

11   but I don't think anybody could say that he would ever put up

12   his wife or children to commit perjury in this court for his

13   own benefit.  His problem is he does too much for his children,

14   not that he exploits them for his own legal issues.

15        So I ask that the obstruction allegation have no

16   impact on your assessment of what type of downward departure is

17   appropriate.

18        Finally, with respect to the fine, your Honor, there's

19   a few things.  We say he doesn't have a lump sum because his

04:25 20   assets aren't liquid.  If you are to impose a substantial fine,

21   we'd ask that you give him six months.  He has all sorts of

22   debts and assets that are just not cash that can be readily

23   used.  Many things are tied up in his business.  So a six month

24   period to pay a substantial fine, I'd suggest, is not arrogant

25   or lacking of humbleness.  It's just an economic reality.

1          Your Honor, in terms of what is the appropriate fine,

2     the government is getting a million dollar forfeiture from him.

3     I believe that's four times the amount anybody else has paid in

4     a fine.  I'd ask that you factor that into your analysis as

5     well.

6          I thank you for your patience as always, your Honor.

7     We await your judgment.

8          THE COURT:  Thank you, Mr. Kendall.

9          Does the defendant wish to address the Court before

04:26 10     sentence is imposed?

11          THE DEFENDANT:  Yes, your Honor.  Can I take this off?

12          THE COURT:  Yes, you may.

13          THE DEFENDANT:  Thank you, your Honor, for the

14     opportunity to speak today.  The last several years have been

15     extremely difficult for me and my family, and yet I know that

16     in many ways I'm a very fortunate person.

17          The U.S. educational system is one of the best in the

18     world, and it's changed my life profoundly for the better.

19     That is why I especially regret and apologize for any negative

04:26 20     impact that my actions have had on the level of trust and

21     confidence that people have in the college admissions process

22     and higher education in general.

23          I have a wonderful wife, three honest and hardworking

24     kids, and my children have earned tremendous success in school

25     with their own hard work and in many other areas as well.  And

1    I am incredibly proud of them.  And I'm terribly sorry that

2    because of the some of the choices I have made that my children

3    have been publically and unfairly harmed.

4          Your Honor, I know that you've been very diligent in

5    trying to root out any unfairness in the college admissions

6    process and I respect that and apologize to you as well.

7          I have always believed that the greatest

8    responsibility of someone who's achieved success in their life

9    is to share it with others, and I have a lifelong history of

04:27 10   doing what I can to help others, at many levels.  As you decide

11   what is an appropriate sentence for me, I ask that you look at

12   my entire life and my entire life history and what I've done

13   for others in the past, and I would like still to do for others

14   in the future.

15         Thank you again for your time.

16         THE COURT:  Thank you, Mr. Wilson.

17         Do counsel know of any reason why sentence ought not

18   to be imposed at this time?  Mr. Stearns?

19         MR. STEARNS:  No, your Honor.

04:28 20   MR. KENDALL:  No, your Honor.

21         THE COURT:  Please stand, Mr. Wilson.

22         Before I impose sentence, I will explain my reasons

23   for doing so.

24         You stand before me the 15th parent whom I have had to

25   sentence in this college admissions scandal, once again leaving

me dumbfounded and appalled.  You are an intelligent and
successful businessman whose achievements are all the more
remarkable considering your difficult childhood.  You have used
your wealth and privilege to help others, as reflected in the
numerous letters submitted on your behalf, but you stand before
me today a convicted felon because you also used your wealth
and privilege to bribe your son's way into Southern California
and attempted to pay for your daughters to get special
treatment and allow them to get into Harvard and Stanford.

04:29 10        Mr. Wilson, as I have said to many of your
co-defendants before, you, of all people, should understand the
value of education and how important it is that the college
admissions be fair and accessible.  Where would you be, for
instance, if your admission to RPI had depended on how much
money your family could pay to secure it?  It astounds me that
someone who worked so hard for his education would enter into a
conspiracy to cheat his son's way into a prestigious university
by paying $200,000 to someone to fabricate an athletic profile
and secure his admission as a water polo recruit based upon
04:30 20 false qualifications.  Nevertheless, you did just that.
Undeterred, you attempted to do the same thing for your
daughters.  Only this time you agreed to pay $500,000 each to
get them into prestigious universities.  In doing so, in
essence, you stole admission spots at good colleges from other
deserving students who did not have all of your advantages.

1          Part of my responsibility as a judge when imposing

2     sentence in criminal cases is to deter, first to deter you from

3     ever doing anything like this again despite the fact that you

4     have not accepted responsibility for the crime of which you

5     have been convicted by a jury, nor shown the least remorse in

6     that crime and, second, to deter generally any parent of a

7     college applicant who is rich enough and unprincipled enough to

8     try to bribe their kids' ways into college from doing so.  That

9     is why I'm going to send you to prison, and I hope you and

04:31 10    others get the message and that you spend the rest of your life

11     and your considerable good fortune making up for your egregious

12     conduct.

