## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN WILSON,<br><br>                    Defendant. | Crim. No. 19-10080-NMG<br><br>Hon. Nathaniel M. Gorton |

## DEFENDANT JOHN WILSON'S MOTION
## FOR RELEASE PENDING APPEAL

Defendant John Wilson respectfully moves for release pending appeal under 18 U.S.C. § 3143(b), so that he is not forced to begin—and potentially complete—serving his 15-month term of imprisonment before the Court of Appeals has the opportunity to review the validity of his convictions.  The attached memorandum in support is incorporated by reference.

## REQUEST FOR ORAL ARGUMENT

Defendant respectfully requests that the Court permit oral argument on this motion.  In light of the nature of the issues, Defendant believes that oral argument would materially assist the Court in adjudicating this motion.

March 18, 2022

| | |
|---|---|
| Michael Kendall (BBO# 544866) | /s/ Noel J. Francisco |
| Lauren M. Papenhausen (BBO# 655527) | Noel J. Francisco (*pro hac vice*) |
| WHITE & CASE LLP | Yaakov M. Roth (*pro hac vice*) |
| 75 State Street | Marco P. Basile (*pro hac vice*) |
| Boston, MA 02109-1814 | Harry S. Graver (*pro hac vice*) |
| (617) 979-9310 | JONES DAY |
| | 51 Louisiana Ave. N.W. |
| Andrew E. Tomback (*pro hac vice*) | Washington, DC  20001 |
| MCLAUGHLIN & STERN, LLP | (202) 879-3939 |
| 260 Madison Avenue | njfrancisco@jonesday.com |
| New York, NY 10016 | |
| (212) 448-0066 | |

*Counsel for Defendant John Wilson*

## LOCAL RULE 7.1 CERTIFICATION

Pursuant to Local Rule 7.1, undersigned counsel certifies that he conferred with counsel for the Government in a good-faith attempt to resolve the issue presented by this motion, but the parties were unable to reach agreement.

/s/ Noel J. Francisco
Noel J. Francisco (*pro hac vice*)

*Counsel for Defendant John Wilson*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 19-10080-NMG |
| v. | Hon. Nathaniel M. Gorton |
| JOHN WILSON, | Memorandum in Support |
| Defendant. | |

## <u>DEFENDANT JOHN WILSON'S MEMORANDUM OF LAW<br>IN SUPPORT OF HIS MOTION FOR RELEASE PENDING APPEAL</u>

Michael Kendall (BBO# 544866)
Lauren M. Papenhausen (BBO# 655527)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
(617) 979-9310

Andrew E. Tomback (*pro hac vice*)
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-0066

Noel J. Francisco (*pro hac vice*)
Yaakov M. Roth (*pro hac vice*)
Marco P. Basile (*pro hac vice*)
Harry S. Graver (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC  20001
(202) 879-3939
njfrancisco@jonesday.com

*Counsel for Defendant John Wilson*

**INTRODUCTION**

Under 18 U.S.C. § 3143(b), the court "shall" grant release pending appeal if a defendant makes two showings.  *First*, the defendant must establish that he does not present a danger to the community or a flight risk.  *Second*, the defendant must show that his appeal is not merely for purposes of delay, but rather presents "substantial" questions that—if resolved in his favor on appeal—would result in acquittal, a new trial, or a shorter sentence.  Of course, the latter element does not require this Court to confess error—otherwise, release pending appeal would almost never be granted.  Rather, as the First Circuit has explained, the standard is met as long as the questions are "close" or *could be* decided the other way.  Applying that test, the First Circuit and district courts in it (plus other courts across the country) have regularly granted release pending appeal in cases, like this one, that present novel applications of the federal fraud and corruption statutes.

Mr. Wilson is entitled to relief under those standards.  As this Court is aware, Mr. Wilson was convicted at the first trial arising from the so-called "Varsity Blues" matters.  His appeal will therefore present the Court of Appeals with the opportunity to scrutinize the full sweep of the Government's novel legal theories.  To be sure, this Court has upheld those theories, in rulings dating back to the indictment stage.  But these are clearly issues on which reasonable jurists could disagree.  Indeed, other judges handling related Varsity Blues matters have reached conflicting conclusions or sent contrary signals on nearly every significant legal issue.  One judge rejected the Government's premise that admission slots are "property" under the fraud statutes, and two judges expressed doubts about the notion that payments to universities themselves could be "bribes."  One judge noted serious skepticism about whether the Government could truly prove a single conspiracy.  And other judges have taken markedly different approaches to critical evidentiary questions, recognizing the centrality of certain evidence that the Court excluded here.  Mr. Wilson's appeal will allow the First Circuit to resolve these divergent rulings.

Mr. Wilson therefore satisfies both elements of the First Circuit's test.  The Government has always conceded that he is neither a flight risk nor a danger to anyone.  As to the merits, the questions presented here are surely "substantial."  Both of the Government's theories of guilt—bribery and property fraud—are novel and untested.  After thorough research, counsel has found *no case*, in the history of federal bribery jurisprudence, that treats a payment to the alleged *victim* of a bribery scheme as itself a "bribe."  The Government itself has acknowledged that it, too, could not identify any such case.  ECF 1170 at 43.  And the Government's principal authority for treating admission to a university as "property" is a 25-year-old out-of-Circuit decision that addressed university *degrees*, not *admission*, and did not involve a property-fraud charge.  The unprecedented nature of these theories is enough to satisfy § 3143(b), and that conclusion is only amplified by the division among judges of this Court, who have suggested (and sometimes held) they would decide these questions the other way.  And if Mr. Wilson prevails on these points, he will be entitled to reversal or a new trial on all counts—including the tax count, since the jury obviously could have relied on the flawed bribery or property fraud theories to find that his tax return was false.

