# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA,      )
                              )           Criminal Action
          Plaintiff,           )           No. 19-10222-DPW
                              )
v.                             )
                              )
JEFFREY BIZZACK,               )
                              )
          Defendant.           )
                              )
```

BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

SENTENCING

October 30, 2019

John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    On Behalf of the Government:
      Eric S. Rosen
 3    Kristen A. Kearney
      United States Attorney's Office MA
 4    1 Courthouse Way
      Suite 9200
 5    Boston, MA 02210
      617-748-3412
 6    eric.rosen@usdoj.gov

 7    On Behalf of the Defendant:
      Jeremy N. Goldman
 8    Law Offices of Jeremy N. Goldman
      19200 Von Karman Avenue
 9    Suite 300
      Irvine, CA 92612
10    949-387-6670
      jeremy@goldmandefense.com
11
      Katherine Corrigan
12    Corrigan Welbourn & Stokke, APLC
      4100 NewportPlace
13    Suite 550
      Newport Beach, CA 92660
14    949-251-0330
      kate@cwsdefense.com
15
      Seth P. Berman
16    Nutter, McClennen & Fish, LLP
      155 Seaport Boulevard
17    Boston, MA 02210
      617-439-2338
18    sberman@nutter.com

19

20

21

22

23

24

25
```

1    question of Mr. Singer's -- Mr. Bizzack's, if I pronounce it

2    correctly, involvement in the conspiracy with Mr. Singer.  Am I

3    correct?  I mean, that's the core of what his involvement is,

4    right?

5            MS. KEARNEY:  Yes, Your Honor.

6            THE COURT:  All right.  So now I want to get to this

7    question of, you know, what's the harm?

8            The government now has kind of settled, I guess --

9    maybe it's not fair to say "now."  The government has this

10   theory that this is bribery, that is the proper way to

11   characterize what's going on.  It's a mail fraud for bribery.

12   Now, I understand it's charged as a conspiracy, but the core

13   charging event is mail fraud.

14           MS. KEARNEY:  Is honest services fraud, mail fraud.

15           THE COURT:  Honest services, the statute is simply a

16   definitional statute.  It's not the charging statute.  You can

17   not charge it alone.

18           MS. KEARNEY:  Correct.

19           THE COURT:  Okay.  So we're talking about mail fraud

20   as being the underlying crime, right?

21           MS. KEARNEY:  Yes.

22           THE COURT:  Okay.  So this is supposed to be bribery.

23           MS. KEARNEY:  Yes.

24           THE COURT:  Who is being bribed?

25           MS. KEARNEY:  Here it was Donna Heinel.

1          THE COURT:  So how much did Ms. Heinel make from this
2     bribery?  What was the bribe that was paid to her?
3          MS. KEARNEY:  Personally she received approximately
4     $160,000.
5          THE COURT:  From this defendant in connection with
6     this matter?
7          MS. KEARNEY:  A portion of that was in connection with
8     this defendant.
9          THE COURT:  What portion?
10         MS. KEARNEY:  That is not specified.
11         THE COURT:  It certainly isn't.  Now, what portion is
12    it?  Does the government have a position on what portion it is?
13    Because I have to find what that is.  You want to talk about it
14    as bribery, and I understand that.  And that's a theory that is
15    at large I suppose in some fashion.  But what is the bribe
16    amount?
17         MS. KEARNEY:  Well, the bribe amount here was the
18    $250,000.
19         THE COURT:  No.  What is the bribe amount with respect
20    to this defendant?  It has to be reasonably foreseeable by this
21    defendant.  So first we're going to talk about what the amount
22    is that Ms. Heinel -- do I pronounce that correctly -- Ms.
23    Heinel received for purposes of this transaction?
24         MS. KEARNEY:  So the defendant, our understanding is
25    that he understood, and he's acknowledged this in his plea,

1   that the $250,000 amount that he agreed with Singer was going

2   to be used to bribe officials at USC to get his son admitted.

3          THE COURT:  So the amount is what he perceives would

4   be used even if it isn't used, even if that isn't the scheme

5   that Mr. Singer had?

6          MS. KEARNEY:  The government acknowledges that there

7   is some disagreement among the case law about whether --

8          THE COURT:  It's not just the case law.  I'm just

9   talking about the facts now.

10          MS. KEARNEY:  Yes, Your Honor.

11          THE COURT:  If this were tried as a mail fraud bribery

12   case, okay, honest services as a commercial bribe.  Put to one

13   side whether it fits easily into commercial bribery.  But let's

14   just say it's a commercial bribery, and the government was

15   taking this to me for an evaluation on sentencing, what's the

16   dollar amount that we're talking about here?

17          MS. KEARNEY:  So --

18          THE COURT:  You said it was $160,000, as I understand

19   it.

20          MS. KEARNEY:  Personally.  In addition there were

21   payments directly to USC but to accounts that she controlled

22   and benefited from.

23          THE COURT:  That's not a bribe, is it?  It's received

24   by USC.  Then we've got a faithless employee.  That's a

25   different issue from bribery, right?

        1            MS. KEARNEY:  No, Your Honor, because in light of

        2    Skilling, there has to be a bribe or kickback.

        3            THE COURT:  Yes, there does, I agree.  And this is a

        4    case in search of a bribe or kickback, and now I'd like to find

        5    it and find it with specificity because you've got to be able

        6    -- if you want to make a request for an enhanced guideline

        7    range, you've got to identify it.

        8            So now we're back to this question of what was the

        9    bribe that she received?  Because it has to be to her, not some

       10    account that she controlled, unless you say it was reasonably

       11    foreseeable to him that she was going to toy with that account.

       12            MS. KEARNEY:  It was reasonably foreseeable to this

       13    defendant because he sent a check directly to her --

       14            THE COURT:  To whom --

       15            MS. KEARNEY:  -- to be deposited into a USC account.

       16            THE COURT:  To whom was the check made out?

       17            MS. KEARNEY:  It was made out to the Galen Center.

       18            THE COURT:  Was it deposited to the Galen Center?

       19            MS. KEARNEY:  It was, and that's an account that Ms.

       20    Heinel oversaw.

       21            THE COURT:  Right.  And now, the Galen Center, was

       22    that a 501(c)(3)?

       23            MS. KEARNEY:  This is a facility at USC.

       24            THE COURT:  Right.  But would a payment to the Galen

       25    Center, apart from machinations that she could undertake, would

1    that be a charitable contribution?

2         MS. KEARNEY:  My understanding is yes.

3         THE COURT:  Okay.  So we've got $50,000 going to the

4    Galen Center that I gather you say is, at least that's

5    identifiable bribery?

6         MS. KEARNEY:  Yes, Your Honor.

7         THE COURT:  Okay.  Anything else?

8         MS. KEARNEY:  There are also payments that Mr. Singer

9    made directly to Ms. Heinel beginning in the summer of 2018.

10   He agreed with her, given the number of students she was

11   helping him admit, including the defendant's son, to pay

12   $20,000 a month.  She would provide invoices to Mr. Singer.

13   One such invoice --

14        THE COURT:  But how do we particularize that to

15   Mr. Singer?

16        MS. KEARNEY:  To Mr. Bizzack.

17        THE COURT:  I mean Mr. Bizzack, sorry.

18        MS. KEARNEY:  She provided invoices to Mr. Singer.

19        THE COURT:  Right, but how do we --

20        MS. KEARNEY:  And one of those invoices identified the

21   defendant's son.

