# EXHIBIT B

1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3     _____

4     UNITED STATES OF AMERICA,           )
                                          )
5              Plaintiff,                 )
                                          )
6          v.                             )    Criminal Action No.
                                          )    1:19-cr-10081-IT-2
7     DONNA HEINEL,                       )
                                          )
8              Defendant.                 )
                                          )
9     _____

10

11         BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE

12

                   RULE 11 HEARING BY VIDEOCONFERENCE
13

14

                       Friday, November 5, 2021
15                           11:38 a.m.

16

17

18

19

20

      John J. Moakley United States Courthouse
21    Courtroom No. 9
      One Courthouse Way
22    Boston, Massachusetts

23

      Robert W. Paschal, RMR, CRR
24    Official Court Reporter
      rwp.reporter@gmail.com
25

1                       **A P P E A R A N C E S**

2

3     On behalf of the Government:

          UNITED STATES ATTORNEY'S OFFICE
4         BY:  KRISS BASIL
               LESLIE WRIGHT
5         One Courthouse Way
          Suite 9200
6         Boston, MA  02210
          (617) 748-3387
7         kriss.basil@usdoj.gov
          leslie.wright@usdoj.gov
8

9

      On behalf of the Defendant:
10
          KAPLAN MARINO, PC
11        BY:  NINA MARINO
               JENNIFER LIESER
12        9454 Wilshire Boulevard
          Suite 902
13        Beverly Hills, CA  90212
          (310) 557-0007
14        marino@kaplanmarino.com
          lieser@kaplanmarino.com
15

16

17

18

19

20

21

22

23

24

25

1            THE COURT:  From the Government?

2            MR. BASIL:  No, Your Honor.

3            THE COURT:  Okay.  So, Mr. Basil, I'll have you

4    proceed with the evidence that you're prepared to present if

5    the case went to trial.

6            Dr. Heinel, I will then inquire as to the parts

7    that we need to make sure are clear and that you agree have

8    been proven beyond a reasonable doubt so that I ensure that

9    there are facts sufficient for the plea.

10           So, with that, Mr. Basil.

11           MR. BASIL:  Yes, Your Honor.

12           If this case were to proceed to trial, the

13   Government would prove the following facts beyond a

14   reasonable doubt:

15           From at least January of 2015 to March 12, 2019,

16   Dr. Donna Heinel was the senior women's administrator in the

17   Department of Athletics at the University of Southern

18   California, or USC.  As the senior women's administrator in

19   the USC's athletics department, Dr. Heinel owed a fiduciary

20   duty to USC to provide honest and faithful services.

21           At all relevant times, USC's admissions department

22   considered the admission of athletes who had been recruited

23   by USC's athletic coaches using a subcommittee composed of

24   admissions officers, and that was called the subcommittee on

25   athletic admissions.

1          One of Dr. Heinel's responsibilities as the senior

2     women's administrator at USC was the presentation to the

3     subcommittee on athletic admissions of recruited student

4     athletes on behalf of the coaches of USC's athletic teams.

5     From at least 2015 to 2019, Dr. Heinel presented student

6     applicants to the subcommittee using athletic profiles for

7     students that she had received from William Rick Singer, who

8     ran a college counseling business.

9          The profiles that Dr. Heinel presented misled the

10    admissions subcommittee into believing that Heinel was

11    presenting the applicants on behalf of USC's athletic

12    coaches.  And they contained falsified information, including

13    in some stances information that Dr. Heinel added herself.

14          Dr. Heinel presented those applicants to the

15    subcommittee as athletic recruits in exchange for payments

16    from Singer or from his clients.  Dr. Heinel did not disclose

17    to the admissions subcommittee that she was presenting the

18    purported athletic recruits in exchange for the payments from

19    Singer and from Singer's clients.

20          Among the applicants Heinel presented to the

21    subcommittee as purported athletic recruits in exchange for

22    such payments were a purported women's volleyball recruit and

23    a purported women's soccer recruit, and that's in the fall of

24    2018.

25          On or about October 5, 2018, Dr. Heinel, who was in

| | |
|---|---|
| 1 | California, spoke by telephone with Mr. Singer, who was in |
| 2 | Massachusetts, and confirmed in that telephone call that she |
| 3 | had presented the purported volleyball recruit and the |
| 4 | purported soccer recruit to the subcommittee, that both had |
| 5 | been approved for admission by the subcommittee.  Singer, in |
| 6 | turn, confirmed that the students' families would each pay |
| 7 | $50,000 to USC athletic funds as directed by Dr. Heinel. |
| 8 | Through that interstate wire communication on |
| 9 | October 5, 2018, Heinel executed a scheme to defraud USC of |
| 10 | its tangible right to her honest services. |
| 11 | That's it, Your Honor. |
| 12 | THE COURT:  Is the Government -- would the |
| 13 | Government be proving beyond a reasonable doubt that |
| 14 | Dr. Heinel also accepted payment that wasn't directed to USC? |
| 15 | MR. BASIL:  At trial, Your Honor, the Government |
| 16 | would present evidence that Dr. Heinel invoiced Mr. Singer in |
| 17 | relation to three recruits, purported recruits, including a |
| 18 | women's basketball recruit and a men's volleyball recruit. |
| 19 | And I'm forgetting what the last student was for.  In -- and |
| 20 | women's volleyball, pardon me.  And that, as a result of |
| 21 | that, Dr. Heinel received -- or actually Dr. Heinel's company |
| 22 | received at least one payment from Mr. Singer. |
| 23 | THE COURT:  With regard to the volleyball and |
| 24 | soccer recruit, does the Government have proof that those |
| 25 | recruits, that those applications contained falsified |

