# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 19-10080-NMG |
| v. | Hon. Nathaniel M. Gorton |
| JOHN WILSON, | Oral Argument Requested |
| Defendant. |  |

## DEFENDANT JOHN WILSON'S REPLY MEMORANDUM
## IN SUPPORT OF HIS MOTION FOR RELEASE PENDING APPEAL

Michael Kendall (BBO# 544866)
Lauren M. Papenhausen (BBO# 655527)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
(617) 979-9310

Andrew E. Tomback (*pro hac vice*)
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-0066

Noel J. Francisco (*pro hac vice*)
Yaakov M. Roth (*pro hac vice*)
Marco P. Basile (*pro hac vice*)
Harry S. Graver (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC  20001
(202) 879-3939
njfrancisco@jonesday.com

*Counsel for Defendant John Wilson*

## INTRODUCTION

It is hard to imagine a stronger case for release pending appeal.  John Wilson is not seeking delay; to the contrary, he has already filed his appellate brief, without seeking a single extension, despite a 5,500-page appendix.  Opening Br., No. 22-1138 (1st Cir. Apr. 25, 2022).  Nor is there any contention that Wilson presents a flight risk or danger to the public.  Yet, if Wilson is forced to report to prison now, he will likely complete his 15-month sentence before the First Circuit has ruled on the validity of his convictions.  That would render his appellate rights illusory.

The Government's sole response in opposition (ECF 2593, "Opp.") is to deny that Wilson's appeal raises *even one* substantial question that, if resolved in his favor, would result in acquittal, a new trial, or a shorter sentence.  But the Government can take that position only by artificially inflating the standard so as to make it virtually impossible to satisfy—effectively demanding that Wilson prove now that he will *win* his appeal.  That is obviously not the test, as confirmed by the plethora of examples of courts granting release pending appeal in analogous cases involving novel applications of the federal fraud statutes.  The Government ignores them all.

The real standard, as the First Circuit has made clear, is that a question is "substantial" if it "very well *could be* decided the other way."  *United States v. Bayko*, 774 F.2d 516, 523 (1st Cir. 1985) (emphasis added).  Here, other sessions of this Court already *have* answered these questions differently.  Judge Talwani squarely rejected the notion that admission slots are "property."  Judge Woodlock called this a case in search of a bribe, and Judge Talwani materially narrowed the Government's unprecedented bribery theory in instructing the jury in a parallel case.  Magistrate Judge Kelley and Judge Talwani also affirmed the relevance of evidence about USC admission practices, contrary to this Court's holding.  Of course, as in every case of release pending appeal, this Court surely stands by its rulings.  But the Government disrespects these other jurists by insisting that their contrary holdings fail to expose even a "substantial question" for appeal.

1

Further confirming the weight of Wilson's appeal, a range of *amici curiae*—independent voices from both sides of the criminal justice bar, as well as well-respected academics—have now served briefs supporting Wilson's First Circuit appeal.  *See* Ex. A (professors); Ex. B (NACDL); Ex. C (former U.S. Attorneys).  These voices do not weigh in on insubstantial appeals.  They chose to weigh in to support this one because of the significance of the legal issues at stake.

Most of the opposition is devoted to defending Wilson's convictions on the merits.  But the Government has already convinced this Court that the convictions are valid.  At this stage, the question is different: Is Wilson's appeal really so insignificant that he should be forced to serve his sentence before the First Circuit resolves it?  Whatever one's views on the merits, everyone ought to be able to agree that the answer to that question is no.  This Court should grant relief.

## ARGUMENT

### I.   THE GOVERNMENT MISSTATES THE STANDARD FOR RELEASE PENDING APPEAL.

The Government's opposition hinges on its gross overstatement of the legal standard for release pending appeal.  The First Circuit has explained that a "substantial question" is simply one that is "close" or "very well could be decided the other way."  *Bayko*, 774 F.2d at 523.  In other words, a substantial question is one over which reasonable jurists could genuinely disagree.  *United States v. Zimny*, 857 F.3d 97, 99–100 (1st Cir. 2017).  But the Government scoffs at surmising what the First Circuit "*could*" hold (Opp. 3–4), even though that is controlling under *Bayko*, and instead seeks to heighten the test in ways that have no basis in circuit precedent or common sense.

Most aggressively, the Government suggests a defendant must identify "controlling First Circuit precedent."  Opp. 4.  That would require the defendant to prove he *will* prevail on appeal.  *Bayko* rejected that test: "Such a strict standard would virtually eliminate bail," which plainly "was not intended by Congress."  774 F.2d at 521–22.  The correct inquiry is whether the First Circuit "very well *could*" rule in the defendant's favor, not whether it *already has*.

