# United States Court of Appeals
## For the First Circuit

---

No. 22-1129

UNITED STATES,

Appellee,

v.

GAMAL ABDELAZIZ,

Defendant, Appellant.

---

No. 22-1138

UNITED STATES,

Appellee,

v.

JOHN WILSON,

Defendant, Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

---

Before

Barron, Chief Judge,
Lynch and Lipez, Circuit Judges.

---

Joshua C. Sharp, with whom Brian T. Kelly, Lauren A. Maynard,
and Nixon Peabody LLP were on brief, for appellant Abdelaziz.

Noel J. Francisco, with whom Yaakov M. Roth, Marco P. Basile, Harry S. Graver, Jones Day, Michael Kendall, Lauren M. Papenhausen, White & Case LLP, Andrew E. Tomback, and McLaughlin & Stern, LLP, were on brief, for appellant Wilson.

Elliott M. Davis, Kateland R. Jackson, Scott A. Chesin, and Shook, Hardy & Bacon L.L.P. on brief for Former United States Attorneys, amici curiae.

Michael J. Iacopino, Brennan Lenehan Iacopino & Hickey, Steven F. Molo, Leonid Grinberg, Justin V. Shur, Kenneth E. Notter III, and MoloLamken LLP on brief for the National Association of Criminal Defense Lawyers and the American Board of Criminal Lawyers, amici curiae.

Robert T. Smith, Mary Fleming, Timothy H. Gray, and Katten Muchin Rosenman LLP on brief for Law Professors, amici curiae.

Alexia R. De Vincentis, Assistant United States Attorney, with whom Rachael S. Rollins, United States Attorney, and Donald C. Lockhart, Ian J. Stearns, Stephen E. Frank, Leslie A. Wright, and Kristen A. Kearney, Assistant United States Attorneys, were on brief, for appellee.

—————————————

May 10, 2023

—————————————

LYNCH, **Circuit Judge**.  The convictions underlying this appeal arise from a government criminal prosecution of alleged misconduct related to college admissions.  The government alleged that Rick Singer -- a college admissions consultant -- and his clients engaged in various forms of bribery and fraud to help secure those clients' children's admission to competitive universities.  Singer, who pleaded guilty in a separate case to multiple charges[1] and cooperated with the government's investigation, is not a defendant here, and his culpability is well established.

The defendants-appellants in this case are two parents, Gamal Abdelaziz and John Wilson, who hired Singer.  Both men agreed with Singer to make payments purportedly to university accounts in exchange for university employees' securing their children's admission as athletic recruits -- a path to admission Singer referred to as the "side door."[2]  Their defense at trial and on appeal is that they believed Singer's services and the side door to be legitimate and that they acted in good faith.

---

[1]    Singer pleaded guilty to conspiracy to commit racketeering, see 18 U.S.C. § 1962(d); conspiracy to commit money laundering, see id. § 1956(h); obstruction of justice, see id. § 1512(c)(2); and conspiracy to defraud the United States, see id. § 371.

[2]    Singer contrasted this side door with the "front door" (admission on merit) and the "back door" (admission through large "institutional advancement" donations).

The government charged Abdelaziz and Wilson with multiple offenses based on their work with Singer. It alleged that both defendants had participated in an overarching conspiracy not only with Singer but also with other Singer clients to corruptly influence university employees through payments to university accounts, in violation of the federal programs bribery statute. See 18 U.S.C. § 666. It further alleged that Abdelaziz and Wilson conspired with other parents to commit two types of mail and wire fraud: honest services fraud, by using their payments to deprive the universities of the honest services of their employees, and property fraud, by depriving the universities of property in the form of "admissions slots." See id. §§ 1341, 1343, 1346, 1349. It also charged Wilson with several substantive counts of federal programs bribery and wire fraud, and with filing a false tax return in connection with his payments through Singer. See 26 U.S.C. § 7206(1).

A jury convicted both Abdelaziz and Wilson of all charges. The defendants challenge those convictions on a number of grounds. They contend that payments to university accounts cannot violate § 666 or constitute honest services fraud because the payments were intended for accounts owned by the universities -- the alleged victims of the scheme. They argue that the property fraud theory is invalid because admissions slots are not property, or, in the alternative, that their convictions

- 4 -

must be vacated because the district court erred by instructing the jury that admissions slots are property as a matter of law. And they argue that the government proved only a narrower conspiracy than the one alleged by the indictment and that this variance prejudiced them on all counts.  Wilson also asserts that various forms of trial error require us to vacate his conviction for filing a false tax return.  Our task in this appeal is to assess these arguments and determine whether the charged conduct falls within the specific crimes of which these defendants were convicted and whether the manner in which this case was charged and tried unacceptably deprived these two defendants of a fair trial on their own conduct, rather than the conduct of others. Nothing in this opinion should be taken as approval of the defendants' conduct in seeking college admission for their children.

We reject the defendants' argument that payments to accounts controlled by the alleged victim of a bribery scheme cannot violate § 666, which lacks any basis in the provision's text, and so deny their request for judgment of acquittal on that basis.  And we affirm Wilson's conviction for filing a false tax return.

We do hold that the government's honest services theory is invalid as a matter of law under the Supreme Court's decision in Skilling v. United States, 561 U.S. 358 (2010), and that, on

the arguments offered by the government, the district court erred in instructing the jury that admissions slots constitute property. Accordingly, we vacate the defendants' mail and wire fraud convictions.  We also hold that the government failed to prove that Abdelaziz or Wilson agreed to join the overarching conspiracy among Singer and his clients charged in the indictment, and that this variance prejudiced the defendants by allowing the government to introduce a significant amount of powerful evidence related to other parents' wrongdoing in which these defendants played no part, creating an unacceptable risk that the jury convicted Abdelaziz and Wilson based on others' conduct rather than their own.  On that basis, we vacate the conspiracy convictions and Wilson's substantive convictions under § 666.[3]

## I.  Background

We begin by laying out the basic facts and procedural history.  We elaborate on this background information as necessary in our analysis of the legal issues.

---

[3]     We acknowledge and thank the amici curiae for their submissions in this case.  Eleven former U.S. Attorneys, five criminal law professors, and the National Association of Criminal Defense Lawyers and the American Board of Criminal Lawyers filed briefs in support of Wilson.

**A.**

**1.**

The charges against Abdelaziz stem from his work with Singer in 2017 and 2018 to secure his daughter's admission to the University of Southern California ("USC"). Abdelaziz had previously paid Singer to work with his two older children in 2012 and 2013; the government does not argue or cite any evidence that these 2012 and 2013 services for Abdelaziz's children were improper.

It is undisputed that Abdelaziz agreed with Singer in approximately June 2017 to pursue side-door admission to USC for his daughter. Abdelaziz maintains that he believed this option to be at least tacitly approved by the school and to entail "preferential admissions treatment to students like [Abdelaziz's daughter] who could assist athletic teams as practice players or team managers and whose parents donated to the athletic department." At the time, Abdelaziz's daughter had not played competitive basketball in over a year; she had played for her school's junior varsity team until January or February 2016 but had stopped playing after failing to make the varsity team. A USC admissions officer testified that Abdelaziz's daughter was also not an academically competitive applicant outside the athletic recruitment process.

On July 16, 2017, Singer sent Abdelaziz an email with the subject line "For Me to complete USC athletic profile" that requested information about Abdelaziz's daughter's scholastic and athletic accomplishments, including "If they play the sport-Basketball," "Accolades if they have them," and "Action Picture." Abdelaziz forwarded the email to his wife, but the record does not otherwise show any response. Eleven days later, Singer emailed Abdelaziz again to request "an action photo or two of [Abdelaziz's daughter] playing basketball." Abdelaziz responded: "Got it." He then sent Singer five photos of high school girls' basketball games, four of which -- as Abdelaziz represents in his brief and the government does not dispute -- contained his daughter, and one of which did not. The file names for the photos used generic letters and numbers (for example, "DSC_0007.JPG") and differed only in the numbers. Singer responded: "We will use this one." His email identified the chosen photo -- the one that did not contain Abdelaziz's daughter -- only by the file name.

Singer instructed one of his associates to prepare the profile. The associate did so; the result included the photo Singer had selected and various basketball statistics and accolades that the associate invented and that Abdelaziz's daughter had not earned. Singer sent this profile to Abdelaziz in early August, together with a message from his associate: "Let me

- 8 -

know if you want me to add any other awards to her profile or if you think that is enough."

As he did at trial, Abdelaziz disputes whether he saw this message. Singer originally sent the profile to gamalaziz@cox.net. This address generated an automatic reply that stated: "Please be advised that I have changed my e-mail address to gamalaziz797@gmail.com." An FBI agent testified that he was not aware of any evidence that Abdelaziz opened or responded to the message, although Abdelaziz later responded to messages Singer sent to the same cox.net address, having apparently forwarded them to the gmail.com account mentioned in his automatic reply. The next day, Singer also sent the profile to amalaziz797@gmail.com -- the address mentioned in the automatic reply, but without the opening "g." The same FBI agent testified that, because of the typo, this message would be "off in cyberspace."

Singer then sent the profile to an administrator in the USC Athletics Department who had agreed with Singer to facilitate Abdelaziz's daughter's side-door admission. That administrator added additional falsehoods to the profile -- including a photo of a different girl. This version of the profile became the basis for the profile presented to "Subco," a subcommittee of USC admissions officers responsible for overseeing admission of

athletic recruits.  Based on this profile, Subco considered and approved Abdelaziz's daughter's admission on October 5, 2017.

On October 10, the same athletics administrator who revised Abdelaziz's daughter's profile sent Singer a letter from the Dean of Admissions conditionally admitting Abdelaziz's daughter as a recruited athlete, pending her submission of a full application packet and other administrative tasks.  Singer emailed this letter to Abdelaziz the same day.

In early November, Abdelaziz forwarded the letter to a Singer employee, together with an email that stated: "[Singer] asked that we work with you to complete USC's application . . . ." Abdelaziz later exchanged emails with this employee, Singer, and another Singer associate about his daughter's application.  In these emails, Singer noted that it was important for the application to discuss "basketball as apassion [sic]."  Abdelaziz later "reminde[d]" the others of this "direction" when it came time to edit his daughter's application essays.

In early January 2018, Abdelaziz's daughter sent Abdelaziz and the Singer employee an application essay in which she described "[t]he basketball court [as her] art studio" and wrote: "Whether I am playing alone or in a pickup game with friends or in front of a crowd of two hundred people at school, I feel an enormous release from my everyday life when I am on the court." Abdelaziz responded in the same email thread that he had "read

[his daughter's] essays," and opined that "overall [they were] . . . good." His daughter had not played on the school basketball team for nearly two years at the time. The Singer employee submitted Abdelaziz's daughter's USC application the following day.

Abdelaziz and the government agree that Abdelaziz's daughter was formally admitted in March 2018, although they do not cite any exact date in the record.

On March 16, 2018, a foundation run by Singer sent Abdelaziz an invoice for $300,000,[4] purportedly for a "[p]rivate [c]ontribution." Abdelaziz wired that sum to the foundation ten days later. Where that money ultimately went is unclear from the record, but an FBI agent testified that Singer's "general pitch [to parents] was that [a side-door payment] was a donation to a program," and government counsel acknowledged at trial that Singer told Abdelaziz the payment would go to a university account. The government does not argue on appeal that the jury could have found that Abdelaziz intended the payment to go to any USC employee personally.

Abdelaziz's daughter enrolled at USC in fall 2018. She never played for or otherwise associated with the women's basketball team.

---

[4] Singer ran both a for-profit business, The Key, and a nonprofit foundation, The Key Worldwide Foundation.

In September 2018, the FBI approached Singer, and he agreed to cooperate with the government's investigation of his clients and university insiders. As part of this cooperation agreement, Singer made various recorded calls at the government's direction.

The government cites two such calls involving Abdelaziz. The first occurred on October 25, 2018. During the call, Singer told Abdelaziz that his foundation was being audited and that the IRS had "asked . . . about" Abdelaziz's payment. Singer further stated that he was "not going to tell the IRS anything about the fact that your $300,000 . . . was paid to . . . [an athletics administrator] at USC to get [Abdelaziz's daughter] into school even though she wasn't a legitimate basketball player at that level." Abdelaziz responded: "OK." Singer asked: "You're OK with that, right?" Abdelaziz answered: "Of course." A moment later, he added:

> No, I -- I mean, I -- you know, I mean . . . my intention was to, uh, donate the money to the foundation and, uh, what -- you know, and then from there obviously, uh -- I don't think -- Uh, do they have the intention of reaching out to the people that sent those payments?

Singer said he did not know and that he "wanted to make sure our stories are correct." He told Abdelaziz that he was "going to essentially say that [the] $300,000 payment . . . was made to our

- 12 -

foundation to help underserved kids," and "wanted to make sure [Abdelaziz was] OK with that."  Abdelaziz replied: "I am."

In the same exchange, Singer told Abdelaziz that the USC athletics administrator with whom Singer had arranged the side door had called Singer to say that she "loved" the profile created for Abdelaziz's daughter and that "going forward, anybody who isn't a real basketball player that's a female, [she] want[ed] [Singer] to use that profile."  Abdelaziz responded: "I love it."

The second call took place on January 3, 2019.  Singer told Abdelaziz that the same athletics administrator had called him to "give [him] a heads up" that the Admissions Department had "asked . . . why [Abdelaziz's daughter] did not show up for Women's Basketball in the fall," and that the administrator had "told them that [Abdelaziz's daughter] had an injury."  Abdelaziz asked whether the Admissions Department would ask his daughter about the situation and whether he needed to "prepare her."  Singer stated that they would not contact Abdelaziz's daughter and that he had "wanted [Abdelaziz] to know what" the administrator had told the Admissions Department.  Abdelaziz responded: "I will answer the same, uh, should they call me."

**2.**

Wilson engaged Singer's services to facilitate side-door admission for his children on multiple occasions between 2013 and

2019: first for his son, and then, years later, for his twin daughters.

Beginning in spring 2013, Wilson worked with Singer to secure his son's admission to USC through the side door as a purported water polo recruit. Singer explained to Wilson by email that the USC men's water polo coach was "giving [him] 1 boys slot," available on a "first come first [sic]" basis. In response to Wilson's asking when payment was due, Singer responded: "No payment of money till [sic] [the USC men's water polo coach] gets a verbal and written [sic] from admissions . . . ."

Wilson's son did play high school water polo, but his high school coach testified that he was not a player of the level ordinarily recruited by USC, a noted water polo powerhouse. In emails sent at the time, Wilson expressed doubts about whether his son would fit in on the team, asking Singer whether "it w[ould] be known that [his son was] a bench warming candidate" and whether his son would "be so weak as to be a clear misfit at practice," and stating that "[o]bviously his [son's] skill level m[ight] be below the other freshmen" and that he "want[ed] to be sure [his son would] not [be] a lepper [sic]." Singer responded that "the commitment is to be on the roster[,] not attend all practices[;] . . . he will have to attend drug tests and other mandatory functions for 1 year [but then can] walk away/ frankly after the 1st semester he can move on."

In August 2013, Singer noted in an email to Wilson that the water polo coach needed "a player profile so he [could] add [Wilson's son] to his recruit list and present him to admissions in October," and that Singer had the necessary materials to create the profile.  Wilson responded: "Great - let me know when [you] have verified [you] have it all completed and into [sic] [the water polo coach]."  In October, Singer updated Wilson: "[The water polo coach] has [Wilson's son's] stuff and asked me to embellish his profile more, which I am doing."  A few days later, Singer emailed the profile to Wilson.  It misrepresented several aspects of Wilson's son's athletic qualifications -- for instance, by erroneously describing him as a captain of his high school team and listing implausibly fast swim times.  Wilson's counsel argued both at trial and on appeal that the government did not prove Wilson was aware of the falsehoods in the profile.  Wilson's counsel emphasized that an FBI agent whose testimony the government used to introduce the email containing the profile acknowledged that he was not aware of emails or other evidence showing Wilson read or responded to Singer's message, and that the profile listed the wrong home address and used Wilson's son's SAT scores rather than his more impressive ACT scores, which Wilson purportedly would have wanted included.

An assistant water polo coach at USC relied on this profile to prepare the athletic profile used by Subco to consider whether to admit Wilson's son.

Subco considered and approved Wilson's son's admission on February 28, 2014, relying in part on the falsified athletic profile.

The day after Subco approved his son's admission, Wilson emailed Singer to "[t]hank[] [him] again for making this happen." He asked about "the options for the payment" and requested an invoice "for consulting or whatever from [Singer's business] so that [Wilson could] pay it from [his private equity firm's] corporate account." After some further discussion of payment mechanics, Wilson's firm wired $220,000 to a combination of Singer, his business, and his foundation on April 7, 2014. The government does not contend that any USC employee personally received a portion of this payment. Singer passed $100,000 along to the USC men's water polo team and, so far as the record shows, retained the other $120,000.

Wilson's son quit the water polo team after his first semester at USC.

Several years later, in September 2018, Wilson called Singer about the possibility of helping Wilson's twin daughters, then juniors in high school, with their college applications. The government recorded this call, which took place before Singer began

cooperating with the government, without the participants' knowledge. Singer explained that for Wilson's daughters to gain admission to the highly competitive schools they were interested in "on their own" would require "essentially perfect grades" and excellent standardized test scores, but added that "if you said you wanted to . . . go through a different door you c[ould] do that." Wilson inquired about "the other door," asking if it was "like . . . water polo and [a] donation," and Singer explained the price and availability of admission through the side door at various universities. Singer informed Wilson that side-door admission to Stanford or Harvard would cost "a minimum of [$]1.2 million," since a coach would have to "giv[e] up his spot" to a purported recruit who is "not a good enough athlete[] to compete," but would provide a "done deal. Just like with [Wilson's son]." Singer explained that the sport "d[id]n't matter," saying he "would make them a sailor or something." Wilson laughed in response. Wilson observed that they were discussing "big numbers," since "there's so many people that want to do th[is]," and asked if "there [was] any way to make [the payments] tax deductible as like donations to the school." Singer stated that payments would be deductible as contributions to his foundation.

Wilson and Singer continued to discuss the use of the side door for Wilson's daughters after Singer began cooperating with the government. From this point on, Singer's references to

university insiders willing to facilitate side-door admission were part of a ruse created by investigators.

In a September 29 call, Wilson confirmed that, while his daughters remained undecided on what schools they wanted to attend, he was "interested about the side door and that stuff" and asked what schools and sports were available. Singer assured him that the side door "is gonna . . . happen where you want it to happen," and that crew or sailing might be potential sports options. Wilson asked: "[W]hat if they're not really that good?" Singer responded: "[A]t the end of the day . . . I may be able to go to the sailing coach and say, 'Hey, this family's willing to make the contributions. . . . [The child] may not be up to the level you are, but . . . you're gonna get a benefit, and the family's gonna get [a] benefit.'" Wilson also asked how the payment would work. Singer stated that "the money [went] into [his] foundation," and that he would then "split the money potentially to the coach or other . . . parties that are at that school that need the money[.] . . . Or it may go right to the coach, . . . depend[ing] on the school."

In October, Wilson called Singer to discuss "making some donations now, whatever -- how that can work." Singer stated that he worked with "a bunch of schools," including Harvard and Stanford, on a "first come, first served" basis, and that, "if [he] were to get a deposit . . . [of] like half a million dollars in the bank,"

they could "figure out where [Wilson's daughters] wanna go" later. "[H]aving the money already, in advance, [would] make[] it much easier" because coaches "don't want to give up a spot" unless "the family guarantee[s] . . . that they're gonna ante up and they're gonna make a payment." Wilson asked whether his daughters "actually ha[d] to do th[e] sport" or whether "[t]hey could just go in and . . . be like . . . the scorekeeper[,] . . . water girl[,] . . . [or] manager." Singer confirmed that they could be "[m]anager[s] or whatever you want to call 'em," and that Wilson's daughters were "athletic and . . . big" enough that he could "sell to anybody that they're athletic enough to be able to take 'em and there'll be no question." Singer further assured Wilson that, if he used the side door, admission would be "a done deal." Wilson requested that Singer send him wiring information, and confirmed with Singer that if he sent "[h]alf a million" he would be "locked in for 2." Wilson's private equity firm wired $500,000 to Singer's foundation two days later at Wilson's direction.

Later that month, Singer told Wilson that he had spoken with Stanford's sailing coach, that the coach was willing to "guarantee[] a spot for next year," and that Wilson could "have first dibs" if Singer sent the coach the "[$]500,000 that [Wilson] wired into [Singer's] account to secure the spot for one of [Wilson's] girls." Singer also mentioned that he had "asked [the coach] for a second spot in sailing and [the coach] said he

c[ould]n't do that because he ha[d] to actually recruit some real sailors so that Stanford d[id]n't . . . catch on." Wilson laughed and said "[r]ight." Wilson asked for more time for his daughters to decide where they wanted to go, and inquired whether there was "any news on the Harvard side." Singer promised to get back to him.[5]

On November 29, Singer informed Wilson that they had "got a spot if . . . [Wilson's daughter] want[ed] to go to Harvard." He claimed that "the senior women's administrator at Harvard [was] going to give [Wilson's daughter] a spot," in exchange for which Wilson would "have to give . . . her . . . $500,000" through Singer's foundation to "fund the senior women's administrator." He added: "I've already paid [the Stanford sailing coach] the [$]500 [thousand] and now we'll give the senior women's administrator [$]500 [thousand] . . . . [Y]our total's going to be [$]1.5 [million]. [$]250 [thousand] will come in the spring for Stanford and [$]250 [thousand] for Harvard in the spring and we'll . . . be done." Wilson responded: "OK, great." When Wilson

---

[5]      Singer and Wilson covered similar ground in a call a few days later, in early November. Singer told Wilson: "[W]e got the Stanford spot. They wanna know if you want it because I have to pay the coach, um, right away." He reiterated that the coach "d[id]n't care if it's a sailor or not." He added that he was "working" on Harvard, but it would "not happen for several months." Wilson again asked for more time to figure out which schools his daughters wanted to attend. He also agreed with Singer that his daughters "weren't going to get into either" Harvard or Stanford without the side door.

asked what sport his daughter would need to play, Singer answered: "[The Harvard administrator will] figure it out. . . . [I]t doesn't matter the sport at this point.  She will . . . just get her in through . . . athletics in one of the sports but it won't matter." Singer also noted that Wilson's other daughter "w[ould]n't have to sail but we're going to put her through sailing" at Stanford. Wilson responded that "sailing is actually a logical thing.  She could be even the mascot, whatever, but she knows sailing."  He confirmed that the plan "sound[ed] fantastic" and was "great news." Wilson's private equity firm wired a further $500,000 to Singer's foundation on December 11, again at Wilson's direction.

