# EXHIBIT C

**WHITE & CASE**

February 27, 2022

Via ECF

Hon. Indira Talwani
Hon. Rya W. Zobel
United States District Court
1 Courthouse Way
Boston, MA 02109

White & Case LLP
75 State Street
Boston, MA 02109-1814
**T** +1 617 979 9300

**whitecase.com**

**Re:**   *United States v. William Singer* **(19-cr-10078-RWZ)**
    *United States v. Jovan Vavic* **(19-cr-10081-IT)**

Dear Judge Zobel and Judge Talwani:

   I am defense counsel in one of the college admissions cases, but I am writing to you as an officer of the court, and not on behalf of any client. I am writing to inform you of information that indicates that William Singer has apparently made false statements about his assets and these false statements may affect the proceedings before you. As described below, it appears that in 2018-2020, Mr. Singer had millions of dollars hidden in foreign bank accounts and the funds have been moved while he was ostensibly cooperating with the government.

   Furthermore, there is substantial evidence that the prosecutors and agents running the investigation and prosecution were on actual notice that Mr. Singer was involved with a variety of criminal activities, including money laundering, and deviated from standard procedures by not investigating these activities or making timely, routine inquiries of Mr. Singer and others about such activities.[1] Such inquiries should have led them to these foreign bank accounts. The government is also aware that Mr. Singer moved millions of dollars out of a U.S. bank account used for his side-door activities. Those funds are unaccounted for.

   The result of this activity is that Mr. Singer has provided financial disclosure forms in connection with court proceedings that appear to be inaccurate. All together, these facts raise the question whether he has received an unwritten promise, reward or inducement for his cooperation and testimony from the government because the government was on notice of such misconduct and deviated from accepted practices by not investigating these issues. This could affect the integrity of any consents or other actions Mr. Singer has taken or refrained from. The government included Mr. Singer on witness lists in the Wilson/Abdelaziz and Vavic trials, but none of this information was included in its *Brady* or *Giglio* disclosures as required under Local

---

[1] This occurred during prior administrations of the U.S. Attorney's Office.

Case 1:19-cr-10080-LTS Document 2766-3 Filed 02/27/23 Page 3 of 6

February 27, 2022

Rule 116.2.[2]  The government made representations in court proceedings that were either incomplete or inaccurate, and Mr. Singer was incentivized to not dispute them.  *See, e.g.*, *United States v. Bizzack*.[3]

I will describe these issues in more detail below.  Because some of the information that the government is aware of was produced subject to government assertions of confidentiality, I have not provided all of the relevant specifics in this letter.

**Overseas Accounts**

In the course of my work, I received information about six overseas banks associated with William Singer, and at least some are also associated with his brother Cliff Singer.  The banks are:

1. Banistmo Bank in Panama City, Panama: It is likely both William and Cliff Singer are associated with an account here. At least one account was probably open for several years and in 2020 had over $600,000.

2. A Middle East bank: At least one account was most likely associated with William and Cliff Singer, and closed in May 2020.

3. A bank in Madrid, Spain: An account associated with William Singer may have been closed in November 2019 and may have had over 150,000 Euros.

4. Deltec Bank & Trust in Nassau, Bahamas: An account associated with William Singer likely held approximately $900,000 in January 2020.  Discovery shows Mr. Singer took his family on two yacht vacations to the Bahamas in 2017 and 2018.

5. IMS Trust in the Cayman Islands: In early 2020 an account associated with William Singer may have had $1.9 million.

---

[2] Local Rule 116.2 requires the government to disclose "any information that tends to cast doubt on the credibility or accuracy of any witness or evidence that the government anticipates calling or offering in its case-in-chief" and "a written description of any prosecutable federal offense known by the government to have been committed by any witness whom the government anticipates calling in its case-in-chief."

[3] The FBI 302 report relevant to Mr. Bizzack was produced under seal and is not quoted in this letter.  The government delayed disclosure of the October 1, 2018 Singer note discussed below, and it was not disclosed until February 2020, months after the Bizzack sentencing.  With respect to the Bizzack sentencing, the government did not disclose to the Court that the $20,000 invoice containing Mr. Bizzack's name was created *after* Mr. Singer became a Confidential Informant ("CI") and was, in fact, an artifact of his cooperation.  *See* Bizzack Tr. dated October 19, 2019 at 17:8-18:1, 34:7-35:3.  There were no names listed on any invoices until *after* Mr. Singer became a CI.  It was the FBI that had insisted Mr. Singer have Ms. Heinel put "more detail" on her invoices.  *See* Abdelaziz Trial Tr. Day 10 at 110:19-110:25.  And Mr. Singer had great incentive to get Ms. Heinel to do his bidding, as set forth below.

February 27, 2022

> 6. A bank in Spain: The account is likely associated with William Singer, and when it was closed in mid-2020 it probably had over $40,000.

It appears funds were moved out of at least some of these accounts after Mr. Singer agreed to work as a CI in September 2018. Defense counsel does not have the investigative resources and subpoena power that are available to the government. I do not mean to imply that the above is or is not an exhaustive list of Mr. Singer's undisclosed assets or bank relationships, or a complete description of William and Cliff Singer's contacts with each bank. Obviously, I am not able to confirm this information with the banks or any law enforcement database.

