UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-LTS |
| | ) | |
| JOHN WILSON, | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

On March 1, 2014, one day after his son was admitted to the University of Southern California ("USC") as a purported water polo recruit in exchange for a payment to the water polo team account, defendant John Wilson thanked William "Rick" Singer for "making this happen" and asked him about "the options for the payment." *United States v. Abdelaziz*, 68 F.4th 1, 63 (1st Cir. 2023). Wilson wrote: "Can we make it for consulting or whatever from the [K]ey so that I can pay it from the corporate account?" *Id.* Singer agreed to send Wilson a fake "invoice for business consulting fees" so that Wilson could "write [the payment] off as an expense." *Id.* Wilson replied, "Awesome!" *Id.* Wilson then provided Singer with the billing information for his private equity firm, Hyannis Port Capital, and instructed his office assistant to work with Singer to craft an invoice that would falsely identify the purpose of the payment as "Business Consulting." *Id.*

Wilson ultimately took fraudulent tax write-offs totaling $220,000 for the *quid pro quo* payment he made to secure his son's college admission, thereby avoiding nearly $90,000 in federal income taxes that he owed. *Id.* at 64. Four years later, he sought to repeat the scheme, this time in connection with *quid pro quo* payments he made to secure the admission of his twin daughters to college as athletic recruits in sports they did not play. Once again, it was Wilson who proposed the fraud, asking Singer—in a September 2018 call intercepted over a court-authorized wiretap

before Singer began cooperating with the government—whether "there [was] any way to make [the payments] tax deductible as like donations to the school."  *Id*. at 17.  This time, however, Wilson's scheme was unsuccessful.  Singer began cooperating with law enforcement authorities just days after that September 2018 phone call, and Wilson was arrested a few months later after he made two $500,000 payments to Singer.

A sophisticated business executive, a graduate of Harvard Business School, and a millionaire many times over, it was Wilson who came up with the idea of committing tax fraud to save himself money—not once, but twice.  He did so as part of a scheme to secure the admission of his children to college in sports they did not play, or did not play particularly well, in exchange for money.  And yet, he would have the world believe, even now, that he is the victim in this case.

Indeed, on the eve of his re-sentencing—following a four-week trial and an appeal in which his tax fraud conviction was affirmed—Wilson remains unrepentant, proclaiming his innocence and insisting that his fake deductions were legal donations.  In a recent statement he issued to the news media after his related convictions for the admissions scheme were vacated and remanded for re-trial, Wilson declared, flatly:  "I did not commit any of these crimes."[1]  In fact, as the First Circuit noted, the evidence of Wilson's tax fraud—comprised largely of his own words—was "very strong" and "powerful."  *Id*. at 68.

The Presentence Investigation Report ("PSR") calculates Wilson's offense level at 14, and his sentencing guidelines range as between 15 and 21 months.  PSR, pp. 94–95.  Notably, that guidelines calculation does not account for Wilson's effort to repeat his tax fraud with respect to

---

[1] Shelley Murphy, "Parent whose convictions were overturned in Varsity Blues college admissions scandal calls decision 'true vindication,'" *Boston Globe*, May 14, 2023, *available at* https://www.boston.com/news/the-boston-globe/2023/05/15/parent-whose-convictions-were-overturned-in-varsity-blues-college-admissions-scandal-calls-decision-true-vindication/ (last visited Aug. 11, 2023).

the $1 million in *quid pro quo* payments he made to secure his daughters' admission.  For the reasons set forth below, the government respectfully requests that the Court sentence Wilson to a term of incarceration of 15 months, at the low end of the applicable range; 12 months of supervised release with 250 hours of community service; a $100,000 fine; and restitution to the IRS of $88,546.

## I.    <u>Procedural Background</u>

Wilson was convicted after trial of multiple crimes in connection with his efforts to secure the admission of his children to college as athletic recruits in exchange for payments to funds controlled by university insiders, and to falsely deduct those payments from his taxes: (i) conspiracy to commit federal programs bribery; (ii) two counts of substantive federal programs bribery; (iii) conspiracy to commit mail fraud, wire fraud, and honest services mail and wire fraud; (iv) three counts of substantive wire fraud and honest services wire fraud; and (v) filing a false tax return.  *Abdelaziz*, 68 F.4th at 12.  He was sentenced to a term of 15 months' incarceration on each count of conviction, to be served concurrently; two years of supervised release on all counts except the tax count, on which he was sentenced to a concurrent term of one year; 400 hours of community service; a fine of $100,000 on each of the two conspiracy counts; and restitution to the IRS of $88,546.  Dkt. 2536.

