# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Cr. No. 19-10080-LTS |
| v. | **Redacted for Filing on CM/ECF** |
| JOHN WILSON, | Leave to File Partially Under Seal Granted Aug. 15, 2023, in ECF No. 2718 |
| Defendant | |

## DEFENDANT JOHN WILSON'S SENTENCING MEMORANDUM

This is an extraordinary sentencing. Defendant John Wilson and his family suffered years of emotional devastation until the First Circuit granted Mr. Wilson a sweeping victory. The appeals court found the government's theories were legally flawed and his trial was fundamentally unfair. The government then abandoned all the charges (conspiracy, bribery, and fraud) that have served as the foundation for its "Varsity Blues" prosecution. What is left before this Court is a single tax count that Mr. Wilson respectfully submits never would have been brought as a criminal case on its own. What is also left before the Court is an individual and family who have already suffered more than enough punishment. The only appropriate sentence at this time is probation.

John Wilson's history and characteristics are in many ways the exact opposite of what the media narrative of what the College Admissions prosecutions would suggest. He was one of six children born to a single mother with a ninth grade education. He lived in abject poverty in the Bowles Park public housing project in North Hartford, Connecticut. He suffered extreme physical and emotional abuse as a child. He struggled in his early school years due to dyslexia. He overcame all the odds stacked against him to achieve success in the business world. He did it through hard work and the power of education. Perhaps most remarkably, he has lived his life as a generous person in all senses of the word, someone who has consistently given his time, his talents, and his empathy, without thought or question, to those in need.

Mr. Wilson's multi-year effort in support of autism charities is emblematic. Though he had no family member affected by autism, Mr. Wilson immersed himself for over 15 years in multiple

ways to make a difference on a broad scale. Those who worked with Mr. Wilson on this effort credit him with dramatically changing the landscape of autism research, funding, and advocacy in the United States. More generally, over his lifetime, Mr. Wilson has donated and pledged millions of dollars to various charities, including hundreds of thousands for education.  He had longstanding bequests in his will for multi-million dollar gifts to universities to fund scholarships for students whose parents did not attend college—at least until this prosecution depleted his income and assets. Mr. Wilson has not only been active in public philanthropy and giving of his time, but he also shares his generosity and empathy on a more individual, private level—quietly making a difference in the lives of many, as the dozens of people who wrote letters in his support attest.

Mr. Wilson's greatest pride is none of this.  It is his strong family life, with his wife of 33 years and his three wonderful children who learned every lesson he ever tried to teach them about the importance of hard work and perseverance.

Mr. Wilson did not commit bribery or fraud, and only made legal donations similar to what numerous other parents have given to USC and other schools.  Nonetheless, he deeply regrets and must live every day with the tremendous pain that his family has suffered by virtue of his donations and role in this case. His son, who dedicated thousands of hours to water polo and played on nationally ranked teams for years, has been demeaned and falsely dismissed as a fake athlete, not just by the government but in the media and on a highly defamatory Netflix "documentary" which aired worldwide during these proceedings. Mr. Wilson's intelligent, industrious daughters, who received perfect and nearly perfect scores on their college board exams and placed highly in multiple international academic competitions, also have been derided as undeserving.  Mr. Wilson has had to work hard to heal the ruptured relationships with his children, even though he does not stand convicted of any of the core Varsity Blues charges.

Mr. Wilson is saddened by the negative impact that the Varsity Blues case and his donations have had on the level of trust and confidence that people across America have in the college admissions process, and on the system of higher education in general. Given his own background, Mr. Wilson feels particular empathy for those without financial resources, like he was

when applying to college.  Recently, Mr. Wilson has begun volunteering at the Epiphany School in Dorchester, mentoring its recent graduates on financial management and entrepreneurship as a way of seeking to help those who started life as he did.

The unique course of these proceedings reflects that, from the outset, Mr. Wilson was different from other Varsity Blues parents.  He agreed to make what he understood were legitimate charitable donations that would benefit universities and serve as a "tie-breaker" if his children were already qualified for admission.  And they were qualified.  All three had grades and test scores that put them in the middle two quartiles, or above, for their colleges of choice.  His son was a national caliber water polo player whose well respected high school coach recommended him to the University of Southern California ("USC") as an extremely fast swimmer with a strong "grinder" work ethic who could contribute to the team.  His son joined the USC team and participated fully. The government agreed that Mr. Wilson never intended that any of his money would go into the pocket of any coach or school insider.  Mr. Wilson got a receipt from USC for his donation.  Nor did Mr. Wilson participate in any lie to a university, or (unlike other parents) in any "cover-up" conversations that the FBI devised to expose guilty consciences.  That is because the government knew that Mr. Wilson—unlike some other parents—was participating in good faith.

Prosecutors pursued him anyway, because he was the necessary hook for venue in this District for all the dozens of out-of-state parents in the "conspiracy" the First Circuit later rejected. Mr. Wilson was the only parent from Massachusetts.  The government brought the various West Coast movie stars and business people, and attendant press coverage, to a Massachusetts court based on the strength of their ostensibly conspiring with the sole Massachusetts resident in the indictment.  The First Circuit has now wholly rejected the conspiracy.

At this juncture, Mr. Wilson stands convicted of just a single count: filing a false tax return in violation of 26 U.S.C. § 7206(1).  That conviction arises from Mr. Wilson's deduction, on his 2014 tax return, of the $220,000 that he donated to and for USC's water polo team in connection with his son's admission.  Despite charitable receipts from both USC and a 501(c)(3) foundation, the government argued that those donations were not properly deductible.  The First Circuit upheld

3

that count, reasoning that the jury permissibly found that Mr. Wilson could not deduct the entirety of that sum, even if the donation was *not* an illicit bribe or otherwise fraudulent.  Of course, Mr. Wilson at this point cannot challenge the validity of this conviction, despite his good faith belief at the time that his donations were legitimate charitable contributions no different than those given and deducted by countless other parents who receive preferential admissions treatment as a result (at USC and other colleges around the country).  Regardless, it is undeniable that this tax issue would *never* have been criminally charged as a single count indictment—it was a last-minute tack-on to the Fourth Superseding Indictment to further bulk up the untenable "bribery and fraud" case that the government has now abandoned.

Indeed, this case is remarkable as a tax case.  In the tax year at issue, Mr. Wilson paid 45% of his taxable income in taxes—nearly $1 million.  In fact, he *overpaid* his taxes that year by a net amount of approximately $120,000 or so—failing to take advantage of tax benefits he was entitled to.  His two conservative tax preparers, after a combined three-plus decades of collaboration, found him to be nothing but an honest and responsible taxpayer.  He didn't hide income or engage in some multi-year scheme to evade taxes.  Rather, he took a deduction the government asserts he wasn't entitled to.  If not for the other, now-abandoned charges, this technical dispute would assuredly have been handled through an IRS civil audit (if anything), not a criminal prosecution.

The proper Guidelines range is the lowest possible one, embracing a non-custodial term. The Presentence Investigation Report ("PSR") computed a higher range only by relying on its pre-appeal premise that *none* of the $220,000 could be deducted since the "entire" payment was "fraudulent."  That generated a "tax loss" of $88,000.  But now that the First Circuit has vacated all the fraud and bribery convictions, and the government purports to have dismissed them, there is no longer any factual predicate for such a finding—and the government has not met its burden to provide one.  Mr. Wilson did incorrectly deduct $120,000 of the $220,000 as a business expense rather than as a charitable contribution, but the tax savings from that error was only $1,425.  To fulfill its burden of proving the much larger tax loss it asserts, the government would have to do something that, based on undersigned counsel's research, neither the IRS nor any university has

4

ever done or suggested should be done:  assign a fair market value to an admissions boost resulting from a donation, and use this to offset the charitable deduction from the donation.  Wilson's counsel submitted FOIA requests to the IRS on this issue, and its responses indicate that it has never taken the position that the U.S. Attorney now advocates.

Regardless of the Guidelines range, however, Mr. Wilson does not deserve anything more than a non-custodial, probationary sentence.  Indeed, that is the *norm* for offenders who share Mr. Wilson's Guidelines profile; a review of sentencing data reveals that most offenders with a single tax count and Criminal History Category I—even at the level of tax loss the government asserts— receive sentences of one day or less.  And that does not even account for the many reasons Mr. Wilson should receive a sentence lower than the norm, including his extraordinary history and personal characteristics, his low risk of recidivism, the many ways in which his tax offense is far less serious than the norm, and the fact that his perseverance in this case—at great personal cost— allowed the First Circuit to rein in the government's overreaching theories and tactics.

Despite abandoning the conspiracy, bribery, and fraud charges, it appears the government will try to invoke those allegations to convince the Court to enhance or influence Mr. Wilson's sentence.  That would be an affront to justice.  The First Circuit agreed that, at a fair trial, a jury could readily have rejected the government's skewed narrative and agreed that Mr. Wilson acted in good faith.  The government has not proved the bribery and fraud allegations—and Mr. Wilson stands ready to refute them, including at an evidentiary hearing, if the Court is inclined to take any of that into account.

The government must not be allowed at sentencing to continue to treat Mr. Wilson as a convicted "Varsity Blues" defendant when he is not.  The Court instead should sentence John Wilson to probation and 200 hours of community service, with his work at the Epiphany School, so that at least *something* positive will come of this misbegotten prosecution.

## I.      BACKGROUND

### A.      Factual Background

To put the tax issues in context, it is helpful to understand how Mr. Wilson came to donate

the $220,000 and the basis for his good faith belief he was making legitimate charitable donations.

### 1.    Rick Singer's Manipulation of Mr. Wilson

Rick Singer, the college admissions counselor at the heart of this prosecution, was a world class con man.  Over the years, he apparently had close to 1700 families as clients of his college counseling business, and the great majority of them did not violate the law.  He mastered the art of manipulating highly intelligent, successful professionals, convincing some to let him deliver hundreds of thousands of dollars in donations, much of which he then pocketed.  Just before federal agents first confronted him, the government caught him on tape explaining to a colleague exactly how he was able to engender such extraordinary trust:

> Mr. Singer:  So, our whole business is in everybody's house.  So, by being in everybody's home, you create amazing relationships with these families because the wealthiest families in the world are my families.
>
> . . . .
>
> Mr. Singer:  They're trusting you to come in their home.  They're trusting you to take care of their kid.  And then what do they do after that?  They trust you to help them with their business.  They give you their client, their people that work in their own companies and they make this accessible to everybody.  But if we weren't in the home, it would be totally different, because when you go to an office, everybody only tells you what they need to tell you.
>
> . . . .
>
> Mr. Singer:  Because I just spent two, three, four years at your home, every week, every fourth week.  And now, I know everything about you, you know everything about me.  Because, remember, I'm in your home.  I know everything.[1]

That was exactly what Mr. Singer did with Mr. Wilson.  In 2010, when Mr. Wilson's son Johnny was a freshman in high school, Mr. Wilson's long-time tax advisor, Jeff DeMaio, who worked for a subsidiary of Goldman Sachs, introduced Mr. Wilson to Mr. Singer to be a college advisor for his son.[2]  DeMaio accurately advised Mr. Wilson that Mr. Singer was one of the most respected college advisors in California, with a constellation of A-list clients.[3]  Starting in 2010,

---

[1] Trial Ex. 8141 (excluded video); Ex. 1, Trial Ex. 8141A (excluded transcript) (excerpts), at 8-12 (referring to his claim to have worked with Bill Gates's and Steve Jobs's families).

[2] Ex. 2, Trial Ex. 8184 (excluded).

[3] *See* Ex. 3, Excerpted Trial Tr. (Sept. 28, 2021), at 42-46; *see also* "Big local names linked to college admissions fraudster," *Daily Post* (Mar. 14, 2019), *available at* https://padailypost.com/2019/03/14/big-local-names-linked-to-

Mr. Singer advised Johnny Wilson on academics and sports and provided him with tutors for the SAT and ACT exams.  Mr. Singer would come to the Wilson home every week or every few weeks.  The Wilsons paid for these services according to the normal fee schedule.  Mr. Singer also engaged Johnny through his non-profit foundation in legitimate community service projects such as helping tutor inner-city children in Sacramento.  The Wilsons trusted Mr. Singer so much they eventually let him meet with their son alone.  When Mr. Wilson in 2012 and his wife and daughters in 2013 moved to Europe for Mr. Wilson's work, Johnny stayed with family friends in California to finish high school.  At the Wilsons' request, Mr. Singer continued to visit or speak with Johnny frequently while the rest of the family was in Europe, to help oversee Johnny's academics, scheduling, and sports.

Johnny Wilson in fact was an outstanding athlete who was deeply committed to swimming and, ultimately, water polo.[4]  He played water polo year-round for seven years, participating on three separate teams, including a club team that consistently ranked among the top in the United States.[5]  Additionally, he was invited to join the U.S. Olympic Development team, and participated for the 2010-2011 season.[6]  He played on his "national caliber" high school team, and the conference's coaches selected him as an all-star.[7]  Johnny also was academically qualified for admission at USC.  He scored in the 93rd percentile on the ACT, and his grades and ACT scores put him within the middle 50th percentile of applicants admitted to USC in 2014.[8]

In spring 2013, after three years of working with the Wilson family, Mr. Singer presented

college-admissions-fraudster/ (describing Mr. Singer 2014 Facebook post claiming that Steve Jobs and Joe Montana are among his clients); "Joe Montana admits hiring fraudster, but says services were 'minimal,'" *Daily Post* (Mar. 15, 2019), *available at* https://padailypost.com/2019/03/15/joe-montana-admits-hiring-fraudster-but-says-services-were-minimal/.

[4] Ex. 4, Trial Ex. 8024 (admitted) and photo of Johnny Wilson playing water polo.

[5] Ex. 5, Excerpted Trial Tr. (Oct. 4, 2021), at 76-77, 80.

[6] Ex. 6, Trial Ex. 8030 (excluded).

[7] Ex. 5, Excerpted Trial Tr. (Oct. 4, 2021), at 80, 115-16; Ex. 7, Trial Ex. 7959 (excluded); Ex. 8, Trial Ex. 7069 (excluded) & Trial Ex. 7070 (excluded).

[8] Ex. 9, Trial Ex. 7785 (admitted); Ex. 10, Trial Ex. 7950 (admitted); *see also* Ex. 11, Excerpted Trial Tr. (Sept. 21, 2021), at 78-79 (government's USC witness acknowledging Johnny's grades and ACT score were "strong" for student-athletes).  Indeed, Johnny Wilson was certainly qualified academically, as he completed all course requirements and graduated from USC with a BA in economics.

Mr. Wilson with the "side door" option for Johnny as a water polo recruit.  Mr. Singer explained that the side door was a legitimate way to donate to a university athletic program that needed funding, and if the student was otherwise qualified, the donation would provide a tip, or a boost, on admission.[9]  Mr. Singer did not claim that a side door donation would guarantee admission for Johnny; to the contrary, he said a side door donation would give Johnny a 95% chance at USC and a 50% chance at Boston College, in light of those schools' athletic teams and Johnny's qualifications.[10]  Mr. Singer called USC a "realistic" school for Johnny even without a donation.[11]  Mr. Wilson repeatedly asked Mr. Singer "What are the odds?" on Johnny's admission to USC, and Mr. Singer responded by telling Mr. Wilson that Mr. Singer and Mr. Wilson have "zero control" over the process.[12]

Mr. Singer did not treat the side door as anything to hide.  He presented it to a roomful of Starbucks executives in a videotaped presentation, claiming (falsely) that he was doing over 700 side doors in a given year.[13]  As he outlined his second book on the college admissions process, he included a whole chapter on the side door.[14]  He informed multiple clients, including Mr. Wilson, that the side door was above-board and a tax-deductible charitable donation.[15]

Mr. Singer also falsely represented himself as part of the inner circle at top universities, name-dropping about meeting with the presidents of Harvard, Tufts, and Brown, and claiming to

---

[9] Mr. Singer distinguished the side door from the "front door," i.e., getting admitted on merit alone, and the "back door," i.e., getting students admitted by making a large gift to the university through institutional advancement.  *See United States v. Abdelaziz*, 68 F.4th 1, 12 & n.2 (1st Cir. 2023).

[10] Ex. 12, Trial Ex. 48 (admitted).  BC did not have a water polo team.  Mr. Singer also stated that Johnny could have, with the side door, a 90% chance at Georgetown, but he would need to improve his grades and test scores.  *Id.*  This further demonstrates that Mr. Singer described the side door to Mr. Wilson as dependent on academic qualifications, and not simply a donation that would guarantee admission.

[11] Ex. 13, Excerpted Trial Tr. (Sept. 15, 2021), at 151.

[12] Ex. 14, Trial Ex. 103 (excluded).  Indeed, Coach Vavic specifically wrote to Mr. Singer that he "cannot guarantee anything" with regard to Johnny Wilson's admission.  Ex. 15, Trial Ex. 101 (admitted).

[13] Trial Ex. 8115 (Starbucks video) (excluded); Ex. 16, Trial Ex. 8115A (transcript excerpt from Starbucks video) (excluded).

[14] Ex. 17, Trial Ex. 9564 (excluded).

