# EXHIBIT 3

```
 1                      UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
 2

 3
      UNITED STATES OF AMERICA,          )
 4                      Plaintiff        )
                                         )
 5    vs.                                )  No. 1-19-CR-10080
                                         )
 6    GAMAL ABDELAZIZ and JOHN           )
      WILSON,                            )
 7                      Defendants.      )
                                         )
 8                                       )

 9


10

                   BEFORE THE HONORABLE NATHANIEL M. GORTON
11                        UNITED STATES DISTRICT JUDGE
                            JURY TRIAL - DAY 13
12

13
                   John Joseph Moakley United States Courthouse
14                            Courtroom No. 4
                              One Courthouse Way
15                        Boston, Massachusetts 02210

16

17                            September 28, 2021
                                  9:09 a.m.
18

19

20
                          Kristin M. Kelley, RPR, CRR
21                         Kathy Silva, RPR, CRR
                            Official Court Reporter
22              John Joseph Moakley United States Courthouse
                       One Courthouse Way, Room 3209
23                      Boston, Massachusetts 02210
                        E-mail: kmob929@gmail.com
24
                   Mechanical Steno - Computer-Aided Transcript
25
```

```
 1   taxable event.
 2   Q.   Do you also recall giving him advice on drafting his will?
 3   A.   I worked with him and a third party attorney to work on
 4   his will, yes.
 5   Q.   You, in fact, referred him to Arnold Kahn, the third party
 6   attorney, correct?
 7   A.   Yes.
 8   Q.   Okay.  And you did several versions of that will from 1999
 9   to 2010, correct?
10   A.   I don't recall how many revisions or versions, but
11   perhaps.
12   Q.   Okay.  And you recall as part of that will he left
13   bequests to set up scholarship funds at two universities,
14   correct?
15   A.   I don't remember his bequests in his estate planning
16   documents.
17   Q.   Okay.
18        MR. KENDALL:  If we could show the witness
19   Exhibit 9809.  Actually, why don't we show the --
20        MS. KEARNEY:  Apologies, your Honor.  Did the witness
21   say that he did or did not remember?
22        THE WITNESS:  I don't remember his specific bequests
23   in his estate planning documents.
24        MS. KEARNEY:  Thank you.
25   Q.   Okay.  If you could take a look at Exhibit 9809.  Do you
```

1  recognize that as one of the trust components of the will that

2  you worked on?

3  A.   I recognize the title of this trust, yes.

4        MR. KENDALL:  Okay.  And I sort of blocked out some of

5  it.  I'd like to offer this document into evidence, your Honor.

6        MS. KEARNEY:  Objection, your Honor.  Relevance,

7  hearsay.

8        THE COURT:  Sustained.

9  Q.   If you could take a look --

09:29 10        MR. KENDALL:  If we could show the witness only

11  page -- starting on the one, two, three, fourth page of the

12  document.

13  Q.   I want you to read that paragraph just to yourself.  I'm

14  going to see if it refreshes your recollection.  Then I'm going

15  to ask you to go to the next page.

16  A.   Okay.

17        MR. KENDALL:  Actually, not the next page.  If we

18  could then go to the next page, please, Mr. Carter, and just

19  show the title and then go to the next page again after that.

09:30 20  Q.   If you can read paragraph 2.7.  Then we're going to drop

21  down to 2.7.d.

22  A.   Okay.

23  Q.   Read 2.7.d.  I'm going to ask you to read that and take a

24  moment to think, and then we'll turn the screen off, and I'll

25  see what refreshes your recollection.

1    A.    Would you mind just scrolling back so I can read that

2    first paragraph?  Thank you.

3    Q.    Would you prefer a paper copy to refresh your

4    recollection?

5    A.    No, thank you.

6    Q.    Okay.  Whatever is best for you.

7    A.    Yes.

8    Q.    Okay.  And if we can go to the top of page 19, please.  If

9    you could just read that double -- paragraph double ii.

09:31 10   Actually, read the whole of that page and then I'll ask you to

11   put the screen off and we'll go through it.

12   A.    Okay.

13   Q.    If we could turn -- does that refresh your recollection

14   that in the will and trust plan that you set up for Mr. Wilson

15   he left bequests to two different universities to set up

16   scholarship funds?

17   A.    This is the trust that I worked with an attorney to

18   prepare, yes.

19   Q.    Arnold Kahn was the attorney, correct?

09:31 20   A.    Yes.

