EXHIBIT 38

```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3
     UNITED STATES OF AMERICA,           )
 4                        Plaintiff      )
                                         )
 5   vs.                                 )  No. 1-19-CR-10080
                                         )
 6   GAMAL ABDELAZIZ and JOHN            )
     WILSON,                             )
 7                        Defendants.    )
                                         )
 8                                       )

 9


10


11            BEFORE THE HONORABLE NATHANIEL M. GORTON
                   UNITED STATES DISTRICT JUDGE
12                    JURY TRIAL - DAY 12


13

14         John Joseph Moakley United States Courthouse
                        Courtroom No. 4
15                     One Courthouse Way
                   Boston, Massachusetts 02210

16


17                     September 27, 2021
                          9:09 a.m.
18

19


20

21              Kristin M. Kelley, RPR, CRR
                   Kathy Silva, RPR, CRR
22                  Official Court Reporter
           John Joseph Moakley United States Courthouse
23                One Courthouse Way, Room 3209
                   Boston, Massachusetts 02210
24                 E-mail: kmob929@gmail.com

25         Mechanical Steno - Computer-Aided Transcript
```

A.   I was introduced to the firm by a colleague of mine.

Q.   When you say "the firm," are you referring to Hyannisport Capital?

A.   Yes.

Q.   And did you begin working for Hyannisport Capital?

A.   I did.

Q.   Approximately when did you work for Hyannisport Capital?

A.   That was March of 2011.

Q.   What work did do you?

A.   Bookkeeping and preparation of the tax return for the corporation.

Q.   For how many years did you prepare Hyannisport Capital's tax return?

A.   I worked for Hyannisport Capital until March 2019.

Q.   What kind of return did Hyannisport Capital file?

A.   It's an S corporation income tax return.

Q.   What is an S corporation?

A.   An S corporation is a -- what's known as a pass-through entity.  The S corporation pays no federal tax itself, unlike a regular corporation that would pay tax on its own income.  Instead, the income and deductions are passed through to the shareholders and they pay tax on the income on their individual return.

Q.   How many shareholders did Hyannisport Capital have during the time you were preparing its tax returns?

1    A.    One.

2    Q.    Who was that shareholder?

3    A.    Mr. Wilson.

4    Q.    On whose return was Hyannisport Capital income reported?

5    A.    Mr. Wilson's.

6    Q.    Did you ever prepare Mr. Wilson's personal taxes?

7    A.    I did not.

8    Q.    Why not?

9    A.    I wasn't hired to do that.

11:46 10    Q.    When it came time to prepare Hyannisport Capital's

11    returns, did you have a typical process that you followed?

12    A.    Yes, I did.

13    Q.    What was that process?

14    A.    I would either phone or e-mail the administrative

15    assistant for Hyannisport Capital and either discuss with her

16    or put in an e-mail a list of standard documentation that I

17    needed.

18         I would also ask for a copy of the QuickBooks file,

19    the electronic accounting system, and I would prepare an

11:46 20    engagement letter to send to the client.

21    Q.    Who was the administrative assistant that you contacted?

22    A.    Debbie Rogers.

23    Q.    What was the standard documentation you requested?

24    A.    It was typically -- the most common documentation I

25    requested was backup for asset and liability accounts.

```
 1   Q.   And during the time that Debbie was working out of the
 2   Atherton, was that the normal corporate office for mail, for
 3   her to sit and do work and take phone calls and things of that
 4   nature?
 5   A.   Yes, it was.
 6   Q.   You told us you provided two services, you did bookkeeping
 7   and you prepared the tax return, correct?
 8   A.   That's correct.
 9   Q.   What did the bookkeeping involve?
10   A.   The bookkeeping typically involved during the year from
11   time to time Debbie would have questions about how to record
12   certain transactions, but most of the work was done at the year
13   end.
14   Q.   And what would you do at year end?
15   A.   It's a typical process for accountants to what we call
16   clean up a client's books.  They will provide us with the
17   QuickBooks files and the underlying documentation that I would
18   request, and just as an example, I would compare an asset
19   account, say, some investment, to a balance shown on an
20   underlying document.  And if there was a discrepancy between
21   the two, I would record an adjustment so that the books matched
22   the underlying documentation.
23   Q.   Is that what you mean when you say you clean up the books?
24   A.   Yes.
25   Q.   And I take it "clean up" is not a negative concept, it's
```

 1    just putting in organizational order, it's not like there's

 2    something bad there?

 3    A.   Correct, correct.

 4    Q.   When you refer to QuickBooks, is that where the general

 5    ledger is located?

