# EXHIBIT 64

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No.: 19-10080-NMG |
| | ) |
| DAVID SIDOO, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF LAURA SMITH

I, Laura Smith, state the following:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Boston, Massachusetts Field Office. I joined the FBI in 2010 as a forensic accountant conducting complex financial investigations. I am currently a special agent on a squad that investigates economic crimes, including various forms of corporate fraud, securities fraud and bribery. I hold a Bachelor's degree in Criminal Justice-Economic Crimes Investigation and a Master's degree in Accounting.

2. Since approximately March 2018, I have been one of the case agents for "Operation Varsity Blues," an investigation of fraud and bribery in the college admissions process.

3. On September 21, 2018, I participated in the approach of William "Rick" Singer, who was a target of the Varsity Blues investigation. On that day, I was accompanied by Special Agent Kaitlyn Cedrone of the FBI and Special Agent Elizabeth Keating of the Internal Revenue Service – Criminal Investigation division ("IRS-CI") who are both assigned to the Varsity Blues investigation. My supervisor, FBI Supervisory Special Agent John Keelan, was also present for part of the approach. The goal of the approach was to determine whether Singer wanted to cooperate with the government's investigation.

4. We approached Singer in a hotel room at the Marriott Long Wharf in Boston where he had been meeting with Rudolph Meredith, the women's soccer coach at Yale University and a cooperating witness in our investigation.

5. When we first approached Singer, he agreed to cooperate with our investigation and to be interviewed. However, Singer was not fully forthcoming regarding parts of his scheme, and it was my impression that he was not taking full responsibility for his conduct. In my training and experience, this reaction is typical of white collar defendants, who often rationalize their actions and have trouble acknowledging that what they have done is criminal. This is particularly true in the early days and weeks after they have been caught.

6. For example, Singer told us that the payments he and his clients made to university athletics programs were "donations." Special Agent Keating told Singer, in substance, that a payment in exchange for recruiting a fake student athlete to an athletic team is illegal.

7. Based on my experience working with Special Agent Keating, she is typically soft-spoken. I recall her raising her voice somewhat during this portion of the interview with Singer.

8. The next day, September 22, 2018, after consulting with his attorney, Singer agreed to consensually record phone calls with other individuals involved in his scheme, including several coaches. Over the next few days, Singer also had calls with new clients and parents who were in the middle of the scheme. For these calls, we instructed Singer to be more explicit about the bribery aspect of the scheme. We told him to tell the parents that in exchange for a payment to a coach, their child would be recruited as an athlete based on falsified credentials.

9. Singer resisted our direction to be more explicit, explaining that he typically told clients that the payments were "donations" to an athletic "program," not payments to the coach. I

do not remember a specific "loud and abrasive" call on October 2, but I do remember having tense conversations with Singer during this period about this issue.

10. Singer ultimately followed our direction with respect to new clients. But in calls to clients who were already engaged in the scheme but had not yet completed it, Singer told us that he needed to remain consistent with what he had said in the past, and that is generally what he did on those calls.

11. Weeks later, toward the end of October 2018, we turned our attention to the parents who had already completed the fraud and bribery scheme before Singer began cooperating. At that time, we asked Singer to make calls to those parents, including the parents charged in this case. For those calls, we instructed Singer to engage in a ruse: to tell the parents that the IRS was auditing their donations to his foundation, and that he would not tell the IRS the truth about those payments.

12. At the time of the audit calls, I believed, based on the evidence developed in the investigation thus far, that the parents knew and understood that their "donations" were made in exchange for having an employee at the University of Southern California ("USC") recruit their children as fake athletes. The purpose of the "audit" calls was to corroborate each parent's knowledge and intent before charging them with a crime. We directed Singer to confirm that the parents understood that they had made payments to induce an individual at USC to recruit their children as fake athletes. Singer did not resist making these calls, or question the substance of them.

13. At no time did I instruct Singer to fabricate evidence against anyone and, to my knowledge, he did not fabricate evidence against anyone.

14. I did not instruct Singer to ask parents to "agree to a lie [he] was telling" about their actions or intent, and to my knowledge Singer did not do that.

15. I did not instruct Singer "to ask questions and retrieve responses that are not accurate" about the parents' actions and intent, and to my knowledge he did not do that.

16. I did not tell Singer that we wanted to "nail" or entrap any defendant, and I did not want to do that.

17. I did not ask Singer to bend the truth, other than by using the proactive investigative techniques described above. I did, however, repeatedly tell Singer that he needed to be truthful with us about his actions and those of his co-conspirators.

18. I first saw Singer's October 2 note on October 28, 2018. I did not address the note with Singer because I knew that it referred to our instructions, in early October 2018, that he be more explicit on calls with clients who had not yet completed the fraud. And I knew that he had resisted that direction. I also knew that the October 2 note did not relate to the historical "audit" calls that occurred weeks later.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4/24/2020

Laura Smith
Special Agent
Federal Bureau of Investigation