# EXHIBIT 79

```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2


 3
     UNITED STATES OF AMERICA,          )
 4                        Plaintiff     )
                                        )
 5   vs.                                )  No. 1-19-CR-10080
                                        )
 6   GAMAL ABDELAZIZ and JOHN           )
     WILSON,                            )
 7                        Defendants.   )
                                        )
 8                                      )

 9


10
                BEFORE THE HONORABLE NATHANIEL M. GORTON
11                   UNITED STATES DISTRICT JUDGE
                          JURY TRIAL - DAY 4
12


13
                 John Joseph Moakley United States Courthouse
14                          Courtroom No. 4
                           One Courthouse Way
15                      Boston, Massachusetts 02210

16


17                         September 13, 2021
                               9:25 a.m.
18


19


20
                        Kristin M. Kelley, RPR, CRR
21                      Kelly Mortellite, CRR, RMR
                          Official Court Reporter
22          John Joseph Moakley United States Courthouse
                     One Courthouse Way, Room 3209
23                    Boston, Massachusetts 02210
                      E-mail: kmob929@gmail.com
24
                Mechanical Steno - Computer-Aided Transcript
25
```

1    Q.    Mr. Isackson, have you ever pled guilty to a crime?

2    A.    Yes.

3    Q.    What crime have you pled guilty to?

4          MR. KENDALL:   Objection, your Honor, just for the

5    matter we discussed.

6          THE COURT:   Overruled.

7    A.    Conspiracy to commit money laundering, mail fraud and tax

8    evasion.

9    Q.    When did you plead guilty to those crimes?

12:24 10    A.    Approximately two and a half years ago.

11   Q.    Mr. Isackson, could you tell the jury in your own words

12   what you did that led you to plead guilty to those crimes?

13   A.    Yes.  I participated in a scheme to get my children

14   admitted to colleges, two of my children admitted to colleges

15   as fake athletic recruits, and I also paid to have one of my

16   daughter's test scores altered.

17   Q.    Who did you enter into that scheme with?

18   A.    Rick Singer.  And I mean, there's a lot of people that,

19   you know -- so let me give you my complete answer, I guess.

12:25 20   Rick Singer who was the mastermind, the ring leader of it, his

21   organization, The Key Foundation, his contacts at colleges in

22   the athletic department, among others, and parents like myself

23   and my wife Davina.

24   Q.    I want to return to that, but I want to take a step back

25   for a moment, sir.  Can you tell this jury where you were born?

1    A.    Yes.

2    Q.    Did you have an understanding from that meeting of whether

3    the director of admissions was aware that your daughter never

4    intended to play soccer at UCLA?

5    A.    He clearly didn't have any idea.

6    Q.    Did you have an understanding of whether he was aware that

7    your daughter was not qualified to play soccer at UCLA?

8    A.    No, he had no idea.

9    Q.    Did you have an understanding of why the people at that

01:01 10    meeting were so concerned that your daughter had had a

11    concussion and wasn't able to play soccer?

12    A.    Yeah, because she couldn't be a player at that point.

13    Q.    Was Lauren ultimately permitted to stay at UCLA?

14    A.    Yes.

15    Q.    How did that happen?

16    A.    They agreed to do a protocol with UCLA doctors that would

17    actually -- you know, she would have to go through and pass,

18    and it took approximately 60 days, and she was able to get

19    approvals that her concussion was subsided and she would be

01:02 20    okay to play.

