UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN WILSON,<br><br>　　　　Defendant | Cr. No. 19-10080-LTS<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANT JOHN WILSON'S REPLY BRIEF
IN SUPPORT OF HIS MOTION FOR RETURN OF FUNDS**

In the course of its investigation of this matter, the Government used its cooperating informant William "Rick" Singer to deceive Mr. Wilson into transferring $1 million to Mr. Singer based on Mr. Singer's false representation that the funds would then be given to two universities. The Government has now dismissed all charges against Mr. Wilson related to the transfer of those funds and has no legal justification for retaining that $1 million (the "Wilson Funds"). Instead of returning Mr. Wilson's money, however, the Government now claims to have forfeited the funds years ago in *Mr. Singer's* criminal case, without any notice to Mr. Wilson or opportunity for him to be heard.

The Government's supposed forfeiture is plainly invalid. The Government and Mr. Singer obtained the relevant forfeiture order only by falsely representing to the Singer court (Zobel, J.) that the Wilson Funds were property involved in or traceable to Mr. Singer's own criminal conspiracies, when in fact they were obtained from Mr. Wilson as part of a law enforcement sting operation after Mr. Singer's conspiracies had concluded. The invalidity of the forfeiture and the falsity of the Government's representation to the court is and was clear from the face of the Government's own charging instruments. The Government then compounded the illegality of the

forfeiture by failing to give Mr. Wilson notice, in violation of the Federal Rules of Criminal Procedure, the Singer court's own preliminary forfeiture order, and Mr. Wilson's well-established due process rights.

Remarkably, the Government seeks to justify its efforts to conceal the forfeiture from Mr. Wilson by claiming that he gave up his ownership of the Wilson Funds when law enforcement deceived him into transferring them to Singer.  Government's Opposition to Defendant John Wilson's Motion For Return of Funds Held For Forfeiture ("Opp. Br."), DE 2708, at 8.  In short, the Government claims that once the Government or its agents have fooled the target of an undercover operation into giving them money, that person lacks standing to seek to reclaim it, *even if he is acquitted* of all charges against him.  If that were the law, the Government could circumvent the forfeiture process altogether, simply targeting anyone it chose in sting transactions and keeping the money even if a court determines the transactions in question were not criminal.  Fortunately, that is not what the law provides.  Mr. Wilson remains the only rightful owner of the Wilson Funds, and the Government is not permitted to unjustly enrich itself at his expense via an unlawful forfeiture obtained without notice and based on false representations.

Accordingly, and for the reasons set forth below, Mr. Wilson is entitled to the return of his property and the Court should order the Government to return the Wilson Funds and all accrued interest immediately.

## BACKGROUND

On Friday, September 21, 2018, IRS and FBI agents confronted Mr. Singer in Boston and persuaded him to carry out an undercover operation, to target parents of college applicants and others.  *See, e.g.,* Trial Tr. 9/21/21, at 150-53.  After meeting with Mr. Singer through the weekend, on Monday, September 24, 2018, agents escorted Mr. Singer to a Bank of America branch to open

a bank account in the name of Mr. Singer's non-profit, The Key Worldwide Foundation ("KWF") (the "Undercover Account").  *Id.* at 152-53.  The FBI had access to the Undercover Account.  *Id.* at 153.  Agents explained to Mr. Singer that he was not allowed to access the Undercover Account without approval from Government agents.

The Government then directed Mr. Singer to target Mr. Wilson as part of its undercover efforts.  In sum, Mr. Singer proposed that Mr. Wilson make two $500,000 donations, one for each of his twin daughters (the "Transfers"), for a total of $1,000,000.  The donations would be made to Harvard University and Stanford University to facilitate their admissions.  The Government's case agent testified at trial that this was a Government "ruse to see if Mr. Wilson would make payment."  Trial Tr. 9/23/21, at 14-15.  At this point, the Government had "the authority to direct" what Mr. Singer said in his calls with parents and was scripting Mr. Singer's calls with Mr. Wilson.[1]  Trial Tr. 9/23/21, at 181-81.

