UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN WILSON,<br><br>   Defendant | Cr. No. 19-10080-LTS |

# DEFENDANT JOHN WILSON'S REPLY TO
# GOVERNMENT'S SENTENCING MEMORANDUM

Incredibly, even though the government abandoned the conspiracy, bribery, and fraud charges against Defendant John Wilson, it asks this Court to impose the *same sentence* as if it had actually proven them. This demonstrates a remarkable lack of respect for the rule of law. The First Circuit ruled that a jury—at a fair trial—could find that Mr. Wilson had no corrupt intent and thus committed none of those crimes. Yet the government asks the Court to punish him anyway, without proving those offenses even by a preponderance of the evidence, and without so much as holding an evidentiary hearing. That is inconceivable, and impermissible. At an evidentiary hearing (or a fair jury trial), Mr. Wilson stands ready to prove his innocence on the core Varsity Blues charges, including by rebutting the falsities, misleading snippets, and unsupported assertions that are ubiquitous in the government's memorandum ("Gov't Mem.").

The only conviction—and the only offense for which Mr. Wilson is being sentenced—is based on a technical dispute over whether and when it is appropriate to deduct a donation to an IRS approved non-profit where the donor expects to receive an unquantifiable benefit in exchange. The IRS has never supported the government's tax theory. The government admits this charge was merely "an adjunct" to the other charges against Mr. Wilson. Gov't Mem. 9. It would never have been pursued criminally if not for the now-abandoned counts. And it would not on its own terms justify *any* prison time, as the national sentencing data confirm, even without correcting the PSR's flawed calculation of tax loss that the government has utterly failed to substantiate. Indeed, that is why the government returns over and over again to the vacated-and-abandoned counts.

1

In short, the government's memorandum illustrates the vindictiveness and casual disregard for justice that drove this defective prosecution from the start—but it certainly does not show that Mr. Wilson deserves to be sent to prison for claiming a disputed deduction on his 2014 taxes.

## I. The Government Wants To Punish Mr. Wilson for Offenses It Never Proved

Throughout the government's memorandum, it tries to reinject into sentencing the fraud, bribery, and conspiracy charges that the First Circuit overturned and that the government thereafter chose to dismiss rather than prove at a fair trial. The government repeatedly describes the offense here as "part" of a broader or "underlying" "scheme" relating to college admissions (Gov't Mem. 2, 9), and goes so far as to assert that "the entire *quid pro quo* arrangement was itself criminal" (at 8), "illicit" (at 11, 21), and "dirty" (at 16). It describes other Varsity Blues defendants as "essentially identical" to Mr. Wilson (at 17) and urges a sentence 66% longer than the harshest sentence given to any other Varsity Blues defendant (at 19). The overall theme cannot be missed: The government thinks Mr. Wilson should be punished for bribery, conspiracy, and fraud.

That is improper. The First Circuit reversed those convictions, some as legally invalid and others because the trial was fundamentally unfair. The government says the decision did not "exonerate" Mr. Wilson. Gov't Mem. 10. But defendants are innocent until proven guilty, and the First Circuit held that the unfairness at his trial was "so pervasive that a miscarriage of justice looms." *United States v. Abdelaziz*, 68 F.4th 1, 61 (1st Cir. 2023).[1] To be sure, judges are permitted to make findings at sentencing about acquitted conduct. But given the fundamental errors that tainted the trial—including the exclusion of most defense evidence—and the fact that this session did not preside over the trial, see the evidence, or evaluate the witnesses' credibility, the only way the Court could consider any conduct beyond that necessarily encompassed by the Count 13 tax conviction, consistent with due process, would be to hold an evidentiary hearing.

---

[1] The government notes the First Circuit did not deem Mr. Wilson's conduct "desirable." Gov't Mem. 4. There are many undesirable behaviors that are not federal crimes and not fairly part of sentencing considerations. The government also falsely claims the appeals court found the evidence of a smaller conspiracy to be "sufficient." Gov't Mem. 10. The court merely noted Mr. Wilson did not dispute on appeal the sufficiency of the evidence to find a conspiracy smaller than the improper one charged. *Abdelaziz*, 68 F.4th at 42. He did not need to. The evidentiary spillover from the variance was so prejudicial that, even if a smaller conspiracy could be proven, the verdict was not trustworthy. *Id.* at 54-62; *see also id.* at 58 (describing evidence as "not so strong").