13          Pursuant to the Sentencing Reform Act of 1984 and

14     having considered the sentencing factors enumerated in Title 18

15     of United States Code, Section 3553(a), it is the Judgment of

16     this Court that you, John Wilson, are hereby committed to the

17     custody of the Bureau of Prisons to be imprisoned for a term of

18     15 months.  This term consists of terms of 15 months on all

19     superseding counts, to be served concurrently.

04:32 20          Upon release from imprisonment, you shall be placed on

21     supervised release for a term of two years.  This term consists

22     of terms of two years on all counts of the Fourth Superseding

23     Indictment except Count 13, and a term of one year on Count 13

24     of the Superseding Indictment, such terms to run concurrently.

25          Within 72 hours of release from custody of the Bureau

1    of Prisons you shall report in person to the district to which

2    you are released.

3         It is further ordered that you shall pay to the United

4    States a fine of $200,000.  This consists of $100,000 on Count

5    1 of the superseding indictment and $100,000 on Count 2 of the

6    superseding indictment.

7         It is further ordered that you shall pay a lump sum of

8    $200,000, which is due and payable within 90 days of

9    sentencing.

04:33 10        Any fine imposed is to be continued to be paid until

11   the full amount, including any interest required by law, is

12   paid.  All fine payments shall be made to the Clerk of the

13   United States District Court.  You are to notify the United

14   States Attorney for this district within 30 days of any change

15   of mailing residence address that occurs while any portion of

16   the fine remains unpaid.

17        While under the Probation Office's supervision, you

18   shall comply with the following terms and conditions: First,

19   you shall not commit another federal, state, or local crime.

04:34 20   You shall not unlawfully possess a controlled substance.  Drug

21   testing conditions are suspended based upon the Court's

22   determination that you pose no risk of substance abuse.  You

23   must cooperate in the collection of a DNA sample as directed by

24   the Probation Officer and you are to comply with the standard

25   conditions that have been adopted by this Court and are

1    described in the Sentencing Guidelines at Section 5D1.3(c),

2    which will be set forth in detail in the Judgment and

3    Committal.

4            The following special conditions apply during your

5    supervised release: First, you must pay restitution to the

6    Internal Revenue Service in the amount of $88,546 according to

7    a court-ordered repayment schedule.  You are to meet with the

8    Internal Revenue Service within the first six months of your

9    period of supervised release in order to determine your prior

04:35 10   tax liability and you are to file tax returns and pay any past

11   or future taxes due.

12           You must complete 400 hours of community service at an

13   agency approved by the Probation Office.

14           You must pay the balance of any fine or restitution

15   imposed according to a court-ordered repayment schedule.

16           You are prohibited from incurring new credit charges

17   or opening additional lines of credit without the approval of

18   the Probation Office while any financial obligation remains

19   outstanding.  And you are to provide the Probation Office

04:35 20   access to any requested financial information which may be

21   shared with the Financial Litigation Unit of the United States

22   Attorney's office.

23           It is further ordered that you shall pay to the United

24   States a Special Assessment of $800, which shall be due and

25   payable immediately.

1          Mr. Wilson, you have a right to appeal this sentence.

2    If you choose to appeal, you must do so within 14 days.  If you

3    cannot afford an attorney, an attorney will be appointed on

4    your behalf.

5          Do you understand that?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Pursuant to the joint motion which was

8    filed by your counsel and counsel for your co-defendant

9    Abdelaziz, which was allowed by this Court last week, your

04:36 10   surrender date is indefinitely postponed pending a decision of

11   this Court, but you nevertheless remain subject to the previous

12   conditions and under the same bond imposed pretrial,

13   specifically relative to reporting to your Probation Officer

14   and receiving permission to travel, et cetera.  Do you

15   understand that?

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  Is there any further business then to come

18   before the Court in these proceedings?  Mr. Stearns?

19          MR. STEARNS:  No, your Honor.

04:37 20          THE COURT:  Mr. Kendall?

21          MR. KENDALL:  One small matter.  We asked if the Court

22   would consider a judicial recommendation to the Bureau of

23   Prisons that he be assigned to FMC Devens.

24          THE COURT:  Yes.  If the Bureau of Prisons deems that

25   the appropriate security level for this defendant, the Court

1    recommends that he be incarcerated at the Devens facility.

2            MR. KENDALL:  Thank you, very much.

3            THE COURT:  We're adjourned.

4            THE CLERK:  All rise.

5            (The Honorable Court exited, 4:37 p.m.)

1          C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8          I, Kristin M. Kelley, certify that the foregoing is a

9    correct transcript from the record of proceedings taken

10   February 16, 2022 in the above-entitled matter to the best of

11   my skill and ability.

12

13

14      /s/ Kristin M. Kelley              February 18, 2022

15      Kristin M. Kelley, RPR, CRR              Date
        Official Court Reporter
16

17

18

19

20

21

22

23

24

25