Beyond the legal viability of the Government's theories of guilt, Mr. Wilson's appeal will also present "substantial" questions about other aspects of his trial.  While respecting this Court's order upholding the sprawling conspiracy charged in the indictment, it is at least a "close" question whether Mr. Wilson truly conspired with dozens of other parents—almost all of whom he did not know, whose goals he did not share, and whose misconduct he could not have foreseen.  Another judge severed two co-defendants' trials after they argued that this is a classic "rimless wheel" conspiracy, forbidden by *Kotteakos v. United States*, 328 U.S. 750 (1946), and the First Circuit could agree.  And this Court has already acknowledged that, in that event, it is "likely" that a new trial on all counts would be necessary due to the resulting prejudice.  Tr. of Aug. 18, 2021, at 13.

Moreover, Mr. Wilson sought to admit a large volume of evidence showing that USC officials regularly supported the admission of athletic candidates, including as "practice" players and for non-athlete roles, based on their financial contributions.  The Court excluded that evidence as irrelevant to Mr. Wilson's *intent*.  Respectfully, however, there are *objective* elements to which this material was important—such as the scope of any fiduciary duties owed by college employees.  The magistrate judge in this case thus recognized that USC's practices were "a very basic fact that you need to get across to a jury to support your defense," Ex. C, ECF 673 at 21–22 (Kelley, M.J.), and another judge refused to exclude *expert* testimony on this topic in a related trial.  If the First Circuit sees it that way too, the result would again be a new trial on all counts.

In short, Mr. Wilson's appeal presents a host of complex, unresolved questions that could well lead to acquittal, a new trial, or partial reversal resulting in a materially shorter sentence.  Yet, without relief, Mr. Wilson will begin to serve his 15-month term—and likely *complete* it—before the First Circuit has a chance to answer these controlling questions.  As courts have recognized, release is therefore especially appropriate if a defendant's sentence is under two years.  Meanwhile, in the event of an affirmance, neither the Government nor the public would suffer any harm, since Mr. Wilson would then serve his full sentence.  The Court should therefore grant this motion.

## **LEGAL STANDARD**

Under 18 U.S.C. § 3143(b), a court "shall order" release on bond of a criminal defendant, pending appeal, if (i) the defendant is "not likely to flee or pose a danger to the safety of any other person," *id.* § 3143(b)(1)(A), and (ii) his appeal is "not for the purpose of delay" but rather "raises a substantial question of law or fact" that, if resolved in his favor, will "likely" result in reversal, a new trial, or a sentence shorter than the expected duration of the appeal, *id.* § 3143(b)(1)(B).

As to the first element, the court must make a finding whether the defendant "poses a danger to the community or is likely to flee."  *United States v. Bayko*, 774 F.2d 516, 520 (1st Cir.

1985).  In evaluating this prong, it is significant whether the defendant "remained out on bail during trial."  *United States v. Zimny*, 857 F.3d 97, 99 (1st Cir. 2017).

The second prong requires a "substantial" issue for appeal.  As *Bayko* clarified, that "cannot be read to mean that bail is not to be granted unless the district court is willing to say that it will probably be reversed."  774 F.2d at 522.  Rather, the appeal need only present "a 'close' question or one that very well could be decided the other way."  *Id.* at 523; *see also United States v. Alfonso-Reyes*, 427 F. Supp. 2d 41, 45 (D.P.R. 2006) ("unsettled material issue of law").

The "substantial" question must also be one that, *if decided in the defense's favor*, is "likely to result in" reversal, a new trial, or a materially shorter sentence.  18 U.S.C. § 3143(b)(1)(B).  Per *Bayko*, all that means is it must be "more probable than not" that, "if error is found, it must not be harmless."  774 F.2d at 522.  In other words, "analysis of the likelihood prong proceeds on the assumption that the substantial question of law or fact 'is determined favorably to defendant on appeal.'"  *Zimny*, 857 F.3d at 100.  The inquiry is into the materiality of the alleged error.

If the defendant meets both prongs, he has an "*entitlement* to release from custody pending appeal," subject to "appropriate conditions."  *Id.* at 101 (emphasis added).  And, as courts have observed, release is particularly appropriate if a defendant would otherwise "serve most or all of his sentence before his appeal has been decided," as that would "substantially diminish the benefit he would ordinarily receive from an appeal."  *United States v. Garcia*, 340 F.3d 1013, 1019 (9th Cir. 2003); *see also, e.g.*, *United States v. McManus*, 651 F. Supp. 382, 383–84 (D. Md. 1987) (granting release in case involving "two-year term of incarceration," because "[t]here seems little point to an appeal if the defendant will serve his time before a decision is rendered").

## **ARGUMENT**

This is a quintessential case for release pending appeal.  Mr. Wilson is a first-time, non-violent offender who presents no danger or flight risk, and who would otherwise likely complete

his sentence before his appeal has run its course.  And his appeal presents an array of novel and important questions of first impression that have divided judges within this District.  Courts in this Circuit and beyond regularly grant release in cases like this.  This Court should too.

I.      MR. WILSON'S APPEAL PRESENTS "SUBSTANTIAL" QUESTIONS THAT, IF RESOLVED IN HIS FAVOR, WOULD RESULT IN REVERSAL, A NEW TRIAL, OR A SHORTER SENTENCE.