22        THE COURT:  How much money?

23        MS. KEARNEY:  That would have been a $20,000 invoice.

24        THE COURT:  Every time there's an invoice, it's

25   $20,000?

```
 1              MS. KEARNEY:  Correct.

 2              THE COURT:  So now we're at 70, giving the government

 3      the benefit of the doubt on this.  Anything else?

 4              MS. KEARNEY:  No, Your Honor.

 5              THE COURT:  Okay.  So we've got a $70,000 bribe that

 6      the government contends here.  Not $250,000.  $70,000.  That's

 7      reasonably foreseeable by anybody in this, unless you take the

 8      position that some speculation on the part of Mr. Bizzack --

 9      sorry if I keep using the wrong pronunciation -- Bizzack, is

10      that the proper --

11              THE DEFENDANT:  Bizzack.

12              THE COURT:  Bizzack.  Okay.  We've got $70,000, right?

13              MS. KEARNEY:  So there was $70,000 actually received

14      by the bribe recipients.

15              THE COURT:  But that was the whole scope, isn't it,

16      from Mr. Singer's point of view?

17              MS. KEARNEY:  Well, the way Mr. Singer worked, the

18      scheme he never disclosed to parents that he was taking a --

19              THE COURT:  He was the hub on this.  And analyzing

20      this as a bribery scheme, it has to be whatever Mr. Singer was

21      prepared to pay to a faithless employee of USC.

22              MS. KEARNEY:  Well, it also involves what the

23      defendant believed his bribe was going to.

24              THE COURT:  So if the defendant believes that somebody

25      says I could get your child into USC for a million dollars,
```

1   doesn't tell him how; it doesn't tell him that it provides

2   Photoshop services, for example, it's a million-dollar bribe?

3           MS. KEARNEY:  If the defendant then paid the

4   million-dollar bribe with the expectation --

5           THE COURT:  Is there any case law that says something

6   like that?

7           MS. KEARNEY:  I believe there is, Your Honor.  I don't

8   have it at hand.  I can submit something to the court.

9           THE COURT:  That is reasonably foreseeable by the

10  defendant in a case like this?

11          MS. KEARNEY:  Yes, Your Honor.

12          THE COURT:  For purposes of sentencing, is that it?

13          MS. KEARNEY:  I would --

14          THE COURT:  You don't want to mix up a substantive

15  liability conspiracy with the liability that's identified for

16  purposes of the sentencing guidelines.

17          MS. KEARNEY:  Your Honor, I would have to go back and

18  look at the cases to confirm.

19          THE COURT:  So you're not familiar with any case law

20  that does it.  Another way of saying it is you're not familiar

21  with the case law in this area; is that right?

22          MS. KEARNEY:  Your Honor, I am aware that there are

23  cases.  I have not looked at them recently.  I apologize.

24          THE COURT:  Did you think that that might be important

25  for purposes of sentencing?  That is, the government bears the

1    burden of proving this, doesn't it?

2         MS. KEARNEY:  Yes, Your Honor.

3         THE COURT:  Okay.  But you're not familiar with the

4    cases or at least you can't call them up right now?

5         MS. KEARNEY:  Not off the top of my head, Your Honor.

6         THE COURT:  So we have $50,000 and $70,000, and that's

7    reasonably foreseeable -- that certainly is reasonably

8    foreseeable from your point of view as to the defendant here?

9         MS. KEARNEY:  Correct.

10        THE COURT:  Okay.  What's the basis for saying that

11   it's reasonably foreseeable that this defendant would have

12   known that that was the amount of money that would go to a

13   faithless employee?

14        MS. KEARNEY:  Well, the government's position is that

15   it was reasonably foreseeable that $250,000 would be going to

16   the faithless employee.

17        THE COURT:  This is not meant to be exegesis by

18   assertion.  Give me the evidence.

19        MS. KEARNEY:  That the defendant understood that

20   $70,000 was --

21        THE, COURT:  Yes, at least $70,000 would go.

22        MS. KEARNEY:  So again, Your Honor, our understanding

23   of the evidence is that the defendant believed $250,000 --

24        THE COURT:  What's the basis for believing that?

25   Mr. Singer apparently extracted from the defendant $250,000.

1    Did he tell him all $250,000 is going to go to Ms. Galen?  Did

2    he tell him $50,000 was going to Ms. Galen?  Did he tell him

3    $70,000 was going to Ms. Galen?  What did he tell him that

4    would give him some reasonable foreseeability with respect to

5    this amount?

6          MS. KEARNEY:  So what Mr. Singer told the defendant

7    and how it worked with the scheme at USC generally was that --

8          THE COURT:  I want to know about this defendant.  The

9    scheme generally is something to be taken up case by case and

10    has been taken up case by case.  I want to understand it with

11    respect to this defendant.

12          MS. KEARNEY:  So with respect to this defendant, this

13    defendant agreed that upon receipt of the conditional

14    acceptance to USC, he would send a $50,000 check directly to an

15    account designated by Donna Heinel; and then upon receipt of

16    his son's formal acceptance to USC, he would have to make a

17    $200,000 payment to Rick Singer's charity, the Key Worldwide

18    Foundation, and from that Mr. Singer would transmit the bribe

19    to USC or to the coaches that he was bribing at USC.

20    Mr. Singer did not share with the defendant that he was taking

21    a middleman fee.

22          THE COURT:  That's not in the Presentence Report as

23    such, is it?

24          MS. KEARNEY:  So in paragraph 33, it identifies that

25    the defendant participated in a scheme and conspired to pay

1   $250,000.

2          THE COURT:  Right.  As I said, that's a kind of

3   summary of it.  I want to get the specifics of the facts here.

4          MS. KEARNEY:  So then -- sorry, Your Honor.  In

5   paragraph 43 it indicates that the defendant at Mr. Singer's

6   direction issued a $50,000 check to USC's Galen Center.

7          THE COURT:  So the Galen Center, yeah.  Does it say to

8   Ms. Heinel?

9          MS. KEARNEY:  Yes, it does, because the voicemail that

10  the defendant left for Mr. Singer before sending the check

11  indicated, "Sending this check off to Donna, and I just put a

12  note in the letter just saying, you know, it's a donation."

13         THE COURT:  So I'm supposed to draw from that that he

14  knew that this was going to Ms. Heinel for her own personal

15  use?

16         MS. KEARNEY:  Yes, because he understood that Ms.

17  Heinel was the one directing him to send the money to this

18  particular account as opposed to USC's general fund or another

19  account within USC.

20         THE COURT:  Okay.  So let's go to the next part of it,

21  which is the $20,000.  Where do I see that?

22         MS. KEARNEY:  Again, the $20,000 is specified in

23  paragraphs 49 and 50.

24         THE COURT:  No.  That says that he's making the

25  payments to Heinel.  The question is where do I see that

1   Mr. Bizzack was aware of that.

2           MS. KEARNEY:  Well, Mr. Bizzack was aware, if we look

3   at paragraph 47 that and 48, that he was paying another

4   $200,000 upon his son's formal acceptance.

5           THE COURT:  Right, right.  But where does it say that

6   it's to be used for a bribe?

7           MS. KEARNEY:  Well, in paragraph 48, one of the

8   payments, the $100,000 check that he sent, he included a note

9   tying the payment to his son's admission.

10          THE COURT:  Right.  But the question is payment as a

11  bribe to someone, and the someone being Ms. Heinel.  So for

12  example, one of the problems, of course, is that people,

13  particularly people whose children are awaiting admission,

14  sometimes make large payments to institutions.

15          MS. KEARNEY:  That's correct.

16          THE COURT:  They're not bribes if they're not matters

17  of concealment, are they?

18          MS. KEARNEY:  Correct, Your Honor.

19          THE COURT:  As a matter of fact, you say that in the

20  previously sealed document that the deprivations here are

21  property in the form of admissions spots.  That is, it's

22  property of USC that's been misappropriated in the form of

23  admissions spots.  So if USC decides to take money, say

24  $100,000 or $200,000, and says, "By the way, we're going to let

25  this kid in," that's not any criminal violation; is that right?

1    MS. KEARNEY:  It might be a violation of their

2 tax-exempt status.  But no, I don't believe that to be a

3 criminal violation.

4    THE COURT:  Okay.  So we're drawing the line between

5 how USC, for whatever reason, decides to deploy its property in

6 the form of admissions spots, right?

7    MS. KEARNEY:  Correct.

8    THE COURT:  Okay.  And so what do we know about Ms.

9 Heinel being the person who intercepts that ability in a way

10 that's knowledgeable to this defendant?

11    MS. KEARNEY:  Well, Your Honor, the defendant

12 understood that his son was being admitted as a fake athlete

13 and that there had to be someone at USC, which he also knew was

14 Donna Heinel, who was arranging that in exchange for his

15 payment.