1    figure out if what is left still amounts to a felony here.  I

2    looked at this.  I think we're there.  But I need to make

3    sure that the facts, in fact, get us there and not that we

4    have some ambiguity around it.

5           So let me just go through it.  There's no dispute

6    about the time that Dr. Heinel was in this position.

7           THE DEFENDANT:  It was the -- March 12th is when I

8    was -- not the 19th.

9           MS. MARINO:  Nobody said the 19th.

10          THE COURT:  March 12, 2019.

11          THE DEFENDANT:  Okay.  Sorry.

12          THE COURT:  That's okay.

13          And that there's no dispute that, as the senior

14   administrator, she did owe a fiduciary duty to USC to provide

15   honest and faithful services, correct?

16          MS. MARINO:  Correct.

17          THE COURT:  And I'm going to go through,

18   Ms. Marino, first and just check with you, and then I'm going

19   to come back to Dr. Heinel on it.

20          And that one of Dr. Heinel's responsibilities was

21   to present to the subcommittee recruited student athletes.

22   You agree with that?

23          MS. MARINO:  I do.

24          THE COURT:  Now, there's further allegation that

25   suggests that she was only to do so on behalf of the coaches.

1    Is that in agreement?

2              MS. MARINO:  She -- I wouldn't say on behalf of

3    the -- I would say with the consent of the coaches.

4              THE COURT:  Okay.  And that she -- between it --

5    during the time period, she did present applicants to the

6    subcommittee using athletic profiles for students that she

7    received from Singer?

8              MS. MARINO:  That is correct.

9              THE COURT:  And that the profiles that she

10   presented -- so here's where -- that the -- the profiles that

11   she presented contained false information.

12             MS. MARINO:  The profiles that she presented

13   contained information that appeared to have been received

14   from coaches, and it was not.

15             THE COURT:  Appeared to have been received from the

16   coaches, and it was not.  Okay.

17             MS. MARINO:  That is correct.

18             THE COURT:  So if I look at the way Mr. Basil

19   presented this, he said it misled the committee into

20   believing she was presenting the applicants on behalf of --

21   the more accurate way would be -- or I'm not sure it's more

22   or less accurate.

23             The way that Dr. Heinel would view it is that the

24   profiles misled the subcommittee into believing that she had

25   received -- that this -- that the material had been provided

1    to Dr. Heinel by the coaches.

2           MS. MARINO:  That is correct.

3           THE COURT:  And with regard to false information

4    that was provided by Dr. Heinel, is that specifically that --

5    where this source of the information was, or is it also

6    additional information such as transcripts or achievements?

7           MS. MARINO:  There was -- Dr. Heinel had no

8    knowledge of any falsified transcripts or test scores or

9    anything like that.  I don't think the Government would

10   disagree with that.

11          THE COURT:  Well, I think there's an allegation

12   about an altered incomplete on one transcript.

13          MS. MARINO:  Yes.  And that -- that -- there was no

14   alteration to that transcript.  So there was a phone call --

15   just so the Court has a full picture, there was a phone call

16   where Dr. Heinel says, "I'll just white out that incomplete,

17   that 'I' on the transcript" 'but ultimately, when that

18   transcript is submitted to subco, nothing is whited out.  So

19   for me, it's just nothing.

20          THE COURT:  So Dr. Heinel is prepared to admit to

21   having presented the information to the -- to USC, misleading

22   them into understanding the information was received from

23   coaches when it was, in fact, received from Rick Singer?

24   That's what Dr. Heinel is prepared to plead to?

25          MS. MARINO:  That's correct.

1          THE COURT:  And that in exchange for this,

2  Dr. Heinel received payments -- and here, again, on her own

3  behalf or on behalf of the school?

4          MS. MARINO:  So in connection with this plea right

5  now before the Court, it is our position that Dr. -- that the

6  university received the money.

7          THE COURT:  Okay.  And --

8          MS. MARINO:  And really, Your Honor, if I can

9  clarify, I think that the key here is that the understanding

10  that the money would be sent to USC predated the admission of

11  the student in connection with Count 11.