Next, the Government denies that disagreement among district judges is indicative of a substantial question, insisting that only a *circuit split* could (perhaps) satisfy the test.  Opp. 1, 4, 8. Again, that is wrong.  If a question actually *has been* decided in a defendant's favor, it follows *a fortiori* that the question "very well could be decided" that way on appeal.  *Bayko*, 774 F.2d at 523. At least until a higher court resolves the issue, when federal judges reach contrary conclusions in the absence of controlling precedent, that is the *precise* situation where release pending appeal is appropriate.  There is certainly no requirement of a circuit-level conflict.  To take just one of many examples, the First Circuit granted release pending appeal in an honest-services fraud case where the law was "vague and undefined" and there was "not very much direct precedent" on the question at issue.  *United States v. Urciuoli*, 513 F.3d 290, 294, 296 (1st Cir. 2008).

In arguing otherwise, the Government mischaracterizes the case law.  It relies heavily on *United States v. Gurry*, 2020 WL 1063001 (D. Mass. Mar. 5, 2020), and the First Circuit's denial of relief in the same case, *United States v. Kapoor*, 2020 WL 5526561 (1st Cir. July 1, 2020).  The Government cites these decisions for the proposition that a disagreement among federal judges is not sufficient to satisfy *Bayko*, intimating that *Gurry* denied release in the face of a circuit split. Opp. 4.  Not so.  *Gurry* took pains to explain that even though there was a split over whether the intracorporate conspiracy doctrine applied in *civil* RICO cases, *no court* had applied that doctrine in *criminal* cases.  2020 WL 1063001, at *5.  The court therefore concluded there was *no* judicial disagreement "regarding the applicability of the doctrine to this case."  *Id.*  Furthermore, the court explained that the defendants' position ran headlong into binding authority.  *Id.*  Here, by contrast, the Government agrees there is no "controlling First Circuit precedent" (Opp. 4), and admits to disagreements between judges in this Court (Opp. 8).  If that does not satisfy *Bayko*, no case does. *But see Bayko*, 774 F.2d at 523 (rejecting interpretation that makes bond impossible).

The Government also plays fast and loose by implying that *Gurry* and *Kapoor* presented "untested applications" of the Controlled Substances Act and honest-services statute.  Opp. 3.  The First Circuit's ultimate decision on the merits addressed those issues, *United States v. Simon*, 12 F.4th 1 (1st Cir. 2021), but they were irrelevant to release pending appeal, because the district court had "*vacated* the Controlled Substances Act and honest services fraud convictions."  *Gurry*, 2020 WL 1063001, at *1 (emphasis added).  It was *the Government* appealing those issues.  The defendants obviously could not justify release pending appeal based on issues they had *won*.  Here, by contrast, the convictions rest on "untested applications" of the federal fraud statutes.

The Government similarly misses the mark in invoking *United States v. Cianci*, No. 02-2164 (1st Cir. 2002), for the point that a *novel* question is not necessarily a *substantial* one.  That is obviously true: As *Bayko* noted, a novel argument might be "patently without merit" or contrary to "unanimous resolution of the issue by other circuits."  774 F.2d at 523.  *Cianci* was exemplary, with the court characterizing the defendant's main claim as in the teeth of "clear circuit authority."  ECF 631 at 33, *United States v. Cianci*, No. 00-cr-83 (D.R.I. Sept. 27, 2002).  But if (as here) an appeal involves "an unsettled *material* issue of law," then release pending appeal is proper.  *United States v. Alfonso-Reyes*, 427 F. Supp. 2d 41, 45 (D.P.R. 2006) (emphasis added).

Meanwhile, the Government tellingly ignores the ample authority that Wilson cited where courts, within this Circuit and beyond, have granted release pending appeal on similar facts.  ECF 2565 ("Wilson Mot.") at 6 (citing numerous examples).  None of those orders can be squared with the Government's notion that relief is dependent on the existence of a circuit split or controlling precedent.  Rather, those cases simply presented unanswered legal questions that could very well be decided either way.  Those courts rightly allowed the appeals to proceed before forcing the defendants to irreversibly serve their sentences.  This Court should do the same.

## II.   ALL FOUR PRINCIPAL ISSUES ON APPEAL RAISE "SUBSTANTIAL QUESTIONS."

Under the proper standard, Wilson's appeal raises four "substantial" questions—ones that "very well could be decided the other way." *Bayko*, 774 F.2d at 523. Indeed, other sessions of this Court *have* come out the other way on many of them. And independent *amici*—including a coalition of former U.S. Attorneys from this district and across the country, and highly respected criminal law scholars—have weighed in to support Wilson's appeal. Exs. A–C. The First Circuit has also recognized the complexity of these issues, granting Wilson's unopposed motion to file a brief nearly double the default length. Order, No. 22-1138 (1st Cir. Apr. 7, 2022).