As with Abdelaziz, the government acknowledged at trial that Singer "told the parents," including Wilson, "that the money would go to the athletic program at the schools."  On appeal, it does not argue that the jury could have found that Wilson intended any of his payments to go to insiders' personal accounts, rather than to university-owned accounts related to the insiders' positions.

**B.**

On March 5, 2019, a federal grand jury in the District of Massachusetts returned a single-count indictment charging David Sidoo -- a parent who had worked with Singer -- with conspiracy to commit mail and wire fraud in connection with Sidoo's allegedly having paid Singer to have one of his associates take various

standardized tests for Sidoo's children.  The indictment further alleged that Singer had also paid his associate "to secretly take the SAT and ACT for the children of other co-conspirators known and unknown to the Grand Jury."

Six days later, the government filed a separate criminal complaint alleging that roughly thirty other parents, including Abdelaziz and Wilson, had conspired with Singer and others to commit mail fraud and honest services mail fraud.  The complaint alleged varying forms of misconduct by the named parents; some were alleged to have schemed to help their children cheat on standardized tests, while others -- like Abdelaziz and Wilson -- were alleged to have conspired to bribe university employees to secure their children's admission.

Many of the parents named in the complaint elected to enter plea agreements with the government.  For example, Gordon Caplan, Agustin Huneeus, and Bruce Isackson -- three parents whose interactions with Singer would later figure in the evidence at Abdelaziz's and Wilson's trial -- agreed to waive the requirement of indictment by a grand jury and plead guilty to various offenses pursuant to criminal informations.

On April 9, 2019, a grand jury returned a superseding indictment in the government's case against Sidoo that named as codefendants eighteen parents from the complaint who had not entered plea agreements, including Abdelaziz and Wilson.  The

government superseded this indictment twice more in the following months.   During this period, four more parents pleaded guilty without written plea agreements.

The operative fourth superseding indictment in this case, returned on January 14, 2020, charged fifteen parents with an overlapping set of offenses.   All fifteen defendants were charged with conspiracy to commit mail and wire fraud and honest services mail and wire fraud.   See 18 U.S.C. §§ 1341, 1343, 1346, 1349.   This count alleged an overarching conspiracy among the defendants and others, including Singer, to defraud two standardized test firms and five universities -- Georgetown; Harvard; Stanford; the University of California, Los Angeles ("UCLA"); and USC -- in two alternative ways: first, by depriving them of property in the form of "standardized tests and test scores" (for the standardized test companies) and "admission to the [u]niversities" (for the universities), and second, by depriving them of the honest services of their employees through the use of "bribes and kickbacks."   Notably, although the indictment contained detailed allegations of fraud related to standardized testing with respect to several other defendants, it did not allege that either Abdelaziz or Wilson had engaged in or even been aware of that form of misconduct.

Eleven parents, including both Abdelaziz and Wilson, were also charged with conspiracy to commit federal programs

bribery.  See id. §§ 371, 666(a)(2).  The indictment alleged that the parents had "conspired . . . to bribe agents of USC to secure their children's admission to that university."

Wilson -- but not Abdelaziz -- was charged with three substantive counts of wire fraud and honest services wire fraud, see id. §§ 1343, 1346, and two substantive counts of federal programs bribery, see id. § 666(a)(2), all in connection with his efforts to secure admission to Harvard and Stanford for his daughters.  In addition, Wilson alone was charged with filing a false tax return, see 26 U.S.C. § 7206(1), in connection with his treatment of his payments to secure his son's admission to USC on his 2014 tax return.[6]

The defendants moved to dismiss on a number of grounds. Three of those grounds previewed arguments Abdelaziz and Wilson now make on appeal: First, the defendants moved to dismiss the federal programs bribery and honest services fraud charges, arguing that payments made to the alleged victim of a bribery scheme -- here, the universities -- cannot constitute bribes. Second, they moved to dismiss the mail and wire fraud charges insofar as these charges alleged that the defendants had defrauded the universities of property, arguing that admissions slots do not

_____

[6]     All fifteen defendants were also charged with conspiracy to commit money laundering.  See 18 U.S.C. § 1956(h).  The district court dismissed this charge as to Abdelaziz and Wilson before trial on the government's motion.

constitute property. Third, they moved to dismiss the conspiracy counts, arguing that the indictment alleged a "rimless wheel" conspiracy barred by the Supreme Court's decision in <u>Kotteakos</u> v. <u>United States</u>, 328 U.S. 750 (1946), and to dismiss the entire indictment because it did not allege that the defendants had participated in a single act, transaction, or series of transactions, such that joinder was improper.

The district court denied these motions in a memorandum opinion and order issued June 23, 2020. <u>United States</u> v. <u>Sidoo</u>, 468 F. Supp. 3d 428, 435 (D. Mass. 2020). It reasoned that "[p]ayments made to accounts controlled by university insiders, even if such payments were ultimately received by the universities," could support the § 666 and honest services fraud charges. <u>Id.</u> at 445; <u>see id.</u> at 444-45. It further concluded that admissions slots "are property interests owned by the university cognizable under the mail and wire fraud statutes."[7] <u>Id.</u> at 441; <u>see id.</u> at 440-42. And it determined that the indictment adequately alleged a single overarching conspiracy and that, as a result, joinder was appropriate. <u>See id.</u> at 437-39.

---

[7] The district court later incorporated this conclusion into its instructions to the jury on the mail and wire fraud counts, which stated: "For purposes of the mail and wire fraud statutes, admission[s] slots are the property of the [u]niversities."

Before trial, twelve of the defendants reached plea agreements with the government, and one received a presidential pardon. After unsuccessfully moving to sever, Abdelaziz and Wilson were tried jointly before a jury in fall 2021.

Singer himself did not testify at trial, despite having cooperated with the investigation. The government did, however, introduce a substantial amount of evidence related to other parents' work with Singer without showing that Abdelaziz or Wilson were personally aware of those activities. For example, Bruce Isackson -- one of the parents who worked with Singer who entered a plea agreement with the government -- was the government's first witness, and described his knowing misconduct in his dealings with Singer. He testified, for instance, that he had paid to have his daughter's standardized test scores altered and that he "knew a good portion of th[e] money [he paid Singer to facilitate his children's college admission] was going into [Singer's] pockets and [to] the people who helped him" rather than to the university accounts for which it was purportedly intended. The government also introduced recorded calls between Singer and other parents, but not between Singer and Abdelaziz or Wilson, in which Singer and those other parents discussed obviously wrongful activities, such as schemes to cheat on standardized tests. And the prosecution drew the jury's attention to this evidence during its opening statement and closing argument. For instance, during

closing argument, government counsel stated: "[One] thing that you need to find . . . [is] that the defendants . . . knew that what they were doing [was] wrong.  One way you know that [they did] is because Bruce Isackson told you that he knew it, from the witness stand."

The defendants argued through counsel that they had believed Singer's services to be legitimate and had acted in good faith.

The jury found both Abdelaziz and Wilson guilty on all counts.  Abdelaziz and Wilson moved for judgment of acquittal or a new trial, raising, as most relevant here, arguments similar to those made in the pretrial motions to dismiss.  The district court denied the motions, relying on the reasoning from its decision denying the motions to dismiss.  See United States v. Abdelaziz, 578 F. Supp. 3d 110, 113-14, 116 (D. Mass. 2021).  The court sentenced Abdelaziz and Wilson to twelve and fifteen months' imprisonment, respectively.

These timely appeals followed.

## II. Rejection of the Defendants' Theory that Their Convictions Under 18 U.S.C. § 666 ("Theft or bribery concerning programs receiving Federal funds") Fail as a Matter of Law

We begin with the defendants' argument that the charges under 18 U.S.C. § 666 (as well as the related § 666 conspiracy counts) "fail as a matter of law."  We review these questions of law about the scope of § 666 de novo, see United States v.

Fernandez, 722 F.3d 1, 8 (1st Cir. 2013), and reject the defendants' argument.

The text of § 666 criminalizes "corruptly giv[ing], offer[ing], or agree[ing] to give anything of value to any person, with intent to influence or reward an agent of an organization . . . in connection with any business, transaction, or series of transactions of such organization . . . involving anything of value of $5,000 or more."[8]  18 U.S.C. § 666(a)(2).  The parties agree that the "agent[s]" in this case are the university employees who worked with Singer and that the "organization[s]" are the universities.  The defendants do not make any developed argument that their dealings with Singer and, through him, the university insiders were not "in connection with . . . business, transaction[s], or [a] series of transactions of [the universities] involving anything of value of $5,000 or more."  Nor do the defendants argue that the payments were not "inten[ded] to influence" the insiders in conducting that business or those transactions.

---

[8]    Section 666 applies only if the "organization" in question "receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."  18 U.S.C. § 666(b); see id. § 666(a).  On appeal, the defendants do not dispute that the universities satisfy this condition.

The focus of the defendants' arguments is instead on whether payments intended for university accounts -- which the government does not dispute the defendants' payments were -- can violate § 666. That is, the defendants dispute that the phrase "any person" in § 666 can refer to the "organization" which is the agent's principal. Here, the organization which is the agent's principal is a university. The defendants contend that a payment to a university principal is not covered by § 666's text and does not align with common or historical understandings of the terms "bribe" and "bribery" or the purposes of "bribery" statutes. In particular, the defendants emphasize that the government cannot produce a single case in the history of Anglo-American law in which a payment to an agent's principal was prosecuted as a bribe. Thus, the defendants contend that construing the provision to proscribe such payments would violate several canons of construction requiring that "ambiguous" criminal statutes be construed narrowly.

### A.

We turn to the plain language of § 666. See, e.g., Baker v. Smith & Wesson, Inc., 40 F.4th 43, 48 (1st Cir. 2022) ("We start with the [statutory] text . . . ."); see also Salinas v. United States, 522 U.S. 52, 55-57 (1997) (interpreting § 666 based on its "plain language"). That text refers to a thing of value given "to any person." 18 U.S.C. § 666(a)(2). At oral argument, defense

counsel conceded that the "person" to whom a "[]thing of value" is given could be an organization.[9]  See 1 U.S.C. § 1 (defining "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies" "unless the context indicates otherwise").

Given this concession, we see no textual reason to exclude the organizational principal from the set of entities that qualify as "any person" for purposes of § 666.  The Supreme Court has explained that courts should give effect to § 666's "expansive, unqualified language," including in its use of the word "any."  Salinas, 522 U.S. at 56-57; see also Sabri v. United States, 541 U.S. 600, 605 (2004) (declining to read § 666 to require proof that crime itself had nexus with federal money); Fischer v. United States, 529 U.S. 667, 677 (2000) (reading "benefit" in § 666 to include Medicare funds).  Salinas, for example, reasoned that Congress's use of "any" before "the business or transaction clause . . . undercut[] [a defendant's] attempt to impose [a] narrowing construction" that would limit § 666's application to bribes affecting federal funds.  522 U.S. at 57.  Here, the use of "any" before "person" militates against excluding principals from the set of eligible "person[s]."

---

[9]    Similarly, in their briefing, the defendants stated that bribes could be directed to the agent's "political campaign, or . . . his favorite charity."

Section 666's context and history buttress the
conclusion that "any person" includes the agent's principal. See
Fernandez, 722 F.3d at 20-27 (considering "statutory context,"
including history of § 666 and related statutes, in interpreting
§ 666).  Congress amended § 666 into essentially its current form
in 1986.  See id. at 21-22.  In so doing, Congress used the same
operative language as used in 18 U.S.C. § 215, the bank bribery
statute, which it had also revised earlier that year.  Indeed, the
committee report on the § 666 amendment explained that "[t]he
provision parallels the bank bribery provision (18 U.S.C.
[§] 215)."  H.R. Rep. No. 99-797, at 30 n.9 (1986).  Compare 18
U.S.C. § 215(a)(1), with id. § 666(a)(2).

Before 1986, § 215 prohibited "directly or indirectly,
giv[ing], offer[ing], or promis[ing] anything of value to any
[agent] of any financial institution . . . or offer[ing] or
promis[ing] any such [agent] to give anything of value to any
person or entity, other than such financial institution, for or in
connection with any transaction or business of such financial
institution."  Act of Oct. 12, 1984, Pub. L. No. 98-473, § 1107(a),
98 Stat. 1837, 2146 (emphasis added).  The 1986 amendment to § 215
revised the statute to bar "corruptly giv[ing], offer[ing], or
promis[ing] anything of value to any person, with intent to
influence or reward an officer, director, employee, agent, or
attorney of a financial institution in connection with any business

- 31 -

or transaction of such institution." Act of Aug. 4, 1986, Pub. L.
No. 99-370, § 2, 100 Stat. 779, 779.

This history of § 215 and thus of § 666 shows that
Congress knew how to exclude the agent's principal from the set of
"person[s]" who could receive the thing of value, and it chose not
to do so in revising § 215 or importing its language into § 666.
Cf. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 357 (2013)
(comparing the text of antidiscrimination statutes and concluding
that "when Congress elected to address [a concept] as part of a
detailed statutory scheme, it did so in clear textual terms").
Section 666 itself includes no express carveout -- the statute
refers only to "any person." That context further undercuts the
defendants' effort to introduce a carveout for payments to the
agent's principal.[10]

The defendants' textual counterarguments are
unpersuasive. They first respond that the "person" and the
"organization" must be distinct in order "to give each term
independent meaning." Even when "person" and "organization"
happen to refer to the same entity, however, each term does
independent work in defining the offense: the former describes the
recipient of the thing of value, while the latter identifies the

---

[10]    The language of § 666 tracks the language of the revised
version of § 215. The defendants make no argument that,
notwithstanding the revisions to the text of § 215, "any person"
in that provision excludes the financial institution.

agent's principal.  See 18 U.S.C. § 666(a)(2); cf. Littlefield v.
Mashpee Wampanoag Indian Tribe, 951 F.3d 30, 38 (1st Cir. 2020)
(finding no surplusage where a statute contained multiple
definitions of potential benefit recipients even though a
particular person might qualify under multiple definitions).
Further, the defendants do not explain -- and we can think of no
explanation -- why their reasoning would not require concluding
that the "agent" must also be distinct from the "person" who
receives the thing of value.  Yet even the defendants acknowledge
that a payment to the agent himself "in exchange for an exercise
of his powers" is a paradigmatic form of bribery covered by § 666.

The defendants turn for support to the Supreme Court's
decision in Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158
(2001), but that case does not help their cause.  Cedric Kushner
involved a suit under the Racketeer Influenced and Corrupt
Organizations ("RICO") Act, which "makes it 'unlawful for any
person employed by or associated with any enterprise'" to engage
in certain conduct.  Id. at 160 (quoting 18 U.S.C. § 1962(c)).
The Court concluded that the RICO Act's text contemplates "two
distinct entities: (1) a 'person'; and (2) an 'enterprise' that is
not simply the same 'person' referred to by a different name,"
because, by the statute's terms, the "person" must be "employed by
or associated with" the "enterprise," and "[i]n ordinary English

- 33 -

one speaks of employing, being employed by, or associating with others, not oneself." Id. at 161.

The premise of the defendants' argument is that § 666 "follows a similar structure" to that of the RICO statute and so, under Cedric Kushner, the "person" and the "organization" must be distinct. The defendants' premise is wrong: § 666's language does not parallel the RICO statute in the relevant respect. The RICO statute sets out a particular relationship between the "person" and the "enterprise" -- the former must be "employed by or associated with" the latter -- that is incompatible with the "person" and the "enterprise" being synonymous. In contrast, § 666's text does not require such a relationship between the "person" and the "organization." Instead, it refers broadly to "any person" and, separately, to an "organization."

At oral argument, Wilson's counsel also asserted that "the thing of value" required by § 666 cannot "be the type of professional benefit that the government has been relying on." See 18 U.S.C. § 666(a)(2) (requiring, inter alia, "giv[ing], offer[ing], or agree[ing] to give anything of value"). We need not decide whether professional benefits can qualify as "anything of value" for purposes of § 666 because that phrase, as used in the statute, refers not to what the agent personally receives from the arrangement but to what the defendants "g[a]ve[], offer[ed], or agree[d] to give . . . to any person" -- here, the money the

defendants paid or agreed to pay to the universities.  Money is indisputably a thing of value.  See, e.g., Salinas, 522 U.S. at 57.  That is all § 666 requires.

**B.**

The defendants also offer nontextual arguments to support their view that § 666 cannot criminalize payments to the university principals.  They contend first that a payment to a university principal does not fall within ordinary or historical understandings of the terms "bribe" or "bribery" or implicate the purpose of antibribery provisions, and second that a series of statutory construction canons favor their reading: They assert that § 666 is "ambiguous," such that the rule of lenity applies. The government's reading, they argue, alters the balance of state and federal criminal jurisdiction, which should not be done without a clear statement by Congress.  They conclude by arguing there are vagueness concerns which require a narrow reading of § 666.

Given the clear meaning of the language chosen by Congress, arguments about the meaning of "bribe" and "bribery" or the generalized purposes of "bribery" laws are beside the point.[11] As the Supreme Court said in Bostock v. Clayton County, 140 S. Ct.

---

[11]    The section's caption does use the term "bribery," 18 U.S.C. § 666, but "[t]he caption of a statute . . . 'cannot undo or limit that which the [statute's] text makes plain,'" Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 256 (2004) (second alteration in original) (quoting Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co., 331 U.S. 519, 529 (1947)).

1731 (2020), "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest." Id. at 1737. Nor does the fact that the government has not identified any historical bribery prosecution involving a payment to the agent's principal override § 666's clear text. Cf. id. at 1750-53 (rejecting narrow reading of Civil Rights Act of 1964 based on historical applications).

The defendants' arguments based on various canons calling for narrow constructions of ambiguous criminal statutes fail because the text of § 666 is not ambiguous with respect to whether it covers payments to the university principals. See Salinas, 522 U.S. at 66 ("The rule [of lenity] does not apply when a statute is unambiguous or when invoked to engraft an illogical requirement to its text."); id. at 59-60 (holding that the canon of construction requiring a clear statement to alter the federal-state balance of criminal jurisdiction "does not warrant a departure from [§ 666's] terms" where the statute's "text . . . is unambiguous on the point under consideration"); cf. Skilling v. United States, 561 U.S. 358, 412 (2010) (finding no vagueness problem where it was "as plain as a pikestaff that" the conduct at issue would violate a statute (quoting Williams v. United States, 341 U.S. 97, 101 (1951))). The rule of lenity, for example, does not apply because "there is [no] '"grievous ambiguity or uncertainty" in the statute.'" Muscarello v. United States, 524

- 36 -

U.S. 125, 139 (1998) (quoting Staples v. United States, 511 U.S. 600, 619 n.17 (1994)).  The Supreme Court has consistently commanded that § 666 be interpreted in keeping with its "expansive, unqualified language," which "undercuts . . . attempt[s] to impose . . . narrowing construction[s]." Salinas, 522 U.S. at 56-57; see also Sabri, 541 U.S. at 605; Fischer, 529 U.S. at 677.

Further, the defendants' policy argument that our interpretation of § 666 would upset the state-federal balance and "criminalize a large swath of ordinary transactions" suffers from several flaws.  That policy argument would arrogate to the federal judiciary choices which have been made by Congress.  And the argument disregards that there are meaningful restrictions on § 666's scope.

The statutory text of § 666 imposes several restrictions on the type of conduct proscribed by the provision.  First, the reach of § 666 is limited by two dollar thresholds.  Section 666 applies only if the organization at issue "receives, in any one year period, benefits in excess of $10,000 under a Federal program."  18 U.S.C. § 666(b); see id. § 666(a).  And "to fall within the purview of § 666, [a bribe] must be made 'in connection with any business, transaction, or series of transactions of [the covered] organization, government, or agency involving anything of value of $5,000 or more.'"  Fernandez, 722 F.3d at 12 (second

alteration in original) (quoting 18 U.S.C. § 666(a)(2)); see id. at 12-13 (discussing this "transactional element").

Most importantly, § 666 requires that a defendant have acted "corruptly." 18 U.S.C. § 666. This "corruptly" element provides a meaningful limit on the provision's sweep. See, e.g., Cooper Indus., Inc. v. Aviall Servs., Inc., 543 U.S. 157, 167 (2004) (describing "the settled rule" that courts "must, if possible, construe a statute to give every word some operative effect").

The government stresses that the requirement that the defendant act "corruptly" restricts the scope of permissible prosecutions. Its brief does not argue that any payment which violates any university policy could violate § 666. Instead, the government focuses on payments intended to induce university insiders to act contrary to the schools' underlying interests. But the definitions of "corruptly" that appear in the legislative histories of other federal bribery statutes point against the conclusion that the term somehow operates to exclude agents' principals from the set of "person[s]" who can receive the thing of value under § 666. See H.R. Rep. No. 87-748, at 18 (1961) ("The word 'corruptly' [in 18 U.S.C. § 201, the federal officials bribery statute,] . . . means with wrongful or dishonest intent."); H.R. Rep. No. 99-335, at 6 n.24 (1985) ("The term 'corruptly' [in § 215, the bank bribery statute,] means that the act is done 'voluntantly

[sic] and intentionally, and with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful methods or means. The motive to act corruptly is ordinarily a hope or expectation of either financial gain or other benefit to one's self, or some aid or profit or benefit to another.'" (quoting 2 E. Devitt & C. Blackmar, <u>Federal Jury Practice and Instructions</u> § 34.08 (3d ed. 1977))). Nothing in those definitions appears uniquely incompatible with payments made to agents' principals.

Moreover, because the defendants' argument for the reversal of the § 666 counts does not squarely raise the meaning of "corruptly" in this context, we see no basis for reversing their convictions on any contention about the meaning of "corruptly."[12]

We reject the defendants' argument that the charges under § 666 fail as a matter of law because the payments at issue were intended for university accounts.[13]

---

[12] Because, as we will explain, we vacate the § 666 convictions on other grounds, we leave it to the district court to address the import of the meaning of "corruptly," if necessary, on remand after full briefing.

[13] The defendants also argue that they are entitled to a new trial due to alleged error in the jury instructions. Because we vacate the convictions under § 666 on other grounds, as discussed below, we do not address this argument.

We address the defendants' more successful argument that the § 666 convictions must be vacated for trial error in Section IV, set forth below.

### III. Acceptance of the Defendants' Defenses as to Convictions Under 18 U.S.C. §§ 1341, 1343, and 1346 ("Honest Services Fraud" and "Property Fraud")

The defendants argue that the charges under the mail and wire fraud statutes, see 18 U.S.C. §§ 1341, 1343, 1346, fail as a matter of law. These mail and wire fraud charges were based on two distinct legal theories: honest services fraud and property fraud.[14] The defendants argue that the conduct charged in the indictment does not involve the core honest services doctrine identified in Skilling. They also argue that the statutory requirement that "property" be the subject of the alleged scheme or artifice to defraud cannot be met here.