The significance of these accounts becomes apparent if one reviews the government's unorthodox handling of Mr. Singer as a CI.

**The Government Recruits Singer as a Confidential Government Informant.**

The government was investigating Mr. Singer in 2018. Prior to September 2018, it was conducting consensual and Title III telephone surveillance, and recorded calls describing Mr. Singer's activities. Because the government claims the tapes are confidential, I will not quote them, but they put the government on notice of a myriad of Mr. Singer's activities. A review of such tapes makes clear that the government should have immediately focused on money laundering and foreign bank accounts. In a recent trial, a FBI financial analyst testified that Mr. Singer collected over $25 million in domestic bank accounts used for his side-door activities and several millions of dollars had been transferred from these accounts but not tracked down.

When the government confronted Mr. Singer in September 2018 and solicited him to become a CI (i.e., to work in an undercover investigation), Mr. Singer initially disputed the government's claim that some of the parents who were his clients had knowingly participated in bribery. In his personal notes written on or about October 1, 2018, Mr. Singer described the intense pressure the agents and prosecutors put on him to change his version of events:

> Loud and abrasive call with agents. They continue to ask me to tell a fib and not restate what I told my clients as to where there money was going -to the program not the coach and that it was a donation and they want it to be a payment. I asked for a script if they want me to ask questions and retrieve responses that are not accurate to the way I should be asking the questions. Essentially they are asking me to bend the truth which is what they asked me not to do when working with the agents and Eric Rosen. Liz raised her voice to me like she did in the hotel room about agreeing with her that everyone Bribed the schools. This time about asking each person to agree to a lie I was telling them.

He also wrote in his notes that he was very concerned about what money he would have left after any prosecution and sentence: "How do I have money when I get out? Sell house, 401 K etc Sprinter Van card etc[.] What do I do about restitution . . . ?"

3

WHITE & CASE

February 27, 2022

In September 2018, the agents instructed Mr. Singer that he had to make all non-privileged calls on a recorded phone, but quickly learned he disobeyed this instruction and called his brother Cliff Singer on a phone that was not recording. There is no indication in the interview reports that the agents questioned Mr. Singer if he and Cliff discussed money laundering or foreign bank accounts in these unrecorded calls.

It is standard FBI procedure that before the agents can agree to work with a person as a Confidential Informant, the agents must fully debrief the proposed CI about all ongoing criminal activity. And the government's February 19, 2019 plea agreement with Mr. Singer includes the right to insist on an immediate and complete financial disclosure:

> If the U.S. Attorney requests, Defendant further agrees to complete truthfully and accurately a sworn financial statement and to deliver that statement to the U.S. Attorney within 30 days of signing this Plea Agreement . . . .[4]

The government has claimed it disclosed to defense counsel all of its reports of Singer interviews from September 2018 to August 2021. In none of these reports prior to August 2021 did the agents question Mr. Singer about money laundering with family members or his assets. Nor do the reports contain much of the information Mr. Singer provided that exculpates parents. An IRS agent testified at trial that the interview reports memorialized information that would assist the prosecution, and generally did not memorialize exculpatory statements by Mr. Singer.[5]

Mr. Singer had an extensive series of interviews memorialized in agents' reports. The government produced hundreds of pages of Singer interview reports, handwritten notes and related attachments. None of the reports dated prior to August 2021 memorializes questioning of Mr. Singer about money laundering or hidden assets. An August 2021 FBI interview report memorializes a perfunctory and uninformative interview with Mr. Singer about assets.[6]

After Mr. Singer wrote in his notes that he was being pressured to lie by the agents, he worked as a CI for almost four months. At the same time, the record reflects little if anything that the government did to learn about or seize Mr. Singer's hidden assets. This quid quo pro—

---

[4] The government did not receive a financial statement from Mr. Singer until June 2021–that is, over two years after the plea agreement was executed, and almost three years after he became a CI. It appears that AUSA Eric Rosen outsourced the financial analysis of Mr. Singer's assets to Mr. Singer's own attorneys. *See* USAO-VB-01719558.

[5] *E.g.*, Abdelaziz Trial Tr. Day 11 at 176:11-176:15, 178:5-178:20.

[6] The circumstances of this 2021 interview underscore the government's conscious decision not to pursue Mr. Singer's assets diligently. It occurred almost three years after the government had asked Mr. Singer to be a CI, and thus was not timely. It does not show the government asked specific questions about relevant topics it knew about. Nor does it indicate any initiative by the government to research Mr. Singer's assets. The government only conducted this lackluster interview on the eve of the Abdelaziz/Wilson trial, after numerous inquiries by defense counsel.

WHITE & CASE

February 27, 2022

where Mr. Singer cooperated despite his misgivings and the government looked the other way while Mr. Singer further concealed his assets—surely was not lost on Mr. Singer. During 2020 and 2021, myself and other defense counsel in the *Sidoo* case repeatedly asked the government to disclose information concerning Mr. Singer's assets. After months of delays, the government provided a financial disclosure form, which does not disclose his overseas assets.

Sincerely,

/s/ Michael Kendall
Michael Kendall (BBO # 544866)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com