On appeal, the First Circuit vacated Wilson's fraud, bribery, and conspiracy convictions, and affirmed his conviction for tax fraud.  *Abdelaziz*, 68 F.4th at 74.  The court found that although the question was a "close one," payments to an agent's principal cannot constitute bribes for purposes of the honest services fraud statute.  *Id*. at 29–30.  Likewise, the court found that although university admissions slots may constitute property for purposes of the wire fraud statute depending "on the evidence in a particular case," the district court erred by instructing the jury that

the admissions slots at issue in this case were property as a matter of law. *Id*. at 34. The court upheld the government's federal program bribery theory, finding that payments to an agent's principal can constitute bribes for purposes of that statute. *Id*. at 21–22. But the court vacated the federal programs bribery convictions, along with the conspiracy and wire fraud convictions, finding that the evidence at trial was insufficient to prove that Wilson agreed to join the broad conspiracy charged—involving an agreement with other parents to facilitate the admission of their children to various universities—and that Wilson was prejudiced by the variance. *Id*. at 40–42. In reaching that conclusion, the court noted that it was undisputed that the evidence sufficed to prove a narrower conspiracy among Wilson, Singer, Singer's staff, and university insiders to secure the college admission of Wilson's own children. *Id*. at 42; *see also id*. at 45 ("The defendants here do not dispute that the evidence suffices to show that all parents alleged to have conspired with Singer and his core group had similar unlawful goals in one sense: getting their own children into particular universities through illicit means."). And, it said: "Nothing in this opinion should be taken as approval of the defendants' conduct in seeking college admission for their children." *Id*. at 12.[2]

The First Circuit rejected Wilson's multiple challenges to the tax fraud conviction,[3] which arose out of his deduction of the *quid pro quo* payments made to secure his son's admission to USC as purported business expenses and charitable donations. The court noted that the conviction "relied largely on Wilson's own emails discussing how to structure the payments related to his son's admission," and that Wilson did "not meaningfully dispute the government's theory that the

---

[2] *See also id*. at 33 ("We should not be misunderstood. We do not say the defendants' conduct is at all desirable.").

[3] On appeal, Wilson did not present any arguments to disturb his sentence on the tax fraud conviction.

payments did not qualify as business expenses (because of their personal nature) or as charitable contributions (because they were his side of a *quid pro quo* to secure his son's admission)." *Id*. at 67–68.  The court also rejected Wilson's contention that the tax loss from his scheme was *de minimis*, noting that this argument "echoe[d] the position Wilson's counsel unsuccessfully presented to the jury during closing argument," "downplay[ed]" the relevant evidence, and rested on assumptions that were both illogical and contrary to the evidence.  *Id*. at 69–70.  The court remanded the case for further proceedings, *id*. at 74, and the government thereafter sought leave to dismiss the non-tax counts and to proceed to re-sentencing on the tax count, Dkt. 2683.

## II.     The Offense and Relevant Conduct

### A.     Wilson Fraudulently Deducted *Quid Pro Quo* Payments Made to Secure the Admission of His Son to USC as a Purported Water Polo Recruit

In the spring of 2013, Wilson asked Singer—his son's private college counselor—about pursuing a "side door" to secure admission for his son to college as a purported water polo recruit. *Abdelaziz*, 68 F.4th at 16.  Singer told Wilson that USC's water polo coach, Jovan Vavic, "is giving me 1 boys slot."  *Id.*  Singer explained that there would be "[n]o payment of money" until Vavic received "a verbal and written [sic] from admissions."  *Id.*

Although Wilson's son played water polo in high school, he was not qualified to play for USC's elite Division I water polo team, and Wilson worried that he would be "a clear misfit" and "a lepper."  *Id.*  Singer explained to Wilson that Vavic had directed him to "embellish" his son's athletic credentials to present him to USC's admissions department as a recruit.  *Id.*  Singer responded by fabricating an athletic profile for Wilson's son, which he emailed to Wilson.  *Id.*

Vavic used the falsified profile to secure the admission of Wilson's son, falsely telling USC's admissions department, among other things, that he was a "top 10" player nationally in his position and would be an "immediate impact player" on USC's championship team.  PSR ¶ 52.

The day after the admissions committee approved his son's admission to USC as a water polo recruit, Wilson sent Singer an email with the subject line "USC fees." *Abdelaziz*, 68 F.4th at 63. In the email, Wilson thanked Singer for "making this happen" and asked him: "What are the options for the payment?  Can we make it for consulting or whatever from the [K]ey so that I can pay it from the corporate account?" *Id.*; PSR ¶ 53.  Singer confirmed that he would send Wilson a fake "invoice for business consulting fees" so that he could take a "write off as an expense." *Abdelaziz*, 68 F.4th at 63.  Wilson replied, "Awesome!" *Id.*  Wilson thereafter instructed his office assistant to pay the invoice from his private equity firm and charge it to "Business Consulting." *Id.*