[15] Ex. 18, Trial Ex. 1043 (excluded); Trial Ex. 562 (recorded call) (admitted); Ex. 19, Trial Ex. 562A (transcript of recorded call) (Mr. Singer informing Mr. Wilson it would all be tax-deductible to a charitable organization).

be reading applications on behalf of the admissions offices at top-tier universities.[16]  He told Mr. Wilson that the universities—including the president of Harvard—welcomed and personally negotiated the side door donations with him:

> [T]hat's why I'm goin' to Harvard next Friday, because the president wants to do a deal with me because he found out that I've already got four already in, without his help, so he's like, how 'bout—why would you go to somebody else if you could come to me?"[17]

The only caution he ever gave Mr. Wilson was that if the development office at Stanford or Harvard learned about Mr. Wilson's donations (in 2018), the universities would hound him for more donations, so he should not contact them directly.[18]  In the next-to-last scripted and recorded set-up call with Mr. Wilson, Mr. Singer explicitly said schools would hound him for more donations, not bribes.[19]

### 2.    Mr. Wilson's Attempts to Vet the Process

Notwithstanding his deep trust in Mr. Singer, Mr. Wilson wanted to make sure he was doing right by his son.  Unlike many of Mr. Singer's parents, who hid their activities with Mr. Singer from their children's high schools, or outright lied to high school employees, Mr. Wilson discussed Johnny's college water polo prospects with Johnny's high school coach, a former U.S. Olympic team alternate named Jack Bowen.[20]  A USC assistant coach testified at trial that Coach

---

[16] Ex. 20, Trial Ex. 684 (admitted) & Trial Ex. 685 (admitted) (Mr. Singer texting Mr. Wilson, "Might be in Boston to meet with Harvard and Tufts President's [sic] Friday, September 21"); Trial Ex. 571 (recorded call) (admitted); Ex. 21, Trial Ex. 571A (transcript of recorded call) (Mr. Singer telling Mr. Wilson, "The president [of Brown] takes meetings all the time from influential people.  She's a good gal . . . and she kinda meets with them, and then she'll give an indication, and he'll get an idea of what it's gonna need—what's gonna need to be done to, to have her go to Brown."); *id.* ("I'm gonna be spending some time in Boston, because I'm gonna be reading in Harvard this year . . . ."); Ex. 16, Trial Ex. 8115A.

[17] Trial Ex. 561 (recorded call) (admitted); Ex. 22, Trial Ex. 561A (transcript of recorded call).

[18] Trial Ex. 571 (recorded call); Ex. 21, Trial Ex. 571A (transcript of recorded call) (Mr. Singer explaining to Mr. Wilson an advantage of his approach "is they don't chase you all the time for money").

[19] Trial Ex. 623 (recorded call) (admitted); Ex. 23, Trial Ex. 623A (transcript of recorded call) (Mr. Singer telling Mr. Wilson, "The issue is, like, I've had f—uh, families before that essentially have gone through the side door, and then because people found out who they were, the Development office calls them, Admissions will call them, all trying to get, you know, donations, and, um, so then as soon as your name is known amongst those other groups, . . . they're gonna say, 'So, you know, so why are you goin' through Athletics, um, you know, when Development has already been talking to you?'").

[20] Ex. 5, Excerpted Trial Tr. (Oct. 4, 2021), at 109-115; Ex. 24, Trial Ex. 7976 (excluded as hearsay).

Bowen was a well respected high school coach and his recommendation would carry weight.[21] Coach Bowen spoke with the USC coaching staff and recommended Johnny for the USC program.[22] Coach Bowen testified that Johnny was "exceptionally fast," with "the water polo IQ" to "contribute to a high-level program like USC" by his junior or senior year.[23]

Prior to visiting USC, Mr. Wilson had questions about whether Johnny—then a high school junior—would fit in on USC's team (due to Mr. Singer's exaggerated descriptions that the team's freshman recruits were largely European semi-professional players in their twenties).[24] But Mr. Wilson was reassured that half of Johnny's teammates would also be "redshirt" freshmen who would practice but not travel for or play in games their first year in accordance with NCAA regulations.[25] After raising his concerns, Mr. Wilson, together with his wife and son, traveled to USC and attended a practice.[26] After observing the team practice, Mr. Wilson then understood his son could hold his own, and he expressed no further concerns about how his son would fit in with the USC team. He also, on that visit, spoke with Jovan Vavic—the coach of the USC water polo team—who told him that, based on Johnny's performance and the competitiveness of Johnny's high school and club teams, Johnny would be qualified to join the USC team as a walk-on.

While meeting with Coach Vavic, Mr. Wilson asked if he could discuss his planned donation with the USC administration. Coach Vavic arranged for Mr. Wilson and his wife to meet with Alex Garfio, an Assistant Athletic Director at USC. Mr. Wilson and his wife met with Mr. Garfio in his office at USC.[27] They told him they were planning to make a donation to USC through Rick Singer, which Mr. Garfio indicated would be fine. Mr. Wilson asked if he should make the donation before USC decided on Johnny's application or afterward, and Mr. Garfio said

---

[21] Ex. 3, Excerpted Trial Tr. (Sept. 28, 2021), at 180:18-21.

[22] Ex. 5, Excerpted Trial Tr. (Oct. 4, 2021), at 113-14.

[23] Ex. 5, Excerpted Trial Tr. (Oct. 4, 2021), at 81-83, 115. Coach Bowen also testified that Johnny Wilson had an A or A plus work ethic and that the team had once voted Johnny "the most inspirational player." *Id.* at 102, 182.

[24] Ex. 13, Excerpted Trial Tr. (Sept. 15, 2021), at 59-60; Ex. 5, Excerpted Trial Tr. (Oct. 4, 2021), at 32.

[25] Ex. 13, Excerpted Trial Tr. (Sept. 15, 2021), at 59-60.

[26] Ex. 25, Trial Ex. 49 (admitted) ("Jovan just texted me he will meet you all at 3:30pm on Tuesday on the pool deck").

[27] *See* Ex. 26 (Mr. Garfio's business card that he provided to the Wilsons at this meeting).

the donation should come after USC made the decision.

Johnny Wilson joined the USC team as a "redshirt."[28]  The team captain and one of Johnny's roommates in the water polo dorm testified at trial that Johnny participated in the team all season and fit in well with the rest of the team.[29]  Johnny ultimately resigned from the team at the end of the first season after suffering a severe, third concussion.[30]

### 3.     Mr. Wilson's USC Donations and 2014 Tax Return

Mr. Wilson donated $220,000 in 2014 to support the USC water polo team in connection with his son's admission.  By the time of trial, the government and its witnesses conceded that Mr. Wilson always understood and intended that his money would be a donation to the USC water polo program—and that (unlike some other parents) he never understood his donation would go into any insider's pocket.[31]  In fact, $100,000 of Mr. Wilson's intended donation did go to the USC water polo program—where it was used to benefit the team.[32]  Mr. Singer stole the other $120,000, which Mr. Wilson also intended as a donation to benefit the team.

Mr. Wilson made his donation in three parts in accordance with Mr. Singer's instructions:

- *First*, Mr. Singer told Mr. Wilson he would deliver Mr. Wilson's $100,000 donation to USC in order to facilitate the side door, and Mr. Singer would use his for-profit business, The Key, to pass through this donation to the USC water polo program. After Mr. Wilson wired $100,000 to The Key, The Key then provided a bank check to USC that said "Wilson Family" in the memo line.[33]  USC is a 501(c)(3) charitable organization, and it sent Mr. Wilson a thank you letter for his gift to USC water polo.[34]  USC deposited the check into the water polo team's bank account used to hold tax deductible gifts.[35]

---

[28] Ex. 27, Trial Ex. 9623 (admitted) (photo of USC water polo team showing Johnny in back row, on the far left); Ex. 28, Excerpted Trial Tr. (Oct. 1, 2021), at 27-28; Ex. 3, Excerpted Trial Tr. (Sept. 28, 2021), at 211.

[29] Ex. 28, Excerpted Trial Tr. (Oct. 1, 2021), at 29, 37, 40, 57-59 ("He was like the rest of us."); Ex. 5, Excerpted Trial Tr. (Oct. 4, 2021), at 22-29; Ex. 29, Trial Ex. 9825 (admitted) (photo of Johnny Wilson attending USC water polo national championship game with other redshirts at the end of the season).

[30] Ex. 30, Trial Ex. 137 (admitted).  Several other freshmen also quit the team after the first season or year.  Ex. 28, Excerpted Trial Tr. (Oct. 1, 2021), at 56, 59-60.

[31] *E.g., Abdelaziz*, 68 F.4th at 19.

[32] Ex. 31, Trial Ex. 121 (admitted), at 3; Ex. 28, Excerpted Trial Tr. (Oct. 1, 2021), at 97 (stipulation on USC account).

[33] Ex. 31, Trial Ex. 121.

[34] Ex. 32, Trial Ex. 126 (admitted).

[35] Ex. 33, Excerpted Trial Tr. (Sept. 29, 2021), at 86-87; Ex. 34, Trial Ex. 125 (admitted).

- *Second*, Mr. Wilson donated an additional $100,000 to Mr. Singer's non-profit, the Key Worldwide Foundation ("KWF"), which Mr. Singer told him KWF would use to fund the USC water polo team's summer training trip to Europe.[36] KWF likewise sent Mr. Wilson a letter thanking him for his tax deductible donation.[37] KWF appeared on the IRS website as a 501(c)(3) organization, and the IRS website specifically states, "Users may rely on this list in determining deductibility of their contributions."[38]

- *Third*, Mr. Wilson paid $20,000 directly to Mr. Singer to fund the expenses (which he understood Mr. Singer would otherwise pay out of his own pocket) associated with administering KWF's donation to fund the training trip, i.e., hiring a bookkeeper/secretary to arrange the payments for the trip.[39] Evidence at trial revealed that Mr. Wilson did not believe that Mr. Singer made any money in connection with these donations, but received only his regular compensation for his college counseling services. Indeed, showcasing his naivete and good faith, Mr. Wilson repeatedly suggested to Mr. Singer that he revamp his pricing model so that he could make a profit from his side-door facilitations.[40]

In a 2018 intercepted telephone call, made before Mr. Singer began is cooperation, he repeated in substance the same tax advice he had given to Mr. Wilson in 2014: "They're all tax de—it's all tax deduct—deductible. It's—it's going into a nonprofit, 501(3)(c) [sic]. It's all non— it's all—it's all tax deductible. Every one—every piece of it."[41]

While he was living and working in Europe, Mr. Wilson kept his available cash in his company, Hyannis Port Capital ("HPC"), which is an "S corporation" or "pass through" entity that passes all income and expenses to Mr. Wilson personally and pays no taxes itself.[42] It is legal and

---

[36] Mr. Singer used this ruse of paying for a non-existent training trip repeatedly over the years to defraud parents into donating to his foundation, so he could divert the funds for his own purposes. *See* Ex. 35, Trial Ex. 1422A (excluded).

[37] Ex. 36, Excerpt of Trial Ex. 134 (admitted).

[38] Ex. 37, Trial Ex. 8112 (admitted); Ex. 38, Excerpted Trial Tr. (Sept. 27, 2021), at 137 (Mr. Wilson's tax preparer testifying he recalls looking up KWF on the IRS's website when preparing Mr. Wilson's 2014 tax returns and finding it there, thereby ensuring it had been or was in the process of being approved by the IRS).

[39] Mr. Singer and Mr. Wilson each separately described the $20,000 as being for "expenses." Ex. 39, Trial Ex. 112 (admitted); Ex. 40, Trial Ex. 118 (excluded). James Nahmens, Mr. Wilson's tax preparer, testified that providing services for a tax deductible charity was deductible. Ex. 38, Excerpted Trial Tr. (Sept. 27, 2021), at 170-72; *see also* 26 U.S.C. § 170(c) (defining charitable contribution as contribution "to or for the use of" charitable entity); *Bauer v. United States*, 449 F. Supp. 755, 758 (W.D. La. 1978), *aff'd*, 594 F.2d 44 (5th Cir. 1979); *see also, e.g., Winn v. Commissioner*, 595 F.2d 1060, 1065 (5th Cir. 1979); *Rockefeller v. Commissioner*, 76 T.C. 178 (1981), *aff'd*, 676 F.2d 35 (2d Cir. 1982).

[40] *E.g.*, Ex. 21, Trial Ex. 571A, at 6; Trial Ex. 578 (recorded call) (admitted); Ex. 41, Trial Ex. 578A (transcript of recorded call), at 2, 17.

[41] Ex. 21, Trial Ex. 571A.

[42] Ex. 38, Excerpted Trial Tr. (Sept. 27, 2021), at 98-99.

common for owners of S corporations to pay personal expenses from a company account; unlike with a C corporation that pays its own corporate income taxes, doing so has no tax consequences. For bookkeeping purposes, Mr. Wilson asked Mr. Singer to provide a placeholder invoice for "consulting or whatever" so that payment could be made "from the corporate account."[43]  Mr. Wilson's request related to how *payment would be made*, not to how taxes would be handled; for tax purposes, it was the forthcoming charitable receipts that mattered.  Mr. Singer responded that he would send "an invoice for business consulting fees" and volunteered that Mr. Wilson "may write off as an expense."[44]  Mr. Wilson responded, "Awesome!"[45]  Mr. Singer then sent two invoices to Mr. Wilson's assistant (for the $100,000 to Mr. Singer's company and the $20,000 to Mr. Singer).  Mr. Wilson does not dispute that the invoices Mr. Singer sent to Mr. Wilson's assistant falsely described consulting services that Mr. Singer did not provide; however, the government does not claim that Mr. Wilson saw these invoices, and, in fact, he did not.  He was living and working in Holland at the time Mr. Singer sent them to his bookkeeper in California.

Mr. Wilson's tax return deducted as business expenses the $100,000 paid to The Key—which ultimately was donated to USC—as well as the $20,000 to Mr. Singer.  Mr. Wilson deducted the $100,000 to KWF as a charitable contribution.  HPC's tax preparer testified that it was his standard practice each year to review and correct bookkeeping and classifications in HPC's Quick Books records.[46]  Due to an error, he did not see the charitable receipt that USC provided for the $100,000 that was donated through The Key.  Had he connected those dots, he likely would have corrected the entry (from a business expense to a charitable donation) during his routine end-of-year reconciliation, as he did with over 60 other bookkeeping entries in 2014, including another charitable donation.[47]

---

[43] Ex. 42, Trial Ex. 710 (admitted).

[44] *Id.*

[45] *Id.*

[46] Ex. 38, Excerpted Trial Tr. (Sept. 27, 2021), at 121-22, 132-34.

[47] *Id.* at 137-39, 151-52, 157-58.

For 2014, Mr. Wilson filed federal, California, and Dutch tax returns that were collectively over 200 pages. He did not personally review his long, complex federal (or other) tax filing when it was circulated to him in December 2015; indeed, a contemporaneous email noted that he had "never looked at a return in 20 years."[48] With his dyslexia, reviewing that volume of detailed written forms was challenging for Mr. Wilson.

At trial, the government's tax witness testified that if the $120,000 deducted as a business expense had been properly deductible as a charitable donation, the tax savings from deducting it on the wrong line would have been only $1,425.[49] Mr. Wilson's tax preparer testified that no one could have foreseen in 2014 that there would be *any* financial benefit, let alone in a particular amount, and one could only have calculated it after the 2014 tax year had closed.[50] That year, Mr. Wilson *overpaid* his taxes by well over a net $110,000—and he made similar overpayments in 2015 and 2016.[51]

### B.     Procedural Background

Based upon some of the government's recent filings, it appears the government intends, at sentencing, to focus on the dismissed charges, and the conduct it asserts underlies the dismissed charges, rather than the actual offense of conviction. As explained below, Mr. Wilson believes that is legally wrong and fundamentally unfair. Of necessity, however, Mr. Wilson provides some background on the skewed way in which the government prosecuted this case to give context for why the Court cannot make any inculpatory findings based upon the trial record, and to assist the Court in understanding the interplay between the tax count and the other, now-dismissed charges.

### 1.     This Case Was Marked by Aggressive Prosecutorial Tactics Designed to Force Guilty Pleas

John Wilson is one of 40 parents charged in the "Varsity Blues" prosecution. This was a

---

[48] Ex. 43, Email correspondence between J. Wilson and D. Rogers, AB-001390.

[49] *See Abdelaziz*, 68 F.4th at 69.

[50] Ex. 38, Excerpted Trial Tr. (Sept. 27, 2021), at 145.

[51] *See, e.g.*, Ex. 3, Excerpted Trial Tr. (Sept. 28, 2021), at 54-55, 87. Mr. Wilson had pointed out to his tax preparers the two issues responsible for the overpayments but never checked to see if they had been implemented. The issues were paying California instead of the lower Massachusetts state income taxes after he had moved his residence to Massachusetts and failing to deduct the rent for HPC's office.

prosecution marked by exceptionally aggressive prosecutorial tactics from the start.  For example, prosecutors told some defense counsel of parents that the government could consider indicting their clients' spouses or children if they did not quickly plead guilty.  The government added a spurious money laundering charge—with its attendant stiff penalties—to the indictment as a tactic to force further guilty pleas.  The government later voluntarily dismissed the money laundering count on the eve of trial, after Mr. Wilson had filed a motion pointing out it would be unethical to argue a count that the government knew did not violate the statute.[52]

Perhaps most significantly, the government decided to charge the case as an overarching conspiracy including all of the dozens of parents and numerous coaches and others, despite the fact that such a rimless hub and spoke conspiracy clearly violated *Kotteakos v United States*, 328 U.S. 750, 754 (1946).  Defense counsel first raised a concern with this "rimless wheel" conspiracy in a letter to then-Chief Judge Saris even before most parents were indicted, when the government was threatening to bring a mega-conspiracy charge to negotiate early pleas.[53]  Ultimately, the First Circuit decried this charging decision,[54] with Judge Lynch at oral argument expressing her concern that the government may have knowingly violated *Kotteakos* from the get-go:

> [O]nce the government shows its hand and shows the type of evidence it has, it then became clear it was a rimless conspiracy and should not have gone forward.  And the U.S. Attorney's [Office] knew what evidence it had before it brought these charges and as a matter of good prosecutorial practice, they shouldn't have proceeded.[55]

### 2.   The Government Indicted Mr. Wilson on Nine Charges

The Fourth Superseding Indictment, ECF No. 732, charged Mr. Wilson with:

---

[52] ECF No. 2042; *see also* ECF No. 1989 (Defendants' motion in limine pointing out there was no conceivable legal basis for a money laundering charge in this case).