21   Q.    And you referred Mr. Kahn to Mr. Wilson, didn't you?

22   A.    Yes.

23   Q.    Okay.  And in this trust structure you set up, the plan

24   was to leave two and a half million dollars to Rensselaer

25   Polytech and two and a half to Harvard University, correct?

```
 1              MS. KEARNEY:  Objection as to who set up the trust.
 2              THE COURT:  Sustained.
 3   Q.   Okay.  Under the trust that was established with
 4   Mr. Kahn's assistance and your assistance, Mr. Wilson was
 5   planning to leave two and a half million dollars to Rensselaer
 6   Polytech, correct?
 7   A.   Yes.
 8   Q.   And two and a half to Harvard, correct?
 9   A.   Yes.
10   Q.   And that was to set up a scholarship fund for students
11   whose parents had not gone to college, correct?
12   A.   I don't recall what the specific scholarship was.
13              MR. KENDADLL:  If we could show the exhibit again to
14   see if we could further refresh his memory.  And if we can go
15   to page 18 of Exhibit 9809.  And I'd -- no.  The other
16   direction, please.  Right there.
17   Q.   Can you read that paragraph again and tell us if that
18   refreshes your recollection.  Then I'll ask him to turn off the
19   screen.  So read it for as long as you need to refresh.
20   A.   Yes.  Now I see.  Thank you.
21   Q.   Okay.  Do you recall that it was to set up scholarships
22   for people whose parents did not receive a college education?
23   A.   Yes.
24   Q.   They call them "first timers"?
25   A.   Yes.
```

1   Q.   First generation.  And it was for people who would study

2   science, engineering, or business?

3   A.   Yes.

4   Q.   And they had to have at least a B average, correct?

5   A.   Yes.

6   Q.   Okay.  And when Mr. Wilson was telling you he wanted to

7   create a structure like this, do you remember having a

8   conversation where he discussed with you his personal

9   background and why he wanted to do this?

09:33 10  A.   I don't -- it was a long time ago.  I don't recall if he

11  worked with Arnold directly on that or we had a three-way call.

12  I don't recall.

13  Q.   Don't you remember raising with him that that was a sort

14  of new type of provision or unusual type of provision you saw

15  for a first generation bequest like that, or restricting it to

16  first generation students, and he explained to you what

17  education had done in his life?

18          MS. KEARNEY:  Objection, your Honor.

19          THE COURT:  Sustained.

09:34 20  A.   I just don't remember.

21  Q.   Okay.  You have no memory of ever discussing any aspect of

22  Mr. Wilson's background when you were doing the estate planning

23  or tax planning for him?

24  A.   It was 20 years ago.  I don't recall.  I apologize.

25  Q.   Well, these wills were refreshed all the way through 2010,

```
        1   A.    I don't remember or recall looking at it at the time.

        2   Q.    Would you like to refresh your recollection?

        3   A.    I'd be happy to look at it if you bring it up.

        4         MR. KENDALL:  If we could show the witness

        5   Exhibit 9057, please.

        6   A.    Yes.  I remember this vaguely.

        7   Q.    Okay.  And fair to say when you read Mr. Singer's

        8   descriptions of his credentials, you took it as being truthful,

        9   correct?

09:59  10   A.    Well, when he provided this copy back to my acquaintance,

       11   I didn't look at it necessarily very, very closely because I

       12   figured -- I know he's a thorough guy.  He would look at it

       13   himself.

       14   Q.    But you got a copy of it, correct?

       15   A.    It appears I was copied on the e-mail when he was replying

       16   to my friend.

       17   Q.    Okay.  And you read it to some degree, correct?

       18   A.    I read it more recently.

       19   Q.    Okay.  Did you read it as well back in 2016?

10:00  20   A.    I don't recall.

       21   Q.    Okay.  You knew -- what was your -- what was your

       22   understanding of Mr. Singer's level of expertise as a college

       23   counselor back at the time that you were making these

       24   referrals?

       25   A.    My understanding was that he was, you know, very
```

```
 1    experienced in this area and had a longstanding business, many
 2    client referrals.
 3    Q.   Representing some of the wealthiest and most successful
 4    people in California?
 5    A.   Yes.
 6    Q.   Who were some of the clients that he told you he
 7    represented that impressed you?
 8    A.   I don't remember specific ones.  I just remember he had a
 9    hard copy packet at the time, which had a fair amount of
10:01 10    materials about that.
11    Q.   Had Steve Jobs of Apple listed?
12    A.   I recall that name.
13    Q.   Joe Montana, the quarterback?
14    A.   Yes.
15    Q.   A group of people who were Chip Rosenbloom, the owner of
16    the St. Louis Rams?
17    A.   I don't recall that one, but.
18    Q.   Christopher Schaepe, the CEO of Lightspeed?
19    A.   I don't recall that specific one, but perhaps.
10:01 20    Q.   A series of other senior executives at major companies?
21    A.   Yes.
22    Q.   John Door at Kleiner Perkins?
23    A.   Yes.
24    Q.   Okay.  What is Kleiner Perkins?
25    A.   Private equity and venture capital firm.
```

1    Q.   An immensely successful and respect one, correct?

2         MS. KEARNEY:  Objection.

3         THE COURT:  Sustained.

4    Q.   How would you describe Kleiner Perkins?

5    A.   A well known and recognized venture capital private equity

6    firm.