 6    A.   Yes.

 7    Q.   Do you want to explain what a general ledger is?

 8    A.   A general ledger is a document that lists all of a

 9    company's transactions for the year.

12:19 10   Q.   And when you do this cleaning up the books, would Debbie

11    get involved at all to assist you with it?

12    A.   Yes, she would.

13    Q.   What would she do?

14    A.   She would generally answer questions that I had with

15    regard to certain transactions and then provide me with

16    additional documentation or clarification.

17    Q.   And how common is it that you provide that service to a

18    client of cleaning up the books at year end or, you know,

19    adjusting the books?

12:20 20   A.   It's very common.  I -- almost every business client I

21    perform that service for.

22    Q.   In the eight years that you worked with HPC, did you ever

23    observe Debbie Rogers try to withhold information from you?

24    A.   Not that I remember.

25    Q.   Or John Wilson?

1    A.    No.

2    Q.    Did they follow your advice?

3    A.    Not always.

4    Q.    When they didn't follow your advice, did it involve an

5    ethical issue or was it just a business decision?

6    A.    I don't recall a specific example of when they didn't

7    follow my advice, but it's common to have give and take between

8    client and CPA.

9    Q.    Okay.  You never had to refuse to sign a return for them,

12:21 10   correct?

11    A.    Correct.

12    Q.    And that's a sign when a CPA finds there's an ethical

13    problem, correct?

14    A.    If they wouldn't sign the return?

15    Q.    Yes.

16    A.    Yeah, I'm not sure I would characterize it as an ethical

17    problem --

18    Q.    But a difference of opinion that was important to the CPA.

19    You never had that is my point.

12:21 20   A.    Correct.

21    Q.    Okay.  Now, if we could put up Exhibit 646, which the

22    government just showed you.  That's the -- that's your sort of

23    standard retention letter, fair to say?

24    A.    Yes, engagement letter.

25    Q.    It's the type you use with many clients?

1   it in front of the witness to refresh his memory if that's what

2   you're trying to do, but the document itself will not be

3   admitted.

4        MR. KENDALL:   Okay.

5   BY MR. KENDALL:

6   Q.   Does this document refresh you that in 2013 you were

7   working with Debbie on this issue of getting the charitable

8   donations aligned so that the receipt and the account where it

9   came from were aligned, whether it would be John or the sub S

12:34 10   corporation?

11   A.   Yes.

12   Q.   If you have your own way to describe that process, it

13   might be clearer than what I'm using, if you want to phrase it

14   in your own words.

15   A.   As I stated before, I would like to see the underlying

16   documentation match the expend -- match the expenditure on the

17   books.  So if Hyannisport Capital made a contribution from its

18   bank account, I would like to see their name on the charitable

19   contribution receipt.

12:34 20   Q.   The -- what you described earlier was the process of

21   cleaning up the books or getting the accounting cleaned up, did

22   that sometimes involve the charitable contributions?

23   A.   I'm sorry, excuse me?

24   Q.   You discussed earlier the service you provided of getting

25   the accounting entries in order and correcting and updating

1    them from what Debbie had done.

2    A.    Right.

3    Q.    And you did that on an annual basis for HPC as well as

4    other clients.

5    A.    Yes.

6    Q.    Okay.  Did that also involve doing those tasks for the

7    charitable contributions?

8    A.    Those were things I noted and brought up to Debbie's

9    attention.

12:35 10  Q.    And would she have to go get the paperwork from the

11   charitable contributions to give to you to finish the

12   correcting of the accounting detail?

13   A.    Yes, that did happen.

14        MR. KENDALL:  I'd like to show you a copy of Exhibit

15   9779 for the witness only.

16   Q.    Is this an e-mail that you recognize?

17   A.    Yes.

18   Q.    Okay.  And does this deal with running down the charitable

19   receipts?

12:36 20  A.    I believe so.

21        MR. KENDALL:  Your Honor, I'd like to offer this into

22   evidence.

23        MS. KEARNEY:  Same objection, your Honor.

24        THE COURT:  The objection is sustained.  Again, it can

25   be used to refresh memory.

BY MR. KENDALL:

Q.   Does that refresh your memory that in September of 2013, Debbie for that year's tax returns was running down charitable receipts so you could clean up the books as you've described?

A.   Yes.  It was not necessarily cleaning up the books as it was having proper documentation in the work papers.

Q.   Now, in fact, when you were first retained, you had to do this process of cleaning up all of the books and transactions for years prior to when were you engaged.  Do you remember doing a multiyear cleanup for HPC?

A.   Yes, for certain accounts on the books.  But that was not something that I was hired to do at the inception of my relationship.  It came upon later.