21    Q.    Did she end up playing soccer at UCLA?

22    A.    No.

23    Q.    What happened?

24    A.    She actually became a team manager on the team.

25          MR. FRANK:  Your Honor, we're going to switch gears at

```
 1    the conclusion of the examination of Mr. Isackson.

 2              We're in recess until 2:00 p.m.

 3              (Recess taken 1:04 p.m. to 2:03 p.m.)

 4              THE CLERK:  You may be seated.  Court is now in

 5    session

 6              THE COURT:  Good afternoon, jurors.  We're ready to

 7    resume.

 8              Mr. Isackson, you're reminded you're still under oath.

 9              You may continue with direct examination, Mr. Frank.

02:04 10        MR. FRANK:  Thank you, your Honor.

11              EXAMINATION OF BRUCE ISACKSON (Continued)

12    BY MR. FRANK:

13    Q.   Good afternoon again, Mr. Isackson.

14    A.   Good afternoon.

15    Q.   When we left off, we had been talking about your daughter

16    Lauren and her admission to UCLA.  Do you recall that

17    testimony?

18    A.   Yes, I do.

19    Q.   I want you to switch gears now and talk about your younger

02:04 20   daughter Audrey.

21    A.   Okay.

22    Q.   Did there come a time where you engaged Rick Singer to

23    pursue this scheme for a second time with your daughter Audrey?

24    A.   Yes.

25    Q.   What kind of student is your daughter Audrey?  Let me
```

1   rephrase that question.  What kind of student was she in high

2   school?

3   A.   She was a good student, above average, mostly Bs and As.

4   Q.   Mr. Isackson, if you could bring the microphone closer to

5   you.  I think we may be having trouble hearing you.  If you can

6   speak directly into the microphone, maybe even closer if you

7   can.

8   A.   Yes.  Is that better?

9   Q.   Could you answer that question again?  What kind of high

02:05 10   school student was your daughter Audrey?

11   A.   Yeah.  She was slightly above average, mostly Bs, some As.

12   Q.   Was she an athlete in high school?

13   A.   Not at all.

14   Q.   Did you ultimately decide with Mr. Singer -- well,

15   withdrawn.

16        What college did you ultimately decide with

17   Mr. Singer to pursue admission to for her?

18   A.   To USC.

19   Q.   What, if anything, did Mr. Singer tell you about how she

02:06 20   would be admitted to USC?

21   A.   At USC, he said she would come in as a crew recruit.

22   Q.   Crew?

23   A.   Crew.

24   Q.   Did your daughter row crew?

25   A.   No.

```
 1    Q.   Had she ever rowed crew?
 2    A.   No.
 3    Q.   What, if anything, did he tell you about how much that
 4    would cost?
 5    A.   It was $250,000.
 6    Q.   What was your understanding of whether Audrey would have
 7    been admitted to USC on her own merit?
 8    A.   She didn't have the grades or the test scores to get in.
 9    Q.   Other than paying the $250,000, what, if anything, did
02:06 10   Rick Singer tell you you had to do in order to get her admitted
11    to USC as a crew recruit?
12    A.   He asked us for a head shot of her.
13    Q.   A head shot?  A photograph?
14    A.   Correct.
15    Q.   Did he tell you how the photograph would be used?
16    A.   He told us that he would be putting together information,
17    a resume, making her out to be a high level high school recruit
18    for colleges as a crew person.
19    Q.   Was he that specific or was that something you understood
02:07 20   from what he told you?
21    A.   Yeah.  That's -- yes.  That's what I understood from him.
22    He said he would put together everything that was needed to
23    handle the application.
24    Q.   What was your understanding of what the athletic profile
25    would say about your daughter?
```

1    A.   Well, make her out to be an athlete, Division 1 athlete,

2    for a sport she'd never entered in her life and never been in a

3    crew boat or anything.

4    Q.   What, if anything, did Mr. Singer tell you Audrey would

5    have to do at USC once admitted pursuant to the scheme?

6    A.   He was pretty clear.  He said she didn't have to do

7    anything, she didn't even have to go to -- around the crew area

8    at all.

9    Q.   What did he tell you about the money?

02:08 10    A.   That we'd make a payment to his foundation, and it would

11    be funneled to the athletic program at USC.

12    Q.   What was your understanding of what would happen if you

13    didn't pay the money?

14    A.   She wouldn't have gotten into the school on her grades or

15    her test scores.

16    Q.   Could we show the witness -- well, before I do that, did

17    you agree to pursue this scheme with respect to your daughter

18    Audrey?

19    A.   Yes, we did.

02:08 20    Q.   Could we show the witness only Exhibit 447.  As that's

21    being pulled up on your screen, Mr. Isackson, did you, in fact,

22    send a photograph of your daughter to Mr. Singer for use in an

23    athletic profile?