On October 15, 2018, Mr. Singer, at the Government's direction, asked Mr. Wilson to make a $500,000 wire transfer to KWF, as a deposit for a later charitable contribution that KWF would make on Mr. Wilson's behalf to a university to facilitate one of his daughter's admission to that university.  *See* Trial Ex. 578, 10/15/18 Call, at 4-5, 9.  On October 17, 2018, Mr. Wilson's company then wired $500,000 to the Undercover Account as Mr. Singer had instructed.  Fourth Superseding Indictment, DE 732 ¶¶ 240-41.[2]  On October 27, 2018, Mr. Singer, at the Government's direction, advised Mr. Wilson that the entire $500,000 would be transferred to Stanford.  *See* Trial Ex. 591, 10/27/18 Call, at 1-2.  On November 29, 2018, Mr. Singer, at the

---

[1] The Government agent testified at trial that the agents deliberately avoided documenting what they told Mr. Singer to say as part of these scripts, or what he refused to say or said incorrectly.  *E.g.,* Trial Tr. 9/24/21, at 17-18, 175-76.

[2] Docket entries in this case will be labeled "DE" throughout.  Docket entries in *United States v. Singer*, No. 1:19-cr-10078-RWZ, will be labeled "*Singer* DE."

3

Government's direction, instructed Mr. Wilson to make a further wire transfer of $500,000 to KWF for KWF to forward to Harvard as a charitable contribution. *See* Trial Ex. 602, 11/29/18 Call, at 2-3. On December 11, 2018, Mr. Wilson's company wired $500,000 to the Undercover Account as Mr. Singer had instructed. Fourth Superseding Indictment, DE 732 ¶ 244. The Wilson Funds were never donated to Stanford and Harvard as Mr. Wilson and Mr. Singer had agreed.

In a criminal Information filed on March 5, 2019, the Government charged Mr. Singer with: (1) engaging in a racketeering conspiracy between 2011 and September 2018; (2) engaging in a money laundering conspiracy between 2013 and September 2018; and (3) engaging in a tax fraud conspiracy between 2013 and September 2018.[3] *Singer* DE 1, at 17-20. The Information also included a racketeering forfeiture allegation under 18 U.S.C. § 1963, *id.* at 22-23, and a money laundering forfeiture allegation under 18 U.S.C. § 982(a)(1), *id.* at 24-25. These allegations essentially sought the forfeiture of any interest Mr. Singer had in certain property that was derived from or traceable to his racketeering and money laundering offenses, which ended in September 2018.

On March 12, 2019, Mr. Singer pled guilty to the Information, pursuant to a written plea agreement that he signed on February 28, 2019. *Singer* DE 2. In his plea agreement, Mr. Singer admitted "that the Properties are subject to forfeiture on the grounds that they were involved in such offenses or traceable to such offenses; were acquired or maintained in violation of 18 U.S.C. § 1962; constitute, or are derived from proceeds obtained directly or indirectly, in such offenses; or were otherwise forfeitable under 18 U.S.C. § 1963." United States' Motion for Preliminary Order of Forfeiture, *Singer* DE 41 ¶ 7.

---

[3] The Government also charged Mr. Singer with obstruction of justice based upon him informing several co-conspirators of the investigation in October 2018. Information, DE 1, at 21. Mr. Wilson was not one of those alleged co-conspirators.

On September 5, 2019, the Government filed a motion for preliminary order of forfeiture in Mr. Singer's case in which it identified various property to be forfeited, including "All funds on deposit in Bank of America checking account in the name of the Key Worldwide Foundation ending in x4086," i.e., the Undercover Account. *Id.* ¶ 2(a). There was no indication in this motion, or any of the prior or subsequent filings regarding the forfeiture, of any details of the listed Bank of America account—no reference to branch location, amount on deposit, source of funds, that it had been used in the undercover sting operation, etc. On September 10, 2019, the Government filed a revised motion for preliminary order of forfeiture in which it further specified that, in his plea agreement, Mr. Singer had "agreed to consent to the entry of the order of forfeiture for such property" and waived certain requirements. United States' Revised Motion for Preliminary Order of Forfeiture, *Singer* DE 42 ¶ 6. In both the original and the revised motions, the Government represented, based on Mr. Singer's supposed admissions, that all the property to be forfeited, including the contents of the Undercover Account, "were involved in [Mr. Singer's offenses] or traceable to such offenses; were acquired or maintained in violation of 18 U.S.C. § 1962; constitute, or are derived from proceeds obtained directly or indirectly, in such offenses; or were otherwise forfeitable under 18 U.S.C. § 1963."[4] *Singer* DE 41 ¶ 7; *Singer* DE 42 ¶ 7.