2

Reviving these issues—remote in both nature and (as to the 2018 conduct) in time from the tax offense—would not be appropriate under these circumstances and at this juncture, for the reasons Mr. Wilson laid out in his memorandum. But if the Court is inclined to stray beyond the tax offense and hold a hearing, Mr. Wilson is confident that it would further vindicate him.

For one thing, Mr. Wilson would be entitled at such a hearing to call Rick Singer—the one person who could explain what he told Mr. Wilson in the eight years leading up to the first recorded call and the government sting operation. The government has kept Mr. Singer far away from the courtroom, because it knows his testimony would destroy its claims. He presumably would testify to exactly what he said in his contemporaneous notes: that the government wanted him to lie to parents like Mr. Wilson and tell them they would be paying bribes when he had always told them the side-door involved legitimate donations. *See* Wilson Sent. Mem. ("Mem.") 22-23.

Mr. Wilson would also be able to rebut the government's knowing lies—many of which he was wrongly blocked from challenging at trial. For example, the government argues that his daughters were not qualified to be athletic recruits—but ignores that Mr. Singer offered to help them pursue roles as *team managers*. The government quotes only part of a recorded call, omitting the critical exchange in which Mr. Wilson asked, and Mr. Singer confirmed, that the daughters could be admitted as "managers," not athletes. *Compare* Gov't Mem. 8, *with Abdelaziz*, 68 F.4th at 18 (providing more fulsome quotation). The First Circuit observed that Mr. Wilson could have innocently believed that his daughters' admission as team managers was a practice the universities approved.[2] In fact, Mr. Wilson was correct, at least as to USC and some other schools.[3] The government also asserts that the Wilson children would have "not be[en] admitted to those schools, unless he paid money to secure their admission." Gov't Mem. 9. This is not only unproven, but false. Again, the government successfully excluded from trial the evidence that showed otherwise.

---

[2] The court noted that excerpts from the recorded call "at least equally support the defendants' argument that they understood side-door admission through athletics was a practice the universities had approved," and flagged that Singer's website included "testimonials" that "described his assisting other clients in obtaining both college admission and positions as 'managers' for college sports teams." *Abdelaziz*, 68 F.4th at 59.

[3] *See* Mem. 20 & n.66 (providing sample of excluded evidence that USC admitted students through athletics in non-player roles, based on donations); Mem. Ex. 50, Summary Chart (same).

Most odious are the government's false and mean-spirited attacks on Johnny Wilson, an innocent young man who worked incredibly hard to become an elite athlete. The statements that he was only a "purported" athlete (Gov't Mem. 1) who did not play water polo "at a Division I level" (at 9) or play "particularly well" (at 2) are outright lies.[4] The government knows it, too, because it successfully excluded evidence of Johnny's qualifications, including that the U.S. Air Force Academy was pursuing him as a recruit for its ***Division I team***.[5] Contrary to the assertion that Johnny was not qualified to join USC's team (at 5), testimony revealed that his well-regarded high school coach recommended him to USC's coaches as having all the attributes USC wants:

| USC Looks For:[6] | Coach Bowen Testified That Johnny Had:[7] |
|---|---|
| Water polo "IQ" | • "water polo IQ" such that "he could make a contribution to a program like USC"<br>• "ability to earn inside water and his defensive ability to read the game and earn steals were his forte" |
| Physical Talent | • "outstanding" stamina<br>• "the fastest player on the team"<br>• "one of the fastest in the league" |
| Hardworking | • "a quiet grinder" with an "A or A plus" work ethic |
| Takes Criticism | • "the kind of guy who I couldn't get to crack" |
| Interactions with Teammates | • "the team decided to vote on who was the most inspirational player . . . they chose Johnny" |

Similarly, the government claims Johnny quit USC's team after one semester "just as Singer had promised he could." Gov't Mem. 7. Again, the government knows this is misleading because it fought—successfully—to exclude evidence of Johnny's third major concussion during the season, including evidence the team pushed the medical staff for him to be "cleared to return to play."[8]

Finally, at an evidentiary hearing, Mr. Wilson would be able to show he was fundamentally different from all other Varsity Blues parents—again, an opportunity he never had at trial given

---

[4] These lies about Johnny contributed to his being defamed in a Netflix documentary distributed world-wide.

[5] Ex. 81, Trial Ex. 7255 (excluded) (Johnny's high school water polo coach informing the Wilsons that the "Air Force Academy coach has expressed a real interest in Johnny" and offering to work on Johnny's college options "with or without water polo"); Ex. 82, Excerpted Trial Tr. (Oct. 4, 2021), at 117 (government objection sustained).