Starting with the second § 3143(b) element, Mr. Wilson's appeal presents substantial and material questions.  Two preliminary observations about this prong are worthwhile.  *First*, it is common for courts to grant release pending appeal in federal fraud and bribery cases.  This is because federal corruption statutes are notoriously murky and frequently give rise to debatable legal questions that require appellate (and often Supreme Court) consideration.  *See, e.g.*, *Kelly v. United States*, 140 S. Ct. 1565 (2020) (considering whether "Bridgegate" scandal constituted wire fraud); *McDonnell v. United States*, 136 S. Ct. 2355 (2016) (considering scope of "official action" under bribery laws); *United States v. Brissette*, 919 F.3d 670 (1st Cir. 2019) (considering scope of "property" under Hobbs Act in case involving pro-union threats by municipal officials).

The First Circuit, for instance, granted release pending appeal in *United States v. Urciuoli*, an honest-services case involving hospital executives who hired a part-time legislator for lobbying work.  513 F.3d 290, 293 (1st Cir. 2008).  The appeal "turn[ed] on how broadly the statute should be read," and the court observed that application of the federal fraud statutes to "corruption" has been "especially fraught."  *Id.*  It is the "nature" of these statutes, the First Circuit noted, "that the problems generated sometimes have to be settled one at a time."  *Id.* at 300.  That, of course, means that defendants convicted under these statutes will often have "substantial" appeals.

Following that lead, district courts in this Circuit have often granted release pending appeal in fraud or bribery cases.  For example, in *United States v. Bravo-Fernández*, a bribery case against a legislator and businessman, the court granted release pending appeal because the case presented

a "substantial question of law" relating to the scope of the federal-program bribery statute.  320 F. Supp. 3d 321, 324 (D.P.R. 2018); *see also, e.g.*, *United States v. DeSimone*, 424 F. Supp. 2d 344, 351–53 (D.R.I. 2006) (granting release pending appeal in tax fraud case); *Alfonso-Reyes*, 427 F. Supp. 2d at 44–46 (same, in case where defendant made false statements to federal official).

Experience in other Circuits is in accord.  In the most high-profile bribery and fraud cases, courts have granted release pending appeal, including at the appellate level when the trial courts initially denied relief.  *See, e.g.*, Order, *United States v. McDonnell*, 792 F.3d 478 (4th Cir. 2015) (No. 15-4019), ECF 39 (bribery case against Virginia Governor); Order at 3, *United States v. Ring*, 47 F. Supp. 3d 38 (D.D.C. 2014) (No. 08-CR-274), ECF 297 (case arising out of Jack Abramoff controversy); Mar. 27, 2008 Order at 1–2, 4, *United States v. Siegelman*, 561 F.3d 1215 (11th Cir. 2009) (No. 07-13163) (bribery case against Alabama Governor); *see also* Order, *United States v. Gilbert*, 355 F. Supp. 3d 1168 (N.D. Ala. 2018) (No. 17-CR-00419), ECF 324 (bribery case involving Alabama legislator).  Revealingly, these courts granted release even though in all four the circuit courts ultimately rejected the appeals.[1]  These cases thus underscore that the standard for release pending appeal is far lower than whether the defendant will ultimately prevail.

*Second*, if lower courts have disagreed about the issues presented by the appeal, those issues are necessarily "close" enough to warrant § 3143(b) relief.  If the question actually *has been* decided in the defendant's favor, it follows *a fortiori* that the question "very well could be" decided that way.  *Bayko*, 774 F.2d at 523.  Accordingly, in *United States v. Roth*, the court found that the *mens rea* for an export control violation was "a substantial question" "because there is a circuit split and the Sixth Circuit has not decided the issue."  642 F. Supp. 2d 796, 799 (E.D. Tenn. 2009).

---

[1] *See McDonnell*, 792 F.3d at 520, *rev'd*, 136 S. Ct. 2355; *United States v. Ring*, 706 F.3d 460, 474 (D.C. Cir. 2013); *United States v. Siegelman*, 640 F.3d 1159, 1190 (11th Cir. 2011); *United States v. Roberson*, 998 F.3d 1237, 1242 (11th Cir. 2021).

Another court pointed to "a split of authority" as evidencing "a substantial question" for appeal. *United States v. Conroy*, No. 07-cr-55, 2009 WL 10706742, at *2 (S.D. Miss. Oct. 13, 2009).

This case falls into both categories. Mr. Wilson's appeal presents novel questions about the notoriously vague and complex federal fraud and bribery statutes. And, in addressing those questions in Varsity Blues cases, judges in this district have disagreed on many of them.

## A.     There Are Substantial Questions About the Government's Legal Theories.

Most fundamentally, both of the Government's theories for why side-door admissions were unlawful rest on novel applications of the statutes at issue. While the Court has sustained those theories, both present substantial questions for appeal given their lack of precedential support, significant practical implications, and disagreement by other judges in this District.

1.     The Government maintains that Mr. Wilson committed "bribery," under the honest-services statute and 18 U.S.C. § 666, by seeking to donate to college athletic programs in purported exchange for his children's admission. *See* ECF 1170 at 42–50; ECF 2424 at 14–16. Almost all the counts rest on this theory (Counts 1, 2, 6, 8, 9, 11, and 12). Yet there is no precedent for treating as a "bribe" a payment to the institution that is the purported victim of the offense. Indeed, after thorough research, counsel has been unable to identify a single example of a bribery case with this feature in the history of federal jurisprudence; the Government has acknowledged that it, too, has not found any example. ECF 1170 at 43. The lack of precedent should not be surprising, because the evil of bribery occurs when an official or employee allows his *private* interests to control the exercise of his duties to his principal. When payment is made *to the agent's principal*, that simply has not occurred, even if the agent also derives some indirect benefit. This is akin to a CEO who approves a transaction that boosts the company's performance and stock price. That may benefit the CEO if he owns stock options, but it is obviously not "bribery," regardless of whether the CEO misrepresents certain transaction terms to the Board.