16    THE COURT:  Well, we settled on Ms. Heinel for $50,000

17 for present purposes.  Now I'm talking about the other

18 $200,000.  Because you're wanting to use the guidelines to pile

19 on the amount of time that could be spent according to the

20 amount of money involved.  So looking at $200,000 more, where

21 do we have that he thought that this was or believed that this

22 was money going to Ms. Heinel as a faithless employee as

23 opposed to the institution itself or whatever it was that

24 Mr. Singer offered by way of services apart from facilitating

25 bribes?

```
 1          MS. KEARNEY:  So we have the defendant's agreement
 2   with Mr. Singer that the defendant's son was being admitted as
 3   a fake athlete and that the defendant understood that all
 4   $250,000 was going to be used as a bribe payment.  He did not
 5   understand that Mr. Singer was taking any kind of middleman
 6   fee.
 7          THE COURT:  Okay.  So Mr. Singer, as I understand it,
 8   is cooperating; is that right?
 9          MS. KEARNEY:  That's correct.
10          THE COURT:  What does Mr. Singer say?
11          MS. KEARNEY:  Mr. Singer has told the government that
12   he did not disclose his middleman fee.
13          THE COURT:  He did not disclose his middleman fee.
14   What did he disclose?
15          MS. KEARNEY:  That --
16          THE COURT:  Did he tell Mr. Bizzack that all $200,000
17   was going to go to Ms. Heinel?
18          MS. KEARNEY:  I'm not exactly sure, Your Honor.  I
19   believe that he generally would tell parents to pay the bribe
20   amount, the full bribe amount and that it was --
21          THE COURT:  Well, you've characterized a bribe amount.
22   That's petitio pincipii.  We're begging the question by saying
23   it's the full bribe amount.  I'm trying to figure out how it's
24   a bribe.  So you say he told them to pay me $200,000, and
25   that's a bribe.  Did he tell him that's a bribe that's going to
```

Case 1:19-cr-10081-IT Document 1335-1 Filed 11/05/22 Page 17 of 254
Case 1:19-cr-10081-IT Document 2585 Filed 05/13/22 Page 26 of 125

26

1    go to Donna Heinel?

2            MS. KEARNEY:  Mr. Singer was not as explicit, but it

3    was understood, given the fabrications to the student's

4    application such as --

5            THE COURT:  Just assuming it was understood, which is

6    the passive voice way of expressing that there was nobody

7    saying anything, is there something that Mr. Singer said?  For

8    instance, did he say, "I'm doing this for free for you.  I'm

9    not taking a finder's fee out of this.  I'm not taking any fee

10    for doing things like Photoshopping a kid"?

11            MS. KEARNEY:  As Your Honor might be aware, with

12    criminal conspiracies like this, the co-conspirators --

13            THE COURT:  I am aware --

14            MS. KEARNEY:  -- don't generally lay out every single

15    detail.

16            THE COURT:  Trust me, I am aware of that.  Now, you

17    still have a responsibility of meeting your burden of proving

18    something like this, and I'm trying to understand what it is

19    that you're relying on for this theory.

20            MS. KEARNEY:  So we're relying on the fact that the

21    defendant had an agreement with Mr. Singer to pay $250,000 to

22    get his son admitted as a fake athlete; that the nature of the

23    payment connected to his son's admission as well as the fact

24    that his son had to be admitted as a fake athlete all in total

25    allowed the defendant to understand that the total amount was

1    being conveyed as a bribe payment.

2        THE COURT:  Okay.  So Ms. Corrigan, is it?

3        MS. CORRIGAN:  Yes, Your Honor.

4        THE COURT:  What's the defendant's position?  I

5    understand you've stipulated to all of this, or you've

6    stipulated to an amount.  Maybe the first question is why did

7    you do that?

8        MS. CORRIGAN:  Well, Your Honor, as the court is

9    aware, Mr. Bizzack and counsel had conversations with the

10   government prior to entering into a plea agreement.

11       THE COURT:  So it's an artifact of the plea agreement.

12       MS. CORRIGAN:  I'm sorry?

13       THE COURT:  It's an artifact of the plea agreement.

14       MS. CORRIGAN:  Well, it essentially -- well, what I'd

15   like to say is that what we have here --

16       THE COURT:  I tried to make clear to your sister, I'll

17   make clear to you, first answer the question I put to you.  If

18   you've got something more that you want to say, of course I'll

19   listen to it.  But it's a fairly simple question.  Is it

20   because you wanted to facilitate a plea agreement?

21       MS. CORRIGAN:  Yes.

22       THE COURT:  Okay.  What is the evidence as you

23   understand it that your client knew that $250,000 was going to

24   be paid for a bribe?

25       MS. CORRIGAN:  We don't have that information.  And in

1   listening to the government today, we don't have the

2   information that I've heard about Mr. Singer.  But what I will

3   tell the court is there's no question that $250,000 was paid.

4   The evidence of the checks and the wiring from Eco-Pivot, one

5   of the companies, is --

6           THE COURT:  But you see what I'm -- the parties can

7   agree to whatever they want.  And the parties apparently have

8   -- not the parties, but the government in particular has been a

9   little upset that the Probation Office actually looked at this

10  carefully.  As if this case begins and ends over the question

11  of what agreements was the government able to extract from

12  those who are vulnerable.  But the court makes the decision

13  about sentencing --

14          MS. CORRIGAN:  Understood.

15          THE COURT:  -- issues, and this is something that I'd

16  like to get to the bottom of rather than just process through.

17  Did your client know that $50,000 was going to be paid as a

18  bribe to Donna Heinel?

19          MS. CORRIGAN:  No.  He knew -- if I might, if we look

20  at the checks, the check was to the Galen Center, and he knew

21  that the check was going to -- that there was someone named

22  Donna that was associated with it.  But beyond that, there was

23  no indication and no conversation that I'm aware of between

24  Mr. Singer and my client that indicates at any time that my

25  client knew that the $50,000 or any amount was going to a

1    person named Donna, whether it's Donna Heinel or not, but let's

2    assume it is --

3           THE COURT:  Why did your client pay $50,000?

4           MS. CORRIGAN:  Your Honor, this case is about getting

5    admission for his son to USC.  There's no question about that.

6           THE COURT:  Right.  So there's an amount that's

7    figured out.

8           MS. CORRIGAN:  Correct.

9           THE COURT:  Is it simply, Mr. Singer says, "I can do

10   it through the side door, and it's, for you, $250,000"?  Is

11   that what it comes to?

12          MS. CORRIGAN:  Yes, it's very simple.  And if I might

13   just address -- I think the court -- I understand the court's

14   -- if I might move a little bit outside of the court's

15   question.

16          THE COURT:  We'll see, we'll see.

17          MS. CORRIGAN:  Okay.  The court has, I understand the

18   tension between what's in the PSR and what's in the plea

19   agreement.  And as the court has noted in our position, we're

20   in a little bit of a difficult position because I don't want to

21   put my client in a position of breach.  However, what I would

22   note to the court is I've read through Judge Talwani's rulings.

23   I've seen what Judge Zobel has done.  And I've read obviously

24   in very great detail what Ms. Victoria and her office has

25   produced in this case.  I think it's very well thought out.

1      THE COURT:  Wait.  You are going beyond, because I do
2  want to move through this in an orderly fashion.  It's not that
3  I'm not interested in all of that.
4      MS. CORRIGAN:  Sure.
5      THE COURT:  So what I'm faced with is the suggestion
6  that the defendant does not agree that he knew that there was
7  money to be paid to Ms. Heinel --
8      MS. CORRIGAN:  He knew that --
9      THE COURT:  -- as a bribe.
10      MS. CORRIGAN:  Correct.  The payments --
11      THE COURT:  Go ahead.  I'm sorry.
12      MS. CORRIGAN:  Sorry.  The payments --
13      THE COURT:  I'm stretching.  Not expressing nonverbal
14  communication about what I think.
15      MS. CORRIGAN:  Thank you.  The payments -- the bulk of
16  the payments go to the Key Foundation, KWF, which the court is
17  well aware of.  And that's a foundation that Mr. Singer put out
18  there, and it's been described in various pleadings and in the
19  PSR as a sham charity.  That's where the bulk of the money
20  went.  There was no idea, no direction that I'm aware of by
21  Mr. Singer or any information given to anyone of where exactly
22  that money was going to go.  He had some ideas about different
23  centers and that sort of thing, and that's all the information
24  that's before the court.
25      The $50,000 check that goes to the Galen Center, I am

1   not aware of any communications or writings between Mr. Singer

2   and my client that indicate, Oh, this particular amount is

3   going to Donna Heinel, or this particular amount is going to

4   Ms. Janke or anybody else.

5   　　　THE COURT:  Well, Ms. Janke could not be a recipient

6   of a commercial bribe because she was not an employee.  The

7   only person who could be the recipient of a commercial bribe

8   would be Ms. Heinel, unless the government disagrees with me

9   about that.