12         THE COURT:  Yes.  But if you are -- if you are

13  basing the -- if the basis for the plea is the money that USC

14  received, and it received the money because Dr. Heinel

15  provided false information to USC, and in return USC received

16  the money, it seems to me that Dr. Heinel violates her duty

17  of honest services.

18         But the bribe kickback piece seems less clear to

19  me.  The bribe kickback piece seems to be proven by the money

20  that goes in her pocket, if it goes there.  But it seems to

21  me you're saying that she doesn't get the money in her

22  pocket.

23         MS. MARINO:  That is -- that is what I'm saying in

24  connection with Count 11.  That's right.  And the

25  Government's theory would be that she derived some personal

1    and professional benefit from money going to USC; and our

2    position would be, well, she's an employee of USC.  She's an

3    employee specifically of the athletic department.  And when

4    the athletic department receives money, that is obviously

5    something that is good for Dr. Heinel.

6             THE COURT:  Well, it's not -- so I guess my problem

7    here is, I certainly see why what Dr. Heinel -- if what

8    Dr. Heinel did was to give false information to USC, I

9    understand why that's a terminable offense for her

10   employment.  And I understand why USC has been deprived of

11   her honest services.

12            I understood it to be an element of the crime that

13   there's also a bribe or a kickback.  And the way I think

14   about that for a private employer is the private employer has

15   somebody doing something, and then whatever the person is

16   doing is supposed to be on behalf of the employer.  And a

17   bribe and kickback -- the person is, in fact, pocketing money

18   for doing those services.

19            And I'm -- I don't -- I don't understand the basis

20   for finding that to be a bribe or kickback under the law.

21   I'm not saying it's proper or right.  I'm saying you have an

22   honest services problem.  I'm just not sure how I get the

23   bribe and kickback I need for the felony.

24            Help me out here, Mr. Basil.

25            MR. BASIL:  Sure.  Dr. Heinel directed these funds

1    to go into an account at USC that directly benefited her

2    professionally.  It was called the Women's Athletic Board.

3    It's not a general donation to USC.  This allows her to

4    advance her own projects, and so she derives -- it's a thing

5    of value being given.  It's subjectively of value to her

6    because it allows her to do her job.

7            So leaving aside that we would prove at trial that

8    she was, in fact, paid through her consulting company for the

9    admission of students, the funds are also directed by her to

10   specific funds at USC that allowed -- that benefit her

11   professionally at USC.  This is not something that is ever

12   disclosed to the university, and the university does not

13   intend for her to raise funds in this way.

14           THE COURT:  So tell me more about the Women's

15   Athletic Board.

16           MR. BASIL:  Sure.  The Women's Athletic Board is a

17   fund that -- it's the fund that got the most number.  There's

18   some other things, like the Galen Center, for example, that

19   received funds.  The Women's Athletic Board is a fund that

20   Dr. Heinel had oversight and control, although not exclusive

21   control.  Other people could spend money out of that.

22           That was a fund on which she was -- and the

23   testimony at trial from the finance officer at USC would be

24   she was the principal on that account.  She could spend money

25   out of that account on projects as she -- through their

1   budgeting process.  It was a way of self-funding herself and

2   her own programs.

3              THE COURT:  When you say "self-funding" --

4              MR. BASIL:  Yes.

5              THE COURT:  -- so was she using it to -- are there

6   any expenses out of that that are for personal expenses?

7              MR. BASIL:  There's no misappropriation out of that

8   fund, that -- she uses it to advance herself professionally.

9              MS. MARINO:  Your Honor, I would kind of liken it

10  to John Vandemoer, who raised money for the Stanford sailing

11  program.

12             THE COURT:  I understand that.

13             MS. MARINO:  Yeah.  So that's what I would liken

14  this to.

15             THE COURT:  But I'm not right now dealing with

16  that -- I'm not dealing with that prosecution here.  And --

17  and I don't want to raise problems where there are no

18  problems.

19             I just -- I don't -- I don't -- I need more to

20  understand -- I mean, my -- this is so much simpler to

21  understand in terms of people taking money in their pocket.

22  But as soon as you're not having money in people's pocket and

23  then you're saying that the money is being paid to programs

24  at a university, if the -- I mean, if your contention is that

25  those programs at the university, you know, there's a

1    misappropriation of funds, then, again, it's easy.

2              But as soon as you're saying, you know -- if, for

3    example, the program is one -- that she's using -- is one

4    that USC is proud of and uses in their recruitment material

5    or has various things, again, you have a problem that you

6    have an employee who was dishonest to their employer, and you

7    have a problem that the person deprived their employer of

8    their honest services.

9              But the bribery or kickback is a meaningless

10   element if you don't have it being something -- and to simply

11   say in a university -- I mean, where -- the point of a

12   bribery or kickback is that the person is gaining something

13   of -- that they have an obligation to do things for their

14   employer.  They're doing something that doesn't benefit their

15   employer.  That's the bribery and kickback.