The Government offers little besides reiterating that these issues have been "extensively litigated and decided against" Defendants. Opp. 1. That is the posture for *every* motion for release pending appeal. *See, e.g.*, *United States v. Carpenter*, No. 04-cr-10029, 2014 WL 2178020, at *4 (D. Mass. May 23, 2014) ("The defendant identifies issues he will present on appeal, all of which have, of course, been previously addressed here[.]"). The question, again, is whether these issues *could be* decided the other way on appeal. The answer as to each issue is plainly yes.

**A.   Bribery.** Almost every count against Wilson rested in whole or part on a bribery theory. The Government concedes that its theory of bribery is unprecedented in American history, but fails to grapple with the consequences of that concession. Its sole retort is that novelty alone does not satisfy *Bayko*. *See* Opp. 6. That misses the point entirely. The utter absence of precedent for the Government's bribery theory bears *directly*, as a matter of law, on whether that theory is viable. That is because the Supreme Court has narrowed the honest-services fraud statute to "core" or "paradigmatic" cases of bribery. *Skilling v. United States*, 561 U.S. 358, 409, 411 (2010). The problem with the Government's theory is therefore not novelty in itself; the fatal problem is that its concededly unprecedented account of "bribery" cannot fairly be described as part of the "core" of pre-*McNally* decisional law that *Skilling* read into 18 U.S.C. § 1346.

5

Equally important, the unprecedented innovation of the Government's theory is not some arbitrary distinction—it goes to the very heart of what defines a bribe.  The Government insists *any* "thing of value" can be a bribe, even if given directly to the principal of the "bribed" employee.  Opp. 6.  Yet scholars who have studied bribery closely have defined bribery as a "payment which is *not passed on to the principal*."  Susan Rose-Ackerman, CORRUPTION: A STUDY IN POLITICAL ECONOMY 6–7 (1978) (emphasis added); *see also, e.g.*, Harvey S. James, Jr., *When Is a Bribe a Bribe? Teaching a Workable Definition of Bribery*, 6 TEACHING BUS. ETHICS 199, 209–16 (2002) ("Any payment made to a principal, for any purpose, is not by definition a bribe.").  A collection of law professors steeped in this subject made this very point in their *amicus* brief supporting Wilson's appeal.  *See* Ex. A.  These experts recognize that, as a matter of history, precedent, and logic, "the essential components of the crime of bribery are lacking when the thing of value in question is provided to the supposed *victim* of the bribery offense."  Ex. A at 3.  Once again, the point here is not that Wilson is *correct*.  This Court has held otherwise.  But in light of these arguments and authorities, there is no doubt the First Circuit could very well rule the other way.

The skepticism by Judges Woodlock and Talwani confirms that conclusion.  *See* Wilson Mot. 9.  The Government argues that neither jurist disagreed with this Court, but that is plainly wrong.  As to Judge Woodlock, the Government claims he *adopted* the bribery theory by accepting Bizzack's guilty plea.  Opp. 7.  At Bizzack's sentencing, however, Judge Woodlock *rejected* that notion; he pointed out that the Government's alternative property theory could have supported the plea.  ECF 2565-1, at 24–29 (*Bizzack* Tr. 33–38).  Nor was Judge Woodlock's skepticism "off-the-cuff."  Opp. 7.  Judge Woodlock exhausted what he labeled a "long, perhaps painful discussion" with the Government before declining to apply the commercial bribery guideline.  ECF 2565-1, at 54 (*Bizzack* Tr. 63).  And in any event, the Government misses the forest for the trees: The fact

that judges—including this Court (Opp. 7)—have recognized the disconnect between this conduct and the bribery sentencing guideline is only further confirmation of the substantiality of Wilson's argument that this conduct is *not bribery* in the first place, just as the criminal law scholars have advised.  At the least, the First Circuit could very well draw that conclusion.

As to Judge Talwani, the Government notes that she later instructed the jury in a related Varsity Blues case that a payment to a university may constitute a bribe under certain conditions. Opp. 8.  But, on Judge Talwani's understanding, Wilson should at minimum secure a new trial. Under her instructions, a donation to a school could be a bribe only if "the payments are made for the employee's own interests and receipt of the payments is contrary to the university's interest." Tr. of Apr. 7, 2022, at 265, *United States v. Ernst*, No. 19-cr-10081 (D. Mass.).  Over objection, this Court's instructions included no such limitation.  *See* Tr. of Oct. 7, 2021, at 48 ("Payments to third parties, including even employer universities, may qualify as bribes or kickbacks."). Accordingly, even if Judge Talwani's modified version of the Government's bribery theory were viable, Wilson would still be entitled to a new trial, as his jury received overbroad instructions that failed to adequately distinguish a legitimate donation from an illicit bribe.  *E.g.*, *United States v. Sawyer*, 85 F.3d 713, 730–31 (1st Cir. 1996) (vacating in similar context).[1]

In the end, it is impossible to deny that the Government's novel bribery theory raises substantial questions sufficient to warrant release pending appeal.