While the question is close, in the end we agree with the defendants. Considering each theory de novo, see United States v. Correia, 55 F.4th 12, 41 (1st Cir. 2022); Fernandez, 722 F.3d

---

[14] The defendants do not dispute that if either theory is legally viable and the jury instructions were proper, the evidence was sufficient. See United States v. Celestin, 612 F.3d 14, 24 (1st Cir. 2010) ("[W]hen the government has advanced several alternate theories of guilt and the trial court has submitted the case to the jury on that basis, an ensuing conviction may stand as long as the evidence suffices to support any one of the submitted theories." (quoting United States v. Gobbi, 471 F.3d 302, 309 (1st Cir. 2006))). They argue separately that, even if the government's theory and the jury instructions were legally sound, they are nonetheless entitled to a new trial because of trial error; we address those contentions in Section IV below.

at 8, we conclude that the honest services fraud theory fails as a matter of law and that the government's arguments with respect to the property theory are not adequate to support the jury instructions given at trial. We vacate the defendants' mail and wire fraud convictions, including the related conspiracy convictions (Counts One, Six, Eight, and Nine of the operative indictment).

### A.

The government's honest services fraud theory essentially charges the defendants with a non-traditionally recognized form of bribery. Understanding this theory and the defendants' objections to it requires some background on the history of the mail and wire fraud statutes. In particular, it is important to understand (1) the law in this area before the Supreme Court's decision in McNally v. United States, 483 U.S. 350 (1987); (2) the congressional reaction to McNally; and (3) the Court's 2010 decision in Skilling interpreting the current scope of the mail and wire fraud statutes after those developments and in light of constitutional concerns. See generally Skilling, 561 U.S. at 399-402 (recounting this history).

### 1.

Sections 1341 and 1343 both prohibit "any scheme or artifice to defraud, or for obtaining money or property by means

of false or fraudulent pretenses, representations, or promises."[15]
18 U.S.C. §§ 1341, 1343 (emphasis added).  As the Supreme Court
said in <u>Skilling</u>: "Emphasizing Congress' disjunctive phrasing, the
Courts of Appeals, [beginning in the 1940s], interpreted the term
'scheme or artifice to defraud' to include deprivations not only
of money or property, but also of intangible rights."  561 U.S. at
400.  This "honest services doctrine" proscribed forms of fraud in
which,

> [w]hile the offender profited, the betrayed
> party suffered no deprivation of money or
> property; instead, a third party, who had not
> been deceived, provided the enrichment.  For
> example, if a city mayor (the offender)
> accepted a bribe from a third party in
> exchange for awarding that party a city
> contract, yet the contract terms were the same
> as any that could have been negotiated at
> arm's length, the city (the betrayed party)
> would suffer no tangible loss.  Even if the
> scheme occasioned a money or property <u>gain</u> for
> the betrayed party, courts reasoned,
> actionable harm lay in the denial of that
> party's right to the offender's "honest
> services."

<u>Id.</u> (citation omitted).  While honest services cases "[m]ost
often . . . involved bribery of public officials," courts also
applied the theory to the private sector.  <u>Id.</u> at 401 (quoting

---

[15]     The mail fraud statute applies to schemes involving use
of the mails, 18 U.S.C. § 1341, while the wire fraud statute
applies to those involving use of the wires, <u>id.</u> § 1343.  Apart
from these elements, the Supreme Court has construed the statutes
coextensively, <u>see, e.g.,</u> <u>Pasquantino</u> v. <u>United States</u>, 544 U.S.
349, 355 n.2 (2005), and so we discuss them interchangeably.

United States v. Bohonus, 628 F.2d 1167, 1171 (9th Cir. 1980)).
The defendants do not assert that the statutes cannot reach purely
private actors. "[B]y 1982, all Courts of Appeals had embraced
the honest-services theory of fraud." Id. (citation omitted).

But the Supreme Court's 1987 decision in McNally
"stopped [the theory] in its tracks." Id. "McNally involved a
state officer who, in selecting Kentucky's insurance agent,
arranged to procure a share of the agent's commissions via
kickbacks paid to companies the official partially controlled."
Id. at 401-02 (citing McNally, 483 U.S. at 360). The prosecution
did not allege that the scheme had cost the state money or resulted
in worse insurance; rather, it argued that the scheme had deprived
Kentucky of its right to honest services. Id. at 402 (citing
McNally, 483 U.S. at 353, 360). The Court rejected this argument
and the honest services doctrine, which, it reasoned, "le[ft] [the
mail and wire fraud statutes'] outer boundaries ambiguous and
involve[d] the Federal Government in setting standards of
disclosure and good government for local and state officials."
Id. (quoting McNally, 483 U.S. at 360). The Court "read the
statute 'as limited in scope to the protection of property
rights,'" and stated that "[i]f Congress desire[d] to go
further, . . . it must speak more clearly." Id. (quoting McNally,
483 U.S. at 360).

Congress responded the following year by enacting 18 U.S.C. § 1346, which provides: "For the purposes of [the mail and wire fraud statutes], the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." See Skilling, 561 U.S. at 402.

In 2010, the Supreme Court considered a vagueness challenge to § 1346 in Skilling. See id. The defendant, a private sector actor, was "charged . . . with conspiring to defraud [a company's] shareholders by misrepresenting the company's fiscal health, thereby artificially inflating its stock price" and allowing the defendant to profit through his salary, bonuses, and stock sales. Id. at 413. He contended that § 1346 did not provide fair notice of the conduct it prohibits and that its "standardless sweep" would enable arbitrary prosecutions. Id. at 403 (quoting defendant's brief); see also, e.g., Kolender v. Lawson, 461 U.S. 352, 357 (1983) ("As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.").

Recognizing the constitutional due process concerns, including fair notice and vagueness, raised by the statute, the Court chose to narrow the statute, rather than invalidate it, to "preserve what Congress certainly intended the statute to cover,"

that is, what the Court called the "core" of the pre-McNally honest services doctrine. Skilling, 561 U.S. at 404. This core "involved fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." Id.; see also id. at 407 ("Although some applications of the pre-McNally honest-services doctrine occasioned disagreement among the Courts of Appeals, these cases do not cloud the doctrine's solid core: The 'vast majority' of the honest-services cases involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." (quoting United States v. Runnels, 833 F.2d 1183, 1187 (6th Cir. 1987))). "To preserve the statute without transgressing constitutional limitations, [the Court] . . . h[e]ld that § 1346 criminalizes only the bribe-and-kickback core of the pre-McNally case law." Id. at 408-09. The defendants here argue that the conduct charged in the indictment does not involve the core honest services doctrine identified in Skilling.

The Court explained that when the narrowed § 1346 is "[c]onfined to these paramount applications," it "presents no vagueness problem." Id. at 404. Turning to the issue of notice, the Court said that, "'whatever the school of thought concerning the scope and meaning of' § 1346, it has always been 'as plain as a pikestaff that' bribes and kickbacks constitute honest-services fraud." Id. at 412 (quoting Williams, 341 U.S. at 101). And the

narrowing construction limited the risk of arbitrary prosecutions by the fact that § 1346's "prohibition on bribes and kickbacks draws content not only from the pre-McNally case law, but also from federal statutes proscribing -- and defining -- similar crimes," id. (citing, inter alia, 18 U.S.C. § 666(a)(2)), such that a "criminal defendant who participated in a bribery or kickback scheme . . . cannot tenably complain about prosecution under § 1346 on vagueness grounds," id. at 413.

Because there was no allegation -- or plausible way of reading the facts to suggest -- that Skilling himself had participated in a bribery or kickback scheme, the Court concluded that he had not committed honest services fraud. Id.

**2.**

The defendants contend that their payments to the universities, the parties whose interests were purportedly betrayed by their agents, cannot constitute bribes under Skilling's interpretation of § 1346. There is no charge of kickbacks in the indictment.

In response, the government relies on Skilling's statement that its narrow construction of § 1346's "prohibition on bribes . . . draws content not only from the pre-McNally case law, but also from federal statutes proscribing -- and defining -- similar crimes. See, e.g., 18 U.S.C. §§ 201(b), 666(a)(2); 41 U.S.C. § 52(2) . . . ." 561 U.S. at 412. The government relies

on this language to argue that § 1346 effectively incorporates a version of § 666, such that -- borrowing the language of § 666 -- § 1346 covers "[w]hoever . . . corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of [a principal]." 18 U.S.C. § 666.

Although the question is a close one, we conclude that the government's reliance on this single statement in Skilling is misplaced. The government's reading is, for several reasons, impossible to reconcile with Skilling's language and its core holding that § 1346 covers only "the bribe-and-kickback core of the pre-McNally case law." 561 U.S. at 409. The government has not identified any pre-McNally case involving a purported bribe paid to the victim of an alleged bribery scheme. Further, the statutes in force while courts developed the pre-McNally case law defining "bribery" do not support the conclusion that payments to the purportedly betrayed party constitute "bribes" as that term is traditionally understood or used in Skilling. Nor is there any support for that view in other legal sources defining "bribery." Rather than interpreting the language the government cites to override these considerations, we understand it instead to constrain the honest services doctrine's sweep. And this understanding that Skilling's reference to other statutes does not mean that § 1346 is coextensive with these other statutes draws additional support from the facts that those statutes define

offenses broader than traditional bribery and that those statutes may vary from each other in their coverage.

The government's reading ignores _Skilling_'s core "hold[ing] that § 1346 criminalizes only the bribe-and-kickback core of the pre-_McNally_ case law." _Id._; _accord_ _id._ at 408 (confining the scope of § 1346 "to the core pre-_McNally_ applications"); _see_ _id._ at 404-09 (looking to "the doctrine developed in pre-_McNally_ cases in an endeavor to ascertain the meaning of the phrase 'the intangible right of honest services'" (quoting 18 U.S.C. § 1346)). The government has not cited any pre-_McNally_ honest services case involving a purported bribe paid to an agent's purportedly betrayed principal, and does not dispute that no pre-_McNally_ case involved such a payment. _Skilling_ embodies a narrower understanding of the meaning of "bribery" for purposes of honest services fraud that cuts against concluding that the conduct involved here, which does not fall "[i]n the main . . . [of] the pre-_McNally_ cases," is a "bribe" in the sense meant by _Skilling_.[16] _Id._ at 404.

The government emphasizes _Skilling_'s characterization of pre-_McNally_ case law as recognizing the potential for honest

---

[16] The defendants argue that the lack of pre-_McNally_ precedent "is dispositive" and requires acquittal. We need not reach so far; even assuming that the lack of pre-_McNally_ precedent is only a relevant but not a dispositive factor in our analysis, we reach the same result.

services fraud "[e]ven if [a] scheme occasioned a money or property gain for the betrayed party." Id. at 400 (citing United States v. Dixon, 536 F.2d 1388, 1400 (2d Cir. 1976)).  But the government does not contend that the Court had in mind a case like this one, where the alleged bribe was paid directly to the purportedly betrayed party.  In fact, the cases to which the Court referred appear to have involved traditional bribery fact patterns that happened incidentally to benefit the agent's principal financially.  See id. (citing, inter alia, Shushan v. United States, 117 F.2d 110, 115, 119 (5th Cir. 1941)).  Dixon, the case the Court cited for the proposition that schemes that financially benefitted the principal could still be actionable under pre-McNally doctrine, did not involve bribery at all; it simply stated in passing that honest services fraud could cover schemes that "enriched" the principal.  536 F.2d at 1400 (citing United States v. Isaacs, 493 F.2d 1124 (7th Cir. 1974) (per curiam)).  In support of that proposition, Dixon, in turn, cited a Seventh Circuit decision in which racing interests bribed certain Illinois officials to allow additional racing events, which incidentally increased tax revenues.  See Isaacs, 493 F.2d at 1135, 1139, 1149-51.  That is a classic bribery fact pattern, distinct from the direct payments to the university principals involved here.

     Nor do statutes in effect during the pre-McNally period show that a payment to the purportedly betrayed party would have

been considered a "bribe." As discussed above, until its amendment in 1986, shortly before the Court decided McNally, the bank bribery statute, 18 U.S.C. § 215, expressly excluded payments to an agent's principal from its coverage. See Act of Oct. 12, 1984, § 1107(a), 98 Stat. at 2146 (prohibiting "directly or indirectly, giv[ing], offer[ing], or promis[ing] anything of value to any [agent] of any financial institution . . . or offer[ing] or promis[ing] any such [agent] to give anything of value to any person or entity, other than such financial institution, for or in connection with any transaction or business of such financial institution" (emphasis added)). This limitation in scope undercuts any argument that it was clear before McNally that "bribery" would encompass a payment to the purportedly betrayed party.

Other legal sources defining "bribery" either weigh against the government's position or are at most ambiguous. Black's Law Dictionary, for example, defines "bribery" as "[t]he corrupt payment, receipt, or solicitation of a private favor for official action." Bribery, Black's Law Dictionary (11th ed. 2019) (emphasis added). While the government contends that the university insiders stood to benefit professionally from the defendants' payments, describing this type of indirect benefit from a payment to a university principal -- the alleged victim of the scheme -- as a "private favor" is at best a stretch. Cf. United States v. Thompson, 484 F.3d 877, 884 (7th Cir. 2007)

(observing, in a pre-_Skilling_ prosecution for honest services
fraud under § 1346, that "[t]he United States has not cited, and
we have not found, any appellate decision holding that an increase
in official salary, or a psychic benefit such as basking in a
superior's approbation (and thinking one's job more secure), is
the sort of 'private gain' that makes an act criminal" under
§ 1346, and rejecting the prosecution's theory (quoting United
States v. Bloom, 149 F.3d 649, 655 (7th Cir. 1998))); see also,
e.g., H. James, When Is a Bribe a Bribe?  Teaching a Workable
Definition of Bribery, 6 Teaching Bus. Ethics 199, 209-16 (2002)
("Any payment made to a principal, for any purpose, is not by
definition a bribe.").

The government's attempt to circumvent this lack of
authority by relying on _Skilling_'s citation to other
anticorruption statutes fails.  The government's reading of § 1346
to incorporate a version of § 666 eliminates the important
limitations on liability included in § 666, including the
requirement that affected programs receive federal funds and the
threshold dollar value involved, which we described above.[17]  See
18 U.S.C. § 666(a)-(b).  More importantly, the Supreme Court in

---

[17]     The jury instructions that the government requested, and
those that were ultimately given at trial, for example, did not
require the jury to find that the alleged bribes satisfied either
of those requirements in order to convict under an honest services
theory.

Skilling emphasized these specific limitations in describing the statutes.  See 561 U.S. at 413 n.45.

Critically, the statement on which the government relies appears in the Court's discussion of why its construction of § 1346 will prevent arbitrary prosecutions.  See id. at 412-13.  In that context, the citation is best read as constraining honest services prosecutions by referring prosecutors to statutes that collectively offer general guidance as to whether particular conduct may be actionable, rather than as expanding the concept of "bribery" to incorporate even the outermost limits of the cited statutes' scopes.  Indeed, the government's argument would stretch criminal liability beyond those statutes' context-specific limitations.  Skilling does not hold, as the government argues, that any conduct that might violate those other statutes also violates § 1346.

Our reading properly accounts for the fact that Congress crafted § 666 and other federal anticorruption statutes to target particular classes of misconduct, and thus did not necessarily confine those statutes to criminalizing the classic crime of "bribery" in the sense described in Skilling and at the core of the pre-McNally case law.  The Supreme Court has repeatedly observed that § 666 uses "expansive, unqualified language" in service of Congress's unique interest in protecting federal funds from misuse.  Salinas, 522 U.S. at 56; see id. at 56-59; see also

*Sabri*, 541 U.S. at 606-07. That language sweeps beyond the type of "bribery" reflected in pre-*McNally* law and the other legal sources discussed above. We do not think that while narrowly construing § 1346 to cover "the bribe-and-kickback core of the pre-*McNally* case law," *Skilling*, 561 U.S. at 409, the Court meant simultaneously to extend § 666's broad language to apply outside the particular context for which Congress designed it.

Indeed, the government's reading would threaten to render § 666 (and other specialized anticorruption statutes) superfluous, since § 1346 would cover the same ground while also extending to other contexts. Cf. id. at 413 n.45 (addressing potential "superfluous[ness]" between § 1346 and more specialized anticorruption statutes).[18] Our reading recognizes the statutes' distinct roles, with § 666 covering a broader set of types of conduct but applying only in a narrower context. Section 666's breadth is inseparable from its narrow focus.

The government ignores the fact that *Skilling* itself recognized that other federal anticorruption statutes may vary in scope. See id. at 412-13 (describing these statutes as "defining . . . similar [but not necessarily identical] crimes").

---

[18]    *Skilling* explained that construing § 1346 to overlap to some degree with specialized anticorruption statutes does not render § 1346 superfluous because it applies to a broader range of contexts. See 561 U.S. at 413 n.45. It is a different question whether reading § 1346 to cover everything that § 666 covers, as well as other conduct, would render § 666 superfluous.

Given the number of potentially relevant statutes, the variation resulting from the government's reading would be problematic. For example, this variation would have existed in this case under the pre-1986 version of the bank bribery statute, § 215, which explicitly excluded payments to an agent's principal. Compare Act of Oct. 12, 1984, § 1107(a), 98 Stat. at 2146 (pre-1986 § 215), with, e.g., 18 U.S.C. § 666(a)(2), and Act of Oct. 23, 1962, Pub. L. No. 87-849, 76 Stat. 1119, 1119 (enacting 18 U.S.C. § 201, the federal officials bribery statute, which potentially applies to payments to "any public official" or "any other person").

Construing § 1346 to cover conduct not covered by the core pre-McNally understanding of "bribes" would not provide sufficient notice for "ordinary people [to] understand what conduct is prohibited." Skilling, 561 U.S. at 402 (quoting Kolender, 461 U.S. at 357). An ordinary person would not be on notice that a payment to a purportedly betrayed party was bribery within the core of pre-McNally law, raising the same concern which motivated the Supreme Court in Skilling to construe honest services fraud as it did. Our holding that § 666 may cover the defendants' conduct does not cure this concern: § 1346 does not have § 666's clear text, and, as we have explained, Skilling did not hold that liability under any other federal anticorruption statute suffices to render an act criminal under § 1346.

- 54 -

Various canons and other interpretive methodologies employed by the Supreme Court reinforce our conclusion that, after Skilling, § 1346 does not cover the defendants' conduct as honest services fraud. Unlike in our interpretation of § 666, these interpretive tools do apply here because the applicability of § 1346 to the charged conduct has little historical antecedent and would introduce ambiguity. And the Supreme Court "ha[s] instructed that 'ambiguity concerning the ambit of criminal statutes[, including the mail and wire fraud statutes,] should be resolved in favor of lenity.'" Cleveland v. United States, 531 U.S. 12, 25 (2000) (quoting Rewis v. United States, 401 U.S. 808, 812 (1971)) (applying rule of lenity in non-honest services mail fraud prosecution). Similarly, in the honest services context, the Court has repeatedly "decline[d] to 'construe [federal criminal] statute[s] in a manner that leaves [their] outer boundaries ambiguous and involves the Federal Government in setting standards' of 'good government for local and state officials.'" McDonnell v. United States, 136 S. Ct. 2355, 2373 (2016) (quoting McNally, 483 U.S. at 360); see, e.g., Skilling, 561 U.S. at 408-12; McNally, 483 U.S. at 360. Indeed, embracing the government's reading of § 1346 would go beyond "'setting standards' of 'good [state and local] government,'" McDonnell, 136 S. Ct. at 2373 (quoting McNally, 483 U.S. at 360), and stretch honest services bribery to potentially criminalize such parental actions as, for

example, donations to preschools by parents who hope to gain admission for their children. Further, the contrast between the Court's repeated instruction to apply the honest services doctrine narrowly and its broad, textualist application of § 666 supplies another reason not to read Skilling as incorporating § 666 into § 1346.

We should not be misunderstood. We do not say the defendants' conduct is at all desirable. That is far different from the issue we face of whether that conduct is in violation of § 1346's honest services language as interpreted by the Supreme Court in Skilling. As Skilling explained, "[i]f Congress desires to go further, . . . it must speak more clearly than it has." 561 U.S. at 411 (quoting McNally, 483 U.S. at 360). The government's honest services theory cannot support the defendants' mail and wire fraud convictions.

**B.**

Independently of honest services fraud, the government argues that we should affirm the defendants' mail and wire fraud convictions on the distinct property fraud theory. The mail and wire fraud statutes prohibit use of the mails or wires, respectively, to effect "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343. A prosecution for property fraud under these statutes requires the

- 56 -

government to prove "that the 'object of the fraud . . . [was] [money or] property in the victim's hands.'" Pasquantino v. United States, 544 U.S. 349, 355 (2005) (second alteration and omission in original) (internal quotation marks omitted) (quoting Cleveland, 531 U.S. at 26).

The asserted "property" that the government argues was obtained here is "admissions slots." Indeed, the district court instructed the jury that, "[f]or purposes of the mail and wire fraud statutes, admission[s] slots are the property of the [u]niversities."

The defendants contend, however, that admissions slots can never qualify as property for purposes of the mail and wire fraud statutes, and thus that their convictions under these statutes must be reversed for that reason alone. As a fallback argument, they also contend that even if some admissions slots could be property for purposes of those statutes, we must vacate the convictions because, given the limitations of the government's arguments and evidence in this case, the district court's instruction that "admissions slots" are property was error.

The government responds to these two different defense arguments with one categorical assertion. It contends that "admissions slots" at the universities supply the necessary

property because admissions slots by their nature constitute property.[19]

We reject the government's argument that admissions slots at any university always qualify as property for purposes of the mail and wire fraud statutes. The government's categorical argument fails, for example, to recognize even the well-known variations in types of admissions slots offered at the university level; for instance, early admission, rolling admission, conditional admission, waiting-list admission, and deferred admission. Nor does the government's categorical approach account for the fact that admissions occur at all levels of education, from nursery school through postgraduate studies, and involve millions of students and parents. We reject, too, the defendants' equally categorical contention to the contrary and so reject their argument that their property-based convictions under these statutes must be reversed on the ground that the government did not prove that property was involved in the commission of those offenses because "admissions slots" cannot be property.

But we do agree with the defendants' more limited fallback argument that the jury instruction erred in stating, based on the arguments and record in this case, that "admission[s] slots

---

[19]     The government does not develop any argument on appeal that the universities were defrauded of money or property, such as instructional resources, associated with the defendants' children's enrollment.

are the property of the [u]niversities."  We see no basis for concluding that such a categorical statement is invariably true of any admissions slot, and the government has not identified any basis in the record that would indicate that the instruction could be upheld on the ground that there was evidence that the admissions slots in question in the charged offenses in this case qualified as property as a matter of law.