Days later, Wilson's assistant advised him that, after consulting with Singer and Singer's bookkeeper, the payment would be divided in three:  $100,000 to Singer's purported charitable foundation, the Key Worldwide Foundation ("KWF"); $100,000 to Singer's for-profit college counseling business, The Key; and $20,000 to Singer personally. *Id.*  Wilson approved the revised plan, and the money was wired from his private equity firm days later. *Id.*  Singer's purported charity, KWF, thereafter sent Wilson a letter acknowledging a purported donation of $100,000 and falsely stating that "no goods or services were exchanged" for the money. *Id.*  Singer and his for-profit business, The Key, also sent Wilson's private equity firm two falsified invoices, one for $20,000, for purported "Special Consulting . . . Concept, design, and implementation of Professional Development program for Hyannis Port Capital associates," and a second for $100,000, for purported "Business Consulting." *Id.*  Wilson deducted the payments as purported business expenses and a charitable donation from his 2014 joint amended federal tax return, netting Wilson $88,546 in taxes he would have otherwise had to pay to the IRS. *Id.* at 65; PSR ¶ 55. Singer, in turn, funneled $100,000 from The Key to the USC water polo account that Vavic

controlled. *Abdelaziz*, 68 F.4th at 64; PSR ¶¶ 54, 56. After one semester on the water polo roster, Wilson's son quit the USC water polo team, just as Singer had promised he could. *Abdelaziz*, 68 F.4th at 16–17.

### B.      Wilson Planned To Fraudulently Deduct Payments Made To Secure His Daughters' Admission to College as Purported Athletic Recruits

In 2018, Wilson approached Singer again, this time about securing the college admission of his twin daughters as purported athletic recruits in exchange for *quid pro quo* payments. *Id.* at 17. In calls captured on a court-authorized wiretap before Singer was approached by the FBI in September 2018, Wilson asked Singer "what sports would be best for them . . . or is it not gonna even matter?" *Id.*; PSR ¶ 57. Singer responded, "It doesn't matter. . . . I'll make them a sailor or something . . . [b]ecause of where you live." *Abdelaziz*, 68 F.4th at 17; PSR ¶ 57. Wilson laughed and asked whether there was "a two for one special for twins." *Abdelaziz*, 68 F.4th at 17; PSR ¶ 57. He also asked Singer if "there [was] any way to make [the payments] tax deductible as like donations to the school." *Abdelaziz*, 68 F.4th at 17 (alterations in original). Singer responded that "it's all tax deductible, it's going into a non-profit."

In a subsequent call, after Singer began cooperating with law enforcement, Wilson acknowledged that his daughters were not college-level athletes: "What if they're not really that good? I mean, they can do some crew, but I don't know they're gonna be good." *Abdelaziz*, 68 F.4th at 17; PSR ¶ 58. He added that one of his daughters was not competitive at sailing and only "did sailing in, you know . . . yacht club." PSR ¶ 58. Singer told Wilson: "[A]t the end of the day . . . I may be able to go to the sailing coach and say, 'Hey, this family's willing to make the

contributions. . . .  [The child] may not be up to the level you are, but . . . you're gonna get a benefit, and the family's gonna get [a] benefit.'"  *Abdelaziz*, 68 F.4th at 17; PSR ¶ 58.

In October 2018, Wilson confirmed that he wanted to proceed with the plan to secure his daughters' admission to Harvard and Stanford as recruited athletes in exchange for payments styled as donations.  *Abdelaziz*, 68 F.4th at 17; PSR ¶ 59.  But Wilson made sure to verify that "they don't actually have to do that sport. . . .  They could just go in and . . . be like the scorekeeper or . . . water boy, water girl."  *Abdelaziz*, 68 F.4th at 18.  Singer confirmed that Wilson's daughters would not have to play the sport, and that, if Wilson paid the money, their admission as athletic recruits would be a "done deal."  *Id*.  Days later, Wilson caused his private equity firm to wire $500,000 to Singer's charity to secure an athletic recruitment slot at Stanford.  PSR ¶ 59.  In an email to his assistant, Wilson described the payment as "Tax write off and help getting into colleges."  *Id*.  Wilson subsequently caused his company to wire an additional $500,000 to KWF to secure a recruitment slot for his other daughter at Harvard.  *Abdelaziz*, 68 F.4th at 19.  Wilson was arrested approximately three months later.  *Id.*

## III.  Sentencing Recommendation

John Wilson is a successful, highly educated, and wealthy business executive who devised a tax fraud scheme to more cheaply facilitate buying his children's way into college as fake athletic recruits.  There is nothing redeeming about his actions, and no reason to depart from the applicable sentencing guidelines in this case.  Indeed, if anything, those guidelines understate the seriousness of Wilson's offense because they do not account his effort to repeat his tax fraud in 2018, much less the fact that the entire *quid pro quo* arrangement was itself criminal.