[53] Ex. 44, Letter from 26 defense counsel to C.J. Saris (Apr. 9, 2019) (expressing concern with government's stated intent to join all remaining parents who had not agreed to plead guilty in a single conspiracy indictment in violation of *Kotteakos* and as "a clear form of judge shopping").

[54] *See Abdelaziz*, 68 F.4th at 13 (holding "the government failed to prove that Abdelaziz or Mr. Wilson agreed to join the overarching conspiracy among Mr. Singer and his clients charged in the indictment, and that this variance prejudiced the defendants by allowing the government to introduce a significant amount of powerful evidence related to other parents' wrongdoing in which these defendants played no part, creating an unacceptable risk that the jury convicted Abdelaziz and Mr. Wilson based on others' conduct rather than their own").

[55] Ex. 45, Unofficial excerpted Oral Arg't Tr., *United States v. Abdelaziz*, No. 22-1138 (1st Cir. Nov. 7, 2022), at 1.

15

1)  Conspiracy to commit mail and wire fraud and honest services mail and wire fraud;

2)  Conspiracy to commit federal programs bribery;

3)  Money laundering conspiracy;

4)  Three counts of wire fraud and honest services wire fraud;

5)  Two counts of federal programs bribery; and

6)  Filing a false tax return.

The original indictment was much simpler.  In fact, in a move that Judge Talwani criticized, prosecutors only added the federal programs bribery and tax charges after they learned that the Probation Department and the Court would not agree with the U.S. Attorney's Office's desired sentencing based on merely the original mail and wire fraud charges.[56]  The Third Superseding Indictment in this case added federal programs bribery.  ECF No. 610.  And the Fourth Superseding Indictment added the tax count against Mr. Wilson.  ECF No. 732.

The government alleged the $220,000 Mr. Wilson donated to USC in connection with his son's admission was a bribe.  The government also pressed at trial that Mr. Wilson knew about a falsified athletic profile that Mr. Singer submitted to USC for Mr. Wilson's son (exaggerating his already impressive athletic credentials), but there was no direct evidence Mr. Wilson ever saw the profile and many reasons to doubt he had.[57]  There was also no allegation that Mr. Wilson ever

---

[56] *See United States v. Abbott*, No. 19-CR-10117-IT, 2019 WL 4394934, at *3 (D. Mass. Sept. 13, 2019) (holding no specific characteristics under the Guidelines were applicable to increase the parents' base offense level of 7).  Judge Talwani called out the government on its transparent gamesmanship:

> I think what you're saying here is the Government has a view of what the sentence should be.  And so rather than saying, "This is the crime we're charging and this is—now, Judge, what do you think is the appropriate sentence?" what it sort of feels like has happened in this case is that the Government says, "We're the ones who are getting to decide what the appropriate sentencing range is.  And if you won't agree with our calculation of it, we're not going to appeal you to the First Circuit," which you certainly had every right to do every step of the way.  Instead, what you're saying is, "We'll just keep charging it differently."

*United States v. Salcedo*, No. 19-CR-10081-IT (D. Mass. Mar. 19, 2021), ECF No. 562, Sentencing Tr. at 24.

[57] Although Mr. Singer emailed the fake profile to Mr. Wilson—with email text that said only "FYI"—the profile had numerous errors and omissions that Mr. Wilson likely would have commented on if he had seen it.  For example, Johnny's home address and coach's name were wrong; the profile included Johnny's less impressive SAT scores (in the 82nd percentile) rather than his more impressive ACT scores (in the 93rd percentile) (and this 11 percentage point difference is very significant when applying to highly competitive schools); and some of Johhny's actual athletic accomplishments were *missing* (including Johnny's third water polo team and a swimming related world record for swimming from Alcatraz to the shore of San Francisco when he was nine years old).

participated in cheating on standardized tests or any other academic fraud, as many of the other charged parents did.

The substantive fraud and bribery charges against Mr. Wilson were based on payments he made to Mr. Singer in 2018, while Mr. Singer was cooperating with the government, that Mr. Wilson intended to use as donations to Stanford University and Harvard University to help his twin daughters' admission prospects to those schools in subsequent years (they were only high school juniors at the time). Mr. Wilson's daughters had perfect and near-perfect ACT scores and were otherwise qualified to attend those schools. At trial, the government conceded that Mr. Wilson never intended his money to go into the personal pocket of any university employee. The government also did not point to any false statements made to any university regarding Mr. Wilson's daughters.

### 3.    Numerous Evidentiary Issues Tainted Mr. Wilson's Trial

The government's tactics to obtain guilty pleas were largely successful, as by the time of trial, only two of the 19 defendants who were part of Mr. Wilson's indictment were left.[58] Mr. Wilson went to trial together with co-defendant Gamal Abdelaziz, who faced only the two conspiracy charges. The trial was dominated by the fraud, bribery, and conspiracy charges. Of the government's 14 witnesses, only three testified to the tax count—and only at the end of the prosecution's case, following seven days of testimony focused on the main charges. The government made every effort to brand Mr. Wilson's tax return as an extension of his other allegedly illicit conduct. For example, the government's closing barely discussed the tax count at all, focusing on the main fraud and bribery charges. But then the government expressly connected those charges to the tax count, telling the jury, "[C]ommon sense tells you it is wrong to lie on your taxes by deducting the cost of those bribes as fake business expenses and phony charitable

---

[58] Of the 40 total parents charged, 37 pled guilty and one received a Presidential pardon. Of the non-parents, all pled guilty except the USC water polo coach, Jovan Vavic, who was charged with accepting bribes based, in part, on Mr. Wilson's donation. Coach Vavic was convicted on all counts at trial, but Judge Talwani ordered a new trial. *United States v. Vavic*, 628 F. Supp. 3d 330 (D. Mass. 2022) (holding, "however distasteful, there is nothing inherently illegal about a private institution accepting money in exchange for a student's admission"). That decision is on appeal.

contributions.  That is tax fraud."[59]  Both defendants were convicted on all counts.  Multiple serious evidentiary issues marred the trial.

> a)  **The First Circuit Found a Pervasive Risk of Prejudice to Mr. Wilson from the Co-Conspirator Evidence the Government Introduced at Trial**

On appeal, the First Circuit held that the government failed to prove that Mr. Wilson (and Mr. Abdelaziz) agreed to join an overarching conspiracy as charged in the indictment and that this variance prejudiced the defendants:

> [W]e agree with the defendants:  "The dangers for transference of guilt [in this case were] . . . so great that no one really can say prejudice to substantial right has not taken place," *Kotteakos*, 328 U.S. at 774, 66 S. Ct. 1239.
>
> . . . .
>
> "[T]here was a pervasive risk" that "the jury might have unfairly transferred to [Abdelaziz and Wilson] the guilt relating to" other parents who worked with Singer. . . . Based on the overarching conspiracy charge, the government introduced powerful evidence of culpable intent on the part of other parents that presented a pervasive risk of prejudicing the jury's assessment of each defendant's own intent.

*Abdelaziz*, 68 F.4th at 54-55 (alterations in original) (internal citation omitted).

Specifically, the court noted that a key issue for trial was whether the defendants "acted in good faith, believing Mr. Singer's side door to be a path to admission of which the universities at least tacitly approved."  *Id.* at 55.  The risk of prejudice to the defendants was exacerbated by the fact, as the government conceded, Mr. Singer provided some "totally legitimate" services and the fact Mr. Singer himself did not testify at the trial.  *See id.* at 54-55.  The court also explained how the government "'subjected the [d]efendants to voluminous testimony relating to unconnected crimes in which they took no part.'"  *Id.* at 56 (quoting *United States v. Dellosantos*, 649 F.3d 109, 125 (1st Cir. 2011)).  In particular, "the government introduced evidence of other parents' paying Singer to facilitate clearly fraudulent conduct that was both plainly wrongful and dissimilar in kind" from Mr. Wilson's actions, such as cheating on standardized tests and committing academic fraud.  *Id.*  The government also introduced evidence that other parents knew they were paying

---

[59] Ex. 46, Excerpted Trial Tr. (Oct. 6, 2021), at 56.

bribes to personally benefit coaches and knew the "side door" as it applied to them was wrongful—and then explicitly asked the jury to infer, as a result, that *Mr. Wilson* also knew *his* conduct was wrongful. *Id.* at 21. In sum, the court held that "the powerful evidence of other parents' obviously culpable conduct was potentially inflammatory—far more so than the evidence of Wilson's own acts," and found an unacceptable risk of prejudice to Mr. Wilson as a result. *Id.* at 62.

> **b)** **The Trial Court's Exclusion of Virtually All of Mr. Wilson's Proffered Evidence Likewise Tainted the Trial**

The prejudice from the government introducing voluminous evidence about other parents' bad conduct and culpable mental states was further exacerbated by the trial court's exclusion—at the government's urging—of virtually all competing evidence that Mr. Wilson sought to admit. This included evidence that, on appeal, the government did not even attempt to defend as correctly excluded. *See, e.g., Abdelaziz*, 68 F.4th at 62 ("We note, however, that the government does not attempt to defend on appeal many of the bases on which the district court relied in excluding various exhibits.").

Perhaps the most prominent example is the misleading and one-sided way in which the jury heard about USC's admission practices. Assistant Dean of Admissions Rebecca Chassin testified at trial that USC did not take donations into account in making admission decisions.[60] Nothing could be further from the truth. ███████████████████████████████████████████████████

---

[60] *E.g.,* Ex. 47, Excerpted Trial Tr. (Sept. 20, 2021), at 127:2 ("Because we don't offer admission in exchange for money."); *see also, e.g.,* Ex. 11, Excerpted Trial Tr. (Sept. 21, 2021), at 100:20-22, 101:2-3 ("The work of the SUBCO was to consider students for athletic talent alone. . . . that is the expectations that all of the members of the office of admission have around what happens at SUBCO.").

[61] ██████████████████████████████████████████████████████████

[REDACTED] the documentary evidence belies these self-serving statements from USC witnesses.   Prior to trial, Mr. Wilson compiled over 50 examples of candidates that USC's Athletics Department supported for admission as athletic recruits due to donor connections, and an additional 100-plus examples of students for whom the Athletics Department otherwise sought preferential admissions treatment due to fundraising benefits.[63] None of these students had any connection to Mr. Singer.  But USC's documents reveal a regular practice, Mr. Singer aside, of USC officials supporting donor candidates as "walk on" recruits regardless of athletic talent, and exaggerating their potential athletic value along the way.  USC had 14 full-time fundraisers in the Athletic Department. [REDACTED]

---

[62] Tr. of Motion Hearing at 27-28, ECF 673.

[63] Ex. 50, Summary Chart, "Applicants with Donor Connections Supported by USC Athletics Department, 2009-2019," ECF No. 2283-27 (provided to Court as part of offer of proof).

[64] Ex. 51, Trial Ex. 7361 (excluded).

[65] *See, e.g.,* Ex. 52, Trial Ex. 7305 (excluded), Trial Ex. 7490 (excluded) & Trial Ex. 7492 (excluded) ([REDACTED]); Ex. 53, Trial Ex. 1155 (excluded) ([REDACTED]); Ex. 54, Trial Ex. 7501 (not offered) & Trial Ex. 7504 (excluded) ([REDACTED]).

[66] *See, e.g.,* Ex. 55, Trial Ex. 8045 (excluded) & Trial Ex. 7242 (excluded) ([REDACTED]); Ex. 56, Trial Ex. 7358 (excluded) (email from Dean Brunold regarding [REDACTED]).

███████████████████████

The trial court did not permit Mr. Wilson to impeach Ms. Chassin with any of this evidence, or even to introduce it at all, holding it all to be irrelevant.[68]  At oral argument on the appeal, Judge Lipez took the government to task for its position on this evidence:

> I mean what the—we've been talking a lot about fairness of this trial.  **The government was notably aggressive in trying to prevent the defendants from mounting what they characterize as a good faith defense**, which you've acknowledged is a proper defense and if successful would have prevented conviction on the charges. I don't understand the argument, although the trial judge focused on relevance.  It seems to me . . . on the general proposition it was highly relevant, if at the University of Southern California there was a culture that promoted the kind of donations here in return for which students were not qualified but nevertheless admitted. . . . I mean that would be critical to the good faith defense.  The notion that we were not doing anything wrong.  That this is simply the way business was done.  **How can you defend the conclusion that that evidence was not relevant?**[69]

Similarly, and particularly relevant to the tax count, the trial court—at the government's urging—blocked all of Mr. Wilson's attempts to obtain and introduce evidence that USC never assigned a fair market value to the admission of any of these students as an offset to the tax-deductible charitable donations to USC.  The trial court denied Mr. Wilson's motion to subpoena USC's records on this point, ECF No. 2265, and denied Mr. Wilson's motion to subpoena a trial witness from USC to give testimony to this effect, ECF No. 2336.  USC confirmed in Court filings that USC **never** assigned a value to any such admissions because "USC does not offer admission

---

[67] *See, e.g.*, Ex. 50, Summary Chart, at 2 (#15) (████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████); *id.* at 4 (#40) ███████████████████); *id.* (#42) (USC employee stating, ███████████████████████ ████████████████████████████████); *id.* (#49) (███████████████████████████████).

[68] Notably, in the trial of Amin Khoury, a parent who did not work with Mr. Singer but was charged with bribing a Georgetown University tennis coach to admit his athletically unqualified daughter, Judge Saris admitted similar evidence about admissions practices at Georgetown.  *United States v. Khoury*, No. 1:20-cr-10177-PBS, ECF 273.  The jury acquitted Mr. Khoury.

[69] Ex. 45, Unofficial excerpted Oral Arg't Tr., *United States v. Abdelaziz*, No. 22-1138 (1st Cir. Nov. 7, 2022), at 2 (emphases added).

to any applicant in exchange for *quid pro quo* payments."[70]  Of course, as explained above, record evidence proved the contrary: that USC regularly granted admissions as a quid pro quo for donations.  Yet USC nonetheless did not instruct the donors to reduce their contribution amounts for tax purposes.

The trial court also refused to admit a plethora of other defense evidence based on faulty applications of the Rules of Evidence.  This included:

- Multiple documents, including a video, in which Mr. Singer explained his side door to parents as a legitimate, above-board way, encouraged by the universities, in which parents could make donations to facilitate their children's admission;

- Communications between Mr. Wilson and Mr. Singer indicating Mr. Wilson's non-culpable intent; and

- Multiple documents that detailed the considerable and legitimate athletic and academic accomplishments of Mr. Wilson's three children,[71] to which the trial court inexplicably sustained hearsay objections even though the proposed exhibits were each accompanied by business records certifications that mirrored the business records certifications the government used in proffering its own evidence.

### c)    The Government Avoided Creating and Providing Exculpatory Evidence

The government also stacked the deck prior to trial with evidence that would be helpful to its case.  In notes that he wrote to himself while working with the government as a cooperator, Mr. Singer explained how the government agents told him to lie to parents in recorded calls and tell them things different than he had said in his non-government-scripted discussions with them:

> Loud and abrasive call with agents.  ***They continue to ask me to tell a fib and not restate what I told my clients as to where there [sic] money was going -to the program not the coach and that it was a donation and they want it to be a payment.***
>
> I asked for a script if they want me to ask questions and retrieve responses that are not accurate to the way I should be asking the questions.  ***Essentially they are asking me to bend the truth*** which is what they asked me not to do when working

---

[70] ECF No. 2264, at 3-4 & n.5 (calling "false" the "premise that USC decided whether to admit particular applicants based on donations by the applicants' parents or other people associated with the applicant").

[71] For example, Mr. Wilson proffered records indicating Johnny Wilson's true swim times, which, although slower than the falsified times Mr. Singer presented to USC, still put him—as a junior in high school—among the fastest swimmers on USC's water polo team.  *E.g.*, Ex. 57, Trial Ex. 8192 (excluded) (indicating swim time of 22.78); Ex. 58, Trial Ex. 105 (admitted) (Coach Vavic stating his fastest players are around 22 seconds).

with the agents and Eric Rosen.

> ***Liz raised her voice to me like she did in the hotel room about agreeing with her that everyone Bribed the schools.  This time about asking each person to agree to a lie I was telling them.***[72]

Mr. Singer also wrote in his iPhone notes that Mr. Wilson made a "donation to USC program for real polo player."[73]

IRS Special Agent Elizabeth Keating, who was the government's lead investigator, then testified at trial as to how the agents deliberately avoided memorializing exculpatory evidence. She testified that the agents did not memorialize what they said to Mr. Singer, including how they scripted him and what he refused to say or failed to say in his recorded calls with Mr. Wilson and other parents.[74]  She also testified that "[n]ot once in hundreds of pages of interview reports" had any agent documented Mr. Singer's admission that "he didn't tell the parents it was a bribe.  He always told them it was a donation."[75]

Indeed, the only evidence about Mr. Wilson's conduct or intent memorialized in the government's reports of their interviews with Mr. Singer (which span over 150 typed, single-spaced pages) totaled less than ten lines, including the statement that Johnny Wilson "actually played water polo."  Mr. Singer (who, again, did not testify at trial) also provided the government with no evidence to support that Mr. Wilson ever saw the fake athletic profile Mr. Singer created and submitted to USC for Mr. Wilson's son.

---

[72] Ex. 59, Trial Ex. 13A, at 1 (admitted).  The government produced these notes only after nine months of repeatedly informing defense counsel they had produced all exculpatory evidence.  ECF No. 972, at 2-5.  The government acknowledged that prosecutors had seen "all or part of" these notes in October 2018, shortly after they were made and months before the arrests in this case and stated they had begun a privilege review process on the notes in August 2019, but the government did not produce them until February 2020, when it learned a defense expert had found problems with the government's production from Singer's iPhone.  ECF No. 972, at 5-6.  The Court found the government had violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to earlier produce the notes, but it declined to order any remedy for that violation.  ECF No. 1169.