7    Q.   Also, Hollywood executives he listed?

8    A.   I don't recall the Hollywood executives.

9    Q.   Peter Guber?

10:01 10  A.   I don't recall that one.

11   Q.   Okay.  And he also listed various corporate clients,

12   correct?

13   A.   Companies?

14   Q.   Yes.

15   A.   You might have to refresh my memory.

16        MR. KENDALL:  If we could show the witness Exhibit

17   9057 and look at page 2.

18   Q.   If you could look at the first paragraph after the list of

19   names.

10:02 20  A.   Yes.

21   Q.   And who did that -- did that refresh you as to who he

22   listed among his various corporate clients?

23   A.   Yes.

24   Q.   And who were they?

25        MS. KEARNEY:  Can we take the document down?

```
 1              THE COURT:  Yes.  Take the document down.
 2   Q.    Okay.  If you could tell us what you remember.
 3   A.    Disney, Morgan Stanley, Wells Fargo.
 4   Q.    Oppenheimer?
 5   A.    Yes.
 6   Q.    Under Armour?
 7   A.    Yes.
 8   Q.    Sacramento Police Foundation?
 9   A.    I don't recall that one.
10   Q.    PIMCO?
11   A.    Yes.
12   Q.    Fair to say all highly respected corporate names in
13   California?
14   A.    Yes.
15   Q.    And Mr. Singer also talked about this sort of public
16   service and initiatives for low income and disadvantaged people
17   that The Key did, correct?
18   A.    I wasn't real familiar with that.
19   Q.    Okay, but it was in the credentials he was circulating,
20   correct?
21   A.    I don't recall.
22              MR. KENDALL:  Why don't we show him again Exhibit 9057
23   and go to page 3, please.  If we could scroll down a little bit
24   more, that's good.
25   Q.    I don't need specific examples, but in general, he was
```

             1    touting all this sort of public service and things he was doing

             2    for disadvantaged people, correct?

             3    A.   Yes.

             4    Q.   And I take it whatever you heard about Mr. Singer prior to

             5    2018 you believed?

             6    A.   Yes.

             7    Q.   You thought -- put it this way.  In the business you're

             8    in, your clients are your biggest asset, correct?

             9    A.   Yes.

    10:04  10    Q.   And the quality of your client service is the most

            11    important thing in your job, correct?

            12    A.   Yes.

            13    Q.   You want to protect your clients, correct?

            14    A.   Yes.

            15    Q.   You want to give them the best services?

            16    A.   Yes.

            17    Q.   That's why AYCO and Goldman Sachs are so preeminent,

            18    correct?

            19    A.   Yes.

    10:04  20    Q.   And in the 10, 11 years that you were -- from when you met

            21    Mr. Singer until his con artist stuff was exposed, you never

            22    had the slightest doubt about his integrity, correct?

            23    A.   I don't recall having any doubt about his integrity.

            24    Q.   You wouldn't have referred him to any of your clients or

            25    your professional contacts if you had the slightest doubt about

1    domicile based on an extensive set of data and a list of

2    information and -- updated and new information that John

3    provided to his employer who then issued the corrected W-2.

4    And based on that new information, we all, as a group, agreed

5    that he would amend his tax returns to reflect the domicile.

6    Q.    Correct.  The point being John didn't get it done until

7    2016, correct?

8    A.    Because that's when the information was provided.

9    Q.    Provided to his employer at Staples?

10:16 10   A.    Us and his employer at Staples.

11   Q.    I'm not criticizing AYCO for anything.

12   A.    I'm just clarifying for you.

13   Q.    If John had done that three years earlier and provided

14   that same information, he wouldn't have overpaid the taxes to

15   California, correct?

16   A.    Okay.  I'd have to look at all the circumstances again,

17   but perhaps.

18   Q.    Well, the same circumstances that were truthful in 2016

19   for calendar 2014 would have been truthful in 2014?

10:16 20   A.    Correct.

21   Q.    So if he had provided that information in 2014 to '15, he

22   could have done it without having to overpay the taxes and

23   refile, correct?

24   A.    Correct.

25   Q.    Okay.  And would you agree with me the amount of money at

1    issue for all of the years you filed amended returns on the

2    California taxes was in the hundreds of thousands of dollars?

3    A.   Yes.  He also had to pay more taxes to the state of

4    Massachusetts as well.

5    Q.   Right.  He'd have to pay more taxes to Massachusetts.

6    He'd have a lower federal deduction because the California

7    taxes are higher than Massachusetts.

8    A.   Correct.

9    Q.   But he got a refund of several hundred thousand dollars

10   from California, correct?