Q.   Do you remember finishing it in early 2015?

A.   I don't know the exact date, but that could very well be.

Q.   Okay.  Now, in preparing the 2014 tax returns, do you remember there was problems with the receipts for some of the charitable contributions?

A.   I believe there was.

Q.   Okay.  I'd like to show you -- the witness only -- Exhibit 9783.

     If you could take a look at that, please.

A.   I don't see anything on the screen.

     MR. KENDALL:  Why don't we give a copy to the witness as well so he can look through the entire thing.

1          For the $100,000 donation listed to The Key

2     Foundation, when you saw that, did you do anything in

3     particular?

4     A.   I read the document, and I was not familiar with that

5     organization, so I looked it up on the -- there is an IRS

6     website that lists 501(c)(3) organizations.  And I looked -- I

7     looked it up and recall finding it there.

8     Q.   You found The Key Foundation on the IRS website.  And what

9     was the purpose of you looking it up?

12:42 10    A.   To ensure that it had been -- or it was in the process of

11    being approved by the IRS.

12    Q.   And so, therefore, it was authorized to take charitable

13    contributions?

14    A.   Yes.

15    Q.   Okay.

16          MR. KENDALL:  Could we show the witness what's already

17    in evidence Exhibit 126, please?

18          If we could show him page 2.

19    Q.   Would it be fair to say that the standard practice was for

12:42 20    Debbie to send you copies of the receipts for charitable

21    contributions?

22    A.   Yes.

23    Q.   Okay.  Did you ever get this one?

24          MS. KEARNEY:  Objection, your Honor, to the

25    characterization of this as a receipt.

1          THE COURT:  Yes, sustained.

2          MR. KENDALL:  I'll rephrase, your Honor.

3     BY MR. KENDALL:

4     Q.    Did you ever get a copy of the letter that's Exhibit 126?

5     A.    I did not.

6     Q.    Okay.  It says, "Thank you for your generous gift to USC

7     athletic men's water polo in the amount of $100,000.

8     Maintaining state-of-the-art facilities is an essential part of

9     USC's commitment to excellence.  Through your contribution, you

12:43 10   are helping the University achieve this important goal.

11          "On behalf of the young student athletes that will

12     benefit from your anonymous gift, thank you.

13          "Fight on!

14          "Ron Orr."

15          Was it your practice if you received gift notices or

16     documents referring to gifts or contributions in the range of

17     $100,000 you would look at them in the accounting books and

18     check them?

19     A.    Yes.

12:43 20   Q.    And if you had found this and found that had it been

21     booked as a business consulting instead of a charitable

22     contribution, would you have raised it with Debbie?

23     A.    Yes.

24     Q.    And because you never got this letter, you never had the

25     reminder to raise it with Debbie, fair to say?

```
 1    A.    Yes.

 2    Q.    Okay.

 3          I'd like to show you next Exhibit 9776.

 4          Do you recognize that document?

 5          MR. KENDALL:  For the witness only.

 6    A.    I do.

 7    Q.    And what is it?

 8    A.    These are my notes that I make while preparing the books

 9    and tax return for Hyannisport Capital.

12:44 10          MR. KENDALL:  I'd like to offer this into evidence,

11    your Honor.

12          MS. KEARNEY:  No objection.

13          THE COURT:  It will be admitted without objection.

14          (Exhibit 9776 received into evidence.)

15          MR. KENDALL:  If we could show the jury Exhibit 9976.

16    BY MR. KENDALL:

17    Q.    I take it it's your handwriting?

18    A.    Yes, it is.

19    Q.    Did they teach you in CPA school to have such fine, small

12:45 20    handwriting?

21    A.    No, it came to me somehow.

22    Q.    And is this a list of tasks that you made for yourself to

23    follow up on after looking at the books and records that had

24    been sent over to you by Debbie?

25    A.    That's correct.
```

1   on your taxes because you need all the numbers at year end to

2   do the calculation, correct?

3           MS. KEARNEY:  Objection as to what someone could

4   predict.

5           THE COURT:  Yes, that part is sustained.

6   BY MR. KENDALL:

7   Q.   In order to calculate if you could have had any positive

8   impact by putting a charitable contribution as a business

9   deduction, what numbers would you need to do the calculation?

12:53 10   A.   What impact it would have on the individual return?

11   Q.   Yes, on the person's 1040.

12   A.   You would need all items of income and deductions for that

13   year.

14   Q.   And are those numbers available in March of 2014?

15   A.   No.

16   Q.   Okay.  I'd like to go to in the same exhibit to Bates --

17   the Bates number ending 3407.

18           It's a long exhibit.

19           3407, please.