24    A.   We did.

25    Q.   Do you recognize Exhibit 447?

1    Please keep this hush hush till late March."

2           Did you have an understanding of why you needed to

3    keep your daughter's admission to USC hush hush until late

4    March?

5    A.   Yes.

6    Q.   What was your understanding?

7    A.   She hadn't applied to the school.  Her high school -- you

8    know, college people that helped her out at her high school

9    would have no idea that she had an application that had not

02:14 10    been submitted and now she's already accepted.  It would have

11    been awfully strange.

12    Q.   What was your understanding of what would have happened if

13    you told people she had been admitted?

14    A.   They would have figured out that something was awry.

15           MR. FRANK:  Could we show the witness only, please,

16    Exhibit 450.

17    Q.   Do you recognize Exhibit 450?

18    A.   Yes.

19    Q.   What is it?

02:14 20    A.   It's an e-mail.

21    Q.   Who is it from?

22    A.   My wife Davina.

23    Q.   Who is it to?

24    A.   Rick Singer, cc'ing my daughter Audrey, myself, and then

25    Steve Masera at the Key Worldwide Foundation.

1   Q.   Did you know why you needed to lie on Audrey's application

2   about her athletic abilities?

3   A.   Yeah.

4   Q.   Why?

5   A.   She would not have gotten into school on her grades or her

6   test scores.

7   Q.   Did you know if the admission department -- did you have

8   an understanding about whether the admission department knew

9   that?

02:19 10   A.   No.  There would be no reason to lie if the admissions

11   department knew about it.

12        MR. FRANK:  We can take that down.

13   Q.   As a part of Audrey's application process, did there come

14   a time when you also engaged Mr. Singer in connection with her

15   standardized college admission tests?

16   A.   Yes.

17   Q.   Tell us about that.

18   A.   He said he had a controlled environment in LA where he

19   would have a proctor administer the test with her one-on-one

02:19 20   and had the ability to change the score after she took the

21   test.

22   Q.   Let's break that down a little bit.  First of all, you

23   said he told you he had a controlled environment in LA.  What

24   did you understand him to mean by "a controlled environment in

25   LA"?

1    A.    That it was something that he oversaw and he was

2    responsible for and he knew exactly the process of the test

3    taking and how it started from beginning to end.

4    Q.    What, if anything, did he tell you you would need to do to

5    have Audrey take the test in the controlled environment?

6    A.    That she would have to have testing shown that she needed

7    additional time to do the test.

8    Q.    How would she get additional time?

9    A.    Well, basically, if you have -- if it's determined that

02:20 10    you have, I would say, below standard -- you just need more

11    time to process the questions than the average student, then

12    they'd allow you to have more time.

13    Q.    And once she got more time, what did you understand would

14    happen?

15    A.    She was able to go to Rick's testing center with the

16    proctor that he had placed in there.

17    Q.    What did you understand would happen there?

18    A.    Audrey would take the test, and when she was finished, the

19    proctor would review it and change the scores to get the score

02:20 20    that Rick felt was needed to get her into the school.