On September 12, 2019, Judge Zobel entered a Preliminary Order of Forfeiture in Mr. Singer's case (the "Preliminary Order of Forfeiture"), consistent with the Government's request. Preliminary Order of Forfeiture, *Singer* DE 43. The Court ordered the Government, in addition to notice by publication, to "give, to the extent practicable, direct written notice to any person known to have alleged an interest in the Properties to be forfeited." *Id.* ¶ 7.

---

[4] "Otherwise forfeitable under 18 U.S.C. § 1963" refers to the provisions of Section 1963(a)(2), which cover various property rights in the underlying racketeering enterprise, and so are clearly inapplicable to the Wilson Funds or the Undercover Account.

On February 3, 2020, the Government filed a motion for final order of forfeiture. United States' Motion for Final Order of Forfeiture, *Singer* DE 48. In its motion, the Government represented that, "Notice of the Preliminary Order of Forfeiture was sent to all interested parties." *Id.* ¶ 2. The government further supported its motion with a declaration from AUSA Carol Head in which Ms. Head certified as to the list of individuals and entities the Government had notified of the forfeiture. Declaration of Carol E. Head Regarding Service of Process, *Singer* DE 46 ¶ 2. Ms. Head's Declaration listed 18 persons to whom the Government gave personal notice. *Id.* Neither Mr. Wilson nor his counsel, nor any other parent who worked with Mr. Singer, appears on this list. On February 5, 2020, the Court entered a Final Order of Forfeiture. *Singer* DE 49 (the "Final Order of Forfeiture" and together with the Preliminary Order of Forfeiture, the "Forfeiture Orders").

Meanwhile, agents arrested Mr. Wilson on a Complaint on March 12, 2019. He was included in the Second Superseding Indictment on April 9, 2019. This indictment made two forfeiture claims based on the Count One and Count Two charges for a bribery/fraud conspiracy and a money laundering conspiracy. Second Superseding Indictment, DE 314, at 50-53. Each of the conspiracy counts included allegations, ¶¶ 250-253, about the Transfers. The Government then expanded the forfeiture claim in the Third Superseding Indictment, returned on October 22, 2019, DE 610, and restated it in identical terms in the Fourth Superseding Indictment, returned on January 14, 2020, DE 732. Specifically, the Fourth Superseding Indictment, which was the operative indictment at trial, included a forfeiture allegation under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) in connection with Counts One through Two and Four through Twelve of the Indictment. This included all Counts against Mr. Wilson except for the money laundering count, Count Three, and the tax count, Count Thirteen. The Indictment also included a money laundering

forfeiture allegation under 18 U.S.C. § 982(a)(1), in connection with the money laundering count, Count Three.

Counsel for Mr. Wilson monitored Mr. Singer's case during the pendency of the proceedings. Declaration of Yakov Malkiel, Esq. in Support of Defendant John Wilson's Motion for Return of Funds ("Malkiel Decl.") ¶ 3. Mr. Wilson's counsel reviewed the above-referenced filings in Mr. Singer's case and understood that the forfeiture in Mr. Singer's case had nothing to do with the Wilson Funds. *Id.* ¶¶ 3-11. Specifically, Mr. Wilson's counsel noted that:

- The Government had taken the position that Mr. Singer's criminal activities had ended in September 2018, before the start of the undercover operation and before the Transfers;
- The Transfers were made to a bank account the prosecution team controlled; and
- The Government did not provide notice to Mr. Wilson or his counsel of any forfeiture of the Transfers in Mr. Singer's case.

Malkiel Decl. ¶¶ 3-11. Mr. Wilson's counsel understood that the Government would seek to forfeit the Wilson Funds, if at all, in the criminal case against Mr. Wilson if the Government prevailed.

The Government voluntarily dismissed the money laundering charge against Mr. Wilson, Count Three, prior to trial, DE 2042, after Mr. Wilson had filed a motion pointing out it would be unethical to argue a count that the Government knew did not violate the statute, DE 1989. Mr. Wilson was convicted at trial on all remaining counts against him.

On appeal, the First Circuit vacated all counts against Mr. Wilson other than the tax count, Count Thirteen. This included the counts related to the Stanford and Harvard ruse, because the court found the evidence rather contrived and easily subject to the prejudicial spillover from the Government's *Kotteakos* violation. The First Circuit issued its mandate on June 29, 2023. DE 2685. Also on June 29, 2023, the Government sought to dismiss all of the vacated counts against

7

Mr. Wilson.  DE 2683.  Thus, as of June 29, 2023, there was no remaining basis for forfeiture of the Wilson Funds.