[6] Ex. 83, Excerpted Trial Tr. (Sept. 28, 2021), at 185:18, 97:2, 96:22-25, 180:18-21.

[7] Ex. 82, Excerpted Trial Tr. (Oct. 4, 2021), at 82:4-83:1, 98:24-99:1, 101:20-22, 102:22-23, 115:5-9, 182:16-18.

[8] Ex. 84, Excerpt of Trial Ex. 133 (excluded) (requesting medical report from athletic trainer and stating, "They need it asap so that he can be cleared to return to play"); Ex. 85, Excerpted Trial Tr. (Oct. 1, 2021), at 99-101; Ex. 85 at 56, 59-60 (USC teammate explaining a number of freshmen quit after first year and how coach said "if you were getting As and Bs, then you were not focused enough on water polo. You should be getting Cs and doing better in the pool").

the overbroad conspiracy charge that tarred him with the unrelated misconduct of others. Of course, Mr. Wilson is not similarly situated to those defendants—and certainly not "essentially identical" to them (Gov't Mem. 17)—for the obvious reason that *they pled guilty* to core Varsity Blues offenses like bribery and fraud, whereas Mr. Wilson does not stand convicted of any. But even setting that aside, the facts and circumstances of his involvement with Rick Singer are totally different; he did not engage in any of the culpable acts like cheating on tests, knowingly paying bribes to corrupt insiders, or providing false information about his children. Yet the government is seeking a sentence *multiple times as long* as imposed on virtually all of the other parents. *See* Gov't Mem. 15 & n.6 (citing *Semprevivo*, *Bizzack*, and *Hauser*, imposing sentences of four months, two months, and two months, respectively). The only explanation given is that Mr. Wilson, unlike those parents, did not demonstrate "remorse." *Id.* at 9.

And there is the rub—the government is angry that, after it racked up dozens of guilty pleas, Mr. Wilson had the temerity to challenge the government's overreaching and, worse, to win. The Court should not indulge this transparent vindictiveness.

## II.     As a Tax Case, There Is No Justification for Prison Time

The government's focus on Mr. Wilson's other alleged conduct only underscores that this case is, and has always been, about those other, now-vacated counts. The tax charge was just a tacked-on afterthought—as the government admits, "an adjunct." Gov't Mem. 9. Standing alone, it does not remotely warrant prison time under any legitimate § 3553 analysis.

The starting point is the Guidelines, and the government has provided no evidence of the sort that the IRS and courts routinely require to prove the amount of any tax loss. Notably, the IRS does not support the government on the tax loss. The government is asking this Court to use a criminal sentencing to make tax policy on the deductibility of a donation to a school that is used to boost the admission prospects of the donor's children. But neither the IRS nor USC has ever taken this position. And the jury did not have to make any finding on tax loss—all that was needed to convict was a finding either that Mr. Wilson willfully made a false statement regarding business expenses or that more than $0 should have been offset from the $220,000 donation. The jury did

5

not need to find an intent to evade taxes, or that there was more than $1,425 in tax loss.

Proving the amount of tax loss would require the government to prove not only that the admissions boost was a tangible benefit that could be valued, but that the objective "fair market value" of the admissions boost, based on comparable transactions, fortuitously equaled $220,000. Instead, all the government has done is recycle its trial theory that a bribe is not deductible, but with slightly different words—replacing "bribe" with "*quid pro quo* payment." But there are many *quid pro quo* payments that do not require offsets. Mem. 29-30. The jury was never asked to find a "*quid pro quo* payment," nor was such finding necessary to the verdict, which could have been based merely on the improper business expense deduction. And even if the government were correct about everything else, it has made no attempt to prove an objective value of the *quid*, as would be required in order for it to value the offset and, hence, the tax loss.[9]

As a tax case, the only reasonable sentence is probation. Even assuming the government has proven the amount of tax loss, the normal sentence for a tax offender with a total offense level of 14 and Criminal History I is one day or less. *See* Mem. 52-53. And that does not account for the many reasons Mr. Wilson deserves a sentence significantly below the norm, including: (i) he has 0 criminal history points, which the Sentencing Commission has found warrants a lower sentence even than defendants with Criminal History Category I (and, just days ago, has voted to make the new Zero-Point Offender adjustment retroactive[10]); (ii) his tax conduct was significantly less egregious than for most offenders, including those who systematically fail to pay taxes or hide income; (iii) his personal characteristics outside this case can only be called exemplary; and (iv) he has, at great personal cost, vindicated his rights and the rights of many defendants to come by giving the First Circuit the opportunity to rein in prosecutorial overreach.