The Government has argued that this theory states an offense because the "benefit" in a bribery case need not go into the pocket of the agent himself. *United States v. Sidoo*, 468 F. Supp. 3d 428, 444–45 (D. Mass. 2020).  That is true, but this case pushes the envelope much further.  It is one thing for a bribe to inure to the benefit of an agent's family, friends, or political campaign. There, the agent is influenced by something *that does not benefit his principal*.  It is quite another thing when the defendant intended to pay *the victim itself*.  *See, e.g.*, ECF 1104 at 7 (admitting this fact as to Wilson).  The latter is unprecedented.  Nor does it matter if there were misrepresentations in Mr. Wilson's son's athletic profile, as a lie does not convert an otherwise-lawful payment into a bribe.  A bribe is a necessary element of these offenses—beyond any false-statement or intent element—and its absence is fatal.  *See Skilling v. United States*, 561 U.S. 358, 368 (2010) (honest-services fraud); *United States v. Fernandez*, 722 F.3d 1, 20–27 (1st Cir. 2013) (§ 666).

This novel interpretation of federal bribery would thus significantly expand the law.  Yet the Supreme Court has repeatedly warned, in the context of these fraud statutes, against accepting "a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress."  *Cleveland v. United States*, 531 U.S. 12, 24 (2000); *see also Kelly*, 140 S. Ct. at 1570. The Government's theory runs afoul of that principle.  Among other things, it offers no principled basis to distinguish the commonplace practice where colleges favor children of large donors.  On the Government's theory, why are those routine donations not also "bribes"?  *See McDonnell*, 136 S. Ct. at 2375 (rejecting "boundless interpretation of the federal bribery statute" that would cover routine conduct).  Moreover, the Court in *Skilling* preserved the honest-services statute against constitutional challenge only by narrowing it to "paradigmatic cases of bribes and kickbacks."  561 U.S. at 411.  There is nothing "paradigmatic" about this prosecution.  Again, nobody has identified a single precedent involving "bribes" paid to the victim of the scheme.

Finally, a compelling consideration is that Judge Woodlock and Judge Talwani have cast doubt on the viability of the Government's bribery theory in their related Varsity Blues matters. Judge Woodlock refused to apply the sentencing guideline for commercial bribery, because the evidence of bribery was "too speculative," even under the lower standard applicable at sentencing. Ex. A, Sentencing Tr. at 56, *United States v. Bizzack*, No. 19-cr-10222 (D. Mass. Nov. 5, 2019); *see also id.* at 33, 35, 38.  When the Government offered the parent's "payments directly to USC" as bribes attributable to that parent, Judge Woodlock responded incredulously: "That's not a bribe, is it?  It's received by USC.  ... That's a different issue from bribery, right?"  *Id.* at 15–16.

Judge Talwani expressed similar skepticism.  She initially ruled that bribery charges could proceed only based on "allegations of bribe payments paid *to accounts not associated with the universities*," meaning payments to insiders *personally*.  *United States v. Ernst*, 502 F. Supp. 3d 637, 666 (D. Mass. 2020) (emphasis added).  She specifically declined to decide whether alleged payments *into university accounts* also constitute bribery, as that "would present a more difficult question."  *Id.*  Although Judge Talwani subsequently accepted the latter theory in an unpublished order, *see* Order, *United States v. Ernst*, No. 19-cr-10081 (D. Mass. July 28, 2021), she more recently expressed grave doubts about it at Ms. Heinel's plea hearing after the Government's proffer of evidence for bribery relied exclusively on payments to universities.  Ex. B, Tr. of Rule 11 Hearing at 27–28, *United States v. Heinel*, No. 19-cr-10081 (D. Mass. Dec. 9, 2021) (proffer); *id.* at 45 ("I don't understand the basis for finding that to be a bribe or kickback"); *id.* at 49 ("what the Government charges ... seems different than what the Supreme Court requires for a bribe or a kickback").  While Judge Talwani ultimately accepted the plea in light of her prior ruling and because the defendant "waive[d] any argument" to the contrary, she expressed "hesitation" and skepticism about the Government's "troubling" theory.  *Id.* at 57–58, 65.

Judge Woodlock's and Judge Talwani's comments make plain that this issue is at minimum a "substantial" one on which reasonable jurists can disagree.

2.    As to several counts (Counts 1, 6, 8, 9), the Government advanced an alternative theory of guilt—namely, that the conduct constituted mail or wire fraud because the scheme sought to obtain "property" in the form of "admission slots" to the universities.  ECF 2424 at 5–6.  The Court agreed that admission slots qualify as "property" under the fraud statutes, and so instructed the jury.  *Sidoo*, 468 F. Supp. 3d at 441; Tr. of Oct. 7, 2021, at 39.  But that, too, is a substantial question.  Offers of admission do not bear the typical features of property, and have not historically been treated as property.  *Cf. Carpenter v. United States*, 484 U.S. 19, 26 (1987).