10   　　　MS. KEARNEY:  Right.  No, Your Honor.

11   　　　MS. CORRIGAN:  And the only reason I bring that up is

12   because she is mentioned throughout the papers.

13   　　　THE COURT:  So let me just go back to this question.

14   What did he think when he wrote "Donation," question mark?  Why

15   was it that, that he was concerned that his accountant would

16   get full information about the payments that he was making?

17   　　　MS. CORRIGAN:  No, Your Honor.  In fact, he did not

18   submit this as some of the other parents did, he did not submit

19   this as a tax deduction.

20   　　　THE COURT:  Why did he say "Donation," question mark?

21   　　　MS. CORRIGAN:  I'm sorry?

22   　　　THE COURT:  Why did he say, "Donation" question mark?

23   　　　MS. CORRIGAN:  I believe that was directed by

24   Mr. Singer to write into the check.

25   　　　THE COURT:  Okay.  So is that the state of the record,

1     that we have a dispute over whether or not there was a full

2     knowledge on the part of Mr. Bizzack?

3           MS. KEARNEY:  Your Honor, I would just note back at

4     the change of plea hearing that the defendant did agree with

5     the government's representation that his participation in the

6     scheme, he agreed --

7           THE COURT:  Could you tell me the page number.

8           MS. KEARNEY:  At page 16, lines 5 through 12 of the

9     change of plea hearing indicate that he agreed and did pay a

10     total of $250,000 to facilitate the admission of his son to USC

11     as a purported athletic recruit.

12           THE COURT:  To use a scheme to use bribery and other

13     forms of fraud to facilitate it?

14           MS. KEARNEY:  Correct.

15           THE COURT:  But of course that's not really factual.

16     He agreed to plead to that, plead guilty to the information.

17     Now we're talking about facts.  What are the underlying facts?

18           MS. KEARNEY:  Right.  And it goes on, Your Honor, on

19     that same page that he agreed to pay Singer an amount

20     ultimately totaling $250,000 to facilitate the admission of his

21     son.

22           THE COURT:  Where does it say "bribery to facilitate"?

23           MS. KEARNEY:  I'm sorry?

24           THE COURT:  Where does it say "bribery to facilitate"?

25     It's different from the language of the charge.  This is the

1　specific language of facts that you have here, and it doesn't

2　seem to say bribery.

3　　　　　MS. KEARNEY:  Well, Your Honor, while it doesn't say

4　the word "bribery," it does.

5　　　　　THE COURT:  Well, words are important, you know.

6　　　　　MS. KEARNEY:  It talks, though, about an exchange of

7　one thing for another, so it talks about that --

8　　　　　THE COURT:  But this exchange could be with

9　Mr. Singer.  If he did nothing but paid Mr. Singer $250,000 and

10　there wasn't bribery involved, then we wouldn't have a bribery

11　guideline, right?

12　　　　　MS. KEARNEY:  I'm sorry, Your Honor.  Can you say that

13　again?

14　　　　　THE COURT:  If he simply paid Mr. Singer to work his

15　magic and there was no evidence of bribery involved, then we

16　wouldn't be dealing with the bribery count, right?

17　　　　　MS. KEARNEY:  If there's no evidence of bribery, then

18　we wouldn't be dealing with bribery.

19　　　　　THE COURT:  Okay.  So now I'm looking for the places

20　where there's evidence of bribery.  You told me about the

21　clearing of the throat that the government did at the outset of

22　its recitation of the factual basis, simply to tell me first

23　what the charge was here.  Then you said then the next thing

24　that they did is the defendant agreed to pay Singer, it

25　ultimately totaled $250,000 to facilitate the admission of his

1    son.

2            MS. KEARNEY:  Correct.

3            THE COURT:  Doesn't say bribery.

4            MS. KEARNEY:  It does not, but it goes on to talk

5    about payments to Donna Heinel from the Key Worldwide

6    Foundation in the amount of $20,000 each month.

7            THE COURT:  But where does it say that the defendant

8    is aware that $20,000 each month is going to be paid to Donna

9    Heinel?

10           MS. KEARNEY:  It does not say that explicitly.

11           THE COURT:  Okay.  And if I understand the

12   government's theory, whether conveyed to the defendant or not,

13   it is that there was an invoice each month for a different

14   person, a different student.  Is this a kind of retention

15   agreement for Ms. Heinel?

16           MS. KEARNEY:  She would send invoices indicating she

17   evaluated certain students and that the total amount of her

18   time for those invoices was $20,000 a month.

19           THE COURT:  So a month in which she evaluated five

20   people, she'd get $20,000, and a month in which she evaluated

21   two, she would get $20,000?

22           MS. KEARNEY:  Correct.

23           THE COURT:  So they were not allocated to the

24   students?

25           MS. KEARNEY:  She did not divvy it up, no.

1    THE COURT:  There's no evidence as to how it's to be

2  divvied up?

3    MS. KEARNEY:  Correct.

4    THE COURT:  Okay.  So now we come back to the question

5  of whether you've got enough evidence here to show bribery by

6  this defendant.  I understand the parties agreed to bribery and

7  appears to be an artifact of plea negotiations; who's got

8  power, who doesn't have power, and who can extract what by way

9  of agreements.  But now I'm looking for the underlying

10  evidence.  And this is it?

11    MS. KEARNEY:  Well, Your Honor, the defendant did

12  plead guilty to conspiring to commit honest services mail

13  fraud, which requires bribery or kickbacks.

14    THE COURT:  No, it doesn't.

15    MS. KEARNEY:  Under Skilling it does.

16    THE COURT:  That's a theory that you have.  You can

17  also have a form of payment that's illegal.  And no, just to

18  the contrary.  A kind of cheating that's involved -- the

19  government doesn't like this because it doesn't run up the

20  sentencing guidelines, but you can have a kind of cheating

21  misrepresentation with respect to the foundation for which this

22  student is brought in.  As a matter of fact, the government

23  takes that position, included it in its list of theories of

24  harm here.

25    MS. KEARNEY:  But without the bribe payments, Your

1      Honor, it would not be honest services fraud.

2            THE COURT:  I understand that.  But to say that it's

3      honest services fraud is simply the government's theory of why

4      there's a violation of 1346.

5            MS. KEARNEY:  Correct, but --

6            THE COURT:  That's all -- I mean, you have a lesser

7      included offense of violation of mail fraud, don't you?

8            MS. KEARNEY:  Yes, Your Honor, but the defendant pled

9      guilty to conspiracy to commit mail fraud and honest services

10     mail fraud.

11           THE COURT:  Specifically stated, he pled guilty to a

12     violation of 1346.

13           MS. KEARNEY:  I believe it's 1349, Your Honor.

14           THE COURT:  1349.  Excuse me.  Right?

15           MS. KEARNEY:  Right, but it was --

16           THE COURT:  Does that require bribery?

17           MS. KEARNEY:  I'm sorry?

18           THE COURT:  Does that require bribery?

19           MS. KEARNEY:  Where he was charged as mail fraud and

20     honest services mail fraud, yes.

21           THE COURT:  The government cannot prove it any other

22     way?

23           MS. KEARNEY:  The government has -- the way it was

24     charged included the honest services mail fraud.

25           THE COURT:  I understand.  The government can't prove

1    it any other way?  So that if there is not proof of bribery

2    here, then the defendant pled to a -- would have been pleading

3    to an offense that he didn't commit?

4         MS. KEARNEY:  Well, Your Honor, I think the issue is

5    that he did plead to an offense he committed.

6         THE COURT:  At some point you will answer my question,

7    I assume, but go ahead and answer the question that you'd like

8    to answer before you answer mine.