16             MR. BASIL:  Your Honor, you -- am I -- I'm not

17   muted.

18             Your Honor, I believe you ruled on this, that a key

19   issue was whether the money -- a bribe to a third party could

20   be a bribe.  The key was the intent.  And this was a thing of

21   value given to her for her to use in -- out of this account

22   for her professional benefit.  And the key was whether she

23   subjectively valued this; and that, we would prove at trial.

24             THE COURT:  I need to go through all of my writings

25   before.  I -- the issue that I recall addressing is the

1    question of what the -- whether she violated her honest

2    services with regard to what their expectations were for

3    these positions.  And I certainly ruled on that.  And I said

4    that the -- that that would be a violation of honest services

5    to -- to, essentially, use those spots for her personal gain.

6         But what the univers- -- what the Government

7    charges, a personal gain simply being, well, this enhances

8    her reputation or things, seems different than what the

9    Supreme Court requires for a bribe or a kickback.

10        I mean, do you disagree that if everything was

11   exactly as happened, but let's say the money, instead of

12   going to -- let's assume these were the facts, which is that

13   rather than having the money go into the Women's Athletic

14   Board, it simply went to USC's general funds.  Would that

15   still, in your view, amount to honest services wire fraud?

16        Because it would be an honest services problem.

17   She wasn't supposed to cheat to let people in.  But if the

18   money went into the university generally, would that still

19   meet the element of a bribe or a kickback?

20        MR. BASIL:  Your Honor, the example you give

21   illustrates the point precisely.  It's that she was using

22   these admissions slots in order to fund specifically the

23   Women's Athletic Board and her accounts.  That's the fraud.

24        THE COURT:  So back up, though.  Would you agree

25   with me my hypothetical for a minute, which is if the money

1    went generally to USC, is it honest services wire fraud?

2              MR. BASIL:  So, yes, it is, Your Honor, because

3    it's not -- it's still honest services wire fraud,

4    Your Honor, because there are -- pardon me -- the kickback,

5    Your Honor, is that there is -- she is illicitly getting

6    money into the -- she's, essentially, selling the admissions

7    slot in order to fund the school.  That is not something the

8    school ever agreed to --

9              THE COURT:  I agree that this is honest services

10   fraud.

11             MR. BASIL:  Yes.

12             THE COURT:  But there's an element -- there's a

13   separate element, which is a bribe and a kickback, or a

14   kickback.

15             MR. BASIL:  Yes, Your Honor.  And the -- a

16   professional gain can be a thing of value that is conveyed.

17   And so if what happens here is the professional gain is what

18   derives from the donation or the payment, whatever we're

19   going to call it in this instance, then, yes, there is a

20   kickback.

21             THE COURT:  And I know that your colleagues have

22   been arguing professional gain for a while.  Have I been

23   given any authority ever for that --

24             MR. BASIL:  I --

25             THE COURT:  -- any case law that suggests that

1      professional gain gets you a bribe or kickback?

2              MR. BASIL:  There are -- in pattern jury

3      instructions, Your Honor, from various districts, there are

4      rulings that have that.  I don't know -- as the Court says,

5      you've issued a lot of rulings.  I don't remember all of the

6      filings.  It is the law, however, that professional gain

7      counts.  So, for example, yes, professional gain counts, and

8      that can certainly be briefed.

9              THE COURT:  Okay.  And tell me again how funding

10     into the -- tell me again what the Women's Athletic Board is.

11     This is not -- it's not a concept that comes up

12     automatically.

13             MR. BASIL:  Sure.  Okay.  So there are -- at USC,

14     there are gift accounts, and there are general operating

15     accounts.  The Women's Athletic Board is a gift account.

16     It's an account that can take donations.

17             In her role as senior women's administrator, that

18     is an account that Dr. Heinel had access to and could use to

19     fund her projects.  She repeatedly gave Singer instructions

20     that that's where the money should go --

21             THE COURT:  Okay.  But tell me, what does it do?

22     It's a gift account.  It comes in.  And what happens with it?

23             MR. BASIL:  I -- Dr. Heinel could use money out of

24     that account to fund various programs that she wanted to fund

25     to advance her career at USC.

1          THE COURT:  And what did she do with it that was

2     for her -- what -- I understand the money is there, but so

3     what did she use it for?

4          MR. BASIL:  A large number -- I don't have a list

5     of those things right now.  There was programming for

6     students.  I understand that there may have been Pride week

7     events, things of that nature, that she put on.  So this is a

8     source of funds that she can use for her own office and to

9     develop her career and advance herself within USC.

10          I want to make clear, though, and this is

11     something I -- Ms. Marino reminded me of last night.  She

12     does not have exclusive control over that account.  It's just

13     an account that she does, in fact, have access to.

14          THE COURT:  Okay.

15          MR. BASIL:  Also, Your Honor, Dr. Heinel got raises

16     in relation to her ability to raise funds in this manner;

17     that is, for raising funds not in this manner.