---

[1] The Government also claims that the payments in Judge Talwani's *Vavic* case were the "same payments at issue here."  Opp. 8.  That is demonstrably false.  In *Vavic*, the main payments at issue were Singer's payments of private school tuition for Vavic's children—in other words, payments that benefited Vavic directly and personally, not donations to USC.  But in this case, Agent Keating testified that none of Wilson's money went to Vavic's tuition.  Tr. of Sept. 24, 2021, at 78.  And the Government has never disputed that Wilson intended his funds to support USC, not any individual.  Moreover, the tuition payments were made 1.5 years after Wilson's son was admitted to USC, and were allegedly exchanged for Vavic's help with *future* students, not prior admittees.  *See* Tr. of Mar. 21, 2022, at 131, *Ernst*, No. 19-cr-10081 (D. Mass.).

**B.**      **Property.**  The Government's fallback theory likewise raises substantial questions for appeal.  The Government admits that Judge Talwani has squarely rejected the premise that admission slots are "property" under the federal fraud statutes.  Opp. 5–6.  In denying that this evinces a "substantial" question, the Government rests on its mischaracterization of the standard, *supra* Part I, and fails to accord due respect to the Court's sister jurist.  This conflict is enough, on its own, to establish that Wilson's challenge to the property theory is "substantial."

The First Circuit has yet to weigh in on this open question.  In holding that admission slots are property, this Court drew an analogy to a 25-year-old case from *another* circuit that described college *degrees* as property, *United States v. Frost*, 125 F.3d 346 (6th Cir. 1997).  But Judge Talwani reasonably questioned that analogy.  *United States v. Ernst*, 502 F. Supp. 3d 637, 648–50 (D. Mass. 2020).  After all, *admission* and *degrees* are very different; degrees reflects a university's certification that the student has satisfied academic requirements, whereas admission is just an offer to engage in a transaction.  Further, as Judge Talwani observed, *Frost* was not a property fraud case, and was based on a now-superseded premise about the scope of the honest-services statute.  *See id.*  And *Frost* also pre-dated *Cleveland v. United States*, 531 U.S. 12 (2000), which cast doubt on its reasoning.  *Ernst*, 502 F. Supp. 3d at 650.  Indeed, even the Sixth Circuit has since implicitly distanced itself from a broad reading of *Frost*, by holding that a seller who was deceived into a sale has not been deprived of property if he obtained the economic benefit of his bargain.  *See United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014) (rejecting argument that "right to accurate information" is "property").  Under *Sadler*, Wilson did not commit property fraud.

To be sure, the Government maintains that *Frost* remains good law in the Sixth Circuit and that this Court's analogy was persuasive.  But, again, Judge Talwani's different conclusion after thorough analysis is enough, at this stage, to warrant the modest relief of release pending appeal.

The Government also points out that Judge Casper treated admission slots as property in *United States v. Khoury*, No. 20-cr-10177, 2021 WL 2784835 (D. Mass. July 2, 2021).  Judge Casper's analysis actually cuts the other way.  *Khoury* invoked the theory that the schools were deprived of the "right to control one's property."  *Id.* at *3.  But even if that theory were preserved here—and it is not—the result would still be acquittal or a new trial.  For one thing, the First Circuit could reject the "right to control" theory, for the reasons explained by the National Association of Criminal Defense Lawyers *amicus* brief.  *See* Ex. B.  Other Circuits have rejected it, which should suffice even on the Government's narrow view of the § 3143(b) test.  *See Sadler*, 750 F.3d at 591; *United States v. Yates*, 16 F.4th 256, 265 (9th Cir. 2021).  At minimum, the "right to control" theory presents a factual question for the jury.  *United States v. Binday*, 804 F.3d 558, 571 (2d Cir. 2015).  Here, however, the Court instructed (over objection) that admission slots are property as a matter of law.  *See* Tr. of Oct. 7, 2021, at 39.  That compels a new trial at the least.

**C.     Single Conspiracy.**  Even if both of the Government's legal theories were sound, it is at least a "close" question whether the trial proof varied from the indictment by demonstrating only a "rimless wheel" conspiracy, contrary to *Kotteakos v. United States*, 328 U.S. 750 (1946).  Challenges to such invalid conspiracies have triggered release pending appeal in other cases.  *E.g.*, *United States v. Sekhon*, No. 06-CR-58, 2012 WL 2203024, at *5 (E.D. Cal. June 14, 2012) (finding that the "*Kotteakos* argument presents a substantial question").  So too here.