We emphasize the narrowness of our holding: We do not hold that admissions slots cannot ever be property.  Nor do we hold that the jury instruction given by the district court could never be appropriate.  The resolution of these questions will require much more detail, both legal and factual, on the nature of the purported property interest at issue.  It may well be that there must be resolution of disputed facts by a jury and resolution of the ultimate legal question by the court.  A court may well be able to validly conclude on the evidence in a particular case that admissions slots constitute property.  Such increased detail would better position a district court to consider, for example, whether dictionaries, case law, treatises, or other legal sources establish that similar interests are treated as property, see, e.g., id. at 356 (citing such sources); Carpenter v. United States, 484 U.S. 19, 26 (1987) (similar), and whether expert educational and/or economic evidence is warranted.  But here, the government does not identify from the record of this case adequate details

about the admissions slots at issue, or admissions slots generally, that would support the instruction given.  Thus, we see no basis for concluding that the district court validly instructed the jury that, "[f]or purposes of the mail and wire fraud statutes, admission[s] slots are the property of the [u]niversities."

### 1.

The fundamental problem with the government's argument as to why the instruction was not in error is that the government fails to describe the purported property interest in anything other than highly general, abstract terms, leaving us no firm basis on which to assess whether the admissions slots at issue here constitute property.  The government's brief describes such slots as economically valuable and exclusively within the power of a university to issue, revoke, or prohibit transfer of, and on that basis alone it asks us to conclude that they are property.

Under controlling Supreme Court precedent, we do not accept the government's argument that admissions slots always qualify as property for purposes of the mail and wire fraud statutes merely because they may bear some hallmarks of traditionally recognized forms of property.  A series of Supreme Court decisions have counseled that courts should resort to traditional notions of property in construing the mail and wire fraud statutes.  See Pasquantino, 544 U.S. at 356 (citing treatises and case law in conducting property analysis); Cleveland, 531 U.S.

at 24 ("We reject the Government's theories of property rights [in part] because they stray from traditional concepts of property."); Carpenter, 484 U.S. at 26; cf. Shaw v. United States, 137 S. Ct. 462, 466-67 (2016) (citing treatises and case law in analyzing whether property requirement was satisfied under bank fraud statute, 18 U.S.C. § 1344). Carpenter, for example, held that "[c]onfidential business information" constitutes property under §§ 1341 and 1343 because it "has long been recognized as property"; the Court cited in support of its conclusion an array of cases, a statute, and a treatise. 484 U.S. at 26. Based on these decisions, the parties agree that "[i]ntangible rights can qualify [as property] . . . if they have historically been treated as property or bear its traditional hallmarks."

The Supreme Court's decision in Pasquantino explained that we must determine whether the alleged property interest constitutes "'property' as that term ordinarily is employed." 544 U.S. at 356; see id. ("When interpreting a statute, we must give words their ordinary or natural meaning." (quoting Leocal v. Ashcroft, 543 U.S. 1, 9 (2004) (internal quotation marks omitted))). The Court's mail and wire fraud decisions offer several potentially relevant guideposts for that inquiry, including whether the purported property at issue falls within a dictionary definition of that term, whether it has been recognized as property in case law or other legal sources, and whether it

exhibits traditional attributes of property.  See, e.g., id. at 355-57.  We consider these factors in turn, none of which support the government's categorical position, in defending the instruction, that admissions slots always constitute property.

Pasquantino itself relied in large part on Black's Law Dictionary's definition of "property" for guidance on the term's ordinary meaning.  See id. at 356 (citing Property, Black's Law Dictionary (4th ed. 1951)).  Here, however, the government does not make any argument based on the dictionary definition of "property."

The government does offer two cases recognizing interests purportedly analogous to admissions slots as property, but both are easily distinguishable.  The government cites the Supreme Court's decision in Bridge v. Phoenix Bond & Indemnity Co., 553 U.S. 639 (2008), which allowed a group of plaintiffs who regularly sought to purchase tax liens at county auctions to pursue a RICO claim against a rival bidder based on allegations that the rival had committed mail fraud by fraudulently attesting that it had complied with a county rule regulating the number of bids that an entity could make.  See id. at 642-44, 647-48, 661.  In fact, Bridge's analysis did not address the money or property requirement -- the Court accepted the case to answer a different question about the interaction between the RICO and mail fraud statutes.  Id. at 641-42.  Nonetheless, the government argues that

it held "that [the] false representation[s] to secure . . . extra bid[s] . . . , thereby depriving other bidders of the opportunity to obtain the liens, w[ere] . . . 'act[s] . . . indictable as mail fraud.'" (Quoting id. at 648.)  To the extent the government seeks to use this case, it misses the fact that the property the fraudulent bidder in Bridge sought to obtain, and of which the plaintiffs claimed to be defrauded, was not the bids, but the "valuable liens" available in the auctions.  Id. at 648; cf. Pasquantino, 544 U.S. at 356 (recognizing a "right to be paid money" as property under mail and wire fraud statutes).

The government's other authority, United States v. Frost, 125 F.3d 346 (6th Cir. 1997), held that a university "ha[d] a property right in [unissued] degree[s]."  Id. at 367.  The government contends that admissions slots are analogous to unissued degrees.  We agree with the defendants, however, that unissued degrees are meaningfully different from admissions slots, at least insofar as the government has described such slots.  Frost itself observed that a degree represents the culmination of the transaction between the university and the student, in which the university, "in return for tuition money and scholarly effort, . . . agrees to provide an education and a degree."  Id. So far as the government's arguments show, an admissions slot, in contrast, involves an offer to participate in that transaction -- one that a potential student may or may not accept.  Even assuming

- 63 -

_Frost_'s correctness, it does not establish that admissions slots are a historically recognized form of property interest.

The government falls back to an argument that admissions slots are necessarily property because they "bear the primary traditional hallmarks of property."[20]  It contends that an interest qualifies as property if it exhibits (1) "exclusivity," see _Carpenter_, 484 U.S. at 26-27 (observing that "exclusivity is an important aspect of confidential business information and most private property"), and (2) "economic value," see _Pasquantino_, 544 U.S. at 355-57 (holding that "[v]aluable entitlement[]" to be paid taxes is property); _Cleveland_, 531 U.S. at 22 (observing that unissued licenses had economic value to Louisiana, but concluding that this value alone did not make the licenses property in the State's hands).  It then asserts that admissions slots always have these features.  We conclude that this purported test is too broad, as it would construe "property" to reach abstract interests that the Court, as well as several circuits, have concluded fall outside the statutes' scope.

---

[20]    It may be that underlying the government's argument is an assumption that a contractual interest necessarily creates a property interest.    But this circuit has never so held, and _Carpenter_ expressly rejected that argument as to honest services fraud.    See 484 U.S. at 25 (citing _McNally_, 483 U.S. at 355, 359 n.8, 360) (explaining that a "contractual right to [an employee's] honest and faithful service" is not a cognizable property interest in this context).

Portions of the government's brief could be read to argue that economic value alone suffices to turn an intangible interest into a property right under the mail and wire fraud statutes. In particular, the brief asserts that Pasquantino defined property as simply "something of value." While the Court did use that phrase, Pasquantino, 544 U.S. at 355 (quoting McNally, 483 U.S. at 358), it did not state that economic value alone brought the purported property at issue within the scope of §§ 1341 and 1343; instead, it looked to a legal dictionary, treatises, and case law to determine whether the particular "[v]aluable entitlement[]" at issue constituted property,[21] id. at 356; see id. at 355-57.

But even to the extent the government argues that admissions slots are always property because they are, by their nature, both exclusive and economically valuable, its proposed test sweeps too broadly. McNally illustrates the problem. The purported right to honest services that McNally declined to recognize as property would satisfy both of the test's prongs: the right belonged exclusively to the entity to which honest services were owed, cf. Skilling, 561 U.S. at 401 (characterizing pre-McNally honest services doctrine as proscribing "breache[s of an employee's] allegiance to his employer" (quoting United States v.

---

[21] A test looking only at whether the purported property interest has economic value would also sweep too broadly for all the same reasons as a test requiring both economic value and exclusivity, discussed below.

McNeive, 536 F.2d 1245, 1249 (8th Cir. 1976))), and plainly held economic value for that entity. The proposed test's failure to reach the right result on McNally's facts demonstrates its overinclusiveness.[22]

The proposed test is also incompatible with multiple circuit decisions holding that various intangible interests that are both exclusive and valuable fall outside the scope of §§ 1341 and 1343. For example, the government's theory conflicts with the Sixth Circuit's decision in United States v. Sadler, 750 F.3d 585 (6th Cir. 2014). There, the government charged one of the defendants, Nancy Sadler, with wire fraud in connection with the purchase of controlled substances. See id. at 588-89. The prosecution did not dispute that Sadler paid full price for the pills at issue; instead, to satisfy the property requirement, it argued that Sadler had lied to the sellers about the patients to

---

[22] The defendants argue that the government's test also conflicts with Cleveland, which held that unissued gaming licenses possessed by the State of Louisiana did not qualify as property for mail fraud purposes despite the State's exclusive control over the licenses, 531 U.S. at 23-24, and the fact that they could potentially generate revenue (in the form of application processing fees) even while in the State's possession, id. at 22. But the Court reached that result because, in administering the licensing scheme, the State acted as a regulator, rather than as a property holder. See id. at 20-25. That reasoning would not apply to entities, like the universities, without regulatory authority. Were Cleveland the only obstacle, then, the government could have proposed the same test but restricted its application to private parties. There is no such easy fix for the test's incompatibility with McNally.

whom she would distribute the pills, "depriv[ing] the [sellers] of . . . a right to accurate information before selling the pills." Id. at 590-91.  The court rejected this argument, reasoning that "the ethereal right to accurate information" did not qualify as a property right, in part because it did not "amount[] to an interest that 'has long been recognized as property.'"  Id. at 591 (quoting Cleveland, 531 U.S. at 23); accord United States v. Yates, 16 F.4th 256, 265 (9th Cir. 2021).  The government's proposed test would call for the opposite result, since a party's purported right to accurate information before engaging in a transaction would presumably both have economic value for and belong exclusively to that party.  See also United States v. Bruchhausen, 977 F.2d 464, 467-68 (9th Cir. 1992) (declining to recognize as property a seller's right to control "the destination of [its] products after sale," even though such a right would, by hypothesis, be exclusive to the seller and potentially economically valuable).

The government's highly general argument would criminalize a wide swath of conduct.  Under the government's broad understanding of property applied to admissions slots as a class, embellishments in a kindergarten application could constitute property fraud proscribed by federal law.  Cleveland explained that it "reject[ed] the Government's theories of property rights not simply because they stray[ed] from traditional concepts of property," but also "because [they] invite[d the Court] to approve

a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress." 531 U.S. at 24; cf. Yates, 16 F.4th at 265 (rejecting property theory that "would transform all deception into fraud").

> Further, as the Court stated in Cleveland:
>
>> [T]o the extent that the word "property" is ambiguous as placed in [the mail and wire fraud statutes], we have instructed that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." This interpretive guide is especially appropriate in construing [the mail and wire fraud statutes] because . . . mail [and wire] fraud [are] predicate offense[s] under RICO . . . . In deciding what is "property" [in this context], we think "it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite."

531 U.S. at 25 (citations omitted) (first quoting Rewis, 401 U.S. at 812; and then quoting United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 222 (1952)); see 18 U.S.C. § 1961(1)(B) (defining mail and wire fraud as predicate offenses for purposes of RICO statute).

## 2.

At the same time, we must also reject the defendants' argument that no admissions slot at any university can qualify as property for purposes of the mail and wire fraud statutes and thus that their property-based convictions under those statutes must be reversed on this basis. The defendants characterize admissions

slots as mere "offer[s] to engage in a transaction: The college is offering to provide educational services to a student in exchange for tuition payments." However, the defendants do not address the complexities that would arise were there to be evidence that a particular admissions slot is more than a mere offer to transact. The same complexities which undercut the government's argument undercut this argument by the defense. Cf. Tamboura v. Singer, No. 19-cv-03411, 2020 WL 2793371, at *1-5 (N.D. Cal. May 29, 2020) (dismissing for lack of standing two class action lawsuits to recover application fees from universities at which Singer arranged side doors alleging that the plaintiffs "did not receive the 'fair' and 'objective' admissions process that they were promised" in a "bargain-for-exchange," only because the plaintiffs did not allege that they "applied for, were being considered for, or were denied . . . athletic spot[s]," which were the "focus[]" of "Singer's scheme").

We thus cannot accept the defendants' contention that admissions slots can never be property, such that we could reverse their property-based convictions on that ground alone.

### 3.

There remains the defendants' argument that their property-based convictions must be vacated because, even if admissions slots could constitute property in some circumstances, the jury instruction here was incorrect. The defendants advance

two distinct arguments in this regard, one of which we cannot
accept but the other of which we do.

The defendants take aim at the instruction in part
because they contend that the question whether admissions slots
constitute property is -- as a matter of law -- a question of fact
to be decided by the jury.  But neither party has provided any
briefing on whether the question whether an interest constitutes
property is, regardless of the facts of the case, a question of
law to be decided by the judge.  Indeed, the parties' arguments
are simply not clear as to what issues would present questions of
fact to be determined by a jury, much less what are questions of
law to be determined by a court.  Neither party has cited any
Supreme Court case law resolving this issue, and, as best we can
tell, the Supreme Court has not resolved the matter.  Perhaps it
will in upcoming cases.  But we do not decide important issues of
law based on vague, broad, and unsupported assertions by the
parties in a case.  We need not resolve the issue here, and nothing
in this opinion should be taken to suggest that the ultimate
determination of whether admissions slots are property is an issue
for the jury.

That said, we do find persuasive the defendants'
separate contention that the jury instruction was erroneous here
because it instructed that "admission[s] slots are the property of
the [u]niversities."  There is some ambiguity as to whether, in

- 70 -

making this instruction, the district court accepted the government's contention that any admissions slot at any university necessarily qualifies as property.  If so, then we have already explained why that conclusion is incorrect.

If, however, the instruction was based on a more specific determination regarding the admissions slots at the universities at issue here, we fail to see the basis in the record for such a conclusion.  We do not understand admissions processes to be universally the same across universities, and the meaning of "admissions slot" may differ across institutions, yet the government's argument treats them interchangeably and in sweeping terms.  Indeed, the government has cited no evidence and offered no argument specific to the admissions slots at the schools at which these two defendants sought admission for their children. Nor does the government offer any guidance -- or record citations -- for understanding the contours of these specific universities' admissions policies and processes or the rights, benefits, or obligations, if any, associated with obtaining an admissions slot at these universities.  It develops no argument, for example, that either a student's application or a university's offer of admission creates a contractual relationship between the applicant and the school.  Nor does it argue that every student awarded an admissions slot will eventually enroll -- in fact, it acknowledges, as it clearly must, that some will not.

With respect to what a proper jury instruction would say, or even whether one would be proper in this case given a more developed record on remand, we are not in a position to address the question, given the nature of the arguments that have been made to us. We do emphasize, though, that the argument that admissions slots are categorically property because they are exclusive and have economic value is insufficient. And, to the extent there are more case-specific arguments about the specific admissions slots involved in the charged offenses in a given case, we emphasize only that any argument that those admissions slots constitute property would have to show that, in light of what the record revealed about the nature of those particular slots, they would satisfy the standards that we have described above that the Supreme Court requires us to apply to determine whether an intangible right is a species of property.

We recognize that our analysis leaves considerable uncertainty as to how district courts should apply the mail and wire fraud statutes' property requirement in cases involving admission to educational institutions. There are sound reasons to be prudent and cautious about criminalizing conduct, even unethical conduct, in this complicated area affecting so many students and parents.

**4.**

We hold that, based on the arguments made by the government, the district court's jury instruction was error. We therefore vacate the defendants' convictions on the mail and wire fraud charges, including the related conspiracy charges.

## IV. Acceptance of the Defendants' Argument that There Was a Prejudicial Variance with Respect to the Conspiracy Charges

We turn to the defendants' core contention that under Supreme Court and First Circuit precedent the conspiracy charges are of an impermissible "rimless wheel" type forbidden by law, depriving them of fair trials.[23]  Count One of the indictment alleged an overarching nationwide conspiracy among Singer, his staff, university insiders, and parents to facilitate the parents' children's admission to Georgetown, Harvard, Stanford, UCLA, and USC by means of mail and wire fraud, in violation of §§ 1341, 1343, and 1346.  Count Two alleged an overarching nationwide conspiracy among a subset of the same individuals to secure children's admission to USC by means of federal programs bribery, in violation of § 666.  The defendants contend that the evidence is at most sufficient to show, however, that they agreed to join only a narrower conspiracy, which was to gain admission for each's own respective child or children (rather than to gain admission also

---

[23]     The defendants are supported in this view by an amicus brief from eleven former U.S. Attorneys.

for other parents' children).  As a result, they contend that there was a variance as to both counts, because that narrower conspiracy is not the broader one charged.[24]

The defendants' characterization of the charged conspiracy as a "rimless wheel" derives from the Supreme Court's decision in Kotteakos v. United States, 328 U.S. 750 (1946). There, the government alleged that a single hub figure had assisted otherwise unrelated clients or groups of clients in fraudulently obtaining separate loans.  See id. at 752-55.  The government indicted the hub figure and his clients as part of one overarching conspiracy.  Id. at 752-53.  The Court concluded that the evidence did not show that several client-defendants had agreed to participate in a single conspiracy with the other clients.[25]  See id. at 754-55.  Instead, "the pattern was that of separate spokes

---

[24]   For convenience, we will refer to the two charged conspiracies as "the charged conspiracy" because the defendants contend that there was a variance because each charged conspiracy was broader than what they contend the evidence at most suffices to show -- their respective agreements to each join a conspiracy to gain admission for their own child or children.

[25]   The government conceded in Kotteakos that the evidence did not support a finding of a single conspiracy.  See 328 U.S. at 754-56, 768-69.  The Court endorsed that conclusion in both Kotteakos and Blumenthal v. United States, 332 U.S. 539 (1947), and its reasoning in doing so informs our analysis.  See Kotteakos, 328 U.S. at 754-56, 768-69; Blumenthal, 332 U.S. at 558; cf., e.g., Brito v. Garland, 22 F.4th 240, 248 (1st Cir. 2021) (noting that this court is "bound to follow 'considered dicta' of the Supreme Court" (quoting United Nurses & Allied Pros. v. NLRB, 975 F.3d 34, 40 (1st Cir. 2020))).

meeting at a common center . . . without the rim of the wheel to enclose the spokes," which "made out a case, not of a single conspiracy, but of several." Id. at 755 (internal quotation marks omitted); see id. at 754-55. Further, the Court held that, while the failure to prove the single conspiracy charged might amount to harmless error in some cases, the defendants had been prejudiced by a defect in the jury instructions. See id. at 767-72. More generally, the Court warned of the danger of prejudice to defendants in cases where the government charges a broad conspiracy but proves only a collection of narrower ones, as the overbroad charge increases the risk that a jury will be exposed to and weigh against a defendant evidence that is actually relevant only to a separate conspiracy in which the defendant was not a participant. See id. at 766-67.

Abdelaziz and Wilson contend that the evidence fits Kotteakos's "rimless wheel" model, with Singer and his associates as the hub and parents as the spokes. They assert that, whatever agreements might have existed among Singer and other parents, the evidence would not allow a reasonable jury to find that each of Abdelaziz and Wilson agreed to conspire with those parents. And they argue that this variance between the charges in the indictment and the proof at trial prejudiced them because the overarching conspiracy charges allowed the government to introduce evidence related to other parents' activities that undermined Abdelaziz's

and Wilson's defenses and led the jury to convict them for those other parents' conduct and not for their own actions. In particular, the defendants contend that the overarching conspiracy charge enabled the prosecution to present to the jury inflammatory evidence, in the form of both witness testimony and recorded calls, of other parents' obviously culpable conduct in which Abdelaziz and Wilson played no part.

This court determines whether convictions for conspiracy must be vacated on the ground that the scope of the conspiracy proved at trial varied from the conspiracy that was charged in the indictment by answering three questions:

> (1) Is the evidence sufficient to permit a jury to find the [conspiracy] that the indictment charges? (2) If not, is it sufficient to permit a jury, under a proper set of instructions, to convict the defendant of a related, similar conspiracy [to violate the same statute]? (3) If so, does the variance affect the defendant's substantial rights or does the difference between the charged conspiracy and the conspiracy proved amount to "harmless error?"

United States v. Glenn, 828 F.2d 855, 858 (1st Cir. 1987) (Breyer, J.); see also United States v. Wihbey, 75 F.3d 761, 773 (1st Cir. 1996) ("[S]o long as the statutory violation remains the same, the jury can convict even if the facts are somewhat different than [those] charged -- so long as the difference does not cause unfair prejudice." (quoting United States v. Twitty, 72 F.3d 228, 231 (1st Cir. 1995))).

The answer to the second question is not in dispute: the government contends -- and the defendants do not make any developed argument to the contrary -- that the evidence was sufficient to permit a jury to convict each defendant of conspiring with Singer, his staff, and university insiders to secure his own child's or children's admission. That leaves only the first and third questions at issue.

We analyze first whether there was sufficient evidence to convict the defendants of the broader charged conspiracy, and second whether, if not, the resulting variance from the indictment prejudiced the defendants. We conclude that the evidence was insufficient to prove that these defendants agreed to join the broader charged conspiracy and that the defendants were prejudiced by the variance, and so we vacate the defendants' conspiracy convictions.[26]  We also vacate Wilson's substantive § 666 convictions.

----

[26]     We have already vacated the defendants' mail and wire fraud conspiracy convictions in Section III.  This variance analysis provides an alternative ground for that holding, in addition to providing the sole ground for vacating the convictions for conspiracy to commit federal programs bribery under § 666. Because we have already vacated the mail and wire fraud conspiracy convictions, we do not address Abdelaziz's argument that his conviction for conspiracy to commit mail and wire fraud must be vacated because of alleged error in the jury instructions' description of the scope of the charged conspiracy.

**A.**

To assess whether the claimed variance occurred, we must determine whether the evidence sufficed for a rational juror to find beyond a reasonable doubt that the defendants agreed to join the broader charged conspiracy. Glenn, 828 F.2d at 858. As with all sufficiency challenges, our review is de novo, and we must review the evidence in the light most favorable to the verdict. United States v. Dellosantos, 649 F.3d 109, 115, 117 (1st Cir. 2011). The evidence cannot suffice to support the verdict through the kind of inference-stacking that "would require impermissible speculation on the jury's part." Glenn, 828 F.2d at 860. We begin this inquiry by providing the relevant legal background, which reveals the relevance to the inquiry of three specific factors. We then turn to the record in this case regarding each of those factors.