Other defendants in the Varsity Blues prosecutions have been sentenced (and served) terms of up to nine months in prison for conduct substantially identical to Wilson's.  And yet, in contrast

to Wilson, those defendants accepted responsibility for their actions and, for the most part, demonstrated remorse.  Wilson has done neither.  His approach, throughout, has been to minimize his own responsibility, blame others, and cast himself as the victim.

The 15-month sentence the government requests—at the low end of the applicable guidelines range—avoids unwarranted disparities with those other defendants.  As set forth below, it appropriately balances the nature and circumstances of Wilson's offense, his lack of remorse, and the need to deter him, and others like him, from committing similar crimes in the future.  It is, in short, a just sentence on the facts of this case.

### A.      The Nature and Circumstances of the Offense

Wilson cheated on his taxes as an adjunct to an underlying scheme to secure the admission of his children to college as athletic recruits in sports they either did not play, or did not play at a Division I level, in exchange for money.  Consistently, he has refused to accept responsibility for his actions, even as his own words belie his denials.  He knew that his son would be a "lepper" on USC's championship water polo team and would not really play.  *Id*. at 72.  He knew that his daughters were unqualified to be anything more than a "scorekeeper" or "mascot" for the crew or sailing teams at Harvard or Stanford.  *Id*. at 17, 19.  He knew that his children would not be recruited, and would therefore not be admitted to those schools, unless he paid money to secure their admission.  *Id*. at 19 n.5.  And he knew that those *quid pro quo* payments could not legally be deducted from his taxes as either charitable contributions or business expenses because they were neither.  *Id*. at 68.  We know these things to a certainty because Wilson said them himself.

To be sure, the First Circuit has found that Wilson's actions did not constitute honest services fraud, that the admissions slots he bought were not necessarily property for purposes of the wire fraud statute, and that the evidence was insufficient to show that Wilson joined the charged

nationwide conspiracy.  But what the court did not do—as Wilson contends—is exonerate him.

To the contrary, it found that "the evidence was sufficient to permit a jury to convict [Wilson] of

conspiring with Singer, his staff, and university insiders to secure his own child's or children's

admission" to college as recruited athletes in exchange for *quid pro quo* payments.  *Id.* at 42

(describing the sufficiency of the evidence of the narrower conspiracy as "not in dispute").  It

rejected Wilson's argument that his actions did not constitute federal programs bribery as a matter

of law.  *Id.* at 26.  It likewise rejected each of the three arguments he advanced for setting aside

his tax fraud conviction and affirmed, repeatedly, that the evidence supporting that conviction was

strong, including that the false "deductions ultimately saved Wilson tens of thousands of dollars."

*See generally id*. at 62–74.  And it made clear that nothing it said "should be taken as approval" of

Wilson's conduct.  *Id*. at 12.  Accordingly, in evaluating the nature and circumstances of Wilson's

offense and imposing sentence, this Court can, and should, take into account all of the conduct

surrounding his tax fraud, as amply proved by his own words and actions.  *See, e.g.*, *United States

v. Blagojevich*, 854 F.3d 918, 920–21 (7th Cir. 2017) (affirming district court's consideration of

conduct underlying vacated counts, which government elected not to retry, in imposing the same

sentence on remand); *see also Nichols v. United States*, 511 U.S. 738, 747 (1994) ("Sentencing

courts have not only taken into consideration a defendant's prior convictions, but have also

considered a defendant's past criminal behavior, even if no conviction resulted from that

behavior."); *United States v. Graciani*, 61 F.3d 70, 74 (1st Cir. 1995) ("relevant conduct may

include both uncharged conduct and conduct underbracing counts that have been charged and then

dropped").

At bottom, the nature and circumstances of the offense are this:  Wilson—a sophisticated

and seasoned business executive—devised and executed a tax fraud scheme of his own accord.

But unlike run-of-the-mill tax avoidance schemes, Wilson employed tax fraud to defray the cost of *quid pro quo* payments he used to secure an illicit path to college admission for his children. He thus sought not only to deprive qualified applicants of admission to the university of their choice—and qualified athletes of places they had earned through hard work and sacrifice—in favor of his own children, but also to defraud the American taxpayers in the process.  He did not just make these illicit payments to secure his children's college admission, like other defendants; instead, Wilson—a millionaire many times over—lied on his taxes in not one, but two ways to save himself money.  The seriousness of this crime, and the circumstances under which it was committed, weigh in favor of a meaningful prison sentence.

### B.     The History and Characteristics of the Defendant

Wilson's interview with Probation, and the letters submitted to the Court in connection with his initial sentencing, describe how he overcame an extremely difficult childhood to attend Harvard Business School and achieve remarkable success as a business executive.  These same letters describe Wilson as a loving parent who wants the best for his own children.  The government accepts all this as true.