[73] Ex. 59, Trial Ex. 13A, at 3.

[74] *E.g.*, Ex. 60, Excerpted Trial Tr. (Sept. 24, 2021), at 17:23-18:03 (stating she had no written record of instructions she gave to Mr. Singer about what to say to Mr. Wilson and no written record of what Mr. Singer refused to say to Mr. Wilson); *id.* at 175:14 ("I did not write down what I said to Mr. Singer."); *id.* at 176:11-15 (agreeing she "did not document" that she "had repeatedly told him to use certain words and [he] repeatedly misspoke and didn't use those words or used the wrong words").  Agent Keating also testified that agents did not document what they said to Mr. Singer "to get him to cooperate."  *Id.* at 178:17-20.

[75] *Id.* at 178:5-14.

After Mr. Singer started cooperating, the government had him do seven calls with Mr. Wilson—more than with any other parent.  Agent Keating testified that the government at this point had "the authority to direct" Mr. Singer to say what the government wanted him to say as to each parent.[76]  Despite having this authority, the government never managed to get the same sort of straightforward admission from Mr. Wilson that it got from many other parents.[77]  And, indeed, the government never gave Mr. Wilson a clear opportunity to inculpate—or exculpate—himself in the calls.  For example, the government had Mr. Singer tell other parents there was an IRS audit, and got them to agree they would lie to the IRS about the purpose of their donations if asked.[78]  The government also easily could have had Mr. Singer tell Mr. Wilson in 2018, "We'll get the girls in as fake athletes, just like we did with Johnny," thus giving Mr. Wilson a clear opportunity to agree or disagree with this characterization.  The government did none of this with Mr. Wilson.

One reason for the government's strange treatment of Mr. Wilson may have been that Mr. Wilson provided a necessary jurisdictional "hook" to join all the other parents in a case in this District based on the alleged overarching conspiracy.  Mr. Wilson was the only one of the 40 alleged conspirator parents who lived in Massachusetts.[79]  Indeed, while the government could not, due to lack of venue, bring substantive tax charges against any of the several other parents who deducted their side door donations on their taxes,[80] Mr. Wilson, by the happenstance of his place of residence, was charged with a tax crime.

---

[76] Ex. 61, Excerpted Trial Tr. (Sept. 23, 2021), at 181:25-182:2.

[77] *Compare, e.g.,* Ex. 62, Trial Ex. 9566A (transcript of recorded call) (excluded) (call with parent in which Mr. Singer told her it was a 'bribe" and she agreed), *with, e.g.,* Ex. 60, Excerpted Trial Tr. (Sept. 24, 2021), at 49:25-50:9 (Agent Keating acknowledging that the words on the tapes of Mr. Singer's conversations with Mr. Wilson left "questions as to the meaning or intent of what was going on").

[78] *E.g.,* Fourth Superseding Indictment, ECF No. 732, at ¶¶ 113, 164, 252, 274 (describing "IRS audit" calls Mr. Singer had with different parents at government's direction); Ex. 63, Trial Ex. 587A (transcript of recorded call) (admitted) (IRS audit call with Mr. Abdelaziz); Ex. 64, Declaration of Laura Smith, at ¶ 12 ("The purpose of the 'audit' calls was to corroborate each parent's knowledge and intent before charging them with a crime.  We directed Singer to confirm that the parents understood that they had made payments to induce an individual at USC to recruit their children as fake athletes.").

[79] Ex. 65, Demonstrative map showing parents' place of residence.

[80] *See infra* Section IV.C.3.

### 4.    On Appeal, the First Circuit Vacated Seven out of Eight Counts

On appeal, the First Circuit vacated all convictions but the tax count.  Specifically, the court agreed with the defense arguments on three key points:

1) The government's honest services theory was invalid as a matter of law.  Specifically, the conduct at issue did not fall within the "the classic crime of 'bribery,'" and construing the mail and wire fraud statutes to cover the conduct at issue "would not provide sufficient notice for 'ordinary people [to] understand what conduct is prohibited.'"[81]

2) The trial court erred in instructing the jury that university admissions slots constitute property for purposes of the government's property fraud theory.  Specifically, the court explained that there was no authority "that admissions slots are a historically recognized form of property interest" and that "[t]here are sound reasons to be prudent and cautious about criminalizing conduct, even unethical conduct, in this complicated area affecting so many students and parents."[82]

3) As described *supra* at 18-19, the court found that the government had violated *Kotteakos* in charging the case as an overarching conspiracy and that the evidentiary spillover from the government's extensive presentation of evidence about other parents' conduct and culpable mental states prejudiced the defendants and "created an unacceptable risk" that the jury convicted Mr. Wilson "based on others' conduct" rather than his own.[83]

The court rejected the government's argument that the convictions against Mr. Wilson could stand, despite the *Kotteakos* violation, because of the supposedly "overwhelming" evidence, from the 2018 recorded calls, that Mr. Wilson agreed to join a smaller conspiracy.  Specifically, the First Circuit recognized that, in context and in light of the other evidence, the evidence from the 2018 calls "was not so strong as to be overwhelming in relation to the significant risk of prejudice posed by the evidence regarding other parents."  *Abdelaziz*, 68 F.4th at 58.  Rather, that evidence was equally susceptible to defense-friendly inferences and so the court could not conclude that, at a fair trial, a jury would have inferred that Wilson acted with guilty intent, which was the core disputed issue at trial.

---

[81] *Abdelaziz*, 68 F.4th at 27-33 (quoting *Skilling v. United States*, 561 U.S. 358, 402 (2010)) (alteration in original) (explaining that the conduct here did not meet traditional definitions of bribery and noting that the government had cited no case involving a purported bribe paid to an agent's purportedly betrayed principal).

[82] *Abdelaziz*, 68 F.4th at 33-40.

[83] *Abdelaziz*, 68 F.4th at 13.

The court accordingly vacated the conspiracy convictions.  *Id.* at 60.  The court similarly vacated Mr. Wilson's substantive convictions for federal programs bribery, finding that Mr. Wilson had shown "'prejudice so pervasive that a miscarriage of justice looms.'"  *Id.* at 61-62 (quoting *United States v. Correia*, 55 F.4th 12, 36-37 (1st Cir. 2022)) (holding "that the government's evidence related to Mr. Wilson himself was insufficiently strong to counteract the pervasive risk of prejudice").

The First Circuit did affirm Mr. Wilson's conviction for filing a false tax return.  *Id.* at 62-74.  The statute at issue makes it a felony to "[w]illfully make[] and subscribe[] any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which [the individual] does not believe to be true and correct as to *every material matter*."  26 U.S.C. § 7206(1) (emphasis added).  The First Circuit agreed that the tax conviction could not rest on the premise that the deducted sums were unlawful bribes or fraudulent, given that the bribery and fraud counts had been vacated.  *Abdelaziz*, 68 F.4th at 64-67.  But the Court of Appeals held that the tax count could survive on narrower grounds.  *See id.*  Specifically, Mr. Wilson acknowledges, as the First Circuit held, that the $120,000 in payments deducted as business expenses were not actually business expenses and could not have been properly deducted as such.  That was a genuine error.  As to whether all or part of the $220,000 in payments could have been properly deducted as charitable contributions, the First Circuit determined on appeal that the government had produced sufficient evidence to rebut that Mr. Wilson "believed he could legitimately deduct ***the entire sum*** as a charitable contribution."  *Abdelaziz*, 68 F.4th at 69 (emphasis added).  Under longstanding First Circuit law, a person can be liable for making a false return even if they did not intend, by making the false statements, to evade any taxes.  *See United States v. Goldberg*, 105 F.3d 770, 774-75 (1st Cir. 1997).  The First Circuit had no occasion to consider whether some *part* of the USC donation was properly deductible as charitable, since that would not affect the validity of the conviction.

**5. Following the Appellate Ruling, the Government Abandoned the Remaining Counts but Seeks to Resentence Mr. Wilson on the Tax Count Just as if It Had Proven Those Counts at a Fair Trial**

Following the First Circuit's ruling, the government rushed to dismiss the remaining counts that were susceptible to retrial.[84]  Although the government of course can no longer ask the Court to sentence Mr. Wilson based on his convictions on these other seven counts, it appears the government seeks to argue that the Court should consider the conduct underlying the vacated convictions in determining Mr. Wilson's sentence on the tax count just as if the government had actually proven that conduct—including that there was bad intent behind it—at a fair trial.[85]

## II.   THE PROPER OFFENSE LEVEL IS 6, BECAUSE THE GOVERNMENT HAS NOT BORNE ITS BURDEN TO PROVE A LARGER TAX LOSS

The default base offense level for Mr. Wilson's tax conviction is 6.  U.S.S.G. § 2T1.1(a).  Given his lack of criminal history, that translates into a Guidelines range of 0-6 months, with eligibility for a probationary sentence.  *See* U.S.S.G. Sentencing Table.

The PSR calculates a higher offense level (14) based on the assertion that Mr. Wilson's conduct caused a tax loss of $88,546.  *See* PSR at 94; U.S.S.G. §§ 2T1.1(a)(1), 2T4.1 (tax table).  That represents the taxes Mr. Wilson should have paid if *none* of the $220,000 he donated in connection with his son's admission to USC was deductible on *any* ground.  *See* PSR at 86-87.

The PSR is incorrect on this point, and Mr. Wilson objects to the PSR's "Revised Guideline Calculations."  Before the First Circuit's decision, the government argued—and both the Probation Department and Judge Gorton agreed—that because Mr. Wilson's entire donation was "fraudulent," none of it could be deducted.  But the appellate reversal of the fraud and bribery convictions has vitiated that rationale.  And without that rationale, the government has offered *nothing* to otherwise substantiate its categorical claim that Mr. Wilson's donations were not

---

[84] ECF No. 2683 (government purporting to file, one day before the court of appeals mandate as to Mr. Wilson, ECF No. 2685, a "Notice" of government's dismissal of Counts One and Two (conspiracy); Six, Eight, and Nine (wire fraud); and Eleven and Twelve (federal programs bribery) as to Mr. Wilson).  As noted in Mr. Wilson's Motion for Entry of Dismissal with Prejudice, ECF No. 2712, the government did not properly file this as a motion for dismissal, nor did it indicate the dismissal would be with prejudice.

[85] *See* ECF No. 2702, at 5 (arguing Mr. Wilson *would have* committed the same tax fraud in 2018 as he did in 2014, had he gotten the opportunity, and hence that his conduct in 2018 "is thus plainly relevant to sentencing").

deductible *at all*. Yet it is the government's burden to prove the amount of tax loss the defendant's conduct caused. *See United States v. Buchanan*, 987 F. Supp. 56, 62 (D. Mass. 1997) (Gertner, J.); *United States v. Hoskins*, 435 Fed. App'x 781, 784 (10th Cir. 2011). Given that, there is no basis for this Court to increase Mr. Wilson's offense level based on a particular tax loss. The proper course—the one other sessions of this Court have followed in analogous Varsity Blues contexts—is to treat the loss amount as unduly speculative.

A.     **The Original Theory of Tax Loss No Longer Holds**

In connection with Mr. Wilson's original sentencing—when the tax count was secondary to the multiple fraud and bribery convictions—the Probation Department opined that the entire "$220,000 payment" was not deductible because it "stemmed from fraud and bribery." PSR at 87. The original PSR rejected Mr. Wilson's argument that "at least some of his $220,000 was a legitimate charitable contribution," reasoning that "[t]he entire payment was fraudulent" and that the deductions were "shams to cover up the fraudulent scheme." *Id.* At the original sentencing, Judge Gorton agreed with that analysis, ruling that no part of Mr. Wilson's payments was deductible "because the entire payment was fraudulent."[86]

In other words, the PSR and Judge Gorton rested on the *other* charges—those for bribery, honest services fraud, and/or property fraud—to conclude the entire sum was not deductible, since it was all illicit. *See Abdelaziz*, 68 F.4th at 67 (so recognizing). But that rationale clearly no longer holds, because the First Circuit overturned the bribery and fraud convictions based on a host of legal errors, as described above. The characterization of the $220,000 as non-deductible in its entirety because it was all "fraudulent" is therefore no longer tenable.

Nevertheless, when the Probation Department amended the PSR following the First Circuit decision, it did not revisit the issue of tax loss—or even acknowledge the decision's impact on the analysis. *See* PSR at 94. Nor did the Probation Department explain how its original theory—that the "entire payment was fraudulent"—could survive reversal of the fraud counts.

---

[86] Tr. of Sentencing, ECF No. 2554, at 12.

**B.** **The Government Failed to Prove the Tax Loss Here**

Notwithstanding its reversal of the other convictions, the First Circuit upheld the tax count. As described above, the Court explained that, even if Mr. Wilson's donations were not fraudulent and were not bribes, that did not mean his tax return was correct. Most obviously, "the payments did not qualify as business expenses (because of their personal nature)" and thus it was wrong to classify $120,000 as such. *Abdelaziz*, 68 F.4th at 68. That alone supported the conviction.

As to that error, however, the record is undisputed that identifying that sum as a business expense "ultimately saved only $1,425, relative to [Mr. Wilson's] liability had he deducted the entire $220,000 as a charitable contribution." *Id.* at 69. That minor loss would not increase Mr. Wilson's offense level at all—it would remain at 6. *See* U.S.S.G. § 2T4.1(A) (cutoff is $2,500).

Generating the higher tax loss reported by the PSR would therefore require a determination that $0 of the $220,000 could have been properly deducted as a charitable donation. So the critical question is whether and to what extent Mr. Wilson's donations were properly deductible as charitable—and, more important, whether the Government has carried its burden to prove any amount that was *not* deductible. *See* U.S.S.G. § 2T1.1, App. Note 3 ("[T]he court should account for any unclaimed credit, deduction, or exemption that is needed to ensure a reasonable estimate of the tax loss"); *see also, e.g.*, *United States v. Hoskins*, 654 F.3d 1086, 1094-95 (10th Cir. 2011). Notably, the jury did not make that determination—it was not asked to, and did not have to, in order to convict. *See Buchanan*, 987 F. Supp. at 62.

Some tax law background is required to understand this issue. As the IRS explains on its website, donors sometimes receive goods or services in consideration of their donations—*e.g.*, a dinner at a charitable gala, or a VIP tour for museum patrons. These are known as "quid pro quo contributions." IRS, *Charitable Contributions – Quid Pro Quo Contributions*.[87] In this setting, the term quid pro quo has no negative or illegal connotation. So long as some "donative element" is involved, the deduction is not wholly vitiated. Rather, the charitable recipient must provide a

---

[87] https://www.irs.gov/charities-non-profits/charitable-organizations/charitable-contributions-quid-pro-quo-contributions.

disclosure to the donor that includes a "good faith estimate of the fair market value of the goods or services that the donor received"; and that value must be offset against the donation for tax purposes. *Id.*; *see also* 26 U.S.C. § 6115. "A taxpayer may therefore claim a deduction for the difference between a payment to a charitable organization and the market value of the benefit received in return, on the theory that the payment has the 'dual character' of a purchase and a contribution." *United States v. Am. Bar Endowment*, 477 U.S. 105, 117 (1986).

This analysis is nuanced and fact-intensive. Some benefits—like the naming rights to a building that follow when a donor makes a large contribution to a college—are considered too intangible to value and thus are not "offset" at all. *Cf.* Rev. Rul. 77-367 (treating naming benefits as "merely incidental" and not affecting tax-exempt status). In other cases, the objective "fair market value" of the benefit may be zero—even though it is clear that donors attach subjective value to it. *E.g.*, IRS, *Charitable Contributions – Quid Pro Quo Contributions* (giving example of "an evening tour of a museum conducted by a well-known artist," when ordinary tours are free to the public). Or consider a charity gala that costs $1,000 to attend. The objective "fair market value" of attending the dinner may be $50 (the cost of the steak); that means $950 is deductible as charitable, even if the donor derives great benefit from rubbing elbows with VIP attendees.

Applying that framework here, there is no basis in the record to find that Mr. Wilson's donations had to be offset *at all* to account for the admissions preference his son received, let alone that the objective "fair market value" of the preferential treatment was the full $220,000, as would be necessary to support the asserted $88,546 tax loss. And because proving the amount of loss is the *government's* burden, the Court should treat the loss as zero, or at least not more than $1,425, thus keeping the offense level at 6. *See Buchanan*, 987 F. Supp. at 62 (emphasizing that "[t]he burden lies with the government to prove the loss with sufficient certainty" and finding it had "not met its burden").

To start, Johnny Wilson was qualified for admission to USC without any donation, and so the fair market value of any benefit was zero.

Second, there was ample evidence of Mr. Wilson's donative intent.  He had a history of donating to education, and had already arranged to bequeath millions of dollars to establish college scholarships for underprivileged students.[88]  Mr. Wilson also had donated approximately $75,000 to the swimming program at his son's high school, and his donation to USC's water polo program was a natural extension.  Mr. Singer never told him the donation gave a guarantee, and Mr. Wilson was willing to contribute the funds to USC before receiving any decision on his son's admission.[89] All that confirms Mr. Wilson saw his donations to USC—at least *in part*—as charitable contributions for the sake of education writ large (rather than mere payment for the education of his son).  Mr. Wilson thought he was doing good and helping his son at the same time.

As to the admissions preference that his son received in exchange, Mr. Wilson understood it to be an intangible, unquantifiable "boost"—no different than the preferences routinely given to donors' children at colleges across the country.  There is no precedent—none—for treating those preferences as having an objective "fair market value" that must be offset against the donation amount.  And there are good reasons to value it as zero: After all, Mr. Wilson paid the same tuition as any other parent, meaning he was already paying full price for the only tangible "services" that his son received from USC (namely, education).  *Cf. Squeri v. Mt. Ida Coll.*, 954 F.3d 56, 71 (1st Cir. 2020) (explaining that the "essence of the transaction" between a student and a university is "education in exchange for . . . tuition").  That is no different than valuing a fancy gala dinner at the price of a steak meal, or a personal guided museum tour at $0.