11   A.   Correct.

12        MR. KENDALL:  Okay.  If I may have a moment, your

13   Honor.

14        THE COURT:  Yes.

15   Q.   When John was preparing his trust and estate plan to leave

16   these bequests for the scholarship funds, do you remember

17   telling John that because the money was going to a university

18   he would get a -- the estate would get a tax deduction, but

19   it's something that he would not realize until the money

20   actually was paid over at the time of his death?

21   A.   That would be something I might explain to a client in the

22   general course of business.  I don't remember that exact

23   conversation.

24   Q.   You don't remember that specific conversation with John,

25   but is setting up that type of trust and estate plan, that

1    in the 2014/15 period, California state income tax was running

2    around 13 percent for people in higher incomes like Mr. Wilson?

3    A.   12 or 13, yes.

4    Q.   12 or 13.  Massachusetts was five?

5    A.   Yes, in that range.

6    Q.   Okay.  Everybody in the courtroom will maybe feel more

7    authoritative than you?

8    A.   Yes.

9    Q.   But so the difference of getting this refund was about

11:03 10   seven to eight percent of Mr. Wilson's income each year?

11    A.   Yes.

12    Q.   And so if it's three, four years, if it's, you know,

13    several millions of dollars, it adds up to hundreds of

14    thousands of dollars that was overpaid, correct?

15    A.   You would pay more in the State of California, yes.

16         MR. KENDALL:  Okay.  Thank you, your Honor.  No

17    further questions.

18         THE COURT:  Mr. Kelly?

19         MR. KELLY:  Nothing for me.

11:04 20        THE COURT:  Thank you, Mr. DeMaio.  You may step down.

21         We're going to take the morning recess at this point,

22    15 minutes, jurors.  I'll see you back here in 15 minutes.

23         THE CLERK:  All rise for the jury.

24         (Jury exits.)

25         THE COURT:  Be seated, counsel.

1   Q.    The Southern Peninsula Club?  You've never heard of Jack

2   Bowen's club?

3   A.    Never heard of Sopen Club.

4   Q.    You agree with me Jack Bowen is a respected water polo

5   coach?

6   A.    Yes.  In the high school community, absolutely.

7   Q.    Do you know his accomplishments as a college player?

8   A.    Yes.  He's an Olympian.  He was a goalie at Stanford.

9   He's a great water polo player.

02:30 10   Q.    MVP 2 years in a row at the NCAA tournament?

11   A.    That I'm not certain.

12   Q.    His Stanford team won 2 years in a row at the NCAA

13   championship, correct?

14   A.    I believe so.  That was before my time at USC.

15   Q.    But he's somebody you would view as a highly regarded,

16   highly successful high school water polo coach, correct?

17   A.    Correct.

18   Q.    And would a recommendation from a coach like Jack Bowen

19   that a candidate was good enough to play at USC, would that

02:31 20   carry weight?

21   A.    Yes.  Behind his name, yes.

22   Q.    The Stanford Water Polo Club, do you know that?

23   A.    Yes.

24   Q.    Jack Barnaigh or John Barnaigh is the guy who runs it?

25   A.    Correct.

```
 1              MR. FRANK:  If we could, Mr. Carter, if you wouldn't
 2      mind, call up 8028, please.
 3      Q.   Do you see 8028, Mr. Moon?
 4      A.   Yes.
 5      Q.   Mr. Kendall asked you some questions about the players
 6      highlighted in green who didn't play in any games.  Do you
 7      recall those questions?
 8      A.   Yes.
 9      Q.   It means very little that a redshirt doesn't play in any
10      games, right, in their freshman year?
11      A.   Yes.  They show up to practice every day.  This list just
12      showed that they participated in games or not.
13      Q.   As a redshirt, they're not allowed to play in games,
14      right?
15      A.   They're not allowed, yes.
16      Q.   They're still required to go to practice?
17      A.   Absolutely.
18      Q.   Besides Johnny Wilson, did the other redshits in green
19      show up to practice?
20      A.   Absolutely.
21      Q.   By the way, would you refer to a redshirt as an immediate
22      impact player?
23      A.   No.
24      Q.   Why not?
25      A.   Because if you're an immediate impact player, you join our
```

```
 1   C E R T I F I C A T E

 2

 3

 4   UNITED STATES DISTRICT COURT )

 5   DISTRICT OF MASSACHUSETTS     )

 6

 7

 8            We, Kristin M. Kelley and Kelly Mortellite, certify

 9   that the foregoing is a correct transcript from the record of

10   proceedings taken September 28, 2021 in the above-entitled

11   matter to the best of our skill and ability.

12

13

14       /s/ Kristin M. Kelley           September 28, 2021

15       /s/ Kelly Mortellite            September 28, 2021

16       Kristin M. Kelley, RPR, CRR           Date
         Debra Joyce, RMR, CRR
17       Official Court Reporter

18

19

20

21

22

23

24

25
```