12:54 20           Perfect.

21           Okay.

22           Could you tell us what is this "W-1"?

23           I take it that's your handwriting.

24   A.   Yes, that's just a reference number, a sequence number for

25   the work papers.

1                      (Recess taken 1:02 p.m. to 2:05 p.m.)

2                THE CLERK:  Thank you.  You may be seated.  Court is

3      now in session.

4                THE COURT:  Good afternoon, jurors.  We're ready to

5      pick up again.

6                Mr. Nahmens, you're reminded that you remain under

7      oath.

8                Mr. Kendall, you may continue with cross-examination.

9                MR. KENDALL:  Thank you, your Honor.

02:06 10     BY MR. KENDALL:

11     Q.   Mr. Nahmens, I want to continue going through Exhibit 134,

12     your work papers.  Just to clarify a couple of points, if you

13     had gotten that thank you letter from USC at the time you were

14     putting together these work papers, you would have raised it

15     with Debbie, correct?

16     A.   Would have raised?

17     Q.   If you got that letter that said thank you for the

18     $100,000, you would have said something to Debbie, correct, and

19     to ask her to explain to you what it was for and figure out

02:06 20     what it was for?

21     A.   Yes.

22     Q.   Okay.  And would it be fair to say Debbie is the one who

23     did all of the Quickbooks classifications?  John wasn't there

24     putting in the entries to Quickbooks.

25     A.   That's my understanding.

1   Q.   Yeah.  And when you would send back corrections for the

2   Quickbooks, you'd send them to Debbie for her to adopt,

3   correct?

4   A.   Yes.

5   Q.   As a general practice for forwarding your paperwork and

6   e-mails and receipts, that was Debbie, correct?

7   A.   Mr. Wilson forwarded me e-mails as well, from time to

8   time.

9   Q.   Excuse me.  Let me take back e-mails.  Receipts,

02:07 10   documents, backup accounting detail.

11   A.   Yes.

12   Q.   That would be Debbie, correct?

13   A.   Yes.

14   Q.   John wasn't in Amsterdam at Staples headquarters e-mailing

15   you a receipt for a $500,000 charitable contribution?

16   A.   That's correct.

17   Q.   I'd like to show you exhibit --

18         MR. KENDALL:  If we can put up Exhibit 118 for a

19   minute.  It's already in evidence.

02:07 20   Q.   I want to show you -- this is an e-mail you've never

21   received, but it's in evidence.  This is from Rick Singer, the

22   man who got that $20,000 that you discussed doing the tax form

23   for.

24         MR. KENDALL:  If we can go up to the middle of it.

25   Q.   It says -- in the middle, we see Rick Singer, April 10th,

1    house, correct?

2    A.    Not that I recall.

3    Q.    Okay.  I want to now turn to the last page, I think we're

4    going to cover in Exhibit 134.  Could we go to the bates ending

5    in 3434.  It says "Hyannis Port Capital, Inc. Journal".

6              MR. KENDALL:  If we could turn that around.  Thank

7    you, Mr. Carter.

8    Q.    What does this document show?

9    A.    These are the journal entries that I made to, as we

02:15 10   discussed before, to clean up the books.

11   Q.    These are corrections you're making in Debbie's entries or

12   bookings of various transactions?

13   A.    It's beyond that.  Some of them are corrections.  Some of

14   them are entries to record transactions that are more technical

15   than would be recorded, you know, just recording transactions

16   from a bank account or a credit card.

17   Q.    Okay.  If we could go to the next page, 2, these are more

18   of those corrections we just discussed?

19   A.    Yes, corrections and original entries.

02:16 20   Q.    Okay.  If I were to suggest to you they count up to about

21   61 lines in those two pages, would that seem reasonable to you?

22   A.    Well, that seems somewhat close.

23   Q.    And are these the type of corrections or additional

24   entries you would recommend each year?

25   A.    Yes.  They -- they tend to be similar from year to year.

```
 1    Q.   And if you had discovered that they had booked a -- they
 2    had booked a charitable deduction mistakenly as a business
 3    deduction, would that have been sort of reclassified in these
 4    pages?
 5    A.   Most likely.
 6    Q.   If we can take a look at Exhibit 164.  I'm not sure if
 7    that's -- maybe we don't need an exhibit.
 8         Who would you send the tax returns to, to Debbie,
 9    didn't you?
10    A.   For signature?
11    Q.   Yes.
12    A.   Yes.
13    Q.   Okay.  And then she'd arrange it with John to get it done?
14    A.   To sign and e-file.
15    Q.   Sign and take care of them.
16         Now, the last thing I want to cover with you, it's
17    only going to take us a couple of minutes is, in 2018, John
18    contacted you about the million dollars he was donating to the
19    Key Foundation, correct?
20    A.   It was either John or Debbie contacted me.
21    Q.   Yeah.  But they e-mailed you wanting your tax advice and
22    then that issue was really referred over to Mr. DeMaio,
23    correct?
24    A.   They didn't want my tax advice about the contribution
25    itself.  It was, I believe -- if I remember correctly, it was a
```

A.   An acknowledgment would follow a payment.

Q.   And you -- the document that Miss Kearney just showed you

is Mr. Wilson saying, consulting or whatever, correct?