21    Q.    Was there a cost associated with that?

22    A.    Yes.

23    Q.    How much?

24    A.    Two hundred -- oh, for that.  Excuse me.  That was

25    $100,000.

```
 1    Q.   Did you agree to participate in that part of the scheme?

 2    A.   We did.

 3    Q.   Did Audrey ultimately -- did there come a time when Audrey

 4    ultimately went to Los Angeles to take the test at Mr. Singer's

 5    controlled facility?

 6    A.   Yes.

 7    Q.   Where do you live?

 8    A.   We live in Hillsborough, California.

 9    Q.   How far is Los Angeles from Hillsborough?

02:21 10    A.   It's about a six- or seven-hour car ride.

11    Q.   Where would Audrey have taken the test if she had not --

12    if you had not pursued the scheme?

13    A.   Most likely at her high school.

14    Q.   How far is that from your house?

15    A.   15 or 20 minutes.

16    Q.   What happened when Audrey took the test in LA?

17    A.   She finished the test and told us that she thought she did

18    really well.  When she came home --

19    Q.   Sorry?

02:22 20    A.   When she came home, she told us she thought she did really

21    well.

22    Q.   What happened after that?

23    A.   We called Rick to see how the test went.  I remember his

24    words exactly.  He said, excuse my language, "She did shit."

25    Q.   What was your reaction when he told you that?
```

```
 1   A.   We were surprised because Audrey studied pretty hard for
 2   the test and thought she had done well on her own.
 3   Q.   So what happened?
 4   A.   Rick said that they had to change the score.
 5   Q.   Did he tell you what he thought they should change the
 6   score to?
 7   A.   Yes.
 8   Q.   What did he tell you?
 9   A.   It was a 31 on the ACT test.
10   Q.   Did you agree?
11   A.   We did.
12   Q.   What score did Audrey ultimately receive on the ACT?
13   A.   She got a 31.
14   Q.   Did you make a payment in connection with that scheme?
15   A.   We did.
16   Q.   How much?
17   A.   $100,000.
18   Q.   Where did you make that payment to?
19   A.   To the Key Worldwide Foundation.
20   Q.   Did you believe that that payment was going to charity?
21   A.   No.
22   Q.   How did you think the money was being used?
23   A.   Only one way it could go.  It would be to Rick and to his
24   proctor that administered the test.
25   Q.   Did there come a time when you took a tax deduction in
```

1    connection with that purported donation?

2    A.   Yes.

3    Q.   Did you think it was a legitimate deduction to which you

4    were entitled?

5    A.   No.  I knew it wasn't.

6    Q.   Why did you take the deduction?

7    A.   I wanted to get the write-off.

8    Q.   Mr. Isackson, did there come a time when you engaged with

9    Rick Singer again with respect -- actually, withdrawn.

02:23 10        Do you know whether that test score you obtained

11   through this scheme was used in connection with your daughter's

12   college applications?

13   A.   Yes.

14   Q.   How it was used?

15   A.   It was part of her application process that was sent into

16   her -- sent into the school.

17   Q.   Was it sent into one school or more than one school?

18   A.   I know I sent it to USC.  I don't recall where else it was

19   sent to.  That was the score that was used for testing.

02:24 20  Q.   Did there come a time when you engaged Mr. Singer again

21   with respect to your son Ryan?

22   A.   Yes.

23   Q.   How so?

24   A.   We started the process of talking with him about working

25   with Ryan.