On July 17, 2023, less than three weeks after the Government's dismissal, Wilson's counsel requested that the U.S. Attorney's Office consent to the return of the Wilson Funds given the dismissal of the counts supporting a potential forfeiture.  Exhibit A to Motion.  The Government refused to consent or even to engage substantively on the basis for its refusal, stating it was "not certain what you are referring to with respect to $1 million seized" from Mr. Wilson.  *Id.*  This Motion followed.

## ARGUMENT

Having failed to convict Mr. Wilson of any crimes supporting forfeiture of the Wilson Funds, the Government attempts to justify its retention of the Wilson Funds by pointing to the Forfeiture Orders entered in Mr. Singer's case.  The Forfeiture Orders, however, are plainly invalid because the Wilson Funds were not involved in the relevant offenses for which Mr. Singer was convicted, which the Government itself alleged had concluded before the Wilson Funds were transferred to Mr. Singer as part of the Government's sting operation.  Moreover, the Government never provided notice of the supposed forfeiture to Mr. Wilson, in violation of Federal Rule of Criminal Procedure 32.2, Judge Zobel's Preliminary Order of Forfeiture, and the due process requirements of the Fifth Amendment.  Mr. Wilson remains the rightful owner of the Wilson Funds, and is entitled to their immediate return.

**I.    THE FORFEITURE ORDERS ARE INVALID AS TO THE WILSON FUNDS BECAUSE THEY WERE NOT INVOLVED IN MR. SINGER'S OFFENSES.**

Property is only subject to criminal forfeiture in a defendant's case where it has the requisite nexus to the offenses of conviction.  *See United States v. Iacaboni*, 363 F.3d 1, 7 (1st Cir. 2004) (vacating forfeiture of property based on concealment money laundering theory where

8

defendant pled guilty only to promotion money laundering); *United States v. Adams*, 189 F. App'x 600, 602 (9th Cir. 2006) ("A criminal defendant. . . may be ordered to forfeit only property purchased with proceeds from the crimes 'for which [he] was convicted.'"); Fed. R. Crim. P 32.2(b)(1)(A).  In order to obtain the Forfeiture Orders in the Singer case, therefore, the Government represented that all property to be forfeited was involved, in various respects, in Mr. Singer's racketeering and money laundering offenses.  *See Singer* DE 43, at 3.  But that representation was demonstrably false with respect to the Wilson Funds.

Mr. Singer was charged with and pled guilty to racketeering and money laundering conspiracies that "continu[ed] through September 2018." *Singer* DE 1 ¶¶ 90, 93.  There was good reason that the charged conspiracies terminated in September 2018, as federal agents confronted him on September 21, 2018, and he agreed to cooperate, submitting to debriefings and conducting a sting operation against Mr. Wilson and other government targets.  Under longstanding First Circuit law, such actions terminated Mr. Singer's membership in any alleged conspiracy.  *See United States v. Pizarro-Berrios*, 448 F.3d 1, 10 (1st Cir. 2006) (withdrawal from a conspiracy "requires either a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals.")  Mr. Wilson did not transfer the donations until October 17th and December 11th, as part of the sting operation after Mr. Singer's conspiracies were terminated and he had begun to cooperate.  DE 732 ¶¶ 240-41, 244.  Necessarily then, the Wilson Funds were not proceeds of, traceable to, or otherwise involved in Mr. Singer's offenses.  Moreover, this was clear on the face of the charging instruments.[5]  Accordingly, any

---

[5] In addition to the clear termination date of the conspiracy charges, the Information filed against Mr. Singer omits the Transfers from the exhaustive 88 paragraphs of factual allegations describing his offenses.  *See Singer* DE 1 ¶¶ 1-88.

forfeiture of the Wilson Funds based on Mr. Singer's conviction was unlawful, and the Forfeiture Orders are invalid to the extent they include the Wilson Funds.