In trying to make Mr. Wilson's tax conduct seem more like a culpable crime and less like

---

[9] The government points to the First Circuit's statement about Mr. Wilson having saved "tens of thousands of dollars" on his taxes (Gov't Mem. 10), but that was, at most, dicta. The court said: "That the deductions ultimately saved Wilson tens of thousands of dollars on his taxes would give the jury further reason to conclude that Wilson acted willfully." *Abdelaziz*, 68 F.4th at 69. The court thus simply acknowledged evidence from which the jury could find savings of tens of thousands of dollars on his taxes; the court made no finding of its own—nor did it have to.

[10] *See* U.S. Sentencing Comm'n, *U.S. Sentencing Commission Votes to Allow Retroactive Sentence Reductions and Announces its Next Set of Policy Priorities* (Aug. 25, 2023), available at https://www.ussc.gov/about/news/press-releases/august-24-2023.

the technical dispute over a deduction that it really is, the government again lies and misleads:

- It claims without record citation that Mr. Wilson "knew" his payments "could not legally be deducted from his taxes" as charitable donations, because "Wilson said [so] himself." Gov't Mem. 9. Mr. Wilson never said or believed anything of the sort.

- The government claims Mr. Wilson "dupe[d]" his tax preparers. Gov't Mem. 13. In fact, Mr. Wilson informed his two tax advisors he was donating to colleges through Mr. Singer's foundation.[11] And when Mr. Wilson donated for Stanford in 2018, he openly described it as for "Tax write off and help getting into colleges." PSR ¶ 59. Every aspect of his conduct was open and obvious. And no one ever told him there was anything wrong with it.

- The government claims Mr. Wilson "came up with the idea of committing tax fraud." Gov't Mem. 21. But the evidence show the opposite—it was Mr. Singer who advised Mr. Wilson he could "write . . . off" the donations, Mem. Ex. 42, and affirmed that "it's all tax . . . deductible" because "it's all going into a nonprofit, 501(3)(c) [sic]." *Id.* Ex. 21.[12]

At bottom, this is (now) a case about a taxpayer who never cut corners, routinely paid high tax rates, and concealed nothing, who donated money to IRS certified 501(c)(3) organizations and received charitable receipts, but who (i) wrongly deducted one such donation as a business expense rather than a charitable deduction based on an accounting mistake, and (ii) believed the donations were deductible even though his well-qualified son would receive an admissions boost. Perhaps that warrants an audit and tax adjustment. It does not remotely warrant prison time.

It is apparent from the government's memorandum that they are not targeting their proposed sentence to the severity of Count 13 or Mr. Wilson's personal characteristics.[13] Rather, it seeks a harsh sentence to punish Mr. Wilson for his lack of "remorse" for crimes he did not commit—*i.e.*, for having stood up to the government and won. The First Circuit not only exposed the government's legal errors but took the prosecutors to task for their knowing and overly aggressive tactics. Their memorandum continues to show contempt for both fairness and justice.

---

[11] Ex. 86, Trial Ex. 614 (admitted).

[12] In the emails, Mr. Wilson asked for a consulting invoice so he could pay the sums "from the corporate account." Mem. Ex. 42. That had nothing to do with *taxes*; it was about *corporate bookkeeping*. It was Mr. Singer who responded with the write-off suggestion. Moreover, the theory that Mr. Wilson intentionally invited a false invoice to facilitate tax fraud makes no sense, because it is clear Mr. Wilson believed the payments to be tax-deductible as charitable donations. With a receipt from USC there was no need (or benefit) to conceal them as business expenses.

[13] There is one exception: the government argues he should be punished more severely for having worked hard and been financially successful. The government mentions Mr. Wilson's (former) wealth 18 times in its 21 page brief. It refers three times to a birthday party at the palace of Versailles, which, like this Courthouse, rents function rooms to the public. The government overcame a defense motion *in limine* to introduce evidence of this party at trial. ECF Nos. 1992, 2101. But this was irrelevant to any issue before the jury, and it is likewise irrelevant for sentencing.

Respectfully submitted,

*Counsel for John Wilson*

/s/ *Michael Kendall*
Michael Kendall (BBO #544866)
Lauren Papenhausen (BBO# 655527)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
lauren.papenhausen@whitecase.com

Andrew Tomback (pro hac vice)
McLaughlin & Stern, LLP
260 Madison Avenue
New York, NY 10016
Telephone: (212) 448-1100
ATomback@mclaughlinstern.com

Date: August 28, 2023