Rather, an admission slot is—as a matter of economic substance—an offer by a university to engage in a transaction with the student: educational services in exchange for tuition.  The First Circuit has understood the nature of the relationship that way.  *See Squeri v. Mount Ida Coll.*, 954 F.3d 56, 71 (1st Cir. 2020) (describing "the essence of the transaction" as "that the students would receive a semester of education in exchange for a semester of tuition").  And other Courts of Appeals have held that a buyer's misrepresentations to a seller do not amount to property fraud so long as the buyer pays full price for the goods or services.  *See United States v. Takhalov*, 827 F.3d 1307, 1314 (11th Cir. 2016) ("[E]ven if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in an acquittal if the jury nevertheless believes that the alleged victims 'received exactly what they paid for.'"); *United States v. Sadler*, 750 F.3d 585, 590–91 (6th Cir. 2014) (reversing fraud conviction where defendant had lied to pharmaceutical distributors but fully "paid the distributors' asking price"); *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) ("[S]chemes that do no more than cause their victims to enter into transactions they would otherwise avoid ... do not violate the mail or wire fraud statutes"); *United States v.*

*Bruchhausen*, 977 F.2d 464, 467–68 (9th Cir. 1992) (reversing property fraud convictions where "manufacturers received the full sale price" and "suffered no monetary loss").  Those are the cases most analogous to this one.  *See* Final PSR at 26 ("There is no evidence to indicate that USC, Stanford, Harvard, or any other individual or entity, suffered an actual financial loss.").

Again, Judge Talwani's treatment of the issue confirms that it could very well be decided the other way—because she did in fact decide it the other way.  In her related Varsity Blues case, Judge Talwani held that "property" does not encompass admission to universities.  *Ernst*, 502 F. Supp. 3d at 650.  She explained that universities neither trade or sell admission slots in the ordinary commercial sense nor convey the universities' property rights to admitted students.  *Id.* at 650–51. She also invoked canons of construction to support her conclusion, including the Supreme Court's directives about the rule of lenity and the need for a clear statement by Congress.  *See id.* at 652– 53; *see also Sadler*, 750 F.3d at 591–92.  Against all this, Judge Talwani noted, the Government offered "little to no support" except for a dated, out-of-circuit decision that was actually about university degrees, not admission, and that did not even involve a property-fraud charge.  *Ernst*, 502 F. Supp. 3d at 650 (distinguishing *United States v. Frost*, 125 F.3d 346 (6th Cir. 1997)).

In light of Judge Talwani's analysis, the Government can hardly deny this is an "unsettled material issue of law" that justifies release pending appeal.  *Alfonso-Reyes*, 427 F. Supp. 2d at 45. Moreover, at minimum, to the extent that universities may have a cognizable property interest in their "right to control" admissions—as Judge Casper reasoned in her Varsity Blues matter, *United States v. Khoury*, No. 20-cr-10177, 2021 WL 2784835, at *2 (D. Mass. July 2, 2021)—that issue should have been submitted to the jury for determination on the facts.  That is the rule in the Second Circuit, which developed the "right to control" theory of property.  *See United States v. Binday*, 804 F.3d 558, 571 (2d Cir. 2015) (explaining that this theory raises "a factual question" for jury).

**B.      There Are Substantial Questions About the Scope of the Conspiracy.**

Even if one assumes that both of the Government's legal theories were valid, there is also an independent "substantial" question about the way in which the Government charged and tried this case.  In the indictment, the Government asserted that Mr. Wilson conspired not only with Mr. Singer, but also with dozens of other parents who were Mr. Singer's independent clients.  On that basis, the Government at trial introduced mountains of evidence about these other parents—many of whom engaged in far more egregious conduct than Mr. Wilson, like arranging for test-cheating and paying bribes to coaches personally.

Yet Mr. Wilson's conduct had no meaningful nexus to the conduct of these other parents—other than Mr. Singer at the center.  Mr. Wilson never worked with anyone but Mr. Singer; had no idea that other parents arranged for test-cheating, academic fraud, or bribes to school employees; and had no stake in whether those other parents' children got into college.  That is the archetypal "rimless wheel" conspiracy, in which many individuals conspire with a central "hub" figure but otherwise have no connection to each other.  *See Kotteakos*, 328 U.S. at 754–55.

Faced with the same basic conspiracy alleged here, Judge Talwani found there was a "dearth of factual allegations that support a common goal, interdependence among the participants, and overlap among the participants, which are the qualities that courts have generally looked for to determine if the evidence supports finding a single conspiracy." *Ernst*, 502 F. Supp. 3d at 654. Judge Talwani declined to dismiss on this basis, but only because doing so would be premature under the "limited" inquiry at the indictment stage.  *Id.*  But she later agreed to sever the trials of Jovan Vavic and Donna Heinel after they raised these concerns.  *See infra* at 18.

Judge Talwani is not an outlier in her skepticism as to the sort of conspiracy alleged here. In other cases resembling these facts, courts have found these kinds of super-sized conspiracies run afoul of *Kotteakos*.  *See, e.g.*, *United States v. Carnagie*, 533 F.3d 1231, 1239 (10th Cir. 2008)

("What is required is a *shared*, single criminal objective, not just similar or parallel objectives between similarly situated people."); *United States v. Rosnow*, 977 F.2d 399, 405–06 (8th Cir. 1992) (reiterating that "mere knowledge of another similarly motivated conspiracy or an overlap in personnel [does] not prove one overall agreement."); *United States v. Townsend*, 924 F.2d 1385, 1397 (7th Cir. 1991) (similar).