9         MS. KEARNEY:  Well, Your Honor, I'll just go back to

10   the fact that there was an agreement here to pay $250,000 to

11   get his son admitted.  He understood that that money was

12   somehow being conveyed to USC.  I acknowledge, Your Honor, we

13   don't have anything explicit saying how much of that amount was

14   going to USC.  We know at least 50,000 he understood was going

15   to USC, or to an individual at USC, excuse me.

16        THE COURT:  The individual at USC was to receive a

17   check for USC.

18        MS. KEARNEY:  For an account that she controlled and

19   designated.

20        THE COURT:  All right.  But it's going to USC.

21        MS. KEARNEY:  Yes, but they had to get the son in as a

22   fake athlete, so he understood that it was not a legitimate

23   donation, that it was tied to his son's acceptance and that

24   they had to hide his son's true nature, who, his son was not a

25   division level 1 volleyball player, was not being recruited by

1    USC to play volleyball, but they had to put him in that way in

2    order to get his admission.

3         THE COURT:  Right.  I understand the government's

4    theory.  The question is the proof of the theory.  So let's

5    perhaps back away from the bribery issue for a moment and

6    analyze the memorandum that you submitted for the methodology

7    of calculating gain and loss to Judge Talwani.

8         You identified three forms of pecuniary loss.  One is

9    the value of the salaries the universities paid to the

10   employees the defendants and their co-conspirators conspired to

11   bribe.  Is that the theory?  In listening to you, you were

12   saying it was actually money paid to Donna Heinel.  It's not to

13   be calculated in terms of some evaluation of what they were

14   being paid in a kind of payroll analysis.

15        MS. KEARNEY:  So separate from the payments that Donna

16   Heinel received personally, in addition, USC was paying her for

17   her honest services.

18        THE COURT:  See, in that memo to Judge Talwani, you

19   identified three separate forms of harm, right?

20        MS. KEARNEY:  Correct.

21        THE COURT:  Those are the ones, at least as of

22   September 5, the government was offering as their theories.

23        MS. KEARNEY:  Yes.

24        THE COURT:  The first one is that the government --

25   that the universities, including USC, lost the value of their

1    corrupt employees' honest services, right?

2          MS. KEARNEY:  Correct.

3          THE COURT:  That's in theory the bribery, but it's

4    particularized.  It's said that the way you calculate this is

5    by looking to the salaries the universities paid to the

6    employees, monies the universities would not have paid had they

7    known their employees were corrupt.

8          MS. KEARNEY:  Correct.

9          THE COURT:  What you just told me was it depends upon

10   the amount of money that Mr. Bizzack knew, not the amount that

11   the universities knew.

12         MS. KEARNEY:  No, Your Honor.

13         THE COURT:  That's what it says here.  Now, maybe

14   you're reformulating it, and certainly you're entitled to do

15   whatever you want to refine and reframe the question, although

16   I will be asking some questions about the evolving explanation

17   of why it was that bribery is being charged in this case and

18   then charged much more explicitly in a statute that provides

19   specifically for bribery in the context of government

20   contracts.  But I want to take this snapshot at September 5,

21   and at September 5 you weren't arguing it this way, the way you

22   have today, right?

23         MS. KEARNEY:  I apologize, Your Honor.  I'm not sure

24   how you've interpreted the way I'm arguing it today.

25         THE COURT:  So let me give a dramatic reading and you

1     can tell me how I've misinterpreted it.  "While it is difficult

2     to calculate the value precisely, the loss can be approximated

3     by looking to the salaries the universities paid to the

4     employees the defendants and their co-conspirators conspired to

5     bribe - monies the university would not have paid had they

6     known their employees were corrupt and that they stopped paying

7     as soon as they found out."

8            MS. KEARNEY:  That's correct, Your Honor.

9            THE COURT:  So it's the salaries that they received,

10    not the amount of money that the defendant anticipated.  Is

11    that it?

12           MS. KEARNEY:  Your Honor, I think that there's two

13    separate issues here.  The first is that under the parties'

14    stipulation as well as the government's --

15           THE COURT:  You keep relying -- I can't be clearer

16    about this.  There is throughout the government's filings this

17    idea that because you can extract an agreement from a defendant

18    that I'm bound by it.  This is not a C plea.  And even in a C

19    plea, I can reject it.

20           One of the insidious aspects of all of this is the

21    suggestion that suffuses this set of discussions that the

22    government decides what the sentence is going to be.  That's

23    not the case.  It certainly wasn't the case before Judge

24    Talwani, and I assure you it's not the case before me.  So the

25    fact of an agreement is, as I've indicated before, an artifact

1 of plea negotiations, the kind of sausage-making that goes on

2 in the criminal justice system, but it does not determine this

3 matter.

4   And so now I'm asking you to justify the positions

5 that you've taken, without respect to there's an agreement.

6 And furthermore, without -- well, you can talk about it if you

7 want, if you think that the guidelines bind me in some fashion

8 on this.  I don't think you'll take that position.  But I need

9 to have evidence of this.  I'm trying to find out the evidence.

10 What I'm hearing is something that is approximated at best, and

11 the approximation that you were talking about was not the

12 approximation that you made here.

13   MS. KEARNEY:  So here, the government looked at 2B4.1,

14 which, the base offense level is 8, and then it can be enhanced

15 based on the bribe amount.

16   THE COURT:  Right.

17   MS. KEARNEY:  Before Judge Talwani, the government was

18 looking at 2B1.1, which, the base offense level is 7 and can be

19 enhanced based on --

20   THE COURT:  But didn't you have a plea agreement at

21 that time with respect to 2B1 -- the bribery one?  Didn't you

22 have a plea agreement that extended to that before Judge

23 Talwani?  Weren't those plea agreements?  So they didn't

24 include this particular plea agreement?

25   MS. KEARNEY:  That's correct, Your Honor.

1        THE COURT:  Okay.  I'm sorry.  That helps me

2  understand this a little bit better.

3        Okay.  So maybe we do go into the history of this,

4  which is, how is it that the government was taking the position

5  with respect to essentially the same case different guidelines

6  at different times were applicable.  As I understand it, let's

7  take the Abbott case, the government did not take the position

8  that there was an agreement in the Abbott case.  It didn't make

9  an argument with respect to bribery, but the bribery argument

10  was not the same as it was here.

11        Then here, I'll just use this as another point in the

12  case, here, the government took the position in the plea

13  agreement which was, whenever it was -- June was it -- I can't

14  remember when the plea agreement was.  I'll pull it out -- took

15  the position in the plea agreement and the defendant agreed to

16  it that the bribery guideline would be the proper guideline to

17  apply, right?

18        MS. KEARNEY:  Correct, Your Honor.

19        THE COURT:  Okay.  So that's that position.  I

20  understand it.  And then at some point, I see it in another

21  case I have, Sui, the government supersedes and says, by the

22  way, it's government fraud, 666 violation, bribery.  Okay.  How

23  did that evolving understanding take place?  What led to that?

24  You know, it just doesn't get pulled out of the air.  It's

25  something that the government chooses to do in its charging

1 decisions.

2     MS. KEARNEY: Your Honor, with respect to the Abbott

3 case and the plea agreements there, the government made the

4 same mistake that you see in the PSR here that this was not a

5 bribery case and that 2B1.1 applies.

6     THE COURT: This is not holding you to some admission

7 or something, but it was a mistake or misunderstanding and not

8 completely developed. Do I fairly say it?

9     MS. KEARNEY: Correct.

10     THE COURT: So then the mistake is clarified in this

11 case or in cases like this where you start to cite to the

12 bribery violation?

13     MS. KEARNEY: That's correct.

14     THE COURT: Okay. And then when you charge 666, what

15 was the new understanding there?

16     MS. KEARNEY: I wouldn't say it's a new understanding.

17 It's just that the charges we believed and the grand jury

18 believed were appropriate.

19     THE COURT: But why didn't you believe it before? I

20 mean, you know, 666 is not a new statute.

21     MS. KEARNEY: It is not, Your Honor, but this, even

22 after it was initially charged in March, was an ongoing

23 investigation.

24     THE COURT: Right. But was there some new information

25 that said, by the way, we didn't know it before but USC

1    contracts with the government in a way that makes a case like

2    this eligible to be charged explicitly as bribery?

3         MS. KEARNEY:  Your Honor, the U.S. Attorney has

4    prosecutorial discretion to decide on charging decisions.