18          THE COURT:  Ms. Marino?

19          MS. MARINO:  We disagree with that.

20          MR. BASIL:  Okay.

21          THE COURT:  Well, I am -- let me -- let me go

22     through the first parts of this, and I'm not quite sure what

23     to do with the bribe element of this.  But let me go through

24     the parts of the element, which seem to me the Government has

25     certainly satisfied me, and I want to make sure that you have

1    no disagreement with this, Dr. Heinel.

2            MR. BASIL:  Your Honor, could I just --

3            THE COURT:  Yes.

4            MR. BASIL:  The Court had asked before about the

5    specific ruling.  It's actually Docket 33 -- 733 at 3, and

6    this is what the Court previously wrote:  "The requirement

7    that the Government prove a private payment or private gain

8    does not foreclose a scenario where the defendant agreed to

9    have bribes paid to university accounts so long as the

10   Government proves that the defendant entered into a corrupt

11   or illegitimate agreement to receive something of value where

12   a thing of value is defined broadly to include the value

13   which the defendant subjectively attaches to the items

14   received."

15           That's what we were relying on.

16           THE COURT:  And I think, in my view, the words

17   there that modified it some are the corrupt -- that the

18   agreement is a corrupt agreement and then the remaining

19   part -- if you can -- I don't have that, again, in front of

20   me, but I think the last part of that.

21           MR. BASIL:  I can read it to you again, Your Honor,

22   if that's helpful.  I -- it's -- you said:  "So long as the

23   Government proves that the defendant entered into a corrupt

24   or illegitimate agreement to receive something of value where

25   a thing of value is defined broadly to include the value

1  which the defendant subjectively attaches to the items

2  received."

3        THE COURT:  That order -- that was -- you're right.

4  That language is a little bit broader, but I don't think that

5  language was regarding the money to universities.  That was

6  regarding the money to -- that's been alleged as to Vavic's

7  tuition for his children, right?  Wasn't -- isn't that the

8  context of that order?

9        MR. BASIL:  Your Honor, so the -- it actually

10  says -- you've described a scenario where the defendant --

11  I'm quoting now -- "a scenario where the defendant agreed to

12  have bribes paid to university accounts."  So that's not --

13  that's not Mr. Vavic.

14        THE COURT:  Okay.  I'm -- let's come back to the

15  bribe or kickback problem, and let me start at the beginning

16  here.  There is -- Dr. Heinel, you have no disagreement, I

17  take it, with the facts that -- described by the Government

18  that you owed USC a fiduciary duty to provide honest and

19  faithful services?  Any dispute with that?

20        THE DEFENDANT:  No, Your Honor.

21        THE COURT:  And do you have any dispute with their

22  assertion that you provided student applicants to the

23  subcommittee using athletic profiles for students where you

24  received the athletic profiles from Williams -- from Rick

25  Singer?

 1              THE DEFENDANT:  No, Your Honor.

 2              THE COURT:  And do you have any dispute that the

 3    profiles from Rick Singer that you presented to the

 4    subcommittee were -- that your presentation was false and

 5    misleading in that you led the subcommittee to believe that

 6    those applications had been received by -- from coaches

 7    rather than from Rick Singer?  Any disagreement with that?

 8              THE DEFENDANT:  No, Your Honor.

 9              THE COURT:  And that you presented those applicants

10    to the subcommittee as athletic recruits in exchange -- in

11    exchange for payments from Singer or his clients to USC?

12              THE DEFENDANT:  No, Your Honor.

13              THE COURT:  No disagreement?

14              THE DEFENDANT:  No disagreement, yeah.

15              THE COURT:  And that you did not disclose to the

16    subcommittee that there was a -- that you had an exchange, an

17    agreement for payments from Singer in return for presenting

18    those or for -- in return for the admission of those clients?

19              THE DEFENDANT:  No disagreement.

20              THE COURT:  Okay.  And that among those were a

21    purported women's volleyball recruit and a purported women's

22    soccer recruit?

23              THE DEFENDANT:  In agreement.

24              THE COURT:  Okay.  And that on October 5, 2018, you

25    spoke by phone with Singer, and you confirmed to him that you

1    presented the volleyball recruit and soccer -- or you -- you

2    confirmed to him that you presented these two applicants --

3    one as if the person was a volleyball recruit and the other

4    as if the person was a soccer recruit -- to the subcommittee,

5    that both had been approved by the subcommittee, and Singer

6    then confirmed that the students' families would each pay

7    $50,000 to USC.  No dispute about that?

8              THE DEFENDANT:  No dispute about that, no.

9              THE COURT:  And that some, if not all, of that

10   money was directed to accounts that -- that some or all of

11   that money was directed to accounts of -- at USC where you

12   were -- where you had sole or some role, at least, in

13   directing the use of those funds.  No dispute about that?