Perhaps the best proof of the weight of Wilson's *Kotteakos* argument is the *amicus* brief by 11 former U.S. Attorneys, including two from this district.  Prosecutors do not typically side with criminal defendants.  Yet they felt compelled to do so because Wilson "did not receive a fair trial" given how prosecutors "poisoned" the jury with prejudicial evidence using a "quintessential rimless-wheel conspiracy."  Ex. C at 5, 6, 13.  The First Circuit could very well agree.

The Government emphasizes that the First Circuit will review only for sufficiency of the evidence whether the proofs supported the single, overarching conspiracy that was charged. Opp. 9. But that is true for every case raising a *Kotteakos* problem. Yet the First Circuit has repeatedly vacated convictions on that basis. *See, e.g.*, *United States v. Franco-Santiago*, 681 F.3d 1 (1st Cir. 2012); *United States v. Dellosantos*, 649 F.3d 109 (1st Cir. 2011); *United States v. Glenn*, 828 F.2d 855 (1st Cir. 1987). And the standard of review is particularly immaterial here, because this dispute is not over historical facts, only whether the undisputed facts are legally sufficient to support an overarching conspiracy embracing the dozens of parents who hired Singer.

The Government's heavy emphasis on the standard of review is understandable given that it is still unable to articulate how the parents who hired Singer were interdependent with each other so as to form a single conspiracy. The Government says that Singer relied on a network of coaches and insiders to pull off his scheme, and that the parents were aware that Singer used this network. Opp. 11. But that misses the point. The problem with the charged conspiracy was lumping *all of the parents* together. Every person who walks up to a bakery knows the cashier is not baking the bread, yet that does not make the bakery's customers interdependent *with one another*. If simply knowing that a "hub" relied on others to provide a service was enough to establish interdependency across the spokes, there would be no such thing as a "rimless wheel." The Government's argument is therefore, at minimum, one that the First Circuit could very well reject.

Neither of the cases cited by the Government says anything different. In *United States v. Maryea*, 704 F.3d 55 (1st Cir. 2013), the defendant was involved in a conspiracy to import drugs into a prison, and she argued that the different streams of narcotics should be understood as distinct conspiracies. The First Circuit rightly rejected that argument in light of the extensive evidence that Maryea was actively involved in *all aspects* of the overarching conspiracy. *E.g.*, *id.* at 76

("Maryea herself embodies the overlap among the activities' participants."). Similarly, in *United States v. Perez-Ruiz*, 353 F.3d 1 (1st Cir. 2003), the defendant maintained that his branch of a drug conspiracy should be taken as separate from the whole. Again, the First Circuit rightly rejected that claim given how Perez-Ruiz actively participated in the broader conspiracy. *E.g.*, *id.* at 7–8 (detailing how defendant helped kill a rival on behalf of the group). Whatever might be said of Wilson's relationship to Singer, it is obvious that this case is fundamentally different in kind.[2]

The Government's attempt to fashion a unifying common goal fares no better. However broadly drawn a common goal may be, it must be a *shared* goal, not just the *same* goal. *United States v. Evans*, 970 F.2d 663, 670–71 (10th Cir. 1992). The Yankees and Red Sox do not have a *common* goal, even though they both have the *same* goal: to win the World Series. Simon Brown's clients in *Kotteakos* did not have a common goal, even though they all wanted a loan. And here, the parents did not have a common goal, even though they all wanted to help their own children to get into a good college. Indeed, the lack of a common goal here is even plainer than in *Kotteakos* because Singer's clients were at times told they were *competitors*. Tr. of Sept. 15, 2021, at 55–56 (Singer tells Wilson's wife that "Jovan [Vavic] is giving me one boys slot" but "[t]here are five plus wanting in"). Competitors—by definition—do not share a common goal.

Last, the Government claims that Judge Talwani held in *Vavic* that the Government proved its charged conspiracy. Opp. 14 n.1. Not so. Judge Talwani found that a preponderance of the evidence supported "the conspiracy charged *or a variance thereof*." ECF 1227 at 5–6, *Ernst*, No. 19-cr-10081 (D. Mass. Apr. 6, 2022) (emphasis added). She reiterated this caveat at the charge

---

[2] The Government says Wilson's argument is based on the (false) claim that he did not know Isackson. Opp. 11. But Wilson never claimed not to *know* Isackson. He said he never *worked* with Isackson or any other parent, and had no stake in getting their children into college. Wilson Mot. 12. It does not matter that Wilson *had met* Isackson socially. Opp. 11; Tr. of Sept. 14, 2021, at 54. What matters is that they were not, in any way, interdependent on one another.

conference: "The other thing you will see if you read my order carefully [is] that I have left open the question of variance.  I am not making a finding at this point as to what and who is in what conspiracy or not in any conspiracy."  Tr. of Apr. 6, 2022, at 166, *Ernst*, No. 19-cr-10081 (D. Mass.).  Judge Talwani's express reservation in no way undermines her earlier observation that even the indictment contained a "dearth of factual allegations" suggesting a true single conspiracy. *Ernst*, 502 F. Supp. 3d at 654.  It certainly does not render this issue insubstantial.