**1.**

The three factors that we have found to be helpful in guiding the inquiry into whether the evidence suffices to show that a defendant agreed to join a conspiracy as broad as the one charged rather than only a smaller, narrower one are "(1) the existence of a common goal [among the alleged participants in the charged conspiracy], (2) interdependence among [the alleged] participants [in the charged conspiracy], and (3) overlap among the [alleged] participants [in the charged conspiracy].'"

Dellosantos, 649 F.3d at 117 (quoting United States v.
Mangual-Santiago, 562 F.3d 411, 421 (1st Cir. 2009)). The analysis
is "pragmatic," United States v. Fenton, 367 F.3d 14, 19 (1st Cir.
2004), and no single factor "is necessarily determinative," United
States v. Díaz-Arias, 717 F.3d 1, 21 (1st Cir. 2013); see, e.g.,
Dellosantos, 649 F.3d at 120-21 (considering factors
collectively).

It is particularly important in this inquiry to look not
only to how these three factors bear on individuals alleged to
have performed a similar role in the charged conspiracy to the
role allegedly played by the specific defendants before us in these
appeals, but also to whether these specific defendants agreed to
join that broader conspiracy rather than at most only a narrower
one. As then-Judge Breyer described:

> [W]e recognize that conspiracy law, like most
> criminal law, focuses upon the activities of
> an individual defendant. It is therefore
> dangerous to think of a conspiracy as a kind
> of "club" that one joins or a "business" in
> which one works. Those metaphors falsely
> suggest that the "member" or "employee"
> automatically becomes legally responsible for
> the entire enterprise. Instead, "the gist of
> the [conspiracy] offense remains the
> agreement, and it is therefore essential to
> determine what kind of agreement or
> understanding existed as to each defendant."

Glenn, 828 F.2d at 857 (second alteration in original) (citation
omitted) (quoting United States v. Borelli, 336 F.2d 376, 384 (2d
Cir. 1964)). And while an agreement to conspire may be express or

tacit and can be proven using direct or circumstantial evidence, see id. at 857-58, "[the government] can prove only the agreement or understanding that the evidence . . . implies beyond a reasonable doubt," id. at 858.

In Glenn, the court held that the evidence did not suffice to show that a defendant, Glenn, had joined the single conspiracy charged by the government to import marijuana from Thailand and hashish from Pakistan. See id. at 858-60. Instead, the court held that the evidence sufficed to show only that Glenn had joined a narrower conspiracy to import hashish, although that conspiracy was with some of those alleged to be part of the broader conspiracy described in the indictment. See id.

Glenn emphasized that the inquiry into whether a defendant has agreed to join the conspiracy charged focuses on the scope of the activity in which the defendant agreed to join. See id. at 857. It explained that the record might have sufficed to show that several other individuals in what it referred to as "the core group" had conspired to import both marijuana and hashish. Id. at 859. But Glenn further explained that while the evidence showed that Glenn had dealings with that core group with respect to the distribution of hashish and was aware that the core group was involved in a broader conspiracy than one just to distribute hashish, that did not mean that the evidence sufficed to show that he had agreed to join that marijuana-hashish conspiracy. See id.

The court explained that, while the evidence showed that Glenn was aware of efforts to import marijuana by those in the core group, there was no evidence that he understood himself to have a stake in the success of those efforts or saw them as interdependent with his efforts to import hashish.  See id.  As a result, the court determined that the government had not proven Glenn's participation in the broader multidrug conspiracy -- just his participation in a narrower, hashish-only scheme.  Id.

**2.**

With this legal framework in mind, we begin by considering what the evidence shows with respect to whether the defendants shared a common goal with the other alleged participants in the broader charged conspiracy.  We do so because if the evidence does show as much, then it would point in favor of finding that the defendants had agreed to join in the charged conspiracy.

We acknowledge that, as the government emphasizes, the common goal factor "is given wide breadth."  Dellosantos, 649 F.3d at 117 (internal quotation marks omitted) (quoting Mangual-Santiago, 562 F.3d at 421).  In the context of drug distribution rings, this court has repeatedly recognized that "selling cocaine for profit" can qualify as a common goal.  Mangual-Santiago, 562 F.3d at 422; accord, e.g., United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999).

But this is not a drug distribution case, and the Supreme Court has distinguished between fact patterns in which members of a broader conspiracy seek to "achiev[e] a single unlawful end" and those in which the alleged coconspirators each pursue "an end in itself, separate from all others, although all [a]re alike in having similar illegal objects." Blumenthal v. United States, 332 U.S. 539, 558 (1947). In the latter class of cases, there is no common goal shared by the alleged participants in the single broader charged conspiracy, even though each alleged participant may have a "similar illegal object[]" as the other participants. Id.

Several decisions from this circuit have also found that alleged coconspirators lacked a common goal where they pursued similar but distinct ends or acted based on different motives from those common to the charged conspiracy. See United States v. Monserrate-Valentín, 729 F.3d 31, 44 (1st Cir. 2013) (finding no common goal between alleged coconspirators who aimed to commit one robbery and others who sought to commit a series of robberies, and noting that the former group was motivated by a desire to seek revenge against the victim while the latter's objective was "purely pecuniary"); United States v. Franco-Santiago, 681 F.3d 1, 9-10 (1st Cir. 2012) (contrasting goal of committing one robbery with goal of committing a series of robberies), abrogated on other grounds by Musacchio v. United States, 577 U.S. 237 (2016); cf.

- 82 -

_Glenn_, 828 F.2d at 859-60 (distinguishing between agreement to import marijuana, agreement to import hashish, and agreement to import both). Other circuits have held the same. _See, e.g.,_ _United States_ v. _Swafford_, 512 F.3d 833, 842 (6th Cir. 2008) (finding no "common goal" where alleged coconspirators engaged in similar conduct but were unaware of and indifferent to one another's activities); _United States_ v. _Rosnow_, 977 F.2d 399, 406 (8th Cir. 1992) (finding no common purpose where defendants "engaged in similar acts for similar reasons . . . in order to benefit themselves individually[ or] to gain revenge on their individual perceived enemies, and not to benefit the group as a whole"); _United States_ v. _Harrison_, 942 F.2d 751, 757 (10th Cir. 1991) (distinguishing between an overarching conspiracy with a "_common_" goal and multiple conspiracies with "_identical_" -- but not common -- goals).

We ask then whether the government's evidence as to each defendant was sufficient to show that that defendant falls into the former class of cases. The government offers two kinds of arguments to show that the cases at hand fall into the former class -- the first of which concerns what the evidence shows about the nature of the alleged scheme and the second of which concerns what the evidence shows as to more specific conduct by each defendant.

**a.**

The government's contention that the nature of the alleged scheme here itself provides a basis for concluding that these defendants shared a goal in common with the other alleged participants faces an immediate difficulty: the alleged scheme has the hallmarks of a hub-and-spoke conspiracy. On the government's own account, the evidence shows that a hub figure or figures (Singer and others working directly with him to assist parents in gaining admission for their children) had dealings with many separate spokes (the individual parents who obtained services from Singer and his group). We consider whether the hub-and-spoke nature of the scheme charged would, in and of itself, support a reasonable inference that any "spoke" shared a common goal with the other "spokes," and reject the government's argument.

Blumenthal is a case of a hub-and-spoke conspiracy in which the evidence was deemed sufficient to show that the spokes shared a common goal due to the nature of the scheme. There, several individuals were charged with conspiring to sell whiskey at rates above a government price ceiling. See 332 U.S. at 541. The Court held that the evidence was sufficient to show that the defendants, each of whom was charged with purchasing whiskey from a single supplier to distribute and then selling it to others, had a common goal -- "to sell . . . whiskey unlawfully [at an above-market rate]" -- with the other defendants, which included not

- 84 -

only the supplier but other distributors.  Id. at 559.  That was
so because the other potential explanations for those defendants'
conduct in purchasing the whiskey at an above-market price from
the conspiracy's hub were so economically irrational as to be
"scarcely conceivable."  Id. at 550.  And the Court concluded that
the fact that they shared that goal with the other alleged
conspirators supported a finding that they had tacitly agreed to
join the single, charged conspiracy.  See id. at 550, 559.

Blumenthal explicitly contrasted the scenario involved
in that case with the contrary outcome in the scenario at issue in
Kotteakos, where a hub figure had helped otherwise unconnected
clients or groups of clients fraudulently obtain loans.  See id.
at 558; Kotteakos, 328 U.S. at 753-55.  The Court explained that
although each client (or group of clients) in Kotteakos pursued a
"similar illegal object[]," none "was interested in whether any
loan except his own went through," and that this lack of common
purpose cut against treating the clients as participants in a
single overarching conspiracy.  Blumenthal, 332 U.S. at 558.
Rather, the evidence "made out a case, not of a single conspiracy,
but of several."  Kotteakos, 328 U.S. at 755; see id. at 754-55.

The defendants here do not dispute that the evidence
suffices to show that all parents alleged to have conspired with
Singer and his core group had similar unlawful goals in one sense:
getting their own children into particular universities through

- 85 -

illicit means. And the evidence does suffice to show that Singer and others in his core group shared a goal of facilitating admissions into universities for the children of parents who sought the group's services, as the business model of the alleged scheme depended on their ability to secure those side doors.

The relevant question, though, is whether the nature of the alleged scheme is such that it would be reasonable to infer that any parents who sought the assistance of the core group shared a goal of getting children other than their own into any university just because they sought such assistance for their own children. We do not see how the nature of the alleged scheme would support such an inference.

The defendants were purchasing a service from the core group in the way that any consumer of a service would purchase it from a service provider. We do not commonly infer, however, that a buyer shares a common goal with a seller just because the two transact with one another. See United States v. Bedini, 861 F.3d 10, 15 (1st Cir. 2017) (looking for "more than a mere buyer-seller relationship" (quoting United States v. Ortiz-Islas, 829 F.3d 19, 25 (1st Cir. 2016) (Souter, J.))); Ortiz-Islas, 829 F.3d at 25 (finding "more than a mere buyer-seller relationship" due to evidence that "seller" fronted wholesale quantities of cocaine to "buyer," showing "act of trust that assumed an ongoing enterprise with a standing objective"); cf. Kotteakos, 328 U.S. at 753

(explaining that hub figure's relationship to each alleged coconspirator was that of a "broker . . . charging a five per cent commission for his services").

Moreover, this is not a case like Blumenthal, in which there is some straightforward reason to draw an inference that the defendants had a goal beyond benefiting themselves. Here, unlike in Blumenthal, the two defendants had a clear self-interest in dealing with the hub figures: obtaining their own children's admission in a discrete buyer-seller transaction. Thus, there is a quite "conceivable" explanation for their willingness to seek Singer's assistance that by no means entails their having a broader goal of ensuring that other parents could obtain similar assistance from Singer for their children and thus a common goal with other spokes. Cf. Blumenthal, 332 U.S. at 550 (describing alternative explanation for defendants' conduct other than participation in a broader conspiracy as "scarcely conceivable").

Indeed, the nature of the defendants' status as buyers in this scheme much more easily leads to the opposite inference: that the defendants were indifferent or even adverse to whether other parents' children were admitted to the schools to which they sought admission, and had no interest in what happened to parents seeking admission at other universities. It is commonplace that universities' admissions processes are competitive and often highly competitive. The defendants argue that, far from proving

pursuit of a common goal, the evidence showed that "Singer's clients were at times led to believe they were competitors." They cite as an example an email exchange involving Singer, Wilson, and Wilson's wife in which Singer stated that USC's water polo coach was "giving [him] 1 boys [sic] slot" and that he had "5 + wanting in that are boys [--] 2 polo[,] 3 others."

Of course, as the government points out, this court and others have explained that competition among alleged coconspirators does not itself preclude a finding of an overarching conspiracy where there is other evidence supporting a finding of an overarching conspiracy notwithstanding that competition. See, e.g., United States v. Rivera Calderón, 578 F.3d 78, 92 & n.2 (1st Cir. 2009) (concluding that "even if there was some competition [among coconspirators in a drug ring], that alone d[id] not detract from the various ways the appellants conspired together," particularly because the evidence did not show "serious competition," such as undercutting one another's sales). However, that does not make competition irrelevant; indeed, competition cuts against the reasonableness of inferring that the defendants shared a common goal with all the alleged coconspirators here. See United States v. Townsend, 924 F.2d 1385, 1397 (7th Cir. 1991) ("The evidence does not suggest that [a defendant conspired with other individuals]; rather, it shows that he was competing with them.").

We do not say that, on different evidence, it would be impossible for any parent who sought out services from Singer and the core group to have adopted the common goal of advancing the success of children seeking admission though side doors. Some parents may have had an interest in the broader success of the venture. Here, the government cites to testimony from Bruce Isackson, an alleged unindicted coconspirator parent who pleaded guilty and cooperated with the government as its lead evidence,[27] that he thought it was "good" that lots of parents worked with Singer because "[m]ost of these people have very complicated [tax] returns," which "would [make it] pretty hard [for the IRS] to figure things out."

As Glenn instructs, however, we must keep our attention focused on whether each individual defendant agreed to join the broader conspiracy that was charged. There is no evidence that either defendant before us on appeal ever spoke with or even was aware of Isackson's dealing with the core group, let alone that they shared his view that the participation of other parents was "good" for the success of the core group's venture.[28] Isackson's

---

[27]  Isackson was named alongside Abdelaziz and Wilson in the government's original criminal complaint. He entered a plea agreement with the government pursuant to a criminal information, waiving the right to indictment, and so was not indicted with the defendants.

[28]  Isackson testified that he had never met or spoken with Abdelaziz and that he had met Wilson at school or charitable events

testimony about his own understanding of how the breadth of participation by other parents mattered does not support a reasonable inference that any parent who worked with Singer was similarly interested in ensuring that other parents were participating, too.

The government also points to evidence that "a stock part of Singer's pitch" included describing the benefits of broad participation, and urges us to conclude that it would be reasonable to infer that each defendant heard that pitch.  While the pitch may help clarify the nature of the scheme, the evidence that the government cites at most shows that Singer told at least some parents, including Wilson, that his operation worked with a large number of parents and schools.  That is the usual assertion of any successful venture.  The idea that a larger venture is more likely to succeed than a smaller one is not necessarily true.

Moreover, while the evidence suffices to show that Singer and his core group had a financial interest in whether children of parents other than the defendants obtained admission, no parent had any similar financial stake in how successful other children were in getting admitted through the services of the core group.  Glenn and Kotteakos do not permit us to conclude that the defendants' mere awareness that Singer and the core group had other

---

but had never had any "substantive conversation[s]" with him.

parents enrolled suffices to permit a rational juror to infer that the defendants shared the goal of advancing the success of that broader conspiracy. Glenn, 828 F.2d at 859; Kotteakos, 328 U.S. at 755.

### b.

The government also points to evidence that is more defendant specific to show that the common goal factor favors its position. For example, the government points to evidence that the Wilson family referred other parents to Singer, and that Abdelaziz responded "I love it" when told that Singer would be using his daughter's profile as a model when creating profiles for children of other parents seeking admission to USC. The government thus contends that even if the nature of the scheme -- even as fleshed out through the Isackson testimony and the evidence of Singer's pitch -- does not in and of itself suffice to support the reasonable inference that the defendants had the common goal of advancing the success of the broader venture, this defendant-specific evidence does when considered in the context of the evidence as a whole.

In pressing this point, the government asks us to accept that the common goal of the charged conspiracy was merely to advance the conspiracy's success. By defining a common goal at that high level of generality, the government's argument threatens to drain the common goal factor of any independent significance in

the inquiry into whether the evidence suffices to show that the scope of the conspiracy that the defendants joined is the same as the one charged. Nor does the government identify any prior precedent of ours that treats as the common goal of the conspiracy charged merely advancing the conspiracy's success. Even in Blumenthal, the "common end" was described not merely as ensuring the conspiracy's success, but more specifically as "to sell the whiskey unlawfully" and "to aid in disposing of the whiskey." 332 U.S. at 559.

The defendant-specific evidence that the government puts forward to show that these defendants shared a common goal is more relevant to the factor that we discuss in the next section -- interdependence. Interdependence, after all, "concerns whether 'the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme.'" Dellosantos, 649 F.3d at 117 (quoting Mangual-Santiago, 562 F.3d at 422).

Indeed, in connection with the interdependence factor, the government does point to the same evidence about the specific conduct of the defendants in allegedly aiding other parents in obtaining admission for their children through Singer's venture. We discuss this body of evidence -- and the weakness of it -- in the next section. The same weaknesses which lead us to conclude, as we next explain, that this evidence does not supportably show

based on the interdependence factor that the defendants tacitly agreed to join the broader charged conspiracy also leads us to conclude that it fails to do so based on the common goal factor.

### 3.

We turn to the other factor in dispute: interdependence. Glenn is instructive once again. As then-Judge Breyer explained in the context of an alleged drug-distribution conspiracy:

> [K]nown interdependence . . . makes it reasonable to speak of a tacit understanding between the distributor and others upon whose unlawful acts the distributor knows his own success likely depends. When such interdependence is missing, when the distributor is indifferent to the purposes of others in the enterprise -- say, other distributors -- the tacit understanding does not exist.

Glenn, 828 F.2d at 857-58 (citation omitted). Thus, as we have explained, "[e]ach individual must think the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key." Dellosantos, 649 F.3d at 117 (quoting Mangual-Santiago, 562 F.3d at 422).

The indictment here alleged that the defendants agreed to conspire not only with Singer and the core group but also with the purported coconspirator parents. See Glenn, 828 F.2d at 857 (observing that conspiracy requires agreement among coconspirators). It is therefore insufficient for the government

to show only that each of the defendants conspired individually with Singer and the core group to secure admission for their own children to prove the broad overarching conspiracy charged. The government must show that each of these two defendants agreed to conspire with the other parents charged as coconspirators in the larger conspiracy. See Kotteakos, 328 U.S. at 755 (recognizing that no single conspiracy existed where the evidence showed only "separate spokes meeting at a common center . . . without the rim of the wheel to enclose the[m]"). For, as other circuits have explained, where the government has charged a hub-and-spoke conspiracy like that alleged here, interdependence must exist between the spokes, and not simply between the hub and each spoke, for the interdependence factor to support a finding of a single conspiracy. See, e.g., United States v. Chandler, 388 F.3d 796, 811 (11th Cir. 2004) (evaluating whether there was "interdependence of the spokes"); United States v. Mathis, 216 F.3d 18, 24 (D.C. Cir. 2000) (rejecting an argument that the government must "show interdependence only among the hub . . . , not among the spoke[s]" because the "spoke[s] . . . in a hub conspiracy must not only have a connection to the hub . . . but must also have interdependence among each other in order to form a rim and constitute a single conspiracy"). Without interdependence between the defendants and other parents, the "tacit understanding" necessary for these defendants to have

agreed to conspire with the other parents does not exist.  Glenn,
828 F.2d at 858; see id. at 857-58.

     We look at whether the evidence of the conduct of each
of these two defendants shows interdependence with the other
parents in the broader charged conspiracy.  See, e.g., Dellosantos,
649 F.3d at 119-20 (assessing interdependence of two branches of
alleged drug conspiracy, one of which distributed cocaine and one
of which distributed both cocaine and marijuana).

**a.**

     Here, too, the government argues, relying on drug
distribution cases, that the jury could infer from "the nature of
the scheme" that the defendants must have understood themselves to
be interdependent with other parents.  We cannot agree.

     This court has found that form of inference appropriate
in the context of defendants selling "wholesale quantit[ies]" of
drugs to drug distribution rings for resale to individual
buyers/users, e.g., Portela, 167 F.3d at 697; see id. at 697-98,
but that fact pattern is not at all analogous to this case.  It is
clearly reasonable to infer that a drug supplier must understand
that "[t]he success of [his] transaction [i]s dependent on [the
existence of] a conspiratorial network capable of disposing
profitably of the [drugs], and the very existence of such a network
[i]s necessarily dependent on the existence of other wholesale
suppliers."  Id. at 697.  The wholesale supplier knows there must

be a further distribution chain for the distribution of his wholesale quantities of drugs. See id.

Singer, though, is not a wholesaler of any good, and neither defendant is a distributor. The evidence here is that Singer brokered such arrangements as he made for the admission of these two defendants' children on an individual basis, with each "an end in itself" rather than an integrated part of a larger conspiracy. Blumenthal, 332 U.S. at 558. Indeed, as with "common goal," the competitive nature of college admissions would, if anything, cut against a finding of interdependence. See United States v. Carnagie, 533 F.3d 1231, 1240 (10th Cir. 2008) (noting that "direct competition" between alleged coconspirators cut against finding interdependence). Nor is there any evidence here of anything akin to coconspirators' "fronting" each other money or drugs, which we have looked to even in drug conspiracy cases to substantiate the notion that coconspirators were interdependent. See, e.g., Bedini, 861 F.3d at 16.

The government also argues that a rational jury could infer interdependence between the defendants and other parents from just the nature of the scheme because "[b]road participation allowed . . . parents to rely on . . . the scheme's success," as "Singer [could] recruit more coaches and . . . offer parents . . . more options at more schools." To support this "nature of the scheme"-based method of proving interdependence, the government

- 96 -

cites a phone call between Singer and parent Agustin Huneeus, an alleged unindicted coconspirator.[29]  In that call, according to the government, Huneeus "motivat[ed] himself to participate in the scheme based on the experience of" another parent who worked with Singer and "the scheme's track record."

Even if a parent chose to work with Singer based on his past success with other parents, the government must prove as to interdependence that "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme."  Dellosantos, 649 F.3d at 117 (quoting Mangual-Santiago, 562 F.3d at 422).  A track record of success may have made parents more confident that Singer could help their children, but it does not mean that those parents necessarily viewed their children's admission as in some way dependent on Singer's work with other parents.  Thus, even accepting the government's interpretation of the inferences to be drawn from the call about Huneeus's understanding of the scheme, they do not supportably show that Abdelaziz and Wilson had the same view.  See id. (noting focus on each defendant's own state of mind).  To draw such a conclusion would require stacking inference upon inference

---

[29]   Like Isackson, Huneeus was named in the government's original criminal complaint alongside Abdelaziz and Wilson, but pleaded guilty pursuant to a criminal information before Abdelaziz and Wilson were indicted.

through "impermissible speculation on the jury's part." Glenn, 828 F.2d at 860.

The government separately argues that a rational jury could find the required interdependence from the nature of the scheme because the inclusion of additional parents in the scheme benefited the defendants by making "the interconnected web of relationships and finances . . . more difficult to unravel." In support of this "nature of the scheme"-based theory for finding that the interdependence factor points in favor of the convictions, the government again cites Isackson's testimony that he thought it was "good" that lots of parents worked with Singer because "[m]ost of these people have very complicated [tax] returns," which "would [make it] pretty hard [for the IRS] to figure things out." The government also asserts that "Wilson and Abdelaziz . . . join[ed] the other parents in channeling millions of dollars through [Singer's operation]," that they discussed "the mechanics of money flow" with Singer, and that "both were sophisticated and successful businessmen" who would understand "the advantages of this feature of the scheme."