At his first sentencing hearing, Wilson also sought to highlight his charitable works, including past contributions to Autism Speaks, on whose board of directors he served for many years, as well as money he promised to various educational organizations in his will.  These

contributions are commendable, if perhaps not as exceptional for a person of Wilson's wealth as his prior sentencing memo suggests.[4]

But neither Wilson's charitable giving, nor his childhood—however difficult—explains or excuses his crime, much less his continued failure to accept responsibility for it. Indeed, the opposite is true. Wilson is a highly educated corporate executive who has for decades worked in the C-suite at a succession of major companies. As a consultant, he advised other corporate executives on business strategy. As a board member, he chaired audit committees. In short, he knew right from wrong. Yet despite enormous wealth that allowed him to provide his children with advantages he could hardly have imagined as a child—private schools, private tutors, coaches and college counselors, expensive extracurricular activities, summer camps, and trips abroad—Wilson chose to cheat, in more ways than one. Eyes wide open, he chose to secure his own children's admission to college through a "side door," as purported athletic recruits, in exchange for money—a scheme that necessarily displaced more qualified candidates. Having overcome tremendous obstacles himself, his actions thus made it more difficult for other hardworking children facing similarly difficult circumstances to do the same. Likewise, despite achieving financial security unimaginable to most Americans—wealth that allowed him to afford a $3 million mansion in the Boston suburbs (PSR ¶ 155), a $10 million second home on Cape Cod adjacent to the Kennedy compound (*id.*), and a birthday party for which he rented out the palace at Versailles, *see* Trial Ex. 578 (transcript)—Wilson chose to use tax fraud to subsidize that cheating. And then he tried to do it all over again.

---

[4] The tax fraud Wilson sought to commit with respect to the *quid pro quo* payments for his daughters alone would have effectively offset all the money he has contributed to Autism Speaks.

Wilson's choices were neither impulsive nor, as he contended in his prior sentencing memorandum, "aberrational."  Dkt. 2525 at 24.  In that brief, Wilson argued that his "tax preparers testified at trial that in general and over the years Wilson was a taxpayer who always paid his fair share and was never looking to do anything inappropriate."  *Id*.  But, of course, his tax preparers didn't know better.  The mechanism of Wilson's scheme was to dupe them into unwittingly facilitating his fraud.  A sophisticated businessman, he knew better than to ask legitimate tax preparers to assist him in using falsified invoices to deduct *quid pro quo* payments as business expenses and a fake charitable donation.  Indeed, his tax preparer stopped working for him the moment he was charged.  *See* 9/28/21 Trial Tr. at 24.

And Wilson's criminal conduct spanned months and years.  His crime was thought out and planned—as carefully considered as any of the other business decisions he made over the course of his long career.  Having succeeded in securing his son's recruitment to USC in exchange for money, he requested fake invoices, instructed his assistant to provide them to his accountants, and months later signed the falsified tax return the accountants prepared.  And then he tried to do it again.  Indeed, even though *years* had elapsed before Wilson called Singer about his daughters, fraud remained at the forefront of his mind:  not just the scheme to secure their admission, but how to once again have taxpayers help foot the bill.  Again, it was Wilson who asked Singer whether they could structure the *quid pro quo* payments "as like donations" to make them appear to be tax deductible, not the other way around.

In those critical moments when he committed and recommitted to fraud, Wilson was not confused or impaired.  He was not acting rashly or struggling financially.  Nor was he suffering under the enduring legacy of his difficult childhood.  He was, instead, cunning and deliberate.  He thought he could get away with it.  Having achieved the pinnacle of business success, he was

driven to crime by avarice, arrogance, and entitlement—the belief that paying their fair share of taxes was for people who applied to college the old-fashioned way:  on merit.  These facts, too, counsel in favor of a meaningful term of incarceration.

**C.**     **The Need to Promote Respect for the Law and Afford Adequate Deterrence**

Throughout these proceedings, Wilson has sought to minimize his misconduct and to blame others—from USC, to law enforcement, to his co-conspirator Rick Singer, and even to the office assistant he enlisted in executing his tax fraud scheme.[5]  He has cast himself as their victim, and sought to deny responsibility even for the tax fraud he devised and that benefited no one but him.  Even after the First Circuit affirmed his tax fraud conviction and repudiated his conduct, he chose—in advance of his re-sentencing—to issue a public statement declaring himself vindicated and proclaiming his innocence.