Moreover, not only did USC never tell Mr. Wilson to offset any portion of his donation,[90] USC never told *any* donors to offset the value of the admissions boost their children received— notwithstanding the extensive evidence that USC has traded preferential admissions consideration for financial support on well over 150 documented cases with just the Athletics Department.  *See*

---

[88] *See, e.g.*, Ex. 3, Trial Tr. (Sept. 28, 2021), at 18-22. Mr. Wilson's will, years before he met Mr. Singer, established gifts of millions of dollars to fund scholarships at Harvard and Rensselaer Polytechnic Institute (his undergraduate institution) for students whose parents did not attend college. Mr. Wilson's will has provided for $2 to $5 million for the scholarships, depending upon the time and his resources.

[89] *See* Ex. 66, Trial Ex. 83, at 3 (admitted).

[90] *See* Ex. 32, Trial Ex. 126 (admitted).

*supra* at 20-21.   The IRS typically determines fair market value of a quid pro quo benefit by looking at comparable transactions.   Many of the cases of donor-influenced admissions involved students who, unlike Mr. Wilson's son, had no intent to participate on a USC team, and often had weaker academics than Mr. Wilson's son.   Additionally, any argument that Mr. Wilson's donation is different than the others because his was a quid pro quo quickly fails based on even a cursory look at these examples.   *See supra* at 20-21 & Ex. 50.   The trade of admissions for donations at USC is clear as day in example after example.   Nor is there any basis in the record for saying Mr. Wilson's donation was different because he got a "guarantee" and others did not.   Mr. Wilson was never told that his son's admission was a guarantee; Mr. Singer gave him *percentage odds* at various schools, including USC, based on his son's credentials and the schools' criteria.   *See supra* at 8 & n.10.   Though the First Circuit held that the exclusion of this USC evidence was not reversible error as it relates to *guilt*, it is clearly relevant to the determination of *tax loss*.

The recent national press has documented what was already widely known:  it is a pervasive practice in United States college admissions for schools to give an admission boost to donors' children.[91]   Defense counsel have made an extensive search to find any examples where the IRS required a parent to offset a donation with the value of an admissions boost, including filing five Freedom of Information Act requests, all of which either produced no responsive records or the IRS denied; interviewing former employees of the IRS Exempt Organizations division; interviewing tax lawyers and accountants specializing in non-profits; and researching the IRS

---

[91] *See, e.g.,* "Education Dept. Opens Inquiry into Harvard Legacy Admissions," *New York Times* (July 25, 2023), *available at* https://www.nytimes.com/2023/07/25/us/politics/harvard-admissions-civil-rights-inquiry.html; "DOE Opens Investigation into Harvard Legacy Admissions," Law360 (July 25, 2023), *available at* https://www.law360.com/appellate/articles/1703676?utm_source=shared-articles&utm_medium=email&utm_campaign=shared-articles (noting data showing that **children of donors are nearly seven times more likely to be admitted to Harvard than other applicants**); "Payoff-based College Admissions," *National Affairs* (Winter 2023), *available at* https://www.nationalaffairs.com/publications/detail/payoff-based-college-admissions ("As many are aware, wealthy parents can donate large sums to elite universities and significantly raise the odds that their child will be admitted. At Harvard, being connected to a wealthy donor boosts an applicant's chances of admission by a factor of *nine*. At Duke in recent years, up to 5% of the student body owed its admission to connections to deep-pocketed donors. Between 2013 and 2019, the state-supported University of California system admitted at least 60 students (and probably well over 400) due to family connections. As state auditors put it, 'under normal circumstances' these applicants would otherwise have had 'virtually no chance of admission.'").

website and advisory opinions.[92]  Counsel have not found any evidence that the IRS has ever taken a public position that the admissions boost requires an offset or that it has imposed such a requirement in any known audit or tax controversy.  It bears repeating that despite the well-known practice of favoring the children of donors for admission, this case apparently is the first time ever that the government has taken the public position that a tax offset was required, and it is a U.S. Attorney's Office, not the IRS, taking that position.

Though the IRS could, as a policy matter, change its longstanding tolerance of allowing these donations to be deducted in full, or Congress could take legislative action, a criminal case should not be the first change to the existing policy.[93]  At most, Mr. Wilson's tax liability could be an issue for an IRS civil audit, to be conducted after the sentencing, but the Court should not apply a never-before-seen policy of disallowing such a donation in full in the context of a tax loss calculation for a criminal sentencing.  Moreover, in a civil audit context, the IRS would have to take into account the amounts by which Mr. Wilson *overpaid* his federal taxes in 2014.

Even accepting the unprecedented premise that a "fair market value" of intangible admissions preference somehow *could* be determined despite the absence of any comparable transactions and valuations, the government certainly never did the work necessary to value it.  To the contrary, the government did the opposite:  It argued that the amount of any offset was *irrelevant* for purposes of guilt or innocence, and successfully blocked the defense from presenting any evidence or witnesses on this issue.[94]  But the analysis at sentencing is different—here, the issue is not only whether the tax return was wrong (which is deemed proven by virtue of the conviction); the government has the additional burden of proving the calculation of loss it caused

---

[92] Ex. 67, Declaration of M. Kendall.

[93] *See* "Payoff-based College Admissions," *National Affairs* (Winter 2023), *available at* https://www.nationalaffairs.com/publications/detail/payoff-based-college-admissions (explaining that IRS has not issued any decision on the non-deductibility of donations that increase the chance of admission, and describing various IRS and legislative actions that could be taken to change the status quo).

[94] The First Circuit noted the government had failed on appeal "to develop any argument that this evidence was properly excluded."  *Abdelaziz*, 68 F.4th at 73.

the IRS.  By purposely avoiding the offset issue, the government has completely failed to carry that burden.

It is not surprising the government has chosen to ignore this issue, because there is no objective standard by which the government—or anyone else—could value an admissions preference.  In the context of seeking a means to value the "loss" from bribery in a related Varsity Blues case, Judge Woodlock concluded that he "can't calculate" the "value" of the "admission spot itself."[95]  This is essentially the same question presented here:  what is the fair market value of the ostensibly tangible benefit that Mr. Wilson received for his donations.  Judge Talwani similarly found that the "gain" to the defendants could not "reasonably . . . be determined."[96]

Indeed, there is no real way to value the admission boost, because it may be worth less for an applicant who is otherwise qualified for admission—as Mr. Wilson's son was—as compared to an applicant who is otherwise wholly unqualified.  In theory, it would need to be valued differently for different students based on a holistic assessment of the applicant's grades, test scores, and other credentials—and their chances of getting in without the boost.  And how should it be valued if a student is admitted but ultimately chooses not to attend?

Nor can the Court shortcut the analysis by looking at the amount a donor paid to indicate the value.  First, it is bedrock IRS practice to base valuations on comparable transactions or market-based pricing, not subjective preferences or amounts paid.  Looking merely at the amount paid would defy the IRS requirement of an objective "fair market value."  Second, the subjective willingness to pay varies widely among parents.  Just looking at the chart of donor-connected applicants USC admitted reveals that the amount of donations ranged from five figures to seven figures.[97]  The fair market value of the spot is not greater merely because a parent chooses to

---

[95] Ex. 68, Excerpt of Sentencing Tr., *United States v. Bizzack*, No. 1:19-cr-10222 (D. Mass. Nov. 5, 2019), at 56-57 (government conceding that the admission spot "is not easily valuable," i.e., capable of being valued, and Judge Woodlock agreeing that he cannot calculate that value for purposes of sentencing).  Judge Woodlock also recognized that a parent's payment to USC may be a charitable contribution if there is no evidence of a portion going to a faithless employee of USC.  *Id.* at 16-19.

[96] Ex. 69, Excerpt of Sentencing Tr., *United States v. Abbott*, No. 19-cr-10117 (D. Mass. Sept. 13, 2019), at 5-6.

[97] Ex. 50, Summary chart.

donate more.  This would be the same as a gold sponsor of a charitable gala who paid $5,000 rather than $1,000 for their ticket being required to offset $5,000 rather than the $50 value of the steak.

In prior filings, the government has suggested that the First Circuit held that the $220,000 was not deductible as a charitable contribution.  That is incorrect.  Due to the error on the business expense deduction, Mr. Wilson did not challenge on appeal the sufficiency of the evidence on the tax count.  And in evaluating the harmlessness of other errors on the tax count, the First Circuit observed only that there was evidence from which a jury could find that Mr. Wilson could not "deduct *the entire sum* as a charitable contribution."  *Abdelaziz*, 68 F.4th at 69 (emphasis added). Again, though, what matters for sentencing is *how much* could be deducted.  If any portion was legitimately deductible, the PSR's tax loss is overstated.  And the First Circuit certainly did not speak to the tax loss amount, which had no relevance to the issues on appeal.

### C.      Because the Government Has Not Proven a Reliable Means of Valuation, the Court Should Impose an Offense Level of 6

When the government fails to prove "a reliable estimate of the magnitude of any tax loss," the proper result is to "impose[] an offense level of 6."  *United States v. Scholl*, 166 F.3d 964, 981 (9th Cir. 1999).  And, indeed, that is how other sessions of this Court have addressed slippery "loss" issues in related Varsity Blues contexts.  For example, in evaluating the "loss" to schools such as USC from the now-rejected bribery theories, Judge Woodlock found the loss "amount" to be "wholly speculative" and accordingly did not increase the base offense level for bribery.[98] Judge Talwani, too, held years ago in connection with related sentencings that neither the "loss" to the universities nor the "gain" to the defendants could "reasonably . . . be determined," and accordingly refused to increase the base offense level under the applicable Guideline.[99]

In sum, the government bears the burden of justifying an enhanced sentence based on a specific tax loss.  Here, aside from the categorical "fraudulent" theory that the appellate court has now rejected, the government offered no evidence to support any such enhancement; it did not

---

[98] Ex. 68, Excerpt of Sentencing Tr., *United States v. Bizzack*, No. 1:19-cr-10222 (D. Mass. Nov. 5, 2019), at 59.

[99] Ex. 69, Excerpt of Sentencing Tr., *United States v. Abbott*, No. 19-cr-10117 (D. Mass. Sept. 13, 2019), at 5-6.

even try.  As a result, this Court should set the base offense level at 6—the only level that the available evidence supports.  *See* U.S.S.G. § 2T1.1(a).

### III.   MOST OF THE PSR IS NOT APPROPRIATE FOR THE COURT'S CONSIDERATION ON RESENTENCING

Though the Second Addendum to the Presentence Report notes the appellate decision, it leaves intact the prior 92-page PSR, which, given the changed circumstances, is rife with information and conclusions that are not appropriate for the Court's consideration on resentencing. Mr. Wilson accordingly objects to vast swaths of the original PSR and addresses the most significant of these issues below.[100]

#### A.   The Court Should Not Consider for Purposes of Sentencing Any Conduct Underlying the Vacated Charges[101]

The First Circuit found Mr. Wilson's trial (other than as to the tax count) fundamentally unfair, and the government has at least implicitly conceded, through its dismissal of all other charges, that it cannot prove the fraud and bribery charges against Mr. Wilson in a fair trial.  *See United States v. Cameron*, No. 1:09-cr-00024-JAW, 2014 WL 5323396, at *6 (D. Me. Oct. 17, 2014), *aff'd*, 835 F.3d 46 (1st Cir. 2016) (finding government had implicitly "conceded it cannot prove at trial" vacated counts that government, upon remand, had indicated its intent to dismiss). However, the government apparently seeks to sidestep the issue of actual proof and wants the Court to consider the alleged conduct underlying the vacated counts *as though* the government had proven it in a fair trial.  This would be unfair and would undermine the public perception of the justice system.  *See id.* (finding it "fundamentally unfair that this Defendant's sentence should be enhanced based on conduct underlying counts that the First Circuit vacated and the Government later conceded it cannot prove at trial" and deciding to "accord[] [Defendant] the fruit of his

---

[100] Mr. Wilson reasserts his original objections to the PSR and states herein only those that are new.

[101] Mr. Wilson objects on this basis to the following paragraphs of the PSR:  4, 7-31, 38-42, 44-52, 56 (second sentence), 57-74, 76, 79-80, 82-90, 97-100, 103, 162 (except the last sentence), 163, 165 (except the last sentence), 166, 167 (except the last sentence), 168, 170, 171, 172 (other than 13ssss), 173, 175 (second sentence), 177-179, and Sentencing Options.  Mr. Wilson also objects to the Court's consideration of the government's objections, and the Probation Officer's responses, with the following objection numbers:  1, 3-8.  There also are statements in the Probation Officer's responses to Mr. Wilson's original objections that Mr. Wilson objects to as no longer valid or appropriate for the Court's consideration:  4-9, 11, 22, 24, 26-27, 38, 41-48, 66-68.

appellate victory" and hence not to include facts from the vacated for purposes of sentencing).

Though a court may consider acquitted conduct in fashioning a sentence, doing so would be wholly inappropriate here.  Here, the First Circuit found the trial irredeemably tainted.  Thus, the Court may not draw *any* conclusions from the evidence presented at trial.  The appeals court found that the voluminous inflammatory evidence about other parents that the government presented substantially prejudiced Mr. Wilson's rights.  Moreover, the panel clearly was troubled by the trial court's wholesale exclusion of Mr. Wilson's proffered evidence.  *See, e.g.,* Ex. 45, Unofficial excerpted Oral Arg't Tr., *United States v. Abdelaziz*, No. 22-1138 (1st Cir. Nov. 7, 2022), at 2 (Judge Lipez calling the government "notably aggressive in trying to prevent the defendants from mounting what they characterize as a good faith defense" and asking, "How can you defend the conclusion that that evidence was not relevant?").  The court ultimately did not need to determine whether the exclusion of virtually all defense evidence prejudiced Mr. Wilson, because it vacated all of the principal counts on either legal error or the substantial prejudice from the *Kotteakos* violation.  But it noted that the government did not even attempt on appeal to defend the bases on which the trial court excluded the much of the evidence.  Certainly the First Circuit's treatment underscores that nothing about the one-sided presentation of evidence at trial should be deemed reliable.

As Judge Woodcock explained in *Cameron*, this scenario makes it "particularly inappropriate" to consider conduct underlying vacated counts:

> When a defendant secures constitutional rights on appeal—not just for himself but for others—it seems particularly inappropriate for a resentencing court to consider the conduct in the constitutionally-tainted counts in fixing a defendant's sentence on remand.
>
> For the Court on remand to consider the exact same conduct underlying the vacated counts, placing him for sentencing purposes in the same situation he would have been in had he lost the appeal, casts a shadow over the significance of the appeals process.  Also, this situation is a variant of acquitted conduct.  Unlike some acquitted conduct, [Defendant] was not acquitted because a fact-finder found that the Government failed to sustain its burden of proof beyond a reasonable doubt.  In that situation, consideration of the same conduct by a preponderance standard is more understandable.  But here, the First Circuit vacated [Defendant]'s convictions because this Court committed an error of constitutional magnitude when it

> convicted him of the later vacated counts.  To consider that same conduct at
> sentencing opens this Court to the charge that when a defendant exposes its legal
> error, it will vindicate itself by imposing the same sentence on a defendant as if it
> was right all along.

*Cameron*, 2014 WL 5323396, at *7.  Mr. Wilson likewise vindicated important rights for both

himself and others, and his appeal served a critical role in reining in government overreach.  *See*

*infra*, Section IV.E.  He, too, should be able to reap "the fruits of his appellate victory," *Cameron*,

at *8, and not have the rug pulled out from under him.

The tax count was largely an afterthought in this case, added in the Fourth Superseding

Indictment and consuming only a tiny sliver of time and attention at trial.  If the Court were now

to consider, for example, the unproven federal programs bribery allegations, the Court would no

longer truly be sentencing Mr. Wilson for filing a false tax return, as § 3553(a) requires, but instead

using the happenstance of the false statements on the tax return (and his residence in

Massachusetts) as a vehicle to punish Mr. Wilson for bribery even though he was never properly

convicted of the latter.

Indeed, the government apparently seeks to argue that the Court should consider Mr.

Wilson's alleged bribery in attempting to facilitate his daughters' college admissions in 2018—

four years after the conduct underlying the 2014 tax count.  ECF No. 2702, at 5.  This is doubly

improper because the government not only urges this Court to consider unproven criminal conduct

it has conceded it cannot prove at a fair trial, but the government also urges the Court to do so

based on speculation that Mr. Wilson *would have* committed a tax crime in 2018 had he not been

prevented from doing so because his conduct was part of an FBI sting.  *Id.* ("But having committed

tax fraud in 2014, the defendant *attempted to do the same thing* with respect to his daughters'

college processes in 2018, and ultimately did not do so only because his actions were part of an

FBI sting.") (emphasis added).  The Court should not countenance the government's clumsy

attempt to shoehorn Mr. Wilson's 2018 actions into an unrelated, years-earlier tax crime.  *See*

*United States v. Santos Batista,* 239 F.3d 16, 22 (1st Cir. 2001) (noting a "defendant must not only

be responsible for any uncharged acts to be considered in his sentencing, but those acts also must

be linked to the offense of conviction").

A further problem is that, even as to acquitted conduct—or uncharged or dismissed conduct—the Court may only consider it if the Court makes factual findings by a preponderance of the evidence.  *United States v. Watts*, 519 U.S. 148 (1997) (holding that a "sentencing court [may] consider[] conduct underlying [an] acquitted charge, so long as that conduct has been proved by a preponderance of the evidence"); *U.S. v. Amirault*, 224 F.3d 9, 15 (1st Cir. 2000) ("From the standpoint of due process, a district court properly may consider uncharged conduct at sentencing (as long as that conduct either is admitted or reliably proved by a preponderance of the evidence)").  Specifically, here, that means the Court could only consider conduct underlying the vacated counts if the Court is able to determine, by a preponderance of the evidence, that those charges "reflect culpable conduct."[102]  Here, there is little dispute as to *what* happened; the key dispute is whether Mr. Wilson had a culpable mental state, and that is the issue this Court would need to determine by the preponderance of the evidence before it could consider such conduct. *See Abdelaziz*, 68 F.4th at 55, 61 (explaining the importance of the jury determining the "key issue" of Wilson's intent).