A.   That's what that document said.

Q.   He's indifferent, consulting or whatever.  He needs a

receipt for Debbie to make the transfer, correct?

      MS. KEARNEY:  Objection, your Honor, as to what

Mr. Wilson.

      THE COURT:  Sustained.

Q.   The language he uses is "consulting or whatever", correct?

A.   That's what was on that e-mail.

Q.   And it gives an invoice just so Debbie knows where to send

the $100,000, correct?

A.   Was it $100,000 or?

Q.   It was $100,000 even.

A.   Okay.

Q.   And then, a few months later, USC sends a thank you note

for the donation, correct?  That was the letter I showed you.

It came in July.

A.   You did show that to me.

Q.   And then, if you, yourself, checked the IRS website to

make sure that The Key Foundation was a recognized certified

charity, correct?

A.   I did.

Q.   And if the head of an IRS approved and certified charity

1    says, can you make another $20,000 contribution to cover the

2    expenses of the foundation, that, too, can be a charitable

3    donation, correct?

4         MS. KEARNEY:  Objection, your Honor.  It's assuming

5    facts not in evidence.

6         THE COURT:  Sustained.

7    Q.   A $20,000 donation to cover the expenses of an IRS

8    approved charity is also a donation, correct?

9    A.   Assuming it makes -- it meets IRS standards.

02:38 10   Q.   And if you do it as a cash contribution, or as a noncash

11   contribution, they're both tax deductible, correct?

12   A.   Yes.

13   Q.   And a cash contribution would be to, say, to the charity,

14   here's $20,000, I'm donating it to the charity.  That's a cash

15   contribution, correct?

16   A.   Right.

17   Q.   And if you also go to the head of the foundation and say,

18   here's $20,000 to cover the expenses, I assume you'll take care

19   of it to pay the bookkeeper, to pay whatever, that could be a

02:39 20   non-cash contribution, correct?

21        MS. KEARNEY:  Objection.  Misstates the evidence.

22        THE COURT:  Sustained.

23   Q.   A $20,000 payment to the head of a foundation to buy

24   resources, you know, personnel, supplies, whatever, for the

25   expenses of the foundation can be a non-cash contribution,

 1    correct?

 2    A.    A payment to the head of the organization, or a payment to

 3    the organization?

 4    Q.    If you give the head of the organization $20,000 to go out

 5    and buy the -- to go out and buy the resources for the place.

 6    We don't have a car.  We don't have paper.  We don't have

 7    computers.  I'll pay for the computers for the foundation.

 8    Here's the cash.  Go get them.

 9          MS. KEARNEY:  Objection.

02:40 10    Q.    That's a non-cash contribution?

 11          THE COURT:  If he understands it as an expert in that

 12    area, I'll allow him to answer.

 13    Q.    That's a non-cash contribution, correct?

 14    A.    You're saying a payment to the head of an organization?

 15    Q.    No.  Let me correct it.  If the person says, I will pay

 16    for the computers of the organization, I'll pay for the

 17    secretarial help, here is the money, you can go buy them with

 18    my money and it's my contribution to the organization, I'm

 19    paying for the expenses of the organization, can that be a

02:40 20    contribution?

 21    A.    By making a charitable contribution to the organization.

 22    Q.    Yes.  Fair enough.

 23          And all the documents you had about the $20,000 to

 24    Mr. Singer and requiring tax stuff, that was all e-mails for

 25    Debbie Rogers.  It wasn't with John Wilson, correct?

1    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8           We, Kristin M. Kelley and Debra Joyce, certify that

9    the foregoing is a correct transcript from the record of

10   proceedings taken September 27, 2021 in the above-entitled

11   matter to the best of our skill and ability.

12

13

14        /s/ Kristin M. Kelley           September 27, 2021

15        /s/ Debra Joyce                 September 27, 2021

16        Kristin M. Kelley, RPR, CRR              Date
          Debra Joyce, RMR, CRR
17        Official Court Reporter

18

19

20

21

22

23

24

25