|  | 1 | Q.   What did you intend to do with Rick Singer with respect to |
|  | 2 | your son Ryan? |
|  | 3 | A.   Used him in the same process for college as we used for |
|  | 4 | our two daughters. |
|  | 5 | Q.   I want to direct your attention now to October of 2018. |
|  | 6 | Do you have that time in mind? |
|  | 7 | A.   Okay. |
|  | 8 | MR. KELLY:  I'm sorry.  What time? |
|  | 9 | MR. FRANK:  October of 2018. |
| 02:24 | 10 | Q.   Mr. Isackson, do you recall receiving a telephone call |
|  | 11 | from Mr. Singer in October of 2018? |
|  | 12 | A.   I do. |
|  | 13 | Q.   What did he tell you in that call? |
|  | 14 | A.   He said his foundation was being audited by the IRS. |
|  | 15 | Q.   Prior to coming here today -- well, on your -- on the desk |
|  | 16 | in front of you, there's a disc labeled Exhibit 671.  Do you |
|  | 17 | see that disk? |
|  | 18 | A.   I do. |
|  | 19 | Q.   Do you recognize it? |
| 02:25 | 20 | A.   I do. |
|  | 21 | Q.   How do you recognize it? |
|  | 22 | A.   I've listened to it and I've initialed it as well. |
|  | 23 | Q.   Prior to coming here today, you had an opportunity to |
|  | 24 | listen to it you said? |
|  | 25 | A.   I have. |

```
 1   Q.   What is it?
 2   A.   It's a recording of conversation, a telephone call between
 3   Rick and me and his foundation being audited.
 4              MR. FRANK:  The government offers 671.
 5              THE COURT:  It will be admitted.
 6              (Exhibit 671 admitted into evidence.)
 7              MR. FRANK:  If the jurors could turn in their binders
 8   to the tab labeled 671.
 9   Q.   Mr. Isackson, if you could do the same.  Prior to coming
10   here today, have you had an opportunity to review that
11   transcript?
12   A.   I have.
13   Q.   Is it a fair and accurate transcript of the recording?
14   A.   Yes, it is.
15   Q.   And are those your initials at the bottom of the page?
16   A.   Yes.
17              MR. FRANK:  Ms. Lewis, if we could start at the
18   beginning.
19              (Audio recording played.)
20   Q.   Mr. Isackson, I just want to ask you a few questions.
21   First of all, do you recognize Mr. Singer's voice on that call?
22   A.   I do.
23   Q.   If I could direct your attention to page 2 of the
24   transcript at line 6, Mr. Singer said, "So they asked about
25   your payments."  Did you have an understanding of who "they"
```

```
 1   was?
 2   A.    Yes.
 3   Q.    What was your understanding?
 4   A.    It was the IRS.
 5   Q.    He said one of them was for when Mark took the test for
 6   Audrey.  Had you heard the name Mark before this phone call?
 7   A.    No.
 8   Q.    Did you have an understanding of who that referred to?
 9   A.    Yes.
10   Q.    Who did it refer to in your understanding?
11   A.    Would have been the proctor in the test who changed the
12   results.
13   Q.    You responded, "Okay."  Was that because you knew what he
14   was talking about?
15   A.    It was just shorthand for the process that took place.
16   Q.    Did you have an understanding of what he was talking
17   about?
18   A.    Yes.
19   Q.    At line 9, he says "The payment that we made to Jorge to
20   help Lauren get into UCLA through soccer."  You again responded
21   "Okay."  Did you have an understanding of who he was referring
22   to there?
23   A.    Yes.
24   Q.    Who?
25   A.    The payment that we made to get Audrey admitted as a fake
```

1    athlete at UCLA.

2    Q.   Who was Jorge?

3    A.   Jorge was the men's soccer coach.

4    Q.   Then he says, at line 12, "and then the payment that we

5    made to Donna Heinel at USC to help Audrey get in through

6    crew."

7         Did you have an understanding of what he was

8    referring to there?

9    A.   Yes.

02:29 10   Q.   What did you understand him to be referring to?

11   A.   Again, Donna Heinel helped Audrey in her admissions

12   process at USC.

13   Q.   When he said to you "The payment that we made to Donna

14   Heinel," did you understand him to be suggesting to you that

15   the payment had gone to Donna Heinel personally?

16        MR. KELLY:  Objection.  Leading.

17        THE COURT:  Sustained.

18   Q.   What was your understanding of what he was telling you

19   about where the payment was going when he said "Payment that we

02:30 20   made to Donna Heinel"?

21   A.   He was just talking about the process of how he did it

22   through the athletic department.

23   Q.   Did you have an understanding of where that money -- what

24   did he tell you about where that money was going?