In an apparent attempt to insulate the Forfeiture Orders from review of their manifest invalidity, the Government suggests that "[a] third party cannot the[sic] 'relitigat[e]' the underlying forfeiture order against the defendant." Opp. Br. at 5 (quoting *United States v. Hallinan*, __ F.4th __, 2023 WL 4612021, at *2 (3d Cir. July 19, 2023)). Due process, however, requires that a party with an interest in property be permitted to challenge the underlying forfeitability of that property because "[i]t is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard." *See United States v. Daugerdas*, 892 F.3d 545, 557-58 (2d Cir. 2018) (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.7 (1979)); *see also United States v. Wolas*, 520 F. Supp. 3d 114, 127 n.15 (D. Mass. 2021) (Saylor, J.) (recognizing due process right identified in *Daugerdas*). In *Daugerdas*, the Second Circuit held that a convicted defendant's wife, to whom he had transferred certain property, had a due process right to challenge whether the property was proceeds of the offense. 892 F.3d at 557. The court noted the practical necessity of such due process protections in the forfeiture context:

> That conclusion is based not merely on a theoretical concern for an abstract right to an opportunity to be heard. There are several reasons to think the prior proceedings—from which Eleanor was statutorily excluded—might in fact have been inadequate to fairly determine her interest in the Accounts. A criminal defendant generally will not have the same incentive as a third-party claimant to argue that property subject to forfeiture is not his. The defendant will not end up with the property either way, and he might actually get a windfall if the money he owes is paid off with someone else's property.

*Id*. The Third Circuit's decision in *Hallinan* does not address *Daugerdas*, *Parklane Hosiery*, or indeed any of the relevant due process case law. Instead, it dismisses any due process concern in three sentences lacking any analysis, while relying solely on a Supreme Court decision which does

10

not address due process rights. *See Hallinan*, 2023 WL 4612021, at *3. It is, therefore, entirely unpersuasive.

The concerns raised in *Daugerdas* could not be more clearly realized than in the case presently before the Court. *Daugerdas* involved a forfeiture order contested by a defendant convicted at trial, and a spouse whose interests the defendant was presumably inclined to protect. Here, by contrast, the forfeiture order was simply agreed to by Mr. Singer, the Government's own cooperating informant. Mr. Singer had no interest in the Wilson Funds, no reason to dispute their forfeiture, and indeed had obtained them for the Government by deceiving Mr. Wilson at the Government's own direction. Mr. Wilson cannot be bound, consistent with due process, by Mr. Singer's self-interested agreement with the Government that the Wilson Funds were involved in his offenses. That their agreed representation was obviously false only further demonstrates the essential nature of the due process right to contest such a forfeiture.

Therefore Mr. Wilson is not bound by the invalid Forfeiture Orders, and is entitled to return of the Wilson Funds.

## II. THE FINAL FORFEITURE ORDER IS ALSO VOID AS TO MR. WILSON BECAUSE HE DID NOT RECEIVE NOTICE AND AN OPPORTUNITY TO BE HEARD.

Having obtained an invalid Preliminary Order of Forfeiture covering the Wilson Funds based on obviously false representations regarding their nexus to Mr. Singer's crimes, the Government then failed to provide Mr. Wilson with notice of the attempted forfeiture. That lack of notice violates Rule 32.2, the Singer court's Preliminary Order of Forfeiture, and the constitutional guarantee of due process. Therefore, the Final Forfeiture Order is void as to Mr. Wilson for lack of notice.

Rule 32.2 expressly requires that "the government must publish notice of [a Preliminary Order of Forfeiture] *and* send notice to any person who reasonably appears to be a potential claimant with standing to contest the forfeiture in the ancillary proceeding." Fed. R. Crim. P. 32.2(b)(6)(A) (emphasis added).  The Preliminary Order of Forfeiture also directed that "the United States shall give, to the extent practicable, direct written notice to any person known to have alleged an interest in the Properties to be forfeited."  *Singer* DE 43 ¶ 7.  Moreover, constitutional due process requires that "the government must afford notice sensibly calculated to inform the interested party of the contemplated forfeiture and to offer him a fair chance to present his claim of entitlement." *Gonzalez-Gonzalez v. United States*, 257 F.3d 31, 36 (1st Cir. 2001). "[W]hen the government knows or easily can ascertain the identity and whereabouts of a potential claimant, reasonableness requires the government, at a minimum, to take easily available steps in its attempt to notify the claimant." *United States v. One Star Class Sloop Sailboat*, 458 F.3d 16, 23 (1st Cir. 2006).  "If the notice turns out to have been inadequate, the forfeiture is void." *United States v. Giraldo*, 45 F.3d 509, 512 (1st Cir. 1995).[6]