To establish interdependence, the Government mainly relied on the testimony of one parent, Bruce Isackson, that (i) he felt the larger number of side-door participants made Mr. Singer's operation harder to expose, and (ii) it was important to him that Mr. Singer had a record of success with other families.  ECF 2424 at 27; ECF 2489 at 7–8.  But it is, at minimum, a close question whether either ground is legally adequate.  As for the first, the First Circuit has held that "concern over [the hub's] ability to avoid detection, by itself" does not suffice.  *United States v. Dellosantos*, 649 F.3d 109, 120 (1st Cir. 2011).  As to the second, even if parents cared about Mr. Singer's past success with other families, that says nothing about whether those parents *relied on one another* as part of a single conspiracy.  *United States v. Chandler*, 388 F.3d 796, 811 (11th Cir. 2004) (no interdependence where "[e]ach spoke acted independently and was an end unto itself").  People select services all the time based on past performance—every time someone goes to Yelp to pick a restaurant, or looks at past returns to choose a fund manager—but that does not make those people *interdependent* with all customers past, present, and future as part of some shared endeavor.

In short, whether the Government proved a single conspiracy is, at best, a close call.  If the First Circuit thinks not, this Court has acknowledged that a "mistrial" (now a new trial) would "likely" be necessary due to prejudice from the resulting admission of vast co-conspirator evidence.  Tr. of Aug. 18, 2021, at 13.  That is indeed the law.  *See Dellosantos*, 649 F.3d at 124–25 (new trial required where failure to prove single conspiracy resulted in prejudicial variance).

**C.     There Are Substantial Questions About the Court's Evidentiary Rulings.**

Finally, the Court's key evidentiary rulings also raise substantial issues for appeal.  Once again, other judges in this District viewed these questions differently.  Even the Court recognized the defense "may have an appellate issue" arising from its rulings.  Tr. of Sept. 30, 2021, at 29.

Most palpably, the Court excluded dozens of exhibits showing that (separate and apart from Mr. Singer's activities) USC officials used athletic programs to support the admission of applicants, including as "practice" players or in non-athletic roles, based on fundraising considerations.  *See, e.g.*, ECF 2032; ECF 2283 and 2292; ECF 2293.  As just one of numerous examples, this evidence showed that, in 2015, Ms. Heinel, the Athletics Department liaison for presenting candidates to the Admissions Office's athletic subcommittee ("Subco"), sent a spreadsheet of candidates to the Dean of Admissions flagging "potential donors."  Ex. 1085.  Before trial, the Court excluded this evidence on the ground that USC's "alleged conduct was not known to" Mr. Wilson and so was "irrelevant."  Tr. of Aug. 18, 2021, at 19.  During trial, the Court added that the evidence could not be introduced even for impeachment purposes.  ECF 2336 at 19–20.

But other judges have taken markedly different views of this evidence.  In this same case, for instance, Magistrate Judge Kelley viewed the fact that USC considered donations in making admissions decisions to be "a very basic fact that you need to get across to a jury to support your defense."  Ex. C, ECF 673 at 21–22; *see also* ECF 2032, Ex. A (collecting similar remarks by Magistrate Judge Kelley).  Indeed, the excluded evidence is highly relevant for *objective* reasons having nothing to do with Mr. Wilson's intent.  For instance, the evidence goes to the central issue of what "honest services" USC's coaches and administrators owed to USC, an issue this Court has rightly described as "a factual question to be resolved at trial."  *Sidoo*, 468 F. Supp. 3d at 445.  If USC expected coaches to secure donations for its athletic programs by supporting the admission of applicants in practice or support roles, then a jury could have found the coaches were faithful

to USC in securing Mr. Wilson's donation to the university and supporting his son's admission. Or, as former lead prosecutor Eric Rosen recently admitted, "[i]f it were a school policy to accept fake athletes in exchange for money, it probably would not be a crime." Jon Wertheim, *The Real Scandal of Varsity Blues*, SPORTS ILLUSTRATED (Jan. 20, 2022), https://www.si.com/college /2022/01/20/varsity-blues-real-scandal-texas-tennis-coach-daily-cover.

For these reasons, Judge Talwani denied the Government's motion to exclude this evidence insofar as it is "relevant to the fiduciary duties owed by" college employees. Order, *United States v. Ernst*, No. 19-cr-10081 (D. Mass. Oct. 28, 2021), ECF 956. And she similarly refused to exclude *expert testimony* that USC "had a culture and practice of suggesting children of prospective donors for preferential admissions consideration …, regardless of particular levels of athletic talent." Opp. to Mot. *In Limine*, *United States v. Vavic*, No. 19-cr-10081 (D. Mass. Mar. 5, 2022), ECF 1120 at 10; Order, *United States v. Vavic*, No. 19-cr-10081 (D. Mass. Mar. 9, 2022), ECF 1146.