5         THE COURT:  That's right.  Absolutely.  I'm asking why

6    it was exercised, and maybe you just say, "None of your

7    business, Your Honor.  It's not before you."  But I don't know.

8    Is that your position?

9         MS. KEARNEY:  I would defer to the prosecutorial

10   discretion of the U.S. Attorney.

11        THE COURT:  Pardon me?

12        MS. KEARNEY:  I would defer to the prosecutorial

13   discretion of the U.S. Attorney.

14        THE COURT:  You are the U.S. Attorney here in court.

15        MS. KEARNEY:  Yes, Your Honor.

16        THE COURT:  So on behalf of the U.S. Attorney, you

17   decline to answer the question?

18        MS. KEARNEY:  Your Honor, as I mentioned, this was an

19   evolving investigation.  Decisions were made not to charge 666

20   initially.  Perhaps we didn't have all the information we

21   needed.  It has been charged against some of the defendants

22   now, not this defendant.

23        THE COURT:  What information did you not have that

24   made you make the change?

25        MS. KEARNEY:  I don't believe I can disclose --

```
 1              THE COURT:  What do you mean you can't disclose it?

 2              MS. KEARNEY:  Under grand jury secrecy rules.

 3              THE COURT:  You changed the charge.  You have made

 4    charges of other people on the basis of 666, and that's public

 5    of course.

 6              MS. KEARNEY:  Yes, Your Honor, the charges are public.

 7              THE COURT:  Right.  And the disclosure will have to

 8    be, right?  Won't there be discovery disclosure?

 9              MS. KEARNEY:  Yes, Your Honor.

10              THE COURT:  So I understand your position is you don't

11    have to answer these questions any further.  Maybe you won't

12    answer this question either.  But perhaps you're familiar with

13    Rule 83.3.1.  It's our rule with respect to release of

14    information by attorneys.

15              MS. KEARNEY:  Yes, Your Honor.

16              THE COURT:  In it, it explicitly says that those

17    persons associated with the prosecution in this case shall not

18    release any information by extrajudicial statement which a

19    reasonable person would expect to be disseminated by means of

20    public communication relating to, and it lists a series of

21    things, but number 5 is the possibility of a plea of guilty to

22    the offense charged.

23              MS. KEARNEY:  I am aware of that rule, Your Honor.

24              THE COURT:  Right.  Now, if someone associated with

25    the prosecution engaged in that public dissemination, that is,
```

1    a discussion of the possibilities of pleas of guilty to the

2    offense charged or the possibility, for example, of enhanced

3    sentences or enhanced charges, would that be a violation of

4    Rule 83.21?

5            MS. KEARNEY:  Your Honor, I don't believe I can answer

6    that question.  I do know in the statements with respect to

7    Mr. Bizzack that have been released by our office, I believe

8    those are in compliance with the rule.

9            THE COURT:  We're talking about the evolving

10   understanding of the United States Attorney's Office, including

11   those kinds of charges that have been subsequently made of

12   other individuals here.  And perhaps you don't want to respond

13   to that.

14           MS. KEARNEY:  Your Honor, I'm happy to convey the

15   message to the office, but as you might imagine --

16           THE COURT:  Then let's go back.  What we have is the

17   government has this evolving understanding of what can be

18   charged and what will be charged, how it will be charged and

19   how this question will be teed up.  In the Abbott case the

20   government made a mistake.  It didn't want to make the mistake

21   again.  It made it explicit and got the defendant to agree to

22   bribery here.

23           MS. KEARNEY:  Correct.

24           THE COURT:  That's where we are.  And the bribery, as

25   I understand it, is variously expressed, including the way you

1   expressed it here today, and I'm asked to draw some conclusions

2   of inferences about what the defendant knew about who was going

3   to be paid because he certainly had to know that someone who

4   was a faithless employee was going to be paid a bribe, right?

5           MS. KEARNEY:  Yes, Your Honor.

6           THE COURT:  And so the inference I'm supposed to draw

7   from the direction of a check made payable to someone, to an

8   entity that could not be bribed, it was the entity that would

9   have been the victim of the bribe or the government contends

10  it's a victim of a bribe.  Although that statement, by the way,

11  of USC doesn't say "Bribery," does it?

12          MS. KEARNEY:  Your Honor, I don't believe the letter

13  addresses that question.

14          THE COURT:  But the letter addresses how it was

15  harmed, right?

16          MS. KEARNEY:  It discusses how it was harmed, yes.

17          THE COURT:  Right.  And it doesn't say it was harmed

18  by bribery, right?

19          MS. KEARNEY:  It doesn't say how it was harmed.  It

20  identifies the harms.

21          THE COURT:  To the contrary.  It says two ways.  One

22  way is that it affected its reputational interest, and the

23  other way is they had to spend money in investigation.  Doesn't

24  say anything else, does it?

25          MS. KEARNEY:  Well, it says that the harm was by the

1  conduct alleged by the government.

2  THE COURT:  But they're talking about -- you know, a

3  victim witness statement generally, particularly by a

4  sophisticated institution, tells us what the loss is that

5  they're claiming or identifies what the harm is.  They don't

6  identify bribery as a harm, do they?

7  MS. KEARNEY:  They identify the conduct alleged by the

8  government.

9  THE COURT:  Right, again, this kind of general charge,

10  right?  Are they asking for restitution?

11  MS. KEARNEY:  No, Your Honor.

12  THE COURT:  Restitution is payment for the harm,

13  right?  Reimbursement for the harm, right?

14  MS. KEARNEY:  Yes, but it's within their discretion

15  whether they want to request it.

16  THE COURT:  No doubt it is, but it doesn't appear that

17  they view this or at least they're not asserting it, I should

18  say, as a bribery case, right?

19  MS. KEARNEY:  They have asserted this based on the

20  conduct alleged by the government.  They are not seeking

21  restitution.  There are many reasons why they might not be

22  seeking restitution, including their potential publicity around

23  it, and so I don't think that we can read anything into that.

24  THE COURT:  So we just have to deal with their actual

25  language, right?

1          MS. KEARNEY:  Yes.

2          THE COURT:  Okay.  So let's read their actual

3     language, since it's now public.  And I've found them -- I'm

4     not even sure they're victims, frankly, but that's a different

5     issue.  I'll assume they're victims.  I'm going hear from them.

6     They submitted it presumably for purposes of influencing me.

7     And, you know, I look at the information, and they say,

8     "Applications containing false information that misrepresent

9     the applicant undermine public confidence in the college

10    admission process," which USC relies upon, and they hired

11    outside counsel.  Those are the harms that they refer to.  They

12    don't refer to anything else, right?

13         MS. KEARNEY:  There's a general statement, Your Honor,

14    about other resources.  But yes, that's right.

15         THE COURT:  Well, those other resources are basically

16    having to spend money in connection with cooperation with the

17    government's investigation.

18         MS. KEARNEY:  Well, it doesn't indicate that's in

19    cooperation with the government's investigation.  They say,

20    "USC has also dedicated valuable employee time and other

21    resources to this matter."

22         THE COURT:  Right.  But where does it say "bribery"?

23         MS. KEARNEY:  Again, Your Honor, it does not say

24    bribery, but it does indicate that the harm was caused by the

25    conduct alleged by the government.

```
1           THE COURT:  Okay.  It says or indicates.  Now, let's
2    look at that language.  Where does it say that, that we could
3    say that they are incorporating by reference whatever the
4    government ultimately ends up alleging?  Where does it say
5    that?
6           MS. KEARNEY:  In the first sentence of the last
7    paragraph on the first page, it references the conduct alleged
8    by the government, and I'll note at the time of this letter in
9    August that was after the information here was filed.
10          THE COURT:  But let me just see precisely the letter,
11   the language that you're alleging they've incorporated by
12   reference what the government said.
13          MS. KEARNEY:  In that first sentence of the last
14   paragraph on the first page of their letter.
15          THE COURT:  The government -- "USC's reputation has
16   been harmed by the conduct alleged."
17          MS. KEARNEY:  Correct.
18          THE COURT:  Not, "We've suffered commercial bribery,"
19   right?
20          MS. KEARNEY:  No, they don't say that.
21          THE COURT:  Okay.  So what they've said is that it
22   undermined the integrity of their process, the selection
23   process.  What you characterize as their property right in
24   admission slots.  And they've suffered some harm to their
25   reputation.  That's reputation, I suppose.  And then they hired
```

1      outside people, and hiring outside people in connection with

2      the investigation is not recoverable, is it?