14             THE DEFENDANT:  Some control.  I agree to that,

15   yes.

16             THE COURT:  And it seems further that there's no

17   dispute that USC didn't know -- this is part of the

18   misleading -- that USC didn't know about this arrangement,

19   that these amounts were going to these accounts in return for

20   your presenting these students as athletic recruits.

21             THE DEFENDANT:  I don't believe that admissions

22   knew about that, no.

23             MS. MARINO:  I think, Your Honor, certainly, when

24   the presentation was made to subco, they didn't know.  At

25   some later time, could those admissions people find out that

1    donations were made or -- you know, that these payments were

2    made to the USC accounts, I presume so.  We don't know.  We

3    don't know the answer to that.

4           THE COURT:  But the critical question is that USC

5    didn't know in extending an admissions office that -- in

6    extending an offer of admission to these students, USC didn't

7    know that there was an arrangement for these funds to be paid

8    in return for the individual to have been presented --

9    I'm drawing a --

10          MS. MARINO:  To the subcommittee.  Yes, that's

11   correct, Your Honor.

12          THE COURT:  So my only -- my only hesitation here

13   is, finally, on the question of whether -- there's clearly

14   a -- you have admitted to an illicit agreement and to

15   misleading the university and to -- to arranging an agreement

16   that the university -- that was contrary to what the

17   university expected from you as part of your fiduciary duty

18   and that there's honest services fraud here.  So I get that

19   far.

20          And I guess my issue is simply, finally, on whether

21   the professional gain satisfies the statutory requirement of

22   a bribe or kickback.  And I guess what I am sort of weighing

23   here is where both sides seem to be in agreement that there

24   is a violation, perhaps the simplest answer is that the --

25   that the defendant waives -- if the defendant is proceeding

1    here, that the defendant waives any argument that a

2    professional gain isn't sufficient for the bribe and kickback

3    element of this crime.

4               MS. MARINO:  Could we have a moment?

5               THE COURT:  Yep.

6               (Pause in proceedings.)

7               MS. MARINO:  Your Honor, I apologize for that

8    delay.

9               In response to the Court's inquiry, part of

10   Dr. Heinel's job responsibilities was development, which

11   means raising money.

12              THE COURT:  So I've gone back and looked at the

13   order that you were referring to, Mr. Basil, and I think what

14   I -- reading slowly, the whole finding there -- which, as you

15   read it, I didn't -- I didn't focus on -- what I said -- it

16   was not just that it benefitted the defendants

17   professionally, but then I included also -- which you

18   probably read, but it went too quickly for me reading it --

19   where the university's admissions office would not have

20   approved such an arrangement.

21              And so I think the question here is -- I think that

22   was that -- that is accurate, that is what I found before,

23   and I certainly have no reason to rethink that.  But I think

24   the question then is, what are the facts -- so, certainly, if

25   the university knew that what -- Rick Singer's profiles were

1    themselves false or fraudulent, I think, again, the

2    university would not be approving admissions on false facts.

3           But I haven't heard Dr. Heinel admit that she knew

4    that Rick Singer's descriptions were fraudulent.  All she's

5    admitted to so far is that she misled the university into

6    believing that these rec- -- that these recommendations came

7    from coaches.

8           And so I guess my next question to you is the

9    allegation -- this is -- this is wording from the

10   superseding -- second superseding indictment:  "The

11   university's admissions office would not have approved such

12   an arrangement."

13          So I see -- it seems implicit, and I don't think I

14   need much further convincing that the university admissions

15   office would not have approved an arrangement where the

16   applications were false, and I think that's what was sort of

17   in my mind as we're going there.

18          But if what Dr. Heinel has admitted to here is only

19   that she was making the recommendations using Rick

20   Singer's -- relying on Rick Singer rather than the coaches'

21   recommendation, and she misled the university, how would the

22   Government be showing this fact the university admission

23   would not have approved such an arrangement, if that's all

24   she's admitted to as to the wrongdoing?

25          MR. BASIL:  Your Honor, she's not only -- she's not

1    simply passing along information from Singer.  She's adding

2    to it, and the information that she's adding to it is not

3    true.  So --

4              THE COURT:  She's adding the information that the

5    coaches were --

6              MR. BASIL:  She's adding information as if it came

7    from the coaches.  I -- so I don't want to name a student,

8    but there's various -- for example, a student on the -- on

9    the information that comes from Singer, the student is listed

10   as having -- it's a basketball player, a height of

11   five-foot-eight.  Dr. Heinel changes that to be

12   five-foot-ten.  She changes the photograph to be a different

13   person.  So there are --

14             THE COURT:  So if that's what we're going -- I

15   mean, if there's -- so my concern here is that we make sure

16   that what -- what facts she's pleading guilty to get you

17   there, not just what facts you believe the Government has,

18   which the Government may very well have, but those are not in

19   front of me, and she's not pleading to whatever is in your

20   files.