      **D.**    **Exclusion of Evidence.**  Finally, the Court's exclusion of core defense evidence— specifically, evidence that USC had an accepted practice of dressing up donor applicants as athletic recruits—also raises "close questions" that warrant release pending appeal.

      This Court held that this evidence was legally irrelevant if Wilson was unaware, at the time of his conduct, of the specific examples at issue.  But once again, other jurists in Varsity Blues cases viewed the matter differently, and the Government's efforts to downplay those differences fail.  *First*, the Government tries to distinguish Magistrate Judge Kelley's ruling by asserting that whether these materials were "discoverable does not bear on their admissibility."  Opp. 16.  That is not true in this context.  Materials are discoverable only if they are *relevant*.  *United States v. Nixon*, 418 U.S. 683, 699–700 (1974) (requiring "relevancy" for pretrial production of documents under Fed. R. Crim. P. 17(c)).  Magistrate Judge Kelley thus necessarily concluded that these documents were relevant.  This Court held otherwise.  *Second*, the Government admits "Judge Talwani admitted similar evidence in the trial of Jovan Vavic," yet tries to reconcile that with this Court's reasoning by pointing out that Vavic was "a USC *insider*."  Opp. 16–17.  But that played no role in Judge Talwani's analysis; she did not require Vavic to prove he *knew* of the incidents described in the evidence before admitting it.  ECF 956, *Ernst*, No. 19-cr-10081 (D. Mass. Oct. 28, 2021).  Both of these conflicts thus expose a "substantial" issue for appeal.

Notwithstanding these divergent rulings, the Government claims evidentiary issues cannot justify release pending appeal because they are reviewed only for abuse of discretion. Opp. 15. That is doubly mistaken. Other courts in this circuit *have* granted release pending appeal based on exclusion of evidence. *E.g.*, *United States v. DeSimone*, 424 F. Supp. 2d 344, 351–53 (D.R.I. 2006). The Government ignores *DeSimone*. Moreover, the error here was a "buried" legal ruling on which trial courts receive no discretion. *Cameron v. Otto Bock Orthopedic Indus., Inc.*, 43 F.3d 14, 16 (1st Cir. 1994). Specifically, the Court failed to appreciate that, regardless of Wilson's personal knowledge, USC's practices bear on the scope of the school employees' fiduciary duties, and therefore whether the alleged conspiracy's object was unlawful. The mistake, in other words, was to think that the fiduciary-duty element of honest-services fraud is *subjective* rather than *objective*. The First Circuit will review that legal issue *de novo*. *See id.*

Notably, the Government does not defend the Court's reasoning on that legal issue. That is, the Government does not deny that, if USC was knowingly dressing up donors' children as athletic recruits for admission, that would be relevant—whether or not Wilson knew about it. Instead, the Government pivots to alternative arguments for excluding the evidence. These new arguments are wrong, but the more critical takeaway is the Government's abandonment of the analysis it previously persuaded the Court to adopt. That concession of error should suffice on its own to establish that Wilson's challenge to these evidentiary rulings is "substantial."

As to the alternative grounds, the Government first posits that the excluded evidence shows only that USC's *Athletics* Department often inflated the credentials of donor candidates, not that USC's *Admissions* Department condoned the practice. Opp. 16. It is not clear why that artificial, internal distinction matters. Regardless, as signaled by the Government's telling use of the caveat "largely" in making the claim (*id.*), Wilson's proffer included evidence that Admissions welcomed

13

Athletics' advocacy for donor candidates. ECF 2032 Ex. N at 1–2. For example, a spreadsheet of the Athletic Director's admission requests, openly flagging "potential donor[s]," was *delivered to the Dean of Admissions himself*. Ex. 1085. Other emails showed that Admissions was intimately involved with, for instance, the USC golf team's recruitment of a donor candidate who the golf coach admitted would not contribute to the team, despite being aware of his poor academic record (including D and F grades). *See* ECF 2293 Ex. I at 20, 31; *see also* Ex. 9735. Based on those and similar exhibits, the jury could readily have rejected the Government's theory that USC's left hand did not know what its right hand was doing. Indeed, the magistrate judge commented that the documentary evidence "belied" the Dean of Admissions' protestations of ignorance. ECF 673 at 21. And even without those exhibits, the jury could fairly have inferred from the sheer extent of the examples that Admissions knew exactly what was going on. *See* ECF 1210 at 47. Of course, the Government could have tried to explain away these documents in its arguments to the jury, but they cannot support withholding the evidence from the jury altogether.[3]