We disagree with the government: this evidence does not support a finding of interdependence. Isackson's testimony reflected his own personal view that it was "good" that other parents of means had also engaged Singer because in his view that made a coverup easier. Neither Abdelaziz nor Wilson discussed

Singer's services with Isackson, and there was no evidence they shared his views or even would have thought those views plausible. See Portela, 167 F.3d at 695 (emphasizing that interdependence depends on defendant's own state of mind); Glenn, 828 F.2d at 859 (evaluating evidence of defendant's state of mind). While sometimes a defendant's efforts to cover up a conspiracy may be probative of his agreement to join the conspiracy, in which case a cover-up effort interdependent with other coconspirators might suffice to show interdependence, the proof the government offered here was of a different actor's guilt.

Further, the discussions about "the mechanics of money flow" that the government cites involved basic logistical questions about payment due dates and wiring instructions; at no point during those exchanges did the defendants allude to any perceived benefit from intermingling their payments with other parents'. That parents made their payments to the universities through Singer is naturally explained by Singer's role in coordinating the transactions. The government stretches too far in arguing that the payments through Singer necessarily show that any parent who hired Singer intended to allow Singer to commingle funds for the purpose of making it more difficult for prosecutors to show Singer was engaged in a criminal conspiracy with other parents by means of transmission of funds to the universities.

We conclude that the nature of the alleged scheme is not such that, because the evidence suffices to show that the defendants sought Singer's services in connection with their own children, the evidence also suffices to show that the defendants were interdependent with other parents for whom Singer coordinated side-door deals.

**b.**

As with the "common goal" factor, the government also contends that there is more defendant-specific evidence that suffices to show that the interdependence factor supports the conclusion that each of the defendants before us agreed to join the broader charged conspiracy, even if the evidence of the scheme's nature in and of itself does not. We conclude, however, that this evidence, when considered in the context of the record as a whole, does not so suffice without the sort of inference-stacking that "would require impermissible speculation on the jury's part." Glenn, 828 F.2d at 860.

The parties do not dispute that both Abdelaziz and Wilson were at least aware that Singer conducted side doors for other parents.[30]  However, as the defendants point out, mere awareness

---

[30]  Abdelaziz argues that he "did not know that the 'side door' was broader than USC," but the government presented evidence that "a stock part of Singer's pitch" was the "wide[] variety of school options" that he was able to offer parents, which could allow a jury to conclude that Abdelaziz learned the same from Singer.

of a common figure's involvement in similar dealings with similarly situated people is far from enough to show interdependence. Indeed, in Glenn we concluded that even though Glenn had "attended one meeting where the core conspirators discussed the smuggling of both marijuana and hashish," this showed "at most that Glenn knew about the marijuana venture," not "that [he] thought [it] interdependent" with the hashish venture in which he was involved. Id. at 859.

     As evidence that Abdelaziz thought his work with Singer interdependent with other parents', the government relies on a phone call between Abdelaziz and Singer in October 2018 -- after Abdelaziz's daughter had been admitted to and enrolled at USC. During the call, which Singer initiated at the government's request after agreeing to cooperate with investigators, Singer told Abdelaziz that a USC athletics administrator had "loved" the basketball profile they had used to facilitate his daughter's admission and wanted Singer to use it for other applicants who "[are]n't . . . real basketball player[s]" in the future. Abdelaziz responded: "I love it."

     That response by a father about his daughter, ambiguous as it is, does not bear the weight the government posits. Further, Abdelaziz's daughter had already been admitted to USC well before Singer made that call. It is not an admission by Abdelaziz that he joined an interdependent conspiracy with other parents in

- 101 -

advancement of his own interests. Construing this conversation as evidence that Abdelaziz considered himself interdependent with other parents would again require impermissible inference-stacking on the jury's part.

As evidence of interdependence related to Wilson, the government relies on evidence that Wilson as well as other parents "referred and recruited other parents." And the government adds that Wilson had a motive to make such referrals because he had other teenage children for whom he might seek Singer's services in the future, and thus he was likely to be a repeat player.

The government points to four such referrals in its brief, only one of which involved Wilson as the speaker: First, a 2013 email from Wilson's wife to Singer asking about the possibility of two of Wilson's son's friends' taking part in a "UCLA workshop/internship" and "college counseling" run by Singer.[31] Second, a 2017 email, also from Wilson's wife, to Marci Palatella -- a codefendant in this case, including in both conspiracy counts -- which states: "I had a few thoughts about [Singer] & USC -- easier to talk on the phone." The third is not from Wilson or his wife, but from Palatella -- a 2018 phone call

---

[31]  One of the friends was later admitted to USC with Singer's assistance; his family made a $100,000 contribution for "USC baseball" through Singer's foundation. The friend's parents do not appear to have been charged in this case, and the government's brief does not describe them as codefendants.

between Palatella and Singer in which Palatella mentioned telling a neighbor about Singer's services and assured Singer that she "d[id]n't say much to anybody unless [she] th[ought] they'd be a good candidate" and that she would "hand [him] the right people." And fourth, a 2018 text exchange and phone call between Singer and Wilson in which Wilson stated that he had a "good -- very wealthy -- friend [with] a daughter applying to Brown." Wilson described the friend as "willin[g] to pay a million, 2 million" to secure his daughter's admission, and said he would "connect" Singer and the friend by email.[32]

Because Wilson's own "state of mind . . . is key" to the interdependence inquiry, the actions of his alleged coconspirators are of limited relevance. Dellosantos, 649 F.3d at 117; see, e.g., Glenn, 828 F.2d at 859 (distinguishing between views of defendant and alleged coconspirators). Further, the referral by Wilson involving Brown University does not fall squarely within the conspiracy alleged by the indictment, which did not include Brown among the set of universities allegedly targeted by the parents.

Regardless, this one referral involving Wilson does not support an inference that Wilson viewed his activities as interdependent with Singer's work with other clients. Wilson's (or another parent's) referring a friend to Singer does not

---

[32] Wilson's friend was not indicted in the operative indictment for his interactions with Singer.

necessarily provide an "indication that [Wilson] thought that [his work with Singer to obtain admission for his own children] was 'necessary or advantageous to the success'" of Singer's work with other parents, or vice versa. Monserrate-Valentín, 729 F.3d at 44 (quoting Dellosantos, 649 F.3d at 117).

A jury could plainly infer that Wilson wanted Singer to work with the friend and that he hoped that that work would be successful. But to conclude based on this evidence that Wilson thought that Singer's work with other parents would be beneficial to his own success, even if he was likely to be a repeat player, would again require stacking inference upon inference.[33] For, as the defendants point out, Kotteakos itself contained evidence that both the defendant and other alleged coconspirators, many of whom were repeat players, had referred others to the "hub" figure, but held that such evidence did not suffice to show that either the defendant or the other alleged coconspirators who made referrals had thereby joined with the "hub" figure in an overarching conspiracy. See 328 U.S. at 754 ("Kotteakos . . . sent Brown [(the hub figure)] applications on behalf of other persons.").

_____

[33] At oral argument, the government contended that the record shows more than "bare referrals" and that parents effectively vetted potential new participants in the scheme to ensure they would benefit Singer's network. The only evidence to this effect is Palatella's statement to Singer, not made by Wilson or even his wife.

We conclude that there was insufficient evidence from which a rational jury could find interdependence with respect to these two defendants.  This factor, too, points against the conclusion that the defendants agreed to join the broader conspiracy that was charged rather than merely the narrower ones to ensure admission for their own children.

**4.**

The defendants do not contest that the final factor, overlap among the participants, is satisfied by Singer's and his associates' interactions with the parents.  See Dellosantos, 649 F.3d at 118.  Rather, they assert, and we agree, that the "evidence of overlap . . . was insufficient to outweigh the lack of interdependence" and common goal.  Id. at 120.

In an abundance of caution before we turn to the issue of prejudice, we discuss the totality of the evidence.  See United States v. Canty, 37 F.4th 775, 796 (1st Cir. 2022) (considering totality of circumstances in addition to common goal, interdependence, and overlap).  The government does not cite any additional considerations beyond the three factors discussed above; the defendants offer one.

As the defendants point out, the dissimilarity in the conduct of the parents alleged to have conspired with Singer undercuts the reasonableness of finding a single conspiracy.  See Franco-Santiago, 681 F.3d at 10.  Franco-Santiago held that the

evidence was insufficient to show that a defendant who had conspired to commit one robbery had agreed to join a broader conspiracy to commit a series of robberies in part because "the robbery in which [the defendant] did participate [was] notably different from the other robberies encompassed by the . . . overarching conspiracy." Id.; see id. at 11-12. In particular, the robbery in which the defendant had participated "was one of cash from a person, whereas the other four robberies were all robberies of places of business." Id. at 10. In this case, the evidence showed significant differences between the conduct of the defendants and that of their alleged coconspirators. The government introduced evidence that other parents who purportedly participated in the alleged overarching conspiracy knowingly made payments to university insiders' personal accounts and paid to alter standardized test scores or have third parties take online classes for their children. The evidence does not show, and the government does not argue, that Abdelaziz or Wilson engaged in those practices.

Evaluating the record as a whole, we conclude that there was insufficient evidence from which a rational jury could find beyond a reasonable doubt that the defendants joined the broader conspiracy charged in the indictment.

**B.**

Our conclusion that the proof varied from the indictment does not, on its own, "upset [the defendants'] conviction[s]." Glenn, 828 F.2d at 858. After all, "[a]s long as administrative convenience leads the government to prosecute many, or all, members of a large criminal enterprise at a single trial, variances between the scope of the conspiracy charged and that proved may, at least as to some defendants, be fairly common," id., and "a defendant 'can hardly . . . complain when the government's proof at trial establishes a scheme similar to but somewhat narrower in breadth and malignity than that charged in the indictment,'" Monserrate-Valentín, 729 F.3d at 49 (internal quotation marks omitted) (quoting United States v. Mubayyid, 658 F.3d 35, 48-49 (1st Cir. 2011)).

To succeed on appeal, then, the defendants must also show that the variance "prejudiced [them -- that] it 'affect[ed] [their] substantial rights.'" Glenn, 828 F.2d at 858 (second alteration in original) (internal quotation marks omitted) (quoting Berger v. United States, 295 U.S. 78, 82 (1935)); accord, e.g., Dellosantos, 649 F.3d at 124. This circuit has "recognized at least three" possible forms of prejudice in this context, Dellosantos, 649 F.3d at 124:

> First, a defendant may receive inadequate
> notice of the charge against him and thus be
> taken by surprise at trial. Second, a

- 107 -

> defendant may be twice subject to prosecution
> for the same offense.  Third, a defendant may
> be prejudiced by "evidentiary spillover": the
> "transference of guilt" to a defendant
> involved in one conspiracy from evidence
> incriminating defendants in another
> conspiracy in which the particular defendant
> was not involved.

Id. at 125 (quoting Wihbey, 75 F.3d at 774 (citations omitted)).

Abdelaziz and Wilson focus exclusively on the third form
of prejudice -- evidentiary spillover.  They argue that because
the government charged, but failed to prove, an overarching
conspiracy, it "was able to admit mountains of inflammatory
evidence about markedly different conduct by other parents,"
including evidence that other parents were aware that their
payments would go to university officials personally, that other
parents paid to alter standardized test answers and scores, and
that other parents paid Singer's staff to take courses for their
children.  This evidence involved parental knowledge and conduct
markedly different in kind from Abdelaziz's and Wilson's alleged
activities and focused on parents with whom the defendants did not
interact.  Meanwhile, the government chose not to put Singer on
the stand, where he would have been subject to cross-examination,
despite the facts that Singer was the person with whom these two
defendants did interact and that he had cooperated with the
prosecution.  The defendants argue that all of this "created an

impermissibly high risk that the jury . . . could not fairly evaluate [the defendants'] own knowledge or intent."

In response, the government emphasizes that "[t]o prevail on a claim of prejudicial spillover, a defendant must prove prejudice so pervasive that a miscarriage of justice looms." Wihbey, 75 F.3d at 776 (internal quotation marks omitted) (quoting United States v. Levy-Cordero, 67 F.3d 1002, 1008 (1st Cir. 1995)). The government contends that the defendants cannot meet that standard because, it asserts, (1) some evidence related to the other parents may have been admissible even to prove the narrower conspiracies involving the defendants, (2) the government compartmentalized its presentation of the evidence in a way that would prevent evidentiary spillover, (3) the trial court issued appropriate limiting instructions to the jury, and (4) the proof of the defendants' participation in those narrower conspiracies was overwhelming.

The record does not support the government's assertions. Rather, applying de novo review, Dellosantos, 649 F.3d at 124, we agree with the defendants: "The dangers for transference of guilt [in this case were] . . . so great that no one really can say prejudice to substantial right has not taken place," Kotteakos, 328 U.S. at 774.

- 109 -

1.

The government does not dispute that to convict Abdelaziz and Wilson of conspiring to violate either § 666 or the mail and wire fraud statutes, it had to show that the defendants possessed the requisite mental state to commit the underlying offense. Violation of § 666 requires acting "corruptly . . . with intent to influence or reward an agent of an organization." 18 U.S.C. § 666(a)(2). Violation of the mail and wire fraud statutes requires acting "with the specific intent to defraud." United States v. Martínez, 994 F.3d 1, 7 (1st Cir. 2021) (quoting United States v. Woodward, 149 F.3d 46, 54 (1st Cir. 1998)). Both conspiracy convictions thus required the government to prove that Abdelaziz and Wilson acted with some culpable state of mind. And at trial both defendants argued that they lacked this mental state and had instead acted in good faith, believing Singer's side door to be a path to admission of which the universities at least tacitly approved.

Notably, the government at trial acknowledged that Singer provided some "totally legitimate" services, including "assistance with college applications," and did not contend that, even when he was committing fraud with some parents, he was committing fraud with all parents who engaged him. Indeed, the evidence at trial showed that Abdelaziz paid Singer for work with his two older children in 2012 and 2013 -- years before Abdelaziz

allegedly began conspiring with Singer to facilitate his youngest daughter's admission, sometime in 2017.  The government has not argued or cited any evidence that those earlier transactions were in any way improper.

Given this context, "there was a pervasive risk" that "the jury might have unfairly transferred to [Abdelaziz and Wilson] the guilt relating to" other parents who worked with Singer. Dellosantos, 649 F.3d at 125.  Based on the overarching conspiracy charge, the government introduced powerful evidence of culpable intent on the part of other parents that presented a pervasive risk of prejudicing the jury's assessment of each defendant's own intent.

For example, in contrast with the government's acknowledgment that Singer told Abdelaziz and Wilson that their payments would go to the universities, the government's first witness, Isackson, testified that he "knew a good portion of [the money he paid Singer] was going into [Singer's] pockets and [to] the people who helped him."  He further described his concerns about shielding the transactions from IRS scrutiny, again evincing a consciousness of guilt.  In addition, a government auditor testified about payments from other parents through Singer to the personal accounts of university insiders at Georgetown, Yale, and UCLA, while a USC soccer coach testified to accepting bribes from Singer for facilitating the admission of other parents' children.

Further, through recordings of calls between Singer and other parents, as well as the testimony of Isackson and a Singer associate, the government introduced evidence of other parents' paying Singer to facilitate clearly fraudulent conduct that was both plainly wrongful and dissimilar in kind from Abdelaziz's and Wilson's actions.  Isackson testified that he "paid to have one of [his] daughter's test scores altered."  In a recorded call, parent Gordon Caplan, an alleged unindicted coconspirator,[34] discussed with Singer a scheme to have his daughter fake a learning disability in order to secure extra time on a standardized test and to bribe a proctor to correct her answers.  A Singer employee testified to having taken online courses with the parents' knowledge for the children of Singer clients other than Abdelaziz and Wilson.  The government thus "subjected the [d]efendants to voluminous testimony relating to unconnected crimes in which they took no part."  Id.

The government, citing case law holding that the risk of "prejudice [is] minimized [where] . . . transactions not directly involving [a defendant are] of the same character as the ones that did involve him," United States v. Levine, 569 F.2d 1175, 1177 (1st Cir. 1978), argues that at least some other parents engaged

---

[34]    Like Huneeus and Isackson, Caplan was named in the government's original criminal complaint alongside Abdelaziz and Wilson, but pleaded guilty pursuant to a criminal information before Abdelaziz and Wilson were indicted.

in the same kind of conduct as Abdelaziz and Wilson by "pay[ing]
Singer to present [their] child[ren] as . . . Division I athletic
recruit[s] based on falsified credentials."

The defendants dispute the degree to which they were
aware of any falsified credentials.  But, even accepting that some
other parents' conduct was similar in some respects to the
defendants', much of the evidence introduced by means of charging
the broader conspiracy nonetheless involved forms of conduct that
were different in kind from Abdelaziz's and Wilson's.  Cf.
Dellosantos, 649 F.3d at 125 (noting risk of evidentiary spillover
where government, based on overarching conspiracy charge,
presented evidence of marijuana transactions against defendants
who had participated only in cocaine distribution).  All this other
evidence threatened to influence the jury on the core issue of the
defendants' state of mind.

Our precedent in Martínez supports our conclusion.
There, a defendant and former public official, López, was charged
with and convicted of receiving bribes from a codefendant,
Hernández, in violation of § 666 and the mail and wire fraud
statutes, and argued that her being tried jointly with Hernández
created an unacceptable risk of evidentiary spillover.  See 994
F.3d at 4-5, 11.  López's "primary defense . . . was that she
merely accepted gifts from [Hernández] without any sort of quid
pro quo."  Id. at 15.  Yet, because she was tried jointly with

- 113 -

Hernández, who was also charged with a series of unrelated bribes involving other public officials, "[t]he jury before which López was tried was exposed to days of detailed evidence regarding Hernández's role in" those other bribery schemes, including "direct evidence of the corrupt intentions of those alleged to have been involved." Id. at 14. This court vacated López's conviction because "the evidence about how Hernández corruptly schemed with others . . . to which her jury . . . was exposed . . . create[d] a grave risk of spillover prejudice." Id. at 15; see id. at 15-16. In particular, "that evidence risked leading the jury in considering her charges to impute the states of mind of [the individuals who had conspired with Hernández in the separate bribery schemes] . . . to López." Id. at 15.

The same reasoning applies here. The overarching conspiracy charge enabled the government to introduce evidence of other parents' corrupt intent and actions in working with Singer, which we have described. Just as Martínez recognized a "grave risk" that the jury imputed to López the state of mind of Hernández's other collaborators, id., we see an unacceptable risk that the jury in this case may have imputed other parents' culpable mental states to the defendants.

Finally, in addition to the specific evidence of other parents' intent and dissimilar conduct, the sheer number of alleged coconspirators and the breadth of the alleged overarching

- 114 -

conspiracy further substantiates that there was prejudicial evidentiary spillover in this case. Kotteakos explained that the risk of prejudice increases with the number of defendants, the number of conspiracies proven, and the number of alleged coconspirators. See 328 U.S. at 766-67; see also United States v. Kemp, 500 F.3d 257, 292 (3d Cir. 2007). Although only Abdelaziz and Wilson went to trial, the operative indictment charged fifteen parents from twelve families in addition to alleged named coconspirators like Caplan, Huneeus, and Isackson who were not charged in the same indictment but who were treated as coconspirators for evidentiary purposes at trial. Cf. Kotteakos, 328 U.S. at 766 (noting that "only one conspiracy was charged, but eight separate ones were proved, involving at the outset thirty-two defendants"); Dellosantos, 649 F.3d at 110, 111 n.2, 125 (finding spillover prejudice where government charged eighteen individuals, of whom three went to trial, and evidence proved two distinct conspiracies).

For those reasons, we agree with the defendants that there was a significant risk that the evidentiary spillover in this case prejudiced them and affected their substantial rights. See Monserrate-Valentín, 729 F.3d at 49-50.

## 2.

The government's responses are unpersuasive. The government first contends that at least some of the evidence

related to other parents may have been admissible against Abdelaziz
or Wilson as proof of their participation in narrower conspiracies.
But "[w]e . . . cannot see how evidence of such depth and quality
about the nature of the allegedly corrupt scheme[s]" in which
Singer engaged with other parents "could have been admitted at a
trial against" Abdelaziz or Wilson on narrower conspiracy charges,
and "the admission of that evidence in a trial of [Abdelaziz or
Wilson] still would have been limited by Federal Rule of
Evidence . . . 403."[35] Martínez, 994 F.3d at 14.

Next, the government argues that the record shows
distinct treatment of evidence related to other parents sufficient
to mitigate the risk of prejudice resulting from evidentiary
spillover. We disagree. The prosecution did, at various times
during its opening statement and closing argument, remind the jury
that "[t]his trial is about [Abdelaziz and Wilson], what they knew,
what they intended and what they agreed to do," and encourage
jurors to "[l]ook at what the defendants did and what the
defendants said." But at other times it invited the jury to use
evidence related to other parents to prove the guilt of Abdelaziz
and Wilson; for example, it chose to call as its first witness

---

[35]    Rule 403 provides that "[t]he court may exclude relevant
evidence if its probative value is substantially outweighed by a
danger of one or more of the following: unfair prejudice, confusing
the issues, misleading the jury, undue delay, wasting time, or
needlessly presenting cumulative evidence."

Isackson -- a parent who confirmed that he had never met Abdelaziz and that, while he had met Wilson at school or charitable events, he had never had any "substantive conversation[s]" with him, and whose own scheme was obviously wrongful. It then built on Isackson's testimony and used it during its closing argument. Its description during closing argument of "the evidence of how the scheme worked" drew almost exclusively on Isackson's testimony and recordings of calls between Singer and other parents. Also in its closing, the government told jurors: "You know . . . that these defendants joined in . . . that conspiracy knowingly and intentionally[,] . . . that the defendants knew what they were doing and . . . intended to do it, and that they knew that what they were doing [was] wrong . . . <u>because Bruce Isackson told you that he knew it</u> . . . ." (Emphasis added.) These statements by the government itself seriously undermine the government's contention that the jury would not have considered evidence regarding other parents in determining what the defendants had done.

The government also argues that the district court's instructions to the jury were sufficient to prevent the risk of spillover. The district court instructed the jury that it must base its verdict as to each defendant "upon evidence of his own words and actions" and "assess the evidence against each defendant individually." However, these limiting instructions "did not

suffice to mitigate th[e] risk of spillover prejudice here." Id.
at 15. Martínez explained that a similar limiting instruction was
inadequate to address the risk of evidentiary spillover where
trying a defendant jointly with her codefendants had "enabled the
government to put forth direct evidence of the corrupt intent of
[an alleged coconspirator's] collaborators in a distinct scheme,
even though the government had only circumstantial evidence as to
[the defendant's] state of mind and the trial . . . implicated a
number of players and . . . complicated charges." Id. The same
concerns apply here. "[W]e do not readily assume that a jury
disregards clear directions," Wihbey, 75 F.3d at 775, but, given
the pervasive risk of evidentiary spillover in this case, the
limiting instructions cannot save the convictions.