Wilson's failure to accept responsibility underscores the need for a sentence that promotes respect for the law and that deters him from committing tax fraud in the future.  The system of taxation in this country, built as it is on self-reporting, relies on the integrity of individual taxpayers.  By its nature, tax fraud is a crime that is easy to commit and nearly impossible to detect or prove.  In Wilson's case, it required only an email and few falsified invoices.  Its discovery, by contrast, required a combination of luck and painstaking investigation.  Indeed, the government would never have learned of Wilson's tax avoidance scheme but for its discovery of his *quid pro quo* college admissions scheme, which itself was uncovered only as the result of an unrelated investigation into a different individual for securities fraud.  Finding the evidence of Wilson's crime—which was buried in his personal emails and private conversations, and hidden even from

---

[5] *See* 10/6/21 Trial Tr. at 119 ("None of the invoices the government focuses on were ever sent to John.  It was all done by Debbie in California when John is working in Europe.  He's delegated it to his bookkeeper.").

his own accountants—required years of effort, including a court-authorized Title III wiretap and multiple search warrants.  And even after four years of litigation and a conviction for tax fraud that was upheld on appeal, Wilson still insists publicly that his *quid quo pro* payments were legitimate donations.  In these circumstances, there is little save the threat of a meaningful sanction to stop him from lying on his taxes again, when he thinks no one is looking.

More broadly, every session of this Court to have imposed sentence in the Varsity Blues cases to date has emphasized the critical importance of general deterrence.[6]  That consideration is particularly important here, for at least two reasons.  <u>First</u>, Wilson's very public refusal to accept responsibility for any of his conduct—including the tax fraud he personally conceived—requires that the sentence imposed reflect the seriousness of his crime.  The defendant literally enlisted Singer and his assistant in crafting false invoices identifying the *quid pro quo* payments for his son's college admission as business consulting expenses so that he could deduct them as such from his taxes.  The breezy nonchalance with which he committed that crime, combined with the

---

[6] *See, e.g., United States v. Semprevivo,* 19-CR-10117-IT, Dkt. 551, 10/15/19 Sentencing Tr. at 40 ("But each time I come back to the question in this series of cases of general deterrence, and the fact that there is this crime that was undertaken where there was already so many—so many things in these defendants working in their favor and yet they took these steps, and the notion that we shouldn't need to have a Government wire and a Government investigation to try to have people not behave in this way. . . . "); *United States v. Bizzack*, 19-CR-10222-DPW, Dkt. 34, 10/30/19 Sentencing Tr. at 88–89 ("[T]he best general deterrence is certainty and immediacy, but that's not what the criminal justice system delivers. It takes a while. And so what we've got left is time in jail. . . .  And so you have identified the fishbone in my throat on this case. That is the other people who think that life is a series of encounters with maitre d's who, you give them a little bit of money and you get in the side door. That's what I'm concerned about here."); *United States v. Center*, 19-CR-10116-RGS, Dkt. 72, 5/21/21 Sentencing Tr. at 14 ("I think it is important, for reasons of general deterrence, that a case like this one, that is this so-called "Varsity Blues" case, not occur again."); *United States v. Hauser*, 20-CR-10166-DPW, Dkt. 27, 5/25/21 Sentencing Tr. at 80 ("What's the price that someone has to pay for what they've done to the community, a community that looks at this and says, See, the rich guy always gets away with it; they can afford to pay for services the rest of us can't. That's not a nuanced evaluation of this crime, but it is a recognition that society has a right to claim.").

enormous difficulty of detecting and proving it, supports a sentence that discourages other, similarly situated taxpayers from engaging in similar frauds.  And, like Wilson, other executives are likely—once caught—to have the means to spend millions of dollars to defend themselves against prosecution, dragging cases out over years of pitched litigation.  That is unquestionably their right.  But having now had his conviction for tax fraud affirmed on appeal after four years of litigation, it is important that Wilson's sentence reflect that he has not been vindicated, as he contends.  Instead, that sentence—which will be highly publicized—must reflect that fraud leads to prison, full stop.  It should serve to shift the calculus of committing this crime, such that the risk of getting caught and punished is not worth the potential reward.  Anything less than a meaningful sentence of incarceration will simply embolden others who have similarly deep pockets and callous disregard for the law.

Second, Wilson's status as a high-ranking executive and graduate of Harvard Business School further underscores the need for general deterrence in this case.  From his perch high on the socioeconomic ladder, with his unparalleled education and vast experience in the intricacies of high finance, Wilson chose to cheat the IRS in order to save money on a dirty backroom college admissions scheme.  And with those savings, he was able to afford even more of his already lavish lifestyle.  At trial, his attorneys quibbled that he didn't rent out the entire palace at Versailles for his birthday party—just part of it.  *See* 9/21/21 Trial Tr. at 163 ("My client mentions that he's planning to have a birthday party in France. The Versailles Museum is a function hall and you can rent out rooms there.  So he's renting out a room there.").  And Wilson has consistently emphasized that he paid a lot of taxes.  That, of course, was because he earned an exceptionally high income,

much of it captured on W-2 forms and K-1 schedules.[7]  But individuals are not entitled to determine for themselves how much to pay in tax.  All Americans are subject to the tax laws, whether their income is high or low, whether their tax burden is great or small.  Indeed, this Court regularly imposes meaningful prison terms for willful tax avoidance on people of far more limited means:  painters and plumbers, fishermen and deckhands.  Wilson's wealth and financial sophistication did not entitle him to defraud the IRS because he thought his tax bill was high enough.  It is important that wealthy and educated tax schemers like Wilson be publicly held to account for their frauds—that their punishment is meaningful enough to deter others in their position from committing such crimes, and to demonstrate that there is no discount on justice for the rich and powerful.