As discussed above, the Court cannot rely on the tainted trial to make such a finding—particularly where the sentencing judge did not have the opportunity to see the witnesses and make credibility determinations.  Thus, if the Court were inclined to consider any unproven criminal conduct—which, as set forth above, the Court need not and should not in the circumstances here—the only solution consistent with Due Process would be for the Court to conduct a full evidentiary hearing to allow both sides to present all appropriate evidence on the nuanced question of Mr. Wilson's intent.  *See United States v. Jimenez Martinez*, 83 F.3d 488, 494 (1st Cir. 1996) (finding error where district court did not hold an evidentiary hearing given questionable reliability of affidavit on which the district court relied at sentencing); *cf. U.S. v. Correy*, 570 F.3d 373, 396 (1st

---

[102] *United States v. Cortés-Medina*, 819 F.3d 566, 580 (1st Cir. 2016) (Lipez, J., dissenting) (conducting detailed review of case law showing "[i]t has been established for decades that a district court may not rely on allegations of a defendant's past criminal activity" to increase his sentence for a separate crime unless it determines, by a preponderance of the evidence, that criminal conduct occurred); *see also Watts*, 519 U.S. at 157; *United States v. Castillo-Torres*, 8 F.4th 68, 71 (1st Cir. 2021).

Cir. 2009) (finding error and remanding for resentencing where district court failed to make credibility assessment of witness's testimony); *United States v. Roberts*, 14 F.3d 502, 521 (10th Cir. 1993) (noting the Guidelines' comment to § 6A1.3 states, "An evidentiary hearing may sometimes be the only reliable way to resolve disputed issues" and remanding because district court did not hold an evidentiary hearing to make requisite findings of fact regarding drug quantity); U.S.S.G. § 6A1.3(a) ("When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor."). Mr. Wilson stands ready to present evidence at such a hearing.

**B.      The Court Should Not Consider the "Other Parent" Evidence in the PSR**[103]

As with the trial, evidence of other parents' conduct pervades the PSR. The PSR spends pages describing how Mr. Singer's scheme generally worked—painting Mr. Wilson with the same broad brush as other Singer clients who pled guilty.[104] The PSR also details the "College Entrance Exam Cheating Scheme" that the government has never alleged Mr. Wilson knew about, let alone participated in.[105] For the same reasons underlying the First Circuit's opinion on the overarching conspiracy and the substantial prejudice to Mr. Wilson as a result, the Court should strike and not consider any statements in the PSR that do not directly relate specifically to Mr. Wilson.

**C.      Mr. Wilson's Financial Condition Is Materially Worse Now**[106]



---

[103] Mr. Wilson objects on this basis to the following paragraphs of the PSR: 7-23, 26-42. There also are statements in the Probation Officer's responses to Mr. Wilson's original objections that Mr. Wilson objects to as no longer valid or appropriate for the Court's consideration: 4-7, 9, 38.

[104] *See, e.g.,* PSR ¶¶ 26, 28-31, 38-42.

[105] *Id.* ¶¶ 32-37.

[106] Mr. Wilson objects on this basis to the following paragraphs of the PSR: 153-155, 157, 159-161.





[redacted]

---

[redacted]

## IV.   THE   §   3553   FACTORS   WARRANT   A   SIGNIFICANT   DOWNWARD VARIANCE

Section 3553(a)(2) requires the Court to impose a sentence "sufficient, but not greater than necessary," (1) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" (2) "to afford adequate deterrence to criminal conduct;" and (3) "to protect the public from further crimes of the defendant."[111]  There certainly is no need to protect the public from further crimes by Mr. Wilson.  Nor is there a need to send a message of deterrence with his sentence.  Divorced from the bribery and fraud charges, this is a straightforward tax conviction regarding taking a deduction on a tax return in which the taxpayer otherwise paid 45% of his income in taxes.[112]  If the Court accepts that the government has not met its burden of proving the fair market value of any quid pro quo that must be offset from the charitable donation deduction, then the amount of tax loss was no more than $1,425—less than two-tenths of one percent of the amount Mr. Wilson actually paid in taxes for 2014.  This is not the sort of flagrant disregard for tax obligations that requires a strong message to other potential wrongdoers.

In considering "just punishment for the offense," the Court also should consider the toll this prosecution has already taken on Mr. Wilson and his family.  After five decades of working extraordinarily hard to pull himself out of poverty, following the rules and leading not only a blameless but a praiseworthy life, Mr. Wilson made an error in judgment by trusting Mr. Singer that cost him nearly everything he worked so hard to attain.  His reputation is shattered, his

---

[111] 18 U.S.C. § 3553(a)(2).

[112] Ex. 33, Excerpted Trial Tr. (Sept. 29, 2021), at 178-179.

prospects for future employment are blown, his finances are devastated, and he has gone through four and a half years of stress facing an unfair prosecution.  But all this matters less to him than the toll his decisions have taken on his family.  His incredibly talented and hard-working children have been publicly vilified and ridiculed, falsely derided in national news, a factually erroneous Netflix "documentary," and social media as "fake athletes" and not qualified to work at McDonald's.  He has had to work hard to repair his relationship with them and explain why he donated to give a tie-breaker boost for them.  And his wife has gone through extraordinary emotional stress on every step of this dark road with him, and lost her financial security.

Under § 3553, the Court also must consider the history and characteristics of the defendant, the nature and circumstances of the offense, the need to avoid unwarranted sentencing disparities, and any other mitigating factors.[113] Here, applying these sentencing factors weighs in favor of a substantial downward variance from the recommended Guidelines sentencing range (if the Court accepts an offense level of 14) or a non-custodial sentence at the low end of the range (if the Court accepts an offense level of 6).

### A.   John Wilson's Extraordinary History and Character Strongly Favor a Low Sentence

#### 1.   Mr. Wilson Overcame Trauma and Adversity with Hard Work and High Ethics

Many defendants who were part of the Varsity Blues prosecution were born with immense privilege. Mr. Wilson is a stark exception. He was born into a situation so grim it easily could have destroyed him. Mr. Wilson's mother became pregnant when she was a child herself—only 15 years old. Her father was a conservative man from Puerto Rico who disapproved of her pregnancy and kicked her out of the family. Over the next eight years, she had six children with several different fathers. Mr. Wilson, the third of six, does not know who his biological father is. He never met his maternal grandparents. His mother had only a ninth-grade education and suffered from severe but undiagnosed mental illness and occasional alcohol abuse. She abused Mr. Wilson and his siblings physically, emotionally, and verbally for years. For example, as a punishment, she would drive

---

[113] 18 U.S.C. § 3553(a); 18 U.S.C. § 3553(b)(1).

him to an orphanage miles from their home, and leave him there. Mr. Wilson suffered her frequent, violent beatings (usually with a hot saucepan) to protect his younger sisters. The family struggled financially. They lived in the Bowles Park public housing development in the Blue Hills neighborhood of North Hartford, Connecticut, until he was six. They subsisted on welfare. At age 12, Mr. Wilson started working full-time picking tobacco during the summers, putting in hours of backbreaking work alongside migrant farmworkers. He also has struggled his whole life with dyslexia.

Everything in Mr. Wilson's young life positioned him to repeat a cycle of poverty, or at least to become an embittered, closefisted person. But that has not been his outcome. Mr. Wilson refused to allow his circumstances to dampen his inherent graciousness, gentleness, and generosity of spirit. Mr. Wilson overcame his dyslexia and became an outstanding student. He graduated valedictorian from his public high school, received a scholarship and loan package to an engineering college, graduated in three and a half years while working full-time during much of those years, attained an MBA from Harvard Business School at age 23, and had a distinguished career as a consultant and executive for multiple companies. Most important to Mr. Wilson, he has a successful marriage and three wonderful children.

### 2. Mr. Wilson's Core Values—Generosity, Hard Work, and Respect for Education—Guide His Life of Extraordinary Action

Many of the approximately 80 people who wrote letters for Mr. Wilson refer to him as an inspiration and the embodiment of the American dream.[114] Mr. Wilson's friends, family, and colleagues identify the core values that helped him achieve the American dream and that continue to guide his life and define his character: generosity, hard work, and respect for education. They confirm that despite his success, he has never forgotten his humble beginnings. Those who know him say he has "no ego" and that he perpetually puts others' interests ahead of his own.[115]

---

[114] The letters written on Mr. Wilson's behalf are organized into exhibits based on the type of letter writer: Ex. 72—Family Members (24 letters); Ex. 73—Non-Profit Colleagues (4 letters); Ex. 74—Business Colleagues (20 letters); Ex. 75—Friends, Neighbors, and Classmates (33 letters); Ex. 76—Other (2 letters). These exhibits are internally paginated, and the citations herein reflect the internal pagination.

[115] Ex. 75 at 29-30 (Letter from Philip Dubuque (sharing that "[n]ever once, in almost thirty years, have I found John to put his interests above anyone else")); Ex. 74 at 5-7 (Letter from Guvarinder Grewal (describing Mr. Wilson as

a)      **Mr. Wilson Is a Generous Person Who Focuses on Anticipating and Meeting the Needs of Others, Expecting Nothing in Return**

Mr. Wilson's sister, Carol Rickless, shares that "[b]eing raised poor with abusive conditions," can make a person more "compassionate" and more "giving to others."[116] Mr. Wilson is a case in point. As Lorne Adrain notes, Mr. Wilson "has contributed and engaged in both large and small, strategic and simple ways to a variety of community needs."[117]

Though Mr. Wilson has made many meaningful philanthropic contributions to educational causes, his church, and other charities, his efforts on behalf of autistic persons particularly stand out. Mr. Wilson does not have an autistic family member. But he saw a great and underfunded need—for people who have even greater disadvantages than he did as a child—and felt compelled to help. He donated significantly (nearly $400,000) and opened his home for fundraising events (raising $1,500,000). And he went beyond offering financial resources and invested his time and talents. He began serving on the board of Cure Autism Now ("CAN") in 2000.

He had the vision that if CAN merged with the other main autism charity in the U.S., Autism Speaks, it could increase research funds and advocacy and reduce costs. Mr. Wilson proposed and helped guide the merger with the CAN board, resulting in the largest and most impactful autism non-profit in the world. This work was difficult, and Mr. Wilson's "leadership in this effort was the key that actually brought this collaboration to the finish line."[118] Mr. Wilson went on to serve on the board of the merged charity for years. Mark Roithmayr, the former President of Autism Speaks, describes that "John negotiated a tripling of private funds dedicated to research into the genetic causes and environmental triggers of autism . . . ."[119] Jon Shestack, the founder of CAN, writes that "[t]here are 1000 excellent scientists working in the field where there

---

having "no ego" and being willing to literally get on his "hands and knees to see how [he] could help")); *id.* at 33-34 (Letter from Karl Blanchard (observing that whether he was "on the manufacturing floor or in a field shop, John greeted each employee with a smile and genuine interest in the person and what they did for our company. . . . I witnessed first-hand John's humility and genuine respect for people, regardless of their position or rank.")).

[116] Ex. 72 at 4-5 (Letter from Carol Rickless).

[117] Ex. 75 at 7 (Letter from Lorne Adrain).

[118] Ex. 73 at 4-5 (Letter from Dr. Ricki Robinson).

[119] *Id.* at 6-7.

once were less than a dozen . . . . None of this would have been possible without John Wilson's help and guidance."[120]

Mr. Wilson brings the same generosity to business and is a selfless leader. His actions while working for Staples Europe exemplify his approach. Staples brought in Mr. Wilson in 2012 to help lead a turnaround of its struggling European division. Mr. Wilson voluntarily took a 10% salary reduction his first year to share the pain his employees were experiencing. He then realized that Staples' financial difficulties severely limited the company's ability to fully reward employees for their outstanding efforts. Mr. Wilson thus *personally* financed more than $50,000 a year in work incentives and recognition rewards for high-performing employees at every level of the organization, including gifts for employees and their children and visits where he flew employees to the United States and hosted them and their families at his home in Hyannis Port for a Cape Cod vacation. Patrick Legro, who worked with Mr. Wilson at Staples Europe, considers Mr. Wilson's actions to be "[s]omething unheard of in my professional life to come across somebody so generous with no personal gain from it."[121]

In his personal life, Mr. Wilson has also consistently aided those facing difficulty. Mr. Wilson's friend, Dr. Richard O'Keeffe, faced terror after a cancer diagnosis when he realized he could not afford the treatments he needed. Unsolicited, Mr. Wilson "stepped in" and helped with the costs of treatment.[122] Dr. O'Keeffe credits Mr. Wilson with saving his life. Similarly, the 2007 financial crisis was devastating to Mr. Wilson's cousin-in-law, Ken Quartermain, and Mr. Wilson helped keep Ken and his family afloat financially. Ken emphasizes that he "was not allowed to feel inadequate, to feel humiliated, to feel failure" because Mr. Wilson provided for his financial needs "in such a way that [Ken's] fragile ego was protected."[123]

Mr. Wilson for years has also cared for the elderly and vulnerable, without being asked.

---

[120] *Id.* at 1-2.

[121] Ex. 74 at 16-17 (Letter from Patrick Legro).

[122] Ex. 75 at 8-9.

[123] Ex. 72 at 20-21.

One letter writer recounts how he checked in regularly on 91-year-old Anna Laughlin, who has depended on him, especially during the pandemic.[124] Jacqueline Bastien recalls how Mr. Wilson cared for her elderly mother, Polly, through acts such as showing up with and personally installing air conditioners during a heat wave.[125] Mr. Wilson renovated his family's home so his mother-in-law, who was suffering from colon cancer, could live with them. He and his wife personally helped nurse her for six years. When Mr. Wilson's nephew, an Army infantryman, was severely disabled by an IED while serving in Afghanistan, Mr. Wilson rushed to Walter Reed hospital to be with him, and his nephew wrote he is "so thankful I had someone like my Uncle who dropped everything to just stand at my side and offer me support while my world had crumbled."[126]

> ### b) Mr. Wilson Built His Life and Career on Hard Work and Integrity and Instills Those Values in Others

The effort that Mr. Wilson puts into all his endeavors astounds those who know him.[127] He not only consistently worked 60-80 hours per week, but also found time to coach Little League, serve as a Scout leader, and create scavenger hunts using math and science problems as clues for his children and their friends. Those who know him best understand that he does things the right way even if it is the hard way.[128] Mr. Wilson taught his children that there is no substitute for hard work. Johnny Wilson believes that the work ethic his father instilled in him is what enabled him to achieve his world record swim at nine years old (from Alcatraz to the San Francisco shore), as well as other successes throughout his life. Coach Jack Bowen described Johnny Wilson as a hard

---

[124] *Id.* at 16.

[125] *Id.* at 17.

[126] *Id.* at 29.

[127] Ex. 74 at 5-7 (Letter from Guvarinder Grewal (noting that he asked Mr. Wilson "why are you putting in all of this time, energy and personal sacrifice" and Mr. Wilson's answer was "his children . . . to ensure that [they] understood . . . nothing comes easy")).

[128] *E.g.*, *id.* at 12-13 (Letter from Michael Patriarca (explaining that when coaching Staples' team to sell its European division Mr. Wilson "stressed to our leadership team that we be completely honest in our presentation of the business and present both the strengths and weaknesses")); *id.* at 31 (Letter from Anthony LeWinter (providing that when representing Mr. Wilson's company, 2G Digital Post, Inc., Mr. Wilson insisted that a plan to assist another shareholder pass a "higher standard" than the IRS required "even though those plans would actually cost John more to assist the other shareholder")).

working "grinder," the kind of athlete "I couldn't get to crack."[129] His daughters similarly credit Mr. Wilson with inspiring them always to give their full effort. His nephew advises, "I recognize that to be successful requires tremendously hard work like how my Uncle John does it."[130]

### c) Mr. Wilson Values Education and Strives to Ensure Educational Opportunities for Others

Mr. Wilson's nephew, Chris Sagherian, notes that Mr. Wilson has "the highest regard for school and education. . . . given our past."[131] Knowing the doors that education opened for him, Mr. Wilson has used his time and resources to ensure that young people—not just those in his family—have educational opportunities and support. Mr. Wilson has provided financial support to a range of educational institutions and students. He donated to the public and private schools his children attended. Mr. Wilson's will, years before he met Mr. Singer, established gifts of millions of dollars to fund scholarships for students whose parents did not attend college.[132] He also donated $100,000 to create trust funds in 1998 to help all of his nieces and nephews pursue education. Mr. Wilson consistently makes great efforts to improve or facilitate learning opportunities for young people: opening his home to exchange students, coaching sports,[133] chaperoning field trips, working in the school library, and even dressing up as Santa Claus at his children's elementary school. Many remark on Mr. Wilson's unique and personal investment in opportunities for children and that he gives his time and attention even when his own children are not involved.[134]

Mr. Wilson has worked to instill his love of learning in his children. "He made nearly

---

[129] Ex. 5, Excerpted Trial Tr. (Oct. 4, 2021), at 82-83.

[130] Ex. 72 at 33.

[131] *Id.* at 30.

[132] Ex. 3, Trial Tr. (Sept. 28, 2021), at 18-22.  A classmate from his MBA program also advises that Mr. Wilson supported scholarships making it "possible for students around the globe to attend Harvard Business School and make a difference in the world." Ex. 75 at 7 (Letter from Lorne Adrain).