25   A.   He told us the money was going to the USC athletic

```
 1   program.
 2   Q.   Did you have an understanding of whether or not he was
 3   telling you anything different in this call?
 4   A.   It was just the process, shorthand, so to speak, how it
 5   took place, how he sent the money in.
 6   Q.   At line 15, he says, "Of course, I'm not going to tell the
 7   IRS this is where the money went, how the money was.  So I
 8   just -- I just want to make sure that what I've told them so
 9   far is that that 600K plus has actually gone to pay to our
 10  foundation for underserved kids," and you responded, "Uh-huh."
 11            Why did you respond "uh-huh"?
 12  A.   Because I wanted to be on board with him in that program
 13  keeping it disguised.
 14  Q.   Was it true, in your understanding, that the money was
 15  going to pay for underserved kids?
 16  A.   Absolutely not.
 17  Q.   Could we pick up at line 24, please.
 18            (Audio recording played.)
 19  Q.   You heard yourself say "Sure, sure"?
 20  A.   Yes.
 21  Q.   If we could go back to page 3, at the top of the page,
 22  line 1, Mr. Singer asks you, "Did you take a write-off for
 23  those," and you responded, "I did take a write-off for those,
 24  yes."  What did you mean by that?
 25  A.   I took a tax deduction for all those checks that I wrote.
```

```
 1   Q.   At line 12, you said, "You know, if we do get audited or
 2   something, we would need a letter or something like that."
 3              What were you talking about?
 4   A.   If we did get audited, we'd have to have some proof saying
 5   we made a gift to a charitable 501(c)(3), so we'd asked for
 6   that letter.  We had only gotten it for the first one, not the
 7   last two.
 8   Q.   You had not gotten it for your daughter?
 9   A.   Yeah.  We didn't get it for Audrey for USC, nor for the
10   test taking.
11   Q.   Why did you want the letter?
12   A.   To keep the ruse going with the IRS that we had made a
13   charitable gift.
14   Q.   At line 17, Mr. Singer says, "so I just wanted to make
15   sure our stories are aligned," and you responded, "Yeah".
16              Why did you respond "yeah"?
17   A.   Because I wanted to be on the same page as him.  I did not
18   want to have the scheme blown up in our face.
19   Q.   At page 4, at line 3, Mr. Singer says, "I'm just saying
20   that everything went to our foundation to help underserved
21   kids, right?"  And you respond at line 6, "But how -- what do
22   they -- do they track that, Rick, though or how do they? Will
23   they?"
24              Who is the "they" you're referring to?
25   A.   The IRS.
```

1    Q.    When you said "do they track that", what were you

2    concerned about the IRS tracking?

3    A.    The flow of money and where it went.

4    Q.    Why were you concerned about that?

5    A.    Because it would be fairly hard for him to hide all that

6    money going into the foundation and going from there to USC

7    when I knew a good portion of that money was going into his

8    pockets and the people who helped him.

9    Q.    When you said you knew a good portion of that money was

02:35 10    going into his pocket and the people that helped him, was that

11    anything that he ever told you?

12    A.    No.

13    Q.    So why did you have that belief?

14    A.    Well, I did not think that Rick was in the business of

15    working full-time for charitable causes.

16    Q.    If we could pick up line 17, please.

17          (Audio recording played.)

18    Q.    You said at line 4 on page 5, "I'm assuming that we're not

19    the only people they're asking about."

02:36 20          What other people were you referring to?

21    A.    Well, Rick had told me that tons and tons of parents, and

22    I would think there would be a lot of people that would be

23    going through their returns.

24    Q.    At line 8, Mr. Singer says, "Tons, tons of people".  And

25    you respond at line 9, "Okay.  Okay.  Good".  Why was that good

1    in your view that there were tons of people involved?

2    A.   If there was a lot of people, there would be a lot of

3    returns to go through.  Most of these people have very

4    complicated returns.  It would be pretty hard to figure things

5    out.

6    Q.   Who would it be hard -- who would have a hard time

7    figuring things out?

8    A.   The IRS.

9         MR. FRANK:  Could we pick up at line 9, please.

02:38 10        (Audio recording played.)

11   Q.   Mr. Isackson, if I could direct your attention to the

12   bottom of page 5 at line 23, you said at line 23, "But you

13   don't think that they would look at the paper trail on it and

14   try to dig deeper or what's your feeling on it?"

15        What paper trail were you referring to?

16   A.   The flow of money from this foundation out.

17   Q.   What was your concern?

18   A.   It was pretty obvious that Rick wasn't doing this all for

19   charitable causes and was helping people --

02:39 20        THE COURT:  I'm having a hard time hearing you.  Pull

21   it over closer to you, please.