Here, there is no question that the Government knew Mr. Wilson's identity, that he was the source of the Wilson Funds, and that he had been induced to transfer the funds to Mr. Singer based on Mr. Singer's Government-directed misrepresentations that they would be donated to Harvard and Stanford.  The Government also knew that Mr. Wilson was contesting all of the charges and forfeiture allegations in his own case.  As discussed further in Section III, Mr. Wilson was and has always remained the owner of the Wilson Funds.  But at a minimum, he "reasonably appear[ed] to be a potential claimant with standing to contest the forfeiture" and thus notice was required by

---

[6] The Government's suggestion that 21 U.S.C. § 853(n) does not require the Government to provide direct notice to potential petitioners is irrelevant given the express requirement in Rule 32.2.

AMERICAS 124844035 v1

Rule 32.2(b)(6)(A), the Preliminary Order of Forfeiture, and due process. The Government's suggestion that Mr. Wilson so obviously lacked standing that he was not even entitled to notice is risible. Having induced Mr. Wilson to transfer $1 million to its agent under false pretenses, and then obtained an illegal forfeiture order under false pretenses, the Government says that it was entitled to keep the money without any challenge from Mr. Wilson. It is hard to imagine a more obvious violation of due process; this is precisely the circumstance that the notice requirements of Rule 32.2 exist to prevent.

The Government does not explain whether it engaged in this violation of Mr. Wilson's due process rights by failing to give notice deliberately and strategically, to avoid Mr. Wilson's challenge to the forfeiture of the Wilson Funds, or if the failure to provide notice to Mr. Wilson was a mere oversight. But the Government's current attempt to bar Mr. Wilson from challenging the forfeiture, rather than conceding the original error in failing to provide him with notice, speaks volumes. Whether through deliberate sharp practice or unwillingness to concede honest error, the Government is effectively claiming the right to similarly withhold notice in any future case in the District. This Court should not allow it.

Finally, the Government argues that Mr. Wilson had actual notice of the forfeiture of his property – despite the Government's efforts to conceal it in a separate proceeding without providing him notice – because defense counsel was aware of the forfeiture proceedings against Mr. Singer. *See* Opp. Br. at 6–8. But Mr. Wilson had no reason to believe that Mr. Singer's forfeiture proceedings involved the Wilson Funds, because the Preliminary Order of Forfeiture did not identify *the Wilson Funds* as subject to forfeiture. The Preliminary Order of Forfeiture refers, in relevant part, only to "All funds on deposit in Bank of America checking account in the name of the Key Worldwide Foundation ending in x0486." Even assuming, unreasonably, that Mr.

13

Wilson should be expected to recognize this as the Undercover Account to which he sent the Transfers in late 2018, he had no reason to believe that the Wilson Funds were still held there a year later when the Government sought to forfeit the current contents of the account.  Indeed, every circumstance surrounding the proceeding assured Mr. Wilson and his counsel that the Wilson Funds were not included in the Singer forfeiture.

First, Mr. Wilson was in the very process of defending the Government's criminal charges against him, charges which included forfeiture allegations seeking to forfeit from Mr. Wilson any proceeds or property involved in his alleged offenses.  DE 732 ¶¶ 381, 383.  The only property which could have been subject to forfeiture under those allegations were the Wilson Funds. Second, Mr. Wilson had not been provided with direct notice of the Singer forfeiture, to which he was obviously entitled.  It was entirely reasonable to rely on the Government to comply with its obligation to provide notice, and to conclude from the lack of notice that the Wilson Funds were not being secretly lumped into "all funds" in an account in a separate proceeding.  Third, the Wilson Funds *could not legally be forfeited in Mr. Singer's case* because they were transferred after the end of Mr. Singer's conspiracy.  Defense counsel reasonably believed that the Government was still seeking to forfeit the Wilson Funds in the criminal case against Mr. Wilson, as the law required, and not unlawfully forfeiting property in the Singer case that was not involved in Mr. Singer's offenses. *See* Malkiel Decl. ¶¶ 3-11.  Had Mr. Wilson been aware that his funds were being forfeited in the Singer case, he would obviously have contested it, just as he has consistently challenged the criminal case against him.