Moreover, the evidence was also admissible to impeach the credibility of the Government's lone witness from the USC admissions office, Rebecca Chassin. She testified that USC does not make "offer[s] [of] admission in exchange for money," Tr. of Sept. 20, 2021, at 187, and that "[t]he work of the SUBCO was to consider students for athletic talent alone," Tr. of Sept. 21, 2021, at 100. The excluded evidence contradicted these statements. The Court nevertheless reasoned that it was "not proper impeachment evidence under Fed. R. Evid. 613 because it does not include statements made by Chassin." ECF 2336 at 19. However, Mr. Wilson had argued that the evidence was admissible for impeachment *by contradiction*, ECF 2292 at 5; ECF 2293 at 1–2, 8, which is a "broader" basis for impeachment that the First Circuit has cautioned should not be "confuse[d]" with the Rule 613 framework. *United States v. Cruz-Rodriguez*, 541 F.3d 19, 29 n.4 (1st Cir. 2008). By excluding this evidence, the Court precluded the jury from hearing powerful

15

impeachment evidence.  Indeed, when Magistrate Judge Kelley saw some of these documents, she did not mince words about how they undercut the credibility of an affidavit from Chassin's boss, the USC Dean of Admissions, who (like Chassin) had denied the role of donations in admissions: "I don't for a second believe [the Dean's] affidavit that he submitted here, and I think it's belied by many of the documents that we've received."  Ex. C, ECF 673 at 21.

That Magistrate Judge Kelley viewed this evidence as central to the defense and that Judge Talwani declined to exclude it shows that the First Circuit could come out differently on these evidentiary questions, which is enough to warrant relief under § 3143(b).  *See DeSimone*, 424 F. Supp. 2d at 351–53 (granting release based on potentially prejudicial exclusion of evidence).

### D.   These Appellate Issues Control the Validity of the Convictions.

Each of the issues discussed above also satisfies the second element of § 3143(b).  "[O]n the assumption that the substantial question of law or fact 'is determined favorably to defendant on appeal,'" none of these are remotely "harmless" errors.  *Zimny*, 857 F.3d at 100–01.

*First*, if the First Circuit concludes that Mr. Wilson's conduct was not bribery, he would be entitled to acquittal on the core of the Government's case.  Alternatively, the First Circuit could conclude that a new trial is warranted because it disagrees with the way the bribery elements were defined for the jury.  Specifically, the court could hold that a payment to a university *could be* a bribe under some circumstances, but that the instructions failed to provide the jury with sufficient clarity about *when*.  *Urciuoli*, 513 F.3d at 297–99.  Those prospects of relief on the bribery counts warrant release pending appeal, and the serious questions about the viability of the property-fraud theory (which could save only a subset of counts) confirms the conclusion.  The First Circuit could hold that admissions slots are not property, or that, as Second Circuit case law requires (*supra* at 11), the issue should have been left for jury determination based on the facts.  Whether the likely result is acquittal or a new trial, release pending appeal is justified.

16

*Second*, as to the scope of the conspiracy, this Court has already acknowledged that reversal on that ground would "likely" require a "mistrial" (at this juncture, a new trial) on all counts.  Tr. of Aug. 18, 2021, at 13.  That is certainly correct: The variance between the "sprawling conspiracy that extended from coast to coast" that the Government charged (Tr. of Sept. 13, 2021, at 26), and any more limited conspiracy that the jury could have reasonably found was incredibly prejudicial. The allegations of a single conspiracy allowed the Government to introduce salacious evidence about the misconduct of other parents that had zero connection to Mr. Wilson's own conduct— arranging for cheating on tests, having one of Mr. Singer's employees take classes for their children, staging photos of their children posing for sports they did not play, and paying coaches and administrators personally.  *See, e.g.*, *id.* at 25–29.  The Government also admitted reams of prejudicial hearsay testimony through the co-conspirator exception.  *E.g.*, Tr. of Oct. 4, 2021, at 191.  And the Government's single-conspiracy theory allowed for joinder of Mr. Wilson's trial with Mr. Abdelaziz's trial.  That caused particularly stark prejudice during the final rebuttal closing, when prosecutors used their last word before the jury to suggest that Mr. Wilson was more likely to be guilty merely because he had presented a similar defense as Mr. Abdelaziz.  Tr. of Oct. 6, 2021, at 143–44.  Judge Talwani severed Mr. Vavic and Ms. Heinel's trials precisely to avoid such prejudice, and in response to motions raising the very *Kotteakos* issue raised here.  Order, *United States v. Ernst*, No. 19-cr-10081 (D. Mass. Oct. 13, 2021), ECF 879.  These forms of prejudice from the overbroad conspiracy charge are grounds for a new trial under First Circuit precedent. *See Glenn*, 828 F.2d at 858 (explaining that the "risks of prejudice in [conspiracy] trials are serious and warrant reversal when they materialize").

*Third*, if the First Circuit agrees with Magistrate Judge Kelley and Judge Talwani that the evidence about USC's admissions practices should not have been categorically excluded, the

remedy would also be a new trial on all counts.  *United States v. Delgado-Marrero*, 744 F.3d 167, 179 (1st Cir. 2014) (evidentiary error merits new trial unless harmless).  This excluded evidence went to the heart of the charges against Mr. Wilson.  It would have allowed the jury to conclude that USC officials did not violate any fiduciary duties by allegedly taking donations into account in making admissions recommendations.  It would have likewise allowed the jury to conclude that any misstatements on Johnny Wilson's athletic profile were immaterial, defeating all of the fraud charges.  And it would have impeached the credibility of key USC testimony against Mr. Wilson. *Compare* Ex. C, ECF 673 at 21 (Magistrate Judge noting that, after seeing this evidence, she did not "for a second believe" USC Dean of Admission's affidavit denying his office took donations into account), *with* Tr. of Sept. 20, 2021, at 187 (Ms. Chassin's testimony that USC does not make "offer[s] [of] admission in exchange for money").  In short, this Court's evidentiary ruling was material enough to raise a serious question about its correctness, warranting release.  *See DeSimone*, 424 F. Supp. 2d at 351–53 (granting release due to potentially prejudicial exclusion of evidence).