3              MS. KEARNEY:  Not as loss, Your Honor.

4              THE COURT:  Right.  Well, that's what we're ultimately

5      talking about here.  So now we're back to what do I make of the

6      bribery here, other than its factual support is somewhat thin

7      and attributing it to the defendant is somewhat difficult under

8      these circumstances.  The short of it being I wonder how

9      reliable that is for purposes of establishing a guideline, even

10     under an evolving theory of what the case is in this case.

11            But let me be sure that I haven't missed something

12     that you've alleged here.  So apart from -- I'm going to

13     Abbott, the submission to Judge Talwani in Abbott.  The second

14     grounds is that they undertook costly internal investigations

15     separate and apart from the government's investigation, and

16     those costs were direct and foreseeable consequences of the

17     defendants.  I think we're agreed that's not a loss.

18            MS. KEARNEY:  Your Honor, I before was speaking to

19     their -- in any investigation related to helping the government

20     with its investigation.  But we would argue that these losses

21     are in fact losses.

22            THE COURT:  Is there case law that says that

23     investigations that are conducted by someone into this sort of

24     thing is a compensable loss that's taken into consideration for

25     purposes of the sentencing guidelines?

1          MS. KEARNEY:  Yes, Your Honor.  There is the Piggie

2     case, where the investigative costs into the coach's scheme to

3     deprive the university of its honest services was properly

4     included in calculating loss.

5          THE COURT:  And?

6          MS. KEARNEY:  Then the DeRosier case, where, if the

7     investigation was prompted there, it was a bank, but for the

8     university's own benefit.

9          THE COURT:  Bank investigation here.  And again, no

10    dollar figure provided by the university here?

11         MS. KEARNEY:  No, we have not received that yet.

12         THE COURT:  So here is the thrust of it, I guess, and

13    that is the guidelines attempt to monetize.  It's an illusory

14    quest and particularly here without more evidence than the

15    government has adduced in this case to monetize in that

16    fashion.  There's nothing here I can rely on to figure out what

17    the amounts are.  You know, the arguments that the government

18    has made here, we've been through I think most of them, are not

19    fully supportable.  I'm sorry.  Go ahead.

20         MS. KEARNEY:  I'm sorry, Your Honor.  That's exactly

21    what our argument was to Judge Talwani, that the loss here is

22    difficult to calculate.  And so that's why we looked to the

23    bribe amount as an alternate measure.

24         THE COURT:  Right.  But I look at the bribe amount and

25    say how much?  So I get to the bribe amount, and it does make a

1   difference, if it's bribery.  I guess we start with the base

2   offense level of 6, and then based on the discussion of

3   specificity at least from the government about the bribe

4   amount, the government would be contending it's more than

5   40,000 but less than 95,000?

6           MS. KEARNEY:  I believe the base offense level would

7   be 7.

8           THE COURT:  7, okay.  I'll take that.

9           MS. KEARNEY:  Then if we are basing it on a $50,000 or

10  $70,000 bribe, then yes, we would want to add 6.  Of course the

11  government's position has been that the bribe amount was

12  $250,000.

13          THE COURT:  I understand that, but I'm not asking you

14  to say uncle, but there hasn't been sufficient evidence about

15  anything over that.  And in fact, the $20,000 in addition to

16  the 50 is questionable but it's within the range here, so we're

17  talking about a guideline range of 13, right?

18          MS. KEARNEY:  Correct.

19          THE COURT:  Base offense level.  Okay.  And the

20  guideline range for the loss that you contended before Judge

21  Talwani, under the Judge Talwani analysis, that is basic fraud?

22          MS. KEARNEY:  Judge Talwani calculated the guideline.

23          THE COURT:  I know what she did.  But the government's

24  position with respect to that was how much?  What was the

25  guideline?

1        MS. KEARNEY:  It varied depending on the amount.

2        THE COURT:  Okay.  If the amounts were the amounts

3   here, somewhere between 40 and 95, although I understand that

4   the numbers change a little bit.

5        MS. KEARNEY:  So if it were the same amounts here,

6   then that would be the same calculation, Your Honor.

7        THE COURT:  13.

8        MS. KEARNEY:  Yes.

9        THE COURT:  Okay.  So I think maybe a way of saying

10  this is I find myself more or less in the position of Judge

11  Talwani.  We've gone through this in some ways, but it seems to

12  me that, you know, she's outlined a protocol for analyzing this

13  in the context of not just uncertainty but inability to

14  identify with the kind of specificity that loss or bribe or

15  whatever should be calculated.

16       Assume that I am coming to that opinion, that is, that

17  the characterization of this seems to be a result in search of

18  a justification, that is, a result of higher guidelines or

19  higher amounts in search of a justification that can't be found

20  in the guidelines themselves.  Is there anything about Judge

21  Talwani's analysis, that is the general analysis that she gave

22  in her preliminary memorandum -- I think it was September

23  5th -- 13th.

24       MS. CORRIGAN:  13th, Your Honor.

25       THE COURT:  13th, that the government disagrees with,

1    just the way in which she's dealt with that?  That is, if you

2    can't specify the amounts here, then you're left to look at the

3    guideline that's provided with specificity, that's 1349 or

4    1341, the underlying one if you go to 2X.  And that's to say

5    it's 0 to 6 as a guideline.  Now, I'm no slave to guidelines,

6    but I just have to make the determination accurately.  But

7    that's where I'd be, right?  With the assumption that I've just

8    built in.  I understand you don't accept the assumption, but

9    with the assumption I've built in.

10       MS. KEARNEY:  With that assumption built in, I would

11   also point out, though, that Judge Talwani did find that the

12   colleges were victims, and she did appear to acknowledge that

13   there was a loss.  It just was not calculable.  And so she left

14   it as no loss rather than looking to the gain.

15       THE COURT:  But what's the gain here?

16       MS. KEARNEY:  The gain here is --

17       THE COURT:  Monies received by Singer?

18       MS. KEARNEY:  Is both monies received by Singer as

19   well --

20       THE COURT:  But that has to be a bribe of some sort,

21   doesn't it?  Let's assume that somebody pays somebody who tells

22   him they're going to give him a terrific benefit, but you can't

23   identify that as a bribe or identify it specifically as a

24   bribe.  That's the same situation.  It's calculable against

25   Singer but not against a defendant like the defendant here or

1    the defendants in Abbott.

2         MS. KEARNEY:  Well, not where it's a conspiracy,

3    though.

4         THE COURT:  Whether it's a conspiracy or not, the

5    question of what the intent was of the conspiracy, that is, to

6    extract money from unwitting or witting victims to receive

7    money for some service that has not been established to involve

8    a bribe of a specific amount amounts to the same thing under

9    this analysis.

10        MS. KEARNEY:  No, Your Honor.  The amounts paid by the

11   defendant to both USC's account at the Galen Center as well as

12   to Mr. Singer would be gains to the conspiracy as a whole.  In

13   addition, the --

14        THE COURT:  No, but the conspiracy has to be one

15   that's violative of federal law, and what you've said is or the

16   assumption that I've dealt with -- I'm not sure you said

17   this -- but essentially, it's not a bribery that can be

18   recognized under the sentencing guidelines because it's too

19   speculative, at best too speculative.  So then we're left with

20   what do we say?  There's money sloshing around, and we should

21   use the sloshing around money as the basis for calculating a

22   guideline.