21             So -- and we can take this in pieces.  Or we can

22   take this one of two ways.  I mean, either we can go through

23   and say here are -- here are these additional facts, as you

24   wanted to do, and you can give me as few or -- as you want or

25   as many as you want.  We can try to figure out whether that

1    gets you there -- that the university admissions would not
2    have approved.
3            If the statement was the more general one, which is
4    where we were up until five minutes ago, which is simply by
5    these being Rick Singer's applications rather than the
6    coaches' recommendations, that the -- on that alone, the
7    university would not have wanted this transaction, my
8    question is, what's the evidence the Government would have to
9    prove that?  Alternatively -- so that's one route.
10           Alternatively is where you started going now, which
11   is, no, she did something more than just say this is Rick
12   Singer's versus the coaches'; and if she admits to that, then
13   we can go that way.  But I need one or the other of those
14   things in order to find that each of the elements is
15   established here.
16           MS. MARINO:  I -- maybe I could answer that,
17   because I think the establishment of the element is by the
18   fact that Dr. Heinel takes these profiles and adds in
19   information that makes these student athletes look like
20   better athletes, makes them -- makes it appear that the
21   coaches are saying, "These are athletes that we want on the
22   team."  And I think that that really --
23           THE COURT:  Okay.
24           MS. MARINO:  -- gets the point.
25           THE COURT:  Dr. Heinel -- and I'm sorry; I believe

```
 1          I've been mispronouncing your name the whole time.
 2    Dr. Heinel --
 3               THE DEFENDANT:  Yes.
 4               THE COURT:  -- is that accurate?  Do you have any
 5    dispute with what your counsel just stated here, which was
 6    that you added information to the applications that made
 7    these individual students look like better athletes than they
 8    were?
 9               THE DEFENDANT:  I added information to these
10    profiles to put them into a format that was a standardized
11    kind of template format of which we presented student
12    athletes to the subco with.
13               THE COURT:  But in doing so --
14               THE DEFENDANT:  I -- there was -- when that -- when
15    I received information and put that into the -- I had found
16    out that that is -- that was fake -- that is fake
17    information.  So I --
18               MS. MARINO:  Can we pause for a second?  Can we
19    pause?  We need to pause.
20               THE COURT:  Yep.
21               (Pause in proceedings.)
22               MS. MARINO:  Your Honor, I think Dr. Heinel
23    misunderstood the question.  So if you could just repeat the
24    question, that would probably be best.
25               THE COURT:  Did you add information to the
```

1    applications that made the applications look better --

2              THE DEFENDANT:  Yes, I did.

3              THE COURT:  And I'm sorry; I was looking away.

4    That was from you, Dr. Heinel?

5              THE DEFENDANT:  Yes.  Yes, I did.

6              THE COURT:  Okay.  And would -- is there any

7    dispute that the university -- do you have any dispute that

8    the university would not have approved the arrangement here

9    where the athletes you were presenting were better -- that

10   you made them look better than they were -- that you would

11   not have approved -- they would not have approved that

12   arrangement where you did that in return for the money being

13   placed in university accounts?

14             MS. MARINO:  Your Honor, I just want to caveat the

15   Court's statement to -- instead of the university, we're

16   talking about subco.  Okay?  And the presentation was made to

17   subco, not to the greater university.  And the subcommittee

18   is -- and the allegations in the indictment specifically

19   refer to misrepresentations to the subcommittee.

20             THE COURT:  So subco would not have admitted the

21   students regardless of where the money was going in the

22   university based on those misrepresentations?

23             MS. MARINO:  I don't think it's where the money is

24   going is the critical -- I'm sorry, Your Honor.  I don't mean

25   to nitpick, but I do want to make this correct.  I think the

1    issue is that the misrepresentations were made to subco; and

2    subco, had they had -- had known that there were

3    misrepresentations, would not have admitted this student.

4            THE COURT:  Okay.  And, Dr. Heinel, you -- no

5    disagreement with that fact?

6            THE DEFENDANT:  No disagreement, yes, that the

7    subco wouldn't have approved it, yes.

8            THE COURT:  Okay.  And, now, the last piece of that

9    is that, regardless of whether raising funds were -- was or

10   was not part of your normal job duties anyway, you did have

11   professional gain in the money going there.  Even if that was

12   part of your normal job responsibilities, you had a

13   professional gain in the money going into those accounts.

14           Do you have any dispute with that?

15           MS. MARINO:  I think, Your Honor, if I could just

16   sort of fine-tune that a little bit, that because there is a

17   job duty to bring money into the university, the fulfillment

18   of that duty would be considered a professional gain.  I

19   mean, if my job duty is to be a lawyer, and if in the course

20   of that duty, I can't spell, then I'm not doing a very good

21   job.  So not fulfilling my job duty, right?