Next, the Government asserts that "the Court acted well within its discretion in excluding this evidence under Fed. R. Evid. 403." Opp. 17. But even if this Court had relied on Rule 403 in the alternative, any such ruling would have been tainted by the misunderstanding of the evidence's probative value, and therefore could not insulate the error on appeal. *See United States v. Minor*, No. 20-1903, 2022 WL 1076087, at *10–11 (1st Cir. Apr. 11, 2022) (refusing to affirm alternative Rule 403 ruling because trial court "conducted this balancing with one empty scale, as it incorrectly understood the testimony to have no relevance and thus no probative value").

---

[3] Similarly, the Government's reliance (Opp. 16) on USC's "internal" distinction between the Subco and VIP processes is irrelevant, because the evidence shows that USC employees used *both* processes to arrange for the admission of donors' children through athletic programs. *See, e.g.*, ECF 2032 at 3–6 (describing evidence about students admitted through Subco).

Relevance aside, the USC evidence should at least have been admitted for impeachment by contradiction of the Government's witness, Rebecca Chassin.  *See* Wilson Mot. 15–16.  As to that, the Government's only response is to deride the issue as "collateral."  Opp. 17–18.  That is not the reason this Court gave for excluding the evidence, however.  *See* ECF 2336 at 19.  So once again, the Government is implicitly confessing error in this Court's rulings and trying to preserve them on other grounds.  And once again, the Government's alternative grounds fail too.  The USC evidence was not "collateral."  That is why *the Government itself* elicited the testimony that Wilson sought to impeach.  Tr. of Sept. 20, 2021, at 157–58, 187.  It is why Magistrate Judge Kelley called this "a very basic fact" for the defense.  ECF 673 at 21–22.  And it is why a former lead prosecutor in this case admitted that "[i]f it were a school policy to accept fake athletes in exchange for money, it probably would not be a crime."  Jon Wertheim, *The Real Scandal of Varsity Blues*, SPORTS ILLUSTRATED (Jan. 20, 2022).  The Government simply ignores all of that.

*          *          *

It is one thing to defend Wilson's convictions.  In light of this Court's rulings, that much is to be expected.  But it is quite another thing to deny that Wilson's appeal presents "substantial" questions.  In light of other jurists' contrary rulings and the diverse *amici* who have weighed in to support Wilson's pending appeal, going that far is simply not plausible.  Wilson's appeal easily satisfies the § 3143(b) standard, correctly understood.

## III.   WILSON'S ARGUMENTS WILL, IF SUCCESSFUL, RESULT IN REVERSAL, A NEW TRIAL, OR A MATERIALLY SHORTER SENTENCE.

As for the second contested element of § 3143(b), the analysis "proceeds on the assumption that the substantial question of law or fact 'is determined favorably to defendant on appeal.'" *Zimny*, 857 F.3d at 100.  That is, the court assumes the defendant is right on the merits, and asks whether any error was harmless.  None of the errors discussed above was remotely harmless.

The Government chides Wilson for supposedly "whistl[ing] past" this prong (Opp. 1), but its single paragraph of analysis (in response to Wilson's four pages) gives little reason for pause. Wilson Mot. 16–20; Opp. 19–20.  It is obvious that if the Court of Appeals agrees with Wilson on the merits, it will order meaningful relief, such as acquittal or a new trial in whole or part.

*First*, as to the validity of the legal theories, the Government argues that even if Wilson is right about bribery, the property fraud theory would still preserve some counts.  But even assuming no prejudicial spillover, that argument ignores that Wilson has *also* shown a substantial question about the alternative property theory.  Moreover, even if Wilson prevailed only on bribery, he still would be entitled to release pending appeal.  Reversing the bribery counts would materially reduce Wilson's guidelines range (Final PSR ¶ 82) and, in turn, likely result in a shorter sentence.  *See* 18 U.S.C. § 3143(b)(1)(B)(iv) (explaining that this suffices for release pending appeal).[4]

*Second*, as for *Kotteakos*, the Government flatly ignores this Court's prescient observation that a "mistrial" (now a new trial) would "likely" be necessary if the Government failed to prove its alleged conspiracy.  Tr. of Aug. 18, 2021, at 13.  The Government just asserts that any variance was not prejudicial because all that would mean is that the Government "did not prove everything alleged in the indictment."  Opp. 20.  Now it is the Government doing the whistling.  As this Court correctly predicted ahead of trial, the Government was able, under the guise of a single conspiracy involving upwards of twenty separate families, to admit troves of inflammatory evidence about markedly different (and worse) conduct by other parents—including test-cheating, academic fraud, fake athletic photos, and personal payments to corrupt insiders.  *Accord* Ex. C.  To dismiss all of that as a mere failure of proof is to erode a mountain into a molehill.