The government lastly asserts that the convictions can
stand because there was "overwhelming evidence that [Abdelaziz and
Wilson] participated in smaller conspiracies that advanced their
own side-door deals." See, e.g., United States v. Morrow, 39 F.3d
1228, 1235-36 (1st Cir. 1994) (finding no prejudice from
evidentiary spillover where "[t]he admissible evidence against
each appellant amply proved his complicity in [a] narrow[er]
conspiracy"). We think the government's evidence of each
defendant's smaller conspiracy with Singer (which the defendants
admit was sufficient) was not so strong as to be overwhelming in
relation to the significant risk of prejudice posed by the evidence

regarding other parents.   Cf. Martínez, 994 F.3d at 11, 15-17
(vacating conviction due to spillover prejudice where there was
sufficient evidence to support conviction but government's case
depended on circumstantial evidence from which competing
inferences were possible).

We reject the government's leading argument relying on
the transcripts of calls between Singer and Wilson in which Wilson
verified that his daughters did not actually need to play the
sports for which they would purportedly be recruited; agreed with
Singer's statement that the girls were "athletic enough" for Singer
to "sell" them without raising any "question" and without
"Stanford['s] . . . catch[ing] on"; and suggested that they could
be nonplayers such as "scorekeeper[s]," "water girl[s],"
"manager[s]," or "mascot[s]."   The reference to Stanford's
"catch[ing] on" was made by Singer, not Wilson, and record evidence
supports the notion that Singer had for years prior to this
conversation represented to Wilson that the side door was a
longstanding path to admission, the proceeds of which went to the
university itself.  This statement, coming as late as it did, must
be weighed against the impression Wilson had gained from years of
conversations with Singer and from Wilson's experience arranging
a side door for his son years earlier.  The government's view also
requires a further inference by the jury that Wilson did not
believe that the university and upper-level administrators tacitly

approved of side-door admission even if that policy was not known to everyone in the university, and that he did not think Singer was referring to such a dynamic when he spoke about "Stanford['s] . . . catch[ing] on."

The references to other nonplayer roles for Wilson's daughters (for instance, as managers) at least equally support the defendants' argument that they understood side-door admission through athletics was a practice the universities had approved, at least tacitly. Indeed, testimonials on Singer's website described his assisting other clients in obtaining both college admission and positions as "managers" for college sports teams. Thus, to construe this evidence as showing Wilson's guilty intent, the jury would have to make at least one inference, even if a reasonable one: that Wilson made these statements knowing that the universities in question did not condone the practice, such that, even if he believed his payments to be part of a quid pro quo, he did not in good faith believe that such a quid pro quo was welcomed by the universities and so did not amount to bribery. And such an inference regarding Wilson's good or bad faith intent based on his understanding of Singer's scheme is precisely the sort that stands to be prejudiced by the evidence of the bad faith intent of other parents when committing similar conduct, as well as evidence of dissimilar conduct that could not plausibly be accompanied by good faith intent.

As to Abdelaziz, the government points chiefly to a phone call that took place between him and Singer after his daughter had already matriculated at USC, in which Singer told him that USC's Admissions Department was investigating why his daughter "did not show up for Women's Basketball in the fall," and that the USC administrator with whom Singer had negotiated the side door had told the Admissions Department that it was because Abdelaziz's daughter had suffered an injury. Singer then told Abdelaziz: "And I doubt that Admissions will call you regarding [your daughter], you know, getting in through the side door and . . . not showing up for practice. . . . But they may ask you . . . So I just wanted you to know in case they call . . . ." Abdelaziz responded by asking Singer whether the Admissions Department would ask his daughter and whether he should "prepare her." Singer said they would not ask her, but might call Abdelaziz, and Abdelaziz responded: "That's fine. I will answer the same [regarding the purported injury], uh, should they call me."

The government argues that this phone call is strong evidence that Abdelaziz understood that the side door was "at odds with the Admissions Department's expectations." But, while it certainly is relevant evidence on that score, the jury -- as with Wilson's phone call -- would have to make multiple inferences to arrive at such a conclusion, such as that this later conversation (which occurred after Abdelaziz's daughter had already

- 121 -

matriculated at USC) was also reflective of his earlier intent, and that he did not believe that other actors and administrators at USC, including potentially higher-up administrators, tacitly approved of and welcomed these side doors even if other USC administrators were not aware of that.

We again point out that the more sweeping the charged conspiracy, the higher the bar for showing that the evidence was "overwhelming," and consequently for showing that an error was harmless. As Kotteakos itself explained, "it is one thing to hold harmless the admission of evidence [in a case] where only two conspiracies involving four persons all told were proved, and an entirely different thing to apply the same rule where, as here, only one conspiracy was charged, but eight separate ones were proved." 328 U.S. at 766; see also Kemp, 500 F.3d at 292. Indeed, the Court in Kotteakos itself commented that each defendant "was clearly shown to have shared in the fraudulent phase of the conspiracy in which he participated," but nonetheless reversed the lower court's finding that the error was harmless because it "d[id] not understand how it can be concluded, in the face of the instruction, that the jury considered and was influenced by nothing else." 328 U.S. at 771. And since that was the case in Kotteakos, where the Court found that the indictment alleged at least eight separate conspiracies, we do not see how that would not be the case here, where the indictment alleges at least fifteen.

For these reasons, we agree with the defendants that the risk of evidentiary spillover in this case rendered prejudicial the variance between the broader conspiracy charged in the indictment and the narrower ones shown at trial.  We therefore vacate the conspiracy convictions (Counts One and Two of the operative indictment).[36]

### C.

Because we have already vacated Wilson's conspiracy and substantive wire fraud convictions and address his tax conviction in the next section, we focus here on whether our holding vacating the conspiracy convictions due to a prejudicial variance requires us also to vacate his substantive convictions for federal programs bribery under § 666.  Wilson's brief repeatedly asserts that the prejudicial variance requires a new trial on "all counts." Although the government's brief explicitly acknowledges Wilson's contention that the prejudicial variance requires us to vacate his

---

[36]   We do not reach Abdelaziz's argument that the variance was prejudicial because there was not venue in the District of Massachusetts for the smaller conspiracy.  Abdelaziz has not argued that we must conduct a venue analysis even where we conclude that a variance is prejudicial on alternative grounds.  Nor did he seek distinct relief based on his venue argument in his opening brief, which sought only vacatur of his conviction.  To the extent Abdelaziz claims an entitlement to different relief in his reply brief, that argument has been waived.  See, e.g., Green Earth Energy Photovoltaic Corp. v. KeyBank Nat'l Ass'n, 51 F.4th 383, 391 n.15 (1st Cir. 2022).

We do not address any Double Jeopardy Clause issues as they are not before us, and we express no opinion on the matter.

substantive convictions, it does not develop any distinct counterargument against this claim, instead relying on its general argument that there was insufficient spillover prejudice to warrant vacating any of the defendants' convictions.[37]

Wilson's argument for vacating the § 666 convictions effectively amounts to a retroactive-misjoinder claim. See, e.g., Mubayyid, 658 F.3d at 72-73, 72 n.39; United States v. Hamilton, 334 F.3d 170, 181-82 (2d Cir. 2003). "Retroactive misjoinder occurs where joinder was proper initially because of a conspiracy allegation, but where later developments, such as [a] . . . court's decision . . . to set aside a defendant's conspiracy conviction, appear to render the initial joinder improper." Mubayyid, 658 F.3d at 72 n.39 (quoting United States v. Deitz, 577 F.3d 672, 693 (6th Cir. 2009) (alterations and internal quotation marks omitted)); accord Hamilton, 334 F.3d at 181. To win "a new trial on the ground of retroactive misjoinder, a defendant 'must show compelling prejudice,'" which "may be found where there is '[p]rejudicial spillover from evidence used to obtain a conviction

---

[37]    In particular, the government has not argued that Wilson failed to preserve his claim that the prejudicial variance requires vacating his substantive convictions, and so we need not decide whether plain error review would apply, had the government argued for it. See United States v. Encarnación-Ruiz, 787 F.3d 581, 586 (1st Cir. 2015) ("When the government fails to request plain error review, we, and many of our sister circuits, review the claim under the standard of review that is applied when the issue is properly preserved below.").

subsequently reversed on appeal.'" Hamilton, 334 F.3d at 181-82 (alteration in original) (first quoting United States v. Vebeliunas, 76 F.3d 1283, 1293 (2d Cir. 1996); and then quoting United States v. Jones, 16 F.3d 487, 493 (2d Cir. 1994)). As in the variance context, succeeding on a claim of spillover prejudice requires Wilson "to show prejudice so pervasive that a miscarriage of justice looms." United States v. Correia, 55 F.4th 12, 36-37 (1st Cir. 2022) (internal quotation marks omitted) (quoting United States v. Simon, 12 F.4th 1, 43-44 (1st Cir. 2021)).

For all the reasons just discussed in the variance analysis, we conclude that this case meets that standard. As with the conspiracy charges, Wilson's intent in his dealings with Singer was a key issue with respect to the substantive § 666 counts. See 18 U.S.C. § 666(a)(2) (covering only parties that act "corruptly . . . with intent to influence or reward an agent of an organization"). And the government offers no reason -- and we can think of none -- why the risk of spillover from evidence of other parents' dealings with Singer would be less acute with respect to Wilson's substantive § 666 counts than with respect to the related conspiracy charges.

Nor is this "a case in which the results of the trial might be thought to undermine any claim of prejudice." Martínez, 994 F.3d at 16. We have observed that "a discriminating verdict," in which the jury convicts on some charges but not others, "is an

indication that spillover prejudice did not infect the jury's decisional calculus." Correia, 55 F.4th at 38; see id. at 38-39. The jury in this case returned guilty verdicts on all counts, offering no reassurance that jurors were "[]able to compartmentalize the evidence of each offense." Id. at 39 (quoting Mubayyid, 658 F.3d at 74).

Case law from other circuits supports our conclusion. See, e.g., United States v. Tellier, 83 F.3d 578, 581-82 (2d Cir. 1996) (finding retroactive misjoinder where a RICO count on which the court found there had been insufficient evidence to convict had allowed the government to introduce "enormous amount[s] of prejudicial spillover evidence" related to "criminal activities in which [the] defendant did not participate"); Jones, 16 F.3d at 492-93 (applying retroactive misjoinder where count on which court had vacated conviction had allowed government to introduce inflammatory evidence of defendant's criminal history); United States v. Aldrich, 169 F.3d 526, 528-29 (8th Cir. 1999) (similar).

The Second Circuit, for example, has developed a "three-part test" for assessing retroactive-misjoinder claims based on prejudicial spillover. Hamilton, 334 F.3d at 182. It examines:

> (1) whether the evidence introduced in support
> of the vacated count "was of such an
> inflammatory nature that it would have tended
> to incite or arouse the jury into convicting
> the defendant on the remaining counts,"
> (2) whether the dismissed count and the
> remaining counts were similar, and (3) whether

- 126 -

> the government's evidence on the remaining
> counts was weak or strong.

Id. (quoting Vebeliunas, 76 F.3d at 1294 (internal quotation marks
omitted)).  This test is satisfied here.  As to the first prong,
the powerful evidence of other parents' obviously culpable conduct
was potentially inflammatory -- far more so than the evidence of
Wilson's own acts.  As to the second prong, the Second Circuit has
explained that "prejudicial spillover is unlikely if the dismissed
count and the remaining counts were either quite similar," such
that the evidence relevant to the invalidated count would be
independently admissible in connection with the other charges, "or
quite dissimilar," such that a jury could readily compartmentalize
the evidence.  Id. at 182; see id. at 182-83.  For the reasons
described in the variance analysis, this case falls in the middle
ground between these extremes, where a retroactive-misjoinder
finding is appropriate.  At least the vast majority of the evidence
of other parents' activities would not have been properly
admissible in a prosecution of Wilson alone.  But the evidence was
not so disconnected from Wilson's activities -- bearing, as it
did, on other parents' understanding of their work with Singer --
as to limit the risk that the jury would impute those parents'
mental states to Wilson.  Cf. Martínez, 994 F.3d at 14.  And, as
to the third prong, we have already explained that the government's

evidence related to Wilson himself was insufficiently strong to counteract the pervasive risk of prejudice.

We vacate Wilson's convictions on the substantive § 666 charges (Counts Eleven and Twelve of the operative indictment). This result makes it unnecessary to address -- outside the context of Wilson's tax conviction -- various evidentiary arguments raised by the defendants as grounds for vacating their convictions.  Many of these rulings may well become moot on remand, and we express no view on the merits of the defendants' evidentiary arguments with respect to the conspiracy, mail and wire fraud, and § 666 charges. We note, however, that the government does not attempt to defend on appeal many of the bases on which the district court relied in excluding various exhibits.

### V.  Affirmance of Wilson's Conviction for Filing a False Tax Return Under 26 U.S.C. § 7206(1)

Finally, we turn to Wilson's conviction for filing a false tax return under 26 U.S.C. § 7206(1), which makes it a felony to "[w]illfully make[] and subscribe[] any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which [the individual] does not believe to be true and correct as to every material matter."  We first lay out the relevant facts, then analyze and reject Wilson's challenges to his conviction.

- 128 -

**A.**

The tax count arises from Wilson's designation of payments he made in 2014 to secure his son's admission to USC as business expenses and charitable contributions on his 2014 income taxes.

At the time he worked with Singer to obtain his son's admission, Wilson was the sole shareholder of Hyannis Port Capital, an S corporation. An S corporation is a "pass-through entity" which does not separately pay federal taxes; instead, the corporation's "income, losses, deductions, and credits are attributed to individual shareholders," Bufferd v. Comm'r, 506 U.S. 523, 524-25 (1993); accord Benenson v. Comm'r, 887 F.3d 511, 513 n.1 (1st Cir. 2018), such that Hyannis Port Capital's profits, losses, and deductions directly affected Wilson's personal tax liability.

On March 1, 2014, the day after Subco considered and approved his son's admission, Wilson sent Singer an email with the subject line "USC fees" that read: "Thanks again for making this happen!  Pls give me the invoice.  What are the options for the payment?  Can we make it for consulting or whatever from the [K]ey [(Singer's business)] so that I can pay it from the corporate account ? [sic]"  Singer replied: "Yes we can send you an invoice for business consulting fees and you may write off as an expense."  He also requested "the name address etc you want the invoice to be

made out to." Wilson responded: "Awesome!" He provided billing information for Hyannis Port Capital.

On March 29, 2014, Wilson emailed Hyannis Port Capital's office manager, Debbie Rogers, that "Monday we will get an invoice and wiring instructions for $250k. To be paid by hpc inc." When Rogers asked what account the invoice should be charged to, Wilson replied: "Business Consulting - the invoice will be for consulting - pls work with [Singer] to get invoice correct." The following day, Wilson emailed Rogers again, stating that "the amount is $200,000 not [$]250,000."

Two days later, Rogers told Wilson by email that she had consulted Singer and one of his business associates, and that they had said the payment structure would be "[$]100k . . . to [Singer's] foundation, [$]100k an invoice from the Key [(Singer's business),] and [$]20k to Rick Singer." Rogers noted that this totaled $220,000, rather than the $200,000 Wilson had previously mentioned, and Wilson explained that he had "added $20 k for [Singer's] expenses." He also confirmed that the entire sum should be invoiced to Hyannis Port Capital.

Consistent with this plan, Hyannis Port Capital wired $100,000 to Singer's business, $100,000 to Singer's foundation, and $20,000 to Singer on April 7, 2014. Nine days later, Singer's business issued a $100,000 check made out to "USC Men's Water Polo" on behalf of the "Wilson family."

Singer's foundation sent Wilson a letter dated April 7, 2014, acknowledging his "contribution of $100,000" and stating that "no goods or services were exchanged" for the payment. Singer and his business also provided invoices, both dated April 1, to Hyannis Port Capital. The business's invoice purported to be for "Business Consulting," and Singer's referred to "Special Consulting . . . Concept, design, and implementation of Professional Development program for Hyannis Port Capital associates." Wilson offered no evidence and does not argue on appeal that Singer or his business actually provided any consulting services to Hyannis Port Capital. In July, USC also sent Wilson and his wife a thank-you letter acknowledging a $100,000 gift, apparently in connection with the $100,000 check from Singer's business.

On his 2014 tax return, Wilson deducted the $120,000 Hyannis Port Capital paid to Singer and Singer's business as business expenses and the $100,000 payment to Singer's foundation as a charitable contribution.[38] Wilson does not dispute that the payment could not properly be deducted as a charitable contribution if he received goods or services in exchange for the payment.

---

[38] Wilson originally filed a 2014 return in December 2015. He later filed two amended returns, neither of which made any changes to his claimed business expenses or charitable contributions.

An IRS agent testified that these deductions saved Wilson $88,546 in taxes. On cross-examination by Wilson's counsel, the same agent testified that treating the $120,000 in payments to Singer and his business as business expenses, rather than deducting the full $220,000 as charitable contributions, saved Wilson roughly $1,425. Wilson's tax preparer testified that the exact effect of deducting the payments as business expenses, rather than charitable contributions, would have been uncertain until all of Wilson's tax information was available at the end of the year.

The indictment charged Wilson with filing a false tax return based on allegations that both the $100,000 charitable contribution deduction and the $120,000 business expense deduction were improper. During closing argument, Wilson's counsel asserted with respect to the charitable deduction that Wilson was "not real attentive to his taxes" and may have made some unintentional errors, but "thought he made a donation" and "could get a deduction for it." He further argued that, given that belief, Wilson would have had little motive to willfully fraudulently deduct the payment as a business expense, since the deduction made only a small difference in his tax liability compared to deducting the entire sum as a charitable contribution.

The jury returned a general verdict of guilty on the tax count without specifying the theory on which it relied. Wilson's

proposed verdict form had not requested a special verdict giving the basis for the jury's decision.

**B.**

Wilson challenges his tax conviction on three grounds. First, he contends that the conviction must be vacated pursuant to the Supreme Court's decision in Yates v. United States, 354 U.S. 298 (1957), and its progeny because the verdict may rest on an invalid legal theory. Second, he argues that spillover prejudice from the variance in the conspiracy counts also tainted this conviction. Third, he asserts that the district court prejudiced his defense through erroneous evidentiary rulings. We consider these arguments in turn.

**1.**

We first reject Wilson's argument that we must vacate his conviction under the Supreme Court's decision in Yates.

The defendants in Yates were charged with a single count of conspiring (1) "to advocate and teach the duty and necessity of overthrowing the Government of the United States by force and violence" and (2) "to organize, as the Communist Party of the United States, a society of persons who so advocate and teach." Id. at 300. The Court concluded that the conduct underlying the latter "organiz[ing]" object had occurred outside the relevant statute of limitations, such that the defendants could not lawfully have been convicted of conspiracy on that basis. See id. at

303-11.  The Court then rejected the government's argument that the convictions could nonetheless stand based on the alternative "advoca[cy]" object, holding that "a verdict [must] be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected."  Id. at 312; see id. at 311-12.  In later cases, the Court has reaffirmed this rule while clarifying that it applies where "a particular theory of conviction submitted to [the jury] is contrary to law," and not where one of several alternative bases for conviction is legally sound but supported by insufficient evidence.  Griffin v. United States, 502 U.S. 46, 59 (1991).

Here, the indictment did offer two types of allegedly false statements on which the jury could have convicted: Wilson's deductions for purported charitable contributions and business expenses.  Wilson does not, however, develop an argument that either of those theories of conviction set forth in the indictment is legally unsound.  He does not disagree with the government's assertion that the jury could convict based on a "find[ing] that Wilson willfully made a false statement as to a material matter on his tax return by falsely claiming the payments were business expenses and/or that he received no goods or services in exchange for them [as necessary to claim a payment as a charitable contribution]."  On the contrary, he acknowledges that "perhaps a jury could [were it not for the alleged Yates and other trial

- 134 -

errors] convict on the [business expense deduction] theory," and appears to concede that "a quid pro quo . . . vitiates any charitable deduction even if the exchange was otherwise lawful." He also does not argue that the jury instructions on the tax count were improper.[39]

Instead, Wilson posits that the jury might have convicted him of tax fraud based on its conclusion that he committed bribery or property fraud, on a theory that unlawful or fraudulent payments are not deductible. And because, he argues, his bribery and property fraud convictions were based on legally flawed premises, the "[d]erivative" tax conviction cannot stand under Yates.

We reject this argument because the record does not support Wilson's claim that the jury could have convicted him on the tax count based on its verdicts on the bribery or property fraud charges.[40] He has not cited anything in the indictment or the jury instructions that would lead a juror to conclude that a

---

[39]   The district court instructed the jury that this count required the government to prove that (1) "Wilson made or caused to be made a [2014] federal income tax return . . . that he verified to be true," (2) the "return was false as to a material matter," (3) "Wilson signed the return willfully and knowingly -- knowing that it was false," and (4) the "return contained a written declaration that it was made under the penalty of perjury."

[40]   We have also partially rejected Wilson's premise that all of the bribery and property fraud charges are legally unsupportable. See supra Sections II-III.

guilty verdict on other charges would necessarily affect the outcome of the tax count.[41]   See Skilling, 561 U.S. at 414 (characterizing Yates as holding that "constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory" (emphasis added)); Griffin, 502 U.S. at 59 (explaining that the Yates rule reflects the fact that "[j]urors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law" (emphasis added)). The jury instructions for the tax count, for example, did not cross-reference the other counts or otherwise suggest that the jury's findings on the bribery or property fraud charges were relevant to the tax count.   Cf. United States v. Foley, 73 F.3d 484, 493-94 (2d Cir. 1996) (vacating tax fraud conviction where jury had convicted defendant of bribery under legally invalid theory and was instructed that bribes were not deductible), abrogated in part on other grounds by Salinas, 522 U.S. 52. Certainly, a juror likely would -- and should -- have viewed some

---

[41]   As we discuss below, to the extent Wilson argues that, even if the jury did not treat its verdict on the other counts as dictating the outcome of the tax count, the presence of such inflammatory charges might have influenced its verdict on the tax count, we note that Wilson has not challenged on appeal the district court's denial of his motion to sever the tax count from the other charges before trial, and the argument that we must vacate his tax conviction due to retroactive misjoinder lacks merit.

factual findings as relevant to multiple counts; for instance, whether Wilson understood himself to be entering a quid pro quo guaranteeing his son's admission in exchange for payment would bear both on the § 666 charge and on the legitimacy of his charitable deductions.  But Wilson offers no support for the assertion that a juror would have viewed the legal status of his payments as bribes as controlling the legitimacy of his deducting those payments.