### D.  The Need to Avoid Unwarranted Sentencing Disparities

Another significant consideration in this case is the need for the sentence imposed to avoid unwarranted disparities relative to similarly situated defendants.  Although Wilson stands convicted of tax fraud, that conviction arose out of conduct essentially identical to that of dozens of other defendants who have already been sentenced.  Those defendants were convicted under a variety of statutes:  wire fraud, honest services wire fraud, federal programs bribery, money

---

[7] According to the IRS, "the underreporting of business income by individual taxpayers—income of sole proprietors, farmers and those earning rental, royalty, partnership, and S Corporation income—is a major contributor" to the "Gross Tax Gap (the amount of 'true' tax that is not paid voluntarily or timely)," which the IRS estimates at approximately $441 billion annually.  *See* Chuck Rettig, "A Closer Look - Impacting the Tax Gap," at 1–3, *available at* https://www.irs.gov/pub/foia/ig/cl/tax-gap-for-web.pdf (last visited Aug. 11, 2023).  That is because such income is generally not visible to the IRS absent voluntary reporting. For income subject to third-party reporting, such as W-2 wages and salaries, tax compliance approaches 100 percent. *Id*. at 4. By contrast, "where income is subject to little or no information reporting or withholding," as is the case with sole proprietorships and S-Corporations, "compliance is as low as 45 percent." *Id*.  Wilson's fraud thus contributes to a persistent injustice:  the shifting of the tax burden to wage-earners and law-abiding businesses.

laundering, and tax fraud.  In imposing sentence, however, different sessions of this Court have given less weight to the statutes of conviction, than to the nature of the defendants' conduct.  In previously sentencing Wilson to a term of 15 months, for example, Judge Gorton specifically imposed that term on Count Thirteen—the tax fraud count for which Wilson is now being re-sentenced—to run concurrently with his sentence on the remaining counts of conviction, reflecting the Court's belief that the conduct underlying that count independently warranted a 15-month term. *See* Dkt. 2536.  Indeed, Wilson himself argued in his initial sentencing memo that his "conduct is no different than parents who were charged differently."  Dkt. 2525 at 15.  What does distinguish Wilson from many of the remaining defendants in this case is not what he did, but the fact that at the time he was caught, he was actively trying to do it again.  And what distinguishes Wilson from *all* of the remaining defendants is his continued refusal to accept responsibility for his crime.

In his initial sentencing memorandum, Wilson suggested that his "lesser culpability" could be "best understood" in comparison to three other defendants:  Douglas Hodge, Mossimo Giannulli, and Michelle Janavs.  *Id*. at 13.  Wilson, of course, is not similarly situated to any of those defendants because they accepted responsibility for their crimes years ago and he has yet to do so.  As the First Circuit has made clear, defendants who accept responsibility and express remorse are not similarly situated to those, like Wilson, who do not. *See, e.g.*, *United States v. Vazquez-Rivera*, 470 F.3d 443, 449 (1st Cir. 2006) ("a defendant who chooses to enter into a plea bargain is not similarly situated to a defendant who contests the charges"); *see also United States v. Navedo–Concepción*, 450 F.3d 54, 60 (1st Cir. 2006) (defendants who pled guilty were not similarly situated to defendant who did not, and affirming 151-month sentence for defendant even though leader of conspiracy who pled guilty received a 63-month sentence); *accord United States v. Davila-Gonzalez*, 595 F.3d 42, 49–50 (1st Cir. 2010) ("no evidence" that defendant and co-

defendant were "fair congeners" because co-defendant pled guilty and was not therefore "similarly situated to the appellant"); *United States v. Rodriguez-Lozada*, 558 F.3d 29, 45 (1st Cir. 2009) (same); *United States v. Brandao*, 539 F.3d 44, 65 (1st Cir. 2008) (same); *United States v. Martinez-Vives*, 475 F.3d 48, 56 (1st Cir. 2007) (same).  Wilson's sentencing guidelines range of between 15 and 21 months is also higher than that of the defendants he cites—and virtually all the other parent defendants in the Varsity Blues cases—whose sentencing guidelines ranges as calculated by Probation and the Court was between 0 and 6 months.