[133] Ex. 75 at 17 (Letter from Tracy Johnson (noting the uniqueness of Mr. Wilson's approach to coaching a youth baseball team, which was "all about the fun of the sport and not winning")).

[134] *Id.* at 10-11 (Letter from Ted Kennedy, Jr. (explaining that in the Hyannis Port community "the children's programs could always count on John to volunteer and to help make things run more smoothly; notably, John even continued to volunteer for our community after his own kids had grown out of these activities")); *id.* at 46-48 (Letter from John Schneeberger (concluding Mr. Wilson "[h]as done more than anyone for children of Hyannis [P]ort")).

everything in [his children's] daily routines and interactions into teachable moments."[135] He worked to ensure that his children had every opportunity to succeed and required that his children "in turn work hard to achieve [their] full potential."[136] His children recall that he did not push them to collect academic accolades. He focused on their acquisition of knowledge and mastery of material.[137] Mr. Wilson's brother, Cliff Wilson, explains that "John wanted his children to get a good education and made sure they were good fits for their chosen schools. He was not trying to enhance himself . . . ."[138] It is no surprise, given the influence of their father, that all three of Mr. Wilson's children had high scores on the ACT, strong grades, and many other impressive accomplishments.

### B. The Nature and Circumstances of the Offense Support a Sentence of Probation

#### 1. Mr. Wilson's Trusting Nature and Generous Character—Not Ego or Striving for Status—Contributed to His Situation

Mr. Wilson did not seek out Mr. Singer for his "side door" but discussed donations with Mr. Singer only after Mr. Singer had provided legitimate services to his family for years. Mr. Wilson did not enter into a relationship with Mr. Singer looking for illicit advantages or quick fixes. He wanted Mr. Singer to help his child become his best self. This is in great contrast to other Varsity Blues defendants. For example, per the recorded call played at trial, Gordon Caplan (sentenced to one month) was discussing faking a learning disability for his daughter and cheating on her exams to "guarantee" a particular score on the ACT or SAT within five minutes of his introduction to Mr. Singer.[139]

Mr. Singer was a world-class manipulator, and Mr. Wilson was his perfect mark. Mr. Wilson was a busy executive who respects the knowledge and expertise of others and was

---

[135] Ex. 72 at 11-12 (Letter from Courtney Wilson).

[136] *Id.*

[137] *Id.* at 13-15 (Letter from Mary Wilson).

[138] Ex. 72 at 2.

[139] Ex. 77, Trial Ex. 525, at 4-7 (admitted).

accustomed to relying on the advice of trusted experts to whom he often delegates.[140]   As Mr.

Wilson's trust in Mr. Singer grew over the years, so did Mr. Singer's knowledge of Mr. Wilson.

Mr. Singer was aware that Mr. Wilson had donated to schools in the past and planned to leave

millions to universities in his will. Mr. Wilson's friend, Matthew LeMerle, suggests:

> . . . I know that John would have wanted to support his own Alma Mat[er] and
> would have thought nothing of giving large amounts to support the institutions that
> might become the same for his children. . . . John's generous nature would have
> made it very easy for him to be taken advantage of.[141]

Mr. Singer exploited Mr. Wilson's generosity and history of donating. Mr. Wilson had told Mr.

Singer of his $5 million scholarship bequest to Harvard and Rensselaer Polytechnic Institute in his

will.  When discussing whether his daughters were "legacy" students at Harvard, Mr. Singer told

Mr. Wilson that it would not help "[u]nless you're a big legacy but you . . . haven't done that

*yet*."[142] Mr. Wilson's large planned gifts to universities before even meeting Mr. Singer distinguish

him from many of the sentenced parents.

### 2.       A Criminal Prosecution of Tax Conduct Like Mr. Wilson's Is Highly Unusual

In the ordinary course, Mr. Wilson's is the sort of criminal tax case that—standing alone—

never would have been brought.  Successful tax prosecutions tend to have certain characteristics,

such as the taxpayer hiding income, a multi-year pattern of clearly wrongful conduct, an

underpayment that is a large percentage of the taxpayer's income (and not counterbalanced by any

overpayments), and no involvement by a fully-informed reputable tax advisor.  Mr. Wilson's case

had none of these.  It is rare for an issue of a deduction to be criminally prosecuted, given the

complexity of the rules.  Still more so if the issue is a deduction on a single year's return.  It is rare

for a criminal tax defendant—or, for that matter, any high net worth individual—to have paid 45%

of his income in taxes in the year in question.  Combined with his non-Singer related donations of

$120,000, Mr. Wilson paid or gave 51% of his 2014 taxable income to various income taxes and

---

[140] *E.g.*, Ex. 74 at 27-28 (Letter from Debbie Rogers (explaining that Mr. Wilson makes his decisions on "recommendations from his trusted professional advisors")).

[141] Ex. 74 at 3-4.

[142] Ex. 21, Trial Ex. 571A, at 16:3-12 (emphasis added).

charitable contributions.[143]  It is rare if not unheard of for the government to criminally prosecute an alleged false statement leading to an underpayment when—that same year—the taxpayer *overpaid* their taxes by an amount comparable to or even higher than the claimed underpayment.[144] Here, too, Mr. Wilson used two conservative, reputable tax advisors.  Neither provided any evidence that they ever thought, over many years, that Mr. Wilson was looking to do anything inappropriate.[145]

Absent the sensational allegations of bribery and college admissions fraud—which the government has now abandoned—it is hard to believe either the IRS or a U.S. Attorney's Office would have signed off on bringing a criminal tax case against Mr. Wilson.  At worst, his deductions would have been a matter for an IRS civil audit.  However, even that much is hard to imagine given the apparent fact that, to defense counsel's knowledge, the IRS has never before—whether publicly or privately—taken the position that a boost in admissions alone should vitiate a deduction for a charitable donation to an educational institution.[146]

The upshot is twofold.  First, this conviction is not so serious that it warrants a heavy sentence.  Second, when considering a range of possible sentences, including sentences courts have imposed on defendants who otherwise appear to be comparable, the Court should consider the aberrational nature of this case *as a tax case*.  *See infra*, Section IV.C.1 (outlining sentencing data for defendants with similar tax counts, offense levels, and criminal history).  This case is far outside the heartland of what a typical tax case entails and thus warrants a much lower sentence than a typical tax defendant would get, even assuming other similar offense characteristics.

---

[143] Ex. 33, Excerpted Trial Tr. (Sept. 29, 2021), at 176-178; Ex. 78 Excerpt of Trial Ex. 501A (admitted).

[144] Here, as noted, Mr. Wilson overpaid his 2014 taxes by approximately $110,000 to $140,000 when his tax preparers did not change his place of residence to Massachusetts from the higher tax-rate California—which he was entitled to do—and failed to claim a $20,000 rent deduction for HPC's office—which he also was entitled to do.  *Supra*, at 14 & n.51.

[145] Ex. 38, Excerpted Trial Tr. (Sept. 27, 2021), at 122-23.

[146] *See supra*, at 29-33.  This apparently is true even where the boost made admission highly likely, i.e., the 95% chance of admission that Mr. Singer quoted Mr. Wilson for USC.  Ex. 11, Trial Ex. 48.

### C.   The Need to Avoid Unwarranted Sentencing Disparities Favors a Non-Custodial Sentence

#### 1.   Nationwide Sentencing Data Shows that Sentencing Mr. Wilson to Any Prison Time Would Be Extreme and Aberrational

In connection with this sentencing, defense counsel retained Mark Allenbaugh, a sentencing expert and former Staff Attorney for the U.S. Sentencing Commission, to analyze publicly available sentencing data reflecting actual sentences imposed for offenders who match Mr. Wilson's Guidelines profile.   As explained in his declaration, Mr. Allenbaugh reviewed Sentencing Commission data to examine the sentences that have been imposed over the past five fiscal years under U.S.S.G § 2T1.1 for defendants assigned a total offense level of 14 and a Criminal History Category of I.   In other words, Mr. Allenbaugh assumed that the PSR is correct (notwithstanding Mr. Wilson's objections to its calculations) and evaluated the sentences courts have imposed for similarly situated defendants.  *See* Ex. 79, Allenbaugh Decl. ¶ 2.

The results of that analysis are clear and striking: A majority of offenders sharing Mr. Wilson's Guidelines profile (again, even accepting the PSR) received a sentence of one day or less in prison.  *See id.* ¶ 9.   The average tax loss for the 57% of defendants who were sentenced to one day or less was $125,691.  *Id.*

Those in this analysis who did receive significant prison time for filing false tax returns, *see id.* ¶ 10, engaged in exceptionally brazen behavior, including threatening others, abusing positions of trust, and repeating violations over and over again.   Chiropractor business owner Gregory Belcher, who received 15 months in prison, engaged in especially egregious conduct, as he filed a false tax return even after being notified that he was the target of a federal grand jury investigation and then filed an additional false tax return the following year even as he was under indictment and awaiting trial.[147]   He also threatened his accountant to prevent his income from being reported to the IRS and sent threatening letters to insurers and other third parties.   Former law office manager Misty West received a 21 month sentence for filing false tax returns that defrauded her employer of more than $400,000 through her position as office manager,

---

[147] *United States v. Belcher*, No. 1:17-cr-00134 (D. Md. March 9, 2017).

bookkeeper, and paralegal.[148]  Prosecutors stated that West had "victimized her employer and defrauded the US by using her position of trust to commit crimes of dishonesty."[149]  Finally, businessman Robert Banos was sentenced to 15 months in prison for filing false tax returns that failed to report his true income for five years in a row.[150]

Mr. Allenbaugh also conducted a second analysis that considered, over the past five fiscal years, all offenders who were convicted of a single tax count generating a tax loss of between $40,000 and $100,000, but had no criminal history points and were not subject to any mandatory minimum or consecutive sentence requirements.  Again, the majority of those defendants received sentences of one day or less in prison.  *See* Ex. 79, Allenbaugh Decl. ¶¶ 11-12.

In short, sentencing data shows that even offenders similarly situated to Mr. Wilson in terms of raw Guidelines factors—and without consideration of any of the unique mitigating factors that are set forth in this memorandum—are generally *not* sentenced to prison.  That confirms that a custodial sentence for Mr. Wilson would be aberrational.

### 2.     The Court Should Consider the Soon-to-Be-Effective Zero-Point Offender Adjustment

Mr. Wilson is the archetypal defendant who is unlikely to re-offend. The United States Sentencing Commission recognizes this fact with respect to defendants who share Mr. Wilson's characteristics and background. On April 27, 2023, the Sentencing Commission submitted to Congress the so-called "zero-point offender" amendment to the Sentencing Guidelines. The amendment provides for a two-point offense-level reduction for defendants—such as Mr. Wilson—who have zero criminal history points and who meet certain other criteria that Mr. Wilson meets.[151] The Sentencing Commission has provided the justification for this new Guideline

---

[148] *United States v. West*, No. 2:17-cr-20132 (W.D. Tenn. May 18, 2017).

[149] Western District of Tennessee, United States Attorney's Office, Dept. of Justice, *Former Law Office Manager Sentenced to 21 Months in Federal Prison* (Nov. 8, 2018), *available at* https://www.justice.gov/usao-wdtn/pr/former-law-office-manager-sentenced-21-months-federal-prison.

[150] *United States v. Banos*, No. 1:16-cr-01423 (D.N.M. April 12, 2016).

[151] Those criteria are that the offense: did not involve terrorism, violence, or threats of violence; did not result in death or serious bodily injury; was not a sex offense; did not cause substantial financial hardship; did not involve a firearm; is not an offense covered by U.S.S.G. § 2H1.1 (Offenses Involving Individual Rights); and did not include an offense-level adjustment for hate crimes, vulnerable victims, serious human rights offenses, or aggravating role. *See*

amendment:

> The lowest Criminal History Category on the Sentencing Table in Chapter Five, Part A of the Guidelines Manual, CHC I, includes offenders with zero or one criminal history point. The Commission's analysis of recidivism data, however, suggests that offenders with zero criminal history points ("zero-point offenders") have considerably lower recidivism rates than other offenders, including offenders in CHC I with one criminal history point. Among other findings, the Commission's recent recidivism report concluded that "zero-point" offenders were less likely to be rearrested than "one point" offenders (26.8% compared to 42.3%). This represents the largest difference in recidivism rates of any comparison of offenders within the same CHC.[152]

The Sentencing Commission's creation of the zero-point offender amendment was "[i]nformed by this recidivism data, as well as other extensive data analyses of offenders with no criminal history points."[153]

The zero-point offender adjustment, if applied here, would reduce Mr. Wilson's total offense level from 14 to 12 based on the PSR's proposed offense level, or from 6 to 4 based on what Mr. Wilson believes is the appropriate offense level.  Mr. Wilson's PSR does not reflect the two-point reduction because the amendment does not go into effect until November 1, 2023—less than eight weeks after when Mr. Wilson's sentencing is scheduled to take place. *See* 88 Fed. Reg. 28,282 (stating the effective date and noting also that the Sentencing Commission will soon consider whether to make the zero-point offender adjustment retroactive).[154] That does not prevent the Court, however, from considering the "Sentencing Commission's current thinking for whatever use it may be in exercising the court's judgment about the proper sentence." *United States v. Godin*, 522 F.3d 133, 136 (1st Cir. 2008) (remanding for new sentencing in light of Guideline amendment

---

Amendments to the Sentencing Guidelines, Policy Statements, Official Commentary, and Statutory Index, 88 Fed. Reg. 28,271 (May 3, 2023) (to be codified at U.S.S.G. § 4C1.1).

[152] Office of Research and Data and Office of General Counsel, U.S. Sentencing Commission, Retroactivity Impact Analysis of Parts A and B of the 2023 Criminal History Amendment, at 4 (May 15, 2023) (footnote omitted), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/retroactivity-analyses/2023-criminal-history-amendment/202305-Crim-Hist-Amdt-Retro.pdf; *see* 88 Fed. Reg. 28,271.

[153] *Id.*

[154] *See also* 28 U.S.C. § 994(p) (providing that a proposed Guideline amendment may be "modified or disapproved by Act of Congress" prior to its effective date). "In the history of the Commission, there has been one instance in which Congress rejected proposed amendments to the Guidelines." Congressional Research Service, *Congressional Review of Proposed Amendments to the U.S. Sentencing Guidelines*, at 1 (June 6, 2023), *available at* https://crsreports.congress.gov/product/pdf/IF/IF12422.

enacted during pendency of appeal, even though amendment was not made retroactive); *see United States v. Ahrendt*, 506 F.3d 69, 79-80 (1st Cir. 2009) (remanding for resentencing in light of intervening Guideline amendment even though the court "committed no error" in its application of the Guideline that existed at the time of sentencing). Under *Godin* and *Ahrendt*, the fact that the Court will sentence Mr. Wilson a few weeks before the zero-point offender adjustment goes into effect does not hinder the Court's discretion to consider both the zero-point offender adjustment and its underlying rationale as expressed by the Sentencing Commission.

### 3.     Mr. Wilson Is Significantly Less Culpable than Any Other Parents

It should come as no surprise that Mr. Wilson, as one of only two parents associated with Mr. Singer who chose to go to trial, had the most exculpatory facts of any parent. Mr. Wilson was an exceptionally hands-on parent, supporting his children in their sports, accompanying them to community service, and monitoring their academic performance. Unlike many—or most or all—of the other parents, Mr. Wilson:

- Did not cheat on any college board exam or commit any other academic fraud;

- Spent years supporting his son's sports career as he became a serious, national caliber athlete;

- Had children with strong grades and test scores who were academically qualified to attend the schools at issue;

- Did not stage or provide any fake photos;

- Did not see any false essays or participate in providing any false information to any school;

- Did not lie to the high school (but instead had a high school coach actively involved in recommending his son for the USC water polo team);

- Had a son who participated as a member of the university team;

- Did not agree with Mr. Singer to lie to the IRS as part of the government's IRS audit ruse when Mr. Singer was cooperating with the government;[155]

- Never understood or intended for any of his money to go to any coach or official personally (and none of it did);

---

[155] *See supra* at 24 & n.78.

- Did not dodge or lie to university development officials or agree to lie to the university to explain why his child was not playing on the team (in fact, Mr. Wilson spoke to the university coach, attended games and practices for the university team when his child was on the team, and spoke to an administrator at USC about his donation); and

- Had a documented pre-existing intent to donate significant sums to universities, including one of the universities at issue (via his will, which significantly pre-dated his work with Mr. Singer).

And, of course, this is without even accounting for the fact that Mr. Wilson is one of only two parents whose fraud and bribery charges were vacated and then dismissed—the others all pled guilty and were sentenced with the spectre of those charges hanging over them.

Mr. Wilson accordingly should receive a sentence commensurate with the lightest sentence imposed on any parent, i.e., probation.  Of the 37 sentenced parents, 24 (65%) received sentences of two months or less, or time served.  Five of them essentially received non-custodial sentences: Peter Jan Sartorio received a sentence of one year of probation (with 250 hours of community service); Robert Repella received a sentence of one year of probation (with the first 25 days spent in home detention and 220 hours of community service); Peter Dameris received a sentence of time served (one day), as well as three years of supervised release with 12 months of in-home detention; Bruce Isackson received a sentence of time served (one day), as well as one year of probation (with 250 hours of community service); and Davina Isackson received a sentence of time served (one day), as well as one year of probation (with 250 hours of community service).  An additional alleged conspirator, the Stanford sailing coach, John Vandemoer, received a time-served sentence of one day (and two years of supervised release, with six months of in-home detention).  There was only one parent who pled guilty to a single tax count, Homayoun Zadeh, and his sentence was six weeks in custody, with one year of supervised release (and 250 hours of community service).

Many other parents took tax deductions on payments they made to Mr. Singer's non-profit foundation or to universities, yet avoided tax charges.  Many of them received light sentences, even though they pled guilty to the more serious fraud and bribery charges rather than any tax

charge and participated in academic cheating.[156]  Some of the sentenced parents also deducted

amounts far greater than the $220,000 that Mr. Wilson deducted and still received low sentences.