22   A.   It was pretty clear that Rick had a lot of people helping

23   him with this scheme, and they would have to be compensated, as

24   well as himself.

25   Q.   At the top of page 7, Mr. Singer says, "He was asking if I

1    had a boy candidate that wanted to get in through UCLA soccer,

2    make the payments, and I didn't know if, you know, potentially

3    Ryan would be one of those".

4            Again, sir, were you considering the scheme at this

5    point for your son Ryan?

6    A.    Yes.

7    Q.    Did he play soccer?

8    A.    He did play soccer.

9    Q.    Did he play at a level that, in your view, was sufficient

02:40 10    to be recruited at the collegiate level?

11    A.    No, not even close.

12    Q.    At line 14 on page 7, you said, "Well, I'm wishing you the

13    best in this thing for both of us here".

14            Why were you wishing Mr. Singer the best for both of

15    you?

16    A.    I was just trying to be nice, but my goal was that we

17    would both be okay in this, so I would be okay in this.

18    Q.    Were you concerned that he wouldn't be?

19    A.    Absolutely.

02:40 20    Q.    At the time of this phone call, sir, did you have any idea

21    that you were being recorded?

22    A.    No.

23    Q.    What was your reaction to receiving this phone call?

24    A.    I was in shock.

25    Q.    I want to direct your attention now to a few months late

1    said, "I'm so paranoid about this F'ing thing you were talking

2    about.  I don't even like talking about it on the phone".

3              What thing were you referring to?

4    A.   The IRS auditing his foundation.

5    Q.   Why were you paranoid and why did you not want to talk

6    about it on the phone?

7    A.   I thought there was a chance they could be taping his

8    phones, and if they hear our conversation about it, I was

9    talking clearly that I knew about the scheme.

02:47 10   Q.   If we could turn to page 28, at line 15, Mr. Singer says,

11   "Money's going to Georgetown over here.  It's going to USC over

12   here."

13             At line 18, "It's going, and then it's going to the

14   we have the place in Oakland.  It's going to fund that."

15             At line 22, "It's taking kids to camp."

16             At line 24, "it's doing this.  It's doing that."

17             Did you believe Mr. Singer's money from his

18   foundation was going to all those different places?

19   A.   I knew he was filtering a little bit of his money to cover

02:48 20   up his scheme.  I knew that the majority of it was not going to

21   anything other than his pockets and people who were involved

22   with him.

23   Q.   If we can pick up at page 29, line 10.

24             (Audio recording played.)

25             MR. FRANK:  We can stop it there.

1    the ten or 15 grand off my statement and have them come back

2    and say show me those receipts or do this or that, I'd just

3    rather do it, so I really -- everything I do is clean."

4         Was it really true that everything you did was clean?

5    A.   No.

6    Q.   What wasn't clean?

7    A.   This process with my children and the process of the test

8    taking and that taking that deduction as well too, the college

9    payments.

03:03 10   Q.   Was it true when you said "I don't take write-offs for

11   taking people out to lunch and those kind of things"?

12   A.   Yes.

13   Q.   Do you think you would actually be entitled to those kind

14   of deductions for actual business expenses?

15   A.   Yeah.

16   Q.   I'm sorry?

17   A.   Yes.  You take people out to lunch, you can write that off

18   if it's business related.

19   Q.   Did you think that because you didn't take those

03:03 20   deductions you were entitled to take these deductions?

21   A.   No.  Not at all.  It had nothing to do with it.

22   Q.   At page 42, you said, at line 3, "That's all in your, in

23   your, in your 10 years, 50.  Okay."

24        Then, at line 6, you said, "Okay, but so -- and

25   there's some big people."

1                     C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8            We, Kristin M. Kelley and Kelly Mortellite, certify

9    that the foregoing is a correct transcript from the record of

10   proceedings taken September 13, 2021 in the above-entitled

11   matter to the best of our skill and ability.

12

13

14       /s/ Kristin M. Kelley           September 13, 2021

15       Kristin M. Kelley, RPR, CRR              Date
         Official Court Reporter
16

17

18

19

20

21

22

23

24

25