14

Mr. Wilson had no actual notice of the unlawful forfeiture, and the Government failed to provide the direct notice to him required by law.  Accordingly, the Final Forfeiture Order is void as to Mr. Wilson, and does not bar return of the Wilson Funds.[7]

### III.    MR. WILSON IS THE OWNER OF THE WILSON FUNDS.

The Government asserts that Mr. Wilson lacks an interest in the Wilson Funds, and therefore had no standing to contest their forfeiture, because he "voluntarily transferred" the Wilson Funds to Mr. Singer when he sent the Transfers and is only an unsecured creditor of Mr. Singer.[8]  Opp. Br. at 8.  But Mr. Wilson did not transfer ownership of the Wilson Funds to Mr. Singer by making the Transfers.  Instead, their transfer was explicitly intended and contingent on Mr. Singer holding them until he transferred them to Harvard and Stanford on Mr. Wilson's behalf.  Mr. Singer was a mere bailee of the funds.  Moreover, even if title had been nominally transferred, Mr. Wilson would still be the rightful owner via a constructive trust, because the Transfers were undisputedly induced by Mr. Singer's false representations.  Accordingly, Mr. Wilson was and remains the owner of the Wilson Funds, and is entitled to the return of his property.

**A.  Mr. Wilson retained ownership of the Wilson Funds as bailor.**

It is well established that a bailor of property under applicable state law remains the owner and has standing to contest any forfeiture. *See, e.g., United States v. $500,000 in U.S. Currency*,

---

[7] In light of the Government's arguments regarding the supposed untimeliness of Mr. Wilson's challenge to the Forfeiture Orders, Mr. Wilson is simultaneously submitting a Petition in the Singer case, based on the same arguments set forth herein, to avoid any suggestion that he is barred from contesting them by delaying such a filing now that he finally has notice.  Though Mr. Wilson believes that the most appropriate remedy is for this session of the Court to order the return of his property, he will obviously defer to the collective judgment of the Court regarding which forum the matter should proceed in and which judge should adjudicate it.

[8] Though the Government's argument is meritless for the reasons set forth below, it is worth noting its inherent absurdity in the context of a sting operation carried out by a cooperating informant at the direction of law enforcement.  The Government appears to suggest that Mr. Wilson's only recourse is to sue Mr. Singer for $1 million.  But Mr. Singer's legitimate defense would be that he did not accept the Transfers in his personal capacity, but as an agent of the Government.  The only debtor here is the United States, and the only appropriate remedy is for the Government to give back the money it owes.

591 F.3d 402, 405 (5th Cir. 2009); *United States v. Alcaraz-Garcia*, 79 F.3d 769, 775-76 (9th Cir. 1996); *United States v. Egan*, 811 F. Supp. 2d 829, 838 (S.D.N.Y. 2011) ("A bailor retains an ownership interest in the bailment"). Under Massachusetts law, "[a] bailment is established by 'delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it[.]'" *King v. Trs. of Boston Univ.*, 52647 N.E.2d 1196, 1201 (Mass. 1995) (citations omitted). The bailor retains title to the property transferred to the bailee. *Nash v. Lang*, 407167 N.E. 762, 765 (Mass. 1929) ("The general title remains in the bailor; the bailee has a special interest for the purposes of the bailment.").

The facts here make clear that Mr. Wilson conveyed the Wilson Funds to Mr. Singer for the "particular purpose" of donating the funds to Stanford and Harvard. They entered into an express agreement to that effect, with Mr. Singer advising Mr. Wilson that he would send the entirety of the Wilson Funds on to Stanford and Harvard. *See* Trial Ex. 578, 10/15/18 Call, at 4-5, 9; Trial Ex. 591, 10/27/18 Call, at 1-2; Trial Ex. 602, 11/29/18 Call, at 2-3. The deposit of the Wilson Funds with Mr. Singer was therefore a bailment under Massachusetts law, and Mr. Wilson retained title to the Wilson Funds until, and unless, they were transferred to Stanford and Harvard as he had directed. The Ninth Circuit's decision in *Alcaraz-Garcia* is particularly instructive on this point. There, third parties challenged the forfeiture of funds seized from a criminal defendant on the grounds that they had entrusted the funds to the defendant to be delivered to various family members in Mexico, and that they therefore remained owners of the funds. *Alcaraz-Garcia*, 79 F.3d at 772. The Court agreed, finding that "because the gift was incomplete, Appellants retained legal title to the bailed funds as the bailors." *Id.* at 776. The situation here is effectively identical:

16

Mr. Wilson entrusted his funds to Mr. Singer to be delivered to Harvard and Stanford, and because Mr. Singer failed to do so, Mr. Wilson retained all legal title to the Wilson Funds.