 *Finally*, Mr. Wilson's tax-return conviction (Count 13) does not change the calculus.  That count is derivative of the others: As the Government has admitted, the jury may have convicted on the premise that Mr. Wilson's payments were not deductible because they were illegal bribes.  *See* ECF 2424 at 48 (agreeing that "the jury could convict on either theory," including "that Wilson deducted an illegal bribe").  Indeed, this Court applied that same logic at sentencing, reasoning that "the entire payment was fraudulent" and therefore "could not have been taken as a deduction." (Wilson Sentencing Tr. at 12.)  Rejection of the bribery theory would thus necessarily entail vacatur of the tax conviction.  *See Yates v. United States*, 354 U.S. 298, 312 (1957) ("[A] verdict [must] be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected.").  Likewise, the jury could have

convicted on the basis that Mr. Wilson's payments were given in exchange for "property" in the form of admission slots, and therefore not deductible as charitable donations. Rejection of the property theory would thus also entail vacatur of the tax conviction. *See id.*; *see also Roth*, 642 F. Supp. 2d at 803 (granting release where reversal on one count might require retrial of another count "because the conduct alleged in this charge is intertwined with the conduct alleged in the [other] charges"). And the tax conviction would also be subject to reversal based on the *Kotteakos* and evidentiary errors: The former caused prejudicial spillover that tainted all counts by undermining Mr. Wilson's good-faith defense to all charges, and the excluded evidence would have supported the legitimacy of the tax deductions by showing that the university assigned no tangible value to the admissions "boost" that it routinely afforded donors.

At minimum, even if the tax count somehow survived, the Guidelines range for that count alone would be less than one-third as high as the Guidelines range under which the Court sentenced Mr. Wilson. *See* Final PSR at 28–30. Given the downward departure that the Court applied, a sentence on the tax count alone would likely be very short or non-custodial. Indeed, even Mr. Wilson's current sentence of 15 months is below "the expected duration of the appeal process," 18 U.S.C. § 3143(b)(1)(B)(iv), in a complex, multi-defendant criminal appeal like this one.[2] Any reduced sentence would thus necessarily be even shorter, and so any "substantial question" affecting even a subset of counts should entitle Mr. Wilson to relief. *See Roth*, 642 F. Supp. 2d at 803 (granting release where sentence for surviving count would be short).

---

[2] *E.g.*, *United States v. Martínez*, 994 F.3d 1 (1st Cir. 2021) (more than three years to decide appeal from honest-services, bribery, and conspiracy convictions); *United States v. Acevedo-Hernández*, 898 F.3d 150 (1st Cir. 2018) (more than three years to decide appeal from bribery and conspiracy convictions); *United States v. Lopez-Cotto*, 884 F.3d 1, 5 (1st Cir. 2018) (four years to decide appeal from bribery and other convictions); *United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017) (nearly five years to decide appeal from honest-services fraud and other convictions).

\*          \*          \*

The question before the Court is not whether any of its rulings were wrong, but whether reasonable jurists could reach a different conclusion.  There is an easy answer, as two judges have expressed grave skepticism about the Government's bribery theory, one judge has squarely rejected its property fraud theory, and two judges have taken a markedly different view on key evidentiary issues.  Further, the entire case rests on an aggressive single-conspiracy theory that has led another judge to sever two trials and given even this Court pause, recognizing retrial as the "likely" result if the theory fell short.  If the First Circuit agrees with Mr. Wilson on any of these issues, the result would be acquittal, a new trial, or at minimum a materially reduced sentence.

## II.    MR. WILSON PRESENTS NO FLIGHT RISK OR DANGER TO THE PUBLIC.

Presumably the Government will continue to concede the other prong under § 3143(b).  Mr. Wilson is a married father of three, with no criminal history whatsoever, and no propensity toward violence or crime.  *See* Final PSR at 31–35.  He has been free on bond since the indictment almost three years ago, without objection from the Government, and has participated fully in pre-trial, trial, and post-trial proceedings.  There is no risk that Mr. Wilson will commit further crimes, and he is committed to vindicating himself and restoring his family's reputation through this appeal.  He plainly "is not likely to flee or pose a danger to the safety of any other person or the community if released."  18 U.S.C. § 1343(b)(1)(A); *see also Zimny*, 857 F.3d at 99.

## <u>CONCLUSION</u>

For these reasons, Mr. Wilson is entitled to remain out of prison while the First Circuit considers his appeal.  The Court should grant release pending appeal, under the same conditions that have been in place for the past three years, so that Mr. Wilson does not risk losing the practical benefit of his appeal by completing his sentence before the First Circuit can rule.

March 18, 2022

Michael Kendall (BBO# 544866)
Lauren M. Papenhausen (BBO# 655527)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
(617) 979-9310

Andrew E. Tomback (*pro hac vice*)
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-0066

/s/ Noel J. Francisco
Noel J. Francisco (*pro hac vice*)
Yaakov M. Roth (*pro hac vice*)
Marco P. Basile (*pro hac vice*)
Harry S. Graver (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC  20001
(202) 879-3939
njfrancisco@jonesday.com

*Counsel for Defendant John Wilson*

## CERTIFICATE OF SERVICE

I, Noel J. Francisco, hereby certify that on this date I electronically filed the foregoing document with the CM/ECF system, which accomplishes service upon all parties to this action. The foregoing document is available for viewing and downloading from the ECF system.

March 18, 2022

s/ Noel J. Francisco

Noel J. Francisco (*pro hac vice*)

*Counsel for John Wilson*