23        MS. KEARNEY:  That's one basis.  In addition, the

24   other gain here is the admission spot itself --

25             THE COURT:  What's the value of that?

```
1              MS. KEARNEY:  -- which is not easily valuable --

2              THE COURT:  Right.  So I can't calculate that.  See,

3    the point I'm getting to is these are -- they're not

4    comprehended by the guidelines.  These are outside of the

5    guidelines.  The guidelines, we're talking about fraud

6    guidelines which have their own problems generally, simply

7    because of the versatility of fraud.  There's so many ways that

8    people can commit fraud, and every time there's a new one, it

9    doesn't really fit into the guidelines themselves.  What you

10   essentially have is a kind of Procrustean bed.  Procrustes was

11   a Greek mythological figure who took slaves and cut them to the

12   size of the bed that he had, not because that fit them, but

13   because it fit the structure that he was trying to deal with.

14   That's what the guidelines are on this, and on many things,

15   frankly.

16             So I do have to decide what the guidelines are.  I'm

17   doing my best to do that.  There's been a challenge to the

18   Probation Office.  I'll put to one side whether or not that was

19   a hyperventilating challenge but a challenge.  The U.S.

20   Attorney's Office says that the Probation Office disregarded

21   their views.  There is no basis for saying that that happened.

22   They considered their views.

23             Now, the Probation Office has their point of view.

24   The reason I have them sitting over there is they are mere

25   witnesses in this court, which brings me to another point.
```

1    Maybe you can't answer it because you're not the person who can

2    answer these questions, but I noted in that submission with

3    respect to the difference of opinion with the Probation Office

4    that the U.S. Attorney's Office took the position that

5    recommendations made by the Probation Office should be public.

6    Is that the general position now, the new position of the

7    United States Attorney's Office?

8            MS. KEARNEY:  Your Honor, the position of the U.S.

9    Attorney's Office is that private recommendations that neither

10   the government nor defense counsel or the defendant can respond

11   to do not further --

12           THE COURT:  "Can respond to," I'm not sure I

13   understand that qualification.  Is it the position of the

14   United States Attorney's Office now that the Probation Office

15   should not submit private recommendations to the judge?

16           MS. KEARNEY:  Yes.

17           THE COURT:  And that's consistent not just in cases in

18   which they have reason to believe that the Probation Office

19   doesn't agree with them but in every case?

20           MS. KEARNEY:  Correct.

21           THE COURT:  And will be taking that in every case --

22   perhaps you know for the last 20 years I've been taking that

23   position.  Some of my colleagues have not.  Most of them

24   haven't.  But that is now the policy of the United States

25   Attorney's Office?  I just want to be clear about that.  And

1    that's something you can answer?

2        MS. KEARNEY:  Yes, Your Honor, I can answer that, and

3    that is correct.

4        THE COURT:  All right.  So now we're back to this

5    issue of evaluating what Probation says, what the government

6    says and challenge to it.  Put to one side the tone and also

7    the kind of defensiveness that was evidenced by the Probation

8    Office, which should understand that they're subject to

9    challenge like everybody else, and I make the decision or my

10    colleagues make the decision ultimately.  That's what the

11    adversarial process is all about.  But we're back down to this

12    question.  We just can't figure a guideline without stretching

13    -- an amount with respect to the guideline without stretching

14    it in some fashion that is wholly speculative.

15        MS. KEARNEY:  Well, going back to, we discussed

16    valuing the admission spot, and it's not wholly speculative in

17    the sense that we know what it was worth to the defendant, what

18    he was willing to pay for it.

19        THE COURT:  But let's pause with that, too, because I

20    want to be sure that I understand for purposes of making an

21    evaluation that is applicable, generally applicable.  Does the

22    culpability of a defendant depend upon the amount of money he

23    paid for the admission slot?

24        MS. KEARNEY:  Yes.

25        THE COURT:  How?  So somebody drives a hard bargain

1    and they get say $15,000 for the same service that Mr. Bizzack

2    spent $250,000; that's a difference in culpability?

3          MS. KEARNEY:  Yes, Your Honor.

4          THE COURT:  How?

5          MS. KEARNEY:  Because in every bribery case someone

6    sets the bribe amount.  It's either the person demanding the

7    bribe or the person receiving the bribe.

8          THE COURT:  But the same thing is being sold.  That's

9    what we're talking about here.  We're talking about a slot.

10    And so some people drive a hard bargain; some people don't.

11    But the same thing is being sold.  The same value is being

12    provided.  Once we start valuing in terms of slots, whether we

13    can figure out what the slot is worth in some reasonable way,

14    I'm not sure we can, but it amounts to the same thing.

15          Some victims spend more money.  Some victims spend

16    less, although we can't really say in this case that we have

17    gullible victims.  We have victims who know exactly what they

18    want and they pay for it, and they pay as much as they want or

19    as little as they want, but they pay it.  But I don't

20    understand how culpability is shaped under these sets of

21    circumstances in the way it would be in the stealing from

22    widows and orphans, another form of fraud.

23          MS. KEARNEY:  Well, here the amount represents what

24    the defendant valued that at.  And so he was willing to spend

25    $250,000 to get this guaranteed admissions spot.

1          THE COURT:  But that doesn't establish the value.  It

2     establishes how rich the defendant is or how good a bargainer

3     he is.  It doesn't value the slot.

4          MS. KEARNEY:  But that's the situation in every

5     bribery case.

6          THE COURT:  Not necessarily.

7          MS. KEARNEY:  In addition, here, Your Honor, the going

8     rate at USC was $250,000.  This is not the only defendant

9     who --

10         THE COURT:  Were all the defendants in the USC

11    circumstances paying $250,000?

12         MS. KEARNEY:  The majority were.

13         THE COURT:  So the minority were not, is another way

14    of saying that, which is to say it was not a consistent market?

15         MS. KEARNEY:  There were one or two outliers.

16         THE COURT:  Well, you can call them outliers, but the

17    point is there's no real market for this sort of thing.

18         MS. KEARNEY:  That's correct, Your Honor, which is why

19    we have to look at the evidence that we do have.

20         THE COURT:  We look at culpability.  That's the point.

21    This is a rich person's crime.  That's what it is.  And so then

22    do we make the distinctions between how rich and how foolish

23    they are?  Is that the way we do it?

24         MS. KEARNEY:  No, Your Honor.

25         THE COURT:  Okay.  So we're back down to, you know,

1    how do we characterize this?  I mean, that's what I've been
2    trying to wrestle with you about, and I appreciate your candor
3    to the degree that you're in a position to respond to the
4    questions I've raised, and I understand there are various
5    reasons why you can't answer some of the questions I raise.
6    But I have to tell you I just don't see this as a case that
7    lends itself to any meaningful analysis of gain or of loss, of
8    bribery amount calculated by means of how much money is spent,
9    even if I could, which I don't think I can in this case.
10           This is, as far as I can see, I mean, I've tried to
11   think of a way of characterizing this, but this is a kind of
12   crime of sneaky conspicuous consumption, the kind of thing that
13   rich people can do that poor people can't because they've got
14   the money to do it, to obtain a good -- let's call it a good --
15   that impresses their friends and satisfies the sense of
16   personal self-worth, but it doesn't monetize in that way or at
17   least there has not been -- maybe there will be in other cases.
18   It wasn't presented to Judge Talwani as near as I could find
19   out, and it isn't presented here.
20           So we're left with a guideline like the one that has
21   been offered here, which I adopt as the guideline in this case.
22   I, in short, reject the government's objection to the
23   guidelines.  But I'll say further that on the basis of this,
24   even if we could calculate it in some fashion, it's meaningless
25   because of all the various unknowns and estimates and

1  speculations that are involved.

2        So I think I've dealt with that issue, that is to say

3  the issue of what the guideline is.  I think that resolves any

4  outstanding questions here about objections, unless there's

5  some other specific objections that aren't tied directly into

6  the guideline calculation.

7        MS. KEARNEY:  Not for the government.

8        THE COURT:  Okay.  All right.

9        MS. CORRIGAN:  Not for the defense, Your Honor.

10        THE COURT:  Okay.  So after this long, perhaps painful

11  discussion of what the guidelines are and my view that

12  Probation has done as well as can be done in this area, and I

13  will add that, while I have an obligation to determine these

14  guidelines accurately, I don't believe that my decision on

15  sentencing is going to be, would be affected by the idea that

16  it's a bribe as opposed to a gain as opposed to a loss.  It is

17  to try to capture what is the culpability of somebody who

18  engages in a cheat of the type that only rich people can do.

19  That's what I'm focusing on for myself to the degree that that

20  shapes the views of the parties in making their allocutions

21  apart from the memorandum that they've had.

22        Now let me turn to another dimension of this, because

23  as Judge Talwani said at the end of her memorandum, of course

24  it all depends on 3553.  Even if the guidelines point in some

25  particular direction, it depends on 3553.  And this is an area