22           THE COURT:  I think with those -- I think with

23   those two parts to this, one is that -- and I think,

24   Ms. Marino, you may be absolutely right that it isn't the

25   exceptional advantage to her of this being an account that

1    she had her signature on or that she used it for pet

2    projects; without any of those, the point being, if you meet

3    job requirements by an arrangement that your employer

4    wouldn't approve of, then that meeting of your job

5    requirements could be considered a sufficient gain for

6    purposes of the bribe and kickback.  I think that's where we

7    have gotten here.

8              Any disagreement with that, Mr. Basil?

9              MR. BASIL:  I would agree with the Court right now.

10             THE COURT:  The point -- the point being here, it

11   isn't -- I think what I have found troubling about these

12   allegations is the notion that these account are ones

13   controlled by the university employees, is so -- it's sort of

14   pregnant with this notion of misappropriation of funds, and

15   that isn't part of the allegation here.  And then the

16   question of whether this was something to overpromote a

17   person, I have overachieved by doing this, also seemed

18   incorrect to me without proving it.

19             But I think Ms. Marino's point is that it was

20   simply fulfilling her job duties in an illicit way when that

21   was a job expectation.  And perhaps that then brings you back

22   to the sailing coach, that it's sort of analogous that there

23   was an expectation that you raise money, but the university

24   isn't expecting you to raise money in this manner where there

25   is a fraudulent representation as part of the package.

1          MS. MARINO:  Yeah.  And I just want to clarify one

2     point, Your Honor.  We -- the approval or disapproval of the

3     manner in which the transaction takes place is pursuant to

4     the indictment related to subco, or related to admissions,

5     and that is a distinction that's important to us.

6          So she had a duty to subco, obviously, because she

7     has a duty as an employee of the athletic department.  She

8     has many duties and duties to different departments.  She has

9     a duty to compliance.  She has a duty to subco, to the

10    admissions.  She has a duty to the development officer.  She

11    has different duties to different departments at USC.

12         But what she's charged with violating and what she

13    is admitting to violating is violating the duty that she has

14    to subco.

15         THE COURT:  And that's sufficient because subco is

16    a subpart of the university?

17         MS. MARINO:  That's correct.

18         MR. BASIL:  Your Honor, subco is a subpart of the

19    admissions department, and admissions is the only part of the

20    university that can let a student in.

21         THE COURT:  Understood.  But right now we're

22    talking about honest services.

23         MS. MARINO:  Right.

24         THE COURT:  And I think, if I understand where

25    Ms. Marino may be going with this, is that perhaps Dr. Heinel

1    feels like she was serving a larger purpose for the

2    university or some other argument.

3            But she is conceding that she had a duty to the

4    admissions people to not give fraudulent information to the

5    admissions committee, and that regardless of whether she was

6    trying to fulfill other parts of her job requirements to the

7    university by giving fraudulent information to the admissions

8    committee, she thereby violated her duty of honest services.

9    I think that's where we're coming out here.

10            MS. MARINO:  The Court is, as usual, very astute,

11    and that is accurate.

12            THE COURT:  I don't know whether we're going to go

13    there, but we are, I think, getting to the end of our hour.

14    So we should probably keep moving here.

15            But for the Government, I think it is a slightly

16    more narrow statement that she's making; and I think you

17    don't seem to be in any disagreement that the problem was her

18    obligations to the side of the university that's dealing with

19    admissions, and that's what she breached.

20            MR. BASIL:  I agree, yes.  I agree with that.

21            THE COURT:  Okay.  So, with that, I believe we have

22    all the facts needed for me to go ahead and take the plea.

23            Counsel, is there any reason at this point for me

24    not to -- oh, I'm not sure I added that, when we went through

25    the statements, the phone call that you made was an

1    interstate call.  Any disagreement, the one that's the issue

2    at this -- of this -- of this count on October --

3              THE DEFENDANT:  Yes.

4              THE COURT:  Okay.  Given all of that, it seems to

5    me we have sufficient facts.  Is there any reason for me not

6    to take the change of plea at this point?

7              MR. BASIL:  From the Government's point of view,

8    no, Your Honor.

9              MS. MARINO:  Not from us, Your Honor.  Thank you.

10             THE COURT:  All right.  And we are taking a change

11   of plea as to a part of Count 11; and with that,

12   Ms. Marchione, if you could proceed.

13             THE DEPUTY CLERK:  Yes, Your Honor.

14             Dr. Heinel, you are charged in a second superseding

15   indictment with Count 11, honest services wire fraud, all in

16   violation of Title 18 United States Code Sections 1343 and

17   1346.  You have previously pleaded not guilty to this charge.

18   Do you now wish to change your plea?

19             THE DEFENDANT:  Yes.

20             THE COURT:  How do you now plead to Count 11,

21   guilty or not guilty?

22             THE DEFENDANT:  Guilty.

23             THE DEPUTY CLERK:  Thank you.

24             THE COURT:  The Court finds that the defendant is

25   fully competent and capable of entering an informed plea,