---

[4] The Government's six conclusory words addressing the tax count (Opp. 19 n.2) do not contest Wilson's showing that this count is derivative of the other convictions.  Accordingly, if those convictions fall, so too must Wilson's tax conviction.  *See* Wilson Mot. 18–19.

Simply put, the Government's decision to charge a single conspiracy "permeated … the entire trial." *Kotteakos*, 328 U.S. at 769.  Prosecutors used "voluminous testimony relating to unconnected crimes," *Dellosantos*, 649 F.3d at 125, to overwhelm the jury and undercut Wilson's ability to put on a defense.  That is paradigmatically prejudicial.  *See United States v. Martínez*, 994 F.3d 1, 15–16 (1st Cir. 2021).  As the First Circuit has explained but the Government ignores, "a defendant may be prejudiced by 'evidentiary spillover': the 'transference of guilt' to a defendant involved in one conspiracy from evidence incriminating defendants in another conspiracy." *Dellosantos*, 649 F.3d at 125.  In the words of the former prosecutor *amici*, this case is a "poster child" for why rimless-wheel conspiracies are dangerous and prejudicial.  Ex. C at 16.  The remedy would therefore be a new trial on all counts.  *See, e.g.*, *Dellosantos*, 649 F.3d at 124.[5]

*Finally*, as to the evidentiary issues, the Government offers only another single-sentence response, asserting here that any errors would be "harmless in light of the overwhelming evidence of [Wilson's] guilt."  Opp. 19.  That is not close to credible.  As Magistrate Judge Kelley observed, the excluded evidence went to the heart of Wilson's defense.  ECF 673 at 21–22.  And even the Government has previously conceded its obligation to prove that USC did not condone the conduct. ECF 906 at 15–16.  So if the categorical exclusion of USC evidence was wrong, it is inescapable that the Government cannot meet its burden to show harmlessness.  And, indeed, the Government's one throwaway sentence does not seriously attempt to shoulder that task.

---

[5] In its response, the Government's use of *United States v. Mubayyid*, 658 F.3d 35 (1st Cir. 2011), is misleading.  The Government quotes *Mubayyid* for the proposition that a variance is not prejudicial when the proof at trial establishes a narrower but similar scheme.  Opp. 12.  But the portion quoted by the Government had nothing to do with prejudice—it came from a section about the difference between a variance and a constructive amendment.  The Court analyzed prejudice five pages later, asking: "Was the Variance Prejudicial?"  658 F.3d at 54.  Nowhere in that analysis did the First Circuit indicate that a variance could not be prejudicial if, as here, it invited a deluge of inflammatory evidence that overwhelmed the jury and undermined the primary defense.

In short, these are not trivial issues.  Wilson's appeal raises substantial questions that go to whether he broke the law and whether his trial was fundamentally fair.  If the First Circuit agrees with Wilson and his diverse array of *amici* on *even just one* of these buckets of issues (legal theories, scope of conspiracy, or evidentiary exclusion), he will be entitled to meaningful relief.  Those appellate rights should not be rendered illusory by forcing Wilson to complete his sentence before the First Circuit has considered and ruled on these issues.

## **CONCLUSION**

The Court should grant Wilson's motion for release pending appeal.

May 2, 2022

/s/ Noel J. Francisco

| | |
|---|---|
| Michael Kendall (BBO# 544866) | Noel J. Francisco (*pro hac vice*) |
| Lauren M. Papenhausen (BBO# 655527) | Yaakov M. Roth (*pro hac vice*) |
| WHITE & CASE LLP | Marco P. Basile (*pro hac vice*) |
| 75 State Street | Harry S. Graver (*pro hac vice*) |
| Boston, MA 02109-1814 | JONES DAY |
| (617) 979-9310 | 51 Louisiana Ave. N.W. |
| | Washington, DC  20001 |
| Andrew E. Tomback (*pro hac vice*) | (202) 879-3939 |
| MCLAUGHLIN & STERN, LLP | njfrancisco@jonesday.com |
| 260 Madison Avenue | |
| New York, NY 10016 | |
| (212) 448-0066 | |

*Counsel for Defendant John Wilson*

## <u>CERTIFICATE OF SERVICE</u>

I, Noel J. Francisco, hereby certify that on this date, May 2, 2022, I electronically filed the foregoing document with the CM/ECF system, which accomplishes service upon all parties to this action. The foregoing document is available for viewing and downloading from the ECF system.

*/s/ Noel J. Francisco*

Noel J. Francisco (*pro hac vice*)

*Counsel for Defendant John Wilson*