Wilson's strongest argument is that the instruction to the jury that, "[f]or purposes of the mail and wire fraud statutes, admission[s] slots are . . . property" -- which we have already held was erroneous based on the theory presented by the government at trial and on appeal, see supra Section III.B -- may have influenced the verdict on the tax count.  He contends that, having been told that an admissions slot is property as a matter of law, the jury might have concluded that Wilson's payment could not constitute a valid charitable contribution, since it would have been made in exchange for goods or services.  Taken in context, however, this erroneous instruction on different counts does not undermine the jury's verdict.  The property instruction was specifically limited to "the mail and wire fraud statutes," and Wilson cites nothing else in the instructions that would indicate to a juror that the verdict on the fraud count should influence

the tax count.[42]   "[We] presum[e] that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." United States v. Olano, 507 U.S. 725, 740 (1993) (alterations in original) (quoting Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985)).  And, although Wilson did move below to sever the tax count from the other counts due in part to the confusion that might be caused by the theory that admissions slots are property, he does not now style his argument as an objection to the district court's denial of any motion to sever, nor to a failure by the district court to issue a clarifying instruction on the tax count to dispel that potential confusion.  In the absence of any such argument, the alleged confusion caused by the district court's

---

[42]   The specific limiting language in the property instruction and the distinctness of the instructions relevant to the different counts undermines Wilson's reliance on United States v. Lindberg, 39 F.4th 151 (4th Cir. 2022).  Lindberg vacated a defendant's conviction under § 666 because it concluded that a jury instruction incorrectly defining the term "official act" for purposes of a separate bribery charge had "infected" the jury's consideration of the § 666 count.  Id. at 164; see id. at 164-65. Although § 666 does not contain an "official act" requirement (it refers instead to payments intended to influence an agent in connection with "any business, transaction, or series of transactions" of an organization), the court recognized that the district court had nonetheless "provided instructions on both counts at the same time using the term 'official act.'"  Id. at 164.  Wilson does not cite any such overlapping instructions in this case.

instructions on a separate count cannot by itself provide a basis for vacating his conviction on this count.

Wilson also argues that post-trial statements by the government and district court show that the jury may have convicted him on the tax count based on its conclusions about the other charges, but neither statement provides a basis for vacating the conviction. First, he highlights that the government, in a memorandum opposing Wilson's post-trial motion for a new trial on Yates grounds, stated that "the jury could convict [either on the theory that] Wilson deducted an illegal bribe as business and charitable deductions, or because he deducted payments . . . that were not in fact charitable contributions or business expenses." Although this statement appears to accept Wilson's premise that the jury could have convicted on this basis, neither Wilson's motion nor the government's response cited any material presented to the jury that would have led jurors to believe that the verdict on the bribery and fraud counts should control the verdict on the tax count. We decline to vacate the jury's verdict based on a single sentence in a post-trial filing. Cf. United States v. McGregor, 650 F.3d 813, 824 n.4 (1st Cir. 2011) (explaining that concession by government in district court does not bind this court).

Second, Wilson relies on a ruling by the district court during sentencing that, for purposes of the tax loss amount

applicable during sentencing, Wilson could not claim any of the $220,000 payment as a legitimate charitable contribution "because the entire payment was fraudulent."  Wilson cites no authority for the proposition that a statement by the court during sentencing is relevant to determining the basis for a jury's verdict.  This statement also does not require vacating Wilson's conviction.

Without some clearer grounding in the record, Wilson's broad argument that the jury might, on its own initiative, have based its resolution of the tax count on the bribery or property fraud charges does not create a <u>Yates</u> problem.

**2.**

We turn to Wilson's argument that the same spillover prejudice that led us to vacate his conspiracy and substantive § 666 convictions also requires us to vacate his tax conviction, which we understand to be a retroactive-misjoinder argument, even though Wilson has not characterized it as such.  <u>See</u> <u>United States v. Cadden</u>, 965 F.3d 1, 21 n.7 (1st Cir. 2020) ("'[R]etroactive misjoinder' arises where joinder of multiple counts was proper initially, but later developments . . . render the initial joinder improper." (quoting <u>Jones</u>, 16 F.3d at 493)).  In discussing this alleged evidentiary spillover, Wilson does not draw a distinction between the charitable and business expense deductions.  We conclude that Wilson has not met his burden to "prove prejudice so pervasive that a miscarriage of justice looms."  <u>Wihbey</u>, 75 F.3d

at 776 (quoting Levy-Cordero, 67 F.3d at 1008). Our analysis applies to both the business expense and charitable contribution theories.

The government's case on the tax count relied largely on Wilson's own emails discussing how to structure the payments related to his son's admission, limiting the risk that Wilson was convicted based on other parents' conduct. See id. at 775-76 (noting that distinctness of evidence related to charged coconspirators' conduct reduced danger of evidentiary spillover or jury confusion); United States v. Moran, 984 F.2d 1299, 1304 (1st Cir. 1993) (similar). The distinctness of this evidence from evidence related to other parents also increases the probability that the jury was able to comply with the district court's instruction to determine Wilson's "guilt or innocence . . . on an individual basis." See Wihbey, 75 F.3d at 775 (observing that similar instruction limited risk of spillover prejudice).

Further, the evidence against Wilson on the tax count, based on his own words and conduct, was very strong. See Morrow, 39 F.3d at 1235-36 (concluding variance did not warrant vacating convictions where evidence properly admissible against defendants "amply proved" their guilt). Importantly, Wilson does not develop on appeal any argument that, as a matter of substantive tax law, the statements on his return were true -- that is, that the payments were properly deductible as business expenses or

charitable contributions.  He does not meaningfully dispute the government's theory that the payments did not qualify as business expenses (because of their personal nature) or as charitable contributions (because they were his side of a quid pro quo to secure his son's admission).[43]  His argument as to spillover prejudice, and as to the alleged evidentiary errors discussed below, focuses instead on the required mental state: that the false return be "ma[de] and subscribe[d]" "[w]illfully."  26 U.S.C. § 7206(1) (emphasis added).  We thus have no cause to reexamine the conviction on the basis of substantive tax law, and instead focus on the evidence of Wilson's intent.

That evidence, with respect to both the business and charitable deductions, was powerful.  After having already discussed the cost of the side door with Singer, Wilson, apparently

---

[43]    In particular, with respect to the business deduction, Wilson does not argue on appeal that the fact that his business was a pass-through S corporation is relevant to the payments' deductibility, thereby waiving any such argument.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  With respect to the charitable deduction, as discussed below, Wilson argues that the district court improperly excluded evidence related to USC's practices in acknowledging donations for tax purposes.  He asserts that this evidence would have shown that "back-door and non-Singer side-door donations were . . . fully deductible."  But Wilson styles this argument as involving an "evidentiary error[]" bearing on his mental state, and, in his opening brief, does not cite any legal authority explaining why this USC practice would bear on the deductibility of his payments.  We thus deem any challenge to the legal deductibility of the payments waived.  See id.; United States v. Diggins, 36 F.4th 302, 320 (1st Cir.) (explaining that arguments not developed in an appellant's opening brief are waived), cert. denied, 143 S. Ct. 383 (2022).

on his own initiative, asked Singer if the payment could be designated "for consulting or whatever from [Singer's business] so that [Wilson] c[ould] pay it from the corporate account." When Singer responded that he could send an invoice for consulting that Wilson could "write off as an expense," Wilson responded, "Awesome!" Wilson then directed his office manager to charge the invoice to "Business Consulting" and to expect invoices from Singer. Wilson offered no evidence and does not argue on appeal that any such consulting actually took place. Indeed, any notion that Wilson deducted these expenses because he believed that Singer's college counseling services qualified as "Business Consulting" is severely undermined by the fact that Wilson deducted the $20,000 that went to Singer personally on the basis that it was for the "[c]oncept, design, and implementation of [a] [p]rofessional [d]evelopment program for Hyannis Port Capital associates," a service completely unrelated to college counseling, and one that Singer clearly never performed.

Wilson does not argue that he could plausibly have relied in good faith on Singer's representation that the payment could legitimately be "writ[ten] off as an expense" so long as it was falsely described as for business consulting services, nor would such an argument be tenable. Instead, Wilson's enthusiastic response to Singer's statement linking payment from Wilson's corporate account with a "write off" provides evidence that Wilson

- 143 -

was aware of the tax benefits of falsely characterizing the payments as business expenses and acted willfully to obtain those benefits.

As for Wilson's deducting the $100,000 payment to Singer's nonprofit foundation as a charitable contribution, it is first worth noting that, although Wilson paid $100,000 to Singer's foundation, it was Singer's for-profit business that then paid $100,000 to USC. Without some link between the two payments, the payment to Singer's nonprofit would clearly be in exchange for goods and services -- the same services that Wilson was simultaneously attempting to deduct as a business expense.

However, even assuming that Wilson deducted the $100,000 payment to Singer's foundation intending that it reflect a charitable contribution that would in turn be made to USC, the government offered strong evidence that Wilson understood this payment to be part of an explicit quid pro quo to secure his son's admission, rather than a gift that might also curry some intangible amount of favor with the university. Singer told Wilson that the USC men's water polo coach was "giving [him] 1 boys slot" on a "first come first [sic]" basis. Later, Wilson asked Singer: "When is [the USC men's water polo coach] going to be able to give us decision [sic] on USC? And when do I pay u [sic]?" Singer responded: "No payment of money till [sic] [the USC men's water polo coach] gets a verbal and written [sic] from

admissions . . . ."  The day after Subco considered and approved his son's admission, Wilson thanked Singer "for making this happen" and asked for an "invoice" with no differentiation between payment for Singer's services and any contribution to USC, further suggesting that he viewed the payment as his side of an exchange to secure his family a concrete benefit, rather than as a gift.

That the deductions ultimately saved Wilson tens of thousands of dollars on his taxes would give the jury further reason to conclude that Wilson acted willfully.

Wilson's brief on appeal downplays this evidence, arguing that Wilson was living overseas at the time of filing; could not have foreseen "whether or how" classifying the payments as business expenses, rather than charitable donations, would affect his tax liability; and ultimately saved only $1,425, relative to his liability had he deducted the entire $220,000 as a charitable contribution.[44]  This argument rests on an assumption that Wilson believed he could legitimately deduct the entire sum as a charitable contribution, but the government produced strong evidence to the contrary.  Further, even if this assumption were correct, the argument offers no plausible good faith explanation of why Wilson himself sought to classify the payments as consulting

_____

[44] Notably, this argument echoes the position Wilson's counsel unsuccessfully presented to the jury during closing argument.

fees, and the unpredictability of the resulting tax benefits cuts both ways -- Wilson may have hoped to gain more through the maneuver.

We conclude that Wilson has not shown a risk of evidentiary spillover that warrants vacating his tax conviction.

**3.**

Finally, Wilson contends that allegedly erroneous evidentiary rulings by the district court require us to vacate the tax conviction. The excluded material he cites falls into three categories: (1) statements by Singer, (2) statements by Wilson, and (3) evidence related to USC's practices in acknowledging donations.[45] We conclude that, even assuming the district court erred in excluding this evidence -- a question we need not and do not decide -- those errors were harmless with respect to the tax conviction.[46]

---

[45] Wilson also argues that the district court's exclusion of various evidence related to USC's admissions practices prejudiced his tax count defense by "hobbl[ing] the defense to the bribery and fraud counts." This claim repackages Wilson's Yates argument, and we reject it for the same reasons. In addition, Wilson asserts elsewhere in his brief that the district court erred in declining to suppress certain call recordings the government captured beginning in September 2018. He does not reference this issue in discussing the tax count, and so we do not consider it here.

[46] We emphasize that our holding that any error in the exclusion of this evidence was harmless is limited to Wilson's tax conviction. We express no view as to whether the exclusion may have been harmful with respect to any other count.

"An error will be treated as harmless only if it is highly probable that the error did not contribute to the verdict." United States v. Kilmartin, 944 F.3d 315, 338 (1st Cir. 2019) (internal quotation marks omitted) (quoting United States v. Fulmer, 108 F.3d 1486, 1498 (1st Cir. 1997)).  "To sustain the verdict, the reviewing court must be able to say with a fair degree of assurance that the erroneous ruling did not substantially sway the jury." Id. (quoting Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 87 (1st Cir. 1998)); see also id. (requiring "a panoramic, case-specific inquiry" (quoting United States v. Piper, 298 F.3d 47, 57 (1st Cir. 2002))).

The first category of excluded evidence cited by Wilson encompasses a variety of statements by Singer to listeners other than Wilson, including public presentations and communications with other parents.  In these statements, Singer generally depicted himself as well connected in the realm of college admissions and experienced in using the side door to help clients' children gain admission.  For example, in a corporate presentation, Singer stated that he "read applications at two schools every year," including some of "the . . . most prominent universities in America," and had "d[one] 761 side doors into the best schools in America."  He asserted to one parent that the "side door is not improper" but is part of "how all schools fund their special programs or needs,"

and told another that he would soon be meeting with "the President[s] of Harvard and Tufts for lunch."[47]

Wilson does not contend that he was aware of these statements during his dealings with Singer. Instead, he argues that "[a] jury could have reasonably inferred that Singer pitched the side-door to Wilson in the same way he pitched his advice to other parents," and that such a pitch would tend to show that Wilson plausibly could have believed that Singer's business was legitimate. For several reasons, we conclude that any error in excluding this evidence was harmless with respect to the tax count.

First, there was other evidence before the jury regarding Singer's pitch. See, e.g., United States v. Veloz, 948 F.3d 418, 434 (1st Cir. 2020) (finding erroneous exclusion of evidence harmless where record contained other evidence "to the same effect"); United States v. Wilkerson, 251 F.3d 273, 280 (1st Cir. 2001) (similar). An IRS agent who assisted the FBI's investigation of Singer and his clients testified at trial that "Singer's general pitch was that [side-door payments were] donation[s] to . . . program[s]"; that "Singer did not use the word 'bribe' when he was discussing the side door"; and that even after he began cooperating with the government, Singer "at times . . . would go back to his whole pitch and go back to the

---

[47] The district court excluded these statements on a combination of relevance, hearsay, and Rule 403 grounds.

old cover story as part of his just being used to saying 'donation' when we asked him to say payment." The agent even acknowledged that Singer's framing of the side door as a donation "does not sound bad." The jury evidently found this similar evidence unpersuasive.

The probative value of the excluded material with respect to the tax count was also quite low. See, e.g., United States v. Brown, 805 F.3d 13, 17 (1st Cir. 2015) (finding evidentiary error harmless where jury likely gave little weight to improperly admitted material). Singer's statements have little apparent relevance to the business deduction theory of tax fraud, as a belief on Wilson's part in Singer's legitimacy would not provide a basis for classifying the payments as business expenses, and Wilson does not offer any explanation for how that could be otherwise. With respect to the charitable deduction, Wilson's understanding of Singer's legitimacy would at most be tangentially relevant to his understanding of whether the payment was pursuant to a quid pro quo, which Wilson does not dispute would "vitiate[] any charitable deduction." And in order to rely on the evidence at all, the jury would need to infer that Singer made similar statements to Wilson himself and that Wilson relied on those statements -- a possible, but hardly inevitable, conclusion.

Most importantly, as discussed above, the government's evidence on the tax count was powerful with respect to both the

charitable and business expense deductions.  See, e.g., Kilmartin, 944 F.3d at 338-39 (noting that "the strength or weakness of the government's evidence of guilt is normally the most important integer in the harmlessness equation").  Considering the totality of the circumstances, we conclude that any error in the exclusion of Singer's statements was harmless.

The second category of excluded evidence consists of statements by Wilson himself.  Wilson's brief identifies six excluded exhibits of this type.  The first three are email threads referring other parents to Singer.  In one thread, for example, Wilson told another parent: "There is a company and [a] CEO I know well who was a great help to us [with Wilson's son] that might be very helpful for you too.  I would be happy to connect you and pay for it . . . if you and your daughter would find it useful." Wilson asserts that a jury might infer "that Wilson would refer Singer's services to [other parents] only if he believed those services were legitimate."

The other three excluded statements appear in emails from Wilson to Singer about his son's admission and enrollment at USC.  In one, sent at the beginning of his son's senior year of high school, Wilson asked whether it was important for his son to retake the ACT and SAT, saying that it "[s]eem[ed] like a lot [to do] in the fall."  The other two, sent during the summer before his son's enrollment at USC, inquired about the start date for his

son's water polo practices.[48]  Wilson argues that these emails
might lead a jury to conclude that Wilson believed that "Singer
was legitimate, that his son needed to do well on his tests, and
that his son was going to play water-polo."

We conclude, for similar reasons as with Singer's
statements, that, even assuming the exclusion of this evidence was
erroneous, it was harmless with respect to the tax count.

Again, evidence similar to the excluded material was
before the jury.  See Veloz, 948 F.3d at 434; Wilkerson, 251 F.3d
at 280.  In a recorded call introduced into evidence by the
government, Wilson told Singer that he planned to refer a friend
to him -- apparently the same friend who received one of the three
excluded referrals.[49]  Another government exhibit included emails
from Wilson to Singer in which Wilson asked whether "it w[ould] be
known that [his son was] a bench warming candidate," noted that
"[o]bviously his skill level m[ight] be below the other freshmen,"
inquired whether his son would "be so weak as to be a clear misfit
at practice," and stated that he "want[ed] to be sure [his son

---

[48]    As with the Singer statements, the district court
excluded these exhibits on a combination of relevance, hearsay,
and Rule 403 grounds.

[49]    During the call, Wilson identified the friend by name,
identified his employer, and said the friend had a daughter who
"want[ed] to go to Brown."  One of the excluded referrals was
addressed to a parent with the same name whose email address
corresponded to the friend's employer, and noted that the parent's
daughter "ha[d] a strong interest in Brown."

would] not [be] a lepper [sic]."   And, although neither party
mentions as much in its briefing, one of Wilson's water polo
inquiries appears to have been admitted as part of a government
exhibit; indeed, when introducing the exhibit, the government had
a witness read Wilson's email aloud to the jury.

          The probative value of the excluded material with
respect to the tax count was also low.  See, e.g., Brown, 805 F.3d
at 17.  For the same reasons as with Singer's statements, whether
Wilson believed that Singer's services were legitimate has limited
relevance to his state of mind for purposes of the tax count.  And,
in any event, the excluded statements provide only weak evidence
about Wilson's understanding of Singer's legitimacy.  Wilson does
not dispute that Singer provided at least some legitimate services
in addition to admission through the side door, and the referral
emails -- which do not mention the side door by name -- could be
for those services, shedding little light on Wilson's perception
of the legitimacy of the services Singer provided to him.  Further,
the email regarding exam scores is, as the government argues,
"consistent with questioning whether [Wilson's son] had to worry
more about test scores at all given the side-door arrangement in
place," and the emails about water polo would be consistent with
Wilson's believing that, even if his son was not a legitimate
athlete, he needed to at least pretend to be a team member for the
side-door scheme to work.  Cf. United States v. Sabean, 885 F.3d

27, 42 (1st Cir. 2018) (finding any error harmless where excluded "statements had as much of a tendency to inculpate the defendant as to exonerate him," because "the net impact of the evidence was likely a wash").

Given the government's strong evidence on the tax count, we conclude it is highly probable the exclusion of these exhibits did not taint Wilson's conviction.  See Kilmartin, 944 F.3d at 338-39.

Finally, Wilson argues that the district court erroneously excluded evidence related to USC's practices in acknowledging donations for tax purposes.  Federal tax law generally requires a charitable organization that receives a payment made "partly as a contribution and partly in consideration for goods or services" to (1) inform the donor that only the excess value of the payment beyond the value of those goods or services is deductible for federal tax purposes, and (2) provide an estimate of the value of the goods or services for the donor to use in preparing her taxes.  26 U.S.C. § 6115(b); see id. § 6115(a).  Wilson sought to introduce evidence that USC did not advise other donors that they were required to offset the value of their charitable deductions by the value of any admissions benefits received in exchange for their donations.  In particular, in response to a subpoena, USC offered "to provide a declaration explaining that . . . it ha[d] no responsive documents reflecting

that USC instructed a donor to reduce his or her tax deductability [sic] in connection with an admission decision because USC does not offer admission to any applicant in exchange for <u>quid pro quo</u> payments." Wilson argues that this evidence, which the district court excluded on relevance grounds, "would have supported the good-faith legitimacy of Wilson's deductions" by showing that he "reasonably believed that no offset was required." The government does not develop any argument that this evidence was properly excluded; it instead contends that the exclusion was harmless. We agree.

The evidence's probative value was limited. <u>See, e.g.</u>, <u>Brown</u>, 805 F.3d at 17. It had no bearing on the legitimacy of Wilson's deductions for business expenses. And it would provide only indirect support for Wilson's claim that he believed the charitable deductions to be legitimate. Wilson did not contend below that he was aware of USC's donation acknowledgement practices at the time he filed his tax return; indeed, the district court excluded the evidence because Wilson did not show such awareness. Instead, we understand Wilson's brief to argue that evidence that USC did not instruct other donors to offset charitable deductions by the value of any admissions boost received would have made Wilson's belief that such an offset was not required appear more reasonable and, as a result, more likely to be sincere. <u>See</u> <u>United States</u> v. <u>Lachman</u>, 521 F.3d 12, 19 (1st Cir. 2008). But to the

- 154 -

extent Wilson asserts that this evidence confirms the reasonableness of his belief in the deduction's legitimacy because it shows that USC shared that belief, the language of USC's proposed declaration undercuts his argument. The university claims not to have instructed donors to offset the value of their contributions only because it "does not offer admission to any applicant in exchange for quid pro quo payments." But we have already shown why the evidence is very strong that Wilson could not have believed in good faith that he was not engaging in a quid pro quo. And to the extent Wilson argues that he was not aware that the benefit he received in that quid pro quo was the kind of valuable benefit that would preclude his payment from being deductible, nothing in the disputed document bears on that question, since the document at most establishes the ordinary point that a donation not given pursuant to a quid pro quo is fully deductible. In truth, then, the proposed declaration does not support Wilson's position, meaning that the exclusion of that declaration was not prejudicial.

Given this context, the government's strong evidence on both theories of the tax count again enables us to "say with a fair degree of assurance that the [exclusion of this evidence] did not substantially sway the jury," rendering any error harmless. Kilmartin, 944 F.3d at 338 (quoting Ruiz-Troche, 161 F.3d at 87).

We affirm Wilson's tax conviction.

## VI.  Conclusion

For the foregoing reasons, we <u>affirm</u> Wilson's conviction for filing a false tax return in violation of 26 U.S.C. § 7206(1) (Count Thirteen of the operative indictment).  We <u>vacate</u> Abdelaziz's and Wilson's other convictions, and <u>remand</u> for proceedings consistent with this opinion.