But even accepting Wilson's comparison, the contrast does not support his contention that he is less culpable.  For example, while Hodge, who was sentenced to nine months in prison, engaged in the side door for five children, Wilson also attempted to engage in it repeatedly:  on two separate occasions, for three children.  On the second occasion, it was Wilson who approached Singer after several years to solicit Singer to engage in the scheme, in a call that was intercepted on the court-authorized wiretap.  Wilson contends that, in contrast to himself, Hodge was "fully aware of the illicit nature" of the scheme, "knew about his children's false athletic profiles," and "was aware that false information was included in their applications."  Dkt. 2525 at 13.  But, of course, all those things are equally true of Wilson.  Although Wilson insists that he didn't see it, there is no dispute that Singer emailed Wilson a falsified athletic profile for his son—an action that would make no sense if Wilson were not aware of the fact that falsehoods would be required to ensure his son's admission.  *Abdelaziz*, 68 F.4th at 16.  And there can be no dispute that Singer told Wilson he would "embellish" his son's profile; that Wilson acknowledged that his son would be a "so weak as to be a clear misfit" on the USC water polo team; or that Singer told Wilson his son would not actually have to play, but simply "be on the roster" for one semester.  *Id.*  All of these admissions are set forth explicitly in written communications between Wilson and Singer.

Likewise, in the initial calls concerning his daughters, it was Wilson who first acknowledged that his daughters were not qualified to be recruited in any sport, in response to which Singer told him that he would "make them a sailor or something . . . [b]ecause of where you live." *Id.* at 17; PSR ¶ 57. Later, after Singer began cooperating with the government's investigation, he advised Wilson that he had asked the Stanford coach "for a second spot in sailing and [the coach] said he c[ould]n't do that because he ha[d] to actually recruit some real sailors so that Stanford d[id]n't ... catch on." *Abdelaziz* 68 F.4th at 18 (alterations original). "Wilson laughed and said '[r]ight.'" *Id.*

Wilson notes that Giannulli and Janavs, who were each sentenced to five months in prison, participated in the side door twice, and Janavs also engaged in test-cheating. Dkt. 2525 at 13. In both instances, he notes, the defendants agreed with Singer to avoid university development officers, and, in Giannulli's case "to say nothing about his daughter's admission when he met with USC's athletic director." But, as noted, Wilson also tried to engage in the side door twice, for three children. And Wilson, too, acknowledged that it would be problematic if Stanford were to "catch on" to the side-door scheme, and agreed with Singer to avoid university development officers and to say nothing about how his daughters were admitted. For example, in a consensually recorded call in January 2019, Wilson and Singer had the following exchange:

> SINGER:     But my only thing to you was I just wanna make sure -- because, you know, you're a known entity, a known family, and people know that you're interested, and they're gonna say, "Hey, I can help you," or people may call you, and I just want to say - you just say, "Hey, listen, we got -- we -- we're taking care of things ourself. We have it all. Girls are great students. We're just gonna apply on our own.
>
> WILSON:     OK, so just kind of -- just say we're applying on our own, nothing . . .
>
> SINGER:     Correct, nothing, nothing -- no side doors. We're not doing anything --
>
> WILSON:     Yeah, don't mention about that, right.

SINGER:      -- where -- yeah where you're makin' a payment to help the kids get into school.

WILSON:      Right, OK. That sounds good.

Trial Ex. 623 (transcript) at pp. 8–9.

Moreover, unlike *any* of these other defendants, it was *Wilson* who independently came up with the idea of committing tax fraud with respect to his *quid pro quo* payments.  While some other parents in the Varsity Blues investigation ultimately deducted their *quid pro quo* payments as purported charitable donations at *Singer's* suggestion, Wilson alone proposed disguising his payments as fake business expenses ("for consulting or whatever"), papered over with falsified invoices that he would use to mislead his accountants and defraud the IRS.  And while Wilson did not, to the government's knowledge, involve his children in misrepresentations to the universities (as some parents did), he *did* involve his office assistant in his tax fraud—and then blame her at trial for his own false deductions.  *See, e.g.*, *supra*, at n.5.  These facts, in addition to his failure to accept responsibility, distinguish Wilson from the other defendants in this case, and demonstrate his heightened culpability.

## IV.    <u>CONCLUSION</u>

John Wilson stands convicted of initiating and executing a tax fraud scheme in furtherance of an illicit plan to secure the admission of his son to college as a purported athletic recruit in exchange for money.  His own words and actions demonstrate his knowledge, intent, desire to do it again, and lack of remorse.  The sentencing guidelines are appropriate in this case, and, if anything, understate his culpability.  The nature and circumstances of the offense and the other relevant considerations of sentencing—including the need for specific and general deterrence and to avoid unwarranted sentencing disparities—require that he be sentenced to a meaningful term of incarceration.  For the foregoing reasons, the government respectfully recommends that the Court

impose the following sentence: 15 months of incarceration; 12 months of supervised release with

250 hours of community service; a $100,000 fine; and $88,546 in restitution.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By: */s/ Stephen E. Frank*            
STEPHEN E. FRANK
KRISTEN A. KEARNEY
IAN J. STEARNS
LESLIE A. WRIGHT
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Stephen E. Frank*      
STEPHEN E. FRANK
Assistant United States Attorney