For example, Marci Palatella deducted the $475,000 she paid Mr. Singer for the side door as a

charitable donation,[157] participated in test cheating, and was sentenced to six weeks (again, based

on the fraud and bribery charges since the government did not charge her with a tax crime).

Mr. Wilson's co-defendant at trial, Gamal Abdelaziz, is receiving the entire fruits of his

appellate victory and hence will have no sentence, as the First Circuit vacated his two conspiracy

convictions and the government will not retry the charges.  Though the government did not charge

Abdelaziz with a tax count, the government argued Abdelaziz agreed, on a recorded call with Mr.

Singer, to lie to the IRS about his payments to USC.[158]  And Abdelaziz's conduct was otherwise

worse than Mr. Wilson's.  For example, even though USC ostensibly admitted Abdelaziz's

daughter as a basketball recruit, she had only briefly played junior varsity basketball in high school,

and her school's basketball team was not highly ranked.  ECF No. 2516, at 2.  Abdelaziz

nevertheless approved a false admission essay that Mr. Singer prepared for his daughter in which

she referred to the basketball court as her "art studio," and he agreed with Mr. Singer to lie to USC

about a fake injury to explain why his daughter did not show up to participate on the team.  ECF

No. 2516, at 4-5.

Bruce Isackson, who testified at Mr. Wilson's trial, was one of the worst parents in terms

of conduct and yet received essentially a no-time sentence (his sentence included time served of

one day).  Mr. Isackson participated in the side door two times, knowingly presented his two

daughters as fake athletes and considered it for his third child, enabled one of his children to cheat

on college board exams, agreed to lie to the IRS, and testified that he knew every bit of this was

---

[156] These parents include, for example, Greg Abbott (one month), Marcia Abbott (one month), Jane Buckingham (three weeks), Gordon Caplan (one month), Robert Flaxman (one month), Felicity Huffman (14 days), and Diane Blake (six weeks).

[157] *See* ECF No. 3-4, at 19-21.

[158] Ex. 63, Trial Ex. 587A (transcript of recorded call) (admitted) (IRS audit call with Mr. Abdelaziz).

wrong and did it anyway.[159]  He did not believe, as Mr. Wilson did, that his money would be a donation to a university program.  Mr. Isackson received credit for cooperating based upon the testimony he gave at Mr. Wilson's trial—testimony that the First Circuit found substantially contributed to the prejudicial variance as to Mr. Wilson and Mr. Abdelaziz stemming from the government's *Kotteakos* violation.

Mr. Wilson's culpability should be evaluated in light of his specific conduct and relative to how the Court has sentenced other defendants.  "[D]istrict courts have discretion, in appropriate cases, to align codefendants' sentences somewhat in order to reflect comparable degrees of culpability—at least in those cases where disparities are conspicuous and threaten to undermine confidence in the criminal justice system." *United States v. Martin*, 520 F.3d 87, 94 (1st Cir. 2008) (affirming district court's decision to impose a below-the-range sentence to align defendant's sentence with those imposed on his co-defendants). Certainly it would be perverse for Mr. Wilson to receive a *greater* sentence than any defendants who pled guilty to the much more serious fraud and bribery charges rather the relatively less serious tax offense that is Mr. Wilson's only remaining count.[160]

Indeed, it would be particularly perverse to sentence Mr. Wilson to prison time for a false tax statement while the former U.S. Attorney for this District—who oversaw Mr. Wilson's initial sentencing on behalf of the government—avoids any prosecution for lying to federal agents under oath about her official misconduct.[161]  Similarly, Dean Brunold faces no charges for his statement under oath that Magistrate Judge Kelley found perjurious.  *See supra* at 19-20.  And Bruce Isackson was sentenced to no prison time for his unabashed test cheating and false statements.  Mr. Wilson

---

[159] *E.g.,* Ex. 80, Excerpted Trial Tr. (Sept. 13, 2021), at 90, 118, 120-23, 128, 132-145, 149, 154.

[160] *See, e.g.,* PSR at 28-30 (calculating offense level of 22 for Mr. Wilson's fraud and bribery counts versus offense level of 14 for his tax count); *see also* Ex. 68, Sentencing Tr. at 109, *United States v. Bizzack*, No. 19-CR-10222-DPW (D. Mass. Oct. 30, 2019) (Judge Woodlock decrying the "[p]rofoundly corrosive" effects of "disparate sentences," which are "[p]robably as corrosive as anything that can happen in the criminal justice system").

[161] *See* Sarah N. Lynch, *Massachusetts US Attorney Accused of Election Meddling and Lying,* REUTERS.COM, *available at* https://www.reuters.com/legal/massachusetts-us-attorney-sought-improperly-influence-local-election-report-2023-05-17/ (noting that OIG referred Rollins's false statements to the Justice Department for possible criminal prosecution though officials declined to do so).

submits that each of these false statements caused far greater injury to society and the public's faith in the rule of law than the false statement on his tax return.

### D.      Mr. Wilson Is Committed to Making Amends

Mr. Wilson regrets that he ever trusted Mr. Singer and let him into his family's lives.  He also truly regrets that he attempted to gain a competitive edge for his children by way of donations. Though Mr. Wilson always believed that his donations were legal and he was operating within a system the universities devised and the IRS had blessed, he deeply regrets the unintended consequences of his actions.  He is sorry for the tremendous pain and emotional stress his family has suffered, and is working every day to make amends and heal his family's wounds.  His daughters were only juniors in high school when Mr. Wilson was indicted. They had to complete their college applications while suffering public vitriol and social media vilification and trying to navigate the reality that their father faced criminal charges for trying to help them.  And his son was demeaned and dismissed as a fake athlete.  His entire family has suffered a four-and-a-half year ordeal, exacerbated by the intense public spotlight on this case, and Mr. Wilson has had to endure one of the worst pains in any parent's life:  the knowledge that his misjudgment led to his wonderful children and wife suffering.

Mr. Wilson also is acutely aware that the media attention on this case has caused disaffection beyond the boundaries of his own family.  Particularly given his own background, and the attention he has always given to increasing opportunities for people with disadvantages, *see supra*, at 43-45 & 48, the last thing he ever wanted to do was undermine the hopes that financially disadvantaged children may have that with enough hard work, they can succeed on their own merit and access the same educational opportunities as children with greater advantages.  He regrets the impact of his donating to colleges that give donors an admissions boost, on the children with whom he most identifies—those with every card in the deck stacked against them—who now have even more reason to despair that the system isn't fair.

As a way to continue his commitment to helping those less fortunate, Mr. Wilson has committed to volunteer at the Epiphany School to mentor its alumni, who are in the profile of the

students most discouraged by donations related to college admissions.  The Epiphany School is an independent, non-profit school for children of economically disadvantaged families in Boston.[162] Mr. Wilson is contributing his unique skills as part of Epiphany's Graduate Support Program to mentor older graduates of Epiphany's middle school in career and business issues and financial literacy.[163]  For example, he started providing advice to one of the school's graduates, a small business owner, about how to grow his business, and the school expects him to be able to help alumni with career counseling and help Epiphany broaden its impact.[164]

Mr. Wilson will fulfill his commitment to the Epiphany School regardless of the outcome of the sentencing.  However, to the extent the Court orders any community service as part of the sentence—which Mr. Wilson would welcome—Mr. Wilson asks that he be permitted to serve his community service hours at Epiphany, given the meaningfulness of that service to him and the fact that he believes his skills and knowledge can make a difference there.

### E.     Mr. Wilson Deserves a Lighter Sentence Because of the Public Service He Has Done to Rein in Prosecutorial Overreach

By fighting his case through appeal, Mr. Wilson has secured important rights not only for himself but for countless other defendants.  It is no news to anyone that many (if not most) criminal defendants lack the resources to mount a full-scale defense through trial and appeal on issues such as invalid conspiracy charges and overbroad conceptions of honest services fraud and property fraud under the mail and wire fraud statutes.[165]  By shouldering the significant financial (and emotional) burden to do so,[166] Mr. Wilson has caused the First Circuit to create important new law that will help protect defendants from overly aggressive prosecutorial action for years to come.

---

[162] https://www.epiphanyschool.com/about.

[163] Ex. 76 at 1-2 (Letter from Rev. John H. Finley IV, head of Epiphany School).

[164] Ex. 76 at 1-2 (explaining Mr. Wilson has already been "terrific" in helping an alumni entrepreneur, and that Mr. Wilson is also helping Epiphany with a major new initiative to broaden its impact).

[165] *See* Br. Former U.S. Attorneys as *Amici Curiae* Supp. Def.-Appellant & Vacatur, *United States v. Abdelaziz*, No. 22-1138 (1st Cir. May 2, 2022), at 4.

[166] Mr. Wilson's legal fees have exceeded $5 million, and, as noted in this brief, the emotional toll on him and his family from remaining in the public spotlight for four-and-a-half years and from enduring a trial and conviction have been significant.

In *United States v. Cameron*, No. 1:09-CR-00024-JAW, 2014 WL 5323396, at *7 (D. Me. Oct. 17, 2014), *aff'd*, 835 F.3d 46 (1st Cir. 2016), the court similarly took account of the defendant's successful efforts in clarifying defendants' rights in a way "that will significantly affect how countless . . . prosecutions are prosecuted and defended in the First Circuit."[167]  The court specifically noted that, there, as here, this involved an effort "against the implacable opposition and later capitulation of the federal prosecutors," who had previously "vigorously urged and successfully persuaded the Court to admit at trial" the evidence the First Circuit later held had violated the Confrontation Clause.  *Id.* at *8.

Here, the rights Mr. Wilson vindicated undeniably are important ones.  The First Circuit recognized the potential for abuse of power in the decision to charge an overarching conspiracy and use that charging decision to admit mountains of inflammatory evidence.[168]  And the First Circuit felt the need to rein in the government's expansive definition of honest services fraud that sought to expand the mail and wire fraud statutes to such an extent that "an ordinary person would not be on notice" of the crime.[169]  The appeals court similarly expressed concern with the government's view of property fraud, which "would criminalize a wide swath of conduct."[170]  The court noted, for example, that under the government's broad understanding of property, "embellishments in a kindergarten application could constitute property fraud proscribed by

---

[167] The *Cameron* case is particularly compelling in that it grants the defendant the benefit of vindicating the rights of other defendants accused of child pornography—a particularly abhorrent offense.  Here, Mr. Wilson's conduct is the polar opposite:  he has led an entirely moral life, with merely an isolated tax offense.  The principle in *Cameron* thus applies with even greater force to Mr. Wilson's case.

[168] *See also* Br. Former U.S. Attorneys as *Amici Curiae* Supp. Def.-Appellant & Vacatur, *United States v. Abdelaziz*, No. 22-1138 (1st Cir. May 2, 2022), at 18-19 ("Though we hesitate to publicly criticize the charging decisions of another federal prosecutor, in this instance we feel obligated to speak out to ensure that future criminal defendants are charged fairly, and are tried fairly.").

[169] *Abdelaziz*, 68 F.4th at 32; *see also* Br. *Amici Curiae* Law Professors Supp. Def.-Appellant & Reversal, *United States v. Abdelaziz*, No. 22-1138 (1st Cir. May 2, 2022), at 16-17 (describing the government's position as "just the sort of unprincipled expansion of federal corruption law that the Supreme Court has repeatedly rejected" and putting the dispute in the context of the government's "long history of attempting to expand laws proscribing bribery and fraud").

[170] *Abdelaziz*, 68 F.4th at 38 ("*Cleveland* explained that it 'reject[ed] the Government's theories of property rights not simply because they stray[ed] from traditional concepts of property,' but also 'because [they] invite[d the Court] to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress.'") (quoting *Cleveland v. United States*, 531 U.S. 12, 24 (2000)) (alterations in original).

federal law."[171]

In just the three months since the First Circuit ruled in this case, numerous defendants have relied on the opinion in a broad variety of contexts, signaling the widespread impact of this decision.

First, in the conspiracy context, Mr. Wilson's successful appeal is being used by defendants to support arguments regarding overbroad conspiracies where the defendant at issue, for example, lacked a common goal with alleged co-conspirators.[172]  Defendants also are seeking to apply the First Circuit ruling to rein in the government's use of prejudicial evidence of co-conspirators' alleged wrongdoing.[173]  For example, Judge Burroughs recently took prosecutors to task for an attempt to use alleged co-conspirator statements at trial that "seem[s] aggressive, especially on the heels of Varsity Blues."[174]

Second, defendants are citing the appellate ruling to caution against attempts to criminalize "wide swath[s] of conduct" that would result in arbitrary prosecutions and a "sweeping expansion of federal criminal jurisdiction."  *Abdelaziz*, 68 F.4th at 18.  Defendants in cases as divergent as kidnaping and insider trading are using *Abdelaziz* to argue against over-criminalization.[175]  For

---

[171] *Id.*; *see also* Br. Amici Curiae Nat'l Ass'n Crim. Defense Lawyers & Am. Bd. Crim. Lawyers Supp. Def.-Appellant John Wilson & Reversal, *United States v. Abdelaziz*, No. 22-1138 (1st Cir. May 2, 2022), at 11 ("The government's theory of property fraud is boundless.").

[172] *See, e.g.,* Appellant's Individual Reply Brief, *United States v. Brightman*, No. 21-50216 (9th Cir. May 19, 2023), at 7; Reply Brief for Defendant-Appellant, *United States, v. Oscar Dillon, III*, No. 22-02447 (8th Cir. July 6, 2023), at 25; Appellant's Opening Brief, *United States v. Yanjun Xu*, No. 22-04020 (6th Cir. June 12, 2023), at 34; *see also* Cormac Connor and Emily Mikes, *'Varsity Blues' Reversal May Inform Conspiracy Defenses*, Law360, June 21, 2023, *available at* https://www.law360.com/articles/1690310/-varsity-blues-reversal-may-inform-conspiracy-defenses (noting how the "*Abdelaziz* ruling provides defendants and defense counsel with possible support for creative and evidence-based arguments" against conspiracy charges "especially in instances where the alleged illicit scheme has multiple goals, and where the various individuals involved do not know or interact with one another.").

[173] *See, e.g.,* Appellant's Brief, *United States v. Sharon Virag*, No. 21-50239 (9th Cir. May 19, 2023), at 12; Defendant's Motion in Limine No. 6, *United States v. Teva Pharmaceuticals USA, INC. et al*, Docket No. 1:20-cv-11548 (D. Mass. Aug 18, 2020).

[174] Julie Manganis, *'Aggressive' Filings By Feds In ADI Trading Case Worry Judge*, Law360, July 11, 2023, *available* at https://www.law360.com/articles/1698096/-aggressive-filings-by-feds-in-adi-trading-case-worry-judge (noting the district judge's warning to prosecutors in *United States v. Forte et al.*, No. 1:22-cr-10026 (D. Mass. July 11, 2023)).

[175] *See, e.g.,* Defendant's First Supplementary Reply to the United States' Response to Defendant's Motion to Dismiss Indictment, *United States v. Chavarria, et al*, No. 23-02102 (10th Cir. Jul 06, 2023) (kidnaping case); *United States v. Porat*, No. 22-1560, at *31 (3d Cir. Aug. 7, 2023) (Krause, J., concurring) (citing to *Abdelaziz* and cautioning that not every tort or breach of contract can or should be prosecuted as a federal crime); *see also* Julie Manganis, *'Aggressive' Filings By Feds In ADI Trading Case Worry Judge*, Law360, July 11, 2023, *available* at

example, Judge Woodlock recently stayed defendants' sentences pending appeal in *United States v. Pullman*, expressly acknowledging *Abdelaziz*'s impact in determining the scope of the wire fraud statute and in recognition of the potential impact of that case on the appeal.[176]

The Court should account for the service Mr. Wilson has done—at great personal cost and risk—in fashioning his sentence.

## V.    CONCLUSION

For all the foregoing reasons, Mr. Wilson respectfully submits that the following suggested sentence is reasonable and appropriate:

1)  One year of probation;

2)  200 community service hours;

3)  $100 special assessment; and

4)  Mr. Wilson will cooperate with an IRS civil audit to determine his 2014 tax liability and pay any difference forthwith.

Mr. Wilson submits that a fine is not necessary or appropriate here, where he has already shouldered a significant financial burden in successfully vindicating his rights and the rights of other defendants through trial and appeal, where his conviction has severely limited his ability to earn a living, and where the government has refused to return the $1,000,000 it extracted from him by way of a ruse and never properly forfeited.[177]  For most of his working life, Mr. Wilson worked for large businesses as an employee or consultant.  Now that a jury has convicted him on this tax charge, these options are gone; thus, he has forever lost the source of over 70-80% of his income.

---

https://www.law360.com/articles/1698096/-aggressive-filings-by-feds-in-adi-trading-case-worry-judge   (discussing *United States v. Forte*, an insider trading case).

[176] Brian Dowling, *Ex-Police Union Prez, Lobbyist Can Delay Kickback Sentences*, Law360, June 13, 2023, *available at* https://www.law360.com/articles/1688268/ex-police-union-prez-lobbyist-can-delay-kickback-sentences.

[177] The parties are in the process of separately briefing this issue.

Respectfully submitted,

*Counsel for John Mr. Wilson*

/s/ Michael Kendall
Michael Kendall (BBO #544866)
Lauren Papenhausen (BBO# 655527)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
lauren.papenhause@whitecase.com

Andrew Tomback (pro hac vice)
McLaughlin & Stern, LLP
260 Madison Avenue
New York, NY 10016
Telephone: (212) 448-1100
ATomback@mclaughlinstern.com

Date: August 14, 2023

## CERTIFICATE OF SERVICE

I hereby certify that the above document is being filed on the date appearing in the header through the ECF system, which will send true copies to the attorneys of record.

/s/ Michael Kendall

Michael Kendall