**B. Mr. Wilson also retained ownership of the Wilson Funds via a constructive trust.**

Under Massachusetts law, "[a] constructive trust is a flexible tool of equity designed to prevent unjust enrichment resulting from fraud, a violation of a fiduciary duty or confidential relationship, mistake, or 'other circumstances' in which a recipient's acquisition of legal title to property amounts to unjust enrichment." *Maffei v. Roman Cath. Archbishop of Boston*, 235867 N.E.2d 300, 312 (Mass. 2007) (internal citations omitted). The overwhelming weight of authority holds that a party's interest in property via a constructive trust constitutes a superior legal interest under 21 U.S.C. § 853(n)(6)(A). *See Willis Mgmt. (Vermont), Ltd. v. United States*, 652 F.3d 236, 244–45 (2d Cir. 2011); *United States v. Wilson*, 659 F.3d 947, 953-54 (9th Cir. 2011); *United States v. Salti*, 579 F.3d 656, 670 (6th Cir. 2009); *United States v. Shefton*, 548 F.3d 1360, 1366 (11th Cir. 2008); *United States v. Marx,* 844 F.2d 1303, 1308 (7th Cir. 1988). Even the D.C. Circuit, the only circuit to adopt a contrary position in *United States v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185 (D.C. Cir. 1995), has indicated its willingness to reconsider its position. *See United States v. Emor*, 785 F.3d 671, 682 (D.C. Cir. 2015) ("SunRise did not specifically request that we overturn *BCCI Holdings*. Such a strategy would have support. Every circuit to consider the constructive trust question in the context of criminal forfeiture has rejected the analysis in *BCCI Holdings*. . . .However, since we cannot overrule a prior panel's decision, except via an *Irons* footnote or en banc review, we leave this issue for another day").

Even if Mr. Wilson had not otherwise retained ownership of the Wilson Funds as a bailor, his interest in the property would have been preserved via a constructive trust. In any context other than a law enforcement operation, Mr. Singer's deception of Mr. Wilson to induce the Transfers

17

AMERICAS 124844035 v1

would be obviously fraudulent.  Whether or not it is properly characterized as fraud under these circumstances, it would obviously constitute unjust enrichment for either Mr. Singer or the Government to retain the Wilson Funds based on that deception.  The sole justification for soliciting the Transfers was the criminal investigation and the prospect that the funds might be forfeited from Mr. Wilson.  Having failed to convict Mr. Wilson of any crime relating to the Transfers or supporting the forfeiture of the Wilson Funds, the Government's retention of the funds for its own enrichment is clearly unjust.  Accordingly, Mr. Wilson is the beneficiary of a constructive trust in the Wilson Funds, to the extent he was not already their titled owner.

## CONCLUSION

For the reasons set forth above, Mr. Wilson is the rightful owner of the Wilson Funds in the Government's possession, and the Forfeiture Orders which purport to divest him of that ownership are invalid.  The Government has no justification for its continued attempt to keep Mr. Wilson's money despite having dismissed the criminal charges against him that could have supported its forfeiture.  Accordingly, the Court should order the Government to return the Wilson Funds and all accrued interest to Mr. Wilson without further delay.

## ORAL ARGUMENT REQUESTED

Now that Mr. Wilson has become apprised, through the Government's Opposition to his Motion, that the Government is contesting the return of the Wilson Funds, and given the importance of the issues, Mr. Wilson respectfully requests that the Court conduct oral argument on the Motion.

Respectfully submitted,

*Counsel for John Wilson*

/s/ Michael Kendall
Michael Kendall (BBO #544866)
Lauren Papenhausen (BBO #655527)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
lauren.papenhausen@whitecase.com

Alexander Joshua Wilson (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone:  +1 212.326.8390
alexanderwilson@jonesday.com

Andrew Tomback (*pro hac vice*)
McLaughlin & Stern, LLP
260 Madison Avenue
New York, NY 10016
Telephone: (212) 448-1100
ATomback@mclaughlinstern.com

Date: August 18, 2023